DOCKET NOS. 25-7132, 25-7297

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

_____

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

_____

**CHAD RENEGAR'S SECOND BRIEF ON CROSS-APPEAL**

_____

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

1

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant states that there are no nongovernmental corporations that are a party to this proceeding.

DATED: July 27, 2026   COLLINS + COLLINS LLP

        By: /S/ JAMES C. JARDIN

          MICHAEL L. WRONIAK
          CHRISTIE B. SWISS
          JAMES C. JARDIN
          Attorneys for Defendant-Appellee-Appellant
          CHAD RENEGAR

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**......................................................2

**TABLE OF CONTENTS** ...............................................................................3

**TABLE OF AUTHORITIES** ..........................................................................5

**INTRODUCTION**........................................................................................7

**I.   JURISDICTIONAL STATEMENT** ..................................................8

**II.  ISSUES PRESENTED**..................................................................8

**III. STATEMENT OF THE RECORD**..................................................10

   **A. The First Encounter.** ............................................................10

   **B. The Second Encounter.** .......................................................12

   **C. Procedural History.**.............................................................15

   **D. Renegar's Rule 50(b) Motion.** .............................................16

   **E. Renegar's Motion for New Trial.**..........................................16

   **F. Plaintiff's Motion for Attorney's Fees and Costs.**...................17

   **G. Renegar's Motion for Summary Adjudication.** .......................18

**IV. STANDARD OF REVIEW**..........................................................19

**V.  DISCUSSION**..........................................................................20

   **A. Renegar's Rule 50(b) Motion Should Have Been Granted Because There Is No Clearly Established Constitutional Right to Be Free from Force Necessary to Gain Compliance over a Resistant Suspect Who Poses a Threat to Officer Safety.**..........…………………………………………………….. 20

**B. There District Court Erred in Refusing to Allow Evidence of Alternate Sources of Emotional Distress After Plaintiff Repeatedly Violated Court Orders Barring Such Evidence.** ..............................................................24

**C. The District Court Erred in Admitting Evidence and Allowing Argument that Renegar's Use of a Taser Constituted Excessive Force.** .........................28

**D. The District Court Should Have Granted a New Trial Based on Plaintiff's Counsel's Prejudicial Misconduct During Trial.** ..............................................30

**E. Renegar Is Entitled to A New Trial Regarding the Award of Punitive Damages.** ...........................................................................................................34

**F. The District Court Correctly Exercised Discretion to Reduce Plaintiff's Request for Attorney's Fees and Costs** ..............................................................37

**G. Renegar Had Probable Cause to Detain and Arrest Plaintiff Based on Information Conveyed by Dispatch and Witnesses on Site.** ..........................53

**VII.  CONCLUSION** ......................................................................................57

**CERTIFICATE OF COMPLIANCE** ...................................................................59

# TABLE OF AUTHORITIES

**CASES**

*A.D. v. Markgraf,* 636 F.3d 555, 561 (9th Cir. 2011) ................................................................ 22

*Aguirre v. Los Angeles Unified School Dist.*, 461 F.3d 1114, 1120 (9th Cir. 2006). ................... 40

*Alves v. County of Riverside*, 135 F.4th 1161 (9th Cir. 2025) ....................................................... 19

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ......................................................................... 21

<u>*Bigelow v. RKO Radio Pictures, Inc.*</u>, 327 U.S. 251, 264 (1946).................................................. 43

*Blanford v. Sacramento County,* 406 F.3d 1110, 1119 (9th Cir. 2005)........................................ 22

*Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007)............................................. 57

*Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984) .......................................................................... 42

*Blum v. Stenson*, 465 U.S. 886, 898 (1984). ................................................................................. 38

*BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75 (1996)............................................ 35

*Bonomi v. City & Cty. of San Francisco*, 2012 WL 2935624, at *4.............................................. 56

*Brady v. Gebbie,* 859 F.2d 1543, 1557 (9th Cir. 1988) ................................................................. 34

*Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ..................................... 56

*Cejka v. Vectrus Sys. Corp.*, 2019 WL 8198090 .......................................................................... 39

*Chalmers v. City of Los Angeles*, 796 F.2d 1205, 12010 (9th Cir. 1986).................................... 37

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991)...................................................................... 52

*Conan v. City of Fontana*, 2017 WL 8941499, at *7 (C.D. Cal. 2017)........................................ 27

*Crockett v Cumberland College*, 316 F.3d 571, 584 (6th Cir. 2003) ........................................... 55

*Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988)................................. 37

*Dang v. Cross,* 422 F.3d 800, 807 (9th Cir.2005) ........................................................................ 35

*Dang, supra*, 422 F.3d at 809 ....................................................................................................... 36

<u>*Dart Industries, Inc. v. Liberty Mut. Ins. Co.*</u>, 484 F.2d 1295, 1298 (9th Cir. 1973) .................. 43

*Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001).......................... 53

*Ewing v. City of Stockton*, 588 F.3d 128, 1223 (9th Cir. 2009).................................................... 20

*Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002) ..................................................................... 54

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) .......................................................................... 38

*Hensley, supra,* 461 U.S. at 440.................................................................................................... 40

*Holloway v. Cnty. of Orange*, 2020 WL 7906691 ................................................................... 43, 44

*Holloway v. Cnty. of Orange*, 2021 WL 430697 ........................................................................... 46

*Holloway v. Cnty. of Orange*, 2021 WL 454239, at *3 (C.D. Cal.  2021) ................................... 47

*Holloway v. Cnty. of Orange*, 2021 WL 6102515 ......................................................................... 39

*Holloway v. Cnty. of Orange*, 2022 WL 3013058 ......................................................................... 49

*Holloway v. Cnty. of Orange*, 538 F. Supp. 3d 973, 976 (C.D. Cal. 2021) ................................. 39

*Holloway v. Orange*, 2021 WL 2515644 (C.D. Cal. 2021)........................................................... 39

*Illinois v. Allen*, 397 U.S. 337, 346 (1970) ................................................................................... 53

*Illinois v. Allen*, 397 U.S. 337, 346-47 (1970)............................................................................. 42

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F3d 935, 942 n.7 (9th Cir. 2011) ...................... 38

*Jimenez v. City of Costa Mesa,* 174 F. App'x 399 (9th Cir. 2006) ................................................ 23

*Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003)............................................................ 19

*Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016).................................................................. 41

*Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) ...................................... 20, 21

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)............................................... 38

*Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 969 (9th Cir. 2010)................................. 55

*Leaf v. County of Los Angeles*, 270 Fed. Appx. 496, 497 (9th Cir. 2008)..................................... 42

*Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ............................................................. 56

*Mason v. Town of New Paltz Police Dep't*, 103 F. Supp. 2d 562, 566 (N.D.N.Y. 2000) ............. 55

*Mayberry v. Pennsylvania*, 400 U.S. 455, 462 (1971).................................................................. 52

*Mendoza v. Block,* 27 F.3d 1357, 1360 (9th Cir.1994).................................................................. 23

*Moreno v. City of Sacramento*, 543 F.3d 1106, 1111 (9th Cir. 2008) .......................................... 38

*Morris v. Long*, 2012 WL 1498889, at *4 (E.D. Cal. 2012)........................................................... 27

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021)...................................................................... 23

*Pearson v. Callahan*, 555 U.S. 223, 237 (2009)........................................................................... 21

*People v. Bennett*, 17 Cal.4th 373, 386 (1998) ............................................................................ 53

*People v. Thompson*, 38 Cal.4th 811, 819 (2006)......................................................................... 56

*Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058 (9th Cir. 2025)........................................ 19

*Saucier v. Katz*, 533 U.S. 194, 200 (2001) ........................................................................ 20, 21, 22

*Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1113 (9th Cir. 2017).................................... 23

*Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 742 (7th Cir. 2003) .................. 50

*Skender v. Eden Isle Corp.*, 33 F.4th 515, 521 (8th Cir. 2022) .................................................... 42

*Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999) ................................................................. 56

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)............................................... 34

*Terry v. Ohio*, 392 U.S. 1, 20-21 (1968)................................................................................. 53, 57

Tobias v. City of Los Angeles, 2018 WL 9669923, at *9 (C.D. Cal. 2018) ............................... 27

*United States v. Marshall,* 371 F.3d 42, 48 (2d Cir.2004)............................................................. 52

*United States v. Mayo*, 394 F.3d 1271, 1275 (9th Cir. 2005) ....................................................... 55

*United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir. 1989)..................................................... 54

*Velez v. Roche,* 335 F.Supp.2d 1022, 1038 (N.D. Cal. 2004)........................................................ 34

*Watson v. County of Riverside*, 300 F.3d 1092, 1095 (9th Cir. 2002)........................................... 20

*Webb v. Sloan*, 330 F.3d 1158, 1168 ..................................................................................... 40, 41

*Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007) ................................................. 41

*White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002)................................................................. 19

*Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ........................................................................... 55

6

**INTRODUCTION**

The District Court erred as a matter of law when it denied Deputy Chad Renegar's Rule 50(b) Motion for Judgment based on qualified immunity because Renegar reasonably believed that Plaintiff Jeremy Holloway was armed and intended harm to others when he arrived at Holloway's campsite in response to a second emergency request that evening, and Holloway had no clearly recognized constitutional right against deputies' use of a punch to force Holloway to the ground after he refused repeated deputy commands to do just that.

