DOCKET NOS. 25-7132, 25-7297

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

## CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 2 OF 9

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,                            )
                                            )
            PLAINTIFF,                       )
                                            )
        vs.                                 ) SACV NO. 19-01514-DOC
                                            ) Day 3, Volume III
                                            )
COUNTY OF ORANGE, et al.,                   )
                                            )
            DEFENDANTS.                      )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, MAY 5, 2025

10:24 A.M.


**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00006                                    2-RenSER-00006

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com


FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com


CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com


RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

    FOR THE DEFENDANT, CHAD RENEGAR:

           MICHAEL L. WRONIAK
           COLLINS + COLLINS, LLP
           750 THE CITY DRIVE
           SUITE 400
           ORANGE, CALIFORNIA 92868
           (714) 823-4100
           mwroniak@ccllp.law

           CHRISTIE SWISS
           COLLINS + COLLINS, LLP
           2011 PALOMAR AIRPORT ROAD
           SUITE 207
           CARLSBAD, CALIFORNIA 92011
           (760)274-2110
           cswiss@ccllp.law

**Also Present:**

    Jeremy Holloway, Plaintiff

    Raymond Farahmand, Paralegal for Plaintiff

    Jameson Gotts, Orange County Deputy Sheriff, Defendant

    Chad Renegar, Orange County Deputy Sheriff, Defendant

    Bryan Stever, Litigation Support, Defendants

*Deborah D. Parker, U.S. Court Reporter*

64

I N D E X

PLAINTIFF'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS

 JOEL GONZALEZ                66
                             83


                  E X H I B I T S

PLAINTIFF'S EXHIBITS:                    IDENTIFICATION   EVIDENCE

 45    Orange County Sheriff's                                75
       Department Call Detail
       Information Report Call
       Number 180121-0093

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00009                                    2-RenSER-00009

65

**SANTA ANA, CALIFORNIA; MONDAY, MAY 5, 2025; 10:24 A.M.**

-oOo-

*(The following proceedings were had in open court*

*in the presence of the jury:)*

THE COURT:  And your next witness, please.

MS. MKRTCHYAN:  Yes, Your Honor.

We will call Deputy Joel Gonzales.

MR. HARRELL:  Very good, Your Honor.

*(Pause.)*

MS. MKRTCHYAN:  Your Honor, we will need to
actually prepare some exhibits, but we can start and then
take a break sometime to prepare exhibits so that we don't
slow down the process.

THE COURT:  Thank you, sir.

If you will come forward, please.

After you enter the double doors -- thank you.

If you will raise your right hand, sir.

JOEL GONZALEZ, PLAINTIFF'S WITNESS, SWORN

THE WITNESS:  I do.

THE COURT:  Please be seated, sir.

And the entrance is closest to the wall.  It's not
this -- thank you.

After you're seated, would you state your full
name for the jurors, please.

*(Pause.)*

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00010      2-RenSER-00010

THE WITNESS:  My name is Joel Gonzalez.

THE COURT:  And would you spell your first name.

THE WITNESS:  J-O-E-L.

THE COURT:  And your last name, sir?

THE WITNESS:  G-O-N-Z-A-L-E-Z.

THE COURT:  Thank you.

Direct examination, please.

DIRECT EXAMINATION

BY MS. MKRTCHYAN:

Q    Good morning, sir.

A    Good morning.

Q    And what is your current occupation and assignment?

A    I am retired.

Q    When were you retired?

When have you retired and from where?

A    About two and half years from the Orange County Sheriff's Department.

Q    Okay.  And how long had you worked for the Orange County Sheriff's Department prior to retirement, sir?

A    Approximately, 18 years.

Q    Okay.  And you graduated from the Academy?

A    That is correct.

Q    And you were trained to testify in court.  True?

A    Yes.

Q    Okay.  And how about -- give us a ballpark.  How many

*Deborah D. Parker, U.S. Court Reporter*

67

times have you testified here in court, generally?

A    Approximately 10 times.

Q    Okay.  Now, describe yourself for the record:  Height
and weight, uniform you wore.

A    5'7".  Weigh about 170.  And my uniform was green in
color, my ballistic vest, my duty belt which included my
duty weapon, pepper spray, baton, radio and handcuffs.

Q    Very good.  And, sir, you were involved --

You were involved in this incident related to
Mr. Holloway on January 21, 2018?

A    Yes, I was.

Q    And you wrote relating to this incident.  True?

A    Yes.

Q    Now, you were involved in this investigation from the
beginning until the end.  You know everything that happened
in this case.  True?

A    Yes.

Q    Okay.  And you wrote a report that I'm holding in my
hands.  After you had discussions with your sergeant at
scene, Sergeant Rawlings and other --

(Court Reporter requests clarification for the
record.)

BY MS. MKRTCHYAN:

Q    You wrote your report after you discussed this incident
with sergeant at scene and other deputies involved in this

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00012                                      2-RenSER-00012

68

incident, including Deputy Chad Renegar?

A    Yes.

Q    Okay.  So backing up to January 2021, you were dispatched to the O'Neill Regional Park, Trabuco Canyon Road, sometime in the morning hours related to a call for disturbance you received through the dispatch.  True?

A    Yes.

Q    Okay.  And you were in uniform?

A    That is correct.

Q    You were driving with your trainee, Kevin Pahel?

A    Yes.

Q    And field training officer for Deputy Kevin Pahel?

A    Yes.

Q    And field training officer does what?  Just briefly for us.

A    Kind of just trains and make sure he does things appropriate and watches over him.

Q    Okay.  And you were together in the car, correct?

A    Yes.

Q    At the time of this incident, in 2018, did you have body-worn recordings?

A    I did not.

Q    And we're talking about body-worn cameras.

      Did you have -- anyone in the department have body-warn cameras?

*Deborah D. Parker, U.S. Court Reporter*

69

A    No, we did not.

Q    You had patrol vehicle recordings -- cameras installed on the car, right?

A    Yes, we do.

Q    And in order to record something, you have to have a microphone connected to your car, right?

A    Yes.  That's correct.

Q    That's a wireless microphone.  True?

A    Yes.

Q    Okay.  So now as a result of this incident, though, we don't have any recording from your microphone, because you did not have a microphone connected to the patrol car. True?

A    Correct.  I did not have a microphone.

Q    It was because you were driving as a passenger in Kevin Pahel's car, and he was the one who had the microphone connected to the car.  True?

A    Yes.

Q    So anything that happened on this day as it pertains to your communications had to be recorded on other officers' microphones?

A    Yes.

Q    Okay.  Now -- so when you get calls for service, you don't get the actual 911 calls from reporting parties, do you?

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00014                                                        2-RenSER-00014

70

A    No, we do not.

Q    You get the dispatch telling you the nature of the 911 call.  True?

A    Yes.

Q    Okay.  But in any event, let's hear -- so you wrote the report.  It was about 3:40 hours in the morning that you arrived to the O'Neill Regional Park, right?

A    The first time, yes.

Q    Okay.  We're talking about from the beginning.  The first you arrived here was about 3:40 a.m. in the morning?

A    Yes.

Q    Okay.  Let's hear the actual 911 call that was registered to the dispatch that brought you to this call.

          MS. MKRTCHYAN:  We're going open -- we're going to play for the record, Your Honor, Exhibit 1 -- 101.

          THE COURT:  101?

          MS. MKRTCHYAN:  -1.

          THE COURT:  -1.  Okay.

          MS. MKRTCHYAN:  So, yes.  That -- we're going to call -- and then we need to give transcripts, Your Honor. This is where I needed to --

          If I may, Your Honor, get the transcripts for the jury for the 911 call.

          THE COURT:  Karlen will help you.  Thank you, Karlen, appreciate it.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00015                                           2-RenSER-00015

71

(Pause.)

THE COURT:  You're going to a dispatch tapes, or a number of dispatch tapes.  You're going to have a transcript.  But remember that the transcript may be accurate or inaccurate.  It's somebody else translating or transcribing what they think -- here.

So your memory you hear is the best evidence. That's what you're going to rely upon.  This is transcript is an aid to you, though.

Now, Counsel, will the jury be allowed to take these transcripts into the jury room to discuss that; or if not, then they better know that they better take notes or subject to replay it.

Counsel, will the jury be allowed to write on these transcripts and take them in?

MS. MKRTCHYAN:  I don't object, yes.

MR. HARRELL:  No objection.

THE COURT:  Counsel?

MR. WRONIAK:  No objection.

THE COURT:  All right.  Then, as these transcripts are played, you can write in the margin of them, and you'll have those in the jury room to consider by stipulation of counsel.  Sometimes it's not allowed, and you have to write your notes and we don't give you the transcripts, but here we're allowing in the transcripts.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00016                                                    2-RenSER-00016

72

(Pause.)

MR. HARRELL:  Your Honor, as a housekeeping matter, is this 911 that we're about to hear?

THE COURT:  That's what I think.  I think we have to look back at 101-1.  And I think it's dispatch that was represented.

MR. HARRELL:  Or is this Mr. Fuerbach calling 911?

THE COURT:  I don't know.  I think it was represented it was the dispatch.

MS. MKRTCHYAN:  This is very short.  We won't need the transcript for this one.  We will give the transcript --

THE COURT:  Well, what's the first we're going to hear?  Is it Fuerbach calling?  Or is it the dispatch?

MS. MKRTCHYAN:  Fuerbach's 911.

THE COURT:  Fuerbach, okay.

This is going to be, apparently, a call into dispatch -- into the sheriff's department from the reporting party -- one of the reporting parties, Bryan Fuerbach; is that correct?

And the exhibit number is going to be 101?

MS. MKRTCHYAN:  Yes, 101-1.

THE COURT:  -1.  Thank you.

MS. MKRTCHYAN:  So, yes -- so let's play that. Well, let's wait for the jury to get the transcripts.  I apologize.  We have a lot of transcripts, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00017                                                      2-RenSER-00017

THE COURT:  Well, you can also put this on up on an ELMO, if you'd like to, at the same time.  That way we can all see it.  So instead of just disbursing each transcript, you can put it on the ELMO.  I'll give leave to either one of you to do that.  Right now, we have a transcript.

So we'll hand those out, Karlen.

THE CLERK:  I don't have enough.

THE COURT:  All right.  So you don't have enough, do you?

All right.  So we don't have enough transcripts.  So what they're going to do is, I'm going to allow them to put this transcript up on the ELMO.  That way you'll see the wording.  That means, you know, you need to take notes, if you decide to take notes.  You don't have to, but --

This is going to be Bryan Fuerbach calling into -- on a 911 call -- into the sheriff's dispatch.

MS. MKRTCHYAN:  Yes, Your Honor.  Thank you.

(*The audiotape was played.*)

BY MS. MKRTCHYAN:

Q   So this was the 911 call that originated the call for service by you to this area of the O'Neill Regional Park at 3:40 a.m.  True?

A   True.

Q   As we've already discussed, you don't hear the actual

*Deborah D. Parker, U.S. Court Reporter*

74

911 call.  You get -- the dispatch tell you what this is all about and you respond.  True?

A     True.

Q     Okay.  And then you responded.  It was dark?

A     Nighttime, yes.

Q     Yes.  And O'Neill Regional Park, we could see some video -- we will play some video when we sort these transcripts.

It's dark at nighttime?

A     Yes.

Q     So you need flashlights or your patrol cars to lighten up your path.  True?

A     True.

Q     And it's pitch dark to the point that if you don't have flashlights, what do you do?  You have to have something lightening your path, right?  Because you can't see within three feet of you.  True?

A     True.

Q     Okay.  Now when you arrived, you came -- you were not alone.  True?

You were with, as we discussed, Kevin Pahel, your trainee, right?

A     Yes.

Q     And you met with Renegar -- Deputy Renegar?

A     Yes.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00019                                          2-RenSER-00019

Q    But prior to that, isn't it true, we have the call detail service log indicating that prior even before your arrival, we have Deputies Borba and Billinger on the scene checking on the source of this disturbance.  True?

A    I didn't remember them being there, so I can't say that for sure.

Q    Let's open the call detail information report and let's look who arrived before you arrived, okay?  That's Exhibit --

MS. MKRTCHYAN:  Exhibit 45, Your Honor, for the record.

(Pause.)

BY MS. MKRTCHYAN:

Q    So do you see on your screen --

MS. MKRTCHYAN:  Can we publish it, Your Honor, the Call Detail Information Report for this incident?

MR. HARRELL:  No objection to 45.

THE COURT:  Received.

(Plaintiff's Exhibit 45 received in evidence.)

THE COURT:  You may publish.

(The document was published in open court.)

BY MS. MKRTCHYAN:

Q    So now let's go and check when you arrived.

MS. MKRTCHYAN:  And scroll down, please.  No, please.  Right here.  Okay.

*Deborah D. Parker, U.S. Court Reporter*

76

BY MS. MKRTCHYAN:

Q    This is the call log describing to us the officers arriving to the scene and on scene, correct, as we can see?

A    Yes.

Q    Okay.  Isn't it true, based on this report, we have Officers Billinger and Borba at scene at 3:54 a.m.  True? On scene?

A    This is status en route.

Q    Look down, sir.  On scene.  Do you see on the left On Scene ONC --OCS?

A    Oh, yes.

Q    Okay.  So there on scene at 3:54 a.m. before you arrived.  True?

A    True.

        MS. MKRTCHYAN:  Go down -- scroll down.

BY MS. MKRTCHYAN:

Q    Let's see what time you arrived.

        On scene highlights, in yellow, we have Chad Renegar and Gonzalez with Kevin Pahel.  True?

A    True.

Q    That was at -- basically, we have you at 4:12 a.m. True?

A    This says 4:24.

Q    I'm sorry.  For Renegar, it's 4:12.  For you 4:24. True?

*Deborah D. Parker, U.S. Court Reporter*

A    Yes.

Q    So according to this though, we know that Deputies Borba and Billinger arrived before you arrived. True?

A    Yes.

Q    Okay.  And when you arrived, did you see them at scene, the Officers, Borba, Billinger, Renegar?

A    No.  I only recall Deputy Renegar and myself and Deputy Pahel.

Q    Okay.  So when you came to the scene, you had interactions with other officers.  You were talking among each other.  You were investigating this call that you just got from Mr. Fuerbach.  True?

A    True.

Q    Okay.  And you were communicating with the dispatch trying to find a location because it was dark.  True?

A    True.

Q    Okay.  And it took you to talk to several other campers to try to see where -- whereabouts this -- whereabouts this incident occurred.  True?

A    I remember Deputy Renegar talking to somebody.  I did not talk to nobody.  I just went off Deputy Renegar.

Q    Okay.  So you were following.  And Deputy Renegar was the investigating officer of this call?

A    That is correct.

*Deborah D. Parker, U.S. Court Reporter*

Q   Okay.  So he assumed sort of an investigative responsibility?

A   Yes.

Q   And you were following up and you were there with him and you were assisting him in all respect?

A   Yes.

Q   Okay.  Then so you recall him having interactions with other officers, before you actually stopped by at Holloway's campsite.  True?

A   No.  Like I said, what I recall was just Renegar, Pahel, and myself talking amongst each other and trying to locate the campsite.  I don't remember Borba or Billinger there until after we had already made contact.

Q   Contacted by who?

A   With Mr. Holloway.

Q   Okay.  But at the time you had contact with Mr. Holloway, you actually saw Deputies Borba and Billinger near his campsite.  True?

A   Like I said, I don't recall them being there until afterwards.

Q   Understood.

        MS. MKRTCHYAN:  So now let's play, you know, the tape of Deputy Renegar, you and others interacting with arriving to the scene and interacting with Mr. Holloway.

        THE COURT:  What number would that be?

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00023                                      2-RenSER-00023

79

MS. MKRTCHYAN:  Yes, Your Honor.  That would be video 102 dash --

THE COURT:  102?

MS. MKRTCHYAN:  Yes, 102.

THE COURT:  Thank you.

MS. MKRTCHYAN:  But I need to find a transcript of that, Your Honor, so I would request -- so this is --

THE COURT:  If you don't have enough transcripts, you can also put that up on the ELMO again and play the transcript.

MR. WRONIAK:  Is this going to be 102-1?

MS. MKRTCHYAN:  Yes.

MR. HARRELL:  Thank you.

THE COURT:  102-1.

(Pause.)

THE COURT:  Counsel, there aren't enough copies, so you could put it up on the ELMO.

I don't need a copy for this.

There's only eight?  Oh, so we're two short, Counsel.

Let's play this.  Put it up on the ELMO, and we'll keep the copies here.  We're short a copy.

No, don't distribute them, because I want all the jurors to have them or none of them.

(Pause.)

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00024                                   2-RenSER-00024

80

MS. MKRTCHYAN: Your Honor, can we ask for a break?

THE COURT: Well, we got it right here, so I think we've got 10 now.

(Pause.)

THE CLERK: We don't have 10.

THE COURT: We don't have 10?

All right. Then we'll take a recess.

You're admonished not to discuss this matter amongst yourselves nor form, nor express an opinion.

We'll come get you about 11:00 o'clock, okay? Have a good recess.

(Jury exits courtroom.)

(The following proceedings were had outside the presence of the jury:)

THE COURT: All right, counsel. 11:00 o'clock. Then we'll resume at that time.

(Recess.)

(The following proceedings were had outside the presence of the jury:)

THE COURT: We're on record.

This gentleman is on the record from 1:38 to 2:06 on direct examination and 3:02 to 4:30. About 120 minutes. That's your time limit on direct examination. On.

Cross-examination you reserved him and called him

*Deborah D. Parker, U.S. Court Reporter*

81

back.

MS. MKRTCHYAN:  Your Honor, the only thing I have with that -- respectfully, Your Honor, here's the issue. Every trial I have presented the evidence in a different chronological order.  We have tapes to play.  Each tape we have, I intend to play the tapes, you know, initial contact with Mr. Holloway.

THE COURT:  I'll bear with you in terms of whatever -- however, you try to present your case.  That's fine.  But what's becoming so unclear in the first couple trials was, we never had an overview or offered an overview, because you have the option of calling witnesses who are adverse witnesses.  So it came in piecemeal.  It was a portion and then an attack.  There has to be some overview. And if you choose to lay it through Deputy Gonzales, that's fine.

MS. MKRTCHYAN:  Yes.  That's what I'm trying to do.

THE COURT:  But I'm going to shorten the other witnesses then.  This is not going to be the same trial. I'll try to give you each time which is trying -- I'm trying to find out who is going to be presented, but I'm going to shorten some of these so it's not redundant.

So if you want to present this overall, Deputy Gonzales, that's fine.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00026                                    2-RenSER-00026

82

MS. MKRTCHYAN:  Yes.  The only thing is when I'm playing video, do not count it against my time.  Because I'm going to play the video one time, that's pretty much, you know, like half an hour.  First incident, half an hour. Second --

You know, Your Honor, I request the Court not to count it against my time, but they're not going to replay the video 10 times this time.  They're trying to do this --

THE COURT:  Let's see how this goes.

MS. MKRTCHYAN:  Yes.  Thank you.

MR. HARRELL:  Your Honor, I'm giving plaintiff's counsel plenty of heads-up.  We need some clarity so we can do our jobs with regard to who is going to be on the witness stand.

THE COURT:  That's the problem I'm having, too. If we don't have that clarity, I'm going to shorten this dramatically.  So I need that clarity also.  But right now, we're going through Gonzalez.

Right now, we're going through Gonzalez, and I'll take this up at noon with you.  The jury is sitting.

MR. HARRELL:  Understood.  Thank you.

THE COURT:  Let's see how this goes.

*(Pause.)*

*(The following proceedings were had in open court in the presence of the jury:)*

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00027                                         2-RenSER-00027

83

THE COURT:  We're back in session.  The jury is present, alternate, all counsel and the witness.

And if you would like to continue, Counsel.

MS. MKRTCHYAN:  Yes, Your Honor.

DIRECT EXAMINATION

BY MS. MKRTCHYAN:

Q    So we will be playing -- going back, sir.

We're going to play the first encounter that you with deputies had with Mr. Holloway, okay?  And then we will ask you some follow-up questions.

Thank you.

(Pause.)

MR. HARRELL:  Your Honor, while we're working on logistical issues, can we have some clarity on whose PVS tape we're about to hear.

MS. MKRTCHYAN:  We already described it, sir. 101-1.  102-1.

MR. HARRELL:  Your Honor, is this Renegar or someone else?

MS. MKRTCHYAN:  That's Renegar.

MR. HARRELL:  Thank you.

MS. MKRTCHYAN:  Thank you.

So --

(Pause.)

(The videotape was played.)

*Deborah D. Parker, U.S. Court Reporter*

84

THE COURT:  Ladies and gentlemen, this is represented to be the --

Plaintiff's counsel, we're going to play this all the way through without interruption.

This is represented to be Renegar's camera.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Getting back to you, sir.

So you were there with the five officers, including you, five officers.

You determined at this time that the domestic violence incident was unfounded as to Jeremy Holloway?

A    Yes.  That's correct.

Q    And you left without arresting him?

A    Yes.

Q    And you left without violating him on probation.  True?

A    Yes.

Q    Okay.  And you -- in fact, you were the second voice -- this recording that you got is Chad Renegar's recording, right?

A    Yes.

Q    And your voice -- in the background, you were talking, and at some point you talked to Mr. Holloway explaining the nature of the calls.  True?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00029                                    2-RenSER-00029

85

Q    And isn't it true as far as right now you're sitting here today, we know there's only one 911 call made, the one that we just heard, Bryan Fuerbach.  True?

A    Yes.

Q    So you do happen to know why Deputy Chad Renegar kept telling Jeremy Holloway that multiple campers called on you?

Do you happen to have an understanding as to why that was said?

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  Sustained.

Renegar will testify.  You can ask another question.

MS. MKRTCHYAN:  Sure.

BY MS. MKRTCHYAN:

Q    Is there any other 911 call that right now, we're sitting here today, that we have not heard from Mr. Fuerbach or anyone else?

A    No.

Q    Okay.  Thank you.

So then you didn't continue your investigation of the female victim.  You didn't go to the Campsite 66, next to Holloway's, to check on that campsite.  True?

A    True.

Q    And isn't it true when he was upset at the end and he was -- you know, somewhat giving you attitude, he did tell

*Deborah D. Parker, U.S. Court Reporter*

86

you -- he did point -- He said, *Yes, I heard the fight.  I know where it's coming from.  I know people who -- I know why you're here.*  And he pointed in the direction of next door, didn't he?

A    I don't recall if he pointed, but I heard him say he knew why we were there.

Q    Right.  But you, basically, left the campground after this.  You didn't finish -- you didn't -- basically, you put domestic violence incident as unfounded and you left the campground.  True?

A    Yes.

Q    Okay.  Now, you came back on the second call.  True?

A    Yes.

Q    Okay.  How much time passed between the time you left the campground and came back?

         Do you remember?

A    Probably about half hour to 45 minutes.

Q    Okay.  And we have -- again, you came back, because the radio dispatched you to come back.  True?

A    True.

Q    Okay.  Now, you wrote in your report that the second time you came back was because, specifically, Jeremy Holloway was walking and harassing campers yelling and cussing demanding who called the police on him, right?  You wrote that in your report.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00031                                    2-RenSER-00031

87

A    Yes.

Q    Okay.  In of itself -- and you recall we questioned you about this incident at a prior deposition.

Do you remember that?

A    Yes.

Q    And how -- have you reviewed that deposition transcript recently.

A    Yes.

Q    And isn't it true at that deposition you told us -- you agreed with us -- that if someone is yelling and screaming without more, that's not a crime.  True?

MR. HARRELL:  Improper use of the deposition.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Didn't you testify before -- I asked you the same question.  I said --

THE COURT:  Testifying before.  You can ask him now.  We can't go back -- it's an improper use of the deposition.  You can ask him.  Just ask him the question.

MS. MKRTCHYAN:  Well, sure.

BY MS. MKRTCHYAN:

Q    Isn't it true, sir, yelling and screaming without physical action is not a crime?  True?

MR. HARRELL:  Incomplete hypothetical.

THE COURT:  Yeah.  It depends upon the situation,

*Deborah D. Parker, U.S. Court Reporter*

88

Counsel.  I'm going to sustain the objection.

MS. MKRTCHYAN:  I asked the same question to you.

THE COURT:  It doesn't mean it's proper, Counsel.

It's sustained.

BY MS. MKRTCHYAN:

Q    Okay.  So in of itself is that a crime:  Yelling and screaming, walking around?  Is that a crime in of itself without more?

MR. HARRELL:  Incomplete hypothetical.

THE COURT:  Are you -- in this fact-situation, this evening; is that correct?

MS. MKRTCHYAN:  Yes, Your Honor.

THE COURT:  Okay.  Overruled.

You can answer as far as this fact-situation what you know and the evening involved.

THE WITNESS:  No, it is not.

BY MS. MKRTCHYAN:

Q    So now -- and the real reason, though, you came back, Code 3, was because there was a dispatch notation that there was a little girl screaming.  True?

A    Yes.

Q    It wasn't because someone was yelling and screaming. It was about a little girl that you came Code 3.  True?

A    Well, that was part of the dispatch call, so it was all included, yes.

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00033                                    2-RenSER-00033

89

Q    Yes.  But the call was updated, if you recall.  We can
I -- maybe we can get up the call information detail report,
again, for the record, Exhibit 45.

       The call was updated to claim that there was a
little girl screaming.  True?

A    It was updated the same night, yes.

Q    And that's the reason why you arrived Code 3 with
lights and sirens.  True?

A    Yes.

Q    Now, let's play the actual second 911 call which,
again, you did not hear.  You were going by what the
dispatch was telling you.  True?

A    True.

Q    Okay.  Very good.

       MS. MKRTCHYAN:  So now we are going to go -- we're
going to play the second 911 call made by Joshua Gomez,
which is going to be 101-3.  101-3.  And they'll play
that --

       Let me see how many transcripts I have here.  We
have -- I have nine transcripts here.

    (Pause.)

       MS. MKRTCHYAN:  Maybe we can just start playing
it, Your Honor, because we don't want to waste time.  We can
start playing --

       THE COURT:  So why don't you put up this on ELMO

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00034                                                    2-RenSER-00034

90

as well.  We have a copy.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Okay.  Sir, we heard this call.  And, of course, you didn't get this call in your car.  You were getting what the dispatch was telling you about this call.  True?

A    True.

Q    Okay.  And when -- by the way, as an officer, you are trained to investigate 911 calls.  True?

A    True.

Q    Okay.  You don't just go by the 911 call.  You come and investigate.  True?

A    Yes.

Q    And the caller that we heard, Joshua Gomez, never identified the campsite number of Jeremy Holloway?

A    True.

Q    And he never gave his name either?

A    True.

Q    And it was clear to you after you spoke with him after the incident, he never came out of his tent to verify where this noise was coming from.  True?

A    I did not talk to him.

Q    Deputy Pahel spoke to him?

A    I don't know.  I don't remember.

Q    We'll go over the video, but -- in any way, when you

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00035                                          2-RenSER-00035

Q   arrived, you had this brief exchange with Joshua Gomez.  He just gave you direction where he heard the noise.  True?

A   I did not have any exchange with Mr. Gomez.

Q   Okay.  So when you approached Jeremy Holloway -- let's go to that point in time.  When you arrived, you had your guns drawn.  You had your flashlights.  You with Kevin Pahel and joined then by Deputy Renegar.  True?

You had your guns drawn?

A   Yes.

Q   Okay.  And you also had your flashlights, because it was dark.  True?

A   Yes.

Q   Still dark, right?

A   Yes.

Q   So aside from your flashlights, your guns and the patrol car lights, still dark.  True?

A   Yes.

Q   Okay.  When you approached, you saw him standing there within his campsite.  True?

A   Yes.

Q   He was not yelling or screaming.  True?

A   True.

Q   And you didn't see a girl with him.  True?

A   No, I did not.

Q   And you did not hear a girl screaming there, did you?

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00036                                    2-RenSER-00036

92

A    I did not.

Q    And so at this point in time when you arrived with guns drawn, was there a crime ongoing in your presence?

A    No, there was not.

Q    Your first order, with Deputy Pahel, was what?  Show his hands, right?  You ordered him, *Let me see your hands.* True?

A    True.

Q    And that's for officer safety.  You want to make sure no one is armed.  True?

A    That is true.

Q    And he -- after brief hesitation, he showed his hands. He stood there like a cross not moving.  True?

A    That is true.

Q    He did not move towards you.  True?

A    True.

Q    He made it very clear he's not moving.  He said it several times, *I'm not moving.*  He's standing there very stationary.  True?

A    True.

Q    Okay.  And you did not see -- you saw his hands.  They were visible to you.  True?

