DOCKET NOS. 25-7132, 25-7297

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**
_____

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

_____

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

_____

**CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 3 OF 9**

_____

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

JEREMY HOLLOWAY,                      )
                                      )
                    Plaintiff,        )   **Certified Transcript**
                                      )
       vs.                            )   Case No.
                                      )   8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,             )
                                      )
                    Defendants.       )   **DAY 6**
                                      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

3-RenSER-00155          3-RenSER-00155

2

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF:**

       MKRTCHYAN LAW
       BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
       655 North Central Avenue
       Suite 1700
       Glendale, California 91203
       818-388-7022
       narine57@gmail.com


**FOR DEFENDANT JAMESON GOTTS:**

       LYNBERG & WATKINS APC
       BY:  S. FRANK HARRELL, ESQ.
       1100 West Town & Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       sharrell@lynberg.com

       LYNBERG & WATKINS APLC
       BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
       1150 South Olive Street
       Suite 1800
       Los Angeles, California 90015
       213-624-8700
       cnaltsas@lynberg.com

       LYNBERG & WATKINS PC
       BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
       1100 West Town & Country Road
       Suite 1450
       Orange, California 92868
       (714) 937-1010
       theathcote@lynberg.com

       LYNBERG & WATKINS
       BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
       1100 Town and Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

3

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

      COLLINS & COLLINS LLP
      BY:  MICHAEL L. WRONIAK, ESQ.
      750 The City Drive
      Suite 400
      Orange, California 92868-4940
      714-823-4100
      mwroniak@ccllp.law

      COLLINS & COLLINS LLP
      BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
      2011 Palomar Airport Road
      Suite 207
      Carlsbad, California 92011
      760-274-2110
      cswiss@ccllp.law


**ALSO PRESENT:**

      Raymond Farahmand, plaintiff's paralegal
      Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

3-RenSER-00157        3-RenSER-00157

**I N D E X**

**WITNESSES**                                                                    **PAGE**

**JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan                              5
    Cross-Examination by Mr. Harrell                              149

**EXHIBITS**

**(None offered.)**

**UNITED STATES DISTRICT COURT**

3-RenSER-00158                                          3-RenSER-00158

5

**SANTA ANA, CALIFORNIA; THURSDAY, MAY 8, 2025**

**8:05 A.M.**

**- - -**

**(In the presence of the jury.)**

THE COURT:  Counsel, we're back in session.  All counsel are present, all parties are present, and the jury and alternates.

And, counsel, thank you for your courtesy.  If you'd be seated.

And, sir, would you retake the stand, please.

This will be continued direct examination of Mr. Holloway.

<u>**JEREMY HOLLOWAY, PREVIOUSLY SWORN, RESUMES THE STAND**</u>

**DIRECT EXAMINATION (continued)**

BY MS. MKRTCHYAN:

Q    So, Mr. Holloway, stopping at the point in time when we discussed the first encounter with police officers, the deputies, they left your campsite without making any arrest?

A    That is correct.

Q    During that point in time, did you make an effort to tell them that you did hear a fight and where it was?

A    Yes, I did.

Q    And who were you talking at that point in time when you tried to make that effort?

**UNITED STATES DISTRICT COURT**

3-RenSER-00159                                                    3-RenSER-00159

6

A    I believe at this point it might have been Deputy Gonzalez.

Q    Okay.  And Deputy Gonzalez was less confrontational than Deputy Renegar?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    This was the conversation where Gonzalez was telling you, "Are you going to allow us to explain what's going on?"  Do you remember?

A    Yeah.  I would say he was trying to de-escalate a little bit.

Q    Okay.  And what did you tell him?

A    I was a little bit frustrated at that moment, and I believed that they were there because of the -- there was two campsites arguing about one campsite's fight.

Q    Did you tell him that, you know, "This is not me.  I've heard something.  You need to go check"?

A    Yes.

MR. HARRELL:  Leading.  Leading.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    What did you say?

A    I was telling them that -- where they should go look.

Q    Okay.  And did you point in some direction?

UNITED STATES DISTRICT COURT

3-RenSER-00160                                    3-RenSER-00160

A    Yes, I did.

Q    What direction did you point?

A    I pointed at the Campsite 66.

Q    Okay.  Then they left.  Did you see them go in that direction, Campsite 66?

A    No.

Q    Okay.  After that, you saw officers leave.  What did you do next?

A    At that time I -- well, they woke me up, so I had to use the restroom.  So I walked straight along the road, which -- because it was dark, and I went straight to the ranger station to complain, for one.  I wanted this written down that, you know, they came out to me when I was using the restroom.

Q    Were you able to make the complaint -- register your complaint with ranger station?

A    No.  As I had been -- I had worked in that ranger station before -- I'd set up the copy machine -- I know there's a back room.  So I saw light back there.  So I was knocking on the window, hoping maybe someone was in there.

Q    Was there anyone?

A    No one -- I don't know if anyone was there, but nobody answered my knock.

Q    Okay.  And then you used the restroom and came back to your campsite?

A    Yes.  The restroom is right across the way of the ranger

**UNITED STATES DISTRICT COURT**

station.  And then I followed the road back to my -- but I -- as I did see -- as I was at the ranger station, I did see two police officer SUVs still parked in front of the campsite -- or the campground, maybe -- probably talking about their report.

Q    So you saw sheriff's car still in the station -- park ranger station?

A    Yes, I did.

Q    So you came back to your campsite.  What did you do next?

A    Well, still trying to calm down from the situation.  And the -- I -- like I said, I heard it most likely come from Campsite 66.  And I told them, "Why haven't you got out of your tent and said something, you guys?  You know you heard the cops here.  You could have let them know what happened."  Instead they let me -- and I was talking to the Campsite 66.

Q    Okay.  Let's make it clear.  Did you actually go to Campsite 66?

A    No.  I was in front of my tent at that point.

Q    And were you hoping that they were going to hear you? How did you expect they were going to hear you?

A    To be honest, I -- I knew everybody was still awake.  I don't know what -- to effect.  Probably honest to this day I probably shouldn't have done that, but I was frustrated.

Q    Okay.  So you were in a loud tone of voice.  You used a loud tone of voice?

A    I wasn't screaming but --

3-RenSER-00162                                    3-RenSER-00162

MR. HARRELL: Leading. Leading.

THE COURT: Just re-ask the question.

BY MS. MKRTCHYAN:

Q    Did you use a loud tone of voice?

A    No.

THE COURT: Overruled.

You can answer once again.

THE WITNESS: I spoke loud enough to speak to someone that was 20-foot away in a tent.

BY MS. MKRTCHYAN:

Q    Okay. And that hope that you were doing this was what?

A    Just to let them know, like, "Hey, I was -- you guys should have got out and said something if you got in a fight, explain who it was. We argued. We apologize. There's nothing going on."

Q    Okay.

A    To that effect.

Q    Did you go to any of the campsites, inside of their campsites?

A    No, I never did.

Q    Did you go to Campsite 67 where Joshua Gomez was?

A    No, I did not.

Q    Did you go to Campsite 63, Fuerbach's campsite with the RV?

A    No. I went the opposite way of that.

3-RenSER-00163                                    3-RenSER-00163

Q    Okay.  So you were in between 66 and 63; right?

A    During -- yes.

Q    Okay.  Your campsite?

A    My campsite, yes.

Q    So then did anyone respond to you when you were yelling?

A    No.

Q    Did anyone come out of their tents and say, "Look, what's going on?" you know, "Why are you upset?" et cetera.  Did you have any conversation with anyone at that point?

A    No.  I said my sentence and just was ready to get back in my tent.

Q    What did you do next?  Were you actually looking for things and organizing your camp at this point?

A    No.  From the visit from the police officer, they had dumped all of my backpack.  And so I was in my tent, putting my -- the knives that they dumped out and clothes, everything that I had.  So I was putting that back into the backpacks.

Q    So going back to the exhibit that we had, the diagram you drew --

        MS. MKRTCHYAN:  This was Exhibit 104, Your Honor, that we went through yesterday.  May I publish?

        THE COURT:  Yes.  From memory, it's either 104-5 or 104-6.

        Do you recall?

        MS. MKRTCHYAN:  Yes.  It was 104 -- I'm not sure

**UNITED STATES DISTRICT COURT**

what number it was, but that was the diagram drawn at the deposition.

THE COURT: 104-6.

MS. MKRTCHYAN: Yes. Thank you.

BY MS. MKRTCHYAN:

Q   So this is the diagram of your campsite -- right? -- that you drew. We spoke about yesterday briefly?

A   Yes. The best I could do. It's not to scale.

Q   Okay. So now looking at this diagram, when you were standing there, your sleeping tent is on the left, supply tent is on the right. And where were your knives when officers left?

A   So my -- I would say my knives were still in the tent, like, where they dumped. There's right here (indicating) where I had put an axe. That's where my axe was leaned up against my picnic table. And this -- I put an "M"; you'll see it right here a little bit, but it was leaned up. That's the machete, but it was more of a fire poker because it was a damaged machete. And as I testified, you heard earlier, that there was a machete leaned up against the truck was not true. That was just that broken machete. There was no other -- and that was it.

Q   So let's focus on the knives though.

A   Okay.

Q   The officers saw the knives. They got them out of the

3-RenSER-00165                3-RenSER-00165

12

backpacks. What were you doing before they arrived second time?

A   Before they -- by the time they had come, everything had already been put away. So --

Q   Were there any knives strewn on the ground?

A   Negative.

Q   Okay. So when you were standing there and doing that -- you said you were preparing to get back to sleep. Where were you standing when you saw officers' lights and sirens?

A   There's a pad right here in front of my tent because I had taken off my shoes. And I was standing right there in front of the tent (indicating).

Q   Okay. And you were wearing still a jacket?

A   Yes. It was cold.

Q   Okay. So as you are doing that, you're getting back -- ready for sleep, what happens next?

A   Well, I was going to get ready to go to sleep. So I usually smoke pot before I go to bed. So I was about to have a bowl, and then I see all these cops coming. And so I was, like, "Oh" -- first thought is they must have found who they were looking for.

        And they came to my tent, so I threw the bowl inside the tent just because I did not want to be involved in any more issues. I threw that in there. So I'm watching what's going on.

**UNITED STATES DISTRICT COURT**

3-RenSER-00166                                    3-RenSER-00166

Q    Let me stop you right there.  So you did have medical marijuana; right?

A    Yes.

Q    Now, were you concerned that officers are going to come and -- you know, why were you so concerned?  Like, did you believe that --

MR. HARRELL:  Leading.

THE COURT:  Just ask the question, Counsel.

MS. MKRTCHYAN:  I'm trying to, Your Honor.  Thank you.

BY MS. MKRTCHYAN:

Q    So -- all right.  So as you are standing there, you see -- how many police officers' cars do you see?

A    So I believe it's two SUVs at the beginning show up.

Q    Okay.

A    And I'm paying attention to -- so I'm standing there. Again, I didn't know what was going on, so I was watching as an observer.  And then they stopped at mine.  So kind of about the same time, I had two officers to my right, which would have been in this area (indicating), and then I'm watching.  And you'll see my arrows.  And, again, I have no left peripheral on both of my eyes.  So I'm trying to watch as I got two officers over here.  And then I have these arrows (indicating).  That is another officer coming at me.

Q    Okay.  So you're still standing near your tent; right?

UNITED STATES DISTRICT COURT

14

A    That is correct.

Q    Okay.  When you see them come, what were -- did they have any guns drawn?

A    They -- yes, as they're coming up, they are fully guns drawn at me.  So this is why I'm very alert as to who is -- and what's going on.

Q    Okay.  And it's still dark.  Their guns are drawn with flashlights.  There's light on their guns?

A    Right.  You could just really barely see from the lights that they've shown on the road.

Q    Okay.  And were you wearing your glasses?

A    No.  I did not have my glasses at that time.

Q    What was the first command you hear from officers?  What were they telling you, the first thing?

A    The first commands was to get away from my tent, toward the center of the campsite.

Q    Okay.  And did you do that?

A    Yes, I did.

Q    Okay.  Where did you go?  Show it on this map -- on this diagram how you complied with that command and where you went.

A    I have it diagrammed right here (indicating).  I'm standing about right here (indicating).

Q    Okay.  And we had video of you -- let me pull this down.  Actually, let's look at the actual video.

          MS. MKRTCHYAN:  This is 104-7 now, I believe,

**UNITED STATES DISTRICT COURT**

3-RenSER-00168                                    3-RenSER-00168

Your Honor.

THE COURT: 104-7.

MS. MKRTCHYAN: I believe so. I will sort that out later, but this is the same 104.

BY MS. MKRTCHYAN:

Q So let's look at this video, if we can, where you were standing at the time officers approached you.

**(Videotape played, not reported.)**

THE WITNESS: All right. We do our best to show you. But as it was, I believe, a year later, things are different. The picnic table has changed shape. That barbecue didn't exist there. So that would have been a little bit different.

But otherwise, my -- where the firepit is and about where they're showing the camera on that left side would be about where my tent would have been. And that's where I would have been standing about, yeah.

BY MS. MKRTCHYAN:

Q Okay. Understood. Now, but were you preventing officers to go check your tents? How far were you from your tents, either sleeping tent or the supplies tent?

MR. WRONIAK: Objection. Compound.

THE COURT: Well, also, there's two tents involved. It's ambiguous.

Restate the question.

**UNITED STATES DISTRICT COURT**

3-RenSER-00169                    3-RenSER-00169

MS. MKRTCHYAN:  Okay.

BY MS. MKRTCHYAN:

Q     Were you in any way preventing their access to your tents if they wanted to?

A     No.  I was at least 15, 20 feet from the supply tent and 5, 6 feet away from my sleeping tent.

Q     So you are pretty much standing there away from your tent, away from the supply tent, standing there?

A     Yes.  Just like they asked me to.

Q     Okay.  What happens -- did they ask you another thing to do?  What else did they ask you to do?

A     They asked me to raise my arms, which I did in the position like they asked me, with my palms up, arms raised out, and I did just as they did.

Q     Okay.  But was this a request, or was it a command?

A     They were guns drawn.  To be honest, I was scared. Anything could happen at that moment.  I know gun safety, and number one gun rule is you don't point your gun at anything you're not planning on shooting.  So everything moved -- everything I did at that movement was life or death.

Q     All right.  So when you stood there with your arms extended, did you move in any way?

A     No.

Q     Did you make any gesture with your hands that could be perceived as threatening or reaching for a weapon?

UNITED STATES DISTRICT COURT

17

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  It's the "perceived."  Just re-ask it concerning what he --

BY MS. MKRTCHYAN:

Q    Did you reach for your waistband?

A    No, I did not.

Q    Did you make any move in any shape or way with your arms?

A    No.

Q    So you were standing there stationary with your arms extended like a cross?

A    Yes, I was.

Q    Okay.  So what happens next?  What are they telling you next to do?

A    Well, at this point I'm asking, "What happened?"  Why are they there?  They're just here.  You know, I'm confused.  I don't know -- I really don't know what's going on.  They barely -- they didn't even talk to me about the first one.  I was too irritated to even want to talk to them.  And then the second one, I really have no idea what's going on.  And they're just guns drawn.  So I'm questioning them.

Q    So what did you say?

A    "Why are you here?  What did I do?"  And then I'm telling them, "I've done nothing.  I've been here.  You were just here."

Q    Did you get any response to that?

UNITED STATES DISTRICT COURT

3-RenSER-00171                                    3-RenSER-00171

A      No, I did not except for yelling to get on the ground.

Q      Okay.  And they were yelling in what tone?  Well, we've heard the tape.  But we have Gonzalez without a tape.  We have Pahel and Renegar with a tape, but Gonzalez has no tape; right?

A      Correct.  I had three officers, and I had multiple commands.

Q      By all three officers?

A      Correct.

Q      And they were all -- when you were asking questions, "Why you are here?" did you get any response?

A      No response.

Q      Did they tell you, "We are here to investigate the little girl screaming"?

A      No, they did not.

Q      Did they tell you, "You need to let us search you.  We are investigating a call for disturbance.  We need to search you, sir"?

A      No information.

Q      Did anyone tell you, "We need to handcuff you so that we can go inside your tent to see if there's anyone else there"?

A      No.

Q      Okay.  Did you expect officers to -- when they came second time within -- how many minutes passed?  How many minutes passed from the time they left your campsite and they came with guns drawn?

**UNITED STATES DISTRICT COURT**

19

A     I would guess 20 -- 20 minutes or so, plus, minus.

Q     And did you recognize these officers from the first time?

A     I recognized a couple of them.

Q     Okay.  So when you were asking this questions and they were not talking to you, the only command you heard, we hear on tape, is what?

A     Just "Get on the ground."

Q     Okay.  And why didn't you get down on the ground?

A     I was scared.

Q     Okay.  What was your thinking at that point in time when they are telling you "Get down on the ground" without explanation?

A     If I would have moved at this moment, the way everything was going on, the way they were yelling, I felt if I would have moved at any moment, it would have been -- he reached for his waistband.  He grabbed something.  Again, I thought I was going to get shot.

Q     And did anyone tell you how you were supposed to get down on the ground?  Face down, on your knees, your hands up?  Did anyone give you those kind of instructions that you would follow?

A     No.  I just have multiple officers screaming at me.

Q     And did anyone try to verbally communicate with you that, "Sir," you know, "we are from the sheriff's department," you know, "We are trying to investigate another call.  Were you

**UNITED STATES DISTRICT COURT**

3-RenSER-00173                                              3-RenSER-00173

disturbing your neighbors?"

A     There was never any de-escalation.

Q     How many seconds passed, from your memory, without thinking about the video?  From that point in time, you're standing there, putting yourself in that moment.  How many minutes or seconds passed from the time you were told "Get down on the ground" and to the time when you first were hit -- struck?

A     Without watching the video and putting my state of mind at that moment, it happened like that.  I'm asking what happened. They're running.  And boom, I get hit in the head.

Q     Did you see that coming -- from what direction it was coming?

A     No, because as I was going -- listening to different commands, watching both -- all three of these officers, I'm on my -- again, left side, I'm blind from my stroke -- I'm hit in the head.  And at that point I see light, like blackout.  I just --

Q     Right.  And that came from your left side?

A     Yes.

Q     Okay.  And we know from this diagram that you drew, on your left side was who, initially when you saw?

A     Yes.  When I was watching, Deputy Renegar was the deputy on the left side that was coming at me.

Q     Okay.  With gun drawn?

3-RenSER-00174                                           3-RenSER-00174

A    Yes, ma'am.

Q    Okay.  When -- and did you see Gonzalez come towards you from the right side?

A    I was watching both of them, yes.  And I was watching their actions for my safety.  I was scared at this moment.

Q    Did Gonzalez give another command?  Did he have something about the Taser?

A    I don't remember him giving a command.  I just remember yelling, "Tase him, tase him."

Q    Okay.  And did you hear them talking about lethal?

A    Yes, I heard -- this is when it just -- it got really real when I hear "You have your lethals?"  And everybody is "Yes, yes."

Q    How fast did you feel officer -- Deputy Renegar approach you and then you were punched?

A    I actually --

            MR. WRONIAK:  Objection.  Calls for speculation.

            THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    How quickly this happened when you were standing there and you were punched?

A    Standing that moment in that time, it happened immediately.

Q    Okay.  So you felt a blow to your face?

A    Yes, I felt -- I felt a blow to my left side.

UNITED STATES DISTRICT COURT

3-RenSER-00175                                           3-RenSER-00175

Q    Okay.  Did you black out?  Because you described something like "I had lights."  What happened?

A    Yes, I believe I blacked out.  I can't tell you how long I was.  Again, I'm not on a stop -- I'm not counting.

So I come to and I'm laying down on top of Officer Renegar.  He's laying -- his back is on the ground, and I'm being held.  His elbow pit is on my neck, and he's holding me and punching me with his other.  And I have other officers holding my arms.

Q    So tell us what happens next.  Tell us that moment in time when you find yourself on the ground.  You were face up, you said?

A    Yes.

Q    Okay.  So you didn't go face down?

A    I did eventually.

Q    Okay.  I'm talking about the moment in time when you are punched by Renegar and you find yourself after brief blackout, you were face up?

A    Yes.  By the initial officers, I was being punched in the ribs and punched in the head, being choked to where I could not breathe.

Q    Okay.  What else did you feel at that point in time?  What other use of force was applied on you?

A    Well, as we go, I'm being turned over.  I have an officer on my back.  I have officers holding my arms, and I'm laying

**UNITED STATES DISTRICT COURT**

down like this (indicating) on the ground. And I'm watching what's going on, trying to figure out what's going on. I'm still yelling, "I have not done anything wrong," trying to figure out what's going on.

And then I see another officer that wasn't from the first three come and knee me right in the eye, in the temple area of my right side. And there is a moment where I did pull up my right arm to try to block my -- to save my face. And you do see blood on my arm from where I was trying to protect my head.

Q    Did you actually feel when you started bleeding from your face?

A    Yes. And I even say it.

Q    And how did you feel the moment in time when you saw blood?

A    The moment I saw blood, because it was warm and it was in my eye.

Q    And how did you feel when that -- when you saw blood?

A    I was scared. I'm just trying to -- we're now in life or death. I'm getting hit in my temple, in my eye. And -- you know, and then I'm getting kicked everywhere right now, and I'm being held down. It's like I have -- nothing I can do because I'm being held down and beaten. I can't do anything.

I'm trying my best to -- so I wasn't fighting. I was protecting my head. But everything else I had a large

UNITED STATES DISTRICT COURT

3-RenSER-00177                                    3-RenSER-00177

24

officer on my legs, on my calf area. I believe Officer Renegar was on my butt area, lower back. And I had other officers holding my -- arms held out while I had one leaning on his buddy, using leverage to knee me in the head. And I see that until like -- and that's why I'm trying to do that as I'm lying on the ground.

Q    So you did feel actually knee strikes on your head?

A    Yes, I did. And I say it.

Q    Okay. And then -- so after that, did you -- and this was ongoing -- were you actually striking them in any shape or way? Can you strike them?

A    No. I even tell them, "I'm not fighting you." And my words -- the best way to say it is I wasn't fighting them; they were fighting me. They were just -- and then with one officer starting it and officers seeing their other buddies in an altercation, they automatically want to save the other officer. So I become now the victim of -- it's pretty much of just -- it's chaos.

Q    So -- all right. So let's -- going to that moment again. So did you feel the Taser?

A    Yes, I did. I felt it several times.

Q    Okay. And you felt the Taser. And when the Taser was applied, did you feel it -- where did you feel it in your body, the Taser?

A    I felt it in my whole body. So I couldn't have told you

the direction where it was coming until they had to take me to the hospital to remove the barbs.

Q    And when the Taser was applied, were you face down?

A    Yes.

Q    Okay.  Could you have done anything?  As this Officer Gotts was saying, "He was trying to get up from the ground," were you trying to get up from the ground before the Taser was applied?

A    No.  I believe at this point we have seven officers on me. Again, and I'm not a big guy, and these guys are much bigger than me, there's no way.  I was not moving.  I was not fighting.  And I had been pinned in every appendage.

Q    And when you were screaming, "Blood on my head," et cetera, did you feel like anyone was actually listening to stop the beating?

A    No.  It just -- it felt like forever was going.

Q    And so did you ever place Renegar, as he has claimed in this lawsuit, in a headlock?

A    No.  It wouldn't have been possible.

Q    When you were taken down to the ground, you came to yourself, you were actually on top of him face up?

A    Correct.  I never hit the ground.

          MR. WRONIAK:  Objection.  Leading.

          THE COURT:  Sustained.  Leading, counsel.

          Just restate the question.

3-RenSER-00179                                    3-RenSER-00179

BY MS. MKRTCHYAN:

Q    As you testified earlier, when you were taken down to the ground by the punch of Renegar, you came to yourself in what position?

A    Laying on top of Renegar's stomach and hit my back.  My back was laying on top of his stomach.  So he had his left arm holding my neck.  So my best would be -- guess he used his body weight to fall backwards with me.  Because I -- my feet were now toward the direction of the picnic table.

          MR. HARRELL:  Your Honor, "guess."  Motion to strike.

          MS. MKRTCHYAN:  That's --

          THE COURT:  Just a moment.  Just a minute.  No, overruled.

BY MS. MKRTCHYAN:

Q    Did you ever at any point in time grab anyone's head?

A    No, I did not.

Q    Did you ever at any point in time grab anyone's ballistic vest?

A    No, I did not.

Q    Were you able to do that when officers, three officers, came to you with guns drawn?  Were you able to do that?

A    No, I was not able to do that.

Q    Were you able to reach for their weapons when you were then face down?

**UNITED STATES DISTRICT COURT**

3-RenSER-00180                                          3-RenSER-00180

A    No.  At any point, no.

Q    When you were face down on the ground, were you kicking with your legs?

A    No.  I was being held down on my legs.

Q    Did you make any movement on the ground?

A    Just when I was trying to save my head from being kicked and kneed.

Q    And how were you moving?  In what way were you moving?

A    Just trying to -- whatever I could do.  Because they're still holding my arm, and I'm just -- I've got my hand about right here (indicating), and it's just blocking the knee strikes.

Q    And this entire thing for you while you are on the ground, how long can you say it was ongoing, that use of force?

A    If you were to ask me that moment, I could have told you maybe an hour.  It felt like -- it felt like a long time.  I was fighting for my life or just -- my life was -- I was held down and beaten.

Q    Now, when officers then brought you up, so now you are placed in handcuffs; right?

A    Yes.

Q    And when you were placed in handcuffs -- even after you were placed in handcuffs, did they actually stop their application of force after you were handcuffed?

A    No.  Also, the guy that was on my legs, he stands on me as

**UNITED STATES DISTRICT COURT**

3-RenSER-00181                                    3-RenSER-00181

he steps on -- like, stomps on me as he gets up.  And you hear me say it.

Q    What did you say?

A    I said, "I'm not fighting.  There's no reason for you to be stepping on me."

Q    So he stepped on you with his body?

A    Yes.

Q    Where?  In which part of your body?

A    On my legs because he was the one laying down.  So in my -- like, back of my knee, top of my calf area.

Q    So then you were picked up and placed on the log to sit there?

A    Yes.  I had an officer grabbing the back of my neck and pushing me down on a log.

Q    Okay.

MS. MKRTCHYAN:  So we are going to play some parts of the use-of-force part, Your Honor -- video, to go over some issues.

THE COURT:  Is this a new segment?  I know it's the 104 series, but is it labeled 104- --

MS. MKRTCHYAN:  No.  We are going to go into Renegar's tape for the use-of-force part.

THE COURT:  So what exhibit number is this so we know?

MS. MKRTCHYAN:  That's 102-2 or something.

**UNITED STATES DISTRICT COURT**

Renegar's second tape.

THE COURT: All right. This will be from Deputy Renegar's video -- or from his body cam. Counsel.

MS. MKRTCHYAN: Yes. Let me just briefly do this.

THE COURT: Is this going to be a video?

MS. MKRTCHYAN: Yes, Your Honor.

THE COURT: We need to get that copied then. Thank you.

MS. MKRTCHYAN: Yes.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So this point in time when you are saying "I'm not moving. I'm not moving. "Why am I being --" your sentence is interrupted?

A    That is correct.

Q    Now, what were you trying to express? What was going on in your mind when you were saying "I'm not moving. I'm not moving"?

A    At that point they had told me to stay at that point. I didn't want to move. I told you I'm scared at this moment. And I'm trying to ask "Why am I being detained?" because I felt I have the right to know -- as a citizen, to know why because I don't know why they're there. I have no idea what's going on.

Q    Right. So -- and your sentence is interrupted. And let's continue playing this.

**UNITED STATES DISTRICT COURT**

3-RenSER-00183                    3-RenSER-00183

(Videotape played, not reported.)

BY MS. MKRTCHYAN:

Q    So when you said, "I'm not.  Why am I being --" is that the point in time when you felt the blow to your face?

A    Yes.

MR. WRONIAK:  Objection.  Leading.

THE COURT:  No, overruled.

You can answer that question concerning timing.

THE WITNESS:  Yes.  That's when I was hit in the head.

BY MS. MKRTCHYAN:

Q    So -- and then when you are on the ground, we hear punches.  Are you the one doing these punches, or is it the officer who's throwing punches on you?

A    No.  I'm being detained and punched.

Q    And then we hear you make sounds -- growling sounds, and then you say, "You're kneeing me in the head."  Did you hear that?

A    Yes.

Q    Okay.  And is this the point in time when you were held in a chokehold by Renegar, as you testified?

A    Yes.  I believe -- because it happens -- in reality it happens actually kind of fast.  I believe this is in the time when I'm getting choked and switched over.

Q    Okay.  So -- but when you are growling, you are making

3-RenSER-00184                                    3-RenSER-00184

sounds of growling, is that the point in time when you cannot breathe?

A     Right.  You can hear me trying to say words, and I'm just being in pain.  I can't breathe.

                    **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     So what are you saying at this juncture?

A     Again, I'm still pleading with these officers, "I have not done anything."  Nobody has said anything to this point.  I have -- they -- still don't know why they're there at my campsite.

Q     And when you are saying "What are you doing?  I didn't do anything," what are you trying to express to them?

A     They're beating me up.  I'm telling you, I haven't done anything.  There's no reason for this, what they're doing to me.

                    **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q     At this point in time, you are saying what?

A     That's about the time I'm getting hit in the -- kneed in the eye socket.  You could hear me saying "I'm bleeding."

Q     And then we have the -- what, Renegar?

A     "Taser, Taser, Taser."

Q     So are you actively resisting at this point in time on the ground when you are bleeding?  You were just hit in the

3-RenSER-00185                                    3-RenSER-00185

32

face.  You were on the ground.  Are you actively resisting?

A    No.  I believe at this time we're at the seven-officer point, and the time I'm trying to stop my head from being kneed and punched.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    We hear the clicks of the Taser?

A    Yes.

Q    And there's a lot of now officers' voices, your voice --

A    Yes.

Q    -- your screaming, your growling.  Describe to me how you -- this point in time when Taser is applied how you felt.

A    Again, on top of the punches and holding down, I'm now -- when you get that electricity, your whole body just tenses up and it hurts.  It does not -- it's just complete pain all over.

Q    So then he says, "Stop moving," in a loud tone of voice. "Stop moving."  Were you actually moving in any shape or form when we have already, by count, at least five officers here?

A    No.  I believe at this moment they have -- everybody has my arms, and I've been tased.  Of course I might have moved a little bit but not in a fighting or wrestling manner.

Q    So you are doing impulsive responses with your body in response to the Taser?

         MR. WRONIAK:  Objection.  Leading.

         THE COURT:  Just a moment.  Sustained.

**UNITED STATES DISTRICT COURT**

3-RenSER-00186                                      3-RenSER-00186

BY MS. MKRTCHYAN:

Q    So when you are moving, what kind of moves were you making at this point in time when the Taser is being applied?

A    Again, like I said, just when that Taser hit me, my whole body jolts and tightens.  So whatever -- if they were holding my arms out, my body instincts want to -- I mean, your body naturally wants to go into a fetal position.  So any kind of jolt that they give me, my body is going for fetal.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    When Renegar says "Check the tents to see if nobody's there," what did you say?

A    I said, "There is nobody in there.  I told you -- like, you guys already knew that."

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    What did you say at this point in time?

A    I think -- if I remember -- it might have been misplaces -- when the step -- if I remember, it says, "Please don't fight -- this might be the point --

Q    Let me replay it.

A    Yeah.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Did you hear when you say something here?

**UNITED STATES DISTRICT COURT**

3-RenSER-00187                                    3-RenSER-00187

34

A    Yeah.  I believe that's "Please don't step on me.  I'm not fighting?

Q    All right.  And then we heard Ren- -- well, sorry, Pahel's tape, the use of force on his microphone.  There is some more sounds we hear on his tape that we don't hear on Renegar's tape; right?

A    Yeah.  As you hear each one -- different tape, you'll hear a better version of certain things.  Like, almost this version we're listening to, it sounds clear on Gotts'.  You'll hear a better version of what's happening.  It's hard sometimes because you're not able to watch what's happening.  So, again -- and I'm on the ground.

Q    Okay.  Let me play --

MS. MKRTCHYAN:  Your Honor, we are going to play Pahel's tape.

THE COURT:  All right.  Now give me a number so I have that, though, for my --

MS. MKRTCHYAN:  102- --

THE COURT:  This is going to be from Pahel's -- Officer -- Deputy Pahel's but --

MS. MKRTCHYAN:  Yes.  That's 102-4, and I --

THE COURT:  Counsel, just a moment.  102-4.

So, Karlen, I'll need your help.  Just keep track, okay?

All right, Counsel.  Now if you'll go -- give those

**UNITED STATES DISTRICT COURT**

3-RenSER-00188          3-RenSER-00188

to Karlen.

Karlen, would you be kind enough to hand these transcripts to the jury, please.  Thank you.  And if I can get a copy also.

**(Transcripts handed to the jury.)**

MR. WRONIAK:  Ms. Mkrtchyan, are you planning on playing the entire thing?

MS. MKRTCHYAN:  Whatever the Court wishes.  I think for the purposes of time, I would not want to play the whole thing.  But if the Court wishes, I can play the whole thing.

THE COURT:  It's not my -- you two decide what you want played.

MR. WRONIAK:  I think we've been playing them all the way through on the first time.

MS. MKRTCHYAN:  Okay.

THE COURT:  All right.  All the way through.

MR. WRONIAK:  Thank you.

THE COURT:  All the way through.

MS. MKRTCHYAN:  Let's play the whole thing.

THE COURT:  Now remember, ladies and gentlemen, you're getting different audios from different deputies that they're carrying with them; and therefore, I'm going to allow this to be played.  Some of this may be redundant, but you may be picking up different parts of a conversation that were inaudible on another officer's audio.  Thank you.

**UNITED STATES DISTRICT COURT**

3-RenSER-00189     3-RenSER-00189

You are going to see once again when we start this, that this is going to be Officer Pahel speaking to begin with. And it will be, once again, his audio.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Okay.  So --

THE COURT:  Why don't we take a recess.

MS. MKRTCHYAN:  Sure.

THE COURT:  Counsel, if you'd remain for a moment.

I need a few moments to speak to both counsel on each side.  So give us about another 5 or 10 minutes.  So about 20 or 30 minutes, okay?  You're admonished not to discuss this matter amongst yourselves nor form or express any opinion concerning the case.  Have a nice recess.

Counsel, if you'd remain and be seated for a moment.

And, Mr. Holloway, you may step down.  Thank you, sir.

**(Out of the presence of the jury.)**

THE COURT:  I'd like to have a discussion with you about this tape for a moment, but I'd like to not do that in the presence of the deputies or Mr. Holloway.  I'd like to have a discussion with counsel.  Would that be acceptable for a moment?

MR. HARRELL:  Yes, Your Honor.  May they be excused?

THE COURT:  Yeah, Mr. Holloway and the deputies,

UNITED STATES DISTRICT COURT

would you remain outside.  I just want to have a discussion with counsel for a moment.  And it might be in light of some of the testimony here, and I want to make certain you're not privy to that.

MS. SWISS:  Your Honor, our tech is still present.  Is that okay?  He's not a party.

THE COURT:  Go have a nice recess.  No, no.  I'm going to need you, actually.  I'm going to need you.

**(Deputies and Mr. Holloway left the courtroom.)**

THE COURT:  Who prepared this transcript?

MS. MKRTCHYAN:  The transcript is prepared by an independent person.

THE COURT:  Okay.  Who prepared this transcript?

MR. HARRELL:  Your Honor, if we can have a copy of the transcript.

THE COURT:  Who prepared this transcript?

MS. MKRTCHYAN:  Your Honor, that's plaintiff's certified interpreter -- or transcriber.

THE COURT:  This transcript is highly inaccurate.  I don't care who prepared it.  I assumed initially it was prepared by the defendants.  I'm absolutely wrong.  I just want to start through this transcript for a moment, and I want to go to page 6.  Could each of you help me and turn to page 6.

MS. SWISS:  I have it, Your Honor.  I can get --

MS. MKRTCHYAN:  Well, I've given exhibit list --

THE COURT: Counsel, there's not to be any further discussion. You're going to follow my directions now, both sides. Understood?

MR. HARRELL: Understood, Your Honor.

THE COURT: All right. Stop the bantering.

Turn to page 6. First of all, on line 19 where the insertion is Jeremy Holloway, that is not Jeremy Holloway. That is Joshua Gomez.

MS. MKRTCHYAN: Yeah.

THE COURT: And this whole conversation beginning on line 5, about 30 seconds, no audible conversation, is Pahel talking to Gomez. And when you read down the ledger, there's been an insertion on line 19 that somehow Jeremy Holloway is saying:

"And so she probably hit him. And then he got angry and started whaling on her and then he said, quote, 'I'm a war veteran. I don't do this shit' and was just, like, yelling. And this other guy was like, 'Why would you hit her?' And we were both in there."

Whoever inserted Holloway or why is baffling to me because you could clearly hear that this is Gomez relating to Pahel. And what he is apparently saying is -- I'm hearing this person, when he's allegedly harming this girl, saying, "I'm a war veteran."

UNITED STATES DISTRICT COURT

I want you also now to play the first page, and I want to hear this repeatedly from lines 1 all through 14.

Can you put that up and put the volume up for all counsel for a moment on Pahel.  Now listen carefully at line 6.

You hear Pahel says, "Get on the ground," and then we're going to hear something.  I want you to play that again.

**(Videotape played, not reported.)**

THE COURT:  Start it again.  I want to hear it one more time.

**(Videotape played, not reported.)**

THE COURT:  Now stop.  Stop.  I may be mistaken, but I hear the word "no."  Now I'm not certain of that.  I'm going to play this three or four times, but it seems audible.  And if I'm correct, this transcript is highly inaccurate.  Now, I'm not placing blame on anybody.  I'm not placing blame on you, counsel for the plaintiff.  I'm not placing blame on the defendant.  In fact, I thought it was the defense who prepared this when I came to this hearing.

Play that again.

**(Videotape played, not reported.)**

THE COURT:  Play it again.  Start it again.  I want to hear it repeatedly.

**(Videotape played, not reported.)**

THE COURT:  Now let's stop the tape for a moment.  I clearly hear "no."  But here's what I don't want.  I don't want

**UNITED STATES DISTRICT COURT**

prejudice falling to the party or person who prepared this.  So what I'm concerned about is if this is an inaccurate transcript -- and much of this is very good, by the way -- then I don't want the parties pointing, for instance, to the defendant or to the plaintiff and have you responsible or portrayed in front of the jury as you somehow either left out or included the inaccuracy.  None of you prepared this.  You placed it with a third party, apparently, I'm learning. Apparently not the sheriff's office prepared this; is that correct?

MS. SWISS:  Correct.

MR. HARRELL:  True, Your Honor.

THE COURT:  I want to take away that prejudice because what I'm afraid of is hearing this that counsel might be tempted, without this conversation, to say, "Oh, Plaintiff, you prepared this, and you left out this portion about 'no,'" or "In fact, this is obviously Gomez, and here somebody inserted 'Holloway,'" which causes confusion.

After hearing plaintiff's representation, I don't want that question then pointed at the plaintiff because she didn't prepare this.  It went out to a third party.  And I would pay the same courtesy to you on the defense side so we're not into the obfuscating accusation or hiding information. That would be prejudicial.

The second thing is whoever transcribed this didn't

3-RenSER-00194                                    3-RenSER-00194

know who the parties were. And we've got experts -- or experts which will be subject to criticism of the deputies in terms of not looping back to the witnesses. Well, here it clearly shows that they're looping back to the witnesses, but it's not entirely clear from the transcriber's standpoint nor should he or she be making assumptions later on when they're talking to the witnesses, who they are.

So, for instance, go through Joshua Gomez, for both of you. Go down to the end of Gomez's initial rendition. What happens is they loop back to Gomez again on page 13. So look at that initial part of Gomez. And loop back and you're seeing 13. And that's right back to Gomez again, but your transcriber doesn't know that.

Now, the second thing is, here the police are talking about different crimes, and they're searching, as you've represented, "Hey, what do we have here?" And they go through a whole rendition of "Well, is it a 415? Is it a 602?" et cetera. This is not a conspiracy, but this -- the plaintiff has the right to show that they're getting together, either rightfully or wrongfully, and they've got access to -- it's not wrongfully. I won't make that determination. This is not a conspiracy.

But you have the right to show -- "Look, they're out at the scene and they're able to match up their stories and, in fact, they're having a conversation on this tape about..."

3-RenSER-00195                    3-RenSER-00195

Now, from your perspective, that's good police work. From your perspective, that is "Hey, what do we have here? We're going back in good faith to talk to these people. We're trying to sort out whether we've got a 602(j)," et cetera. But you have the right to say whatever this is. This is the ability for them to get their stories together in a sense.

Now, I leave that for the jury. That's going to be a tussle between the two of you.

I encourage you to go back through this transcript again. There are certain portions -- and I won't go any further. They're even more audible than the part that stands out to me, and I clearly heard "no" the first time, and I heard "no" the second time.

And number two, this insertion of Holloway in the middle of Gomez -- this is Gomez.

No, I'm speaking now. You're not speaking. And I'm pointing to the defense on this occasion. You let me finish with courtesy, and I'll give you the rest of the day. I really get frustrated with counsel interrupting me, okay? Now I'm not frustrated anymore.

Number 2, I want you to go back and check this for accuracy. And I doubt that you can reach a stipulation. You haven't reached a stipulation on anything, but I'm prepared to hear this this evening again and go through this piece by piece as well as any other transcript you want me to go through

3-RenSER-00196                    3-RenSER-00196

because I'm not satisfied in submitting this to the jury right now that this is accurate at all.

Now you can self-correct my stipulation and take this thing out of this. You can stipulate it's Holloway, if you want to, in the portion of Gomez. But what I don't want is I don't want the pointing now, as I find out, to the plaintiff side when you sent this out to an independent party and an accusation in front of the jury that you've obfuscated that.

Now it's your turn. What did you want to say on the defense side?

MR. HARRELL: Your Honor, briefly, we have a transcript that we prepared. It does have accurate words ascribed to Mr. Gomez instead of Mr. Holloway. We also have the word "no."

THE COURT: Are you going to play this again? In other words, during your case-in-chief? In other words, we have one transcript in from the defense side. I would allow another transcript to be played that is more accurate, but I don't know if the defense -- if plaintiff has even seen that.

Have you seen whatever their transcript is?

MS. MKRTCHYAN: Your Honor, here is the problem I have. No.

THE COURT: Okay.

MS. MKRTCHYAN: Every time -- we've had three trials, of course.

THE COURT: No, I'm done with the number of trials. Two of these trials lie with the plaintiff.

MS. MKRTCHYAN: I disagree.

THE COURT: All right. I'll make my record again. The first trial was a jury that hung up; the second trial was caused by your client.

MS. MKRTCHYAN: I disagree, Your Honor.

THE COURT: I will make my record again. That was a blatant disregard of the Court's order, and I granted a mistrial. That is my record. Whether you disagree or not, that's my ruling. The third trial occurred with liability for all five officers, zero money awarded, and you brought the motion for new trial, which I granted.

So when you complain about the number of trials, quite frankly, the number of trials would seem to weigh on the plaintiff's side and why we find ourselves in the fourth trial here. Now, whether you disagree or not, go back to this transcript.

MS. MKRTCHYAN: Can I speak, Your Honor?

THE COURT: You can speak, but I'm trying to forego the prejudice to you and trying to forego, and you're not hearing me that the other side points out that these are highly inaccurate and comes out with another transcript that puts you in the position, when you represent to me that you had nothing to do with the preparation of this and sent it out to a third

3-RenSER-00198                    3-RenSER-00198

party.  I'm trying to avoid that prejudice to you.

All right.  Now you speak.

MS. MKRTCHYAN:  Well, first of all, I was -- I'm not complaining every day about three trials, but, you know, let the record speak for itself.  I asked for a trial on damages only, and we are doing liability plus damages.  So that's just for the record.

But I'm not complaining here about -- I'm saying that this transcripts have been produced three times at each trial, and we have made it very clear we don't want this transcripts to go into evidence.  We made it very clear day one that, yes, it is transcribed, as you can look at my --

THE COURT:  Counsel, I'll allow this transcript then to go into evidence, but I'm going to then allow you to put your transcript in.

MS. MKRTCHYAN:  Well, I didn't want that to go -- okay, again, let's make it very clear, plaintiff's position.  I actually think their transcripts are inaccurate.  At the very least, my transcripts here were prepared by someone who is certified.  She declared that she is, you know -- there is a declaration here.  Anytime I get the defense transcripts, there's no certification.  And that's why I myself believe their transcripts are inaccurate.

And this issue, we have had the same transcripts.  We never had the jury take them with them to the deliberations

**UNITED STATES DISTRICT COURT**

because we admonish the jury that the video is the best evidence. So I do not want this transcript to go. This is just aid.

THE COURT: Then let's just agree. We never had an agreement that the transcript goes into evidence; correct?

MR. HARRELL: Yes.

THE COURT: Then you're going to be able to present your transcript through Pahel; you're going to go through it again.

Apparently you're going to be able to point out the inaccuracies, but that transcript won't go into evidence either. And the jury can hear based upon both transcripts so in the presentation of your case, you'll apparently put on a new transcript or you'll go through cross-examination on this one.

All right. We'll resume at 10:00 o'clock. You have 15 minutes for recess.

MS. SWISS: Your Honor, there are --

THE COURT: Counsel, you have 15 minutes for recess. Just a moment. I don't mean to be curt, but I'm going to hear in a minute that you don't have enough time. Is this really important or can whatever you have wait until the end of the day or lunchtime?

MS. SWISS: Lunchtime is fine, Your Honor.

THE COURT: Then take it up at lunchtime so you have

UNITED STATES DISTRICT COURT

3-RenSER-00200                                    3-RenSER-00200

47

a 15-minute break.

**(Recess from 9:48 a.m. to 10:03 a.m.)**

THE COURT:  The jury is present, the alternates, all counsel.

Mr. Holloway, if you'd have a seat.

The deputies.

And, Counsel, continue direct examination, please.

MS. MKRTCHYAN:  Yes, Your Honor.

BY MS. MKRTCHYAN:

Q   So, Mr. Holloway, I'm going to highlight a couple of points from the video, and we will move next issue.

So looking back at this tape again...

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q   So at 5:07:00, we have Pahel's car turned around, and we can see you still on the ground when you are making those statements complaining about kneed in the face and in the head?

A   Yes.  I'm asking him if that is protocol to knee and kick people in the head.

Q   So we have you still on the ground.  Let's -- pressed on the ground.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q   Let's count how many officers are already at the scene at this time.  We have Chad Renegar; we have another officer --

**UNITED STATES DISTRICT COURT**

3-RenSER-00201                                   3-RenSER-00201

one, two, three, four, five, six -- seven?

A    Yes.

            **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    At this point as you are sitting here on the log, are you still bleeding?

A    Yes.

            **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    At that juncture we see Officer Gotts cleaning his hands?

            MR. WRONIAK:  Objection.  Leading.

            THE COURT:  Overruled.

            THE WITNESS:  Yes.

            **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Is this Officer Gotts?

A    It looks like it, yes.

            **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Moving on -- so in this segment, at 5:11:37, we see -- is this Officer Brown?

A    Yes.

Q    And he picks up your machete and puts it on the picnic table?

A    Yes.

3-RenSER-00202                                    3-RenSER-00202

49

Q    How far was this machete from where you were picked up from the ground?

A    Over 15 feet, at least.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Is this your axe by the picnic table?

A    Yes.

Q    On this ground -- on this tape, do we see any knives laying on the ground?

A    No, we don't.

Q    Let's continue playing and see what Brown does next.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    5:12:17, Brown picks up the axe and puts it on the picnic table?

A    Yes.

Q    So it wasn't near the firepit or near where you were picked up from the ground, was it?

A    No, it was not.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    We see Brown pick up something from the tent and goes then to the picnic table?

A    Yes.

Q    Those are your knives?

**UNITED STATES DISTRICT COURT**

A    Yes, it looks like.

Q    Okay.

                **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So on this tape, you saw Brown pick up something from your tent and put it on the picnic table?

A    Yes.  I keep see him doing back and forth, picking up, and putting my stuff on the table.

Q    And we saw that also on Gotts's tape?

A    Yes.

Q    In the interest of time, we are going to replay the whole thing, not to be redundant, but let's look at the photos taken at the scene by the officer, Renegar.  We saw on this tape -- true? -- that Deputy Renegar took pictures of the campsite after Brown put the knives on the picnic table; true?

A    Right.  They didn't take it before the actual scene.  They changed the scene of the incident and put everything out of my backpack and put it onto the picnic table.

Q    So let's look at some of the photographs, 99 -- well, 100.  100 series.  We looked at some of them, but let's make sure we are clear on the numbers here.  100- -- and let's see. 100- -- this was -- we already saw this.  This was the place you were seated on a log where we see you after the paramedics came -- right? -- and wrapped your face?

A    Yes.  The -- that's where they wrapped my head, and I was

**UNITED STATES DISTRICT COURT**

approached by Renegar to now take pictures.

Q    Okay.  So this is Renegar taking pictures after paramedics wrapped your face?

A    Yes.

Q    Okay.  So let's look at your face and tell us the -- where you were hit the first time when Deputy Renegar came towards you, the very first time.

A    The very first time I felt it in this area (indicating).

Q    Okay.  And when you were on the ground, you said --

            MR. WRONIAK:  Objection.  Can we describe that for the record since he's writing on the screen, please.

            MS. MKRTCHYAN:  It speaks for itself, Counsel.  Thank you.

            THE COURT:  You can do that on cross-examination, Counsel.  Well, it's his left ear.

            THE WITNESS:  It's my, I'll say, cheekbone.  The cheekbone area, temple area, to clear it up.

BY MS. MKRTCHYAN:

Q    Don't circle so that it's not -- describe it for the record so that it's clear.  Thank you.

A    Yes, ma'am.

            THE COURT:  Just redescribe it because the confusion was the circle.  Just redescribe it.

            THE WITNESS:  Okay.

BY MS. MKRTCHYAN:

3-RenSER-00205                                    3-RenSER-00205

52

Q    So -- and then on the right side of the face -- obviously we see you -- your face is red but just tell us where in the face area you were hit when you were on the ground.

A    From this picture, and I knew, but you can see that I've been hit in the side of the face that can't be covered because it's not bleeding, but you do see bruises and it's swollen.  My mouth has been hit.  I'm bleeding from the mouth.  My whole eye is covered because at this time everything is swollen and everything -- it had been dripping blood.  So they had to try to stop the blood.

Q    So your left eye is also covered pretty much.  We don't see your left eye.

A    Yes.  You could see a bruise right there under my tear duct area of where I've been hit.  And bruising under -- to the right of that.

Q    Okay.  There has been an allegation in this lawsuit that you actually sustained this head injuries from falling to the ground.  You are aware of that?

A    Yes.  I hear that -- them say that.

Q    Did you sustain this head injuries when you went down to the ground?

A    No, I did not.  My face did not go down to the ground, and also there is no blood -- or I mean -- I apologize, no dirt on my face right there.  There's no rocks that they had to pull out of my face when I got sutures.  My jacket's fairly clean.

**UNITED STATES DISTRICT COURT**

Q    So but in any event, did you actually feel getting the blood oozing from your face after you were kneed in the head?

A    Yes, and I narrate it all of the times.

Q    Now, as you were -- so 100-3, this is where you were sitting there on the log, and this is still you at the scene before paramedics arrived or after paramedics arrived?

A    I want to say that's after because you'll notice on the other pictures I'm sitting on the larger log, and you'll see much more blood in front of my -- on that area.  And this is the second place I sat after the paramedics wrapped me.

Q    Okay.  Then you have your hands.  So we have you with your jacket.  This is 100-4.  Your jacket, the right sleeve, is that blood?

A    Yes.  And you'll see blood on my hand and blood on my jacket.

Q    Okay.  And this is -- why this -- why do you have blood on your right sleeve and right hand?

A    This is where, when I felt blood coming out of my head, I tried to protect myself just by natural instincts as I'm being kneed in the head.

Q    Okay.  So this is more, you know, pictures -- 100-5 -- pictures of your hands?  More pictures of your -- 100-6, more pictures of your hands?

A    Yes.

Q    And this is the ground, 100-7, where you were picked up?

**UNITED STATES DISTRICT COURT**

3-RenSER-00207                                    3-RenSER-00207

Where you were seated, and there was some blood here; right?

A    Yeah.  That's about the area where everything happened and ended up right there for a bit.

Q    Now, let's look at the pictures with the knives.  So this where, as we saw on video, we have one, two -- this is the axe.

MS. MKRTCHYAN:  This is 100-11 for the record.

BY MS. MKRTCHYAN:

Q    So we have an axe.  This is the machete -- right? -- with this thing here (indicating), handle, and then we have some knives here in sheaths.  These are some camping tools behind.

So this knives -- let's look.  This knife in the front, was this what you had in your backpack that was picked up by Deputy Brown?

A    Yes, that was in my backpack.

Q    Okay.  And this is pretty clean; right?  It doesn't look like there is dirt on it?

MR. HARRELL:  Leading.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Does this look like this knife was laying on the ground before officers arrived?

A    No.  That looks clean.

Q    We have some other knives here in sheaths.  Does this look like -- also, were these knives in your backpacks?

A    Yes, they were.

Q    What did you use these knives for?  Why did you have these knives?

A    Just in case.  This -- I have the one where your cursor is, that was an extra knife.  I had bought an extra sheath, and that was sitting in my backpack in case I lost one.

This other one, they call it a ranger knife.  It has a different kind of blade, and it also -- I carry -- if you notice, the bottom is a fire starter.  Then you have -- this one with the wooden handle is a garden tool for using the restroom, and that's in my backpack because I don't need it at that park.  But when you're in a dispersed camping, you have to use the restroom anywhere.  This black -- these two in the back top right is just two sheaths.  That's the sheath for the garden tool; that's the sheath for that broken machete.

Q    Okay.  And you had some also kitchen utensils here?

A    That's where I put my little stove, and that's a cast iron pot.

Q    Was it apparent to a naked eye that you might be homeless?

MR. WRONIAK:  Objection.  Argumentative. Speculation.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, the officers are going to testify, as you know, that "We had no idea that Mr. Holloway was homeless"; right?

**UNITED STATES DISTRICT COURT**

56

You're aware of that?

MR. WRONIAK: Objection. Improper. Lacks foundation.

THE COURT: Sustained.

MS. MKRTCHYAN: Well --

THE COURT: You can ask him about his status, Counsel.

MS. MKRTCHYAN: Well, yes, but --

THE COURT: Speculating about what the officers -- it's --

MS. MKRTCHYAN: Not speculating, Your Honor. Okay.

BY MS. MKRTCHYAN:

Q     The stuff that you had -- you said that your car had your clothes, you had lots of things there on your campsite. What was your thinking when officers came and searched your tent the first time?

A     To be honest, I did not know what they were doing at my tent. But they were going through -- before even talking to me, knowing who I was, they had already been searching my car, looking in my car. They had seen, you know, what my situation was. So I just believe I was an easy target for them maybe.

Q     So did you feel like -- the point in time when they were searching your tent, for example, did they look at your supplies tent here?

MR. WRONIAK: Objection. Calls for speculation.

UNITED STATES DISTRICT COURT

3-RenSER-00210                                    3-RenSER-00210

57

Vague as to time.

THE COURT: If you know, you can answer that question.

This is the first encounter; is that correct?

MS. MKRTCHYAN: Yes.

THE COURT: First encounter.

You can answer the question.

THE WITNESS: Yes. I believe they were looking through the supplies tent.

BY MS. MKRTCHYAN:

Q    And you had a bunch of stuff here that look like you were there for a while?

A    Yeah, you could -- if you were looking at that, it could look that somebody was living in there.

Q    So you have lots of food here. You had -- this is, you know, lots of stuff in here in the supplies tent; right?

A    Yeah, that's the dog -- the dog crate and the dog blankets.

Q    Okay. Now -- and, you know, did you -- in your car -- truck, you said you had clothes. Was it visible to someone who's looking at your truck from outside, the clothes?

A    Yes, it was. You can see that I was living in that truck.

Q    Now, flash-forward a little bit. So -- and then after pictures were taken of you after paramedics wrapped your face and head, you had Sergeant Rawlings come and talk to you

**UNITED STATES DISTRICT COURT**

briefly?

A     Yes.  I was in a -- I was already in a gurry [sic] with the neck -- gurney, and the neck brace is already on me, and they've already done several things, you know, check blood pressure, all the things.  I had a concussion; so they were checking that.

Q     Were they trying to remove the Taser probes there?

A     The -- initially the officers were trying to yank them out of me so that I wouldn't -- they wouldn't have to take them to the hospital.  But they wouldn't come out.  So they had to be surgically removed.

Q     Okay.  Now, at this point in time when you are being, you know, treated by the paramedics, is that the time when Sergeant Rawlings talks to you?

A     Yes.  I was about to go in the back of the ambulance.

Q     And how long was this conversation?

A     It was very brief, and I didn't realize the point of that interaction.

Q     Did he actually tell you, "I'm the sergeant, Rawlings here.  I'm investigating use of force," et cetera?

A     No.  Nothing like that.

Q     So he came up to you.  And how were you feeling, physically speaking?  Like, physically, what kind of a condition were you at this point in time when he's talking to you?

**UNITED STATES DISTRICT COURT**

A    Again, I'm in pain at this time.  I've been beaten all over my body, you know, kind of just trying to stay conscious because I'm getting these headaches, and you get tired.  And then he just comes up with these accusative questions.

Q    So let's move slowly, please.  So he asks you a question.  He basically says, "Where are you hurting?"

A    Yes.

Q    You tell him?

A    Yes.  I tell, you know, my wrist, my back, my head.

Q    Okay.  And does he ask you, "What happened?"  Did he ask you what happened?

A    No.  He asked me if I didn't get on the ground when they told me.

Q    Okay.  So he basically said -- and it's on tape; right?

A    Yes.

Q    We will hear the tape with Sergeant Rawlings.  But in the interest of time, we won't play it right now.

So he says -- he accuses you of something, you say?

A    Yeah, he basically told me, "Well, why didn't you get on the ground?"  Not "Why did" -- like, there was no -- a question about the interaction before anything, just "Why didn't you get on the ground?"

Q    And what did you say?

A    Something to the effect I -- to be honest, I can't remember.  If we listen to the video, I -- I can't remember

UNITED STATES DISTRICT COURT

3-RenSER-00213                    3-RenSER-00213

right there.

Q    Okay.  So do you remember him asking you, "How did you get this head injuries?"

A    I don't remember him asking me that.

Q    Okay.  Do you remember telling him, "You've got the wrong person.  You need to go check next door campsite?"

A    Yes, I did.

Q    And so did you know the campsite number at the time when you were talking to him?

A    I didn't actually know the campsites at night.  You can't really tell.

Q    Okay.  So how did you tell him to go -- that you are the wrong person to go to?  What did you tell him, do you remember?

A    I remember saying, "Over there, the next campground" of mine -- the next campsite.

Q    Okay.  And so then you are taken to hospital?

A    Yes.  I was escorted by two police officers to the hospital.

Q    Okay.  And then you are taken to hospital.  We saw the medical records.

Tell us what was your understanding you were treated there for.

A    I was treated there for a head trauma.  I had sutures. Well, the way my injury was -- because it wasn't a regular laceration, like a scrape.  It was like a rug burn style where

**UNITED STATES DISTRICT COURT**

it was -- all my skin was off.  So they had a rough time suturing it.  So it was -- it was a little bit of time trying to get the blood stopped from there.  Check blood pressure again, check my brain.  I believe x-rays and MRIs were done.

Q    And then you also had some, you know, painkillers given to you?

A    I believe so.  They did do some doctor work.  I do remember that.

Q    Okay.  Now, do you still have a scar on your right eye?

A    Yes, I do.  And I have no nerve.  It just kind of -- there's no feeling in it anymore.  It is just -- it's just -- if I take it off, it gets swollen, it sags, and it twitches a lot.

Q    Okay.  Now -- then you were taken to jail?

THE COURT:  I'm sorry, Counsel.  You hit the microphone.

MS. MKRTCHYAN:  Yes.  I apologize.

BY MS. MKRTCHYAN:

Q    And then you were jailed?

A    Yes.  I was taken to jail from the hospital.

Q    Were you told what you were being jailed for?

A    Nobody has told me nothing.  I really felt being bullied by the officers that were with me.  Every time I'd move, they got mad at me because the chain -- the handcuff -- I was attached to the bed.  So I was still being -- I still felt I

**UNITED STATES DISTRICT COURT**

62

was being bullied.

MR. HARRELL: Your Honor. Relevance, 403. Motion *in limine*.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    So when you were --

MR. HARRELL: Motion to strike.

THE COURT: Stricken.

BY MS. MKRTCHYAN:

Q    When you were taken to jail, by that time, did anyone tell you you were arrested for something and for what?

A    No. At some time during the process of that -- and, again, I don't really know what time it is, as I've been -- it was dark. I've been in the hospital I'm in now. And at some point in processing, I received paperwork about the event, and that's it.

Q    Okay. And then you were taken -- you know, there were pictures taken of you in the jail?

A    Yes.

Q    One picture?

A    That is the booking photo.

Q    Yes, 100-13. This is where you were in jail after the hospital?

A    Yes.

Q    Why was your head unwrapped now? Do you know?

UNITED STATES DISTRICT COURT

3-RenSER-00216                                    3-RenSER-00216

A    They took it off when I went into jail.  And my shirt was also cut because it was ripped and bloody.  And they cut it off in jail because of the -- it was damaged.

Q    Okay.  Did we get this picture early in this litigation?  Do you recall?

A    No.  As far as I knew, this was held from us for a while.

Q    Okay.

          MR. WRONIAK:  Objection.

          THE COURT:  Sustained.  Stricken.

          MR. WRONIAK:  Move to strike.

          THE COURT:  Stricken.

          You're to disregard, ladies and gentlemen.

BY MS. MKRTCHYAN:

Q    Then flash-forward, how many days were you in jail?

A    I want to say two, three days.

Q    Okay.

A    It's hard to know really when you're in there.

Q    Right.  So -- and then your mom bailed you out?

A    Yeah.  Like, it took me a while.  I couldn't get ahold of her.  So I just was making the phone calls I can, and she finally was able to bail me out.

Q    Okay.  And so when she bailed you out, you got out, you went to pick up your stuff in the tent?

A    Got my dog first.

Q    Yes.  So you got your dog from animal shelter?

3-RenSER-00217                    3-RenSER-00217

A    Yeah.  They were closed, so I had to wait there for a second.  I had to pay a bunch of fees.  They made me get shots for him again, and they tried to have me give a city license, which, I don't live in Irvine.  But we finally got it.

Q    I understand.  So animal shelter.  And then you go to pick up your stuff from the campground?

A    Yes.

MR. HARRELL:  Leading.

THE COURT:  No, overruled.

THE WITNESS:  Yes.  After that we go straight to the campground.

BY MS. MKRTCHYAN:

Q    And when you got there and you were looking at your stuff, was there damage to your property?

A    Yes.  The tent was undone, like, the sticks were flat but not taken out.  Everything was just shoved in the tent.  And I guess they drug it into, like, kind of one of those little four-wheelers, threw it all in there.  They drug that and put it into a -- some kind of warehouse.  And my truck was just left there unlocked.

Q    So -- and how were you feeling when you were picking up your stuff, your animal?  Tell us.

A    I'm still in shock.  I'm still upset.  I'm still in shock.  Like, I can't believe this has happened to me.

Q    Right.  So -- and then flash-forward to -- you went to

stay with your mom?

A     Yes.  I was -- I was -- again, we went to the hospital. They checked -- all my injuries were pretty much the same as admission.  I was -- because of the beatings, I was being incontinent; so I couldn't hold my restroom because the bruising.  I really wasn't in any kind of ability to go camping again or start working to get another job.  So my mom was available, luckily, and I had a place.

Q     And then in jail did anyone come and take pictures of you, of your injuries?

A     No.

Q     Aside from the booking photograph that we saw?

        MR. WRONIAK:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Did Sergeant Rawlings at the scene take pictures of your injuries?

A     No.

Q     So now you took pictures, your own pictures, because you were concerned about the criminal case hanging over your head?

        MR. WRONIAK:  Objection.  Leading.

        THE COURT:  No, you can get into the area.  It's foundational.  Overruled.

        You can answer the question.

        THE WITNESS:  Yes.  I received paperwork saying I

3-RenSER-00219                                    3-RenSER-00219

was -- I assaulted a police officer, and so I was very upset because I know what happened.  I was the one that was assaulted.  So I wanted to make evidence of what happened.  Like, I knew this was not going to be just a quick going to court and get this fixed because I knew I was innocent.  I knew I didn't do anything.

BY MS. MKRTCHYAN:

Q   Right.  And you took pictures.  Let's look at the pictures.

MS. MKRTCHYAN:  This is 99 series, Your Honor --

BY MS. MKRTCHYAN:

Q   -- of pictures that you took at home.

THE COURT:  As you go through this series, do 99-1 so I have a record.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q   So you took pictures with your own camera yourself after -- how many days after the incident?

A   When I got home from jail, I was just in there taking a shower and just by myself trying to, like, process and take pictures.  I didn't -- I don't know.  I didn't even think of asking my mom to help me.  I was just -- like, this is important.  Again, I do a lot of things on my own.

Q   Yes.  So this is a picture of your left side of the face, 99-1?

A     That -- yes.  Yes.

Q     Okay.  Let's look at 99-2.  What part of your body is this?

A     That's my rib cage under my arm.  So if I was like this (indicating), that bruise is under there.

Q     Okay.  Then we have 99-3, another bruise on your left side --

A     Yes.

Q     -- of the upper rib cage?

A     Again, under my armpit area.

Q     Okay.  And 99-4, why did you take a picture of this one?

A     I could see it.  It's harder to see, but you can see above my ear, it's just one big knot from the top of my hair part to my ear.

Q     Okay.  This is another picture, 99-5, of your left side rib cage?

A     Yes.  Another in this -- this area (indicating).

Q     So -- and this bruises were why?  Were you hit in that area?

A     They're kicks and bruises.  I believe one of them -- I look at it, and it looks like the bottom of a boot.

Q     So this is a picture, 99-6.  Why did you take a picture of this one?

A     That's a lip cut from being hit in the lip.

Q     Okay.  99-7, you took a picture of your right side of the

UNITED STATES DISTRICT COURT

3-RenSER-00221                                      3-RenSER-00221

68

face and head to illustrate your head injury?

A    Yeah, this is the one with the big knee strikes.

Q    Okay.  So this is where you were kneed in the head?

A    Yeah.  This is the -- yeah, that's the main -- where the blood started coming out of my eyes and --

Q    Okay.  This is, again, another picture, 99-8, of your right ear.  There's blood in your right ear from the bleeding and from where there was an injury here in your right ear?

A    Yes.  I'm sure that, as they're kicking and punching, they weren't directly in the same spot.  It's an all area, and I got hit there in the side of the head.  I mean, you do see the bruise on the top of my head too.

Q    99-9 is the same area of your right ear.  This is a picture you took in the mirror, 99-10?

A    Yeah.  It's a mirror image.

Q    So your eye was still shut.  Your right eye was still shut after you got out of jail?

A    Yes.

Q    Were you able to go to work with this kind of a face, 99-11?  This is another picture of you in the mirror.  Were you able to go to work?

A    I -- no, not at all at first because of my injuries.

Q    Okay.  Another picture of your -- 99-12, of head injuries.  There is more pictures of your rib cage area, 99-14?

        THE COURT:  Just a moment, Counsel.  99-12, can you

3-RenSER-00222                                        3-RenSER-00222

show that again, please.

MS. MKRTCHYAN:  99-12.

THE COURT:  Slow down, so I have a record.

MS. MKRTCHYAN:  Yes, 99-12, Your Honor.

THE COURT:  Just a moment.  99-10 is the right eye.  99-11 --

MS. MKRTCHYAN:  Right eye.

THE COURT:  Just a moment.  99-12?

MS. MKRTCHYAN:  The head -- right side of the head.

THE COURT:  All right.  And what's the next -- is 99-13 the next?

MS. MKRTCHYAN:  Yes.  There are some --

BY MS. MKRTCHYAN:

Q    Why were you taking several shots of the same area?

A    Me?

Q    Yes.

A    I'm just making sure -- I don't know.  I'm not a professional.  I'm just trying my best to pick up everything.

Q    99-14, again, rib cage area?

A    Yes.

Q    99-15, and this is your cell phone pictures or --

A    This is my cell phone.

Q    So you didn't go and get a digital camera to take pictures?

A    No.  This is the first time I actually just -- taken off

**UNITED STATES DISTRICT COURT**

3-RenSER-00223                                    3-RenSER-00223

70

my clothes since the incident and about to shower and just --

THE COURT: No. I'm going to ask you to stop the photographs. I can't keep a record of this, and I apologize.

MS. MKRTCHYAN: Your Honor.

THE COURT: No, we went from 99-12, and then the photograph went up. I don't know what 99-14 is.

MS. MKRTCHYAN: I will slow down. That's okay. I'm just trying to --

THE COURT: Counsel, I'm sorry, I don't have a record. That's the problem. So you can't just put photographs up. If you're going to show them, I'm allowing that. Are you showing 99-12? That's my last note, 99-14, then 99-15. If you're going to show those, then I need a record, and I just need them marked.

MS. MKRTCHYAN: Yes. So 99-14 through -16 are the rib cage area.

THE COURT: Just a moment. I want you to testify to what these are. So 99-14, -15, and -16, go up for a moment. What are they?

THE WITNESS: These are underarm pit, rib cage area, chest -- you know, the rear chest area right in this area (indicating).

THE COURT: Thank you.

BY MS. MKRTCHYAN:

Q    You will hear allegation here -- well, we've heard

**UNITED STATES DISTRICT COURT**

3-RenSER-00224                                    3-RenSER-00224

Deputy Gotts testify that you were tucking your arms underneath you on the ground.

Do you remember that?

A    Yes.

Q    Okay.  And if you were tucking your arms underneath you, you will be covering your rib cages with your arms, wouldn't you?

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Would you have sustained this kind of rib cage injuries if you were actually tucking your arms underneath your body?

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  "Would you sustain this kind of rib cage injuries" -- I'm going to sustain the objection.  You can ask him about the rib cage area.  You can ask him if he had his arms tucked, if this feigned off the blow somehow.  The objection is sustained.

BY MS. MKRTCHYAN:

Q    When you were face down on the ground, did you ever tuck your arms underneath you?

A    No.  My arms were being held out.

Q    What about the point in time when you said that you were trying to cover your right head -- right eye from getting kneed?  What was the position?  Show it to the jury.

3-RenSER-00225                3-RenSER-00225

A    I would say I'm closest like this (indicating).  I probably fought out of that one and did this (indicating).

Q    Okay.  But you did not have your arms and --

MS. MKRTCHYAN:  For the record, I just want to display.

BY MS. MKRTCHYAN:

Q    You did not have your arms underneath you like this or like this (indicating), the chest area?  I'm holding my arms near my chest area.  Did you have your arms underneath your chest area?

A    No.  I wasn't like this (indicating).  And I wouldn't believe I would have bruises under my armpit if I was doing this.  I would have bruises in my back more if they were trying to open up my arms that way.

Q    Okay.  In any event, let's move on with the photographs and see what other injuries you had.

99-17, what part of your body is this one?

A    That's a bruise, I -- might be -- it looks like an upper thigh area.  I can't tell you.

Q    Okay.

A    Right there, yeah, looks like lower back, upper thigh.

Q    99-18.  We have some bruise here.  Can we -- can you say which part of your body was this?

A    I would say, like, upper waist towards the buttocks area.

Q    Okay.  And then these are better pictures of your right

eye with the flash -- with the flashlight.  We see --

THE COURT:  What --

MS. MKRTCHYAN:  99-19.

THE COURT:  Thank you.

BY MS. MKRTCHYAN:

Q    We have -- there are some bruising there; right?

A    Right.  I can see it more.  I'm trying to get from -- the bruise starts from -- you can see the eye, and it goes all the way behind my ear.  It's all one big bruise.

Q    99-20.  This is the laceration you had, and you said that -- are there still stitches there, sutures?

A    Yes.  You can see the blue and how they're not in, like, a line.  And you could see the -- how the wound is, like I said, more of a -- like a knee hit in the head instead of -- you don't see a scratch, like --

MR. WRONIAK:  Objection.  Lacks foundation.  Calls for a medical opinion.

THE COURT:  No, this is his opinion.  I'll let you cast your opinion about what this was.  Overruled.

BY MS. MKRTCHYAN:

Q    Okay.  So let's -- then you took pictures of your hands, 99-21.  Why did you take pictures of your hands?

A    The charges I were -- are given were assault on a police officer.  And I wanted to show my hands have zero scratches.  There is no assault -- if you tried to grab a ballistic vest,

UNITED STATES DISTRICT COURT

74

say, so -- there's the walkie. There's Velcro strapping. There is multi things on that ballistic vest as we've seen in the pictures. If I went in, I would have scratched my knuckles, anything. I would have broken a nail. And my hand is clean.

Q    99-22.

A    The same thing. You have an old scab, but that's not fresh.

Q    Okay. 99-23, another picture of your right hand?

A    Yeah, the same one we saw from the close-up. You'll see there's no fresh scrapes or wounds.

Q    This is 99-24, your buttocks?

A    That's where they had to surgically remove the Taser.

Q    Okay. Then we have 99-25. What was this picture all about?

A    It's just more bruises. This one's not as dark, but you'll see it under the cross.

Q    Okay. Your clothes -- you took pictures of your clothes, 99-26?

A    Yes, it's bloodied jeans.

Q    Then you took some pictures of your whole body, the torso that you had, 99-28?

A    Right. There's more -- this was when -- like I said, it looks like a boot to me.

Q    Okay. We have you take pictures of your --

**UNITED STATES DISTRICT COURT**

3-RenSER-00228                    3-RenSER-00228

A    Yeah.

Q    This is area, also, you sustained injury?

A    Yeah.  That's where the -- they were kicking on me and stepping on me.

Q    99-30, same picture of you.  Same pictures.

Okay.  So these pictures you took -- were you ever prosecuted for this crimes?

A    No.

MR. HARRELL:  Relevance.  403.

THE COURT:  Ladies and gentlemen, would you go back in the jury room.  You have my apologies.  I want to speak to counsel for a moment.  Thank you.

**(Out of the presence of the jury.)**

THE COURT:  If you'd be seated.  Thank you.

Mr. Holloway, you can step off the stand for a moment.

Counsel?

MR. HARRELL:  Your Honor, there was a false arrest claim at one point in time, but now that's gone.  There has never been a malicious prosecution claim.  And the reasons why there was no prosecution are totally outside of my client's hands, totally.  Those decisions are made by the Orange County District Attorney for a variety of reasons that we need not get into here.  But the suggestion is trying to be made that he didn't do anything wrong on that night and my clients had no

**UNITED STATES DISTRICT COURT**

3-RenSER-00229                    3-RenSER-00229

reason to be there, and none of that's true.

THE COURT: The other suggestion is that the charges were filed, and he's guilty of these charges. In other words, when you balance those two, you've got a situation that the Court is facing, and this decision of, on one hand, the officers have the right to bring these charges.

I understand that the district attorney or deputy district attorney decides the value of those charges, and it's outside your client's hands. But it also leaves the jury then with the impression that these charges are filed and then Mr. Holloway is guilty of these charges. How do I resolve that?

MR. HARRELL: We should strike the question and the answer. Frankly, we should have never gotten into him going to jail. That also is not part of the case. My clients don't work in the jail. My client does not work in the jail; so that has nothing to do with anything. And I want to say that the Court has already made that point before in a motion *in limine*. So here we are again, not paying close attention to court orders and going into areas that have nothing to do with anything.

THE COURT: This was excluded in the first trial?

MR. HARRELL: Your Honor, I know for sure we filed a motion *in limine* in this case, and I believe that was granted. We're not going to go into the jail.

UNITED STATES DISTRICT COURT

77

THE COURT: Well, bring out that motion *in limine*, and let's go back to the second and third trials. We never got to this in the second trial. Refresh my memory concerning what the ruling was and what occurred in the third trial.

MR. HARRELL: In the first trial? In the third?

THE COURT: Let's take the third. That's the most recent. Let's take our time with that.

MR. HARRELL: Take a look.

MS. MKRTCHYAN: And yesterday -- Your Honor, the reason we asked this question, yesterday the Court said that because there's -- the Court allowed me to.

THE COURT: I recall that conversation, and I may be correct or incorrect, but I want to go back now to the motion *in limine*.

MS. MKRTCHYAN: And the motion --

THE COURT: And what I'm balancing is the prejudicial effect of filing these charges and then leaving this in a situation where -- the accusation that, in the jury's mind, where they may speculate that he was guilty of these charges.

MR. HARRELL: Your Honor --

THE COURT: There's no way to resolve that because a lot of this is irrelevant, frankly.

MR. HARRELL: Your Honor, it's not in direct answer to the Court's question about trial three. We're looking for

**UNITED STATES DISTRICT COURT**

that.  But for this trial -- and I'm looking at Document 778 in the Court's -- in the Court's file, and we filed defendant's Motion *in Limine* Number 5 -- Document 778 is the Court's ruling on that motion.

THE COURT:  Read the ruling.

MR. HARRELL:  And -- sorry, Your Honor.  Is the Court asking for something?

THE COURT:  Read the ruling.

MR. HARRELL:  Yes.  (Reading:)

"Defense Motion *in Limine* Number 5 to exclude
   evidence, argument, or testimony regarding
   plaintiff's alleged experience in Orange County
   jail."

THE COURT:  Just a moment.  That's the experience. That, I have sustained your objection to.  All of the things he went through, I've excluded those.  It's not relevant.

This is a different issue.  This is -- these involve the charges, not the experiences.

MR. HARRELL:  Your Honor, it would seem to be a logical extension of the Court's ruling.

THE COURT:  It's not.  It's not.  I don't think I've dealt with this specific issue other than at the third or first trial.  And you're going to be required to get that out and help me with what that prior ruling was.

MR. HARRELL:  Your Honor, we're looking --

3-RenSER-00232                                        3-RenSER-00232

THE COURT: I have excluded those experiences about how he was treated, et cetera, in the jail. You made a motion; I sustained that. That is not the same issue about what happened to these charges. So I'm looking on a way of fairness to both parties, okay? But that doesn't mean we'll come up with a satisfactory solution.

All right. We're going to bring the jury back in. You're going to be precluded from this area. I'm going to let you get back into it potentially or not after I get a pretty clear memory on my part at least of what happened in the third trial and how we dealt with this. And I just don't recall, frankly. This is not the same *in limine* motion brought to me though.

MS. MKRTCHYAN: Can I make some comments just briefly, Your Honor?

THE COURT: Please.

And, by the way, I did make the comment that he could get into it. I want that clear on the record. That may be wrong; I'm not sure. I'm going to look at that again.

And by the way, for your record concerning the collateral issue you brought to me, I reverse my position on that. In the first trial, I allowed that evidence in. Doing further resource [sic], that's an incorrect ruling on the Court's part. That collateral ruling is in effect.

MS. MKRTCHYAN: Thank you. I just want to make

**UNITED STATES DISTRICT COURT**

clear why this issue is relevant. Because officers testified, over my objection, that my client was guilty of Penal Code Section 148, 69, 243. It's going to come. They've arrested my client for those charges, and there is going to be an insinuation inference -- and he was jailed -- that my client was guilty.

So, you know, this goes to his damages, emotional distress, Your Honor. Why is it relevant? It's because if my client is facing prosecution until the time it's -- you know, it's dismissed, it goes to his emotional distress.

THE COURT: I want to hear how this was dealt with. It may be as simple as the Court instructed the jury regardless that this was not a prosecution that was brought forward by the District Attorney's Office. Because I'm a little leery of you both getting into the back and forth with bickering going on, quite frankly.

And this is -- the taint needs to be taken away of any inference that Mr. Holloway was guilty of these charges. By the same token, the deputies have the right to file these charges is outside their control. So something from the Court that the district attorney independently in this matter decided that they would not pursue charges, I think it's as simple as that.

I'm going to instruct the jury that way, counsel. Let's hear your objection so we get through this.

3-RenSER-00234                    3-RenSER-00234

MS. MKRTCHYAN: Well, Your Honor, the defense has the full right to say that it's a different agency. However, it's still Orange County. But that's not relevant for my purposes. I was -- I had listed the district attorneys on my witness list.

THE COURT: They won't be coming to this court, Counsel.

MS. MKRTCHYAN: I understand. But what I'm saying is that I don't want an inference drawn, and I've already gone into this area. I tried to ask Mr. Clark -- Lieutenant Clark about whether he believed my client was guilty of PC 69, 243. The Court did not allow me. It would be unfair to my client to leave an inference to this jury that, in fact, he was prosecuted for this charges.

So if the Court wants to instruct the jury, that's fine. If the Court can instruct them, say, you know, this is an independent agency, I'm fine. But I don't want an inference drawn that my client was actually prosecuted.

THE COURT: I understand.

MS. MKRTCHYAN: Thank you.

MR. HARRELL: Your Honor, briefly, on the *Graham vs. Connor* instruction, I believe, which is the basis for the Ninth Circuit's pattern instruction on excessive force, it does make mention that the jury is to consider the nature of the crime that is an issue. Now, my client has testified to the

nature of the crime that they had knowledge of.

THE COURT: At that time.

MR. HARRELL: At that time. Not even once have --

THE COURT: That's not the issue, Counsel. The issue is what I'm going to do with this evaluation for the District Attorney's Office. I think that resolves it if I instruct the jury that this was an independent agency, the District Attorney's Office, and they decide what crimes will go forward. In this particular case, this crime was not pursued. It's as simple as that. Besides that, it's truthful and it's accurate.

Now thank you very much. Get the jury, please.

**(In the presence of the jury.)**

THE COURT: The jury and alternates are present.

You previously have heard evidence and will hear evidence about the officers' evaluation in the field of what charges they believed would be appropriate being brought against Mr. Holloway based upon either their personal experience with Mr. Holloway or information that they were receiving from third-party witnesses.

Those charges are then submitted to the Orange County District Attorney's Office, which is an entirely separate body from the sheriff's department. That body makes a determination of whether to go forward or not with those charges. The District Attorney's Office in this case decided

3-RenSER-00236                                    3-RenSER-00236

not to pursue those charges.

Now, I'm instructing you as such from the bench. The admonition is a concrete piece of evidence that you're to follow.  Okay?

So, once again, charges were not pursued, but the officers in the evaluation in their field are making a determination of what they believe those charges would be based upon their independent -- or their experience with Mr. Holloway and/or the information that they're getting from third parties. They then submit that to the District Attorney's Office through their office.  The District Attorney's Office makes an independent evaluation of whether they wish to pursue charges or not.  That's at the discretion of the district attorney.

All right, counsel.  Let's move on from this now.

MS. MKRTCHYAN:  Right.

BY MS. MKRTCHYAN:

Q    But you did still -- before you learned that the charges were not pursued, you did hire a criminal defense attorney, didn't you?

A    Yes, I did.

Q    Were you violated on probation?

A    No, I was not.

Q    Did you then stay at your mom's and continue your -- well, let me back up a little bit.

So you were working as a technical repairman prior

to this incident?

A    Yes.  I went out to -- as a subcontract, go out to whatever business.  I fix servers, access points, printers, all the business solution stuff like that, and I was able to do it through a website.  It was almost like Uber for techs.

Q    So you were working -- you were doing this kind of work, contracts.  You were contractor?

A    Correct.

Q    Okay.  So now after this incident, for some period of time you were unable to work.  Tell me how long you were unable to work?

A    I believe -- I really didn't do much for about a month.

Q    Okay.  And did that cause you loss of wages?

A    Yes.  I wasn't able to work.  I was -- I was bedridden for the first -- at least the first week.  I couldn't move out of bed.

Q    And that -- you were staying at your mom's?

A    Yes.

Q    And then you went to Long Beach; you started your treatment there.  You were unable to work.  How did you feel during that period of time in terms of emotionally?

A    I couldn't work so I didn't feel good about myself.  I normally take care of myself.  I was kind of scared of the police right there.  Didn't want any kind of -- I didn't want to see them.  I didn't want to do anything.  And I was still in

3-RenSER-00238                                3-RenSER-00238

a lot of pain.

Q    Okay.  And when you were at your mom's, you were hoping to get back camping?

A    I did after a while when I started feeling I can do it.  I did not want to go to Orange County anymore.  Really was not -- so I started trying to get jobs out in Riverside County, which there were less.  I tried to do it, and the money wasn't as good as in Orange County.

Q    Okay.  So -- and then at some point in time you moved out of California?

A    Yes.  I -- like I said, I was trying to go back into the way it was.  So it had been -- I want to say we're now in May at this point.  I went and camped again at O'Neill Park, thinking maybe it was an isolated incident.

Q    Okay.  So you went back to the O'Neill Regional Park for the first time after the incident in May of 2018?

A    Yes.

Q    Describe to me what happened there briefly.

        MR. WRONIAK:  Objection. Relevance.

        THE COURT:  Back to O'Neill Park right after the incident?  You can talk about O'Neill Park and what you found there, but I think we've already covered that through all of the photographs.

        So Counsel --

        MS. MKRTCHYAN:  No, Your Honor.  This is -- this

UNITED STATES DISTRICT COURT

goes to his damages and how he left for Pennsylvania.  So this is another incident.

THE COURT:  I thought he stated he was concerned and afraid of the police.

MS. MKRTCHYAN:  Yes.

THE COURT:  We've already covered this.

MS. MKRTCHYAN:  No, we didn't.

THE COURT:  I'll give you a little bit of discretion, Counsel.

MS. MKRTCHYAN:  Thank you.

BY MS. MKRTCHYAN:

Q    So in May of 2018, you went back to O'Neill.  This is how many months after the incident?

A    We're now three months.  About three months, maybe two and a half.

Q    If you were afraid of the police, why did you go there?

A    Well, I was trying to have my normal life back.  I didn't think I was going to -- I was in a campground.  Again, I just tried my normal life back.  I didn't think I'd have an incident again.

Q    And what happened there?

MR. WRONIAK:  Your Honor, relevance.  403.

MR. HARRELL:  Join.  Not our clients.

THE COURT:  Yeah, I don't know that it's relevant in terms of leaving to go to Pennsylvania or Montana, Counsel.

UNITED STATES DISTRICT COURT

3-RenSER-00240                                    3-RenSER-00240

MS. MKRTCHYAN: Your Honor, it goes to his emotional distress damages. We discussed this before.

THE COURT: You can go up to July, I agree.

MS. MKRTCHYAN: Yes.

THE COURT: I've instructed the jury.

I'm going to allow you to answer the question.

Overruled.

BY MS. MKRTCHYAN:

Q    So, sir, briefly tell us what happened in May of 2018 at the campground.

A    So as I was starting to feel a little better and try to get my life back, I stayed at O'Neill Park. I unpacked my stuff, set up my tent. And sure enough, an Orange County sheriff showed up and started going through my stuff. They ended up letting --

THE COURT: Just a moment. Were any of these officers involved? Any of these officers?

THE WITNESS: No.

THE COURT: I'm going to sustain the objection, Counsel. It's irrelevant. You're to strike this then. I had assumed that some of these officers might be involved again or not. That's not the case.

MS. MKRTCHYAN: Your Honor, it goes to his emotional distress.

THE COURT: Thank you. It doesn't matter, Counsel.

3-RenSER-00241                    3-RenSER-00241

The prejudicial effect outweighs the probative value under 403.

BY MS. MKRTCHYAN:

Q    Okay.  And then that -- after that, you left for California?

A    But I was --

Q    You left California?

A    Yeah, because of the situation.  I just didn't feel safe anymore.  I put my resumé out in the -- on Indeed.  Was going to take the first job I got.  I got a job in Pittsburgh, where I was going to do the copiers for Pittsburgh public schools.  I moved out, loaded my truck, and I was gone.

Q    So now before that, before you left, let's look at some of the treatment you got at Long Beach VA.  We went through some of the medical records with Dr. Hopp yesterday.  In the interest of time, we won't go over that again.  But you did some work-up, diagnostic testing at the Long Beach VA?

A    Yes.  When I first -- I got to go see my primary clinic, was Dr. Hopp, and she had to refer me to go get the MRs [sic] and the CT scans and x-rays.  She tried to remove my stitches, but the way they were in there, she told me I had to go to the emergency room to get them removed.

        So that's when I went to the VA hospital in Long Beach and got my treatment of the removal of the sutures and the -- all the imaging.

Q    Okay.  So they did imaging of your spine?

**UNITED STATES DISTRICT COURT**

89

A      Yes.

Q      Neck area?

A      Yes.

Q      Back area?

A      Yes.

Q      Okay.  Because you moved to Pennsylvania, Pittsburgh, you didn't continue your treatment at Long Beach, did you?

A      No.  I had to start over because they -- it's a different clinic, a whole different medical, I guess, group.  And so I was starting again my treatment when I moved to Pennsylvania and had started --

Q      Let's slow down.  Don't go into narrative.  Let's go step by step.  Thank you.

A      Yes, ma'am.

Q      So when you went to Pittsburgh VA hospital, you then -- of course, as you said, started over the diagnostic tests again?

A      Yes.

Q      Okay.  And then you were recommended for your back.  Let's focus on your back.  You had pain in the back area?

A      Yes.  In an image they can see it.

Q      Okay.  What did you start doing for your back in Pittsburgh, Pennsylvania?

A      I did a -- physical therapy.  I did acupuncture.  And she also did what is called cupping to try to relieve the pain and

**UNITED STATES DISTRICT COURT**

3-RenSER-00243                                              3-RenSER-00243

just a lot of, you know, going back to the clinic, checking to make sure everything's good.

Q    Okay.  So let me -- let's look at some of the treatment that you received in Pittsburgh.  Did you go for -- did you have headaches related to your -- after the concussion that you sustained in this incident?

A    Yes.  After this incident I started receiving severe migraines, especially in that right eye.  So they put me on a divalproex and made sure my eyeglasses have a tint now.

Q    Okay.  So what kind of other testing was done, neurologically speaking, in terms of your headaches?

A    I've seen a neurology constantly.

Q    Neurology?

A    Yes.

Q    Okay.  Now, in Pittsburgh did you also see a dentist for your teeth?  Did anything happen to your teeth as a result of this incident?

A    Yes.  I was having issues, and one of the first things I did -- I had to go to the dentist in Pittsburgh, and they ended up -- I ended up having fractures in my skull from the teeth, and they removed, like, five teeth.

Q    Okay.  So in Pittsburgh you went for -- how many sessions do you remember you went to?

A    Three or four.

MS. MKRTCHYAN:  Let me see, Your Honor.  Your Honor,

**UNITED STATES DISTRICT COURT**

we have Exhibit 6 for physical therapy records, I want to go over with my client.

THE COURT:  Exhibit 6?

MS. MKRTCHYAN:  Yes, Exhibit 6.

BY MS. MKRTCHYAN:

Q   So let's briefly look at this document.  This is referred -- you were referred by the Long Beach VA for physical therapy?

A   Yes.  They sent out to -- they call it community care.

Q   Okay.  And so you went through this physical -- how many sessions do you remember you went through?

A   I can't remember.  I know we did -- I think two times a week I would go for maybe like -- I know we were going for more than a year.

Q   Okay.  So you went through that, and then you -- did it help you with your back pain?

A   It briefly helped.  Usually it would feel good for the day, day or so, but, you know -- and then I'd do something to where I made it worse.  And then -- but I did do -- I did acupuncture weekly, and I did physical therapy weekly.

Q   Okay.  And then the dentist, what exactly the dentist did with your teeth?

A   So they removed --

MS. MKRTCHYAN:  This is Exhibit 9, Your Honor, the dental reports for his treatment.

**UNITED STATES DISTRICT COURT**

92

THE COURT:  Thank you.

BY MS. MKRTCHYAN:

Q    Yes.  So which part of your face did you have treatment?

A    On the upper left.  And you'll see in the -- that it's not as much as the teeth that -- I might not even be able to get fills because of the fractures of the bone.  So since such a bone loss, I don't know if they could repair that.

Q    Did the dentist tell you that this was, could be, with a degree of certainty a result of this incident?

A    Yes.

Q    How did that happen?  Was it because you were punched in the face?

A    Yes.  They asked me what happened.  They could see that there is damage, and they asked me what happened.  I explained to them.

Q    And what were you recommended to do in the future -- first of all, what did they do actually?  Did they put partial denture for you?

A    They measured for me the full partial because they knew they were going to have to do more.  And then I got a partial, and that actually will fill the front couple teeth.

Q    And you paid some amount of money for this partial denture?

A    Yes, I did.

Q    How much, based on this report in front of you?

UNITED STATES DISTRICT COURT

A     2,000 -- over $2,000.

Q     Okay.  Then you were recommended actually to do implants or abutment-supported porcelain, basically to put crown over those teeth instead of denture?

MR. WRONIAK:  Objection.  Leading.

THE COURT:  Overruled.  It's preliminary.

You can answer the question.

THE WITNESS:  Yes.  To repair it, they were suggesting...

BY MS. MKRTCHYAN:

Q     Because the partial denture is not going to last?

A     That's correct.

Q     Okay.  So how much is that going to cost if you decide to do that?

A     You're looking over $8,000.

Q     Okay.  Now, after that, did you go to neurologist in California?  In fact, you traveled to neurologist, Dr. Gross, in California?

A     Yes.  Because of the situation in Pittsburgh with the way the VA was, I went back, and I was in California.  I went and seen specialists.

Q     Right.  And Dr. Gross did some nerve studies?

A     Yes.

Q     We discussed it with Dr. Raiszadeh, but did Dr. Gross tell you what was the result of your nerve studies?

94

A    We were talking about sciatica issues and problems in my -- from my back in my leg, radiating up to my neck, including ribs.

Q    Okay.  And you went, then, to Dr. Raiszadeh in San Diego?

A    Yes.

Q    We've heard his testimony where he discussed the imaging he did and the diagnosis that he did -- that he came up with --

A    Yes.

Q    -- remember that?  What did he tell you in layperson's terms is wrong with your back as a result of this incident?

A    The best way he explained it to me, and I explain it, is that the -- your back is like Coke cans stacked on each other and mine are off.  They're not sitting right.

Q    Okay.  When he did MRI images, did he give you those MRI imaging?

        MS. MKRTCHYAN:  Your Honor, this is Exhibit 14, the MRI imaging of Mr. Holloway from Dr. Raiszadeh's office.

BY MS. MKRTCHYAN:

Q    So we had -- this was done August 20, 2020.  He did a variety of imaging here for you for T3, T4.

        But let's look at the actual back treatment for -- is this what you received from him related to your spine -- for back?

A    Yes.

Q    Okay.  And this confirmed his diagnosis -- right? -- that

**UNITED STATES DISTRICT COURT**

95

you have a spondylolisthesis as he described at his deposition?

MR. WRONIAK: Objection. Lacks --

THE COURT: We're just scrolling down. This has -- just a moment.

MR. WRONIAK: Objection. Lacks foundation. Improper medical opinion.

MS. MKRTCHYAN: This is discussing the MRI image that was discussed at Dr. Raiszadeh's deposition.

THE COURT: Overruled. Now, just a moment.

BY MS. MKRTCHYAN:

Q    Okay. So this is the confirmation of what Dr. Raiszadeh was talking about at his deposition?

MR. WRONIAK: Objection. Lacks foundation.

THE COURT: I'm going to sustain that. This is not a doctor we've heard from so far, is it?

MS. MKRTCHYAN: I'm sorry, Your Honor? I can't hear you.

THE COURT: Is this a doctor that we've heard from?

MS. MKRTCHYAN: This is Dr. Raiszadeh, who testified already.

THE COURT: This is the lady who was on the zoom?

MS. MKRTCHYAN: No. Raiszadeh, the orthopedist.

THE COURT: Just a moment. Has this doctor testified, Mr. Wroniak?

MR. WRONIAK: Yes.

UNITED STATES DISTRICT COURT

THE COURT: And this is her report?

MS. MKRTCHYAN: This is the MRI images by the report for Dr. --

THE COURT: What's your objection?

MR. WRONIAK: It lacks foundation.

THE COURT: In what way?

MR. WRONIAK: It calls for --

THE COURT: Just a moment. We'll do it one at a time. How does it lack foundation?

MR. WRONIAK: She's asking him to confirm a medical diagnosis. He's not a doctor. He's not qualified to make that determination.

THE COURT: The witness?

MR. WRONIAK: Mr. Holloway, correct.

THE COURT: I agree. He's not entitled to make that diagnosis, but he can state what he was told.

MR. WRONIAK: Understood.

THE COURT: Overruled. What's your next objection?

MR. WRONIAK: Your Honor, if you look at the question that was asked, it was "Does this confirm the diagnosis"? And that's my objection. He can testify to what his understanding is.

THE COURT: I see. Just restate the question. Sustained.

MS. MKRTCHYAN: Okay.

UNITED STATES DISTRICT COURT

97

THE COURT: Just restate the same question without his confirming, Counsel. It's as simple as that.

BY MS. MKRTCHYAN:

Q    So, sir, what did you -- what did he tell you your diagnosis was?

A    This was where he showed my -- that I have a spondylolysis of my L5 over S1, secondary to bilateral L5 spondylosis, which is where he explained Coke can issue.

Q    Okay. Now, after that did you also continue having -- after you finished with Dr. Raiszadeh in 2020, you continued your treatment for your back in Pittsburgh; true?

A    As much as I could, yes.

Q    Okay. And you went through more testing there. You did some more, for example, MRIs?

A    Yes.

Q    Were you told the same thing by the VA doctors that you had this kind of condition?

A    Yes. And I received medication for it.

Q    Okay. What kind of medication was prescribed to you?

A    Gabapentin.

Q    That was for what?

A    It's supposed to be a nerve stopping.

Q    Okay. So in -- were you told in 2022 by the VA hospital that your condition actually -- the amount of the disc displacement was actually increasing?

UNITED STATES DISTRICT COURT

A    Yes.

Q    In what way?  Do you remember what way was there aggravation of your condition?  What exactly --

A    I believe it was the separation and the loss of cartilage.

Q    Okay.  So it's actually chronically going worse?

MR. WRONIAK:  Objection.  Lacks foundation.

THE COURT:  Sustained.

And I'd like further foundation of who in the VA made this statement.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    So we have Exhibit 15, Your Honor.  That's the medical records from the VA hospital.

THE COURT:  And who's the doctor?

MS. MKRTCHYAN:  That's the doctor at the VA hospital, radiology and orthopedic.

THE COURT:  That's what I'm having trouble with.  Of course, I recall the witness who testified, but I get confused when there's an MRI taken by a different doctor.  It's not clear to me until you made it clear to me, thank you, that this was the MRI submitted to that doctor.

Here, I'm asking a different question.  I want to go back to 2022.  I need to know for my purposes who the doctor was.

MS. MKRTCHYAN:  The doctor I can show is called

ordering provider Regina Lewis from VA hospital.

THE COURT:  Thank you.  And this is in 2022?

MS. MKRTCHYAN:  Yes, Your Honor.

THE COURT:  Can you spell that name for me.

MS. MKRTCHYAN:  L-e-w-i-s, Regina.

THE COURT:  Thank you very much.

MS. MKRTCHYAN:  May I publish to the jury?

THE COURT:  You may.

MS. MKRTCHYAN:  So we have an MRI note from 2022, Pittsburgh Health Care System, for Mr. Holloway.

THE COURT:  This is Pittsburgh then.  This isn't back in Los Angeles?

MS. MKRTCHYAN:  Yes, this is Pittsburgh.

BY MS. MKRTCHYAN:

Q    And then we have findings for lumbar spine MRI:

"Desiccation, disc spaces.  There's minimal anterolisthesis of L5 on S1, approximately 1.5 millimeters.  Disc bulge" -- et cetera.

So were you told that this confirms what Dr. Raiszadeh told you, but -- let me strike that.

THE COURT:  Just a moment, Counsel.  I'm looking for that diagnosis that he's testifying to about the separation.

MS. MKRTCHYAN:  I'm sorry, Your Honor.  I can't hear you.

THE COURT:  I'm looking for the diagnosis concerning

3-RenSER-00253                                    3-RenSER-00253

separation.  So let me have a moment.  Would you go back to the top again, and please quit scrolling.  If you could leave it there for just a moment.  Thank you.  Appreciate that.

MS. MKRTCHYAN:  Sure.

**(Pause in proceedings.)**

THE COURT:  Now would you scroll down to the rest of that.  Thank you.

**(Counsel complies.)**

THE COURT:  You can stop right there.  Then scroll down just a few more lines.  Is this -- Vidhi Gupta, is this the doctor.

MS. MKRTCHYAN:  No.

THE COURT:  All right.  Just a moment.

MS. MKRTCHYAN:  The doctor is actually -- well, ordering provider is Lewis.  This is the radiologist signing.

THE COURT:  Now it's clear.  So just a moment.  The ordering doctor is Lewis?

MS. MKRTCHYAN:  Yes.  And this is the radiologist --

THE COURT:  Counsel, just a moment.  The radiologist is Gupta?

MS. MKRTCHYAN:  Yes.

THE COURT:  Thank you very much.  Now you may continue.

BY MS. MKRTCHYAN:

Q    But basically your diagnosis that -- the way you

3-RenSER-00254                                    3-RenSER-00254

understood was confirmed at the VA hospital; true?

A    Yes.

Q    Okay.  Now -- and flash-forward from 2022 up until today, what have you done for treatment of your back?

A    I have continued a physical therapy.  There's been a brief -- due to medical reasons I discontinued the physical therapy, but I will be continuing physical therapy, and probably I'm looking at a -- at what is called --

BY MS. MKRTCHYAN:

Q    Surgery?

A    Well, no -- to start, before surgery, they want to give me shots of, like, a numbing shot.  I'm sorry.

Q    Injections?

A    Yeah.  I'm sorry I'm looking at you.  Demerol -- epidural.  Sorry.  Yeah, that's what they want to give me before they want to jump to surgery to see if they could last a little bit longer.  It's up to me.

Q    I see.  So but has physical -- first of all, let's talk about back pain and how it affected your work.  You were doing this copy repairman -- well, repairing technical stuff.  And how did this injury related to your back affect you in terms of doing your regular job duties ?

A    Well, when you're doing the copy machine, you're doing a lot of pushing of these machines, rolling them under.  And when they're brand-new, they're actually not together.  You actually

102

have to, with a partner, lift them up and then put them on the tray. Depending on whatever addition you get on your copy machines, it's also more weight.

And I just -- I just didn't have the ability -- there's a couple times where I'd feel like I'd get stuck when I was laying under a desk. So I'm trying to do -- I mean, under 15 pounds, I'm trying to look at, you know, something where I'm on Zoom dealing with the other tech as something I can do now. But lifting is just out of the question.

Q   So it reduced your ability to actually do lifting; true?

A   Right. At one time I did construction. I -- so I -- to do things like that as a hobby is hard to not be able to do that either.

Q   Okay. You are talking about before the incident, you were doing construction?

A   Yeah. I was able to do handyman work. I was able to do tech work. I had a PennySaver at one time.

Q   Okay. So now you're talking about after the incident?

A   After this incident.

Q   After the incident, when you got this back complaints, how else -- did it affect your income?

A   Yes. The very first time, this was -- I had -- I went to all the schools of city of Santa Ana and, like, the elementaries. I replaced toner, replaced whenever their printer was issued. And I tried to go back, and they told me I

3-RenSER-00256                                           3-RenSER-00256

couldn't -- they didn't want --

MR. HARRELL: Hearsay. Hearsay.

THE COURT: Sustained.

MS. MKRTCHYAN: Objection. This is very inappropriate. It's his state of mind. We are not bringing it for its truth. We are talking about his damages and his understanding. It's not for his truth. It's not hearsay. There's proper --

THE COURT: I'm going to allow this as his opinion, but this is not for the truth of the matter. We don't have that witness in front of us subject to cross-examination. So I'm allowing it for his perception, his belief, but not for the truth underlying this.

Counsel.

BY MS. MKRTCHYAN:

Q    You were saying?

A    Yeah, so I really -- they didn't want me to going to the elementary schools and stuff like that until I was healed. So I wasn't getting that regular -- that regular contract that I was getting. And plus having to move out of Orange County -- and the amount of work wasn't the same.

Q    Okay. So let's look at some of your pay stubs before the incident and compare after to see how this incident affected your income.

MS. MKRTCHYAN: This is Exhibit 28, Your Honor, for

**UNITED STATES DISTRICT COURT**

the record.

BY MS. MKRTCHYAN:

Q    So before the incident, you worked at Apex?

A    Yes.  That was a copy machine place that dealt with Riverside medical center.

Q    And this represented pay period sometime in 2017?

A    Yes.

Q    So how much money, generally speaking, you were -- you were making at Apex?

A    Over 3,000 a month.

Q    And Apex you were doing what?  Again, technical repairs?

A    Yes.  Basically I would show up to -- there's five different clinics in Riverside medical center.  This was before the Corona one.  So I'd go through Eastvale and Norco, and I'd just check the printers, make sure they needed anything.  I would -- to speak to doctors.  Sometimes I didn't have to do anything.  I just had to show up and just make sure everything was running.

Q    Okay.  So 29, Exhibit 29, this is -- you were doing the contracts of the Santa Ana and basically some agencies?

A    Yes.  That's -- that was the --

         MR. WRONIAK:  Objection, Your Honor.  Can we have this document pulled down?

         THE COURT:  I'm sorry?

         MR. WRONIAK:  There's writing on this document that

should not be there, should not be posed to the jury.

THE COURT: I'm going to sustain that, Counsel. Take the document down.

BY MS. MKRTCHYAN:

Q    You made the writings yourself; true?

A    Yes.  Those are --

THE COURT: It doesn't matter.  You can testify verbally about this.  We're not going to show the document.

BY MS. MKRTCHYAN:

Q    Okay.  So that was the document -- Barrister -- tell me what was that document about?

A    Barrister is one of the websites that I worked with and that was -- they pay per job.  So you get -- it tells you where it was, how much you got paid.

During that time I had calls I was supposed to be in on the days that I was beaten that I wasn't able to show up. And so I was docked paid.  I owed them money for not showing up.

Q    So let's look at your income in 2017.

A    Yes.

Q    Tell the jury how much money you were making approximately at Apex plus your contract jobs prior to the incident.

A    At that time with my side work plus Apex, I was making about 60 grand a year.

UNITED STATES DISTRICT COURT

Q   In 2018, let's look at Exhibit 30.  You got a job in Pittsburgh; true?

A   Yes.

Q   Okay.  This is Exhibit 30.  Wilson Group.  Isn't this Pittsburgh job that we have here?

A   Yes, it is.

Q   How much money do we see you making in 2018?

A   2018, that's about -- I don't know -- that's not a full year, but that's $2,000.

Q   I'm talking about -- so -- okay.

A   I mean, 20,000 for wages of 2018.

Q   And what was this document representing?  How many months of work was this?  Do you know?

A   I know I started in July, and so I know tax season is in April.  So August, September -- maybe about eight months' worth, nine months.

Q   Okay.  Aside from the $20,000 that you made in 2018, were you able to make any more money?

A   No.  I didn't really know the area.  I lived far from Pittsburgh, and I was in a vehicle car.  So I couldn't really do side work in the vehicle -- in their car.

Q   So moving from California actually affected also your ability to do work?

A   Yes.

Q   So in Pittsburgh, that was in 2018, pretty much 20,000 in

UNITED STATES DISTRICT COURT

a ballpark?

A    Yes.

Q    So that's a drop of income about how much?

A    About 40,000.

Q    Then in 20 -- next year --

THE COURT:  Just a moment.  I'm going to ask the jury to take a recess.  I'm going to ask you to go back in the jury room for just a moment.  Let me speak to both counsel so I'm certain of something.

**(Out of the presence of the jury.)**

THE COURT:  Counsel, have a seat for just a moment. I want to be certain where we're potentially going so there's not a claim that the door was opened.  I'm trying desperately to avoid the -- opening the door where the Court has to reverse prior rulings.

In Pittsburgh at some point, the defendant represents that there was an incident involving a lady across the hallway.  And I believe that that was sometime around 2020 or 2021.  But you need to tell me the year at least.

MR. HARRELL:  November 7 of 2020, Your Honor.

THE COURT:  2020.  So 2020; is that right?

MR. HARRELL:  Yes, Your Honor.

THE COURT:  And the problem is going to be, once we get into years that continue forward, more things happen in your life and other people's lives.  And therefore, if we have

**UNITED STATES DISTRICT COURT**

an incident that causes you to then move from Pittsburgh to Montana because the police have harassed you, for instance, or there's been a charge or an incident involving some lady, then I get worried about the defense coming back and making a motion to open that door because your salary is somewhat dependent upon your moving and having to move if the police are harassing you in Pittsburgh as well as California.

At some point this has been, at least in the prior trials, represented to be elective surgery. That doesn't mean you haven't expended money and pain, but it does mean also you probably have been put in the choice that that's expensive and can't afford that kind of surgery without compensation.

How far are you going in terms of lost salary? Because last time I think we went clear up to the last trial, 2023 or 2024. But I need my memory refreshed.

And by the way, I apologize to you. I didn't pick up the MRI being from the one doctor to the treating doctor who was on the screen. It wasn't clear to me how those doctors were playing out. But now I understand the MRI.

But help me with where you're going with this so that I don't have a motion on the other side that the door has now been opened because circumstances have changed and "Judge, we'd like to get in this incident involving the lady across the hallway, which may have caused him to move." Please, how far are you going to go with the salary? Up to the present time?

**UNITED STATES DISTRICT COURT**

3-RenSER-00262                    3-RenSER-00262

MS. MKRTCHYAN: Your Honor, we did the same exact thing. I'm not doing anything new that was not done at the third trial. I am presenting damages. First of all, Your Honor, here's what I'm concerned here. All this stressors issued that relates to emotional distress damages, that's general damages.

THE COURT: I made my ruling concerning emotional distress, but I haven't precluded you from going forward with how this has affected him physically. Nothing's changed in the Court's ruling. But I am asking now because this is a different trial, and a couple things have happened differently. For instance, first we've discussed the homelessness issue before. I've made those rulings. We have now discussed the stressors where I, unfortunately, believe that the door got opened and information came in. We've also had the mother testify. So it's a little bit different trial.

But I'm asking once again, and it's a simple question. Are you going into his salary after 2020?

MS. MKRTCHYAN: Well, Your Honor, that's loss of wages.

THE COURT: I'm sorry. Are you going into his salary after 2020?

MS. MKRTCHYAN: That's what I'm trying to do.

THE COURT: You'd like to go into his salary in 2020. And what was that salary?

MS. MKRTCHYAN:  What was that salary?

THE WITNESS:  In 2020 that would have been COVID.  Maybe -- it would have been real low.  I have to look at the books, but maybe about 30,000.

THE COURT:  Okay.  How about 2021?

THE WITNESS:  Maybe about the same, 30-, 40,000.

THE COURT:  30-, 40,000.

When did you go to Montana?

THE WITNESS:  Went to Montana in January of '23.

THE COURT:  So you stayed in the Pittsburgh area, then, for three more years after this accusation was made against you concerning some lady; is that correct?

THE WITNESS:  That's correct.

THE COURT:  Hold on.  So I'm surmising, then, you didn't move out of the Pittsburgh area because you believed that the police were harassing you.  In other words, you moved out of California because you wanted to tell the jury that the police had come by the campsite, you suffered some emotional stress over that, and you left.  But you didn't move out of the Pittsburgh area after this accusation against you, did you?

THE WITNESS:  No.  No.

THE COURT:  Okay.  What caused you to move out of the Pittsburgh area to Montana?

THE WITNESS:  I did a job in Montana, and I loved it, and I stayed.

**UNITED STATES DISTRICT COURT**

THE COURT: Fair enough. And what have you earned in -- so you moved to Montana in 2023.

THE WITNESS: Yes.

THE COURT: Once again, in 2021, you're in 30- to 40,000. What did you earn in 2022 in the Pittsburgh area?

THE WITNESS: I'm going to say still about 40,000.

THE COURT: Okay. And how about 2023 in the Pittsburgh area, or did you split that year?

THE WITNESS: That one was still about the same.

THE COURT: About 40,000?

THE WITNESS: Yeah.

THE COURT: And how are you doing now in --

THE WITNESS: And in June is when I had my stroke, and I haven't worked since.

THE COURT: Okay. And you were up in Montana when you had your stroke?

THE WITNESS: Yes.

THE COURT: So you worked about half a year?

THE WITNESS: Yes.

THE COURT: And --

THE WITNESS: I lived in Montana for about two years. One and a half, two years.

THE COURT: Hold on.

THE WITNESS: I think.

THE COURT: You had your stroke in 2024. So let me

3-RenSER-00265                                         3-RenSER-00265

take 2024.  You had your stroke sometime in June.  So January through the time of your stroke --

THE WITNESS:  Yeah, so I lost my apartment.  I was living fine.

THE COURT:  Hold on.  I just want to know what you earned.

THE WITNESS:  Oh, what I earned?  Nothing.  Nothing.

THE COURT:  So from January to June in Montana, before you had your stroke, you were completely unemployed?

THE WITNESS:  Right.

THE COURT:  You had no job?

THE WITNESS:  Right.

THE COURT:  Then why had you gone to Montana if you believed that there was a job that you loved, and you could make a better salary?

THE WITNESS:  No, it was one job.  It was a -- I did --

MS. MKRTCHYAN:  Project.  It was a project.

THE WITNESS:  It was a project in Cole's in Montana.

MS. MKRTCHYAN:  And it ended?

THE WITNESS:  Yeah.  It was just, like, a month-long thing.  And I liked Montana.

THE COURT:  So 2022, about 40,000.  2023, about 40,000.  So if you're earning -- I think your testimony was -- just a moment.  In 2017 you earned about $60,000?

**UNITED STATES DISTRICT COURT**

THE WITNESS: Correct.

THE COURT: So you're earning about $20,000 less than 2022 than you were here in California.

THE WITNESS: Yes.

THE COURT: And you're earning about $20,000 less in 2023, and you're still in Pittsburgh? In other words, another $40,000, but it's $20,000 less than you earned in California, in 2023.

THE WITNESS: Correct.

THE COURT: And then you go to Montana in 2024?

MS. MKRTCHYAN: '23, Your Honor.

THE WITNESS: '23.

THE COURT: You're not testifying, Counsel.

MS. MKRTCHYAN: I --

THE COURT: And until I get this straight, you're not testifying.

THE WITNESS: It was late '23.

THE COURT: Late '23. Okay. So had you earned by -- what month in 2023, if you recall?

THE WITNESS: I want to remember about November.

THE COURT: Fair enough. And up to that time, then, you had earned about $40,000?

THE WITNESS: Yes.

THE COURT: You go up to Montana because you'd had a prior one job that you liked?

3-RenSER-00267                                    3-RenSER-00267

THE WITNESS:  Right.  It was a project for Cole's.

THE COURT:  You get to Montana, and you don't find employment?

THE WITNESS:  I worked at Costco after that project.

THE COURT:  And were you working at Costco in 2024 before your stroke in June of 2024?

THE WITNESS:  Yes.  I was actually --

THE COURT:  Let me come back to that question.  If you were working in 2024, before your stroke, at Costco, what did you earn?  Assuming you were working at Costco from January 1st of 2024 through June -- I think that was the time you had your stroke -- of June of 2024, what did you earn?

THE WITNESS:  I was about between 30- and 40,000.

THE COURT:  Okay.  So, once again, I know you didn't mean to be incorrect, but you told me before, no criticism by the Court, that you hadn't earned any money in 2024.  But you've earned money at Costco between 30- to 40,000?

THE WITNESS:  Right.

THE COURT:  You know the question's going to come -- well, I'll leave that to both counsel.  If you're earning 30- to $40,000 in six months at Costco, is it the stroke that caused that stopping of your employment?  That stroke in June of 2024?

THE WITNESS:  It was a myriad of things.  When I had the stroke, I was in the hospital for ten days.

UNITED STATES DISTRICT COURT

THE COURT: I see.

THE WITNESS: And while I had my stroke, I did a colonoscopy; they removed seven polyps. I had an infection in my stomach. I had to get -- and while they're doing a test, they found a hole in my heart, which was from birth.

THE COURT: Birth. Okay.

THE WITNESS: And so then they put a -- I did an operation in December, and I have an implant now. So I've actually had help by the VA for housing. And I have a helper that comes and helps me three times a week.

THE COURT: I see.

THE WITNESS: So I haven't made any money, and my mom has been helping me.

THE COURT: Okay. I'm going to retrace what I heard, and then I want you to correct me.

In 2017, you earn approximately $60,000. In 2018, sometime in July you moved to Pittsburgh, but for the -- for eight months, whether it's California or Pittsburgh, about $20,000.

THE WITNESS: Right.

THE COURT: Okay so far?

THE WITNESS: Right. I end up getting fired at that job.

THE COURT: Yeah, but you don't --

THE WITNESS: I'm sorry.

UNITED STATES DISTRICT COURT

3-RenSER-00269                                    3-RenSER-00269

THE COURT:  In 2020 you earned -- because it's a COVID year, about -- and I know things are hard for everybody in that time -- about $30,000?

THE WITNESS:  Correct.

THE COURT:  In 2021 you're able to elevate that between 30- and $40,000, someplace as a rough estimate.

THE WITNESS:  Right.

THE COURT:  In 2022, you're still in Pittsburgh, as I understand it, and you earn again about $40,000, give or take?

THE WITNESS:  Right.

THE COURT:  About $20,000 less than we'd earned in California.

THE WITNESS:  Right.  And I don't know if it matters, but everything is cheaper out there.

THE COURT:  It doesn't matter.

THE WITNESS:  I don't know.  I'm just trying to be honest.

THE COURT:  In 2023 you earn another $40,000, and you're still in Pittsburgh for most of the year.  But at some point in the latter part of that year, you move to Montana because you've had a good -- one job experience up there.  And there, you go eventually to work for Costco?

THE WITNESS:  Right.

THE COURT:  In 2024, between January 1st and the

**UNITED STATES DISTRICT COURT**

3-RenSER-00270                                    3-RenSER-00270

117

time of your stroke sometime in June, you earn -- just a moment -- you said between 30- and $40,000?

THE WITNESS:  Yes.

THE COURT:  Okay.  So if you would have continued on without that stroke, you'd be someplace, once again, about the ballpark of 60- to maybe 70- or $80,000 at Costco?

THE WITNESS:  A lot of stuff is going on right now.  Again, I didn't have a car in Montana.  So I've been doing it without a vehicle because I can't see.  I've been in too many accidents.

THE COURT:  But the point is about that time, if you would have continued on at Costco, because you worked half a year for 30- to $40,000, you would have had hopefully another 30- to $40,000 without the stroke?

THE WITNESS:  I would have estimated about 60-.

THE COURT:  About 60-?

THE WITNESS:  Yeah.  Because I was actually on my way to work to Lowe's.

THE COURT:  So, first of all, don't worry about -- inflation decreases some of that -- cost of living.  I understand all that.  But we're trying to get some rough numbers.

Now Costco -- Costco -- counsel, let me talk to both of you.  What I want to avoid is us walking into a situation where you're asked a question that you think that opens the

**UNITED STATES DISTRICT COURT**

door, and maybe rightfully so, but I hope not, when we get into the salary. Is it enough that we go through those years?

And number two, at some point, although I allowed this in the first trial, I've reversed myself a couple times in terms of the rulings. Are you saying that these physical injuries -- I know the dental because allegedly there was some dental damage.

MS. MKRTCHYAN: And pain.

THE COURT: Well, but the physical therapy, understood. But he had a history of stroke. Are you arguing -- going to argue that the stroke is tied to the incident with the police? In other words, his 2024 June stroke.

MS. MKRTCHYAN: Well, Your Honor, the issue here is the stroke is a neurological issue. I don't have an expert really to tie that in.

THE COURT: Okay.

MS. MKRTCHYAN: The only issue about the stroke that would -- I would -- the only issue with that is the fact that combination of the -- his neurological -- because we know for a fact he had a concussion as a result of this incident. Neurology after that, Gross -- Dr. Gross and what's his name --

THE COURT: Neurology, I haven't precluded or even insinuated that I'm concerned about. I'm concerned about whether some of these preconditions have either been

UNITED STATES DISTRICT COURT

3-RenSER-00272                                    3-RenSER-00272

exacerbated, which you're allowed to show.  You take your person as you find them.

MS. MKRTCHYAN:  Right.

THE COURT:  But I'm also worried about salary.  And as we get into salary, then counsel on cross-examination will be asking to go in depth because you've brought out these years of salary.

And one of the -- remember, I get paid a lot to think about what each of you can do that's horrible -- and I'm just joking about that.  I have to anticipate.  So one of the things I'm anticipating is "Judge, it's not fair that he moves at some point."  And I thought it might be, until we've had this discussion, because you felt harassed by the police because of an incident involving a woman that you represented to me he'd entered the apartment across -- where no charges were filed, but he'd entered an apartment across the hallway.

I didn't know until this time why he'd moved or even when he'd moved, I couldn't recall, from Pittsburgh to Montana.  Now I know it's not harassment, from his standpoint.

Why are we going into the salary though?  In other words, he's diminished salary.  We know in 2018, when he moves, he's only down to $20,000.  He's got a $40,000 downward swing in his salary that year.  But in the subsequent years, COVID explains any downturn briefly in 2020 and maybe 2021.  And he's right back up to some de minimis amount that's differential --

UNITED STATES DISTRICT COURT

differentiated in 2022 and 2023.  He's $20,000 down.

But when you get to 2024, if you compute this out, he's working five months before his stroke.  Well, five months at 30- to $40,000 at Costco equals 60- to $80,000.  Once again, he's almost fully employed, making more money.

Now, that's what I'm having trouble understanding how this salary that we're getting into over all these years is valuable to either side to this matter.

MS. MKRTCHYAN:  Well, can I -- Your Honor, may I respond to this issue?

THE COURT:  Briefly, sure.  -- I'm not at the first trial; I understand that.  But I'm really questioning why it's relevant right now.

MS. MKRTCHYAN:  Your Honor, if you look at the progression of his employment -- 2019 was missed by the Court. 2019 he had a job at Wilson Group, and he lost that.  So his income went down also that year.  I think the Court missed that.  Prior to COVID --

THE COURT:  No, I have 30- to $40,000 he said he earned that year.

MS. MKRTCHYAN:  Wilson Group?  Was that --

THE WITNESS:  Wilson Group was, yes, Pittsburgh.

MS. MKRTCHYAN:  Yes.  How much?

THE WITNESS:  That one was only -- we looked at that, it was about 20 grand.

**UNITED STATES DISTRICT COURT**

THE COURT: No, I wrote it down. He said -- fine. I'll write down 20,000, but he told us 30- to 40-, and that's fine. 20,000.

MS. MKRTCHYAN: He lost his job at Wilson Group. What year was it?

THE WITNESS: Same year, I believe.

MS. MKRTCHYAN: 2018 or 2019?

THE WITNESS: We'll go 2019. It was about a year.

MS. MKRTCHYAN: So that's -- here's the thing, Your Honor, about this. My client needs to get some damages in this case; right? If you are going to preclude -- here's the issue I have here. I'm precluded from proving emotional distress damages beyond July 2018, which is a very severe restriction on us, but we have agreed to do that.

THE COURT: You're entitled to damages as long as they're related to the incident.

MS. MKRTCHYAN: Risk, yes. We understand that.

THE COURT: That's why I'm asking you about the stroke. He's got a precondition concerning the prior strokes. Now, as far as his back is concerned, neurology, absolutely. He's got damages, absolutely.

MS. MKRTCHYAN: Yes, but my understanding, Your Honor -- here's the thing. If the person had a stroke, prior preexisting condition, this person is an eggshell skull plaintiff. After that incident in 2018, this incident, he had

**UNITED STATES DISTRICT COURT**

122

exacerbation of his headaches.  Neurology speaking, if you look at entirety of his medical records, he had exacerbated headaches.

THE COURT:  I have, but a large part of these records show normalcy.  This cannot be argued both ways, but I'm giving you the benefit of the doubt in this and allowing you to get into neurological or discussions that you had with the doctor, Mr. Holloway.  Some of that doesn't appear in this record.  Some of this shows normalcy except for the shift in the spinal column.

MS. MKRTCHYAN:  That's the spinal issue, Your Honor. That's the spinal -- that's the CAT scan of the spine.  That has nothing to do with the head.  They're talking about -- and I'm very, very much --

THE COURT:  Well, it does if he's kicked.

MS. MKRTCHYAN:  Your Honor, I am very much conscious of the Court's concerns and rulings, but let me just kind of explain my position so that it's clear where we are so that then there is no argument.

What I've been trying to do -- as you can see, I do not have an expert neurologist to come to court.  I'm very open and honest with this Court, transparent.  I don't have a neurologist to come and say, "Oh, look, the stroke he sustained in 2024 is a direct result of this incident."  No.  And that's not going to be in the argument that I made nor am I going to

**UNITED STATES DISTRICT COURT**

make nor I can make.  However, we have record -- medical records where he continued having issues related to his headaches in 2020, for example, when he was in Pittsburgh.

THE COURT:  But that hasn't precluded him from the job at Costco, for instance, where he's actually increased his salary.

MS. MKRTCHYAN:  Well, in 2020, Your Honor, it was COVID.  He had another episode where he might have had a stroke in 2020.  And, you know -- and then, though, right now after his stroke, he's completely unemployed.  So what we are trying to do is to show that over the years this man's health has deteriorated.  We are not going to necessarily argue that this is all the result of this incident.

THE COURT:  I'm going to let you go into this, but I'm trying to forewarn you.  I'm not going to then preclude possibly in trying to foresee some of the cross-examination.  Although I am precluding you from this incident concerning the woman.  I know now that that's not the reason he moved to Montana.

But the -- I have to tell you, Counsel, it's extraordinarily dangerous ground that you're entering into, but I'll let you try your lawsuit, and if you're going to go into these damages.  But let me hear from the defense because I think you would object, of course.  Although now you seem to be in the position of Mr. Holloway increasing his salary in 2024.

So why don't you have a discussion about whether you're going to object or not and let the foundation in. That means get together because I don't want to hear from each of you. And let's get on with it. This is becoming collateral, quite frankly, and unduly consumptive of time. We're dealing with minimal amounts, whether there's a $20,000 differential, and now Mr. Holloway is earning potentially more money up until his stroke.

MS. MKRTCHYAN: Can I --

THE COURT: Counsel, just a moment. I want to hear. Just a minute.

MR. HARRELL: Your Honor, this is what the defense's concern is. If Mr. Holloway is going to get up on the stand and say, "Hey, wait. I was fired from a job. I was unable to make money" after he left the state of California, well, we all know that he was involved in an incident in Pennsylvania. And it is not uncommon for employers to do background checks particularly when individuals stop showing up for work because they're in jail, as Mr. Holloway was. And so plaintiff needs to be strategic about this.

THE COURT: And that's my concern also. I can see the door potentially opening concerning that incident in Pennsylvania depending upon how artful each of you are and, quite frankly, how Mr. Holloway answers or volunteers.

Listen, I'm going to let you go ahead with fair

UNITED STATES DISTRICT COURT

warning on this matter.

MS. MKRTCHYAN: No, I want to understand what's going on here, Your Honor. I'm utterly confused right now because there is a representations made, and I'm sorry that I'm kind of getting -- here's the issue I have. My client's arrest in Pennsylvania was completely -- there was no -- nothing -- like, basically there was an arrest and charges -- he got an acquittal. The court is closed. But that happened in 2020, wasn't it? That was COVID year.

THE WITNESS: I think so, yes.

MS. MKRTCHYAN: In any event, he lost his job at Wilson Group 2019, and that was directly as a result of his irritable mood. He still suffered from anxiety as a result directly of this incident. Now, I have agreed -- I have agreed to limit my emotional distress damages but somewhat unfairly because my hands are tied with this Pittsburgh arrest, which happened in 2020, COVID year. But up to that point in time, he was still suffering from PTSD.

So I can stop the loss of wages issue up until 2020 because we can say that "Look, there was COVID," and we can do that, and therefore, we will stop this issue completely.

THE COURT: If it stops before the incident, then there's no chance of -- that I would reverse a ruling because we're not getting past the incident in 2020. What I'm afraid of is a spontaneous explanation by your client painting a

3-RenSER-00279                                    3-RenSER-00279

picture of "I was injured. I couldn't get a job. I had to move" because counsel's right. You don't know if an employer is running a background or not.

And so if you're going to limit it to 2020, fine. If you're going to go forward, I'm going to let you do that. But I'm trying to put you on fair notice that that door could be opened.

But I've had to reverse myself one time already concerning the child being removed. That was a good ruling by the Court to begin with -- well, you'll disagree. But it was changed because of the volunteerism coming in, quite frankly, from the mother.

Now, I'm going to deal with that also before we get into that area. We might as well deal with it now. How am I going to deal now with what I believe is the correct ruling in light of the testimony that came in when you eagerly spring forward and say, "Judge, they opened the door again, and now I'd like to talk to Mr. Holloway about this removal"? Because what we've done is we left the jury with removal.

Now the mother's explanation blurted out "Well, this was a give and take between the parties." It's not a give and take. It's a court order. And so I've left it, hopefully not starting another trial again with the removal, and that ends it. But I'm afraid of the volunteerism or, quite frankly, a question that sets Mr. Holloway off where he just steps into

3-RenSER-00280                                    3-RenSER-00280

it.

MR. HARRELL:  Your Honor, I don't own or control Mr. Holloway.

THE COURT:  I understand that.

MS. MKRTCHYAN:  And I object.

MR. HARRELL:  He's responsible for what he says.

THE COURT:  Okay, listen.  I'm going to let you try your lawsuit.  If you want to take it up to 2024, you go forward with that.  I've expressed all my concerns, but they're not rulings.  I'm just trying to foresee where this could go. If you want to limit it to 2020, I leave that to your decision as counsel, or 2024, concerning salary.  You decide.

MS. MKRTCHYAN:  Here's the issue I have.  You are leaving me in a kind of limbo because I need to know if I raise the stroke issue, how is that going to -- because stroke, as I said yesterday, the only reason why mom testified about that was because my understanding was that stroke is a neurological issue.  It is not an emotional distress issue.  And that's why in good faith --

THE COURT:  I have no problem with that.  What I'm saying to you is the salary issue.

MS. MKRTCHYAN:  Salary, we will stop it at 2020 so that there is no issue.

THE COURT:  That probably resolves it.

MR. HARRELL:  Your Honor, if I may.  I have a

UNITED STATES DISTRICT COURT

suggestion then. If we have an agreement from plaintiff's counsel to stop Mr. Holloway's salary issue from when he -- he moved to Pennsylvania again, July of 2018, the defense would ask for a court --

MS. MKRTCHYAN: No, that's not the agreement.

MR. HARRELL: Well, let me just get it out there. Whenever we agree it happens, Mr. Holloway, on direct, has gone past whatever date we have been talking about, and we need a court admonition to the jury to disregard all salary discussions by Mr. Holloway after whatever date it is.

THE COURT: No. I'm going to let counsel for the plaintiff govern her lawsuit. If she decides to take this up to 2020, then that's all that's going to be in front of the jury.

MR. HARRELL: Your Honor, she's gone past that already.

THE COURT: But I haven't heard a salary past that to the jury. In other words, I've asked the questions about salary out of their presence. The jury doesn't know what these salaries are.

MR. HARRELL: Okay.

THE COURT: Go back and look at the record. I stopped it immediately, trying to foresee where we could be going, and they haven't heard salaries for 2020 or 2021. They haven't heard about COVID yet. That's all outside the presence

**UNITED STATES DISTRICT COURT**

129

of the jury.

MR. HARRELL:  Thank you for refreshing my memory. And we want to be very clear on our side.  Switching gears now to this stroke that Mr. Holloway's mother got into, we've already had court instruction that that is to be disregarded.

THE COURT:  If you only go with salary up to 2020, then what do we do with claimed damages that are physical?  In other words, I've instructed the jury concerning emotional distress.  I hadn't precluded physical because I didn't know, you know, what the ongoing injuries were.

MR. HARRELL:  Right.

THE COURT:  I think he's still able to testify about his physical and see if there's a nexus.  With the salary --

MR. HARRELL:  Your Honor, here's the challenge with regard to the physical.  In particular, the stroke and the polyps we're hearing about and a heart attack and variety of other things, which I believe Mr. Holloway tells us is June of 2024, what the mother said.  Regardless, it is after July of 2018, and it's after what happened in Pennsylvania.  The suggestion with all of that is that --

THE COURT:  That's somehow tied to the confrontation with the employees.

MR. HARRELL:  And plaintiff's counsel, to her credit, has told us candidly, "I don't have a doctor that can make that connection."  So that's one problem with --

**UNITED STATES DISTRICT COURT**

THE COURT: I think we'll do this. I'm going admonish the jury, with each of your permission, that they are to disregard the testimony thus far concerning any symptomology after 2020. And then leave that to you, counsel, to decide if you want to go further. And if you decide to, you can go back into that. If you decide not to -- if you think the stroke is really tied to this altercation, I'm not going to preclude you.

MS. MKRTCHYAN: Your Honor --

MR. HARRELL: Your Honor --

MS. MKRTCHYAN: Excuse me. You are the one who takes the floor constantly. Can I speak --

THE COURT: Please.

MS. MKRTCHYAN: Okay, you know, seriously.

Your Honor, last trial, third trial after two mistrials, we got zero damages because I was handicapped in proving my client's damages. They brought in collateral sources of payments. Now I'm basically handicapped. I cannot function in this court. I cannot prove physical injuries.

We are not talking about emotional distress. We are not talking about general damages. We are talking about this man's special damages. It's already out there that he had a stroke. It's already out there that he basically had heart surgery, through his mom, and that was done because it is not necessarily part of emotional distress damages. All I was trying to do with his mom is to prove pain and suffering, you

3-RenSER-00284          3-RenSER-00284

know, through -- before he left.

But right now, basically I'm working on a minefield here. What I'm trying to do here is only the following: First of all, okay, we had three trials where I had to spend enormous resources of bringing three experts to court, a lot of money spent on that. Now, fourth trial I'm forced to prove not only damages but also liability. It is extremely, extremely prejudicial to plaintiff after three trials to limit my ability to prove any damages. All I'm trying to do --

THE COURT: I'm not going to limit you. In other words, you make the decision tactically. You know my concerns. I don't know where this is going to lead.

You make your motions after counsel decides how she's going to conduct the next examination.

All this may be premature. I'm just getting very, very concerned. But I'm not going to limit you, Counsel. You take this where you want to.

MS. MKRTCHYAN: But the problem, Your Honor, I have now -- here's the problem. I'm concerned because I don't want an allegation made like yesterday -- two days ago that I'm opening doors, no. I want to make -- I want to understand -- I understand the issue. I want to understand the Court's ruling in advance. Because I don't want to have -- go somewhere and then come back. But here's the problem I have.

THE COURT: I'm not going to do that because then

UNITED STATES DISTRICT COURT

3-RenSER-00285                    3-RenSER-00285

you'll complain or the other party will complain that I'm limiting you in some way. I'm going to leave this to your trial strategy. You know my concerns, but they're not absolute. They may be ill-founded, but you know what I'm concerned about. Okay? You make that decision as counsel, and let's go forward.

Karlen, if you'd get the jury now.

MS. MKRTCHYAN: I need to use -- okay.

THE COURT: Do you want to send them to lunch and come back?

MS. MKRTCHYAN: Yes.

THE COURT: Let me apologize and explain that the recess was my fault. Can we make it 45 minutes and get back to it? We're taking an awful lot of time from the jury right now.

**(In the presence of the jury.)**

THE COURT: First of all, we're going to reconvene at 1:00 o'clock to make certain everybody gets some rest. We've been in session obviously outside your presence. Also, I want to state that any time delay and the inconvenience to you is solely my responsibility. It's the Court's fault. So I apologize for that time we're taking. It's neither one of counsel's fault. I'm going to ask you back at 1:00 o'clock. Please don't discuss this matter. We'll continue with the case at that time. Have a nice lunch.

**(Out of the presence of the jury.)**

**UNITED STATES DISTRICT COURT**

3-RenSER-00286          3-RenSER-00286

THE COURT: Counsel, have a nice lunch. See you at 1:00 o'clock. Let's make that a full hour so you're not stressed.

MR. WRONIAK: Your Honor, if we can have ten minutes. We were supposed to take up some issues during the lunch hour.

THE COURT: Let's take up those issues.

MR. WRONIAK: Can we use the restroom first?

THE COURT: Certainly, but we'll go on the recording in just a moment.

MS. MKRTCHYAN: Let's let them do that, but --

THE COURT: What are these -- can they wait until the evening hours, or do you really want to take the lunch hour?

MS. SWISS: One issue we can take in the evening hour, but there is a witness issue that I would just like to confirm because we have Joshua Gomez, who's in the Navy. He is going to be on a boat doing testing all next week, and we're asking to take him out of order tomorrow, and I need to make sure that the Navy will release him tomorrow. I've let counsel for plaintiff know yesterday evening, and we just want to make sure that's okay with the Court and to confirm a time so he can be released and up here tomorrow.

THE COURT: Yes, but I want each witness now to finish their testimony. So that assumes that we have completed

this gentleman. Now, if you're going over tomorrow, you control that. So I will allow that witness to be taken out of order because he's in the Navy, but that means you're controlling the time of your cross-examination. And what I'm not going to do is hear that he's partway through that examination that "We haven't finished."

I have no idea how much longer plaintiff's counsel is going to go. I don't know how long you're going to go, but I haven't limited the time as to Mr. Holloway.

MS. SWISS: Understood.

THE COURT: That's up to you. I'll take him -- I'm happy to take him out of order, but I can't judge the time.

MR. HARRELL: Your Honor, the hint that we're trying to drop is we are making good progress, and we hope to argue the case on Wednesday because we know the Court has another pressing matter on Thursday.

THE COURT: Don't worry about that. Absolutely not. I'm tied up on Thursday, but I'm going to be right back in session Friday.

MR. HARRELL: Understood, Your Honor.

THE COURT: So you're not pressed for time on your side and don't please the Court in any shape. We estimated anywhere from two to four weeks, hopefully -- the jury -- about three weeks as the last trial. So I'm not concerned.

MR. HARRELL: We haven't lost anybody yet.

3-RenSER-00288                                          3-RenSER-00288

THE COURT: So don't do any favors for me. I'm just fine.

Sir, step down. You have a good lunch and then come back at 1:00 o'clock.

**(Lunch recess from 12:09 p.m. to 1:04 p.m.)**

**(In the presence of the jury.)**

THE COURT: Mr. Holloway, if you'd return to the stand. Thank you.

We're back in session. All counsel, the parties are present, the jury, the alternates.

This will be continued direct examination, please.

BY MS. MKRTCHYAN:

Q    Mr. Holloway, so let's go back on track here for -- let's cover some of the medical billing that you received for medical costs related to this incident.

MS. MKRTCHYAN: For the record, Your Honor, we will pull up some medical billing from Mission Hospital, Exhibit 16.

THE COURT: Exhibit 16, thank you.

BY MS. MKRTCHYAN:

Q    So we've got -- this is from the day of the incident when you were hospitalized. Do you see that? January 21, 2018?

A    Yes.

Q    Okay. So this is for the treatment there. You received -- actually your attorney received this billing from the Mission Hospital?

UNITED STATES DISTRICT COURT

3-RenSER-00289                                        3-RenSER-00289

A     Yes.

Q     Okay.  About 22,279?

A     Yes.

Q     Okay.  Then we have some billing that you received from treatment for -- at the Hardy Physical Therapy in Pennsylvania?

A     Yes.

Q     You were getting this kind of bills in Pennsylvania for Hardy Physical Therapy treatment periodically?

A     Yes.  Every time I went I got a bill.

Q     So isn't you true you were getting this treatment through the VA hospital?

A     Yes.

Q     Okay.  And you've got billing also from the VA hospital are related to your medical costs, treatment for this injuries?

A     Yes.

Q     Okay.  So let's pull up that and look at that.  This is your billing from VA hospital where --

        MR. WRONIAK:  Objection.  Excuse me.  Exhibit number, please.

        MS. MKRTCHYAN:  Exhibit 26.

BY MS. MKRTCHYAN:

Q     This is compilation of some of the bills that we received from VA for treatment in Montana, Long Beach, Pittsburgh?

A     Yes.

Q     20,396?

**UNITED STATES DISTRICT COURT**

3-RenSER-00290                                          3-RenSER-00290

A    Yes.

Q    Okay.

MR. HARRELL:  Your Honor, objection to Montana, for sure.

THE COURT:  Well, Counsel, I'm leaving that to you. If we're going to extend this beyond, you know, the date that's --

MS. MKRTCHYAN:  Your Honor, this is Montana related to --

THE COURT:  That's fine.

MS. MKRTCHYAN:  -- his treatment for back pain.

MR. HARRELL:  Your Honor, objection to Montana and to Pennsylvania after July 2018.

THE COURT:  This is not emotional distress though. This is physical.  Overruled.

BY MS. MKRTCHYAN:

Q    So then we go into some of your billing that you received here in California.  This is for the paramedics' treatment that you've got?

A    Yes.  This is for the ride.

Q    Okay. We looked at the dental work that you did.  You went through doctor -- neurologist there.  Let's look at some of those billing.  And you're responsible for this billing, aren't you?

A    Yes.

3-RenSER-00291                                    3-RenSER-00291

Q    Okay.  Regardless of what happens to this lawsuit, are you going to be obligated to pay this doctors that treated you at the VA, at the Mission Hospital, et cetera?

MR. HARRELL:  Calls for speculation.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q    Is it your understanding that you're obligated to pay for this stuff?

A    Yes.  I'm currently receiving calls from Sunrise, which is a credit --

MR. HARRELL:  Hearsay.

MS. MKRTCHYAN:  Objection, Your Honor.  This is so inappropriate.

THE COURT:  Sustained.

The billings, you can show, Counsel.

BY MS. MKRTCHYAN:

Q    Okay.  So this is billing from Dr. Gross.  We've got a total of 5,425.  This one is 3,825 for the treatment you received in 2020.

MR. WRONIAK:  Objection.  Counsel is testifying.

THE COURT:  No.  This is just foundational.

BY MS. MKRTCHYAN:

Q    And then 1,600 for treatment with the neurologist in -- here in California?

A    Yes.

UNITED STATES DISTRICT COURT

3-RenSER-00292                                          3-RenSER-00292

139

Q    Okay.  Dr. Raiszadeh also sent you some billing --
true? -- for his treatment in 2020?

A    Yes.

Q    How much do you -- well, let's look at the billing here.
So --

MR. WRONIAK:  Can we please get exhibit numbers.

MS. MKRTCHYAN:  I'm sure that counsel has all the --

THE COURT:  It doesn't matter.

MR. WRONIAK:  We need it for the record, Counsel.

THE COURT:  I need it for the record.

MS. MKRTCHYAN:  For the record, Exhibit 24.

THE COURT:  Exhibit 24.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    We have Exhibit 24.  This is Dr. Raiszadeh's treatment
billing in August -- from August 12 through October 7, 2020,
1,620?

A    Yes.

Q    He also treated you sometime in November after this;
right?  After October 7, 2020, you had another treatment note
from Dr. Raiszadeh.

Do you recall that?

A    Yes.

Q    Okay.  We have not received the billing yet for that,
have we?

UNITED STATES DISTRICT COURT

3-RenSER-00293                                           3-RenSER-00293

140

A    No.

Q    Okay.  Looking at some more documentation from Dr. Raiszadeh's office, 1,900?

A    Yes.

Q    So these are all the out-of-pocket that you have incurred as a result of this incident?

A    Yes.

Q    You said that you paid for attorney before you learned that the charges were not filed against you?

A    Yes.  When I received the charges paper.

Q    Okay.  Do you recall how much money you paid to that lawyer -- criminal defense attorney for this incident?

A    I want to say some -- around 5,000.

Q    Let's actually open that so that we can --

A    Yes.

Q    -- refresh your memory.  You were placed on a payment plan.  The total amount -- the retainer that was charged on you -- and this was the charges that you were arrested for.  So is this the document that we are referencing?

A    Yes.

Q    Okay.  So it says here, "Felony preliminary, 2,500"?

A    Yeah.  2,500.

Q    Okay.  You paid some of it, but you still owe some of it?

        MR. WRONIAK:  Objection.  Leading.  Can we get an exhibit number as well.

3-RenSER-00294                                    3-RenSER-00294

THE COURT: What exhibit number is this?

MS. MKRTCHYAN: 68, Your Honor.

THE COURT: 5-8.

MS. MKRTCHYAN: 68.

THE COURT: 6-8.

And, Counsel, just re-ask the question about how much he paid.

BY MS. MKRTCHYAN:

Q    How much did you pay, and how much do you remember -- this was paid by credit card, wasn't it?

A    Yes.

Q    Okay. So at the time you put a balance -- I mean, you put a down payment, and then you paid the rest later?

A    That's correct.

Q    And total was 2,500?

A    Correct.

Q    Okay. Then you borrowed some money from your mom to move from California to Pittsburgh?

A    Right. Because I had spent all my money on bail and all that stuff. So I didn't have anything left.

Q    Okay. And do you remember how much you borrowed from your mom just to move from California to Pittsburgh?

A    Well, I'm going to guess at least --

Q    Don't guess.

A    Well, just from the travel to the -- to Pittsburgh, we're

UNITED STATES DISTRICT COURT

going to go about 2,500 bucks.

Q    Okay.  You have also borrowed money from your mom for other living costs or for miscellaneous costs related to this incident?

THE COURT:  Up to what date, counsel?

MS. MKRTCHYAN:  Various times, Your Honor.  I don't have dates.  Up to -- up until today.  Up until today in 20- -- sometime in -- let me just strike that.

Let's go over some other issues here.  You complained to the department about this incident, didn't you?  Before even you filed a lawsuit, you complained.  You made a complaint to the Orange County Sheriff's Department through your attorney about this incident, have you?

MR. HARRELL:  Objection.  Relevance.

MR. WRONIAK:  Objection.  Relevance.

MR. HARRELL:  403.

THE COURT:  Sustained.  Oh, just a moment.  The time period.

MS. MKRTCHYAN:  In 2018, Your Honor.

THE COURT:  All right.  Overruled.  You can -- won't necessarily want to get into the content of that complaint.  It's the fact of the complaint.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    You made a complaint through that.  Did anyone reach out

to you or your attorney to interview you?

MR. HARRELL: Objection.

MR. WRONIAK: Objection.

THE COURT: I'm going to sustain that. This is collateral.

MS. MKRTCHYAN: It goes to his damages, Your Honor. It goes to his emotional distress.

THE COURT: No, it doesn't. It has the fact that he made a fresh complaint, Counsel. Overruled [sic].

MS. MKRTCHYAN: Okay.

BY MS. MKRTCHYAN:

Q    Now, sir, that's your past medical costs that we covered. To your understanding, you have to pay the VA hospital and all those hospital that you were treated at?

A    Yes. I'm still under liens on that.

Q    And as far as your future medical cost, as far as your continuing treatment, let's say for your back pain. You said that you've gone through physical therapy for -- the acupuncture. You've done a lot of other things. You've done cupping for pain?

A    Yes.

Q    What is going to be your future prognosis based on your doctor's recommendation? What are you supposed to do if this pain does not resolve?

MR. HARRELL: Hearsay.

3-RenSER-00297                                    3-RenSER-00297

THE COURT: Overruled.

You can answer the question.

THE WITNESS: From what I'm told right now, it's continual physical therapy. And as it gets worse, they could do the epidural, and then the final step is surgery.

BY MS. MKRTCHYAN:

Q    Do you want to do surgery?

A    No, I don't.

Q    Well, at some point if injections do not cure the issue, are you going to actually be doing the surgery?

A    Yes. Sooner or later I'm going to have to, but it's just not something I'm looking forward to, I guess. Not to say I don't want to do it. I'm just really not looking forward to back surgery.

Q    Okay. And so let me ask you: Were you told that the VA hospital actually going to undertake this surgery, or do you have to do it at some other facility?

A    Where I'm at it's going to be ended up in a Logan Health and not in the VA hospital.

Q    And that's a private facility?

A    Yes.

Q    And how much have you been told cost surgery like that, the fusion of the back spine?

MR. WRONIAK: Objection. Hearsay.

THE COURT: Do we have some documents concerning

145

this, Counsel?

MS. MKRTCHYAN: Dr. Raiszadeh testified about that. And that goes to his --

THE COURT: Overruled.

MS. MKRTCHYAN: -- damages. His understanding.

MR. WRONIAK: Objection. Misstates the testimony.

THE COURT: Overruled.

THE WITNESS: I've been told the back surgery, like, this is going to be around $250,000.

BY MS. MKRTCHYAN:

Q    Are you able to pay for that?

A    Right now, no.

Q    Why did you file this lawsuit?

MR. WRONIAK: Objection. Relevance.

THE COURT: No. Goes to state of mind.

You can answer the question.

THE WITNESS: For justice. I felt I was wronged. If I did something wrong, I'd take care of it. But I felt I was mistreated very badly. I felt just very badly mistreated and hopefully maybe something will come out of this, some kind of -- I don't know -- justice. I know I'll need future medical experience; so I'm hoping this will end up in helping with that. But as this is civil, maybe an apology would have been nice at least.

BY MS. MKRTCHYAN:

**UNITED STATES DISTRICT COURT**

3-RenSER-00299                    3-RenSER-00299

Q    So did you try to get your property back after this incident, the stuff that they took from you that night?

MR. WRONIAK:  Objection.  Assumes facts not in evidence.  Relevance.

THE COURT:  We've already talked about the dog.  Got the dog back.  What are you --

MS. MKRTCHYAN:  The stuff he -- that belonged to him, Your Honor.  They took -- they confiscated his knives.  That cost him money.

THE COURT:  I think it's irrelevant, Counsel.  Let's move on.

MS. MKRTCHYAN:  Okay.  Sure.

BY MS. MKRTCHYAN:

Q    So as far as your feelings are concerned about this, you know, I want to understand -- why did you feel you were wronged?  You -- after all, you had, you know, felony conviction.  You had -- you were on probation, as these attorneys are continuously raising that.  Why do you feel you were wronged in this case?  Please explain.

MR. WRONIAK:  Objection.  Argumentative as to the form.

THE COURT:  Do you understand the question?

THE WITNESS:  I believe I do.

THE COURT:  I'm going to let you answer that one more time.

3-RenSER-00300                                        3-RenSER-00300

THE WITNESS:  Okay.

THE COURT:  All right.

THE WITNESS:  The whole night, the fear I experienced that night, the trauma I've had to subdue during that time, nightmares that -- waking up feeling like someone's holding you down, the medical experience I've had to deal with, all of that included has reached my conclusion.

BY MS. MKRTCHYAN:

Q    So you moved out of California after this -- as a result of this, you left your family?  Let me strike that.

You've lived in California for most of your life, have you?

A    Yes.  I grew up here.

Q    And you moved out of California because of --

MR. HARRELL:  Leading.

BY MS. MKRTCHYAN:

Q    -- this incident?

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Why did you move out of California?

A    Second time I got confronted with the sheriffs, I felt like this was going to keep happening because I felt that my record would show up every time they would see an ID, pull up my truck's license.  What's going to pop up is something negative toward cops, and that's the way I was going to be

UNITED STATES DISTRICT COURT

treated from now on.  And I felt like I want to get away, just different, maybe start over.  Can be anonymous.  And I just went wherever the first job came.

Q    Okay.  Thank you.

No further questions.

THE COURT:  Do you want a break before you start your cross-examination?  We've been at it a long time.  Although the jury's had a lot of rest.

MR. HARRELL:  Your Honor, yes.  The lawyers would appreciate a quick break.

THE COURT:  Just a quick break as we make that quick transition into cross-examination.  About ten minutes, but we're going to come back and get you pretty quickly now.

Counsel, you can get set up.

MR. HARRELL:  Thank you, Your Honor.

**(Recess from 1:22 p.m. to 1:38 p.m.)**

**(In the presence of the jury.)**

THE COURT:  The jurors are present, all counsel, parties.

Mr. Holloway, if you can retake the stand.

Who will begin with cross-examination?

Mr. Harrell, then, on behalf of Deputy Gotts.  Thank you.

///

///

**UNITED STATES DISTRICT COURT**

**CROSS-EXAMINATION**

BY MR. HARRELL:

Q    Sir, we've met previously?

A    Yes, sir.

Q    You gave a deposition in this case; right?

A    Yes, I did.

Q    Does August of 2020 sound about right?

A    Sounds fine.

Q    I was there asking you questions?

A    Yes, you were.

Q    And you gave answers under oath?

A    Yes, I did.

Q    And you promised to state the truth at that time; right?

A    Yes, I did.

Q    You also promised to give us your most accurate answers at the deposition; right?

A    Yes.  Best possible answers I was able to, yes.

Q    And you believe that you did that; right?

A    Yes, I did.

Q    You have also testified in prior proceedings; correct?

A    Yes, I have.

Q    And in those proceedings too, you promised to tell the truth; correct?

A    Correct.

Q    And you believe you did that; right?

**UNITED STATES DISTRICT COURT**

A    Yes, I have.

Q    Okay, sir.  Now, you claimed to have been emotionally traumatized as a result of this incident; correct?

A    Yes.  Having a gun pointed at my face was traumatizing.

Q    Okay.  But you were already dealing with emotionally upsetting events at the time of this incident; true?

A    I had other life issues I was taking care of.

Q    Right.  In fact, we hear you on audio stating to the deputies at your first encounter, reference the domestic violence, that you were already dealing with emotionally upsetting events at the time of the incident in this case; true?

        MS. MKRTCHYAN:  Objection.  Vague and ambiguous. What tape are we talking about?  It's vague.

        THE COURT:  Overruled.

        THE WITNESS:  No, that's incorrect.

BY MR. HARRELL:

Q    Okay, sir.  In fact, when you were addressing Deputy Renegar, you tell him, quote, "I've gone through enough shit"; right?

A    No.

Q    Okay.

        MR. HARRELL:  Your Honor, we're at a prior proceeding.  This is Prior Proceeding 1.  It took place on August 18 of 2021.  This is Volume V.

UNITED STATES DISTRICT COURT

THE COURT: I don't have --

MR. HARRELL: Your Honor, we're going to get you everything we need.

THE COURT: All right. Let me see that. Come up here informally.

MR. HARRELL: This is page 49, lines 14 through 20.

THE COURT: Somebody can come up also perhaps and turn to that page. It might help.

MR. HARRELL: Your Honor, they need to bring all --

THE COURT: All right. Thank you, Counsel. It's page 49.

MR. HARRELL: Right. Page 49, lines 14 through 20.

THE COURT: Just a moment.

Counsel, you may read that.

BY MR. HARRELL:

Q    Question to you, sir, in a prior proceeding:

"Sir, right here when you're addressing Deputy Renegar, you tell him, 'I've gone through enough shit'; right?

Your answer:

"That's what those words say, yes."

Sir, that's what you said at the prior proceeding because it was the truth; right?

A    Well, the correct words is "I've had enough of this shit" because I was -- it was toward the end of the meeting of the

officers, and they had been harassing me, and I said, "I'm having enough of this."  And you'll hear it clearly on the tape.

Q    Sir, I'm going to read your testimony from a prior proceeding again, and then I'm going to move on.

A    Okay.

          MS. MKRTCHYAN:  Objection, Your Honor.

BY MR. HARRELL:

Q    (Reading:)

          "QUESTION:  Sir, right here when you're
     addressing Deputy Renegar, you tell him, quote,
     'I've gone through enough shit'; right?"
          Close quote.  Your answer:
          "That's what those words say, yes."
          Sir, there were emotionally upsetting events that you were dealing with at the time of this incident that have nothing to do with my clients; true?

A    I wouldn't put it in those words, but I had life issues I was dealing with.

Q    Right.  Sir, let's focus on what I'm talking about.
          Just five days before the incident in this case, in another courtroom in state court, in front of a state court judge, you appeared in connection with criminal charges against you; correct?

A    That is correct.

Q    And at that time, the state court judge found you guilty of a crime; true?

A    At that time I was completing all the responsibilities I had to do in that court because I believe that date originated more than a year ago.  So at that time I was completing all the requirements the court gave to me and finishing off what was left of my informal probation.

Q    Sir, did I ask you anything about completing paperwork?

        MS. MKRTCHYAN:  Objection, Your Honor. Argumentative.

        THE COURT:  Sustained.

BY MR. HARRELL:

Q    Sir, I'm going to ask you again --

        Did you learn anything in the Marine Corps when you --

        MS. MKRTCHYAN:  Objection.  Your Honor, objection. What is this?  Marine Corps.

        THE COURT:  Just a moment.  Finish your question.

BY MR. HARRELL:

Q    Sir, you told us about serving in the Marine Corps; correct?

A    Yes.  I served in the Marine Corps.

Q    And that's something you're rightly proud of; true?

A    Yes, I am.

Q    Sir, when you were serving in the Marine Corps, did you

**UNITED STATES DISTRICT COURT**

154

learn anything about the value of straight talk --

MS. MKRTCHYAN: Objection, Your Honor.

BY MR. HARRELL:

Q     -- straight answers to direct questions?

MS. MKRTCHYAN: Badgering the witness. Objection.

THE COURT: Counsel, let's move on from that question.

BY MR. HARRELL:

Q     Sir, I'm going to ask my question again. When you appeared in state court five days before our incident, the state court judge found you guilty of a crime; true?

A     Yes.

Q     Right. The judge found you guilty of a felony; true?

A     Yes. A year ago before that. But, yes, it continued on.

Q     Sir, on the date of this incident, just five days after your felony conviction, you viewed your conviction as a serious matter; right?

A     Yes.

Q     And you have admitted under oath that being convicted of a felony was a big deal to you; right?

A     Yes. It was a big mistake.

Q     And because it was a felony and because it was a big deal to you on the date of the incident, it was still causing you emotional distress; right?

A     I wouldn't have said it like that, no.

**UNITED STATES DISTRICT COURT**

3-RenSER-00308                                        3-RenSER-00308

Q     Sir, I'm going to ask it again.

            MS. MKRTCHYAN:  Objection.

BY MR. HARRELL:

Q     Because it was a felony and because it was a big deal to you on the date of the incident, it was still causing you emotional distress; right?

            THE COURT:  On the day of the incident or the day?

            MR. HARRELL:  The day of the incident.

            THE WITNESS:  At 3:00 in the morning when that incident -- that was not in my mind.  It existed.  I'm not saying it didn't exist that day.  But to be honest, it wasn't in the top of my mind at 3:00 at the morning, getting guns pointed at me.

BY MR. HARRELL:

Q     Sir, with respect, did I ask you if it was the top of your mind?

            MS. MKRTCHYAN:  Objection, Your Honor.  Objection, Your Honor.  This is argumentative.

            THE COURT:  Sustained.

BY MR. HARRELL:

Q     Sir, one more time.  On the date of the incident, was the felony that you had just been convicted of causing you emotional distress or not?

            MS. MKRTCHYAN:  Asked and answered.

            THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

3-RenSER-00309                                    3-RenSER-00309

THE WITNESS:  No.

BY MR. HARRELL:

Q    Okay, sir.  I'd like to show you a little bit about your guilty plea since there's been some talk about it in this case.

MR. HARRELL:  Your Honor, we have a certified copy of the guilty plea we'd like to put up.

THE COURT:  I'm not going to allow that, Counsel. You can talk about the conditions if you'd like to, but before that goes up, I'd like to see the factual basis, et cetera. So...

MR. HARRELL:  Okay.  Would the Court like to see a copy of what I'm going to put up?

THE COURT:  No, it's not going to go up right now.

MR. HARRELL:  All right.

THE COURT:  You're not precluded from asking terms and conditions, et cetera.

BY MR. HARRELL:

Q    Now, sir, moving ahead a little bit, which we'll get back to later.  Since we're going to talk about terms and conditions, I'll ask you about that when you're told to get on the ground.  And we're getting there, so just bear with me.

First of all, let's talk about some other things and ask you if this was causing you emotional distress at the time of the incident.

You had mental health issues before the date of the

3-RenSER-00310          3-RenSER-00310

incident; right?

MS. MKRTCHYAN: Objection. "Mental health," very vague and ambiguous.

THE COURT: Overruled.

BY MR. HARRELL:

Q    Sir?

A    I suffered from general anxiety, yes.

Q    Okay.  And that was ongoing at the time of the incident; right?

A    Yeah, from my stroke in 2016.

Q    And for nothing else?  Is that your testimony?

MS. MKRTCHYAN: Objection.  Very vague and ambiguous and argumentative.

THE COURT:  Overruled.

THE WITNESS:  My diagnosis was after my stroke.

BY MR. HARRELL:

Q    Right.  Sir, my question has another focus.

A    Oh, yes, sir.

Q    The general anxiety disorder that you told us about, is it your testimony that the sole source of anxiety that you were suffering from at the time of the incident was the stroke in 2016?  Or was there something else?

MS. MKRTCHYAN: Objection.  Vague and ambiguous.

THE COURT:  That is vague.

BY MR. HARRELL:

**UNITED STATES DISTRICT COURT**

3-RenSER-00311                                        3-RenSER-00311

Q    Sir, you did have a prescription for a drug called trazodone at the time of the incident; correct?

A    Yes.

Q    And you first received this prescription for trazodone on September 20, 2017 --

         MS. MKRTCHYAN:  Misstates the evidence.

BY MR. HARRELL:

Q    -- four months before the incident in our case; true?

         MS. MKRTCHYAN:  Objection.  Misstates the evidence.

         THE COURT:  Overruled.

         THE WITNESS:  Yes.

BY MR. HARRELL:

Q    And you were taking 100-milligram tablet to be taken at bedtime; true?

A    As needed, yes.

Q    And that's what you did at the time of the incident; correct?

A    Yes.

Q    All right.  Now, September 20, 2017, just a couple of months before that, you lost any right to visitation with your daughter, didn't you?

A    Yes, I did.

Q    And that was emotionally upsetting to you?

A    I was sad about that.

Q    And that's part of the reason why you got a prescription

3-RenSER-00312                                    3-RenSER-00312

for trazodone; right?

A     No.

Q     No?  That had nothing to do with losing visitation rights with your daughter?

A     That's correct.

Q     In fact, you lost custody of your daughter on June 23rd of 2017; correct?

A     Yes, sir.

          MS. MKRTCHYAN:  Objection, Your Honor.

BY MR. HARRELL:

Q     Just a couple of months before you got your prescription for trazodone; right?

A     That's correct.

Q     And losing custody of your daughter is something that continued to cause you emotional distress at the time of the incident; right?

A     Are we talking about trazodone or missing my daughter?

Q     Ma'am [sic] --

A     I'm just -- ma'am?

Q     Losing custody of your daughter in June of 2017, that continued to cause you emotional distress at the time of this incident; correct?

A     I was sad about my daughter, but it had nothing to do with the incident.

Q     So my question has another focus.

UNITED STATES DISTRICT COURT

160

MS. MKRTCHYAN: Objection.

BY MR. HARRELL:

Q    Did losing custody of your daughter in June of 2017 continue to cause you emotional distress at the time of the incident?  Yes or no.

A    Not at that exact time of the incident, no.

Q    No, you had completely gotten over losing custody of your daughter; right?

MS. MKRTCHYAN: Objection, Your Honor.

THE COURT: Counsel, I think that's been asked and answered now.

MR. HARRELL: Okay.

BY MR. HARRELL:

Q    In any event, sir, that's another reason why you told the deputies on that night "I've been dealing with enough shit"; right?

A    No.  It was after the officers were harassing me and lying to me, I said, "I'm done -- enough with this shit," and I was very frustrated with them.

Q    All right.  So let's talk about what happened before deputies arrived at your tent the first time, reference the domestic violence.  Do you have that period of your life in mind?

A    Before any cops are in my area; correct?

Q    Sir, I'm now going to ask you questions that focus on

UNITED STATES DISTRICT COURT

3-RenSER-00314                                    3-RenSER-00314

what you were doing or not doing in the hours before deputies showed up at your tent at 4:00 o'clock in the morning on January 21st, 2018, reference the domestic violence.

Do you understand what period of time we're focused on?

A    Yes, sir.

Q    Now, what time did you go to sleep on the evening of the incident just before the incident happened?

A    I'd say about sundown from the -- there's no lights out there.  So you sit there for a fire a little bit and then you go to bed.

Q    About 5:00 or 6:00 in the afternoon, does that sound about right?

A    It would be a guess as I didn't have a watch back then.  I didn't have nothing to tell what time was anything.

Q    And you have claimed that the sheriffs made contact with you at about 4:00 or 5:00 in the morning on the date of the incident; correct?

A    Whatever their timestamp, I'm okay with that.

Q    Sir, my question has another focus.

MS. MKRTCHYAN:  Objection, Your Honor.  This is very vague.

THE COURT:  Just re-ask the question, Counsel.

BY MR. HARRELL:

Q    You have claimed that the sheriffs made contact with you

3-RenSER-00315                                    3-RenSER-00315

at about 4:00 or 5:00 in the morning on the date of the incident; correct?

A    I'm not understanding the question.

MR. HARRELL:  Your Honor, this is from the deposition.

MS. MKRTCHYAN:  Improper impeachment, Your Honor. The question --

THE COURT:  Just repeat the question to make certain.

MR. HARRELL:  Sure.

BY MR. HARRELL:

Q    Sir, you have claimed that the sheriffs made contact with you at about 4:00 or 5:00 in the morning on the date of the incident; correct?

THE COURT:  Is this the first encounter or the --

MR. HARRELL:  Yes, Your Honor.

THE COURT:  Are you sure?

MR. HARRELL:  Domestic violence.

THE COURT:  On the first encounter, okay. Now you can answer the question.

THE WITNESS:  And these are my words from a deposition?

BY MR. HARRELL:

Q    Sir, have you made that claim or not?

A    If I -- if you're reading my words, yes.  I know they came

UNITED STATES DISTRICT COURT

at a certain time. I just want to make sure I'm at the right time. That's it. That's not disputing you. I just want to make sure I'm -- we're talking at the right time. But, yes, the sheriffs did show up early in the morning.

Q    At about 4:00 or 5:00 in the morning; right?

A    If that's the right time.

MR. HARRELL: Your Honor, may I play some video from the deposition? This is page 69, lines --

MS. MKRTCHYAN: Your Honor, I object because this is not proper impeachment.

THE COURT: First of all, you'll show him what you're referring to first to refresh his recollection. This is not impeaching. So you'll refresh his recollection first by approaching him and showing him what you're referring to to see if it refreshes his recollection.

BY MR. HARRELL:

Q    Okay, sir. We're going to send someone up there with the correct page and lines, okay? You ready to read?

A    Yes. Thank you.

Q    This is page 69, line 21 through and including page 70, line 1.

A    Say again, sir.

Q    Page 69.

THE COURT: They'll actually turn to the page for you.

UNITED STATES DISTRICT COURT

MS. SKINNER:  It's turned, yeah.

BY MR. HARRELL:

Q     Start at line 21.

A     I see your name.

Q     And then continue over to the next page, page 70, to line 1, and please let us know when you're done reading.

**(Pause in proceedings.)**

BY MR. HARRELL:

Q     Just to line 1, sir, and then please stop.

A     Okay.

Q     Sir, you have claimed that the sheriffs made contact with you at about 4:00 or 5:00 in the morning on the date of the incident; is that correct?

A     Yes, that time is what I said.

Q     All right.  And you have claimed that you slept straight through the night and only woke up when the sheriffs arrived at your tent; true?

A     Yeah, I had a full night's sleep.

Q     Okay.  Now, your own statements at the start of the incident indicate that you understood law enforcement showed up at your tent the first time to investigate a woman being beaten; right?

MS. MKRTCHYAN:  Statements where?  Objection.  Vague and ambiguous.

THE COURT:  As to when, the time of the incident or

**UNITED STATES DISTRICT COURT**

today in court?

BY MR. HARRELL:

Q    Sir, your own statements to law enforcement at the start of the incident indicate that you understood law enforcement showed up at your tent the first time to investigate a woman being beaten; right?

THE COURT:  I'm overruling the objection.  I understand.

THE WITNESS:  No.  I believe I'm asking why they're there.

BY MR. HARRELL:

Q    Okay, sir.

MR. HARRELL:  We'd like to play some -- a PVS tape. This is from Deputy Renegar's PVS, and the time of day stamp is 4:23 and 41 seconds --

THE COURT:  Just a minute.

MR. HARRELL:  -- through and including 4:24 and 1 second.  We have this internally marked as 162-F.

THE COURT:  What's the number?

MR. HARRELL:  Does the Court need the exhibit number or the --

THE COURT:  I need the exhibit number for my record.

MR. HARRELL:  That's going to be Exhibit Number 102. This is Deputy Renegar's PVS tape.

THE COURT:  So, in other words -- so the jury knows,

UNITED STATES DISTRICT COURT

3-RenSER-00319                                          3-RenSER-00319

this is Renegar's body cam again?

MR. HARRELL:  That's correct, Your Honor.

THE COURT:  You can play that.

**(Videotape played, not reported.)**

BY MR. HARRELL:

Q    Sir, did you say, "I'm the only one here" on this portion of the tape?

A    Yes, I did.

Q    You said, "I'm the only one here" before law enforcement said one word about a domestic violence; right?

A    No, that's not true.

Q    Where on this tape did Deputy Renegar say anything to you about domestic violence before you said "I'm the only one here"?

MS. MKRTCHYAN:  Objection.  Argumentative, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I'm guessing on Gonzalez's tape, if he had one.

BY MR. HARRELL:

Q    Are you speculating now?

A    No, I heard -- there was three people talking to me.  But on this one, the volume is only showing Renegar's.

Q    Sir, did you say "I'm the only one here" to try and convince the officers not to suspect you of beating a woman on

3-RenSER-00320                                          3-RenSER-00320

that night?

A    I'm responding from the officers -- I'm guessing that's why they're saying -- because they asked me, "Are you alone?"

And I'm saying, "I'm the only one here."  This is the second time I've responded to that kind of answer.

Q    All right, sir.

Now you've told us that you went to sleep at sundown; right?

A    Yes, sir.

Q    After taking some trazodone; right?

A    Yes.

Q    Slept the whole night through; right?

A    Yes.

Q    And then suddenly the deputies are at your tent at about 4:30 in the morning, according to the tape stamp; right?

A    That's correct.

Q    Why would you start talking about you being alone to the deputies if you didn't know anything about the domestic violence that was going on in that campground on that night?

MS. MKRTCHYAN:  Objection, Your Honor.  That is very vague and ambiguous and argumentative.

THE COURT:  Overruled.

BY MR. HARRELL:

Q    Sir?

A    For one, they asked me if I was the only one alone.

Q    We're going to play this portion of the tape again.

A    Can you play Gonzalez's?

Q    Sir, ask your lawyer to do that, okay?

A    Okay.  Yes, sir.

Q    Right now I'm going to play the tape of the person that was addressing you, Deputy Renegar.  Is that okay?

A    I'm just explaining to you there was three officers there.

Q    Okay, sir.  Here.  Let's play that clip again.

MR. HARRELL:  And, Brian, can you turn it up as loud as it can go without causing an evacuation of the courthouse.

THE COURT:  You can play it as loud as you can.

MS. MKRTCHYAN:  Objection.  It's already been asked and answered.

THE COURT:  Overruled.  You can turn it up loud.

**(Videotape played, not reported.)**

BY MR. HARRELL:

Q    Okay, sir.  Now, you also stated, when your lawyer was asking you questions, that you told the deputies that they needed to be investigating the people at Campsite 66; correct?

A    Correct.  I did.  Like I said --

Q    That's all you need to say, sir.

A    Okay.

MS. MKRTCHYAN:  Objection, Your Honor.  He asks a question and then interrupts the witness.

THE COURT:  No.  This is cross-examination.

UNITED STATES DISTRICT COURT

3-RenSER-00322                              3-RenSER-00322

BY MR. HARRELL:

Q    Sir, so Campsite 66; right?

A    Yes, sir.

Q    All right.  You also stated to the deputies in encounter one, the domestic violence encounter, that you didn't know where the domestic violence fight was happening; right?

A    I couldn't have given an exact place because I didn't look out of my tent.

Q    Sir?

A    I gave him a direction of a sound.

Q    You flat-out said, "I don't know where the domestic violence fight is happening"; right?

A    There's two difference --

Q    Sir, did you say that or not?

        MS. MKRTCHYAN:  Objection.  Vague as to time.  Can we play the tape?

        THE COURT:  Overruled.

        THE WITNESS:  Yeah, I did say, "I don't know the exact location."

BY MR. HARRELL:

Q    Let's play it and find out.

        MR. HARRELL:  This is more of Exhibit 102.  This is from Deputy Renegar's tape, and this is clip 102-P.  And volume nice and good so we can all hear.

        **(Videotape played, not reported.)**

**UNITED STATES DISTRICT COURT**

3-RenSER-00323                                      3-RenSER-00323

BY MR. HARRELL:

Q    Sir, did you hear your voice on that tape?

A    Yes, I did.

Q    Deputy Renegar flat-out asked you, "Where is the domestic violence if it's not at your tent"; right?

A    I was not being very -- what's the word?

Q    Truthful?

A    I wanted nothing more to do with Renegar at this point. Renegar is a liar.

Q    Okay.  Well --

A    Okay.

Q    -- we'll get into liar a little bit later in the case and see where that fits.

But let me ask you this --

MS. MKRTCHYAN:  This colloquy is so inappropriate.

THE COURT:  We'll strike the colloquy, counsel.

BY MR. HARRELL:

Q    Sir, you haven't responded to my question yet, so I'm going to ask it again.

Deputy Renegar flat-out asked you words to the effect of "Well, if the domestic violence is not at your tent, where is it?"

And you told him, "I don't know"; right?

A    Because the way Renegar is treating me, "I don't know" is the best answer.  It is like -- best thing to do is just shut

up.  When I talked to Gonzalez, who was a little bit more calmer, I told him about it.

Q     Where is that on the tape, sir?

A     On his tape.  We can find it on there.

Q     All right.  Now, the reason -- well, if you knew it was Campsite 66 where this domestic violence was happening when you were with the deputies, why did you tell the deputies you didn't know where the fight was happening?

        MS. MKRTCHYAN:  Asked and answered already, this line of questioning, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Are we talking about this same thing about my interchange with Renegar or other deputies?

BY MR. HARRELL:

Q     Sir, do you need me to read the question again?

A     I'm really not -- okay, yes, please.  And explain as far as deputies.

Q     If you knew it was Campsite 66 where the fight was happening when you were with Deputy Renegar, why didn't you tell Deputy Renegar -- why did you tell Deputy Renegar that you didn't know where the fight was happening?

A     Because I didn't like -- this is the third time.  I didn't like Renegar's attitude.  He had been lying.  He had been bullying me.  My best reaction with him was to just shut up.

        When I spoke to Gonzalez, I pointed out, didn't see

UNITED STATES DISTRICT COURT

it, but I heard them yell and them yell.  It's probably about two minutes after Renegar's conversation.  I can't tell you exactly.

But, yes, I was done talking to Renegar, and my best answer was just shut up.  So I don't know, but when I do talk to Gonzalez, because he is calm, I talked better.

Q    Sir, you now know that law enforcement received at least one 911 call asking for deputies to protect a woman from being physically abused at your campsite; correct?

MS. MKRTCHYAN:  Objection, Your Honor.  That's --

THE COURT:  Overruled.

BY MR. HARRELL:

Q    Correct?

A    It's kind of vague as far as which campsite.  It was just a direction at one point, if I remember correctly.  It was more of over that direction.  I'm 63 to my right area, if I remember correctly.  But I would be willing to listen to the tape to get it exactly right.

Q    Sir, I have a 911 call to play for you.  Does the name Brian Fuerbach -- does that ring any bells?

A    Yes, it does.

Q    Do you know Brian Fuerbach to be the neighbor right next to you in a white RV; correct?

A    Yes, him and his wife and the -- that were in the domestic abuse were arguing.  So I remember Fuerbach's wife fighting

3-RenSER-00326                                          3-RenSER-00326

with -- so there was really nobody else needed for 911 because she was doing it.

Q    All right.  So, sir, you recognize the white RV we see in Exhibit 244 in evidence.  Do you represent that to be -- you recognize that's where Brian Fuerbach was on that night; true?

A    As we're in this, yes, now.  Then, no, I didn't have any -- I wasn't paying attention, and I don't know.

Q    And that's you inside the blue tent; correct?

A    At that moment, no.  But I slept there.  That's my sleeping tent.

Q    Okay, sir.  The blue tent is located at Campsite 65; right?

A    Correct.

Q    And that's where you claim to have slept the whole night before sheriffs showed up at your door; correct?

A    That's correct.

Q    And you recognize Brian Fuerbach's white RV as Campsite 63; correct?

A    That's correct.

        MR. HARRELL:  Your Honor, we have transcripts of this 911 phone call.  It is brief.  But we do have transcripts to hand out that we prepared at our office and take responsibility for.

        THE COURT:  Okay.  And you're going to play what, the dispatch ?

**UNITED STATES DISTRICT COURT**

MR. HARRELL:  The 9- -- Mr. Fuerbach's 911 call.

THE COURT:  This is the 911 call?

MR. HARRELL:  I believe it to be in evidence.

MS. MKRTCHYAN:  Yes, it was introduced at 100 -- let me tell the Court.

MR. WRONIAK:  I believe it's 101-1.

THE COURT:  Ladies and gentlemen, you've already heard this.  There's been one transcript that you'll be given. You'll be given a different transcript.  Remember, the best evidence is always what you're hearing.  Okay.  These transcripts are only an aid.

**(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    That's redacted out for his privacy.

THE COURT:  All right.

**(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    All right, sir.  You've now heard Mr. Fuerbach's 911 call; correct?

A    Yes, sir.

Q    Do you hear Mr. Fuerbach say he's in Campsite 63?

A    That is correct.

Q    In a white RV?

A    Yes, sir.

Q    And as you've told us, you're in Campsite 65; correct?

**UNITED STATES DISTRICT COURT**

175

A    Yes, sir.

Q    Did you hear --

MR. HARRELL:  Let's put up 244 again.

BY MR. HARRELL:

Q    Sir, you recognize this as a view from the road?

A    Yes.  Yes.

Q    All right.  Do you hear Mr. Fuerbach say that "If you're facing his campsite, the problem between the man and the woman is to the right"?

A    Correct.

Q    Whose blue tent is that to the right of Mr. Fuerbach's white RV?

A    Well, if you pan out a little bit more, you'll see Angel Gomez's also blue tent.

Q    Sir, your blue tent is to the immediate right of Mr. Fuerbach's white RV; correct?

A    Along with Mr. Angel Gomez, I believe, his blue tent.

Q    Okay.  And you will agree that if someone faces Campsite 63 and looks to the right, we're looking at Campsite 65; correct?

A    If you were coming up there and you were trying to investigate something and you've seen four tents in the same direction, I believe it would be worth investigating.

Q    Okay.

MR. HARRELL:  And let's pull up the call history.

UNITED STATES DISTRICT COURT

3-RenSER-00329                              3-RenSER-00329

This is Exhibit 45 in evidence. If we can go to page 5 of that. And I'd like Mr. Stever to pull up the entry for 4:06:58 in the morning, just after Mr. Fuerbach's call.

BY MR. HARRELL:

Q    Sir, do you see that? Do you see that language, sir? It's right in front of you.

A    Yes.

Q    Sir, you see here law enforcement is told that there is a domestic violence occurring, white truck and a tent to the right of Campsite 63; right?

A    That is correct.

Q    Let's go back to Exhibit 244. You had a vehicle at your Campsite 65 on the night of the incident; correct?

A    That is correct.

Q    It was a truck; right?

A    Yes, it is.

Q    It was white?

A    That is correct.

Q    Did Angel Romo [sic] in 66 have a white truck at his campsite?

A    No, he didn't.

Q    The only white truck we see in a picture to the right of Mr. Fuerbach is your white truck; correct?

A    I see if you're in that dark of a view with a tinted window when you can't even see three feet past yourself, RV

would have been a good landmark to give as a direction because behind the trees, you don't see the other two cars.

Q   You now say the domestic violence was happening at Campsite 66 even though you told Deputy Renegar you didn't know where it was; right?

A   That is what I told Renegar, yes.

Q   Right.  And now you say that you do know and you're certain the domestic violence was happening at Campsite 66; correct?

A   That's because just after I spoke to Renegar --

Q   Sir?

A   -- I spoke to Gonzalez and told him where it was.

Q   I'm not asking about any conversation with Deputy Gonzalez, respectfully.  My question has a different focus.

A   My apologies.

Q   You now say that you're certain that the domestic violence was happening at Campsite 66; true?

A   I would say 80 percent.

Q   Okay.  And the other 20 percent is who?

A   Wouldn't be able to get out of my tent and actually see it and do an investigation.  But, yeah, I -- again, I was in my tent, and it sounded like I heard two sounds.  Fuerbach's yelling, these people yelling.

Q   All right.  In any event, let's pull up Exhibit 245.  And this is a still photograph of -- from Deputy Renegar's patrol

**UNITED STATES DISTRICT COURT**

3-RenSER-00331                                3-RenSER-00331

video, which is in evidence.

Sir, this is the white truck; correct?

A    Yes.  This is the white truck.

Q    Yours; right?

A    Yes, this is a white truck.

Q    It was parked at Campsite 65 at the time Mr. Fuerbach made his phone call to 911; correct?

A    Yes.  That is correct.

Q    All right.  Was there any friction between you and Mr. Fuerbach that might cause him to say untrue things about you?

A    Well, being that it was dark, and I was in the middle of their altercation, yeah, I believe he could have thought I was the one he's yelling at.  And now -- because there was some mean things said about his wife.  So I believe him thinking it was me could cause a grudge.  I would not put that past him.

Q    What did you say about Mr. Fuerbach's wife?

A    I said there was nasty things.  When she was yelling at the people in the domestic violence, they were yelling back. And that's why I'm saying he did not let her talk from what I hear because she was the one doing most of the yelling.

Q    And this happens during the night where you --

A    This is when I got woken up briefly.

Q    This is where you slept during the night before the sheriff showed up at your tent at 4:30 in the morning; correct?

3-RenSER-00332                                3-RenSER-00332

A    That's correct.

Q    All right.  Sir, if you're asleep, how do you hear all these things?

A    Briefly wake up and go right back to sleep.

Q    Sir, didn't you tell us you slept the whole night?

A    Yes, I did, except for that moment.  But, yeah, for the most part I was asleep.

Q    Okay.  So as you sit here now, do you now understand why law enforcement was at your Campsite 65?  Yes?  No?

A    As I know now, I don't understand why he only went to my campsite.  That's the only thing I think about.

Q    Well, maybe part of the reason they didn't go to Campsite 66 is because you told them -- before there was any lawsuit or any lawyers, you told them, "I don't know where it is"; right?

        MS. MKRTCHYAN:  Objection.  Misstates the evidence.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I don't understand how me saying not knowing would stop the officers from doing their investigation.  That's what I don't understand.

        THE COURT:  Question?

BY MR. HARRELL:

Q    Sir, when Deputy Renegar asked you to tell him where the fight happened, you told him you did not know; right?

A    I didn't like Renegar at that moment because he had

UNITED STATES DISTRICT COURT

treated me very bad. So the best thing you do -- to do when cops that you don't trust is to keep your mouth shut and do not talk. When I spoke to Officer Gomez [sic] was when I was calming down a little bit. I explained to him what was going on.

Q    Where did you learn that the best thing to do when you're dealing with cops you don't trust is to keep your mouth shut? Where did you learn that, sir?

MS. MKRTCHYAN:  Objection, Your Honor.  That's improper.

THE COURT:  Overruled.

MS. MKRTCHYAN:  Irrelevant.

THE COURT:  Overruled.  Goes to state of mind.

THE WITNESS:  My own brain.

BY MR. HARRELL:

Q    Your own brain?

A    Yes.

Q    Well, sir, you --

MR. HARRELL:  Your Honor, matter outside the presence?

THE COURT:  Not at this time.  Let's move on.

MR. HARRELL:  Okay.

BY MR. HARRELL:

Q    Okay, sir.  You learned that the best thing to do when you're with a cop that you don't trust is to shut up and not

3-RenSER-00334                                    3-RenSER-00334

say anything.  Is that what you said?  Words to that effect?

A    Yes.

Q    But you did say something to Deputy Renegar, didn't you?

MS. MKRTCHYAN:  Objection, Your Honor.  Asked and answered several times.  Badgering the witness.  This is highly improper.

THE COURT:  Overruled.

THE WITNESS:  I said nothing that can be used against me.

BY MR. HARRELL:

Q    You said you didn't know where the fight was; right?

A    And which is true.

Q    So if you don't send them to -- if you don't send law enforcement to Campsite 66 and Mr. Fuerbach sends them to the tent just to the right of his RV with the white truck, and there's no white truck at Campsite 66, can you understand now why law enforcement is at your tent so early in the morning?

MS. MKRTCHYAN:  Vague as to --

THE COURT:  Sustained.  It doesn't matter, I think, Counsel, what he understands now.  In other words, that's something you can argue.

MR. HARRELL:  Okay.

BY MR. HARRELL:

Q    Sir, in terms of why -- you are saying that you're emotionally traumatized as a result of the incident; right?

UNITED STATES DISTRICT COURT

3-RenSER-00335                                    3-RenSER-00335

A     Yes, sir.

Q     All right.  So in terms of why you're upset, do you understand that law enforcement has a responsibility to respond to complaints of criminal conduct?  That's part of their job.  You understand that; right?

A     I believe their job is a mixture of communicating with the community and protecting the law.  And they have a tough job of doing that, but that's why they get trained.

Q     Again, you're refusing to respond to my question; correct?

A     I apologize.  I thought I did.

Q     One more time, sir.

A     Yes, sir.

Q     You do understand that law enforcement has a responsibility to respond to complaints of criminal conduct.  That's part of their job.  You understand that; right?

A     Yes.

Q     Now we move on.

      Sir, to sum up, do you hold it against law enforcement that they responded to the complaint of criminal conduct at the campground, reference domestic violence?  Or do you think they just should have ignored that?

A     I believe this -- that's a wide -- do I believe how they treated me or how they treated the entire -- their entire investigation, which --

Q    Sir, I'm going to read it again.

A    Thank you.

Q    To sum up, do you hold it against law enforcement that they responded to the complaint of domestic violence at the campground, or do you think they just should have ignored that?

A    No, they should have been at that campground.

Q    Okay, sir.  Let's talk about the first encounter when deputies actually arrive at your tent at about 4:30 in the morning, the tape shows us.  And this is reference the domestic violence, the first encounter that you have with law enforcement on that night.  Do you have that period of time in mind, sir?

A    Yes.

Q    Now, you now know that the entire incident was taped. There's an audio recording of what you said; correct?

A    Yes.

Q    That's something that you know now; right?

A    Something I always knew, yes.

Q    Something you always knew, even at the time of the incident?

A    Yes.

Q    Sir, how is it that you know that law enforcement tapes their contact with criminal suspects?  How do you know that?

        MS. MKRTCHYAN:  Objection.

BY MR. HARRELL:

**UNITED STATES DISTRICT COURT**

184

Q    On the date of the incident.

MS. MKRTCHYAN:  Objection.  Irrelevant, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  If anybody knows what's -- has ever looked up what is in a police car and what they have, you know.  You know they have the computer.  You know they have the front lights.  You know you have the speaker up front.  You know you have that camera they have.  I didn't know how it worked.  I'm pretty sure all of them had it.  I was surprised that some of them don't.

MR. HARRELL:  Your Honor, may be, again, a matter for outside the presence.

THE COURT:  No, counsel.

MR. HARRELL:  But not at this time.  I have another question.

BY MR. HARRELL:

Q    Now, sir, in the pretrial phase before we came to this trial, you claimed you conducted yourself during the incident with respect; correct?

A    I did my best that night.

Q    Okay, sir.  This is Prior Proceeding 1, Day 3, Volume I.

THE COURT:  I will need that in front of me, Counsel.

MR. HARRELL:  On its way, Your Honor.  Page 30, lines 16 through 19.

THE COURT: Just stay here in case I need -- Counsel, I'm not going to be able to remember that as you have that brought to me. So page 30. What line?

MR. HARRELL: Lines 16 through 19.

MS. SKINNER: 14, Your Honor. He's misspeaking.

THE COURT: Line 16? No, Counsel. What line?

MR. HARRELL: 16 through 19.

THE COURT: 16, did you say? Or am I mishearing?

MR. HARRELL: 1-6 to 1-9.

THE COURT: I'm going to give this back to your associate.

MR. HARRELL: Your Honor --

THE COURT: 16 starts in the middle of a paragraph.

MR. HARRELL: Okay. How about 14, at the start of the question, to line 19.

THE COURT: Counsel, you can start at line 15, the word "we."

MR. HARRELL: Okay.

BY MR. HARRELL:

Q    Question to you, sir, at a prior proceeding:

"We heard a big part of it yesterday, but you did tell us yesterday that you believed that you conducted yourself during the entire incident with respect; right?"

Your answer: "Yes."

UNITED STATES DISTRICT COURT

THE COURT: Now, just a moment. Would you ask the juror -- yeah. The juror was trying to catch Karlen's eyes. Maybe they need a restroom break.

**(Pause in proceedings.)**

THE COURTROOM DEPUTY: He needs five minutes.

THE COURT: Yeah. So let's take a ten-minute recess. Juror needs a recess. Counsel, we'll return in ten minutes, okay?

MR. HARRELL: Understood, Your Honor.

THE COURT: Thank you.

**(Recess from 2:27 p.m. to 2:40 p.m.)**

THE COURT: The jury is present. Counsel is present. This is continued cross-examination.

BY MR. HARRELL:

Q   So, sir, aside from talking about respect, your claim in the pretrial phase was that you did exactly as law enforcement asked in an effort to help them not have any safety concerns; correct?

A   I did my best. I emptied -- exited the tent, showed them I had knives, was completely up front with them.

Q   Sir, my question has a different focus. You claimed in the pretrial phase, before you knew that there was a tape, that you were doing exactly as law enforcement asked in an effort to help them not have any safety concerns; correct? Correct?

A   Can you explain about before I knew there was a tape?

3-RenSER-00340                                        3-RenSER-00340

MR. HARRELL: Your Honor, I'd like to play some deposition testimony from the witness.

MS. MKRTCHYAN: Improper impeachment, Your Honor.

THE COURT: Yeah, I'm not sure it's clear yet, Counsel. You can re-ask the question one more time.

MS. MKRTCHYAN: Refresh his memory. Can we have him show the transcript?

THE COURT: Overruled.

MS. MKRTCHYAN: Refresh the memory.

THE COURT: Overruled.

BY MR. HARRELL:

Q    Sir, you claimed in the pretrial phase that you were doing exactly as law enforcement asked in an effort to help them not to have any safety concerns?

MS. MKRTCHYAN: Asked and answered.

BY MR. HARRELL:

Q    Right?

A    Sure.

MS. MKRTCHYAN: He answered this question. Objection.

BY MR. HARRELL:

Q    We had some cross talk, sir, regrettably, and the court reporter has to get the words down. So now I have to ask you, I don't know, a fourth time?

MS. MKRTCHYAN: Objection, Your Honor. This is so

UNITED STATES DISTRICT COURT

188

inappropriate.

THE COURT: All right. I want both of you to cease now.

Ask your question.

BY MR. HARRELL:

Q    Sir, you claimed in the pretrial phase that you were doing exactly as law enforcement asked in an effort to help them not to have any safety concerns; true?

A    Yes.

Q    Sir, it was within your power on that night, when the officers told you repeatedly to get on the ground, to get on the ground; right?

A    No.  I was scared.

Q    Sir, you thought if you did exactly as the officers asked, they would use force against you?

A    As all three different are giving me commands, I felt one wrong move -- it's not like it's uncommon -- cops will shoot somebody and say, "They were reaching for their wallet."  It's a very intense situation.  And if I would have moved fast, everybody was already at an intense level.  I think I was in danger.  I felt I was in danger.  I don't know anything about what the officer felt.

Q    Well, sir, let's find out if it's entirely accurate.

MS. MKRTCHYAN: Objection.

THE COURT: Just a moment.  Strike the comment.

UNITED STATES DISTRICT COURT

BY MR. HARRELL:

Q   In the first encounter, reference the domestic violence, you received some instructions from the officer at that time; right?

MS. MKRTCHYAN:  Objection.  Vague and ambiguous, "some instructions."

THE COURT:  Well, it is vague, Counsel.  I don't know that he knows what you're specifically referring to.  So make it specific.  What are you referring to?

BY MR. HARRELL:

Q   Sir, the deputies asked you to sit down during your first encounter with them, reference the domestic violence; right?

A   Correct.

Q   And at that time you elected to do as you were asked; right?

A   I believe I asked.

Q   Sir, you went over and you sat down, didn't you?

A   I asked, and they said, "No, I can't stand."  And then I said, "Well, then, under duress I'm going to go sit down."

Q   And you did sit down?

A   Yes, I did.

Q   Just as you were asked; correct?

A   I didn't want to.

Q   Sir --

A   But I did.

3-RenSER-00343                                    3-RenSER-00343

Q     And when you did as the officers asked, you learned at that time with these police officers if you do as they ask, no physical force is going to be used against you; right?

MS. MKRTCHYAN:  Objection, Your Honor.  Objection. It's irrelevant, and it's speculation.

THE COURT:  Just re-ask the question, Counsel.

BY MR. HARRELL:

Q     Sir, when you did as the officers asked during the first encounter, reference domestic violence, and you sat down, no force was used against you; right?

A     Yes.  They were pushing down on my neck.

Q     Okay, sir.  Nobody said you were making a quick move and shot you, did they?

MS. MKRTCHYAN:  Objection.  Vague as to time.

THE COURT:  Overruled.  This is the first incident.

THE WITNESS:  I believe I was questioning the whole time, and nobody was answering me.  So I think that was not very pleasant.  I think they should have an obligation to introduce themselves as "Sheriff, badge number this.  We are here to detain you for this."  I believe I rated that at least.

BY MR. HARRELL:

Q     Do you remember what I asked you, sir?

MS. MKRTCHYAN:  Objection.

THE COURT:  Overruled .

THE WITNESS:  It's a question to the answer that I

UNITED STATES DISTRICT COURT

gave you.

BY MR. HARRELL:

Q    What was the question?

A    You asked me --

MS. MKRTCHYAN:  Objection, Your Honor.  That's improper.

THE COURT:  Overruled.

THE WITNESS:  I believe if -- shoot.  Now, I'm going to lose track.  I answered it.  Something about if I moved over to the log under duress, if the cops are going to hurt me.

BY MR. HARRELL:

Q    Sir, you went and sat down and did as the officers asked; right?

A    I said I'm opposing to do it.  Under duress I sat down.

Q    And nobody shot you at that time when you sat down and moved; right?

A    I moved very slowly.

Q    Now we have the second encounter when you're asked to get down on the ground; right?

A    That is correct.

Q    Did it ever occur to you to move very slowly at that time and get down on the ground?

A    No, because last time they weren't pointing loaded weapons at my face.

Q    Okay, sir.  In the pretrial phase, you also claimed that

3-RenSER-00345                                    3-RenSER-00345

you did every command the officers said; right?

A    Yes.

Q    Sir, your claim was you did every command they said, no exceptions.  Every command; right?

A    I will add "lawful" command to that to make it sound better.  In my mind I was following every lawful command.

Q    Sir, in the pretrial phase, you didn't know that your words were recorded, and so you thought it was your word against theirs; right?

A    Negative.  That's not true.

Q    And you now know that your words were recorded; right?

A    That's not true.

Q    And you now know that you didn't follow every command that you got; right?

A    I believe I followed every command that was lawful.  And your statements about lying is pretty offensive.

Q    Well, sir, your claim in the pretrial phase again was you did every command that you got from the officers on that night; right?

A    Yes, I did.

        MS. MKRTCHYAN:  Asked and answered, Your Honor.  This is going into same question.

        THE COURT:  Overruled.

BY MR. HARRELL:

Q    Sir, can we have your answer again?  We had some cross

UNITED STATES DISTRICT COURT

talk.

A    Yes, I felt like I -- like I said, the only word I'm adding today would be "lawful" just to be a little bit more descriptive.  But I did everything they told me to do that I felt -- that was reasonable.  It was scary to get on the ground.

Q    Okay.  You also claimed in the pretrial phase that you 100 percent wanted to help the officers; right?

A    Yes, I did.

Q    And you also claimed in the pretrial phase that you were calm and cool during the entire time of the incident; true?

A    Yes.

Q    All before you knew that the words were recorded on tape that you spoke; right?

A    No.  I still stand by -- a few raised words do not mean I'm out of control.

Q    All right, sir.  You now know that your testimony in the pretrial phase about being calm and cool with the deputies during the entire time of the incident is false; right?

A    No, I've read it.  I'm pretty calm.  I mean, I might have used one or two, but I -- I really think I was fairly -- I mean, for the situation I was in, I'm pretty calm.

Q    In the pretrial phase, you gave a different answer, didn't you?

MS. MKRTCHYAN:  Objection.

UNITED STATES DISTRICT COURT

THE WITNESS: I did my best.

BY MR. HARRELL:

Q   You said that you were calm --

A   I was calm.

Q   You said you were calm and cool the entire time of the incident, no exceptions, no qualifications, no extra words. Okay?

MS. MKRTCHYAN: Objection.

THE WITNESS: Okay. "Cinnamon. Cinnamon." Sorry.

MS. MKRTCHYAN: Can we just slow down. Improper impeachment, Your Honor. This is going -- badgering the witness.

THE COURT: Overruled.

MS. MKRTCHYAN: Then I'm not going to object then. Period.

BY MR. HARRELL:

Q   Right, sir?

A   Just different adjectives.

Q   Okay, sir. Let's play some audio of your first contact with deputies on the night of this incident, the domestic violence call. This is -- for the record, this is Deputy Renegar's PVS, and the time of day on this is 4:00 in the morning, 23 minutes, 41 seconds through and including 4:27:45. This is clip --

(Videotape played, not reported.)

UNITED STATES DISTRICT COURT

BY MR. HARRELL:

Q    Sir, did you hear one of the officers say that they were doing what they were doing, at least in part, because of officer safety?

A    Yeah, sarcastically I heard that.

Q    In fact, sir, you have claimed in prior proceedings that when they -- when the officer mentioned officer safety, he was laughing; right?

A    Yeah.  Like, it was a sarcastic laugh.  Like officer safety, because I was already wrapped up.

Q    Sir, you didn't hear any laughter at all on that tape, did you?

A    I heard sarcasm, yes.

Q    Sir, with regret I'm going to ask you again.

     You did not hear any laughter on that tape at all, did you?

A    Yes.  I heard sarcasm.

Q    Sir, you will agree that "sarcasm" and "laughter" are two different words; right?

A    Not really.

Q    Okay, sir.

     Are you refusing to answer my question about whether or not you hear laughter on this tape?

A    I've answered it.

Q    You also cursed at the officers during this portion of

**UNITED STATES DISTRICT COURT**

the tape; correct?

A    Yes, I did.

Q    And, in fact, you already told us that you did everything in your power to help the officers feel safe during this incident; right?

A    Yep.  Told them I had knives.  Explained I might have had one in my pocket.  Questions -- I know, no doubt in my mind, I had questions.  I believe everybody -- I don't know why they're there.  I believe I have a right to ask questions.

Q    Well, sir, it was within your power that night to avoid cursing at the officers; right?

A    It wasn't something I thought about.

Q    No?

A    It wasn't on purpose.  It wasn't on purpose; it wasn't not on purpose.  It was just my vocabulary.  I'm camping.

Q    Sir, you haven't cursed yet in court, have you?  While you've been on the witness stand?

A    I have respect for this courtroom.

Q    And that's one of the reasons why you've avoided cursing; correct?

A    Correct.

Q    On the night of the incident, did it ever occur to you that "Hey, it's within my power to avoid cursing at the officers.  So I'm going to address them in a respectful way." Did that ever occur to you?

A    Why?  They're peers.

Q    Did you think curse words would help officers feel safer during the incident with you?

A    I figure they were grown men.  I've been around military men that the language is not going to offend them.  I really didn't think that anybody would have been offended.  I mean, it wasn't a concern.  I wasn't sitting down and processing that situation.

Q    You were in charge of the words you chose to use on that night; correct?

A    Yes.

Q    And it was right after an officer mentions "officer safety" that you chose to start cursing; right?

A    Yes.

Q    All right.  So let's play some more of Exhibit 102.  This is -- the timestamp is 4:27:44 through and including 4:28:14.

            **(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    Sir, you give the officer approximately five curse words during this segment of audiotape; right?

A    Yes, I did.

Q    During this segment of audio, you also questioned one of the deputy's intelligence by calling him a, quote, "smart one," close quote; right?

A    Yes, responding to a smart -- they weren't very pleasant.

**UNITED STATES DISTRICT COURT**

3-RenSER-00351                                    3-RenSER-00351

Q    When you were cursing -- well, up to this point has anybody cursed at you, sir?

A    You haven't heard all the voices.  You haven't heard the people in the background making fun of me.  You hear Renegar.

Q    Okay, sir.  So it's your testimony that while Deputy Renegar is professionally addressing you, avoiding curse words, the other deputies were in the background making fun of you?

A    I'm saying even Renegar's actions were semibullying.

Q    Okay, sir.

A    I felt that way anyways.

Q    When you were cursing at the officers during this segment of audio, did you do that in some effort to bring down the level of tension there?

A    No.  As far as I know, the de-escalation relies on the officers.

Q    So it's the officers that have an obligation to be professional and responsible, in your view; right?

A    Technically, yes.

Q    And you can do or say whatever you want.  That's your view; right?

A    No, I'm not saying that, but legally, yes.

Q    And that's what you did on that night.  You did anything you wanted to do, didn't you?

A    No.

199

Q    You said anything you wanted to say --

A    No.

Q    -- right?

All right, sir.  So when you call the officer a, quote, "smart one," close quote, were you trying to help the officers to feel safer around you?

A    My concern right there was the circle of officers around me that were armed, digging through my stuff.  And it shows my concern because I'm asking what they were doing.  That is what is on my mind at that time, and I wasn't trying to be any offensive to cops, but I just wanted to be treated with a little more respect.

Q    Sir, the speech that we just heard on this clip of audio, is this respectful speech by you, at least in your mind?

A    Which one?

Q    The clip we just heard, sir.

A    Just -- the counter?

Q    4:27:44 to 4:28:14, when you were calling the deputies a "smart one" and cursing at them?

A    Yeah.

Q    Do you think that that's respectful speech on your part, at least in your mind?

A    It was just reciprocal.

Q    And once again, you're refusing to answer my question; true?

UNITED STATES DISTRICT COURT

3-RenSER-00353                                3-RenSER-00353

A    I'm just answering the best I could answer it.

Q    You're answering a question that I haven't even asked you; right?

A    I don't know.

Q    Okay, sir.  With you cursing at the deputies and calling them a "smart one," is this calm and cool speech by you, like you claimed you had in the pretrial phase before you heard the tape?

A    I don't think I've raised my voice at that point yet.

Q    So, is it calm -- sir, I didn't ask you --

A    Okay.  Then yes.

Q    Sir, we had some cross talk.

A    Okay.

Q    I'm going to ask you one more time.  Can you try to make your answers concise, to the point, and responsive to my question?

A    I apologize.

Q    Can you try to do that, sir?  That was my question.

A    I will do my very best.  I apologize, sir.

Q    Well, we don't need apologies.

         THE COURT:  Counsel, your question.

BY MR. HARRELL:

Q    My question is:  During this segment of audio that we played, cursing by you, calling one of the deputies a "smart one," is this calm and cool speech by you at this time?  Yes,

**UNITED STATES DISTRICT COURT**

no, or I don't know?

A    In that situation, yes.

Q    Okay.  Now we move on.

The people showing courtesy at this segment of audio are the deputies; right?

A    I don't feel that way.

Q    Did Deputy Renegar curse at you at this time, sir?

A    To be honest, cursing isn't the only way to be rude.  If that is -- I'm not even going to say cursing is being rude. But the way you handle somebody and treat somebody is much more offensive than any curse words can be.

Q    Sir, my question has another focus, and so I'm going to ask it again.

Did Deputy Renegar curse at you at this time, sir?

A    If -- that might be the time when he called me "sweetheart," I'm not sure.  But I know at one point during this time he called me sweetheart, which was pretty -- that's almost worse than getting cursed at.

Q    Sir, the only one cursing in this segment of audio is you; right?

A    We'll have to read the actual -- not the doctored one, but, yeah, during that time he called me "sweetheart."  I'm not sure if you just cut it off right before or it's been doctored, but, yeah, during that time we did.

Q    Sir, do you remember what I asked you?

UNITED STATES DISTRICT COURT

A    Yeah, during that time he cursed at me.

Q    No, sir.  I'm going to ask you again.

A    Sorry about that.  I lost track then.

Q    All right.  If you need me to repeat the question, just ask me.

A    Yes, sir.  Yes, sir.  I apologize.

Q    The only one cursing during this segment of audiotape is you; right?

A    I think -- yeah, I think so.

Q    One more time, sir.

A    Yeah, I might think so.  Like I said --

Q    Whoa.  Whoa.

A    -- at one point he said "sweetheart," and I'm not sure if it's there or not.  If we can play it again just to make sure.

Q    In fact, sir, Deputy Renegar even says, "I'm asking you to sit down nicely"; right?

A    And why he couldn't have nicely let me stand up.

Q    Sir, are you going to respond to my question?

A    I just didn't agree with his actions.  To me, it was a bullying action.

Q    Which, again, is not what I asked; right?

A    You asked me about sitting down and --

Q    Sir, I'm going to read my question again.

A    Yes, sir.

Q    Deputy Renegar even says during this section of

3-RenSER-00356                                    3-RenSER-00356

audiotape, "I'm asking you to sit down nicely"; right?

A    Right.

Q    Now we move on.  Did that suggest to you that Deputy Renegar was looking to lower the level of tension at the scene after you started cursing?

A    No.  At this level, the situation seemed tenser because now instead of talking where we can both talk like humans, I am now being under -- controlled by the officers, which had not yet told me why they're there.

Q    When you did sit, did that appear to cause the deputy safety concerns to drop?

MS. MKRTCHYAN:  Objection.  Calls for speculation.

THE COURT:  I'm sorry.  I didn't hear, Counsel.

MS. MKRTCHYAN:  Calls for speculation.  How is he going to know officer safety concerns dropping or raising?

BY MR. HARRELL:

Q    How did they appear, sir?

A    How did it appear?

Q    Right.

MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  Again, I can't talk to how the officers felt.  But at that time I'm being held down, not very comfortably, without being told what's going on, and people are digging through my stuff.  So I don't feel I've changed any

**UNITED STATES DISTRICT COURT**

officer safety.  They've been doing the same thing they've been doing since they got there.

Q    You do know that, just to sum up here, no physical force was used on you when you did as they asked and sat on the log; right?

A    Just verbal force; correct.

Q    No physical force?

A    No physical force.

Q    Which was my question; correct?

A    That is correct, yes.

Q    All right.  Let's play some more audio here.  This is more of Deputy Renegar's audio.  This is 4:28:12 to 4:28:23.

**(Videotape played, not reported.)**

BY MR. HARRELL:

Q    Sir, when Deputy Renegar says "I'm asking you politely" and uses the term "please," did that suggest to you that the deputy was trying to lower the level of tension at the scene after you started cursing?

A    No.  He's speaking in a firm voice, and I don't feel comfortable.  At this point you can see in my voice I don't feel comfortable in this situation.  And he is being very, very firm, like -- and there was no need.  Why couldn't he have just talked to me?

He's looking for a girl.  He's just pushing -- he's just pushing his search longer.  Messing with me without -- he

3-RenSER-00358                                    3-RenSER-00358

could have answered my questions when he first got there and moved on.

Q    Sir, in your mind, isn't the term "please" a term of courtesy?

A    It involves tone that, to me -- somebody just saying "please" in a certain tone matters.

Q    Was something the matter with Deputy Renegar's tone?

A    Yes.

Q    Okay.

A    He yelled and "please."  That's not being polite.  That's just the vocab he has to speak in because he's trained.

Q    Okay, sir.  We're going to play some more tape here for you.  This is 4:28:21 through and including 4:28:37.

                    **(Videotape played, not reported.)**

BY MR. HARRELL:

Q    Here, sir, when you sat down, Deputy Renegar said "thank you" in a courteous way when you sat down as he asked; right?

A    That's where he did say "sweetheart."

Q    No physical force was used against you at this time; true?

A    Just bullying and teasing.

Q    Okay.  During this first encounter, which, by the way, we don't hear on tape, do we?

A    Which one?

Q    Bullying or teasing.

**UNITED STATES DISTRICT COURT**

3-RenSER-00359                                        3-RenSER-00359

A     I hear it.

Q     Okay.  Well, will you commit to play that for us?

A     The whole thing.

Q     No, sir.  Will you commit to play for us bullying and teasing, which you have sworn under penalty of perjury is on some tape somewhere?

A     I played it right there.

Q     Okay --

A     This whole tape.

Q     All right.  And during this first encounter, you heard Deputy Gonzalez mention "officer safety"; right?

A     Yes.

Q     Did it occur to you that the deputy asked you to sit down to get you away from and out of reach of the machete and the axe you had there at your campsite?

A     No, it wasn't my concern at that moment.

Q     Okay.  Didn't matter to you one way or the other if the officers were concerned about that; right?

          MS. MKRTCHYAN:  Objection, Your Honor.  That is just so -- I don't know.  That's vague and ambiguous and argumentative.

          THE COURT:  Do you understand the question?

          THE WITNESS:  I think he's asking me if -- that night if officer safety is my most important thought.

BY MR. HARRELL:

**UNITED STATES DISTRICT COURT**

Q    No, sir, let me read it for you again.

That night, sir, while it was going on, did it occur to you that the deputy asked you to sit down to get you away from the machete and the axe that you had there at your campsite?  Did that occur to you?  Yes or no or I don't know.

A    As I was never near those during that time, that never occurred to me.

Q    Okay.  The officers did find these weapons at your campsite in their first encounter with you that night; correct?

A    Yes, in the picnic table.

Q    And we hear that on Deputy Borba's recording; right?

A    Sure, if that's the one we hear from, yeah.

Q    You recall Deputy Borba saying during this first encounter "knives, knives, knives" when he sees them; right?

A    Yes.

Q    All right.  And when you heard a deputy, who you now know to be Deputy Borba, say, "Knives, knives, knives," does that suggests to you that the deputy had found you were in possession of multiple knives?

A    Yes.

Q    And you were in possession of multiple knives on that night; true?

A    Yes.  I even told them.

Q    When you heard a deputy say "Knives, knives, knives," repeating it three times, did that suggest to you that the

**UNITED STATES DISTRICT COURT**

deputy had officer safety concerns about you getting access to one of these knives while they were there?

A    I would assume they have some sort of, like, "Okay, we're in a campsite.  We're going to see knives."  If it was different, they're in a baby's room and they saw six knives laying next, that raises a concern.  You're in a campground, you see knives, it's not less of a concern.

I could see where, yes, he's pointed it out.  Everyone knows they're here.  We now they're here.  I said, "Yes, they're here."  So there is no real officer safety because it's all been out in the open.  Nobody's reaching. I've walked away from it.  I'm not even clear.

Q    You did walk away from it when you were asked to walk away from it; right?

A    Under duress, yes.

Q    And you took a seat; right?

A    Under duress, yes.

Q    Now that we talked about it for a while, do you understand that the deputy's request for you to take a seat away from the knives could have been to help address their officer safety concerns?

MS. MKRTCHYAN:  Objection.  Calls for speculation.

THE COURT:  Well, it's unclear too.  Does he understand that today in court, are you asking him?  Or did he understand out at the scene?  It's ambiguous.

UNITED STATES DISTRICT COURT

3-RenSER-00362                                    3-RenSER-00362

BY MR. HARRELL:

Q    Let me rephrase it, sir.

When you were out there at the scene on that night, encounter one, did you understand that the deputy's request for you to take a seat away from the knives was to help address officer safety concerns?

MS. MKRTCHYAN:  Objection.  Calls for speculation.

THE COURT:  Overruled.

This is in your own mind, sir.

MS. MKRTCHYAN:  And asked and answered.

THE WITNESS:  No.  That night I still had not been informed on why anybody showed up.  Nobody's answered my questions.  So it could have been anything.  I have no idea.

BY MR. HARRELL:

Q    Okay, sir.  Let's talk about some documents that you signed in the state court system across the street, reference your felony insurance fraud conviction.

A    Yes, sir.

Q    Do you have that period of time in mind?

A    Yes, I do.

Q    And you do recall signing documents; right?

A    Of course.

Q    Okay.  Now, when your case was pending, you became aware that you had the option of pleading guilty and instead of serving jail time, going on probation; correct?

3-RenSER-00363                                    3-RenSER-00363

A    Yes.  When they called me on the phone, they showed me my options.

Q    And you did not want to go to jail; correct?

A    Correct.

Q    You wanted to go on probation; right?

A    Of course.

Q    And so you agreed to sign some documents associated with your probation; correct?

A    Yes.  It was an informal probation where a lot of the regular probations weren't involved.

Q    In order to get probation, you made some agreements including on the issue of weapons; true?

A    Yes.  And we discussed some more of a -- firearms and stuff like that.

MR. HARRELL:  Your Honor, may we pull up Exhibit 222, page 11 at paragraph 20.  And this has been redacted in accord with proceedings outside the presence.

THE COURT:  I don't know what that is.  I'm not sure what that is, Counsel.  It's just a number to me right now.

MR. HARRELL:  Sure.  Exhibit 222, and this is --

THE COURT:  Place that in front of me, Counsel.  I'm not going to fumble through boxes now.

MR. HARRELL:  And for those that are going through boxes, this is 222, page 11, and this is paragraph 20 on that page.

UNITED STATES DISTRICT COURT

THE COURT:  Thank you very much.

MR. HARRELL:  Paragraph 20, Your Honor.

THE COURT:  You may.  Just one moment.  I want to look at 29.  You may.

MR. HARRELL:  All right.  We're just going to put up paragraph 20, sir.

THE COURTROOM DEPUTY:  Your Honor, is this received?

**(No audible response.)**

BY MR. HARRELL:

Q    You recognize this language in their probation agreement?

A    Yes.

Q    All right.  And off to the side of paragraph 20, we have your initials; right?

A    Yes.

Q    Which signifies your agreement with the requirement stated in paragraph 20; correct?

A    Correct.

Q    All right.  And for the record, you agree that you will not own -- I'm quoting now -- quote:

"Own, use, or possess any type of dangerous or deadly weapon including any firearm or ammunition," close quote.

Did I read that correctly, sir?

A    That is correct.

Q    All right.  Let me return this to Ms. Swiss, and then

**UNITED STATES DISTRICT COURT**

3-RenSER-00365                                    3-RenSER-00365

I'll ask you another question.

Now, when you signed this agreement, was it important to you to comply with the terms of paragraph 20?

A    I didn't own any firearms, so to be honest, I wasn't really worried about it.  And I didn't -- yeah, so I was already abiding by it.

Q    Sir, I'm going to ask my question again.

A    Okay.

Q    It was a completely different focus.

When you signed this agreement, was it important for you to comply with the requirements stated in paragraph 20?  Yes or no.

A    Yeah.  I'm sure.

Q    Is that a "yes"?

A    Yeah.  Yeah.

Q    Okay.  Sir, "yeah" is a slang term.  It doesn't type well.  If you mean to tell me "yes" --

A    Yes.  Yes.  That's fine.

Q    All right.  So since it was important to you to comply with this term, what did the term "any type of dangerous or deadly weapon" mean to you when you signed your probation agreement?  What did that term mean?

A    Well, it was pretty -- well, I apologize, but it says, "including any firearm and ammunition."

Q    Right, sir.  We all know what a firearm --

3-RenSER-00366                    3-RenSER-00366

A    So it's saying, "No deadly weapons, and we're telling you these deadly weapons include firearms and ammunitions."

Q    Right.  And you did not have any firearms or ammunition on that night; true?

A    Correct.

Q    Which is why my question has a focus.

A    Yes, sir.

Q    You want to talk about firearms and ammunition.  They're not an issue in our case.  You agree with that; right?

A    Yes, sir.

Q    Let's talk about what might be in issue.

A    Okay.

Q    So I have to ask yet again.

A    Okay.

Q    What did the term "any type of dangerous or deadly weapon" mean to you when you signed your probation agreement?  Tell us in your own words.

A    It means to not include any firearms or ammunition.  That's a list.  To me -- I'm sorry.  I read it as a list.

Q    Which only had firearms and ammunition on the list?

A    Right.

Q    Okay.  And --

A    I'm not in full probation.  I don't know what full probation terms are, are different than an informal.  I don't know.  I signed what I got.

3-RenSER-00367          3-RenSER-00367

Q    Sir, let's focus on what you signed.

A    Yes, sir.

Q    Can we do that?

A    Yes, sir.

Q    All right.  So it's your testimony that the term "any type of dangerous or deadly weapon" only means ammunition and firearms and nothing else; right?

A    It's including any firearm or ammunition.

Q    Sir, that's not a response to my question.

A    Yes, it's including any firearm or ammunition.

Q    There's no question pending now.  So I have to state it so we have a clear record.

A    Okay.

Q    In your mind, when you signed this probation agreement, the term "any type of dangerous or deadly weapon" meant firearms, ammunition, and nothing else; true?

        MS. MKRTCHYAN:  Objection, Your Honor.  This is already badgering the witness.

        THE COURT:  Overruled.

BY MR. HARRELL:

Q    True?

        MS. MKRTCHYAN:  You are wearing him down with the same question over and over again, Your Honor.  We need a break.  This is ridiculous.

        THE COURT:  Overruled.

3-RenSER-00368                                    3-RenSER-00368

BY MR. HARRELL:

Q    True, sir?

A    Yeah.  Firearms -- firearm is a big list.  So I -- that's what I assumed, and I followed by it.  I didn't -- for the whole year --

BY MR. HARRELL:

Q    Sir, if I can stop you.

A    Okay.  I apologize.

Q    With respect, not even once am I going to ask you about the whole year.  Okay?

A    Okay.  Apologize.

Q    All right.  I ask again, sir, if you agree with what I'm saying, your answer is "yes."  If you disagree, your answer is "no."  And then I'm going to have some follow-up depending on whether you tell me yes or no.

        Do you understand?

A    Yes.

Q    Perfect.

        When you signed this probation agreement, in your mind, the term "any type of dangerous or deadly weapon" to you meant firearms, ammunition, and nothing else; true?

A    I wouldn't have put nothing else.  I just put firearm and ammunition, like it says.  But, yes, I wouldn't have added extra words.

Q    Sir, I thought you were going to tell me yes or no.

**UNITED STATES DISTRICT COURT**

3-RenSER-00369                    3-RenSER-00369

A    Well, you added words.  I can't -- to what I said -- you added words to what I said.  And I can't answer "yes" or "no" to when you added your own words to my statement.

Q    Sir, let me know what part of this you don't understand.

A    Okay.

Q    When you signed this probation agreement, paragraph 20 --

A    Yes.

Q    -- you signed an agreement not to have any type of dangerous or deadly weapon; true?  True?

A    Including any firearm or ammunition.

Q    But not limited to firearm and ammunition; correct?

A    I didn't see that on that words.

Q    Sir?

A    It's a legal document.

Q    Are you in the habit of signing and agreeing to things when you don't know what they mean?

        MS. MKRTCHYAN:  Objection, Your Honor.  That's very argumentative.

        THE COURT:  Sustained.

BY MR. HARRELL:

Q    Sir, is it your testimony you signed paragraph 20 not knowing what it meant?

A    I'm standing by what I know it meant.

Q    Sir, you haven't -- which is not a response to my question.

MS. MKRTCHYAN: He answered the question. Your Honor, what is this? He answered the question several times. That is his understanding, this is a legal document.

THE COURT: No. It's a question. I think, Counsel, though this can be shortened. If you're going to inquire about another type of weapon, why don't you inquire and see if he -- put that into consideration.

MR. HARRELL: All right.

BY MR. HARRELL:

Q All right, sir. So you consider yourself -- well, sir, in a prior proceeding, you told us that you weren't worried about what a dangerous or a deadly weapon was --

MS. MKRTCHYAN: Objection.

BY MR. HARRELL:

Q -- after you signed this agreement and particularly on the night of the incident; right?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Unintelligible.

THE COURT: Overruled.

THE WITNESS: Can you show me in text -- in context where I did say that?

BY MR. HARRELL:

Q Sure. Prior Proceeding 3, 89, Volume I. This is --

THE COURT: Counsel, will you get that for me? I'll give you this binder back.

MR. HARRELL: The Court needs a copy.

THE COURT: Counsel, thank you very much. All you have to do is hand it to me. We'll give this binder back to you so you keep track.

Counsel, what page and line would I be referring to?

MR. HARRELL: Your Honor, this is 112.

THE COURT: What lines?

MR. HARRELL: Lines 3 through 5.

THE COURT: Just a moment. You were asking him lines 3 through 12? Counsel, what lines? 3 through -- you said, lines 3 through 5? That's simply a question, Counsel.

MR. HARRELL: Right, Your Honor. We'll check the cite, and we'll circle back to that.

BY MR. HARRELL:

Q   Sir, you do remember saying in a prior proceeding that you weren't worried about what the term "dangerous or deadly weapon" meant; right?

MS. MKRTCHYAN: Let him read.

THE WITNESS: Say again. What were the lines? I never heard the --

MR. HARRELL: There's nothing for him to read. You can take it back.

MS. MKRTCHYAN: Well, then, it's improper impeachment. He already said he doesn't remember. Ask to look at the transcript.

UNITED STATES DISTRICT COURT

3-RenSER-00372                                        3-RenSER-00372

219

THE COURT: If there's something you have to refresh his recollection, you can show him that.

MR. HARRELL: Your Honor, I'd like to move on.

THE COURT: Okay.

BY MR. HARRELL:

Q    All right. You consider yourself to be a person with common sense; correct?

MS. MKRTCHYAN: Objection, Your Honor. That's offensive already.

THE COURT: Sustained.

BY MR. HARRELL:

Q    Sir, the term "dangerous or deadly weapon" means a weapon that's able to cause harm or injury to a human being; right?

A    Yes.

Q    All right. Now, you possessed knives and a machete at the time of this incident; right?

A    Yes, I did.

Q    Let's look at Exhibit 100-11.

Now, you already told us that you possessed the items on the top of the picnic table depicted on 100-11; right?

A    Correct.

Q    They were all found at your campsite on the night of the incident; true?

A    Inside my backpacks, yes.

Q    Including the knives?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    So when a deputy says "knives, knives, knives," these knives were all at your campsite at that time; right?

A    When they dumped out of my backpack, they saw and said, "Knives, knives, knives."

Q    You had a machete too on that night; correct?

A    Yes, I did.

Q    Can you identify the machete for us?

A    Yes, the broken part is hidden by the axe, but it's under the axe.

Q    Do you know how to draw circles around the machete?  Do you know how to do it on this screen?

A    We did this last time, and I kind of messed it up, but I'll try.

Q    Anything that you touch is going to make a mark.  So be certain what you doing before you touch it.

        Do you understand?

A    I can clear it if I want.  So here (indicating), we've got a machete with a broken handle.  I kind of melted 550 cord around it.  It wasn't very stable.  I just kind of fixed it while I was at a campsite.

        And here (indicating), it's just a Big 5 special. This is not anything special.  You go up to here, but it's under the axe, and all of this is broken, again, as I use it as a fire poker because it was a cheap Big 5 tool.

**UNITED STATES DISTRICT COURT**

Q    Do you remember what I asked you, sir?

A    About where the machete was.

Q    Sir, I asked you to draw a circle around the machete. Have you now done that?

A    Oh, I erased it now.  I'll put it again.

Q    Just draw a circle around the machete, and then I might have another question.  Okay?

A    Apologize.  I got excited.

                **(Witness complies.)**

BY MR. HARRELL:

Q    Sir, are you now done?

A    Working on it.  This is not part of it right here.  That's not part of it.

Q    Sir.  That's good enough for our purposes, okay?

A    Yes, sir.

Q    Do you understand?

A    Yes, sir.

Q    How long is the blade on that machete?  I'm looking for inches.

A    24?  18 to 24.  Something like that.

Q    About two feet long?

A    Probably a little bit smaller than that, but, yeah.

Q    All right, sir.  I apologize about the technical glitch earlier.  You did testify that the term "dangerous or deadly weapon," that didn't mean anything to you on that night, and

**UNITED STATES DISTRICT COURT**

3-RenSER-00375                                    3-RenSER-00375

you weren't worried about it; right?

A   In context --

Q   Correct?

A   -- I don't know what you mean.  Again, if we're talking about that night, that moment when these guys are punching me in the head, I'm not thinking about whether I have dangerous weapons or not or anything, to be honest.  I'm worried about what's happening in that very moment.  So if that's the question, that's -- I can't answer whether I was thinking about these knives.

Q   Was I asking you if you were thinking about the knives?

A   You asked me if I was thinking about the machete.

Q   Do you remember my question, sir?

A   Now I don't.

Q   I'm going to read it again for the second time.

On the night of the incident, the term "dangerous or deadly weapon" didn't mean anything to you on that night.  You weren't worried about it; right?

A   At what time?

MS. MKRTCHYAN:  Asked --

BY MR. HARRELL:

Q   On that night, sir.

A   What time that night?

MS. MKRTCHYAN:  Asked --

MR. HARRELL:  Your Honor, may I read from a

3-RenSER-00376                                3-RenSER-00376

223

transcript?

THE COURT:  Not yet.  Your question --

MS. MKRTCHYAN:  It's improper impeachment.

THE COURT:  You can't possibly get that as a court reporter?

THE REPORTER:  No.

THE COURT:  Re-ask the question.  There's too much interruption.  We don't get a clean transcript.  So re-ask the question.

BY MR. HARRELL:

Q    Sir, on that night the term "dangerous or deadly weapon" didn't mean anything to you on that night.  You weren't worried about it; true?

A    Again, a hard time to answer.  That's a very vague question.  What time are you talking about?  When I was getting beating [sic] up, no, I wasn't concerned about much.  When they were asking me questions, having me sit down on the log, I wasn't thinking about this stuff.  So it really wasn't a concern of that night, and I don't -- and I wish in context, if I did say something like that, I'd gladly admit it.  I'm just not sure what context we're speaking of.  And I'd like to see if -- my words so I can agree with you, if I can.

MR. HARRELL:  May I approach?

THE COURT:  You may.

MR. HARRELL:  This is from a prior proceeding,

**UNITED STATES DISTRICT COURT**

August 2.

THE COURT:  Counsel, just show him that.

MR. HARRELL:  Okay.

THE COURT:  This is getting unduly consumptive of time.

MR. HARRELL:  Agreed.

THE COURT:  Show that to him.  Give me a copy, please.  Thank you.

THE WITNESS:  And the question --

BY MR. HARRELL:

Q    Sir, I've outlined in blue where you're supposed to read.

A    It looked like it was a little bit off.  So 9; right?

Q    Yes.

A    "Sir" --

Q    Don't read it out loud.  Read it to yourself, please.

A    Sorry about that.

Q    Let me know when you're done.

A    Okay.  Give me a chance.

Q    We're going down to line 19.

A    Thank you very much.

THE COURT:  No, you go down to line 19, Counsel, not 18, line 19.

BY MR. HARRELL:

Q    Right.

A    (Reading.)

**UNITED STATES DISTRICT COURT**

3-RenSER-00378                                    3-RenSER-00378

Q    Are you done, sir?

A    Yes, sir.

         THE COURT:  Counsel, ask him if that refreshes his recollection.

BY MR. HARRELL:

Q    Sir --

         THE COURT:  That's your first question.

BY MR. HARRELL:

Q    Sir, does that refresh your recollection?

A    Yes, it does.

         THE COURT:  All right.  Now you might want to put that in front of him, and then you can ask the question again.

         MR. HARRELL:  Okay.

BY MR. HARRELL:

Q    Sir, I'm going to read it, and then I'm going to --

         THE COURT:  No, you're not going to read it to him.  You're going to show it to him.  You're going to see if that refreshes his recollection, then you can ask the question.  Put it down from him.  Now you can look over his shoulder.

         Now what's your question?

BY MR. HARRELL:

Q    Sir, on that night, the term "dangerous or deadly weapon" did not mean anything to you.  You weren't worried about it; true?

         THE COURT:  Now, sir, you can answer.

3-RenSER-00379                                    3-RenSER-00379

THE WITNESS:  In this question, he's asking just the term "deadly weapon"?

THE COURT:  Just a moment.  Sir, you can answer that question, please.

THE WITNESS:  I'm trying to answer the best because he's not asking properly.

THE COURT:  No, he is asking properly.  You can answer that question, sir.

THE WITNESS:  I said the cops were the only deadly weapons.

THE COURT:  Counsel, you may read from lines 3 to 20 -- 3 to 19.

BY MR. HARRELL:

Q    Sir, this is from a prior proceeding, August 2, 2023.  My question to you, lines 9 through 19:

"Sir, I ask again, since you say it was left up to your judgment and no one else's as to what is a dangerous or deadly weapon, what did that term mean to you on the night of the incident when you had knives, a machete, and an axe at your campsite?

"ANSWER:  The only dangerous weapons that -- in my campsite that night are when the officers were pointing their guns at my face.

"QUESTION:  What did the term mean to you?"

Your answer:

3-RenSER-00380                              3-RenSER-00380

"It didn't mean anything that night because I wasn't worried about it."

That was your testimony; correct, sir?

A     Yeah.  For those -- that brief paragraph about that subject matter.

Q     And you said that because it was the truth.  You weren't worried about it; right?

A     I'm having a hard time distinguishing this question.  I seriously am.  Are we talking about my weapons being deadly weapons?  Generically, deadly weapons can be deadly weapons?  I seriously have a question about that because at that moment, no, I wasn't thinking about -- and, no, deadly weapons weren't in my brain.  So I would really like to be -- know what deadly weapon are we speaking of, or are we speaking generic deadly weapons?

Q     Sir, there's a circle drawn around the machete; correct?

A     Okay.

Q     Right?

A     Yes.

Q     Does the machete we're looking at here look like it's able to inflict injury on a human being?

A     Yes.

Q     Now, let's talk about your knives, okay?  We see what you call tracking knives on the picnic table; right?

A     Yes.  Well, one of them is.

3-RenSER-00381                                                    3-RenSER-00381

Q    Identify that knife for us by drawing on the screen. Just erase what we already have about the machete. We've covered that. Draw for us -- that's the tracking knife?

A    There we go (indicating).

Q    Have you now completed your circle?

     For the record, I can see it.

A    It is not a pretty one, but I did it.

Q    Well, sir, I can see the circle. This is just for our official take-down record.

     You've now completed the circle; correct?

A    Got it.

Q    All right. Does the knife -- well, how long is the blade on that knife? Looking for inches.

A    About five inches, maybe.

Q    All right. Does the knife we're looking at right now look like it's able to inflict injury on a human being?

A    If you tried hard enough.

Q    It can be used potentially to hurt someone; right?

A    Yes.

Q    And, in fact, you have told us that you use that knife to cut through animal tendons; right?

A    No. I said that's what it is designed for, for helping with hunting. And it has a spot for that, but I've never used it in that fashion.

Q    Okay, sir. It can be used to cut through tendons; right?

**UNITED STATES DISTRICT COURT**

A     Yes, it's part hunting knife.

Q     Which, in your mind, is part of a muscle; correct? Tendon is part of a muscle; right?

A     Yes.  Yes.  Part of the inside of an animal, yes.

Q     Human beings have tendons and muscle, don't they?

A     I've never eaten a human being.

Q     Right.  So that knife can be used to kill someone if you wanted to do that; right?

A     Yeah.  Anything, the sticks on the ground, your car, anything could have been used that night to kill anybody that night.

Q     Your probation agreement did not allow you to possess any dangerous weapons, did it?

A     I don't agree with that statement.

Q     It did allow you to possess dangerous weapons?

A     In my eyes, those were not dangerous weapons.  Those are camping tools.  They were used in this campsite.  When I am in dispersed camping and there is mountain lions and other -- I do want protection.  I don't own a gun.  I'm not out shooting anything.  Those are protection.

          MS. MKRTCHYAN:  Excuse me.

BY MR. HARRELL:

Q     We are getting --

          MS. MKRTCHYAN:  Excuse me.

BY MR. HARRELL:

**UNITED STATES DISTRICT COURT**

3-RenSER-00383                                    3-RenSER-00383

Q     -- far away from the question --

MS. MKRTCHYAN:  I object to this.

THE COURT:  Both of you --

MS. MKRTCHYAN:  He interrupts the witness.  I want a break.  What is this?  This is a wearing-down marathon.

THE COURT:  Counsel, I'm going to have him finish the question.

MS. MKRTCHYAN:  I object because he interrupted the witness.  I do not appreciate --

THE COURT:  Then I won't have him finish the --

MS. MKRTCHYAN:  Okay.  Let them -- I request a break.

THE COURT:  Ask the question, please.  What's the question?

BY MR. HARRELL:

Q     Sir, you also have what's called a Gerber knife, G-e-r-b-e-r, Gerber knife?

A     Yeah, that was a small pocketknife.

Q     All right.  In the pretrial phase, you admitted that your Gerber knife was sharp enough to cut through flesh; right?

A     Yeah.

Q     Yes?

A     Yes.

Q     Okay.  Sir, we need a "yes" so that we have what we call a clear record.

**UNITED STATES DISTRICT COURT**

Do you understand?

A    Yes.  I apologize that time.  I really do.

THE COURT:  Let's go back because I don't think your Counsel heard correctly for a moment.  And that is I was going to let you finish the answer to the question that was asked.

THE WITNESS:  What's that?

THE COURT:  I was going to let you finish the answer to the question that was asked.

THE WITNESS:  Now I don't remember.  They're all over the place.

THE COURT:  Okay.  Counsel, continue then.

BY MR. HARRELL:

Q    Sir, your Gerber knife is able to inflict injury on a human being; right?

A    In the wrong hands, I guess -- or yeah.  A toddler had it waving around, yes, but not in my hands.

Q    It can potentially be used to hurt someone; right?

A    Can, yes.

Q    You also owned what's called a KA-BAR knife, K-A-B-A-R knife; right?

A    You're pertaining to where do I own this KA-BAR knife?

Q    Sir, you also owned what's called a KA-BAR knife on the night of the incident?

A    Oh, on the night of the incident?

Q    Yes, sir.

**UNITED STATES DISTRICT COURT**

3-RenSER-00385                                    3-RenSER-00385

A    Not in this location, but I did own a KA-BAR knife.

Q    A KA-BAR knife is something the Marines train on to use in hand-to-hand combat; right?

A    Marine Corps KA-BAR is a knife that the Marine Corps use, but KA-BAR is a brand name.

Q    Sir, I'm going to ask you again.

A    Yes, sir.

Q    A KA-BAR knife is something the marines train on to use in hand-to-hand combat; right?

A    Yes, we do some hand-to-hand combat with the knife.

Q    And you are familiar with the emblem of the U.S. Marine Corps; correct?

A    Yes, I am.

Q    One of your knives has the emblem of the U.S. Marine Corps on it, doesn't it?

A    Yeah, because I like the EGA.  I'm pretty proud of it.

Q    You like the what, sir?

A    The EGA, the eagle, globe, and anchor.

Q    Right.  Your knife with the Marine Corps symbol on there that we're all familiar with, the globe and the anchor?

A    Yes, sir.

Q    That's a KA-BAR knife used in hand-to-hand combat; right?

A    No, it is not.

Q    Okay.  Well, if it has the U.S. Marine Corps emblem on it, what kind of knife is it, sir?

**UNITED STATES DISTRICT COURT**

3-RenSER-00386                                    3-RenSER-00386

A    Well, I went to Hobby Lobby and bought that little medallion and put it on the leather sheath that I had been making.  All of that leather stuff I do when I am camping, I work with the leather a lot.  So, yeah, I was decorating my camping knife, but that is not a KA-BAR knife.

Q    It's not one that you took from the Marines when you left that branch of the service?

A    That is correct.

Q    All right.  This is something that you made that just looks like a KA-BAR knife.  Is that your testimony?

A    It doesn't even look like a KA-BAR knife.

Q    Aside from the emblem of the U.S. Marine Corps on there; right?

A    A KA-BAR knife doesn't have an emblem like that on it.

Q    Okay, sir.  You were trained in the Marines on how to use a knife in hand-to-hand combat; true?

A    Briefly during boot camp.

Q    You were trained in the Marines to use a knife to fight and win; right?

A    Hopefully win, yeah.

Q    And you were trained in the Marines how to use a knife to kill an opponent if you needed to do that in combat; right?

A    In a war zone, yes.

Q    All right.  And you considered the KA-BAR knife to be a deadly weapon when you were training with it in the Marines;

UNITED STATES DISTRICT COURT

right?

A       Yeah.  It was a side to my sidearm.

Q       And you considered your knife with the Marine Corps emblem on it to be a deadly weapon on the night of the incident; right?

A       No.  I believe I chopped wood with that knife more than anything.

Q       All right, sir.  Let me ask you a question.

MS. MKRTCHYAN:  But, Your Honor, he keeps interrupting the witness.  I don't appreciate this.

THE COURT:  Let him --

Finish your answer.  "I chopped wood..."

THE WITNESS:  Yeah.  I use wood.  I split up the chopped wood because they make you buy bundles.  And so I make it into smaller -- and that knife is perfect for splitting.

THE COURT:  All right.  Thank you.

Counsel.

BY MR. HARRELL:

Q       Well, you have claimed that you had a reason for having all these knives at your campsite; right?

MS. MKRTCHYAN:  Vague and ambiguous.

THE COURT:  Overruled.

THE WITNESS:  I do have a reason for them.

BY MR. HARRELL:

Q       Right.  In the pretrial phase you claim that you have all

**UNITED STATES DISTRICT COURT**

these knives as protection for any bobcats or bears you might encounter; right?

A      Yeah.  Again, two of those only, I carry with my pack when I'm out in a dispersed area.  You don't really have to carry those at O'Neill Park, which is in a really -- so that's why they were in my backpack.

Q      You had those knives because you recognize that they can be a dangerous or deadly weapon when used against a bobcat; right?

A      It could be defense, yes.

Q      And you had those knives because you recognized that they could be dangerous or deadly weapons when used against a bear; right?

A      I think I would rather pick up the knife than a stick, which can both do the same damage because a bear is not going to do much.  That knife is not going to do much against a bear.

Q      Right, sir.  Maybe we'll talk about sticks later.  For right now, I'm going to read my question back, okay?

A      Awesome.  I love sticks.

Q      You love what, sir?

A      Sticks.

Q      Sir, is this some type of joke to you?  What's going on now?

A      No, you said you're going to talk about sticks and I have a bunch -- I collect them.

3-RenSER-00389                                    3-RenSER-00389

MS. MKRTCHYAN: Your Honor, this colloquy is -- first of all, this is cumulative.

THE COURT: Let's move on to the next question.

BY MR. HARRELL:

Q    Sir, you had those knives because you recognize that they could be a dangerous or deadly weapon when used against a bear; right?

A    I have them as great tools when I'm camping. Yes, they can help me in a bear situation maybe. I doubt it but maybe.

Q    All right. In your mind, the bears that you were prepared to confront and hurt with your knives are larger than any of the deputies you encountered on the night of the incident; correct?

A    Yeah.

Q    In your mind, your knives could also be a dangerous or deadly weapon when used against a human being; right?

A    Not to me. I wouldn't have done that. That's not in my -- it wasn't in my mind. That's something you've added, not to me. I don't think it like that.

Q    All right, sir. Your probation agreement, paragraph 20, didn't allow you to have dangerous or deadly weapons as long as, in your mind, you weren't planning on using them to hurt anyone. That's not the way it's worded; true?

A    Well, when the -- I spoke to the judge and showed him all that.

UNITED STATES DISTRICT COURT

Q     Let's not do any hearsay.

          MS. MKRTCHYAN:  Objection, Your Honor.  First of all, can we -- I requested a break.  I asked for a break already for a while.

          THE COURT:  No.  I don't want to disturb the cross-examination, Counsel.

          Counsel, I think that that's hearsay.  And re-ask your question or ask another question.

BY MR. HARRELL:

Q     My question has a very narrow focus, sir.  A great number of my questions --

          THE COURT:  Counsel, without the comment now.  This is becoming unduly consumptive of time.  You want to ask him about that section, ask him about that section.  Now let's move on.

BY MR. HARRELL:

Q     Sir, you weren't allowed to possess deadly weapons during the incident under the probation agreement, full stop, no exceptions, no qualifications; right?

A     I don't agree with that as par to my camping equipment.

Q     Okay, sir.  So if the deputies say that they saw these knives and the machete and the axe on the night of the incident, are you suggesting it would have been improper for them to have safety concerns about these camping tools?

          MS. MKRTCHYAN:  Objection.  Calls for speculation.

3-RenSER-00391                                                    3-RenSER-00391

THE COURT: Overruled.

THE WITNESS: There was no -- when they first walk up, there is no reason to be fearing of those. They were put away. I was speaking to him on a log or was I ever reaching for them.

Q    Now, sir, you understand that if -- when you signed your probation agreement, that if you violated the terms of your probation agreement, you could face some serious consequences; right?

A    Of course.

Q    It was explained to you, you could be subject to arrest; right?

A    You'd have to start my probation again.

Q    No, sir. It was explained to you that if you violated your probation, you could be sent to jail; right?

A    Right.

Q    For as much as three years in your case; right?

A    It could have been.

Q    Right. So back to emotional distress.

Is part of your emotional distress at the time of the incident caused by your concern that the deputies would arrest you for violation of your probation because you were in possession of dangerous or deadly weapons?

MS. MKRTCHYAN: Objection. That's unintelligible.

THE COURT: No, overruled.

You can answer the question.

THE WITNESS:  Oh, not at all.  In my eyes, I did not have dangerous weapons.

BY MR. HARRELL:

Q    You did tell the deputies in response to their question you were on probation during your first encounter that night; true?

A    Yes.  I informed them I was on informal probation.  And they said, "No, you're on probation" and caused more misinformation to spread.

Q    And you yourself agree that the officers did see the knives, the axe, and the machete on that night; right?

A    Yes.

Q    The officers didn't arrest you for violation of probation at the conclusion of your first encounter, did they?

A    Couldn't.

Q    I'm sorry, sir?

A    They wouldn't have.  It wouldn't have went through because I wasn't carrying dangerous weapons.  I didn't break probation. I did everything by answering out of my tent, let them see -- if I wasn't on search and seizure, I would have never got out of my tent.

Q    So, sir, during the entire first encounter, none of the deputies used any physical force on you at all in the first encounter; right?

**UNITED STATES DISTRICT COURT**

3-RenSER-00393                                    3-RenSER-00393

A    Like I said, a little bit of bully, Renegar kind of adjusting where I need to walk.  But mostly, it was just verbal.  Verbal, make you feel down, try to -- you know, they're better than you kind of thing, that kind of attitude.

Q    Aside from patting you down for weapons, they never even touched you; right?

A    Correct.  Well, except for the putting me on the log, setting me on the log.

Q    They just left; right?

A    After they searched through all my stuff and found nothing, yes, they --

Q    Well, they didn't find a battered woman at your campsite; right?

A    They had no evidence of that either.

Q    Is that because she ran off before they got there?

A    No.  I have no idea where she was.  I'm guessing at the Campsite 66.

Q    Okay, sir.  Sir, you've repeatedly said that you've done nothing wrong; right?

A    Correct.

Q    If you've done nothing wrong, why not just work with the deputies during the first encounter instead of all the curse words?

A    The first one or the second one?

Q    Which encounter?

3-RenSER-00394                                    3-RenSER-00394

A    Yeah, which encounter are we -- sorry.  First or second encounter?

Q    If you've done nothing wrong, why not just work with the deputies instead of all the curse words during the first encounter?

A    The curse words are of none concern.  I didn't know -- to be honest, I apologize if I offended the officers with curse words, but I'm just speaking.  I was groggy.  I woke up.  These guys accusing me -- they're lying.  I wasn't very happy.  So that's the basic situation.

Q    Well, did you view the officers not arresting you for violating probation as an effort on their part to cut you a break?

MS. MKRTCHYAN:  Objection.  Calls for a legal conclusion.  And it calls --

THE COURT:  Counsel, I think that's argument later on.  I don't know that this even passed through his mind.  It's the way it's being asked, you're asking about the officers and what they're thinking.  I'm going to sustain the objection, Counsel.

BY MR. HARRELL:

Q    Sir, after the deputies found the knives but before they left, Deputy Gonzalez tried to explain why they were there at your tent; true?

A    Correct.

UNITED STATES DISTRICT COURT

Q    And in response, you raise your voice and cursed at him; right?

A    Yeah, I really didn't want anything to do with him anymore.

Q    Okay.  This is more audio from Deputy Renegar's tape, Exhibit 102 in evidence, and the counter on this is 04:31:39 to 4:31:50.

                    **(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    In your mind, is this calm and cool speech on your part?

A    I was scolding the officer.

Q    Sir --

A    It wasn't out of control, no.

Q    Sir --

A    Could it have been the calmest?  No.

Q    Sir, I didn't ask you about calm --

A    Okay.

Q    -- out of control.

A    Okay.

Q    What I did ask you about was, in your mind, is this the calm and cool speech that you told us in the pretrial phase that you maintained throughout the entire incident?

A    I don't find that -- that very terrible.  I raised my -- for four seconds and then calmed right back down.  I don't find that that terrible.  I'm very frustrated, and the cops should

**UNITED STATES DISTRICT COURT**

3-RenSER-00396                                    3-RenSER-00396

understand that.

Q   In your mind, do you sound calm on this tape, sir?

A   For the most part on that video, yes.

Q   I'm referring to the clip that we just played, sir.

A   Yeah, it shows me -- shows my frustrations but in talking at a normal voice.  I raise my voice for a second and go right back down to normal voice again.

Q   In your mind, sir, do you sound respectful on this tape?

A   I believe they need to hear what they've done to a civilian.

Q   Sir, did you pick these words in this tone of voice in an effort to help officers to feel safe around you?

A   Officer safety wasn't a concern at that moment.

Q   Not for you; right?

A   I don't believe for them either.

Q   Are you speculating now?

A   Well, I mean, seven officers -- there's five officers there.  They've already dug through my stuff.  They know I'm sitting down with nothing; so there was no fear.  I wasn't acting in any aggressive way.  I was just sitting there.  So officer safety should have been at the lowest point.

Q   So, sir, now that we've played some of the tape, your testimony in the pretrial phase that you were calm and cool the entire incident, that you were respectful the entire incident, and that you did everything in your power to help the deputies

feel safe around you -- you made all of these claims in the pretrial phase before you found out that there was a recording of what you said; right?

A    No, that's not true.

Q    When you said these things, you thought it was your word against the deputies; right?

A    No, that's not true.

Q    But now you know the audiotape of your own words played here in court shows that you weren't calm and cool the entire incident; right?

A    I think I was -- for the situation that I was in, I did the best I could.  I don't find myself in the wrong.

Q    You weren't respectful the entire incident; right?

A    I wasn't disrespectful.

Q    You didn't do everything in your power to help the deputies feel safe around you; true?

A    Yes, I did.

Q    Now, as your own words are being played in court, you have a new claim about how you acted on that night; right?

          MS. MKRTCHYAN:  Objection, Your Honor. Argumentative.

          THE COURT:  Sustained.

          MS. MKRTCHYAN:  We are going over same issue.

          THE COURT:  Counsel, I just sustained the objection.

          MS. MKRTCHYAN:  4:00 p.m. and I asked the break.

**UNITED STATES DISTRICT COURT**

THE COURT: No, Counsel. I'm not going to interrupt cross-examination now. But, please, I've already made my ruling, and you're carrying on. Please don't do that.

MS. MKRTCHYAN: I apologize. I just -- I need a break.

THE COURT: Please don't do that.

MS. MKRTCHYAN: Can I go restroom?

THE COURT: You can go use the restroom.

MS. MKRTCHYAN: Thank you. I mean, seriously --

THE COURT: We'll be right here, Counsel. Go use the restroom.

MS. MKRTCHYAN: Well, if you are not going to take a break for the jury --

THE COURT: Counsel, I worry about interrupting cross-examination and convenience of either Counsel. So any time we get into it on either side, if I simply start recessing, it's a tactical advantage.

MS. MKRTCHYAN: Your Honor --

THE COURT: Counsel, if we need to take a restroom break -- well, ladies and gentlemen, for five minutes, okay? Come right back. All right.

Counsel, we'll take a restroom break.

**(Recess from 4:05 p.m. to 4:13 p.m.)**

THE COURT: All right, Counsel. Thank you. And the jury is present, all counsel, parties, Mr. Holloway. Thank

3-RenSER-00399                    3-RenSER-00399

you.  Please continue.

BY MR. HARRELL:

Q    Sir, after the deputies left your tent, after your first encounter with law enforcement, you did not go back to sleep; true?

A    No, I did not.

Q    And you're aware that deputies received radio calls that you were going from campsite to campsite bothering your neighbors, trying to find out who had called law enforcement on you; right?

A    It's subject -- yeah, there's a lot of misunderstanding at that point, I think, because it wasn't directly to me, but it could be to me.  So, yeah, it was a little bit of both.

Q    Okay.  And you were already angry and upset with your neighbors at the campground before the deputies left the scene of your first contact with them; right?

A    I wouldn't say that, no.  I was irritated of the overall situation.  And --

Q    Okay.  So this is Exhibit 102, Deputy Renegar's audiotape, and the timestamp on this is 4:31:09 through and including 4:31:57.  This is Clip I, India.

                    **(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    Sir, did you follow through on your statements to the deputies and start yelling at your neighbors after the deputies

3-RenSER-00400                                        3-RenSER-00400

left the scene?

A    Well, that was a statement out of frustration directed towards Renegar because I knew everybody hadn't called my scene.  Everybody hadn't called me.  I was 100 percent sure at that point nobody called me.  So I was saying they're assholes, and they're stupid, and it was more directed to the cop because I knew he was lying.

Q    Right, sir.  Did I ask you if anybody was lying when they called 911?

A    I'm answering your question the way I answered it the best.

Q    All right, sir.  I'm going to read it again.

A    Yes, sir.

Q    Did you follow through on your statements to the deputies and start yelling at your neighbors after the deputies left the scene?  Yes or no.

A    Again, no threatens were done to anybody.  No harm done -- was anybody -- that statement wasn't directed at anybody.

Q    Did you yell at your neighbors after the deputies left?  Yes or no?

A    I spoke to 66.

Q    You yelled; right?

A    Yes.  I spoke loudly.  I wouldn't say "yell," enough for him to hear.  He wasn't -- he wasn't as far as 63 was to me.

Q    "Assholes and morons" is what you said to the deputies

**UNITED STATES DISTRICT COURT**

about your neighbors; right?

A    About to the fake callers.

Q    And when you use the term "assholes and morons," you're referring to your neighbors in the campground at that point; right?

A    No, I'm referring to the pretend calls that Renegar's talking about.

Q    When you made these statements, did you believe some of your neighbors were assholes?

A    No.  That comment was made about the pretend calls that Renegar was saying about.

Q    When you made these statements, did you believe some of your neighbors were morons?

A    That statement was called to Renegar for calling fake 911 calls and lying about ten people.

Q    Are you saying in this segment of audio, you're calling Deputy Renegar a moron and an asshole?

A    Pretty much.

Q    Okay.  Let's play it again, sir.

                **(Audiotape played, not reported.)**

BY MR. HARRELL:

Q    Sir, you said they are assholes and morons in reference to your neighbors at the campsite; right?

A    Can I ask for a -- to step -- we can speak -- to play what you're playing, can we play one by one, line by line --

**UNITED STATES DISTRICT COURT**

3-RenSER-00402                                3-RenSER-00402

Q    Sir --

A    -- so we can do it very clear?  I can explain.  You want me to answer what you want me to say, but I want to explain to you what's happening.  And the best way we could do that would be top -- line by line.  Otherwise, I can't answer your question properly.

Q    I'm going to play it one more time.

A    Can we do it line by line?

Q    Sir, I'm going to tell you what's about to happen, and then I'm going to give you an instruction on what I'd like to you listen for, okay?

A    Line by line?

Q    Sir, we're going to play the same audio for you.

A    Okay.  Yes, sir.

Q    I want you to listen to the term "assholes and morons."  Can you do that?

A    Like I explained --

Q    Can you do that?

A    I've already explained to you the situation.  So you're going forward with my answers, but we can try.  I can do my best.

Q    And while you're listening to the term "assholes and morons," I want you to tell me that this is in reference to Deputy Renegar or your neighbors at the campsite or somebody else we haven't heard about yet.  Can you do that?

3-RenSER-00403                    3-RenSER-00403

A      Yes, sir.

MR. HARRELL:  All right.  Let's play it.

**(Audiotape played, not reported.)**

BY MR. HARRELL:

Q      Sir, you're talking about the neighbors here; right?

A      That was in regards to every single -- three lines that go right there that are Deputy Renegar's false statements.  That's where I'm talking to in response to.

Q      Okay, sir.  Why did you say that your neighbors are assholes and morons?

A      First thing that popped out when he was lying to me.  So it was directed at him.

Q      Sir, were you calling your neighbors assholes and morons because you concluded they had called for law enforcement help with regard to you beating a woman?

A      No, because as far as I know, there's no 911 calls directing Jeremy Holloway beating a woman.

Q      And you're excluding Brian Fuerbach; right?

A      Brian Fuerbach never said Jeremy Holloway beat a woman.

Q      He didn't know your name, did he?

A      He didn't know anything.  He was inside of his tinted tent.

Q      Okay, sir.

A      Or his RV.  I apologize.

Q      Now, let's move to when the deputies leave the scene,

**UNITED STATES DISTRICT COURT**

leaving you and the campers all by yourselves.  Do you have that period of time in mind?

A    Yes, sir.

Q    You now know that a gentleman named Joshua Gomez, serving in the Navy, called 911 on you after the deputies left your tent after the first encounter; correct?

A    I will say he did call 911.

Q    He called 911 about somebody rampaging around the campground, yelling and screaming and doing some more unlawful things; right?

A    Correct.  And since it wasn't me, it wasn't a 911 call on me.

Q    Okay, sir.  You have heard Mr. Gomez's 911 call from that night; right?

A    Yes, I have.

          MR. HARRELL:  Let's play it now in some segments.

          Your Honor, the 911 tape is in evidence.

          THE COURT:  What's the exhibit number?

          MR. WRONIAK:  101-3.

          THE COURT:  101-3.  Thank you, Counsel.

          MR. HARRELL:  Okay.  Let's play the first clip.
Let's try -- 2 -- internal number 228-B.

          THE COURT:  Just a moment.  For my record, I'm not concerned about your internal numbers for either party.  I am concerned that I have a record.  Is this 101-3?

MR. HARRELL:  Yes, it is, Your Honor.

THE COURT:  Thank you.

MR. HARRELL:  Well, no.  No, no, no Bryan.  Let's do Clip A, and this has a runtime of 32 seconds.

**(Audiotape played, not reported.)**

BY MR. HARRELL:

Q     Sir, did you hear Mr. Gomez say that there's a gentleman who was in a domestic disturbance and the sheriffs came to talk to him, but they did not arrest him.  Did you hear that?

A     Yes, I did.

Q     The sheriff's department did come and talk to you and didn't arrest you on that night; right?

A     Yeah, but I wasn't involved in a domestic.

Q     Mr. Gomez says the person in issue is going campsite to campsite trying to find the person who called; true?

A     Yes, he did.

Q     You were awake and outside your tent during the period of time between your first encounter with law enforcement and the second encounter with law enforcement; correct?

A     I wasn't in campsite to campsite.

Q     Sir, my question has another focus.

A     I thought we were talking about the 911 call.

Q     Here comes the question.

A     Yes, sir.

Q     Between your first encounter with law enforcement and

UNITED STATES DISTRICT COURT

your second encounter with law enforcement, referenced a little girl screaming, you were outside of your tent on that night; right?

A    Depending on what time.  I could have been either in front of my tent or at the ranger station, yes.

Q    All right.  You didn't go back to sleep; right?

A    No, I wasn't able to.

Q    Now, you told us that you were yelling in a raised voice at the people in Campsite 66; true?

A    Yeah, I told them they should have got out and talked to the cops and not let me take the wrap for what they were doing.

Q    When you were outside of your tent between the first and second encounter as you had with law enforcement, did you see anyone else going from campsite to campsite, trying to find the person who called 911 as Mr. Gomez reports?

A    No.

Q    During your first encounter, you specifically asked law enforcement who has called 911 on you; right?

A    I might have.  I'm not sure.  Wondering why someone called.  I can't remember if I did that or not.

Q    You wanted to find them, didn't you?

A    What's that?

Q    You wanted to find who called 911 on you, didn't you?

A    No.  I didn't do anything.  So I wanted them to find who they were looking for from the 911.

**UNITED STATES DISTRICT COURT**

Q    And law enforcement did not tell you who had called them about the domestic disturbance they were investigating; right?

A    They never told me they were investigating anything.  They never told me anything.

Q    So when deputies left, you didn't know which other campers had called 911 about the domestic violence; right?

A    No.  It wasn't my concern.

Q    After the deputies left, after the first encounter, can you identify anyone else at the campground who asked law enforcement who had called 911 on them?

A    I couldn't have heard where they were talking about 61.  I was the opposite way.  So whatever was happening that side of the campsite, I was at the ranger station, which is completely opposite.

Q    Can you identify anyone at the campground on that night, aside from you, that stated the 911 caller was an asshole?

A    No.  I didn't hear anybody else say that.

Q    Can you identify anyone else at the campground on that night, aside from you, that stated the 911 caller was a moron?

A    No.  I didn't hear anybody else say that.

         MR. HARRELL:  Let's play some more tape.  This -- the counter runs from 27 seconds and ends at 1 minute and 53 seconds.

         **(Audiotape played, not reported.)**

BY MR. HARRELL:

3-RenSER-00408                                                    3-RenSER-00408

Q    Sir, did you see a man when you were outside your tent between encounter one and encounter two walking by all the campsites as Mr. Gomez is describing in the clip we just played?

A    As I was walking away from the campground where the ranger station is, away from where all the commotion, I guess, was going, if there was commotion, I don't know.  From what it looks like is Gomez seems pretty scared.  He's inside of his tent, and he's, you know, doing the best he -- you don't want to stop a 911 call, but it looks like he put out a lot of misinformation.

Q    Well, sir, you told us you were calm and cool the entire incident; right?

A    Yeah.  Yes, sir.

Q    And that's part of the reason why you say he couldn't have been calling about you; right?

A    I'm sure he wasn't calling about me.  But I don't know. He did say "fuck."  So he did curse right there.

Q    Okay, sir.  Maybe we'll ask about that when he comes here.  Okay?

A    Okay.

Q    Let me ask you this, sir:  You did hear Mr. Gomez say that he wanted a Code 3 response; right?

A    Yeah.  That was probably bad for a civilian to put someone in danger.

UNITED STATES DISTRICT COURT

Q    One more time now?

A    A civilian putting people in danger because he doesn't know what's going on.  He hasn't even looked out of his tent.  And telling the cops Code 3, they don't know if he works.  So they don't know if it's worse, just like when Renegar said he possible has a gun, that made a situation that wasn't as bad, it made it multiple -- it made it worse.

Q    Okay.  So at this point you're outside of your tent, not doing anything; right?

A    Correct.

Q    And, Mr. Gomez, in your view, by calling 911, is making the situation worse.  Is that what you're telling us?

A    No, I'm saying, like, Code 3, using his Explorer talk -- because he doesn't really know what's going on.  He could hear things, which is good to let -- I hear things, but calling -- "You need to call Code 3" because he knows that vocabulary, I believe, put people in danger.

Q    Okay.  Let me ask you this:  You do understand, due to your participation in the case, that Code 3 is shorthand law enforcement term for emergency lights and sirens, hurry as quickly as you can; right?

A    Right.  And if a cop was involved in that situation and made -- because you know they got their six months of training, they were more likely to give Code 3.  But you have a civilian that's been an Explorer and is very scared.  I believe his

**UNITED STATES DISTRICT COURT**

words of Code 3 were dangerous.

Q   Okay.  So you believe 911 should have ignored Mr. Gomez and not called anybody to go to the scene Code 3; correct?

A   Maybe listen to the deputies.  Call the deputies, see what's going on.  Say you need to get in touch with this guy.  He's saying Code 3.  But he's a civilian, so we're not going to listen to him.  But maybe you need to go and reach in touch with this guy.  He seems to know what's going on.

Q   Do you believe 911 should have listened to people who are civilians that call asking for help with problems they can't handle on their own?  Is that what you're telling us?

A   I'm not saying that at all.  I'm just saying be careful in what you're adding to a 911 call.

Q   And you believe Mr. Gomez was not careful?

A   Correct.

Q   You were fault-free, but Mr. Gomez bears some responsibility here.  Is that what you are telling us?

A   No.  I just believe his added information on the 911 calls kind of added more misinformation.

Q   Okay, sir.  Let's play some additional tape now from Mr. Gomez, same exhibit.

        MR. HARRELL:  Our counter is 1:51, and it ends at 4:07 for a runtime of 2 minutes and 16 seconds.  This is Clip C, Charlie.

        **(Audiotape played, not reported.)**

**UNITED STATES DISTRICT COURT**

3-RenSER-00411                                    3-RenSER-00411

BY MR. HARRELL:

Q   Sir, do you hear Mr. Gomez say, "The same person involved in the domestic battery is the same one who is now walking around and yelling"?  Do you hear him say that?

A   I do hear him say that.

Q   You hear Mr. Gomez say that he recognized the man's voice because the same man was also speaking loudly with the sheriff's department earlier that night on the domestic violence call; right?

A   I hear him say that.

Q   You do admit that you were speaking with the sheriff's department earlier that night during your first encounter with them; true?

A   I had a conversation with the sheriffs, yes.

Q   Well, you also admit that you were speaking loudly at times when you were dealing with the sheriff's department earlier that night; true?

A   Yes.

Q   You weren't making some effort to speak quietly with the sheriff's department the first time you had contact with them; right?

A   Just as -- yeah, we were talking about the same height just as a normal conversation.

Q   All right.  Let's play some more tape.

        THE COURT:  Counsel, is it convenient for you to --

and all the parties to resume tomorrow?

MR. HARRELL:  It most certainly is.  Yes, Your Honor, that's a great idea.

THE COURT:  I'll keep my promise to you.  I said I'll send you home about 4:30, but we've gone over -- a little over that time.  So pardon me.

Please don't discuss this matter.  Anybody talk about the case so we get to start all over again?  Don't do it.  Don't even form or express in your own mind.  Please go home and drive safely.  See you tomorrow at 8:00 o'clock.

Also at 1:00 o'clock, I know that we have a doctor's appointment?

THE JUROR:  No, my appointment is at 4:15.  I just need 30 minutes to get there.

THE COURT:  So 3:30.  On Monday, plan on recessing at 3:30, and maybe we'll just have a -- trim the lunch down a little bit, get a full day in.  Have a good evening.

Mr. Holloway, thank you, sir.  You may step down.

**(Out of the presence of the jury.)**

THE COURT:  Karlen is going to work with you.  I'm going to be back about 6:15 to 6:30.  If one of you has a problem or you need something resolved tonight, I'll come out at 6:15 to 6:30.  If you're here, I'll resolve that.  If you're not here, then go home and rest because you're right in the center of the case.  Better rested you are, the better you're

3-RenSER-00413                    3-RenSER-00413

all going to be, okay?  This is a critical witness.  Renegar will be a critical witness.

Now I've got an appointment tonight.  When Karlen comes back in, you'll talk to her.  I will be out at 6:30.  Whatever you need resolved then, fine.  If you both agree and you want to go home, then meet me tomorrow at 7:30 and I'll resolve whatever you had which was, you know, apparently whatever.  I'll see you at 6:15, 6:30.  I could be a little bit later.  So be patient with me.  So if you're here, I'll come out, I promise you.  But it could be 6:30.  If I go now, I'll be fine, okay.  If you're here, fine.  If not, have a good evening.  We'll see you at 7:30.  Please work with Karlen before you leave.  Thank you.

**(Proceedings concluded at 4:40 p.m.)**

**--oOo--**

3-RenSER-00414                    3-RenSER-00414

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 10, 2025*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

3-RenSER-00415                                    3-RenSER-00415

**$**

**$2,000** [2] - 93:1, 106:9
**$20,000** [9] - 106:17, 113:2, 113:5, 113:7, 115:19, 116:12, 119:22, 120:1, 124:6
**$250,000** [1] - 145:9
**$30,000** [1] - 116:3
**$40,000** [12] - 113:7, 113:22, 114:21, 116:6, 116:9, 116:19, 117:2, 117:13, 117:14, 119:22, 120:4, 120:19
**$60,000** [2] - 112:25, 115:16
**$8,000** [1] - 93:15
**$80,000** [2] - 117:6, 120:4

**'**

**'23** [5] - 110:9, 113:11, 113:12, 113:17, 113:18
**'Holloway** [1] - 40:18
**'I've** [2] - 151:18, 152:12
**'no** [1] - 40:16
**'why** [1] - 38:19

**/**

**/S** [1] - 261:19

**0**

**04:31:39** [1] - 242:6

**1**

**1** [8] - 39:2, 150:24, 163:21, 164:6, 164:9, 165:17, 184:21, 254:22
**1,600** [1] - 138:23
**1,620** [1] - 139:17
**1,900** [1] - 140:3
**1-053** [1] - 1:24
**1-6** [1] - 185:9
**1-9** [1] - 185:9
**1.5** [1] - 99:17
**10** [2] - 36:11, 261:15
**100** [7] - 50:20, 50:21, 50:22, 174:4, 193:8, 247:4
**100-11** [3] - 54:6,
219:18, 219:20
**100-13** [1] - 62:22
**100-3** [1] - 53:4
**100-4** [1] - 53:12
**100-5** [1] - 53:21
**100-6** [1] - 53:22
**100-7** [1] - 53:25
**100-milligram** [1] - 158:13
**101-1** [1] - 174:6
**101-3** [3] - 251:19, 251:20, 251:25
**102** [6] - 34:18, 165:23, 169:22, 197:15, 242:6, 246:19
**102-2** [1] - 28:25
**102-4** [2] - 34:21, 34:22
**102-P** [1] - 169:23
**104** [5] - 10:20, 10:25, 15:4, 28:20
**104-5** [1] - 10:22
**104-6** [2] - 10:23, 11:3
**104-7** [2] - 14:25, 15:2
**10:00** [1] - 46:16
**10:03** [1] - 47:2
**11** [2] - 210:16, 210:24
**1100** [3] - 2:10, 2:18, 2:22
**112** [1] - 218:6
**1150** [1] - 2:14
**12** [2] - 139:16, 218:10
**12:09** [1] - 135:5
**13** [2] - 41:10, 41:12
**14** [6] - 39:2, 94:16, 151:6, 151:12, 185:5, 185:14
**1450** [3] - 2:11, 2:19, 2:23
**148** [1] - 80:3
**149** [1] - 4:5
**15** [8] - 16:5, 46:17, 46:19, 49:3, 70:18, 98:12, 102:7, 185:16
**15-minute** [1] - 47:1
**16** [11] - 70:15, 70:18, 135:17, 135:18, 184:25, 185:4, 185:6, 185:7, 185:8, 185:13, 257:23
**162-F** [1] - 165:18
**1700** [1] - 2:5
**18** [3] - 150:25, 221:20, 224:22
**1800** [1] - 2:15
**19** [11] - 38:6, 38:13, 184:25, 185:4, 185:7, 185:15, 224:19, 224:21,
224:22, 226:12, 226:15
**1:00** [5] - 132:17, 132:22, 133:2, 135:4, 259:11
**1:04** [1] - 135:5
**1:22** [1] - 148:16
**1:38** [1] - 148:16
**1:51** [1] - 257:22
**1st** [2] - 114:11, 116:25

**2**

**2** [5] - 42:21, 224:1, 226:14, 251:22, 257:23
**2,000** [1] - 93:1
**2,500** [4] - 140:21, 140:22, 141:15, 142:1
**20** [25] - 16:5, 19:1, 36:12, 94:19, 107:5, 120:25, 142:7, 151:6, 151:12, 158:5, 158:19, 177:19, 210:16, 210:24, 211:2, 211:6, 211:12, 211:16, 212:3, 212:11, 216:6, 216:21, 226:12, 236:20
**20,000** [4] - 106:11, 106:25, 121:2, 121:3
**20,396** [1] - 136:25
**20-foot** [1] - 9:9
**2011** [1] - 3:9
**2016** [2] - 157:10, 157:22
**2017** [9] - 104:6, 105:19, 112:25, 115:16, 158:5, 158:19, 159:7, 159:20, 160:3
**2018** [20] - 85:16, 86:12, 87:9, 106:1, 106:7, 106:8, 106:11, 106:17, 106:25, 115:16, 119:21, 121:7, 121:13, 121:25, 128:3, 129:19, 135:21, 137:13, 142:19, 161:3
**2019** [5] - 120:15, 120:16, 121:7, 121:8, 125:12
**2020** [31] - 94:19, 97:10, 107:18,
107:20, 107:21, 109:18, 109:22, 109:25, 110:2, 116:1, 119:24, 123:3, 123:7, 123:9, 125:8, 125:17, 125:19, 125:24, 126:4, 127:11, 127:22, 128:13, 128:24, 129:6, 130:4, 138:19, 139:2, 139:16, 139:20, 149:7
**2021** [7] - 107:19, 110:5, 111:4, 116:5, 119:24, 128:24, 150:25
**2022** [10] - 97:23, 98:23, 99:2, 99:9, 101:3, 111:5, 112:23, 113:3, 116:8, 120:1
**2023** [10] - 108:15, 111:2, 111:7, 112:23, 113:6, 113:8, 113:19, 116:19, 120:1, 226:14
**2024** [19] - 108:15, 111:25, 112:1, 113:10, 114:5, 114:6, 114:9, 114:11, 114:12, 114:16, 114:23, 116:25, 118:12, 120:2, 122:24, 123:25, 127:8, 127:12, 129:18
**2025** [3] - 1:13, 5:1, 261:15
**207** [1] - 3:9
**21** [3] - 135:21, 163:20, 164:3
**213-624-8700** [1] - 2:16
**21st** [1] - 161:3
**22,279** [1] - 136:2
**222** [3] - 210:16, 210:20, 210:24
**228-B** [1] - 251:22
**23** [1] - 194:23
**23rd** [1] - 159:6
**24** [5] - 139:11, 139:12, 139:15, 221:20
**243** [2] - 80:3, 81:11
**244** [3] - 173:4, 175:3, 176:12
**245** [1] - 177:24
**26** [1] - 136:20
**27** [1] - 254:22
**28** [2] - 103:25, 261:8
**29** [3] - 104:19, 211:4
**2:27** [1] - 186:11
**2:40** [1] - 186:11

**3**

**3** [17] - 184:21, 217:23, 218:8, 218:10, 218:11, 226:11, 226:12, 255:23, 256:4, 256:13, 256:16, 256:19, 256:24, 257:1, 257:3, 257:6
**3,000** [1] - 104:10
**3,825** [1] - 138:18
**30** [20] - 36:12, 38:11, 106:1, 106:4, 110:6, 110:7, 111:4, 114:13, 114:17, 114:20, 116:6, 117:2, 117:13, 117:14, 120:4, 120:19, 121:2, 184:24, 185:3, 259:14
**30,000** [1] - 110:4
**32** [1] - 252:4
**3:00** [2] - 155:9, 155:12
**3:30** [2] - 259:15, 259:16

**4**

**40** [1] - 121:2
**40,000** [10] - 107:4, 110:6, 110:7, 111:5, 111:6, 111:10, 112:23, 112:24, 114:13, 114:17
**400** [1] - 3:5
**403** [5] - 62:2, 75:9, 86:22, 88:1, 142:16
**41** [2] - 165:15, 194:23
**411** [1] - 1:24
**415** [1] - 41:17
**45** [2] - 132:13, 176:1
**49** [3] - 151:6, 151:11, 151:12
**4:00** [8] - 161:2, 161:17, 162:1, 162:13, 163:5, 164:12, 194:22, 244:25
**4:05** [1] - 245:23
**4:06:58** [1] - 176:2
**4:07** [1] - 257:23

3-RenSER-00416          3-RenSER-00416

**4:13** [1] - 245:23
**4:15** [1] - 259:13
**4:23** [1] - 165:15
**4:24** [1] - 165:17
**4:27:44** [2] - 197:16, 199:18
**4:27:45** [1] - 194:23
**4:28:12** [1] - 204:12
**4:28:14** [2] - 197:16, 199:18
**4:28:21** [1] - 205:13
**4:28:23** [1] - 204:12
**4:28:37** [1] - 205:13
**4:30** [4] - 167:15, 178:25, 183:8, 259:5
**4:31:09** [1] - 246:20
**4:31:50** [1] - 242:7
**4:31:57** [1] - 246:21
**4:40** [1] - 260:14
**4TH** [1] - 1:24

## 5

**5** [11] - 4:4, 16:6, 36:11, 38:11, 78:3, 78:10, 176:1, 218:8, 218:11, 220:22, 220:25
**5,000** [1] - 140:13
**5,425** [1] - 138:18
**5-8** [1] - 141:3
**53** [1] - 254:22
**550** [1] - 220:19
**5:00** [6] - 161:12, 161:17, 162:1, 162:13, 163:5, 164:12
**5:07:00** [1] - 47:15
**5:11:37** [1] - 48:20
**5:12:17** [1] - 49:14

## 6

**6** [9] - 1:8, 16:6, 37:23, 38:6, 39:4, 91:1, 91:3, 91:4
**6-8** [1] - 141:5
**60** [4] - 105:25, 117:6, 117:16, 120:4
**60-** [1] - 117:15
**602** [1] - 41:17
**602(j** [1] - 42:4
**61** [1] - 254:11
**63** [8] - 9:23, 10:1, 172:16, 173:18, 174:21, 175:19, 176:10, 247:24
**65** [6] - 173:11, 174:25, 175:20, 176:13, 178:6, 179:9

**655** [1] - 2:5
**66** [20] - 7:3, 7:5, 8:11, 8:14, 8:16, 10:1, 168:19, 169:2, 171:6, 171:18, 176:19, 177:4, 177:8, 177:17, 179:13, 181:14, 181:16, 240:17, 247:21, 253:9
**67** [1] - 9:21
**68** [2] - 141:2, 141:4
**69** [5] - 80:3, 81:11, 163:8, 163:20, 163:23
**6:00** [1] - 161:12
**6:15** [3] - 259:21, 259:23, 260:8
**6:30** [5] - 259:21, 259:23, 260:4, 260:8, 260:10

## 7

**7** [3] - 107:20, 139:16, 139:20
**70** [3] - 117:6, 163:20, 164:5
**714** [1] - 2:20
**714-823-4100** [1] - 3:6
**714-937-1010** [2] - 2:12, 2:24
**750** [1] - 3:5
**753** [1] - 261:8
**760-274-2110** [1] - 3:10
**778** [2] - 78:1, 78:3
**7953** [2] - 1:23, 261:20
**7:30** [2] - 260:6, 260:12

## 8

**8** [2] - 1:13, 5:1
**80** [1] - 177:18
**818-388-7022** [1] - 2:6
**89** [1] - 217:23
**8:00** [1] - 259:10
**8:05** [2] - 1:14, 5:2
**8:19-cv-01514-DOC-DFM** [1] - 1:7

## 9

**9** [4] - 91:24, 174:1, 224:12, 226:15
**90015** [1] - 2:15
**911** [32] - 172:8, 172:19, 173:1, 173:21, 174:1,

174:2, 174:18, 178:7, 247:9, 248:14, 250:16, 251:5, 251:7, 251:8, 251:11, 251:13, 251:17, 252:22, 253:15, 253:18, 253:23, 253:25, 254:6, 254:10, 254:16, 254:19, 255:10, 256:11, 257:2, 257:9, 257:13, 257:18
**91203** [1] - 2:6
**92011** [1] - 3:10
**92701** [1] - 1:24
**92868** [3] - 2:11, 2:19, 2:23
**92868-4940** [1] - 3:6
**937-1010** [1] - 2:20
**99** [2] - 50:19, 66:10
**99-1** [2] - 66:13, 66:25
**99-10** [2] - 68:14, 69:5
**99-11** [2] - 68:20, 69:6
**99-12** [7] - 68:23, 68:25, 69:2, 69:4, 69:8, 70:5, 70:12
**99-13** [1] - 69:11
**99-14** [6] - 68:24, 69:19, 70:6, 70:12, 70:15, 70:18
**99-15** [2] - 69:21, 70:12
**99-17** [1] - 72:17
**99-18** [1] - 72:22
**99-19** [1] - 73:3
**99-2** [1] - 67:2
**99-20** [1] - 73:10
**99-21** [1] - 73:22
**99-22** [1] - 74:6
**99-23** [1] - 74:9
**99-24** [1] - 74:12
**99-25** [1] - 74:14
**99-26** [1] - 74:19
**99-28** [1] - 74:22
**99-3** [1] - 67:6
**99-30** [1] - 75:5
**99-4** [1] - 67:11
**99-5** [1] - 67:15
**99-6** [1] - 67:22
**99-7** [1] - 67:25
**99-8** [1] - 68:6
**99-9** [1] - 68:13
**9:48** [1] - 47:2

## A

**A.M** [2] - 1:14, 5:2
**a.m** [2] - 47:2
**abiding** [1] - 212:6

**ability** [6] - 42:6, 65:6, 102:4, 102:10, 106:23, 131:8
**able** [31] - 7:14, 26:21, 26:22, 26:23, 26:24, 34:11, 41:24, 46:7, 46:10, 63:21, 68:19, 68:21, 84:4, 84:14, 92:5, 102:12, 102:16, 105:16, 106:18, 116:5, 129:12, 145:11, 149:17, 177:20, 185:2, 219:13, 227:21, 228:16, 231:13, 253:7
**about..** [1] - 41:25
**above-entitled** [1] - 261:11
**absolute** [1] - 132:4
**absolutely** [4] - 37:21, 121:20, 121:21, 134:17
**abuse** [1] - 172:25
**abused** [1] - 172:9
**abutment** [1] - 93:3
**abutment-supported** [1] - 93:3
**acceptable** [1] - 36:22
**access** [4] - 16:3, 41:20, 84:3, 208:1
**accidents** [1] - 117:10
**accord** [1] - 210:17
**according** [1] - 167:15
**accuracy** [1] - 42:22
**accurate** [6] - 43:2, 43:12, 43:18, 82:11, 149:15, 188:23
**accusation** [5] - 40:23, 43:8, 77:18, 110:11, 110:20
**accusative** [1] - 59:4
**accuses** [1] - 59:18
**accusing** [1] - 241:9
**acquittal** [1] - 125:8
**acted** [1] - 244:19
**acting** [1] - 243:20
**action** [1] - 202:20
**actions** [3] - 21:5, 198:9, 202:19
**actively** [2] - 31:24, 32:1
**actual** [4] - 14:24, 50:16, 94:21, 201:21
**acupuncture** [3] - 89:24, 91:20, 143:19
**add** [1] - 192:5
**added** [7] - 215:23, 216:1, 216:2, 216:3, 236:18, 257:18,

257:19
**adding** [2] - 193:3, 257:13
**addition** [1] - 102:2
**additional** [1] - 257:20
**address** [3] - 196:24, 208:20, 209:5
**addressing** [5] - 150:18, 151:17, 152:11, 168:6, 198:6
**adjectives** [1] - 194:18
**adjusting** [1] - 240:2
**admission** [1] - 65:4
**admit** [3] - 223:20, 258:11, 258:15
**admitted** [2] - 154:19, 230:19
**admonish** [2] - 46:1, 130:2
**admonished** [1] - 36:12
**admonition** [2] - 83:3, 128:9
**advance** [1] - 131:23
**advantage** [1] - 245:17
**affect** [2] - 101:21, 102:21
**affected** [4] - 101:19, 103:23, 106:22, 109:9
**afford** [1] - 108:12
**afraid** [5] - 40:14, 86:4, 86:16, 125:24, 126:24
**afternoon** [1] - 161:12
**again..** [1] - 47:12
**agencies** [1] - 104:20
**agency** [3] - 81:2, 81:17, 82:7
**aggravation** [1] - 98:3
**aggressive** [1] - 243:20
**ago** [3] - 131:20, 153:5, 154:14
**agree** [15] - 46:4, 87:3, 96:15, 128:7, 175:18, 195:18, 202:19, 211:18, 213:9, 215:12, 223:22, 229:14, 237:20, 239:11, 260:5
**agreed** [5] - 121:14, 125:14, 210:7, 224:6
**agreeing** [1] - 216:15
**agreement** [19] - 46:5, 128:1, 128:5, 211:10, 211:15, 212:2, 212:10,

3-RenSER-00417          3-RenSER-00417

212:22, 213:16, 214:14, 215:19, 216:6, 216:8, 217:15, 229:12, 236:20, 237:18, 238:7, 238:8

**agreements** [1] - 210:11

**ahead** [2] - 124:25, 156:18

**ahold** [1] - 63:19

**aid** [2] - 46:3, 174:11

**Airport** [1] - 3:9

**al** [1] - 1:7

**alert** [1] - 14:5

**allegation** [3] - 52:16, 70:25, 131:20

**alleged** [1] - 78:12

**allegedly** [2] - 38:24, 118:6

**allow** [13] - 6:9, 35:22, 43:17, 45:13, 45:14, 81:12, 87:6, 103:9, 134:2, 156:7, 229:12, 229:15, 236:21

**allowed** [5] - 77:11, 79:22, 118:3, 119:1, 237:17

**allowing** [3] - 70:11, 103:12, 122:6

**almost** [4] - 34:8, 84:5, 120:5, 201:18

**alone** [3] - 167:3, 167:17, 167:25

**ALSO** [1] - 3:12

**altercation** [3] - 24:16, 130:7, 178:13

**alternates** [4] - 5:8, 47:3, 82:14, 135:10

**ambiguous** [13] - 15:24, 150:13, 157:3, 157:12, 157:23, 164:24, 167:21, 189:5, 203:20, 206:20, 208:25, 217:17, 234:21

**ambulance** [1] - 58:15

**ammunition** [14] - 211:22, 212:24, 213:3, 213:8, 213:18, 213:20, 214:6, 214:8, 214:10, 214:16, 215:21, 215:23, 216:10, 216:11

**ammunitions** [1] - 213:2

**amount** [5] - 92:22,

97:24, 103:21, 119:25, 140:17

**amounts** [1] - 124:6

**Ana** [2] - 102:23, 104:20

**ANA** [3] - 1:14, 1:24, 5:1

**anchor** [2] - 232:18, 232:20

**Angel** [2] - 175:13, 176:19

**angel** [1] - 175:17

**ANGELES** [1] - 261:3

**Angeles** [2] - 2:15, 99:12

**angry** [2] - 38:16, 246:14

**animal** [5] - 63:25, 64:5, 64:22, 228:21, 229:4

**anonymous** [1] - 148:2

**answer** [42] - 9:7, 30:8, 57:2, 57:7, 65:24, 76:14, 77:24, 87:6, 93:7, 144:2, 145:16, 146:24, 151:20, 152:13, 162:20, 167:5, 170:25, 172:5, 185:25, 190:25, 192:25, 193:23, 195:22, 199:24, 200:1, 203:21, 215:13, 216:2, 222:9, 223:14, 225:25, 226:3, 226:5, 226:8, 226:25, 231:5, 231:7, 234:12, 239:1, 249:3, 249:5

**ANSWER** [1] - 226:21

**answered** [17] - 7:22, 155:24, 160:11, 168:13, 171:9, 181:5, 187:15, 187:19, 191:9, 192:21, 195:24, 205:1, 209:10, 209:12, 217:1, 217:2, 247:10

**answering** [5] - 190:17, 200:1, 200:2, 239:20, 247:10

**answers** [7] - 124:24, 149:11, 149:15, 149:17, 154:4, 200:15, 249:20

**anterolisthesis** [1] -

99:17

**anticipate** [1] - 119:10

**anticipating** [1] - 119:11

**anxiety** [4] - 125:13, 157:7, 157:19, 157:20

**anytime** [1] - 45:21

**anyways** [1] - 198:11

**apartment** [3] - 112:3, 119:15, 119:16

**APC** [1] - 2:9

**Apex** [5] - 104:3, 104:9, 104:11, 105:22, 105:24

**APLC** [1] - 2:13

**apologies** [3] - 75:11, 177:15, 200:20

**apologize** [20] - 9:14, 52:23, 61:17, 70:3, 108:16, 132:12, 132:21, 182:11, 200:17, 200:19, 202:6, 212:23, 215:8, 215:11, 221:8, 221:23, 231:2, 241:7, 245:4, 250:24

**apology** [1] - 145:23

**apparent** [1] - 55:18

**appear** [4] - 122:8, 203:10, 203:17, 203:18

**APPEARANCES** [2] - 2:1, 3:1

**appeared** [2] - 152:23, 154:10

**appendage** [1] - 25:12

**application** [1] - 27:24

**applied** [6] - 22:23, 24:23, 25:3, 25:8, 32:12, 33:3

**appointment** [3] - 259:12, 259:13, 260:3

**appreciate** [4] - 100:3, 148:10, 230:9, 234:10

**approach** [2] - 21:14, 223:23

**approached** [2] - 15:7, 51:1

**approaching** [1] - 163:14

**appropriate** [1] - 82:17

**April** [1] - 106:15

**area** [48] - 13:20, 23:7, 24:1, 24:2, 28:10, 51:8, 51:17, 52:3,

52:14, 53:9, 54:2, 65:22, 67:10, 67:17, 67:19, 68:10, 68:13, 68:24, 69:14, 69:19, 70:16, 70:20, 70:21, 71:16, 72:8, 72:9, 72:10, 72:19, 72:24, 75:2, 79:8, 81:10, 89:2, 89:4, 89:20, 106:19, 110:10, 110:15, 110:20, 110:23, 111:5, 111:8, 126:14, 160:24, 172:16, 235:4

**areas** [1] - 76:20

**argue** [4] - 118:11, 123:12, 134:14, 181:21

**argued** [2] - 9:14, 122:5

**arguing** [3] - 6:16, 118:11, 172:25

**argument** [4] - 78:11, 122:19, 122:25, 241:16

**argumentative** [7] - 153:10, 155:18, 157:13, 167:21, 206:21, 216:18, 244:21

**Argumentative** [4] - 6:5, 55:20, 146:20, 166:15

**arm** [5] - 23:8, 23:9, 26:6, 27:10, 67:4

**armed** [1] - 199:8

**armpit** [2] - 67:10, 72:12

**arms** [22] - 16:12, 16:13, 16:21, 17:7, 17:9, 22:9, 22:25, 24:3, 32:20, 33:6, 71:1, 71:5, 71:6, 71:12, 71:17, 71:21, 71:22, 72:3, 72:7, 72:8, 72:9, 72:14

**arrest** [10] - 5:19, 75:18, 125:5, 125:7, 125:16, 238:11, 238:22, 239:14, 252:9, 252:12

**arrested** [3] - 62:11, 80:3, 140:18

**arresting** [1] - 241:11

**arrive** [1] - 183:8

**arrived** [6] - 12:1, 53:6, 54:21, 160:21, 164:16

**arrows** [2] - 13:21,

13:23

**artful** [1] - 124:23

**ascribed** [1] - 43:13

**aside** [7] - 65:12, 106:17, 186:15, 233:12, 240:5, 254:16, 254:19

**asleep** [2] - 179:2, 179:7

**assault** [2] - 73:23, 73:25

**assaulted** [2] - 66:1, 66:3

**asshole** [2] - 248:17, 254:16

**assholes** [9] - 247:5, 247:25, 248:3, 248:9, 248:22, 249:15, 249:22, 250:10, 250:13

**associate** [1] - 185:11

**associated** [1] - 210:7

**assume** [1] - 208:3

**assumed** [3] - 37:20, 87:21, 215:4

**assumes** [2] - 133:25, 146:3

**assuming** [1] - 114:10

**assumptions** [1] - 41:6

**AT** [5] - 2:4, 2:14, 2:18, 2:22, 3:8

**attached** [1] - 61:25

**attack** [1] - 129:16

**attention** [3] - 13:16, 76:19, 173:7

**attitude** [2] - 171:23, 240:4

**Attorney** [1] - 75:23

**ATTORNEY** [5] - 2:4, 2:14, 2:18, 2:22, 3:8

**attorney** [10] - 76:7, 76:8, 80:21, 83:13, 83:18, 135:24, 140:8, 140:12, 142:13, 143:1

**Attorney's** [7] - 80:14, 82:6, 82:8, 82:22, 82:25, 83:10, 83:11

**attorneys** [2] - 81:4, 146:18

**audible** [4] - 38:11, 39:13, 42:11, 211:8

**audio** [16] - 35:25, 36:3, 150:8, 183:15, 194:19, 197:22, 198:13, 199:13, 200:23, 201:4, 201:19, 204:11, 204:12, 242:5,

248:16, 249:13
**audios** [1] - 35:21
**Audiotape** [10] -
174:12, 174:16,
197:17, 242:8,
246:22, 248:20,
250:3, 252:5,
254:24, 257:25
**audiotape** [5] -
197:20, 202:7,
203:1, 244:8, 246:20
**August** [8] - 94:19,
106:15, 139:16,
149:7, 150:25,
224:1, 226:14
**automatically** [1] -
24:16
**available** [1] - 65:8
**Avenue** [1] - 2:5
**avoid** [5] - 45:1,
107:14, 117:24,
196:10, 196:23
**avoided** [1] - 196:19
**avoiding** [1] - 198:6
**awake** [2] - 8:20,
252:17
**awarded** [1] - 44:12
**aware** [4] - 52:18,
56:1, 209:23, 246:7
**awesome** [1] - 235:19
**awful** [1] - 132:14
**axe** [14] - 11:15, 49:6,
49:14, 54:5, 54:8,
206:15, 207:4,
220:9, 220:10,
220:24, 226:20,
237:22, 239:12

**B**

**baby's** [1] - 208:5
**background** [4] -
124:17, 126:3,
198:4, 198:7
**backpack** [8] - 10:15,
50:18, 54:12, 54:14,
55:5, 55:10, 220:4,
235:6
**backpacks** [4] - 10:17,
12:1, 54:24, 219:24
**backwards** [1] - 26:8
**bad** [3] - 180:1,
255:24, 256:6
**badge** [1] - 190:19
**badgering** [4] - 154:5,
181:5, 194:11,
214:18
**badly** [2] - 145:19
**baffling** [1] - 38:21
**bail** [2] - 63:21, 141:19

**bailed** [2] - 63:18,
63:22
**balance** [2] - 76:4,
141:12
**balancing** [1] - 77:16
**ballistic** [3] - 26:18,
73:25, 74:2
**ballpark** [2] - 107:1,
117:6
**bantering** [1] - 38:5
**BAR** [14] - 231:19,
231:21, 231:22,
232:1, 232:2, 232:4,
232:5, 232:8,
232:22, 233:5,
233:10, 233:11,
233:14, 233:24
**barbecue** [1] - 15:11
**barbs** [1] - 25:2
**barely** [2] - 14:9, 17:17
**Barrister** [1] - 105:10
**barrister** [1] - 105:12
**based** [5] - 46:12,
82:18, 83:7, 92:25,
143:22
**basic** [1] - 241:10
**basis** [2] - 81:22,
156:9
**battered** [1] - 240:12
**battery** [1] - 258:3
**Beach** [7] - 84:19,
88:13, 88:16, 88:23,
89:7, 91:7, 136:23
**bear** [6] - 156:21,
235:12, 235:15,
235:16, 236:6, 236:9
**bears** [3] - 235:1,
236:10, 257:16
**beat** [1] - 250:19
**beaten** [6] - 23:23,
27:18, 59:1, 105:16,
164:22, 165:6
**beating** [6] - 25:15,
31:14, 166:25,
223:16, 250:15,
250:17
**beatings** [1] - 65:4
**became** [1] - 209:23
**become** [1] - 24:17
**becoming** [2] - 124:4,
237:13
**bed** [4] - 12:18, 61:25,
84:16, 161:11
**bedridden** [1] - 84:14
**bedtime** [1] - 158:14
**begin** [3] - 36:2,
126:10, 148:21
**beginning** [2] - 13:14,
38:10
**behalf** [1] - 148:22

**behind** [3] - 54:10,
73:9, 177:2
**beings** [1] - 229:5
**belief** [1] - 103:12
**bells** [1] - 172:20
**belonged** [1] - 146:7
**bench** [1] - 83:2
**benefit** [1] - 122:6
**best** [28] - 11:8, 15:9,
23:24, 24:13, 26:7,
46:1, 69:18, 94:11,
149:17, 170:25,
171:24, 172:4,
174:9, 180:1, 180:6,
180:24, 184:20,
186:19, 194:1,
200:1, 200:19,
226:5, 244:12,
247:11, 249:4,
249:21, 255:9
**better** [10] - 34:8,
34:10, 72:25, 87:11,
112:15, 172:6,
192:6, 240:4, 259:25
**between** [14] - 10:1,
42:8, 114:13,
114:17, 116:6,
116:25, 117:2,
126:21, 175:8,
178:9, 252:18,
252:25, 253:12,
255:2
**beyond** [2] - 121:13,
137:6
**bickering** [1] - 80:15
**big** [10] - 25:10, 67:13,
68:2, 73:9, 154:20,
154:21, 154:22,
155:4, 185:21, 215:3
**Big** [2] - 220:22,
220:25
**bigger** [1] - 25:10
**bilateral** [1] - 97:7
**bill** [1] - 136:9
**billing** [14] - 135:14,
135:17, 135:24,
136:4, 136:13,
136:17, 137:17,
137:23, 138:17,
139:1, 139:4,
139:16, 139:24
**billings** [1] - 138:15
**bills** [2] - 136:7,
136:22
**binder** [2] - 217:25,
218:3
**birth** [1] - 115:5
**Birth** [1] - 115:6
**bit** [26] - 6:12, 6:14,
11:17, 15:12, 32:21,

54:3, 57:23, 61:2,
83:24, 86:8, 101:16,
109:16, 156:3,
156:18, 161:10,
170:12, 171:1,
175:13, 180:4,
193:3, 221:22,
224:12, 240:1,
246:13, 259:17,
260:8
**black** [2] - 22:1, 55:12
**blacked** [1] - 22:3
**blackout** [2] - 20:17,
22:17
**blade** [3] - 55:7,
221:18, 228:12
**blame** [3] - 39:15,
39:16
**blankets** [1] - 57:18
**blatant** [1] - 44:9
**bleeding** [7] - 23:11,
31:21, 31:25, 48:6,
52:6, 52:7, 68:7
**blind** [1] - 20:16
**block** [1] - 23:8
**blocking** [1] - 27:11
**blood** [21] - 23:9,
23:15, 23:16, 23:18,
25:13, 52:9, 52:10,
52:23, 53:2, 53:9,
53:13, 53:14, 53:16,
53:18, 54:1, 58:4,
61:3, 68:5, 68:7
**bloodied** [1] - 74:20
**bloody** [1] - 63:2
**blow** [4] - 21:24,
21:25, 30:4, 71:17
**blue** [8] - 73:12, 173:8,
173:11, 175:11,
175:14, 175:15,
175:17, 224:11
**blurted** [1] - 126:20
**boat** [1] - 133:18
**bobcat** [1] - 235:8
**bobcats** [1] - 235:1
**BODNAR** [1] - 3:8
**body** [21] - 24:23,
24:25, 26:7, 28:6,
28:8, 29:3, 32:14,
32:22, 33:5, 33:6,
33:8, 59:2, 67:2,
71:12, 72:17, 72:23,
74:21, 82:23, 166:1
**bone** [2] - 92:6, 92:7
**booking** [2] - 62:21,
65:12
**books** [1] - 110:4
**boom** [1] - 20:11
**boot** [3] - 67:21,
74:24, 233:17

**Borba** [2] - 207:13,
207:17
**Borba's** [1] - 207:11
**borrowed** [3] - 141:17,
141:21, 142:2
**bothering** [1] - 246:8
**bottom** [2] - 55:8,
67:21
**bought** [2] - 55:4,
233:1
**bowl** [2] - 12:19, 12:22
**boxes** [2] - 210:22,
210:24
**brace** [1] - 58:3
**brain** [4] - 61:4,
180:14, 180:16,
227:13
**branch** [1] - 233:7
**brand** [2] - 101:25,
232:5
**brand-new** [1] -
101:25
**break** [17] - 47:1,
148:6, 148:10,
148:11, 186:3,
214:24, 230:5,
230:12, 237:3,
239:19, 241:13,
244:25, 245:5,
245:13, 245:20,
245:22
**breathe** [3] - 22:21,
31:2, 31:4
**Brian** [7] - 168:9,
172:20, 172:22,
173:5, 173:17,
250:18, 250:19
**brief** [5] - 22:17,
58:17, 101:6,
173:21, 227:4
**briefly** [15] - 11:7,
29:4, 43:11, 58:1,
79:15, 81:21, 85:18,
87:9, 91:6, 91:17,
119:24, 120:11,
178:23, 179:4,
233:17
**bring** [5] - 76:6, 77:1,
79:7, 151:9, 198:13
**bringing** [2] - 103:5,
131:5
**broken** [6] - 11:21,
55:14, 74:4, 220:9,
220:19, 220:24
**brought** [9] - 27:19,
44:12, 79:12, 79:21,
80:13, 82:17, 119:6,
130:16, 185:3
**Brown** [7] - 48:21,
49:11, 49:14, 49:22,

3-RenSER-00419                                                3-RenSER-00419

50:5, 50:15, 54:13
**bruise** [8] - 52:13, 67:5, 67:6, 68:12, 72:18, 72:22, 73:8, 73:9
**bruises** [6] - 52:6, 67:18, 67:20, 72:12, 72:13, 74:16
**bruising** [3] - 52:14, 65:6, 73:6
**Bryan** [2] - 3:14, 252:3
**bucks** [1] - 142:1
**buddies** [1] - 24:15
**buddy** [1] - 24:4
**bulge** [1] - 99:18
**bullied** [2] - 61:22, 62:1
**bully** [1] - 240:1
**bullying** [5] - 171:24, 202:20, 205:21, 205:25, 206:4
**bunch** [3] - 57:11, 64:2, 235:25
**bundles** [1] - 234:14
**burn** [1] - 60:25
**business** [2] - 84:3, 84:4
**butt** [1] - 24:2
**buttocks** [2] - 72:24, 74:12
**buy** [1] - 234:14
**BY** [213] - 2:4, 2:14, 3:8, 4:4, 5:16, 6:7, 6:22, 9:3, 9:10, 11:5, 13:11, 15:5, 15:18, 16:2, 17:4, 21:19, 26:1, 26:15, 29:11, 30:2, 30:11, 31:6, 31:18, 32:6, 33:1, 33:10, 33:16, 33:24, 36:5, 47:9, 47:14, 47:23, 48:4, 48:9, 48:15, 48:19, 49:5, 49:13, 49:21, 50:4, 51:18, 51:25, 54:7, 54:19, 55:23, 56:12, 57:10, 61:18, 62:5, 62:9, 63:13, 64:12, 65:15, 66:7, 66:11, 66:16, 69:13, 70:24, 71:10, 71:19, 72:6, 73:5, 73:20, 83:16, 86:11, 87:8, 88:2, 91:5, 92:2, 93:10, 94:18, 95:10, 97:3, 98:11, 99:14, 100:24, 101:9, 103:15, 104:2, 105:4, 105:9, 135:12, 135:19,

136:21, 137:16, 138:6, 138:16, 138:22, 139:14, 141:8, 142:24, 143:11, 144:6, 145:10, 145:25, 146:13, 147:8, 147:16, 147:19, 149:2, 150:17, 151:15, 152:8, 153:12, 153:19, 154:3, 154:8, 155:3, 155:14, 155:20, 156:2, 156:17, 157:5, 157:16, 157:25, 158:7, 158:12, 159:10, 160:2, 160:13, 161:24, 162:11, 162:23, 163:16, 164:2, 164:8, 165:2, 165:11, 166:5, 166:20, 167:23, 168:16, 169:1, 169:20, 170:1, 170:17, 171:14, 172:12, 174:13, 174:17, 175:4, 176:4, 179:22, 180:15, 180:23, 181:10, 181:23, 183:25, 184:16, 185:19, 186:14, 187:11, 187:16, 187:21, 188:5, 189:1, 189:10, 190:7, 190:21, 191:2, 191:11, 192:24, 194:2, 194:16, 195:1, 197:18, 200:22, 203:16, 204:14, 205:15, 206:25, 209:1, 209:14, 211:9, 214:20, 215:1, 215:6, 216:20, 217:9, 217:14, 217:22, 218:14, 219:5, 219:11, 221:10, 222:21, 223:10, 224:10, 224:23, 225:5, 225:8, 225:14, 225:21, 226:13, 229:22, 229:25, 230:15, 231:12, 234:18, 234:24, 236:4, 237:9, 237:16, 239:4, 241:21, 242:9, 246:2,

246:23, 248:21, 250:4, 252:6, 254:25, 258:1

## C

**CA** [1] - 1:24
**cage** [10] - 67:4, 67:9, 67:16, 68:24, 69:19, 70:16, 70:20, 71:11, 71:14, 71:16
**cages** [1] - 71:6
**calf** [2] - 24:1, 28:10
**California** [30] - 2:6, 2:11, 2:15, 2:19, 2:23, 3:6, 3:10, 85:10, 88:4, 88:6, 93:17, 93:18, 93:20, 106:22, 108:7, 110:17, 113:3, 113:7, 115:18, 116:13, 124:15, 137:18, 138:24, 141:18, 141:22, 147:9, 147:11, 147:14, 147:20, 261:7
**CALIFORNIA** [4] - 1:2, 1:14, 5:1, 261:4
**CALLED** [1] - 4:4
**caller** [2] - 254:16, 254:19
**callers** [1] - 248:2
**calm** [19] - 8:9, 172:6, 193:11, 193:18, 193:20, 193:22, 194:3, 194:4, 194:5, 200:6, 200:10, 200:25, 242:10, 242:16, 242:21, 243:2, 243:23, 244:9, 255:12
**calmed** [1] - 242:24
**calmer** [1] - 171:2
**calmest** [1] - 242:15
**calming** [1] - 180:4
**cam** [2] - 29:3, 166:1
**camera** [4] - 15:15, 66:17, 69:23, 184:8
**camp** [2] - 10:13, 233:17
**camped** [1] - 85:13
**campers** [2] - 251:1, 254:6
**campground** [18] - 8:4, 60:14, 64:6, 64:11, 86:18, 87:10, 167:19, 182:21, 183:5, 183:6, 208:6, 246:15, 248:4,

251:9, 254:9, 254:15, 254:18, 255:5
**camping** [12] - 54:10, 55:11, 65:6, 85:3, 196:15, 229:17, 229:18, 233:3, 233:5, 236:8, 237:20, 237:24
**campsite** [45] - 5:19, 7:24, 8:3, 8:8, 9:23, 10:3, 10:4, 11:6, 14:16, 18:24, 31:11, 50:14, 56:14, 60:6, 60:8, 60:15, 110:18, 172:9, 172:14, 175:8, 176:20, 179:11, 206:15, 207:5, 207:9, 208:4, 219:22, 220:3, 220:21, 226:20, 226:22, 229:17, 234:20, 240:12, 246:8, 248:23, 249:24, 252:14, 252:15, 252:20, 253:14, 254:13
**Campsite** [29] - 7:3, 7:5, 8:11, 8:14, 8:16, 9:21, 9:23, 168:19, 169:2, 171:6, 171:18, 173:11, 173:17, 174:21, 174:25, 175:19, 175:20, 176:10, 176:13, 177:4, 177:8, 177:17, 178:6, 179:9, 179:13, 181:14, 181:16, 240:17, 253:9
**campsite's** [1] - 6:16
**campsites** [5] - 6:16, 9:18, 9:19, 60:10, 255:3
**candidly** [1] - 129:24
**cannot** [4] - 31:1, 122:5, 130:17, 130:18
**cans** [1] - 94:12
**car** [11] - 8:5, 47:15, 56:13, 56:19, 56:20, 57:19, 106:20, 106:21, 117:8, 184:5, 229:9
**card** [1] - 141:10
**care** [5] - 37:20, 84:23, 91:9, 145:18, 150:7
**Care** [1] - 99:10
**careful** [2] - 257:12,

257:14
**carefully** [1] - 39:4
**Carlsbad** [1] - 3:10
**carry** [3] - 55:7, 235:3, 235:4
**carrying** [3] - 35:22, 239:19, 245:3
**cars** [2] - 13:13, 177:2
**CARTER** [1] - 1:3
**cartilage** [1] - 98:4
**Case** [1] - 1:6
**case** [28] - 36:14, 43:16, 46:13, 55:3, 55:5, 65:20, 76:15, 76:24, 82:9, 82:25, 87:22, 121:11, 132:23, 134:15, 146:19, 149:5, 150:11, 152:21, 156:4, 158:8, 170:12, 185:1, 209:23, 213:9, 238:17, 256:19, 259:8, 259:25
**case-in-chief** [1] - 43:16
**cast** [2] - 55:16, 73:19
**CAT** [1] - 122:12
**catch** [1] - 186:2
**CATHERINE** [1] - 2:14
**caused** [6] - 44:6, 108:24, 110:22, 114:22, 238:21, 239:9
**causes** [2] - 40:18, 108:1
**causing** [5] - 154:23, 155:5, 155:22, 156:23, 168:10
**cease** [1] - 188:2
**cell** [2] - 69:21, 69:22
**center** [4] - 14:16, 104:5, 104:13, 259:25
**Central** [2] - 2:5, 261:7
**CENTRAL** [1] - 1:2
**certain** [13] - 34:8, 37:3, 39:12, 42:10, 107:9, 107:12, 132:17, 162:9, 163:1, 177:8, 177:16, 205:6, 220:16
**certainly** [2] - 133:9, 259:2
**certainty** [1] - 92:9
**CERTIFICATE** [1] - 261:1
**certification** [1] - 45:22

3-RenSER-00420                    3-RenSER-00420

**certified** [3] - 37:18, 45:20, 156:5
**Certified** [1] - 1:5
**certify** [1] - 261:7
**cetera** [10] - 10:8, 25:14, 41:18, 42:4, 58:20, 79:2, 99:18, 138:3, 156:9, 156:16
**Chad** [1] - 47:25
**CHAD** [1] - 3:3
**chain** [1] - 61:24
**challenge** [1] - 129:14
**chance** [2] - 125:23, 224:18
**changed** [6] - 15:11, 50:17, 108:22, 109:9, 126:11, 203:25
**chaos** [1] - 24:18
**charge** [2] - 108:3, 197:9
**charged** [1] - 140:17
**charges** [30] - 73:23, 76:2, 76:3, 76:6, 76:8, 76:10, 76:11, 77:17, 77:20, 78:18, 79:4, 80:4, 80:18, 80:20, 80:22, 81:14, 82:17, 82:21, 82:25, 83:1, 83:5, 83:7, 83:12, 83:17, 119:15, 125:7, 140:9, 140:10, 140:18, 152:23
**Charlie** [1] - 257:24
**cheap** [1] - 220:25
**cheaper** [1] - 116:15
**check** [10] - 6:18, 15:20, 33:11, 42:21, 58:4, 60:6, 61:3, 61:4, 104:15, 218:12
**checked** [1] - 65:3
**checking** [2] - 58:6, 90:1
**checks** [1] - 124:17
**cheekbone** [2] - 51:16, 51:17
**chest** [5] - 70:21, 72:8, 72:9, 72:10
**chief** [1] - 43:16
**child** [1] - 126:9
**choice** [1] - 108:11
**choked** [2] - 22:20, 30:24
**chokehold** [1] - 30:21
**chopped** [3] - 234:6, 234:12, 234:14
**chose** [2] - 197:9, 197:13
**CHRISTIE** [1] - 3:8

**chronically** [1] - 98:5
**Cinnamon** [2] - 194:9
**circle** [10] - 51:19, 51:23, 199:7, 218:13, 221:3, 221:6, 227:16, 228:5, 228:8, 228:10
**circles** [1] - 220:11
**Circuit's** [1] - 81:23
**circumstances** [1] - 108:22
**cite** [1] - 218:13
**citizen** [1] - 29:22
**City** [1] - 3:5
**city** [2] - 64:3, 102:23
**civil** [1] - 145:23
**civilian** [5] - 243:10, 255:24, 256:2, 256:24, 257:6
**civilians** [1] - 257:10
**claim** [10] - 75:19, 75:20, 107:13, 162:24, 173:14, 186:15, 192:3, 192:17, 234:25, 244:19
**claimed** [18] - 25:17, 129:7, 150:2, 161:16, 161:25, 162:12, 164:11, 164:15, 184:18, 186:21, 187:12, 188:6, 191:25, 193:7, 193:10, 195:6, 200:7, 234:19
**claims** [1] - 244:1
**Clark** [2] - 81:10
**clean** [5] - 52:25, 54:15, 54:22, 74:5, 223:8
**cleaning** [1] - 48:10
**clear** [25] - 8:15, 34:9, 41:5, 45:10, 45:11, 45:17, 50:21, 51:17, 51:20, 79:10, 79:18, 80:1, 98:20, 100:16, 108:14, 108:18, 122:18, 129:3, 187:4, 208:12, 214:12, 220:18, 230:25, 249:2
**clearly** [5] - 38:22, 39:25, 41:3, 42:12, 152:2
**clicks** [1] - 32:7
**client** [13] - 44:6, 76:16, 80:2, 80:4, 80:5, 80:9, 81:11, 81:12, 81:18, 81:25, 91:2, 121:10, 125:25

**client's** [4] - 75:21, 76:9, 125:5, 130:16
**clients** [4] - 75:25, 76:15, 86:23, 152:17
**clinic** [3] - 88:17, 89:9, 90:1
**clinics** [1] - 104:13
**Clip** [3] - 246:21, 252:4, 257:23
**clip** [8] - 168:8, 169:23, 194:24, 199:13, 199:16, 243:4, 251:21, 255:3
**close** [6] - 74:10, 76:19, 152:13, 197:24, 199:5, 211:22
**close-up** [1] - 74:10
**closed** [2] - 64:1, 125:8
**closest** [1] - 72:1
**clothes** [7] - 10:16, 56:14, 57:20, 57:21, 70:1, 74:18
**cnaltsas@lynberg. com** [1] - 2:16
**Code** [11] - 80:2, 255:23, 256:4, 256:13, 256:16, 256:19, 256:24, 257:1, 257:3, 257:6, 261:8
**Coke** [2] - 94:12, 97:8
**cold** [1] - 12:14
**Cole's** [2] - 112:19, 114:1
**collateral** [5] - 79:21, 79:24, 124:4, 130:16, 143:5
**collect** [1] - 235:25
**COLLINS** [4] - 3:4, 3:8
**colloquy** [3] - 170:15, 170:16, 236:1
**colonoscopy** [1] - 115:3
**column** [1] - 122:10
**combat** [6] - 232:3, 232:9, 232:10, 232:22, 233:16, 233:22
**combination** [1] - 118:20
**comfortable** [2] - 204:20, 204:21
**comfortably** [1] - 203:24
**coming** [13] - 12:19, 13:24, 14:4, 20:12, 20:13, 20:24, 25:1, 53:18, 68:5, 81:6,

108:4, 126:11, 175:21
**command** [14] - 14:13, 14:20, 16:15, 19:5, 21:6, 21:8, 192:1, 192:3, 192:4, 192:5, 192:6, 192:13, 192:15, 192:18
**commands** [4] - 14:15, 18:6, 20:15, 188:16
**comment** [4] - 79:17, 188:25, 237:12, 248:10
**comments** [1] - 79:14
**commit** [2] - 206:2, 206:4
**common** [1] - 219:7
**commotion** [2] - 255:6, 255:7
**communicate** [1] - 19:23
**communicating** [1] - 182:6
**community** [2] - 91:9, 182:7
**compare** [1] - 103:23
**compensation** [1] - 108:12
**compilation** [1] - 136:22
**complain** [4] - 7:12, 44:14, 132:1
**complained** [2] - 142:10, 142:11
**complaining** [3] - 45:4, 45:8, 47:17
**complaint** [9] - 7:14, 7:15, 142:12, 142:21, 142:22, 142:25, 143:9, 182:20, 183:4
**complaints** [3] - 102:20, 182:4, 182:15
**complete** [1] - 32:15
**completed** [3] - 133:25, 228:5, 228:10
**completely** [8] - 112:9, 123:10, 125:6, 125:21, 160:7, 186:20, 212:9, 254:13
**completing** [3] - 153:3, 153:5, 153:8
**complied** [1] - 14:20
**complies** [2] - 100:8, 221:9
**comply** [3] - 212:3,

212:11, 212:19
**Compound** [1] - 15:22
**compute** [1] - 120:2
**computer** [1] - 184:6
**concern** [13] - 124:13, 124:21, 197:7, 199:7, 199:9, 206:16, 208:6, 208:7, 223:19, 238:21, 241:6, 243:13, 254:7
**concerned** [18] - 13:4, 13:5, 40:2, 65:20, 86:3, 109:4, 118:24, 121:20, 131:16, 131:19, 132:5, 134:24, 146:14, 206:18, 223:16, 251:24, 251:25
**concerning** [16] - 17:3, 30:8, 36:14, 77:3, 79:20, 99:25, 109:7, 110:12, 121:19, 123:17, 124:22, 126:9, 127:12, 129:8, 130:3, 144:25
**concerns** [14] - 122:17, 127:9, 131:11, 132:3, 186:17, 186:24, 187:14, 188:8, 203:11, 203:15, 208:1, 208:21, 209:6, 237:24
**concise** [1] - 200:15
**concluded** [2] - 250:14, 260:14
**conclusion** [3] - 147:7, 239:15, 241:15
**concrete** [1] - 83:3
**concussion** [3] - 58:5, 90:5, 118:21
**condition** [5] - 58:24, 97:17, 97:24, 98:3, 121:24
**conditions** [3] - 156:8, 156:16, 156:20
**conduct** [4] - 131:14, 182:4, 182:15, 182:21
**conducted** [2] - 184:18, 185:23
**Conference** [1] - 261:12
**confirm** [4] - 96:10, 96:20, 133:17, 133:22
**confirmation** [1] -

3-RenSER-00421          3-RenSER-00421

95:11
**confirmed** [2] - 94:25, 101:1
**confirming** [1] - 97:2
**confirms** [1] - 99:19
**confiscated** [1] - 146:8
**conformance** [1] - 261:12
**confront** [1] - 236:11
**confrontation** [1] - 129:21
**confrontational** [1] - 6:3
**confronted** [1] - 147:21
**confused** [3] - 17:15, 98:18, 125:3
**confusion** [2] - 40:18, 51:22
**connection** [2] - 129:25, 152:23
**Connor** [1] - 81:22
**conscious** [2] - 59:2, 122:16
**consequences** [1] - 238:8
**consider** [3] - 81:24, 217:10, 219:6
**consideration** [1] - 217:7
**considered** [2] - 233:24, 234:3
**conspiracy** [2] - 41:18, 41:22
**constantly** [2] - 90:12, 130:11
**construction** [2] - 102:11, 102:15
**consumptive** [3] - 124:5, 224:4, 237:13
**contact** [8] - 161:16, 161:25, 162:12, 164:11, 183:23, 194:19, 246:16, 258:20
**content** [1] - 142:21
**context** [4] - 217:20, 222:2, 223:19, 223:21
**continual** [1] - 144:4
**continue** [13] - 29:25, 47:7, 49:11, 83:23, 89:7, 97:9, 100:23, 107:24, 132:23, 160:4, 164:5, 231:11, 246:1
**continued** [13] - 3:1, 5:12, 5:15, 97:10, 101:5, 117:4,

117:12, 123:2, 135:11, 154:14, 159:15, 159:21, 186:13
**continuing** [2] - 101:7, 143:17
**continuously** [1] - 146:18
**contract** [2] - 103:19, 105:22
**contractor** [1] - 84:7
**contracts** [2] - 84:7, 104:20
**control** [6] - 80:20, 127:2, 134:2, 193:16, 242:13, 242:18
**controlled** [1] - 203:8
**controlling** [1] - 134:4
**convenience** [1] - 245:15
**convenient** [1] - 258:25
**conversation** [13] - 6:8, 10:9, 35:24, 38:10, 38:11, 40:15, 41:25, 58:16, 77:12, 172:2, 177:13, 258:14, 258:23
**convicted** [2] - 154:19, 155:22
**conviction** [4] - 146:17, 154:16, 209:17
**convince** [1] - 166:25
**cool** [10] - 193:11, 193:18, 194:5, 200:6, 200:25, 242:10, 242:21, 243:23, 244:9, 255:12
**cop** [3] - 180:25, 247:6, 256:22
**copied** [1] - 29:7
**copiers** [1] - 88:10
**cops** [13] - 8:12, 12:19, 147:25, 160:24, 180:2, 180:7, 188:17, 191:10, 199:11, 226:9, 242:25, 253:11, 256:4
**copy** [11] - 7:17, 35:4, 37:14, 101:20, 101:23, 102:2, 104:4, 156:5, 156:12, 218:1, 224:7
**cord** [1] - 220:19
**CORINNE** [1] - 2:22
**Corona** [1] - 104:14

**Corps** [13] - 153:14, 153:17, 153:20, 153:22, 153:25, 232:4, 232:12, 232:15, 232:19, 232:24, 233:12, 234:3
**correct** [122] - 5:20, 14:1, 18:5, 18:8, 25:22, 29:15, 39:14, 40:10, 40:11, 43:3, 46:5, 57:4, 77:13, 84:8, 93:12, 96:14, 110:12, 110:13, 113:1, 113:9, 115:15, 116:4, 126:15, 141:14, 141:16, 149:20, 149:23, 149:24, 150:3, 151:24, 152:24, 152:25, 153:21, 158:2, 158:17, 159:5, 159:7, 159:13, 159:22, 160:24, 161:18, 162:2, 162:14, 163:18, 164:13, 166:2, 167:16, 168:19, 168:20, 172:9, 172:13, 172:23, 173:8, 173:13, 173:15, 173:16, 173:18, 173:19, 174:19, 174:22, 174:25, 175:10, 175:16, 175:20, 176:11, 176:13, 176:14, 176:18, 176:23, 177:9, 178:2, 178:7, 178:8, 178:25, 179:1, 182:10, 183:15, 184:19, 186:18, 186:24, 189:13, 189:22, 191:20, 196:1, 196:20, 196:21, 197:10, 204:6, 204:9, 204:10, 207:9, 209:25, 210:3, 210:4, 210:8, 211:16, 211:17, 211:24, 213:5, 216:11, 219:7, 219:21, 220:6, 222:3, 227:3, 227:16, 228:10, 229:2, 232:12, 233:8, 236:13, 240:7, 240:20,

241:25, 251:6, 251:11, 252:19, 256:10, 257:3, 257:15, 261:9
**correctly** [4] - 172:15, 172:17, 211:23, 231:4
**cost** [5] - 93:13, 117:20, 143:16, 144:22, 146:9
**Costco** [13] - 114:4, 114:5, 114:9, 114:10, 114:17, 114:21, 116:23, 117:6, 117:12, 117:23, 120:4, 123:5
**costs** [5] - 135:15, 136:14, 142:3, 143:12
**COUNSEL** [1] - 2:1
**Counsel** [75] - 13:8, 34:25, 47:7, 51:12, 51:15, 56:7, 61:15, 68:25, 81:7, 82:4, 85:24, 86:9, 86:25, 87:20, 87:25, 97:2, 99:21, 100:8, 105:2, 113:13, 123:20, 131:16, 137:5, 138:15, 139:9, 141:6, 143:9, 145:1, 146:10, 151:10, 156:7, 161:23, 181:20, 184:23, 185:2, 185:6, 185:16, 186:7, 186:12, 187:5, 189:7, 190:6, 200:21, 203:13, 210:19, 210:21, 217:4, 217:24, 218:2, 218:5, 218:10, 218:11, 224:2, 224:21, 225:3, 226:11, 230:6, 231:4, 231:11, 234:17, 237:6, 237:7, 237:12, 241:16, 241:20, 244:24, 245:1, 245:10, 245:14, 245:15, 245:19, 245:22, 245:24, 251:20, 258:25
**counsel** [54] - 5:6, 5:7, 5:9, 25:24, 29:3, 34:22, 36:9, 36:10, 36:15, 36:22, 37:2, 38:1, 39:4, 39:16,

40:14, 42:19, 45:13, 46:19, 47:4, 70:9, 75:12, 75:17, 80:24, 83:14, 100:19, 103:14, 107:8, 107:11, 114:20, 117:23, 119:5, 124:10, 127:12, 128:2, 128:11, 129:23, 130:4, 131:13, 132:5, 133:1, 133:20, 134:7, 135:9, 138:20, 139:7, 142:5, 148:14, 148:18, 151:14, 154:6, 160:10, 170:16, 184:13, 245:25
**counsel's** [2] - 126:2, 132:22
**count** [2] - 32:18, 47:24
**counter** [4] - 199:17, 242:6, 254:22, 257:22
**counting** [1] - 22:4
**Country** [3] - 2:10, 2:18, 2:22
**County** [10] - 75:22, 78:12, 81:3, 82:22, 85:5, 85:6, 85:8, 87:13, 103:20, 142:12
**COUNTY** [2] - 1:7, 261:3
**couple** [8] - 19:3, 47:10, 92:21, 102:5, 109:11, 118:4, 158:19, 159:11
**course** [8] - 32:20, 43:25, 89:16, 98:18, 123:24, 209:22, 210:6, 238:10
**COURT** [446] - 1:1, 1:23, 5:6, 6:6, 6:21, 9:2, 9:6, 10:22, 11:3, 13:8, 15:2, 15:23, 17:2, 21:18, 25:24, 26:13, 28:19, 28:23, 29:2, 29:5, 29:7, 30:7, 32:25, 34:16, 34:19, 34:22, 35:11, 35:16, 35:18, 35:20, 36:7, 36:9, 36:19, 36:25, 37:7, 37:10, 37:13, 37:16, 37:19, 38:1, 38:5, 38:10, 39:8, 39:11, 39:21, 39:24, 40:13, 43:15,

3-RenSER-00422          3-RenSER-00422

43:23, 44:1, 44:4, 44:8, 44:20, 45:13, 46:4, 46:7, 46:19, 46:25, 47:3, 48:12, 51:14, 51:22, 54:18, 55:22, 56:4, 56:6, 56:9, 57:2, 57:6, 61:15, 62:4, 62:8, 63:9, 63:11, 64:9, 65:14, 65:22, 66:13, 68:25, 69:3, 69:5, 69:8, 69:10, 70:2, 70:5, 70:9, 70:17, 70:23, 71:9, 71:14, 73:2, 73:4, 73:18, 75:10, 75:14, 76:2, 76:22, 77:1, 77:6, 77:12, 77:16, 77:22, 78:5, 78:8, 78:14, 78:21, 79:1, 79:16, 80:11, 81:6, 81:19, 82:2, 82:4, 82:14, 85:20, 86:3, 86:6, 86:8, 86:24, 87:3, 87:5, 87:16, 87:19, 87:25, 91:3, 92:1, 93:6, 95:3, 95:9, 95:14, 95:18, 95:21, 95:23, 96:1, 96:4, 96:6, 96:8, 96:13, 96:15, 96:18, 96:23, 97:1, 98:7, 98:14, 98:17, 99:2, 99:4, 99:6, 99:8, 99:11, 99:21, 99:25, 100:6, 100:9, 100:13, 100:16, 100:19, 100:22, 103:3, 103:9, 104:24, 105:2, 105:7, 107:6, 107:11, 107:21, 107:23, 109:7, 109:21, 109:24, 110:5, 110:7, 110:10, 110:14, 110:22, 111:1, 111:4, 111:7, 111:10, 111:12, 111:15, 111:18, 111:20, 111:23, 111:25, 112:5, 112:8, 112:11, 112:13, 112:23, 113:2, 113:5, 113:10, 113:13, 113:15, 113:18, 113:21, 113:24, 114:2, 114:5, 114:8, 114:14, 114:19, 115:1, 115:6, 115:11, 115:14,

115:21, 115:24, 116:1, 116:5, 116:8, 116:12, 116:16, 116:19, 116:25, 117:4, 117:11, 117:16, 117:19, 118:9, 118:17, 118:23, 119:4, 120:11, 120:19, 121:1, 121:15, 121:18, 122:4, 122:15, 123:4, 123:14, 124:10, 124:21, 125:22, 127:4, 127:7, 127:20, 127:24, 128:11, 128:17, 128:22, 129:6, 129:12, 129:21, 130:1, 130:12, 131:10, 131:25, 132:9, 132:12, 132:16, 133:1, 133:7, 133:9, 133:12, 133:24, 134:11, 134:17, 134:21, 135:1, 135:7, 135:18, 137:5, 137:10, 137:14, 138:5, 138:14, 138:21, 139:8, 139:10, 139:12, 141:1, 141:3, 141:5, 142:5, 142:17, 142:20, 143:4, 143:8, 144:1, 144:25, 145:4, 145:7, 145:15, 146:5, 146:10, 146:22, 146:24, 147:2, 147:18, 148:6, 148:11, 148:18, 150:15, 151:1, 151:4, 151:7, 151:10, 151:13, 153:11, 153:18, 154:6, 155:7, 155:19, 155:25, 156:7, 156:13, 156:15, 157:4, 157:14, 157:24, 158:10, 160:10, 161:23, 162:8, 162:15, 162:17, 162:19, 163:11, 163:24, 164:25, 165:7, 165:16, 165:19, 165:22, 165:25, 166:3, 166:17, 167:22, 168:11, 168:14,

168:25, 169:17, 170:16, 171:11, 172:11, 173:24, 174:2, 174:7, 174:15, 179:17, 179:21, 180:11, 180:13, 180:21, 181:7, 181:19, 184:3, 184:13, 184:22, 185:1, 185:6, 185:8, 185:10, 185:13, 185:16, 186:1, 186:6, 186:10, 186:12, 187:4, 187:8, 187:10, 188:2, 188:25, 189:7, 190:6, 190:15, 190:24, 191:7, 192:23, 194:13, 200:21, 203:13, 203:21, 206:22, 208:23, 209:8, 210:18, 210:21, 211:1, 211:3, 214:19, 214:25, 216:19, 217:4, 217:19, 217:24, 218:2, 218:7, 218:9, 219:1, 219:4, 219:10, 223:2, 223:4, 223:7, 223:24, 224:2, 224:4, 224:7, 224:21, 225:3, 225:7, 225:11, 225:16, 225:25, 226:3, 226:7, 226:11, 230:3, 230:6, 230:10, 230:13, 231:3, 231:7, 231:11, 234:11, 234:16, 234:22, 236:3, 237:5, 237:12, 238:1, 238:25, 241:16, 244:22, 244:24, 245:1, 245:6, 245:8, 245:10, 245:14, 245:19, 245:24, 251:18, 251:20, 251:23, 252:2, 258:25, 259:4, 259:15, 259:20, 261:6

**Court** [27] - 35:8, 35:10, 76:5, 76:18, 77:10, 77:11, 78:7, 80:12, 80:20, 81:12, 81:15, 81:16,

107:14, 114:16, 120:15, 120:17, 122:22, 126:10, 133:22, 134:15, 134:22, 156:11, 165:20, 174:5, 218:1, 261:6, 261:20
**court** [26] - 66:5, 76:19, 81:6, 122:21, 125:8, 126:22, 128:4, 128:9, 129:5, 130:18, 131:5, 152:22, 153:1, 153:4, 153:6, 154:10, 154:11, 165:1, 187:22, 196:16, 208:24, 209:16, 223:4, 244:9, 244:18
**Court's** [11] - 44:9, 77:25, 78:2, 78:3, 78:20, 79:24, 109:10, 122:17, 131:22, 132:20
**courteous** [1] - 205:17
**courtesy** [5] - 5:9, 40:22, 42:18, 201:4, 205:4
**courthouse** [1] - 168:10
**COURTROOM** [2] - 186:5, 211:7
**courtroom** [3] - 37:9, 152:22, 196:18
**cover** [2] - 71:24, 135:14
**covered** [7] - 52:5, 52:8, 52:11, 85:22, 86:6, 143:12, 228:3
**covering** [1] - 71:6
**COVID** [9] - 110:2, 116:2, 119:23, 120:18, 123:8, 125:9, 125:17, 125:20, 128:25
**crate** [1] - 57:17
**credit** [3] - 129:24, 138:10, 141:10
**crime** [5] - 81:25, 82:1, 82:9, 153:2, 154:11
**crimes** [3] - 41:15, 75:7, 82:8
**criminal** [8] - 65:20, 83:18, 140:12, 152:23, 182:4, 182:15, 182:20, 183:23
**critical** [2] - 260:1, 260:2

**criticism** [2] - 41:2, 114:15
**Cross** [1] - 4:5
**cross** [20] - 17:10, 46:14, 51:14, 74:17, 103:11, 119:5, 123:16, 134:4, 148:7, 148:12, 148:21, 149:1, 168:25, 186:13, 187:22, 192:25, 200:12, 237:6, 245:2, 245:15
**cross-examination** [15] - 46:14, 51:14, 103:11, 119:5, 123:16, 134:4, 148:7, 148:12, 148:21, 149:1, 168:25, 186:13, 237:6, 245:2, 245:15
**Cross-Examination** [1] - 4:5
**crown** [1] - 93:3
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 261:20
**cswiss@ccllp.law** [1] - 3:11
**CT** [1] - 88:19
**cumulative** [1] - 236:2
**cupping** [2] - 89:25, 143:20
**cure** [1] - 144:9
**curse** [11] - 197:2, 197:19, 198:6, 201:7, 201:11, 201:14, 240:22, 241:4, 241:6, 241:7, 255:18
**cursed** [6] - 195:25, 196:16, 198:2, 201:18, 202:1, 242:1
**cursing** [15] - 196:11, 196:19, 196:23, 197:13, 198:1, 198:12, 199:19, 200:5, 200:24, 201:8, 201:9, 201:19, 202:7, 203:5, 204:18
**cursor** [1] - 55:3
**curt** [1] - 46:20
**custody** [5] - 159:6, 159:14, 159:20, 160:3, 160:7
**cut** [8] - 63:2, 67:24, 201:23, 228:21, 228:25, 230:20, 241:12

UNITED STATES DISTRICT COURT

# D

**damage** [4] - 64:14, 92:14, 118:7, 235:15
**damaged** [2] - 11:18, 63:3
**damages** [25] - 45:5, 45:6, 80:7, 86:1, 87:2, 103:6, 109:3, 109:5, 109:6, 121:10, 121:13, 121:15, 121:21, 123:23, 125:15, 129:7, 130:15, 130:16, 130:20, 130:21, 130:24, 131:7, 131:9, 143:6, 145:5
**danger** [5] - 188:21, 255:25, 256:2, 256:17
**dangerous** [30] - 123:21, 211:20, 212:20, 213:15, 214:6, 214:15, 215:20, 216:9, 217:12, 218:16, 219:12, 221:24, 222:6, 222:16, 223:11, 225:22, 226:18, 226:21, 229:13, 229:15, 229:16, 235:8, 235:12, 236:6, 236:15, 236:21, 238:23, 239:3, 239:19, 257:1
**dark** [6] - 7:11, 14:7, 62:14, 74:16, 176:24, 178:12
**date** [15] - 128:8, 128:10, 137:6, 142:5, 153:4, 154:15, 154:23, 155:5, 155:21, 156:25, 161:17, 162:1, 162:13, 164:12, 184:1
**Date** [1] - 261:15
**dates** [1] - 142:7
**daughter** [9] - 158:21, 159:4, 159:6, 159:14, 159:17, 159:20, 159:23, 160:3, 160:8
**DAVID** [1] - 1:3
**DAY** [1] - 1:8
**days** [9] - 63:14, 63:15, 66:18, 105:16, 114:25,

131:20, 152:21, 154:10, 154:15
**de** [4] - 6:11, 20:2, 119:25, 198:15
**de-escalate** [1] - 6:11
**de-escalation** [2] - 20:2, 198:15
**deadly** [34] - 211:21, 212:21, 213:1, 213:2, 213:15, 214:6, 214:15, 215:20, 216:9, 217:12, 218:16, 219:12, 221:24, 222:17, 223:11, 225:22, 226:2, 226:9, 226:18, 227:9, 227:10, 227:12, 227:13, 227:14, 233:25, 234:4, 235:8, 235:12, 236:6, 236:16, 236:21, 237:17, 238:23
**deal** [7] - 126:13, 126:14, 126:15, 147:6, 154:20, 154:22, 155:4
**dealing** [9] - 102:8, 124:5, 150:5, 150:10, 152:16, 152:19, 160:15, 180:7, 258:16
**dealt** [4] - 78:22, 79:11, 80:11, 104:4
**death** [2] - 16:20, 23:20
**Debbie** [1] - 261:20
**DEBBIE** [3] - 1:23, 261:5, 261:19
**December** [1] - 115:8
**decide** [7] - 35:11, 82:8, 93:13, 127:12, 130:4, 130:5, 130:6
**decided** [2] - 80:21, 82:25
**decides** [3] - 76:8, 128:12, 131:13
**decision** [4] - 76:5, 127:11, 131:11, 132:5
**decisions** [1] - 75:22
**declaration** [1] - 45:21
**declared** [1] - 45:20
**decorating** [1] - 233:4
**decreases** [1] - 117:20
**defendant** [3] - 39:17, 40:5, 107:16
**DEFENDANT** [2] - 2:8, 3:3

**defendant's** [1] - 78:2
**defendants** [1] - 37:21
**Defendants** [1] - 1:8
**defense** [16] - 3:14, 39:17, 40:22, 42:17, 43:10, 43:17, 43:19, 45:21, 78:10, 81:1, 83:18, 108:4, 123:23, 128:3, 140:12, 235:10
**defense's** [1] - 124:12
**degree** [1] - 92:9
**delay** [1] - 132:19
**deliberations** [1] - 45:25
**Demerol** [1] - 101:14
**dental** [4] - 91:25, 118:6, 118:7, 137:21
**dentist** [5] - 90:15, 90:19, 91:21, 92:8
**denture** [4] - 92:18, 92:23, 93:4, 93:11
**Department** [1] - 142:12
**department** [8] - 19:24, 82:23, 142:10, 252:11, 258:8, 258:12, 258:16, 258:20
**dependent** [1] - 108:5
**depicted** [1] - 219:20
**deposition** [10] - 11:2, 95:1, 95:8, 95:12, 149:5, 149:16, 162:5, 162:22, 163:8, 187:2
**depth** [1] - 119:6
**Deputies** [1] - 37:9
**deputies** [55] - 5:19, 35:21, 36:21, 36:25, 41:2, 47:6, 80:19, 150:9, 160:15, 160:21, 161:1, 167:14, 167:18, 168:18, 169:4, 171:7, 171:13, 171:17, 172:8, 183:8, 189:11, 193:18, 194:20, 198:7, 199:18, 200:5, 200:24, 201:5, 236:12, 237:21, 238:21, 239:5, 239:24, 240:22, 241:4, 241:22, 243:25, 244:6, 244:16, 246:3, 246:7, 246:15, 246:25, 247:14, 247:15,

247:19, 247:25, 250:25, 251:5, 254:5, 254:8, 257:4
**deputy** [11] - 20:23, 76:7, 203:10, 204:17, 206:13, 207:3, 207:16, 207:18, 207:24, 208:1, 220:2
**DEPUTY** [2] - 186:5, 211:7
**Deputy** [51] - 6:2, 6:3, 6:4, 20:23, 21:14, 29:3, 34:20, 50:14, 51:6, 54:13, 71:1, 148:22, 150:19, 151:18, 152:11, 165:14, 165:24, 166:12, 168:6, 169:23, 170:4, 170:20, 171:19, 171:20, 177:4, 177:13, 177:25, 179:23, 181:3, 194:21, 198:6, 201:7, 201:14, 202:15, 202:25, 203:3, 204:12, 204:15, 205:7, 205:16, 206:11, 207:11, 207:13, 207:17, 241:23, 242:5, 246:19, 248:17, 249:24, 250:7
**deputy's** [3] - 197:23, 208:19, 209:4
**describe** [4] - 32:11, 51:10, 51:19, 85:18
**described** [2] - 22:1, 95:1
**describing** [1] - 255:3
**descriptive** [1] - 193:4
**desiccation** [1] - 99:16
**designed** [1] - 228:22
**desk** [1] - 102:6
**desperately** [1] - 107:13
**detain** [1] - 190:20
**detained** [2] - 29:21, 30:15
**deteriorated** [1] - 123:12
**determination** [4] - 41:21, 82:24, 83:7, 96:12
**dhinospaan@yahoo. com** [1] - 1:25
**diagnosis** [10] - 94:7,

94:25, 96:11, 96:16, 96:21, 97:5, 99:22, 99:25, 100:25, 157:15
**diagnostic** [2] - 88:16, 89:16
**diagram** [6] - 10:18, 11:1, 11:6, 11:9, 14:20, 20:21
**diagrammed** [1] - 14:21
**Diego** [1] - 94:4
**difference** [1] - 169:13
**different** [29] - 15:11, 15:13, 20:14, 34:7, 35:21, 35:24, 41:15, 55:7, 78:17, 81:2, 89:8, 89:9, 98:19, 98:22, 104:13, 109:11, 109:16, 148:2, 174:9, 177:14, 186:21, 188:16, 193:23, 194:18, 195:19, 208:5, 212:9, 213:24
**differential** [2] - 119:25, 124:6
**differentiated** [1] - 120:1
**differently** [1] - 109:11
**digging** [2] - 199:8, 203:25
**digital** [1] - 69:23
**diminished** [1] - 119:21
**Direct** [1] - 4:4
**DIRECT** [1] - 5:15
**direct** [7] - 5:12, 47:7, 77:24, 122:24, 128:7, 135:11, 154:4
**directed** [4] - 247:2, 247:6, 247:18, 250:12
**directing** [1] - 250:17
**direction** [11] - 6:25, 7:2, 7:5, 20:12, 25:1, 26:9, 169:10, 172:15, 172:16, 175:23, 177:1
**directions** [1] - 38:2
**directly** [4] - 68:10, 125:12, 125:14, 246:12
**dirt** [2] - 52:23, 54:16
**disagree** [6] - 44:3, 44:7, 44:10, 44:17, 126:10, 215:13
**disc** [3] - 97:24, 99:16, 99:18
**discontinued** [1] -

101:6
**discretion** [2] - 83:13, 86:9
**discuss** [3] - 36:12, 132:23, 259:7
**discussed** [8] - 5:18, 87:2, 93:24, 94:6, 95:8, 109:12, 109:13, 210:13
**discussing** [1] - 95:7
**discussion** [6] - 36:19, 36:22, 37:1, 38:2, 119:13, 124:1
**discussions** [2] - 122:7, 128:10
**dismissed** [1] - 80:10
**disorder** [1] - 157:19
**dispatch** [1] - 173:25
**dispersed** [3] - 55:11, 229:18, 235:4
**displacement** [1] - 97:25
**display** [1] - 72:5
**disputing** [1] - 163:2
**disregard** [4] - 44:9, 63:12, 128:9, 130:3
**disregarded** [1] - 129:5
**disrespectful** [1] - 244:14
**distinguishing** [1] - 227:8
**distress** [23] - 80:8, 80:10, 87:2, 87:24, 109:5, 109:8, 121:13, 125:15, 127:18, 129:9, 130:19, 130:24, 137:14, 143:7, 154:24, 155:6, 155:23, 156:23, 159:15, 159:21, 160:4, 238:19, 238:20
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [10] - 75:23, 80:14, 82:6, 82:8, 82:22, 82:25, 83:10, 83:11, 261:6, 261:7
**district** [5] - 76:7, 76:8, 80:21, 81:4, 83:13
**disturb** [1] - 237:5
**disturbance** [3] - 18:16, 252:8, 254:2
**disturbing** [1] - 20:1
**divalproex** [1] - 90:9
**DIVISION** [1] - 1:2
**docked** [1] - 105:17

**doctor** [19] - 61:7, 95:15, 95:18, 95:23, 96:11, 98:14, 98:15, 98:19, 98:21, 98:23, 98:25, 100:11, 100:14, 100:17, 108:17, 122:8, 129:24, 137:22
**doctor's** [2] - 143:23, 259:11
**doctored** [2] - 201:21, 201:23
**doctors** [4] - 97:16, 104:16, 108:18, 138:2
**Document** [2] - 78:1, 78:3
**document** [11] - 91:6, 104:23, 104:25, 105:3, 105:8, 105:10, 105:11, 106:12, 140:19, 216:14, 217:3
**documentation** [1] - 140:2
**documents** [4] - 144:25, 209:15, 209:21, 210:7
**dog** [7] - 57:17, 63:24, 63:25, 146:5, 146:6
**domestic** [32] - 150:9, 160:22, 161:3, 162:18, 166:10, 166:13, 167:18, 169:5, 169:6, 169:11, 170:4, 170:21, 171:6, 172:24, 176:9, 177:3, 177:8, 177:16, 178:19, 182:21, 183:4, 183:9, 189:2, 189:12, 190:9, 194:20, 252:8, 252:13, 254:2, 254:6, 258:3, 258:8
**done** [31] - 8:22, 17:23, 23:3, 25:5, 31:9, 31:14, 44:1, 58:4, 61:4, 90:10, 94:19, 101:4, 109:2, 126:19, 130:23, 143:19, 160:18, 164:6, 172:4, 221:4, 221:11, 224:17, 225:1, 236:17, 240:18, 240:21, 241:3, 243:9, 247:17
**door** [11] - 60:6, 107:13, 107:14,

108:5, 108:21, 109:14, 118:1, 124:22, 126:6, 126:17, 173:15
**doors** [1] - 131:21
**doubt** [4] - 42:22, 122:6, 196:7, 236:9
**down** [83] - 7:12, 8:9, 14:23, 19:8, 19:11, 19:18, 19:19, 20:6, 22:5, 22:14, 23:1, 23:22, 23:23, 25:3, 25:20, 26:2, 26:25, 27:2, 27:4, 27:18, 28:9, 28:14, 32:13, 36:16, 38:12, 41:9, 52:20, 52:22, 69:3, 70:7, 71:20, 89:12, 95:3, 100:6, 100:10, 104:23, 105:3, 119:22, 120:1, 120:17, 121:1, 121:2, 135:3, 141:13, 147:6, 180:4, 187:23, 189:11, 189:17, 189:19, 189:20, 190:9, 190:11, 191:12, 191:14, 191:15, 191:19, 191:22, 194:10, 197:7, 198:13, 202:16, 202:22, 203:1, 203:23, 205:16, 205:17, 206:13, 207:3, 214:22, 223:17, 224:19, 224:21, 225:19, 228:9, 230:5, 240:3, 240:5, 242:24, 243:7, 243:19, 259:16, 259:18
**downturn** [1] - 119:24
**downward** [1] - 119:22
**Dr** [21] - 88:14, 88:18, 93:17, 93:22, 93:24, 94:4, 94:17, 95:8, 95:11, 95:19, 96:3, 97:10, 99:20, 118:22, 138:17, 139:1, 139:15, 139:21, 140:3, 145:2
**draw** [4] - 220:11, 221:3, 221:6, 228:3
**drawing** [1] - 228:1
**drawn** [12] - 11:1, 14:3, 14:5, 14:7, 16:16, 17:20, 18:25,

20:25, 26:22, 81:9, 81:18, 227:16
**drew** [3] - 10:19, 11:7, 20:21
**dripping** [1] - 52:9
**drive** [1] - 259:10
**Drive** [1] - 3:5
**drop** [3] - 107:3, 134:14, 203:11
**dropping** [1] - 203:15
**drug** [3] - 64:17, 64:18, 158:1
**duct** [1] - 52:14
**due** [2] - 101:6, 256:18
**dug** [1] - 243:18
**dumped** [4] - 10:15, 10:16, 11:14, 220:4
**duress** [5] - 189:19, 191:10, 191:14, 208:15, 208:17
**during** [42] - 5:21, 10:2, 43:16, 62:12, 84:21, 105:15, 133:5, 147:4, 178:22, 178:24, 184:18, 185:23, 189:11, 190:8, 193:11, 193:19, 195:25, 196:4, 197:3, 197:20, 197:22, 198:12, 200:23, 201:16, 201:22, 201:24, 202:1, 202:7, 202:25, 205:22, 206:10, 207:6, 207:13, 233:17, 237:17, 239:6, 239:23, 240:22, 241:4, 252:17, 253:17, 258:12
**duties** [1] - 101:22

## E

**eagerly** [1] - 126:16
**eagle** [1] - 232:18
**ear** [8] - 51:15, 67:13, 67:14, 68:7, 68:8, 68:13, 73:9
**early** [3] - 63:4, 163:4, 181:17
**earn** [7] - 111:5, 114:10, 114:12, 115:16, 116:9, 116:19, 117:1
**earned** [12] - 111:1, 112:6, 112:7, 112:25, 113:7, 113:18, 113:22,

114:16, 114:17, 116:1, 116:12, 120:20
**earning** [5] - 112:24, 113:2, 113:5, 114:20, 124:7
**Eastvale** [1] - 104:14
**easy** [1] - 56:21
**eaten** [1] - 229:6
**effect** [8] - 8:21, 9:17, 59:24, 77:17, 79:24, 88:1, 170:21, 181:1
**effort** [10] - 5:21, 5:25, 186:17, 186:23, 187:13, 188:7, 198:13, 241:12, 243:12, 258:19
**EGA** [2] - 232:16, 232:18
**eggshell** [1] - 121:24
**eight** [2] - 106:15, 115:18
**either** [15] - 10:22, 15:21, 40:6, 41:19, 46:12, 82:18, 102:13, 118:25, 120:8, 240:14, 243:15, 245:15, 245:16, 251:24, 253:4
**elbow** [1] - 22:7
**elected** [1] - 189:14
**elective** [1] - 108:9
**electricity** [1] - 32:14
**elementaries** [1] - 102:24
**elementary** [1] - 103:18
**elevate** [1] - 116:5
**emblem** [6] - 232:11, 232:14, 232:24, 233:12, 233:14, 234:4
**emergency** [2] - 88:21, 256:20
**emotional** [24] - 80:7, 80:10, 87:1, 87:23, 109:5, 109:7, 110:18, 121:12, 125:15, 127:18, 129:8, 130:19, 130:24, 137:14, 143:7, 154:24, 155:6, 155:23, 156:23, 159:15, 159:21, 160:4, 238:19, 238:20
**emotionally** [7] - 84:21, 150:2, 150:5, 150:10, 152:15,

158:23, 181:25
**employed** [1] - 120:5
**employees** [1] - 129:22
**employer** [1] - 126:2
**employers** [1] - 124:17
**employment** [3] - 114:3, 114:22, 120:15
**emptied** [1] - 186:19
**encounter** [41] - 5:18, 57:4, 57:6, 150:9, 162:15, 162:19, 169:4, 169:5, 183:7, 183:10, 189:2, 189:12, 190:9, 191:18, 205:22, 206:10, 207:9, 207:14, 209:4, 235:2, 239:6, 239:15, 239:23, 239:25, 240:22, 240:25, 241:1, 241:2, 241:5, 246:4, 251:6, 252:18, 252:19, 252:25, 253:1, 253:13, 253:17, 254:8, 255:2, 258:12
**encountered** [1] - 236:12
**encourage** [1] - 42:9
**end** [5] - 41:9, 46:22, 115:22, 145:22, 151:25
**ended** [6] - 54:3, 87:15, 90:19, 90:20, 112:20, 144:18
**ends** [3] - 126:23, 254:22, 257:22
**enforcement** [31] - 164:20, 165:3, 165:4, 166:9, 172:7, 176:8, 179:9, 181:14, 181:17, 182:3, 182:14, 182:20, 183:3, 183:11, 183:22, 186:16, 186:23, 187:13, 188:7, 246:4, 246:9, 250:14, 252:18, 252:19, 252:25, 253:1, 253:13, 253:18, 254:1, 254:10, 256:20
**enormous** [1] - 131:4
**entered** [2] - 119:15, 119:16

**entering** [1] - 123:21
**entire** [16] - 27:13, 35:7, 182:24, 183:14, 185:23, 193:11, 193:19, 194:5, 239:23, 242:22, 243:24, 244:9, 244:13, 255:12
**entirely** [3] - 41:5, 82:22, 188:23
**entirety** [1] - 122:2
**entitled** [3] - 96:15, 121:15, 261:11
**entry** [1] - 176:2
**epidural** [2] - 101:14, 144:5
**episode** [1] - 123:8
**equals** [1] - 120:4
**equipment** [1] - 237:20
**erase** [1] - 228:2
**erased** [1] - 221:5
**escalate** [1] - 6:11
**escalation** [2] - 20:2, 198:15
**escorted** [1] - 60:17
**especially** [1] - 90:8
**ESQ** [2] - 2:10, 3:4
**estimate** [1] - 116:6
**estimated** [2] - 117:15, 134:22
**et** [11] - 1:7, 10:8, 25:14, 41:18, 42:4, 58:20, 79:2, 99:18, 138:3, 156:9, 156:16
**evacuation** [1] - 168:10
**evaluation** [4] - 82:5, 82:16, 83:6, 83:12
**evening** [7] - 42:24, 133:13, 133:15, 133:21, 161:7, 259:17, 260:12
**event** [6] - 53:1, 62:15, 72:15, 125:11, 160:14, 177:24
**events** [3] - 150:6, 150:11, 152:15
**eventually** [2] - 22:15, 116:23
**everywhere** [1] - 23:21
**evidence** [23] - 45:11, 45:14, 46:2, 46:5, 46:11, 66:3, 78:11, 79:22, 82:15, 82:16, 83:3, 146:4, 158:6, 158:9, 173:4, 174:3, 174:10, 176:1,

178:1, 179:16, 240:14, 242:6, 251:17
**exacerbated** [2] - 119:1, 122:2
**exacerbation** [1] - 122:1
**exact** [4] - 109:1, 160:6, 169:7, 169:19
**exactly** [9] - 91:21, 98:3, 172:3, 172:18, 186:16, 186:23, 187:13, 188:7, 188:14
**Examination** [2] - 4:4, 4:5
**EXAMINATION** [2] - 5:15, 149:1
**examination** [19] - 5:12, 46:14, 47:7, 51:14, 103:11, 119:5, 123:16, 131:14, 134:4, 134:6, 135:11, 148:7, 148:12, 148:21, 168:25, 186:13, 237:6, 245:2, 245:15
**example** [3] - 56:23, 97:14, 123:3
**except** [4] - 18:1, 122:9, 179:6, 240:7
**exceptions** [3] - 192:4, 194:6, 237:19
**excessive** [1] - 81:23
**excited** [1] - 221:8
**exclude** [1] - 78:10
**excluded** [3] - 76:22, 78:16, 79:1
**excluding** [1] - 250:18
**excuse** [4] - 130:10, 136:18, 229:21, 229:24
**excused** [1] - 36:24
**exhibit** [11] - 10:18, 28:23, 37:25, 139:6, 139:12, 140:25, 141:1, 165:20, 165:22, 251:18, 257:21
**Exhibit** [29] - 10:20, 91:1, 91:3, 91:4, 91:24, 94:16, 98:12, 103:25, 104:19, 106:1, 106:4, 135:17, 135:18, 136:18, 136:20, 139:11, 139:15, 165:23, 169:22, 173:4, 176:1,

176:12, 177:24, 197:15, 210:16, 210:20, 219:18, 242:6, 246:19
**EXHIBITS** [1] - 4:15
**exist** [2] - 15:12, 155:11
**existed** [1] - 155:10
**exited** [1] - 186:19
**expect** [2] - 8:19, 18:22
**expended** [1] - 108:10
**expensive** [1] - 108:11
**experience** [7] - 78:12, 78:14, 82:19, 83:8, 116:22, 145:22, 147:6
**experienced** [1] - 147:4
**experiences** [2] - 78:18, 79:1
**expert** [2] - 118:15, 122:21
**experts** [3] - 41:1, 131:5
**explain** [11] - 6:9, 9:14, 94:11, 122:18, 132:12, 146:19, 171:16, 186:25, 241:23, 249:2, 249:3
**explained** [9] - 92:14, 94:11, 97:8, 180:4, 196:6, 238:11, 238:14, 249:17, 249:19
**explaining** [1] - 168:7
**explains** [1] - 119:24
**explanation** [3] - 19:12, 125:25, 126:20
**Explorer** [2] - 256:13, 256:25
**express** [4] - 29:16, 31:13, 36:13, 259:9
**expressed** [1] - 127:9
**extend** [1] - 137:6
**extended** [2] - 16:22, 17:10
**extension** [1] - 78:20
**extra** [4] - 55:4, 194:6, 215:24
**extraordinarily** [1] - 123:21
**extremely** [2] - 131:7
**eye** [17] - 23:6, 23:17, 23:20, 31:21, 52:7, 52:11, 52:12, 55:18, 61:9, 68:16, 69:5, 69:7, 71:24, 73:1, 73:8, 90:8

**eyeglasses** [1] - 90:9
**eyes** [5] - 13:22, 68:5, 186:2, 229:16, 239:2

**F**

**face** [35] - 21:24, 22:11, 22:14, 22:18, 23:8, 23:12, 25:3, 25:21, 26:25, 27:2, 30:4, 32:1, 47:17, 50:24, 51:3, 51:5, 52:1, 52:2, 52:3, 52:5, 52:22, 52:24, 52:25, 53:2, 57:24, 66:24, 68:1, 68:19, 71:20, 92:3, 92:12, 150:4, 191:24, 226:23, 238:8
**Face** [1] - 19:19
**faces** [1] - 175:18
**facility** [2] - 144:17, 144:20
**facing** [3] - 76:5, 80:9, 175:8
**fact** [16] - 39:17, 40:17, 41:25, 81:13, 93:17, 118:19, 118:21, 142:22, 143:8, 150:8, 150:18, 159:6, 195:6, 196:3, 202:15, 228:20
**facts** [1] - 146:3
**factual** [1] - 156:9
**fair** [5] - 111:1, 113:21, 119:11, 124:25, 126:6
**fairly** [2] - 52:25, 193:21
**fairness** [1] - 79:4
**faith** [2] - 42:3, 127:19
**fake** [2] - 248:2, 248:14
**fall** [1] - 26:8
**falling** [2] - 40:1, 52:17
**false** [3] - 75:18, 193:19, 250:7
**familiar** [2] - 232:11, 232:20
**family** [1] - 147:10
**far** [19] - 15:20, 49:1, 63:6, 95:15, 106:19, 108:13, 108:24, 115:21, 121:20, 130:3, 143:16, 146:14, 171:16, 172:14, 198:15, 230:1, 247:24,

3-RenSER-00426          3-RenSER-00426

250:16
**Farahmand** [1] - 3:13
**fashion** [1] - 228:24
**fast** [3] - 21:14, 30:23, 188:19
**fault** [4] - 132:13, 132:20, 132:22, 257:16
**fault-free** [1] - 257:16
**favors** [1] - 135:1
**fear** [2] - 147:3, 243:19
**fearing** [1] - 238:3
**FEDERAL** [2] - 1:23, 261:5
**Federal** [1] - 261:20
**feelings** [1] - 146:14
**fees** [1] - 64:2
**feet** [6] - 16:5, 16:6, 26:8, 49:3, 176:25, 221:21
**feigned** [1] - 71:17
**Felony** [1] - 140:21
**felony** [8] - 146:16, 154:13, 154:16, 154:20, 154:22, 155:4, 155:22, 209:17
**felt** [31] - 19:14, 21:24, 21:25, 24:21, 24:22, 24:25, 25:16, 27:16, 29:21, 30:4, 32:12, 51:8, 53:18, 61:22, 61:25, 119:13, 145:17, 145:18, 145:19, 147:21, 147:22, 148:1, 188:16, 188:21, 188:22, 193:2, 193:5, 198:11, 203:23
**fetal** [2] - 33:7, 33:8
**few** [3] - 36:10, 100:10, 193:15
**field** [2] - 82:16, 83:6
**fight** [12] - 5:22, 6:16, 9:13, 33:20, 169:6, 169:12, 171:8, 171:18, 171:21, 179:24, 181:11, 233:18
**fighting** [10] - 23:24, 24:12, 24:13, 24:14, 25:12, 27:17, 28:4, 32:21, 34:2, 172:25
**figure** [3] - 23:2, 23:4, 197:4
**file** [3] - 78:2, 80:19, 145:13
**filed** [7] - 76:3, 76:10, 76:23, 78:2, 119:16,

140:9, 142:11
**filing** [1] - 77:17
**fill** [1] - 92:21
**fills** [1] - 92:6
**final** [1] - 144:5
**finally** [2] - 63:21, 64:4
**findings** [1] - 99:15
**fine** [14] - 46:24, 81:16, 81:17, 112:4, 121:1, 121:3, 126:4, 135:2, 137:10, 149:8, 212:18, 260:5, 260:11
**finish** [8] - 42:17, 133:25, 153:18, 230:6, 230:10, 231:5, 231:7, 234:12
**finished** [2] - 97:10, 134:6
**finishing** [1] - 153:6
**fire** [4] - 11:18, 55:8, 161:10, 220:25
**firearm** [9] - 211:21, 212:24, 212:25, 214:8, 214:10, 215:3, 215:22, 216:10, 216:11
**firearms** [11] - 210:13, 212:4, 213:2, 213:3, 213:8, 213:18, 213:20, 214:7, 214:16, 215:3, 215:21
**fired** [2] - 115:22, 124:14
**firepit** [2] - 15:14, 49:17
**firm** [2] - 204:19, 204:22
**first** [93] - 5:18, 12:20, 14:13, 14:14, 14:15, 17:17, 19:2, 20:7, 23:6, 35:14, 38:6, 39:1, 42:12, 44:5, 45:3, 51:6, 51:7, 51:8, 56:16, 57:4, 57:6, 63:24, 68:22, 69:25, 76:22, 77:5, 78:22, 79:22, 84:15, 85:16, 88:9, 88:17, 90:18, 92:17, 101:18, 102:22, 109:3, 109:12, 117:19, 118:4, 120:11, 131:3, 132:16, 133:8, 148:3, 150:9, 156:22, 158:4, 160:21, 162:15, 162:19, 163:11,

163:12, 163:13, 164:21, 165:5, 183:7, 183:10, 189:2, 189:11, 190:8, 190:15, 194:19, 205:1, 205:22, 206:10, 207:9, 207:13, 225:7, 236:2, 237:2, 238:2, 239:6, 239:15, 239:23, 239:24, 240:22, 240:24, 241:1, 241:4, 246:3, 246:16, 250:11, 251:6, 251:21, 252:18, 252:25, 253:12, 253:17, 254:8, 258:12, 258:20
**fits** [1] - 170:13
**five** [15] - 32:18, 44:12, 48:1, 90:21, 104:12, 120:3, 152:21, 154:10, 154:15, 186:5, 197:19, 228:14, 243:17, 245:20
**fix** [1] - 84:3
**fixed** [2] - 66:5, 220:20
**flash** [5] - 57:23, 63:14, 64:25, 73:1, 101:3
**flash-forward** [4] - 57:23, 63:14, 64:25, 101:3
**flashlight** [1] - 73:1
**flashlights** [1] - 14:8
**flat** [4] - 64:15, 169:11, 170:4, 170:20
**flat-out** [3] - 169:11, 170:4, 170:20
**flesh** [1] - 230:20
**floor** [1] - 130:11
**focus** [15] - 11:23, 89:20, 152:20, 157:17, 159:25, 160:25, 161:20, 177:14, 186:21, 201:12, 212:9, 213:6, 214:1, 237:10, 252:21
**focused** [1] - 161:4
**follow** [7] - 19:21, 38:2, 83:4, 192:13, 215:14, 246:24, 247:14
**follow-up** [1] - 215:14
**followed** [3] - 8:1, 192:15, 215:4

**following** [2] - 131:3, 192:6
**food** [1] - 57:15
**FOR** [3] - 2:3, 2:8, 3:3
**force** [17] - 22:23, 27:14, 27:24, 28:17, 28:22, 34:4, 58:20, 81:23, 188:15, 190:3, 190:10, 204:3, 204:6, 204:7, 204:8, 205:19, 239:24
**forced** [1] - 131:6
**forego** [2] - 44:20, 44:21
**foregoing** [1] - 261:9
**foresee** [3] - 123:16, 127:10, 128:23
**forever** [1] - 25:16
**forewarn** [1] - 123:15
**form** [4] - 32:17, 36:13, 146:21, 259:9
**format** [1] - 261:11
**forth** [2] - 50:7, 80:15
**forward** [16] - 57:23, 63:14, 64:25, 80:13, 82:9, 82:24, 101:3, 107:24, 109:8, 126:5, 126:17, 127:9, 132:6, 144:12, 144:13, 249:20
**fought** [1] - 72:2
**foundation** [9] - 56:3, 73:16, 95:5, 95:13, 96:5, 96:9, 98:6, 98:8, 124:2
**foundational** [2] - 65:23, 138:21
**founded** [1] - 132:4
**four** [8] - 39:13, 48:1, 64:18, 90:24, 134:23, 158:8, 175:22, 242:24
**four-wheelers** [1] - 64:18
**fourth** [3] - 44:16, 131:6, 187:24
**fractures** [2] - 90:20, 92:6
**FRANK** [1] - 2:10
**frankly** [9] - 44:15, 76:14, 77:23, 79:12, 80:16, 124:5, 124:24, 126:11, 126:24
**fraud** [1] - 209:17
**free** [1] - 257:16
**fresh** [3] - 74:8, 74:11, 143:9

**friction** [1] - 178:9
**Friday** [1] - 134:19
**front** [21] - 8:3, 8:17, 12:10, 12:11, 40:6, 43:8, 53:9, 54:12, 92:21, 92:25, 103:11, 128:13, 152:22, 176:6, 184:6, 184:7, 184:22, 186:20, 210:21, 225:12, 253:4
**frustrated** [6] - 6:14, 8:22, 42:19, 42:20, 160:19, 242:25
**frustration** [1] - 247:2
**frustrations** [1] - 243:5
**fuck** [1] - 255:18
**Fuerbach** [11] - 172:20, 172:22, 173:5, 174:21, 175:7, 176:23, 178:6, 178:10, 181:14, 250:18, 250:19
**Fuerbach's** [10] - 9:23, 172:25, 173:17, 174:1, 174:18, 175:11, 175:16, 176:3, 177:22, 178:17
**full** [9] - 81:2, 92:19, 106:8, 133:2, 164:18, 213:23, 237:18, 259:17
**fully** [2] - 14:4, 120:5
**fumble** [1] - 210:22
**fun** [2] - 198:4, 198:7
**function** [1] - 130:18
**fusion** [1] - 144:23
**future** [4] - 92:16, 143:16, 143:22, 145:21

## G

**gabapentin** [1] - 97:20
**garden** [2] - 55:9, 55:14
**gears** [1] - 129:3
**general** [4] - 109:6, 130:20, 157:7, 157:19
**generally** [1] - 104:8
**generic** [1] - 227:14
**generically** [1] - 227:10
**gentleman** [3] - 134:1, 251:4, 252:7

3-RenSER-00427          3-RenSER-00427

| | | | | |
|---|---|---|---|---|
| **gentlemen** [5] - 35:20, 63:12, 75:10, 174:7, 245:20 | **grew** [1] - 147:13 | 38:19, 257:5, 257:8 | 136:8 | 174:17, 175:3, |
| | **groggy** [1] - 241:8 | **guys** [6] - 8:12, 9:12, | **harm** [2] - 219:13, | 175:4, 175:25, |
| | **Gross** [1] - 118:22 | 25:10, 33:14, 222:5, | 247:17 | 176:4, 179:22, |
| **Gerber** [4] - 230:16, | **gross** [5] - 93:17, | 241:9 | **harming** [1] - 38:24 | 180:15, 180:19, |
| 230:17, 230:20, | 93:22, 93:24, | | **HARRELL** [240] - 2:10, | 180:22, 180:23, |
| 231:13 | 118:22, 138:17 | | 6:20, 9:1, 13:7, | 181:10, 181:22, |
| **GERBER** [1] - 230:17 | **ground** [51] - 12:5, | **H** | 26:10, 36:24, 37:14, | 181:23, 183:25, |
| **gesture** [1] - 16:24 | 18:1, 19:7, 19:8, | | 38:4, 40:12, 43:11, | 184:11, 184:14, |
| **girl** [4] - 18:13, 38:24, | 19:11, 19:19, 20:7, | **habit** [1] - 216:15 | 46:6, 54:17, 62:2, | 184:16, 184:24, |
| 204:24, 253:2 | 22:6, 22:11, 23:1, | **hair** [1] - 67:13 | 62:7, 64:8, 75:9, | 185:4, 185:7, 185:9, |
| **given** [6] - 37:25, 61:5, | 24:6, 25:6, 25:7, | **half** [4] - 86:15, | 75:18, 76:13, 76:23, | 185:12, 185:14, |
| 73:23, 169:7, 174:8, | 25:20, 25:22, 26:3, | 111:18, 111:22, | 77:5, 77:8, 77:21, | 185:18, 185:19, |
| 174:9 | 27:2, 27:5, 27:14, | 117:12 | 77:24, 78:6, 78:9, | 186:9, 186:14, |
| **gladly** [1] - 223:20 | 30:12, 31:25, 32:1, | **hallway** [3] - 107:18, | 78:19, 78:25, 81:21, | 187:1, 187:11, |
| **glasses** [2] - 14:11, | 34:12, 39:5, 47:16, | 108:24, 119:16 | 82:3, 86:23, 103:2, | 187:16, 187:21, |
| 14:12 | 47:20, 47:21, 49:2, | **hand** [19] - 27:10, | 107:20, 107:22, | 188:5, 189:1, |
| **Glendale** [1] - 2:6 | 49:8, 49:9, 49:18, | 35:2, 53:14, 53:17, | 124:12, 127:2, | 189:10, 190:7, |
| **glitch** [1] - 221:23 | 51:9, 52:3, 52:18, | 74:4, 74:9, 76:5, | 127:6, 127:25, | 190:21, 191:2, |
| **globe** [2] - 232:18, | 52:21, 52:22, 53:25, | 173:22, 218:3, | 128:6, 128:15, | 191:11, 192:24, |
| 232:20 | 54:20, 59:12, 59:20, | 232:3, 232:9, | 128:21, 129:2, | 194:2, 194:16, |
| **Gomez** [30] - 9:21, | 59:22, 71:2, 71:20, | 232:10, 232:22, | 129:11, 129:14, | 195:1, 197:18, |
| 38:8, 38:12, 38:22, | 123:21, 156:21, | 233:16 | 129:23, 130:9, | 200:22, 203:16, |
| 40:17, 41:8, 41:10, | 188:11, 188:12, | **hand-to-hand** [5] - | 134:13, 134:20, | 204:14, 205:15, |
| 41:11, 41:12, 42:15, | 191:19, 191:22, | 232:3, 232:9, | 134:25, 137:3, | 206:25, 209:1, |
| 43:5, 43:13, 133:17, | 193:6, 229:9 | 232:10, 232:22, | 137:12, 138:4, | 209:14, 210:15, |
| 175:17, 180:3, | **group** [1] - 89:9 | 233:16 | 138:11, 142:14, | 210:20, 210:23, |
| 251:4, 252:7, | **Group** [6] - 106:4, | **handcuff** [2] - 18:19, | 142:16, 143:2, | 211:2, 211:5, 211:9, |
| 252:14, 253:15, | 120:16, 120:21, | 61:24 | 143:25, 147:15, | 214:20, 215:1, |
| 255:3, 255:8, | 120:22, 121:4, | **handcuffed** [1] - 27:24 | 148:9, 148:15, | 215:6, 216:20, |
| 255:22, 256:11, | 125:12 | **handcuffs** [3] - 27:20, | 149:2, 150:17, | 217:8, 217:9, |
| 257:2, 257:14, | **growling** [4] - 30:16, | 27:22, 27:23 | 150:23, 151:2, | 217:14, 217:22, |
| 257:16, 257:21, | 30:25, 31:1, 32:11 | **handed** [1] - 35:5 | 151:6, 151:9, | 218:1, 218:6, 218:8, |
| 258:2, 258:6 | **grown** [1] - 197:4 | **handicapped** [2] - | 151:12, 151:15, | 218:12, 218:14, |
| **Gomez's** [3] - 41:9, | **grudge** [1] - 178:16 | 130:15, 130:17 | 152:8, 153:12, | 218:21, 219:3, |
| 175:14, 251:13 | **guess** [11] - 19:1, | **handle** [5] - 54:9, | 153:19, 154:3, | 219:5, 219:11, |
| **Gonzalez** [14] - 6:2, | 26:7, 26:10, 64:17, | 55:9, 201:10, | 154:8, 155:3, 155:8, | 221:10, 222:21, |
| 6:3, 6:8, 18:3, 18:4, | 89:9, 141:23, | 220:19, 257:11 | 155:14, 155:20, | 222:25, 223:10, |
| 21:2, 21:6, 171:1, | 141:24, 144:12, | **hands** [14] - 16:24, | 156:2, 156:5, | 223:23, 223:25, |
| 171:25, 172:6, | 161:14, 231:15, | 19:19, 48:10, 53:11, | 156:11, 156:14, | 224:3, 224:6, |
| 177:12, 177:14, | 255:6 | 53:22, 53:23, 73:21, | 156:17, 157:5, | 224:10, 224:23, |
| 206:11, 241:23 | **guessing** [3] - 166:18, | 73:22, 73:24, 75:22, | 157:16, 157:25, | 225:5, 225:8, |
| **Gonzalez's** [2] - | 167:2, 240:16 | 76:9, 125:16, | 158:7, 158:12, | 225:13, 225:14, |
| 166:18, 168:2 | **guilty** [13] - 76:3, | 231:15, 231:16 | 159:10, 160:2, | 225:21, 226:13, |
| **Gotts** [5] - 25:6, 48:10, | 76:11, 77:19, 80:2, | **handyman** [1] - | 160:12, 160:13, | 229:22, 229:25, |
| 48:16, 71:1, 148:22 | 80:6, 80:18, 81:11, | 102:16 | 161:24, 162:4, | 230:15, 231:12, |
| **GOTTS** [1] - 2:8 | 153:1, 154:11, | **hanging** [1] - 65:20 | 162:10, 162:11, | 234:18, 234:24, |
| **Gotts'** [1] - 34:9 | 154:13, 156:4, | **happy** [2] - 134:12, | 162:16, 162:18, | 236:4, 237:9, |
| **Gotts's** [1] - 50:9 | 156:6, 209:24 | 241:9 | 162:23, 163:7, | 237:16, 239:4, |
| **govern** [1] - 128:12 | **gun** [7] - 16:17, 16:18, | **harassed** [2] - 108:2, | 163:16, 164:2, | 241:21, 242:9, |
| **grab** [3] - 26:16, | 20:25, 150:4, | 119:13 | 164:8, 165:2, | 246:2, 246:23, |
| 26:18, 73:25 | 229:19, 256:6 | **harassing** [4] - 108:6, | 165:11, 165:13, | 248:21, 250:2, |
| **grabbed** [1] - 19:16 | **guns** [10] - 14:3, 14:4, | 110:16, 152:1, | 165:17, 165:20, | 250:4, 251:16, |
| **grabbing** [1] - 28:13 | 14:7, 14:8, 16:16, | 160:17 | 165:23, 166:2, | 251:21, 252:1, |
| **Graham** [1] - 81:21 | 17:20, 18:25, 26:22, | **harassment** [1] - | 166:5, 166:20, | 252:3, 252:6, |
| **grand** [2] - 105:25, | 155:12, 226:23 | 119:19 | 167:23, 168:9, | 254:21, 254:25, |
| 120:25 | **Gupta** [2] - 100:10, | **hard** [7] - 34:10, | 168:16, 169:1, | 257:22, 258:1, 259:2 |
| **granted** [3] - 44:9, | 100:20 | 63:17, 102:12, | 169:20, 169:22, | **Harrell** [2] - 4:5, |
| 44:13, 76:24 | **gurney** [1] - 58:3 | 116:2, 223:14, | 170:1, 170:17, | 148:22 |
| **great** [3] - 236:8, | **gurry** [1] - 58:2 | 227:8, 228:17 | 171:14, 172:12, | **head** [39] - 20:11, |
| 237:10, 259:3 | **guy** [5] - 25:10, 27:25, | **harder** [1] - 67:12 | 173:20, 174:1, | 20:17, 22:20, 23:10, |
| | | **Hardy** [2] - 136:5, | 174:3, 174:13, | 23:25, 24:4, 24:7, |

25:13, 26:16, 27:6, 30:10, 30:17, 32:3, 47:17, 47:19, 50:25, 52:17, 52:20, 53:2, 53:18, 53:20, 57:25, 59:9, 60:3, 60:23, 62:25, 65:20, 68:1, 68:3, 68:11, 68:12, 68:23, 69:9, 71:24, 73:14, 122:13, 222:6

**headaches** [6] - 59:3, 90:5, 90:11, 122:1, 122:3, 123:3

**headlock** [1] - 25:18

**healed** [1] - 103:18

**Health** [2] - 99:10, 144:18

**health** [3] - 123:11, 156:25, 157:2

**hear** [76] - 5:22, 8:18, 8:19, 14:13, 19:5, 21:10, 21:12, 28:1, 30:12, 30:16, 30:17, 31:3, 31:21, 32:7, 33:25, 34:5, 34:7, 34:9, 38:22, 39:2, 39:5, 39:6, 39:8, 39:12, 39:22, 39:25, 42:24, 46:12, 46:20, 52:19, 59:16, 70:25, 80:11, 80:25, 82:15, 95:16, 99:23, 123:23, 124:3, 124:10, 134:5, 150:8, 152:2, 169:24, 170:2, 174:21, 175:2, 175:7, 178:21, 179:2, 195:2, 195:11, 195:15, 195:23, 198:4, 203:13, 205:23, 206:1, 207:11, 207:12, 243:9, 247:24, 252:7, 252:9, 254:17, 254:20, 255:22, 256:14, 256:15, 258:2, 258:4, 258:5, 258:6, 258:10

**heard** [41] - 6:18, 8:10, 8:12, 11:19, 18:3, 19:5, 21:11, 34:3, 42:12, 70:25, 82:15, 94:6, 95:15, 95:18, 115:15, 128:17, 128:24, 128:25, 166:22, 172:1, 174:8, 174:18, 177:22, 185:21,

195:5, 195:13, 195:17, 198:3, 199:13, 199:16, 200:7, 206:10, 207:16, 207:24, 218:20, 231:4, 249:25, 251:13, 254:11

**hearing** [7] - 38:23, 39:18, 40:14, 40:19, 44:22, 129:16, 174:10

**hearsay** [7] - 103:2, 103:7, 138:11, 143:25, 237:1, 237:7

**Hearsay** [1] - 144:24

**heart** [3] - 115:5, 129:16, 130:22

**HEATHCOTE** [1] - 2:18

**height** [1] - 258:22

**held** [11] - 22:7, 23:22, 23:23, 24:3, 27:4, 27:17, 30:20, 63:6, 71:22, 203:23, 261:10

**help** [24] - 34:23, 37:23, 66:22, 78:24, 91:16, 108:20, 115:9, 151:8, 186:17, 186:24, 187:13, 188:7, 193:8, 196:4, 197:2, 199:5, 208:20, 209:5, 236:9, 243:12, 243:25, 244:15, 250:14, 257:10

**helped** [1] - 91:17

**helper** [1] - 115:9

**helping** [3] - 115:13, 145:22, 228:22

**helps** [1] - 115:10

**hereby** [1] - 261:7

**hidden** [1] - 220:9

**hiding** [1] - 40:23

**highlight** [1] - 47:10

**highly** [4] - 37:19, 39:14, 44:22, 181:5

**Hino** [1] - 261:20

**HINO** [3] - 1:23, 261:5, 261:19

**Hino-Spaan** [1] - 261:20

**HINO-SPAAN** [3] - 1:23, 261:5, 261:19

**hint** [1] - 134:13

**hire** [1] - 83:18

**history** [2] - 118:10, 175:25

**hit** [22] - 20:7, 20:11, 20:16, 23:20, 25:22, 26:5, 30:9, 31:20, 31:25, 33:4, 38:15, 38:19, 51:6, 52:3, 52:5, 52:7, 52:14, 61:15, 67:18, 67:24, 68:11, 73:14

**Hobby** [1] - 233:1

**hobby** [1] - 102:12

**hold** [6] - 65:5, 110:14, 111:23, 112:5, 182:19, 183:3

**holding** [10] - 22:7, 22:9, 22:25, 24:3, 26:7, 27:10, 32:13, 33:5, 72:8, 147:6

**hole** [1] - 115:5

**Holloway** [45] - 5:13, 5:17, 36:16, 36:21, 36:25, 37:9, 38:7, 38:13, 38:21, 42:14, 43:4, 43:13, 47:5, 47:10, 55:25, 75:15, 76:11, 80:18, 82:18, 82:19, 83:8, 94:17, 96:14, 99:10, 122:8, 123:25, 124:7, 124:13, 124:19, 124:24, 126:18, 126:25, 127:3, 128:7, 128:10, 129:17, 134:9, 135:7, 135:13, 148:20, 245:25, 250:17, 250:19, 259:18

**HOLLOWAY** [3] - 1:4, 4:4, 5:14

**Holloway's** [2] - 128:2, 129:4

**home** [6] - 66:12, 66:19, 259:5, 259:9, 259:24, 260:6

**homeless** [2] - 55:19, 55:25

**homelessness** [1] - 109:12

**honest** [12] - 8:20, 8:21, 16:16, 56:17, 59:24, 116:18, 122:22, 155:11, 201:8, 212:4, 222:7, 241:7

**Honor** [154] - 10:20, 13:9, 15:1, 26:10, 28:17, 29:6, 34:14, 36:24, 37:5, 37:14, 37:17, 37:24, 38:4, 40:12, 43:11, 43:21,

44:7, 44:19, 46:18, 46:24, 47:8, 56:11, 62:2, 66:10, 69:4, 70:4, 75:18, 76:23, 77:9, 77:21, 77:24, 78:6, 78:19, 78:25, 79:15, 80:8, 81:1, 81:21, 85:25, 86:22, 87:1, 87:23, 90:25, 91:24, 94:16, 95:16, 96:19, 98:12, 99:3, 99:23, 103:25, 104:22, 107:20, 107:22, 109:1, 109:4, 109:19, 113:11, 118:14, 120:9, 120:14, 121:10, 121:23, 122:11, 122:16, 123:7, 124:12, 125:3, 127:2, 127:25, 128:15, 129:14, 130:8, 130:9, 130:14, 131:18, 133:4, 134:13, 134:20, 135:16, 137:3, 137:8, 137:12, 138:12, 141:2, 142:6, 142:19, 143:6, 146:8, 148:9, 148:15, 150:23, 151:2, 151:9, 152:7, 153:9, 153:16, 154:2, 155:17, 155:18, 156:5, 159:9, 160:9, 161:21, 162:4, 162:6, 162:16, 163:7, 163:9, 166:2, 166:16, 167:20, 168:23, 171:10, 172:10, 173:20, 180:9, 180:19, 181:4, 184:2, 184:11, 184:24, 185:5, 185:12, 186:9, 187:1, 187:3, 187:25, 190:4, 191:5, 192:21, 194:11, 206:19, 210:15, 211:2, 211:7, 214:17, 214:23, 216:17, 217:2, 218:6, 218:12, 219:3, 219:8, 222:25, 234:9, 236:1, 237:2, 244:20, 245:18, 251:17, 252:1, 259:3

**HONORABLE** [1] - 1:3

**hope** [3] - 9:11, 118:1, 134:14

**hopefully** [5] - 117:13, 126:22, 134:23, 145:20, 233:20

**hoping** [4] - 7:19, 8:18, 85:2, 145:22

**Hopp** [2] - 88:14, 88:18

**horrible** [1] - 119:9

**Hospital** [3] - 135:17, 135:25, 138:3

**hospital** [24] - 25:2, 58:10, 60:16, 60:18, 60:19, 61:20, 62:14, 62:23, 65:2, 88:22, 89:15, 97:23, 98:13, 98:16, 99:1, 101:1, 114:25, 136:11, 136:13, 136:17, 143:13, 143:14, 144:16, 144:19

**hospitalized** [1] - 135:21

**hour** [5] - 27:16, 133:2, 133:6, 133:14, 133:16

**hours** [2] - 133:13, 161:1

**housing** [1] - 115:9

**human** [7] - 219:13, 227:21, 228:16, 229:5, 229:6, 231:14, 236:16

**humans** [1] - 203:7

**hung** [1] - 44:5

**hunting** [2] - 228:23, 229:1

**hurry** [1] - 256:20

**hurt** [5] - 191:10, 228:18, 231:17, 236:11, 236:22

**hurting** [1] - 59:6

**hurts** [1] - 32:15

## I

**ID** [1] - 147:23

**idea** [7] - 17:19, 29:23, 55:25, 134:7, 209:13, 240:16, 259:3

**identify** [5] - 220:8, 228:1, 254:9, 254:15, 254:18

**ignored** [3] - 182:22, 183:5, 257:2

**ill** [1] - 132:4

**ill-founded** [1] - 132:4

**illustrate** [1] - 68:1

**image** [3] - 68:15, 89:21, 95:7
**images** [2] - 94:14, 96:2
**imaging** [6] - 88:24, 88:25, 94:6, 94:15, 94:17, 94:20
**immediate** [1] - 175:15
**immediately** [2] - 21:23, 128:23
**impeaching** [1] - 163:13
**impeachment** [6] - 162:6, 163:10, 187:3, 194:11, 218:24, 223:3
**implant** [1] - 115:8
**implants** [1] - 93:2
**important** [6] - 46:22, 66:23, 206:24, 212:3, 212:10, 212:19
**impression** [1] - 76:10
**improper** [11] - 56:2, 95:6, 162:6, 180:10, 181:6, 187:3, 191:6, 194:10, 218:23, 223:3, 237:23
**impulsive** [1] - 32:22
**inaccuracies** [1] - 46:11
**inaccuracy** [1] - 40:7
**inaccurate** [6] - 37:19, 39:14, 40:2, 44:23, 45:18, 45:23
**inappropriate** [4] - 103:5, 138:13, 170:15, 188:1
**inaudible** [1] - 35:25
**inches** [3] - 221:19, 228:13, 228:14
**incident** [118] - 50:17, 66:18, 70:1, 84:1, 84:9, 85:14, 85:16, 85:21, 86:2, 86:13, 86:19, 90:6, 90:7, 90:17, 92:9, 94:10, 102:14, 102:18, 102:19, 102:20, 103:23, 104:3, 105:23, 107:17, 108:1, 108:3, 108:23, 118:12, 118:21, 119:14, 121:16, 121:25, 122:24, 123:13, 123:17, 124:16, 124:22, 125:14, 125:22, 125:24,

135:15, 135:20, 140:6, 140:12, 142:4, 142:10, 142:13, 146:2, 147:17, 150:3, 150:6, 150:11, 152:16, 152:21, 154:10, 154:15, 154:23, 155:5, 155:7, 155:8, 155:10, 155:21, 156:24, 157:1, 157:8, 157:21, 158:2, 158:8, 158:16, 159:16, 159:22, 159:24, 160:5, 160:6, 161:8, 161:18, 162:2, 162:14, 164:13, 164:20, 164:25, 165:4, 176:13, 181:25, 183:14, 183:20, 184:1, 184:18, 185:23, 190:15, 193:11, 193:19, 194:6, 194:20, 196:5, 196:22, 197:3, 217:16, 219:16, 219:23, 222:16, 226:19, 231:23, 231:24, 234:5, 236:13, 237:18, 237:23, 238:21, 242:22, 243:24, 244:10, 244:13, 255:13
**include** [2] - 213:2, 213:18
**included** [2] - 40:7, 147:7
**including** [14] - 94:3, 163:20, 165:17, 194:23, 197:16, 205:13, 210:12, 211:21, 212:24, 214:8, 214:10, 216:10, 219:25, 246:21
**income** [5] - 102:21, 103:24, 105:19, 107:3, 120:17
**incontinent** [1] - 65:5
**inconvenience** [1] - 132:19
**incorrect** [4] - 77:13, 79:23, 114:15, 150:16
**increased** [1] - 123:5
**increasing** [2] - 97:25,

123:25
**incurred** [1] - 140:5
**Indeed** [1] - 88:8
**independent** [6] - 37:12, 43:7, 81:17, 82:7, 83:8, 83:12
**independently** [1] - 80:21
**India** [1] - 246:21
**indicate** [2] - 164:20, 165:4
**indicating** [9] - 11:14, 13:20, 23:1, 27:11, 54:9, 67:5, 72:8, 220:18, 220:22
**indicating)** [11] - 12:12, 13:23, 14:21, 14:22, 51:8, 67:17, 70:22, 72:1, 72:2, 72:11, 228:4
**individuals** [1] - 124:18
**infection** [1] - 115:3
**inference** [5] - 80:5, 80:18, 81:9, 81:13, 81:17
**inflation** [1] - 117:20
**inflict** [3] - 227:21, 228:16, 231:13
**informal** [4] - 153:7, 210:9, 213:24, 239:8
**informally** [1] - 151:5
**information** [6] - 18:18, 40:23, 82:19, 83:9, 109:15, 257:18
**informed** [2] - 209:12, 239:8
**initial** [3] - 22:19, 41:9, 41:11
**initials** [1] - 211:13
**injections** [2] - 101:13, 144:9
**injured** [1] - 126:1
**injuries** [15] - 52:17, 52:20, 60:3, 65:3, 65:10, 65:17, 68:22, 68:24, 71:11, 71:15, 72:16, 118:6, 129:10, 130:18, 136:14
**injury** [9] - 60:24, 68:1, 68:8, 75:2, 101:21, 219:13, 227:21, 228:16, 231:13
**innocent** [1] - 66:5
**inquire** [2] - 217:5, 217:6
**inserted** [2] - 38:21, 40:18

**insertion** [3] - 38:7, 38:13, 42:14
**inside** [8] - 9:18, 12:22, 18:20, 173:8, 219:24, 229:4, 250:21, 255:8
**insinuated** [1] - 118:24
**insinuation** [1] - 80:5
**instance** [5] - 40:4, 41:8, 108:2, 109:12, 123:5
**instead** [8] - 8:13, 43:13, 73:14, 93:4, 203:7, 209:24, 240:22, 241:4
**instincts** [2] - 33:6, 53:19
**instruct** [4] - 80:24, 81:15, 81:16, 82:7
**instructed** [3] - 80:12, 87:5, 129:8
**instructing** [1] - 83:2
**instruction** [4] - 81:22, 81:23, 129:5, 249:10
**instructions** [3] - 19:20, 189:3, 189:6
**insurance** [1] - 209:17
**intelligence** [1] - 197:23
**intense** [2] - 188:19, 188:20
**interaction** [2] - 58:18, 59:21
**interchange** [1] - 171:13
**interest** [3] - 50:11, 59:17, 88:15
**internal** [2] - 251:22, 251:24
**internally** [1] - 165:18
**interpreter** [1] - 37:18
**interrupt** [1] - 245:1
**interrupted** [3] - 29:14, 29:24, 230:8
**interrupting** [3] - 42:19, 234:10, 245:14
**interruption** [1] - 223:8
**interrupts** [2] - 168:24, 230:4
**interview** [1] - 143:1
**introduce** [1] - 190:19
**introduced** [1] - 174:4
**investigate** [5] - 18:12, 19:25, 164:21, 165:5, 175:22

**investigating** [6] - 18:16, 58:20, 168:19, 175:23, 254:2, 254:3
**investigation** [3] - 177:21, 179:19, 182:25
**involve** [1] - 78:17
**involved** [9] - 12:23, 15:23, 87:17, 87:21, 124:16, 210:10, 252:13, 256:22, 258:2
**involves** [1] - 205:5
**involving** [4] - 107:17, 108:3, 108:23, 119:14
**iron** [1] - 55:16
**irrelevant** [6] - 77:23, 87:20, 146:10, 180:12, 184:2, 190:5
**irritable** [1] - 125:13
**irritated** [2] - 17:18, 246:17
**Irvine** [1] - 64:4
**isolated** [1] - 85:14
**issue** [38] - 45:24, 47:11, 78:17, 78:22, 79:3, 79:21, 80:1, 81:25, 82:4, 82:5, 97:8, 109:12, 118:14, 118:15, 118:18, 118:19, 120:10, 121:12, 122:11, 125:5, 125:19, 125:21, 127:13, 127:15, 127:18, 127:21, 127:23, 128:2, 131:22, 133:15, 133:16, 144:9, 210:12, 213:9, 213:11, 244:23, 252:14
**issued** [2] - 102:25, 109:5
**issues** [11] - 12:24, 28:18, 90:18, 94:1, 123:2, 133:5, 133:7, 142:9, 150:7, 152:18, 156:25
**IT** [1] - 3:14
**items** [1] - 219:20
**itself** [2] - 45:5, 51:12

**J**

**jacket** [4] - 12:13, 53:12, 53:15
**jacket's** [1] - 52:25

**UNITED STATES DISTRICT COURT**

**jail** [21] - 61:14, 61:20, 62:10, 62:18, 62:22, 63:1, 63:3, 63:14, 65:9, 66:19, 68:17, 76:15, 76:16, 76:25, 78:13, 79:2, 124:19, 209:25, 210:3, 238:15

**jailed** [3] - 61:19, 61:21, 80:5

**JAMESON** [1] - 2:8

**January** [7] - 110:9, 112:1, 112:8, 114:11, 116:25, 135:21, 161:3

**jeans** [1] - 74:20

**JEREMY** [3] - 1:4, 4:4, 5:14

**Jeremy** [5] - 38:7, 38:13, 250:17, 250:19

**job** [25] - 65:7, 88:9, 101:22, 105:13, 106:1, 106:5, 110:24, 112:11, 112:14, 112:16, 113:25, 115:23, 116:22, 120:16, 121:4, 123:5, 124:14, 125:11, 126:1, 148:3, 182:4, 182:6, 182:7, 182:16

**jobs** [2] - 85:6, 105:22

**join** [1] - 86:23

**joke** [1] - 235:22

**joking** [1] - 119:10

**jolt** [1] - 33:8

**jolts** [1] - 33:5

**Joshua** [5] - 9:21, 38:8, 41:8, 133:17, 251:4

**JUDGE** [1] - 1:3

**judge** [9] - 108:22, 119:11, 126:17, 134:12, 152:23, 153:1, 154:11, 154:13, 236:24

**judgment** [1] - 226:17

**Judicial** [1] - 261:12

**July** [7] - 87:3, 106:14, 115:17, 121:13, 128:3, 129:18, 137:13

**jump** [1] - 101:16

**juncture** [2] - 31:7, 48:10

**June** [13] - 111:13, 112:1, 112:8, 114:6, 114:11, 114:12, 114:22, 117:1,

118:12, 129:17, 159:6, 159:20, 160:3

**juror** [3] - 186:2, 186:7

**JUROR** [1] - 259:13

**jurors** [1] - 148:18

**jury** [57] - 5:5, 5:7, 35:3, 35:5, 36:18, 40:6, 42:7, 43:1, 43:8, 44:5, 45:25, 46:1, 46:12, 47:3, 71:25, 75:11, 75:13, 76:9, 79:7, 80:12, 80:24, 81:13, 81:15, 81:24, 82:7, 82:12, 82:13, 82:14, 87:5, 99:7, 105:1, 105:21, 107:7, 107:8, 107:10, 110:17, 126:19, 128:9, 128:14, 128:18, 128:19, 129:1, 129:8, 130:2, 132:7, 132:14, 132:15, 132:25, 134:23, 135:6, 135:10, 148:17, 165:25, 186:12, 245:13, 245:25, 259:19

**JURY** [1] - 1:13

**jury's** [2] - 77:18, 148:8

**justice** [2] - 145:17, 145:21

### K

**KA** [14] - 231:19, 231:21, 231:22, 232:1, 232:2, 232:4, 232:5, 232:8, 232:22, 233:5, 233:10, 233:11, 233:14, 233:24

**KA-BAR** [14] - 231:19, 231:21, 231:22, 232:1, 232:2, 232:4, 232:5, 232:8, 232:22, 233:5, 233:10, 233:11, 233:14, 233:24

**KABAR** [1] - 231:19

**Karlen** [7] - 34:23, 35:1, 35:2, 132:7, 259:20, 260:3, 260:12

**Karlen's** [1] - 186:2

**keep** [8] - 34:23, 50:7, 70:3, 147:22, 180:2, 180:7, 218:4, 259:4

**keeps** [1] - 234:9

**kick** [1] - 47:18

**kicked** [3] - 23:21, 27:6, 122:15

**kicking** [3] - 27:2, 68:9, 75:3

**kicks** [1] - 67:20

**kill** [3] - 229:7, 229:10, 233:22

**kind** [38] - 13:18, 19:20, 30:23, 33:2, 33:7, 35:2, 55:7, 58:23, 59:2, 61:10, 64:17, 64:19, 65:6, 68:19, 71:11, 71:14, 84:6, 84:23, 84:24, 90:10, 97:17, 97:19, 108:12, 122:17, 125:5, 127:14, 136:7, 145:20, 167:5, 172:14, 220:13, 220:19, 220:20, 232:25, 240:1, 240:4, 257:19

**kitchen** [1] - 55:15

**knee** [8] - 23:6, 24:4, 24:7, 27:11, 28:10, 47:18, 68:2, 73:14

**kneed** [8] - 27:7, 31:20, 32:3, 47:17, 53:2, 53:20, 68:3, 71:25

**kneeing** [1] - 30:17

**knees** [1] - 19:19

**knife** [42] - 54:11, 54:20, 55:4, 55:6, 228:1, 228:3, 228:12, 228:13, 228:15, 228:20, 229:1, 229:7, 230:16, 230:17, 230:20, 231:13, 231:19, 231:20, 231:21, 231:22, 232:1, 232:2, 232:4, 232:8, 232:10, 232:19, 232:22, 232:25, 233:5, 233:10, 233:11, 233:14, 233:16, 233:18, 233:21, 233:24, 234:3, 234:6, 234:15, 235:14, 235:16

**knives** [60] - 10:16, 11:11, 11:13, 11:23, 11:25, 12:5, 49:8, 49:25, 50:15, 54:4, 54:10, 54:11, 54:23, 54:24, 55:1, 55:2, 146:8, 186:20,

196:6, 207:14, 207:17, 207:19, 207:21, 207:24, 208:2, 208:4, 208:5, 208:7, 208:20, 209:5, 219:15, 219:25, 220:2, 220:3, 220:5, 222:10, 222:11, 226:20, 227:23, 227:24, 232:14, 234:20, 235:1, 235:7, 235:11, 236:5, 236:11, 236:15, 237:22, 239:12, 241:22

**Knives** [1] - 220:5

**knock** [1] - 7:22

**knocking** [1] - 7:18

**knot** [1] - 67:13

**knowing** [3] - 56:19, 179:19, 216:22

**knowledge** [1] - 82:1

**knows** [5] - 165:25, 184:4, 189:8, 208:9, 256:16

**knuckles** [1] - 74:4

### L

**L5** [3] - 97:7, 99:17

**labeled** [1] - 28:20

**laceration** [2] - 60:25, 73:10

**lack** [1] - 96:9

**lacks** [3] - 56:2, 73:16, 96:5

**Lacks** [4] - 95:2, 95:5, 95:13, 98:6

**ladies** [5] - 35:20, 63:12, 75:10, 174:7, 245:20

**lady** [5] - 95:21, 107:17, 108:3, 108:23, 110:12

**landmark** [1] - 177:1

**language** [3] - 176:5, 197:5, 211:10

**large** [2] - 23:25, 122:4

**larger** [2] - 53:8, 236:11

**last** [9] - 70:12, 93:11, 101:16, 108:14, 130:14, 134:24, 191:23, 220:13

**late** [2] - 113:17, 113:18

**latter** [1] - 116:21

**laugh** [1] - 195:9

**laughing** [1] - 195:8

**laughter** [4] - 195:11, 195:15, 195:18, 195:23

**LAW** [6] - 2:4, 2:4, 2:14, 2:18, 2:22, 3:8

**law** [32] - 164:20, 165:3, 165:4, 166:9, 172:7, 176:8, 179:9, 181:13, 181:17, 182:3, 182:7, 182:14, 182:19, 183:3, 183:10, 183:22, 186:16, 186:23, 187:13, 188:7, 246:4, 246:9, 250:14, 252:18, 252:19, 252:25, 253:1, 253:13, 253:17, 254:1, 254:9, 256:19

**lawful** [4] - 192:5, 192:6, 192:15, 193:3

**lawsuit** [9] - 25:18, 52:16, 123:22, 127:8, 128:12, 138:1, 142:11, 145:13, 179:14

**lawyer** [3] - 140:12, 168:3, 168:17

**lawyers** [2] - 148:9, 179:14

**laying** [10] - 22:5, 22:6, 22:25, 26:5, 26:6, 28:9, 49:9, 54:20, 102:6, 208:6

**layperson's** [1] - 94:9

**lead** [1] - 131:12

**leading** [9] - 6:20, 9:1, 13:7, 25:24, 54:17, 64:8, 147:15

**Leading** [7] - 25:23, 30:6, 32:24, 48:11, 65:21, 93:5, 140:24

**leaned** [3] - 11:15, 11:17, 11:20

**leaning** [1] - 24:3

**learn** [4] - 153:14, 154:1, 180:6, 180:8

**learned** [4] - 83:17, 140:8, 180:24, 190:1

**learning** [1] - 40:8

**least** [15] - 16:5, 32:18, 45:19, 49:3, 79:10, 84:15, 107:19, 108:8, 141:23, 145:24, 172:7, 190:20, 195:3, 199:14, 199:22

**UNITED STATES DISTRICT COURT**

3-RenSER-00431          3-RenSER-00431

**leather** [3] - 233:2, 233:3, 233:4
**leave** [10] - 7:7, 42:7, 81:13, 100:2, 114:20, 127:11, 130:4, 132:2, 250:25, 260:13
**leaves** [1] - 76:9
**leaving** [5] - 77:17, 86:25, 127:14, 137:5, 251:1
**ledger** [1] - 38:12
**leery** [1] - 80:14
**left** [48] - 5:19, 7:4, 11:10, 11:12, 13:21, 15:15, 18:24, 20:16, 20:19, 20:22, 20:24, 21:25, 26:6, 37:9, 40:6, 40:16, 51:15, 52:11, 52:12, 64:20, 66:24, 67:6, 67:15, 86:1, 88:3, 88:6, 88:12, 92:4, 110:19, 124:15, 126:19, 126:22, 131:1, 141:20, 147:10, 153:7, 226:16, 233:6, 240:9, 241:23, 246:3, 246:15, 247:1, 247:15, 247:19, 251:5, 254:5, 254:8
**leg** [1] - 94:2
**legal** [3] - 216:14, 217:3, 241:14
**legally** [1] - 198:22
**legs** [5] - 24:1, 27:3, 27:4, 27:25, 28:9
**less** [7] - 6:3, 85:7, 113:2, 113:5, 113:7, 116:12, 208:7
**lethal** [1] - 21:10
**lethals** [1] - 21:12
**letting** [1] - 87:15
**level** [5] - 188:20, 198:14, 203:4, 203:6, 204:17
**leverage** [1] - 24:4
**Lewis** [3] - 99:1, 100:15, 100:17
**LEWIS** [1] - 99:5
**liability** [3] - 44:11, 45:6, 131:7
**liar** [2] - 170:9, 170:12
**license** [2] - 64:3, 147:24
**lie** [1] - 44:2
**liens** [1] - 143:15
**Lieutenant** [1] - 81:10
**life** [12] - 16:20, 23:19,

27:17, 86:17, 86:19, 87:12, 107:25, 147:11, 150:7, 152:18, 160:22
**lift** [1] - 102:1
**lifting** [2] - 102:9, 102:10
**light** [5] - 7:18, 14:8, 20:17, 37:2, 126:16
**lights** [6] - 12:9, 14:9, 22:2, 161:9, 184:7, 256:20
**likely** [2] - 8:10, 256:24
**limbo** [1] - 127:14
**Limine** [2] - 78:3, 78:10
**limine** [6] - 62:3, 76:18, 76:24, 77:1, 77:14, 79:12
**limit** [6] - 125:15, 126:4, 127:11, 131:8, 131:10, 131:16
**limited** [2] - 134:9, 216:11
**limiting** [1] - 132:2
**line** [28] - 38:6, 38:11, 38:13, 39:4, 73:13, 163:20, 163:21, 164:3, 164:6, 164:9, 171:10, 185:3, 185:6, 185:15, 185:16, 218:5, 224:19, 224:21, 224:22, 248:25, 249:5, 249:8, 249:12
**lines** [17] - 39:2, 100:10, 151:6, 151:12, 163:8, 163:18, 184:25, 185:4, 218:7, 218:8, 218:10, 218:11, 218:19, 226:11, 226:15, 250:6
**lions** [1] - 229:18
**lip** [2] - 67:24
**list** [6] - 37:25, 81:5, 213:19, 213:20, 215:3
**listed** [1] - 81:4
**listen** [9] - 39:4, 59:25, 124:25, 127:7, 172:17, 249:11, 249:15, 257:4, 257:7
**listened** [1] - 257:9
**listening** [4] - 20:14, 25:14, 34:9, 249:22
**litigation** [1] - 63:4
**live** [1] - 64:4

**lived** [3] - 106:19, 111:21, 147:11
**lives** [1] - 107:25
**living** [5] - 57:14, 57:22, 112:4, 117:20, 142:3
**LLP** [2] - 3:4, 3:8
**loaded** [2] - 88:11, 191:23
**Lobby** [1] - 233:1
**located** [1] - 173:11
**location** [2] - 169:19, 232:1
**log** [12] - 28:11, 28:14, 48:5, 50:23, 53:5, 53:8, 191:10, 204:4, 223:17, 238:4, 240:7, 240:8
**Logan** [1] - 144:18
**logical** [1] - 78:20
**look** [48] - 6:24, 14:24, 15:6, 41:10, 41:23, 45:12, 50:12, 50:19, 51:5, 54:4, 54:11, 54:15, 54:20, 54:24, 56:23, 57:11, 57:14, 66:8, 67:2, 67:21, 77:8, 79:19, 88:12, 90:3, 91:6, 94:21, 96:19, 102:7, 103:22, 105:19, 106:1, 110:3, 120:14, 122:1, 122:23, 125:20, 128:22, 136:16, 137:22, 139:4, 169:7, 211:4, 218:24, 219:18, 225:19, 227:20, 228:16, 233:11
**Look** [1] - 10:7
**looked** [6] - 50:20, 120:24, 137:21, 184:5, 224:12, 256:3
**looking** [29] - 10:12, 11:9, 12:21, 47:12, 56:20, 57:8, 57:13, 57:21, 64:13, 77:25, 78:1, 78:25, 79:4, 93:15, 99:21, 99:25, 101:8, 101:14, 140:2, 144:12, 144:13, 175:19, 203:4, 204:24, 221:18, 227:20, 228:13, 228:15, 253:25
**looks** [11] - 48:17, 50:1, 54:22, 67:21, 72:18, 72:21, 74:24,

175:19, 233:10, 255:8, 255:10
**loop** [2] - 41:10, 41:11
**looping** [2] - 41:3, 41:4
**Los** [2] - 2:15, 99:12
**LOS** [1] - 261:3
**lose** [1] - 191:9
**losing** [5] - 159:3, 159:14, 159:20, 160:3, 160:7
**loss** [5] - 84:13, 92:7, 98:4, 109:19, 125:19
**lost** [10] - 55:5, 108:13, 112:3, 120:16, 121:4, 125:11, 134:25, 158:20, 159:6, 202:3
**loud** [9] - 8:23, 8:24, 9:4, 9:8, 32:16, 168:9, 168:11, 168:14, 224:15
**loudly** [3] - 247:23, 258:7, 258:15
**love** [2] - 235:19, 235:20
**loved** [2] - 110:24, 112:14
**low** [1] - 110:3
**Lowe's** [1] - 117:18
**lower** [4] - 24:2, 72:21, 203:4, 204:17
**lowest** [1] - 243:21
**luckily** [1] - 65:8
**lumbar** [1] - 99:15
**lunch** [7] - 132:9, 132:24, 133:1, 133:6, 133:13, 135:3, 259:16
**Lunch** [1] - 135:5
**lunchtime** [3] - 46:23, 46:24, 46:25
**lying** [9] - 24:5, 160:17, 171:23, 192:16, 241:9, 247:7, 247:8, 248:15, 250:11
**LYNBERG** [4] - 2:9, 2:13, 2:17, 2:21

## M

**ma'am** [5] - 21:1, 51:21, 89:14, 159:18, 159:19
**machete** [26] - 11:17, 11:19, 11:20, 11:21, 48:23, 49:1, 54:8, 55:14, 206:14, 207:4, 219:15,

220:6, 220:8, 220:11, 220:19, 221:2, 221:3, 221:6, 221:18, 222:12, 226:20, 227:16, 227:20, 228:2, 237:22, 239:12
**machine** [3] - 7:17, 101:23, 104:4
**machines** [2] - 101:24, 102:3
**mad** [1] - 61:24
**main** [1] - 68:4
**maintained** [1] - 242:22
**malicious** [1] - 75:20
**man** [3] - 175:8, 255:1, 258:7
**man's** [3] - 123:11, 130:21, 258:6
**manner** [1] - 32:21
**map** [1] - 14:19
**marathon** [1] - 230:5
**marijuana** [1] - 13:2
**Marine** [13] - 153:14, 153:17, 153:20, 153:22, 153:25, 232:4, 232:11, 232:14, 232:19, 232:24, 233:12, 234:3
**Marines** [6] - 232:2, 233:6, 233:15, 233:18, 233:21, 233:25
**marines** [1] - 232:8
**mark** [1] - 220:15
**marked** [2] - 70:14, 165:18
**match** [1] - 41:24
**matter** [20] - 36:13, 80:21, 87:25, 103:10, 105:7, 116:16, 120:8, 125:1, 132:23, 134:16, 139:8, 154:17, 180:19, 181:19, 184:11, 205:7, 206:17, 227:5, 259:7, 261:11
**matters** [2] - 116:15, 205:6
**MAY** [2] - 1:13, 5:1
**mean** [31] - 33:6, 46:20, 52:23, 68:11, 79:5, 102:6, 106:11, 108:9, 108:10, 114:15, 141:12, 178:15, 193:15, 193:20, 193:22,

197:6, 212:17, 212:21, 212:22, 213:16, 216:16, 221:25, 222:4, 222:17, 223:12, 225:23, 226:19, 226:24, 227:1, 243:17, 245:9
**means** [5] - 124:3, 134:3, 213:18, 214:6, 219:12
**meant** [5] - 214:15, 215:21, 216:22, 216:23, 218:17
**measured** [1] - 92:19
**medallion** [1] - 233:2
**medical** [21] - 13:1, 60:20, 73:17, 88:14, 89:9, 95:6, 96:10, 98:12, 101:6, 104:5, 104:13, 122:2, 123:1, 135:14, 135:17, 136:14, 143:12, 143:16, 145:21, 147:6
**medication** [2] - 97:18, 97:19
**meet** [1] - 260:6
**meeting** [1] - 151:25
**melted** [1] - 220:19
**memory** [9] - 10:22, 20:3, 77:3, 79:10, 108:15, 129:2, 140:16, 187:6, 187:9
**men** [2] - 197:4, 197:5
**mental** [2] - 156:25, 157:2
**mention** [2] - 81:24, 206:11
**mentioned** [1] - 195:7
**mentions** [1] - 197:12
**messed** [1] - 220:13
**messing** [1] - 204:25
**met** [1] - 149:3
**MICHAEL** [1] - 3:4
**microphone** [2] - 34:4, 61:16
**middle** [3] - 42:15, 178:12, 185:13
**might** [24] - 6:1, 32:20, 33:18, 33:20, 37:2, 40:14, 55:18, 72:18, 87:21, 92:5, 119:12, 123:8, 126:14, 151:8, 178:10, 193:20, 196:6, 201:15, 202:11, 213:11, 221:6, 225:11, 235:1, 253:19

**migraines** [1] - 90:8
**military** [1] - 197:4
**millimeters** [1] - 99:18
**mind** [33] - 20:9, 29:17, 77:19, 103:5, 145:15, 155:10, 155:12, 155:16, 160:23, 180:13, 183:12, 192:6, 196:7, 199:10, 199:14, 199:22, 205:3, 209:9, 209:19, 214:14, 215:20, 229:2, 236:10, 236:15, 236:18, 236:22, 241:17, 242:10, 242:20, 243:2, 243:8, 251:2, 259:9
**mine** [3] - 13:18, 60:15, 94:13
**minefield** [1] - 131:2
**minimal** [2] - 99:16, 124:6
**minimis** [1] - 119:25
**minus** [1] - 19:1
**minute** [6] - 26:13, 46:21, 124:11, 165:16, 186:6, 254:22
**minutes** [18] - 18:23, 18:24, 19:1, 20:6, 36:11, 36:12, 46:17, 46:19, 132:13, 133:5, 148:12, 172:2, 186:5, 186:8, 194:23, 245:20, 257:23, 259:14
**mirror** [3] - 68:14, 68:15, 68:20
**miscellaneous** [1] - 142:3
**mishearing** [1] - 185:8
**misinformation** [3] - 239:10, 255:11, 257:19
**misplaces** [1] - 33:19
**missed** [2] - 120:15, 120:17
**missing** [1] - 159:17
**Mission** [3] - 135:17, 135:25, 138:3
**misspeaking** [1] - 185:5
**misstates** [4] - 145:6, 158:6, 158:9, 179:16
**mistake** [1] - 154:21
**mistaken** [1] - 39:11
**mistreated** [2] - 145:19

**mistrial** [1] - 44:10
**mistrials** [1] - 130:15
**misunderstanding** [1] - 246:11
**mixture** [1] - 182:6
**Mkrtchyan** [2] - 4:4, 35:6
**MKRTCHYAN** [341] - 2:4, 2:4, 5:16, 6:7, 6:22, 9:3, 9:10, 10:20, 10:25, 11:4, 11:5, 13:9, 13:11, 14:25, 15:3, 15:5, 15:18, 16:1, 16:2, 17:4, 21:19, 26:1, 26:12, 26:15, 28:16, 28:21, 28:25, 29:4, 29:6, 29:9, 29:11, 30:2, 30:11, 31:6, 31:18, 32:6, 33:1, 33:10, 33:16, 33:24, 34:14, 34:18, 34:21, 35:8, 35:15, 35:19, 36:5, 36:8, 37:11, 37:17, 37:25, 38:9, 43:21, 43:24, 44:3, 44:7, 44:19, 45:3, 45:16, 47:8, 47:9, 47:14, 47:23, 48:4, 48:9, 48:15, 48:19, 49:5, 49:13, 49:21, 50:4, 51:12, 51:18, 51:25, 54:6, 54:7, 54:19, 55:23, 56:5, 56:8, 56:11, 56:12, 57:5, 57:10, 61:17, 61:18, 62:5, 62:9, 63:13, 64:12, 65:15, 66:7, 66:10, 66:11, 66:15, 66:16, 69:2, 69:4, 69:7, 69:9, 69:12, 69:13, 70:4, 70:7, 70:15, 70:24, 71:10, 71:19, 72:4, 72:6, 73:3, 73:5, 73:20, 77:9, 77:15, 79:14, 79:25, 81:1, 81:8, 81:20, 83:15, 83:16, 85:25, 86:5, 86:7, 86:10, 86:11, 87:1, 87:4, 87:8, 87:23, 88:2, 90:25, 91:4, 91:5, 91:24, 92:2, 93:10, 94:16, 94:18, 95:7, 95:10, 95:16, 95:19, 95:22, 96:2, 96:25, 97:3, 98:10, 98:11, 98:15, 98:25, 99:3, 99:5, 99:7, 99:9, 99:13,

99:14, 99:23, 100:4, 100:12, 100:14, 100:18, 100:21, 100:24, 101:9, 103:4, 103:15, 103:25, 104:2, 105:4, 105:9, 109:1, 109:19, 109:23, 110:1, 112:18, 112:20, 113:11, 113:14, 118:8, 118:14, 118:18, 119:3, 120:9, 120:14, 120:21, 120:23, 121:4, 121:7, 121:9, 121:17, 121:22, 122:11, 122:16, 123:7, 124:9, 125:2, 125:11, 127:5, 127:13, 127:22, 128:5, 130:8, 130:10, 130:13, 131:18, 132:8, 132:11, 133:11, 135:12, 135:16, 135:19, 136:20, 136:21, 137:8, 137:11, 137:16, 138:6, 138:12, 138:16, 138:22, 139:7, 139:11, 139:13, 139:14, 141:2, 141:4, 141:8, 142:6, 142:19, 142:23, 142:24, 143:6, 143:10, 143:11, 144:6, 145:2, 145:5, 145:10, 145:25, 146:7, 146:12, 146:13, 147:8, 147:16, 147:19, 150:13, 152:7, 153:9, 153:16, 154:2, 154:5, 155:2, 155:17, 155:24, 157:2, 157:12, 157:23, 158:6, 158:9, 159:9, 160:1, 160:9, 161:21, 162:6, 163:9, 164:23, 166:15, 167:20, 168:12, 168:23, 169:15, 170:15, 171:9, 172:10, 174:4, 179:16, 180:9, 180:12, 181:4, 181:18, 183:24, 184:2, 187:3, 187:6,

187:9, 187:15, 187:19, 187:25, 188:24, 189:5, 190:4, 190:14, 190:23, 191:5, 192:21, 193:25, 194:8, 194:10, 194:14, 203:12, 203:14, 203:20, 206:19, 208:22, 209:7, 209:10, 214:17, 214:22, 216:17, 217:1, 217:13, 217:17, 218:18, 218:23, 219:8, 222:20, 222:24, 223:3, 229:21, 229:24, 230:2, 230:4, 230:8, 230:11, 234:9, 234:21, 236:1, 237:2, 237:25, 238:24, 241:14, 244:20, 244:23, 244:25, 245:4, 245:7, 245:9, 245:12, 245:18
**mom** [11] - 63:18, 65:1, 65:7, 66:22, 115:13, 127:16, 130:23, 130:25, 141:17, 141:22, 142:2
**mom's** [3] - 83:23, 84:17, 85:2
**moment** [73] - 6:14, 16:17, 19:13, 19:15, 20:5, 20:10, 21:5, 21:22, 22:10, 22:16, 23:7, 23:14, 23:16, 24:19, 26:13, 27:15, 29:20, 32:19, 32:25, 34:22, 36:9, 36:15, 36:20, 36:23, 37:2, 37:22, 39:4, 39:24, 46:20, 68:25, 69:5, 69:8, 70:17, 70:18, 75:12, 75:16, 78:14, 87:16, 95:4, 95:9, 95:23, 96:8, 99:21, 100:1, 100:3, 100:13, 100:16, 100:19, 107:6, 107:8, 107:11, 112:25, 117:2, 124:10, 133:10, 142:17, 151:13, 153:18, 173:9, 179:6, 179:25, 186:1, 188:25, 206:16, 211:3,

3-RenSER-00433     3-RenSER-00433

218:9, 222:5, 222:8, 226:3, 227:11, 231:4, 243:13, 251:23

**moments** [1] - 36:10

**Monday** [1] - 259:15

**money** [21] - 44:12, 85:7, 92:22, 104:8, 105:17, 105:21, 106:7, 106:18, 108:10, 114:16, 114:17, 115:12, 120:5, 124:7, 124:15, 131:5, 140:11, 141:17, 141:19, 142:2, 146:9

**Montana** [24] - 86:25, 108:2, 110:8, 110:9, 110:23, 110:24, 111:2, 111:15, 111:21, 112:8, 112:13, 112:19, 112:22, 113:10, 113:24, 114:2, 116:21, 117:8, 119:18, 123:19, 136:23, 137:3, 137:8, 137:12

**month** [4] - 84:12, 104:10, 112:21, 113:19

**month-long** [1] - 112:21

**months** [13] - 86:13, 86:14, 106:12, 106:16, 114:21, 115:18, 120:3, 158:8, 158:20, 159:11, 256:23

**months'** [1] - 106:15

**mood** [1] - 125:13

**morning** [15] - 155:9, 155:12, 161:2, 161:17, 162:1, 162:13, 163:4, 163:5, 164:12, 167:15, 176:3, 178:25, 181:17, 183:9, 194:23

**moron** [2] - 248:17, 254:19

**morons** [8] - 247:25, 248:3, 248:13, 248:22, 249:15, 249:23, 250:10, 250:13

**most** [10] - 8:10, 77:6, 116:20, 147:11, 149:15, 178:21, 179:7, 206:24,

243:3, 259:2

**mostly** [1] - 240:2

**mother** [4] - 109:15, 126:12, 129:4, 129:18

**mother's** [1] - 126:20

**Motion** [2] - 78:3, 78:10

**motion** [14] - 26:10, 44:13, 62:2, 62:7, 76:18, 76:24, 77:1, 77:13, 77:15, 78:4, 79:2, 79:12, 108:4, 108:21

**motions** [1] - 131:13

**mountain** [1] - 229:18

**mouth** [4] - 52:7, 180:2, 180:7

**move** [36] - 16:22, 17:7, 29:20, 47:11, 59:5, 61:23, 63:10, 72:15, 83:14, 84:15, 103:20, 108:1, 108:6, 108:24, 110:15, 110:19, 110:22, 116:21, 126:2, 141:17, 141:22, 146:11, 147:20, 152:5, 154:6, 180:21, 182:18, 188:17, 190:12, 191:21, 201:3, 203:3, 219:3, 236:3, 237:14, 250:25

**moved** [22] - 16:19, 19:13, 19:15, 32:20, 85:9, 88:11, 89:6, 89:10, 110:16, 111:2, 115:17, 119:17, 119:18, 123:18, 128:3, 147:9, 147:14, 188:19, 191:9, 191:16, 191:17, 205:2

**movement** [2] - 16:20, 27:5

**moves** [3] - 33:2, 119:11, 119:21

**moving** [15] - 25:11, 27:8, 29:13, 29:17, 29:18, 32:16, 32:17, 33:2, 48:20, 106:22, 108:6, 156:18

**MR** [293] - 6:5, 6:20, 9:1, 13:7, 15:22, 17:1, 21:17, 25:23, 26:10, 30:6, 32:24, 35:6, 35:13, 35:17,

36:24, 37:14, 38:4, 40:12, 43:11, 46:6, 48:11, 51:10, 54:17, 55:20, 56:2, 56:25, 62:2, 62:7, 63:8, 63:10, 64:8, 65:13, 65:21, 71:8, 71:13, 73:16, 75:9, 75:18, 76:13, 76:23, 77:5, 77:8, 77:21, 77:24, 78:6, 78:9, 78:19, 78:25, 81:21, 82:3, 85:19, 86:22, 86:23, 93:5, 95:2, 95:5, 95:13, 95:25, 96:5, 96:7, 96:10, 96:14, 96:17, 96:19, 98:6, 103:2, 104:22, 104:25, 107:20, 107:22, 124:12, 127:2, 127:6, 127:25, 128:6, 128:15, 128:21, 129:2, 129:11, 129:14, 129:23, 130:9, 133:4, 133:8, 134:13, 134:20, 134:25, 136:18, 137:3, 137:12, 138:4, 138:11, 138:20, 139:6, 139:9, 140:24, 142:14, 142:15, 142:16, 143:2, 143:3, 143:25, 144:24, 145:6, 145:14, 146:3, 146:20, 147:15, 148:9, 148:15, 149:2, 150:17, 150:23, 151:2, 151:6, 151:9, 151:12, 151:15, 152:8, 153:12, 153:19, 154:3, 154:8, 155:3, 155:8, 155:14, 155:20, 156:2, 156:5, 156:11, 156:14, 156:17, 157:5, 157:16, 157:25, 158:7, 158:12, 159:10, 160:2, 160:12, 160:13, 161:24, 162:4, 162:10, 162:11, 162:16, 162:18, 162:23, 163:7, 163:16, 164:2, 164:8, 165:2, 165:11, 165:13,

165:17, 165:20, 165:23, 166:2, 166:5, 166:20, 167:23, 168:9, 168:16, 169:1, 169:20, 169:22, 170:1, 170:17, 171:14, 172:12, 173:20, 174:1, 174:3, 174:6, 174:13, 174:17, 175:3, 175:4, 175:25, 176:4, 179:22, 180:15, 180:19, 180:22, 180:23, 181:10, 181:22, 181:23, 183:25, 184:11, 184:14, 184:16, 184:24, 185:4, 185:7, 185:9, 185:12, 185:14, 185:18, 185:19, 186:9, 186:14, 187:1, 187:11, 187:16, 187:21, 188:5, 189:1, 189:10, 190:7, 190:21, 191:2, 191:11, 192:24, 194:2, 194:16, 195:1, 197:18, 200:22, 203:16, 204:14, 205:15, 206:25, 209:1, 209:14, 210:15, 210:20, 210:23, 211:2, 211:5, 211:9, 214:20, 215:1, 215:6, 216:20, 217:8, 217:9, 217:14, 217:22, 218:1, 218:6, 218:8, 218:12, 218:14, 218:21, 219:3, 219:5, 219:11, 221:10, 222:21, 222:25, 223:10, 223:23, 223:25, 224:3, 224:6, 224:10, 224:23, 225:5, 225:8, 225:13, 225:14, 225:21, 226:13, 229:22, 229:25, 230:15, 231:12, 234:18, 234:24, 236:4, 237:9, 237:16, 239:4, 241:21, 242:9, 246:2, 246:23,

248:21, 250:2, 250:4, 251:16, 251:19, 251:21, 252:1, 252:3, 252:6, 254:21, 254:25, 257:22, 258:1, 259:2

**MRI** [11] - 94:14, 94:17, 95:7, 96:2, 98:19, 98:21, 99:9, 99:15, 108:17, 108:19

**MRIs** [2] - 61:4, 97:14

**MS** [348] - 5:16, 6:7, 6:22, 9:3, 9:10, 10:20, 10:25, 11:4, 11:5, 13:9, 13:11, 14:25, 15:3, 15:5, 15:18, 16:1, 16:2, 17:4, 21:19, 26:1, 26:12, 26:15, 28:16, 28:21, 28:25, 29:4, 29:6, 29:9, 29:11, 30:2, 30:11, 31:6, 31:18, 32:6, 33:1, 33:10, 33:16, 33:24, 34:14, 34:18, 34:21, 35:8, 35:15, 35:19, 36:5, 36:8, 37:5, 37:11, 37:17, 37:24, 37:25, 38:9, 40:11, 43:21, 43:24, 44:3, 44:7, 44:19, 45:3, 45:16, 46:18, 46:24, 47:8, 47:9, 47:14, 47:23, 48:4, 48:9, 48:15, 48:19, 49:5, 49:13, 49:21, 50:4, 51:12, 51:18, 51:25, 54:6, 54:7, 54:19, 55:23, 56:5, 56:8, 56:11, 56:12, 57:5, 57:10, 61:17, 61:18, 62:5, 62:9, 63:13, 64:12, 65:15, 66:7, 66:10, 66:11, 66:15, 66:16, 69:2, 69:4, 69:7, 69:9, 69:12, 69:13, 70:4, 70:7, 70:15, 70:24, 71:10, 71:19, 72:4, 72:6, 73:3, 73:5, 73:20, 77:9, 77:15, 79:14, 79:25, 81:1, 81:8, 81:20, 83:15, 83:16, 85:25, 86:5, 86:7, 86:10, 86:11, 87:1, 87:4, 87:8, 87:23, 88:2, 90:25, 91:4, 91:5, 91:24, 92:2, 93:10, 94:16, 94:18, 95:7, 95:10, 95:16,

95:19, 95:22, 96:2, 96:25, 97:3, 98:10, 98:11, 98:15, 98:25, 99:3, 99:5, 99:7, 99:9, 99:13, 99:14, 99:23, 100:4, 100:12, 100:14, 100:18, 100:21, 100:24, 101:9, 103:4, 103:15, 103:25, 104:2, 105:4, 105:9, 109:1, 109:19, 109:23, 110:1, 112:18, 112:20, 113:11, 113:14, 118:8, 118:14, 118:18, 119:3, 120:9, 120:14, 120:21, 120:23, 121:4, 121:7, 121:9, 121:17, 121:22, 122:11, 122:16, 123:7, 124:9, 125:2, 125:11, 127:5, 127:13, 127:22, 128:5, 130:8, 130:10, 130:13, 131:18, 132:8, 132:11, 133:11, 133:15, 134:10, 135:12, 135:16, 135:19, 136:20, 136:21, 137:8, 137:11, 137:16, 138:6, 138:12, 138:16, 138:22, 139:7, 139:11, 139:13, 139:14, 141:2, 141:4, 141:8, 142:6, 142:19, 142:23, 142:24, 143:6, 143:10, 143:11, 144:6, 145:2, 145:5, 145:10, 145:25, 146:7, 146:12, 146:13, 147:8, 147:16, 147:19, 150:13, 152:7, 153:9, 153:16, 154:2, 154:5, 155:2, 155:17, 155:24, 157:2, 157:12, 157:23, 158:6, 158:9, 159:9, 160:1, 160:9, 161:21, 162:6, 163:9, 164:1, 164:23, 166:15, 167:20, 168:12, 168:23, 169:15,

170:15, 171:9, 172:10, 174:4, 179:16, 180:9, 180:12, 181:4, 181:18, 183:24, 184:2, 185:5, 187:3, 187:6, 187:9, 187:15, 187:19, 187:25, 188:24, 189:5, 190:4, 190:14, 190:23, 191:5, 192:21, 193:25, 194:8, 194:10, 194:14, 203:12, 203:14, 203:20, 206:19, 208:22, 209:7, 209:10, 214:17, 214:22, 216:17, 217:1, 217:13, 217:17, 218:18, 218:23, 219:8, 222:20, 222:24, 223:3, 229:21, 229:24, 230:2, 230:4, 230:8, 230:11, 234:9, 234:21, 236:1, 237:2, 237:25, 238:24, 241:14, 244:20, 244:23, 244:25, 245:4, 245:7, 245:9, 245:12, 245:18
**multi** [1] - 74:2
**multiple** [5] - 18:5, 19:22, 207:19, 207:21, 256:7
**muscle** [3] - 229:2, 229:3, 229:5
**must** [1] - 12:20
**mwroniak@ccllp.law** [1] - 3:7
**myriad** [1] - 114:24

## N

**nail** [1] - 74:4
**naked** [1] - 55:18
**NALTSAS** [1] - 2:14
**name** [6] - 99:4, 118:22, 164:4, 172:19, 232:5, 250:20
**named** [1] - 251:4
**NARINE** [1] - 2:4
**narine57@gmail. com** [1] - 2:7
**narrate** [1] - 53:3
**narrative** [1] - 89:12

**narrow** [1] - 237:10
**nasty** [1] - 178:18
**natural** [1] - 53:19
**naturally** [1] - 33:7
**nature** [2] - 81:24, 82:1
**Navy** [4] - 133:17, 133:20, 134:3, 251:5
**near** [5] - 13:25, 49:17, 72:9, 207:6
**necessarily** [3] - 123:12, 130:24, 142:21
**neck** [8] - 22:7, 26:7, 28:13, 58:3, 89:2, 94:2, 190:11
**need** [48] - 6:18, 18:15, 18:16, 18:19, 29:7, 34:23, 36:10, 37:8, 55:10, 60:6, 70:13, 70:14, 75:23, 98:23, 107:19, 108:15, 127:14, 128:8, 132:8, 133:19, 139:9, 139:10, 145:21, 151:3, 151:9, 165:20, 165:22, 168:21, 171:15, 184:22, 185:1, 186:3, 200:20, 202:4, 204:22, 214:23, 230:24, 240:2, 243:9, 245:4, 245:19, 256:16, 257:5, 257:7, 259:14, 259:22, 260:5
**needed** [5] - 104:15, 158:15, 168:19, 173:1, 233:22
**needs** [6] - 80:17, 121:10, 124:19, 186:5, 186:7, 218:1
**negative** [3] - 12:6, 147:25, 192:10
**neighbor** [1] - 172:22
**neighbors** [15] - 20:1, 246:9, 246:15, 246:25, 247:15, 247:19, 248:1, 248:4, 248:9, 248:13, 248:23, 249:24, 250:5, 250:9, 250:13
**nerve** [4] - 61:10, 93:22, 93:25, 97:22
**neurological** [4] - 118:15, 118:20, 122:7, 127:17

**neurologically** [1] - 90:11
**neurologist** [6] - 93:16, 93:17, 122:21, 122:23, 137:22, 138:23
**neurology** [6] - 90:12, 90:13, 118:22, 118:23, 121:20, 122:1
**never** [18] - 9:20, 20:2, 25:22, 45:25, 46:4, 75:20, 76:14, 77:2, 207:6, 218:20, 228:23, 229:6, 239:21, 240:5, 250:19, 254:3, 254:4
**new** [6] - 28:19, 44:13, 46:14, 101:25, 109:2, 244:19
**next** [22] - 7:8, 8:8, 10:12, 12:16, 17:12, 17:13, 22:10, 47:11, 49:11, 60:6, 60:14, 60:15, 69:10, 69:11, 96:18, 107:5, 131:14, 133:18, 164:5, 172:22, 208:6, 236:3
**nexus** [1] - 129:13
**nice** [6] - 36:14, 37:7, 132:24, 133:1, 145:24, 169:24
**nicely** [3] - 202:16, 202:17, 203:1
**night** [66] - 60:10, 75:25, 146:2, 147:3, 147:4, 160:15, 164:16, 167:1, 167:12, 167:19, 173:5, 173:14, 176:13, 178:22, 178:24, 179:5, 183:11, 184:20, 188:10, 192:18, 194:20, 196:10, 196:22, 197:10, 198:23, 206:24, 207:2, 207:9, 207:22, 209:3, 209:11, 213:4, 217:16, 219:22, 220:6, 221:25, 222:5, 222:16, 222:17, 222:22, 222:23, 223:11, 223:12, 223:19, 225:22, 226:19, 226:22, 227:1, 229:10, 229:11,

231:23, 231:24, 234:4, 236:12, 237:22, 239:6, 239:12, 244:19, 251:14, 252:12, 253:2, 254:15, 254:19, 258:8, 258:12, 258:17
**night's** [1] - 164:18
**nightmares** [1] - 147:5
**nine** [1] - 106:16
**Ninth** [1] - 81:23
**nobody** [9] - 7:21, 31:9, 33:13, 61:22, 173:1, 190:12, 190:17, 191:15, 247:5
**nobody's** [3] - 33:11, 208:11, 209:12
**none** [4] - 40:7, 76:1, 239:23, 241:6
**None** [1] - 4:16
**Norco** [1] - 104:14
**normal** [5] - 86:17, 86:19, 243:6, 243:7, 258:23
**normalcy** [2] - 122:5, 122:9
**normally** [1] - 84:23
**North** [1] - 2:5
**note** [3] - 70:12, 99:9, 139:20
**nothing** [29] - 9:14, 17:23, 23:22, 44:24, 58:21, 61:22, 76:17, 76:20, 112:7, 122:13, 125:6, 152:17, 157:11, 159:3, 159:23, 161:15, 170:8, 181:8, 214:7, 214:16, 215:21, 215:22, 218:21, 240:11, 240:19, 240:21, 241:3, 243:19
**nothing's** [1] - 109:9
**notice** [3] - 53:7, 55:8, 126:6
**November** [3] - 107:20, 113:20, 139:19
**number** [22] - 11:1, 16:18, 28:23, 34:16, 42:14, 42:21, 44:1, 44:14, 44:15, 60:8, 118:3, 136:19, 140:25, 141:1, 165:19, 165:20, 165:22, 190:19,

210:19, 237:10, 251:18, 251:22
**Number** [3] - 78:3, 78:10, 165:23
**numbers** [4] - 50:21, 117:22, 139:6, 251:24
**numbing** [1] - 101:12

**O**

**o'clock** [8] - 46:16, 132:17, 132:22, 133:2, 135:4, 161:2, 259:10, 259:11
**O'Neill** [7] - 85:13, 85:15, 85:20, 85:21, 86:12, 87:12, 235:5
**oath** [2] - 149:11, 154:19
**obfuscated** [1] - 43:8
**obfuscating** [1] - 40:23
**object** [7] - 123:24, 124:2, 127:5, 163:9, 194:14, 230:2, 230:8
**objection** [109] - 6:5, 15:22, 17:1, 21:17, 25:23, 30:6, 32:24, 48:11, 51:10, 55:20, 56:2, 56:25, 63:8, 65:13, 65:21, 71:8, 71:13, 71:15, 71:18, 73:16, 78:15, 80:2, 80:25, 85:19, 87:19, 93:5, 95:2, 95:5, 95:13, 96:4, 96:18, 96:21, 98:6, 103:4, 104:22, 136:18, 137:3, 137:12, 138:12, 138:20, 140:24, 142:14, 142:15, 143:2, 143:3, 144:24, 145:6, 145:14, 146:3, 146:20, 150:13, 152:7, 153:9, 153:16, 154:2, 154:5, 155:2, 155:17, 157:2, 157:12, 157:23, 158:9, 159:9, 160:1, 160:9, 161:21, 164:23, 165:7, 166:15, 167:20, 168:12, 168:23, 169:15, 172:10, 179:16, 180:9, 181:4, 183:24, 184:2, 187:20,

187:25, 188:24, 189:5, 190:4, 190:14, 190:23, 191:5, 193:25, 194:8, 203:12, 203:20, 206:19, 208:22, 209:7, 214:17, 216:17, 217:13, 217:17, 219:8, 237:2, 237:25, 238:24, 241:14, 241:19, 244:20, 244:24
**obligated** [2] - 138:2, 138:7
**obligation** [2] - 190:18, 198:17
**observer** [1] - 13:18
**obviously** [3] - 40:17, 52:1, 132:18
**occasion** [1] - 42:17
**occur** [6] - 191:21, 196:22, 196:25, 206:13, 207:2, 207:5
**occurred** [3] - 44:11, 77:4, 207:7
**occurring** [1] - 176:9
**October** [2] - 139:16, 139:20
**OF** [7] - 1:2, 1:7, 1:12, 2:1, 261:1, 261:3, 261:4
**offend** [1] - 197:5
**offended** [2] - 197:6, 241:7
**offensive** [4] - 192:16, 199:11, 201:11, 219:9
**offered** [1] - 4:16
**Office** [7] - 80:14, 82:6, 82:8, 82:22, 82:25, 83:10, 83:11
**office** [5] - 40:9, 83:11, 94:17, 140:3, 173:22
**officer** [37] - 8:3, 10:14, 13:24, 21:14, 22:24, 23:5, 24:1, 24:14, 24:16, 28:13, 30:14, 32:2, 47:25, 50:13, 66:1, 73:24, 188:22, 189:3, 195:4, 195:7, 195:9, 197:12, 197:19, 199:4, 203:15, 204:1, 206:11, 206:24, 208:1, 208:10, 208:21, 209:6, 242:11, 243:13, 243:21

**Officer** [9] - 22:6, 24:1, 25:5, 34:20, 36:2, 48:10, 48:16, 48:21, 180:3
**officer's** [1] - 35:25
**officers** [81] - 5:18, 7:7, 11:11, 11:25, 13:4, 13:19, 13:22, 14:13, 15:7, 15:19, 18:5, 18:7, 18:22, 19:2, 19:22, 20:15, 22:8, 22:19, 22:25, 24:2, 24:15, 25:9, 26:21, 27:19, 31:8, 32:18, 44:12, 47:24, 54:21, 55:24, 56:9, 56:15, 58:8, 60:17, 61:23, 76:6, 80:1, 83:6, 87:17, 87:21, 152:1, 160:17, 166:25, 167:2, 168:7, 179:19, 188:11, 188:14, 190:1, 190:2, 190:8, 191:12, 192:1, 192:18, 193:8, 195:2, 195:25, 196:4, 196:11, 196:24, 197:2, 198:12, 198:16, 198:17, 199:6, 199:7, 203:8, 203:23, 206:18, 207:8, 226:22, 239:11, 239:14, 241:7, 241:11, 241:18, 243:12, 243:17
**officers'** [4] - 12:9, 13:13, 32:9, 82:16
**Official** [1] - 261:20
**official** [1] - 228:9
**OFFICIAL** [3] - 1:23, 261:1, 261:5
**old** [1] - 74:7
**Olive** [1] - 2:14
**once** [13] - 9:7, 36:1, 36:3, 82:3, 83:5, 107:23, 109:17, 111:4, 114:14, 117:5, 120:4, 199:24, 215:9
**one** [116] - 6:16, 7:12, 7:21, 16:18, 17:17, 17:19, 24:3, 24:14, 28:9, 30:13, 34:7, 39:8, 43:17, 45:11, 46:15, 48:1, 54:5, 55:3, 55:5, 55:6, 55:9, 62:20, 64:17,

66:2, 67:11, 67:13, 67:20, 67:23, 68:2, 72:2, 72:17, 73:9, 74:10, 75:19, 76:5, 90:18, 96:8, 102:11, 102:17, 104:14, 105:12, 108:17, 111:9, 111:22, 112:16, 113:25, 116:22, 119:8, 119:10, 120:24, 126:8, 129:25, 130:10, 132:21, 133:15, 138:18, 146:24, 155:21, 166:6, 166:9, 166:10, 166:13, 166:19, 166:23, 166:24, 167:4, 167:25, 169:5, 172:8, 172:15, 174:8, 178:14, 178:21, 182:12, 187:5, 188:16, 193:21, 195:2, 196:7, 196:19, 197:22, 197:23, 199:5, 199:15, 199:19, 200:6, 200:14, 200:24, 200:25, 201:16, 201:19, 201:21, 202:7, 202:10, 202:13, 205:24, 206:17, 207:12, 208:2, 209:4, 211:3, 226:17, 227:25, 228:7, 232:14, 233:6, 240:24, 248:25, 249:7, 255:2, 256:1, 258:3, 259:21
**one's** [1] - 74:16
**ongoing** [4] - 24:10, 27:14, 129:10, 157:8
**oOo** [1] - 260:15
**oozing** [1] - 53:2
**open** [5] - 72:14, 108:5, 122:21, 140:14, 208:11
**opened** [5] - 107:13, 108:22, 109:15, 126:7, 126:17
**opening** [3] - 107:14, 124:22, 131:21
**opens** [1] - 117:25
**operation** [1] - 115:8
**opinion** [6] - 36:13, 73:17, 73:18, 73:19, 95:6, 103:9

**opponent** [1] - 233:22
**opposing** [1] - 191:14
**opposite** [3] - 9:25, 254:12, 254:14
**option** [1] - 209:24
**options** [1] - 210:2
**ORANGE** [1] - 1:7
**Orange** [12] - 2:11, 2:23, 3:6, 75:22, 78:12, 81:3, 82:21, 85:5, 85:8, 87:13, 103:20, 142:12
**orange** [1] - 2:19
**order** [6] - 44:9, 126:22, 133:19, 134:3, 134:12, 210:11
**ordering** [3] - 99:1, 100:15, 100:17
**orders** [1] - 76:20
**organizing** [1] - 10:13
**originated** [1] - 153:4
**orthopedic** [1] - 98:16
**orthopedist** [1] - 95:22
**otherwise** [2] - 15:14, 249:5
**ourselves** [1] - 44:16
**out-of-pocket** [1] - 140:5
**outlined** [1] - 224:11
**outside** [15] - 37:1, 57:21, 75:21, 76:9, 80:20, 128:25, 132:18, 180:19, 184:12, 210:17, 252:17, 253:2, 253:12, 255:1, 256:8
**outweighs** [1] - 88:1
**overall** [1] - 246:17
**overruled** [48] - 9:6, 26:14, 30:7, 48:12, 64:9, 65:23, 73:19, 87:7, 93:6, 95:9, 96:18, 137:15, 138:5, 142:20, 143:9, 144:1, 145:4, 145:7, 150:15, 155:25, 157:4, 157:14, 158:10, 166:17, 167:22, 168:14, 169:17, 171:11, 172:11, 180:11, 180:13, 181:7, 184:3, 187:8, 187:10, 190:15, 190:24, 191:7, 192:23, 194:13, 203:21, 209:8, 214:19, 214:25,

217:19, 234:22, 238:1, 238:25
**overruling** [1] - 165:7
**owe** [1] - 140:23
**owed** [1] - 105:17
**own** [21] - 65:19, 66:17, 66:23, 127:2, 164:19, 165:3, 180:14, 180:16, 209:9, 211:19, 211:20, 212:4, 213:17, 216:3, 229:19, 231:21, 232:1, 244:8, 244:18, 257:11, 259:9
**owned** [2] - 231:19, 231:22

**P**

**p.m** [10] - 135:5, 148:16, 186:11, 244:25, 245:23, 260:14
**pack** [1] - 235:3
**pad** [1] - 12:10
**PAGE** [1] - 4:3
**page** [25] - 37:23, 38:6, 39:1, 41:10, 151:6, 151:8, 151:11, 151:12, 163:8, 163:18, 163:20, 163:23, 163:24, 164:5, 176:1, 184:24, 185:3, 210:16, 210:24, 210:25, 218:5, 261:11
**Pahel** [7] - 18:4, 36:2, 38:11, 38:23, 39:4, 39:5, 46:8
**Pahel's** [5] - 34:4, 34:15, 34:19, 34:20, 47:15
**paid** [10] - 92:22, 105:14, 105:17, 119:8, 140:8, 140:11, 140:23, 141:7, 141:10, 141:13
**pain** [15] - 31:4, 32:15, 59:1, 85:1, 89:20, 89:25, 91:16, 101:19, 108:10, 118:8, 130:25, 137:11, 143:17, 143:20, 143:24
**painkillers** [1] - 61:5
**painting** [1] - 125:25

**palms** [1] - 16:13
**Palomar** [1] - 3:9
**pan** [1] - 175:13
**paper** [1] - 140:10
**paperwork** [3] - 62:15, 65:25, 153:8
**par** [1] - 237:20
**paragraph** [13] - 185:13, 210:16, 210:24, 211:2, 211:6, 211:12, 211:16, 212:3, 212:11, 216:6, 216:21, 227:4, 236:20
**paralegal** [1] - 3:13
**paramedics** [7] - 50:23, 51:3, 53:6, 53:10, 57:24, 58:13
**paramedics'** [1] - 137:18
**pardon** [1] - 259:6
**Park** [6] - 85:13, 85:15, 85:20, 85:21, 87:12, 235:5
**park** [2] - 8:5, 55:11
**parked** [2] - 8:3, 178:6
**part** [37] - 28:8, 28:17, 28:22, 41:11, 42:11, 67:2, 67:13, 72:17, 72:23, 76:15, 79:10, 79:24, 92:3, 116:21, 122:4, 130:24, 158:25, 179:7, 179:12, 182:4, 182:16, 185:21, 195:3, 199:21, 216:4, 220:9, 221:12, 221:13, 229:1, 229:2, 229:3, 229:4, 238:20, 241:12, 242:10, 243:3, 255:15
**partial** [5] - 92:17, 92:19, 92:20, 92:22, 93:11
**participation** [1] - 256:19
**particular** [2] - 82:9, 129:15
**particularly** [2] - 124:18, 217:15
**parties** [10] - 5:7, 40:4, 41:1, 79:5, 83:9, 126:21, 135:9, 148:19, 245:25, 259:1
**partner** [1] - 102:1
**parts** [2] - 28:16, 35:24

**partway** [1] - 134:5
**party** [9] - 37:6, 40:1, 40:8, 40:21, 43:7, 45:1, 82:20, 132:1, 251:24
**passed** [5] - 18:23, 18:24, 20:3, 20:6, 241:17
**past** [7] - 125:24, 128:8, 128:15, 128:17, 143:12, 176:25, 178:16
**patient** [1] - 260:9
**patrol** [1] - 177:25
**pattern** [1] - 81:23
**patting** [1] - 240:5
**Pause** [3] - 100:5, 164:7, 186:4
**pay** [10] - 40:22, 64:2, 103:22, 104:6, 105:13, 138:2, 138:7, 141:9, 143:13, 145:11
**paying** [3] - 13:16, 76:19, 173:7
**payment** [2] - 140:16, 141:13
**payments** [1] - 130:17
**PC** [2] - 2:17, 81:11
**peers** [1] - 197:1
**Penal** [1] - 80:2
**penalty** [1] - 206:5
**pending** [2] - 209:23, 214:11
**Pennsylvania** [13] - 86:1, 86:25, 89:6, 89:10, 89:23, 124:16, 124:23, 125:6, 128:3, 129:19, 136:5, 136:7, 137:13
**PennySaver** [1] - 102:17
**people** [14] - 42:3, 47:19, 166:22, 168:19, 177:23, 178:19, 198:4, 201:4, 203:24, 248:15, 253:9, 256:2, 256:17, 257:9
**people's** [1] - 107:25
**per** [1] - 105:13
**perceived** [2] - 16:25, 17:2
**percent** [4] - 177:18, 177:19, 193:8, 247:4
**perception** [1] - 103:12
**perfect** [2] - 215:18, 234:15

**perhaps** [1] - 151:7
**period** [11] - 84:9, 84:21, 104:6, 142:18, 160:22, 161:4, 183:11, 194:15, 209:19, 251:2, 252:17
**periodically** [1] - 136:8
**peripheral** [1] - 13:21
**perjury** [1] - 206:5
**permission** [1] - 130:2
**person** [14] - 37:12, 38:24, 40:1, 60:6, 60:13, 119:2, 121:23, 121:24, 168:5, 219:6, 252:14, 252:15, 253:15, 258:2
**personal** [1] - 82:18
**perspective** [2] - 42:1, 42:2
**pertaining** [1] - 231:21
**phase** [18] - 184:17, 186:16, 186:22, 187:12, 188:6, 191:25, 192:7, 192:17, 193:7, 193:10, 193:18, 193:23, 200:7, 230:19, 234:25, 242:21, 243:23, 244:2
**phone** [6] - 63:20, 69:21, 69:22, 173:21, 178:7, 210:1
**photo** [1] - 62:21
**photograph** [3] - 65:12, 70:6, 177:25
**photographs** [5] - 50:19, 70:3, 70:10, 72:15, 85:23
**photos** [1] - 50:12
**Physical** [2] - 136:5, 136:8
**physical** [25] - 89:24, 91:1, 91:7, 91:10, 91:20, 101:5, 101:6, 101:7, 101:18, 118:5, 118:9, 129:7, 129:9, 129:13, 129:15, 130:18, 137:15, 143:18, 144:4, 190:3, 204:3, 204:7, 204:8, 205:19, 239:24
**physically** [4] - 58:23, 109:9, 172:9
**pick** [8] - 49:22, 50:5, 63:23, 64:6, 69:18,

108:16, 235:14, 243:11
**picked** [5] - 28:11, 49:1, 49:18, 53:25, 54:12
**picking** [3] - 35:24, 50:7, 64:21
**picks** [2] - 48:23, 49:14
**picnic** [13] - 11:16, 15:11, 26:9, 48:23, 49:6, 49:14, 49:23, 50:6, 50:15, 50:18, 207:10, 219:20, 227:24
**picture** [18] - 52:4, 62:20, 63:4, 66:24, 67:11, 67:15, 67:22, 67:25, 68:6, 68:14, 68:20, 68:23, 74:9, 74:14, 75:5, 126:1, 176:22
**pictures** [32] - 50:14, 51:1, 51:2, 53:8, 53:21, 53:22, 53:23, 54:4, 57:24, 62:18, 65:9, 65:16, 65:19, 66:8, 66:9, 66:12, 66:17, 66:21, 68:24, 69:21, 69:24, 72:25, 73:21, 73:22, 74:3, 74:18, 74:21, 74:25, 75:5, 75:6
**piece** [3] - 42:24, 83:3
**pinned** [1] - 25:12
**pit** [2] - 22:7, 70:20
**Pittsburgh** [40] - 88:9, 88:10, 89:6, 89:15, 89:23, 90:4, 90:15, 90:19, 90:22, 93:19, 97:11, 99:10, 99:11, 99:13, 106:2, 106:5, 106:20, 106:25, 107:16, 108:1, 108:7, 110:10, 110:15, 110:20, 110:23, 111:5, 111:8, 113:6, 115:17, 115:18, 116:8, 116:20, 119:18, 120:22, 123:3, 125:16, 136:23, 141:18, 141:22, 141:25
**place** [9] - 25:17, 50:22, 53:10, 65:8, 104:4, 150:24, 169:7, 210:21, 231:10
**placed** [6] - 27:20,

3-RenSER-00437

3-RenSER-00437

27:22, 27:23, 28:11, 40:8, 140:16

**placing** [3] - 39:15, 39:16

**Plaintiff** [2] - 1:5, 40:15

**PLAINTIFF** [2] - 2:3, 4:4

**plaintiff** [12] - 39:16, 40:5, 40:20, 41:18, 43:6, 43:19, 44:2, 121:25, 124:19, 128:12, 131:8, 133:21

**plaintiff's** [9] - 3:13, 37:17, 40:19, 44:16, 45:17, 78:12, 128:1, 129:23, 134:7

**plan** [2] - 140:17, 259:15

**planning** [3] - 16:19, 35:6, 236:22

**play** [44] - 28:16, 34:13, 34:14, 35:9, 35:10, 35:19, 39:1, 39:6, 39:13, 39:19, 39:21, 43:15, 59:17, 163:7, 165:13, 166:3, 168:1, 168:2, 168:5, 168:8, 168:11, 169:16, 169:21, 172:19, 173:24, 187:1, 194:19, 197:15, 202:14, 204:11, 205:12, 206:2, 206:4, 248:19, 248:24, 248:25, 249:7, 249:13, 250:2, 251:16, 251:21, 254:21, 257:20, 258:24

**played** [50] - 15:8, 29:10, 30:1, 31:5, 31:17, 32:5, 33:9, 33:15, 33:23, 35:12, 35:23, 36:4, 39:7, 39:10, 39:20, 39:23, 43:18, 47:13, 47:22, 48:3, 48:8, 48:14, 48:18, 49:4, 49:12, 49:20, 50:3, 166:4, 168:15, 169:25, 174:12, 174:16, 194:25, 197:17, 200:24, 204:13, 205:14, 206:7, 242:8, 243:4, 243:22, 244:8, 244:18, 246:22,

248:20, 250:3, 252:5, 254:24, 255:4, 257:25

**playing** [6] - 29:25, 35:7, 35:13, 49:11, 108:19, 248:25

**plea** [2] - 156:4, 156:6

**pleading** [2] - 31:8, 209:24

**pleasant** [2] - 190:18, 197:25

**plus** [5] - 19:1, 45:6, 103:20, 105:22, 105:24

**pocket** [2] - 140:5, 196:7

**pocketknife** [1] - 230:18

**point** [66] - 5:17, 5:21, 5:24, 6:1, 6:25, 7:2, 8:17, 10:9, 10:13, 16:18, 17:14, 19:10, 20:4, 20:17, 22:22, 25:9, 26:16, 26:18, 27:1, 29:12, 29:19, 30:4, 30:20, 31:1, 31:9, 31:19, 31:24, 32:3, 32:12, 33:3, 33:17, 33:20, 46:10, 48:5, 56:22, 58:12, 58:17, 58:24, 62:15, 71:23, 75:19, 76:18, 85:9, 85:13, 107:16, 108:8, 116:21, 117:11, 118:3, 119:12, 125:17, 144:9, 170:8, 172:15, 198:1, 200:9, 200:15, 201:16, 202:13, 204:20, 243:21, 246:12, 247:5, 248:4, 256:8

**pointed** [6] - 7:3, 40:20, 150:4, 155:13, 171:25, 208:8

**pointing** [5] - 40:4, 42:17, 43:6, 191:23, 226:23

**points** [3] - 44:22, 47:11, 84:3

**poker** [2] - 11:18, 220:25

**police** [20] - 5:18, 8:3, 10:14, 13:13, 41:14, 42:1, 60:17, 66:1, 73:23, 84:24, 86:4, 86:16, 108:2, 108:6, 110:16, 110:18,

118:12, 119:13, 184:5, 190:2

**polite** [1] - 205:10

**politely** [1] - 204:15

**polyps** [2] - 115:3, 129:16

**pop** [1] - 147:24

**popped** [1] - 250:11

**porcelain** [1] - 93:3

**portion** [5] - 40:16, 43:5, 166:6, 168:1, 195:25

**portions** [1] - 42:10

**portrayed** [1] - 40:6

**posed** [1] - 105:1

**position** [9] - 16:13, 26:4, 33:7, 44:24, 45:17, 71:25, 79:21, 122:18, 123:25

**possess** [4] - 211:20, 229:12, 229:15, 237:17

**possessed** [2] - 219:15, 219:19

**possession** [3] - 207:19, 207:21, 238:23

**possible** [3] - 25:19, 149:17, 256:6

**possibly** [2] - 123:16, 223:4

**pot** [2] - 12:18, 55:17

**potentially** [6] - 79:9, 107:12, 124:7, 124:22, 228:18, 231:17

**pounds** [1] - 102:7

**power** [6] - 188:10, 196:4, 196:10, 196:23, 243:25, 244:15

**preclude** [3] - 121:11, 123:15, 130:7

**precluded** [7] - 79:8, 109:8, 118:23, 121:12, 123:4, 129:9, 156:15

**precluding** [1] - 123:17

**precondition** [1] - 121:19

**preconditions** [1] - 118:25

**preexisting** [1] - 121:24

**prejudice** [4] - 40:1, 40:13, 44:21, 45:1

**prejudicial** [4] - 40:24, 77:17, 88:1, 131:8

**preliminary** [2] - 93:6,

140:21

**premature** [1] - 131:15

**preparation** [1] - 44:25

**prepare** [1] - 40:21

**prepared** [16] - 37:10, 37:11, 37:13, 37:16, 37:20, 37:21, 39:17, 40:1, 40:7, 40:9, 40:16, 42:23, 43:12, 45:19, 173:22, 236:11

**preparing** [1] - 12:8

**prescribed** [1] - 97:19

**prescription** [4] - 158:1, 158:4, 158:25, 159:11

**presence** [17] - 5:5, 36:18, 36:21, 75:13, 82:13, 107:10, 128:19, 128:25, 132:15, 132:18, 132:25, 135:6, 148:17, 180:20, 184:12, 210:17, 259:19

**PRESENT** [1] - 3:12

**present** [12] - 5:7, 37:5, 46:7, 47:3, 82:14, 108:25, 135:10, 148:18, 186:12, 186:13, 245:25

**presentation** [1] - 46:13

**presenting** [1] - 109:3

**pressed** [2] - 47:20, 134:21

**pressing** [1] - 134:16

**pressure** [2] - 58:5, 61:3

**pretend** [2] - 248:6, 248:10

**pretrial** [18] - 184:17, 186:16, 186:22, 187:12, 188:6, 191:25, 192:7, 192:17, 193:7, 193:10, 193:18, 193:23, 200:7, 230:19, 234:25, 242:21, 243:23, 244:2

**pretty** [18] - 16:7, 24:17, 52:11, 54:15, 65:3, 79:9, 106:25, 148:13, 184:9, 192:16, 193:20, 193:22, 201:17, 212:23, 228:7,

232:16, 248:18, 255:8

**preventing** [2] - 15:19, 16:3

**previously** [2] - 82:15, 149:3

**PREVIOUSLY** [1] - 5:14

**primary** [1] - 88:17

**printer** [1] - 102:25

**printers** [2] - 84:3, 104:15

**privacy** [1] - 174:14

**private** [1] - 144:20

**privy** [1] - 37:3

**probation** [30] - 83:21, 146:17, 153:7, 209:25, 210:5, 210:8, 210:9, 210:11, 211:10, 212:21, 213:16, 213:23, 213:24, 214:14, 215:19, 216:6, 229:12, 236:20, 237:18, 238:7, 238:8, 238:13, 238:15, 238:22, 239:6, 239:8, 239:9, 239:14, 239:19, 241:12

**probations** [1] - 210:10

**probative** [1] - 88:1

**probes** [1] - 58:7

**problem** [10] - 43:21, 70:10, 107:23, 127:20, 129:25, 131:18, 131:19, 131:24, 175:8, 259:22

**problems** [2] - 94:1, 257:10

**proceeding** [9] - 150:24, 151:16, 151:22, 152:5, 185:20, 217:11, 218:15, 223:25, 226:14

**Proceeding** [3] - 150:24, 184:21, 217:23

**PROCEEDINGS** [1] - 1:12

**Proceedings** [1] - 260:14

**proceedings** [8] - 100:5, 149:20, 149:22, 164:7, 186:4, 195:6,

3-RenSER-00438       3-RenSER-00438

210:17, 261:10
**process** [2] - 62:12, 66:20
**processing** [2] - 62:15, 197:7
**produced** [1] - 45:9
**professional** [2] - 69:18, 198:18
**professionally** [1] - 198:6
**prognosis** [1] - 143:22
**progress** [1] - 134:14
**progression** [1] - 120:15
**project** [5] - 112:18, 112:19, 114:1, 114:4
**promise** [2] - 259:4, 260:10
**promised** [3] - 149:13, 149:15, 149:22
**proper** [2] - 103:8, 163:10
**properly** [3] - 226:6, 226:7, 249:6
**property** [2] - 64:14, 146:1
**prosecuted** [3] - 75:7, 81:14, 81:18
**prosecution** [4] - 75:20, 75:21, 80:9, 80:13
**protect** [3] - 23:9, 53:19, 172:8
**protecting** [2] - 23:25, 182:7
**protection** [3] - 229:19, 229:20, 235:1
**protocol** [1] - 47:18
**proud** [2] - 153:23, 232:16
**prove** [4] - 130:18, 130:25, 131:6, 131:9
**provider** [2] - 99:1, 100:15
**proving** [2] - 121:12, 130:16
**PTSD** [1] - 125:18
**public** [1] - 88:10
**publish** [2] - 10:21, 99:7
**pull** [10] - 14:23, 23:7, 52:24, 135:17, 136:16, 147:23, 175:25, 176:2, 177:24, 210:15
**pulled** [1] - 104:23
**punch** [1] - 26:3
**punched** [8] - 21:15, 21:21, 22:17, 22:19,

22:20, 30:15, 32:4, 92:11
**punches** [4] - 30:13, 30:14, 32:13
**punching** [3] - 22:8, 68:9, 222:5
**purpose** [3] - 196:14, 196:15
**purposes** [4] - 35:9, 81:4, 98:23, 221:14
**pursuant** [1] - 261:8
**pursue** [3] - 80:22, 83:1, 83:12
**pursued** [3] - 82:9, 83:5, 83:18
**pushing** [5] - 28:14, 101:24, 190:11, 204:24, 204:25
**put** [41] - 11:15, 11:16, 12:4, 39:3, 45:14, 46:13, 50:6, 50:15, 50:17, 50:18, 55:16, 64:18, 70:10, 88:8, 90:8, 92:17, 93:3, 102:1, 108:11, 115:7, 126:6, 141:12, 141:13, 152:18, 156:6, 156:12, 175:3, 178:16, 211:5, 215:22, 217:7, 221:5, 225:11, 225:18, 233:2, 238:3, 255:10, 255:24, 256:17
**puts** [3] - 44:23, 48:23, 49:14
**putting** [7] - 10:15, 10:17, 20:5, 20:9, 50:8, 240:7, 256:2
**PVS** [4] - 165:13, 165:14, 165:24, 194:22

## Q

**qualifications** [2] - 194:6, 237:19
**qualified** [1] - 96:11
**QUESTION** [2] - 152:10, 226:24
**question's** [1] - 114:19
**questioned** [1] - 197:22
**questioning** [4] - 17:20, 120:12, 171:10, 190:16
**questions** [16] - 18:9, 19:4, 59:4, 128:18,

148:5, 149:9, 154:4, 160:25, 168:18, 196:7, 196:8, 196:9, 205:1, 209:13, 223:17, 237:11
**quick** [5] - 66:4, 148:10, 148:11, 190:12
**quickly** [3] - 21:20, 148:13, 256:21
**quietly** [1] - 258:19
**quit** [1] - 100:2
**quite** [6] - 44:15, 80:16, 124:5, 124:24, 126:11, 126:24
**quote** [10] - 38:17, 150:19, 152:11, 152:13, 197:23, 197:24, 199:5, 211:19, 211:22
**quoting** [1] - 211:19

## R

**radiating** [1] - 94:2
**radio** [1] - 246:7
**radiologist** [3] - 100:15, 100:18, 100:19
**radiology** [1] - 98:16
**raise** [4] - 16:12, 127:14, 242:1, 243:6
**raised** [5] - 16:13, 193:15, 200:9, 242:23, 253:8
**raises** [1] - 208:6
**raising** [2] - 146:18, 203:15
**Raiszadeh** [10] - 93:24, 94:4, 95:11, 95:19, 95:22, 97:10, 99:20, 139:1, 139:21, 145:2
**Raiszadeh's** [4] - 94:17, 95:8, 139:15, 140:3
**rampaging** [1] - 251:8
**ran** [1] - 240:15
**ranger** [10] - 7:11, 7:15, 7:16, 7:25, 8:2, 8:6, 55:6, 253:5, 254:13, 255:5
**rated** [1] - 190:20
**rather** [1] - 235:14
**Rawlings** [5] - 57:25, 58:14, 58:19, 59:16, 65:16
**Raymond** [1] - 3:13
**rays** [2] - 61:4, 88:19

**re** [9] - 9:2, 17:2, 141:6, 161:23, 187:5, 190:6, 223:7, 223:8, 237:7
**re-ask** [9] - 9:2, 17:2, 141:6, 161:23, 187:5, 190:6, 223:7, 223:8, 237:7
**reach** [6] - 17:5, 26:24, 42:22, 142:25, 206:14, 257:7
**reached** [3] - 19:15, 42:23, 147:7
**reaching** [4] - 16:25, 188:18, 208:11, 238:4
**reaction** [1] - 171:24
**read** [26] - 38:12, 78:5, 78:8, 151:14, 152:4, 163:18, 171:15, 183:1, 193:20, 201:21, 202:23, 207:1, 211:23, 213:19, 218:18, 218:21, 222:15, 222:25, 224:11, 224:15, 225:15, 225:16, 226:11, 235:18, 247:12
**Reading** [2] - 78:9, 152:9
**reading** [3] - 162:25, 164:6, 224:25
**ready** [4] - 10:10, 12:16, 12:17, 163:18
**real** [3] - 21:11, 110:3, 208:10
**reality** [1] - 30:22
**realize** [1] - 58:17
**really** [34] - 14:9, 17:16, 17:19, 21:11, 42:18, 46:21, 60:11, 61:22, 62:13, 63:17, 65:6, 84:12, 85:5, 103:17, 106:19, 106:20, 118:16, 120:12, 130:7, 133:13, 144:13, 171:16, 173:1, 193:21, 195:20, 197:5, 212:5, 223:18, 227:13, 231:2, 235:4, 235:5, 242:3, 256:14
**REALTIME** [1] - 261:5
**rear** [1] - 70:21
**reason** [14] - 28:4, 31:15, 76:1, 77:10, 123:18, 127:16,

158:25, 160:14, 171:5, 179:12, 234:19, 234:23, 238:3, 255:15
**reasonable** [1] - 193:5
**reasons** [4] - 75:20, 75:23, 101:6, 196:19
**received** [19] - 62:15, 65:25, 90:4, 94:22, 97:18, 135:14, 135:24, 136:4, 136:22, 137:17, 138:19, 139:24, 140:10, 158:4, 172:7, 189:3, 211:7, 246:7
**receiving** [3] - 82:20, 90:7, 138:9
**recent** [1] - 77:7
**Recess** [4] - 47:2, 148:16, 186:11, 245:23
**recess** [10] - 36:7, 36:14, 37:7, 46:17, 46:19, 107:7, 132:13, 135:5, 186:7
**recessing** [2] - 245:17, 259:15
**reciprocal** [1] - 199:23
**recognize** [8] - 19:2, 173:3, 173:5, 173:17, 175:5, 211:10, 235:7, 236:5
**recognized** [3] - 19:3, 235:11, 258:6
**recollection** [7] - 163:12, 163:13, 163:15, 219:2, 225:4, 225:9, 225:18
**recommendation** [1] - 143:23
**recommended** [3] - 89:19, 92:16, 93:2
**reconvene** [1] - 132:16
**record** [34] - 44:4, 44:8, 44:10, 45:5, 45:7, 51:11, 51:20, 54:6, 66:14, 69:3, 70:3, 70:10, 70:13, 72:4, 79:18, 79:20, 104:1, 122:9, 123:1, 128:22, 135:16, 139:9, 139:10, 139:11, 147:23, 165:22, 194:21, 211:18, 214:12, 228:6, 228:9, 230:25, 251:23, 251:25

3-RenSER-00439     3-RenSER-00439

**recorded** [3] - 192:8, 192:11, 193:13
**recording** [4] - 133:9, 183:15, 207:11, 244:2
**records** [7] - 60:20, 88:14, 91:1, 98:13, 122:2, 122:5, 123:2
**red** [1] - 52:2
**redacted** [2] - 174:14, 210:17
**redescribe** [2] - 51:22, 51:23
**reduced** [1] - 102:10
**redundant** [2] - 35:23, 50:12
**refer** [1] - 88:18
**reference** [11] - 150:9, 160:21, 161:3, 182:21, 183:9, 189:2, 189:12, 190:9, 209:16, 248:22, 249:23
**referenced** [1] - 253:1
**referencing** [1] - 140:19
**referred** [2] - 91:7
**referring** [8] - 163:12, 163:14, 189:8, 189:9, 218:5, 243:4, 248:4, 248:6
**refresh** [8] - 77:3, 140:16, 163:12, 163:13, 187:6, 187:9, 219:1, 225:9
**refreshed** [1] - 108:15
**refreshes** [3] - 163:15, 225:3, 225:18
**refreshing** [1] - 129:2
**refusing** [3] - 182:9, 195:22, 199:24
**regard** [2] - 129:15, 250:15
**regarding** [1] - 78:11
**regardless** [3] - 80:12, 129:18, 138:1
**regards** [1] - 250:6
**Regina** [2] - 99:1, 99:5
**Regional** [1] - 85:15
**register** [1] - 7:14
**regret** [1] - 195:14
**regrettably** [1] - 187:22
**regular** [5] - 60:24, 101:22, 103:19, 210:10
**regulations** [1] - 261:12
**related** [9] - 90:5, 94:22, 101:21,

121:16, 123:2, 135:15, 136:14, 137:8, 142:3
**relates** [1] - 109:5
**relating** [1] - 38:22
**release** [1] - 133:20
**released** [1] - 133:23
**relevance** [4] - 62:2, 75:9, 86:22, 146:4
**Relevance** [5] - 65:13, 85:19, 142:14, 142:15, 145:14
**relevant** [6] - 78:16, 80:1, 80:8, 81:3, 86:24, 120:13
**relies** [1] - 198:15
**relieve** [1] - 89:25
**remain** [3] - 36:9, 36:15, 37:1
**remember** [37] - 6:10, 21:8, 33:18, 33:19, 35:20, 59:25, 60:2, 60:4, 60:5, 60:13, 60:14, 61:8, 71:3, 90:23, 91:11, 91:12, 94:9, 98:2, 113:20, 119:8, 141:9, 141:21, 172:15, 172:16, 172:25, 174:9, 185:2, 190:22, 201:25, 218:15, 218:24, 221:1, 222:13, 231:9, 253:20
**removal** [4] - 88:23, 126:18, 126:19, 126:23
**remove** [4] - 25:2, 58:7, 74:13, 88:19
**removed** [6] - 58:11, 88:21, 90:21, 91:23, 115:3, 126:9
**Ren** [1] - 34:3
**rendition** [2] - 41:9, 41:17
**Renegar** [56] - 6:4, 18:4, 20:23, 21:14, 22:6, 22:17, 24:1, 25:17, 26:3, 30:21, 31:22, 33:11, 47:25, 50:13, 50:14, 51:1, 51:2, 51:6, 150:19, 151:18, 152:11, 166:12, 168:6, 170:4, 170:8, 170:9, 170:20, 170:24, 171:13, 171:19, 171:20, 172:4, 177:4, 177:6, 177:10, 179:23,

179:25, 181:3, 198:4, 198:6, 201:7, 201:14, 202:15, 202:25, 203:4, 204:15, 205:16, 240:1, 247:3, 248:11, 248:14, 248:17, 249:24, 256:5, 260:1
**RENEGAR** [1] - 3:3
**Renegar's** [21] - 26:5, 28:22, 29:1, 29:3, 34:6, 165:14, 165:24, 166:1, 166:23, 169:23, 171:23, 172:2, 177:25, 194:22, 198:9, 204:12, 205:7, 242:5, 246:19, 248:6, 250:7
**repair** [2] - 92:7, 93:8
**repairing** [1] - 101:20
**repairman** [2] - 83:25, 101:20
**repairs** [1] - 104:11
**repeat** [2] - 162:8, 202:4
**repeatedly** [4] - 39:2, 39:22, 188:11, 240:18
**repeating** [1] - 207:25
**rephrase** [1] - 209:2
**replaced** [2] - 102:24
**replay** [2] - 33:21, 50:11
**report** [4] - 8:4, 92:25, 96:1, 96:2
**reported** [41] - 15:8, 29:10, 30:1, 31:5, 31:17, 32:5, 33:9, 33:15, 33:23, 36:4, 39:7, 39:10, 39:20, 39:23, 47:13, 47:22, 48:3, 48:8, 48:14, 48:18, 49:4, 49:12, 49:20, 50:3, 166:4, 168:15, 169:25, 174:12, 174:16, 194:25, 197:17, 204:13, 205:14, 242:8, 246:22, 248:20, 250:3, 252:5, 254:24, 257:25, 261:10
**reporter** [2] - 187:23, 223:5
**REPORTER** [4] - 1:23, 223:6, 261:1, 261:6
**Reporter** [1] - 261:20
**REPORTER'S** [1] -

1:12
**reports** [2] - 91:25, 253:15
**represent** [2] - 44:24, 173:4
**representation** [1] - 40:19
**representations** [1] - 125:4
**represented** [4] - 41:16, 104:6, 108:9, 119:14
**representing** [1] - 106:12
**represents** [1] - 107:17
**request** [4] - 16:15, 208:19, 209:4, 230:11
**requested** [1] - 237:3
**required** [1] - 78:23
**requirement** [1] - 211:15
**requirements** [2] - 153:6, 212:11
**resisting** [2] - 31:24, 32:1
**resolve** [5] - 76:11, 77:22, 143:24, 259:23, 260:7
**resolved** [2] - 259:22, 260:5
**resolves** [2] - 82:6, 127:24
**resource** [1] - 79:23
**resources** [1] - 131:5
**respect** [7] - 155:15, 184:19, 185:24, 186:15, 196:18, 199:12, 215:9
**respectful** [6] - 196:24, 199:14, 199:21, 243:8, 243:24, 244:13
**respectfully** [1] - 177:14
**respond** [6] - 10:5, 120:10, 182:3, 182:9, 182:15, 202:18
**responded** [4] - 167:5, 170:18, 182:20, 183:4
**responding** [2] - 167:2, 197:25
**response** [11] - 17:25, 18:10, 18:11, 32:23, 211:8, 214:9, 216:24, 239:5, 242:1, 250:8, 255:23

**responses** [1] - 32:22
**responsibilities** [1] - 153:3
**responsibility** [5] - 132:20, 173:23, 182:3, 182:15, 257:17
**responsible** [4] - 40:5, 127:6, 137:23, 198:18
**responsive** [1] - 200:15
**rest** [6] - 42:18, 100:6, 132:17, 141:13, 148:8, 259:24
**restate** [4] - 15:25, 25:25, 96:23, 97:1
**rested** [1] - 259:25
**restriction** [1] - 121:14
**restroom** [14] - 7:10, 7:13, 7:23, 7:25, 55:10, 55:12, 65:5, 133:8, 186:3, 245:7, 245:8, 245:11, 245:19, 245:22
**result** [13] - 90:16, 92:9, 93:25, 94:10, 118:21, 122:24, 123:13, 125:12, 125:13, 140:6, 147:9, 150:3, 181:25
**resume** [2] - 46:16, 259:1
**RESUMES** [1] - 5:14
**resumé** [1] - 88:8
**retainer** [1] - 140:17
**retake** [2] - 5:11, 148:20
**retrace** [1] - 115:14
**return** [3] - 135:7, 186:7, 211:25
**reverse** [4] - 79:21, 107:14, 125:23, 126:8
**reversed** [1] - 118:4
**rib** [11] - 67:4, 67:9, 67:16, 68:24, 69:19, 70:16, 70:20, 71:6, 71:11, 71:14, 71:16
**ribs** [2] - 22:20, 94:3
**ride** [1] - 137:20
**ridiculous** [1] - 214:24
**rightfully** [2] - 41:20, 118:1
**rightly** [1] - 153:23
**rights** [1] - 159:3
**ring** [1] - 172:20
**ripped** [1] - 63:2
**risk** [1] - 121:17
**Riverside** [3] - 85:6,

3-RenSER-00440          3-RenSER-00440

104:5, 104:13
**Road** [4] - 2:10, 2:18, 2:22, 3:9
**road** [4] - 7:10, 8:1, 14:10, 175:5
**rocks** [1] - 52:24
**rolling** [1] - 101:24
**Romo** [1] - 176:19
**room** [5] - 7:18, 75:11, 88:21, 107:8, 208:5
**ROOM** [1] - 1:24
**rough** [3] - 61:1, 116:6, 117:21
**rskinner@lynberg. com** [1] - 2:24
**rude** [2] - 201:8, 201:9
**rug** [1] - 60:25
**rule** [1] - 16:18
**ruling** [16] - 44:11, 77:4, 78:3, 78:5, 78:8, 78:20, 78:24, 79:23, 79:24, 109:7, 109:10, 125:23, 126:9, 126:15, 131:22, 245:3
**rulings** [5] - 107:15, 109:13, 118:5, 122:17, 127:10
**running** [3] - 20:11, 104:18, 126:3
**runs** [1] - 254:22
**runtime** [2] - 252:4, 257:23
**RV** [10] - 9:24, 172:23, 173:3, 173:17, 174:23, 175:12, 175:16, 176:25, 181:15, 250:24
**RYANE** [1] - 2:22

## S

**S1** [2] - 97:7, 99:17
**sad** [2] - 158:24, 159:23
**safe** [5] - 88:7, 196:4, 243:12, 244:1, 244:16
**safely** [1] - 259:10
**safer** [2] - 197:2, 199:6
**safety** [22] - 16:17, 21:5, 186:17, 186:24, 187:14, 188:8, 195:4, 195:7, 195:10, 197:13, 203:11, 203:15, 204:1, 206:11, 206:24, 208:1, 208:10, 208:21, 209:6, 237:24,

243:13, 243:21
**sags** [1] - 61:12
**salaries** [2] - 128:20, 128:24
**salary** [28] - 108:5, 108:13, 108:25, 109:18, 109:22, 109:24, 109:25, 110:1, 112:15, 118:2, 119:4, 119:5, 119:7, 119:20, 119:21, 119:23, 120:7, 123:6, 123:25, 127:12, 127:21, 127:22, 128:2, 128:9, 128:17, 128:19, 129:6, 129:13
**San** [1] - 94:4
**SANTA** [3] - 1:14, 1:24, 5:1
**Santa** [2] - 102:23, 104:20
**sarcasm** [3] - 195:13, 195:17, 195:18
**sarcastic** [1] - 195:9
**sarcastically** [1] - 195:5
**sat** [9] - 53:10, 189:17, 190:9, 191:12, 191:14, 191:15, 204:4, 205:16, 205:17
**satisfactory** [1] - 79:6
**satisfied** [1] - 43:1
**save** [3] - 23:8, 24:16, 27:6
**saw** [20] - 7:7, 7:18, 8:5, 11:25, 12:9, 20:22, 23:14, 23:16, 23:18, 50:5, 50:9, 50:13, 50:22, 54:5, 60:19, 65:12, 74:10, 208:5, 220:4, 237:21
**scab** [1] - 74:7
**scale** [1] - 11:8
**scan** [1] - 122:12
**scans** [1] - 88:19
**scar** [1] - 61:9
**scared** [9] - 16:16, 19:9, 21:5, 23:19, 29:20, 84:23, 188:13, 255:8, 256:25
**scary** [1] - 193:5
**scene** [17] - 41:24, 47:24, 50:13, 50:16, 50:17, 53:5, 65:16, 203:4, 204:17, 208:25, 209:3,

246:15, 247:1, 247:4, 247:16, 250:25, 257:3
**schools** [3] - 88:10, 102:23, 103:18
**sciatica** [1] - 94:1
**scolding** [1] - 242:11
**scrape** [1] - 60:25
**scrapes** [1] - 74:11
**scratch** [1] - 73:15
**scratched** [1] - 74:3
**scratches** [1] - 73:24
**screaming** [7] - 8:25, 18:13, 19:22, 25:13, 32:11, 251:9, 253:2
**screen** [4] - 51:11, 108:18, 220:12, 228:1
**scroll** [2] - 100:6, 100:9
**scrolling** [2] - 95:3, 100:2
**search** [4] - 18:15, 18:16, 204:25, 239:21
**searched** [2] - 56:15, 240:10
**searching** [3] - 41:15, 56:19, 56:23
**season** [1] - 106:14
**seat** [5] - 47:5, 107:11, 208:16, 208:19, 209:5
**seated** [5] - 5:10, 36:15, 50:23, 54:1, 75:14
**second** [23] - 12:1, 17:19, 18:23, 29:1, 40:25, 41:14, 42:13, 44:5, 53:10, 64:2, 77:2, 77:3, 147:21, 165:18, 167:5, 191:18, 222:15, 240:24, 241:1, 243:6, 252:19, 253:1, 253:13
**secondary** [1] - 97:7
**seconds** [10] - 20:3, 20:6, 38:11, 165:15, 194:23, 242:24, 252:4, 254:22, 254:23, 257:23
**Section** [2] - 80:3, 261:8
**section** [3] - 202:25, 237:14
**see** [106] - 7:4, 8:2, 11:16, 12:19, 13:13, 13:21, 14:2, 14:9, 18:20, 20:12, 20:17,

21:2, 23:5, 23:9, 24:4, 33:11, 36:1, 47:16, 48:10, 48:20, 49:8, 49:11, 49:22, 50:7, 50:21, 50:23, 52:2, 52:4, 52:6, 52:12, 52:13, 53:8, 53:14, 57:22, 67:12, 68:11, 72:16, 73:1, 73:7, 73:8, 73:12, 73:13, 73:15, 74:10, 74:17, 84:25, 88:17, 89:21, 90:15, 90:25, 92:4, 92:13, 96:23, 101:16, 101:18, 103:23, 106:7, 115:1, 115:11, 117:9, 122:20, 124:21, 129:13, 133:1, 135:21, 147:23, 151:4, 156:9, 156:11, 163:14, 164:4, 170:13, 171:25, 173:3, 175:13, 176:5, 176:8, 176:22, 176:24, 176:25, 177:2, 177:20, 204:20, 208:4, 208:7, 208:8, 216:12, 217:6, 223:21, 225:17, 227:23, 228:6, 228:8, 239:11, 239:20, 253:13, 255:1, 257:4, 259:10, 260:8, 260:12
**seeing** [2] - 24:15, 41:11
**seem** [3] - 44:15, 78:19, 123:24
**sees** [1] - 207:14
**segment** [10] - 28:19, 48:20, 197:20, 197:22, 198:12, 200:23, 201:4, 201:19, 202:7, 248:16
**segments** [1] - 251:16
**seizure** [1] - 239:21
**self** [1] - 43:3
**self-correct** [1] - 43:3
**semibullying** [1] - 198:9
**send** [5] - 132:9, 163:17, 181:13, 259:5
**sends** [1] - 181:14
**sense** [2] - 42:6, 219:7

**sent** [5] - 43:7, 44:25, 91:9, 139:1, 238:15
**sentence** [3] - 10:10, 29:13, 29:24
**separate** [1] - 82:23
**separation** [3] - 98:4, 99:22, 100:1
**September** [3] - 106:15, 158:5, 158:19
**Sergeant** [4] - 57:25, 58:14, 59:16, 65:16
**sergeant** [1] - 58:19
**series** [4] - 28:20, 50:20, 66:10, 66:13
**serious** [2] - 154:16, 238:8
**seriously** [4] - 130:13, 227:9, 227:11, 245:9
**served** [1] - 153:22
**servers** [1] - 84:3
**service** [1] - 233:7
**serving** [4] - 153:20, 153:25, 209:25, 251:4
**session** [4] - 5:6, 132:18, 134:19, 135:9
**sessions** [2] - 90:22, 91:11
**set** [3] - 7:17, 87:13, 148:14
**sets** [1] - 126:25
**setting** [1] - 240:8
**seven** [5] - 25:9, 32:2, 48:1, 115:3, 243:17
**seven-officer** [1] - 32:2
**several** [5] - 24:21, 58:4, 69:14, 181:5, 217:2
**severe** [2] - 90:7, 121:13
**shape** [5] - 15:11, 17:7, 24:10, 32:17, 134:22
**sharp** [1] - 230:20
**sharrell@lynberg. com** [1] - 2:12
**sheath** [4] - 55:4, 55:13, 55:14, 233:2
**sheaths** [3] - 54:10, 54:23, 55:13
**shelter** [2] - 63:25, 64:5
**sheriff** [2] - 87:14, 178:25
**Sheriff** [1] - 190:19
**sheriff's** [9] - 8:5, 19:24, 40:9, 82:23,

3-RenSER-00441

3-RenSER-00441

252:11, 258:8, 258:11, 258:16, 258:20
**Sheriff's** [1] - 142:12
**sheriffs** [10] - 147:21, 161:16, 161:25, 162:12, 163:4, 164:11, 164:16, 173:15, 252:8, 258:14
**shift** [1] - 122:9
**shirt** [1] - 63:1
**shit** [4] - 150:20, 151:24, 160:15, 160:18
**shit'** [3] - 38:18, 151:19, 152:12
**shock** [2] - 64:23
**shoes** [1] - 12:11
**shoot** [2] - 188:17, 191:8
**shooting** [2] - 16:19, 229:19
**shortened** [1] - 217:5
**shorthand** [1] - 256:19
**shot** [4] - 19:17, 101:12, 190:13, 191:15
**shots** [3] - 64:2, 69:14, 101:12
**shoulder** [1] - 225:19
**shoved** [1] - 64:16
**show** [29] - 13:14, 14:19, 15:9, 41:19, 41:23, 69:1, 70:11, 70:13, 71:25, 73:24, 98:25, 104:12, 104:17, 105:8, 105:16, 119:1, 122:5, 123:11, 138:15, 147:23, 156:3, 163:4, 163:11, 187:7, 217:20, 219:2, 224:2, 224:7, 225:17
**showed** [11] - 87:14, 97:6, 161:2, 164:20, 165:5, 173:15, 178:25, 186:19, 209:12, 210:1, 236:24
**shower** [2] - 66:20, 70:1
**showing** [7] - 15:15, 70:12, 105:17, 124:18, 163:14, 166:23, 201:4
**shown** [1] - 14:10
**shows** [7] - 41:3,

122:9, 183:9, 199:8, 243:5, 244:9
**shut** [8] - 68:16, 68:17, 170:25, 171:24, 172:5, 180:2, 180:7, 180:25
**sic** [7] - 58:2, 79:23, 88:18, 159:18, 176:19, 180:3, 223:16
**sic]** [1] - 143:9
**side** [33] - 15:15, 20:16, 20:19, 20:22, 20:24, 21:3, 21:25, 23:7, 36:11, 40:22, 43:7, 43:10, 43:17, 44:16, 44:22, 52:1, 52:5, 66:24, 67:7, 67:15, 67:25, 68:11, 69:9, 105:24, 106:21, 108:21, 120:8, 129:3, 134:22, 211:12, 234:2, 245:16, 254:12
**sidearm** [1] - 234:2
**sides** [1] - 38:3
**sign** [1] - 210:7
**signed** [14] - 209:16, 212:2, 212:10, 212:21, 213:16, 213:25, 214:1, 214:14, 215:19, 216:6, 216:8, 216:21, 217:15, 238:6
**signifies** [1] - 211:15
**signing** [3] - 100:15, 209:21, 216:15
**simple** [5] - 80:12, 80:22, 82:10, 97:2, 109:17
**simply** [2] - 218:11, 245:16
**single** [1] - 250:6
**sirens** [2] - 12:9, 256:20
**sit** [12] - 28:11, 161:10, 179:8, 189:11, 189:19, 189:20, 202:16, 203:1, 203:10, 206:13, 207:3, 223:17
**sitting** [9] - 48:5, 53:5, 53:8, 55:5, 94:13, 197:7, 202:22, 243:19, 243:20
**situation** [21] - 8:9, 56:20, 76:4, 77:18,

88:7, 93:19, 117:24, 188:19, 193:22, 197:8, 201:2, 203:6, 204:21, 236:9, 241:10, 244:11, 246:18, 249:19, 256:6, 256:12, 256:22
**six** [4] - 48:1, 114:21, 208:5, 256:23
**skin** [1] - 61:1
**SKINNER** [3] - 2:22, 164:1, 185:5
**skull** [2] - 90:20, 121:24
**slang** [1] - 212:16
**sleep** [9] - 12:8, 12:16, 12:17, 161:7, 164:18, 167:7, 179:4, 246:4, 253:6
**sleeping** [4] - 11:10, 15:21, 16:6, 173:10
**sleeve** [2] - 53:12, 53:17
**slept** [6] - 164:15, 167:12, 173:9, 173:14, 178:24, 179:5
**slow** [4] - 69:3, 70:7, 89:12, 194:10
**slowly** [3] - 59:5, 191:17, 191:21
**small** [1] - 230:18
**smaller** [2] - 221:22, 234:15
**smart** [6] - 197:23, 197:25, 199:5, 199:19, 200:6, 200:24
**smoke** [1] - 12:18
**so..** [1] - 156:10
**socket** [1] - 31:21
**sole** [1] - 157:20
**solely** [1] - 132:20
**solution** [2] - 79:6, 84:4
**someone** [11] - 7:19, 9:9, 45:19, 57:20, 163:17, 175:18, 228:18, 229:7, 231:17, 253:19, 255:24
**someplace** [2] - 116:6, 117:5
**sometime** [7] - 104:6, 107:18, 112:1, 115:17, 117:1, 139:19, 142:8
**sometimes** [2] - 34:10, 104:16

**somewhat** [2] - 108:5, 125:15
**somewhere** [2] - 131:23, 206:6
**sooner** [1] - 144:11
**sorry** [20] - 34:3, 61:15, 70:9, 78:6, 95:16, 99:23, 101:12, 101:14, 101:15, 104:24, 109:21, 115:25, 125:4, 194:9, 202:3, 203:13, 213:19, 224:16, 239:17, 241:1
**sort** [3] - 15:3, 42:4, 208:3
**sound** [6] - 149:7, 161:12, 169:10, 192:5, 243:2, 243:8
**sounded** [1] - 177:22
**sounds** [7] - 30:16, 31:1, 34:5, 34:9, 149:8, 177:22
**source** [1] - 157:20
**sources** [1] - 130:17
**South** [1] - 2:14
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 261:20
**SPAAN** [3] - 1:23, 261:5, 261:19
**spaces** [1] - 99:16
**speaker** [1] - 184:7
**speaking** [16] - 36:2, 42:16, 58:23, 90:11, 104:8, 122:1, 204:19, 223:21, 227:14, 238:4, 241:8, 258:7, 258:11, 258:15
**speaks** [1] - 51:12
**special** [3] - 130:21, 220:22, 220:23
**specialists** [1] - 93:21
**specific** [2] - 78:22, 189:9
**specifically** [2] - 189:8, 253:17
**speculate** [1] - 77:19
**speculating** [4] - 56:9, 56:11, 166:21, 243:16
**speculation** [10] - 21:17, 55:21, 56:25, 138:4, 190:5, 203:12, 203:14, 208:22, 209:7, 237:25
**Speculation** [3] - 17:1, 71:8, 71:13

**speech** [7] - 199:13, 199:14, 199:21, 200:6, 200:25, 242:10, 242:21
**spell** [1] - 99:4
**spend** [1] - 131:4
**spent** [2] - 131:6, 141:19
**spinal** [3] - 122:10, 122:11, 122:12
**spine** [5] - 88:25, 94:22, 99:15, 122:12, 144:23
**split** [2] - 111:8, 234:13
**splitting** [1] - 234:15
**spondylolisthesis** [1] - 95:1
**spondylolysis** [1] - 97:6
**spondylosis** [1] - 97:7
**spontaneous** [1] - 125:25
**spot** [2] - 68:10, 228:23
**spread** [1] - 239:10
**spring** [1] - 126:16
**stable** [1] - 220:20
**stacked** [1] - 94:12
**stamp** [2] - 165:14, 167:15
**stand** [9] - 5:11, 75:15, 124:13, 135:8, 148:20, 189:18, 193:15, 196:17, 202:17
**STAND** [1] - 5:14
**standing** [17] - 11:10, 12:7, 12:9, 12:11, 13:12, 13:16, 13:25, 14:22, 15:7, 15:17, 16:7, 16:8, 17:9, 20:5, 21:20, 21:22, 216:23
**standpoint** [2] - 41:5, 119:19
**stands** [2] - 27:25, 42:11
**start** [22] - 36:1, 37:22, 39:8, 39:21, 65:7, 89:8, 89:22, 101:11, 148:2, 148:6, 164:3, 164:19, 165:3, 167:17, 185:14, 185:16, 197:13, 238:13, 245:16, 246:25, 247:15, 259:8
**started** [13] - 23:11, 38:16, 68:5, 84:19,

85:4, 85:6, 87:14, 89:11, 89:16, 90:7, 106:14, 203:5, 204:18
**starter** [1] - 55:8
**starting** [4] - 24:15, 87:11, 89:10, 126:23
**starts** [2] - 73:8, 185:13
**STATE** [1] - 261:4
**state** [15] - 20:9, 96:16, 103:5, 124:15, 132:19, 145:15, 149:13, 152:22, 153:1, 154:10, 154:11, 180:13, 209:16, 214:11
**statement** [6] - 98:9, 216:3, 229:14, 247:2, 247:18, 248:14
**statements** [10] - 47:17, 164:19, 164:23, 165:3, 192:16, 246:24, 247:14, 248:8, 248:12, 250:7
**STATES** [1] - 1:1
**States** [3] - 261:6, 261:8, 261:13
**stating** [1] - 150:8
**station** [10] - 7:11, 7:15, 7:16, 8:1, 8:2, 8:5, 8:6, 253:5, 254:13, 255:6
**stationary** [1] - 17:9
**status** [1] - 56:6
**stay** [5] - 29:19, 59:2, 65:1, 83:23, 185:1
**stayed** [3] - 87:12, 110:10, 110:25
**staying** [1] - 84:17
**stenographically** [1] - 261:10
**step** [10] - 33:19, 34:1, 36:16, 75:15, 89:12, 89:13, 135:3, 144:5, 248:24, 259:18
**stepped** [1] - 28:6
**stepping** [2] - 28:5, 75:4
**steps** [2] - 28:1, 126:25
**Stever** [2] - 3:14, 176:2
**stick** [1] - 235:14
**sticks** [6] - 64:15, 229:9, 235:17, 235:19, 235:21,

235:24
**still** [44] - 8:3, 8:5, 8:9, 8:20, 11:13, 12:13, 13:25, 14:7, 23:3, 27:10, 31:8, 31:10, 37:5, 47:16, 47:20, 48:6, 53:5, 61:9, 61:25, 64:23, 68:16, 73:11, 81:3, 83:17, 84:25, 111:6, 111:9, 113:6, 116:8, 116:20, 125:13, 125:18, 129:12, 140:23, 143:15, 154:23, 155:5, 177:25, 193:15, 209:11
**stipulate** [1] - 43:4
**stipulation** [3] - 42:22, 42:23, 43:3
**stitches** [2] - 73:11, 88:19
**stomach** [3] - 26:5, 26:6, 115:4
**stomps** [1] - 28:1
**stood** [1] - 16:21
**stop** [24] - 13:1, 22:4, 25:15, 27:23, 32:3, 32:16, 32:17, 38:5, 39:11, 39:24, 52:10, 70:2, 100:9, 124:18, 125:19, 125:21, 127:22, 128:2, 164:9, 179:19, 215:7, 237:18, 255:10
**stopped** [3] - 13:18, 61:3, 128:23
**stopping** [3] - 5:17, 97:22, 114:22
**stops** [1] - 125:22
**stories** [2] - 41:24, 42:6
**stove** [1] - 55:16
**straight** [7] - 7:10, 7:11, 64:10, 113:15, 154:1, 154:4, 164:15
**strapping** [1] - 74:1
**strategic** [1] - 124:20
**strategy** [1] - 132:3
**Street** [1] - 2:14
**STREET** [1] - 1:24
**street** [1] - 209:16
**stress** [1] - 110:19
**stressed** [1] - 133:3
**stressors** [2] - 109:4, 109:14
**strewn** [1] - 12:5
**stricken** [3] - 62:8, 63:9, 63:11

**strike** [11] - 24:11, 26:11, 62:7, 63:10, 76:13, 87:20, 99:20, 142:8, 147:10, 170:16, 188:25
**strikes** [3] - 24:7, 27:12, 68:2
**striking** [1] - 24:10
**stroke** [39] - 20:16, 111:13, 111:16, 111:25, 112:1, 112:2, 112:9, 114:6, 114:9, 114:12, 114:21, 114:22, 114:25, 115:2, 117:1, 117:5, 117:14, 118:10, 118:11, 118:13, 118:15, 118:18, 120:3, 121:19, 121:23, 122:23, 123:8, 123:10, 124:8, 127:15, 127:17, 129:4, 129:15, 130:6, 130:22, 157:10, 157:15, 157:21
**strokes** [1] - 121:19
**struck** [1] - 20:8
**stubs** [1] - 103:22
**stuck** [1] - 102:5
**studies** [2] - 93:22, 93:25
**stuff** [25] - 50:8, 56:13, 57:11, 57:16, 63:23, 64:6, 64:14, 64:22, 84:4, 87:13, 87:14, 101:20, 103:18, 117:7, 138:8, 141:20, 146:2, 146:7, 199:8, 203:25, 210:14, 223:18, 233:3, 240:10, 243:18
**stupid** [1] - 247:6
**style** [1] - 60:25
**subcontract** [1] - 84:2
**subdue** [1] - 147:4
**subject** [5] - 41:2, 103:11, 227:5, 238:11, 246:11
**submit** [1] - 83:10
**submitted** [2] - 82:21, 98:21
**submitting** [1] - 43:1
**subsequent** [1] - 119:23
**suddenly** [1] - 167:14
**suffered** [3] - 110:18, 125:13, 157:7

**suffering** [3] - 125:18, 130:25, 157:21
**suggest** [3] - 203:3, 204:16, 207:25
**suggesting** [1] - 237:23
**suggesting..** [1] - 93:9
**suggestion** [4] - 75:24, 76:2, 128:1, 129:20
**suggests** [1] - 207:18
**Suite** [6] - 2:5, 2:11, 2:15, 2:23, 3:5, 3:9
**suite** [1] - 2:19
**sum** [3] - 182:19, 183:3, 204:3
**sundown** [2] - 161:9, 167:8
**Sunrise** [1] - 138:9
**supplies** [4] - 15:21, 56:24, 57:9, 57:16
**supply** [3] - 11:10, 16:5, 16:8
**supported** [1] - 93:3
**supposed** [6] - 19:18, 97:22, 105:15, 133:5, 143:23, 224:11
**surgery** [13] - 101:10, 101:11, 101:16, 108:9, 108:12, 130:23, 144:5, 144:7, 144:10, 144:14, 144:16, 144:22, 145:8
**surgically** [2] - 58:11, 74:13
**surmising** [1] - 110:14
**surprised** [1] - 184:9
**suspect** [1] - 166:25
**suspects** [1] - 183:23
**sustain** [8] - 52:20, 71:14, 71:15, 87:19, 95:14, 105:2, 143:4, 241:19
**sustained** [33] - 6:6, 6:21, 21:18, 25:24, 32:25, 52:17, 54:18, 55:22, 56:4, 62:4, 63:9, 65:14, 71:9, 71:11, 71:18, 75:2, 78:15, 79:3, 90:6, 96:24, 98:7, 103:3, 122:23, 138:14, 142:17, 147:18, 153:11, 155:19, 181:19, 216:19, 219:10, 244:22, 244:24
**sutures** [4] - 52:25,

60:23, 73:11, 88:23
**suturing** [1] - 61:2
**SUVs** [2] - 8:3, 13:14
**sweetheart** [5] - 201:16, 201:17, 201:22, 202:13, 205:18
**swing** [1] - 119:22
**Swiss** [1] - 211:25
**SWISS** [8] - 3:8, 37:5, 37:24, 40:11, 46:18, 46:24, 133:15, 134:10
**switched** [1] - 30:24
**switching** [1] - 129:3
**swollen** [3] - 52:6, 52:8, 61:12
**SWORN** [1] - 5:14
**sworn** [1] - 206:5
**symbol** [1] - 232:19
**symptomology** [1] - 130:3
**system** [1] - 209:16
**System** [1] - 99:10

## T

**T3** [1] - 94:20
**T4** [1] - 94:20
**table** [14] - 11:16, 15:11, 26:9, 48:24, 49:6, 49:15, 49:23, 50:6, 50:8, 50:15, 50:18, 207:10, 219:20, 227:24
**tablet** [1] - 158:13
**tactical** [1] - 245:17
**tactically** [1] - 131:11
**taint** [1] - 80:17
**take-down** [1] - 228:9
**talks** [1] - 58:14
**TAMARA** [1] - 2:18
**tape** [59] - 18:3, 18:4, 19:6, 28:22, 29:1, 34:4, 34:5, 34:6, 34:7, 34:15, 36:20, 39:24, 41:25, 47:12, 49:8, 50:5, 50:9, 50:13, 59:14, 59:16, 150:14, 152:3, 165:13, 165:24, 166:7, 166:12, 166:18, 167:15, 168:1, 168:5, 169:16, 169:23, 170:2, 171:3, 171:4, 172:17, 183:9, 186:22, 186:25, 193:13, 195:11, 195:15, 195:23,

3-RenSER-00443                    3-RenSER-00443

196:1, 200:8, 205:12, 205:23, 206:6, 206:9, 242:5, 243:2, 243:8, 243:22, 251:17, 254:21, 257:20, 258:24

**taped** [1] - 183:14

**tapes** [1] - 183:22

**target** [1] - 56:21

**Tase** [1] - 21:9

**tase** [1] - 21:9

**tased** [1] - 32:20

**Taser** [17] - 21:7, 24:20, 24:22, 24:24, 25:3, 25:7, 31:23, 32:7, 32:12, 32:23, 33:3, 33:4, 58:7, 74:13

**tax** [1] - 106:14

**tear** [1] - 52:13

**teasing** [3] - 205:21, 205:25, 206:5

**tech** [3] - 37:5, 102:8, 102:17

**technical** [4] - 83:25, 101:20, 104:11, 221:23

**technically** [1] - 198:19

**technician** [1] - 3:14

**techs** [1] - 84:5

**teeth** [8] - 90:16, 90:20, 90:21, 91:22, 92:5, 92:21, 93:4

**temple** [3] - 23:6, 23:20, 51:17

**tempted** [1] - 40:15

**ten** [6] - 114:25, 133:4, 148:12, 186:6, 186:7, 248:15

**ten-minute** [1] - 186:6

**tendon** [1] - 229:3

**tendons** [3] - 228:21, 228:25, 229:5

**tenser** [1] - 203:6

**tenses** [1] - 32:14

**tension** [3] - 198:14, 203:4, 204:17

**tent** [72] - 8:12, 8:17, 9:9, 10:11, 10:15, 11:10, 11:13, 12:10, 12:12, 12:22, 12:23, 13:25, 14:15, 15:16, 15:21, 16:5, 16:6, 16:8, 18:20, 49:22, 50:6, 56:15, 56:18, 56:23, 56:24, 57:9, 57:16, 63:23, 64:15, 64:16, 87:13,

160:21, 161:2, 164:17, 164:21, 165:5, 167:14, 169:8, 170:5, 170:21, 173:8, 173:10, 173:11, 175:11, 175:14, 175:15, 175:17, 176:9, 177:20, 177:22, 178:25, 181:15, 181:17, 183:8, 186:19, 239:20, 239:22, 241:24, 246:3, 250:22, 251:6, 252:17, 253:2, 253:5, 253:12, 255:1, 255:9, 256:3, 256:8

**tents** [7] - 10:7, 15:20, 15:23, 16:3, 33:11, 175:22

**term** [24] - 204:16, 205:3, 212:16, 212:20, 212:22, 213:15, 214:5, 214:15, 215:20, 218:16, 219:12, 221:24, 222:16, 223:11, 225:22, 226:2, 226:18, 226:24, 248:3, 249:15, 249:22, 256:20

**terms** [15] - 41:2, 84:21, 86:25, 90:11, 94:10, 101:21, 108:13, 118:5, 156:15, 156:19, 181:24, 182:2, 212:3, 213:24, 238:7

**terrible** [2] - 242:23, 242:25

**test** [1] - 115:4

**testified** [11] - 11:19, 26:2, 30:21, 80:1, 81:25, 95:19, 95:24, 98:18, 127:16, 145:2, 149:20

**testify** [8] - 55:24, 70:17, 71:1, 96:21, 105:7, 109:16, 129:12, 221:24

**testifying** [4] - 99:22, 113:13, 113:16, 138:20

**testimony** [19] - 37:3, 78:11, 94:6, 112:24, 126:16, 130:3, 133:25, 145:6,

152:4, 157:11, 157:20, 187:2, 193:17, 198:5, 214:5, 216:21, 227:3, 233:10, 243:23

**testing** [4] - 88:16, 90:10, 97:13, 133:18

**tests** [1] - 89:16

**text** [1] - 217:20

**THE** [557] - 4:4, 5:6, 5:14, 6:6, 6:21, 9:2, 9:6, 9:8, 10:22, 11:3, 13:8, 15:2, 15:9, 15:23, 17:2, 21:18, 25:24, 26:13, 28:19, 28:23, 29:2, 29:5, 29:7, 30:7, 30:9, 32:25, 34:16, 34:19, 34:22, 35:11, 35:16, 35:18, 35:20, 36:7, 36:9, 36:19, 36:25, 37:7, 37:10, 37:13, 37:16, 37:19, 38:1, 38:5, 38:10, 39:8, 39:11, 39:21, 39:24, 40:13, 43:15, 43:23, 44:1, 44:4, 44:8, 44:20, 45:13, 46:4, 46:7, 46:19, 46:25, 47:3, 48:12, 48:13, 51:14, 51:16, 51:22, 51:24, 54:18, 55:22, 56:4, 56:6, 56:9, 57:2, 57:6, 57:8, 61:15, 62:4, 62:8, 63:9, 63:11, 64:9, 64:10, 65:14, 65:22, 65:25, 66:13, 68:25, 69:3, 69:5, 69:8, 69:10, 70:2, 70:5, 70:9, 70:17, 70:20, 70:23, 71:9, 71:14, 73:2, 73:4, 73:18, 75:10, 75:14, 76:2, 76:22, 77:1, 77:6, 77:12, 77:16, 77:22, 78:5, 78:8, 78:14, 78:21, 79:1, 79:16, 80:11, 81:6, 81:19, 82:2, 82:4, 82:14, 85:20, 86:3, 86:6, 86:8, 86:24, 87:3, 87:5, 87:16, 87:18, 87:19, 87:25, 91:3, 92:1, 93:6, 93:8, 95:3, 95:9, 95:14, 95:18, 95:21, 95:23, 96:1, 96:4, 96:6, 96:8, 96:13, 96:15, 96:18, 96:23, 97:1,

98:7, 98:14, 98:17, 99:2, 99:4, 99:6, 99:8, 99:11, 99:21, 99:25, 100:6, 100:9, 100:13, 100:16, 100:19, 100:22, 103:3, 103:9, 104:24, 105:2, 105:7, 107:6, 107:11, 107:21, 107:23, 109:7, 109:21, 109:24, 110:2, 110:5, 110:6, 110:7, 110:9, 110:10, 110:13, 110:14, 110:21, 110:22, 110:24, 111:1, 111:3, 111:4, 111:6, 111:7, 111:9, 111:10, 111:11, 111:12, 111:13, 111:15, 111:17, 111:18, 111:19, 111:20, 111:21, 111:23, 111:24, 111:25, 112:3, 112:5, 112:7, 112:8, 112:10, 112:11, 112:12, 112:13, 112:16, 112:19, 112:21, 112:23, 113:1, 113:2, 113:4, 113:5, 113:9, 113:10, 113:12, 113:13, 113:15, 113:17, 113:18, 113:20, 113:21, 113:23, 113:24, 114:1, 114:2, 114:4, 114:5, 114:7, 114:8, 114:13, 114:14, 114:18, 114:19, 114:24, 115:1, 115:2, 115:6, 115:7, 115:11, 115:12, 115:14, 115:20, 115:21, 115:22, 115:24, 115:25, 116:1, 116:4, 116:5, 116:7, 116:8, 116:11, 116:12, 116:14, 116:16, 116:17, 116:19, 116:24, 116:25, 117:3, 117:4, 117:7, 117:11, 117:15, 117:16, 117:17, 117:19, 118:9, 118:17, 118:23, 119:4, 120:11, 120:19, 120:22,

120:24, 121:1, 121:6, 121:8, 121:15, 121:18, 122:4, 122:15, 123:4, 123:14, 124:10, 124:21, 125:10, 125:22, 127:4, 127:7, 127:20, 127:24, 128:11, 128:17, 128:22, 129:6, 129:12, 129:21, 130:1, 130:12, 131:10, 131:25, 132:9, 132:12, 132:16, 133:1, 133:7, 133:9, 133:12, 133:24, 134:11, 134:17, 134:21, 135:1, 135:7, 135:18, 137:5, 137:10, 137:14, 138:5, 138:14, 138:21, 139:8, 139:10, 139:12, 141:1, 141:3, 141:5, 142:5, 142:17, 142:20, 143:4, 143:8, 144:1, 144:3, 144:25, 145:4, 145:7, 145:8, 145:15, 145:17, 146:5, 146:10, 146:22, 146:23, 146:24, 147:1, 147:2, 147:3, 147:18, 148:6, 148:11, 148:18, 150:15, 150:16, 151:1, 151:4, 151:7, 151:10, 151:13, 153:11, 153:18, 154:6, 155:7, 155:9, 155:19, 155:25, 156:1, 156:7, 156:13, 156:15, 157:4, 157:14, 157:15, 157:24, 158:10, 158:11, 160:10, 161:23, 162:8, 162:15, 162:17, 162:19, 162:21, 163:11, 163:24, 164:25, 165:7, 165:9, 165:16, 165:19, 165:22, 165:25, 166:3, 166:17, 166:18, 167:22, 168:11, 168:14, 168:25, 169:17,

3-RenSER-00444

3-RenSER-00444

169:18, 170:16, 171:11, 171:12, 172:11, 173:24, 174:2, 174:7, 174:15, 179:17, 179:18, 179:21, 180:11, 180:13, 180:14, 180:21, 181:7, 181:8, 181:19, 184:3, 184:4, 184:13, 184:22, 185:1, 185:6, 185:8, 185:10, 185:13, 185:16, 186:1, 186:5, 186:6, 186:10, 186:12, 187:4, 187:8, 187:10, 188:2, 188:25, 189:7, 190:6, 190:15, 190:16, 190:24, 190:25, 191:7, 191:8, 192:23, 194:1, 194:9, 194:13, 200:21, 203:13, 203:21, 203:22, 206:22, 206:23, 208:23, 209:8, 209:11, 210:18, 210:21, 211:1, 211:3, 211:7, 214:19, 214:25, 216:19, 217:4, 217:19, 217:20, 217:24, 218:2, 218:7, 218:9, 218:19, 219:1, 219:4, 219:10, 223:2, 223:4, 223:6, 223:7, 223:24, 224:2, 224:4, 224:7, 224:9, 224:21, 225:3, 225:7, 225:11, 225:16, 225:25, 226:1, 226:3, 226:5, 226:7, 226:9, 226:11, 230:3, 230:6, 230:10, 230:13, 231:3, 231:6, 231:7, 231:9, 231:11, 234:11, 234:13, 234:16, 234:22, 234:23, 236:3, 237:5, 237:12, 238:1, 238:2, 238:25, 239:2, 241:16, 244:22, 244:24, 245:1, 245:6, 245:8,

245:10, 245:14, 245:19, 245:24, 251:18, 251:20, 251:23, 252:2, 258:25, 259:4, 259:13, 259:15, 259:20
**theathcote@lynberg .com** [1] - 2:20
**theirs** [1] - 192:9
**themselves** [1] - 190:19
**Therapy** [2] - 136:5, 136:8
**therapy** [10] - 89:24, 91:1, 91:8, 91:20, 101:5, 101:7, 118:9, 143:18, 144:4
**therefore** [3] - 35:22, 107:25, 125:21
**they've** [8] - 14:10, 41:20, 58:4, 80:3, 204:1, 243:9, 243:18
**thigh** [2] - 72:19, 72:21
**thinking** [12] - 19:10, 20:4, 56:15, 85:14, 178:15, 222:6, 222:9, 222:11, 222:12, 223:18, 227:12, 241:19
**third** [15] - 40:8, 40:21, 44:11, 44:25, 77:2, 77:4, 77:5, 77:6, 78:22, 79:10, 82:20, 83:9, 109:3, 130:14, 171:22
**third-party** [1] - 82:20
**threatening** [1] - 16:25
**threatens** [1] - 247:17
**three** [28] - 18:5, 18:7, 20:15, 23:6, 26:21, 39:13, 43:24, 45:4, 45:9, 48:1, 63:15, 77:25, 86:14, 90:24, 110:11, 115:10, 131:4, 131:5, 131:8, 134:24, 166:22, 168:7, 176:25, 188:16, 207:25, 238:17, 250:6
**threw** [3] - 12:22, 12:24, 64:18
**throughout** [1] - 242:22
**throwing** [1] - 30:14
**Thursday** [2] - 134:16, 134:18
**THURSDAY** [2] - 1:13,

5:1
**tie** [1] - 118:16
**tied** [5] - 118:11, 125:16, 129:21, 130:7, 134:18
**tightens** [1] - 33:5
**timestamp** [3] - 161:19, 197:16, 246:20
**timing** [1] - 30:8
**tint** [1] - 90:9
**tinted** [2] - 176:24, 250:21
**tired** [1] - 59:3
**Title** [1] - 261:8
**today** [6] - 101:3, 142:7, 165:1, 193:3, 208:24
**toddler** [1] - 231:15
**together** [4] - 41:19, 42:6, 101:25, 124:3
**token** [1] - 80:19
**tomorrow** [7] - 133:19, 133:20, 133:23, 134:1, 259:1, 259:10, 260:6
**tone** [9] - 8:23, 8:24, 9:4, 18:2, 32:16, 205:5, 205:6, 205:7, 243:11
**toner** [1] - 102:24
**tonight** [2] - 259:22, 260:3
**took** [18] - 50:14, 63:1, 63:19, 65:19, 66:8, 66:12, 66:17, 67:25, 68:14, 73:21, 74:18, 74:21, 75:6, 146:2, 146:8, 150:24, 208:16, 233:6
**tool** [3] - 55:9, 55:14, 220:25
**tools** [4] - 54:10, 229:17, 236:8, 237:24
**top** [14] - 22:5, 25:21, 26:5, 26:6, 28:10, 32:13, 55:13, 67:13, 68:12, 100:2, 155:12, 155:15, 219:20, 249:5
**torso** [1] - 74:21
**total** [3] - 138:18, 140:17, 141:15
**totally** [2] - 75:21, 75:22
**touch** [4] - 220:15, 220:16, 257:5, 257:7
**touched** [1] - 240:6
**tough** [1] - 182:7

**toward** [4] - 14:15, 26:9, 147:25, 151:25
**towards** [4] - 21:2, 51:7, 72:24, 247:3
**Town** [3] - 2:10, 2:18, 2:22
**track** [5] - 34:23, 135:13, 191:9, 202:3, 218:4
**tracking** [2] - 227:24, 228:3
**train** [2] - 232:2, 232:8
**trained** [5] - 182:8, 205:11, 233:15, 233:18, 233:21
**training** [2] - 233:25, 256:23
**transcribed** [2] - 40:25, 45:12
**transcriber** [2] - 37:18, 41:12
**transcriber's** [1] - 41:5
**Transcript** [1] - 1:5
**transcript** [32] - 37:10, 37:11, 37:13, 37:15, 37:16, 37:19, 37:22, 39:14, 40:3, 42:9, 42:25, 43:12, 43:17, 43:18, 43:20, 44:18, 44:23, 45:13, 45:15, 46:2, 46:5, 46:8, 46:11, 46:14, 174:8, 174:9, 187:7, 218:25, 223:1, 223:8, 261:9, 261:11
**TRANSCRIPT** [1] - 1:12
**transcripts** [12] - 35:3, 45:9, 45:11, 45:18, 45:19, 45:21, 45:23, 45:24, 46:12, 173:20, 173:21, 174:11
**Transcripts** [1] - 35:5
**transition** [1] - 148:12
**transparent** [1] - 122:22
**trauma** [2] - 60:23, 147:4
**traumatized** [2] - 150:3, 181:25
**traumatizing** [1] - 150:4
**travel** [1] - 141:25
**traveled** [1] - 93:17
**tray** [1] - 102:2
**trazodone** [6] - 158:2, 158:4, 159:1, 159:12, 159:17,

167:10
**treat** [1] - 201:10
**treated** [12] - 58:13, 60:21, 60:23, 79:2, 138:2, 139:19, 143:14, 148:1, 180:1, 182:24, 199:11
**treating** [2] - 108:17, 170:24
**treatment** [25] - 84:20, 88:13, 88:23, 89:7, 89:10, 90:3, 91:25, 92:3, 94:21, 97:11, 101:4, 135:23, 136:5, 136:8, 136:10, 136:14, 136:23, 137:11, 137:18, 138:18, 138:23, 139:2, 139:15, 139:20, 143:17
**trees** [1] - 177:2
**trial** [29] - 44:5, 44:11, 44:13, 44:16, 45:5, 45:10, 76:22, 77:3, 77:4, 77:5, 77:25, 78:1, 78:23, 79:11, 79:22, 108:14, 109:3, 109:11, 109:16, 118:4, 120:12, 126:23, 130:14, 131:6, 132:3, 134:24, 184:18
**TRIAL** [1] - 1:13
**trials** [10] - 43:25, 44:1, 44:2, 44:14, 44:15, 45:4, 77:2, 108:9, 131:4, 131:8
**tried** [11] - 5:25, 53:19, 64:3, 73:25, 81:10, 85:7, 86:19, 88:19, 102:25, 228:17, 241:23
**trim** [1] - 259:16
**trouble** [2] - 98:17, 120:6
**truck** [16] - 11:20, 57:20, 57:21, 57:22, 64:19, 88:11, 176:9, 176:15, 176:19, 176:22, 176:23, 178:2, 178:3, 178:5, 181:15, 181:16
**truck's** [1] - 147:24
**true** [57] - 11:20, 40:12, 50:14, 50:15, 76:1, 97:11, 101:1, 102:10, 105:5,

3-RenSER-00445                    3-RenSER-00445

106:2, 136:10, 139:2, 150:6, 150:12, 152:17, 153:2, 153:23, 154:11, 154:13, 158:8, 158:14, 164:17, 166:11, 173:5, 177:17, 181:12, 188:8, 192:10, 192:12, 193:11, 199:25, 205:20, 207:22, 210:12, 213:4, 214:16, 214:21, 215:2, 215:21, 216:9, 219:23, 223:13, 225:24, 233:16, 236:23, 239:7, 241:24, 244:4, 244:7, 244:16, 246:5, 252:15, 253:9, 258:13, 258:17, 261:9

**trust** [3] - 180:2, 180:7, 180:25

**truth** [8] - 103:6, 103:7, 103:10, 103:13, 149:13, 149:23, 151:23, 227:6

**truthful** [2] - 82:10, 170:7

**try** [15] - 19:23, 23:8, 52:9, 87:11, 89:25, 123:22, 127:7, 146:1, 166:24, 200:14, 200:18, 220:14, 240:3, 249:20, 251:22

**trying** [64] - 6:11, 8:9, 13:9, 13:22, 19:25, 23:2, 23:3, 23:9, 23:19, 23:24, 24:5, 25:6, 25:7, 27:6, 27:9, 29:16, 29:21, 31:3, 31:13, 32:3, 42:4, 44:20, 44:21, 45:1, 58:7, 58:8, 59:2, 61:2, 66:20, 69:18, 70:8, 71:24, 72:13, 73:7, 75:24, 85:6, 85:11, 86:17, 102:6, 102:7, 107:13, 109:23, 116:17, 117:21, 122:20, 123:10, 123:15, 123:16, 126:6, 127:10, 128:23, 130:25,

131:3, 131:9, 134:13, 175:21, 186:2, 199:5, 199:10, 204:17, 226:5, 246:9, 252:15, 253:14

**tuck** [1] - 71:20

**tucked** [1] - 71:17

**tucking** [3] - 71:1, 71:5, 71:12

**turn** [7] - 37:23, 38:6, 43:9, 151:8, 163:24, 168:9, 168:14

**turned** [3] - 22:24, 47:15, 164:1

**tussle** [1] - 42:8

**twitches** [1] - 61:12

**two** [34] - 6:15, 8:2, 13:14, 13:19, 13:22, 15:23, 35:11, 42:8, 42:14, 44:2, 48:1, 54:5, 55:12, 55:13, 60:17, 63:15, 76:4, 86:14, 91:12, 111:21, 111:22, 118:3, 130:14, 131:20, 134:23, 169:13, 172:2, 177:2, 177:22, 193:21, 195:18, 221:21, 235:3, 255:2

**type** [10] - 211:20, 212:16, 212:20, 213:15, 214:6, 214:15, 215:20, 216:8, 217:6, 235:22

## U

**U.S** [5] - 1:3, 232:11, 232:14, 232:24, 233:12

**Uber** [1] - 84:5

**unable** [4] - 84:10, 84:20, 124:14

**unclear** [1] - 208:23

**uncommon** [2] - 124:17, 188:17

**under** [24] - 52:13, 52:14, 67:4, 67:5, 67:10, 72:12, 74:17, 88:1, 101:24, 102:6, 143:15, 149:11, 154:19, 189:19, 191:10, 191:14, 203:8, 206:5, 208:15, 208:17, 220:9, 220:24, 237:18

**underarm** [1] - 70:20

**underlying** [1] - 103:13

**underneath** [6] - 71:1, 71:5, 71:12, 71:21, 72:7, 72:9

**Understood** [1] - 38:3

**understood** [10] - 15:19, 38:4, 96:17, 101:1, 118:10, 134:10, 134:20, 164:20, 165:4, 186:9

**undertake** [1] - 144:16

**undone** [1] - 64:15

**unduly** [3] - 124:5, 224:4, 237:13

**unemployed** [2] - 112:9, 123:10

**unfair** [1] - 81:12

**unfairly** [1] - 125:15

**unfortunately** [1] - 109:14

**unintelligible** [2] - 217:18, 238:24

**UNITED** [1] - 1:1

**United** [3] - 261:6, 261:8, 261:13

**unlawful** [1] - 251:9

**unlocked** [1] - 64:20

**unpacked** [1] - 87:12

**untrue** [1] - 178:10

**unwrapped** [1] - 62:25

**up** [150] - 7:9, 7:17, 11:15, 11:17, 11:20, 13:14, 14:4, 16:13, 19:19, 22:11, 22:18, 23:8, 25:6, 25:7, 25:21, 27:19, 28:1, 28:11, 31:14, 32:14, 35:24, 39:3, 41:24, 44:5, 46:25, 48:23, 49:1, 49:14, 49:18, 49:22, 50:5, 50:7, 51:17, 53:25, 54:3, 54:13, 58:22, 59:4, 63:23, 64:6, 64:21, 69:18, 70:6, 70:11, 70:18, 72:14, 74:10, 79:5, 83:24, 87:3, 87:13, 87:14, 87:15, 88:16, 90:20, 94:2, 94:7, 101:3, 101:17, 102:1, 104:12, 104:17, 105:16, 105:18, 108:14, 108:17, 108:25, 111:15, 113:21, 113:24, 115:22, 116:22, 119:25, 124:7, 124:13, 124:18, 125:17,

125:19, 127:8, 128:12, 129:6, 133:5, 133:7, 133:23, 134:11, 134:18, 135:17, 136:16, 142:5, 142:7, 144:18, 145:22, 147:5, 147:13, 147:23, 147:24, 148:14, 151:4, 151:7, 156:6, 156:9, 156:12, 156:13, 161:2, 163:4, 163:17, 164:16, 164:20, 165:5, 168:9, 168:14, 171:1, 171:24, 172:5, 173:15, 175:3, 175:21, 175:25, 176:2, 177:24, 178:23, 178:25, 179:4, 180:25, 182:19, 183:3, 184:5, 184:7, 186:20, 195:10, 198:1, 202:17, 204:3, 209:12, 210:15, 211:5, 215:14, 220:13, 220:23, 223:16, 226:17, 234:13, 235:14, 238:3, 241:8

**upper** [5] - 67:9, 72:18, 72:21, 72:24, 92:4

**upset** [5] - 10:8, 64:23, 66:1, 182:2, 246:14

**upsetting** [4] - 150:6, 150:11, 152:15, 158:23

**use-of-force** [2] - 28:17, 28:22

**uses** [1] - 204:16

**utensils** [1] - 55:15

**utterly** [1] - 125:3

## V

**VA** [22] - 88:13, 88:16, 88:22, 89:15, 91:7, 93:20, 97:16, 97:23, 98:8, 98:13, 98:15, 99:1, 101:1, 115:9, 136:11, 136:13, 136:17, 136:23, 138:3, 143:13, 144:15, 144:19

**vague** [14] - 57:1,

150:14, 157:3, 157:12, 157:24, 161:22, 167:21, 169:15, 172:14, 181:18, 189:7, 206:20, 223:14, 234:21

**Vague** [7] - 150:13, 157:23, 164:23, 189:5, 190:14, 203:20, 217:17

**valuable** [1] - 120:8

**value** [3] - 76:8, 88:1, 154:1

**variety** [3] - 75:23, 94:20, 129:16

**various** [1] - 142:6

**vehicle** [4] - 106:20, 106:21, 117:9, 176:12

**Velcro** [1] - 74:1

**verbal** [3] - 204:6, 240:3

**verbally** [2] - 19:23, 105:8

**version** [3] - 34:8, 34:10

**vest** [3] - 26:19, 73:25, 74:2

**veteran** [2] - 38:17, 38:25

**victim** [1] - 24:17

**video** [15] - 14:23, 14:24, 15:6, 20:4, 20:9, 28:17, 29:3, 29:5, 46:1, 47:11, 54:5, 59:25, 163:7, 178:1, 243:3

**Videotape** [30] - 15:8, 29:10, 30:1, 31:5, 31:17, 32:5, 33:9, 33:15, 33:23, 36:4, 39:7, 39:10, 39:20, 39:23, 47:13, 47:22, 48:3, 48:8, 48:14, 48:18, 49:4, 49:12, 49:20, 50:3, 166:4, 168:15, 169:25, 194:25, 204:13, 205:14

**Vidhi** [1] - 100:10

**view** [6] - 175:5, 176:24, 198:18, 198:21, 241:11, 256:11

**viewed** [1] - 154:16

**violated** [3] - 83:21, 238:7, 238:14

**violating** [1] - 241:12

**violation** [2] - 238:22,

3-RenSER-00446          3-RenSER-00446

239:14
**violence** [27] - 150:10, 160:22, 161:3, 162:18, 166:10, 166:13, 167:19, 169:5, 169:6, 169:12, 170:5, 170:21, 171:6, 176:9, 177:3, 177:8, 177:17, 178:19, 182:21, 183:4, 183:10, 189:2, 189:12, 190:9, 194:21, 254:6, 258:9
**visible** [1] - 57:20
**visit** [1] - 10:14
**visitation** [2] - 158:20, 159:3
**vocab** [1] - 205:11
**vocabulary** [2] - 196:15, 256:16
**voice** [16] - 8:23, 8:24, 9:4, 32:9, 32:16, 170:2, 200:9, 204:19, 204:20, 242:1, 243:6, 243:7, 243:11, 253:8, 258:6
**voices** [2] - 32:9, 198:3
**Volume** [3] - 150:25, 184:21, 217:23
**volume** [3] - 39:3, 166:23, 169:23
**volunteerism** [2] - 126:11, 126:24
**volunteers** [1] - 124:24
**vs** [2] - 1:6, 81:21

**W**

**wages** [4] - 84:13, 106:11, 109:20, 125:19
**waist** [1] - 72:24
**waistband** [2] - 17:5, 19:16
**wait** [4] - 46:22, 64:1, 124:14, 133:12
**wake** [1] - 179:4
**waking** [1] - 147:5
**walk** [4] - 208:13, 238:2, 240:2
**walked** [2] - 7:10, 208:12
**walkie** [1] - 74:1
**walking** [4] - 117:24, 255:2, 255:5, 258:3
**wallet** [1] - 188:18
**wants** [2] - 33:7, 81:15

**war** [3] - 38:17, 38:25, 233:23
**warehouse** [1] - 64:19
**warm** [1] - 23:16
**warning** [1] - 125:1
**watch** [3] - 13:22, 34:11, 161:14
**watching** [9] - 12:24, 13:17, 13:20, 20:9, 20:15, 20:23, 21:4, 23:1
**WATKINS** [4] - 2:9, 2:13, 2:17, 2:21
**waving** [1] - 231:16
**ways** [1] - 122:5
**weapon** [25] - 16:25, 211:21, 212:21, 213:16, 214:6, 214:15, 215:20, 216:9, 217:6, 217:12, 218:17, 219:12, 221:25, 222:17, 223:11, 225:22, 226:2, 226:18, 227:14, 233:25, 234:4, 235:8, 236:6, 236:16
**weapons** [25] - 26:24, 191:23, 207:8, 210:12, 213:1, 213:2, 222:7, 226:10, 226:21, 227:9, 227:10, 227:12, 227:15, 229:13, 229:15, 229:16, 235:12, 236:21, 237:17, 238:23, 239:3, 239:19, 240:5
**wearing** [4] - 12:13, 14:11, 214:22, 230:5
**wearing-down** [1] - 230:5
**website** [1] - 84:5
**websites** [1] - 105:12
**Wednesday** [1] - 134:15
**week** [4] - 84:15, 91:13, 115:10, 133:18
**weekly** [2] - 91:20
**weeks** [2] - 134:23, 134:24
**weigh** [1] - 44:15
**weight** [2] - 26:8, 102:3
**WEST** [1] - 1:24
**West** [2] - 2:10, 2:18
**whaling** [1] - 38:16
**wheelers** [1] - 64:18

**white** [16] - 172:23, 173:3, 173:17, 174:23, 175:12, 175:16, 176:9, 176:17, 176:19, 176:22, 176:23, 178:2, 178:3, 178:5, 181:15, 181:16
**whoa** [2] - 202:12
**whole** [21] - 24:25, 32:14, 33:4, 35:9, 35:10, 35:19, 38:10, 41:17, 50:11, 52:7, 74:21, 89:9, 147:3, 167:12, 173:14, 179:5, 190:16, 206:3, 206:9, 215:5, 215:10
**wide** [1] - 182:23
**wife** [4] - 172:24, 172:25, 178:15, 178:17
**willing** [1] - 172:17
**Wilson** [6] - 106:4, 120:16, 120:21, 120:22, 121:4, 125:12
**win** [2] - 233:19, 233:20
**window** [2] - 7:19, 176:25
**wish** [2] - 83:12, 223:19
**wishes** [2] - 35:8, 35:10
**Witness** [1] - 221:9
**WITNESS** [108] - 9:8, 15:9, 30:9, 48:13, 51:16, 51:24, 57:8, 64:10, 65:25, 70:20, 87:18, 93:8, 110:2, 110:6, 110:9, 110:13, 110:21, 110:24, 111:3, 111:6, 111:9, 111:11, 111:13, 111:17, 111:19, 111:21, 111:24, 112:3, 112:7, 112:10, 112:12, 112:16, 112:19, 112:21, 113:1, 113:4, 113:9, 113:12, 113:17, 113:20, 113:23, 114:1, 114:4, 114:7, 114:13, 114:18, 114:24, 115:2, 115:7, 115:12, 115:20, 115:22,

115:25, 116:4, 116:7, 116:11, 116:14, 116:17, 116:24, 117:3, 117:7, 117:15, 117:17, 120:22, 120:24, 121:6, 121:8, 125:10, 144:3, 145:8, 145:17, 146:23, 147:1, 147:3, 150:16, 155:9, 156:1, 157:15, 158:11, 162:21, 165:9, 166:18, 169:18, 171:12, 179:18, 180:14, 181:8, 184:4, 190:16, 190:25, 191:8, 194:1, 194:9, 203:22, 206:23, 209:11, 217:20, 218:19, 224:9, 226:1, 226:5, 226:9, 231:6, 231:9, 234:13, 234:23, 238:2, 239:2
**witness** [19] - 81:5, 96:13, 98:18, 103:11, 133:16, 133:24, 134:2, 154:5, 168:24, 181:5, 187:2, 194:12, 196:17, 214:18, 230:4, 230:9, 234:10, 260:1, 260:2
**WITNESSES** [1] - 4:3
**witnesses** [4] - 41:3, 41:4, 41:7, 82:20
**woke** [3] - 7:9, 164:16, 241:8
**woken** [1] - 178:23
**woman** [11] - 119:14, 123:18, 164:21, 165:5, 166:25, 172:8, 175:8, 240:12, 250:15, 250:17, 250:19
**wondering** [1] - 253:19
**wood** [3] - 234:6, 234:13, 234:14
**wood..** [1] - 234:12
**wooden** [1] - 55:9
**word** [8] - 39:12, 43:14, 166:10, 170:6, 185:17, 192:8, 193:2, 244:5
**worded** [1] - 236:23

**words** [50] - 24:13, 31:3, 43:12, 43:16, 76:3, 110:16, 113:6, 118:12, 119:21, 128:18, 129:8, 131:11, 151:21, 151:24, 152:14, 152:18, 162:21, 162:25, 165:25, 170:20, 181:1, 181:20, 187:23, 192:8, 192:11, 193:13, 193:15, 194:6, 195:19, 197:2, 197:9, 197:19, 198:7, 201:11, 213:17, 215:24, 216:1, 216:2, 216:3, 216:12, 223:22, 240:23, 241:4, 241:6, 241:8, 243:11, 244:8, 244:18, 257:1
**work-up** [1] - 88:16
**works** [1] - 256:4
**worried** [12] - 108:4, 119:4, 212:5, 217:11, 218:16, 222:1, 222:7, 222:18, 223:12, 225:23, 227:2, 227:7
**worry** [3] - 117:19, 134:17, 245:14
**worse** [7] - 91:19, 98:5, 144:4, 201:18, 256:5, 256:7, 256:12
**worth** [2] - 106:16, 175:23
**wound** [1] - 73:13
**wounds** [1] - 74:11
**wrap** [1] - 253:11
**wrapped** [6] - 50:24, 50:25, 51:3, 53:10, 57:24, 195:10
**wrestling** [1] - 32:21
**wrist** [1] - 59:9
**write** [1] - 121:2
**writing** [2] - 51:11, 104:25
**writings** [1] - 105:5
**written** [1] - 7:12
**wronged** [3] - 145:17, 146:16, 146:19
**wrongfully** [2] - 41:20, 41:21
**Wroniak** [1] - 95:24
**WRONIAK** [55] - 3:4, 6:5, 15:22, 17:1, 21:17, 25:23, 30:6,

3-RenSER-00447                 3-RenSER-00447

32:24, 35:6, 35:13, 35:17, 48:11, 51:10, 55:20, 56:2, 56:25, 63:8, 63:10, 65:13, 65:21, 71:8, 71:13, 73:16, 85:19, 86:22, 93:5, 95:2, 95:5, 95:13, 95:25, 96:5, 96:7, 96:10, 96:14, 96:17, 96:19, 98:6, 104:22, 104:25, 133:4, 133:8, 136:18, 138:20, 139:6, 139:9, 140:24, 142:15, 143:3, 144:24, 145:6, 145:14, 146:3, 146:20, 174:6, 251:19
**wrote** [1] - 121:1

## X

**x-rays** [2] - 61:4, 88:19

## Y

**yank** [1] - 58:8
**year** [24] - 15:10, 91:14, 105:25, 106:9, 107:5, 107:19, 111:8, 111:18, 116:2, 116:20, 116:21, 117:13, 119:23, 120:17, 120:20, 121:5, 121:6, 121:8, 125:9, 125:17, 153:5, 154:14, 215:5, 215:10
**years** [10] - 107:24, 110:11, 111:22, 118:2, 119:6, 119:23, 120:7, 123:11, 238:17
**yell** [4] - 172:1, 247:19, 247:23
**yelled** [2] - 205:10, 247:22
**yelling** [18] - 10:5, 18:1, 18:2, 19:14, 21:9, 23:3, 38:18, 177:23, 178:14, 178:18, 178:19, 178:21, 246:25, 247:15, 251:9, 253:8, 258:4
**yesterday** [10] - 10:21, 11:7, 77:9, 77:10, 88:14, 127:16, 131:20, 133:21,

185:21, 185:22
**yourself** [14] - 20:5, 22:11, 22:17, 25:21, 26:3, 66:17, 105:5, 176:25, 184:18, 185:23, 217:10, 219:6, 224:15, 239:11
**yourselves** [2] - 36:13, 251:1

## Z

**zero** [3] - 44:12, 73:24, 130:15
**zone** [1] - 233:23
**Zoom** [1] - 102:8
**zoom** [1] - 95:21

**UNITED STATES DISTRICT COURT**

3-RenSER-00448          3-RenSER-00448