DOCKET NOS. 25-7132, 25-7297

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

**CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 4 OF 9**

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                              )
                                             )
                    Plaintiff,               )  **Certified Transcript**
                                             )
       vs.                                   )  Case No.
                                             )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,                     )
                                             )
                    Defendants.              )  **DAY 10, VOLUME I**
                                             )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

4-RenSER-00450                                           4-RenSER-00450

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    MKRTCHYAN LAW
    BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
    655 North Central Avenue
    Suite 1700
    Glendale, California 91203
    818-388-7022
    narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

    LYNBERG & WATKINS APC
    BY:  S. FRANK HARRELL, ESQ.
    1100 West Town & Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    sharrell@lynberg.com

    LYNBERG & WATKINS APLC
    BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
    1150 South Olive Street
    Suite 1800
    Los Angeles, California 90015
    213-624-8700
    cnaltsas@lynberg.com

    LYNBERG & WATKINS PC
    BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
    1100 West Town & Country Road
    Suite 1450
    Orange, California 92868
    (714) 937-1010
    theathcote@lynberg.com

    LYNBERG & WATKINS
    BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
    1100 Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

4-RenSER-00451        4-RenSER-00451

3

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

       COLLINS & COLLINS LLP
       BY:  MICHAEL L. WRONIAK, ESQ.
       750 The City Drive
       Suite 400
       Orange, California 92868-4940
       714-823-4100
       mwroniak@ccllp.law

       COLLINS & COLLINS LLP
       BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
       2011 Palomar Airport Road
       Suite 207
       Carlsbad, California 92011
       760-274-2110
       cswiss@ccllp.law


**ALSO PRESENT:**

       Raymond Farahmand, plaintiff's paralegal
       Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

4-RenSER-00452                        4-RenSER-00452

4

# I N D E X

**WITNESSES**                                                          **PAGE**

**KENDALL WAGNER, M.D., CALLED BY THE DEFENDANTS**
    Cross-Examination by Ms. Mkrtchyan                        6

**BRIAN FUERBACH, CALLED BY THE DEFENDANTS**
    Direct Examination by Mr. Harrell                        24
    Cross-Examination by Ms. Swiss                           52
    Cross-Examination by Ms. Mkrtchyan                       53
    Redirect Examination by Mr. Harrell                     117
    Recross-Examination by Ms. Mkrtchyan                    122

**CHAD MATTHEW RENEGAR, CALLED BY THE PLAINTIFF:**
    Direct Examination by Mr. Wroniak                       130

## EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 39 | Deputy Johnston's report | 122 | |

UNITED STATES DISTRICT COURT

**SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 14, 2025**

**8:10 A.M.**

**- - -**

**(Out of the presence of the jury.)**

MR. HARRELL:  Your Honor, we have an agreement on witness order today.  We have Dr. Wagner on the stand now.  By agreement, we have Brian Fuerbach.  It works for his schedule for him to follow Dr. Wagner, get on and get off, and then finish up with Deputy Renegar.

THE COURT:  Acceptable?

MS. MKRTCHYAN:  That's fine, Your Honor.

THE COURT:  All right.  Let me know when you're ready to begin.

MS. MKRTCHYAN:  Just make sure the technical stuff is --

THE COURT:  Yeah, check that.

MS. MKRTCHYAN:  We are ready, Your Honor.

THE COURT:  Thank you.

**(In the presence of the jury.)**

THE COURT:  All right, counsel.  Thank you for your courtesy.  If you'd be seated.  All counsel are present; the parties are present.

And, Counsel, cross-examination, please.

MS. MKRTCHYAN:  Yes.  Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

6

**KENDALL WAGNER, M.D., PREVIOUSLY SWORN, RESUMES THE STAND**

**CROSS-EXAMINATION**

BY MS. MKRTCHYAN:

Q    Good morning, Dr. Wagner.  How are you?

A    I'm good, thank you.  How are you?

Q    Thank you.

So during the course of your review of the materials, you did look at Dr. Kamshad Raiszadeh's treatment notes and his opinions; true?

A    Yes.

Q    Okay.

MS. MKRTCHYAN:  Let's pull up Exhibit 13 that has been admitted into evidence, Your Honor.

THE COURT:  Thank you.

MS. MKRTCHYAN:  Thank you.

**(Exhibit displayed.)**

BY MS. MKRTCHYAN:

Q    And let's look at the discussion plan that Dr. Raiszadeh had for him.  So you looked at this; right?  This was his discussion and assessment post-assault January 21, 2018?

A    Yes, I've seen this document.

Q    Okay.  So you don't disagree -- right? -- that -- with Dr. Raiszadeh, who was also treating provider for Mr. Holloway in 2020 regarding the diagnosis of spondylolisthesis related to his spine.  You don't agree with that diagnosis?

**UNITED STATES DISTRICT COURT**

4-RenSER-00455                                4-RenSER-00455

A    I agree with that diagnosis.

Q    Okay.  And you also agree with his analysis that this incident caused aggravation of this asymptomatic condition?

A    I agree with that too.

Q    Okay.  So you only disagree with him as it relates to what to do about it, whether Mr. Holloway needs to do surgery and whether -- or he needs to do conservative management of that situation; right?  Condition?

A    Right.

Q    Okay.  Did you see that he noticed other thoracic-related issues to a disc abnormality on the first -- in the first paragraph of that discussion?  Do you see that?  He had -- he discussed that thoracic pain is likely secondary to T3-T4 disc abnormality, and he did not think surgical intervention is indicated for that disc abnormality.

A    That's what he wrote down, yes.

Q    Okay.  So going --

A    I don't disagree with that.

Q    Right.  Okay.  So -- and then only for the lumbar condition, going below, about his back pain, he said:

         "He has moderate foraminal stenosis, which
     was likely rendered symptomatic secondary to the
     assault.  He will require epidural injections, and
     if his symptoms persist, then he may require
     decompression and fusion."

**UNITED STATES DISTRICT COURT**

4-RenSER-00456                                    4-RenSER-00456

8

Which is the surgery; right?

A    Right.

Q    So you agree with him so far to the extent that he will need epidural injections.  And then if those symptoms persist, if that does not resolve, then the last resort is the fusion, decompression, which is the surgery?

A    Surgery is always the last resort because the results are unpredictable.

Q    Right.  But you see that Dr. Raiszadeh is not quick at recommending surgery.  He says for this issue, thoracic pain, surgical intervention is not required.  For this situation, spondylolisthesis, the spinal -- the back issue, we want first injections, and then if it doesn't persist [sic], we want surgery; right?

A    That's what he wrote down.  I don't disagree with that.

Q    Right.  So your opinion is that basically he's not a good candidate for surgery because he has a preexisting condition of a stroke?

A    Well, there's lots of reasons why he's a bad candidate, but that's the most important one.

Q    Right.  And you described it to us, the risks involved entailed in surgery; right?

A    Right.  Because he could have another stroke.  And if he does and it hits the same spot, then he could be blind afterwards forever.  So this is a big deal.

**UNITED STATES DISTRICT COURT**

4-RenSER-00457                                    4-RenSER-00457

Q    Right.  Have you reviewed -- as far as, you know, after you wrote -- you wrote the report -- right? -- Rule 26 report in this case?

A    Yes.

Q    Have you reviewed his recent medical records related to his spine?

MS. SWISS:  Objection.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I've seen some medical records from Montana.

BY MS. MKRTCHYAN:

Q    Okay.  And you are aware that he -- based on your review of that, he has, in fact, had another stroke after that stroke in 2016, most recently in 2024?

MS. SWISS:  Objection.

MR. HARRELL:  Join.

THE COURT:  No, overruled.  The limitation was on emotional distress, not physical.  Overruled.

THE WITNESS:  He had a stroke in June of last year and temporarily lost the ability to speak or swallow.  But fortunately, this was temporary, and it went away.  So he's already had another stroke.  So here's a person who's at risk for more strokes.  Makes him even less of a good candidate to have surgery because of the risks.

4-RenSER-00458                    4-RenSER-00458

10

BY MS. MKRTCHYAN:

Q    Right.  And you notice that he had a heart surgery after the stroke.  Did you see that?

A    I didn't see anything about a heart surgery.

Q    Okay.  So but your opinion, based on your experience of many years, is that this is not a good candidate for surgery, but he does have this condition; right?

A    I think we all agree he has spondylolisthesis.

Q    Let me ask you this though.  If the options for this man, then, is either to live his life in chronic pain as a result of this condition or elect to have a surgery at the risk of severe complications might result in death; true?

A    I don't know that he's going to have chronic pain until such time he has -- as he has the epidurals.  And it may be that his pain is relieved with this medication.  It may last a long time.  He may have to have a shot every couple times a year.

Q    Okay.

A    But I'm not ready to testify that he's going to be in chronic pain until he completes conservative care.  And if conservative care fails, which has not been tried, well, then he can accept the great risk of having a catastrophic outcome from surgery.  But before he has the epidurals, this is all speculation.

Q    And are you aware he didn't do epidurals because of his

**UNITED STATES DISTRICT COURT**

health conditions as a result of the stroke?

A    Each --

Q    Did you look at his records?

A    -- epidurals in multiple medical records, but he's elected not to do so.

Q    I'm sorry.  Well, sir --

THE COURT:  I'm sorry.  Would you move closer to that microphone.

THE WITNESS:  Oh, sure, Your Honor.

THE COURT:  We can't hear you.

THE WITNESS:  Okay.

BY MS. MKRTCHYAN:

Q    Let's look at your Rule 26 report.  Isn't it true your review of his medical history stopped in 2020, based on your Rule 26 report that we have before us?

A    Well, you just asked me if I had seen updated records, and the answer was, yes, I have.

Q    Yes.  But let me ask you this --

A    This was way back in 2021 that I did this report.  This is four years ago.

Q    Sir, I understand that.  But we are going by -- you know the benefit of the Rule 26 report.  You were asked to write reports; right?

A    Yes.

Q    Did you offer a supplemental report after you reviewed

**UNITED STATES DISTRICT COURT**

12

his medical records after 2021?

A     No.  I was not asked to do so.

Q     Okay.  So but let's look at what he has done.  You said he hasn't tried conservative management?

A     No, that's not what I said.  You're misstating my testimony once again.

Q     Let's make it clear what he has tried.  Okay?  He has tried physical therapy -- lengthy physical therapy sessions.  You're aware of that?

A     Yes.

Q     That was done where?

A     I can't recall where he had it done.

Q     Pennsylvania; right?

So he has done -- had physical therapy, multiple sessions, during his stay in Pennsylvania.  You're aware of that based on your report?

A     Yes.

Q     Okay.  Then he has done battlefield acupuncture.  Do you know what that is?

A     I know what acupuncture is.

Q     So what is that?

A     I don't understand it, but it works.

Q     I'm sorry?

A     I don't understand it, but it works frequently.

Q     Right.  And that is another way of managing chronic pain?

**UNITED STATES DISTRICT COURT**

13

A    Yes.

Q    And so you know how long he did that?

A    I believe he did it for a month.

Q    Okay.

A    Plus or minus.  Around a month.

Q    Okay.

A    And it worked temporarily, but it was not long term.

Q    Okay.  Are you aware that when he was doing physical therapy also, it was only very brief, moderate alleviation of the pain.  It wasn't lasting resolution of his pain.  Are you aware of that based on his medical history?

A    Yes.  It was of benefit but short term.

Q    Right.  So now, as far as the injections, isn't it true also injections are intrusive?  You have to go to a -- go through a procedure.  These injections are surgical sort of procedure?

A    It's not surgical.  They stick a needle in your back, but you are sedated.

Q    Exactly.

A    You are in a procedure room, but it's a needle.  It's unfortunately a big needle.  In fact, you never show them the needle before, you only show them the needle afterwards.

Q    Right.  But it's still more intrusive than physical therapy; right?

A    Of course it is, and they frequently get a headache

**UNITED STATES DISTRICT COURT**

4-RenSER-00462                                      4-RenSER-00462

afterwards.

Q    Right.  And if this man -- you've seen his history after this incident.  You also saw that he had persistent headaches?

A    Yes.

Q    He had neurological deficits, memory loss, cognitive disabilities after the incident as a result of his condition?

A    Yes.  That's all in the records.

Q    Right.  So if this man has this kind of neurological deficits of headaches, would it be fair to say that it's hard for a man like that, as you said, go through injections?

A    I don't think I said that.

Q    Well, okay.

A    I didn't say he couldn't go through injections because he has headaches.  What I said was when you do a lumbar puncture, frequently there's a headache afterwards that lasts a couple of days.

Q    So how long ago -- how far back did you look at his records from last year in June of 2024?

A    There was a hospitalization in Montana from June 4th of '24, to June 8th of '24.  That's when he had the stroke.  And he came in, and he couldn't talk.  And we worked him up, and they found out he had another stroke in his brain.

Q    Okay.

A    So he's really at risk for strokes.

Q    Understood.  So but you're aware that if he has that kind

of a condition, that will also disable his ability to go through injections?

A    No.  He will not be -- he can undergo injections with his -- all of his medical issues.  He's still a candidate for epidural injections.

Q    So if he had a surgery -- I'm sorry.  If he had a stroke in 2024, if he had a surgery, heart surgery -- do you know what kind of heart surgery he had?

A    I'm unaware of heart surgery.

Q    Okay.  So then you're not aware how his medical condition has deteriorated to have prevented him to go through injections.  Is it fair to say?

A    No, that's not fair to say.

Q    Well, if you don't know what kind of a heart surgery he has had in December of 2024, how can you say that this man could have elected injections but didn't?

A    He's had an opportunity to get injections now for about seven and a half years and has elected not to do so.  And I can't imagine any heart condition that would render him incapable of having a needle stuck in his back.  That's my opinion.

Q    Okay, sir.  But how many injections do you recommend for Mr. Holloway as of right now you are sitting today?

A    A series of three.

Q    And in what period of time?

UNITED STATES DISTRICT COURT

A    It would depend on the results of the first one.

Q    Right.  And so if --

A    So I'd be speculating to say over what time frame.

Q    Okay.  Have you treated most recently any patients with this kind of condition, spondylolisthesis?

A    Recently, yes.  It's not that uncommon.

Q    Right.  And isn't it true patients with this kind of a condition do have lasting pain?  It's not like it goes away.  For example, this incident happened in 2018.  Up until today in 2025 he still has persistent back pain based on his medical records; true?

A    Yes.

Q    Okay.  So if it hasn't resolved with physical therapy, it hasn't resolved with battlefield acupuncture, can you tell this jury to a degree of medical certainty, to any degree of medical certainty, that injections will resolve that either?

A    More likely than not an epidural injection will be of great benefit.  What I cannot tell is the duration of improvement.  I don't know that until he tries the injection, but it almost always works.  You just don't know how long it's going to work.

Q    Okay, sir.

A    But until it's been tried, you have no idea if it's going to work or not.  Usually it does but not always.

Q    Right.  Doctor, so how much does the injection -- each

UNITED STATES DISTRICT COURT

4-RenSER-00465                                                    4-RenSER-00465

injection cost?

A    3- to $5,000.

Q    Does that include the procedure, anesthesia, the sedation?  Does that include that or --

A    That's the works.

Q    I'm sorry?

A    That's the works.  You can get one 3- to $5,000 each.

Q    Okay.  And so that would cost about -- three of them, how much does it cost?

A    Say $5,000, we're talking $15,000 for the shots.

Q    Right.

A    And then if it did work, you could do it a couple of times a year, and it would be the same price.

Q    Okay.  So -- and, sir, chronic pain does affect all areas of our life; true?

A    Yes.

Q    You know what kind of work Mr. Holloway has been doing in the last few years of his life?

         MS. SWISS:  Objection.  Outside the scope.

         MS. MKRTCHYAN:  He talks about the pain management --

         THE COURT:  Is personal lifestyle something that you would take into account?

         THE WITNESS:  Yes, Your Honor, you would.

         THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

4-RenSER-00466                                    4-RenSER-00466

BY MS. MKRTCHYAN:

Q     So you're aware of what kind of work he's been doing?

A     No, I'm not.

Q     So why would you not consider that if Dr. Raiszadeh found it relevant and he wrote it in his report?

A     I'm unaware of what your client's been doing.

Q     Hypothetically, if he has been doing technical repairs requiring lifting, carrying, bending, would this kind of chronic pain limit his range of motion as it relates to his job functions?

A     It's possible.

Q     Okay.  Enjoyment of life, for example, hiking, camping, doing things, recreational activities, does chronic pain affect that area of our life?

A     What I would say is he likely would be able to hike.  He'd likely would not be able to do repetitive heavy lifting.

Q     Okay.  And pain management with medications, for example, let's say the injections -- what is epidural injections? That's a drug -- right? -- epidural.

A     There's two components.  There's an anesthetic, and there's a long-acting drug called a steroid.  So the anesthetic works right away, and then over a couple of days the steroid kicks in.  So it's a cocktail of two drugs.

Q     Right.  And if someone, for example -- let's say Mr. Holloway decides that his medical conditions do not allow

**UNITED STATES DISTRICT COURT**

4-RenSER-00467                                    4-RenSER-00467

19

him to go through injections.  He elects not to do injections.
He would be taking painkillers -- right? -- to alleviate his
pain; true?

A    One would be hesitant to prescribe long-term narcotics in
this setting.  More likely would be the use of
anti-inflammatories; likely over the counter, like Aleve,
Advil, Motrin, these things.

Q    Understood.

A    This is not somebody you want to put on narcotics --

Q    Well, sir --

A    -- because of all the stuff going on.  So that would be
contraindicated.

Q    Sir, are under counter medications, like you said, Aleve,
Motrin, Advil, don't they have, under the FDA, liver damage?

A    You know --

Q    Risk of liver -- let me finish my --

A    -- that's in the little package insert.  I've never seen a
case of liver damage from anti-inflammatories, but I can't say
it's impossible.  I've just never seen this happen.

Q    In other words, sir, isn't it true that there are side
effects of long-term medications used for any patient with
chronic pain?

A    There can be.  Sure.

Q    And the FDA inserts we are talking about -- let's talk
about the FDA inserts.  They -- the Food and Drug

**UNITED STATES DISTRICT COURT**

Administration puts out warning even when there is 1 percent of the population that is reported to have adverse side effects; true?

A    I think you're right.

Q    Okay.  So and are you aware of what medications Mr. Holloway is prescribed as of right now to treat his pain?

A    No.  I have not got that information.

Q    Okay.  So but, for example, tramadol, do you know what that is prescribed for?  Do you know?

A    Tramadol is a mild pain reliever.

Q    Okay.  Pantoprazole.  Are you aware of -- what is that he's prescribed this medication for?

A    I have no idea.

Q    Well, what is that prescribed for, pantoprazole?

A    Can you say that again?

Q    Pantoprazole.

A    I have no idea what that is.  I'd have to look it up.

Q    Okay.  Maybe we can -- divalproex --

A    I could pull out my phone and look it up.

Q    Sir?

A    I could pull out my phone and look it up, but I'm unfamiliar with that medicine.

Q    That's fine.  Thank you.

        Divalproex, do you know what is that prescribed for?

A    Which one?

**UNITED STATES DISTRICT COURT**

4-RenSER-00469                                    4-RenSER-00469

Q      Divalproex.  Am I saying it wrong?

A      I have no idea what that is.

Q      Okay.  What about gabapentin?

A      Gabapentin is for nerve pain.

Q      Do you know why he's prescribed that drug?

A      For nerve pain.

Q      Okay.  So but based on his medical history, why is he prescribed that drug?

A      Because he has nerve pain.

Q      Related to what?  His spinal injury?

A      Possibly.

Q      Okay.  Did you see as part of your review of his medical records -- Benjamin Gross's neurological study that was done in 2020 for Mr. Holloway?

A      Are you talking about the EMG nerve conduction study that was done?

Q      Yes.

A      Yes, that showed he has a pinched nerve in his back.

Q      Right.  So isn't it true this condition of spondylolisthesis was not only corroborated by the MRI and extra findings but also with neurological studies that came abnormal for Mr. Holloway?

A      I agree with you, yes.

Q      So but basically you are telling us, no, because of Mr. Holloway's existing condition of strokes, he's not a good

4-RenSER-00470                                          4-RenSER-00470

candidate for surgery, and you also are telling us that "I'm not sure whether injections will or will not help him in the long run"; true?

A    Don't know until he has the injections.  That would be -- we don't -- it doesn't work on everybody.  It works on most people but not everybody.  You're right.

Q    Right.  And you cannot tell this jury that if, for example, since 2018, this pain has not resolved up until 2025 that it will resolve in the next seven or ten years.  You cannot tell this jury to a degree of medical certainty; true?

A    True.

Q    I have no questions.  Thank you.

MS. SWISS:  I have no questions.  Thank you.

THE COURT:  Doctor, thank you very much.  You're excused from these proceedings.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  If we need you, we'll be courteous.  I doubt folks will be returning, but just in case, we'll find you.  Thank you very much.

THE WITNESS:  You can always find me, Your Honor.

THE COURT:  Counsel, call your next witness, please.

By the way, there's an agreement today that -- obviously these witnesses that you're seeing -- the next witness also would normally be called by the defense if the defendants had started their case.  But we still have the

4-RenSER-00471                                    4-RenSER-00471

finishing -- the cross-examination of Deputy Renegar. And there's one more witness who's not available today that the defense would be calling.

So, Counsel, your next witness.

MR. HARRELL: Your Honor, thank you. The defense calls Brian Fuerbach.

THE COURT: Thank you. Ask the gentleman to come forward, please.

Thank you, sir. If you'd come forward between the double doors. And would you raise your right hand, sir.

**BRIAN FUERBACH, DEFENDANTS' WITNESS, IS SWORN**

THE COURT: Thank you very much. If you'd be seated here in the witness box. And after you're seated, would you push your chair closer to that microphone. Make sure you're comfortable. And then would you face the jury and state your full name, sir.

THE WITNESS: Brian Fuerbach.

THE COURT: Would you spell your last name.

THE WITNESS: F as in "Frank," -u-e-r-b-a-c-h.

THE COURT: And just to make sure, will you spell your first name also.

THE WITNESS: B-r-i-a-n.

THE COURT: Thank you.

This would be direct examination, please.

///

**UNITED STATES DISTRICT COURT**

4-RenSER-00472                                    4-RenSER-00472

24

## DIRECT EXAMINATION

BY MR. HARRELL:

Q    Good morning, sir.

A    Good morning.

Q    Are you employed at the present time?

A    Yes, I am.

Q    Generally, what do you do for a living?

A    Engineering manager in the plastics industry.

Q    Okay.  Let's get right to it.

On January 21, 2018, did you own an RV?

A    Yes.

Q    On January 21 of 2018, did you go camping?

A    Yes.

Q    With your RV?

A    Yes.

Q    Where did you go camping, sir?

A    O'Neill Park.

Q    And that's located generally where?

A    Trabuco Canyon, I believe.

Q    Okay.  In Orange County?

A    Yes.

Q    All right.

MR. HARRELL:  Let's pull up Exhibit 244 in evidence.

BY MR. HARRELL:

Q    And you don't need to do a thing, sir.  We'll pull it up

**UNITED STATES DISTRICT COURT**

4-RenSER-00473                                    4-RenSER-00473

25

for you.

(Exhibit displayed.)

BY MR. HARRELL:

Q    Sir, do you see a photograph in front of you?

A    Yes.

Q    Do you recognize the RV depicted in Exhibit 244?

A    Yes, I do.

Q    Do you have any association with that RV?

A    I did own it.  My wife got it in the divorce.  So -- sorry.

Q    All right.  Let's move on quickly.

What is the make of the RV there?

A    It's a Winnebago on a Mercedes chassis.

Q    Okay.  And I know that we can all see it.  The official record for our trial is what is being typed down right in front of you.

So just for the record, can you tell us the color of your RV on that night.

A    It's white with some gray cladding on the bottom.

Q    Okay.  Do you see a large black rectangle on the side of your RV?

A    Yes.

Q    What is that?

A    That's a window for the dinette area, and it turns into a sleeping bed.

**UNITED STATES DISTRICT COURT**

26

Q    Okay.  That big black square is a window?

A    Yeah.

Q    There's now a red circle around it?

A    Yeah.

Q    All right.  What campsite were you in on that night?

A    This was seven years ago.  Off the top of my head, I couldn't tell you 100 percent which spot I was.

Q    Does 63 sound about right?

A    I'm sure it's on the record.  Yeah.

Q    All right.

        MR. HARRELL:  Let's pull up Exhibit 54, which I believe is in evidence.  It's our campground sign-up sheet.  Do I have it right?  Let's go to Campsite 63 on the campground sign up sheet.  Hang on a second, sir.

            **(Exhibit displayed.)**

BY MR. HARRELL:

Q    Okay, sir.  Does this help refresh your recollection as to your campsite on that night?

A    Yeah.  That's my name.  That's my address.

Q    All right.

        MR. HARRELL:  Can we show the number associated with that?  Yes, we can.

BY MR. HARRELL:

Q    Sir, does this refresh your recollection as to the number of the campsite that you occupied on that night?

**UNITED STATES DISTRICT COURT**

4-RenSER-00475                                        4-RenSER-00475

27

A     Yes.

Q     What campsite was that?

A     Site 63.

Q     Okay.

        MR. HARRELL:  Now let's pull up a new exhibit.  This is 76.  This is our campground map already in evidence.

        **(Exhibit displayed.)**

        MR. HARRELL:  And, Mr. Stever, if you can focus on Numbers 63 and 65 for us.  You can blow that up for us.

BY MR. HARRELL:

Q     Sir, do you see Campsite 63 on our campground map?

A     Yes.

Q     As you face your Winnebago from the road, what campsite number is to your immediate right?

A     65.

Q     All right.  So it's your testimony you were in 63; correct?

A     Correct.

Q     All right.

        MR. HARRELL:  And let's zoom out, if we can.  I think we have a direction marker.

BY MR. HARRELL:

Q     Do you see north there, sir?

A     Yes.

Q     All right.  Would it be accurate to state that your

**UNITED STATES DISTRICT COURT**

4-RenSER-00476                                   4-RenSER-00476

Campsite 63 was to the immediate north of Campsite 65?

A    Yes.

Q    All right, sir.

And if you could stay in close proximity to the microphone.

All right.

MR. HARRELL:  Now, let's go back to Exhibit 244, the photograph.

BY MR. HARRELL:

Q    Now, sir, now that we're oriented, do you see a blue tent in Photograph 244?

A    Yes.

Q    Now that we're oriented, what campsite number did that blue tent occupy on that night?

A    65.

Q    Okay.  So what time did you go to bed on that night?

A    I believe it was around midnight.

Q    Were you with anyone at that time?

A    I was with my wife.

Q    When you went to bed at midnight, did you fall asleep?

A    Yeah.  Yeah.  We had dinner, watched some TV, and then we fell asleep.

Q    Okay.  Was there anything that interrupted your sleep on that night?

A    There was -- sounded like a thump on the side of the

UNITED STATES DISTRICT COURT

camper, which woke my wife up, and she woke me up and said, "Hey, something just hit the camper."

And so I got up and was, you know, shaking off my sleep, started to look around, and then we heard another (imitating sound), and we realized it was car doors shutting.

Q     How many car doors did you hear shut?

A     Two.

Q     Okay.  And about what time of day or night did you hear what sounded like two car doors shutting?

A     I believe it was around 2:00 o'clock in the morning.

Q     Okay.  So, sir, at 2:00 o'clock in the morning, after you heard the car doors shut, did you hear any other activity coming from Campsite 65?

A     There was some talking.

Q     From the voices that you heard, were you able to associate the genders of the people that you heard talking?

A     Sounded like a man and a woman --

Q     Okay.

A     -- talking.

Q     Did you go to -- back to sleep at that point in time?  Did you stay awake?  What happened next?

A     No, we went back to sleep.

Q     All right.  During the course of that night, after you went back to sleep, did you hear any other activity coming from Campsite 65?

**UNITED STATES DISTRICT COURT**

4-RenSER-00478                                        4-RenSER-00478

A    Yeah.

MS. MKRTCHYAN:  Objection.  Misstates -- assumes facts not in evidence.  Misstates the testimony, "from Campsite 65."

THE COURT:  Overruled.

BY MR. HARRELL:

Q    Sir, you can answer.  The judge is allowing you to answer.

A    My wife was awoken again, and she said, "Here, listen, listen."  And so we can hear somebody yelling.  And we opened the window, and we can hear a man yelling, "You want more of this?  You want more of this?"  And then we heard punching and "Why you doing this?" -- a woman's voice -- "Why you doing this?  I'm just a girl.  Why you doing this?"  And this went on for a little bit.

My wife yelled out, "Stop hitting her."  And then momentarily it stopped.

Q    Okay.  Let me stop you there.  While you were testifying, I thought I saw you take your fist and move it to the palm of your hand.

A    Yeah.  It was -- you could hear the blows being landed.  It was -- and you could hear the tent moving.  You could see the tent moving.  I could hear almost like the hand going along the nylon -- zip (imitating sound).  It was bad.

Q    Okay.  Let me ask you a couple of things about what you

4-RenSER-00479                                    4-RenSER-00479

just told us for our official record that's being typed down. I need now to paint a word picture. Tell me if I have it right, okay?

What -- by the way, when you are making observation, are you at the black -- big black window that we see on Exhibit 244?

A    Yes.

Q    Did you feel like you had a good view of the tent at that time?

A    Yeah.  The backside of the tent.

Q    Okay.  For the record, did you hear any sounds coming from that blue tent at Campsite 65 that sounded like a fist making contact with someone?

A    That was definitely where it was coming from.

Q    Okay.

A    Yes.

Q    All right.  Did you hear sounds coming from that tent that sounded like a fist making contact with someone making a smacking sound?

A    Oh, yeah.  Yeah.  Yes.  It was -- somebody was getting pummeled.

Q    Okay.

A    A woman from what I could hear.

Q    And why do you believe it was the woman that was getting pummeled instead of the male voice that you heard?

32

A     She was the one that was crying out.

MS. MKRTCHYAN:  Calls for speculation.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  She was the one that was crying out "Why are you doing this?  I'm just a girl.  Why are you doing this?"

BY MR. HARRELL:

Q     How many blows did you hear, sir?  It's fine if -- you can approximate it if it's something that you can swear it to.

A     Probably five.

Q     Okay.  Now, I believe in your earlier answer, you also told us that you saw the tent moving?

A     Yes.

Q     Can you describe what you saw there while this argument is going on?

A     We just see the tent kind of moving like this (imitating sound).  And you can -- you know, clearly it was 25 feet away.  We were -- had the window wide open.  We can see. It was right there.

Q     And during your last answer, you were making a gesture that seemed to suggest that the tent was moving from left to right.  Is that what you were trying to suggest?

A     It was just moving.  It was -- you can tell that there was something going on exactly where we were hearing was happening.

UNITED STATES DISTRICT COURT

4-RenSER-00481                    4-RenSER-00481

Q    Okay.  I believe in an earlier answer you also said that it sounded to you like there was something making contact with the fabric of the tent?

A    Yeah.  Coincided with the sounds of the contact, the fist blows.

Q    What type of movement did you see that you associated with the fist blows?

A    Just a general -- you know, it sounded like somebody's fist going along the contours of the tent, zip, zip, and then (imitating sound).

Q    It sounded to you like the fist on the way to striking the woman was in direct contact with the fabric --

MS. MKRTCHYAN:  Objection, Your Honor.

BY MR. HARRELL:

Q    -- of the tent?

MS. MKRTCHYAN:  This is a series --

BY MR. HARRELL:

Q    Do I have it correctly?

MS. MKRTCHYAN:  Speculation.

THE COURT:  Sustained.  Just re-ask the question.

MR. HARRELL:  Sure.

BY MR. HARRELL:

Q    Sir, can you describe for us, paint a word picture for us on what you saw in terms of the sound of a body part moving along the fabric of the tent.  Describe what you observed and

UNITED STATES DISTRICT COURT

4-RenSER-00482                                    4-RenSER-00482

what you heard.

A    As it was happening, the tent was shimmying, and we can hear the yelling.  And then the zip, bam, zip, bam.  I don't know how to best describe it.  I don't.

Q    That works fine, sir.

While this was going on, was the male voice saying anything?

A    Oh, yelling, "You want more fucking of this?"  Or -- he was cussing, and she was crying out, just "Why you doing this?  Why you doing this?  I'm just a girl."

Q    What about -- did you make any phone calls in response to what you were seeing?

A    I called 911.

Q    What about your observations made you call 911?

A    This incident.  It was -- somebody was clearly getting assaulted.

Q    We're going to play your 911 call from that night, sir.

MR. HARRELL:  This is in evidence.  It is Exhibit 228.

BY MR. HARRELL:

Q    And we're going to get you a copy of a transcript, okay, if you hang on for one second, and for the jury too.

**(Counsel confer off the record.)**

MR. HARRELL:  It's my understanding the jury already has a copy.  We're going to have one for you.

**UNITED STATES DISTRICT COURT**

BY MR. HARRELL:

Q    Ms. Skinner, from our office, is going to bring you a copy, Mr. Fuerbach.  I have a copy.  It's fine if we give this --

THE COURT:  Do you also have an extra copy, by any chance?

MS. SKINNER:  I do, Your Honor.

THE COURT:  Thank you.  Make sure that the jury has -- do you have a copy of this?

MR. HARRELL:  Your Honor, can you let our team know when it's okay to play?

THE COURT:  Pardon me?

MR. HARRELL:  Can you let us know when it's okay to play the tape?

THE COURT:  Just a moment.  Jury is shuffling through numerous transcripts at the present time.

Okay.

**(Audio recording played, not reported.)**

BY MR. HARRELL:

Q    Sir, have you now heard the 911 call?

A    Yes.

Q    Do you recognize your voice on that tape?

A    I do.

Q    Are the statements you made to 911 truthful?

A    Yes.

UNITED STATES DISTRICT COURT

4-RenSER-00484                                                    4-RenSER-00484

Q    Now, based on your observations, did you consider trying to handle this situation yourself instead of calling 911?

A    No, I didn't.

Q    Why not?

MS. MKRTCHYAN:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I didn't know what this individual is capable of.  My wife wanted to do something, but I said, "Let's just wait for the police to come."  And that's what we did.

BY MR. HARRELL:

Q    On the tape, did you say words to the effect of "It sounds bad"?

A    Yes.

Q    What did you mean when you said that?

A    It sounded like someone was getting a serious beatdown.

Q    Sir, did you observe law enforcement respond after your 911 call about the domestic violence?

A    Yes.

Q    Did you hear any words exchanged between law enforcement and the suspect in Campsite 65 at that time?

A    Yes.

Q    All right.  I'd like to play some audio from that night and see if you hear yourself speaking with law enforcement. This is from -- well, let me ask you first before we get to the

4-RenSER-00485                                    4-RenSER-00485

37

contact with the suspect.

Did you have any contact with law enforcement before they went to Mr. Holloway's tent at Campsite 65?

A    There was some confusion as to which campsite he was in, even though the 911 operator had said if you are facing my campsite, which campsite would it be, and I said to the right. So if you were standing in the road, it would have been the right-hand side.

They went to the campsite to the left at first, and they came to talk to me to clarify, and then they went and spoke.

Q    Okay, sir.  Let's play some tape of what we believe to be that contact, and you tell us if you hear your voice.

MR. HARRELL:  Your Honor, this is from Deputy Borba's tape.  We'd like to publish just the portion showing contact between Deputy Borba and this witness.

MS. MKRTCHYAN:  I'd like -- Your Honor, if they're going to play Deputy Borba's tape, that portion, I would like to play it in entirety, not to leave things out of context, please.

MR. HARRELL:  He will be here to testify.

MS. MKRTCHYAN:  No.  I object.  I want to have the entirety of the tape.

THE COURT:  You can play the portion that relates to this witness.  Then Borba's entire tape will be played when

4-RenSER-00486          4-RenSER-00486

Borba's here to testify.

MR. HARRELL: Yes.

THE COURT: All right.

MR. HARRELL: All right. And --

THE COURT: This only relates to the conversation with Mr. Fuerbach.

MR. HARRELL: True.

THE COURT: All right.

MR. HARRELL: And, Your Honor, we do have a transcript of this portion of Deputy Borba's tape. And we'd like to hand that out and give everybody a page number.

THE COURT: What's this marked?

MR. HARRELL: Your Honor, the transcript has not got an exhibit number. It's our understanding that's not going to go back to the jury. But we do have copies of those transcripts.

THE COURT: What's this marked?

MR. HARRELL: Borba's tape is marked as 102-12.

THE COURT: Okay.

Now you're eventually going to hear all of Borba's tape. I'm only allowing a specific portion if it involves this witness, Mr. Holloway [sic]. But you'll hear the entire portion of this tape.

MR. HARRELL: And I'll let everybody get a copy, and then I'll give everybody a page number.

4-RenSER-00487                    4-RenSER-00487

THE COURT: The clerk will hand that up to the jury. Thank you.

Counsel.

MR. HARRELL: Okay. The page reference for the transcript is page 10 -- it starts on page 9 at line 3, continuing over to page 10, line 25.

THE COURT: Just a moment.

**(Pause in proceedings.)**

THE COURT: All right. You may play that.

**(Audio recording played, not reported.)**

THE COURT: Just a moment, Counsel. Would you stop the tape for just a moment.

MR. HARRELL: Yes.

THE COURT: Counsel, I'm going to reverse that ruling I made. I want you to start at page 1 so there's context to this tape.

MS. MKRTCHYAN: Thank you.

THE COURT: And to go through page -- and then at page 10, when the initial contact is then made between Renegar and Holloway.

MR. HARRELL: Very good, Your Honor.

THE COURT: That will give context to it.

MR. HARRELL: Page 10, line 25?

THE COURT: You'll finish on page 10, line 25. That's when Renegar makes contact with Holloway.

**UNITED STATES DISTRICT COURT**

4-RenSER-00488                                    4-RenSER-00488

Then when Borba plays, the entire tape will be played.

But I think there will be more context for the jury if we simply start at the beginning of this.

MR. HARRELL:  Very good, Your Honor.

THE COURT:  So, ladies and gentlemen, we're simply going to start at page 1 and play up to the contact between Renegar and Holloway.  And then Borba, you'll hear this entire tape again, whole portions thereof.

Counsel.

**(Audio recording played, not reported.)**

BY MR. HARRELL:

Q    Sir, have you now heard the audiotape that was played for us, Deputy Borba's tape?

A    Yes.

Q    I know you have.  This is just for the record.  Do you hear your voice speak with law enforcement?

A    I do.

Q    Did you give law enforcement any instructions on that night on where they needed to go?

A    Yes.

MR. HARRELL:  Let's pull up Exhibit 245 in evidence.

**(Exhibit displayed.)**

BY MR. HARRELL:

Q    Sir, do you see the location of where you told law

**UNITED STATES DISTRICT COURT**

4-RenSER-00489                                    4-RenSER-00489

enforcement to go on the night of the incident in Exhibit 245?

A     Yes.

Q     For the record, is there a vehicle in that photograph?

A     Yes, a white truck.

Q     Okay, sir.

            MR. HARRELL:  Let's go back to 244.

BY MR. HARRELL:

Q     Sir, when you had your contact with law enforcement, giving them instructions on where they needed to go, where were you located?  Do we see that in 244, the photograph?

A     Yes.  I was in the white RV.

Q     Okay.  Did you intend to communicate to law enforcement that they needed to be at the blue tent?

A     I'm not understanding the question.

Q     Sure.  Sure.  You communicated to law enforcement where they needed to be to investigate the domestic violence that you reported on 911; true?

            MS. MKRTCHYAN:  Objection.  Vague.  Vague as to time.  And vague and ambiguous.

            THE COURT:  Overruled.

            THE WITNESS:  I directed them over because they were on the wrong side.  They were on the opposite side.

BY MR. HARRELL:

Q     And so do you see the location that you directed law enforcement to go to?

4-RenSER-00490                                           4-RenSER-00490

A     Yeah.  The blue tent.

Q     Okay, sir.  Campsite 65?

A     Yes.

Q     All right, sir.

Was there any doubt in your mind that that's where they needed to be?

MS. MKRTCHYAN:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  That was precisely where they needed to be.

BY MR. HARRELL:

Q     Okay, sir.

Now, after you directed law enforcement to Campsite 65, did you hear any of the law enforcement contact with Mr. Holloway after you told law enforcement to go to Campsite 65?

A     Yes.

Q     Did Mr. Holloway ever speak in what you would characterize as a loud voice?

A     Yeah.  He was quite agitated that they were bothering him.

Q     All right.

MR. HARRELL:  We're going to play some audiotape from that night.  And this is from Deputy Renegar's PVS tape.  Our internal marking is 162-N.

**UNITED STATES DISTRICT COURT**

43

THE COURT: Well, I need a court marking. What's the court marking?

MR. HARRELL: Sure. It is Exhibit -- Deputy Renegar's PVS tape is --

MS. SWISS: 102-2.

THE COURT: 102-2?

MS. SWISS: Yes, Your Honor.

THE COURT: All right. Thank you.

So, ladies and gentlemen, this is back to Renegar's tape.

**(Audio recording played, not reported.)**

MS. SWISS: There is a transcript.

THE COURT: Well, I think the jury already has the transcript, but I'm not certain at this point.

MS. SWISS: They have the plaintiff's transcript. We'd like to distribute the defense transcript.

THE COURT: All right. You may do so.

MR. HARRELL: And while we're doing that, if we can get a page and line number of the transcript, that would be helpful. I'll give it to the jury as soon as I have it.

THE COURT: You know what, we've been in session an hour and a half. Why don't you take a recess, and we can do those logistics.

You're admonished not to discuss this matter amongst yourselves or discuss your opinions concerning the case.

**UNITED STATES DISTRICT COURT**

44

Counsel, why don't you take 20 minutes.

Sir, you may step down.

**(Recess from 9:34 a.m. to 9:53 a.m.)**

THE COURT:  We're back in session.  All counsel are present.  The parties are present.

Thank you, sir.  If you could retake the stand.

With the clerk's help, would you help hand out the transcripts.

MS. SWISS:  Your Honor, may I correct the number on the exhibit number?

THE COURT:  Yes.

MS. SWISS:  The exhibit is actually 102-1.  That's the clip that will be played.  And the transcripts being handed out contain both Exhibits 102-1 and 102-2, which would be Deputy Renegar's PVS tape.

THE COURT:  All right.  Thank you.

MR. HARRELL:  The time of day counter on what's about to be played is 4:29:19 in the morning through and including 4:29:41.  And when everybody's situated with the transcript, I have a page and line number.

THE COURT:  What page, Counsel?

MR. HARRELL:  Your Honor, on the transcript that's being handed out, this starts on page 16, line 22.

THE COURT:  Just a moment.

MR. HARRELL:  And, Your Honor, it ends on page 17,

**UNITED STATES DISTRICT COURT**

line 12.

THE COURT:  And this, just to make certain for my record, is, once again, the recording of Renegar?

MR. HARRELL:  That is correct.  This is from Renegar's PVS tape.

THE COURT:  All right.

And, ladies and gentlemen, these two transcripts that you're looking at may have some variations in them.  And that's why what you hear is the best evidence.  These transcripts are only an aid.

So, Counsel, you may play that.

MR. HARRELL:  And, again, our transcript is on page 16, line 22, and goes through and including page 17, line 12.

BY MR. HARRELL:

Q    Sir, do you remember where we left off?  You were about to tell us about what you saw and heard, reference the contact law enforcement had with Mr. Holloway, reference the domestic violence; correct?

Do you remember that?

A    Yes.

Q    Okay.  We're going to play some tape now, and I want you to listen.  And I want you to tell me if any of the voices that you hear match the voice of the person that prompted you to report them for domestic violence.  Okay?  Do you understand

4-RenSER-00494                                        4-RenSER-00494

46

the assignment?

A     Yes.

Q     Okay.  We're going to play that clip now.

**(Audio recording played, not reported.)**

BY MR. HARRELL:

Q     Sir, did you hear any voice on that recording that matched the voice of the person that prompted you to report them for domestic violence?

MS. MKRTCHYAN:  Objection, Your Honor.  It lacks foundation.  Is he a voice recognition expert?

THE COURT:  First, before you answer that question...

Redirect me to what was just played, Counsel.  What page?

MR. HARRELL:  Your Honor, this is -- for the transcript, it starts on page 16, line 22.

THE COURT:  You said page 15.  My apologies.

MR. HARRELL:  Oh, I'm sorry.  I misspoke then.  Page 16, line 22, through and including page 17, line 12.

THE COURT:  So line 16 -- or page 16, line 22 --

MR. HARRELL:  Correct.

THE COURT:  -- through page 17, line 12?

MR. HARRELL:  Correct, Your Honor.

THE COURT:  And you just played that portion?

MR. HARRELL:  Correct, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT: Was that clear to the jury? Were you tracking it? Okay.

I apparently wasn't. My apologies.

And then can you ask the question?

MS. MKRTCHYAN: And I objected, Your Honor. Vague as to time. Are we talking about now he's recognizing or then he recognize it? And lacks foundation.

THE COURT: The question is directed -- does he recognize the voice that evening? Overruled.

You can ask the question.

MS. MKRTCHYAN: He didn't hear this tape that evening. Lacks foundation. Calls for speculation, Your Honor.

THE COURT: Overruled.

Re-ask the question, Counsel.

BY MR. HARRELL:

Q    Sir, at that evening do you recall hearing the words that was spoken on the portion of Deputy Renegar's tape that we just played?

A    Yes.

Q    Did that -- did that voice match up with the voice of the person that prompted you to report them for domestic violence?

A    Yes, it did.

Q    Did law enforcement leave shortly after Mr. Holloway cursed at them as we heard on tape?

A    They looked around his tent, and then they did leave.

4-RenSER-00496                                    4-RenSER-00496

Q    Did they take Mr. Holloway away in handcuffs at that time?

A    No, they did not.

Q    So after law enforcement leaves, does Mr. Holloway go to sleep and stay quiet?

A    Well, he did go back into his tent for a short while.

Q    And did he appear to go to sleep at that time?

MS. MKRTCHYAN:  Objection.  That is so --

THE COURT:  Sustained.  Sustained.

BY MR. HARRELL:

Q    Did he stay in his tent after he initially entered?

MS. MKRTCHYAN:  Lacks foundation.

THE COURT:  Counsel, simply ask what occurred.  I'm going to sustain the objection.

BY MR. HARRELL:

Q    Sir, what was the next thing that happened?

A    Shortly after, he came back out, and then we heard more yelling.  And the first thing he did was he walked down the road in the opposite direction, yelling, "Who's the motherfucker who called the police?  Come out, you motherfucker."  Down.  Then he came back, and he passed us, and he went up the road yelling the same thing, up and down the campground.

Came back, stood right in front of my camper, and literally six feet away from the front of my camper, yelling at

4-RenSER-00497                                                    4-RenSER-00497

it, saying, "Come out, motherfucker.  Come out."

And I was behind a sunshade that had a cutout, and I was just watching him.  He was just right there.  And my wife was freaking.  And I was just -- told her, "Be quiet."  And I said, "Let him play it out."  He yelled at me for I don't know how long -- he didn't know I was watching him -- telling me to come out.  And then he went, got back in his tent, zipped it up, all quiet.

Q    Now, at the time of the incident, you didn't know Mr. Holloway's name; right?

A    No.

Q    True?

A    No, I did not know his name.

Q    Oh, okay.

The voice that was yelling to you about "Come outside, motherfucker," and the rest of that, did that match up with the voice that we hear on the audiotape that was played earlier from Deputy Renegar's PVS tape?

A    Definitely.  Definitely was the same man.

Q    Okay.  So did law enforcement respond for a second time after Mr. Holloway stands outside your Winnebago yelling and cursing?

A    Yes.  I didn't call.  That -- the second 911 call didn't come from me.

Q    But you do know law enforcement did respond again?

4-RenSER-00498                    4-RenSER-00498

A    Yes, I did.

Q    Is there a reason why you didn't call the second time?

A    My wife wanted me to, and I said, "You know what, we're inside the camper."  If I was outside -- if we were in a tent, I would have been completely freaked out.  But I figured, "You know what, the guy went back in his tent."  He fell asleep -- or I don't know.  He's sleeping it off because I assumed he -- well, anyway.

So we decided -- we talked.  We decided that -- because I had things outside in the campsite, I thought, "You know what, I'm not going outside.  First light, we'll get up, I'll grab the things, and we're pulling out of here, and we're just going to leave."  And so we sat there on the bed, and we couldn't sleep.  And then we heard vehicles coming.  And then at that point I assumed that there were sheriffs coming.

Q    Did you hear any sirens?

A    No.

Q    Okay.

A    Not that I recall.

Q    Now, did you see any of the law enforcement contact with Mr. Holloway on the second time they came to Campsite 65?

A    Yes.

Q    Did you see any member of law enforcement come running up and knee Mr. Holloway in the head?

MS. MKRTCHYAN:  Objection.  Lacks foundation.  Vague

UNITED STATES DISTRICT COURT

as to time.

THE COURT:  Well, I thought the question was any time.

You can answer the question, sir.

Overruled.

THE WITNESS:  Absolutely not.

MR. HARRELL:

Q    Did you see on that night any law enforcement knee him in the head in any manner?

A    No.

Q    Did you see any member of law enforcement kick Mr. Holloway in the head?

A    No.

Q    During the second encounter, did it seem like Mr. Holloway wanted to cooperate with law enforcement?

A    Absolutely not.

Q    Why do you say that?

A    Because he was -- he wouldn't get out of his tent.  He was combative.  When he did and -- he wouldn't follow their commands.  He created the situation entirely by threatening everybody in that campground.  Could have just went to sleep and slept it off, but instead he threatened everybody in that campground, including me.

Q    Now, I believe that you told us that you didn't know Mr. Holloway prior to this incident; right?

**UNITED STATES DISTRICT COURT**

A    No.

Q    Prior to this incident, did you have some type of grievance with Mr. Holloway where you wanted to get him in trouble for no reason?

A    No.

Q    Did you tell the truth on the 911 call?

A    Yes.

Q    Have you told the truth here?

A    Of course.  Yes.

Q    Sir, thank you for coming.  I have no further questions.

**CROSS-EXAMINATION**

BY MS. SWISS:

Q    Just briefly, sir.  On the second encounter, did you see any member of law enforcement go up and punch Mr. Holloway in the face?

MS. MKRTCHYAN:  Lacks foundation.

THE COURT:  I'm going to sustain that.  I want to know more about what his view was, what he could see, Counsel.

BY MS. SWISS:

Q    Sir, on the second encounter, did you observe anything through the window of your RV when law enforcement was at Mr. Holloway's campsite?

A    Yes.  We watched the entire situation unfold.

Q    And when you were watching outside of your RV, did you see any member of law enforcement punch Mr. Holloway in the

**UNITED STATES DISTRICT COURT**

53

face?

A    No.

Q    Thank you.  No further questions.

THE COURT:  Then cross-examination.

MS. MKRTCHYAN:  Sure.  Thank you.

**CROSS-EXAMINATION**

BY MS. MKRTCHYAN:

Q    Sir, we have met before, didn't we, many times before?
We've met before?

A    You and I?

Q    Yes.

A    I wouldn't say "many times."  I've spoken with you.

Q    Okay.  Sir, you've testified at a deposition; true?

A    True.

Q    Prior proceedings?

A    Yeah.

Q    Okay.  So now, you are giving -- you also spoke with
police on the night of this very incident; true?

A    Yes.

Q    You spoke to them twice on the night of the incident;
true?

A    Yes.

Q    You spoke to them couple of weeks after the incident --
true? -- in 2018?

A    Yes.

**UNITED STATES DISTRICT COURT**

4-RenSER-00502                          4-RenSER-00502

Q    Okay.  So you gave a different version to police on the night of the incident up until the time you are here today; isn't it true?

A    No.

Q    Okay.  Then let's look at what you actually told the police on the night of the incident.

On the night of the incident when the police officers came to speak to you, first of all, you spoke with one officer as we heard on this tape.  This is one officer, Borba.  We heard that on this tape; right?

A    Correct.

Q    Okay.  After that, you spoke with other officers after the use of force; true?

A    The next morning, yes.

Q    No.  The same night.  The same very night after Mr. Holloway was arrested and taken away, you spoke with police officers the same very night; true?

A    No.  I don't recall that.  We watched them clean the campground up, his campsite, go through it.  They came to my camper door early the next morning and knocked.

Q    So --

A    That's what I recall.

Q    Okay.  If Deputy Pahel said on tape that he spoke to you after the use of force and you told him you didn't see anything, but you heard noises, would that be inaccurate, sir?

**UNITED STATES DISTRICT COURT**

55

Would that be inaccurate?

A    Well, you'd have to be specific about what I've seen.  I didn't -- I don't know what you're exactly referring to.

Q    Well, we will be very specific.

A    Because I did see the incident.  So if I -- why would I say I didn't?

Q    So, sir, you were in your RV -- true? -- at the time this DV was occurring; true?

A    True.

Q    You never came out of your RV?

A    No.

Q    Your RV was not running, the lights were not in your RV?

A    No.

Q    You did not have flashlights, did you?

A    I have flashlights, yeah.

Q    Did you use flashlights?

A    I did not use flashlights.

Q    Okay.  Let's look at the campground some -- I've got some of the video here.  Let's see how dark this was.  This was pitch dark -- isn't it true? -- this campground?

A    Yes, it was.

Q    At nighttime -- this was nighttime when the call came in, 3:39 your call -- 911 call?

A    Uh-huh.

Q    Right?

**UNITED STATES DISTRICT COURT**

56

A      Yes.

Q      Did you have x-ray vision to be able -- to be able to see through a tent in a dark campground?

Let's have this tape -- this is Gotts's tape that we played before.

THE COURT:  Counsel, there's no question pending. Do you want him to answer that?  First of all, strike the "x-ray."  Re-ask the question, please.

BY MS. MKRTCHYAN:

Q      Did you use any night goggles to actually see through your windows of your RV to see how Mr. Holloway's tent was moving and that something was happening in that tent in that dark campground, sir?

MR. HARRELL:  Objection, Your Honor.

THE COURT:  You can answer if you had night goggles.

THE WITNESS:  No night goggles, no.

BY MS. MKRTCHYAN:

Q      Okay, sir.  Let's see how dark this campground is.  Did you ever estimate how far was your camper parked, dark campground, from Mr. Holloway's campsite?  Did you ever estimate?

A      I've estimated 20, 20 feet.

Q      Did you ever actually walk out of your tent that night and walk and measure towards the tent, the distance that you had between your RV and his tent, sir?

**UNITED STATES DISTRICT COURT**

4-RenSER-00505                                                    4-RenSER-00505

A    No.  No, I did not.

Q    Okay.  So now, when you --

A    So it's an estimate.

Q    Okay.  And you were hearing this noises from your window of an RV.  Isn't it true your window --

MS. MKRTCHYAN:  Let's open -- can you have this played for a second?

MS. SWISS:  Exhibit number?

MS. MKRTCHYAN:  This is Gotts' tape.

THE COURT:  Gotts' tape.

MS. MKRTCHYAN:  We already played it before.  Thank you.

Just play this.

MR. HARRELL:  Your Honor, counter number, please, for our record.

THE COURT:  Counsel, just play the tape.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    So if there are no lights there, are you telling me that you were able to see through the window of your RV what was going on at Mr. Holloway's tent?

A    Yes.

Q    Okay.  So, sir, let's see.  You told Deputy Johnston just two weeks after, on February 8, 2018, that you never -- you never saw any female.  You just heard noises and called 911;

UNITED STATES DISTRICT COURT

58

isn't it true?

A    It's true I didn't see a female.  I heard a female.  I could see the tent.

Q    Sir, let's -- so were you -- let me ask you this:  Was the memory of this incident in your mind more fresh on February 8, 2018, or today here, 2025?

A    2018.

Q    Okay.  And when you recall -- throughout this period of time since toward the night of the incident up until today, you have cooperated with this defense counsel; true?

A    True.

Q    Okay.  And when my private investigator has tried to spoke to you as early as in 2019, isn't it true you refused to speak with him?  Two investigators, separate occasions, tried to speak with you.

A    Do you want to talk about the harassment of your investigator?  Jeffrey --

Q    Sir?

A    -- LeTourneau?

Q    Sir, I'm talking about Robert --

A    Chasing my children down, harassing my -- yeah, laugh about it.  It's not funny to me at all.

Q    Sir, private investi- -- so you're biased in favor of police; isn't it true?

        MS. SWISS:  Objection.

**UNITED STATES DISTRICT COURT**

4-RenSER-00507                                    4-RenSER-00507

THE WITNESS: Being harassed? I'm not in favor of my family being harassed --

BY MS. MKRTCHYAN:

Q    Sir, we had --

A    -- for something like this.

Q    On November 6, 2019, we had investigator Robert Acosta, separate investigator on another day, tried to speak to you.

Do you remember that?

A    I did speak with him.

Q    Okay. Do you remember that when he was asking you questions about this incident, you said you believed Mr. Holloway was transient and that you didn't want to do anything with this lawsuit. You were upset that he filed a lawsuit against police for injuries.

Do you remember that?

A    I never said that.

Q    Well, let me state what he said.

A    I had no idea he was a transient.

MR. HARRELL: Objection. Hearsay.

THE COURT: Just a moment. I think we've got some speak-overs. The answer was: "I never said that."

The question was: "Well, let me state what he said."

MS. MKRTCHYAN: No.

MR. HARRELL: Hearsay.

UNITED STATES DISTRICT COURT

BY MS. MKRTCHYAN:  What you told --

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q     -- Mr. Acosta was that the guy -- you know, you got the impression the guy was possibly a transient.  Is that false?  Is that false?

A     That is false.

Q     Okay.  So private investigator, certified by the -- California, is going to lie in report when he has no stake in the outcome of this lawsuit?

MS. SWISS:  Objection.

THE WITNESS:  And I do?

MS. SWISS:  Objection.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Let's continue what you told him.  You told him that you didn't really want to talk about the incident, didn't know the guy had that much time to bring a lawsuit.  You told him you didn't want to say anything to help the individual we were representing.  And you also said that "If the attorney wants to depose me, that's the only way I will discuss anything."  You said that to Mr. Acosta on November 6, 2019?

A     I did.  I did.  It was a very cordial conversation, and I just laid it out.  Basically I'm not going to help a criminal.

Q     I see.  Sir --

UNITED STATES DISTRICT COURT

A    So I thank you very much.  And he went away, and then you sent in the big guns, and you sent LeTourneau.

Q    Are you aware that Mr. --

A    Chase me down.

Q    You said "criminal."  Are you aware that Mr. Holloway was not found with a female that night?

          MR. HARRELL:  Relevance.

          THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Are you aware that he was not prosecuted for any domestic violence that night?

          MS. SWISS:  Relevance.

          THE COURT:  Sustained.

          MS. MKRTCHYAN:  Okay.

BY MS. MKRTCHYAN:

Q    So then we have to actually subpoena you after multiple attempts to get to a deposition where you said completely different story; true?  You testified under oath?

          MR. HARRELL:  Compound.

          THE WITNESS:  That is not true.  It's not true.

BY MS. MKRTCHYAN:

Q    Okay, sir.  Let's go to your deposition, what you said at your deposition.  You testified under oath; right?  You remember that, on Zoom, under oath?

A    Yes, I remember.

4-RenSER-00510                                    4-RenSER-00510

Q      That you did not see the use of force occurring because your view of the incident was obstructed by Mr. Holloway's tent.

Do you remember that, sir?

MR. HARRELL:  Improper use of the deposition.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q      Do you remember that?

A      Yeah, I watched -- I couldn't see what happened after they tased him because he fell behind the tent.

Q      Okay.  Sir, but today you were asked series of questions under oath.  You were asked, "Did you see him being kneed?  Did you see him being combative?  Did you see him getting struck?"  You were obstructed.

Let's play that tape again.

Your RV, the way you were watching this tent where he was standing, you had obstruction to your view.  You didn't see anything; isn't it true?  That's what you testified at your prior deposition?

THE COURT:  Counsel, it's too compound.  Just re-ask it.  Simplify the question down, please.

BY MS. MKRTCHYAN:

Q      So you told us different version of what you told us today.  You said you could not see much of the use of force because you were blocked by Jeremy's tent and it was dark in

UNITED STATES DISTRICT COURT

the campsite; isn't it true?

A    Yes.

Q    So how, then -- if you didn't see what happened on that ground, how Mr. Holloway was being on that ground, how could you have told, under oath today, that you saw him combative, that you didn't see anyone kneeing him in the head?  You're assuming that never happened when you never saw it; true?

MR. HARRELL:  Multiple questions.

THE COURT:  Do you understand the question, sir?  Do you understand the question?  If not, it can be re-asked.

THE WITNESS:  Oh, okay.  I did see up and to the point he got tased and he went face down into the gravel and they got on him to handcuff him.  I could see them standing there.  He stands taller than the tent.  So I -- to say I never saw what was happening is not entirely true.  You're misconstruing my words.

BY MS. MKRTCHYAN:

Q    Let's read your deposition transcript.  Would that refresh your memory?

MS. SWISS:  Objection.

THE COURT:  We're not going to read -- ask him the question and then refresh it.  See if he says, you know, "Did you see the following?" or whatever.  And if he disagrees with that, then show him the deposition.

MS. MKRTCHYAN:  I already asked.

**UNITED STATES DISTRICT COURT**

4-RenSER-00512                    4-RenSER-00512

BY MS. MKRTCHYAN:

Q    Did you see how Mr. Holloway was taken to the ground?

A    Yeah.  He was tased in the chest.

Q    So according to you, he was tasered.  And then by the force of the Taser, was taken down to the ground; is that --

A    Oh, like a tree.  Yeah.  Flat on his face.

Q    So you believe the Taser was applied while he was standing?

A    Yes.

Q    Okay.

A    100 percent.  Nobody was near him.

Q    Okay, sir.  So you believe he was taken down to the ground and he was tased.  That's how he went down to the ground?

A    Yes.

Q    Okay.  And after that, your view was blocked.  You didn't see how officers approached him and what happened on that ground; true?

A    True.

Q    Okay.  So then if he was kneed, if he was kicked, if he was punched on that ground, you would not have been able to see that because your view was obstructed; isn't it true?

A    Yes.

Q    And it was dark?

A    Yes.

UNITED STATES DISTRICT COURT

Q    And you never came out of your tent -- or RV.  You never came out of your RV during the actual altercation with the police; isn't it true?

A    That's true.  I never came out.

Q    Prior to you getting this domestic violence incident -- let's go to that part.  You said that "I was awakened" -- no, let's go back even before that.

You said that "I heard two car doors hitting, and then I was awakened with -- you know, with that noise"; true?

A    True.

Q    Okay.  The day before, did you see Mr. Holloway's campsite?

And by the way, when did you arrive to this campsite that weekend?

A    I don't recall the exact time, but I believe it was in the afternoon.

Q    Okay.  Did you see your surrounding campsites?  Did you observe Mr. Holloway's truck, tents?

A    I did.  And we were concerned because there was a dog left in a tent, the second tent on his -- in his campsite, that was barking continually for hours.  And we were concerned.  It was, like, "Where is this person?"

Q    Okay, sir.  Did you ever see Mr. Holloway?

A    No.  There was nobody there.

Q    Okay.  Can I please -- did you ever see Mr. Holloway with

**UNITED STATES DISTRICT COURT**

a female the day before this night? Did you see him with a female?

A    No.

Q    When the night came, this was the very first night you were sleeping in your RV at this campground; true?

A    Yes.

Q    Okay. At the nighttime, when you heard this noises, did you actually come out of your RV to see if there was a female there with Mr. Holloway?

A    No, I didn't come out of my RV.

Q    And you didn't see Mr. Holloway that night either; true? Until officers came and the use of force occurred, you never saw him?

A    I saw him when he came out and threatened everybody in the campground. And then I watched him walking back and get into that tent. Same man. Same man.

Q    Sir, we are talking about before that, before the officers came and arrested him. We are talking about the DV incident now. Let's go back to that part, okay?

So did you ever see him -- when you heard the car doors noise, did you see him? Did you come out and see whose car was that?

A    No.

Q    Okay. And you saw only one truck parked at Mr. Holloway's campsite the whole night; true? White truck

4-RenSER-00515                                    4-RenSER-00515

67

that we see on this --

A    It wasn't parked there until this car door slammed.

Q    So, sir, you are telling us that actually you saw the white truck?  Because the way I understood from your prior testimony and today is that you didn't see the car arrive.  You just heard the noise, and you were sleeping.  Are you going to change your story now?

        MR. HARRELL:  Objection.  Argumentative.

        THE COURT:  Sustained.

        Just restate it, Counsel.

BY MS. MKRTCHYAN:

Q    So you said earlier and you testified at your deposition, you actually never saw the truck arrive, the night; true?

A    True.

Q    Okay.  So why are you changing your story as we go along?  Now you are telling us, "I saw the truck arrive at night."

        MS. SWISS:  Objection.  Argumentative.

        MR. HARRELL:  Misstates.  He heard it.  He didn't see it.

        THE COURT:  Counsel.

        MS. MKRTCHYAN:  No, it's not misstating.  He changes his story.

        THE COURT:  Counsel --

        THE WITNESS:  Can I answer?

        THE COURT:  Just a moment.

**UNITED STATES DISTRICT COURT**

68

You can answer that question, sir.

THE WITNESS:  So when -- before we went to bed, we did look over there.  There was still nobody there.  My wife was concerned about the dog, and nobody was there all day long, and this dog was locked into what we called the dog tent.  Okay.

So I do know nobody was there at least up to 12:00 o'clock, 12:00 p.m. -- or, you know, in the evening, 12:00 a.m.  So when we heard the doors slam, that was our assumption when we heard talking in the tent.

BY MS. MKRTCHYAN:

Q    That's an assumption you made; isn't it true?

A    I just said it was an assumption.

Q    Isn't it true, though, when we asked -- do you remember your deposition how many questions were asked of you at your deposition, sworn deposition?

A    Yes.

MR. HARRELL:  Relevance.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Do you remember you were asked if you saw the man arrive that night or leave, for that matter, leave or arrive?  You said, "No, I never saw that."

Do you remember that?

A    Yeah.

**UNITED STATES DISTRICT COURT**

MR. HARRELL:  403.

MS. SWISS:  Asked and answered.

THE COURT:  Just a moment.  It's also multiple --
also.

MS. MKRTCHYAN:  Your Honor, these objections are
interrupting the flow of my questioning.

THE COURT:  First of all, we need to calm the voice
down and address -- first of all, it's going to cause a
confrontation.  I'm going to ask you just to reduce the level
of the voice to the witness for a moment.

And now I'm going to look back at the record for a
moment.

**(Pause in proceedings.)**

THE COURT:  Counsel, re-ask the question.

MS. MKRTCHYAN:  And I forgot my question.

THE COURT:  Well, there were multiple questions.

MS. MKRTCHYAN:  In any event, that's fine.

BY MS. MKRTCHYAN:

Q    Sir, so let's go back.  Isn't it true you never saw the
man leave the campground -- campsite next to you in a truck?

MR. HARRELL:  Asked and answered.

THE COURT:  Overruled.

You can answer it one more time, sir, just because
of interchange.

THE WITNESS:  No, I never saw anybody at that

UNITED STATES DISTRICT COURT

campsite at all.

BY MS. MKRTCHYAN:

Q    Okay, sir.  So during the day you didn't see the truck.
That's what you are telling us?

A    Truck was never there.

Q    Okay.  You didn't see the man arrive in the truck, come
out of his truck, and with a woman; true?

A    True.

Q    You are telling us what you are hearing at nighttime at a
dark campground when you have not even come out of your RV;
isn't it true?  Isn't it true?

A    I had a window that was about 20 feet away from where all
this was happening.

Q    Sir, I'm asking you, when the truck arrived, did the
truck -- when the truck arrived and you heard noise, car doors,
did you ever look out your window and saw that actually it was
this white truck that arrived at around 2:00 a.m. that morning,
sir?  Did you?

A    We opened the window, and I looked out.  I didn't see them
walk from the truck to the tent, no.  I did not.

Q    Well, sir, I asked you this question before.  Do you
remember that at your deposition, I asked you, "How many cars
would you remember" -- let me just --

        MS. MKRTCHYAN:  33.

        MR. HARRELL:  Objection.  Improper use.

**UNITED STATES DISTRICT COURT**

THE COURT: Just a moment.

What page, Counsel?

MS. MKRTCHYAN: Page 33.

THE COURT: 33. All right. Just a moment. I need that deposition. I've got a -- yeah. Thank you.

BY MS. MKRTCHYAN:

Q    So do you remember I asked you --

THE COURT: Counsel, I need the deposition. Just give me a moment, please.

MS. SWISS: Can I have one for the witness as well?

THE COURT: Yeah, would you give the witness one also.

BY MS. MKRTCHYAN:

Q    Multiple pages starting 24 when you were asked questions about this --

THE COURT: Counsel, Counsel, just a moment, please.

Counsel, this is not impeaching.

MS. MKRTCHYAN: What page are you looking at, Your Honor?

THE COURT: I've looked at 24 -- I'm sorry, 33. I also went over to 34.

MS. MKRTCHYAN: 33, 34, 86, 87 -- there are multiple pages.

THE COURT: Well, 33 and 34 is not impeachment, Counsel.

UNITED STATES DISTRICT COURT

4-RenSER-00520                                    4-RenSER-00520

Now what other pages would you like me to look at concerning the truck and the time it returned and what he heard or saw?

MS. MKRTCHYAN:  86, starting 85.

THE COURT:  85 and 86?

MS. MKRTCHYAN:  Yes.

THE COURT:  All right.

MS. MKRTCHYAN:  And going up until 87, 88.

THE COURT:  Thank you.

MS. MKRTCHYAN:  86, lines 3 through 8, and going up.

BY MS. MKRTCHYAN:

Q    Did you hear?  Did you read the right pages, sir?

A    No.  I'm confused as what you wanted me to read.

Q    Because there has been colloquy here.  Page 86, sir, when you were asked a question --

MR. HARRELL:  Objection.  Just -- can we have a page and stop there?

THE COURT:  We did.  We have a page.

For a moment, before asking another question, sir, let's just take the time.  Would you look at page 33 and 34 to be sure.  The Court's read that also.

MS. MKRTCHYAN:  The question was --

THE COURT:  No, Counsel.  He's going to read those pages now before the next question.

**(Pause in proceedings.)**

**UNITED STATES DISTRICT COURT**

4-RenSER-00521                                    4-RenSER-00521

73

THE COURT:  Then take a look at page 86 just to be certain.

And if counsel would like, go over to page 87.  Just take a moment.

Counsel, now your question.

BY MS. MKRTCHYAN:

Q    Up until -- did you read, sir, the pages that we were discussing?

A    Yes, I did.

Q    Okay.  So isn't it true when I was asking you questions about what exactly you saw at your next-door campsite, you basically told us that "We were awakened by the slams of the doors.  We heard conversation, but we didn't see who arrived"; isn't it true?

A    That's true.

Q    Okay.  So you were assuming that was your next-door campsite because you didn't see; true?

A    That's true.

Q    Okay.  Now, when the noise came out, the sound of the struggle, it was disturbing to you; right?

A    Yes.

Q    As a citizen, you have a wife, it was disturbing to you, and you were concerned; true?

A    True.

Q    Okay.  And isn't it true there was a conversation between

4-RenSER-00522                                    4-RenSER-00522

your wife and the noise of the man who was, to you, involved in this altercation?

A    It wasn't a conversation.  She yelled out to stop hitting her.

Q    Neither you nor your wife actually saw either the man involved in this altercation or the female because you were still inside of your RV; true?

A    No, we didn't see them.

Q    Right.  And when your wife was saying "Stop hitting on her," what was she doing?  What was she trying to do with that?

MR. HARRELL:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Exactly what she was saying.  "Stop hitting her."

BY MS. MKRTCHYAN:

Q    How was she screaming?

A    She yelled it.

Q    From where?

A    And he did stop.  At that point it got quiet.

Q    Sir, from where was she -- let's slow down.  From where did she scream?

A    From the side window that was open.

Q    Okay.  So you have this door -- window in your RV; right?  It was not -- I'm sorry, it was not open when you first heard this noise, was it?

4-RenSER-00523                    4-RenSER-00523

75

A    Which noise?

Q    The domestic violence noise.

A    Yes, it was.  We opened it, and we were listening.

Q    I'm talking about when you first heard the noise.  Were you sleeping with your windows open?

MR. HARRELL:  Vague.  Car door slamming?  What noise?

THE COURT:  Just a moment.

THE WITNESS:  Yeah, I need more specific --

THE COURT:  No, both of you now.  I think we're referring to not the car door noise.

You're asking about the domestic violence noise?

MS. MKRTCHYAN:  Yes.

THE COURT:  And you're asking if initially the window was closed?

MS. MKRTCHYAN:  Yes.

THE COURT:  All right.

Answer that question.

THE WITNESS:  Yes.  The window -- we opened the window when we started to hear the violence.

BY MS. MKRTCHYAN:

Q    Right.  Because you were not sleeping -- you were not going to sleep with the window open at January, 31 degrees?

A    No.  It just shows you how loud it was that it woke us up, and we opened the window.

**UNITED STATES DISTRICT COURT**

76

Q    Sure.  And when you opened the window, did you actually see the domestic violence disturbance?

A    I could see the tent moving, and I can tell precisely where the noise was coming from.

Q    Well --

A    20 feet away isn't very far.

Q    Sir, you say you saw it.  It was still dark campground; right?  There were no lights there; true?

A    That's true.

Q    True?

A    True.

Q    Okay.  So -- and you didn't actually -- did you have x-ray vision?  This tent is not transparent, is it?  Right now we see -- can we play --

THE COURT:  Counsel, the question.  Now you --

BY MS. MKRTCHYAN:

Q    Was his tent transparent?

A    No, it's not.

Q    Okay.  And so when you are telling us that you actually saw something in the tent, you're assuming that actually what you saw was a man and a woman struggling; true?  Isn't it true?

A    That's true.

Q    Okay.  And you told deputies on February 2018 you heard a male say -- this is what was described, what you telling:

"On Sunday, January 21, 2018, at

**UNITED STATES DISTRICT COURT**

approximately 3:30 hours, Brian was woken up by the sounds of a verbal altercation at the campsite next to his.  Brian heard the male say, 'You want more of this?  You want more of this?'  He then heard -- heard what sounded like someone being hit three times.  Brian thought it sounded like punching your fist into your own hand.  The fight seemed to be occurring inside a tent, and he could hear sounds of a scuffle inside the tent.  Brian then heard the voice of a young female say, 'Why are you doing this?  I'm just a girl.'  Brian then called 911.

"No male or female were ever seen, and he never heard anyone leave the campsite.  After Orange County Sheriff's Department arrived, they were unable to locate the female.  The deputies left the area.

"Approximately 15 minutes later, Brian heard the voice of the same male yelling, 'Come out.  Who's the motherfucker that called the police?  Come out.'  Brian estimated the male was yelling and walking around for about ten minutes.  Brian was not in fear.  Would have called 911 again if the yelling had lasted longer.  He kept his RV locked, lights off.  Brian did not see anyone, never heard the female again, left the campground

**UNITED STATES DISTRICT COURT**

4-RenSER-00526                                    4-RenSER-00526

again later in the morning around 9:00 hours.

"See Deputy Pahel's full -- for additional information related to the second 911 call from informant Joshua Gomez."

This is Officer Johnston from Orange County Sheriff's Department speaking to you on February 8, 2018.

Do you recall this interview?

A     I do.  I was on the phone.

Q     Okay.  So you remember this.  Is there anything here that Deputy Johnston might have misheard or misstated from your interview with him that was fresh in your memory two weeks after the incident?

MS. SWISS:  Speculation.  Foundation.  He hasn't reviewed it.  It's hearsay.

MS. MKRTCHYAN:  It's called --

THE COURT:  You can answer that question.

THE WITNESS:  All right.  I had a -- he called me and asked me if my wife and I were okay.  And we had a casual conversation.  It wasn't a deposition.  I wasn't offering him a story.  So that's -- if you want to go by the facts, you need to go by the deposition.  That was just kind of a -- it seemed like a cursory call from the department.  It wasn't -- he was just saying, "Are you okay?  Everything good?  Got any questions?"

BY MS. MKRTCHYAN:

**UNITED STATES DISTRICT COURT**

Q    Are you telling us that Deputy Johnston misquoted your statements on this --

A    In which statement?

Q    The fact that we never see you ever telling Deputy Johnston that you actually saw the tent moving, that you actually saw and thought that that was Campsite 65.

A    Again, I didn't go into detail with him.  You're bringing up something that was just kind of a casual conversation with him.

Q    And prior to deposition, isn't it true, sir, before we subpoenaed you for this deposition that occurred July 10, 2020, you spoke with defense counsel; isn't it true?

A    Yeah.  I think so.

Q    So you are telling us that your statements to the police officers near the time of the incident are not accurate, are incomplete, are -- should not be reliable, but the deposition, after you spoke with defense counsel, and what you are telling us here today after cooperating for years with the defense counsel is more reliable and more accurate and complete?  Because --

A    I'm not sure --

        MR. HARRELL:  Compound.  And some more problems.

        THE COURT:  Just a moment.

        Sir, do you understand the question?

        THE WITNESS:  I didn't understand the question at

all.

BY MS. MKRTCHYAN:

Q    Let me then paraphrase it for you.

A    Okay.

Q    So is there anywhere in this report by Deputy Johnston on February 8, 2018, any indication that you actually saw, other than heard the noises -- the domestic violence noises, sir?  Is there anything?  Would you like me to show this report?

THE COURT:  Counsel, your question.

BY MS. MKRTCHYAN:

Q    Is there anything that we read in this report that states that you actually saw the tent moving, that you actually saw through this -- you know --

THE COURT:  Counsel, this is argument.  Just ask the question.

MS. MKRTCHYAN:  That's what I'm saying.

BY MS. MKRTCHYAN:

Q    Is there anything saying here that you actually saw the domestic violence disturbance that night?  Yes or no?

THE COURT:  Just a moment.

You can answer the question fully.

THE WITNESS:  No, there isn't anything in there, but what I'd like to say -- can I say something?

THE COURT:  You can finish.

THE WITNESS:  The details are not -- there wasn't

4-RenSER-00529                                    4-RenSER-00529

anything that -- you're reading into that as if it was a full statement like my deposition. And you're inferring things that simply aren't true.

BY MS. MKRTCHYAN:

Q    Well, sir, Deputy --

A    My intention wasn't to deceive anybody.

MR. HARRELL: Might the witness --

THE WITNESS: That's how I feel you're phrasing this.

BY MS. MKRTCHYAN:

Q    Well, sir --

MR. HARRELL: Can the witness finish?

THE COURT: Just a moment. Just a moment, both of you --

MS. MKRTCHYAN: It's like --

THE COURT: Counsel.

MS. MKRTCHYAN: I don't think he should -- thank you.

THE COURT: Counsel, Counsel -- no, Counsel. Thank you.

Now, there's going to be silence for a couple minutes, okay? We're all going to calm down.

Now, Counsel, sit down for a moment, please.

And, Mr. Fuerbach, we're going to take a rest.

And, Counsel, we're going to take a rest.

We're resting.

**(Pause in proceedings.)**

THE COURT: All right. Now, Counsel, your question, please.

BY MS. MKRTCHYAN:

Q    It wasn't only Deputy Johnston that you spoke to; right? There was another deputy that came to speak to you on the same night?

A    The same night --

Q    Deputy Pahel came and talked to you?

A    At the campground?

Q    Yes.  On the same very night, sir.

A    I believe somebody did come talk to me.

Q    Right.  And isn't it true you did tell the same deputy on the same very night, Deputy Pahel, you didn't see anything; that you only heard noises, you thought it was possibly DV, and that's why you called 911?

A    I didn't see anything?  I saw a lot.  I heard a lot.

Q    That's what you -- okay.  You heard a lot, yes.  But we are talking about seeing.  There is a difference between seeing something and hearing; isn't it true?  Isn't it true, sir?

A    Yes.

Q    Okay.  So would you like me to play Deputy Pahel's video/audio where he is talking to you, where you are discussing this incident on the same very night, and he is

UNITED STATES DISTRICT COURT

asking you questions?  Would you like me to do that?

MR. HARRELL:  Relevance.

THE COURT:  Overruled.

Pahel is going to testify.

MR. HARRELL:  True.

THE COURT:  Is there a concern about having a portion of this video played --

MR. HARRELL:  No.

THE COURT:  -- Counsel?

Now, just a moment.  If you're going to stipulate to it, let me see Pahel's binder again.  And, Counsel, I'm having trouble with the number of binders here.

MS. MKRTCHYAN:  No.  Pahel's -- we are talking about Pahel's video, Your Honor, not the deposition.  So I think we played Pahel's tape last week.  I might want to play a portion of it.

THE COURT:  Counsel, just a moment.

Could somebody give me Pahel's transcript?  We've got a transcript of Pahel.  Portions of this were played.

Now, you're going to hear Pahel testify.  You're going to get the entire video.

MS. MKRTCHYAN:  Yes.

THE COURT:  But -- in other words, I don't know right now why we're playing Pahel's.  That's the problem.  I don't know of anything -- any question that was asked about

**UNITED STATES DISTRICT COURT**

this that would call Pahel's video.

MS. MKRTCHYAN:  Your Honor, to refresh his memory that, in fact, he did speak with Deputy Pahel because he said he doesn't remember.

MR. HARRELL:  Incorrect.  He said he does remember speaking to a member of the sheriff's department that night.

THE COURT:  To a deputy.

THE WITNESS:  Exactly what was said, I'm unsure, yes.

MS. MKRTCHYAN:  Your Honor, we would like to play portions of the tape.

THE COURT:  I want Pahel's entire tape, though, played.

MS. MKRTCHYAN:  We played it already last week, Your Honor.

THE COURT:  We did?

MS. MKRTCHYAN:  Yes.  We played it.  The jury has the transcript.  I don't want to play the whole thing for the interest of time.  All I want is to highlight those portions where he spoke --

THE COURT:  Show me the transcript.  I need that transcript back from you.  And you had two transcripts concerning Pahel, didn't you?  In other words, there was one from the defense, and one from the --

MR. HARRELL:  Your Honor, we do have a defense

85

transcript.

THE COURT: Let me say it simply. There were two transcripts concerning Pahel. Those transcripts don't match in different parts. I want to see each of those transcripts.

MR. HARRELL: Your Honor, we can supply ours.

THE COURT: Counsel.

MS. MKRTCHYAN: Your Honor, it is in the exhibit books. We gave you trial exhibit books. It should be -- the Court has already had them.

THE COURT: Counsel, I may have. Come on up here. Let's save some time.

MR. HARRELL: Your Honor, if --

MS. SWISS: What exhibit number?

THE COURT: Counsel, that's an order, both of you. I'm not going to go through everything and scramble through different binders. Counsel, you're ordered to come up to the bench, both of you. Find those transcripts. I want to see each of those because they don't match.

Now, be patient with us. These transcripts don't match with Pahel. That's why I keep cautioning you, because I've heard them before, to be careful about the transcripts. So what you hear is the best evidence, okay? And that's what's causing the problem here. These transcripts do not match in certain parts.

**(Pause in proceedings.)**

**UNITED STATES DISTRICT COURT**

4-RenSER-00534      4-RenSER-00534

THE COURT: Counsel, I'll need plaintiff's transcript also.

I need defense transcript, Pahel.

**(Pause in proceedings.)**

MR. HARRELL: Your Honor --

THE COURT: Counsel, no, there's no question. I've given each of you an order.

**(Pause in proceedings.)**

THE COURT: Each of you can sort this out as counsel. Walk over to each other. This is simple. While we sit here and wait, the jury and the Court, walk over to opposing counsel -- opposing counsel and show the --

MS. SWISS: I'm right here.

THE COURT: -- respective transcripts to each other. That's an order, not a request.

MR. FARAHMAND: She's right here, Your Honor.

THE COURT: Thank you, Counsel. Go. This is unnecessary and it's time-consuming. You should have these ready, both sides.

MS. MKRTCHYAN: Your Honor --

THE COURT: Counsel, there is no question. There is no question. Please sit down. Do not address the Court until this is done.

Now, I don't want you caught in the position of this discord and different transcripts getting sorted out. If I

**UNITED STATES DISTRICT COURT**

87

can't turn to them quickly enough, you can't turn them quickly enough. So -- and that's counsel's responsibility on both sides.

All right. This is the plaintiff's?

MR. FARAHMAND: Yes.

THE COURT: Thank you.

MS. NALTSAS: Your Honor, hers is continuous; ours is broken up per PVS. So they each have different start text.

THE COURT: All right. We'll try to sort through the three.

Now, Counsel, your question please. Which portions do you want to play?

MS. MKRTCHYAN: We are going to play some portions, and we'll ask some follow-up questions.

THE COURT: Okay. And I need the page and what portions you're playing so I have a record so the jury can turn to these transcripts.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So at this point, 5:18 minutes on Pahel's tape, did you hear your voice talking with Deputy Pahel when he's asking you questions about this interaction with the police officers?

A    Yeah. That was me. It didn't sound like me.

Q    Well, the person was talking about how he was in his camper, how, you know, he heard the noise, him coming down,

**UNITED STATES DISTRICT COURT**

88

et cetera.  Would you like me to replay that?

A     No.  It's okay.

Q     And then Deputy Pahel continues on -- let me just tell you where -- 5:25.  That -- so you have no reason to doubt that he spoke to you at 5:18?

A     Well --

          MS. SWISS:  Objection.  Foundation.  Speculation.  Did not authenticate his voice.

          THE COURT:  Just a moment, sir.

          What, Counsel?

          MS. SWISS:  No foundation.  No authentication of what was heard on the tape.  There's no foundation for the question.

          THE COURT:  Well --

          MS. SWISS:  Played the wrong portion.

          THE COURT:  I think all of them are so lost.  What page are we on on these transcripts?  In other words, you distributed these to the jury to be an aid.  The transcripts don't match.  What is the jury supposed to be doing?

          MS. MKRTCHYAN:  Your Honor, I don't have the transcript in front of me.  I'm going by the tape.  And the tape is the best evidence, isn't it?

          THE COURT:  It is, but when you distribute transcripts to the jury that they're listening to that's an aid, these transcripts do not match in certain portions.  And

UNITED STATES DISTRICT COURT

if we're going to play this and there's transcripts that the jury have, they ought to be able to look at them and follow them.

MS. MKRTCHYAN: Well, that's why we're asking them to follow the video rather than the transcripts actually because the transcripts are not the best evidence anyway.

THE COURT: Counsel, can you help? Where are we on these transcripts?

MS. SWISS: It appears on plaintiff's transcript the correct portion should be on page 18. But I don't know where that is in the video. All I have is the transcript in front of me.

MS. MKRTCHYAN: In any event, he recognizes his voice. If he doesn't recognize his voice but recognizes his voice in Borba's tape, then that's for the jury to decide. So --

THE COURT: Do you want that played again to see if that's --

THE WITNESS: Yeah, play it again.

THE COURT: Play it again.

MS. MKRTCHYAN: Can we have that played again, 5:18.

THE COURT: This would be page 18.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So when he talked at this juncture to the person,

**UNITED STATES DISTRICT COURT**

Deputy Pahel, did you recognize your voice, sir?

A    That was not me.  The individual on that recording referenced his brother.

Q    Okay.  And that's not your voice?

A    That is not me.

Q    Okay.

A    No, he referenced his brother.  He said, "My brother and I."

Q    Okay, sir.

A    I don't have a brother.

Q    So -- but he did speak to you.  Let's continue on.

Is there anyone else who had a motor home that night that you saw in the immediate vicinity of Campsite 65?

A    I don't recall, no.

Q    Okay.  Let's continue playing on and see at what point in time, then, you can recognize your voice.  5:40.

THE COURT:  Just a moment.  Can you help me, then, with the defense transcripts where we are.

**(Pause in proceedings.)**

THE COURT:  Counsel, we're not going to play just anything that doesn't pertain to -- you know, hopefully, you're recognizing your voice if you're there or if there's any discussion with the officers.  We just need to make sure it's you.  You need to make sure it's you.  Now we're getting different sections now.

4-RenSER-00539                                    4-RenSER-00539

MS. MKRTCHYAN:  5:40.  Can we play 5:40, Your Honor?

THE COURT:  Counsel, could you turn to -- why don't you show this to plaintiff's counsel, see if she agrees.  Just a moment.

MS. MKRTCHYAN:  Your Honor, I'm not using the transcripts.  So I'm not sure why --

THE COURT:  Just a moment.  Because we've got transcripts in front of the jury that each of you distributed.

Counsel, if both of you go to the -- well, you're playing Renegar right now; correct.

MS. MKRTCHYAN:  No, we are playing the same tape, Your Honor.

THE COURT:  Borba?

MS. MKRTCHYAN:  Pahel.

THE COURT:  All right.  Pahel.

MS. MKRTCHYAN:  And the transcripts --

THE COURT:  This gentleman is clearly heard in Borba's tape on pages 9 and 10.

MS. MKRTCHYAN:  We will move on from this area.

THE COURT:  He's clearly heard on Borba's tape, though, on 9 and 10.

MS. MKRTCHYAN:  Can I play what I want to play?

THE COURT:  You can play it, Counsel.  I'm not sure what we're playing though, frankly.  I don't know -- I haven't heard his voice.

**UNITED STATES DISTRICT COURT**

(Videotape played, not reported.)

BY MS. MKRTCHYAN:

Q    So this is your motor home that we see on the screen; right?  Your RV?

A    Yes.

Q    Okay.  And we hear you give your name to Deputy Pahel; true?

A    Yeah, I heard.

Q    Okay.  So you did speak with Deputy Pahel that same morning about this incident, about the DV, and what you've heard and what you've seen; true?

A    Yes.

Q    Okay.  And Deputy Pahel then -- do you have any reason to think that Deputy Pahel would not accurately tell other deputies about what you said?

MR. HARRELL:  403.  Deputy Pahel will be here.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So isn't it true you told Deputy Pahel you did not see anything?  You heard noises about -- related to DV and you called 911?

A    Correct.

Q    Okay.  So then here you are adding at this trial because you are cooperating with the defense --

MR. HARRELL:  Argumentative.

UNITED STATES DISTRICT COURT

93

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    -- you are adding --

THE COURT: Counsel, that is stricken. That's improper.

BY MS. MKRTCHYAN:

Q    Well, you have not cooperated with us; true? You have not. You refused to speak to --

MS. SWISS: Objection.

BY MS. MKRTCHYAN:

Q    -- two investigators. We had to subpoena you after multiple attempts to come talk at a deposition. And then throughout these years of this litigation, you have never cooperated with us. You have cooperated with the defense; true?

MS. SWISS: Objection.

THE WITNESS: Not true. You didn't subpoena me. I contacted you after you had your goon chase my kids around and trespass on my property, saying that he was coming to serve me, which was a lie. He took pictures of my RV -- walked in a posted no trespassing, came into my backyard, and took pictures of my RV, turned around, and left. I have it all on video.

BY MS. MKRTCHYAN:

Q    You were upset; isn't it true? You were upset that we were trying to contact you to get your statement about this

UNITED STATES DISTRICT COURT

night?

A    Could have come to my work.  My wife kept telling him, "He's at work.  He's always at work."

Q    Sir, you were upset --

A    Instead they harassed my family.

Q    You were upset.  You didn't want to cooperate with us, but you have been very cooperative -- you even wrote a declaration in support of their motion for summary judgment. Do you remember that?  You signed a declaration.  Do you remember that?

A    I do.

         MS. SWISS:  Objection.  Compound.  Argument.

BY MS. MKRTCHYAN:

Q    Isn't it true?  You didn't even want to talk to investigators twice, but you wrote a declaration for the defense, and you are telling this jury, adding statements that you never told the police that night; isn't it true?

A    I didn't add statements.

         MS. SWISS:  Argument.  Compound.  Move to strike.

BY MS. MKRTCHYAN:

Q    Let's focus on your statements today.  You said, "I saw the tent even though I did not have night vision.  This tent is not transparent.  I saw the tent moving, and I saw a fist going and struggling.  I saw -- I saw something."

         You said that here under oath; true?  True?  Yes or

**UNITED STATES DISTRICT COURT**

no, sir?

A    I didn't say I saw a fist.  I said I heard a fist going along -- and I could see the tent moving.  I can see the tent moving.  It's not as dark as you portray it to be.

Q    Sir, when you see a tent moving, are you assuming that that is actually the DV that is occurring or something else is going on in that tent?

A    Just as much as I know you're talking in front of me here, that's about the distance the tent was.  And I know they're not talking over here (indicating), they're talking here (indicating).

Q    Sir --

A    So --

Q    -- do you know how much distance is this right now as of right now we're standing here (indicating)?

A    Yeah, we're about 20 feet.

Q    Okay.  Do you know, is this the same visibility, same, you know, light conditions as the campground at that night?

A    I don't believe you can draw a parallel.

Q    Okay.  Then why are you drawing parallels?

          MR. HARRELL:  Assumes facts not in evidence --

          THE COURT:  Sustained.

          MR. HARRELL:  -- that he's doing that.

          THE COURT:  Sustained.

BY MS. MKRTCHYAN:

4-RenSER-00544                    4-RenSER-00544

Q    Let's move to the next area.

Now, isn't it true you saw Campsite 66 now -- let's focus your attention to Campsite 66.  Occupied.

MS. MKRTCHYAN:  Let's open the map, please.

**(Document displayed.)**

BY MS. MKRTCHYAN:

Q    Do you remember that campsite next door to Campsite 65?  Do you remember that?

A    I'd have to see the -- I'd have to see the campsite to -- map.  I'm not sure where 66 is.

Q    Well, we asked you that same question at your deposition, and we showed you map.  Let's look at the map again.

So you were at 63.  There was 65 to your right, and next to 65 is 66; isn't it true?

A    That is true.

Q    Okay.  And do you remember I asked you that same question, if you saw Campsite 66 during the day occupied?

A    Yes, I did.

Q    Okay.  And you said it was occupied; true?

A    Yes.

Q    Okay.  You -- when you called 911 at night, 3:39 call comes in -- we heard your tape.  We are not going to replay it -- you never said it's Campsite 65; true?  You never said that?  You said, "Campsite" --

A    I didn't know that --

**UNITED STATES DISTRICT COURT**

Q    This is what you said.  You said, "Campsite to the right of us"; true?

A    If you're facing my campsite from the road, it's on the right-hand side.  So if you're standing in the road, it's the right-hand side, which is --

Q    Yes.  And the noise was coming from the right side of your RV; isn't it true?

MS. MKRTCHYAN:  Let's go to Exhibit 104 map that we had of the -- this campground during light conditions.  Let's look from --

MR. HARRELL:  I think the map, for the record, is 76.

MS. MKRTCHYAN:  No, 104.  We are going into the videos.

BY MS. MKRTCHYAN:

Q    Let's play the maps -- the videos that we went through and see it in light conditions.  Not even dark conditions, light conditions.

How far is your campsite from 65 and 66 and the direction?  Yes?

MR. HARRELL:  Your Honor, an exhibit number and deputy name before we play it, please.

THE COURT:  These were played before.  These were the videos taken at a later time, I believe, during the daylight hours; is that correct?

UNITED STATES DISTRICT COURT

4-RenSER-00546                                    4-RenSER-00546

MS. MKRTCHYAN: It's been admitted. It's been admitted. Let's play this.

THE COURT: I don't recall the exhibit number.

MR. HARRELL: Your Honor, can we have an exhibit number?

MS. MKRTCHYAN: I already said Exhibit 104.

THE COURT: 104.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    How often have you gone to this park, sir, just on a ballpark?

A    I believe I might have camped there twice.

Q    Okay.

A    I've hiked there often.

Q    Right. And this is a pretty popular campsite -- campground?

A    Yeah.

Q    Okay. So you have gone there before; you knew the terrain. At nighttime there are no streetlights; true?

A    True.

Q    Okay. And so next to Campsite 65, we have a tree, large tree. Do you remember seeing that tree that night?

MS. MKRTCHYAN: Let's stop right there where there is the tree. Go back. Yeah.

BY MS. MKRTCHYAN:

**UNITED STATES DISTRICT COURT**

Q     Did you remember there was this large tree canvassing Campsite 66 from you.  Did you ever remember that tree?

A     Yes.

Q     Okay.  Isn't it true the Campsite 66 was behind that tree hidden?  You saw that?

            THE COURT:  Counsel --

            THE WITNESS:  Campsites goes back to the creek bed. So they're quite -- that was one portion of it, yeah, that was hidden.  I don't know where you're going with that.

BY MS. MKRTCHYAN:

Q     To the right of your RV is not only 65 but also 66; isn't it true, sir?

A     When you reference "right," are you speaking from my terminology being in the roadway looking at my campsite?  That being right or by sitting in the driver's seat of my RV?

Q     Well, when you call 911, that's what we are talking about.  When you are --

A     When I stated that it was on the -- standing in the road on the right.

Q     Standing from the road, looking at your RV, to the right is not only Campsite 65, but also Campsite 66; isn't it true?

A     Yes.

Q     Okay.  So let's play and see how far is -- are the distances.  You say, you know, it's about 20 feet.  Let's kind of look at this actual campsite and see how far are the

distances are these campsite from each other.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Do you recognize this is your campsite on that night, 63?

A    No, I don't.

Q    No?  Okay.  So you can't tell us, then, from this video if this is an accurate representation of the campground?

A    No, I can't.  Seven years ago.

Q    Okay.  So fair to say based on this video though --

MS. MKRTCHYAN:  Let's continue playing.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    Based on this video, the way we look at it, this campsites are situated close to each other, but there is a separation, big logs, with -- look at how many stones there.  There is this picnic table, et cetera.  There are separation between the campsites; isn't it true?

MR. HARRELL:  Your Honor, lacks foundation as to this exhibit.  The witness has said this exhibit is not helpful to him.

THE COURT:  This is a daylight exhibit.  It's not taken at the same time.  I don't know that any witness can identify this.

BY MS. MKRTCHYAN:

Q    So you can't recognize this campground from this video?

**UNITED STATES DISTRICT COURT**

4-RenSER-00549                                         4-RenSER-00549

Is that what you're telling us?

A     Well, this last shot I did recognize that 63 and 65, that open space between my camper and where Holloway's tent was, you can see that open -- I don't understand the relevance of Campsite 66 with the trees.  Why --

Q     You saw it occupied; isn't it true?  That's the relevance.

A     I did.

Q     Okay.  And the officers came to you, they asked you -- first time when Officer Borba came to talk to you, you said, "It must be next to us"; right?  You told him?

            MR. HARRELL:  Misstates.

            THE COURT:  Sustained.

            MS. MKRTCHYAN:  Well, we heard the tape with Borba.

BY MS. MKRTCHYAN:

Q     But when you said that "We continued watching" -- this is what I would like to bring your attention.  You said, "We continued watching from the window of our RV until officers arrived the first time to speak with the campsite next door"; true?

            MR. HARRELL:  Your Honor.  Objection.  I don't know what she's reading.

            THE COURT:  She's not.  She's asking a question. Overruled.

            THE WITNESS:  True.

**UNITED STATES DISTRICT COURT**

BY MS. MKRTCHYAN:

Q    Okay.  And you say that "I was watching and then officers came."  You're aware that Mr. Holloway was alone when they came.  You're aware of that.  You didn't see them find a female; true?

MR. HARRELL:  Multiple questions.

THE COURT:  Just re-ask the question.

BY MS. MKRTCHYAN:

Q    So you were watching when you heard the noise of the DV sound; right?  And you continued watching from the window of your RV until officers arrived and started talking with Mr. Holloway; true?

A    I didn't watch Mr. Holloway's tent the whole time, no.  We waited.

Q    Well, you testified at the deposition, do you remember that?  At prior proceedings or deposition, we asked you same question:  "Did you continue watching the noise, the DV sounds?"

A    Oh, I did.  Yeah.  That whole thing I watched that.  But once we called 911 and the tent had opened up and we heard -- after my wife yelled, the tent -- it all stopped.  Tent zipped open, heard some gravel.  That was it.  And then it got quiet.  And we thought, "Okay, he's" -- it's just quiet.

Q    Sir --

A    And then we waited for the police.  But I didn't sit there

4-RenSER-00551                                      4-RenSER-00551

and watch his campsite the whole time, no, if that's what you're implying. I don't understand the question.

Q    The question is very simple. Did you see any female leave that campsite until officers -- before the officers arrived?

A    No, I believe I heard somebody leave.

Q    Again, in a dark campground you're hearing stuff, you are not seeing it. And you are telling us that there was a female in that campsite; isn't it true?

A    Yeah. According to my senses, other than sight, 100 percent.

Q    And you are 100 percent sure that a female was at Holloway's campsite, and she left before the officers arrived?

A    100 percent.

Q    Okay. And so this female came, according to you. There was one truck parked at Mr. Holloway's campsite, the white truck; true?

A    Yes.

Q    So the female walked in this wildlife in a 31-degree temperature in the -- you know, walked somewhere. We've never found -- police officers came to this campground, never found any female. She walked in this wildlife miles somewhere away. Is that what you are telling us?

        MR. HARRELL: Assumes facts not in evidence. Argumentative.

4-RenSER-00552                    4-RenSER-00552

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    You didn't see a female leaving a car because there was only one car parked at Mr. Holloway's campsite; true?

A    True.  There's guest parking in the front.

Q    Sir, did you see a female actually walk towards the guest parking at park rangers?  Did you ever see that?

A    I didn't.

Q    Did you see any female that night at Mr. Holloway's campsite that you are telling us, "100 percent I believe there was a female"?

A    Two voices don't lie.

Q    Sir, two voices don't lie.

        Isn't it true your wife, when she said "Stop hitting on her," the male voice responded by cussing at her.  Do you remember, like, said "bitch," something like that; isn't it true?

A    He didn't cuss at my wife.

Q    No, something to the effect of, you know, "you, the bitch," et cetera; right?  You were upset about that?

A    "You want more of this, bitch?  You want more of this?" Smack, smack.  "You want more of this?"

Q    I'm talking --

        MR. HARRELL: Don't interrupt the witness.  Please, Your Honor.

UNITED STATES DISTRICT COURT

MS. MKRTCHYAN: And I don't want interruptions from defense counsel.

THE COURT: Just a moment. The question --

BY MS. MKRTCHYAN:

Q    Now, the question is the following: When your wife said "Stop beating on her," the male voice retorted something directly to your wife; isn't it true?

A    No.

Q    Well, if Mr. Holloway testified that, in fact, he heard the conversation between your wife and the male voice at Campsite 66 yelling at each other --

A    What?

Q    -- your wife saying, "Stop beating on her," and then the male saying, "You fucking bitch," this and that, that would be false?

A    100 percent.

Q    And so your wife is not going to come to court to testify, is she?

MR. HARRELL: Relevance.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    And, in fact, we asked --

A    Call her.

Q    -- we asked you --

THE COURT: Counsel, sustained.

UNITED STATES DISTRICT COURT

BY MS. MKRTCHYAN:

Q    Well, do you remember our investigator asked if we could interview your wife about what happened.

Do you remember that?

MS. SWISS:  Objection.

THE COURT:  Sustained.

MS. MKRTCHYAN:  That's relevant, Your Honor.  It goes to his bias.  It goes to the fact that he is not telling us the whole truth.

His wife was there.

THE COURT:  Counsel, just a moment.

Each of you are free to subpoena any witness and --

MS. MKRTCHYAN:  No, we didn't have his wife's information, Your Honor.  It was never --

MS. SWISS:  Objection.

MS. MKRTCHYAN:  Excuse me.

THE COURT:  Well, just a moment.

MS. MKRTCHYAN:  If we are going to make this --

THE COURT:  Counsel.

MS. MKRTCHYAN:  -- the record in front of the jury --

THE COURT:  Counsel, Counsel, no.  You actually went to the house, not you, but investigators went to this home. You're free to subpoena, if you want to, his wife.  You're free to subpoena any witness.  But to get into this kind of

4-RenSER-00555                                          4-RenSER-00555

comparison --

MS. MKRTCHYAN:  Sir, Your Honor, we never were given her information to subpoena her, for this witness.

MS. SWISS:  Objection.

MR. HARRELL:  Your Honor, objection.  They were at her house.

MS. MKRTCHYAN:  Then why --

THE WITNESS:  I'll give it to you.

BY MS. MKRTCHYAN:

Q    Right now?  I'm not interested in right now.

A    I'll write it down.

Q    I'm interested in when we --

A    I'll give you her personal phone number.  You can call her.

Q    We asked you, sir.  How many times we asked private investigator to give us --

THE COURT:  Counsel.  Counsel, let's lower the voice.

MS. MKRTCHYAN:  Yes.  No, but, you know, this is becoming out of control.  And this is improper.

THE COURT:  No, it is, and I'd like you just to lower your voice just a little.

MS. MKRTCHYAN:  Sure.

BY MS. MKRTCHYAN:

Q    Sir, isn't it true my private investigator several times,

**UNITED STATES DISTRICT COURT**

4-RenSER-00556                                    4-RenSER-00556

two investigators, not just one, asked if you would give us your wife's information so that we could interview her or depose her.

Do you remember that?

MS. SWISS: Objection. Argument. 403.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    Okay.  Let's move on.

So you also testified that you heard Mr. Holloway's tent when the officers came.  They searched through his tent and found some stuff on his campsite; true?  You remember that?

A    Yes.

Q    Okay.  You testified that you heard they went and saw -- found some knives in his backpack.  Do you remember that?

A    I remember saying something about a knife or a hatchet or something like that.  Doesn't sound like anything that would be out of place camping.

Q    Okay.  And then you went back to sleep; right?

A    After they left?

Q    Yes.

A    Yeah.

Q    Okay.  And then you testified that you were awakened by Jeremy, Mr. Holloway, walking down and yelling, "Who called the cops on me?"  That's what you testified; right?

A    Yeah.

UNITED STATES DISTRICT COURT

109

Q    And then you heard the deputies arrive again, second time?

A    Second time, yes.

Q    And when the officers came -- before they came, you didn't call 911 -- true? -- the second time?  You never called the second time?

A    I did not.

Q    Okay.  You testified that when the officers came, you were obstructed of the view.  The only part of the force you saw was when Mr. Holloway to you -- according to you, was tasered while standing on the ground, and then he went down to the ground by the force of the Taser; right?

              MR. HARRELL:  Asked and answered.

              THE COURT:  You can answer it one more time, sir.

              THE WITNESS:  Yes.

BY MS. MKRTCHYAN:

Q    Did you actually see the Taser -- any lighting or any type of -- have you ever seen prior to this incident Taser being discharged?

A    On video.  Never in real life.

Q    Not in real life; right?

A    No.

Q    So you don't have law enforcement training?

A    No.

Q    Okay.  Did you actually see the Taser discharge before

4-RenSER-00558                                    4-RenSER-00558

Mr. Holloway was taken down to the ground?

A    Yes.

Q    Okay.  So -- and in what way?  Describe to us how you saw the Taser discharge.

MR. HARRELL:  Asked and answered.

THE COURT:  You can answer it one more time, sir.

THE WITNESS:  They were asking him to get on his knees, and he was being very combative and refusing to do what they asked him to do.  And they told him flat-out, "We're going to tase you if you don't cooperate, if you don't do what we want you to do.  You need to get down on your knees.  You need to get down on your knees."

He wouldn't do it.  And at one point it looked like he -- they said, "Okay.  Look, we're going to count down," and they counted down, and they -- as he started to kind of walk forward, they tased him.

BY MS. MKRTCHYAN:

Q    Tased him.  So you saw --

A    Yeah, and he went flat.  Just (indicating).

Q    Okay.  So you actually saw the Taser be -- but did you see any lights coming out of any weapon that -- and this was still dark; right?  It was still dark?

A    Yes.

Q    Officers had flashlights?

A    Yeah.

UNITED STATES DISTRICT COURT

Q    Okay.  So did you see actually, when the Taser was discharged and he went down to the ground, any lights coming out of the weapon?

A    Not that I recall, no.

Q    Okay.  So and then after that when he went down to the ground, you've already testified you were obstructed, you didn't see what happened on that ground; true?

A    True.

Q    Okay.  Now, you wrote a declaration under penalty of perjury by defense, and you gave it to the defense counsel. You remember that?

A    Yes.

Q    And isn't it true that declaration -- in that declaration --

        MR. HARRELL:  Hearsay.

        THE COURT:  You can ask the question, Counsel.

BY MS. MKRTCHYAN:

Q    In that declaration you maintained that Mr. Holloway was extremely combative and threatening towards the officers?

A    I thought so, yes.

Q    And yet you never saw Mr. Holloway striking at any officer; true?

A    No.

Q    You did not see him punch at any officer?

A    No.

UNITED STATES DISTRICT COURT

Q    You did not see him give -- you know, kick at any officer; true?

A    No.

Q    All you saw was that he was not going down on the ground, and to you, according to what you observed, he was tasered while standing, and then he was taken down to the ground; true?

A    Yeah.

Q    Okay.  So then in your understanding, if someone is not going down on the ground, that is considered, the way you wrote in that declaration, extremely combative and threatening?

A    Yeah.  He was cussing at the officers and after threatening an entire campground, yeah.

Q    And --

A    He brought it on himself.

Q    Let's go back to that threatening the entire campground thing.  You didn't come out of your RV; true?

            MS. SWISS:  Asked and answered.  403.

            THE COURT:  Counsel, that's been asked and answered.

            MS. MKRTCHYAN:  No, it wasn't asked and -- I did not go into details about --

            MR. HARRELL:  Motion to strike.

            MS. MKRTCHYAN:  Your Honor, I didn't go into details about that second encounter.  This is like --

            THE COURT:  Are you now at the second encounter?

            MS. MKRTCHYAN:  Before the police arrived the second

**UNITED STATES DISTRICT COURT**

time.  I have some --

THE COURT:  Be cautious.  I'm going to let you ask the question, Counsel.

BY MS. MKRTCHYAN:

Q   Sir, you didn't call 911 because you were not in fear of Mr. Holloway; true?

A   That's not -- that's not entirely true.

Q   Well, you told Deputy Johnston that, you know:

"The male was yelling and walking around for about ten minutes.  Brian was not in fear.  Would have called 911 again if the yelling lasted longer."

A   No, if he hadn't gone back into his tent.  And then I said, "Okay.  Let's not push this any further."

I had -- I had a bat in hand.  Trust me, if he touched my rig, I would have been out there.

Q   Right.  He didn't touch your rig?

A   He didn't touched, no.  He yelled.

Q   He didn't come in con- --

A   He yelled and yelled and called me all kinds of expletives.  Doesn't mean my wife wasn't afraid.

Q   Sir, you did not call 911, and that's what you told Deputy Johnston; true?

A   Restate.

Q   You did not call 911 the second time, and you told

4-RenSER-00562                    4-RenSER-00562

Deputy Johnston those statements that I just read?

A    No, I didn't.

Q    Okay.  So this report that we have with Deputy Johnston is not false, is it?

MS. SWISS:  Asked and answered.

THE COURT:  I don't understand the question.

BY MS. MKRTCHYAN:

Q    What I wrote to you that you told him you were not in fear and that you would have called 911 if the yelling lasted longer, that's what you told Deputy Johnston two weeks after the incident?

A    You took it out of context, though.

Q    Okay, sir.

A    That statement is missing a lot of nuance because it was just a quick conversation I had with him, and you're trying to turn it into a -- my character, which is being misrepresented.

Q    Sir, we are talking about what you observed and you are testifying under oath.  The deposition occurred after you spoke with Deputy Johnston, two years after in July 10, 2020; true?  Your deposition.

A    True.

Q    Prior to deposition after you spoke with Deputy Johnston, you spoke with this defense counsel; true?

A    True.

Q    And then after that deposition, you prepared a

4-RenSER-00563                                    4-RenSER-00563

declaration assisted by the same defense counsel where you maintained that my client was extremely combative and threatening; true?

A     True.

Q     So the declaration was basically given to you by this defense -- same defense counsel where you read and signed with no questions asked; true?

MR. HARRELL:  Objection.

BY MS. MKRTCHYAN:

Q     True?

MR. HARRELL:  Misstates.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Did you actually write the declaration, or was it prepared by defense counsel for you to sign?

A     It was prepared, and I did some edits to it as I recall.

Q     So and then flash-forward throughout this years of this case up until today, 2025, you have cooperated actively with the defense counsel; true?

A     Yeah, I cooperate with them.  Definitely.

Q     You come to and speak with them.  You do not even say hello to us in the morning; true?

MS. SWISS:  Relevance.

MR. HARRELL:  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

BY MS. MKRTCHYAN:

Q    You have lunch with them?

MS. SWISS:  Relevance.  Assumes facts.

THE WITNESS:  Not true.

THE COURT:  Counsel, this is irrelevant.

MS. MKRTCHYAN:  Yes, sir.

BY MS. MKRTCHYAN:

Q    You understand that when you are camping at a campground and you provide information to the 911 callers, you have to be accurate to the best of your recollection; true?  To the best of your information and knowledge; true?

A    Definitely, yes.

Q    Okay.  And you understand that when you provide information to the 911 call, you need to give them personal knowledge based -- information that is based on your personal knowledge, not assumptions; true?  Isn't it true?

A    True.

Q    Isn't it true you were assuming that night -- very, very, very severely assuming -- that there was a female when you never saw any female at Mr. Holloway's campsite?

MR. HARRELL:  "Severely assuming," vague.

THE WITNESS:  Would you be asking this of a blind man?

BY MS. MKRTCHYAN:

Q    Okay.  You are not blind.  We know you are not blind.

**UNITED STATES DISTRICT COURT**

4-RenSER-00565                                    4-RenSER-00565

A    So --

MR. HARRELL:  May the witness finish?

THE COURT:  You can finish your answer, sir.

THE WITNESS:  Nothing more.

BY MS. MKRTCHYAN:

Q    Now, you testified even at your deposition, even after you spoke with defense counsel, you never saw anything.  You only heard; isn't it true?

MS. SWISS:  Asked and answered.  403.

THE COURT:  Sustained.  It's been asked and answered now numerous times, Counsel.

BY MS. MKRTCHYAN:

Q    No further questions.  Thank you.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MR. HARRELL:

Q    Good morning again, sir.

A    Hello.

Q    Just to briefly touch on our timeline here, you heard a female voice during the domestic violence; correct?

A    Correct.

Q    And then your wife yells out what to now we know to be Mr. Holloway?

A    "Stop hitting her."

Q    And then do you hear anything happen with the zipper of

**UNITED STATES DISTRICT COURT**

the tent?

A     It opened shortly after.  It got quiet, and then I grabbed her and pulled her away from the window after she yelled it, and I said "Do not.  Don't.  Don't."  And I pulled her away, and I went to shut the window, and that's when I heard zip.  And we shut the window and never saw anything from there.

Q     Okay, sir.  But did you hear any sound associated with gravel after --

A     Yes.  Zip, (imitating sound).  And that was about the time I'm shutting the window.

Q     What did it sound like was going on based on what you heard with the zipper --

            MS. MKRTCHYAN:  Objection.

            MR. HARRELL:  Might I finish my question?

            MS. MKRTCHYAN:  Calls for speculation.

            THE COURT:  Next question.

BY MR. HARRELL:

Q     Sir, you heard the tent unzip; correct?

A     Yeah.

Q     Yes?

A     Yes.

Q     And then you heard sound associated with the gravel; correct?

A     Correct.

Q     Based on what you heard, did you draw any conclusions as

4-RenSER-00567                                                                4-RenSER-00567

to what happened with the female that you heard during the domestic violence?

A    I assumed she escaped.  That's the only possible --

MS. MKRTCHYAN:  Objection.  Move to strike.

BY MR. HARRELL:

Q    Thank you, sir.  I have no further questions.

MS. MKRTCHYAN:  Objection, Your Honor.  This is speculation after speculation.

THE COURT:  Overruled.

MS. SWISS:  No questions.

THE COURT:  Counsel, recross?

Just a moment.  Counsel, I'm going to reverse that last ruling.  You can ask what he heard.  In other words, he formed the conclusion she escaped.  I'm not certain what he heard.  So I'm going to reverse that.

Ladies and gentlemen, I want to make sure.  I'm going to reverse that ruling.

Ask the question about what he heard, Counsel.

MR. HARRELL:  Sure.

BY MR. HARRELL:

Q    Sir, you've already told us multiple times that you heard some things associated with Campsite 65 on that night; right?

A    Correct.

Q    And so with focus on the female voice that you heard involved in a domestic violence, I'd like to ask you some

questions.

Did you hear what sounded to you like a tent unzip after your wife addressed Mr. Holloway with words to the effect of "Stop hurting her"?

A    Yes.

Q    What did you hear?

A    The zipper zip.  It took -- after my wife yelled, it probably -- I don't know, it seemed like a while, but it stopped -- the fighting stopped.  And then we listened for a second.  I pulled her back and said, "Don't yell."  And I went to shut the window, and then I heard "zip" and someone leaving, what I assumed was someone leaving.

Q    Why did you make that assumption, sir, that someone was leaving the tent --

MS. MKRTCHYAN:  Objection.

BY MR. HARRELL:

Q    -- based on what you heard?

MS. MKRTCHYAN:  Objection.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  Because it was happening right in front of me, and I know that's where everything was happening.  And when I hear more things coming from there -- I know what a zipper sounds like.  I know what gravel sounds like.  And it got quiet after that.  So I can only make the assumption

**UNITED STATES DISTRICT COURT**

that --

BY MR. HARRELL:

Q    Based on your observations with your ears; right?

A    Yeah.

MR. HARRELL:  No further questions.

MS. MKRTCHYAN:  Objection.  "Observations."

MS. SWISS:  No questions.

THE COURT:  Overruled.

Now recross, Counsel.

MS. MKRTCHYAN:  Yes.  So I would like to now publish to the jury Exhibit 39, Deputy Johnston's report.  I would like to admit it into evidence.

MS. SWISS:  Outside the scope.

MR. HARRELL:  Beyond the scope.

THE COURT:  No, Counsel, we'll take it up at the recess.  It may or may not be admitted.

MS. MKRTCHYAN:  No, I have further questions on this, Your Honor.

THE COURT:  I'm allowing you to ask them.

MS. MKRTCHYAN:  Okay.  But I would like to -- is there any objection to his statements to Deputy Johnston -- Deputy Johnston's report?

THE COURT:  I don't think so, Counsel, but I'm going to take it up at -- I think it's going to be admitted.

MS. MKRTCHYAN:  Okay.

**UNITED STATES DISTRICT COURT**

THE COURT: As long as that's his statement.

You've identify that as your statement?

THE WITNESS: Yes.

THE COURT: Okay.

Yeah, it's received.

**(Exhibit Number 39 received.)**

**RECROSS-EXAMINATION**

BY MS. MKRTCHYAN:

Q    So if you heard the tent unzip and you assumed that someone left Mr. Holloway's campsite, is that a significant fact that you would have told the officers when they spoke to you on the night of the incident, sir?

MR. HARRELL: Assumes facts not in evidence they asked him about that.

MS. MKRTCHYAN: Excuse me.

THE COURT: Overruled.

You can answer the question if you were asked about it or if you made any --

THE WITNESS: My recollection is they didn't give me a full interview about everything. So you can add or subtract things like you tend to do, but go by my deposition. I mean that's --

BY MS. MKRTCHYAN:

Q    Sir --

A    That night, there was a lot happening that night. A lot.

Q    Are you telling us that when Deputy Johnston was asking you questions about what happened and you missed ever telling him -- again, we read this deposition -- I mean, this report where you told him no male or female were ever seen, you never indicated that you heard someone leaving, gravel sounds, or zip -- the zipping or unzipping of a tent.  If that was something that you observed and heard, why not -- why is it not in the reports early in time?

THE COURT:  There's two questions.  First, what did you see and hear that night?  And the second is whether it was included in your report?

THE WITNESS:  Yeah.  And you're citing the phone call?  That Johnston is the phone call?

BY MS. MKRTCHYAN:

Q    Sir --

A    That was the phone call interview?

Q    You spoke with Deputy Pahel, as we've covered.  You spoke with Deputy Johnston right around this incident before the deposition ever took place in 2020.  We are talking about 2018.  Let's bring your -- again, 2018; right?  You spoke to at least two officers.

THE COURT:  Counsel, please, both parties, this is getting confusing.  It's simply when was this first statement made?  Was it made that night or sometime after, if you recall?  This whole area is getting incredibly confusing.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  I'm a bit confused myself.

THE COURT:  It would be about the tent unzipping.  I think you stated that you assumed there was an escape because you heard the gravel.

THE WITNESS:  Heard zip and (imitating sound) --

MS. MKRTCHYAN:  Your Honor --

THE WITNESS:  -- like somebody getting outside of the tent.

THE COURT:  What counsel is asking you is when did you recall making that first statement?  Was it that night or was there another occasion?

THE WITNESS:  I don't recall.  That night I was never asked about exactly what happened.  And when Johnston called me, that was more of a -- it was kind of a cursory call.  He just asked me if we were okay.  And he asked me -- it wasn't telling him the whole story.  So you keep referring to this Johnston thing.

THE COURT:  It's unduly consumptive of time.  You both have transcripts from the deposition.  Was this statement made at the deposition?

MS. MKRTCHYAN:  Your Honor, we have the report made --

THE COURT:  You're focusing on Johnston's phone call, but there was a deposition that goes on for some period of time.

UNITED STATES DISTRICT COURT

MS. MKRTCHYAN: We are talking about the report that he made the first time.

THE COURT: Counsel, I understand that. I've received that.

MS. MKRTCHYAN: Can we publish it before the jury?

THE COURT: No. You'll get it in just a moment, Counsel.

MS. SWISS: It's in the deposition, Your Honor.

THE COURT: So in the deposition these statements were made?

MS. SWISS: Yes.

THE COURT: Is that correct?

MS. SWISS: Yes.

BY MS. MKRTCHYAN:

Q    The first time this -- so let me then paraphrase this. Isn't it true the very first time you spoke about a female that you heard assumed leaving the tent next door was at your deposition on July 20, 2020?

A    That was the first time I was -- I had to reaccount the entire thing.

Q    Okay.

A    So I didn't give sworn statements to --

Q    So are you telling us --

MR. HARRELL: Might he finish?

THE COURT: Finish your answer, sir.

4-RenSER-00574                              4-RenSER-00574

THE WITNESS:  I didn't give sworn statements to Pahel or -- or the -- or Johnston.

BY MS. MKRTCHYAN:

Q    Sir, you are telling us that you basically did not provide accurate, complete information to the officers when they arrived and spoke to you?

MR. HARRELL:  Argumentative.

THE COURT:  Sustained.

THE WITNESS:  I have --

MR. HARRELL:  You don't have to answer.

MS. MKRTCHYAN:  Exhibit 36 --

THE COURT:  No, it's sustained.

MS. MKRTCHYAN:  I request --

THE COURT:  36 is in evidence.

MS. MKRTCHYAN:  Okay.  Can we publish it?

THE COURT:  You can ask him questions about it if you want to.

MS. MKRTCHYAN:  Then can we publish it to the jury?

THE COURT:  You can publish it if you'd like to.

MS. MKRTCHYAN:  Let's do that.

THE COURT:  So the chronology, so everyone has an understanding according to the Court, is the Johnston call is before your deposition, but your deposition is the first time you're asked for the entire --

THE WITNESS:  Correct.

4-RenSER-00575                    4-RenSER-00575

BY MS. MKRTCHYAN:

Q   Sir, this is Deputy Johnston's report that we read on the record that you gave Thursday, February 8, 2018; right?  Isn't it true?

A   Well, it sounds like he made that assumption because I never -- it's not a statement that I said.  This is something he wrote that I -- so it sounds like an inference.  And maybe he got that because the feeling I got with that whole conversation was he was just calling me, "Hey, you okay?  You and your wife okay?"  And I -- we talked a little bit and I went back to work.

Q   Sir, we are talking about -- so we've talked about this same report before many times; true?

MS. SWISS:  Relevance.  403.

THE COURT:  No, overruled.

You can answer the question.

BY MS. MKRTCHYAN:

Q   So isn't it true you remember we discussed this report at the deposition, at prior proceedings; true?

A   True.  And --

Q   Okay.

A   And I'm adamant about the same thing, that you've used this the same way every time and tried to discredit me based on this, which I'm telling you the context of that conversation --

Q   Sure.

**UNITED STATES DISTRICT COURT**

4-RenSER-00576                           4-RenSER-00576

A    -- was not in a formal interview type of situation.  I just said -- he said, "Are you okay?"  And I said, you know....

Q    In any event, sir, you are basically telling us that Deputy Johnston did not accurately write your statements when he wrote, "No male or female were ever seen, and he never heard anyone leave the campsite."

MS. MKRTCHYAN:  Please highlight that.

BY MS. MKRTCHYAN:

Q    "No male or female were ever seen, and he never heard anyone leave the campsite."

Are you telling us, Deputy Johnston, officer of Orange County Sheriff's Department, has actually misstated your statement on February 8, 2018?

A    I'm not saying that at all.  I don't know.

Q    Well, so today, though, and at deposition, you have said, "No, I did hear someone leave the campsite because of the sounds of the gravel"; true?

A    True.

Q    And you agree with us, based on plain English review of this report, it's inaccurate, it's inconsistent -- inconsistent with this report that you provided to Deputy Johnston; true?

MR. HARRELL:  Argumentative.

MS. SWISS:  Argumentative.

THE COURT:  Sustained.

You can argue it, Counsel.

UNITED STATES DISTRICT COURT

4-RenSER-00577                    4-RenSER-00577

BY MS. MKRTCHYAN:

Q    And flash-forward between 2018 and that deposition, in 2019 you refuse to give a statement to my investigator, Robert Acosta; true?

MS. SWISS:  Outside the scope of cross.

THE COURT:  Sustained.

We've covered that, Counsel, numerous times.

MS. MKRTCHYAN:  Thank you.  No further questions.

THE COURT:  Any questions by anybody?

MR. HARRELL:  Nothing, Your Honor.

THE COURT:  Questions?

MR. HARRELL:  Nothing further.

MS. SWISS:  No.

THE COURT:  Sir, thank you very much.  You may step down.  And you can go.

THE WITNESS:  Completed?

THE COURT:  Yeah, thank you very much.

And, Counsel, who would your next witness be?

MR. HARRELL:  Your Honor, I believe by agreement it would be Chad Renegar.

THE COURT:  You want to start with Deputy Renegar?

MR. HARRELL:  He says it's up to the Court.

THE COURT:  Why don't we start with Deputy Renegar and go into the lunch hour if we need to.

Thank you, sir.  You recall the oath you previously

UNITED STATES DISTRICT COURT

4-RenSER-00578                                    4-RenSER-00578

took, Deputy Renegar?

THE WITNESS:  Yes, Your Honor.

THE COURT:  You're under the same oath.  If you'd please be seated.

**CHAD MATTHEW RENEGAR, PREVIOUSLY SWORN, RESUMES THE STAND**

**CROSS-EXAMINATION (Continued)**

BY MR. WRONIAK:

Q    Good morning, Deputy.

A    Good morning.

Q    All right.  When we left off yesterday, we talked about two prior incidents that counsel had brought up.

Do you recall that?

A    Yes.

Q    And right before we broke, I wanted to start talking to you about the third incident, and that's the one where the sergeant instructed you to repair a report.

Do you remember that incident?

A    Yes.

Q    And do you remember the circumstances of how that came about?

A    I do.

Q    Can you please tell the jury what occurred in that incident?

A    Yes.  We took a report for a stolen license plate or somebody was reporting that.  And she had reported it happened

4-RenSER-00579                                          4-RenSER-00579

in Santa Monica, but she lives in South Orange County.  So we took the report, and it was completed, and the sergeant told us to come back and do a quick fix.

We told them we would go out the next day and just have her -- and explain everything to her, and he said, "No.  We're going to change it right now."  He ordered us to do it, and we again told him -- or I told him that "we'll do it tomorrow."

He said, "No.  You're going to do it right now because we're just trying to help her.  And if we tell her to go back up to Santa Monica to report it, they're just going to tell her to go right back down to Orange County.  And it's just going to end up in a loop for her."

So we completed a report.  I signed it for her under the order of a sergeant, and we turned it in.

Q    And that form, is that the CHP form?

A    Yes.  It's called a CHP 180.

Q    Did you decide on your own to complete a new CHP 180 form?

A    No, we were ordered to do it by a sergeant.

Q    And you did that; correct?

A    Yes.

Q    And you understood that a deputy has an obligation to prepare an accurate report; correct?

A    Yes.

**UNITED STATES DISTRICT COURT**

4-RenSER-00580                                    4-RenSER-00580

Q     But you still prepared the new report?

A     Yes, because at the time what the sergeant was telling us, it made sense.

Q     And do you regret creating that new report?

A     Yes, because it almost ruined my career.

Q     How so?

A     I was investigated and charged by the Orange County DA's Office.

Q     And then you pled guilty to a misdemeanor for willfully and unlawfully omitting to do a legal duty required of you as a peace officer; correct?

A     That's correct.

Q     Were you sentenced as a result of that?

A     I was.

Q     Did you perform all the terms of your sentence?

A     I did.

Q     So you've taken responsibility for your actions; correct?

A     Yes.

Q     Now let's turn your attention to the incident that's actually the subject of this, the one that occurred on January 21, 2018.  Okay?

A     Okay.

Q     What was your shift that day?

A     I worked night shift.  So it started at 6:00 p.m. and went to 6:30 in the morning the next -- the following day.

4-RenSER-00581                                    4-RenSER-00581

Q     And you were out on patrol?

A     Correct.

Q     For what area?

A     It's called unincorporated southeast.  So, again, it's Trabuco Canyon, Coto, Ladera, the new community of Rancho Mission Viejo, and the Ortega Highway all the way down to Lake Elsinore and the all mountain areas in between.

Q     Were you dispatched to O'Neill Park on January 21, 2018?

A     Yes.

Q     Can you explain to the jury how the dispatch system works?

A     Yes.  So if you call 911, it goes to either two places. It goes to CHP, or it goes to your local municipality.  So in this case, the sheriff's department.

When you talk -- the first person you talk to -- for the sheriff's department's view it's called a call taker, so it's just a man or a woman that takes all the basic facts or whatever you're telling them is going on.

From there they generate a call that gets sent to a dispatcher, and then the dispatcher puts it over the air to whatever unit or patrol area it is.  And they assign, most of the time randomly, whatever deputy or officer, if you're not in the sheriff's department's purview, to that call.  And then depending on which call, they will send either a second person with you or sometimes a third.  Typically at night, it's a --

**UNITED STATES DISTRICT COURT**

every call is a two-person call just because of the time.

Q    Are you verbally in contact with the dispatcher?

A    Just over the radio.

Q    So you're able to communicate on the radio with the dispatcher?

A    Yes.

Q    Are you also in communication with other deputies through a radio?

A    Yes.

Q    How does that work?

A    All the radios and all the deputies that work in certain areas, we all work on the same what's called a radio channel. So all the deputies, for example, in this instance that work Mission Viejo, Lake Forest unincorporated, and Rancho Santa Margarita, we share the same channels. So we're able to talk to any deputy that's working in that area. We do have the ability to switch channels and talk to people in different areas, but all those deputies are assigned on that channel.

Q    We've heard some testimony about a computer that you have inside of your unit. Do you recall that?

A    Yes.

Q    What is that called?

A    We call it an MDC. I believe it stands for mobile data center. It's a laptop.

Q    Can you please explain -- what's the purpose of the MDC?

**UNITED STATES DISTRICT COURT**

A     So the MDC, the main function is -- the program that we use, we can see the dispatcher send us the call.  So when we receive a call, it will show the location, the grid -- for those of you who remember what a Thomas Guide is -- the caller number, and then any notes that are put on by either the call taker, the dispatcher, or if a deputy adds notes to it, you can see it as well.

Q     So you're in verbal communication with the dispatcher; right?

A     Yes.

Q     And verbal communication with your fellow deputies?

A     Yes.

Q     And then you also have the MDC where you can see information that's being exchanged?

A     Yes.

Q     So why were you dispatched to O'Neill Park?  We're talking about the first instance.  Why were you dispatched to O'Neill Park that evening?

A     The first one was for a domestic violence dispute between a male and a woman.

Q     Do you recall where you were when you were dispatched?

A     Yeah.  I was down on the Ortega Highway, I believe by the fire station, which is on Hot Springs Road.

Q     How far away is that from O'Neill Park?

A     About 20, 25 miles.

4-RenSER-00584                                    4-RenSER-00584

Q    And after you were dispatched, did you head towards O'Neill Park?

A    Yes.

Q    And approximately how long did it take you to get to O'Neill Park?

A    I believe 25, 30 minutes, somewhere around there.

Q    And as you're driving to O'Neill Park, did you receive any additional information from the dispatcher about the call you were going to?

A    Yeah.  That it was to the right of Campsite 63 with a tent and a white truck.

Q    Did you receive that information from the dispatcher?

A    Yes.

Q    Was that verbal information that you were hearing?

A    Yes.

        MR. WRONIAK:  If we can pull up Exhibit 45, which is already in evidence, and publish that, Your Honor.

        THE COURT:  You may.

        MR. WRONIAK:  Thank you.

        **(Document displayed.)**

        If we can go to page 5 --

BY MR. WRONIAK:

Q    Well, first off, you recognize this as the dispatch log?

A    Yes, I do.

Q    Let's start on page 5.  You've seen this before; right?

**UNITED STATES DISTRICT COURT**

4-RenSER-00585                    4-RenSER-00585

137

A    Correct.

Q    And you know how to read this; correct?

A    Yes.

Q    Okay.  So let me just draw your attention to the middle of page 5, where it says "Call Dispositions."

Do you see that?

A    Yes.

Q    Okay.  And there's some information below that.  Do you see it?

A    Yes.

Q    Can you please explain to the jury how to read what appears below "Call Dispositions" on it?

MS. MKRTCHYAN:  Your Honor, objection.  Lacks foundation.  It has not been established as to what -- how he knows to read this.  I was asking him questions.  He couldn't understand this.

THE COURT:  Overruled.

THE WITNESS:  Can you say your question one more time?

BY MR. WRONIAK:

Q    Yeah.  Starting with the "Call Dispositions," explain to the jury how to read Exhibit 45 where it references "Call Dispositions."

A    That's just at the end of the call, or you can do it in the call too.  That's just -- there is a part of the program

UNITED STATES DISTRICT COURT

that we use.  It says "Dispositions," and it just comes up with a list -- a drop-down menu of a list of things.  It's like arrest, citation, medical aid, report taken, assisting back-up officer, homeless, not homeless, mental health, nonmental health.  It's just a number of lists.

Typically at the end of each call, it will generate and be generated by a dispatcher or the deputy where it will say -- typically there's either two or three.  It will say "arrest" or "report" or "no action" or -- at that time, yeah. Currently there's some different things, but at that time it was -- typically will end with "report taken," "assist," things like that.

Q    Now let me focus on down below.  It says, "Call Log."

Do you see that?

A    Yes.

Q    What is this portion of Exhibit 45?

A    So this is when the dispatcher starts sending you -- or starts sending deputies to that call, and we read it, this one, from top down like you would a book.  So when you look at, starting on the left, you see where it says "Unit."  It's redacted, but those would be the units assigned.  The next says "Status."  "ENR" means en route; "ONS" means on scene.  And then those are the times that it's broadcast over the air.  And then "Department" is just the sheriff's department and then the address of the location.  The "Deputy ID" is our HID, similar

4-RenSER-00587                                    4-RenSER-00587

to a badge number.  And then the "Deputy" and then the "Odometer."

Q    Okay.  And if we read this and wanted to follow the call log, we would just go to page 6 for the next entry and continue down the document?

A    Yes.

Q    You mentioned ENR.  What does that stand for again?

A    En route.

Q    What does that mean when you list yourself ENR?

A    That means we're on our way there.

Q    And you also mentioned ONS for on scene?

A    Yeah, it just means on scene.

Q    Means that you've arrived at the scene that you were dispatched to?

A    Not always.  It's common practice that you put yourself on scene just before you arrive.  So, for example, for this call, most deputy -- for this call for, like, myself, I put myself on scene before I entered the campground.  That's just so that way we don't have to try to remember or be fumbling around while we're there.

Q    So when you put yourself on scene on the dispatch log, you weren't right in front of Mr. Holloway's campsite?

A    No.

Q    Where were you within O'Neill Park when you put yourself on scene?

UNITED STATES DISTRICT COURT

A    I believe I was just entering the park by the front, by the gate.

Q    And then if we jump -- so that's how we read this going down.

Let's go back up to "Call Dispositions" and the entries that are just above that.  Are you with me?

A    Okay.

Q    There's an entry at 3:40:57.

Do you see that?

A    Yes.

Q    Okay.  Can you please explain to the jury how to read that portion of Exhibit 45.

A    Starting at the top, that's the time and date. Position -- where it says "Position 12," that's either the call taker or the dispatcher.  It's just kind of like the seat that they sit in up at dispatch.

The next is the name of whoever -- or the last name and first initial of whatever dispatcher or call taker it is.

Moving down, "cross streets" is cross streets.

"Landmark" is O'Neill Park.  Typically if there's, like, a big building or like an Angel Stadium or some giant landmark that people would understand, that would be there.

"NBH" is the grid.  So if you guys remember the Thomas Guides, that would be a grid from a Thomas Guide.  The ZIP code and then the latitude and longitude of where the call

4-RenSER-00589                                          4-RenSER-00589

is taking place. And then the rest are the same thing, just broken down vertically.

And then at the very bottom where it says "Male versus female in a physical," that is the start of the call or whatever the dispatcher or call taker is putting on the call.

Q    So it was -- based on this document was that the initiation of the call to Mr. Holloway's site?

A    Yes.

Q    And then if we want to look at the progression of calls that are coming in on dispatch communication, do we read up from that -- on that portion of the document?

A    Yes, this part you read from bottom up.

Q    So the first entry at 3:40:57:

      "Male versus female in a physical 415,
      occurring to the right of the Campsite Number 63.
      INF is not involved."

      Do you see that?

A    Yes.

Q    First off, what is "INF"?

A    "INF" is -- stands for informant. You'll see it sometimes as INFO.

Q    Was that information that you were aware of as you were driving to O'Neill Park that evening?

A    Yes.

Q    And just again for the jury, what is a 415?

4-RenSER-00590                    4-RenSER-00590

A    415 is just a physical altercation.  It's police jargon for that.

Q    So as you are heading to O'Neill Park, the information you had was that a domestic violence was occurring to the right of Campsite 63?

A    Yes.

Q    Based on reviewing this, do you know who made that entry?

A    No, I don't.  Not this.

Q    Okay.

A    Well, are you talking about who called?  The dispatcher or call taker is Morrison, and you see that at the top.  The person who called 911, we don't know that.

Q    It was a poor question.  Thank you.

I was asking if you know who made the entry that we see on Exhibit 45.

A    Oh, yes, at the top right next to the highlight it says, "Position 12 Morrison DL."  So whatever dispatcher or call taker is -- last name is Morrison.

Q    So as you're driving to O'Neill Park, you continued to receive information?

A    Yes.

Q    If you look up at the entry at 4:06:58, do you see that?

A    Yes.

Q    "DV occurring.  White truck and a tent to the right of Camp Number 63"; correct?

**UNITED STATES DISTRICT COURT**

A    Correct.

Q    Was that information that you were provided as you were driving back to O'Neill Park?

A    Yes.

Q    The entry at 4:08:06, do you see that?

A    Correct.

Q    "Informant is at Arroyo Campground in O'Neill Park.  DV POSS occurring at 65."

        Do you see that?

A    Yes.

Q    Was that information that you had received as you were going back to O'Neill Park?

A    Yes.

Q    And that's information you received before you had even reached O'Neill Park; correct?

A    Correct.

        MR. WRONIAK:  If we can go to page 6.

BY MR. WRONIAK:

Q    There's an entry at 4:23:19.

        Do you see that?

        THE COURT:  Counsel, can you make it --

        MR. WRONIAK:  I'm sorry.  Page 4.  Go to page 4. I'm reading it backwards myself.  Go to page 4.

        **(Document displayed.)**

BY MR. WRONIAK:

4-RenSER-00592                                4-RenSER-00592

144

Q    4:23:19.

A    Yes.

Q    "Contact with informant will be Campsite 65."

Do you see that?

A    Yes, I do.

Q    Do you know who made that entry on the log?

A    That would be Jurgenson WA.

Q    How do you know that?

A    Because it says "Position 4 Jurgenson" at the top.

Q    So when you arrived at Campsite -- or O'Neill Park, what was the first thing that you did?

A    The first thing we did upon arrival is we spoke with Deputy Borba and Billinger at the front.  And then we made our way to the general area where we were -- where we thought the call was at.  And then the first person I made contact with was Joshua Gomez in Campsite 67.

Q    And let me back it up.  At any time prior to arriving at O'Neill Park, had you received any information that you were going to a situation possibly involving a homeless individual?

A    No.

Q    All the information you had was through the dispatch and the dispatch log that we see; correct?

A    Yes.

Q    And prior to arriving at O'Neill Park, what was going through your mind relative to the call that you were going to?

**UNITED STATES DISTRICT COURT**

A    That we were going to a domestic violence call involving a male and female.

Q    Did that cause you any concerns?

A    Domestic violence is one of our more dangerous calls. It's where most officers get injured at.

Q    Were you concerned with the safety of the individuals in the campsite?

A    Yes.

Q    Why?

A    There was multiple different campers.  Majority of people in tents.  Every situation is different.  So we're always concerned about other people.

Q    Were you concerned for officer safety?

A    Yes.

Q    Why?

A    It was dark.  O'Neill Campground is not an easy place to get to.  If somebody is asking for help, even though it's by Rancho Santa Margarita, it still takes time to get down there.

Q    Do you know how many officers were dispatched to O'Neill Park when the initial call came in?

A    I believe there was two initial units.  One of them was a training unit, which was Gonzalez and Pahel.  But typically, because of the location of where O'Neill Park is at, deputies in Rancho Santa Margarita will typically follow us, especially at night.  So that's why Borba and Billinger went with us -- or

**UNITED STATES DISTRICT COURT**

4-RenSER-00594                                          4-RenSER-00594

went down there first.

THE COURT:  Counsel, let's take the recess now at 12:00 noon and return at 1:00 o'clock.

Ladies and gentlemen, why don't you go to lunch from 12:00 to 1:00.  You're admonished not to discuss this matter amongst yourselves nor form or express any opinion concerning the case.  Have a nice lunch.  We'll see you at 1:00 o'clock.

**(Proceedings recessed at 12:00 p.m.)**

**--oOo--**

**UNITED STATES DISTRICT COURT**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 14, 2025*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

4-RenSER-00596                                              4-RenSER-00596

**$**

**$15,000** [1] - 17:10
**$5,000** [3] - 17:2, 17:7, 17:10

**'**

**'24** [2] - 14:20
**'Come** [1] - 77:18
**'Why** [1] - 77:10
**'you** [1] - 77:3

**/**

**/S** [1] - 147:19

**1**

**1** [3] - 20:1, 39:15, 40:7
**1-053** [1] - 1:24
**10** [10] - 1:8, 39:5, 39:6, 39:19, 39:23, 39:24, 79:11, 91:18, 91:21, 114:19
**100** [7] - 26:7, 64:11, 103:11, 103:12, 103:14, 104:10, 105:16
**102-1** [2] - 44:12, 44:14
**102-12** [1] - 38:18
**102-2** [3] - 43:5, 43:6, 44:14
**104** [4] - 97:8, 97:13, 98:6, 98:7
**1100** [3] - 2:10, 2:18, 2:22
**1150** [1] - 2:14
**117** [1] - 4:7
**12** [6] - 45:1, 45:14, 46:19, 46:22, 140:14, 142:17
**122** [2] - 4:8, 4:18
**12:00** [6] - 68:8, 68:9, 146:3, 146:5, 146:8
**13** [1] - 6:12
**130** [1] - 4:9
**14** [3] - 1:13, 5:1, 147:15
**1450** [3] - 2:11, 2:19, 2:23
**15** [2] - 46:17, 77:17
**16** [6] - 44:23, 45:13, 46:16, 46:19, 46:20
**162-N** [1] - 42:25
**17** [4] - 44:25, 45:13, 46:19, 46:22
**1700** [1] - 2:5

**18** [2] - 89:10, 89:22
**180** [2] - 131:17, 131:18
**1800** [1] - 2:15
**1:00** [3] - 146:3, 146:5, 146:7

**2**

**20** [9] - 44:1, 56:22, 70:12, 76:6, 95:16, 99:24, 125:18, 135:25
**2011** [1] - 3:9
**2016** [1] - 9:15
**2018** [20] - 6:20, 16:9, 22:8, 24:10, 24:12, 53:24, 57:24, 58:6, 58:7, 76:23, 76:25, 78:6, 80:6, 123:19, 123:20, 127:3, 128:13, 129:2, 132:21, 133:8
**2019** [4] - 58:13, 59:6, 60:22, 129:3
**2020** [7] - 6:24, 11:14, 21:14, 79:11, 114:19, 123:19, 125:18
**2021** [2] - 11:19, 12:1
**2024** [4] - 9:15, 14:18, 15:7, 15:15
**2025** [7] - 1:13, 5:1, 16:10, 22:8, 58:6, 115:18, 147:15
**207** [1] - 3:9
**21** [6] - 6:20, 24:10, 24:12, 76:25, 132:21, 133:8
**213-624-8700** [1] - 2:16
**22** [5] - 44:23, 45:13, 46:16, 46:19, 46:20
**228** [1] - 34:19
**24** [3] - 4:6, 71:14, 71:20
**244** [7] - 24:23, 25:6, 28:7, 28:11, 31:6, 41:6, 41:10
**245** [2] - 40:22, 41:1
**25** [6] - 32:18, 39:6, 39:23, 39:24, 135:25, 136:6
**26** [4] - 9:2, 11:13, 11:15, 11:22
**28** [1] - 147:8
**2:00** [3] - 29:10, 29:11, 70:17

**3**

**3** [4] - 17:2, 17:7, 39:5, 72:10
**30** [1] - 136:6
**31** [1] - 75:23
**31-degree** [1] - 103:19
**33** [7] - 70:24, 71:3, 71:4, 71:20, 71:22, 71:24, 72:20
**34** [4] - 71:21, 71:22, 71:24, 72:20
**36** [2] - 126:11, 126:14
**39** [3] - 4:18, 121:11, 122:6
**3:30** [1] - 77:1
**3:39** [2] - 55:23, 96:21
**3:40:57** [2] - 140:8, 141:13

**4**

**4** [4] - 143:22, 143:23, 144:9
**400** [1] - 3:5
**403** [6] - 69:1, 92:16, 108:5, 112:17, 117:9, 127:14
**411** [1] - 1:24
**415** [3] - 141:14, 141:25, 142:1
**45** [5] - 136:16, 137:22, 138:16, 140:12, 142:15
**4:06:58** [1] - 142:22
**4:08:06** [1] - 143:5
**4:23:19** [2] - 143:19, 144:1
**4:29:19** [1] - 44:18
**4:29:41** [1] - 44:19
**4th** [1] - 14:19
**4TH** [1] - 1:24

**5**

**5** [3] - 136:21, 136:25, 137:5
**52** [1] - 4:6
**53** [1] - 4:7
**54** [1] - 26:11
**5:18** [3] - 87:20, 88:5, 89:21
**5:25** [1] - 88:4
**5:40** [3] - 90:16, 91:1

**6**

**6** [5] - 4:4, 59:6, 60:22, 139:4, 143:17
**63** [14] - 26:8, 26:13,

27:3, 27:9, 27:11, 27:16, 28:1, 96:13, 100:4, 101:2, 136:10, 141:15, 142:5, 142:25
**65** [28] - 27:9, 27:15, 28:1, 28:15, 29:13, 29:25, 30:4, 31:12, 36:21, 37:3, 42:2, 42:15, 42:17, 50:21, 79:6, 90:13, 96:7, 96:13, 96:14, 96:23, 97:19, 98:21, 99:11, 99:21, 101:2, 119:22, 143:8, 144:3
**655** [1] - 2:5
**66** [12] - 96:2, 96:3, 96:10, 96:14, 96:17, 97:19, 99:2, 99:4, 99:11, 99:21, 101:5, 105:11
**67** [1] - 144:16
**6:00** [1] - 132:24
**6:30** [1] - 132:25

**7**

**714** [1] - 2:20
**714-823-4100** [1] - 3:6
**714-937-1010** [2] - 2:12, 2:24
**750** [1] - 3:5
**753** [1] - 147:8
**76** [2] - 27:6, 97:12
**760-274-2110** [1] - 3:10
**7953** [2] - 1:23, 147:20

**8**

**8** [7] - 57:24, 58:6, 72:10, 78:6, 80:6, 127:3, 128:13
**818-388-7022** [1] - 2:6
**85** [2] - 72:4, 72:5
**86** [6] - 71:22, 72:4, 72:5, 72:10, 72:14, 73:1
**87** [3] - 71:22, 72:8, 73:3
**88** [1] - 72:8
**8:10** [2] - 1:14, 5:2
**8:19-cv-01514-DOC-DFM** [1] - 1:7
**8th** [1] - 14:20

**9**

**9** [3] - 39:5, 91:18, 91:21

**90015** [1] - 2:15
**911** [31] - 34:13, 34:14, 34:17, 35:20, 35:24, 36:2, 36:18, 37:5, 41:17, 49:23, 52:6, 55:23, 57:25, 77:11, 77:22, 78:3, 82:17, 92:21, 96:21, 99:16, 102:20, 109:5, 113:5, 113:11, 113:22, 113:25, 114:9, 116:9, 116:14, 133:12, 142:12
**91203** [1] - 2:6
**92011** [1] - 3:10
**92701** [1] - 1:24
**92868** [3] - 2:11, 2:19, 2:23
**92868-4940** [1] - 3:6
**937-1010** [1] - 2:20
**9:00** [1] - 78:1
**9:34** [1] - 44:3
**9:53** [1] - 44:3

**A**

**A.M** [2] - 1:14, 5:2
**a.m** [4] - 44:3, 68:9, 70:17
**ability** [3] - 9:21, 15:1, 134:17
**able** [10] - 18:15, 18:16, 29:15, 56:2, 57:20, 64:21, 89:2, 134:4, 134:15
**abnormal** [1] - 21:22
**abnormality** [3] - 7:11, 7:14, 7:15
**above-entitled** [1] - 147:11
**absolutely** [2] - 51:6, 51:16
**accept** [1] - 10:22
**acceptable** [1] - 5:11
**according** [6] - 64:4, 103:10, 103:15, 109:10, 112:5, 126:22
**account** [1] - 17:23
**accurate** [7] - 27:25, 79:15, 79:19, 100:7, 116:10, 126:5, 131:24
**accurately** [2] - 92:14, 128:4
**Acosta** [4] - 59:6, 60:4, 60:22, 129:4
**acting** [1] - 18:21
**action** [1] - 138:9

**actions** [1] - 132:17
**actively** [1] - 115:18
**activities** [1] - 18:13
**activity** [2] - 29:12, 29:24
**actual** [2] - 65:2, 99:25
**acupuncture** [3] - 12:18, 12:20, 16:14
**adamant** [1] - 127:22
**add** [2] - 94:18, 122:20
**adding** [3] - 92:23, 93:3, 94:16
**additional** [2] - 78:2, 136:8
**address** [4] - 26:19, 69:8, 86:22, 138:25
**addressed** [1] - 120:3
**adds** [1] - 135:6
**Administration** [1] - 20:1
**admit** [1] - 121:12
**admitted** [5] - 6:13, 98:1, 98:2, 121:16, 121:24
**admonished** [2] - 43:24, 146:5
**adverse** [1] - 20:2
**Advil** [2] - 19:7, 19:14
**affect** [2] - 17:14, 18:13
**afraid** [1] - 113:21
**afternoon** [1] - 65:16
**afterwards** [4] - 8:25, 13:22, 14:1, 14:15
**aggravation** [1] - 7:3
**agitated** [1] - 42:21
**ago** [4] - 11:20, 14:17, 26:6, 100:8
**agree** [8] - 6:25, 7:1, 7:2, 7:4, 8:3, 10:8, 21:23, 128:19
**agreement** [4] - 5:6, 5:8, 22:22, 129:19
**agrees** [1] - 91:3
**aid** [4] - 45:10, 88:18, 88:25, 138:3
**air** [2] - 133:20, 138:23
**Airport** [1] - 3:9
**al** [2] - 1:7, 2:8
**Aleve** [2] - 19:6, 19:13
**alleviate** [1] - 19:2
**alleviation** [1] - 13:9
**allow** [1] - 18:25
**allowing** [3] - 30:7, 38:21, 121:19
**almost** [3] - 16:20, 30:23, 132:5
**alone** [1] - 102:3
**ALSO** [1] - 3:12

**altercation** [5] - 65:2, 74:2, 74:6, 77:2, 142:1
**ambiguous** [1] - 41:19
**ANA** [3] - 1:14, 1:24, 5:1
**analysis** [1] - 7:2
**anesthesia** [1] - 17:3
**anesthetic** [2] - 18:20, 18:21
**Angel** [1] - 140:21
**ANGELES** [1] - 147:3
**Angeles** [1] - 2:15
**answer** [29] - 9:9, 11:17, 30:7, 30:8, 32:4, 32:12, 32:21, 33:1, 36:7, 42:9, 46:11, 51:4, 56:7, 56:15, 59:21, 67:24, 68:1, 69:23, 75:18, 78:16, 80:21, 109:14, 110:6, 117:3, 120:20, 122:17, 125:25, 126:10, 127:16
**answered** [9] - 69:2, 69:21, 109:13, 110:5, 112:17, 112:18, 114:5, 117:9, 117:10
**anti** [2] - 19:6, 19:18
**anti-inflammatories** [2] - 19:6, 19:18
**anyway** [2] - 50:8, 89:6
**APC** [1] - 2:9
**APLC** [1] - 2:13
**apologies** [2] - 46:17, 47:3
**appear** [1] - 48:7
**APPEARANCES** [2] - 2:1, 3:1
**applied** [1] - 64:7
**approached** [1] - 64:17
**approximate** [1] - 32:10
**area** [10] - 18:14, 25:24, 77:16, 91:19, 96:1, 123:25, 133:3, 133:21, 134:16, 144:14
**areas** [4] - 17:14, 133:7, 134:12, 134:18
**argue** [1] - 128:25
**argument** [5] - 32:15, 80:14, 94:12, 94:19, 108:5
**Argumentative** [2] -

67:8, 67:17
**argumentative** [5] - 92:25, 103:25, 126:7, 128:22, 128:23
**arrest** [2] - 138:3, 138:9
**arrested** [2] - 54:16, 66:18
**arrival** [1] - 144:12
**arrive** [9] - 65:13, 67:5, 67:13, 67:16, 68:21, 68:22, 70:6, 109:1, 139:16
**arrived** [13] - 70:14, 70:15, 70:17, 73:13, 77:14, 101:19, 102:11, 103:5, 103:13, 112:25, 126:6, 139:13, 144:10
**arriving** [2] - 144:17, 144:24
**Arroyo** [1] - 143:7
**asleep** [3] - 28:20, 28:22, 50:6
**assault** [2] - 6:20, 7:23
**assaulted** [1] - 34:16
**assessment** [1] - 6:20
**assign** [1] - 133:21
**assigned** [2] - 134:18, 138:21
**assignment** [1] - 46:1
**assist** [1] - 138:11
**assisted** [1] - 115:1
**assisting** [1] - 138:3
**associate** [1] - 29:16
**associated** [5] - 26:21, 33:6, 118:7, 118:22, 119:22
**association** [1] - 25:8
**assumed** [7] - 50:7, 50:15, 119:3, 120:12, 122:9, 124:3, 125:17
**assumes** [5] - 30:2, 95:21, 103:24, 116:3, 122:13
**assuming** [7] - 63:7, 73:16, 76:20, 95:5, 116:18, 116:19, 116:21
**assumption** [6] - 68:10, 68:12, 68:13, 120:13, 120:25, 127:5
**assumptions** [1] - 116:16
**asymptomatic** [1] - 7:3

**AT** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**attempts** [2] - 61:17, 93:12
**attention** [4] - 96:3, 101:17, 132:19, 137:4
**attorney** [1] - 60:20
**ATTORNEY** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**Audio** [5] - 35:18, 39:10, 40:11, 43:11, 46:4
**audio** [1] - 36:23
**audiotape** [3] - 40:13, 42:23, 49:17
**authenticate** [1] - 88:8
**authentication** [1] - 88:11
**available** [1] - 23:2
**Avenue** [1] - 2:5
**awake** [1] - 29:21
**awakened** [4] - 65:6, 65:9, 73:12, 108:22
**aware** [17] - 9:13, 10:25, 12:9, 12:15, 13:8, 13:11, 14:25, 15:10, 18:2, 20:5, 20:11, 61:3, 61:5, 61:10, 102:3, 102:4, 141:22
**awoken** [1] - 30:9

## B

**B-r-i-a-n** [1] - 23:22
**back-up** [1] - 138:3
**backpack** [1] - 108:14
**backside** [1] - 31:10
**backwards** [1] - 143:23
**backyard** [1] - 93:21
**bad** [3] - 8:19, 30:24, 36:13
**badge** [1] - 139:1
**ballpark** [1] - 98:11
**bam** [2] - 34:3
**barking** [1] - 65:21
**based** [20] - 9:13, 10:5, 11:14, 12:16, 13:11, 16:10, 21:7, 36:1, 100:9, 100:13, 116:15, 118:11, 118:25, 120:17, 121:3, 127:23, 128:19, 141:6, 142:7
**basic** [1] - 133:17
**bat** [1] - 113:15
**battlefield** [2] - 12:18, 16:14

**beatdown** [1] - 36:16
**beating** [2] - 105:6, 105:13
**becoming** [1] - 107:20
**bed** [6] - 25:25, 28:16, 28:20, 50:13, 68:2, 99:7
**begin** [1] - 5:14
**beginning** [1] - 40:4
**behind** [3] - 49:2, 62:10, 99:4
**below** [4] - 7:20, 137:8, 137:12, 138:13
**bench** [1] - 85:17
**bending** [1] - 18:8
**benefit** [3] - 11:22, 13:12, 16:18
**Benjamin** [1] - 21:13
**best** [7] - 34:4, 45:9, 85:22, 88:22, 89:6, 116:10
**between** [14] - 23:9, 36:20, 37:16, 39:19, 40:7, 56:25, 73:25, 82:20, 100:17, 101:3, 105:10, 129:2, 133:7, 135:19
**beyond** [1] - 121:14
**bias** [1] - 106:8
**biased** [1] - 58:23
**big** [7] - 8:25, 13:21, 26:1, 31:5, 61:2, 100:15, 140:21
**Billinger** [2] - 144:13, 145:25
**binder** [1] - 83:11
**binders** [2] - 83:12, 85:16
**bit** [3] - 30:15, 124:1, 127:10
**bitch** [4] - 104:16, 104:20, 104:21, 105:14
**black** [4] - 25:20, 26:1, 31:5
**blind** [4] - 8:24, 116:22, 116:25
**blocked** [2] - 62:25, 64:16
**blow** [1] - 27:9
**blows** [4] - 30:21, 32:9, 33:5, 33:7
**blue** [5] - 28:10, 28:14, 31:12, 41:13, 42:1
**BODNAR** [1] - 3:8
**body** [1] - 33:24
**book** [1] - 138:19
**books** [2] - 85:8
**Borba** [9] - 37:16,

40:1, 40:8, 54:9, 91:13, 101:10, 101:14, 144:13, 145:25
**Borba's** [11] - 37:15, 37:18, 37:25, 38:1, 38:10, 38:18, 38:20, 40:14, 89:15, 91:18, 91:20
**bothering** [1] - 42:21
**bottom** [3] - 25:19, 141:3, 141:12
**box** [1] - 23:13
**brain** [1] - 14:22
**Brian** [13] - 5:8, 23:6, 23:17, 77:1, 77:3, 77:6, 77:9, 77:11, 77:17, 77:20, 77:21, 77:24, 113:10
**BRIAN** [2] - 4:5, 23:11
**brief** [1] - 13:9
**briefly** [2] - 52:13, 117:19
**bring** [4] - 35:2, 60:18, 101:17, 123:20
**bringing** [1] - 79:7
**broadcast** [1] - 138:23
**broke** [1] - 130:14
**broken** [2] - 87:8, 141:2
**brother** [4] - 90:3, 90:7, 90:10
**brought** [2] - 112:14, 130:11
**Bryan** [1] - 3:14
**building** [1] - 140:21
**BY** [136] - 2:4, 2:14, 3:8, 4:4, 4:5, 4:9, 6:3, 6:17, 9:12, 10:1, 11:12, 18:1, 24:2, 24:24, 25:3, 26:16, 26:23, 27:10, 27:22, 28:9, 30:6, 32:8, 33:14, 33:17, 33:22, 34:20, 35:1, 35:19, 36:11, 40:12, 40:24, 41:7, 41:23, 42:12, 45:15, 46:5, 47:15, 48:10, 48:15, 52:12, 52:19, 53:7, 56:9, 56:17, 57:18, 59:3, 60:1, 60:3, 60:15, 61:9, 61:15, 61:21, 62:7, 62:22, 63:17, 64:1, 67:11, 68:11, 68:20, 69:18, 70:2, 71:6, 71:13, 72:11, 73:6, 74:15, 75:21, 76:16, 78:25, 80:2, 80:10, 80:17, 81:4,

81:10, 82:5, 87:19, 89:24, 92:2, 92:18, 93:2, 93:6, 93:10, 93:23, 94:13, 94:20, 95:25, 96:6, 97:15, 98:9, 98:25, 99:10, 100:3, 100:12, 100:24, 101:15, 102:1, 102:8, 104:2, 105:4, 105:21, 106:1, 107:9, 107:24, 108:7, 109:16, 110:17, 111:17, 113:4, 114:7, 115:9, 115:13, 116:1, 116:7, 116:24, 117:5, 117:12, 117:16, 118:17, 119:5, 119:20, 120:16, 121:2, 122:8, 122:23, 123:14, 125:14, 126:3, 127:1, 127:17, 128:8, 129:1, 130:7, 136:22, 137:20, 143:18, 143:25

## C

**CA** [1] - 1:24
**California** [9] - 2:6, 2:11, 2:15, 2:19, 2:23, 3:6, 3:10, 60:9, 147:7
**CALIFORNIA** [4] - 1:2, 1:14, 5:1, 147:4
**CALLED** [3] - 4:4, 4:5, 4:9
**caller** [1] - 135:4
**callers** [1] - 116:9
**calm** [2] - 69:7, 81:22
**Camp** [1] - 142:25
**camped** [1] - 98:12
**camper** [9] - 29:1, 29:2, 48:24, 48:25, 50:4, 54:20, 56:19, 87:25, 101:3
**campers** [1] - 145:10
**campground** [32] - 26:12, 26:13, 27:6, 27:11, 48:23, 51:21, 51:23, 54:19, 55:18, 55:20, 56:3, 56:13, 56:18, 56:20, 66:5, 66:15, 69:20, 70:10, 76:7, 77:25, 82:11, 95:18, 97:9, 98:16, 100:7, 100:25,

103:7, 103:21, 112:12, 112:15, 116:8, 139:18
**Campground** [2] - 143:7, 145:16
**camping** [5] - 18:12, 24:12, 24:16, 108:17, 116:8
**campsite** [51] - 26:5, 26:18, 26:25, 27:2, 27:13, 28:13, 37:4, 37:6, 37:9, 50:10, 52:22, 54:19, 56:20, 63:1, 65:12, 65:13, 65:20, 66:25, 69:20, 70:1, 73:11, 73:17, 77:2, 77:13, 96:7, 96:9, 97:1, 97:3, 97:19, 98:15, 99:14, 99:25, 100:1, 100:4, 101:19, 103:1, 103:4, 103:9, 103:13, 103:16, 104:4, 104:10, 108:11, 116:20, 122:10, 128:6, 128:10, 128:16, 139:22, 145:7
**Campsite** [36] - 26:13, 27:11, 28:1, 29:13, 29:25, 30:4, 31:12, 36:21, 37:3, 42:2, 42:15, 42:17, 50:21, 79:6, 90:13, 96:2, 96:3, 96:7, 96:17, 96:23, 96:24, 98:21, 99:2, 99:4, 99:21, 101:5, 105:11, 119:22, 136:10, 141:15, 142:5, 144:3, 144:10, 144:16
**campsites** [4] - 65:17, 99:7, 100:14, 100:17
**candidate** [6] - 8:17, 8:19, 9:24, 10:6, 15:4, 22:1
**cannot** [3] - 16:18, 22:7, 22:10
**canvassing** [1] - 99:1
**Canyon** [2] - 24:19, 133:5
**capable** [1] - 36:9
**car** [14] - 29:5, 29:6, 29:9, 29:12, 65:8, 66:20, 66:22, 67:2, 67:5, 70:15, 75:6, 75:11, 104:3, 104:4
**care** [2] - 10:20, 10:21
**career** [1] - 132:5

**careful** [1] - 85:21
**Carlsbad** [1] - 3:10
**carrying** [1] - 18:8
**cars** [1] - 70:22
**CARTER** [1] - 1:3
**case** [8] - 9:3, 19:18, 22:18, 22:25, 43:25, 115:18, 133:14, 146:7
**Case** [1] - 1:6
**casual** [2] - 78:18, 79:8
**catastrophic** [1] - 10:22
**CATHERINE** [1] - 2:14
**caught** [1] - 86:24
**caused** [1] - 7:3
**causing** [1] - 85:23
**cautioning** [1] - 85:20
**cautious** [1] - 113:2
**center** [1] - 134:24
**CENTRAL** [1] - 1:2
**Central** [2] - 2:5, 147:7
**certain** [7] - 43:14, 45:2, 73:2, 85:24, 88:25, 119:14, 134:11
**certainty** [3] - 16:15, 16:16, 22:10
**CERTIFICATE** [1] - 147:1
**certified** [1] - 60:8
**Certified** [1] - 1:5
**certify** [1] - 147:7
**cetera** [3] - 88:1, 100:16, 104:20
**Chad** [1] - 129:20
**CHAD** [3] - 3:3, 4:9, 130:5
**chair** [1] - 23:14
**chance** [1] - 35:6
**change** [2] - 67:7, 131:6
**changes** [1] - 67:21
**changing** [1] - 67:15
**channel** [2] - 134:12, 134:18
**channels** [2] - 134:15, 134:17
**character** [1] - 114:16
**characterize** [1] - 42:20
**charged** [1] - 132:7
**chase** [2] - 61:4, 93:18
**chasing** [1] - 58:21
**chassis** [1] - 25:13
**check** [1] - 5:17
**chest** [1] - 64:3
**children** [1] - 58:21

**CHP** [4] - 131:16, 131:17, 131:18, 133:13
**CHRISTIE** [1] - 3:8
**chronic** [8] - 10:10, 10:13, 10:20, 12:25, 17:14, 18:9, 18:13, 19:22
**chronology** [1] - 126:21
**circle** [1] - 26:3
**circumstances** [1] - 130:19
**citation** [1] - 138:3
**citing** [1] - 123:12
**citizen** [1] - 73:22
**City** [1] - 3:5
**cladding** [1] - 25:19
**clarify** [1] - 37:10
**clean** [1] - 54:18
**clear** [2] - 12:7, 47:1
**clearly** [4] - 32:18, 34:15, 91:17, 91:20
**clerk** [1] - 39:1
**clerk's** [1] - 44:7
**client** [1] - 115:2
**client's** [1] - 18:6
**clip** [2] - 44:13, 46:3
**close** [2] - 28:4, 100:14
**closed** [1] - 75:15
**closer** [2] - 11:7, 23:14
**cnaltsas@lynberg. com** [1] - 2:16
**cocktail** [1] - 18:23
**code** [1] - 140:25
**Code** [1] - 147:8
**cognitive** [1] - 14:5
**coincided** [1] - 33:4
**COLLINS** [4] - 3:4, 3:8
**colloquy** [1] - 72:14
**color** [1] - 25:17
**combative** [7] - 51:19, 62:13, 63:5, 110:8, 111:19, 112:10, 115:2
**comfortable** [1] - 23:15
**coming** [16] - 29:13, 29:24, 31:11, 31:14, 31:17, 50:14, 50:15, 52:10, 76:4, 87:25, 93:19, 97:6, 110:21, 111:2, 120:23, 141:10
**commands** [1] - 51:20
**common** [1] - 139:15
**communicate** [2] - 41:12, 134:4

4-RenSER-00599          4-RenSER-00599

communicated [1] - 41:15
communication [4] - 134:7, 135:8, 135:11, 141:10
community [1] - 133:5
comparison [1] - 107:1
complete [3] - 79:19, 126:5, 131:18
completed [3] - 129:16, 131:2, 131:14
completely [2] - 50:5, 61:17
completes [1] - 10:20
complications [1] - 10:12
components [1] - 18:20
Compound [1] - 94:12
compound [4] - 61:19, 62:20, 79:22, 94:19
computer [1] - 134:19
con [1] - 113:19
concern [1] - 83:6
concerned [7] - 65:19, 65:21, 68:4, 73:23, 145:6, 145:12, 145:13
concerning [5] - 43:25, 72:2, 84:23, 85:3, 146:6
concerns [1] - 145:3
conclusion [1] - 119:14
conclusions [1] - 118:25
condition [14] - 7:3, 7:8, 7:20, 8:17, 10:7, 10:11, 14:6, 15:1, 15:10, 15:19, 16:5, 16:8, 21:19, 21:25
conditions [7] - 11:1, 18:25, 95:18, 97:9, 97:17, 97:18
conduction [1] - 21:15
confer [1] - 34:23
Conference [1] - 147:12
conformance [1] - 147:12
confrontation [1] - 69:9
confused [2] - 72:13, 124:1
confusing [2] - 123:23, 123:25
confusion [1] - 37:4
conservative [4] - 7:7,

10:20, 10:21, 12:4
consider [2] - 18:4, 36:1
considered [1] - 112:9
consuming [1] - 86:18
consumptive [1] - 124:18
contact [20] - 31:13, 31:18, 33:2, 33:4, 33:12, 37:1, 37:2, 37:13, 37:16, 39:19, 39:25, 40:7, 41:8, 42:15, 45:17, 50:20, 93:25, 134:2, 144:3, 144:15
contacted [1] - 93:18
contain [1] - 44:14
context [6] - 37:19, 39:16, 39:22, 40:3, 114:12, 127:24
continually [1] - 65:21
continue [6] - 60:16, 90:11, 90:15, 100:10, 102:17, 139:4
continued [5] - 3:1, 101:16, 101:18, 102:10, 142:19
Continued [1] - 130:6
continues [1] - 88:3
continuing [1] - 39:6
continuous [1] - 87:7
contours [1] - 33:9
contraindicated [1] - 19:12
control [1] - 107:20
conversation [11] - 38:5, 60:23, 73:13, 73:25, 74:3, 78:19, 79:8, 105:10, 114:15, 127:9, 127:24
cooperate [4] - 51:15, 94:6, 110:10, 115:20
cooperated [5] - 58:10, 93:7, 93:14, 115:18
cooperating [2] - 79:18, 92:24
cooperative [1] - 94:7
copies [1] - 38:15
cops [1] - 108:24
copy [7] - 34:21, 34:25, 35:3, 35:5, 35:9, 38:24
cordial [1] - 60:23
CORINNE [1] - 2:22
correct [36] - 27:17, 27:18, 44:9, 45:4, 45:19, 46:21, 46:23,

46:25, 54:11, 89:10, 91:10, 92:22, 97:25, 117:20, 117:21, 118:18, 118:23, 118:24, 119:23, 125:12, 126:25, 131:21, 131:24, 132:11, 132:12, 132:17, 133:2, 137:1, 137:2, 142:25, 143:1, 143:6, 143:15, 143:16, 144:22, 147:9
correctly [1] - 33:18
corroborated [1] - 21:20
cost [3] - 17:1, 17:8, 17:9
Coto [1] - 133:5
counsel [70] - 5:21, 5:22, 22:21, 34:23, 39:3, 39:14, 40:10, 44:1, 44:4, 48:13, 56:6, 57:16, 58:10, 62:20, 67:20, 67:23, 69:14, 71:8, 71:16, 71:17, 73:3, 73:5, 76:15, 79:12, 79:17, 79:19, 80:9, 80:14, 81:16, 81:19, 83:17, 85:6, 85:10, 85:14, 85:16, 86:1, 86:6, 86:10, 86:12, 86:21, 89:7, 90:20, 91:2, 91:3, 91:9, 93:4, 99:6, 105:2, 105:25, 106:11, 106:22, 107:17, 111:10, 112:18, 114:23, 115:1, 115:6, 115:15, 115:19, 116:5, 117:7, 119:11, 119:12, 124:9, 125:3, 130:11, 143:21, 146:2
COUNSEL [1] - 2:1
Counsel [38] - 5:24, 23:4, 39:11, 44:21, 45:11, 46:13, 47:14, 52:18, 67:10, 71:2, 71:16, 71:25, 72:23, 81:19, 81:23, 81:25, 82:3, 83:9, 83:11, 86:17, 87:11, 88:10, 91:23, 106:19, 106:22, 111:16, 113:3, 117:11, 119:18, 121:9,

121:15, 121:23, 123:22, 125:7, 128:25, 129:7, 129:18
counsel's [1] - 87:2
count [1] - 110:14
counted [1] - 110:15
counter [4] - 19:6, 19:13, 44:17, 57:14
Country [3] - 2:10, 2:18, 2:22
County [7] - 24:20, 77:14, 78:5, 128:12, 131:1, 131:12, 132:7
COUNTY [3] - 1:7, 2:8, 147:3
couple [7] - 10:16, 14:15, 17:12, 18:22, 30:25, 53:23, 81:21
course [4] - 6:7, 13:25, 29:23, 52:9
Court [7] - 85:9, 86:11, 86:22, 126:22, 129:22, 147:6, 147:20
COURT [246] - 1:1, 1:23, 5:11, 5:13, 5:17, 5:19, 5:21, 6:14, 9:8, 9:18, 11:7, 11:10, 17:22, 17:25, 22:14, 22:17, 22:21, 23:7, 23:12, 23:18, 23:20, 23:23, 30:5, 32:3, 33:20, 35:5, 35:8, 35:12, 35:15, 36:6, 37:24, 38:3, 38:5, 38:8, 38:12, 38:17, 38:19, 39:1, 39:7, 39:9, 39:11, 39:14, 39:18, 39:22, 39:24, 40:6, 41:20, 42:8, 43:1, 43:6, 43:8, 43:13, 43:17, 43:21, 44:4, 44:11, 44:16, 44:21, 44:24, 45:2, 45:6, 46:11, 46:17, 46:20, 46:22, 46:24, 47:1, 47:8, 47:13, 48:9, 48:13, 51:2, 52:17, 53:4, 56:6, 56:15, 57:10, 57:16, 59:20, 60:2, 60:14, 61:8, 61:13, 62:6, 62:20, 63:9, 63:21, 67:9, 67:20, 67:23, 67:25, 68:19, 69:3, 69:7, 69:14, 69:16, 69:22, 71:1, 71:4, 71:8, 71:11, 71:16, 71:20, 71:24,

72:5, 72:7, 72:9, 72:18, 72:23, 73:1, 74:12, 75:8, 75:10, 75:14, 75:17, 76:15, 78:16, 79:23, 80:9, 80:14, 80:20, 80:24, 81:13, 81:16, 81:19, 82:3, 83:3, 83:6, 83:9, 83:17, 83:23, 84:7, 84:12, 84:16, 84:21, 85:2, 85:6, 85:10, 85:14, 86:1, 86:6, 86:9, 86:14, 86:17, 86:21, 87:6, 87:9, 87:15, 88:9, 88:14, 88:16, 88:23, 89:7, 89:17, 89:20, 89:22, 90:17, 90:20, 91:2, 91:7, 91:13, 91:15, 91:17, 91:20, 91:23, 92:17, 93:1, 93:4, 95:22, 95:24, 97:23, 98:3, 98:7, 99:6, 100:21, 101:13, 101:23, 102:7, 104:1, 105:3, 105:20, 105:25, 106:6, 106:11, 106:17, 106:19, 106:22, 107:17, 107:21, 108:6, 109:14, 110:6, 111:16, 112:18, 112:24, 113:2, 114:6, 115:12, 115:25, 116:5, 117:3, 117:10, 117:14, 118:16, 119:9, 119:11, 120:19, 121:8, 121:15, 121:19, 121:23, 122:1, 122:4, 122:16, 123:9, 123:22, 124:2, 124:9, 124:18, 124:23, 125:3, 125:6, 125:9, 125:12, 125:25, 126:8, 126:12, 126:14, 126:16, 126:19, 126:21, 127:15, 128:24, 129:6, 129:9, 129:11, 129:14, 129:17, 129:21, 129:23, 130:3, 136:18, 137:17, 143:21, 146:2, 147:6
court [3] - 43:1, 43:2, 105:17
Court's [1] - 72:21

**courteous** [1] - 22:17
**courtesy** [1] - 5:22
**covered** [2] - 123:17, 129:7
**created** [1] - 51:20
**creating** [1] - 132:4
**creek** [1] - 99:7
**criminal** [2] - 60:24, 61:5
**Cross** [3] - 4:4, 4:6, 4:7
**cross** [6] - 5:24, 23:1, 53:4, 129:5, 140:19
**CROSS** [4] - 6:2, 52:11, 53:6, 130:6
**Cross-Examination** [3] - 4:4, 4:6, 4:7
**cross-examination** [3] - 5:24, 23:1, 53:4
**CROSS-EXAMINATION** [4] - 6:2, 52:11, 53:6, 130:6
**CRR** [1] - 1:23
**crying** [3] - 32:1, 32:5, 34:9
**CSR** [2] - 1:23, 147:20
**cswiss@ccllp.law** [1] - 3:11
**cursed** [1] - 47:24
**cursing** [1] - 49:22
**cursory** [2] - 78:22, 124:14
**cuss** [1] - 104:18
**cussing** [3] - 34:9, 104:15, 112:11
**cutout** [1] - 49:2

**D**

**DA's** [1] - 132:7
**damage** [2] - 19:14, 19:18
**dangerous** [1] - 145:4
**dark** [16] - 55:19, 55:20, 56:3, 56:13, 56:18, 56:19, 62:25, 64:24, 70:10, 76:7, 95:4, 97:17, 103:7, 110:22, 145:16
**data** [1] - 134:23
**date** [1] - 140:13
**Date** [1] - 147:15
**DAVID** [1] - 1:3
**DAY** [1] - 1:8
**daylight** [2] - 97:25, 100:21
**days** [2] - 14:16, 18:22
**deal** [1] - 8:25
**death** [1] - 10:12

**Debbie** [1] - 147:20
**DEBBIE** [3] - 1:23, 147:5, 147:19
**deceive** [1] - 81:6
**December** [1] - 15:15
**decide** [2] - 89:15, 131:18
**decided** [2] - 50:9
**decides** [1] - 18:25
**declaration** [11] - 94:8, 94:9, 94:15, 111:9, 111:13, 111:14, 111:18, 112:10, 115:1, 115:5, 115:14
**decompression** [2] - 7:25, 8:6
**DEFENDANT** [2] - 2:8, 3:3
**defendants** [1] - 22:25
**DEFENDANTS** [2] - 4:4, 4:5
**Defendants** [1] - 1:8
**DEFENDANTS'** [1] - 23:11
**defense** [26] - 3:14, 22:24, 23:3, 23:5, 43:16, 58:10, 79:12, 79:17, 79:18, 84:24, 84:25, 86:3, 90:18, 92:24, 93:14, 94:16, 105:2, 111:10, 114:23, 115:1, 115:6, 115:15, 115:19, 117:7
**deficits** [2] - 14:5, 14:9
**definitely** [5] - 31:14, 49:19, 115:20, 116:12
**degree** [3] - 16:15, 22:10
**degrees** [1] - 75:23
**Department** [4] - 77:14, 78:6, 128:12, 138:24
**department** [4] - 78:22, 84:6, 133:14, 138:24
**department's** [2] - 133:16, 133:23
**depicted** [1] - 25:6
**depose** [2] - 60:21, 108:3
**deposition** [45] - 53:13, 61:17, 61:22, 61:23, 62:5, 62:19, 63:18, 63:24, 67:12, 68:15, 68:16, 70:22, 71:5, 71:8, 78:19,

78:21, 79:10, 79:11, 79:16, 81:2, 83:14, 93:12, 96:11, 102:15, 102:16, 114:18, 114:20, 114:22, 114:25, 117:6, 122:21, 123:3, 123:19, 124:19, 124:20, 124:24, 125:8, 125:9, 125:18, 126:23, 127:19, 128:15, 129:2
**deputies** [11] - 76:23, 77:15, 92:15, 109:1, 134:7, 134:11, 134:13, 134:18, 135:11, 138:18, 145:23
**Deputy** [57] - 4:18, 5:10, 23:1, 37:15, 37:16, 37:18, 38:10, 40:14, 42:24, 43:3, 44:15, 47:17, 49:18, 54:23, 57:23, 78:2, 78:10, 79:1, 79:5, 80:5, 81:5, 82:6, 82:10, 82:15, 82:23, 84:3, 87:21, 88:3, 90:1, 92:6, 92:9, 92:13, 92:14, 92:16, 92:19, 113:8, 113:23, 114:1, 114:3, 114:10, 114:19, 114:22, 121:11, 121:21, 121:22, 123:1, 123:17, 123:18, 127:2, 128:4, 128:11, 128:21, 129:21, 129:23, 130:1, 130:8, 144:13
**deputy** [12] - 82:7, 82:14, 84:7, 97:22, 131:23, 133:22, 134:16, 135:6, 138:7, 138:25, 139:1, 139:17
**describe** [5] - 32:15, 33:23, 33:25, 34:4, 110:3
**described** [2] - 8:21, 76:24
**detail** [1] - 79:7
**details** [3] - 80:25, 112:20, 112:22
**deteriorated** [1] - 15:11
**dhinospaan@yahoo.com** [1] - 1:25

**diagnosis** [3] - 6:24, 6:25, 7:1
**difference** [1] - 82:20
**different** [12] - 54:1, 61:18, 62:23, 85:4, 85:16, 86:25, 87:8, 90:25, 134:17, 138:10, 145:10, 145:11
**dinette** [1] - 25:24
**dinner** [1] - 28:21
**Direct** [2] - 4:6, 4:9
**direct** [2] - 23:24, 33:12
**DIRECT** [1] - 24:1
**directed** [4] - 41:21, 41:24, 42:14, 47:8
**direction** [3] - 27:21, 48:19, 97:20
**directly** [1] - 105:7
**disabilities** [1] - 14:6
**disable** [1] - 15:1
**disagree** [4] - 6:22, 7:5, 7:18, 8:15
**disagrees** [1] - 63:23
**disc** [3] - 7:11, 7:13, 7:15
**discharge** [2] - 109:25, 110:4
**discharged** [2] - 109:19, 111:2
**discord** [1] - 86:25
**discredit** [1] - 127:23
**discuss** [4] - 43:24, 43:25, 60:21, 146:5
**discussed** [2] - 7:13, 127:18
**discussing** [2] - 73:8, 82:25
**discussion** [4] - 6:18, 6:20, 7:12, 90:23
**dispatch** [7] - 133:10, 136:23, 139:21, 140:16, 141:10, 144:21, 144:22
**dispatched** [7] - 133:8, 135:16, 135:17, 135:21, 136:1, 139:14, 145:19
**dispatcher** [16] - 133:20, 134:2, 134:5, 135:2, 135:6, 135:8, 136:8, 136:12, 138:7, 138:17, 140:15, 140:18, 141:5, 142:10, 142:17
**displayed** [8] - 6:16, 25:2, 26:15, 27:7,

40:23, 96:5, 136:20, 143:24
**Dispositions** [5] - 137:5, 137:12, 137:21, 137:23, 140:5
**dispositions** [1] - 138:1
**dispute** [1] - 135:19
**distance** [3] - 56:24, 95:9, 95:14
**distances** [2] - 99:24, 100:1
**distress** [1] - 9:19
**distribute** [2] - 43:16, 88:23
**distributed** [2] - 88:18, 91:8
**District** [2] - 147:6, 147:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**disturbance** [2] - 76:2, 80:19
**disturbing** [2] - 73:20, 73:22
**divalproex** [3] - 20:18, 20:24, 21:1
**DIVISION** [1] - 1:2
**divorce** [1] - 25:9
**DL** [1] - 142:17
**doctor** [2] - 16:25, 22:14
**document** [4] - 6:21, 139:5, 141:6, 141:11
**Document** [3] - 96:5, 136:20, 143:24
**dog** [4] - 65:19, 68:4, 68:5
**domestic** [20] - 36:18, 41:16, 45:18, 45:25, 46:8, 47:21, 61:10, 65:5, 75:2, 75:12, 76:2, 80:7, 80:19, 117:20, 119:2, 119:25, 135:19, 142:4, 145:1, 145:4
**done** [8] - 12:3, 12:11, 12:12, 12:14, 12:18, 21:13, 21:16, 86:23
**door** [10] - 54:20, 67:2, 73:11, 73:16, 74:23, 75:6, 75:11, 96:7, 101:19, 125:17
**doors** [10] - 23:10, 29:5, 29:6, 29:9, 29:12, 65:8, 66:21, 68:9, 70:15, 73:13
**double** [1] - 23:10
**doubt** [3] - 22:18,

**UNITED STATES DISTRICT COURT**

4-RenSER-00601                    4-RenSER-00601

42:5, 88:4
**down** [47] - 7:16, 8:15, 25:15, 31:1, 44:2, 48:18, 48:21, 48:22, 58:21, 61:4, 62:21, 63:12, 64:5, 64:12, 64:13, 69:8, 74:20, 81:22, 81:23, 86:22, 87:25, 107:11, 108:23, 109:11, 110:1, 110:11, 110:12, 110:14, 110:15, 111:2, 111:5, 112:4, 112:6, 112:9, 129:15, 131:12, 133:6, 135:22, 138:2, 138:13, 138:19, 139:5, 140:4, 140:19, 141:2, 145:18, 146:1
**Dr** [8] - 5:7, 5:9, 6:4, 6:8, 6:18, 6:23, 8:9, 18:4
**draw** [3] - 95:19, 118:25, 137:4
**drawing** [1] - 95:20
**Drive** [1] - 3:5
**driver's** [1] - 99:15
**driving** [4] - 136:7, 141:23, 142:19, 143:3
**drop** [1] - 138:2
**drop-down** [1] - 138:2
**drug** [4] - 18:19, 18:21, 21:5, 21:8
**Drug** [1] - 19:25
**drugs** [1] - 18:23
**duration** [1] - 16:18
**during** [12] - 6:7, 12:15, 29:23, 32:21, 51:14, 65:2, 70:3, 96:17, 97:9, 97:24, 117:20, 119:1
**duty** [1] - 132:10
**DV** [10] - 55:8, 66:18, 82:16, 92:10, 92:20, 95:6, 102:9, 102:17, 142:24, 143:7

**E**

**early** [3] - 54:20, 58:13, 123:8
**ears** [1] - 121:3
**easy** [1] - 145:16
**edits** [1] - 115:16
**effect** [3] - 36:12, 104:19, 120:3
**effects** [2] - 19:21,

20:2
**either** [9] - 10:10, 16:16, 66:11, 74:5, 133:12, 133:24, 135:5, 138:8, 140:14
**elect** [1] - 10:11
**elected** [3] - 11:4, 15:16, 15:18
**elects** [1] - 19:1
**Elsinore** [1] - 133:7
**EMG** [1] - 21:15
**emotional** [1] - 9:19
**employed** [1] - 24:5
**en** [2] - 138:22, 139:8
**encounter** [5] - 51:14, 52:13, 52:20, 112:23, 112:24
**end** [4] - 131:13, 137:24, 138:6, 138:11
**ends** [1] - 44:25
**enforcement** [28] - 36:17, 36:20, 36:24, 37:2, 40:17, 40:19, 41:1, 41:8, 41:12, 41:15, 41:25, 42:14, 42:15, 42:16, 45:18, 47:23, 48:4, 49:20, 49:25, 50:20, 50:23, 51:8, 51:11, 51:15, 52:14, 52:21, 52:25, 109:23
**engineering** [1] - 24:8
**English** [1] - 128:19
**enjoyment** [1] - 18:12
**ENR** [3] - 138:22, 139:7, 139:9
**entailed** [1] - 8:22
**entered** [2] - 48:11, 139:18
**entering** [1] - 140:1
**entire** [11] - 37:25, 38:22, 40:1, 40:8, 52:23, 83:21, 84:12, 112:12, 112:15, 125:20, 126:24
**entirely** [3] - 51:20, 63:15, 113:7
**entirety** [2] - 37:19, 37:23
**entitled** [1] - 147:11
**entries** [1] - 140:6
**entry** [9] - 139:4, 140:8, 141:13, 142:7, 142:14, 142:22, 143:5, 143:19, 144:6
**epidural** [6] - 7:23, 8:4, 15:5, 16:17, 18:18, 18:19

**epidurals** [4] - 10:14, 10:23, 10:25, 11:4
**escape** [1] - 124:3
**escaped** [2] - 119:3, 119:14
**especially** [1] - 145:24
**ESQ** [2] - 2:10, 3:4
**established** [1] - 137:14
**estimate** [3] - 56:19, 56:21, 57:3
**estimated** [2] - 56:22, 77:20
**et** [5] - 1:7, 2:8, 88:1, 100:16, 104:20
**evening** [6] - 47:9, 47:12, 47:16, 68:8, 135:18, 141:23
**event** [3] - 69:17, 89:13, 128:3
**eventually** [1] - 38:20
**EVIDENCE** [1] - 4:17
**evidence** [17] - 6:13, 24:23, 26:12, 27:6, 30:3, 34:18, 40:22, 45:9, 85:22, 88:22, 89:6, 95:21, 103:24, 121:12, 122:13, 126:14, 136:17
**exact** [1] - 65:15
**exactly** [7] - 13:19, 32:25, 55:3, 73:11, 74:13, 84:8, 124:13
**Examination** [7] - 4:4, 4:6, 4:6, 4:7, 4:7, 4:8, 4:9
**examination** [4] - 5:24, 23:1, 23:24, 53:4
**EXAMINATION** [7] - 6:2, 24:1, 52:11, 53:6, 117:15, 122:7, 130:6
**example** [8] - 16:9, 18:12, 18:17, 18:24, 20:8, 22:8, 134:13, 139:16
**exchanged** [2] - 36:20, 135:14
**excuse** [2] - 106:16, 122:15
**excused** [1] - 22:15
**exhibit** [15] - 27:5, 38:14, 44:10, 44:12, 57:8, 85:7, 85:8, 85:13, 97:21, 98:3, 98:4, 100:19, 100:21, 126:11
**Exhibit** [24] - 6:12, 6:16, 24:23, 25:2,

25:6, 26:11, 26:15, 27:7, 28:7, 31:6, 34:19, 40:22, 40:23, 41:1, 43:3, 97:8, 98:6, 121:11, 122:6, 136:16, 137:22, 138:16, 140:12, 142:15
**EXHIBIT** [1] - 4:17
**Exhibits** [1] - 44:14
**EXHIBITS** [1] - 4:15
**existing** [1] - 21:25
**experience** [1] - 10:5
**expert** [1] - 46:10
**explain** [6] - 131:5, 133:10, 134:25, 137:11, 137:21, 140:11
**expletives** [1] - 113:21
**express** [1] - 146:6
**extent** [1] - 8:3
**extra** [2] - 21:21, 35:5
**extremely** [3] - 111:19, 112:10, 115:2

**F**

**fabric** [3] - 33:3, 33:12, 33:25
**face** [6] - 23:15, 27:13, 52:15, 53:1, 63:12, 64:6
**facing** [2] - 37:5, 97:3
**fact** [8] - 9:14, 13:21, 79:4, 84:3, 105:9, 105:22, 106:8, 122:11
**facts** [7] - 30:3, 78:20, 95:21, 103:24, 116:3, 122:13, 133:17
**fails** [1] - 10:21
**fair** [4] - 14:9, 15:12, 15:13, 100:9
**fall** [1] - 28:20
**false** [5] - 60:5, 60:6, 60:7, 105:15, 114:4
**family** [2] - 59:2, 94:5
**far** [10] - 8:3, 9:1, 13:13, 14:17, 56:19, 76:6, 97:19, 99:23, 99:25, 135:24
**FARAHMAND** [2] - 86:16, 87:5
**Farahmand** [1] - 3:13
**favor** [2] - 58:23, 59:1
**FDA** [3] - 19:14, 19:24, 19:25
**fear** [4] - 77:22, 113:5,

113:10, 114:9
**February** [7] - 57:24, 58:6, 76:23, 78:6, 80:6, 127:3, 128:13
**Federal** [1] - 147:20
**FEDERAL** [2] - 1:23, 147:5
**feet** [7] - 32:19, 48:25, 56:22, 70:12, 76:6, 95:16, 99:24
**fell** [3] - 28:22, 50:6, 62:10
**fellow** [1] - 135:11
**female** [35] - 57:25, 58:2, 61:6, 66:1, 66:2, 66:8, 74:6, 77:10, 77:12, 77:15, 77:25, 102:5, 103:3, 103:8, 103:12, 103:15, 103:19, 103:22, 104:3, 104:6, 104:9, 104:11, 116:19, 116:20, 117:20, 119:1, 119:24, 123:4, 125:16, 128:5, 128:9, 141:4, 141:14, 145:2
**few** [1] - 17:18
**fight** [1] - 77:7
**fighting** [1] - 120:9
**figured** [1] - 50:5
**filed** [1] - 59:13
**findings** [1] - 21:21
**fine** [6] - 5:12, 20:23, 32:9, 34:5, 35:3, 69:17
**finish** [10] - 5:10, 19:16, 39:24, 80:24, 81:12, 117:2, 117:3, 118:14, 125:24, 125:25
**finishing** [1] - 23:1
**fire** [1] - 135:23
**first** [38] - 7:11, 8:12, 16:1, 23:21, 36:25, 37:9, 46:11, 48:18, 50:11, 54:8, 56:7, 66:4, 69:7, 69:8, 74:24, 75:4, 101:10, 101:19, 123:9, 123:23, 124:10, 125:2, 125:15, 125:16, 125:19, 126:23, 133:15, 135:17, 135:19, 136:23, 140:18, 141:13, 141:19, 144:11, 144:12, 144:15, 146:1

**fist** [11] - 30:19, 31:12, 31:18, 33:4, 33:7, 33:9, 33:11, 77:7, 94:23, 95:2
**five** [1] - 32:11
**fix** [1] - 131:3
**flash** [2] - 115:17, 129:2
**flash-forward** [2] - 115:17, 129:2
**flashlights** [5] - 55:14, 55:15, 55:16, 55:17, 110:24
**flat** [3] - 64:6, 110:9, 110:19
**flat-out** [1] - 110:9
**flow** [1] - 69:6
**focus** [5] - 27:8, 94:21, 96:3, 119:24, 138:13
**focusing** [1] - 124:23
**folks** [1] - 22:18
**follow** [7] - 5:9, 51:19, 87:14, 89:2, 89:5, 139:3, 145:24
**follow-up** [1] - 87:14
**following** [3] - 63:23, 105:5, 132:25
**Food** [1] - 19:25
**FOR** [3] - 2:3, 2:8, 3:3
**foraminal** [1] - 7:21
**force** [8] - 54:13, 54:24, 62:1, 62:24, 64:5, 66:12, 109:9, 109:12
**foregoing** [1] - 147:9
**Forest** [1] - 134:14
**forever** [1] - 8:25
**forgot** [1] - 69:15
**form** [4] - 131:16, 131:19, 146:6
**formal** [1] - 128:1
**format** [1] - 147:11
**formed** [1] - 119:14
**fortunately** [1] - 9:22
**forward** [5] - 23:8, 23:9, 110:16, 115:17, 129:2
**foundation** [11] - 46:10, 47:7, 47:12, 48:12, 50:25, 52:16, 78:13, 88:11, 88:12, 100:18, 137:14
**Foundation** [1] - 88:7
**four** [1] - 11:20
**frame** [1] - 16:3
**FRANK** [1] - 2:10
**Frank** [1] - 23:19
**frankly** [1] - 91:24
**freaked** [1] - 50:5

**freaking** [1] - 49:4
**free** [3] - 106:12, 106:24
**frequently** [3] - 12:24, 13:25, 14:15
**fresh** [2] - 58:5, 78:11
**front** [14] - 25:4, 25:15, 48:24, 48:25, 88:21, 89:11, 91:8, 95:8, 104:5, 106:20, 120:22, 139:22, 140:1, 144:13
**fucking** [2] - 34:8, 105:14
**FUERBACH** [2] - 4:5, 23:11
**Fuerbach** [6] - 5:8, 23:6, 23:17, 35:3, 38:6, 81:24
**full** [4] - 23:16, 78:2, 81:1, 122:20
**fully** [1] - 80:21
**fumbling** [1] - 139:19
**function** [1] - 135:1
**functions** [1] - 18:10
**funny** [1] - 58:22
**fusion** [2] - 7:25, 8:5

## G

**gabapentin** [2] - 21:3, 21:4
**gate** [1] - 140:2
**genders** [1] - 29:16
**general** [2] - 33:8, 144:14
**generally** [2] - 24:7, 24:18
**generate** [2] - 133:19, 138:6
**generated** [1] - 138:7
**gentleman** [2] - 23:7, 91:17
**gentlemen** [5] - 40:6, 43:9, 45:7, 119:16, 146:4
**gesture** [1] - 32:21
**giant** [1] - 140:21
**girl** [4] - 30:14, 32:6, 34:10, 77:11
**given** [3] - 86:7, 107:2, 115:5
**Glendale** [1] - 2:6
**goggles** [3] - 56:10, 56:15, 56:16
**Gomez** [2] - 78:4, 144:16
**Gonzalez** [1] - 145:22
**goon** [1] - 93:18
**Gotts'** [2] - 57:9, 57:10

**Gotts's** [1] - 56:4
**grab** [1] - 50:12
**grabbed** [1] - 118:2
**gravel** [8] - 63:12, 102:22, 118:8, 118:22, 120:24, 123:5, 124:4, 128:17
**gray** [1] - 25:19
**great** [2] - 10:22, 16:18
**grid** [3] - 135:3, 140:23, 140:24
**grievance** [1] - 52:3
**Gross's** [1] - 21:13
**ground** [17] - 63:4, 64:2, 64:5, 64:13, 64:14, 64:18, 64:21, 109:11, 109:12, 110:1, 111:2, 111:6, 111:7, 112:4, 112:6, 112:9
**guest** [2] - 104:5, 104:6
**Guide** [2] - 135:4, 140:24
**Guides** [1] - 140:24
**guilty** [1] - 132:9
**guns** [1] - 61:2
**guy** [4] - 50:6, 60:4, 60:5, 60:18
**guys** [1] - 140:23

## H

**half** [2] - 15:18, 43:22
**hand** [11] - 23:10, 30:20, 30:23, 37:8, 38:11, 39:1, 44:7, 77:7, 97:4, 97:5, 113:15
**handcuff** [1] - 63:13
**handcuffs** [1] - 48:1
**handed** [2] - 44:13, 44:23
**handle** [1] - 36:2
**hang** [2] - 26:14, 34:22
**harassed** [3] - 59:1, 59:2, 94:5
**harassing** [1] - 58:21
**harassment** [1] - 58:16
**hard** [1] - 14:9
**HARRELL** [144] - 2:10, 5:6, 9:17, 23:5, 24:2, 24:23, 24:24, 25:3, 26:11, 26:16, 26:21, 26:23, 27:5, 27:8, 27:10, 27:20, 27:22, 28:7, 28:9, 30:6,

32:8, 33:14, 33:17, 33:21, 33:22, 34:18, 34:20, 34:24, 35:1, 35:10, 35:13, 35:19, 36:11, 37:14, 37:21, 38:2, 38:4, 38:7, 38:9, 38:13, 38:18, 38:24, 39:4, 39:13, 39:21, 39:23, 40:5, 40:12, 40:22, 40:24, 41:6, 41:7, 41:23, 42:12, 42:23, 43:3, 43:18, 44:17, 44:22, 44:25, 45:4, 45:12, 45:15, 46:5, 46:15, 46:18, 46:21, 46:23, 46:25, 47:15, 48:10, 48:15, 51:7, 56:14, 57:14, 59:19, 59:25, 61:7, 61:19, 62:5, 63:8, 67:8, 67:18, 68:18, 69:1, 69:21, 70:25, 72:16, 74:11, 75:6, 79:22, 81:7, 81:12, 83:2, 83:5, 83:8, 84:5, 84:25, 85:5, 85:12, 86:5, 92:16, 92:25, 95:21, 95:23, 97:11, 97:21, 98:4, 100:18, 101:12, 101:21, 102:6, 103:24, 104:24, 105:19, 107:5, 109:13, 110:5, 111:15, 112:21, 115:8, 115:11, 115:24, 116:21, 117:2, 117:16, 118:14, 118:17, 119:5, 119:19, 119:20, 120:16, 121:2, 121:5, 121:14, 122:13, 125:24, 126:7, 126:10, 128:22, 129:10, 129:12, 129:19, 129:22
**Harrell** [2] - 4:6, 4:7
**hatchet** [1] - 108:15
**head** [6] - 26:6, 50:24, 51:9, 51:12, 63:6, 136:1
**headache** [2] - 13:25, 14:15
**headaches** [3] - 14:3, 14:9, 14:14
**heading** [1] - 142:3
**health** [3] - 11:1, 138:4, 138:5

**hear** [43] - 11:10, 29:6, 29:8, 29:12, 29:24, 30:10, 30:11, 30:21, 30:22, 30:23, 31:11, 31:17, 31:23, 32:9, 34:3, 36:20, 36:24, 37:13, 38:20, 38:22, 40:8, 40:17, 42:15, 45:9, 45:24, 46:6, 47:11, 49:17, 50:16, 72:12, 75:20, 77:8, 83:20, 85:22, 87:21, 92:6, 117:25, 118:7, 120:2, 120:6, 120:23, 123:10, 128:16
**heard** [86] - 29:4, 29:12, 29:15, 29:16, 30:12, 31:25, 34:1, 35:20, 40:13, 45:17, 47:24, 48:17, 50:14, 54:9, 54:10, 54:25, 57:25, 58:2, 65:8, 66:7, 66:20, 67:6, 67:18, 68:9, 68:10, 70:15, 72:2, 73:13, 74:24, 75:4, 76:23, 77:3, 77:4, 77:5, 77:9, 77:13, 77:17, 77:25, 80:7, 82:16, 82:18, 82:19, 85:21, 87:25, 88:12, 91:17, 91:20, 91:25, 92:8, 92:11, 92:20, 95:2, 96:22, 101:14, 102:9, 102:20, 102:22, 103:6, 105:9, 108:9, 108:13, 109:1, 117:8, 117:19, 118:5, 118:12, 118:18, 118:22, 118:25, 119:1, 119:13, 119:15, 119:18, 119:21, 119:24, 120:11, 120:17, 122:9, 123:5, 123:7, 124:4, 124:5, 125:17, 128:5, 128:9, 134:19
**hearing** [7] - 32:25, 47:16, 57:4, 70:9, 82:21, 103:7, 136:14
**Hearsay** [1] - 59:19
**hearsay** [3] - 59:25, 78:14, 111:15
**heart** [7] - 10:2, 10:4, 15:7, 15:8, 15:9, 15:14, 15:19
**HEATHCOTE** [1] -

**UNITED STATES DISTRICT COURT**

4-RenSER-00603                    4-RenSER-00603

2:18

**heavy** [1] - 18:16
**held** [1] - 147:10
**hello** [2] - 115:22, 117:18
**help** [10] - 22:2, 26:17, 44:7, 60:19, 60:24, 89:7, 90:17, 131:10, 145:17
**helpful** [2] - 43:20, 100:19
**hereby** [1] - 147:7
**hesitant** [1] - 19:4
**HID** [1] - 138:25
**hidden** [2] - 99:5, 99:9
**highlight** [3] - 84:19, 128:7, 142:16
**Highway** [2] - 133:6, 135:22
**hike** [1] - 18:15
**hiked** [1] - 98:14
**hiking** [1] - 18:12
**himself** [1] - 112:14
**HINO** [3] - 1:23, 147:5, 147:19
**Hino** [1] - 147:20
**HINO-SPAAN** [3] - 1:23, 147:5, 147:19
**Hino-Spaan** [1] - 147:20
**history** [4] - 11:14, 13:11, 14:2, 21:7
**hit** [2] - 29:2, 77:5
**hits** [1] - 8:24
**hitting** [7] - 30:16, 65:8, 74:3, 74:9, 74:14, 104:14, 117:24
**Holloway** [47] - 6:23, 7:6, 15:23, 17:17, 18:25, 20:6, 21:14, 21:22, 38:22, 39:20, 39:25, 40:8, 42:16, 42:19, 45:18, 47:23, 48:1, 48:4, 49:21, 50:21, 50:24, 51:12, 51:15, 51:25, 52:3, 52:14, 52:25, 54:16, 59:12, 61:5, 63:4, 64:2, 65:23, 65:25, 66:9, 66:11, 102:3, 102:12, 105:9, 108:23, 109:10, 110:1, 111:18, 111:21, 113:6, 117:23, 120:3
**HOLLOWAY** [1] - 1:4
**Holloway's** [22] - 21:25, 37:3, 49:10, 52:22, 56:11, 56:20,

57:21, 62:2, 65:11, 65:18, 66:25, 101:3, 102:13, 103:13, 103:16, 104:4, 104:9, 108:9, 116:20, 122:10, 139:22, 141:7
**home** [3] - 90:12, 92:3, 106:23
**homeless** [3] - 138:4, 144:19
**Honor** [70] - 5:6, 5:12, 5:18, 5:25, 6:13, 11:9, 17:24, 22:16, 22:20, 23:5, 33:13, 35:7, 35:10, 37:14, 37:17, 38:9, 38:13, 39:21, 40:5, 42:7, 43:7, 44:9, 44:22, 44:25, 46:9, 46:15, 46:23, 46:25, 47:5, 47:12, 56:14, 57:14, 69:5, 71:19, 83:14, 84:2, 84:10, 84:15, 84:25, 85:5, 85:7, 85:12, 86:5, 86:16, 86:20, 87:7, 88:20, 91:1, 91:5, 91:12, 97:21, 98:4, 100:18, 101:21, 104:25, 106:7, 106:14, 107:2, 107:5, 112:22, 119:7, 121:18, 124:6, 124:21, 125:8, 129:10, 129:19, 130:2, 136:17, 137:13
**HONORABLE** [1] - 1:3
**hopefully** [1] - 90:21
**hospitalization** [1] - 14:19
**Hot** [1] - 135:23
**hour** [2] - 43:22, 129:24
**hours** [4] - 65:21, 77:1, 78:1, 97:25
**house** [2] - 106:23, 107:6
**hurting** [1] - 120:4
**hypothetically** [1] - 18:7

---

## I

**ID** [1] - 138:25
**idea** [5] - 16:23, 20:13, 20:17, 21:2, 59:18
**identify** [2] - 100:23, 122:2

**imagine** [1] - 15:19
**imitating** [5] - 29:5, 30:24, 32:18, 33:10, 124:5
**immediate** [3] - 27:14, 28:1, 90:13
**impeaching** [1] - 71:17
**impeachment** [1] - 71:24
**implying** [1] - 103:2
**important** [1] - 8:20
**impossible** [1] - 19:19
**impression** [1] - 60:5
**improper** [4] - 62:5, 70:25, 93:5, 107:20
**improvement** [1] - 16:19
**IN** [1] - 4:17
**inaccurate** [3] - 54:25, 55:1, 128:20
**incapable** [1] - 15:20
**incident** [35] - 7:3, 14:3, 14:6, 16:9, 34:15, 41:1, 49:9, 51:25, 52:2, 53:18, 53:20, 53:23, 54:2, 54:6, 54:7, 55:5, 58:5, 58:9, 59:11, 60:17, 62:2, 65:5, 66:19, 78:12, 79:15, 82:25, 92:10, 109:18, 114:11, 122:12, 123:18, 130:15, 130:17, 130:23, 132:19
**incidents** [1] - 130:11
**include** [2] - 17:3, 17:4
**included** [1] - 123:11
**including** [4] - 44:19, 45:13, 46:19, 51:23
**incomplete** [1] - 79:16
**inconsistent** [2] - 128:20
**incorrect** [1] - 84:5
**incredibly** [1] - 123:25
**indicated** [2] - 7:15, 123:5
**indicating** [2] - 95:10, 95:15
**indicating)** [2] - 95:11, 110:19
**indication** [1] - 80:6
**individual** [4] - 36:8, 60:19, 90:2, 144:19
**individuals** [1] - 145:6
**industry** [1] - 24:8
**INF** [3] - 141:16, 141:19, 141:20

**inference** [1] - 127:7
**inferring** [1] - 81:2
**inflammatories** [2] - 19:6, 19:18
**INFO** [1] - 141:21
**informant** [4] - 78:4, 141:20, 143:7, 144:3
**information** [23] - 20:7, 78:3, 106:14, 107:3, 108:2, 116:9, 116:11, 116:14, 116:15, 126:5, 135:14, 136:8, 136:12, 136:14, 137:8, 141:22, 142:3, 142:20, 143:2, 143:11, 143:14, 144:18, 144:21
**initial** [4] - 39:19, 140:18, 145:20, 145:21
**initiation** [1] - 141:7
**injection** [4] - 16:17, 16:19, 16:25, 17:1
**injections** [22] - 7:23, 8:4, 8:13, 13:13, 13:14, 13:15, 14:10, 14:13, 15:2, 15:3, 15:5, 15:12, 15:16, 15:17, 15:22, 16:16, 18:18, 19:1, 22:2, 22:4
**injured** [1] - 145:5
**injuries** [1] - 59:14
**injury** [1] - 21:10
**insert** [1] - 19:17
**inserts** [2] - 19:24, 19:25
**inside** [5] - 50:4, 74:7, 77:8, 77:9, 134:20
**instance** [2] - 134:13, 135:17
**instead** [4] - 31:25, 36:2, 51:22, 94:5
**instructed** [1] - 130:16
**instructions** [2] - 40:19, 41:9
**intend** [1] - 41:12
**intention** [1] - 81:6
**interaction** [1] - 87:22
**interchange** [1] - 69:24
**interest** [1] - 84:19
**interested** [2] - 107:10, 107:12
**internal** [1] - 42:25
**interrupt** [1] - 104:24
**interrupted** [1] - 28:23
**interrupting** [1] - 69:6

**interruptions** [1] - 105:1
**intervention** [2] - 7:14, 8:11
**interview** [7] - 78:7, 78:11, 106:3, 108:2, 122:20, 123:16, 128:1
**intrusive** [2] - 13:14, 13:23
**investi** [1] - 58:23
**investigate** [1] - 41:16
**investigated** [1] - 132:7
**investigator** [9] - 58:12, 58:17, 59:6, 59:7, 60:8, 106:2, 107:16, 107:25, 129:3
**investigators** [5] - 58:14, 93:11, 94:15, 106:23, 108:1
**involved** [5] - 8:21, 74:1, 74:6, 119:25, 141:16
**involves** [1] - 38:21
**involving** [2] - 144:19, 145:1
**irrelevant** [1] - 116:5
**IS** [1] - 23:11
**issue** [2] - 8:10, 8:12
**issues** [2] - 7:11, 15:4
**IT** [1] - 3:14

---

## J

**January** [7] - 6:20, 24:10, 24:12, 75:23, 76:25, 132:21, 133:8
**jargon** [1] - 142:1
**Jeffrey** [1] - 58:17
**JEREMY** [1] - 1:4
**Jeremy** [1] - 108:23
**Jeremy's** [1] - 62:25
**job** [1] - 18:9
**Johnston** [25] - 57:23, 78:5, 78:10, 79:1, 79:5, 80:5, 82:6, 113:8, 113:23, 114:1, 114:3, 114:10, 114:19, 114:22, 121:21, 123:1, 123:13, 123:18, 124:13, 124:17, 126:2, 126:22, 128:4, 128:11, 128:21
**Johnston's** [5] - 4:18, 121:11, 121:22, 124:23, 127:2

**UNITED STATES DISTRICT COURT**

**join** [1] - 9:17
**Joshua** [2] - 78:4, 144:16
**judge** [1] - 30:7
**JUDGE** [1] - 1:3
**judgment** [1] - 94:8
**Judicial** [1] - 147:12
**July** [3] - 79:11, 114:19, 125:18
**jump** [1] - 140:3
**juncture** [1] - 89:25
**June** [4] - 9:20, 14:18, 14:19, 14:20
**Jurgenson** [2] - 144:7, 144:9
**jury** [36] - 5:5, 5:20, 16:15, 22:7, 22:10, 23:15, 34:22, 34:24, 35:8, 35:15, 38:15, 39:1, 40:3, 43:13, 43:20, 47:1, 84:17, 86:11, 87:16, 88:18, 88:19, 88:24, 89:2, 89:15, 91:8, 94:16, 106:21, 121:11, 125:5, 126:18, 130:22, 133:10, 137:11, 137:22, 140:11, 141:25
**JURY** [1] - 1:13

## K

**Kamshad** [1] - 6:8
**keep** [2] - 85:20, 124:16
**KENDALL** [2] - 4:4, 6:1
**kept** [2] - 77:23, 94:2
**kick** [2] - 51:11, 112:1
**kicked** [1] - 64:20
**kicks** [1] - 18:23
**kids** [1] - 93:18
**kind** [17] - 14:8, 14:25, 15:8, 15:14, 16:5, 16:7, 17:17, 18:2, 18:8, 32:17, 78:21, 79:8, 99:24, 106:25, 110:15, 124:14, 140:15
**kinds** [1] - 113:20
**knee** [2] - 50:24, 51:8
**kneed** [2] - 62:12, 64:20
**kneeing** [1] - 63:6
**knees** [3] - 110:8, 110:11, 110:12
**knife** [1] - 108:15
**knives** [1] - 108:14
**knocked** [1] - 54:20

**know...** [1] - 128:2
**knowledge** [3] - 116:11, 116:15, 116:16
**knows** [1] - 137:15

## L

**Lacks** [2] - 50:25, 137:13
**lacks** [6] - 46:9, 47:7, 47:12, 48:12, 52:16, 100:18
**Ladera** [1] - 133:5
**ladies** [5] - 40:6, 43:9, 45:7, 119:16, 146:4
**laid** [1] - 60:24
**Lake** [2] - 133:6, 134:14
**landed** [1] - 30:21
**landmark** [2] - 140:20, 140:22
**laptop** [1] - 134:24
**large** [3] - 25:20, 98:21, 99:1
**last** [14] - 8:5, 8:7, 9:20, 10:15, 14:18, 17:18, 23:18, 32:21, 83:15, 84:14, 101:2, 119:13, 140:17, 142:18
**lasted** [3] - 77:23, 113:11, 114:9
**lasting** [2] - 13:10, 16:8
**lasts** [1] - 14:15
**latitude** [1] - 140:25
**laugh** [1] - 58:21
**law** [28] - 36:17, 36:20, 36:24, 37:2, 40:17, 40:19, 40:25, 41:8, 41:12, 41:15, 41:24, 42:14, 42:15, 42:16, 45:18, 47:23, 48:4, 49:20, 49:25, 50:20, 50:23, 51:8, 51:11, 51:15, 52:14, 52:21, 52:25, 109:23
**LAW** [6] - 2:4, 2:4, 2:14, 2:18, 2:22, 3:8
**lawsuit** [4] - 59:13, 59:14, 60:10, 60:18
**least** [2] - 68:7, 123:20
**leave** [13] - 37:19, 47:23, 47:25, 50:13, 68:22, 69:20, 77:13, 103:4, 103:6, 128:6, 128:10, 128:16
**leaves** [1] - 48:4
**leaving** [6] - 104:3,

120:11, 120:12, 120:14, 123:5, 125:17
**left** [12] - 32:22, 37:9, 45:16, 65:19, 77:16, 77:25, 93:22, 103:13, 108:19, 122:10, 130:10, 138:20
**legal** [1] - 132:10
**lengthy** [1] - 12:8
**less** [1] - 9:24
**LeTourneau** [2] - 58:19, 61:2
**level** [1] - 69:9
**license** [1] - 130:24
**lie** [4] - 60:9, 93:20, 104:12, 104:13
**life** [7] - 10:10, 17:15, 17:18, 18:12, 18:14, 109:20, 109:21
**lifestyle** [1] - 17:22
**lifting** [2] - 18:8, 18:16
**light** [5] - 50:11, 95:18, 97:9, 97:17, 97:18
**lighting** [1] - 109:17
**lights** [6] - 55:12, 57:19, 76:8, 77:24, 110:21, 111:2
**likely** [7] - 7:13, 7:22, 16:17, 18:15, 18:16, 19:5, 19:6
**limit** [1] - 18:9
**limitation** [1] - 9:18
**line** [16] - 39:5, 39:6, 39:23, 39:24, 43:19, 44:20, 44:23, 45:1, 45:13, 45:14, 46:16, 46:19, 46:20, 46:22
**lines** [1] - 72:10
**list** [3] - 138:2, 139:9
**listen** [3] - 30:9, 30:10, 45:23
**listened** [1] - 120:9
**listening** [2] - 75:3, 88:24
**lists** [1] - 138:5
**literally** [1] - 48:25
**litigation** [1] - 93:13
**live** [1] - 10:10
**liver** [3] - 19:14, 19:16, 19:18
**lives** [1] - 131:1
**living** [1] - 24:7
**LLP** [2] - 3:4, 3:8
**local** [1] - 133:13
**locate** [1] - 77:15
**located** [2] - 24:18, 41:10

**location** [5] - 40:25, 41:24, 135:3, 138:25, 145:23
**locked** [2] - 68:5, 77:24
**log** [5] - 136:23, 139:4, 139:21, 144:6, 144:22
**Log** [1] - 138:13
**logistics** [1] - 43:23
**logs** [1] - 100:15
**long-acting** [1] - 18:21
**long-term** [2] - 19:4, 19:21
**longitude** [1] - 140:25
**look** [28] - 6:8, 6:18, 11:3, 11:13, 12:3, 14:17, 20:17, 20:19, 20:21, 29:4, 54:5, 55:18, 68:3, 69:11, 70:16, 72:1, 72:20, 73:1, 89:2, 96:12, 97:10, 99:25, 100:13, 100:15, 110:14, 138:19, 141:9, 142:22
**looked** [5] - 6:19, 47:25, 70:19, 71:20, 110:13
**looking** [4] - 45:8, 71:18, 99:14, 99:20
**loop** [1] - 131:13
**LOS** [1] - 147:3
**Los** [1] - 2:15
**loss** [1] - 14:5
**lost** [2] - 9:21, 88:16
**loud** [2] - 42:20, 75:24
**lower** [2] - 107:17, 107:22
**lumbar** [2] - 7:19, 14:14
**lunch** [4] - 116:2, 129:24, 146:4, 146:7
**LYNBERG** [4] - 2:9, 2:13, 2:17, 2:21

## M

**M.D** [2] - 4:4, 6:1
**main** [1] - 135:1
**maintained** [2] - 111:18, 115:2
**majority** [1] - 145:10
**male** [19] - 31:25, 34:6, 76:24, 77:3, 77:12, 77:18, 77:20, 104:15, 105:6, 105:10, 105:14, 113:9, 123:4, 128:5, 128:9, 135:20,

141:3, 141:14, 145:2
**man** [18] - 10:9, 14:2, 14:8, 14:10, 15:15, 29:17, 30:11, 49:19, 66:16, 68:21, 69:20, 70:6, 74:1, 74:5, 76:21, 116:23, 133:17
**management** [4] - 7:7, 12:4, 17:21, 18:17
**manager** [1] - 24:8
**managing** [1] - 12:25
**manner** [1] - 51:9
**map** [8] - 27:6, 27:11, 96:4, 96:10, 96:12, 97:8, 97:11
**maps** [1] - 97:16
**Margarita** [3] - 134:15, 145:18, 145:24
**marked** [3] - 38:12, 38:17, 38:18
**marker** [1] - 27:21
**marking** [3] - 42:25, 43:1, 43:2
**match** [9] - 45:24, 47:20, 49:16, 85:3, 85:18, 85:20, 85:23, 88:19, 88:25
**matched** [1] - 46:7
**materials** [1] - 6:8
**matter** [4] - 43:24, 68:22, 146:5, 147:11
**MATTHEW** [2] - 4:9, 130:5
**MAY** [2] - 1:13, 5:1
**MDC** [4] - 134:23, 134:25, 135:1, 135:13
**mean** [5] - 36:15, 113:21, 122:21, 123:3, 139:9
**means** [5] - 138:22, 139:10, 139:12, 139:13
**measure** [1] - 56:24
**medical** [16] - 9:5, 9:10, 11:4, 11:14, 12:1, 13:11, 15:4, 15:10, 16:10, 16:15, 18:25, 21:7, 21:12, 22:10, 138:3
**medication** [2] - 10:15, 20:12
**medications** [4] - 18:17, 19:13, 19:21, 20:5
**medicine** [1] - 20:22
**member** [5] - 50:23, 51:11, 52:14, 52:25, 84:6

**memory** [5] - 14:5, 58:5, 63:19, 78:11, 84:2
**mental** [1] - 138:4
**mentioned** [2] - 139:7, 139:11
**menu** [1] - 138:2
**Mercedes** [1] - 25:13
**met** [2] - 53:8, 53:9
**MICHAEL** [1] - 3:4
**microphone** [3] - 11:8, 23:14, 28:5
**middle** [1] - 137:4
**midnight** [2] - 28:17, 28:20
**might** [7] - 10:12, 78:10, 81:7, 83:15, 98:12, 118:14, 125:24
**mild** [1] - 20:10
**miles** [2] - 103:22, 135:25
**mind** [3] - 42:5, 58:5, 144:25
**minus** [1] - 13:5
**minutes** [7] - 44:1, 77:17, 77:21, 81:22, 87:20, 113:10, 136:6
**misconstruing** [1] - 63:16
**misdemeanor** [1] - 132:9
**misheard** [1] - 78:10
**misquoted** [1] - 79:1
**misrepresented** [1] - 114:16
**missed** [1] - 123:2
**missing** [1] - 114:14
**Mission** [2] - 133:6, 134:14
**misspoke** [1] - 46:18
**misstated** [2] - 78:10, 128:12
**misstates** [5] - 30:2, 30:3, 67:18, 101:12, 115:11
**misstating** [2] - 12:5, 67:21
**MKRTCHYAN** [210] - 2:4, 2:4, 5:12, 5:15, 5:18, 5:25, 6:3, 6:12, 6:15, 6:17, 9:12, 10:1, 11:12, 17:20, 18:1, 30:2, 32:2, 33:13, 33:16, 33:19, 36:5, 37:17, 37:22, 39:17, 41:18, 42:7, 46:9, 47:5, 47:11, 48:8, 48:12, 50:25, 52:16, 53:5, 53:7,

56:9, 56:17, 57:6, 57:9, 57:11, 57:17, 57:18, 59:3, 59:24, 60:1, 60:3, 60:15, 61:9, 61:14, 61:15, 61:21, 62:7, 62:22, 63:17, 63:25, 64:1, 67:11, 67:21, 68:11, 68:20, 69:5, 69:15, 69:17, 69:18, 70:2, 70:24, 71:3, 71:6, 71:13, 71:18, 71:22, 72:4, 72:6, 72:8, 72:10, 72:11, 72:22, 73:6, 74:15, 75:13, 75:16, 75:21, 76:16, 78:15, 78:25, 80:2, 80:10, 80:16, 80:17, 81:4, 81:10, 81:15, 81:17, 82:5, 83:13, 83:22, 84:2, 84:10, 84:14, 84:17, 85:7, 86:20, 87:13, 87:19, 88:20, 89:4, 89:13, 89:21, 89:24, 91:1, 91:5, 91:11, 91:14, 91:16, 91:19, 91:22, 92:2, 92:18, 93:2, 93:6, 93:10, 93:23, 94:13, 94:20, 95:25, 96:4, 96:6, 97:8, 97:13, 97:15, 98:1, 98:6, 98:9, 98:23, 98:25, 99:10, 100:3, 100:10, 100:12, 100:24, 101:14, 101:15, 102:1, 102:8, 104:2, 105:1, 105:4, 105:21, 106:1, 106:7, 106:13, 106:16, 106:18, 106:20, 107:2, 107:7, 107:9, 107:19, 107:23, 107:24, 108:7, 109:16, 110:17, 111:17, 112:19, 112:22, 112:25, 113:4, 114:7, 115:9, 115:13, 116:1, 116:6, 116:7, 116:24, 117:5, 117:12, 118:13, 118:15, 119:4, 119:7, 120:15, 120:18, 121:6, 121:10, 121:17, 121:20, 121:25, 122:8, 122:15, 122:23, 123:14, 124:6, 124:21,

125:1, 125:5, 125:14, 126:3, 126:11, 126:13, 126:15, 126:18, 126:20, 127:1, 127:17, 128:7, 128:8, 129:1, 129:8, 137:13
**Mkrtchyan** [3] - 4:4, 4:7, 4:8
**mobile** [1] - 134:23
**moderate** [2] - 7:21, 13:9
**moment** [33] - 35:15, 39:7, 39:11, 39:12, 44:24, 59:20, 67:25, 69:3, 69:10, 69:12, 71:1, 71:4, 71:9, 71:16, 72:19, 73:4, 75:8, 79:23, 80:20, 81:13, 81:23, 83:10, 83:17, 88:9, 90:17, 91:4, 91:7, 105:3, 106:11, 106:17, 119:12, 125:6
**momentarily** [1] - 30:17
**Monica** [2] - 131:1, 131:11
**Montana** [2] - 9:11, 14:19
**month** [2] - 13:3, 13:5
**morning** [16] - 6:4, 24:3, 24:4, 29:10, 29:11, 44:18, 54:14, 54:20, 70:17, 78:1, 92:10, 115:22, 117:17, 130:8, 130:9, 132:25
**Morrison** [3] - 142:11, 142:17, 142:18
**most** [7] - 8:20, 9:15, 16:4, 22:5, 133:21, 139:17, 145:5
**motherfucker** [5] - 48:20, 48:21, 49:1, 49:16, 77:19
**motion** [3] - 18:9, 94:8, 112:21
**motor** [2] - 90:12, 92:3
**Motrin** [2] - 19:7, 19:14
**mountain** [1] - 133:7
**move** [8] - 11:7, 25:11, 30:19, 91:19, 94:19, 96:1, 108:8, 119:4
**movement** [1] - 33:6
**moving** [16] - 30:22, 30:23, 32:13, 32:17, 32:22, 32:24, 33:24,

56:12, 76:3, 79:5, 80:12, 94:23, 95:3, 95:4, 95:5, 140:19
**MR** [154] - 5:6, 9:17, 23:5, 24:2, 24:23, 24:24, 25:3, 26:11, 26:16, 26:21, 26:23, 27:5, 27:8, 27:10, 27:20, 27:22, 28:7, 28:9, 30:6, 32:8, 33:14, 33:17, 33:21, 33:22, 34:18, 34:20, 34:24, 35:1, 35:10, 35:13, 35:19, 36:11, 37:14, 37:21, 38:2, 38:4, 38:7, 38:9, 38:13, 38:18, 38:24, 39:4, 39:13, 39:21, 39:23, 40:5, 40:12, 40:22, 40:24, 41:6, 41:7, 41:23, 42:12, 42:23, 43:3, 43:18, 44:17, 44:22, 44:25, 45:4, 45:12, 45:15, 46:5, 46:15, 46:18, 46:21, 46:23, 46:25, 47:15, 48:10, 48:15, 51:7, 56:14, 57:14, 59:19, 59:25, 61:7, 61:19, 62:5, 63:8, 67:8, 67:18, 68:18, 69:1, 69:21, 70:25, 72:16, 74:11, 75:6, 79:22, 81:7, 81:12, 83:2, 83:5, 83:8, 84:5, 84:25, 85:5, 85:12, 86:5, 86:16, 87:5, 92:16, 92:25, 95:21, 95:23, 97:11, 97:21, 98:4, 100:18, 101:12, 101:21, 102:6, 103:24, 104:24, 105:19, 107:5, 109:13, 110:5, 111:15, 112:21, 115:8, 115:11, 115:24, 116:21, 117:2, 117:16, 118:14, 118:17, 119:5, 119:19, 119:20, 120:16, 121:2, 121:5, 121:14, 122:13, 125:24, 126:7, 126:10, 128:22, 129:10, 129:12, 129:19, 129:22, 130:7, 136:16, 136:19, 136:22, 137:20, 143:17, 143:18,

143:22, 143:25
**MRI** [1] - 21:20
**MS** [261] - 5:12, 5:15, 5:18, 5:25, 6:3, 6:12, 6:15, 6:17, 9:7, 9:12, 9:16, 10:1, 11:12, 17:19, 17:20, 18:1, 22:13, 30:2, 32:2, 33:13, 33:16, 33:19, 35:7, 36:5, 37:17, 37:22, 39:17, 41:18, 42:7, 43:5, 43:7, 43:12, 43:15, 44:9, 44:12, 46:9, 47:5, 47:11, 48:8, 48:12, 50:25, 52:12, 52:16, 52:19, 53:5, 53:7, 56:9, 56:17, 57:6, 57:8, 57:9, 57:11, 57:17, 57:18, 58:25, 59:3, 59:24, 60:1, 60:3, 60:11, 60:13, 60:15, 61:9, 61:12, 61:14, 61:15, 61:21, 62:7, 62:22, 63:17, 63:20, 63:25, 64:1, 67:11, 67:17, 67:21, 68:11, 68:20, 69:2, 69:5, 69:15, 69:17, 69:18, 70:2, 70:24, 71:3, 71:6, 71:10, 71:13, 71:18, 71:22, 72:4, 72:6, 72:8, 72:10, 72:11, 72:22, 73:6, 74:15, 75:13, 75:16, 75:21, 76:16, 78:13, 78:15, 78:25, 80:2, 80:10, 80:16, 80:17, 81:4, 81:10, 81:15, 81:17, 82:5, 83:13, 83:22, 84:2, 84:10, 84:14, 84:17, 85:7, 85:13, 86:13, 86:20, 87:7, 87:13, 87:19, 88:7, 88:11, 88:15, 88:20, 89:4, 89:9, 89:13, 89:21, 89:24, 91:1, 91:5, 91:11, 91:14, 91:16, 91:19, 91:22, 92:2, 92:18, 93:2, 93:6, 93:9, 93:10, 93:16, 93:23, 94:12, 94:13, 94:19, 94:20, 95:25, 96:4, 96:6, 97:8, 97:13, 97:15, 98:1, 98:6, 98:9, 98:23, 98:25, 99:10, 100:3, 100:10, 100:12, 100:24, 101:14, 101:15, 102:1,

4-RenSER-00606

4-RenSER-00606

102:8, 104:2, 105:1, 105:4, 105:21, 106:1, 106:5, 106:7, 106:13, 106:15, 106:16, 106:18, 106:20, 107:2, 107:4, 107:7, 107:9, 107:19, 107:23, 107:24, 108:5, 108:7, 109:16, 110:17, 111:17, 112:17, 112:19, 112:22, 112:25, 113:4, 114:5, 114:7, 115:9, 115:13, 115:23, 116:1, 116:3, 116:6, 116:7, 116:24, 117:5, 117:9, 117:12, 118:13, 118:15, 119:4, 119:7, 119:10, 120:15, 120:18, 121:6, 121:7, 121:10, 121:13, 121:17, 121:20, 121:25, 122:8, 122:15, 122:23, 123:14, 124:6, 124:21, 125:1, 125:5, 125:8, 125:11, 125:13, 125:14, 126:3, 126:11, 126:13, 126:15, 126:18, 126:20, 127:1, 127:14, 127:17, 128:7, 128:8, 128:23, 129:1, 129:5, 129:8, 129:13, 137:13

**multiple** [12] - 11:4, 12:14, 61:16, 63:8, 69:3, 69:16, 71:14, 71:22, 93:12, 102:6, 119:21, 145:10

**municipality** [1] - 133:13

**must** [1] - 101:11

**mwroniak@ccllp.law** [1] - 3:7

## N

**NALTSAS** [2] - 2:14, 87:7

**name** [11] - 23:16, 23:18, 23:21, 26:19, 49:10, 49:13, 92:6, 97:22, 140:17, 142:18

**narcotics** [2] - 19:4,

19:9

**NARINE** [1] - 2:4

**narine57@gmail. com** [1] - 2:7

**NBH** [1] - 140:23

**near** [2] - 64:11, 79:15

**need** [20] - 8:4, 22:17, 24:25, 31:2, 43:1, 69:7, 71:4, 71:8, 75:9, 78:20, 84:21, 86:1, 86:3, 87:15, 90:23, 90:24, 110:11, 116:14, 129:24

**needed** [6] - 40:20, 41:9, 41:13, 41:16, 42:6, 42:10

**needle** [6] - 13:17, 13:20, 13:21, 13:22, 15:20

**needs** [2] - 7:6, 7:7

**nerve** [5] - 21:4, 21:6, 21:9, 21:15, 21:18

**neurological** [4] - 14:5, 14:8, 21:13, 21:21

**never** [42] - 13:21, 19:17, 19:19, 55:10, 57:24, 57:25, 59:16, 59:21, 63:7, 63:14, 65:1, 65:4, 66:12, 67:13, 68:23, 69:19, 69:25, 70:5, 77:13, 77:25, 79:4, 93:13, 94:17, 96:23, 103:20, 103:21, 106:14, 107:2, 109:5, 109:20, 111:21, 116:20, 117:7, 118:6, 123:4, 124:13, 127:6, 128:5, 128:9

**new** [5] - 27:5, 131:18, 132:1, 132:4, 133:5

**next** [28] - 22:9, 22:21, 22:23, 23:4, 29:21, 48:16, 54:14, 54:20, 69:20, 72:24, 73:11, 73:16, 77:2, 96:1, 96:7, 96:14, 98:21, 101:11, 101:19, 118:16, 125:17, 129:18, 131:4, 132:25, 138:21, 139:4, 140:17, 142:16

**next-door** [2] - 73:11, 73:16

**nice** [1] - 146:7

**night** [66] - 25:18,

26:5, 26:18, 26:25, 28:14, 28:16, 28:24, 29:8, 29:23, 34:17, 36:23, 40:20, 41:1, 42:24, 51:8, 53:18, 53:20, 54:2, 54:6, 54:7, 54:15, 54:17, 56:10, 56:15, 56:16, 56:23, 58:9, 61:6, 61:11, 66:1, 66:4, 66:11, 66:25, 67:13, 67:16, 68:22, 80:19, 82:8, 82:9, 82:12, 82:15, 82:25, 84:6, 90:12, 94:1, 94:17, 94:22, 95:18, 96:21, 98:22, 100:4, 104:9, 116:18, 119:22, 122:12, 122:25, 123:10, 123:24, 124:10, 124:12, 132:24, 133:25, 145:25

**nighttime** [5] - 55:22, 66:7, 70:9, 98:19

**nobody** [5] - 64:11, 65:24, 68:3, 68:4, 68:7

**noise** [18] - 65:9, 66:21, 67:6, 70:15, 73:19, 74:1, 74:25, 75:1, 75:2, 75:4, 75:7, 75:11, 75:12, 76:4, 87:25, 97:6, 102:9, 102:17

**noises** [8] - 54:25, 57:4, 57:25, 66:7, 80:7, 82:16, 92:20

**nonmental** [1] - 138:4

**noon** [1] - 146:3

**normally** [1] - 22:24

**north** [2] - 27:23, 28:1

**North** [1] - 2:5

**notes** [3] - 6:9, 135:5, 135:6

**nothing** [3] - 117:4, 129:10, 129:12

**notice** [1] - 10:2

**noticed** [1] - 7:10

**November** [2] - 59:6, 60:22

**nuance** [1] - 114:14

**Number** [3] - 122:6, 141:15, 142:25

**number** [22] - 26:21, 26:24, 27:14, 28:13, 38:11, 38:14, 38:25, 43:19, 44:9, 44:10, 44:20, 57:8, 57:14, 83:12, 85:13, 97:21,

98:3, 98:5, 107:13, 135:5, 138:5, 139:1

**Numbers** [1] - 27:9

**numerous** [3] - 35:16, 117:11, 129:7

**nylon** [1] - 30:24

## O

**o'clock** [5] - 29:10, 29:11, 68:8, 146:3, 146:7

**O'Neill** [23] - 24:17, 133:8, 135:16, 135:18, 135:24, 136:2, 136:5, 136:7, 139:24, 140:20, 141:23, 142:3, 142:19, 143:3, 143:7, 143:12, 143:15, 144:10, 144:18, 144:24, 145:16, 145:19, 145:23

**oath** [9] - 61:18, 61:23, 61:24, 62:12, 63:5, 94:25, 114:18, 129:25, 130:3

**object** [1] - 37:22

**objected** [1] - 47:5

**Objection** [1] - 88:7

**objection** [40] - 9:7, 9:16, 17:19, 30:2, 33:13, 36:5, 41:18, 42:7, 46:9, 48:8, 48:14, 50:25, 56:14, 58:25, 59:19, 60:11, 60:13, 63:20, 67:8, 67:17, 70:25, 72:16, 93:9, 93:16, 94:12, 101:21, 106:5, 106:15, 107:4, 107:5, 108:5, 115:8, 118:13, 119:4, 119:7, 120:15, 120:18, 121:6, 121:21, 137:13

**objections** [1] - 69:5

**obligation** [1] - 131:23

**observation** [1] - 31:4

**observations** [4] - 34:14, 36:1, 121:3, 121:6

**observe** [3] - 36:17, 52:20, 65:18

**observed** [4] - 33:25, 112:5, 114:17, 123:7

**obstructed** [5] - 62:2, 62:14, 64:22, 109:9, 111:6

**obstruction** [1] - 62:17

**obviously** [1] - 22:23

**occasion** [1] - 124:11

**occasions** [1] - 58:14

**occupied** [5] - 26:25, 96:3, 96:17, 96:19, 101:6

**occupy** [1] - 28:14

**occurred** [6] - 48:13, 66:12, 79:11, 114:18, 130:22, 132:20

**occurring** [8] - 55:8, 62:1, 77:8, 95:6, 141:15, 142:4, 142:24, 143:8

**odometer** [1] - 139:2

**OF** [8] - 1:2, 1:7, 1:12, 2:1, 2:8, 147:1, 147:3, 147:4

**offer** [1] - 11:25

**offering** [1] - 78:19

**Office** [1] - 132:8

**office** [1] - 35:2

**Officer** [2] - 78:5, 101:10

**officer** [10] - 54:9, 111:22, 111:24, 112:2, 128:11, 132:11, 133:22, 138:4, 145:13

**officers** [28] - 54:8, 54:12, 54:17, 64:17, 66:12, 66:18, 79:15, 87:22, 90:23, 101:9, 101:18, 102:2, 102:11, 103:4, 103:13, 103:21, 108:10, 109:4, 109:8, 110:24, 111:19, 112:11, 122:11, 123:21, 126:5, 145:5, 145:19

**Official** [1] - 147:20

**official** [2] - 25:14, 31:1

**OFFICIAL** [3] - 1:23, 147:1, 147:5

**often** [2] - 98:10, 98:14

**Olive** [1] - 2:14

**omitting** [1] - 132:10

**once** [3] - 12:6, 45:3, 102:20

**one** [32] - 8:20, 16:1, 17:7, 19:4, 20:25, 23:2, 32:1, 32:5, 34:22, 34:25, 54:8, 54:9, 66:24, 69:23,

**UNITED STATES DISTRICT COURT**

71:10, 71:11, 84:23, 84:24, 99:8, 103:16, 104:4, 108:1, 109:14, 110:6, 110:13, 130:15, 132:20, 135:19, 137:18, 138:18, 145:4, 145:21
**ONS** [2] - 138:22, 139:11
**oOo** [1] - 146:9
**open** [10] - 32:19, 57:6, 74:22, 74:24, 75:5, 75:23, 96:4, 101:3, 101:4, 102:22
**opened** [8] - 30:10, 70:19, 75:3, 75:19, 75:25, 76:1, 102:20, 118:2
**operator** [1] - 37:5
**opinion** [4] - 8:16, 10:5, 15:21, 146:6
**opinions** [2] - 6:9, 43:25
**opportunity** [1] - 15:17
**opposing** [2] - 86:12
**opposite** [2] - 41:22, 48:19
**options** [1] - 10:9
**OR** [1] - 4:17
**ORANGE** [2] - 1:7, 2:8
**Orange** [10] - 2:11, 2:23, 3:6, 24:20, 77:14, 78:5, 128:12, 131:1, 131:12, 132:7
**orange** [1] - 2:19
**order** [5] - 5:7, 85:14, 86:7, 86:15, 131:15
**ordered** [3] - 85:16, 131:6, 131:20
**oriented** [2] - 28:10, 28:13
**Ortega** [2] - 133:6, 135:22
**ought** [1] - 89:2
**outcome** [2] - 10:22, 60:10
**outside** [10] - 17:19, 49:16, 49:21, 50:4, 50:10, 50:11, 52:24, 121:13, 124:7, 129:5
**overruled** [24] - 9:8, 9:18, 9:19, 17:25, 30:5, 32:3, 36:6, 41:20, 42:8, 47:9, 47:13, 51:5, 60:2, 62:6, 69:22, 74:12, 83:3, 101:24, 119:9, 120:19, 121:8,

122:16, 127:15, 137:17
**overs** [1] - 59:21
**own** [4] - 24:10, 25:9, 77:7, 131:18

## P

**p.m** [3] - 68:8, 132:24, 146:8
**package** [1] - 19:17
**page** [48] - 38:11, 38:25, 39:4, 39:5, 39:6, 39:15, 39:18, 39:19, 39:23, 39:24, 40:7, 43:19, 44:20, 44:21, 44:23, 44:25, 45:13, 46:14, 46:16, 46:17, 46:19, 46:20, 46:22, 71:2, 71:3, 71:18, 72:14, 72:16, 72:18, 72:20, 73:1, 73:3, 87:15, 88:17, 89:10, 89:22, 136:21, 136:25, 137:5, 139:4, 143:17, 143:22, 143:23, 147:11
**PAGE** [1] - 4:3
**pages** [7] - 71:14, 71:23, 72:1, 72:12, 72:24, 73:7, 91:18
**Pahel** [25] - 54:23, 82:10, 82:15, 83:4, 83:19, 83:20, 84:3, 84:23, 85:3, 85:20, 86:3, 87:21, 88:3, 90:1, 91:14, 91:15, 92:6, 92:9, 92:13, 92:14, 92:16, 92:19, 123:17, 126:2, 145:22
**Pahel's** [11] - 78:2, 82:23, 83:11, 83:13, 83:14, 83:15, 83:18, 83:24, 84:1, 84:12, 87:20
**pain** [25] - 7:13, 7:20, 8:10, 10:10, 10:13, 10:15, 10:20, 12:25, 13:10, 16:8, 16:10, 17:14, 17:20, 18:9, 18:13, 18:17, 19:3, 19:22, 20:6, 20:10, 21:4, 21:6, 21:9, 22:8
**painkillers** [1] - 19:2
**paint** [2] - 31:2, 33:23
**palm** [1] - 30:19
**Palomar** [1] - 3:9

**pantoprazole** [3] - 20:11, 20:14, 20:16
**paragraph** [1] - 7:12
**paralegal** [1] - 3:13
**parallel** [1] - 95:19
**parallels** [1] - 95:20
**paraphrase** [2] - 80:3, 125:15
**pardon** [1] - 35:12
**Park** [22] - 24:17, 133:8, 135:16, 135:18, 135:24, 136:2, 136:5, 136:7, 139:24, 140:20, 141:23, 142:3, 142:19, 143:3, 143:7, 143:12, 143:15, 144:10, 144:18, 144:24, 145:20, 145:23
**park** [3] - 98:10, 104:7, 140:1
**parked** [5] - 56:19, 66:24, 67:2, 103:16, 104:4
**parking** [2] - 104:5, 104:7
**part** [7] - 21:12, 33:24, 65:6, 66:19, 109:9, 137:25, 141:12
**parties** [3] - 5:23, 44:5, 123:22
**parts** [2] - 85:4, 85:24
**passed** [1] - 48:21
**patient** [2] - 19:21, 85:19
**patients** [2] - 16:4, 16:7
**patrol** [2] - 133:1, 133:21
**Pause** [8] - 39:8, 69:13, 72:25, 82:2, 85:25, 86:4, 86:8, 90:19
**PC** [1] - 2:17
**peace** [1] - 132:11
**penalty** [1] - 111:9
**pending** [1] - 56:6
**Pennsylvania** [2] - 12:13, 12:15
**people** [6] - 22:6, 29:16, 134:17, 140:22, 145:10, 145:12
**per** [1] - 87:8
**percent** [8] - 20:1, 26:7, 64:11, 103:11, 103:12, 103:14, 104:10, 105:16
**perform** [1] - 132:15

**period** [3] - 15:25, 58:8, 124:24
**perjury** [1] - 111:10
**persist** [3] - 7:24, 8:4, 8:13
**persistent** [2] - 14:3, 16:10
**person** [12] - 9:23, 45:24, 46:7, 47:21, 65:22, 87:24, 89:25, 133:15, 133:24, 134:1, 142:12, 144:15
**personal** [4] - 17:22, 107:13, 116:14, 116:15
**pertain** [1] - 90:21
**phone** [9] - 20:19, 20:21, 34:11, 78:8, 107:13, 123:12, 123:13, 123:16, 124:23
**Photograph** [1] - 28:11
**photograph** [4] - 25:4, 28:8, 41:3, 41:10
**phrasing** [1] - 81:8
**physical** [10] - 9:19, 12:8, 12:14, 13:8, 13:23, 16:13, 141:4, 141:14, 142:1
**picnic** [1] - 100:16
**picture** [2] - 31:2, 33:23
**pictures** [2] - 93:20, 93:21
**pinched** [1] - 21:18
**pitch** [1] - 55:20
**place** [4] - 108:17, 123:19, 141:1, 145:16
**places** [1] - 133:12
**plain** [1] - 128:19
**PLAINTIFF** [2] - 2:3, 4:9
**Plaintiff** [1] - 1:5
**plaintiff's** [6] - 3:13, 43:15, 86:1, 87:4, 89:9, 91:3
**plan** [1] - 6:18
**plastics** [1] - 24:8
**plate** [1] - 130:24
**play** [37] - 34:17, 35:11, 35:14, 36:23, 37:12, 37:18, 37:19, 37:24, 39:9, 40:7, 42:23, 45:11, 45:22, 46:3, 49:5, 57:13, 57:16, 62:15, 76:14, 82:23, 83:15, 84:10,

84:18, 87:12, 87:13, 89:1, 89:19, 89:20, 90:20, 91:1, 91:22, 91:23, 97:16, 97:22, 98:2, 99:23
**played** [33] - 35:18, 37:25, 39:10, 40:2, 40:11, 40:13, 43:11, 44:13, 44:18, 46:4, 46:13, 46:24, 47:18, 49:17, 56:5, 57:7, 57:11, 83:7, 83:15, 83:19, 84:13, 84:14, 84:17, 87:18, 88:15, 89:17, 89:21, 89:23, 92:1, 97:23, 98:8, 100:2, 100:11
**playing** [7] - 83:24, 87:16, 90:15, 91:10, 91:11, 91:24, 100:10
**plays** [1] - 40:1
**pled** [1] - 132:9
**plus** [1] - 13:5
**point** [8] - 29:20, 43:14, 50:15, 63:12, 74:19, 87:20, 90:15, 110:13
**police** [18] - 36:10, 48:20, 53:18, 54:1, 54:6, 54:7, 54:16, 58:24, 59:14, 65:3, 77:19, 79:14, 87:22, 94:17, 102:25, 103:21, 112:25, 142:1
**poor** [1] - 142:13
**popular** [1] - 98:15
**population** [1] - 20:2
**portion** [16] - 37:15, 37:18, 37:24, 38:10, 38:21, 38:23, 46:24, 47:17, 83:7, 83:15, 88:15, 89:10, 99:8, 138:16, 140:12, 141:11
**portions** [8] - 40:9, 83:19, 84:11, 84:19, 87:11, 87:13, 87:16, 88:25
**portray** [1] - 95:4
**position** [4] - 86:24, 140:14, 142:17, 144:9
**Position** [1] - 140:14
**POSS** [1] - 143:8
**possible** [2] - 18:11, 119:3
**possibly** [4] - 21:11, 60:5, 82:16, 144:19
**post** [1] - 6:20

**post-assault** [1] - 6:20
**posted** [1] - 93:21
**practice** [1] - 139:15
**precisely** [2] - 42:10, 76:3
**preexisting** [1] - 8:17
**prepare** [1] - 131:24
**prepared** [4] - 114:25, 115:15, 115:16, 132:1
**prescribe** [1] - 19:4
**prescribed** [7] - 20:6, 20:9, 20:12, 20:14, 20:24, 21:5, 21:8
**presence** [2] - 5:5, 5:20
**PRESENT** [1] - 3:12
**present** [6] - 5:22, 5:23, 24:5, 35:16, 44:5
**pretty** [1] - 98:15
**prevented** [1] - 15:11
**PREVIOUSLY** [2] - 6:1, 130:5
**previously** [1] - 129:25
**price** [1] - 17:13
**private** [5] - 58:12, 58:23, 60:8, 107:15, 107:25
**problem** [2] - 83:24, 85:23
**problems** [1] - 79:22
**procedure** [4] - 13:15, 13:16, 13:20, 17:3
**PROCEEDINGS** [1] - 1:12
**Proceedings** [1] - 146:8
**proceedings** [13] - 22:15, 39:8, 53:15, 69:13, 72:25, 82:2, 85:25, 86:4, 86:8, 90:19, 102:16, 127:19, 147:10
**program** [2] - 135:1, 137:25
**progression** [1] - 141:9
**prompted** [3] - 45:24, 46:7, 47:21
**property** [1] - 93:19
**prosecuted** [1] - 61:10
**provide** [3] - 116:9, 116:13, 126:5
**provided** [2] - 128:21, 143:2
**provider** [1] - 6:23
**proximity** [1] - 28:4
**publish** [7] - 37:15,

121:10, 125:5, 126:15, 126:18, 126:19, 136:17
**pull** [9] - 6:12, 20:19, 20:21, 24:23, 24:25, 26:11, 27:5, 40:22, 136:16
**pulled** [3] - 118:3, 118:4, 120:10
**pulling** [1] - 50:12
**pummeled** [2] - 31:21, 31:25
**punch** [3] - 52:14, 52:25, 111:24
**punched** [1] - 64:21
**punching** [2] - 30:12, 77:6
**puncture** [1] - 14:14
**purpose** [1] - 134:25
**pursuant** [1] - 147:8
**purview** [1] - 133:23
**push** [2] - 23:14, 113:14
**put** [6] - 19:9, 135:5, 139:15, 139:17, 139:21, 139:24
**puts** [2] - 20:1, 133:20
**putting** [1] - 141:5
**PVS** [6] - 42:24, 43:4, 44:15, 45:5, 49:18, 87:8

## Q

**question..** [1] - 46:12
**questioning** [1] - 69:6
**questions** [31] - 22:12, 22:13, 52:10, 53:3, 59:11, 62:11, 63:8, 68:15, 69:16, 71:14, 73:10, 78:24, 83:1, 87:14, 87:22, 102:6, 115:7, 117:13, 119:6, 119:10, 120:1, 121:5, 121:7, 121:17, 123:2, 123:9, 126:16, 129:8, 129:9, 129:11, 137:15
**quick** [3] - 8:9, 114:15, 131:3
**quickly** [3] - 25:11, 87:1
**quiet** [8] - 48:5, 49:4, 49:8, 74:19, 102:22, 102:23, 118:2, 120:25
**quite** [2] - 42:21, 99:8

## R

**radio** [4] - 134:3, 134:4, 134:8, 134:12
**radios** [1] - 134:11
**raise** [1] - 23:10
**Raiszadeh** [4] - 6:18, 6:23, 8:9, 18:4
**Raiszadeh's** [1] - 6:8
**Rancho** [4] - 133:5, 134:14, 145:18, 145:24
**randomly** [1] - 133:22
**range** [1] - 18:9
**rangers** [1] - 104:7
**rather** [1] - 89:5
**ray** [3] - 56:2, 56:8, 76:13
**Raymond** [1] - 3:13
**re** [7] - 33:20, 47:14, 56:8, 62:20, 63:10, 69:14, 102:7
**re-ask** [6] - 33:20, 47:14, 56:8, 62:20, 69:14, 102:7
**re-asked** [1] - 63:10
**reaccount** [1] - 125:19
**reached** [1] - 143:15
**read** [22] - 63:18, 63:21, 72:12, 72:13, 72:21, 72:23, 73:7, 80:11, 114:1, 115:6, 123:3, 127:2, 137:2, 137:11, 137:15, 137:22, 138:18, 139:3, 140:3, 140:11, 141:10, 141:12
**reading** [3] - 81:1, 101:22, 143:23
**ready** [4] - 5:14, 5:18, 10:19, 86:19
**real** [2] - 109:20, 109:21
**realized** [1] - 29:5
**really** [2] - 14:24, 60:17
**REALTIME** [1] - 147:5
**reason** [4] - 50:2, 52:4, 88:4, 92:13
**reasons** [1] - 8:19
**receive** [4] - 135:3, 136:7, 136:12, 142:20
**received** [6] - 122:5, 122:6, 125:4, 143:11, 143:14, 144:18
**recent** [1] - 9:5
**recently** [3] - 9:15,

16:4, 16:6
**recess** [3] - 43:22, 121:16, 146:2
**Recess** [1] - 44:3
**recessed** [1] - 146:8
**recognition** [1] - 46:10
**recognize** [11] - 25:6, 35:22, 47:7, 47:9, 89:14, 90:1, 90:16, 100:4, 100:25, 101:2, 136:23
**recognizes** [2] - 89:13, 89:14
**recognizing** [2] - 47:6, 90:22
**recollection** [4] - 26:17, 26:24, 116:10, 122:19
**recommend** [1] - 15:22
**recommending** [1] - 8:10
**record** [15] - 25:15, 25:17, 26:9, 31:1, 31:11, 34:23, 40:16, 41:3, 45:3, 57:15, 69:11, 87:16, 97:11, 106:20, 127:3
**recording** [8] - 35:18, 39:10, 40:11, 43:11, 45:3, 46:4, 46:6, 90:2
**records** [10] - 9:5, 9:10, 11:3, 11:4, 11:16, 12:1, 14:7, 14:18, 16:11, 21:13
**recreational** [1] - 18:13
**recross** [2] - 119:11, 121:9
**Recross** [1] - 4:8
**RECROSS** [1] - 122:7
**Recross-Examination** [1] - 4:8
**RECROSS-EXAMINATION** [1] - 122:7
**rectangle** [1] - 25:20
**red** [1] - 26:3
**redacted** [1] - 138:21
**REDIRECT** [1] - 117:15
**Redirect** [1] - 4:7
**redirect** [2] - 46:13, 117:14
**reduce** [1] - 69:9
**reference** [4] - 39:4, 45:17, 45:18, 99:13

**referenced** [2] - 90:3, 90:7
**references** [1] - 137:22
**referring** [3] - 55:3, 75:11, 124:16
**refresh** [5] - 26:17, 26:24, 63:19, 63:22, 84:2
**refuse** [1] - 129:3
**refused** [2] - 58:13, 93:8
**refusing** [1] - 110:8
**regarding** [1] - 6:24
**regret** [1] - 132:4
**regulations** [1] - 147:12
**REJECTED** [1] - 4:17
**related** [6] - 6:25, 7:10, 9:5, 21:10, 78:3, 92:20
**relates** [4] - 7:5, 18:9, 37:24, 38:5
**relative** [1] - 144:25
**relevance** [12] - 42:7, 61:7, 61:12, 68:18, 83:2, 101:4, 101:7, 105:19, 115:23, 115:24, 116:3, 127:14
**Relevance** [1] - 36:5
**relevant** [2] - 18:5, 106:7
**reliable** [2] - 79:16, 79:19
**relieved** [1] - 10:15
**reliever** [1] - 20:10
**remember** [41] - 45:16, 45:20, 59:8, 59:10, 59:15, 61:24, 61:25, 62:4, 62:8, 68:14, 68:21, 68:24, 70:22, 70:23, 71:7, 78:9, 84:4, 84:5, 94:9, 94:10, 96:7, 96:8, 96:16, 98:22, 99:1, 99:2, 102:15, 104:16, 106:2, 106:4, 108:4, 108:11, 108:14, 108:15, 111:11, 127:18, 130:17, 130:19, 135:4, 139:19, 140:23
**render** [1] - 15:19
**rendered** [1] - 7:22
**Renegar** [11] - 5:10, 23:1, 39:19, 39:25, 40:8, 45:3, 91:10, 129:20, 129:21,

4-RenSER-00609　　　　　　　　　　　　　　　　4-RenSER-00609

129:23, 130:1
**RENEGAR** [3] - 3:3, 4:9, 130:5
**Renegar's** [7] - 42:24, 43:4, 43:9, 44:15, 45:5, 47:17, 49:18
**repair** [1] - 130:16
**repairs** [1] - 18:7
**repetitive** [1] - 18:16
**replay** [2] - 88:1, 96:22
**report** [40] - 4:18, 9:2, 11:13, 11:15, 11:19, 11:22, 11:25, 12:16, 18:5, 45:25, 46:7, 47:21, 60:9, 80:5, 80:8, 80:11, 114:3, 121:11, 121:22, 123:3, 123:11, 124:21, 125:1, 127:2, 127:13, 127:18, 128:20, 128:21, 130:16, 130:24, 131:2, 131:11, 131:14, 131:24, 132:1, 132:4, 138:3, 138:9, 138:11
**reported** [15] - 20:2, 35:18, 39:10, 40:11, 41:17, 43:11, 46:4, 87:18, 89:23, 92:1, 98:8, 100:2, 100:11, 130:25, 147:10
**Reporter** [1] - 147:20
**REPORTER** [3] - 1:23, 147:1, 147:6
**REPORTER'S** [1] - 1:12
**reporting** [1] - 130:25
**reports** [2] - 11:23, 123:8
**representation** [1] - 100:7
**representing** [1] - 60:20
**request** [2] - 86:15, 126:13
**require** [2] - 7:23, 7:24
**required** [2] - 8:11, 132:10
**requiring** [1] - 18:8
**resolution** [1] - 13:10
**resolve** [3] - 8:5, 16:16, 22:9
**resolved** [3] - 16:13, 16:14, 22:8
**resort** [2] - 8:5, 8:7
**respective** [1] - 86:14
**respond** [3] - 36:17, 49:20, 49:25

**responded** [1] - 104:15
**response** [1] - 34:11
**responsibility** [2] - 87:2, 132:17
**rest** [4] - 49:16, 81:24, 81:25, 141:1
**restate** [2] - 67:10, 113:24
**resting** [1] - 82:1
**result** [5] - 10:10, 10:12, 11:1, 14:6, 132:13
**results** [2] - 8:7, 16:1
**RESUMES** [2] - 6:1, 130:5
**retake** [1] - 44:6
**retorted** [1] - 105:6
**return** [1] - 146:3
**returned** [1] - 72:2
**returning** [1] - 22:18
**reverse** [4] - 39:14, 119:12, 119:15, 119:17
**review** [5] - 6:7, 9:13, 11:14, 21:12, 128:19
**reviewed** [4] - 9:1, 9:5, 11:25, 78:14
**reviewing** [1] - 142:7
**rig** [2] - 113:16, 113:17
**right-hand** [3] - 37:8, 97:4, 97:5
**risk** [5] - 9:23, 10:11, 10:22, 14:24, 19:16
**risks** [2] - 8:21, 9:25
**Road** [5] - 2:10, 2:18, 2:22, 3:9, 135:23
**road** [8] - 27:13, 37:7, 48:19, 48:22, 97:3, 97:4, 99:18, 99:20
**roadway** [1] - 99:14
**Robert** [3] - 58:20, 59:6, 129:3
**room** [1] - 13:20
**ROOM** [1] - 1:24
**route** [2] - 138:22, 139:8
**rskinner@lynberg. com** [1] - 2:24
**ruined** [1] - 132:5
**Rule** [4] - 9:2, 11:13, 11:15, 11:22
**ruling** [3] - 39:15, 119:13, 119:17
**run** [1] - 22:3
**running** [2] - 50:23, 55:12
**RV** [38] - 24:10, 24:14, 25:6, 25:8, 25:12,

25:18, 25:21, 41:11, 52:21, 52:24, 55:7, 55:10, 55:12, 56:11, 56:25, 57:5, 57:20, 62:16, 65:1, 65:2, 66:5, 66:8, 66:10, 70:10, 74:7, 74:23, 77:23, 92:4, 93:20, 93:22, 97:7, 99:11, 99:15, 99:20, 101:18, 102:11, 112:16
**RYANE** [1] - 2:22

## S

**safety** [2] - 145:6, 145:13
**SANTA** [3] - 1:14, 1:24, 5:1
**Santa** [5] - 131:1, 131:11, 134:15, 145:18, 145:24
**sat** [1] - 50:13
**save** [1] - 85:11
**saw** [55] - 14:3, 30:19, 32:13, 32:15, 33:24, 45:17, 57:25, 63:5, 63:7, 63:15, 66:13, 66:14, 66:24, 67:3, 67:13, 67:16, 68:21, 68:23, 69:19, 69:25, 70:16, 72:3, 73:11, 74:5, 76:7, 76:20, 76:21, 79:5, 79:6, 80:6, 80:12, 80:18, 82:18, 90:13, 94:21, 94:23, 94:24, 95:2, 96:2, 96:17, 99:5, 101:6, 108:13, 109:10, 110:3, 110:18, 110:20, 111:21, 112:4, 116:20, 117:7, 118:6
**scene** [8] - 138:22, 139:11, 139:12, 139:13, 139:16, 139:18, 139:21, 139:25
**schedule** [1] - 5:8
**scope** [4] - 17:19, 121:13, 121:14, 129:5
**scramble** [1] - 85:15
**scream** [1] - 74:21
**screaming** [1] - 74:16
**screen** [1] - 92:3
**scuffle** [1] - 77:9
**searched** [1] - 108:10
**seat** [2] - 99:15,

140:15
**seated** [4] - 5:22, 23:12, 23:13, 130:4
**second** [23] - 26:14, 34:22, 49:20, 49:23, 50:2, 50:21, 51:14, 52:13, 52:20, 57:7, 65:20, 78:3, 109:1, 109:3, 109:5, 109:6, 112:23, 112:24, 112:25, 113:25, 120:10, 123:10, 133:24
**secondary** [2] - 7:13, 7:22
**Section** [1] - 147:8
**sections** [1] - 90:25
**sedated** [1] - 13:18
**sedation** [1] - 17:4
**see** [133] - 7:10, 7:12, 8:9, 10:3, 10:4, 21:12, 25:4, 25:14, 25:20, 27:11, 27:23, 28:10, 30:22, 31:5, 32:17, 32:19, 33:6, 36:24, 40:25, 41:10, 41:24, 50:20, 50:23, 51:8, 51:11, 52:13, 52:18, 52:25, 54:24, 55:5, 55:19, 56:2, 56:10, 56:11, 56:18, 57:20, 57:23, 58:2, 58:3, 60:25, 62:1, 62:9, 62:12, 62:13, 62:18, 62:24, 63:3, 63:6, 63:11, 63:13, 63:22, 63:23, 64:2, 64:17, 64:21, 65:11, 65:17, 65:23, 65:25, 66:1, 66:8, 66:11, 66:20, 66:21, 67:1, 67:5, 67:19, 70:3, 70:6, 70:19, 73:13, 73:17, 74:8, 76:2, 76:3, 76:14, 77:24, 78:2, 79:4, 82:15, 82:18, 83:11, 85:4, 85:17, 89:17, 90:15, 91:3, 92:3, 92:19, 95:3, 95:5, 96:9, 97:17, 99:23, 99:25, 101:4, 102:4, 103:3, 104:3, 104:6, 104:7, 104:9, 109:17, 109:25, 110:21, 111:1, 111:7, 111:24, 112:1, 123:10, 135:2, 135:7, 135:13, 137:6, 137:9,

138:14, 138:20, 140:9, 141:17, 141:20, 142:11, 142:15, 142:22, 143:5, 143:9, 143:20, 144:4, 144:22, 146:7
**seeing** [6] - 22:23, 34:12, 82:20, 98:22, 103:8
**seem** [1] - 51:14
**send** [2] - 133:24, 135:2
**sending** [2] - 138:17, 138:18
**sense** [1] - 132:3
**senses** [1] - 103:10
**sent** [3] - 61:2, 133:19
**sentence** [1] - 132:15
**sentenced** [1] - 132:13
**separate** [2] - 58:14, 59:7
**separation** [2] - 100:15, 100:16
**sergeant** [5] - 130:16, 131:2, 131:15, 131:20, 132:2
**series** [3] - 15:24, 33:16, 62:11
**serious** [1] - 36:16
**serve** [1] - 93:19
**session** [2] - 43:21, 44:4
**sessions** [2] - 12:8, 12:15
**setting** [1] - 19:5
**seven** [4] - 15:18, 22:9, 26:6, 100:8
**several** [1] - 107:25
**severe** [1] - 10:11
**severely** [2] - 116:19, 116:21
**shaking** [1] - 29:3
**share** [1] - 134:15
**sharrell@lynberg. com** [1] - 2:12
**sheet** [2] - 26:12, 26:14
**Sheriff's** [3] - 77:14, 78:6, 128:12
**sheriff's** [5] - 84:6, 133:14, 133:16, 133:23, 138:24
**sheriffs** [1] - 50:15
**shift** [2] - 132:23, 132:24
**shimmying** [1] - 34:2
**short** [2] - 13:12, 48:6
**shortly** [3] - 47:23,

4-RenSER-00610      4-RenSER-00610

48:17, 118:2
**shot** [2] - 10:16, 101:2
**shots** [1] - 17:10
**show** [9] - 13:21, 13:22, 26:21, 63:24, 80:8, 84:21, 86:12, 91:3, 135:3
**showed** [2] - 21:18, 96:12
**showing** [1] - 37:16
**shows** [1] - 75:24
**shuffling** [1] - 35:15
**shut** [5] - 29:6, 29:12, 118:5, 118:6, 120:11
**shutting** [3] - 29:5, 29:9, 118:10
**sic** [1] - 8:13
**sic]** [1] - 38:22
**side** [11] - 19:20, 20:2, 25:20, 28:25, 37:8, 41:22, 74:22, 97:4, 97:5, 97:6
**sides** [2] - 86:19, 87:3
**sight** [1] - 103:10
**sign** [3] - 26:12, 26:14, 115:15
**sign-up** [1] - 26:12
**signed** [3] - 94:9, 115:6, 131:14
**significant** [1] - 122:10
**silence** [1] - 81:21
**similar** [1] - 138:25
**simple** [2] - 86:10, 103:3
**simplify** [1] - 62:21
**simply** [6] - 40:4, 40:6, 48:13, 81:3, 85:2, 123:23
**sirens** [1] - 50:16
**sit** [5] - 81:23, 86:11, 86:22, 102:25, 140:16
**site** [2] - 27:3, 141:7
**sitting** [2] - 15:23, 99:15
**situated** [2] - 44:19, 100:14
**situation** [8] - 7:8, 8:11, 36:2, 51:20, 52:23, 128:1, 144:19, 145:11
**six** [1] - 48:25
**SKINNER** [2] - 2:22, 35:7
**Skinner** [1] - 35:2
**slam** [1] - 68:9
**slammed** [1] - 67:2
**slamming** [1] - 75:6
**slams** [1] - 73:12

**sleep** [11] - 28:23, 29:4, 29:20, 29:22, 29:24, 48:5, 48:7, 50:14, 51:21, 75:23, 108:18
**sleeping** [6] - 25:25, 50:7, 66:5, 67:6, 75:5, 75:22
**slept** [1] - 51:22
**slow** [1] - 74:20
**smack** [2] - 104:22
**smacking** [1] - 31:19
**someone** [12] - 18:24, 31:13, 31:18, 36:16, 77:5, 112:8, 120:11, 120:12, 120:13, 122:10, 123:5, 128:16
**sometime** [1] - 123:24
**sometimes** [2] - 133:25, 141:20
**somewhere** [3] - 103:20, 103:22, 136:6
**soon** [1] - 43:20
**sorry** [10] - 11:6, 11:7, 12:23, 15:6, 17:6, 25:10, 46:18, 71:20, 74:24, 143:22
**sort** [3] - 13:15, 86:9, 87:9
**sorted** [1] - 86:25
**sound** [12] - 26:8, 29:5, 31:19, 33:24, 73:19, 87:23, 102:10, 108:16, 118:7, 118:11, 118:22, 124:5
**sound)** [4] - 30:24, 32:18, 33:10, 118:9
**sounded** [12] - 28:25, 29:9, 29:17, 31:12, 31:18, 33:2, 33:8, 33:11, 36:16, 77:5, 77:6, 120:2
**sounds** [13] - 31:11, 31:17, 33:4, 36:13, 77:2, 77:8, 102:18, 120:24, 123:5, 127:5, 127:7, 128:17
**South** [2] - 2:14, 131:1
**southeast** [1] - 133:4
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 147:20
**SPAAN** [3] - 1:23, 147:5, 147:19
**space** [1] - 101:3
**speak-overs** [1] - 59:21
**speaking** [4] - 36:24,

78:6, 84:6, 99:13
**specific** [4] - 38:21, 55:2, 55:4, 75:9
**speculating** [1] - 16:3
**speculation** [10] - 10:24, 32:2, 33:19, 47:12, 74:11, 78:13, 88:7, 118:15, 119:8
**spell** [2] - 23:18, 23:20
**spinal** [2] - 8:12, 21:10
**spine** [2] - 6:25, 9:6
**spoken** [2] - 47:17, 53:12
**spondylolisthesis** [5] - 6:24, 8:12, 10:8, 16:5, 21:20
**spot** [2] - 8:24, 26:7
**Springs** [1] - 135:23
**square** [1] - 26:1
**Stadium** [1] - 140:21
**stake** [1] - 60:9
**stand** [3] - 5:7, 44:6, 139:7
**STAND** [2] - 6:1, 130:5
**standing** [10] - 37:7, 62:17, 63:13, 64:8, 95:15, 97:4, 99:18, 99:20, 109:11, 112:6
**stands** [4] - 49:21, 63:14, 134:23, 141:20
**start** [9] - 39:15, 40:4, 40:7, 87:8, 129:21, 129:23, 130:14, 136:25, 141:4
**started** [6] - 22:25, 29:4, 75:20, 102:11, 110:15, 132:24
**starting** [5] - 71:14, 72:4, 137:21, 138:20, 140:13
**starts** [5] - 39:5, 44:23, 46:16, 138:17, 138:18
**STATE** [1] - 147:4
**state** [4] - 23:15, 27:25, 59:17, 59:22
**statement** [12] - 79:3, 81:2, 93:25, 114:14, 122:1, 122:2, 123:23, 124:10, 124:19, 127:6, 128:13, 129:3
**statements** [12] - 35:24, 79:2, 79:14, 94:16, 94:18, 94:21, 114:1, 121:21, 125:9, 125:22, 126:1, 128:4
**STATES** [1] - 1:1

**states** [1] - 80:11
**States** [3] - 147:6, 147:8, 147:13
**station** [1] - 135:23
**Status** [1] - 138:22
**stay** [5] - 12:15, 28:4, 29:21, 48:5, 48:11
**stenographically** [1] - 147:10
**stenosis** [1] - 7:21
**step** [2] - 44:2, 129:14
**steroid** [2] - 18:21, 18:22
**Stever** [2] - 3:14, 27:8
**stick** [1] - 13:17
**still** [11] - 13:23, 15:4, 16:10, 22:25, 68:3, 74:7, 76:7, 110:22, 132:1, 145:18
**stipulate** [1] - 83:10
**stolen** [1] - 130:24
**stones** [1] - 100:15
**stood** [1] - 48:24
**stop** [13] - 30:16, 30:18, 39:11, 72:17, 74:3, 74:9, 74:13, 74:19, 98:23, 104:14, 105:6, 105:13, 117:24
**Stop** [1] - 120:4
**stopped** [5] - 11:14, 30:17, 102:21, 120:9
**story** [6] - 61:18, 67:7, 67:15, 67:22, 78:20, 124:16
**STREET** [1] - 1:24
**Street** [1] - 2:14
**streetlights** [1] - 98:19
**streets** [2] - 140:19
**stricken** [1] - 93:4
**strike** [4] - 56:7, 94:19, 112:21, 119:4
**striking** [2] - 33:11, 111:21
**stroke** [11] - 8:18, 8:23, 9:14, 9:20, 9:23, 10:3, 11:1, 14:20, 14:22, 15:6
**strokes** [3] - 9:24, 14:24, 21:25
**struck** [1] - 62:13
**struggle** [1] - 73:20
**struggling** [2] - 76:21, 94:24
**stuck** [1] - 15:20
**studies** [1] - 21:21
**study** [2] - 21:13, 21:15
**stuff** [4] - 5:15, 19:11, 103:7, 108:11

**subject** [1] - 132:20
**subpoena** [7] - 61:16, 93:11, 93:17, 106:12, 106:24, 106:25, 107:3
**subpoenaed** [1] - 79:11
**subtract** [1] - 122:20
**suggest** [2] - 32:22, 32:23
**Suite** [6] - 2:5, 2:11, 2:15, 2:23, 3:5, 3:9
**suite** [1] - 2:19
**summary** [1] - 94:8
**Sunday** [1] - 76:25
**sunshade** [1] - 49:2
**supplemental** [1] - 11:25
**supply** [1] - 85:5
**support** [1] - 94:8
**supposed** [1] - 88:19
**surgery** [21] - 7:6, 8:1, 8:6, 8:7, 8:10, 8:14, 8:17, 8:22, 9:25, 10:2, 10:4, 10:6, 10:11, 10:23, 15:6, 15:7, 15:8, 15:9, 15:14, 22:1
**surgical** [4] - 7:14, 8:11, 13:15, 13:17
**surrounding** [1] - 65:17
**suspect** [2] - 36:21, 37:1
**sustain** [2] - 48:14, 52:17
**sustained** [25] - 33:20, 48:9, 60:14, 61:8, 61:13, 67:9, 68:19, 92:17, 93:1, 95:22, 95:24, 101:13, 104:1, 105:20, 105:25, 106:6, 108:6, 115:12, 115:25, 117:10, 126:8, 126:12, 128:24, 129:6
**swallow** [1] - 9:21
**swear** [1] - 32:10
**SWISS** [52] - 3:8, 9:7, 9:16, 17:19, 22:13, 43:5, 43:7, 43:12, 43:15, 44:9, 44:12, 52:12, 52:19, 57:8, 58:25, 60:11, 60:13, 61:12, 63:20, 67:17, 69:2, 71:10, 78:13, 85:13, 86:13, 88:7, 88:11, 88:15, 89:9, 93:9, 93:16, 94:12,

**UNITED STATES DISTRICT COURT**

94:19, 106:5, 106:15, 107:4, 108:5, 112:17, 114:5, 115:23, 116:3, 117:9, 119:10, 121:7, 121:13, 125:8, 125:11, 125:13, 127:14, 128:23, 129:5, 129:13

**Swiss** [1] - 4:6

**switch** [1] - 134:17

**SWORN** [3] - 6:1, 23:11, 130:5

**sworn** [3] - 68:16, 125:22, 126:1

**symptomatic** [1] - 7:22

**symptoms** [2] - 7:24, 8:4

**system** [1] - 133:10

## T

**T3-T4** [1] - 7:13

**table** [1] - 100:16

**taker** [7] - 133:16, 135:6, 140:15, 140:18, 141:5, 142:11, 142:18

**talks** [1] - 17:20

**taller** [1] - 63:14

**TAMARA** [1] - 2:18

**tape** [49] - 35:14, 35:22, 36:12, 37:12, 37:15, 37:18, 37:23, 37:25, 38:10, 38:18, 38:21, 38:23, 39:12, 39:16, 40:1, 40:9, 40:14, 42:24, 43:4, 43:10, 44:15, 45:5, 45:22, 47:11, 47:17, 47:24, 49:18, 54:9, 54:10, 54:23, 56:4, 57:9, 57:10, 57:16, 62:15, 83:15, 84:11, 84:12, 87:20, 88:12, 88:21, 88:22, 89:15, 91:11, 91:18, 91:20, 96:22, 101:14

**tase** [1] - 110:10

**tased** [6] - 62:10, 63:12, 64:3, 64:13, 110:16, 110:18

**Taser** [9] - 64:5, 64:7, 109:12, 109:17, 109:18, 109:25, 110:4, 110:20, 111:1

**tasered** [3] - 64:4, 109:11, 112:5

**team** [1] - 35:10

**technical** [2] - 5:15, 18:7

**technician** [1] - 3:14

**temperature** [1] - 103:20

**temporarily** [2] - 9:21, 13:7

**temporary** [1] - 9:22

**ten** [3] - 22:9, 77:21, 113:10

**tend** [1] - 122:21

**tent** [81] - 28:10, 28:14, 30:22, 30:23, 31:8, 31:10, 31:12, 31:17, 32:13, 32:17, 32:22, 33:3, 33:9, 33:15, 33:25, 34:2, 37:3, 41:13, 42:1, 47:25, 48:6, 48:11, 49:7, 50:4, 50:6, 51:18, 56:3, 56:11, 56:12, 56:23, 56:24, 56:25, 57:21, 58:3, 62:3, 62:10, 62:16, 62:25, 63:14, 65:1, 65:20, 66:16, 68:5, 68:10, 70:20, 76:3, 76:13, 76:17, 76:20, 77:8, 77:9, 79:5, 80:12, 94:22, 94:23, 95:3, 95:5, 95:7, 95:9, 101:3, 102:13, 102:20, 102:21, 108:10, 113:13, 118:1, 118:18, 120:2, 120:14, 122:9, 123:6, 124:2, 124:8, 125:17, 136:10, 142:24

**tents** [2] - 65:18, 145:11

**term** [4] - 13:7, 13:12, 19:4, 19:21

**terminology** [1] - 99:14

**terms** [2] - 33:24, 132:15

**terrain** [1] - 98:19

**testified** [14] - 53:13, 61:18, 61:23, 62:18, 67:12, 102:15, 105:9, 108:9, 108:13, 108:22, 108:24, 109:8, 111:6, 117:6

**testify** [6] - 10:19, 37:21, 38:1, 83:4, 83:20, 105:18

**testifying** [2] - 30:18,

114:18

**testimony** [5] - 12:6, 27:16, 30:3, 67:5, 134:19

**text** [1] - 87:8

**THE** [305] - 2:3, 4:4, 4:5, 4:9, 5:11, 5:13, 5:17, 5:19, 5:21, 6:1, 6:14, 9:8, 9:10, 9:18, 9:20, 11:7, 11:9, 11:10, 11:11, 17:22, 17:24, 17:25, 22:14, 22:16, 22:17, 22:20, 22:21, 23:7, 23:12, 23:17, 23:18, 23:19, 23:20, 23:22, 23:23, 30:5, 32:3, 32:5, 33:20, 35:5, 35:8, 35:12, 35:15, 36:6, 36:8, 37:24, 38:3, 38:5, 38:8, 38:12, 38:17, 38:19, 39:1, 39:7, 39:9, 39:11, 39:14, 39:18, 39:22, 39:24, 40:6, 41:20, 41:21, 42:8, 42:10, 43:1, 43:6, 43:8, 43:13, 43:17, 43:21, 44:4, 44:11, 44:16, 44:21, 44:24, 45:2, 45:6, 46:11, 46:17, 46:20, 46:22, 46:24, 47:1, 47:8, 47:13, 48:9, 48:13, 51:2, 51:6, 52:17, 53:4, 56:6, 56:15, 56:16, 57:10, 57:16, 59:1, 59:20, 60:2, 60:12, 60:14, 61:8, 61:13, 61:20, 62:6, 62:20, 63:9, 63:11, 63:21, 67:9, 67:20, 67:23, 67:24, 67:25, 68:2, 68:19, 69:3, 69:7, 69:14, 69:16, 69:22, 69:25, 71:1, 71:4, 71:8, 71:11, 71:16, 71:20, 71:24, 72:5, 72:7, 72:9, 72:18, 72:23, 73:1, 74:12, 74:13, 75:8, 75:9, 75:10, 75:14, 75:17, 75:19, 76:15, 78:16, 78:17, 79:23, 79:25, 80:9, 80:14, 80:20, 80:22, 80:24, 80:25, 81:8, 81:13, 81:16, 81:19, 82:3, 83:3, 83:6, 83:9, 83:17, 83:23, 84:7, 84:8, 84:12, 84:16, 84:21,

85:2, 85:6, 85:10, 85:14, 86:1, 86:6, 86:9, 86:14, 86:17, 86:21, 87:6, 87:9, 87:15, 88:9, 88:14, 88:16, 88:23, 89:7, 89:17, 89:19, 89:20, 89:22, 90:17, 90:20, 91:2, 91:7, 91:13, 91:15, 91:17, 91:20, 91:23, 92:17, 93:1, 93:4, 93:17, 95:22, 95:24, 97:23, 98:3, 98:7, 99:6, 99:7, 100:21, 101:13, 101:23, 101:25, 102:7, 104:1, 105:3, 105:20, 105:25, 106:6, 106:11, 106:17, 106:19, 106:22, 107:8, 107:17, 107:21, 108:6, 109:14, 109:15, 110:6, 110:7, 111:16, 112:18, 112:24, 113:2, 114:6, 115:12, 115:25, 116:4, 116:5, 116:22, 117:3, 117:4, 117:10, 117:14, 118:16, 119:9, 119:11, 120:19, 120:21, 121:8, 121:15, 121:19, 121:23, 122:1, 122:3, 122:4, 122:16, 122:19, 123:9, 123:12, 123:22, 124:1, 124:2, 124:5, 124:7, 124:9, 124:12, 124:18, 124:23, 125:3, 125:6, 125:9, 125:12, 125:25, 126:1, 126:8, 126:9, 126:12, 126:14, 126:16, 126:19, 126:21, 126:25, 127:15, 128:24, 129:6, 129:9, 129:11, 129:14, 129:16, 129:17, 129:21, 129:23, 130:2, 130:3, 130:5, 136:18, 137:17, 137:18, 143:21, 146:2

**theathcote@lynberg .com** [1] - 2:20

**therapy** [6] - 12:8,

12:14, 13:9, 13:24, 16:13

**thereof** [1] - 40:9

**third** [2] - 130:15, 133:25

**Thomas** [3] - 135:4, 140:24

**thoracic** [3] - 7:10, 7:13, 8:10

**thoracic-related** [1] - 7:10

**threatened** [2] - 51:22, 66:14

**threatening** [6] - 51:20, 111:19, 112:10, 112:12, 112:15, 115:3

**three** [5] - 15:24, 17:8, 77:5, 87:10, 138:8

**throughout** [3] - 58:8, 93:13, 115:17

**thump** [1] - 28:25

**Thursday** [1] - 127:3

**time-consuming** [1] - 86:18

**timeline** [1] - 117:19

**Title** [1] - 147:8

**today** [16] - 5:7, 15:23, 16:9, 22:22, 23:2, 54:2, 58:6, 58:9, 62:11, 62:24, 63:5, 67:5, 79:18, 94:21, 115:18, 128:15

**tomorrow** [1] - 131:8

**took** [8] - 93:20, 93:21, 114:12, 120:7, 123:19, 130:1, 130:24, 131:2

**top** [6] - 26:6, 138:19, 140:13, 142:11, 142:16, 144:9

**touch** [2] - 113:17, 117:19

**touched** [2] - 113:16, 113:18

**toward** [1] - 58:9

**towards** [4] - 56:24, 104:6, 111:19, 136:1

**Town** [3] - 2:10, 2:18, 2:22

**Trabuco** [2] - 24:19, 133:5

**tracking** [1] - 47:2

**training** [2] - 109:23, 145:22

**tramadol** [2] - 20:8, 20:10

**transcript** [27] - 34:21, 38:10, 38:13, 39:5, 43:12, 43:14, 43:15,

43:16, 43:19, 44:20, 44:22, 45:12, 46:16, 63:18, 83:18, 83:19, 84:18, 84:21, 84:22, 85:1, 86:2, 86:3, 88:21, 89:9, 89:11, 147:9, 147:11
**Transcript** [1] - 1:5
**TRANSCRIPT** [1] - 1:12
**transcripts** [30] - 35:16, 38:16, 44:8, 44:13, 45:7, 45:10, 84:22, 85:3, 85:4, 85:17, 85:19, 85:21, 85:23, 86:14, 86:25, 87:17, 88:17, 88:18, 88:24, 88:25, 89:1, 89:5, 89:6, 89:8, 90:18, 91:6, 91:8, 91:16, 124:19
**transient** [3] - 59:12, 59:18, 60:5
**transparent** [3] - 76:13, 76:17, 94:23
**treat** [1] - 20:6
**treated** [1] - 16:4
**treating** [1] - 6:23
**treatment** [1] - 6:8
**tree** [8] - 64:6, 98:21, 98:22, 98:24, 99:1, 99:2, 99:4
**trees** [1] - 101:5
**trespass** [1] - 93:19
**trespassing** [1] - 93:21
**TRIAL** [1] - 1:13
**trial** [3] - 25:15, 85:8, 92:23
**tried** [9] - 10:21, 12:4, 12:7, 12:8, 16:23, 58:12, 58:14, 59:7, 127:23
**tries** [1] - 16:19
**trouble** [2] - 52:4, 83:12
**truck** [22] - 41:4, 65:18, 66:24, 66:25, 67:4, 67:13, 67:16, 69:20, 70:3, 70:5, 70:6, 70:7, 70:14, 70:15, 70:17, 70:20, 72:2, 103:16, 103:17, 136:11, 142:24
**true** [163] - 6:9, 10:12, 11:13, 13:13, 16:7, 16:11, 17:15, 19:3, 19:20, 20:3, 21:19, 22:3, 22:10, 22:11,

38:7, 41:17, 49:12, 53:13, 53:14, 53:18, 53:21, 53:24, 54:3, 54:13, 54:17, 55:7, 55:8, 55:9, 55:20, 57:5, 58:1, 58:2, 58:10, 58:11, 58:13, 58:24, 61:18, 61:20, 62:18, 63:1, 63:7, 63:15, 64:18, 64:19, 64:22, 65:3, 65:4, 65:9, 65:10, 66:5, 66:11, 66:25, 67:13, 67:14, 68:12, 68:14, 69:19, 70:7, 70:8, 70:11, 73:10, 73:14, 73:15, 73:17, 73:18, 73:23, 73:24, 73:25, 74:7, 76:8, 76:9, 76:10, 76:11, 76:21, 76:22, 79:10, 79:12, 81:3, 82:14, 82:21, 83:5, 92:7, 92:11, 92:19, 93:7, 93:15, 93:17, 93:24, 94:14, 94:17, 94:25, 96:2, 96:14, 96:15, 96:19, 96:23, 97:2, 97:7, 98:19, 98:20, 99:4, 99:12, 99:21, 100:17, 101:6, 101:20, 101:25, 102:5, 102:12, 103:9, 103:17, 104:4, 104:5, 104:14, 104:17, 105:7, 107:25, 108:11, 109:5, 111:7, 111:8, 111:13, 111:22, 112:2, 112:6, 112:16, 113:6, 113:7, 113:23, 114:19, 114:21, 114:23, 114:24, 115:3, 115:4, 115:7, 115:10, 115:19, 115:22, 116:4, 116:10, 116:11, 116:16, 116:17, 116:18, 117:8, 125:16, 127:4, 127:13, 127:18, 127:19, 127:20, 128:17, 128:18, 128:21, 129:4, 147:9
**trust** [1] - 113:15
**truth** [3] - 52:6, 52:8, 106:9
**truthful** [1] - 35:24
**try** [2] - 87:9, 139:19

**trying** [6] - 32:23, 36:1, 74:10, 93:25, 114:15, 131:10
**turn** [6] - 87:1, 87:16, 91:2, 114:16, 132:19
**turned** [2] - 93:22, 131:15
**turns** [1] - 25:24
**TV** [1] - 28:21
**twice** [3] - 53:20, 94:15, 98:12
**two** [24] - 18:20, 18:23, 29:7, 29:9, 45:7, 57:24, 58:14, 65:8, 78:11, 84:22, 85:2, 93:11, 104:12, 104:13, 108:1, 114:10, 114:19, 123:9, 123:21, 130:11, 133:12, 134:1, 138:8, 145:21
**two-person** [1] - 134:1
**type** [4] - 33:6, 52:2, 109:18, 128:1
**typed** [2] - 25:15, 31:1
**typically** [7] - 133:25, 138:6, 138:8, 138:11, 140:20, 145:22, 145:24

## U

**u-e-r-b-a-c-h** [1] - 23:19
**U.S** [1] - 1:3
**unable** [1] - 77:15
**unaware** [2] - 15:9, 18:6
**uncommon** [1] - 16:6
**under** [12] - 19:13, 19:14, 61:18, 61:23, 61:24, 62:12, 63:5, 94:25, 111:9, 114:18, 130:3, 131:14
**undergo** [1] - 15:3
**understood** [4] - 14:25, 19:8, 67:4, 131:23
**unduly** [1] - 124:18
**unfamiliar** [1] - 20:22
**unfold** [1] - 52:23
**unfortunately** [1] - 13:21
**unincorporated** [2] - 133:4, 134:14
**unit** [3] - 133:21, 134:20, 145:22
**Unit** [1] - 138:20
**UNITED** [1] - 1:1

**United** [3] - 147:6, 147:8, 147:13
**units** [2] - 138:21, 145:21
**unlawfully** [1] - 132:10
**unnecessary** [1] - 86:18
**unpredictable** [1] - 8:8
**unsure** [1] - 84:8
**unzip** [3] - 118:18, 120:2, 122:9
**unzipping** [2] - 123:6, 124:2
**up** [61] - 5:10, 6:12, 14:21, 16:9, 20:17, 20:19, 20:21, 22:8, 24:23, 24:25, 26:11, 26:12, 26:14, 27:5, 27:9, 29:1, 29:3, 39:1, 40:7, 40:22, 47:20, 48:22, 49:8, 49:16, 50:11, 50:23, 52:14, 54:2, 54:19, 58:9, 63:11, 68:7, 72:8, 72:10, 73:7, 75:24, 77:1, 79:8, 85:10, 85:16, 87:8, 87:14, 102:20, 115:18, 121:15, 121:24, 129:22, 130:11, 131:11, 131:13, 136:16, 138:1, 138:3, 140:5, 140:16, 141:10, 141:12, 142:22, 144:17
**updated** [1] - 11:16
**upset** [6] - 59:13, 93:24, 94:4, 94:6, 104:20

## V

**Vague** [1] - 41:18
**vague** [6] - 41:18, 41:19, 47:5, 50:25, 75:6, 116:21
**variations** [1] - 45:8
**vehicle** [1] - 41:3
**vehicles** [1] - 50:14
**verbal** [4] - 77:2, 135:8, 135:11, 136:14
**verbally** [1] - 134:2
**version** [2] - 54:1, 62:23
**versus** [2] - 141:4, 141:14

**vertically** [1] - 141:2
**vicinity** [1] - 90:13
**video** [13] - 55:19, 83:7, 83:14, 83:21, 84:1, 89:5, 89:11, 93:22, 100:6, 100:9, 100:13, 100:25, 109:20
**video/audio** [1] - 82:24
**videos** [3] - 97:14, 97:16, 97:24
**Videotape** [6] - 87:18, 89:23, 92:1, 98:8, 100:2, 100:11
**Viejo** [2] - 133:6, 134:14
**view** [8] - 31:8, 52:18, 62:2, 62:17, 64:16, 64:22, 109:9, 133:16
**violence** [21] - 36:18, 41:16, 45:19, 45:25, 46:8, 47:21, 61:11, 65:5, 75:2, 75:12, 75:20, 76:2, 80:7, 80:19, 117:20, 119:2, 119:25, 135:19, 142:4, 145:1, 145:4
**visibility** [1] - 95:17
**vision** [3] - 56:2, 76:13, 94:22
**voice** [37] - 30:13, 31:25, 34:6, 35:22, 37:13, 40:17, 42:20, 45:24, 46:6, 46:7, 46:10, 47:9, 47:20, 49:15, 49:17, 69:7, 69:10, 77:10, 77:18, 87:21, 88:8, 89:14, 89:15, 90:1, 90:4, 90:16, 90:22, 91:25, 104:15, 105:6, 105:10, 107:18, 107:22, 117:20, 119:24
**voices** [4] - 29:15, 45:23, 104:12, 104:13
**VOLUME** [1] - 1:8
**vs** [1] - 1:6

## W

**WA** [1] - 144:7
**WAGNER** [2] - 4:4, 6:1
**Wagner** [3] - 5:7, 5:9, 6:4
**wait** [2] - 36:10, 86:11
**waited** [2] - 102:14,

**UNITED STATES DISTRICT COURT**

102:25
**walk** [7] - 56:23, 56:24, 70:20, 86:10, 86:11, 104:6, 110:15
**walked** [5] - 48:18, 93:20, 103:19, 103:20, 103:22
**walking** [4] - 66:15, 77:21, 108:23, 113:9
**wants** [1] - 60:20
**warning** [1] - 20:1
**watch** [2] - 102:13, 103:1
**watched** [6] - 28:21, 52:23, 54:18, 62:9, 66:15, 102:19
**watching** [10] - 49:3, 49:6, 52:24, 62:16, 101:16, 101:18, 102:2, 102:9, 102:10, 102:17
**WATKINS** [4] - 2:9, 2:13, 2:17, 2:21
**weapon** [2] - 110:21, 111:3
**WEDNESDAY** [2] - 1:13, 5:1
**week** [2] - 83:15, 84:14
**weekend** [1] - 65:14
**weeks** [4] - 53:23, 57:24, 78:11, 114:10
**West** [2] - 2:10, 2:18
**WEST** [1] - 1:24
**white** [9] - 25:19, 41:4, 41:11, 66:25, 67:4, 70:17, 103:16, 136:11, 142:24
**whole** [10] - 40:9, 66:25, 84:18, 102:13, 102:19, 103:1, 106:9, 123:25, 124:16, 127:8
**wide** [1] - 32:19
**wife** [31] - 25:9, 28:19, 29:1, 30:9, 30:16, 36:9, 49:3, 50:3, 68:3, 73:22, 74:1, 74:5, 74:9, 78:18, 94:2, 102:21, 104:14, 104:18, 105:5, 105:7, 105:10, 105:13, 105:17, 106:3, 106:10, 106:24, 113:21, 117:22, 120:3, 120:7, 127:10
**wife's** [2] - 106:13, 108:2

**wildlife** [2] - 103:19, 103:22
**willfully** [1] - 132:9
**window** [27] - 25:24, 26:1, 30:11, 31:5, 32:19, 52:21, 57:4, 57:5, 57:20, 70:12, 70:16, 70:19, 74:22, 74:23, 75:15, 75:19, 75:20, 75:23, 75:25, 76:1, 101:18, 102:10, 118:3, 118:5, 118:6, 118:10, 120:11
**windows** [2] - 56:11, 75:5
**Winnebago** [3] - 25:13, 27:13, 49:21
**WITHDRAWN** [1] - 4:16
**WITNESS** [57] - 9:10, 9:20, 11:9, 11:11, 17:24, 22:16, 22:20, 23:11, 23:17, 23:19, 23:22, 32:5, 36:8, 41:21, 42:10, 51:6, 56:16, 59:1, 60:12, 61:20, 63:11, 67:24, 68:2, 69:25, 74:13, 75:9, 75:19, 78:17, 79:25, 80:22, 80:25, 81:8, 84:8, 89:19, 93:17, 99:7, 101:25, 107:8, 109:15, 110:7, 116:4, 116:22, 117:4, 120:21, 122:3, 122:19, 123:12, 124:1, 124:5, 124:7, 124:12, 126:1, 126:9, 126:25, 129:16, 130:2, 137:18
**witness** [22] - 5:7, 22:21, 22:24, 23:2, 23:4, 23:13, 37:16, 37:25, 38:22, 69:10, 71:10, 71:11, 81:7, 81:12, 100:19, 100:22, 104:24, 106:12, 106:25, 107:3, 117:2, 129:18
**witnesses** [1] - 22:23
**WITNESSES** [1] - 4:3
**woke** [3] - 29:1, 75:24
**woken** [1] - 77:1
**woman** [8] - 29:17, 31:23, 31:24, 33:12, 70:7, 76:21, 133:17, 135:20

**woman's** [1] - 30:13
**word** [2] - 31:2, 33:23
**words** [10] - 19:20, 36:12, 36:20, 47:16, 63:16, 83:23, 84:23, 88:17, 119:13, 120:3
**works** [10] - 5:8, 12:22, 12:24, 16:20, 17:5, 17:7, 18:22, 22:5, 34:5, 133:11
**write** [4] - 11:22, 107:11, 115:14, 128:4
**WRONIAK** [10] - 3:4, 130:7, 136:16, 136:19, 136:22, 137:20, 143:17, 143:18, 143:22, 143:25
**Wroniak** [1] - 4:9
**wrote** [12] - 7:16, 8:15, 9:2, 18:5, 94:7, 94:15, 111:9, 112:9, 114:8, 127:7, 128:5

## X

**x-ray** [3] - 56:2, 56:8, 76:13

## Y

**year** [4] - 9:20, 10:17, 14:18, 17:13
**years** [11] - 10:6, 11:20, 15:18, 17:18, 22:9, 26:6, 79:18, 93:13, 100:8, 114:19, 115:17
**yell** [1] - 120:10
**yelled** [10] - 30:16, 49:5, 74:3, 74:17, 102:21, 113:18, 113:20, 118:3, 120:7
**yelling** [18] - 30:10, 30:11, 34:3, 34:8, 48:18, 48:19, 48:22, 48:25, 49:15, 49:21, 77:18, 77:20, 77:23, 105:11, 108:23, 113:9, 113:11, 114:9
**yells** [1] - 117:22
**yesterday** [1] - 130:10
**young** [1] - 77:10
**yourself** [6] - 36:2, 36:24, 139:9, 139:15, 139:21, 139:24
**yourselves** [2] - 43:25, 146:6

## Z

**ZIP** [1] - 140:25
**zip** [11] - 30:24, 33:9, 34:3, 118:5, 118:9, 120:7, 120:11, 123:6, 124:5
**zipped** [2] - 49:7, 102:21
**zipper** [4] - 117:25, 118:12, 120:7, 120:24
**zipping** [1] - 123:6
**Zoom** [1] - 61:24
**zoom** [1] - 27:20

**UNITED STATES DISTRICT COURT**

4-RenSER-00614
4-RenSER-00614

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | Case No. SA CV 19-01514-DOC- |
| | ) | (DFMx) |
| Plaintiff, | ) | |
| | ) | Santa Ana, California |
| vs. | ) | |
| | ) | Wednesday, May 14, 2025 |
| COUNTY OF ORANGE, et al., | ) | |
| | ) | (1:12 p.m. to 1:58 p.m.) |
| Defendants. | ) | (2:11 p.m. to 3:06 p.m.) |
| _____ | ) | (3:20 p.m. to 4:47 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF TRIAL (DAY 10)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE, and a jury

Appearances:                    See next page.

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               Melissa H. Kunig

Transcribed by:                 Jessica Reuter
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Echo Reporting, Inc.*

4-RenSER-00615
4-RenSER-00615

2

APPEARANCES:

For the Plaintiff:             NARINE MKRTCHYAN, ESQ.
                               Narine Mkrtchyan
                               655 North Central Avenue
                               Suite 1700
                               Glendale, California 91203
                               (818) 388-7022

For the Defendants:            S. FRANK HARRELL, ESQ.
                               RYANE C. SKINNER, ESQ.
                               Lynberg & Watkins, APC
                               1100 West Town and Country
                                 Road Suite 1450
                               Orange, CA 92868
                               (714) 937-1003

                               CATHERINE A. NALTSAS, ESQ.
                               Lynberg & Watkins, APC
                               1150 South Olive Street
                               Suite 1800
                               Los Angeles, California 90015
                               (213) 624-8700

                               MICHAEL L. WRONIAK, ESQ.
                               Collins Collins Muir &
                                 Stewart, LLP
                               750 The City Drive
                               Suite 400
                               Orange, California 92868
                               (714) 823-4108

                               CHRISTIE B. SWISS, ESQ.
                               Collins & Collins, LLP
                               2011 Palomar Airport Road
                               Suite 207
                               Carlsbad, California 92011
                               (760) 274-2111

*Echo Reporting, Inc.*

I N DE X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Chad Matthew Renegar | -- | 3 | 43 | -- |
| Mark William Borba | 90 | -- | -- | -- |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| 35    Renegar report | 76 | -- |
| 37    Holloway report | 89 | -- |
| 102-12   Borba PVS | 89 | -- |
| 244   Photograph | 96 | -- |

*Echo Reporting, Inc.*

1

Santa Ana, California; Wednesday, May 14, 2025 1:12 p.m.

--o0o--

(Call to Order)

(Portion of proceedings omitted.)

THE COURT:  Okay.  Thank you very much, counsel.  If you'd be seated, and all parties are present.

The jurors were asking what the time estimate would be.  So, sometime today I'm going to ask you to meet informally before 4:30, so we can give them a pretty good roadmap of the days remaining, okay.  You're not in session tomorrow.  You will be back Friday for a full day, okay.

Counsel, you'll continue to do questions on cross-examination of Deputy Renegar.

MR. WRONIAK:  Thank you, your Honor.

CHAD MATTHEW RENEGAR - WITNESS - PREVIOUSLY SWORN

CROSS EXAMINATION (RESUMED)

BY MR. WRONIAK:

Q    Deputy, before the break we were talking about being dispatched back to -- or strike that.

We were being dispatched to O'Neill Park on the first instant, do you recall that?

A    Yes.

Q    Okay.  And you had -- we were talking about the type of call impacting the number of deputies, do you recall that?

A    Yes.

4-RenSER-00618                                    4-RenSER-00618

2

Q    Okay.  So how did the type of call impact the number of deputies that were dispatched?

A    So, where it's located, like I was saying earlier, is O'Neill Park.  It's not some place that you can get to quickly.  So, other deputies from the -- the City of Rancho Santa Margarita went as well.  And at night most calls are two-person calls, in this case we had three, but domestic violence calls typically three deputies will go.

Q    Are you familiar with the term "command presence"?

A    Yes.

Q    What does that mean?

A    It just means our presence is two-fold.  It's to show how many people were there, de-escalation, and, you know, we show up in force to different calls.

Q    Do the number of deputies present factor into command presence?

A    Yes.

Q    How so?

A    Typically, the more deputies that are there, the higher the command presence is, because we'll either outnumber somebody so there will just be a lot of us there.

Q    When you first arrived -- or strike that.

     Prior to contacting Mr. Holloway at his tent, what did you do?

A    I spoke with campsite 67 who we know now is Joshua

4-RenSER-00619                                           4-RenSER-00619

3

Gomez. And then we also -- or I also spoke to a female that was outside her tent, and then with the deputies that were there on scene.

Q So you spoke with Mr. Gomez in campsite 67?

A Yes.

Q And where were you within the campsite when you were talking to him?

A I had walked into his campsite and I was near his tent and firepit area.

Q And what did Mr. Gomez tell you?

A He told us that he was not the one involved and pointed back in the direction of campsite 65.

Q Did you rule out Mr. Gomez as being involved in the domestic violence incident?

A At that time I did.

Q How?

A He told us that, one, that they weren't involved, and that it was occurring back towards campsite 65 where the call had -- had stated it in a -- in a white truck. We just talked to them because they happened to be outside their tent talking. So when we got there and heard people talking, that's -- we just went over there to talk with them first since they were outside.

Q When Mr. Gomez pointed you in the direction of where he thought the domestic violence incident was occurring, where

*Echo Reporting, Inc.*

4

did he point you to?

A    Campsite 65.

Q    Why do you say that?

A    Because where his tent was located inside the campground, directly across would be campsite 65.

Q    Did Mr. Gomez point you in the direction of campsite 66?

A    No.

Q    Did he say anything to you that led you to believe that the domestic violence was taking place in campsite 66?

A    No, and there was no indication that campsite 66 had anything to do with our call.

Q    So after you left Mr. Gomez' site, where did you go?

A    I walked back out of his campsite back towards campsite 65, and that's when we came into contact with another female -- or with a female who had just walked out of her campsite on to the road.  And that's why we spoke with her, because our call involved a male and a female, and we happened to find a female outside her tent.

Q    Did you rule her out as being involved in the domestic violence incident?

A    Yes.  Our call was involving a male and female, and she said that she was in there with her partner, which she indicated was another female.

Q    Okay.  What did you do after you spoke to that female

*Echo Reporting, Inc.*

5

walking down the road?

A    At that point Deputy Borba had come over and indicated it was campsite 65, and we went to campsite 65.  We ran the truck's license plate over air -- over the radio, and our dispatcher came back with who it belonged to or who it was registered to, and that's when we contacted Mr. Holloway at his tent.  And I identified myself as the Sheriff's Department and asked him to come out and talk to us.

Q    And before you got to Mr. Holloway's tent and asked him to come out, did you see a white truck in his campsite?

A    Yes.  His campsite was the only one with a white truck in it.

Q    Was there a white truck in campsite 66?

A    No, there was not.

Q    Did you see a white truck in any other campsites in the vicinity of Mr. Holloway's campsite 65?

A    No, there was no white truck.  It was only campsite 65.

Q    Did the fact there was a white truck in campsite 65 have any significance to you at that time?

A    Yes, because our dispatcher had told us that it was in the tent to the campsite to the right of campsite 63, which was campsite 65, with a white truck, and that's where we went to.

Q    Based on all the information you had before contacting Mr. Holloway, did you believe you were in the right campsite

*Echo Reporting, Inc.*

6

where this domestic violence might have occurred?

A    Yes.

Q    Why did you believe that?

A    Based on the totality of everything.  Our call was to the right of campsite 63 with a tent and a truck.  And Mr. Holloway's campsite was to the right of campsite 63 with a blue tent and a white truck.  And we had talked to campsite 67, a female that was walking around, and then Deputy Borba spoke with the original informant who was here earlier, Brian Fuerbach, who told Deputy Borba that it was that tent right there -- or tent to the right.  So we were under -- we came to the assumption that we were in the right place.

Q    And by the way, did you have a flashlight with you that evening?

A    I did, yes.

Q    Were you using it as you were walking around the campsite before you contacted Mr. Holloway?

A    Yes.

Q    Were you using it when you approached Mr. Holloway's tent before making contact with him?

A    Yes, I did.

Q    Okay.  So when you approached Mr. Holloway's tent the first time, did you make any observations of the campsite itself?

A    Yeah.  There was two tents, a firepit, a table, the --

*Echo Reporting, Inc.*

7

there was dirt and gravel, and that he had knives spread out throughout his campground.

Q    Okay.  So this campsite is not paved, is it?

A    No.  The road's paved, but the campsite itself is dirt and gravel.

Q    Did you observe any rocks in the campsite?

A    Yes, there's rocks in the campsite.

Q    I think you mentioned knives as well, correct?

A    Yes.

Q    Where did you observe knives?

A    There was a knife by the firepit -- or there was a machete by the firepit, and there's different knives throughout the campground.

Q    Okay.  Sitting here today do you remember how many knives you saw in the campground as you approached Mr. Holloway's tent the first time?

A    No.

Q    Okay.  But you saw knives?

A    Yes.  And you hear on Borba's tape, he says, knives, knives, knives.  And every deputy that was there that has testified have said there's knives throughout the campground.

Q    You mentioned a machete.  Where did you see that?

A    By the firepit.

Q    Did you see an ax?

*Echo Reporting, Inc.*

8

A    Yes.

Q    Where was that located?

A    I believe it was by the picnic table.

Q    And based on your observations of the campsite, did you believe you were dealing with a homeless individual?

A    No.

Q    Why not?

A    There was no indication that he was homeless.

Q    Did any of these observations that you made of the campsite cause you any safety concerns?

A    Yes.  The type of call, it's domestic violence.  The location, again, it's in a campground, it's dark.  The knives throughout the campground.  Everything adds to the totality of what we were there for.

Q    Why did the knives present a safety concern to you?

A    Because you can be injured and hurt if a knife is used on you.

Q    Did the machete cause you a safety concern?

A    Yes.  It's still a longer bladed weapon.

Q    How about the ax?

A    Yeah, it still has the potential to hurt you.

Q    So when you first contacted Mr. Holloway, what did you say?

A    Sheriff's Department.  Can you come out and talk to us?

Q    What was his response?

4-RenSER-00625                                          4-RenSER-00625

9

A He said he was the only one in there.

Q Was that significant to you?

A Yes, because prior to me saying that or asking him to come out, we had never told him why we were there. We had just identified ourselves, and his first response was, he's the only one in there.

Q How long did it take Mr. Holloway to get out of his tent?

A A minute, minute and a half, something right around there.

Q Did that cause you any concerns?

A We don't know -- or, yes, because we don't know what he has inside his tent or if anybody's in the tent with him.

Q So after Mr. Holloway exits the tent, what do you do next?

A I asked him if I could pat him down.

Q Why?

A One, officer safety, because we do see the knives and everything throughout his campsite, but also just the time it took him to get out and for our safety.

Q What was Mr. Holloway's demeanor like when he exited the tent?

A No, he was upset.

Q Were you assessing Mr. Holloway's behavior?

A Yes.

4-RenSER-00626          4-RenSER-00626

10

Q     How were you doing that?

A     Just visually.  It goes to the totality of everything that happened.

Q     And why were you assessing his behavior?

A     Because we're there to investigate a domestic violence incident.

Q     Are you assessing his words?

A     Yes.

Q     What was he saying?

A     He did not want to come out.  He didn't want us to pat him down.  He didn't want us to be there.

Q     Were you assessing his tone of voice?

A     Yes.

Q     Why were you doing that?

A     Just goes to the totality of the call.  He was being verbally aggressive and cussing at us.

Q     And so what was his tone of voice?

A     Agitated.

Q     Were you assessing his body language?

A     Yes.

Q     Why were you doing that?

A     Again, it just kind of goes to the overall totality of everything.

Q     So based on your observations of Mr. Holloway's demeanor, words and tone of voice and body language, were

4-RenSER-00627                                                    4-RenSER-00627

11

you getting any message from that?

A    Yeah.  He was not happy with us.  He didn't want us to be around there.  He's denied everything and didn't want the police there.

Q    Did Mr. Holloway become verbally aggressive toward you?

A    Yeah.  Well, you -- yes, he became verbally aggressive I think with all of us there.

Q    Did that cause you any concern?

A    Just his demeanor and the way he was yelling, he was just agitated.  And we're there for a domestic violence call, so it didn't add or -- it didn't subtract anything from the situation.

Q    And Mr. Holloway was wearing a jacket when he exited the tent, right?

A    Yes.

Q    Did that cause you any safety concerns?

A    Yes.  It was big and bulky, and we didn't know what he had or if he had anything underneath it.

Q    And did -- you asked Mr. Holloway if you could pat him down, correct?

A    I did, yes.

Q    Why did you do that?

A    For our safety.  People -- suspects can hide knives or things in their waistband or the pockets.  It's a safety concern for not only me but other deputies there.

4-RenSER-00628                4-RenSER-00628

12

Q    Mr. Holloway tell you if he had any weapons on him?

A    He said he believed he had a pocketknife.

Q    When you patted him down did you find a pocketknife?

A    No.

Q    Did you find anything when you patted him down?

A    I think he had a lighter in his pocket.

Q    During that first encounter when you talking to Mr. Holloway, did you ever tell him that you wanted to put him in handcuffs?

A    No.  I told him I was not going to put him in handcuffs.

Q    Why did you tell him that?

A    Because at that point he was just being detained for our investigation.  And, you know, as long as he was cooperating with us, there was -- at that point I didn't feel like there was a need to put him in handcuffs.

Q    At the time you're asking to pat him down, had you told him why you were there yet?

A    Not yet, no.

Q    Why not?

A    Because, one, the way he was acting, and we were just trying to first render the scene safe before we started getting into our investigation.

Q    Did you eventually tell Mr. Holloway that 10 people had called and brought you to his tent?

4-RenSER-00629    4-RenSER-00629

13

A    Yes.

Q    Why did you tell him that?

A    One, it was trying to de-escalate the situation.  I was -- the hope was that he would understand that people had called on him, and that maybe he would realize he did something wrong or is being too loud.  The next is, I didn't want him to try to figure out who called.  People have the right to be anonymous and not have people know that they called the 911 -- or called for emergency.  And I didn't want -- not knowing if he had an alternation with somebody in the campground before, for him to automatically assume that those were the people that called the cops.

Q    Was this a de-escalation technique on your part?

A    Yes, in my mind it was.

Q    And Mr. Holloway told you he was on -- or strike that.
     You asked him if he was on probation or parole, correct?

A    Yes.

Q    Why did you ask him that?

A    Just the way he was acting and -- yeah, just the way he was acting.

Q    He told you he was on probation, correct?

A    Yes.

Q    Did you ever find a female with Mr. Holloway?

A    No.

4-RenSER-00630
4-RenSER-00630

14

Q    Were you able to conclusively determine if there was ever a female with Mr. Holloway?

MS. MKRTCHYAN:  Objection, calls for -- well, first of all, vague and ambiguous.  Calls for speculation.  Conclusively determine --

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  No, we were never able to determine if there was -- a female had been there earlier and left for the time it took us -- or took us to get to the campground, there was enough time for somebody to leave.

MS. MKRTCHYAN:  Objection, calls for speculation, your Honor.  Move to strike.  Entirely speculative.

THE COURT:  I think the answer was that you never located a female, is that correct?

THE WITNESS:  I -- we never located a female.  And just for the time it took us to get there, it's possible that a female could have left.

MS. MKRTCHYAN:  Objection, your Honor.  That's speculation.

THE COURT:  No, this is the state of mind at the time.  Overruled.

BY MR. WRONIAK:

Q    So after determining -- not finding a female there, talking to Mr. Holloway, what did you do next?

*Echo Reporting, Inc.*

15

A      From there, we told him he was, you know, free to leave.  And we left the campground, and I headed back to Ladera Ranch.

Q      As you were leaving Mr. Holloway's campsite heading back to your patrol unit, did he say anything?

A      Yeah.  He was yelling out that he was going to find the person that called the cops on him.

Q      During that first encounter before you left, did you ever see any deputy go inside of Mr. Holloway's tents?

A      No, no deputy ever went inside any tent.

Q      Did you ever see a deputy pull out a backpack out of Mr. Holloway's tent?

A      No.

Q      Did you ever see a deputy dump out the knives out of Mr. Holloway's backpack?

A      No.

Q      As you were leaving O'Neill Park what did you do next -- or strike that.

      As you left Mr. Holloway's tent, what did you do next?

A      I conducted a records check on Mr. Holloway for warrants and things like that.  And then updated the call log.  I went over the air and said that it was unfounded, and we left.

Q      Okay.  Did you run a search -- what did your search determine -- strike that.

*Echo Reporting, Inc.*

4-RenSER-00632                                          4-RenSER-00632

16

Q    Did you learn that Mr. Holloway was on probation?

A    Yes.  I just confirmed that he was on probation.

Q    Did you determine whether or not he was on probation with search and seizure terms?

A    Yes.  When you run somebody's name through our system you're able to tell what their conditions are of their -- of their probation.  We can see what they were convicted of and what the terms are.

Q    So when you learned he was on probation with search and seizure terms but -- or strike that.

So, after you ran him what did you do next?

A    I updated our call log and then unfounded it, and we -- we drove out of the campground.

Q    At any time prior to leaving the campground the first time, did you tell dispatch that you believed Mr. Holloway might possibly be in possession of a gun?

A    No.

Q    Did you ever indicate at any time that you believe Mr. Holloway might be in possession of a gun?

A    No, I did not.

Q    Okay.  So, when you left Mr. Holloway's campsite after the first encounter, he had -- or strike that.

During the first encounter, he had cursed at you, correct?

A    Yes.

4-RenSER-00633                                    4-RenSER-00633

17

Q    Was aggressive toward you, correct?

A    Verbally, yes.

Q    And was uncooperative?

A    Yes.

Q    As a deputy had you ever been cursed at before by somebody you were talking to?

A    Yes.

Q    How many -- how many times?

A    Probably once every couple weeks.  Typically, people aren't happy with law enforcement, especially just the types of calls we respond to.

Q    Do you get upset or angry at individuals who curse at you?

A    No.

Q    Were you angry at Mr. Holloway because he had cursed at you?

A    No.  I thought we were going back to Ladera Ranch to conclude our night.

Q    Had -- prior to encountering Mr. Holloway, had you ever had your authority questioned as a deputy?

A    Sometimes a couple times before, especially in the jails with -- we just -- it's just part of the job.

Q    Does it upset you when somebody questions your authority?

A    No.

4-RenSER-00634                                                      4-RenSER-00634

18

Q     Were you upset with Mr. Holloway because he questioned your authority?

A     No.

Q     As you left O'Neill Park, were you intending to go back to Mr. Holloway's campsite for any reason?

A     No, I had no intention of going back to Mr. Holloway's campground.

Q     Were you upset with him at all?

A     No.

Q     So, at some point you were dispatched back to O'Neill Park, right?

A     Yes.

Q     When you were -- where were you when you were dispatched back, do you recall?

A     I was in the City of Rancho Santa Margarita going towards -- back towards Ladera Ranch.

Q     When you were dispatched back, what were you told?

A     That there was a male going campsite to campsite yelling.

Q     And when you heard that, did you believe at that time that it was Mr. Holloway who was doing that?

A     Yes, because our dispatcher reactivated the call that he were on previously.  And on our screen it sends us right back to -- indicated we were going right back to the campsite we were just at.

*Echo Reporting, Inc.*

4-RenSER-00635                                    4-RenSER-00635

19

Q    So, in your mind, this was not a separate and unrelated call?

A    No.  It was just a reactivation of the first call.

Q    And as you were heading back to O'Neill Park, did you receive any additional information?

A    Yes.  We received that he was now in a different campsite going through things.  And then it got updated again that he was in an RV and there was a girl screaming, a little girl screaming.

Q    And that's being relayed to you by the dispatcher, correct?

A    Yes.  That's being relayed to everybody over the radio.

Q    And in your line of work do you rely upon the dispatcher and the information he or she is providing you?

A    Yes.

Q    Why?

A    Because that's what we know of when we get sent to calls.  That's the information we get.  So we rely on -- for the most part, solely on what we already -- what we are given by our dispatcher.

Q    Okay.  At the time you're receiving additional information from the dispatcher as you're coming back to O'Neill Park, did you have any reason to question what the dispatcher was telling you?

A    No.

4-RenSER-00636                                        4-RenSER-00636

20

Q     And this call gets upgraded to a priority one, correct?

A     Yes.

Q     What is priority one?

A     Priority one for us just means that there's a threat to life or injury to life.  And so it gets upgraded to -- which pretty much just means we're allowed to go -- it's called code 3, which is just lights and sirens.

Q     And that was in -- was that in reference to the little girl screaming?

A     Yes.  Because dispatch was told that there was a girl screaming, it upgrades it because there's a threat of life or injury to life.

Q     And when you were heading back to O'Neill Park with lights and sirens going, did you think you were going to find or investigate a little girl screaming?

A     Yes.

Q     Was that a high priority for you as you were driving back to O'Neill park?

A     Yes, it is.

Q     Why?

A     Because we don't want the girl to get hurt or injured or worse.

Q     And as you're returning back to O'Neill Park and you're getting this information from the dispatcher, did you have in mind your prior contact with Mr. Holloway?

4-RenSER-00637          4-RenSER-00637

21

A     Yes.

Q     What did you have in mind?

A     Just the way he was acting, the location of the campground and just his overall demeanor.  He didn't like the -- it appeared he didn't like us.  He was agitated and cursing at us, things like that.

Q     Did you have in mind his failure to cooperate with you the first time?

A     Yeah.

Q     Did you have in mind his probation with search and seizure terms?

A     Yes.  I knew he was on probation with search and seizure terms.

Q     Did you have in mind that you observed knives in the campground?

A     Yes.  It adds to the totality and I -- and officer safety.

Q     And Mr. Holloway in your first encounter also told you he had knives in the campground, correct?

A     Yes.

Q     Did you have that in mind that he told you he had knives, whether you could see them or not, in his campground?

A     Yes.  He let us know that he had multiple knives.

Q     Did you have the machete in your mind as you were

4-RenSER-00638                                                    4-RenSER-00638

22

heading back?

A    Yes.

Q    Why?

A    Just, again, it a larger bladed weapon that can hurt us --

Q    Did you have --

A    -- or hurt anybody.

Q    Sorry.  Did you have the ax that you saw in his campground in mind?

A    Yes.  It goes to the totality of everything.

Q    Okay.  So was all of this information important to you as you were going back to O'Neill Park for the second call with lights and sirens?

A    Yes, and it was broadcast over the air.

Q    Why was all of that important to you?

A    Because that's what we were facing when we go back. And that's why so many deputies went back the second time.

Q    When you were returning back to O'Neill Park did you have any assurances in your mind that Mr. Holloway had not armed himself with one of the knives that were in his campground?

A    No.  There was a fair amount of time in between each call.

Q    Did you have any assurance that he had not armed himself with the machete?

4-RenSER-00639    4-RenSER-00639

23

A     No.

Q     Did you have any assurances that he had not grabbed the ax?

A     No.

Q     So as you get back to O'Neill Park the second time, lights and sirens, what do you do?

A     We drive through the gate and go straight towards campsite 65.  We pull, I believe, right alongside it.

Q     And you stop your vehicle in the road?

A     Correct.

Q     And you're facing forward in the road when you stopped your vehicle, correct?

A     Yes.

Q     And your vehicle has, as we've seen, the PVS that's recording out the front windshield of your vehicle, right?

A     Yes.

Q     Why didn't you stop your vehicle pointing at Mr. Holloway's camp, so that you could have the PVS pointed in his campsite?

A     Because the last update that we had from our dispatcher that he was going through stuff in campsite 67.

Q     So you -- did you park your vehicle short of campsite 67 then?

A     Yes.

Q     Were you intending to park your vehicle in a way that

4-RenSER-00640          4-RenSER-00640

24

it would purposely not catch any type of encounter you were having with Mr. Holloway?

A    No.  We were told we were going to campsite -- or that he was now in campsite 67.  So we stopped our car short of campsite 67, which would -- ended up showing the entrance to campsite 67.

Q    As you exit your vehicle, what do you do next?

A    I draw my service weapon and proceed in front of my car and eventually end up in campsite 67.

Q    Why did you grab your service weapon?

A    One, the type of call that we're going to, and, two, it has a flashlight on it -- or it has a weapons mounted light, a flashlight.

Q    When you were exiting your vehicle, where did you go first?

A    I walked in front of my vehicle towards campsite 67, and then ended up on the road and then inside briefly campsite 67.

Q    You had your service weapon in which hand?

A    Left hand.

Q    And did you have your service mounted light operating in -- on the service weapon?

A    Yes, and you see that in the video.

Q    Were you using it to illuminate the area that you were heading toward?

4-RenSER-00641                                           4-RenSER-00641

25

A    I was.

Q    Were you also using a flashlight at that time?

A    Yes.

Q    Was that in your right?

A    Yes.

Q    Were you using that to illuminate the area so you could see?

A    Yes.

Q    When you returned to Mr. Holloway's campsite -- strike that.

You asked Mr. Gomez, where's he at, correct?

A    Yes.

Q    Does he point you in a direction, tell you where to go?

A    He said something like back that way, and pointed toward -- back towards campsite 64.

Q    Is -- did you then go back to campsite 65?

A    Yes, we went back in the direction, and you see me run right in front of my car -- or walk fastly in front of my car.

Q    And as you're approaching Mr. Holloway's campsite the second time, do you still have your service weapon out?

A    Yes.

Q    Why?

A    It has a flashlight on it.

Q    Were you giving -- when you returned back to campsite

4-RenSER-00642                              4-RenSER-00642

26

65 that second time and you first approached, did you give Mr. Holloway any commands?

A    Yeah.  We were -- told him to get down on the ground multiple times.  And then also at the same time, Deputy Pahel and Gonzalez were giving him commands as well.

Q    Why were you telling him to get down on the ground?

A    Because at that point he was detained per our investigation, and the safest way to handcuff somebody is have them, you know, lay down on the ground to where we can place his hands behind his back.

Q    Can you describe your tone of voice as you're giving Mr. Holloway the commands to get on the ground?

A    Loud and assertive.

Q    Why were you giving him loud and assertive commands?

A    So he would listen to our commands and obey our directives to get down on the ground.

Q    Did you -- did you ever tell Mr. Holloway to step away from his tent?

A    No.

Q    Did you ever tell Mr. Holloway to step away from his tent into the center of his campsite?

A    No, I did not.

Q    Did you ever hear Deputy Pahel tell Mr. Holloway to step away from his tent into the center of his campsite?

A    I did not.

*Echo Reporting, Inc.*

27

Q    Did you ever hear Deputy Gonzalez say anything like that?

A    I personally did not.

Q    Did you ever tell Mr. Holloway to stand there with his arms out and his palms up?

A    No.

Q    Did you ever hear Deputy Pahel or Deputy Gonzalez tell him to do that?

A    I don't believe I did.

Q    As you're approaching you ask, "Do you have lethal," do you remember that?

A    Yes.

Q    Why did you say, "Do you have lethal"?

A    Because we're trained when we approach somebody that's not cooperating, to place them in handcuffs or they're just not cooperating, that one person will always have lethal coverage in case the less-than-lethal option fails.

Q    So who had lethal?

A    I believe it was Deputy Pahel.

Q    Did somebody have less than lethal?

A    Deputy Gonzalez.

Q    And as you're approaching, giving these commands, you had your service weapon out, right?

A    Yes.

Q    Did you holster it at some point?

4-RenSER-00644                                    4-RenSER-00644

28

A    Yes.  I had to holster it in order to take control of Mr. Holloway's left arm to put it behind his back.

Q    Okay.  And as you're approaching him and telling him to get down on the ground, do you know how many times you told him that?

A    Probably at least a dozen.

Q    Did he -- and did he get on the ground?

A    No.  He was given multiple directives by all three of us and ample enough time to at least make a effort to get down on the ground.

Q    And when he didn't get down on the ground, what was your next intention?  What were you going to do?

A    Our next intention was we had to go up and handcuff him.

Q    Did you try to do that?

A    We tried, but it didn't happen.  As soon as I grabbed a hold of Mr. Holloway he tensed his left arm up and that's when the use of force started.

Q    When you went back to put handcuffs on Mr. Holloway, did you run up and punch him in the face?

A    No, I did not.

Q    When Mr. Holloway tensed up after you grabbed his left arm, what did you do next?

A    From there I had transitioned to trying to take him down to the ground using the arm bar takedown.  Yeah.

4-RenSER-00645                                    4-RenSER-00645

29

Q    I think you described it once before, but once again for the jury.  What's an arm bar takedown?

A    An arm bar takedown in this case is on the left-hand side.  So using my left hand, I took control of -- or I grabbed on to Mr. Holloway's left wrist, and with my right hand and right forearm I pushed down on his right -- or, sorry, his left wrist and then his left tricep, pushing downing down in a downward motion.

Q    Were you able to successfully do the arm bar takedown?

A    No.

Q    Why not?

A    Because Mr. Holloway continued to resist and tried to get back up.

Q    So after you grabbed his arm to take -- put handcuffs on him and then transition to an arm bar takedown, what happens next?

A    From there we went to the ground where he put me -- he wrapped his arm around the back of my head, pinning my head to his chest.

Q    Do you recall what arm he used to --

A    I believe it was his left arm.

Q    And what did you do next?

A    To free my head from the headlock, I punched him approximately seven times in his left abdomen/rib area.

Q    What happened after you punched him in the ribs?

*Echo Reporting, Inc.*

4-RenSER-00646                    4-RenSER-00646

30

A    He loosened up his arm to where I pulled my head out, and at that point I was down by his legs.

Q    Okay.  Were Deputy Gonzalez and Pahel involved in this struggle at that time?

A    Yes, by that time they were involved.

Q    Do you know where they were?

A    They were up by his chest/shoulder area.

Q    Did you see what they were doing?

A    At that time, no, I was focused on trying to get control of his legs.  I'm assuming they were -- they were trying to get a hold of his left and right arm.

Q    As they were -- or strike that.

As you're down by his legs, did you hear anything from Deputy Pahel or Gonzalez?

A    Yeah.  They were telling him to stop -- stop resisting and give us your hands.

Q    Okay.  At that point in time, was Mr. Holloway resisting?

A    Yes, he was still fighting with us.

Q    Was he actively resisting?

A    Yes.

Q    What is "active resistance"?

A    Active resistance is somebody who's physically resisting being detained or fighting with us.

Q    When Mr. Holloway grabbed the back of your head and put

*Echo Reporting, Inc.*

31

you in a headlock, were you afraid?

A    Yeah, because it's -- it's a huge safety concern.  We have multiple things on our vests and we all carry weapons. So, there's lots of things that he could have grabbed on or used to hurt us, or at that time still unknown that there was a little girl there.

Q    You being in a headlock, did that put you in a position of disadvantage?

A    Yes.

Q    How so?

A    Because he had his arm wrapped around my head.

Q    So after you got out from the headlock and go down to his legs, what did you do next?

A    I tried to control his legs with both my hands and I wasn't able to, so I pulled out my taser that was issued by the Department, and I tased Mr. Holloway in the butt.

Q    When you deployed the taser, was Mr. Holloway still actively resisting?

A    Yes.

Q    Was he under control at that time?

A    No, he was not.

Q    Was he in handcuffs?

A    No.

Q    After you deployed the taser, what happened next?

A    So the first taser was not effective.  So for a taser

4-RenSER-00648                                    4-RenSER-00648

32

to be effective the two probes that come out have to have a certain amount of spread in between each one of them to get its desired effect.  It's called, "neuromuscular incapacitation."  And because that didn't -- because it wasn't effective, you get a different tone in the taser. And from there to create that connection, I delivered a second taser -- or second tasing to the right calf, which completes that circuit and that neuromuscular incapacitation.

Q   So when you deployed the taser the first time, you applied the taser probes to his buttocks?

A   Yes.

Q   How long did you apply the taser?

A   Once you pull the trigger on the taser, it will automatically go for five seconds before shutting itself off.

Q   And you mentioned "neuromuscular incapacitation," right?

A   Yes.

Q   Again, what is that?

A   It's pretty much like the seizing up of a muscle.  It prevents you from moving, things like that nature.  If it doesn't work, it doesn't have any effect on seizing up the muscle.

Q   If it works, is the person incapacitated so you can

4-RenSER-00649                                    4-RenSER-00649

33

handcuff them?

A     Yes.  That's what the taser's designed for.

Q     Okay.  So on the first application it did not incapacitate Mr. Holloway so that you could handcuff him?

A     No.

Q     That's correct, it did not incapacitate him?

A     Yes, that's correct.  It did not incapacitate him.

Q     My -- and so based on that, he was continuing to struggle with you and Deputy Pahel and Gonzalez?

A     Yes.

Q     You determined that you had to do a second application of the taser?

A     Yes.

Q     And how long -- and that was in his calf?

A     Yes.

Q     How long did that taser application last?

A     Five seconds.  The taser will automatically go for five seconds.

Q     And did that -- did that cause neuromuscular incapacitation for Mr. Holloway?

A     Yes, it did.

Q     Were you then able to handcuff him?

A     Yes.

Q     Did you handcuff him?

A     No.  The deputies that were -- were assisting us -- or

4-RenSER-00650                                              4-RenSER-00650

34

were assisting me handcuffed him.

Q    And before you deployed the taser the very first time, did you give any type of warning?

A    Yes.  And you hear on my PVS, I say, "taser, taser, taser."

Q    Why did you do that?

A    It's two-fold.  It's, one, to alert the person that they're about to be tased, and, two, to let the other deputies or officers know that a taser is being deployed.

Q    So when you deployed the taser the second time, was Mr. Holloway still resisting?

A    Yes.

Q    And after Mr. Holloway was handcuffed, did you use any additional force on him?

A    No.

Q    Did you see any other deputy use any type of force on Mr. Holloway after he was handcuffed?

A    No.

Q    After Mr. Holloway was handcuffed, did you notice he was bleeding?

A    Yes.

Q    Did you notice he was bleeding at any time during the struggle?

A    No.

Q    When you noticed that he was bleeding, what did you do?

*Echo Reporting, Inc.*

4-RenSER-00651                                        4-RenSER-00651

35

A    The -- like I said yesterday, Station 91, which is the Fire Department for Orange County, was called -- was requested.

Q    And after the -- Mr. Holloway was handcuffed, what did you do next?

A    I told somebody to go check the tent for the little girl.

Q    Did you -- were you still concerned for the little girl?

A    Yes, because at that point we needed to start trying to locate her.

Q    Was there a little girl in either of Mr. Holloway's tents?

A    No, we did not locate a little girl.

Q    But were there -- not in those tents, correct?

A    Not in those tents.

Q    Did you then do anything to try and locate the little girl?

A    Yes.  I had -- I instructed Deputy Pahel to start going and trying to find out where she's at and talking to RV -- or Mr. Fuerbach that we know, and then Joshua Gomez now.

Q    And then did you instruct anybody to pick up the knives from the campground?

A    Yeah.  I asked Deputy Brown (phonetic) to pick everything up.

*Echo Reporting, Inc.*

4-RenSER-00652                                       4-RenSER-00652

36

Q    Why did you do that?

A    Because at that point Mr. Holloway was under arrest. We weren't going to leave any weapons inside the campground.

Q    I'm going to ask you a couple more questions -- or strike that before I do.

So the force that you used on Mr. Holloway consisted of punching him in the rib area?

A    Yes.

Q    And tasing him?

A    Yes.  And the takedown itself, but --

Q    Okay.

A    Yes.

Q    So the arm bar takedown, that's a use of force, yes?

A    Yes.

Q    The punching in the ribs?

A    Yes.

Q    And the tasing?

A    Yes.

Q    Was that all of the force that you used on Mr. Holloway?

A    Yes.

Q    Did you ever kick him in the head?

A    No.

Q    Did you ever knee him in the head?

A    No, I did not.

*Echo Reporting, Inc.*

37

Q     Did you ever see any deputy kick him in the head?

A     No, I did not.

Q     Did you ever see any deputy knee him in the head?

A     No.

Q     I want to ask you a couple of quick questions about --
going back to Exhibit 45, which is in evidence.

        MR. WRONIAK:  If I can publish it, your Honor?
It's a dispatch log.

        THE COURT:  You may.

BY MR. WRONIAK:

Q     And if we can go to page two at 5:04:07, that entry.
So do you see that entry?

A     Yes.  Yes.

Q     And that indicates, "one at cuffs, taser employment,"
do you see that?

A     Yes.

Q     Is that an entry made by you?

A     No.

Q     Do you know who made this entry?

A     Dispatcher Jergenson (phonetic).

Q     And as we're looking at this, it says, "one at cuffs."
What did you understand that to mean?

        MS. MKRTCHYAN:  Objection, lacks foundation.

        THE COURT:  Overruled.

        You can answer the question.

4-RenSER-00654                                                4-RenSER-00654

38

THE WITNESS:  That just means that the person's finally in handcuffs.

BY MR. WRONIAK:

Q    And then it says, "taser deployment."  What did you understand that to mean?

A    That sometime during the altercation the taser was deployed, and that that's the notification to the sergeant.

Q    Looking at that entry, does that indicate to you that the person was in cuffs before the taser was deployed?

A    No.  Dispatchers just put in information when they get a -- there are calls when they get a chance to.  So during a priority call or a call that's evolving and changing, that they are updating continuously, when they get a chance they put everything in.

Q    I'm going to actually go back and ask you, before you -- or strike that.

You were doing your investigation of a little girl screaming.  Mr. Holloway possibly going into other campsites after the use of force incident, correct?

A    Yes.

Q    And you stayed on scene for how long after the force was used?

A    Probably 40, 45 minutes, somewhere like right around there.

Q    Were you the last person to leave the campsite that

4-RenSER-00655                                    4-RenSER-00655

39

evening?

A    I was.

Q    And when you left, what was the condition of Mr. Holloway's campsite?

A    As you see it when my camera turns off.

Q    Had anybody destroyed any of his tents?

A    No.  He had paid for the weekend or however long he stayed, so the campsite stays the way it is.

Q    Did you return at any time after that evening to Mr. Holloway's campsite to gather his things?

A    No.  That would be up to the park rangers after his -- whatever he paid for, to collect his things.

MS. MKRTCHYAN:  Your Honor, lacks foundation. Calls for speculation.

THE COURT:  The last portion stricken as to who went back to the campsite after the officer left.

BY MR. WRONIAK:

Q    So you never went back to Mr. Holloway's campsite and did anything with his property, is that correct?

A    No, I did not.

Q    And as you sit here today -- strike that.

The -- after you were -- after the incident and force, you were discussing the possible charges that you could bring against Mr. Holloway with your fellow deputies, do you recall that?

4-RenSER-00656                                                4-RenSER-00656

40

A    Yes.

Q    Why were you doing that?

A    It's a common practice.  We want to make sure that the charges are correct.  That there's nothing that they're being charged for that's -- that doesn't meet the elements. That's something that every -- that we do on every call.

Q    Have you -- so you've done that in the past where you've discussed possible charges against somebody?

A    Yes.

Q    Sir, let me ask you this.  At any time during this incident, the second incident where the force was used, did you kick Mr. Holloway anywhere in his body?

A    No.

Q    At any time did you knee Mr. Holloway?

A    No.

Q    Did you knee him to the head?

A    No, I did not.

Q    Did you run up and punch Mr. Holloway in the face?

A    No, I did not.

        MR. WRONIAK:  If I could just have one moment, your Honor?

        Nothing further at this time.

        THE COURT:  Counsel, would you like to start with redirect or would you like a brief recess?

        MS. MKRTCHYAN:  No -- well, I mean, restroom break

*Echo Reporting, Inc.*

41

would be fine, but we could go for --

THE COURT:  Okay.  Why don't we take 10 minutes or so.

MS. MKRTCHYAN:  Yeah.

THE COURT:  We'll come right back for redirect. Thank you.

Please don't discuss this matter or form or express any opinion concerning the case.

And, counsel, about 10 minutes, okay?

MR. HARRELL:  Very good, your Honor.

THE COURT:  Sir, if you'd return to the stand in about 10 minutes.

THE WITNESS:  Yes, 10 after.

(Jurors exit courtroom.)

(Proceedings recessed briefly.)

(Jurors enter courtroom.)

THE COURT:  Thank you, counsel.  If you'd be seated.  Thank you for the courtesy.

All counsel are present.  The parties are present. This would be actually redirect examination.

MS. MKRTCHYAN:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. MKRTCHYAN:

Q    So, good afternoon.

A    Good afternoon.

*Echo Reporting, Inc.*

4-RenSER-00658                    4-RenSER-00658

42

Q    Sir, you've been asked several questions about your prior incidents related to use of force, right?

A    Correct.

Q    Okay.  So let's recap it briefly.  November 24, 2015 you had the incident with Andy Anroucha (phonetic) that was investigated by Lieutenant -- at the time, Sergeant Lavinia Vega, correct?

A    Yes.

Q    As a result of that incident, the Department did not reprimand you, but you got a pass on that incident even though you were investigated for falsifying reports?

        MR. WRONIAK:  Objection, argumentative, misstates the evidence.

        THE COURT:  Overruled.

        You can answer that question.

        THE WITNESS:  I was -- that claim was unfounded. It was an allegation against me that the Department investigated, and it was found that the allegations were incorrect.

BY MS. MKRTCHYAN:

Q    "Incorrect."  So that was -- we've heard from Lieutenant Ramirez who testified about his -- you have a video that we have yet to see, true?

        MR. WRONIAK:  Objection, argumentative.

        THE COURT:  Overruled.  I'll allow the question.

*Echo Reporting, Inc.*

43

THE WITNESS: I don't have any control of what videos are produced or not.

BY MS. MKRTCHYAN:

Q Sure. So, you were given a warning not to falsify reports at the time, true?

A No, I don't believe so, because I didn't falsify a report.

Q Okay. At the very least, you wrote that Deputy Bader (phonetic) entered the cell when he never did, isn't it true?

A No, he did.

Q Well, you testified he didn't in this court, right?

A Can you show me that?

Q You testified yesterday that Deputy Bader was not there with you when you entered, true, the cell of Andy Anroucha?

A I don't believe that's what I testified.

Q Well, you said, "it was me and Deputy Selich (phonetic) who entered the cell of Andy Anroucha." Did I misquote you?

A Me and Phillips (phonetic) did enter the cell.

Q Okay. Isn't -- so you never testified, nor it ever occurred, that Deputy Bader, a third deputy, entered the cell with you to remove this inmate?

A That's not what you just asked me.

Q Okay, sir. Isn't it true in your report that you wrote about that incident, at the very least you wrote, "an

*Echo Reporting, Inc.*

44

unknown Deputy Bader entered the cell with you," when it never occurred?

A    Deputy Bader was known.  He's not unknown.  I don't understand your question.

Q    Did he enter the cell with you or not?

A    If that's what I put in my report at that time, then he did.

Q    He did.  But that never occurred.  Isn't it true we heard it from Lieutenant Ramirez, it never occurred.  She (sic) show it on the tape.

A    That's not what he said yesterday.

Q    Okay, sir.  In any event, fast-forward to August 2016, that's just within a year of that incident.  Now you have Captain Deorio, the same captain who had reviewed the prior incident with Andy Anroucha, reprimand you in the incident involving that jail again with another inmate, Alfredo Luna (phonetic), true?

A    That is correct.

Q    Okay.  So within a year basically, one time you get a pass.  You're told not to do this.  Within a year, you didn't learn a lesson, and you got reprimanded?

        MR. WRONIAK:  Objection, argumentative.  Move to strike.

        THE COURT:  Sustained.

//

*Echo Reporting, Inc.*

4-RenSER-00661                                            4-RenSER-00661

45

BY MS. MKRTCHYAN:

Q    So, you've got -- you say the reprimand letter, right? No need to review that, true?

A    True.

Q    Okay.  Within just three years after that, and I hope --we would hope that the letter of reprimand would have told you, be careful about falsifying reports.  Within three years after that, in May 11, 2019, you were criminally investigated by your Department again for nothing else but falsifying reports, and this time more seriously, isn't it true?

        MR. WRONIAK:  Objection.  Argumentative, compound.

        THE COURT:  Overruled.

        You can answer the question.

        THE WITNESS:  I don't believe my letter of reprimand had anywhere in there about falsifying reports. You want to show me that section, please?

BY MS. MKRTCHYAN:

Q    Well, letter of -- are you talking about August 2016 incident?

A    Well, you said, "my letter of reprimand."

Q    Yeah.

A    That was your question, not mine.

Q    No --

        THE COURT:  Counsel, I think there's a confusion

4-RenSER-00662                                        4-RenSER-00662

46

between 2016 and then you asking about the criminal incident.

BY MS. MKRTCHYAN:

Q    In 2016, you were told that you used gratuitous push -- you pushed this inmate, Luna.  You did not report it and you did not accurately describe it in your use of force report, yes or no?

          MR. WRONIAK:  Objection, misstates the evidence.

          MS. MKRTCHYAN:  Well --

          THE COURT:  Overruled.

          You can answer fully.

          THE WITNESS:  That's not what my letter of reprimand said.

BY MS. MKRTCHYAN:

Q    Okay.  You looked at it, right?  There's no secrets about that?

A    Yes.  You want to show me it again then, and show me where it says about the reports?

Q    We'll move on, and you'll have it as part of the evidence, sir.  Thank you very much.  Maybe your attorney can go it with you again.

     May 11, 2019, we're now about the Janina Piburn (phonetic) incident, the receipt of stolen property, right?

A    It was a stolen license plate.

Q    Okay.  And again -- again now, you're being reviewed.

4-RenSER-00663                                        4-RenSER-00663

47

Now not just reviewed, not just reprimanded.  There is an independent agency, as the court indicated, "the Orange County District Attorney's Office," not the Sheriff's Department, Orange County District Attorney's Office now is prosecuting you for falsifying an official report in violation of the California Penal Code section, isn't it true?

A     They did.

Q     Okay.  So now you are in a civil lawsuit even after that incident, as a main defendant, as an arresting officer where there is a major, glaring contradiction of your reports, not just from plaintiff, but from other witnesses at the scene, isn't it true, sir?

        MR. WRONIAK:  Objection, argumentative.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Well, so you -- isn't it true, Gonzalez and Pahel and Borba and Gotts, who came to the scene of this incident and admittedly used force on Mr. Holloway, never ever wrote or saw in anywhere, in any point in time, that Mr. Holloway placed you in this so-called, "headlock" that you claim happened, true?

        MR. WRONIAK:  Objection, argumentative, compound.

        THE COURT:  Overruled.

        You can answer that question.

4-RenSER-00664                                    4-RenSER-00664

48

THE WITNESS:  Again, you're misstating the facts. Borba and Gotts weren't there when that occurred, and Deputy Gonzalez testified that he heard me say, "he has my head."

BY MS. MKRTCHYAN:

Q    He heard you say something, which we don't hear on anybody's tapes, true?

A    Yes, but he testified to that.

Q    That he heard but didn't see it, true?

A    Yes, because we were all involved in the altercation.

Q    Okay.  So, is there anyone else who heard but did not see this claimed headlock that you can point to --

MR. WRONIAK:  Objection --

BY MS. MKRTCHYAN:

Q    -- the jury?

MR. WRONIAK:  -- argumentative.

THE COURT:  Overruled.

MR. WRONIAK:  Speculation.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    Okay.  So now, let's move to what you alleged yesterday on cross-examination.  You said, even though I never wrote in my report, nor ever claimed anywhere to the sergeant, nor ever claimed at deposition that Mr. Holloway struck his face on the ground when he went down to the ground, it's possible

*Echo Reporting, Inc.*

49

that he struck his face on the ground and that's how he sustained his injuries. Do you remember that when Defense Counsel Harrell was asking you questions?

A    Yes.  He asked me, is it possible, just like you've asked me many hypothetical questions.

Q    So, even though nowhere in your reports, never at two depositions you ever claimed that happened, prior proceedings, you never ever testified to that.  Now here you're offering that speculation to this jury saying, it's possible even though I didn't see it, I didn't ever mention it before, never wrote it in my report, he possibly could have struck his face on the ground when they took him down to the ground, and that's how he got his head injuries, true?  That's what you're telling this jury?

        MR. WRONIAK:  Objection, argumentative.

        THE COURT:  Sustained.

        Just re-ask the question, counsel.

BY MS. MKRTCHYAN:

Q    So, we heard your deposition clip, and that was the reason why we played the clip, when you were describing how Mr. Holloway and you went down to the ground.  Do you remember that yesterday?

A    Yes.

Q    You claimed he never face plant.  He was facing me when we went down to the ground.  My head was towards his chest

4-RenSER-00666                                    4-RenSER-00666

50

area.  You were facing each other on the ground.  Mr.
Holloway was on his back and I was facing him, true?  You
remember that?

A    I testified in my deposition that he landed on his
right side.  And then Mr. Harrell asked me, is it possible
that he hit his head, and it is a possibility.

Q    And you never --

A    You never asked me that question.

Q    That same question was asked several times, many ways
at your depositions twice -- two depositions, and you never
ever mentioned that he might have possibly struck his face
on the ground, do you remember that?

        MR. HARRELL:  Improper use --

        MR. WRONIAK:  Objection.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Can you point to us anywhere at your deposition that
you claimed that Mr. Holloway struck his face on the ground?

        MR. HARRELL:  Assumes facts that he was asked.

        THE COURT:  Overruled.

        THE WITNESS:  I believe at my deposition I was
asked by your co-counsel if I ever saw it, and I said I
didn't see it.  Mr. Harrell asked me, is it possible, and I
said, it's possible.  That's two different things
completely.

4-RenSER-00667                                    4-RenSER-00667

51

BY MS. MKRTCHYAN:

Q    Okay.  So if you're talking about realm of possibilities here, you as an officer are testifying under oath.  You understand the penalties of perjury here?

A    Yes, and --

MR. HARRELL:  Objection --

THE COURT:  Also --

MS. MKRTCHYAN:  Okay.

MR. HARRELL:  -- argumentative.

THE COURT:  Sustain and stricken.

MS. MKRTCHYAN:  Well, okay.

BY MS. MKRTCHYAN:

Q    So, you're talking about a realm of possibilities about something you didn't see, and you're offering that as your testimony under oath?

A    Yes.  Just like you've asked me multiple hypothetical questions, which would be in the realm of possibility, too.

Q    And if that is the case, if you're talking about a realm of possibilities, then is it also possible that you actually punched him to his face but you're denying it under oath?

A    That's because I never punched him in his face.

Q    I see.  And is it also possible that you kneed him in the head and you're denying it under oath?  If they are talking about a realm of possibilities, and testimony under

4-RenSER-00668                                                   4-RenSER-00668

52

oath does not mean anything to you --

MR. WRONIAK:  Objection, argumentative.

BY MS. MKRTCHYAN:

Q    -- then perhaps you are --

THE COURT:  Sustained.

Counsel --

BY MS. MKRTCHYAN:

Q    -- telling us the truth?

THE COURT:  Counsel, I'm going to strike the question.  Just re-ask the question.

BY MS. MKRTCHYAN:

Q    So if you're talking about realm of possibilities, then it's possible that you kneed him in the head, or saw someone knee him in the head, as we hear him screaming on this tape, and yet you're denying it under oath.  Is that not possible?

A    No, because the time he's screaming that, I'm by his legs.  I wouldn't be able to knee him or kick him in the head at that point.

Q    So you're denying lot of things, but you can't deny the application of taser, can you?

A    I've never denied that I tased Mr. Holloway.

Q    Because the taser you have independent documentation that you actually applied your taser, true?

A    Again, I've never denied not tasing him.

Q    And if he --

4-RenSER-00669          4-RenSER-00669

53

A    That's been fact since the beginning.

Q    Sir, and you also cannot deny that you threw punches on him on the ground because you said, I had to free my head from his grip, true?

A    Yes.  And you hear me punch on our PVS video in the ribs.

Q    Right.  So, basically, the fact of the matter is that you never saw my client hit his face on the ground, and you're just basically offering that speculation here under oath, true?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Again, I didn't see it.  I was asked, is it possible.  You've asked me multiple hypothetical questions.

BY MS. MKRTCHYAN:

Q    So you -- okay.  Let's go to the call detail information report and see some of the things that you were discussing here.  This document is the same document -- this is Exhibit 45, that was displayed to you by the defense a few minutes ago on cross, true?

A    Correct.

Q    Okay.  So, going back to the first time when this call came in.  Let's establish a couple of things, make sure that

4-RenSER-00670                                    4-RenSER-00670

54

it's clear.

MS. MKRTCHYAN:  Go below.  Yeah.  So, stop right there.

BY MS. MKRTCHYAN:

Q    So the call we know now, the Fuerbach call came in at 3:40 a.m., true, sir, based on this call detail dispatch?

A    Yes.

Q    Okay.

A    At the time though we didn't know it was Fuerbach, but that's when the first call was originated.

Q    Understood.  3:40 call comes in.  We hear the call.  At 3:00 --

MS. MKRTCHYAN:  Let me have this myself, please. Thank you.

BY MS. MKRTCHYAN:

Q    We know that Borba with Billinger (phonetic) arrived to scene -- on scene, you've discussed it.  You already know how to read this, at 3:54, right?

A    That is correct.

Q    Okay.  So we -- how many minutes is that from the time the call comes in to time they've arrived to the scene?

A    Fourteen, almost 15 minutes.

Q    Okay.  And we saw some of the tape of Borba.  Let's play some portions of Borba's tape.

MS. MKRTCHYAN:  That's exhibit that was admitted,

*Echo Reporting, Inc.*

4-RenSER-00671                                          4-RenSER-00671

55

your Honor, earlier.

THE COURT: All right. Thank you.

MS. MKRTCHYAN: We'll only play a few portions of that.

MR. HARRELL: No objection.

MR. WRONIAK: Just exhibit number, please.

THE COURT: Well, counsel?

MS. MKRTCHYAN: We have it -- part of the exhibit lists.

THE COURT: Yeah.

MS. MKRTCHYAN: It was admitted today.

THE COURT: I don't recall it offhand, but we know where the Borba's tape is. Okay.

MS. MKRTCHYAN: So, let's play that and see.

(Begin audio.)

(End audio.)

MS. MKRTCHYAN: Stop right there.

So this portion that I'm playing is at 3:56 a.m.

Can you enlarge this? Is there any way to enlarge that?

UNIDENTIFIED SPEAKER: No.

MS. MKRTCHYAN: Okay. 3:56 a.m., this is Borba's tape.

Let's play it a little bit.

(Begin audio.)

4-RenSER-00672                                    4-RenSER-00672

56

(End audio.)

MS. MKRTCHYAN:  Stop right there.

BY MS. MKRTCHYAN:

Q    Isn't it true right now when we see this, he arrived, he turned off his car lights, and this is how dark this campground is without any flashlights, without any car lights, isn't it true?

MR. WRONIAK:  Objection, vague, ambiguous.

THE COURT:  Do you understand the question?

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    Well, you watched this tape from the beginning up until the time -- today, up until the time you actually -- it was stopped when you were talking with Mr. Holloway, true?  You showed this tape?

A    Yes.  I just don't know where he's at in relationship to the campground.

Q    So you don't know where he is right now.  We've looked at the transcripts, we've looked at the tape.  You don't know where he is right now when he actually came to the scene, turned off his lights, and he's walking about campsite 65, you don't know?

MR. WRONIAK:  Objection, argumentative, speculation.

THE COURT:  Do you understand the question?

4-RenSER-00673                    4-RenSER-00673

57

THE WITNESS:  I do.

THE COURT:  You can answer it.

THE WITNESS:  yes.  I don't show up for like 15 more minutes.  And when I first contact Borba, it's in front of the campground itself.  So, prior to my arrival, I don't know where inside the campground he is at this point.  And you hear throughout his tape them ask for them to verify the location.  So, I can't testify to where he's at at this exact moment, other that -- other than that he's somewhere inside O'Neill Campground.

Q    Sir, you watch -- I'm talking about what you observed and heard on this video with us this morning.  When we were looking at the transcripts and playing the entirety of this up until the time you spoke with Holloway, you can't tell us where he was prior to you talking with Holloway?

MR. WRONIAK:  Objection, speculation.

THE COURT:  Sustained.

MS. MKRTCHYAN:  Okay.  We'll ask Borba.

BY MS. MKRTCHYAN:

Q    Let's move forward to -- you have a conversation with Mr. Holloway.  You arrive to the scene.  Deputy Borba is there with you, right?

A    That is correct.  Yes.

Q    Okay.  He was there before you even, right?

A    Yes, that's been established.

4-RenSER-00674                                        4-RenSER-00674

58

Q    Okay.  And then you have a conversation with you say, Borba and Holloway, and then you leave, true?

A    Yes.

Q    You testified that you said that, you know, the incident was basically they couldn't conclusively decide if there was a female.  Well, sir, isn't it true that Deputy Pahel checked tents?  According to your report, Deputy Pahel checked both tents of Mr. Holloway prior to you leaving his campsite the first time, and there was no trace of any female in his tents, isn't it true?

A    Yes.  He did a -- what's called a "protective sweep," making sure that there's nobody else inside the tents or any victims, things like that.

Q    Protective sweep.  You wrote here, "Deputy Pahel checked both tents belonging to Jeremy located at campsite 65.  Did not locate any other individuals.  While Deputy Pahel looked for the other party involved, et cetera, for the other party, we were still talking with Jeremy, but --

A    That's considered a protective sweep.

Q    Well, sir, but why did you tell on cross-examination when asked by your attorney, if you checked tents of Mr. Holloway, you said, no, you didn't check his tents.  Why did you say that?  That was false.

        MR. WRONIAK:  Objection, misstates his testimony.

        THE COURT:  Sustained.

4-RenSER-00675                                          4-RenSER-00675

59

BY MS. MKRTCHYAN:

Q    Well, earlier you testified, and the record is clear, you were asked, if it was not conclusively determined to be, you know, false -- it was not conclusively determined that Mr. Holloway was involved or was not involved in DV, do you remember that?

A    That is correct.

Q    Okay.  And then your attorney asked, okay, did you check his tents?  You said, no.

A    Yes, because I physically didn't.

Q    Well --

A    Deputy Pahel did, and he can testify to that.

Q    When he was asking that question, were you understanding it to mean that you personally were checking his tents, or we checked his tents?

A    He asked me what I was doing and if I checked the tents, and I did not.  That I was --

Q    But there were other officers with you.

THE COURT:  Just a moment.  Just a moment.

Finish -- finish your answer.

THE WITNESS:  We asked me if I checked the tents. I did not.  Deputy Pahel did, and that's in my report, and Deputy Pahel can testify to that.

BY MS. MKRTCHYAN:

Q    Well, sir, when you work with other officers, you work

4-RenSER-00676          4-RenSER-00676

60

together assisting each other in that call, isn't it true?

A    Yes.  We were all there.

Q    Okay.  I'm not talking about, we are all there.  You were actually working together to investigate this DV call, true?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  Are we discussing whether Renegar personally checked the tents or Pahel personally checked the tents?  I'm confused by this.

MS. MKRTCHYAN:  The question was whether they checked the tents and why did they find that this was --

THE COURT:  No.  I'm going to sustain the objection.  The question initially of Renegar was, did you check the tent?  That was specific to him.  So if Pahel is being lumped in with Renegar --

MS. MKRTCHYAN:  Okay.

BY MS. MKRTCHYAN:

Q    So, if Pahel --

THE COURT:  Sustained.  Objection sustained.

BY MS. MKRTCHYAN:

Q    Sir, if Pahel checked the tents, did not find any trace of a female, no female clothes, no any sort of indication that there was a female there at that campsite earlier, why would you tell us, to this jury, that, you know, we didn't conclusively negate that there might have been a female

4-RenSER-00677                                    4-RenSER-00677

61

there and evaporated somehow?

MR. WRONIAK:  Objection --

BY MS. MKRTCHYAN:

Q    Why did -- why are you confusing/misleading the jury?

MR. WRONIAK:  Objection --

THE COURT:  Sustained --

MR. WRONIAK:  -- argumentative.

THE COURT:  -- sustained and stricken.

BY MS. MKRTCHYAN:

Q    So, is it true that Pahel did check the tents and the surroundings of the -- his campsite to see if there was ever any female there?

A    Yes, I just said that, that Pahel checked the area.

Q    You said it a few minutes ago when I asked.  You didn't say that when your attorney was asking those questions, were -- did you?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  Sustained.

MS. MKRTCHYAN:  Okay.

BY MS. MKRTCHYAN:

Q    In any event, sir, you know the difference between speculation and evidence, true?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  Sustained.

//

*Echo Reporting, Inc.*

4-RenSER-00678                                                4-RenSER-00678

62

BY MS. MKRTCHYAN:

Q    Can you arrest someone on mere speculation?

MR. WRONIAK:  Objection, argumentative, lacks foundation.

THE COURT:  You can ask --

MR. WRONIAK:  403.

THE COURT:  You can answer that question.

THE WITNESS:  You need probable cause.

BY MS. MKRTCHYAN:

Q    And what is probable cause to you?

A    That the likelihood a crime did occur --

Q    Right.

A    -- simply as it can be put.

Q    And -- well, likelihood.  So, probable cause means that there is a crime, and you need to connect that crime to a specific individual, not to the neighbor, not to someone else, true?

MR. WRONIAK:  Objection, 403.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, you didn't arrest Mr. Holloway because you had no victim.  You did not find any evidence of a crime, true?

MR. WRONIAK:  Objection, asked and answered, 403.

THE COURT:  You can answer it one more time.

THE WITNESS:  Yes, we didn't arrest Mr. Holloway

4-RenSER-00679                                        4-RenSER-00679

63

for domestic violence that night.

BY MS. MKRTCHYAN:

Q    Well, no, that's not my question.  You did not arrest him not because you were doing him a favor.  You know, we are not asking you to do any favors, officer, here.  You didn't arrest him for DV because you didn't find any evidence, isn't it true?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  You can answer the question.

THE WITNESS:  Again, we didn't arrest him for domestic violence that night.

BY MS. MKRTCHYAN:

Q    Because there was no evidence he was involved in a DV, isn't it true?

A    At that time we couldn't find the female.

Q    Right.  And in order to arrest someone for a DV, you need to find a victim, true?

MR. WRONIAK:  Objection, relevance, 403.

MS. MKRTCHYAN:  He already was going into this area, your Honor.

THE COURT:  Well, we're getting into -- I'll let you answer it one more time, and then we'll move on.

THE WITNESS:  We didn't arrest him for domestic violence that night.

THE COURT:  All right.

*Echo Reporting, Inc.*

64

MS. MKRTCHYAN: That was not my question. Move to strike, non-responsive.

THE COURT: Well, counsel, I think that will give me the probable cause for getting the officer's state of mind, which I've allowed. Whether he could arrest for other reasons, et cetera, it's obvious that they didn't arrest him that night. So, it's --

BY MS. MKRTCHYAN:

Q    And then you -- when you continued your conversation with Borba, let's hear your conversation with Borba on his tape.

MS. MKRTCHYAN: Let's move -- fast-forward to 4:34, the tape on Borba.

(Begin audio.)

(End audio.)

BY MS. MKRTCHYAN:

Q    So this is the conversation you had. Did we play it right, where you have the conversation with Deputy Borba, you telling him, "this guy might have a warrant, definitely on probation." And then he says, "may not be worth it." True, this is what you -- we've heard?

A    Something to that affect, yeah.

Q    This -- I didn't hear you, sir.

A    Something to that affect, yeah.

Q    Okay. And this is after you left his campsite at the

*Echo Reporting, Inc.*

4-RenSER-00681                                                 4-RenSER-00681

65

first encounter, after you did not locate any female.  You did not find any evidence of crime, and you did not arrest him, true?

MR. WRONIAK:  Objection, 403.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yeah, and then we left the campground.

BY MS. MKRTCHYAN:

Q    So, fast-forward, the next call -- or, actually, let's go back to the call detail information report and see from your perspective.

MS. MKRTCHYAN:  May I have that, please?  Thank you.

BY MS. MKRTCHYAN:

Q    Okay.  4:47, we already -- we covered this at one point.  You put down on the dispatch or your -- on your mobile data computer, that you spoke with multiple informants and all of them stated it was campsite 65, et cetera.  And then you wrote that, you know, that "subject is on formal probation, lots of knives, subject aggressive.  No injuries.  Scene 1098."

A    Yes, so we know that's me.

Q    Okay.  What is 1098?

A    It's a police radio code for like complete and done.

*Echo Reporting, Inc.*

4-RenSER-00682                                          4-RenSER-00682

66

Q     Okay.

A     Like call's done.

Q     Okay.  So it says, "Renegar" next to your name, right?
Like can we --

A     Yes.  And we know this is inputted by me because it
says, "MOB" next to the black square.  It means "mobile."


Q     Okay, sir.  Between that information that you input at
4:47, 30 seconds, and the information that we see next input
by, you told us, the dispatch, 4:48:13, do we see any other
officer communicating with the dispatch on their mobile
computer about this incident?

A     You don't see this on this log, but there -- our
dispatchers and our call takers all have the ability to
communicate with any deputy that's working.

Q     We heard the radio calls, didn't we?

A     Yeah.

Q     Okay.  Between 4:47, 30 seconds, and 4:48, 13 seconds
that we see here, is there any other officer who told the
dispatch anything about this first encounter with Mr.
Holloway about the knives, him being aggressive, anything
like that?

A     No, but I cleared the call and left.

Q     Right.  And both times isn't it true you were the
primary unit investing the calls?

4-RenSER-00683                                          4-RenSER-00683

67

A    Yes, because dispatch assigned it to me.

Q    Okay, sir.  So, when the dispatch puts down the information there next, 4:48:13, this is per you.  This is the information per you.  The -- the unit number is redacted for officer safety.  Informant has -- informed, per unit, informed has several machetes, hammers, knives.  This is the information that you provided to the dispatch, and the dispatch puts down on the radio, true?

        MR. WRONIAK:  Objection, calls for speculation.

        THE COURT:  Overruled.

        You can answer the question.

        THE WITNESS:  I provided some of that information to dispatch, but I never told her anything about a handgun.

BY MS. MKRTCHYAN:

Q    In any event though, there's no other officer when they -- when you left, how many officers, Pahel, Gonzalez, Borba, Billinger.  They had multiple officers at Holloway's campsite.  You are the only one who gave information about this incident.  You told them about the formal probation, which came out to be false.  You told them about multiple people said it was all campsite 65.  And then you talked about knives, subject aggressive.

    You're the only officer who provided this information to the dispatch, and then the dispatch put that information there and wrote, next time three units next call.  Do you

4-RenSER-00684                                4-RenSER-00684

68

see that?

MR. WRONIAK:  Objection, compound, speculation.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Can you restate your question?

BY MS. MKRTCHYAN:

Q    Well, is there any other officer we see on this call
detail log that input information about this encounter to
the dispatch?

A    No.  I put the information on on 4:47.  You'd have to
talk to the dispatcher on where she got that information
from.

Q    Well, based on this call detail information, it appears
to us there is redaction.  Let's look what is redactions
for.  Let's look.  We have redactions provided here in the
call disposition face sheet.  Let's look at the call
disposition face sheet.

A    I don't have any control of what's redacted in these
reports.

Q    Sir, we understand that.  Let's look at the call
disposition.  Where is that?

MS. MKRTCHYAN:  Can I have this call disposition
log?

BY MS. MKRTCHYAN:

Q    This -- this document is the same document that the

4-RenSER-00685                                                4-RenSER-00685

69

defense has gone over with you, true?

A    Yes, it was put up earlier.

Q    And the unit numbers are redacted.  Do you know why unit numbers are redacted from this document?

MR. WRONIAK:  Objection, calls for speculation.  Foundation.

THE COURT:  No, you can answer that.

THE WITNESS:  I don't know why they're redacted.  I didn't provide any of these.  You'd have to ask whoever provided you these documents why they're redacted.

BY MS. MKRTCHYAN:

Q    Well, you know, we have -- in any event, this list provided by your office.  It wasn't us that redacted this information, isn't it true?

MR. WRONIAK:  Objection, argumentative.  403.

THE COURT:  "403," yeah.  Sustained.

MS. MKRTCHYAN:  Please, show that there.

BY MS. MKRTCHYAN:

Q    They have unit numbers redacted here, but there are names next to it for the call dispositions.  Do you see that, "unit number," and then next to it there are names listed, "Renegar, Renegar, Baeke (phonetic), Renegar.  Do you see that, sir?

A    Yes.

Q    Okay.  And you said that your name was there for the

*Echo Reporting, Inc.*

70

call dispositions because you were the primary unit handling this calls, true?

A    Again, I'm the primary unit, but I have no control over what's put on this document that was turned over to you.  I did not put names next to things or redact stuff.  That would be the Sheriff's Department or wherever you got that from.

Q    In any event, sir, is there any indication based on this call log detail information that there was another officer who input this information other than you?

A    Again, it says, Jergenson inputted this information. You would have to ask her where she got all her information. She's allowed to talk to all the deputies involved.  Any dispatcher can talk to any deputy that's working that night.

Q    Okay.  So you're denying this information came from nobody else but you?

A    No, you're asking me to speculate.  I'm telling you what I put in, and then the next entrance is done by a dispatcher.

Q    All right, sir.  So, and then we go to the scene, second time you arrived.  We know for a fact already that Mr. Holloway was not at campsite --

        MS. MKRTCHYAN:  We need some water her.  Maybe we need some --

        THE COURT:  Yeah.  Want to take a break?

71

MR. HARRELL:  Yes, please.

UNIDENTIFIED SPEAKER:  It went down the wrong tube.

THE COURT:  Okay.

MS. MKRTCHYAN:  Maybe water?

THE COURT:  Go grab a cup of water.  Make sure you're comfortable, okay?

UNIDENTIFIED SPEAKER:  I have water.

THE COURT:  You do?  Okay.

Okay.  All right.  All right.  Thank you, counsel.

BY MS. MKRTCHYAN:

Q    Right.  So you testified about the knives, sir.  You know the value of crime scene investigation, right?  You know what is crime scene investigation?

MR. WRONIAK:  Objection, relevance, 403.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    If there were knives thrown on the ground as your maintaining before and after this incident, why did you not take pictures of those knives in their original condition before you asked Brown to pick them and put them on a picnic table?  Why would you not do that?

A    Because at the time I didn't think about it.

Q    Okay.  So -- and as an officer you're telling us that you, you know, are allowed to change the crime scene before

4-RenSER-00688                                    4-RenSER-00688

72

you take pictures?

MR. WRONIAK: Objection, argumentative.

THE COURT: Sustained. Sustained. Stricken.

BY MS. MKRTCHYAN:

Q    So if there were knives thrown on the ground -- well, let me strike that.

We see knives only on the picnic table in that picture that you took, true?

A    Yes, because at the time that's where they were when Sergeant Rawlings (phonetic) told me to take photos.

Q    Right.  But this is after we see Brown pick up those -- whatever we see him picking up from the tent.  There were -- he was picking up those things from inside of the tent and putting them on the table, true?

MR. WRONIAK: Objection, assumes facts not in evidence.

THE COURT: You can answer the question.

THE WITNESS: Wherever Brown picked them up from, we took photos of it after the fact, after being directed to by the sergeant.

BY MS. MKRTCHYAN:

Q    And isn't it true there were no knives on the ground, because Brown picked up whatever knives Mr. Holloway had from inside of his tent, not on the ground?

A    That's not true.

4-RenSER-00689                                        4-RenSER-00689

73

Q    Well, if it's not true, do you have any independent evidence, other than patrol vehicle recordings where we see what Brown does, is there any other independent evidence that you have that there were actually knives strewn on the ground?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  You can answer the question.

THE WITNESS:  I believe every deputy's going to be testifying to that fact.

BY MS. MKRTCHYAN:

Q    I'm asking you.  I'm not asking other deputies.  I'm interested in what you've got to say under oath about these knives.  Because you've testified, you've maintained that there were knives strewn on the ground --

A    And --

Q    -- true?

A    -- and so has every deputy.

Q    And we don't -- the knives that we see --

MS. MKRTCHYAN:  Can you pull up those photographs, please?

BY MS. MKRTCHYAN:

Q    The knives that we saw they were in sheaths, right.  These knives were in sheaths, they were in -- they were not dirty.  They were clean knives.

MS. MKRTCHYAN:  Let's open them and --

*Echo Reporting, Inc.*

74

MR. WRONIAK:  Objection.

THE COURT:  Sustained.  There's no question pending.

MS. MKRTCHYAN:  Let's just show the knives, please, real quick.  Yeah.

BY MS. MKRTCHYAN:

Q    Are these the knives that you say were strewn on the ground, sir?

A    Yes.

Q    Okay.  And so, we saw on the -- I mean, we saw on the PVS recordings there was no knives -- there were no knives when Mr. Holloway was picked up from the ground after the use of force, true?

A    Can you restate your question?

Q    Well, we saw when your car's finally turned around and were facing the campsite, we did not see knives on the ground, true?

A    I believe I asked Deputy Brown to start collecting them before my car was turned -- turned around.

Q    Okay.  And so Deputy Brown picked them up from in front of the tent, true?

MR. WRONIAK:  Objection, assumes facts not in evidence.

THE COURT:  You can answer the question, if you know the answer.

4-RenSER-00691                                    4-RenSER-00691

75

THE WITNESS:  I don't know the answer.

THE COURT:  Okay.

BY MS. MKRTCHYAN:

Q    Okay, sir.  So if there any dirt on these knives in the sheaths that you see?  Is there any dirt there?

A    They look worn and dirtier.  To me they do.

Q    Okay.  Let's look at the photographs of Mr. Holloway after he was wrapped by the paramedics.  Only after Sergeant Rawlings came and asked you to take pictures of Mr. Holloway, only then you took pictures of him, right, after paramedics wrapped him up?

A    Yes, because he directed us to.

MS. MKRTCHYAN:  The bigger one, the other one. Not that one.  Yes.

BY MS. MKRTCHYAN:

Q    So, on this picture -- nothing prevented you, by the way, to take pictures of him before he was wrapped by the paramedics, true?

A    He was being attended to by the paramedics.

Q    Okay, but before.  Paramedics arrived about 15 minutes after the use of force, true?

A    If you're saying that time frame, then, true.

Q    Okay.  And nothing prevented you -- you know your use of force policy.  You need to take pictures of suspects who are injured, true?

*Echo Reporting, Inc.*

76

A     We have to document the use of force.  I'm not sure if the word "pictures" is in there.

Q     Okay.

A     Typically, we would call our crime scene unit to do it.

Q     Okay, sir.

MS. MKRTCHYAN:  So let's enlarge this photograph.

BY MS. MKRTCHYAN:

Q     If Mr. Holloway actually struck his face on the ground, would you expect his face to have dirt, mud on his face? Would you expect to see dirt from the ground on his face?

MR. WRONIAK:  Objection, speculation.

THE COURT:  I'll allow you to answer that question.

THE WITNESS:  I think you see clumps of blood. That would probably be blood coagulating with dirt --

BY MS. MKRTCHYAN:

Q     I see.

A     -- but I'm not a medical expert.

Q     Okay, sir.  So -- and going back to your report, isn't it true you also -- when --

MS. MKRTCHYAN:  Let's pull up his report, please, Exhibit 35, a couple of points there.  35 is in the file folders.  No, it has to have a front.  Let me -- no, it's not the one.  It's not the one.  Can I have this, please? Why did you close this?  Right here.  Please open that.

*Echo Reporting, Inc.*

77

BY MS. MKRTCHYAN:

Q    So, in your front page of your report, you wrote you were responding to -- you have listed the victims.  Let's look at it.  Offenses.  You've arrested Mr. Holloway for felony obstruction, resisting executive officer, true?

         MR. WRONIAK:  Objection, beyond the scope, 403.

         THE COURT:  Overruled.

         THE WITNESS:  Yes.

BY MS. MKRTCHYAN:

Q    Okay.  then you arrested him for misdemeanor assault/battery on peace officer?

A    Yes.

Q    Going down, you've listed the victims of Mr. Holloway as Renegar, Gonzalez and Pahel?

         MR. WRONIAK:  Objection, 403, asked and answered.

         THE COURT:  You can answer one more time.

         THE WITNESS:  Yes.

BY MS. MKRTCHYAN:

Q    Okay.  You wrote here, deputy activity at the time of offense, "responding to a disturbance," right, that's what you wrote?

A    Yes.

Q    Okay.  Disturbance of the peace.  What penal code section is that, sir?

         MR. WRONIAK:  Objection, asked and answered.

*Echo Reporting, Inc.*

78

THE COURT:  Counsel, this has been asked and answered, hasn't it?

MS. MKRTCHYAN:  No.

THE COURT:  I'm being cautious.

MS. MKRTCHYAN:  No, it has not been asked and answered, your Honor.  This is the first time we're going over this part of his report.

THE COURT:  Well, but we're going to do this quickly now, counsel.

MS. MKRTCHYAN:  Yes, very quickly.

THE COURT:  Very quickly now.  I think this has been asked and answered, but I'm going to be cautious.

THE WITNESS:  This is a drop-down menu on our reports, and it just gives a -- it just gives options.

BY MS. MKRTCHYAN:

Q    Did --

A    So we were responding to a call for service -- we were responding to a call for service reference a disturbance.

Q    Did I ask you that question?

A    Yes.

Q    I asked you, what penal code section --

MR. WRONIAK:  Objection, argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Sir, what is disturbance of the peace?  What penal code

4-RenSER-00695                                    4-RenSER-00695

79

section is that?

A    Again, that's different from what's on this report. This report's a drop-down menu for this question.  The options are disturbing -- or responding to a disturbance.

Q    Okay.  And disturbance, what does it mean in that context for you?

A    In this context is we're responding to a man walking around a campground with a -- possibly entering an RV with a little girl screaming.  That would be a disturbance.

Q    Okay.  And I asked you a simple question.  What penal code section is disturbance of the peace under California -- in California?

MR. WRONIAK:  Objection, argumentative.

THE COURT:  This is Exhibit 35, is that correct?

MS. MKRTCHYAN:  Yes, your Honor.  This is his report.

THE COURT:  You can answer that question.

THE WITNESS:  Again, there's -- this report, the drop-down menu, but to reference your question, there's different things.  An assault and battery is considered a disturbance, 240/242, assault and battery.  Somebody that gets, you know, shot, it's 245, which is a disturbance of the peace.  Your question is too broad.  There's every --

BY MS. MKRTCHYAN:

Q    I asked you very simple --

*Echo Reporting, Inc.*

4-RenSER-00696                                    4-RenSER-00696

80

A    A majority of the calls we get are disturbances, so it really just is call specific.

Q    Sir, do you -- did you -- do you remember my question?

A    Yes, I do, but --

Q    Okay.

THE COURT:  Counsel, that question was --

BY MS. MKRTCHYAN:

Q    Okay.  Is that disturbance of the peace?  I asked you, what penal code section is that, and you cannot tell us, right?

MR. WRONIAK:  Objection, argumentative, asked and answered.

MS. MKRTCHYAN:  Your Honor, it goes to his state of mind, and it -- he dearly wants -- this is his report.

THE COURT:  I will allow you to answer the question, if you know the answer.

THE WITNESS:  Reference this report, your Honor, that -- that part that she's asking --

MS. MKRTCHYAN:  Move to strike.

THE WITNESS:  -- is --

THE COURT:  Counsel.

MS. MKRTCHYAN:  Your Honor, he's --

THE WITNESS:  -- is a drop-down menu.  It doesn't ask for penal codes or anything like that.  It's --

THE COURT:  Yeah.  I think this has been --

4-RenSER-00697                                                                4-RenSER-00697

81

THE WITNESS:  -- a drop-down menu.

THE COURT:  -- it has been covered a number of times, counsel.

MS. MKRTCHYAN:  I'm asking him about his knowledge of the penal code section, your Honor, and it goes to his state of mind as a peace officer.  I mean --

MR. WRONIAK:  403 at this point.

THE COURT:  Well, I'm having a problem seeing the relevance of it.  That's the difficulty.

MS. MKRTCHYAN:  Well, the relevance comes after and comes in closing argument, your Honor.  Am I allowed to question this officer or not?

THE COURT:  You can argue whatever you'd like to off these documents, counsel, but this is 403 now.

BY MS. MKRTCHYAN:

Q   Well, you can't us what penal code section this disturbance of the peace, can you?

MR. WRONIAK:  Section 403.  That's sustained.

THE COURT:  I'll sustain the objection, counsel.

BY MS. MKRTCHYAN:

Q   Disturbance of the peace is also misdemeanor, true?

MR. WRONIAK:  Objection, 403.

THE COURT:  Counsel, I'm going to sustain this objection.

MS. MKRTCHYAN:  Okay.

*Echo Reporting, Inc.*

4-RenSER-00698          4-RenSER-00698

82

THE COURT:  This is --

BY MS. MKRTCHYAN:

Q    So, and then about -- you write the information about Mr. Holloway.  The only place where we see you identify any injuries related to him is here in this drop-down menu you wrote, "apparent minor injury," true?

A    Yes, because that's the only option in the drop-down menu.

Q    Well --

A    It's that or major injury, none, things like that.

Q    Okay, sir.  But you basically have the opportunity to write a narrative report after you finish this drop-down menu.  This is your narrative portion of the report, true?

A    That's correct.

Q    Okay.  And in your narrative portion of your report, you have the opportunity to write what kind of a minor apparent injury does this person have or does not have after you use force on him, true?

A    If the sergeant asks me to put that in there, but typically the sergeant would write what the injuries were in his use of force summary.

Q    Are you telling me that your report does not have to identify the injuries that a suspect on whom you apply force sustains?

A    No, it does identify it.  It says, minor -- apparent

4-RenSER-00699                                    4-RenSER-00699

83

minor injury.  That's the identification of it.

Q    Sir, I'm talking about your narrative report.  Are you saying that you're not obligated to document the kind of injuries that a suspect on whom you apply force accurately in your report?

A    At that time I don't believe I -- we were required to, but most of the times we would put that in there.  And this time I just checked "apparent minor injuries."

Q    So, your understanding is that in your report you don't have to identify where the person sustained injuries and how he sustained them, true?

A    That's not what I said.  I said that at times you would identify it and other times you wouldn't.

Q    Well, and yet in your report, as we've looked many times before, there's no indication how Mr. Holloway sustained head injuries and the extent of his head injuries, true?

          MR. WRONIAK:  Objection, asked and answered, 403.

          THE COURT:  I'll let you answer it one more time.

          THE WITNESS:  Again, that's not in my report.

BY MS. MKRTCHYAN:

Q    Is there any particular reason why you didn't put that information in your report?

A    Like I stated the other day, I didn't see how his head got injured.

84

Q    Well, you saw him bleeding after the incident?

A    And he was attended to by medical.

Q    And did you ask any other officers at scene, did you see how this man got his head injuries?

MR. WRONIAK:  Objection, asked and answered, 403.

THE COURT:  You can answer that question.

THE WITNESS:  That would be the sergeant's job to do his use of force investigation.

BY MS. MKRTCHYAN:

Q    Not your job.  As the primary investigating officer at the scene, it's not your job to find out how this man sustained head injuries and what is the extent of his head injuries, true?

A    My job is to investigate the crime that is there.  If you sustain an injury and reported that to our sergeant, like he did, and we hear on video, it is up to the sergeant in his performance of his duties to investigate any allegations that Mr. Holloway made.

Q    The sergeant was not on scene when he sustained the head injuries, was he?

A    No.  I think that's well established.

Q    So you're putting it on sergeant to actually speculate and find out how this man sustained head injuries when you're not even reporting it to him?

MR. HARRELL:  Argumentative, 403.

*Echo Reporting, Inc.*

85

THE COURT: You're talking about how he sustained it or what the injuries were?

MS. MKRTCHYAN: Both.

THE COURT: Well, that's unclear.

BY MS. MKRTCHYAN:

Q Well, your use of force policy requires you to document and report, notify the sergeant of any use of force that you are involved in or witness, true?

MR. WRONIAK: Objection, 403.

THE COURT: Overruled.

THE WITNESS: Our policy states that we need to notify the supervisor, and that is what we did. And as it's been established, you notify him of the use of force. He asked each one of us what our involvement was, and we tell him what we -- what our involvement was. It's on video. It was -- our sergeant was here and testified to that.

BY MS. MKRTCHYAN:

Q Well, did you hear anyone tell Sergeant Rawlings that, yes, we saw him getting kneed in the head, or we saw him getting struck in the head?

A Today I didn't hear any of that, but at that time I wasn't around or close enough to hear all of his interviews with all the deputies.

MS. MKRTCHYAN: All right. I have no other questions. Thank you.

4-RenSER-00702                    4-RenSER-00702

86

MR. WRONIAK:  Nothing further.

MR. HARRELL:  No questions, your Honor.

THE COURT:  Sir, thank you very much.  You may step down.

And, counsel, your next witness, please.

MS. NALTSAS:  The defense calls Deputy Mark Borba.

THE COURT:  Okay.

MS. NALTSAS:  I'm sorry.  Your Honor?

THE COURT:  Yes.

MS. NALTSAS:  A logistical -- I believe Plaintiff -- I may have jumped the gun.

MR. WRONIAK:  He needs to rest.

MS. NALTSAS:  I believe Plaintiff is -- needs to rest.

THE COURT:  Well, not yet.  The peculiarity of this is, there's another witness I think that the Plaintiff wanted to call.  Is that correct, Deputy Brown?

MS. MKRTCHYAN:  Yes, your Honor.  We --

THE COURT:  All right.

MS. MKRTCHYAN:  With that agreement, yes.

THE COURT:  The defense would have called Deputy Brown regardless, okay.  You see much of the defense case being presented during the Plaintiff's case because of this oddity that the Plaintiff can call witnesses from the other side.  So you're seeing much of what the defense would be

4-RenSER-00703                                                4-RenSER-00703

87

presenting.

I'm going to allow Borba to testify, counsel, and those motions can be brought, et cetera, on Monday. Technically though, the defense is not resting, but wishes to call Deputy Brown, and Deputy Brown's available on Monday, okay. So, technically, they're not resting, but I'm going to let the defense go ahead with some of their witnesses now who are available.

So, if we'd like to call Borba, would you like to get set up with machines, et cetera?

MS. NALTSAS: I do have to put an exhibit book on the stand.

THE COURT: Well, let's do this. Let's take about 10 minutes again. Okay, counsel, about 10 minutes? Come back in about 10 minutes. We're going to get set up for Deputy Borba.

(Jurors exit courtroom.)

(Proceedings recessed briefly.)

(Jurors enter courtroom.)

THE COURT: All right. We're back in session. All parties are present, counsel. And if you'd like to call your next witness, please.

MS. NALTSAS: Thank you, your Honor. The defense calls Deputy Mark Borba.

THE COURT: Thank you. If you'd ask Deputy Borba

88

to come forward.  There he is.

And, sir, would you be kind enough to raise your right hand.  The clerk will administer an oath to you.

MARK WILLIAM BORBA - DEFENDANT'S WITNESS - SWORN

THE WITNESS:  I do.

THE COURT:  Thank you, sir.  Would you please be seated in the witness box.  And the entrance to the witness box is closest to this wall.  It's not this little door.

Sir, after you're seated would you face the jurors and would you state your full name, please.

THE WITNESS:  Mark William Borba, B-O-R --

THE COURT:  And would you spell --

THE WITNESS:  -- B-A.

THE COURT:  Thank you.

Direct examination, please.

BY MS. NALTSAS:

Q    Good afternoon.

A    Good afternoon.

Q    What are your current duties for the Orange County Sheriff's Department?

A    I'm currently a deputy sheriff assigned to the bomb squad in the mass transportation bureau.

Q    And what were your duties for the Orange County Sheriff's Department in January of 2018?

A    My duties would have been the same assignment.

*Echo Reporting, Inc.*

89

Q    Sir, did you draft a report in what has come to be known as the "Holloway incident"?

A    Yes, I did.

Q    And that was previously published by Plaintiff's counsel.  It's been marked as Exhibit 37.  Do you have access to that, sir?

A    Yes, I do.

Q    Can you glance at that and confirm that it's the report you drafted in connection with this incident?

A    Yes, it is.

Q    Have you reviewed any PVS tapes in connection with this incident?

A    Yes, I have.

Q    And have you seen yourself on either your PVS or other deputies' PVS tapes in connection with this incident?

A    Yes, I have.

Q    And did you have a PVS in your vehicle at the time of this incident?

A    Yes.

     MS. NALTSAS:  Your Honor, I'd like to play Exhibit 102-12.  It was partially played earlier.  I think even though it is consumptive --

     THE COURT:  It was.

     MS. NALTSAS:  -- for continuity --

     THE COURT:  We went half-way through, I believe,

4-RenSER-00706                                                4-RenSER-00706

90

didn't we?

MS. NALTSAS:  Correct.  But for context, I think perhaps we should play it all the way through for the jury.

THE COURT:  I would prefer that.  One time now, one place.

MS. NALTSAS:  Okay.  And it's a --

THE COURT:  Allowed the defense to play a portion of that.  Why don't you play the entire tape.

MS. NALTSAS:  Okay.  It's about 41 minutes long. The jury has a transcript --

THE COURT:  Okay.

MS. NALTSAS:  -- that was distributed earlier.

THE COURT:  Okay.

Sir, you've seen a part of this before.

Counsel, do you have an extra --

MS. SKINNER:  Yes.

THE COURT:  Does the deputy have one, also?

MS. SKINNER:  No, but I can get one for the deputy.

THE COURT:  Why don't you give the deputy one first.

(Pause.)

(Begin audio.)

(End audio.)

MS. NALTSAS:  Thank you.

*Echo Reporting, Inc.*

91

BY MS. NALTSAS:

Q    With reference to your PVS that we just played, I'm going to ask you a series of questions about specific portions.

MS. NALTSAS:  The first portion, Ryane, is 406 and seven seconds, through and including 406 and 31 seconds.

(Begin audio.)

(End audio.)

BY MS. NALTSAS:

Q    Sir, there's a reference here that you're bleeding at this time.  What is the significance of that?

MS. MKRTCHYAN:  Relevance.

THE COURT:  Overruled.

MS. NALTSAS:  thank you.

THE COURT:  You can answer the question.

THE WITNESS:  Earlier in the night, I believe it was the call prior to this one, I had responded to a solo vehicle traffic collision with a motorist trapped inside of a car.  And I had to break the window to get the occupant out of the vehicle, and I had sustained some like micro abrasions to my hand from smashing the glass.

BY MS. NALTSAS:

Q    And were you able to get the person out of the vehicle?

A    I was.  There was an issue with the occupant trying to flee back into the car.  At the time I didn't know that she

4-RenSER-00708                                          4-RenSER-00708

92

was possibly under the influence, which is why she was retreating from me.  So I had to get her out, like forcefully remove her from the vehicle through the window. And in doing so I had gotten some abrasions on my hands.

Q    And is that the reference to the lifesaving award?

A    Yes, ma'am.

MS. NALTSAS:  I'd like to play clip 4:06:31 through 4:06:42.

(Begin audio.)

(End audio.)

BY MS. NALTSAS:

Q    Is this a broadcast from dispatch?

A    Yes, ma'am.

Q    And what information was being conveyed to you through dispatch?

A    Dispatch was advising me of the call for service regarding the DV occurring to the right of campsite 63 with the while pickup truck.

Q    So in this piece of dispatch you are learning that there is a domestic violence occurring at the tent with the white truck in -- parked in front of it?

A    That's correct.

Q    And that's to the right of the Winnebago?

A    So as you look at the campsites, if you're looking at the campsites from the street, it would be to the right of

*Echo Reporting, Inc.*

93

63.    The confusion was when you speak of to the right of 63, are you referring as if you're standing at the campsite or from the roadway looking at the campsite, because that would change where the location of the DV would be occurring.  But narrowing it down even further to having a white pickup truck pretty much explained that it would be occurring to the right of 63 as you look at the campsites from the roadway.

Q    And when you responded that night, there was a campsite to the right of the Winnebago, correct?

A    That's correct.

Q    And what campsite was that, if you can recall?

A    Sixty-five.

Q    And you were told in radio traffic that you needed to go to a campsite with a white truck.  Did campsite 65 have a white truck?

A    Yes, it did.

          MS. NALTSAS:  I'd like to pull up Exhibit 245, which is a still photo from Pahel's PVS, which is has been previously admitted.

BY MS. NALTSAS:

Q    Do you see a white truck in Exhibit 245?

A    Yes, I do.

Q    And which campsite number, if you know, is in this photograph with the blue tent?

*Echo Reporting, Inc.*

94

A     It's unreadable on this photo.

Q     Is that the campsite that you responded to, that you previously identified as campsite 65?

A     Yes, it is.

Q     Okay.

MS. NALTSAS:  We're going to play some more radio traffic.  I'd like to ask that 4:06:50 to 4:08:16 be played.

(Begin audio.)

(End audio.)

BY MS. NALTSAS:

Q     And do you recall who you were speaking to in that segment?

A     I do.

Q     And who was that?

A     It was a subject at a different campsite, different campsite number 71 by the name of Patrick Dennis (phonetic), I believe.

Q     And what did Mr. Dennis say to you?

A     So actually he was talking to Deputy Renegar, I believe.  My PVS was picking up part -- parts of the conversation.  From what I can hear, he was describing a domestic violence incident that was occurring in the area. And he was advising that he had originally driven past it on our first approach to the location, and gave some details regarding the nature of the domestic violence that was

4-RenSER-00711                                    4-RenSER-00711

95

occurring.

Q    And as Mr. Dennis reported this to you, did that do anything to lower your officer safety concerns?

A    No.  At this point in my mind I now knew that I had multiple informants.  So I had the original caller, who we had yet to make contact with, and then now I had a second informant advising me of a domestic violence incident occurring in the same area.  And based on the nature of what he was describing it sounded pretty serious.

Q    And he said he could hear boom, boom, boom, is that what you heard him say Deputy Renegar -- to Deputy Renegar?

A    Yes, ma'am.

Q    Thank you.

        MS. NALTSAS:  I'd like to play 4:21:20 to 4:22:05, please.

     (Begin audio.)

     (End audio.)

BY MS. NALTSAS:

Q    And, sir, who are you speaking with during this portion of the tape?

A    Mr. Fuerbach.

Q    Did Mr. Fuerbach give you any information that told you where you needed to go to deal with this reported domestic violence incident?

A    Yes, he did.

*Echo Reporting, Inc.*

96

Q    And where did he tell you to go?

A    Mr. Fuerbach pointed in the direction of campsite 65 to the two tents located on the campgrounds, and told me that's where the DV was occurring.

Q    And is that how you knew it was definitely those tents, as you stated on your PVS?

A    Yes, ma'am.

        MS. NALTSAS:  Let's pull up Exhibit 244.

BY MS. NALTSAS:

Q    Do you recognize the white RV in that exhibit?

A    Yes, ma'am.

Q    Is that Mr. Fuerbach's white RV?

A    Yes, it is.

Q    Do you recall what campsite he was in that night?

A    His number is 63.

Q    And do you see where Mr. Fuerbach told you to go when he said it was definitely those tents?

A    Yes, I do.

Q    And can you describe that on the exhibit?

A    Based off the exhibit, I'm looking at a blue tent. There's a few deputies standing next to it.  So he would have pointed in the direction of that blue tent.  And then as we look at the exhibit, it would be further off-screen to the right would be a second tent.

Q    So, he told you to go to the campsite, which we now

*Echo Reporting, Inc.*

4-RenSER-00713                                                                4-RenSER-00713

97

know was occupied by Mr. Holloway?

A     That's correct.

Q     And did you have any reason to doubt Mr. Fuerbach's direction when he told you to go to definitely those tents?

A     No, I did not.

Q     Can you think of any reason why Mr. Fuerbach would lie about the location when he told you to go to directly those tents?

            MS. MKRTCHYAN:  Objection.

            THE COURT:  Sustained.

BY MS. NALTSAS:

Q     Why not go over to another campsite, like campsite 66? Why did you go to campsite 65?

A     So at this point in time based off Mr. Fuerbach's information, pointing literally to the tents, to the campsite, as well as the dispatch information describing a campsite with a white pickup truck to the right of 63, which is 65, I had enough information to go to campsite 65 and make contact and assume that that's where the DV would be occurring.

Q     Deputy Borba, in your law enforcement job do you sometimes make credibility determinations with regards to residents who complain about criminal conduct?

            MS. MKRTCHYAN:  Objection, your Honor, very vague and --

*Echo Reporting, Inc.*

98

THE COURT:  Sustained.

BY MS. NALTSAS:

Q    In your law enforcement experience, sometimes you might get a report from a 911 caller or an informant, is that true?

A    Correct.  It goes through dispatch and then we're sent to the call.

Q    And in your law enforcement experience, do you sometimes make a determination based on information provided to you, whether it is a credible -- whether it is credible?

MS. MKRTCHYAN:  Objection, your Honor.  It's very vague.

THE COURT:  Sustained as vague, counsel.  There's all sorts of variations.

BY MS. NALTSAS:

Q    In this circumstance, based on the information that Mr. Fuerbach gave to you, did you believe that the information he gave you with regard to where the domestic violence was occurring was credible?

MS. MKRTCHYAN:  Objection.  Same objection, your Honor.

THE COURT:  Overruled.  That goes to state of mind.

You can answer the question, sir, that night.

THE WITNESS:  Yes, I did.  So it aligned with the

*Echo Reporting, Inc.*

99

information that I had already received through dispatch, being that it's to the right of campsite 63 with a white pickup truck.  He's describing this same thing.  He's pointing in the same direction.  Also, his demeanor seemed calm but yet concerned.  So, I absolutely would take his statement as credible and go investigate what he's telling me.

BY MS. NALTSAS:

Q    Sir, what did you do next after speaking with Mr. Fuerbach?

A    I advised the deputies who were next to me that we had narrowed it down, and that it was definitely going to be the two tents.  I pointed them in that direction.  I then followed the deputies over to campsite 65 to assist with making contact with the occupants.

Q    And who occupied campsite 65?

A    Mr. Holloway.

Q    Did Mr. Holloway ever tell you that you needed to be someplace else, not at his campsite?

        MS. MKRTCHYAN:  Objection, your Honor.  That's very vague.

        THE COURT:  Overruled.

        You can answer the question.

        THE WITNESS:  I believe he made a statement regarding that something was occurring, but it was none of

4-RenSER-00716                                        4-RenSER-00716

100

his business, somewhere else.

BY MS. NALTSAS:

Q    And did you believe him when he told you that you were in the wrong campsite that night?

A    No, I did not.

Q    And why not?

A    From the initial point of contact, Mr. Holloway was argumentative.  Upon exiting the tent he also made a statement that I found odd in regards to mentioning -- before we had posed any questions to him, that he was the only one in the tent.  Why are you here?  I'm the only one in the tent, something to that effect, which I found odd.

I'm responding to call for service, yet Mr. Holloway would not know why I'm there.  And answering in that -- in that manner, kind of caught me off guard as far as why would someone offer up information that they're the only occupant in a tent when they really don't know why I'm there yet.  So I found his behavior odd and argumentative.  Not credible.

Q    So, prior to Mr. Holloway saying that he was the only one there, had anyone in your group of deputies said to Mr. Holloway that you were investigating anything about a man beating a woman?

A    Not at that point, no.

MS. NALTSAS:  I'd like to play 4:26:15 to 4:27:53, please.

*Echo Reporting, Inc.*

4-RenSER-00717                                        4-RenSER-00717

101

        (Begin audio.)

        (End audio.)

BY MS. NALTSAS:

Q    Sir, do you wear someone saying, "knives, knives,
knives" in that clip?

A    Yes.

Q    And is that you?

A    Yes, it is.

Q    And did you see any knives or bladed weapons on
Holloway's campsite before Jeremy Holloway ever exited his
tent?

A    No, I did not.

Q    And why did you say, "knives, knives, knives"?

A    At the point that I made that statement, I was in the
role of a cover officer as Deputy Renegar was making contact
with Mr. Holloway.  So my job was to observe the scene and
look for anything that might pose a hazard.  In doing so, I
was illuminating the area with my flashlight and came across
multiple sharp-edged weapons scattered throughout the
campsite, the firepit and the picnic table area.

        MS. NALTSAS:  I'm going to ask to display 100-11.
It's been admitted into evidence.

        THE COURT:  100-11?

        MS. NALTSAS:  Correct.

        THE COURT:  You may do so.

*Echo Reporting, Inc.*

102

BY MS. NALTSAS:

Q    Are these the knives that you saw strewn around the campsite?

A    Yes, they are.

Q    And when you just testified that you illuminated the area and saw knives around his campsite, those knives were around his campsite before he exited his tent?

         MS. MKRTCHYAN:  Objection, leading.

         THE COURT:  Sustained.

BY MS. NALTSAS:

Q    Where were those knives when Jeremy Holloway was in his tent?

A    So the knives were located on the ground near the firepit and the picnic table.

Q    And did you go into Jeremy Holloway's backpack or tent to retrieve any knives?

A    No, I did not.  I never entered his tent.

Q    In where were you when you said, "knives, knives, knives," if you can recall?

A    All I can recall is I was standing a short distance away from Deputy Renegar.  As I stated earlier, I was in the role of a cover officer, so I wouldn't be far from him.  As to exactly where I was at in his campsite at that moment, I don't recall.

Q    But you were outside in the campground, not inside his

4-RenSER-00719                                         4-RenSER-00719

103

tent?

A    I was standing in the campsite outside of the tent illuminating the ground with my flashlight.

Q    Okay.  And you returned a second time to Mr. Holloway's campsite later that evening, correct?

A    Yes.

Q    And did you have these knives, knives, knives in your mind when you received radio traffic stating that you were needed back at the campsite a second time?

A    Yes, I did.

        MS. NALTSAS:  I'd like to play the next clip, 4:34, I believe it's 51, to 4:35:26.

        (Begin audio.)

        (End audio.)

BY MS. NALTSAS:

Q    And who is speaking there?

A    That was myself and Deputy Renegar.

Q    And you say, I'm going to get out here, something to that effect.  What is the significance of that statement?

A    So I believe at that time it was sometime around 4:30 in the morning.  I was actually scheduled to be off probably an hour and a half to two hours prior to that.  So, I was already extended past my end of shift time.  So I was heading home.  I take my unit back to my house because I had a canine in it at the time.

4-RenSER-00720                                           4-RenSER-00720

104

Q    And how long had you been on shift at this point?

A    It's probably somewhere around 13 hours maybe.

Q    And you testified that you returned in the second call, is that correct?

A    That's correct.

Q    Even though your shift had already ended, correct?

A    That's correct.

Q    And why not just clock out and stay home?

A    So based on the circumstances of the second call that had came out, the serious nature of the call and then I also knew that I was only one of maybe three deputies that knew exactly how to get back to that campsite, that location.  So I chose to respond back because I had prior knowledge.

        MS. NALTSAS:  Your Honor, I'm going to go into incident two, but this might be a good time for a break.

        THE COURT:  Friday at 8:00 o'clock, okay?  Not tomorrow, and that's my fault.  I've got hearings in Los Angeles all day long, and I just don't know when I'm going to be back.  So, my fault, but you'll be in recess for a day.

        I'm going to talk to counsel tonight about the remaining witnesses and try to get a time estimate between the two sides.  I don't want to keep you here for that.  Let me talk to them after hours and see where we are.  I know the case is going to you next week though.  I know that for

4-RenSER-00721

4-RenSER-00721

105

sure, okay.  Thank you very much and goodnight.

Please don't discuss this matter.  Don't form or express any opinion concerning the case.

(Jurors exit courtroom.)

THE COURT:  Deputy, thank you very much.  If you could return Friday at 8:00 a.m.

THE WITNESS:  Yes, sir.  Thank you.

THE COURT:  Thank you very much.

I know Sergeant Brown's going to be called at the request of the Plaintiff, but he'd be testifying anyway I assume.  So, we have Sergeant Brown left.  Who else?

MR. HARRELL:  Your Honor, we have a use of force expert, Bob Fonzi.

THE COURT:  Fonzi.  Okay.

MR. HARRELL:  And let me know when the Court's ready for another name.  Yes.  We also have Deputy Kevin Pahel.

THE COURT:  Yeah.  Pahel.  We have Borba on the stand now.

MR. HARRELL:  That is correct.

THE COURT:  Okay.

MR. HARRELL:  We also have our toxicologist.  His name is Dr. Clark (phonetic), to talk about trazodone and marijuana.

THE COURT:  Okay.  You also got the civilian

*Echo Reporting, Inc.*

4-RenSER-00722                    4-RenSER-00722

106

witness, Jeremy --

MS. NALTSAS:  Joshua Gomez.

THE COURT:  I mean, "Joshua Gomez."  I'm sorry. Joshua Gomez.

MR. HARRELL:  Exactly.  Joshua Gomez, now out at sea, but he's scheduled to dock sometime between now and Monday.

THE COURT:  Okay.

MR. HARRELL:  So we hope to have him on the stand on Monday.

THE COURT:  And Sergeant Brown's available Monday, also?

MR. HARRELL:  That's our understanding.

THE COURT:  I just want --

MR. HARRELL:  He's on vacation this week.

THE COURT:  All right.  Monday.  And Gomez is back Monday, but regardless, even if they miss the ship, he's back by Tuesday.  He's coming back.  Okay.

MR. HARRELL:  Your Honor, one additional name. It's entirely optional up until -- maybe we know some more about the case and we need to think about it some more, but we have a tech specialist from the Orange County Sheriff's Department to talk about the nature of the PVS tapes and the time stamps and how that works.  And I don't know that they're needed yet.

*Echo Reporting, Inc.*

4-RenSER-00723                                    4-RenSER-00723

107

THE COURT:  All right.  But at least I'm notified.

MS. MKRTCHYAN:  Well, can we -- your Honor, may I request to know, first of all, who's testifying on Friday.

And then I would object to technical guys, whoever testifying, because this individuals were never disclosed in Rule 26 disclosures.  I would not know their nature of their testimony.  I do not -- I've never deposed them.  I never received any reports.  You know, if they are bringing someone out of the blue from the communications department who testifies about something that I don't know, what is -- I need an offer of proof at the very least, what exactly they're going to testify.

THE COURT:  Let's wait --

MR. HARRELL:  Your Honor, very briefly.  We hope to be able to give Plaintiff's counsel our order of witnesses for Friday tomorrow while the Court's attending to its other matter.  We need to make some phone calls and need to confirm some things as soon as we're excused.

THE COURT:  Okay.  Thank -- I want to thank both of you.  Deputy Matt Brown was on the witness stand in the last trial from 12:48 to 1:15, about 27 minutes.  He was called by the Plaintiff, and there was no cross-examination.  So it's a relatively short witness.  So I would say approximately 30 minutes per side.

Just as Clark was significantly cut down in time,

4-RenSER-00724                                    4-RenSER-00724

108

Fonzi going to be -- have their time cut down, also. Fonzi was on the stand from 9:57 to 11:00 o'clock for 63 minutes, 11:20 to 12:00 o'clock for 40 minutes, from 1:20 to 1:45 for another 25 minutes. And at cross-examination he was on the stand for 2:09 to 3:39 and 4:00 o'clock to 4:46.

I think I initially said that Clark was on the stand as the Plaintiff's witness for an hour and 15 minutes, and then I extended that because I said an hour and 30 minutes. Fonzi is limited to an hour and 30 minutes on each side, so 90 minutes per side. That's more than enough time.

Borba was on the stand and called by the Defendant from 2:12 to 2:32 for 20 minutes, and 2:53 to 2:54 for two minutes on redirect. On cross for -- I'm sorry. My apologies. That's Lieutenant Jeff Burton (phonetic). My apologies. Just a moment.

Here we go. We scrolled by the defense for a -- 1:55 to 2:36 for 48 minutes. And on redirect from 9:15 to 9:22, about seven more minutes, total of about 55 minutes. On cross-examination he was on the stand from 2:58 to 4:33 for 95 minutes. From 8:45 to 9:15 for 30 minutes, and on recross from 9:22 to 9:37. I haven't counted either of the time that the portion of Borba's tape was played at the Plaintiff's request. I haven't counted that. And I haven't counted the whole run through of Borba's tape against either of you.

4-RenSER-00725          4-RenSER-00725

109

I would think that there's going to be some limitation.  Borba's got the same leeway I've given concerning Deputy Renegar or Deputy Gotts, who were before the -- before the Court, or Mr. Holloway, who's the Plaintiff.  There I gave you basically almost unlimited time.  Let me think about that, but I'm thinking probably about 90 minutes a piece.  I don't know how much more time you envision.  What's your thought?

MS. NALTSAS:  I have about 30 more minutes of questions --

THE COURT:  Yeah.

MS. NALTSAS:  -- so that's fine.

THE COURT:  So that's enough time.

MS. MKRTCHYAN:  Well, your Honor, the only thing is that he was involved in the use of force part.  There is going to be some playing of the use of force.  Also, the defense did not play all his tapes.

THE COURT:  Okay.

MS. MKRTCHYAN:  There was more tapes.

THE COURT:  I've been -- I've been pretty generous.  I'm giving you kind of a ballpark figure right now.  It's not definite, but this isn't going to go on now for like the first, second and third trial, for hours and hours and hours.  I've got a pretty good handle on the time that's needed.  It's about 90 minutes.  I'm not adamant

*Echo Reporting, Inc.*

110

about that, and I haven't counted Borba's tape against anybody playing it so far.  So, there's plenty of time.

But with Dr. Clark -- is this Roger Clark?

MR. HARRELL:  No, your Honor.  This is Dr. Richard Clark.

THE COURT:  "Richard Clark."

MR. HARRELL:  He's --

THE COURT:  The new witness?

MR. HARRELL:  Right.  He is a toxicologist who is here to address trazodone and marijuana --

THE COURT:  That's --

MR. HARRELL:  -- and what that does to memory.

THE COURT:  That should be pretty quick by both of you, frankly.

MR. HARRELL:  Your Honor, we don't plan to mess around.  We plan to get right to it and get him off the stand, if I can.

THE COURT:  I'm not assigning a specific time, but he's a fairly brief witness.

Joshua Gomez may take a little bit longer.  But I'm thinking about an hour and a half, something of that range, for each side.  And your tech specialist, let's leave that on the table when you decide if you're going to call him or not.

MR. HARRELL:  Understood, your Honor.

4-RenSER-00727                                           4-RenSER-00727

111

THE COURT: And let's get the objections then if you are calling him and see what I do at that point, because I'll have a better idea.

Pahel's also -- same courtesies extended. I'm not going to count the playing of the initial tape all the way through against either side. So, I think --

MR. HARRELL: Your Honor, in terms of time management, I believe his entire tape has already been played, so I don't know we need to do that again.

THE COURT: Well, it's up to you. I think each of you will go back into the tape. When you do, I'm counting that time, but -- and if you want Pahel's tape played completely through by either side, I'm happy to do that, okay --

MR. HARRELL: Understood.

THE COURT: -- just for continuity. So it's kind of hard to guesstimate. I think -- well, I know we'll be through Deputy Borba. And any idea who you might call on Friday though, so we can be prepared?

MR. HARRELL: Deputy Pahel is ready to go.

THE COURT: Okay.

MR. HARRELL: P-A-H-E-L.

THE COURT: Okay. That's a courtesy then to the Plaintiff. You know it's probably Pahel after this. I'm not sure when you finish. It sounds -- probably like

*Echo Reporting, Inc.*

4-RenSER-00728                                          4-RenSER-00728

112

Wednesday.

MR. HARRELL:  Very --

THE COURT:  That's what I'm guessing.

MR. HARRELL:  Early next week, your Honor, is our intent.  And I -- we had --

THE COURT:  By the way, Mr. Holloway, if you want to leave this evening, I'm just having a chat.  Deputies, if you want to go home.  This is kind of a waste of time on your part, Mr. Holloway, and both deputies.  Why don't you go back to your -- your families on respective sides, okay.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.  Yeah.

MR. HARRELL:  Your Honor, we had envisioned getting together jury instructions.  I believe --

THE COURT:  Well, let me help you.  I'm ordering you into my courtroom.  It's not envisioning, you're here.

MR. HARRELL:  Yes.

THE COURT:  And I'm coming back from L.A. anywhere between 12:00 o'clock tomorrow and 8:00 o'clock, and you'll be here.

MR. HARRELL:  We hope to have --

THE COURT:  No, time out lectern now.  We're wasting time.  And you don't want to come back and see this evening, do you?

MS. NALTSAS:  No.

4-RenSER-00729    4-RenSER-00729

113

THE COURT:  No.  So we need -- let me have a moment --

MR. HARRELL:  No, your Honor.

THE COURT:  Let me talk to you.  I'm telling you what to do politely.

MR. HARRELL:  Your Honor --

THE COURT:  Thank you, counsel.  I'm telling you politely what to do.

MR. HARRELL:  I understand.  I just want to ask if Ms. Naltsas can be excused?

THE COURT:  Thank you, counsel.  I'll get to that in a moment.  You keep interrupting me --

MR. HARRELL:  All right.  I'm sorry.

THE COURT:  -- and I don't appreciate that.

I need those instructions laid out again.  I think that I'm going to go basically with the packet we had the first time, but they need to be modified obviously.  And we now have two deputies, we don't have five, so there's a lot of just kind of craftsmanship that's time consuming, and I'd like to get those laid out on the table -- or tables.  And if you want to, you can use the tables down in the 10th floor jury room, if it's easier for you.  You can also clear off these tables, but I'm trying not to tear down your operator's equipment.  So I just suggest you use the tables down the hallway.

*Echo Reporting, Inc.*

114

The beginning instructions shouldn't take you more than 20 minutes to look through and your concluding instructions.  It's the quote-unquote, "in between instructions."  Now this is a new trial, so you have another right to argue that the Court's original instructions were incorrect, et cetera, but I think this time we need to pay a lot more attention to damages.  And, also, you mentioned you had a special verdict form.

MR. HARRELL:  That's correct, your Honor.

THE COURT:  I want to see that verdict form early on.  In other words, I can do my best work when you get it to me and I have the weekend to think about it.  If it comes to me at the last moment, I don't want you up all night, but you'll be up all night, okay.  So, okay.

Now -- now it's your turn, uninterrupted.  So each of you had questions.  And I think the Defendant had some questions or statements, and then the Plaintiff, or vice versa.  Lectern's yours.

MR. HARRELL:  Your Honor, first and foremost, Ms. Naltsas has a family obligation on Thursday.  May she be excused?  And I promise to do a great job with the jury instructions in her absence.

THE COURT:  Okay.  Here's what doesn't happen. She jumps in on Monday with a whole bunch of bright, new ideas and acts like lead counsel, okay.

*Echo Reporting, Inc.*

4-RenSER-00731                                    4-RenSER-00731

115

MS. NALTSAS:  No ideas.

THE COURT:  I need my lead counsel who's arguing this to be responsible.  I know you can have associates work on it, but -- and, of course, but I just don't want the tag team going on, okay.

MR. HARRELL:  Ms. Naltsas has a great number of bright ideas, but she's already shared those with me and I'm ready to go.

THE COURT:  Okay.  you're ready to go on the instructions.  All right.

MR. HARRELL:  Yes.

MS. NALTSAS:  We'll be here, your Honor.

THE COURT:  Okay.

MS. MKRTCHYAN:  Your Honor, so here's my request obviously.  If you're going to go over jury instructions, can we have a fresh day to do it tomorrow, rather than today, because it's been a long day?

THE COURT:  Well, I'm -- we're not going to do them today.

MS. MKRTCHYAN:  Okay.

THE COURT:  I'm going to send you home tonight.  I just don't think there's any value at the end of a long day.

MS. MKRTCHYAN:  Yes.

THE COURT:  Because you're going to be here tomorrow anyway.

*Echo Reporting, Inc.*

116

Now I expect to be 99-percent done with these instructions, or struggling with the disagreements you have, so I have the weekend to look at them.

MR. HARRELL:  Yes.

THE COURT:  So these get in pretty final form by Friday.  And what I'm trying not to do, and I hope this doesn't have a chilling effect, but keep your Friday night, okay.  So, please, work out of my presence with each other as best you can so save some long evening hours, okay.

Now is there anything else you need this evening?

MR. HARRELL:  Would --

MS. MKRTCHYAN:  So tomorrow I'm not --

MR. HARRELL:  -- the Court like us here tomorrow?

THE COURT:  I'd like you here -- well, are you going to be the clerk tomorrow?  Who's going to open the doors for them?  You know what, they can work down -- they can work down the hallway, can't they?

THE CLERK:  We don't have anyone assigned since you are gone.

THE COURT:  Huh?

THE CLERK:  We don't have anyone assigned since you're gone.

THE COURT:  Counsel, you can work down the hallway.  I just need to make sure that you or Deb or somebody has that open when I'm in L.A.  I need to leave

*Echo Reporting, Inc.*

117

about 5:00 o'clock.

THE CLERK:  The conference room?

THE COURT:  Yeah, the conference room.

THE CLERK:  She has all day.

THE COURT:  Okay.  Okay.  And if not, could you --
could somebody double check it for me tomorrow, okay.

MS. MKRTCHYAN:  What conference room are we
talking about, the attorney room?

THE COURT:  Yes.

MS. MKRTCHYAN:  Okay.

THE COURT:  You have tables down there, lots of
tables.

MS. MKRTCHYAN:  Yes.  No, no problem, your Honor.
So the Court -- let me -- I'm just --

THE COURT:  Just a moment.

What?

THE CLERK:  (Indiscernible) the 10th floor?

THE COURT:  It's right here on the 10th floor.

THE CLERK:  Fair enough.

THE COURT:  Yeah.  You're on the ninth floor.
You're -- I'm sorry.

MS. MKRTCHYAN:  So the way I understand, the Court
wants us to meet and confer with defense regarding jury
instructions?

THE COURT:  Yeah.  Let me help both of you.

*Echo Reporting, Inc.*

4-RenSER-00734                                          4-RenSER-00734

118

You're ordered to meet and confer. It's not a -- ordered. Now I'm try to pick a decent time. Let's make that 8:30 instead of 8:00 o'clock. You're ordered to get out those jury instructions and try to meet and confer and resolve those that you can, and show me the disputes when I come in. All I'm representing to you is, is I could be back as early as 12:00 or 1:00 o'clock, but I could be back at 6:00 or 7:00 o'clock and you're here waiting for me, understood?

MR. HARRELL: Understood.

THE COURT: Understood?

MS. MKRTCHYAN: Well, your Honor, I -- you know, your Honor, here's the problem I have with that. I mean, I will definitely be here to meet and confer, but because I also need to prepare for the rest of the trial presentation of the case, I just do not want to be sitting here without doing anything.

The defense has multiple attorneys. They have a lot of benefit of the time, you know, sitting. So I would want to limit our meet-and-confer time period to the time --

THE COURT: It's 8:00 o'clock until I get -- or 8:30 until I get here. That's your time period.

And, number two, I'm trying to keep you away from weekends. Because what's not going to happen is the case ends and then we adjourn for a day or two to look at jury instructions. I need the weekend to look at some of your

*Echo Reporting, Inc.*

119

disputes to make sure that they're in order.

All right.  Anything else?

MS. MKRTCHYAN:  So, as I understand, we have to meet and confer at 10:00 o'clock?

THE COURT:  No, no.  Ordered to be here at 8:30. 8:30.  Now I can make it 9:00 o'clock.  There's nothing specific about, you know -- what time --

MS. MKRTCHYAN:  I would prefer to do -- if the Court is not going to meet us until --

THE COURT:  10:00 o'clock?  10:00 o'clock's fine.

MS. MKRTCHYAN:  Yeah.

THE COURT:  10:00 clock, counsel?  10:00 o'clock's fine.

MR. HARRELL:  Fine, your Honor.

THE COURT:  10:00 o'clock.  I think 10:00 o'clock. And I'll try to get back, okay, as early as I can, but I will definitely be back.

Now is there anything else?

MS. MKRTCHYAN:  Well, your Honor, if the Court may not meet us until about 6:00 p.m. --

THE COURT:  No, counsel, I said from 12:00 to 6:00.

MS. MKRTCHYAN:  Okay.

THE COURT:  Now let's stop this, okay.  I was very clear about that.  All right.  Then we want to go home?

*Echo Reporting, Inc.*

4-RenSER-00736                              4-RenSER-00736

120

MS. MKRTCHYAN:  Yes.  Thank you.

THE COURT:  Okay.  Go home.  Have a good evening.

MS. NALTSAS:  Thank you, your Honor.

MR. HARRELL:  Thank you, your Honor.

THE COURT:  I'll see you tomorrow sometime.

Well, just a moment.  I want to make sure.  I'm not going to make any -- any decisions on those instructions tomorrow.  In other words, I just want to see what they are, what you agree upon.  Most of these will be agreed upon because they were in the first trial.  There will be some conflict, again, you want to make a record.  I'll provide that record for you, okay.

MR. HARRELL:  Very good, your Honor.

MS. NALTSAS:  Thank you, your Honor.

(Proceedings recessed.)

*Echo Reporting, Inc.*

4-RenSER-00737

4-RenSER-00737

121

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jessica Reuter                    5/29/2025
Transcriber                          Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*

4-RenSER-00738                    4-RenSER-00738