DOCKET NOS. 25-7132, 25-7297

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

## CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 5 OF 9

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 11 |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 16, 2025

8:04 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00740
5-RenSER-00740

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

                NARINE MKRTCHYAN
                NARINE MKRTCHYAN, ATTORNEY AT LAW
                1010 NORTH CENTRAL AVENUE
                SUITE 204
                GLENDALE, CALIFORNIA 91202
                (818) 388-7022
                narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

                S. FRANK HARRELL
                LYNBERG & WATKINS
                1100 TOWN & COUNTRY ROAD
                SUITE 1450
                ORANGE, CALIFORNIA 92868
                (714) 937-1010
                sharrell@lynberg.com

                CATHERINE A. NALTSAS
                LYNBERG & WATKINS
                1150 S. OLIVE STREET
                SUITE 1800
                LOS ANGELES, CALIFORNIA 90015
                (213) 624-8700
                cnaltsas@lynberg.com

                RYANE SKINNER
                LYNBERG & WATKINS
                1100 TOWN & COUNTRY ROAD
                SUITE 1450
                ORANGE, CALIFORNIA 92868
                (714) 937-1010
                rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

     FOR THE DEFENDANT, CHAD RENEGAR:

               MICHAEL L. WRONIAK
               COLLINS + COLLINS, LLP
               750 THE CITY DRIVE
               SUITE 400
               ORANGE, CALIFORNIA 92868
               (714) 823-4100
               mwroniak@ccllp.law

               CHRISTIE SWISS
               COLLINS + COLLINS, LLP
               2011 PALOMAR AIRPORT ROAD
               SUITE 207
               CARLSBAD, CALIFORNIA 92011
               (760)274-2110
               cswiss@ccllp.law

**Also Present:**

     Jeremy Holloway, Plaintiff

     Raymond Farahmand, Paralegal for Plaintiff

     Bryan Stever, Litigation Support Defense

*Deborah D. Parker, U.S. Court Reporter*

I N D E X

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK BORBA | 6 | 22 | | |
| | | 24 | | |
| | | 111 | | |
| KEVIN PAHEL | 136 | 165 | | |
| | | 166 | | |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 37  Supplemental Report Mark Borba, 01/23/2018 | | 74 |

E X H I B I T S

| DEFENDANTS' EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 35-4  Deputy Pahel's Arrest Report of Incident | | 138 |
| 102-13 Patrol Vehicle System, Video/Audio, Deputy Mark Borba | | 8 |

*Deborah D. Parker, U.S. Court Reporter*

5

**SANTA ANA, CALIFORNIA; FRIDAY, MAY 16, 2025; 8:04 A.M.**

-oOo-

*(The following proceedings were had in open court*

*in the presence of the jury:)*

THE COURT:  We're on the record.

Thank you, Counsel.  Thank you for your courtesy.

All counsel are present, the parties, the jury.

And, Deputy, would you return to the stand.  Thank you.

While you're doing so --

And, Deputy, you recall the prior oath that was given Wednesday.

MARK BORBA, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

THE WITNESS:  Yes, sir.

THE COURT:  Same oath applies, sir.  If you'd be seated.  Thank you.

We have an estimate for you when the case will come and it's in good faith.  The earliest the case will be argued to you is next Tuesday.  So we'll be in session today, Monday.  The case could be argued to you and go to your deliberations as early as next Tuesday.  The latest -- all counsel believe -- is next Wednesday, so that will give you have some kind of time frame about --

Now, your deliberations, that's your deliberations.  We don't know what that length of time will

*Deborah D. Parker, U.S. Court Reporter*

6

be.  But earliest, next Tuesday; latest next Wednesday.

All right.  Well, counsel, the Deputy has returned to the stand.

And, once again, would you reintroduce yourself by name, sir, to the jury.

THE WITNESS:  Deputy Mark Borba.

THE COURT:  Counsel, would you continue with direct examination.

MS. NALTSAS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. NALTSAS:  *(Continuing)*

Q   Good morning, Deputy.

A   Good morning.

Q   We last left off on Wednesday, at the end of Incident 1.

Do you recall that?

A   Yes.

Q   I'd like to play your PVS for Incident 2.

MS. NALTSAS:  We have a transcript for that, and it has not played yet.  We're going to play it in full with the run time of 36 minutes.

THE COURT:  So 36 minutes.  And the Court could have a copy as well.

And, Deb, could you help -- would you distribute this to the jury so counsel doesn't -- would you just take

*Deborah D. Parker, U.S. Court Reporter*

7

those transcripts.

Give them to the Court Clerk and she'll hand those out to the jury.

(Pause.)

THE COURT:  Counsel, you may begin.

Remember at all times what you hear and see is the best evidence.  These transcripts are an aid, but that's all they are.  They may be accurate or not.

Counsel, please, stop for just one moment.

(Pause.)

UNIDENTIFIED JUROR:  There's an extra.

THE COURT:  Oh, that's okay.  Just put it on the ledge.  That's fine.

Then, Counsel, start again, please.

(The audiotape was played.)

MS. NALTSAS:  The rest of the tape has no audio. We can turn it off or continue.  It's up to the Court.

THE COURT:  Each counsel, do you want to play it all the way through one time?

MS. MKRTCHYAN:  Yes, Your Honor.

THE COURT:  Continue on so we can have one -- so all counsel can ask questions about this tape.

(The video/audiotape was played.)

THE COURT:  While this is playing, how much longer does this continue without the audio?

*Deborah D. Parker, U.S. Court Reporter*

8

MS. NALTSAS: 21 minutes.

THE COURT: Okay. 21 minutes.

*(Laughter.)*

*(The video/audiotape was played.)*

MS. NALTSAS: Thank you.

What was just played was Exhibit 102-13. I'd like to move that into evidence.

THE COURT: Received.

*(Defendants' Exhibit 102-13 received in evidence.)*

BY MS. NALTSAS:

Q    At some point in the tape, your microphone goes out. Did you hear that?

A    Yes.

Q    Was your microphone on or off when Mr. Holloway was subdued?

A    It was on.

Q    When you turned it off, had he already been subdued and in handcuffs?

A    Yes, he was.

Q    Are you aware of a department policy that allows you to turn off your PVS microphone at some point in time?

A    Yes, I am.

Q    And based on the Orange County Sheriff's Department policy, are you able to turn off your microphone like you did on the night of the Holloway incident?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00747          5-RenSER-00747

9

MS. MKRTCHYAN:  Objection.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. NALTSAS:

Q    When are you allowed to turn it off?

A    At the time, the PVS policy 446 stated that during an extended incident, when your interaction with the public ceases, you're allowed to disable your recording device.

Q    And is this an extended incident?

A    Yes, it was.

Q    And on Wednesday, you testified that you had already been in service for 13 hours; is that correct?

A    That's correct.

Q    Was there something about your microphone that told you it's time to turn it off?

A    Yes.

Q    And what was that?

A    The recording device at the time was wireless, and it connected to your patrol vehicle with radio frequency, and the mic that you would wear on your ballistic vest had a battery and the batteries didn't last very long.  It wasn't uncommon for the mics to not last through an entire shift. You would have to remove the mic from your ballistic vest and put it in a charging cradle inside of the car or often times in between calls to try to charge the battery back up.

*Deborah D. Parker, U.S. Court Reporter*

So when the battery gets low, it would indicate that it's low via a LED light at the top and it would vibrate.

Q    Did your microphone vibrate before you turned it off?

A    Yes.  It had been vibrating for some time.

Q    I'm going to go back to sort of the beginning of the tape.  I'm not going to replay it, but we hear when you're arriving to the scene in the audio in your vehicle, you can hear dispatch.

Do you recall that?

A    Yes.

Q    Was there any information that you received from dispatch when you arrived to the scene that told you that this was a priority call, a Code 3, with lights and sirens?

A    Yes.

Q    What information did you receive?

A    A couple pieces of information.  One being, there was a little girl screaming.  Dispatch actually updated the call to P-1, which stands for priority one call, which is lights and sirens.

In addition to that, the little girl screaming and then another update informing that the subject was in someone's campsite and possibly in someone's RV, in and around, I believe it was Campsite 61.

Q    And did dispatch tell you who you needed to find on the

*Deborah D. Parker, U.S. Court Reporter*

11

second call?

A    Yes.

Q    And who did you understand that to be?

A    Mr. Holloway.

Q    About 5:03:37, you arrived at Mr. Holloway's campsite, correct?

A    That may be correct.  I would have to look at the video.  There is some discrepancy as far as to my actual on-scene time and when I say I'm on scene.  And there's a reason for that.

Q    And what is that reason?

A    Due to the fact that we had gone to 1033, which is emergency traffic.  You're not to use your radio.  It's to give the deputies on the scene priority with their pack sets, if they need to put out any communications.  So we try to not use our radios when there is emergency traffic.

Prior to getting on scene, I had put myself 1097, which means on scene.  I did that for two reasons:  One being, I wanted my partners to know that I was close and then also to free up any needed airtime that they might need if they're trying to key their pack sets at the same time I am.

Q    Okay.  When you arrived on scene, who is already on scene?

A    I recall Deputies Renegar and Gonzalez.  As I sit here

*Deborah D. Parker, U.S. Court Reporter*

12

today, I now know that Deputy Pahel was also on scene.

Q    And in the beginning of the tape when you arrived at O'Neill campground, it appears you're following a vehicle.

But at some point, you're driving in a vehicle and the vehicle is following you.

Do you know who's in that other vehicle?

A    Yes.

Q    Who was in that other vehicle?

A    It would be Deputy Gotts and I believe his FTO at the time, Deputy Gunderson.

Q    So when you arrive on scene at Campsite 65 with Mr. Holloway [sic], Deputies Gotts and Gunderson are in the vehicle behind you; is that correct?

A    That is correct.

MS. NALTSAS:  I would like to play 5:03:37 to 50 4:45 with an approximate run time of one minute.

THE COURT:  You may do so.

(*The videotape was played.*)

BY MS. NALTSAS:

Q    Okay.  That video started at 5:03:37, and it appears your car is lurching to a stop.

Does that refresh your recollection as to when you actually arrived at the campsite?

A    Yes, it does.

Q    Okay.  Now, when you arrived, was Mr. Holloway still

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00751                                              5-RenSER-00751

standing up or was he on the ground?

A    He was on the ground.

Q    And was he face up or face down?

A    Face down.

Q    Did you believe you had any obligation to your colleagues to help out at that moment?

A    Yes, I did.

Q    Why do you say that?

A    While responding to the call, I believe Deputy Renegar had updated dispatch that he had one at gunpoint.  This is a very serious call.

        Just after putting out that radio transmission, you can hear a struggle in the background and then another transmission of 415, which means that there's now a deputy in a fight.  That information, in addition to the information that I had already obtained from my first contact with Mr. Holloway, obviously elevated my urgency to get to the scene and assist the deputies.

Q    And when you arrived, you had in your mind the knives you had seen during --

        *(Court Reporter requests clarification for the record.)*

BY MS. NALTSAS:

Q    When you arrived, you had in your mind the knives you had seen during your first encounter?

*Deborah D. Parker, U.S. Court Reporter*

14

A    Yes, I did.  It was also rebroadcasted during the second call by dispatch.

Q    And did you help get Mr. Holloway in handcuffs?

A    I did.

Q    What did you do?

A    When I arrived on scene, I exited my patrol car. Deputy -- Mr. Holloway was on the ground face down.  He had his hands underneath him kind of underneath his waistband area.  And I remember Deputies Renegar and Gonzalez on and around Mr. Holloway's back trying to gain control of his arms.  And so I proceeded to the area where the altercation was occurring.

Mr. Holloway had exposed his left hand and begin to push up from the ground.  At which point, I gained control of his left arm in an attempt to put it behind his back.  At the same time, I placed my right knee onto his upper back and applied some pressure to ensure that he wasn't going to extend back up to his feet.

Q    Based on what you had seen the first time that you went to Mr. Holloway's campsite and when he had his hands underneath him when you approached to assist to get him in handcuffs, did you know if he had a weapon underneath his body?

A    No, I did not.

Q    And did you consider when you went to his campsite and

*Deborah D. Parker, U.S. Court Reporter*

15

saw the knives on the ground and the machete and the axe, did you consider those to be dangerous weapons?

A    Yes, I did.

Q    And you testified there came a time when Mr. Holloway's hands came out from underneath him.

How did that happen?

A    So as I stated earlier, as I arrived, he had exposed his left hand and begin to push up from the ground, resisting the deputies' attempts to place him under arrest. And in doing so, he exposed that hand which allowed me to grab control of it.

Q    In the -- I would like to draw your attention to Exhibit 45 in the Call Detail -- which Exhibit 45 has been previously admitted -- it says:  *1 in cuffs.  Further Taser deployment.*

Do you recall whether you communicated that information to dispatch?

A    I did.

Q    And what does that mean?

A    So a few things:  One, I'm letting, probably, 15 to 20 deputies that may be on this channel, know that the suspect is in handcuffs so that they can stop responding.

And I'm also advising dispatch and my supervisor that there's been a Taser deployment, because there is procedures -- POST Use Force and POST Taser Deployment --

*Deborah D. Parker, U.S. Court Reporter*

16

depending on the nature of the call.

Q   Does that communication mean you put someone in handcuffs and then deploy the Tasers on them while they are in handcuffs?

A   No.

Q   We hear on your dispatch you say something to the effect of "367.  Sufficient Units."

Did you hear that?

A   Yes.

Q   What is the significance of that statement?

A   Again, due to the nature of the call, there was multiple deputies responding to this area, and I wanted -- I wanted to let them know that they didn't need to respond any longer.

When units are responding lights and sirens, it's dangerous -- dangerous to the public.  It's dangerous to us. So I was advising everyone that had started responding to the call that we had enough deputies on scene and they could, basically, go back to their respective areas.

Q   We also hear you say, "367.  Can you start 91 for the suspects?"

Did you hear that?

A   Yes.

Q   And what does that mean?

A   "91" is referring to Orange County Fire Authority,

*Deborah D. Parker, U.S. Court Reporter*

17

which is Station 91, so I was requesting medical for Mr. Holloway.

Q    And we hear on your PVS, you say something to the effect, *Make sure there's no knives on hand.*

Did you hear that?

A    I did.

Q    And why did you say that?

A    Some time had elapsed from the first contact with Mr. Holloway due to the nature of his agitated state and the weapons and knives we had already located on scene during the first call.  And the time that had elapsed, it could have gave him an opportunity to arm himself with one of the weapons, so I wanted to make sure that he was unarmed.

Q    At some point in your audio, we hear you say something to the effect of *I think I went airborne.*

Why did you say that?

A    I think I went over one the aggressive speed bumps like 45 miles an hour.

Q    During the incident where Mr. Holloway was subdued, did you see anyone punch Mr. Holloway in the face?

A    No.

Q    Did you see anyone knee Mr. Holloway in the head?

A    No.

Q    Approximately how many hours of use-of-force training

*Deborah D. Parker, U.S. Court Reporter*

18

have you received?

A    It would have to be over 100.

Q    Did you ever deviate from what you were trained on how to handle calls like this during this incident?

MS. MKRTCHYAN:  Objection.  Vague.  This is highly vague and ambiguous and "deviate."

THE COURT:  Overruled.

*(Court Reporter requests clarification for the record.)*

THE COURT REPORTER:  I didn't get his answer.

THE COURT:  I'm sorry, Deb.  My apologies.  He did, but we didn't pick it up.

MS. NALTSAS:  I'm sorry.

BY MS. NALTSAS:

Q    Did you ever deviate from what you were trained on how to handle calls like this even once during this incident?

A    No.

Q    Did you ever see any other deputy deviate from what you were trained on how to handle calls like this even once during this incident?

A    No.

MS. NALTSAS:  I would like to play 102-14.  It's a third PVS with a run time of seven minutes.

THE COURT:  Well, we're still on the same transcript.  The difficulty for the jury is going to be --

*Deborah D. Parker, U.S. Court Reporter*

19

oh, these are new transcripts?

MS. NALTSAS:  Yes.  We have a new transcript.

THE COURT:  This is of Deputy Borba.

MS. NALTSAS:  Borba, correct.

THE COURT:  Deb, could you help us again, so counsel isn't distributing these to the jury?

(Pause.)

THE COURT:  And if you have an extra copy, don't worry.  Just put it on the corner.

(Pause.)

THE COURT:  Just a moment.  I wanted these transcripts played all the way through.  Do you have any other transcripts that are going to be played?

MS. NALTSAS:  No, Your Honor.  And the confusion is, Deputy Borba has three separate PVS's, so I was playing each one of these separately with a separate transcript.

THE COURT:  Play this all the way through then. And this is still going to be marked 102 --

MS. NALTSAS:  -14, I think?

MR. HARRELL:  -12.

MS. NALTSAS:  102-14.

(The videotape was played.)

BY MS. NALTSAS:

Q    Who are you speaking with at the beginning on this tape?

*Deborah D. Parker, U.S. Court Reporter*

20

A    Mr. Dennis.

Q    And this is the second time you spoke to Mr. Dennis?

A    So the first time, he was speaking to Deputy Renegar, I was within microphone range of that conversation.  Second, technically, this would be my first time speaking with him.

Q    And what did Mr. Dennis tell you?

A    Mr. Dennis basically restated what he had told us initially during the first call; that he heard an altercation occurring in the area of where Mr. Holloway was and described it to me in detail.  I had went to talk to him to obtain his information and just facts in case I needed to put that in our report.

Q    At the end of the tape, are you communicating with Deputy Renegar?

A    Yes.

Q    And we hear you say something to the effect of, *I'll type it up on Tuesday.*

     Did you hear that?

A    Yes.

Q    And what are you referring to?

A    My use-of-force report.

Q    And why Tuesday?

A    So I was working an overtime shift that night, so it's not my normal day.  It's my off day.  And Tuesday would have been my Monday, starting the next workweek.  And due to the

*Deborah D. Parker, U.S. Court Reporter*

21

extended length of the shift already, I decided to type my report the next following workday which would have been Tuesday.

Q    And you spoke to two informants -- Mr. Dennis and Mr. Fuerbach -- that night, correct?

A    Yes.

Q    And you also spoke with Mr. Holloway; is that correct?

A    That's correct.

Q    And how would you characterize Mr. Dennis' attitude towards you when you were speaking with him?

MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

THE COURT:  Overruled.

You can describe that.

THE WITNESS:  He was calm, collected and also concerned.

BY MS. NALTSAS:

Q    How would you characterize Mr. Fuerbach's attitude towards you when you were speaking with him?

A    Cooperative.  Concerned.  Kind of identical.

Q    And how would you characterize Mr. Holloway's attitude towards you when you were speaking with him?

A    Confrontational.  Evasive.  Argumentive.  Agitated.

Q    Did Mr. Holloway ever tell you you needed to go to Campsite 66 that night?

A    No.

*Deborah D. Parker, U.S. Court Reporter*

22

Q    You've reviewed your PVS recordings before you were testifying today, correct?

A    That's correct.

Q    And when was the first time, if you can recall, that you reviewed or had the opportunity to review your PVS recordings?

A    It would be sometime, probably, in 2020 after my deposition was taken.

        MS. NALTSAS:  I have no further questions.

        THE COURT:  Counsel.

                    CROSS-EXAMINATION

BY MS. SWISS:

Q    Good morning, Deputy Borba.

A    Good morning.

Q    Counsel showed you Exhibit 45, the entry that said "1 at cuffs" and then "Taser deployment."

        Do you recall that?

A    Yes.

Q    Can you explain, again, why you put that out into the dispatch?

A    So I'm letting dispatch and the arriving units know that the suspect is in handcuffs, as well as that there's been a Taser deployment so that dispatch will start medical for the suspect.  That's part of our policy.  I'm also advising the supervisor who would be monitoring this channel

*Deborah D. Parker, U.S. Court Reporter*

23

that there's been a Taser deployment.

Q    So was it your understanding when you put out the Taser deployment that medical would then be called on scene starting at that point?

A    I did.  But I also requested them just in case.

Q    And that was a separate radio transmission?

A    Yes.

Q    Okay.  And when you put out that the Taser was deployed, you witnessed the Taser being deployed on Mr. Holloway; is that right?

A    I did.

Q    And did you, yourself, use any force on Mr. Holloway after he was in handcuffs?

A    No.

Q    And did you see anyone use force of any kind after Mr. Holloway was in handcuffs?

A    No.

        MS. SWISS:  Thank you.

        No further questions.

        THE COURT:  Counsel, would you like a recess before cross-examination?

        MS. MKRTCHYAN:  Yes, Your Honor.  Thank you.

        THE COURT:  Ladies and gentlemen, why don't we take about 15 minutes.

        You're admonished not to discuss this matter, nor

*Deborah D. Parker, U.S. Court Reporter*

24

form or express any opinion.

We'll start cross-examination then.

(*Jury exits courtroom.*)

(*Recess taken from 9:13 a.m. to 9:33 a.m.*)

(*The following proceedings were had in open court in the presence of the jury:*)

(*Jury enters courtroom.*)

THE COURT:  Thank you, Counsel.  If you will be seated.  Thank you for your courtesy.

All counsel are present.  Mr. Holloway is present. Cross-examination.

MS. MKRTCHYAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MKRTCHYAN:

Q    Good morning, sir.

A    Good morning.

Q    Would you, please, describe for the record your height and weight at the time of this incident?

A    I'm 6-foot 4 inches.  At the time of the incident probably 225 pounds.

Q    Okay.  And is this the uniform, pretty similar uniform, that you were wearing on that night?

A    It's similar.  It is not the uniform.

Q    So what is the difference between this uniform and the one that you were wearing on the night in question, sir?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00763                5-RenSER-00763

25

A    During the incident, I was working overtime as a patrol deputy, so I was wearing the standard OD green with gold patch uniform, also wearing a different outer ballistic vest.

Q    Okay.  So -- but describe for us what you were -- what equipment you have with you on the night of the incident?

A    As far as what I was wearing?

Q    No.  Equipment.  Equipment.  What kind of weapons did you have?

Is it pretty much the same that you have now?

MS. NALTSAS:  Objection.  Vague.

THE COURT:  Overruled.

You can describe it once again.

THE WITNESS:  I carry a collapsable baton, pepper spray and a handgun.

BY MS. MKRTCHYAN:

Q    Okay.  Did you also wear a ballistic vest?

A    Yes.

Q    Today, as you're here, you have a body-worn camera?

A    I'm not wearing a body-worn camera, no.

Q    You are not.  Okay.  So the equipment right now you're wearing is not the similar ones that you had on that night?

A    It's different.

Q    Okay.  So -- but you had a handgun.  You had a baton, and you had a Taser?

*Deborah D. Parker, U.S. Court Reporter*

26

A    No.

Q    You didn't have a Taser?

A    I did not have a Taser.

Q    Okay.  And that equipment also weighs a few pounds.
True?

A    Yes.

Q    How many pounds would you say your equipment were,
including ballistic vest, including your gun, including the
baton, everything that you believe weighed -- weighed at the
time of this incident?

A    I've never weighed my equipment by itself.

Q    About 20 pounds?

A    It's possible.

Q    So the call came in -- this 911 call, the dispatch gave
you the call at 3:40, based on call detail information.
True?

A    The call was not given to me.  It was given to
Deputy Billinger.

Q    Okay, sir.  But I'm talking about the call came in at
3:40, as far as you know from Call Detail Information
Report?

A    Sounds about right.

Q    Okay.  And you were -- you were at scene with
Deputy Billinger at about 3:54 a.m.?

A    If that's what it says.  I don't have it in front of

*Deborah D. Parker, U.S. Court Reporter*

27

me, so...

Q    But you've looked at this report before.

Would you like us to look at it again, together?

A    Ma'am, that's not in my report.

Q    Let's look at the call.  You've looked at the Call Detail Information Report with your attorney yesterday and today.  True?

A    I don't remember looking at a Call Detail Information. We watched a video and we went over some transcription.

Q    Okay, sir.

*(The document was published in open court.)*

BY MS. MKRTCHYAN:

Q    So you -- after [sic] this day, you haven't looked at this document?

A    I have seen this document in prior testimony.  Not yesterday.  Not today.

Q    Okay.  Very good.  So based on this document, you were at scene -- on scene at 3:54:47 seconds.  True?

A    That is correct.

Q    With Deputy Billinger, right?

A    That is correct.

Q    Okay.  And then you arrived to the scene -- the ride that you took from the park ranger station -- let's look at the map.  Let's look at the route that you took.

Can you tell us -- and we have a marker.  You can

*Deborah D. Parker, U.S. Court Reporter*

28

actually mark on that screen with the red, and you can show us what route you took when you entered the park.

THE COURT:  Place on that screen with a finger. And then if you want to, I believe -- after 25 years, I should know this, but you can erase it by tapping the right.

BY MS. MKRTCHYAN:

Q    Yes.  So please mark, you know, the route you took from the entry of the park.

A    (Witness so complies.)

MS. MKRTCHYAN:  Very good.  Thank you, sir.

For the record, the witness has marked with the red on the map -- this is Exhibit 76 -- the entry from the park -- into the park.

BY MS. MKRTCHYAN:

Q    So you go through this ranger station area and then you go -- this is a driveway entering the campsites.  You make a round and then you stopped at or near Campsite 63.  True?

A    I stopped somewhere in the area vicinity of, I'd say, Campsite 61 through 65.  I'm not going to say 63.  It was pitch black.

Q    Okay, sir.  Right.  And it was pitch dark, right?  We saw on your tape how dark it was in this campground (indicating).  In this area (indicating).  True?

A    It was very dark.

Q    And the call -- you went to this particular area,

*Deborah D. Parker, U.S. Court Reporter*

29

because you knew that the caller -- the informant said he was at 63, at Winnebago, and the incident was occurring somewhere next to his -- right next -- to the right of his RV.  True?  That's what you heard on the dispatch?

A    I would need to look at the CAD detail to give you specifics.  But what I remember is that the informant from Campsite 63 stated that it was occurring to the right of his campsite.

Q    Right.  So that's why you went to this area.

A    Correct.

Q    Okay.  So when you went to this area you parked your cars [sic] with Deputy Billinger.  You turned off your car lights.  True?

A    That's correct.

Q    You came out of your cars and you turned off your flashlights.  You were in a stealth mode, trying to hear and see what is going on in this particular area.  True?

A    True.

Q    Okay.  So you, basically -- and what is "stealth mode"?  You're basically doing your surveillance but in a way that you're not noticed to anyone.  True?

A    Partially.  It's mainly for our safety while responding to, especially, a domestic violence call.  That's very dangerous for us, so we don't want our presence known.  If the suspect knows that we are there, it can result in

*Deborah D. Parker, U.S. Court Reporter*

something dangerous.

Q    Okay, sir.  So -- but you -- another reason also for you to do this is to hear and see if there's any disturbance ongoing at the time you arrived without being noticed.  True?

A    I guess you could say that.  I mean, if I wanted to see, I would illuminate the area but that's going to give away my location and that's dangerous for me is what I'm saying.

Q    You had two officers, though, right?  You had deputy Billinger with you?

A    Two would be including me, so there's two of us there, yes.

Q    Okay, sir.  So -- but in any event, you were in the stealth mode.  Your flashlights were off.  Your car lights were off.  And it's pitch dark.  You're walking around in this area of Campsite 63 and 65.  True?

A    True.

Q    Okay.  And based on your PVS, you said, *I don't hear anything.*  We looked at the transcript yesterday.  You were talking with -- on the radio or were you talking with your partner, Deputy Billinger?

A    Speaking to Deputy Billinger.

Q    Okay.  You said, *I don't hear anything.  I'm about ready to clear, even.  There's nothing going on.  If they*

*Deborah D. Parker, U.S. Court Reporter*

31

*were arguing, they went back to bed.* The only person out there is that first person in that tent down there, right?

So that's what you were talking about at the time you came, first, to the scene before even any other officer arrived. True?

MS. NALTSAS: Objection. Compound.

THE COURT: Do you understand the question, sir?

THE WITNESS: I do, Your Honor.

THE COURT: You can answer it.

Overruled.

THE WITNESS: I'm discussing the call with Deputy Billinger as to how we're going to complete the call or wait.

BY MS. MKRTCHYAN:

Q    Okay. So in any event, sir, you didn't --

*(Court Reporter requests clarification for the record.)*

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

Q    You didn't hear any disturbance at this time when you arrived. True?

A    That is correct.

Q    Okay. And then you were even talking about clearing the call, but you didn't want to do that because you were not the primary unit responding to this call. True?

*Deborah D. Parker, U.S. Court Reporter*

32

A    That's one reason.  The second reason is there was uncertainty as if we were in the correct location.  I wasn't familiar with this area.  This was outside of my primary work location at the time, which would have been the City of Rancho Santa Margarita.  This is an area that we referred to as "Unincorporated East," and I wasn't familiar with the park.

So the discrepancy was the campsites have names and I didn't know -- neither did Deputy Billinger -- if there was another Campsite 63 somewhere in the park with a different name.  So because of that, I didn't want to just clear, the call being unfamiliar with the area, so I was waiting for the deputies that are assigned to this area who would have more knowledge --

Q    Yes, sir.  But in any event, now we know -- now we know and after your investigation, you were near where the reporting party identified the DV was occurring.  True?

Isn't it true?

A    Can you restate that for me?

Q    You were near Campsite 63 and 65 when you arrived at the scene at 3:54 a.m.  True?

A    That is correct.

Q    Okay.  Did you see any female walking around from Campsite 65 when you arrived?

A    No, I did not.

*Deborah D. Parker, U.S. Court Reporter*

33

Q   When you were driving from your entry into the park -- into this area, did you see any female walking around in that area?

A   No, I did not.

Q   Did you see any lights at Campsite 65 when you arrived at 3:54 a.m., minutes after Fuerbach's call?

A   I would disagree with your statement of minutes after Fuerbach's call.  We would need to look at the time that the call was received to the time that I responded to the scene.  It's quite some time.  So there's plenty of time for a female to leave the scene prior to my arrival.

To your question of did I see any female or lights near Campsite 65 at the time I arrived the first time, no, I did not.

Q   Let's talk about the questions that were posed to you.

3:49, you're aware right now, based on every evidence that we've got in this case, the call from Fuerbach came at 3:39 and was put out on dispatch at 3:40.

Is there any secret about that?

A   I don't have --

Q   Yes or no?

Do you want me to open the Call Detail Information Report again?

THE COURT:  Just a moment, Counsel.

MS. NALTSAS:  Your Honor, can he finish?

*Deborah D. Parker, U.S. Court Reporter*

34

THE COURT: The question needs to be answered.

You were cut off. Finish your answer.

THE WITNESS: I have no problem answering your questions. The problem is I don't have what you're talking about in front of me. So if you're asking me to testify to a specific time, if you just put that exhibit in front of me, I will gladly do so.

BY MS. MKRTCHYAN:

Q   Sir, we just looked at it. We just looked --

THE COURT: Counsel. Just --

BY MS. MKRTCHYAN:

Q   Let's look at this document.

THE COURT: Just a moment. This is unduly consumptive. Just put the document in front of him so he has that as a reference.

MS. MKRTCHYAN: Your Honor, this -- showing to him.

THE COURT: No, then I'm going to exclude it. Just put the document in front of him.

MS. MKRTCHYAN: It's right there. It's right there, Your Honor.

THE COURT: Okay. Thank you. I appreciate it.

Now we have the document in front of you.

(The exhibit was displayed on the screen.)

////

*Deborah D. Parker, U.S. Court Reporter*

35

BY MS. MKRTCHYAN:

Q    Isn't it true the call came in 3:40, the dispatch shows:  "Male versus Female"?

A    So that is the time that the call is dispatched to me. So the call would have came in even prior to 3:40 to a call taker at sheriff's dispatch.  It would then be interpreted, passed along to the dispatcher who would then type this and send me and Deputy Billinger to the location.

So the time that this would be reported is actually prior to 3:40.

Q    Sir, are you aware that the 911 call that we have from Fuerbach based on the documents produced by the Orange County Sheriff's Department came in at 3:39?

A    Well, that just verifies what I just said.  It would have been prior to 3:40.

Q    Okay.  But this was so -- that's what we're establishing right now.  3:40, the dispatch gives you the information --

THE COURT:  Just a moment.

BY MS. MKRTCHYAN:

Q    3:39.

THE COURT:  Can we stipulate that the call came in at 3:39.

Counsel?

MS. NALTSAS:  So stipulated.

*Deborah D. Parker, U.S. Court Reporter*

36

THE COURT:  Counsel?

MS. MKRTCHYAN:  Yes.

THE COURT:  3:39?

MS. MKRTCHYAN:  This was not disputed.

THE COURT:  3:39, okay.

Ladies and gentlemen, the call came in at 3:39.

BY MS. MKRTCHYAN:

Q    Okay.  So how many minutes after that you arrived to the scene?  You're en route.  Let's look at your en route. En route.  What does "ENR" mean?  "ENR"?

A    En route.

Q    Okay.  And that means that you were on route to this location at 3:42 within minutes -- two minutes.  True?

A    False.

Q    Okay, sir.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  False.

BY MS. MKRTCHYAN:

Q    False, okay.

So what is false about that statement, sir?  When it says on route 3:42:37, you were on route or not, based on this document?

MS. NALTSAS:  Multiple questions.

THE COURT:  Overruled.

*Deborah D. Parker, U.S. Court Reporter*

If you understand the question, you can answer it.

THE WITNESS: So at 3:42 hours, that's when I would have used my pack set, advised dispatch that I would be in or out to the location. That's doesn't mean I'm at the location. It doesn't even mean that I'm driving to the location. It's just when I acknowledge that I will be en route.

Q  Okay. We'll look at your patrol vehicle recording as well. But in any event, based on this document, which is an official record, at the very least we know you're on scene 3:54:47 seconds. True?

That's within how many minutes of the call that --

THE COURT: Just a moment. Now, it's multiple questions, Counsel.

Answer the question about when you were on scene.

THE WITNESS: So this shows me arriving at 3:54 hours which -- I mean, I'm not doing math in my head. 15 or 20 minutes after the call came in? That's a significant amount of time.

BY MS. MKRTCHYAN:

Q  In any event, you know, you're asking your questions.

Do you have a problem with answering my questions?

MS. NALTSAS: Objection.

MS. SWISS: Objection.

THE COURT: Sustained. Stricken.

*Deborah D. Parker, U.S. Court Reporter*

38

BY MS. MKRTCHYAN:

Q   Okay.  So I'm asking you, specifically, you came -- based on this document, you were at scene and they have a patrol vehicle recording indicating that you were at scene at the very least talking with Deputy Billinger at 3:56:57.  This is the transcript you gave us.

Is there any problem with confirming times?

MS. NALTSAS:  Objection.

MS. SWISS:  Argumentative.

MS. NALTSAS:  Compound.

THE COURT:  Sustained.  That assumes he's having problems confirming time.

Sustained.

BY MS. MKRTCHYAN:

Q   So, in any event, sir, you were at scene, give a ballpark within 20 minutes of the call that came in saying "Male versus Female."  True?  Yes or no?

I'm not interested in your --

THE COURT:  Counsel.  Counsel, just ask the question without adding to it.

You can answer that question, sir.

BY MS. MKRTCHYAN:

Q   Yes or no?

A   I will agree with that statement.

Q   Okay.  Let's see what else you're going to agree with

*Deborah D. Parker, U.S. Court Reporter*

us.

So you came -- you didn't see a female. You were walking there in dark with no flashlights. You did not hear anything. And you were about to clear the call. True?

A So we do illuminate our flashlights. You can actually see that a few times on the video, I believe. So we're actively searching the area for anyone who may need our assistance. We're listening for an altercation. We're trying to figure out where it's occurring, if we're in the right spot. There's a multiple -- multitude of factors that are going on rather than just clearing the call. That's not the case.

Q But in any event, we heard transcript. You were there. You were telling everyone, *I don't hear anything.*

And then Deputy Renegar shows up with other officers. True?

A So Deputy Renegar did show up. He didn't show up to the area that we were just referring to. We had actually left that location, driven back to the entrance of the park and that's where we met with Deputy Renegar.

Q Right. So you actually went back to the exit -- the park ranger station area. You left your -- you, basically, got inside your cars, you and Billinger, and you left the area towards the ranger station. True?

A Correct.

40

Q   Okay.  So you, basically, left the area because you didn't at that time confirm any disturbance ongoing at 3:54, 3:56 a.m.  True?

A    Partially -- that statement is true.  We also did not know if we were at the right location and that was my main concern.  I wanted to know if we were at the right location, because I didn't want to clear a call that's this serious in nature and then be in the wrong location and that incident could still could be occurring somewhere else.  So that was also a concern which is why I proceeded back to the entrance to meet with Deputy Renegar.

Q   Well, but right now -- as of right now you're sitting here today, you had been -- at that time, you had been at the location:  63 and 65.  True?  You know now?  True?

A    As I sit here today, I now know I was at the correct location.

Q   Okay.  So you left -- show us again your direction where you went on this map back to the area ranger station.

Just mark it -- the exit that you made, the area you went on this map.  Which way did you go.

A    So I can start it off and give you direction, but unfortunately, there's several ways I could have went and I can't do that right now accurately.  I can tell you what direction I went, if that's the question you're asking me. I went from -- we'll say the direction of 63 towards 78,

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00779                                      5-RenSER-00779

41

right? I didn't turn around. I just continued forward, if that's the question. I'm not going to draw it, because I don't know how exactly I got back to the ranger station.

Q   In any event, you didn't go back in the same route that you took entering the campground. True?

A   True.

Q   Okay. So -- but I want to make sure that it's clear that you actually went down. You passed about 65. You passed by 66, 68, 70, 71, back to the ranger station area. True?

A   Yes. If you'd like, I'll draw a line --

Q   Yes, please. Please.

A   (Witness so complied.)

Q   Okay. You passed by 71 campsite. You passed by 66. True?

A   Correct.

Q   Okay. So -- and then while you are -- you went to the ranger station. You had the brief exchange with Deputy Renegar about this call for service. True?

A   True.

Q   And then you had a camper, Luke Dennis, approach you guys in the same area? Is this in the park ranger area where Luke Dennis approached you?

A   Correct.

Q   That was the guy from Campsite 71. True?

5-RenSER-00780          5-RenSER-00780

A    Correct.

Q    Okay.  And he told you that he had heard something.  True?

A    Yes.

Q    And this was the -- page 5 of the transcript.  You said -- he told you, *Oh, one of your neighbors are having a big fight* and then -- *and they arrived over there by -- I mean, Campsite 71.*  And then he talks about this fight.  You asked him about which campsite he was from.  And he said he was from Campsite 71, right?

This is pages 5 or 6 of your transcript, sir -- of your PVS recording.

A    You made several statements in there, so I'm just going to need to read it.  I just need time to read it.

Q    We heard this yesterday, didn't we?

MS. NALTSAS:  Objection.

MS. SWISS:  Argumentative.

MS. NALTSAS:  Argumentative.

THE COURT:  Sustained.  You can refresh your recollection.

MS. MKRTCHYAN:  Sure.  Read pages 5 or 6, sir.

THE WITNESS:  *(Witness so complies.)*

*(Pause.)*

THE WITNESS:  So he describes to us what he heard and advised us that we had driven past where it was

*Deborah D. Parker, U.S. Court Reporter*

43

occurring.

BY MS. MKRTCHYAN:

Q    Right.  And isn't it true that driven past not only Campsite 65, but Campsite 66, prior to reaching his location at 71.  True?  On this map.  True?

A    That is correct.

Q    And he could not pinpoint.  You spoke to him twice that night:  First time before the first encounter with Mr. Holloway and afterwards -- after he was arrested and use of force occurred.

You spoke to him twice.  True?

MS. NALTSAS:  Objection.  Misstates prior testimony.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  So as I stated earlier, I believe I spoke to him one time.  That was during -- would be the third video that we watched where I interviewed Mr. Dennis. The first encounter I had with Mr. Dennis, I was around Mr. Dennis and Deputy Renegar when the conversation was occurring.  I didn't actually interact with him.

BY MS. MKRTCHYAN:

Q    So you were not the one who spoke with Luke Dennis, but it captured on your mic; isn't it true?  You were close enough.

*Deborah D. Parker, U.S. Court Reporter*

44

A   As I stated earlier, yes.

Q   Okay.  And you became privy to that conversation, because you were standing there with Renegar.  True?

A   Correct.

Q   Okay.  So then when Luke Dennis talked to you, he gave statements that were somewhat different from how, for example, Fuerbach described this incident.  True?

Isn't it true?

A   My problem with the question is that I don't know what you're referring by Fuerbach's statement.  I am confused by the question.  You have to restate it.

Q   You spoke with Fuerbach on your PVS.  You discussed it yesterday, right after Renegar spoke with Luke Dennis, you spoke with Fuerbach; isn't it true?

A   At some point during our investigation, I did speak with Fuerbach.

Q   I'm talking about before you had an exchange with Mr. Holloway.  On this transcript, yesterday, you spoke with Fuerbach, didn't you, sir?

THE COURT:  Counsel, the question is:  What time?  I think that's the --

BY MS. MKRTCHYAN:

Q   That's the time we're talking about, sir.

THE COURT:  Just a moment.  I'm not sure that that's clear.

*Deborah D. Parker, U.S. Court Reporter*

45

Do you understand the question?

THE WITNESS: I believe I do, sir.

THE COURT: All right. Then you can respond, please. Thank you.

THE WITNESS: So I had spoken to Fuerbach that night before making contact with Mr. Holloway and after being around the conversation that Mr. Dennis had with Deputy Renegar.

BY MS. MKRTCHYAN:

Q   Okay, sir. But that's what's my question is. You had a conversation with Fuerbach prior to going and interacting with Mr. Holloway at 4:23. True?

A   Sounds correct.

Q   Okay. So when Luke Dennis says *The guy was, you know, saying, fucking bitch, I'm going to kill you,* that's not what you heard Fuerbach tell you. True?

Isn't it true? They're different statements. True?

A   So a lot of the recording when Mr. Fuerbach is talking, it's low volume. You can't hear everything. I'll agree with you the statements are different. Of course they would be. They are different people.

Q   Sir, so the statements are different. Did Fuerbach ever tell you when you spoke to him after you had an exchange with Luke Dennis, that he heard a female walk away

*Deborah D. Parker, U.S. Court Reporter*

46

from Campsite 65?  Did he ever tell you that?

A    No, I don't recall that.

Q    And if Fuerbach, in fact, told you that *I heard a female leave Campsite 65 before you arrived,* wouldn't it be incumbent upon you as a police officer to a walk around in this area, find that female who walked away?

                MS. SWISS:  Speculation.

                MS. NALTSAS:  Assumes facts not in evidence and incomplete hypothetical.

                THE COURT:  Do you understand the question?

                THE WITNESS:  I do, Your Honor.

                THE COURT:  You can answer it.

                THE WITNESS:  So the difficulty with that question is that as I sit here today, I know what transpired.  At the time I'm investigating what's going on, I don't know if I have a crime.  I don't know if a domestic violence is occurring yet.  I don't have the facts.

                If that would have been posed to me and I -- at the time, I would have most likely looked for a female.

BY MS. MKRTCHYAN:

Q    Right.  Because the first goal when you're investigating the incident is to find the victim -- true? -- as a police officer?

A    False.

Q    Oh, false.  Okay.  Let's see what you did next.

*Deborah D. Parker, U.S. Court Reporter*

47

You basically spoke. You had a brief exchange with Luke Dennis, with Deputy Chad Renegar, who also -- you asked him -- one of the officers on this transcript asks him, *by the white truck?*

The man says, *I don't know. But you drove right past it,* right? That's what he says.

A    Yes.

Q    So this second camper, unlike Fuerbach, never said that he actually heard the DV by the campsite with the white truck; isn't it true?

Isn't it true, sir?

A    Are you referring to the first interaction that we had with Mr. Dennis or the second?

Q    Both. First time, right now before you even -- let's talk about the chronologically [sic] not to confuse anyone.

Chronologically, when you spoke to Luke Dennis prior to going and interacting with Mr. Holloway, he never told you that the DV occurred this specific location, Campsite 65, by the white truck. True?

A    I did not speak with Mr. Dennis during the first interaction.

Q    And the microphone that -- your microphone picked up the conversation with Renegar.

Do you want me to play the tape?

THE COURT: Counsel.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00786                                                    5-RenSER-00786

48

MS. NALTSAS: Objection.

THE COURT: Counsel, that's -- just ask the question.

BY MS. MKRTCHYAN:

Q    Did you hear on your tape --

Let's put it this way: Did you hear on your tape deputy asked him, *By the white truck?*

And he says, *I don't know, man. But you drove right past it.*

Is this Luke Dennis talking with one of the officers that is picked up on your mic, sir? Yes or no?

MS. SWISS: Relevance. 403. What we hear today in court is not relevant.

THE COURT: Overruled.

MS. NALTSAS: Compound.

MR. WRONIAK: If you overheard that portion of the conversation with Renegar, you can answer it.

THE WITNESS: I do recall that. It's on the transcript. I heard it in court.

BY MS. MKRTCHYAN:

Q    Okay. So confirm with me that's Luke Dennis talking to one of your officers picked up on your mic. How is this difficult? I don't understand.

MS. NALTSAS: Objection. Argumentative.

THE COURT: Sustained.

*Deborah D. Parker, U.S. Court Reporter*

49

BY MS. MKRTCHYAN:

Q    Is this Luke Dennis or some other person?

A    It is Luke Dennis.

Q    Okay, sir.  Then let's go move on.

So then he said you drove right past it.  And we can see on this map when you were at 63, you did drive past not only 63, not only 65, but Campsite 66 before you reached your exit towards the park ranger station; isn't it true, sir?

A    I drove past a lot of campsites including 66.  Sure.

Q    Right.  And then flash forward, you had a brief exchange with Fuerbach.  Isn't it true the information from the dispatch that we see on page -- the tent -- the DV -- dispatch, this is page 5.

Dispatch tells you, *The informant on the tent 21 stated that the DV is occurring at the tent with the white truck parked in front of it.  The informant will be Campsite 63 with the Winnebago.*

Do you see that on page 6, sir, of your transcript?  Do you have that transcript?

THE COURT:  Just a moment.  I don't know that he's got that transcript, Counsel.

THE WITNESS:  If you'll just give me an exhibit number, I'll maybe go to the book.  It would make it faster.

THE COURT:  Just a moment.  Let's supply that

*Deborah D. Parker, U.S. Court Reporter*

50

transcript, because there's so many transcripts --

MS. MKRTCHYAN: I thought we had that transcript yesterday.

THE COURT: Well, Counsel, he may have.

(Pause.)

MS. MKRTCHYAN: Look at mine. Thank you. Look at mine.

BY MS. MKRTCHYAN:

Q So that information came in from Fuerbach, because he was at Campsite 63 providing that information. True?

A Correct.

Q Okay. So from right now, you're sitting here today and from that night you knew the person who told you about a white truck was Campsite 63, Winnebago, Fuerbach; isn't it true?

A Correct.

Q Not anyone else. Not Luke Dennis that we heard? True?

A Luke Dennis did not direct me to a white truck.

Q Okay. So then you had a conversation. You had an interaction with Holloway. You were still investigating the source of the disturbance. True?

A Correct.

Q It wasn't like 100 percent you were going to Campsite 65 to arrest him for a DV. True?

A I need you to give me a time frame.

*Deborah D. Parker, U.S. Court Reporter*

51

Q   At that first time you interacted with Mr. Holloway, you were not going there to make an arrest.  You were still investigating the disturbance call.  True?  Yes or no?

A   It would still be an investigation.

Q   Okay.  And then you had a conversation with him.  Your primary call when you're talking to him is to find this female, right?  You need to find the female.

THE COURT:  Just a moment.  When you're talking to him, is it Fuerbach or Holloway?

MS. MKRTCHYAN:  Holloway, Your Honor.

THE COURT:  All right.  Thank you.

BY MS. MKRTCHYAN:

Q   You're talking with Holloway now.  4:23 a.m., we hear that on your tape with Deputy Renegar.  We have you, Billinger, Gonzalez, Pahel and Renegar.  Five of you, at Campsite 65, at 4:23, talking with Holloway.  Are you there with me?

A   Restate your question.  I don't understand the question.  Am I there?  Yes.  I don't understand the question.  I'm sorry.

Q   I'm asking you about the point in time when you are first interacting with Mr. Holloway at 4:23, okay?  That's the time we're on.

Okay.  You have five officers there -- true -- including you?

*Deborah D. Parker, U.S. Court Reporter*

52

A    Correct.

Q    Okay.  And your primary goal is to find the female, because that's why -- that's what you're investigating.  True?

A    False.

Q    Oh.  So your DV call, you're not going to look for a female in distress?  When it says "male versus female," you're not going to look for the female?

   MS. NALTSAS:  Objection.  Relevance.

   THE COURT:  Sustained.

   Well, it's not that it's relevant, Counsel.

   MS. NALTSAS:  Argumentative.

   THE COURT:  It's argumentative.

BY MS. MKRTCHYAN:

Q    So why is then Renegar asking him, *Something happened here?  Are you alone?*

   I don't understand.  Are you telling us that your goal was not to find a female with him?

   MS. NALTSAS:  Multiple questions.  Speculation.

   THE COURT:  I think you asked the primary goal.  He stated that it's not the primary goal, but it may be one of the goals.

BY MS. MKRTCHYAN:

Q    Okay.  Let's look at your training in investigative DV calls.  Prior to this incident, how long were you on patrol?

*Deborah D. Parker, U.S. Court Reporter*

53

THE COURT:  That night?

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    Prior to this call, how long were you on patrol if you recall?

A    Probably two or three years.

Q    Okay.  Prior to that you were assigned to jail?

THE COURT:  Counsel, you've moved now to his overall, not that night, correct?

MS. MKRTCHYAN:  Yes.

THE COURT:  Prior --

BY MS. MKRTCHYAN:

Q    No.  Prior to that, you were assigned to jail?

THE COURT:  You can answer the question.

BY MS. MKRTCHYAN:

Q    Custody operations.  True?

THE COURT:  In other words, how long on patrol and how long jail?

THE WITNESS:  At this time, I spent approximately six years in custody operations and then two to three years patrol operations.

BY MS. MKRTCHYAN:

Q    Were you assigned to Orange County Transit Authority at the time of this incident?

A    Yes, ma'am.

*Deborah D. Parker, U.S. Court Reporter*

54

Q    Okay.  Transit Authority does what?  What is Transit Authority?

A    Transit Authority is what manages the public transportation system for Orange County:  Buses, trains right-of-ways, things like that.

Q    So you were not regularly dispatched to investigate domestic violence calls at the time of this incident; isn't it true?

A    False.

Q    So as part of your -- can you tell us in a ballpark how many investigations did you conduct for domestic violence, in a ballpark, prior to this incident?

A    Probably 50 to 100.  I worked patrol operations prior to working those CTA and I also respond to domestic violence incidences on buses.  I mean, it's an ongoing thing for me. It's part of my job.

Q    Is part of job when you get a call for service as DV occurring, male versus female in an altercation, you come -- you have to investigate and find whether a crime is ongoing. True?  And stop the crime.  True?

A    So when I respond to a domestic violence call for service, there's a multitude of things that I must do.  Part of my job is to investigate and obtain facts and determine if there is a crime.

Q    Okay.  So in order for the domestic violence to occur,

*Deborah D. Parker, U.S. Court Reporter*

55

you need a victim --

(Court Reporter requests clarification for the record.)

BY MS. MKRTCHYAN:

Q    You need a victim in order for there to be a crime of domestic battery; isn't it true?

A    Disagree with that statement.

Q    Okay.  Have you ever made an arrest for domestic violence when you did not establish who's the victim?

A    I can't say I have.

Q    Okay.  So in this case, sir, you're telling me when you approached Mr. Holloway's tent, you were not looking for a female?

A    That's not what I said.

Q    So I asked you -- I said, What were you looking for?

Tell us in your words what were you looking for when you approached Mr. Holloway's tent?

A    So as I approached that campsite, after listening to the statements made by Mr. Dennis, the seriousness of the call, the campsite location being directly pointed to me from Mr. Fuerbach, in my state of you mind, I was approaching the location where the incident had occurred and I didn't know what I was going to find, whether that was female in distress or nobody there.  I had no details.

So my main concern was officer safety, checking

Deborah D. Parker, U.S. Court Reporter

56

the area, checking for occupants.  A multitude of things were going on in my mind at that time.

Q   Did you check the tents to see if there's a female there with Mr. Holloway?  Yes or no?

A   No.

Q   You did not.

Did you see any other officers to check his tents to see if there's a female or not or the surroundings?

A   I don't recall.

Q   Okay.  You say "officer safety."  You testified earlier and you wrote in your report, there were knives strown around on the ground, Mr. Holloway's campsite.  True?

A   Correct.

Q   You testified also before Mr. Holloway came out of his tent, you didn't see any knives.  True?

A   At that point, I had not seen the knives.

Q   Okay.  Only after he came out of his tent, then you saw some knives.  True?

A   That is correct.

Q   Okay.  Did any of the officers look into his tents to see where is this female?

MS. NALTSAS:  Asked and answered.

THE COURT:  Overruled.

You can answer -- if you know if any officers did, you can answer that.

*Deborah D. Parker, U.S. Court Reporter*

THE WITNESS: As I sit here today, I don't recall.

BY MS. MKRTCHYAN:

Q   Isn't that the next logical step to do?  He comes out of his tent.  He's talking to you.  And Officer Renegar is asking him questions.  Isn't that the next logical step to do, to look through the tents to see if there is a female?

MS. SWISS: Argumentative.  403.

THE COURT: Overruled.

You can answer the question, if you understand.

THE WITNESS: As I sit here today, I can't recall in 2018 if one of my partners may have looked in the tent. I can only talk and testify as to what I did and what I did was the role of the cover officer.

And as a cover officer, I'm going to focus my attention on suspect, deputies on scene and ensure their safety.  I'm not going to get distracted by other things. There's five of us there.  There's more than enough personnel that can look for a victim and do other things. But my primary function was officer safety.  Cover officer.

BY MS. MKRTCHYAN:

Q   Okay.  So you're denying that anyone went through his tents to see if there's a female there?

A   What I stated is I don't recall anybody looking in a tent.  I don't remember anyone entering any tents.  My primary function was a cover officer.  I did not enter any

5-RenSER-00796                                            5-RenSER-00796

58

tents. I was observing the interaction with Mr. Holloway and Deputy Renegar and ensuring officer safety for the people who were there.

Q    And when you said "knives, knives, knives," isn't it true that you were looking through his tents to find those knives, knives, knives?

A    That is false.

Q    So knives were laying on the ground, even though you did not notice it before Mr. Holloway came out of his tent; isn't it true?  Is that what you're telling us?

A    So the reason that is true is because we chose not to illuminate the area as we approached the tents.  It's an officer safety issue.  If I illuminate my flashlight, the suspect knows that I am on scene.  If he has a gun or a weapon, he can shoot through the tent.  He can shoot at me. He can train on the light.

We're trained at the sheriff's academy to have light discipline.  When you're illuminating a light, you're a target.  So, oftentimes, you'll see officers turn the lights on, turn them off, turn them on, turn them off.  The reason for that is so that no one can pinpoint our location.

So upon walking up to the tents, I may have illuminated my flashlight once or twice.  Once Mr. Holloway exited the tent, at that point I would leave my flashlight on and I would be searching the grounds, the area looking

*Deborah D. Parker, U.S. Court Reporter*

for any weapons, looking for any signs of a victim, things of that nature.  Then my light would be on.

Q   Okay.  So he says -- this is what he said when you said, "Knives, knives, knives."  It's on the tape.

*Why are you looking through my shit?  I have about six knives.*  Do you recall that?

A   You're going to need to refer me to what this is at so I can look at it.

Q   You've heard this tape yesterday.  It's in front of you, the transcript.  Please take a look at transcript. That's what it states.  I just gave you --

THE COURT:  You may have three transcripts, so let's make certain -- there are three separate transcripts that have come in.  There may be a fourth, actually.

MS. NALTSAS:  Objection.  The best evidence is the tape.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q   This is the transcript you're [SIC]looking, sir, when you talked about "Knives, knives, knives" and et cetera?

THE COURT:  And by the way, the best evidence is the tape, but questions can be asked about the tape.  State of mind.

*(Pause.)*

*////*

*Deborah D. Parker, U.S. Court Reporter*

60

BY MS. MKRTCHYAN:

Q    Can you look at this transcript with me?

        MS. MKRTCHYAN:  Sure.  Thank you.

BY MS. MKRTCHYAN:

Q    So if you would like, I will play the tape.

        MR. HARRELL:  Your Honor, I can't hear.

        THE COURT:  Just a moment.  We've got two things going on.

        First of all -- No, Counsel.

        MS. MKRTCHYAN:  Maybe we --

        THE COURT:  Look at the pages you've referred to, for just a moment.

        THE WITNESS:  Your Honor, so the difficulty I'm having is I need to be referred to a section that she's referring to.  Otherwise, the statements that are being made, I can't take them out of context.

        THE COURT:  Understood.

        What page?  I thought you had shown him the page.

        MS. MKRTCHYAN:  Good enough.  We'll play the transcript, Your Honor -- I mean, we'll play the tape.

        THE COURT:  Then that question is withdrawn. They'll just play the transcript -- the tape.

    (Pause.)

        MS. MKRTCHYAN:  No, just go play it.

    (The audiotape was played.)

*Deborah D. Parker, U.S. Court Reporter*

61

BY MS. MKRTCHYAN:

Q    Okay.  So this is the interaction you had with him about this "Knives, knives, knives," right?

A    Correct.

Q    And he complains twice to you and Renegar:  "Why are you looking through my shit," right?

A    False.

Q    You didn't hear him talk about Renegar about "Why are looking through my stuff?"  And then he tells you the same thing?

A    So the difficulty that I have with that statement is that I don't know if he's talking to me or another deputy on scene.  I don't know who he's saying that to.

Q    But you are the one who said "Knives, knives, knives." True?

A    I did make that statement.

Q    Right.  And then he tells you, *Yes, I have about six knives.*  And then you tell him, you know -- and he -- he says, *Why you looking through my stuff?*  You say, *Officer safety.*  True?

A    False.

       MS. MKRTCHYAN:  Okay.  Let's play this again. Maybe we're miscommunicating.

    (*The audiotape was played.*)

////

*Deborah D. Parker, U.S. Court Reporter*

62

BY MS. MKRTCHYAN:

Q    Did you hear him say, *Why are you looking through my stuff?*

A    I do hear that.

Q    This is independent evidence that you were looking through his stuff; isn't it true?

MS. NALTSAS:  Argumentive.

THE COURT:  Sustained in its present form.

MS. MKRTCHYAN:  Let's continue playing this.

(*The audiotape was played.*)

BY MS. MKRTCHYAN:

Q    This is you saying, "Knives, knives, knives."  No one else, right?

A    Correct.

Q    Okay.  And then he tells you, *I have about six knives.* True?

He's the one that tells you that?

A    Correct.

MS. MKRTCHYAN:  And then let's continue playing.

(*The audiotape was played.*)

BY MS. MKRTCHYAN:

Q    And he says, *Why are you looking through my shit?* That's directed to you.  True?  When you say "Knives, knives, knives."  True?

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

63

Q   Are you denying here under oath that you actually got the knives from inside the tent where they were in a backpack?

Are you denying it, sir?

MS. SWISS:  Assumes facts not in evidence.

THE COURT:  No, overruled.

You can answer the question.

THE WITNESS:  As I sit here today, what I'm telling you is that I observed knives, machete, axe, multiple dangerous weapons spread around this campsite near the fire pit and the picnic on the ground.

In [sic] no point in time did I make entry into Mr. Holloway's tent, go through his backpack and locate anything.  In fact, the recording supports what I'm saying. If I had been doing any of those things, it would have been picked up on my microphone.  You hear me clear my throat. If I was unzipping a backpack, rummaging through things, you would have that audible alert on my PVS, and you don't.

In fact, you hear me get closer to Renegar.  The audio gets better because as Mr. Holloway becomes more agitated, I take that role as a cover officer, and I move closer to Deputy Renegar.

BY MS. MKRTCHYAN:

Q   The knives basically, according to you, were on the ground.  That's what you're testifying?

*Deborah D. Parker, U.S. Court Reporter*

64

A    Yes.

Q    And you left them in the same position after you left Mr. Holloway's camp.  True?  You didn't put them away.  You didn't confiscate them.  You did not take them away from him.  True?

A    That is correct.

Q    Okay.  You didn't violate him on probation.  True?

A    That is correct.

Q    So if you found them dangerous weapons, you learned that Mr. Holloway was on probation, right there from him.  You didn't make an arrest on probation violation.  True?  Did you?  Yes or no?

          I'm interested in yes or no?

A    I did not arrest Mr. Holloway that night.

Q    Okay.  And you did not arrest him at any point in time until after you came back and you assisted to place him in handcuffs with deputies that were at scene after use of force.  True?

A    I helped affect an arrest of Mr. Holloway during my second interaction with him.

Q    Okay, sir.  When you came back second time -- let's look at the chronology of this.  So you left his campsite; is that true?

          You left with other officers this campsite at this point in time?

*Deborah D. Parker, U.S. Court Reporter*

65

A   After my first interaction with Mr. Holloway and we determined that we did not have enough probable cause for an arrest, we chose to leave the location.

Q   Okay.  You didn't see any female there near his campsite.  True?  That's why you left.

A   That is not the only reason, but I will agree that I did not see a female at that campsite.

Q   Okay.  So the incident was unfounded as it pertains to Mr. Holloway at this point in time when you left the campsite.  True?

A   False.

Q   Did you see any other evidence that he was with a female prior to your arrival anywhere at this tent?  Anywhere at this campsite?  Anywhere?  Any evidence of a female there?

A   No, I did not.

Q   Okay.  Now, when you had the conversation, you went back in your patrol car.  You drove, again, towards the park station -- the ranger station.  True?

A   Correct.

Q   And then you had a conversation that we can hear on your patrol vehicle with Renegar telling you this guy might have a warrant and you said, *It may not be worth it.*  True?

A   I'm not sure if that was a the ranger station.  That did occur, though.  As to the location, I won't agree that

5-RenSER-00804                                     5-RenSER-00804

it was at the ranger station.

Q   Okay.  So -- but that conversation occurred, and you -- when you said it may not be worth with, what were you referencing to Renegar?

A   So when I made that statement -- this referenced Mr. Holloway's agitated state.  Oftentimes when a subject has a warrant, we have a determination factor if we are going to arrest that individual or not.  It can be based on a multitude of factors.  Some warrants require mandatory arrests.

My statement to Deputy Renegar of "might not be worth it" means, I don't want to go back and have contact with Mr. Holloway.  Because he's so agitated, it might result in a fight or a use of force, and I don't want to do that.

Q   Okay, sir.  So in any event, though, there was no warrant on him, right?  He told you he does not have a warrant.  He told you that right in the same conversation?

A   So Deputy Renegar informed me that Mr. Holloway was on probation and that there was no active warrant.

Q   So after you left Holloway's campsite, did you continue doing your investigation into this DV?

A   After I left the campsite the second time?

Q   Mr. Holloway's campsite, the 65.

Did you continue in any shape or form your

*Deborah D. Parker, U.S. Court Reporter*

67

investigation into this DV incident?

A    No.

Q    You left the campground.  True?

A    Correct.

Q    You didn't go to next door, Campsite 66, did you?

        MS. NALTSAS:  Asked and answered.

        THE COURT:  Overruled.

        You can answer it one more time.  At this time.

        THE WITNESS:  Nowhere during the interaction with Mr. Holloway were we ever told or interaction with Fuerbach, nowhere were we ever told to go to Campsite 66.

        At this point, I left.  It was the end of my shift.  I was also not the handling deputy.  The handling deputy would have been Deputy Renegar.  My job and duties at that time were finished, and I was on my way home.

Q    Isn't it true that you heard Mr. Holloway actually make an attempt -- he said to you, the deputies, that *I know why you're here.  I heard the fight.*

        Isn't it true that you heard that on tape?

A    I believe he said, *I know why you're here, but it's none of my business.*  And I find that appalling.  It's a significant incident that somebody wouldn't choose to cooperate.

Q    You've heard on tape him saying, *Someone was fighting. I know why you're here.*  True.

*Deborah D. Parker, U.S. Court Reporter*

68

A    Something to that effect, yes.

Q    Okay.  So let me ask you this:  If you're doing a DV investigation, are you going to just listen to what one person says as opposed to do your own independent investigation?

        Let's say Holloway doesn't specifically --

        *(Court Reporter requests clarification for the record.)*

        THE COURT:  Counsel, it's compound.  Reask the question.

        MS. MKRTCHYAN:  I appreciate.

        Thank you.  Sorry about that.

BY MS. MKRTCHYAN:

Q    Let's say Holloway doesn't specifically say, *It's Campsite 66.  You need to go there.*

        As an officer, you're investigating --

        THE COURT:  Counsel, you're adding to it, and it's going to be compound.

        Just ask the question, please.

BY MS. MKRTCHYAN:

Q    Are you relying on Holloway's statements to you when you're doing an investigation into a DV?

        THE COURT:  Do you understand the question?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  You can respond.

*Deborah D. Parker, U.S. Court Reporter*

69

THE WITNESS:  So when I do a domestic violence investigation, I'm basing it off of a multitude of factors, not just one individual statement.

BY MS. MKRTCHYAN:

Q    Okay.  But, you know, you didn't find this female at 65.  Did it occur to you that Mr. Fuerbach might have been mistaken?  This is a dark campground.  He's unreliable.  Let me go check, see next door campsite.  Make sure it was occupied.

MS. NALTSAS:  Argumentative.  Compound.

THE COURT:  This is argument.

BY MS. MKRTCHYAN:

Q    Didn't you see Campsite 66, next door?  How far was it from Mr. Holloway?

MS. NALTSAS:  Compound.

THE COURT:  Well, I'm not -- it's compound, but do you understand that question.

THE WITNESS:  Yes, Your Honor.

THE COURT:  You can answer it, sir.

THE WITNESS:  So nowhere at this point did Campsite 66 come to mind once Mr. Fuerbach literally pointed to the tents where Mr. Holloway was occupied.

BY MS. MKRTCHYAN:

Q    So one person points you -- this is not an apartment complex, is it?  Is this an apartment complex you're

*Deborah D. Parker, U.S. Court Reporter*

70

investigating saying, *Oh, this apartment was the DV*?

THE COURT:  Counsel, re-ask the question now.

BY MS. MKRTCHYAN:

Q   This was a campground you were investigating and you said this was pitch dark.  True?  Isn't it true?

A   It was dark.

Q   So one camper gives you information, says, *It's this tents.*  You go there.  You don't find female.

Next step is to just leave the campground and not finish your investigation.  Is that what you're telling us?

A   No.

Q   All of you left.  You left.  Renegar left.  All of you left.  You didn't go anywhere else after this to find who is this female who was being beat up and raped and doing all this things?

MS. SWISS:  Asked and answered.  403.  Misstates the evidence.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   In any event, you did not to go to Campsite 66.  It didn't occur to you, right?

MS. SWISS:  Asked and answered.  403.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   Did you go back to Fuerbach?  You had a brief exchange.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00809                    5-RenSER-00809

71

Did you go back to Fuerbach and say, *Sir, what did you actually hear or see?  We didn't find a female nextdoor to you.*

Did you do that?  Did it occur to you to do that?

THE COURT:  Well, that's two questions:  Did it occur to you, or did you do that?

You can answer either one, sir.

THE WITNESS:  So my primary function at that time as a cover officer is what I said earlier is to provide safety for the deputies on scene.  The investigation, the domestic violence investigation would be handled by Deputy Renegar.  I wouldn't make contact with anyone else unless directed to do so by Deputy Renegar, if the investigation was going to continue.

At that point in time, the investigation had stopped, and it was -- I was past the end of my shift.  It was not my patrol area and I was done for the night, so I was heading home.

BY MS. MKRTCHYAN:

Q    So in any event, sir, you did not see any of the officers go to Campsite 66 that were there?

Billinger did not go to Campsite 66.  True?

MS. SWISS:  Asked and answered.  403.

MS. MKRTCHYAN:  No, we're talking about Billinger now.

*Deborah D. Parker, U.S. Court Reporter*

72

THE COURT:  Counsel, it's --

MS. SWISS:  Relevance.

THE COURT:  Just a moment.  It's been asked and answered, but you can ask one more time if any officers went to Campsite 66, if he knows.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    Before you left, did you see any officer go to Campsite 66 or even go talk to Fuerbach?

THE COURT:  No, that's compound again, Counsel.

BY MS. MKRTCHYAN:

Q    Did you see anyone go to Campsite 66 or any other campsite before you left?

THE COURT:  Now you can answer the question.

THE WITNESS:  Are you referring to after our contact with Mr. Holloway or during this incident?

BY MS. MKRTCHYAN:

Q    I'm talking about after you finished your conversation with Mr. Holloway.  We're clear --

THE COURT:  Counsel, please, don't add to it.  We have a question now and that's after the contact with Mr. Holloway.

THE WITNESS:  After the contact with Mr. Holloway, all of the deputies on the scene, to my knowledge, left the area without making additional contact.

*Deborah D. Parker, U.S. Court Reporter*

BY MS. MKRTCHYAN:

Q   Now, you came back to the scene.  This is the second interaction with Mr. Holloway.  Use of force.  So let's focus on that.

You came back.  You were the fourth at scene based on this patrol vehicle recordings.  True?

A   Correct.

Q   Okay.

*(Court Reporter requests clarification for the record.)*

BY MS. MKRTCHYAN:

Q   Fourth at scene also by your own admission involved in the use of force against Mr. Holloway.  True?

A   Correct.

Q   Okay.  And you wrote the report about your involvement in this use of force.  True?

A   Correct.

Q   And you reviewed it many times before?

A   I had reviewed my report.

Q   Have you reviewed it recently before your testifying?

A   I believe I reviewed it on Wednesday.

Q   Okay.  So let's look at your report.  This is Exhibit 30-something -- 37.

With the Court's -- I'm not sure if this was published before, their request to publish it before the

*Deborah D. Parker, U.S. Court Reporter*

74

jury.

THE COURT:  You may publish.

MS. MKRTCHYAN:  Thank you.

THE COURT:  At the recess, we'll check if it's 37. It's received.

*(Plaintiff's Exhibit 37 received in evidence.)*

MS. SWISS:  It is 37.

BY MS. MKRTCHYAN:

Q   So let's look at paragraph, third.  "I arrived on scene," you wrote.

And, of course, is there anything right now that you can tell us that is inaccurate in this report?

Is there anything that you would like to change, correct, add, amend?

A   I mean, at the time I wrote this report to the best of my ability.

Q   And you wrote it after you spoke with other officers at scene.  True?

A   I completed my report on Tuesday which was several days or two days after the incident.

Q   Well, date of report says "January 23, 2018."  True?

A   So that would be two days after the incident.

Q   So that gave you the opportunity to speak with other officers prior to your writing your report.  True?

A   No.  False.

*Deborah D. Parker, U.S. Court Reporter*

75

Q    Well, you were at scene talking with other officers we see on your tape about this incident.  True?

A    I'm on tape talking to other deputies, yes.

Q    Right.  About nothing else but Holloway's incident.  True?

A    No.  False.  I don't know what I was talking about.  It may have been part of a conversation, sure.  I know that I advised Sergeant Steve Rawlings of my use-of-force involvement, as well as other deputies on scene, yes.

THE COURT:  Just a moment.  There's two inferences going on here, and it's not clear.  One is if there's a conversation with other deputies at the scene, but then the question is asked and inferred that there's a conversation possibly in the next two days when he's not on scene.  That needs to be clear.

So re-ask those questions.  Both were proper areas, but it's unclear.

MS. MKRTCHYAN:  That's what we're [sic] going, Your Honor.

BY MS. MKRTCHYAN:

Q    So are you telling us that at the time when you wrote this report at station, you didn't have any discussion with the officers?

THE COURT:  After the night of the incident, Counsel?

*Deborah D. Parker, U.S. Court Reporter*

76

MS. MKRTCHYAN: Yes.

THE COURT: All right. Now, you can answer that question: After the night of the incident, was there any conversation in the next two days with the officers?

THE WITNESS: Absolutely not.

BY MS. MKRTCHYAN:

Q    Okay. So at scene, you spoke and we see you on Renegar's tape. True?

A    Yes.

Q    And your tape, though, is turned off because you tell us that the battery was dying. True?

A    The microphone, not the tape.

Q    Okay. The microphone was dying?

A    That's correct.

Q    But the same microphone was working when you went and spoke with Luke Dennis, not with the officers when you were discussing about -- how many minutes? The same microphone was working when you went and spoke with Luke Dennis. True?

A    Restate the question, please.

Q    Look at your patrol vehicle recordings. Let's focus on your report: *I arrived on scene and saw Holloway laying on his stomach on the ground of Campsite 65.*

So right away you are telling us that he's face down on his stomach when you arrived to the scene, when you jump out of your car. True?

*Deborah D. Parker, U.S. Court Reporter*

A    Upon exiting my patrol vehicle, he's on the ground, face down, correct.

Q    Okay.  Next.  "Deputy Renegar, Deputy Gonzalez were on Holloway's back attempting to gain control of his arms."

So right away you're pointing out at least two officers -- Renegar and Gonzales -- were on his back attempting to gain control of his arms.  True?

A    Correct.

Q    So nothing about Pahel -- right -- was there, but there's no indication in your report what was Pahel doing?

A    So Pahel was on scene as I know today.  At the time of the incident, I don't recall Pahel's involvement and it's not in our report.

Q    Okay.  But that's what we're going for.  There's no indication in your report what was Pahel doing at the time you arrived.  True?

A    As I stated, Pahel -- Deputy Pahel is not in my report.

Q    Yes, sir.

Did you see Pahel at the time you arrived and what he was doing?

A    No, I don't recall.

Q    And we know that Pahel wrote his own report, right?  If I were to tell you that Pahel said that *I was also on his back, trying to gain the left arm for Mr. Holloway* --

MS. NALTSAS:  Objection.

*Deborah D. Parker, U.S. Court Reporter*

78

BY MS. MKRTCHYAN:

Q    -- what would you say to that?

         MS. NALTSAS:  Pahel will testify.

         MS. MKRTCHYAN:  I'm interested in what he has got to say.

         THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So you didn't see Pahel on top of Mr. Holloway, including with Deputy Renegar and Deputy Gonzalez?  You didn't see that?

A    No.

Q    Okay.  Then you write -- there's no indication about where is Gotts when we know Gotts arrived right about the same time you arrived with Gunderson?

         MS. SWISS:  Assumes facts not in evidence.

         THE COURT:  Do you understand the question?

         THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    You testified earlier -- you testified earlier that Gotts and Gunderson arrived and you saw them at scene right around the same time you arrived.  True?

A    I believe my counsel posed the question of the deputies that were in a vehicle that I had passed, something to that effect.  And I stated that it was Deputy Gotts and Deputy Gunderson.

*Deborah D. Parker, U.S. Court Reporter*

79

Q   So you did not see -- in other words, let's make it very clear.  You did not see Pahel on the ground with Mr. Holloway.  True?

A   That's correct.

Q   And you did also see Gotts on the ground with Mr. Holloway when you arrived?

A   I would not have seen him, because he was behind me.

Q   Sir, we'll play the tapes.

But, sir, you were not aware of any point in time Gotts joining in as the officer in this use of force?  Yes or no?

A   Restate that question, please.

Q   You're saying, *Gotts arrived after me.*

Sir, did you ever see him arrive and join in the use of force against Mr. Holloway?  Yes or no?

A   Yes.

MS. NALTSAS:  Asked and answered.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q   And what point in time did you see Gotts arrive?

A   He would have arrived seconds after me.

Q   Okay.  And what did he do when he arrived?

A   I don't recall the purpose of my report.  When we document a use of force it's to talk about our involvement for the use of force.  We're actually trained to not include

*Deborah D. Parker, U.S. Court Reporter*

80

involvement from other parties.  You're only to document your use of force against the subject.

Q    Yet you wrote -- if that's accurate --

First of all, when you're talking about use of force, your participation in use of force, as we can understand, depends on the actions of the suspect whom you're arresting or handcuffing.  True?

MS. NALTSAS:  Objection.  Incomplete hypothetical.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Because you're saying -- is this in a vacuum?  You're going to write your report completely neglecting other officers?  You're going to focus on what you did, but your involvement -- isn't it true -- depends what suspect was doing or not doing at the time you used force?

MS. NALTSAS:  Objection.  Argumentative and incomplete hypothetical.

THE COURT:  Do you understand the question?

THE WITNESS:  No, Your Honor.

THE COURT:  All right.  Thank you.

BY MS. MKRTCHYAN:

Q    Let's continue reading your report.  You say, "I could see multiple knives scattered around the campsite within close proximity of Holloway."

This is exactly the same thing we hear from other

*Deborah D. Parker, U.S. Court Reporter*

81

officers at scene -- right -- that were there knives, close proximity?

This is exactly same scenario portrayed by other officers.  True?

MS. NALTSAS:  Objection.  Calls for speculation.

THE COURT:  The question is what he knows now versus what he knew then.  That's what's unclear.  So if you're asking about what he saw then, then you can respond.

Is that the question?

MS. MKRTCHYAN:  No.  No, this is not what he knows.

THE COURT:  No, I'm going to sustain the objection then.

BY MS. MKRTCHYAN:

Q   Okay.  So if I were to tell you that is exactly why Pahel says he was involved that is exactly how --

MS. NALTSAS:  Objection, Your Honor.  Counsel is testifying.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   Anyway, Holloway was actively resisting Deputies Renegar and Gonzales by tensing his body and pulling his arms away from their grasp.

You wrote this, right?

A   I did.

*Deborah D. Parker, U.S. Court Reporter*

82

Q    So if Pahel was also involved in this and you missed it, how is this --

MS. NALTSAS:  Objection.

MS. MKRTCHYAN:  Excuse me.

BY MS. MKRTCHYAN:

Q    How is this report accurate if you're missing other officers at scene?

MS. NALTSAS:  Objection.  Pahel will testify.

THE COURT:  That assumes facts not in evidence. Sustained.

This is his use of force, what he saw when he arrived, Counsel.

MS. MKRTCHYAN:  Yes.  And Pahel was here, Your Honor.

THE COURT:  This is for argument.  Later on, you're more than welcome to argue this.

BY MS. MKRTCHYAN:

Q    Well, would you like me to put Pahel's report as to what exactly he was doing at the time before you arrived?

MS. SWISS:  Objection.

THE COURT:  Sustained.

Pahel will testify, Counsel.

MS. MKRTCHYAN:  No, Your Honor.  It goes to impeaching --

THE COURT:  Pahel -- Thank you, Counsel.  Pahel

*Deborah D. Parker, U.S. Court Reporter*

83

will testify.

BY MS. MKRTCHYAN:

Q    There's no conversation about Pahel and then you write here:  "I approached Holloway and placed my right knee onto his upper back."

That's what you wrote, right?

A    Correct.

Q    Okay.  Isn't it true that you didn't only place your right knee.  You also placed your body weight with your uniform, with all your equipment on Mr. Holloway's back while according to your own report there's at least other officers on his back; isn't it true?

A    Not as you stated it, no.

Q    Well, you did place your body weight on him; isn't it true?

A    Part of my body weight, yes.

Q    Part of your body weight.  They're [sic] trying to understand.

You've testified about exactly same thing at your deposition, right?

Do you remember that?

MS. NALTSAS:  Improper use.

BY MS. MKRTCHYAN:

Q    Do you remember me asking --

THE COURT:  Overruled.

*Deborah D. Parker, U.S. Court Reporter*

84

You can answer that question if there was testimony about this at the deposition, if you recall.

THE WITNESS: If you can refresh my recollection with the deposition and page number, I'll gladly look at it.

BY MS. MKRTCHYAN:

Q Okay. So, first, let's figure out what you were asked. You were asked what kind of force you applied at your deposition, okay?

Do you remember that?

MS. NALTSAS: Improper use. He's asked for his recollection to be refreshed.

THE COURT: I'm assuming that that's today's question. Overruled.

You can answer that, pertaining to questions asked for today.

Well, first of all, do you understand the question?

THE WITNESS: No, Your Honor. But when she's referring to my deposition, I just asked if she --

THE COURT: No, no, it's not. It's any question asked today.

THE WITNESS: Okay. As today as I stated, placing my right knee on his back would assume there's body weight applied to Mr. Holloway, yes.

////

*Deborah D. Parker, U.S. Court Reporter*

85

BY MS. MKRTCHYAN:

Q    That's what they're trying to figure out.

Because placing someone's knee on someone's back, there can be different positions of doing this.  True?

A    Sure.

Q    Okay.  So when you're placing your knee -- you said right upper knee -- you [sic] placed my right knee onto his upper back.

You placed your body weight on him.  True?

A    Some of my weight, yes.

Q    Okay.  Well, let's read your deposition transcript, pages 132 --

MS. MKRTCHYAN:  Let's have the witness -- we'll show the witness --

THE COURT:  What is the difference in contention between -- concerning this questioning, whether the amount of weight that was placed?  In other words, is this discussion that's taking place:  Full body weight versus partial body weight?  Is that what we're discussing?

MS. MKRTCHYAN:  The way he described body weight, Your Honor, at his deposition, I would like to have him refresh his memory first.

THE COURT:  That transcript, if it refreshes his recollection -- I think that we're discussing his whole body weight versus some kind of partial body weight.  That

*Deborah D. Parker, U.S. Court Reporter*

86

transcript has to placed in front of you to refresh.

MS. NALTSAS:  And can we get pages and lines?

MS. MKRTCHYAN:  We talked about body weight applied, pages --

THE COURT:  Just a moment, Counsel.  Page and line and please put that transcript in front of him.

MS. MKRTCHYAN:  That's what I'm trying to do, Your Honor.  138, 1 through -- oh, he does have it?

BY MS. MKRTCHYAN:

Q    Do you have it in front of you?

A    I don't --

THE COURT:  Counsel, just a moment how.

MS. MKRTCHYAN:  Page 132, first and then 138 through 139.

THE COURT:  You're jumping around.  This is very unclear.

Very slowly now.  What pages are you referring to?

MS. MKRTCHYAN:  I said 132 --

THE COURT:  I'm sorry?

MS. MKRTCHYAN:  -- starting that interaction and then 138 through 139, Your Honor.

THE COURT:  Okay.  So would you repeat?  Was it 132 or 133?

MS. MKRTCHYAN:  132.

THE COURT:  132.  All right.  Now, can somebody

*Deborah D. Parker, U.S. Court Reporter*

87

get me that transcript also, so I can look at it?

(Pause.)

THE COURT:  Thank you very much.

Would you just turn to that page for me, I'd appreciate that, 132.

Why don't you remain here for just a moment.

BY MS. MKRTCHYAN:

Q    So there are multiple pages.  Let us know when you finish.

THE COURT:  No, Counsel.  Just a moment.  Please, thank you.

(Pause.)

THE COURT:  All right.  Page 132, Counsel, there is no reference to his placing his body weight.

MS. MKRTCHYAN:  Your Honor, it's --

THE COURT:  Counsel, just a moment.

You can make your record in just a moment.  I want to look at 138 and 139 now.

(Pause.)

MS. MKRTCHYAN:  And if you finish --

THE COURT:  Counsel, just a moment, please.

(Pause.)

THE COURT:  Counsel, there is no reference to his placing his body weight.

Objection.  Sustained.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00826                                              5-RenSER-00826

88

Thank you.  Just remain here just in case.

MS. MKRTCHYAN:  Your Honor, there is reference -- there's multiple references of applying -- I was the one who took --

THE COURT:  Counsel, point me to the line.

MS. MKRTCHYAN:  138 through --

THE COURT:  Counsel, I looked at 138 and 139.

MS. MKRTCHYAN:  Yes.  And then 182 to -49 [sic].  Multiple pages, Your Honor.

THE COURT:  No, Counsel.

Now, if you can point me to the line where he talks about his applying body weight, then you have to give me that specific line and page number.

That is contained there, Counsel.  Thank you.

MS. MKRTCHYAN:  Well --

THE COURT:  I'll give you time during the recess to go through those again, Counsel.  Discuss that with the Court.

(Pause.)

MS. MKRTCHYAN:  It's all about body weight, Your Honor.  It's all the discussion about body weight.

THE COURT:  Not in relation to what this officer did, Counsel.

MS. MKRTCHYAN:  Page 182, there's continuation of --

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00827                    5-RenSER-00827

89

THE COURT: 182?

MS. MKRTCHYAN: Yes.

THE COURT: Counsel, that page wasn't given to me. You'll move on now. We'll discuss this during the recess. This is unduly consumptive of time.

MS. MKRTCHYAN: We'll move on. That's fine.

BY MS. MKRTCHYAN:

Q You're not denying that you actually applied body weight on him when you placed your right knee on his upper back, are you?

A I'm not denying that I placed my knee on him and applied body weight, no.

Q Okay. And what kind of body weight -- now you can make it clear, what part of your body weight was on his back?

MS. NALTSAS: Argumentative.

THE COURT: Overruled.

You can answer that question.

THE WITNESS: So as I approached the scene, Mr. Holloway was attempting to get back to his feet. He was pushing off of the ground.

So upon arriving, I placed my right knee onto his upper back, applied some amount of body weight to keep Mr. Holloway from standing back to his feet.

BY MS. MKRTCHYAN:

Q So -- so I'm still not clear what kind of body weight.

*Deborah D. Parker, U.S. Court Reporter*

90

Are you applying your partial body?  Half body? Where is your other leg?

You said upper back, my right knee.  Where is your left leg?

THE COURT:  That's multiple questions.  Do you understand them?

THE WITNESS:  Yes, Your Honor.

THE COURT:  You can answer.

THE WITNESS:  So if I was to place my right knee on Mr. Holloway and put all of my body weight on him, I would become unbalanced, and I would fall over myself but assume that some of my body weight would be shifted to my left leg to maintain balance as I'm crouched down to Mr. Holloway.  How much body weight?  I couldn't tell you. That's impossible.

Q    But you were -- you know, you were making sure that he doesn't get up.  As you say -- you wrote that he was trying to get up from the ground, right?  That's what you wrote.

A    Yes.

Q    Okay.  So you're telling me, we have Deputy Gonzales, Renegar -- at least two officers, by your admission, on top of him and he's able to get up from the ground that you needed to place your body weight on his upper back?  Is that what you're telling us?

A    No.

*Deborah D. Parker, U.S. Court Reporter*

91

Q   Okay.  So then that was speculation you're making that he's trying to get up from the ground -- from the body weight of multiple officers, weren't you?

MS. SWISS:  Argumentative.

MS. NALTSAS:  Objection.

THE COURT:  Overruled.

You can answer the question, if you can.

THE WITNESS:  False.

BY MS. MKRTCHYAN:

Q   You wrote, Attempting to use it.

You wrote you had gotten his left arm free and was attempting to use it to lift his body off of the ground possibly to stand back up.

That's what you wrote in your official report.  True?

A   Correct.

Q   So you're saying that this man was able to have his left arm freed from grip of two officers at the scene that you saw and was able to -- was attempting to get up from the ground when there are multiple officers on top of him.  Is that what you're telling us?

A   False.

Q   Well, at the time you left, he was screaming.  We hear it on your tape.  He was screaming, *You're kneeing me in the head.  I've got blood.  I haven't done anything*.  True?

*Deborah D. Parker, U.S. Court Reporter*

92

MS. NALTSAS:  Compound.

THE COURT:  It is compound, Counsel.  Re-ask the question.

BY MS. MKRTCHYAN:

Q   He was screaming.  When you arrived to hear on your tape.  True?

A   There's -- you hear Mr. Holloway a lot on my tape.  I don't know to which point you're referring to.

Q   I'm talking about when the point in time you arrived. And you said it was necessary for you to place your right knee, your body weight onto his upper back, even though other officers were also doing the same thing.

I'm trying to figure out what you saw.  You heard this man screaming, *You're kneeing me in the head.  I've got blood in my head.*

THE COURT:  Counsel, this is argument.

If the question is, simply, when you applied your knee and what you heard at that time, you can ask it, but you're arguing this matter.  Please.

BY MS. MKRTCHYAN:

Q   So you heard him scream.  You heard him complain, and yet you found it necessary to place your body weight onto his upper back.  That's what you admit you have done.  True?

MS. NALTSAS:  Argumentative.

THE COURT:  Sustained.

*Deborah D. Parker, U.S. Court Reporter*

93

BY MS. MKRTCHYAN:

Q   Right?  That's the only thing --

          THE COURT:  Counsel, counsel, that question is sustained.

          You can re-ask it.

BY MS. MKRTCHYAN:

Q   According to your report, no other force was applied on him by you.  True?

A   False.

Q   What else did you do then that is not reported in your report?

          MS. SWISS:  Misstates --

          THE COURT:  What else did you do at what time?

BY MS. MKRTCHYAN:

Q   At the time you arrived to the scene and got involved in the use of force, what else did you do that is not reported in this report as you said?

          MS. NALTSAS:  Misstates the evidence.

          THE COURT:  Sustained.

          Counsel, just ask him what he did.

          MS. MKRTCHYAN:  That's what I'm trying to do.

BY MS. MKRTCHYAN:

Q   Sir, is this all you did, based on your report: Applied body weight on his upper back?

A   Misstates my report.

*Deborah D. Parker, U.S. Court Reporter*

94

Q   You grabbed his left arm.  That's what you wrote.
Let's continue reading this:  Holloway had gotten his --
         Continuing on, "I immediately grabbed control of
Holloway's left arm, using both of my hands and placed it
behind his back," right?  That's what you did?

A    Correct.

Q    Nothing else.  You grabbed his left arm, which he was
trying to lift himself from the ground as a Superman from
the combined body weight of multiple officers.  True?

         MS. NALTSAS:  Objection.  "Superman."

         THE COURT:  Argumentative.

         Sustained.

BY MS. MKRTCHYAN:

Q    If I were to show you Pahel reports where he says *I
also was grabbing his left arm and I was placing my body
weight on top of Mr. Holloway because he was trying to left
himself off the ground* --

         MS. NALTSAS:  Objection.

BY MS. MKRTCHYAN:

Q    -- is that going to be -- is that going to be basically
same scenario you're telling us?

         MS. NALTSAS:  Objection.  Pahel will testify.

         THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Have you read Pahel's report?

*Deborah D. Parker, U.S. Court Reporter*

95

A    At some point in time, I may have read it.

Q    Okay.  And you've noticed -- and I asked you the same questions at your deposition -- do you recall that? -- about how Gotts and Pahel are describing their involvement exactly the same way as you have.

Do you remember that?

MS. NALTSAS:  Improper use.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Well, you remember this discussion about how you were involved and I was comparing it with how Pahel described it at your deposition?

MS. NALTSAS:  Improper use.

THE COURT:  Counsel, you're going to be able to argue this from the testimony of the different witnesses, but we're not going to get --

MS. MKRTCHYAN:  State of mind, Your Honor.

THE COURT:  No, no.  Pahel will testify.

BY MS. MKRTCHYAN:

Q    And you agree --

THE COURT:  Borba is testifying.  Gonzalez is testifying.

BY MS. MKRTCHYAN:

Q    Did you see --

MS. MKRTCHYAN:  Yes, Your Honor.  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

96

BY MS. MKRTCHYAN:

Q   Did you see Pahel -- basically, based on your report, we don't see anything about Pahel; isn't that true?

MS. SWISS:  Asked and answered.

THE COURT:  Sustained.

We've been over this, Counsel.  He doesn't --

MS. MKYRTCHYAN:  Your Honor --

THE COURT:  Please.  Go ahead and ask the question.

BY MS. MKRTCHYAN:

Q   Did you see Gotts arriving and actually trying to grab the same arm?  You are writing here that you grabbed -- and placing his upper knee, also, on the upper back of his body.

Did you see that?  Did you hear that?

THE COURT:  You can testify about what you saw concerning Gotts, if anything, at the scene.

THE WITNESS:  As I sit here today, the incident occurred in 2018.  It's 2025.  I don't recall what Deputy Gotts did when he got there.  I can only refer to my report to refresh my memory of what occurred that night and the video and the audio that we have here today.

So as I sit here today, I do not recall Deputy Gotts' specific involvement in the use of force.  I can only refresh my recollection from my report and what I did.

*Deborah D. Parker, U.S. Court Reporter*

97

BY MS. MKRTCHYAN:

Q   Okay, sir.  But you were asked the same questions at the deposition and you were able to recall quite precisely --

MS. NALTSAS:  Improper use.

BY MS. MKRTCHYAN:

Q   -- what Gotts was doing.  Do you remember that?

THE COURT:  You can answer.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q   Well, you were asked to look at --

MS. NALTSAS:  Objection.

THE COURT:  That states a fact, Counsel.

It's been an hour and a half.  Why don't you take a recess for just a moment.  Come back in about 15 minutes.

You're admonished not to discuss this matter nor form or express an opinion.

(*Jury exits courtroom.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  Counsel, if you would have a seat and, Deputy, if you will have a seat.

All this can be -- I would like to see that portion, specifically, because my recollection over these multitude of trials is that whatever he saw concerning Gotts

*Deborah D. Parker, U.S. Court Reporter*

98

is significantly different from the evening versus what he later knew. And when those questions were asked of Gotts, those were because he was being asked from the perspective of what he knew then after the incident.

The second thing is, we're running into difficulty because my record is -- and I know we have a dispute -- when you refer me to 132, there is nothing about his application of body weight. When you referred me to 138 and 139, it's not his application of body weight. And then you're arguing with the Court and throwing out an additional page so it appears to the jury that somehow this Court is withholding information and the inference is that the deputy is being untruthful when, in fact, the pages you are referring to do not contain this information.

Now, I'm going to give you an extra 10 minutes, but we're at 90 minutes now. I want to pay you the courtesy of about 10 more minutes just to be certain that you refocus on the questions that you think are essential.

And we're going to take a break for 15 minutes and then come back.

So, Deputy, if you will return --

MS. MKRTCHYAN: I need to make my record about the impeachment --

THE COURT: Well, please. I'm more than happy to.

MS. MKRTCHYAN: First of all, this is again

*Deborah D. Parker, U.S. Court Reporter*

99

ongoing situation with this Court. Every time I try to pull out a deposition transcript of any of this witnesses, key witnesses, either defendant or key witness, the Court scrutinizes heavily. This is my attorney work-product. This is my understanding of what was discussed, and I provided pages. The Court does not really look at the context and then talks about, you know, this is not impeachment.

The pages that I gave was discussing right around the time he arrived. So if you're going to talk about pages taken out of context, it's not helpful. But he discussed at his deposition, in fact, how body weight was applied, not just by him but by other officers.

Continuing on, I asked him questions when he reviewed his patrol vehicle recordings --

And I don't want to make my record in front of this witness, because that is improper.

THE COURT: Sir, would you step down and take a recess for a moment.

Thank you very much.

*(Pause.)*

MS. MKRTCHYAN: I was asking him on Patrol Vehicle Recordings how he's discussing the incident to Rawlings. And I asked him, "Isn't it true you did not tell Rawlings about the body weight? You only told him about the

*Deborah D. Parker, U.S. Court Reporter*

100

control-hold on Jeremy's arm?"

THE COURT: You can ask that question. That has nothing to do with the question you previously asked.

MS. MKRTCHYAN: Your Honor, we're going with a hostile witness who is refusing to answer questions multiple times.

First of all, I object -- the Court is not the one who is deciding credibility of this witnesses. The Court is continuously getting involved in my ability to present this evidence to the jury. It's not for this Court to decide this case. It's for the jury. And when I'm continuously deprived of opportunity to impeach the way I believe -- I know in depositions [sic] by heart. I would say that the Court should have certain amount of, you know, faith in my presentation of this evidence, because I've done this trial three times already, you know. So there's absolutely no bad faith here. I know this deposition transcripts by heart. He testified three times already about the same thing. He was asked about body weight and he discussed it at this deposition.

Here, he's trying to minimize use of force and it's incumbent on me to show this is excessive force. But this Court continuously interjects, not just every -- every issue the Court continues to interject. How is that proper? Basically, the Court is sitting as a juror and telling the

*Deborah D. Parker, U.S. Court Reporter*

101

jury, *No, this is -- this witness is credible to me and therefore you should disregard Ms. Mkrtchyan's questioning.* How that is proper?

My client has the right to jury trial, not to bench trial. So pages -- I wanted to make my record clear.

On pages 132 through 139, he was discussing -- I was asking him, What were Renegar and Gonzalez doing at the time he arrived? And he talked about them applying body weight on them. And then continuing on after that, I asked him multiple times, what -- how he was applying his body weight, pages 148, 149.

So the Court -- it's a flow. Cross-examination is a flow. And, you know, there's a lot of questions there. This witness is hostile. And the Court is, basically, depriving my client of his right to impeach credibility of a key witness who came to the scene and was involved in the use of force.

So I object. This is not just new to me. Gonzalez, I was not allowed to impeach credibility. Renegar, I was not allowed. You might as well just decide the issue. Maybe we should, you know, have the Judge try this case and jury should be dismissed so that the Court decides whether Mr. Holloway has proved his case or not. How is that proper?

No, I request the Court to give me leeway. I've

*Deborah D. Parker, U.S. Court Reporter*

102

done this three times already.  I've known this deposition transcript several times.  I'm giving pages.  But if you're not reading the transcript in its context -- it's the attorney who knows.  It's for the jury to decide if it's impeachment or not.  And if the Court --

Let the witness read.  If he refreshes his memory of what he said, then question ends.

THE COURT:  Counsel, I would like to hear a response now from the defense.

MR. HARRELL:  Your Honor, briefly.

The Court has an important role to play at every stage of the trial that we're now engaged in.  Right now, with the witness on the stand, the Court has a critically important role in ruling on the admissibility of evidence, including objections that are made to evidence.

The record will reflect that again and again and over again, the Court issues its rulings and it is met from plaintiff's counsel with combative statements that sometimes rise to insults.  And I think we need to all recognize what's going on here.  This is nothing short of an assault on our judicial system.  And there's a remedy for conduct of that type.  We all know what that is.  How does it impact my client?

My client is entitled to have his liability assessed, based on our Federal Rules of Civil Procedure, our

*Deborah D. Parker, U.S. Court Reporter*

103

Federal Rules of Evidence.  He is entitled to have his liability assessed in an environment where rules are respected.  And to this point in time on repeated occasions, my client has been deprived of that right by conduct, outbursts by the other side that contribute to what I could only describe as a circus-like atmosphere that is beneath the dignity of Courtroom 10-A -- it is.  And what we do about it?

I have real concerns that my client is going to get a fair result here, just because of the intentional tactical choices that have been on display by plaintiff's counsel.

And with that, I'll submit it and try to have a little bit of a break.

THE COURT:  Counsel.

MS. SWISS:  Thank you.

I join in Mr. Harrell's comments.

And to directly address the issue with regard to use of a deposition during trial, plaintiff's counsel repeatedly fails to use the way to use a deposition at trial, how we learned it in law school and how to impeach a witness.

This Court has taken great pains outside the presence of the jury to instruct counsel for all parties that the deposition can be used to refresh the recollection

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00842                                           5-RenSER-00842

104

of the witness first; if it does not refresh recollection and the question is asked where there is a contrary response, then that specific page and line may be read to the jury. That's in a nutshell how we how learned how to do it.

Counsel for plaintiff repeatedly offers multiple pages. Oftentimes, the Court and the counsel can't find and the witness can't find what pages are being talked about. No lines are identified. And then there is an emotional outburst and a challenge to the Court if the Court sustains a proper objection regarding misuse of a deposition during trial. And the witness is sitting there embarrassed and they're not actually impeached, but the jury doesn't know what's going on, and it's causing confusion to the jury and prejudice to the defendants.

With respect to the specific issue that I recall from this morning regarding the body weight, there were multiple pages in the 130's of Mr. Borba's deposition that were correctly not read to the jury because it had nothing do with body weight. We then went into the 180s and beyond.

THE COURT: Just a moment. It had something to do with body weight applied by the other deputies. It had nothing to do in relation to the body weight applied by this witness.

MS. SWISS: The actual page regarding what body

*Deborah D. Parker, U.S. Court Reporter*

105

weight was applied by Deputy Borba to Mr. Holloway on that night --

THE COURT:  It's not on page 132.  It's not on page 138.  It's not on page 139.  And I've made that ruling.

MS. SWISS:  Correct.

The actual pages, I believe, are at the bottom of page 149 and on page 150.  So those pages were not identified by Counsel.  But sitting here going through the index, searching for "body weight," I was able to locate those pages and those were not put before this Court during the deposition, and it was not used to potentially refresh the recollection of Deputy Borba.

I would just like to make the record that I believe the Court has correctly sustained the objections to the improper use of the deposition.  And we've all been instructed by this Court on how to do it and plaintiff's counsel repeatedly refuses to follow the instructions that we all received.

THE COURT:  I'll stand on this record.

But in anticipation then of these pages being referred to, I'll ask you to come up with 149 and 150. Because what's occurring is the Court has made the correct ruling concerning the pages put in front of it.  The problem is that another page is tossed out, and I believe it was in the 180, the inference being someplace in these transcripts,

106

there is the information that counsel is referring to, but none of us can find it quickly enough. And if we're going to get into those pages you note, 149 and 150, let's look at them now.

MS. SWISS: Your Honor, I believe there's a transcript directly in front of you on this.

THE COURT: Well, there's about a number of transcripts, Counsel.

MS. MKRTCHYAN: So I want --

THE COURT: Just a moment, Counsel. If it applies to his body weight --

MS. MKRTCHYAN: It's 148 and 150. Am I allowed to make --

THE COURT: No, Counsel, you're not. I'm going to look at these pages for just a moment and then you're going to come back after I read 148 and 149 and 150.

(Pause.)

THE COURT: All right. The relevant pages -- which is if they are pages in relation to the question asked -- would be at page 150.

The question was asked not about the position because there's no contradictory evidence. It was about the body weight. And the only indication of the body weight is:

"Do you recall which knee you used?"

"The right knee."

*Deborah D. Parker, U.S. Court Reporter*

107

"And was the knee holding" -- and by the way, this is on page 150.

"And was the knee holding your weight?

Or was your weight distributed so that

it was being held by another knee?"

"I was placing my body weight onto

Mr. Holloway."

"So the other knee wasn't bearing any

weight."

"I don't recall.  I just don't know that

I was placing body weight into

Mr. Holloway."

Now, let me read that again.  At line 9:

"I was placing my body weight onto

Mr. Holloway."

"QUESTION:  So the other knee wasn't bearing any

weight?

"ANSWER:  I don't recall.  I just know that I was

placing my body weight into Mr. Holloway."

There's nothing contradictory in this testimony about either the position that the deputy has testified to or the weight being applied, whether it was full weight or partial weight.

His answer is:  "I don't know.  I just know I was placing my body weight into Mr. Holloway."

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00846                                        5-RenSER-00846

108

That's not contradictory and it's not impeaching.

Now, Counsel, now you make your record, please, and refer me to any other pages.

MS. MKRTCHYAN:  Again --

*(Court Reporter requests clarification for the record.)*

MS. MKRTCHYAN:  I'm not responsible with the speed that everyone works in this courtroom.  I'm also not responsible with how well other attorneys or this Court knows the facts here.  I'm not responsible for that.

I'm only responsible as to my knowledge and understanding of the facts after I've done this case since 2018 through three trials through all this depositions.

By the way, I did have a liability verdict against this defendant with the same line of questioning.  So let's not forget that.

Secondly -- now, the issue here is minimizing.  In his report, there is no indication of body weight applied.  He says, "Right knee onto his upper left."  There are many different ways of placing someone's right knee on upper back.  And that's what he testified to this jury in this case, yesterday and today.

Now, if is there any -- there is minimization of the use of force by someone who arrives while -- before the Taser is applied.  This is highly relevant to plaintiff's

*Deborah D. Parker, U.S. Court Reporter*

109

case. I have been deprived many times. This is not just the first time. Continuously, the Court is sitting as a juror. And when I challenge the way the Court admonishes the jury, I am entitled to do that. There is now nothing improper --

THE COURT: This is --

MS. MKRTCHYAN: I didn't finish.

THE COURT: -- this is a general --

MS. MKRTCHYAN: I didn't finish.

THE COURT: Yes, you have now, Counsel.

This is a general attack on the Court's ruling.

And, quite frankly, there is nothing impeaching thus far, in terms of the description of where this deputy placed his knee and there is nothing that I can see that would infer impeachment thus far, including the prior pages you referred me to that had nothing to do with your question which was concerning body weight.

The implication is that 225 pounds, he put his knee in the back and the implication is, which you can argue, he couldn't get up. Why were you placing the knee in his body weight [sic]? You can argue what Reneger was doing from these tapes, et cetera and Pahel and Gonzales. That's all argument. But there's nothing here that is impeaching. And what is happening is that the inferences that it's impeaching, as you continually bring up these pages.

*Deborah D. Parker, U.S. Court Reporter*

110

Thank goodness that the jury is not receiving a lot of this because the Court has made the determination with what is in front of it. Also, as you claim concern on the defendant's part, most of this is not going to the jury, because many of the objections have been sustained. So far I don't see any prejudice to either party at least concerning this witness.

Now, the compilation of this may be something you want to put together and argue to the Court, if there is liability here and a motion for new trial. I leave that to you. I don't encourage it or discourage it, but that's premature right now. With the diatribe and attack on the Court, quite frankly, is getting a little wearisome.

We're going to be in recess for another 10 minutes so that you can use the restroom facilities.

Thank you.

(Recess taken from 11:16 a.m. to 11:27 a.m.)

(Jury enters courtroom.)

(The following proceedings were had in open court in the presence of the jury:)

THE COURT: We're back in session.

Counsel, thank you for your courtesy. If you will be seated.

All parties and the witnesses are present.

And counsel, your continued examination, please.

*Deborah D. Parker, U.S. Court Reporter*

111

MS. MKRTCHYAN:  Yes.

CROSS-EXAMINATION

BY MS. MKRTCHYAN:

Q    Sir, after you came to the scene, you denied that you ever saw anyone strike Mr. Holloway in the head.  True?

A    Correct.

Q    Okay.  But at the time you write, we can hear on your Patrol Vehicle Recording him screaming about getting kneed in the head and that's how he was bleeding -- that's why he was bleeding.  He's screaming about that at the time you arrived on your PVS.  True?

MS. NALTSAS:  Argumentative.

THE COURT:  Overruled.

And is that at the time does he hear it, or does he know it now?

So if you're going to answer that question, define what you knew then versus what you know now.

THE WITNESS:  As I sit here today, I've reviewed the audiotape that we've listened to from my Patrol Video System.  You can hear Mr. Holloway mention that he is being kneed in the head.  That statement I will agree with.

BY MS. MKRTCHYAN:

Q    Okay.  But at the time you came to the scene, you never saw anyone knee him in the head; isn't it true?  That's what you're testifying to us.

*Deborah D. Parker, U.S. Court Reporter*

112

A    Correct.

Q    Let's play this -- let's hear what exactly was said and done at the time you arrived.

This is the same tape that was played just a few --

(*The audiotape was played.*)

BY MS. MKRTCHYAN:

Q    So you did become aware that there was blood.  You said it on tape:  "There's blood somewhere"; isn't it true?

A    Yes.

Q    So at the scene you became aware that Mr. Holloway was bleeding?

A    Yes.

Q    Okay.  Did you see where he was bleeding from?

A    Yes.

Q    Where?

A    From his head.

Q    Okay.  Did you ever turn around and ask anyone, *How did this man get this head injuries* [sic]?

A    No.

Q    So you had blood on your hands.  Your heard him say, "I'm bleeding."  You saw the blood.  And, yet, it was not interesting to you to find out how he got this head injuries and where he was bleeding from?

MS. NALTSAS:  Argumentative.

*Deborah D. Parker, U.S. Court Reporter*

113

THE COURT:  Do you understand the question?

THE WITNESS:  No, Your Honor.

THE COURT:  Re-ask it, please.

BY MS. MKRTCHYAN:

Q    But if you see blood on a suspect, you heard him complain about getting kneed, that he's bleeding.  You become aware of blood on your hands.  You said it -- right -- on the tape *I've got blood*, it was not important for you to find out how this man got head injuries?  How he was bleeding?

MS. NALTSAS:  Argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So, basically, you know, this man is bleeding.  There is -- you saw him with head injuries.  You saw what was going on.  You had to wipe off your hands with the wipes and, yet, none of you, none of you were discussing how this man got this head injuries.  Is it true?

A    I did not discuss how he got his head injury, no.

Q    Did -- Sergeant Rawlings, he arrived.  He was doing use-of-force investigation.  True?

A    Yes.

Q    Did he ever ask you -- specifically, you, since you were the fourth one who arrived and got involved in the use of force.  Did Sergeant Rawlings ask you, *How did this man*

*Deborah D. Parker, U.S. Court Reporter*

114

*got this head injuries?*

A    I don't recall him asking me that at the scene, no.

Q    Did you ever hear any of other officers volunteering this information to Rawlings telling him how this man got head injuries?

A    I don't recall.

Q    Okay.  So -- and then you also -- have you ever seen prior -- you know, before Mr. Holloway was placed in handcuffs, did you ever see him strike at any officer?

A    No.  He was resisting, but I didn't witness any strikes.

Q    Resisting is a very broad term.  According to your report, the amount of resistance he was doing, as you wrote, was that tensing his body, pulling his arms away from your grasp and other officers.  True?

That's what he was doing at the time you arrived.  True.

A    I'll need to refer to my report.

Q    Well, look at your report, sir.

Based on your report all he was doing was tensing his body, pulling his arms away from your grasp?

MS. NALTSAS:  Argumentative.

THE COURT:  Just a moment.

Let the officer look at the report first.

THE WITNESS:  I'm good, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

115

THE COURT:  All right.

BY MS. MKRTCHYAN:

Q    Isn't it true that's the amount of resisting he was doing.  True?

A    So I stated in my report upon my approval that he was tensing his body and pulling his arms away from their grasp. So that would be referring to Deputies Renegar and Gonzalez.

Q    So I asked you specific question:  Did you see him strike at anyone?

A    No.

Q    Did you see him place anyone in a headlock?

A    No.

Q    Did you see him grab anyone's ballistic vest?

A    No.

Q    He was face down when you arrived.  True?

A    Correct.

Q    Okay.  On his stomach.  True?

A    Correct.

Q    Multiple officers involved in and around him.  We know for a fact that, as you said here, Deputy Gonzalez and Renegar were on Holloway's back.

At the very least, based on your report, at least two officers had their body weight on Mr. Holloway's back at the time you arrived and got involved and placed third officer's body weight on Mr. Holloway.  True?

*Deborah D. Parker, U.S. Court Reporter*

116

A    So what my -- what my report states is that upon my arrival, I saw Deputies Renegar and Gonzalez on Holloway's back.  That's referring to as I arrived.  That's not referring to the time frame at which my involvement occurred.  So it's an active fluid situation.  Meaning that at any point in time, deputies may have shifted their position, taken weight off Mr. Holloway, moved to a different area.  It's an active altercation.

So what I refer to in my report is what I'm witnessing upon my arrival.

Q    Sir, I asked you the same series of question.  When you arrived before you got involved what other officers were doing.  Do you remember that at the deposition?

MS. NALTSAS:  Improper use.

THE COURT:  You can answer that question, if you understand it.

THE WITNESS:  I believe at my deposition you may have asked what deputies' involvements were.  Sure, it's a vague question, so --

BY MS. MKRTCHYAN:

Q    I just gave you -- we just read before --

THE COURT:  Counsel, that's argumentative.  That's argumentative:  "I just gave you."

Please ask the question now.

MS. MKRTCHYAN:  Okay.

*Deborah D. Parker, U.S. Court Reporter*

117

BY MS. MKRTCHYAN:

Q   So isn't it true, based on your deposition testimony, based on everything you told us prior today is that both Gonzalez and Renegar were placing their body weight on Mr. Holloway at the time you arrived and also got involved in this use of force?  Yes or no?

A   What I'm stating is that in my report, the way I wrote my report is that I'm writing what I observed upon my arrival.  What I explained earlier was that, as I became a participant in the use of force, I'm not going to testify as to what the other deputies were doing during the altercation.  I can't accurately document that.  I documented what I did in my report.

Q   Well, sir, you testified about that.

MS. MKRTCHYAN:  This is pages now 138 through 139, Your Honor, that we looked previously.

I'd like --

MS. NALTSAS:  Objection.

THE COURT:  Just a minute.

*(Pause.)*

THE COURT:  Just to be sure, Counsel, you can read from page 139, line 2 through 139, line 13.

139, line 2 through 139, line 13.

MS. MKRTCHYAN:  Okay.  That's fine, Your Honor.

*////*

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00856                                     5-RenSER-00856

118

BY MS. MKRTCHYAN:

Q    So *(Reading)*:

"QUESTION:  Was any body weight being applied to Mr. Renegar -- I mean, Mr. Holloway's body at that moment?

"ANSWER:  I believe so.

"QUESTION:  And what do you believe the weight was being borne by?  What part of Mr. Holloway was bearing the weight of the officers?

"ANSWER:  Probably their knees, I remember.

"QUESTION:  Okay.  Were they both on the same side of the body or on opposite sides of the body?

"ANSWER:  I don't remember that.

THE COURT:  That's line 13.

BY MS. MKRTCHYAN:

Q    Okay.  So this discussion of what Chad Renegar and Gonzalez were doing when you arrived and got involved in this use of force.  True?

A    False.  Page 138, if you read the context of the question, you're asking what I observed -- what I saw as I arrived.  And I'm describing what I saw as I arrived.

Q    Okay, sir.  But you arrived and told us that you saw Mr. Holloway fighting under the body weight of at least two officers and then that made it necessary for you to get involved as you testified today on direct examination; isn't

*Deborah D. Parker, U.S. Court Reporter*

119

it true?

A    I don't believe you used the term "fighting."

THE COURT:  To be certain in this colloquy, you can read from page 138 back through 139 so we have the time established about what he's observing.

MS. MKRTCHYAN:  And then it goes on, Your Honor, to pages 140 --

THE COURT:  Counsel, I'm directing, first of all, so it's not confusing.  You can read, if you choose, 17, 138 where we began on line 2, on 139.

MS. MKRTCHYAN:  I want to read not only that, but also continuation of everything else that he discussed, Your Honor.  So that would mean, I would read 139, 140, 141 up until 150 when he placed his body weight on Mr. Holloway.

THE COURT:  Counsel, none of that has to do with body weight.  That has to do with different positions until we get to 139 which you just read to the jury, lines 2 through 13.  All the rest is about hands and locations and waistband, et cetera.

MS. MKYRTCHYAN:  Your Honor --

THE COURT:  Please, Counsel.

MS. MKRTCHYAN:  I'm not sure what the Court's ruling is, but I will move on.

BY MS. MKRTCHYAN:

Q    In any event, sir, basically, you're not denying you

*Deborah D. Parker, U.S. Court Reporter*

120

did apply body weight?

A    Correct.

Q    Okay.  And then you saw the Taser applied on Mr. Holloway.  True?

A    Correct.

Q    After you applied your body weight, according to your report, you were the third officer, according to your report, to apply body weight.  These are now three officers, at least.  According to your own report, there was a Taser applied.  True?

A    Correct.

Q    And you heard the Taser.  Tell us how did you become aware of the Taser application?

A    I heard Deputy Renegar announce "Taser, Taser, Taser," which is part of our use-of-force policy regarding the use of a Taser.  It's to let the other officers on scene know that a Taser is being deployed so we don't infer that someone is drawing their handgun.

The notification "Taser, Taser, Taser," as well as I physically saw the Taser applied to Mr. Holloway's buttocks area, so I saw the application and I heard the announcement.

Q    Okay.  Did you see Taser first time when it was applied to -- effective to get Mr. Holloway handcuffed?

A    No.  So the type of application is what we refer to as

*Deborah D. Parker, U.S. Court Reporter*

121

a drive stun; meaning, that the Taser was applied directly to Mr. Holloway's buttocks. In order for a Taser to be truly effective, a dart application with the proper spread of the two darts in a subject's body would allow for what we refer to as NMI and would allow us ample time to place a subject in handcuffs while they're subdued. The type of application that was applied in this incident was what I refer to as a dry stun and that's a direction application of the Taser. So the spread of the prongs isn't there. So it's not going to be as effective.

Q   Okay, sir. You're telling us that it was not effective to relax Mr. Holloway?

A   Correct.

Q   And then did you see the second application of the Taser?

A   So at the time of the incident, I don't recall the second application. As I sit here today, I now know there was a second application known as a stapling technique. But at the time of the altercation, I only recall the one Taser application.

Q   And you're telling us that the first Taser was not effective and you were unable to take control of Mr. Holloway at that point in time. True?

A   Correct.

Q   Do you remember I asked -- it was Mr. Beck who asked

*Deborah D. Parker, U.S. Court Reporter*

122

the same questions about the Taser --

MS. NALTSAS:  Objection.  Improper use.

THE COURT:  What's the question?

BY MS. MKRTCHYAN:

Q    The same question was asked about whether you saw the first time Taser applied, whether it was effective to relax Mr. Holloway?

Do you remember that question?

THE COURT:  You can answer, if you recall.

THE WITNESS:  Are you referring to the deposition?

BY MS. MKRTCHYAN:

Q    Yes, sir.

A    It may have been asked.  Sure.

Q    Okay.  Do you remember what you discussed about that in your deposition when you asked that question?

A    What I remember is that I didn't have access to my Patrol Video System while I was being deposed so I was recalling this incident from 2018 in 2020, two years later, all from memory.

And at that time -- at that time, as I state in my report, I only recalled one Taser.

Q    That was not my question.  You were asked the question if -- the question:

"QUESTION:  What response did the Taser elicit from Mr. Holloway?

*Deborah D. Parker, U.S. Court Reporter*

123

"ANSWER:  After the --

MS. NALTSAS:  Objection.

THE COURT:  Just a moment.  It's being stated as a fact.  Ask him if he made this statement.

BY MS. MKRTCHYAN:

Q    Yes.  Did you tell us at your deposition, sworn deposition after the Electronic Control Device finished its cycle, "Mr. Holloway began to stop pulling away and we were able to place his hands together and cuff him."

Do you remember that?

A    Yes.

Q    This is after the first very first cycle when you -- I mean, Chad Renegar, placed this Taser on his buttocks, so there was no need to have a second application.

MS. SWISS:  Objection.  Relevance.

THE COURT:  Argumentative.  Also sustained.

BY MS. MKRTCHYAN:

Q    Right now you're telling us, no, it was not --

THE COURT:  Counsel, you're arguing with the Court's ruling.  He didn't apply the second Taser, so this comes through Renegar, Gonzalez, if he drew his Taser, et cetera.

MS. MKRTCHYAN:  It goes to his testimony, Counsel.

THE COURT:  No, Counsel.  Thank you very much.

Counsel, a couple of more minutes.  I've been

*Deborah D. Parker, U.S. Court Reporter*

124

generous with this. I've let you go over the time period.

A couple more questions, please.

BY MS. MKRTCHYAN:

Q   And the Taser was applied while you still had your bodily weight on Mr. Holloway.  True?

A   I don't recall.

Q   Well, you testified about that, too, at your deposition.

Are you telling us that your deposition --

MS. NALTSAS:  Objection.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   -- is entirely false?

MS. NALTSAS:  Move to strike "your deposition was false."

THE COURT:  Stricken at this time.

Ask the question.

BY MS. MKRTCHYAN:

Q   He asked you the same question:

"When the Taser was applied, did you still have your knee with body weight on Mr. Holloway?"

And you said, "Yes."

Do you remember that?

A   If you want to show me the deposition, I'll gladly go

*Deborah D. Parker, U.S. Court Reporter*

125

over it with you. I'm not denying that. What I'm saying, as I sit here today, I don't recall if my knee was on his back while the Taser was being deployed or not. If I said that in my deposition in 2020, then I will agree with you, but I haven't seen it.

THE COURT: First of all, let's see if it refreshes your recollection at all.

So, Counsel, what page?

Sir, you have -- look at the deposition if we have that page.

What page, Counsel?

MS. MKRTCHYAN: Starting discussion of the Taser becomes 157 through 158.

THE COURT: 157 through 158.

MS. MKRTCHYAN: Through 160. 157 through 160 and then continuing on through 164.

THE COURT: All right. Just a moment.

So do you have the deposition in front of you?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Why don't you read that quickly and I'll take a look also.

(Pause.)

THE COURT: Counsel, I've already allowed the reading, haven't I -- just a moment. Let me be sure.

MS. MKRTCHYAN: Lines, Your Honor --

*Deborah D. Parker, U.S. Court Reporter*

126

THE COURT:  I couldn't hear you.

MS. MKRTCHYAN:  I can give you the lines:  159, page 23, line starting up until the next, page 160.

THE COURT:  All right.  159, line 23?

MS. MKRTCHYAN:  Yes, continuing on.

THE COURT:  Thank you.

*(Pause.)*

THE COURT:  And up to what line, Counsel?

MS. MKRTCHYAN:  160, going down that entire page.

THE COURT:  I'm sorry?

MS. MKRTCHYAN:  The entire page.

*(Pause.)*

THE COURT:  Then would all the parties look at page 159, line 23 and 160 and over to 161, line 2.

Could you look at that, Deputy?

THE WITNESS:  Got it.

THE COURT:  Got it.  Okay.

Counsel.

MS. MKRTCHYAN:  So, yes, Your Honor.  What would you like me to do now?

THE COURT:  Well, an abundance of caution, why don't we just read that, okay?

And then deputy respond.  I'm not finding this impeaching, non-impeaching, but just in an abundance of caution.

*Deborah D. Parker, U.S. Court Reporter*

127

BY MS. MKRTCHYAN:

Q   Okay.  159, line 23:  "Where were you when the Taser" --

"QUESTION:  Where were you when the Taser was actually deployed?"

"A." --

"ANSWER:  Maintaining control -- trying to maintain control of the left arm to get behind his back.

"QUESTION:  All right.  Where was your right knee?

"ANSWER:  Still -- it would still be on his back, I believe.

"QUESTION:  Okay.  So what you're saying is, he's tased the buttocks while you've got a knee into his center back with grasp on his left arm?

"ANSWER:  I believe when I heard the Taser go off, I may have let go of Mr. Holloway to avoid the electronic control device transferring through me.

"QUESTION:  May have but --

"ANSWER:  I don't recall, sir.

"QUESTION:  -- can't say for sure.

"ANSWER:  No.

"QUESTION:  All right.  So it's also just as possible that you continued to hold your weight on his back and continued to hold his left arm as the

*Deborah D. Parker, U.S. Court Reporter*

128

Taser went through its five-second cycle?

"ANSWER: It is possible, yes."

THE COURT: Counsel, you can continue reading, if you'd like.

MS. MKRTCHYAN: Oh.

THE COURT: Over -- 160 over to line 2 of 161.

MS. MKRTCHYAN: *(Reading)*:

"ANSWER: I don't --

MS. MKRTCHYAN: Let's see.

THE COURT: No. *(Reading)*:

"QUESTION: All right.

MS. MKRTCHYAN: *(Reading)*:

"QUESTION: All right. Did you feel any effects of it?

"ANSWER: I don't recall. I don't recall.

"QUESTION: Did Mr. Holloway articulate any sounds as he's being tased?

"ANSWER: I think he moans. Yeah, I remember him moaning.

"QUESTION: Okay. And then within seconds of the deployment, somebody puts handcuffs on him?

"ANSWER: Yes, sir.

"QUESTION: Okay."

MS. NALTSAS: Objection.

THE COURT: That's sufficient.

*Deborah D. Parker, U.S. Court Reporter*

129

MS. MKRTCHYAN: Okay. But I would like, also, Your Honor, to read pages 157 through 158 about the cycle of the Taser and the --

THE COURT: There's impeaching concerning that, Counsel.

MS. MKRTCHYAN: Okay.

THE COURT: Counsel, one more question in area if you'd like and then we're going to turn to redirect.

BY MS. MKRTCHYAN:

Q   So -- and then after that, you -- after the Taser was applied, handcuffs were placed on Mr. Holloway and you, basically, you, basically, got up -- got up from his back as the handcuffs were placed on him. True?

A   When you make the reference got up from him, I can't accurately tell you that. It's supported in the deposition, itself, when we're talking on page 160, line 15 through 19, we're talking in the realm of possibility. And I agreed with Mr. Beck that it's possible my knee may have still been on his back while he was tased.

As I sit here today, I don't know after he was cuffed if my knee was still on his back or if I had removed my body weight from him entirely. But after Mr. Holloway was handcuffed, I didn't immediately stand up. I started to broadcast radio traffic while still crouched down.

Q   You can hear Mr. Holloway complaining about someone

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00868                                                    5-RenSER-00868

130

standing on his leg and he says, *Please, stop stomping on my leg.  I'm not fighting.*

You can hear that, right, on tape?

MS. NALTSAS:  Vague as to time.

THE COURT:  I'm going to let the question be asked.

Please you may respond to that.

THE WITNESS:  The way in which you stated it, it's incorrect.

MS. MKRTCHYAN:  Well, let's continue playing that part and see what it states.

(*The audiotape was played.*)

BY MS. MKRTCHYAN:

Q    So did you hear that comment?

A    Yes.

Q    Okay.  Are you aware that, first of all, Mr. Holloway has testified at his deposition that this was you.  He was able to identify you as the person who stomped on his leg when he stood up?

MS. NALTSAS:  Objection.  Mr. Holloway's testimony should have come in through Mr. Holloway.

MS. MKRTCHYAN:  Objection.  That's a speaking objection, Your Honor.

THE COURT:  If you recall that, you can respond to the question.  If you recall Mr. Holloway's --

*Deborah D. Parker, U.S. Court Reporter*

131

THE WITNESS:  Your Honor, I believe she was referring to his deposition, and I don't know what he said in his deposition.

BY MS. MKRTCHYAN:

Q   So there has been an allegation in this case that it was you who stood up on his leg when Mr. Holloway complained of this at this point.

You're aware of that, right?

MS. SWISS:  Assumes facts not in evidence.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  I'm not aware of that, no.

BY MS. MKRTCHYAN:

Q   Well, you don't remember the prior proceeding that information came up?

MS. SWISS:  Relevance.  403.

THE COURT:  Just a moment.  Finish your question.

BY MS. MKRTCHYAN:

Q   That you were the one who stood up on his leg after he was handcuffed.  After he was handcuffed.  That it was you?

THE COURT:  I think the problem is that it's coming in as hearsay through Holloway who was on the stand.

You can simply ask him if he stood on his leg or not.

MS. MKRTCHYAN:  Yes.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00870                                    5-RenSER-00870

132

BY MS. MKRTCHYAN:

Q    When you got up and you're 6.3 feet officer, right?
You're tall, as we discussed?

A    Yes.

Q    You were among the tallest officers [sic] at the scene,
right?

MS. SWISS:  Relevance.

THE COURT:  Counsel, please ask the question.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    Did you stomp on his leg when you got up from the
ground -- from Mr. Holloway's back?

A    No.

THE COURT:  Thank you very much.

Now, Counsel, this is redirect.

BY MS. MKRTCHYAN:

Q    Sir, and then --

MS. MKRTCHYAN:  Well, I didn't finish.

THE COURT:  I know you haven't finished.  You've
got your record.  I've been generous now with the time.

All right.  Counsel, redirect.

MS. NALTSAS:  No further questions, on behalf of
Deputy Gotts.

MS. SWISS:  No questions.

THE COURT:  Deputy, if we need you to return,

*Deborah D. Parker, U.S. Court Reporter*

133

we'll be courteous.  The case is going to conclude next Tuesday or Wednesday, okay?  Thank you very much.  You may step down.

Now, we have another witness, I assume, out in the hallway; is that correct?

MS. NALTSAS:  I think down the hallway but yes.

THE COURT:  Is it a quick witness?

MR. WRONIAK:  Deputy Pahel.

THE COURT:  It's not a quick witness.

You're going to lunch then.  We're going to return at 1:00 o'clock so counsel is replenished.

And, please, don't form or express any opinion concerning this case.

We'll see you at 1:00 o'clock.

(Jury exits courtroom.)

(The following proceedings were had outside the presence of the jury:)

THE COURT:  Formally, Counsel, I would like each of you to go to lunch but would one of you stay with me on each side.  I'd just like to walk through some of the things we did the other night on the table, okay?

So, otherwise, lead counsel can go get rested and we'll see you at 1:00 o'clock.

(Recess taken from 11:58 a.m. to 1:03 p.m.)

(The following proceedings were had in open court

*Deborah D. Parker, U.S. Court Reporter*

134

*in the presence of the jury:)*

THE COURT: We're back in session.

Counsel, thank you for your courtesy. All counsel are present.

Counsel, would you be seated and call your next witness, please.

MS. NALTSAS: Thank you, Your Honor.

Defense calls Deputy Kevin Pahel.

THE COURT: All right. And if Deputy Pahel would step forward, please.

*(Pause.)*

THE COURT: Thank you, sir.

Would you raise your right hand, please. The clerk is going to administer an oath to you.

KEVIN PAHEL, DEFENDANTS' WITNESS, SWORN

THE WITNESS: I do.

THE COURT: Thank you, sir.

Would you please be seated here in the witness box.

And you're being seated -- Counsel, I'm going to have you play all of Pahel's tapes if they are segmented at one time and either party can go back through those tapes. But last time they were segmented out, and I would prefer that they be played one time, one place, all the tapes, okay?

*Deborah D. Parker, U.S. Court Reporter*

135

MS. NALTSAS: Yes, Your Honor.

So Deputy Pahel has three tapes. Is it the Court's preference that I play all three?

THE COURT: All three at one time.

MS. NALTSAS: Great.

THE COURT: That way you can go back to them.

So, sir, would you state your full name, please.

THE WITNESS: Kevin Pahel.

THE COURT: Move your chair for me.

And would you face the jury and spell your last name, please.

THE WITNESS: P-A-H-E-L.

THE COURT: Thank you.

And, Counsel, has -- I'm not counting the time on these tapes against counsel, but each counsel have 90 minutes on each side.

MS. MKRTCHYAN: One point I just wanted to make. We did play the tape on Pahel one time fully.

THE COURT: If you don't want to replay the tape, that's fine, but he's being called again as another witness.

It's up to you, counsel, if you want to play the tapes; but if you do, at one time. I'm not sure the jury recalls these tapes. I just don't know. I'll leave that to each of you.

MS. NALTSAS: Very good. We can play all the

*Deborah D. Parker, U.S. Court Reporter*

136

tapes.

THE COURT:  No, I don't care.  It's your case, but what -- let's just get started, okay?

MS. NALTSAS:  Thank you.

THE COURT:  Thank you very much.

DIRECT EXAMINATION

BY MS. NALTSAS:

Q    Good afternoon.

A    Good afternoon.

Q    When did you complete the sheriff's academy?

A    July of 2013.

Q    And when did you go to the sheriff's academy?

A    I started January of 2013.

Q    And where did you work after completing the sheriff's academy?

A    After completion, I was assigned to jail operations.

Q    And what is your understanding of why you're being called here today?

MS. MKRTCHYAN:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm a witness to an incident that happened in 2018.

BY MS. NALTSAS:

Q    Did you write a report in what you now understand to be the Holloway incident?

*Deborah D. Parker, U.S. Court Reporter*

137

A    I did.

Q    And that has been marked as Exhibit 35-4.

Can you take a look at it in the binder?

MS. NALTSAS:  And with the Court's permission, can we publish it to the jury?

THE COURT:  You may.  And since this tape has already been played -- it was early on in the case -- I'll let each counsel go back in portions of this tape.  If they decide not to play it at one time, it's already been played at one time.  But to save time if they decide not to play it all the way through, then they can go back to different portions, okay, on each side.

MS. NALTSAS:  And this isn't -- I've asked him to look at his report.

THE COURT:  I know.

BY MS. NALTSAS:

Q    Is this your report?

A    Yes.

MS. NALTSAS:  And with the Court's permission, I'm going to publish and ask for the report to be admitted into evidence.

THE COURT:  You may.  And the exhibit was once again 32?

MS. NALTSAS:  35-4.

THE COURT:  35-4.  My apologies.

*Deborah D. Parker, U.S. Court Reporter*

138

*(Defendants' Exhibit 35-4 received in evidence.)*

*(The exhibit was displayed on the screen.)*

MS. NALTSAS:  And just to confirm, is that the correct exhibit number "35-4" or is it -1?  35-4.

BY MS. NALTSAS:

Q    And let's talk about the incident.

Have you reviewed your PVS from the night of the incident?

A    Yes.

Q    And have you reviewed other deputies' PVS from the night of the incident?

A    Yes.

Q    Have you seen yourself on both your PVS and other deputies' PVS from the night of the incident?

A    Yes.

MS. NALTSAS:  And I'm going to play incident 1, the tape in its entirety which is 102-9, starting at 4:19 a.m. and it's 15 minutes long.  This has not yet been played, and we do have a transcript.

THE COURT:  And, Debbie, I'll need help once again distributing those to the jury.  I don't want counsel doing that.

So this has not been played to the jury before.

MS. NALTSAS:  Correct.

THE COURT:  So we made the representation that all

*Deborah D. Parker, U.S. Court Reporter*

139

of Pahel's tapes have been played.  That's not correct.

MS. NALTSAS:  That's correct.

THE COURT:  Counsel, you may play his tape.

(*The audiotape was played.*)

THE COURT:  Counsel, just a moment.  You said you had other tapes to play.  Let's play those at one segment. I'd like to see the distribution of that next transcript for a moment.

MS. NALTSAS:  The next transcript has already been distributed to the jury.  I believe the tape was already played in full.  And we can play that again for continuity, because there are a total of three tapes.  It's really --

THE COURT:  All right.  So you can play that.

MS. MKRTCHYAN:  Your Honor, I would say I would object.  If the tape was already played once, it's cumulative.

THE COURT:  If you don't want these played at one time, that's fine.  Then we'll proceed and you can question through the statement and move on to the next tape.  And you can both refer back to the tape that's already been played.

MS. NALTSAS:  Very well.

THE COURT:  Okay.  Thank you.

BY MS. NALTSAS:

Q   Deputy, did you respond to a call at the O'Neill campground?

*Deborah D. Parker, U.S. Court Reporter*

140

A    I did.

Q    And what was the nature of the call that brought you to the O'Neill campground the first time?

A    Domestic violence.

Q    And based on your training and experience, did anything about the nature of the domestic violence call lower or raise your officer safety concerns?

A    No.

Q    And when you arrived at the tent, did you see any weapons at Mr. Holloway's campsite?

A    I did.

Q    What did you see?

A    I saw a machete laying behind a fire pit and some other knives towards the rear of the campsite next to a table.

Q    Did viewing these weapons at Mr. Holloway's campsite the first time you responded to the scene, did that have an impact on your officer safety concerns?

A    It did.

Q    And what did that do?

A    Domestic violence calls are some of the most dangerous calls that we respond to.  So knowing that, plus seeing the weapons there just elevates officer safety concerns.

Q    Were you present at the tent where Mr. Holloway is being recorded as saying he's been alone all night?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

141

Q   And what did that do to your officer safety concerns, if anything?

A   Just raised them.  Seemed evasive.  He didn't seem like he just woke up.  It's pretty early in the morning, so just that voluntary statement that he was alone all night was a little suspicious.

Q   Had you informed Mr. Holloway that you were investigating a domestic violence incident at the time he had made that statement?

A   No.

Q   Did you speak any words to Mr. Holloway during your first exchange at Campsite 65?

A   I did not.

Q   And why not?

A   I was the cover officer.  So Deputy Renegar was the primary officer speaking to Mr. Holloway.  My job as a cover officer is just scene safety, walking around the campsite making sure that there wasn't a potential victim on scene.

Q   And when you were there at Campsite 65, during the first incident, how many other deputies were there with you at the scene?

A   Four other deputies.

Q   And can you recall who the other deputies were?

A   Deputies Renegar, Gonzales, Billinger and Borba.

Q   And, sir, with these other deputies there during this

*Deborah D. Parker, U.S. Court Reporter*

142

domestic violence call, did you ever say to yourself, *There's Plenty of people here. I should just leave*?

A    No.

Q    And why not?

A    It's -- overall it's just safety. The more deputies are present, less likely there's going to be a negative result.

Q    And when the officers arrived at Mr. Holloway's tent, did he come out of the tent right away?

A    He did not.

Q    And when he didn't come out of the tent right away, did that raise your officer safety concerns?

A    It did.

Q    Why do you say that?

A    Just the time it took him to come out. We're in a pretty bad situation standing outside of a tent. It's very thin material. We have no cover, concealment. We've never met Mr. Holloway before. We don't know if he has any weapons inside the tent. It's kind of an awkward place to stand waiting for someone to come out.

Q    And did you ever find a domestic violence victim at Mr. Holloway's tent?

A    I did not.

Q    Did you took for a domestic violence victim?

A    I did.

*Deborah D. Parker, U.S. Court Reporter*

143

Q    And what did you do?

A    Just looked around the campsite.  There was also a second tent in his campsite.  I did not see anyone inside the tent.  Didn't see any female belongings.  Also, there was a large ravine behind the campsite, so looked back there for potential victim but did not find any female.

MS. NALTSAS:  I would like to play the radio traffic from that evening.  It's previously been marked as 101-4 and we have a transcript.

THE COURT:  Okay.  And, Deb, would you help.

THE CLERK:  Yes.

THE COURT:  All right.  Counsel.

(The audiotape was played.)

THE COURT:  Counsel, just a moment.  Just a moment.

I would like you to show me what page we're on.

MS. MKRTCHYAN:  For the record --

THE COURT:  So you're page 2?

MS. NALTSAS:  Near the bottom.

THE COURT:  All right.  Thank you very much.

All right.  Thank you, Counsel.

Now, Counsel.

MS. MKRTCHYAN:  I was just saying we did play this before, just for the record.

THE COURT:  All right.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00882                                        5-RenSER-00882

144

MS. MKRTCHYAN:  We had this played.

THE COURT:  Okay.

(*The audiotape was played.*)

MS. NALTSAS:  Okay.  Thank you.

BY MS. NALTSAS:

Q    Sir, when you came to the campground for the second time, had your safety concerns for yourself regarding this domestic violence call ended or was it something you still had in your mind?

A    Something that I still had in mind?

Q    And were you involved in the second call for help?

A    I was.

Q    And what was the nature of that call?

A    That a male subject was going through campsite to campsite saying who called on him.

Q    And based on your training and experience of someone going around campsite to campsite asking who called on him, is that worthy of a law enforcement response?

A    Yes.

Q    Was the call ever upgraded?

A    It was.

Q    And what do you remember about that?

A    Initially, it was further -- we got further information that a subject was going through the campsite to campsite saying, *Who's the motherfucker who called on me?*

*Deborah D. Parker, U.S. Court Reporter*

145

Then he was possibly entering a recreational vehicle.  From there, we got an update that there was a little girl screaming which upgraded the call to a priority one which is a lights-and-sirens response.

Q    And the information that you received about a little girl screaming and him trying to enter someone's recreational vehicle, where did you get that information?

A    From sheriff's dispatch.

Q    And based on your training and experience, when you receive a call like that from dispatch, what are you supposed to do?

A    Just take the information that's given to me from sheriff's dispatch.

Q    Are you supposed to speak to the 911 caller to verify the information before you respond to the scene?

A    No.

Q    Did the nature of this call about campsite to campsite, who's the motherfucker who called on me, little girl screaming, did that have any impact on your officer safety concerns?

A    It did.

Q    And why do you say that?

A    Due to the first call being a domestic violence call, and like I previously stated, they're the most -- some of the most violent calls that we go to.  Being the nighttime,

*Deborah D. Parker, U.S. Court Reporter*

146

very dark down there, subject also mentioned -- or
Mr. Holloway also mentioned that he was a Marine Corps
veteran, so possibly had some combat experience or further
experience than your average person and the multiple knives
that we saw on the first encounter, did not know if he armed
himself at that point or if anyone was injured.

Q    Did dispatch inform you that the call at O'Neill
campground involved the same subject as the first call?

A    It did.

Q    And did the fact that the campground was dark, did that
elevate your safety concerns?

A    Yes.

Q    Were you certain when you responded to the second call
that Mr. Holloway had not armed himself with one of the
knives you had seen during your first encounter at his
campsite?

A    No, I was not.

Q    Before you returned to the campground, did you learn
anything about Mr. Holloway's criminal background?

A    Yes.  That he was on probation and he was a convicted
felon.

Q    Do you know where you got that information from?

A    Deputy Renegar, after the first call.

Q    And did the information that Mr. Holloway was a
convicted felon on probation, did that have any impact on

*Deborah D. Parker, U.S. Court Reporter*

147

your officer safety concerns when you returned to the campground the second time?

A    Yes.

Q    And why do you say that?

A    He was on probation and I know he's a convicted felon, but I don't know his whole criminal history at that point. I just know that he's a convicted felon, so --

Q    And when you returned to the second incident --

MS. NALTSAS:  I'm going to play a portion of Deputy Pahel's second tape.  It has been played in full, maybe 10 days ago, and it's 102-4 with an internal marking of "C."  And on the transcript, it just starts at the beginning of Pahel's transcript, 4:58:40, and continues down to page 3, line 20.

THE COURT:  Counsel, I apologize.  I'm lost.  I want you to show me where this is.

(Pause.)

THE COURT:  This is 101-4.

MS. NALTSAS:  It's 102.

THE COURT:  And where is that located?  Take mine.

(Pause.)

THE COURT:  All right.  Thank you.

Now, is it clear where we are for the jury?  I'm having trouble flipping these transcripts.  I'm not sure -- maybe the jury is ahead of me.  But what are you asking them

*Deborah D. Parker, U.S. Court Reporter*

148

to refer back to?  These are just numbers to them.

MS. NALTSAS:  Understood.  I'll try to explain it as best I can.  Last week we handed out a transcript that says Transcript of Video Recorded, Body Cam Footage, Deputy Kevin Pahel, January 21, 2018.  And if you flip to the --

THE COURT:  Why don't you put the first page up, so we can all see it, because they have quite a group of transcripts by now.

MS. NALTSAS:  Sure.  It looks like --

THE COURT:  Put it on the ELMO.  Now, flip to the first page so we see:  4:58:40:  Dispatch 489.  Inaudible.  That's your first page.  That's your first line, correct?

MS. NALTSAS:  Correct.

THE COURT:  All right.  Just a moment.  Do you folks have that?  Got it?

Okay.  Counsel.

MS. NALTSAS:  Thank you.

(Pause.)

THE COURT:  All right.  Please continue.

MS. NALTSAS:  Thank you.

(The videotape was played.)

THE COURT:  Will you turn that up, please.

BY MS. NALTSAS:

Q    Deputy, is this your PVS of you arriving to the scene

*Deborah D. Parker, U.S. Court Reporter*

149

of the second incident?

A    Yes.

Q    And when you did make contact with Mr. Holloway the second time, what did you want him to do?

A    Initially, wanted him to show me his hands.  And then after he showed his hands, I wanted him to get down on the ground.

Q    And why did you want to see his hands?

A    Make sure that he didn't have any weapons in his hands.

Q    And why did you want him on the ground?

A    Position of disadvantage.  Generally under high-risk calls like this, we try to minimize any use of force and so we'll have someone prone down on the ground.  That way we can safely handcuff them without anyone getting injured.

Q    So based on your training and experience, does having Mr. Holloway on the ground, does that improve your -- lessen your officer safety concerns?  Lower your officer safety concerns?

        MS. MKRTCHYAN:  Vague and ambiguous.

        THE COURT:  Overruled.

        You can answer the question.

        THE WITNESS:  Could you repeat that question?

BY MS. NALTSAS:

Q    Yes.  Based on your training and experience, would having Mr. Holloway on the ground lower your officer safety

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00888                                    5-RenSER-00888

150

concerns?

A     Yes.

Q     Did you communicate anything to Mr. Holloway that you wanted him to get on the ground?

A     Yes.

Q     And did he say "No"?

A     He stated, *I'm not moving.  I'm not fucking moving.*

Q     Did you ask him more than once?

A     I did.

Q     And what was your tone when you asked him?

A     Initially, pretty normal voice.  And then you can hear me raise my voice in a more authoritative manner to get the point across that this was a serious call that we were responding to and we need him to listen.

Q     Were you trying to be rude to Mr. Holloway when you asked him on the ground?

A     No.

Q     Did you want Mr. Holloway to know that you were serious when you ordered him to the ground?

A     Yes.

Q     And was he listening to your commands?

A     No.

Q     After you raised your voice, did Mr. Holloway comply with your commands?

A     He took his hands out of his pockets and placed his

*Deborah D. Parker, U.S. Court Reporter*

151

arms out to the side, but he would not get on the ground.

Q    Did his refusal to get on the ground, did that elevate your officer safety concerns?

A    Yes.

Q    At the time of the incident that night, did you have a concern he may try to run away from you or flee the scene?

            MS. MKRTCHYAN:  Objection.

            THE COURT:  It's leading, counsel.  Sustained.

            MS. NALTSAS:  Thank you.

BY MS. NALTSAS:

Q    At that -- the time of the second incident when you ordered him to the ground, what was in your mind in terms of your officer safety concerns?

A    I saw the machete on the first call that was behind the fire pit which was very close to where he was standing at the time.  I didn't want to -- didn't want him to obtain a weapon or take off running.

Q    Now, when Mr. Holloway was not getting on the ground, did you have a concern that he could reach for a weapon that you might have seen during your first encounter?

A    Yes.

Q    Had you searched Mr. Holloway between the first encounter and the time you ordered him to the ground?

A    I did not.

Q    How was he dressed, if you recall, when you arrived for

*Deborah D. Parker, U.S. Court Reporter*

152

the second incident?

A    He was wearing a bulky jacket and blue jeans.

Q    Did you know whether Mr. Holloway had a weapon underneath his clothing?

A    I did not.

Q    Are you trained at the Orange County Sheriff's Department to assume someone is not armed in a situation like this?

A    No.

Q    What are you trained?

A    Common weapon areas.  Pockets, armpits, waistband are common areas to hide weapons.

Q    And before you told him to get down on the ground, did you walk up to Mr. Holloway calmly and explain to Mr. Holloway the officer safety concerns you had at that time?

A    No.

Q    And why not?

A    That would be unreasonable, given the type of call. It's a priority one call.  It's not something we would just arrive to and have a casual conversation with someone.  In that case, we need to get them detained as safely, as quickly as possible and then further investigate.

Q    And when you arrived during the second incident, did you walk up to Mr. Holloway and explain your suspicions of

*Deborah D. Parker, U.S. Court Reporter*

153

his criminal conduct before ordering him to the ground?

A    No.

Q    And why not?

A    At that point, it's a high risk.  We don't have debates or casual conversations with potential suspects.

Q    Mr. Holloway, eventually, does go to the ground, correct?

A    Correct.

Q    And how did that happen?

A    The assistance of Deputy Renegar, Deputy Gonzalez and myself.

Q    You were standing -- well, let me strike that.

When you approached Mr. Holloway and ordered him to the ground, did you have your service weapon out?

A    Not initially.  I just had my flashlight out.  And then on the second command, I pulled out my firearm.

Q    Did your flashlight remain out until he went to the ground?

A    No.

Q    What part of -- were you involved in any use of force with Mr. Holloway?

A    Yes.

Q    And what part of you touched which part of Mr. Holloway, if any?

MS. MKRTCHYAN:  Vague as to time.  This is very

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00892                                    5-RenSER-00892

154

vague and ambiguous as to time.

THE COURT:  Yes, what time?  Upon initial approach?

Sustained.

BY MS. NALTSAS:

Q    Were you involved in the takedown of Mr. Holloway?

A    Yes.

Q    During the takedown of Mr. Holloway, do you recall what part of you touched which part of Mr. Holloway?

A    Both my hands touched his left bicep.

Q    And were you involved in any use of force when Mr. Holloway was on the ground?

A    Yes.

Q    And when Mr. Holloway was on the ground, what part of you touched which part of Mr. Holloway?

A    Both my hands were initially on his left bicep area, and I was trying to get his left arm behind his back.

Q    And did you see Mr. Holloway go to the ground?

A    Not initially.

Q    Did Mr. Holloway resist going to the ground?

A    Yes.

Q    Once Mr. Holloway was on the ground, where were his hands, if you know?

A    He tucked them underneath where his waistband would be.

Q    And when Mr. Holloway was on the ground, did you go to

*Deborah D. Parker, U.S. Court Reporter*

155

the ground, too?

A    Yes.

Q    And with him on the ground with his hands tucked underneath him, did that cause you concern?

A    Yes.

Q    And why?

A    I didn't know if he was trying to retrieve a weapon, if he had one in his pockets or his waistband.  He had his hands clasped underneath him and it wasn't easy to get his hands out.

Q    And were you making an effort to observe with all the other deputies were doing while you were on the ground trying to get Mr. Holloway's hands out?

A    No.

Q    Where was your focus?

A    My primary focus was getting his left arm from underneath him and place them behind his back so we can place him in handcuffs.

Q    When you were down on the ground with Mr. Holloway's hand pulling on his bicep, were you initially successful?

A    No.

Q    What did he do?

A    He continued to resist.  And then I moved over to his right side to assist Deputy Gonzalez to try to retrieve his right hand.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00894                                                    5-RenSER-00894

156

Q    And did the concept of "hands kill" have any applicability to the situation you were confronting with Mr. Holloway on the ground when his hands were clasped underneath him?

A    Yes.

Q    Why do you say that?

A    Basically, until we get a suspect's hands in handcuffs, there's a -- our danger is -- I mean, it's a lot higher.  He can, potentially, retrieve a knife or retrieve a gun, any sort of weapon and use it against us.  And once he's placed in the handcuffs, the officer's safety concerns come down near to zero.

Q    So at some point you and Mr. -- strike that.

At some point, you and Deputy Gonzalez are both attempting to get out his right hand.

Is what you testified to?

A    Correct.

Q    Were you able to obtain control of his right arm?

A    No.

Q    How long do you continue on the ground attempting to pull out his arm?

A    Approximately a minute.

Q    And do you recall which other deputy arrived to the scene after you and Deputy Gonzalez were on his right arm?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

157

Q    And who was that?

A    Deputy Borba.

Q    And did you make any observations as to what Deputy Borba was doing with Mr. Holloway's left arm?

A    I did not see what he was doing.  I could see that he was working on his left arm and then I heard him say, "Cuffs."

Q    As you observe it, which wrist was handcuffed first?

A    Left wrist.

Q    And did you apply those handcuffs?

A    I did.

Q    And, eventually, is a handcuff applied to the right wrist?

A    Yes.

Q    From the point of time that Mr. Holloway went to the ground until handcuffs are applied, how much time passes, approximately?

A    Approximately one minute.

Q    And have you now told us about the use of force that you used during the incident?

A    Yes.

Q    When Mr. Holloway's hands were cuffed, did that do anything to lower your officer safety concerns?

A    Yes.

Q    Did you ever see anyone strike Mr. Holloway in the head

*Deborah D. Parker, U.S. Court Reporter*

158

during the time that you ordered him to the ground and the time that he was placed in handcuffs?

A    No.

Q    Did you ever see anyone strike Mr. Holloway in the head after he was in handcuffs?

A    No.

Q    Did you ever see any use of force applied on Mr. Holloway after he was in handcuffs?

A    No.

Q    Did you ever see anyone knee Mr. Holloway in the head?

A    No.

Q    And you've been trained in use-of-force principles, correct?

A    Correct.

Q    About how much use of force training did you have at that time in 2018?

A    Approximately, 100 hours.

Q    And did you ever observe any of the deputies violating any of the policies or training involving use of force that evening?

        MS. MKRTCHYAN:  Objection.  Vague and ambiguous. Overbroad.  Lacks foundation as well.  He's not a use-of-force expert here.

        THE COURT:  Sustained.

        He can testify to himself.  All the officers will

*Deborah D. Parker, U.S. Court Reporter*

159

testify individually.

BY MS. NALTSAS:

Q    Based your training and experience and the hundred hours of use-of-force training that you've had, did you violate any department policy in your use of force with Mr. Holloway that evening?

A    No.

MS. NALTSAS:  Okay.  I'd like to play a third video which has not been played.  It is Pahel's third PVS.

THE COURT:  You have those transcripts.

The clerk will help you distribute those so that --

Thanks a lot.

MS. NALTSAS:  For the record this is Exhibit 102-10.

THE COURT:  102-10.  Thank you.

All right.  Then you may play that video, but make sure that the video plays from beginning to end.

MS. NALTSAS:  Your Honor, that was my error.  It's 102-11.

THE COURT:  102-11.  All right.

(*The audiotape was played.*)

BY MS. NALTSAS:

Q    In that tape, we see you walking away from a white RV.

Do you see that?  Or did you see that?

*Deborah D. Parker, U.S. Court Reporter*

160

A    Yes.

Q    And do you know who was in that white RV?

A    Mr. Fuerbach.

Q    Did you conduct an interview with Mr. Fuerbach?

A    Briefly.

Q    Was this after the second incident?

A    Yes.

Q    And what did he say to you?

A    Just said he heard, basically, a fight between a male and a female.  Didn't hear the impact but that did not physically see, but just heard it.

Q    And did you interview anyone else that evening after the Incident 2?

A    I did.

Q    Do you recall who you spoke to?

A    Mr. Gomez.

        MS. NALTSAS:  I'd like to play a portion of the interview with Joshua Gomez.  It appears on the second transcript which has already been distributed and the tape has been played.

        THE COURT:  Let's make sure the Court and the jury has that in front of it.

        MS. NALTSAS:  Once everyone has a transcript, I can refer you to a page and line.

        THE COURT:  I'm not certain we have those

*Deborah D. Parker, U.S. Court Reporter*

161

transcripts.  Did you previously distribute them?

MS. SKINNER:  Yes, Your Honor.

THE COURT:  By now we've got quite a stack of transcripts.  Why don't you put up the first page of what this transcript is.

Some of these transcripts, you've got different transcripts that may have different wording.  So these transcripts are just an aid.  The best evidence is what you hear on these tapes.

MS. NALTSAS:  The first page of the transcript starts at 4:58:40 and the reference portion will begin at page 8, line 5.  And we'll play from 5:12 to 5:16:26.

THE COURT:  All right.  You may play that.

(*The videotape was played.)*

THE COURT:  I would like to have that transcript. I don't know what -- I have too many transcripts on my bench, and I would like that transcript, please.

*(Pause.)*

THE COURT:  Looking at the transcript, I want to be certain what page you're on and what line.

MS. NALTSAS:  We're currently at -- we begin at page 8, line 5.  I believe we're currently at page 8 around line 12, 13.

We'll just start it over at page 8, line 5.

THE COURT:  Now, I've got a lot of transcripts up

*Deborah D. Parker, U.S. Court Reporter*

162

here. You folks have to have a lot of transcripts.

Do you have this transcript in front of you?

Okay. I just want to make sure.

Thank you.

(*The videotape was played.*)

BY MS. NALTSAS:

Q    Deputy, who were you speaking with at that point in time?

A    Mr. Gomez.

Q    And why did you go speak to him?

A    To see if he witnessed domestic violence.

Q    Were you aware when you went to speak to him that he had placed a 911 call?

A    Not initially.

MS. MKRTCHYAN:  Vague as to time.

THE COURT:  No, overruled.

BY MS. NALTSAS:

Q    And what did he say to you?

A    He said that he called 911 after he heard the subject going through his campsite saying, *Who's the motherfucker who called on me.  Come out.*

Q    And he mentioned something about a veteran in this conversation.  What was the significance of that to you, if anything?

A    He mentioned a prior incident earlier in the morning

*Deborah D. Parker, U.S. Court Reporter*

163

where no one called, and he heard the male subject from that campsite say he was a war veteran and that he also heard him tell us on our first contact that he was a war veteran as well.

Q    Based on your interview with Mr. Gomez and the information that he provided to you on that night, did you determine that he was a credible informant?

A    Yes.

Q    After you left Joshua Gomez, what did you do next?

A    I spoke to Mr. Fuerbach, briefly.

Q    Did you go back to Joshua Gomez' tent and interview him a second time?

A    I don't believe so.

        MS. NALTSAS:  Why don't we play -- it's the same transcript.

        THE COURT:  Well, Counsel, you can have him refer to the transcript.

        MS. NALTSAS:  Sure.

BY MS. NALTSAS:

Q    If you can turn to the bottom of page 17 of your transcript, beginning at line 23.

A    Okay.

Q    And does this refresh your recollection?

A    Yes.

Q    And did you go back to Joshua Gomez's tent and

*Deborah D. Parker, U.S. Court Reporter*

164

interview him a second time?

A    Yes.

        MS. NALTSAS:  I would like to play a portion of that interview which for the record is 5:31:15 through 5:34:53.  And on the transcript it begins on page 17, line 23.

        THE COURT:  All right.  You may play that portion.

        (*The videotape was played.*)

BY MS. NALTSAS:

Q    Did Joshua Gomez confirm that he called 911 and reported a little girl screaming?

A    He did.

Q    And did he confirm that he reported that a suspect may have been going through people's campgrounds?

A    Yes.

Q    And on the night in question, January 21st, 2018, you spoke to several informants including the 911 callers, Joshua Gomez and Brian Fuerbach, and you also interacted with Mr. Holloway; is that correct?

A    Yes.

Q    And how would you characterize Mr. Gomez' attitude towards you when you interviewed him?

A    He was very respectful but seemed scared, maybe because -- he was with his girlfriend at the time, so he seemed more frightened for his girlfriend and being down in

*Deborah D. Parker, U.S. Court Reporter*

165

the campgrounds, dark and it's early in the morning.

Q    And how would you characterize Mr. Fuerbach's attitude and interactions with you that night?

A    He was also really scared being right next to his campsite and his wife was also in that RV with him as well.

Q    And how would you characterize Mr. Holloway's attitude and interactions towards you that night?

A    Reckless.

            MS. NALTSAS:  I have no further questions.

            THE COURT:  Counsel, would this be a good time for a recess?

            Well, strike that.

            Do you have questions, Counsel?

            MR. WRONIAK:  Real short.

            THE COURT:  All right then.

                        CROSS-EXAMINATION

BY MR. WRONIAK:

Q    Good afternoon, Deputy.

A    Good afternoon.

Q    You were the first one to make contact with Mr. Holloway during the second incident, correct?

A    Yes.

Q    And then, eventually, Deputy Renegar joins you and Deputy Gonzalez, correct?

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

166

Q    And Deputy Renegar is the first one to approach Mr. Holloway to go hands-on; is that correct?

A    Yes.

Q    Before Deputy Renegar went hands-on with Mr. Holloway, did he punch Mr. Holloway in the face?

A    No.

MR. WRONIAK:  No further questions.

THE COURT:  Then let's take a recess, counsel, until -- for 15 minutes.  And we'll come back and get you about 2:41, okay?

Please don't form or express any opinion concerning this case.  And have a good recess.

Counsel, 15 to 20 minutes.  Go use the restroom.

*(Recess taken from 2:32 p.m. to 2:49 p.m.)*

*(The following proceedings were had in open court in the presence of the jury:)*

THE COURT:  Thank you very much.

We're back in session.

All parties are present.  Counsel are present. Deputy Pahel is present.

This would be cross-examination.  Thank you.

CROSS-EXAMINATION

BY MS. MKRTCHYAN:

Q    Okay, sir.  Good afternoon.

A    Good afternoon.

*Deborah D. Parker, U.S. Court Reporter*

167

Q   At the time of this incident, you were the trainer of Deputy Gonzalez -- Joel Gonzalez.  True?

A   Correct.

Q   He was your field training officer?

A   Yes.

Q   And how long were you on patrol, sir?

A   At that time, approximately, four months.

Q   Okay.  And prior to that, you were the custody operations in jail?

A   I worked custody and court operations.

Q   Okay.  So your experience on patrol was about four months at the time of this incident.  True?

A   Correct.

Q   And when you arrived, you were equipped with the microphone connected to your patrol car?

A   Yes.

Q   Deputy Gonzales was with you next to you as a passenger?

A   Yes.

Q   He did not have a microphone to the patrol car.  True? Because you have basically one officer connected to the patrol car, right?

A   Correct.

Q   Okay.  Now, you wrote a report about this incident, right?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00906                    5-RenSER-00906

168

A   Yes.

Q   Okay.  When you wrote your report, did you review your patrol vehicle recordings?

A   No.

Q   Do you remember where you wrote your report?

A   Yes.  The report writing room.

Q   That's at the station, right?

A   Correct.

Q   Prior to the writing of the report -- formal report at the station, you had conversations with officers -- true? -- at the scene?

A   Correct.  I talked to my partners.

Q   And your partners that night were who?

A   Deputy Gotts, Gonzalez, Renegar, Borba, Billinger, Sergeant Rawlings.

Q   Okay.  And at the station, did you have conversations with any of those officers prior to you formalizing your report?

A   Just Sergeant Rawlings.

Q   Okay.  And what was that conversation like with Sergeant Rawlings, if you could tell us?

A   He asked me if I saw anyone kick Mr. Holloway in the head.

Q   And that was at the station, talking only with you?

A   Correct.

*Deborah D. Parker, U.S. Court Reporter*

169

Q    No one else was present?

A    No.

Q    And what did you tell him?

A    No.

Q    That never happened -- right? -- according to you?

A    Correct.

Q    Let me ask you this:  Regardless of the 911 calls that we've heard -- little girl screaming, DV call -- would that be appropriate to hit someone, knee someone and struck someone in the head --

        MS. NALTSAS:  Objection.

BY MS. MKRTCHYAN:

Q    -- under your policy, as you understand it?

        THE COURT:  Overruled.

        You can answer the question in light of the events that evening.

        THE WITNESS:  That's a pretty vague scenario.

BY MS. MKRTCHYAN:

Q    Why is it vague?  You were there from the beginning to the end of this use of force.  True?

A    Yes.

Q    Okay.  You knew what the call said.  You already heard the dispatch.  True?

A    Yes.

Q    Under those circumstances, you arrived to the scene.

*Deborah D. Parker, U.S. Court Reporter*

170

Whatever you did under this circumstances, will that have been appropriate to knee Mr. Holloway in the head repeatedly?

A     No.

Q     Okay.  Well, would it have been appropriate to punch him in the head?

A     No.

Q     Would it have been appropriate to strike him to his face?

A     No.

Q     Okay.  Now, you are denying that that happened.  True?  All of you?

A     Correct.

Q     And in your report -- let's look at your report.  This is Exhibit 30-something -- 35, I believe.

          MS. MKRTCHYAN:  Your Honor --

          THE COURT:  It's fine.  You can continue on.  I'll get the number.  35-4.

BY MS. MKRTCHYAN:

Q     So let's look at your report, sir.  It's recently true, right?

          I mean, you looked at recently prior to your testimony?

A     Yes.

Q     Okay.  So just to recap, you wrote that -- upon my

*Deborah D. Parker, U.S. Court Reporter*

171

arrival -- this is the first encounter -- Deputy Renegar was attempting to make contact with a potential suspect, later identified as Jeremy Holloway, at Camp 65, et cetera.

Deputy Renegar was making verbal announcements for Jeremy to exit his tent. Jeremy exited the tent and began yelling, "Why are you harassing me?"

Deputy Renegar patted Jeremy down for weapons and began interviewing him. After the interview, you're aware unable to locate the other half to determine if crime was committed.

The "other half" meaning the female, right?

A    Correct.

Q    And you were the one who looked through his tents, through his surroundings to see if there was any trace of a female at this campground. True?

MR. WRONIAK: Objection. Assumes facts not in evidence.

THE COURT: No, overruled.

You can answer the question.

THE WITNESS: Yes. I looked around the campsite and beyond the campsite.

BY MS. MKRTCHYAN:

Q    And there were no female belongings. No trace of a female that you could point out to your partners that night. True?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00910                                                5-RenSER-00910

172

A    Correct.

THE COURT:  And just for the record, I'm not sure 34- -- 35-4, I think is the transcript.  We'll get the number of this report.

MS. SWISS:  It is 35-4, Your Honor.

THE COURT:  35-4, this is the report; is that correct?

MS. SWISS:  Okay.

THE COURT:  My apologies.  Thank you.

BY MS. MKRTCHYAN:

Q    And then you wrote:  There was no other person in this campsite.  There were no eyewitnesses to the alleged domestic violence.  We left the scene with no further incident.  True?

A    Correct.

Q    This is the one paragraph about this first encounter.  True?

A    Correct.

Q    And you write no significant material facts in your report.  True?

A    Correct.

Q    Okay.  And you wrote here no eyewitnesses to the alleged domestic violence.  True?

A    Yes.

Q    You meant to say there were no eyewitnesses.  True?

*Deborah D. Parker, U.S. Court Reporter*

173

Meaning that no one saw actual DV at that campsite.  True?

A     On the first call, yes.

Q     Okay.  And that includes even Mr. Fuerbach, right?  You had an interaction with Mr. Fuerbach prior to going into Campsite 65 -- Mr. Holloway's campsite.  True?

A     No.

Q     Didn't we hear Borba and Renegar talk with Fuerbach while you were there?

A     No.

Q     You were not there?

A     No.

Q     So you arrived later?

A     Correct.

Q     Okay.  But right now -- you're sitting here today, you know that Borba with Renegar had an interaction with Fuerbach prior to entering Jeremy Holloway's campsite?

          MS. NALTSAS:  Objection.  Calls for speculation.

          THE COURT:  Well, if you know that as of today, you can state that.

          THE WITNESS:  As of today.

BY MS. MKRTCHYAN:

Q     So you know that they went and did a brief exchange with Fuerbach, prior to talking with Holloway.  You know that?

          THE COURT:  That's what's confusing.

*Deborah D. Parker, U.S. Court Reporter*

174

I've let you state that what you know today about Renegar and Fuerbach or Borba being there, but I don't want to get that confused with what you knew then.

Did you know if Renegar and Fuerbach or Borba had made contact with [sic] Fuerbach before you got to the scene?

THE WITNESS: I did not.

BY MS. MKRTCHYAN:

Q What did Renegar -- or whoever was there -- Renegar, Borba, Billinger tell you when you arrived to the scene?

How did you know what you were investigating?

MR. WRONIAK: Objection. Compound.

THE COURT: Overruled.

You can answer.

THE WITNESS: By the time I got there, Deputy Renegar pointed towards Campsite 65.

BY MS. MKRTCHYAN:

Q Okay. So you were not there prior to there -- whatever was meaning prior to that?

A No.

Q In any event, so -- but you wrote no eyewitnesses and you meant it, right?

There were no eyewitnesses to this DV?

A Correct.

Q The second time you arrived -- we've heard the radio

*Deborah D. Parker, U.S. Court Reporter*

175

calls.  First of all, sir, as a -- you know, when we hear the radio to cars, let's pull up the Call Detail Information Report for a second.

This is ongoing.  A dark campground.  As an officer, you're trained when you're responding to calls, you need to consider the terrain, location where something is ongoing.  True?

A     True.

Q     Okay.  This is -- you already arrived minutes before the second call to speak with, you know, Jeremy Holloway related to this DV incident.  It is about an half hour that you returned.  True?

A     I believe it was a lot shorter than that.

Q     Okay.  It was still dark.  True?

A     Correct.

Q     You knew this dark campground already that it -- this is a campground we are returning.  True?

A     Yes.

Q     Okay.  And the first call you found unfounded.  It was unfounded.  Did that have any consideration in your mind that I'm going to the same campground.  It's dark.  And the first time -- the first 911 caller somehow was unreliable, because we didn't find a female.

Did that ever factor that in this your mind when you're --

*Deborah D. Parker, U.S. Court Reporter*

176

MS. NALTSAS:  Objection.

MS. MKRTCHYAN:  Excuse me.  I didn't even finish.

BY MS. MKRTCHYAN:

Q   -- when you're returning the second time to this campground?  Did that factor in any shape or form where you are, the first call is unreliable, et cetera?

MR. WRONIAK:  Objection.

THE COURT:  You can answer the basic question.  I think it was if you had any concerns about unreliability.

BY MS. MKRTCHYAN:

Q   And the terrain of the location.

THE COURT:  That's two different questions now, Counsel.

THE WITNESS:  Could you repeat the question?

THE COURT:  One was, Counsel, that it was dark.

BY MS. MKRTCHYAN:

Q   This is not broad daylight.  This is dark campground. And the first caller was unreliable, because you didn't find the female at Campsite 65.

Did that in any shape or form -- all I want to know your state of mind at the time of this incident.

Did that in any shape or form have any factor when you're returning with guns drawn?

MS. NALTSAS:  Objection.  Argumentative.

THE COURT:  You can tell us your state of mind at

*Deborah D. Parker, U.S. Court Reporter*

177

the time.

THE WITNESS: No.

BY MS. MKRTCHYAN:

Q    Okay.  So when the call says "Informant states male subject is by Campsite 61 in a white RV," does that necessarily tell you in plain English that that person is actually invading an RV?

Is that the only interpretation of that statement of the dispatch?

MR. WRONIAK: Objection.  Argumentative.  Speculation.

THE COURT: Do you understand the question?

THE WITNESS: I don't.

BY MS. MKRTCHYAN:

Q    Well, sir, you wrote in your report that, you know, we came back.  Reference, male subject walking through the campground yelling about people calling the police on him and entering people's personal recreation vehicles.

You wrote that in your report, right?

A    Correct.

Q    That's the next paragraph after the -- basically, third paragraph.  You wrote that:  Entering people's recreational vehicles.  You got this information from the dispatch.  You haven't spoken with Joshua Gomez, right?

MS. NALTSAS: Objection.  Compound.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00916                                    5-RenSER-00916

178

THE COURT: I'm going to sustain it as compound, Counsel.

BY MS. MKRTCHYAN:

Q   You haven't spoken to Joshua Gomez at the time you approached Mr. Holloway at gunpoint. True?

A   No, I have not.

Q   Okay. And you wrote "entering people's recreational vehicle," right?

A   Correct.

Q   Okay. Let's go back to the Call Detail Information and see where it says that he's entering people's recreational vehicles. This is the statement I would like to bring your attention to.

It says: "Informant states male subject is by Campsite 61 in a white RV."

Does that statement in and of itself suggest that the person is entering someone's RV? Or does it also equally can be interpreted to mean that the person is actually standing by Campsite 61 and he's next to an RV?

How do you put things together when you're writing to the scene?

MS. NALTSAS: Objection. Compound and argumentative.

THE COURT: It is compound.

Do you understand the question?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00917                                          5-RenSER-00917

179

THE WITNESS: No, Your Honor.

THE COURT: Repeat the question, Counsel.

BY MS. MKRTCHYAN:

Q    Let's go step by step.

You wrote that the person was invading RV, right? Entering people's recreational vehicles. True?

A    Correct.

Q    Okay. When we look at this statement Informant states male subject is by Campsite 61 --

(Court Reporter requests clarification for the record.)

MS. MKRTCHYAN: Well, we have an objection.

THE COURT: Oh, no. We're not getting it on realtime. That's all she's asking. Deb's asking, just to repeat it.

BY MS. MKRTCHYAN:

Q    "Informant states that male subject by Campsite 61." Is the only interpretation from this statement that you hear on dispatch that the person is entering RV?

A    Well, it says: "Informant states that male subject is by Campsite 61 in a white RV."

Q    Well, is the only interpretation -- this is the question I have for you, sir: In plain English, is the only interpretation from this that the person is invading someone's RV?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00918                                    5-RenSER-00918

180

MR. WRONIAK: Objection. Argumentative.

BY MS. MKRTCHYAN:

Q   Or can it also be equally interpreted that the person who you're looking for is standing by Campsite 61?

THE COURT:  It's not interpretation.  It's what is his state of mind.  So if you're asking what his state of mind is, I'm going to allow the question.

MS. MKRTCHYAN:  Yeah.

THE COURT:  At that time.

THE WITNESS:  Like it says, "In a white RV."

BY MS. MKRTCHYAN:

Q   Does it say that he's invading someone's RV?  Does it say that?

A   It says he's in a white RV.

Q   Sir, when you're going into dark campground and you're hearing all this stuff.  Next says, *Informant states male subject is going through things in his campsite.*

Looking at that statement in plain English, can it be interpreted that he's looking things in his own campsite or someone else's campsite?  How can you put things together?

THE COURT:  Compound.  Once you start adding to it, I'm going to get an objection "compound," and I'm going to have to sustain it.  So let's stop the question there.

Do you recall the question that was just asked?

*Deborah D. Parker, U.S. Court Reporter*

181

THE WITNESS:  No, Your Honor.

BY MS. MKRTCHYAN:

Q   You're hearing this stuff coming to dark campground. Information is put out there on the dispatch.  Your job as a police officer is to investigate calls, not just go by what you're getting from the dispatch; isn't it true?

A   Well, the information I get from dispatch comes before the investigation.

Q   Okay, sir.  But when you arrive to the scene, is it your testimony that you as a police officer are just going to go and start, you know, pointing your guns at people without knowing what is happening?

MS. NALTSAS:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   You learned in the police academy that you need to investigate calls for disturbance of [sic] service.  True?

A   Yes.

Q   Okay.  And how many times on your limited patrol experience did you get 911 calls that were false?  How many times?

MR. WRONIAK:  Objection.  Argumentative.

BY MS. MKRTCHYAN:

Q   In a ballpark?

THE COURT:  You can answer that question.  Is this

*Deborah D. Parker, U.S. Court Reporter*

182

as to domestic violence calls or all calls?

MS. MKRTCHYAN:  All calls.

THE COURT:  No, sustained.  If it's domestic violence calls, at least we're narrowing the area.

But this can be anywhere from traffic stops to anything.

MS. MKRTCHYAN:  911 calls, Your Honor.  911 calls. I said 9-1-1 calls.

BY MS. MKRTCHYAN:

Q    How many times have you heard false 911 calls?

THE COURT:  You can answer it.  Just be sure.

THE WITNESS:  Not often.

BY MS. MKRTCHYAN:

Q    But that was out of four months of your patrol experience.  True?

A    Correct.

Q    Okay.  In any event, so I arrived to the scene.  You held Mr. Holloway at gunpoint without ever speaking with Mr. Gomez.  True?  You, yourself?

A    True.

Q    Okay.  And you learned after the fact.  You spoke with Mr. Gomez after the fact.  He didn't see anything.  He was hearing noises from inside of his tent and telling that to the dispatcher whatever he could hear.  True?

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

183

Q   Okay.  You spoke with Fuerbach.  Fuerbach also told you that, *I was hearing things.  I didn't even call 911 the second time.  I was giving you information from the prior DV call what I heard.  I did not see any female.*  True?

MR. WRONIAK:  Objection.  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  I don't.

THE COURT:  All right.  Repeat.

BY MS. MKRTCHYAN:

Q   Fuerbach told you that what he meant when he called 911.  True?

A   Where in time is this?

Q   After you used force on Mr. Holloway, arrested him. You went and spoke with reporting parties.  That's where we are, okay?

A   Correct.

Q   So you spoke with Gomez, we already covered.  Gomez told you, *I heard all this stuff going on.  Everything I heard was in my tent.  I never came out to see where this was happening.  I never saw anyone.  I cannot point to anyone.*  True?

A   Correct.

Q   And he never told that you that, *Yes, it was Mr. Holloway that I saw with the female or involved, even walking down the campground.*  True?

*Deborah D. Parker, U.S. Court Reporter*

184

MS. NALTSAS: Objection misstates the evidence and assumes facts not in evidence.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: He did not see him.

BY MS. MKRTCHYAN:

Q    And he never asked to make a citizen's arrest of Mr. Holloway either. True?

MR. WRONIAK: Objection. Relevance.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    So it became clear to you that Mr. Gomez was going from his audient perceptions. Do you know what is word "audient"? From his -- he was going from what he heard, not what he saw. Not what he observed. True?

A    True.

Q    Okay. Let's go to Fuerbach. You spoke with Fuerbach after this man was arrested and injured. True?

A    Yes.

Q    Okay. You asked Mr. Fuerbach what he heard, what you saw. True?

A    Yes.

Q    What did he tell you?

A    That he heard domestic violence, campsite next to him -- Campsite 65 -- a male and a female.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00923          5-RenSER-00923

185

Q    Did he ever tell you that he saw anything out there?

A    He did not.

Q    Did he ever tell you that he heard a female leave Mr. Holloway's campsite?

A    Not at this time.

Q    Did he ever tell you that, in fact, he came out of his RV. Came out of his RV to investigate where he heard the noise?

MS. NALTSAS:  Objection.  Misstates facts.

THE COURT:  Overruled.

He can answer the question.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    And about the second call, you also asked him about whether he heard the man yelling and screaming, *Who called the cops on me,* right?

A    Yes.

Q    And he told you he did not call 911 the second time. True?

A    Correct.

Q    And he also said that *I did not call -- I heard him.  I didn't see him where he went.*  True?

A    Correct.

Q    Okay.  So now going back in time to the moment when you arrived to the scene.  So you're going by the calls.  You

*Deborah D. Parker, U.S. Court Reporter*

186

are not -- basically are not making any effort to actually find out at scene right there at that point in time what is ongoing at that campground before you drew your guns and told this man get down on the ground; isn't it true?

MS. NALTSAS: Objection.

THE COURT: Sustained.

It's argumentative, Counsel.

BY MS. MKRTCHYAN:

Q     So you immediately got out of your car.  You're running towards the direction of where Renegar ran.  With Gonzalez you come back and you have your guns out.  True?

A     Correct.

Q     Okay.  So you haven't found out what's going on?  You haven't learned what Mr. Holloway has been doing so far, but you already have your guns drawn out with your, you know, holster.  True?

MS. NALTSAS: Objection. Argumentative.

THE COURT: No, overruled.

You can answer the question.

THE WITNESS: Correct.

BY MR. HARRELL:

Q     And you've learned in your use-of-force academy and training when you're allowed to point your guns.  True?

A     Yes.

Q     Okay.  When are you allowed to draw your guns?

*Deborah D. Parker, U.S. Court Reporter*

187

MS. NALTSAS:  Objection.  Incomplete hypothetical.

THE COURT:  Overruled.

In relation to this evening, you can testify about this evening.

MS. MKRTCHYAN:  No, I'm talking about his training.

THE COURT:  I'm narrowing that, Counsel.  That was his training.

MS. MKRTCHYAN:  No, his training.

THE COURT:  I'll reverse that.  I'll reverse that. You can answer about --

BY MS. MKRTCHYAN:

Q    When are you allowed to draw your guns according to your policy and training?

A    We draw our guns when we're clearing houses, alarm calls, when we are encountering dangerous suspects, such as risk-car stops, high-risk pedestrian stop.  Someone is likely to be armed and dangerous.

Q    So you arrived to the scene.  You saw Mr. Holloway within his tent -- I mean, his own campsite.  Not of 61, not of 67, not of 63.  His own campsite that you just left within, you said, how many minutes?  20 minutes before?

MS. NALTSAS:  Objection.  Compound.

BY MS. MKRTCHYAN:

Q    True?

*Deborah D. Parker, U.S. Court Reporter*

188

THE COURT: Just a moment. It is compound, Counsel.

Do you understand the question?

MS. MKRTCHYAN: Why is that compound?

THE COURT: No, just a moment.

THE WITNESS: No, I don't.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q He was within his own campsite when you came and saw him, right?

A Yes.

Q Okay. Is he alone?

A From what I could tell when I get in my car, yes.

Q Okay. Is there a little girl screaming when you arrived?

A Not on my arrival.

Q Is he running away somewhere when he sees you?

A No.

Q Is he reaching for a weapon that you can tell?

A Not sure. That's why I gave him the commands to move his hands in the pockets.

Q You said, "Let me see your hands" -- right? -- on tape?

A Yes.

Q Okay. And he showed you his hands; isn't it true?

A Eventually.

*Deborah D. Parker, U.S. Court Reporter*

189

Q   Eventually, you know, we have -- this is seconds. We're talking about seconds before he was taken down to the ground.

What eventually are we talking about?

MR. WRONIAK:  Objection.

MS. NALTSAS:  Objection.  Argument.

THE COURT:  Just re-ask the question.

BY MS. MKRTCHYAN:

Q   How many seconds it took him in that dark campground to process what you were asking him to do and show is hands?

How many seconds?

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  Overruled.

THE WITNESS:  Maybe 20 seconds.

BY MS. MKRTCHYAN:

Q   20 seconds.

So within 20 seconds, he was taken down to the ground.  We can tell from this PVS, in fact?

A   No.

Q   No?

Do you want us to play this?

MR. WRONIAK:  Objection.

THE COURT:  Sustained.

It's not what he wants, Counsel.

////

*Deborah D. Parker, U.S. Court Reporter*

190

BY MS. MKRTCHYAN:

Q    So you're telling us that it took, like, 20 seconds for him to show his hands?

A    Correct.

Q    Okay.  What happens next?

How many seconds did it take you to then to approach him and take him down to the ground?

A    On the whole scenario before going hands-on is approximately a minute.

Q    Approximately from what point in time to where, sir?  I'm talking about the point in time -- let's make it very clear what I'm asking you.  I asked you, your first command when you approached him -- *Let me see your hands* -- up until the point in time when he showed his hands?

THE COURT:  Just moment.  I believe the question is -- it's twofold.  One is, the scenario of when you first arrived in that time to the confrontation or the incident versus the time you're giving the first command to the time of the incident.

MS. MKRTCHYAN:  No, Your Honor, that's not my question.

THE COURT:  My apologies.  Sustained.

Re-ask it then.  It's not clear.

BY MS. MKRTCHYAN:

Q    We're talking about the point in time when you're

*Deborah D. Parker, U.S. Court Reporter*

191

approaching him.

MS. MKRTCHYAN: Let's play this tape.

THE COURT: Counsel, that's the problem. In approaching -- they are approaching for some period of time before the commands are given. There's some period of time after the command and between the incident. That's what's confusing. That's why I'm sustaining it.

Okay. Please.

BY MS. MKRTCHYAN:

Q   According to you, your testimony here under oath, it took 20 -- at least 20 seconds for him to show his hands?

MS. NALTSAS: Asked and answered.

THE COURT: Overruled.

THE WITNESS: At what point? When I'm talking towards him or when I give him the first command?

BY MS. MKRTCHYAN:

Q   The point in time when we hear you say, "Let me see your hands." That's the first command you tell him to show you his hands. True?

A   Correct.

Q   In other words, how would he know if you're not giving him commands what to do? I'm talking specifically the command you gave "let me see your hands" and how much time had passed until he showed his hands?

MS. NALTSAS: Objection. Argumentative and

*Deborah D. Parker, U.S. Court Reporter*

192

compound.

THE COURT: Overruled.

So we're talking about the time of the command until the time of the incident.

THE WITNESS: 10 to 15 seconds.

BY MS. MKRTCHYAN:

Q    And how much time passed from the time you said "Let me see your hands" until the time he was taken down to the ground?

A    45 seconds to a minute.

Q    Okay. That's according to your view of the video or is it from your independent recollection as of right now you're sitting here today?

A    It's my recollection and everything: The reports, the video, PVS.

MS. MKRTCHYAN: Okay. So let's play the video, please. And that's going to be starting at 5:43.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    This is 5:02:33 seconds, right? 5:02:33. That's your first command when you're running towards his campsite at 65, "Let me see your hands." True?

A    True.

Q    Going back to your report -- this is what you wrote at this juncture, so we're going to compare this PVS with your

*Deborah D. Parker, U.S. Court Reporter*

193

report.  You wrote:  Jeremy was standing between the tent and an unlit fire pit.  There were multiple large bladed knives on the ground within reach of him.  Jeremy had both of his hands in his pocket and appeared agitated.

I began giving verbal commands to Jeremy, *Show me your hands.*  Jeremy ignored my commands.  I then pointed my handgun at Jeremy, in order to him to show me his hands for a second time.  Jeremy would not remove his hands from his pockets.  I ordered Jeremy to lay on the ground and he refused.

This is what you wrote in your report related to that point in time that we see on PVS.  True?

A    True.

Q    Okay.  So first couple of observations here that I would like to ask you.  You say "I see large bladed knives on the ground within reach of him," right?  This is all of you, you wrote this in your report.  All of you, the same thing, right?

MR. WRONIAK:  Objection.  Argumentative.

BY MS. MKRTCHYAN:

Q    All of you have claimed that Holloway had large bladed knives on the ground within reach.  True?

A    Yes.

MR. WRONIAK:  Objection.

////

*Deborah D. Parker, U.S. Court Reporter*

194

BY MS. MKRTCHYAN:

Q    Okay.  What do you make of that fact that right there on your Patrol Vehicle Recording after use of force is finished, your car is turned around.  We can see Holloway being picked up from the ground.  There are no large bladed knives anywhere on that ground that we can see.

What do you want to make of that?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  You've seen video, correct?

THE WITNESS:  Correct, Your Honor.

THE COURT:  You can respond.

THE WITNESS:  No, not from the point of the video.

BY MS. MKRTCHYAN:

Q    Well, we have Brown -- Deputy Brown is asked by Deputy Renegar, *Please, grab all the knives.*

Do you remember that part?

A    I don't remember being there when he told him that.

Q    Okay.  I'm talking about your Patrol Vehicle Recording that can be observed on your recording.  True?

A    Yes.

Q    Okay.  What do you make of the fact that Brown does not reach for knives on the ground.  He goes into the tent.  He picks up the knives and he puts them on the picnic table.

What do you make of that?

MR. WRONIAK:  Objection.  Argumentative.  Assumes

*Deborah D. Parker, U.S. Court Reporter*

195

facts.

THE COURT:  Well, if he saw Brown he can testify as to what he saw.

Overruled.

THE WITNESS:  I did not see him that day.  I just saw what was on the recording.

BY MS. MKRTCHYAN:

Q    On the recording, you see what he does; isn't it true?

A    Partially.

Q    Okay.  In any event, let's continue on.  So you say that he did not even show his hands until twice you ordered him to do so, right?

A    Correct.

Q    Okay.  And then you say because he was not showing me his hands for the second time, then I had my gun drawn.  You saw, you know, I ordered Jeremy, et cetera.

Let's read this again:  I began giving verbal commands.  Show me your hands.  Jeremy ignored.  I then pointed my handgun at him and ordered him to show me his hands for a second time.

Do you see that?

A    Yes.

Q    If you had your handgun from the very beginning, you approached him; isn't it true?

A    No.

*Deborah D. Parker, U.S. Court Reporter*

196

Q    Well, let's go back again and see.  You had your handgun from the very beginning in your hands before you even made the command "Let me see your hands."

THE COURT:  Is that a question?

MS. MKRTCHYAN:  Yes.  That's a question, Your Honor.

THE COURT:  All right.  Your answer?

THE WITNESS:  Can we watch the video?

BY MS. MKRTCHYAN:

Q    Sure, we will watch the video.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Did you see yourself in that tape?

A    Yes.

Q    Was it able -- were you able to see what was in your hands?

A    Flashlight.

Q    Only flashlight?

A    Yes.

Q    Not your handgun?

A    That was Deputy Gonzalez.

Q    Okay, sir.  So you're telling us that whatever you were holding in your hands, that was a flashlight, not your handgun?

MR. WRONIAK:  Objection.  Argumentative.

*Deborah D. Parker, U.S. Court Reporter*

197

THE COURT:  You can answer the question if it was a handgun or flashlight?

BY MS. MKRTCHYAN:

Q   And your handgun --

THE COURT:  Counsel, there's a question pending, whether it was a handgun or a flashlight.

MS. MKRTCHYAN:  I think he answered and now we're going to play the tape, Your Honor.

THE COURT:  All right.  Had you answered that question?  I want to make sure.

THE WITNESS:  What was the question?

THE COURT:  Whether it was a handgun or flashlight?

THE WITNESS:  I was holding a flashlight.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q   We'll move on from this point but, you know, meanwhile we'll come back to that.

So then, sir, let's look at the rest of his report until he figures that out.

"Then I ordered Jeremy to lay on the ground and he refused," right?  That's what you wrote?

A   Yes.

Q   This is after he showed his hands to you.  True?  He already showed his hands to you and then you were still

*Deborah D. Parker, U.S. Court Reporter*

198

telling him, "Get down to the ground."  True?

A    Can you repeat that?

Q    Well, you wrote *(Reading)*:

"Due to Jeremy's continued noncompliance, Deputy Renegar approached Jeremy.  Jeremy pulled his hands out of his pockets and placed them straight out to the side in formation of a cross.  Deputy Renegar attempted to take Jeremy to the ground using an arm-bar takedown on Jeremy's left arm," et cetera.

So the way we understand your report that is even after he complies and shows his hands, we have Deputy Renegar still going down and taking him into an arm-bar takedown.  True?

A    Correct.

Q    Okay.  The way we heard from Deputy Renegar is that he was showing his hands but multiple times there were commands to get down on the ground and he was hesitant to get down on the ground, but he was standing with his hands out to his sides.

Is that not the description of how this happened, according to you and your memory?

MR. WRONIAK:  Objection.  Vague.

THE COURT:  Okay.  The way we heard from

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00937                    5-RenSER-00937

199

Deputy Renegar is that he was --

Deb, the word? You've got "smog his hands," but --

THE COURT REPORTER: -- he was showing his hands multiple times --

THE COURT: -- showing his hands but multiple times there were commands to get down on the ground and he was -- standing?

THE COURT REPORTER: No. Just a second -- hesitant --

THE COURT: -- hesitant to get down on the ground.

THE WITNESS: Could you repeat that?

MS. MKRTCHYAN: Sure.

BY MS. MKRTCHYAN:

Q    The way we understand from your report is that:

"Mr. Holloway was not showing his hands. That's why Deputy Renegar approached him, based on this report that you wrote. Because you wrote, I ordered Jeremy to lay on the ground. He refused. Due to Jeremy's continued noncompliance Deputy Renegar approached Jeremy. Jeremy pulled his hands out of his pockets and placed them straight out to the side in formation of a cross.

*Deborah D. Parker, U.S. Court Reporter*

200

Deputy Renegar attempted to take Jeremy
to the ground using an arm-bar
takedown."

Did I read that right?

A    Yes.

Q    He was not showing his hands until Renegar approaches him.  That's based on your report.  True?

A    Yes.

Q    Okay.  Well, Gonzalez testified that as we told him, as we ordered him to show his hands, he showed his hands.

MS. NALTSAS:  Objection.

BY MS. MKRTCHYAN:

Q    He was refusing to get down to the ground.

MS. NALTSAS:  Objection.  Misstates the testimony.

BY MS. MKRTCHYAN:

Q    Would you like me to show --

MS. NALTSAS:  Objection.  Relevance.

THE COURT:  Sustained.

Ask him what he saw and did, Counsel.

MS. MKRTCHYAN:  That's what I'm trying to figure out.

BY MS. MKRTCHYAN:

Q    So if Gonzalez said that he didn't show his hands before Renegar approached him, will that be inconsistent with your report, sir?

*Deborah D. Parker, U.S. Court Reporter*

201

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  You can answer that question.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    Well, based on your report, things happened [sic] different chronological order.  True?

MS. NALTSAS:  Objection.  Argumentative.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q    Okay.  Let's go back to the video because we want to go back to the video and see exactly how you approached and what orders you gave and how many seconds it took.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Are you right or left-handed, sir?

A    Right-handed.

Q    Okay.  So we see you with your left-hand reaching for your flashlight and you show your flashlight.  True?

A    Yes.

Q    But with your right hand, you're holding your weapon; isn't it true?

MR. WRONIAK:  Objection.  Asked and answered.

403.

*Deborah D. Parker, U.S. Court Reporter*

202

THE COURT: Overruled.

THE WITNESS: You can see me pull it out at the end of the clip. And I'm holding it at a low ready position.

BY MS. MKRTCHYAN:

Q Okay. But when I asked you, were you drawing your [sic] guns when you were approaching to Holloway's campsite, you said, *No, I was holding my flashlight.* You see it on this tape. Let's back up a little bit.

You are going for your flashlight with your left arm and your right arm is going for your gun. And Gonzalez is also doing the same thing; isn't it true?

MR. WRONIAK: Objection. Misstates the testimony.

THE COURT: Overruled.

MS. MKRTCHYAN: Let's go back and play this part.

*(The exhibit was displayed on the screen.)*

BY MS. MKRTCHYAN:

Q We have Gonzales to the right. And you are on the left -- true? -- on this tape?

A True.

Q Okay. And Gonzalez is holding also flashlight with his left hand and the gun in his right hand. True?

A I don't know if that's his gun or his Taser at that point. It's too blurry.

Q You can speak -- you know, you were holding your

*Deborah D. Parker, U.S. Court Reporter*

203

left -- you know, we established you were holding your gun already at this point in time.  True?

A    True.

MS. MKRTCHYAN:  Let's continue playing.  And then stop at the point in time where it says, "Let me see your hands."

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    So this is at 5:02:33 seconds.  You made that command, right?

A    Yes.

Q    Okay.  Let's see how much time passes from the point in time that we can tell something is happening in terms of officers reaching to him, contacting him and taking him down to the ground.

MS. MKRTCHYAN:  Let's play this.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    So let me just -- couple of things in between that happened.  In between this period of time -- so we stopped right now at 5:03:12 seconds.

We heard the first command made by you, "Let me see your hands," 5:02:33 seconds, right?

A    Correct.

Q    Okay.  That was not yet "Get down on the ground."

*Deborah D. Parker, U.S. Court Reporter*

204

Your first command was "Let me see your hands," right?

A     Correct.

Q     Okay.  And you're telling us he didn't show his hands?

A     Not initially, no.

Q     And how many seconds you see passed from that initial command until he actually showed his hands?

A     10 to 15 seconds.

Q     Okay.  10 to 15 seconds.  And then you said, "Get down on the ground."  True?

A     Correct.

Q     Okay.  So let's go back and see what was -- who said, "Get down to the ground" the first time.  Very first time "Get down on the ground," and let's calculate how much time -- how much time passed -- how much time you gave to this man to get down on the ground.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q     So let's also establish what Mr. Holloway said.  When you said "Let me see your hands," what did he say?

A     "You guys already been here."

Q     Okay.  That's a valid question and valid response. True?  Because you were just there before and you didn't arrest him a few minutes before.  True?

MR. WRONIAK:  Objection.  Argumentative.

*Deborah D. Parker, U.S. Court Reporter*

205

BY MS. MKRTCHYAN:

Q    True?

THE COURT:  It's two questions.  First, is it a valid question?  But the question is, the second part:  You were just there before and you didn't arrest him, which is a question you can answer.

You were there before and you did not arrest him, correct?

THE WITNESS:  Correct.

BY MS. MKRTCHYAN:

Q    I mean, is that reasonable for that person to ask you: You were just here?

MR. WRONIAK:  Objection.  Vague.  Speculation. Legal conclusion.

THE COURT:  Are you asking if that's reasonable from the officer's perspective?

MS. MKRTCHYAN:  Yes.

THE COURT:  You can answer that.

THE WITNESS:  Sure.

BY MS. MKRTCHYAN:

Q    Okay.  So 5:02:37 seconds is the first time you say, "Get down on the ground."  You, yourself.  True?

A    True.

MS. MKRTCHYAN:  Okay.  Let's continue playing that, please.

*Deborah D. Parker, U.S. Court Reporter*

206

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q   Let's stop right there.

So while you're telling him "Get down on the ground," among each other, three officers, gunpoint are talking about lethal and Taser.  True?

MS. NALTSAS:  Objection.  Misstates the facts.  Misstates the evidence.

THE COURT:  Overruled.

THE WITNESS:  I don't know if all three of us have our guns out at that point.

BY MS. MKRTCHYAN:

Q   In any event, sir, Gonzalez said "I holstered my gun and got my Taser out" at some point, right?  We know that?

MR. WRONIAK:  Objection.  Speculation.

THE COURT:  Well, from the video.  I assume he's testifying from his video or his recollection.

Overruled.

THE WITNESS:  You can't see that in the video, but we discuss --

BY MS. MKRTCHYAN:

Q   You discussed, you've got lethal.  You have less lethal.  True?

A   Yes.

Q   And that is done why?  Why do you have to discuss among

*Deborah D. Parker, U.S. Court Reporter*

207

officers about what weapons they have?

A    Force options and we're verbalizing that for tactical reasons.  There's no point to have three guns pointed at him when we have other weapons.  So by me saying "I have lethal" that is a hint to my partner to pull out a less lethal option, because it might be a situation where I can't use my firearm.  If were to run at me, the Taser might be a better option.  So it just gives us force options.

I had my gun out.  Deputy Gonzalez pulled out his Taser and then Deputy Renegar decided to go hands-on.  There's three different force options that we were utilizing.

Q    So, in other words, sir, in force situations where you might be expected to use force, you're trained to be aware what other officers are or are not doing.  True?

MR. WRONIAK:  Objection.  Vague.  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  To a certain extent.

MS. MKRTCHYAN:  Okay.  So let's continue playing here.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    So this is point in time when there is the -- "I'm not moving" and we hear struggle already, someone -- we know

*Deborah D. Parker, U.S. Court Reporter*

208

that Renegar is the one, according to your report, you wrote: "Attempted to take Jeremy to the ground, using an arm-bar takedown on Jeremy's left arm."

That's what you wrote, right?

A   Yes.

Q   As far as this tape is concerned, on your tape, the point in time when you said "Get down on the ground" is 5:02:37 seconds.  At the point in time when we can hear something is ongoing, a struggle ensues, it's 5:03:11.  So --

A   Those are incorrect times.

Q   Sir, we can go back and see when we hear the first time Mr. Holloway says, *I'm not -- why am I being --*

And then stopping right there, we can tell that now there's a struggle ongoing.  So let's go back again.  And that's about -- how many seconds is that if you calculate that?

A   You're changing --

*(Overtalking:  Unable to report.)*

BY MS. MKRTCHYAN:

Q   What I am changing, sir?

You tell me based on your understanding.  How many seconds is it based on your tape that -- from the point in time you say "Get down on the ground" and he's taken down to the ground from your understanding?

*Deborah D. Parker, U.S. Court Reporter*

209

A    I would say 49 seconds.

Q    Okay.  Based on Renegar's tape, the way we could tell from Renegar's tape, for example, it was about 29 seconds.

Do you have any reason to doubt that?

MR. WRONIAK:  Objection.  Argumentative. Foundation.  Speculation.

THE COURT:  No, his best memory is 49 seconds, Counsel, on --

Sustained.  We'll take his --

BY MS. MKRTCHYAN:

Q    Okay.  In any event, the video speaks for itself.  But do you think even 49 seconds under this circumstances, when you have just left this man within 20 minutes having not arrested him, having not found any criminal -- you know, behavior by him, no criminal contraband, nothing.  You left him.  Do you think it's enough time for him to understand now why he's being detained if you're not giving him any information but telling him at gunpoint, "Get down on the ground"?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  It's argumentative, Counsel.

You can reserve that for argument.

Sustained.

BY MS. MKRTCHYAN:

Q    As an officer, as your training is concerned, you're

*Deborah D. Parker, U.S. Court Reporter*

210

trained in tactical communications to gain compliance by suspects.  True?

A     Yes.

Q     You were investigating him, right?

A     Yes.

Q     He was a suspect?

A     Possibly.

Q     You still did not have probable cause to arrest him for a crime because you were still investigating.  True?

MS. NALTSAS:  Objection.  Outside the scope.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Correct.

BY MS. MKRTCHYAN:

Q     So if you're investigating the crime, you're engaging with a suspect.  You need to communicate to that person what you're doing so they gain voluntary compliance so that there's no force applied; isn't it true?  That's your policy?

MS. NALTSAS:  Objection.  Incomplete hypothetical.

THE COURT:  You can answer from your perspective of the time of this incident.  Not a generalized question.

THE WITNESS:  We did give him commands.

BY MS. MKRTCHYAN:

Q     If you're telling me "Get down on the ground" without

*Deborah D. Parker, U.S. Court Reporter*

211

telling me why, do you think that's sufficient information for me to comply?

MR. WRONIAK: Objection. Argumentative. Foundation. Speculation as to "her."

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    Let's go back to your report. So it appears that, you know, because Jeremy was refusing to get down on the ground and Renegar approached Jeremy, even before Jeremy showed his hands and he tried to do an arm-bar takedown. That's where we are on your report. So far, so good?

A    Yes.

Q    Okay. And then you wrote: "As Jeremy was going towards the ground, he begin to stand back up."

So you're seeing this as you are writing. How far were you from him when you saw this occurring?

A    15 to 20 feet.

Q    How far was Gonzalez when this was occurring?

A    I'm not sure his exact distance.

Q    Okay. So you're telling me -- you guys are officers. You have officer safety concerns. This man is dangerous. There are knives on the ground and, yet, you allowed Renegar approach this dangerous -- very dangerous suspect by himself, not you or Gonzales going by his side?

MR. WRONIAK: Objection. Argumentative.

*Deborah D. Parker, U.S. Court Reporter*

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Can you repeat the question?

BY MS. MKRTCHYAN:

Q    You told us from the very beginning of this case this man was dangerous.  There were knives on the ground.  He was not showing his hands.  He was agitated.  And, yet, according to your report that Deputy Renegar approached him by himself and you're telling me you were 15 feet away.  Gonzalez, you're not even sure where he was.  That this man was not a danger; isn't it true?

A    Well, I know where Gonzalez was.  I just don't have the exact footage.

Q    Well, I didn't ask you exact footage.

Did I tell you tell me -- measure the tape where he was on that campsite?  No.  I asked you where was Gonzalez when Renegar approached him?

A    To the left of me.

THE COURT:  Counsel, lower your voice.

BY MS. MKRTCHYAN:

Q    15 feet away?

THE COURT:  Counsel.  Counsel, just a moment. Lower your voice, okay?

Just ask questions now.  Stop the yelling.

////

*Deborah D. Parker, U.S. Court Reporter*

213

BY MS. MKRTCHYAN:

Q    15 feet away?

A    Approximately.

Q    Okay.  So both of you -- you're telling me that Renegar is approaching Mr. Holloway who is a danger, who has not been searched yet, who has knives within his reach, who is not showing his hands while you with Gonzales are 50 feet away from him; is that true?

A    Correct.

Q    Okay.  Very interesting.

         MR. WRONIAK:  Objection.  Argumentative.  Move to strike.

         THE COURT:  Sustained.

         Strike "very interesting."  It's improper.

BY MS. MKRTCHYAN:

Q    So this man was, therefore, not a danger.  If one man, one officer approaches him without backup, without cover.  So that if this man really actually has a knife, he pokes at him, then therefore he's alone?

A    That's not true.

Q    Okay.  Well, then what is true?  Is this -- either this man was a danger.  You allowed your partner to approach him by himself, or was he -- he was not a danger, and you were just assaulting him for no reason.

         MS. NALTSAS:  Objection.  Argumentative.

*Deborah D. Parker, U.S. Court Reporter*

214

THE COURT: I don't understand the question, Counsel.

Re-ask the question.

BY MS. MKRTCHYAN:

Q   Let's move forward from that point in time.

So Renegar approaches him by himself. You're 15 feet away. Renegar then, you write -- let's look at your report: "Renegar fell to the ground with Jeremy and was struggling to keep Jeremy from getting back up to his feet."

You saw this, right?

A   Yes.

Q   Okay. So Renegar approached him by himself. He tried to grab Jeremy by his arm and they fell to the ground. That's what you wrote.

A   Yes.

Q   Well, are you aware that Gonzalez testified something entirely different from what you write here?

MS. NALTSAS: Objection. Misstates the testimony.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q   Are you aware that Gonzales said that I saw -- "I was close enough when I saw Renegar not being able to do the arm-bar takedown. I actually immediately got involved. I holstered my Taser and went forth to grab him."

Are you aware of that?

*Deborah D. Parker, U.S. Court Reporter*

215

MS. NALTSAS: Objection. Misstates the testimony.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q   So if you were 15 feet away, you wouldn't have been able to get involved timely if Chad Renegar was in danger. True?

A   Not true.

Q   Okay. Let's continue on: "I immediately holstered my handgun so I could assist Deputy Renegar."

It doesn't say how far you are from them. It doesn't say how you approached. You basically write -- it's not clear where you are. You just say, "I immediately holstered my handgun so that I could assist Deputy Renegar." True?

MR. WRONIAK: Objection. Compound. Argumentative.

THE COURT: If the first question is about you immediately holstering your handgun so you could assist Renegar; is that true?

THE WITNESS: Yes.

BY MS. MKRTCHYAN:

Q   Okay. And then you write -- it doesn't say how you changed your positions, from where changed your position, how fast you walked.

You wrote, "I took Jeremy to the ground with the

*Deborah D. Parker, U.S. Court Reporter*

216

assistance of Deputies Renegar and Gonzales," right?

Do you see that?

A    Correct.

Q    You also don't know any information about how Gonzalez ended up there, how you ended up there.  All we see is that you holstered your handgun to assist and then you went and assisted, you know, Renegar and Gonzales to take him down to the ground.  True?

MS. NALTSAS:  Objection.  Argumentative. Compound.

THE COURT:  Sustained.  Compound.

BY MS. MKRTCHYAN:

Q    So it took three of you, in other words?  Three of you to take this one man on the ground?

A    For him to be flat on the ground, yes.

Q    "Once on the ground, I attempted to gain control of Jeremy's hands, but he was tucking them underneath his body near his front waistband."

You wrote this, right?

A    Yes.

Q    And this was at the time you were already on the ground with him.  True?

A    Yes.

Q    Okay.  Nowhere here any information that you saw Mr. Holloway either attempt or grab anyone's ballistic vest.

*Deborah D. Parker, U.S. Court Reporter*

217

True?

A     True.

Q     No information here anywhere in your report that Mr. Holloway was able to place Chad Renegar in a headlock. True?

A     True.

Q     So you didn't see that?

A     No.

Q     You didn't see any aggressive movements by Holloway towards any of the officers.  True?

MS. NALTSAS:  Objection.  Vague.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  That's not true.

BY MS. MKRTCHYAN:

Q     Okay.  Let's see what kind of -- did you see him strike at any officer?

A     I did not see him punch any officer, no.

Q     Okay.  Did you see him place any officer in a headlock? Do you know what is a headlock?

MR. WRONIAK:  Objection.  Compound.  Asked and answered.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yes.

*Deborah D. Parker, U.S. Court Reporter*

218

BY MS. MKRTCHYAN:

Q    Did you see him wrap his left arm around someone's neck?

A    No.

Q    Did you see him attempt to grab and reach for someone's weapon?

A    No.

Q    Did you see him grab someone's ballistic vest?

A    No.

Q    The only thing you saw is that he was tucking his hands underneath his body near his waistband.

A "waistband" is this area (indicating), right? For the record, I'm showing are front of my -- I don't know, the waist area.  True?

That's the waist area?

A    Yes.

Q    Okay.  Not the chest area, right?

A    Correct.

Q    So if Gonzales said he was -- he went down.  He was tucking his arms underneath his chest area, would that be inconsistent with your recollection?

MR. WRONIAK:  Objection.  Misstates the testimony. Foundation.  Speculation.

THE COURT:  There's a question:  Would it be inconsistent if Gonzalez saw him tuck his arms underneath

219

his chest, instead of underneath his body?

MS. MKRTCHYAN: Your Honor, that's incorrect. That's not my question.

THE COURT: All right. Sustained.

BY MS. MKRTCHYAN:

Q    If Gonzalez said that he saw right around the same time Mr. Holloway tuck his arms underneath his chest area, not waistband area as you said, would that be consistent with your recollection?

A    Yes. This was a fluid situation and they both had contact before I did.

Q    Oh, fluid situation. So -- but did you -- this is what I'm asking you now: Did you ever see him place his hands under his chest area?

A    No, I did not.

Q    Okay. Now -- so, then, you wrote: "I ordered Jeremy to give me his hands for a third time. He ignored my command."

So this is the third time from the beginning -- very beginning when you approached and said, "Let me see your hands"?

Is this how you're counting this?

A    Could you repeat that?

Q    Because it says "third time." I'm trying to understand where is the second time, the first time that he was

*Deborah D. Parker, U.S. Court Reporter*

220

refusing you to show his hands.

A    I don't understand.

Q    Well, you wrote here -- you wrote:  "I ordered Jeremy to give me his hands for a third time, and he ignored my command."

You're counting from the very first time that you approached and you said, "Let me see your hands"?  Or is this some other time in chronology of this events?

A    Where at in the report?

Q    Sir, going back to the paragraph right before that, you said, basically, "Show me your hands.  Jeremy ignored my command."  Do you see that?

Is that the first time that you gave him command and he ignored?

A    Yes.

Q    But you're telling me that this is the third time he's refusing to show his hands to you?

A    Are you talking about before we made contact or after contact?

Q    Well, I'm talking about your report, the way you wrote it.  You said this is the third time that he ignored my command.  But we know for a fact --

    (Court Reporter requests clarification for the record.)

////

*Deborah D. Parker, U.S. Court Reporter*

221

BY MS. MKRTCHYAN:

Q    Let me slow down.

We know before he was taken down to the ground, he showed his hands to you.  All three of you.  He was standing there like a cross.  True?

MS. NALTSAS:  Objection.  Misstates the document and the evidence.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Can you repeat the question?

BY MS. MKRTCHYAN:

Q    Because you're making it look like this man is consistently refusing to comply with your commands.  True?

MS. NALTSAS:  Objection.

BY MS. MKRTCHYAN:

Q    You said, "Third time he ignored my command."

A    It was a different command, though.

Q    What command.  Did you say, *I order you to show* -- to give me his hands for a third time?  What command are we talking about?

Tell me in your chronology.

A    The first two times I said "Show me your hands," and that was while I was standing.  The third time, I ordered him to give me his hands.  That's during the use of force.

Q    Well, on your PVS tape, we never hear you actually say

*Deborah D. Parker, U.S. Court Reporter*

222

that, that "Give me your hands."  I don't hear you say that.

Do you hear that?  You can point us?

MS. NALTSAS:  Objection.  Misstates the evidence.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    On the tape, can we hear you actually loudly say that: "Give me your hands"?

MS. NALTSAS:  Same objection.

THE COURT:  You can answer the question.

THE WITNESS:  To my knowledge, yes.

BY MS. MKRTCHYAN:

Q    Okay.  We'll play the tape in a moment.

So that's what you reference when you say, *Third time he's not giving me his hands*?

A    Correct.  Different wording.

Q    Okay.  So, basically, twice he didn't listen to you. He didn't show his hands before he was taken down to the ground, right?

A    Correct.

Q    Okay.  And then three times on the ground, he was not listening to your commands?

A    No.

Q    Okay.  That's what you say third time and he ignored my command?

A    The third time.  But you said "three times on the

*Deborah D. Parker, U.S. Court Reporter*

223

ground."  I only said it once on the ground.

Q    Okay.  Let's move on.  "I moved around to Jeremy's" --

This is what you did:  "I moved around to Jeremy's upper torso and placed my knee on his upper back and head in order to get a better angle to gain control of his arms."

This is what you wrote, right?

A    Correct.

Q    Please describe to us how that actually happened.

A    Do you want me to demonstrate it?

Q    No, I don't need demonstration.  Just tell me what side of his body you placed your body -- you said, "I placed my knee on his upper back and head."

Just tell us how did that happen?

A    Well, I was on the left side trying to get his left arm, pulling on his bicep.  And then I could not get his left arm out.  I transitioned to the right side where I placed my knee and I was trying to get the right arm with Deputy Gonzalez.

Q    So two officers could not get his right arm?

A    Correct.

Q    Okay.  But you say you placed your upper -- your knee on his upper back and head.  What does that mean to us?

A    I would have to show you.  I demonstrated it on video for you at the deposition.

Q    I don't want to do demonstrations, because isn't it

*Deborah D. Parker, U.S. Court Reporter*

224

true this courtroom is not accurate?  This is not the campground where you were.

THE COURT:  You can describe it as best you can.

THE WITNESS:  So I would kneel on my right knee, basically, over the shoulder on the upper back trap area, and then it would be along his head as well.  It's kind of hard to describe without --

BY MS. MKRTCHYAN:

Q   Well, you were kneeing his upper shoulders and head -- as well the head?

MS. NALTSAS:  Objection.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q   You had your knee -- describe to us how much weight did you put on that -- on that -- in that position.  Were both knees on top of him, or one knee?  Explain to us.

A   I had one knee.  My right knee.

Q   Where was your other knee?

A   In the dirt.

Q   Okay.  Were you placing any body weight on him?

A   Yes.

Q   Okay.  Was -- how much body weight did you apply on him?

A   I don't think we can figure that out.

Q   Okay.  So -- but how long was this position?  How long

*Deborah D. Parker, U.S. Court Reporter*

225

did it last?

A    Five, 10 seconds.

Q    And then what happened?

A    Then Deputy Borba yelled, "Cuffs."  And that's when I transitioned back to the left side and used my handcuffs to place him on his left wrist.

Q    Well, in the middle of that, did anything else happen before he was placed in handcuffs?

A    Yes.

Q    What else happened?

A    Taser was deployed.

Q    So Taser was deployed by Deputy Renegar.  True?

A    True.

Q    And what was your position when the Taser was deployed?

A    So when I was on his left side grabbing his left bicep, trying to get it out, I heard "Taser, Taser, Taser," which was a command for Renegar which let me know that the Taser was about to be deployed.  At that time, I transitioned to the right side, placed my right knee on the upper back head area, began pulling on his right arm with Deputy Gonzalez.  And then I heard, "Cuffs, cuffs, cuffs."  Transition back to the left side.  Place the handcuffs on him.

Q    So where we're talking about transiting on his body, right?

        You're not going around his body, right?

*Deborah D. Parker, U.S. Court Reporter*

226

A   No.   These were close transitions.   This is like close quarters.   Wrestling, basically.

Q   Well, sir, he's face down.   True?   Let's imagine. Let's make it very clear what is happening.   He's face down. He's not facing you.   True?

A   True.

Q   We have Gonzalez around you that you're aware of -- true? -- assisting you?

A   True.

Q   You became aware at some point of Borba arriving and also assisting you.

A   True.

Q   And you were aware of Renegar.   True?

A   True.

Q   So you're saying "transitioning."   We know for a fact, Renegar Tasered him in his butt area while holding his leg.

Did you see that?

A   I did not see it.

Q   Well, you were there.   What position were you when actually the Taser was applied?

A   So when I heard "Taser, Taser, Taser," I was on his left bicep facing Mr. Holloway's head.   Renegar would be behind me.   As I was moving to the right to transition, I heard the Taser go off.

Q   Were you still holding his hand when Taser went off?

*Deborah D. Parker, U.S. Court Reporter*

227

A    No, not his left hand.

Q    Did you release his hand?

A    Yes.  I could not get it, so I figured me and Deputy Gonzalez would be able to get his right hand together.

Q    So both you and Gonzales could not get this man's right hand?

A    Correct.

Q    And isn't it true he was screaming?  He was screaming, *You're kneeing me in the head.*  And he was trying to pull his right arm to cover his head from getting kneed?

          MR. WRONIAK:  Objection.  Speculation.

          THE COURT:  Overruled.

          THE WITNESS:  No, he continued to keep his hands clasped underneath him.

BY MS. MKRTCHYAN:

Q    Well, how did he then -- how did he get blood on his jacket on the right sleeve, if that's what you're telling us?

          MS. NALTSAS:  Objection.  Misstates --

BY MS. MKRTCHYAN:

Q    He's tucking his hands under his waistband, as you're telling us and you're unable to grab his arms from underneath his body -- first of all, how did you see him having that much blood on his sleeve, especially on the

*Deborah D. Parker, U.S. Court Reporter*

228

right sleeve of his jacket, sir?

MR. WRONIAK:  Objection.  Compound.

THE COURT:  Counsel, it's compound.

Just re-ask the question.

BY MS. MKRTCHYAN:

Q    Did you see the photographs taken by
Deputy Chad Renegar that night?

A    Yes.

Q    And you saw him bleeding when you picked him up from
the ground, if not before.  True?

A    I did not see where he was bleeding from, no.

Q    Did you become aware that he was injured?

A    Yes.

Q    What point in time did you become aware?

A    When someone called County Fire for him to be checked
out.

Q    So before then when people were screaming, "Blood,
blood" and he was screaming, you didn't hear that?

MR. WRONIAK:  Objection.  Argumentative.  Assumes
facts not in evidence.

THE COURT:  Just a moment.

"ANSWER:  When someone called County Fire for him
to be checked out.

"QUESTION:  So before then when people were
screaming "Blood, blood" and he was screaming, you

*Deborah D. Parker, U.S. Court Reporter*

didn't hear that?

Sustained.

BY MS. MKRTCHYAN:

Q    So you were completely unaware that he was injured.  He was bleeding until paramedics were called -- fire was called?

A    That was me on the PVS.  I said, "We've got blood."  At that point, I saw blood on the dirt from the ambient lighting.  And I didn't know who the blood was coming from.  I didn't know if it was from Mr. Holloway or if it was from another deputy.

Q    So when he was screaming on that ground, *You're kneeing me in head.  I've got blood in my head.*  You didn't hear none of that?

A    I heard that.

Q    So then why are you saying that I thought it could be another [sic] deputies?

A    Because I just saw some blood on the dirt.  It could have been his.  It could have been another deputy that was injured.  I didn't know who was bleeding at the time.

Q    Sir, I'm talking about during use of force.  Is my question clear?

During use of force when he's screaming, *There's blood in my head.  You're kneeing me in the head,* et cetera, and officers are saying, *Blood, blood,* are you becoming

230

aware of that at that point in time or no?  That's my question.

MS. NALTSAS:  Asked and answered.

THE COURT:  No, overruled.

Counsel, the time you're referring to, is this during the scuffle?

MS. MKRTCHYAN:  Yes.

THE COURT:  Okay.  You can answer that.

THE WITNESS:  I was the one that said "We've got blood" on the PVS.

BY MS. MKRTCHYAN:

Q    So you then became aware that he was bleeding?

MR. WRONIAK:  Objection.  Asked and answered. 403.

THE COURT:  No, overruled.

You can answer the question.

THE WITNESS:  Yes.  I didn't know if Mr. Holloway was bleeding or if it was from another deputy.

THE COURT:  Now, it has been answered now twice, Counsel.

BY MS. MKRTCHYAN:

Q    Is only -- when did you learn that he was the one who was injured?

A    After he was handcuffed and we called County Fire.

Q    And you didn't hear him complaining that you kneed me

*Deborah D. Parker, U.S. Court Reporter*

231

and struck me in the head either.

You didn't hear that?

A    I did hear that.

Q    Okay.  That's what I'm asking you, sir.  When he was saying *Someone kneed me in the head,* et cetera, complaining before, during after use of force, did that -- did that register in your mind?

MR. WRONIAK:  Objection.  Vague.

THE COURT:  That's what I'm asking you, sir.

"When he was saying *Someone kneed me in the head,* et cetera, complaining before, during after use of force, did that -- did that register in your mind?"

Do you understand the question?

THE WITNESS:  No, Your Honor.

THE COURT:  Re-ask the question, Counsel.

BY MS. MKRTCHYAN:

Q    In other words, sir, isn't it true in your report there is absolutely no indication of Mr. Holloway sustaining head injuries?

A    No, not in my report.

Q    Nowhere in your report there's any indication how this man could have gotten this head injuries.  True?

A    That would be in the primary report.

Q    I'm asking you, you were the one who wrote this report,

*Deborah D. Parker, U.S. Court Reporter*

232

right?

A    Correct.  I wrote a supplemental report.

Q    Okay.  And nowhere in this report there's any indication about Mr. Holloway either getting struck in the head or sustaining any injuries to his head.  True?

A    Not in my report.

Q    Nor is there any explanation, one way or another, whether he struck his face to the ground or whether he was kicked in the head.  No explanation how he could have sustained this injuries.  True?

A    Not in my report.

Q    And when Rawlings came to you and asked you, *Sir, did you see anyone strike him in the head,* you -- it was negative, right?

A    Correct.  I did not see that.

Q    "So I finally gained control of Jeremy's hands, placed him into handcuffs."

No indication of the Taser application in your report either.  True?

A    Correct.  I did not use the Taser.

Q    Well, okay.  Just because you didn't use the Taser, sir, are you telling us that you're not obligated to report use of force applied on a suspect?

A    I report my use of force.

Q    If you were only obligated to write only your use of

*Deborah D. Parker, U.S. Court Reporter*

233

force, why are you even mentioning in your report Deputy Renegar doing the arm-bar takedown, Gonzalez helping him?  Why are you mentioning that point in time but not the Taser in your report?

A    Those are things that I observed that led me to get involved in the use of force which is why I have to write that.  I don't -- I wasn't in Deputy Renegar's shoes, nor could I see him at the time.  So I don't know what was going on in his mind, what was happening to him, whether he was being kicked.

Q    Okay, sir.  So -- and there's no indication what Gotts was doing at the time when you saw him at the time.  True?

A    No.

Q    And you mentioned Borba, also.  No indication what Borba was doing.  Yes?

A    No.

Q    And then, so flash forward --

        THE COURT:  Counsel, about five more minutes, but I'll extend it a little bit until 4:15, okay?  About 10 more minutes.

        *(Pause.)*

BY MS. MKRTCHYAN:

Q    So as far as you're right now sitting here today, you did not, yourself, get any injuries as a result of this incident.  True?

*Deborah D. Parker, U.S. Court Reporter*

234

A    True.

Q    Okay.  And yet you were listed with not --

     *(Court Reporter requests clarification for the record.)*

BY MS. MKRTCHYAN:

Q    We have not heard Holloway battering you in any shape or form or placing you in any shape or form in a headlock. True?

          MR. WRONIAK:  Objection.  Compound.

BY MS. MKRTCHYAN:

Q    True.

          THE COURT:  Overruled.

          You can answer the question.

          THE WITNESS:  I would say resisting being detained puts me in danger.

BY MS. MKRTCHYAN:

Q    I'm sorry?

A    Resisting being detained puts me in danger.

Q    Oh, okay.  So there are five officers at the scene with complete uniforms and equipment.  And this one man was in danger when he was face down, struggling with you.  True?

          MR. WRONIAK:  Objection.  Argumentative.

BY MS. MKRTCHYAN:

Q    Yes?

          THE COURT:  Just a moment.  So you're talking

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00973                                    5-RenSER-00973

235

about in the struggle itself.

All right.  You can answer the question.

THE WITNESS:  Could you repeat that question?

BY MS. MKRTCHYAN:

Q   You're saying "resisting."  If someone is face down on the ground, multiple officers in and around him.  We know at the very least by your report, we have you, two more officers take him down to the ground.  That's force, right?  That's application of force.  True?

A   Yes.

Q   After that -- based on your report, entirely on your report, we have at the very least you, Gonzalez, Renegar using different times body weight on him, just based on your report.  True?

A   Yes.

Q   Okay.  So you're telling me three of you were unable to either take down this one man on the ground or place him in handcuffs and he was a danger to you?

A   Yes.

Q   Okay.  Sure.  And after the incident, you had conversations with your sergeant at scene.  True?

A   Yes.

Q   Okay.  And then you spoke with the reporting parties.  You did your investigation?

A   Briefly, yes.

*Deborah D. Parker, U.S. Court Reporter*

236

Q   And isn't it true when you were discussing your report with Deputy Chad Renegar, you had the opportunity to turn on your tape, your PVS recording when you were discussing the report?

A   What are you talking about?  Are you talking about on scene?

Q   Yes.  On scene.

A   My PVS was on.

Q   Well, your PVS stops after you spoke.  We saw the last time it was played by deputy -- defense counsel, your PVS vehicle recording stopped at about 5:40, right?

A   I'm not sure.  It's not in front of me.

Q   Let's go back on that and see when your last tape -- this is the third tape that we heard from you stops, the time on that, okay, when you spoke.

        MS. MKRTCHYAN:  Okay.  That's the one.  Let's see time stops, your tape.

BY MS. MKRTCHYAN:

Q   This is the exhibit that we had --

        MS. MKRTCHYAN:  No, there's another tape after that.  Let me make sure we have it clear.  No, this is the one that I'm talking about:  5:41.

    (Pause.)

        THE COURT:  Counsel, while you're -- so you don't -- so you can use this time --

*Deborah D. Parker, U.S. Court Reporter*

237

(Pause.)

THE COURT: Do you have some other questions that you can ask, please?

MS. MKRTCHYAN: I want to play the tape.

THE COURT: I'm going to let you play the tape, but if you have other questions --

BY MS. MKRTCHYAN:

Q So this is the tape -- the last tape of yours starts at 5:41 and ends about -- let me see -- 5:41 up to 5:46.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q Is this your last tape, sir? Can you corroborate for us? Confirm?

A Yes.

Q And how long was this tape?

MS. MKRTCHYAN: Can we end the tape?

BY MS. MKRTCHYAN:

Q I think we heard this tape, so we're not going to play, again.

MS. MKRTCHYAN: End the tape and go all the way and see what time it ends.

BY MS. MKRTCHYAN:

Q 5:51. That's the time you stopped your tape that day, right?

A Correct.

*Deborah D. Parker, U.S. Court Reporter*

238

Q   And after that, we know that you went back and you were talking with Deputy Chad Renegar and Gonzalez about the police report writing.  True?

A   Not true.

MS. MKRTCHYAN:  Well, let's play Renegar's tape.

Go back.

(Pause.)

(The videotape was played.)

BY MS. MKRTCHYAN:

Q   This is what I'm talking about.

Isn't this you in the baseball cap and with Gonzales -- Officer Gonzales?

A   Yes.

Q   And this is what time?  Can you tell us?  5:58.  True?

A   Yes.

Q   Okay. and so you stopped your tape at 5:51, right?

A   Correct.

Q   And then ongoing, you have a conversation with deputies Chad Renegar and Gonzales about that incident.  True?

A   Correct.  We were filling out the booking paperwork and putting them into our computer, writing a probable cause declaration.

Q   Okay.  You're discussing Holloway's incident.  True?

A   Briefly.  But we have a lot of paperwork to fill out when we arrest someone.

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00977                                         5-RenSER-00977

239

Q    And you're talking.  You can see on this tape -- prior to it goes off, it goes inaudible, because Renegar says, *Oh, my battery was dying.*

     You were talking about how you were going to show this in your reports.  True?

A    I don't know what conversation we're having at this point in the video.

Q    Okay, sir.  But is there anything that prevented you actually to continue your PVS playing?

A    I did not have any public contact at this time on the call.  Everyone was gone.  The PVS is not to record deputy conversations between other deputies.  The call at this time point is still -- we're just doing computer work. Mr. Holloway is at the hospital.  We're not interviewing anyone.

Q    I see.

A    That's not part of the PVS policy.

          THE COURT:  Counsel, five more minutes.  That's it.

BY MS. MKRTCHYAN:

Q    Well, let's look at your --

          MS. MKRTCHYAN:  Can we publish this?  This is Exhibit 248 by the defense, Your Honor.

          THE COURT:  All right.

          MS. MKRTCHYAN:  Let's look at your PVS policy and

*Deborah D. Parker, U.S. Court Reporter*

240

see how we understand this policy in terms of recording incidents.

(The exhibit was displayed on the screen.)

MS. MKRTCHYAN: Go back up. Let's corroborate.

BY MS. MKRTCHYAN:

Q This is the policy actually: "Patrol Vehicle System."

Do you recognize this policy, sir?

A Yes.

Q Okay. So PVS -- you received training how to use this patrol vehicle recordings, right?

A A long time ago. We don't use this anymore.

Q Prior to what -- prior to body-worn recordings, you used this very -- with extensively. True?

A Correct.

Q Let's go down and see -- so it says that:

"The PVS system records onto a memory card that has an approximate 24-hour recording capacity. To ensure memory card will last an entire tour of duty and to maximum system storage capacity, deputies should only record active 'events' as described in paragraph '8' of this policy."

Did I read it accurately, this part?

A Yes.

Deborah D. Parker, U.S. Court Reporter

241

Q   Let's go to 8 of this policy:  "Each Member shall record both visually and audibly."

What does that mean?  Both video and microphone, right?

A   For active calls.  I stated this is a stale moment of the call.

Q   I'm asking you very specific questions.  Let's focus on my questions.

Visually and audibly means you need to have both your video and audio on, right?

A   For active calls.

Q   Yes, we look at that, sir.  Let's go down:

"All calls for service.

"This should include all Members who arrive to a call for service whether or not he/she was assigned to the call.

"PVS shall be activated prior to arriving to the call and remain on until the call is completed."

True?

A   On active calls.

Q   Sir, does it say "active calls" here?  It says "All calls for service."  True?

Up until the time you completed, all calls for service must be recorded.  True?

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00980                                    5-RenSER-00980

242

A    In this point, the call is completed.  The suspect is gone.  We're not interviewing any victims.  Otherwise, we would just leave it on all day.

Q    No, you cleared the call when you leave --

THE COURT:  Counsel.  Counsel.  Just a moment.

There are two parts that you're showing.

Would you go back up to the prior portion also, both of you?  Just a moment.  So disagreement here that you're referring to "Deputies should only record active 'events' as described in paragraph 8"?

THE WITNESS:  Correct, Your Honor.

THE COURT:  And, Counsel, you're referring now down to paragraph 8:  "All calls for service," correct?

MS. MKRTCHYAN:  Yes.

THE COURT:  Okay.  And ask one more question and then we're going to terminate.

BY MS. MKRTCHYAN:

Q    And, sir, when you are involved in a call for service, there is a clear communication to the dispatch when you're on scene and when you clear the scene and you leave the call for service.  True?

A    Yes.

Q    Okay.  Let's go back to Call Detail Information Report.

Do you know what time you cleared from this call?

A    I do not.

*Deborah D. Parker, U.S. Court Reporter*

243

Q    If you look at this, will that show on this document?

So your arrival -- let's go down and see what time you arrived and what time you left.

We have Kevin Pahel with Gonzalez.  We have you. Dispatched, dispatched, dispatched.

We have -- you were with Gonzales on that night. True?

A    True.

Q    D-I-S what does "DIS" mean?

A    Dispatch.

Q    Okay. so you were dispatched to this call when this call was reactivated the second time and you arrived to the scene.  Here it says, On scene, 4:24, the first time, right? Gonzalez with Kevin Pahel.  True?

A    Correct.

Q    And then when it was reactivated, it says:  Dispatched back to the scene on -- around the time -- it's hard to see. Gonzalez with Kevin Pahel 4:55.  True?

A    True.

THE COURT:  Counsel, I'm going to let you get to the last time he's on duty and who's with him at that time. That will conclude this session.  Please, show us on the screen.

BY MS. MKRTCHYAN:

Q    I'm going to scroll down and you can tell me if you see

*Deborah D. Parker, U.S. Court Reporter*

244

when you actually cleared this call.

THE COURT: I don't think anybody can read that yet, Counsel. Slow down.

MS. MKRTCHYAN: I want to scroll down to the area where I believe they'll show.

BY MS. MKRTCHYAN:

Q I'm scrolling down.

Just let me know when you see yourself clearing from this call.

A Can you scroll back up? It's too fast.

THE COURT: Do we have a copy that they can show, because it's hard to see scrolling that fast.

Let's stop the scrolling for a moment. Nobody can keep track of that. Show the deputy a hard copy.

MS. MKRTCHYAN: Yes. Thank you.

*(Pause.)*

MS. MKRTCHYAN: We have exhibit books.

THE COURT: Counsel, just show the deputy the hard copy. We can't follow the scrolling.

MS. MKRTCHYAN: If you look at 45, you will see that document, please. Thank you.

THE COURT: Will the confusion between the two of you be whether it's Pahel who is being cleared or when he's with the other officer when that officer is being cleared in the car? In other words, you may have the other car

*Deborah D. Parker, U.S. Court Reporter*

245

clearing at a certain time and Pahel is in that car.

MS. MKRTCHYAN: No, there's no confusion, Your Honor. I'm trying to establish what time he cleared the call. That's all.

THE COURT: Well, it may list this. What I'm saying is, it may list the officer, the senior officer he's with at that time. It may not list Pahel. It may list Gonzalez.

MS. MKRTCHYAN: We have -- it's on page -- if you look, sir.

THE COURT: Just a moment.

THE WITNESS: I found it, Your Honor.

THE COURT: Okay. Tell us what the answer is.

MS. MKRTCHYAN: And what page?

THE WITNESS: The call was cleared by Renegar at 07:10 hours.

BY MS. MKRTCHYAN:

Q   Sir, that's not -- I'm talking about when you cleared the call. If you go to page 8 where it says "Call Detail Information Report," the names of the officers. Maybe there we can get that information, please.

So we have page 8. On top of page 8, you will see the names of officers: Billinger, Borba, Gonzalez, Pahel.

Do you see that?

A   Correct.

*Deborah D. Parker, U.S. Court Reporter*

246

Q    Okay.  So focusing on Gonzalez, Pahel, we have first all on scene 4:24:47?

THE COURT:  Counsel, just a moment.  We're not going to go through that.  I just want now the answer to when the call was cleared, if you know it.

THE WITNESS:  07:10 hours.

THE COURT:  07:10.  Thank you.

BY MS. MKRTCHYAN:

Q    Based on what I asked you, can you tell me on page 8 where does it show when you cleared from the call with Deputy Renegar?

A    It's the same time.

Q    Okay.  So you were there --

THE COURT:  Counsel --

MS. MKRTCHYAN:  Can.

THE COURT:  Thank you very much.  I've been generous with my time now.

Those times have been set.

Counsel, redirect?

MS. NALTSAS:  Nothing on behalf of Deputy Gotts.

THE COURT:  Redirect?

MR. WRONIAK:  Nothing further, Your Honor.

THE COURT:  Sir, you may step down.  Thank you very much.

Now, Counsel, I've got some other matters this

*Deborah D. Parker, U.S. Court Reporter*

247

evening -- two other matters to call.

You're ordered back to my court at 5:30 this evening. If you'll clear this area though. Thank you.

Ladies and gentlemen, you're going to go home. We're going to reconvene at 8:00 o'clock, on Monday.

Now, be patient with me. I've got four other matters starting at 7:30, but I calculated pretty precisely. I think I'll be ready at 8:00 o'clock, okay? But if so, give me 5 or 10 minutes at the most and I'll be with you.

Now, has anybody talked to anybody about the case, again, so we get to start over?

No, we're not going to do that, right?

Okay. Now go home and have a wonderful weekend.

Please don't form or express an opinion, even in your own mind.

And, sir, if you've got any notebooks with you, leave them here. Leave them on the seat you occupy. You take nothing home with you. You leave everything right here.

MS. SWISS: Your Honor, may the parties be excused?

THE COURT: Mr. Holloway and Deputy Renegar would like to be excused?

MR. HARRELL: Yes, they would.

THE COURT: We will be going over jury

*Deborah D. Parker, U.S. Court Reporter*

248

instructions, unless you like watching paint dry.

Have a good week, okay?  We'll see you Monday.

*(At 4:25 p.m., proceedings were adjourned.)*

-oOo-

*Deborah D. Parker, U.S. Court Reporter*

249

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 19, 2025

_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

5-RenSER-00988                                    5-RenSER-00988

BY MR. HARRELL: [1] 186/21
BY MR. WRONIAK: [1] 165/17
BY MS. MKRTCHYAN: [242] 24/14 25/16 27/12 28/6 28/14 31/14 31/19 34/8 34/11 34/25 35/20 36/7 36/19 37/20 38/1 38/14 38/22 43/2 43/22 44/22 45/9 46/20 48/4 48/20 49/1 50/8 51/12 52/14 52/23 53/3 53/12 53/15 53/22 55/4 57/2 57/20 59/18 59/25 60/4 61/1 61/25 62/11 62/21 63/23 68/13 68/20 69/4 69/12 69/23 70/3 70/19 70/24 71/19 72/7 72/11 72/17 73/1 73/11 74/8 75/20 76/6 78/1 78/7 78/18 79/19 80/10 80/21 81/14 81/20 82/5 82/17 83/2 83/23 84/5 84/25 86/9 87/7 89/7 89/24 91/9 92/4 92/20 93/1 93/6 93/14 93/22 94/13 94/19 94/24 95/9 95/19 95/23 96/1 96/10 97/1 97/6 97/10 111/3 111/22 112/7 113/4 113/13 115/2 116/20 117/1 117/25 118/15 119/24 122/4 122/11 123/5 123/17 124/3 124/12 124/18 127/1 129/9 130/13 131/4 131/13 131/18 132/1 132/10 132/16 166/23 169/12 169/18 170/19 171/22 172/10 173/21 174/8 174/17 176/3 176/10 176/16 177/3 177/14 178/3 179/3 179/16 180/2 180/11 181/2 181/15 181/23 182/9 182/13 183/9 184/6 184/11 185/13 186/8 187/12 187/24 188/8 189/8 189/15 189/25 190/24 191/9 191/16 192/6 192/19 193/20 193/25 194/13 195/7 196/9 196/12 197/3 197/16 199/14 200/12 200/15 200/22 201/4 201/11 201/16 202/5 202/17 203/8 203/18 204/18 205/1 205/10 205/20 206/2 206/12 206/21 207/23 208/20 209/10 209/24 210/14 210/24 211/6 212/4 212/20 212/25 213/15 214/4 214/20 215/3 215/21 216/12 217/15 218/1 219/5 220/25 221/11 221/15 222/5 222/11 224/8 224/13 227/16 227/21 228/5 229/3 230/11

230/21 231/17 233/22 234/5 234/10 234/16 234/23 235/4 236/18 237/7 237/11 237/17 237/22 238/9 239/20 240/5 242/17 243/24 244/6 245/17 246/8
BY MS. NALTSAS: [24] 6/11 8/10 9/4 12/19 13/23 18/14 19/23 21/16 136/7 136/23 137/16 138/5 139/23 144/5 148/24 149/23 151/10 154/5 159/2 159/23 162/6 162/17 163/19 164/9
BY MS. SWISS: [1] 22/12
MR. HARRELL: [4] 19/20 60/6 102/10 247/24
MR. WRONIAK: [44] 48/16 133/8 165/14 166/7 171/16 174/12 176/7 177/10 180/1 181/22 183/5 184/9 189/5 189/12 189/22 193/19 193/24 194/8 194/25 196/25 198/24 201/1 201/24 202/13 204/25 205/13 206/15 207/16 209/5 209/20 211/3 211/25 213/11 215/15 217/21 218/22 227/12 228/2 228/19 230/13 231/8 234/9 234/22 246/22
MS. MKRTCHYAN: [147] 7/20 9/1 18/5 21/11 23/22 24/12 28/10 31/18 34/16 34/20 36/2 36/4 42/21 50/2 50/6 51/10 53/2 53/10 60/3 60/10 60/19 60/24 61/22 62/9 62/19 68/11 71/24 72/6 74/3 75/18 76/1 78/4 81/10 82/4 82/13 82/23 85/13 85/20 86/3 86/7 86/13 86/18 86/20 86/24 87/15 87/20 88/2 88/6 88/8 88/15 88/20 88/24 89/2 89/6 93/21 95/17 95/25 98/22 98/25 99/22 100/4 106/9 106/12 108/4 108/7 109/7 109/9 111/1 116/25 117/15 117/24 119/6 119/11 119/22 123/23 125/12 125/15 125/25 126/2 126/5 126/9 126/11 126/19 128/5 128/7 128/9 128/12 129/1 129/6 130/10 130/22 131/25 132/9 132/18 135/17 136/19 139/14 143/17 143/23 144/1 149/19 151/7 153/25 158/21 162/15 170/16 176/2 179/12 180/8 182/2 182/7 187/5 187/9 188/4 190/20 191/2

192/16 196/5 197/3 199/13 200/20 202/15 203/4 203/16 205/17 205/24 207/20 219/2 230/7 236/16 236/20 237/4 237/16 237/20 238/5 239/22 239/25 240/4 242/14 244/4 244/15 244/17 244/20 245/2 245/9 245/14 246/15
MS. MKYRTCHYAN: [2] 96/7 119/20
MS. NALTSAS: [150] 6/9 6/19 7/16 8/1 8/5 12/15 18/13 18/22 19/2 19/4 19/14 19/19 19/21 22/9 25/11 31/6 33/25 35/25 36/24 37/23 38/8 38/10 42/16 42/18 43/12 46/8 48/1 48/15 48/24 52/9 52/12 52/19 56/22 59/15 62/7 67/6 69/10 69/15 77/25 78/3 79/17 80/8 80/16 81/5 81/17 82/3 82/8 83/22 84/10 86/2 89/15 91/5 92/1 92/24 93/18 94/10 94/18 94/22 95/7 95/13 97/5 97/12 111/12 112/25 113/11 114/22 116/14 117/18 122/2 123/2 124/10 124/14 128/24 130/4 130/20 132/22 133/6 134/7 135/1 135/5 135/25 136/4 137/4 137/13 137/19 137/24 138/3 138/16 138/24 139/2 139/9 139/21 143/7 143/19 144/4 147/9 147/19 148/2 148/10 148/14 148/18 148/21 151/9 159/8 159/14 159/19 160/17 160/23 161/10 161/21 163/14 163/18 164/3 165/9 169/11 173/17 176/1 176/24 177/25 178/22 181/13 184/1 185/9 186/5 186/17 187/1 187/23 189/6 191/12 191/25 200/11 200/14 200/17 201/7 206/7 210/10 210/20 213/25 214/18 215/1 216/9 217/11 221/6 221/14 222/3 222/8 224/11 227/20 230/3 246/20
MS. SKINNER: [1] 161/2
MS. SWISS: [30] 23/18 37/24 38/9 42/17 46/7 48/12 57/7 63/5 70/16 70/22 71/23 72/2 74/7 78/15 82/20 91/4 93/12 96/4 103/16 104/25 105/5 106/5 123/15 131/9 131/16 132/7 132/24 172/5 172/8 247/20
THE CLERK: [1] 143/11
THE COURT
REPORTER: [3] 18/10

199/4 199/9
THE COURT: [419]
THE WITNESS: [115] 5/14 6/6 9/3 21/14 25/14 31/8 31/11 34/3 36/18 37/2 37/16 42/22 42/24 43/16 45/2 45/5 46/11 46/13 48/18 49/23 53/19 57/1 57/10 60/13 63/8 67/9 68/24 69/1 69/18 69/20 71/8 72/15 72/23 76/5 78/17 80/19 84/3 84/18 84/22 89/18 90/7 90/9 91/8 96/17 97/9 111/18 113/2 114/25 116/17 122/10 125/19 126/16 130/8 131/1 131/12 134/16 135/8 135/12 136/21 149/22 169/17 171/20 173/20 174/7 174/15 176/14 177/2 177/13 179/1 180/10 181/1 182/12 183/7 184/5 185/12 186/20 188/6 189/14 191/14 192/5 194/10 194/12 195/5 196/8 197/11 197/14 199/12 201/3 201/10 202/2 205/9 205/19 206/10 206/19 207/19 210/13 210/23 212/3 215/20 217/14 217/25 221/10 222/10 224/4 224/12 227/14 230/9 230/17 231/15 234/14 235/3 242/11 245/12 245/15 246/6
UNIDENTIFIED
JUROR: [1] 7/11

**,**

'8' [1] 240/22
'events' [2] 240/22 242/10

**-**

-1 [1] 138/4
-12 [1] 19/20
-14 [1] 19/19
-49 [1] 88/8
-oOo [2] 5/2 248/4

**/**

/s/DEBORAH [1] 249/12

**0**

01/23/2018 [1] 4/12
053 [1] 1/22
07:10 [3] 245/16 246/6 246/7

**1**

1-053 [1] 1/22
10 [11] 98/15 98/17 110/14 147/11 159/15 159/16 192/5 204/8 204/9 233/19 247/9
10 seconds [1] 225/2
10-A [1] 103/7
100 [3] 18/2 54/13 158/17

100 percent [1] 50/23
101-4 [2] 143/9 147/18
1010 [3] 2/4 2/11 2/20
102 [2] 19/18 147/19
102-10 [1] 159/16
102-11 [2] 159/20 159/21
102-13 [1] 8/9
102-14 [2] 18/22 19/21
102-4 [1] 147/11
102-9 [1] 138/17
1033 [1] 11/12
10342 [1] 1/20
1097 [1] 11/17
11 [3] 1/8 159/20 159/21
1100 [2] 2/9 2/18
1150 [1] 2/14
11:16 [1] 110/17
11:27 [1] 110/17
11:58 [1] 133/24
12 [2] 19/20 161/23
13 [8] 8/6 8/9 9/12 117/22 117/23 118/14 119/18 161/23
130's [1] 104/18
132 [11] 85/12 86/13 86/18 86/23 86/24 86/25 87/5 87/13 98/7 101/6 105/3
133 [1] 86/23
138 [12] 86/8 86/13 86/21 87/18 88/6 88/7 98/8 105/4 117/15 118/19 119/4 119/9
139 [16] 86/14 86/21 87/18 88/7 98/8 101/6 105/4 117/15 117/22 117/22 117/23 117/23 119/4 119/10 119/13 119/17
14 [3] 18/22 19/19 19/21
140 [2] 119/7 119/13
141 [1] 119/13
1450 [2] 2/10 2/19
148 [3] 101/11 106/12 106/16
149 [5] 101/11 105/7 105/21 106/3 106/16
15 [12] 15/20 23/24 37/18 97/15 98/19 129/16 166/13 192/5 204/8 204/9 211/17 212/21
15 feet [4] 212/9 213/2 214/7 215/4
15 minutes [2] 138/18 166/9
150 [8] 105/7 105/21 106/3 106/12 106/16 106/20 107/2 119/14
157 [4] 125/13 125/14 125/15 129/2
158 [3] 125/13 125/14 129/2
159 [4] 126/2 126/4 126/14 127/2
16 [2] 1/16 5/1
160 [7] 125/15 125/15 126/3 126/9 126/14 128/6 129/16
161 [2] 126/14 128/6

**1**

164 [1] 125/16
17 [3] 119/9 163/20 164/5
180 [1] 105/25
1800 [1] 2/14
180s [1] 104/20
182 [3] 88/8 88/24 89/1
19 [2] 129/16 249/9
19-01514-DOC [1] 1/8
1:00 [1] 133/11
1:00 o'clock [2] 133/14 133/23
1:03 [1] 133/24

**2**

20 [9] 15/20 147/14 166/13 187/22 189/14 189/16 189/17 191/11 191/11
20 feet [1] 211/17
20 minutes [3] 37/18 38/16 209/13
20 pounds [1] 26/12
20 seconds [1] 190/2
2011 [1] 3/8
2013 [2] 136/11 136/13
2018 [10] 4/12 57/11 74/21 96/18 108/13 122/18 136/22 148/5 158/16 164/16
2020 [3] 22/7 122/18 125/4
2025 [4] 1/16 5/1 96/18 249/9
204 [1] 2/4
207 [1] 3/8
21 [3] 8/1 49/15 148/5
21 minutes [1] 8/2
2110 [1] 3/9
213 [1] 2/15
21st [1] 164/16
225 [1] 109/18
225 pounds [1] 24/20
229-4305 [1] 1/23
23 [7] 74/21 126/3 126/4 126/14 127/2 163/21 164/6
24-hour [1] 240/17
248 [1] 239/23
25 years [1] 28/4
274-2110 [1] 3/9
28 [1] 249/3
29 seconds [1] 209/3
2:32 [1] 166/14
2:41 [1] 166/10
2:49 [1] 166/14

**3**

32 [1] 137/23
34 [1] 172/3
35 [1] 170/15
35-4 [9] 137/24 137/25 138/1 138/4 138/4 170/18 172/3 172/5 172/6
36 [2] 6/21 6/22
367 [2] 16/7 16/20
37 [4] 73/23 74/4 74/6 74/7
388-7022 [1] 2/5
3:39 [7] 33/18 35/13

35/21 35/23 36/3 36/5 36/6
3:40 [8] 26/15 26/20 33/18 35/2 35/5 35/10 35/15 35/17
3:42 [2] 36/13 37/2
3:42:37 [1] 36/22
3:49 [1] 33/16
3:54 [2] 26/24 40/2
3:54 a.m [2] 32/21 33/6
3:54 hours [1] 37/17
3:54:47 [2] 27/18 37/11
3:56 [1] 40/3
3:56:57 [1] 38/5

**4**

4 inches [1] 24/19
400 [1] 3/4
403 [8] 48/12 57/7 70/16 70/22 71/23 131/16 201/25 230/14
4100 [1] 3/5
411 [1] 1/22
415 [1] 13/14
4305 [1] 1/23
446 [1] 9/6
45 [5] 15/13 15/13 22/15 192/10 244/20
45 miles [1] 17/19
489 [1] 148/12
49 [2] 88/8 209/1
49 seconds [2] 209/7 209/12
4:15 [1] 233/19
4:19 a.m [1] 138/18
4:23 [4] 45/12 51/13 51/16 51/22
4:24 [1] 243/13
4:24:47 [1] 246/2
4:25 [1] 248/3
4:45 [1] 12/16
4:55 [1] 243/18
4:58:40 [2] 147/13 148/12
4:58:40 and [1] 161/11

**5**

50 [2] 12/15 54/13
50 feet [1] 213/7
5:02:33 [4] 192/20 192/20 203/9 203/23
5:02:37 [2] 205/21 208/8
5:03:11 [1] 208/9
5:03:12 [1] 203/21
5:03:37 [3] 11/5 12/15 12/20
5:12 [1] 161/12
5:16:26 [1] 161/12
5:30 [1] 247/2
5:31:15 through [1] 164/4
5:34:53 [1] 164/5
5:40 [1] 236/11
5:41 [3] 236/22 237/9 237/9
5:43 [1] 192/17
5:46 [1] 237/9
5:51 [2] 237/23 238/16
5:58 [1] 238/14

**6**

6-foot [1] 24/19

6 3 [1] 132/2
61 [10] 10/24 28/19 177/5 178/15 178/19 179/9 179/17 179/21 180/4 187/20
624-8700 [1] 2/15
63 [15] 28/17 28/19 29/2 29/7 30/17 32/10 32/20 40/14 40/25 49/6 49/7 49/18 50/10 50/14 187/21
65 [27] 12/11 28/19 30/17 32/20 32/24 33/5 33/13 40/14 41/8 43/4 46/1 46/4 47/19 49/7 50/24 51/16 66/24 69/6 76/22 141/12 141/19 171/3 173/5 174/16 176/19 184/25 192/22
657 [1] 1/23
66 [17] 21/24 41/9 41/14 43/4 49/7 49/10 67/5 67/11 68/15 69/13 69/21 70/20 71/21 71/22 72/5 72/9 72/12
67 [1] 187/21
68 [1] 41/9

**7**

70 [1] 41/9
7022 [1] 2/5
71 [6] 41/9 41/14 41/25 42/8 42/10 43/5
714 [3] 2/11 2/20 3/5
750 [1] 3/4
753 [1] 249/2
76 [1] 28/12
760 [1] 3/9
78 [1] 40/25
7:30 [1] 247/7

**8**

818 [1] 2/5
823-4100 [1] 3/5
8700 [1] 2/15
8:00 o'clock [2] 247/5 247/8
8:04 [2] 1/17 5/1

**9**

9-1-1 [1] 182/8
90 [1] 98/16
90 minutes [1] 135/16
90015 [1] 2/15
91 [3] 16/20 16/25 17/1
911 [16] 26/14 35/11 145/14 162/13 162/19 164/10 164/17 169/7 175/22 181/20 182/7 182/7 182/10 183/2 183/11 185/18
91202 [1] 2/5
92011 [1] 3/9
92701 [1] 1/23
92868 [3] 2/10 2/19 3/5
937-1010 [2] 2/11 2/20
9:13 [1] 24/4
9:33 [1] 24/4

**A**

a.m [13] 1/17 5/1 24/4 24/4 26/24 32/21 33/6 40/3 51/13 110/17

110/17 133/24 138/18
ability [2] 74/16 100/9
able [16] 8/24 90/22 91/17 91/19 95/14 97/3 105/9 123/9 130/18 156/18 196/15 196/15 214/22 215/5 217/4 227/4
about [145] 5/23 7/22 9/14 11/5 23/24 26/12 26/19 26/22 26/24 30/24 31/3 31/23 33/15 33/19 34/5 36/21 37/15 39/4 41/8 41/19 42/8 42/9 44/17 44/23 47/15 50/13 51/21 59/5 59/20 59/22 61/3 61/8 61/8 61/17 62/15 68/12 71/24 72/18 73/15 75/2 75/4 75/6 76/17 77/9 78/12 78/13 79/24 80/4 81/8 83/3 83/19 84/2 86/3 88/12 88/20 88/21 92/9 95/3 95/10 96/3 96/15 97/15 98/7 98/17 98/22 99/7 99/10 99/25 99/25 100/18 100/19 101/8 103/8 104/8 106/7 106/21 106/22 107/21 111/8 111/10 113/6 117/14 119/5 119/18 122/1 122/5 122/14 124/7 129/2 129/25 138/6 140/6 144/22 145/5 145/17 146/19 157/19 158/15 162/22 166/10 167/11 167/24 172/16 174/1 175/11 176/9 177/17 185/14 185/14 187/3 187/5 187/11 189/2 189/4 190/11 190/25 192/3 194/18 206/6 207/1 208/16 209/3 215/17 216/4 220/18 220/20 221/20 225/18 225/23 229/21 232/4 233/18 233/19 235/1 236/5 236/5 236/11 236/22 237/9 238/2 238/10 238/19 239/4 245/18 247/10
above [1] 249/5
above-entitled [1] 249/5
absolutely [3] 76/5 100/16 231/19
abundance [2] 126/21 126/24
academy [6] 58/17 136/10 136/12 136/15 181/16 186/22
access [1] 122/16
according [14] 63/24 83/11 93/7 114/12 120/6 120/7 120/9 169/5 187/13 191/10 192/11 198/23 208/1 212/8
accurate [4] 7/8 80/3 82/6 224/1
accurately [4] 40/23 117/12 129/15 240/24
acknowledge [1] 37/6

across [1] 150/13
actions [1] 80/6
activated [1] 241/17
active [9] 66/20 116/5 116/8 240/21 241/5 241/11 241/21 241/22 242/9
actively [2] 39/7 81/21
actual [4] 11/8 104/25 105/6 173/1
actually [32] 10/18 12/23 28/1 35/10 39/5 39/18 39/21 41/8 43/21 47/9 59/14 63/1 67/16 71/2 79/25 89/8 96/11 104/13 127/5 177/7 178/19 186/1 204/7 213/18 214/23 221/25 222/6 223/8 226/20 239/9 240/6 244/1
add [2] 72/20 74/14
adding [3] 38/20 68/17 180/22
addition [2] 10/21 13/15
additional [2] 72/25 98/10
address [1] 103/18
adjourned [1] 248/3
administer [1] 134/14
admissibility [1] 102/14
admission [2] 73/12 90/21
admit [1] 92/23
admitted [2] 15/14 137/20
admonished [2] 23/25 97/16
admonishes [1] 109/3
advised [3] 37/3 42/25 75/8
advising [3] 15/23 16/17 22/25
affect [1] 64/19
after [81] 13/12 22/7 23/13 23/15 27/13 28/4 32/16 33/6 33/7 36/8 37/18 43/9 44/13 45/6 45/24 55/18 56/17 64/2 64/16 64/17 65/1 66/21 66/23 70/13 72/15 72/18 72/21 72/23 74/17 74/20 74/22 75/24 76/3 79/13 79/21 98/4 101/9 106/16 108/12 111/4 120/6 123/1 123/7 123/12 129/10 129/10 129/20 129/22 131/19 131/20 136/14 136/16 146/23 149/6 150/23 156/24 158/5 158/8 160/6 160/12 162/19 163/9 171/8 177/21 182/21 182/22 183/13 184/18 191/6 194/3 197/24 198/13 220/18 230/24 231/6 231/12 235/11 235/20 236/9 236/20 238/1
afternoon [6] 136/8 136/9 165/18 165/19 166/24 166/25
afterwards [1] 43/9

5-RenSER-00990
5-RenSER-00990

**A**

again [28] 6/4 7/14 16/11 19/5 22/19 25/13 27/3 33/23 40/17 61/22 65/18 72/10 88/17 98/25 102/16 102/16 102/17 107/13 108/4 135/20 137/23 138/20 139/11 195/17 196/1 208/15 237/19 247/11
against [6] 73/13 79/15 80/2 108/14 135/15 156/10
aggressive [2] 17/18 217/9
agitated [7] 17/9 21/22 63/21 66/6 66/13 193/4 212/7
ago [2] 147/11 240/11
agree [8] 38/24 38/25 45/20 65/6 65/25 95/20 111/21 125/4
agreed [1] 129/17
ahead [2] 96/8 147/25
aid [2] 7/7 161/8
airborne [1] 17/16
AIRPORT [1] 3/8
airtime [1] 11/20
al [2] 1/9 2/7
alarm [1] 187/15
alert [1] 63/18
all [116] 5/7 5/22 6/2 7/6 7/7 7/19 7/22 19/12 19/17 24/10 45/3 51/11 60/9 70/12 70/12 70/14 72/24 76/2 80/4 80/20 83/10 84/16 86/25 87/13 88/20 88/21 90/10 93/23 97/23 98/25 100/7 102/19 102/22 103/24 105/15 105/18 106/18 108/13 109/23 110/24 114/20 115/1 119/8 119/18 122/19 125/6 125/7 125/17 125/20 126/4 126/13 127/10 127/23 128/11 128/13 130/16 132/21 134/3 134/9 134/21 134/24 135/3 135/4 135/25 137/11 138/25 139/13 140/24 141/5 143/12 143/20 143/21 143/25 147/22 148/8 148/15 148/20 155/11 158/25 159/17 159/21 161/13 164/7 165/15 166/19 170/12 175/1 176/20 179/14 180/16 182/1 182/2 183/8 183/18 193/16 193/17 193/21 194/15 196/7 197/9 206/10 216/5 219/4 221/4 227/24 235/2 237/20 239/24 241/13 241/14 241/22 241/24 242/3 242/13 245/4 246/2
allegation [1] 131/5
alleged [2] 172/12 172/23
allow [3] 121/4 121/5

180/7
allowed [12] 9/5 9/8 15/10 101/19 101/20 106/12 125/23 186/23 186/25 187/13 211/22 213/22
allows [1] 8/20
alone [5] 52/16 140/24 141/5 188/12 213/19
along [2] 35/7 224/6
already [27] 8/17 9/11 11/23 13/16 17/10 21/1 100/16 100/18 102/1 125/23 137/7 137/9 139/9 139/10 139/15 139/20 160/19 169/22 175/9 175/16 183/17 186/15 197/25 203/2 204/21 207/25 216/21
also [58] 3/12 11/20 12/1 14/1 15/23 16/20 21/7 21/14 22/24 23/5 25/3 25/17 26/4 30/2 40/4 40/10 47/2 54/14 56/14 67/13 73/12 77/23 79/5 82/1 83/9 87/1 92/12 94/15 96/13 108/8 110/3 114/7 117/5 119/12 123/16 125/21 127/23 129/1 143/2 143/4 146/1 146/2 163/2 164/18 165/4 165/5 178/17 180/3 183/1 185/14 185/21 202/12 202/21 204/19 216/4 226/11 233/14 242/7
altercation [7] 14/11 20/9 39/8 54/18 116/8 117/12 121/19
am [9] 8/22 11/22 44/10 51/19 58/14 106/12 109/4 208/13 208/21
ambient [1] 229/8
ambiguous [5] 18/6 21/11 149/19 154/1 158/21
amend [1] 74/14
among [3] 132/5 206/5 206/25
amount [6] 37/19 85/16 89/22 100/14 114/13 115/3
ample [1] 121/5
ANA [4] 1/3 1/15 1/23 5/1
ANGELES [1] 2/15
angle [1] 223/5
announce [1] 120/14
announcement [1] 120/22
announcements [1] 171/4
another [16] 10/22 13/13 30/2 32/10 61/12 105/24 107/5 110/14 133/4 135/20 229/11 229/17 229/19 230/18 232/7 236/20
answer [61] 18/10 31/9 34/2 37/1 37/15 38/21 43/15 46/12 48/17 53/14 56/24 56/25 57/9

63/7 67/8 69/19 71/7 72/14 76/2 84/1 84/14 89/17 90/8 91/7 97/8 100/5 107/24 111/16 116/15 122/9 131/11 149/21 169/15 171/19 174/14 176/8 181/25 182/11 184/4 185/11 186/19 187/11 196/7 197/1 201/2 201/9 205/6 205/18 210/12 210/21 212/2 217/13 217/24 221/9 222/9 230/8 230/16 234/13 235/2 245/13 246/4
answered [17] 34/1 56/22 67/6 70/16 70/22 71/23 72/4 79/17 96/4 191/12 197/7 197/9 201/24 217/22 230/3 230/13 230/19
answering [2] 34/3 37/22
anticipation [1] 105/20
any [124] 10/12 11/15 11/20 13/5 16/13 18/18 19/12 23/12 23/15 24/1 30/3 30/14 31/4 31/15 31/20 32/15 32/23 33/2 33/5 33/12 33/19 37/9 37/21 38/7 38/15 39/13 40/2 41/4 56/7 56/15 56/20 56/24 57/24 57/25 59/1 59/1 63/15 64/15 65/4 65/12 65/14 66/16 66/25 70/20 71/20 71/20 72/4 72/8 72/12 75/22 76/3 79/9 84/20 99/2 107/8 107/16 108/3 108/23 110/6 114/3 114/9 114/10 116/6 118/3 119/25 128/13 128/16 133/12 140/9 141/11 142/18 143/4 143/6 145/19 146/25 149/9 149/12 153/20 153/24 154/11 156/1 156/9 157/3 158/7 158/18 158/19 159/5 166/11 168/17 171/14 174/21 175/20 176/5 176/9 176/20 176/22 176/22 182/17 183/4 186/1 195/10 206/13 209/4 209/11 209/14 209/17 216/4 216/24 217/9 217/10 217/17 217/18 217/19 224/20 231/22 232/3 232/5 232/7 233/24 234/6 234/7 239/10 242/2 247/16
anybody [4] 57/23 244/2 247/10 247/10
anymore [1] 240/11
anyone [28] 17/21 17/23 23/15 29/21 39/7 47/15 50/17 57/21 57/24 71/12 72/12 111/5 111/24 112/18 115/9 115/11 143/3 146/6 149/14 157/25 158/4 158/10 160/12

168/22 183/20 183/21 232/13 239/15
anyone's [2] 115/13 216/25
anything [21] 30/20 30/24 39/4 39/14 63/14 74/11 74/13 91/25 96/3 96/16 140/5 141/2 146/19 150/3 157/23 162/24 182/6 182/22 185/1 225/7 239/8
Anyway [1] 81/21
anywhere [7] 65/13 65/14 65/14 70/13 182/5 194/6 217/3
apartment [3] 69/24 69/25 70/1
apologies [4] 18/11 137/25 172/9 190/22
apologize [1] 147/15
appalling [1] 67/21
APPEARANCES [2] 1/25 2/22
appeared [1] 193/4
appears [5] 12/3 12/20 98/11 160/18 211/7
applicability [1] 156/2
application [15] 98/7 98/9 120/13 120/21 120/25 121/3 121/7 121/8 121/14 121/17 121/18 121/20 123/14 232/18 235/9
applied [35] 14/17 84/7 84/24 86/4 89/8 89/12 89/22 92/17 93/7 93/24 99/12 104/22 104/23 105/1 107/22 108/18 108/25 118/3 120/3 120/6 120/10 120/20 120/23 121/1 121/7 122/6 124/4 124/20 129/11 157/12 157/16 158/7 210/18 226/20 232/23
applies [2] 5/15 106/10
apply [5] 120/1 120/8 123/20 157/10 224/22
applying [5] 88/3 88/12 90/1 101/8 101/10
appreciate [3] 34/22 68/11 87/5
approach [6] 41/21 154/3 166/1 190/7 211/23 213/22
approached [24] 14/21 41/23 55/12 55/17 55/18 58/12 83/4 89/18 153/13 178/5 190/13 195/24 198/5 199/17 199/22 200/24 201/13 211/9 212/8 212/17 214/12 215/11 219/20 220/7
approaches [3] 200/6 213/17 214/6
approaching [6] 55/22 191/1 191/4 191/4 202/7 213/5
appropriate [4] 169/9 170/2 170/5 170/8
approval [1] 115/5
approximate [2] 12/16

240/17
approximately [10] 17/25 53/19 156/22 157/17 157/18 158/17 167/7 190/9 190/10 213/3
are [133] 5/7 7/7 7/8 8/20 8/24 9/5 12/12 16/3 16/15 19/1 19/13 19/24 20/13 20/20 24/10 25/21 29/25 32/13 35/11 39/11 41/17 42/6 45/21 45/22 45/23 47/12 51/16 51/21 52/16 52/17 59/5 59/13 60/15 61/5 61/8 61/14 62/2 62/22 63/1 63/4 66/7 68/3 68/21 72/15 75/21 76/23 86/17 87/8 89/10 90/1 91/20 95/4 96/12 98/13 98/18 102/15 103/2 104/8 104/9 105/6 106/19 108/19 110/24 120/8 122/10 124/9 130/16 134/4 134/21 139/12 140/20 142/6 145/10 145/14 147/23 147/25 148/1 152/6 152/10 152/11 156/14 157/16 161/8 166/19 166/19 170/11 171/6 175/17 176/6 181/10 183/15 186/1 186/1 186/25 187/13 187/16 189/4 191/4 191/5 194/5 201/17 202/10 202/18 205/15 206/5 207/15 207/15 208/11 211/11 211/15 211/20 211/22 213/7 214/16 214/21 214/25 215/10 215/12 218/13 220/18 221/19 229/16 229/25 229/25 232/22 233/1 233/3 233/5 234/19 236/5 236/5 242/6 242/18
area [53] 14/9 14/11 16/12 20/9 28/15 28/18 28/23 28/25 29/9 29/11 29/17 30/7 30/17 32/3 32/5 32/12 32/13 33/2 33/3 39/7 39/18 39/22 39/24 40/1 40/18 40/19 41/9 41/22 41/22 46/6 56/1 58/12 58/25 71/17 72/25 116/8 120/21 129/7 154/16 182/4 218/12 218/14 218/15 218/17 218/20 219/7 219/8 219/14 224/5 225/20 226/16 244/4 247/3
areas [4] 16/19 75/17 152/11 152/12
argue [5] 82/16 95/15 109/20 109/21 110/9
argued [2] 5/19 5/20
arguing [4] 31/1 92/19 98/9 123/19
argument [6] 69/11 82/15 92/16 109/23

**A**

argument... [2] 189/6 209/22

argumentative [47] 38/9 42/17 42/18 48/24 52/12 52/13 57/7 69/10 80/16 89/15 91/4 92/24 94/11 111/12 112/25 113/11 114/22 116/22 116/23 123/16 176/24 177/10 178/23 180/1 181/13 181/22 186/7 186/17 191/25 193/19 194/8 194/25 196/25 201/1 201/7 204/25 209/5 209/20 209/21 211/3 211/25 213/11 213/25 215/16 216/9 228/19 234/22

Argumentive [2] 21/22 62/7

arm [40] 14/15 17/12 77/24 91/11 91/18 94/1 94/4 94/7 94/15 96/12 100/1 127/8 127/15 127/25 154/17 155/16 156/18 156/21 156/24 157/4 157/6 198/10 198/11 198/15 200/2 202/11 202/11 208/3 208/3 211/10 214/13 214/23 218/2 223/15 223/16 223/17 223/19 225/20 227/11 233/2

arm-bar [7] 198/10 198/15 200/2 208/3 211/10 214/23 233/2

armed [4] 146/5 146/14 152/7 187/18

armpits [1] 152/11

arms [13] 14/11 77/4 77/7 81/23 114/14 114/21 115/6 151/1 218/20 218/25 219/7 223/5 227/23

around [31] 10/24 14/10 30/16 32/23 33/2 41/1 43/19 45/7 46/5 56/12 63/10 78/21 80/23 86/15 99/9 112/18 115/19 141/17 143/2 144/17 161/22 171/20 194/4 218/2 219/6 223/2 223/3 225/25 226/7 235/6 243/17

arrest [17] 4/17 15/9 50/24 51/2 55/8 64/11 64/14 64/15 64/19 65/3 66/8 184/7 204/24 205/5 205/7 210/8 238/25

arrested [4] 43/9 183/13 184/18 209/14

arresting [1] 80/7

arrests [1] 66/10

arrival [8] 33/11 65/13 116/2 116/10 117/9 171/1 188/16 243/2

arrive [6] 12/11 79/14 79/20 152/21 181/9 241/15

arrived [73] 10/13 11/5

11/23 12/2 12/23 12/25 13/19 13/24 14/6 15/7 27/22 30/4 31/5 31/21 32/20 32/24 33/5 33/13 36/8 42/7 46/4 74/9 76/21 76/24 77/16 77/19 78/13 78/14 78/20 78/21 79/6 79/13 79/21 79/22 82/12 82/19 92/5 92/9 93/15 99/10 101/8 111/11 112/3 113/20 113/24 114/16 115/15 115/24 116/3 116/12 117/5 118/17 118/21 118/21 118/22 140/9 142/8 151/25 152/24 156/23 167/14 169/25 173/12 174/10 174/25 175/9 182/17 185/25 187/19 188/15 190/17 243/3 243/12

arrives [1] 108/24

arriving [8] 10/8 22/21 37/16 89/21 96/11 148/25 226/10 241/18

articulate [1] 128/16

as [151] 5/21 5/21 6/23 11/8 11/8 11/25 12/22 15/7 15/7 22/22 22/22 25/1 25/7 25/7 25/19 26/20 26/20 31/12 32/2 32/6 34/15 37/8 40/12 40/15 43/16 44/1 46/5 46/14 46/23 54/10 54/17 55/18 57/1 57/10 57/12 57/14 58/12 63/8 63/20 63/21 65/8 65/25 68/4 68/16 71/9 75/9 75/9 77/11 77/17 79/10 80/5 82/18 83/13 84/22 84/22 89/18 90/13 90/17 93/17 94/8 95/5 96/17 96/22 100/25 101/20 103/6 108/11 109/2 109/25 110/3 111/18 114/13 115/20 116/3 117/9 117/10 118/20 118/21 118/25 120/19 120/19 120/25 121/5 121/8 121/10 121/17 121/18 122/20 123/3 125/2 127/23 127/25 128/17 129/12 129/20 130/4 130/18 131/22 132/3 135/20 137/2 140/24 141/16 143/8 146/8 148/3 152/22 152/22 152/23 153/25 154/1 157/3 157/8 158/22 162/15 163/3 165/5 167/17 169/13 171/3 173/18 173/20 175/1 175/4 178/1 181/4 181/10 182/1 187/16 192/12 195/3 200/9 200/9 208/6 208/6 209/25 209/25 211/4 211/13 211/15 219/8 224/3 224/6 224/10 226/23 227/22 233/23 233/23 233/24 240/22 242/10

ask [39] 7/22 38/19 48/2 68/2 68/19 70/2 72/4 75/16 92/2 92/18 93/5 93/20 96/8 100/2 105/21 112/18 113/3 113/23 113/25 116/24 123/4 124/17 131/23 132/8 137/20 150/8 169/7 189/7 190/23 193/15 200/19 205/11 212/14 212/24 214/3 228/4 231/16 237/3 242/15

asked [64] 42/9 47/3 48/7 52/20 55/15 56/22 59/22 67/6 70/16 70/22 71/23 72/3 75/13 79/17 84/6 84/7 84/10 84/14 84/19 84/21 95/2 96/4 97/2 97/11 98/2 98/3 99/14 99/24 100/3 100/19 101/9 104/2 106/20 106/21 115/8 116/11 116/18 121/25 121/25 122/5 122/13 122/15 122/22 124/19 130/6 137/13 150/10 150/16 168/22 180/25 184/7 184/20 185/14 190/12 191/12 194/14 201/24 202/6 212/16 217/21 230/3 230/13 232/12 246/9

asking [26] 34/5 37/21 38/2 40/24 51/21 52/15 57/5 81/8 83/24 99/22 101/7 114/2 118/20 144/17 147/25 179/14 179/14 180/6 189/10 190/12 205/15 219/13 231/4 231/9 231/25 241/7

asks [1] 47/3

assault [1] 102/20

assaulting [1] 213/24

assessed [2] 102/25 103/2

assigned [6] 32/13 53/7 53/13 53/23 136/16 241/16

assist [7] 13/18 14/21 155/24 215/9 215/13 215/18 216/6

assistance [3] 39/8 153/10 216/1

assisted [2] 64/16 216/7

assisting [2] 226/8 226/11

assume [5] 84/23 90/12 133/4 152/7 206/16

assumes [10] 38/11 46/8 63/5 78/15 82/9 131/9 171/16 184/2 194/25 228/19

assuming [1] 84/12

atmosphere [1] 103/6

attack [2] 109/11 110/12

attempt [4] 14/15 67/17 216/25 218/5

attempted [4] 198/9 200/1 208/2 216/16

attempting [9] 77/4 77/7

89/19 91/10 91/12 91/19 156/15 156/20 171/2

attempts [1] 15/9

attention [3] 15/12 57/15 178/13

attitude [6] 21/9 21/17 21/20 164/21 165/2 165/6

attorney [4] 2/3 27/6 99/4 102/4

attorneys [1] 108/9

audible [1] 63/18

audibly [2] 241/2 241/9

audient [2] 184/13 184/14

audio [8] 4/19 7/16 7/25 10/8 17/15 63/20 96/21 241/10

audiotape [14] 7/15 7/23 8/4 60/25 61/24 62/10 62/20 111/19 112/6 130/12 139/4 143/13 144/3 159/22

authoritative [1] 150/12

Authority [5] 16/25 53/23 54/1 54/2 54/3

AVENUE [1] 2/4

average [1] 146/4

avoid [1] 127/17

aware [24] 8/20 33/16 35/11 79/9 112/8 112/11 113/7 120/13 130/16 131/8 131/12 162/12 171/8 207/14 214/16 214/21 214/25 226/7 226/10 226/13 228/12 228/14 230/1 230/12

away [23] 30/8 45/25 46/6 64/3 64/4 76/23 77/5 81/23 114/14 114/21 115/6 123/8 142/9 142/11 151/6 159/24 188/17 212/9 212/21 213/2 213/8 214/7 215/4

awkward [1] 142/19

axe [2] 15/1 63/9

**B**

back [112] 9/25 10/6 14/10 14/16 14/17 14/18 16/19 31/1 39/19 39/21 40/10 40/18 41/3 41/4 41/9 64/16 64/21 65/18 66/12 70/25 71/1 73/2 73/5 77/4 77/6 77/24 83/5 83/10 83/12 84/23 85/3 85/8 89/10 89/14 89/19 89/22 89/23 90/3 90/23 91/13 92/11 92/23 93/24 94/5 96/13 97/15 98/20 106/16 108/21 109/19 110/21 115/21 115/23 116/3 119/4 125/3 127/9 127/11 127/15 127/25 129/12 129/19 129/21 132/12 134/2 134/22 135/6 137/8 137/11 139/20 143/5 148/1 154/17 155/17

163/11 163/25 166/9 166/18 177/16 178/10 185/24 186/11 192/24 196/1 197/18 201/12 201/13 202/9 202/15 204/12 208/12 208/15 211/7 211/14 214/9 220/10 223/4 223/12 223/22 224/5 225/5 225/19 225/21 236/13 238/1 238/6 240/4 242/7 242/23 243/17 244/10 247/2

background [2] 13/13 146/19

backpack [3] 63/3 63/13 63/17

backup [1] 213/17

bad [2] 100/16 142/16

balance [1] 90/13

ballistic [8] 9/20 9/23 25/3 25/17 26/8 115/13 216/25 218/8

ballpark [4] 38/16 54/10 54/12 181/24

bar [7] 198/10 198/15 200/2 208/3 211/10 214/23 233/2

baseball [1] 238/11

based [35] 8/23 14/19 26/15 27/17 30/19 33/16 35/12 36/22 37/9 38/3 66/8 73/5 93/23 96/2 102/25 114/20 115/22 117/2 117/3 140/5 144/16 145/9 149/15 149/24 159/3 163/5 199/18 200/7 201/5 208/22 208/23 209/2 235/11 235/13 246/9

basic [1] 176/8

basically [26] 16/19 20/7 29/19 29/20 39/22 40/1 47/1 63/24 94/20 96/2 100/25 101/14 113/14 119/25 129/12 129/12 156/7 160/9 167/21 177/21 186/1 215/11 220/11 222/16 224/5 226/2

basing [1] 69/2

baton [3] 25/14 25/24 26/9

batteries [1] 9/21

battering [1] 234/6

battery [6] 9/21 9/25 10/1 55/6 76/11 239/3

be [119] 5/15 5/18 5/19 5/20 6/1 7/8 11/3 11/7 12/9 15/2 15/21 18/2 18/25 19/13 19/18 20/5 22/7 22/25 23/3 24/8 30/12 34/1 35/6 35/9 37/4 37/6 40/8 40/9 43/17 45/22 46/4 49/17 51/4 52/21 55/5 58/25 59/2 59/14 59/22 60/14 65/23 66/3 66/8 66/11 68/18 71/11 74/22 75/15 84/11 85/4 90/12 94/20 94/20 95/14 97/23 98/17 101/22

5-RenSER-00992          5-RenSER-00992

**B**

be... [62] 103/25 104/3 106/20 110/8 110/14 110/23 115/7 117/21 119/3 121/2 121/10 125/24 127/11 130/5 133/1 134/5 134/18 134/24 136/24 137/20 142/6 150/15 152/19 154/24 161/20 165/10 166/21 169/9 178/18 180/3 180/19 182/5 182/11 187/18 192/17 194/19 200/24 207/6 207/7 207/14 207/14 216/15 218/20 218/24 219/8 224/6 225/18 226/22 227/4 228/15 228/23 229/16 231/24 241/17 241/25 244/23 247/6 247/8 247/9 247/20 247/23 247/25
bearing [3] 107/8 107/16 118/9
beat [1] 70/14
became [6] 44/2 112/11 117/9 184/12 226/10 230/12
because [51] 15/24 29/1 31/24 32/11 40/1 40/7 41/2 44/3 46/21 50/1 50/9 52/3 58/11 63/20 66/13 76/10 79/7 80/11 85/3 94/16 97/24 98/3 98/6 99/17 100/15 103/10 104/19 105/22 106/22 110/2 110/5 139/12 148/8 164/24 167/21 175/23 176/18 195/14 199/19 201/12 204/23 207/6 210/9 211/8 219/24 221/12 223/25 229/18 232/21 239/2 244/12
Beck [2] 121/25 129/18
become [6] 90/11 112/8 113/7 120/12 228/12 228/14
becomes [2] 63/20 125/13
becoming [1] 229/25
bed [1] 31/1
been [60] 8/17 9/12 10/5 15/13 15/24 20/25 21/2 22/23 23/1 32/4 35/15 40/13 40/13 46/18 63/15 63/15 67/14 69/6 72/3 75/7 96/6 97/14 103/4 103/11 105/15 109/1 110/5 122/13 123/25 129/18 131/5 132/20 137/2 137/7 137/9 138/18 138/23 139/1 139/9 139/20 140/24 143/8 147/10 158/12 159/9 160/19 160/20 164/14 170/2 170/5 170/8 186/14 204/21 213/6 215/4 229/19 229/19 230/19 246/16 246/18

before [59] 10/4 22/1 23/21 27/2 31/4 43/8 44/17 45/6 46/4 47/14 49/7 56/14 58/9 72/8 72/13 73/18 73/20 73/25 73/25 82/19 105/10 108/24 114/8 116/12 116/21 138/23 142/18 143/24 145/15 146/18 152/13 153/1 166/4 174/5 175/9 181/7 186/3 187/22 189/2 190/8 191/5 196/2 200/24 204/23 204/24 205/5 205/7 211/9 219/11 220/10 220/18 221/3 222/17 225/8 228/10 228/17 228/24 231/6 231/11
began [7] 119/10 123/8 171/5 171/8 193/5 195/17 225/20
begin [6] 7/5 14/13 15/8 161/11 161/21 211/14
beginning [12] 10/6 12/2 19/24 147/13 159/18 163/21 169/19 195/23 196/2 212/5 219/19 219/20
begins [1] 164/5
behalf [2] 132/22 246/20
behavior [1] 209/15
behind [11] 12/13 14/15 79/7 94/5 127/8 140/13 143/5 151/14 154/17 155/17 226/23
being [43] 10/17 11/19 23/9 30/4 32/12 45/7 55/20 60/15 70/14 98/3 98/12 104/8 105/20 105/25 107/5 107/22 111/20 118/3 118/8 120/17 122/17 123/3 125/3 128/17 134/20 135/20 136/17 140/24 145/23 145/25 164/25 165/4 174/2 194/5 194/17 208/13 209/17 214/22 233/10 234/14 234/18 244/23 244/24
believe [32] 5/22 10/24 12/9 13/5 13/9 26/9 28/4 39/6 43/16 45/2 67/20 73/21 78/22 100/12 105/6 105/14 105/24 106/5 116/17 118/6 118/7 119/2 127/12 127/16 131/1 139/10 161/22 163/13 170/15 175/13 190/15 244/5
belongings [2] 143/4 171/23
bench [2] 101/5 161/17
beneath [1] 103/6
best [8] 7/7 59/15 59/21 74/15 148/3 161/8 209/7 224/3
better [3] 63/20 207/7 223/5
between [11] 9/25 24/24 85/16 151/22

160/9 191/6 193/1 203/19 203/20 239/12 244/22
beyond [2] 104/20 171/21
bicep [6] 154/10 154/16 155/20 223/15 225/15 226/22
big [1] 42/7
Billinger [19] 26/18 26/24 27/20 29/12 30/11 30/22 30/23 31/12 32/9 35/8 38/5 39/23 51/15 71/22 71/24 141/24 168/14 174/10 245/23
binder [1] 137/3
bit [3] 103/14 202/9 233/19
bitch [1] 45/15
black [1] 28/20
bladed [4] 193/2 193/15 193/21 194/5
bleeding [15] 111/9 111/10 112/12 112/14 112/22 112/24 113/6 113/10 113/14 228/9 228/11 229/5 229/20 230/12 230/18
blood [24] 91/25 92/15 112/8 112/9 112/21 112/22 113/5 113/7 113/8 227/17 227/25 228/17 228/18 228/25 228/25 229/7 229/8 229/9 229/13 229/18 229/24 229/25 229/25 230/10
blue [1] 152/2
blue jeans [1] 152/2
blurry [1] 202/24
bodily [1] 124/5
body [97] 14/23 25/19 25/20 81/22 83/9 83/14 83/16 83/17 84/23 85/9 85/18 85/19 85/20 85/24 85/25 86/3 87/14 87/24 88/12 88/20 88/21 89/8 89/12 89/13 89/14 89/22 89/25 90/1 90/1 90/10 90/12 90/14 90/23 91/2 91/12 92/11 92/22 93/24 94/9 94/15 96/13 98/8 98/9 99/12 99/25 100/19 101/8 101/10 104/17 104/20 104/22 104/23 104/25 105/9 106/11 106/23 106/23 107/6 107/11 107/14 107/19 107/25 108/18 109/17 109/21 114/14 114/21 115/6 115/23 115/25 117/4 118/3 118/4 118/12 118/12 118/23 119/14 119/16 120/1 120/6 120/8 121/4 124/21 129/22 148/4 216/17 218/11 219/1 223/11 223/11 224/20 224/22 225/23 225/25 227/24 235/13 240/12
body-worn [3] 25/19

25/20 240/12
book [1] 49/24
booking [1] 238/20
books [1] 244/17
Borba [25] 4/12 4/19 5/13 6/6 19/3 19/4 19/15 22/13 95/21 105/1 105/12 141/24 157/2 157/4 168/14 173/7 173/15 174/2 174/4 174/10 225/4 226/10 233/14 233/15 245/23
Borba's [1] 104/18
borne [1] 118/8
both [19] 47/14 75/16 94/4 117/3 118/11 138/13 139/20 154/10 154/16 156/14 193/3 213/4 219/10 224/15 227/6 241/2 241/3 241/9 242/8
bottom [3] 105/6 143/19 163/20
box [1] 134/19
break [2] 98/19 103/14
Brian [1] 164/18
brief [5] 41/18 47/1 49/11 70/25 173/22
briefly [5] 102/10 160/5 163/10 235/25 238/24
bring [2] 109/25 178/12
broad [2] 114/12 176/17
broadcast [1] 129/24
brought [1] 140/2
Brown [4] 194/14 194/14 194/21 195/2
Bryan [1] 3/15
bulky [1] 152/2
bumps [1] 17/18
buses [2] 54/4 54/15
business [1] 67/21
butt [1] 226/16
buttocks [4] 120/21 121/2 123/13 127/14

**C**

CAD [1] 29/5
calculate [2] 204/14 208/17
calculated [1] 247/7
CALIFORNIA [10] 1/2 1/15 1/23 2/5 2/10 2/15 2/19 3/5 3/9 5/1
call [117] 10/14 10/18 10/19 11/1 13/9 13/11 14/2 15/13 16/1 16/11 16/18 17/11 20/8 26/14 26/14 26/15 26/15 26/17 26/19 26/20 27/5 27/5 27/8 28/25 29/23 31/11 31/12 31/24 31/25 32/12 33/6 33/8 33/9 33/17 33/22 35/2 35/4 35/5 35/6 35/11 35/22 36/6 37/12 37/18 38/16 39/4 39/11 40/7 41/19 51/3 51/6 52/6 53/4 54/17 54/21 55/20 134/5 139/24 140/2 140/6 142/1 144/8 144/11 144/13 144/20 145/3 145/10 145/17

145/23 145/23 146/7 146/8 146/13 146/23 150/13 151/14 152/19 152/20 162/13 169/8 169/22 173/2 175/2 175/10 175/19 176/6 177/4 178/10 183/2 183/4 185/14 185/18 185/21 239/11 239/12 241/6 241/15 241/16 241/18 241/19 242/1 242/4 242/18 242/20 242/23 242/24 243/11 243/12 244/1 244/9 245/4 245/15 245/19 245/19 246/5 246/10 247/1
call taker [1] 35/6
called [18] 23/3 135/20 136/18 144/15 144/17 144/25 145/18 162/19 162/21 163/1 164/10 183/10 185/15 228/15 228/22 229/5 229/6 230/24
caller [4] 29/1 145/14 175/22 176/18
callers [1] 164/17
calling [1] 177/17
calls [37] 9/25 18/4 18/16 18/19 52/25 54/7 81/5 134/8 140/20 140/21 145/25 149/12 169/7 173/17 175/1 175/5 181/5 181/17 181/20 182/1 182/1 182/2 182/4 182/7 182/7 182/8 182/10 185/25 187/16 241/5 241/11 241/13 241/21 241/22 241/23 241/24 242/13
calm [1] 21/14
calmly [1] 152/14
Cam [1] 148/4
came [35] 15/4 15/5 26/14 26/19 29/15 31/4 33/18 35/2 35/5 35/13 35/22 36/6 37/18 38/2 38/16 39/2 50/9 56/14 56/17 58/9 64/16 64/21 73/2 73/5 101/16 111/4 111/23 131/15 144/6 177/16 183/19 185/6 185/7 188/9 232/12
camera [2] 25/19 25/20
camp [2] 64/3 171/3
camper [3] 41/21 47/8 70/7
campground [28] 12/3 28/22 41/5 67/3 69/7 70/4 70/9 139/25 140/3 144/6 146/8 146/10 146/18 147/2 171/15 175/4 175/16 175/17 175/21 176/5 176/17 177/17 180/15 181/3 183/25 186/3 189/9 224/2
campgrounds [2] 164/14 165/1
campsite [112] 10/23 10/24 11/5 12/11 12/23

# C

campsite... [107] 14/20 14/25 21/24 28/17 28/19 29/7 29/8 30/17 32/10 32/20 32/24 33/5 33/13 41/14 41/25 42/8 42/9 42/10 43/4 43/4 46/1 46/4 47/9 47/19 49/7 49/18 50/10 50/14 50/24 51/16 55/18 55/20 56/12 63/10 64/22 64/24 65/5 65/7 65/10 65/14 66/21 66/23 66/24 67/5 67/11 68/15 69/8 69/13 69/21 70/20 71/21 71/22 72/5 72/9 72/12 72/13 76/22 80/23 140/10 140/14 140/15 141/12 141/17 141/19 143/2 143/3 143/5 144/14 144/15 144/17 144/17 144/24 144/24 145/17 145/17 146/16 162/20 163/2 165/5 171/20 171/21 172/12 173/1 173/5 173/5 173/16 174/16 176/19 177/5 178/15 178/19 179/9 179/17 179/21 180/4 180/17 180/19 180/20 184/24 184/25 185/4 187/20 187/21 188/9 192/21 202/7 212/16

Campsite 61 [7] 28/19 177/5 178/15 178/19 179/17 179/21 180/4

Campsite 63 [8] 28/17 29/7 30/17 32/10 32/20 49/18 50/10 50/14

Campsite 65 [12] 32/24 33/5 33/13 43/4 46/1 46/4 50/24 76/22 141/12 141/19 173/5 184/25

Campsite 66 [8] 21/24 43/4 49/7 67/11 68/15 69/21 71/21 72/9

Campsite 71 [3] 41/25 42/8 42/10

campsites [3] 28/16 32/8 49/10

can [196] 7/17 7/21 7/22 10/8 13/13 15/22 16/20 21/13 22/4 22/19 25/13 27/25 27/25 28/1 28/5 29/25 31/9 32/19 33/25 35/22 37/1 38/21 39/5 40/21 40/23 42/19 43/15 45/3 46/12 48/17 49/6 53/14 54/10 56/24 56/25 57/9 57/12 57/18 58/15 58/15 58/16 58/21 59/8 59/22 60/2 63/7 65/21 66/8 67/8 68/25 69/19 71/7 72/4 72/14 74/12 76/2 80/5 81/8 84/1 84/3 84/14 85/4 86/2 86/25 87/1 87/17 88/11 89/13 89/17 90/8 91/7 91/7 92/18 93/5 96/15 96/19

96/24 97/8 97/23 100/2 103/25 106/2 109/14 109/19 109/21 110/15 111/7 111/20 116/15 117/21 119/4 119/9 122/9 126/2 128/3 129/25 130/3 130/24 131/11 131/23 133/22 134/22 135/6 135/25 137/3 137/4 137/11 139/11 139/13 139/18 139/20 141/23 148/3 148/8 149/14 149/21 150/11 155/17 156/9 158/25 160/24 163/16 163/20 169/15 170/17 171/19 173/19 174/14 176/8 176/25 178/18 180/3 180/18 180/20 181/25 182/5 182/11 184/4 185/11 186/19 187/3 187/11 188/19 189/18 194/4 194/6 194/11 194/19 195/2 196/8 197/1 198/2 201/2 201/9 202/2 202/25 203/13 205/6 205/18 208/8 208/12 208/14 209/22 210/12 210/21 212/2 212/3 217/13 217/24 221/9 221/10 222/2 222/6 222/9 224/3 224/3 224/24 230/8 230/16 234/13 235/2 236/25 237/3 237/12 237/16 238/14 239/1 239/22 243/25 244/2 244/10 244/11 244/13 245/21 246/9 246/15

can't [14] 40/23 45/20 55/10 57/10 60/6 60/16 104/7 104/8 117/12 127/21 129/14 206/19 207/6 244/19

cannot [1] 183/20

cap [1] 238/11

capacity [2] 240/18 240/20

captured [1] 43/24

car [17] 9/24 12/21 14/6 29/12 30/15 65/18 76/25 167/15 167/20 167/22 186/9 187/17 188/13 194/4 244/25 244/25 245/1

card [2] 240/17 240/19

care [1] 136/2

CARLSBAD [1] 3/9

carry [1] 25/14

cars [4] 29/12 29/15 39/23 175/2

CARTER [1] 1/4

case [24] 5/17 5/18 5/20 20/11 23/5 33/17 39/12 55/11 88/1 100/11 101/22 101/23 108/12 108/22 109/1 131/5 133/1 133/13 136/2 137/7 152/22 166/12 212/5 247/10

casual [2] 152/21 153/5

CATHERINE [1] 2/13

cause [4] 65/2 155/4 210/8 238/21

causing [1] 104/14

caution [2] 126/21 126/25

ccllp.law [2] 3/6 3/10

ceases [1] 9/8

center [1] 127/15

CENTRAL [2] 1/2 2/4

certain [9] 59/13 98/17 100/14 119/3 146/13 160/25 161/20 207/19 245/1

CERTIFICATE [1] 248/5

CERTIFIED [1] 1/5

certify [1] 249/2

cetera [11] 59/20 109/22 119/19 123/22 171/3 176/6 195/16 198/11 229/24 231/5 231/11

CHAD [10] 3/2 47/2 118/16 123/13 215/5 217/4 228/7 236/2 238/2 238/19

Chad Renegar [1] 123/13

chair [1] 135/9

challenge [2] 104/10 109/3

change [1] 74/13

changed [2] 215/23 215/23

changing [2] 208/18 208/21

channel [2] 15/21 22/25

characterize [6] 21/9 21/17 21/20 164/21 165/2 165/6

charge [1] 9/25

charging [1] 9/24

check [4] 56/3 56/7 69/8 74/4

checked [2] 228/15 228/23

checking [2] 55/25 56/1

chest [5] 218/17 218/20 219/1 219/7 219/14

choices [1] 103/11

choose [2] 67/22 119/9

chose [2] 58/11 65/3

CHRISTIE [1] 3/7

chronological [1] 201/6

chronologically [2] 47/15 47/16

chronology [3] 64/22 220/8 221/21

circumstances [3] 169/25 170/1 209/12

circus [1] 103/6

circus-like [1] 103/6

citizen's [1] 184/7

CITY [2] 3/4 32/4

Civil [1] 102/25

claim [1] 110/3

claimed [1] 193/21

clarification [11] 13/21 18/8 31/16 36/16 55/2 68/7 73/9 108/5 179/10 220/23 234/3

clasped [3] 155/9 156/3 227/15

clear [25] 30/25 32/12 39/4 40/7 41/7 44/25 63/16 72/19 75/11 75/15 79/2 89/14 89/25 101/5 147/23 184/12 190/12 190/23 215/12 226/4 229/22 236/21 242/19 242/20 247/3

cleared [10] 242/4 242/24 244/1 244/23 244/24 245/3 245/15 245/18 246/5 246/10

clearing [5] 31/23 39/11 187/15 244/8 245/1

clerk [3] 7/2 134/14 159/11

client [6] 101/4 101/15 102/23 102/24 103/4 103/9

clip [1] 202/3

close [8] 11/19 43/24 80/24 81/1 151/15 214/22 226/1 226/1

closer [2] 63/19 63/22

clothing [1] 152/4

cnaltsas [1] 2/16

Code [2] 10/14 249/3

Code 3 [1] 10/14

collapsable [1] 25/14

colleagues [1] 13/6

collected [1] 21/14

COLLINS [4] 3/3 3/3 3/7 3/7

colloquy [1] 119/3

combat [1] 146/3

combative [1] 102/18

combined [1] 94/9

come [18] 5/18 54/18 59/14 69/21 97/15 98/20 105/21 106/16 130/21 142/9 142/11 142/15 142/20 156/11 162/21 166/9 186/11 197/18

comes [3] 57/3 123/21 181/7

coming [3] 131/22 181/3 229/9

command [25] 153/16 190/12 190/18 191/6 191/15 191/18 191/23 192/3 192/21 196/3 203/9 203/22 204/1 204/7 219/18 220/5 220/12 220/13 220/22 221/16 221/17 221/18 221/19 222/24 225/17

commands [13] 150/21 150/24 188/20 191/5 191/22 193/5 193/6 195/18 198/18 199/7 210/23 221/13 222/21

comment [1] 130/14

comments [1] 103/17

committed [1] 171/10

common [2] 152/11 152/12

communicate [2] 150/3 210/16

communicated [1] 15/16

communicating [1] 20/13

communication [2] 16/2

242/19

communications [2] 11/15 210/1

compare [1] 192/25

comparing [1] 95/11

compilation [1] 110/8

complain [2] 92/21 113/6

complained [1] 131/6

complaining [4] 129/25 230/25 231/5 231/11

complains [1] 61/5

complete [3] 31/12 136/10 234/20

completed [4] 74/19 241/19 241/24 242/1

completely [2] 80/12 229/4

completing [1] 136/14

completion [1] 136/16

complex [2] 69/25 69/25

compliance [2] 210/1 210/17

complied [1] 41/13

complies [3] 28/9 42/22 198/13

comply [3] 150/23 211/2 221/13

compound [29] 31/6 38/10 48/15 68/9 68/18 69/10 69/15 69/16 72/10 92/1 92/2 174/12 177/25 178/1 178/22 178/24 180/22 180/23 187/23 188/1 188/4 192/1 215/15 216/10 216/11 217/21 228/2 228/3 234/9

computer [2] 238/21 239/13

concealment [1] 142/17

concept [1] 156/1

concern [7] 40/6 40/10 55/25 110/3 151/6 151/19 155/4

concerned [4] 21/15 21/19 208/6 209/25

concerning [9] 85/16 96/16 97/25 105/23 109/17 110/7 129/4 133/13 166/12

concerns [20] 103/9 140/7 140/17 140/22 141/1 142/12 144/7 145/20 146/11 147/1 149/17 149/18 150/1 151/3 151/13 152/15 156/11 157/23 176/9 211/21

conclude [2] 133/1 243/22

conclusion [1] 205/14

conduct [5] 54/11 102/21 103/4 153/1 160/4

Conference [1] 249/7

confirm [6] 40/2 48/21 138/3 164/10 164/13 237/13

confirming [2] 38/7 38/12

confiscate [1] 64/4

**C**

conformance [1] 249/6
confrontation [1] 190/17
Confrontational [1] 21/22
confronting [1] 156/2
confuse [1] 47/15
confused [2] 44/10 174/3
confusing [3] 119/9 173/25 191/7
confusion [4] 19/14 104/14 244/22 245/2
connected [3] 9/19 167/15 167/21
consider [3] 14/25 15/2 175/6
consideration [1] 175/20
consistent [1] 219/8
consistently [1] 221/13
consumptive [2] 34/14 89/5
contact [18] 13/17 17/8 45/6 66/12 71/12 72/16 72/21 72/23 72/25 149/3 163/3 165/20 171/2 174/5 219/11 220/18 220/19 239/10
contacting [1] 203/14
contain [1] 98/14
contained [1] 88/14
contention [1] 85/15
context [5] 60/16 99/7 99/11 102/3 118/19
continually [1] 109/25
continuation [2] 88/24 119/12
continue [22] 6/7 7/17 7/21 7/25 62/9 62/19 66/21 66/25 71/14 80/22 94/2 128/3 130/10 148/20 156/20 170/17 195/10 203/4 205/24 207/20 215/8 239/9
continued [8] 41/1 110/25 127/24 127/25 155/23 198/4 199/21 227/14
continues [2] 100/24 147/13
continuing [6] 6/11 94/3 99/14 101/9 125/16 126/5
continuity [1] 139/11
continuously [4] 100/9 100/11 100/23 109/2
contraband [1] 209/15
contradictory [3] 106/22 107/20 108/1
contrary [1] 104/2
contribute [1] 103/5
control [16] 14/10 14/15 15/11 77/4 77/7 94/3 100/1 121/22 123/7 127/7 127/8 127/18 156/18 216/16 223/5 232/16
control-hold [1] 100/1
conversation [24] 20/4 43/20 44/2 45/7 45/11 47/23 48/17 50/19 51/5
65/17 65/21 66/2 66/18 72/18 75/7 75/12 75/13 76/4 83/3 152/21 162/23 168/20 238/18 239/6
conversations [5] 153/5 168/10 168/16 235/21 239/12
convicted [4] 146/20 146/25 147/5 147/7
cooperate [1] 67/23
Cooperative [1] 21/19
cops [1] 185/16
copy [5] 6/23 19/8 244/11 244/14 244/19
corner [1] 19/9
Corps [1] 146/2
correct [141] 9/12 9/13 11/6 11/7 12/13 12/14 19/4 21/5 21/7 21/8 22/2 22/3 27/19 27/21 29/10 29/14 31/22 32/2 32/22 39/25 40/15 41/16 41/24 42/1 43/6 44/4 45/13 50/11 50/16 50/22 52/1 53/9 56/13 56/19 61/4 62/14 62/18 62/25 64/6 64/8 65/20 67/4 73/7 73/14 73/17 74/14 76/14 77/2 77/8 79/4 83/7 91/16 94/6 105/5 105/22 111/6 112/1 115/16 115/18 120/2 120/5 120/11 121/13 121/24 133/5 138/4 138/24 139/1 139/2 148/13 148/14 153/7 153/8 156/17 158/13 158/14 164/19 165/21 165/24 165/25 166/2 167/3 167/13 167/23 168/8 168/12 168/25 169/6 170/13 171/12 172/1 172/7 172/15 172/18 172/21 173/13 174/24 175/15 177/20 178/9 179/7 182/16 182/25 183/16 183/22 185/20 185/23 186/12 186/20 190/4 191/20 194/9 194/10 195/13 198/16 203/24 204/3 204/11 205/8 205/9 210/13 213/9 216/3 218/18 222/15 222/19 223/7 223/20 227/8 232/2 232/15 232/20 237/25 238/17 238/20 240/14 242/11 242/13 243/15 245/25 249/4
correctly [2] 104/19 105/14
corroborate [2] 237/12 240/4
could [39] 5/20 6/22 6/24 16/19 17/12 19/5 30/6 40/9 40/9 40/22 43/7 80/22 103/5 126/15 149/22 151/19 157/5 168/21 171/24 176/14 182/24 188/13 199/12 209/2 215/9
215/13 215/18 219/23 223/15 223/19 227/3 227/6 229/16 229/18 229/19 231/23 232/9 233/8 235/3
could have [1] 17/12
couldn't [3] 90/14 109/20 126/1
counsel [170] 2/1 3/1 5/6 5/7 5/22 6/2 6/7 6/25 7/5 7/9 7/14 7/18 7/22 19/6 22/10 22/15 23/20 24/8 24/10 33/24 34/10 35/24 36/1 37/14 38/19 38/19 44/20 47/25 48/2 49/22 50/4 52/11 53/8 60/9 68/9 68/17 70/2 72/1 72/10 72/20 75/25 78/22 81/17 82/12 82/22 82/25 86/5 86/12 87/10 87/13 87/16 87/21 87/23 88/5 88/7 88/10 88/14 88/17 88/23 89/3 92/2 92/16 93/3 93/3 93/20 95/14 96/6 97/13 97/21 102/8 102/18 103/12 103/15 103/19 103/24 104/6 104/7 105/8 105/17 106/1 106/8 106/10 106/14 108/2 109/10 110/22 110/25 116/22 117/21 119/8 119/15 119/21 123/19 123/23 123/24 123/25 125/8 125/11 125/23 126/8 126/18 128/3 129/5 129/7 132/8 132/15 132/21 133/11 133/18 133/22 134/3 134/3 134/5 134/20 135/14 135/15 135/15 135/21 137/8 138/21 139/3 139/5 143/12 143/14 143/21 143/22 147/15 148/17 151/8 163/16 165/10 165/13 166/8 166/13 166/19 176/13 176/15 178/2 179/2 186/7 187/7 188/2 189/24 191/3 197/5 200/19 209/8 209/21 212/19 212/22 212/22 214/2 228/3 230/5 230/20 231/16 233/18 236/10 236/24 239/18 242/5 242/5 242/12 243/20 244/3 244/18 246/3 246/14 246/19 246/25
counting [3] 135/14 219/22 220/6
COUNTRY [2] 2/9 2/18
COUNTY [11] 1/9 2/7 8/23 16/25 35/13 53/23 54/4 152/6 228/15 228/22 230/24
couple [5] 10/17 123/25 124/2 193/14 203/19
course [2] 45/21 74/11
court [63] 1/1 1/21 1/21 5/3 6/22 7/2 7/17 13/21 18/8 24/5 27/11 31/16
36/16 48/13 48/19 55/2 68/7 73/9 88/18 98/10 98/11 99/1 99/3 99/6 100/7 100/8 100/10 100/14 100/23 100/24 100/25 101/12 101/14 101/22 101/25 102/5 102/11 102/13 102/17 103/23 104/7 104/10 104/10 105/10 105/14 105/16 105/22 108/5 108/9 109/2 109/3 110/2 110/9 110/13 110/19 133/25 160/21 166/15 167/10 179/10 220/23 234/3 247/2
Court's [7] 73/24 109/11 119/22 123/20 135/3 137/4 137/19
courteous [1] 133/1
courtesy [5] 5/6 24/9 98/16 110/22 134/3
courtroom [8] 24/3 24/7 97/18 103/7 108/8 110/18 133/15 224/1
cover [11] 57/13 57/14 57/19 57/25 63/21 71/9 141/15 141/16 142/17 213/17 227/11
covered [1] 183/17
cradle [1] 9/24
credibility [3] 100/8 101/15 101/19
credible [2] 101/1 163/7
crime [8] 46/16 54/19 54/20 54/24 55/5 171/9 210/9 210/15
criminal [5] 146/19 147/6 153/1 209/14 209/15
critically [1] 102/13
cross [14] 4/3 22/11 23/21 24/2 24/11 24/13 101/12 111/2 165/16 166/21 166/22 198/8 199/25 221/5
cross-examination [10] 22/11 23/21 24/2 24/11 24/13 101/12 111/2 165/16 166/21 166/22
crouched [2] 90/13 129/24
CSR [1] 1/20
cswiss [1] 3/10
CTA [1] 54/14
cuff [1] 123/9
cuffed [2] 129/21 157/22
cuffs [7] 15/14 22/16 157/7 225/4 225/21 225/21 225/21
cumulative [1] 139/16
currently [2] 161/21 161/22
custody [4] 53/16 53/20 167/8 167/10
cut [1] 34/2
cycle [4] 123/8 123/12 128/1 129/2

**D**

D-I-S [1] 243/9
danger [11] 156/8
212/11 213/5 213/16 213/22 213/23 215/5 234/15 234/18 234/21 235/18
dangerous [16] 15/2 16/16 16/16 16/16 29/24 30/1 30/8 63/10 64/9 140/20 187/16 187/18 211/21 211/23 211/23 212/6
dark [20] 28/21 28/22 28/24 30/16 39/3 69/7 70/5 70/6 146/1 146/10 165/1 175/4 175/14 175/16 175/21 176/15 176/17 180/15 181/3 189/9
dart [1] 121/3
darts [1] 121/4
date [2] 74/21 249/9
DAVID [1] 1/4
day [7] 1/8 20/24 20/24 27/13 195/5 237/23 242/3
daylight [1] 176/17
days [6] 74/19 74/20 74/22 75/14 76/4 147/11
ddparker.com [1] 1/24
Deb [5] 6/24 18/11 19/5 143/10 199/2
Deb's [1] 179/14
debates [1] 153/4
Debbie [1] 138/20
DEBORAH [3] 1/20 249/12 249/12
decide [5] 100/10 101/20 102/4 137/9 137/10
decided [2] 21/1 207/10
decides [1] 101/23
deciding [1] 100/8
declaration [1] 238/22
defendant [3] 3/2 99/3 108/15
defendant's [1] 110/4
defendants [3] 1/10 2/7 104/15
DEFENDANTS' [6] 4/3 4/16 5/13 8/9 134/15 138/1
defense [5] 3/15 102/9 134/8 236/10 239/23
define [1] 111/16
deliberations [3] 5/21 5/24 5/25
demonstrate [1] 223/9
demonstrated [1] 223/23
demonstration [1] 223/10
demonstrations [1] 223/25
denied [1] 111/4
Dennis [29] 20/1 20/2 20/6 20/7 21/4 41/21 41/23 43/18 43/19 43/20 43/23 44/5 44/13 45/7 45/14 45/25 47/2 47/13 47/16 47/20 48/10 48/21 49/2 49/3 50/17 50/18 55/19 76/16 76/18

# D

Dennis' [1] 21/9
denying [8] 57/21 63/1 63/4 89/8 89/11 119/25 125/1 170/11
department [5] 8/20 8/23 35/13 152/7 159/5
depending [1] 16/1
depends [2] 80/6 80/14
deploy [1] 16/3
deployed [9] 23/9 23/9 120/17 125/3 127/5 225/11 225/12 225/14 225/18
deployment [8] 15/15 15/24 15/25 22/16 22/23 23/1 23/3 128/21
deposed [1] 122/17
deposition [42] 22/8 83/20 84/2 84/4 84/8 84/19 85/11 85/21 95/3 95/12 97/3 99/2 99/12 100/17 100/20 102/1 103/19 103/20 103/25 104/11 104/18 105/11 105/15 116/13 116/17 117/2 122/10 122/15 123/6 123/7 124/8 124/9 124/14 124/25 125/4 125/9 125/18 129/15 130/17 131/2 131/3 223/24
depositions [2] 100/13 108/13
deprived [3] 100/12 103/4 109/1
depriving [1] 101/15
deputies [38] 11/14 11/25 12/12 13/18 14/9 15/21 16/12 16/18 32/13 57/15 64/17 67/17 71/10 72/24 75/3 75/9 75/12 78/22 81/22 104/22 115/7 116/2 116/6 117/11 141/20 141/22 141/23 141/24 141/25 142/5 155/12 158/18 216/1 229/17 238/18 239/12 240/21 242/9
Deputies Gotts [1] 12/12
Deputies Renegar [3] 11/25 14/9 81/22
deputies' [4] 15/9 116/18 138/10 138/14
deputy [142] 4/17 4/19 5/8 5/11 6/2 6/6 6/12 12/1 12/9 12/10 13/9 13/14 14/7 18/18 19/3 19/15 20/3 20/14 22/13 25/2 26/18 26/24 27/20 29/12 30/11 30/22 30/23 31/12 32/9 35/8 38/5 39/15 39/17 39/20 40/11 41/19 43/20 45/8 47/2 48/7 51/14 58/2 61/12 63/22 66/11 66/19 67/13 67/14 67/14 71/12 71/13 77/3 77/3 77/17 78/9 78/9 78/24 78/25 90/20

96/19 96/23 97/22 98/12 98/21 105/1 105/12 107/21 109/13 115/20 120/14 126/15 126/23 132/23 132/25 133/8 134/8 134/9 135/2 139/24 141/15 146/23 147/10 148/5 148/25 153/10 153/10 155/24 156/14 156/23 156/24 157/2 157/4 162/7 165/18 165/23 165/24 166/1 166/4 166/20 167/2 167/17 168/14 171/1 171/4 171/7 174/16 194/14 194/15 196/21 198/5 198/9 198/14 198/17 199/1 199/17 199/22 200/1 207/9 207/10 212/8 215/9 215/13 223/18 225/4 225/12 225/20 227/4 228/7 229/11 229/19 230/18 233/2 233/7 236/2 236/10 238/2 239/11 244/14 244/18 246/11 246/20 247/22
deputy Billinger [11] 26/18 26/24 27/20 29/12 30/11 30/22 30/23 31/12 32/9 35/8 38/5
Deputy Borba [7] 19/3 22/13 105/1 105/12 157/2 157/4 225/4
Deputy Brown [1] 194/14
Deputy Chad Renegar [4] 47/2 228/7 236/2 238/2
Deputy Gonzales [1] 167/17
Deputy Gonzalez [13] 77/3 78/9 153/10 155/24 156/14 156/24 165/24 167/2 196/21 207/9 223/18 225/20 227/4
Deputy Gotts [6] 12/9 78/24 96/19 132/23 168/14 246/20
Deputy Gotts' [1] 96/23
Deputy Gunderson [2] 12/10 78/25
Deputy Kevin [2] 134/8 148/5
Deputy Pahel [4] 12/1 77/17 135/2 166/20
Deputy Renegar [43] 13/9 20/3 20/14 39/15 39/17 39/20 40/11 41/19 45/8 51/14 58/2 63/22 66/11 66/19 67/14 71/12 71/13 78/9 120/14 141/15 146/23 153/10 165/23 166/1 166/4 171/1 171/4 174/16 194/15 198/5 198/14 198/17 199/1 199/17 199/22 200/1 207/10 212/8 215/9 215/13 225/12 233/2

246/11
describe [9] 21/13 24/17 25/5 25/13 103/6 223/8 224/3 224/7 224/14
described [6] 20/10 44/7 85/20 95/11 240/22 242/10
describes [1] 42/24
describing [2] 95/4 118/21
description [2] 109/13 198/22
detail [12] 15/13 20/10 26/15 26/20 27/6 27/8 29/5 33/22 175/2 178/10 242/23 245/19
details [1] 55/24
detained [4] 152/22 209/17 234/14 234/18
determination [2] 66/7 110/2
determine [3] 54/23 163/7 171/9
determined [1] 65/2
deviate [4] 18/3 18/6 18/15 18/18
device [4] 9/8 9/18 123/7 127/18
diatribe [1] 110/12
did [333]
didn't [78] 9/21 16/13 18/10 18/12 26/2 31/15 31/20 31/24 32/9 32/11 39/2 39/17 40/2 40/7 41/1 41/4 42/15 43/21 44/19 55/23 56/15 61/8 64/3 64/4 64/7 64/11 65/4 67/5 69/5 69/13 70/13 70/21 71/2 75/22 78/8 78/10 83/8 109/7 109/9 114/10 122/16 123/20 129/23 132/18 141/3 142/11 143/4 149/9 151/16 151/16 155/7 160/10 173/7 175/23 176/2 176/18 182/22 183/2 185/22 200/23 204/4 204/23 205/5 212/14 217/7 217/9 222/16 222/17 228/18 229/1 229/9 229/10 229/13 229/20 230/17 230/25 231/2 232/21
difference [2] 24/24 85/15
different [24] 25/3 25/23 32/11 44/6 45/17 45/21 45/22 45/23 85/4 95/15 98/1 108/20 116/8 119/16 137/11 161/6 161/7 176/12 201/6 207/11 214/17 221/17 222/15 235/13
difficult [1] 48/23
difficulty [5] 18/25 46/13 60/13 61/11 98/5
dignity [1] 103/7
direct [6] 4/3 6/8 6/10 50/18 118/25 136/6
directed [2] 62/23 71/13
directing [1] 119/8

direction [6] 40/17 40/21 40/24 40/25 121/8 186/10
directly [4] 55/20 103/18 106/6 121/1
dirt [3] 224/19 229/8 229/18
DIS [1] 243/9
disable [1] 9/8
disadvantage [1] 149/11
disagree [2] 33/7 55/7
disagreement [1] 242/8
discipline [1] 58/18
discourage [1] 110/11
discrepancy [2] 11/8 32/8
discuss [7] 23/25 88/17 89/4 97/16 113/19 206/20 206/25
discussed [8] 44/12 99/5 99/11 100/19 119/12 122/14 132/3 206/22
discussing [11] 31/11 76/17 85/19 85/24 99/9 99/23 101/6 113/17 236/1 236/3 238/23
discussion [6] 75/22 85/18 88/21 95/10 118/16 125/12
dismissed [1] 101/22
dispatch [36] 10/9 10/13 10/18 10/25 13/10 14/2 15/17 15/23 16/6 22/20 22/21 22/23 26/14 29/4 33/18 35/2 35/6 35/17 37/3 49/13 49/14 49/15 145/8 145/10 145/13 146/7 148/12 169/23 177/9 177/23 179/19 181/4 181/6 181/7 242/19 243/10
dispatched [7] 35/4 54/6 243/5 243/5 243/5 243/11 243/16
dispatcher [2] 35/7 182/24
display [1] 103/11
displayed [4] 34/24 138/2 202/16 240/3
dispute [1] 98/6
disputed [1] 36/4
disregard [1] 101/2
distance [1] 211/19
distracted [1] 57/16
distress [2] 52/7 55/24
distribute [3] 6/24 159/11 161/1
distributed [3] 107/4 139/10 160/19
distributing [2] 19/6 138/21
distribution [1] 139/7
DISTRICT [3] 1/1 1/2 1/21
disturbance [6] 30/3 31/20 40/2 50/21 51/3 181/17
DIVISION [1] 1/3
do [148] 6/16 7/18 10/10 12/6 12/17 13/8 14/5 15/16 19/12 22/17

30/3 31/7 31/8 31/24 33/22 34/7 37/22 39/5 40/23 45/1 45/2 46/10 46/11 47/24 48/18 49/19 49/20 54/22 57/3 57/6 57/18 59/6 62/4 66/14 68/4 68/23 69/1 69/16 71/4 71/4 71/6 71/13 78/16 79/22 80/18 83/21 83/24 84/9 84/16 86/7 86/10 90/5 93/10 93/13 93/16 93/21 95/3 95/6 96/22 97/7 98/13 100/3 103/7 104/4 104/20 104/21 104/23 105/16 106/24 109/4 109/16 113/1 116/13 118/7 119/15 119/16 121/25 122/8 122/14 123/10 124/24 125/18 126/20 134/16 135/22 138/19 140/19 141/1 142/14 143/1 144/22 145/11 145/22 146/22 147/4 148/15 149/4 154/8 155/22 156/6 156/20 156/23 157/22 159/25 160/2 160/15 162/2 163/9 165/13 168/5 177/12 178/20 178/25 180/25 183/6 184/13 188/3 189/10 189/21 191/22 194/2 194/7 194/16 194/21 194/24 195/12 195/21 206/25 209/4 209/12 209/16 211/1 211/10 214/22 216/2 217/20 220/12 222/2 223/9 223/25 231/14 237/2 240/7 242/24 242/25 244/11 245/24 247/12
DOC [1] 1/8
document [17] 27/11 27/14 27/15 27/17 34/12 34/14 34/19 34/23 36/23 37/9 38/3 79/24 80/1 117/12 221/6 243/1 244/21
documented [1] 117/13
documents [1] 35/12
does [31] 7/25 12/22 12/24 15/19 16/2 16/24 36/10 54/1 66/17 86/8 99/6 102/22 104/1 111/14 111/14 149/15 149/16 153/6 163/23 177/5 178/16 178/17 180/12 180/12 194/21 195/8 223/22 241/3 241/22 243/9 246/10
doesn't [11] 6/25 37/4 37/5 68/6 68/14 90/17 96/6 104/13 215/10 215/11 215/22
doing [40] 5/10 15/10 29/20 37/17 63/15 66/22 68/2 68/22 70/14 77/10 77/15 77/20 80/15 80/15 82/19 85/4 92/12 97/7 101/7 109/21 113/20 114/13

**D**

doing... [18] 114/16 114/20 115/4 116/13 117/11 118/17 138/21 155/12 157/4 157/5 186/14 202/12 207/15 210/17 233/2 233/12 233/15 239/13

domestic [26] 29/23 46/16 54/7 54/11 54/14 54/21 54/25 55/6 55/8 69/1 71/11 140/4 140/6 140/20 141/8 142/1 142/21 142/24 144/8 145/23 162/11 172/13 172/23 182/1 182/3 184/24

domestic violence [1] 142/24

don't [107] 5/25 19/8 23/23 26/25 27/8 29/24 30/19 30/24 33/20 34/4 39/14 41/3 44/9 46/2 46/15 46/16 46/17 47/5 48/8 48/23 49/21 51/18 51/19 52/17 56/9 57/1 57/23 57/24 61/12 61/13 63/18 66/12 66/14 70/8 72/20 75/6 77/12 77/21 79/23 86/11 87/6 92/8 96/3 96/18 97/14 99/16 107/10 107/10 107/18 107/24 110/6 110/11 114/2 114/6 118/13 119/2 120/17 121/16 124/6 125/2 125/20 126/22 127/20 128/8 128/15 128/15 129/20 131/2 131/14 133/12 135/19 135/23 136/2 138/21 139/17 142/18 147/6 148/7 153/4 161/4 161/16 163/13 163/14 166/11 174/2 177/13 183/7 188/6 194/17 202/23 206/10 212/12 214/1 216/4 218/13 220/2 222/1 223/10 223/25 224/24 233/7 233/8 236/25 239/6 240/11 244/2 247/14

done [8] 71/17 91/25 92/23 100/15 102/1 108/12 112/3 206/25

door [3] 67/5 69/8 69/13

doubt [1] 209/4

down [70] 13/3 13/4 14/7 31/2 41/8 76/24 77/2 90/13 99/18 115/15 126/9 129/24 133/3 133/6 146/1 147/13 149/6 149/13 152/13 155/19 156/11 164/25 171/7 183/25 186/4 189/2 189/17 190/7 192/8 198/1 198/14 198/19 198/19 199/7 199/11 200/13 203/14 203/25 204/9 204/13 204/14 204/16

205/22 206/4 208/7 208/24 208/24 209/18 210/25 211/8 216/7 218/19 221/2 221/3 222/17 226/3 226/4 234/21 235/5 235/8 235/17 240/15 241/12 242/13 243/2 243/25 244/3 244/4 244/7 246/23

draw [6] 15/12 41/2 41/11 186/25 187/13 187/15

drawing [2] 120/18 202/6

drawn [3] 176/23 186/15 195/15

dressed [1] 151/25

drew [2] 123/21 186/3

drive [3] 3/4 49/6 121/1

driven [3] 39/19 42/25 43/3

driveway [1] 28/16

driving [3] 12/4 33/1 37/5

drove [5] 47/5 48/8 49/5 49/10 65/18

dry [2] 121/8 248/1

due [7] 11/12 16/11 17/9 20/25 145/23 198/4 199/21

during [39] 9/6 13/20 13/25 14/1 17/10 17/20 18/4 18/16 18/20 20/8 25/1 43/17 44/15 47/20 64/19 67/9 72/16 88/16 89/4 103/19 104/11 105/10 117/11 141/11 141/19 141/25 146/15 151/20 152/24 154/8 157/20 158/1 165/21 221/24 229/21 229/23 230/6 231/6 231/12

duties [1] 67/14

duty [2] 240/19 243/21

DV [19] 32/17 47/9 47/18 49/13 49/16 50/24 52/6 52/24 54/17 66/22 67/1 68/3 68/22 70/1 169/8 173/1 174/23 175/11 183/3

DV investigation [1] 68/3

dying [3] 76/11 76/13 239/3

**E**

each [11] 7/18 19/16 133/18 133/20 135/15 135/16 135/24 137/8 137/12 206/5 241/1

earlier [9] 15/7 43/16 44/1 56/10 71/9 78/19 78/19 117/9 162/25

earliest [2] 5/18 6/1

early [4] 5/21 137/7 141/4 165/1

East [1] 32/6

easy [1] 155/9

effect [6] 16/7 17/4 17/16 20/16 68/1 78/24

effective [6] 120/24 121/3 121/10 121/11

121/22 122/6

effects [1] 128/13

effort [2] 155/11 186/1

either [12] 71/7 99/3 107/21 110/6 134/22 184/8 213/21 216/25 231/1 232/4 232/19 235/17

elapsed [2] 17/8 17/11

electronic [2] 123/7 127/18

elevate [2] 146/11 151/2

elevated [1] 13/17

elevates [1] 140/22

elicit [1] 122/24

ELMO [1] 148/11

else [16] 38/25 40/9 50/17 62/13 70/13 71/12 75/4 93/10 93/13 93/16 94/7 119/12 160/12 169/1 225/7 225/10

else's [1] 180/20

embarrassed [1] 104/12

emergency [2] 11/13 11/16

emotional [1] 104/9

en [5] 36/9 36/9 36/10 36/11 37/7

en route [1] 37/7

encounter [9] 13/25 43/8 43/19 146/5 146/15 151/20 151/23 171/1 172/16

encountering [1] 187/16

encourage [1] 110/11

end [9] 6/14 20/13 67/12 71/16 159/18 169/20 202/3 237/16 237/20

ended [3] 144/8 216/5 216/5

ends [3] 102/7 237/9 237/21

enforcement [1] 144/18

engaged [1] 102/12

engaging [1] 210/15

English [3] 177/6 179/23 180/18

enough [8] 16/18 43/25 57/17 60/19 65/2 106/2 209/16 214/22

ENR [2] 36/10 36/10

ensues [1] 208/9

ensure [3] 14/17 57/15 240/18

ensuring [1] 58/2

enter [2] 57/25 145/6

entered [1] 28/2

entering [12] 28/16 41/5 57/24 145/1 173/16 177/18 177/22 178/7 178/11 178/17 179/6 179/19

enters [2] 24/7 110/18

entire [4] 9/22 126/9 126/11 240/19

entirely [4] 124/13 129/22 214/17 235/11

entirety [1] 138/17

entitled [4] 102/24 103/1 109/4 249/5

entrance [2] 39/19 40/10

entry [5] 22/15 28/8 28/12 33/1 63/12

environment [1] 103/2

equally [2] 178/18 180/3

equipment [9] 25/6 25/8 25/8 25/21 26/4 26/7 26/11 83/10 234/20

equipped [1] 167/14

erase [1] 28/5

error [1] 159/19

especially [2] 29/23 227/25

essential [1] 98/18

establish [3] 55/9 204/19 245/3

established [2] 119/5 203/1

establishing [1] 35/17

estimate [1] 5/17

et [13] 1/9 2/7 59/20 109/22 119/19 123/22 171/3 176/6 195/16 198/11 229/24 231/5 231/11

et cetera [7] 59/20 109/22 119/19 123/22 198/11 231/5 231/11

evasive [2] 21/22 141/3

even [23] 18/16 18/19 30/25 31/4 31/23 35/5 37/5 47/14 58/8 72/9 92/11 173/3 176/2 183/2 183/24 195/11 196/3 198/12 209/12 211/9 212/10 233/1 247/14

evening [10] 98/1 143/8 158/20 159/6 160/12 169/16 187/3 187/4 247/1 247/3

event [17] 30/14 31/15 32/15 37/9 37/21 38/15 39/13 41/4 66/16 70/20 71/20 119/25 174/21 182/17 195/10 206/13 209/11

events [2] 169/15 220/8

eventually [6] 153/6 157/12 165/23 188/25 189/1 189/4

ever [30] 18/3 18/15 18/18 21/23 45/24 46/1 55/8 67/10 67/11 79/14 111/5 112/18 113/23 114/3 114/7 114/9 142/1 142/21 144/20 157/25 158/4 158/7 158/10 158/18 175/24 182/18 185/1 185/3 185/6 219/13

every [5] 33/16 99/1 100/23 100/23 102/11

everyone [5] 16/17 39/14 108/8 160/23 239/11

everything [7] 26/9 45/20 117/3 119/12 183/18 192/14 247/18

evidence [35] 4/11 4/16 7/7 8/7 8/9 33/17 46/8 59/15 59/21 62/5 63/5

65/12 65/14 70/17 74/6 78/15 82/9 93/18 100/10 100/15 102/14 102/15 103/1 106/22 131/9 137/21 138/1 161/8 171/17 184/1 184/2 206/8 221/7 222/3 228/20

exact [3] 211/19 212/13 212/14

exactly [10] 41/3 80/25 81/3 81/15 81/16 82/19 83/19 95/4 112/2 201/13

examination [15] 6/8 6/10 22/11 23/21 24/2 24/11 24/13 101/12 110/25 111/2 118/25 136/6 165/16 166/21 166/22

example [2] 44/7 209/3

excessive [1] 100/22

exchange [8] 41/18 44/17 45/25 47/1 49/12 70/25 141/12 173/22

exclude [1] 34/18

Excuse [2] 82/4 176/2

excused [2] 247/21 247/23

exhibit [23] 8/6 8/9 15/13 15/13 22/15 28/12 34/6 34/24 49/23 73/23 74/6 137/2 137/22 138/1 138/2 138/4 159/15 170/15 202/16 236/19 239/23 240/3 244/17

Exhibit 102-10 [1] 159/15

Exhibit 102-13 [1] 8/6

Exhibit 248 [1] 239/23

Exhibit 30-something [2] 73/23 170/15

Exhibit 35-4 [1] 137/2

Exhibit 45 [3] 15/13 15/13 22/15

Exhibit 76 [1] 28/12

EXHIBITS [2] 4/11 4/16

exit [4] 39/21 40/19 49/8 171/5

exited [3] 14/6 58/24 171/5

exiting [1] 77/1

exits [3] 24/3 97/18 133/15

expected [1] 207/14

experience [11] 140/5 144/16 145/9 146/3 146/4 149/15 149/24 159/3 167/11 181/20 182/15

expert [1] 158/23

explain [5] 22/19 148/2 152/14 152/25 224/16

explained [1] 117/9

explanation [2] 232/7 232/9

exposed [3] 14/13 15/7 15/10

express [5] 24/1 97/17 133/12 166/11 247/14

extend [2] 14/18 233/19

extended [3] 9/7 9/9

**E**

extended... [1] 21/1
extensively [1] 240/13
extent [1] 207/19
extra [3] 7/11 19/8 98/15
eyewitnesses [5] 172/12 172/22 172/25 174/21 174/23

**F**

face [16] 13/3 13/3 13/4 14/7 17/21 76/23 77/2 115/15 135/10 166/5 170/9 226/3 226/4 232/8 234/21 235/5
facilities [1] 110/15
facing [2] 226/5 226/22
fact [18] 11/12 46/3 63/14 63/19 97/13 98/13 99/12 115/20 123/4 146/10 182/21 182/22 185/6 189/18 194/2 194/21 220/22 226/15
factor [4] 66/7 175/24 176/5 176/22
factors [3] 39/10 66/9 69/2
facts [17] 20/11 46/8 46/17 54/23 63/5 78/15 82/9 108/10 108/12 131/9 171/16 172/19 184/2 185/9 195/1 206/7 228/20
fails [1] 103/20
fair [1] 103/10
faith [3] 5/18 100/14 100/17
fall [1] 90/11
false [22] 36/14 36/18 36/20 36/21 46/24 46/25 52/5 54/9 58/7 61/7 61/21 65/11 74/25 75/6 91/8 91/22 93/9 118/19 124/13 124/15 181/20 182/10
familiar [2] 32/3 32/6
far [14] 11/8 25/7 26/20 69/13 109/13 109/15 110/5 186/14 208/6 211/11 211/15 211/18 215/10 233/23
Farahmand [1] 3/14
fast [3] 215/24 244/10 244/12
faster [1] 49/24
Federal [2] 102/25 103/1
feel [1] 128/13
feet [12] 14/18 89/19 89/23 132/2 211/17 212/9 212/21 213/2 213/7 214/7 214/9 215/4
fell [2] 214/8 214/13
felon [4] 146/21 146/25 147/5 147/7
female [47] 32/23 33/2 33/11 33/12 35/3 38/17 39/2 45/25 46/4 46/6 46/19 51/7 51/7 52/2

52/7 52/7 52/8 52/18 54/18 55/13 55/24 56/3 56/8 56/21 57/6 57/22 65/4 65/7 65/13 65/15 69/5 70/8 70/14 71/2 143/4 143/6 160/10 171/11 171/15 171/23 171/24 175/23 176/19 183/4 183/24 184/25 185/3
few [5] 15/20 26/4 39/6 112/5 204/24
field [1] 167/4
fight [6] 13/15 42/7 42/8 66/14 67/18 160/9
fighting [4] 67/24 118/23 119/2 130/2
figure [6] 39/9 84/6 85/2 92/13 200/20 224/24
figured [1] 227/3
figures [1] 197/20
fill [1] 238/24
filling [1] 238/20
finally [1] 232/16
find [25] 10/25 46/6 46/22 51/6 51/7 52/2 52/18 54/19 55/23 58/5 67/21 69/5 70/8 70/13 71/2 104/7 104/8 106/2 112/23 113/9 142/21 143/6 175/23 176/18 186/2
finding [1] 126/23
fine [6] 7/13 89/6 117/24 135/20 139/18 170/17
finger [1] 28/3
finish [10] 33/25 34/2 70/10 87/9 87/20 109/7 109/9 131/17 132/18 176/2
finished [5] 67/15 72/18 123/7 132/19 194/4
fire [9] 16/25 63/11 140/13 151/15 193/2 228/15 228/22 229/5 230/24
fire pit [1] 63/11
firearm [2] 153/16 207/7
first [94] 13/16 13/25 14/19 17/8 17/11 20/3 20/5 20/8 22/4 31/2 31/4 33/13 43/8 43/8 43/19 46/21 47/12 47/14 47/20 51/1 51/22 60/9 65/1 80/4 84/6 84/16 85/22 86/13 98/25 100/7 104/1 109/2 114/24 119/8 120/23 121/21 122/6 123/12 123/12 125/6 130/16 140/3 140/16 141/12 141/20 145/23 146/5 146/8 146/15 146/23 148/7 148/12 148/13 148/13 151/14 151/20 151/22 157/8 161/4 161/10 163/3 165/20 166/1 171/1 172/16 173/2 175/1 175/19 175/22 175/22 176/6 176/18 190/12 190/16 190/18 191/15

191/18 192/21 193/14 203/22 204/1 204/13 204/13 205/3 205/21 208/12 215/17 219/25 220/6 220/13 221/22 227/24 243/13 246/1
five [8] 51/15 51/24 57/17 128/1 225/2 233/18 234/19 239/18
five-second [1] 128/1
flash [2] 49/11 233/17
flashlight [17] 58/13 58/23 58/24 153/15 153/17 196/17 196/18 196/23 197/2 197/6 197/13 197/14 201/20 201/20 202/8 202/10 202/21
flashlights [4] 29/16 30/15 39/3 39/5
flat [1] 216/15
flee [1] 151/6
flip [2] 148/5 148/11
flipping [1] 147/24
flow [2] 101/12 101/13
fluid [3] 116/5 219/10 219/12
focus [7] 57/14 73/4 76/20 80/13 155/15 155/16 241/7
focusing [1] 246/1
folks [2] 148/16 162/1
follow [2] 105/17 244/19
following [10] 5/3 12/3 12/5 21/2 24/5 97/19 110/19 133/16 133/25 166/15
foot [1] 24/19
footage [3] 148/4 212/13 212/14
force [67] 15/25 17/25 20/21 23/12 23/15 43/10 64/18 66/14 73/3 73/13 73/16 75/8 79/10 79/15 79/24 79/25 80/2 80/5 80/5 80/15 82/11 84/7 93/7 93/16 96/23 100/21 100/22 101/17 108/24 113/21 113/25 117/6 117/10 118/18 120/15 149/12 153/20 154/11 157/19 158/7 158/12 158/15 158/19 158/23 159/4 159/5 169/20 183/13 186/22 194/3 207/2 207/8 207/11 207/13 207/14 210/18 221/24 229/21 229/23 231/6 231/12 232/23 232/24 233/1 233/6 235/8 235/9
foregoing [1] 249/3
forget [1] 108/16
form [12] 24/1 62/8 66/25 97/17 133/12 166/11 176/5 176/20 176/22 234/7 234/7 247/14
formal [1] 168/9
formalizing [1] 168/17
Formally [1] 133/18
format [1] 249/6
formation [2] 198/8

forth [1] 214/24
forward [5] 41/1 49/11 134/10 214/5 233/17
found [6] 64/9 92/22 175/19 186/13 209/14 245/12
foundation [5] 9/1 158/22 209/6 211/4 218/23
four [5] 141/22 167/7 167/12 182/14 247/6
four months [1] 167/12
fourth [5] 1/22 59/14 73/5 73/12 113/24
frame [3] 5/23 50/25 116/4
FRANK [1] 2/8
frankly [2] 109/12 110/13
free [2] 11/20 91/11
freed [1] 91/18
frequency [1] 9/19
FRIDAY [2] 1/16 5/1
frightened [1] 164/25
front [21] 26/25 34/5 34/6 34/14 34/19 34/23 49/17 59/9 86/1 86/6 86/10 99/16 105/23 106/6 110/3 125/18 160/22 162/2 216/18 218/13 236/12
FTO [1] 12/9
fucking [2] 45/15 150/7
Fuerbach [44] 21/5 33/17 35/12 44/7 44/12 44/14 44/16 44/19 45/5 45/11 45/16 45/19 45/23 46/3 47/8 49/12 50/9 50/14 51/9 55/21 67/10 69/6 69/21 70/25 71/1 72/9 160/3 160/4 163/10 164/18 173/3 173/4 173/7 173/16 173/23 174/2 174/4 174/5 183/1 183/1 183/10 184/17 184/17 184/20
Fuerbach's [5] 21/17 33/6 33/8 44/10 165/2
full [6] 6/20 85/18 107/22 135/7 139/11 147/10
fully [1] 135/18
function [3] 57/19 57/25 71/8
further [12] 15/14 22/9 23/19 132/22 144/23 144/23 146/3 152/23 165/9 166/7 172/13 246/22

**G**

gain [8] 14/10 77/4 77/7 77/24 210/1 210/17 216/16 223/5
gained [2] 14/14 232/16
gave [14] 17/12 26/14 38/6 44/5 59/11 74/23 99/9 116/21 116/23 188/20 191/23 201/14 204/15 220/13
general [2] 109/8

109/11
generalized [1] 210/22
Generally [1] 149/11
generous [3] 124/1 132/20 246/17
gentlemen [3] 23/23 36/6 247/4
get [82] 13/18 14/3 14/21 18/10 54/17 57/16 63/19 86/2 87/1 89/19 90/17 90/18 90/22 91/2 91/19 95/16 103/10 106/3 109/20 112/19 118/24 119/17 120/24 127/8 133/22 136/3 145/7 149/6 150/4 150/12 151/1 151/2 152/13 152/22 154/17 155/9 155/13 156/7 156/15 166/9 170/18 172/3 174/3 180/23 181/7 181/20 186/4 188/13 198/1 198/19 198/19 199/7 199/11 200/13 203/25 204/9 204/13 204/14 204/16 205/22 206/4 208/7 208/24 209/18 210/25 211/8 215/5 223/5 223/14 223/15 223/17 223/19 225/16 227/3 227/4 227/6 227/17 233/5 233/24 243/20 245/21 247/11
gets [2] 10/1 63/20
getting [13] 11/17 100/9 110/13 111/8 113/6 149/14 151/18 155/16 179/13 181/6 214/9 227/11 232/4
girl [8] 10/18 10/21 145/3 145/6 145/18 164/11 169/8 188/14
girlfriend [2] 164/24 164/25
give [23] 5/22 7/2 11/14 29/5 30/7 38/15 40/21 49/23 50/25 88/12 88/16 98/15 101/25 126/2 191/15 210/23 219/17 220/4 221/19 221/24 222/1 222/7 247/9
given [7] 5/12 26/17 26/17 89/3 145/12 152/19 191/5
gives [3] 35/17 70/7 207/8
giving [8] 102/2 183/3 190/18 191/21 193/5 195/17 209/17 222/14
gladly [3] 34/7 84/4 124/25
GLENDALE [1] 2/5
gmail.com [1] 2/6
go [78] 5/20 10/6 16/19 21/23 28/15 28/16 40/20 41/4 49/4 49/24 60/24 63/13 66/12 67/5 67/11 68/15 69/8 70/8 70/13 70/20 70/25 71/1 71/21 71/22 72/8 72/9 72/12 88/17 96/8 124/1

**G**

go... [48]  124/25 127/16 127/17 133/19 133/22 134/22 135/6 136/12 137/8 137/11 145/25 153/6 154/18 154/25 162/10 163/11 163/25 166/2 166/13 178/10 179/4 181/5 181/11 184/17 196/1 201/12 201/12 202/15 204/12 207/10 208/12 208/15 211/7 226/24 236/13 237/20 238/6 240/4 240/15 241/1 241/12 242/7 242/23 243/2 245/19 246/4 247/4 247/13

goal [5]  46/21 52/2 52/18 52/20 52/21

goals [1]  52/22

goes [7]  8/11 82/23 119/6 123/23 194/22 239/2 239/2

going [119]  6/20 10/6 10/7 14/18 18/25 19/13 19/18 28/19 29/17 30/7 30/25 31/12 34/18 38/25 39/11 41/2 42/13 45/11 45/15 46/15 47/17 50/23 51/2 52/6 52/8 55/23 56/2 57/14 57/16 59/7 60/8 66/8 68/3 68/18 71/14 75/11 75/18 77/14 80/12 80/13 81/12 94/20 94/20 95/14 95/16 98/15 98/19 99/10 100/4 102/20 103/9 104/14 105/8 106/2 106/14 106/15 110/4 110/14 111/16 113/16 117/10 121/10 126/9 129/8 130/5 133/1 133/10 133/10 134/14 134/20 137/20 138/16 142/6 144/14 144/17 144/24 147/9 154/20 162/20 164/14 173/4 175/21 178/1 180/7 180/15 180/17 180/23 180/23 181/10 183/18 184/12 184/14 185/24 185/25 186/13 190/8 192/17 192/24 192/25 197/8 198/14 202/10 202/11 211/13 211/24 220/10 225/25 233/8 237/5 237/18 239/4 242/16 243/20 243/25 246/4 247/4 247/5 247/12 247/25

gold [1]  25/2

Gomez [14]  160/16 160/18 162/9 163/5 163/9 164/10 164/18 177/24 178/4 182/19 182/22 183/17 183/17 184/12

Gomez' [2]  163/11 164/21

Gomez's [1]  163/25

gone [3]  11/12 239/11 242/2

Gonzales [18]  77/6 81/22 90/20 109/22 141/24 167/17 202/18 211/24 213/7 214/21 216/1 216/7 218/19 227/6 238/12 238/12 238/19 243/6

Gonzalez [51]  11/25 14/9 51/15 77/3 78/9 95/21 101/7 101/19 115/7 115/20 116/2 117/4 118/17 123/21 153/10 155/24 156/14 156/24 165/24 167/2 167/2 168/14 186/10 196/21 200/9 200/23 202/11 202/21 206/13 207/9 211/18 212/10 212/12 212/17 214/16 216/4 218/25 219/6 223/18 225/20 226/7 227/4 233/2 235/12 238/2 243/4 243/14 243/18 245/8 245/23 246/1

good [22]  5/18 6/12 6/13 22/13 22/14 24/15 24/16 27/17 28/10 60/19 114/25 135/25 136/8 136/9 165/10 165/18 165/19 166/12 166/24 166/25 211/11 248/2

goodness [1]  110/1

got [53]  33/17 39/23 41/3 49/22 60/7 63/1 78/4 91/25 92/14 93/15 96/19 112/23 113/8 113/9 113/18 113/19 113/24 114/1 114/4 115/24 116/12 117/5 118/17 126/16 126/17 127/14 129/12 129/12 129/14 132/2 132/11 132/20 144/23 145/2 146/22 148/16 161/3 161/6 161/25 174/5 174/15 177/23 186/9 199/2 206/14 206/22 214/23 229/7 229/13 230/9 246/25 247/6 247/16

gotten [3]  91/11 94/2 231/23

Gotts [21]  12/9 12/12 78/13 78/13 78/20 78/24 79/5 79/10 79/13 79/20 95/4 96/11 96/16 96/19 97/7 97/25 98/2 132/23 168/14 233/11 246/20

Gotts' [1]  96/23

grab [10]  15/11 96/11 115/13 194/15 214/13 214/24 216/25 218/5 218/8 227/23

grabbed [4]  94/1 94/3 94/7 96/12

grabbing [2]  94/15 225/15

grasp [5]  81/23 114/15

114/21 115/6 127/15

great [2]  103/23 135/5

green [1]  25/2

grip [1]  91/18

ground [114]  13/1 13/2 14/7 14/14 15/1 15/8 56/12 58/8 63/11 63/25 76/22 77/1 79/2 79/5 89/20 90/18 90/22 91/2 91/12 91/20 94/8 94/17 132/12 149/7 149/10 149/13 149/16 149/25 150/4 150/16 150/19 151/1 151/2 151/12 151/18 151/23 152/13 153/1 153/6 153/14 153/18 154/12 154/14 154/18 154/20 154/22 154/25 155/1 155/3 155/12 155/19 156/3 156/20 157/16 158/1 186/4 189/3 189/18 190/7 192/9 193/3 193/9 193/16 193/22 194/5 194/6 194/22 197/21 198/1 198/10 198/19 198/20 199/7 199/11 199/20 200/2 200/13 203/15 203/25 204/10 204/13 204/14 204/16 205/22 206/5 208/2 208/7 208/24 208/25 209/19 210/25 211/8 211/14 211/22 212/6 214/8 214/13 215/25 216/8 216/14 216/15 216/16 216/21 221/3 222/18 222/20 223/1 223/1 228/10 229/12 232/8 235/6 235/8 235/17

grounds [1]  58/25

group [1]  148/8

guess [1]  30/6

gun [10]  26/8 58/14 156/9 195/15 202/11 202/22 202/23 203/1 206/13 207/9

Gunderson [5]  12/10 12/12 78/14 78/20 78/25

gunpoint [5]  13/10 178/5 182/18 206/5 209/18

guns [12]  176/23 181/11 186/3 186/11 186/15 186/23 186/25 187/13 187/15 202/7 206/11 207/3

guy [3]  41/25 45/14 65/22

guys [3]  41/22 204/21 211/20

**H**

had [121]  5/3 8/17 9/11 9/20 10/5 11/12 11/17 13/5 13/10 13/10 13/16 13/19 13/20 13/24 13/25 14/7 14/13 14/19 14/20 14/22 15/7 16/17 16/18 17/8 17/10 17/11 20/7 20/10 22/5 24/5

25/22 25/24 25/24 25/25 30/10 30/10 39/18 40/13 40/13 41/18 41/21 42/2 42/25 43/19 44/17 45/5 45/7 45/10 45/24 47/1 47/12 49/11 50/2 50/19 50/19 51/5 55/22 55/24 56/16 60/18 61/2 63/15 65/17 65/21 70/25 71/15 73/19 78/23 91/11 94/2 97/19 104/19 104/21 104/22 109/16 110/19 112/21 113/16 115/23 124/4 129/21 133/16 133/25 139/6 141/7 141/9 144/1 144/7 144/9 144/10 146/3 146/14 146/15 151/22 152/3 152/15 153/15 155/8 155/8 159/4 162/13 166/15 168/10 173/4 173/15 174/4 176/9 191/24 193/3 193/21 195/15 195/23 196/1 197/9 207/9 219/10 224/14 224/17 235/20 236/2 236/19

half [5]  90/1 97/14 171/9 171/11 175/11

hallway [2]  133/5 133/6

hand [18]  7/2 14/13 15/8 15/10 17/4 134/13 155/20 155/25 156/15 201/19 201/22 202/22 202/22 226/25 227/1 227/2 227/4 227/7

handcuff [2]  149/14 157/12

handcuffed [6]  120/24 129/23 131/20 131/20 157/8 230/24

handcuffing [1]  80/7

handcuffs [28]  8/18 14/3 14/22 15/22 16/3 16/4 22/22 23/13 23/16 64/17 114/9 121/6 128/21 129/11 129/13 155/18 156/7 156/11 157/10 157/16 158/2 158/5 158/8 225/5 225/8 225/22 232/17 235/18

handed [3]  148/3 201/17 201/18

handgun [17]  25/15 25/24 120/18 193/7 195/19 195/23 196/2 196/20 196/24 197/2 197/4 197/6 197/12 215/9 215/13 215/18 216/6

handle [3]  18/4 18/16 18/19

handled [1]  71/11

handling [2]  67/13 67/13

hands [100]  14/8 14/20 15/5 94/4 112/21 113/7 113/16 119/18 123/9 149/5 149/6 149/8 149/9 150/25 154/10 154/16 154/23 155/3

155/9 155/10 155/13 156/1 156/3 156/7 157/22 166/2 166/4 188/21 188/22 188/24 189/10 190/3 190/8 190/13 190/14 191/11 191/18 191/19 191/23 191/24 192/8 192/22 193/4 193/6 193/7 193/8 195/11 195/15 195/18 195/20 196/2 196/3 196/16 196/23 197/24 197/25 198/6 198/13 198/18 198/20 199/2 199/4 199/6 199/16 199/23 200/6 200/10 200/10 200/23 203/6 203/23 204/1 204/4 204/7 204/20 207/10 211/10 212/7 213/7 216/17 218/10 219/13 219/17 219/21 220/1 220/4 220/7 220/11 220/17 221/4 221/19 221/22 221/24 222/1 222/7 222/14 222/17 227/14 227/22 232/16

hands-on [4]  166/2 166/4 190/8 207/10

happen [4]  15/6 153/9 223/13 225/7

happened [10]  52/15 136/22 169/5 170/11 198/22 201/5 203/20 223/8 225/3 225/10

happening [6]  109/24 181/12 183/20 203/13 226/4 233/9

happens [1]  190/5

happy [1]  98/24

harassing [1]  171/6

hard [5]  224/7 243/17 244/12 244/14 244/18

HARRELL [1]  2/8

Harrell's [1]  103/17

has [47]  6/2 6/20 7/16 15/13 19/15 28/11 34/15 58/14 66/7 78/4 86/1 100/2 101/4 101/23 102/11 102/13 103/4 103/23 105/14 105/22 107/21 110/2 119/15 119/16 130/17 131/5 135/2 135/14 137/2 137/6 138/18 138/23 139/9 142/18 147/10 159/9 160/19 160/20 160/22 160/23 186/14 213/5 213/6 213/18 230/19 240/17 247/10

have [217]  5/17 5/23 6/19 6/23 7/21 9/23 11/7 17/12 18/1 18/2 19/2 19/8 19/12 20/24 21/2 22/9 25/6 25/9 25/10 25/19 26/2 26/3 26/25 27/15 27/25 32/4 32/8 32/14 33/20 34/3 34/4 34/23 35/5 35/11 35/15 37/3 37/22 38/3 40/22 44/11 46/16

5-RenSER-00999    5-RenSER-00999

**H**

have... [176] 46/17 46/18 46/19 49/20 50/4 51/14 51/24 54/19 55/8 55/10 57/11 58/17 58/22 59/5 59/12 59/14 61/11 61/17 62/15 63/15 63/18 65/2 65/23 66/7 66/12 66/17 67/14 69/6 72/21 73/20 75/7 75/22 79/7 79/21 85/13 85/21 86/8 86/10 88/12 90/20 91/17 92/23 94/25 95/1 95/5 96/21 97/21 97/22 98/6 100/14 101/21 102/24 103/1 103/9 103/11 103/13 108/14 109/1 109/10 110/5 114/7 116/6 116/18 119/4 122/13 122/16 123/14 124/21 125/9 125/9 125/18 127/17 127/19 129/18 130/21 133/4 134/21 135/15 138/7 138/10 138/13 138/19 139/1 140/16 142/17 143/9 145/19 146/25 148/8 148/16 149/9 149/13 151/5 151/19 151/20 152/21 153/4 153/14 156/1 157/19 158/15 159/10 160/25 161/7 161/15 161/16 162/1 162/1 162/2 163/16 164/14 165/9 165/13 166/12 167/20 167/21 168/16 170/1 170/5 170/8 175/20 176/22 178/6 179/12 179/23 180/24 182/10 186/11 186/15 189/1 193/21 194/14 198/13 202/18 206/10 206/22 206/25 207/1 207/3 207/4 207/4 209/4 209/13 210/8 211/21 212/12 215/4 223/23 226/7 229/19 229/19 231/23 232/9 233/6 234/6 235/7 235/12 236/21 237/2 237/6 238/18 238/24 239/10 241/9 243/4 243/4 243/6 244/11 244/17 244/25 245/9 245/22 246/1 246/18 247/13 248/2

haven't [9] 27/13 91/25 125/5 125/24 132/19 177/24 178/4 186/13 186/14

having [10] 38/11 42/6 60/14 147/24 149/15 149/25 209/13 209/14 227/25 239/6

he [353]

he's [46] 38/11 49/21 57/4 61/12 61/13 62/17 66/13 69/7 75/14 76/23 77/1 84/10 90/22 91/2 99/23 100/21 111/10

113/6 119/5 127/13 128/17 135/20 140/24 147/5 147/7 156/10 158/22 178/11 178/19 180/12 180/14 180/19 206/16 208/24 209/17 213/19 220/16 222/14 226/3 226/4 226/5 227/22 229/23 243/21 244/23 245/6

he/she [1] 241/16

head [48] 17/23 37/17 91/25 92/14 92/15 111/5 111/9 111/21 111/24 112/17 112/19 112/23 113/9 113/15 113/18 113/19 114/1 114/5 157/25 158/4 158/10 168/23 169/10 170/2 170/6 223/4 223/12 223/22 224/6 224/9 224/10 225/19 226/22 227/10 227/11 229/13 229/13 229/24 229/24 231/1 231/5 231/11 231/19 231/23 232/5 232/5 232/9 232/13

heading [1] 71/18

headlock [5] 115/11 217/4 217/19 217/20 234/7

hear [70] 7/6 8/12 10/7 10/9 13/13 16/6 16/8 16/20 16/22 17/3 17/5 17/15 20/16 20/18 29/16 30/3 30/19 30/24 31/20 39/3 39/14 45/20 48/5 48/6 48/12 51/13 60/6 61/8 62/2 62/4 63/16 63/19 65/21 71/2 80/25 91/23 92/5 92/7 96/14 102/8 111/7 111/14 111/20 112/2 114/3 126/1 129/25 130/3 130/14 150/11 160/10 161/9 173/7 175/1 179/18 182/24 191/17 207/25 208/8 208/12 221/25 222/1 222/2 222/6 228/18 229/1 229/13 230/25 231/2 231/3

heard [58] 20/8 29/4 39/13 42/2 42/15 42/24 45/16 45/25 46/3 47/9 48/19 50/17 59/9 67/16 67/18 67/19 67/24 92/13 92/18 92/21 92/21 112/21 113/5 120/12 120/14 120/21 127/16 157/6 160/9 160/11 162/19 163/1 163/2 169/8 169/22 174/25 182/10 183/4 183/18 183/19 184/14 184/20 184/24 185/3 185/7 185/15 185/21 198/17 198/25 203/22 225/16 225/21 226/21 226/24 229/15 234/6 236/14 237/18

hearing [4] 180/16

181/3 182/23 183/2

hearsay [1] 131/22

heart [2] 100/13 100/17

heavily [1] 99/4

height [1] 24/17

held [3] 107/5 182/18 249/5

help [8] 6/24 13/6 14/3 19/5 138/20 143/10 144/11 159/11

helped [1] 64/19

helpful [1] 99/11

helping [1] 233/2

her [1] 211/4

here [60] 11/25 25/19 40/13 40/15 46/14 50/12 52/16 57/1 57/10 63/1 63/8 67/18 67/20 67/25 75/11 82/13 83/4 87/6 88/1 96/12 96/17 96/21 96/22 100/17 100/21 102/20 103/10 105/8 108/10 108/17 109/23 110/10 111/18 115/20 121/17 125/2 129/20 134/18 136/18 142/2 158/23 162/1 172/22 173/14 191/10 192/13 193/14 204/21 205/12 207/21 214/17 216/24 217/3 220/3 233/23 241/22 242/8 243/13 247/17 247/19

hereby [1] 249/2

hesitant [3] 198/19 199/10 199/11

hide [1] 152/12

high [3] 149/11 153/4 187/17

high-risk [2] 149/11 187/17

higher [1] 156/8

highly [2] 18/5 108/25

him [229] 14/8 14/21 14/21 15/5 15/9 17/12 20/5 20/10 21/10 21/18 21/21 34/14 34/17 34/19 42/9 43/7 43/11 43/17 43/21 45/24 47/3 47/4 48/7 50/24 51/5 51/6 51/9 52/15 52/18 57/5 60/18 61/2 61/8 61/18 62/2 64/5 64/7 64/10 64/15 64/16 64/20 66/17 67/24 79/7 79/14 83/14 85/9 85/21 86/6 89/9 89/11 90/10 90/22 91/20 92/21 92/21 93/8 93/20 99/13 99/14 99/22 99/24 99/25 101/7 101/10 111/8 111/24 112/21 113/5 113/15 114/2 114/4 114/9 115/8 115/11 115/13 115/19 123/4 123/9 128/18 128/21 129/13 129/14 129/22 131/23 137/13 142/15 144/15 144/17 145/6 149/4 149/5 149/6 149/10 150/4 150/8 150/10 150/14 150/16 150/19 151/12

151/16 151/23 152/13 153/1 153/13 155/3 155/4 155/9 155/17 155/18 156/4 157/6 158/1 162/10 162/12 163/2 163/11 163/16 164/1 164/22 165/5 169/3 170/6 170/8 171/8 177/17 183/13 184/5 184/25 185/14 185/21 185/22 188/10 188/20 189/9 189/10 190/3 190/7 190/7 190/13 191/1 191/11 191/15 191/15 191/18 191/22 193/3 193/7 193/16 194/17 195/5 195/12 195/19 195/19 195/24 198/1 198/14 199/18 200/7 200/9 200/10 200/19 200/24 203/14 203/14 203/14 204/24 205/5 205/7 206/4 207/3 209/14 209/15 209/16 209/16 209/17 209/18 210/4 210/8 210/23 211/16 212/8 212/17 213/8 213/17 213/19 213/22 213/24 214/6 214/12 214/24 216/7 216/15 216/22 217/16 217/18 217/19 218/2 218/5 218/8 218/25 219/13 220/13 221/24 224/16 224/20 224/23 225/6 225/22 226/16 227/15 227/24 228/9 228/9 228/15 228/22 230/25 232/13 232/17 233/3 233/8 233/9 233/12 235/6 235/8 235/13 235/17 243/21

himself [11] 17/12 94/8 94/17 146/6 146/14 158/25 211/24 212/9 213/23 214/6 214/12

hint [1] 207/5

his [304]

history [1] 147/6

hit [1] 169/9

hold [3] 100/1 127/24 127/25

holding [12] 107/1 107/3 196/23 197/14 201/22 202/3 202/8 202/21 202/25 203/1 226/16 226/25

HOLLOWAY [190] 1/6 2/2 3/13 8/14 8/25 11/4 12/12 12/25 13/17 14/3 14/7 14/13 17/2 17/9 17/20 17/21 17/23 20/9 21/7 21/23 23/10 23/12 23/16 24/10 43/9 44/18 45/6 45/12 47/17 50/20 51/1 51/9 51/10 51/13 51/16 51/22 56/4 56/14 58/1 58/9 58/23 63/20 64/10 64/14 64/19 65/1 65/9 66/13 66/19 67/10 67/16 68/6 68/14 69/14 69/22 72/16 72/19

72/22 72/23 73/3 73/13 76/21 77/24 78/8 79/3 79/6 79/15 80/24 81/21 83/4 84/24 89/19 89/23 90/10 90/14 92/7 94/2 94/16 101/23 105/1 107/7 107/12 107/15 107/19 107/25 111/5 111/20 112/11 114/8 115/25 116/7 117/5 118/8 118/23 119/14 120/4 120/24 121/12 121/23 122/7 122/25 123/8 124/5 124/22 127/17 128/16 129/11 129/22 129/25 130/16 130/21 131/6 131/22 136/25 140/23 141/7 141/11 141/16 142/18 146/2 146/14 146/24 149/3 149/16 149/25 150/3 150/15 150/18 150/23 151/18 151/22 152/3 152/14 152/15 152/25 153/6 153/13 153/21 153/24 154/6 154/8 154/9 154/12 154/14 154/15 154/18 154/20 154/22 154/25 156/3 157/15 157/25 158/4 158/8 158/10 159/6 164/19 165/21 166/2 166/4 166/5 168/22 170/2 171/3 173/23 175/10 178/5 182/18 183/13 183/24 184/8 186/14 187/19 193/21 194/4 199/16 204/19 208/13 213/5 216/25 217/4 217/9 219/7 229/10 230/17 231/19 232/4 234/6 239/14 247/22

Holloway's [43] 11/5 14/10 14/20 15/4 21/20 55/12 55/17 56/12 63/13 64/3 66/6 66/21 66/24 68/21 75/4 77/4 83/10 94/4 115/21 115/23 116/2 118/4 120/20 121/2 130/20 130/25 132/12 140/10 140/15 142/8 142/22 146/19 155/13 155/19 157/4 157/22 165/6 173/5 173/16 185/4 202/7 226/22 238/23

holster [1] 186/16

holstered [5] 206/13 214/24 215/8 215/13 216/6

holstering [1] 215/18

home [5] 67/15 71/18 247/4 247/13 247/18

Honor [72] 6/9 7/20 19/14 23/22 24/12 31/8 33/25 34/16 34/21 46/11 51/10 60/6 60/13 60/20 68/24 69/18 75/19 80/19 81/17 82/14 82/23 84/18 85/21 86/8 86/21 87/15 88/2 88/9 88/21 90/7

5-RenSER-01000
5-RenSER-01000

# H

Honor... [42] 95/17 95/25 96/7 100/4 102/10 106/5 113/2 114/25 117/16 117/24 119/6 119/13 119/20 125/19 125/25 126/19 129/2 130/23 131/1 134/7 135/1 136/19 139/14 159/19 161/2 170/16 172/5 179/1 181/1 182/7 190/20 194/10 196/6 197/8 219/2 231/15 239/23 242/11 245/3 245/12 246/22 247/20
HONORABLE [1] 1/4
hospital [1] 239/14
hostile [2] 100/5 101/14
hour [4] 17/19 97/14 175/11 240/17
hours [8] 9/12 17/25 37/2 37/17 158/17 159/4 245/16 246/6
houses [1] 187/15
how [113] 7/24 15/6 17/25 18/3 18/15 18/19 21/9 21/17 21/20 26/7 28/22 31/12 36/8 37/12 41/3 44/6 48/22 52/25 53/4 53/17 53/18 54/10 69/13 76/17 81/16 82/2 82/6 86/12 90/14 95/4 95/10 95/11 99/12 99/23 100/24 101/3 101/10 101/24 102/22 103/21 103/21 104/4 104/4 104/4 105/16 108/9 111/9 112/18 112/23 113/9 113/9 113/17 113/19 113/25 114/4 120/12 141/20 151/25 153/9 156/20 157/16 158/15 164/21 165/2 165/6 167/6 174/11 178/20 180/20 181/19 181/20 182/10 187/22 189/9 189/11 190/6 191/21 191/23 192/7 198/22 201/13 201/14 203/12 204/6 204/14 204/15 204/15 208/16 208/22 211/15 211/18 215/10 215/11 215/22 215/24 216/4 216/5 219/22 223/8 223/13 224/14 224/22 224/25 224/25 227/17 227/17 227/24 231/22 232/9 237/15 239/4 240/1 240/9
hundred [1] 159/3
hypothetical [6] 46/9 80/8 80/17 187/1 207/17 210/20

# I

I'd [9] 6/18 8/6 28/18 87/4 117/17 133/20 139/7 159/8 160/17
I'll [22] 20/16 41/11 45/20 49/24 84/4 88/16 103/13 105/19 105/21 114/18 124/25 125/21 135/23 137/7 138/20 148/2 170/17 187/10 187/10 233/19 247/8 247/9
I'm [130] 10/6 10/7 11/9 15/20 15/23 18/11 18/13 22/21 22/24 24/19 25/20 26/19 28/19 30/8 30/24 31/11 34/18 37/4 37/5 37/17 38/2 38/18 41/2 42/13 44/17 44/24 45/15 46/15 51/20 51/21 57/14 57/16 60/13 63/8 63/14 64/13 65/24 69/2 69/16 72/18 73/24 75/3 78/4 81/12 84/12 86/7 86/19 89/11 89/25 90/13 92/9 92/13 93/21 98/15 98/24 100/11 102/2 106/14 108/7 108/8 108/10 108/11 112/22 114/25 116/9 117/7 117/8 117/10 118/21 119/8 119/22 125/1 125/1 126/10 126/23 130/2 130/5 131/12 134/20 135/14 135/22 136/21 137/19 138/16 147/9 147/15 147/23 147/24 150/7 150/7 160/25 172/2 175/21 178/1 180/7 180/23 180/23 187/5 187/7 190/11 190/12 191/7 191/14 191/22 194/18 200/20 202/3 207/24 208/13 211/19 218/13 219/13 219/24 220/20 229/21 231/4 231/9 231/25 234/17 236/12 236/22 237/5 238/10 241/7 243/20 243/25 244/7 245/3 245/5 245/18
I've [21] 26/11 91/25 92/14 100/15 101/25 102/1 105/4 108/12 111/18 113/8 123/25 124/1 125/23 132/20 137/13 161/25 174/1 229/13 246/16 246/25 247/6
identical [1] 21/19
IDENTIFICATION [2] 4/11 4/16
identified [4] 32/17 104/9 105/8 171/3
identify [1] 130/18
ignored [9] 193/6 195/18 219/17 220/4 220/11 220/14 220/21 221/16 222/23
illuminate [4] 30/7 39/5 58/12 58/13
illuminated [1] 58/23
illuminating [1] 58/18
imagine [1] 226/3
immediately [7] 94/3 129/23 186/9 214/23 215/8 215/12 215/18
impact [5] 102/22 140/17 145/19 146/25 160/10
impeach [4] 100/12 101/15 101/19 103/21
impeached [1] 104/13
impeaching [8] 82/24 108/1 109/12 109/23 109/25 126/24 126/24 129/4
impeachment [4] 98/23 99/8 102/5 109/15
implication [2] 109/18 109/19
important [3] 102/11 102/14 113/8
impossible [1] 90/15
improper [11] 83/22 84/10 95/7 95/13 97/5 99/17 105/15 109/5 116/14 122/2 213/14
improve [1] 149/16
inaccurate [1] 74/12
inaudible [2] 148/12 239/2
inches [1] 24/19
incidences [1] 54/15
incident [76] 4/17 6/15 6/18 8/25 9/7 9/9 17/20 18/4 18/16 18/20 24/18 24/19 25/1 25/6 26/10 29/2 40/8 44/7 46/22 52/25 53/24 54/7 54/12 55/22 65/8 67/1 67/22 72/16 74/20 74/22 75/2 75/4 75/24 76/3 77/12 96/17 98/4 99/23 121/7 121/16 122/18 136/21 136/25 138/6 138/8 138/11 138/14 138/16 141/8 141/20 147/8 149/1 151/5 151/11 152/1 152/24 157/20 160/6 160/13 162/25 165/21 167/1 167/12 167/24 172/14 175/11 176/21 190/17 190/19 191/6 192/4 210/22 233/25 235/20 238/19 238/23
Incident 1 [1] 6/15
incidents [1] 240/2
include [2] 79/25 241/14
includes [1] 173/3
including [10] 26/8 26/8 26/8 30/12 49/10 51/25 78/9 102/15 109/15 164/17
incomplete [6] 46/9 80/8 80/17 187/1 207/16 210/20
inconsistent [3] 200/24 218/21 218/25
incorrect [3] 130/9 208/11 219/2
incumbent [2] 46/5 100/22
independent [3] 62/5 68/4 192/12
index [1] 105/9
indicate [1] 10/1
indicating [4] 28/23 28/23 38/4 218/12
indication [11] 77/10 77/15 78/12 106/23 108/18 231/19 231/22 232/4 232/18 233/11 233/14
individual [2] 66/8 69/3
individually [1] 159/1
infer [2] 109/15 120/17
inference [2] 98/12 105/25
inferences [2] 75/10 109/24
inferred [1] 75/13
inform [1] 146/7
informant [11] 29/1 29/6 49/15 49/17 163/7 177/4 178/14 179/8 179/17 179/20 180/16
informants [2] 21/4 164/17
information [44] 10/12 10/16 10/17 13/15 13/16 15/17 20/11 26/15 26/20 27/6 27/8 33/22 35/18 49/12 50/9 50/10 70/7 98/12 98/14 106/1 114/4 131/15 144/23 145/5 145/7 145/12 145/15 146/22 146/24 163/6 175/2 177/23 178/10 181/4 181/7 183/3 209/18 211/1 216/4 216/24 217/3 242/23 245/20 245/21
informed [2] 66/19 141/7
informing [1] 10/22
initial [2] 154/2 204/6
initially [10] 20/8 144/23 149/5 150/11 153/15 154/16 154/19 155/20 162/14 204/5
injured [7] 146/6 149/14 184/18 228/12 229/4 229/20 230/23
injuries [12] 112/19 112/23 113/9 113/15 113/18 114/1 114/5 231/20 231/23 232/5 232/10 233/24
injury [1] 113/19
inside [6] 9/24 39/23 63/2 142/19 143/3 182/23
instead [1] 219/1
instruct [1] 103/24
instructed [1] 105/16
instructions [2] 105/18 248/1
insults [1] 102/19
intentional [1] 103/10
interact [1] 43/21
interacted [2] 51/1 164/18
interacting [3] 45/11 47/17 51/22
interaction [14] 9/7 47/12 47/21 50/20 58/1 61/2 64/20 65/1 67/9 67/10 73/3 86/20 173/4 173/15
interactions [2] 165/3
165/7
interested [3] 38/18 64/13 78/4
interesting [3] 112/23 213/10 213/14
interject [1] 100/24
interjects [1] 100/23
internal [1] 147/11
interpretation [5] 177/8 179/18 179/22 179/24 180/5
interpreted [4] 35/7 178/18 180/3 180/19
interview [8] 160/4 160/12 160/18 163/5 163/11 164/1 164/4 171/8
interviewed [2] 43/18 164/22
interviewing [3] 171/8 239/14 242/2
invading [4] 177/7 179/5 179/24 180/12
investigate [7] 54/6 54/19 54/23 152/23 181/5 181/17 185/7
investigating [13] 46/15 46/22 50/20 51/3 52/3 68/16 70/1 70/4 141/8 174/11 210/4 210/9 210/15
investigation [17] 32/16 44/15 51/4 66/22 67/1 68/3 68/5 68/22 69/2 70/10 71/10 71/11 71/14 71/15 113/21 181/8 235/24
investigations [1] 54/11
investigative [1] 52/24
involved [24] 73/12 81/16 82/1 93/15 95/11 100/9 101/16 113/24 115/19 115/24 116/12 117/5 118/17 118/25 144/11 146/8 153/20 154/6 154/11 183/24 214/23 215/5 233/6 242/18
involvement [9] 73/15 75/9 77/12 79/24 80/1 80/14 95/4 96/23 116/4
involvements [1] 116/18
involving [1] 158/19
is [462]
isn't [50] 19/6 32/18 35/2 43/3 43/24 44/8 44/14 45/17 47/10 47/11 49/8 49/12 50/14 54/7 55/6 57/3 57/5 58/4 58/10 62/6 67/16 67/19 70/5 80/14 83/8 83/12 83/14 96/3 99/24 111/24 112/9 115/3 117/2 118/25 121/9 137/13 181/6 186/4 188/24 195/8 195/24 201/23 202/12 210/18 212/11 223/25 227/9 231/18 236/1 238/11
issue [6] 58/13 100/24 101/21 103/18 104/16 108/17
issues [1] 102/17

**I**

it [384]

it's [133] 5/18 7/17 9/15 10/2 11/13 16/15 16/16 18/22 20/23 20/24 24/23 25/23 26/13 29/22 30/16 33/10 34/20 34/20 37/6 37/13 39/9 41/7 45/20 48/18 52/11 52/11 52/13 52/21 54/15 54/16 58/12 59/4 59/9 67/20 67/21 68/9 68/14 68/17 69/16 70/7 72/1 72/3 74/4 74/5 75/11 75/17 77/12 79/24 84/20 84/20 87/15 88/20 88/21 96/18 97/14 98/8 99/11 100/10 100/11 100/22 101/12 102/3 102/4 102/4 104/14 105/3 105/3 105/4 106/12 108/1 109/24 116/5 116/8 116/18 119/9 120/16 121/10 123/3 127/23 129/15 129/18 130/8 131/21 133/9 135/21 136/2 137/9 138/18 139/12 139/15 141/4 142/5 142/5 142/16 142/19 143/8 147/11 147/19 151/8 152/20 152/20 153/4 156/8 159/19 163/14 165/1 170/17 170/20 175/21 180/5 180/5 182/3 186/7 189/24 190/16 190/23 192/14 202/24 205/3 208/9 209/16 209/21 213/14 215/11 224/6 228/3 236/12 243/17 244/10 244/12 244/23 245/9 246/12

its [6] 62/8 102/3 102/17 123/7 128/1 138/17

itself [5] 26/11 129/16 178/16 209/11 235/1

**J**

jacket [3] 152/2 227/18 228/1

jail [5] 53/7 53/13 53/18 136/16 167/9

January [4] 74/21 136/13 148/5 164/16

January 21 [1] 148/5

January 21st [1] 164/16

January 23 [1] 74/21

jeans [1] 152/2

JEREMY [38] 1/6 2/2 3/13 171/3 171/5 171/5 171/7 173/16 175/10 193/1 193/3 193/5 193/6 193/7 193/8 193/9 195/16 195/18 197/21 198/6 198/6 198/9 199/20 199/23 199/23 200/1 208/2 211/8 211/9 211/9 211/13 214/8 214/9

214/13 215/25 219/16 220/3 220/11

Jeremy Holloway's [1] 173/16

Jeremy's [9] 100/1 198/4 198/11 199/21 208/3 216/17 223/2 223/3 232/16

job [6] 54/16 54/17 54/23 67/14 141/16 181/4

Joel [1] 167/2

join [2] 79/14 103/17

joining [1] 79/10

joins [1] 165/23

Joshua [8] 160/18 163/9 163/11 163/25 164/10 164/18 177/24 178/4

Joshua Gomez [4] 160/18 163/9 164/10 177/24

Joshua Gomez' [1] 163/11

Joshua Gomez's [1] 163/25

JUDGE [2] 1/4 101/21

judicial [2] 102/21 249/7

July [1] 136/11

jump [1] 76/25

jumping [1] 86/15

juncture [1] 192/25

juror [2] 100/25 109/3

jury [46] 5/4 5/7 6/5 6/25 7/3 18/25 19/6 24/3 24/6 24/7 74/1 97/18 97/20 98/11 100/10 100/11 101/1 101/4 101/22 102/4 103/24 104/4 104/13 104/14 104/19 108/21 109/4 110/1 110/4 110/18 110/20 119/17 133/15 133/17 134/1 135/10 135/22 137/5 138/21 138/23 139/10 147/23 147/25 160/21 166/16 247/25

just [163] 6/25 7/9 7/12 8/6 13/12 19/9 19/11 20/11 23/5 32/11 33/24 34/6 34/9 34/9 34/10 34/13 34/14 34/19 35/14 35/14 35/19 37/6 37/13 38/19 39/11 39/18 40/19 41/1 42/13 42/14 44/24 48/2 49/21 49/23 49/25 51/8 59/11 60/7 60/12 60/22 60/24 68/3 68/19 69/3 70/9 72/3 75/10 84/19 86/5 86/12 87/4 87/6 87/10 87/16 87/17 87/21 88/1 88/1 93/20 97/15 98/17 99/13 100/23 101/18 101/20 103/10 104/21 105/13 106/10 106/15 107/10 107/18 107/24 109/1 112/4 114/23 116/21 116/21 116/23 117/19 117/21 119/17 123/3 125/17 125/24 126/22 126/24 127/23

131/17 133/20 135/17 135/23 136/3 138/3 139/5 140/22 141/3 141/4 141/4 141/17 142/2 142/5 142/15 143/2 143/14 143/14 143/23 143/24 145/12 147/7 147/12 148/1 148/15 152/20 153/15 160/9 160/11 161/8 161/24 162/3 168/19 170/25 172/2 179/14 180/25 181/5 181/10 182/11 187/21 188/1 188/5 189/7 190/15 195/5 199/9 203/19 204/23 205/5 205/12 207/8 209/13 212/12 212/22 212/24 213/24 215/12 223/10 223/13 228/4 228/21 229/18 232/21 234/25 235/13 239/13 242/3 242/5 242/8 244/8 244/18 245/11 246/3 246/4

**K**

keep [4] 89/22 214/9 227/14 244/14

Kevin [7] 134/8 134/15 135/8 148/5 243/4 243/14 243/18

key [4] 11/21 99/2 99/3 101/16

kick [1] 168/22

kicked [2] 232/9 233/10

kill [2] 45/15 156/1

kind [12] 5/23 14/8 21/19 23/15 25/8 84/7 85/25 89/13 89/25 142/19 217/16 224/6

knee [50] 14/16 17/23 83/4 83/9 84/23 85/3 85/6 85/7 85/7 89/9 89/11 89/21 90/3 90/9 92/11 92/18 96/13 106/24 106/25 107/1 107/3 107/5 107/8 107/16 108/19 108/20 109/14 109/19 109/20 111/24 124/21 125/2 127/10 127/14 129/18 129/21 158/10 169/9 170/2 223/4 223/12 223/17 223/21 224/4 224/14 224/16 224/17 224/17 224/18 225/19

kneed [7] 111/8 111/21 113/6 227/11 230/25 231/5 231/10

kneeing [6] 91/24 92/14 224/9 227/10 229/12 229/24

kneel [1] 224/4

knees [2] 118/10 224/16

knew [9] 29/1 50/13 81/7 98/2 98/4 111/17 169/22 174/3 175/16

knife [2] 156/9 213/18

knives [55] 13/19 13/24 15/1 17/4 17/10 56/11 56/15 56/16 56/18 58/4

58/4 58/4 58/6 58/6 58/6 58/8 59/4 59/4 59/4 59/6 59/20 59/20 59/20 61/3 61/3 61/3 61/14 61/14 61/14 61/18 62/12 62/12 62/12 62/15 62/23 62/24 62/24 63/2 63/9 63/24 80/23 81/1 140/14 146/4 146/15 193/3 193/15 193/22 194/6 194/15 194/22 194/23 211/22 212/6 213/6

know [130] 5/25 11/19 12/1 12/6 14/22 15/21 16/13 22/21 26/20 28/5 28/7 32/9 32/15 32/15 37/10 37/21 40/5 40/6 40/14 40/15 41/3 44/9 45/14 46/14 46/15 46/16 47/5 48/8 49/21 55/23 56/24 61/12 61/13 61/18 67/17 67/20 67/25 69/5 75/6 75/7 77/11 77/22 78/13 87/8 90/16 92/8 98/6 99/7 100/13 100/14 100/16 100/17 101/13 101/21 102/22 104/13 107/10 107/18 107/24 107/24 111/15 111/17 113/14 114/8 115/19 120/16 121/17 129/20 131/2 132/19 135/23 137/15 142/18 146/5 146/22 147/5 147/6 147/7 150/18 152/3 154/23 155/7 160/2 161/16 173/15 173/18 173/22 173/23 174/1 174/4 174/11 175/1 175/10 176/21 177/15 181/11 184/13 186/15 189/1 191/21 195/16 197/17 202/23 202/25 203/1 206/10 206/14 207/25 209/14 211/8 212/12 216/4 216/7 217/20 218/13 220/22 221/3 225/17 226/15 229/9 229/10 229/20 230/17 233/8 235/6 238/1 239/6 242/24 244/8 246/5

knowing [2] 140/21 181/12

knowledge [4] 32/14 72/24 108/11 222/10

known [3] 29/24 102/1 121/18

knows [7] 29/25 58/14 72/5 81/6 81/11 102/4 108/10

**L**

Lacks [2] 9/1 158/22

Ladies [3] 23/23 36/6 247/4

large [5] 143/5 193/2 193/15 193/21 194/5

last [13] 6/14 9/21 9/22 134/23 135/10 148/3

225/1 236/9 236/13 237/8 237/12 240/19 243/21

later [5] 82/15 98/2 122/18 171/2 173/12

latest [2] 5/21 6/1

Laughter [1] 8/3

law [3] 2/3 103/21 144/18

law enforcement [1] 144/18

lay [3] 193/9 197/21 199/20

laying [3] 58/8 76/21 140/13

lead [1] 133/22

leading [1] 151/8

learn [2] 146/18 230/22

learned [7] 64/9 103/21 104/4 181/16 182/21 186/14 186/22

least [14] 37/10 38/5 77/5 83/11 90/21 110/6 115/22 115/22 118/23 120/9 182/4 191/11 235/7 235/12

leave [15] 33/11 46/4 58/24 65/3 70/9 110/10 135/23 142/2 185/3 242/3 242/4 242/20 247/17 247/17 247/18

led [2] 10/2 233/5

ledge [1] 7/13

leeway [1] 101/25

left [74] 6/14 14/13 14/15 15/8 39/19 39/22 39/23 40/1 40/17 64/2 64/2 64/22 64/24 65/5 65/9 66/21 66/23 67/3 67/12 70/12 70/12 70/12 70/13 72/8 72/13 72/24 77/24 90/4 90/13 91/11 91/18 91/23 94/1 94/4 94/7 94/15 94/16 108/19 127/8 127/15 127/25 154/10 154/16 154/17 155/16 157/4 157/6 157/9 163/9 172/13 187/21 198/11 201/17 201/19 202/10 202/19 202/22 203/1 208/3 209/13 209/15 212/18 218/2 223/14 223/14 223/16 225/5 225/6 225/15 225/15 225/22 226/22 227/1 243/3

left-hand [1] 201/19

left-handed [1] 201/17

leg [11] 90/2 90/4 90/13 130/1 130/2 130/18 131/6 131/19 131/23 132/11 226/16

Legal [1] 205/14

length [2] 5/25 21/1

less [3] 142/6 206/22 207/5

lessen [1] 149/16

let [37] 16/13 68/2 69/7 87/8 102/6 107/13 114/24 120/16 124/1 125/24 127/17 130/5 137/8 153/12 169/7

**L**

let... [22] 174/1 188/22 190/13 191/17 191/23 192/7 192/22 196/3 203/5 203/19 203/22 204/1 204/20 219/20 220/7 221/2 225/17 236/21 237/5 237/9 243/20 244/8

let's [90] 27/5 27/23 27/24 33/15 34/12 36/9 38/25 46/25 47/14 48/6 49/4 49/25 52/24 59/13 61/22 62/9 62/19 64/21 68/6 68/14 73/3 73/22 74/9 76/20 79/1 80/22 84/6 85/11 85/13 94/2 106/3 108/15 112/2 112/2 125/6 128/9 130/10 136/3 138/6 139/6 160/21 166/8 170/14 170/20 175/2 178/10 179/4 180/24 184/17 190/11 191/2 192/16 195/10 195/17 196/1 197/19 201/12 202/9 202/15 203/4 203/12 203/16 204/12 204/14 204/19 205/24 206/3 207/20 208/15 211/7 214/5 214/7 215/8 217/16 223/2 226/3 226/4 236/13 236/16 238/5 239/21 239/25 240/4 240/15 241/1 241/7 241/12 242/23 243/2 244/13

lethal [5] 206/6 206/22 206/23 207/4 207/5

letting [2] 15/20 22/21

liability [4] 102/24 103/2 108/14 110/10

lift [2] 91/12 94/8

light [6] 10/2 58/16 58/18 58/18 59/2 169/15

lighting [1] 229/9

lights [9] 10/14 10/19 16/15 29/13 30/15 33/5 33/12 58/20 145/4

like [55] 6/18 8/6 8/24 12/15 15/12 17/18 18/4 18/16 18/19 18/22 23/20 27/3 41/11 50/23 54/5 60/5 74/13 82/18 85/21 97/23 102/8 103/6 105/13 117/17 126/20 128/4 129/1 129/8 133/18 133/20 139/7 141/3 143/7 143/16 145/10 145/24 148/10 149/12 152/8 159/8 160/17 161/15 161/17 164/3 168/20 178/12 180/10 190/2 193/15 200/16 221/5 221/12 226/1 247/23 248/1

likely [3] 46/19 142/6 187/18

limited [1] 181/19

line [32] 41/11 86/5

88/5 88/11 88/13 104/3 107/13 108/15 117/22 117/22 117/23 117/23 118/14 119/10 126/3 126/4 126/8 126/14 126/14 127/2 128/6 129/16 147/14 148/13 160/24 161/12 161/20 161/22 161/23 161/24 163/21 164/6

line 13 [2] 117/22 117/23

line 2 [2] 119/10 128/6

line 23 [4] 126/4 127/2 163/21 164/6

line 5 [1] 161/24

line 9 [1] 107/13

lines [5] 86/2 104/9 119/17 125/25 126/2

lines 2 [1] 119/17

list [4] 245/5 245/6 245/7 245/7

listed [1] 234/2

listen [3] 68/3 150/14 222/16

listened [1] 111/19

listening [4] 39/8 55/18 150/21 222/21

literally [1] 69/21

Litigation [1] 3/15

little [13] 10/18 10/21 103/14 110/13 141/6 145/3 145/5 145/18 164/11 169/8 188/14 202/9 233/19

LLP [2] 3/3 3/7

locate [3] 63/13 105/9 171/9

located [2] 17/10 147/20

location [23] 30/8 32/2 32/4 35/8 36/13 37/4 37/5 37/6 39/19 40/5 40/6 40/8 40/14 40/16 43/4 47/18 55/20 55/22 58/21 65/3 65/25 175/6 176/11

locations [1] 119/18

logical [2] 57/3 57/5

long [12] 9/21 52/25 53/4 53/17 53/18 138/18 156/20 167/6 224/25 224/25 237/15 240/11

longer [2] 7/24 16/14

look [53] 11/7 27/3 27/5 27/23 27/24 29/5 33/8 34/12 36/9 37/8 50/6 50/6 52/6 52/8 52/24 56/20 57/6 57/18 59/8 59/10 60/2 60/11 64/22 73/22 74/9 76/20 84/4 87/1 87/18 97/11 99/6 106/3 106/15 114/19 114/24 125/9 125/21 126/13 126/15 137/3 137/14 170/14 170/20 179/8 197/19 214/7 221/12 239/21 239/25 241/12 243/1 244/20 245/10

looked [15] 27/2 27/5 27/13 30/20 34/9 34/9

46/19 57/11 88/7 117/16 143/2 143/5 170/22 171/13 171/20

looking [20] 27/8 55/12 55/15 55/16 57/23 58/5 58/25 59/1 59/5 59/19 61/6 61/9 61/19 62/2 62/5 62/22 161/19 180/4 180/18 180/19

looks [1] 148/10

LOS [1] 2/15

lost [1] 147/15

lot [11] 45/19 49/10 92/7 101/13 110/2 156/8 159/13 161/25 162/1 175/13 238/24

loudly [1] 222/6

low [4] 10/1 10/2 45/20 202/3

lower [6] 140/6 149/17 149/25 157/23 212/19 212/23

Luke [17] 41/21 41/23 43/23 44/5 44/13 45/14 45/25 47/2 47/16 48/10 48/21 49/2 49/3 50/17 50/18 76/16 76/18

lunch [2] 133/10 133/19

lurching [1] 12/21

LYNBERG [3] 2/9 2/13 2/18

lynberg.com [3] 2/11 2/16 2/20

**M**

ma'am [2] 27/4 53/25

machete [4] 15/1 63/9 140/13 151/14

made [19] 40/19 42/13 55/8 55/19 60/16 66/5 102/15 105/4 105/22 110/2 118/24 123/4 138/25 141/9 174/5 196/3 203/9 203/22 220/18

main [2] 40/5 55/25

mainly [1] 29/22

maintain [2] 90/13 127/8

Maintaining [1] 127/7

make [41] 17/4 17/13 28/16 41/7 49/24 51/2 59/13 61/16 63/12 64/11 67/16 69/8 71/12 79/1 87/17 89/13 98/22 99/16 101/5 105/13 106/13 108/2 129/14 135/17 149/3 149/9 157/3 159/18 160/21 162/3 165/20 171/2 184/7 190/11 194/2 194/7 194/21 194/24 197/10 226/4 236/21

making [9] 45/6 72/25 90/16 91/1 141/18 155/11 171/4 186/1 221/12

male [15] 35/3 38/17 52/7 54/18 144/14 160/9 163/1 177/4 177/16 178/14 179/9 179/17 179/20 180/16 184/25

man [27] 47/5 48/8 91/17 92/14 112/19 113/9 113/14 113/18 113/25 114/4 184/18 185/15 186/4 204/16 209/13 211/21 212/6 212/10 213/16 213/16 213/18 213/22 216/14 221/12 231/23 234/20 235/17

man's [1] 227/6

manages [1] 54/3

mandatory [1] 66/9

manner [1] 150/12

many [24] 17/25 26/7 36/8 37/12 50/1 54/11 73/18 76/17 108/19 109/1 110/5 141/20 161/16 181/19 181/20 182/10 187/22 189/9 189/11 190/6 201/14 204/6 208/16 208/22

map [6] 27/24 28/12 40/18 40/20 43/5 49/6

Margarita [1] 32/5

Marine [1] 146/2

mark [7] 4/12 4/19 5/13 6/6 28/1 28/7 40/19

Mark Borba [1] 6/6

marked [4] 19/18 28/11 137/2 143/8

marker [1] 27/25

marking [1] 147/11

material [2] 142/17 172/19

math [1] 37/17

matter [4] 23/25 92/19 97/16 249/5

matters [3] 246/25 247/1 247/7

maximum [1] 240/20

may [46] 1/16 5/1 7/5 7/8 11/7 12/17 15/21 39/7 50/4 52/21 57/11 58/22 59/12 59/14 65/23 66/3 74/2 75/7 95/1 104/3 110/8 116/6 116/17 122/13 127/17 127/19 129/18 130/7 133/2 137/6 137/22 139/3 151/6 159/17 161/7 161/13 164/7 164/13 244/25 245/5 245/6 245/7 245/7 246/23 247/20 249/9

MAY 16 [1] 1/16

maybe [9] 49/24 60/10 61/23 101/21 147/11 147/25 164/23 189/14 245/20

me [149] 15/10 20/10 26/17 27/1 30/8 30/12 32/19 33/22 34/5 34/5 34/7 35/4 35/8 37/16 40/24 46/18 47/24 48/21 49/23 50/18 50/25 51/17 54/15 55/11 55/20 58/15 59/7 60/2 61/12 63/16 63/19 66/19 68/2 69/8 79/7 79/13 79/21 82/4 82/18 83/24 87/1 87/4 88/5 88/11 88/13 89/3 90/20

91/24 92/14 98/7 98/8 100/22 101/1 101/18 101/25 107/13 108/3 109/16 114/2 124/25 125/24 126/20 127/18 133/19 135/9 143/16 144/25 145/12 145/18 147/16 147/25 149/5 150/12 153/12 162/21 168/22 169/7 171/6 176/2 185/16 188/22 190/13 191/17 191/23 192/7 192/22 193/5 193/7 195/14 195/18 195/19 196/3 200/16 202/2 203/5 203/19 203/22 204/1 204/20 207/4 207/7 208/22 210/25 211/1 211/2 211/20 212/9 212/15 212/18 213/4 219/17 219/20 220/4 220/7 220/11 220/16 221/2 221/19 221/21 221/22 221/24 222/1 222/7 222/14 223/9 223/10 225/17 226/23 227/3 227/10 229/7 229/13 229/24 230/25 231/1 231/5 231/10 233/5 234/15 234/18 235/16 236/12 236/21 237/9 243/25 244/8 246/9 247/6 247/9

mean [23] 15/19 16/2 16/24 30/6 36/10 37/4 37/5 37/17 42/8 54/15 60/20 74/15 118/4 119/13 123/13 156/8 170/22 178/18 187/20 205/11 223/22 241/3 243/9

meaning [5] 116/5 121/1 171/11 173/1 174/19

means [5] 11/18 13/14 36/12 66/12 241/9

meant [3] 172/25 174/22 183/10

meanwhile [1] 197/17

measure [1] 212/15

medical [3] 17/1 22/23 23/3

meet [1] 40/11

Member [1] 241/1

Members [1] 241/14

memory [8] 85/22 96/20 102/6 122/19 198/23 209/7 240/16 240/18

mention [1] 111/20

mentioned [5] 146/1 146/2 162/22 162/25 233/14

mentioning [2] 233/1 233/3

met [3] 39/20 102/17 142/18

mic [5] 9/20 9/23 43/24 48/11 48/22

MICHAEL [1] 3/3

microphone [17] 8/11 8/14 8/21 8/24 9/14 10/4 20/4 47/22 47/22

5-RenSER-01003          5-RenSER-01003

**M**

microphone... [8]  63/16 76/12 76/13 76/15 76/17 167/15 167/20 241/3

mics [1]  9/22

middle [1]  225/7

might [10]  11/20 65/22 66/11 66/13 69/6 101/20 151/20 207/6 207/7 207/14

miles [1]  17/19

mind [20]  13/19 13/24 55/21 56/2 59/23 69/21 95/17 144/9 144/10 151/12 175/20 175/24 176/21 176/25 180/6 180/7 231/7 231/13 233/9 247/15

mine [3]  50/6 50/7 147/20

minimization [1]  108/23

minimize [2]  100/21 149/12

minimizing [1]  108/17

minute [6]  12/16 117/19 156/22 157/18 190/9 192/10

minutes [35]  6/21 6/22 8/1 8/2 18/23 23/24 33/6 33/7 36/8 36/13 36/13 37/12 37/18 38/16 76/17 97/15 98/15 98/16 98/17 98/19 110/14 123/25 135/16 138/18 166/9 166/13 175/9 187/22 187/22 204/24 209/13 233/18 233/20 239/18 247/9

miscommunicating [1] 61/23

missed [1]  82/1

missing [1]  82/6

misstates [17]  43/12 70/16 93/12 93/18 93/25 184/1 185/9 200/14 202/13 206/7 206/8 214/18 215/1 218/22 221/6 222/3 227/20

mistaken [1]  69/7

misuse [1]  104/11

MKRTCHYAN [2]  2/3 2/3

Mkrtchyan's [1]  101/2

moaning [1]  128/19

moans [1]  128/18

mode [3]  29/16 29/19 30/15

moment [52]  7/9 13/6 19/11 33/24 34/13 35/19 37/13 44/24 49/21 49/25 51/8 60/7 60/12 72/3 75/10 86/5 86/12 87/6 87/10 87/16 87/17 87/21 97/15 99/19 104/21 106/10 106/15 114/23 118/5 123/3 125/17 125/24 131/17 139/5 139/8 143/14 143/15 148/15

185/24 188/1 188/5 190/15 212/22 222/12 228/21 234/25 241/5 242/5 242/8 244/13 245/11 246/3

Monday [4]  5/20 20/25 247/5 248/2

monitoring [1]  22/25

months [3]  167/7 167/12 182/14

more [20]  32/14 57/17 63/20 67/8 72/4 82/16 98/17 98/24 123/25 124/2 129/7 142/5 150/8 150/12 164/25 233/18 233/19 235/7 239/18 242/15

morning [10]  6/12 6/13 22/13 22/14 24/15 24/16 104/17 141/4 162/25 165/1

most [6]  46/19 110/4 140/20 145/24 145/25 247/9

motherfucker [3]  144/25 145/18 162/20

motion [1]  110/10

move [14]  8/7 49/4 63/21 89/4 89/6 119/23 124/14 135/9 139/19 188/20 197/17 213/11 214/5 223/2

moved [5]  53/8 116/7 155/23 223/2 223/3

movements [1]  217/9

moving [4]  150/7 150/7 207/25 226/23

Mr [9]  66/24 77/24 84/24 130/21 130/25 155/19 156/13 164/19 247/22

Mr. [228]  8/14 11/4 11/5 12/12 12/25 13/17 14/3 14/7 14/10 14/13 14/20 15/4 17/2 17/9 17/20 17/21 17/23 20/1 20/2 20/6 20/7 20/9 21/4 21/5 21/7 21/9 21/17 21/20 21/23 23/10 23/12 23/16 24/10 43/9 43/18 43/19 43/20 44/18 45/6 45/7 45/12 45/19 47/13 47/17 47/20 51/1 51/22 55/12 55/17 55/19 55/21 56/4 56/12 56/14 58/1 58/9 58/23 63/13 63/20 64/3 64/10 64/14 64/19 65/1 65/9 66/6 66/13 66/19 67/10 67/16 69/6 69/14 69/21 69/22 72/16 72/19 72/22 72/23 73/3 73/13 78/8 79/3 79/6 79/15 83/10 89/19 89/23 90/10 90/14 92/7 94/16 101/23 103/17 104/18 105/1 107/7 107/12 107/15 107/19 107/25 111/5 111/20 112/11 114/8 115/23 115/25 116/7 117/5 118/4 118/4 118/8 118/23 119/14 120/4

120/20 120/24 121/2 121/12 121/23 121/25 122/7 122/25 123/8 124/5 124/22 127/17 128/16 129/11 129/18 129/22 129/25 130/16 130/20 131/6 132/12 140/10 140/15 140/23 141/7 141/11 141/16 142/8 142/18 142/22 146/2 146/14 146/19 146/24 149/3 149/16 149/25 150/3 150/15 150/18 150/23 151/18 151/22 152/3 152/14 152/15 152/25 153/6 153/13 153/21 153/24 154/6 154/8 154/9 154/12 154/14 154/15 154/18 154/20 154/22 154/25 155/13 156/3 157/4 157/15 157/22 157/25 158/4 158/8 158/10 159/6 160/3 160/4 160/16 162/9 163/5 163/10 164/21 165/2 165/6 165/21 166/2 166/4 166/5 168/22 170/2 173/3 173/4 173/5 178/5 182/18 182/19 182/22 183/13 183/24 184/8 184/12 184/20 185/4 186/14 187/19 199/16 204/19 208/13 213/5 216/25 217/4 219/7 226/22 229/10 230/17 231/19 232/4 239/14

Mr. Beck [2]  121/25 129/18

Mr. Borba's [1]  104/18

Mr. Dennis [12]  20/1 20/2 20/6 20/7 21/4 43/18 43/19 43/20 45/7 47/13 47/20 55/19

Mr. Dennis' [1]  21/9

Mr. Fuerbach [11]  21/5 45/19 55/21 69/6 69/21 160/3 160/4 163/10 173/3 173/4 184/20

Mr. Fuerbach's [2] 21/17 165/2

Mr. Gomez [6]  160/16 162/9 163/5 182/19 182/22 184/12

Mr. Gomez' [1]  164/21

Mr. Harrell's [1]  103/17

Mr. Holloway [160]  8/14 11/4 12/12 12/25 13/17 14/3 14/7 14/13 17/2 17/9 17/20 17/21 17/23 20/9 21/7 21/23 23/10 23/12 23/16 24/10 43/9 44/18 45/6 45/12 47/17 51/1 51/22 56/4 56/14 58/1 58/9 58/23 63/20 64/10 64/14 64/19 65/1 65/9 66/13 66/19 67/10 67/16 69/14 69/22 72/16 72/19 72/22 72/23 73/3 73/13 78/8 79/3 79/6 79/15 89/19 89/23 90/10 90/14 92/7

94/16 101/23 105/1 107/7 107/12 107/15 107/19 107/25 111/5 111/20 112/11 114/8 115/25 116/7 117/5 118/8 118/23 119/14 120/4 120/24 121/12 121/23 122/7 122/25 123/8 124/5 124/22 127/17 128/16 129/11 129/22 129/25 130/16 131/6 140/23 141/7 141/11 141/16 142/18 146/2 146/14 146/24 149/3 149/16 149/25 150/3 150/15 150/18 150/23 151/18 151/22 152/3 152/14 152/15 152/25 153/6 153/13 153/21 153/24 154/6 154/8 154/9 154/12 154/14 154/15 154/18 154/20 154/22 154/25 156/3 157/15 157/25 158/4 158/8 158/10 159/6 165/21 166/2 166/4 166/5 168/22 170/2 178/5 182/18 183/13 183/24 184/8 186/14 187/19 199/16 204/19 208/13 213/5 216/25 217/4 219/7 229/10 230/17 231/19 232/4 239/14

Mr. Holloway's [30]  11/5 14/10 14/20 15/4 21/20 55/12 55/17 56/12 63/13 64/3 66/6 83/10 115/23 118/4 120/20 121/2 130/20 132/12 140/10 140/15 142/8 142/22 146/19 155/13 157/4 157/22 165/6 173/5 185/4 226/22

Mr. Renegar [1]  118/4

Ms. [1]  101/2

Ms. Mkrtchyan's [1] 101/2

much [24]  7/24 25/10 87/3 90/14 99/20 123/24 132/14 133/2 136/5 143/20 157/16 158/15 166/17 191/23 192/7 203/12 204/14 204/15 204/15 224/14 224/22 227/25 246/16 246/24

multiple [25]  16/12 36/24 37/13 39/10 52/19 63/10 80/23 87/8 88/3 88/9 90/5 91/3 91/20 94/9 100/5 101/10 104/6 104/18 115/19 146/4 193/2 198/18 199/5 199/6 235/6

multitude [6]  39/10 54/22 56/1 66/9 69/2 97/25

must [2]  54/22 241/25

mwroniak [1]  3/6

my [195]  11/8 11/19 13/16 13/17 14/6 14/16

15/23 18/11 20/5 20/21 20/24 20/24 20/25 21/1 22/7 26/11 27/4 30/8 32/3 33/11 37/3 37/17 37/22 40/5 44/9 45/10 54/16 54/23 55/21 55/25 56/2 57/11 57/14 57/19 57/24 58/13 58/23 58/24 59/2 59/5 61/6 61/9 61/19 62/2 62/22 63/16 63/16 63/18 64/19 65/1 66/11 67/12 67/14 67/15 67/21 71/8 71/16 71/17 72/24 73/19 74/16 74/19 75/8 77/1 77/17 78/22 79/23 83/4 83/16 84/3 84/19 84/23 85/7 85/10 89/11 89/21 90/3 90/9 90/10 90/12 90/12 92/7 92/15 93/25 94/4 94/15 96/19 96/20 96/24 96/24 97/24 98/6 98/22 99/4 99/5 99/16 100/9 100/14 101/4 101/5 101/15 102/22 102/24 103/4 103/9 107/6 107/14 107/19 107/25 108/11 111/19 114/18 115/5 115/5 116/1 116/1 116/1 116/4 116/9 116/10 116/17 117/7 117/8 117/8 117/13 122/16 122/20 122/22 125/2 125/4 129/18 129/21 129/22 130/1 137/25 141/16 150/12 153/15 153/16 154/10 154/16 155/16 159/19 161/16 168/12 170/25 172/9 183/19 188/13 188/16 190/20 190/22 192/14 193/6 193/6 195/15 195/19 202/8 206/13 206/14 207/5 207/6 207/9 214/24 215/8 215/13 218/13 219/3 219/17 220/4 220/11 220/21 221/16 222/10 222/23 223/4 223/11 223/17 224/4 224/17 225/5 225/19 229/13 229/21 229/24 230/1 231/21 232/6 232/11 232/24 236/8 239/3 241/8 246/17 247/2

myself [3]  11/17 90/11 153/11

**N**

NALTSAS [1]  2/13

name [4]  6/5 32/11 135/7 135/11

names [3]  32/8 245/20 245/23

NARINE [2]  2/3 2/3

narine57 [1]  2/6

narrowing [2]  182/4 187/7

nature [9]  16/1 16/11 17/9 40/8 59/2 140/2 140/6 144/13 145/17

**N**

near [10] 28/17 32/16 32/20 33/13 63/10 65/4 143/19 156/12 216/18 218/11
necessarily [1] 177/6
necessary [3] 92/10 92/22 118/24
neck [1] 218/3
need [28] 11/15 11/20 16/13 29/5 33/8 39/7 42/14 42/14 50/25 51/7 55/1 55/5 59/7 60/14 68/15 98/22 102/19 114/18 123/14 132/25 138/20 150/14 152/22 175/6 181/16 210/16 223/10 241/9
needed [5] 10/25 11/20 20/11 21/23 90/23
needs [2] 34/1 75/15
negative [2] 142/6 232/14
neglecting [1] 80/12
neighbors [1] 42/6
neither [1] 32/9
never [11] 26/11 47/8 47/17 111/23 142/17 169/5 183/19 183/20 183/23 184/7 221/25
new [4] 19/1 19/2 101/18 110/10
next [34] 5/19 5/21 5/22 6/1 6/1 20/25 21/2 29/3 29/3 46/25 57/3 57/5 67/5 69/8 69/13 70/9 75/14 76/4 77/3 126/3 133/1 134/5 139/7 139/9 139/19 140/14 163/9 165/4 167/17 177/21 178/19 180/16 184/24 190/5
nextdoor [1] 71/2
night [34] 8/25 20/23 21/5 21/24 24/22 24/25 25/6 25/22 43/8 45/6 50/13 53/1 53/9 64/14 71/17 75/24 76/3 96/20 105/2 133/21 138/7 138/11 138/14 140/24 141/5 151/5 163/6 164/16 165/3 165/7 168/13 171/24 228/7 243/6
nighttime [1] 145/25
NMI [1] 121/5
no [217] 1/8 7/16 14/24 16/5 17/4 17/22 17/24 18/17 18/21 19/14 21/25 22/9 23/14 23/17 23/19 25/8 25/20 26/1 32/25 33/4 33/13 33/21 34/3 34/18 38/17 38/23 39/3 46/2 48/11 51/3 53/13 55/24 56/4 56/5 58/21 60/9 60/24 62/12 63/6 63/12 64/12 64/13 65/16 66/16 66/20 67/2 70/11 71/24 72/10 74/25 75/6 77/10 77/14 77/21 78/11 78/12 78/17 79/11 79/15

80/10 81/19 81/19 81/12 82/23 83/3 83/13 84/18 84/20 84/20 87/10 87/14 87/23 88/10 89/12 90/25 93/7 95/18 95/18 97/9 100/16 101/1 101/25 104/9 106/14 106/22 108/18 112/20 113/2 113/19 114/2 114/10 115/10 115/12 115/14 117/6 120/25 123/14 123/18 123/24 127/22 128/10 131/12 132/13 132/22 132/24 136/2 140/8 141/10 142/3 142/17 145/16 146/17 150/6 150/17 150/22 152/9 152/17 153/2 153/19 155/14 155/21 156/19 158/3 158/6 158/9 158/11 159/7 162/16 163/1 165/9 166/6 166/7 168/4 169/1 169/2 169/4 170/4 170/7 170/10 171/18 171/23 171/23 172/11 172/12 172/13 172/19 172/22 172/25 173/1 173/6 173/9 173/11 174/20 174/21 174/23 177/2 178/6 179/1 179/13 181/1 182/3 185/12 186/18 187/5 187/9 188/5 188/6 188/18 189/19 189/20 190/20 194/5 194/12 195/25 199/9 201/3 201/10 202/8 204/5 207/3 209/7 209/15 210/18 212/16 213/24 217/3 217/8 217/18 218/4 218/7 218/9 219/15 222/22 223/10 224/12 226/1 227/1 227/14 228/11 230/1 230/4 230/15 231/15 231/19 231/21 232/9 232/18 233/11 233/13 233/14 233/16 236/20 236/21 242/4 245/2 245/2 247/12
nobody [2] 55/24 244/13
noise [1] 185/8
noises [1] 182/23
non [1] 126/24
non-impeaching [1] 126/24
noncompliance [2] 198/5 199/22
none [6] 67/21 106/2 113/17 113/17 119/15 229/14
normal [2] 20/24 150/11
NORTH [1] 2/4
not [323]
note [1] 106/3
notebooks [1] 247/16
nothing [19] 30/25 75/4 77/9 94/7 98/7 100/3 102/20 104/19 104/23 107/20 109/4 109/12

108/14 109/16 109/23 209/15 246/20 246/22 247/18
notice [1] 58/9
noticed [3] 29/21 30/4 95/2
notification [1] 120/19
now [94] 5/24 12/1 12/25 13/14 25/10 25/21 32/15 32/15 33/16 34/23 35/17 37/13 40/12 40/12 40/14 40/15 40/23 47/14 50/12 51/13 53/8 65/17 70/2 71/25 72/14 72/21 73/2 74/11 76/2 81/6 86/17 86/25 87/18 88/11 89/4 89/13 98/15 98/16 102/9 102/12 102/12 106/4 107/13 108/2 108/2 108/17 108/23 109/4 109/10 110/8 110/12 111/15 111/17 116/24 117/15 120/8 121/17 123/18 126/20 132/15 132/20 133/4 136/24 143/22 147/23 148/9 148/11 151/18 157/19 161/3 161/25 167/24 170/11 173/14 176/12 185/24 192/12 197/7 203/21 208/15 209/17 212/24 219/13 219/16 230/19 230/19 233/23 242/12 246/4 246/17 246/25 247/6 247/10 247/13
nowhere [6] 67/9 67/11 69/20 216/24 231/22 232/3
number [7] 49/24 84/4 88/13 106/7 138/4 170/18 172/4
numbers [1] 148/1
nutshell [1] 104/4

**O**

o'clock [5] 133/11 133/14 133/23 247/5 247/8
O'Neill [4] 12/3 139/24 140/3 146/7
oath [5] 5/11 5/15 63/1 134/14 191/10
object [3] 100/7 101/18 139/15
objection [116] 9/1 18/5 21/11 25/11 31/6 37/23 37/24 38/8 42/16 43/12 48/1 48/24 52/9 59/15 77/25 80/8 80/16 81/5 81/12 81/17 82/3 82/8 82/20 87/25 91/5 94/10 94/18 94/22 97/12 104/11 117/18 122/2 123/2 123/15 124/10 128/24 130/20 130/22 130/23 136/19 151/7 158/21 169/11 171/16 173/17 174/12 176/1 176/7 176/24 177/10 177/25 178/22 179/12 180/1 180/23 181/13

181/22 183/5 184/1 184/9 185/9 186/5 186/17 187/1 187/23 189/5 189/6 189/12 189/22 191/25 193/19 193/24 194/8 194/25 196/25 198/24 200/11 200/14 200/17 201/1 201/7 201/24 202/13 204/25 205/13 206/7 206/15 207/16 209/5 209/20 210/10 210/20 211/3 211/25 213/11 213/25 214/18 215/1 215/15 216/9 217/11 217/21 218/22 221/6 221/14 222/3 222/8 224/11 227/12 227/20 228/2 228/19 230/13 231/8 234/9 234/22
objections [3] 102/15 105/14 110/5
obligated [2] 232/22 232/25
obligation [1] 13/5
observations [2] 157/3 193/14
observe [3] 155/11 157/8 158/18
observed [6] 63/9 117/8 118/20 184/15 194/19 233/5
observing [2] 58/1 119/5
obtain [4] 20/11 54/23 151/16 156/18
obtained [1] 13/16
obviously [1] 13/17
occasions [1] 103/3
occupants [1] 56/1
occupied [2] 69/9 69/22
occupy [1] 247/17
occur [6] 54/25 65/25 69/6 70/21 71/4 71/6
occurred [7] 43/10 47/18 55/22 66/2 96/18 96/20 116/5
occurring [15] 14/12 20/9 29/2 29/7 32/17 39/9 40/9 43/1 43/21 46/17 49/16 54/18 105/22 211/16 211/18
OD [1] 25/2
off [30] 6/14 7/17 8/14 8/17 8/21 8/24 9/5 9/15 10/4 20/24 29/12 29/15 30/15 30/16 34/2 40/21 58/20 58/20 69/2 76/10 89/20 91/12 94/17 113/16 116/7 127/16 151/17 226/24 226/25 239/2
offers [1] 104/6
officer [57] 31/4 46/5 46/23 55/25 56/10 57/4 57/13 57/14 57/19 57/19 57/25 58/2 58/13 61/19 63/21 68/16 71/9 72/8 79/10 88/22 114/9 114/24 120/7 132/2 140/7 140/17 140/22 141/1 141/15 141/16 141/17 142/12 145/19

147/1 149/17 149/17 149/25 151/3 151/13 152/15 157/23 167/4 167/21 175/5 181/5 181/10 209/25 211/21 213/17 217/17 217/18 217/19 238/12 244/24 244/24 245/6 245/6
Officer Renegar [1] 57/4
officer's [3] 115/25 156/11 205/16
officers [59] 30/10 39/16 47/3 48/11 48/22 51/24 56/7 56/20 56/24 58/19 64/24 71/21 72/4 74/17 74/24 75/1 75/23 76/4 76/16 77/6 80/13 81/1 81/4 82/7 83/12 90/21 91/3 91/18 91/20 92/12 94/9 99/13 114/3 114/15 115/19 115/23 116/12 118/9 118/24 120/8 120/16 132/5 142/8 158/25 168/10 168/17 203/14 206/5 207/1 207/15 211/20 217/10 223/19 229/25 234/19 235/6 235/8 245/20 245/23
official [4] 1/21 37/10 91/14 249/12
often [2] 9/24 182/12
oftentimes [3] 58/19 66/6 104/7
oh [12] 7/12 19/1 42/6 46/25 52/6 70/1 86/8 128/5 179/13 219/12 234/19 239/2
okay [255]
OLIVE [1] 2/14
once [17] 6/4 18/16 18/19 25/13 58/23 58/23 69/21 137/22 138/20 139/15 150/8 154/22 156/10 160/23 180/22 216/16 223/1
one [83] 7/9 7/19 7/21 10/17 10/19 11/18 12/16 13/10 15/20 17/12 17/18 19/16 24/25 32/1 42/6 43/17 43/23 47/3 48/10 48/22 52/21 57/11 58/21 61/14 62/12 62/17 67/8 68/3 69/3 69/24 70/7 71/7 72/4 75/11 88/3 100/7 113/24 121/19 122/21 129/7 131/19 133/19 134/22 134/24 134/24 135/4 135/17 135/18 135/22 137/9 137/10 139/6 139/17 145/4 146/14 152/20 155/8 157/18 163/1 165/20 166/1 167/21 169/1 171/13 172/16 173/1 176/15 190/16 208/1 213/16 213/17 216/14 224/16 224/17 230/9 230/22 231/25 232/7 234/20 235/17 236/16 236/22 242/15

**O**

ones [1]  25/22
ongoing [11]  30/4 40/2 54/15 54/19 99/1 175/4 175/7 186/3 208/9 208/15 238/18
only [32]  31/1 43/3 49/7 49/7 56/17 57/12 65/6 80/1 83/8 93/2 96/19 96/24 99/25 103/6 106/23 108/11 119/11 121/19 122/21 168/24 177/8 179/18 179/22 179/23 196/18 218/10 223/1 230/22 232/25 232/25 240/21 242/9
oOo [2]  5/2 248/4
open [7]  5/3 24/5 27/11 33/22 110/19 133/25 166/15
operations [7]  53/16 53/20 53/21 54/13 136/16 167/9 167/10
opinion [5]  24/1 97/17 133/12 166/11 247/14
opportunity [5]  17/12 22/5 74/23 100/12 236/2
opposed [1]  68/4
opposite [1]  118/12
option [2]  207/6 207/8
options [3]  207/2 207/8 207/11
ORANGE [11]  1/9 2/7 2/10 2/19 3/5 8/23 16/25 35/12 53/23 54/4 152/6
order [7]  54/25 55/5 121/2 193/7 201/6 221/18 223/5
ordered [16]  150/19 151/12 151/23 153/13 158/1 193/9 195/11 195/16 195/19 197/21 199/19 200/10 219/16 220/3 221/23 247/2
ordering [1]  153/1
orders [1]  201/14
other [75]  12/6 12/8 18/18 19/13 31/4 39/15 49/2 53/17 56/7 57/16 57/18 64/24 65/12 72/12 74/17 74/23 75/1 75/3 75/9 75/12 79/1 80/1 80/12 80/25 81/3 82/6 83/11 85/17 90/2 92/12 93/7 99/13 103/5 104/22 107/8 107/16 108/3 108/9 114/3 114/15 116/12 117/11 120/16 133/21 138/10 138/13 139/6 140/13 141/20 141/22 141/23 141/25 155/12 156/23 171/9 171/11 172/11 191/21 206/5 207/4 207/13 207/15 216/13 220/8 224/18 231/18 237/2 237/6 239/12 244/24 244/25 244/25 246/25 247/1 247/6
otherwise [3]  60/15

133/22 242/2
our [21]  11/16 20/12 22/24 29/22 29/24 39/5 39/7 44/15 58/21 72/15 77/13 79/24 102/21 102/25 102/25 120/15 156/8 163/3 187/15 206/11 238/21
out [80]  7/3 8/11 11/15 13/6 13/12 15/5 22/19 23/2 23/8 29/15 31/1 33/18 37/4 39/9 56/14 56/17 57/3 58/9 60/16 76/25 77/5 84/6 85/2 92/13 98/10 99/2 99/11 105/24 112/23 113/9 133/4 134/23 142/9 142/11 142/15 142/20 148/3 150/25 151/1 153/14 153/15 153/16 153/17 155/10 155/13 156/15 156/21 162/21 171/24 181/4 182/14 183/19 185/1 185/6 185/7 186/2 186/9 186/11 186/13 186/15 197/20 198/6 198/7 198/20 199/23 199/24 200/21 202/2 206/11 206/14 207/5 207/9 207/9 223/16 224/24 225/16 228/16 228/23 238/20 238/24
outburst [1]  104/10
outbursts [1]  103/5
outer [1]  25/3
outside [6]  32/3 97/19 103/23 133/16 142/16 210/10
over [18]  17/18 18/2 27/9 42/7 90/11 96/6 97/24 102/17 124/1 125/1 126/14 128/6 128/6 155/23 161/24 224/5 247/11 247/25
overall [2]  53/9 142/5
Overbroad [1]  158/22
overheard [1]  48/16
overruled [49]  9/2 18/7 21/12 25/12 31/10 36/25 43/14 48/14 56/23 57/8 59/17 63/6 67/7 79/18 83/25 84/13 89/16 91/6 111/13 131/10 136/20 149/20 162/16 169/14 171/18 174/13 184/3 185/10 186/18 187/2 189/13 191/13 192/2 195/4 201/8 202/1 202/14 206/9 206/18 207/18 210/11 212/1 217/12 217/23 221/8 227/13 230/4 230/15 234/12
Overtalking [1]  208/19
overtime [2]  20/23 25/1
own [10]  68/4 73/12 77/22 83/11 120/9 180/19 187/20 187/21 188/9 247/15

**P**

P-1 [1]  10/19

P-A-H-E-L [1]  135/12
p.m [4]  133/24 166/14 166/14 248/3
pack [3]  11/14 11/21 37/3
page [60]  42/5 49/13 49/14 49/19 60/18 60/18 84/4 86/5 86/13 87/4 87/13 88/13 88/24 89/3 98/10 104/3 104/25 105/3 105/4 105/4 105/7 105/7 105/24 106/20 107/2 117/22 118/19 119/4 125/8 125/10 125/11 126/3 126/3 126/9 126/11 126/14 129/16 143/16 143/18 147/14 148/7 148/12 148/13 160/24 161/4 161/10 161/12 161/20 161/22 161/22 161/24 163/20 164/5 245/9 245/14 245/19 245/22 245/22 246/9 249/6
page 132 [1]  105/3
page 138 [2]  118/19 119/4
page 139 [1]  117/22
page 149 [1]  105/7
page 150 [2]  105/7 106/20
page 159 [1]  126/14
page 160 [1]  129/16
page 17 [2]  163/20 164/5
page 2 [1]  143/18
page 3 [1]  147/14
page 5 [1]  49/14
page 6 [1]  49/19
page 8 [7]  161/12 161/22 161/22 161/24 245/19 245/22 246/9
page number [1]  88/13
pages [35]  42/11 42/21 60/11 85/12 86/2 86/4 86/17 87/8 88/9 98/13 99/6 99/9 99/10 101/5 101/6 101/11 102/2 104/7 104/8 104/18 105/6 105/7 105/10 105/20 105/23 106/3 106/15 106/18 106/19 108/3 109/15 109/25 117/15 119/7 129/2
pages 148 [1]  101/11
pages 157 [1]  129/2
pages 5 [2]  42/11 42/21
Pahel [47]  12/1 51/15 77/9 77/10 77/11 77/15 77/17 77/17 77/19 77/22 77/23 78/3 78/8 79/2 81/16 82/1 82/8 82/13 82/22 82/25 82/25 83/3 94/14 94/22 95/4 95/11 95/18 96/2 96/3 109/22 133/8 134/8 134/9 134/15 135/2 135/8 135/18 148/5 166/20 243/4 243/14 243/18 244/23 245/1 245/7 245/23 246/1

Pahel's [9]  4/17 77/12 82/18 94/25 134/21 139/1 147/10 147/13 159/9
pains [1]  103/23
paint [1]  248/1
PALOMAR [1]  3/8
paperwork [2]  238/20 238/24
paragraph [8]  74/9 172/16 177/21 177/22 220/10 240/22 242/10 242/13
paragraph '8' [1]  240/22
paragraph 8 [2]  242/10 242/13
Paralegal [1]  3/14
paramedics [1]  229/5
park [13]  27/23 28/2 28/8 28/13 28/13 32/7 32/10 33/1 39/19 39/22 41/22 49/8 65/18
parked [2]  29/11 49/17
PARKER [3]  1/20 249/12 249/12
part [25]  22/24 54/10 54/16 54/17 54/22 75/7 83/16 83/17 89/14 110/4 118/8 120/15 130/11 153/20 153/23 153/23 154/9 154/9 154/14 154/15 194/16 202/15 205/4 239/17 240/24
partial [4]  85/19 85/25 90/1 107/23
Partially [3]  29/22 40/4 195/9
participant [1]  117/10
participation [1]  80/5
particular [2]  28/25 29/17
parties [9]  5/7 80/1 103/24 110/24 126/13 166/19 183/14 235/23 247/20
partner [3]  30/22 207/5 213/22
partners [5]  11/19 57/11 168/12 168/13 171/24
parts [1]  242/6
party [3]  32/17 110/6 134/22
passed [10]  35/7 41/8 41/9 41/14 41/14 78/23 191/24 192/7 204/6 204/15
passenger [1]  167/18
passes [2]  157/16 203/12
past [8]  42/25 43/3 47/6 48/9 49/5 49/6 49/10 71/16
patch [1]  25/3
patient [1]  247/6
patrol [34]  4/18 9/19 14/6 25/1 37/8 38/4 52/25 53/4 53/17 53/21 54/13 65/18 65/22 71/17 73/6 76/20 77/1 99/15 99/22 111/8 111/19 122/17 167/6 167/11 167/15 167/20

167/22 168/3 181/19 182/14 194/3 194/18 240/6 240/10
patted [1]  171/7
Pause [29]  7/4 7/10 19/7 19/10 42/23 50/5 59/24 60/23 87/2 87/12 87/19 87/22 88/19 99/21 106/17 117/20 125/22 126/7 126/12 134/11 147/17 147/21 148/19 161/18 233/21 236/23 237/1 238/7 244/16
pay [1]  98/16
pedestrian [1]  187/17
pending [1]  197/5
people [7]  45/22 58/3 142/2 177/17 181/11 228/17 228/24
people's [6]  164/14 177/18 177/22 178/7 178/11 179/6
pepper [1]  25/14
percent [1]  50/23
perceptions [1]  184/13
period [4]  124/1 191/4 191/5 203/20
permission [2]  137/4 137/19
person [18]  31/1 31/2 49/2 50/13 68/4 69/24 130/18 146/4 172/11 177/6 178/17 178/18 179/5 179/19 179/24 180/3 205/11 210/16
personal [1]  177/18
personnel [1]  57/18
perspective [3]  98/3 205/16 210/21
pertaining [1]  84/14
pertains [1]  65/8
photographs [1]  228/6
physically [2]  120/20 160/11
pick [1]  18/12
picked [6]  47/22 48/11 48/22 63/16 194/5 228/9
picks [1]  194/23
picnic [2]  63/11 194/23
pieces [1]  10/17
pinpoint [2]  43/7 58/21
pit [4]  63/11 140/13 151/15 193/2
pitch [4]  28/20 28/21 30/16 70/5
place [23]  15/9 28/3 64/16 83/8 83/14 85/18 90/9 90/23 92/10 92/22 115/11 121/5 123/9 134/24 142/19 155/17 155/18 217/4 217/19 219/13 225/6 225/22 235/17
placed [32]  14/16 83/4 83/9 85/7 85/9 85/17 86/1 89/9 89/11 89/21 94/4 109/14 114/8 115/24 119/14 123/13 129/11 129/13 150/25 156/10 158/2 162/13 198/7 199/24 223/4

# P

placed... [7] 223/11 223/11 223/17 223/21 225/8 225/19 232/16

placing [17] 84/22 85/3 85/6 87/14 87/24 94/15 96/13 107/6 107/11 107/14 107/19 107/25 108/20 109/20 117/4 224/20 234/7

plain [3] 177/6 179/23 180/18

plaintiff [5] 1/7 2/2 3/13 3/14 104/6

plaintiff's [7] 4/11 74/6 102/18 103/11 103/19 105/17 108/25

plaintiff's counsel [1] 105/17

play [51] 6/18 6/20 7/18 12/15 18/22 19/17 47/24 60/5 60/19 60/20 60/22 60/24 61/22 79/8 102/11 112/2 134/21 135/3 135/18 135/21 135/25 137/9 137/10 138/16 139/3 139/6 139/6 139/11 139/13 143/7 143/23 147/9 159/8 159/17 160/17 161/12 161/13 163/14 164/3 164/7 189/21 191/2 192/16 197/8 202/15 203/16 222/12 237/4 237/5 237/18 238/5

played [50] 6/20 7/15 7/23 8/4 8/6 12/18 19/12 19/13 19/22 60/25 61/24 62/10 62/20 112/4 112/6 130/12 134/24 137/7 137/9 138/19 138/23 139/1 139/4 139/11 139/15 139/17 139/20 143/13 144/1 144/3 147/10 148/22 159/9 159/22 160/20 161/14 162/5 164/8 192/18 196/11 197/15 201/15 203/7 203/17 204/17 206/1 207/22 236/10 237/10 238/8

playing [9] 7/24 19/15 62/9 62/19 130/10 203/4 205/24 207/20 239/9

plays [1] 159/18

please [48] 7/9 7/14 24/17 28/7 41/12 41/12 45/4 59/10 68/19 72/20 76/19 79/12 86/6 87/10 87/21 92/19 96/8 98/24 108/2 110/25 113/3 116/24 119/21 124/2 130/1 130/7 132/8 133/12 134/6 134/10 134/13 134/18 135/7 135/11 148/20 148/23 161/17 166/11 191/8 192/17 194/15 205/25 223/8 237/3 243/22

plenty [2] 33/10 142/2

plus [1] 140/21

pocket [1] 193/4

pockets [7] 150/25 152/11 155/8 188/21 193/9 198/7 199/24

point [71] 8/11 8/21 12/4 14/14 17/15 23/4 44/15 51/21 56/16 58/24 63/12 64/15 64/25 65/9 67/12 69/20 71/15 79/9 79/20 88/5 88/11 92/8 92/9 95/1 103/3 116/6 121/23 131/7 135/17 146/6 147/6 150/13 153/4 156/13 156/14 157/15 162/7 171/24 183/20 186/2 186/23 190/10 190/11 190/14 190/25 191/14 191/17 193/12 194/12 197/17 202/24 203/2 203/5 203/12 206/11 206/14 207/3 207/24 208/7 208/8 208/23 214/5 222/2 226/10 228/14 229/8 230/1 233/3 239/7 239/13 242/1

pointed [6] 55/20 69/21 174/16 193/6 195/19 207/3

pointing [2] 77/5 181/11

points [1] 69/24

pokes [1] 213/18

police [7] 46/5 46/23 177/17 181/5 181/10 181/16 238/3

policies [1] 158/19

policy [16] 8/20 8/24 9/6 22/24 120/15 159/5 169/13 187/14 210/19 239/17 239/25 240/1 240/6 240/7 240/23 241/1

portion [8] 48/16 97/24 147/9 160/17 161/11 164/3 164/7 242/7

portions [2] 137/8 137/12

portrayed [1] 81/3

posed [3] 33/15 46/18 78/22

position [11] 64/2 106/21 107/21 116/7 149/11 202/4 215/23 224/15 224/25 225/14 226/19

positions [3] 85/4 119/16 215/23

possibility [1] 129/17

possible [5] 26/13 127/24 128/2 129/18 152/23

possibly [6] 10/23 75/14 91/13 145/1 146/3 210/7

POST [2] 15/25 15/25

potential [4] 141/18 143/6 153/5 171/2

potentially [2] 105/11 156/9

sounds [5] 24/20 26/4 26/7 26/12 109/18

precisely [2] 97/4 247/7

prefer [1] 134/23

preference [1] 135/3

prejudice [2] 104/15 110/6

premature [1] 110/12

presence [9] 5/4 24/6 29/24 97/20 103/24 110/20 133/17 134/1 166/16

present [14] 3/12 5/7 24/10 24/10 62/8 100/9 110/24 134/4 140/23 142/6 166/19 166/19 166/20 169/1

presentation [1] 100/15

PRESIDING [1] 1/4

pressure [1] 14/17

pretty [7] 24/21 25/10 141/4 142/16 150/11 169/17 247/7

prevented [1] 239/8

previously [7] 5/13 15/14 100/3 117/16 143/8 145/24 161/1

primary [12] 31/25 32/3 51/6 52/2 52/20 52/21 57/19 57/25 71/8 141/16 155/16 231/24

principles [1] 158/12

prior [40] 5/11 11/17 27/15 33/11 35/5 35/10 35/15 43/4 43/12 45/11 47/17 52/25 53/4 53/7 53/11 53/13 54/12 54/13 65/13 74/24 109/15 114/8 117/3 131/14 162/25 167/8 168/9 168/17 170/22 173/4 173/16 173/23 174/18 174/19 183/3 239/1 240/12 240/12 241/17 242/7

priority [5] 10/14 10/19 11/14 145/3 152/20

privy [1] 44/2

probable [3] 65/2 210/8 238/21

probably [6] 15/20 22/7 24/20 53/6 54/13 118/10

probation [7] 64/7 64/10 64/11 66/20 146/20 146/25 147/5

problem [8] 34/3 34/4 37/22 38/7 44/9 105/23 131/21 191/3

problems [1] 38/12

Procedure [1] 102/25

procedures [1] 15/25

proceed [1] 139/18

proceeded [2] 14/11 40/10

proceeding [1] 131/14

proceedings [10] 1/14 5/3 24/5 97/19 110/19 133/16 133/25 166/15 248/3 249/5

process [1] 189/10

produced [1] 35/12

product [1] 99/4

prone [1] 149/13

prongs [1] 121/9

proper [6] 75/16 100/24 101/3 101/24 104/11 121/3

proved [1] 101/23

provide [1] 71/9

provided [2] 99/6 163/6

providing [1] 50/10

proximity [2] 80/24 81/2

public [4] 9/7 16/16 54/3 239/10

publish [5] 73/25 74/2 137/5 137/20 239/22

published [2] 27/11 73/25

pull [6] 99/1 156/21 175/2 202/2 207/5 227/10

pulled [4] 153/16 198/6 199/23 207/9

pulling [8] 81/23 114/14 114/21 115/6 123/8 155/20 223/15 225/20

punch [4] 17/21 166/5 170/5 217/18

purpose [1] 79/23

pursuant [1] 249/2

push [2] 14/14 15/8

pushing [1] 89/20

put [31] 7/12 9/24 11/15 11/17 14/15 16/2 19/9 20/12 22/19 23/2 23/8 33/18 34/6 34/14 34/19 48/6 64/3 82/18 86/6 90/10 105/10 105/23 109/18 110/9 148/7 148/11 161/4 178/20 180/20 181/4 224/15

puts [4] 128/21 194/23 234/15 234/18

putting [2] 13/12 238/21

PVS [36] 6/18 8/21 9/6 17/3 18/23 22/1 22/5 30/19 42/12 44/12 63/18 111/11 138/7 138/10 138/13 138/14 148/25 159/9 189/18 192/15 192/25 193/12 221/25 229/7 230/10 236/3 236/8 236/9 236/10 239/9 239/11 239/17 239/25 240/9 240/16 241/17

PVS's [1] 19/15

# Q

quarters [1] 226/2

question [142] 24/25 31/7 33/12 34/1 37/1 37/15 38/20 38/21 40/24 41/2 43/15 44/9 44/11 44/20 45/1 45/10 46/10 46/13 48/3 51/18 51/19 51/20 53/14 57/9 60/21 63/7 68/10 68/19 68/23 69/17 70/2 72/14 72/21 75/13 76/3 76/19 78/16 78/22 79/12 80/18 81/6 81/9 84/1 84/13 84/17 84/20 89/17 91/7 92/3 92/17 93/3 96/9 100/2 100/3

quick [2] 133/7 133/9

quickly [3] 106/2 125/21 152/23

quite [6] 33/10 97/3 109/12 110/13 148/8 161/3

# R

radio [9] 9/19 11/13 13/12 23/6 30/21 129/24 143/7 174/25 175/2

radios [1] 11/16

raise [4] 134/13 140/7 142/12 150/12

raised [2] 141/3 150/23

ran [1] 186/10

Rancho [1] 32/5

range [1] 20/4

ranger [13] 27/23 28/15 39/22 39/24 40/18 41/3 41/9 41/18 41/22 49/8 65/19 65/24 66/1

raped [1] 70/14

rather [1] 39/11

ravine [1] 143/5

Rawlings [10] 75/8 99/23 99/24 113/20 113/25 114/4 168/15

102/7 104/2 106/19 106/21 109/16 111/16 113/1 115/8 116/11 116/15 116/19 116/24 118/20 122/3 122/5 122/8 122/15 122/22 122/22 122/23 124/17 124/19 129/7 130/5 130/25 131/11 131/17 132/8 139/18 149/21 149/22 164/16 169/15 171/19 176/8 176/14 177/12 178/25 179/2 179/23 180/7 180/24 180/25 181/25 183/6 184/4 185/11 186/19 188/3 189/7 190/15 190/21 196/4 196/5 197/1 197/5 197/10 197/11 201/2 201/9 204/22 205/4 205/4 205/6 210/12 210/22 212/2 212/3 214/1 214/3 215/17 217/13 217/24 218/24 219/3 221/9 221/10 222/9 228/4 229/22 230/2 230/16 231/14 231/16 234/13 235/2 235/3 242/15

questioning [3] 85/16 101/2 108/15

questions [37] 7/22 22/9 23/19 33/15 34/4 36/24 37/14 37/21 37/22 52/19 57/5 59/22 71/5 75/16 84/14 90/5 95/3 97/2 98/2 98/18 99/14 100/5 101/13 122/1 124/2 132/22 132/24 165/9 165/13 166/7 176/12 205/3 212/24 237/2 237/6 241/7 241/8

**R**

Rawlings... [3]  168/19 168/21 232/12
Raymond [1]  3/14
re [10]  70/2 75/16 92/2 93/5 113/3 189/7 190/23 214/3 228/4 231/16
re-ask [10]  70/2 75/16 92/2 93/5 113/3 189/7 190/23 214/3 228/4 231/16
reach [7]  151/19 193/3 193/16 193/22 194/22 213/6 218/5
reached [1]  49/7
reaching [4]  43/4 188/19 201/19 203/14
reactivated [2]  243/12 243/16
read [26]  42/14 42/14 42/21 85/11 94/25 95/1 102/6 104/3 104/19 106/16 107/13 116/21 117/21 118/19 119/4 119/9 119/11 119/13 119/17 125/20 126/22 129/2 195/17 200/4 240/24 244/2
reading [10]  80/22 94/2 102/3 118/2 125/24 128/3 128/7 128/10 128/12 198/3
ready [3]  30/25 202/3 247/8
real [2]  103/9 165/14
really [4]  99/6 139/12 165/4 213/18
realm [1]  129/17
realtime [1]  179/14
rear [1]  140/14
Reask [1]  68/9
reason [10]  11/10 11/11 30/2 32/1 32/1 58/11 58/21 65/6 209/4 213/24
reasonable [2]  205/11 205/15
reasons [2]  11/18 207/3
rebroadcasted [1]  14/1
recall [45]  5/11 6/16 10/10 11/25 15/16 22/4 22/17 46/2 48/18 53/5 56/9 57/1 57/10 57/23 59/6 77/12 77/21 79/23 84/2 95/3 96/18 96/22 97/3 104/16 106/24 107/10 107/18 114/2 114/6 121/16 121/19 122/9 124/6 125/2 127/20 128/15 128/15 130/24 130/25 141/23 151/25 154/8 156/23 160/15 180/25
recalled [1]  122/21
recalling [1]  122/18
recalls [1]  135/23
recap [1]  170/25
receive [2]  10/16 145/10
received [11]  8/8 8/9 10/12 18/1 33/9 74/5

74/6 105/18 138/1 145/5 240/9
receiving [1]  110/1
recently [3]  73/20 170/20 170/22
recess [14]  23/20 24/4 74/4 88/16 89/4 97/15 99/19 110/14 110/17 133/24 165/11 166/8 166/12 166/14
Reckless [1]  165/8
recognize [2]  102/19 240/7
recollection [17]  12/22 42/20 84/3 84/11 85/24 96/24 97/24 103/25 104/1 105/12 125/7 163/23 192/12 192/14 206/17 218/21 219/9
reconvene [1]  247/5
record [35]  5/5 13/22 18/9 24/17 28/11 31/17 36/17 37/10 55/3 68/8 73/10 87/17 98/6 98/22 99/16 101/5 102/16 105/13 105/19 108/2 108/6 132/20 143/17 143/24 159/14 164/4 172/2 179/11 218/13 220/24 234/4 239/11 240/21 241/2 242/9
recorded [3]  140/24 148/4 241/25
recording [17]  9/8 9/18 37/8 38/4 42/12 45/19 63/14 111/8 194/3 194/18 194/19 195/6 195/8 236/3 236/11 240/1 240/18
recordings [9]  22/1 22/6 73/6 76/20 99/15 99/23 168/3 240/10 240/12
records [1]  240/16
recreation [1]  177/18
recreational [6]  145/1 145/7 177/22 178/7 178/11 179/6
RECROSS [1]  4/3
red [2]  28/1 28/12
redirect [6]  4/3 129/8 132/15 132/21 246/19 246/21
refer [13]  59/7 96/19 98/7 108/3 114/18 116/9 120/25 121/5 121/8 139/20 148/1 160/24 163/16
reference [8]  34/15 87/14 87/23 88/2 129/14 161/11 177/16 222/13
referenced [1]  66/5
references [1]  88/3
referencing [1]  66/4
referred [6]  32/5 60/11 60/14 98/8 105/21 109/16
referring [20]  16/25 20/20 39/18 44/10 47/12 60/15 72/15 84/19 86/17 92/8 98/13 106/1 115/7 116/3 116/4 122/10 131/2

230/5 242/9 242/12 reflect [1]  102/16
refocus [1]  98/17
refresh [11]  12/22 42/19 84/3 85/22 86/1 96/20 96/24 103/25 104/1 105/11 163/23
refreshed [1]  84/11
refreshes [3]  85/23 102/6 125/7
refusal [1]  151/2
refused [3]  193/10 197/22 199/21
refuses [1]  105/17
refusing [6]  100/5 200/13 211/8 220/1 220/17 221/13
regard [1]  103/18
regarding [5]  104/11 104/17 104/25 120/15 144/7
Regardless [1]  169/7
register [2]  231/7 231/13
regularly [1]  54/6
regulations [1]  249/7
reintroduce [1]  6/4
related [2]  175/11 193/11
relation [4]  88/22 104/23 106/19 187/3
relax [2]  121/12 122/6
release [1]  227/2
Relevance [9]  48/12 52/9 72/2 123/15 131/16 132/7 136/19 184/9 200/17
relevant [4]  48/13 52/11 106/18 108/25
relying [1]  68/21
remain [4]  87/6 88/1 153/17 241/18
remedy [1]  102/21
remember [26]  7/6 14/9 27/8 29/6 57/24 83/21 83/24 84/9 95/6 95/10 97/7 116/13 118/10 118/13 121/25 122/8 122/14 122/16 123/10 124/24 128/18 131/14 144/22 168/5 194/16 194/17
remove [2]  9/23 193/8
removed [1]  129/21
RENEGAR [115]  3/2 11/25 13/9 14/9 20/3 20/14 39/15 39/17 39/20 40/11 41/19 43/20 44/3 44/13 45/8 47/2 47/23 48/17 51/14 51/15 52/15 57/4 58/2 61/5 61/8 63/19 63/22 65/22 66/4 66/11 66/19 67/14 70/12 71/12 71/13 77/3 77/6 78/9 81/22 90/21 101/7 101/20 115/7 115/21 116/2 117/4 118/4 118/16 120/14 123/13 123/21 141/15 141/24 146/23 153/10 165/23 166/1 166/4 168/14 171/1 171/4 171/7

173/7 173/15 174/2 174/4 174/9 174/9 174/16 186/10 194/15 198/5 198/9 198/14 198/17 199/1 199/17 199/22 200/1 200/6 200/24 207/10 208/1 211/9 211/22 212/8 212/17 213/4 214/6 214/7 214/8 214/12 214/22 215/5 215/9 215/13 215/19 216/1 216/7 217/4 225/12 225/17 226/13 226/16 226/22 228/7 233/2 235/12 236/2 238/2 238/19 239/2 245/15 246/11 247/22
Renegar's [5]  76/8 209/2 209/3 233/7 238/5
Reneger [1]  109/21
repeat [12]  86/22 149/22 176/14 179/2 179/15 183/8 198/2 199/12 212/3 219/23 221/10 235/3
repeated [1]  103/3
repeatedly [4]  103/20 104/6 105/17 170/3
replay [2]  10/7 135/19
replenished [1]  133/11
report [122]  4/12 4/17 20/12 20/21 21/2 26/21 27/2 27/4 27/6 33/23 56/11 73/15 73/19 73/22 74/12 74/15 74/19 74/21 74/24 75/22 76/21 77/10 77/13 77/15 77/17 77/22 79/23 80/12 80/22 82/6 82/18 83/11 91/14 93/7 93/11 93/17 93/23 93/25 94/25 96/2 96/20 96/24 108/18 114/13 114/18 114/19 114/20 114/24 115/5 115/22 116/1 116/9 117/7 117/8 117/13 120/7 120/8 120/9 122/21 136/24 137/14 137/17 137/20 167/24 168/2 168/5 168/6 168/9 168/9 168/18 170/14 170/14 170/20 172/4 172/6 172/20 175/3 177/15 177/19 192/24 193/1 193/11 193/17 197/19 198/12 199/15 199/18 200/7 200/25 201/5 208/1 208/19 211/7 211/11 212/8 214/8 217/3 220/9 220/20 231/18 231/21 231/22 231/24 231/25 232/2 232/3 232/6 232/11 232/19 232/22 232/24 233/1 233/4 235/7 235/11 235/12 235/14 236/1 236/4 238/3 242/23 245/20
reported [6]  35/9 93/10

93/17 164/11 164/13 249/4
REPORTER [13]  1/21 13/21 18/8 31/16 36/16 55/2 68/7 73/9 108/5 179/10 220/23 234/3 249/12
REPORTER'S [1]  1/14
reporting [3]  32/17 183/14 235/23
reports [3]  94/14 192/14 239/5
representation [1]  138/25
request [2]  73/25 101/25
requested [1]  23/5
requesting [1]  17/1
requests [11]  13/21 18/8 31/16 36/16 55/2 68/7 73/9 108/5 179/10 220/23 234/3
require [1]  66/9
reserve [1]  209/22
resist [2]  154/20 155/23
resistance [1]  114/13
resisting [8]  15/9 81/21 114/10 114/12 115/3 234/14 234/18 235/5
respect [1]  104/16
respected [1]  103/3
respectful [1]  164/23
respective [1]  16/19
respond [13]  16/13 45/3 54/14 54/21 68/25 81/8 126/23 130/7 130/24 139/24 140/21 145/15 194/11
responded [3]  33/9 140/16 146/13
responding [9]  13/9 15/22 16/12 16/15 16/17 29/22 31/25 150/14 175/5
response [6]  102/9 104/3 122/24 144/18 145/4 204/22
responsible [4]  108/7 108/9 108/10 108/11
rest [3]  7/16 119/18 197/19
restate [5]  32/19 44/11 51/18 76/19 79/12
restated [1]  20/7
rested [1]  133/22
restroom [2]  110/15 166/13
result [5]  29/25 66/14 103/10 142/7 233/24
retrieve [4]  155/7 155/24 156/9 156/9
return [4]  5/8 98/21 132/25 133/10
returned [5]  6/2 146/18 147/1 147/8 175/12
returning [3]  175/17 176/4 176/23
reverse [2]  187/10 187/10
review [2]  22/5 168/2
reviewed [10]  22/1 22/5 73/18 73/19 73/20 73/21 99/15 111/18

**R**

reviewed... [2]  138/7 138/10
ride [1]  27/22
right [213]  6/2 14/16 23/10 25/21 26/22 27/20 28/5 28/21 28/21 29/3 29/3 29/7 29/9 30/10 31/2 33/16 34/20 34/20 35/17 39/10 39/21 40/5 40/6 40/12 40/12 40/23 41/1 42/10 43/3 44/13 45/3 46/21 47/5 47/6 47/14 48/9 49/5 49/11 50/12 51/7 51/11 54/5 61/3 61/6 61/17 62/13 64/10 66/17 66/18 70/21 74/11 75/4 76/2 76/23 77/5 77/9 77/22 78/13 78/20 80/20 81/1 81/24 83/4 83/6 83/9 83/20 84/23 85/7 85/7 86/25 87/13 89/9 89/21 90/3 90/9 90/18 92/10 93/2 94/5 99/9 101/4 101/15 102/12 103/4 106/18 106/25 108/19 108/20 110/12 113/8 115/1 123/18 125/17 125/20 126/4 127/10 127/10 127/23 128/11 128/13 130/3 131/8 132/2 132/6 132/21 134/9 134/13 139/13 142/9 142/11 143/12 143/20 143/21 143/25 147/22 148/15 148/20 155/24 155/25 156/15 156/18 156/24 157/12 159/17 159/21 161/13 164/7 165/4 165/15 167/22 167/25 168/7 169/5 170/21 171/11 173/3 173/14 174/22 177/19 177/24 178/8 179/5 183/8 185/16 186/2 188/10 188/22 192/12 192/20 193/16 193/18 194/2 195/12 196/7 197/9 197/22 200/4 201/17 201/18 201/22 202/11 202/18 202/22 203/10 203/21 203/23 204/2 206/3 206/14 208/4 208/14 210/4 214/10 216/1 216/19 218/12 218/17 219/4 219/6 220/10 222/18 223/6 223/16 223/17 223/19 224/4 224/17 225/19 225/19 225/20 225/24 225/25 226/23 227/4 227/6 227/11 227/18 228/1 232/1 232/14 233/23 235/2 235/8 236/11 237/24 238/16 239/24 240/10 241/4 241/10 243/13 247/12 247/18
Right-handed [1]  201/18

rise [1]  102/19
risk [4]  149/11 153/4 187/17 187/17
risk-car [1]  187/17
ROAD [3]  2/9 2/18 3/8
role [4]  57/13 63/21 102/11 102/14
room [1]  168/6
round [1]  28/17
route [12]  27/24 28/2 28/7 36/9 36/9 36/10 36/11 36/12 36/22 36/22 37/7 41/4
rskinner [1]  2/20
rude [1]  150/15
rules [3]  102/25 103/1 103/2
ruling [6]  102/14 105/4 105/23 109/11 119/23 123/20
rulings [1]  102/17
rummaging [1]  63/17
run [5]  6/21 12/16 18/23 151/6 207/7
running [5]  98/5 151/17 186/9 188/17 192/21
RV [19]  10/23 29/4 159/24 160/2 165/5 177/5 177/7 178/15 178/17 178/19 179/5 179/19 179/21 179/25 180/10 180/12 180/14 185/7 185/7
RYANE [1]  2/17

**S**

SACV [1]  1/8
safely [2]  149/14 152/22
safety [29]  29/22 55/25 56/10 57/16 57/19 58/2 58/13 61/20 71/10 140/7 140/17 140/22 141/1 141/17 142/5 142/12 144/7 145/19 146/11 147/1 149/17 149/17 149/25 151/3 151/13 152/15 156/11 157/23 211/21
said [67]  22/15 29/1 30/19 30/24 35/14 42/6 42/9 47/8 49/5 55/14 55/15 58/4 59/3 59/4 61/14 65/23 66/3 67/17 67/20 70/5 71/9 77/23 85/6 86/18 90/3 92/10 93/17 102/7 112/2 112/8 113/7 115/20 124/23 125/3 131/2 139/5 160/9 162/19 169/22 182/8 185/21 187/22 188/22 192/7 200/23 202/8 204/9 204/12 204/19 204/20 206/13 208/7 214/21 218/19 219/6 219/8 219/20 220/7 220/11 220/21 221/16 221/22 222/25 223/1 223/11 229/7 230/9
same [39]  5/15 11/21 14/16 18/24 25/10 41/4 41/22 61/9 64/2 66/18 76/15 76/17 78/14

78/21 80/25 81/3 83/19 92/12 94/21 95/2 95/5 96/12 97/2 100/18 108/15 112/4 116/11 118/11 122/1 122/5 124/19 146/8 163/14 175/21 193/17 202/12 219/6 222/8 246/12
SANTA [5]  1/3 1/15 1/23 4/21 32/5
save [1]  137/10
saw [54]  15/1 28/22 56/17 76/21 78/20 81/8 82/11 91/19 92/13 96/15 97/25 111/5 111/24 112/22 113/15 113/15 116/2 118/20 118/21 118/22 120/3 120/20 120/21 122/5 140/13 146/5 151/14 168/22 173/1 183/20 183/24 184/15 184/21 185/1 187/19 188/9 195/2 195/3 195/6 195/16 200/19 211/16 214/10 214/21 214/22 216/24 218/10 218/25 219/6 228/9 229/8 229/18 233/12 236/9
say [65]  11/9 13/8 16/6 16/20 17/3 17/7 17/15 17/17 20/16 26/7 28/18 28/19 30/6 40/25 55/10 56/10 61/19 62/2 62/23 68/6 68/14 68/14 71/1 78/2 78/5 80/22 90/17 100/13 112/21 127/21 139/14 142/1 142/14 145/22 147/4 150/6 156/6 157/6 160/8 162/18 163/2 172/25 180/12 180/13 191/17 193/15 195/10 195/14 204/20 205/21 208/24 209/1 215/10 215/11 215/12 215/22 221/18 221/25 222/1 222/6 222/13 222/23 223/21 234/14 241/22
saying [26]  30/9 38/16 45/15 61/13 62/12 63/14 67/24 70/1 79/13 80/11 91/17 125/1 127/13 140/24 143/23 144/15 144/25 162/20 207/4 226/15 229/16 229/25 231/5 231/10 235/5 245/6
says [35]  15/14 26/25 36/22 45/14 47/5 47/6 48/8 52/7 59/3 61/19 62/22 68/4 70/7 74/21 81/16 94/14 108/19 130/1 148/4 177/4 178/11 178/14 179/20 180/10 180/14 180/16 203/5 208/13 219/24 239/2 240/15 241/22 243/13 243/16 245/19
scared [2]  164/23 165/4
scattered [1]  80/23
scenario [5]  81/3 94/21 169/17 190/8 190/16

scene [92]  10/8 10/13 11/9 11/9 11/14 11/17 11/18 11/23 11/24 12/1 12/11 13/18 14/6 16/18 17/10 23/3 26/23 27/18 27/18 27/22 31/4 32/21 33/9 33/11 36/9 37/10 37/15 38/3 38/4 38/15 57/15 58/14 61/13 64/17 71/10 72/24 73/2 73/5 73/12 74/10 74/18 75/1 75/9 75/12 75/14 76/7 76/21 76/24 77/11 78/20 81/1 82/7 89/18 91/18 93/15 96/16 101/16 111/4 111/23 112/11 114/2 120/16 132/5 140/16 141/17 141/18 141/21 145/15 148/25 151/6 156/24 168/11 169/25 172/13 174/6 174/10 178/21 181/9 182/17 185/25 186/2 187/19 234/19 235/21 236/6 236/7 242/20 242/20 243/13 243/13 243/17 246/2
school [1]  103/21
scope [1]  210/10
scream [1]  92/21
screaming [23]  10/18 10/21 91/23 91/24 92/5 92/14 111/8 111/10 145/3 145/6 145/19 164/11 169/8 185/15 188/14 227/9 227/9 228/17 228/18 228/25 228/25 229/12 229/23
screen [7]  28/1 28/3 34/24 138/2 202/16 240/3 243/23
scroll [3]  243/25 244/4 244/10
scrolling [4]  244/7 244/12 244/13 244/19
scrutinizes [1]  99/4
scuffle [1]  230/6
searched [2]  151/22 213/6
searching [3]  39/7 58/25 105/9
seat [3]  97/21 97/22 247/17
seated [6]  5/16 24/9 110/23 134/5 134/18 134/20
second [50]  11/1 14/2 20/2 20/4 32/1 47/8 47/13 64/20 64/21 66/23 73/2 98/5 121/14 121/17 121/18 123/14 123/20 128/1 143/3 144/6 144/11 146/13 147/2 147/8 147/10 149/1 149/4 151/11 152/1 152/24 153/16 160/6 160/18 163/12 164/1 165/21 174/25 175/3 175/10 176/4 183/3 185/14 185/18 193/8 195/15 195/20 199/9 205/4 219/25 243/12

Secondly [1]  108/17
seconds [33]  27/18 37/11 79/21 128/20 189/1 189/2 189/9 189/11 189/14 189/16 189/17 190/2 190/6 191/11 192/5 192/10 192/20 201/14 203/9 203/21 203/23 204/6 204/8 204/9 205/21 208/8 208/16 208/23 209/1 209/3 209/7 209/12 225/2
secret [1]  33/19
section [2]  60/14 249/2
see [165]  7/6 17/21 17/23 18/18 23/15 29/17 30/3 30/7 32/23 33/2 33/5 33/12 38/25 39/2 39/6 46/25 49/6 49/13 49/19 56/3 56/7 56/8 56/15 56/21 57/6 57/22 58/19 65/4 65/7 65/12 69/8 69/13 71/2 71/20 72/8 72/12 75/2 76/7 77/19 78/8 78/10 79/1 79/2 79/5 79/14 79/20 80/23 95/24 96/2 96/3 96/11 96/14 97/23 109/14 110/6 112/14 113/5 114/9 115/8 115/11 115/13 120/23 121/14 125/6 128/9 130/11 133/14 133/23 139/7 140/9 140/12 143/3 143/4 148/8 148/12 149/8 154/18 157/5 157/5 157/25 158/4 158/7 158/10 159/24 159/25 159/25 160/11 162/11 171/14 178/11 182/22 183/4 183/19 184/5 185/22 188/22 190/13 191/17 191/23 192/8 192/22 193/12 193/15 194/4 194/6 195/5 195/8 195/21 196/1 196/3 196/13 196/15 201/13 201/19 202/2 202/8 203/5 203/12 203/23 204/1 204/6 204/12 204/20 206/19 208/12 216/2 216/5 217/7 217/9 217/16 217/16 217/18 217/19 218/2 218/5 218/8 219/13 219/20 220/7 220/12 226/17 226/18 227/24 228/6 228/11 232/13 232/15 233/8 236/13 236/16 237/9 237/21 239/1 239/16 240/1 240/15 243/2 243/17 243/25 244/8 244/12 244/20 245/22 245/24 248/2
seeing [2]  140/21 211/15
seem [1]  141/3
seemed [3]  141/3 164/23 164/25
seen [12]  13/20 13/25

5-RenSER-01009

5-RenSER-01009

**S**

seen... [10] 14/19 27/15 56/16 79/7 114/7 125/5 138/13 146/15 151/20 194/9

sees [1] 188/17

segment [1] 139/6

segmented [2] 134/21 134/23

send [1] 35/8

senior [1] 245/6

separate [4] 19/15 19/16 23/6 59/13

separately [1] 19/16

sergeant [7] 75/8 113/20 113/25 168/15 168/19 168/21 235/21

sergeant at [1] 235/21

Sergeant Rawlings [5] 113/20 113/25 168/15 168/19 168/21

Sergeant Steve [1] 75/8

series [1] 116/11

serious [4] 13/11 40/7 150/13 150/18

seriousness [1] 55/19

service [13] 9/12 41/19 54/17 54/22 153/14 181/17 241/13 241/15 241/23 241/25 242/13 242/18 242/21

session [5] 5/19 110/21 134/2 166/18 243/22

set [2] 37/3 246/18

sets [2] 11/15 11/21

seven [1] 18/23

several [5] 40/22 42/13 74/19 102/2 164/17

shall [2] 241/1 241/17

shape [6] 66/25 176/5 176/20 176/22 234/6 234/7

sharrell [1] 2/11

she [3] 84/19 131/1 241/16

she'll [1] 7/2

she's [3] 60/14 84/18 179/14

sheriff's [10] 8/23 35/6 35/13 58/17 136/10 136/12 136/14 145/8 145/13 152/6

shift [5] 9/22 20/23 21/1 67/13 71/16

shifted [2] 90/12 116/6

shit [3] 59/5 61/6 62/22

shoes [1] 233/7

shoot [2] 58/15 58/15

short [2] 102/20 165/14

shorter [1] 175/13

should [10] 28/5 100/14 101/2 101/21 101/22 130/21 142/2 240/21 241/14 242/9

shoulder [1] 224/5

shoulders [1] 224/9

show [40] 28/1 39/17 39/17 40/17 85/14 94/14 100/22 124/25 143/16 147/16 149/5 189/10 190/3 191/11 191/18 193/5 193/7 195/11 195/18 195/19 200/10 200/16 200/23 201/20 204/4 220/1 220/11 220/17 221/18 221/22 222/17 223/23 239/4 243/1 243/22 244/5 244/11 244/14 244/18 246/10

showed [11] 22/15 149/6 188/24 190/14 191/24 197/24 197/25 200/10 204/7 211/9 221/4

showing [11] 34/16 195/14 198/18 199/4 199/6 199/16 200/6 212/7 213/7 218/13 242/6

shown [1] 60/18

shows [4] 35/3 37/16 39/15 198/13

sic [19] 12/12 27/13 29/12 47/15 59/19 63/12 75/18 83/17 85/7 88/8 100/13 109/21 112/19 132/5 174/5 181/17 201/5 202/7 229/17

side [17] 103/5 118/11 133/20 135/16 137/12 151/1 155/24 198/8 199/25 211/24 223/10 223/14 223/16 225/5 225/15 225/19 225/22

sides [2] 118/12 198/21

significance [2] 16/10 162/23

significant [3] 37/19 67/22 172/19

significantly [1] 98/1

signs [1] 59/1

similar [3] 24/21 24/23 25/22

simply [2] 92/17 131/23

since [3] 108/12 113/23 137/6

sir [102] 5/14 5/15 6/5 24/15 24/25 26/19 27/10 28/10 28/21 30/2 30/14 31/7 31/15 32/15 34/9 35/11 36/15 36/21 38/15 38/21 42/11 42/21 44/19 44/23 45/2 45/10 45/23 47/11 48/11 49/4 49/9 49/19 55/11 59/19 63/4 64/21 66/16 69/19 71/1 71/7 71/20 77/18 79/8 79/9 79/14 93/23 97/2 99/18 111/4 114/19 116/11 117/14 118/22 119/25 121/11 122/12 125/9 127/20 128/22 132/17 134/12 134/17 135/7 141/25 144/6 166/24 167/6 170/20 175/1 177/15 179/23 180/15 181/9 190/10 196/22 197/19 200/25 201/17 206/13 207/13 208/12 208/21 220/10 226/3 228/1 229/21 231/4 231/9 231/18 232/12 232/22 233/11 237/12 239/8 240/7 241/12 241/22 242/18 245/10 245/18 246/23 247/16

sirens [4] 10/14 10/20 16/15 145/4

sit [12] 11/25 40/15 46/14 57/1 57/10 63/8 96/17 96/22 111/18 121/17 125/2 129/20

sitting [9] 40/12 50/12 100/25 104/12 105/8 109/2 173/14 192/13 233/23

situation [8] 99/1 116/5 142/16 152/7 156/2 207/6 219/10 219/12

situations [1] 207/13

six [4] 53/20 59/6 61/17 62/15

SKINNER [1] 2/17

sleeve [3] 227/18 227/25 228/1

slow [2] 221/2 244/3

slowly [1] 86/17

smog [1] 199/2

so [356]

some [36] 5/23 8/11 8/21 10/5 11/8 12/4 14/17 17/8 17/15 27/9 33/10 44/15 49/2 56/18 66/9 85/10 85/25 89/22 90/12 95/1 133/20 140/13 140/20 145/24 146/3 156/13 156/14 161/6 191/4 191/5 206/14 220/8 226/10 229/18 237/2 246/25

somebody [3] 67/22 86/25 128/21

somehow [2] 98/11 175/22

someone [22] 16/2 67/24 108/24 120/18 129/25 142/20 144/16 149/13 152/7 152/21 169/9 169/9 169/10 180/20 187/17 207/25 228/15 228/22 231/5 231/10 235/5 238/25

someone's [12] 10/23 10/23 85/3 85/3 108/20 145/6 178/17 179/25 180/12 218/2 218/5 218/8

someplace [1] 105/25

something [22] 9/14 16/6 17/3 17/15 20/16 30/1 42/2 52/15 68/1 73/23 78/23 104/21 110/8 144/8 144/10 152/20 162/22 170/15 175/6 203/13 208/9 214/16

sometime [1] 22/7

sometimes [1] 102/18

somewhat [1] 44/6

somewhere [6] 28/18 29/3 32/10 40/9 112/9 188/17

sorry [7] 18/11 18/13 51/20 68/12 86/19 126/10 234/17

sort [2] 10/6 156/10

sounds [3] 26/22 45/13 128/16

source [1] 50/21

SOUTHERN [1] 1/3

speak [9] 44/15 47/20 74/23 141/11 145/14 162/10 162/12 175/10 202/25

speaking [11] 19/24 20/3 20/5 21/10 21/18 21/21 30/23 130/22 141/16 162/7 182/18

speaks [1] 209/11

specific [8] 34/6 47/18 88/13 96/23 104/3 104/16 115/8 241/7

specifically [6] 38/2 68/6 68/14 97/24 113/23 191/22

specifics [1] 29/6

speculation [13] 46/7 52/19 81/5 91/1 173/17 177/11 189/12 205/13 206/15 209/6 211/4 218/23 227/12

speed [2] 17/18 108/7

spell [1] 135/10

spent [1] 53/19

spoke [29] 20/2 21/4 21/7 43/7 43/11 43/17 43/23 44/12 44/13 44/14 44/18 45/24 47/1 47/16 74/17 76/7 76/16 76/18 160/15 163/10 164/17 182/21 183/1 183/14 183/17 184/17 235/23 236/9 236/15

spoken [3] 45/5 177/24 178/4

spot [1] 39/10

spray [1] 25/15

spread [3] 63/10 121/3 121/9

stack [1] 161/3

stage [1] 102/12

stale [1] 241/5

stand [9] 5/8 6/3 91/13 102/13 105/19 129/23 131/22 142/20 211/14

standard [1] 25/2

standing [14] 13/1 44/3 89/23 130/1 142/16 151/15 153/12 178/19 180/4 193/1 198/20 199/8 221/4 221/23

stands [1] 10/19

stapling [1] 121/18

start [9] 7/14 16/20 22/23 24/2 40/21 161/24 180/22 181/11 247/11

started [5] 12/20 16/17 129/23 136/3 136/13

starting [8] 20/25 23/4 86/20 125/12 126/3 138/17 192/17 247/7

starts [3] 147/12 161/11 237/8

state [13] 17/9 55/21 59/22 66/6 95/17 122/20 135/7 173/19 174/1 176/21 176/25

180/6 180/6

stated [18] 9/6 15/7 29/7 43/16 44/1 49/16 52/21 57/23 77/17 78/24 83/13 84/22 115/5 123/3 130/8 145/24 150/7 241/5

statement [23] 16/10 33/7 36/21 38/24 40/4 44/10 55/7 61/11 61/16 66/5 66/11 69/3 111/21 123/4 139/19 141/5 141/9 177/8 178/12 178/16 179/8 179/18 180/18

statements [9] 42/13 44/6 45/17 45/21 45/23 55/19 60/15 68/21 102/18

states [14] 1/1 1/21 59/11 97/13 116/1 130/11 177/4 178/14 179/8 179/17 179/20 180/16 249/3 249/7

stating [1] 117/7

station [19] 17/1 27/23 28/15 39/22 39/24 40/18 41/3 41/9 41/18 49/8 65/19 65/19 65/24 66/1 75/22 168/7 168/10 168/16 168/24

stay [1] 133/19

stealth [3] 29/16 29/19 30/15

stenographically [1] 249/4

step [9] 57/3 57/5 70/9 99/18 133/3 134/10 179/4 179/4 246/23

Steve [1] 75/8

Stever [1] 3/15

still [24] 12/25 18/24 19/18 40/9 50/20 51/2 51/4 89/25 124/4 124/21 127/11 127/11 129/18 129/21 129/24 144/8 144/10 175/14 197/25 198/14 210/8 210/9 226/25 239/13

stipulate [1] 35/22

stipulated [1] 35/25

stomach [3] 76/22 76/24 115/17

stomp [1] 132/11

stomped [1] 130/18

stomping [1] 130/1

stood [4] 130/19 131/6 131/19 131/23

stop [12] 7/9 12/21 15/22 54/20 123/8 130/1 180/24 187/17 203/5 206/3 212/24 244/13

stopped [7] 28/17 28/18 71/16 203/20 236/11 237/23 238/16

stopping [1] 208/14

stops [5] 182/5 187/17 236/9 236/14 236/17

storage [1] 240/20

straight [2] 198/7 199/24

STREET [2] 1/22 2/14

5-RenSER-01010      5-RenSER-01010

**S**

Stricken [2] 37/25 124/16
strike [14] 111/5 114/9 115/9 124/14 153/12 156/13 157/25 158/4 165/12 170/8 213/12 213/14 217/16 232/13
strikes [1] 114/11
strown [1] 56/11
struck [4] 169/9 231/1 232/4 232/8
struggle [5] 13/13 207/25 208/9 208/15 235/1
struggling [2] 214/9 234/21
stuff [7] 61/9 61/19 62/3 62/6 180/16 181/3 183/18
stun [2] 121/1 121/8
subdued [4] 8/15 8/17 17/20 121/6
subject [17] 10/22 66/6 80/2 121/6 144/14 144/24 146/1 146/8 162/19 163/1 177/5 177/16 178/14 179/9 179/17 179/20 180/17
subject's [1] 121/4
submit [1] 103/13
successful [1] 155/20
such [1] 187/16
sufficient [3] 16/7 128/25 211/1
suggest [1] 178/16
SUITE [7] 1/22 2/4 2/10 2/14 2/19 3/4 3/8
Superman [2] 94/8 94/10
supervisor [2] 15/23 22/25
supplemental [2] 4/12 232/2
supply [1] 49/25
Support [1] 3/15
supported [1] 129/15
supports [1] 63/14
supposed [2] 145/11 145/14
sure [40] 17/4 17/13 41/7 42/21 44/24 49/10 60/3 65/24 69/8 73/24 75/7 85/5 90/16 116/18 117/21 119/22 122/13 125/24 127/21 135/22 141/18 147/24 148/10 149/9 159/18 160/21 162/3 163/18 172/2 182/11 188/20 196/10 197/10 199/13 205/19 211/19 212/10 235/20 236/12 236/21
surroundings [2] 56/8 171/14
surveillance [1] 29/20
suspect [16] 15/21 22/22 22/24 29/25 57/15 58/14 80/6 80/14 113/5 164/13 171/2 210/6 210/16 211/23 232/23 242/1

suspect's [1] 156/7
suspects [4] 16/21 153/5 187/16 210/2
suspicions [1] 152/25
suspicious [1] 141/6
sustain [3] 81/12 178/1 180/24
sustained [49] 37/25 38/11 38/13 42/19 48/25 52/10 62/8 70/18 70/23 78/6 80/9 81/19 82/10 82/21 87/25 92/25 93/4 93/19 94/12 94/23 95/8 96/5 105/14 110/5 113/12 123/16 124/11 151/8 154/4 158/24 181/14 182/3 184/10 186/6 188/7 189/23 190/22 200/18 209/9 209/23 211/5 213/13 214/19 215/2 216/11 219/4 222/4 229/2 232/10
sustaining [3] 191/7 231/19 232/5
sustains [1] 104/10
SWISS [1] 3/7
sworn [3] 5/13 123/6 134/15
system [8] 4/18 54/4 102/21 111/20 122/17 240/6 240/16 240/20

**T**

table [3] 133/21 140/14 194/23
tactical [3] 103/11 207/2 210/1
take [27] 6/25 23/24 59/10 60/16 63/21 64/4 97/14 98/19 99/18 121/22 125/21 137/3 145/12 147/20 151/17 166/8 190/6 190/7 198/9 200/1 208/2 209/9 216/7 216/14 235/8 235/17 247/18
takedown [9] 154/6 154/8 198/10 198/15 200/3 208/3 211/10 214/23 233/2
taken [15] 22/8 24/4 99/11 103/23 110/17 116/7 133/24 166/14 189/2 189/17 192/8 208/24 221/3 222/17 228/6
taker [1] 35/6
taking [3] 85/18 198/14 203/14
talk [10] 20/10 33/15 47/15 57/12 61/8 72/9 79/24 99/10 138/6 173/7
talked [7] 44/5 59/20 86/3 101/8 104/8 168/12 247/10
talking [53] 26/19 30/21 30/21 31/3 31/23 34/4 38/5 44/17 44/23 45/19 48/10 48/21 51/6 51/8 51/13 51/16 57/4 61/12 71/24 72/18 75/1 75/3

75/6 80/4 92/9 129/16 129/17 168/24 173/23 187/5 189/2 189/4 190/11 190/25 191/14 191/22 192/3 194/18 206/6 220/18 220/20 221/20 225/23 229/21 234/25 236/5 236/5 236/22 238/2 238/10 239/1 239/4 245/18
talks [3] 42/8 88/12 99/7
tall [1] 132/3
tallest [1] 132/5
tape [80] 7/16 7/22 8/11 10/7 12/2 19/25 20/13 28/22 47/24 48/5 48/6 51/14 59/4 59/9 59/16 59/22 59/22 60/5 60/20 60/22 67/19 67/24 75/2 75/3 76/8 76/10 76/12 91/24 92/6 92/7 112/4 112/9 113/8 130/3 135/18 135/19 137/6 137/8 138/17 139/3 139/10 139/15 139/19 139/20 147/10 159/24 160/19 188/22 191/2 196/13 197/8 202/9 202/19 208/6 208/6 208/23 209/2 209/3 212/15 221/25 222/6 222/12 236/3 236/13 236/14 236/17 236/20 237/4 237/5 237/8 237/8 237/12 237/15 237/16 237/18 237/20 237/23 238/5 238/16 239/1
tapes [14] 79/8 109/22 134/21 134/22 134/24 135/2 135/15 135/22 135/23 136/1 139/1 139/6 139/12 161/9
tapping [1] 28/5
target [1] 58/19
tased [3] 127/14 128/17 129/19
Taser [73] 15/14 15/24 15/25 22/16 22/23 23/1 23/2 23/8 23/9 25/25 26/2 26/3 108/25 120/3 120/9 120/12 120/13 120/14 120/14 120/14 120/16 120/17 120/19 120/19 120/19 120/20 120/23 121/1 121/2 121/9 121/15 121/19 121/21 122/1 122/6 122/21 122/24 123/13 123/20 123/21 124/4 124/20 125/3 125/12 127/3 127/4 127/16 128/1 129/3 129/10 202/23 206/6 206/14 207/7 207/10 214/24 225/11 225/12 225/14 225/16 225/16 225/16 225/17 226/20 226/21 226/21 226/21 226/24 226/25 232/18 232/20 232/21 233/4
Tasered [1] 226/16

Tasers [1] 16/3
technically [1] 20/5
technique [1] 121/18
tell [47] 10/25 20/6 21/23 27/25 40/23 45/16 45/24 46/1 54/10 55/16 61/18 74/12 76/10 77/23 81/15 90/14 99/24 120/12 123/6 129/15 163/3 168/21 169/3 174/10 176/25 177/6 184/23 185/1 185/3 185/6 188/13 188/19 189/18 191/18 203/13 208/14 208/22 209/2 212/15 212/15 221/21 223/10 223/13 238/14 243/25 245/13 246/9
telling [36] 39/14 52/17 55/11 58/10 63/9 65/22 70/10 75/21 76/23 90/20 90/24 91/21 94/21 100/25 114/4 121/11 121/21 123/18 124/9 182/23 190/2 196/22 198/1 204/4 206/4 209/18 210/25 211/1 211/20 212/9 213/4 220/16 227/18 227/23 232/22 235/16
tells [5] 49/15 61/9 61/17 62/15 62/17
tensing [4] 81/22 114/14 114/20 115/6
tent [36] 31/2 49/13 49/15 49/16 55/12 55/17 56/15 56/17 57/4 57/11 57/24 58/9 58/15 58/24 63/2 63/13 65/13 140/9 140/23 142/8 142/9 142/11 142/16 142/19 142/22 143/3 143/4 163/11 163/25 171/5 171/5 182/23 183/19 187/20 193/1 194/22
tents [13] 56/3 56/7 56/20 57/6 57/22 57/24 58/1 58/5 58/12 58/22 69/22 70/8 171/13
term [2] 114/12 119/2
terminate [1] 242/16
terms [4] 109/13 151/12 203/13 240/1
terrain [2] 175/6 176/11
testified [17] 9/11 15/4 56/10 56/14 78/19 78/19 83/19 100/18 107/21 108/21 117/14 118/25 124/7 130/17 156/16 200/9 214/16
testify [14] 34/5 57/12 78/3 82/8 82/22 83/1 94/22 95/18 96/15 117/10 158/25 159/1 187/3 195/2
testifying [8] 22/2 63/25 73/20 81/18 95/21 95/22 111/25 206/17
testimony [16] 27/15 43/13 84/2 95/15 107/20 117/2 123/23

130/20 170/23 181/10 191/10 200/14 202/13 214/18 215/1 218/22
than [7] 39/11 57/17 82/16 98/24 146/4 150/8 175/13
thank [61] 5/6 5/6 5/8 5/16 6/9 8/5 23/18 23/22 24/8 24/9 24/12 28/10 34/22 45/4 50/6 51/11 60/3 68/12 74/3 80/20 82/25 87/3 87/11 88/1 88/14 95/25 99/20 103/16 110/1 110/16 110/22 123/24 126/6 132/14 133/2 134/3 134/7 134/12 134/17 135/13 136/4 136/5 139/22 143/20 143/21 144/4 147/22 148/18 148/21 151/9 159/16 162/4 166/17 166/21 172/9 244/15 244/21 246/7 246/16 246/23 247/3
Thanks [1] 159/13
that [912]
that's [146] 5/24 7/7 7/12 7/13 9/13 21/8 22/3 22/24 26/25 27/4 29/4 29/9 29/14 29/23 30/7 30/8 31/3 32/1 35/16 37/2 37/4 37/12 37/18 39/11 39/20 40/7 40/24 41/2 44/21 44/23 44/25 45/10 45/15 47/6 48/2 48/21 51/22 52/3 52/3 55/14 59/11 62/23 63/25 65/5 71/5 72/10 72/21 75/18 76/14 77/14 79/4 80/3 81/7 83/6 84/12 85/2 85/18 86/7 89/6 90/5 90/15 90/18 91/14 92/23 93/2 93/21 94/1 94/5 104/4 108/1 108/21 109/22 110/11 111/9 111/9 111/24 114/16 115/3 116/3 116/3 116/22 116/22 117/24 118/14 121/8 128/25 130/22 135/20 139/1 139/2 139/18 139/20 145/12 148/13 148/13 168/7 169/17 173/25 176/12 177/21 179/14 183/14 188/20 190/20 191/3 191/6 191/7 191/18 192/11 192/17 192/20 196/5 197/22 199/17 200/7 200/20 202/23 204/22 205/15 208/4 208/16 210/18 211/1 211/10 213/20 214/14 217/14 218/15 219/2 219/3 221/24 222/13 222/23 225/4 227/18 230/1 231/4 231/9 235/8 235/9 236/16 237/23 239/17 239/18 245/4 245/18
their [13] 11/14 11/21 16/19 57/15 73/25

T

their... [8] 81/23 95/4 115/6 115/23 116/6 117/4 118/10 120/18

them [35] 7/2 16/3 16/13 23/5 58/20 58/20 58/20 60/16 64/2 64/3 64/4 64/4 64/9 78/20 90/6 101/8 101/9 106/4 135/6 141/3 147/25 148/1 149/14 152/22 154/24 155/17 161/1 194/23 198/7 199/24 215/10 216/17 238/21 247/17 247/17

then [131] 7/14 10/22 11/20 13/13 16/3 19/17 22/16 23/3 24/2 27/22 28/4 28/15 28/17 31/23 34/18 35/6 35/7 39/15 40/8 41/17 41/21 42/7 42/8 44/5 45/3 49/4 49/5 49/11 50/19 51/5 52/15 53/20 56/17 59/2 60/21 61/9 61/17 61/18 62/15 62/19 65/21 75/12 78/12 81/7 81/8 81/8 81/13 83/3 86/13 86/21 88/8 88/12 91/1 93/10 98/4 98/9 98/20 99/7 101/9 102/7 104/3 104/9 104/20 105/20 106/15 111/17 114/7 118/24 119/6 120/3 121/14 125/4 125/16 126/13 126/23 128/20 129/8 129/10 132/17 133/10 137/11 139/18 145/1 149/5 150/11 152/23 153/15 155/23 157/6 159/17 165/15 165/23 166/8 172/11 174/3 190/6 190/23 193/6 195/14 195/15 195/18 197/19 197/21 197/25 203/4 204/9 207/10 208/14 211/13 213/19 213/21 214/7 215/22 216/6 219/16 222/20 223/15 224/6 225/3 225/4 225/21 227/17 228/17 228/24 229/16 230/12 233/17 235/23 238/18 242/16 243/16

there [139] 9/14 10/12 10/17 11/8 11/16 15/4 15/24 16/11 29/25 30/12 31/2 31/2 32/1 32/10 33/19 34/20 34/21 38/7 39/3 39/13 42/7 42/13 44/3 51/2 51/16 51/19 51/24 54/24 55/5 55/24 56/4 56/11 57/6 57/17 57/22 58/3 59/13 59/14 64/10 65/4 65/15 66/16 66/20 68/15 70/8 71/21 74/11 74/13 76/3 77/9 81/1 84/1 85/4 87/8 87/13 87/23 88/2 88/14 91/20 96/19 98/7 101/13

104/2 104/9 104/12 104/17 106/1 108/18 108/19 108/23 108/23 109/4 109/12 109/14 110/9 112/8 113/14 120/9 121/9 121/17 123/14 131/5 139/12 140/22 141/18 141/19 141/20 141/25 143/2 143/4 143/5 145/2 145/2 146/1 169/19 171/14 171/23 172/11 172/12 172/25 173/8 173/10 174/2 174/9 174/15 174/18 174/18 174/23 180/24 181/4 185/1 186/2 188/14 193/2 194/2 194/5 194/17 198/18 199/7 204/23 205/5 205/7 206/3 207/24 208/14 211/22 212/6 216/5 216/5 221/5 226/19 231/18 232/7 234/19 239/8 242/6 242/19 245/20 246/13

there's [58] 7/11 11/9 13/14 15/24 17/4 22/22 23/1 30/3 30/12 30/25 33/10 39/10 40/22 50/1 54/22 56/3 56/8 57/17 57/17 57/22 75/10 75/11 75/13 77/10 77/14 78/12 83/3 83/11 84/23 88/3 88/24 92/7 100/16 101/13 102/21 106/5 106/7 106/22 107/20 109/23 112/9 129/4 142/2 142/6 156/8 191/5 197/5 207/3 207/11 208/15 210/18 218/24 229/23 231/22 232/3 233/11 236/20 245/2

therefore [3] 101/2 213/16 213/19

these [23] 7/7 19/1 19/6 19/11 19/16 97/24 105/20 105/25 106/15 109/22 109/25 120/8 135/15 135/23 139/17 140/15 141/25 147/24 148/1 161/6 161/7 161/9 226/1

they [32] 7/8 7/8 11/15 11/20 15/22 16/3 16/13 16/18 30/25 31/1 38/3 42/7 45/21 45/22 63/2 106/19 118/11 134/21 134/23 134/24 137/8 137/10 137/11 148/8 173/22 191/4 207/1 210/17 214/13 219/10 244/11 247/24

they'll [2] 60/22 244/5

they're [7] 11/21 45/17 83/17 85/2 104/13 121/6 145/24

thin [1] 142/17

thing [11] 54/15 61/10 80/25 83/19 92/12 93/2 98/5 100/18 193/18 202/12 218/10

things [20] 15/20 54/5 54/22 56/1 57/16 57/18 59/1 60/7 63/15 63/17 70/15 133/20 178/20 180/17 180/19 180/20 183/2 201/5 203/19 233/5

think [21] 17/16 17/18 19/19 44/21 52/20 85/24 98/18 102/19 128/18 131/21 133/6 172/3 176/9 197/7 209/12 209/16 211/1 224/24 237/18 244/2 247/8

third [21] 18/23 43/18 74/9 115/24 120/7 159/8 159/9 177/21 219/17 219/19 219/24 220/4 220/16 220/21 221/16 221/19 221/23 222/13 222/23 222/25 236/14

this [449]

those [26] 7/1 7/2 15/2 54/14 58/5 63/15 75/16 88/17 98/2 98/3 105/7 105/10 105/10 106/3 134/22 138/21 139/6 157/10 159/10 159/11 160/25 168/17 169/25 208/11 233/5 246/18

though [8] 30/10 58/8 65/25 66/16 76/10 92/11 221/17 247/3

thought [3] 50/2 60/18 229/16

three [24] 19/15 53/6 53/20 59/12 59/13 100/16 100/18 102/1 108/13 120/8 135/2 135/3 135/4 139/12 206/5 206/10 207/3 207/11 216/13 216/13 221/4 222/20 222/25 235/16

throat [1] 63/16

through [59] 7/19 9/22 19/12 19/17 28/15 28/19 57/6 57/21 58/5 58/15 59/5 61/6 61/9 61/19 62/2 62/6 62/22 63/13 63/17 86/8 86/14 86/21 88/6 88/17 101/6 105/8 108/13 108/13 117/15 117/22 117/23 119/4 119/18 123/21 125/13 125/14 125/15 125/15 125/16 127/18 128/1 129/2 129/16 130/21 131/22 133/20 134/22 137/11 139/19 144/14 144/24 162/20 164/4 164/14 171/13 171/14 177/16 180/17 246/4

throwing [1] 98/10

thus [2] 109/13 109/15

time [263]

timely [1] 215/5

times [24] 7/6 9/25 38/7 39/6 73/18 100/6 100/16 100/18 101/10

192/1 102/2 109/1 181/19 181/21 182/10 198/18 199/5 199/7 208/11 221/22 222/20 222/25 235/13 246/18

Title [1] 249/3

today [35] 5/20 12/1 22/2 25/19 27/7 27/16 40/13 40/15 46/14 48/12 50/12 57/1 57/10 63/8 77/11 84/15 84/21 84/22 96/17 96/21 96/22 108/22 111/18 117/3 118/25 121/17 125/2 129/20 136/18 173/14 173/18 173/20 174/1 192/13 233/23

today's [1] 84/12

together [6] 27/3 110/9 123/9 178/20 180/21 227/5

told [26] 9/14 10/13 20/7 42/2 42/6 46/3 47/18 50/13 66/17 66/18 67/10 67/11 99/25 117/3 118/22 152/13 157/19 183/1 183/10 183/18 183/23 185/18 186/4 194/17 200/9 212/5

tone [1] 150/10

too [5] 124/7 155/1 161/16 202/24 244/10

took [15] 27/23 27/24 28/2 28/7 41/5 88/4 142/15 142/24 150/25 189/9 190/2 191/11 201/14 215/25 216/13

top [7] 10/2 78/8 90/21 91/20 94/16 224/16 245/22

torso [1] 223/4

tossed [1] 105/24

total [1] 139/12

touched [4] 153/23 154/9 154/10 154/15

tour [1] 240/19

towards [16] 21/10 21/18 21/21 39/24 40/25 49/8 65/18 140/14 164/22 165/7 174/16 186/10 191/15 192/21 211/14 217/10

TOWN [2] 2/9 2/18

trace [2] 171/14 171/23

track [1] 244/14

traffic [5] 11/13 11/16 129/24 143/8 182/5

train [1] 58/16

trained [11] 18/3 18/15 18/19 58/17 79/25 152/6 152/10 158/12 175/5 207/14 210/1

trainer [1] 167/1

training [19] 17/25 52/24 140/5 144/16 145/9 149/15 149/24 158/15 158/19 159/3 159/4 167/4 186/23 187/6 187/8 187/9 187/14 209/25 240/9

trains [1] 54/4

transcript [57] 1/5 1/14

6/19 18/25 19/2 19/16 30/20 38/6 39/13 42/5 42/11 44/18 47/3 48/19 49/20 49/20 49/22 50/1 50/2 59/10 59/10 59/19 60/2 60/20 60/22 85/11 85/23 86/1 86/6 87/1 99/2 102/2 102/3 106/6 138/19 139/7 139/9 143/9 147/12 147/13 148/3 148/4 160/19 160/23 161/5 161/10 161/15 161/17 161/19 162/2 163/15 163/17 163/21 164/5 172/3 249/4 249/6

transcription [1] 27/9

transcripts [23] 1/24 7/1 7/7 19/1 19/12 19/13 50/1 59/12 59/13 100/17 105/25 106/8 147/24 148/9 159/10 161/1 161/4 161/6 161/7 161/8 161/16 161/25 162/1

transferring [1] 127/18

Transit [4] 53/23 54/1 54/1 54/3

transiting [1] 225/23

transition [2] 225/21 226/23

transitioned [3] 223/16 225/5 225/18

transitioning [1] 226/15

transitions [1] 226/1

transmission [3] 13/12 13/14 23/6

transpired [1] 46/14

transportation [1] 54/4

trap [1] 224/5

trial [8] 100/15 101/4 101/5 102/12 103/19 103/21 104/12 110/10

trials [2] 97/25 108/13

tried [2] 211/10 214/12

trouble [1] 147/24

truck [7] 47/4 47/10 47/19 48/7 49/17 50/14 50/18

true [298]

truly [1] 121/3

try [9] 9/25 11/15 99/1 101/21 103/13 148/2 149/12 151/6 155/24

trying [29] 11/21 14/10 29/16 39/9 77/24 83/17 85/2 86/7 90/17 91/2 92/13 93/21 94/8 94/16 96/11 100/21 127/7 145/6 150/15 154/17 155/7 155/13 200/20 219/24 223/14 223/17 225/16 227/10 245/3

tuck [2] 218/25 219/7

tucked [2] 154/24 155/3

tucking [4] 216/17 218/10 218/20 227/22

Tuesday [9] 5/19 5/21 6/1 20/17 20/22 20/24 21/3 74/19 133/2

turn [16] 7/17 8/21 8/24 9/5 9/15 41/1 58/19 58/20 58/20 58/20 87/4

**T**

turn... [5] 112/18 129/8 148/23 163/20 236/2
turned [6] 8/17 10/4 29/12 29/15 76/10 194/4
twice [7] 43/7 43/11 58/23 61/5 195/11 222/16 230/19
two [30] 11/18 21/4 30/10 30/12 30/12 36/13 53/6 53/20 60/7 71/5 74/20 74/22 75/10 75/14 76/4 77/5 90/21 91/18 115/23 118/23 121/4 122/18 176/12 205/3 221/22 223/19 235/7 242/6 244/22 247/1
twofold [1] 190/16
type [7] 20/17 21/1 35/8 102/22 120/25 121/6 152/19

**U**

unable [5] 121/22 171/9 208/19 227/23 235/16
unarmed [1] 17/14
unaware [1] 229/4
unbalanced [1] 90/11
uncertainty [1] 32/2
unclear [3] 75/17 81/7 86/16
uncommon [1] 9/22
under [11] 15/9 63/1 118/23 149/11 169/13 169/25 170/1 191/10 209/12 219/14 227/22
underneath [19] 14/8 14/8 14/21 14/22 15/5 152/4 154/24 155/4 155/9 155/17 156/4 216/17 218/11 218/20 218/25 219/1 219/7 227/15 227/24
understand [34] 11/3 31/7 37/1 45/1 46/10 48/23 51/18 51/19 52/17 57/9 68/23 69/17 78/16 80/6 80/18 83/18 84/16 90/6 113/1 116/16 136/24 169/13 177/12 178/25 183/6 188/3 198/12 199/15 209/16 214/1 219/24 220/2 231/14 240/1
understanding [6] 23/2 99/5 108/12 136/17 208/22 208/25
Understood [2] 60/17 148/2
unduly [2] 34/13 89/5
unfamiliar [1] 32/12
unfortunately [1] 40/22
unfounded [3] 65/8 175/19 175/20
uniform [6] 24/21 24/21 24/23 24/24 25/3 83/10
uniforms [1] 234/20
Unincorporated [1] 32/6
unit [1] 31/25
UNITED [4] 1/1 1/21

249/3 249/7
United States [1] 249/7
units [3] 16/7 16/15 22/21
unless [2] 71/13 248/1
unlike [1] 47/8
unlit [1] 193/2
unreasonable [1] 152/19
unreliability [1] 176/9
unreliable [4] 69/7 175/22 176/6 176/18
until [20] 64/16 119/14 119/16 126/3 153/17 156/7 157/16 166/9 190/13 191/24 192/4 192/8 195/11 197/20 200/6 204/7 229/5 233/19 241/18 241/24
untruthful [1] 98/13
unzipping [1] 63/17
up [64] 7/17 9/25 11/20 13/1 13/3 14/14 14/18 15/8 18/12 20/17 39/15 39/17 39/17 47/22 48/11 48/22 58/22 63/16 70/14 90/17 90/18 90/22 91/2 91/13 91/19 105/21 109/20 109/25 119/14 126/3 126/8 129/12 129/12 129/14 129/23 130/19 131/6 131/15 131/19 132/2 132/11 135/21 141/4 148/7 148/23 152/14 152/25 161/4 161/25 175/2 190/13 194/5 194/23 202/9 211/14 214/9 216/5 216/5 228/9 237/9 240/4 241/24 242/7 244/10
update [2] 10/22 145/2
updated [2] 10/18 13/10
upgraded [2] 144/20 145/3
upon [10] 46/5 58/22 77/1 89/21 115/5 116/1 116/10 117/8 154/2 170/25
upon my [1] 170/25
upper [23] 14/17 83/5 85/7 85/8 89/9 89/22 90/3 90/23 92/11 92/23 93/24 96/13 96/13 108/19 108/20 223/4 223/4 223/12 223/21 223/22 224/5 224/9 225/19
urgency [1] 13/17
us [64] 16/16 19/5 20/7 25/5 27/3 27/25 28/2 29/24 30/12 38/6 39/1 40/17 42/24 42/25 52/17 54/10 55/16 57/17 58/10 70/10 74/12 75/21 76/11 76/23 87/8 90/24 91/21 94/21 106/2 111/25 117/3 118/22 120/12 121/5 121/11 121/21 123/6 123/18 124/9 156/10 157/19 163/3

168/21 176/25 189/21 190/2 196/22 204/4 206/10 207/8 212/5 222/2 223/8 223/13 223/22 224/14 224/16 227/19 227/23 232/22 237/13 238/14 243/22 245/13
use [80] 11/13 11/16 15/25 17/25 20/21 23/12 23/15 43/9 64/17 66/14 73/3 73/13 73/16 75/8 79/10 79/15 79/24 79/25 80/2 80/4 80/5 82/11 83/22 84/10 91/10 91/12 93/16 95/7 95/13 96/23 97/5 100/21 101/17 103/19 103/20 103/20 105/15 108/24 110/15 113/21 113/24 116/14 117/6 117/10 118/18 120/15 120/15 122/2 149/12 153/20 154/11 156/10 157/19 158/7 158/12 158/15 158/19 158/23 159/4 159/5 166/13 169/20 186/22 194/3 207/6 207/14 221/24 229/21 229/23 231/6 231/12 232/20 232/21 232/23 232/24 232/25 233/6 236/25 240/9 240/11
used [10] 37/3 80/15 103/25 105/11 106/24 119/2 157/20 183/13 225/5 240/13
using [5] 94/4 198/10 200/2 208/2 235/13
utilizing [1] 207/12

**V**

vacuum [1] 80/11
vague [19] 18/5 18/6 21/11 25/11 116/19 130/4 149/19 153/25 154/1 158/21 162/15 169/17 169/19 183/5 198/24 205/13 207/16 217/11 231/8
valid [3] 204/22 204/22 205/4
vehicle [28] 4/18 9/19 10/8 12/3 12/4 12/5 12/6 12/8 12/13 37/8 38/4 65/22 73/6 76/20 77/1 78/23 99/15 99/22 111/8 145/2 145/7 168/3 178/8 194/3 194/18 236/11 240/6 240/10
vehicles [4] 177/18 177/23 178/12 179/6
verbal [3] 171/4 193/5 195/17
verbalizing [1] 207/2
verdict [1] 108/14
verifies [1] 35/14
verify [1] 145/14
versus [10] 35/3 38/17 52/7 54/18 81/7 85/18 85/25 98/1 111/17

190/18
very [46] 9/21 13/11 27/17 28/10 28/24 29/23 37/10 38/5 79/2 86/15 86/17 87/3 99/20 114/12 115/22 123/12 123/24 132/14 133/2 135/25 136/5 139/21 142/16 143/20 146/1 151/15 153/25 164/23 166/17 190/11 195/23 196/2 204/13 211/23 212/5 213/10 213/14 219/20 220/6 226/4 235/7 235/12 240/13 241/7 246/16 246/24
vest [8] 9/20 9/23 25/4 25/17 26/8 115/13 216/25 218/8
veteran [4] 146/3 162/22 163/2 163/3
via [1] 10/2
vibrate [2] 10/3 10/4
vibrating [1] 10/5
vicinity [1] 28/18
victim [10] 46/22 55/1 55/5 55/9 57/18 59/1 141/18 142/21 142/24 143/6
victims [1] 242/2
video [32] 4/19 7/23 8/4 11/8 12/20 27/9 39/6 43/18 96/21 111/19 122/17 148/4 159/9 159/17 159/18 192/11 192/15 192/16 194/9 194/12 196/8 196/10 201/12 201/13 206/16 206/17 206/19 209/11 223/23 239/7 241/3 241/10
Video/Audio [1] 4/19
video/audiotape [2] 7/23 8/4
videotape [17] 12/18 19/22 148/22 161/14 162/5 164/8 192/18 196/11 197/15 201/15 203/7 203/17 204/17 206/1 207/22 237/10 238/8
view [1] 192/11
viewing [1] 140/15
violate [2] 64/7 159/5
violating [1] 158/18
violation [1] 64/11
violence [25] 29/23 46/16 54/7 54/11 54/14 54/21 54/25 55/9 69/1 71/11 140/4 140/6 140/20 141/8 142/1 142/21 142/24 144/8 145/23 162/11 172/13 172/23 182/1 182/4 184/24
violent [1] 145/25
visually [2] 241/2 241/9
voice [5] 150/11 150/12 150/23 212/19 212/23
volume [1] 45/20
voluntary [2] 141/5 210/17
volunteering [1] 114/3

vs [1] 1/8

**W**

waist [2] 218/14 218/15
waistband [10] 14/8 119/19 152/11 154/24 155/8 216/18 218/11 218/12 219/8 227/22
wait [1] 31/13
waiting [2] 32/13 142/20
walk [5] 45/25 46/5 133/20 152/14 152/25
walked [2] 46/6 215/24
walking [9] 30/16 32/23 33/2 39/3 58/22 141/17 159/24 177/16 183/25
want [42] 7/18 28/4 29/24 31/24 32/11 33/22 40/7 41/7 47/24 66/12 66/14 87/17 98/16 99/16 106/9 110/9 119/11 124/25 135/19 135/21 138/21 139/17 147/16 149/4 149/8 149/10 150/18 151/16 151/16 161/19 162/3 174/2 176/20 189/21 194/7 197/10 201/12 223/9 223/25 237/4 244/4 246/4
wants [1] 189/24
war [2] 163/2 163/3
warrant [5] 65/23 66/7 66/17 66/18 66/20
warrants [1] 66/9
was [521]
wasn't [11] 9/21 14/18 32/2 32/6 50/23 89/3 107/8 107/16 141/18 155/9 233/7
watch [2] 196/8 196/10
watched [2] 27/9 43/18
watching [1] 248/1
WATKINS [3] 2/9 2/13 2/18
way [28] 7/19 19/12 19/17 29/20 40/20 48/6 59/21 67/15 85/20 95/5 100/12 103/20 107/1 108/14 109/3 117/7 130/8 135/6 137/11 149/13 198/12 198/17 198/25 199/15 209/2 220/20 232/7 237/20
ways [3] 40/22 54/5 108/20
we [233] 5/17 5/25 6/14 6/19 7/17 7/21 10/7 11/12 11/15 16/6 16/18 16/20 17/3 17/10 17/15 18/12 19/2 20/16 23/23 27/9 27/9 27/25 28/21 29/24 29/25 30/20 32/2 32/5 32/15 32/15 33/8 34/9 34/9 34/23 35/11 35/22 37/10 39/5 39/13 39/18 39/18 39/20 40/4 40/5 40/6 42/15 42/15

# W

we... [186] 42/25 43/18 47/12 48/12 49/5 49/13 50/2 50/17 51/13 51/14 58/11 58/12 60/10 65/1 65/2 65/3 65/21 66/7 66/7 67/10 67/11 71/2 72/20 75/1 76/7 77/22 78/13 79/23 80/5 80/25 86/2 86/3 90/20 91/23 96/3 96/21 98/6 101/21 102/19 102/22 103/7 103/21 104/4 104/20 105/18 111/7 115/19 116/21 117/16 119/4 119/10 119/17 120/17 120/25 121/4 123/8 125/9 126/22 132/3 132/25 133/4 133/21 135/18 135/25 137/5 138/19 138/25 139/11 140/21 142/17 142/18 143/9 143/23 144/1 144/23 145/2 145/25 146/5 147/23 148/3 148/8 148/12 149/12 149/13 150/13 150/14 152/20 152/22 153/4 155/17 156/7 159/24 160/25 161/21 163/14 172/13 173/7 175/1 175/17 175/23 177/15 179/8 179/12 183/14 183/17 187/15 187/16 189/1 189/4 189/18 191/17 193/12 194/4 194/6 194/14 196/8 196/10 198/12 198/13 198/17 198/25 199/15 200/9 200/10 201/12 201/19 202/18 203/1 203/13 203/20 203/22 206/14 206/20 207/4 207/11 207/25 207/25 208/8 208/12 208/12 208/14 209/2 210/23 211/11 216/5 220/18 220/22 221/3 221/19 221/25 222/6 224/24 226/7 226/15 230/24 234/6 235/6 235/7 235/12 236/9 236/14 236/19 236/21 237/16 237/18 238/1 238/20 238/24 238/25 239/22 240/1 240/11 241/12 242/2 243/4 243/4 243/6 244/11 244/17 244/19 245/9 245/21 245/22 246/1 247/11 247/25

we'll [25] 5/19 24/2 37/8 40/25 60/19 60/20 74/4 79/8 85/13 89/4 89/6 133/1 133/14 133/23 139/18 149/13 161/12 161/24 166/9 172/3 197/17 197/18 209/9 222/12 248/2

we're [58] 5/5 6/20 18/24 31/12 35/16 39/6 39/8 39/8 39/9 44/23

51/23 58/17 61/23 71/24 72/19 75/18 77/14 79/25 85/19 85/24 95/16 98/5 98/16 98/19 100/4 102/12 106/2 110/14 110/21 129/8 129/16 129/17 133/10 134/2 142/15 143/16 161/21 161/22 166/18 179/13 182/4 187/15 189/2 190/25 192/3 192/25 197/7 207/2 225/23 237/18 239/6 239/13 239/14 242/2 242/16 246/3 247/5 247/12

we've [11] 33/17 60/7 96/6 105/15 111/19 142/17 161/3 169/8 174/25 229/7 230/9

weapon [12] 14/22 58/15 151/17 151/19 152/3 152/11 153/14 155/7 156/10 188/19 201/22 218/6

weapons [16] 15/2 17/10 17/13 25/8 59/1 63/10 64/9 140/10 140/15 140/22 142/19 149/9 152/12 171/7 207/1 207/4

wear [2] 9/20 25/17

wearing [8] 24/22 24/25 25/2 25/3 25/7 25/20 25/22 152/2

wearisome [1] 110/13

Wednesday [7] 5/12 5/22 6/1 6/14 9/11 73/21 133/2

week [2] 148/3 248/2

weekend [1] 247/13

weighed [3] 26/9 26/9 26/11

weighs [1] 26/4

weight [88] 24/18 83/9 83/14 83/16 83/17 84/23 85/9 85/10 85/17 85/18 85/19 85/20 85/25 85/25 86/3 87/14 87/24 88/12 88/20 88/21 89/9 89/12 89/13 89/14 89/22 89/25 90/10 90/12 90/14 90/23 91/3 92/11 92/22 93/24 94/9 94/16 98/8 98/9 99/12 99/25 100/19 101/9 101/11 104/17 104/20 104/22 104/23 105/1 105/9 106/11 106/23 106/23 107/3 107/4 107/6 107/9 107/11 107/14 107/17 107/19 107/22 107/22 107/23 107/25 108/18 109/17 109/21 115/23 115/25 116/7 117/4 118/3 118/7 118/9 118/23 119/14 119/16 120/1 120/6 120/8 124/5 124/21 127/24 129/22 224/14 224/20 224/22 235/13

welcome [1] 82/16

well [75] 6/2 6/23 18/24 22/22 35/14 37/9 40/12 50/4 52/11 69/16 71/5 74/21 75/1 75/9 82/18 83/14 84/16 85/11 88/15 91/23 95/10 97/11 98/24 101/20 106/7 108/9 114/19 117/14 120/19 124/7 126/21 130/10 131/14 132/18 139/21 153/12 158/22 163/4 163/16 165/5 165/12 170/5 173/18 177/15 179/12 179/20 179/22 181/7 194/14 195/2 196/1 198/3 200/9 201/5 206/16 212/12 212/14 213/21 214/16 220/3 220/20 221/25 223/14 224/6 224/9 224/10 225/7 226/3 226/19 227/17 232/21 236/9 238/5 239/21 245/5

went [37] 14/19 14/25 17/16 17/18 20/10 27/9 28/25 29/9 29/11 31/1 39/21 40/18 40/20 40/22 40/24 40/25 41/8 41/17 57/21 65/17 72/4 76/15 76/18 104/20 128/1 153/17 157/15 162/12 166/4 173/22 183/14 185/22 214/24 216/6 218/19 226/25 238/1

were [229] 5/3 18/3 18/15 18/19 21/10 21/18 21/21 22/1 24/5 24/22 24/25 25/5 26/7 26/23 26/23 27/17 29/16 30/14 30/15 30/16 30/20 30/21 31/1 31/3 31/23 31/24 32/2 32/16 32/20 33/1 33/15 34/2 36/12 36/22 37/15 38/3 38/4 38/15 39/2 39/4 39/13 39/14 39/18 40/5 40/6 43/23 43/24 44/3 44/6 49/6 50/20 50/23 51/2 51/2 52/25 53/4 53/7 53/13 53/23 54/6 55/12 55/15 55/16 56/2 56/11 58/3 58/5 58/8 62/5 63/2 63/24 64/17 66/3 67/10 67/11 67/15 70/4 71/21 73/5 75/1 75/16 76/16 77/3 77/6 77/23 78/23 79/9 81/1 81/15 84/6 84/7 90/16 90/16 92/12 94/14 95/10 97/2 97/3 97/11 97/19 98/2 98/3 101/7 104/17 104/19 105/7 105/10 109/20 110/19 113/17 113/24 115/21 116/12 116/18 117/4 117/11 118/11 118/17 120/7 121/22 122/22 123/8 127/2 127/4 129/11 129/13 131/19 132/5 133/16 133/25 134/23 140/23

141/7 141/19 141/20 141/23 144/11 146/13 150/13 150/15 150/18 153/12 153/20 154/6 154/11 154/16 154/22 155/11 155/12 155/12 155/19 155/20 156/2 156/3 156/18 156/24 157/22 162/7 162/12 165/20 166/15 167/1 167/6 167/8 167/14 168/13 169/19 171/13 171/23 172/12 172/25 173/8 173/10 174/11 174/18 174/23 181/20 189/10 193/2 196/15 196/22 197/25 198/18 199/7 202/6 202/7 202/25 203/1 204/23 205/5 205/7 205/12 207/7 207/11 210/4 210/9 211/16 212/6 212/9 213/23 215/4 216/21 224/2 224/9 224/15 224/20 226/1 226/13 226/19 226/19 226/25 228/17 228/24 229/4 229/5 231/25 232/25 234/2 235/16 236/1 236/3 238/1 238/20 239/4 239/4 243/6 243/11 246/13 248/3

weren't [1] 91/3

WEST [1] 1/22

what [305]

what's [10] 45/10 46/15 81/7 102/20 104/14 105/22 122/3 173/25 186/13 191/6

whatever [5] 97/25 170/1 174/18 182/24 196/22

when [229] 5/17 8/14 8/17 9/5 9/7 10/1 10/7 10/13 11/9 11/16 11/23 12/2 12/11 12/22 12/25 13/19 13/24 14/6 14/20 14/21 14/25 15/4 16/15 21/10 21/18 21/21 22/4 23/2 23/8 28/2 29/11 31/20 32/20 32/24 33/1 33/5 36/21 37/2 37/6 37/15 43/20 44/5 45/14 45/19 45/24 46/21 47/16 49/6 51/6 51/8 51/21 52/7 54/17 54/21 55/9 55/11 55/17 58/4 58/18 59/3 59/19 62/23 64/21 65/9 65/17 66/3 66/5 66/6 68/21 69/1 75/14 75/21 76/15 76/16 76/18 76/24 76/24 78/13 79/6 79/22 79/23 80/4 82/11 84/18 85/6 87/8 89/9 91/20 92/5 92/9 92/17 96/19 98/2 98/6 98/8 98/13 99/14 100/11 109/3 115/15 116/11 118/17 119/14 120/23 122/15 123/12 124/20 127/2 127/4 127/16 129/14

129/16 130/19 131/6 132/2 132/11 136/10 136/12 140/9 141/19 142/8 142/11 144/6 145/9 146/13 147/1 147/8 149/3 150/10 150/15 150/19 151/11 151/18 151/25 152/24 153/13 154/11 154/14 154/25 155/19 156/3 157/22 162/12 164/22 167/14 168/2 174/10 175/1 175/5 175/24 176/4 176/22 177/4 178/20 179/8 180/15 181/9 183/10 185/24 186/23 186/25 187/13 187/15 187/16 188/9 188/13 188/14 188/17 190/13 190/14 190/16 190/25 191/14 191/15 191/17 192/21 194/17 202/6 202/7 204/19 207/4 207/24 208/7 208/8 208/12 209/12 211/16 211/18 212/17 214/22 219/20 222/13 225/4 225/14 225/15 226/19 226/21 226/25 228/9 228/15 228/17 228/22 228/24 229/12 229/23 230/22 231/4 231/10 232/12 233/12 234/21 236/1 236/3 236/13 236/15 238/25 242/4 242/18 242/19 242/20 243/11 243/16 244/1 244/8 244/23 244/24 245/18 246/5 246/10

where [72] 14/11 17/20 20/9 32/16 39/9 39/20 40/18 41/23 42/25 43/18 55/22 56/21 63/2 69/22 78/13 88/11 90/2 90/3 94/14 103/2 104/2 109/13 112/14 112/16 112/24 119/10 127/2 127/4 127/10 136/14 140/23 145/7 146/22 147/16 147/20 147/23 151/15 154/22 154/24 155/15 163/1 168/5 175/6 176/5 178/11 183/12 183/14 183/19 185/7 185/22 186/10 190/10 203/5 207/6 207/13 211/10 212/10 212/12 212/15 212/16 215/12 215/23 219/25 220/9 223/16 224/2 224/18 225/23 228/11 244/5 245/19 246/10

whether [17] 15/16 54/19 55/23 85/16 101/23 107/22 122/5 122/6 152/3 185/15 197/6 197/12 232/8 232/8 233/9 241/15 244/23

which [43] 10/19 10/19 11/12 11/18 13/14 14/14 15/10 15/13 17/1

5-RenSER-01014

5-RenSER-01014

# W

which... [34]  21/2 32/4 37/9 37/17 40/10 40/20 42/9 74/19 92/8 94/7 106/19 106/24 109/17 109/19 116/4 119/17 120/15 130/8 138/17 145/3 145/4 151/15 153/23 154/9 154/15 156/23 157/8 159/9 160/19 164/4 205/5 225/16 225/17 233/6

while [22]  5/10 7/24 13/9 16/3 29/22 41/17 83/11 108/24 121/6 122/17 124/4 125/3 127/14 129/19 129/24 155/12 173/8 206/4 213/7 221/23 226/16 236/24

white [14]  47/4 47/9 47/19 48/7 49/16 50/14 50/18 159/24 160/2 177/5 178/15 179/21 180/10 180/14

who [55]  10/25 11/3 11/23 12/8 19/24 22/25 32/13 35/7 39/7 43/23 46/6 47/2 50/13 58/3 61/13 61/14 70/13 70/14 88/3 100/5 100/8 101/16 102/4 108/24 113/24 121/25 130/18 131/6 131/19 131/22 141/23 144/15 144/17 144/25 145/18 157/1 160/2 160/15 162/7 162/21 168/13 171/13 180/4 185/15 204/12 213/5 213/5 213/6 213/6 229/9 229/20 230/22 231/25 241/14 244/23

who's [6]  12/6 55/9 144/25 145/18 162/20 243/21

whoever [1]  174/9

whole [3]  85/24 147/6 190/8

whom [1]  80/6

why [58]  13/8 17/7 17/17 20/22 22/19 23/23 29/9 40/10 52/3 52/15 59/5 61/5 61/8 61/19 62/2 62/22 65/5 67/17 67/20 67/25 81/15 87/6 97/14 109/20 111/9 125/20 126/21 136/17 141/14 142/4 142/14 145/22 147/4 148/7 149/8 149/10 152/18 153/3 155/6 156/6 161/4 162/10 163/14 169/19 171/6 188/4 188/20 191/7 199/17 206/25 206/25 208/13 209/17 211/1 229/16 233/1 233/3 233/6

wife [1]  165/5

will [39]  5/17 5/18 5/22 5/25 22/23 24/8 34/7

37/6 38/24 49/17 60/5 65/6 78/3 82/8 82/22 83/1 94/22 95/18 97/22 98/21 102/16 110/22 111/21 119/23 125/4 148/23 158/25 159/11 161/11 170/1 196/10 200/24 240/19 243/1 243/22 244/20 244/22 245/22 247/25

Winnebago [3]  29/2 49/18 50/14

wipe [1]  113/16

wipes [1]  113/16

wireless [1]  9/18

withdrawn [1]  60/21

withholding [1]  98/11

within [15]  20/4 36/13 37/12 38/16 80/23 128/20 187/20 187/22 188/9 189/17 193/3 193/16 193/22 209/13 213/6

without [11]  7/25 30/4 38/20 72/25 149/14 181/12 182/18 210/25 213/17 213/17 224/7

witness [30]  5/13 28/9 28/11 41/13 42/22 85/13 85/14 99/3 99/17 100/5 101/1 101/14 101/16 102/6 102/13 103/22 104/1 104/8 104/12 104/24 110/7 114/10 133/4 133/7 133/9 134/6 134/15 134/18 135/20 136/21

witnessed [2]  23/9 162/11

witnesses [6]  4/3 95/15 99/2 99/3 100/8 110/24

witnessing [1]  116/10

woke [1]  141/4

won't [1]  65/25

wonderful [1]  247/13

word [2]  184/13 199/2

wording [2]  161/7 222/15

words [10]  53/17 55/16 79/1 85/17 141/11 191/21 207/13 216/13 231/18 244/25

work [4]  32/4 99/4 136/14 239/13

work-product [1]  99/4

workday [1]  21/2

worked [2]  54/13 167/10

working [6]  20/23 25/1 54/14 76/15 76/18 157/6

works [1]  108/8

workweek [1]  20/25

worn [3]  25/19 25/20 240/12

worry [1]  19/9

worth [3]  65/23 66/3 66/12

worthy [1]  144/18

would [136]  5/8 6/4 6/7 6/24 6/25 9/20 9/23 10/1 10/2 11/7 12/9 12/15 15/12 18/2 18/22

20/5 20/24 21/2 21/9 21/17 21/20 22/7 22/25 23/3 23/20 24/17 26/7 27/3 29/5 30/7 30/12 32/4 32/14 33/7 33/8 35/5 35/6 35/7 35/9 35/14 37/3 37/3 43/17 45/21 46/18 46/19 49/24 51/4 58/24 58/25 59/2 60/5 63/15 63/18 67/14 71/11 74/13 74/22 78/2 79/7 79/21 82/18 84/23 85/21 86/22 87/4 90/11 90/11 90/12 97/21 97/23 99/18 100/13 102/8 105/13 106/20 109/15 115/7 119/13 119/13 121/4 121/5 126/13 126/19 127/11 129/1 133/18 133/19 134/5 134/9 134/13 134/18 134/23 135/7 135/10 139/14 139/14 143/7 143/10 143/16 149/24 151/1 152/19 152/20 154/24 161/15 161/17 164/3 164/21 165/2 165/6 165/10 166/21 169/8 170/5 170/8 178/12 191/21 193/8 193/15 200/16 209/1 218/20 218/24 219/8 223/23 224/4 224/6 226/22 227/4 231/24 234/14 242/3 242/7 247/22 247/24

wouldn't [4]  46/4 67/22 71/12 215/4

wrap [1]  218/2

Wrestling [1]  226/2

wrist [4]  157/8 157/9 157/13 225/6

write [12]  78/12 80/12 83/3 111/7 136/24 172/19 214/7 214/17 215/11 215/22 232/25 233/6

writing [9]  74/24 96/12 117/8 168/6 168/9 178/20 211/15 238/3 238/21

wrong [1]  40/8

WRONIAK [1]  3/3

wrote [51]  56/11 73/15 74/10 74/15 74/17 75/21 77/22 80/3 81/24 83/6 90/17 90/18 91/10 91/11 91/14 94/1 114/13 117/7 167/24 168/2 168/5 170/25 172/11 172/22 174/21 177/15 177/19 177/22 178/7 179/5 192/24 193/1 193/11 193/17 197/22 198/3 199/19 199/19 208/2 208/4 211/13 214/14 215/25 216/19 219/16 220/3 220/3 220/20 223/6 231/25 232/2

# Y

Yeah [2]  128/18 180/8

years [5]  28/4 53/6 53/20 53/20 122/18

yelled [1]  225/4

yelling [4]  171/6 177/17 185/15 212/24

yes [209]  5/14 6/17 7/20 8/13 8/19 8/22 9/3 9/10 9/16 10/5 10/11 10/15 11/2 12/7 12/24 13/7 14/1 15/3 16/9 16/23 19/2 20/15 20/19 21/6 22/18 23/7 23/22 25/18 26/6 28/7 30/13 31/18 32/15 33/21 36/2 38/17 38/23 41/11 41/12 42/4 44/1 47/7 48/11 51/3 51/19 53/2 53/10 53/25 56/4 61/17 64/1 64/12 64/13 68/1 68/24 69/18 72/6 75/3 75/9 76/1 76/9 77/18 79/10 79/15 79/16 82/13 83/16 84/24 85/10 88/8 89/2 90/7 90/19 95/25 109/10 111/1 112/10 112/13 112/15 113/22 117/6 122/12 123/6 123/11 124/23 125/19 126/5 126/19 128/2 128/22 130/15 131/25 132/4 132/9 133/6 135/1 137/18 138/9 138/12 138/15 140/25 143/11 144/19 146/12 146/20 147/3 149/2 149/24 150/2 150/5 150/20 151/4 151/21 153/22 154/2 154/7 154/13 154/21 155/2 155/5 156/5 156/25 157/14 157/21 157/24 160/1 160/7 161/2 163/8 163/24 164/2 164/15 164/20 165/22 166/3 167/5 167/16 167/19 168/1 168/6 169/21 169/24 170/24 171/20 172/24 173/2 175/18 181/18 183/23 184/19 184/22 185/17 186/24 188/11 188/13 188/23 193/23 194/20 195/22 196/5 196/14 196/19 197/23 200/5 200/8 201/21 203/11 205/17 206/24 208/5 210/3 210/5 211/12 214/11 214/15 215/20 216/15 216/20 216/23 217/25 218/16 219/10 220/15 222/10 224/21 225/9 227/3 228/8 228/13 230/7 230/17 233/15 234/24 235/10 235/15 235/19 235/22 235/25 236/7 237/14 238/13 238/15 240/8 240/25 241/12 242/14 242/22 244/15 247/24

yesterday [9]  27/6 27/16 30/20 42/15 44/13 44/18 50/3 59/9 108/22

yet [13]  6/20 46/17 80/3 92/22 112/22 113/17 138/18 203/25 211/22 212/7 213/6 234/2 244/3

you [1682]

you'd [4]  5/15 41/11 128/4 129/8

you'll [4]  49/23 58/19 89/4 247/3

you're [164]  5/10 9/8 10/7 11/13 12/3 12/4 23/25 25/19 25/21 29/20 29/21 30/16 33/16 34/4 34/5 36/9 37/10 37/21 38/25 40/12 40/24 44/10 46/21 50/12 51/6 51/8 51/13 52/3 52/6 52/8 55/11 57/21 58/10 58/18 58/18 59/7 59/19 63/25 67/18 67/20 67/25 68/2 68/16 68/17 68/22 69/25 70/10 77/5 79/13 80/1 80/4 80/7 80/11 80/11 80/13 81/8 82/6 82/16 85/6 86/15 89/8 90/20 90/24 91/1 91/17 91/21 91/24 92/8 92/14 92/19 94/21 95/14 97/16 98/9 99/10 102/2 106/14 106/15 111/16 111/25 118/20 119/25 121/11 121/21 123/18 123/19 127/13 131/8 132/2 132/3 133/10 134/20 136/17 143/18 161/20 171/8 173/14 175/5 175/5 175/25 176/4 176/23 178/20 180/4 180/6 180/15 180/15 181/3 181/6 185/25 186/9 186/23 190/2 190/18 190/25 191/21 192/12 192/21 196/22 201/22 204/4 206/4 207/14 208/18 209/17 209/25 210/15 210/15 210/17 210/25 211/15 211/20 212/9 212/10 213/4 214/6 219/22 220/6 220/16 221/12 225/25 226/7 226/15 227/10 227/18 227/22 227/23 229/12 229/24 230/5 232/22 233/23 234/25 235/5 235/16 236/24 238/23 239/1 242/6 242/9 242/12 242/19 247/2 247/4

you've [19]  22/1 27/2 27/5 53/8 59/9 60/11 67/24 83/19 95/2 127/14 132/19 158/12 159/4 161/6 186/22 194/9 199/2 206/22 247/16

your [463]

**Y**

Your Honor [10]  7/20
23/22 68/24 75/19
82/14 88/21 95/17
119/13 196/6 245/3
yours [1]  237/8
yourself [10]  6/4 23/12
138/13 142/1 144/7
182/19 196/13 205/22
233/24 244/8

**Z**

zero [1]  156/12

5-RenSER-01016

5-RenSER-01016