DOCKET NOS. 25-7132, 25-7297

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

**CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 6 OF 9**

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 12, Volume III |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, MAY 19, 2025

8:23 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01018     6-RenSER-01018

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Jameson Gotts, Orange County Deputy Sheriff, Defendant

Chad Renegar, Orange County Deputy Sheriff, Defendant

Bryan Stever, Litigation Support, Defendants

*Deborah D. Parker, U.S. Court Reporter*

13

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MATTHEW BROWN | 96 | 106 | | |

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSHUA ANTHONY GOMEZ | 14 | 35 | | |
| ROBERT FONZI | 111 | | | |

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01021                                    6-RenSER-01021

14

SANTA ANA, CALIFORNIA; MONDAY, MAY 19, 2025; 8:23 A.M.

-oOo-

*(Prior proceedings reported by CourtSmart, in*

*Volume II.)*

*(The following proceedings were had in open court*

*in the presence of the jury:)*

JOSHUA ANTHONY GOMEZ, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. SWISS:

Q    Thank you.

Mr. Gomez, did you hear your voice on the recording we just heard?

A    I did.

Q    And were you talking to the deputy that showed up at your tent?

A    I was.

Q    At the time when the deputy showed up at your tent, in your mind did you feel they suspected that you might be involved in the man beating the woman that night?

A    Yes.

Q    Why do you say that?

A    Because at the time, I was a Police Explorer.  And, typically, when we were going through training, if you're showing up to a domestic violence, you want to separate the two parties so that there's no altercations, or fighting, or

*Deborah D. Parker, U.S. Court Reporter*

15

potentially talking amongst each other so they can get the story of what happened.  So when he said to "separate," to come talk to his partner that's when I figured that they thought it was us.

Q    And what did you do next after they asked to you separate?

A    I told them that it wasn't us.

Q    Did you tell the truth that night to the officers?

A    Absolutely.

Q    Now, can you explain what the Police Explorer program was that you participated in?

MS. MKRTCHYAN:  Objection.  Your Honor, relevance. He's not testifying --

THE COURT:  "Can you explain what the Police Explorer" -- well, it sounds like you may have some background in some of the terminology, but -- overruled.

Were you involved in some kind of Police Explorer background?

THE WITNESS:  Yes, I was.

THE COURT:  All right.  Counsel, your question.

BY MS. SWISS:

Q    Just briefly can you explain what that Police Explorer program was that you participated in?

A    Absolutely.  I was a Police Explorer with --

*(Court Reporter requests clarification for the*

*Deborah D. Parker, U.S. Court Reporter*

16

*record.)*

THE WITNESS: I was a Police Explorer with the Westminster Police Department at the time and it's a program for youth who want to explore becoming a police officer in the future. So they teach you and you do community service, as well as ride-alongs and learn, basically, what it's like to be a police officer.

BY MS. SWISS:

Q   And was it in that program that you learned some of the investigation techniques that you described earlier?

A   Yes.

MS. MKRTCHYAN: Objection. Vague and ambiguous, Your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. SWISS:

Q   Thank you.

Now, when you were speaking with the deputies, did you give them a direction as to where they should go to continue their investigation?

A   Yes.

MS. SWISS: And if we could take a look back at Exhibit 76, that map.

*(The exhibit was displayed on the screen.)*

*////*

*Deborah D. Parker, U.S. Court Reporter*

17

BY MS. SWISS:

Q    And looking at the map, can you describe where you told the deputies to go that night to continue their investigation while they were at your tent 67?

A    Yes.  I pointed towards the direction of Campground 65 and 63.

Q    Why did you tell them to go towards 65 and 63?

A    That was the direction that we heard all of the activity taking place.

Q    And what do you mean by "activity"?

A    The sounds of domestic assault or whatever was going on.  Assault.

Q    Then after the police left your tent, what happened next?

A    They proceeded that way and we could hear them speaking to somebody.

Q    And when you say the deputies went that way, does that mean towards 65 and 63?

A    Correct.  Yes.

Q    Did you hear any of the conversation between the deputies and the person they made contact with next?

A     It was very difficult to hear, but there was some points that stood out, just key phrases or words.

Q    What key phrases or words that stood out to you sitting here today?

*Deborah D. Parker, U.S. Court Reporter*

18

A    Specifically, that "I'm a vet" and "it wasn't me." Just certain things like that.  Those are what I remember at this time.

Q    Do you recall how long the deputies were talking to the person across the way?

A    I wouldn't be able to recall that, no.

Q    Can you estimate was it minutes?  Half hour?  Hour, anything like that?

A    I would say minutes.

Q    All right.  After you heard whatever you could hear from the deputies encountering the person across the way, what happened next?

A    The officers left.  I laid down with my girlfriend. And a few moments later, somebody began to walk up and down the road, basically, yelling obscenities directed at the 911 caller saying, "Pussy with the cell phone.  Come out.  Fight me.  Fuck you," all these things.  Basically, he was getting very agitated and angry and said, basically, I was going to find you.

Q    So you said the words that were yelled made you think that he was looking for the 911 caller; is that right?

A    Absolutely.  Yeah.

Q    Why do you say that?

A    Because they began to say "Pussy with the cell phone," basically, called 911 on me, or -- "called the police on

*Deborah D. Parker, U.S. Court Reporter*

19

me."  And so that led me to believe that.

Q    What happened next?

A    Just kept going up and down, kicking dirt around, yelling and then it faded away.

Q    Were you scared?

A    Absolutely.

Q    Why was that?

A    Because I was the one that called 911.

Q    Do you know if Lauren was scared as well?

A    Absolutely.

Q    Did you do anything else that night after the man was yelling in the road?

A    Yes.  I called 911, again, later because of that.  And then as we were on the phone with 911, we heard what sounded like a little girl screaming.  And that's when I looked at my girlfriend at the time and I was like, "Do you hear that?"  And she said "Yes."

        And so I relayed that information to the dispatcher.

Q    And in that second call for 911 that night, did you tell the truth to the dispatcher?

A    I did, yes.

        MS. SWISS:  Your Honor, we would like to play some clips from the 911 call.  It's Exhibit 228-B.  The call in its entirety has already played through other testimony to

*Deborah D. Parker, U.S. Court Reporter*

20

this jury, but we do have a transcript that we would like to distribute.

THE COURT: All right. Give that to Karlen, please.

(Pause.)

THE COURT: I keep reminding the jury, the best evidence is what you hear. These transcripts may be accurate; they may be inaccurate. So you may have multiple transcripts concerning the same call. So the best evidence is what you hear or see.

Counsel.

MS. SWISS: Thank you.

We would like to play the first clip. It will be starting on page 2.

THE COURT: You may do so.

(The audiotape was played.)

BY MS. SWISS:

Q    Mr. Gomez, in that clip, did you hear your voice?

A    Yes.

Q    Was that the call you made to 911?

A    Yes.

Q    Now, in that clip, you say something to the effect of There's a gentleman who was in a domestic disturbance. The sheriffs came to talk to him, but they did not arrest him. Did you hear that on the tape?

*Deborah D. Parker, U.S. Court Reporter*

21

A    Yes.

Q    What did you mean by that when you said that?

A    I'm sorry.  Repeat the question.

Q    How did you -- why did you tell the dispatcher that the person you were calling on had been in a domestic disturbance and that the sheriffs came to talk to him but did not arrest him?

Why did you say that?

A    Because I called previously the disturbance.

Q    And so in your mind that night, the person that you had heard the deputies talk to was the person who was involved in the domestic disturbance and the reason you called 911 the first time?

MS. MKRTCHYAN:  Objection.  Leading, Your Honor.

THE COURT:  Sustained.  Sustained.

BY MS. SWISS:

Q    We heard in the tape you said:

"There's a gentleman who was in a domestic disturbance.  The sheriffs came to talk to him but they did not arrest him."

Why did you say that?

A    I said that because I did associate what had happened prior to the individual who was currently walking up and down looking for the 911 caller.

*Deborah D. Parker, U.S. Court Reporter*

22

Q    And why?

A    I wouldn't be able to answer that currently.

Q    So you called the second time.  You said, when we heard on the tape, because "he's going to campsites and he's trying to find the person who called"; is that right?

A    Correct.

Q    Did you in your mind connect the person that the police talked to after the first call to 911 with the person who was going through the campsites and trying to find the person who called 911 on him?

A    Yes.

        MS. SWISS:  I would like to play the next clip. It starts in the transcript, page 3, line 20.

        THE COURT:  You may do so.

        MS. SWISS:  Thank you.

    (*The audiotape was played.*)

BY MS. SWISS:

Q    Sir, in this clip the dispatcher asks why you're whispering.

        Why were you whispering at that point?

A    Because I was scared that the individual would either hear me or see the light from my phone and try -- and come up to me.

Q    When you were on the phone with dispatch at this point, do you recall where you were?

*Deborah D. Parker, U.S. Court Reporter*

23

A    Yes.  I was in my tent still.

MS. SWISS:  The next clip I would like to play on the transcript starts on page 5, line 15.

May I play it, Your Honor?

THE COURT:  You may.  Thank you.

(*The audiotape was played.*)

BY MS. SWISS:

Q    Sir, was that your voice on the tape?

A    Yes.

Q    And in that segment, were you telling the truth to the dispatch that night?

A    Yes.

Q    And we heard on the tape:

"I know he was the person involved in a
domestic battery.  I know it was him,
because he said some things to the
sheriff that he said out loud when he
was fighting with his girlfriend."

Did you hear that on the tape?

A    Yes.

Q    And what do you recall from that night of the things had he said to the sheriffs that made the connection to you that it was the same as when he was fighting with his girlfriend as we heard on the tape?

A    I wouldn't be able to recall the entire conversation.

*Deborah D. Parker, U.S. Court Reporter*

24

However, it was the point that he made being a veteran.  He said it during the disturbance and then he said it to the officers.

MS. SWISS:  Thank you.

The next clip starts at page 7, line 1.

May I play, Your Honor?

THE COURT:  Just one moment.

*(Pause.)*

THE COURT:  You may.

*(The audiotape was played.)*

BY MS. SWISS:

Q    Mr. Gomez, in this clip, did you tell the dispatch that he's in a RV?

A    I did.

Q    Why did you say that?

A    Because I seen the RV on the left side over in the general area, so I just assumed because I heard wrestling and movement.

Q    What do you mean by "wrestling and movement"?  What did you observe that night that made you tell the dispatch you thought he was in a RV?

A    It just sounded like there was a lot of wrestling around the campground or the campsite, just moving things around.  Throwing things.  I don't know.

Q    From your testimony, it sounds like you heard the

*Deborah D. Parker, U.S. Court Reporter*

25

rummaging; is that right?

A    Correct.

Q    Could you see anything at this point?

A    No.  I was in my tent.

Q    And were you looking through the top mesh portion --

MS. MKRTCHYAN:  Objection.

BY MS. SWISS:

Q    -- at all, at this point?

MS. MKRTCHYAN:  Leading.  Objection.  Leading.

THE COURT:  No, overruled.

You can answer the question.

THE WITNESS:  Yes.

BY MS. SWISS:

Q    Could you see anything from the top of the tent at this point?

A    No.

Q    Did you ever see a person walking up and down the road between the campsites?

A    No.  Just heard him.

MS. SWISS:  The next portion I would like to play on the transcript, it starts on page 8 and line 6.

THE COURT:  You may.

MS. SWISS:  Thank you.

(*The audiotape was played.*)

*////*

*Deborah D. Parker, U.S. Court Reporter*

26

BY MS. SWISS:

Q    Mr. Gomez, in this section, you tell the dispatch that there was a little girl screaming.

        Can you tell the jury what you heard that night?

A    Yes.  I was on the phone and begin to hear what sounded like just a -- like -- just a little -- what sounded like a little girl screaming, so I relayed that to the dispatcher.  And, obviously, I had my girlfriend there.  So everything that I was hearing I was looking at her for validation, so that's what I heard.

Q    You also say "The guy is yelling."  "There's a little girl screaming."

        Did you hear that on the tape?

A    Yes.

Q    Do you recall what you -- why you said there was a guy yelling as well?

A    Yeah.  I couldn't make out any words or anything, just sounded like he was yelling at this person -- that girl -- little girl -- the little girl screaming.

Q    All right.  We're almost through the call here.  I'm looking at the transcript, page 12, and starting at line 5.

        May I play it, Your Honor?

        THE COURT:  You may.

    (*The audiotape was played.*)

////

*Deborah D. Parker, U.S. Court Reporter*

27

BY MS. SWISS:

Q    Mr. Gomez, in this clip, can you tell us what was happening?

A    Yes.  I was just outside my tent.  So foot still in -- one foot out.  The officers had run up to me and that's when I proceeded to talk to them and direct to where it was coming from.

Q    And did you tell them which way to go?

A    Yes.

Q    Which way did you direct the officers?

A    In the same direction as previously stated.

Q    That's towards Campsite 65 and 63?

A    Correct.

        MS. SWISS:  All right.  And the last clip from this segment -- starts on page 13 of the transcript, line 15.

        May I play it, Your Honor?

        THE COURT:  You may.

    (*The audiotape was played.*)

BY MS. SWISS:

Q    And in this clip, Mr. Gomez, what are you telling the dispatch?

A    I was explaining that a nonlethal form of use is being used such as the Taser, because I heard them "Taser, Taser, Taser" which means they're deploying their Taser.

*Deborah D. Parker, U.S. Court Reporter*

28

Q    And why do you feel that was important to tell the dispatch that night?

A    I guess I was just doing what I thought I should be doing.

MS. SWISS:  All right.  I would like to switch to Deputy Renegar's PVS.  This excerpt comes from Exhibit 102-2, but the same transcript we used earlier this morning.  And the clip I would like to play is on page 23, and it starts line 2.

May I play it, Your Honor?

THE COURT:  You may.

(*The audiotape was played.*)

(*The exhibit was displayed on the screen.*)

MS. SWISS:  All right.  Let's leave that image for a minute there, Mr. Stever.

BY MS. SWISS:

Q    In that clip, Mr. Gomez, did you hear yourself briefly on the video?

A    Yes.

Q    And looking at the photo on the screen -- I know you can't see yourself, right?

A    Correct.

Q    But can you describe for the jury, generally, where you were standing on that picture?

A    Yes.  I was to the right about 10, 15 feet from the

*Deborah D. Parker, U.S. Court Reporter*

29

road.

Q    So if you're looking at the photo, you would be looking at the road.  You would be to the right?

A    Correct.

Q    And you were in your campsite; is that right?

A    That's correct.

Q    Were you inside your tent or outside?

A    Inside my tent, peering out.

Q    And then what did you tell the deputies?  It was difficult to hear?

A    I told them that -- which direction it was coming from, and then I proceeded to ask a question and not really sure what I said after that.

Q    Did you try to point the deputies in the direction where you heard the disturbance?

A    Correct.

Q    And was that between Campsite 65 and 63?

        MS. MKRTCHYAN:  Objection.  Leading, Your Honor. Continuously.

        THE COURT:  Sustained.

        Reask the question, Counsel.

BY MS. SWISS:

Q    What direction did you point them in?

A    In the same direction as previously stated.

        MS. SWISS:  All right.  Thank you, Mr. Stever for

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01037                                      6-RenSER-01037

30

that.

BY MS. SWISS:

Q    Now, with regard to what happened that night -- after this clip when you saw the deputies run past, what happened next?

A    They made contact with someone and just sounded like they were struggling to apprehend this person.

Q    What did you hear?

A    Just a whole lot of yelling.  Noncompliance.  That's about it.

Q    What do you mean by "noncompliance"?

A    Just sound like whoever it was, was not going to go willingly.

Q    Did you hear anything that the deputy said?

A    I can't recall at this moment.

Q    Do you recall any of the things that the person the deputies encountered said?

A    I can't recall at this moment.

Q    Now, we heard on the 911 tape that you told dispatch that "nonlethal deploy."

        Do you remember that testimony?

A    Yes.

Q    From that point do you recall what happened next after you relayed that nonlethal was deployed?

A    No.

*Deborah D. Parker, U.S. Court Reporter*

31

Q   Now, at some point after this incident, did you speak to deputies again?

A   Yes.

MS. SWISS:  I'd like to play a clip from Deputy Pahel's tape.  It's Exhibit 102-4.

I believe the transcript has already been distributed.

THE COURT:  This would be Pahel?

MS. SWISS:  Yes, Your Honor.

THE COURT:  I have a number of transcripts for -- I would like you to put up the first page of what you propose to play.

*(The exhibit was displayed on the screen.)*

THE COURT:  Just a moment.

THE WITNESS:  Your Honor, your badge is going to fall off.

*(Pause.)*

THE COURT:  What page, Counsel?

MS. SWISS:  We'll be on page 8, Your Honor, line 5.

THE COURT:  Just pull up the initial page for just a moment.

*(Pause.)*

THE WITNESS:  I'm sorry.  What page?

MS. SWISS:  Page 8, line 5.

*Deborah D. Parker, U.S. Court Reporter*

32

THE COURT:  I'm going to take a look at the -- I'm opening the first page to make sure the jury has the transcript.  So the first page would have "4:58:40" on it. That's how we know, because I don't see how you keep up with the numbers.

*(Pause.)*

THE COURT:  Okay.  Got it?  You can play.

MS. SWISS:  Thank you, Your Honor.

*(The videotape was played.)*

BY MS. SWISS:

Q    Mr. Gomez, did you hear your voice on that clip?

A    Yes.

Q    And was this a recording of your conversation with a deputy after the incident that night?

A    Yes.

Q    Did you tell the truth to that deputy that night?

A    Yes.

Q    Now, at the beginning of the conversation -- and I'm looking at the transcript page 8, lines 20 and 21 -- we heard in the reporting something to the effect of:  "All I hear is like contact.  Like this.  Contact."

Did you hear that on the recording?

A    Yes.

Q    What did you mean by that?

A    I meant that I was hearing what sounded like skin on

*Deborah D. Parker, U.S. Court Reporter*

33

skin contact.

(Court Reporter requests clarification for the record.)

THE WITNESS:  I recall hearing what sounded like skin on skin contact and even gesturing on the -- that, basically, the sound that it was making.

BY MS. SWISS:

Q    And can you describe in words that sound?

A    Best I could say it's skin-on-skin contact.

Q    Did it sound like a fist hitting skin?

MS. MKRTCHYAN:  Objection, Your Honor.  It's leading.

THE COURT:  Sustained.

BY MS. SWISS:

Q    And when you say "skin on skin," can you describe in words?  Was it -- well, what was it?  Was it forceful?  Was it --

How could you hear -- how could you describe in words what you heard?

A    It didn't sound soft that's for sure.  It definitely sounded somewhat aggressive.  That's all.

Q    And the top of page 9 the transcript, you said "He got angry and started wailing on her."

What did you mean by "started wailing on her," if you recall?

*Deborah D. Parker, U.S. Court Reporter*

34

A    Yes.  I was referring to the noises that I was hearing and the woman speaking, basically, saying "Stop hitting me."

Q    Thank you.

Sir, when you called 911 that night, you wanted law enforcement to respond, right?  That's why you called?

A    Correct.

MS. SWISS:  Thank you no further questions.

THE COURT:  Counsel, do you want to break before you start -- strike that.

Questions?

MR. HARRELL:  No questions, Your Honor.

THE COURT:  Do you want a break before we start cross-examination?

Let's take a break for about 15 minutes before we start cross-examination.  We'll come and get you.

Counsel, thank you.

*(Jury exits courtroom.)*

*(Recess taken from 9:03 a.m. to 9:19 a.m.)*

*(The following proceedings were had outside the presence of the jury:)*

THE COURT:  Counsel, about 90 minutes.  I think that's what we had for Mr. Gomez also.  So about 90 minutes.

*(Jury enters courtroom.)*

*(The following proceedings were had in open court in the presence of the jury:)*

*Deborah D. Parker, U.S. Court Reporter*

35

THE COURT:  We're back in session.  The jury and alternates present, all counsel, witness, parties.

And, counsel, this would be cross-examination, please.

MS. MKRTCHYAN:  Yes.  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MKRTCHYAN:

Q    Good morning, sir.

A    Good morning.

Q    We met before?

A    Yes.

Q    And you did provide a sworn testimony at a deposition on August of 2020?

A    Correct.

Q    Okay.  And so let's go back to what you recollect from that night.  It's been a while, right?

A    Correct.

Q    Okay.  Prior to your testimony today, have you reviewed any documents to refresh your memory?

A    No.

Q    You haven't read your deposition transcript either?

A    No.

Q    So isn't it true, sir, you did not see the campsite where you heard the noise of the domestic violence?

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

36

Q   And no one saw the man actually who was yelling afterwards?

A   Correct.

Q   And when you called 911 -- and, by the way, are you aware that we heard today only one 911 call made by you, right?

A   Yes.

Q   You say you called twice, right?

A   Yes.

Q   Have you ever heard your first 911 call?

A   No.

Q   Okay.  What do you make of the fact we have not received your first 911 call about this domestic disturbance?

MR. HARRELL:  403.

THE COURT:  Well, just a moment.  Can there be a stipulation regarding that?

In other words, we're really into whether this is available or not, aren't we?

MS. SWISS:  This should be outside the presence, Your Honor.

THE COURT:  Well, I'm going to resolve this very quickly frankly.

MS. MKRTCHYAN:  So --

THE COURT:  You can ask the question, Counsel.

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01044                                    6-RenSER-01044

37

MS. MKRTCHYAN: Okay.

BY MS. MKRTCHYAN:

Q So you have not heard your first 911 call today or ever in this case. True?

A True.

Q Do you have any understanding as to why we don't have your first 911 call, if you actually heard the DV and called 911?

A No, I don't.

Q Okay. Now -- so isn't it true when you were telling the 911 the second time -- the dispatch that we've heard -- you were assuming that when officers went and spoke to Mr. Holloway and you heard it, you were assuming that was the man -- same man involved in the DV?

You were simply assuming?

A Assuming based off of what I heard.

Q Okay. You never saw, right?

A Correct.

Q Okay. So you were making an assumption when you were talking to the dispatch and telling him, you just came and spoke to this man who was involved in an DV. That was an assumption. Speculation by you. True?

A Sorry. Repeat the question.

Q When you were talking with the dispatch, second time, that's the only time we hear on this tape. And you told

*Deborah D. Parker, U.S. Court Reporter*

38

him -- told the dispatch that, *I heard you come and talk with the male who was involved in the DV.* You were making an assumption that the man you spoke to was involved in the DV. True?

A    I told her, based off of the -- of what I heard at the time, yes.

Q    Okay, sir. But you agreed with us at your sworn deposition in August of 2020 but that was an assumption you were making. True?

          MR. HARRELL: Improper use.

          THE COURT: Overruled.

          You can answer the question.

          THE WITNESS: Yes.

BY MS. MKRTCHYAN:

Q    Okay. You also said you heard the man going through things in a RV -- right? -- on tape?

A    I can't remember if I said "RV."

Q    Okay. But isn't it true you did not see the man going through people's RVs. You were connecting the man you thought he was in an RV. True?

A    I can't remember at the time -- I can't remember at this time.

Q    You thought the man was going through things in his own RV. True?

A    True.

*Deborah D. Parker, U.S. Court Reporter*

39

Q   Okay.  So you were -- you thought that the RV --

MS. MKRTCHYAN:  Let's open the exhibit that we have, 244, before that has been admitted, please.  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MKRTCHYAN:

Q   So this is the exhibit we have in the Winnebago, white RV.

Do you see this, sir?

A   Yes.

Q   Okay.  You had seen this on the night or the day before -- true? -- this RV?

A   Yes.

Q   Okay.  And when you were talking to the dispatch, you were saying, *Man is going through things in a RV.  He's by Campsite 61.*

You were meaning this RV.  True?

A   I don't remember if I said "61."

Q   In any event, when you were talking about the RV and this man yelling, you meant this RV, right?

A   I don't recall if I said "RV" or not.

Q   But what is this?  This is a recreational vehicle?

A   Understood.

Q   What word do you use?  Do you recall?

A   No, I don't recall.

*Deborah D. Parker, U.S. Court Reporter*

40

Q    In any event, when you were saying that you were connecting the man with this RV, that was -- you were thinking that the man was staying in this RV.  True?

A    I don't recall.  I just recall pointing in the direction.

Q    Okay, sir.  Do you want me to show you the pages where you testified about this RV?

A    Yes, please.

MS. MKRTCHYAN:  With the Court's permission.

THE COURT:  Please.

MS. MKRTCHYAN:  Let's go back to pages -- I'm going to ask you to read pages 92 and 94 through 95, please. Thank you.  So first 92 and then 94 through 95.  We'll show you the transcript.

THE COURT:  Do you have a transcript in front of you?

THE WITNESS:  I don't know.

MS. MKRTCHYAN:  92 --

THE COURT:  Somebody is going to hand him the transcript and then you can look at those pages, sir.

THE WITNESS:  Okay.

THE COURT:  I believe it's 92 through 95.  Is that right, Counsel?

MS. MKRTCHYAN:  Yes.  Thank you.

THE COURT:  You read those pages.

*Deborah D. Parker, U.S. Court Reporter*

41

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

Q    Please read that for yourself.

A    *(Witness so complies.)*

*(Pause.)*

THE WITNESS: Okay.

BY MS. MKRTCHYAN:

Q    Did that refresh your memory, sir? Did you read all pages, 92 through 95?

A    Oh, 95. I'll continue reading.

Q    Up to 93, 94. Mainly, 92, 94 and 95. Thank you.

A    Okay. *(Witness so complies.)*

*(Pause.)*

THE WITNESS: Okay.

BY MS. MKRTCHYAN:

Q    Did that refresh your memory, sir?

A    It did.

Q    So isn't it true you never told the dispatch when you were talking about man going and yelling and stuff, you never said that he was going through other people's RVs?

A    Correct.

Q    You meant that he was in the RV. That was his -- you connected the RV with the man and it was his own things he was looking for. True?

A    No. No, I said it was the campsite.

*Deborah D. Parker, U.S. Court Reporter*

42

Q    I'm sorry?

A    No, I had said it was the campsite.

Q    What campsite?

A    His campsite.

Q    Okay.  Right.  So, basically, what you meant when you were talking to the dispatch is that this man was looking for his things in his campsite?

A    Yes.

Q    So you never told the dispatch he was invading someone's RV.  True?

A    True.

Q    Okay.  So then when you were talking about a little girl screaming, you also -- isn't it true, you testified at the sworn deposition when you were asked this question, you never saw this little girl screaming, right?

A    No, I did not see her.

Q    And you were making also an assumption that when you heard a little girl screaming that was connected with the male yelling, right?  That was an assumption you were making from inside of your tent.  True?

A    True.

Q    Okay.  And then when the officers came and talked to you as we saw in the transcript, you interchanged.  You said there was a woman screaming -- second call.  You're talking about second call.  You said there was a woman screaming and

*Deborah D. Parker, U.S. Court Reporter*

43

then next you said 12-, 13-year-old girl.  True?

A    I don't recall that, ma'am.

Q    Well, let's look at the transcript.

         THE COURT:  Just a moment.

     *(Court Reporter requests clarification for the*
     *record.)*

BY MS. MKRTCHYAN:

Q    So right now we just heard your conversation with
Deputy Pahel.

         Do you recall that?

A    Yes.

Q    And you were looking at this transcript was provided to
us, right now, a few minutes ago?

A    Yes.

Q    Okay.  So I would like to show you the pages, 10 and
18.  So, please, can you look at the page 10, line 13.

         When we have a transcript, it states:

         "And then, uh, yea... while I was on the

         phone we heard like a woman like

         screaming.  But it was kind of muffled.

         It sounded like it was coming from

         inside someone's, uh."

         This is page 10, right?  This is you're talking
about the second call when you said referencing a little
girl screaming, right?

*Deborah D. Parker, U.S. Court Reporter*

44

A    Correct.

Q    So you said the woman here, right?

A    Yes.

Q    Okay.  Let's go to page 18 where you were asked again -- the officer came back to talk to you.  Pahel, same officer.  Line 15 -- no, line 22 through 25.

Are you there with me?

A    What page?

Q    18.  If you want we can play the tape, too, to refresh your memory, but let's look at the transcript.

THE COURT:  Everyone, we're back to Pahel's transcript; is that correct?

MS. MKRTCHYAN:  Yes.  Page 18.

THE COURT:  And we're on page 18 --

MS. MKRTCHYAN:  Yes.

THE COURT:  -- of Pahel's transcript.

Do you have that in front of you, sir?

THE WITNESS:  I do.

BY MS. MKRTCHYAN:

Q    Right.  So please read lines 22 through 25.

A    You would like me to read it?

Q    Just for yourself.  Read it.

A    Oh.

Q    Does that refresh your memory?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

45

Q    Okay.  *(Reading)*:

Deputy asks:  "So you just heard.  Was it... was it male or female?"

"JOSHUA GOMEZ:  It was female.  Maybe like...12, 13 years of age.  Right?"

A    Correct.

Q    Okay.  And then you also added later on, going to page 19, that you thought it might have been a movie, right?  That it was -- you were not sure what exactly that was about.  True?

A    What line?

Q    Well, let's look at this.

*(Pause.)*

MS. MKRTCHYAN:  Maybe we should play.  Can we play this?

THE COURT:  Sure.

MS. MKRTCHYAN:  I don't think this transcript is -- play 102-, Pahel's tape.

MR. HARRELL:  Motion to strike the comment about the transcript.

THE COURT:  Well, once again, I'm informing the jury any of these transcripts may be accurate or inaccurate.  It's what you hear.

MS. MKRTCHYAN:  So we're going to play that.  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

46

(Pause.)

MS. MKRTCHYAN:  That's going to be 5:30, 5:30 minutes, Pahel's tape.

(The audiotape was played.)

THE COURT:  Could you turn that up just a little bit, please.

(Pause.)

THE COURT:  Maybe you can put the microphone closer to it.  You can start it over again so we can hear.

(Pause.)

THE COURT:  Why don't you start it over again.

(The audiotape was played.)

BY MS. MKRTCHYAN:

Q    So this was one of the conversations you were having that night, right?  Is this refreshing your memory?

A    Yes.

Q    So nothing definitive about this little girl that you could tell this officers.  True?

A    No.

Q    All right.  So you were making a lot of assumptions that night, because you did not come out of your tent to verify what you were hearing.  True?

MS. SWISS:  Argumentative.

THE COURT:  Overruled.

You can answer the question.

*Deborah D. Parker, U.S. Court Reporter*

47

THE WITNESS: Yeah, I didn't come out of my tent out of fear.

BY MS. MKRTCHYAN:

Q    Okay, sir.  We understand.

But when you were telling the dispatch the information you were giving exactly from your audient perceptions from inside of your tent.  True?

A    Yes.  What I was hearing, yeah.

Q    And the man that was yelling never came towards your tent.  True?

A    As in the campsite?

Q    Your campsite?

A    Correct.

Q    He didn't walk towards your campsite.  Did not knock on your tent.  Did not come towards you and tell you, *Get out of your tent.  I want to talk to you.*  True?

A    True.

Q    Okay.  And then let's go to the campsite that you were at.  You were at -- let's look at the map.  You were at 67, we established that.  And you've testified that you called 911 first time when you heard this DV, right?

A    Correct.

Q    And officers arrived.

Deputies spoke to you thinking that it might have been you, right?

*Deborah D. Parker, U.S. Court Reporter*

48

A    Correct.

Q    Okay.  And then you gave them a direction where you heard the noise from inside of your tent.  You never again -- you never came out to see where it came from. True?

A    Incorrect.  I stuck my head out to take a look around to see if I could see anything.

Q    But did you see anything?

A    No.

Q    So when the officers came and told you -- asked you about this DV, you were standing inside your campsite. True?

A    Yes.

Q    You didn't come out towards the driveway to point them in any direction.  True?

A    The first time, no.

Q    Okay.  We're talking about the very first time.  And when they're looking at your campsite location, you had looked at Campsite 66 during the day.  True?  Right across from you, right?

A    Correct.

        MS. MKRTCHYAN:  Let's play 104- -- the 104- -- the exhibits that we established, Your Honor, the video of the campsite's location.

////

*Deborah D. Parker, U.S. Court Reporter*

49

BY MS. MKRTCHYAN:

Q   Right across from you, your location, was Campsite 66?

A   Right.

Q   Earlier here --

     *(Court Reporter requests clarification for the record.)*

BY MS. MKRTCHYAN:

Q   Earlier here you testified that even though you saw toys, cars parked there, you did not believe there was anyone there?

A   Correct.

Q   You were making that assumption.  True?

A   Based off of what I experienced, yes.

Q   And you were there, you know, how many days?

A   Three days total.

Q   Okay.  But Friday -- this incident happened Friday night.  True?

A   No.

Q   Saturday, okay.  So -- but you were there from Friday?

A   Yes.

Q   Okay.  And you had this Explorer event.  You said there was an event, Boy Scouts event that you were attending?

        MS. SWISS:  Misstates testimony.

        THE WITNESS:  No.

////

*Deborah D. Parker, U.S. Court Reporter*

50

BY MS. MKRTCHYAN:

Q    What event that you were attending --

    *(Court Reporter requests clarification for the record.)*

BY MS. MKRTCHYAN:

Q    What event were you attending to?  You said there was an organized event that you were attending to.

A    I had said that there was an event that was happening at the campground.  It was a Boy Scouts event.  We had seen them earlier in the day.  But I, myself, was not attending, no.

Q    So why would you then talk to us about that event, if you didn't even attend to?

        MS. SWISS:  Argumentative.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    In any event, let's go and see the Campsite 67 where you were located that night, sir.

    *(The exhibit was displayed on the screen.)*

        MS. MKRTCHYAN:  Let's play that.

BY MS. MKRTCHYAN:

Q    Do you recognize this campsite?

A    Yes.

Q    Okay.  And how often had you gone to this location, please?

*Deborah D. Parker, U.S. Court Reporter*

51

A    This is my first time.

Q    Okay.  So the -- it was dark, right?

A    Yes.

Q    Okay.  And right cross from your campsite was Campsite 66, right?

A    Correct.

Q    And do you remember we asked you at your deposition --

Well, first of all, let's examine your campsite. You have a log there.  We have a picnic table, you know, barbecue.

Do you think that this is pretty accurate representation of the night in question?

A    Yes.

MS. MKRTCHYAN:  Okay.  So let's stop right there. Or go back one second, please.

BY MS. MKRTCHYAN:

Q    Isn't it true when you're viewing from your campsite, there are trees or large brushes that are obstructing your view?

MS. MKRTCHYAN:  Go back again.  Stop right there where there is a brush.

BY MS. MKRTCHYAN:

Q    Basically, the driveway -- your campsite is lined up with trees and brushes.  True?

A    True.

*Deborah D. Parker, U.S. Court Reporter*

52

Q   Okay.  So when you are looking from your -- inside of your campsite, all this brushes are obstructing your view towards Campsite 65.  True?

A    True.

Q    Okay.  So when -- but we can see from your campsite, Campsite 66, if we are standing right in front of your campsite log, right?

MS. MKRTCHYAN:  Let's play this.

BY MS. MKRTCHYAN:

Q    We can see.  We have unobstructed view of Campsite 66. True?

A    True.

Q    Okay.  But you remember, I asked you same questions at this deposition, sworn deposition.  I asked you, *Okay.  Was Campsite 66 that night occupied?*  And you said, *Affirmative. It was occupied.  And there was a tent with toys and stuff.*

Do you remember that?

MR. HARRELL:  Improper use.

THE COURT:  No, overruled.

If you recall that, you can answer.

THE WITNESS:  I don't recall.

BY MS. MKRTCHYAN:

Q    Let's look at page 27 of your deposition, please. Maybe that will refresh your memory.  And read that -- yes -- and --

*Deborah D. Parker, U.S. Court Reporter*

53

THE COURT:  What page, Counsel?

MS. MKRTCHYAN:  Page 27.

THE COURT:  47?

MS. MKRTCHYAN:  27.

THE COURT:  My apologies.

BY MS. MKRTCHYAN:

Q    And you never told us that you never saw anyone there that is sitting down occupied to you.

Please read that and tell us -- tell us when you finish that, please.  Thank you.

A    *(Witness so complies.)*

Q    Does that help you refresh --

A    Yes.

Q    So you reading me that at your deposition when I asked you if this Campsite 66 was occupied, it was affirmative?

A    Incorrect.  The --

THE COURT:  Just a moment.

BY MS. MKRTCHYAN:

Q    What is incorrect, sir?

THE COURT:  It's on page 27, Counsel, and page 28.

BY MS. MKRTCHYAN:

Q    Did you ever tell us that you believed there were no one there?

A    Yes.

Q    Really?  Okay.  Let's read then what you said.

*Deborah D. Parker, U.S. Court Reporter*

54

MS. SWISS:  Objection.

THE COURT:  Counsel, just a moment.  I'm inviting both of you to look at the question at the bottom of line -- of page 27, line 25 and turn the page to page 28, where the answer is given on lines 2 through 3.

MS. MKRTCHYAN:  Well, Your Honor, it goes before then.  The line of questioning starts from line 10, question 6 all the way up to page 28.  So it goes all the way --

THE COURT:  It goes to page 28, line 3.

MS. MKRTCHYAN:  Starts line 6.

MS. SWISS:  The objection is non-impeachment.

THE COURT:  Counsel, both of you now.  Let's slow this down.

MS. MKRTCHYAN:  Page --

THE COURT:  Counsel, Counsel, please.  Just a moment.

Counsel, this is not impeaching.

Sustained.

BY MS. MKRTCHYAN:

Q    Okay.  So you did see toys and stuff in that campsite.
True?

A    True.

Q    You saw cars parked there?

A    True.

Q    Okay.  It's just you didn't see people?

*Deborah D. Parker, U.S. Court Reporter*

55

A    Correct.

Q    And you assumed there was no one there, even though there were cars -- two cars and toys and stuff of people. True?

A    True.

Q    Okay.  You also thought that Mr. Holloway, for example, was at some Campsite 61.  True?

That was the assumption you were making when you called 911.  True?

MS. SWISS:  Misstates testimony.  Vague as to time.

THE COURT:  Overruled.

THE WITNESS:  May I answer?

BY MS. MKRTCHYAN:

Q    Yes.

THE COURT:  You may.

THE WITNESS:  Repeat the question.  Sorry.

BY MS. MKRTCHYAN:

Q    So even though you never saw Mr. Holloway the day before, the night of the incident, thought he was at Campsite 61.  You were making that assumption.  True?

A    I can't recall at this time.

Q    Well, sir, let's look at your prior deposition.  Maybe that will refresh your memory.  This was page 92.

I thought that we read that before, didn't we?

*Deborah D. Parker, U.S. Court Reporter*

56

A    Yes.  I specifically don't recall whether I said "Campsite 61."  In the deposition, it looks like you referred to "Campsite 61."

Q    Well, let's look at page 92 again.  And I asked you that same question.

MS. MKRTCHYAN:  And, Your Honor, he read it before.  May I read it for the record?

THE COURT:  Can I look at 91, please?

MS. MKRTCHYAN:  92.

THE COURT:  92?

MS. MKRTCHYAN:  Yes.

(Pause.),

THE COURT:  Counsel, your question is if he identified 61.  I invite you both -- all Counsel to look -- start at page 92, question on line 22 and go over to the question on line 3 of page 93.

The question was different, counsel, than you're asking now.

Now, continue to read wherever you'd like, Counsel, on the page.

MS. MKRTCHYAN:  Well, Your Honor, it's -- is not refreshing his memory so therefore, I'd like to read for the record.

THE COURT:  Counsel, you may not.  It's not impeaching.

*Deborah D. Parker, U.S. Court Reporter*

57

If your question is -- here's the difference.  If the question is:  Did he identify 61 -- which is your question -- this is not inconsistent.  If you're asking him about the direction -- I'm sorry, if you're asking about the direction on line 3, *Was it the direction 61,* that's not inconsistent.  If you're asking if he actually identified 61, then I may let you read that, but this is not --

MS. MKRTCHYAN:  That was not identification.

BY MS. MKRTCHYAN:

Q    Isn't it true you were associating the man who was yelling at Campsite 61 when you called 911?

A    I don't recall.

MS. MKRTCHYAN:  Okay.  Your Honor, there's a need to read this transcript.  He read it and he testified, and we would like to read it for the record.

THE COURT:  Counsel -- I'll caution Counsel, then, but these are the designated -- page 92, question up to page 6 of page 93.

MS. MKRTCHYAN:  May I read it?

MS. SWISS:  Your Honor -- Your Honor, before we read, I would request for completeness.

THE COURT:  Well, that's pretty complete, Counsel.

MS. SWISS:  Starting on page 91, on line 18.

THE COURT:  No, you can request that when you re-examine, Counsel, for completeness.

*Deborah D. Parker, U.S. Court Reporter*

58

Let's get this portion read.

MS. MKRTCHYAN:  Thank you.  Line 22 *(Reading)*:

BY MS. MKRTCHYAN:

"QUESTION:  Okay.  But here's my question for you. If you haven't seen him, how could you tell that he was going towards RV, towards 61?

"ANSWER:  Because of the direction of his voice.

"QUESTION:  So you had a pretty good direction of the campsite ground where you were.  You could tell which direction was 61, et cetera?

"ANSWER:  I guess at the time possibly.  Like I said, I was trying to -- you are taught to know where you were, right?  So --

"QUESTION:  Absolutely?

"ANSWER:  But I don't know.  I can't tell right now, like, exactly where 61 is unless I will look at the map, again, but I think it's to the left, right?"

BY MS. MKRTCHYAN:

Q    So you were associating the man with the RV in Campsite 61.  True?

A    No.

Q    Okay, sir.  In any event, you never came out.  You never know which campsite numbers were there, right?

You didn't know which campsite numbers were at

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01066                                         6-RenSER-01066

59

this time?

A    At this time, I did.

Q    Did you ever tell officers he's at Campsite 65?  Yes or no?

A    No.

Q    Okay.  Did you ever tell officers he was at Campsite 63?  Yes or no?

A    No.

Q    Did you tell any officers that he's at Campsite 67? Yes or no?

        THE COURT:  He's at 67, Counsel.

        THE WITNESS:  I'm in 67.

BY MS. MKRTCHYAN:

Q    Yes.  But did you ever tell officers, as we hear on the radio call -- if officers were talking about the male yelling near Campsite 67, going through things in Campsite 67, would that be false?

A    I don't know.

Q    Well, we have played your 911 tape, right?

A    Yes.

Q    We just heard it?

A    Yes.

Q    Okay.  Did you ever tell to that 911 dispatcher, *He's at my campsite*?

A    No.

*Deborah D. Parker, U.S. Court Reporter*

60

Q   So if the dispatcher tells the officers that the male is at Campsite 67, that will be false.  True?

MS. SWISS:  Relevance.  Incomplete hypothetical.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  True.

BY MS. MKRTCHYAN:

Q   Okay, sir.  So the three deputies came talk to you, left.  You said that -- isn't it true on tape?  We can hear -- you said, *Right across.  That's where I heard the noise.*  True.

A   I don't remember if I said "Right across."

Q   Well, would you like us to play this tape?

MR. HARRELL:  Relevance.

THE COURT:  Counsel, if it's not what he'd like.  If you want to play the tape --

BY MS. MKRTCHYAN:

Q   Would that refresh your memory, if I actually show you your prior deposition?

MR. HARRELL:  Speculation.

THE COURT:  Well, concerning that question, if it would refresh your recollection, you can look at your deposition.

THE WITNESS:  Yes.

////

*Deborah D. Parker, U.S. Court Reporter*

61

BY MS. MKRTCHYAN:

Q   Okay.  Page 76 --

A   I'm sorry.  I thought the question was that -- the 911 call, not the deposition.

Q   Oh, sir.  We asked you the same questions about the 911 call at your deposition.

Do you remember?

A   Yes.

Q   Okay.  So now I'm going to ask you, just look at your deposition transcript and tell us what you told the officers when they arrived.

Did you say "direction"?  Did you say "right across"?  Please, do so.

MR. HARRELL:  Improper use.

THE COURT:  What are you asking him -- first of all, what are you asking him to refresh his recollection about?  Is it page 76?  Is it whether he actually identified the campsite or pointed to --

MS. MKRTCHYAN:  He provided the direction, Your Honor.

THE COURT:  In the direction?

MS. MKRTCHYAN:  Yes.

THE COURT:  And what would -- what am I looking for, Counsel?  What page?

MS. MKRTCHYAN:  Page 76, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

62

THE COURT: All right. Just a moment.

THE WITNESS: As far as direction, I did provide it, yes.

BY MS. MKRTCHYAN:

Q   You provided the direction.

THE COURT: Counsel, just a moment.

MS. MKRTCHYAN: That's what I'm trying to establish here.

THE COURT: Because it's not impeaching on this page, Counsel.

MS. MKYRTCHYAN: Your Honor, let the jury decide, please. Thank you.

THE COURT: No, Counsel, the jury is not going to look at this transcript as this is what you directed them to, because this is not impeaching.

You're directing to page 76 --

*(Overtalking: Unable to report.)*

THE COURT: I won't argue with you, Counsel.

MS. MKRTCHYAN: Thank you.

BY MS. MKRTCHYAN:

Q   Please read that for your memory and see if that refreshes your memory about what you discussed when officers arrived the first time they arrived and spoke to you, please.

THE COURT: And you're looking at page 76; is that

*Deborah D. Parker, U.S. Court Reporter*

63

correct?

THE WITNESS:  Yes.  Only 76, correct.

BY MS. MKRTCHYAN:

Q    Yes.

A    Okay.

Q    Does that refresh your memory?

A    Yes.

Q    Okay.  Isn't it true that you never pointed specific campsite?  You provided the direction.  You said southeast direction.  True?

A    As previously said, yes, I pointed in the direction to my left in the general area of the noise.

Q    Well, that's not what you testified, sir.

A    It's exactly what's in there.

Q    You said southeast direction?

A    I didn't say specific direction, per page 76 which I was just reading.

Q    Let's look at what you said.

A    Okay.

Q    Pointed in the direction.

"QUESTION:  Yes.

MS. SWISS:  Objection.

MS. MKRTCHYAN:  Excuse me.

MS. SWISS:  Objection.  Improper use of the deposition for not impeaching.

*Deborah D. Parker, U.S. Court Reporter*

64

THE COURT: Counsel, I don't see impeachment here. And you're going to have to point this out to me.

MS. MKYRTCHYAN: Your Honor, there is a question, lines 19 through 23: So when you basically got out and spoke --

MS. SWISS: Objection.

THE COURT: Just a moment.

MS. SWISS: Improper use of the deposition.

THE COURT: The question is on line 19, 76.

(Pause.)

MS. MKYRTCHYAN: Your Honor, lines --

THE COURT: Counsel, both of you now. Counsel both of you.

(Pause.)

THE COURT: Counsel, you can read page 76, lines 19 through 23.

MS. MKRTCHYAN: I actually wanted to go before that for context, Your Honor, because the entire page, it talks about the location, direction --

THE COURT: Ladies and gentlemen, I'm not certain that this is contradictory or not. I'm going to have this read to you.

BY MS. MKRTCHYAN:

Q    So --

"QUESTION: Okay. Yes. So you gave only

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01072                                      6-RenSER-01072

65

direction" --

MS. SWISS:  Objection.  Counsel is not reading what the Court instructed.

THE COURT:  No, I'm going to allow her to expand that, Counsel, to the first page.

And Counsel, if you'd --

MS. MKRTCHYAN:  Okay.  Yes.

MS. SWISS:  Can we get a line?

THE COURT:  Yes, I think --

MS. MKRTCHYAN:  Line 6.

THE COURT:  -- line 6.

MS. MKRTCHYAN:  Page 76.  Thank you.

"QUESTION:  Okay.  Yes.  So you gave only direction, but you didn't give them a campsite number.  For example, here we can see on this post or whatever we call this thing, this is No. 65, right?

"ANSWER:  Yes.

"QUESTION:  You never told the police that I believe I heard 65 involved in disturbance, right?

"ANSWER:  That's correct.

"QUESTION:  Okay.  You just gave them a direction and it was in this general area as we established on the map.  Let's look at the map again.  That's towards southeast."

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01073                                    6-RenSER-01073

66

MS. MKRTCHYAN:  And let's open the map.

*(The exhibit was displayed on the screen.)*

THE COURT:  Counsel, continue reading.

MS. SWISS:  Objection to the exhibit on the screen.

THE COURT:  All right.  Both of you.  Thank you very much.

Continue to read, please.

BY MS. MKRTCHYAN:

Q    *(Reading)*:

"ANSWER:  Yes.  So I pointed in that direction, yes.

"QUESTION:  Yes.  So when you basically got out and spoke with police, you said it's somewhere in the direction of southeast but you did not ever tell them a campsite number, correct?

"ANSWER:  That's right."

MS. MKRTCHYAN:  Okay.  All right.  I'm going to play the 911 call, et cetera.

THE COURT:  Counsel.

BY MS. MKRTCHYAN:

Q    Now, let's look at this map, sir.  And southeast -- you're pretty good as an Explorer in determining southeast and northeast.  True?

A    True.

*Deborah D. Parker, U.S. Court Reporter*

67

Q   Okay.  So let's look at this map.

MS. MKRTCHYAN:  Can you make it smaller and see the directions of the north and south on this map.

BY MS. MKRTCHYAN:

Q   Do you see the directions of the north and south, if you're looking at this map?

A   Yes, I was referring to the -- during the deposition, you showed me this map.  I was using this atlas to determine southeast, yes.

Q   Okay, sir.  And so isn't it true that southeast from your campsite direction would be, what?

What campsite would be southeast direction, if we can make the map -- yeah, what direction would be southeast from your campsite, sir?

A   65 to 66.

Q   Well, that would be northeast.

A   No, because I was inside the campground, so...

Q   Sir, when you gave them a direction, you were not -- you know, you said "southeast," right?

A   In the deposition, correct.  But when the deputies came out to me, I pointed in the direction of 65, 63.

Q   Okay, sir.  You said "right across" to officers?

A   No, I didn't.

Q   Okay.  Let's go then and play this tape.

A   Okay.

*Deborah D. Parker, U.S. Court Reporter*

68

*(Pause.)*

MS. MKRTCHYAN:  This is transcript starting at 4:07, for the record.

Let's play that, please.

THE COURT:  Which transcript are we looking at?

MS. MKRTCHYAN:  4:07, the time on Renegar's 102.

THE COURT:  Of Renegar's.

MS. MKRTCHYAN:  Yes.  Renegar's tape.  We're going to play your conversation with deputy --

*(The audiotape was played.)*

BY MS. MKRTCHYAN:

Q    You gave a direction and you said, "Right across." True?

A    True.  I didn't mean directly across, though.  I was pointing in the direction across the road.

Q    Okay.  So in any event, you told the officers that it was right across.  You didn't say right across to the left. True?  From looking from inside of your campsite.  True?

A    From words, no --

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  From words, no, but with a gesture.

BY MS. MKRTCHYAN:

Q    Okay, sir.  But in any event, I mean, listen.  If you have not seen where this occurred, you couldn't give an

*Deborah D. Parker, U.S. Court Reporter*

69

exact location; isn't it true?

A    Based off of the audio, yes.

Q    No, not based on -- I'm talking about your recollection, sir.

A    Correct.

Q    You did not see something that happened.  You're assuming where it happened.  True?

A    Sight is not the only thing I rely on.  I also have hearing.  So when I heard it, I knew exactly where it was coming from.

Q    Exactly.  Exactly.

A    Direction.

Q    Okay.

A    My apology.

Q    Direction.

     You gave a direction and officers went and then they talked to this person and you assumed that because they talked to this person, then, therefore, he was involved in the DV; isn't it true?

A    Based off of the audio that I heard and connected, yes.

Q    Okay.  So -- and then when officers left, you became aware of a male yelling and screaming.  True?

A    Aware, yeah.

Q    Okay, sir.  But when you did not see -- you didn't come out of your tent.  You didn't see this man.  You were

*Deborah D. Parker, U.S. Court Reporter*

70

connecting things.  You thought that he was involved in the DV.  That's why officers talked to [sic] them.  True?

A    I'm sorry.  Say that again.

Q    When they went and talked to this person you were hearing inside your tent, you didn't come out of your tent at that point in time.  True?

A    No.  Definitely not.

Q    Okay.  So you were connecting it -- later on you spoke to the dispatcher, you said, *The man* -- you just talked about DV now -- *is walking around*.  You thought that man they spoke to was involved in the DV.  You were assuming. True?

A    I was assuming based off of the phone call that I made for the DV, because he was walking and saying those obscene words about sheriffs and coming for him.

Q    Sir, in the 911 call -- the first one we haven't heard or seen.  True?

A    True.

Q    So --

A    Well, I definitely made it.

Q    And you remember what you said seven years later on that night?

A    I didn't say that.

Q    Okay, sir.  Now -- and then they spoke to him.  They left.  And then you called 911.  We hear your statements to

*Deborah D. Parker, U.S. Court Reporter*

71

the 911, right?

A    Yes.

Q    And we already established that you were making certain assumptions where you talked to the dispatcher.  True?

A    Based off of what I was hearing, yes.

Q    Also, you didn't come out of your tent.  True?

A    No, ma'am.

Q    You did not see this man go to anyone's campsite. True?

A    No.  Just was hearing everything happening.

Q    Okay.  And because you thought in your mind, officer spoke to him, you thought he was the man involved in the DV. True?

A    Well, due to the words that were being exchanged between all the parties, yes.

Q    Well, sir -- okay.  Let's talk about you heard during the DV.  Let's go back to the DV.

         You heard the third voice, right?

A    Yes.

Q    Was that a male or a female?

A    A male.

Q    Okay.  And the male voice was saying what?

A    Why would you hit her.

Q    And you said something to Deputy Pahel that *I thought the female left with that second male*, right?

*Deborah D. Parker, U.S. Court Reporter*

72

A    Correct.

Q    You also assumed that?

A    Yes.  Because I didn't hear them anymore.

Q    Okay.  So the sound stopped?

A    At a certain point, yes.

Q    But you didn't see anyone leave or walk.  True?

A    True.

Q    So, basically, though, in your mind, that's what you heard, a man -- a second male voice saying *Stop hitting her*, and that's it, right?  That's all you heard?

A    There was more, but I wouldn't be able to recall at this time.

Q    Okay, sir.  There's more, but when you were talking with officers, you were telling us --

THE COURT:  Would you just stand up for just a moment and just stretch.

*(Pause.)*

THE COURT:  Okay.  Thank you.

BY MS. MKRTCHYAN:

Q    Okay.  So then you testified about you heard while on the 911 call, while inside your tent, a little girl screaming, right?

A    Correct.

Q    Okay.  And, again, we've already established, you were making an assumption that this little girl was screaming

*Deborah D. Parker, U.S. Court Reporter*

73

connected to this male yelling?

A    Yes.

Q    Okay.  And so then it was a guess.  You were guessing that there's all this sounds were connected to this one man.

You were assuming things?

A    Yes.

Q    Would it be a great idea for you to -- when the 911 is talking to you to tell her I'm not -- I'm assuming this is what is occurring?

MS. SWISS:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    You said Code 3.  You know -- I mean, you've heard some terms on Explorer, right?

A    Yes.

Q    How long was your Explorer experience?

A    It was four years [sic] and at the time.

Q    So you wanted to become a police officer at the time, right?

A    Eventually, yes.

Q    Okay.  And you have a lot of family friends in law enforcement?

MS. SWISS:  Objection.  Relevance.

THE COURT:  Can answer that, if you want to.

THE WITNESS:  Sure.  I have an uncle in

*Deborah D. Parker, U.S. Court Reporter*

74

law enforcement, and I have some friends, but I don't talk
to them anymore.

BY MS. MKRTCHYAN:

Q    Okay.  So you do have law enforcement exposure and
relationship.  True?

A    True.

Q    And when you were talking with the dispatcher, you
sounded like you wanted to investigate this call.  True?

        MS. SWISS:  Objection.  Speculation.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    You said "Code 3."  How do you understand the term,
Code 3?

A    "Code 3" means lights and sirens.

Q    Okay.  So -- and then you said they need to turn off
their lights and sirens when they're coming --

    (Court Reporter requests clarification for the
    record.)

BY MS. MKRTCHYAN:

Q    So you said certain things that you learned in your
experience as an Explorer?

A    Yes.

Q    You really were interested in investigating this call?

        MS. SWISS:  Objection.  Relevance.

        THE COURT:  Also speculation.  Sustained.

*Deborah D. Parker, U.S. Court Reporter*

75

MS. MKRTCHYAN:  It goes to his state of mind, Your Honor.

THE COURT:  I'll reverse that and let you answer the question, sir.  State of mind.

You can answer the question.

THE WITNESS:  Okay.  Yes, state of mind, I was reverting to training so I was scared.  So, yeah, I reverted to training.

BY MS. MKRTCHYAN:

Q    So you were hearing noises and you were saying "Code 3" understanding the word "Code 3" means.

What does it mean?

A    It means lights and sirens.

Q    Okay.  But, yet, you were still assuming that a little girl was screaming.  We don't hear on 911 call any screams of a little girl.  True?

MR. HARRELL:  Compound.

THE COURT:  It's compound, Counsel.

Re-ask the question.

BY MS. MKRTCHYAN:

Q    While you're saying and we hear "little girl screaming," we don't hear any sounds on that 911 tape to the dispatcher.  True?

A    True.  Other than my girlfriend.

Q    You were sitting inside your tent.  You're telling us

*Deborah D. Parker, U.S. Court Reporter*

76

you heard someone loudly screaming. You asked them to come Code 3 and, yet, on that 911 clip, you don't hear any sound of a little girl screaming. True?

A    True.

Q    So -- and then you recanted your statements to police. You said, you know, *It might not have been little girl. It might have been a woman. We thought he was fucking with us.*

Do you remember your statements?

A    I do remember saying that, yes, but there was no doubt that it was a little girl.

Q    Okay, sir. And when you talked about your girlfriend, your girlfriend was there with you. Do you remember that? You know, you talked about that at your deposition.

A    Yes.

Q    Okay. So -- and your girlfriend never provided an official statement to the police -- right? -- other than what we hear on this muffled tapes?

MS. SWISS:  Objection.

MR. HARRELL:  Speculation.

THE COURT:  Well, that evening in his presence?

You can answer that question, if you saw her give a statement to the police that evening in your presence.

BY MS. MKRTCHYAN:

Q    At any point in time?

A    No, I don't recall.

*Deborah D. Parker, U.S. Court Reporter*

77

Q    Okay.  But you did give an official statement to the officers.  True?

A    Yes.

Q    And even to sergeant arrived later.  True?

A    I can't recall that.

Q    Okay.  I'll show you.  But in any event, the deputies came.

You stepped out of your tent because the dispatch told you to step out of your tent.  True?

A    True.

Q    And when you had that brief exchange with the deputies, they didn't ask you where you heard the little girl screaming.  True?

A    I don't recall.

Q    Well, we see everything that is on the tape, right?  We heard it before, a few minutes before this defense counsel has played it for you?

A    We heard it, yes.

Q    Okay. It's just basically -- he's asking -- Deputy Renegar is asking, *Where did he go?  Where did he go?*

And you replied, *Oh, did he run?  Did he run?  And he went in that direction.*  That's it, right?  That's all?

A    Yes.

Q    Okay.  So no one stopped and talked to you at that point in time, ask you questions about what you heard.

*Deborah D. Parker, U.S. Court Reporter*

78

True?

A    No.  Not until after.

Q    They said, *Go back inside your tent.*  True?

A    Correct.

Q    You went back inside your tent?

A    Yes.

Q    You didn't see how they actually got involved with this man.  True?

A    No, I followed direction.

Q    You went inside your tent?

A    I stood outside in front of my tent.

Q    Okay.  You said that you heard the Taser, right?

A    Correct.

Q    In your terminology as an Explorer, you thought that's less lethal?

A    It is considered nonlethal.

Q    Well, have you received any training recently on Tasers?

         MS. SWISS:  Relevance.

         THE COURT:  Overruled.

         You can answer the question.

         THE WITNESS:  Actually, as a member of the United States Navy, we do have to work with Tasers and nonlethal force, yes.

////

*Deborah D. Parker, U.S. Court Reporter*

79

BY MS. MKRTCHYAN:

Q    Are you aware of that right now, as of right now you're sitting here today, Taser is considered less lethal, not nonlethal?

     *(Court Reporter requests clarification for the record.)*

          THE WITNESS:  I said, no, I was not aware.

BY MS. MKRTCHYAN:

Q    And you are aware that from your experience with Navy that Taser can actually be lethal?

A    Yes.

          MS. SWISS:  Objection.  Relevance.  403.  And speculation.

          MS. MKRTCHYAN:  Goes to his state of mind.

          THE COURT:  Overruled.

          The answer stands.

          THE WITNESS:  Can you repeat the question?

          THE COURT:  You don't have to answer.  You've already answered.

          THE WITNESS:  Oh, okay.

          THE COURT:  Thank you.

          MS. MKRTCHYAN:  Did he answer?

          THE COURT:  Yes, he's answered.

BY MS. MKRTCHYAN:

Q    Sir, you said on tape, 911 dispatcher, *I heard*

*Deborah D. Parker, U.S. Court Reporter*

80

*nonlethal deployed*, right?  Meaning the Taser?

A     Yes.

Q     Where were you standing when you heard that?

A     By my tent.

Q     Outside?

A     Yes.

Q     Did you see actually how the Taser was deployed?

A     No.

Q     Why not?

A     Because I was standing by my tent?

Q     Okay.

A     Oh, because of instructions.

Q     So there was obstructions because --

*(Court Reporter requests clarification for the record.)*

BY MS. MKRTCHYAN:

Q     Where you're standing inside your campsite, you can't have an unobstructed view of Campsite 65.  True?

A     True.

Q     There was the trees that we saw.  True?

A     True.

Q     And there was the car parked -- truck parked there that obstructed your view.  True?

A     True.

Q     Okay.  So you didn't see how the Taser was deployed?

*Deborah D. Parker, U.S. Court Reporter*

81

A    That's correct.

Q    Do you remember you testified earlier at a deposition that you actually walked a little bit and you saw Taser deployed while the man was standing.

        Do you remember that?

A    I do not know.

Q    Okay.  So maybe we can have you read pages -- where is the transcript? -- 67 through 69 where I was asking you questions about what you saw at the time force was applied.

        THE COURT:  67 through 69.  I want to repeat that back to you.  Just a moment.

        MS. MKRTCHYAN:  Yes.

    (Pause.)

        MS. MKRTCHYAN:  So we just want to --

        THE COURT:  Counsel just a moment, please.

    (Pause.)

        MS. MKRTCHYAN:  Please read it for yourself and let me know when you finish, please.

    (Pause.)

        THE WITNESS:  Okay.

BY MS. MKRTCHYAN:

Q    Did that refresh your memory, sir?

A    Yes.

Q    Okay.  So you did testify -- you did tell us that you did see the application of the Taser while the man was

*Deborah D. Parker, U.S. Court Reporter*

82

standing?

A    No.   You asked me if -- may I refer to the testimony?

MS. SWISS:  There should be a transcript up there.

MS. MKRTCHYAN:  67 through 69.

THE COURT:  Well, I thought you read that.  You didn't have the transcript in front of you?

THE WITNESS:  They took it back.

THE COURT:  Counsel, would you return the transcript to him.  I thought he was able to read 67 through 69.

MS. MKRTCHYAN:  Well, your Honor, if it doesn't refresh his memory, I would like to read it now.

THE COURT:  No, Counsel.  Put the transcript in front of him -- I thought you had that.  I apologize -- and read 67 to 69 for just a moment, trying to refresh your memory.

THE WITNESS:  I was just going to say that you had asked me if the Taser caused him to fall, and I said, I could not remember.  I did not know.

THE COURT:  Read 67 through to 69 for just a moment.

MS. MKRTCHYAN:  Please.

     (Pause.)

MS. MKRTCHYAN:  I would like to read it for the record.

*Deborah D. Parker, U.S. Court Reporter*

83

(Pause.)

THE WITNESS: Okay.

THE COURT: Now, the question was *(Reading)*:

"Do you remember you testified earlier

at a deposition that you actually walked

a little bit and you saw" --

THE COURT: Deb, help me with that on realtime. It's on line 8.

(Record read.)

THE COURT: *(Reading)*:

"Do you remember when you testified

earlier at your deposition that you

actually walked a little bit and you saw

Taser deployed while the man was

standing? Do you remember that?"

That's the question. You can answer.

THE WITNESS: Okay. No, I didn't say that he was standing when the Taser was deployed.

BY MS. MKRTCHYAN:

Q   Okay. What did you say?

A   Said that it looked like it knocked him to the ground, but that he wasn't -- that he didn't fall all the way to the ground on his own. He was assisted.

MS. MKRTCHYAN: Your Honor, I would like to read it for the record. Now, he read it. It's not refreshing

*Deborah D. Parker, U.S. Court Reporter*

84

his memory. I would like to read the pages.

THE COURT: Just a moment. What portions are you requesting to be read?

MS. MKRTCHYAN: Can I have the transcript back? Thank you.

THE COURT: No, he's going to keep the transcripts. We need -- that's the problem. The witness doesn't have it in front of him.

Here, you can have my transcript.

Now, what's the question?

MS. SWISS: I provided another one earlier this morning.

Karlen, is it maybe on the desk here? I provided two copies this morning.

MS. MKRTCHYAN: Your Honor, I need my copy, please.

THE COURT: Well, I don't want you disadvantaged. I want you to be able to ask. But you need a transcript and if we're going to refresh, he needs a transcript.

(Pause.)

THE COURT: And we'll help him turn to those pages so --

Sir, help him turn to those pages so he has them as a courtesy.

MS. MKRTCHYAN: May I read it for the record?

*Deborah D. Parker, U.S. Court Reporter*

85

THE COURT: Not yet, because I don't know what you believe is impeaching.

MS. MKRTCHYAN: Okay. This is going from question line 2 to 67, going all the way up to 69, highlights that I have. It's 67, line 2, et cetera.

MS. SWISS: The entire section is non-impeaching.

THE COURT: Just --

MS. MKRTCHYAN: Page 68.

THE COURT: Counsel, just a moment.

MS. MKRTCHYAN: Answer, 20- --

THE COURT: Counsel, please. Just a moment. Let me read this.

*(Pause.)*

THE COURT: Counsel, would you point out the line that you believe is impeaching, at least down to page 68, which is line 6, which is as far as I've read.

MS. MKYRTCHYAN: Your Honor, look at page -- continuing on --

THE COURT: I'm going to continue on down to that point, so it's specific. I'm not just going to allow pages to be read.

What is impeaching on page 67 through 68, line 7?

MS. MKRTCHYAN: Line 8, 16 through 18, when I asked him, "Did you see him go to the ground?"

THE COURT: Page 68 now?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01093 6-RenSER-01093

86

MS. MKRTCHYAN:  67, there's a highlight there line 16 to 18.  That's one impeachment.  68, lines 20 through 24, Your Honor.

THE COURT:  I'm going to have your associate come up here and show me these pages, okay?

And pardon us for just a moment.  You can visit amongst yourselves for just a minute.

MS. MKRTCHYAN:  That is not the -- we're looking at deposition, Your Honor.

THE COURT:  I've got the deposition.

MS. MKRTCHYAN:  Yes.

THE COURT:  Show the specific portions.

MS. MKRTCHYAN:  67, line 16 through 18.

THE COURT:  Counsel, just a moment.

*(Pause.)*

MS. MKRTCHYAN:  And lines -- 68, 16 through 24.  I think that's more pointed towards that issue.  Page 68, lines 16 through 24.

THE COURT:  Counsel, you can read those lines.

MS. MKRTCHYAN:  Which ones, Your Honor?

THE COURT:  You can start on page 67, as you requested, and start at line 2, you can read to page 68.

Ladies and gentlemen, I want this read so you can judge what --

MS. MKRTCHYAN:  So I'm going to read --

*Deborah D. Parker, U.S. Court Reporter*

87

THE COURT: Fairly broad.

You can read.

MS. MKRTCHYAN: Okay. Thank you. *(Reading)*:
"QUESTION: So how many officers do you remember
surrounding him?

"ANSWER: Like I said, I saw about anywhere
between four to six or five to six.

"QUESTION: And then you said earlier that you saw
them grab him. At what point in time did you see
them grab him? Was it before or after Taser?

"ANSWER: It was after the Taser.

"QUESTION: So when the Taser was deployed, was he
still standing on the ground?

"ANSWER: I don't remember.

"QUESTION: Did you see him at all on the ground?

"ANSWER: Oh, did I see him at all on the ground?

"QUESTION: Yes.

"ANSWER: Yeah, I saw him. I saw him fall and go
to the ground, but I don't remember. I couldn't
see anything after that.

"QUESTION: Why could you not see? Did you leave
the scene or was it because you were --

"ANSWER: No, because of the truck.

"QUESTION: The truck, okay. Did you see officers
get on top of him as he was on the ground?

*Deborah D. Parker, U.S. Court Reporter*

88

"ANSWER:  Yes.  Well, I mean I saw them go towards him.  I don't know if they like jumped on top of him, but they went towards him.

"QUESTION:  Okay.  This was after he was tasered?

"ANSWER:  Yes.

"QUESTION:  So you believed the Taser was very early on?

"ANSWER:  As far as I can remember, yes.

"QUESTION:  Okay.  And you heard the officers tell him, Hey, we will tase you.  We will tase you?

"ANSWER:  As far as I remember, yes.

"QUESTION:  What else do you remember officers telling him?

"ANSWER:  That's all I could say or hear.  After that, it was kind of like me and Lauren were talking to each other like trying to, like, basically calm ourselves down.

"QUESTION:  But you could -- you could not tell us if you saw the Taser knock Jeremy off the ground.

"ANSWER:  Like make him fall to the ground?

"QUESTION:  Yes.

"ANSWER:  I'd say yes.  I definitely did see.  So when they tasered him, I definitely saw him go towards the ground.  I don't know if he fell all the way to the ground on his own or he was

*Deborah D. Parker, U.S. Court Reporter*

89

assisted because they went in to grab him."

THE COURT:  Counsel, you can continue to read the question if you want to the next page.

MS. MKRTCHYAN:  Sure.  Continuing on.  *(Reading)*: "QUESTION:  Okay.  But you remember that the Taser was very early on?

"ANSWER:  Yes.  As far as my memory serves me, yes."

And then there is other questions, Your Honor.  I will move on.  Thank you.

BY MS. MKRTCHYAN:

Q    So that was your sworn deposition; right, sir?

A    Yes.

Q    And you knew you were testifying under oath.  True?

A    True.

Q    Okay.  And this was more fresh in your memory than now, seven years later.  True?

A    True.

Q    Okay.  And then this was ongoing.  I continued asking you at this deposition.  As of right now, you're sitting here today, sitting here, you did not see Jeremy Holloway, the man --

At the time, you didn't know his name, did you?

A    No.

Q    You learned only through this proceedings, right?

*Deborah D. Parker, U.S. Court Reporter*

90

A    Yes.

Q    Okay.  You didn't see him make any threatening movements towards officers before he was taken down to the ground.  True?

A    True.  It was all just audio.

Q    Okay.  And even on the ground, because your view was obstructed, you didn't see what happened on that ground?

A    All I can remember is:  After going back to the tent, I don't remember if I went out to go take a look or not past the truck.

Q    And you did not see him resisting on the ground?

A    No, just hearing everything.

Q    Or kicking at officers?

A    Just hearing everything.

Q    Or being violent towards the officers?

A    Like I said, just everything hearing.

Q    And, also, you did not see him when he was handcuffed?

A    Correct.  I just saw the ambulance come up.

Q    Okay.  And isn't it true, sir, after this use of force occurred, you also were never asked to point out this man to the officers.  True?

A    True.

Q    Because you didn't know him.  True?

A    True.

        MS. SWISS:  Objection.  Speculation.

*Deborah D. Parker, U.S. Court Reporter*

91

THE COURT: Overruled.

BY MS. MKRTCHYAN:

Q    You also never asked officers to make a citizen's arrest of him.  True?

MS. SWISS:  Objection.  Relevance.

THE COURT:  Sustained.

Assumes facts not in evidence, Counsel.

BY MS. MKRTCHYAN:

Q    You didn't ask officers to arrest him, did you?

A    No.

Q    Okay.  And then so another officer came to talk to you, Sergeant Rawlings, right?  Do you remember that?

A    I don't recall, no.

MS. MKRTCHYAN:  Okay.  So let's pull up his report.  This was admitted already before.  This is Exhibit 38, I believe.

*(The exhibit was displayed on the screen.)*

BY MS. MKRTCHYAN:

Q    This is report by Sergeant Rawlings of statements allegedly you made to him.

Do you remember we went to this statements -- this report before?  Does this refresh your memory?

If you would like to look at it before -- do you want -- does this --

A    I do remember us going over it.  I don't remember

*Deborah D. Parker, U.S. Court Reporter*

92

specifics of it, no.

Q   Okay.  So -- but if you would like, you can read this to refresh your memory, but --

Do you want to do that?

A   Yes.

Q   Please read it for yourself, briefly, and let us know when that is ending, please.  Thank you.

(Pause.)

THE WITNESS:  Okay.

BY MS. MKRTCHYAN:

Q   Is this the report allegedly statements you made to Sergeant Rawlings accurate, sir?

A   No.

Q   Okay.  So let's look at it, specifically, more.  He wrote that you pointed out the suspect who was yelling and screaming on the campsite to the officers.

Do you see that?

A   Yes.

Q   Is that false?

A   It would be false.  I pointed him to general direction.

Q   If he wrote -- he wrote in his report that the Taser was applied after Holloway was already on the ground resisting.

Do you see that?

A   Yes.

*Deborah D. Parker, U.S. Court Reporter*

93

Q   That -- that is false.  True?

(Court Reporter requests clarification for the record.)

THE WITNESS:  I wouldn't remember.

BY MS. MKRTCHYAN:

Q   Well, you testified at your deposition that you saw the Taser applied before he was taken down to the ground.  True?

A   No.  I began to talk on it and then I redacted by saying, "I don't remember."

Q   Well, sir, we heard your deposition.

A   Understood.  And that's what I also got at my deposition.

Q   Okay.  But did you see Mr. Holloway being tasered while on the ground?

A   No.

Q   Okay.  If Sergeant Rawlings wrote in his report that you told him you saw the deputies try to take control of the subject and get him into handcuffs, would that be false?

A   Yes.  It was all audio.

Q   So you didn't see that?

A   No.

Q   And he wrote that you told him that you saw Holloway struggling and resisting and not complying on the ground until he was handcuffed.

Do you see that?

*Deborah D. Parker, U.S. Court Reporter*

94

A    Yes.

Q    Is that false?

A    I don't remember if I told him that.

Q    But, sir, would you be telling him a lie if you didn't see that?  You testified to us earlier you didn't see what happened on the ground.  True?

A    Correct.

MS. SWISS:  Compound.

BY MS. MKRTCHYAN:

Q    Okay.  So I wouldn't be lying to an officer.  True?

A    True.

Q    So you didn't make this statements to him, because you didn't see what was ongoing during this altercation on the ground.  True?

A    True.  All verbal and audio.

MS. MKRTCHYAN:  I have no other questions.  Thank you.

THE COURT:  And redirect?

MS. SWISS:  No questions.

THE COURT:  Redirect?

MR. HARRELL:  None, Your Honor.

THE COURT:  Sir, thank you very much.  You're excused from these proceedings.

Counsel, your next witness.

MS. MKRTCHYAN:  Yes, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

95

Based on the defense information, we are going to call Deputy Brown.

THE COURT: Deputy Brown.

Deputy Brown is, I believe, out in the hallway. Would you ask him to come in. Thank you.

And just for our help, I believe, between the two of you, you have Deputy Brown and then you have your expert.

MR. HARRELL: Correct, Your Honor.

THE COURT: Would that conclude the witnesses? Maybe?

MR. HARRELL: We're very close to wrapping up the evidence today.

THE COURT: I think the case is going to be argued to you tomorrow; not on Wednesday, okay? If all counsel and I stay late tonight, I think we'll have it ready for you tomorrow.

(Pause.)

THE COURT: Thank you, sir.

If you would step between the double doors, which is just to your left and come through the door, sir.

(Pause.)

THE COURT: Thank you.

Would you raise your right hand, please.

MATTHEW BROWN, PLAINTIFF'S WITNESS, SWORN

THE WITNESS: I do.

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01103                                    6-RenSER-01103

96

THE COURT:  Thank you, sir.

Would you please be seated here in the witness box and the entrance is closest to the left.

And after you're seated, sir, would you face the jury and would you state your full name.

THE WITNESS:  Matt Brown.

THE COURT:  And would you spell your last name, sir.

THE WITNESS:  B-R-O-W-N.

THE COURT:  And direct examination, please.

DIRECT EXAMINATION

BY MS. MKRTCHYAN:

Q    Good morning.

A    Good morning.

Q    You are working currently for Orange County Sheriff's Department?

A    I am.

Q    How long have you been working there, sir?

A    13 years.

Q    Okay.  On the night of January 21, 2018, you were dispatched to the O'Neill Regional Park to assist in a call?

A    Yes.

Q    Okay.  Do you recall that?

A    Yes.

Q    Okay.  Have you written report about this?

*Deborah D. Parker, U.S. Court Reporter*

97

A    No.

Q    And you are sitting here and have an independent recollection of this?

A    Somewhat, yes.

Q    Okay.  Do you remember that you were asked -- and you know this officer, Deputy Chad Renegar, here, the defendant?

A    I do.

Q    How long have you worked with him, please?

A    It's probably been five years since I worked with him.

Q    Which station do you work together?

        *(Court Reporter requests clarification for the record.)*

        THE WITNESS:  Southeast substation.

BY MS. MKRTCHYAN:

Q    Okay, sir.  So you were -- you responded.  He asked you to do something related to this call.  True?

A    He did.

Q    What did he ask you to do?

A    Pick up some knives.

Q    Okay.  And what was your understanding of this call -- strike that.

        Pick up some knives from where?

A    Throughout the campsite.

Q    Okay.  Do you remember -- did you have your own mic on for the patrol vehicle recordings?

*Deborah D. Parker, U.S. Court Reporter*

98

A    Yes.

Q    Did you ever produce that video to us if you had a mic on, on your tape?

A    I was not asked to.

Q    In any event, we don't have that tape, do we?

A    I don't know.

Q    Okay.  So let's play Deputy Pahel's tape where you were asked to grab some knives and we'll see exactly what you did.

Do you remember playing this before -- watching this with us?

A    Yes.

Q    Okay.

MS. MKRTCHYAN:  So can we make this larger please?

THE COURT:  And is this once again Deputy Renegar's tape?

MS. MKRTCHYAN:  No.  This is Deputy Pahel's tape.

THE COURT:  Pahel's tape.

MS. MKRTCHYAN:  457.

BY MS. MKRTCHYAN:

Q    Do you remember -- before we get to the tape, do you remember where you grabbed the knives from, sir?

A    Not from memory, no.

Q    Okay.  So -- and this was a campground, right?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

99

Q    Dark?

A    Yes.

Q    But you were, basically, in charge of taking knives and putting them on a picnic table?

A    Yes.

Q    Okay.  So --

MS. MKRTCHYAN:  And let's play this 516, please. So let's first recognize you on this tape.

(*The videotape was played.*)

THE COURT:  Counsel for each of you about 30 minutes a piece.  30 minutes a piece.

(*Pause.*)

BY MS. MKRTCHYAN:

Q    Okay.  Sir, you recognize yourself in short sleeves in winter weather?

A    Yes.

Q    Okay.  So it's very easy to recognize you.  You're the officer with short sleeves, and you are grabbing something near the picnic table.  True?

A    Yes.

Q    And putting it on the table?

A    Yes.

Q    Do you know what that was?

A    From the video, no.

Q    Okay.  So -- but you would know that you took an object

*Deborah D. Parker, U.S. Court Reporter*

100

near from the picnic table and you put it on the table.
True?

A    Yes.

Q    Was that a machete?  Broken machete?

A    I don't recall.

        MS. MKRTCHYAN:  Okay.  Let's continue playing.

    (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    We can't see this ground right there illuminated by the
[sic] flashlights of the car.  True?

A    Yes.

Q    We don't see right there on that ground near the fire
pit or the log any weapons.  True?

A    From the video, no.

Q    But let's see if you're going to actually pick up
something from that area where there's the log and the fire
pit and put something on the picnic table, okay?

A    Okay.

        MS. MKRTCHYAN:  Let's play this, please.

    (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    So you picked up the axe that was laying near picnic
table and you put it on the table.  True?

A    Yes.

Q    That was the axe?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01108                                                6-RenSER-01108

A    Yes.

Q    Okay.

     (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Can you tell us how far was that picnic table from the
log behind the tent near the truck?  Can you tell us,
approximately.

A    Maybe 15 feet.

Q    To you that was 15 feet.  Did you ever measure that?

A    We don't measure that.

          MS. MKRTCHYAN:  Okay, sir.  Let's play that.

     (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    You're standing by the picnic table.  Do you remember
what you were doing at that time?

A    I don't recall.

Q    You were organizing stuff there.  True?

A    Possibly.  I don't recall from the video.

Q    Okay.  Do you see Deputy Chad Renegar take pictures of
the picnic table, the knives and weapons you put there
after?

A    I did not.

Q    5:13:27, we see you opening -- the first time we see on
this tape -- opening the -- the tent and reaching out into
the tent.  True?

*Deborah D. Parker, U.S. Court Reporter*

102

A    Yes.

         MS. MKRTCHYAN:  Okay.  Let's continue playing.

    (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Right there.  So, by the way, these officers standing in the front on the screen is Officer Gonzales and Renegar?

A    Yes.

Q    Okay.  So this is the first time we see you reaching something from the tent and putting it on the picnic table.  True?

A    Yes.

Q    Can you tell us what that was, sir?

A    I don't recall.

Q    Those were not the knives that you placed on the picnic table, sir?

A    I don't recall exactly what I pulled out the --

    (*Court Reporter requests clarification for the record.*)

         THE COURT:  Just a little bit slower.

         THE WITNESS:  Yes, sir.

         I don't recall exactly what I pulled out of the tent.

BY MS. MKRTCHYAN:

Q    Well, if Deputy Renegar asked you to grab the knives, you were going to follow his request.  True?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01110                                    6-RenSER-01110

103

A    True.

Q    That was the assignment you had?

A    True.

Q    And we know for a fact that knives were placed on that picnic table.  True?

A    True.

Q    And pictures were taken of that?

A    True.

Q    So, logically, would that be you or was there any other officer who was picking those knives and putting them on the picnic table, sir?

A    Could be logical, but I don't recall at the moment.

        MS. MKRTCHYAN:  Okay.  Let's continue playing.

    (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    The second time -- 5:14:20 seconds, this is the second time we see you reach into the tent and pick up something from the tent.  True?

A    True.

        MS. MKRTCHYAN:  Let's see what happens next, please.  Thank you.

    (*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    We see you holding something.  It's a large object; isn't it true?

*Deborah D. Parker, U.S. Court Reporter*

104

A    I can't tell by the video if it's large, but I'm holding something.  True.

Q    And you put it on the picnic table?

A    I do.

Q    5:14:46 seconds.  We see you reach third time into the tent.  True?

A    True.

MS. MKRTCHYAN:  And let's see what happens next.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    Okay.  We see you go back to the picnic table and put something.  True?

A    True.

MS. MKRTCHYAN:  Okay.  Continue playing.

BY MS. MKRTCHYAN:

Q    And you can't tell us what it was third time?

A    I cannot.

Q    Those were not the knives?

A    Possibly.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q    5:15:54, we saw you do another trip from the tent to the picnic table.  True?  And you put something there?

A    True.

(*The videotape was played.*)

*Deborah D. Parker, U.S. Court Reporter*

105

BY MS. MKRTCHYAN:

Q   And we have also Deputy Gonzales or Renegar.  This is Renegar -- right? -- right now on this tape, going inside the tent with you.  True?

A   Yes.

Q   Pick [sic] something.  True?

A   True.

Q   Okay.

(*The videotape was played.*)

MS. MKRTCHYAN:  We're going to flash forward to 5:24 minutes on this tape, same tape.

(*The videotape was played.*)

BY MS. MKRTCHYAN:

Q   At 5:24 -- starting 5:24 through 5:25:16, this is Officer Chad Renegar who is taking pictures of the campsite and the picnic table.  True?

A   True.

Q   After you put those objects you cannot remember on the picnic table?

A   Yes.

MS. MKRTCHYAN:  Let's go back to the Exhibit 100, please.  This is 100 dash admitted already:  100-11.

BY MS. MKRTCHYAN:

Q   This is the picnic table where you were putting stuff. True?

*Deborah D. Parker, U.S. Court Reporter*

106

A    True.

Q    And this is the picture that was taken by Deputy Chad Renegar on that day.  True?

A    True.

Q    And on this picture, we see the objects that you were picking up and putting on the picnic table.  True?

A    True.

Q    Okay.  And so --

No, I have no other questions.  Thank you.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. SWISS:

Q    Good morning, Deputy.

A    Good morning.

Q    Now, do you recall that night about when you arrived on scene?

A    I do not.

Q    Do you recall what was happening when you arrived on scene?

A    I do not.

Q    Do you know when you arrived on the scene whether Mr. Holloway had already been put in handcuffs?

A    I do not.

Q    When you arrived, were you aware that the incident involving Mr. Holloway and the deputies was over?

*Deborah D. Parker, U.S. Court Reporter*

107

MS. MKRTCHYAN:  Objection, Your Honor.

That is very vague and ambiguous and lacks foundation.

THE COURT:  I'm assuming he's referring to the incident.

THE WITNESS:  Physical altercation, yes.

BY MS. SWISS:

Q    So to reframe:  Did you see any of the physical altercation between Mr. Holloway and other deputies?

A    I did not.

Q    Now, when we saw the video of you putting items on the picnic table, just to situate you, when you were looking into Mr. Holloway's tent, did you go to anyone's backpack to get knives that night?

A    No, I did not.

Q    Was what you picked up, to your recollection, in plain view?

A    Yes.

Q    And did you move the tents in any way?

A    No.

Q    Did you destroy any of Mr. Holloway's property?

A    No.

Q    Did you see anyone destroy Mr. Holloway's property?

A    No.

MS. SWISS:  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

108

No further questions.

MR. HARRELL:  No questions Your Honor.

THE COURT:  Counsel, redirect -- strike that.  No recross.

MS. MKRTCHYAN:  No, Your Honor.  Redirect is now.

THE COURT:  Deputy Brown, you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Counsel, your next witness, please.

(Pause.)

MR. HARRELL:  Your Honor, it's still plaintiff's case.

Is plaintiff resting?

THE COURT:  You've heard a large part of the defense case during the plaintiff's case, et cetera.

Counsel, are you resting at this time subject to -- and you heard the plaintiff's case, but I want to make certain, because they've accommodated each other concerning some witnesses, also, that might not even be adverse.

Are you resting at this time, subject to going over the evidence with Karlen, making sure the record is correct?

MS. MKRTCHYAN:  Yes.  And the exhibits, Your Honor.  Thank you.

MR. HARRELL:  Your Honor, a motion?

THE COURT:  And I'll --

*Deborah D. Parker, U.S. Court Reporter*

109

MS. SWISS:  As well.

THE COURT:  I'll delay that motion.  I'll bookmark it at this time, Counsel.

MR. HARRELL:  Very good, Your Honor.

THE COURT:  Would you like to continue on with your case, which is --

MR. HARRELL:  Your Honor, we have an expert.  I believe Mr. Wroniak is going out to get him.

THE COURT:  Why don't we take a break for a couple of minutes while you get situated then.

Ladies and gentlemen, we'll come back and get you in 10 minutes.  Let me just say to you -- once again, let me remind you that certain cases are a little different. Parties can call people from the other side who would normally be testifying on either side and so you probably heard a large part of the -- well, you've heard the plaintiff's case now.  You've probably heard a large part of the plaintiff's [sic] case already during that presentation, okay?

We'll see who remains in just a moment.

Well, just a moment.  Why don't you have a seat. I think he's coming through the doors.  Come on back.

Counsel, if he's ready, can we start?  I see some movement out there.

Stay with us for just a second.  Anybody need the

*Deborah D. Parker, U.S. Court Reporter*

110

restroom?

Yes, we do.  We're going to take a break.

*(Laughter.)*

THE COURT:  We'll see counsel back in 10 minutes.

*(Recess taken from 10:59 a.m. to 11:15 a.m.)*

*(The following proceedings were had in open court*

*in the presence of the jury:)*

THE COURT:  We're back in session.  All counsel are present.  The jury is present, the alternates.

And if you would like to call your next witness, please.

If you would be seated.

MR. WRONIAK:  Defense would like to call Robert Fonzi.

THE COURT:  Sir, would you raise your right hand, please.

Karlen is going to administer an oath to you.

ROBERT FONZI, DEFENDANTS' WITNESS, SWORN

THE WITNESS:  Yes, I do.

THE COURT:  Thank you, sir.

*(Pause.)*

THE COURT:  Would you come forward.  Would you be seated here in the witness box.

Counsel, these are extraneous exhibits.  I don't know what you have.  Would each of you come up and just

*Deborah D. Parker, U.S. Court Reporter*

111

collect these, please, if they're not needed for this witness.

(Pause.)

THE COURT: Have a seat. Thank you, sir.

Would you face the jury. Would you state your full name, please.

THE WITNESS: First name is Robert; last name is Fonzi, F-O-N-Z-I.

THE COURT: And direct examination, please.

MR. WRONIAK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WRONIAK:

Q   Sir, are you currently employed?

A   Yes, sir, I am.

Q   What do you do for a living?

THE COURT: We're going to slow you way down. Start again.

BY MR. WRONIAK:

Q   Are you currently employed?

A   Yes, sir.

Q   And what do you do for a living?

A   I currently have a consulting firm involved with police litigation, training and practicing.

Q   Do you provide courtroom testimony relating to law enforcement actions including uses of force?

*Deborah D. Parker, U.S. Court Reporter*

112

A    Yes, sir.

Q    How long have you been doing that?

A    I would estimate 30-plus years.

Q    And how many times have you testified as an expert in a courtroom setting?

A    I would estimate over 300 times.

Q    And for your expert witness testimony, what percentage of your time is spent testifying on behalf of plaintiffs versus defendants?

A    I would estimate the majority of my work which is defense is about 90 -- 95 to 98 percent and then the balance would be for plaintiff.

Q    Have you ever been asked to work on a case on behalf of law enforcement and concluded that the law enforcement officers did something wrong?

A    Yes, I have.

Q    Have you been paid for your work on this matter?

A    I have in the past, yes.

Q    How much have you been paid to date?

A    I would estimate approximately between 10 and $12,000.

Q    Can you please tell the jury your background and qualifications as a law enforcement expert?

A    Yes.  I began my career with the sheriff's department, 1981.  Of course, went through the academy.

          I progressed through the department at various

*Deborah D. Parker, U.S. Court Reporter*

113

positions and ranks.  I worked corrections as a deputy sheriff.  I worked internal affairs as an investigator.  I was a corporal assigned to a patrol station where I was a field training officer and also a patrol supervisor, later involved in criminal investigations.

As a sergeant, I was assigned to corrections and then the majority of my time as a sergeant assigned to our academy, which is a regional law enforcement training facility providing law enforcement training to agencies all over the state, federal, military, FBI, Secret Service.  I also was assigned to a patrol as a sergeant watch commander, later promoted to lieutenant.  Worked again -- went back to the jail and worked as a watch commander as a lieutenant and then later transferred to Yucaipa as a contract city, second in command of patrol operations.

Promoted to captain.  Remained there at the contract city.  I was a chief of police for the City of Yucaipa as a captain.  And then I held other assignments as a captain, employee resources.

And then I ran our large jail facility before being promoted to deputy chief.  Assigned deputy chief, I had the bureau of operations, corrections, crime lab, court security, a number of other trainings in the academy.  And then I was appointed assistant sheriff.  I had one half of the department as my responsibility, pretty much all the

*Deborah D. Parker, U.S. Court Reporter*

114

support operations.

And then I was appointed under sheriff, second in command. I answered only directly to the sheriff who was the elected official and I ran the entire department, all the day-to-day operations: Budget, resources, employment issues and discipline. Internal affairs answered directly to me. And I had two assistant sheriffs and six deputy chiefs that reported directly to me.

Q    And you mentioned the sheriff's department. Which sheriff's department did you work for?

A    San Bernardino County.

Q    For how long of a period of time did you work for San Bernardino County Sheriff's Department?

A    I would say just shy of 33 years.

Q    And what was the rank that you retired at -- strike that.

Did you retire?

A    Yes. I retired in 2014 and I was the undersheriff.

Q    And during your 30 or so years of law enforcement with the San Bernardino Sheriff's Department, did you conduct use-of-force investigations at any point in your career?

A    Yes, I did.

Q    Just generally, what did those consist of?

A    Depending on my rank and position, there are different areas of responsibility, and I would have different areas

*Deborah D. Parker, U.S. Court Reporter*

115

that I would be tasked with.  As an operations or field supervisor, whether it be a corporal or a sergeant, I would be the one that would investigate allegations of use of force or complaints towards any deputy sheriffs or professional staff or civilians.

As a lieutenant or command staff lieutenant captain, then become more -- ensure that reviewing the reports, ensure that's in compliance with the expectations of the organizations and make a determination on what path that investigation would go, whether it be held within the station or assignment, had the authority to impose discipline if the allegations were sustained; if they were more serious or severe, then it would be forwarded to what we refer to as a board of chiefs.  I sat on that board of chiefs.  There's typically three chiefs and an assistant sheriff that chairs it.  I sat in that role as well and made a determination within or without a policy.

I sat as the assistant sheriff.  I was responsible for that entire process and accepting or returning or denying whatever was recommended and then, ultimately, as undersheriff, you have the authority to impose discipline if in fact there is a policy violation.

So I held all the ranks and positions.  And not to mention, as I said a few moments ago, I was assigned as investigator in internal affairs.

*Deborah D. Parker, U.S. Court Reporter*

Q    Do you have a ballpark of how many use-of-force investigations you were involved in while with the San Bernardino County Sheriff's Department?

A    I would say there in my 10 years hundreds, several hundreds.

Q    And in those several hundreds, did you ever find that one of the deputies that you were investigating used excessive force?

A    Yes, I did.

Q    Now you were retained as an expert witness in this case to determine the actions of Renegar and Gotts; isn't that correct?

A    Yes, sir.

Q    What was your assignment?

A    Initially -- and just like in all cases -- my assignment is to review the materials available, whatever documents, or audio, or videos, or photographs, or reports are available.  I review those and then I make a determination or compare them to the standards that I'm familiar with, both statewide and nationally, with respect to law enforcement training and practices and policy and then I'll form an opinion whether or not based on what I reviewed if they were within the industry standards that I'm familiar with.

Q    And did you do that in this case?

6-RenSER-01124                                    6-RenSER-01124

117

A    Yes, sir, I did.

Q    To prepare for developing your opinions did you review evidentiary material that had been gathered in the case?

A    Yes, I did.

Q    What did you review?

A    Quite a few documents:  The reports that were generated from the incident, CAD reports, which are computer-aided dispatch printouts.  It's the call for service.  There were 911 call audios, if I remember, directly transcribed as well, photographs, the allegations or complaints involving this matter, there was some video, deposition testimony and other statements from witnesses and things of that nature.

Q    Did you read the deposition testimony from the plaintiff?

A    Yes, I did.

Q    Did you read the deposition testimony from the deputies involved?

A    Yes, sir, I did.

Q    Did you read the deposition testimony from third-party witnesses?

A    Yes, I did.

Q    Did you ask for any materials to review in order to formulate your opinions that you weren't provided?

A    No.

Q    So you had all the information you needed to review the

*Deborah D. Parker, U.S. Court Reporter*

118

matter and render an opinion?

A    Yes, sir, I did.

Q    And after reviewing all the materials, did you form opinions?

A    Yes, I did.

Q    Did you prepare a Rule 26 expert report in this matter?

A    Yes.

Q    And your opinions are contained in that report?

A    Yes, they are listed within my report.

Q    Before we get to your opinions, let's focus on officer safety concerns for a moment.  Does the expression "hands kill" have any meaning in law enforcement?

A    Yes, it does.

Q    What does it mean?

A    It's a basic concept that you learn from the very beginning of basic academy that you need to have visual on a subject's hands.  If you're involved in a call for a service, or car stop, or confrontation, or whatever the situation may be, you want to be able to see the hands because the hands are what will produce and cause harm to you, the officer, or others involved.  So it's just -- I don't want to use the word cliché, but it's an officer safety issue that you want to see hands.  That's why you ask to see the hands.  That's why when you make a car stop, why officers will have you put your hands on the steering wheel,

*Deborah D. Parker, U.S. Court Reporter*

119

just to make sure everybody's safe and there's no inadvertent movements or actions that can be perceived the wrong way.  It just helps maintain a safer environment for all parties involved.

Q    And are officers taught when they are allowed to use force in order to address their officer safety concerns in the field?

A    Yes.

Q    What are they taught?

A    Depending on the circumstances, if it's an initial contact or call for service, it's predicated on the information provided.  The officers have the authority to stop and detain someone if they have a belief that that person may be involved in a situation or crime only for the time to ensure that a person is or is not involved.  It depends on if they cooperate and, of course, it will just be simple verbal commands or direction or questioning.

If there's resistance or actions that prohibit or slow the officer or officers down from inquiring why they are there, then they can direct someone using what we refer to as a physical control measure.  It can be simple as just directing them to have a seat or to stand in a certain location or whatever is appropriate under those circumstances.  It's a reaction to what you're confronted with up to and including more physical force, whether it be

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01127     6-RenSER-01127

120

a control hold or takedown or something else, because as this progresses, then there becomes a violation of certain penal codes that an officer is trained to be aware of that allows him to use additional force if need be. So it's really predicated on the contact and what transpires.

Q    Are there different levels of force that can be used by law enforcement officers?

A    Yes, there are.

Q    Can you please explain what those are?

A    To give you just a simple breakdown, you can classify them in three areas: Low, moderate, or high. Low levels of force are to gain compliance or provide direction. Those are simple commands: Just your uniform presence, an officer in uniform -- a person recognizes that they're an officer to physical control measures which are more simple. Just hand gestures, like I indicated: *I need you to step out of the car* and you place your hand on their elbow and just direct a person or you direct them to have seat. It's those simple low level types of force that an officer is trained to utilize. And then you have the moderate levels which is to establish or gain control. And there's a number of force options that an officer may use there and that's kind of where a lot of the force options are contained.

You have chemical agents, which is primary pepper spray, electronic devices which are Tasers, police batons,

*Deborah D. Parker, U.S. Court Reporter*

121

canines and other physical control measures that are more of a higher level type of force application.

And, of course, you have the highest level which is deadly force where it's imperative that an officer stop life-threatening actions.

Q    Are law enforcement officers taught that they have to start at the low level of force?

MS. MKRTCHYAN:  Objection.

THE COURT:  Sorry?

MS. MKRTCHYAN:  Incomplete hypothetical.

MR. WRONIAK:  I'll complete the question, Your Honor, then.

BY MR. WRONIAK:

Q    Are law enforcement officers taught that they have to start at the bottom level of force and gradually work their way up?

MS. MKRTCHYAN:  Objection.  Very vague.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  No, not at all.

BY MR. WRONIAK:

Q    What are they taught?

A    Officers are taught when they are confronted with a situation to engage at a level of force that is reasonable under the totality of the circumstances.  And depending on

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01129      6-RenSER-01129

122

what the threat assessment is, what's occurring, an officer may escalate without going through the lower levels, and I can give an example if you would like, but they're not trained you have to start at the bottom. They can select whatever is reasonable under the circumstances.

Q    If you can give us an example, that would be great.

A    So as I explained, you have the low, the moderate and high levels of force. But if an officer steps out of their police car and they are confronted with a firearm, you're not going to start at the bottom and work your way up, because the life-threatening situation is obvious and imperative that they defend themself or defend someone else, so that's why it's not a stair-step process. Never has been and that's not how it's trained. They do, however, have to select which is reasonable under the circumstances.

Q    Thank you.

Are law enforcement officers taught about de-escalation as a law enforcement tactic?

A    Yes, they are.

Q    What are they taught?

A    De-escalation is a process by which an officer, depending on the circumstances, again -- generally speaking, the vast majority of situations are just verbal interaction, verbal commands, verbal direction, questions to establish control or what may have transpired.

*Deborah D. Parker, U.S. Court Reporter*

123

The de-escalation requires cooperation. If a person isn't cooperating, then, of course, an officer must escalate. Depending on what's occurring, you may have to use some of the other force options. And even when they do escalate, for example, if they are using a physical control measure, if they then start giving some commands, that's a sign of de-escalation. They're attempting to de-escalate. So throughout the process, officers are trained, even though they may escalate, they can de-escalate to resolve the situation and that's what they're trained with respect to de-escalation.

Q   Let's get to your opinions in this matter. Did you see from the material that there were two encounters with Mr. Holloway on the night of January 21, 2018?

A   Yes, I am aware.

Q   Did you form an opinion as it relates to the first contact the deputies had with Mr. Holloway?

A   Yes, I did.

Q   And what opinion did you form?

A   Based on the information provided to the deputies responding to the park that it was appropriate and consistent with their training to, of course, initiate contact at the location provided to them in the call for service and to detain the individual that may be a participant in that call for service. Of course, the call

124

for service was domestic violence which is very important for an officer to handle in that the actions they took to determine whether or not there, in fact, was a domestic violence was reasonable and consistent with their training.

Q    Sir, did you see in the material that dispatch sent deputies to O'Neill Park to investigate the possible domestic violence incident?

A    Yes.  That was very important, domestic violence being the issue.

Q    Why do you say it's "very important"?

A    Domestic violence, it's a very serious issue socially in our society.  It's a serious matter.  There are many victims or individuals that are victimized by domestic violence.  There are usually high emotions -- high level emotions involved on both sides, separating and demonstrating whether or not it occurred is really important.  And the most important thing is to initiate contact, establish control and control is really important. Because you have somebody injured or worse, the officers need to bring in medical aid or summon medical aid.  You can't do that until you figure out what took place, who is involved and you have control.  That's why it's very important in the initial few moments to make contact, ask questions and determine if, in fact, there was a crime or not.  And that's why domestic violence is very serious and

*Deborah D. Parker, U.S. Court Reporter*

125

it's the one crime where more police officers are assaulted in any other type of call for service.

MS. MKRTCHYAN: Objection, Your Honor. That is highly improper. Appeals to passion and prejudice.

First of all, he's -- this is a use-of-force case, not domestic violence case.

So I object. This is not relevant.

MR. HARRELL: Speaking objection. Move to strike.

THE COURT: Overruled.

Concerning the type of incident and what this hierarchy is, I'm going to overrule the objection.

BY MR. WRONIAK:

Q    Would a reasonably well-trained officer be entitled to have officer safety concerns relating to a domestic violence call before ever arriving at O'Neill Park to investigate the call.

A    Yes, they would.

Q    Why do you say that?

A    For a lot of reasons I just articulated: Whether there are weapons involved, what the emotions are, do we have alcohol involved, do we have narcotics. All those are still questions that an officer has in their mind as they are responding.

THE COURT: Just a moment. You're here concerning this incident. So if it's a generalized answer, then I am

*Deborah D. Parker, U.S. Court Reporter*

126

sustaining the objection.  If you're referring to this incident, then you can respond.

So, Counsel, you're going to re-ask that question.

I'm going to sustain that objection.

Re-ask the question.

BY MR. WRONIAK:

Q    We can limit to this instance.  Would a reasonably well-trained officer be entitled to have officer safety concerns relating to a domestic violence call before ever arriving at O'Neill Park?

A    Yes.

Q    Why?

A    For the reasons I've articulated:  Not knowing who's involved, not knowing if there's injuries, not knowing the emotional level of both or how many parties are actually involved, whether there's weapons.  There's a whole host of things that will go through the officers minds responding to this call for service.

Q    Did you see in the material that dispatch continued to provide the deputies with information as to the location of where the incident may be taking place as they were traveling to O'Neill Park?

A    Yes, I did.

Q    Is a reasonably well-trained law enforcement officer allowed to rely on the information being provided by

*Deborah D. Parker, U.S. Court Reporter*

127

dispatch?

A    Yes.

Q    Why do you say that?

A    That is the lifeline to an officer with respect to the call for service and the information that the dispatcher has received.  In many cases, they are still on the line with the reporting party so that information from a dispatch is very important.

Q    You listened to PVS recordings from the first encounter; is that correct?

A    Yes, I did.

Q    And how did you describe Deputy Renegar's demeanor during that first contact?

        MS. MKRTCHYAN:  Objection, Your Honor.

        First of all goes to credibility issues.  This is not for this expert to decide credibility.

        THE COURT:  No, overruled.

        You can answer that.

        THE WITNESS:  The -- when listening to the dispatch and the recordings, based on what I reviewed is interaction and contact.  Initially, Deputy Renegar was very professional.  If you listen and you read the transcribed portions of that, he uses "yes, please," several times.  He used the word "please" several plus times.

        In listening and reading the deposition and

*Deborah D. Parker, U.S. Court Reporter*

128

statements and the audio recording and also the transcription, he's very professional.

THE COURT: Now, just a moment.

You'll determine demeanor of the various parties involved. You heard the tapes. This is for escalation, de-escalation. But, ultimately, will be the excessive force, or lack thereof, or whatever you determine as a jury whether excessive force was used. That's the central question here, okay?

Now, Counsel, please continue.

BY MR. WRONIAK:

Q   As to Mr. Holloway, how would you describe is demeanor during that first contact?

A   Based on my review and listening and reading the transcription, less than cooperative.

Q   Did you hear Mr. Holloway's tone of voice in the PVS recordings?

A   I did.

Q   How would you describe his tone of voice?

A   To me appeared, angry, aggressive, noncompliant, questioning the authority in the presence of the deputy there.

Q   Would Mr. Holloway's demeanor and tone of voice have an impact on a reasonably well-trained officer as it relates to safety concerns?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01136                                     6-RenSER-01136

129

A    Oh, yes, absolutely.

Q    Why do you say that?

A    Based on the type of call, the domestic violence, we've been trained to recognize these kinds of issues or signs. It's important to establish control. When you're not able to gain control or compliance, initially, determine if someone, in fact, has been injured. It escalates officer safety not knowing the mindset of the individual. So it does raise a concern when you're dealing with that type of situation.

Q    Did you also see the material that during the first encounter officers saw an axe, a machete and knives in Mr. Holloway's campsite?

A    Yes, I did.

Q    Did you also see that Mr. Holloway indicated he had knives?

A    Yes, I did.

Q    Would the presence of those weapons raise any officer safety concerns to a reasonably well-trained officer?

A    Yes, it would.

Q    Why do you say that?

A    Well, for obvious reasons, those items can be used as weapons and can cause serious injury or death. So when an officer responds to a call for service such as this and those are present, they will cause some concern and an

*Deborah D. Parker, U.S. Court Reporter*

130

officer will take note of that and recognize they're there.

Q    Did you also see in the material that during the first encounter, Mr. Holloway told the deputies he was on informal probation for insurance fraud?

A    Yes, I do recall that was the information provided.

Q    Would that have any significance to a reasonably well-trained law enforcement officer?

A    Yes.

Q    Why do you say that?

A    Based on my experience and training, those on probation for the most part are cooperative.  They have conditions of their probation, and they do vary depending on the type of crime and whatever was ordered by the Court.  There are terms that vary slightly, but the majority of them have what we refer to as "search terms."  They agree to sign and follow those terms of their probation in lieu of perhaps some custody time, so they do sign what's referred to as "search terms."  So officers are aware of that that the search terms are there, whether they elect to utilize -- it depends on the circumstances, but it's just something to have a mental note of.

Q    Did you also see in the material that after the deputies could not locate a female victim of Mr. Holloway, they left Mr. Holloway's campsite and Deputy Renegar ran Mr. Holloway through the criminal database on his computer?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01138                                              6-RenSER-01138

131

A    Yes, I'm aware of that.

Q    Did you see that Deputy Renegar found out that Mr. Holloway was on felony probation with search and seizure terms?

A    Yes.

Q    From the perspective of a reasonably well-trained officer, what does it mean for someone to be on felony probation with search and seizure terms?

A    Felony probation, first of all, there's been a felony conviction and the agreement based on the terms is that the person in that probation has agreed to waive their Fourth Amendment search and seizure by signing a document that says they will comply, whatever the terms are, and that they must be -- they must submit themselves to search when in the presence of a police officer when asked to do so.

Q    Did you see the search and seizure -- strike that.

Did you see Mr. Holloway's plea where he indicated he had waived his Fourth Amendment search and seizure rights?

MS. MKRTCHYAN:  Objection, Your Honor.  Outside the scope of this expert.

THE COURT:  Overruled.

You may answer the question.

THE WITNESS:  Yes, I have.

////

*Deborah D. Parker, U.S. Court Reporter*

132

BY MR. WRONIAK:

Q    So you confirmed that that was the case?

A    Yes.

Q    Did you also see in the materials that the deputies were dispatched back to O'Neill Park in reference to someone going up and down the campground yelling and screaming and looking for the person who called the cops on him?

A    Yes.

Q    And the deputies were dispatched back.  Would a reasonably well-trained officer believe that they were going back to locate Mr. Holloway?

A    Yes, they would.

Q    Why do you say that?

A    Well, the two calls of service are close in time. We're talking early morning hours.  General speaking, there is not a lot of activity at campgrounds at 3:00 and 4:00 o'clock in the morning.  And the information that the person's yelling and screaming who called the police on them would, obviously, place it in the context it was from the previous encounter with the deputies when they were summoned there for the domestic violence.

So any officer getting that information, it would be reasonable for them to believe that Mr. Holloway was the individual going up and down the campsites yelling and screaming.

*Deborah D. Parker, U.S. Court Reporter*

133

Q   Would a reasonably well-trained officer have the prior contact with Mr. Holloway in mind as they were going back to O'Neill Park the second time?

A   Yes, they would.

Q   Why do you say that?

A   You had responded initially.  The first one was somewhat resolved.

*(Court Reporter requests clarification for the record.)*

THE WITNESS:  Yes.  The first call for service they had initiated contact, investigated.  It had been resolved, and they theft.  And then a short time later, they are summoned back and it appears that it escalated.  Now the information is that the person is wandering or walking around the campground yelling in search of who called the police in the first call for service.  So that would raise some concern for officer safety.

Q   Did you see in the materials as the deputies were returning back to O'Neill Park, dispatch provided additional information that the person was going through things in an RV?

A   Yes, it would.

Q   And did you also see in the material that when they were returning, dispatch advised there was now a little girl screaming and upgraded the call to a priority one?

*Deborah D. Parker, U.S. Court Reporter*

6-RenSER-01141                                        6-RenSER-01141

134

A    Yes, I did see that information.

Q    "Priority one" is lights and sirens, correct?

A    Yes, it is.  It's the highest response for law enforcement.

Q    So what impact would the additional information of the little girl screaming and activating it to a priority one have on a reasonably well-trained officer returning to O'Neill Park?

A    It would have significant impact on an officer responding.

Q    Why do you say that?

A    If you take the backdrop and the context of all this information which is -- because in this case, it's the same officers responding to the initial call for service, the contact -- what they observed, the contact with Mr. Holloway.  Then you're summoned back there a short time later and has escalated substantially to a priority one -- which is, of course, Code 3 lights and sirens -- the concern is now who has been harmed, if anyone has been armed; what has taken place.

Going into a private RV is substantial.  It's like a home.  Has someone been injured or not injured?  All these things are unknown as you are responding there.  And now you have information you got a little girl screaming would certainly stand the hair on the back of an officer's neck

*Deborah D. Parker, U.S. Court Reporter*

135

when responding.  It's pretty -- it has continued to escalate with the information provided to them which they are trained to rely upon.

Q    Would a reasonably well-trained officer believe that Mr. Holloway, potentially, had enough time to arm himself with a knife between the first encounter and being dispatched back the second time?

A    Yes, they would.

Q    Why do you say that?

A    Well, you know, from the first call for service, he had a knife on him.  He even indicated that, or he indicated he had a knife on him at some point.  They took note and observed the various types of things -- machete and an axe and other knives -- within the campground.

So those are things that would be important to take notes.  So any of those things could have been accessed, hidden or placed on a person, or other.

Q    When the deputies returned to Mr. Holloway's site the second time, there was a use-of-force incident, correct?

A    Yes, there was.

Q    Before any force is used on Mr. Holloway, did you form an opinion as to the deputy's conduct from the time they arrived to the time they went hands-on?

A    Yes, I did.

Q    What opinion did you form?

*Deborah D. Parker, U.S. Court Reporter*

136

A    That the response, which is Code 3, and the initial contact with Mr. Holloway was consistent with law enforcement training based on the escalation of the call and the severity that it's now risen to to establish control immediately and to gain compliance of Mr. Holloway was imperative and important to ensure the safety of all parties involved.  You need to come in there very quickly, give them the commands to do certain things -- it's for their safety, too -- to get on the ground to do the things that they are asked to do so that you can control it, secure that person and then you start to see if anybody has been injured and that's the number one priority.

And you can't check for injuries until you have a safe environment to work in.  Medical personnel will not respond -- officers know that -- until the scene is safe.

So that response initially before the force application was consistent with the training I'm familiar with statewide and nationally.

Q    I want to make sure I understood something there.  It would be the officers' objective to make the scene safe before investigating and looking for the little girl?

MS. MKYRTCHYAN:  Your Honor, it's leading. Continuously leading.

THE COURT:  You can lead an expert.

Overruled.

*Deborah D. Parker, U.S. Court Reporter*

137

THE WITNESS: Oh, absolutely. You can't investigate or look for a little girl if you have a potential suspect that is armed or could be armed or has been involved in a violent crime. That's why I said a moment ago, control the person you believe may be involved. Make it safe. Make it safe for the officers. Make it safe for the public, and make it safe for that person you're detaining. Once you have them controlled, then you can do the investigation which would be, number one, to see if there's a little girl that has been injured, if there's been others injured, all the things I said a moment ago.

Q    Sir, do you know who Roger Clark is?

A    Yes, I do.

Q    He's a use-of-force expert. That's your understanding?

A    Yes, sir.

Q    If Mr. Clark testified that the deputies should have searched for the little girl first, would you agree with that?

A    No, I would not.

Q    Why not?

A    It's absolutely wrong. A call for service has now escalated. You know there are things that could be used as weapons there at the site. The first contact, less than cooperative Mr. Holloway. You're summoned there again with two pieces of information: He's running around the

*Deborah D. Parker, U.S. Court Reporter*

138

campground yelling for who called the police -- three, actually. He had entered a private RV, which I said a moment ago is like someone's home and now you got a little girl screaming. You needed to control him first if he, in fact, is a suspect. If he has information to help with the investigation, that's important but not until we make sure he's safe and secure then we can do the things that are really important to do.

Q    Did you see as the deputies return that second time that they ordered Mr. Holloway to get on the ground?

A    Yes, they did.

Q    Did you see in the material that the deputies wanted Mr. Holloway on the ground so they could handcuff him?

A    Yes.

Q    Based on law enforcement standards, that you are aware of, can handcuffs be applied to someone as an officer safety tool, even though the person is not being arrested?

A    Yes.

Q    Why do you say that?

A    It's to ensure -- again, not to go back over the things, but because of this type of call, the information that they were provided and why they were responding there to detain a person, Mr. Holloway, under these situations, secure him in cuffs for his safety and the officers is important so that allows them to do the other top priority

139

things that we've already discussed.

Q   Was attempting to get Mr. Holloway on the ground a valid law enforcement tactic for a reasonably well-trained officer?

A   Yes.

Q   Why do you say that?

A   Placing someone or directing them on the ground minimizes their ability to assault, flee, or access weapons not presently on them.  So having them get on the ground is a means of soliciting cooperation and if the person follows the commands and things, it makes the encounter much easier; if they're not then, of course, you have to escalate if they're not following real commands.  So having them on the ground is for their safety and the officers.

Q   Based on your review of the material, did Mr. Holloway get on the ground when he was told to do so?

A   No, he did not.

Q   Do you recall approximately how many commands to get on the ground Mr. Holloway was given?

A   If I remember correctly, in listening and reading the transcripts, at least seven times.  It might have been seven plus but at least seven times.

Q   Did you see from your review of the material that there were two versions with regard to the opportunity given to Mr. Holloway to get on the ground?

*Deborah D. Parker, U.S. Court Reporter*

140

MS. MKRTCHYAN:  Objection.  It goes to credibility, Your Honor.

THE COURT:  Just a moment.

MS. MKRTCHYAN:  This is not for the expert to decide.

Is he assessing credibility of someone here?

Objection.

MR. WRONIAK:  Objection.  Move to strike the speaking objection.

MR. HARRELL:  Join.

THE COURT:  Just a moment.

(Pause.)

THE COURT:  Which of these versions is credible will be a jury determination.  And if you are speaking about officer safety --

MS. MKRTCHYAN:  Your Honor, the version is provided.  It's, first of all, vague and ambiguous, number one.  Misstates the testimony, number two.  Version provided is not known at the time of the incident.  They are talking about credibility of Mr. Holloway after the incident as to why he didn't get down on the ground.

It's improper for this witness to extrapolate from that about what was ongoing in the officers' state of mind when --

THE COURT:  Counsel, restate your question.

*Deborah D. Parker, U.S. Court Reporter*

141

I'm not sure where this is going in terms of -- it could be foundational that you've seen two versions.  What's not going to be allowed is a credibility determination.

BY MR. WRONIAK:

Q    Did you see in the material that Mr. Holloway claimed he was not given enough time to get on the ground?

A    Yes.

Q    Did you determine how much time Mr. Holloway was given to get on the ground?

A    Based on the time stamps, I would estimate almost 30 seconds.

Q    Based on law enforcement standards you are aware of, is 30 seconds enough time for an individual to get on the ground?

MS. MKRTCHYAN:  Objection.

THE COURT:  In this situation.  You can answer that question.

Overruled.

THE WITNESS:  Yes, sir.

BY MR. WRONIAK:

Q    Why you do say that?

A    Just because based on the transcript that indicates a number of times commands were issued, as I recall, as I indicated seven plus times.

Q    Given that there was potentially a little girl hurt or

*Deborah D. Parker, U.S. Court Reporter*

142

potentially in Mr. Holloway's tent, were the deputies required under law enforcement standards that you're aware of to stand there and discuss with Mr. Holloway why they were there before they could do anything to help the little girl?

MS. MKRTCHYAN: Assumes facts not in evidence.

THE COURT: Overruled.

You can answer that question. You can answer that question.

THE WITNESS: No, not at all.

BY MR. WRONIAK:

Q    Please explain.

A    Based on this call for service -- and, again, the things that we've already gone over -- if I have someone in a tent I believe is injured, I'm not going to sit there and debate with a person that is confrontational, noncompliant. I'm going to have to take some action after I gave him time to comply with the commands to get on the ground or whatever direction they're given to show their hands.

So it's not a time to debate. We can talk about their differences or what transpired once we ensure that there is nobody injured. If they are injured and bleeding out or worse -- we need to get there as quickly as possible and having somebody delay that makes it very complicated.

Q    Did you see in the material that after Mr. Holloway

*Deborah D. Parker, U.S. Court Reporter*

143

refused to get on the ground, Deputy Renegar approached him to place him in a control hold to handcuff him?

A    Yes.

Q    From a law enforcement standpoint, was the decision to use a control hold appropriate to get Mr. Holloway on the ground?

A    Yes, it was.

Q    Why do you say that?

A    As I mentioned earlier, the levels of force, we've already had the lower levels -- presence, commands -- those are not -- have not occurred or effective.  So escalating to moderate levels -- hands on, physical control measure -- directing someone on the ground is at the lower end of that. So to escalate to that point would be consistent with the training that officers receive.

Q    Did you see in the material that rather than get on the ground, Mr. Holloway stood in his campsite with his arms out like a cross?

A    Yes, I'm aware of that.

Q    Did you see in the material that when he's standing there with his arms out, Mr. Holloway claimed that Deputy Renegar just ran up and punched him in the face?

A    Yes.  I'm aware that that was his testimony.

Q    So if Mr. Holloway is correct and Deputy Renegar just ran up and punched him in the face, that would be excessive

*Deborah D. Parker, U.S. Court Reporter*

144

force, right?

A    I would agree.  Yes, it would be.

Q    But you saw from the material that Deputy Renegar denied ever running up and punching Mr. Holloway in the face, correct?

A    Yes.

Q    From your review of the material, did you see any third-party witness who confirmed Mr. Holloway's contention that Deputy Renegar just ran up and punched him in the face?

A    No, I have not seen anyone.

Q    What did the deputies say Mr. Holloway -- strike that.

MR. WRONIAK:  Would this be a good time to break, Your Honor, for lunch?

THE COURT:  Yes, this would be a good time, Counsel.

Ladies and gentlemen, it's 12:00 noon.  Is 1:00 o'clock still acceptable to all of you folks?

We'll see you about 1:00 o'clock.  Go have a nice lunch.

And, please, don't discuss this matter, nor form or express any opinion concerning the case.

(*Jury exits courtroom.*)

(*The following proceedings were had outside the presence of the jury:*)

THE COURT:  All right.  Counsel, have a nice

*Deborah D. Parker, U.S. Court Reporter*

145

lunch.  If you'd vacate that, I need to talk to some counsel from this morning for just a moment.

*(Further proceedings reported by CourtSmart, in Volume IV.)*

*(At 11:59 a.m., proceedings were recessed.)*

-oOo-

*Deborah D. Parker, U.S. Court Reporter*

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 24, 2025


                        /s/DEBORAH D. PARKER
                DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

BY MR. WRONIAK:
[11] 111/12 111/18 121/13 121/21 125/12 126/6 128/11 131/25 141/4 141/20 142/11

BY MS. MKRTCHYAN:
[82] 35/7 37/2 38/14 39/6 41/2 41/7 41/15 43/7 44/19 46/13 47/3 48/25 49/7 49/25 50/5 50/16 50/21 51/16 51/22 52/9 52/22 53/6 53/18 53/21 54/19 55/14 55/18 57/9 58/3 58/19 59/13 60/7 60/17 60/25 62/4 62/20 63/3 64/23 66/9 66/21 67/4 68/11 68/23 72/19 73/12 74/3 74/11 74/19 75/9 75/20 76/23 78/25 79/8 79/24 80/16 81/21 83/19 89/11 91/2 91/8 91/18 92/10 93/5 94/9 96/12 97/14 98/20 99/13 100/8 100/21 101/4 101/13 102/4 102/23 103/15 103/23 104/10 104/15 104/21 105/1 105/13 105/23

BY MS. SWISS: [23]
14/9 15/21 16/8 16/16 16/25 20/17 21/16 22/17 23/7 24/11 25/7 25/13 25/25 26/25 27/20 28/16 29/22 30/2 32/10 33/7 33/14 106/12 107/7

MR. HARRELL: [20]
34/11 36/15 38/10 45/19 52/18 60/14 60/20 61/14 75/17 76/19 94/21 95/8 95/11 108/2 108/10 108/24 109/4 109/7 125/8 140/10

MR. WRONIAK: [5]
110/13 111/10 121/11 140/8 144/12

MS. MKRTCHYAN:
[114] 15/12 16/12 21/14 25/6 25/9 29/18 33/11 35/5 36/24 37/1 39/2 40/9 40/11 40/18 40/24 41/1 44/13 44/15 45/14 45/17 45/24 46/2 48/22 50/20 51/14 51/20 52/8 53/2 53/4 54/6 54/10 54/14 56/6 56/9 56/11 56/21 57/8 57/13 57/19 58/2 61/19 61/22 61/25 62/7 62/19 63/23 64/17 65/7 65/10 65/12 66/1 66/18 67/2 68/2 68/6 68/8 75/1 79/14 79/22 81/12 81/14 81/17 82/4 82/11 82/22 82/24 83/24 84/4 84/15 84/25 85/3 85/8 85/10 85/23 86/1 86/8 86/11 86/13 86/16 86/20 86/25 87/3 89/4 91/14 94/16 94/25

98/14 98/17 98/19 99/7 100/6 100/19 101/11 102/2 103/13 103/20 104/8 104/14 105/10 105/21 107/1 108/5 108/22 121/8 121/10 121/17 125/3 127/14 131/20 140/1 140/4 140/16 141/15 142/6

MS. MKYRTCHYAN:
[5] 62/11 64/3 64/11 85/17 136/22

MS. SWISS: [52] 16/22 19/23 20/12 22/12 22/15 23/2 24/4 25/20 25/23 27/14 28/5 28/14 29/25 31/4 31/9 31/19 31/25 32/8 34/7 36/20 46/23 49/23 50/14 54/1 54/11 55/10 57/20 57/23 60/3 63/22 63/24 64/6 64/8 65/2 65/8 66/4 73/10 73/23 74/9 74/24 76/18 78/19 79/12 82/3 84/11 85/6 90/25 91/5 94/8 94/19 107/25 109/1

THE COURT: [188]

THE WITNESS: [53]
15/19 16/2 16/15 25/12 31/15 31/24 33/4 38/13 40/17 40/21 41/6 41/14 44/18 47/1 49/24 52/21 55/13 55/17 59/12 60/6 60/24 62/2 63/2 68/22 73/25 75/6 78/22 79/7 79/17 79/20 81/20 82/7 82/17 83/2 83/17 92/9 93/4 95/25 96/6 96/9 97/13 102/20 107/6 108/7 110/19 111/7 121/20 127/19 131/24 133/10 137/1 141/19 142/10

$

$12,000 [1] 112/20

-

-oOo [2] 14/2 145/6

/

/s/DEBORAH [1] 146/12

0

053 [1] 10/22

1

1-053 [1] 10/22
10 [7] 28/25 43/15 43/16 43/23 54/7 112/20 116/4
10 minutes [2] 109/12 110/4
100 [2] 105/21 105/22
100-11 [1] 105/22
1010 [3] 11/4 11/11 11/20
102 [2] 45/18 68/6
10342 [1] 10/20
104 [2] 48/22 48/22
10:59 [1] 110/5

11 [4] 105/22
1100 [2] 117/9 11/18
1150 [1] 11/14
11:15 [1] 110/5
11:59 [1] 145/5
12 [3] 10/8 26/21 43/1
12:00 [1] 144/16
13 [2] 27/15 43/16
13 years [2] 45/5 96/19
13-year-old [1] 43/1
1450 [2] 11/10 11/19
15 [3] 23/3 27/16 44/6
15 feet [3] 28/25 101/8 101/9
15 minutes [1] 34/14
16 [5] 85/23 86/2 86/13 86/16 86/18
18 [9] 43/16 44/4 44/9 44/13 44/14 57/23 85/23 86/2 86/13
19 [6] 10/16 14/1 45/8 64/4 64/9 64/16
19-01514-DOC [1] 10/8
1981 [1] 112/24
1:00 [1] 144/18
1:00 o'clock [1] 144/17

2

20 [4] 22/13 32/19 85/10 86/2
2011 [1] 12/8
2014 [1] 114/18
2018 [2] 96/20 123/14
2020 [2] 35/13 38/8
2025 [3] 10/16 14/1 146/9
204 [1] 11/4
207 [1] 12/8
21 [3] 32/19 96/20 123/14
2110 [1] 12/9
213 [1] 11/15
22 [4] 44/6 44/20 56/15 58/2
229-4305 [1] 10/23
23 [3] 28/8 64/4 64/16
24 [4] 86/3 86/16 86/18 146/9
244 [1] 39/3
25 [3] 44/6 44/20 54/4
26 [1] 118/6
27 [5] 52/23 53/2 53/4 53/20 54/4
274-2110 [1] 12/9
28 [5] 53/20 54/4 54/8 54/9 146/3

3

30 [2] 99/11 114/19
30 minutes [1] 99/11
30 seconds [2] 141/11 141/13
30-plus [1] 112/3
300 [1] 112/6
33 [1] 114/14
38 [1] 91/16
388-7022 [1] 11/5
3:00 [1] 132/16

4

400 [1] 12/4
403 [2] 36/15 79/12

4100 [1] 12/5
411 [1] 10/22
4305 [1] 10/23
457 [1] 98/19
47 [1] 53/3
4:00 o'clock [1] 132/17
4:07 [2] 68/3 68/6
4:58:40 [1] 32/3

5

516 [1] 99/7
5:13:27 [1] 101/23
5:14:20 seconds [1] 103/16
5:14:46 seconds [1] 104/5
5:15:54 [1] 104/22
5:24 [2] 105/14 105/14
5:24 minutes [1] 105/11
5:25:16 [1] 105/14
5:30 [1] 46/2
5:30 minutes [1] 46/3

6

61 [15] 39/16 39/18 55/7 55/21 56/2 56/3 56/14 57/2 57/5 57/7 57/11 58/6 58/10 58/16 58/21
624-8700 [1] 11/15
63 [7] 17/6 17/7 17/18 27/12 29/17 59/7 67/21
65 [12] 17/5 17/7 17/18 27/12 29/17 52/3 59/3 65/16 65/20 67/15 67/21 80/18
657 [1] 10/23
66 [8] 48/19 49/2 51/5 52/6 52/10 52/15 53/15 67/15
67 [21] 17/4 47/19 50/17 59/9 59/11 59/12 59/16 59/17 60/2 81/8 81/10 82/4 82/9 82/15 82/20 85/4 85/5 85/22 86/1 86/13 86/21
68 [8] 85/8 85/15 85/22 85/25 86/2 86/16 86/17 86/22
69 [7] 81/8 81/10 82/4 82/10 82/15 82/20 85/4

7

7022 [1] 11/5
714 [3] 11/11 11/20 12/5
750 [1] 12/4
753 [1] 146/2
76 [11] 16/23 61/2 61/17 61/25 62/16 62/25 63/2 63/16 64/9 64/15 65/12
760 [1] 12/9

8

818 [1] 11/5
823-4100 [1] 12/5
8700 [1] 11/15
8:23 [2] 10/17 14/1

9

90 [3] 34/21 34/22 112/11

90015 [1] 11/15
91 [2] 56/8 57/23
911 [41] 18/15 18/21 18/25 19/8 19/13 19/14 19/20 19/24 20/20 21/12 21/25 22/8 22/10 30/19 34/4 36/4 36/5 36/10 36/13 37/3 37/7 37/8 37/11 47/21 55/9 57/11 59/19 59/23 61/3 61/5 66/19 70/16 70/25 71/1 72/21 73/7 75/15 75/22 76/2 79/25 117/9
91202 [1] 11/5
92 [12] 40/12 40/13 40/18 40/22 41/9 41/11 55/24 56/4 56/9 56/10 56/15 57/17
92011 [1] 12/9
92701 [1] 10/23
92868 [3] 11/10 11/19 12/5
93 [3] 41/11 56/16 57/18
937-1010 [2] 11/11 11/20
94 [4] 40/12 40/13 41/11 41/11
95 [7] 40/12 40/13 40/22 41/9 41/10 41/11 112/11
98 percent [1] 112/11
9:03 [1] 34/18
9:19 [1] 34/18

A

a.m [7] 10/17 14/1 34/18 34/18 110/5 110/5 145/5
ability [1] 139/8
able [8] 18/6 22/2 23/25 72/11 82/9 84/18 118/19 129/5
about [45] 28/25 30/10 34/14 34/21 34/22 36/13 39/19 40/7 41/19 42/12 42/25 43/24 45/10 45/19 46/17 48/11 48/17 50/12 57/4 57/4 59/15 61/5 61/17 62/22 64/19 69/3 70/10 70/15 71/16 72/20 76/11 76/13 77/25 81/9 87/6 96/25 99/10 106/15 112/11 122/17 140/14 140/20 140/23 142/20 144/18
above [1] 146/5
above-entitled [1] 146/5
absolutely [9] 15/9 15/24 18/22 19/6 19/10 58/14 129/1 137/1 137/21
academy [4] 112/24 113/8 113/23 118/16
acceptable [1] 144/17
accepting [1] 115/19
access [1] 139/8
accessed [1] 135/17
accommodated [1] 108/17
accurate [4] 20/8 45/22 51/11 92/12

**A**

across [13]  18/5 18/11 48/19 49/2 60/10 60/12 61/13 67/22 68/12 68/14 68/15 68/17 68/17
action [1]  142/17
actions [6]  111/25 116/11 119/2 119/18 121/5 124/2
activating [1]  134/6
activity [3]  17/9 17/10 132/16
actually [16]  36/1 37/7 57/6 60/18 61/17 64/17 78/7 78/22 79/10 80/7 81/3 83/5 83/13 100/15 126/15 138/2
added [1]  45/7
additional [3]  120/4 133/19 134/5
address [1]  119/6
administer [1]  110/17
admitted [3]  39/3 91/15 105/22
adverse [1]  108/18
advised [1]  133/24
affairs [3]  113/2 114/6 115/25
affirmative [2]  52/15 53/15
after [27]  15/5 17/13 18/10 19/11 22/8 29/13 30/3 30/23 31/1 32/14 78/2 87/10 87/11 87/20 88/4 88/14 90/8 90/19 92/22 96/4 101/21 105/18 118/3 130/22 140/20 142/17 142/25
afterwards [1]  36/2
again [21]  19/13 31/2 44/5 45/21 46/9 46/11 48/4 51/20 56/4 58/17 65/24 70/3 72/24 98/15 109/12 111/17 113/12 122/22 137/24 138/20 142/13
age [1]  45/5
agencies [1]  113/9
agents [1]  120/24
aggressive [2]  33/21 128/20
agitated [1]  18/18
ago [5]  43/13 115/24 137/5 137/11 138/3
agree [3]  130/15 137/17 144/2
agreed [2]  38/7 131/11
agreement [1]  131/10
aid [2]  124/20 124/20
aided [1]  117/7
AIRPORT [1]  12/8
al [2]  10/9 11/7
alcohol [1]  125/21
all [62]  15/20 17/8 18/10 18/17 20/3 25/8 26/20 27/14 28/5 28/14 29/25 32/20 33/21 35/2 41/8 46/20 51/8 52/2 54/8 54/8 56/14 61/16 62/1 66/6 66/18 71/15 72/10 73/4 77/22 83/22 85/4 87/15 87/16 88/14 88/24 90/5 90/8 93/19 94/15 95/14 110/8 113/9 113/25 114/4 115/23 116/15 117/25 118/3 119/4 121/20 125/5 125/21 127/15 131/9 134/12 134/22 136/6 137/11 140/17 142/10 144/17 144/25
allegations [3]  115/3 115/12 117/10
allegedly [2]  91/20 92/11
allow [2]  65/4 85/20
allowed [3]  119/5 126/25 141/3
allows [2]  120/4 138/25
almost [2]  26/20 141/10
alongs [1]  16/6
already [13]  19/25 31/6 71/3 72/24 79/19 91/15 92/22 105/22 106/22 109/18 139/1 142/14 143/10
also [27]  12/12 26/11 34/22 38/15 42/13 42/17 45/7 55/6 69/8 71/6 72/2 74/25 90/17 90/20 91/3 93/11 105/2 108/18 113/4 113/11 128/1 129/11 129/15 130/2 130/22 132/4 133/23
altercation [3]  94/13 107/6 107/9
altercations [1]  14/25
alternates [2]  35/2 110/9
am [5]  61/23 96/17 111/14 123/15 125/25
ambiguous [3]  16/12 107/2 140/17
ambulance [1]  90/18
Amendment [2]  131/12 131/18
amongst [2]  15/1 86/7
ANA [4]  10/3 10/15 10/23 14/1
ANGELES [1]  11/15
angry [3]  18/18 33/23 128/20
another [3]  84/11 91/11 104/22
answer [25]  22/2 25/11 38/12 46/25 52/20 54/5 55/13 60/5 73/24 75/3 75/5 76/21 78/21 79/16 79/18 79/22 83/16 85/10 121/19 125/25 127/18 131/23 141/16 142/8 142/8
answered [4]  79/19 79/23 114/3 114/6
ANTHONY [1]  14/7
any [39]  17/20 26/17 30/16 35/19 37/6 39/19 40/1 45/22 48/15 50/17 58/23 59/9 68/16 68/24 75/15 75/22 76/2 76/24 77/6 78/17 90/2 98/5 100/13 103/9 107/8 107/19 107/21 114/21

115/4 117/22 118/12 125/2 129/18 130/6 132/22 135/16 135/21 144/7 144/21
anybody [2]  109/25 136/11
anymore [2]  72/3 74/2
anyone [6]  49/10 53/7 72/6 107/23 134/19 144/10
anyone's [2]  71/8 107/13
anything [10]  18/8 19/11 25/3 25/14 26/17 30/14 48/7 48/8 87/20 142/4
anywhere [1]  87/6
apologies [1]  53/5
apologize [1]  82/14
apology [1]  69/14
Appeals [1]  125/4
APPEARANCES [2]  10/25 11/22
appeared [1]  128/20
appears [1]  133/13
application [3]  81/25 121/2 136/17
applied [4]  81/9 92/22 93/7 138/16
appointed [2]  113/24 114/2
apprehend [1]  30/7
approached [1]  143/1
appropriate [3]  119/23 123/21 143/5
approximately [3]  101/7 112/20 139/18
are [90]  18/2 27/21 36/4 44/7 51/18 51/18 52/1 52/2 52/6 57/17 58/12 61/15 61/16 68/5 79/2 79/9 84/2 95/1 96/15 97/2 99/18 108/15 108/19 109/13 110/9 110/24 111/13 111/19 114/24 116/18 117/7 118/8 118/9 118/20 119/5 119/5 119/9 119/20 120/6 120/8 120/9 120/12 120/13 120/15 120/23 120/25 121/1 121/6 121/14 121/22 121/23 121/23 122/9 122/17 122/19 122/20 122/23 123/5 123/8 124/12 124/13 124/14 125/1 125/20 125/20 125/21 125/22 126/15 127/6 129/25 130/11 130/13 130/18 130/19 131/13 132/14 133/13 134/23 134/23 135/3 135/15 136/9 137/22 138/7 138/15 140/14 140/19 141/12 142/22 143/11
area [4]  24/17 63/12 65/23 100/16
areas [3]  114/25 114/25 120/11
aren't [1]  36/19
argue [1]  62/18
argued [1]  95/13

Argumentative [3]  46/23 50/14 73/10
arm [1]  135/5
armed [3]  134/19 137/3 137/3
arms [2]  143/17 143/21
around [7]  19/3 24/23 24/24 48/6 70/10 133/15 137/25
arrest [5]  20/24 21/7 21/20 91/4 91/9
arrested [1]  138/17
arrived [10]  47/23 61/11 62/23 62/23 77/4 106/15 106/18 106/21 106/24 135/23
arriving [2]  125/15 126/10
articulated [2]  125/19 126/13
as [91]  16/6 16/6 16/19 19/9 19/14 23/23 23/24 26/16 27/11 27/24 29/24 37/6 42/23 47/11 55/10 59/14 62/2 62/2 62/14 63/11 65/23 66/23 74/21 78/14 78/22 79/2 84/24 85/16 85/16 86/21 87/25 88/8 88/8 88/11 88/11 89/7 89/7 89/20 109/1 112/4 112/22 113/1 113/2 113/6 113/7 113/11 113/13 113/13 113/14 113/18 113/18 113/25 115/1 115/6 115/14 115/16 115/18 115/20 115/24 115/24 116/10 117/9 119/21 119/21 120/1 122/7 122/18 123/16 125/22 126/20 126/21 128/7 128/12 128/24 129/22 129/24 130/15 130/17 133/2 133/18 134/23 135/22 137/22 138/9 138/16 140/20 141/23 141/23 142/23 142/23 143/9
ask [16]  29/12 36/25 40/12 61/9 75/19 77/12 77/25 84/18 91/9 95/5 97/18 117/22 118/23 124/23 126/3 126/5
asked [24]  15/5 42/14 44/4 48/10 51/7 52/13 52/14 53/14 56/4 61/5 76/1 82/2 82/18 85/24 90/20 91/3 97/5 97/15 98/4 98/8 102/24 112/13 131/15 136/10
asking [10]  56/18 57/3 57/4 57/6 61/15 61/16 77/19 77/20 81/8 89/19
asks [2]  22/18 45/2
assault [3]  17/11 17/12 139/8
assaulted [1]  125/1
assessing [1]  140/6
assessment [1]  122/1
assigned [6]  113/3 113/6 113/7 113/11 113/21 115/24
assignment [4]  103/2

115/11 116/14 116/16
assignments [1]  113/18
assist [1]  96/21
assistant [4]  113/24 114/7 115/15 115/18
assisted [2]  83/23 89/1
associate [2]  21/23 86/4
associating [2]  57/10 58/20
assumed [4]  24/17 55/2 69/17 72/2
Assumes [2]  91/7 142/6
assuming [11]  37/12 37/13 37/15 37/16 69/7 70/11 70/13 73/5 73/8 75/14 107/4
assumption [10]  37/19 37/22 38/3 38/8 42/17 42/19 49/12 55/8 55/21 72/25
assumptions [2]  46/20 71/4
atlas [1]  67/8
attempting [2]  123/7 139/2
attend [1]  50/13
attending [5]  49/22 50/2 50/6 50/7 50/10
ATTORNEY [1]  11/3
audient [1]  47/6
audio [7]  69/2 69/20 90/5 93/19 94/15 116/17 128/1
audios [1]  117/9
audiotape [11]  20/16 22/16 23/6 24/10 25/24 26/24 27/19 28/12 46/4 46/12 68/10
August [2]  35/13 38/8
authority [4]  115/11 115/21 119/12 128/21
available [3]  36/19 116/16 116/18
AVENUE [1]  11/4
aware [16]  36/5 69/22 69/23 79/2 79/7 79/9 106/24 120/3 123/15 130/18 131/1 138/15 141/12 142/2 143/19 143/23
away [1]  19/4
axe [4]  100/22 100/25 129/12 135/13

**B**

B-R-O-W-N [1]  96/9
back [32]  16/22 35/1 35/15 40/11 44/5 44/11 51/15 51/20 71/17 78/3 78/5 81/11 82/7 84/4 90/8 104/11 105/21 109/11 109/22 110/4 110/8 113/12 132/5 132/9 132/11 133/2 133/13 133/19 134/16 134/25 135/7 138/20
backdrop [1]  134/12
background [3]  15/16 15/18 112/21
backpack [1]  107/13
badge [1]  31/15
balance [1]  112/11
ballpark [1]  116/1

**B**

barbecue [1] 51/10
based [23] 37/16 38/5 49/13 69/2 69/3 69/20 70/13 71/5 95/1 116/22 123/20 127/20 128/14 129/3 130/10 131/10 136/3 138/15 139/15 141/10 141/12 141/22 142/13
basic [2] 118/15 118/16
basically [15] 16/6 18/15 18/17 18/18 18/25 33/6 34/2 42/5 51/23 64/4 66/13 72/8 77/19 88/17 99/3
batons [1] 120/25
battery [1] 23/15
be [84] 14/18 16/7 18/6 20/7 20/8 20/13 22/2 23/25 28/3 29/2 29/3 31/8 31/19 35/3 36/16 36/20 45/22 46/2 59/17 60/2 67/11 67/12 67/13 67/16 72/11 73/7 79/10 82/3 84/3 84/18 85/21 92/20 93/18 94/4 94/10 95/13 96/2 103/9 103/12 108/18 109/15 110/12 110/22 112/12 115/1 115/2 115/3 115/10 115/13 118/19 118/19 119/2 119/14 119/16 119/21 119/25 120/3 120/4 120/6 122/6 123/24 125/13 126/8 126/21 128/6 129/22 131/7 131/14 132/23 135/15 136/20 137/3 137/5 137/9 137/22 138/16 140/14 141/2 141/3 143/14 143/25 144/2 144/12 144/14
beating [1] 14/19
became [1] 69/21
because [42] 14/22 18/24 19/8 19/13 21/9 21/23 22/4 22/21 23/16 24/16 24/17 27/24 32/4 46/21 58/7 62/9 62/15 64/18 67/17 69/17 70/14 71/11 72/3 77/8 80/10 80/12 80/13 85/1 87/22 87/23 89/1 90/6 90/23 94/12 108/17 118/20 120/1 122/11 124/19 134/13 138/21 141/22
become [2] 73/18 115/7
becomes [1] 120/2
becoming [1] 16/4
been [30] 21/5 31/6 35/16 39/3 45/8 47/25 76/6 76/7 96/18 97/9 106/22 112/2 112/13 112/17 112/19 117/3 122/13 129/4 129/7 131/9 133/11 134/19 134/19 134/22 135/16 136/11 137/4 137/10 137/10 139/21

before [30] 34/8 34/12 34/14 35/10 39/3 39/12 54/6 55/20 55/25 56/7 57/20 64/17 77/16 77/16 87/10 90/3 91/15 91/22 91/23 93/7 98/10 98/21 113/20 118/10 125/15 126/9 135/21 136/16 136/21 142/4
began [4] 18/14 18/24 93/8 112/23
begin [1] 26/5
beginning [2] 32/18 118/16
behalf [2] 112/8 112/13
behind [1] 101/6
being [10] 24/1 27/23 71/14 90/15 93/13 113/21 124/8 126/25 135/6 138/17
belief [1] 119/13
believe [16] 19/1 31/6 40/22 49/9 65/20 85/2 85/15 91/16 95/4 95/6 109/8 132/10 132/23 135/4 137/5 142/15
believed [2] 53/22 88/6
Bernardino [4] 114/11 114/13 114/20 116/3
best [3] 20/6 20/9 33/9
between [10] 17/20 25/18 29/17 71/15 87/7 95/6 95/19 107/9 112/20 135/6
bit [5] 46/6 81/3 83/6 83/13 102/19
bleeding [1] 142/22
board [2] 115/14 115/14
bookmark [1] 109/2
both [9] 54/3 54/12 56/14 64/12 64/13 66/6 116/20 124/15 126/15
bottom [4] 54/3 121/15 122/4 122/10
box [2] 96/2 110/23
Boy [2] 49/22 50/9
Boy Scouts [1] 50/9
break [6] 34/8 34/12 34/14 109/9 110/2 144/12
breakdown [1] 120/10
brief [1] 77/11
briefly [3] 15/22 28/17 92/6
bring [1] 124/20
broad [1] 87/1
Broken [1] 100/4
Brown [7] 95/2 95/3 95/4 95/7 95/24 96/6 108/6
brush [1] 51/21
brushes [3] 51/18 51/24 52/2
Bryan [1] 12/17
Budget [1] 114/5
bureau [1] 113/22

**C**

CAD [1] 117/7
CALIFORNIA [10] 10/2 10/15 10/23 11/5 11/10 11/15 11/19 12/5 12/9 14/1

call [57] 19/20 19/24 19/24 20/9 20/20 22/8 26/20 36/5 36/10 36/13 37/3 37/7 42/24 42/25 43/24 59/15 61/4 61/6 65/16 66/19 70/13 70/16 72/21 74/8 74/23 75/15 95/2 96/21 97/16 97/20 109/14 110/10 110/13 117/8 117/9 118/17 119/11 123/23 123/25 123/25 125/2 125/15 125/16 126/9 126/18 127/5 129/3 129/24 133/10 133/16 133/25 134/14 135/10 136/3 137/21 138/21 142/13
called [22] 18/25 18/25 19/8 19/13 21/9 21/12 22/3 22/5 22/10 34/4 34/5 36/4 36/8 37/7 47/20 55/9 57/11 70/25 132/7 132/18 133/15 138/1
caller [3] 18/16 18/21 21/25
calling [1] 21/5
calls [1] 132/14
calm [1] 88/17
came [15] 20/24 21/6 21/19 37/20 42/22 44/5 47/9 48/4 48/4 48/10 58/23 60/8 67/20 77/7 91/11
campground [9] 17/5 24/23 50/9 67/17 98/24 132/6 133/15 135/14 138/1
Campground 65 [1] 17/5
campgrounds [1] 132/16
campsite [68] 24/23 27/12 29/5 29/17 35/23 39/16 41/25 42/2 42/3 42/4 42/7 47/11 47/12 47/14 47/18 48/11 48/18 48/19 49/2 50/17 50/22 51/4 51/5 51/8 51/17 51/23 52/2 52/3 52/5 52/6 52/7 52/10 52/15 53/15 54/20 55/7 55/21 56/2 56/3 57/11 58/9 58/21 58/24 58/25 59/3 59/7 59/9 59/16 59/17 59/24 60/2 61/18 63/9 65/14 66/16 67/11 67/12 67/14 68/18 71/8 80/17 80/18 92/16 97/23 105/15 129/13 130/24 143/17
Campsite 61 [7] 39/16 55/7 55/21 56/2 56/3 57/11 58/21
Campsite 63 [1] 59/7
Campsite 65 [5] 27/12 29/17 52/3 59/3 80/18
Campsite 66 [6] 48/19 49/2 51/5 52/10 52/15 53/15
Campsite 67 [5] 50/17 59/9 59/16 59/17 60/2

campsite's [1] 48/24
campsites [4] 22/4 22/9 25/18 132/24
can [89] 15/1 15/10 15/14 15/22 17/2 18/7 25/11 26/4 27/2 28/23 32/7 33/8 33/15 36/16 36/25 38/12 40/20 43/16 44/9 45/14 46/8 46/9 46/9 46/25 52/5 52/10 52/20 56/8 57/24 60/5 60/9 60/22 64/15 65/8 65/15 67/2 67/13 73/24 75/5 76/21 78/21 79/10 79/17 81/7 83/16 84/4 84/9 86/6 86/19 86/21 86/22 86/23 87/2 88/8 89/2 90/8 92/2 98/14 101/5 101/6 102/12 109/14 109/23 112/21 119/2 119/20 119/21 120/6 120/9 120/10 121/19 122/3 122/4 122/6 123/9 126/2 126/7 127/18 129/22 129/23 136/10 136/24 137/8 138/7 138/16 141/16 142/8 142/8 142/20
can't [16] 28/21 30/15 30/18 38/17 38/21 38/21 55/22 58/15 77/5 80/17 100/9 104/1 104/16 124/21 136/13 137/1
canines [1] 121/1
cannot [2] 104/17 105/18
captain [4] 113/16 113/18 113/19 115/7
car [6] 80/22 100/10 118/18 118/24 120/17 122/9
career [2] 112/23 114/21
CARLSBAD [1] 12/9
cars [4] 49/9 54/23 55/3 55/3
CARTER [1] 10/4
case [18] 37/4 95/13 108/11 108/14 108/14 108/16 109/6 109/17 109/18 112/13 116/10 116/25 117/3 125/5 125/6 132/2 134/13 144/21
cases [3] 109/13 116/15 127/6
CATHERINE [1] 11/13
cause [3] 118/20 129/23 129/25
caused [1] 82/18
caution [1] 57/16
ccllp.law [2] 12/6 12/10
cell [2] 18/16 18/24
central [3] 10/2 11/4 128/8
certain [10] 18/2 64/20 71/3 72/5 74/20 108/17 109/13 119/22 120/2 136/8
certainly [1] 134/25
CERTIFICATE [1]

145/7
CERTIFIED [1] 10/5
certify [1] 146/2
cetera [4] 58/10 66/19 85/5 108/14
CHAD [6] 12/2 12/16 97/6 101/19 105/15 106/3
chairs [1] 115/16
charge [1] 99/3
check [1] 136/13
chemical [1] 120/24
chief [3] 113/17 113/21 113/21
chiefs [4] 114/8 115/14 115/15 115/15
CHRISTIE [1] 12/7
circumstances [7] 119/10 119/24 121/25 122/5 122/15 122/22 130/20
citizen's [1] 91/3
city [4] 12/4 113/14 113/17 113/17
civilians [1] 115/5
claimed [2] 141/5 143/21
clarification [13] 15/25 33/2 43/5 49/5 50/3 68/20 74/17 79/5 80/14 93/2 97/11 102/17 133/8
Clark [2] 137/12 137/16
classify [1] 120/10
cliché [1] 118/22
clip [17] 20/13 20/18 20/22 22/12 22/18 23/2 24/5 24/12 27/2 27/14 27/21 28/8 28/17 30/4 31/4 32/11 76/2
clips [1] 19/24
close [2] 95/11 132/14
closer [1] 46/9
closest [1] 96/3
cnaltsas [1] 11/16
Code [10] 73/13 74/12 74/13 74/14 75/10 75/11 76/2 134/18 136/1 146/3
Code 3 [9] 73/13 74/12 74/13 74/14 75/10 75/11 76/2 134/18 136/1
codes [1] 120/3
collect [1] 111/1
COLLINS [4] 12/3 12/3 12/7 12/7
come [22] 15/3 18/16 22/22 34/15 38/1 46/21 47/1 47/15 48/14 69/24 70/5 71/6 76/1 86/4 90/18 95/5 95/20 109/11 109/22 110/22 110/25 136/7
comes [1] 28/6
coming [7] 27/7 29/11 43/21 69/10 70/15 74/16 109/22
command [3] 113/15 114/3 115/6
commander [2] 113/11 113/13
commands [11] 119/17

**C**

commands... [10] 120/13 122/24 123/6 136/8 139/11 139/13 139/18 141/23 142/18 143/10
comment [1] 45/19
community [1] 16/5
compare [1] 116/19
complaints [2] 115/4 117/10
complete [2] 57/22 121/11
completeness [2] 57/21 57/25
compliance [4] 115/8 120/12 129/6 136/5
complicated [1] 142/24
complies [3] 41/4 41/12 53/11
comply [2] 131/13 142/18
complying [1] 93/23
compound [3] 75/17 75/18 94/8
computer [2] 117/7 130/25
computer-aided [1] 117/7
concept [1] 118/15
concern [4] 129/9 129/25 133/17 134/18
concerning [6] 20/9 60/21 108/17 125/10 125/24 144/21
concerns [6] 118/11 119/6 125/14 126/9 128/25 129/19
conclude [1] 95/9
concluded [1] 112/14
conditions [1] 130/11
conduct [2] 114/20 135/22
Conference [1] 146/7
confirmed [2] 132/2 144/8
conformance [1] 146/6
confrontation [1] 118/18
confrontational [1] 142/16
confronted [3] 119/24 121/23 122/9
connect [1] 22/7
connected [5] 41/23 42/18 69/20 73/1 73/4
connecting [4] 38/19 40/2 70/1 70/8
connection [1] 23/22
considered [2] 78/16 79/3
consist [1] 114/23
consistent [5] 123/22 124/4 136/2 136/17 143/14
consulting [1] 111/22
contact [22] 17/21 30/6 32/21 32/21 33/1 33/5 33/9 119/11 120/5 123/17 123/23 124/18 124/23 127/13 127/21 128/13 133/2 133/11 134/15 134/15 136/2

137/23
contained [2] 118/8 120/23
contention [1] 144/8
context [3] 64/18 132/19 134/12
continue [14] 16/20 17/3 41/10 56/19 66/3 66/8 85/19 89/2 100/6 102/2 103/13 104/14 109/5 128/10
continued [3] 89/19 126/19 135/1
continuing [2] 85/18 89/4
Continuously [2] 29/19 136/23
contract [2] 113/14 113/17
contradictory [1] 64/21
control [20] 93/17 119/21 120/1 120/15 120/21 121/1 122/25 123/5 124/18 124/18 124/22 129/5 129/6 136/4 136/10 137/5 138/4 143/2 143/5 143/12
controlled [1] 137/8
conversation [6] 17/20 23/25 32/13 32/18 43/8 68/9
conversations [1] 46/14
conviction [1] 131/10
cooperate [1] 119/16
cooperating [1] 123/2
cooperation [2] 123/1 139/10
cooperative [3] 128/15 130/11 137/24
copies [1] 84/14
cops [1] 132/7
copy [1] 84/15
corporal [2] 113/3 115/2
correct [47] 17/19 22/6 25/2 27/13 28/22 29/4 29/6 29/16 34/6 35/14 35/17 35/25 36/3 37/18 41/21 44/1 44/12 45/6 47/13 47/22 48/1 48/21 49/11 51/6 55/1 63/1 63/2 65/21 66/16 67/20 69/5 72/1 72/23 78/4 78/13 81/1 90/18 94/7 95/8 108/21 116/12 127/10 134/2 135/19 143/24 144/5 146/4
corrections [3] 113/1 113/6 113/22
correctly [1] 139/20
could [26] 16/22 17/15 18/10 25/3 25/14 33/9 33/18 33/18 46/5 46/18 48/7 58/5 58/9 82/19 87/21 88/14 88/18 88/18 103/12 130/23 135/16 137/3 137/22 138/13 141/2 142/4
couldn't [3] 26/17 68/25 87/19
counsel [74] 11/1 12/1 15/20 20/11 29/21 31/18 34/8 34/16 34/21

35/2 35/3 36/25 40/23 53/1 53/20 54/2 54/12 54/15 54/15 54/17 56/13 56/14 56/17 56/20 56/24 57/16 57/16 57/22 57/25 59/11 60/15 61/24 62/6 62/10 62/13 62/18 64/1 64/12 64/12 64/15 65/2 65/5 65/6 66/3 66/20 75/18 77/16 81/15 82/8 82/13 85/9 85/11 85/14 86/14 86/19 89/2 91/7 94/24 95/14 99/10 108/3 108/8 108/15 109/3 109/23 110/4 110/8 110/24 126/3 128/10 140/25 144/15 144/25 145/1
COUNTRY [2] 11/9 11/18
COUNTY [8] 10/9 11/7 12/15 12/16 96/15 114/11 114/13 116/3
couple [1] 109/9
course [8] 112/24 119/16 121/3 123/2 123/22 123/25 134/18 139/12
court [22] 10/1 10/21 10/21 14/5 15/25 33/2 34/24 43/5 49/5 50/3 65/3 68/20 74/17 79/5 80/14 93/2 97/11 102/17 110/6 113/22 130/13 133/8
Court's [1] 40/9
courtesy [1] 84/24
courtroom [5] 34/17 34/23 111/24 112/5 144/22
CourtSmart [2] 14/3 145/3
credibility [6] 127/15 127/16 140/2 140/6 140/20 141/3
credible [1] 140/13
crime [6] 113/22 119/14 124/24 125/1 130/13 137/4
criminal [2] 113/5 130/25
cross [10] 13/3 13/6 34/13 34/15 35/3 35/6 51/4 106/10 106/11 143/18
cross-examination [6] 34/13 34/15 35/3 35/6 106/10 106/11
CSR [1] 10/20
cswiss [1] 12/10
cuffs [1] 138/24
currently [6] 21/24 22/2 96/15 111/13 111/19 111/22
custody [1] 130/17

**D**

dark [2] 51/2 99/1
dash [1] 105/22
database [1] 130/25
date [2] 112/19 146/9
DAVID [1] 10/4

day [8] 10/8 39/11 48/19 50/10 53/19 106/3 114/5 114/5
days [2] 49/14 49/15
ddparker.com [1] 10/24
de [8] 122/18 122/21 123/1 123/7 123/7 123/9 123/11 128/6
de-escalate [2] 123/7 123/9
de-escalation [6] 122/18 122/21 123/1 123/7 123/11 128/6
deadly [1] 121/4
dealing [1] 129/9
death [1] 129/23
Deb [1] 83/7
debate [2] 142/16 142/20
DEBORAH [3] 10/20 146/12 146/12
decide [3] 62/11 127/16 140/5
decision [1] 143/4
defend [2] 122/12 122/12
defendant [4] 12/2 12/15 12/16 97/6
defendants [4] 10/10 11/7 12/17 112/9
DEFENDANTS' [3] 13/6 14/7 110/18
defense [5] 77/16 95/1 108/14 110/13 112/11
definitely [5] 33/20 70/7 70/20 88/22 88/23
definitive [1] 46/17
delay [2] 109/2 142/24
demeanor [4] 127/12 128/4 128/12 128/23
demonstrating [1] 124/16
denied [1] 144/4
denying [1] 115/20
department [11] 16/3 96/16 112/23 112/25 113/25 114/4 114/9 114/10 114/13 114/20 116/3
depending [6] 114/24 119/10 121/25 122/22 123/3 130/12
depends [2] 119/16 130/20
deploy [1] 30/20
deployed [8] 30/24 80/1 80/7 80/25 81/4 83/14 83/18 87/12
deploying [1] 27/25
deposition [36] 35/12 35/21 38/8 42/14 51/7 52/14 52/14 52/23 53/14 55/23 56/2 60/19 60/23 61/4 61/6 61/10 63/25 64/8 67/7 67/20 76/13 81/2 83/5 83/12 86/9 86/10 89/12 89/20 93/6 93/10 93/12 117/11 117/13 117/16 117/19 127/25
deputies [38] 16/18 17/3 17/17 17/21 18/4 18/11 21/11 29/9 29/14

30/4 30/17 31/2 47/24 60/8 67/20 77/6 77/11 93/17 106/25 107/9 116/7 117/16 123/17 123/20 124/6 126/20 130/3 130/23 132/4 132/9 132/20 133/18 135/18 137/16 138/9 138/12 142/1 144/11
deputy [43] 12/15 12/16 14/14 14/17 28/6 30/14 31/5 32/14 32/16 43/9 45/2 68/9 71/24 77/20 95/2 95/3 95/4 95/7 97/6 98/7 98/16 98/17 101/19 102/24 105/2 106/3 106/13 108/6 113/1 113/21 113/21 114/7 115/4 127/12 127/21 128/21 130/24 131/2 143/1 143/22 143/24 144/3 144/9
Deputy Brown [5] 95/2 95/3 95/4 95/7 108/6
Deputy Chad Renegar [3] 97/6 101/19 106/3
Deputy Gonzales [1] 105/2
Deputy Pahel [2] 43/9 71/24
Deputy Pahel's [3] 31/5 98/7 98/17
Deputy Renegar [10] 77/20 102/24 127/21 130/24 131/2 143/1 143/22 143/24 144/3 144/9
Deputy Renegar's [3] 28/6 98/16 127/12
deputy's [1] 135/22
describe [8] 17/2 28/23 33/8 33/15 33/18 127/12 128/12 128/19
described [1] 16/10
designated [1] 57/17
desk [1] 84/13
destroy [2] 107/21 107/23
detain [3] 119/13 123/24 138/23
detaining [1] 137/8
determination [5] 115/9 115/17 116/19 140/14 141/3
determine [8] 67/8 116/11 124/3 124/24 128/4 128/7 129/6 141/8
determining [1] 66/23
developing [1] 117/2
devices [1] 120/25
did [179]
didn't [37] 33/20 47/1 47/14 48/14 50/13 54/25 55/25 58/25 63/16 65/14 67/23 68/14 68/17 69/24 69/25 70/5 70/23 71/6 72/3 72/6 77/12 78/7 80/25 82/6 83/17 83/22 89/23 90/2 90/7 90/23 91/9 93/20 94/4 94/5 94/12 94/13 140/21

6-RenSER-01158 6-RenSER-01158

**D**

difference [1] 57/1
differences [1] 142/21
different [5] 56/17 109/13 114/24 114/25 120/6
difficult [2] 17/22 29/10
direct [12] 13/3 13/6 14/8 27/6 27/10 96/10 96/11 111/9 111/11 119/20 120/17 120/18
directed [2] 18/15 62/14
directing [4] 62/16 119/22 139/7 143/13
direction [51] 16/19 17/5 17/8 27/11 29/11 29/14 29/23 29/24 40/5 48/2 48/15 57/4 57/5 57/5 58/7 58/8 58/10 61/12 61/19 61/21 62/2 62/5 63/9 63/10 63/11 63/15 63/16 63/20 64/19 65/1 65/14 65/22 66/11 66/15 67/11 67/12 67/13 67/18 67/21 68/12 68/15 69/12 69/15 69/16 77/22 78/9 92/20 119/17 120/12 122/24 142/19
directions [2] 67/3 67/5
directly [5] 68/14 114/3 114/6 114/8 117/9
dirt [1] 19/3
disadvantaged [1] 84/17
discipline [3] 114/6 115/12 115/21
discuss [2] 142/3 144/20
discussed [2] 62/22 139/1
dispatch [26] 22/24 23/11 24/12 24/20 26/2 27/22 28/2 30/19 37/11 37/20 37/24 38/1 39/14 41/18 42/6 42/9 47/5 77/8 117/8 124/5 126/19 127/1 127/7 127/20 133/19 133/24
dispatched [4] 96/21 132/5 132/9 135/7
dispatcher [13] 19/19 19/21 21/4 22/18 26/7 59/23 60/1 70/9 71/4 74/7 75/23 79/25 127/5
displayed [7] 16/24 28/13 31/13 39/5 50/19 66/2 91/17
distribute [1] 20/2
distributed [1] 31/7
DISTRICT [3] 10/1 10/2 10/21
disturbance [9] 20/23 21/6 21/9 21/12 21/19 24/2 29/15 36/14 65/20
DIVISION [1] 10/3
do [130] 14/21 15/5 16/5 17/10 18/4 18/23 19/9 19/11 19/16 20/1 20/15 22/14 22/25 23/21 24/19 26/15 28/1 30/11 30/16 30/21

30/23 34/8 34/12 36/12 37/6 39/9 39/24 39/24 40/6 40/15 43/10 44/17 44/18 50/22 51/7 51/11 52/17 61/7 61/13 67/5 74/4 74/12 76/8 76/9 76/12 78/23 81/2 81/5 81/6 83/4 83/11 83/15 87/4 88/12 91/12 91/17 91/23 91/25 92/4 92/4 92/17 92/24 93/25 95/25 96/23 97/5 97/7 97/10 97/16 97/18 97/24 98/5 98/10 98/21 98/21 99/23 101/14 101/19 104/4 104/22 106/15 106/17 106/18 106/20 106/21 106/23 110/2 110/19 111/15 111/15 111/21 111/21 111/24 116/1 116/25 122/14 123/4 124/10 124/21 125/18 125/20 125/21 127/3 129/2 129/21 130/5 130/9 130/12 130/17 131/15 132/13 133/5 134/11 135/9 136/8 136/9 136/10 137/8 137/12 137/13 138/7 138/8 138/19 138/25 139/6 139/16 139/18 141/21 142/4 143/8
DOC [1] 10/8
document [1] 131/12
documents [3] 35/19 116/17 117/6
does [12] 17/17 44/24 53/12 63/6 75/12 91/22 91/24 118/11 118/13 118/14 129/9 131/7
doesn't [2] 82/11 84/8
doing [4] 28/3 28/4 101/15 112/2
domestic [21] 14/24 17/11 20/23 21/5 21/12 21/19 23/15 35/24 36/13 124/1 124/3 124/7 124/8 124/11 124/13 124/25 125/6 125/14 126/9 129/3 132/21
domestic violence [1] 132/21
don't [53] 24/24 32/4 37/6 37/9 39/18 39/21 39/25 40/4 40/17 43/2 45/17 46/11 52/21 56/1 57/12 58/15 59/18 60/12 64/1 74/1 75/15 75/22 76/2 76/25 77/14 79/18 84/17 85/1 87/14 87/19 88/2 88/24 90/9 91/13 91/25 93/9 94/3 98/5 98/6 100/5 100/12 101/10 101/16 101/18 102/13 102/16 102/21 103/12 109/9 109/21 110/24 118/22 144/20
door [1] 95/20
doors [2] 95/19 109/22
double [1] 95/19
doubt [1] 76/9

down [18] 18/13 18/14 19/3 21/25 25/17 53/8 54/13 85/15 85/19 88/17 90/3 93/7 108/6 111/16 119/19 132/6 132/24 140/21
DRIVE [1] 12/4
driveway [2] 48/14 51/23
due [1] 71/14
during [12] 24/2 48/19 67/7 71/16 94/13 108/14 109/18 114/19 127/13 128/13 129/11 130/2
DV [15] 37/7 37/14 37/21 38/2 38/4 47/21 48/11 69/19 70/2 70/10 70/11 70/14 71/12 71/17 71/17

**E**

each [5] 15/1 88/16 99/10 108/17 110/25
earlier [12] 16/10 28/7 49/4 49/8 50/10 81/2 83/4 83/12 84/11 87/8 94/5 143/9
early [3] 88/7 89/6 132/15
easier [1] 139/11
easy [1] 99/17
effect [2] 20/22 32/20
effective [1] 143/11
either [3] 22/21 35/21 109/15
elbow [1] 120/17
elect [1] 130/19
elected [1] 114/4
electronic [1] 120/25
else [4] 19/11 88/12 120/1 122/12
emotional [1] 126/15
emotions [3] 124/14 124/15 125/20
employed [2] 111/13 111/19
employee [1] 113/19
employment [1] 114/5
encounter [6] 127/10 129/12 130/3 132/20 135/6 139/11
encountered [1] 30/17
encountering [1] 18/11
encounters [1] 123/13
end [1] 143/13
ending [1] 92/7
enforcement [27] 34/5 73/22 74/1 74/4 111/25 112/14 112/14 112/22 113/8 113/9 114/19 116/21 118/12 120/7 121/6 121/14 122/17 122/18 126/24 130/7 134/4 136/3 138/15 139/3 141/12 142/2 143/4
engage [1] 121/24
enough [3] 135/5 141/6 141/13
ensure [6] 115/7 115/8 119/15 136/6 138/20 142/21

entered [1] 128/2
enters [1] 34/23
entire [5] 23/25 64/18 85/6 114/4 115/19
entirety [1] 19/25
entitled [3] 125/13 126/8 146/5
entrance [1] 96/3
environment [2] 119/3 136/14
escalate [9] 122/2 123/3 123/5 123/7 123/9 123/9 135/2 139/12 143/14
escalated [3] 133/13 134/17 137/22
escalates [1] 129/7
escalating [1] 143/11
escalation [8] 122/18 122/21 123/1 123/7 123/11 128/5 128/6 136/3
establish [6] 62/8 120/21 122/24 124/18 129/5 136/4
established [5] 47/20 48/23 65/23 71/3 72/24
estimate [6] 18/7 112/3 112/6 112/10 112/20 141/10
et [6] 10/9 11/7 58/10 66/19 85/5 108/14
et cetera [3] 58/10 85/5 108/14
even [12] 33/5 49/8 50/13 55/2 55/19 77/4 90/6 108/18 123/4 123/8 135/11 138/17
evening [2] 76/20 76/22
event [17] 39/19 40/1 49/21 49/22 49/22 50/2 50/6 50/7 50/8 50/9 50/12 50/17 58/23 68/16 68/24 77/6 98/5
Eventually [1] 73/20
ever [16] 25/17 36/10 37/3 53/22 59/3 59/6 59/14 59/23 66/15 98/2 101/9 112/13 116/6 125/15 126/9 144/4
everybody's [1] 119/1
Everyone [1] 44/11
everything [6] 26/8 71/10 77/15 90/12 90/14 90/16
evidence [6] 20/7 20/9 91/7 95/12 108/20 142/6
evidentiary [1] 117/3
exact [1] 69/1
exactly [10] 45/9 47/6 58/16 63/14 69/9 69/11 69/11 98/8 102/16 102/21
examination [11] 14/8 34/13 34/15 35/3 35/6 96/10 96/11 106/10 106/11 111/9 111/11
examine [2] 51/8 57/25
example [5] 55/6 65/15 122/3 122/6 123/5
excerpt [1] 28/6
excessive [4] 116/8

128/6 128/8 143/25
exchange [1] 77/11
exchanged [1] 71/14
Excuse [1] 63/23
excused [1] 94/23
exhibit [16] 16/23 16/24 19/24 28/7 28/13 31/5 31/13 39/2 39/5 39/7 50/19 66/2 66/4 91/16 91/17 105/21
Exhibit 102-2 [1] 28/7
Exhibit 102-4 [1] 31/5
Exhibit 228-B [1] 19/24
Exhibit 38 [1] 91/16
Exhibit 76 [1] 16/23
exhibits [3] 48/23 108/22 110/24
exits [2] 34/17 144/22
expand [1] 65/4
expectations [1] 115/8
experience [4] 73/16 74/21 79/9 130/10
experienced [1] 49/13
expert [12] 95/7 109/7 112/4 112/7 112/22 116/10 118/6 127/16 131/21 136/24 137/14 140/4
explain [5] 15/10 15/14 15/22 120/9 142/12
explained [1] 122/7
explaining [1] 27/23
explore [1] 16/4
Explorer [13] 14/22 15/10 15/15 15/17 15/22 15/24 16/2 49/21 66/23 73/14 73/16 74/21 78/14
exposure [1] 74/4
express [1] 144/21
expression [1] 118/11
extraneous [1] 110/24
extrapolate [1] 140/22

**F**

F-O-N-Z-I [1] 111/8
face [6] 96/4 111/5 143/22 143/25 144/5 144/9
facility [2] 113/9 113/20
fact [7] 36/12 103/4 115/22 124/3 124/24 129/7 138/5
facts [2] 91/7 142/6
faded [1] 19/4
Fairly [1] 87/1
fall [5] 31/16 82/18 83/22 87/18 88/20
false [7] 59/17 60/2 92/19 92/20 93/1 93/18 94/2
familiar [3] 116/20 116/24 136/17
family [1] 73/21
far [6] 62/2 85/16 88/8 88/11 89/7 101/5
Farahmand [1] 12/14
FBI [1] 113/10
fear [1] 47/2
federal [1] 113/10
feel [2] 14/18 28/1
feet [3] 28/25 101/8 101/9

**F**

fell [1]  88/24
felony [4]  131/3 131/7 131/9 131/9
female [5]  45/3 45/4 71/20 71/25 130/23
few [6]  18/14 43/13 77/16 115/24 117/6 124/23
field [3]  113/4 115/1 119/7
Fight [1]  18/16
fighting [3]  14/25 23/18 23/23
figure [1]  124/21
figured [1]  15/3
find [4]  18/19 22/5 22/9 116/6
finish [2]  53/10 81/18
fire [2]  100/12 100/16
firearm [1]  122/9
firm [1]  111/22
first [42]  20/13 21/13 22/8 31/11 32/2 32/3 36/10 36/13 37/3 37/7 40/13 47/21 48/16 48/17 51/1 51/8 61/15 62/23 65/5 70/16 99/8 101/23 102/8 111/7 123/16 125/5 127/9 127/13 127/15 128/13 129/11 130/2 131/9 133/6 133/10 133/16 135/6 135/10 137/17 137/23 138/4 140/17
fist [1]  33/10
five [2]  87/7 97/9
flash [1]  105/10
flashlights [1]  100/10
flee [1]  139/8
focus [1]  118/10
folks [1]  144/17
follow [2]  102/25 130/16
followed [1]  78/9
following [6]  14/5 34/19 34/24 110/6 139/13 144/23
follows [1]  139/10
Fonzi [3]  110/14 110/18 111/8
foot [2]  27/4 27/5
force [32]  78/24 81/9 90/19 111/25 114/21 115/4 116/1 116/8 119/6 119/25 120/4 120/6 120/12 120/19 120/21 120/23 121/2 121/4 121/7 121/15 121/24 122/8 123/4 125/5 128/7 128/8 135/19 135/21 136/16 137/14 143/9 144/1
forceful [1]  33/16
foregoing [1]  146/3
form [8]  27/23 116/22 118/3 123/16 123/19 135/21 135/25 144/20
format [1]  146/6
formulate [1]  117/23
forward [2]  105/10 110/22
forwarded [1]  115/13

found [1]  131/2
foundation [1]  107/3
foundational [1]  141/2
four [2]  73/17 87/7
FOURTH [3]  10/22 131/12 131/18
Fourth Amendment [2]  131/12 131/18
FRANK [1]  11/8
frankly [1]  36/23
fraud [1]  130/4
fresh [1]  89/16
Friday [3]  49/16 49/16 49/19
friends [2]  73/21 74/1
front [8]  40/15 44/17 52/6 78/11 82/6 82/14 84/8 102/6
Fuck [1]  18/17
fucking [1]  76/7
full [2]  96/5 111/6
further [3]  34/7 108/1 145/3
future [1]  16/5

**G**

gain [4]  120/12 120/21 129/6 136/5
gathered [1]  117/3
gave [8]  48/2 64/25 65/13 65/22 67/18 68/12 69/16 142/17
general [5]  24/17 63/12 65/23 92/20 132/15
generalized [1]  125/25
generally [3]  28/23 114/23 122/22
generated [1]  117/6
gentleman [2]  20/23 21/18
gentlemen [4]  64/20 86/23 109/11 144/16
gesture [1]  68/22
gestures [1]  120/16
gesturing [1]  33/5
get [30]  15/1 34/15 47/15 58/1 65/8 87/25 93/18 98/21 107/14 109/8 109/10 109/11 118/10 123/12 136/9 138/10 139/2 139/9 139/16 139/18 139/25 140/21 141/6 141/9 141/13 142/18 142/23 143/1 143/5 143/16
getting [2]  18/17 132/22
girl [32]  19/15 26/3 26/7 26/12 26/18 26/19 26/19 42/13 42/15 42/18 43/1 43/25 46/17 72/21 72/25 75/15 75/16 75/21 76/3 76/6 76/10 77/12 133/24 134/6 134/24 136/21 137/2 137/10 137/17 138/4 141/25 142/5
girlfriend [9]  18/13 19/16 23/18 23/24 26/8 75/24 76/11 76/12 76/15
give [10]  16/19 20/3 65/14 68/25 76/21 77/1 120/10 122/3 122/6

136/7
given [7]  54/5 139/19 139/24 141/6 141/8 141/25 142/19
giving [2]  47/6 123/6
GLENDALE [1]  11/5
gmail.com [1]  11/6
go [32]  16/19 17/3 17/7 27/8 30/12 35/15 40/11 44/4 47/18 50/17 51/15 51/20 56/15 64/17 67/24 71/8 71/17 77/20 77/20 78/3 85/24 87/18 88/1 88/23 90/9 104/11 105/21 107/13 115/10 126/17 138/20 144/18
goes [7]  54/6 54/8 54/9 75/1 79/14 127/15 140/1
going [67]  14/23 17/11 18/18 19/3 22/4 22/9 30/12 31/15 32/1 36/22 38/15 38/18 38/23 39/15 40/12 40/19 41/19 41/20 45/7 45/24 46/2 58/6 59/16 61/9 62/13 64/2 64/21 65/4 66/18 68/8 82/17 84/6 84/19 85/3 85/4 85/19 85/20 86/4 86/25 90/8 91/25 95/1 95/13 100/15 102/25 105/3 105/10 108/19 109/8 110/2 110/17 111/16 122/2 122/10 125/11 126/3 126/4 132/6 132/10 132/24 133/2 133/20 134/21 141/1 141/3 142/15 142/17
GOMEZ [11]  14/7 14/11 20/18 24/12 26/2 27/2 27/21 28/17 32/11 34/22 45/4
gone [2]  50/24 142/14
Gonzales [2]  102/6 105/2
good [11]  35/8 35/9 58/8 66/23 96/13 96/14 106/13 106/14 109/4 144/12 144/14
got [9]  32/7 33/22 64/4 66/13 78/7 86/10 93/11 134/24 138/3
Gotts [2]  12/15 116/11
grab [5]  87/9 87/10 89/1 98/8 102/24
grabbed [1]  98/22
grabbing [1]  99/18
gradually [1]  121/15
great [2]  73/7 122/6
ground [44]  58/9 83/21 83/23 85/24 87/13 87/15 87/16 87/19 87/25 88/19 88/20 88/24 88/25 90/4 90/6 90/7 90/11 92/22 93/7 93/14 93/23 94/6 94/14 100/9 100/12 136/9 138/10 138/13 139/2 139/7 139/9 139/14 139/16 139/19 139/25 140/21 141/6 141/9 141/14 142/18 143/1

143/6 143/13 143/17
guess [3]  28/3 58/11 73/3
guessing [1]  73/3
guy [2]  26/11 26/15

**H**

had [43]  14/5 21/5 21/10 21/23 23/22 26/8 27/5 34/19 34/22 34/24 39/11 42/2 48/18 49/21 50/8 50/9 50/24 58/8 77/11 82/14 82/17 98/2 103/2 106/22 110/6 113/22 113/24 114/7 115/11 117/3 117/25 123/17 129/15 131/18 133/6 133/11 133/11 135/5 135/10 135/12 138/2 143/10 144/23
hair [1]  134/25
half [2]  18/7 113/24
hallway [1]  95/4
hand [5]  40/19 95/23 110/15 120/15 120/17
handcuff [2]  138/13 143/2
handcuffed [2]  90/17 93/24
handcuffs [3]  93/18 106/22 138/16
handle [1]  124/2
hands [10]  118/11 118/17 118/19 118/20 118/23 118/24 118/25 135/23 142/19 143/12
hands-on [1]  135/23
happened [13]  15/2 17/13 18/12 19/2 21/23 30/3 30/4 30/23 49/16 69/6 69/7 90/7 94/6
happening [4]  27/3 50/8 71/10 106/18
happens [2]  103/20 104/8
harm [1]  118/20
harmed [1]  134/19
HARRELL [1]  11/8
has [22]  19/25 31/6 32/2 39/3 77/17 84/23 122/13 125/22 127/5 129/7 131/11 134/17 134/19 134/19 134/20 134/22 135/1 136/11 137/3 137/10 137/21 138/5
have [116]  15/15 20/1 20/8 31/10 32/3 35/18 36/10 36/12 37/3 37/6 37/6 39/3 39/7 40/15 43/17 44/17 45/8 47/24 51/9 51/9 52/10 59/19 64/2 64/21 68/25 69/8 73/21 73/25 74/1 74/4 76/6 76/7 78/17 78/23 79/18 80/18 81/7 82/6 84/4 84/8 84/9 85/5 86/4 94/16 95/7 95/7 95/15 96/18 96/25 97/2 97/8 97/24 98/5 105/2 106/9 109/7 109/21 110/25 111/4 111/22 112/2 112/4 112/13

112/16 112/17 112/18 112/19 114/25 115/21 116/1 118/12 118/16 118/25 119/12 119/13 119/22 120/18 120/20 120/24 121/3 121/6 121/14 122/4 122/7 122/14 122/25 123/3 124/19 124/22 125/14 125/20 125/21 126/8 128/23 130/6 130/11 130/14 130/21 131/24 133/1 134/7 134/9 134/24 135/16 136/13 137/2 137/8 137/16 139/12 139/21 142/14 142/17 143/11 144/10 144/18 144/25
haven't [3]  35/21 58/5 70/16
having [4]  46/14 139/9 139/13 142/24
he [85]  15/2 18/17 18/21 23/14 23/16 23/17 23/17 23/22 23/23 24/1 24/1 24/2 24/21 26/18 33/22 38/20 41/20 41/22 41/23 42/9 47/14 55/20 56/6 56/13 57/2 57/6 57/14 57/14 58/6 59/6 61/17 61/19 69/18 70/1 70/14 71/12 76/7 77/20 77/20 77/21 77/21 77/22 79/22 82/9 83/17 83/22 83/22 83/23 83/25 84/19 84/23 87/12 87/25 88/4 88/24 88/25 90/3 90/17 92/14 92/21 92/21 93/7 93/22 93/24 97/15 97/17 97/18 127/23 127/23 129/15 130/3 131/17 131/18 135/10 135/11 135/11 135/11 138/2 138/4 138/5 139/16 139/17 140/6 140/21 141/6
he'd [1]  60/15
he's [21]  15/13 22/4 22/4 24/13 39/15 59/3 59/9 59/11 59/23 77/19 79/23 84/6 107/4 109/22 109/23 125/5 128/2 137/14 137/25 138/7 143/20
head [1]  48/6
hear [36]  14/11 17/15 17/20 17/22 18/10 19/16 20/7 20/10 20/18 20/25 22/22 23/19 26/5 26/13 28/17 29/10 30/8 30/14 32/11 32/21 32/22 33/18 37/25 45/23 46/9 59/14 60/10 70/25 72/3 75/15 75/21 75/22 76/2 76/17 88/14 128/16
heard [64]  14/12 17/8 18/10 19/14 21/11 21/17 22/3 23/13 23/24 24/17 24/25 25/19 26/4 26/10 27/24 29/15

**H**

heard... [48] 30/19 32/20 33/19 35/24 36/5 36/10 37/3 37/7 37/11 37/13 37/16 38/1 38/5 38/15 42/18 43/8 43/19 45/2 47/21 48/3 59/21 60/10 65/20 69/9 69/20 70/16 71/16 71/18 72/9 72/10 72/20 73/13 76/1 77/12 77/16 77/18 77/25 78/12 79/25 80/3 88/9 93/10 108/13 108/16 109/16 109/16 109/17 128/5

hearing [14] 26/9 32/25 33/4 34/1 46/22 47/8 69/9 70/5 71/5 71/10 75/10 90/12 90/14 90/16

held [4] 113/18 115/10 115/23 146/5

help [7] 53/12 83/7 84/21 84/23 95/6 138/5 142/4

helps [1] 119/3

her [10] 26/9 33/23 33/24 38/5 42/16 65/4 71/23 72/9 73/8 76/21

here [21] 17/25 26/20 44/2 49/4 49/8 62/8 64/1 65/15 79/3 84/9 84/13 86/5 89/21 89/21 96/2 97/2 97/6 110/23 125/24 128/9 140/6

here's [2] 57/1 58/4

hereby [1] 146/2

Hey [1] 88/10

hidden [1] 135/17

hierarchy [1] 125/11

high [4] 120/11 122/8 124/14 124/14

higher [1] 121/2

highest [2] 121/3 134/3

highlight [1] 86/1

highlights [1] 85/4

highly [1] 125/4

him [77] 20/24 20/24 21/6 21/7 21/20 21/21 22/10 23/15 25/19 37/20 38/1 40/19 57/3 58/5 61/15 61/16 70/15 70/24 71/12 82/9 82/14 82/18 83/21 84/8 84/21 84/23 85/24 85/24 87/5 87/9 87/10 87/15 87/16 87/18 87/18 87/25 88/2 88/3 88/3 88/10 88/13 88/20 88/23 88/23 89/1 90/2 90/11 90/17 90/23 91/4 91/9 91/20 92/20 93/17 93/18 93/22 94/3 94/4 94/12 95/5 97/8 97/9 109/8 120/4 132/7 135/11 135/12 138/4 138/13 138/24 142/17 143/1 143/2 143/2 143/22 143/25 144/9

himself [1] 135/5

his [32] 15/3 23/18 23/23 38/23 41/22 41/23 42/4 42/7 42/7

56/22 58/7 61/16 75/1 76/20 79/14 82/12 83/23 84/1 88/25 89/23 91/14 92/21 93/16 102/25 128/19 130/25 131/18 138/24 143/17 143/17 143/21 143/23

hit [1] 71/23

hitting [3] 33/10 34/2 72/9

hold [3] 120/1 143/2 143/5

holding [2] 103/24 104/2

HOLLOWAY [48] 10/6 11/2 12/13 37/13 55/6 55/19 89/21 92/22 93/13 93/22 106/22 106/25 107/9 123/14 123/17 128/12 129/15 130/3 130/23 130/25 131/3 132/11 132/23 133/2 134/16 135/5 135/21 136/2 136/5 137/24 138/10 138/13 138/23 139/2 139/15 139/19 139/25 140/20 141/5 141/8 142/3 142/25 143/5 143/17 143/21 143/24 144/4 144/11

Holloway's [11] 107/13 107/21 107/23 128/16 128/23 129/13 130/24 131/17 135/18 142/1 144/8

home [2] 134/22 138/3

Honor [61] 15/12 16/13 19/23 21/14 23/4 24/6 26/22 27/17 28/10 29/18 31/9 31/15 31/19 32/8 33/11 34/11 35/5 36/21 48/23 54/6 56/6 56/21 57/13 57/20 57/20 61/20 61/25 62/11 64/3 64/11 64/18 75/2 82/11 83/24 84/15 85/17 86/3 86/9 86/20 89/9 94/21 94/25 95/8 107/1 108/2 108/5 108/7 108/10 108/23 108/24 109/4 109/7 111/10 121/12 125/3 127/14 131/20 136/22 140/2 140/16 144/13

HONORABLE [1] 10/4

host [1] 126/16

hour [2] 18/7 18/7

hours [1] 132/15

how [30] 18/4 21/4 32/4 32/4 33/18 33/18 49/14 50/24 58/5 73/16 74/12 78/7 80/7 80/25 87/4 96/18 97/8 101/5 112/2 112/4 112/19 114/12 116/1 122/14 126/15 127/12 128/12 128/19 139/18 141/8

however [2] 24/1 122/14

hundreds [3] 116/4 116/5 116/6

hurt [1] 141/25

hypothetical [2] 60/3 121/10

**I**

I'd [3] 31/4 56/22 88/22

I'll [9] 41/10 57/16 75/3 77/6 108/25 109/2 109/2 116/22 121/11

I'm [42] 18/1 21/3 26/20 31/24 32/1 32/1 32/18 36/22 40/11 42/1 45/21 54/2 57/4 59/12 61/3 61/9 62/7 64/20 64/21 65/4 66/18 69/3 70/3 73/8 73/8 85/19 85/20 86/4 86/25 104/1 107/4 116/19 116/23 125/11 126/4 131/1 136/17 141/1 142/15 142/17 143/19 143/23

I've [3] 85/16 86/10 126/13

idea [1] 73/7

identification [1] 57/8

identified [3] 56/14 57/6 61/17

identify [1] 57/2

II [1] 14/4

III [1] 10/8

illuminated [1] 100/9

image [1] 28/14

immediately [1] 136/5

impact [3] 128/24 134/5 134/9

impeaching [9] 54/17 56/25 62/9 62/15 63/25 85/2 85/6 85/15 85/22

impeachment [3] 54/11 64/1 86/2

imperative [3] 121/4 122/12 136/6

important [15] 28/1 124/1 124/8 124/10 124/17 124/17 124/18 124/23 127/8 129/5 135/15 136/6 138/6 138/8 138/25

impose [2] 115/11 115/21

improper [7] 38/10 52/18 61/14 63/24 64/8 125/4 140/22

inaccurate [2] 20/8 45/22

inadvertent [1] 119/2

incident [15] 31/1 32/14 49/16 55/20 106/24 107/5 117/7 124/7 125/10 125/25 126/2 126/21 135/19 140/19 140/20

including [2] 111/25 119/25

Incomplete [2] 60/3 121/10

inconsistent [2] 57/3 57/6

incorrect [3] 48/6 53/16 53/19

independent [1] 97/2

indicated [6] 120/16 129/15 131/17 135/11 135/11 141/24

indicates [1] 141/22

individual [6] 21/24 22/21 123/24 129/8 132/24 141/13

individuals [1] 124/13

industry [1] 116/23

informal [1] 130/3

information [23] 19/18 47/6 95/1 117/25 119/12 123/20 126/20 126/25 127/5 127/7 130/5 132/17 132/22 133/14 133/20 134/1 134/5 134/13 134/24 135/2 137/25 138/5 138/21

informing [1] 45/21

initial [5] 31/21 119/10 124/23 134/14 136/1

initially [5] 116/15 127/21 129/6 133/6 136/16

initiate [2] 123/22 124/17

initiated [1] 133/11

injured [10] 124/19 129/7 134/22 134/22 136/11 137/10 137/11 142/15 142/22 142/22

injuries [2] 126/14 136/13

injury [1] 129/23

inquiring [1] 119/19

inside [18] 29/7 29/8 42/20 43/22 47/7 48/3 48/11 52/1 67/17 68/18 70/5 72/21 75/25 78/3 78/5 78/10 80/17 105/3

instance [1] 126/7

instructed [1] 65/3

instructions [1] 80/12

insurance [1] 130/4

interaction [2] 122/23 127/21

interchanged [1] 42/23

interested [1] 74/23

internal [3] 113/2 114/6 115/25

invading [1] 42/9

investigate [5] 74/8 115/3 124/6 125/15 137/2

investigated [1] 133/11

investigating [3] 74/23 116/7 136/21

investigation [6] 16/10 16/20 17/4 115/10 137/9 138/6

investigations [3] 113/5 114/21 116/2

investigator [2] 113/2 115/25

invite [1] 56/14

inviting [1] 54/2

involved [33] 14/19 15/17 21/11 23/14 37/14 37/21 38/2 38/3 65/20 69/18 70/1 70/11 71/12 78/7 111/22 113/5 116/2 117/17 118/17 118/21 119/4 119/14 119/15 124/15 124/22 125/20 125/21

126/14 126/16 128/5 136/7 137/4 137/5

involving [2] 106/25 117/10

is [182]

isn't [16] 35/23 37/10 38/18 41/18 42/13 51/17 57/10 60/9 63/8 67/10 69/1 69/19 90/19 103/25 116/11 123/2

issue [4] 86/17 118/23 124/9 124/11

issued [1] 141/23

issues [3] 114/6 127/15 129/4

it [193]

it's [62] 16/3 16/6 19/24 31/5 33/9 33/11 35/16 40/22 45/23 53/20 54/25 56/21 56/24 58/17 60/15 62/9 63/14 66/14 75/18 77/19 83/8 83/25 85/5 85/20 97/9 99/17 103/24 104/1 108/10 117/8 118/15 118/21 118/22 119/10 119/11 119/24 120/4 120/18 121/4 122/13 122/14 124/10 124/11 124/12 124/22 125/1 125/25 129/5 130/20 134/3 134/13 134/21 135/1 136/4 136/8 136/22 137/21 138/20 140/17 140/22 142/20 144/16

items [2] 107/11 129/22

its [1] 19/25

IV [1] 145/4

**J**

jail [2] 113/13 113/20

Jameson [1] 12/15

January [2] 96/20 123/14

January 21 [2] 96/20 123/14

JEREMY [5] 10/6 11/2 12/13 88/19 89/21

Jeremy Holloway [1] 89/21

Join [1] 140/10

JOSHUA [2] 14/7 45/4

judge [2] 10/4 86/24

Judicial [1] 146/7

jumped [1] 88/2

jury [23] 14/6 20/1 20/6 26/4 28/23 32/2 34/17 34/20 34/23 34/25 35/1 45/22 62/11 62/13 96/5 110/7 110/9 111/5 112/21 128/7 140/14 144/22 144/24

just [98] 14/12 15/22 17/23 18/2 19/3 24/7 24/17 24/22 24/23 25/19 26/6 26/6 26/17 27/4 28/3 30/6 30/9 30/12 31/14 31/21 31/21 36/16 37/20 40/4 43/4 43/8 44/22 45/2 46/5 53/17 54/2 54/15 54/25 59/21 61/9 62/1

**J**

just... [62] 62/6 63/17 64/7 65/22 70/9 71/10 72/15 72/15 72/16 77/19 81/11 81/14 81/15 82/15 82/17 82/20 84/2 85/7 85/9 85/11 85/20 86/6 86/7 86/14 90/5 90/12 90/14 90/16 90/18 95/6 95/20 102/19 107/12 109/12 109/20 109/21 109/25 110/25 114/14 114/23 116/15 118/21 119/1 119/3 119/16 119/21 120/10 120/13 120/15 120/17 122/23 125/19 125/24 128/3 130/20 140/3 140/11 141/22 143/22 143/24 144/9 145/2

**K**

Karlen [4] 20/3 84/13 108/20 110/17
keep [3] 20/6 32/4 84/6
kept [1] 19/3
key [2] 17/23 17/24
kicking [2] 19/3 90/13
kill [1] 118/12
kind [4] 15/17 43/20 88/15 120/22
kinds [1] 129/4
knew [2] 69/9 89/14
knife [3] 135/6 135/11 135/12
knives [15] 97/19 97/22 98/8 98/22 99/3 101/20 102/14 102/24 103/4 103/10 104/18 107/14 129/12 129/16 135/14
knock [2] 47/14 88/19
knocked [1] 83/21
know [38] 19/9 23/14 23/15 24/24 28/20 32/4 40/17 49/14 51/9 58/12 58/15 58/24 58/25 59/18 67/19 73/13 76/6 76/13 81/6 81/18 82/19 85/1 88/2 88/24 89/23 90/23 92/6 97/6 98/6 99/23 99/25 103/4 106/21 110/25 135/10 136/15 137/12 137/22
knowing [4] 126/13 126/14 126/14 129/8
known [1] 140/19

**L**

lab [1] 113/22
lack [1] 128/7
lacks [1] 107/2
Ladies [4] 64/20 86/23 109/11 144/16
laid [1] 18/13
large [7] 51/18 103/24 104/1 108/13 109/16 109/17 113/20
larger [1] 98/14
last [3] 27/14 96/7 111/7
late [1] 95/15

later [12] 18/14 19/13 45/7 70/8 70/21 77/4 89/17 113/4 113/12 113/14 133/12 134/17
Laughter [1] 110/3
Lauren [2] 19/9 88/15
law [28] 11/3 34/5 73/22 74/1 74/4 111/25 112/14 112/14 112/22 113/8 113/9 114/19 116/21 118/12 120/7 121/6 121/14 122/17 122/18 126/24 130/7 134/4 136/3 138/15 139/3 141/12 142/2 143/4
law enforcement [25] 34/5 73/22 74/1 74/4 111/25 112/14 112/14 113/8 113/9 114/19 116/21 118/12 120/7 121/6 121/14 122/17 122/18 126/24 134/4 136/3 138/15 139/3 141/12 142/2 143/4
laying [1] 100/22
lead [1] 136/24
leading [7] 21/14 25/9 25/9 29/18 33/12 136/22 136/23
learn [2] 16/6 118/15
learned [3] 16/9 74/20 89/25
least [3] 85/15 139/21 139/22
leave [3] 28/14 72/6 87/21
led [1] 19/1
left [13] 17/13 18/13 24/16 58/17 60/9 63/12 68/17 69/21 70/25 71/25 95/20 96/3 130/24
less [4] 78/15 79/3 128/15 137/23
let [8] 57/7 62/11 75/3 81/18 85/11 92/6 109/12 109/12
let's [48] 28/14 34/14 35/15 39/2 40/11 43/3 44/4 44/10 45/12 47/18 47/19 48/22 50/17 50/20 51/8 51/14 52/8 52/23 53/25 54/12 55/23 56/4 58/1 63/18 65/24 66/1 66/22 67/1 67/24 68/4 71/16 71/17 91/14 92/14 98/7 99/7 99/8 100/6 100/15 100/19 101/11 102/2 103/13 103/20 104/8 105/21 118/10 123/12
lethal [3] 78/15 79/3 79/10
level [8] 120/19 121/2 121/3 121/7 121/15 121/24 124/14 126/15
levels [8] 120/6 120/11 120/20 122/2 122/8 143/9 143/10 143/12
lie [1] 94/4
lieu [1] 130/16
lieutenant [4] 113/12

113/13 115/6 115/6
life [2] 121/5 122/11
life-threatening [2] 121/5 122/11
lifeline [1] 127/4
light [1] 22/22
lights [5] 74/14 74/16 75/13 134/2 134/18
like [66] 15/15 16/6 18/2 18/8 19/15 19/16 19/23 20/1 20/13 22/12 23/2 24/22 24/25 25/20 26/6 26/6 26/6 26/18 28/5 28/8 30/6 30/12 31/4 31/11 32/21 32/21 32/25 33/4 33/10 43/15 43/19 43/19 43/21 44/21 56/2 56/19 56/22 57/15 58/11 58/16 60/13 60/15 74/8 82/12 82/24 83/21 83/24 84/1 87/6 88/2 88/15 88/16 88/16 88/20 90/16 91/23 92/2 109/5 110/10 110/13 116/15 120/16 122/3 134/21 138/3 143/18
like...12 [1] 45/5
limit [1] 126/7
line [39] 22/13 23/3 24/5 25/21 26/21 27/16 28/9 31/20 31/25 43/16 44/6 44/6 45/11 54/3 54/4 54/7 54/7 54/9 54/10 56/15 56/16 57/5 57/23 58/2 64/9 65/8 65/10 65/11 83/8 85/4 85/5 85/14 85/16 85/22 85/23 86/2 86/13 86/22 127/6
line 1 [1] 24/5
line 10 [1] 54/7
line 15 [3] 23/3 27/16 44/6
line 16 [2] 86/2 86/13
line 18 [1] 57/23
line 19 [1] 64/9
line 2 [4] 28/9 85/4 85/5 86/22
line 20 [1] 22/13
line 22 [2] 44/6 56/15
line 25 [1] 54/4
line 3 [2] 56/16 57/5
line 5 [3] 26/21 31/20 31/25
line 6 [4] 25/21 65/10 65/11 85/16
Line 8 [1] 85/23
lined [1] 51/23
lines [10] 32/19 44/20 54/5 64/4 64/11 64/16 86/2 86/16 86/18 86/19
lines 16 [1] 86/18
lines 19 [2] 64/4 64/16
lines 2 [1] 54/5
lines 20 [1] 86/2
lines 22 [1] 44/20
listed [1] 118/9
listen [2] 68/24 127/22
listened [1] 127/9
listening [4] 127/19 127/25 128/14 139/20
litigation [2] 12/17

111/23
little [37] 19/15 26/3 26/6 26/7 26/11 26/19 26/19 42/12 42/15 42/18 43/24 46/5 46/17 72/21 72/25 75/14 75/16 75/21 76/3 76/6 76/10 77/12 81/3 83/6 83/13 102/19 109/13 133/24 134/6 134/24 136/21 137/2 137/10 137/17 138/3 141/25 142/4
living [2] 111/15 111/21
LLP [2] 12/3 12/7
locate [2] 130/23 132/11
located [1] 50/18
location [9] 48/18 48/24 49/2 50/24 64/19 69/1 119/23 123/23 126/20
log [5] 51/9 52/7 100/13 100/16 101/6
logical [1] 103/12
logically [1] 103/9
long [6] 18/4 73/16 96/18 97/8 112/2 114/12
look [28] 16/22 32/1 40/20 43/3 43/16 44/10 45/12 47/19 48/6 52/23 54/3 55/23 56/4 56/8 56/14 58/16 60/22 61/9 62/14 63/18 65/24 66/22 67/1 85/17 90/9 91/23 92/14 137/2
looked [3] 19/15 48/19 83/21
looking [24] 17/2 18/21 21/25 25/5 26/9 26/21 28/20 29/2 29/2 32/19 41/24 42/6 43/12 48/18 52/1 61/23 62/25 67/6 68/5 68/18 86/8 107/12 132/7 136/21
looks [1] 56/2
LOS [1] 11/15
lot [7] 24/22 30/9 46/20 73/21 120/23 125/19 132/16
loud [1] 23/17
loudly [1] 76/1
low [5] 120/11 120/11 120/19 121/7 122/7
lower [3] 122/2 143/10 143/13
lunch [3] 144/13 144/19 145/1
lying [1] 94/10
LYNBERG [3] 11/9 11/13 11/18
lynberg.com [3] 11/11 11/16 11/20

**M**

ma'am [2] 43/2 71/7
machete [4] 100/4 100/4 129/12 135/13
made [13] 17/21 18/20 20/20 23/22 24/1 24/20 30/6 36/5 70/13 70/20 91/20 92/11 115/16
Mainly [1] 41/11

maintain [1] 119/3
majority [4] 112/10 113/7 122/23 130/14
make [23] 26/17 32/2 36/12 67/2 67/13 88/20 90/2 91/3 94/12 98/14 108/16 115/9 116/18 118/24 119/1 124/23 136/19 136/20 137/6 137/6 137/6 137/7 138/6
makes [2] 139/11 142/24
making [13] 33/6 37/19 38/2 38/9 42/17 42/19 46/20 49/12 55/8 55/21 71/3 72/25 108/20
male [12] 38/2 42/19 45/3 59/15 60/1 69/22 71/20 71/21 71/22 71/25 72/9 73/1
man [34] 14/19 19/11 36/1 37/14 37/14 37/21 38/3 38/15 38/18 38/19 38/23 39/15 39/20 40/2 40/3 41/19 41/23 42/6 47/9 57/10 58/20 69/25 70/9 70/10 71/8 71/12 72/9 73/4 78/8 81/4 81/25 83/14 89/22 90/20
many [8] 49/14 87/4 112/4 116/1 124/12 126/15 127/6 139/18
map [13] 16/23 17/2 47/19 58/17 65/24 65/24 66/1 66/22 67/1 67/3 67/6 67/8 67/13
material [17] 117/3 123/13 124/5 126/19 129/11 130/2 130/22 133/23 138/12 139/15 139/23 141/5 142/25 143/16 143/20 144/3 144/7
materials [5] 116/16 117/22 118/3 132/4 133/18
Matt [1] 96/6
matter [8] 112/17 117/11 118/1 118/6 123/12 124/12 144/20 146/5
MATTHEW [1] 95/24
may [41] 10/16 14/1 15/15 20/7 20/8 20/8 20/15 22/14 23/4 23/5 24/6 24/9 25/22 26/22 26/23 27/17 27/18 28/10 28/11 45/22 55/13 55/16 56/7 56/24 57/7 57/19 82/2 84/25 108/6 118/19 119/14 120/22 122/2 122/25 123/3 123/9 123/24 126/21 131/23 137/5 146/9
maybe [9] 45/4 45/14 46/8 52/24 55/23 81/7 84/13 95/10 101/8
me [30] 18/1 18/17 18/25 19/1 19/1 22/22 22/23 27/5 34/2 40/6

**M**

me... [20] 44/7 44/21 53/14 63/23 64/2 67/8 67/21 81/18 82/2 82/18 83/7 85/12 86/5 88/15 89/7 109/12 109/12 114/7 114/8 128/20

mean [14] 17/10 17/18 21/2 24/19 30/11 32/24 33/24 68/14 68/24 73/13 75/12 88/1 118/14 131/7

meaning [3] 39/17 80/1 118/12

means [5] 27/25 74/14 75/11 75/13 139/10

meant [4] 32/25 39/20 41/22 42/5

measure [5] 101/9 101/10 119/21 123/6 143/12

measures [2] 120/15 121/1

medical [3] 124/20 124/20 136/14

member [1] 78/22

memory [22] 35/19 41/8 41/16 44/10 44/24 46/15 52/24 55/24 56/22 60/18 62/21 62/22 63/6 81/22 82/12 82/16 84/1 89/7 89/16 91/22 92/3 98/23

mental [1] 130/21

mention [1] 115/24

mentioned [2] 114/9 143/9

mesh [1] 25/5

met [1] 35/10

mic [2] 97/24 98/2

MICHAEL [1] 12/3

microphone [1] 46/8

might [7] 14/18 45/8 47/24 76/6 76/7 108/18 139/21

military [1] 113/10

mind [12] 14/18 21/10 22/7 71/11 72/8 75/1 75/4 75/6 79/14 125/22 133/2 140/23

minds [1] 126/17

mindset [1] 129/8

minimizes [1] 139/8

minute [2] 28/15 86/7

minutes [14] 18/7 18/9 34/14 34/21 34/22 43/13 46/3 77/16 99/11 99/11 105/11 109/10 109/12 110/4

Misstates [3] 49/23 55/10 140/18

MKRTCHYAN [2] 11/3 11/3

moderate [4] 120/11 120/20 122/7 143/12

moment [35] 24/7 30/15 30/18 31/14 31/22 36/16 43/4 53/17 54/2 54/16 62/1 62/6 64/7 72/16 81/11 81/15 82/15 82/21 84/2 85/9 85/11 86/6 86/14

103/12 109/20 109/21 118/11 125/24 128/3 137/5 137/11 138/3 140/3 140/11 145/2

moments [3] 18/14 115/24 124/23

MONDAY [2] 10/16 14/1

more [11] 72/11 72/13 86/17 89/16 92/14 115/7 115/13 119/25 120/15 121/1 125/1

morning [12] 28/8 35/8 35/9 84/12 84/14 96/13 96/14 106/13 106/14 132/15 132/17 145/2

most [2] 124/17 130/11

motion [3] 45/19 108/24 109/2

move [4] 89/10 107/19 125/8 140/8

movement [3] 24/18 24/19 109/24

movements [2] 90/3 119/2

movie [1] 45/8

moving [1] 24/23

Mr. [66] 14/11 20/18 24/12 26/2 27/2 27/21 28/15 28/17 29/25 32/11 34/22 37/13 55/6 55/19 93/13 106/22 106/25 107/9 107/13 107/21 107/23 109/8 123/14 123/17 128/12 128/16 128/23 129/13 129/15 130/3 130/23 130/24 130/25 131/3 131/17 132/11 132/23 133/2 134/16 135/5 135/18 135/21 136/2 136/5 137/16 137/24 138/10 138/13 138/23 139/2 139/15 139/19 139/25 140/20 141/5 141/8 142/1 142/3 142/25 143/5 143/17 143/21 143/24 144/4 144/8 144/11

Mr. Clark [1] 137/16

Mr. Gomez [9] 14/11 20/18 24/12 26/2 27/2 27/21 28/17 32/11 34/22

Mr. Holloway [42] 37/13 55/6 55/19 93/13 106/22 106/25 107/9 123/14 123/17 128/12 129/15 130/3 130/23 130/25 131/3 132/11 132/23 133/2 134/16 135/5 135/21 136/2 136/5 137/24 138/10 138/13 138/23 139/2 139/15 139/19 139/25 140/20 141/5 141/8 142/3 142/25 143/5 143/17 143/21 143/24 144/4 144/11

Mr. Holloway's [11] 107/13 107/21 107/23 128/16 128/23 129/13 130/24 131/17 135/18

142/1 144/8

Mr. Stever [2] 28/15 29/25

Mr. Wroniak [1] 109/8

much [6] 66/7 94/22 112/19 113/25 139/11 141/8

muffled [2] 43/20 76/17

multiple [1] 20/8

must [3] 123/2 131/14 131/14

mwroniak [1] 12/6

my [34] 18/13 19/16 22/22 23/1 25/4 26/8 27/4 29/8 47/1 48/6 51/1 53/5 58/4 59/24 63/12 69/14 75/24 78/11 80/4 80/10 84/9 84/15 89/7 93/11 112/10 112/23 113/7 113/25 114/24 116/4 116/15 118/9 128/14 130/10

myself [1] 50/10

**N**

NALTSAS [1] 11/13

name [6] 89/23 96/5 96/7 111/6 111/7 111/7

narcotics [1] 125/21

NARINE [2] 11/3 11/3

narine57 [1] 11/6

nationally [2] 116/20 136/18

nature [1] 117/12

Navy [2] 78/23 79/9

near [6] 59/16 99/19 100/1 100/12 100/22 101/6

neck [1] 134/25

need [13] 57/13 74/15 84/7 84/15 84/18 109/25 118/16 120/4 120/16 124/20 136/7 142/23 145/1

needed [3] 111/1 117/25 138/4

needs [1] 84/19

never [19] 37/17 41/18 41/20 42/9 42/15 47/9 48/3 48/4 53/7 53/7 55/19 58/23 58/24 63/8 65/19 76/15 90/20 91/3 122/13

next [18] 15/5 17/14 17/21 18/12 19/2 22/12 23/2 24/5 25/20 30/5 30/23 43/1 89/3 94/24 103/20 104/8 108/8 110/10

nice [2] 144/18 144/25

night [29] 14/19 15/8 17/3 19/11 19/20 21/10 23/11 23/21 24/20 26/4 28/2 30/3 32/14 32/16 34/4 35/16 39/11 46/15 46/21 49/17 50/18 51/12 52/15 55/20 70/22 96/20 106/15 107/14 123/14

no [94] 10/8 14/25 18/6 25/4 25/10 25/16 25/19 30/25 34/7 34/11 35/20

35/22 36/1 36/11 37/9 39/25 41/25 41/25 42/2 42/16 44/6 46/19 48/9 48/16 49/18 49/24 50/11 52/19 53/22 55/2 57/24 58/22 59/4 59/5 59/7 59/8 59/10 59/25 62/13 65/4 67/17 67/23 68/19 68/22 69/3 70/7 71/7 71/10 76/9 76/25 77/24 78/2 78/9 79/7 80/8 82/2 82/13 83/17 84/6 87/23 89/24 90/12 91/10 91/13 92/1 92/13 93/8 93/15 93/21 94/16 94/19 97/1 98/17 98/23 99/24 100/14 106/9 106/9 107/15 107/20 107/22 107/24 108/1 108/2 108/3 108/5 117/24 119/1 121/20 127/17 137/19 139/17 142/10 144/10

No. [1] 65/16

No. 65 [1] 65/16

nobody [1] 142/22

noise [4] 35/24 48/3 60/11 63/12

noises [2] 34/1 75/10

non [2] 54/11 85/6

non-impeaching [1] 85/6

non-impeachment [1] 54/11

noncompliance [2] 30/9 30/11

noncompliant [2] 128/20 142/16

None [1] 94/21

nonlethal [7] 27/23 30/20 30/24 78/16 78/24 79/4 80/1

noon [1] 144/16

normally [1] 109/15

north [3] 11/4 67/3 67/5

northeast [2] 66/24 67/16

not [124] 15/13 20/24 21/7 21/20 29/12 30/12 35/23 36/12 36/19 37/3 38/18 39/21 42/16 45/9 46/21 47/14 47/15 49/9 50/10 54/17 56/21 56/24 56/24 57/3 57/5 57/7 57/8 60/15 61/4 62/9 62/13 62/15 63/13 63/25 64/20 64/21 65/2 66/15 67/18 68/25 69/3 69/6 69/8 69/24 70/7 71/8 73/8 76/6 78/2 79/3 79/7 80/9 81/6 82/19 82/19 83/25 85/1 85/20 86/8 87/21 88/18 89/21 90/9 90/11 90/17 91/7 93/23 95/14 98/4 98/23 101/22 102/14 104/18 106/17 106/20 106/23 107/10 107/15 108/18 111/1 115/23 116/22 119/15 121/20 122/3 122/10 122/13 122/14 124/3 124/16 124/25 125/6 125/7

126/13 126/14 126/14 127/16 129/5 129/8 130/23 132/16 134/22 136/14 137/19 137/20 138/6 138/17 138/20 139/9 139/12 139/13 139/17 140/4 140/19 141/1 141/3 141/6 142/6 142/10 142/15 142/20 143/11 143/11 144/10

note [3] 130/1 130/21 135/12

notes [1] 135/16

nothing [1] 46/17

now [43] 15/10 16/18 20/22 30/3 30/19 31/1 32/18 37/10 43/8 43/13 54/12 56/18 56/19 58/16 61/9 64/12 66/22 70/10 70/24 79/2 79/2 82/12 83/3 83/25 84/10 85/25 89/16 89/20 105/3 106/15 107/11 108/5 109/17 116/10 128/3 128/10 133/13 133/24 134/19 134/23 136/4 137/21 138/3

number [10] 31/10 65/15 66/16 113/23 120/21 136/12 137/9 140/17 140/18 141/23

numbers [3] 32/5 58/24 58/25

**O**

o'clock [3] 132/17 144/17 144/18

O'Neill [9] 96/21 124/6 125/15 126/10 126/22 132/5 133/3 133/19 134/8

oath [2] 89/14 110/17

object [3] 99/25 103/24 125/7

objection [37] 15/12 16/12 21/14 25/6 25/9 29/18 33/11 54/1 54/11 63/22 63/24 64/6 65/2 66/4 73/10 73/23 74/9 74/24 76/18 79/12 90/25 91/5 107/1 121/8 121/17 125/3 125/8 125/11 126/1 126/4 127/14 131/20 140/1 140/7 140/8 140/9 141/15

objective [1] 136/20

objects [2] 105/18 106/5

obscene [1] 70/14

obscenities [1] 18/15

observe [1] 24/20

observed [2] 134/15 135/13

obstructed [2] 80/23 90/7

obstructing [2] 51/18 52/2

obstructions [1] 80/13

obvious [2] 122/11 129/22

obviously [2] 26/8

**O**

obviously... [1] 132/19
occupied [4] 52/15 52/16 53/8 53/15
occurred [4] 68/25 90/20 124/16 143/11
occurring [3] 73/9 122/1 123/3
off [10] 31/16 37/16 38/5 49/13 69/2 69/20 70/13 71/5 74/15 88/19
officer [56] 16/4 16/7 44/5 44/6 71/11 73/18 91/11 94/10 97/6 99/18 102/6 103/10 105/15 113/4 118/10 118/21 118/22 119/6 119/19 120/3 120/13 120/14 120/19 120/22 121/4 122/1 122/8 122/21 123/2 124/2 125/13 125/14 125/22 126/8 126/8 126/24 127/4 128/24 129/7 129/18 129/19 129/24 130/1 130/7 131/7 131/15 132/10 132/22 133/1 133/17 134/7 134/9 135/4 138/16 139/4 140/15
Officer Chad [1] 105/15
Officer Gonzales [1] 102/6
officer's [1] 134/25
officers [59] 15/8 18/13 24/3 27/5 27/10 37/12 42/22 46/18 47/23 48/10 59/3 59/6 59/9 59/14 59/15 60/1 61/10 62/22 67/22 68/16 69/16 69/21 70/2 72/14 77/2 87/4 87/24 88/9 88/12 90/3 90/13 90/15 90/21 91/3 91/9 92/16 102/5 112/15 118/25 119/5 119/12 119/19 120/7 121/6 121/14 121/23 122/17 123/8 124/19 125/1 126/17 129/12 130/18 134/14 136/15 137/6 138/24 139/14 143/15
officers' [2] 136/20 140/23
official [5] 10/21 76/16 77/1 114/4 146/12
often [1] 50/24
Oh [9] 41/10 44/23 61/5 77/21 79/20 80/12 87/16 129/1 137/1
okay [153]
old [1] 43/1
OLIVE [1] 11/14
once [5] 45/21 98/15 109/12 137/8 142/21
one [26] 19/8 24/7 27/5 36/1 36/5 46/14 51/15 53/23 55/2 70/16 73/4 77/24 84/11 86/2 113/24 115/3 116/7 125/1 133/6 133/25 134/2 134/6 134/17

136/12 137/9 140/18
ones [1] 86/20
ongoing [3] 89/19 94/13 140/23
only [9] 36/5 37/25 63/2 64/25 65/13 69/8 89/25 114/3 119/14
oOo [2] 14/2 145/6
open [5] 14/5 34/24 39/2 66/1 110/6
opening [3] 32/2 101/23 101/24
operations [5] 113/15 113/22 114/1 114/5 115/1
opinion [7] 116/22 118/1 123/16 123/19 135/22 135/25 144/21
opinions [6] 117/2 117/23 118/4 118/8 118/10 123/12
opportunity [1] 139/24
options [3] 120/22 120/23 123/4
ORANGE [8] 10/9 11/7 11/10 11/19 12/5 12/15 12/16 96/15
order [2] 117/22 119/6
ordered [2] 130/13 138/10
organizations [1] 115/9
organized [1] 50/7
organizing [1] 101/17
other [23] 15/1 19/25 36/18 41/20 75/24 76/16 88/16 89/9 94/16 103/9 106/9 107/9 108/17 109/14 113/18 113/23 117/12 121/1 123/4 125/2 135/14 135/17 138/25
others [2] 118/21 137/11
our [4] 95/6 113/7 113/20 124/12
ourselves [1] 88/17
out [41] 17/23 17/24 18/16 23/17 26/17 27/5 29/8 46/21 47/1 47/2 47/15 48/4 48/6 48/14 58/23 64/2 64/4 66/13 67/21 69/25 70/5 71/6 77/8 77/9 85/14 90/9 90/20 92/15 95/4 101/24 102/16 102/21 109/8 109/24 120/16 122/8 124/21 131/2 142/23 143/17 143/21
outside [8] 27/4 29/7 34/19 36/20 78/11 80/5 131/20 144/23
over [11] 24/16 46/9 46/11 56/15 91/25 106/25 108/20 112/6 113/10 138/20 142/14
overrule [1] 125/11
overruled [18] 15/16 16/14 25/10 38/11 46/24 52/19 55/12 60/4 78/20 79/15 91/1 121/18 125/9 127/17 131/22 136/25 141/18 142/7

Overtalking [1] 62/17
own [5] 38/23 41/23 83/23 88/25 97/24

**P**

page [67] 20/14 22/13 23/3 24/5 25/21 26/21 27/15 28/8 31/11 31/18 31/19 31/21 31/24 31/25 32/2 32/3 32/19 33/22 43/16 43/23 44/4 44/8 44/13 44/14 45/8 52/23 53/1 53/2 53/20 53/20 54/4 54/4 54/4 54/8 54/9 54/14 55/24 56/4 56/15 56/16 56/20 57/17 57/18 57/18 57/23 61/2 61/17 61/24 61/25 62/10 62/16 62/25 63/16 64/15 64/18 65/5 65/12 85/8 85/15 85/17 85/22 85/25 86/17 86/21 86/22 89/3 146/6
page 10 [2] 43/16 43/23
page 12 [1] 26/21
page 13 [1] 27/15
page 18 [3] 44/4 44/13 44/14
page 19 [1] 45/8
page 2 [1] 20/14
page 23 [1] 28/8
page 27 [3] 52/23 53/2 54/4
page 28 [3] 54/4 54/8 54/9
page 3 [1] 22/13
page 5 [1] 23/3
page 6 [1] 57/18
page 67 [2] 85/22 86/21
page 68 [5] 85/8 85/15 85/25 86/17 86/22
page 7 [1] 24/5
page 76 [7] 61/2 61/17 61/25 62/25 63/16 64/15 65/12
page 8 [4] 25/21 31/19 31/25 32/19
page 9 [1] 33/22
page 91 [1] 57/23
page 92 [4] 55/24 56/4 56/15 57/17
page 93 [2] 56/16 57/18
pages [13] 40/6 40/11 40/12 40/20 40/25 41/9 43/15 81/7 84/1 84/21 84/23 85/20 86/5
pages 92 [1] 40/12
Pahel [4] 31/8 43/9 44/5 71/24
Pahel's [8] 31/5 44/11 44/16 45/18 46/3 98/7 98/17 98/18
paid [2] 112/17 112/19
PALOMAR [1] 12/8
Paralegal [1] 12/14
pardon [1] 86/6
park [10] 96/21 123/21 124/6 125/15 126/10 126/22 132/5 133/3 133/19 134/8
parked [4] 49/9 54/23 80/22 80/22

PARKER [3] 10/20 146/12 146/12
part [4] 108/13 109/16 109/17 130/11
participant [1] 123/25
participated [2] 15/11 15/23
parties [8] 14/25 35/2 71/15 109/14 119/4 126/15 128/4 136/6
partner [1] 15/3
party [3] 117/19 127/7 144/8
passion [1] 125/4
past [3] 30/4 90/9 112/18
path [1] 115/9
patrol [5] 97/25 113/3 113/4 113/11 113/15
Pause [32] 20/5 24/8 31/17 31/23 32/6 41/5 41/13 45/13 46/1 46/7 46/10 56/12 64/10 64/14 68/1 72/17 81/13 81/16 81/19 82/23 83/1 84/20 85/13 86/15 92/8 95/17 95/21 99/12 108/9 110/21 111/3 140/12
peering [1] 29/8
penal [1] 120/3
people [3] 54/25 55/3 109/14
people's [2] 38/19 41/20
pepper [1] 120/24
per [1] 63/16
perceived [1] 119/2
percent [1] 112/11
percentage [1] 112/7
perceptions [1] 47/7
perhaps [1] 130/16
period [1] 114/12
permission [1] 40/9
person [35] 17/21 18/5 18/11 21/5 21/10 21/11 22/5 22/7 22/8 22/10 23/14 25/17 26/18 30/7 30/16 69/17 69/18 70/4 119/14 119/15 120/14 120/18 123/2 131/11 132/7 133/14 133/20 135/17 136/10 137/5 137/7 138/17 138/23 139/10 142/16
person's [1] 132/18
personnel [1] 136/14
perspective [1] 131/6
phone [8] 18/16 18/24 19/14 22/22 22/24 26/5 43/19 70/13
photo [2] 28/20 29/2
photographs [2] 116/17 117/10
phrases [2] 17/23 17/24
physical [8] 107/6 107/8 119/21 119/25 120/15 121/1 123/5 143/12
pick [5] 97/19 97/22 100/15 103/17 105/6
picked [2] 100/22 107/16
picking [2] 103/10 106/6
picnic [21] 51/9 99/4

99/19 100/1 100/17 100/22 101/5 101/14 101/20 102/9 102/14 103/5 103/11 104/3 104/11 104/23 105/16 105/19 105/24 106/6 107/12
picnic table [7] 104/3 104/23 105/16 105/19 105/24 106/6 107/12
picture [3] 28/24 106/2 106/5
pictures [3] 101/19 103/7 105/15
piece [2] 99/11 99/11
pieces [1] 137/25
pit [2] 100/13 100/17
place [7] 17/9 120/17 124/21 126/21 132/19 134/20 143/2
placed [3] 102/14 103/4 135/17
Placing [1] 139/7
plain [1] 107/16
plaintiff [7] 10/7 11/2 12/13 12/14 108/12 112/12 117/14
plaintiff's [7] 13/3 95/24 108/10 108/14 108/16 109/17 109/18
plaintiffs [1] 112/8
play [32] 19/23 20/13 22/12 23/2 23/4 24/6 25/20 26/22 27/17 28/8 28/10 31/4 31/12 32/7 44/9 45/14 45/14 45/18 45/24 48/22 50/20 52/8 60/13 60/16 66/19 67/24 68/4 68/9 98/7 99/7 100/19 101/11
played [28] 19/25 20/16 22/16 23/6 24/10 25/24 26/24 27/19 28/12 32/9 46/4 46/12 59/19 68/10 77/17 99/9 100/7 100/20 101/3 101/12 102/3 103/14 103/22 104/9 104/20 104/25 105/9 105/12
playing [5] 98/10 100/6 102/2 103/13 104/14
plea [1] 131/17
please [53] 20/4 35/4 39/3 40/8 40/10 40/12 41/3 43/16 44/20 46/6 50/25 51/15 52/23 53/9 53/10 54/15 56/8 61/13 62/12 62/21 62/24 66/8 68/4 81/15 81/17 81/18 82/22 84/16 85/11 92/6 92/7 95/23 96/2 96/10 97/8 98/14 99/7 100/19 103/21 105/22 108/8 110/11 110/16 111/1 111/6 111/9 112/21 120/9 127/23 127/24 128/10 142/12 144/20
plus [4] 112/3 127/24 139/22 141/24
point [23] 22/20 22/24 24/1 25/3 25/8 25/15 29/14 29/23 30/23 31/1 48/14 64/2 70/6 72/5

**P**

point... [9] 76/24 77/25 85/14 85/20 87/9 90/20 114/21 135/12 143/14
pointed [10] 17/5 61/18 63/8 63/11 63/20 66/11 67/21 86/17 92/15 92/20
pointing [2] 40/4 68/15
points [1] 17/23
police [28] 14/22 15/10 15/14 15/17 15/22 15/24 16/2 16/3 16/4 16/7 17/13 18/25 22/7 65/19 66/14 73/18 76/5 76/16 76/22 111/22 113/17 120/25 122/9 125/1 131/15 132/18 133/16 138/1
policy [3] 115/17 115/22 116/21
portion [3] 25/5 25/20 58/1
portions [3] 84/2 86/12 127/23
position [1] 114/24
positions [2] 113/1 115/23
possible [2] 124/6 142/23
possibly [3] 58/11 101/18 104/19
post [1] 65/15
potential [1] 137/3
potentially [4] 15/1 135/5 141/25 142/1
practices [1] 116/21
practicing [1] 111/23
predicated [2] 119/11 120/5
prejudice [1] 125/4
prepare [2] 117/2 118/6
presence [13] 14/6 34/20 34/25 36/20 76/20 76/22 110/7 120/13 128/21 129/18 131/15 143/10 144/24
present [5] 12/12 35/2 110/9 110/9 129/25
presentation [1] 109/18
presently [1] 139/9
PRESIDING [1] 10/4
pretty [6] 51/11 57/22 58/8 66/23 113/25 135/1
previous [1] 132/20
previously [5] 14/7 21/9 27/11 29/24 63/11
primary [1] 120/24
printouts [1] 117/8
prior [6] 14/3 21/24 35/18 55/23 60/19 133/1
priority [6] 133/25 134/2 134/6 134/17 136/12 138/25
private [2] 134/21 138/2
probably [3] 97/9 109/15 109/17
probation [8] 130/4 130/10 130/12 130/16 131/3 131/8 131/9

131/11
problem [1] 84/7
proceeded [3] 17/15 27/6 29/12
proceedings [12] 10/14 14/3 14/5 34/19 34/24 89/25 94/23 110/6 144/23 145/3 145/5 146/5
process [4] 115/19 122/13 122/21 123/8
produce [2] 98/2 118/20
professional [3] 115/5 127/22 128/2
program [4] 15/10 15/23 16/3 16/9
progressed [1] 112/25
progresses [1] 120/2
prohibit [1] 119/18
promoted [3] 113/12 113/16 113/21
property [2] 107/21 107/23
propose [1] 31/12
provide [5] 35/12 62/2 111/24 120/12 126/20
provided [18] 43/12 61/19 62/5 63/9 76/15 84/11 84/13 117/23 119/12 123/20 123/23 126/25 130/5 133/19 135/2 138/22 140/17 140/18
providing [1] 113/9
public [1] 137/7
pull [2] 31/21 91/14
pulled [2] 102/16 102/21
punched [3] 143/22 143/25 144/9
punching [1] 144/4
pursuant [1] 146/2
Pussy [2] 18/16 18/24
put [13] 31/11 46/8 82/13 100/1 100/17 100/23 101/20 104/3 104/11 104/23 105/18 106/22 118/25
putting [7] 99/4 99/21 102/9 103/10 105/24 106/6 107/11
PVS [3] 28/6 127/9 128/16

**Q**

qualifications [1] 112/22
question [50] 15/20 21/3 25/11 29/12 29/21 36/25 37/23 38/12 42/14 46/25 51/12 54/3 54/7 55/17 56/5 56/13 56/15 56/16 56/17 57/1 57/2 57/3 57/17 58/4 60/5 60/21 61/3 64/3 64/9 75/4 75/5 75/19 76/21 78/21 79/17 83/3 83/16 84/10 85/3 89/3 121/11 121/19 126/3 126/5 128/9 131/23 140/25 141/17 142/8 142/9
questioning [3] 54/7 119/17 128/21

questions [16] 34/7 34/10 34/11 52/13 61/5 77/25 81/9 89/9 94/16 94/19 106/9 108/1 108/2 122/24 124/24 125/22
quickly [3] 36/23 136/7 142/23
Quite [1] 117/6

**R**

radio [1] 59/15
raise [5] 95/23 110/15 129/9 129/18 133/16
ran [6] 113/20 114/4 130/24 143/22 143/25 144/9
rank [2] 114/15 114/24
ranks [2] 113/1 115/23
rather [1] 143/16
Rawlings [4] 91/12 91/19 92/12 93/16
Raymond [1] 12/14
re [4] 57/25 75/19 126/3 126/5
re-ask [3] 75/19 126/3 126/5
re-examine [1] 57/25
reach [2] 103/17 104/5
reaching [2] 101/24 102/8
reaction [1] 119/24
read [56] 35/21 40/12 40/25 41/3 41/8 44/20 44/21 44/22 52/24 53/9 53/25 55/25 56/6 56/7 56/19 56/22 57/7 57/14 57/14 57/15 57/19 57/21 58/1 62/21 64/15 64/22 66/8 81/7 81/17 82/5 82/9 82/12 82/15 82/20 82/24 83/9 83/24 83/25 84/1 84/3 84/25 85/12 85/16 85/21 86/19 86/22 86/23 86/25 87/2 89/2 92/2 92/6 117/13 117/16 117/19 127/22
reading [15] 41/10 45/1 53/14 58/2 63/17 65/2 66/3 66/10 83/3 83/10 87/3 89/4 127/25 128/14 139/20
ready [2] 95/15 109/23
real [1] 139/13
really [8] 29/12 36/18 53/25 74/23 120/5 124/16 124/18 138/8
realtime [1] 83/7
Reask [1] 29/21
reason [1] 21/12
reasonable [5] 121/24 122/5 122/15 124/4 132/23
reasonably [12] 125/13 126/7 126/24 128/24 129/19 130/6 131/6 132/10 133/1 134/7 135/4 139/3
reasons [3] 125/19 126/13 129/22
recall [42] 18/4 18/6 22/25 23/21 23/25

26/15 30/15 30/16 30/18 30/23 33/4 33/25 39/21 39/24 39/25 40/4 40/4 43/2 43/10 52/20 52/21 55/22 56/1 57/12 72/11 76/25 77/5 77/14 91/13 96/23 100/5 101/16 101/18 102/13 102/16 102/21 103/12 106/15 106/18 130/5 139/18 141/23
recanted [1] 76/5
receive [1] 143/15
received [3] 36/13 78/17 127/6
recently [1] 78/17
Recess [2] 34/18 110/5
recessed [1] 145/5
recognize [6] 50/22 99/8 99/14 99/17 129/4 130/1
recognizes [1] 120/14
recollect [1] 35/15
recollection [5] 60/22 61/16 69/4 97/3 107/16
recommended [1] 115/20
record [22] 16/1 33/3 43/6 49/6 50/4 56/7 56/23 57/15 68/3 68/21 74/18 79/6 80/15 82/25 83/9 83/25 84/25 93/3 97/12 102/18 108/20 133/9
recording [4] 14/12 32/13 32/22 128/1
recordings [4] 97/25 127/9 127/20 128/17
recreational [1] 39/22
recross [3] 13/3 13/6 108/4
redacted [1] 93/8
redirect [6] 13/3 13/6 94/18 94/20 108/3 108/5
refer [4] 82/2 115/14 119/20 130/15
reference [1] 132/5
referencing [1] 43/24
referred [2] 56/3 130/17
referring [4] 34/1 67/7 107/4 126/1
reframe [1] 107/8
refresh [18] 35/19 41/8 41/16 44/9 44/24 52/24 53/12 55/24 60/18 60/22 61/16 63/6 81/22 82/12 82/15 84/19 91/22 92/3
refreshes [1] 62/22
refreshing [3] 46/15 56/22 83/25
refused [1] 143/1
regard [2] 30/3 139/24
regarding [1] 36/17
regional [2] 96/21 113/8
regulations [1] 146/7
related [1] 97/16
relates [2] 123/16 128/24
relating [3] 111/24 125/14 126/9
relationship [1] 74/5

relayed [3] 19/18 26/7 30/24
relevance [8] 15/12 60/3 60/14 73/23 74/24 78/19 79/12 91/5
relevant [1] 125/7
rely [3] 69/8 126/25 135/3
Remained [1] 113/16
remains [1] 109/20
remember [46] 18/2 30/21 38/17 38/21 38/21 39/18 51/7 52/13 52/17 60/12 61/7 70/21 76/8 76/9 76/12 81/2 81/5 82/19 83/4 83/11 83/15 87/4 87/14 87/19 88/8 88/11 88/12 89/5 90/8 90/9 91/12 91/21 91/25 91/25 93/4 93/9 94/3 97/5 97/24 98/10 98/21 98/22 101/14 105/18 117/9 139/20
remind [1] 109/13
reminding [1] 20/6
render [1] 118/1
RENEGAR [20] 12/2 12/16 77/20 97/6 101/19 102/6 102/24 105/2 105/3 105/15 106/3 116/11 127/21 130/24 131/2 143/1 143/22 143/24 144/3 144/9
Renegar's [6] 28/6 68/6 68/7 68/8 98/16 127/12
repeat [5] 21/3 37/23 55/17 79/17 81/10
replied [1] 77/21
report [11] 62/17 91/15 91/19 91/22 92/11 92/21 93/16 96/25 118/6 118/8 118/9
reported [4] 14/3 114/8 145/3 146/4
REPORTER [15] 10/21 15/25 33/2 43/5 49/5 50/3 68/20 74/17 79/5 80/14 93/2 97/11 102/17 133/8 146/12
REPORTER'S [1] 10/14
reporting [2] 32/20 127/7
reports [4] 115/8 116/17 117/6 117/7
representation [1] 51/12
request [3] 57/21 57/24 102/25
requested [1] 86/22
requesting [1] 84/3
requests [13] 15/25 33/2 43/5 49/5 50/3 68/20 74/17 79/5 80/14 93/2 97/11 102/17 133/8
required [1] 142/2
requires [1] 123/1
resistance [1] 119/18
resisting [3] 90/11 92/23 93/23
resolve [2] 36/22 123/9
resolved [2] 133/7 133/12

6-RenSER-01165

6-RenSER-01165

**R**

resources [2] 113/19 114/5
respect [3] 116/20 123/10 127/4
respond [3] 34/5 126/2 136/15
responded [2] 97/15 133/6
responding [8] 123/21 125/23 126/17 134/10 134/14 134/23 135/1 138/22
responds [1] 129/24
response [3] 134/3 136/1 136/16
responsibility [2] 113/25 114/25
responsible [1] 115/18
restate [1] 140/25
resting [3] 108/12 108/15 108/19
restroom [1] 110/1
retained [1] 116/10
retire [1] 114/17
retired [2] 114/15 114/18
return [2] 82/8 138/9
returned [1] 135/18
returning [4] 115/19 133/19 133/24 134/7
reverse [1] 75/3
reverted [1] 75/7
reverting [1] 75/7
review [10] 116/16 116/18 117/2 117/5 117/22 117/25 128/14 139/15 139/23 144/7
reviewed [3] 35/18 116/23 127/20
reviewing [2] 115/7 118/3
ride [1] 16/6
ride-alongs [1] 16/6
right [96] 15/20 18/10 18/21 20/3 22/5 25/1 26/20 27/14 28/5 28/14 28/21 28/25 29/3 29/5 29/25 34/5 35/16 36/6 36/8 37/17 38/16 39/20 40/23 42/5 42/15 42/19 43/8 43/13 43/23 43/25 44/2 44/20 45/5 45/8 46/15 46/20 47/21 47/25 48/19 48/20 49/2 49/3 51/2 51/4 51/5 51/14 51/20 52/6 52/7 58/13 58/15 58/18 58/24 59/19 60/10 60/12 61/12 62/1 65/17 65/20 66/6 66/17 66/18 67/19 67/22 68/12 68/17 68/17 71/1 71/18 71/25 72/10 72/22 73/14 73/19 76/16 77/15 77/22 78/12 79/2 79/2 80/1 89/12 89/20 89/25 91/12 95/23 98/24 100/9 100/12 102/5 105/3 105/3 110/15 144/1 144/25
rights [1] 131/19

risen [1] 136/4
road [9] 11/9 11/18 12/8 18/15 19/12 25/17 29/1 29/3 68/15
Robert [3] 110/14 110/18 111/7
Robert Fonzi [1] 110/14
Roger [1] 137/12
role [1] 115/16
rskinner [1] 11/20
Rule [1] 118/6
Rule 26 [1] 118/6
rummaging [1] 25/1
run [4] 27/5 30/4 77/21 77/21
running [2] 137/25 144/4
RV [26] 24/13 24/16 24/21 38/16 38/17 38/20 38/24 39/1 39/8 39/12 39/15 39/17 39/19 39/20 39/21 40/2 40/3 40/7 41/22 41/23 42/10 58/6 58/20 133/21 134/21 138/2
RVs [2] 38/19 41/20
RYANE [1] 11/17

**S**

SACV [1] 10/8
safe [9] 119/1 136/14 136/15 136/20 137/6 137/6 137/6 137/7 138/7
safer [1] 119/3
safety [15] 118/11 118/23 119/6 125/14 126/8 128/25 129/8 129/19 133/17 136/6 136/8 138/16 138/24 139/14 140/15
said [69] 15/2 18/18 18/20 19/17 21/2 21/17 21/23 22/3 23/16 23/17 23/22 24/2 24/2 26/15 29/13 30/14 30/17 33/22 38/15 38/17 39/18 39/21 41/20 41/25 42/2 42/23 42/25 43/1 43/24 44/2 49/21 50/6 50/8 52/15 53/25 56/1 58/12 60/9 60/10 60/12 63/9 63/11 63/15 63/18 66/14 67/19 67/22 68/12 70/9 70/21 71/24 73/13 74/12 74/15 74/20 76/6 78/3 78/12 79/7 79/25 82/18 83/21 87/6 87/8 90/16 115/24 137/4 137/11 138/2
same [12] 20/9 23/23 27/11 28/7 29/24 37/14 44/5 52/13 56/5 61/5 105/11 134/13
San [4] 114/11 114/13 114/20 116/3
San Bernardino [4] 114/11 114/13 114/20 116/3
SANTA [4] 10/3 10/15 10/23 13/10
sat [3] 115/14 115/16

115/18
Saturday [1] 49/19
saw [30] 30/4 36/1 37/17 42/15 42/23 49/8 53/7 54/23 55/19 76/21 80/20 81/3 81/9 83/6 83/13 87/6 87/8 87/18 87/18 88/1 88/19 88/23 90/18 93/6 93/17 93/22 104/22 107/11 129/12 144/3
say [42] 14/21 17/17 18/9 18/23 18/24 20/22 21/8 21/22 24/15 26/11 33/9 33/15 36/8 61/12 61/12 63/16 68/17 70/3 70/23 82/17 83/17 83/20 88/14 88/22 109/12 114/14 116/4 124/10 125/18 127/3 129/2 129/21 130/9 132/13 133/5 134/11 135/9 138/19 139/6 141/21 143/8 144/11
saying [11] 18/16 34/2 39/15 40/1 70/14 71/22 72/9 75/10 75/21 76/9 93/9
says [1] 131/13
scared [4] 19/5 19/9 22/21 75/7
scene [6] 87/22 106/16 106/19 106/21 136/15 136/20
scope [1] 131/21
Scouts [2] 49/22 50/9
screaming [28] 19/15 26/3 26/7 26/12 26/19 42/13 42/15 42/18 42/24 42/25 43/20 43/25 69/22 72/22 72/25 75/15 75/22 76/1 76/3 77/13 92/16 132/6 132/18 132/25 133/25 134/6 134/24 138/4
screams [1] 75/15
screen [10] 16/24 28/13 28/20 31/13 39/5 50/19 66/2 66/5 91/17 102/6
search [10] 130/15 130/18 130/19 131/3 131/8 131/12 131/14 131/16 131/18 133/15
searched [1] 137/17
seat [4] 109/21 111/4 119/22 120/18
seated [4] 96/2 96/4 110/12 110/23
second [19] 19/20 22/3 37/11 37/24 42/24 42/25 43/24 51/15 71/25 72/9 103/16 103/16 109/25 113/14 114/2 133/3 135/7 135/19 138/9
seconds [4] 103/16 104/5 141/11 141/13
Secret [1] 113/10
section [3] 26/2 85/6 146/2
secure [3] 136/10 138/7 138/24
security [1] 113/23

see [104] 20/10 22/22 25/3 25/14 25/17 28/21 32/4 35/23 38/18 39/9 42/16 48/4 48/7 48/7 48/8 50/17 52/5 52/10 54/20 54/25 62/21 64/1 65/15 67/2 67/5 69/6 69/24 69/25 71/8 72/6 77/15 78/7 80/7 80/25 81/25 85/24 87/9 87/15 87/16 87/20 87/21 87/24 88/22 89/21 90/2 90/7 90/11 90/17 92/17 92/24 93/13 93/20 93/25 94/5 94/5 94/13 98/8 100/9 100/12 100/15 101/19 101/23 101/23 102/8 103/17 103/20 103/24 104/5 104/8 104/11 106/5 107/8 107/23 109/20 109/23 110/4 118/19 118/23 118/24 123/12 124/5 126/19 129/11 129/15 130/2 130/22 131/2 131/16 131/17 132/4 133/18 133/23 134/1 136/11 137/9 138/9 138/12 139/23 141/5 142/25 143/16 143/20 144/7 144/18
seen [8] 24/16 39/11 50/9 58/5 68/25 70/17 141/2 144/10
segment [2] 23/10 27/15
seizure [5] 131/3 131/8 131/12 131/16 131/18
select [2] 122/4 122/15
sent [1] 124/5
separate [3] 14/24 15/2 15/6
separating [1] 124/15
sergeant [9] 77/4 91/12 91/19 92/12 93/16 113/6 113/7 113/11 115/2
sergeant arrived [1] 77/4
sergeant assigned [1] 113/7
Sergeant Rawlings [4] 91/12 91/19 92/12 93/16
sergeant watch [1] 113/11
serious [5] 115/13 124/11 124/12 124/25 129/23
serves [1] 89/7
service [19] 16/5 113/10 117/8 118/18 119/11 123/24 123/25 124/1 125/2 126/18 127/5 129/24 132/14 133/10 133/16 134/14 135/10 137/21 142/13
session [2] 35/1 110/8
setting [1] 112/5
seven [6] 70/21 89/17 139/21 139/21 139/22 141/24
several [4] 116/4 116/6

127/23 127/24
severe [1] 115/13
severity [1] 136/4
sharrell [1] 11/11
she [1] 19/17
sheriff [9] 12/15 12/16 23/17 113/2 113/24 114/2 114/3 115/16 115/18
sheriff's [7] 96/15 112/23 114/9 114/10 114/13 114/20 116/3
sheriffs [7] 20/24 21/6 21/19 23/22 70/15 114/7 115/4
short [4] 99/14 99/18 133/12 134/16
should [6] 16/19 28/3 36/20 45/14 82/3 137/16
show [8] 40/6 40/13 43/15 60/18 77/6 86/5 86/12 142/19
showed [3] 14/14 14/17 67/8
showing [1] 14/24
shy [1] 114/14
sic [5] 70/2 73/17 100/10 105/6 109/18
side [3] 24/16 109/14 109/15
sides [1] 124/15
Sight [1] 69/8
sign [3] 123/7 130/15 130/17
significance [1] 130/6
significant [1] 134/9
signing [1] 131/12
signs [1] 129/4
simple [6] 119/17 119/21 120/10 120/13 120/15 120/18
simply [1] 37/15
since [1] 97/9
sir [72] 22/18 23/8 34/4 35/8 35/23 38/7 39/9 40/6 40/20 41/8 41/16 44/17 47/4 50/18 53/19 55/23 58/23 60/8 61/5 63/13 66/22 67/10 67/14 67/18 67/22 68/24 69/4 69/24 70/16 70/24 71/16 72/13 75/4 76/11 79/25 81/22 84/23 89/12 90/19 92/12 93/10 94/4 94/22 95/18 95/20 96/1 96/4 96/8 96/18 97/15 98/22 99/14 101/11 102/12 102/15 102/20 103/11 110/15 110/20 111/4 111/13 111/14 111/20 112/1 116/13 117/1 117/18 118/2 124/5 137/12 137/15 141/19
sirens [5] 74/14 74/16 75/13 134/2 134/18
sit [1] 142/15
site [2] 135/18 137/23
sitting [7] 17/24 53/8 75/25 79/3 89/20 89/21 97/2
situate [1] 107/12

**S**

situated [1] 109/10
situation [7] 118/19 119/14 121/24 122/11 123/10 129/10 141/16
situations [2] 122/23 138/23
six [3] 87/7 87/7 114/7
skin [9] 32/25 33/1 33/5 33/5 33/9 33/9 33/10 33/15 33/15
SKINNER [1] 11/17
sleeves [2] 99/14 99/18
slightly [1] 130/14
slow [3] 54/12 111/16 119/19
slower [1] 102/19
smaller [1] 67/2
so [166]
socially [1] 124/11
society [1] 124/12
soft [1] 33/20
soliciting [1] 139/10
some [25] 15/15 15/16 15/17 16/9 17/22 19/23 23/16 31/1 55/7 73/13 74/1 97/19 97/22 98/8 108/18 109/23 117/11 123/4 123/6 129/25 130/17 133/17 135/12 142/17 145/1
somebody [5] 17/16 18/14 40/19 124/19 142/24
someone [14] 30/6 76/1 119/13 119/20 122/12 129/7 131/7 132/5 134/22 138/16 139/7 140/6 142/14 143/13
someone's [3] 42/10 43/22 138/3
something [19] 20/22 32/20 69/6 71/24 97/16 99/18 100/16 100/17 102/9 103/17 103/24 104/2 104/12 104/23 105/6 112/15 120/1 130/20 136/19
somewhat [3] 33/21 97/4 133/7
somewhere [1] 66/14
sorry [9] 21/3 31/24 37/23 42/1 55/17 57/4 61/3 70/3 121/9
sound [7] 30/12 33/6 33/8 33/10 33/20 72/4 76/2
sounded [11] 19/14 24/22 26/5 26/6 26/18 30/6 32/25 33/4 33/21 43/21 74/8
sounds [5] 15/15 17/11 24/25 73/4 75/22
south [2] 67/3 67/5
southeast [12] 63/9 63/15 65/25 66/15 66/22 66/23 67/9 67/10 67/12 67/13 67/19 97/13
SOUTHERN [1] 10/3
speak [1] 31/1
speaking [8] 16/18 17/15 34/2 122/22 125/8 132/15 140/9 140/14
specific [4] 63/8 63/16 85/20 86/12
specifically [3] 18/1 56/1 92/14
specifics [1] 92/1
speculation [7] 37/22 60/20 74/9 74/25 76/19 79/13 90/25
spell [1] 96/7
spent [1] 112/8
spoke [11] 37/12 37/21 38/3 47/24 62/23 64/5 66/14 70/8 70/11 70/24 71/12
spray [1] 120/25
staff [2] 115/5 115/6
stair [1] 122/13
stair-step [1] 122/13
stamps [1] 141/10
stand [4] 72/15 119/22 134/25 142/3
standards [5] 116/19 116/23 138/15 141/12 142/2
standing [14] 28/24 48/11 52/6 80/3 80/10 80/17 81/4 82/1 83/15 83/18 87/13 101/14 102/5 143/20
standpoint [1] 143/4
stands [1] 79/16
start [16] 34/9 34/12 34/15 46/9 46/11 56/15 86/21 86/22 109/23 111/17 121/7 121/15 122/4 122/10 123/6 136/11
started [2] 33/23 33/24
starting [5] 20/14 26/21 57/23 68/2 105/14
starts [8] 22/13 23/3 24/5 25/21 27/15 28/9 54/7 54/10
state [8] 75/1 75/4 75/6 79/14 96/5 111/5 113/10 140/23
stated [2] 27/11 29/24
statement [3] 76/16 76/22 77/1
statements [9] 70/25 76/5 76/8 91/19 91/21 92/11 94/12 117/12 128/1
states [6] 10/1 10/21 43/17 78/23 146/3 146/7
statewide [2] 116/20 136/18
station [3] 97/10 113/3 115/11
stay [2] 95/15 109/25
staying [1] 40/3
steering [1] 118/25
stenographically [1] 146/4
step [5] 77/9 95/19 108/6 120/16 122/13
stepped [1] 77/8
steps [1] 122/8
Stever [3] 12/17 28/15 29/25
still [8] 23/1 27/4 75/14 87/13 108/10 125/21 127/6 144/17
stipulation [1] 36/17
stood [4] 17/23 17/24 78/11 143/17
stop [8] 34/2 51/14 51/20 72/9 118/18 118/24 119/13 121/4
stopped [2] 72/4 77/24
story [1] 15/2
STREET [2] 10/22 11/14
stretch [1] 72/16
strike [9] 34/9 45/19 97/21 108/3 114/15 125/8 131/16 140/8 144/11
struggling [2] 30/7 93/23
stuck [1] 48/6
stuff [6] 41/19 52/16 54/20 55/3 101/17 105/24
subject [3] 93/18 108/15 108/19
subject's [1] 118/17
submit [1] 131/14
substantial [1] 134/21
substantially [1] 134/17
substation [1] 97/13
such [2] 27/24 129/24
SUITE [7] 10/22 11/4 11/10 11/14 11/19 12/4 12/8
summon [1] 124/20
summoned [4] 132/20 133/13 134/16 137/24
supervisor [2] 113/4 115/2
support [2] 12/17 114/1
sure [12] 29/12 32/2 33/20 45/9 45/16 73/25 89/4 108/20 119/1 136/19 138/6 141/1
surrounding [1] 87/5
suspect [3] 92/15 137/3 138/5
suspected [1] 14/18
sustain [1] 126/4
sustained [11] 21/15 21/15 29/20 33/13 50/15 54/18 73/11 74/10 74/25 91/6 115/12
sustaining [1] 126/1
SWISS [1] 12/7
switch [1] 28/5
sworn [8] 14/7 35/12 38/7 42/14 52/14 89/12 95/24 110/18

**T**

table [24] 51/9 99/4 99/19 99/21 100/1 100/1 100/17 100/23 100/23 101/5 101/14 101/20 102/9 102/15 103/5 103/11 104/3 104/11 104/23 105/16 105/19 105/24 106/6 107/12
tactic [2] 122/18 139/3
take [13] 16/22 32/1 34/14 48/6 90/9 93/17 101/19 109/9 110/2 130/1 134/12 135/16 142/17
takedown [1] 120/1
taken [7] 34/18 90/3 93/7 103/7 106/2 110/5 134/20
taking [4] 17/9 99/3 105/15 126/21
talk [17] 15/3 20/24 21/6 21/11 21/20 27/6 38/1 44/5 47/16 50/12 60/8 71/16 74/1 91/11 93/8 142/20 145/1
talked [11] 22/8 42/22 69/17 69/18 70/2 70/4 70/9 71/4 76/11 76/13 77/24
talking [21] 14/14 15/1 18/4 37/20 37/24 39/14 39/19 41/19 42/6 42/12 42/24 43/23 48/17 59/15 69/3 72/13 73/8 74/7 88/16 132/15 140/19
talks [1] 64/19
tape [36] 20/25 21/17 22/4 23/8 23/13 23/19 23/24 26/13 30/19 31/5 37/25 38/16 44/9 45/18 46/3 59/19 60/9 60/13 60/16 67/24 68/8 75/22 77/15 79/25 98/3 98/5 98/7 98/16 98/17 98/18 98/21 99/8 101/24 105/3 105/11 105/11
tapes [2] 76/17 128/5
tase [2] 88/10 88/10
Taser [24] 27/24 27/24 27/24 27/25 27/25 78/12 79/3 79/10 80/1 80/7 80/25 81/3 81/25 82/18 83/14 83/18 87/10 87/11 87/12 88/6 88/19 89/5 92/21 93/7
tasered [3] 88/4 88/23 93/13
Tasers [3] 78/18 78/23 120/25
tasked [1] 115/1
taught [9] 58/12 119/5 119/9 121/6 121/14 121/22 121/23 122/17 122/20
teach [1] 16/5
techniques [1] 16/10
tell [38] 15/8 17/7 19/21 21/4 24/12 24/20 26/2 26/4 27/2 27/8 28/1 29/9 32/16 46/18 47/15 53/9 53/9 53/22 58/5 58/10 58/15 59/3 59/6 59/9 59/14 59/23 61/10 66/16 73/8 81/24 88/9 88/18 101/5 101/6 102/12 104/1 104/16 112/21
telling [9] 23/10 27/21 37/10 37/20 47/5 72/14 75/25 88/13 94/4
tells [1] 60/1
tent [47] 14/15 14/17 17/4 17/13 23/1 25/4 25/14 27/4 29/7 29/8 42/20 46/21 47/1 47/7 47/10 47/15 47/16 48/3 52/16 69/25 70/5 70/5 71/6 72/21 75/25 77/8 77/9 78/3 78/5 78/10 78/11 80/4 80/10 90/8 101/6 101/24 101/25 102/9 102/22 103/17 103/18 104/6 104/22 105/4 107/13 142/1 142/15
tents [1] 107/19
term [1] 74/12
terminology [2] 15/16 78/14
terms [11] 73/14 130/14 130/15 130/16 130/18 130/19 131/4 131/8 131/10 131/13 141/1
testified [14] 40/7 42/13 47/20 49/8 57/14 63/13 72/20 81/2 83/4 83/11 93/6 94/5 112/4 137/16
testify [1] 81/24
testifying [4] 15/13 89/14 109/15 112/8
testimony [16] 19/25 24/25 30/21 35/12 35/18 49/23 55/10 82/2 111/24 112/7 117/11 117/13 117/16 117/19 140/18 143/23
than [7] 56/17 75/24 76/16 89/16 128/15 137/23 143/16
thank [45] 14/10 16/17 20/12 22/15 23/5 24/4 25/23 29/25 32/8 34/3 34/7 34/16 35/5 39/3 40/13 40/24 41/11 45/25 53/10 58/2 62/12 62/19 65/12 66/6 72/18 79/21 84/5 87/3 89/10 92/7 94/16 94/22 95/5 95/18 95/22 96/1 103/21 106/9 107/25 108/7 108/23 110/20 111/4 111/10 122/16
that [514]
that's [51] 15/3 19/15 26/10 27/5 27/12 29/6 30/9 32/4 33/20 33/21 34/5 34/22 37/25 46/2 57/5 57/22 60/10 62/7 63/13 65/21 65/24 66/17 70/2 72/8 72/10 72/10 77/22 77/22 78/14 81/1 83/16 84/7 86/2 86/17 88/14 93/11 115/8 118/23 118/24 120/22 122/13 122/14 123/6 123/10 124/22 124/25 128/8 136/12 137/4 137/14 138/6
theft [1] 133/12
their [19] 16/20 17/3 27/25 74/16 119/6 120/17 121/15 122/8 123/22 124/4 125/22

## T

**their...** [8] 130/12 130/16 131/11 136/8 139/8 139/14 142/19 142/21
**them** [43] 15/7 16/19 17/7 17/15 27/6 27/8 27/24 29/11 29/23 48/2 48/14 50/10 62/14 65/14 65/22 66/16 67/18 70/2 72/3 74/2 76/1 84/23 87/9 87/10 88/1 99/4 103/10 116/19 119/22 120/11 120/18 123/23 130/14 132/18 132/23 135/2 136/7 137/8 138/25 139/7 139/9 139/9 139/13
**themself** [1] 122/12
**themselves** [1] 131/14
**then** [63] 17/13 19/4 19/14 24/2 29/9 29/12 40/13 40/20 42/12 42/22 43/1 43/18 45/7 47/18 48/2 50/12 53/25 54/7 57/7 57/16 67/24 69/16 69/18 69/21 70/24 70/25 72/20 73/3 74/15 76/5 87/8 89/9 89/19 91/11 93/8 95/7 109/10 112/11 113/7 113/14 113/18 113/20 113/24 114/2 115/7 115/13 115/20 116/18 116/22 119/20 120/2 120/20 121/12 123/2 123/6 125/25 126/2 133/12 134/16 136/11 137/8 138/7 139/12
**there** [96] 17/22 24/22 26/3 26/8 26/15 28/15 36/16 42/24 42/25 44/7 49/9 49/9 49/10 49/14 49/19 49/21 50/6 50/8 51/9 51/14 51/18 51/20 51/21 52/16 53/7 53/22 53/23 54/23 55/2 55/2 55/3 58/24 63/14 64/3 72/11 76/9 76/12 80/13 80/20 80/22 80/22 82/3 82/3 86/1 89/9 96/18 100/9 100/12 101/17 101/20 102/5 103/9 104/23 109/24 113/16 114/24 115/22 116/4 117/8 117/11 119/20 120/2 120/6 120/8 120/22 123/13 124/3 124/12 124/14 124/24 125/19 128/22 130/1 130/13 130/19 132/15 132/21 133/24 134/16 134/23 135/19 135/20 136/7 136/19 137/22 137/23 137/24 138/22 139/23 141/25 142/3 142/4 142/15 142/22 142/23 143/21
**there's** [19] 14/25 20/23 21/18 26/11 57/13 72/13 73/4 86/1 100/16

115/15 119/1 119/18 120/21 126/14 126/16 126/16 131/9 137/10 137/10
**therefore** [2] 56/22 69/18
**thereof** [1] 128/7
**these** [13] 18/17 20/7 45/22 57/17 86/5 94/23 102/5 110/24 111/1 129/4 134/22 138/23 140/13
**they** [96] 14/18 15/1 15/3 15/5 16/5 16/19 17/4 17/15 17/21 18/24 20/8 20/24 21/20 30/6 30/7 61/11 62/23 69/17 69/17 70/4 70/11 70/24 70/24 74/15 77/12 78/3 78/7 82/7 88/2 88/3 88/23 89/1 115/12 116/23 118/9 119/5 119/9 119/13 119/16 119/19 119/20 121/6 121/14 121/22 121/23 122/4 122/9 122/12 122/14 122/19 122/20 123/4 123/5 123/6 123/9 123/9 124/2 125/17 125/22 126/21 127/6 129/25 130/11 130/12 130/15 130/17 130/19 130/24 131/13 131/14 131/14 132/10 132/12 132/20 133/2 133/4 133/11 133/12 133/12 133/23 134/15 135/2 135/8 135/12 135/22 135/23 136/9 138/10 138/11 138/13 138/22 138/22 140/19 142/3 142/4 142/22
**they're** [12] 27/25 48/18 74/16 111/1 120/14 122/3 123/7 123/10 130/1 139/12 139/13 142/19
**they've** [1] 108/17
**thing** [3] 65/16 69/8 124/17
**things** [32] 18/2 18/17 23/16 23/21 24/23 24/24 30/16 38/16 38/23 39/15 41/23 42/7 59/16 70/1 73/5 74/20 117/12 126/17 133/20 134/23 135/13 135/15 135/16 136/8 136/9 137/11 137/22 138/7 138/21 139/1 139/11 142/14
**think** [10] 18/20 34/21 45/17 51/11 58/17 65/9 86/17 95/13 95/15 109/22
**thinking** [2] 40/3 47/24
**third** [5] 71/18 104/5 104/16 117/19 144/8
**third-party** [2] 117/19 144/8
**this** [200]
**those** [27] 18/2 40/20 40/25 70/14 84/21

84/23 86/19 102/14 103/10 104/18 105/18 114/23 116/6 116/18 119/23 120/9 120/12 120/18 125/21 129/18 129/22 129/25 130/10 130/16 135/15 135/16 143/10
**though** [7] 49/8 55/2 55/19 68/14 72/8 123/8 138/17
**thought** [21] 15/4 24/21 28/3 38/20 38/23 39/1 45/8 55/6 55/20 55/25 61/3 70/1 70/10 71/11 71/12 71/24 76/7 78/14 82/5 82/9 82/14
**threat** [1] 122/1
**threatening** [3] 90/2 121/5 122/11
**three** [5] 49/15 60/8 115/15 120/11 138/1
**through** [41] 14/23 19/25 22/9 25/5 26/20 38/15 38/19 38/23 39/15 40/12 40/13 40/22 41/9 41/20 44/6 44/20 54/5 59/16 64/4 64/16 81/8 81/10 82/4 82/9 82/20 85/22 85/23 86/3 86/13 86/16 86/18 89/25 95/20 105/14 109/22 112/24 112/25 122/2 126/17 130/25 133/20
**throughout** [2] 97/23 123/8
**Throwing** [1] 24/24
**time** [67] 14/17 14/22 16/3 18/3 19/16 21/13 22/3 37/11 37/24 37/25 38/6 38/21 38/22 47/21 48/16 48/17 51/1 55/11 55/22 58/11 59/1 59/2 62/23 68/6 70/6 72/12 73/17 73/18 76/24 77/25 81/9 87/9 89/23 101/15 101/23 102/8 103/16 103/17 104/5 104/16 108/15 108/19 109/3 112/8 113/7 114/12 119/15 130/17 132/14 133/3 133/12 134/16 135/5 135/7 135/19 135/22 135/23 138/9 140/19 141/6 141/8 141/10 141/13 142/17 142/20 144/12 144/14
**times** [8] 112/4 112/6 127/23 127/24 139/21 139/22 141/23 141/24
**Title** [1] 146/3
**today** [7] 17/25 35/18 36/5 37/3 79/3 89/21 95/12
**together** [1] 97/10
**told** [20] 15/7 17/2 29/11 30/19 37/25 38/1 38/5 41/18 42/9 48/10 53/7 61/10 65/19 68/16 77/9 93/17 93/22 94/3 130/3 139/16

**tomorrow** [2] 95/14 95/16
**tone** [3] 128/16 128/19 128/23
**tonight** [1] 95/15
**too** [2] 44/9 136/9
**took** [5] 82/7 99/25 124/2 124/21 135/12
**tool** [1] 138/17
**top** [6] 25/5 25/14 33/22 87/25 88/2 138/25
**total** [1] 49/15
**totality** [1] 121/25
**towards** [19] 17/5 17/7 17/18 27/12 47/9 47/14 47/15 48/14 52/3 58/6 58/6 65/25 86/17 88/1 88/3 88/24 90/3 90/15 115/4
**TOWN** [2] 11/9 11/18
**toys** [4] 49/9 52/16 54/20 55/3
**trained** [20] 120/3 120/19 122/4 122/14 123/8 123/10 125/13 126/8 126/24 128/24 129/4 129/19 130/7 131/6 132/10 133/1 134/7 135/3 135/4 139/3
**training** [15] 14/23 75/7 75/8 78/17 111/23 113/4 113/8 113/9 116/21 123/22 124/4 130/10 136/3 136/17 143/15
**trainings** [1] 113/23
**transcribed** [2] 117/9 127/22
**transcript** [43] 10/5 10/14 20/1 22/13 23/3 25/21 26/21 27/15 28/7 31/6 32/3 32/19 33/22 35/21 40/14 40/15 40/20 42/23 43/3 43/12 43/17 44/10 44/12 44/16 45/17 45/20 57/14 61/10 62/14 68/2 68/5 81/8 82/3 82/6 82/9 82/13 84/4 84/9 84/18 84/19 141/22 146/4 146/6
**transcription** [2] 128/2 128/15
**transcripts** [7] 10/24 20/7 20/9 31/10 45/22 84/7 139/21
**transferred** [1] 113/14
**transpired** [2] 122/25 142/21
**transpires** [1] 120/5
**traveling** [1] 126/22
**trees** [3] 51/18 51/24 80/20
**trip** [1] 104/22
**truck** [5] 80/22 87/23 87/24 90/10 101/6
**true** [158]
**truth** [4] 15/8 19/21 23/10 32/16
**try** [3] 22/22 29/14 93/17
**trying** [6] 22/5 22/9

58/12 62/7 82/15 88/16
**turn** [5] 46/5 54/4 74/15 84/21 84/23
**twice** [1] 36/8
**two** [11] 14/25 55/3 84/14 95/6 114/7 123/13 132/14 137/25 139/24 140/18 141/2
**type** [7] 121/2 125/2 125/10 129/3 129/9 130/12 138/21
**types** [2] 120/19 135/13
**typically** [2] 14/23 115/15

## U

**uh** [2] 43/18 43/22
**ultimately** [2] 115/20 128/6
**Unable** [1] 62/17
**uncle** [1] 73/25
**under** [8] 89/14 114/2 119/23 121/25 122/5 122/15 138/23 142/2
**undersheriff** [2] 114/18 115/21
**understand** [2] 47/4 74/12
**understanding** [4] 37/6 75/11 97/20 137/14
**understood** [3] 39/23 93/11 136/19
**uniform** [2] 120/13 120/14
**UNITED** [5] 10/1 10/21 78/23 146/3 146/7
**United States** [2] 78/23 146/7
**unknown** [1] 134/23
**unless** [1] 58/16
**unobstructed** [2] 52/10 80/18
**until** [6] 78/2 93/24 124/21 136/13 136/15 138/6
**up** [41] 14/14 14/17 14/24 18/14 19/3 21/24 22/23 25/17 27/5 31/11 31/21 32/4 41/11 46/5 51/23 54/8 57/17 72/15 82/3 85/4 86/5 90/18 91/14 95/11 97/19 97/22 100/15 100/22 103/17 106/6 107/16 110/25 119/25 121/16 122/10 132/6 132/24 143/22 143/25 144/4 144/9
**upgraded** [1] 133/25
**upon** [1] 135/3
**us** [29] 15/4 15/7 27/2 38/7 43/13 50/12 53/7 53/9 53/9 53/22 60/13 61/10 72/14 75/25 76/7 81/24 86/6 88/18 91/25 92/6 94/5 98/2 98/11 101/5 101/6 102/12 104/16 109/25 122/6
**use** [20] 27/23 38/10 39/24 52/18 61/14 63/24 64/8 90/19 114/21 115/3 116/1 118/22 119/5 120/4

6-RenSER-01168

6-RenSER-01168

**U**

use... [6]  120/22 123/4 125/5 135/19 137/14 143/5
used [9]  27/24 28/7 116/7 120/6 127/24 128/8 129/22 135/21 137/22
uses [2]  111/25 127/23
using [3]  67/8 119/20 123/5
usually [1]  124/14
utilize [2]  120/20 130/19

**V**

vacate [1]  145/1
vague [5]  16/12 55/10 107/2 121/17 140/17
valid [1]  139/3
validation [1]  26/9
various [3]  112/25 128/4 135/13
vary [2]  130/12 130/14
vast [1]  122/23
vehicle [2]  39/22 97/25
verbal [5]  94/15 119/17 122/23 122/24 122/24
verify [1]  46/22
version [2]  140/16 140/18
versions [3]  139/24 140/13 141/2
versus [1]  112/9
very [25]  17/22 18/18 36/22 48/17 66/7 88/6 89/6 94/22 95/11 99/17 107/2 109/4 118/15 121/17 124/1 124/8 124/10 124/11 124/22 124/25 127/8 127/21 128/2 136/7 142/24
vet [1]  18/1
veteran [1]  24/1
victim [1]  130/23
victimized [1]  124/13
victims [1]  124/13
video [9]  28/18 48/23 98/2 99/24 100/14 101/18 104/1 107/11 117/11
videos [1]  116/17
videotape [14]  32/9 99/9 100/7 100/20 101/3 101/12 102/3 103/14 103/22 104/9 104/20 104/25 105/9 105/12
view [7]  51/19 52/2 52/10 80/18 80/23 90/6 107/17
viewing [1]  51/17
violation [2]  115/22 120/2
violence [14]  14/24 35/24 124/1 124/4 124/7 124/8 124/11 124/14 124/25 125/6 125/14 126/9 129/3 132/21
violent [2]  90/15 137/4
visit [1]  86/6
visual [1]  118/16

**W**

wailing [2]  33/23 33/24
waive [1]  131/11
waived [1]  131/18
walk [3]  18/14 47/14 72/6
walked [3]  81/3 83/5 83/13
walking [5]  21/24 25/17 70/10 70/14 133/14
wandering [1]  133/14
want [22]  14/24 16/4 34/8 34/12 40/6 44/9 47/16 60/16 73/24 81/10 81/14 84/17 84/18 86/23 89/3 91/24 92/4 108/16 118/19 118/22 118/23 136/19
wanted [5]  34/4 64/17 73/18 74/8 138/12
was [307]
wasn't [3]  15/7 18/1 83/22
watch [2]  113/11 113/13
watching [1]  98/10
WATKINS [3]  11/9 11/13 11/18
way [18]  17/15 17/17 18/5 18/11 27/8 27/10 36/4 54/8 54/8 83/22 85/4 88/25 102/5 107/19 111/16 119/3 121/16 122/10
we [119]  14/12 14/23 16/22 17/8 17/15 19/14 19/14 19/23 20/1 20/1 20/13 21/17 22/3 23/13 23/24 28/7 30/19 32/4 32/19 34/12 34/14 34/22 35/10 36/5 36/12 36/19 37/6 37/25 39/2 39/7 42/23 43/8 43/17 43/19 44/9 45/14 45/14 46/9 47/4 47/20 48/23 50/9 51/7 51/9 52/5 52/6 52/10 52/10 55/25 55/25 57/15 57/20 59/14 59/19 59/21 60/9 61/5 65/8 65/15 65/16 65/23 67/12 68/5 70/16 70/25 71/3 75/15 75/21 75/22 76/7 76/17 77/15 77/15 77/18 78/23 80/20 81/7 81/14 84/7 88/10 88/10 91/21 93/10 95/1 98/5 98/5 98/14 98/21 100/9 100/12 101/10 101/23 101/23 102/8 103/4 103/17 103/24 104/5 104/11 104/22 105/2 106/5 107/11 109/7 109/9 109/23 110/2 115/14 118/10 119/20

voice [11]  14/11 20/19 23/8 32/11 58/7 71/18 71/22 72/9 128/16 128/19 128/23
Volume [3]  10/8 14/4 145/4
vs [1]  10/8

125/20 125/21 126/7 130/15 138/6 138/7 142/20 142/21 142/23
we'll [10]  31/19 34/15 40/13 84/21 95/15 98/8 109/11 109/20 110/4 144/18
we're [16]  26/20 35/1 36/18 44/11 44/14 45/24 48/17 68/8 84/19 86/8 95/11 105/10 110/2 110/8 111/16 132/15
we've [6]  37/11 72/24 129/3 139/1 142/14 143/9
weapons [8]  100/13 101/20 125/20 126/16 129/18 129/23 137/23 139/8
weather [1]  99/15
Wednesday [1]  95/14
well [54]  15/15 16/6 19/9 26/16 33/16 36/16 36/22 43/3 45/12 45/21 51/8 54/6 55/23 56/4 56/21 57/22 59/19 60/13 60/21 63/13 67/16 70/20 71/14 71/16 76/20 77/15 78/17 82/5 82/11 84/17 88/1 93/6 93/10 102/24 109/1 109/16 109/21 115/16 117/10 125/13 126/8 126/24 128/24 129/19 129/22 130/7 131/6 132/10 132/14 133/1 134/7 135/4 135/10 139/3
well-trained [12]  125/13 126/8 126/24 128/24 129/19 130/7 131/6 132/10 133/1 134/7 135/4 139/3
went [14]  17/17 37/12 69/16 70/4 77/22 78/5 78/10 88/3 89/1 90/9 91/21 112/24 113/12 135/23
were [143]
weren't [1]  117/23
WEST [1]  10/22
Westminster [1]  16/3
what [152]
what's [6]  63/14 84/10 122/1 123/3 130/17 141/2
whatever [12]  17/11 18/10 65/16 115/20 116/16 118/18 119/23 122/5 128/7 130/13 131/13 142/18
wheel [1]  118/25
when [92]  14/17 14/23 15/2 15/3 16/18 17/17 19/15 21/2 22/3 22/24 23/17 23/23 27/5 30/4 33/15 34/4 36/4 37/10 37/12 37/19 37/24 39/14 39/19 40/1 41/18 42/5 42/12 42/14 42/17 42/22 43/17 43/24 47/5 47/21 48/10 48/18

51/17 52/1 52/5 53/9 53/14 55/8 57/11 57/24 61/11 62/22 64/4 66/13 67/18 67/20 69/9 69/21 69/24 70/4 72/13 73/7 74/7 74/16 76/11 77/11 80/3 81/18 83/11 83/18 85/23 87/12 88/23 90/17 92/7 106/15 106/18 106/21 106/24 107/11 107/12 118/24 119/5 121/23 123/4 127/19 129/5 129/9 129/23 131/14 131/15 132/20 133/23 135/1 135/18 139/16 140/24 143/20
where [41]  16/19 17/2 22/25 27/6 28/23 29/15 35/24 40/6 44/4 48/2 48/4 50/17 51/21 54/4 58/9 58/13 58/16 60/10 68/25 69/7 69/9 71/4 77/12 77/20 77/20 80/3 80/17 81/7 81/8 97/22 98/7 98/22 100/16 105/24 113/3 120/23 121/4 125/1 126/21 131/17 141/1
wherever [1]  56/19
whether [14]  36/18 56/1 61/17 106/21 115/2 115/10 116/22 119/25 124/3 124/16 125/19 126/16 128/8 130/19
which [35]  27/8 27/10 27/25 29/11 57/2 58/10 58/24 58/25 63/16 68/5 85/16 85/16 86/20 95/19 97/10 109/6 112/10 113/8 114/9 117/7 120/15 120/20 120/24 120/25 121/3 122/15 122/21 124/1 134/13 134/18 135/2 136/1 137/9 138/2 140/13
while [12]  17/4 35/16 43/18 72/20 72/21 75/21 81/4 81/25 83/14 93/13 109/10 116/2
whispering [2]  22/19 22/20
white [1]  39/7
who [26]  16/4 20/23 21/11 21/18 21/24 22/5 22/8 22/10 36/1 37/21 38/2 57/10 92/15 103/10 105/15 109/14 109/20 114/3 124/21 132/7 132/18 133/15 134/19 137/12 138/1 144/8
who's [1]  126/13
whoever [1]  30/12
whole [2]  30/9 126/16
why [50]  14/21 17/7 18/23 19/7 21/4 21/8 21/22 22/1 22/18 22/20 24/15 26/15 28/1 34/5 37/6 46/11 50/12 70/2 71/23 80/9 87/21 109/9 109/21 118/23 118/24

118/24 119/19 122/13 124/10 124/22 124/25 125/18 126/12 127/3 129/2 129/21 130/9 132/13 133/5 134/11 135/9 137/4 137/20 138/19 138/22 139/6 140/21 141/21 142/3 143/8
will [18]  20/13 52/24 55/24 58/16 60/2 88/10 88/10 89/10 118/20 118/25 119/16 126/17 128/6 129/25 130/1 131/13 136/14 140/14
willingly [1]  30/13
Winnebago [1]  39/7
winter [1]  99/15
within [5]  115/10 115/17 116/23 118/9 135/14
without [2]  115/17 122/2
witness [18]  14/7 35/2 41/4 41/12 53/11 84/7 94/24 95/24 96/2 108/8 110/10 110/18 110/23 111/2 112/7 116/10 140/22 144/8
witnesses [6]  13/3 13/6 95/9 108/18 117/12 117/20
woman [7]  14/19 34/2 42/24 42/25 43/19 44/2 76/7
won't [1]  62/18
word [4]  39/24 75/11 118/22 127/24
words [12]  17/23 17/24 18/20 26/17 33/8 33/16 33/19 36/18 68/19 68/22 70/15 71/14
work [10]  78/23 97/10 112/10 112/13 112/17 114/10 114/12 121/15 122/10 136/14
worked [6]  97/8 97/9 113/1 113/2 113/12 113/13
working [2]  96/15 96/18
worse [2]  124/19 142/23
would [114]  18/9 19/23 20/1 20/13 22/12 22/21 23/2 25/20 28/5 28/8 29/2 29/3 31/8 31/11 32/3 35/3 43/15 44/21 50/12 57/15 57/21 59/17 60/13 60/18 60/22 61/23 67/11 67/12 67/13 67/16 71/23 72/15 73/7 82/8 82/12 82/24 83/24 84/1 85/14 91/23 92/2 92/20 93/18 94/4 95/5 95/9 95/19 95/23 96/2 96/4 96/5 96/7 99/25 103/9 109/5 109/14 110/10 110/12 110/13 110/15 110/22 110/22 110/25 111/5 111/5 112/3 112/6 112/10 112/12 112/20 114/14 114/25 115/1 115/2 115/3

6-RenSER-01169                    6-RenSER-01169

**W**

would... [39]  115/10 115/13 116/4 122/3 122/6 125/13 125/17 126/7 128/12 128/19 128/23 129/18 129/20 130/6 132/9 132/12 132/19 132/22 133/1 133/4 133/16 133/22 134/5 134/9 134/24 135/4 135/8 135/15 136/20 137/9 137/17 137/19 141/10 143/14 143/25 144/2 144/2 144/12 144/14

wouldn't [6]  18/6 22/2 23/25 72/11 93/4 94/10

wrapping [1]  95/11

wrestling [3]  24/17 24/19 24/22

written [1]  96/25

wrong [3]  112/15 119/3 137/21

WRONIAK [2]  12/3 109/8

wrote [5]  92/15 92/21 92/21 93/16 93/22

**Y**

yea [1]  43/18

yeah [8]  18/22 26/17 47/1 47/8 67/13 69/23 75/7 87/18

year [1]  43/1

years [10]  45/5 70/21 73/17 89/17 96/19 97/9 112/3 114/14 114/19 116/4

yelled [1]  18/20

yelling [22]  18/15 19/4 19/12 26/11 26/16 26/18 30/9 36/1 39/20 41/19 42/19 47/9 57/11 59/16 69/22 73/1 92/15 132/6 132/18 132/24 133/15 138/1

yes [229]

yet [3]  75/14 76/2 85/1

you [954]

you'd [3]  56/19 65/6 145/1

You'll [1]  128/4

you're [38]  14/23 22/18 29/2 42/24 43/23 51/17 56/17 57/3 57/4 57/6 62/16 62/25 64/2 66/23 67/6 69/6 75/21 75/25 79/2 80/17 89/20 94/22 96/4 99/17 100/15 101/14 118/17 119/24 122/9 125/24 126/1 126/3 129/5 129/9 134/16 137/7 137/24 142/2

you've [7]  47/20 73/13 79/18 108/13 109/16 109/17 141/2

your [213]

Your Honor [10]  31/9 32/8 57/20 61/20 75/2 94/25 108/2 108/23 121/12 127/14

yourself [7]  28/17 28/21 41/3 44/22 81/17 92/6 99/14

yourselves [1]  86/7

youth [1]  16/4

Yucaipa [2]  113/14 113/18

6-RenSER-01170    6-RenSER-01170



Rel 01·22·18

## CRIME SUMMARY INFORMATION,
## PROBABLE CAUSE DECLARATION AND BAIL SETTING INFORMATION

**STATUS: APPROVED**          TRACKING NO.: 108722          IRC BOOKING NO.: 3035919

| ARRESTEE (LAST, FIRST, MIDDLE)<br>HOLLOWAY, JEREMY, RYAN | | AGENCY BOOKING NO. | DR NO.<br>18-002898 | | |
|---|---|---|---|---|---|
| ADDRESS (RESIDENCE)<br>22602 SILVER DOLLAR , CORONA, CA, USA, 92883 | | D.O.B<br>1976-10-23 | AGE<br>41 | | SEX<br>M |

| BOOKING CHARGE(S)<br>CPC 69<br>CPC 243 (B) | SUPPLEMENTARY HOLDS<br>[ ] PAROLE HOLD<br>[ ] PROBATION HOLD<br>[ ] OUTSTANDING WARRANT<br>[ ] INS HOLD<br>[ ] OTHER |
|---|---|

| DATE/TIME OF ARREST<br>2018-01-21 05:04:00 | EXPIRY<br>48 HR-EXP | EXPIRY DATE/TIME<br>2018-01-23 05:04:00 |
|---|---|---|

| ARRESTING AGENCY<br>OCSD P-Z | STATION<br>18 | ARRESTING OFFICER(S)<br>RENEGAR, C., 9250 |
|---|---|---|

**CRIME LOCATION**
UNINCORPORATED AREA, COUNTY OF ORANGE

**FACTS ESTABLISHING ELEMENTS OF CRIME AND IDENTIFICATION OF ARRESTEE**
ON 01/21/18 AT APPROXIMATELY 0456 HOURS, DEPUTIES K. PAHEL #8534, J. GONZALEZ #1397 AND I WERE DISPATCHED TO O'NEILL' CAMP GROUND IN TRABUCO CANYON REFERENCE DISTURBANCE. TRABUCO CANYON IS AN UNINCORPORATED AREA OF ORANGE COUNTY, CALIFORNIA.

UPON ARRIVAL, WE CONTACTED JEREMY RYAN HOLLOWAY (10-23-1976) WHO IS ON FORMAL PROBATION AND HAD MULTIPLE KNIVES WITHIN ARM'S REACH. DEPUTY GONZALEZ GAVE JEREMY MULTIPLE VERBAL COMMANDS TO PUT HIS HANDS ABOVE HIS HEAD AND GO DOWN TO HIS KNEES. JEREMY SAID, "NO." I ATTEMPTED TO PLACE AN ARM BAR TAKE DOWN ON JEREMY IN ORDER TO SAFELY PLACE HANDCUFFS ON JEREMY. AS I ATTEMPTED TO TAKE CONTROL OF JEREMY'S LEFT ARM, JEREMY TENSED UP AND BEGAN TO PULL AWAY FROM ME. JEREMY AND I WENT TO THE GROUND. JEREMY WRAPPED HIS LEFT ARM AROUND MY HEAD PREVENTING ME FROM MOVING MY HEAD. WHILE ON THE GROUND JEREMY KICKED ME MULTIPLE TIMES AND TURNED HIS BODY TOWARDS ME AND ATTEMPTED TO GRAB ONTO MY VEST. WITH THE ASSISTANCE ADDITIONAL DEPUTIES, HANDCUFFS WERE PLACED ON JEREMY.

BASED ON JEREMY'S ACTIONS JEREMY'S WAS PLACED UNDER ARREST FOR CPC 69 RESISTING A POLICE OFFICER AND CPC 243 (B) BATTERY ON A POLICE OFFICER.
JEREMY WAS IDENTIFIED BY HIS DMV PHOTO AND OWN ADMISSION.

SERGEANT J. AVALOS #4211 APPROVED.

| [ ] PAS/BREATH SCREEN | 1) WEAPON DESCRIPTION | |
|---|---|---|
| 2) VICTIM'S AGE | VICTIM'S INJURIES | |
| 3) VALUE OF PROPERTY LOSS $ | TYPE OF PROPERTY | |
| 4) NARCOTIC TYPE AND QUANTITY | 5) NARCOTIC WHOLESALE VALUE | NARCOTIC STREET VALUE |

6) PRESUMPTIVE TEST FOR: (POSITIVE Y/N)

I DECLARE UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY INFORMATION AND BELIEF.

| EXECUTED ON DATE/TIME<br>2018-01-24 05:32:44 | AT ORANGE COUNTY, CALIFORNIA BY<br>RENEGAR, CHAD | BADGE #<br>9250 |
|---|---|---|

ON THE BASIS OF [ X ] THE OFFICER'S DECLARATION [ ] REPORTS REVIEWED,
I HEREBY DETERMINE THAT THERE [ X ] IS [ ] IS NOT PROBABLE CAUSE TO BELIEVE THIS ARRESTEE HAS COMITTED A CRIME

| DATE/TIME<br>2018-01-21 14:18:05 | SIGNATURE OF HEARING OFFICER<br>BROWN, JACKI, C |
|---|---|

6-RenSER-01171          6-RenSER-01171

| 7/25/2018 | Orange County Sheriff Department | 10:53:33AM |
|---|---|---|
| | **Call Detail Information Report** | |
| | Call Number: 180121-0093 | |

**Call Number** 180121-0093

## Call Detail Information

| Call Number | Class | Taker | Pos | Call Owner | Date - Time Received | Cat |
|---|---|---|---|---|---|---|
| 180121-0093 | C | morrisondl | 12 | | 01/21/2018 03:39:44 | 0 |

| Complaint | | Ten Code | Priority | Disp Zone | IRA | How Received |
|---|---|---|---|---|---|---|
| 241 ASSAULT ON POLICE OFFICER | | | 2 | SE | TC01 | WIRE |

| Incident Location | Apt/Suite | Floor/Bldg | Incident City | Grid |
|---|---|---|---|---|
| 30892 TRABUCO CANYON RD | | | TC | 893A1 |

| Caller Name | Patrol Zone | Telephone | Tower ID | Jurisdiction | Tract |
|---|---|---|---|---|---|
| BRIAN | 89 | 714-928-4939 | 714-511-3776 | OCSD | TC |

☐ Images  ☐ Medical  ☐ Hazard  ☒ Previous  ☐ DR Issued in Error

| ALI Time | Call Rec'd | Xmit | Dispatch | Enroute | OnScene | Departed | Arrived | Comp | Unit |
|---|---|---|---|---|---|---|---|---|---|
| 03:39:32 | 03:39:44 | 03:40:57 | 03:42:36 | 03:42:36 | 03:54:46 | 05:40:18 | 06:01:46 | 14:11:55 | 489 |

**Narrative**

[01/21/2018 14:13:23 : pos4 : CHAVEZGA]
DR= 243b/69

Barrientos/ Brown
[01/21/2018 13:47:25 : pos4 : LGALLANT]
Unit : ███
10-49 AREA

Barrientos/ Brown
[01/21/2018 13:12:00 : pos4 : LGALLANT]
Unit : ███
10-97 OCJ

Barrientos/ Brown
[01/21/2018 12:50:29 : pos4 : LGALLANT]
Unit : ███
10-15

Barrientos/ Brown
[01/21/2018 06:01:42 : pos4 : LGALLANT]
Unit : ███
10-97 MISSION

Barrientos/ Brown
[01/21/2018 05:39:07 : pos4 : JURGENSENWA]
Unit : ███
WILL BE EN RTE TO MISSION HOSPITAL WITH THE SUSPECT ALL OTHER UNITS C4 10-6

Renegar
[01/21/2018 05:34:40 : pos4 : JURGENSENWA]
Unit : ███
REQ DR WILL ADV ON TITLE

[01/21/2018 05:25:04 : pos12 : morrisondl]
STA 17 ADVISED - EXTENDED ETA FROM ORANGE

Barrientos/ Brown
[01/21/2018 05:19:32 : pos4 : JURGENSENWA]
Unit : ███
REQ ANIMAL CONTROL FOR 5 LB DOG

Borba
[01/21/2018 05:07:30 : pos4 : JURGENSENWA]
Unit : ███
SEND IN OCFA FOR OUR SUBJ

Page 1 of 15

COUNTY OF ORANGE
000209

October 25, 2019

6-RenSER-01172          6-RenSER-01172

| | |
|---|---|
| 7/25/2018 | **Orange County Sheriff Department** 10:53:33AM |
| | **Call Detail Information Report** |
| | Call Number: 180121-0093 |

**Borba**
[01/21/2018 05:06:06 : pos4 : JURGENSENWA]
Unit ▮▮
10-34 ON Y3

[01/21/2018 05:05:42 : pos1 : RAMIREZLV]
INF IS: JOSH GOMEZ #714-583-5615

**Borba**
[01/21/2018 05:04:57 : pos4 : JURGENSENWA]
Unit : ▮▮
SUFFICIENT UNITS

**Borba**
[01/21/2018 05:04:27 : pos4 : JURGENSENWA]
Unit : ▮▮
ALL RESPONDING UNITS SHUT DOWN CODE

[01/21/2018 05:04:13 : pos1 : RAMIREZLV]
INF STATING NON LETHAL HAS BEEN DEPLOYED

**Borba**
[01/21/2018 05:04:07 : pos4 : JURGENSENWA]
Unit : ▮▮
1 AT CUFFS....TAZER DEPLOYMENT

**Gonzalez/**
**Pahel**
[01/21/2018 05:03:31 : pos4 : JURGENSENWA]
Unit : ▮▮
415

[01/21/2018 05:02:55 : pos4 : JURGENSENWA]
PER 4S66 DO NOT NEED ADDL UNNITS AT THIS TIME

**Renegar**
[01/21/2018 05:02:49 : pos4 : JURGENSENWA]
Unit : ▮▮
1 AT GP AT CAMP 65

[01/21/2018 05:02:38 : pos1 : RAMIREZLV]
DESK ON 10-21 WITH SUBJ  HAS CONTACT WITH DEPS

**Renegar**
[01/21/2018 05:02:29 : pos4 : JURGENSENWA]
Unit : ▮▮
ASK INF WHERE IS HE AT NOW AND DESCRIP

[01/21/2018 05:01:48 : pos4 : JURGENSENWA]
10-33 ON Y3

Page 2 of 15

COUNTY OF ORANGE
000210

October 25, 2019

6-RenSER-01173          6-RenSER-01173

| | |
|---|---|
| 7/25/2018 | **Orange County Sheriff Department** 10:53:33AM |
| | **Call Detail Information Report** |
| | Call Number:  180121-0093 |

Renegar

[01/21/2018 05:00:49 : pos4 : JURGENSENWA]
Unit : ███
KEEP INF ON THE LINE

[01/21/2018 05:00:27 : pos1 : RAMIREZLV]
INF IS AT CAMPSITE 67

Borba

[01/21/2018 04:59:58 : pos4 : JURGENSENWA]
Unit : ███
C3 SADDLEBACK//ROBINSON RANCH

Gotts/
Gunderson

[01/21/2018 04:59:41 : pos4 : JURGENSENWA]
Unit : ███
C3 SMP//PLANO TRABUCO

[01/21/2018 04:59:32 : pos1 : RAMIREZLV]
INF STS THE MALE SUBJ IS YELLING AND THERE IS STILL A LITTLE GIRL SCREAMING

Gonzalez/
Pahel

[01/21/2018 04:59:13 : pos4 : JURGENSENWA]
Unit : ███
C3 PLANO TRABUCO//SMP

Renegar

[01/21/2018 04:59:04 : pos4 : JURGENSENWA]
Unit : ███
C3 PLANO TRABUCO//SMP

[01/21/2018 04:58:29 : pos1 : RAMIREZLV]
INF NOW STATING A LITTLE GIRL IS SCREAMING    UPGRADED TO A P1

[01/21/2018 04:58:18 : pos1 : RAMIREZLV]
INF STS MALE SUBJ IS GOING THROUGH THINGS IN HIS CAMPSITE

[01/21/2018 04:56:36 : pos1 : RAMIREZLV]
INF STS MALE SUBJ IS BY CAMPSITE 61  IN AN WHITE RV

[01/21/2018 04:55:38 : pos1 : RAMIREZLV]
**Appended Information from duplicate call:
Caller Name : , Phone : ,Complaint : 415
Apt/Suite : , Flr/Bldg :
Narrative : Landmark Comment: 893A1    92692
Landmark: ONEILL PARK

Page 3 of 15

COUNTY OF ORANGE                                        October 25, 2019
000211

6-RenSER-01174                                                          6-RenSER-01174

| 7/25/2018 | **Orange County Sheriff Department** | 10:53:33AM |
|---|---|---|
| | **Call Detail Information Report** | |
| | Call Number:   180121-0093 | |

Cross streets: TRABUCO CANYON RD//
NBH: 893A1    92679  33.6530325102696,-117.599035586489
ARROYO SOUTH CAMPGROUND  INF STATING MALESUBJ IS WALKING AROUND FROM CAMPSITE TO CAMPITE
LOOKING FOR THE SUBJ WHO CALLED POLICE
**End of Appended Information.

[01/21/2018 04:48:13 : pos4 : JURGENSENWA]
  [Cleared with unit 489]

**Renegar**
PER ▮▮ INF HAS SEVERAL MACHETES, HAMMERS, KNIVES, AND DENIED HAVING A HANDGUN BUT IT IS POSSIBLE.
489 ADV TO SEND 3 UNITS NEXT CALL AND THE SUBJ IS ON FORMAL PROBATION ALTHOUGH HE ADV INFORMAL

**Renegar**
[01/21/2018 04:47:30 : MOB : ▮▮▮]
spoke with multiple info who all stated it was campsite 65. spoke with subj who was un cooperative. subj was alone in campsite
no female present. subj on formal probation. ***lots of knives in campsite.***** Subj agressive**** no injuries seen 10-98.

**Renegar**
[01/21/2018 04:33:02 : pos4 : JURGENSENWA]
Unit :▮▮▮
C4 10-6

[01/21/2018 04:23:50 : pos4 : JURGENSENWA]
REG VALID FROM: 04/30/13 TO 04/30/14
LIC#:7U75121 YRMD:05 MAKE:CHEV BTM :PK VIN :2GCEC19V851284104
R/O :HOLLAWAY JEREMY R, 1100 E FAIRHAVEN 160 CITY:SANTA ANA C.C.:30
RIP OFC:691 D:04/13/16 ID/S:E00005 T:H00
PENDING MASTER FILE RECORD
LIC#:        YRMD:05 MAKE:CHEV BTM :PK VIN :2GCEC19V851284104
R/O :HOLLAWAY JEREMY R, 615 E ADAMS AVE CITY:ORANGE C.C.:30 ZIP#:92867

**Renegar**
[01/21/2018 04:23:19 : pos4 : JURGENSENWA]
Unit :▮▮▮
CONTACT W INF WILL BE CAMP SITE  65

**Borba**
[01/21/2018 04:16:05 : pos4 : JURGENSENWA]
Unit :▮▮▮
CAMPSITE 67

**Billinger**
[01/21/2018 04:15:25 : pos4 : JURGENSENWA]
Unit :▮▮▮
HAVE CONTACT WITH BOTH PARTIES

[01/21/2018 04:13:30 : pos4 : JURGENSENWA]
PER ECB SUPER SOUTH ARROYA CAMPGROUND

COUNTY OF ORANGE
000212

October 25, 2019

6-RenSER-01175                                                                      6-RenSER-01175



7/25/2018     **Orange County Sheriff Department**     10:53:33AM

**Call Detail Information Report**

Call Number: 180121-0093

**Billinger**

[01/21/2018 04:08:06 : pos4 : JURGENSENWA]
INF IS AT ARROYO CAMPGROUND IN ONEIL PARK, DV POSS OCCURRING AT 65

[01/21/2018 04:06:58 : pos4 : JURGENSENWA]
DV OCCURRING WHITE TRUCK AND A TENT TO THE RT OF CAMP #63

[01/21/2018 04:05:24 : pos4 : JURGENSENWA]
Unit : ▊
UTL SO FAR CAN YOU CONFIRM THE CAMP SITE WITH RP

[01/21/2018 03:40:57 : pos12 : morrisondl]
Cross streets: TRABUCO CANYON RD//
Landmark: ONEILL PARK
NBH: 893A1   92679   33.6530325102696,-117.599035586489
Landmark Comment: 893A1   92692
ALI X Coordinate: 33.63307700
ALI Y Coordinate: -117.611711
ALI Uncertainty Factor: 4043
ALI Confidence Factor: 100
MALE VS FEMALE IN A PHYSICAL 415 OCCURING TO THE RIGHT OF CAMP SITE # 63 INF IS NOT INVOLVED

**Location Comment**

NBH: 893A1   92679   33.6530325102696,-117.599035586489

## Call Dispositions

| Date - Time | Disposition | Unit | |
|---|---|---|---|
| 01/21/2018 04:47:33 | Assist | ▊ | Renegar |
| 01/21/2018 04:48:13 | No Report Needed | | Renegar |
| 01/21/2018 05:35:14 | Assisting Officer-Backup | | Baek |
| 01/21/2018 07:10:06 | Report Taken | | Renegar |

## Department

| Department | OCA Number |
|---|---|
| OCUN | 18-002898 |

## Call Complaints

| Date-Time | Complaint | Action By |
|---|---|---|
| 1/21/2018 7:55:50AM | 415 | LGALLANT |

## Call Locations

| Date-Time | Location | City |
|---|---|---|

## Call Log

**As Reflected**

| Unit | Status | Date-Time | Dept | Comments | Deputy ID | Deputy | Odometer |
|---|---|---|---|---|---|---|---|
| ▊ | ENR | 01/21/2018 03:42:36 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | ENR | 01/21/2018 03:42:37 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | ONS | 01/21/2018 03:54:46 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | ONS | 01/21/2018 03:54:47 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |

COUNTY OF ORANGE

000213

October 25, 2019

6-RenSER-01176      6-RenSER-01176

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/25/2018 | | **Orange County Sheriff Department** | | | | 10:53:33AM |
| | | **Call Detail Information Report** | | | | |
| | | Call Number: 180121-0093 | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| ENR | 01/21/2018 04:09:14 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| ENR | 01/21/2018 04:09:14 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| ONS | 01/21/2018 04:12:59 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| ONS | 01/21/2018 04:24:47 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | 01/21/2018 04:48:09 | OCUN | Primary Unit | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| COM | 01/21/2018 04:48:13 | OCRS | COM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| COM | 01/21/2018 04:48:13 | OCRS | COM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| COM | 01/21/2018 04:48:14 | OCUN | COM | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| COM | 01/21/2018 04:48:14 | OCUN | COM | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | 01/21/2018 04:55:26 | | Reactivated | | | 0.0 |
| DIS | 01/21/2018 04:55:31 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| DIS | 01/21/2018 04:55:31 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| DIS | 01/21/2018 04:55:32 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| DIS | 01/21/2018 04:55:32 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| REM | 01/21/2018 04:55:44 | OCRS | REM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| REM | 01/21/2018 04:55:45 | OCRS | REM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| ENR | 01/21/2018 04:55:50 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| REM | 01/21/2018 04:56:06 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| ENR | 01/21/2018 04:56:11 | OCUN | 30892 TRABUCO CANYON RD, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| ENR | 01/21/2018 04:56:33 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| ENR | 01/21/2018 04:57:26 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| REM | 01/21/2018 04:57:28 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| ENR | 01/21/2018 04:59:32 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| ONS | 01/21/2018 05:01:35 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |

As Reflected

Page 6 of 15

COUNTY OF ORANGE

000214

October 25, 2019

6-RenSER-01177     6-RenSER-01177

7/25/2018

**Orange County Sheriff Department**

**Call Detail Information Report**

Call Number: 180121-0093

10:53:33AM

As Reflected

| | | | | | | |
|---|---|---|---|---|---|---|
| ONS | 01/21/2018 05:01:35 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| ONS | 01/21/2018 05:01:55 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| ONS | 01/21/2018 05:03:13 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 39659.0 |
| ENR | 01/21/2018 05:03:42 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| ENR | 01/21/2018 05:03:42 | OCRS | 30892 TRABUCO CANYON RD, TC | 3313 | BAEK,PATRICK LEE | 0.0 |
| ONS | 01/21/2018 05:03:55 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| ONS | 01/21/2018 05:03:57 | OCRS | 30892 TRABUCO CANYON RD, TC | 3313 | BAEK,PATRICK LEE | 0.0 |
| ONS | 01/21/2018 05:05:40 | OCUN | 30892 TRABUCO CANYON RD, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| REM | 01/21/2018 05:25:46 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| ONS | 01/21/2018 05:29:30 | OCRS | 30892 TRABUCO CANYON RD, TC | 1854 | RAWLINGS,STEWART ALAN | 0.0 |
| LEF | 01/21/2018 05:40:18 | OCUN | Left Scene, MISSION HOSPITAL MV, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| REM | 01/21/2018 05:42:14 | OCRS | REM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| REM | 01/21/2018 05:45:48 | OCRS | REM | 3313 | BAEK,PATRICK LEE | 0.0 |
| REM | 01/21/2018 05:58:31 | OCRS | REM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| ENR | 01/21/2018 05:58:46 | OCUN | 30892 TRABUCO CANYON RD, TC | 5732 | DANIELS,JASON GARRETT | 0.0 |
| ARR | 01/21/2018 06:01:46 | OCUN | Radio Communication, MISSION, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| ONS | 01/21/2018 06:11:51 | OCUN | 30892 TRABUCO CANYON RD, TC | 5732 | DANIELS,JASON GARRETT | 0.0 |
| REM | 01/21/2018 06:12:41 | OCRS | REM | 1854 | RAWLINGS,STEWART ALAN | 0.0 |
| REM | 01/21/2018 06:30:21 | OCUN | REM | 5732 | DANIELS,JASON GARRETT | 0.0 |
| REM | 01/21/2018 07:10:06 | OCUN | REM | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| REM | 01/21/2018 07:10:08 | OCUN | REM | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| LEF | 01/21/2018 12:50:32 | OCUN | Left Scene, OCJ, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| ARR | 01/21/2018 13:12:03 | OCUN | Radio Communication, OCJ, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| LEF | 01/21/2018 13:47:29 | OCUN | Left Scene, 10-49 REA, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| REM | 01/21/2018 14:09:14 | OCUN | REM | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |

Page 7 of 15

COUNTY OF ORANGE

000215

October 25, 2019

6-RenSER-01178          6-RenSER-01178



| 7/25/2018 | | | Orange County Sheriff Department | | | | | | 10:53:33AM |

**Call Detail Information Report**

Call Number: 180121-0093

| | Unit | Department | DIS | ENR | ONS | LEF | ARR | BUS | REM | CDM |
|---|---|---|---|---|---|---|---|---|---|---|
| Billinger | | OCRS | 04:55:31 | 03:42:36 | 03:54:46 | | | | 05:42:14 | 04:48:13 |
| Borba | | OCRS | 04:55:31 | 03:42:37 | 03:54:47 | | | | 05:58:31 | 04:48:13 |
| Gonzalez/Pahel | | OCUN | 04:55:32 | 04:09:14 | 04:24:47 | | | | 07:10:08 | 04:48:14 |
| Renegar | | OCUN | 04:55:32 | 04:09:14 | 04:12:59 | | | | 07:10:06 | 04:48:14 |
| Gotts/Gunderson | | OCRS | | 04:55:50 | 05:03:13 | | | | 05:25:46 | |
| Barrientos/Brown | | OCUN | | 04:56:11 | 05:05:40 | 05:40:18 | 06:01:46 | | 14:09:14 | |
| Baek | | OCRS | | 05:03:42 | 05:03:57 | | | | 05:45:48 | |
| Rawlings | | OCRS | | | 05:29:30 | | | | 06:12:41 | |
| Daniels | | OCUN | | 05:58:46 | 06:11:51 | | | | 06:30:21 | |

**Unit Log**

| Date Time | Dept | Unit | Deputy | Action | Comments |
|---|---|---|---|---|---|
| 01/21/2018 03:42:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:42:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:42:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | | 9153 | Billinger | |
| 01/21/2018 03:59:11 | OCRS | | 5073 | Borba | |
| 01/21/2018 03:59:11 | OCRS | | 5073 | Borba | |
| 01/21/2018 03:59:11 | OCRS | | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | | 5073 | Borba | |
| 01/21/2018 04:04:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:04:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:04:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:05:11 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:05:11 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:05:12 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:05:24 | OCRS | | 9153 | Note Billinger | UTL SO FAR CAN YOU CONFIRM THE CAMP SITE WITH RP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:06:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:06:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:06:53 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | | 9153 | Billinger | |

Page 8 of 15

COUNTY OF ORANGE
000216

October 25, 2019

6-RenSER-01179          6-RenSER-01179

| 7/25/2018 | **Orange County Sheriff Department** | 10:53:33AM |
|---|---|---|
| | **Call Detail Information Report** | |
| | Call Number: 180121-0093 | |

| | | | | |
|---|---|---|---|---|
| 01/21/2018 04:12:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:12:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:12:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:13:25 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:13:25 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:13:25 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:15:12 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:15:12 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:15:12 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:15:25 | OCRS | | 9153 | Note Billinger | HAVE CONTACT WITH BOTH PARTIES, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:15:34 | OCRS | | 9153 | Note Billinger | HAVE CONTACT WITH BOTH PARTIES, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:15:53 | OCRS | | 5073 | Borba |
| 01/21/2018 04:15:53 | OCRS | | 5073 | Borba |
| 01/21/2018 04:15:53 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:04 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:04 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:04 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:05 | OCRS | | 5073 | Note Borba | CAMPSITE 67, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:16:11 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:11 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:11 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:39 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:39 | OCRS | | 5073 | Borba |
| 01/21/2018 04:16:39 | OCRS | | 5073 | Borba |
| 01/21/2018 04:18:01 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:18:01 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:18:01 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:19:51 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 04:19:51 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 04:19:51 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 04:20:22 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:22 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:22 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:31 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:31 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:31 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:56 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:20:56 | OCRS | | 9153 | Billinger |

COUNTY OF ORANGE
000217

October 25, 2019

6-RenSER-01180     6-RenSER-01180

| 7/25/2018 | **Orange County Sheriff Department** | 10:53:33AM |
| --- | --- | --- |
| | **Call Detail Information Report** | |
| | Call Number: 180121-0093 | |

| | | | | |
| --- | --- | --- | --- | --- |
| 01/21/2018 04:20:56 | OCRS | | 9153 | Billinger |
| 01/21/2018 04:22:08 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:08 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:08 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:14 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:14 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:14 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:25 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:25 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:25 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:59 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:59 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:22:59 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:23:19 | OCUN | | 9250 | Note Renegar | CONTACT W ING WILL BE CAMP SITE 65, 30892 TRABUCO CANYON RD, TC |

| | | | | |
| --- | --- | --- | --- | --- |
| 01/21/2018 04:32:56 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:32:56 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:32:56 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:33:02 | OCUN | | 9250 | Note Renegar | C4 10-6, 30892 TRABUCO CANYON RD, TC |

| | | | | |
| --- | --- | --- | --- | --- |
| 01/21/2018 04:47:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:47:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:47:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:56:50 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:56:50 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:56:50 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:57:25 | OCRS | | 8699/9090 | Gotts/Gunderson |
| 01/21/2018 04:57:25 | OCRS | | 8699/9090 | Gotts/Gunderson |
| 01/21/2018 04:57:25 | OCRS | | 8699/9090 | Gotts/Gunderson |
| 01/21/2018 04:58:53 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:58:53 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:58:53 | OCUN | | 9250 | Renegar |
| 01/21/2018 04:59:04 | OCUN | | 9250 | Note Renegar | C3 PLANO TRABUCO//SMP, 30892 TRABUCO CANYON RD, TC |

| | | | | |
| --- | --- | --- | --- | --- |
| 01/21/2018 04:59:12 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 04:59:12 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 04:59:12 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 04:59:13 | OCUN | | 1397/8534 | Note Gonzalez/Pahel | C3 PLANO TRABUCO//SMP, 30892 TRABUCO CANYON RD, TC |

| | | | | |
| --- | --- | --- | --- | --- |
| 01/21/2018 04:59:20 | OCRS | | 5073 | Borba |
| 01/21/2018 04:59:20 | OCRS | | 5073 | Borba |

COUNTY OF ORANGE
000218

October 25, 2019

6-RenSER-01181　　　　　6-RenSER-01181



| 7/25/2018 | | Orange County Sheriff Department<br>Call Detail Information Report<br>Call Number: 180121-0093 | | 10:53:33AM |
|---|---|---|---|---|
| 01/21/2018 04:59:20 | OCRS | █ | 5073 | Borba |
| 01/21/2018 04:59:41 | OCRS | | 8699/9090 | Note Gotts/Gunderson | C3 SMP//PLANO TRABUCO, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:59:58 | OCRS | █ | 5073 | Note Borba | C3 SADDLEBACK//ROBINSON RANCH, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:00:38 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:00:38 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:00:38 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:00:49 | OCUN | | 9250 | Note Renegar | KEEP INF ON THE LINE, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:01:29 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:29 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:29 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:39 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:01:51 | OCRS | | 5073 | Borba |
| 01/21/2018 05:01:51 | OCRS | | 5073 | Borba |
| 01/21/2018 05:01:51 | OCRS | | 5073 | Borba |
| 01/21/2018 05:02:09 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:09 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:09 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:12 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:12 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:12 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:29 | OCUN | | 9250 | Note Renegar | ASK INF WHERE IS HE AT NOW AND DESCRIP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:02:37 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:37 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:37 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:02:49 | OCUN | | 9250 | Note Renegar | 1 AT GP AT CAMP 65, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:03:16 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:03:16 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:03:16 | OCUN | | 9250 | Renegar |
| 01/21/2018 05:03:22 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 05:03:22 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 05:03:22 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 05:03:26 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 05:03:26 | OCUN | | 1397/8534 | Gonzalez/Pahel |
| 01/21/2018 05:03:26 | OCUN | | 1397/8534 | Gonzalez/Pahel |

Page 11 of 15

COUNTY OF ORANGE
000219

October 25, 2019

6-RenSER-01182

6-RenSER-01182



| 7/25/2018 | | | Orange County Sheriff Department | | 10:53:33AM |
|---|---|---|---|---|---|
| | | | **Call Detail Information Report** | | |
| | | | Call Number: 180121-0093 | | |

| 01/21/2018 05:03:31 | OCUN | ▮ | 1397/8534 | Note Gonzalez/Pahel | 415, 30892 TRABUCO CANYON RD, TC |
|---|---|---|---|---|---|
| 01/21/2018 05:03:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:03:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:03:51 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:04:00 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:01 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:01 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:07 | OCRS | | 5073 | Note Borba | 1 AT CUFFS, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:04:13 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:13 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:13 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:27 | OCRS | | 5073 | Note Borba | ALL RESPONDING UNITS SHUT DOWN CODE, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:04:41 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:41 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:41 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:04:57 | OCRS | | 5073 | Note Borba | SUFFICIENT UNITS, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:05:01 | OCRS | | 3313 | Baek | |
| 01/21/2018 05:05:02 | OCRS | | 3313 | Baek | |
| 01/21/2018 05:05:02 | OCRS | | 3313 | Baek | |
| 01/21/2018 05:05:12 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:13 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:13 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:05:36 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:05:36 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:05:36 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:06:06 | OCRS | | 5073 | Note Borba | 10-34 ON Y3, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:07:30 | OCRS | | 5073 | Note Borba | SEND IN OCFA FOR OUR SUBJ, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:18:37 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:18:37 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:18:37 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:17 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:18 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:18 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:25 | OCUN | | 3724/9289 | Barrientos/Brown | |

Page 12 of 15

October 25, 2019

6-RenSER-01183          6-RenSER-01183



| 7/25/2018 | | | | **Orange County Sheriff Department** | | 10:53:33AM |

**Call Detail Information Report**

Call Number: 180121-0093

| 01/21/2018 05:19:25 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:25 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:32 | OCUN | | 3724/9289 | Note Barrientos/Brown | REQ ANIMAL CONTROL FOR 5 LB DOG, 30892 TRABUCO CANYON RD, TC |

| 01/21/2018 05:25:34 | OCRS | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:25:34 | OCRS | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:25:34 | OCRS | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:34:14 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:34:14 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:34:15 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:34:40 | OCUN | | 9250 | Note Renegar | REQ DR WILL ADV ON TITLE, 30892 TRABUCO CANYON RD, TC |

| 01/21/2018 05:34:48 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:34:48 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:34:48 | OCUN | | 9250 | Renegar | |
| 01/21/2018 05:38:42 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:38:42 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:38:42 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:39:07 | OCUN | | 3724/9289 | Note Barrientos/Brown | WILL BE EN RTE TO MISSION HOSPITAL WITH THE SUSPECT ALL OTHER UNITS C4 10-6, 30892 TRABUCO CANYON RD, TC |

| 01/21/2018 05:42:09 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:42:09 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:42:09 | OCRS | | 9153 | Billinger | |
| 01/21/2018 05:58:17 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:58:17 | OCRS | | 5073 | Borba | |
| 01/21/2018 05:58:17 | OCRS | | 5073 | Borba | |
| 01/21/2018 06:01:32 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:32 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:32 | OCUN | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:42 | OCUN | | 3724/9289 | Note Barrientos/Brown | 10-97 MISSION, MISSION HOSPITAL MV, TC |

| 01/21/2018 06:11:45 | OCUN | | 5732 | Daniels | |
| 01/21/2018 06:11:45 | OCUN | | 5732 | Daniels | |
| 01/21/2018 06:11:45 | OCUN | | 5732 | Daniels | |
| 01/21/2018 06:12:35 | OCRS | | 1854 | Rawlings | |
| 01/21/2018 06:12:35 | OCRS | | 1854 | Rawlings | |
| 01/21/2018 06:12:35 | OCRS | | 1854 | Rawlings | |
| 01/21/2018 06:30:13 | OCUN | | 5732 | Daniels | |
| 01/21/2018 06:30:13 | OCUN | | 5732 | Daniels | |
| 01/21/2018 06:30:13 | OCUN | | 5732 | Daniels | |

Page 13 of 15

COUNTY OF ORANGE
000221

October 25, 2019

6-RenSER-01184        6-RenSER-01184



| 7/25/2018 | Orange County Sheriff Department | 10:53:33AM |
|---|---|---|
| | **Call Detail Information Report** | |
| | Call Number: 180121-0093 | |

| | | | | |
|---|---|---|---|---|
| 01/21/2018 07:09:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 07:09:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 07:09:54 | OCUN | | 9250 | Renegar |
| 01/21/2018 12:50:20 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 12:50:20 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 12:50:20 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 12:50:29 | OCUN | | 3724/9289 | Note Barrientos/Brown 10-15, MISSION, TC |
| 01/21/2018 13:11:51 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:11:52 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:11:52 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:12:00 | OCUN | | 3724/9289 | Note Barrientos/Brown 10-97 OCJ, OCJ, TC |
| 01/21/2018 13:47:17 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:47:18 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:47:18 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 13:47:25 | OCUN | | 3724/9289 | Note Barrientos/Brown 10-49 AREA, OCJ, TC |
| 01/21/2018 14:08:41 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 14:08:41 | OCUN | | 3724/9289 | Barrientos/Brown |
| 01/21/2018 14:08:41 | OCUN | | 3724/9289 | Barrientos/Brown |

**Call Vehicles**

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 8J90643 | | | |

| Comments | | | | Owner | | | |
|---|---|---|---|---|---|---|---|

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 6L52058 | | | |

| Comments | | | | Owner | | | |
|---|---|---|---|---|---|---|---|

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 7U75121 | | | |

| Comments | | | | Owner | | | |
|---|---|---|---|---|---|---|---|

**Subject**

| Category | Last Name | First Name | Middle Name | Suffix | Race | Ethnic |
|---|---|---|---|---|---|---|
| SUBJ | HOLLOWAY | JEREMY | RYAN | | H | H |

| Height | Weight | Age | DOB | SSN | OL-State | OLN | Description |
|---|---|---|---|---|---|---|---|
| 505 | 185 | 41 | 10/23/1976 | - - | CA | B3003420 | |

Page 14 of 15

COUNTY OF ORANGE
000222

October 25, 2019

6-RenSER-01185                    6-RenSER-01185

| 7/25/2018 | **Orange County Sheriff Department** | 10:53:33AM |
|---|---|---|
| | **Call Detail Information Report** | |
| | Call Number:  180121-0093 | |

## Call Reference Information

| Reference Type | Reference | Related Calls |
|---|---|---|

COUNTY OF ORANGE
000223

October 25, 2019

6-RenSER-01186

6-RenSER-01186