Alternatively, the District Court should have granted Renegar's Motion for New Trial. The District Court's refusal to permit Renegar to offer mitigating evidence based on Plaintiff's alternate sources of emotional distress, failure to bar prejudicial evidence and argument in violation of court orders, failure to meaningfully regulate the conduct of Plaintiff's counsel, and refusal to set aside the jury's award of punitive damages against Renegar constitute abuses of discretion entitling Renegar to a new trial.

Regardless, the District Court correctly reduced Plaintiff's attorney fee award, a reasonable measure given repeated mistrials resulting from Plaintiff's litigation conduct and related activity.

So too with the District Court's grant of partial summary judgment of Holloway's false arrest claim, because Holloway's detention and arrest were

7

supported by probable cause based on the testimony of reporting witnesses and Holloway's refusal to comply with deputies' lawful commands.

## I. JURISDICTIONAL STATEMENT

The jury issued a Special Verdict in Holloway's favor which the District Court entered on May 21, 2025. 1-RenSER-2-4. The District Court issued an Order Denying Renegar's Rule 50(b) Motion for Judgment on July 24, 2026. 1-ER-22-58. Plaintiff lodged a proposed judgment with the District Court on July 29, 2026 which the District Court did not sign. Dkt. 882-1. The District Court issued its Order Denying Plaintiff's Motion to Compel and Granting in Part and Denying in Part Plaintiff's Motion for Attorney Fees and Costs on October 14, 2025, less than 150 days after entry of the Special Verdict. 1-ER-2-21. The County filed its Notice of Appeal on November 12, 2025. 9-RenSER-1919. The appeal is timely, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ISSUES PRESENTED

1. May a District Court deny judgment as a matter of law based on qualified immunity where undisputed evidence confirms deputies responding to repeated reports of aggressive, threatening behavior used a punch to subdue a noncompliant and resisting suspect whom they had earlier observed in possession of such concealable weapons which they could not account for?

8

2.      Does a District Court abuse discretion in denying a new trial based on the exclusion of evidence of alternate stressors for Plaintiff's emotional distress following counsel's repeated violation of in limine rulings barring the introduction of evidence of the emotional distress arising from those alternate stressors?

3.      Does a District Court abuse discretion in denying a new trial based on the introduction of evidence and argument that a use of force previously deemed reasonable was excessive?

4.      Does a District Court abuse discretion in denying a new trial based on repeated instances of contempt of the court, repeated violation of numerous court orders, and rhetoric exceeding the bounds of proper advocacy?

5.      Does a District Court abuse discretion in denying a new trial on punitive damages where the weight of evidence is clearly against the jury's determination?

6.      Does a District Court abuse discretion in reducing an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988 to reflect repeated mistrials occasioned by Plaintiff's conduct?

7.      Does a District Court correctly grant summary judgment of claims for false arrest based on undisputed evidence that deputies relied upon witness reports to identify, detain and arrest a person suspected of battery and resisting arrest?

9

## III. STATEMENT OF THE RECORD

### A. The First Encounter.

Witness Brian Fuerbach was asleep with his wife in a White RV parked at Campsite 63 at O'Neill Park. 4-RenSER-473-477. At around 2:00 a.m. he and his wife were awakened by the sound of slamming car doors and what sounded like a man and woman talking. 4-RenSER-477-478. They went back to sleep, only to be awakened again by the sound of a man yelling "You want more of this? You want more of this?" followed by what sounded like punches being landed and a woman's voice asking "Why you doing this? I'm just a girl. Why you doing this?" 4-RenSER-479. This went on "for a little bit" until Fuerbach's wife yelled out "Stop hitting her," at which point it stopped momentarily. *Id.* Fuerbach "could hear the blows being landed," "could hear the tent moving," and "could see the tent moving." *Id.*

Fuerbach called 911 because "someone was clearly getting assaulted." 4-RenSER-483; Trial Exhibit 101-1.[1] He advised 911 that a "man is beating a woman right now" in a campsite "to the right of us if you're facing my campsite." Trial Exhibit 101-1, 00:01-00:27.

---

[1] See Motion for Leave to Transmit Physical Exhibit (Flash Drive). References to "Trial Exhibits" denote a document that is submitted either pursuant to a Motion to Transmit Physical Evidence or a Motion to Continue Seal.

Deputy Renegar was dispatched to O'Neill Park in response to Fuerbach's call. 4-RenSER-582. He was advised that a male and female were involved in a physical altercation to the right of Campsite 63. 4-RenSER-590. Renegar made contact with Deputies Borba and Billinger at the entrance to the park and they proceeded to the campground. 4-RenSER-593. The first person Renegar made contact with was witness Joshua Gomez in Campsite 67. *Id.* Gomez pointed to a campsite across the road from where his tent was pitched as the source of the disturbance, which Gomez understood to be in the direction of Campsites 63 and 65, because that's where the sounds of "domestic assault or whatever as going on" were coming from. 4-RenSER-619-621; 6-RenSER-1024-1025.

Renegar walked out of Gomez's campsite towards the campsite directly across from Gomez's tent. 4-RenSER-621. He made contact with Deputy Borba, who told him it was Campsite 65 based on a conversation he had with Fuerbach. 4-RenSER-621-622; 5-RenSER-834-836. Renegar approached Campsite 65 and observed a white truck parked there, which was significant because dispatch had told the deputies that the disturbance had occurred in a campsite to the right of Campsite 63 with a white truck parked in it. 4-RenSER-622. Renegar ran the truck's license plate over the radio, and dispatch advised that it belonged to Jeremy Holloway. *Id.* Renegar also observed several knives spread out throughout the

campsite, including an axe and a machete, which concerned him because knives are weapons that can cause injury. 4-RenSER-622-625.

After dispatch confirmed the owner of the truck was Jeremy Holloway, Renegar identified himself as a Sheriff's Deputy and asked Holloway to come out and talk. 4-RenSER-625. After an initial exchange with Holloway inside the tent complaining that it was cold and he was being harassed, Holloway came out of his blue tent. Trial Exhibit 102-01, 16:16-18:50. Renegar asked Holloway if he could pat him down for officer safety. 4-RenSER-626-629. Although Holloway complied, he was otherwise uncooperative and combative, cussing, calling the deputies "stupid" and complaining that he was being harassed. Trial Exhibit 102-01, 18:51-23:04. Holloway told Renegar that he was on informal probation and confirmed his identity as Jeremy Holloway. *Id.*, 23:05-23:55. After one of the deputies advised Holloway that they had responded to 911 calls, Holloway called the people who had called "assholes and morons" and "fucking idiots" *Id.*, 23:56-24:46. The deputies left without placing Holloway under arrest.

### B.      The Second Encounter.

After the deputies left, Gomez heard someone begin walking up and down the road yelling obscenities at the 911 caller, saying "Pussy with the cell phone. Come out. Fight me. Fuck you." 6-RenSER-1026-1027. Gomez was scared, because he had called 911, and called 911 again. 6-RenSER-1027; Trial Exhibit

228B, 00:01-06:23. As he was on the phone, he heard what sounded like a girl screaming, and he relayed that information to the dispatcher. 6-RenSER-1027; Trial Exhibit 228B, 06:44-06:59. He advised dispatch that "something" was going on, and the "guy is yelling and there's a little girl screaming." Trial Exhibit 228B, 07:19-07:24. Gomez could not see what was happening. *Id.*, 07:58-08:05.

Renegar was driving towards Ladera Ranch when he was called back to O'Neill Park. R-RenSER-635. He was initially told that there was a male going campsite to campsite yelling. 4-RenSER-636; 6-RenSER-1176. As he drove, he was further advised that the subject male was near a different campsite with a white RV, and that the subject male was going through things in the campsite. 4-RenSER-636; 6-RenSER-1175. He was then advised that a little girl was screaming, and the subject male was yelling, at which point the emergency call was upgraded to priority one. 6-RenSER-1175. Priority one means that there's a threat to life or injury to life. 4-RenSER-637. Renegar had Holloway in mind as he drove, which concerned him given Holloway's demeanor during their earlier encounter as well as the knives at Holloway's campsite. 4-RenSER-641.

Deputies Renegar, Gonzalez and Pahel made contact with Holloway at roughly the same time. Gonzalez and Pahel ordered Holloway to "let me see your hands" and also told him to get on the ground. 2-RenSER-TT-36-37; 5-RenSER-888; Trial Exhibit 101-04, 04:35-04:45. Holloway held his arms out to the side but

13

did not get down on the ground. 5-RenSER-889-890. Renegar approached

Campsite 65 with his gun drawn and a flashlight in his hand. 4-RenSER-TT-641-

642. As he approached Holloway, Renegar repeatedly ordered him to "get on the

ground now," and Gonzales told Holloway he would be tased if he did not comply.

4-RenSER-642-643; Trial Exhibit 102-02, 03:47-04:12; 2-RenSER-TT-47-48.

Renegar twice more ordered Holloway to "get on the ground," but Holloway did

not comply and protested that he was "not moving." Trial Exhibit 102-02, 04:13-

04:18. Holloway then appeared to question why the deputies had returned to his

campsite, at which point a struggle ensued. *Id.*, 04:18-04:55.