A    I can't recall.  I mean, it was dark, so I don't remember.  I know his hands were out to his side, though.

Q    Did you see any weapon that you could see in his hands,

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00037                                                        2-RenSER-00037

93

sir?  Yes or no?

A    No, I did not.

Q    Did he make any threats to you?  Did he say anything that was threatening towards you?

A    No, he did not.

Q    He was asking why. *What did I do? Why am I being detained,* since you were there just a few minutes, you said within a half an hour.  True?

A    That is true.

Q    Okay.  Did you provide him an explanation why you were detaining him second time now with guns drawn?

A    I was not going to.

Q    Okay.  So now you did not see a crime in progress.  You didn't see him armed.  He had his arms extended and yet -- and you were investigating a call for disturbance at this point in time.  True?

A    No.  I -- I -- we were there because we heard -- based on dispatch, he was threatening the campers and there was a little girl crying.

Q    Well, sir, that's what the dispatch told you.  And you just told me you have to investigate calls.  You just don't go by the 911 call, do you?

A    We do investigate it, but we have to make sure the scene is safe first.

Q    Sure.  And, of course, when you came, did you make any

*Deborah D. Parker, U.S. Court Reporter*

94

effort to find that little girl screaming because that was dispatched to you?

MR. HARRELL:  Vague as to time.

BY MS. MKRTCHYAN:

Q   At that point in time?  When you came, what effort did you make to find that little girl before you took him down to the ground?

A   It was --

THE COURT:  Just a moment.  To be clear, this is before he's taken to the ground?

MS. MKRTCHYAN:  Yes, sir.

THE COURT:  All right.

MS. MKRTCHYAN:  Yes, Your Honor.

THE WITNESS:  I wasn't going to, because, again, I just said, I wanted to make sure the scene is safe for everybody.

BY MS. MKRTCHYAN:

Q   So if he's standing there within his campsite -- as we discussed, he's not moving, running away and he's asking you, *Why am I being detained*?  You didn't believe it was necessary to explain to him.  True?

A   That is true.

Q   Okay.  And how many seconds it took you from the moment you approached him at gunpoint?  You had multiple -- you have your gun out, drawing at him.  You have Kevin Pahel

*Deborah D. Parker, U.S. Court Reporter*

95

drawing the gun with you and Chad Renegar.  Three of you with guns drawn.

How many seconds did it take from the moment you approached him at gunpoint and ordered him to get down to the ground.

MR. HARRELL:  Multiple questions.

THE COURT:  Sustained.

MS. MKRTCHYAN:  That's not a multiple.

BY MS. MKRTCHYAN:

Q    How many seconds it took you from the --

MR. HARRELL:  Motion to strike.

MS. MKRTCHYAN:  Excuse me.

MR. HARRELL:  Motion to strike.

MS. MKRTCHYAN:  Thank you.

THE COURT:  Counsel.  Counsel.  Just a moment.

MS. MKRTCHYAN:  Your Honor -- this is distracting, Your Honor.  I'm losing my train of thought.

I don't appreciate this.  Thank you.

THE COURT:  Counsel, that objection is sustained.

MS. MKRTCHYAN:  Sure.  Thank you, Your Honor.

BY MS. MKRTCHYAN:

Q    How many seconds it took you from the moment you approached three officers with guns drawn to the moment you ordered him to get down to the ground?

A    I'm sorry.  What is the question, again?

*Deborah D. Parker, U.S. Court Reporter*

96

Q   How many seconds?  Did you watch the PVS?  We'll watch it together.

If I were to tell you that based on the patrol vehicle audio recording it was 29 seconds, do you have any reason to doubt that?

A   Again, I'm not sure what the question is.  You're --

Q   How many seconds it took you.  And if I were to tell you from PVS recordings from the point in time you approached with guns drawn, until the point in time you actually took him down to the ground is 29 seconds, would you have any reason to quarrel that?

A   No, I will not.

Q   Okay.  Now, we have officer safety concerns, right? The fact that he was making any --

MR. HARRELL:  Multiple questions.

THE COURT:  No, I haven't heard the question yet.

Overruled.

Question.

BY MS. MKRTCHYAN:

Q   The fact that he was not making any threatening gestures towards you.  He was not running away.  He did not have any arms.  Did that in any way alleviate your officer safety concerns?

A   No, it did not.

Q   And you are trained -- isn't it true, sir? -- by your

*Deborah D. Parker, U.S. Court Reporter*

policy.  We have a very established use-of-force departmental policy that before you apply force on any subject, you have to gain voluntary compliance.  True?

MR. HARRELL:  Incomplete hypothetical.

MR. WRONIAK:  Objection.  Incomplete hypothetical. Misstates the evidence.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Have you read your policy on use of force lately?

A    Yes.

Q    Okay.

MS. MKRTCHYAN:  Exhibit 44, we would like to publish for the jury.  Thank you.

That's policy 300-3.2.

THE COURT:  All right.  Point out that specific portion.

MS. MKRTCHYAN:  Yes, Your Honor.

This is a policy, "Use of Force, 3.2."

Highlight it.

*(The document was published in open court.)*

BY MS. MKRTCHYAN:

Q    So isn't it true you are trained to -- this is -- do you recognize this document, sir?

A    Yes, I do.

Q    Okay.  Isn't it true that according to your policy --

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00042                                        2-RenSER-00042

go down -- you need to gain voluntary compliance of individuals before you use force?

MR. WRONIAK:  Objection.  Misstates the evidence.

THE COURT:  You need to gain voluntary compliance.

Overruled.  You can answer the question.

Do you understand the question, though?

THE WITNESS:  I do not.

THE COURT:  Okay.  Re-ask the question.

BY MS. MKRTCHYAN:

Q    Again look at the screen.  Do you see 300-3.2?

"Voluntary compliance," what does that mean to you, sir?

A    That they do it on their own.

Q    I'm sorry?

A    That they do it on their own voluntarily.

Q    Well, let's read it.

*It's the preferred means of achieving resolution to potential use-of-force encounters.  When practical, both deputies should ask for and allow reasonable time for compliance.*

True?  Reasonable time, right?

A    Yes.

Q    Okay.  Do you think that 29 seconds is enough time for someone at around 4:00 a.m. in the morning to understand what is being asked of him and why he needs to get down to

*Deborah D. Parker, U.S. Court Reporter*

the ground, sir?

MR. HARRELL:  Calls for speculation.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   Did you give him a chance?

Did you try to gain his voluntary compliance by telling him, sir, you got a 911 call?  Did you try to do that, sir?  Yes or no?

MR. HARRELL:  It's a compound question.

THE COURT:  Overruled.

You can answer.

BY MS. MKRTCHYAN:

Q   Did you -- did negotiate -- did you talk to him?

THE COURT:  Counsel, you have a pending question now.

MS. MKRTCHYAN:  Yes.

THE COURT:  You can answer that question.

THE WITNESS:  We told him many times to get on the ground.

BY MS. MKRTCHYAN:

Q   Okay.  If I'm being told, 4:00 a.m. in the morning, after I have been searched, you know, ordered out of my tent.  You're coming back.  You left me without arresting me a few minutes before.  Do you believe that just by telling him get down on the ground without any further explanation,

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00044                                        2-RenSER-00044

100

no questions asked, no conversation, that's voluntary

compliance according to your policy?

MR. HARRELL:  Objection, Your Honor.

BY MS. MKRTCHYAN:

Q    Is that what you are telling us?

THE COURT:  Just a moment.

BY MS. MKRTCHYAN:

Q    Yes or no?

THE COURT:  Counsel.

(Pause.)

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, he was not under arrest at this time, was he?

A    He was there -- we were trying to detain him.

Q    You were just detaining him, pending an investigation of the 911 call.  True?

A    Yes.

Q    You still did not have probable cause to arrest him for any crime, did you?

MR. HARRELL:  Legal conclusion.

THE COURT:  You can ask about this officer's state of mine.  When you say "they" or "we," you can ask him about his state of mind.

MS. MKRTCHYAN:  Yes.

////

*Deborah D. Parker, U.S. Court Reporter*

101

BY MS. MKRTCHYAN:

Q    Did you have probable cause to arrest him at this point in time.  Yes or no?

MR. WRONIAK:  Objection.  Vague as to time.

THE COURT:  Overruled.

THE WITNESS:  We were trying to detain him.  Not arrest him.

BY MS. MKRTCHYAN:

Q    Okay.  And there's a difference between those two concepts for a police officer.  True?

A    True.

Q    Very good.

Now, you ordered him to get down on the ground at gunpoint.  And in addition, you personally also had your Taser out and you told him, *If you don't get down on the ground, you will be tased.*  True?

A    No, it's not true.

Q    You did not order him to get down on the ground and threatened him with a taser according to your report?

MR. HARRELL:  Compound.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, let's read your report, sir.  And this report is accurate.

You are trained to write reports.  True?

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00046                                                2-RenSER-00046

102

A    That is true.

Q    Okay.  Let's look at this:

I holstered my gun.  Got my Taser out and pointed it at him.

And this is Exhibit 35.  Maybe we have that published to the jury so that we can read it together.

This is Exhibit 35-2.

MR. HARRELL:  No objection.

MS. MKRTCHYAN:  Okay.

BY MS. MKRTCHYAN:

Q    Okay isn't it true that you wrote:  *I holstered my gun and got my taser out and pointed at him.  I told Jeremy to get down to the ground or he will get tased.*

Did that happen?

MR. HARRELL:  Your Honor, I -- we don't have Exhibit 35 up.

MS. MKRTCHYAN:  That's fine.

BY MS. MKRTCHYAN:

Q    Did that happen?

MS. MKRTCHYAN:  Please show that -- Yes, very good.  No, that's not the one.

THE COURT:  Just a moment.  There's a pending question now.

BY MS. MKRTCHYAN:

Q    Did that happen?

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00047                                   2-RenSER-00047

103

A    I did have my Taser out, after I holstered my weapon. Your original statement earlier was did I have both of them out?  And that is not true.

Q    We'll look at the video.

But in any event, you did tell him, *Get down on the ground or you will be tased,* didn't you?

A    I did, yes.

Q    And this is your report.  So we'll look at that report a little bit more closer later, but -- so, now, when you have Taser out that's considered force; isn't it true?

A    Yes, it is.

Q    Application of the Taser that's application less lethal, right?

A    Yes, it is.

Q    And you were talking among each other with Deputy Pahel, with Renegar, asking about, *Do you have lethal?*  True?

A    True.

Q    You got guns drawn.  You've got taser out.  And you're talking even about lethal.  True?

MR. HARRELL:  Your Honor, objection.  "You"?  It's vague.  "You" plural or singular.

THE COURT:  Counsel.

Do you understand the question?

THE WITNESS:  If she can repeat it, that would be

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00048                                    2-RenSER-00048

104

better.

Reask the question, Counsel.

MS. MKRTCHYAN: Sure.

BY MS. MKRTCHYAN:

Q   So now you've got -- we're talking about three of you.
We have other officers arriving.  We're talking initially
the three of you.  You have your Taser out now.  Pahel has
his gun drawn.  Renegar has his gun drawn.  And you're
talking among each other about lethal.  True?

A   Yes.

Q   Okay.  Up to this point in time, you have not told this
man why this is ongoing.  True?  Yes or no?

A   That is true.

Q   Okay.  And did you have legal reason -- actually, by
your policy, when are you allowed to use your policy, sir?

What is your policy on the terms of Taser?

MR. WRONIAK: Objection.  Vague.  Compound.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   If someone is standing there, hesitating to get down on
the ground to show his hands, he's not getting down on the
ground -- that's why you took him down to the ground.  True.

A   True.

Q   Okay.  So now is this considered aggression towards
you?  Is that violence towards you, if someone is standing

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00049                                                    2-RenSER-00049

105

there showing his hands, not moving, not running away, not making any threats, not armed?  Is this violence towards you or is it considered passive resistance rather, sir?

A    We don't --

MR. HARRELL:  Multiple questions.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Is that behavior considered passive resistance?  Yes or no?

MR. HARRELL:  Vague.  What behavior?

THE COURT:  Overruled.

And your question was:  Yes, it is?  I didn't hear your question -- I'm sorry, your answer.

She asked about whether this was passive resistance.  I heard the objection.  I think you said, *Yes, it is*?

THE WITNESS:  It is passive resistance.

Okay.  Thank you.  I apologize.  I didn't hear it.

BY MS. MKRTCHYAN:

Q    He was not aggressive towards you, was he?

A    No, he was not.

Q    Okay.  And under your policy, when are you allowed to use a Taser, sir?

A    When they are resisting.

Q    Let's look at your policy on taser.  That's

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00050                                                    2-RenSER-00050

106

Exhibit 44-8.

Isn't it true under your policy of application of Tasers, you're allowed to use it when someone is in immediate danger to you or others.  True?

MR. WRONIAK:  Objection.  Relevance.

BY MS. MKRTCHYAN:

Q    Let's look at that.

MS. MKRTCHYAN:  Scroll down.

THE COURT:  We're going to take a recess at this time, also.  Or we'll resume on this issue concerning taser right after lunch, okay?

MS. MKRTCHYAN:  Your Honor, there's a question pending.  I'd like to have --

THE COURT:  You can re-ask it right after lunch.

I need you back at 1:15.  I need to go through lunch hour just as a courtesy to other folks we called at 7:30 this morning.

So I'm going to send my staff to lunch.  We can go on CourtSmart, but I need about an extra 15 minutes.

See you at 1:15, okay?

Don't discuss this matter nor form or express an opinion.

(*Jury exits courtroom.*)

(*Further proceedings reported by Debbie Hino-Spaan, in Volume IV.*)

*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00051                                          2-RenSER-00051

107

(At 12:06 p.m., proceedings were recessed.)

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  May 25, 2025


_____/s/DEBORAH D. PARKER____
DEBORAH D. PARKER, OFFICIAL REPORTER


*Deborah D. Parker, U.S. Court Reporter*

2-RenSER-00052                                                            2-RenSER-00052

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| Plaintiff, | ) **Certified Transcript** |
| | ) |
| vs. | ) Case No. |
| | ) 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| Defendants. | ) **DAY 3, VOLUME IV** |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
MONDAY, MAY 5, 2025
1:32 P.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

            MKRTCHYAN LAW
            BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
            655 North Central Avenue
            Suite 1700
            Glendale, California 91203
            818-388-7022
            narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

            LYNBERG & WATKINS APC
            BY:  S. FRANK HARRELL, ESQ.
            1100 West Town & Country Road
            Suite 1450
            Orange, California 92868
            714-937-1010
            sharrell@lynberg.com

            LYNBERG & WATKINS APLC
            BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
            1150 South Olive Street
            Suite 1800
            Los Angeles, California 90015
            213-624-8700
            cnaltsas@lynberg.com

            LYNBERG & WATKINS PC
            BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
            1100 West Town & Country Road
            Suite 1450
            Orange, California 92868
            (714) 937-1010
            theathcote@lynberg.com

            LYNBERG & WATKINS
            BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
            1100 Town and Country Road
            Suite 1450
            Orange, California 92868
            714-937-1010
            rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

        COLLINS & COLLINS LLP
        BY:  MICHAEL L. WRONIAK, ESQ.
        750 The City Drive
        Suite 400
        Orange, California 92868-4940
        714-823-4100
        mwroniak@ccllp.law

        COLLINS & COLLINS LLP
        BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
        2011 Palomar Airport Road
        Suite 207
        Carlsbad, California 92011
        760-274-2110
        cswiss@ccllp.law

**ALSO PRESENT:**

        Raymond Farahmand, plaintiff's paralegal
        Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

2-RenSER-00055        2-RenSER-00055

4

**I N D E X**

**WITNESSES**                                                                                    **PAGE**

**JOEL GONZALEZ, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan (continued)        12

**EXHIBITS**

(None offered.)

**UNITED STATES DISTRICT COURT**

5

**SANTA ANA, CALIFORNIA; MONDAY, MAY 5, 2025**

**1:32 P.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURT:  Counsel, did you want to put something on the record?

MR. WRONIAK:  Thank you, Your Honor.  Counsel is getting into the use of --

THE COURT:  I can't hear you.

MR. WRONIAK:  May I sit?

With this witness, counsel is getting into the Taser policy.  And pursuant to the Court's ruling previously on the posttrial motions, the Taser was deemed as to Deputy Renegar to be subject to qualified immunity.  So when she's going into the Taser policy itself and the reasonableness of it, it's irrelevant.  And it's 403 to the extent it violates the Court's order that Deputy Renegar is entitled to qualified immunity on the use of the Taser.

The Court's already indicated we hear the whole story, including the Taser, because it's part of the story, but getting into the policy is irrelevant.

THE COURT:  That's one of the issues I've got.  That is, I'm not going to preclude the plaintiff, though, from arguing that the compilation of this, the number of officers

**UNITED STATES DISTRICT COURT**

2-RenSER-00057                                    2-RenSER-00057

6

involved and the use of Taser, are all part of this animus towards Mr. Holloway. That's the relevance of that. But as far as the Taser policy, et cetera, I have ruled on that. And that's why I kind of stopped it at the Taser issue at that time. So I turn back to the plaintiff to make your record.

MS. MKRTCHYAN: Your Honor, first of all, defendants in my motion *in limine* was denied. They were trying the same thing with -- you know, about the internal policies to be completely excluded. The Court denied that.

Now, how is this Taser policy relevant? It is extremely relevant to plaintiff's case. Why? Because not only Chad Renegar used actually the Taser on my client, but --

THE COURT: First of all, we have a disagreement on my ruling already, don't we?

MS. MKRTCHYAN: Wait a minute. I'm sorry.

THE COURT: Just a moment. Before we even get into this policy or not, you both disagree about what I ruled.

MS. MKRTCHYAN: But there's no ruling there. What ruling are we talking about? The motion *in limine* was denied, Your Honor.

MR. WRONIAK: I'm referring to the Court's omnibus order on posttrial motions, Docket Number 679.

MS. MKRTCHYAN: That's a very different issue. That's -- the Court dismissed some defendants --

THE COURT: Hold on. I'm confused by that now.

**UNITED STATES DISTRICT COURT**

2-RenSER-00058                                                    2-RenSER-00058

MR. WRONIAK:  In the posttrial motions, Your Honor, for trial number 3, you ruled that -- why we ended up with the two deputies only, that the -- three of the deputies were entitled to qualified immunity.

As to Deputy Renegar, you specifically ruled after the first -- that trial, that the punch to the face was not subject to qualified immunity.

THE COURT:  That's right.

MR. WRONIAK:  But that Deputy Renegar was entitled to qualified immunity on the use of the Taser.

THE COURT:  Yeah, I don't see the use of the Taser for both of you being inappropriate in this case.  In other words, the specific use and policy, I believe, was adequately followed.  The only reason Deputy Gotts is here and I didn't grant qualified immunity was because of the tape you hear Mr. Holloway saying basically, "Quick kicking me."  Well, a person isn't saying that unless he's being kicked.  And later on, unlike the first trial, you identified Deputy Gotts. That's why Deputy Gotts doesn't have qualified immunity.

Plus you also have a statement later on, something about "What do they do, teach you this in the academy?" something to that effect -- I'm a gatekeeper, that goes to the jury.  They decide on Gotts.  Otherwise, Gotts would have qualified immunity.

With Renegar, the whole issue is coming down to that

UNITED STATES DISTRICT COURT

2-RenSER-00059                    2-RenSER-00059

8

punch in the face, quite frankly, and do you believe it or not.

MR. WRONIAK:  That's why the Taser policy and going to the Taser is --

THE COURT:  I tend to agree with that.  I don't think -- I think you can talk about the use of the Taser.  I think you could argue the number of deputies that were eventually involved.  I'm not precluding that.  I'm not even precluding you getting together with their stories, although it's not a conspiracy.  I ruled against you on that.  But you can certainly say that they got together in terms of credibility and matched their stories.  You're not precluded from that.

But as far as getting into the Taser policy, I believe that there, that Taser was properly employed.  So I don't see why we're getting into the policy at all.  I think it's unduly consumptive of time.  Although you can talk about the Taser and how they used it, the fact it malfunctioned a number of times.  You can argue that it was excessive as a total overall perspective and picture, but we're not into policy concerning this Taser.

MS. MKRTCHYAN:  Your Honor, I need to be heard because the crux of this case -- and may I make my record?  Because it seems to me that we are not communicating properly right now.  The crux of this case is excessive force, isn't it?  Okay.  And there are two officers who not only drew Taser, but

one of them applied.

The ruling on qualified immunity is a legal ruling. It does not foreclose plaintiff to raise the issue of impropriety of the use of Taser. And policies of Taser are relied upon by use of force experts to determine if an officer's actions were within the law enforcement standards, POST or within their policy. Policy is relevant also to determination of the excessive use of the force.

This is the crux of this case. Was this -- was this proper for this officer to draw a Taser? Was it proper for Renegar to apply the Taser? And how the jury is going to be given any guideline either through witnesses, their training.

THE COURT: Then I will take this up when Renegar testifies because he employed the Taser.

This officer employs the Taser?

MS. MKRTCHYAN: He drew his Taser, Your Honor. That's where -- he drew his Taser. He told my client, "You need to get down on the ground or you will be tased." And I'm asking him what is his training on Taser application. Was it proper for him to actually apply the Taser? He didn't apply it, but he said that, you know, "I drew my Taser, and I told him, 'Get down on the ground or you will be tased.'" This is the crux of this case, Your Honor.

THE COURT: It's not the crux of this case, Counsel. This case has gotten so many, quite frank, collateral issues

that we've lost the focus on this case, quite frankly.

I'm going to hear you again, but I'm going to preclude this area concerning policy at this time. I'm going to hear you tonight, and we may bring this officer back, or I may let you get into this with Renegar.

But I'm getting concerned about the number of delays with the jury sitting, and that's why I'm employing both of you to get together and give a smooth trial. I don't feel comfortable already about the way that this trial is going. I think there's too many collateral issues, and we still aren't focused on excessive force. And that is Renegar's actions and/or Gotts's actions where both experts testify that if Gotts is kicking Mr. Holloway on the ground, that that is excessive use of force. And to back that up, Mr. Holloway has a tape where I've heard a complaint about the force being used and somebody kicking him.

Now, he's either making that up or he's not. And as a gatekeeper, I don't make that determination. But that is on that tape, and apparently Mr. Holloway feels like he's getting kicked. Number two, Mr. Holloway also complains about that when he's sitting on the ground and comes right back and says, "What are they going to do? Teach this in the police academy?" or something to that effect. That's the only reason Mr. Gotts is here without qualified immunity.

As far as Renegar is concerned, we've always come

**UNITED STATES DISTRICT COURT**

down to Renegar's actions. This has been the crux of the lawsuit from the beginning. That is, Mr. Holloway has his arms outstretched. He gets hit in the face. That is the crux of this case.

As far as the Taser's concerned, the employment or not, I have felt that that was a proper employment under the situation, and I think this is unduly consumptive of time. I think you're losing the focus, quite frankly, Counsel.

MS. MKRTCHYAN: Your Honor --

THE COURT: No. We're done with this conversation. We really are. I'm going to have the jury -- I'll hear you again at the end of the day and give you that time. And if I'm wrong, I will bring this officer back. And I'm not saying at the present time I'm not going to let Renegar testify to that. But coming in the middle of this, not now. I want the jury back in session. We've been sitting for over --

Karlen, would you get the jury, please.

You can certainly go into the facts. He employed it. You can get in the fact of how he used it. But as far as the policy, not at this time.

(To the courtroom deputy) Would you get the deputy?

Sir, would you retake the stand? Thank you very much.

Sir, I'm instructing you that you'll be asked questions about the way that the Taser was deployed, but the

**UNITED STATES DISTRICT COURT**

12

policy won't be discussed at this time.  Maybe later.  We may be calling you back.  We're not sure.

**(In the presence of the jury.)**

THE COURT:  Thank you for your patience.  The recess was entirely my fault, and I apologize to you.

Counsel, we're back in session.  The deputy has taken the stand.

And, Counsel, if you'd like to resume, please.

**JOEL GONZALEZ, PREVIOUSLY SWORN, RESUMES THE STAND**

**DIRECT EXAMINATION (Continued)**

BY MS. MKRTCHYAN:

Q    Going back on the record, sir, isn't it true, generally speaking, application of use of force depends on the resistance of the individual you're dealing with?

MR. WRONIAK:  Objection.  Incomplete hypothetical.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  Yes.

BY MS. MKRTCHYAN:

Q    So according to your policy -- well, you are trained in use-of-force policies, how to apply force; true?

A    Yes.

Q    Okay.  When are you permitted to use force according to your own policy?

A    Whenever I need to overcome resistance to make -- effect

**UNITED STATES DISTRICT COURT**

an arrest.

Q    Okay.  Isn't it true your policy, 300- -- .2.1, which is Policy Number 44 --

MS. MKRTCHYAN:  With the Court's permission, we will publish this as the use-of-force policy.

THE COURT:  You may.

BY MS. MKRTCHYAN:

Q    Okay.  It says:

"Use of Reasonable Force to Effect an Arrest.

"Any peace officer that has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance."

Right?  Did I read it accurately?

A    Yes.

Q    And you've been trained about this policy for how many years?

A    18.

Q    Okay.  And we covered the fact that at the time you arrived with guns drawn, you were still detaining, not arresting Mr. Holloway, were you?  True?

A    True.

Q    And he was not escaping.  He was standing there still with hands extended; true?

14

A    True.

Q    And he was only passively resisting, asking questions; true?

A    True.

Q    And is asking questions considered verbal noncompliance, sir?

A    Can you rephrase that question.

Q    Well, if I'm asking you questions, is that considered active resistance to you?

A    No.  That is passive.

Q    When you drew your Taser, were you going to use your Taser on Mr. Holloway under these circumstances?

A    No, I was not.

Q    But you threatened him, didn't you?

A    Yes.  Did not threaten him.  I told him what I was going to do with it.

Q    And you did it in a loud commanding tone of voice, not in a very polite, nice manner; true?

A    Commanding voice, yes.

Q    Loud?

A    Yes.

Q    Okay.  And it was in a tone that should be taken seriously by a civilian; true?

A    Yes.

Q    Okay.  Did you believe that if he didn't get down on the

**UNITED STATES DISTRICT COURT**

2-RenSER-00066                                          2-RenSER-00066

ground, you could, by your own policy, use Taser on him? Yes or no?

A    No.

Q    Isn't it true you were just teaching him a lesson? You didn't like his attitude initially, and you were just teaching him a lesson?

        MR. WRONIAK: Objection. Argumentative.

        THE COURT: Sustained. You can argue that Counsel, but sustained.

BY MS. MKRTCHYAN:

Q    Did you use Taser on Mr. Holloway while he was standing?

A    I never used the Taser.

Q    What do you make of the fact that in this lawsuit, the reporting parties -- Brian Fuerbach, the 911 callers, Joshua Gomez -- testified that they saw Mr. Holloway go down on the ground. They heard the click of the Taser, and they thought the Taser was applied initially while he was standing on the ground. What do you make of that?

        MR. WRONIAK: Objection.

        THE COURT: Sustained. Counsel, confine your questions to what he did, said, heard.

        MS. MKRTCHYAN: Okay.

BY MS. MKRTCHYAN:

Q    So you didn't apply the Taser when he was standing there?

A    I never applied the Taser, period.

UNITED STATES DISTRICT COURT

16

Q    Okay.  But you drew the Taser, and you told him, "Get down on the ground or you will be tased"; true?

A    Yes.

Q    So then you and Renegar and Pahel, three of you, approached him at fast pace with intent to take him down to the ground because he was not going down on the ground; true?

A    I believe we said it was about 29 seconds.

Q    Uh-huh.  Yes.  But you approached him; true?

A    I approached him after Deputy Renegar tried to do an arm bar takedown, yes.

Q    Okay.  But three of you approached the same time -- around the same time towards where Mr. Holloway was standing, with guns drawn; true?

A    If you're referring to when we first saw him, all three of us, yes, we did.

Q    Okay.  And takedown is considered use of force; true? Arm bar takedown?

A    Yes, it is.

Q    Okay.  Are you permitted by your policy, that we've just seen, to do an arm bar takedown of a passively resisting individual?  Yes or no?

          MR. HARRELL:  Incomplete hypothetical.  Prohibition. 148.

          THE COURT:  Counsel, just a minute.  The question is:  Is an arm bar takedown passive?  Restate the question.

2-RenSER-00068                                    2-RenSER-00068

17

BY MS. MKRTCHYAN:

Q    Are you permitted to take down an individual on the ground, which is considered use of force by your policy, when that person is simply asking questions?  Yes or no?  I don't know?

MR. HARRELL:  Incomplete hypothetical.  Prohibition. 148.