Holloway testified that the struggle began as the deputies approached him,

Renegar on his left side and Gonzalez on his right side, and Renegar punched him

on the left side of his head. 3-RenSER-174-177. It happened quickly, and

Holloway did not actually see the blow coming because he has no peripheral vision

from his left eye due to a stroke injury. 3-RenSER-174. Holloway momentarily

blacked out and fell to the ground, eventually winding up face-down with his

hands tucked underneath him. 3-RenSER-176-177. Deputies Gonzalez and Pahel

attempted to secure Holloway's hands but were unable to do so. 2-RenSER-76-77;

TT-11, pp. 154-155. Pahel, Gonzalez and Renegar believed Holloway was

resisting. 5-RenSER-893; 2-RenSER-82-85; 4-RenSER-645-647.  Deputy Renegar

14

punched Holloway several times in the side in an attempt to gain control of Holloway's left hand but likewise was unable to do so. 4-RenSER-646.

After approximately 37 seconds from the start of the sounds of struggle, Renegar shouted "taser taser taser" and then unsuccessfully attempted to tase Holloway in the buttocks. Trial Exhibit 102-02, 04:50-55; 4-RenSER-648-650. Deputy Borba arrived and gained control of Holloway's left arm at roughly the same time as the first unsuccessful taser deployment. 5-RenSER-858-860.

Renegar deployed the taser a second time to one of Holloway's calves. 4-RenSER-650-651. The second deployment was effective and deputies were able to gain control of both of Holloway's arms and handcuff him. *Id.*

Deputies searched but were unable to locate the female victim. 4-RenSER-652. Deputy Renegar subsequently executed a probable cause declaration charging Holloway with resisting arrest and battery on a police officer. 6-RenSER-1171.

### C.     Procedural History.

"This was the fourth trial in this case. The first trial ended in a hung jury. The second ended in a mistrial after Plaintiff violated a pretrial order not to mention the first trial. In the third trial, the jury deliberated for less than one day and concluded that all five Defendant Officers had violated Plaintiff Jeremy Holloway's Fourth Amendment right to be free from excessive force, but that he did not sustain any compensable injuries. In post-trial motions, the Court granted

15

qualified immunity to three of the officers on the scene and granted a new trial on all issues with Gotts and Renegar as the remaining Defendants." 1-ER-25.

In trial four, the jury issued a Special Verdict against both Renegar and Gotts, awarding Holloway $337,000 in compensatory damages, $30,000 in punitive damages against Gotts, and $45,000 in punitive damages against Renegar. 1-SER-2-4.

### D.     Renegar's Rule 50(b) Motion.

After presenting a Rule 50(a) Motion that the District Court declined to rule on at the close of Plaintiff's case, Renegar filed a Rule 50(b) Motion for Judgment based on qualified immunity as to excessive force. See Dkt. 819 (Rule 50(a) Motion) and Dkt. 834 (Rule 50(b) Motion). The District Court denied Renegar's Rule 50(b) Motion on grounds Renegar's punch constituted excessive force and the constitutional right to be free from "non-trivial" force in the absence of active resistance was clearly established at the time of the subject incident. 1-ER-36-41.

### E.     Renegar's Motion for New Trial.

Renegar filed a Motion for New Trial on grounds the District Court erred in excluding evidence of alternate sources of Plaintiff's emotional distress after Plaintiff violated an agreement to refrain from any mention of emotional distress incurred post-incident, erred in allowing evidence and argument that Renegar's use of a taser constituted excessive force, erred in denying a mistrial due to Plaintiff's

16

misconduct, and erred in determining that the weight of evidence was insufficient to sustain an award of punitive damages. See Dkt. 845 (Motion for New Trial). The District Court denied the Motion for New Trial on grounds limiting instructions were adequate to address any prejudice resulting from the trial court's evidentiary rulings, that the same limiting instructions justified the refusal to grant a mistrial, and that the evidence was adequate to sustain the jury's award of punitive damages. 1-ER-42-57.

### F. Plaintiff's Motion for Attorney's Fees and Costs.

Plaintiff sought recovery of attorney fees in the amount of $3,395,307.50 based on her expenditure of 3,668.7 hours of attorney time across all four trials, with a requested rate of $850 per hour, as well as time spent by supporting attorney Thomas Beck (119.75 hours at $1,250 per hour), time spent by paralegals at an hourly rate of $200, and costs in the amount of $142,485.86. See Dkt. 888.

Noting that Plaintiff's experience did not rise to the level of comparable attorneys at $850 per hour, as well as her repeated instances of misconduct and incompetence in this case, the District Court reduced her hourly rate to $525 per hour and reduced Mr. Beck's hourly rate to $1,000 per hour. 1-ER-10-14.

The District Court next addressed Plaintiff's total hours requested, finding instances of overbilling, extensive billing on preparation for re-trial despite having completed earlier trials, vague time entries, entries for unrecoverable

17

administrative and menial tasks, and block billing, reducing the recoverable hours by 40 percent to 2,201.22 hours. 1-ER-14-16.

The District Court then adjusted the resulting lodestar by a further 40 percent reduction, noting that Plaintiff's ultimate recovery was limited (a single claim against a single defendant despite starting with six defendants and numerous claims), that the lodestar amount was disproportionate to the recovery, and that the numerous instances of misconduct by Plaintiff throughout the litigation had contributed significantly to the "tortured and prolonged existence" of the litigation. 1-ER-17-20.

Finally, the District Court reduced the amount of costs requested to exclude expert witness fees pursuant to 42 U.S.C. § 1988(c), for a total award of $848,754.30 in costs and $100,435.86 in costs.

### G. Renegar's Motion for Summary Adjudication.

Renegar sought summary adjudication of Plaintiff's claim for false arrest, on grounds his reliance on witness reports that Plaintiff was the source of the late night disturbance and sounds of a physical altercation between a man and a woman. See Dkt. 105. The District Court granted summary adjudication on grounds the existence of probable cause "does not depend on what the witnesses knew, but the 'reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." 1-ER-99. Noting that Renegar had been

directed to Plaintiff's campsite by reporting witnesses each time he responded to O'Neill Park, the District Court concluded that "the information about a man allegedly beating a woman was reasonably trustworthy to [Renegar]." 1-ER-100. "Accordingly, because Plaintiff concedes the search and seizure provisions of his probation, and because [Renegar] had probably cause to arrest Plaintiff, the Court GRANTS summary judgment as to Plaintiff's claims for unreasonable search and seizure and false arrest." *Id.*

## IV.   STANDARD OF REVIEW

This Court reviews the District Court's denial of Renegar's Rule 50(b) Motion de novo. *Alves v. County of Riverside*, 135 F.4th 1161, 1168 (9th Cir. 2025). Judgment as a matter of law is proper only when "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1066 (9th Cir. 2025), quoting *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).

A district court's grant or denial of a new trial pursuant to Rule 59(a) is reviewed for abuse of discretion. Since specific grounds for such a motion are not listed in the rule, the district court "enjoys considerable discretion in granting or denying the motion." *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003).

19

A district court's grant of summary judgment is reviewed *de novo*. *Ewing v. City of Stockton*, 588 F.3d 128, 1223 (9th Cir. 2009). This Court's role is to determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law, taking the evidence in the light most favorable to the non-moving party. *Id.*

A district court decision to award attorney's fees pursuant to 42 U.S.C. § 1988 generally is reviewed for abuse of discretion. *Watson v. County of Riverside*, 300 F.3d 1092, 1095 (9th Cir. 2002).

## V.    DISCUSSION

### A.    Renegar's Rule 50(b) Motion Should Have Been Granted Because There Is No Clearly Established Constitutional Right to Be Free from Force Necessary to Gain Compliance over a Resistant Suspect Who Poses a Threat to Officer Safety.

Courts use a two-part inquiry to determine whether an officer is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). In the first prong, courts determine whether a constitutional right has been violated, resolving all disputes of fact and credibility in favor of the party asserting the injury. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The second prong prompts the court to determine if the right was clearly established at the time of the violation. *Id*. A right is clearly established if its "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that

20

right." *Saucier, supra*, 533 U.S. at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The relevant inquiry is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Id*. However, if an officer makes a mistake in applying the relevant legal doctrine, and if "the officer's mistake as to what the law requires is reasonable. . . the officer is entitled to the immunity defense." *Kennedy*, *supra*, 439 F.3d at 1062 (internal quotation marks and citation omitted). Courts may exercise sound discretion in deciding which of the two prongs of the *Saucier* inquiry should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).

It is well settled that a police officer may be deprived of his entitlement to qualified immunity only if a reasonable police officer should have known, on the basis of the relevant case and statutory law, that his challenged conduct violated the Constitution. *Saucier, supra*, 533 U.S. at 202. The Supreme Court has acknowledged that "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id*. at 205.