THE COURT:  I don't understand the response.

MR. HARRELL:  She's leaving out some key facts of our incident.

MS. MKRTCHYAN:  Your Honor, this is speaking objections.  This is not allowed.

THE COURT:  Just a moment.  I don't think the jury, unfortunately, has seen the totality of this so far.  So what's coming out now are piecemeal portions.  This is incomplete at the present time.  I'll allow you to come back later on and testify, but I want more in front of the jury about what happened at this second takedown.

And although we're allowed to call witnesses on the other side, it's giving kind of a pretty incomplete picture in terms of this hypothetical right now.  I'm not going to have you answer that at the present time.  I may have you come back and extend that courtesy.

So, Counsel, move on now.  It's incomplete.

MS. MKRTCHYAN:  That goes to his state of mind, Your

**UNITED STATES DISTRICT COURT**

Honor.

THE COURT: I need more in front of the jury, Counsel, so they see more about this incident.

MS. MKRTCHYAN: That goes to his state of mind.

THE COURT: Thank you very much.

BY MS. MKRTCHYAN:

Q You approached at a quick pace, didn't you?

A Yes.

Q All three of you; true?

A I did, yes.

Q Yes. And you did not. When you approached him, three of you, you had still your Taser out; right? True?

A When I first approached him, I had my gun out, yes.

Q Pahel had his gun out -- true? -- drawn at him; true?

A I believe he did, yes.

Q And Renegar also had his gun drawn at him when you approached him, three of you; true?

A Yes, he did.

Q When you approached him at quick pace, three of you with guns drawn, did you ever tell Mr. Holloway, "We are going to approach you, and we are going to place you under arrest, and we are going to place you in handcuffs"? Did you ever explain to him why you are approaching him?

A No, we did not.

Q And you talked about lethal force; true? When you

UNITED STATES DISTRICT COURT

19

approached him, you were talking about lethal force by asking each other, "Do you have lethal?"

MR. WRONIAK: Objection. Asked and answered. 403.

THE COURT: Sustained. Counsel, that's been asked and answered now a number of times. This will be the third time.

BY MS. MKRTCHYAN:

Q    Is it your normal tactics to approach individuals with guns drawn, talking about lethal force, threatening them with a Taser without ever explaining to them why?

A    In the situation, it was appropriate.

Q    And we will talk about the situation, but we've heard the 911 call; right? We've heard your first encounter with him when you left without arresting him, without violating him for any reasons. We heard everything thus far; right?

MR. WRONIAK: Objection. Argumentative.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    Did I leave out anything -- did I leave out anything so far that you are telling me depends on the situation? I'm going chronologically everything you've heard, everything you've got. Is there anything I left out?

MR. WRONIAK: Objection. Argumentative.

BY MS. MKRTCHYAN:

Q    Please tell us.

**UNITED STATES DISTRICT COURT**

20

THE COURT:  Just restate the question, Counsel.

BY MS. MKRTCHYAN:

Q   No.  Please tell us, is there anything -- because you're saying depending on the situation.  This situation, you've got -- we've heard the 911 calls.  You said, "We came.  We were investigating the call.  We were detaining him.  We were not arresting him.  We didn't see a little girl.  He's not screaming and yelling.  He's not committing a crime.  He's just standing there with arms extended" --

THE COURT:  Counsel, Counsel.  This is argument.  That's the problem with it.  What are you asking him now?

MS. MKRTCHYAN:  I'm asking him my next question.

THE COURT:  This is argument.  This is what you're going to argue eventually to the jury.

MS. MKRTCHYAN:  Your Honor --

THE COURT:  Question about what he said, he heard, he did.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q   Is this your normal tactics to approach individuals in that situation without telling them why?  Why do you have to approach him with guns drawn and tell him get down on the ground?  Is this your normal tactics?

A   In this situation like you just said, yes.

Q   Okay.  And then is that considered verbal de-escalation?

**UNITED STATES DISTRICT COURT**

21

By your policy, we have you required to verbally de-escalate situations; true?

MR. HARRELL: Lacks foundation to this point.

THE COURT: Well, as far as this situation is concerned, you can answer that question.

THE WITNESS: I explained we weren't going to do any of that stuff based on the circumstances.

BY MS. MKRTCHYAN:

Q What verbal de-escalation did you do, sir, up to this point in time before you approached and took him down to the ground with multiple officers? What? Tell me. Tell this jury.

THE COURT: Counsel.

BY MS. MKRTCHYAN:

Q What verbal --

MS. MKRTCHYAN: Your Honor, I object.

THE COURT: No. No.

MS. MKRTCHYAN: Am I allowed to question this witness or not?

THE COURT: No, you're not, not when you keep badgering. You asked the question, and then you go on with the next question. I'm going to curtail this now.

MS. MKRTCHYAN: Your Honor --

THE COURT: Now, number one, it has to be clear that she's referring to the second time you responded, not the first

time in terms of any de-escalation when you left, okay?  So we're back on the second incident.

Now, Counsel, ask your question, but please don't carry on to the next.

MS. MKRTCHYAN:  We are on the second encounter.

THE COURT:  Counsel.

BY MS. MKRTCHYAN:

Q    Did you do any verbal de-escalation before you took him down to the ground, sir?

A    Aside from telling him multiple times to get on the ground, no.

THE COURT:  And now we're done with this area.  Move on.  You've asked him three times now.

BY MS. MKRTCHYAN:

Q    Now, of course, you're denying -- right? -- that Chad Renegar punched Jeremy Holloway in the face before takedown. You're denying that; true?

A    I didn't see him do any of that stuff.

Q    Okay.  But you were there; wasn't it true?  From the very beginning when he was taken down to the ground until the time he was picked up from that ground, you were there, weren't you?

A    Yes, I was.

Q    And you did not see how Mr. Holloway was punched to his face; true?

A    I never saw him get punched in the face.

23

Q    And you also never saw anyone kicking him in the head; true?

A    That is correct.

Q    Okay.  Then how, sir, did he get those facial head injuries that you've described in your report -- in your police report?  You wrote -- isn't it true? -- "I saw Jeremy was bleeding from the right side of his head above his eye."  How did he get those head injuries if, according to you, you never saw him punched to his face, hit in the head?

A    In previous testimony, I believe I stated that I felt he got that injury when we took him to the ground and he hit his head or face on the ground.

Q    Isn't it true you also testified in the deposition -- do you remember your sworn deposition?

A    Yes, I do.

Q    Did you read that recently, as you said earlier?

A    Yes, I did.

Q    And isn't it true you did testify that you never saw him get down face -- hit his face on the ground?  Remember that?

            MR. HARRELL:  Improper use of the deposition.

            THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So let's, you know, show the photograph of -- so you are claiming that you actually believe that he went and hit his face on the ground; right?  That's what you are claiming now at

**UNITED STATES DISTRICT COURT**

this trial?

A    That's what I've always said, yes.

Q    Okay.

MS. MKRTCHYAN:  Exhibit 100- -- 100-2.  With the Court's permission, we will publish it to the jury.

THE COURT:  You may.

BY MS. MKRTCHYAN:

Q    Isn't it true this is a picture of Mr. Holloway after the use of force after you picked him up from the ground and after paramedics wrapped his face?

A    Yes, that is true.

Q    Okay.  And you are telling me that -- and we can see his face.  He was not in this condition before you arrived to his campground at the second encounter, was he?

A    No, he was not.

Q    Okay.  This was caused by your use of force; true?

A    Yes.

Q    Okay.  And you are telling me that he sustained this facial injuries to his right and left side of his body because he hit his face on the ground?  Is that what you are telling us?

A    That is correct.

Q    Okay.  Let's see -- let's continue.

You also -- when you approached him, you got involved in the takedown; right?

UNITED STATES DISTRICT COURT

A    Yes, I did.

Q    Okay.  Tell us how you got involved in the takedown.

A    I got involved because I -- if I remember correctly, I saw him reach up towards Deputy Renegar's ballistic vest with his right hand.  So at that point I immediately holstered my Taser and ran up to him and grabbed his right hand and tried to do an arm bar takedown as well.

Q    Okay.  So you are claiming that he actually was in a position to, as you said, grab someone's ballistic vest?

A    To grab Deputy Renegar's vest, yes.

Q    And so do you recall when you were asked the same series of questions of your deposition, at the point in time how Mr. Holloway was taken down to the ground, about this use of force.  Do you remember that?

A    Yes, I do.

Q    Okay.  Do you remember that, when asked the same series of questions --

        MR. HARRELL:  Improper use of the deposition.

        THE COURT:  He hasn't been asked the question to impeach him or to refresh his recollection yet, Counsel.  So re-ask the question.

BY MS. MKRTCHYAN:

Q    Did you testify at a previous deposition that you did not see if Mr. Holloway hit his head on the ground?

        MR. HARRELL:  Improper use of the deposition.

UNITED STATES DISTRICT COURT

2-RenSER-00077                                         2-RenSER-00077

THE COURT: Overruled.

You can answer that question.

THE WITNESS: I did not see.

BY MS. MKRTCHYAN:

Q    Okay. So you did not see Mr. Holloway hit his face on the ground; true?

A    That is true.

Q    Okay. So then how -- a minute ago I asked you how Mr. Holloway got this head injuries. You told this jury under oath that "I believed he hit his face on the ground."

A    I said I believe he hit his head on the ground when we were taking him down.

THE COURT: Counsel, Counsel, just a moment.

Ladies and gentlemen, please disregard the overtures towards you, okay? The body language.

Now, Counsel, stay engaged with the witness, not the jury.

MS. MKRTCHYAN: Your Honor, I'm not --

THE COURT: No, when you rise like this to the jury (indicating), I will preclude you or the other side from that body language.

MS. MKRTCHYAN: Your Honor --

THE COURT: Stay focused on this witness, please.

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

UNITED STATES DISTRICT COURT

2-RenSER-00078                                    2-RenSER-00078

Q    So there is a big difference between believing something happened and seeing something happen; true?

A    True.

Q    And you understand that as an officer -- law enforcement officer; true?

A    True.

Q    Okay.  You did not see that he hit his head on the ground when you guys were taking him down to the ground; is that true?

         MR. HARRELL:  Asked and answered.  403.

         THE COURT:  You can answer it one more time.

         THE WITNESS:  That is true.

         THE COURT:  All right.  Now move on, Counsel.

BY MS. MKRTCHYAN:

Q    Isn't it true, according to your report -- Jeremy Holloway, according to your report, was never really facing you after the takedown; isn't it true?

A    Can you show me the report?

BY MS. MKRTCHYAN:

Q    Well, let's look at your report.

         MS. MKRTCHYAN:  Let's -- maybe we can also publish it to the jury so that we can be on the same page, everyone.

BY MS. MKRTCHYAN:

Q    This is Exhibit 35.  You wrote:

         "Deputy Renegar attempted an arm bar takedown
         at which point I saw Jeremy Holloway tense up, turn

**UNITED STATES DISTRICT COURT**

2-RenSER-00079                                      2-RenSER-00079

his body towards Deputy Renegar in attempt to grab
onto his ballistic vest.  I holstered my Taser and
grabbed Jeremy's right arm and attempted to do an
arm bar takedown.  Jeremy, Deputy Renegar, and I
fell to the ground."

      Do you see that?  I mean, do you remember that?

      Maybe we can publish that portion so that you can
agree with me.

      **(Exhibit displayed.)**

BY MS. MKRTCHYAN:

Q    And then you wrote:

"I immediately -- I told Jeremy to stop
resisting and put his hands behind his back.  I
immediately grabbed Jeremy's right hand and
attempted to place it behind his back so that we
could handcuff him.  But Jeremy tensed up and
locked his hands under and along his chest/rib
area."

      Right?  So did I read it accurately, sir, your
report?

A    Yes, you did.

Q    Okay.  And isn't it true -- based on your report it
appears that Mr. Holloway was always face down because,
according to you, he had his arms, hands locked underneath his
chest area; true?

A     That is true.

Q     Okay.  And then if that is the case, isn't it true you never saw Mr. Holloway place Deputy Renegar in a headlock as he has claimed; true?

A     I never said he did.

Q     Right.  And isn't it true, according to your report, there is no -- no indication whatsoever that there was any aggressive move placing an officer in a headlock by Mr. Holloway?

A     I did not write anything about a headlock on my report.

Q     Well, okay.  But if you didn't write it, then it didn't happen; true?

          MR. WRONIAK:  Objection.  Misstates the evidence. Calls for speculation.

          THE COURT:  Overruled.

          THE WITNESS:  I remember -- like I said, from what I remember, Deputy Renegar saying something to the effect "He's got my head" or something to that effect, but I did not write that in my report.

BY MS. MKRTCHYAN:

Q     And, sir, when we asked you -- you remember at your deposition we asked you several times:  Did you ever see Mr. Holloway place Mr. Renegar -- Chad Renegar -- Deputy Chad Renegar in the so-called headlock.

          Do you remember that question asked of you several

2-RenSER-00081                                   2-RenSER-00081

times?

A    Yes, I do.

Q    Do you remember what you responded?

MR. HARRELL:  Improper use of the deposition.

THE COURT:  No.  Overruled.

You can answer that question.

THE WITNESS:  I do remember what I said.

BY MS. MKRTCHYAN:

Q    Okay.  And what did you tell us?

MR. HARRELL:  Improper use of the deposition.

THE COURT:  Overruled.

THE WITNESS:  That I did not see it.

BY MS. MKRTCHYAN:

Q    Okay.  And isn't it true, sir, you never saw Jeremy Holloway rotate on the ground, facing up Officer Renegar, as he has claimed, Deputy Renegar?  Do you remember?  Isn't it true you never saw him rotate on the ground?

MR. WRONIAK:  Objection. Compound.  Assumes facts not in evidence.

THE COURT:  Overruled.

You can answer the question.

BY MS. MKRTCHYAN:

Q    True?

A    I did not see him rotate.

Q    And isn't it true, sir, according to your previous

deposition testimony, you agreed with us that Jeremy Holloway was only passively resisting on the ground; true?

MR. WRONIAK: Objection. Improper use.

THE COURT: Overruled.

THE WITNESS: I remember saying that, but after, he was actively resisting on the ground.

BY MS. MKRTCHYAN:

Q    Wait a minute. So you testified one thing at one point in time, at the deposition, and then you changed your story another way, another time. Is that what you are telling us?

A    Well, I had made a mistake the first time around.

Q    How many more mistakes have you made?

MR. HARRELL: Objection. Argumentative.

THE COURT: Sustained. Stricken.

BY MS. MKRTCHYAN:

Q    So you say one time that he was passively resisting and then you said actively resisting, changing your words -- true? --to justify the use of force against this man?

MR. WRONIAK: Objection. Argumentative.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    Isn't there a difference between a passive resistance and an active resistance in your law enforcement?

A    Yes, there is.

Q    Sure. And then, sir, you also testified -- this

**UNITED STATES DISTRICT COURT**

deposition was very long deposition.  Do you remember that day when you were being deposed all day?

A     Yes, I do.

Q     You testified that Mr. Holloway was not physically combative on the ground.

Do you remember that?

MR. HARRELL:  Improper use.

THE COURT:  Overruled.

THE WITNESS:  Not on the ground.  I don't remember that part.  If you can show me that part, I would --

BY MS. MKRTCHYAN:

Q     Pages 297, 298.  Would you like me to show you those pages for you to read?

A     Please.

Q     Thank you.  Sure.

Please read for yourself for the record pages 297, 298, and let me know when you are done.  Thank you very much.

A     And I'm sorry, this is for him being -- I'm sorry.  What --

Q     Combative and what he was doing on the ground.  Thank you very much.  Yes.

**(Witness reads document.)**

THE WITNESS:  Okay.  I read it.

BY MS. MKRTCHYAN:

Q     Did you read both pages?

A    I did.

Q    Okay.  So you agree with me that according to your testimony at the deposition, you agreed that he was not physically combative on the ground?

A    I state on there that he was resistant.

Q    Okay.  And you've testified he was passively resisting; true?

A    It doesn't say "passive" or "active" on there.  It just says "resistant."

Q    You can continue reading pages 300 to 301, sir, where --
          **(Witness reads document.)**
          THE WITNESS:  I read it.

Q    Okay.  So earlier you said, "I said he was resisting"; right?  You denied that you told us that he was not physically combative; right?

A    Correct.

Q    Okay.

          MS. MKRTCHYAN:  Reading, Your Honor, from page 297, lines 22 through 25 -- Court's permission to read?

          THE COURT:  I don't have the transcript in front of me, Counsel.  No one supplied that.  Could I see it?

          Tomorrow I would appreciate knowing which witness will be testifying so I can get out those transcripts.  Thank you, Counsel.

          Just a moment.  Page 290- what?

**UNITED STATES DISTRICT COURT**

MS. MKRTCHYAN: 297, lines 22 through 25, and continuing on 298.

THE COURT: That is not the question that was asked here. That's not appropriate. 298, which lines?

MS. MKRTCHYAN: 298 continuing on lines 1 through 4. And there's no objection, by the way, Your Honor.

THE COURT: Counsel, different words are being used here: "combative," "physically aggressive," "passive-aggressive," et cetera. I think you should be asking -- and I suggest ask the witness what he saw and what he heard first. We're getting into the depositional transcripts, and we're attempting to impeach him without asking the proper question to begin with. So we're getting into a whole series of transcripts. So just re-ask the question again.

MS. MKRTCHYAN: I asked him.

THE COURT: Ask him again.

MS. MKRTCHYAN: I asked him. Was he passively resisting or not on the ground?

THE WITNESS: On the ground, he was actively resisting.

BY MS. MKRTCHYAN:

Q   Okay. But you testified earlier that he was not actively resisting.

MS. MKRTCHYAN: And this is where his testimony is inconsistent, Your Honor. We've already gone through this.

UNITED STATES DISTRICT COURT

2-RenSER-00086          2-RenSER-00086

THE COURT: No. Your question, Counsel, is overall. If you look at Question 1 through 5, it doesn't pertain to that particular time period while he's on the ground. It's -- we're talking about a physically or aggressive person. And you're referring to the overall situation, not this particular point in time. This objection is sustained.

Now, I'm going to preclude this testimony, Counsel, unless you can, quite frankly, ask him about what he said, he heard, he did. This is becoming unduly consumptive of time. I'm going to give you until 2:30 to conclude your direct examination.

BY MS. MKRTCHYAN:

Q    Isn't it true, sir, you didn't see Jeremy Holloway choke or restrain Renegar?

A    No, I did not.

Q    You didn't see Renegar also band his legs; true?

A    I'm sorry. Can you repeat --

Q    Did you see Deputy Renegar band Jeremy Holloway's legs before application of Taser?

A    I don't recall seeing that.

Q    Isn't it true you didn't see Jeremy Holloway kicking with his legs?

A    Again, I didn't see. I was too busy with his hand.

Q    Okay. That's one hand. Which hand were you busy with, sir?

UNITED STATES DISTRICT COURT

A    The right hand.

Q    Okay.  And you were listed in his report -- in your report as the victim of Jeremy Holloway; true?

A    I did not list myself as a victim on my report, no.

Q    Well, in Deputy Chad Renegar's report, you were listed as the victim of a battery on a peace officer, weren't you?

A    I don't recall.

Q    Let's look at Exhibit 35, the -- Deputy Chad Renegar's report, please.  Exhibit 35 where he was listing you among Kevin Pahel and himself as the victim.

         MS. MKRTCHYAN:  With the Court's permission, we will publish the report by Deputy Chad Renegar.

BY MS. MKRTCHYAN:

Q    And confirm with me that you, with --

         THE COURT:  Just a moment.  Please take that down.

         Any objection?

         MR. WRONIAK:  No objection.  We just need to identify it as --

         THE COURT:  Now you may publish, Counsel.

         MR. HARRELL:  It needs to be identified as 35-1, Your Honor.

         THE COURT:  35-1.

BY MS. MKRTCHYAN:

Q    Isn't it true this is the report written by Deputy Chad Renegar?

2-RenSER-00088                                    2-RenSER-00088

A    Yes, it is.

Q    And all three of you are listed as victims in this crime of battery on a peace officer; true?  You, Gonzalez, Pahel, and Renegar; true?

A    Yes, that is correct.

Q    Do you have any understanding as to how on earth could you have been his victim if there is no indication anywhere in your report, in anybody's report that Mr. Holloway used violence towards you, sir?

            MR. WRONIAK:  Objection.  Argumentative.

            THE COURT:  Sustained.  But you could restate the question, Counsel.  It was appropriate.  You can ask it.

BY MS. MKRTCHYAN:

Q    Did Mr. Holloway ever punch you?

A    No, he did not.

Q    Did he ever place you in a headlock?

A    No, he did not.

Q    Did he ever kick at you?

A    No, he did not.

Q    Did you ever sustain any injuries as a result of this so-called incident?

A    I did not.

Q    Okay.  But you were listed as the victim of a battery on a peace officer, weren't you, by Deputy Chad Renegar?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    Okay.  And then isn't it true you saw a fourth deputy? We have not only you, Pahel, and Renegar with him on the ground, now we have a fourth deputy place his knee on Jeremy Holloway's back before you heard the Taser applied by Renegar; true?

A    Yes, that is correct.

Q    And we've established that the application of Taser is not warranted on a passively resisting individual; true?

MR. WRONIAK:  Objection.  Relevance.  403.

THE COURT:  You can answer the question.

THE WITNESS:  On the ground he's actively resistant, so, yes.

BY MS. MKRTCHYAN:

Q    So he's actively resisting even though you have -- you have four officers involved with him with the body weights in the use of force against him.  Is that what you are telling us?

A    Yes, I am.

Q    Okay.  And you don't -- testified previously at the deposition that he was not fighting with you, he just didn't want to be cuffed.

Do you remember that?

MR. HARRELL:  Improper use of the deposition.

BY MS. MKRTCHYAN:

Q    Before the Taser was applied.

THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

You can answer the question.

BY MS. MKRTCHYAN:

Q    Do you remember that?

A    I remember that, yes.

Q    Okay.  You said that, didn't you?

A    Yes, that he was resisting, yes.

Q    Okay.  Well, no.  Let's look at your actual words.  Words matter.  You agreed that he was not fighting, that he was not actively resisting, at your deposition.

A    Him holding his hands underneath his rib cage/chest area is actively resisting.

Q    Oh, really?  So if I have my hands -- and by the way, you said you were holding his arm, didn't you?

A    I wasn't holding.  I was trying to pull it back behind his back.

Q    Okay.  Is that active resistance if I have my arms underneath my body?  Is that considered active resistance?

A    Yes, it is.  I'm trying to pull your hand behind your back so I can handcuff you, and you're fighting me.

Q    Fighting.  You're using a lot of words interchangeably.

        MR. HARRELL:  Motion to strike.

        THE COURT:  Stricken.

        Just re-ask the question, Counsel.

BY MS. MKRTCHYAN:

Q    Sir, do you want us to go back to your deposition?

**UNITED STATES DISTRICT COURT**

2-RenSER-00091                    2-RenSER-00091

THE COURT: Counsel, just re-ask the question.

BY MS. MKRTCHYAN:

Q    So was he fighting or was he not fighting?  How was he fighting?  Tell this jury how he was fighting on the ground. You have four officers on top of him.  He's fighting you.  How was he fighting?

A    He is not allowing me to pull his hand out from underneath his body.  So he is -- like a tug of war, so to speak.  So that is one way to explain it.

Q    Okay.  And he's got his hands underneath his body.  He has multiple officers with their body weights.  He's compressed on the ground.  And you're telling me that you can't pull his arms from underneath his body; true?

A    That is exactly what I'm telling you.

Q    Okay.  But if I'm compressed on the ground face down by multiple officers with their armor, with their body weights, with their knees striking me, am I going to be able to pull my arms from underneath my body?

MR. WRONIAK: Objection. Argumentative. Assumes facts not in evidence.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    You just told me.  You said -- let's go back to your report because you said, "Oh, I" -- let's go back to your report.

2-RenSER-00092                    2-RenSER-00092

MS. MKRTCHYAN:  Pull 34, please.

BY MS. MKRTCHYAN:

Q    You said:

"I immediately grabbed -- after he went down to the ground, I immediately grabbed Jeremy's right hand and attempted to place it behind his back so that we could handcuff him.  But Jeremy tensed up and locked up his hands under and along his chest/rib area."

Chest/rib area is upper chest; true?

A    Yes.

Q    Okay.  And:

"At this point, other deputies arrived and assisted me by grabbing his right hand and pulling it free from under his chest"; right?

A    Yes.

Q    Okay.  Let's read this and see where is he fighting here.

"At this point -- so I managed to place his right hand behind his back.  I saw Deputy Renegar had lost control of his left hand and heard him tell Jeremy to stop resisting or he would get tased."

And then there was the application of Taser.

Did we hear anywhere here that he was kicking his legs, trying to get officers off of top of him?  Did we hear

UNITED STATES DISTRICT COURT

42

that here?

A    I did not put that in my report.

Q    And we asked you more details at your deposition; true?

A    Yes.

Q    We asked you to describe this in detail; true?

A    Yes.

Q    And you corroborated to us that you never saw him kick at anyone; true?

A    That is true.

Q    You never saw him actually punch at anyone or strike anyone on the ground; true?

A    That is true.

Q    And you never saw him choke or place anyone in a headlock; true?

A    That is true.

Q    Okay.  And this entire use-of-force incident, according to your PVS recording, says how many minutes, sir?

A    I don't know.

Q    About two minutes?  We will review that in a moment.

But in any event -- now, you were taking him into custody.  You were placing handcuffs on him, weren't you?

A    Yes.  I was trying to, yes.

Q    But if he heard -- we just heard that you weren't just investigating this call.  You had not placed him under arrest yet.  Why were you taking him into custody in the first place,

2-RenSER-00094          2-RenSER-00094

sir?

A    We weren't.  I think I said earlier that we were trying to detain him, and he wasn't obeying our commands.

Q    Okay.  But, sir, isn't the other way -- there could be other ways for you to detain someone; true?  You've learned that; true?

A    Yes, there's multiple ways of detaining someone.  But in this situation, that was what I felt was right.

Q    In this situation we've heard everything.  We've heard the 911 calls.  We've heard everything so far, and we watched a video; right?  This is the situation we are talking about.

            MR. WRONIAK:  Objection.  Vague.

BY MS. MKRTCHYAN:

Q    Right?

            THE COURT:  Do you understand the question?

            THE WITNESS:  I do.

            THE COURT:  You can answer then.

            Overruled.

            THE WITNESS:  We're talking about this situation, yes.

BY MS. MKRTCHYAN:

Q    Okay.  But -- so your tactics, on this day, you decided to detain someone, use force, beating to that condition and then investigate what crime he had committed; true?

            MR. WRONIAK:  Objection.  Argumentative.

**UNITED STATES DISTRICT COURT**

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    And isn't it true, sir, even though you did admit in your report that he was bleeding from his right side -- right side of his head, you have absolutely no explanation whatsoever in your report how this man sustained this head injuries; true?

MR. HARRELL: Objection. A 403 at this point.

THE COURT: Overruled.

MR. HARRELL: He said it again and again.

THE COURT: You can answer that question.

But this will be the last time. We've asked and answered this now two or three different times. You can re-answer the question.

THE WITNESS: I'm sorry. What was the question here?

BY MS. MKRTCHYAN:

Q    Head injuries. How did this man get his head injuries? There's no explanation in your report anywhere; true?

A    There is no explanation in my report because I told you how I felt he -- or how I believed he got them. But, no, there's nothing like that in my report.

Q    And you are trained to identify use of force and describe injuries in your report; true?

A    Yes, and I put the injury he had on his body.

Q    And isn't it true, sir, you are also trained to report

UNITED STATES DISTRICT COURT

45

truthfully and honestly the use of force, how it happened to your supervisor when he arrives to the scene?

A     Yes.

Q     And you were there from the beginning until the end of this use of force; true?

A     That is true.

Q     And yet right now -- as of right now, you are sitting here today, can you tell us how he sustained his head injuries?

            MR. HARRELL:  Objection.

            MR. WRONIAK:  Objection.

            THE COURT:  Sustained.  This has been asked and answered, Counsel, four times.

BY MS. MKRTCHYAN:

Q     Isn't it true you are denying that he was kneed in the head by deputies?

A     I didn't see any of that.

Q     But you can't deny it if you didn't see it; true?

A     I can't.

Q     So it could have happened?

            MR. HARRELL:  Can he finish his answer?

            THE WITNESS:  I can't testify to it because I didn't see it.

BY MS. MKRTCHYAN:

Q     Okay.  But you heard him scream on that ground -- and we will hear the tape -- "You are kneeing me in the head," didn't

UNITED STATES DISTRICT COURT

46

you?