A review of Ninth Circuit decisions interpreting the qualified immunity inquiry established in *Saucier* makes clear that the Ninth Circuit does not view the existence of a settled legal principle, standing alone, as dispositive of a government official's immunity defense. See *Blanford v. Sacramento County,* 406 F.3d 1110, 1119 (9th Cir. 2005) (holding it was not clearly established that using deadly force against man carrying a sword, who did not heed officers' instructions, who appeared to be breaking into a residence, and whom officers feared was a threat to others' safety violated the Fourth Amendment); see also *A.D. v. Markgraf,* 636 F.3d 555, 561 (9th Cir. 2011) (holding it was not clearly established that split-second decision to use deadly force in the course of a high-speed chase, where suspect was using her car as a weapon, shocked the conscience in violation of substantive due process).

Instead, courts have looked to both the law and the facts, and asked whether the official reasonably should have known that his conduct was unlawful under the particular circumstances. Thus, although the principle that "excessive force" violates a person's Fourth Amendment rights is undoubtedly well settled, that principle by itself plainly does not enable a reasonable law enforcement officer to ascertain whether his actions are permissible as the application of the legal standard depends upon a myriad of case-specific factors. "This inquiry must be undertaken in light of the case's specific context, not as a broad general proposition." *Saucier, supra*, 533 U.S. at 194-195. "[W]hether the law was clearly established ... is a pure question of

22

law for the court to decide." *Mendoza v. Block,* 27 F.3d 1357, 1360 (9th Cir.1994).

There is no authority that would have been sufficiently clear to a reasonable deputy that it was unlawful to punch an agitated, non-complaint, known convicted felon with access to multiple weapons, and who may have committed multiple crimes that night, in order for the deputy to subdue and handcuff the suspect. Renegar certainly did not know or was aware of such authority. The Ninth Circuit has confirmed that officers are entitled to qualified immunity in cases where the officer was in a less challenging situation than Renegar, but used much more significant force than Renegar used. See *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1113 (9th Cir. 2017) (officer did not violate clearly established law when college student "refuse[d] to comply with the officer's orders" to drop water balloons and the officer "progressively increase[d] his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver," sending student "face first onto the pavement"); see also *Jimenez v. City of Costa Mesa,* 174 F. App'x 399 (9th Cir. 2006) (even though officer's use of force was objectively unreasonable, officer entitled to qualified immunity after officer pepper sprayed arrestee who was being held to the ground by three officers and was only being arrested for minor crime); see also *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) (officer did not violate clearly established law when officer executed a "reverse reap throw," which involved tripping suspect and bringing him to the ground, after officer responded to

23

a "Code 3" situation and found suspect naked on busy street who then repeatedly failed to follow officers' commands to stop and turned to officers in threatening manner, with his fists clenched).

Since Renegar's conduct did not violate any clearly established law of which a reasonable deputy would have known, Renegar is entitled to qualified immunity.

**B.      There District Court Erred in Refusing to Allow Evidence of Alternate Sources of Emotional Distress After Plaintiff Repeatedly Violated Court Orders Barring Such Evidence.**

On April 4, 2025, the parties agreed, and the Court ordered that Plaintiff's emotional distress damages would be cut off after July of 2018. 8-RenSER-1494:16-1495:19; 8-RenSER-1507:2-1508:23; 8-RenSER-1540:12-1542:7. The Court ruled that because of the agreement by both parties that Plaintiff's emotional distress damages would be cut off after July of 2018, alternate sources of emotional distress incurred in Pennsylvania after the incident were irrelevant. However, Plaintiff's counsel on two separate occasions intentionally and purposefully violated the Court's order on the April 4, 2025 causing irreparable prejudice to Defendants Gotts and Renegar that was not allowed to be corrected by the Court.

First, on May 6, 2025, on direct examination of Plaintiff's mother, Loretta Tafoya, Plaintiff's counsel specifically asked Ms. Tafoya the following questions in blatant disregard of the April 4, 2025 agreement and purposeful disobedience

24

from this Court's ruling:

> Q: In any event what credit card did you give him?
>
> MS. SWISS: Relevance.
>
> THE COURT: Yeah, I think this is getting peripheral at this point, Counsel. I think that the damages surrounding the incident, the credit card I'm going to exclude, Counsel.
>
> BY MS. MKRTCHYAN:
>
> Q: Well, how much money have you lent Mr. Holloway thus far, to date, for living costs, for rent, for food, for traveling? How much money so far have you calculated you've lent him?
>
> A: At least $40,000.
>
> Q: Okay. And 40,000, that's part of his credit card?
>
> A: It's our credit card.
>
> Q: Right. And are you still paying those credit card bills?
>
> A: Yes.
>
> Q: And is there interest on this credit card bills?
>
> A: Yes.
>
> Q: Okay. When he went to Pittsburgh, Pennsylvania, and after that he went to Montana; right?
>
> A: Yes.
>
> Q: Right. And was he homeless for certain periods of time in Montana?
>
> A: Yes.
>
> Q: To get him off the streets, did you help him with rent?

A: I did for a certain amount of time, but my credit card got maxed, and so he ended up living on the streets for a couple days. But then that's when he called me and said come and get his dog. And I knew what that meant. So I got more money, and I told him to get a hotel. But thank goodness, Montana is very good for VA. He did get to go to a shelter.

Q: So he had a stroke?

A: He ended up having another stroke. This was right -- that's right. He had -- that was another reason why he couldn't work. He had another stroke in the same spot where his head was -- I had to fly out there. And he still has two aneurysms still in his head now.

Q: Right. And when was this stroke that he sustained approximately? Was it last year?

A: It's been -- it's probably been about, what, four months ago or so.

Q: Okay. And he had a heart surgery after the stroke?

A: He's had -- he's had heart surgery. When he had the stroke, you know, because of his age, they're trying to figure out why.

8-RenSER-1577:17-1579:9.

Following this blatant disregard of the April 4, 2025 agreement and court order, Renegar requested a mistrial, or at the very least to introduce evidence of Plaintiff's November 7, 2020 arrest in Pennsylvania for assault on a female neighbor. Despite Plaintiff's counsel's intentional violation of a Court ordered agreement, the Court did not allow the defense to present of other reasons why Mr. Holloway might have been experiencing so much stress after the subject incident. 8-RenSER-1548:1-5.

26

Second, Plaintiff's counsel disregarded the District Court's rulings by presenting to the jury, over defense counsel's objections, unredacted medical billing summaries, which disclosed thousands of dollars in psychological treatment post July 2018, in clear violation of the agreed-upon cutoff date for emotional distress. 8-RenSER-1606:20-1607:13; 8-RenSER-1609-1633. Although the Court agreed that Plaintiff's counsel errored and once again placed the Defendants at a disadvantage, the Court ruled once more that the defense was precluded from introducing any alternative stressors relating to Holloway's time in Pennsylvania or thereafter. (8-RenSER-1647:18-1648:17; 8-RenSER-1652:17-1653:10; 8-RenSER-1654:10-12).

It is well-settled that a defendant is entitled to present evidence of alternate sources of stress in response to a claim for emotional damages. See, e.g., Tobias v. City of Los Angeles, 2018 WL 9669923, at *9 (C.D. Cal. 2018); *Conan v. City of Fontana*, 2017 WL 8941499, at *7 (C.D. Cal. 2017); *Morris v. Long*, 2012 WL 1498889, at *4 (E.D. Cal. 2012). The District Court erred by refusing Renegar the opportunity to demonstrate that Plaintiff's emotional distress was attributable to other events which have nothing to do with their conduct in this case. Holloway and his counsel should not have been permitted to recover increased damages for emotional distress without offering Renegar the opportunity to present evidence that there were multiple sources of emotional distress in Plaintiff's life between the

time of the subject incident and the fourth trial in this case.

**C. The District Court Erred in Admitting Evidence and Allowing Argument that Renegar's Use of a Taser Constituted Excessive Force.**

On March 18, 2024, the District Court issued an Omnibus Order on Post-Trial Motions Submitted after the Third Trial. 9-RenSER-1853-1870. The Court ruled that Renegar's use of a taser did not violate clearly established law and he was entitled to qualified immunity. 9-RenSER-1860-1863. The Court determined "there is no case law that would put Renegar on notice that the tasings were excessive." 9-RenSER-1861:4-6. The Court further found that Plaintiff was a threat to Renegar and the other officers when Renegar tased him. 9-RenSER-1862:6-16. As such, "Renegar's use of the taser is protected by qualified immunity." 9-RenSER-1863:3. The Court clarified that Plaintiff would nonetheless be entitled to present evidence of the tasings at the fourth trial because it is "relevant to other issues in the case (e.g. whether Gotts' knees were reasonable)." 9-RenSER-1863, fn. 5.

Consistent with the Omnibus Order, the Court issued an instruction to the jury on Day 9 as follows: "This court holds that the initial use and drawing of the taser did not violate department policy. But the fact that the individual was tased is presented to you, the jury, in evaluating the reasonableness of the officers' actions after the initial tasing." 7-RenSER-1439:3-16.