A    I heard that, but I did not see it.

Q    Okay.  And you saw him bleeding before you pulled him off the ground, didn't you?

A    No, I did not.

Q    Well, how, then, did you see him bleeding when you wrote in your report, sir?

A    After we picked him up off the ground.

Q    So now, if this man was -- as you've described to us, all that you've described he was doing, would head strikes be permissible?

MR. WRONIAK:  Objection.  Calls for a legal conclusion.  Expert testimony.

THE COURT:  (Reading:)

"So now, if this man was -- as you've described to us, all that you've described he was doing, would head strikes be permissible."

BY MS. MKRTCHYAN:

Q    According to your policy and training?

THE COURT:  I don't think the jury has enough facts in front of it, Counsel, to have that question understandable.  We haven't laid out or heard the second incident yet.  That's --

MS. MKRTCHYAN:  This is the second incident, Your Honor.

**UNITED STATES DISTRICT COURT**

2-RenSER-00098                                   2-RenSER-00098

47

THE COURT: I know, but the jury has no idea, Counsel, what we're talking about. We haven't shown that second incident or anything surrounding it.

MS. MKRTCHYAN: I object, Your Honor. What incident are we talking about? This is confusing to the jury.

THE COURT: We actually have a tape of this, don't we?

MS. MKRTCHYAN: We are going to play the tape, but I am asking him based on his training.

THE COURT: I'm going to sustain the objection, Counsel. Thank you.

BY MS. MKRTCHYAN:

Q    In any event, sir, did any of you -- when Sergeant Rawlings arrived -- you were there when Sergeant Rawlings arrived; right?

A    I was.

Q    Okay. Did any of you explain to Sergeant Rawlings how Jeremy Holloway sustained head injuries?

MR. HARRELL: "Any of you"? Lacks foundation.

THE COURT: You can answer that, and tell us who was there.

THE WITNESS: I wasn't there.

BY MS. MKRTCHYAN:

Q    So if you had witness --

Let me ask you this: You have a policy which says

**UNITED STATES DISTRICT COURT**

2-RenSER-00099                                          2-RenSER-00099

48

if you -- even if you are not involved in the use of force, you witness another deputy use force, you have to report it; true? True?

A    I report what I did, and that's why I did my use of force report.

Q    No, wait a minute.  The policy says regardless of what you did or you do not do, even if you witness, you are obligated to report it.  I'm asking you about your understanding of your policy; true?

Let's open the policy -- use-of-force policy, which is 300-7.  You have an obligation to report all kinds of use of force that you witness, true?

A    Yes.

Q    Okay.  And if you had witnessed the head strikes, someone kneeing Mr. Holloway in the head, causing his bleeding and his head injuries, if you had witnessed punching in the face, would you have an obligation to report it to your supervisor, sir, under your policy 300- -- .7?

MR. WRONIAK:  Objection.  Vague.

THE COURT:  Do you understand the question?

MR. WRONIAK:  Incomplete hypothetical.

THE COURT:  Do you understand the question?

THE WITNESS:  I do not.

THE COURT:  Re-ask it.

BY MS. MKRTCHYAN:

**UNITED STATES DISTRICT COURT**

Q    Let's look at the policy.  300 --

THE COURT:  No, Counsel.  Put the policy down now for just a moment.  Just ask him the question again about use-of-force policy and whether he has a duty to report it.

BY MS. MKRTCHYAN:

Q    Do you have a duty to report any use of force that you witness?

A    My understanding --

THE COURT:  Counsel, just a moment.  We're going to take this screen down now.  I'm going to preclude this screen until I give permission to put it up.  This is a violation of that.  Understood?  All right.

Now, Counsel, ask him about this use-of-force policy.

BY MS. MKRTCHYAN:

Q    Yes.  So --

A    So my understanding of the policy is if they do not report it, then I need to report it.  But I do know that they did report it, so I did not report it.  And I only did what I -- I report what I did.

Q    So, wait a minute.  Let's look --

MS. MKRTCHYAN:  Actually, I need to pull the report because --

THE COURT:  Counsel, your next question now.

BY MS. MKRTCHYAN:

2-RenSER-00101                                    2-RenSER-00101

Q    Well, isn't it true the policy says --

THE COURT:  You're putting it up gratuitously without my permission.  I'm precluding this until I give my permission.

Ask your question now.

BY MS. MKRTCHYAN:

Q    Isn't it true the policy does not distinguish whether someone reports it or does not report it.  The policy simply says:

"Any employee involved in or who witnesses a use of force shall notify a supervisor as soon as practical.  Failure to notify supervisor of a use of force may result in discipline pursuant to department policy"; true?

Yes or no, did I read it accurately?  Yes or no?

A    The use of force was reported.

Q    Did you hear any officer report to Sergeant Rawlings how Mr. Holloway sustained head strikes?

A    No, I did not.

Q    Okay.  And if you had seen it and you had not reported, would that be a violation of your policy?  Yes or no?  I don't know?

A    No.

Q    Isn't it true -- no?

A    No.  Because I reported what I did, and my understanding

UNITED STATES DISTRICT COURT

51

is that they reported what they did.  So the use of force was reported, and it was documented.

Q    Again, we are going in circles, sir.  The policy speaks for itself.

MS. MKRTCHYAN:  Your Honor --

MR. HARRELL:  Motion to strike.

MS. MKRTCHYAN:  -- I request --

THE COURT:  It's argumentative.

MS. MKRTCHYAN:  -- to publish the use-of-force policy.

THE COURT:  No, Counsel.  Thank you.

BY MS. MKRTCHYAN:

Q    Now, sir, isn't it true head strikes are actually prohibited?

MR. WRONIAK:  Objection. Vague. Ambiguous. Incomplete hypothetical.

MS. MKRTCHYAN:  If you hit someone in the head --

THE COURT:  Just a moment, Counsel.

If it pertains to this incident and you're answering about this incident instead of a general answer, you can respond to that question.  In other words, if the use of head strikes is permissible in this situation.

But generally, there's too many variables in that question in a general -- when it's prohibited and when it's not.  So, Counsel, as far as this incident is concerned -- and

UNITED STATES DISTRICT COURT

the jury is not even aware yet of what this second tape is about -- that's what I'm cautioning you about.

BY MS. MKRTCHYAN:

Q    Sir, if you had seen it -- if you had -- you're saying you never saw head strikes; right?

A    Correct.

Q    Okay.  Would head strikes be permissible in this situation?

A    No.

Q    Okay.  Now, so if -- that would have been a violation of your policy to hit someone in the head like Mr. Holloway; true?

A    Yes.

Q    Okay.  And then now, you were driving alongside Deputy Pahel.  You testified -- well, you wrote in your report -- let's go back to your report where you said that there were several knives, hammers, machetes, and an ax in his campsite.

Do you remember that?

A    Yes, I do.

Q    Okay.  And isn't it true, these knives, hammers, machetes and an ax on his campsite were not strewn on the ground as Deputy Renegar claimed in his report; true?

MR. WRONIAK:  Objection.  Argumentative.  Assumes fact not in evidence.

THE COURT:  Well, it compares what Renegar says to

53

what you observed. If the question is "What did you observe?" you can ask him where the knives, machetes were. But I'm going to sustain the objection. This is not a comparison to what Renegar saw. He'll testify and allegedly tell us what he saw. So if you want to ask him what he saw, more than permissible.

BY MS. MKRTCHYAN:

Q    Did you see knives strewn on the ground?

A    I remember seeing knives on the ground, yes.

Q    You did see?

A    Yes, I did.

Q    Okay. So isn't it true, sir, we have patrol vehicle recording showing that there were not knives on the ground and it was Deputy Brown and you, you -- including you who went inside his tent into the backpacks and pulled those knives out and put them on the picnic table? Do you want me to play the tape?

          MR. HARRELL:  Motion to strike the testimony by plaintiff's counsel. Compound.

          THE COURT:  Well, it is compound, but the question basically is where you saw those knives. And if you went into different packs to retrieve knives -- or the tent, you can answer that question.

          THE WITNESS:  I remember seeing the knives the first time we were there. The second time I don't recall. And, no, I did not go in the tent to retrieve those knives. It was not

UNITED STATES DISTRICT COURT

me.

MS. MKRTCHYAN:  Let's play the tape now.  We are going to play Renegar's Tape 101- -- 102 -- 102-2.  And we request Karlen please provide transcripts.

THE COURT:  This is going to be the tape of the second incident?

MS. MKRTCHYAN:  Yes, Your Honor.

THE COURT:  Now you're going to see the second incident.  And that way maybe it will become a little bit more understandable.  So we're going to give you a transcript.  And remember, this is going to be from Renegar's body cam now as he's responding out to that scene.  It's not from this officer, but it's from Renegar approaching.  So I think you'll see the scene now on the second incident.

Now let's play the tape.  Go all the way through without interruption.

Then right after this, ladies and gentlemen, we'll take a recess, okay.  Bear with us.

**(Videotape played, not reported.)**

THE COURT:  If you're watching this, ladies and gentlemen --

Continue playing this continuously without stopping.

-- this is responding to the second incident.  This is the response after the first time they've been to the scene.

**(Videotape played, not reported.)**

**UNITED STATES DISTRICT COURT**

THE COURT: As you're watching this, you've heard the audio of that first encounter, and you've heard testimony about this private citizen calling and the dispatcher calling back with information. Now they're responding back.

**(Videotape played, not reported.)**

THE COURT: As you're watching this, let me remind you this is Renegar's patrol car. This isn't this officer's patrol car.

**(Videotape played, not reported.)**

THE COURT: Now your transcript should pick up at that point.

**(Videotape played, not reported.)**

THE COURT: Ladies and gentlemen, why don't you take a recess for about 15 minutes, and then we'll try to send you home about 4:30. You're admonished not to discuss this matter amongst yourselves nor form or express any opinions concerning the case.

**(Recess from 3:13 p.m. to 3:31 p.m.)**

**(In the presence of the jury.)**

THE COURT: The jurors are present. All counsel are present. The parties are present. And in talking to counsel, I'm going to leave about another hour for direct examination, and then we'll start cross-examination of the witness tomorrow.

And now it should make a little more sense to you. You've got the first incident, the audio, and some of the

UNITED STATES DISTRICT COURT

video.  And you've got the second incident now.  You've got a tape and some audio and video.  Now you have kind of a better picture of what the response was, what the initial was, what the in-between was.  Now we should be able to ask some more concise questions.

So Counsel --

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q     -- go back to the video --

MS. MKRTCHYAN:  With the Court's permission, we'll go back to the video.

BY MS. MKRTCHYAN:

Q     So, sir, when you reviewed this video, at 5:11 time counter, we see you standing near Mr. Holloway's tent; isn't it true?

A     Yes.

Q     And isn't it true -- this is after Deputy Chad Renegar asked you and other officers, including Deputy Matt Brown, to grab the knives.  Remember that?

A     He did not ask me.  He asked Deputy Brown.

Q     Okay.  Let's play this and see what you are doing near the tent.

**(Videotape played, not reported.)**

MS. MKRTCHYAN:  Stop right there.

BY MS. MKRTCHYAN:

2-RenSER-00108                                              2-RenSER-00108

Q    So what were you doing near his tent at that point in time, sir?

A    Honestly, I do not recall.  I might have been looking inside, but I don't recall what I was doing.

Q    Okay.  But isn't it true, sir, you saw Deputy Brown -- after Deputy Chad Renegar asked to grab the knives, Deputy Brown went inside the tent and took the knives and placed the them on the picnic table; true?

         MR. WRONIAK:  Objection.  Assumes facts not in evidence.

         THE COURT:  Overruled.

         You can answer the question.

         THE WITNESS:  I know that he was told to pick up the knives or grab the knives, but I don't remember him -- I wasn't there when he did that.

BY MS. MKRTCHYAN:

Q    Well, let's play that and see who's Deputy Brown and where you were at that point in time.

         MS. MKRTCHYAN:  Let's play that, sir, please.

         **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Okay.  Is this Deputy Brown, sir?

A    Yes, it is.

Q    Okay.  So isn't it true he was walking from the direction of the picnic table towards the tent in this juncture, 5:13?

2-RenSER-00109                    2-RenSER-00109

A     Yes.

Q     Okay.  And isn't it true -- let's look what he just said.

                    **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     You saw at this juncture Deputy Brown pick up something from inside the tent and walk towards the picnic table; true?

A     Yes, in the video I did see that.

                    **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     You saw him, again, go inside the tent and pick up something and go towards the picnic table; true?

A     Yes, I'm seeing him do that.

Q     Okay.  So let's look at the photos of the picnic table where he went and placed the knives.

         MS. MKRTCHYAN:  Please, let's show the photographs 100-1 through 100-12, the photographs taken by Deputy Chad Renegar at the scene, with the Court's permission.  So we'll show all the photographs taken by Deputy Renegar of the incident and the scene.  Publish it.

                    **(Documents displayed.)**

BY MS. MKRTCHYAN:

Q     You were there when Deputy Renegar was taking these pictures, were you?

A     I was not in the immediate area.

Q     Okay.  In any event, so this is -- we already covered.

**UNITED STATES DISTRICT COURT**

2-RenSER-00110                                    2-RenSER-00110

This is Mr. Holloway, the 100-1, after the use of force; true?

A     Yes.

Q     Okay.

          MS. MKRTCHYAN:  Next.  100-2.

          You need to show all the photos.

          Okay.  100-3.

          **(Document displayed.)**

BY MS. MKRTCHYAN:

Q     So we see -- this is, again, Mr. Holloway bleeding, where he was sitting?

A     Is there a question or --

Q     Yes.  Is this Mr. Holloway sitting there on the log bleeding after the incident?  Yes or no or I don't know?

A     Yes.

Q     Okay.  Next picture, is this Mr. Holloway's hands and jacket, bleeding with blood after the incident in handcuffs?

A     Yes, it is.

          THE COURT:  Is that 100-3?

          MS. MKRTCHYAN:  100-4.

          THE COURT:  Just a moment.  100-1 was Mr. Holloway's face.  100-2, you told me, was the blood on the ground.  100-4 is the next one; is that correct?

          MS. MKRTCHYAN:  Your Honor, we will have that all covered later.  Thank you.  100-1 --

          THE COURT:  No, no.  Just a moment.  I need

60

direction. You take direction from me now.

What is this photo?

MS. MKRTCHYAN: Which one are we talking about? 100-4?

THE COURT: -4. So we skipped 100-3?

MS. MKRTCHYAN: His hands.

THE COURT: We skipped 100-3.

MS. MKRTCHYAN: 100-3.

THE COURT: Okay. Is this 100-3?

MS. MKRTCHYAN: Uh-huh. Yes. Thank you.

THE COURT: Okay, Counsel, I need this for my record now. Oh, no, we're going to follow my directions now.

MS. MKRTCHYAN: Yes, Your Honor.

THE COURT: Show me 100-1. Put that up on the screen, please. This is going to be an accurate record now. All right. Show me 100-2.

**(Document displayed.)**

THE COURT: No. Is this going to be 100-2, a second photo of Mr. Holloway? All right. This is 100-2.

The blood on the ground that you referred to as 100-2 just a moment ago, is that going to be 100-3?

MR. FARAHMAND: Yes.

THE COURT: All right. Now show me 100-4.

**(Document displayed.)**

THE COURT: All right. Fine. Hands.

**UNITED STATES DISTRICT COURT**

2-RenSER-00112          2-RenSER-00112

61

Now make these labels accurate.  I need the record for this.  Okay.  Please continue.

BY MS. MKRTCHYAN:

Q     100-5, sir, is that also his hands?

A     Yes.

Q     Do you see his hands -- and we see blood on his hands and his jacket?

THE COURT:  Counsel, what Exhibit --

MS. MKRTCHYAN:  This is 100-6.

THE COURT:  100-6.  Thank you.

BY MS. MKRTCHYAN:

Q     This is the ground where he was picked up; true?

A     Yes.

**(Document displayed.)**

BY MS. MKRTCHYAN:

Q     100-7; true?

A     Yes.

Q     Okay.  Do we see any knives on that ground right now in this picture?

A     I do not.

**(Document displayed.)**

BY MS. MKRTCHYAN:

Q     100-8, there is also -- this is the same close-up, the ground where he was picked up with blood; true?

A     Yes.

**UNITED STATES DISTRICT COURT**

62

Q    Do we see any knives there in that vicinity of that ground?

A    No.

Q    This is his campsite we have on the 100-9.  On the right side we have a sleeping tent, picnic table in the background, firepit, a dog.  And on the left side is the sleeping tent where he was sleeping; true?

A    Yes.

Q    Okay.  And this is where -- the blood is where the use of force occurred; true?

A    Yes.

Q    Okay.  Do we see any knives here on this picture, strewn on the ground?

A    I do not.

            **(Document displayed.)**

BY MS. MKRTCHYAN:

Q    Okay.  Now, let's go back to another picture.  This is also another view of -- 100-10, another view of the campsite of Mr. Holloway; true?

A    Yes.

Q    Okay.  Do we see any knives, et cetera, anything on this picture?

A    I do not.

            **(Document displayed.)**

BY MS. MKRTCHYAN:

**UNITED STATES DISTRICT COURT**

Q   Okay.  So there is the picture of where we see the knives after Chad Renegar asked Deputy Brown to grab the knives. 100-11.  This is on the picnic table; true?

A   Yes, it is.

Q   Okay.  And this is all the knives that you confiscated and booked into property from Mr. Holloway; right?

A   No, I did not do any of that.

Q   Well, your officers, your deputies.

A   Yes.

Q   Okay.  And isn't it true, based on the video of Deputy Renegar and Deputy Pahel, your trainee, we see Deputy Brown going to the inside of the tent and pick the knives and place them on the picnic table; true?

MR. WRONIAK:  Objection.  Assumes facts not in evidence.

THE COURT:  Overruled.

THE WITNESS:  I see him pick something up.  I'm not sure what it was.

BY MS. MKRTCHYAN:

Q   From prior proceedings you have heard Deputy Brown testify that he went into the inside of tents and picked up knives and put them on the picnic table; true?

MR. HARRELL:  Objection.

MS. MKRTCHYAN:  What is the objection there?

THE COURT:  Just a moment.

**UNITED STATES DISTRICT COURT**

64

The objection is?

MR. HARRELL:  Improper use of the prior proceeding.

MR. WRONIAK:  Also hearsay.

THE COURT:  I think you can ask him about what he saw, he did, he heard.  So re-ask the question.

BY MS. MKRTCHYAN:

Q    You were present at prior proceedings; true?

A    Yes.

Q    And you heard Deputy Brown testify; true?

A    Yes, I did.

Q    Isn't it true Deputy Brown testified that he went inside the tent of Mr. Holloway, picked up the knives, and put them on the picnic table?  Do you remember that?

MR. WRONIAK:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Okay.  So we can --

MS. MKRTCHYAN:  Next picture.  Let's have the next picture.

BY MS. MKRTCHYAN:

Q    And this is camp -- his sleeping -- this is 100-12.  This is his sleeping tent; true?

A    By "sleeping tent," do you --

Q    I'm sorry, the supplies tent.

A    Yes.

2-RenSER-00116          2-RenSER-00116

Q     Okay.  And when you first came to his campsite, you searched both his sleeping tent and supplies tent -- true? -- to find if there was a female there; true?

A     I did not.  I know the other deputies did, but I did not.

Q     Okay.  So now in your report also, we don't have any indication when you arrived the second time that there were knives strewn on the ground and near Mr. Holloway's reach; true?

A     That is true.

Q     And going back to the video when Mr. -- Chad Renegar --

          MS. MKRTCHYAN:  Play the video please, 5:19.

          **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     When Deputy Renegar on tape, at 5:19 time frame, explains to Sergeant Rawlings so-called headlock -- how Mr. Holloway allegedly placed him in a headlock --

          MS. MKRTCHYAN:  Let's play that part again.  5:19, please.

          **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     5:20, isn't it true -- this is Chad Renegar telling your Sergeant, Rawlings, how Mr. Holloway placed him in a headlock when he was taking him down to the ground; true?

A     Yes, that's true.

Q     Okay.  And you testified that you were present during

this entire use of force from the beginning until the end; true?

A     Yes, that is true.

Q     And you testified that you participated actively in the arm bar takedown by Deputy Renegar by assisting him; true?

A     That is true.

Q     Okay.  And yet how could you not have seen this claimed headlock by Mr. Holloway if you were there, you were present, from the beginning until the end?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  No.  Overruled.

You can answer the question.

THE WITNESS:  I didn't see it because it was really dark.  And again, I was focusing on his right hand myself to try and handcuff him.

BY MS. MKRTCHYAN:

Q     But you saw him, as you said, grabbing him by the ballistic vest; right?  You wrote that in your report; true?

A     Yes, that is true.

Q     So it wasn't dark enough to see how Holloway grabbed him by the ballistic vest, but it was too dark to have seen this claimed headlock by Chad Renegar?

A     Yes, that is correct.  That happened when we first approached him, and I had my Taser out and the flashlights out so I was able to see distance.  And you're talking about on the

2-RenSER-00118                                          2-RenSER-00118

67

ground where my flashlights -- I don't know where my flashlight was at.

Q    In any event, we don't hear anywhere on this tape that we played about the use of force anywhere, Chad Renegar complaining that "He's got my head," giving you, other officers, warning that he might be in danger; true?

MR. WRONIAK:  Objection.  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  No.  Can you restate the question, please.

BY MS. MKRTCHYAN:

Q    Do you have any indication on the tape that Chad Renegar had his -- had his head locked by Mr. Holloway, placing him in danger?

MR. HARRELL:  403 with this witness.

THE COURT:  Renegar will testify?

MR. HARRELL:  Yes.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    You were present.

MS. MKRTCHYAN:  He was present.

BY MS. MKRTCHYAN:

Q    You were present.  So --

THE COURT:  Counsel, Renegar will testify.
Sustained.

UNITED STATES DISTRICT COURT

2-RenSER-00119                                    2-RenSER-00119

BY MS. MKRTCHYAN:

Q    In any event, isn't it true you were helping -- based on this videotape that we have played, you were helping Pahel with interviews of reporting parties.  And you came back and reported to Renegar your investigative results; true?

A    I wasn't helping him.  If I spoke to anybody, I don't recall because it was supposed to be Pahel doing all the interviewing.

Q    But you were talking among the officers.  You heard what Pahel said, and you were there, present; correct?

A    Yes, but your question was if I did the interviewing, and, no, I did not.

Q    Okay, sir.  But isn't it true, based on what occurred after the use of force, it turned out, based on what reporting parties told you, none of them saw Jeremy with a female; true?

A    True.

            THE COURT:  Would you repeat that question.  I don't --

BY MS. MKRTCHYAN:

Q    None of them saw Jeremy Holloway with a female that night; true?

            MR. HARRELL:  Vague.  Obscured fabric.

            THE COURT:  Overruled.  You can ask that question about the conversation, if anyone saw him with a female that night.

UNITED STATES DISTRICT COURT

THE WITNESS: Based on the conversation I heard them say, yes, that's what I heard. But I didn't talk to anybody; so I wasn't told directly that.

BY MS. MKRTCHYAN:

Q   Sir, you were there when Pahel -- I'm asking you what you learned as part of this investigation.

THE COURT: You asked him what he saw. Now are you asking what he learned?

MS. MKRTCHYAN: Yes.

THE COURT: All right. Now your question.

BY MS. MKRTCHYAN:

Q   You learned that no one saw Jeremy Holloway with a female that night; true? Yes or no?

A   Yes. Based on this video, yes. That's what was said, yes.

Q   Okay. Nor did anyone actually see him going to anyone's campsite; true?

A   True.

Q   And no one specifically pointed out where exactly they heard noises; true?

MR. WRONIAK: Objection. Vague. Misstates the evidence. Assumes facts not in evidence.

THE COURT: No, just a moment. Question is: Nor did anyone actually see him going to anyone's campsite; true?"

If you know the answer, you can state it.

UNITED STATES DISTRICT COURT

THE WITNESS: What was the question again? I'm sorry.

THE COURT: The question was: "Nor did anyone actually see him going to anyone's campsite; true?"

THE WITNESS: True.

BY MS. MKRTCHYAN:

Q And no one specifically could point out exactly where they heard these noises; true?

MR. HARRELL: Vague. Incident one or two? Vague as to time.

THE COURT: I'm assuming it's either. Either the first response or the second response.

THE WITNESS: From what I'm gathering here, they could only point out in the direction of what they heard. But no one said specifically where it was at.

BY MS. MKRTCHYAN:

Q Right.

THE COURT: Also, your witnesses are going to be available to testify; correct?

MR. HARRELL: Yes. Fuerbach will be here.

THE COURT: All right.

MS. MKRTCHYAN: That's -- Your Honor, we are talking about --

THE COURT: But you're asking his summation. We're actually going to have those witnesses here, Counsel. There's

a lot of speculation.

Now let's move on.  You've got 35 minutes left.

MS. MKRTCHYAN:  We are interested in --

THE COURT:  You have 35 minutes left, Counsel.

BY MS. MKRTCHYAN:

Q     You made the determination -- isn't it true, sir? -- not to arrest Mr. Holloway for anything else but resisting police and battering a police officer; true?

A     False.  I did not make any decision on that.  It wasn't my call to make.

Q     I'm not asking you personally.  You and other officers arrested Mr. Holloway for resisting police and battery on a police officer where you were listed as a victim.  You personally; true?

A     False.  I personally -- I didn't do any of that.

Q     Sir, you were personally listed as a victim.  We just saw Renegar's report.  Do you want me to show that again?

A     So am I a victim, or am I an arresting party?

Q     You were the victim in this case where Mr. Holloway was arrested for resisting police and battery on a peace officer.  Yes or no?

A     Yes, I was listed as a victim.

Q     Was he arrested for domestic violence that night?

A     No, he was not.

Q     Was he arrested for intimidating a witness that night?

A    I don't know what he was arrested for, to be honest.

Q    So you wrote the report.  You've got Chad Renegar write a report.  And you don't know what he was arrested for?

MR. HARRELL:  Argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So you don't know what Mr. Holloway was arrested for that night?

MR. HARRELL:  Same objection.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Okay.  Let play, then, the tape where you guys were talking about arresting Mr. Holloway and for what reasons you were arresting him for.  This is Exhibit 100 -- Exhibit 102-6.  So let's play that tape where you, with Chad Renegar and Kevin Pahel, were discussing specifically what you were arresting my client for.  So maybe that will refresh your memory.

MS. MKRTCHYAN:  With the Court's permission, we will publish it to the jury, 102-6.

THE COURT:  You can play that portion.

MS. MKRTCHYAN:  Thank you.

(Videotape played, not reported.)

MS. MKRTCHYAN:  We are going to flash-forward to the point in time for the interest of time, Your Honor.

(Videotape played, not reported.)

UNITED STATES DISTRICT COURT

2-RenSER-00124                    2-RenSER-00124

BY MS. MKRTCHYAN:

Q    Sir, isn't it true in this picture -- in this frame, we see you with your Sergeant Rawlings and Kevin Pahel; true?

A    True.

Q    And this is after you spoke with the Winnebago, the RV reporting party, Brian Fuerbach; true?

A    True.

Q    Okay.  And isn't it true, isn't it, that Brian Fuerbach told you that he also did not see what he told the 911 dispatch; true?  He just said he heard noises and he called 911; true?

MR. WRONIAK:  Objection.  Vague.  Hearsay.

MR. HARRELL:  Multiple questions, too.

THE COURT:  Counsel, just a moment.  There's really two questions:

"And isn't it true, isn't it, that Brian Fuerbach told you that he also did not see what he told the 911 dispatch; true?  He just said he heard noises, and he called 911."

There are two questions there, but I think they can be taken together.  Do you understand them?

THE WITNESS:  Yes, I do.

THE COURT:  You can answer, then.

THE WITNESS:  True.

BY MS. MKRTCHYAN:

2-RenSER-00125                                        2-RenSER-00125

Q    Okay.  And after this discussion, you were discussing your report writing with Chad Renegar and Kevin Pahel and sergeant; true?

A    I don't recall what we were discussing.

Q    Okay.  Let's play it, then, for the benefit of everyone.

            (Videotape played, not reported.)

            MS. MKRTCHYAN:  Let me just make sure the frame is 5:49.

BY MS. MKRTCHYAN:

Q    This is you with your writing pad and a pen; true?

A    True.

Q    Okay.  And Kevin Pahel is right next to you to your right; right?

A    True.

Q    And you are discussing with Chad Renegar what to arrest him for, and he is discussing about whether you should even give him a ticket for expired registration; true?

A    True.

            (Videotape played, not reported.)