28

Despite the clear language of the Omnibus Order, Plaintiff repeatedly referenced the use of the taser as unreasonable and excessive force during the fourth trial. First, Plaintiff questioned his use of force expert, Roger Clark, regarding the permissible use of the taser. Mr Clark was permitted to testify to the jury that "[t]he use of the taser has specific requirements that are focused on aggressive behavior and credible threat. None of that is apparent." 7-RenSER-1413:5-23. Mr. Clark testified that the taser, along with the other force used, was "very extreme and not necessary in the totality of the circumstance…" 7-RenSER-1414:1-17. Plaintiff then asked Mr. Clark whether the use of the taser was appropriate and necessary under these circumstances and he responded that because there were three officers present at the time, he "considered the taser as provocative." 7-RenSER-1415:4-14. Finally, Plaintiff asked Mr. Clark whether it is "reasonable to taser someone multiple times" and Mr. Clark was permitted to respond "no" over the objections of counsel. 7-RenSER-1418:12-21.

During closing argument, Plaintiff repeatedly referenced the use of the taser as being malicious and unnecessary. 7-RenSER-1466:11-16 (Plaintiff was growling from pain from the taser application and was tasered "multiple times" while Gotts had his knee on Plaintiff's back); 7-RenSER-1467:1-6 (Renegar was "out of control" and "unreasonable" when he used the taser multiple times); 7-RenSER-1468:10-20 (Renegar's use of the taser was malicious and unnecessary).

29

Plaintiff also blatantly misstated the evidence to the jury and argued that he was actually tasered three times, not two. 7-RenSER-1465:2-8; see also 9-RenSER-1860:26-1861:6 (Renegar deployed the taser twice and both tasings are protected by qualified immunity).

Plaintiff's conduct throughout the trial severely prejudiced Renegar and was intended to mislead or confuse the jury regarding the scope of issues they were to consider when evaluating whether Renegar used excessive force. The only remaining allegation made by Plaintiff against Deputy Renegar in support of his excessive force claim should have been that Deputy Renegar punched him, but Plaintiff was permitted to offer evidence and argument that the taser was still at issue.

> **D.   The District Court Should Have Granted a New Trial Based on Plaintiff's Counsel's Prejudicial Misconduct During Trial.**

Plaintiff's counsel's prejudicial misconduct falls into three overarching categories: (1) contempt for the authority of the Court, (2) repeated violations of court orders, and (3) the use of inflammatory rhetoric that exceeds the bounds of proper and zealous advocacy.

Throughout the trial, Plaintiff's counsel repeatedly acted in contempt of court—whether by openly arguing with the Court over its rulings or by making inappropriate, prejudicial remarks to the jury that required immediate intervention

30

by the Court. See 8-RenSER-1667-1736. However, two specific incidents stand out as particularly egregious and underscore Renegar's undeniable right to a new, fair trial.

In a brazen and utterly inappropriate display of disrespect toward the District Court, Plaintiff's counsel abruptly walked out of the courtroom following a judicial admonishment for her prior misconduct causing a halt in proceedings. 8-RenSER-1639:13-1640:12. When Plaintiff's counsel eventually returned to the courtroom, she did not offer an apology or make any effort to restore order and allow the proceedings to resume. Instead, after the District Court respectfully instructed her on its reasoning, she escalated her misconduct by accusing the District Court of intimidation and went so far as to declare that the District Court believed it was "above the law." 8-RenSER-1644:4-1646:15). This blatant disregard for courtroom procedure and authority is emblematic of the pervasive pattern of misconduct that irreparably compromised the integrity of trial proceedings in this case.

Furthermore, Plaintiff's counsel was in clear contempt of court when she openly accused the District Court of bias in favor of the defense. Her exact words, as reflected in the record, were: "The Court is advocating for the defense. I might as well be, basically, going up against defense counsel and — which is — yes, the Court is advocating." 8-RenSER-1664:16-18. This is a direct attack on the Court's impartiality and authority, and reflects a profound disregard for the professional

31

and ethical obligations of counsel. This level of disrespect not only undermines the integrity of the proceedings but also further supports the necessity of a new trial.

As previously mentioned, Plaintiff's counsel violated the April 4, 2025 Court ordered agreement between the parties. However, Plaintiff's counsel's obvious disregard for this Court's orders did not end there. Her continued and repeated violations of multiple court directives prompted the Court itself to invite defense counsel to draft the present motion for a new trial based solely on her misconduct. 8-RenSER-1661:21-1662:2.

The arguably most egregious violation occurred when Plaintiff's counsel, during cross-examination and in the presence of the jury, deliberately asked a witness whether they were aware that the same captain who "gave a slap to Deputy Chad Renegar in this incident found him in violation of multiple policies just one year later." 8-RenSER-1660:4-7. Plaintiff's counsel posed this question in direct contravention of the Court's explicit ruling, which limited inquiry into only two specific prior incidents involving Deputy Renegar. See Dkt. 778.

This was not an inadvertent misstep—it was a knowing, intentional breach of the Court's order. Plaintiff's counsel exhibited neither hesitation nor remorse in violating the Court's directives and prejudicing the jury against Deputy Renegar, further demonstrating a pattern of misconduct that irreparably tainted the proceedings and warrants a new trial.

Plaintiff's counsel hides behind the guise of what she deems "aggressive advocacy" of her client. However, even an individual with no legal training would recognize that Plaintiff's counsel's so-called "advocacy" amounts to improper, hostile, and inflammatory language that has no place in a court of law. The record reflects that, during what Plaintiff's counsel characterized as "advocacy," she went so far as to wish a stroke upon everyone involved in this litigation, including the District Court: "I hope everyone in this courtroom has a stroke. Everyone in this courtroom gets a stroke so that you understand this man is going through right now in this court." 8-RenSER-1642:23-1643:1.

This disturbing and highly inappropriate statement did not go unnoticed or unacknowledged by the District Court. On May 13, 2025, the Court formally placed on the record that Plaintiff's counsel had made remarks wishing a stroke upon the Court and all those present in the courtroom. 8-RenSER-1664:21-24. This conduct undermines the integrity of the proceedings and calls into question counsel's fitness to appear before the Court. The fact that the Court was compelled to memorialize such conduct on the record speaks to the gravity of the situation and the prejudicial impact it undoubtedly had on the fairness of the trial.

Moreover, in response to Renegar's motion for mistrial, Plaintiff's counsel argued that the defense would "shoot her" and "lynch" her and her client to prevail in this lawsuit, language that is not only inflammatory but entirely inappropriate in

any courtroom setting. 8-RenSER-1521:21-1522:5. Plaintiff's counsel did not relent; instead, she escalated her misconduct by openly challenging the District Court and the defense to "put her in jail," and by making the outrageous claim that the defense wished she would die for merely representing her client. 8-RenSER-1535:19-24.

Attorney misconduct of the type in evidence in this case cannot be tolerated by the judiciary. The correct resolution of this matter is to grant Renegar a new trial where civility and professionalism will be upheld and followed.

**E.      Renegar Is Entitled to A New Trial Regarding the Award of Punitive Damages.**

This Court has held that a jury's finding on the amount of damages should be reversed if the amount is "clearly unsupported by the evidence" or "shocking to the conscience." *Brady v. Gebbie,* 859 F.2d 1543, 1557 (9th Cir. 1988). In making this determination, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). "The severity or pervasiveness of the conduct is relevant insofar as it provides probative evidence from which a jury may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof." *Velez v. Roche,* 335 F.Supp.2d 1022, 1038 (N.D. Cal. 2004).

The award of punitive damages against Renegar is not supported by the evidence. In a case such as this, a jury may only award punitive damages upon a finding of "evil motive or intent," "reckless or callous indifference" to the constitutional rights of others or "oppression." *Dang v. Cross,* 422 F.3d 800, 807 (9th Cir. 2005). On a motion for judgment as a matter of law, the court must determine whether there is "substantial evidence" to support such a finding by the jury. The overall constitutionality of a punitive damage award is to be evaluated in light of three factors: (1) the degree of reprehensibility; (2) the disparity between the harm suffered and the punitive damages award; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. See *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75 (1996). These many factors ultimately reduce to one simple question: based on the evidence presented at trial, could a reasonable jury have concluded that Deputy Renegar did not just make a mistake, but rather went out of his way to deliberately hurt Plaintiff?

Here, it could not. Not a single witness testified as to any overt cruelty by Renegar. There was no evidence that the conduct of Renegar was malicious, oppressive, or with reckless disregard for Plaintiff's civil rights. There is no evidence that Renegar acted out of ill will or spite toward Plaintiff. In every version of the facts, Renegar used methods of restraint to gain compliance from a

suspect he perceived was actively resisting and combative. The closest that Plaintiff can come to identifying the requisite "cruelty" from Renegar is the claim that Renegar allegedly punched him in the face to subdue him, which is not supported by a single witness other than Plaintiff himself.

Plaintiff has not presented any witnesses or documents to corroborate his claim that Deputy Renegar punched him in the face. To the contrary, numerous witnesses unequivocally testified that Deputy Renegar did ***not*** punch Plaintiff in the face. 7-RenSER-1405:23-25 (Deputy Gonzalez never saw Plaintiff get punched in the face); 7-RenSER-1459:20-22 (Deputy Borba did not see anyone punch Plaintiff in the face); 7-RenSER-1460:4-6, -1461:5-13 (Deputy Pahel testified Deputy Renegar did not punch Plaintiff in the face); 7-RenSER-1453:20-1454:2 (eyewitness Brian Fuerbach testified he witnessed "the entire situation unfold" and did not see any deputy punch Plaintiff in the face); 7-RenSER-1453:20-1454:2 (Plaintiff never reported to his treating physician that he was punched in the face). Plaintiff also presented the Patrol Video System recordings which do not show Plaintiff being punched in the face. See Trial Exhibits 102-1, 102-2, and 102-6. There is simply no evidence that Renegar misused or abused his authority, or took advantage of some weakness, disability, or misfortune of Plaintiff. *See Dang, supra*, 422 F.3d at 809 (citations omitted).