            THE COURT:  Counsel, before you go forward, 102-2 was Renegar's body cam that we looked at.  Counsel, please stop this tape for just a moment.  This is not Renegar's body cam. This is from Gonzalez; is that correct?

            MS. MKRTCHYAN:  No.

            THE COURT:  This is still Renegar?

UNITED STATES DISTRICT COURT

75

MS. MKRTCHYAN:  This is Renegar.

THE COURT:  Still Renegar.  Thank you.  So 102-2, then; correct?

MS. MKRTCHYAN:  No, this is 102-6.  This is another tape, Your Honor, as we discussed earlier.

THE COURT:  No, we didn't discuss this earlier.  This is 102-6.  Still Renegar, though, for my record?

MS. MKRTCHYAN:  Uh-huh.

THE COURT:  All right.  Thank you very much.

MS. MKRTCHYAN:  Thank you.

BY MS. MKRTCHYAN:

Q    So this is still the point in time when you are discussing your report writing with Kevin Pahel and Chad Renegar; true?

A    Right there where I'm -- from what I recall, I'm writing my notes from my report.  I don't hear a discussion of charges or anything like that.

Q    Well, let's continue.  Isn't it true at 5:55, the tape suddenly goes silent; true?

A    Yes, it did.

Q    Do you have an understanding why the tape suddenly at 5:55 -- 5:55, when we play, goes silent?  Do you have any understanding of that?

MR. WRONIAK:  Objection.  Speculation.

MR. HARRELL:  403 with this witness.

UNITED STATES DISTRICT COURT

THE COURT: Well, if you know. But this is Renegar's tape; correct? His body cam?

THE WITNESS: Yes.

THE COURT: Do you know the reason it went silent?

THE WITNESS: I do not.

THE COURT: Okay.

BY MS. MKRTCHYAN:

Q    And you know how to use your microphone on your patrol vehicle recording; true, sir?

A    Yes.

Q    Isn't it true there is a button you can turn it off?

A    Yes, there is.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So I want to make sure that we are clear on this. When he says "I take it I'm the primary on this one," what does that mean?

A    He's the handling deputy.

Q    We are talking about Jeremy Holloway's incident, not the other incident; true?

A    Yes.

Q    Okay.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    When he says "We need to find where this chick is," he

**UNITED STATES DISTRICT COURT**

means the female from the first call; true?

MR. HARRELL: Speculation.

THE COURT: Overruled.

You can answer the question, sir.

THE WITNESS: Yes.

BY MS. MKRTCHYAN:

Q    We are talking about Mr. Holloway when he says also, "We need to figure out what to charge him"; true?

A    True.

Q    And when he says "148, 243," what does he reference? Isn't it Penal Code sections of resisting police and battery on a peace officer?

A    True.

Q    Okay. And isn't it true, sir, after your investigation that night, even though you spent about an hour after the use of force at the scene, as we see on this tapes, you never once went to Campsite 66 next door to Mr. Holloway to check on that campsite if that was the campsite where the female was in distress, did you?

A    No, I did not.

Q    And neither did your Deputy Chad Renegar; true?

MR. WRONIAK: Objection. Speculation.

THE COURT: If you know, you can answer that.

THE WITNESS: I don't know if he did or not.

BY MS. MKRTCHYAN:

2-RenSER-00129                    2-RenSER-00129

Q    To your knowledge, did anyone from any of the deputies -- you, Kevin Pahel, Deputy Chad Renegar -- right now as you are standing here and talking about "We need to find this chick," to your knowledge, did anyone went to Campsite 66 next door?

A    I do not know.

Q    Wouldn't that be the next logical step in your investigation of finding the female who was beat up that night?

        MR. WRONIAK:  Objection.  Argumentative.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, you were called for disturbance to that campground in the first place because Brian Fuerbach called and said, "A man is beating on a woman.  It's really bad"; true?

        MR. WRONIAK:  Objection.

BY MS. MKRTCHYAN:

Q    And isn't it true officer's first job duty is to investigate calls and to find victims; true?

        MR. WRONIAK:  Objection.  Speculation.  Compound.

        THE COURT:  Sustained.

        Ask your question, Counsel.

BY MS. MKRTCHYAN:

Q    And Sergeant Rawlings, when he arrived, he told you, "You need to find the female at the reservation"; true?

A    He didn't tell me that.  I think he told a different deputy that.

79

Q     Okay.  But you were part of this investigation; right?  You were one of the officers who were involved in this arrest; true?

A     Yes, I was.

Q     Okay.  And you -- neither you nor anyone else went to that Campsite 66, which was occupied; true?  There were cars parked there, and there was -- it was registered?

THE COURT:  Counsel, Counsel, this is compound already.  Just ask the question.

BY MS. MKRTCHYAN:

Q     And that campsite was occupied based on this PVS recordings we saw; true?  True?

A     I --

MR. WRONIAK:  Objection.  Calls for speculation.

THE COURT:  Counsel, you're referring to Campsite 66 -- is that correct? -- when you say "That campsite" --

MS. MKRTCHYAN:  Yes.

THE COURT:  -- "was occupied based on the PVS recordings we saw."

So based on what you've seen, you can answer that question.

THE WITNESS:  Based on this PVS, I see vehicles there, but I do not know if it was occupied.  I don't know if anybody was there or not because I didn't talk to anybody

UNITED STATES DISTRICT COURT

2-RenSER-00131                                                    2-RenSER-00131

there.

BY MS. MKRTCHYAN:

Q    Okay.  Did you know -- we have the registration of all campers for that night, don't we?

MR. WRONIAK:  Objection.  Speculation.  403.

THE COURT:  Just a moment.

BY MS. MKRTCHYAN:

Q    Isn't it true Campsite 66 that night was occupied, according to the registration?

MR. WRONIAK:  Objection.  Calls for speculation. Lacks foundation.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Exhibit 54 -- let's look at the Exhibit 54.

THE COURT:  Counsel, first of all, foundation.  He has to be aware of this.  And to start with, I think you need to ask if he's aware of 54 and the registrations that evening at the campsite.  Renegar and others are going to testify in this matter, and I think that that will become very clear to both sides.

MS. MKRTCHYAN:  Your Honor, is there any objection to have registration of the campers?

THE COURT:  I don't know.  Why don't you step over and see if the two of you can stipulate to it.

MR. HARRELL:  Your Honor, there's --

**UNITED STATES DISTRICT COURT**

2-RenSER-00132                                      2-RenSER-00132

81

THE COURT: That means why don't you two get up on your feet -- that's an order -- move towards each other and have a quick conversation and see if we can stipulate. Okay?

Now they're going to talk and see if they can save us some time.

**(Counsel confer off the record.)**

THE COURT: Well, this doesn't seem to be working out too well. So we'll continue on.

Eventually, folks, I think all of this will become clear, and it will all come in in some way or some form. But we'll see.

So, Counsel, we don't have a stipulation; right?

MR. HARRELL: That's correct.

THE COURT: Okay. Then it's what you know, what you heard, what you saw.

So, Counsel.

BY MS. MKRTCHYAN:

Q    Let's finish playing this, and then we will go into the other PVS recording, and we will show Campsite 66.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Why would you ask him, in this part, why we detained this guy at gunpoint? If you were there, you made the decision to -- you know, as you testified, to have guns drawn at him. Why did you ask him before writing your report?

UNITED STATES DISTRICT COURT

A    As in previous testimony, it was kind of something that we do, not kind of to just -- I don't want to say "cop humor," but kind of like just see what his thought process is.

Q    So that you corroborate what he's going to say in his report with your report; true?

A    No, because I didn't see his report until the trial started.

Q    In any event, sir, let's continue playing this.

          (Videotape played, not reported.)

BY MS. MKRTCHYAN:

Q    So we can see you talking.  We can see you writing in the report.  But suddenly at 5:55 up until -- for another four minutes -- over four minutes, as you are discussing the police report, we have no audio; true?

A    True.

Q    And this is Chad Renegar's patrol vehicle microphone; true?

A    Yes, it is.

Q    And you continue discussing this while he's --

          (Brief interruption.)

          THE COURT:  Sorry, sir, would you be kind enough to take the child outside.  It's distracting for this trial. Thank you very much.  You can bring the child in back later if you'd like to, but it's distracting for the jury.

          I'm sorry, Counsel.  Please.

**UNITED STATES DISTRICT COURT**

83

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    And so you continue talking, you continue writing your report while this tape is silent; true?  And we have Kevin Pahel there also coming with his laptop.  You're writing this report, and you are discussing it among each other, and yet we have no sound for this jury to hear what exactly you were talking about; true?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  (Reading:)

"So you continue talking, you continue writing your report while the tape is silent; true?"  That's one question.

"And we have Kevin Pahel there also coming with his laptop.  You're writing this report, and you are discussing it amongst each other, and yet we have no sound for this jury to hear -- or what exactly you were talking about; true."

Sustained.  Re-ask the question.  Just break it down.  Not compound.

BY MS. MKRTCHYAN:

Q    Kevin Pahel was also -- he wrote the report; true?

A    He wrote his own report, yes.

Q    Right.  And Chad Renegar wrote his report; true?

A    Yes.

UNITED STATES DISTRICT COURT

84

Q    All three of you wrote a report; true?

A    True.

Q    Okay.  And all three of you here are discussing the incident of Mr. Holloway; true?

A    Right.  Without having the audio, I don't know what we were discussing.

Q    Okay.  So -- and then we will just make sure that there is no sound here.  There is no sound for about over four minutes; true?  You've heard this tape before?

A    True.

Q    Okay.

MS. MKRTCHYAN:  Let's take that down and go back to the other tape for -- this was 102- -- to Renegar's first tape, 4:58.  And go to 5:08.  Play that.

BY MS. MKRTCHYAN:

Q    Isn't it true this is Renegar's car being turned around to face Mr. Holloway's campsite after the use of force, at 5:08?

A    Yes.

Q    Okay.  And isn't it true --

MS. MKRTCHYAN:  Let's continue playing.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    This is Campsite 66; isn't it true?  Did you see that?

A    Yes.

UNITED STATES DISTRICT COURT

Q    Okay.  And isn't it true there were two cars parked there?  Let's make sure it's clear again.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    We saw that, but I just want to ask you this:  So you saw -- how far was Campsite 66 from Campsite 65?  Give me a ballpark.  How many feet?

A    I'm not sure, to be honest.

Q    Based on what you know from this videotapes and based on the maps that we've seen, isn't it true Campsite 66 is right across from Campsite 67?

A    Yes.

Q    Okay.  And isn't it true when you first arrived to the campsite, that -- before the first encounter with Mr. Holloway, you had, on Chad Renegar's tape, conversation with Joshua Gomez; true?

A    Yes, I did hear that.

Q    And isn't it true Joshua Gomez at Campsite 67, when you asked him about the DV noise, the domestic violence noise, he said, "I heard right across"; true?

A    You mean when Deputy Renegar asked him?  Yes, I heard that on the audiotape.

Q    And right across from 67 is 66, based on this map and based on this PVS recordings, true, sir?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    And yet no one, no one, among how many officers we've seen arrive to this scene ever that night, that morning went to Campsite 66.  Is that what you are telling us?

MR. WRONIAK:  Objection.

MR. HARRELL:  Rule 403.  Very repetitive.

THE COURT:  Overruled, but it's argumentative.  I'm going to strike the question.

You can re-ask it.

BY MS. MKRTCHYAN:

Q    Did you -- anyone go to Campsite 66 to find that female to resolve a domestic violence incident you were called that night?

A    I did not.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Two cars parked with stuff there, and we can see how dark this campground is.  If you didn't turn your vehicle towards the campsite, would you be able to see what was happening without flashlights, sir?

A    No, we wouldn't.

Q    So isn't it true, Mr. Fuerbach, who called 911, he was talking -- this was around the same time in the dark campground.  He was telling everyone, 911, that "I heard the woman beat up"; true?  This is the same conditions, night, dark campground; true?

MR. WRONIAK: Objection. Argumentative. Compound. Speculation.

THE COURT: Compound. Sustained.

Just re-ask the question.

BY MS. MKRTCHYAN:

Q    So that 911 call that came in by Brian Fuerbach, registering this DV, happened at 3:39 in the morning. We heard this in this case; true?

A    True.

Q    And it was still dark; true?

A    Yes.

Q    Okay. And yet no one that day, after you arrested Mr. Holloway, went to Campsite 66 to see if that was where the female was; true?

MR. HARRELL: 403.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    And isn't it true my client, the only reason he was arrested that day was because he hesitated to get down on the ground; true? You taught him a lesson. You didn't like his attitude?

THE COURT: Counsel, once again, that's compound. Ask the question.

BY MS. MKRTCHYAN:

Q    True?

2-RenSER-00139                                        2-RenSER-00139

THE COURT: No. Re-ask the question.

BY MS. MKRTCHYAN:

Q    So we know now even when you arrived, you did not have evidence that he was involved in DV. You did not have evidence that he was assaulting a little girl. You did not have evidence that he was committing any crime, went into someone's RV. He was standing in his own campsite, as we discussed, and you arrested him, and you used force against him, and you injured him because he didn't get down on the ground; isn't it true?

MR. HARRELL: Compound.

THE COURT: Sustained.

MS. MKRTCHYAN: I have no further questions. Thank you.

THE COURT: All right. Then we'll start your cross-examination tomorrow.

Now I'm going to ask each of you to come back. We have another matter at 4:30, and you're ordered back to my court at 5:30 this evening. Thank you. Please be prompt, with the parties. Okay. Thank you.

Can we resume at 8:00 o'clock tomorrow morning?

**(No audible response.)**

THE COURT: Forget about this case. That means forget about the case. You go home. Don't discuss it. Don't form or express any opinion in your own mind. We'll see you

**UNITED STATES DISTRICT COURT**

tomorrow at 8:00 o'clock.  Thank you.

**(Further proceedings recorded by CourtSmart**

**in Volume V.)**

**-oOo-**

**UNITED STATES DISTRICT COURT**

2-RenSER-00141                    2-RenSER-00141

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 26, 2025*


                                    */S/ DEBBIE HINO-SPAAN*

                                    *Debbie Hino-Spaan, CSR No. 7953*
                                    *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

2-RenSER-00142                                          2-RenSER-00142

**'**

'Get [1] - 9:22

**/**

/S [1] - 90:19

**1**

1 [2] - 34:5, 35:2
1-053 [1] - 1:24
100 [2] - 24:4, 72:14
100-1 [5] - 58:16, 59:1, 59:20, 59:24, 60:14
100-10 [1] - 62:18
100-11 [1] - 63:3
100-12 [2] - 58:16, 64:21
100-2 [7] - 24:4, 59:4, 59:21, 60:16, 60:18, 60:19, 60:21
100-3 [7] - 59:6, 59:18, 60:5, 60:7, 60:8, 60:9, 60:21
100-4 [4] - 59:19, 59:21, 60:4, 60:23
100-5 [1] - 61:4
100-6 [2] - 61:9, 61:10
100-7 [1] - 61:16
100-8 [1] - 61:23
100-9 [1] - 62:4
101 [1] - 54:3
102 [2] - 54:3, 84:13
102-2 [3] - 54:3, 74:20, 75:2
102-6 [4] - 72:14, 72:19, 75:4, 75:7
1100 [3] - 2:10, 2:18, 2:22
1150 [1] - 2:14
12 [1] - 4:4
1450 [3] - 2:11, 2:19, 2:23
148 [3] - 16:23, 17:7, 77:10
15 [1] - 55:14
1700 [1] - 2:5
18 [1] - 13:19
1800 [1] - 2:15
1:32 [2] - 1:14, 5:2

**2**

2.1 [1] - 13:2
2011 [1] - 3:9
2025 [3] - 1:13, 5:1, 90:15
207 [1] - 3:9
213-624-8700 [1] -

2:16
22 [2] - 33:19, 34:1
243 [1] - 77:10
25 [2] - 33:19, 34:1
26 [1] - 90:15
28 [1] - 90:8
29 [1] - 16:7
290 [1] - 33:25
297 [4] - 32:12, 32:16, 33:18, 34:1
298 [5] - 32:12, 32:17, 34:2, 34:4, 34:5
2:30 [1] - 35:10

**3**

3 [2] - 1:8, 7:2
300 [4] - 13:2, 33:10, 48:18, 49:1
300-7 [1] - 48:11
301 [1] - 33:10
34 [1] - 41:1
35 [5] - 27:23, 36:8, 36:9, 71:2, 71:4
35-1 [2] - 36:20, 36:22
3:13 [1] - 55:18
3:31 [1] - 55:18
3:39 [1] - 87:7

**4**

4 [2] - 34:5, 60:5
400 [1] - 3:5
403 [10] - 5:17, 19:3, 27:9, 38:9, 44:7, 67:15, 75:25, 80:5, 86:5, 87:15
411 [1] - 1:24
44 [1] - 13:3
4:30 [2] - 55:15, 88:18
4:58 [1] - 84:14
4TH [1] - 1:24

**5**

5 [3] - 1:13, 5:1, 35:2
54 [3] - 80:14, 80:17
5:08 [2] - 84:14, 84:18
5:11 [1] - 56:13
5:13 [1] - 57:25
5:19 [3] - 65:11, 65:14, 65:17
5:20 [1] - 65:21
5:30 [1] - 88:19
5:49 [1] - 74:8
5:55 [4] - 75:18, 75:22, 82:12

**6**

65 [1] - 85:6
655 [1] - 2:5
66 [13] - 77:17, 78:4, 79:6, 79:16, 80:8, 81:19, 84:24, 85:6, 85:10, 85:23, 86:3, 86:10, 87:13
67 [3] - 85:11, 85:18, 85:23
679 [1] - 6:22

**7**

7 [1] - 48:18
714 [1] - 2:20
714-823-4100 [1] - 3:6
714-937-1010 [2] - 2:12, 2:24
750 [1] - 3:5
753 [1] - 90:8
760-274-2110 [1] - 3:10
7953 [2] - 1:23, 90:20

**8**

818-388-7022 [1] - 2:6
8:00 [2] - 88:21, 89:1
8:19-cv-01514-DOC-DFM [1] - 1:7

**9**

90015 [1] - 2:15
911 [11] - 15:14, 19:13, 20:5, 43:10, 73:9, 73:11, 73:18, 73:19, 86:21, 86:23, 87:6
91203 [1] - 2:6
92011 [1] - 3:10
92701 [1] - 1:24
92868 [3] - 2:11, 2:19, 2:23
92868-4940 [1] - 3:6
937-1010 [1] - 2:20

**A**

able [4] - 40:17, 56:4, 66:25, 86:18
above-entitled [1] - 90:11
absolutely [1] - 44:5
academy [2] - 7:21, 10:22
according [12] - 12:20, 12:23, 23:8, 27:14, 27:15, 28:24,

29:6, 30:25, 33:2, 42:16, 46:19, 80:9
accurate [2] - 60:15, 61:1
accurately [3] - 13:15, 28:19, 50:15
actions [4] - 9:6, 10:11, 10:12, 11:1
active [5] - 14:9, 31:23, 33:8, 39:16, 39:17
actively [9] - 31:6, 31:17, 34:19, 34:22, 38:11, 38:14, 39:9, 39:11, 66:4
actual [1] - 39:7
adequately [1] - 7:13
admit [1] - 44:3
admonished [1] - 55:15
aggressive [4] - 29:8, 34:8, 34:9, 35:4
ago [2] - 26:8, 60:21
agree [3] - 8:4, 28:8, 33:2
agreed [3] - 31:1, 33:3, 39:8
Airport [1] - 3:9
al [2] - 1:7, 2:8
allegedly [2] - 53:4, 65:16
allow [1] - 17:16
allowed [3] - 17:12, 17:19, 21:18
allowing [1] - 40:7
alongside [1] - 52:13
ALSO [1] - 3:12
ambiguous [1] - 51:15
ANA [3] - 1:14, 1:24, 5:1
Angeles [1] - 2:15
ANGELES [1] - 90:3
animus [1] - 6:1
answer [23] - 12:17, 17:22, 21:5, 26:2, 27:10, 30:6, 30:21, 38:10, 39:1, 43:17, 44:10, 44:13, 45:20, 47:20, 51:20, 53:22, 57:12, 66:12, 69:25, 73:23, 77:4, 77:23, 79:21
answered [5] - 19:3, 19:5, 27:9, 44:12, 45:12
answering [1] - 51:19
APC [1] - 2:9
APLC [1] - 2:13
apologize [1] - 12:5
APPEARANCES [2] -

2:1, 3:1
application [5] - 9:19, 12:13, 35:19, 38:7, 41:23
applied [5] - 9:1, 15:17, 15:25, 38:4, 38:24
apply [5] - 9:11, 9:20, 12:21, 15:24
appreciate [1] - 33:22
approach [4] - 18:21, 19:8, 20:20, 20:22
approached [13] - 16:5, 16:8, 16:9, 16:11, 18:7, 18:11, 18:13, 18:17, 18:19, 19:1, 21:10, 24:24, 66:24
approaching [2] - 18:23, 54:13
appropriate [3] - 19:11, 34:4, 37:12
area [8] - 10:3, 22:12, 28:18, 28:25, 39:10, 41:9, 41:10, 58:24
argue [4] - 8:6, 8:18, 15:8, 20:14
arguing [1] - 5:25
argument [2] - 20:10, 20:13
Argumentative [12] - 15:7, 19:16, 19:23, 31:19, 37:10, 40:19, 43:25, 52:23, 66:10, 78:8, 83:9, 87:1
argumentative [4] - 31:13, 51:8, 72:4, 86:6
arm [10] - 16:9, 16:17, 16:20, 16:25, 25:7, 27:24, 28:3, 28:4, 39:13, 66:5
armor [1] - 40:16
arms [6] - 11:2, 20:9, 28:24, 39:16, 40:13, 40:18
Arrest [1] - 13:9
arrest [7] - 13:1, 13:13, 18:21, 42:24, 71:7, 74:15, 79:2
arrested [11] - 13:11, 71:12, 71:20, 71:23, 71:25, 72:1, 72:3, 72:7, 87:12, 87:19, 88:8
arresting [7] - 13:22, 19:14, 20:7, 71:18, 72:13, 72:14, 72:16
arrive [1] - 86:2
arrived [9] - 13:21,

24:13, 41:13, 47:14, 47:15, 65:6, 78:22, 85:13, 88:3
**arrives** [1] - 45:2
**aside** [1] - 22:10
**assaulting** [1] - 88:5
**assisted** [1] - 41:14
**assisting** [1] - 66:5
**assumes** [6] - 30:18, 40:19, 52:23, 57:9, 63:14, 69:22
**assuming** [1] - 70:11
**AT** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**attempt** [1] - 28:1
**attempted** [4] - 27:24, 28:3, 28:15, 41:6
**attempting** [1] - 34:12
**attitude** [2] - 15:5, 87:21
**ATTORNEY** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**audible** [1] - 88:22
**audio** [5] - 55:2, 55:25, 56:2, 82:14, 84:5
**audiotape** [1] - 85:22
**available** [1] - 70:19
**Avenue** [1] - 2:5
**aware** [3] - 52:1, 80:16, 80:17
**ax** [2] - 52:16, 52:21

## B

**background** [1] - 62:5
**backpacks** [1] - 53:14
**bad** [1] - 78:13
**badgering** [1] - 21:21
**ballistic** [5] - 25:4, 25:9, 28:2, 66:18, 66:21
**ballpark** [1] - 85:7
**band** [2] - 35:16, 35:18
**bar** [8] - 16:10, 16:17, 16:20, 16:25, 25:7, 27:24, 28:4, 66:5
**based** [17] - 21:7, 28:22, 47:9, 63:10, 68:2, 68:13, 68:14, 69:1, 69:14, 79:11, 79:19, 79:21, 79:23, 85:9, 85:23, 85:24
**battering** [1] - 71:8
**battery** [6] - 36:6, 37:3, 37:23, 71:12, 71:20, 77:11
**bear** [1] - 54:18
**beat** [2] - 78:7, 86:24

**beating** [2] - 43:23, 78:13
**become** [3] - 54:9, 80:19, 81:9
**becoming** [1] - 35:9
**begin** [1] - 34:13
**beginning** [5] - 11:2, 22:20, 45:4, 66:1, 66:9
**behind** [6] - 28:13, 28:15, 39:14, 39:18, 41:6, 41:19
**benefit** [1] - 74:5
**better** [1] - 56:2
**between** [3] - 27:1, 31:22, 56:4
**big** [1] - 27:1
**bit** [1] - 54:9
**bleeding** [8] - 23:7, 44:4, 46:3, 46:6, 48:15, 59:9, 59:13, 59:16
**blood** [6] - 59:16, 59:21, 60:20, 61:6, 61:24, 62:9
**BODNAR** [1] - 3:8
**body** [17] - 24:19, 26:15, 26:21, 28:1, 38:15, 39:17, 40:8, 40:10, 40:11, 40:13, 40:16, 40:18, 44:24, 54:11, 74:21, 74:22, 76:2
**booked** [1] - 63:6
**break** [1] - 83:19
**Brian** [6] - 15:14, 73:6, 73:8, 73:16, 78:12, 87:6
**Brief** [1] - 82:20
**bring** [3] - 10:4, 11:13, 82:23
**Brown** [13] - 53:13, 56:18, 56:20, 57:5, 57:7, 57:17, 57:22, 58:5, 63:2, 63:12, 63:20, 64:9, 64:11
**Bryan** [1] - 3:14
**busy** [2] - 35:23, 35:24
**button** [1] - 76:11
**BY** [131] - 2:4, 2:14, 3:8, 4:4, 12:11, 12:19, 13:7, 15:10, 15:23, 17:1, 18:6, 19:7, 19:18, 19:24, 20:2, 20:19, 21:8, 21:14, 22:7, 22:14, 23:22, 24:7, 25:22, 26:4, 26:25, 27:13, 27:18, 27:22, 28:10, 29:20, 30:8, 30:13,

30:22, 31:7, 31:15, 31:21, 32:11, 32:24, 34:21, 35:12, 36:13, 36:23, 37:13, 38:13, 38:23, 39:2, 39:24, 40:2, 40:22, 41:2, 43:13, 43:21, 44:2, 44:16, 45:13, 45:23, 46:18, 47:12, 47:23, 48:25, 49:5, 49:15, 49:25, 50:6, 51:12, 52:3, 53:6, 56:8, 56:12, 56:25, 57:16, 57:21, 58:4, 58:9, 58:21, 59:8, 61:3, 61:11, 61:15, 61:22, 62:16, 62:25, 63:19, 64:6, 64:16, 64:20, 65:13, 65:20, 66:16, 67:11, 67:19, 67:22, 68:1, 68:19, 69:4, 69:11, 70:6, 70:16, 71:5, 72:6, 72:11, 73:1, 73:25, 74:9, 75:11, 76:7, 76:14, 76:24, 77:6, 77:25, 78:10, 78:15, 78:21, 79:10, 80:2, 80:7, 80:13, 81:17, 81:21, 82:10, 83:2, 83:21, 84:15, 84:23, 85:4, 86:9, 86:15, 87:5, 87:17, 87:24, 88:2

## C

**CA** [1] - 1:24
**cage/chest** [1] - 39:10
**California** [8] - 2:6, 2:11, 2:15, 2:19, 2:23, 3:6, 3:10, 90:7
**CALIFORNIA** [4] - 1:2, 1:14, 5:1, 90:4
**CALLED** [1] - 4:4
**callers** [1] - 15:14
**cam** [4] - 54:11, 74:21, 74:22, 76:2
**camp** [1] - 64:21
**campers** [2] - 80:4, 80:22
**campground** [5] - 24:14, 78:11, 86:17, 86:23, 86:25
**campsite** [17] - 52:17, 52:21, 62:4, 62:18, 65:1, 69:17, 69:24, 70:4, 77:18, 79:11, 79:17, 80:18, 84:17, 85:14, 86:18, 88:7
**Campsite** [15] - 77:17,