The evidence in this case does not support even an inference that any deputy acted with malice, oppression, or reckless disregard for Plaintiff's rights. For that reason, no reasonable jury would have any legally sufficient evidentiary basis to find that an award of punitive damages against Deputy Renegar is warranted. The jury's punitive damages finding and award is unsupported by the evidence and should be set aside.

**F.     The District Court Correctly Exercised Discretion to Reduce Plaintiff's Request for Attorney's Fees and Costs.**

"In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title…the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee as part of the costs…" 42 U.S.C. § 1988(b). The "presumptively reasonable" fee is determined by the "lodestar" calculation, which requires multiplying the number of hours the prevailing party reasonably expended by the reasonable hourly rate for each lawyer. *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988). Counsel bears the burden of establishing reasonable hours and "[t]hose hours may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; [or] if the hours expended are deemed excessive or otherwise unnecessary." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 12010 (9th Cir. 1986).

In awarding attorneys' fees, a federal court "must strike a balance between granting sufficient fees to attract qualified counsel to civil rights cases and avoiding a windfall to counsel." *Moreno v. City of Sacramento*, 543 F.3d 1106, 1111 (9th Cir. 2008). The lodestar is presumed to represent a reasonable fee, unless evidence shows that an adjustment upward or downward is necessary to determine a reasonable fee, taking into account those *Kerr* factors[2] not subsumed within the lodestar calculation." *DeJesus Ortega Melendres v. Arpaio*, 2017 WL 10808812, at *1 (9th Cir. Mar. 2, 2017). "The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant." *Blum v. Stenson*, 465 U.S. 886, 898 (1984).

The extent of a plaintiff's success is a "crucial factor" in determining the proper amount of an award of attorneys' fees under Section 1983. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The trial court has broad discretion in determining the level of a party's success on the merits. *Id.*; *see also Cejka v.*

---

[2] The *Kerr* factors are "(1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F3d 935, 942 n.7 (9th Cir. 2011) (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

*Vectrus Sys. Corp.*, 2019 WL 8198090, at *3 (D. Colo. Feb. 21, 2019) ("the critical question is whether the plaintiff has obtained excellent results, regardless of the fact that he did not prevail on every contention raised in the lawsuit…, or whether he achieved only partial or limited success even when his claims were interrelated with other (or others') claims, were nonfrivolous, and were raised in good faith (in which case the lodestar should be adjusted downward).").

Below, Plaintiff sought a lodestar of $3,395,307.50 in fees based on 4,484.45 hours billed by two lawyers and one paralegal. Plaintiff's proposed billing rates exceed the typical rates charged in Southern California. More importantly, the number of hours Plaintiff's counsel spent litigating the matter were excessive, especially in light of the dismissal of 7 of the 8 defendants and all but one issue before and during the four trials in this matter.

Plaintiff's "false arrest" and "unreasonable search" claims against the individual deputies and all of his claims against the County of Orange were dismissed by summary judgment. *See Holloway v. Cnty. of Orange*, 538 F. Supp. 3d 973, 976 (C.D. Cal. 2021), *reconsideration denied sub nom. Holloway v. Orange*, 2021 WL 2515644 (C.D. Cal. 2021), and *motion to certify appeal denied*, 2022 WL 18278383 (C.D. Cal. 2022). Plaintiff's claims against two other individual Defendants were also found to be insufficient for jury submission. *See Holloway v. Cnty. of Orange*, 2021 WL 6102515, at *1 (C.D. Cal. 2021) Plaintiff's

"conspiracy" claims suffered a similar fate – with all of them being dismissed just prior to the case being submitted to the jury in Trial 3. Finally, Plaintiff's claims against Defendant Gotts were dismissed by the Court following Trial 4. See ECF No. 881. Following years of litigation and 4 trials, Plaintiff succeeded against a single defendant on a single issue within a single cause of action. This is hardly a victory supporting over $3 million in attorneys' fees. Holloway is not a "prevailing party" for purposes of a fee recovery in this case. Without "prevailing party" status, Holloway's fee request is frivolous on its face. See, 42 U.S.C. § 1988 ("prevailing party" status required to seek "civil rights" attorneys' fees).

"[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley, supra,* 461 U.S. at 440. There can be no doubt that Plaintiff "failed to prevail on claims that were unrelated to the claims on which he succeeded." *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003) (citation omitted). Applying *Hensley* is particularly appropriate here, as that standard is designed to "help deter submission of multiple, nonmeritorious claims." *Aguirre v. Los Angeles Unified School Dist.*, 461 F.3d 1114, 1120 (9th Cir. 2006).

Plaintiff's lodestar calculation ignores the fact that by the close of the fourth trial, the Court had dismissed 7 out of 8 Defendants and narrowed the issues down to one. Plaintiff did not succeed on his false arrest, unreasonable search, or

40

conspiracy claims. Plaintiff also seeks to recover fees incurred for the second trial, which resulted in a mistrial exclusively due to Plaintiff's violation of Court orders while he testified. By the time the case went to the jury at the close of the fourth trial, the only remaining issues were whether Deputy Renegar punched Plaintiff in the head and whether Deputy Gotts kneed Plaintiff in the head – and Deputy Gotts was dismissed through a post-trial motion. Plaintiff succeeded on a single narrow issue unrelated to a significant majority of the original claims. Plaintiff's attempt to recover attorneys' fees for each of these failed claims against dismissed Defendants is unreasonable and unfounded. Hours expended on such unsuccessful claims "shall be deducted from the lodestar." *Webb*, 330 F.3d at 1168.

Likewise, a "reasonable hourly rate" for purposes of determining the appropriate lodestar figure "is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (citation omitted). The Ninth Circuit has "repeatedly held that the determination of a reasonable hourly rate is not made by reference to the rates actually charged to the prevailing party." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007). "Rather, billing rates 'should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity.'" *Id.* (citation omitted).

Skill and professionalism matter in fee litigation. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984) (attorney fee applicant's "skill, experience and reputation" matter in fee proceedings); *Leaf v. County of Los Angeles*, 270 Fed. Appx. 496, 497 (9th Cir. 2008) (". . . plaintiffs' attorneys' lack of skill and professionalism" critically relevant in fee decision); *Skender v. Eden Isle Corp.*, 33 F.4th 515, 521 (8th Cir. 2022) (court may reject fee request "if the court detects unprofessional conduct on the part of counsel."). The billing rates sought by Plaintiff's attorneys – $850/hour for Ms. Mkrtchyan, $1,150/hour for Mr. Beck, and $200/hour for an unnamed paralegal – are much higher than the prevailing rate for an attorney of similar skill and experience, as demonstrated by Plaintiff's counsel's misconduct and unprofessionalism throughout this case.

Since the outset of this litigation, Plaintiff's counsel has treated the judicial system and opposing counsel with utter contempt. Plaintiff's counsel's astonishing history of rule violations, her unforgettably scathing attacks on Magistrate Judge Douglas McCormick, this Court's reporting staff, and defense counsel, and her repeated defiance of this Court and its orders are plainly not the type of "skill" befitting a fee award. In fact, it represents the exact opposite of what is required. *See, e.g., Illinois v. Allen*, 397 U.S. 337, 346-47 (1970) ("if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with . . . scurrilous, abusive language and conduct.");

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (stating the long-standing principle that the justice system should not "enable the wrongdoer to profit by his wrongdoing."); *Dart Industries, Inc. v. Liberty Mut. Ins. Co.*, 484 F.2d 1295, 1298 (9th Cir. 1973) ("[T]he wrongdoer as a matter of public policy should not profit from his own wrong.").

The provable record of Plaintiff's counsel's bad behavior begins with her inappropriate and unprofessional deposition misconduct and her astounding attacks on the integrity of Magistrate Judge Douglas McCormick. Plaintiff's counsel's conduct of the deposition of Defendant Chad Renegar featured one wild outburst after another. After his patient review of the relevant videotape record, Magistrate Judge McCormick did not hesitate to find that Plaintiff's counsel's pugilistic and profane word choices produced a "train wreck." *Holloway v. Cnty. of Orange*, 2020 WL 7906691, at *2 (C.D. Cal. 2020) (finding Renegar's deposition "was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.")[3] As the Magistrate Judge noted:

---

[3] "Tr. at 166 ('A. I do not recall. Q. You don't recall a lot of things.'); 270 ('Q. Do you remember ever telling him why this guy is bleeding to his face? A. I do not recall what I told him. Q. Because you didn't care; right? The guy is injured. You don't give a shit.')...By her own admission on the record, [Mkrtchyan] raised her voice, and the Court's review of the video recording shows that she raised her voice several times. See, e.g., Tr. at 267 ('I will raise my voice as long as I want.')... Plaintiff's counsel erupted 'Excuse me. Excuse me. I'm tired of you.... If you are here to testify to the truth, the whole truth, but the truth, why can't you admit a simple fact from

> If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything but. Not only does she raise her voice, but it appears to me that she slaps the conference room table at least twice. Her tone of voice ranges from exasperated to indignant. She appears to lose her temper several times. I am confident that none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County.