78:4, 79:6, 79:16, 80:8, 81:19, 84:24, 85:6, 85:10, 85:11, 85:18, 86:3, 86:10, 87:13
**car** [3] - 55:7, 55:8, 84:16
**Carlsbad** [1] - 3:10
**carry** [1] - 22:4
**cars** [3] - 79:6, 85:1, 86:16
**CARTER** [1] - 1:3
**case** [16] - 6:11, 7:12, 8:22, 8:24, 9:9, 9:23, 9:24, 9:25, 10:1, 11:4, 29:2, 55:17, 71:19, 87:8, 88:23, 88:24
**Case** [1] - 1:6
**CATHERINE** [1] - 2:14
**caused** [1] - 24:16
**causing** [1] - 48:15
**cautioning** [1] - 52:2
**Central** [2] - 2:5, 90:7
**CENTRAL** [1] - 1:2
**certainly** [2] - 8:10, 11:18
**CERTIFICATE** [1] - 90:1
**Certified** [1] - 1:5
**certify** [1] - 90:7
**cetera** [3] - 6:3, 34:9, 62:21
**CHAD** [1] - 3:3
**Chad** [28] - 6:12, 22:15, 29:23, 36:5, 36:8, 36:12, 36:24, 37:24, 56:17, 57:6, 58:16, 63:2, 65:10, 65:21, 66:22, 67:4, 67:12, 72:2, 72:15, 74:2, 74:15, 75:13, 77:21, 78:2, 82:16, 83:24, 85:15
**changed** [1] - 31:9
**changing** [1] - 31:17
**charge** [1] - 77:8
**charges** [1] - 75:16
**check** [1] - 77:17
**chest** [3] - 28:25, 41:10, 41:15
**chest/rib** [3] - 28:17, 41:9, 41:10
**chick** [2] - 76:25, 78:3
**child** [2] - 82:22, 82:23
**choke** [2] - 35:13, 42:13
**CHRISTIE** [1] - 3:8
**chronologically** [1] - 19:21

**circles** [1] - 51:3
**circumstances** [2] - 14:12, 21:7
**citizen** [1] - 55:3
**City** [1] - 3:5
**civilian** [1] - 14:23
**claimed** [5] - 29:4, 30:16, 52:22, 66:7, 66:22
**claiming** [3] - 23:24, 23:25, 25:8
**clear** [5] - 21:24, 76:15, 80:19, 81:10, 85:2
**click** [1] - 15:16
**client** [4] - 6:12, 9:17, 72:17, 87:18
**close** [1] - 61:23
**close-up** [1] - 61:23
**cnaltsas@lynberg. com** [1] - 2:16
**Code** [2] - 77:11, 90:8
**collateral** [2] - 9:25, 10:10
**COLLINS** [4] - 3:4, 3:8
**combative** [5] - 32:5, 32:20, 33:4, 33:15, 34:8
**comfortable** [1] - 10:9
**coming** [5] - 7:25, 11:15, 17:15, 83:5, 83:14
**commanding** [2] - 14:17, 14:19
**commands** [1] - 43:3
**committed** [2] - 13:12, 43:24
**committing** [2] - 20:8, 88:6
**communicating** [1] - 8:23
**compares** [1] - 52:25
**comparison** [1] - 53:3
**compilation** [1] - 5:25
**complaining** [1] - 67:5
**complains** [1] - 10:20
**complaint** [1] - 10:15
**completely** [1] - 6:9
**compound** [8] - 53:18, 53:19, 79:8, 83:20, 87:1, 87:3, 87:22, 88:11
**Compound** [2] - 30:18, 78:18
**compressed** [2] - 40:11, 40:15
**concerned** [5] - 10:6, 10:25, 11:5, 21:5, 51:25
**concerning** [3] - 8:20,

10:3, 55:16
**concise** [1] - 56:5
**conclude** [1] - 35:10
**conclusion** [1] - 46:13
**condition** [2] - 24:13, 43:23
**conditions** [1] - 86:24
**confer** [1] - 81:6
**Conference** [1] - 90:12
**confine** [1] - 15:20
**confirm** [1] - 36:14
**confiscated** [1] - 63:5
**conformance** [1] - 90:12
**confused** [1] - 6:25
**confusing** [1] - 47:5
**considered** [6] - 14:5, 14:8, 16:16, 17:3, 20:25, 39:17
**conspiracy** [1] - 8:9
**consumptive** [3] - 8:16, 11:7, 35:9
**continue** [13] - 24:23, 33:10, 54:22, 61:2, 75:18, 81:8, 82:8, 82:19, 83:3, 83:11, 84:21
**continued** [1] - 3:1
**Continued** [1] - 12:10
**continuing** [2] - 34:2, 34:5
**continuously** [1] - 54:22
**control** [1] - 41:20
**conversation** [5] - 11:10, 68:24, 69:1, 81:3, 85:15
**cop** [1] - 82:2
**CORINNE** [1] - 2:22
**correct** [16] - 23:3, 24:22, 33:16, 37:5, 38:6, 52:6, 59:22, 66:23, 68:10, 70:19, 74:23, 75:3, 76:2, 79:16, 81:13, 90:9
**correctly** [1] - 25:3
**corroborate** [1] - 82:4
**corroborated** [1] - 42:7
**counsel** [25] - 5:6, 5:8, 5:12, 12:6, 15:20, 19:4, 20:10, 21:13, 22:6, 26:13, 34:7, 40:1, 49:9, 49:24, 53:18, 55:20, 55:21, 61:8, 67:24, 73:14, 74:20, 74:21, 79:8, 79:15, 80:15
**COUNSEL** [1] - 2:1

**Counsel** [41] - 9:24, 11:8, 12:8, 15:8, 16:24, 17:24, 18:3, 20:1, 20:10, 22:3, 25:20, 26:13, 26:16, 27:12, 33:21, 33:24, 35:1, 35:7, 36:19, 37:12, 39:23, 45:12, 46:21, 47:2, 47:11, 49:2, 49:13, 51:11, 51:18, 51:25, 56:6, 60:11, 70:25, 71:4, 78:20, 79:8, 81:6, 81:12, 81:16, 82:25, 87:22
**counter** [1] - 56:14
**Country** [3] - 2:10, 2:18, 2:22
**COUNTY** [3] - 1:7, 2:8, 90:3
**course** [1] - 22:15
**Court** [4] - 6:9, 6:24, 90:6, 90:20
**COURT** [172] - 1:1, 1:23, 5:6, 5:10, 5:23, 6:13, 6:16, 6:25, 7:8, 7:11, 8:4, 9:13, 9:24, 11:10, 12:4, 12:16, 13:6, 15:8, 15:20, 16:24, 17:8, 17:13, 18:2, 18:5, 19:4, 19:17, 20:1, 20:10, 20:13, 20:16, 21:4, 21:13, 21:17, 21:20, 21:24, 22:6, 22:12, 23:21, 24:6, 25:19, 26:1, 26:13, 26:19, 26:23, 27:10, 27:12, 29:15, 30:5, 30:11, 30:20, 31:4, 31:14, 31:20, 32:8, 33:20, 34:3, 34:7, 34:16, 35:1, 36:15, 36:19, 36:22, 37:11, 38:10, 38:25, 39:22, 40:1, 40:21, 43:15, 43:17, 44:1, 44:8, 44:10, 45:11, 46:14, 46:20, 47:1, 47:6, 47:10, 47:20, 48:20, 48:22, 48:24, 49:2, 49:9, 49:24, 50:2, 51:8, 51:11, 51:18, 52:25, 53:19, 54:5, 54:8, 54:20, 55:1, 55:6, 55:10, 55:13, 55:20, 57:11, 59:18, 59:20, 59:25, 60:5, 60:7, 60:9, 60:11, 60:14, 60:18, 60:23, 60:25,

61:8, 61:10, 63:16, 63:25, 64:4, 64:15, 66:11, 67:8, 67:16, 67:18, 67:24, 68:17, 68:23, 69:7, 69:10, 69:23, 70:3, 70:11, 70:18, 70:21, 70:24, 71:4, 72:5, 72:10, 72:20, 73:14, 73:23, 74:20, 74:25, 75:2, 75:6, 75:9, 76:1, 76:4, 76:6, 77:3, 77:23, 78:9, 78:19, 79:8, 79:15, 79:19, 80:6, 80:12, 80:15, 80:23, 81:1, 81:7, 81:14, 82:21, 83:10, 86:6, 87:3, 87:16, 87:22, 88:1, 88:12, 88:15, 88:23, 90:6
**court** [1] - 88:19
**Court's** [11] - 5:13, 5:17, 5:20, 6:21, 13:4, 24:5, 33:19, 36:11, 56:10, 58:17, 72:18
**courtesy** [1] - 17:23
**courtroom** [1] - 11:21
**CourtSmart** [1] - 89:2
**covered** [3] - 13:20, 58:25, 59:24
**credibility** [1] - 8:11
**crime** [4] - 20:8, 37:2, 43:24, 88:6
**cross** [2] - 55:23, 88:16
**cross-examination** [2] - 55:23, 88:16
**CRR** [1] - 1:23
**crux** [7] - 8:22, 8:24, 9:9, 9:23, 9:24, 11:1, 11:3
**CSR** [2] - 1:23, 90:20
**cswiss@ccllp.law** [1] - 3:11
**cuffed** [1] - 38:20
**curtail** [1] - 21:22
**custody** [2] - 42:21, 42:25

---

**D**

**danger** [2] - 67:6, 67:14
**dark** [7] - 66:14, 66:20, 66:21, 86:16, 86:22, 86:24, 87:10
**Date** [1] - 90:15
**DAVID** [1] - 1:3
**DAY** [1] - 1:8

**de** [5] - 20:25, 21:1, 21:9, 22:1, 22:8
**de-escalate** [1] - 21:1
**de-escalation** [4] - 20:25, 21:9, 22:1, 22:8
**dealing** [1] - 12:14
**DEBBIE** [3] - 1:23, 90:5, 90:19
**Debbie** [1] - 90:20
**decide** [1] - 7:23
**decided** [1] - 43:22
**decision** [2] - 71:9, 81:23
**deemed** [1] - 5:14
**DEFENDANT** [2] - 2:8, 3:3
**defendants** [2] - 6:6, 6:24
**Defendants** [1] - 1:8
**defense** [1] - 3:14
**delays** [1] - 10:6
**denied** [4] - 6:7, 6:9, 6:19, 33:14
**deny** [1] - 45:17
**denying** [3] - 22:15, 22:17, 45:14
**department** [1] - 50:14
**deployed** [1] - 11:25
**deposed** [1] - 32:2
**deposition** [20] - 23:13, 23:14, 23:20, 25:12, 25:18, 25:23, 25:25, 29:22, 30:4, 30:10, 31:1, 31:9, 32:1, 33:3, 38:19, 38:22, 39:9, 39:25, 42:3
**depositional** [1] - 34:11
**deputies** [8] - 7:3, 8:6, 41:13, 45:15, 63:8, 65:4, 78:1
**deputy** [8] - 11:21, 12:6, 38:1, 38:3, 48:2, 76:18, 78:25
**Deputy** [51] - 5:14, 5:18, 7:5, 7:9, 7:14, 7:18, 7:19, 16:9, 25:4, 25:10, 27:24, 28:1, 28:4, 29:3, 29:17, 29:23, 30:16, 35:18, 36:5, 36:8, 36:12, 36:24, 37:24, 41:19, 52:14, 52:22, 53:13, 56:17, 56:18, 56:20, 57:5, 57:6, 57:7, 57:17, 57:22, 58:5, 58:16, 58:18, 58:22, 63:2, 63:11,

63:12, 63:20, 64:9, 64:11, 65:14, 66:5, 77:21, 78:2, 85:21
**describe** [2] - 42:5, 44:22
**described** [5] - 23:5, 46:9, 46:10, 46:16
**detail** [1] - 42:5
**details** [1] - 42:3
**detain** [3] - 43:3, 43:5, 43:23
**detained** [1] - 81:22
**detaining** [3] - 13:21, 20:6, 43:7
**determination** [3] - 9:8, 10:18, 71:6
**determine** [1] - 9:5
**dhinospaan@yahoo. com** [1] - 1:25
**difference** [2] - 27:1, 31:22
**different** [5] - 6:23, 34:7, 44:12, 53:21, 78:24
**direct** [2] - 35:10, 55:22
**Direct** [1] - 4:4
**DIRECT** [1] - 12:10
**direction** [4] - 57:24, 60:1, 70:14
**directions** [1] - 60:12
**directly** [1] - 69:3
**disagree** [1] - 6:17
**disagreement** [1] - 6:13
**discipline** [1] - 50:13
**discuss** [3] - 55:15, 75:6, 88:24
**discussed** [3] - 12:1, 75:5, 88:7
**discussing** [12] - 72:16, 74:1, 74:4, 74:15, 74:16, 75:13, 82:13, 82:19, 83:6, 83:16, 84:3, 84:6
**discussion** [2] - 74:1, 75:16
**dismissed** [1] - 6:24
**dispatch** [2] - 73:10, 73:18
**dispatcher** [1] - 55:3
**displayed** [9] - 28:9, 58:20, 59:7, 60:17, 60:24, 61:14, 61:21, 62:15, 62:24
**disregard** [1] - 26:14
**distance** [1] - 66:25
**distinguish** [1] - 50:7
**distracting** [2] - 82:22, 82:24

**distress** [1] - 77:19
**District** [2] - 90:6, 90:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**disturbance** [1] - 78:11
**DIVISION** [1] - 1:2
**Docket** [1] - 6:22
**document** [9] - 32:22, 33:11, 59:7, 60:17, 60:24, 61:14, 61:21, 62:15, 62:24
**documented** [1] - 51:2
**Documents** [1] - 58:20
**dog** [1] - 62:6
**domestic** [3] - 71:23, 85:19, 86:11
**done** [3] - 11:10, 22:12, 32:17
**door** [2] - 77:17, 78:4
**down** [29] - 7:25, 9:18, 9:22, 11:1, 14:25, 15:15, 16:2, 16:5, 16:6, 17:2, 20:22, 21:10, 22:9, 22:20, 23:19, 25:13, 26:12, 27:8, 28:23, 36:15, 40:15, 41:4, 49:2, 49:10, 65:23, 83:20, 84:12, 87:19, 88:9
**draw** [1] - 9:10
**drawn** [8] - 13:21, 16:13, 18:14, 18:16, 18:20, 19:9, 20:22, 81:24
**drew** [6] - 8:25, 9:16, 9:17, 9:21, 14:11, 16:1
**Drive** [1] - 3:5
**driving** [1] - 52:13
**during** [1] - 65:25
**duty** [3] - 49:4, 49:6, 78:16
**DV** [3] - 85:19, 87:7, 88:4

### E

**earth** [1] - 37:6
**effect** [6] - 7:22, 10:23, 12:25, 13:13, 29:17, 29:18
**Effect** [1] - 13:9
**either** [4] - 9:12, 10:17, 70:11
**employed** [3] - 8:14, 9:14, 11:18
**employee** [1] - 50:10
**employing** [1] - 10:7

**employment** [2] - 11:5, 11:6
**employs** [1] - 9:15
**encounter** [5] - 19:13, 22:5, 24:14, 55:2, 85:14
**end** [4] - 11:12, 45:4, 66:1, 66:9
**ended** [1] - 7:2
**enforcement** [3] - 9:6, 27:4, 31:23
**engaged** [1] - 26:16
**entire** [2] - 42:16, 66:1
**entirely** [1] - 12:5
**entitled** [4] - 5:18, 7:4, 7:9, 90:11
**escalate** [1] - 21:1
**escalation** [4] - 20:25, 21:9, 22:1, 22:8
**escape** [1] - 13:13
**escaping** [1] - 13:24
**ESQ** [2] - 2:10, 3:4
**established** [1] - 38:7
**et** [5] - 1:7, 2:8, 6:3, 34:9, 62:21
**evening** [2] - 80:17, 88:19
**event** [6] - 42:20, 47:13, 58:25, 67:3, 68:2, 82:8
**eventually** [3] - 8:7, 20:14, 81:9
**evidence** [11] - 29:13, 30:19, 40:20, 52:24, 57:10, 63:15, 69:22, 88:4, 88:6
**exactly** [5] - 40:14, 69:19, 70:7, 83:7, 83:18
**Examination** [1] - 4:4
**examination** [4] - 35:11, 55:22, 55:23, 88:16
**EXAMINATION** [1] - 12:10
**excessive** [5] - 8:18, 8:24, 9:8, 10:11, 10:13
**excluded** [1] - 6:9
**Exhibit** [10] - 24:4, 27:23, 28:9, 36:8, 36:9, 61:8, 72:14, 80:14
**EXHIBITS** [1] - 4:15
**expert** [1] - 46:13
**experts** [2] - 9:5, 10:12
**expired** [1] - 74:17
**explain** [3] - 18:22, 40:9, 47:17

**explained** [1] - 21:6
**explaining** [1] - 19:10
**explains** [1] - 65:14
**explanation** [3] - 44:5, 44:18, 44:19
**express** [2] - 55:16, 88:25
**extend** [1] - 17:23
**extended** [2] - 13:25, 20:9
**extent** [1] - 5:17
**extremely** [1] - 6:11
**eye** [1] - 23:7

### F

**fabric** [1] - 68:22
**face** [21] - 7:6, 8:1, 11:3, 22:16, 22:24, 22:25, 23:9, 23:12, 23:19, 23:25, 24:10, 24:13, 24:20, 26:5, 26:10, 28:23, 40:15, 48:16, 59:21, 84:17
**facial** [2] - 23:4, 24:19
**facing** [2] - 27:15, 30:15
**fact** [5] - 8:17, 11:19, 13:20, 15:13, 52:24
**facts** [8] - 11:18, 17:9, 30:18, 40:20, 46:20, 57:9, 63:14, 69:22
**failure** [1] - 50:12
**false** [2] - 71:9, 71:15
**far** [12] - 6:3, 8:13, 10:25, 11:5, 11:19, 17:14, 19:15, 19:20, 21:4, 43:10, 51:25, 85:6
**FARAHMAND** [1] - 60:22
**Farahmand** [1] - 3:13
**fast** [1] - 16:5
**fault** [1] - 12:5
**FEDERAL** [2] - 1:23, 90:5
**Federal** [1] - 90:20
**feet** [2] - 81:2, 85:7
**fell** [1] - 28:5
**felt** [4] - 11:6, 23:10, 43:8, 44:20
**female** [11] - 65:3, 68:15, 68:20, 68:24, 69:12, 77:1, 77:18, 78:7, 78:23, 86:10, 87:14
**fighting** [11] - 38:19, 39:8, 39:19, 39:20, 40:3, 40:4, 40:5, 40:6, 41:17

**figure** [1] - 77:8
**fine** [1] - 60:25
**finish** [2] - 45:20, 81:18
**firepit** [1] - 62:6
**first** [25] - 6:6, 6:13, 7:6, 7:18, 16:14, 18:13, 19:13, 21:25, 31:11, 34:11, 42:25, 53:23, 54:24, 55:2, 55:25, 65:1, 66:23, 70:12, 77:1, 78:12, 78:16, 80:15, 84:13, 85:13, 85:14
**flash** [1] - 72:23
**flash-forward** [1] - 72:23
**flashlight** [1] - 67:1
**flashlights** [3] - 66:24, 67:1, 86:19
**focus** [2] - 10:1, 11:8
**focused** [2] - 10:11, 26:23
**focusing** [1] - 66:14
**folks** [1] - 81:9
**follow** [1] - 60:12
**followed** [1] - 7:14
**FOR** [3] - 2:3, 2:8, 3:3
**force** [48] - 8:24, 9:5, 9:8, 10:11, 10:14, 10:15, 12:13, 12:21, 12:23, 13:5, 13:12, 16:16, 17:3, 18:25, 19:1, 19:9, 24:9, 24:16, 25:14, 31:18, 38:16, 42:16, 43:23, 44:22, 45:1, 45:5, 48:1, 48:2, 48:4, 48:10, 48:12, 49:4, 49:6, 49:13, 50:11, 50:13, 50:16, 51:1, 51:9, 59:1, 62:10, 66:1, 67:4, 68:14, 77:16, 84:17, 88:8
**Force** [1] - 13:9
**foreclose** [1] - 9:3
**foregoing** [1] - 90:9
**forget** [2] - 88:23, 88:24
**form** [3] - 55:16, 81:10, 88:25
**format** [1] - 90:11
**forward** [2] - 72:23, 74:20
**foundation** [4] - 21:3, 47:19, 80:11, 80:15
**four** [6] - 38:15, 40:5, 45:12, 82:12, 82:13, 84:8
**fourth** [2] - 38:1, 38:3

**frame** [3] - 65:14, 73:2, 74:7
**frank** [1] - 9:25
**FRANK** [1] - 2:10
**frankly** [4] - 8:1, 10:1, 11:8, 35:8
**free** [1] - 41:15
**front** [4] - 17:17, 18:2, 33:20, 46:21
**Fuerbach** [8] - 15:14, 70:20, 73:6, 73:8, 73:17, 78:12, 86:21, 87:6

### G

**gatekeeper** [2] - 7:22, 10:18
**gathering** [1] - 70:13
**general** [2] - 51:20, 51:24
**generally** [2] - 12:12, 51:23
**gentlemen** [4] - 26:14, 54:17, 54:21, 55:13
**girl** [2] - 20:7, 88:5
**given** [1] - 9:12
**Glendale** [1] - 2:6
**Gomez** [3] - 15:15, 85:16, 85:18
**GONZALEZ** [2] - 4:4, 12:9
**Gonzalez** [2] - 37:3, 74:23
**Gotts** [7] - 7:14, 7:18, 7:19, 7:23, 10:12, 10:23
**Gotts's** [1] - 10:12
**grab** [7] - 25:9, 25:10, 28:1, 56:19, 57:6, 57:14, 63:2
**grabbed** [6] - 25:6, 28:3, 28:14, 41:4, 41:5, 66:20
**grabbing** [2] - 41:14, 66:17
**grant** [1] - 7:15
**gratuitously** [1] - 50:2
**ground** [68] - 9:18, 9:22, 10:13, 10:21, 15:1, 15:16, 15:18, 16:2, 16:6, 17:3, 20:23, 21:11, 22:9, 22:11, 22:20, 22:21, 23:11, 23:12, 23:19, 23:25, 24:9, 24:20, 25:13, 25:24, 26:6, 26:10, 26:11, 27:7, 27:8, 28:5, 30:15, 30:17, 31:2, 31:6,

32:5, 32:9, 32:20, 33:4, 34:18, 34:19, 35:3, 38:3, 38:11, 40:4, 40:12, 40:15, 41:5, 42:11, 45:24, 46:4, 46:8, 52:21, 53:7, 53:8, 53:12, 59:21, 60:20, 61:12, 61:18, 61:24, 62:2, 62:13, 65:7, 65:23, 67:1, 87:20, 88:9
**guideline** [1] - 9:12
**gun** [3] - 18:13, 18:14, 18:16
**gunpoint** [1] - 81:23
**guns** [6] - 13:21, 16:13, 18:20, 19:9, 20:22, 81:24
**guy** [1] - 81:23
**guys** [2] - 27:8, 72:12

**H**

**hammers** [2] - 52:16, 52:20
**hand** [14] - 25:5, 25:6, 28:14, 35:23, 35:24, 36:1, 39:18, 40:7, 41:6, 41:14, 41:19, 41:20, 66:14
**handcuff** [4] - 28:16, 39:19, 41:7, 66:15
**handcuffs** [3] - 18:22, 42:21, 59:16
**handling** [1] - 76:18
**hands** [14] - 13:25, 28:13, 28:17, 28:24, 39:10, 39:12, 40:10, 41:8, 59:15, 60:6, 60:25, 61:4, 61:6
**HARRELL** [40] - 2:10, 16:22, 17:6, 17:9, 21:3, 23:20, 25:18, 25:25, 27:9, 30:4, 30:10, 31:13, 32:7, 36:20, 38:22, 39:21, 44:7, 44:9, 45:9, 45:20, 47:19, 51:6, 53:17, 63:23, 64:2, 67:15, 67:17, 68:22, 70:9, 70:20, 72:4, 72:9, 73:13, 75:25, 77:2, 80:25, 81:13, 86:5, 87:15, 88:11
**head** [33] - 23:1, 23:4, 23:7, 23:8, 23:9, 23:12, 25:24, 26:9, 26:11, 27:7, 29:18, 44:5, 44:6, 44:17, 45:8, 45:15, 45:25,

46:10, 46:17, 47:18, 48:14, 48:15, 48:16, 50:18, 51:13, 51:17, 51:21, 52:5, 52:7, 52:11, 67:5, 67:13
**headlock** [11] - 29:3, 29:8, 29:10, 29:24, 37:16, 42:14, 65:15, 65:16, 65:22, 66:8, 66:22
**hear** [15] - 5:10, 5:20, 7:15, 10:2, 10:4, 11:11, 41:24, 41:25, 45:25, 50:17, 67:3, 75:16, 83:7, 83:17, 85:17
**heard** [41] - 8:21, 10:15, 15:16, 15:21, 19:12, 19:13, 19:15, 19:21, 20:5, 20:16, 34:11, 35:9, 38:4, 41:20, 42:23, 43:9, 43:10, 45:24, 46:2, 46:22, 55:1, 55:2, 63:20, 64:5, 64:9, 68:9, 69:1, 69:2, 69:20, 70:8, 70:14, 73:10, 73:18, 81:15, 84:9, 85:20, 85:21, 86:23, 87:7
**hearsay** [2] - 64:3, 73:12
**Hearsay** [1] - 64:14
**HEATHCOTE** [1] - 2:18
**held** [1] - 90:10
**helping** [3] - 68:2, 68:3, 68:6
**hereby** [1] - 90:7
**hesitated** [1] - 87:19
**himself** [1] - 36:10
**Hino** [1] - 90:20
**HINO** [3] - 1:23, 90:5, 90:19
**Hino-Spaan** [1] - 90:20
**HINO-SPAAN** [3] - 1:23, 90:5, 90:19
**hit** [13] - 11:3, 23:9, 23:11, 23:19, 23:24, 24:20, 25:24, 26:5, 26:10, 26:11, 27:7, 51:17, 52:11
**hold** [1] - 6:25
**holding** [3] - 39:10, 39:13, 39:14
**Holloway** [62] - 6:2, 7:16, 10:13, 10:14, 10:19, 10:20, 11:2, 13:22, 14:12, 15:11,

15:15, 16:12, 18:20, 22:16, 22:23, 24:8, 25:13, 25:24, 26:5, 26:9, 27:15, 27:25, 28:23, 29:3, 29:9, 29:23, 30:15, 31:1, 32:4, 35:13, 35:21, 36:3, 37:8, 37:14, 47:18, 48:15, 50:18, 52:11, 59:1, 59:9, 59:12, 60:19, 62:19, 63:6, 64:12, 65:15, 65:22, 66:8, 66:20, 67:13, 68:20, 69:12, 71:7, 71:12, 71:19, 72:7, 72:13, 77:7, 77:17, 84:4, 85:14, 87:13
**HOLLOWAY** [1] - 1:4
**Holloway's** [8] - 35:18, 38:4, 56:14, 59:15, 59:20, 65:7, 76:19, 84:17
**holstered** [2] - 25:5, 28:2
**home** [2] - 55:15, 88:24
**honest** [2] - 72:1, 85:8
**honestly** [2] - 45:1, 57:3
**Honor** [30] - 5:8, 6:6, 6:20, 7:1, 8:21, 9:16, 9:23, 11:9, 17:11, 18:1, 20:15, 21:16, 21:23, 26:18, 26:22, 33:18, 34:6, 34:25, 36:21, 46:25, 47:4, 51:5, 54:7, 59:23, 60:13, 70:22, 72:24, 75:5, 80:21, 80:25
**HONORABLE** [1] - 1:3
**hour** [2] - 55:22, 77:15
**humor** [1] - 82:2
**hypothetical** [6] - 12:15, 16:22, 17:6, 17:21, 48:21, 51:16

**I**

**idea** [1] - 47:1
**identified** [2] - 7:18, 36:20
**identify** [2] - 36:18, 44:22
**immediate** [1] - 58:24
**immediately** [5] - 25:5, 28:12, 28:14, 41:4, 41:5
**immunity** [10] - 5:15, 5:18, 7:4, 7:7, 7:10,

7:15, 7:19, 7:24, 9:2, 10:24
**impeach** [2] - 25:20, 34:12
**improper** [9] - 23:20, 25:18, 25:25, 30:4, 30:10, 31:3, 32:7, 38:22, 64:2
**impropriety** [1] - 9:4
**in-between** [1] - 56:4
**inappropriate** [1] - 7:12
**incident** [26] - 17:10, 18:3, 22:2, 37:21, 42:16, 46:22, 46:24, 47:3, 47:4, 51:19, 51:20, 51:25, 54:6, 54:9, 54:14, 54:23, 55:25, 56:1, 58:19, 59:13, 59:16, 70:9, 76:19, 76:20, 84:4, 86:11
**including** [3] - 5:21, 53:13, 56:18
**incomplete** [8] - 12:15, 16:22, 17:6, 17:15, 17:20, 17:24, 48:21, 51:16
**inconsistent** [1] - 34:25
**indicated** [1] - 5:20
**indicating** [1] - 26:20
**indication** [4] - 29:7, 37:7, 65:6, 67:12
**individual** [4] - 12:14, 16:21, 17:2, 38:8
**individuals** [2] - 19:8, 20:20
**information** [1] - 55:4
**initial** [1] - 56:3
**injured** [1] - 88:9
**injuries** [12] - 23:5, 23:8, 24:19, 26:9, 37:20, 44:6, 44:17, 44:23, 45:8, 47:18, 48:16
**injury** [2] - 23:11, 44:24
**inside** [8] - 53:14, 57:4, 57:7, 58:6, 58:10, 63:12, 63:21, 64:11
**instead** [1] - 51:20
**instructing** [1] - 11:24
**intent** [1] - 16:5
**interchangeably** [1] - 39:20
**interest** [1] - 72:24
**interested** [1] - 71:3
**internal** [1] - 6:8