*Id.*

The Magistrate Judge's order plainly called for Ms. Mkrtchyan move forward in a new spirit of professionalism. *Holloway v. County. of Orange*, 2020 WL 7906691, at *2-3 (C.D. Cal. 2020) (going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom…I trust that my remarks on July 9 and this subsequent ruling will cause [future] depositions to be conducted without the rancor that was exhibited on July 7 [at the Renegar deposition].")

Plaintiff's counsel chose another path. Her venomous conduct at the August 14, 2020 deposition of Plaintiff Jeremy Holloway reached a new low. Magistrate Judge McCormick was once again forced to review and comment on the unprofessional conduct at that deposition:

---

your own fricking fucking report.' *Holloway v. Cnty. of Orange*, 2020 WL 7906691, at *2-3 (C.D. Cal. 2020).

Plaintiff's misconduct reached a zenith during questions about Plaintiff's Facebook account. After some back and forth over attorney-client privilege objections, Plaintiff's counsel, whom the Court had previously chided for slamming her fists down on the table, stood up and threw documents across the deposition table in the direction of Defendants' counsel and deposition staff. See Depo at 260. Nothing – absolutely nothing – would justify this type of outburst. Were it to occur in a courtroom, the Court cannot imagine any possible outcome other than a finding of contempt. It is no less contemptuous because it occurred during a deposition.

After a short recess, Defendants' counsel attempted to continue his line of questioning. In response, Plaintiff's counsel repeatedly threatened to leave and became so argumentative that the court reporter was unable to read back counsel's questions, prompting Defendants' counsel to suggest the Court's assistance. This did not deter Plaintiff's counsel:

MR. HARRELL: Ma'am, I'm going to go to the Magistrate Judge, and I'm going to ask him to bring your client back.

MS. MKRTCHYAN: I will. I will go to the Magistrate Judge to stop this, and I will walk away. Okay? And my client is not going to come back for another deposition.

MR. HARRELL: Maybe the judge will have the final word on that, ma'am.

MS. MKRTCHYAN: Well, you know what? I'm sorry. A lot of the things right now are still up in the air in this country. So whether you have a judge saying something . . ., it really doesn't matter anymore. Okay?

MR. HARRELL: It doesn't matter to you what the judge says?

MS. MKRTCHYAN: Right now what I care is my client being badgered by you and your condescending behavior toward me.

45

> MR. HARRELL: Ma'am, are you saying it doesn't matter to you what the judge says?
>
> MS. MKRTCHYAN: At this point all I care is what the books say. I don't care what one specific judge says or does not do. Nobody is above the law.

*Holloway v. Cnty. of Orange*, 2021 WL 430697, at *11–12 (C.D. Cal. 2021).

Ms. Mkrtchyan thereafter proved her statement made at her client's deposition – that she "doesn't care" about federal court bench officers, the office they hold or the rulings they make. Indeed, during a September 2, 2020 discovery hearing, Ms. Mkrtchyan wasted no time in offering an excoriating tirade to Magistrate Judge McCormack the instant she received a ruling which was not to her liking, which including shouting and thoroughly nasty insults to the Magistrate. 7-RenSER-1193:3-1198:6.

Due to Ms. Mkrtchyan's demonstrably improper conduct – and her loudly-voiced hostility to any type of corrective judicial admonitions – Magistrate Judge McCormick ultimately found that discovery sanctions were appropriate in this case to address the escalating defense costs her misconduct has inflicted on Orange County taxpayers.[4]

---

[4] Those sanctions remain unpaid pending further order of this Court. *See, e.g., Holloway v. Cnty. of Orange*, 2021 WL 430697, at *2 (C.D. Cal. 2021) ("The Court ORDERS that Plaintiff and Plaintiff's counsel, jointly and severally, shall pay at least a portion of Defendants' reasonable expenses and attorney's fees for bringing this motion under Rule 30(d)(2) and Rule 37(a)(5)(A)."); *Id.* ("The Court ORDERS

Ms. Mkrtchyan's behavior continued through each of the four trials in this matter. Early in the first trial, Ms. Mkrtchyan bluntly refused to provide the defense with copies of her trial exhibits:

> MR. HARRELL:  Your Honor, the defense does not have Plaintiff's paper exhibits. We don't. We're four days into trial now, and we've tried to be good sports about it. We have asked nicely. We have re-asked nicely. It was promised in writing that we were gonna have them today. And so if Plaintiff's counsel has brought them, great.
>
> THE COURT:  Okay.  Well, just ask her.
>
> MR. HARRELL: I don't see them.
>
> MS. MKRTCHYAN: They didn't ask me. See, this is the problem, Your Honor. They did not ask me this morning. I have them in the attorney conference room. They were just - - we need to bind them because we didn't get a chance.
> THE COURT:  I'm not worried about binding. Can we get through the first witness at least, the doctor, apparently who is waiting for us by Zoom?  And can we at least get those documents to you for cross-examination purposes?
>
> Now, if you've seen them in another form; in other words, if you've seen them in electronic exchange.
>
> MS. MKRTCHYAN: I - -

---

Plaintiff's counsel to pay Defendants' counsel the costs of the court reporter and videographer for Plaintiff's August 14, 2020 deposition in the amount of **$7,086.82** within thirty (30) days of the date of this order."); *Holloway v. Cnty. of Orange*, 2021 WL 454239, at *3 (C.D. Cal.  2021) ("IT IS HEREBY ORDERED that Defendants' motion for sanctions based on spoliation of evidence is GRANTED.")

THE COURT:  No. Have you seen these documents in any other form?

MR. HARRELL: Your Honor, it's my understanding it's been represented to us that plaintiff's counsel has sent them electronically, but they weren't the best organized, and we don't have numbers to clearly correlate - -

THE COURT: I see.

MR. HARRELL: -- with that – and so, for example, plaintiff's counsel will say, 'I'd like to show the witness Plaintiff's Number 1,' and we over here are looking at each other going, 'What is that? What is everybody looking at?'

THE COURT:  So can we just for a moment - - to get this doctor's testimony, can we just get those paper copies exchanged between the two of you for the first witness today? Could you go get those for us?

MS. MKRTCHYAN:  Yes.
. . .
THE COURT: Let's not waste time, 'cause you've got the doctor waiting.  Go get those exhibits for them, and then we'll get them to you in paper form.

7-RenSER-1206:14-1208:8.

As was the case with Magistrate Judge McCormick, the Court's efforts to maintain order at the first trial and ensure a just result in this case were met with open scorn and contemptuous outbursts. As noted by the Court:

Plaintiff's counsel's behavior during trial, include[ed] interrupting the Court and loudly disagreeing with evidentiary rulings in front of the jury. See, [Trial Transcript] at 94:4-96:1; see also *id.* at 95:16-18 ('this is the third time for my record that that confrontation has taken place where you direct the

48

comment to the Court.'). The Court also noted her lack of decorum outside the presence of the jury: 'what I've seen is a continuing conduct on your part that's ***abusive towards the court system*** in general and this court in particular.' *Id.* at 105:1-4. Plaintiff's counsel's conduct predated the trial, and led the Magistrate Judge to admonish her on professional conduct after a 'train wreck' deposition in which Plaintiff's counsel cursed at the deponent and 'los[t] her temper several times.' Order (Dkt. 73) at 2-3.

*Holloway v. Cnty. of Orange*, 2022 WL 3013058, at *2 (C.D. Cal. 2022), *motion to certify appeal denied,* 2022 WL 18278383 (C.D. Cal. 2022) (emphasis added).

In response, Ms. Mkrtchyan filed multiple recusal motions in an apparent effort to obtain a more favorable jurist. *Id.* The Court responded by patiently denying Mkrtchyan's recusal motions. *Id.* In denying recusal, the Court optimistically expressed "full confidence in all counsel's ability to ensure the second trial proceeds smoothly and professionally." *Holloway v. Cnty. of Orange*, 2022 WL 3013058, at *3 (C.D. Cal. 2022), *motion to certify appeal denied,* 2022 WL 18278383 (C.D. Cal. 2022). But such an outcome required Ms. Mkrtchyan's good faith efforts to reform. But there was no reform at the second trial.

Plaintiff's counsel began the second trial by ignoring Court orders in her Opening Statement to the jury:

> MS. MKRTCHYAN: . . .When I took an oath as an attorney, I also took an oath --
>
> MS. SWISS: Objection.
>
> THE COURT: Sustained as to this portion, Counsel.

49

MS. MKRTCHYAN: -- to defend and protect the Constitution.

MS. SWISS: Objection.

THE COURT: Counsel, I already made that ruling. Please obey it. . ..

7-RenSER-1213:7-17.