**interruption** [2] - 54:16, 82:20
**interviewing** [2] - 68:8, 68:11
**interviews** [1] - 68:4
**intimidating** [1] - 71:25
**investigate** [2] - 43:24, 78:17
**investigating** [2] - 20:6, 42:24
**investigation** [4] - 69:6, 77:14, 78:7, 79:1
**investigative** [1] - 68:5
**involved** [10] - 6:1, 8:7, 24:25, 25:2, 25:3, 38:15, 48:1, 50:10, 79:2, 88:4
**irrelevant** [2] - 5:17, 5:22
**issue** [4] - 6:4, 6:23, 7:25, 9:3
**issues** [3] - 5:23, 9:25, 10:10
**IT** [1] - 3:14
**itself** [2] - 5:16, 51:4
**IV** [1] - 1:8

**J**

**jacket** [2] - 59:16, 61:7
**Jeremy** [21] - 22:16, 23:6, 27:14, 27:25, 28:4, 28:12, 28:16, 30:14, 31:1, 35:13, 35:18, 35:21, 36:3, 38:3, 41:7, 41:21, 47:18, 68:15, 68:20, 69:12, 76:19
**JEREMY** [1] - 1:4
**Jeremy's** [3] - 28:3, 28:14, 41:5
**job** [1] - 78:16
**JOEL** [2] - 4:4, 12:9
**Joshua** [3] - 15:14, 85:15, 85:18
**JUDGE** [1] - 1:3
**Judicial** [1] - 90:12
**juncture** [2] - 57:25, 58:5
**jurors** [1] - 55:20
**JURY** [1] - 1:13
**jury** [28] - 5:5, 7:23, 9:11, 10:7, 11:11, 11:15, 11:17, 12:3, 17:13, 17:17, 18:2, 20:14, 21:12, 24:5, 26:9, 26:17, 26:19,

**UNITED STATES DISTRICT COURT**

27:21, 40:4, 46:20, 47:1, 47:5, 52:1, 55:19, 72:19, 82:24, 83:7, 83:17
**justify** [1] - 31:18

## K

**Karlen** [2] - 11:17, 54:4
**keep** [1] - 21:20
**Kevin** [10] - 36:10, 72:15, 73:3, 74:2, 74:12, 75:13, 78:2, 83:4, 83:14, 83:22
**key** [1] - 17:9
**kick** [2] - 37:18, 42:7
**kicked** [2] - 7:17, 10:20
**kicking** [6] - 7:16, 10:13, 10:16, 23:1, 35:21, 41:24
**kind** [7] - 6:4, 17:20, 56:2, 82:1, 82:2, 82:3, 82:21
**kinds** [1] - 48:11
**knee** [1] - 38:3
**kneed** [1] - 45:14
**kneeing** [2] - 45:25, 48:15
**knees** [1] - 40:17
**knives** [28] - 52:16, 52:20, 53:2, 53:7, 53:8, 53:12, 53:14, 53:20, 53:21, 53:23, 53:25, 56:19, 57:6, 57:7, 57:14, 58:14, 61:18, 62:1, 62:12, 62:21, 63:1, 63:2, 63:5, 63:13, 63:22, 64:12, 65:7
**knowing** [1] - 33:22
**knowledge** [2] - 78:1, 78:4

## L

**labels** [1] - 61:1
**lacks** [3] - 21:3, 47:19, 80:11
**ladies** [4] - 26:14, 54:17, 54:20, 55:13
**laid** [1] - 46:22
**language** [2] - 26:15, 26:21
**laptop** [2] - 83:5, 83:15
**last** [1] - 44:11
**LAW** [6] - 2:4, 2:4, 2:14, 2:18, 2:22, 3:8

**law** [3] - 9:6, 27:4, 31:23
**lawsuit** [2] - 11:2, 15:13
**learned** [4] - 43:5, 69:6, 69:8, 69:12
**leave** [3] - 19:19, 55:22
**leaving** [1] - 17:9
**left** [8] - 19:14, 19:22, 22:1, 24:19, 41:20, 62:6, 71:2, 71:4
**legal** [2] - 9:2, 46:12
**legs** [4] - 35:16, 35:18, 35:22, 41:25
**lesson** [3] - 15:4, 15:6, 87:20
**lethal** [4] - 18:25, 19:1, 19:2, 19:9
**limine** [2] - 6:7, 6:19
**lines** [4] - 33:19, 34:1, 34:4, 34:5
**list** [1] - 36:4
**listed** [7] - 36:2, 36:5, 37:2, 37:23, 71:13, 71:16, 71:22
**listing** [1] - 36:9
**LLP** [2] - 3:4, 3:8
**locked** [4] - 28:17, 28:24, 41:8, 67:13
**log** [1] - 59:12
**logical** [1] - 78:6
**look** [9] - 27:19, 35:2, 36:8, 39:7, 49:1, 49:21, 58:2, 58:13, 80:14
**looked** [1] - 74:21
**looking** [1] - 57:3
**LOS** [1] - 90:3
**Los** [1] - 2:15
**losing** [1] - 11:8
**lost** [2] - 10:1, 41:20
**loud** [2] - 14:17, 14:20
**LYNBERG** [4] - 2:9, 2:13, 2:17, 2:21

## M

**machetes** [3] - 52:16, 52:20, 53:2
**malfunctioned** [1] - 8:17
**man** [6] - 31:18, 44:6, 44:17, 46:9, 46:15, 78:13
**managed** [1] - 41:18
**manner** [1] - 14:18
**map** [1] - 85:23
**maps** [1] - 85:10
**matched** [1] - 8:11

**Matt** [1] - 56:18
**matter** [5] - 39:8, 55:15, 80:19, 88:18, 90:11
**MAY** [2] - 1:13, 5:1
**mean** [3] - 28:6, 76:17, 85:21
**means** [3] - 77:1, 81:1, 88:23
**memory** [1] - 72:17
**MICHAEL** [1] - 3:4
**microphone** [2] - 76:8, 82:16
**middle** [1] - 11:15
**might** [2] - 57:3, 67:6
**mind** [3] - 17:25, 18:4, 88:25
**minute** [6] - 6:15, 16:24, 26:8, 31:8, 48:6, 49:21
**minutes** [8] - 42:17, 42:19, 55:14, 71:2, 71:4, 82:13, 84:9
**misstates** [2] - 29:13, 69:21
**mistake** [1] - 31:11
**mistakes** [1] - 31:12
**Mkrtchyan** [1] - 4:4
**MKRTCHYAN** [208] - 2:4, 2:4, 6:6, 6:15, 6:18, 6:23, 8:21, 9:16, 11:9, 12:11, 12:19, 13:4, 13:7, 15:10, 15:22, 15:23, 17:1, 17:11, 17:25, 18:4, 18:6, 19:7, 19:18, 19:24, 20:2, 20:12, 20:15, 20:18, 20:19, 21:8, 21:14, 21:16, 21:18, 21:23, 22:5, 22:7, 22:14, 23:22, 24:4, 24:7, 25:22, 26:4, 26:18, 26:22, 26:24, 26:25, 27:13, 27:18, 27:20, 27:22, 28:10, 29:20, 30:8, 30:13, 30:22, 31:7, 31:15, 31:21, 32:11, 32:24, 33:18, 34:1, 34:5, 34:15, 34:17, 34:21, 34:24, 35:12, 36:11, 36:13, 36:23, 37:13, 38:13, 38:23, 39:2, 39:24, 40:2, 40:22, 41:1, 41:2, 43:13, 43:21, 44:2, 44:16, 45:13, 45:23, 46:18, 46:24, 47:4, 47:8, 47:12, 47:23, 48:25, 49:5,

49:15, 49:22, 49:25, 50:6, 51:5, 51:7, 51:9, 51:12, 51:17, 52:3, 53:6, 54:2, 54:7, 56:7, 56:8, 56:10, 56:12, 56:24, 56:25, 57:16, 57:19, 57:21, 58:4, 58:9, 58:15, 58:21, 59:4, 59:8, 59:19, 59:23, 60:3, 60:6, 60:8, 60:10, 60:13, 61:3, 61:9, 61:11, 61:15, 61:22, 62:16, 62:25, 63:19, 63:24, 64:6, 64:16, 64:18, 64:20, 65:11, 65:13, 65:17, 65:20, 66:16, 67:11, 67:19, 67:21, 67:22, 68:1, 68:19, 69:4, 69:9, 69:11, 70:6, 70:16, 70:22, 71:3, 71:5, 72:6, 72:11, 72:18, 72:21, 72:23, 73:1, 73:25, 74:7, 74:9, 74:24, 75:1, 75:4, 75:8, 75:10, 75:11, 76:7, 76:14, 76:24, 77:6, 77:25, 78:10, 78:15, 78:21, 79:10, 79:18, 80:2, 80:7, 80:13, 80:21, 81:17, 81:21, 82:10, 83:1, 83:2, 83:21, 84:12, 84:15, 84:21, 84:23, 85:4, 86:9, 86:15, 87:5, 87:17, 87:24, 88:2, 88:13
**moment** [17] - 6:16, 17:13, 26:13, 33:25, 36:15, 42:19, 49:3, 49:9, 51:18, 59:20, 59:25, 60:21, 63:25, 69:23, 73:14, 74:22, 80:6
**MONDAY** [2] - 1:13, 5:1
**morning** [3] - 86:2, 87:7, 88:21
**motion** [5] - 6:7, 6:19, 39:21, 51:6, 53:17
**motions** [3] - 5:14, 6:22, 7:1
**move** [6] - 17:24, 22:12, 27:12, 29:8, 71:2, 81:2
**MR** [87] - 5:8, 5:11, 6:21, 7:1, 7:9, 8:2, 12:15, 15:7, 15:19, 16:22, 17:6, 17:9,

19:3, 19:16, 19:23, 21:3, 23:20, 25:18, 25:25, 27:9, 29:13, 30:4, 30:10, 30:18, 31:3, 31:13, 31:19, 32:7, 36:17, 36:20, 37:10, 38:9, 38:22, 39:21, 40:19, 43:12, 43:25, 44:7, 44:9, 45:9, 45:10, 45:20, 46:12, 47:19, 48:19, 48:21, 51:6, 51:15, 52:23, 53:17, 57:9, 60:22, 63:14, 63:23, 64:2, 64:3, 64:14, 66:10, 67:7, 67:15, 67:17, 68:22, 69:21, 70:9, 70:20, 72:4, 72:9, 73:12, 73:13, 75:24, 75:25, 77:2, 77:22, 78:8, 78:14, 78:18, 79:14, 80:5, 80:10, 80:25, 81:13, 83:9, 86:4, 86:5, 87:1, 87:15, 88:11
**MS** [206] - 6:6, 6:15, 6:18, 6:23, 8:21, 9:16, 11:9, 12:11, 12:19, 13:4, 13:7, 15:10, 15:22, 15:23, 17:1, 17:11, 17:25, 18:4, 18:6, 19:7, 19:18, 19:24, 20:2, 20:12, 20:15, 20:18, 20:19, 21:8, 21:14, 21:16, 21:18, 21:23, 22:5, 22:7, 22:14, 23:22, 24:4, 24:7, 25:22, 26:4, 26:18, 26:22, 26:24, 26:25, 27:13, 27:18, 27:20, 27:22, 28:10, 29:20, 30:8, 30:13, 30:22, 31:7, 31:15, 31:21, 32:11, 32:24, 33:18, 34:1, 34:5, 34:15, 34:17, 34:21, 34:24, 35:12, 36:11, 36:13, 36:23, 37:13, 38:13, 38:23, 39:2, 39:24, 40:2, 40:22, 41:1, 41:2, 43:13, 43:21, 44:2, 44:16, 45:13, 45:23, 46:18, 46:24, 47:4, 47:8, 47:12, 47:23, 48:25, 49:5, 49:15, 49:22, 49:25, 50:6, 51:5, 51:7, 51:9, 51:12, 51:17, 52:3, 53:6, 54:2, 54:7, 56:7, 56:8,

56:10, 56:12, 56:24, 56:25, 57:16, 57:19, 57:21, 58:4, 58:9, 58:15, 58:21, 59:4, 59:8, 59:19, 59:23, 60:3, 60:6, 60:8, 60:10, 60:13, 61:3, 61:9, 61:11, 61:15, 61:22, 62:16, 62:25, 63:19, 63:24, 64:6, 64:16, 64:18, 64:20, 65:11, 65:13, 65:17, 65:20, 66:16, 67:11, 67:19, 67:21, 67:22, 68:1, 68:19, 69:4, 69:9, 69:11, 70:6, 70:16, 70:22, 71:3, 71:5, 72:6, 72:11, 72:18, 72:21, 72:23, 73:1, 73:25, 74:7, 74:9, 74:24, 75:1, 75:4, 75:8, 75:10, 75:11, 76:7, 76:14, 76:24, 77:6, 77:25, 78:10, 78:15, 78:21, 79:10, 79:18, 80:2, 80:7, 80:13, 80:21, 81:17, 81:21, 82:10, 83:1, 83:2, 83:21, 84:12, 84:15, 84:21, 84:23, 85:4, 86:9, 86:15, 87:5, 87:17, 87:24, 88:2, 88:13

**multiple** [6] - 21:11, 22:10, 40:11, 40:16, 43:7, 73:13

**mwroniak@ccllp.law** [1] - 3:7

## N

**NALTSAS** [1] - 2:14
**NARINE** [1] - 2:4
**narine57@gmail. com** [1] - 2:7
**near** [4] - 56:14, 56:21, 57:1, 65:7
**need** [16] - 8:21, 9:18, 12:25, 18:2, 36:17, 49:18, 49:22, 59:5, 59:25, 60:11, 61:1, 76:25, 77:8, 78:3, 78:23, 80:16
**needs** [1] - 36:20
**never** [16] - 15:12, 15:25, 22:25, 23:1, 23:8, 23:18, 27:15, 29:3, 29:5, 30:14, 30:17, 42:7, 42:10, 42:13, 52:5, 77:16

**next** [13] - 20:12, 21:22, 22:4, 49:24, 59:4, 59:15, 59:22, 64:18, 74:12, 77:17, 78:4, 78:6
**nice** [1] - 14:18
**night** [13] - 68:21, 68:25, 69:13, 71:23, 71:25, 72:8, 77:15, 78:7, 80:4, 80:8, 86:2, 86:12, 86:24
**noise** [2] - 85:19
**noises** [4] - 69:20, 70:8, 73:10, 73:19
**noncompliance** [1] - 14:5
**none** [2] - 68:15, 68:20
**None** [1] - 4:16
**normal** [3] - 19:8, 20:20, 20:23
**North** [1] - 2:5
**notes** [1] - 75:16
**nothing** [1] - 44:21
**notify** [2] - 50:11, 50:12
**number** [8] - 5:25, 7:2, 8:6, 8:18, 10:6, 10:20, 19:5, 21:24
**Number** [2] - 6:22, 13:3

## O

**o'clock** [2] - 88:21, 89:1
**oath** [1] - 26:10
**obeying** [1] - 43:3
**object** [2] - 21:16, 47:4
**objection** [52] - 12:15, 15:7, 15:19, 19:3, 19:16, 19:23, 29:13, 30:18, 31:3, 31:13, 31:19, 34:6, 35:6, 36:16, 36:17, 37:10, 38:9, 40:19, 43:12, 43:25, 44:7, 45:9, 45:10, 46:12, 47:10, 48:19, 51:15, 52:23, 53:3, 57:9, 63:14, 63:23, 63:24, 64:1, 64:14, 66:10, 67:7, 69:21, 72:9, 73:12, 75:24, 77:22, 78:8, 78:14, 78:18, 79:14, 80:5, 80:10, 80:21, 83:9, 86:4, 87:1
**objections** [1] - 17:12
**obligated** [1] - 48:8

**obligation** [2] - 48:11, 48:17
**obscured** [1] - 68:22
**observe** [1] - 53:1
**observed** [1] - 53:1
**occupied** [5] - 79:6, 79:11, 79:19, 79:24, 80:8
**occurred** [2] - 62:10, 68:13
**OF** [8] - 1:2, 1:7, 1:12, 2:1, 2:8, 90:1, 90:3, 90:4
**offense** [1] - 13:12
**offered** [1] - 4:16
**officer** [17] - 9:10, 9:15, 10:4, 11:13, 13:10, 27:4, 27:5, 29:8, 36:6, 37:3, 37:24, 50:17, 54:12, 71:8, 71:13, 71:20, 77:12
**Officer** [1] - 30:15
**officer's** [3] - 9:6, 55:7, 78:16
**officers** [15] - 5:25, 8:25, 21:11, 38:15, 40:5, 40:11, 40:16, 41:25, 56:18, 63:8, 67:6, 68:9, 71:11, 79:2, 86:1
**OFFICIAL** [3] - 1:23, 90:1, 90:5
**Official** [1] - 90:20
**Olive** [1] - 2:14
**omnibus** [1] - 6:21
**once** [2] - 77:16, 87:22
**one** [23] - 5:23, 9:1, 21:24, 27:10, 31:8, 31:16, 33:21, 35:24, 40:9, 59:22, 60:3, 69:12, 69:19, 70:7, 70:9, 70:15, 76:16, 79:2, 83:13, 86:1, 87:12
**oOo** [1] - 89:4
**open** [1] - 48:10
**opinion** [1] - 88:25
**opinions** [1] - 55:16
**ORANGE** [2] - 1:7, 2:8
**Orange** [3] - 2:11, 2:23, 3:6
**orange** [1] - 2:19
**order** [3] - 5:18, 6:22, 81:2
**ordered** [1] - 88:18
**otherwise** [1] - 7:23
**outside** [1] - 82:22
**outstretched** [1] - 11:3

**overall** [3] - 8:19, 35:1, 35:5
**overcome** [2] - 12:25, 13:14
**Overruled** [2] - 26:1, 30:11
**overruled** [15] - 12:16, 29:15, 30:5, 30:20, 31:4, 32:8, 38:25, 43:18, 44:8, 57:11, 63:16, 66:11, 68:23, 77:3, 86:6
**overtures** [1] - 26:14
**own** [5] - 12:24, 15:1, 83:23, 88:7, 88:25

## P

**p.m** [2] - 55:18
**P.M** [2] - 1:14, 5:2
**pace** [3] - 16:5, 18:7, 18:19
**packs** [1] - 53:21
**pad** [1] - 74:10
**PAGE** [1] - 4:3
**page** [4] - 27:21, 33:18, 33:25, 90:11
**pages** [5] - 32:12, 32:13, 32:16, 32:25, 33:10
**Pahel** [20] - 16:4, 18:14, 36:10, 37:3, 38:2, 52:14, 63:11, 68:3, 68:7, 68:10, 69:5, 72:16, 73:3, 74:2, 74:12, 75:13, 78:2, 83:5, 83:14, 83:22
**Palomar** [1] - 3:9
**paralegal** [1] - 3:13
**paramedics** [1] - 24:10
**parked** [3] - 79:7, 85:1, 86:16
**part** [8] - 5:21, 6:1, 32:10, 65:17, 69:6, 79:1, 81:22
**participated** [1] - 66:4
**particular** [2] - 35:3, 35:5
**parties** [5] - 15:14, 55:21, 68:4, 68:15, 88:20
**party** [2] - 71:18, 73:6
**passive** [5] - 14:10, 16:25, 31:22, 33:8, 34:9
**passive-aggressive** [1] - 34:9
**passively** [7] - 14:2,

16:20, 31:2, 31:16, 33:6, 34:17, 38:8
**patience** [1] - 12:4
**patrol** [5] - 53:11, 55:7, 55:8, 76:8, 82:16
**PC** [1] - 2:17
**peace** [6] - 13:10, 36:6, 37:3, 37:24, 71:20, 77:12
**pen** [1] - 74:10
**Penal** [1] - 77:11
**period** [2] - 15:25, 35:3
**permissible** [5] - 46:11, 46:17, 51:22, 52:7, 53:5
**permission** [10] - 13:4, 24:5, 33:19, 36:11, 49:11, 50:3, 50:4, 56:10, 58:17, 72:18
**permitted** [3] - 12:23, 16:19, 17:2
**person** [4] - 7:17, 13:11, 17:4, 35:4
**personally** [4] - 71:11, 71:14, 71:15, 71:16
**perspective** [1] - 8:19
**pertain** [1] - 35:2
**pertains** [1] - 51:19
**photo** [2] - 60:2, 60:19
**photograph** [1] - 23:23
**photographs** [3] - 58:15, 58:16, 58:18
**photos** [2] - 58:13, 59:5
**physically** [5] - 32:4, 33:4, 33:14, 34:8, 35:4
**pick** [6] - 55:10, 57:13, 58:5, 58:10, 63:12, 63:17
**picked** [7] - 22:21, 24:9, 46:8, 61:12, 61:24, 63:21, 64:12
**picnic** [11] - 53:15, 57:8, 57:25, 58:6, 58:11, 58:13, 62:5, 63:3, 63:13, 63:22, 64:13
**picture** [13] - 8:19, 17:20, 24:8, 56:3, 59:15, 61:19, 62:12, 62:17, 62:22, 63:1, 64:18, 64:19, 73:2
**pictures** [1] - 58:23
**piecemeal** [1] - 17:15
**place** [13] - 18:21,

18:22, 28:15, 29:3, 29:23, 37:16, 38:3, 41:6, 41:18, 42:13, 42:25, 63:13, 78:12
**placed** [5] - 42:24, 57:8, 58:14, 65:16, 65:22
**placing** [3] - 29:8, 42:21, 67:13
**plaintiff** [3] - 5:24, 6:5, 9:3
**PLAINTIFF** [2] - 2:3, 4:4
**Plaintiff** [1] - 1:5
**plaintiff's** [3] - 3:13, 6:11, 53:18
**play** [16] - 47:8, 53:15, 54:2, 54:3, 54:15, 56:21, 57:17, 57:19, 65:11, 65:17, 72:12, 72:15, 72:20, 74:5, 75:22, 84:14
**played** [24] - 54:19, 54:25, 55:5, 55:9, 55:12, 56:23, 57:20, 58:3, 58:8, 65:12, 65:19, 67:4, 68:3, 72:22, 72:25, 74:6, 74:19, 76:13, 76:23, 81:20, 82:9, 84:22, 85:3, 86:14
**playing** [4] - 54:22, 81:18, 82:8, 84:21
**plus** [1] - 7:20
**point** [17] - 21:3, 21:10, 25:5, 25:12, 27:25, 31:8, 35:5, 41:13, 41:18, 44:7, 55:11, 57:1, 57:18, 70:7, 70:14, 72:24, 75:12
**pointed** [1] - 69:19
**police** [9] - 10:22, 23:5, 71:7, 71:8, 71:12, 71:13, 71:20, 77:11, 82:13
**policies** [3] - 6:8, 9:4, 12:21
**policy** [45] - 5:13, 5:16, 5:22, 6:3, 6:10, 6:17, 7:13, 8:2, 8:13, 8:15, 8:20, 9:7, 10:3, 11:20, 12:1, 12:20, 12:24, 13:2, 13:5, 13:17, 15:1, 16:19, 17:3, 21:1, 46:19, 47:25, 48:6, 48:9, 48:10, 48:18, 49:1, 49:2, 49:4, 49:14, 49:17, 50:1, 50:7,

50:8, 50:14, 50:21, 51:3, 51:10, 52:11
**Policy** [1] - 13:3
**polite** [1] - 14:18
**portion** [2] - 28:7, 72:20
**portions** [1] - 17:15
**position** [1] - 25:9
**POST** [1] - 9:7
**posttrial** [3] - 5:14, 6:22, 7:1
**practical** [1] - 50:12
**preclude** [5] - 5:24, 10:3, 26:20, 35:7, 49:10
**precluded** [1] - 8:11
**precluding** [3] - 8:7, 8:8, 50:3
**presence** [3] - 5:5, 12:3, 55:19
**present** [13] - 11:14, 17:16, 17:22, 55:20, 55:21, 64:7, 65:25, 66:8, 67:20, 67:21, 67:23, 68:10
**PRESENT** [1] - 3:12
**pretty** [1] - 17:20
**prevent** [1] - 13:13
**previous** [4] - 23:10, 25:23, 30:25, 82:1
**previously** [2] - 5:13, 38:18
**PREVIOUSLY** [1] - 12:9
**primary** [1] - 76:16
**private** [1] - 55:3
**problem** [1] - 20:11
**proceeding** [1] - 64:2
**PROCEEDINGS** [1] - 1:12
**proceedings** [4] - 63:20, 64:7, 89:2, 90:10
**process** [1] - 82:3
**prohibited** [2] - 51:14, 51:24
**Prohibition** [2] - 16:22, 17:6
**prompt** [1] - 88:19
**proper** [5] - 9:10, 9:20, 11:6, 34:12
**properly** [2] - 8:14, 8:23
**property** [1] - 63:6
**provide** [1] - 54:4
**public** [1] - 13:12
**publish** [9] - 13:5, 24:5, 27:20, 28:7, 36:12, 36:19, 51:9, 58:19, 72:19

**pull** [7] - 39:14, 39:18, 40:7, 40:12, 40:17, 41:1, 49:22
**pulled** [2] - 46:3, 53:14
**pulling** [1] - 41:14
**punch** [4] - 7:6, 8:1, 37:14, 42:10
**punched** [4] - 22:16, 22:23, 22:25, 23:9
**punching** [1] - 48:16
**pursuant** [3] - 5:13, 50:13, 90:8
**put** [10] - 5:6, 28:13, 42:2, 44:24, 49:2, 49:11, 53:15, 60:14, 63:22, 64:12
**putting** [1] - 50:2
**PVS** [6] - 42:17, 79:11, 79:19, 79:23, 81:19, 85:24

## Q

**qualified** [10] - 5:15, 5:18, 7:4, 7:7, 7:10, 7:15, 7:19, 7:24, 9:2, 10:24
**questions** [13] - 11:25, 14:2, 14:5, 14:8, 15:21, 17:4, 25:12, 25:17, 56:5, 73:13, 73:15, 73:20, 88:13
**quick** [4] - 7:16, 18:7, 18:19, 81:3
**quite** [5] - 8:1, 9:25, 10:1, 11:8, 35:8

## R

**raise** [1] - 9:3
**ran** [1] - 25:6
**Rawlings** [8] - 47:14, 47:15, 47:17, 50:17, 65:15, 65:22, 73:3, 78:22
**Raymond** [1] - 3:13
**re** [11] - 25:21, 34:14, 39:23, 40:1, 44:13, 48:24, 64:5, 83:19, 86:8, 87:4, 88:1
**re-answer** [1] - 44:13
**re-ask** [10] - 25:21, 34:14, 39:23, 40:1, 48:24, 64:5, 83:19, 86:8, 87:4, 88:1
**reach** [2] - 25:4, 65:7
**read** [11] - 13:15, 23:16, 28:19, 32:13, 32:16, 32:23, 32:25,

33:12, 33:19, 41:17, 50:15
**Reading** [2] - 46:14, 83:10
**reading** [2] - 33:10, 33:18
**reads** [2] - 32:22, 33:11
**really** [6] - 11:11, 27:15, 39:12, 66:13, 73:14, 78:13
**REALTIME** [1] - 90:5
**reason** [4] - 7:14, 10:23, 76:4, 87:18
**Reasonable** [1] - 13:9
**reasonable** [2] - 13:10, 13:12
**reasonableness** [1] - 5:16
**reasons** [2] - 19:15, 72:13
**recently** [1] - 23:16
**Recess** [1] - 55:18
**recess** [3] - 12:4, 54:18, 55:14
**recollection** [1] - 25:20
**record** [10] - 5:7, 6:5, 8:22, 12:12, 32:16, 60:11, 60:15, 61:1, 75:7, 81:6
**recorded** [1] - 89:2
**recording** [4] - 42:17, 53:12, 76:9, 81:19
**recordings** [3] - 79:12, 79:20, 85:24
**reference** [1] - 77:10
**referred** [1] - 60:20
**referring** [5] - 6:21, 16:14, 21:25, 35:5, 79:15
**refresh** [2] - 25:20, 72:17
**regardless** [1] - 48:6
**registered** [1] - 79:7
**registering** [1] - 87:7
**registration** [4] - 74:17, 80:3, 80:9, 80:22
**registrations** [1] - 80:17
**regulations** [1] - 90:12
**Relevance** [1] - 38:9
**relevance** [1] - 6:2
**relevant** [3] - 6:10, 6:11, 9:7
**relied** [1] - 9:5
**remember** [26] - 23:14, 25:3, 25:14, 25:16, 28:6, 29:16,