Ultimately, Plaintiff joined his counsel in violating this Court's orders. While on the stand, Holloway violated one of this Court's key Motion in Limine orders – yet another act of contempt which resulted in an immediate mistrial. 7-RenSER-1220:2-1225:18.[5]

Ms. Mkrtchyan's disregard for the Court and Counsel infected the third trial of this case well. For example, Ms.Mkrtchyan sought to take more breaks than necessary in a bad faith effort to rescue her client from his own self-destructive performance on the witness stand. She also misrepresented the Court's pattern of break scheduling:

THE COURT: I've taken all the recesses you've asked except for your interruption yesterday, and you're not going to interrupt cross-examination depending upon how your client is doing, so I went an hour and forty-five minutes. I gave you two

---

[5] Undaunted, Holloway seeks taxpayer funds to pay for the second trial he poisoned. If anything, the check should be written by Holloway to Orange County for the wasted funds created by his violation of this Court's orders. "[W]hen a retrial results from the prevailing party's own unreasonable conduct, attorney fees for work performed during the first trial should be denied." *Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 742 (7th Cir. 2003).

50

hours the prior day. So I don't appreciate a record that's false, quite frankly.

7-RenSER-1236:6-1237:22.

On July 20, 2023, the Court sustained defense counsel's objection to using certain portions of Deputy Gonzalez's deposition transcript for "impeachment," chiefly because Mkrtchyan misrepresented the content of the deposition in issue. As is too often the case, Mkrtchyan reacted to the Court's ruling with fury:

> MS. MKRTCHYAN: Is the Court not allowing me to impeach credibility of this officer with his prior deposition testimony, sir?
>
> THE COURT: Your statement to the jury was just misleading, counsel. There is no statement on 297 nor 298 as to your question. As to the ruling of the Court, now be very careful.

7-RenSER-1228:22-1229:3. Ms. Mkrtchyan's combative challenge to judicial authority on this issue ultimately grew so heated that the Court was required to excuse the jury for yet another admonition:

> THE COURT: Ladies and gentlemen -- I don't wish to engage you, counsel.
>
> Ladies and gentlemen, you are ordered to disregard the comments of counsel.
>
> MS. MKRTCHYAN: Well, I object.
>
> THE COURT: I'm going to have to take a recess for just a moment. Thank you very much.
>
> (Jury not present)

51

THE COURT: Have a seat, counsel. Counsel, I'm going to admonish you that you need a cooling period. When you confront the Court, you are on the edge of contempt. This is your first warning. If you confront me again, that will be the second I'm going to try to forebear.

You have directly confronted this Court with a specific ruling. Your statement to the jury was not only improper, but it was misleading. That statement that you made does not exist on page 297 or 298. Now, I am going to take a recess.

MS. MKRTCHYAN: I need to --

THE COURT: Thank you, counsel. You have made your record.

MS. MKRTCHYAN: Excuse me. I am moving for a mistrial. I am done with this Court. I am moving for a mistrial. Thank you.

7-RenSER-1229:10-1230:9.

Section 1988 was not enacted to reward rogue litigation tactics of the sort in evidence here. And it would be difficult to conceive of a stronger "equity" than the judiciary's entitlement to "respect, and decorum in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991). Indeed, "there is an implicit standing order that parties, counsel, and courtroom attendees refrain from direct and egregious insults to judicial authority." *United States v. Marshall,* 371 F.3d 42, 48 (2d Cir.2004) (emphasis added); *see also Mayberry v. Pennsylvania*, 400 U.S. 455, 462 (1971) ("brazen efforts to denounce, insult, and slander the court and to paralyze [litigation] are at war with the concept

52

of justice under law."); *Illinois v. Allen*, 397 U.S. 337, 346 (1970) ("It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed.")

**G.      Renegar Had Probable Cause to Detain and Arrest Plaintiff Based on Information Conveyed by Dispatch and Witnesses on Site.**

A police officer may temporarily detain a person for investigatory purposes if the officer has a "reasonable suspicion" the person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); see, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot,'….") (citations omitted.); see also, *People v. Bennett*, 17 Cal.4th 373, 386 (1998), as modified (Apr. 1, 1998) (A police officer "may temporarily detain a suspect based on a 'reasonable suspicion' that the suspect has committed or is about to commit a crime.").

Probable cause to arrest "exists when, under the totality of the circumstances known to the arresting officer…a prudent person would believe the suspect had committed a crime." *Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001). Probable cause requires "only the probability**,** and not a prima facie showing, of criminal activity." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir.

2002) (citations omitted). "Requiring more would unduly hamper law enforcement." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

These standards are clearly met here. Immediately before initially encountering Holloway, Renegar received a radio report that Holloway was beating a woman. 9-RenSER-1876-1877. An eyewitness to the reported abuse, Brian Fuerbach, has confirmed that he witnessed the beating in issue, and that he made a "911" call to request law enforcement assistance for the apparent victim. 9-RenSER-1872-1873. Once Renegar arrived on scene, witnesses Joshua Gomez and his girlfriend also advised the deputy that he knew where the sound of fighting and arguing was coming from and pointed to Holloway's campsite (number 65). 9-RenSER-1876-1877.

Following a discussion, Deputy Renegar concluded that Holloway's denials of the reports against him were unconvincing. 9-RenSER-1877, ¶ 8. He also concluded that the third party complainants against Holloway had no motive to lie about what they say they saw and heard. *Id.* Based on the information available to Renegar, there was no obvious exonerating explanation for Fuerbach and Gomez's identification of Holloway as the source of the disturbances that evening. See *United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir. 1989) ("It is not uncommon for seemingly innocent conduct to provide the basis for probable cause.").

Furthermore, police radio bulletins of illegal conduct, like the one Renegar received, routinely give rise to probable cause to arrest. See, e.g., *Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("We do not, of course, question that the . . . police were entitled to act on the strength of the radio bulletin" in forming their reasonable suspicion/probable cause opinion.); *United States v. Mayo*, 394 F.3d 1271, 1275 (9th Cir. 2005) (As a matter of Fourth Amendment search and seizure law, an officer is entitled to rely on information learned from a police "dispatcher [who] told him to investigate suspicious narcotics activity and gave him a description of the cars involved . . ..").

This is particularly so where, as here, the radio bulletin was based on eyewitness accounts of illegal conduct reported to 911, like the report made by Mr. Fuerbach in this case. Indeed, "[a] police officer, when making a probable cause determination, is entitled to rely on the allegations of a victim or witness that a crime has been committed." *Mason v. Town of New Paltz Police Dep't*, 103 F. Supp. 2d 562, 566 (N.D.N.Y. 2000). Courts have made the point over and over again. See, e.g., *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 969 (9th Cir. 2010) ("We conclude that qualified immunity applies, as 'a reasonable police officer could have believed that his or her conduct was lawful' when arresting a suspect following a report from two university employees and a student alleging an attack."); *Crockett v Cumberland College*, 316 F.3d 571, 584 (6th Cir. 2003) ("It is

55

clearly established that reliance on the account of an eyewitness is sufficient to establish probable cause."); *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."); *Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999) ("So long as a reasonably credible witness . . . informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity [even] if the arrestee is later found innocent."); see also, *People v. Thompson*, 38 Cal.4th 811, 819 (2006) (California Supreme Court concluding that a report by a private citizen to police that the defendant had thrown an empty vodka bottle from his car, passed out, woke up, drove away erratically and too fast and ran red lights and stop signs, established probable cause justifying the warrantless arrest of the driver.)

Because Renegar had "reasonable suspicion" to detain (and "probable cause" to arrest) Holloway, the District Court correctly determined that Plaintiff's false arrest claims fail as a matter of law. See, *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his Section 1983 claim for false arrest…, [plaintiff] would have to demonstrate that there was no probable cause to arrest him."); *Bonomi v. City & Cty. of San Francisco*, 2012 WL 2935624, at *4

(N.D.Cal. 2012), citing, *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968) ("The...cause of action for unlawful detention and confinement fails because...[a]n investigatory detention — a brief, warrantless seizure by police officers — is lawful if based on reasonable suspicion."); *Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007) ("[O]ur inquiry is not whether [plaintiff] was trespassing. Rather, it is whether a reasonable officer had probable cause to think he could have been.").

## VI.  CONCLUSION

For the foregoing reasons, the order denying Renegar's Rule 50(b) Motion as to excessive force should be vacated, and Judgment should be entered in his favor, or the order denying Renegar's Motion for New Trial should be vacated, and this matter should be remanded for a new trial. Alternatively, the District Court's reduced award of attorney's fees and costs should be affirmed, as should the District Court's order granting summary adjudication of Plaintiff's false arrest claim.

DATED: July 27, 2026          COLLINS + COLLINS LLP

By:  /S/ JAMES C. JARDIN

57

MICHAEL L. WRONIAK
CHRISTIE B. SWISS
JAMES C. JARDIN
Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

## CERTIFICATE OF COMPLIANCE

<u>Fed.R.App.P.</u> 32(a)(7)(C)

Circuit Rule 32-1

I certify that:

Pursuant to Fed. R. App. P.32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached answering brief is proportionately spaced, has a typeface of 14 or more and contains 12,765 words.

DATED: April 27, 2026      COLLINS + COLLINS LLP

By: /S/ JAMES C. JARDIN

    MICHAEL L. WRONIAK
    CHRISTIE B. SWISS
    JAMES C. JARDIN
    Attorneys for Appellant
    CHAD RENEGAR