29:17, 29:21, 29:25, 30:3, 30:7, 30:16, 31:5, 32:1, 32:6, 32:9, 38:21, 39:3, 39:4, 52:18, 53:8, 53:23, 54:11, 56:19, 57:14, 64:13
**Remember** [1] - 23:19
**remind** [1] - 55:6
**Renegar** [70] - 5:14, 5:18, 6:12, 7:5, 7:9, 7:25, 9:11, 9:13, 10:5, 10:25, 11:14, 16:4, 16:9, 18:16, 22:16, 27:24, 28:1, 28:4, 29:3, 29:17, 29:23, 29:24, 30:15, 30:16, 35:14, 35:16, 35:18, 36:12, 36:25, 37:4, 37:24, 38:2, 38:4, 41:19, 52:22, 52:25, 53:4, 54:13, 56:17, 57:6, 58:17, 58:18, 58:22, 63:2, 63:11, 65:10, 65:14, 65:21, 66:5, 66:22, 67:4, 67:12, 67:16, 67:24, 68:5, 72:2, 72:15, 74:2, 74:15, 74:25, 75:1, 75:2, 75:7, 75:14, 77:21, 78:2, 80:18, 83:24, 85:21
**RENEGAR** [1] - 3:3
**Renegar's** [17] - 10:11, 11:1, 25:4, 25:10, 36:5, 36:8, 54:3, 54:11, 55:7, 71:17, 74:21, 74:22, 76:2, 82:16, 84:13, 84:16, 85:15
**repeat** [2] - 35:17, 68:17
**repetitive** [1] - 86:5
**rephrase** [1] - 14:7
**report** [72] - 23:5, 23:6, 27:14, 27:15, 27:17, 27:19, 28:20, 28:22, 29:6, 29:10, 29:19, 36:2, 36:3, 36:4, 36:5, 36:9, 36:12, 36:24, 37:8, 40:24, 40:25, 42:2, 44:4, 44:6, 44:18, 44:19, 44:21, 44:23, 44:25, 46:7, 48:2, 48:4, 48:5, 48:8, 48:11, 48:17, 49:4, 49:6, 49:17, 49:18, 49:19, 49:20, 49:22,

50:8, 50:17, 52:15, 52:22, 65:5, 66:18, 71:17, 72:2, 72:3, 74:2, 75:13, 75:16, 81:25, 82:5, 82:6, 82:12, 82:14, 83:4, 83:6, 83:12, 83:15, 83:22, 83:23, 83:24, 84:1
**reported** [29] - 50:16, 50:20, 50:25, 51:1, 51:2, 54:19, 54:25, 55:5, 55:9, 55:12, 56:23, 57:20, 58:3, 58:8, 65:12, 65:19, 68:5, 72:22, 72:25, 74:6, 74:19, 76:13, 76:23, 81:20, 82:9, 84:22, 85:3, 86:14, 90:10
**Reporter** [1] - 90:20
**REPORTER** [3] - 1:23, 90:1, 90:6
**REPORTER'S** [1] - 1:12
**reporting** [4] - 15:14, 68:4, 68:14, 73:6
**reports** [1] - 50:8
**request** [2] - 51:7, 54:4
**required** [1] - 21:1
**reservation** [1] - 78:23
**resistance** [8] - 12:13, 12:25, 13:14, 14:9, 31:22, 31:23, 39:16, 39:17
**resistant** [3] - 33:5, 33:9, 38:11
**resisting** [22] - 14:2, 16:20, 28:13, 31:2, 31:6, 31:16, 31:17, 33:6, 33:13, 34:18, 34:20, 34:23, 38:8, 38:14, 39:6, 39:9, 39:11, 41:21, 71:7, 71:12, 71:20, 77:11
**resolve** [1] - 86:11
**respond** [1] - 51:21
**responded** [2] - 21:25, 30:3
**responding** [3] - 54:12, 54:23, 55:4
**response** [6] - 17:8, 54:24, 56:3, 70:12, 88:22
**restate** [4] - 16:25, 20:1, 37:11, 67:9
**restrain** [1] - 35:14
**result** [2] - 37:20, 50:13

**results** [1] - 68:5
**resume** [2] - 12:8, 88:21
**RESUMES** [1] - 12:9
**retake** [1] - 11:22
**retrieve** [2] - 53:21, 53:25
**review** [1] - 42:19
**reviewed** [1] - 56:13
**rib** [1] - 39:10
**rise** [1] - 26:19
**Road** [4] - 2:10, 2:18, 2:22, 3:9
**ROOM** [1] - 1:24
**rotate** [3] - 30:15, 30:17, 30:24
**rskinner@lynberg. com** [1] - 2:24
**Rule** [1] - 86:5
**ruled** [5] - 6:3, 6:17, 7:2, 7:5, 8:9
**ruling** [6] - 5:13, 6:14, 6:18, 6:19, 9:2
**RV** [2] - 73:5, 88:7
**RYANE** [1] - 2:22

**S**

**SANTA** [3] - 1:14, 1:24, 5:1
**save** [1] - 81:4
**saw** [40] - 15:15, 16:14, 22:25, 23:1, 23:6, 23:9, 23:18, 25:3, 27:25, 29:3, 30:14, 30:17, 34:10, 38:1, 41:19, 42:7, 42:10, 42:13, 46:3, 52:5, 53:4, 53:5, 53:20, 57:5, 58:5, 58:10, 64:5, 66:17, 68:15, 68:20, 68:24, 69:7, 69:12, 71:16, 79:12, 79:20, 81:15, 85:5, 85:6
**scene** [8] - 45:2, 54:12, 54:14, 54:24, 58:17, 58:19, 77:16, 86:2
**scream** [1] - 45:24
**screaming** [1] - 20:8
**screen** [3] - 49:10, 60:15
**searched** [1] - 65:2
**second** [18] - 17:18, 21:25, 22:2, 22:5, 24:14, 46:22, 46:24, 47:3, 52:1, 53:24, 54:6, 54:8, 54:14, 54:23, 56:1, 60:18,

65:6, 70:12
**seconds** [1] - 16:7
**Section** [1] - 90:8
**sections** [1] - 77:11
**see** [70] - 7:11, 8:15, 18:3, 20:7, 22:18, 22:23, 24:12, 24:23, 25:24, 26:3, 26:5, 27:7, 28:6, 29:22, 30:12, 30:24, 33:21, 35:13, 35:16, 35:18, 35:21, 35:23, 41:17, 45:16, 45:17, 45:22, 46:2, 46:6, 53:7, 53:9, 54:8, 54:13, 56:14, 56:21, 57:17, 58:7, 59:9, 61:6, 61:18, 62:1, 62:12, 62:21, 63:1, 63:11, 63:17, 66:13, 66:20, 66:25, 69:16, 69:24, 70:4, 73:3, 73:9, 73:17, 77:16, 79:23, 80:24, 81:3, 81:4, 81:11, 82:3, 82:6, 82:11, 84:24, 86:16, 86:18, 87:13, 88:25
**seeing** [5] - 27:2, 35:20, 53:8, 53:23, 58:12
**seem** [1] - 81:7
**send** [1] - 55:14
**sense** [1] - 55:24
**sergeant** [1] - 74:3
**Sergeant** [8] - 47:14, 47:17, 50:17, 65:15, 65:22, 73:3, 78:22
**series** [3] - 25:11, 25:16, 34:13
**seriously** [1] - 14:23
**session** [2] - 11:16, 12:6
**several** [3] - 29:22, 29:25, 52:16
**shall** [1] - 50:11
**sharrell@lynberg. com** [1] - 2:12
**show** [12] - 23:23, 27:17, 32:10, 32:12, 58:15, 58:18, 59:5, 60:14, 60:16, 60:23, 71:17, 81:19
**showing** [1] - 53:12
**shown** [1] - 47:2
**side** [8] - 17:20, 23:7, 24:19, 26:20, 44:4, 62:5, 62:6
**sides** [1] - 80:20
**silent** [5] - 75:19, 75:22, 76:4, 83:4,

83:12
**simply** [2] - 17:4, 50:8
**sit** [1] - 5:11
**sitting** [6] - 10:7, 10:21, 11:16, 45:7, 59:10, 59:12
**situation** [16] - 11:7, 19:11, 19:12, 19:20, 20:4, 20:21, 20:24, 21:4, 35:5, 43:8, 43:9, 43:11, 43:19, 51:22, 52:8
**situations** [1] - 21:2
**SKINNER** [1] - 2:22
**skipped** [2] - 60:5, 60:7
**sleeping** [7] - 62:5, 62:6, 62:7, 64:21, 64:22, 64:23, 65:2
**smooth** [1] - 10:8
**so-called** [3] - 29:24, 37:21, 65:15
**someone** [7] - 43:5, 43:7, 43:23, 48:14, 50:8, 51:17, 52:11
**soon** [1] - 50:11
**sorry** [9] - 6:15, 32:18, 35:17, 44:14, 64:24, 70:2, 82:21, 82:25
**sound** [4] - 83:7, 83:17, 84:8
**South** [1] - 2:14
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 90:20
**SPAAN** [3] - 1:23, 90:5, 90:19
**speaking** [2] - 12:13, 17:11
**speaks** [1] - 51:3
**specific** [1] - 7:13
**specifically** [5] - 7:5, 69:19, 70:7, 70:15, 72:16
**Speculation** [4] - 75:24, 77:22, 78:18, 80:5
**speculation** [6] - 29:14, 71:1, 77:2, 79:14, 80:10, 87:2
**spent** [1] - 77:15
**stand** [2] - 11:22, 12:7
**STAND** [1] - 12:9
**standards** [1] - 9:6
**standing** [9] - 13:24, 15:11, 15:17, 15:24, 16:12, 20:9, 56:14, 78:3, 88:7
**start** [3] - 55:23, 80:16, 88:15
**started** [1] - 82:7

**state** [4] - 17:25, 18:4, 33:5, 69:25
**STATE** [1] - 90:4
**statement** [1] - 7:20
**STATES** [1] - 1:1
**States** [3] - 90:6, 90:8, 90:13
**stay** [2] - 26:16, 26:23
**stenographically** [1] - 90:10
**step** [2] - 78:6, 80:23
**Stever** [1] - 3:14
**still** [9] - 10:10, 13:21, 13:24, 18:12, 74:25, 75:2, 75:7, 75:12, 87:10
**stipulate** [2] - 80:24, 81:3
**stipulation** [1] - 81:12
**stop** [4] - 28:12, 41:21, 56:24, 74:21
**stopped** [1] - 6:4
**stopping** [1] - 54:22
**stories** [2] - 8:8, 8:11
**story** [3] - 5:21, 31:9
**STREET** [1] - 1:24
**Street** [1] - 2:14
**strewn** [4] - 52:21, 53:7, 62:12, 65:7
**stricken** [2] - 31:14, 39:22
**strike** [5] - 39:21, 42:10, 51:6, 53:17, 86:7
**strikes** [8] - 46:10, 46:17, 48:14, 50:18, 51:13, 51:22, 52:5, 52:7
**striking** [1] - 40:17
**stuff** [3] - 21:7, 22:18, 86:16
**subject** [2] - 5:15, 7:7
**suddenly** [3] - 75:19, 75:21, 82:12
**suggest** [1] - 34:10
**Suite** [6] - 2:5, 2:11, 2:15, 2:23, 3:5, 3:9
**suite** [1] - 2:19
**summation** [1] - 70:24
**supervisor** [4] - 45:2, 48:17, 50:11, 50:12
**supplied** [1] - 33:21
**supplies** [2] - 64:24, 65:2
**supposed** [1] - 68:7
**surrounding** [1] - 47:3
**sustain** [3] - 37:20, 47:10, 53:3
**Sustained** [1] - 45:11
**sustained** [29] - 15:8,

15:9, 15:20, 19:4, 19:17, 23:21, 24:18, 31:14, 31:20, 35:6, 37:11, 40:21, 44:1, 44:6, 45:8, 47:18, 50:18, 64:15, 67:18, 67:25, 72:5, 72:10, 78:9, 78:19, 80:12, 83:19, 87:3, 87:16, 88:12

**SWISS** [1] - 3:8
**sworn** [1] - 23:14
**SWORN** [1] - 12:9

## T

**table** [11] - 53:15, 57:8, 57:25, 58:6, 58:11, 58:13, 62:5, 63:3, 63:13, 63:22, 64:13
**tactics** [4] - 19:8, 20:20, 20:23, 43:22
**takedown** [14] - 16:10, 16:16, 16:17, 16:20, 16:25, 17:18, 22:16, 24:25, 25:2, 25:7, 27:16, 27:24, 28:4, 66:5
**TAMARA** [1] - 2:18
**tape** [28] - 7:15, 10:14, 10:19, 45:25, 47:6, 47:8, 52:1, 53:16, 54:2, 54:5, 54:15, 56:2, 65:14, 67:3, 67:12, 72:12, 72:15, 74:22, 75:5, 75:18, 75:21, 76:2, 83:4, 83:12, 84:9, 84:13, 85:15
**Tape** [1] - 54:3
**tapes** [1] - 77:16
**tased** [4] - 9:18, 9:22, 16:2, 41:22
**Taser** [52] - 5:12, 5:14, 5:16, 5:19, 5:21, 6:1, 6:3, 6:4, 6:10, 6:12, 7:10, 7:11, 8:2, 8:3, 8:5, 8:13, 8:14, 8:17, 8:20, 8:25, 9:4, 9:10, 9:11, 9:14, 9:15, 9:16, 9:17, 9:19, 9:20, 9:21, 11:25, 14:11, 14:12, 15:1, 15:11, 15:12, 15:16, 15:17, 15:24, 15:25, 16:1, 18:12, 19:10, 25:5, 28:2, 35:19, 38:4, 38:7, 38:24, 41:23, 66:24

**Taser's** [1] - 11:5
**taught** [1] - 87:20
**teach** [2] - 7:21, 10:22
**teaching** [2] - 15:4, 15:5
**technician** [1] - 3:14
**tend** [1] - 8:4
**tense** [1] - 27:25
**tensed** [2] - 28:16, 41:7
**tent** [19] - 53:14, 53:21, 53:25, 56:14, 56:22, 57:1, 57:7, 57:25, 58:6, 58:10, 62:5, 62:6, 63:12, 64:12, 64:22, 64:23, 64:24, 65:2
**tents** [1] - 63:21
**terms** [3] - 8:10, 17:21, 22:1
**testified** [13] - 15:15, 23:13, 31:8, 31:25, 32:4, 33:6, 34:22, 38:18, 52:14, 64:11, 65:25, 66:4, 81:24
**testifies** [1] - 9:14
**testify** [13] - 10:12, 11:14, 17:17, 23:18, 25:23, 45:21, 53:4, 63:21, 64:9, 67:16, 67:24, 70:19, 80:18
**testifying** [1] - 33:23
**testimony** [9] - 23:10, 31:1, 33:3, 34:24, 35:7, 46:13, 53:17, 55:2, 82:1
**THE** [207] - 2:3, 4:4, 5:6, 5:10, 5:23, 6:13, 6:16, 6:25, 7:8, 7:11, 8:4, 9:13, 9:24, 11:10, 12:4, 12:9, 12:16, 12:18, 13:6, 15:8, 15:20, 16:24, 17:8, 17:13, 18:2, 18:5, 19:4, 19:17, 20:1, 20:10, 20:13, 20:16, 21:4, 21:6, 21:13, 21:17, 21:20, 21:24, 22:6, 22:12, 23:21, 24:6, 25:19, 26:1, 26:3, 26:13, 26:19, 26:23, 27:10, 27:11, 27:12, 29:15, 29:16, 30:5, 30:7, 30:11, 30:12, 30:20, 31:4, 31:5, 31:14, 31:20, 32:8, 32:9, 32:23, 33:12, 33:20, 34:3, 34:7, 34:16, 34:19, 35:1, 36:15,

36:19, 36:22, 37:11, 38:10, 38:11, 38:25, 39:22, 40:1, 40:21, 43:15, 43:16, 43:17, 43:19, 44:1, 44:8, 44:10, 44:14, 45:11, 45:21, 46:14, 46:20, 47:1, 47:6, 47:10, 47:20, 47:22, 48:20, 48:22, 48:23, 48:24, 49:2, 49:9, 49:24, 50:2, 51:8, 51:11, 51:18, 52:25, 53:19, 53:23, 54:5, 54:8, 54:20, 55:1, 55:6, 55:10, 55:13, 55:20, 57:11, 57:13, 59:18, 59:20, 59:25, 60:5, 60:7, 60:9, 60:11, 60:14, 60:18, 60:23, 60:25, 61:8, 61:10, 63:16, 63:17, 63:25, 64:4, 64:15, 66:11, 66:13, 67:8, 67:9, 67:16, 67:18, 67:24, 68:17, 68:23, 69:1, 69:7, 69:10, 69:23, 70:1, 70:3, 70:5, 70:11, 70:13, 70:18, 70:21, 70:24, 71:4, 72:5, 72:10, 72:20, 73:14, 73:22, 73:23, 73:24, 74:20, 74:25, 75:2, 75:6, 75:9, 76:1, 76:3, 76:4, 76:5, 76:6, 77:3, 77:5, 77:23, 77:24, 78:9, 78:19, 79:8, 79:15, 79:19, 79:23, 80:6, 80:12, 80:15, 80:23, 81:1, 81:7, 81:14, 82:21, 83:10, 86:6, 87:3, 87:16, 87:22, 88:1, 88:12, 88:15, 88:23
**theathcote@lynberg.com** [1] - 2:20
**they've** [1] - 54:24
**third** [1] - 19:5
**threaten** [1] - 14:15
**threatened** [1] - 14:14
**threatening** [1] - 19:9
**three** [13] - 7:3, 16:4, 16:11, 16:14, 18:9, 18:11, 18:17, 18:19, 22:13, 37:2, 44:12, 84:1, 84:3
**ticket** [1] - 74:17
**Title** [1] - 90:8
**today** [1] - 45:8

**together** [4] - 8:8, 8:10, 10:8, 73:21
**tomorrow** [5] - 33:22, 55:23, 88:16, 88:21, 89:1
**tone** [2] - 14:17, 14:22
**tonight** [1] - 10:4
**took** [4] - 21:10, 22:8, 23:11, 57:7
**top** [2] - 40:5, 41:25
**total** [1] - 8:19
**totality** [1] - 17:14
**towards** [11] - 6:2, 16:12, 25:4, 26:15, 28:1, 37:9, 57:25, 58:6, 58:11, 81:2, 86:17
**Town** [3] - 2:10, 2:18, 2:22
**trained** [4] - 12:20, 13:17, 44:22, 44:25
**trainee** [1] - 63:11
**training** [4] - 9:12, 9:19, 46:19, 47:9
**transcript** [5] - 33:20, 54:10, 55:10, 90:9, 90:11
**Transcript** [1] - 1:5
**TRANSCRIPT** [1] - 1:12
**transcripts** [4] - 33:23, 34:11, 34:14, 54:4
**trial** [8] - 7:2, 7:6, 7:18, 10:8, 10:9, 24:1, 82:6, 82:22
**TRIAL** [1] - 1:13
**tried** [2] - 16:9, 25:6
**true** [232] - 12:12, 12:21, 13:2, 13:22, 13:23, 13:25, 14:1, 14:3, 14:4, 14:18, 14:23, 15:4, 16:2, 16:6, 16:8, 16:13, 16:16, 18:9, 18:12, 18:14, 18:17, 18:25, 21:2, 22:17, 22:19, 22:24, 23:2, 23:6, 23:13, 23:18, 24:8, 24:11, 24:16, 26:6, 26:7, 27:2, 27:3, 27:5, 27:6, 27:8, 27:11, 27:14, 27:16, 28:22, 28:25, 29:1, 29:2, 29:4, 29:6, 29:12, 30:14, 30:16, 30:23, 30:25, 31:2, 31:18, 33:7, 35:13, 35:16, 35:21, 36:3, 36:24, 37:3, 37:4, 38:1, 38:5, 38:8,

40:13, 41:10, 42:3, 42:5, 42:8, 42:9, 42:11, 42:12, 42:14, 42:15, 43:5, 43:6, 43:24, 44:3, 44:6, 44:18, 44:23, 44:25, 45:5, 45:6, 45:14, 45:17, 48:2, 48:3, 48:9, 48:12, 50:1, 50:7, 50:14, 50:24, 51:13, 52:11, 52:20, 52:22, 53:11, 56:15, 56:17, 57:5, 57:8, 57:24, 58:2, 58:6, 58:11, 59:1, 61:12, 61:16, 61:24, 62:7, 62:10, 62:19, 63:3, 63:10, 63:13, 63:22, 64:7, 64:9, 64:11, 64:22, 65:2, 65:3, 65:8, 65:9, 65:21, 65:23, 65:24, 66:2, 66:3, 66:5, 66:6, 66:18, 66:19, 67:6, 68:2, 68:5, 68:13, 68:15, 68:16, 68:21, 69:13, 69:17, 69:18, 69:20, 69:24, 70:4, 70:5, 70:8, 71:6, 71:8, 71:14, 73:2, 73:3, 73:4, 73:6, 73:7, 73:8, 73:10, 73:11, 73:16, 73:18, 73:24, 74:3, 74:10, 74:11, 74:14, 74:17, 74:18, 75:14, 75:18, 75:19, 76:9, 76:11, 76:20, 77:1, 77:8, 77:9, 77:13, 77:14, 77:21, 78:13, 78:16, 78:17, 78:23, 79:3, 79:6, 79:12, 80:8, 82:5, 82:14, 82:15, 82:17, 83:4, 83:8, 83:13, 83:18, 83:22, 83:24, 84:1, 84:2, 84:4, 84:9, 84:10, 84:16, 84:20, 84:24, 85:1, 85:10, 85:13, 85:16, 85:18, 85:20, 85:24, 86:21, 86:24, 86:25, 87:8, 87:9, 87:10, 87:14, 87:18, 87:20, 87:25, 88:10, 90:9
**truthfully** [1] - 45:1
**try** [2] - 55:14, 66:15
**trying** [6] - 6:7, 39:14, 39:18, 41:25, 42:22, 43:2
**tug** [1] - 40:8

**UNITED STATES DISTRICT COURT**

**turn** [4] - 6:5, 27:25, 76:11, 86:17
**turned** [2] - 68:14, 84:16
**two** [12] - 7:3, 8:25, 10:20, 42:19, 44:12, 70:9, 73:15, 73:20, 80:24, 81:1, 85:1, 86:16

## U

**U.S** [1] - 1:3
**under** [9] - 11:6, 14:12, 18:21, 26:9, 28:17, 41:8, 41:15, 42:24, 48:18
**underneath** [7] - 28:24, 39:10, 39:17, 40:7, 40:10, 40:13, 40:18
**understandable** [2] - 46:21, 54:10
**understood** [1] - 49:12
**unduly** [3] - 8:16, 11:7, 35:9
**unfortunately** [1] - 17:14
**UNITED** [1] - 1:1
**United** [3] - 90:6, 90:8, 90:13
**unless** [2] - 7:17, 35:8
**unlike** [1] - 7:18
**up** [32] - 7:2, 9:13, 10:14, 10:17, 21:9, 22:21, 24:9, 25:4, 25:6, 27:25, 28:16, 30:15, 41:7, 41:8, 46:8, 49:11, 50:2, 55:10, 57:13, 58:5, 58:10, 60:14, 61:12, 61:23, 61:24, 63:17, 63:21, 64:12, 78:7, 81:1, 82:12, 86:24
**upper** [1] - 41:10
**use-of-force** [7] - 12:21, 13:5, 42:16, 48:10, 49:4, 49:13, 51:9

## V

**Vague** [6] - 43:12, 48:19, 51:15, 67:7, 69:21, 73:12
**vague** [3] - 68:22, 70:9
**variables** [1] - 51:23
**vehicle** [4] - 53:11, 76:9, 82:16, 86:17

**vehicles** [1] - 79:23
**verbal** [5] - 14:5, 20:25, 21:9, 21:15, 22:8
**verbally** [1] - 21:1
**vest** [6] - 25:4, 25:9, 25:10, 28:2, 66:18, 66:21
**vicinity** [1] - 62:1
**victim** [11] - 36:3, 36:4, 36:6, 36:10, 37:7, 37:23, 71:13, 71:16, 71:18, 71:19, 71:22
**victims** [2] - 37:2, 78:17
**video** [11] - 43:11, 56:1, 56:2, 56:9, 56:11, 56:13, 58:7, 63:10, 65:10, 65:11, 69:14
**videotape** [1] - 68:3
**Videotape** [22] - 54:19, 54:25, 55:5, 55:9, 55:12, 56:23, 57:20, 58:3, 58:8, 65:12, 65:19, 72:22, 72:25, 74:6, 74:19, 76:13, 76:23, 81:20, 82:9, 84:22, 85:3, 86:14
**videotapes** [1] - 85:9
**view** [2] - 62:18
**violates** [1] - 5:17
**violating** [1] - 19:14
**violation** [3] - 49:11, 50:21, 52:10
**violence** [4] - 37:9, 71:23, 85:19, 86:11
**voice** [2] - 14:17, 14:19
**Volume** [1] - 89:3
**VOLUME** [1] - 1:8
**vs** [1] - 1:6

## W

**wait** [4] - 6:15, 31:8, 48:6, 49:21
**walk** [1] - 58:6
**walking** [1] - 57:24
**war** [1] - 40:8
**warning** [1] - 67:6
**warranted** [1] - 38:8
**watched** [1] - 43:10
**watching** [3] - 54:20, 55:1, 55:6
**WATKINS** [4] - 2:9, 2:13, 2:17, 2:21
**ways** [2] - 43:5, 43:7

**weights** [3] - 38:15, 40:11, 40:16
**WEST** [1] - 1:24
**West** [2] - 2:10, 2:18
**whatsoever** [2] - 29:7, 44:5
**whole** [3] - 5:20, 7:25, 34:13
**Winnebago** [1] - 73:5
**witness** [15] - 5:12, 21:19, 26:16, 26:23, 33:22, 34:10, 47:24, 48:2, 48:7, 48:12, 49:7, 55:23, 67:15, 71:25, 75:25
**WITNESS** [35] - 12:18, 21:6, 26:3, 27:11, 29:16, 30:7, 30:12, 31:5, 32:9, 32:23, 33:12, 34:19, 38:11, 43:16, 43:19, 44:14, 45:21, 47:22, 48:23, 53:23, 57:13, 63:17, 66:13, 67:9, 69:1, 70:1, 70:5, 70:13, 73:22, 73:24, 76:3, 76:5, 77:5, 77:24, 79:23
**Witness** [2] - 32:22, 33:11
**witnessed** [2] - 48:14, 48:16
**witnesses** [5] - 9:12, 17:19, 50:10, 70:18, 70:25
**WITNESSES** [1] - 4:3
**woman** [2] - 78:13, 86:24
**words** [7] - 7:13, 31:17, 34:7, 39:7, 39:20, 51:21
**wrapped** [1] - 24:10
**write** [4] - 29:10, 29:11, 29:18, 72:2
**writing** [10] - 74:2, 74:10, 75:13, 75:15, 81:25, 82:11, 83:3, 83:5, 83:12, 83:15
**written** [1] - 36:24
**WRONIAK** [48] - 3:4, 5:8, 5:11, 6:21, 7:1, 7:9, 8:2, 12:15, 15:7, 15:19, 19:3, 19:16, 19:23, 29:13, 30:18, 31:3, 31:19, 36:17, 37:10, 38:9, 40:19, 43:12, 43:25, 45:10, 46:12, 48:19, 48:21, 51:15, 52:23, 57:9, 63:14, 64:3, 64:14,

66:10, 67:7, 69:21, 73:12, 75:24, 77:22, 78:8, 78:14, 78:18, 79:14, 80:5, 80:10, 83:9, 86:4, 87:1
**wrote** [11] - 23:6, 27:23, 28:11, 46:6, 52:14, 66:18, 72:2, 83:22, 83:23, 83:24, 84:1

## Y

**years** [1] - 13:18
**yelling** [1] - 20:8
**yourself** [1] - 32:16
**yourselves** [1] - 55:16

**UNITED STATES DISTRICT COURT**