DOCKET NOS. 25-7132, 25-7297

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

**CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 7 OF 9**

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

**Michael L. Wroniak (State Bar No. 210347)**
**Christie B. Swiss (State Bar No. 245151)**
**COLLINS + COLLINS LLP**
**750 The City Drive, Suite 400**
**Orange, CA 92868**
**(714) 823-4100 – FAX (714) 823-4101**
**Email: mwroniak@ccllp.law**
**Email: cswiss@ccllp.law**

Attorneys for Defendant
DEPUTY CHAD RENEGAR

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DISTRICT

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE; DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer. DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS, individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1 through 10, Inclusive<br><br>Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br>*Honorable David O. Carter; Courtroom 10A*<br><br>**DECLARATION OF CHRISTIE B. SWISS IN SUPPORT OF DEFENDANT CHAD RENEGAR'S OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**<br><br>**[filed concurrently with the Opposition; Declaration of O'Connor]**<br><br>**Date: September 15, 2025**<br>**Time: 9:00 a.m.**<br>**Dept: 10-A**<br><br>**Complaint Filed: August 6, 2019**<br><br>**Trial Date: April 29, 2025** |

*FILE # 23084*

1

**SWISS DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01188        7-RenSER-01188

I, Christie B. Swiss, hereby declare as follows:

1.     I am an attorney admitted to practice before all the courts of the State of California and the Central District of California. I am a partner with the law firm of Collins + Collins LLP, counsel of record for Defendant Deputy Chad Renegar ("Deputy Renegar") in this matter. I have personal knowledge of the facts stated herein, except as to those matters that I state upon information and belief, and as to those matters I believe them to be true. If called upon to testify I could and would competently do so. This Declaration is made in support of Defendant Chad Renegar's Opposition to Plaintiff's Motion for Award of Attorney Fees and Costs.

2.     Attached hereto as **Exhibit A** is a true and correct copy of relevant portions from the transcript of pre-trial proceedings on September 2, 2020.

3.     Attached hereto as **Exhibit B** is a true and correct copy of relevant portions from the transcript of trial proceedings on August 23, 2021, Trial 1, Day 5, Volume I.

4.     Attached hereto as **Exhibit C** is a true and correct copy of relevant portions from the transcript of trial proceedings on December 7, 2022, Trial 2, Day 2, Volume II.

5.     Attached hereto as **Exhibit D** is a true and correct copy of relevant portions from the transcript of trial proceedings on December 16, 2022, Trial 2, Day 9, Volume I.

6.     Attached hereto as **Exhibit E** is a true and correct copy of relevant portions from the transcript of trial proceedings, Trial 3, Day 5, Volume II.

7.     Attached hereto as **Exhibit F** is a true and correct copy of relevant portions from the transcript of trial proceedings on August 3, 2023, Trial 3, Day 10, Volume I.

8.     Attached hereto as **Exhibit G** is a true and correct copy of relevant portions from the transcript of trial proceedings on April 4, 2025, Trial 4, Pre-Trial Proceedings.

9.     Attached hereto as **Exhibit H** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 6, 2025, Trial 4, Day 4, Volume I.

*FILE # 23084*

2

**SWISS DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone   (714) 823-4100
Fax      (714) 823-4101

7-RenSER-01189                                    7-RenSER-01189

10.     Attached hereto as **Exhibit I** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 6, 2025, Trial 4, Day 4, Courtsmart.

11.     Attached hereto as **Exhibit J** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 7, 2025, Trial 4, Day 5, Volume II.

12.     Attached hereto as **Exhibit K** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 8, 2025, Trial 4, Day 6.

13.     Attached hereto as **Exhibit L** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 9, 2025, Trial 4, Day 7, Volume I.

14.     Attached hereto as **Exhibit M** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 13, 2025, Trial 4, Day 9, Volume II.

15.     Attached hereto as **Exhibit N** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 20, 2025, Trial 4, Day 13, Volume I.

16.     Attached hereto as **Exhibit O** is a true and correct copy of relevant portions from the transcript of trial proceedings on December 8, 2022, Trial 2, Day 3, Volume II.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of August, 2025, at Carlsbad, California.

CHRISTIE BODNAR SWISS

*FILE # 23084*

3

**SWISS DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

**COLLINS + COLLINS** LLP
750 The City Drive
Suite 400
Orange, CA  92868
Phone   (714) 823-4100
Fax      (714) 823-4101

Case 25-7132, 07/27/2026, DktEntry: 308.15, Page 5 of 300

# EXHIBIT A

7-RenSER-01191

7-RenSER-01191

TRANSCRIPT OF AUDIO-RECORDED

TELEPHONIC HEARING


SEPTEMBER 2, 2020


IN THE CASE OF HOLLOWAY V. COUNTY OF ORANGE, ET AL.

7-RenSER-01192                                    7-RenSER-01192

THE COURT: -- supplemental response to Interrogatory Number 13 [sic] within 14 days.

MS. MKRTCHYAN: Well, you know, I would object to that because I think that that is --

THE COURT: You can take it with --

MS. MKRTCHYAN: -- exactly --

THE COURT: -- Judge Carter by --

MS. MKRTCHYAN: -- [inaudible] --

THE COURT: -- filing a motion for review.

MS. MKRTCHYAN: Well, you know, Your Honor, I -- I will take it up with the Judge Carter because I think that --

THE COURT: Ms. --

MS. MKRTCHYAN: -- you are bias against plaintiff and you're bias towards me. In fact, from the very beginning of this case that I would like to say that, you know, I don't appreciate impartiality. Judiciary is a very important fact especially inside of court --

THE COURT: You may -- you may -- you may --

MS. MKRTCHYAN: -- [inaudible] --

THE COURT: -- you may put that in a --

MS. MKRTCHYAN: -- [inaudible] --

THE COURT: -- Ms. Mkrtchyan, please stop talking.

MS. MKRTCHYAN: [inaudible] --

17

7-RenSER-01193          7-RenSER-01193

THE COURT: The fact -- you -- you may put that in your --

MS. MKRTCHYAN: -- [inaudible] --

THE COURT: -- filing to Judge --

MS. MKRTCHYAN: -- you're going to interrupt me? If you're going to interrupt me, Your Honor, then this proceeding is totally out of place.

THE COURT: Okay.

MS. MKRTCHYAN: Now you can make --

THE COURT: Ms. --

MS. MKRTCHYAN: -- your ruling --

THE COURT: -- Mkrtchyan --

MS. MKRTCHYAN: -- I don't want to be --

THE COURT: -- Ms. Mkrtchyan --

MS. MKRTCHYAN: -- part of this when I'm being interrupted. As an attorney, I have the right to speak and represent my client.

And if you're not going to let me speak, then I would like to be just -- get -- get off this, uh, hearing because it's not appreciated that you're interrupting me as an attorney of record. So, please, you know, as a judge, you are obligated to hear from each party, regardless of whether you agree with me or not.

THE COURT: Okay.

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

7-RenSER-01194

7-RenSER-01194

MS. MKRTCHYAN:  And if I'm not going -- if I'm going to be interrupted and I have no right to speak, maybe I will just, uh, ask you to make your rulings in writing. I have made my record in writing, so perhaps I should not be part of this since you're biased towards me personally.

THE COURT:  That's what I'll do then. Court will issue a written ruling --

MS. MKRTCHYAN:  [inaudible] --

THE COURT:  -- um, and I'll have a written ruling for you on each of the interrogatory responses.

MS. MKRTCHYAN:  Thank you --

THE COURT:  Um --

MS. MKRTCHYAN:  -- very much.

THE COURT:  -- we'll do that. I don't have any problem with that. Um --

MS. MKRTCHYAN:  Thank you.

THE COURT:  -- Interrogatory Number 4 --

MS. MKRTCHYAN:  Well, then I'm going to be excused from this hearing?

THE COURT:  Yeah.

MS. MKRTCHYAN:  Because I don't want to be part of the hearing where I'm being interrupted and disrespected, so perhaps, um, you know I can just, uh -- you know, be excused and the court can make its

7-RenSER-01195                    7-RenSER-01195

rulings.

THE COURT:  No.

MS. MKRTCHYAN:  I have nothing yet -- I have nothing else to add to what I have written and I just do not appreciate, uh, the fact that I'm being disrespected and, um, mistreated entirely, um, inappropriately by the court.

So, I just, um -- I'm going to ask to be excused and you can continue with your hearing without me, uh, because this is disrespectful toward me. I feel like this is not only bias towards plaintiff but also to me personally, despairingly, constantly interrupting me.

You know, I -- just because we have judge, um, it does not mean that the judge can interrupt counsel. And I am representing a party, a victim of police brutality, uh, and I just do not appreciate this type of treatment.

So, if the court is inclined to continue interrupting me and not hearing from, I will -- I'm just going to be asking to excuse me so that I can leave, and you can make your rulings. Do I have the permission --

THE COURT:  [inaudible] --

MS. MKRTCHYAN:  -- to leave this hearing?

THE COURT:  You do not have permission to leave

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

7-RenSER-01196                    7-RenSER-01196

the hearing, Ms. Mkrtchyan.

MS. MKRTCHYAN: Well, I want to be excused. I don't want to be part of this proceeding because I don't appreciate the court, you know, violating the rules of impartiality and interrupting me.

It's discourteous. It's discourteous. You are bias towards me as plaintiff's counsel. You have also disparaged me on the record.

As an attorney of many years, you have disparaged me, called my deposition a train wreck that has been used by the defense skillfully to disparage me, that's defamation of, okay? None of my depositions have been a train wreck. It's just it's in the eye of the beholder.

I don't know what is your background, Your Honor, I don't appreciate that, you know, and I understand that that is bias towards me and towards my client.

So, right now, I don't feel comfortable continuing this because I feel like, you know, I'm being really, um, mistreated and disparaged and harassed, uh, as a female attorney, I don't appreciate that. So, if you can continue without me, that is great. Uh, I appreciate your time taking this.

I'm not going to continue with this proceeding where I'm being disrespected entirely and, um, you

7-RenSER-01197          7-RenSER-01197

know, my client's rights are being violated wrongly.

So, um, I'm going to excuse myself if you're not letting me to excuse myself because I don't think that this proceeding is impartial. Okay. Thank you.

AUTOMATED VOICE:  Narine Mkrtchyan has left the conference.

THE COURT:  All right. The record will show that Ms. Mkrtchyan has left the conference.

Uh, Mr. Harrell, would you like to, uh, be heard on the, uh, interrogatories which I intend to deny the County or Deputy Renegar's, uh, motion on?

MR. HARRELL:  Uh, Your Honor, I -- I believe we've adequately addressed it in the papers. Uh, we made our best pitch and the court did not find it persuasive and we accept that. And, uh --

THE COURT:  Well, I -- I don't -- I -- I -- I have others that I would -- would have discussed with you, uh, and -- and I -- I would -- I don't want to, um, forestall or foreshorten your opportunity to be heard on those because Mkrtchyan chose not to participating in this hearing.

MR. HARRELL:  I understand. Um, the denials are with regard to 1 and 2 and the court is granting the motion as to Number 3 and that's what my notes show how far we made it before, um -- uh, plaintiff's

22

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

7-RenSER-01198                                    7-RenSER-01198

Case 25-7183, 07/27/2026, DktEntry: 89.8, (13 of 300)

I, Chris Naaden, a transcriber, hereby declare under penalty of perjury that to the best of my ability the above 32 pages contain a full, true and correct transcription of the tape-recording that I received regarding the event listed on the caption on page 1.

I further declare that I have no interest in the event of the action.

September 24, 2020
Chris Naaden

X_____

(Holloway v. County of Orange, telephonic hearing, 9-2-20)

33

7-RenSER-01199 7-RenSER-01199

7-RenSER-01200

# EXHIBIT B

7-RenSER-01200

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

JEREMY HOLLOWAY,            )
                           )      **CERTIFIED**
         Plaintiff,        )
                           )
    vs.                    ) No. 8:19-CV-01514-DOC
                           )    Day 5, Volume I
COUNTY OF ORANGE, et al.,  )
                           )
         Defendants.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Monday, August 23, 2021

Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

7-RenSER-01201                                    7-RenSER-01201

**APPEARANCES:**

FOR PLAINTIFF JEREMY HOLLOWAY:

    Narine Mkrtchyan
    1010 North Central Avenue
    Suite 204
    Glendale, California 91202
    818-388-7022
    narine57@gmail.com

FOR DEFENDANT COUNTY OF ORANGE, et al.:

    S. Frank Harrell
    LYNBERG & WATKINS APC
    1100 West Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    sharrell@lynberg.com

    Tamara M. Heathcote
    LYNBERG & WATKINS PC
    1100 West Town and Country Road, Suite 1450
    Orange, California 92868
    714-937-1010
    theathcote@lynberg.com

    Jonathan C. Bond
    LYNBERG & WATKINS APC
    1100 Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    jbond@lynberg.com

Certified for Lynberg & Watkins APC
Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter

7-RenSER-01202                                                    7-RenSER-01202

**APPEARANCES (continued):**


FOR DEFENDANT CHAD RENEGAR:

    Michael L. Wroniak
    COLLINS COLLINS MUIR & STEWART LLP
    750 The City Drive, Suite 400
    Orange, California 92868
    714-823-4100
    mwroniak@ccllp.law

    Christie Bodnar Swiss
    COLLINS & COLLINS LLP
    2011 Palomar Airport Road
    Suite 207
    Carlsbad, California 92011
    760-274-2110
    cswiss@ccllp.law


ALSO PRESENT:

    Jeremy Holloway, Plaintiff

    Thomas Beck

    Deputy Joel Gonzalez

    Deputy Kevin Pahel

    Deputy Brandon Billinger

    Deputy Mark Borba

    Deputy Jameson Gotts

    Deputy Justin Gunderson

    Bryan Stever, defense technician

7-RenSER-01203                                      7-RenSER-01203

**I N D E X**

PROCEEDINGS                                                      PAGE

JURY TRIAL - DAY 5, VOLUME I

RAISZADEH, Dr. Kamshad (via Zoom)                                 21
(called by plaintiff)

(Further proceedings reported by Debbie Hino Spaan
in Volume II.)

**WITNESSES**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RAISZADEH, Dr. Kamshad (via Zoom) | | | | |
| By Ms. Mkrtchyan | 22 | | 69 | |
| By Mr. Harrell | | 48 | | 76 |
| By Ms. Swiss | | 67 | | |

Certified for Lynberg & Watkins APC
Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter

7-RenSER-01204                                        7-RenSER-01204

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held telephone in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  August 23, 2021

/s/ Debbie Gale

_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR, CCRR

7-RenSER-01205                                    7-RenSER-01205

MS. MKRTCHYAN: Your Honor, before the jury comes in, may we take up an issue, Your Honor?

*(Clerk escorts Juror Number 1 out of the courtroom.)*

*(Outside the presence of the jury.)*

THE COURT: You know, here's my concern with both of you, co-equally. These pop-ups are getting burdensome, and I've been asking you to come in at 8:30 or 8:00. From now on, maybe we should just come in an hour earlier, because these last-moment pop-ups can't be of great concern. So the first pop-up is, if there's one for the plaintiff, now it's with the defendant.

What's your last-moment issue or concern, Counsel?

MR. HARRELL: Your Honor, the defense does not have plaintiff's paper exhibits. We don't. We're four days into trial now, and we've tried to be good sports about it. We have asked nicely. We have reasked nicely. It was promised in writing that we were gonna have them today. And so if plaintiff's counsel has brought them, great.

THE COURT: Okay. Well, just ask her.

MR. HARRELL: I don't see them.

MS. MKRTCHYAN: They didn't ask me. See, this is the problem, Your Honor. They did not ask me this morning. I have them in the attorney conference room. They were just -- we need to bind them because we didn't get a chance.

Certified for Lynberg & Watkins APC
Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter

7-RenSER-01206                                    7-RenSER-01206

9

THE COURT: I'm not worried about binding. Can we get through the first witness at least, the doctor, apparently, who is waiting for us by Zoom? And can we at least get those documents to you for cross-examination purposes?

Now, if you've seen them in another form; in other words, if you're seen them in electronic exchange.

MS. MKRTCHYAN: I --

THE COURT: No. Have you seen these documents in any other form?

MR. HARRELL: Your Honor, it's my understanding it's been represented to us that plaintiff's counsel has sent them electronically, but they weren't the best organized, and we don't have numbers to clearly correlate --

THE COURT: I see.

MR. HARRELL: -- with what -- and so, for example, plaintiff's counsel will say, "I'd like to show the witness Plaintiff's Number 1," and we over here are looking at each other going, "What is that? What is everybody looking at?"

THE COURT: So can we just for a moment -- to get this doctor's testimony, can we just get those paper copies exchanged between the two of you for the first witness today? Could you go get those for us?

MS. MKRTCHYAN: Yes.

THE COURT: Thank you.

Certified for Lynberg & Watkins APC
Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter

7-RenSER-01207                                    7-RenSER-01207

MS. MKRTCHYAN: And by the way, Your Honor, just FYI, I have provided them electronic exhibits. They gave me their flash drive. They are numbered electronically, and had they come to me this morning, I would have told them exhibits are in the room.

THE COURT: Let's not waste time, 'cause you've got the doctor waiting. Go get those exhibits for them, and then we'll get them to you in paper form.

MS. MKRTCHYAN: Yes.

THE COURT: And if we need to bring the person back if either party is not prepared, we'll do so.

But let's do that right now first. Let's accomplish that.

*(Pause in the proceedings at 8:41 a.m.)*

MS. MKRTCHYAN: Your Honor, I --

THE COURT: I'm going to get to your motion for just a moment. Let me handle the jury first. Okay? I promise we'll be back with you.

*(In the presence of the jury.)*

THE COURT: Good morning. First of all, we're on record. All counsel and the parties are present. If you would be seated, please. Let me first of all start with a compliment to all of you.

I'm amazed at the ethics, and I'm always amazed and surprised by how great this country is because of you

Case: 25-7182, 07/27/2026, DktEntry: 89.8, (23 of 290)

# EXHIBIT C

7-RenSER-01209

7-RenSER-01209

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| Plaintiff, | ) **Certified Transcript** |
| | ) |
| vs. | ) Case No. |
| | ) 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| Defendants. | ) **DAY 2, VOLUME II** |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, DECEMBER 7, 2022
10:08 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01210                           7-RenSER-01210

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

       NARINE MKRTCHYAN, ATTORNEY AT LAW
       1010 North Central Avenue
       Suite 204
       Glendale, California 91202
       818-388-7022
       narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

       LYNBERG & WATKINS APC
       BY:  S. FRANK HARRELL, ESQ.
       1100 West Town and Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       sharrell@lynberg.com

       LYNBERG & WATKINS PC
       BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
       1100 West Town and Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       theathcote@lynberg.com

       LYNBERG & WATKINS APC
       BY:  JONATHAN C. BOND, ESQ.
       1100 Town and Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       jbond@lynberg.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01211                         7-RenSER-01211

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

      COLLINS COLLINS MUIR & STEWART LLP
      BY:  MICHAEL L. WRONIAK, ESQ.
      750 The City Drive
      Suite 400
      Orange, California 92868-4940
      714-823-4100
      mwroniak@ccllp.law

      COLLINS & COLLINS LLP
      BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
      2011 Palomar Airport Road
      Suite 207
      Carlsbad, California 92011
      760-274-2110
      cswiss@ccllp.law

**ALSO PRESENT:**

      Jeremy Holloway
      Deputy Joel Gonzalez
      Deputy Kevin Pahel
      Deputy Mark Borba
      Deputy Jameson Gotts
      Bryan Stever, defense technician
      Zinnia Sayegh, plaintiff

**UNITED STATES DISTRICT COURT**

7-RenSER-01212                         7-RenSER-01212

MS. SWISS:  Objection.

MS. MKRTCHYAN:  Four years we don't get this booking photograph until today, ladies and gentlemen.

THE COURT:  Overruled.

MS. MKRTCHYAN:  Why?  Because they don't want you to find out how is his face and head was injured.  We have rules in discovery.  We have rules to produce all evidence.  They don't produce that.  Why?  You will see why.  This is a cover-up.  They don't produce 911 calls.

MS. SWISS:  Objection.

MS. MKRTCHYAN:  We have Joshua Gomez calling twice.  We have only one 911 call.  Why?  Because they don't want us to find out the whole truth about what reporting parties gave, what information they gave to the dispatcher, and why this man was targeted on that campground.  They also -- he saw a witness there, park ranger who witnessed this use of force while he's on the ground.  They did not identify that witness.

So you will hear in this case from lieutenant -- retired Lieutenant Roger Clark, from Los Angeles County Sheriff's Department, who has received the same training for years and years in the Los Angeles -- LASD, and he will tell you -- and he has prominent expertise in the use of force and police practices.  He will testify and tell you that whatever they did to him on that day was not supported either by their policy, the laws of this country, or the United States

7-RenSER-01213                                    7-RenSER-01213

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

          I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  December 7, 2022*

                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01214                                    7-RenSER-01214

# EXHIBIT D

7-RenSER-01215

7-RenSER-01215

Case 25-7182, 07/27/2026, DktEntry: 39.8 (302 of 360)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                      )
                                      )
            Plaintiff,                )  **Certified Transcript**
                                      )
      vs.                             )  Case No.
                                      )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,             )
                                      )
            Defendants.               )  **DAY 9**
                                      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
FRIDAY, DECEMBER 16, 2022
9:31 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01216          7-RenSER-01216

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    NARINE MKRTCHYAN, ATTORNEY AT LAW
    1010 North Central Avenue
    Suite 204
    Glendale, California 91202
    818-388-7022
    narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

    LYNBERG & WATKINS APC
    BY:  S. FRANK HARRELL, ESQ.
    1100 West Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    sharrell@lynberg.com

    LYNBERG & WATKINS PC
    BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
    1100 West Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    theathcote@lynberg.com

    LYNBERG & WATKINS APC
    BY:  JONATHAN C. BOND, ESQ.
    1100 Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    jbond@lynberg.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01217    7-RenSER-01217

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

 COLLINS COLLINS MUIR & STEWART LLP
 BY:  MICHAEL L. WRONIAK, ESQ.
 750 The City Drive
 Suite 400
 Orange, California 92868-4940
 714-823-4100
 mwroniak@ccllp.law

 COLLINS & COLLINS LLP
 BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
 2011 Palomar Airport Road
 Suite 207
 Carlsbad, California 92011
 760-274-2110
 cswiss@ccllp.law


**ALSO PRESENT:**

 Jeremy Holloway
 Deputy Joel Gonzalez
 Deputy Kevin Pahel
 Deputy Mark Borba
 Deputy Jameson Gotts
 Bryan Stever, defense technician
 Zinnia Sayegh, plaintiff

**UNITED STATES DISTRICT COURT**

7-RenSER-01218                                        7-RenSER-01218

**I N D E X**

**WITNESSES**                                                                 **PAGE**

**JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF**
    Cross-Examination by Mr. Harrell                                            5

**EXHIBITS**

(None offered.)

**UNITED  STATES  DISTRICT  COURT**

7-RenSER-01219                                              7-RenSER-01219

placed his 911 call?

A    I don't even know who Mr. Gomez is.  To this day, the only time I've seen him is in a prior trial.

Q    Did you two ever meet before Mr. Gomez placed his 911 call?

A    No.

Q    Can you think of any reason for Mr. Gomez to lie about what he's saying was going on at the campground on the night of the incident?

A    Yes, I can.

Q    And that would be what, sir?

A    Again, there's an indoctrination group involved in the police force.  It's called The Explorers.  And for people that are excited about law enforcement, this gives them the ability to, like, be a kid but, like, to get to be involved.  They take the kids to events.  They pass out fliers.  They get to do ride-alongs.  It's fun.  It's fun for children.

This guy was one of them.  And so this was his moment.  He got everything mistaken, which was tragic because mistaken 911 calls lead to people dying.

But that's why -- I don't think he was -- he had anything against me.  I just believe he was an overexcited kid that was trying to help.  But he never seen anything.  And so the only thing he was doing was guessing, which is very dangerous.

UNITED STATES DISTRICT COURT

7-RenSER-01220                    7-RenSER-01220

Q    Sir, does listening to Mr. Gomez's 911 call help you understand why law enforcement came to Campsite 65 on that night?

MS. MKRTCHYAN:  Vague and ambiguous as to time.

THE COURT:  It's vague, Counsel.  Sustained.

Q    BY MR. HARRELL:  Sir, let's talk about the second encounter that you had with law enforcement.

THE COURT:  Counsel, would this be a good time for a recess?  I think the jury's getting --

MR. HARRELL:  It would.

THE COURT:  Ladies and gentlemen, why don't you take 15 minutes.  And then if we can, we'll go partway through the lunch hour, but we'll still get you the necessary time.

Please don't discuss this matter, nor form or express an opinion.

Mr. Holloway, you can step down.

**(Recess from time 11:17 a.m. to 11:35 a.m.)**

**(Out of the presence of the jury.)**

THE COURT:  We're on the record.  And, Counsel, the clerk said that you wanted to speak to the Court in camera -- or strike that -- a sidebar.  The jury is not present.  And I don't know which counsel --

MR. HARRELL:  Your Honor, the defense would like to make a motion.

THE COURT:  Okay.

**UNITED STATES DISTRICT COURT**

7-RenSER-01221                                    7-RenSER-01221

MR. HARRELL:  I believe the record will reflect that, unprovoked and unsolicited, Mr. Holloway blurted out that there was a prior trial in this matter.

The Court was very clear going into this trial, "Tell all of your clients not to do that."  And we have and we do.  In our emails to witnesses, to everybody, it's right in there.  And we say it orally, "Do not do this."

The Court was very clear that if anyone says anything about a prior trial, that is a mistrial.  And that's what we have now.  There are certain lines in litigation that you just do not cross.  Those lines have been crossed many times in this case, but now it's reached a new level.

Now we have mention of a prior trial in front of this jury, and I do not know how our clients can get a fair trial now with that poisonous information out there.  That bell can't be unrung.  We need a mistrial.

THE COURT:  And counsel on behalf of Renegar, you move --

MR. WRONIAK:  We concur, on behalf of Deputy Renegar.

THE COURT:  Counsel, your thoughts?

MS. MKRTCHYAN:  Yes, Your Honor.  My thought on it is that that was completely inadvertent.  First of all, the mention of the trial is prejudicial to both sides.  I never wanted this jury to learn that there was a hung jury.

UNITED STATES DISTRICT COURT

7-RenSER-01222                                    7-RenSER-01222

Absolutely not. And I have advised both my client and all witnesses not to mention it.

My client was confused when I spoke to him a minute after this. He was confused. He thought that when we are constantly talking about "prior hearing," "prior hearing," he thought that that was allowed. He basically -- that's what -- his understanding was that when we are referencing "prior hearing," "prior hearing," he thought that that was allowed now. So he was under complete misimpression.

I think that the jury did not even pay attention to that, frankly. I would be the one to actually ask for mistrial if I believed that that made an impression on the jury. Because that's prejudicial, frankly, to both sides. I would never have wanted any of the jurors to know that we had a hung jury. Are you kidding me?

So -- but I think this was inadvertent. Nobody paid attention. And it was brought only because Mr. Harrell keeps hammering my client on unrelated issues.

We have had how many days already? Yesterday we started. Today we are going into the lunch hour. We haven't even gotten to the use of force, the claims in this case, Your Honor. And he keeps asking the same questions over and over. And my client, of course he's stressed. Of course sometimes he's not giving direct answers to questions, true. But at the same time, you know, if there are issues that are

**UNITED STATES DISTRICT COURT**

7-RenSER-01223                    7-RenSER-01223

being irrelevant, it takes undue consumption of time to keep hammering him on the collateral issues.

The issues here are excessive force. We haven't gotten there. So I think that the -- you know, I object to even, you know, talking about this. My client blurted this out when he was stressed. Nobody paid attention. Half of the jury did not even listen to that.

And when we talk about prior hearing, I think a lot of people might have actually an inclination to think "What kind of a prior hearing?" We let the cat out the door anyway by keep talking about prior deposition, prior hearing. The jury is going to kind of have an idea that this case has been going on.

And by the way, Mr. Harrell was the one, in his opening statement, said, "Oh, we've been -- we really going over this case for several months and years. We want closure, ladies and gentlemen."

And when we talk about prior hearings and they bring out transcripts of prior hearings, the jury has a very good idea that this case has been going on for quite some time in the court system.

So I think that, Your Honor, this is really -- I've instructed my client not to blurt out statements like that. He was, again, under misimpression that when we are talking about prior hearings, then he's allowed to talk about prior trial.

7-RenSER-01224          7-RenSER-01224

And, again, it was not intentional on his part. So, therefore, there's no grounds for mistrial.

THE COURT: Counsel?

MR. WRONIAK: Your Honor, briefly. Whether it was intentional or not, it was said. We cannot unring that bell. They've now heard about prior hearings, which the Court has indicated was appropriate to use. But Mr. Holloway got up there and said, "In a prior trial." And the Court's direction was clear: Any mention of a prior trial will be an immediate mistrial misaction, and we are requesting a mistrial.

THE COURT: Okay. Counsel, are you joining?

MR. HARRELL: Join, Your Honor.

THE COURT: Give me a few moments.

(Pause in proceedings.)

THE COURT: All right. Counsel, all of you be seated.

The Court means what it says. It's as simple as that. And this case is now mistried.

You're ordered to meet and confer with this Court on Monday afternoon, Mr. Holloway, because you're still in the area. I'm going to take a look at my calendar. We're going to be setting as quick a trial date as we can. And I want to go over that calendar with all counsel so there's as little inconvenience as possible. I just don't know those dates yet, okay?

**UNITED STATES DISTRICT COURT**

7-RenSER-01225　　　　　　　7-RenSER-01225

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  December 16, 2022*

                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01226                                    7-RenSER-01226

# EXHIBIT E

7-RenSER-01227

7-RenSER-01227

48

tell me if that's what you read on those pages in your sworn deposition, please.

MR. HARRELL: Line on 297, Your Honor.

THE WITNESS: I'm still having a hard time finding the location. Which line did you want me to read?

MS. MKRTCHYAN: 297 through 298. There is two pages.

THE COURT: This is only to refresh his recollection if it needs it counsel.

What's the question?

MS. MKRTCHYAN: I asked a question whether he testified previously that taser could not be used on a passively resisting individual?

MR. HARRELL: That misstates the testimony.

THE COURT: Counsel, point me to that line, please. That's not page 297 or 298, counsel.

Ladies and gentlemen, I'm going to caution you, to please disregard --

MS. MKRTCHYAN: I can find it. It's inappropriate. Give me a moment I will find it. Objection.

THE COURT: Counsel --

MS. MKRTCHYAN: Is the Court not allowing me to impeach credibility of this officer with his prior deposition testimony, sir?

THE COURT: Your statement to the jury was just

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01228                    7-RenSER-01228

misleading, counsel. There is no statement on 297 nor 298 as to your question. As to the ruling of the Court, now be very careful.

MS. MKRTCHYAN: On page --

THE COURT: Counsel, on 297 and 298, I specifically instructed you to point out that line. That line does not exist. Your question was improper.

Ladies and gentlemen --

MS. MKRTCHYAN: 298, I'm getting you the line.

THE COURT: Ladies and gentlemen -- I don't wish to engage you, counsel.

You are ordered to disregard the comments of counsel.

MS. MKRTCHYAN: Well, I object.

THE COURT: I'm going to have to take a recess for just a moment. Thank you very much.

(Jury not present)

THE COURT: Have a seat, counsel.

Counsel, I'm going to admonish you that you need a cooling period. When you confront the Court, you are on the edge of contempt. This is your first warning. If you confront me again, that will be the second I'm going to try to forebear.

You have directly confronted this Court with a specific ruling. Your statement to the jury was not only

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01229

7-RenSER-01229

improper, but it was misleading. That statement that you made does not exist on page 297 or 298.

Now, I am going to take a recess.

MS. MKRTCHYAN: I need to --

THE COURT: Thank you, counsel. You have made your record.

MS. MKRTCHYAN: Excuse me. I am moving for a mistrial. I am done with this Court. I am moving for a mistrial. Thank you.

(Recess)

THE COURT: We are back in session outside the presence of the jury. Counsel are present. The parties are present. Thank you for your courtesy.

I am going to go back to page 297 and 298. Once again, after having asked plaintiff's counsel where this appeared, I'm not seeing this after reading these two pages. I will give you a chance to show me on 297 and 298 where that appears.

MS. MKRTCHYAN: Yes. The question was asked of him if you believe taser is permitted on a passively resisting individual.

THE COURT: Would you say that again.

MS. MKRTCHYAN: I asked him a question at this trial right now.

THE COURT: Passively resisting a taser.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01230                    7-RenSER-01230

7-RenSER-01231

# EXHIBIT F

7-RenSER-01231

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA


HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

JEREMY HOLLOWAY,                    )
                                    )  CERTIFIED TRANSCRIPT
        Plaintiff,                  )
                                    )
    vs.                             ) No. 8:19-CV-01514-DOC
                                    )
COUNTY OF ORANGE, et al.,           )
                                    )  TRIAL DAY 10, VOL. 1
        Defendants.                 )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Thursday, August 3, 2023


SHARON A. SEFFENS
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(612) 804-8655

7-RenSER-01232                                    7-RenSER-01232

APPEARANCES:

FOR PLAINTIFF JEREMY HOLLOWAY:

    Narine Mkrtchyan
    1010 North Central Avenue
    Suite 204
    Glendale, California 91202
    818-388-7022
    narine57@gmail.com


FOR DEFENDANT COUNTY OF ORANGE, et al.:

    S. Frank Harrell
    Catherine A. Naltsas
    LYNBERG & WATKINS APC
    1100 West Town and Country Road
    Suite 1450
    Orange, California 92868
    714-937-1010
    sharrell@lynberg.com

    Tamara M. Heathcote
    LYNBERG & WATKINS PC
    1100 West Town and Country Road, Suite 1450
    Orange, California 92868
    714-937-1010
    theathcote@lynberg.com

FOR DEFENDANT CHAD RENEGAR:

    Michael L. Wroniak
    COLLINS COLLINS MUIR & STEWART LLP
    750 The City Drive, Suite 400
    Orange, California 92868
    714-823-4100
    mwroniak@ccllp.law

    Christie Bodnar Swiss
    COLLINS & COLLINS LLP
    2011 Palomar Airport Road
    Suite 207
    Carlsbad, California 92011
    760-274-2110
    cswiss@ccllp.law

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01233         7-RenSER-01233

```
                        I-N-D-E-X

PLAINTIFF'S
WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

JEREMY HOLLOWAY
   (Continued)                    37

PLAINTIFF'S
EXHIBITS:                                MARKED    RECEIVED

(None)

DEFENSE
WITNESSES:             DIRECT   CROSS   REDIRECT   RECROSS

(None)

DEFENSE
EXHIBITS:                                MARKED    RECEIVED

(None)
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01234                                    7-RenSER-01234

heavily to limit our ability to impeach these defendants' testimony, but 403 is not being applied to limit my client's -- you know, the character assassination of Mr. Holloway to deprive him of any ability to recover for his injuries. Undue consumption of time does not apply to us.

Furthermore, you know, it's ensuring that we are going to have another mistrial, because I guarantee none of these jurors -- none of these jurors are going to give a defense verdict. These people are not going to give a defense verdict. You can bet on it. These defendants are not going to walk away. And if I was a prosecutor, if I was a U.S. Attorney, I would have prosecuted them. They are only lucky I'm not a U.S. Attorney. Someday, I may become. Someday, I may take this Court's bench, and I will ensure that law enforcement will be held accountable.

But at this point, I'm going to do only what is in my power, and my power is to ask this Court to apply the law, 403, evenhandedly and not ensure another mistrial, because I can tell that we are going to have another mistrial. This jury is going to be prejudiced against my client with this sandbagged evidence. They are not going to be able to reach a verdict.

We already had a long break last week. We came back. They are not going to come back beyond August 14. They are taking another day of cross-exam.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01235

7-RenSER-01235

11

THE COURT: Let's set the record straight on that. You've asked me to file an in-camera document. Part of that break in the Court's scheduling was to accommodate you, counsel, after you filed that document with the Court.

MS. MKRTCHYAN: What document, Your Honor? I'm not sure what you are referring to.

THE COURT: You filed a document with this -- do you want me to state this on the record?

MS. MKRTCHYAN: I did not file any document.

THE COURT: Yes, you did. You filed a document with this Court saying you couldn't hold up to the hours. You submitted a document to the Court from your -- counsel, be very careful with this now. Part of this Court's scheduling was to accommodate you because of your claim that you couldn't keep the Court's hours. You filed that document with the Court. Do you want me to produce it for you?

MS. MKRTCHYAN: That is not the issue here.

THE COURT: Yes, it is. So when you make the statement that we had a recess last week, partially that was as an accommodation to you.

MS. MKRTCHYAN: Well, I don't believe so, but I appreciate that.

THE COURT: Okay. Well, thank you very much. I do appreciate that because partially that was because you

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01236                                      7-RenSER-01236

12

filed an in-camera document saying you couldn't hold up to the Court's hours, so I decided under those circumstances let's go eight days and have a recess.  That's an inconvenience to the defendants, quite frankly, and they didn't know about that until this.  So when you create a record about a delay, this delay was to accommodate you, so I had a record that you wouldn't keep extraneous hours because you constantly complained about being able to start at 7:30.  I start my court at 7:30 and accommodate you by starting at 8:30.

MS. MKRTCHYAN:  I did not request --

THE COURT:  I've taken all the recesses you've asked except for your interruption yesterday, and you're not going to interrupt cross-examination depending upon how your client is doing, so I went an hour and forty-five minutes. I gave you two hours the prior day.  So I don't appreciate a record that's false, quite frankly.  This was to accommodate you to make certain you could hold up.

MS. MKRTCHYAN:  I didn't --

THE COURT:  I want you to continue your argument on the merits because I don't wish to confront you over this.

MS. MKRTCHYAN:  Well, first of all, I --

THE COURT:  It's a false record you're creating.

MS. MKRTCHYAN:  No.  First of all, I didn't ask

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01237                                      7-RenSER-01237

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  August 4, 2023


/s/   Sharon A. Seffens  8/4/23
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

7-RenSER-01238

7-RenSER-01238

Case: 25-7182, 07/27/2026, DktEntry: 39.8 (532 of 290)

# EXHIBIT G

7-RenSER-01239

7-RenSER-01239

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

JEREMY HOLLOWAY,                          )
                                          )
                                          )
                                          )
                    Plaintiff,            )
                                          )
                                          )
                                          )
        Vs.                               )   No. SACV19-01514-DOC
                                          )
                                          )
                                          )
COUNTY OF ORANGE, ET AL.,                 )
                                          )
                                          )
                                          )
                    Defendants.           )
                                          )
_____          )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*Motion Hearing*

SANTA ANA, CALIFORNIA

FRIDAY, APRIL 4, 2025

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
411 WEST FOURTH STREET, SUITE 1-053
SANTA ANA, CALIFORNIA 97201
VELIZBAIRDMIRIAM@GMAIL.COM

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**
**JEREMY HOLLOWAY:**

NARINE MKRTCHYAN
655 NORTH CENTRAL AVENUE
SUITE 1700
GLENDALE, CA 91203


**IN BEHALF OF THE DEFENDANT,**
**COUNTY OF ORANGE, ET AL.,:**

S. FRANK HARRELL
RYANE SKINNER
LYNBERG AND WATKINS APC
1100 WEST TOWN AND COUNTRY
ROAD
SUITE 1450
ORANGE, CA 92868

CHRISTIE BODNAR SWISS
MICHAEL WRONIAK
CATHERINE NALTSAS
COLLINS AND COLLINS LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CA 92011

UNITED STATES DISTRICT COURT

7-RenSER-01241                                      7-RenSER-01241

-- putting the pressure on you to say, well, Judge, we're going to cut off emotional distress.  Now, if you do, this isn't even on the table.  Understood?

But if you're going into emotional distress, this is wide open for the Court.  And what I don't want to hear later on is, Judge, I was surprised.  I'm telling you right now that that is still on the table.

So if emotional distress is going to carry over to damages from X point forward at some point, it's ridiculous.  First of all, he hasn't even had an operation that I know of.

MS. MKRTCHYAN:  Well, Your Honor, may I?

THE COURT:  Sure.  Absolutely.  And I'm not putting you to the choice now, but I am telling you I'm not ruling against the defendant at this time.  That's going to come back on the table.

MS. MKRTCHYAN:  Your Honor, if you recall at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages by plaintiff are limited to the time he left.

THE COURT:  Time out.

MS. MKRTCHYAN:  We already agreed to that, so what is the problem here?

THE COURT:  No, you haven't.  No, you haven't.  This is a new trial.

MS. MKRTCHYAN:  That's why I'm agreeing now,

UNITED STATES DISTRICT COURT

7-RenSER-01242                    7-RenSER-01242

because I don't want -- my argument is this, that --

THE COURT:  Well, hold on.  Wait.  Wait.  Just reach an agreement.

MS. MKRTCHYAN:  Yeah.

THE COURT:  If you're agreeing now to that same instruction, then I'm making the same ruling.  These alternate stressors aren't coming in.

MS. MKRTCHYAN:  Yeah, because this is a prejudicial issue.

THE COURT:  You're winning on this.  No more.  We have an agreement, then.  The same instruction is going to be read which now cuts off these alternate stressors.  We're done.

Okay.  So by agreement of counsel, the instruction -- and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after.  That makes the alternate stressors irrelevant in Rhode Island.  Okay -- I'm sorry.  I mean Pennsylvania.  My apologies.

MR. HARRELL:  They're often confused.

THE COURT:  Yeah.  Okay.  Then 730 is that David and Goliath argument.  We've gone through that before.  This is the concern you have that you're going to be -- well, your motion.

MR. HARRELL:  Your Honor, briefly.  We have no

7-RenSER-01243                    7-RenSER-01243

# EXHIBIT H

7-RenSER-01244

7-RenSER-01244

Case 8:19-cv-01514-DOC-DFM  Case 25-7182, 07/27/2026, DktEntry: 89.8 (592 of 260)  Page 58 of 133
Document 892-1  Filed 05/25/25
Page ID #:37998

1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

|                          |                              |
| ------------------------ | ---------------------------- |
| JEREMY HOLLOWAY,         | )                            |
|                          | )                            |
|     Plaintiff, | ) **Certified Transcript** |
|                          | )                            |
|   vs.          | ) Case No.                   |
|                          | ) 8:19-cv-01514-DOC-DFM      |
| COUNTY OF ORANGE, et al.,| )                            |
|                          | )                            |
|     Defendants. | ) **DAY 4, VOLUME I** |
|                          | )                            |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TUESDAY, MAY 6, 2025
8:06 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

7-RenSER-01245                                    7-RenSER-01245

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

      MKRTCHYAN LAW
      BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
      655 North Central Avenue
      Suite 1700
      Glendale, California 91203
      818-388-7022
      narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

      LYNBERG & WATKINS APC
      BY:  S. FRANK HARRELL, ESQ.
      1100 West Town & Country Road
      Suite 1450
      Orange, California 92868
      714-937-1010
      sharrell@lynberg.com

      LYNBERG & WATKINS APLC
      BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
      1150 South Olive Street
      Suite 1800
      Los Angeles, California 90015
      213-624-8700
      cnaltsas@lynberg.com

      LYNBERG & WATKINS PC
      BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
      1100 West Town & Country Road
      Suite 1450
      Orange, California 92868
      (714) 937-1010
      theathcote@lynberg.com

      LYNBERG & WATKINS
      BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
      1100 Town and Country Road
      Suite 1450
      Orange, California 92868
      714-937-1010
      rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01246                                    7-RenSER-01246

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

       COLLINS & COLLINS LLP
       BY:  MICHAEL L. WRONIAK, ESQ.
       750 The City Drive
       Suite 400
       Orange, California 92868-4940
       714-823-4100
       mwroniak@ccllp.law

       COLLINS & COLLINS LLP
       BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
       2011 Palomar Airport Road
       Suite 207
       Carlsbad, California 92011
       760-274-2110
       cswiss@ccllp.law

**ALSO PRESENT:**

       Raymond Farahmand, plaintiff's paralegal
       Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

7-RenSER-01247　　　7-RenSER-01247

4

# I N D E X

**WITNESSES**                                                              **PAGE**

**JOEL GONZALEZ, CALLED BY THE PLAINTIFF**
    Cross-Examination by Mr. Harrell (continued)              5
    Cross-Examination by Mr. Wroniak                         57
    Redirect Examination by Ms. Mkrtchyan                    67
    Recross-Examination by Mr. Harrell                       98

**LAVINIA SUE BETZLER, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan                     109
    Cross-Examination by Mr. Wroniak                        132
    Redirect Examination by Ms. Mkrtchyan                   144
    Recross-Examination by Mr. Wroniak                      148

**LORETTA HOLLOWAY TAFOYA, CALLED BY THE PLAINTIFF:**
    Direct Examination by Ms. Mkrtchyan                     150

# EXHIBITS

(None offered.)

UNITED STATES DISTRICT COURT

7-RenSER-01248                                    7-RenSER-01248

time because of the peripheral vision. And emotionally he was still having a hard time. So -- but even on the way there, I had to lend him money to -- his truck broke down. So I ended up giving him a credit card --

Q     Yes.

A     -- to live on.

Q     Right. And so you have given him your credit card, you know, to help him with this kind of cost because he couldn't leave -- work the same way as he used to do?

A     Right.

         MS. SWISS: Objection. Leading. Counsel's testifying. Relevance.

         THE COURT: Counsel, you keep summarizing it. We want to hear from the witness. Sustained.

         MS. MKRTCHYAN: This goes to damages.

BY MS. MKRTCHYAN:

Q     In any event what credit card did you give him?

         MS. SWISS: Relevance.

         THE COURT: Yeah, I think this is getting peripheral at this point, Counsel. I think that the damages surrounding the incident, the credit card I'm going to exclude, Counsel.

BY MS. MKRTCHYAN:

Q     Well, how much money have you lent Mr. Holloway thus far, to date, for living costs, for rent, for food, for traveling? How much money so far have you calculated you've lent him?

UNITED STATES DISTRICT COURT

7-RenSER-01249                                                    7-RenSER-01249

A       At least $40,000.

Q       Okay.   And 40,000, that's part of his credit card?

A       It's our credit card.

Q       Right.   And are you still paying those credit card bills?

A       Yes.

Q       And is there interest on this credit card bills?

A       Yes.

Q       Okay.   When he went to Pittsburgh, Pennsylvania, and after that he went to Montana; right?

A       Yes.

Q       Right.   And was he homeless for certain periods of time in Montana?

A       Yes.

Q       To get him off the streets, did you help him with rent?

A       I did for a certain amount of time, but my credit card got maxed, and so he ended up living on the streets for a couple days.   But then that's when he called me and said come and get his dog.   And I knew what that meant.   So I got more money, and I told him to get a hotel.   But thank goodness, Montana is very good for VA.   He did get to go to a shelter.

Q       So he had a stroke?

A       He ended up having another stroke.   This was right -- that's right.   He had -- that was another reason why he couldn't work.   He had another stroke in the same spot where his head was -- I had to fly out there.   And he still has two

7-RenSER-01250                                                    7-RenSER-01250

aneurysms still in his head now.

Q    Right.  And when was this stroke that he sustained approximately?  Was it last year?

A    It's been -- it's probably been about, what, four months ago or so.

Q    Okay.  And he had a heart surgery after the stroke?

A    He's had -- he's had heart surgery.  When he had the stroke, you know, because of his age, they're trying to figure out why.  So they've been doing a lot of testing.  So they said he needed heart surgery.  So with all this, he has not been able to work again.  And so -- but yes, he had another stroke. And he was talking to me on the phone, actually, when he had gotten the stroke.  He said, "I'm feeling funny," and I told him to call.

Q    And how old is he now?

A    48.

Q    Right.  And you didn't expect him at 48 to be dependent on you?

A    No.

Q    And you had to -- when you retired, did you expect to go back to work?

A    No, not really.

Q    And now you're working, you said, part time?

A    Yes.

         MS. SWISS:  Objection.  Relevance.

UNITED STATES DISTRICT COURT

7-RenSER-01251                                                    7-RenSER-01251

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES      )
                           )
STATE OF CALIFORNIA        )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 27, 2025*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01252                                          7-RenSER-01252

# EXHIBIT I

7-RenSER-01253

7-RenSER-01253

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY, | ) Case No. SA CV 19-01514-DOC |
| | ) (DFMx) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Santa Ana, California |
| | ) |
| COUNTY OF ORANGE, et al., | ) Tuesday, May 6, 2025 |
| | ) |
| Defendants. | ) (12:59 p.m. to 1:09 p.m.) |
| _____ | ) (5:52 p.m. to 6:59 p.m.) |
| | (7:01 p.m. to 7:11 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF JURY TRIAL
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                    See next page.

Court Reporter:                 Recorded;CourtSmart

Courtroom Deputy:               Karlen Dubon

Transcribed by:                 Jordan Keilty
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

7-RenSER-01254                    7-RenSER-01254

APPEARANCES:

For the Plaintiff:                    NARINE MKRTCHYAN, ESQ.
                                      Mkrtchyan Law
                                      655 North Central Avenue
                                      Suite 1700
                                      Glendale, California 91203
                                      (818) 388-7022

For the Defendants:                   S. FRANK HARRELL, ESQ.
                                      RYANE SKINNER, ESQ.
                                      Lynberg & Watkins, APC
                                      1100 West Town and Country
                                      Road, Suite 1450
                                      Orange, California 92868
                                      (714) 937-1010

                                      CATHERINE A. NALTSAS, ESQ.
                                      Lynberg & Watkins, APLC
                                      1150 South Olive Street
                                      Suite 1800
                                      Los Angeles, California 90015
                                      (213) 624-8700

                                      CHRISTIE B. SWISS, ESQ.
                                      Collins & Collins, LLP
                                      2011 Palomar Airport Road
                                      Suite 207
                                      Carlsbad, California 92011
                                      (760) 274-2110

                                      MICHAEL L. WRONIAK, ESQ.
                                      Collins & Collins, LLP
                                      750 The City Drive
                                      Suite 400
                                      Orange, California 92868
                                      (714) 823-4100

*Echo Reporting, Inc.*

7-RenSER-01255          7-RenSER-01255

Case 19-01151 Doc 25-7 Filed 07/27/2023 Entry 8963 (70 of 300) Page 69 of 173 Page ID #3429

12

(Pause.)

THE COURT:  Now, show me the agreement.

(Pause.)

MR. HARRELL:  Your Honor, you have --

THE COURT:  Counsel, read those --

MR. HARRELL:  -- the pertinent page up.

THE COURT:  -- portions that you think are relevant, okay.

MR. HARRELL:  Ms. Mkrtchyan now -- and I'm reading from the transcript:

"Your Honor, if you recall at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages by Plaintiff are limited to the time he left.

THE COURT:  Time out.

MS. MKRTCHYAN:  We already agreed to that.  So, what is the problem here?

THE COURT:  No, you haven't.  No, you haven't.  This is a new trial.

MS. MKRTCHYAN:  That's why I'm agreeing now, because I don't want -- my argument is this, that --

THE COURT:  Well, hold on.  Wait.

7-RenSER-01256    7-RenSER-01256

13

Wait.  Just reach an agreement.

MS. MKRTCHYAN:  Yeah.

THE COURT:  If you're agreeing now to that same instruction, then I'm making the same ruling.  These alternate stressors aren't coming in.

MS. MKRTCHYAN:  Yeah, because this is a prejudicial issue.

THE COURT:  You're winning on this. No more.  We have an agreement then. The same instruction is going to be read which now cuts off these alternate stressors.  We're done.  Okay.  So, by agreement of counsel, the instruction -- and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after.  That makes the alternate stressors irrelevant in Rhode Island. Okay.  I'm sorry.  I mean Pennsylvania. My apologies."

And that was the on-the-record agreement, your Honor.

THE COURT:  And then we have the mother that gets up on the stand.  We have a narrative.  Did you object in

7-RenSER-01257                    7-RenSER-01257

45

MR. HARRELL:  Yes.

THE COURT:  And just put it on the screen, and let's read this once again back into the record.  And if co-counsel could help find the location --

MR. HARRELL:  We've got it.

THE COURT:  Okay.  Then state that so it's clear.

MS. SWISS:  Page 68 and 69.

MR. HARRELL:  Your Honor, this begins on page 68, line 16.

THE COURT:  And what date and where will I find this?

MR. HARRELL:  Your Honor, this is our transcript from Friday, April 4, 2025.

THE COURT:  Okay.  Now read that into the record.

MR. HARRELL:  All right.

"MS. MKRTCHYAN:  Your Honor, if you recall, at the last trial" --

THE COURT:  Put it on the lectern.  I just want to be able to see it.  Well, there it is.  Thank you.  "Your Honor, if you recall" -- keep reading.

MR. HARRELL:  MS. Mkrtchyan speaks:

MS. MKRTCHYAN:  Your Honor, if you recall, at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages

*Echo Reporting, Inc.*

7-RenSER-01258                                    7-RenSER-01258

46

by Plaintiff are limited to the time he left.

THE COURT: Time out.

MS. MKRTCHYAN: We already agreed to that. So, what is the problem here?

THE COURT: No, you haven't. No, you haven't. This is a new trial.

MS. MKRTCHYAN: That's why I'm agreeing now, because I don't want -- my argument is this, that --

THE COURT: Well, hold on. Wait. Wait. Just reach an agreement.

MS. MKRTCHYAN: Yeah.

THE COURT: If you're agreeing now to that same instruction, then I'm making the same ruling. These alternate stressors aren't coming in.

MS. MKRTCHYAN: Yeah, because this is a prejudicial issue.

THE COURT: You're winning on this. No more. We have an agreement then. The same instruction is going to be read which now cuts off these alternate stressors. We're done. Okay. So, by agreement of counsel, the instruction --

7-RenSER-01259          7-RenSER-01259

47

"and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after. That makes the alternate stressors irrelevant in Rhode Island. Okay. I'm sorry. I mean Pennsylvania. My apologies."

And this concludes at line 19.

THE COURT: With that agreement, now turning to the Plaintiff, after my concern about no objection being made by the Defendant, there's absolutely no reason to bring in through this witness the mother, these events after June or July of 2018 pursuant to the prior instruction and pursuant to the agreement, and there was no reason to emphasize homelessness, which caused the Court to literally instruct the jury during the opening statements that homelessness was not the center or gravamen of this case, that this was about excessive force.

And I believed, without warning, that any issue concerning homelessness that you were referring to was what had come up in the first trial about the O'Neil Campsite. I never envisioned that we would get the sympathetic testimony of two or three days of homelessness which counsel has argued, and I think he's right, has a nexus back and an inference to this jury that this homelessness and this

*Echo Reporting, Inc.*

54

tomorrow morning.  Goodnight.

(Proceedings concluded.)


I certify that the foregoing is a correct transcript
from the electronic sound recording of the
proceedings in the above-entitled matter.


/s/Jordan Keilty                        5/9/2025
Transcriber                             Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

7-RenSER-01261                                    7-RenSER-01261

Case: 25-7182, 07/27/2026, DktEntry: 89.8 (76 of 260) Page 75 of 133

7-RenSER-01262

# EXHIBIT J

7-RenSER-01262

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 5, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 7, 2025

1:07 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01263　　　　7-RenSER-01263

```
                        I N D E X


PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 ROGER ALMA CLARK           5       49       107        119
                                   103


 JEREMY HOLLOWAY           123
```

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01264          7-RenSER-01264

25

were not necessary or appropriate. In my hopeful testimony here is, I did not consider that at all necessary or appropriate. None of those aspects of force.

BY MS. MKRTCHYAN:

Q    And why not? Tell us why not. What is it, you're based on?

After all, we have a situation here. There are 911 callers. He's on probation. He has got some knives in his campground. Why not?

A    So just to unpack that a bit, the blows to the head are specifically trained to be avoided. Blows to the head. So punches -- any punches or kicks or smashing the head into a solid area is totally against policy and in the training to be avoided. There are parts of the body that are to be avoided wherever possible. And the head is one of them, the spine and the neck, those things.

The use of the taser.

MR. WRONIAK: Objection. 403. Irrelevant.

THE COURT: You may speak about the taser.

You may answer.

THE WITNESS: The use of the taser has specific requirements that are focused on aggressive behavior and credible threat. None of that is apparent. There's three on one, initially, and then there's seven. It's about 1,400 pounds of muscle -- trained muscle on one person.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01265                    7-RenSER-01265

26

The -- so I did not consider that the taser -- especially used in what's termed "dry stun" mode.  I can be precise on what the implications are there, and there were two applications:  One elongated tasing, one dry stun tasing.

And -- so -- and then the totality of the energy in terms of blows, kicks, et cetera, and then the choke -- any choking of the neck -- the neck is also one other area, and just -- there's a term "carotid restraint" which by law is forbidden, but also can cause, in the training, spasms and respiratory failure, choking and so forth, windpipes and spasms and so forth depending on the person.

So those are all aspects of force I considered very extreme and not necessary in the totality of the circumstance and that combined with the time they had to use verbal skills and de-escalate, the absence of weapons, all of those factored in.

Q   So, Lieutenant, so we established that the degree of force depends on the actions of the suspect, whether the suspect is cooperative, passive, noncompliant, aggressive or combatant, right?

A   Right.  And I gave the four categories in the training. This is how an officer gauges, *Okay.  What can I do?  What's necessary?  What's appropriate?*

And it is a very good commentary.  It's all

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01266                                          7-RenSER-01266

33

different time, so it's just not five officers at one time.

Sustained. All right, Counsel.

BY MS. MKRTCHYAN:

Q   So you've known from the materials, how many officers were there by the time taser was applied, involved with Holloway on the ground?

A   Well, I know there were three, and I considered that good enough. You know, it's three on one. So I considered the taser as a provocative. That's my term. Another term is, it's throwing gasoline on the fire. It's not mitigating the circumstances. It's not controlling force in this case that's necessary.

You got three guys. It's not much Holloway can do, in my opinion.

MR. WRONIAK: Objection. Irrelevant. 403. Move to strike.

THE COURT: Overruled.

BY MS. MKRTCHYAN:

Q   And when they -- you've heard evidence that there is a claim by Renegar that Mr. Holloway placed him in a headlock.

Do you recall that?

A   I saw it in his report and his testimony.

Q   Right. And that headlock was not corroborated by any of the other officers present. True?

A   That was my understanding of the reports.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01267                                                    7-RenSER-01267

112

Assuming that.

THE WITNESS: It would not be reasonable to punch him in the face.

BY MS. MKRTCHYAN:

Q Would it be reasonable to hit him in the head multiple times causing bleeding, if a probationer is refusing to go down on the ground?

MR. WRONIAK: Objection. Improper opinion.

THE COURT: Overruled.

THE WITNESS: No.

BY MS. MKRTCHYAN:

Q Is it reasonable to taser someone multiple times when that person is face down in a prone position with multiple officers with their body weights on him?

MR. WRONIAK: Objection. Irrelevant. 403.

THE COURT: Overruled.

But is that your understanding that he was on the ground when he was tasered?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

THE WITNESS: The answer is no.

BY MS. MKRTCHYAN:

Q So the issue is really not whether he did or did not go down to the ground. The issue is whether the force was reasonable when it was applied. True?

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01268                                   7-RenSER-01268

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 9, 2025

_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01269                                      7-RenSER-01269

Case 25-7182, 07/27/2026, DktEntry: 89.8 (84 of 290)

# EXHIBIT K

7-RenSER-01270

7-RenSER-01270

1

7-RenSER-01271

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                    )
                                    )
                Plaintiff,          )  **Certified Transcript**
                                    )
        vs.                         )  Case No.
                                    )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,           )
                                    )
                Defendants.         )  **DAY 6**
                                    )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

7-RenSER-01271                                    7-RenSER-01271

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF:**

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, ATTORNEY AT LAW
655 North Central Avenue
Suite 1700
Glendale, California 91203
818-388-7022
narine57@gmail.com

**FOR DEFENDANT JAMESON GOTTS:**

LYNBERG & WATKINS APC
BY: S. FRANK HARRELL, ESQ.
1100 West Town & Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

LYNBERG & WATKINS APLC
BY: CATHERINE A. NALTSAS, ATTORNEY AT LAW
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
213-624-8700
cnaltsas@lynberg.com

LYNBERG & WATKINS PC
BY: TAMARA M. HEATHCOTE, ATTORNEY AT LAW
1100 West Town & Country Road
Suite 1450
Orange, California 92868
(714) 937-1010
theathcote@lynberg.com

LYNBERG & WATKINS
BY: RYANE CORINNE SKINNER, ATTORNEY AT LAW
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01272                    7-RenSER-01272

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

> COLLINS & COLLINS LLP
> BY:  MICHAEL L. WRONIAK, ESQ.
> 750 The City Drive
> Suite 400
> Orange, California 92868-4940
> 714-823-4100
> mwroniak@ccllp.law
>
> COLLINS & COLLINS LLP
> BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
> 2011 Palomar Airport Road
> Suite 207
> Carlsbad, California 92011
> 760-274-2110
> cswiss@ccllp.law

**ALSO PRESENT:**

> Raymond Farahmand, plaintiff's paralegal
> Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

7-RenSER-01273                                    7-RenSER-01273

**I N D E X**

**WITNESSES**                                                         **PAGE**

**JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan            5
    Cross-Examination by Mr. Harrell            149

**EXHIBITS**

**(None offered.)**

**UNITED STATES DISTRICT COURT**

7-RenSER-01274                                                                7-RenSER-01274

A    Yes.

Q    Okay.  About 22,279?

A    Yes.

Q    Okay.  Then we have some billing that you received from treatment for -- at the Hardy Physical Therapy in Pennsylvania?

A    Yes.

Q    You were getting this kind of bills in Pennsylvania for Hardy Physical Therapy treatment periodically?

A    Yes.  Every time I went I got a bill.

Q    So isn't you true you were getting this treatment through the VA hospital?

A    Yes.

Q    Okay.  And you've got billing also from the VA hospital are related to your medical costs, treatment for this injuries?

A    Yes.

Q    Okay.  So let's pull up that and look at that.  This is your billing from VA hospital where --

        MR. WRONIAK:  Objection.  Excuse me.  Exhibit number, please.

        MS. MKRTCHYAN:  Exhibit 26.

BY MS. MKRTCHYAN:

Q    This is compilation of some of the bills that we received from VA for treatment in Montana, Long Beach, Pittsburgh?

A    Yes.

Q    20,396?

UNITED  STATES  DISTRICT  COURT

7-RenSER-01275                                    7-RenSER-01275

137

A     Yes.

Q     Okay.

          MR. HARRELL:   Your Honor, objection to Montana, for sure.

          THE COURT:   Well, Counsel, I'm leaving that to you. If we're going to extend this beyond, you know, the date that's --

          MS. MKRTCHYAN:   Your Honor, this is Montana related to --

          THE COURT:   That's fine.

          MS. MKRTCHYAN:   -- his treatment for back pain.

          MR. HARRELL:   Your Honor, objection to Montana and to Pennsylvania after July 2018.

          THE COURT:   This is not emotional distress though. This is physical.  Overruled.

BY MS. MKRTCHYAN:

Q     So then we go into some of your billing that you received here in California.  This is for the paramedics' treatment that you've got?

A     Yes.  This is for the ride.

Q     Okay.  We looked at the dental work that you did.  You went through doctor -- neurologist there.  Let's look at some of those billing.  And you're responsible for this billing, aren't you?

A     Yes.

**UNITED STATES DISTRICT COURT**

7-RenSER-01276          7-RenSER-01276

261

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 10, 2025*

                            */S/ DEBBIE HINO-SPAAN*

                            *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01277                    7-RenSER-01277

Case: 25-7182, 07/27/2026, DktEntry: 89.8 (92 of 300)

# EXHIBIT L

7-RenSER-01278

7-RenSER-01278

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 7, Volume I |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01279          7-RenSER-01279

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

        NARINE MKRTCHYAN
        NARINE MKRTCHYAN, ATTORNEY AT LAW
        1010 NORTH CENTRAL AVENUE
        SUITE 204
        GLENDALE, CALIFORNIA 91202
        (818) 388-7022
        narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

        S. FRANK HARRELL
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        sharrell@lynberg.com

        CATHERINE A. NALTSAS
        LYNBERG & WATKINS
        1150 S. OLIVE STREET
        SUITE 1800
        LOS ANGELES, CALIFORNIA 90015
        (213) 624-8700
        cnaltsas@lynberg.com

        RYANE SKINNER
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01280        7-RenSER-01280

**APPEARANCES OF COUNSEL:**

        FOR THE DEFENDANT, CHAD RENEGAR:

                MICHAEL L. WRONIAK
                COLLINS + COLLINS, LLP
                750 THE CITY DRIVE
                SUITE 400
                ORANGE, CALIFORNIA 92868
                (714) 823-4100
                mwroniak@ccllp.law

                CHRISTIE SWISS
                COLLINS + COLLINS, LLP
                2011 PALOMAR AIRPORT ROAD
                SUITE 207
                CARLSBAD, CALIFORNIA 92011
                (760)274-2110
                cswiss@ccllp.law

**Also Present:**

    Jeremy Holloway, Plaintiff

    Raymond Farahmand, Paralegal for Plaintiff

    Jameson Gotts, Orange County Deputy Sheriff, Defendants

    Chad Renegar, Orange County Deputy Sheriff, Defendants

    Bryan Stever, Litigation Support, Defendants

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01281                                7-RenSER-01281

```
                         I N D E X


PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 JEREMY HOLLOWAY                      19      133
                                      97
                                     111
```

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01282                                    7-RenSER-01282

7

THE COURT: Mr. Harrell, be on time. Am I clear? Am I clear?

MR. HARRELL: Understood, Your Honor.

THE COURT: Counsel.

MS. MKRTCHYAN: Yes, Your Honor. So very briefly. If the Court -- well, yesterday, I asked for a break during cross-examination. First, I needed a break to go to the restroom.

THE COURT: I gave you that break.

MS. MKRTCHYAN: No --

*(Court Reporter requests clarification for the record.)*

THE COURT: Counsel, I'm going to continue now to cross-examination. You take up your complaints with the Court at the end of the day. I do not want this interrupted. And I do not like the fact that we're in the middle of cross-examination, when we get to a point where there's a good interchange going on about the facts, and suddenly, we need a break. That occurred during the first couple trials also. And sometimes, I wonder if that's not tactical to speak to your client in the hallway.

MS. MKRTCHYAN: Your Honor --

THE COURT: I gave you the break yesterday --

*(Simultaneous speakers.)*

MS. MKRTCHYAN: I need to finish my record. No,

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01283                    7-RenSER-01283

8

I'm not going to participate in this. You know, Ninth Circuit is going to watch this. I need to make my record; otherwise, I'm not going to participate. You guys continue without me. Thank you very much.

(Plaintiff's attorney exits the courtroom.)

THE COURT: Counsel, we're going back on the record. We're missing one juror.

Mr. Harrell, please continue.

THE COURT REPORTER: She left, Your Honor.

THE COURT: Now she's missing.

Would you please get your counsel. When that juror goes back in, we go back into session.

(Pause.)

(Ms. Mkrtchyan enters courtroom.)

THE COURT: One juror is missing, so if you'd like to continue to make your record. We have a little bit of time until that juror -- but as soon as that juror is here, we're back in session.

MS. MKRTCHYAN: Your Honor, it seems to me that we're going to go up on the Ninth Circuit. And I'm entitled to make my record without interruptions, without being told that --

THE COURT: I was here at 6:45 for you to make this record last evening, and you weren't here.

MS. MKRTCHYAN: Well, because the defense were not

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01284                                                7-RenSER-01284

appreciate that.

Now, let me respond to a few things.

*(Court Reporter requests for clarification.)*

THE COURT: First, yesterday, I told you that you could present the case any way you wanted to. You could proceed with this compensation and salary through the years. That was your choice. I was concerned where that would lead, but you could conduct your lawsuit.

Second, you got your restroom break.

Number three, we were in session a little less than an hour or just over an hour when you called for this break. We're right in the middle of a cross-examination where counsel believes that he is getting relevant or irrelevant information from your client. This happened numerous times in the past, and I'm wondering if this is a restroom break, which I gave you, versus counseling your client to calm down on the stand when his answers have been nonresponsive, quite frankly. The repetitiveness of this is because your client has not answered the questions -- and I'll make that record -- whether it's avoidance or his handicap.

When you warned the Court about what to do, this is a long series of confrontations with this Court, and it goes clear back to the magistrate judge, that you've chosen to conduct yourself on your rules, not the Court's rules.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01285          7-RenSER-01285

13

And yesterday, you were so combative with the Court that I had ruled in your favor, and you continued to argue with the Court after that ruling that your client could answer those questions, because you were so combative you didn't hear or care. And I will pull that transcript for you.

And finally, your comment was, *Well, I just won't ask any questions, then.* I think you're more interested in confrontation, quite frankly, at this point and has become repetitive, quite frankly, and boring.

Control yourself. You can have that outburst in front of me, and I will absorb that. But if you do that in front of the jury, this Court will respond in the strongest terms. You don't tell the Court what to do. And I want that clear.

Am I clear with you? Am I clear with you?

Am I clear with you?

MS. MKRTCHYAN: Is this Court intimidating --

*(Court Reporter requests clarification.)*

THE COURT: No. I want to know that you understand what I've said, that I will make --

*(Overtalking: Unable to report.)*

MS. MKRTCHYAN: Is the Court above the law --

THE COURT: -- the rulings, and you will follow those rulings.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01286                    7-RenSER-01286

14

MS. MKRTCHYAN:  Is the Court above the law?

THE COURT:  That's right.  And you're not obeying it.

MS. MKRTCHYAN:  Okay.  Is the Court above the law?

THE COURT:  You're not obeying my --

MS. MKRTCHYAN:  I'm obeying it the way I understand.  But you're depriving me of the right to represent my client.  My client has a right to due process; doesn't he?

THE COURT:  You are deciding what the rules will be and disobeying the admonitions of the Court.  And if we made that record that counsel want to bring in terms of sanctions, that would be quite a record.  And we can start with the magistrate judge, quite frankly, and carry on to this Court.

Now, I'm counseling counsel that they can bring whatever motion they want, but I'm not going to grant terminating sanctions; I think that's totally inappropriate at this point.

But if you're really badgering the Court into a mistrial, and that's really want you want, and you stipulate to that, tell me that.  Because I'm not declaring mistrial regardless of your antics so far.  Your client has the right to get a jury on this issue.  And we're trying to get there, whether you like my rulings or not.  I could have declared a

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01287                                                    7-RenSER-01287

156

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 10, 2025

_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01288                    7-RenSER-01288

7-RenSER-01289

# EXHIBIT M

7-RenSER-01289

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 9, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 13, 2025

12:16 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01290                    7-RenSER-01290

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

        NARINE MKRTCHYAN
        NARINE MKRTCHYAN, ATTORNEY AT LAW
        1010 NORTH CENTRAL AVENUE
        SUITE 204
        GLENDALE, CALIFORNIA 91202
        (818) 388-7022
        narine57@gmail.com


FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

        S. FRANK HARRELL
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        sharrell@lynberg.com


        CATHERINE A. NALTSAS
        LYNBERG & WATKINS
        1150 S. OLIVE STREET
        SUITE 1800
        LOS ANGELES, CALIFORNIA 90015
        (213) 624-8700
        cnaltsas@lynberg.com


        RYANE SKINNER
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01291        7-RenSER-01291

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Bryan Stever, Litigation Support Defense

*Deborah D. Parker, U.S. Court Reporter*

```
                              I N D E X


DEFENDANTS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 CHAD MATTHEW RENEGAR               10

 MARTIN RAMIREZ             18      40
                           33




                         E X H I B I T S

PLAINTIFF'S EXHIBITS:                     IDENTIFICATION  EVIDENCE

 243-1 Unredacted Version of                    47
       Ramirez Memo re Onwuka
       Incident




                         E X H I B I T S

DEFENDANTS' EXHIBITS:                     IDENTIFICATION  EVIDENCE

 243   Ramirez Memo re Onwuka                                 24
       Incident
```

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01293                                    7-RenSER-01293

104

and Luna, and there is no other, and whatever words you want to put in there.  In other words, no other inference which is a weak way of saying it.  You can be stronger, but there's no other evidence before this Court.

MR. HARRELL:  Your Honor, another only very quick --

MS. MKRTCHYAN:  Excuse me.  Your Honor, I need to respond --

MR. HARRELL:  -- point --

*(Overtalking:  Unable to report.)*

MS. MKRTCHYAN:  Excuse me.

I am not going to be speaking already.  If there is an accusation here, I want to -- actually, the transcript to be read.  What specifically did I say that is objectionable?  Because there is this all --

And the Court is advocating for the defense.  I might as well be, basically, going up against defense counsel and -- which is -- yes, the Court is advocating.

THE COURT:  I'm not going to --

*(Overtalking:  Unable to report.)*

THE COURT:  -- again tonight -- you've already wished this Court and the whole body here a stroke, among other things.  And I'm starting to now pull those.  It's been redundant and repetitive.

MS. MKRTCHYAN:  No, but let's --

*Deborah D. Parker, U.S. Court Reporter*

108

                         CERTIFICATE

        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  May 16, 2025




                        _____/s/DEBORAH D. PARKER____
                        DEBORAH D. PARKER, OFFICIAL REPORTER

                  *Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01295                                    7-RenSER-01295

7-RenSER-01296

# EXHIBIT N

7-RenSER-01296

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 13, Volume I |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 20, 2025

8:11 A.M.


**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01297                                                                 7-RenSER-01297

4

I N D E X

CLOSING ARGUMENT:                                              PAGE

     By Ms. Mkrtchyan                                          34

     By Mr. Wroniak                                            86

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01298                                    7-RenSER-01298

45

(*The audiotape was played.*)

MS. MKRTCHYAN:  You can hear the screams of Holloway and the Taser clicks third time.

(*The audiotape was played.*)

MS. MKRTCHYAN:  5:04:07.  So this is about three times we can tell on this tape that he's tasered.  They claim it was twice.

How is it that we hear clicks and him screaming?

(*The audiotape was played.*)

MS. MKRTCHYAN:  So how many times this guy says, "There's blood.  It's on my head."

And they're going to keep denying that they hit him in the head?  They're going to keep denying it.

Let's hear Pahel's tape, how he complains. Pahel's tape.  This is in evidence.

(*The audiotape was played.*)

MS. MKRTCHYAN:  This is better sounds of him complaining on 5:03:27 seconds:  "You're kneeing me in the head."

This is contemporaneous and independent evidence of what happened on that night.

(*The audiotape was played.*)

MS. MKRTCHYAN:  5:03:49.  You hear another complaint:  "You hit me in the fucking head.  I'm bleeding." So don't let them blow falsification.  It's a falsehood to

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01299                                    7-RenSER-01299

49

Here it's 53 seconds. On Renegar's and Pahel's tape, it's about 48 seconds. I'll show it to you in a moment. So this is a little bit slower. This is not in sync with Pahel's and Renegar's tape. So when this arrived -- this deputy arrived to the scene, this man was screaming, *You hit me in the head. I'm bleeding.* And Taser is applied at that point. So he's trying to claim he had absolutely nothing to do with any use of force is another falsification. Another falsification.

(*The audiotape was played.*)

MS. MKRTCHYAN: Okay. You see. When Holloway is [sic] growling from pain, that's the Taser application. That's the Taser getting applied on him. He's growling -- pain. So the Taser is applied here. You can hear on Gotts' tape very well that he's tasered multiple times while Gotts is there by his own admission placing his knee on the back. Really? You think that was just like innocuous, placing his knee on his back? How did he get his pants bloodied?

No, he came in and struck him with his knee. That's what happened. Because if he's on his back, he was not going to get blood on his uniform. And, of course, he's going to deny that he had blood on his uniform.

So they just hope that they're going to believe -- you're going to believe them, and that's it. That's the end of the story. Let's, you know, cover this under the rug in

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01300                                        7-RenSER-01300

56

course, Renegar is going to lie, because he's lied before. He has a vested interest to justify his use of force. He's the only one who used the Taser. No one else there to use the Taser, and he used it multiple times. Not just once. This guy is basically out of control. He's overreacting, you know. Is that a reasonable police officer?

We're looking at it from the state of what is reasonable. Is that reasonable for someone to come and attack someone when you haven't even investigated what crime he has committed? Falsification 5. This is not ending. This is continuing. They say he was tucking his arms underneath him, not giving up his arms.

Ladies and gentlemen, Pahel, Borba, Gotts have exactly same story about this. I was not -- there were time limits in court. I couldn't, in fact, go into that. But let me show you their police reports, and you can see how this is preposterous. They're basically trying to tell us *Oh, look, we did exactly same thing. This man was not giving his arms.*

Just nonsense. Same scenario. Same exact scenario is given both -- all three officers.

(Pause.)

MS. MKRTCHYAN: I need to open up these reports. As you can see, I have technical issues with using this screen, because sometimes when you open something you can

*Deborah D. Parker, U.S. Court Reporter*

investigate. They needed to take injuries of his --

photographs of his injuries. They didn't. So if this man

didn't take photos of his own injuries, they would be doing

a lot more falsifications here.

So they exactly the same scenario minimizing. Why

this is happening? Because they are minimizing use of

force. They are minimizing it. Because body weight with

control hold, you know, is the most minimal use of force.

And no one is going to admit that they hit him in the head.

We looked at the police reports. And then they

say Holloway was kicking with Renegar with legs, justifying

Taser. Well, Gonzales did not say that. He's there he

didn't see that. He said on direct exam, Holloway was

passively resisting on the ground. Did not see him punch or

strike anyone. He also said, *I didn't use the Taser.*

Meaning, I didn't use the Taser. Renegar used the Taser. I

didn't find it necessary. So you can't get control of this

unarmed disabled man on the ground -- five officers -- and

you have to use the Taser?

No, that was malicious. That was malicious. And

Holloway is in the face-down position. This is not a

position of advantage to kick at anyone. He was barefoot.

You saw how he was taken, pulled from the ground in Pahel's

tape. This man was pressed on the ground by the force of

multiple officers, hefty officers with their uniforms, with

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01302                7-RenSER-01302

72

life when those in power abuse that authority?  How can we have pursuit of happiness when those in power we have given that much power?  We have given them guns.  We have given them power over us to arrest us.  How are we going to live our lives if we entrust our lives to them, and they abuse it?

This officers had to restrain themselves.  This officers had to use their proper judgment.  They have training.  They received hours of training.

This man had issues.  He had psychological issues.  He was on anxiety medications.  They are trained to deal with difficult people.  They are trained to deal with even mentally sick people.  There are people who have serious mental health problems.  They are trained.  And they -- basically, what they did was to pick on the weak one.  Pick on the weak one on that campground.  They thought he might be homeless.  It was clear to them, because he has two tents with lots of supplies.  They searched him the first time.  They saw his stuff there.  They knew he's homeless.  They thought, oh, what are the chances that he's going to actually take us to federal court?  What are the chances?

This is why it's not about Mr. Holloway.  Today it's about this homeless veteran.  Tomorrow it's going to be one of us.

MR. WRONIAK:  Objection.  Argumentative.  Improper

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01303                                                            7-RenSER-01303

75

memo.  That didn't happen.  But he falsified that to justify the use of force.

I'm asking you to think about assessing punitive damages against this officer, especially Renegar but also Gotts.  Why is he denying his blood on his uniform?  Why?  You could have just said, *Yes, I came.  I got involved.  Accidentally, I have blood on my uniform and my hands.*

They are denying because they don't want to admit that they hit him in the head.  So punitive damages is to deter so that if we as a society do not have the same kind of situation.  I ask you to issue punitive damages against each officer in the amount of at the very least $30,000.  That I'm asking you, personally, because this is so outrageous to me as a citizen.  You don't come to court and try it bring your falsifications here and try to do, what?  What are you trying to do?  This is the integrity of this justice system.  They are bringing their falsehoods and trying to make you believe that?  I think that's outrageous to me, because this Holloway -- today is Holloway.  Tomorrow it's going to be someone else.

MR. WRONIAK:  Objection.  Improper.

THE COURT:  Overruled.

MS. MKRTCHYAN:  And there's malice.  There's malice here.  There's reckless disregard here.  Because they know what they did.  And they're denying him -- they are

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01304                                        7-RenSER-01304

76

denying, you know, striking in the head.  So I ask you, please, you know, whatever you decide to compensate Mr. Holloway -- I give you a lot of -- I trust that you will be able to come to a number with the pain and suffering.

But punitive damages is critical, because we need to make sure that we say to this officers, *You do not dare to do that again.  You do not dare to lie under oath.  You do not dare to lie on police reports,* okay?

Because we as a society will perish.  Society will perish.  We'll perish.  American justice system will not survive if we have officers, people entrusted with law who lie.  We cannot handle that.  We will collapse.  There are many countries in the world who have collapsed because they did not --

MR. WRONIAK:  Objection.

MS. MKRTCHYAN:  -- their rights.

MR. WRONIAK:  Objection.  Improper.

THE COURT:  Overruled.

We have -- we live in America.  Why do we live in America?

Why people like us came from another country to live in America?  There's a reason behind it.  How many people from the world, all over the world like me, came to this country?  Why?  Because we believe in the Constitution.  Because we believe in the integrity of the legal system, law

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01305                                                    7-RenSER-01305

77

and order.  We believe.  My -- my dad was a police --

MR. WRONIAK:  Objection.

THE COURT:  Overruled -- just a moment.  My apologies.  Sustained.

Sustained.

MS. MKRTCHYAN:  We believe in the integrity of law enforcement.  But when one officer lies, every one else goes down the drain.  It leaves a trace.  It's, basically, like a pebble you throw into a lake.  It's not going -- it's going to go and reverberate.  And it's going to make the lake, you know, dark and that lake is not going to be pure anymore.  We need to vigilantly guard this because otherwise, we're going to turn into a tyranny.  We're going to turn into a tyranny by those who have power.  They have grounds.  What about our rights as the people?

We have decided this is government of the people. Not by the police officers, not by the -- those in power. It is extremely disturbing to have an officer we give that much power to lie and do this kind of -- on the weak person.

So we need to send a clear, long message, ladies and gentlemen, to officers --

(Overtalking:  Unable to report.)

MR. WRONIAK:  Objection.  Improper.

MS. MKRTCHYAN:  Before --

MR. WRONIAK:  Move to strike.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01306                                    7-RenSER-01306

78

THE COURT: Sustained.

MS. MKRTCHYAN: -- this is going to be deterrent effect. You will hear the jury instruction which says why punitive damages are assessed is to deter. It's to deter this conduct. And, you know, we have -- if we are going to let this injustice from this court remain, remain untouched without any accountability, what is that going to do to the rest of us?

Because injustice to one is injustice to everyone.

So let's look at the verdict forms here. What I'm going to ask you to do when you go back, you're going to have this verdict forms printed [sic] to you. You're going to choose a foreperson who will help you and foreperson, of course, decides how to organize everything. But everyone I want to -- I want everyone to deliberate. I want everyone to voice their opinions. I want you to please look at the exhibits.

Here's the special verdict that you will get: We, the jury, in the above-entitled action, render the following findings of fact by this verdict. First question: Deputy Jameson Gotts use excessive force on plaintiff, Jeremy Holloway?

You say "Yes". All of you unanimously, you have to be unanimous.

No. 2: Did Deputy Chad Renegar use excessive

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01307　　　　　　　　　　　　　　　　　7-RenSER-01307

Case 25-7182, 07/27/2026, DktEntry: 89.8, Page 122 of 300

81

so that's -- you know, he's allowed to ask questions.

Right to reasonable self-defense against excessive force by peace officers. If Mr. Holloway on that ground believed even that he's going to face death, he had the right to make movements to protect himself. He testified that the only thing he was doing is to cover his head with his arm -- right arm. And they are claiming, *Oh, he was not giving his arms.* Are you serious? He has the right to self-defense himself against the blows to his head. And that's how he's got his sleeves blood-stained.

Probation. They're going to say, *Oh, he waived his Fourth Amendment rights.* Nope, that's not what the law says. The law says the fact that plaintiff -- this is your jury instruction -- was on probation does not legally amount to a waiver of his Fourth Amendment rights. Think about it. If I am placed on probation with search and seizure terms, does that entitle this officers to assault me? Does that entitle them to attack me and use excessive force?

No. And, you know, so it's -- that's -- Probation is irrelevant as to excessiveness of the force. Probation allowed them to search him, but they didn't come second time and say, *Mr. Holloway, you know what? We've heard calls, again, on you. We want to search.*

You know, they came with guns drawn. Told him, *Get down on the ground,* no questions asked. What kind of,

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01308                    7-RenSER-01308

you know -- what kind of a system we have?  Today they're going to tell us *Get on the ground* and then they will Taser us.  Tomorrow they will shoot us, if we don't get down on the ground.  Is that what we want from our police officers?

What crime did they investigate?  Think about it. Disturbance of the peace, uncorroborated 911 calls in the dark campground.

First call is unreliable.  They come.  They don't find a female.  Why are picking on this homeless guy?  Why are they picking on this homeless guy?  Oh, because they didn't like his attitude.

Well, ladies and gentlemen, so far as we know in this country, attitude does not entitle them to beat you up, so --

And then the excessive force instruction, it will give you guidelines in the determining what officers -- what are the circumstances?  You need to consider extent of plaintiff's injury, availability of alternative methods to take the plaintiff into custody and subdue plaintiff.

I asked Lieutenant Clark -- this is a, you know, veteran from LA County Sheriff's Department.  I asked, *Are there any other ways to put him into custody?*

Sure.  They could have told him, *Place your hands behind your back.  I'm going to handcuff you.  There are*

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01309                    7-RenSER-01309

84

desperation.  Laundry list of excuses.

Did you see they didn't even bring their toxicologist, Dr. Clark.  They said -- because I had the first witness, Dr. Okorocha, who testified that Trazodone, marijuana had no impact, could not have had an impact on someone who had used it for awhile.  Did they bring their toxicologist to desperately argue that, *Oh, Mr. Holloway might have been under the influence of this legally prescribed medications and marijuana and, therefore, he does not remember what happened.*

Did they bring their toxicologist?  No, they did not.  So this is -- it's a tale of desperation.

They're objecting to everything.  How many times did we hear "objection"?  And I was getting frustrated, because this is a court of law.

MR. WRONIAK:  Objection.  Objection.  Improper.

THE COURT:  Sustained.

MS. MKRTCHYAN:  So in any event, I trust in the jury system.  You've heard enough.

I'm going to leave you with one final remark: When one of us is in trouble, when one of us is in danger, the rest of the society --

MR. WRONIAK:  Objection.  Improper.

THE COURT:  Sustained.

Back to the case, Counsel.  Facts of this case.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01310                    7-RenSER-01310

133

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 22, 2025

                    /s/DEBORAH D. PARKER
          DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01312

# EXHIBIT O

7-RenSER-01312

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | CASE NO: 8:19-cv-01514-DOC-DFMx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| COUNTY OF ORANGE, ET AL., | ) | Thursday, December 8, 2022 |
| | ) | ( 9:53 a.m. to 10:45 a.m.) |
| Defendants. | ) | (11:01 a.m. to 12:00 p.m.) |

VOLUME II

JURY TRIAL - DAY 3

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

7-RenSER-01313                              7-RenSER-01313

2

APPEARANCES:

For Plaintiff:                    NARINE MKRTCHYAN, ESQ.
                                  P.O. Box 2288
                                  Toluca Lake, CA 91610
                                  818-388-7022


For Defendants:                   S. FRANK HARRELL, ESQ.
                                  TAMARA M. HEATHCOTE, ESQ.
                                  Lynberg & Watkins
                                  1100 West Town and Country Road
                                  Suite 1450
                                  Orange, CA 92868
                                  714-937-1010

                                  CHRISTIE B. SWISS, ESQ.
                                  Collins & Collins
                                  2011 Palomar Airport Road
                                  Suite 207
                                  Carlsbad, CA 92011
                                  760-274-2110

                                  MICHAEL L. WRONIAK, ESQ.
                                  Collins Collins Muir & Stewart
                                  750 The City Drive
                                  Suite 400
                                  Orange, CA 92868
                                  714-823-4100

7-RenSER-01314                                          7-RenSER-01314

3

                              INDEX

| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHAD RENEGAR | 4 | -- | -- | -- |

                EXCEPTIONAL REPORTING SERVICES, INC

7-RenSER-01315                    7-RenSER-01315

Case 25-7182, 07/27/2026, DktEntry: 89.8, Page 130 of 300

Renegar - Direct / By Ms. Mkrtchyan                    34

THE COURT:  Overruled.

A    Well, every situation is different.  To effect an arrest, we're allowed to use reasonable force to overcome resistance, effect an arrest, and prevent escape.

Q    Right.  But that's when you're arresting someone, right?

You are allowed, by Policy 300.2.1, when you are arresting someone, when you have probable cause to arrest someone, then you can use reasonable force to effect the arrest, to prevent escape, or to overcome resistance.  True?  Do you disagree with that?

A    I don't disagree with that.  But there's a lot of movement in that.

Q    Okay.

MR. WRONIAK:  Your Honor, objection to the document being published.

MS. MKRTCHYAN:  Well, Your Honor --

THE COURT:  Yeah.  Counsel, take down the document, please.

MS. MKRTCHYAN:  Well, Your Honor, clearly --

THE COURT:  Counsel, that's --

MS. MKRTCHYAN:  -- we have --

THE COURT:  -- an order.

MS. MKRTCHYAN:  -- the problem with --

THE COURT:  Counsel, that's an order.  Thank you very much.

EXCEPTIONAL REPORTING SERVICES, INC

7-RenSER-01316                                    7-RenSER-01316

Renegar - Direct / By Ms. Mkrtchyan                    35

MS. MKRTCHYAN: Well, I request --

THE COURT: It has not been --

MS. MKRTCHYAN: -- this document --

THE COURT: Counsel -- Counsel, that has not been received yet. Nothing goes up until I receive the document.

MS. MKRTCHYAN: There has been no objection to this document before, Your Honor.

THE COURT: Thank you very much, Counsel. You're next question now, please.

BY MS. MKRTCHYAN:

Q    Well, is it your understanding that, even when you're not arresting someone, you can use that kind of force that we just discussed?

A    Again, every situation is different. If we go to try to place handcuffs on somebody to detain them, and they start pulling away or fighting with us, that's now a crime. So we would be able to use force to effect-an-arrest them.

Q    Well, sir -- okay. But at this point, you are not arresting Holloway, correct? You are detaining him, pending an investigation of a 911 call, correct?

A    Again --

Q    Yes or no?

A    Say the question again?

Q    Are you arresting Holloway or not, sir? Can we get a straight answer to any of my questions this morning?

EXCEPTIONAL REPORTING SERVICES, INC

7-RenSER-01317                                    7-RenSER-01317

108

## CERTIFICATION

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____        December 8, 2022

      **Signed**                     **Dated**

*TONI HUDSON, TRANSCRIBER*

7-RenSER-01318             7-RenSER-01318

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California,     )
                          ) ss.
County of Los Angeles.    )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, California 91101.

On this date, I served the foregoing document described as **DECLARATION OF CHRISTIE B. SWISS IN SUPPORT OF DEFENDANT CHAD RENEGAR'S OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

Executed on **August 25, 2025** at Pasadena, California.

☒ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
AMY NARBER
anarber@ccllp.law

*FILE # 23084*

4

**SWISS DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01319         7-RenSER-01319

**SERVICE LIST**
**Case Name: Holloway v. County of Orange, et al.**
**Case Number: 8:19-cv-01514-DOC-DFM**
**CCMS: 23084**

| | |
|---|---|
| Narine Mkrtchyan | S. Frank Harrell |
| 655 North Central Avenue Suite 1700 | Tamara M. Heathcote |
| Glendale CA, CA 91203 | Lynberg and Watkins APC |
| **Mailing Address:** | 1100 West Town and Country Road Suite 1450 |
| 10063 Riverside Dr #2288 | Orange, CA 92868 |
| Toluca Lake, CA 91602 | 714-937-1010 |
| Tel: 818-388-7022 | Fax: 714-937-1003 |
| Email: narine56@msn.com | sharrell@lynberg.com |
| **ATTORNEYS FOR PLAINTIFF** | cnaltsas@lynberg.com |
| **JEREMY HOLLOWAY** | theathcote@lynberg.com |
| | **ATTORNEY FOR County of Orange, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts, Deputy Justin Gunderson** |

*FILE # 23084*

5

**SWISS DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

**COLLINS + COLLINS LLP**
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

Case 25-7192, 07/27/2026, DktEntry-89.8, Page 135 of 300

**Michael L. Wroniak (State Bar No. 210347)**
**Christie B. Swiss (State Bar No. 245151)**
**COLLINS + COLLINS LLP**
**750 The City Drive, Suite 400**
**Orange, CA 92868**
**(714) 823-4100 – FAX (714) 823-4101**
**Email: mwroniak@ccllp.law**
**Email: cswiss@ccllp.law**

Attorneys for Defendant
DEPUTY CHAD RENEGAR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DISTRICT

| | |
|---|---|
| JEREMY HOLLOWAY, | CASE NO. 8:19-cv-01514-DOC-DFM |
| | *Honorable David O. Carter; Courtroom 10A* |
| Plaintiff, | |
| vs. | **DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF** |
| COUNTY OF ORANGE; DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer. DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS, individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1 through 10, Inclusive | **DEFENDANT CHAD RENEGAR'S OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS** |
| | **[filed concurrently with the Opposition; Declaration of Swiss]** |
| | **Date:  September 15, 2025** |
| | **Time:  9:00 a.m.** |
| | **Dept:  10-A** |
| | **Complaint Filed: August 6, 2019** |
| Defendants. | **Trial Date: April 29, 2025** |

*FILE # 23084*

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

**O'CONNOR DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION
FOR AWARD OF ATTORNEY FEES AND COSTS**

7-RenSER-01321 7-RenSER-01321

**DECLARATION OF JOHN D. O'CONNOR**

I, John D. O'Connor, do hereby declare as follows:

**I.      EDUCATION, EXPERIENCE, AND WORK HISTORY**

1.      I am an attorney and licensed to practice law in all courts in the State of California and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of me and several associates that specializes in commercial litigation. I have fifty-two years of significant trial experience, including current jury trial experience. In addition to my litigation practice, I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions. My most prominent expertise is lodestar calculation in significantly complex litigation.

2.      The following is a summary of my background and qualifications.

3.      I attended the University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

4.      After being admitted to the California bar, I held numerous positions at private law firms where my practice focused on trial litigation. In 1972 and

DECLARATION OF JOHN D. O'CONNOR      1

7-RenSER-01322                                                      7-RenSER-01322

1973, I was an associate with the trial firm of Belli, Ashe, and Choulos, where I assisted Mr. Melvin Belli in the trial of several significant cases and tried three cases independently. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In that capacity, I tried white-collar criminal cases as well as a variety of civil matters.  Much of my civil work with the U.S. Attorney's office involved personal injury and employment discrimination cases brought against Government facilities, including one class action race and discrimination case, which involved negotiating fees for thirteen lawyers.  In 1980 and 1981, I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger, and Harrison.

5.      From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

6.      From 2001 through 2006, I was Special Counsel and a Director (equivalent in a legal corporation to a partner) for the Howard Rice firm, now merged with Arnold and Porter, practicing within the litigation department.  At Howard Rice, I pursued a high-stakes litigation practice, including the defense of R. J. Reynolds Tobacco Company and intellectual property disputes.  At Howard

**DECLARATION OF JOHN D. O'CONNOR    2**

7-RenSER-01323                                                    7-RenSER-01323

Rice, I was designated as chief trial counsel in two major "soft IP" litigations, each involving the scope of rights transferred under specific contractual arrangements. One case represented an e-commerce platform provider, and the other represented Vivendi regarding the scope of rights to license video games in internet café settings.

7. Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates. My practice continues to focus on complex business litigation, with some personal injury work for both plaintiff and defense, including an active trial practice. In my career, I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country. Approximately eighty percent of my time in recent years has been spent as a consultant and expert witness in attorney fee disputes. In such disputes, I have assisted parties seeking fees and those seeking to oppose or reduce them.

8. In 1982, I began managing the Tarkington office, and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report. I also reviewed periodically more widely published legal periodicals.

9. As written billing guidelines became in vogue for institutional

**DECLARATION OF JOHN D. O'CONNOR**      **3**

7-RenSER-01324                                                  7-RenSER-01324

clients in the mid-eighties, I participated heavily in working with our institutional clients in government, insurance, and other large businesses to establish and implement practical billing standards. I regularly consulted with these clients about their perception of the positive and negative in our billings and, where appropriate, remedied the same.

10. I have kept abreast of the billing rates in both Northern and Southern California, and generally throughout the country since 1982. Because we represented clientele in different business and governmental sectors, it was important to me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

11. Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups. I also became immersed in the "auditing" practices of insurers as they evolved in the late 1980s and early 1990s.

12. Due to my growing expertise in legal fees and auditing issues, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled

DECLARATION OF JOHN D. O'CONNOR     4

7-RenSER-01325                    7-RenSER-01325

against their practices, almost invariably involving large fee disputes.  I also consulted on numerous occasions with fee payors in fee disputes.  I continue to work on this as a subspecialty of my litigation practice to this day.

13.     I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions.  A significant portion of those cases have been large and complex, including those in which attorneys' fees are sought under the lodestar method based on hourly billings contemporaneously paid by a prevailing client.

14.     In total, I have testified as an expert or handled litigation in approximately twenty states.  I regularly review published rate surveys, which are typically categorized by location, field of practice, firm size, and lawyer status. For the past several years, I have also been consulting and lecturing nationwide through the auspices of the National Association of Legal Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of legal fee analysts, expert witnesses, and general counsel on fee matters. I have had the honor of being named by NALFA the "nation's top attorney fee expert" since 2017.

15.     My *Curriculum Vitae* is attached hereto as **Exhibit A**.

16.     I have many years of experience representing government agencies, including six years with the United States Attorney's Office in San Francisco and

**DECLARATION OF JOHN D. O'CONNOR     5**

7-RenSER-01326                                                    7-RenSER-01326

approximately twenty years with the Tarkington firm, where we represented numerous municipal, county, and federal clients. I also have experience litigating both for the plaintiff and the defendant.

17. I have opined in approximately fifty cases brough against county and municipal governments and have both litigated and served as an expert witness in class action prison cases involving allegations of physical abuse by law enforcement officers. I have tried numerous personal injury cases throughout my career, including serious personal injury and wrongful death cases both to Court and jury. I have litigated and settled cases on behalf of both plaintiffs and defendants.

18. In rendering my opinion, I have reviewed the following: the docket for the instant litigation; Complaint; Second Amended Complaint; briefing and order related to Motion for Sanctions and Dismissal; briefing and orders related to Motion for Review magistrate's recommendation as to motion to dismiss; briefing and orders related to Motion for Review magistrate's recommendation as to motion to dismiss and spoliation order; briefing and orders related to motions to disqualify judge and related motion to certify appeal; discovery dispute briefing including Joint Discovery Stipulation, motions to compel and related request for sanctions; the premature motion for attorneys' fees and opposition thereto; Order re Omnibus on Post Trial Motion after Third Trial; the instant

**DECLARATION OF JOHN D. O'CONNOR** 6

7-RenSER-01327                    7-RenSER-01327

motion for attorneys' fees, supporting declarations and invoices.

19.     As a result of the foregoing, I believe I am highly competent to render expert opinions about the reasonableness of fees sought in this case.

## II.     <u>SUMMARY OF OPINIONS</u>

20.     Petitioning counsel achieved a limited degree of success in this case.

21.     Two causes of action, distinct from the excessive force claims, including illegal search and false arrest claims, were dismissed on summary judgment. Five of the seven individual defendants were sued on claims not strong enough to proceed to a jury determination.  One claim, against Defendant Gotts, was presented to a jury, but ultimately without sufficient evidence to overcome qualified immunity.

22.     These unsuccessful claims involved much evidence and legal work separate from and not inextricably intertwined with the evidence supporting the one successful claim against Defendant Renegar. In my opinion, this should have been the only claim presented in this case.  In my opinion, the petitioning counsel, Ms. Mkrtchyan, cast her net too widely.

23.     Ms. Mkrtchyan avers in her Declaration that the 3,668 hours she has billed and for which she seeks compensation "seems excessive at first blush…" (P. 25, para 5) In fact this amount seems excessive precisely because it is what it appears to be, excessive.

DECLARATION OF JOHN D. O'CONNOR     7

7-RenSER-01328                                                       7-RenSER-01328

24.     Case law requires that degree of success determines the extent of compensation. (*See, Hensley v. Eckerhart* (1983) 461 U.S. 424, 436 ["Again, the most critical factor is the degree of success obtained."].)

25.     By the conclusion of the first trial, what should have been a simple case focusing on but not limited to one punch from one Defendant, Renegar, the case has ballooned to one on which Ms. Mkrtchyan logged 1,646.6 hours and Mr. Beck 107.05 hours, for a total of 1,753.65 hours.  Much of this time should not be compensated, as I will later discuss as part of a degree of success analysis.

26.     In this first phase and first trial, the document discovery was essentially concluded as was every percipient witness as well as all experts but one later named. But yet 2,730.8 additional hours are sought for the three retrials, out of the total of 4,483 hours claimed. See Hours by Trial Period Chart attached as **Exhibit B.**

27.     For fifty of my fifty-three years in practice, I had an active trial practice and supervised, and acted as billing attorney, on cases tried by others. I have also reviewed hundreds of collections of invoices billing for trial activities.

28.     The retrials in this case as a general expectation should have each consumed an additional 150 hours in preparation and 150 hours in trial, for 300 hours for each of the three retrials. In addition, some post-trial work was necessitated following the third and fourth trials, which should have consumed

**DECLARATION OF JOHN D. O'CONNOR     8**

about 100 hours for each. Thus, about 1,100 hours would be an expected baseline for reasonable handling of this case following the first trial, considerably less than 2,730.8.

29. I do not here assert that all hours over 1,100 are excessive but do believe that while Mr. Beck was efficient in his work, Ms. Mkrtchyan was not, and putting aside lack of success, her hours should be reduced at a minimum 20% in total for inefficiency.

30. Much of the time billed, whether for successful or unsuccessful claims, was not only inefficient but also involved contemptuous and uncivil actions, including but not limited to challenges to the impartiality of two judicial officers. Whether contemptuous or not, and they appear to qualify so, these actions both contributed to inefficiency and also merit a negative multiplier, as prescribed by case law, for continuously uncivil demeanor and conduct.

31. In addition to the inefficiency of petitioning counsel, there are billings, especially as to the more recently billed trial time, which appear substantially inflated and bear badges of unethical overbilling. These are exemplified by a string of 14.0-hour trial days during the fourth trial, likely entries logged after achieving success. See 8+ Hour Days Chart attached as **Exhibit C.**

32. Time billed for routine tasks or vaguely described tasks appears routinely overstated. The entries were generally block billed, which is not

DECLARATION OF JOHN D. O'CONNOR        9

necessarily wrongful, unless, as here, it appears to involve purposeful vagueness used to hide empty time.

33.     There was also no billing judgment shown. Time was billed for talks with reporters, searching for associating counsel, routine file management, and time that is overhead rather than billable legal services calling for legal acumen. Time was also billed for moving to disqualify the Court, and to impugn the Magistrate Judge, showing lack of billing judgment.

34.     No paralegal time, for which 696 hours in compensation is sought, is directly identified in the moving papers.  Not only is a paralegal not identified in the moving papers, but there are also no time entries submitted for paralegal time. The billing of 696 hours at $200 per hour, without a specified paralegal or specified services, in my opinion, is a fraudulent attempt to obtain compensation for Mr. Beck during a period (March 31, 2021, through September 30, 2022) when the California State Bar suspended him from the practice of law. See Mr. Beck's CalBar License Status in **Exhibit D**.

35.     Even if it is assumed that Mr. Beck could practice law in the guise of a paralegal, the evidence I have reviewed is strong that he spent nowhere near 696 hours as a paralegal during his suspension or otherwise.  Rather, it appears that he spent around 100 hours between March 31, 2021, and the conclusion of the first trial in September 2021.

**DECLARATION OF JOHN D. O'CONNOR     10**

7-RenSER-01331                                        7-RenSER-01331

36. I infer that the 696 hours were meant to compensate Mr. Beck for 116 hours billed at $1,200 per hour. In essence, Ms. Mkrtchyan and Mr. Beck are acting in concert, in my opinion, to obtain illegal compensation for the illegal services of Mr. Beck, and in so doing are committing fraud while breaching their duties of candor to this Court. In addition to the Court and State Bar, I believe that the County of Orange is a victim and know that defense counsel and I are charging the County for dealing with seemingly obvious fraud.

37. At least 40% (likely more) of Ms. Mkrtchyan's time is attributable to unsuccessful claims. Her degree of success should be considered no more than 60% before any deductions for incivility and overbilling.

38. In addition to the 40% reduction of hours due to unsuccessful claims, Ms. Mkrtchyan has also overbilled at least 20% of her time, so a 20% reduction of her hours is also warranted.

39. Finally, Ms. Mkrtchyan was thoroughly uncivil throughout this litigation, engaging in conduct unbecoming of a member of the Bar and a federal court advocate. Approximately 40% of the remaining 60% of Ms. Mkrtchyan's time should be disallowed for this conduct and uncivil waste of Court and counsel time. (*See, e.g., Snoeck v. ExakTime Innovations, Inc.* (2023) 96 Cal.App.5th 908, 911 [approving negative 0.4 multiplier to account for counsel's lack of civility to

**DECLARATION OF JOHN D. O'CONNOR     11**

opposing counsel and the court.])  Citing *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 744, the *Snoeck* court found:

'Incivility between counsel is sand in the gears. [¶] Incivility can rankle relations and thereby increase the friction, extent, and cost of litigation. Calling opposing counsel a liar … can invite destructive reciprocity and generate needless controversies. Seasoning a disagreement with avoidable irritants can turn a minor conflict into a costly and protracted war. … All sides lose, as does the justice system, which must supervise the hostilities. [¶] By contrast civility in litigation tends to be efficient by allowing disputants to focus on core disagreements and to minimize tangential distractions. It is a salutary incentive for counsel in fee-shifting cases to know their own low blows may return to hit them in the pocketbook.'

(*Snoeck v. ExakTime Innovations, Inc.* (2023) 96 Cal.App.5th 908, 926.)  The *Snoeck* court further noted that civility is an aspect of skill and that incivility reflects on ones skills as professionals. (*See*, *id.* at 927; *see also*, *Karton v. Ari*

**DECLARATION OF JOHN D. O'CONNOR    12**

7-RenSER-01333                    7-RenSER-01333

*Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 747 ["Excellent lawyers deserve higher fees, and excellent lawyers are civil."].)

40.     Therefore, consistent with the case of *Snoeck*, I recommend deductions from Ms. Mkrtchyan's successful lodestar hours of 20% for overbilling, and 40% for incivility, applied to declining balances as opposed to the entirety of the lodestar.

41.     As to her rate, Ms. Mkrtchyan displayed poor skills in both deposition and trial and lacked a professional demeanor.  I have reviewed much of her work, and her writing is significantly below average.  Many skilled lawyers, whether practicing in Glendale or Santa Ana, are pleased to receive $500 per hour for litigation services in cases such as this.  This rate of $500 per hour is the very highest rate that Ms. Mkrtchyan should receive.  Indeed, it is a rate that many skilled litigators charge in personal injury cases.  The undersigned recently agreed to this rate in a case arising out of a hard-fought personal injury dispute.

42.     The net result of these deductions for Ms. Mkrtchyan would be that Ms. Mkrtchyan should be compensated for 1,056.59 hours at $500 per hour, or for $528,295.

43.     Mr. Beck was efficient in deposition and not uncivil and, indeed, while a suspended lawyer sitting through the first trial, acted civilly toward opposing counsel, albeit apparently illegally.

**DECLARATION OF JOHN D. O'CONNOR     13**

7-RenSER-01334                                        7-RenSER-01334

44.     Mr. Beck is a capable lawyer who bills efficiently, but no services requiring extraordinary skill were required of him as an adjunct or associated counsel.  He attended and took depositions, and in my opinion, did so capably and efficiently.  In any case, $800 per hour is the maximum hourly rate that should be awarded for these limited adjunct services.

45.     If Mr. Beck's time billed while he was a non-suspended lawyer is to be compensated, approximately 40% of his 119.75 hours should be deducted for the lack of success of the claims brought, thus reducing his lodestar to 71.85 hours for compensation, if he is to be compensated at all in light of his improper attempts to be compensated for work while suspended.

46.     If Ms. Mkrtchyan and Mr. Beck are to be compensated at all, Ms. Mkrtchyan. should be compensated for no more than 1,056.59 hours at no more than $500 per hour, for a total of $528,295. Mr. Beck should be compensated for 71.85 hours at $800 per hour, for a total of $57,480.

47.     Total fee compensation for both petitioning lawyers should therefore be no more than $585,775.

48.     The remaining time for which compensation is sought is the 696 hours of paralegal time billed at $200 per hour.  As noted above, it is my firm opinion that this constitutes fraud against the Court and the County of Orange;

**DECLARATION OF JOHN D. O'CONNOR     14**

7-RenSER-01335                                                    7-RenSER-01335

therefore, both petitioning attorneys should be disqualified from receiving any compensation.

## III.   OVERVIEW OF RECOMMENDED BILLING ADJUSTMENTS

49.   This case should not have been greatly complicated. Still, it appears that petitioning counsel made it so by bringing forth unwarranted claims and suing Defendants who were only peripherally involved in performing normal law enforcement services in the incident giving rise to the asserted damages.

50.   The facts of this case are well known to a Court which has presided over four trials and significant discovery disputes. Accordingly, the Court is a better witness than I to the substantial time and effort spent by all on unsuccessful claims that are segregable from the work on successful claims, and to the lack of skill and civility of petitioning counsel.

### Non-Compensable Activity

51.   There was a claim of excessive force against Defendant Renegar for an alleged punch to Plaintiff's face, allegedly causing severe trauma.

52.   The claim against Defendant Gotts for placing a knee on the Plaintiff's head area was marginal in terms of potential damages and the question of qualified immunity. Even though Plaintiff did not prevail because of qualified immunity, it was not unreasonable for Plaintiff's counsel to bring such a claim against Defendant Gotts.  That said, the time and effort in pursuing Defendant

DECLARATION OF JOHN D. O'CONNOR     **15**

7-RenSER-01336                                                                    7-RenSER-01336

Gotts, to the extent independent of the evidence adduced versus Renegar, should be non-compensable.

53.     The claims against five other deputies were unsuccessful, and each required a separate analysis.  Two defendants were charged with one set of similar claims, while three others shared a common set of claims.

54.     Therefore, the proof here adduced at various trials required four categories of proof and four categories of analysis: the Renegar claim, the Gotts claim, and two other sets of claims against the remaining five deputies.

55.     There was also a separate set of claims against the County for unreasonable search and seizure and false arrest, dismissed through Summary Judgment.  I will term this the fifth grouping of claims.

56.     Accordingly, grouping all the non-compensable claims and activities together, to the extent they were separate and distinct from the Renegar claim, such are non-compensable and rendered this litigation only partly successful.  I estimate that this lack of success is at least forty percent of the billed activity. (*See*, *Hensley v. Eckerhart* (1983) 461 U.S. 424, 436-437 ["The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."]; *see also*, *Martinez v. Longs Drug Stores, Inc.* (E.D.Cal. Nov. 28, 2005, No. CIV-S-03-1843 DFL CMK) 2005 U.S.Dist.LEXIS 30226, at *9 [applying negative 2/3 multiplier for unsuccessful

**DECLARATION OF JOHN D. O'CONNOR    16**

claims because "[t]he time records [fee petitioner] provided are not sufficiently detailed to enable the court to match each entry to the corresponding claims."].)

### **Overbilling; Lack of Billing Judgment**

57.     As to those activities otherwise compensable, there is a question of some substantial degree of excessive billing and lack of billing judgment.

58.     For just one example of excessive billing, after trying three cases where Ms. Mkrtchyan usually billed ten-hour days, after she was successful on the fourth trial, she then entered all of her fourth trial days as identical 14.0-hour days. This is just one example of overbilling and lack of billing judgment, but it lends itself to the inference that this was not the only intentionally excessive time logged.

59.     There was nothing objectionable about the billed time of Mr. Beck. Throughout Ms. Mkrtchyan's billings, there are vague and seemingly excessive entries, often blocked and aggregated, that do not accurately describe activities worthy of the time spent.

60.     Overall, Ms. Mkrtchyan shows lack of billing judgment, with vague billings for activities, the necessity of which is unclear, and otherwise suggesting excessive time.

//

//

**DECLARATION OF JOHN D. O'CONNOR      17**

**Incivility**

61.     Ms. Mkrtchyan was shockingly uncivil to all – opposing counsel, the Magistrate Judge, and the trial Court – which, under case law, deserves a significant negative multiplier to be applied to the lodestar.

**Reductions in Hours for Ms. Mkrtchyan**

62.     Out of the five separate areas of activity, four of them embody non-compensable activity and lack of success, requiring, in my opinion, a minimum cut of 40% of hours requested, before any other objections are considered.  This leaves 60% of Ms. Mkrtchyan's and Mr. Beck's billed hours, which arguably relate to the successful claim against Defendant Renegar.

63.     Of the remaining 60% of hours, I opine an across-the-board reduction of 20% of Ms. Mkrtchyan's time is appropriate for intentionally vague, careless, heavy-pencil overbilling. This leaves 1,760.98 hours for compensation, subject to any further reduction.

64.     A final 40% deduction on those remaining compensable hours is warranted for Ms. Mkrtchyan's incivility, in my opinion. However, this matter is clearly within the discretion of the Court. Whatever deduction which may be applied should be taken only from the net amount thus far calculated, as opposed to the initial lodestar before adjustment.

**DECLARATION OF JOHN D. O'CONNOR     18**

7-RenSER-01339                    7-RenSER-01339

65.     The reduction of 20% for overbilling and 40% for incivility is supported by case law.  Similar reductions were imposed by the Court in *Snoeck v. ExakTime Innovations, Inc.,* and are a worthy factual precedent for adjustment in this case.

66.     To summarize, Ms. Mkrtchyan's requested hours of 3,668.70 should be thus reduced, in summary, by 40% for lack of success, 20% for overbilling, and 40% for incivility to 1,056.59 hours.  See the Opinion Chart attached as **Exhibit E** for this breakdown.

67.     Mr. Beck's time of 119.75 hours should be reduced by 40% for the lack of success, yielding 71.85 hours of compensable time.  Mr. Beck was neither uncivil nor inefficient, and he kept time well; therefore, no further deductions are warranted for his time.

## IV.     REASONABLE RATES

68.     To begin, this case was not complex, as are many civil rights disputes. Instead, it is a simple case of excessive force, involving a punch to the face.  It is a worthy claim, but not a complex one.

69.     In virtually every case of alleged civil rights, Ms. Sobel is a witness on rates and invariably opines as she does here to the very highest rates awarded as being applicable in the case at hand.

**DECLARATION OF JOHN D. O'CONNOR     19**

7-RenSER-01340                                                        7-RenSER-01340

70. She uniformly expresses the opinion that the complexity of a case has nothing to do with the applicable rate, but rather, complexity is only a factor in analyzing hours and efficiency.

71. In my view, that is akin to saying that a skilled house painter should get the same rate as a skilled portrait artist. They both paint, after all, and the portrait artist may get paid more because his job takes longer, arguably.

72. There are some questions in civil rights cases, such as voting matters, for example, where skill in polling and statistics, as well as population maps, and complex case law, make this area one that warrants higher rates than an excessive force case, merely an offshoot of personal injury tort claims.

73. Ms. Mkrtchyan practices out of a Glendale office, and this case was venued in Santa Ana, two similar legal markets.

74. The broad market of litigation attorneys, many with personal injury experience, would form the cohort of comparable lawyers of similar skill, reputation, and experience for the instant case.

75. A privately hired litigation counsel, that is, counsel not retained by a governmental entity or an insurance company, would yield a rate of $500 per hour for the median in that sector for a mid-level, 19-year lawyer trained as a local public defender, with ten years of personal injury experience. However, within that cohort, some lawyers possess excellent skills, a strong reputation, and

**DECLARATION OF JOHN D. O'CONNOR 20**

7-RenSER-01341 7-RenSER-01341

extensive experience, and can charge at the upper end of this market, ranging from $575 to $700 per hour.

76.     While some lawyers are above the median in skill, reputation, and experience, some are below.  Ms. Mkrtchyan is one of those.  As the Supreme Court instructed in *Blum v. Stenson*, the relevant inquiry is whether "requested rates are in line with those prevailing in the community ***for similar services by lawyers of reasonably comparable skill, experience, and reputation.***" (*Blum v. Stenson* (1984) 465 U.S. 886, 895, fn. 11 [emphasis added].)  Applying this standard herein, Ms. Mkrtchyan's appropriate rate is approximately $500 per hour.

77.     In this case, Ms. Mkrtchyan's skill was clearly lacking, as was obvious both in the questions she propounded in deposition and trial, her objections, methods of pursuing them, and her demeanor.  Therefore, in my opinion, Ms. Mkrtchyan is not worthy of a median rate.

78.     In my opinion, Mr. Beck is a skilled lawyer, but it does not appear that he was responsible for the overall litigation strategy, formed before his association in the case, and did not participate in any meaningful way at trial. While he deserves an above-median rate for his skill and experience, the upper elastic limit of an applicable rate for Mr. Beck is $800 per hour.

**DECLARATION OF JOHN D. O'CONNOR     21**

7-RenSER-01342                                   7-RenSER-01342

79. There are many forms of complex civil rights actions, and often in my experience, such cases, when skillfully litigated by experienced counsel, class actions and voting rights cases, as two examples, can be worthy of high rates. This was not one of those cases.

80. Petitioning counsel's expert, Ms. Sobel, is a highly experienced and skillful lawyer who frequently opines in civil rights cases. She invariably opines very high rates for prevailing lawyers, in some cases, accurately so. However, her opinions are always identical, with those opinions sometimes being applicable and sometimes not, given her inflexible stance that the complexity of the case or litigation area is of no consequence in assessing rates. Her opinions in this case are unwarranted for a simple excessive force claim.

81. A very good survey of all litigating lawyers is conducted by the National Association of Legal Fee Analysis ("NALFA"), and the NALFA survey is deemed reliable and authoritative.

82. One desirable feature of the NALFA survey is that it divides legal rates by locality, years of experience, position, practice area/complexity of the case, and law firm size, aggregated into four tiers with five strata in each tier, thereby giving twenty total strata of rates, showing their distribution on a percentage of the market.

**DECLARATION OF JOHN D. O'CONNOR**    **22**

7-RenSER-01343                                         7-RenSER-01343

83. The rate of $500 per hour puts Ms. Mkrtchyan in the 14.65 to 21.64 percentile of all litigating lawyers.  The rate of $800 per hour puts Mr. Beck in the 56.17 to 62.67 percentile of all litigating lawyers. See NALFA survey Los Angeles data cut attached as **Exhibit F**.

84. In my opinion, these rates are consistent with Mr. Beck being a better-than-average litigating lawyer and Ms. Mkrtchyan being a below-average lawyer. Indeed, this is why she sought Mr. Beck as a "mentor"; that is, he is experienced, skilled, and capable of directing this type of litigation. Admittedly, she is not.

85. I believe that I am a skilled and experienced jury trial personal injury lawyer of fifty-three years of experience. I am not as knowledgeable as Mr. Beck in this area and would fetch a lower rate, perhaps no more than $600. But I am far more skillful than Ms. Mkrtchyan as a trial lawyer.  Moreover, my reputation would be sullied if I acted uncivilly, as she does, which has a bearing on her deserved lower rate.

86. In conclusion, putting aside any questions of fraud, discussed *infra*, Ms. Mkrtchyan should be compensated for 1,056.59 hours at $500 per hour for $528,295.  Mr. Beck should be compensated for 71.85 hours at $800 per hour for $57,480.   The total fees awarded to both attorneys should be $585,775.

**DECLARATION OF JOHN D. O'CONNOR   23**

7-RenSER-01344                              7-RenSER-01344

## V.     PROBABLE FRAUD DISQUALIFYING FEE COLLECTION

87.     One of the anomalies in this case has been the claim of 696 paralegal hours for $139,200 in fees.

88.     No detailed mention of paralegals was made in the fees motion beyond these amounts noted.  No mention is made in the various invoice entries of any paralegal activities.

89.     Ms. Mkrtchyan did aver under oath in her Declaration that "I… have hired contract-based part-time law clerks and paralegals to perform specific tasks…" She further stated under oath that "they performed some hours on a contingency basis amounting to 696 hours and are still owed, as described in this fees motion."

90.     I believe, and have strong evidence, that Mr. Beck submitted his time sheets to Ms. Mkrtchyan to transmute into paralegal hours. I believe that the scheme was intended to pay him $1200 per hour for 116 hours, billed as 696 hours at $200 per hour.

91.     Mr. Beck billed for his time through March 20, 2021, in the amount of 107.05 hours and does not show up thereafter on any billing entries until August 18, 2023, following the third trial.

**DECLARATION OF JOHN D. O'CONNOR     24**

7-RenSER-01345                                                                    7-RenSER-01345

92.     In a premature fee motion, Ms. Mkrtchyan made after the third trial, Mr. Beck logged his time at 112.0 hours, only involving several hours after August 18, 2023.

93.     The present motion, after the fourth trial, captures a total of 12.7 more hours of Mr. Beck's time past 2021, now totaling 119.75 hours.

94.     I know from my interview with defense attorneys that Mr. Beck did attend the first trial shortly following his cessation of billing, in August and September 2021.  He did not appear at any of the following three trials or any activity between these trials.

95.     Mr. Beck was suspended by the California State Bar from the practice of law from March 31, 2021, through September 30, 2022.  It was during this period, in August and September 2021, that Mr. Beck attended the first trial, assisted with exhibits and discussions with opposing counsel, but did not question witnesses or participate in arguments before the Court.  Thus, Mr. Beck appears to have been involved in the case for six months following his suspension, from the end of March 2021 through the end of September 2021.

96.     It appears that the 696 hours billed as paralegal time were intended to compensate Mr. Beck for $139,200, expressed in those 696 hours as billed at $200 per hour.

**DECLARATION OF JOHN D. O'CONNOR     25**

7-RenSER-01346                                                            7-RenSER-01346

97.     It is clear that the paralegal time sought was intended to compensate Mr. Beck for legal services.

98.     On September 28, 2023, while Ms. Mkrtchyan was preparing the fee motion after the third trial, Mr. Beck, having now reappeared in the billing records, made the following entry for 1.9 hours:

> Pull together the complete billing records for the case to date and separate out the 18 months that must apply a paralegal rate.
>
> Sent both to Narine to confirm and comment.

99.     Since there is no suggestion in any of the records of specific paralegals performing paralegal work for Ms. Mkrtchyan and Mr. Beck, I conclude that the 696 hours of time billed by Mr. Beck and/or Ms. Mkrtchyan for paralegal time represents attorney time billed by Mr. Beck during the six months of March 2021 through September 2021 (when his Bar license was suspended).  I note that 696 hours is divisible by six, and the paralegal rate of $200, when multiplied by 6, results in a rate of $1,200, very close to the rate Mr. Beck seeks in this motion, and a rate supported by Ms. Sobel, who opined after the third trial, but not after the fourth.

100.    Parenthetically, Ms. Sobel did not submit a Declaration for this Motion. Rather, she submitted a Declaration in the premature motion filed after

**DECLARATION OF JOHN D. O'CONNOR     26**

the third trial. Strictly speaking, her Declaration was not made in support of the instant Motion and, arguably should not be considered.

101.    In these same billing records following the third trial, Mr. Beck notes that he is seeking advice from Ms. Sobel as to the applicable hourly rates. It is therefore consistent that Mr. Beck is effectively billing $1,200 per hour for 116 hours of lawyer time, but presenting it as 696 hours of paralegal time, calculated at $200 per hour.

102.    Oddly, and again parenthetically, in the Motion following the third trial, no paralegal time was sought. Why not, one must ask. But the billing entries of May 6, 2022, suggest a dispute between Mr. Beck and Ms. Mkrtchyan over their "shared fee" arrangement, and Ms. Mkrtchyan suggests she will be writing a letter of rescission to Mr. Beck, who has contacted the Plaintiff. It is therefore possible that the instant billing of 696 hours was ultimately used as a means to pay Mr. Beck, but not from Ms. Mkrtchyan's own pocket.

103.    Whatever the multiplier and rate, it is clear that Mr. Beck, in conjunction with Ms. Mkrtchyan, is using this method to avoid informing the Court that Mr. Beck is billing for legal time while he was suspended from the practice of law.  In the moving papers, neither Ms. Mkrtchyan nor Mr. Beck informed the Court as to the times of Mr. Beck's suspension, or that he was suspended, and they do not attempt to explain these paralegal hours.

DECLARATION OF JOHN D. O'CONNOR    27

7-RenSER-01348                                                7-RenSER-01348

104.     I infer that the two petitioning attorneys intended that if the opposition to inquired about this billing, petitioning counsel had the option of informing the defense that 696 hours represented legitimate paralegal hours by Mr. Beck and that he was not acting as a lawyer. Alternatively, they assumed no questions would be asked about identities of the paralegals and law clerks supposedly billing these amounts.

105.     I do not have an opinion as to whether a suspended lawyer can practice as a paralegal and receive compensation for those services.  However, I believe that question to be academic because, clearly, Mr. Beck and Ms. Mkrtchyan agreed to bill Mr. Beck's services in total amounts as would be those of an attorney, while disguising them as paralegal services at multiplied hours. My point is that, at the least, even if one were to concede that Mr. Beck could legally act as a paralegal, he had not spent 696 hours as a paralegal or in any other capacity, and therefore, the two were committing billing fraud.

106.     The above facts have been concealed from the Court and counsel.  I therefore believe that this violates the duty of candor of counsel to the Court and constitutes a fraud on both the Court and the County responsible for this litigation.

107.     This fraudulent and unethical billing, along with the lack of disclosure, in my opinion, disqualifies both counsel from receiving compensation.

**DECLARATION OF JOHN D. O'CONNOR     28**

7-RenSER-01349                                    7-RenSER-01349

For example, in *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.*, the court noted the follow broad statement of this rule:

> [A] court may refuse to allow an attorney any sum as an attorney's fee if his relations with his client are tainted with fraud. 'Fraud or unfairness on the part of the attorney will prevent him from recovering for services rendered; as will acts in violation or excess of authority, and acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.'

(*Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 14-15.)

108. Expressed differently, in the billing entries of September 28, 2023, Mr. Beck acknowledges that he "must apply a paralegal rate" to his billings. The question is whether he is applying a paralegal rate to an expanded number of hours so that he can collect an attorney's rate in the guise of collecting a paralegal rate.

109. One method that would help determine this issue is a production by Mr. Beck and Ms. Mkrtchyan of the timesheets he submitted to Ms. Mkrtchyan around September 28, 2023. Shouldn't these timesheets and their entries have been submitted with this motion? If not, why not?

**DECLARATION OF JOHN D. O'CONNOR** **29**

110.    On May 6, 2022, Ms. Mkrtchyan made the following entry:

Follow-up with client re update on the case and the letter

he got from Tom Beck re fee sharing unauthorized by

me; drafted a letter of rescission.

111.    This entry suggests that there was a dispute between Mr. Beck and Ms. Mkrtchyan as to Mr. Beck's entitlement to fees.  Accordingly, the first indication after the first trial to the effect that counsel had a right to collect fees would have been following the third trial, whereupon Mr. Beck sent his timesheets to Ms. Mkrtchyan to apply for compensation.

112.    In addition to the timesheets submitted by Mr. Beck to Ms. Mkrtchyan in September 2023, production of the letter around May 6, 2022, and the follow-up letter of recission, apparently sent by Ms. Mkrtchyan, could shed light on the arrangement between Mr. Beck and Ms. Mkrtchyan, possibly giving rise to the apparent fraudulent billing.

113.    Because it appears that Mr. Beck was involved in this litigation from the time of his suspension on March 31, 2021, through the end of trial in September 2021, it appears the 696 hours of paralegal time is disguised time for Mr. Beck's services during those six months in which he was suspended but was still involved with this litigation.

**DECLARATION OF JOHN D. O'CONNOR**    30

7-RenSER-01351                                                   7-RenSER-01351

114.    It does not appear that Mr. Beck was engaged in the litigation thereafter until around August 18, 2023, when he reappeared following what seemed to be a successful trial meriting fees.

115.    In conclusion, it appears that Ms. Mkrtchyan is far more responsible, as the lead lawyer on this case, for this fraudulent initiative. It is Ms. Mkrtchyan who makes the fraudulent representations, and it is Ms. Mkrtchyan who files this Motion with the deceptive Declaration. Arguably, Mr. Beck does not directly commit fraud, although it appears he has so conspired.

## VI.   <u>EXCESSIVE BILLING</u>

116.    In this case, petitioning counsel knew they would be paid, if at all, only upon a successful outcome.  There is, accordingly, no need for regular billings to a responsible, paying Plaintiff, who then would scrutinize each billing and discuss adjustments as necessary.

117.    Indeed, there is every motive for a plaintiff attorney to plump up recorded time, if indeed the attorney was cynical about the responsibility to bill honestly.

118.    In this case, I detected two related problematic areas.  One is that, for tasks that an observer can roughly analyze in terms of likely time and effort expended, the entries of Ms. Mkrtchyan appeared to have been made with a heavy pencil.  There are indicia of excessive amounts of recorded time.

**DECLARATION OF JOHN D. O'CONNOR   31**

7-RenSER-01352                    7-RenSER-01352

119.    The second issue is "block billing," which is often cited as a billing problem because it can obscure total time spent.  I rarely criticize so-called "block billing" in which many prestigious firms engage, usually with excellent descriptions of several component tasks.

120.    There is nothing wrong with an entry such as, "draft correspondence demanding expert file from defense (0.5); depose John Smith (4.5)."  For that entry, an observer could detect the reasonableness of the total time or lack thereof.

121.    But, on the other hand, if an entry read, "strategy re case; follow-up with witness; review notes" for 6.0 hours, there is no basis to truly understand what was done because of the generality and vagueness of description.

122.    A significant issue that can arise in block billing is purposeful vagueness.  Each task in such billing is vaguely described without a component time listed, so that one cannot comment on the time spent on any one task.  More problematic is the vague descriptions of each component entry.

123.    For instance, on March 27, 2025, Ms. Mkrtchyan billed for the following for 6.5 hours:

> Follow-up with defense re designations of transcripts;
> review of MILs for pre-trial conference; notes re new
> issues to be addressed

**DECLARATION OF JOHN D. O'CONNOR**    **32**

7-RenSER-01353                                                    7-RenSER-01353

124. These entries are so vague as to be meaningless, and there is no way to evaluate the reasonableness of this time. If, instead, in this billing entry, Ms. Mkrtchyan separately informed the reviewer exactly what she did to "follow up" with the defense, that would be of great help. Was it by a personal meeting? Email? Conference call? And roughly how long did that follow-up take? If it were a phone call or an email, the defense would have a record.

125. But in this latter entry, let's assume that all Ms. Mkrtchyan did was send an email asking for the defense's status on the designations of transcripts. Or, alternatively, that counsel sent the defense her latest designation of transcripts. Such a designation would help the reviewer to understand the likelihood that the "review MILs for pre-trial conference" and the "notes re new issues to be addressed" were likely overbilled.

126. After all, what time does it take to jot down any new issue meant to be discussed? Five minutes? The MILs have been completed, likely for the fourth time with but small variation. What needs reviewing?

127. Similar entries pervade.

128. I have read many other entries much like this throughout the billings of Ms. Mkrtchyan, and as a result, I doubt the amounts of time actually spent on activities described in relation to the amounts billed.

**DECLARATION OF JOHN D. O'CONNOR** **33**

129.   Even though Ms. Mkrtchyan had tried this same case three times prior to the fourth trial, the amount of trial preparation for the fourth trial was extremely high. A chart I have attached as **Exhibit G** shows, for example, that after the third trial and before the fourth, Ms. Mkrtchyan billed 451.3 hours. That is quite a bit for a case that has been tried three times, and no depositions are needed.

130.   After the third trial and addressing the understandable issues that arose, Ms. Mkrtchyan spent 149.5 hours specifically labeled as trial preparation time, a substantial amount given the limited scope of the fourth trial.  Some entries, as noted, seemed overstated, while some were more reasonable.  On March 28, 2025, Ms. Mkrtchyan billed 7.0 hours for "travel to Santa Ana for pre-trial conference; in court from 8:30 – 12:30." This appears to be a reasonable billing entry, noting 4 hours for in-court time, which allows for a reasonable 3-hour travel time to and from the courthouse.

131.   In contrast, however, on April 4, 2025, Ms. Mkrtchyan billed 9.0 hours for "pre-trial conference; travel to OC."  Unless the pre-trial conference somehow lasted six hours, this entry appears excessive. I am assuming that there were two pre-trial conferences within a tight window, somewhat unusually.

132.   To be sure, any one entry may be explainable, but overall, after reviewing hundreds of entries of Ms. Mkrtchyan, it appears that at least as to trial

**DECLARATION OF JOHN D. O'CONNOR**   **34**

7-RenSER-01355                                                                7-RenSER-01355

preparation time and trial attendance at the fourth trial, Ms. Mkrtchyan billed with an unreasonably heavy pencil.

133.    In the prior trials, Ms. Mkrtchyan rarely billed over a 10-hour day, occasionally billing 11 or 12 hours.  However, regarding the fourth trial, which presumably occurred after the successful trial verdict, she billed every trial day at 14.0 hours, without any variation.  I opine that there can be no other conclusion but that Ms. Mkrtchyan overstated her time in anticipation of a fee motion.  See **Exhibit C**.

134.    The potential fraud in the paralegal billing of Mr. Beck's time is a separate matter, but it does reflect Ms. Mkrtchyan's dishonesty in billing matters, since it was she who filed a Motion with this court that was less than candid. So, in my view of this, the formerly Latinized saying embodied in jury instructions seems to apply: *Falsus in uno, falsus in omnibus.* The finder of fact may impute skepticism as to the veracity of other statements.

135.    In addition to the time, which appears to be overstated, there is also the issue of vague block billing. Furthermore, Ms. Mkrtchyan billed for a substantial amount of time for activities that were unnecessary and contentious. For instance, Ms. Mkrtchyan billed for her motion to disqualify the Court, and then for reviewing the Order denying her Motion.  This shows extremely poor billing judgment.

DECLARATION OF JOHN D. O'CONNOR     35

7-RenSER-01356                                                    7-RenSER-01356

136.   Ms. Mkrtchyan also billed on several occasions for speaking with reporters and for searching for associate counsel.

137.   A 20% downward adjustment is therefore reasonable.

138.   Caselaw supports downward adjustments for time that appears to be unreasonable.  (*See*, *Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1399 ("when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'"].)

## XII. CONCLUSION

139.   Ms. Mkrtchyan made unsuccessful claims for constitutional violations, such as false arrest and unreasonable search and seizure, which were dismissed upon motion.  Five of the seven deputies named were sued on claims not strong enough to warrant submission to a jury.  The claim against Deputy Gotts was held to be subject to qualified immunity.

140.   Based upon the foregoing, each of which set of claims required independent analysis and evidence gathering, a minimum of 40% of the billed hours for both Ms. Mkrtchyan and Mr. Beck should be excised for lack of success, meaning that 60% of Ms. Mkrtchyan's time and 60% of Mr. Beck's time can be attributed to successful claims.

7-RenSER-01357                                         7-RenSER-01357

141.     However, in pursuit of those successful claims, Ms. Mkrtchyan, and not Mr. Beck, billed excessively, at approximately 20%, a deduction I recommend here.

142.     Because of Ms. Mkrtchyan's shocking incivility to the Court and counsel throughout this litigation, it is my opinion that a deduction of at least 40% of her otherwise compensable time should be made, a result found in *Snoeck v. ExakTime Innovations, Inc*.

143.     In conclusion, putting aside any questions of fraud, discussed *infra*, Ms. Mkrtchyan should be compensated for 1,056.59 hours at $500 per hour for $528,295.  Mr. Beck should be compensated for 71.85 hours at $800 per hour for $57,480.   The total fees awarded to both attorneys should be $585,775.

144.     Both Ms. Mkrtchyan and Mr. Beck have engaged in fraud by billing 696 paralegal hours at $200 each, totaling $139,200.  While the moving papers vaguely suggest that there were independent contract paralegals, Mr. Beck's billing entry of September 28, 2023, indicates that these hours are those of Mr. Beck, likely expanded to compensate him as a high-billing lawyer for his services.

145.     I infer that the 696 paralegal hours are, in fact, 116 lawyer hours for which the lawyers are seeking, in essence, $1,200 per hour, while Mr. Beck was suspended from the practice of law. These lawyers should have the documents sent on September 28, 2023, which would verify this conclusion, and

**DECLARATION OF JOHN D. O'CONNOR     37**

correspondence after May 6, 2022, regarding the fee-sharing agreement in dispute. Consequently, it is my opinion that neither Ms. Mkrtchyan nor Mr. Beck should receive compensation for work performed on this case.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25ᵗʰ day of August 2025, in Marin County, California.

_____

John D. O'Connor

**DECLARATION OF JOHN D. O'CONNOR     38**

7-RenSER-01359                                              7-RenSER-01359

# Exhibit
# A

7-RenSER-01360
7-RenSER-01360



**O'CONNOR**
**AND ASSOCIATES**
*Special Counsel Services*

1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
T: 415-693-9960 / F: 415-692-6537 / www.joclaw.com



**JOHN D. O'CONNOR**
**Phone: 415-693-9960**
**Direct: 415-464-6250**
**Mobile: 415-999-2528**
**john@joclaw.com**

## *CURRICULUM VITAE*

**Education**

University of Michigan Law School, *cum laude* – Juris Doctorate, 1972

- Member, Michigan Law Review (1970-1972), Associate Editor (1971-1972)
- Member, *Order of the Coif* (1971-72)
- Winner of three AmJur awards as the most outstanding student in a subject.

University of Notre Dame, *magna cum laude* – A.B., 1968

**Work Experience**

Associate, Belli, Ashe & Choulos – 1972-1973

- Dealt with assessing and negotiating "splits" with other attorneys of contingency fees; pursued complex tort and class action litigation; significant trial experience

U.S. Attorney's Office, Criminal and Civil Divisions – 1974-1979

- Dealt with attorney fees, "fee-shifting" civil rights cases; assessed, negotiated, and litigated attorney fees in both individual cases and class action cases; litigated Saunders v. NARF in the Northern District of California and the 9th Circuit; significant trial experience

Senior Associate, Brobeck, Phleger and Harrison – 1980-1981

- Working for prestigious litigation firm, learned staffing and billing procedures and protocols for large commercial and insurance cases

Managing Partner, Tarkington, O'Connor and O'Neill – 1982-2000

- Managing partner responsible for all firm billings
- Supervised billing seminars for newly graduated and recently hired lawyers within firm
- Kept current both with hourly fees charged in the community and billing protocols for various firms and cases throughout the area

7-RenSER-01361       7-RenSER-01361

- Subscribed to various periodicals such as <u>Partners Report</u> and <u>Altman Weil</u> annual reports
- Consulted with insurance executives regarding billing procedures for their companies
- Consulted with insurance claims executives regarding CUMIS issues including billing rates for various types of litigation throughout the Bay Area
- Worked with various government agencies, such as FDIC, FLIC, NCUA, and RTC regarding appropriate billing protocols, and discussed bills with government officials regarding compliance; Dealt with governmental auditors regarding same
- Consulted with insurance executives regarding CUMIS issues; was resource for those executives negotiating CUMIS fees with independent counsel
- Represented numerous entities including governmental entities, in attorney fees litigation (e.g. in the Sonoma County jail class action litigation, litigated the fees of Heller Ehrman in a fee-shifting civil rights context)
- Defended legal malpractice cases and examined legal malpractice and other professional liability cases for clients, including the conservators and receivers of failed and failing financial institutions
- Interacted with legal counsel and claims executives for governmental and insurance clients in review and analysis of firm billings
- Kept current on hourly rates charged in various litigation sectors in both Northern and Southern California; per assignments, in selected areas of the country
- Dealt with <u>Brandt</u> fee issues both as a plaintiff and defendant in insurance coverage cases
- Reviewed bills of firms in underlying cases while representing insurers, reinsurers and access carriers
- Significant work regarding legal fee auditing and litigation regarding legal fees and legal fee auditing, detailed below

Director (Partner) and Special Counsel, Howard Rice – 2001-2006
- Regularly apprised of market rates of competing law firms, as firm annually reset its rates
- Acquired knowledge of total fees charged on various complex cases, both by the Howard Rice firm, now merged with Arnold and Porter, and others
- Named arbitrator on 3-arbitrator JAMS panel regarding over $2,000,000 of asbestos billings; heard and evaluated testimony of competing fee experts and auditors

Principal, O'Connor and Associates – 2006-Present
- Expert witness and consultant, legal fees and litigation management
- Member, National Associations of Legal Fee Analysis
- Lecturer on Attorney Fees on nationwide webinars, NALFA and other organizations
- Named as the "Nation's Top Attorney Fee Expert" by NALFA for the years 2017 through 2024
- Accepted as an expert witness in over 300 cases throughout California and the country
- Continues a litigation career with over 80 trials in federal and state courts throughout the country, enabling fee opinions based on experience

7-RenSER-01362                    7-RenSER-01362

**Overview of Services**

John D. O'Connor offers expert consultant services in a variety of attorney fee and litigation management contexts. He is regularly employed as both an expert and litigator in attorney fee disputes, and as a confidential fee consultant. His services often involve an analysis of the skill and efficiency of attorneys in litigation and litigation management.

**Background and Qualifications**

John O'Connor has over 50 years of experience in a wide variety of litigation matters, ranging from personal injury to civil rights and employment to complex business cases. A significant part of that experience is the trial of over 80 cases in both state and federal Courts throughout the country, and the preparation for and settlement of many more, as well as a substantial number of arbitrations. Additionally, for 20 years, O'Connor functioned as managing partner of a substantial litigation firm. His law firm experience includes partnerships in small boutique firms, a substantial mid- sized firm, and larger nationally known firms.

A significant portion of his work for over 40 years has been the evaluation, litigation and resolution of attorney fee issues. First as an Assistant United States Attorney, and later representing county and municipal governments, O'Connor has represented potential fee payors under "fee shifting" statutes.  He, as well, has worked extensively for fee petitioners.

As a private lawyer for federal government agencies during the financial institutions crises of the 1980's and 90's, and as well working with a variety of insurers and self-insurers, O'Connor has worked to develop with the client, and implement on behalf of his law firm, sophisticated billing guidelines. O'Connor has worked with many clients in mutually cooperative fashion to examine firm billings, assure compliance and rectify shortcomings.

Since the advent in the late 1980's of adversarial legal auditing, O'Connor has served extensively as both an expert and litigator analyzing audit criticisms, applying community standards, and construing applicable case law. In this context, O'Connor has consulted on hundreds of adversarial legal fee disputes over three decades. He has as well served as JAMS mediator, a litigator representing both law firms and fee payors on fee issues, and an expert witness both through written Declaration and oral testimony.

**O'CONNOR AND ASSOCIATES**

1 Embarcadero Center, Suite 1200, San Francisco, CA 94111
T: 415-693-9960 / F: 415-692-6537 / www.joclaw.com

7-RenSER-01363          7-RenSER-01363

# Exhibit
# B

7-RenSER-01364

7-RenSER-01364

**HOLLOWAY - Hours By Trial Period**

| Timekeeper | Rate | Pretrial #1 4/24/2018 - 8/15/2021 | | Trial #1 8/16/2021 - 9/7/2021 | | Pretrial #2 9/9/2021 - 12/4/2022 | | Trial #2 12/6/2022 - 12/19/2022 | | Pretrial #3 12/26/2022 - 7/11/2023 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees |
| Narine Mkrtchyan | $850.00 | 1,460.80 | $1,241,680.00 | 185.8 | $157,930.00 | 619.10 | $526,235.00 | 97.10 | $82,535.00 | 146.80 | $124,780.00 |
| Thomas E.Beck | $1,150.00 | 107.05 | $123,107.50 | | | | | | | | |
| **TOTALS** | | **1,567.85** | **$1,364,787.50** | **185.8** | **$157,930.00** | **619.10** | **$526,235.00** | **97.10** | **$82,535.00** | **146.80** | **$124,780.00** |

**HOLLOWAY - Hours By Trial Period (Continued)**

| Timekeeper | Rate | Trial #3 7/13/2023 - 8/16/2023 | | Pretrial #4 8/18/2023 - 4/30/2025 | | Trial #4 5/1/2025 - 5/22/2025 | | Post Trials 5/27/2025 - 8/4/2025 | | TOTAL 4/24/2018 - 8/4/2025 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees |
| Narine Mkrtchyan | $850.00 | 257.00 | $218,450.00 | 451.9 | $384,115.00 | 273.30 | $232,305.00 | 176.90 | $150,365.00 | 3,668.70 | $3,118,395.00 |
| Thomas E.Beck | $1,150.00 | | | 10.7 | $12,305.00 | 0.50 | $575.00 | 1.50 | $1,725.00 | 119.75 | $137,712.50 |
| **TOTALS** | | **257.00** | **$218,450.00** | **462.6** | **$396,420.00** | **273.80** | **$232,880.00** | **178.40** | **$152,090.00** | **3,788.45** | **$3,256,107.50** |

# Exhibit C

7-RenSER-01366

7-RenSER-01366

| | | | | | | | TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|
| **HOLLOWAY - 8+ Hour Days** | | | | | | | | | |
| **Timekeeper** | **8.1-9.0** | **9.1-10.0** | **10.1-11.0** | **11.1-12.0** | **12.1-13.0** | **13.1-14.0** | **DAYS** | **HOURS** | **FEES** |
| Narine Mkrtchyan | 49 | 20 | 13 | 12 | 1 | 14 | 109 | 1,106.90 | $ 940,865.00 |
| Thomas Beck | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 19 | $ 21,850.00 |
| **TOTALS** | **50** | **21** | **13** | **12** | **1** | **14** | **111** | **1,125.90** | **$ 962,715.00** |

7-RenSER-01367                                                    7-RenSER-01367

| | HOLLOWAY - 8+ Hour Days | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 7/20/2020 | Thomas E.Beck | Holloway Pahel "Pell" depo Glendale done, Review Harrell's Re 37 M&C invite. Wrote to Narine.  got video files working and screened  Pahel's, Sgt. and  Billingsly. Proves he was present when  he claims he was not. | 10.00 | $1,150.00 | $11,500.00 |
| 8/14/2020 | Narine Mkrtchyan | Deposition of Plaintiff | 9.00 | $850.00 | $7,650.00 |
| 8/20/2020 | Narine Mkrtchyan | Depo of Sergeant Stewart Rawlings | 8.50 | $850.00 | $7,225.00 |
| 8/20/2020 | Thomas E.Beck | Holloway, depo by Zoom of Sgt. Rawlings. One crappy witness. both his investigations were biased and superficial. Reviewed  Renegar's depo transcript and found reporter mistakes Emailed Narine to point them out. | 9.00 | $1,150.00 | $10,350.00 |
| 11/5/2020 | Narine Mkrtchyan | Drafting Opposition to MSJ; review of defense 3rd  motion to compel | 8.20 | $850.00 | $6,970.00 |
| 11/13/2020 | Narine Mkrtchyan | MSJ Opposition; statement of facts; review of transcripts; review of expert witness report for disclosure; follow-up and discussion with expert Witness on his report; opposition to motion to compel, declaration of counsel | 8.50 | $850.00 | $7,225.00 |
| 11/19/2020 | Narine Mkrtchyan | Opposition to MSJ; revise and review statement of  facts; follow-up with expert witnesses re scheduled depos | 8.20 | $850.00 | $6,970.00 |
| 11/20/2020 | Narine Mkrtchyan | Opposition to MSJ; statement of facts; received defense new subpoenas; sent objections to defense, copy services and custodians | 8.30 | $850.00 | $7,055.00 |
| 11/24/2020 | Narine Mkrtchyan | Opposition to  MSJ; statement of facts; preparing exhibits; follow-up with defense re expert Witness depo; follow-up with expert witness | 8.20 | $850.00 | $6,970.00 |
| 11/26/2020 | Narine Mkrtchyan | Opposition to  MSJ; statement of facts; finalize exhibits for filing; declaration of counsel | 8.50 | $850.00 | $7,225.00 |
| 11/30/2020 | Narine Mkrtchyan | Finalize and filed MSJ; mailed exhibit to court | 8.30 | $850.00 | $7,055.00 |
| 4/22/2021 | Narine Mkrtchyan | Finalize and file MILs; review and revise of defense FPTCO ;   sent scanned subpoenas for VA's providers | 8.20 | $850.00 | $6,970.00 |
| 5/4/2021 | Narine Mkrtchyan | Meeting on Zoom with Long Beach providers; interviews with providers; strategy re medical provider witnesses; follow-up with PI on wits; follow-up with witnesses re trial testimony; finalize subpoenas; review of PVS recordings and notes re trial testimony | 8.20 | $850.00 | $6,970.00 |
| 5/5/2021 | Narine Mkrtchyan | Meeting on Zoom with Long Beach providers; interviews with providers; strategy re medical Witnesses; review of court's MSJ rulings; preparing for pre-trial conference; follow-up with Wits | 8.60 | $850.00 | $7,310.00 |

7-RenSER-01368                                                                                                7-RenSER-01368

| | HOLLOWAY - 8+ Hour Days | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 5/17/2021 | Narine Mkrtchyan | Motion for reconsideration, review of law and research; review of TB's comments, spoke with JP on his thoughts: follow-up with witness and investigator re trial; follow-up with clerk; returned the call by the press reporter | 8.50 | $850.00 | $7,225.00 |
| 8/2/2021 | Narine Mkrtchyan | Preparing for trial; review of reports, video and depo transcripts; sent video to transcriber; review of exhibits; jury instructions | 8.50 | $850.00 | $7,225.00 |
| 8/3/2021 | Narine Mkrtchyan | Preparing for trial; review of depos; exhibit books; interview on Zoom with Dr. Hardy; follow-up with PI on witnesses; follow-up with TB on JI and verdict forms | 8.60 | $850.00 | $7,310.00 |
| 8/4/2021 | Narine Mkrtchyan | Preparing for trial; back and forth with defense on exhibit/witness lists; filed P's amended lists with declaration objecting to the defense newly designated expert ; follow-up with witnesses ; follow-up with PI | 8.70 | $850.00 | $7,395.00 |
| 8/5/2021 | Narine Mkrtchyan | Preparing for trial; follow-up with witnesses; trial testimony points; review of defense expert reports; follow-up with PI; finalize exhibits ; review of JI and joint statement by TB | 8.40 | $850.00 | $7,140.00 |
| 8/6/2021 | Narine Mkrtchyan | Preparing for trial; follow-up with witnesses; trial testimony points; JI; wrote and filed a supp brief on late designation of expert witness; finalize exhibits | 8.60 | $850.00 | $7,310.00 |
| 8/9/2021 | Narine Mkrtchyan | Preparing for trial; preparing points for plaintiff's trial testimony; review of Plaintiff's deposition; Fedex for poster of the map; sent defense proposed JI, proposed statement of the case ; follow-up with VA re custodians and witnesses | 8.50 | $850.00 | $7,225.00 |
| 8/10/2021 | Narine Mkrtchyan | Preparing client for trial testimony; filed JI, verdict and joint statement of the case | 8.70 | $850.00 | $7,395.00 |
| 8/11/2021 | Narine Mkrtchyan | Preparing for trial; review of MILs; review of defense filings; notes for JI; filed voir dire; plaintiffs testimony ; finalize exhibits | 8.60 | $850.00 | $7,310.00 |
| 8/13/2021 | Narine Mkrtchyan | Preparing for trial; opening statement; trial testimony points, follow-up with wits re trial | 8.40 | $850.00 | $7,140.00 |
| 8/17/2021 | Narine Mkrtchyan | Trial opening; jury selection; opening statement | 11.00 | $850.00 | $9,350.00 |
| 8/18/2021 | Narine Mkrtchyan | Witness testimony; preparation; discussions after trial with judge | 11.00 | $850.00 | $9,350.00 |
| 8/19/2021 | Narine Mkrtchyan | Witness testimony; preparation; discussions with judge off  and on record | 11.50 | $850.00 | $9,775.00 |
| 8/20/2021 | Narine Mkrtchyan | Witness testimony; preparation | 12.00 | $850.00 | $10,200.00 |
| 8/22/2021 | Narine Mkrtchyan | Preparing for trial; witness preparation | 10.90 | $850.00 | $9,265.00 |

| HOLLOWAY - 8+ Hour Days | | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 8/23/2021 | Narine Mkrtchyan | Witness testimony; break from testimony; in court going over issues and preparation | 11.00 | $850.00 | $9,350.00 |
| 8/24/2021 | Narine Mkrtchyan | Witness testimony; preparing | 12.00 | $850.00 | $10,200.00 |
| 8/25/2021 | Narine Mkrtchyan | Witness testimony; preparing; discussions with judge on and off record | 11.80 | $850.00 | $10,030.00 |
| 8/26/2021 | Narine Mkrtchyan | Witness testimony; preparation; discussions with judge | 12.00 | $850.00 | $10,200.00 |
| 8/27/2021 | Narine Mkrtchyan | Witness testimony; preparation | 10.70 | $850.00 | $9,095.00 |
| 8/30/2021 | Narine Mkrtchyan | Not in session; discussions with counsel and judge over jury instructions off record ; review of  notes for cross-exam | 11.00 | $850.00 | $9,350.00 |
| 8/31/2021 | Narine Mkrtchyan | Witness testimony; preparation for trial | 11.50 | $850.00 | $9,775.00 |
| 9/1/2021 | Narine Mkrtchyan | Witness testimony; preparation for trial and closing | 13.00 | $850.00 | $11,050.00 |
| 9/2/2021 | Narine Mkrtchyan | Witness testimony; closing arguments | 9.00 | $850.00 | $7,650.00 |
| 4/6/2022 | Narine Mkrtchyan | Preparing for trial; review of trial transcripts; Video depos; finalize MIL ; declaration; review of defense lists for MILs | 8.20 | $850.00 | $6,970.00 |
| 4/7/2022 | Narine Mkrtchyan | Motions in limine; finalized and filed PTCO and memorandum of points and contentions; review of  defense MILs and strategy on opposition | 8.60 | $850.00 | $7,310.00 |
| 4/8/2022 | Narine Mkrtchyan | Review of defense MILs and drafting opposition | 8.50 | $850.00 | $7,225.00 |
| 4/9/2022 | Narine Mkrtchyan | Opposition to defense MILs | 8.40 | $850.00 | $7,140.00 |
| 4/10/2022 | Narine Mkrtchyan | Opposition to defense MILs | 8.60 | $850.00 | $7,310.00 |
| 4/11/2022 | Narine Mkrtchyan | Opposition to defense MILs; finalize and filing and sent mandatory chamber copies | 10.00 | $850.00 | $8,500.00 |
| 4/13/2022 | Narine Mkrtchyan | Motion for sanctions; drafted and filed, sent mandatory chamber copies; follow-up with process server on witnesses, and then got a court order on trial continuance | 8.30 | $850.00 | $7,055.00 |
| 11/8/2022 | Narine Mkrtchyan | Preparing for PT conference; Pretrial conference in court | 10.00 | $850.00 | $8,500.00 |
| 12/6/2022 | Narine Mkrtchyan | First day of trial; jury selection | 9.00 | $850.00 | $7,650.00 |
| 12/7/2022 | Narine Mkrtchyan | second day of trial; opening statement; beginning of Renegar ;  preparation | 10.00 | $850.00 | $8,500.00 |
| 12/8/2022 | Narine Mkrtchyan | Third day of trial ; preparation | 10.50 | $850.00 | $8,925.00 |
| 12/9/2022 | Narine Mkrtchyan | Fourth day of trial; preparation | 11.00 | $850.00 | $9,350.00 |
| 12/13/2022 | Narine Mkrtchyan | Sixth day of trial; preparation | 10.00 | $850.00 | $8,500.00 |
| 12/14/2022 | Narine Mkrtchyan | Seventh day of trial; preparation | 11.00 | $850.00 | $9,350.00 |
| 12/15/2022 | Narine Mkrtchyan | Eight day of trial; court kept us until 8 without a break , had to leave court before excused because got sick all day was hungry | 12.00 | $850.00 | $10,200.00 |

7-RenSER-01370                                                                                 7-RenSER-01370

| HOLLOWAY - 8+ Hour Days | | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 12/19/2022 | Narine Mkrtchyan | Status conference; judge set another trial date ; spoke with appellate lawyer re appellate options; spoke with LA times re mistrial ; sent press release to  several news outlets ;  considering dismissal for appeal because do not believe will ever get a fair trial or verdict in this court | 8.20 | $850.00 | $6,970.00 |
| 1/23/2023 | Narine Mkrtchyan | Drafting writ; preparing the appendix, finalized draft for Paul Hoffman | 8.20 | $850.00 | $6,970.00 |
| 7/13/2023 | Narine Mkrtchyan | trial ; selection of jury | 8.20 | $850.00 | $6,970.00 |
| 7/14/2023 | Narine Mkrtchyan | trial; selection of jury | 8.60 | $850.00 | $7,310.00 |
| 7/17/2023 | Narine Mkrtchyan | Trial; examination of witnesses ;  preparation | 11.00 | $850.00 | $9,350.00 |
| 7/18/2023 | Narine Mkrtchyan | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/20/2023 | Narine Mkrtchyan | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/21/2023 | Narine Mkrtchyan | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/24/2023 | Narine Mkrtchyan | Trial ; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/1/2023 | Narine Mkrtchyan | Back in session; trial exam of witnesses | 10.00 | $850.00 | $8,500.00 |
| 8/2/2023 | Narine Mkrtchyan | Trial; exam of witnesses, preparation | 10.00 | $850.00 | $8,500.00 |
| 8/3/2023 | Narine Mkrtchyan | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/4/2023 | Narine Mkrtchyan | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/8/2023 | Narine Mkrtchyan | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/9/2023 | Narine Mkrtchyan | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/10/2023 | Narine Mkrtchyan | Trial; exam of witnesses; preparation | 12.00 | $850.00 | $10,200.00 |
| 8/13/2023 | Narine Mkrtchyan | Closing argument preparation; jury instructions session in court | 9.00 | $850.00 | $7,650.00 |
| 8/14/2023 | Narine Mkrtchyan | Defense rested ; jury instructions ; preparing for closing | 12.00 | $850.00 | $10,200.00 |
| 8/15/2023 | Narine Mkrtchyan | Closing arguments | 9.00 | $850.00 | $7,650.00 |
| 8/16/2023 | Narine Mkrtchyan | Jury deliberations | 10.00 | $850.00 | $8,500.00 |
| 3/19/2025 | Narine Mkrtchyan | Refile opp to MILs , updated memo of facts and contentions of law ; review of transcripts for read-back; considering who would be doing read-back | 8.60 | $850.00 | $7,310.00 |
| 4/4/2025 | Narine Mkrtchyan | Pre-trial conference; travel to OC | 9.00 | $850.00 | $7,650.00 |
| 4/17/2025 | Narine Mkrtchyan | Review of trial notes and exhibits; depo transcripts to refresh; conference call with Loretta Tafoya, Roger Clark | 9.20 | $850.00 | $7,820.00 |
| 4/23/2025 | Narine Mkrtchyan | Preparing for trial; review of defense objection to trial brief on collateral sources; review of defense filings; review of trial notes ;  response to  defense phone call ; bought supplies for trial, exhibit books etc. | 8.30 | $850.00 | $7,055.00 |

| HOLLOWAY - 8+ Hour Days | | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 4/24/2025 | Narine Mkrtchyan | Preparing for trial; exhibits; drafted response to defense brief on collateral sources filed; review of trial testimony points; follow-up with defense counsel on outstanding issues | 8.40 | $850.00 | $7,140.00 |
| 4/25/2025 | Narine Mkrtchyan | Preparing opening statement; finalize exhibits and file; follow-up with Roger Clark ; review of exhibits with paralegal ; sent updated exhibits to defense; follow-up with rest of witnesses and paralegal for trial | 8.70 | $850.00 | $7,395.00 |
| 4/28/2025 | Narine Mkrtchyan | Opening statement preparation; voir dire notes; travel to OC hotel and setting up at hotel; received court text messaging re trailing trial to May 1 ; follow-up with witnesses and client re trailing of trial; running errands for food at hotel | 8.20 | $850.00 | $6,970.00 |
| 4/29/2025 | Narine Mkrtchyan | Preparing for trial; trial notes; opening statement; jury selection issues; review of exhibits; discussion with YH re trial | 9.90 | $850.00 | $8,415.00 |
| 4/30/2025 | Narine Mkrtchyan | Follow-up with client; preparing client for trial testimony on Zoom· review of trial notes ; preparing Loretta Tafoya; review of her credit card bills | 9.00 | $850.00 | $7,650.00 |
| 5/1/2025 | Narine Mkrtchyan | Jury trial begins; jury selection; preparing opening statement; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/2/2025 | Narine Mkrtchyan | Opening statement; first witness Okorie Okorocha; beginning read-back testimony of experts ; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/3/2025 | Narine Mkrtchyan | Preparing for trial; focus group with client on Zoom and Okorie who organized it; discussion with Okorie | 12.00 | $850.00 | $10,200.00 |
| 5/4/2025 | Narine Mkrtchyan | Preparing for trial; review of trial notes; preparing trial testimony points ; discussion with Okorie and YH | 8.30 | $850.00 | $7,055.00 |
| 5/5/2025 | Narine Mkrtchyan | Trial testimony of witnesses; in court after hours in session ; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/6/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation after hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/7/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/8/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/9/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/10/2025 | Narine Mkrtchyan | Preparation for trial ; follow-up with witnesses and Okorie; review of trial notes; discussion with YH | 9.50 | $850.00 | $8,075.00 |

| HOLLOWAY - 8+ Hour Days | | | | | |
|---|---|---|---|---|---|
| Date | Timekeeper | Description | Hours | Rate | Total |
| 5/11/2025 | Narine Mkrtchyan | Preparation for trial; review of trial notes and points; discussion with YH | 10.50 | $850.00 | $8,925.00 |
| 5/12/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation of witnesses after court hours in session discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/13/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation of witnesses after court hours in session discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/14/2025 | Narine Mkrtchyan | Trial testimony of witnesses; preparation of issues and witnesses after court hours; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/15/2025 | Narine Mkrtchyan | Court ordered parties to meet and confer in court at 10 and met us for discussion of jury instructions; review of proposed jury instructions; meet and confer with counsel; filed objections to defense JI; preparation of trial notes after court hours in session | 14.00 | $850.00 | $11,900.00 |
| 5/16/2025 | Narine Mkrtchyan | Trial testimony of witnesses; in court until 8 pm for discussion of various issues | 14.00 | $850.00 | $11,900.00 |
| 5/17/2025 | Narine Mkrtchyan | Preparing for closing argument; trial notes for Witnesses; prepared briefs for filing; discussion with YH | 10.30 | $850.00 | $8,755.00 |
| 5/18/2025 | Narine Mkrtchyan | Preparing closing argument; PowerPoint presentation; review of notes for final witnesses; discussion with paralegal on PowerPoint presentation; discussion with YH | 10.70 | $850.00 | $9,095.00 |
| 5/19/2025 | Narine Mkrtchyan | Trial testimony of witnesses; prepared closing argument ; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/20/2025 | Narine Mkrtchyan | Closing arguments; jury went deliberating; court discussion re Rule 50 motions; review of law and motions for response | 14.00 | $850.00 | $11,900.00 |
| 5/21/2025 | Narine Mkrtchyan | Jury verdict reached and read; waiting in court to speak with jury; with client after jury left explaining the next steps before he left town | 12.00 | $850.00 | $10,200.00 |
| 5/27/2025 | Narine Mkrtchyan | Review of defense Rule 50 motions per Court orders; drafting a response; review of transcripts; discussions with other attorneys | 9.50 | $850.00 | $8,075.00 |
| 5/28/2025 | Narine Mkrtchyan | Drafting a response to Rule 50 motions | 8.70 | $850.00 | $7,395.00 |
| 6/17/2025 | Narine Mkrtchyan | Review of defense filings for motion for new trial | 8.80 | $850.00 | $7,480.00 |
| 6/18/2025 | Narine Mkrtchyan | Drafting opposition to motion for new trial; review of cases ; conference call with YH | 8.50 | $850.00 | $7,225.00 |
| 6/19/2025 | Narine Mkrtchyan | Drafting opposition to motion for new trial ; opposition to seal docs; filed CPRA request with OCSD and OC | 9.20 | $850.00 | $7,820.00 |
| 6/22/2025 | Narine Mkrtchyan | Drafting opposition to motion for new trial ; exhibits | 8.50 | $850.00 | $7,225.00 |

7-RenSER-01373                                                                 7-RenSER-01373

| | HOLLOWAY - 8+ Hour Days | | | | |
|---|---|---|---|---|---|
| **Date** | **Timekeeper** | **Description** | **Hours** | **Rate** | **Total** |
| 6/23/2025 | Narine Mkrtchyan | Finalize and file opp to motion for new trial with exhibits and declaration; filed opp to application to seal records | 8.20 | $850.00 | $6,970.00 |
| 7/14/2025 | Narine Mkrtchyan | Post-trial motions hearing, in court since 8 to 5 pm, plus travel time of 3 hours | 12.00 | $850.00 | $10,200.00 |
| | | **TOTAL** | **1,125.90** | | **$962,715.00** |

7-RenSER-01374                                                         7-RenSER-01374

# Exhibit D

7-RenSER-01375

7-RenSER-01375

Case 8:19-cv-01514-DOC-DFM, Document Entry 29.8 (190 of 300)
Case 25-7132, 07/27/2026, DktEntry: 29.8, Filed 07/27/2026



# The State Bar *of California*

**Thomas Ernst Beck #81557**
License Status: Active

Address: THE BECK LAW FIRM, PO Box 101, Los Alamitos, CA 90720-0101
Phone: 562-795-5835 | Fax: Not Available
Email: **THEBECKLAWFIRM@GMAIL.COM** | Website: Not Available

## More about This Attorney ▾

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status ❶ | Discipline ❶ | Administrative Action ❶ |
|---|---|---|---|
| Present | Active | | |
| 9/30/2022 | Active | | |
| 3/31/2021 | Not eligible to practice law in CA | Discipline w/actual suspension 19-O-30715 ❶ | |
| 12/20/2019 | | Disciplinary charges filed in State Bar Court 19-O-30715 ❶ | |
| 6/8/1992 | | Public reproval with/duties 90-O-17502 ❶ | |
| 11/29/1978 | Admitted to the State Bar of California | | |

Here is what you need to know to access discipline documents in public cases:

Documents are added to the State Bar Court's online docket as events occur.

**Search for a Case**

To search for a case, please copy the case number displayed above and click Search for a Case. In the search box, paste the complete case number. If the case number begins with "19" or higher, you must add the prefix SBC to the case number, e.g., SBC [CASE NUMBER]. If a case number begins with 18 or lower, there's no need to add SBC.

Most public case records since 2000 are available through search. Older case records are **available on request**. The State Bar Court began posting public discipline documents online in 2005.

NOTE: Only **Published Opinions** may be cited or relied on as precedent in State Bar Court proceedings.

DISCLAIMER: Any posted Notice of Disciplinary Charges, Conviction Transmittal or other initiating document, contains only allegations of professional misconduct. The licensee is presumed to be innocent of any misconduct warranting discipline until the charges have been proven.

7-RenSER-01376                7-RenSER-01376

# Exhibit
# E

7-RenSER-01377

7-RenSER-01377

| HOLLOWAY - O'Connor Opinion Chart with Suggested Adjustments | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Timekeeper | Requested Lodestar | | | Suggested Adjustments | | | | | | Lodestar with Suggested Rate and Adjustments Applied |
| | Rate | Hours | Total | Suggested Rate | 40% Reduction for Unsuccessful Claims | | Additional 20% Reduction for Overbilling | | Additional 40% Reduction for Incivility | |
| | | | | | Hours Reduced | Remaining Hours | Hours Reduced | Remaining Hours | Hours Reduced | Remaining Hours | |
| Narine Mkrtchyan | $850.00 | 3,668.70 | $3,118,395.00 | $500 | 1,467.48 | 2,201.22 | 440.24 | 1,760.98 | 704.39 | 1,056.59 | $528,295.00 |
| Thomas E.Beck | $1,150.00 | 119.75 | $137,712.50 | $800 | 47.90 | 71.85 | 0.00 | 71.85 | 0.00 | 71.85 | $57,480.00 |
| TOTALS | | 3,788.45 | $3,256,107.50 | | 1,515.38 | 2,273.07 | 440.24 | 1,832.83 | 704.39 | 1,128.44 | $585,775.00 |

Case 25-7132, 07/27/2026, DktEntry 30.8, 193 of 300

# Exhibit
# F

7-RenSER-01379

7-RenSER-01379

# Los Angeles, CA (Micro Data)

| | Rate Tier | Rate Range | Defense | | | | Plaintiffs | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Regular Rate | | Complex Rate | | Regular Rate | | Complex Rate | | All Rates | |
| | | | # | % | # | % | # | % | # | % | # | % |
| 1 | Tier 1 | $250 or Less | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 2 | Tier 1 | $251-$300 | 2 | 0.28% | 0 | 0.00% | 6 | 0.84% | 0 | 0.00% | 8 | 0.28% |
| 3 | Tier 1 | $301-$350 | 11 | 1.56% | 13 | 1.84% | 14 | 1.97% | 12 | 1.69% | 50 | 1.77% |
| 4 | Tier 1 | $351-$400 | 35 | 4.96% | 33 | 4.68% | 31 | 4.36% | 33 | 4.64% | 132 | 4.66% |
| 5 | Tier 1 | $401-$450 | 57 | 8.09% | 52 | 7.38% | 62 | 8.72% | 54 | 7.59% | 225 | 7.94% |
| | Sub Totals | | 105 | 14.89% | 98 | 13.90% | 113 | 15.89% | 99 | 13.92% | 415 | 14.65% |
| 6 | Tier 2 | $451-$500 | 52 | 7.38% | 55 | 7.80% | 40 | 5.63% | 51 | 7.17% | 198 | 6.99% |
| 7 | Tier 2 | $501-$550 | 44 | 6.24% | 52 | 7.38% | 48 | 6.75% | 46 | 6.47% | 190 | 6.71% |
| 8 | Tier 2 | $551-$600 | 55 | 7.80% | 45 | 6.38% | 58 | 8.16% | 42 | 5.91% | 200 | 7.06% |
| 9 | Tier 2 | $601-$650 | 59 | 8.37% | 51 | 7.23% | 39 | 5.49% | 45 | 6.33% | 194 | 6.85% |
| 10 | Tier 2 | $651-$700 | 58 | 8.23% | 44 | 6.24% | 50 | 7.03% | 44 | 6.19% | 196 | 6.92% |
| | Sub Totals | | 268 | 38.01% | 247 | 35.04% | 235 | 33.05% | 228 | 32.07% | 978 | 34.53% |
| 11 | Tier 3 | $701-$750 | 45 | 6.38% | 50 | 7.09% | 48 | 6.75% | 55 | 7.74% | 198 | 6.99% |
| 12 | Tier 3 | $751-$800 | 44 | 6.24% | 45 | 6.38% | 45 | 6.33% | 50 | 7.03% | 184 | 6.50% |
| 13 | Tier 3 | $801-$850 | 39 | 5.53% | 49 | 6.95% | 55 | 7.74% | 53 | 7.45% | 196 | 6.92% |
| 14 | Tier 3 | $851-$900 | 46 | 6.52% | 42 | 5.96% | 50 | 7.03% | 51 | 7.17% | 189 | 6.67% |
| 15 | Tier 3 | $901-$950 | 45 | 6.38% | 47 | 6.67% | 51 | 7.17% | 54 | 7.59% | 197 | 6.96% |
| | Sub Totals | | 219 | 31.06% | 233 | 33.05% | 249 | 35.02% | 263 | 36.99% | 964 | 34.04% |
| 16 | Tier 4 | $951-$1000 | 31 | 4.40% | 29 | 4.11% | 30 | 4.22% | 33 | 4.64% | 123 | 4.34% |
| 17 | Tier 4 | $1001-$1100 | 20 | 2.84% | 25 | 3.55% | 22 | 3.09% | 23 | 3.23% | 90 | 3.18% |
| 18 | Tier 4 | $1101-$1200 | 21 | 2.98% | 22 | 3.12% | 21 | 2.95% | 19 | 2.67% | 83 | 2.93% |
| 19 | Tier 4 | $1201-$1300 | 21 | 2.98% | 25 | 3.55% | 17 | 2.39% | 24 | 3.38% | 87 | 3.07% |
| 20 | Tier 4 | Over $1300 | 20 | 2.84% | 26 | 3.69% | 24 | 3.38% | 22 | 3.09% | 97 | 3.43% |
| | Sub Totals | | 113 | 16.03% | 127 | 18.01% | 114 | 16.03% | 121 | 17.02% | 475 | 16.77% |
| | | | | | | | | | | | | |
| | Totals | | 705 | 100% | 705 | 100% | 711 | 100% | 711 | 100% | 2832 | 100% |

*2024 Rate Data for Los Angeles, CA*

Copyright © 2025 NALFA. All Rights Reserved.

7-RenSER-01380                    7-RenSER-01380

Case 2:57132, 07/27/2026, DktEntry: 30.8, (195 of 300)

# Los Angeles, CA (Macro Data)





Copyright © 2025 NALFA. All Rights Reserved.

7-RenSER-01381

7-RenSER-01381

# Exhibit G

7-RenSER-01382

7-RenSER-01382

| HOLLOWAY - Trial Preparation and Attendance Hours | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Timekeeper | Rate | Pretrial #1 7/26/2021 - 8/15/2022 | | Trial #1 8/16/2021 - 9/7/2021 | | Pretrial #2 9/28/2022 - 12/4/2022 | | Trial #2 12/6/2022 - 12/19/2022 | |
| | | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees |
| Narine Mkrtchyan | $850.00 | 126.20 | $107,270.00 | 185.8 | $157,930.00 | 284.10 | $241,485.00 | 97.10 | $82,535.00 |
| Thomas E.Beck | $1,150.00 | - | - | - | - | - | - | - | - |
| TOTAL | | 126.20 | $107,270.00 | 185.8 | $157,930.00 | 284.10 | $241,485.00 | 97.10 | $82,535.00 |

| HOLLOWAY - Trial Preparation and Attendance Hours (Continued) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Timekeeper | Rate | Pretrial #3 6/15/2023 - 7/11/2023 | | Trial #3 7/13/2023 - 8/16/2023 | | Pretrial #4 4/4/2025 - 4/30/2025 | | Trial #4 5/1/2025 - 5/22/2025 | | TOTAL | |
| | | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees | Hours | Fees |
| Narine Mkrtchyan | $850.00 | 58.80 | $49,980.00 | 257.00 | $218,450.00 | 149.5 | $127,075.00 | 273.30 | $232,305.00 | 1,431.80 | $1,217,030.00 |
| Thomas E.Beck | $1,150.00 | - | - | - | - | - | - | 0.50 | $575.00 | 0.50 | $575.00 |
| TOTAL | | 58.80 | $49,980.00 | 257.00 | $218,450.00 | 149.5 | $127,075.00 | 273.80 | $232,880.00 | 1,432.30 | $1,217,605.00 |

7-RenSER-01383     7-RenSER-01383

| | | | HOLLOWAY -  Trial Preparation and Attendance Entries | | | |
|---|---|---|---|---|---|---|
| Date | Timekeeper | Trial # | Description | Hours | Rate | Fees |
| 7/26/2021 | Narine Mkrtchyan | PreTrial #1 | Finalize supp brief for prior bad acts; extract use of force reports and make into exhibits; application to file docs under seal; preparing for trial, trial exhibit books, contact with transcribers re transcription of video; plaintiff's supplemental disclosures of medical records; follow-up with PI on the rest of subpoenas; spoke with UOF Witness re trial ; office supplies for trial exhibits | 7.00 | $850.00 | $5,950.00 |
| 7/27/2021 | Narine Mkrtchyan | PreTrial #1 | Finalize supp brief for prior bad acts; filed application to file docs under seal; preparing trial exhibit books; modifying exhibit lists; sent subpoenas to PI,  with witness fee checks; review of audio traffic for transcription, send to transcriber, figuring out how to transcribe the video; follow-up on video enhancement | 6.20 | $850.00 | $5,270.00 |
| 7/28/2021 | Narine Mkrtchyan | PreTrial #1 | Filed supp brief for prior bad acts; finalize and review exhibit lists; preparing exhibit books; amending witness lists; review of video for transcription; strategy re trial | 6.50 | $850.00 | $5,525.00 |
| 7/29/2021 | Narine Mkrtchyan | PreTrial #1 | Follow-up with PI on the subpoenas; preparing exhibit inserts; review of video and notes on trial strategy with wits | 3.20 | $850.00 | $2,720.00 |
| 7/30/2021 | Narine Mkrtchyan | PreTrial #1 | Got a trial confirmation; follow-up with PI and wits re confirmation; sent exhibit/witness lists to defense; preparing for trial, review of Renegar depo transcript , points for trial testimony | 7.60 | $850.00 | $6,460.00 |
| 8/1/2021 | Narine Mkrtchyan | PreTrial #1 | Review of Renegar depos; notes for trial testimony; follow-up with TB; follow-up with witness; opening statement points | 5.00 | $850.00 | $4,250.00 |
| 8/2/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; review of reports, video and depo transcripts; sent video to transcriber; review of exhibits; jury instructions | 8.50 | $850.00 | $7,225.00 |
| 8/3/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; review of depos; exhibit books; interview on Zoom with Dr. Hardy; follow-up with PI on witnesses; follow-up with TB on JI and verdict forms | 8.60 | $850.00 | $7,310.00 |
| 8/4/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; back and forth with defense on exhibit/witness lists; filed P's amended lists with declaration objecting to the defense newly designated expert ; follow-up with witnesses ; follow-up with PI | 8.70 | $850.00 | $7,395.00 |
| 8/5/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; follow-up with witnesses; trial testimony points; review of defense expert reports; follow-up with PI; finalize exhibits ; review of JI and joint statement by TB | 8.40 | $850.00 | $7,140.00 |
| 8/6/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; follow-up with witnesses; trial testimony points; JI; wrote and filed a supp brief on late designation of expert witness; finalize exhibits | 8.60 | $850.00 | $7,310.00 |
| 8/9/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; preparing points for plaintiff's trial testimony; review of Plaintiff's deposition; Fedex for poster of the map; sent defense proposed JI, proposed statement of the case ; follow-up with VA re custodians and witnesses | 8.50 | $850.00 | $7,225.00 |

7-RenSER-01384

7-RenSER-01384

| HOLLOWAY - Trial Preparation and Attendance Entries | | | | | | |
|---|---|---|---|---|---|---|
| Date | Timekeeper | Trial # | Description | Hours | Rate | Fees |
| 8/10/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing client for trial testimony; filed JI, verdict and joint statement of the case | 8.70 | $850.00 | $7,395.00 |
| 8/11/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; review of MILs; review of defense filings; notes for JI; filed voir dire; plaintiffs testimony ; finalize exhibits | 8.60 | $850.00 | $7,310.00 |
| 8/12/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; preparing client for trial testimony issues; finalize exhibits and file for court; went to fedex | 7.60 | $850.00 | $6,460.00 |
| 8/13/2021 | Narine Mkrtchyan | PreTrial #1 | Preparing for trial; opening statement; trial testimony points, follow-up with wits re trial | 8.40 | $850.00 | $7,140.00 |
| 8/14/2021 | Narine Mkrtchyan | PreTrial #1 | Visited O'Neill regional park with client to take photos and videos | 3.60 | $850.00 | $3,060.00 |
| 8/15/2021 | Narine Mkrtchyan | PreTrial #1 | Downloading videos and photos of scene from cell phone to Dropbox for defense | 2.50 | $850.00 | $2,125.00 |
| 8/16/2021 | Narine Mkrtchyan | Trial #1 | Opening statement; getting to Santa ana hotel ; Follow-up with witnesses | 3.10 | $850.00 | $2,635.00 |
| 8/17/2021 | Narine Mkrtchyan | Trial #1 | Trial opening; jury selection; opening statement | 11.00 | $850.00 | $9,350.00 |
| 8/18/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation; discussions after trial with judge | 11.00 | $850.00 | $9,350.00 |
| 8/19/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation; discussions with judge off  and on record | 11.50 | $850.00 | $9,775.00 |
| 8/20/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation | 12.00 | $850.00 | $10,200.00 |
| 8/22/2021 | Narine Mkrtchyan | Trial #1 | Preparing for trial; witness preparation | 10.90 | $850.00 | $9,265.00 |
| 8/23/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; break from testimony; in court going over issues and preparation | 11.00 | $850.00 | $9,350.00 |
| 8/24/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparing | 12.00 | $850.00 | $10,200.00 |
| 8/25/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparing; discussions with judge on and off record | 11.80 | $850.00 | $10,030.00 |
| 8/26/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation; discussions with judge | 12.00 | $850.00 | $10,200.00 |
| 8/27/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation | 10.70 | $850.00 | $9,095.00 |
| 8/28/2021 | Narine Mkrtchyan | Trial #1 | Preparing for trial; review of notes for cross- exam | 2.00 | $850.00 | $1,700.00 |
| 8/29/2021 | Narine Mkrtchyan | Trial #1 | Preparing for trial; review of notes for cross- exam ; jury instructions | 7.30 | $850.00 | $6,205.00 |
| 8/30/2021 | Narine Mkrtchyan | Trial #1 | Not in session; discussions with counsel and judge over jury instructions off record ; review of  notes for cross-exam | 11.00 | $850.00 | $9,350.00 |
| 8/31/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation for trial | 11.50 | $850.00 | $9,775.00 |
| 9/1/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; preparation for trial and closing | 13.00 | $850.00 | $11,050.00 |
| 9/2/2021 | Narine Mkrtchyan | Trial #1 | Witness testimony; closing arguments | 9.00 | $850.00 | $7,650.00 |
| 9/3/2021 | Narine Mkrtchyan | Trial #1 | Waiting for jury verdict in court | 8.00 | $850.00 | $6,800.00 |
| 9/7/2021 | Narine Mkrtchyan | Trial #1 | Waiting for jury verdict in court ; jury deadlocked; waited to speak with jury in court | 7.00 | $850.00 | $5,950.00 |
| 9/28/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial ; review of opening statement and voir dire questions; review of PVS recordings; follow-up with client re video recordings | 5.20 | $850.00 | $4,420.00 |
| 9/29/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; trial testimony notes; refreshing discovery and depos; search for jury consultants, contacted 4 jury consultants for their input and hourly rate | 5.30 | $850.00 | $4,505.00 |
| 9/30/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; trial testimony notes; trial transcripts; search for jury consultants | 4.20 | $850.00 | $3,570.00 |

7-RenSER-01385                                                                                7-RenSER-01385

| | | | HOLLOWAY - Trial Preparation and Attendance Entries | | | |
|---|---|---|---|---|---|---|
| **Date** | **Timekeeper** | **Trial #** | **Description** | **Hours** | **Rate** | **Fees** |
| 10/3/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; trial testimony notes; review of discovery | 5.20 | $850.00 | $4,420.00 |
| 10/4/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; trial testimony notes; review of video transcripts | 6.00 | $850.00 | $5,100.00 |
| 10/5/2022 | Narine Mkrtchyan | Pretrial #2 | Review of trial transcripts and depositions; spoke with jury consultant; review of exhibits and notes for trial | 6.20 | $850.00 | $5,270.00 |
| 10/6/2022 | Narine Mkrtchyan | Pretrial #2 | Review of trial transcripts and notes for trial; follow-up with witness and client; review of medical records | 5.40 | $850.00 | $4,590.00 |
| 10/11/2022 | Narine Mkrtchyan | Pretrial #2 | Follow-up with medical providers and expert Witnesses re trial testimony; review of updated medical records and discovery for medical providers testimony | 5.50 | $850.00 | $4,675.00 |
| 10/12/2022 | Narine Mkrtchyan | Pretrial #2 | Plaintiff's supplemental disclosures, sent updated medical records to defense; sent roadmap to Barcay; review of notes for Vilke | 4.30 | $850.00 | $3,655.00 |
| 10/13/2022 | Narine Mkrtchyan | Pretrial #2 | Review of discovery; preparing for Trial; follow- up with witnesses ; strategy re trial issues | 5.60 | $850.00 | $4,760.00 |
| 10/14/2022 | Narine Mkrtchyan | Pretrial #2 | Review of discovery; trial testimony notes | 2.00 | $850.00 | $1,700.00 |
| 10/17/2022 | Narine Mkrtchyan | Pretrial #2 | Review of proposed jury instructions; judge's JI at trial; issues for JI objections; follow-up with Witnesses | 6.20 | $850.00 | $5,270.00 |
| 10/18/2022 | Narine Mkrtchyan | Pretrial #2 | Review of depos; trial testimony points; JI at trial | 6.80 | $850.00 | $5,780.00 |
| 10/19/2022 | Narine Mkrtchyan | Pretrial #2 | Review of videos; main issues for trial; trial transcripts; follow-up with witnesses and process server | 2.50 | $850.00 | $2,125.00 |
| 10/20/2022 | Narine Mkrtchyan | Pretrial #2 | Review of videos and depo transcripts; follow-up With client re medical treatment and records update | 6.30 | $850.00 | $5,355.00 |
| 10/21/2022 | Narine Mkrtchyan | Pretrial #2 | Review of videos and trial testimony notes; follow-up with VA counsel on trial; review of JI and exhibits | 5.30 | $850.00 | $4,505.00 |
| 10/24/2022 | Narine Mkrtchyan | Pretrial #2 | Review of notes for Vilke testimony; review of prior testimony of Vilke; review of MILs; review of new MRI note and sent it to Raiszadeh | 6.00 | $850.00 | $5,100.00 |
| 10/25/2022 | Narine Mkrtchyan | Pretrial #2 | Review of Barcay report for trial; review of medical records for trial; review of exhibits and edit for trial ; asked defense to bring exhibits to court | 7.00 | $850.00 | $5,950.00 |
| 10/26/2022 | Narine Mkrtchyan | Pretrial #2 | Updating exhibits for trial; review of trial transcripts; notes for witness testimony; opening statement; follow-up with witnesses and experts; follow-up with client; supplemental disclosures with medical records | 7.20 | $850.00 | $6,120.00 |
| 10/27/2022 | Narine Mkrtchyan | Pretrial #2 | conference with Dr. Barcay 1.4 ; going over notes for his testimony; preparing expert for trial testimony; sent exhibit lists to defense ;  review of JI | 5.60 | $850.00 | $4,760.00 |
| 10/30/2022 | Narine Mkrtchyan | Pretrial #2 | Review of trial notes; Barcay/Vilke trial testimony | 2.50 | $850.00 | $2,125.00 |
| 10/31/2022 | Narine Mkrtchyan | Pretrial #2 | Review of trial notes, Barcay/Vilke and expert reports; conference with Raiszadeh re new MRI images; conference with client | 6.50 | $850.00 | $5,525.00 |
| 11/1/2022 | Narine Mkrtchyan | Pretrial #2 | Roger Clark roadmap; Raiszadeh roadmap; follow-up with client; updated and sent exhibit lists to defense; review of defense opp to P MIL 1 and supp brief | 6.80 | $850.00 | $5,780.00 |

7-RenSER-01386
7-RenSER-01386

| HOLLOWAY - Trial Preparation and Attendance Entries | | | | | | |
|---|---|---|---|---|---|---|
| Date | Timekeeper | Trial # | Description | Hours | Rate | Fees |
| 11/2/2022 | Narine Mkrtchyan | Pretrial #2 | Review of defendants opposition to P's supp brief re expungement; research of the law on issues; draft reply | 7.20 | $850.00 | $6,120.00 |
| 11/3/2022 | Narine Mkrtchyan | Pretrial #2 | Drafting a reply to d opposition; follow-up with client and Raiszadeh re plaintiff's injuries; filed reply and updated exhibit lists ; review of renewed MILs and other pretrial filings for PT | 7.00 | $850.00 | $5,950.00 |
| 11/4/2022 | Narine Mkrtchyan | Pretrial #2 | Follow-up with Roger Clark re trial testimony; notes re trial; review of MILs and motions for PT conference; sent mandatory chamber copies to court of new filings | 5.30 | $850.00 | $4,505.00 |
| 11/7/2022 | Narine Mkrtchyan | Pretrial #2 | Review of motions for PT conference; exhibit lists; trial notes for Roger Clark testimony ; opening and plaintiff testimony notes | 7.30 | $850.00 | $6,205.00 |
| 11/8/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for PT conference; Pretrial conference in court | 10.00 | $850.00 | $8,500.00 |
| 11/9/2022 | Narine Mkrtchyan | Pretrial #2 | Follow-up with witnesses and client re trial confirmation; drafted and filed supp briefing re court's order to produce the PVS recording with transcript; review of JI ; sent reports to witness Clark for preparation | 7.00 | $850.00 | $5,950.00 |
| 11/10/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; Roger Clark conference Zoom; trial notes for testimony and main points ;  review of JI | 6.80 | $850.00 | $5,780.00 |
| 11/11/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; opening statement; spoke With jury consultant ;  voir dire questions; meeting with paralegal re trial | 5.50 | $850.00 | $4,675.00 |
| 11/13/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; finalize exhibits; review of PVS recordings | 3.30 | $850.00 | $2,805.00 |
| 11/14/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; trial notes for Roger Clark testimony; conference Zoom with Roger Clark , for  trial testimony; follow-up with other Witnesses; follow-up with client | 7.20 | $850.00 | $6,120.00 |
| 11/15/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing witnesses for trial; conference call with witnesses; notes for trial testimony | 6.00 | $850.00 | $5,100.00 |
| 11/16/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing witnesses for trial; conference call With Roger Clark and Susan Hopp Midani ; follow-up with Raiszadeh | 6.80 | $850.00 | $5,780.00 |
| 11/17/2022 | Narine Mkrtchyan | Pretrial #2 | Finalize jury instructions; review and research of law on legal issues; Roger Clark testimony notes; prepared him a flash drive ; printed booking photos; follow-up with paralegal | 4.50 | $850.00 | $3,825.00 |
| 11/18/2022 | Narine Mkrtchyan | Pretrial #2 | Finalize and review JI;  plaintiff's testimony preparation points; review of trial notes | 5.00 | $850.00 | $4,250.00 |
| 11/21/2022 | Narine Mkrtchyan | Pretrial #2 | Plaintiffs testimony notes; opening statement; expert witness testimony; filed jury instructions ; follow-up with witnesses; organize exhibits; reservation for  hotel room | 7.00 | $850.00 | $5,950.00 |
| 11/22/2022 | Narine Mkrtchyan | Pretrial #2 | Opening statement; main points for officers; review of exhibits ;  strategy re trial testimony of Witnesses and order of witnesses | 7.20 | $850.00 | $6,120.00 |
| 11/23/2022 | Narine Mkrtchyan | Pretrial #2 | Opening statement; main points for officers; follow-up with witnesses; organize exhibits | 7.40 | $850.00 | $6,290.00 |
| 11/24/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing for trial; testimony points; review of video | 3.00 | $850.00 | $2,550.00 |
| 11/26/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing plaintiff for trial testimony; meeting with client | 5.00 | $850.00 | $4,250.00 |

7-RenSER-01387

7-RenSER-01387

| | HOLLOWAY - Trial Preparation and Attendance Entries | | | | | |
|---|---|---|---|---|---|---|
| Date | Timekeeper | Trial # | Description | Hours | Rate | Fees |
| 11/27/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing Roger Clark for trial testimony; conference on Zoom; review of notes | 3.40 | $850.00 | $2,890.00 |
| 11/28/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing plaintiff for trial testimony; review of court orders on MILs | 7.30 | $850.00 | $6,205.00 |
| 11/29/2022 | Narine Mkrtchyan | Pretrial #2 | Review of law on recusal and appeals; drafted motion to recuse and certify the case for appeal | 7.20 | $850.00 | $6,120.00 |
| 11/30/2022 | Narine Mkrtchyan | Pretrial #2 | Filed motions; preparing trial notes and testimony ;  follow-up with witnesses | 7.40 | $850.00 | $6,290.00 |
| 12/1/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing plaintiff for trial testimony; trial notes | 8.00 | $850.00 | $6,800.00 |
| 12/2/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing files ;  preparing Dr. Raiszadeh for trial; review of trial notes | 4.20 | $850.00 | $3,570.00 |
| 12/3/2022 | Narine Mkrtchyan | Pretrial #2 | Preparing opening statement; preparing files for transportation to  hotel | 2.50 | $850.00 | $2,125.00 |
| 12/4/2022 | Narine Mkrtchyan | Pretrial #2 | Transportation of files to hotel Santa Ana | 2.00 | $850.00 | $1,700.00 |
| 12/6/2022 | Narine Mkrtchyan | Trial #2 | First day of trial; jury selection | 9.00 | $850.00 | $7,650.00 |
| 12/7/2022 | Narine Mkrtchyan | Trial #2 | second day of trial; opening statement; beginning of Renegar ;  preparation | 10.00 | $850.00 | $8,500.00 |
| 12/8/2022 | Narine Mkrtchyan | Trial #2 | Third day of trial ; preparation | 10.50 | $850.00 | $8,925.00 |
| 12/9/2022 | Narine Mkrtchyan | Trial #2 | Fourth day of trial; preparation | 11.00 | $850.00 | $9,350.00 |
| 12/10/2022 | Narine Mkrtchyan | Trial #2 | Preparing for trial | 2.50 | $850.00 | $2,125.00 |
| 12/12/2022 | Narine Mkrtchyan | Trial #2 | Fifth day of trial ; preparation | 6.00 | $850.00 | $5,100.00 |
| 12/13/2022 | Narine Mkrtchyan | Trial #2 | Sixth day of trial; preparation | 10.00 | $850.00 | $8,500.00 |
| 12/14/2022 | Narine Mkrtchyan | Trial #2 | Seventh day of trial; preparation | 11.00 | $850.00 | $9,350.00 |
| 12/15/2022 | Narine Mkrtchyan | Trial #2 | Eight day of trial; court kept us until 8 without a break , had to leave court before excused because got sick all day was hungry | 12.00 | $850.00 | $10,200.00 |
| 12/16/2022 | Narine Mkrtchyan | Trial #2 | Ninth day of trial; judge declared mistrial on a technicality because was upset | 3.50 | $850.00 | $2,975.00 |
| 12/16/2022 | Narine Mkrtchyan | Trial #2 | Waited in the hallway and spoke with jury about their impressions ; they said client did not do well on the second day and they had not even paid attention to the statement about 'prior trial.' | 3.40 | $850.00 | $2,890.00 |
| 12/19/2022 | Narine Mkrtchyan | Trial #2 | Status conference; judge set another trial date ; spoke with appellate lawyer re appellate options; spoke with LA times re mistrial ; sent press release to several news outlets ;  considering dismissal for appeal because do not believe will ever get a fair trial or verdict in this court | 8.20 | $850.00 | $6,970.00 |
| 6/5/2023 | Narine Mkrtchyan | Pretrial #3 | Follow-up with client re trial and witnesses; follow-up with defense ;  filed a motion to enforce subpoenas | 1.30 | $850.00 | $1,105.00 |
| 6/13/2023 | Narine Mkrtchyan | Pretrial #3 | Follow-up with witnesses for trial; email client | 1.00 | $850.00 | $850.00 |
| 6/14/2023 | Narine Mkrtchyan | Pretrial #3 | More subpoenas for witnesses; follow-up with witnesses | 1.50 | $850.00 | $1,275.00 |
| 6/21/2023 | Narine Mkrtchyan | Pretrial #3 | Review of defense MILs; opposition; filed 3 MILs | 7.20 | $850.00 | $6,120.00 |
| 6/22/2023 | Narine Mkrtchyan | Pretrial #3 | Filed opposition to defense MILs | 5.60 | $850.00 | $4,760.00 |
| 6/27/2023 | Narine Mkrtchyan | Pretrial #3 | Drafting trial brief; modifying jury instructions ; exhibits, declaration | 5.00 | $850.00 | $4,250.00 |
| 6/28/2023 | Narine Mkrtchyan | Pretrial #3 | Finalize trial brief with jury instructions and filed; Follow-up with client on trial testimony; responded to Dr. Raiszadeh about his concerns | 6.00 | $850.00 | $5,100.00 |
| 6/29/2023 | Narine Mkrtchyan | Pretrial #3 | Searching for  John Lee ;  email to Barcay ;  filed special verdict forms | 2.00 | $850.00 | $1,700.00 |

7-RenSER-01388          7-RenSER-01388

| | HOLLOWAY - Trial Preparation and Attendance Entries | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Timekeeper** | **Trial #** | **Description** | **Hours** | **Rate** | **Fees** |
| 7/3/2023 | Narine Mkrtchyan | Pretrial #3 | Review of exhibits; review of trial notes for preparation ;  voir dire questions; opening statement; review of defendants opposition to Plaintiff's MILs | 7.50 | $850.00 | $6,375.00 |
| 7/4/2023 | Narine Mkrtchyan | Pretrial #3 | Preparing exhibits and files for trial | 2.00 | $850.00 | $1,700.00 |
| 7/5/2023 | Narine Mkrtchyan | Pretrial #3 | Preparing for trial; review of discovery; follow-up with witnesses | 1.20 | $850.00 | $1,020.00 |
| 7/7/2023 | Narine Mkrtchyan | Pretrial #3 | Review of defense filings | 2.00 | $850.00 | $1,700.00 |
| 7/8/2023 | Narine Mkrtchyan | Pretrial #3 | Review of defense exhibit/witness lists; revise and send them the proposed joint lists for filing ; preparing files for transport | 2.00 | $850.00 | $1,700.00 |
| 7/10/2023 | Narine Mkrtchyan | Pretrial #3 | Zoom meeting with Roger Clark; opening statement review; follow-up with expert Witnesses for trial; review and finalize joint exhibit/witness lists for filing; organize files for trial | 7.20 | $850.00 | $6,120.00 |
| 7/11/2023 | Narine Mkrtchyan | Pretrial #3 | Preparing for trial; follow-up with witnesses; Zoom conference with Dr. Hopp; review of medical records | 7.30 | $850.00 | $6,205.00 |
| 7/13/2023 | Narine Mkrtchyan | Trial #3 | trial ; selection of jury | 8.20 | $850.00 | $6,970.00 |
| 7/14/2023 | Narine Mkrtchyan | Trial #3 | trial; selection of jury | 8.60 | $850.00 | $7,310.00 |
| 7/15/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial ; review of trial notes | 4.20 | $850.00 | $3,570.00 |
| 7/16/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of trial notes; conference with client and witnesses | 4.60 | $850.00 | $3,910.00 |
| 7/17/2023 | Narine Mkrtchyan | Trial #3 | Trial; examination of witnesses ;  preparation | 11.00 | $850.00 | $9,350.00 |
| 7/18/2023 | Narine Mkrtchyan | Trial #3 | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/19/2023 | Narine Mkrtchyan | Trial #3 | Preparation | 6.00 | $850.00 | $5,100.00 |
| 7/20/2023 | Narine Mkrtchyan | Trial #3 | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/21/2023 | Narine Mkrtchyan | Trial #3 | Trial; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/22/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; conference with witnesses; preparing plaintiff for testimony | 5.00 | $850.00 | $4,250.00 |
| 7/23/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; conference with witnesses; trial notes | 4.70 | $850.00 | $3,995.00 |
| 7/24/2023 | Narine Mkrtchyan | Trial #3 | Trial ; examination of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 7/25/2023 | Narine Mkrtchyan | Trial #3 | Review of notes; conference with witnesses | 2.00 | $850.00 | $1,700.00 |
| 7/26/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of exhibits; trial brief | 4.00 | $850.00 | $3,400.00 |
| 7/27/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of discovery | 3.50 | $850.00 | $2,975.00 |
| 7/28/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of discovery | 4.60 | $850.00 | $3,910.00 |
| 7/29/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of discovery | 3.60 | $850.00 | $3,060.00 |
| 7/30/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; conference with witnesses | 4.00 | $850.00 | $3,400.00 |
| 7/31/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial; review of trial notes | 3.00 | $850.00 | $2,550.00 |
| 8/1/2023 | Narine Mkrtchyan | Trial #3 | Back in session; trial exam of witnesses | 10.00 | $850.00 | $8,500.00 |
| 8/2/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses, preparation | 10.00 | $850.00 | $8,500.00 |
| 8/3/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/4/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/5/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial | 2.00 | $850.00 | $1,700.00 |
| 8/6/2023 | Narine Mkrtchyan | Trial #3 | Preparing for trial | 5.00 | $850.00 | $4,250.00 |

| HOLLOWAY - Trial Preparation and Attendance Entries | | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Timekeeper** | **Trial #** | **Description** | **Hours** | **Rate** | **Fees** |
| 8/7/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 8.00 | $850.00 | $6,800.00 |
| 8/8/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/9/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 10.00 | $850.00 | $8,500.00 |
| 8/10/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; preparation | 12.00 | $850.00 | $10,200.00 |
| 8/11/2023 | Narine Mkrtchyan | Trial #3 | Trial; exam of witnesses; jury instructions session | 8.00 | $850.00 | $6,800.00 |
| 8/12/2023 | Narine Mkrtchyan | Trial #3 | Meet and confer with defense; jury instructions objections; review of notes | 5.00 | $850.00 | $4,250.00 |
| 8/13/2023 | Narine Mkrtchyan | Trial #3 | Closing argument preparation; jury instructions session in court | 9.00 | $850.00 | $7,650.00 |
| 8/14/2023 | Narine Mkrtchyan | Trial #3 | Defense rested ; jury instructions ; preparing for closing | 12.00 | $850.00 | $10,200.00 |
| 8/15/2023 | Narine Mkrtchyan | Trial #3 | Closing arguments | 9.00 | $850.00 | $7,650.00 |
| 8/16/2023 | Narine Mkrtchyan | Trial #3 | Jury deliberations | 10.00 | $850.00 | $8,500.00 |
| 4/4/2025 | Narine Mkrtchyan | Pretrial #4 | Pre-trial conference; travel to OC | 9.00 | $850.00 | $7,650.00 |
| 4/7/2025 | Narine Mkrtchyan | Pretrial #4 | Review of P previous trial testimony, follow-up with client for preparation; sent him notes and transcripts of trial testimony for review | 7.60 | $850.00 | $6,460.00 |
| 4/8/2025 | Narine Mkrtchyan | Pretrial #4 | Review of court order on MILs; filed verdict form, voir dire questions; Jury instructions updated; review of P testimony for preparation ; highlights for him to review | 7.60 | $850.00 | $6,460.00 |
| 4/10/2025 | Narine Mkrtchyan | Pretrial #4 | Review of trial notes and exhibits; p deposition review; trial brief re collateral source rule | 7.80 | $850.00 | $6,630.00 |
| 4/15/2025 | Narine Mkrtchyan | Pretrial #4 | Review of P trial testimony ;  follow-up with client | 4.20 | $850.00 | $3,570.00 |
| 4/16/2025 | Narine Mkrtchyan | Pretrial #4 | Review of trial notes and exhibits; conference call with Dr. Hopp for trial prep; Zoom meeting With client for trial preparation | 8.00 | $850.00 | $6,800.00 |
| 4/17/2025 | Narine Mkrtchyan | Pretrial #4 | Review of trial notes and exhibits; depo transcripts to refresh; conference call with Loretta Tafoya, Roger Clark | 9.20 | $850.00 | $7,820.00 |
| 4/18/2025 | Narine Mkrtchyan | Pretrial #4 | Review of videos and audio, all video recordings from patrol cars; trial strategy and notes on the list of witnesses | 7.40 | $850.00 | $6,290.00 |
| 4/19/2025 | Narine Mkrtchyan | Pretrial #4 | Review of depos videos and audio; setting up external speakers for laptop | 7.20 | $850.00 | $6,120.00 |
| 4/21/2025 | Narine Mkrtchyan | Pretrial #4 | Review of Renegar depos and video depo ; notes for P preparation of trial | 7.50 | $850.00 | $6,375.00 |
| 4/22/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing for trial; review of trial notes, preparing updated exhibits | 7.80 | $850.00 | $6,630.00 |
| 4/23/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing for trial; review of defense objection to trial brief on collateral sources; review of defense filings; review of trial notes ;  response to defense phone call ;  bought supplies for trial, exhibit books etc. | 8.30 | $850.00 | $7,055.00 |
| 4/24/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing for trial; exhibits; drafted response to defense brief on collateral sources filed; review of trial testimony points; follow-up with defense counsel on outstanding issues | 8.40 | $850.00 | $7,140.00 |
| 4/25/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing opening statement; finalize exhibits and file; follow-up with Roger Clark ; review of exhibits with paralegal ; sent updated exhibits to defense; follow-up with rest of witnesses and paralegal for trial | 8.70 | $850.00 | $7,395.00 |

7-RenSER-01390                                                                    7-RenSER-01390

| HOLLOWAY - Trial Preparation and Attendance Entries | | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Timekeeper** | **Trial #** | **Description** | **Hours** | **Rate** | **Fees** |
| 4/26/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing opening statement; review of trial notes; follow-up with client and witnesses for trial testimony; spoke with Okorie; last minute issues for trial prep | 7.20 | $850.00 | $6,120.00 |
| 4/27/2025 | Narine Mkrtchyan | Pretrial #4 | Follow-up with client and witnesses for trial testimony; review of trial notes; contacted the hotel for reservations; organizing files for travel to OC | 6.50 | $850.00 | $5,525.00 |
| 4/28/2025 | Narine Mkrtchyan | Pretrial #4 | Opening statement preparation; voir dire notes; travel to  OC hotel and setting up at hotel; received court text messaging re trailing trial to May 1 ; follow-up with witnesses and client re trailing of trial; running errands for food at hotel | 8.20 | $850.00 | $6,970.00 |
| 4/29/2025 | Narine Mkrtchyan | Pretrial #4 | Preparing for trial; trial notes; opening statement; jury selection issues; review of exhibits; discussion with YH re trial | 9.90 | $850.00 | $8,415.00 |
| 4/30/2025 | Narine Mkrtchyan | Pretrial #4 | Follow-up with client; preparing client for trial testimony on Zoom· review of trial notes ; preparing Loretta Tafoya; review of her credit card bills | 9.00 | $850.00 | $7,650.00 |
| 5/1/2025 | Narine Mkrtchyan | Trial #4 | Jury trial begins; jury selection; preparing opening statement; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/2/2025 | Narine Mkrtchyan | Trial #4 | Opening statement; first witness Okorie Okorocha; beginning read-back testimony of experts ;  discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/3/2025 | Narine Mkrtchyan | Trial #4 | Preparing for trial; focus group with client on Zoom and Okorie who organized it;  discussion with Okorie | 12.00 | $850.00 | $10,200.00 |
| 5/4/2025 | Narine Mkrtchyan | Trial #4 | Preparing for trial; review of trial notes; preparing trial testimony points ; discussion with Okorie and YH | 8.30 | $850.00 | $7,055.00 |
| 5/5/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; in court after hours in session ;  discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/6/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation after hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/7/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/8/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/9/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation after court hours in session; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/10/2025 | Narine Mkrtchyan | Trial #4 | Preparation for trial ; follow-up with witnesses and Okorie; review of trial notes; discussion with YH | 9.50 | $850.00 | $8,075.00 |
| 5/11/2025 | Narine Mkrtchyan | Trial #4 | Preparation for trial; review of trial notes and points; discussion with YH | 10.50 | $850.00 | $8,925.00 |
| 5/12/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation of witnesses after court hours in session discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/13/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation of witnesses after court hours in session discussion with YH | 14.00 | $850.00 | $11,900.00 |

| HOLLOWAY - Trial Preparation and Attendance Entries | | | | | | |
|---|---|---|---|---|---|---|
| Date | Timekeeper | Trial # | Description | Hours | Rate | Fees |
| 5/14/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; preparation of issues and witnesses after court hours; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/15/2025 | Narine Mkrtchyan | Trial #4 | Court ordered parties to meet and confer in court at 10 and met us for discussion of jury instructions; review of proposed jury instructions; meet and confer with counsel; filed objections to defense JI; preparation of trial notes after court hours in session | 14.00 | $850.00 | $11,900.00 |
| 5/16/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; in court until 8 pm for discussion of various issues | 14.00 | $850.00 | $11,900.00 |
| 5/17/2025 | Narine Mkrtchyan | Trial #4 | Preparing for closing argument; trial notes for Witnesses; prepared briefs for filing; discussion with YH | 10.30 | $850.00 | $8,755.00 |
| 5/18/2025 | Narine Mkrtchyan | Trial #4 | Preparing closing argument; PowerPoint presentation; review of notes for final witnesses; discussion with paralegal on PowerPoint presentation; discussion with YH | 10.70 | $850.00 | $9,095.00 |
| 5/19/2025 | Narine Mkrtchyan | Trial #4 | Trial testimony of witnesses; prepared closing argument ; discussion with YH | 14.00 | $850.00 | $11,900.00 |
| 5/20/2025 | Narine Mkrtchyan | Trial #4 | Closing arguments; jury went deliberating; court discussion re Rule 50 motions; review of law and motions for response | 14.00 | $850.00 | $11,900.00 |
| 5/21/2025 | Narine Mkrtchyan | Trial #4 | Jury verdict reached and read; waiting in court to speak with jury; with client after jury left explaining the next steps before he left town | 12.00 | $850.00 | $10,200.00 |
| 5/21/2025 | Thomas E.Beck | Trial #4 | Narine texted me she got a plaintiffs verdict again and punis against Renegar and I more. Went over the notice of judgment rules, post trial motions and the costs and fees motion deadlines. | 0.50 | $1,150.00 | $575.00 |
| 5/22/2025 | Narine Mkrtchyan | Trial #4 | Organizing files, clothes and checking out the hotel room, travel home | 4.00 | $850.00 | $3,400.00 |
| | | | TOTAL | 1,432.30 | | $1,217,605.00 |

PROOF OF SERVICE
(CCP §§ 1013(a) and 2015.5; FRCP 5)

State of California,          )
                             )   ss.
County of Los Angeles.        )

I am employed in the County of Los Angeles.  I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, California 91101.

On this date, I served the foregoing document described as **DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF DEFENDANT CHAD RENEGAR'S OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

Executed on **August 25, 2025**  at Pasadena**,** California.

☒ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
AMY NARBER
anarber@ccllp.law

*FILE # 23084*

1

**O'CONNOR DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA  92868
Phone   (714) 823-4100
Fax      (714) 823-4101

7-RenSER-01393                                    7-RenSER-01393

**COLLINS + COLLINS** LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone   (714) 823-4100
Fax      (714) 823-4101

**SERVICE LIST**
**Case Name: Holloway v. County of Orange, et al.**
**Case Number: 8:19-cv-01514-DOC-DFM**
**CCMS: 23084**

Narine Mkrtchyan
655 North Central Avenue Suite 1700
Glendale CA, CA 91203
**Mailing Address:**
10063 Riverside Dr #2288
Toluca Lake, CA 91602
Tel: 818-388-7022
Email: narine56@msn.com
**ATTORNEYS FOR PLAINTIFF**
**JEREMY HOLLOWAY**

S. Frank Harrell
Tamara M. Heathcote
Lynberg and Watkins APC
1100 West Town and Country Road Suite 1450
Orange, CA 92868
714-937-1010
Fax: 714-937-1003
sharrell@lynberg.com
cnaltsas@lynberg.com
theathcote@lynberg.com
**ATTORNEY FOR County of Orange, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts, Deputy Justin Gunderson**

*FILE # 23084*

2

**O'CONNOR DECLARATION ISO OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS**

7-RenSER-01394                                      7-RenSER-01394

**Michael L. Wroniak (State Bar No. 210347)**
**Christie B. Swiss (State Bar No. 245151)**
**Bonnie J. Bennett (State Bar No. 240313)**
**COLLINS + COLLINS LLP**
**750 The City Drive, Suite 400**
**Orange, CA 92868**
**(714) 823-4100 – FAX (714) 823-4101**
**Email: mwroniak@ccllp.law**
**Email: cswiss@ccllp.law**
**Email: bbennett@ccllp.law**

Attorneys for Defendant
DEPUTY CHAD RENEGAR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DISTRICT

| | |
|---|---|
| JEREMY HOLLOWAY, <br><br> Plaintiff, <br> vs. <br><br> COUNTY OF ORANGE; DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer. DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS, individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1 through 10, Inclusive <br><br> Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM <br> *Honorable David O. Carter; Courtroom 10A* <br><br> **DECLARATION OF CHRISTIE B. SWISS IN SUPPORT OF DEFENDANTS' MOTION FOR NEW TRIAL** <br><br> **Complaint Filed: August 6, 2019** <br><br> **Trial Date: April 29, 2025** |

*FILE # 23084*

1

**SWISS DECLARATION ISO DEFENDANTS' MOTION FOR NEW TRIAL**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01395          7-RenSER-01395

I, Christie B. Swiss, hereby declare as follows:

1. I am an attorney admitted to practice before all the courts of the State of California and the Central District of California. I am a partner with the law firm of Collins + Collins LLP, counsel of record for Defendant Deputy Chad Renegar ("Deputy Renegar") in this matter. I have personal knowledge of the facts stated herein. If called upon to testify I could and would competently do so. This Declaration is made in support of Defendants' Motion for New Trial.

2. Attached hereto as **Exhibit A** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 5, 2025, Day 3, Volume IV.

3. Attached hereto as **Exhibit B** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 7, 2025, Day 5, Volume II.

4. Attached hereto as **Exhibit C** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 8, 2025, Day 6, Volume I.

5. Attached hereto as **Exhibit D** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 9, 2025, Day 7, Volume I.

6. Attached hereto as **Exhibit E** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 13, 2025, Day 9, Volume I.

7. Attached hereto as **Exhibit F** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 13, 2025, Day 9, Volume II.

///

**COLLINS + COLLINS** LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01396          7-RenSER-01396

8.     Attached hereto as **Exhibit G** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 14, 2025, Day 10, Volume I.

9.     Attached hereto as **Exhibit H** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 16, 2025, Day 11.

10.     Attached hereto as **Exhibit I** is a true and correct copy of relevant portions from the transcript of trial proceedings on May 20, 2025, Day 13, Volume I.

11.     At trial, Defendants requested that the Court permit written questions to the jury to accompany the verdict form in accordance with Federal Rule of Civil Procedure 49(b), which permits written questions on one or more issues of fact that the jury must decide. See ECF No. 580. The Court denied this request. However, and particularly in light of the fact that Plaintiff was wrongly permitted to offer evidence and argument that Deputy Renegar's use of the taser was at issue, it was error to deny the request to submit written questions to the jury to determine on what basis they determined the force used on Plaintiff was excessive. See e.g. Reese v. County of Sacramento, 888 F.3d 1030, 1036-1040 (9th Cir. 2018) (affirming district courts' grant of judgment as a matter of law following jury's finding of excessive force based on responses to jury questions); see Smith v. City of Hemet, 394 F.3d 689, 704 n.7 (9th Cir. 2005) ("Whether the officers are entitled to qualified immunity may depend in large part on factual determinations the jury will be required to make"). As it stands, it is unclear whether the jury determined Deputy Renegar used excessive force based on his use of the taser on Plaintiff or based on the alleged punch to Plaintiff's head.

*FILE # 23084*

**SWISS DECLARATION ISO DEFENDANTS' MOTION FOR NEW TRIAL**

**COLLINS + COLLINS** LLP
750 The City Drive
Suite 400
Orange, CA  92868
Phone   (714) 823-4100
Fax      (714) 823-4101

7-RenSER-01397          7-RenSER-01397

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this on June 16, 2025, at Carlsbad, California.

CHRISTIE BODNAR SWISS

*FILE # 23084*

4

**SWISS DECLARATION ISO DEFENDANTS' MOTION FOR NEW TRIAL**

**COLLINS + COLLINS** ℓℓᵖ
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                          )
                                          )
                    Plaintiff,            )  **Certified Transcript**
                                          )
          vs.                             )  Case No.
                                          )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,                 )
                                          )
                    Defendants.           )  **DAY 3, VOLUME IV**
                                          )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
MONDAY, MAY 5, 2025
1:32 P.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

4

# I N D E X

**WITNESSES**                                                                    **PAGE**

**JOEL GONZALEZ, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan (continued)          12

## EXHIBITS

(None offered.)

**UNITED STATES DISTRICT COURT**

7-RenSER-01400                                        7-RenSER-01400

**SANTA ANA, CALIFORNIA; MONDAY, MAY 5, 2025**

**1:32 P.M.**

**- - -**

**(Out of the presence of the jury.)**

THE COURT:  Counsel, did you want to put something on the record?

MR. WRONIAK:  Thank you, Your Honor.  Counsel is getting into the use of --

THE COURT:  I can't hear you.

MR. WRONIAK:  May I sit?

With this witness, counsel is getting into the Taser policy.  And pursuant to the Court's ruling previously on the posttrial motions, the Taser was deemed as to Deputy Renegar to be subject to qualified immunity.  So when she's going into the Taser policy itself and the reasonableness of it, it's irrelevant.  And it's 403 to the extent it violates the Court's order that Deputy Renegar is entitled to qualified immunity on the use of the Taser.

The Court's already indicated we hear the whole story, including the Taser, because it's part of the story, but getting into the policy is irrelevant.

THE COURT:  That's one of the issues I've got.  That is, I'm not going to preclude the plaintiff, though, from arguing that the compilation of this, the number of officers

**UNITED STATES DISTRICT COURT**

6

involved and the use of Taser, are all part of this animus towards Mr. Holloway. That's the relevance of that. But as far as the Taser policy, et cetera, I have ruled on that. And that's why I kind of stopped it at the Taser issue at that time. So I turn back to the plaintiff to make your record.

MS. MKRTCHYAN: Your Honor, first of all, defendants in my motion *in limine* was denied. They were trying the same thing with -- you know, about the internal policies to be completely excluded. The Court denied that.

Now, how is this Taser policy relevant? It is extremely relevant to plaintiff's case. Why? Because not only Chad Renegar used actually the Taser on my client, but --

THE COURT: First of all, we have a disagreement on my ruling already, don't we?

MS. MKRTCHYAN: Wait a minute. I'm sorry.

THE COURT: Just a moment. Before we even get into this policy or not, you both disagree about what I ruled.

MS. MKRTCHYAN: But there's no ruling there. What ruling are we talking about? The motion *in limine* was denied, Your Honor.

MR. WRONIAK: I'm referring to the Court's omnibus order on posttrial motions, Docket Number 679.

MS. MKRTCHYAN: That's a very different issue. That's -- the Court dismissed some defendants --

THE COURT: Hold on. I'm confused by that now.

**UNITED STATES DISTRICT COURT**

MR. WRONIAK:  In the posttrial motions, Your Honor, for trial number 3, you ruled that -- why we ended up with the two deputies only, that the -- three of the deputies were entitled to qualified immunity.

As to Deputy Renegar, you specifically ruled after the first -- that trial, that the punch to the face was not subject to qualified immunity.

THE COURT:  That's right.

MR. WRONIAK:  But that Deputy Renegar was entitled to qualified immunity on the use of the Taser.

THE COURT:  Yeah, I don't see the use of the Taser for both of you being inappropriate in this case.  In other words, the specific use and policy, I believe, was adequately followed.  The only reason Deputy Gotts is here and I didn't grant qualified immunity was because of the tape you hear Mr. Holloway saying basically, "Quick kicking me."  Well, a person isn't saying that unless he's being kicked.  And later on, unlike the first trial, you identified Deputy Gotts. That's why Deputy Gotts doesn't have qualified immunity.

Plus you also have a statement later on, something about "What do they do, teach you this in the academy?" something to that effect -- I'm a gatekeeper, that goes to the jury.  They decide on Gotts.  Otherwise, Gotts would have qualified immunity.

With Renegar, the whole issue is coming down to that

UNITED STATES DISTRICT COURT

==punch in the face, quite frankly, and do you believe it or not.==

MR. WRONIAK: That's why the Taser policy and going to the Taser is --

THE COURT: I tend to agree with that. I don't think -- I think you can talk about the use of the Taser. I think you could argue the number of deputies that were eventually involved. I'm not precluding that. I'm not even precluding you getting together with their stories, although it's not a conspiracy. I ruled against you on that. But you can certainly say that they got together in terms of credibility and matched their stories. You're not precluded from that.

But as far as getting into the Taser policy, I believe that there, that Taser was properly employed. So I don't see why we're getting into the policy at all. I think it's unduly consumptive of time. Although you can talk about the Taser and how they used it, the fact it malfunctioned a number of times. You can argue that it was excessive as a total overall perspective and picture, but we're not into policy concerning this Taser.

MS. MKRTCHYAN: Your Honor, I need to be heard because the crux of this case -- and may I make my record? Because it seems to me that we are not communicating properly right now. The crux of this case is excessive force, isn't it? Okay. And there are two officers who not only drew Taser, but

UNITED STATES DISTRICT COURT

time in terms of any de-escalation when you left, okay?  So we're back on the second incident.

Now, Counsel, ask your question, but please don't carry on to the next.

MS. MKRTCHYAN:  We are on the second encounter.

THE COURT:  Counsel.

BY MS. MKRTCHYAN:

Q    Did you do any verbal de-escalation before you took him down to the ground, sir?

A    Aside from telling him multiple times to get on the ground, no.

THE COURT:  And now we're done with this area.  Move on.  You've asked him three times now.

BY MS. MKRTCHYAN:

Q    Now, of course, you're denying -- right? -- that Chad Renegar punched Jeremy Holloway in the face before takedown. You're denying that; true?

A    I didn't see him do any of that stuff.

Q    Okay.  But you were there; wasn't it true?  From the very beginning when he was taken down to the ground until the time he was picked up from that ground, you were there, weren't you?

A    Yes, I was.

Q    And you did not see how Mr. Holloway was punched to his face; true?

A    I never saw him get punched in the face.

**UNITED STATES DISTRICT COURT**

Q    And you also never saw anyone kicking him in the head; true?

A    That is correct.

Q    Okay.  Then how, sir, did he get those facial head injuries that you've described in your report -- in your police report?  You wrote -- isn't it true? -- "I saw Jeremy was bleeding from the right side of his head above his eye."  How did he get those head injuries if, according to you, you never saw him punched to his face, hit in the head?

A    In previous testimony, I believe I stated that I felt he got that injury when we took him to the ground and he hit his head or face on the ground.

Q    Isn't it true you also testified in the deposition -- do you remember your sworn deposition?

A    Yes, I do.

Q    Did you read that recently, as you said earlier?

A    Yes, I did.

Q    And isn't it true you did testify that you never saw him get down face -- hit his face on the ground?  Remember that?

        MR. HARRELL:  Improper use of the deposition.

        THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So let's, you know, show the photograph of -- so you are claiming that you actually believe that he went and hit his face on the ground; right?  That's what you are claiming now at

UNITED STATES DISTRICT COURT

A    That is true.

Q    Okay.  And then if that is the case, isn't it true you never saw Mr. Holloway place Deputy Renegar in a headlock as he has claimed; true?

A    I never said he did.

Q    Right.  And isn't it true, according to your report, there is no -- no indication whatsoever that there was any aggressive move placing an officer in a headlock by Mr. Holloway?

A    I did not write anything about a headlock on my report.

Q    Well, okay.  But if you didn't write it, then it didn't happen; true?

        MR. WRONIAK:  Objection.  Misstates the evidence. Calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  I remember -- like I said, from what I remember, Deputy Renegar saying something to the effect "He's got my head" or something to that effect, but I did not write that in my report.

BY MS. MKRTCHYAN:

Q    And, sir, when we asked you -- you remember at your deposition we asked you several times:  Did you ever see Mr. Holloway place Mr. Renegar -- Chad Renegar -- Deputy Chad Renegar in the so-called headlock.

        Do you remember that question asked of you several

UNITED STATES DISTRICT COURT

A     That is true.

Q     Okay.  And then if that is the case, isn't it true you never saw Mr. Holloway place Deputy Renegar in a headlock as he has claimed; true?

A     I never said he did.

Q     Right.  And isn't it true, according to your report, there is no -- no indication whatsoever that there was any aggressive move placing an officer in a headlock by Mr. Holloway?

A     I did not write anything about a headlock on my report.

Q     Well, okay.  But if you didn't write it, then it didn't happen; true?

          MR. WRONIAK:  Objection.  Misstates the evidence. Calls for speculation.

          THE COURT:  Overruled.

          THE WITNESS:  I remember -- like I said, from what I remember, Deputy Renegar saying something to the effect "He's got my head" or something to that effect, but I did not write that in my report.

BY MS. MKRTCHYAN:

Q     And, sir, when we asked you -- you remember at your deposition we asked you several times:  Did you ever see Mr. Holloway place Mr. Renegar -- Chad Renegar -- Deputy Chad Renegar in the so-called headlock.

          Do you remember that question asked of you several

7-RenSER-01408                                    7-RenSER-01408

times?

A    Yes, I do.

Q    Do you remember what you responded?

        MR. HARRELL:  Improper use of the deposition.

        THE COURT:  No.  Overruled.

        You can answer that question.

        THE WITNESS:  I do remember what I said.

BY MS. MKRTCHYAN:

Q    Okay.  And what did you tell us?

        MR. HARRELL:  Improper use of the deposition.

        THE COURT:  Overruled.

        THE WITNESS:  That I did not see it.

BY MS. MKRTCHYAN:

Q    Okay.  And isn't it true, sir, you never saw Jeremy Holloway rotate on the ground, facing up Officer Renegar, as he has claimed, Deputy Renegar?  Do you remember?  Isn't it true you never saw him rotate on the ground?

        MR. WRONIAK:  Objection.  Compound.  Assumes facts not in evidence.

        THE COURT:  Overruled.

        You can answer the question.

BY MS. MKRTCHYAN:

Q    True?

A    I did not see him rotate.

Q    And isn't it true, sir, according to your previous

UNITED STATES DISTRICT COURT

7-RenSER-01409                                          7-RenSER-01409

90

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 26, 2025*

                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01410          7-RenSER-01410

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 5, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 7, 2025

1:07 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01411     7-RenSER-01411

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROGER ALMA CLARK | 5 | 49 103 | 107 | 119 |
| JEREMY HOLLOWAY | 123 | | | |

*Deborah D. Parker, U.S. Court Reporter*

25

were not necessary or appropriate.  In my hopeful testimony here is, I did not consider that at all necessary or appropriate.  None of those aspects of force.

BY MS. MKRTCHYAN:

Q    And why not?  Tell us why not.  What is it, you're based on?

After all, we have a situation here.  There are 911 callers.  He's on probation.  He has got some knives in his campground.  Why not?

A    So just to unpack that a bit, the blows to the head are specifically trained to be avoided.  Blows to the head.  So punches -- any punches or kicks or smashing the head into a solid area is totally against policy and in the training to be avoided.  There are parts of the body that are to be avoided wherever possible.  And the head is one of them, the spine and the neck, those things.

The use of the taser.

MR. WRONIAK:  Objection.  403.  Irrelevant.

THE COURT:  You may speak about the taser.

You may answer.

THE WITNESS:  The use of the taser has specific requirements that are focused on aggressive behavior and credible threat.  None of that is apparent.  There's three on one, initially, and then there's seven.  It's about 1,400 pounds of muscle -- trained muscle on one person.

*Deborah D. Parker, U.S. Court Reporter*

The -- so I did not consider that the taser -- especially used in what's termed "dry stun" mode. I can be precise on what the implications are there, and there were two applications: One elongated tasing, one dry stun tasing.

And -- so -- and then the totality of the energy in terms of blows, kicks, et cetera, and then the choke -- any choking of the neck -- the neck is also one other area, and just -- there's a term "carotid restraint" which by law is forbidden, but also can cause, in the training, spasms and respiratory failure, choking and so forth, windpipes and spasms and so forth depending on the person.

So those are all aspects of force I considered very extreme and not necessary in the totality of the circumstance and that combined with the time they had to use verbal skills and de-escalate, the absence of weapons, all of those factored in.

Q   So, Lieutenant, so we established that the degree of force depends on the actions of the suspect, whether the suspect is cooperative, passive, noncompliant, aggressive or combatant, right?

A   Right. And I gave the four categories in the training. This is how an officer gauges, *Okay. What can I do? What's necessary? What's appropriate?*

And it is a very good commentary. It's all

33

different time, so it's just not five officers at one time.

Sustained.  All right, Counsel.

BY MS. MKRTCHYAN:

Q    So you've known from the materials, how many officers were there by the time taser was applied, involved with Holloway on the ground?

A    Well, I know there were three, and I considered that good enough.  You know, it's three on one.  So I considered the taser as a provocative.  That's my term.  Another term is, it's throwing gasoline on the fire.  It's not mitigating the circumstances.  It's not controlling force in this case that's necessary.

You got three guys.  It's not much Holloway can do, in my opinion.

MR. WRONIAK:  Objection.  Irrelevant.  403.  Move to strike.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q    And when they -- you've heard evidence that there is a claim by Renegar that Mr. Holloway placed him in a headlock.

Do you recall that?

A    I saw it in his report and his testimony.

Q    Right.  And that headlock was not corroborated by any of the other officers present.  True?

A    That was my understanding of the reports.

*Deborah D. Parker, U.S. Court Reporter*

104

into that subject.

THE COURT:  Well, the subject didn't come up, Counsel.

Are you making the accusation that this gentleman has falsified a report?

MR. WRONIAK:  No, sir.

THE COURT:  What's your question?

MR. WRONIAK:  I need to indicate that because his version did not match the suspect, it means he did not necessarily write a false report.

MS. MKRTCHYAN:  Beyond the scope, Your Honor.

THE COURT:  Sustained.

MR. WRONIAK:  I'll move on.

BY MR. WRONIAK:

Q    You agree that there are no independent witnesses who saw Deputy Renegar punch Mr. Holloway in the face, correct?

A    Yes.

Q    Deputies Gonzalez and Pahel were the two closest persons to Mr. Holloway when Deputy Renegar first approached him the second encounter, correct?

A    Yes.

Q    And neither -- and you saw in the materials that Deputy Gonzalez says he did not see Deputy Renegar punch Mr. Holloway in the face, correct?

A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

105

Q   He said that didn't happen, correct?

A   I don't know if it didn't happen.  I think he said he didn't see it.

Q   And Deputy Pahel said he didn't see that occur, correct?

A   Correct.

Q   Sir, you would agree that if an officer is attempting to handcuff an individual and a scuffle occurs and a suspect wraps his arm around the officer's head, the officer would be justified in using reasonable force to prevent that from happening, correct?

            MS. MKRTCHYAN:  Incomplete hypothetical.

            THE COURT:  Overruled.  You can answer that question.

            THE WITNESS:  Yes.

BY MR. WRONIAK:

Q   Similarly, you agree that if an officer is attempting to handcuff an individual and a scuffle occurs and the suspect tries to grab the officer's ballistic vest, the officer would be justified in using reasonable force to prevent that from happening, correct?

A   Yes.

Q   Sir, officers don't have to say "you're under arrest" before they can use force on a suspect, correct?

            MS. MKRTCHYAN:  Incomplete hypothetical,

*Deborah D. Parker, U.S. Court Reporter*

112

Assuming that.

THE WITNESS:  It would not be reasonable to punch him in the face.

BY MS. MKRTCHYAN:

Q   Would it be reasonable to hit him in the head multiple times causing bleeding, if a probationer is refusing to go down on the ground?

MR. WRONIAK:  Objection.  Improper opinion.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MKRTCHYAN:

Q   Is it reasonable to taser someone multiple times when that person is face down in a prone position with multiple officers with their body weights on him?

MR. WRONIAK:  Objection.  Irrelevant.  403.

THE COURT:  Overruled.

But is that your understanding that he was on the ground when he was tasered?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

THE WITNESS:  The answer is no.

BY MS. MKRTCHYAN:

Q   So the issue is really not whether he did or did not go down to the ground.  The issue is whether the force was reasonable when it was applied.  True?

*Deborah D. Parker, U.S. Court Reporter*

167

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 9, 2025

_____/s/DEBORAH D. PARKER___
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

JEREMY HOLLOWAY,                      )
                                      )
                  Plaintiff,          )   **Certified Transcript**
                                      )
        vs.                           )   Case No.
                                      )   8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,             )
                                      )
                  Defendants.         )   **DAY 6**
                                      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

**I N D E X**

**WITNESSES**                                                      **PAGE**

**JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan                         5
    Cross-Examination by Mr. Harrell                          149

**EXHIBITS**

**(None offered.)**

**UNITED STATES DISTRICT COURT**

7-RenSER-01421                                    7-RenSER-01421

down like this (indicating) on the ground.  And I'm watching what's going on, trying to figure out what's going on.  I'm still yelling, "I have not done anything wrong," trying to figure out what's going on.

And then I see another officer that wasn't from the first three come and knee me right in the eye, in the temple area of my right side.  And there is a moment where I did pull up my right arm to try to block my -- to save my face.  And you do see blood on my arm from where I was trying to protect my head.

Q    Did you actually feel when you started bleeding from your face?

A    Yes.  And I even say it.

Q    And how did you feel the moment in time when you saw blood?

A    The moment I saw blood, because it was warm and it was in my eye.

Q    And how did you feel when that -- when you saw blood?

A    I was scared.  I'm just trying to -- we're now in life or death.  I'm getting hit in my temple, in my eye.  And -- you know, and then I'm getting kicked everywhere right now, and I'm being held down.  It's like I have -- nothing I can do because I'm being held down and beaten.  I can't do anything.

I'm trying my best to -- so I wasn't fighting.  I was protecting my head.  But everything else I had a large

7-RenSER-01422                                    7-RenSER-01422

officer on my legs, on my calf area. I believe Officer Renegar was on my butt area, lower back. And I had other officers holding my -- arms held out while I had one leaning on his buddy, using leverage to knee me in the head. And I see that until like -- and that's why I'm trying to do that as I'm lying on the ground.

Q    So you did feel actually knee strikes on your head?

A    Yes, I did. And I say it.

Q    Okay. And then -- so after that, did you -- and this was ongoing -- were you actually striking them in any shape or way? Can you strike them?

A    No. I even tell them, "I'm not fighting you." And my words -- the best way to say it is I wasn't fighting them; they were fighting me. They were just -- and then with one officer starting it and officers seeing their other buddies in an altercation, they automatically want to save the other officer. So I become now the victim of -- it's pretty much of just -- it's chaos.

Q    So -- all right. So let's -- going to that moment again. So did you feel the Taser?

A    Yes, I did. I felt it several times.

Q    Okay. And you felt the Taser. And when the Taser was applied, did you feel it -- where did you feel it in your body, the Taser?

A    I felt it in my whole body. So I couldn't have told you

7-RenSER-01423          7-RenSER-01423

A    No.  At any point, no.

Q    When you were face down on the ground, were you kicking with your legs?

A    No.  I was being held down on my legs.

Q    Did you make any movement on the ground?

A    Just when I was trying to save my head from being kicked and kneed.

Q    And how were you moving?  In what way were you moving?

A    Just trying to -- whatever I could do.  Because they're still holding my arm, and I'm just -- I've got my hand about right here (indicating), and it's just blocking the knee strikes.

Q    And this entire thing for you while you are on the ground, how long can you say it was ongoing, that use of force?

A    If you were to ask me that moment, I could have told you maybe an hour.  It felt like -- it felt like a long time.  I was fighting for my life or just -- my life was -- I was held down and beaten.

Q    Now, when officers then brought you up, so now you are placed in handcuffs; right?

A    Yes.

Q    And when you were placed in handcuffs -- even after you were placed in handcuffs, did they actually stop their application of force after you were handcuffed?

A    No.  Also, the guy that was on my legs, he stands on me as

**UNITED STATES DISTRICT COURT**

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES     )
                          )
STATE OF CALIFORNIA       )

                I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 10, 2025*

                                  */S/ DEBBIE HINO-SPAAN*

                                  *Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 7, Volume I |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01426          7-RenSER-01426

```
                        I N D E X


  PLAINTIFF'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

   JEREMY HOLLOWAY                   19     133
                                     97
                                    111
```

*Deborah D. Parker, U.S. Court Reporter*

120

A    No.

Q    Did you have a phone number on the date of the incident?

A    No.

Q    Did you provide a phone number to the register for the campers?

A    No.

Q    Now, the second encounter, you claimed that you're standing there, arms out saying, "I'm not moving," and Deputy Renegar just runs up and punches you in the face, correct?

A    That is correct.

Q    Is that the first thing that you claim Deputy Renegar did to you?

A    I believe that when they were yelling and he didn't think that I got down fast enough for him, he punched me in the head.

Q    So the first thing Deputy Renegar does, according to you, is runs up and punches you in the face?

A    Like I said, I'm looking around, and I hear people yell, "Get down on the ground.  Tase him," and I believe those are the words that are being said.  I was just looking at everybody, watching, just for my safety.

Q    Sir, the first thing, according to you, that Deputy Renegar does as he approaches you is run up and punch

156

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 10, 2025

_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                    )
                                    )
                    Plaintiff,      )   **Certified Transcript**
                                    )
        vs.                         )   Case No.
                                    )   8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,           )
                                    )
                    Defendants.     )   **DAY 9, VOLUME I**
                                    )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TUESDAY, MAY 13, 2025
8:02 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

4

# I N D E X

**WITNESSES**                                                               **PAGE**

**CHAD MATTHEW RENEGAR, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan (continue)    5
    Cross Examination by Mr. Wroniak           119

## EXHIBITS

**(None offered.)**

**UNITED STATES DISTRICT COURT**

7-RenSER-01431                                      7-RenSER-01431

MR. WRONIAK: Objection. Argumentative.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: Again, I notified our sergeant, and you hear that on PVS -- or the audio recording.

BY MS. MKRTCHYAN:

Q    And when you talked about this headlock, as we covered this yesterday, to Sergeant Rawlings, you told him before you went down to the ground, Mr. Holloway placed you in a headlock. You said it; true?

A    I believe that's what I said, yes.

Q    On your report it appears completely different story as we covered it. Let's go back to your report for a moment. You said --

MS. MKRTCHYAN: Let's please pull up the report. Thank you.

BY MS. MKRTCHYAN:

Q    You wrote here, "Jeremy began to go to the ground but continued to pull away from me." Then you jump. We don't hear any indication here how you went down to the ground.

Then you wrote:

"Once Jeremy and I were on the ground, Jeremy was able to pull his arm away from me. Jeremy then rotated his body towards me on the ground and attempted to grab ahold of my ballistic vest.

7-RenSER-01432                              7-RenSER-01432

Jeremy was unable to grab onto my vest. Jeremy then wrapped his left arm around my head, squeezing his arm, preventing me from pulling my head free."

Did I read it accurately? Is this your report, sir?

A    Yes, that's my report.

Q    So, first of all, I would like to bring your attention to something. There is a jump here. You say:

"I placed my right hand and forearm on Jeremy's left triceps and attempted to push his arm in downwards motion in order to take Jeremy to the ground."

Then you write:

"Jeremy began to go down to the ground but continued to pull away from me."

And then you jump. We don't see any information how you guys went down to the ground. And then you wrote, "Once Jeremy and I were on the ground," then this headlock occurred; true?

Did I describe the chronology of your report and chronology of this use of force accurately based on your report, sir?

A    I don't understand what you mean by "jump."

Q    Well, is there any indication after the sentence, you said, "He pulled away from me." And then you wrote, "Once Jeremy and I were on the ground." There's no indication how

7-RenSER-01433                    7-RenSER-01433

you went down to the ground. Was it by your force that he went down to the ground or he did something to go down to the ground, or some other officer did something to get you on the ground; true? True?

MR. WRONIAK: Objection. Vague. Compound.

THE COURT: "There's no indication how you went down to the ground. Was it by your force that he went down to the ground or did something you did go down to the ground, or other officer did something to get you on the ground?"

Do you understand the question?

THE WITNESS: No.

THE COURT: All right. Repeat it, Counsel.

BY MS. MKRTCHYAN:

Q Based on your report, we don't know how you went down to the ground because you wrote, "He pulled away from me after I grabbed his arm," and then "Once Jeremy and I were on the ground," there is no information how you went down to the ground based on your report; true?

A Also if you read above where you highlighted, it says:

"Deputy Gonzalez attempted to gain control of Jeremy's right arm to assist me in taking him down to the ground."

Q Well, okay. We know that, that Gonzalez was assisting. That's not in dispute. We know Pahel was assisting. That's not in dispute. We are talking about how you were writing your

7-RenSER-01434                    7-RenSER-01434

report, how this use of force occurred. Are we clear, my question?

MR. WRONIAK: Objection. Argumentative.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q So it doesn't say that Gonzalez took him down to the ground; right? When you write "I grabbed his arm. He pulled away from me," it doesn't say Gonzalez took him down to the ground or Pahel. It just then says -- jumps, "Once Jeremy and I were on the ground"; true?

A Again, I don't understand what you mean by "jump." The whole action is taking him to the ground using the arm bar takedown.

Q Okay. But based on this report so far we read, it appears to us that you guys were down on the ground and then he rotated his body on the ground and then somehow placed you in this hypothetical headlock; true?

MR. WRONIAK: Objection. Argumentative.

THE COURT: Just a moment. Overruled.

You can answer that question.

THE WITNESS: It's the whole use of force in total, trying to take him down to the ground using the arm bar, and we ended up on the ground.

BY MS. MKRTCHYAN:

Q We are talking about the headlock, sir. The way you are

7-RenSER-01435                                                  7-RenSER-01435

Q     Okay.  Isn't it true you described it completely differently to Mr. Beck, the same attorney who was asking you questions at deposition, when you said -- you, in fact, indicated that Mr. Holloway had contact, had grabbed you of your ballistic vest?  Remember that?

MR. WRONIAK:  Objection.  Improper use of the deposition.

THE COURT:  Overruled.

THE WITNESS:  I believe I said that in my deposition.

BY MS. MKRTCHYAN:

Q     So one place you say he didn't -- "He wasn't able to grab ahold of my vest."  Another time you say he was able; true?

A     Yes.

Q     Okay.  And you claimed you had to punch him, as we've heard, in the abdomen several times with full fist -- closed fist that you described to free yourself from this headlock; true?

A     Yes.  And you hear that on my PVS when I hit him.

Q     Well, okay.  If the claimed headlock never happened, there would have been no reason to hit him in the rib cage area that many times with a closed fist; true?

MR. WRONIAK:  Objection. Speculation. Legal conclusion.

THE COURT:  No, this is from his state of mind.

UNITED STATES DISTRICT COURT

get him under control.

BY MS. MKRTCHYAN:

Q    "Actively resisting."  And that term we already discussed with Sergeant -- no, Lieutenant Clark; right?  We discussed what is active resistance; true?

A    You did talk to him about that, yes.

Q    Okay.  And we asked the same question to Deputy Gonzalez, "What is active resistance in your law enforcement jargon?"; true?

A    I believe so.  But there is one day of his testimony I wasn't here for.

Q    Okay.  So you're aware -- you were not here when Deputy Gonzalez testified?

A    One of the days I was.  The other day I wasn't.

Q    In any event, he was face down, you said that, at the time the Taser was applied; right?  That's what you said.

A    I believe so, yes.

Q    And there were, at the very least, three officers around him and more arriving.  We know that from the patrol vehicle recordings; true?

A    That is correct.

Q    And you found it necessary to Taser him; true?

A    Yes, because he was still struggling, preventing us from getting him handcuffed.

Q    So you're telling us that it was -- it took five officers

7-RenSER-01437                                    7-RenSER-01437

to place handcuffs on this one man; true?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  It's also been asked and answered, Counsel.

You can answer it one more time, sir.

THE WITNESS:  At the conclusion of the use of force, it took five of us to get him handcuffed, yes.

BY MS. MKRTCHYAN:

Q    Okay.  And you know about your Taser and when to use the Taser; true?

MR. WRONIAK:  Objection.  Relevance.  403.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I do.

BY MS. MKRTCHYAN:

Q    You are trained to apply the Taser, under what circumstances to apply; true?

A    I am.

Q    Yes?

A    Yes.

Q    Okay.  Isn't it true you're allowed to use the Taser when someone is violent or aggressive towards you?

A    That is one of the parameters that we're allowed to use it for.

Q    Are you allowed to use the Taser when someone is

**UNITED STATES DISTRICT COURT**

7-RenSER-01438     7-RenSER-01438

You were the only officer who used a Taser on him; true?

MR. WRONIAK: Objection. Argumentative. Compound.

THE COURT: I'm going to instruct you as follows. I've indicated to counsel outside your presence the following: This Court holds that the initial use and drawing of the Taser did not violate department policy. But the fact that the individual was tased is presented to you, the jury, in evaluating the reasonableness of the officers' actions after the initial tasing. And I'll reinstruct you on that again. Let me read that to you again:

"This court holds that the initial use and drawing of the Taser did not violate department policy. But the fact that the individual was tased is presented to you, the jury, in evaluating the reasonableness of the officers' actions after the initial tasing."

Now, Counsel, you can ask your question.

MS. MKRTCHYAN: Let's continue playing this.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    So at 5:03:52, we've heard so far him screaming, "I haven't done anything. I'm bleeding." And right after that, when he says "I'm bleeding," you use the Taser warning. You say, "Taser, Taser, Taser"; true?

A    Yes. Because he's still actively resisting and fighting

7-RenSER-01439                                    7-RenSER-01439

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    When you say "We couldn't confirmed if that happened or not.  We don't have a crime to begin with," that's related to this incident and no other incident; true?

A    Yes.  I didn't know we were arguing that.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q    And this is, again, Pahel's second time on this tape telling you that no one saw anything.  Witnesses only heard something, and he was just storming around asking -- telling "Who called the cops on me?"; true?  That's what he says.

A    That's what he says at this point.  But, again, the totality of the circumstances, we are told, as we're going back, that he was in somebody's RV and a little girl -- that's what we were going on as we went back to the campground the second time.

Q    Well, sir, we've covered this.  You are trained as an officer -- peace officer to investigate calls.  You don't just go by the calls because if I get a false 911 call or incomplete or inaccurate 911 call, it's the duty of the officer to check on that; true?

            MR. WRONIAK:  Objection.  Incomplete hypothetical.  Legal conclusion.

            THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

7-RenSER-01440                                    7-RenSER-01440

Q     So, again, you tell your Sergeant Rawlings that he's on formal probation, not on informal probation.  Why do you keep telling everyone he's on formal probation?  Why do you keep telling them misinformation when you already learned he's on informal probation?

MR. WRONIAK:  Objection.  Argumentative.

THE COURT:  Sustained.

Just restate the question, Counsel.

BY MS. MKRTCHYAN:

Q     Well, by this time you testified --

THE COURT:  No, Counsel, you can restate the question.  Just don't make it compound.  You can restate the question.

BY MS. MKRTCHYAN:

Q     Why do you tell Sergeant Rawlings he got on formal probation when you already learned he's on informal probation by this time, sir?

A     Because I'm not sure if it's at this time that I know he's on informal or formal or not.

Q     Well, that's part of the records check; right?  When you do records check -- are you telling us that, when you do records check, you get misinformation?

A     No, that's not what I'm saying at all.  I'm saying, like I stated earlier, when I did it, in the record checks I saw he was convicted of a felony.  At that time, if you're convicted

UNITED STATES DISTRICT COURT

of a felony, most of them are formal probation, and I just went with that.

Q    So you assumed he was on formal probation?

A    That's because we see "probation" on it, and he's convicted of a felony at that time.  Most people that are convicted of a felony automatically get formal probation at that time.

Q    So -- but you -- as a police officer, you don't talk about speculations.  You talk -- you don't talk about assumptions.  You talk about actual facts; true?  When you are telling your sergeants and other deputies, you need to talk about actual facts; true?

          MR. WRONIAK:  Objection.  Vague.

          THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    What does it do to you when you are telling everyone -- to your credibility when you are telling everyone he's on formal probation, enhancing his exposure?

          MR. WRONIAK:  Objection.  Argumentative.

          MS. MKRTCHYAN:  Excuse me.  I didn't finish.

BY MS. MKRTCHYAN:

Q    When you're enhancing his criminal exposure by telling everyone that he's on probation, formal probation?

          MR. WRONIAK:  Objection.

          THE COURT:  Just a moment.

7-RenSER-01442                                    7-RenSER-01442

BY MR. WRONIAK:

Q   Good morning, sir.

A   Good morning.

Q   Did you attend college?

A   I did.

Q   Where at?

MS. MKRTCHYAN:  Objection.  Relevance.

THE COURT:  I'm sorry?

MS. MKRTCHYAN:  Relevance.  Why is his --

THE COURT:  No, overruled.  I've let the background of Mr. Holloway come in.  I'm going to allow some background concerning each of the officers.  Overruled.

THE WITNESS:  I have a bachelor's degree from Cal State Fullerton and master's degree from Arizona State.

BY MR. WRONIAK:

Q   Are you married?

MS. MKRTCHYAN:  Objection, Your Honor.  That's just not relevant.

THE COURT:  Overruled.

THE WITNESS:  I am.

BY MR. WRONIAK:

Q   Do you have kids?

A   Yes, I have two boys and a girl.

Q   How old are they?

A   Five, four, and almost two.

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES    )
                                                  )
STATE OF CALIFORNIA      )

            I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

COURT REPORTER, in and for the United States District Court for

the Central District of California, do hereby certify that

pursuant to Section 753, Title 28, United States Code that the

foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter and that the transcript page format is in

conformance with the regulations of the Judicial Conference of

the United States.


*Date:  May 13, 2025*




                        */S/ DEBBIE HINO-SPAAN*

                        *Debbie Hino-Spaan, CSR No. 7953*
                        *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01444                                    7-RenSER-01444

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 9, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 13, 2025

12:16 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

I N D E X


DEFENDANTS' WITNESSES:     DIRECT   CROSS   REDIRECT   RECROSS

 CHAD MATTHEW RENEGAR                 10

 MARTIN RAMIREZ                18      40
                              33



E X H I B I T S

PLAINTIFF'S EXHIBITS:                    IDENTIFICATION   EVIDENCE

 243-1 Unredacted Version of                  47
       Ramirez Memo re Onwuka
       Incident


E X H I B I T S

DEFENDANTS' EXHIBITS:                     IDENTIFICATION   EVIDENCE

 243   Ramirez Memo re Onwuka                                24
       Incident


*Deborah D. Parker, U.S. Court Reporter*

31

me.

Q   And in the second paragraph, this -- is this with regard to your investigation of the allegations that occurred outside the cell?

A   That is correct.

Q   And would that have been on the video?

A   On the overhead camera, yes.

Q   Okay.  And this is in regard to the allegation that Mr. Onwuka was grabbed by the hair and struck in the face numerous times?

Is that what this paragraph is regarding?

A   Yes.

Q   And what was your conclusion with regard to the investigation of those allegations?

A   I did see him clinching up on the video when they were escorting him out.  And I saw that Deputy Renegar had taken him by the arm and the shoulder and had taken him to the ground.

I saw that Deputy Phillips came over to help him, assist him with the resistance that Onwuka was taking.  They take him to the ground.  They handcuffed him.  And then they escorted him out of the cell.

I looked at the allegations of Mr. Onwuka's hair being pulled, and I didn't see that at all.  As a matter of fact, Mr. Onwuka was wearing a T-shirt over his hair, and I

*Deborah D. Parker, U.S. Court Reporter*

32

didn't see the allegations that were made that Deputy Renegar had punched Onwuka in the face.

Q    So when you reviewed the video, you did not find support for the allegation that Deputy Renegar punched the inmate in the face; is that right?

A    Yes.

Q    As part of your investigation, did you interview Deputy Renegar?

A    Yes.

Q    And to refresh your recollection, this is the bottom of page 3 of 7, the top of page 4; is that right?

A    That's correct.

Q    What was the purpose of interviewing Deputy Renegar?

A    As part of the investigation, it's my job to make sure that I interview all the -- all the people that were involved in this incident.

Q    And, sir, can you describe what you learned as part of your investigation when you interviewed Deputy Renegar?

A    When I read the reports -- when I read the report that he wrote and I saw the overhead video, I found that his report was consistent with the observations of the video.

He described Onwuka's behavior inside the cell as cooperative.  And that's what I observed.  That's why there was no use of force inside the cell.

He told me that Deputy [sic] Onwuka was being

*Deborah D. Parker, U.S. Court Reporter*

based it on the report that he wrote. I based it on the overhead video that I saw. I based it on Inmate Onwuka's statements. I based it on the J-119 -- on all the information that was available to me.

Q   And looking at the fifth paragraph under that section where it says "After reviewing the video...," do you see that?

A   Yes.

Q   Did you make a determination whether Deputy Renegar punched Onwuka in the head?

A   Yes, I did.

Q   And what did you determine?

A   I determined that that did not happen.

Q   How did you come to that conclusion?

A   By reviewing the video.

Q   And did you make a conclusion that Deputy Renegar did not use excessive force?

A   Yes, I did.

Q   Do you recall in your investigation a discussion with another inmate, Mr. Ceja?

        Did you see any information on Mr. Ceja's statements?

A   I --

        MS. MKRTCHYAN: Objection. Vague. Vague. Where are we talking about?

*Deborah D. Parker, U.S. Court Reporter*

108

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 16, 2025

                    /s/DEBORAH D. PARKER
          DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, ) | |
| ) | |
| Plaintiff, ) | **Certified Transcript** |
| ) | |
| vs. ) | Case No. |
| ) | 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., ) | |
| ) | |
| Defendants. ) | **DAY 10, VOLUME I** |
| ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

7-RenSER-01451                              7-RenSER-01451

4

**I N D E X**

**WITNESSES**                                                    **PAGE**

**KENDALL WAGNER, M.D., CALLED BY THE DEFENDANTS**
    Cross-Examination by Ms. Mkrtchyan                             6

**BRIAN FUERBACH, CALLED BY THE DEFENDANTS**
    Direct Examination by Mr. Harrell                            24
    Cross-Examination by Ms. Swiss                               52
    Cross-Examination by Ms. Mkrtchyan                           53
    Redirect Examination by Mr. Harrell                         117
    Recross-Examination by Ms. Mkrtchyan                        122

**CHAD MATTHEW RENEGAR, CALLED BY THE PLAINTIFF:**
    Direct Examination by Mr. Wroniak                           130

**EXHIBITS**

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 39 | Deputy Johnston's report | 122 | |

**UNITED STATES DISTRICT COURT**

7-RenSER-01452                                    7-RenSER-01452

52

A    No.

Q    Prior to this incident, did you have some type of grievance with Mr. Holloway where you wanted to get him in trouble for no reason?

A    No.

Q    Did you tell the truth on the 911 call?

A    Yes.

Q    Have you told the truth here?

A    Of course.  Yes.

Q    Sir, thank you for coming.  I have no further questions.

**CROSS-EXAMINATION**

BY MS. SWISS:

Q    Just briefly, sir.  On the second encounter, did you see any member of law enforcement go up and punch Mr. Holloway in the face?

        MS. MKRTCHYAN:  Lacks foundation.

        THE COURT:  I'm going to sustain that.  I want to know more about what his view was, what he could see, Counsel.

BY MS. SWISS:

Q    Sir, on the second encounter, did you observe anything through the window of your RV when law enforcement was at Mr. Holloway's campsite?

A    Yes.  We watched the entire situation unfold.

Q    And when you were watching outside of your RV, did you see any member of law enforcement punch Mr. Holloway in the

7-RenSER-01453                                    7-RenSER-01453

face?

A    No.

Q    Thank you.  No further questions.

THE COURT:  Then cross-examination.

MS. MKRTCHYAN:  Sure.  Thank you.

**CROSS-EXAMINATION**

BY MS. MKRTCHYAN:

Q    Sir, we have met before, didn't we, many times before?
We've met before?

A    You and I?

Q    Yes.

A    I wouldn't say "many times."  I've spoken with you.

Q    Okay.  Sir, you've testified at a deposition; true?

A    True.

Q    Prior proceedings?

A    Yeah.

Q    Okay.  So now, you are giving -- you also spoke with
police on the night of this very incident; true?

A    Yes.

Q    You spoke to them twice on the night of the incident;
true?

A    Yes.

Q    You spoke to them couple of weeks after the incident --
true? -- in 2018?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    But you still prepared the new report?

A    Yes, because at the time what the sergeant was telling us, it made sense.

Q    And do you regret creating that new report?

A    Yes, because it almost ruined my career.

Q    How so?

A    I was investigated and charged by the Orange County DA's Office.

Q    And then you pled guilty to a misdemeanor for willfully and unlawfully omitting to do a legal duty required of you as a peace officer; correct?

A    That's correct.

Q    Were you sentenced as a result of that?

A    I was.

Q    Did you perform all the terms of your sentence?

A    I did.

Q    So you've taken responsibility for your actions; correct?

A    Yes.

Q    Now let's turn your attention to the incident that's actually the subject of this, the one that occurred on January 21, 2018.  Okay?

A    Okay.

Q    What was your shift that day?

A    I worked night shift.  So it started at 6:00 p.m. and went to 6:30 in the morning the next -- the following day.

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  May 14, 2025*

                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**

7-RenSER-01456                                    7-RenSER-01456

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,                          )
                                          )
            PLAINTIFF,                     )
                                          )
       vs.                                ) SACV NO. 19-01514-DOC
                                          ) Day 11
                                          )
COUNTY OF ORANGE, et al.,                 )
                                          )
            DEFENDANTS.                    )
_____   )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 16, 2025

8:04 A.M.


**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01457                                   7-RenSER-01457

I N D E X

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK BORBA | 6 | 22 | | |
| | | 24 | | |
| | | 111 | | |
| KEVIN PAHEL | 136 | 165 | | |
| | | 166 | | |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 37   Supplemental Report<br>Mark Borba, 01/23/2018 | | 74 |

E X H I B I T S

| DEFENDANTS' EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 35-4  Deputy Pahel's Arrest<br>Report of Incident | | 138 |
| 102-13 Patrol Vehicle System,<br>Video/Audio, Deputy Mark<br>Borba | | 8 |

*Deborah D. Parker, U.S. Court Reporter*

17

which is Station 91, so I was requesting medical for Mr. Holloway.

Q    And we hear on your PVS, you say something to the effect, *Make sure there's no knives on hand.*

Did you hear that?

A    I did.

Q    And why did you say that?

A    Some time had elapsed from the first contact with Mr. Holloway due to the nature of his agitated state and the weapons and knives we had already located on scene during the first call.  And the time that had elapsed, it could have gave him an opportunity to arm himself with one of the weapons, so I wanted to make sure that he was unarmed.

Q    At some point in your audio, we hear you say something to the effect of *I think I went airborne.*

Why did you say that?

A    I think I went over one the aggressive speed bumps like 45 miles an hour.

Q    During the incident where Mr. Holloway was subdued, did you see anyone punch Mr. Holloway in the face?

A    No.

Q    Did you see anyone knee Mr. Holloway in the head?

A    No.

Q    Approximately how many hours of use-of-force training

*Deborah D. Parker, U.S. Court Reporter*

166

Q    And Deputy Renegar is the first one to approach Mr. Holloway to go hands-on; is that correct?

A    Yes.

Q    Before Deputy Renegar went hands-on with Mr. Holloway, did he punch Mr. Holloway in the face?

A    No.

         MR. WRONIAK:  No further questions.

         THE COURT:  Then let's take a recess, counsel, until -- for 15 minutes.  And we'll come back and get you about 2:41, okay?

         Please don't form or express any opinion concerning this case.  And have a good recess.

         Counsel, 15 to 20 minutes.  Go use the restroom.

    *(Recess taken from 2:32 p.m. to 2:49 p.m.)*

    *(The following proceedings were had in open court in the presence of the jury:)*

         THE COURT:  Thank you very much.

         We're back in session.

         All parties are present.  Counsel are present. Deputy Pahel is present.

         This would be cross-examination.  Thank you.

                    CROSS-EXAMINATION

BY MS. MKRTCHYAN:

Q    Okay, sir.  Good afternoon.

A    Good afternoon.

*Deborah D. Parker, U.S. Court Reporter*

170

Whatever you did under this circumstances, will that have been appropriate to knee Mr. Holloway in the head repeatedly?

A    No.

Q    Okay.  Well, would it have been appropriate to punch him in the head?

A    No.

Q    Would it have been appropriate to strike him to his face?

A    No.

Q    Okay.  Now, you are denying that that happened.  True?  All of you?

A    Correct.

Q    And in your report -- let's look at your report.  This is Exhibit 30-something -- 35, I believe.

          MS. MKRTCHYAN:  Your Honor --

          THE COURT:  It's fine.  You can continue on.  I'll get the number.  35-4.

BY MS. MKRTCHYAN:

Q    So let's look at your report, sir.  It's recently true, right?

          I mean, you looked at recently prior to your testimony?

A    Yes.

Q    Okay.  So just to recap, you wrote that -- upon my

*Deborah D. Parker, U.S. Court Reporter*

249

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  May 19, 2025



                              /s/DEBORAH D. PARKER
                         DEBORAH D. PARKER, OFFICIAL REPORTER


*Deborah D. Parker, U.S. Court Reporter*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,                  )
                                  )
          PLAINTIFF,        )
                                  )
       vs.                 ) SACV NO. 19-01514-DOC
                                  ) Day 13, Volume I
                                  )
COUNTY OF ORANGE, et al.,     )
                                  )
         DEFENDANTS.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 20, 2025

8:11 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01463                                  7-RenSER-01463

4

I N D E X

CLOSING ARGUMENT:                                          PAGE

      By Ms. Mkrtchyan                                       34

      By Mr. Wroniak                                         86

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01464                                    7-RenSER-01464

45

(The audiotape was played.)

MS. MKRTCHYAN: You can hear the screams of Holloway and the Taser clicks third time.

(The audiotape was played.)

MS. MKRTCHYAN: 5:04:07. So this is about three times we can tell on this tape that he's tasered. They claim it was twice.

How is it that we hear clicks and him screaming?

(The audiotape was played.)

MS. MKRTCHYAN: So how many times this guy says, "There's blood. It's on my head."

And they're going to keep denying that they hit him in the head? They're going to keep denying it.

Let's hear Pahel's tape, how he complains. Pahel's tape. This is in evidence.

(The audiotape was played.)

MS. MKRTCHYAN: This is better sounds of him complaining on 5:03:27 seconds: "You're kneeing me in the head."

This is contemporaneous and independent evidence of what happened on that night.

(The audiotape was played.)

MS. MKRTCHYAN: 5:03:49. You hear another complaint: "You hit me in the fucking head. I'm bleeding." So don't let them blow falsification. It's a falsehood to

*Deborah D. Parker, U.S. Court Reporter*

Here it's 53 seconds. On Renegar's and Pahel's tape, it's about 48 seconds. I'll show it to you in a moment. So this is a little bit slower. This is not in sync with Pahel's and Renegar's tape. So when this arrived -- this deputy arrived to the scene, this man was screaming, *You hit me in the head. I'm bleeding.* And Taser is applied at that point. So he's trying to claim he had absolutely nothing to do with any use of force is another falsification. Another falsification.

(*The audiotape was played.*)

MS. MKRTCHYAN: Okay. You see. When Holloway is [sic] growling from pain, that's the Taser application. That's the Taser getting applied on him. He's growling -- pain. So the Taser is applied here. You can hear on Gotts' tape very well that he's tasered multiple times while Gotts is there by his own admission placing his knee on the back. Really? You think that was just like innocuous, placing his knee on his back? How did he get his pants bloodied?

No, he came in and struck him with his knee. That's what happened. Because if he's on his back, he was not going to get blood on his uniform. And, of course, he's going to deny that he had blood on his uniform.

So they just hope that they're going to believe -- you're going to believe them, and that's it. That's the end of the story. Let's, you know, cover this under the rug in

*Deborah D. Parker, U.S. Court Reporter*

56

course, Renegar is going to lie, because he's lied before. He has a vested interest to justify his use of force. He's the only one who used the Taser. No one else there to use the Taser, and he used it multiple times. Not just once. This guy is basically out of control. He's overreacting, you know. Is that a reasonable police officer?

We're looking at it from the state of what is reasonable. Is that reasonable for someone to come and attack someone when you haven't even investigated what crime he has committed? Falsification 5. This is not ending. This is continuing. They say he was tucking his arms underneath him, not giving up his arms.

Ladies and gentlemen, Pahel, Borba, Gotts have exactly same story about this. I was not -- there were time limits in court. I couldn't, in fact, go into that. But let me show you their police reports, and you can see how this is preposterous. They're basically trying to tell us *Oh, look, we did exactly same thing. This man was not giving his arms.*

Just nonsense. Same scenario. Same exact scenario is given both -- all three officers.

(Pause.)

MS. MKRTCHYAN: I need to open up these reports. As you can see, I have technical issues with using this screen, because sometimes when you open something you can

*Deborah D. Parker, U.S. Court Reporter*

60

investigate.  They needed to take injuries of his --
photographs of his injuries.  They didn't.  So if this man
didn't take photos of his own injuries, they would be doing
a lot more falsifications here.

So they exactly the same scenario minimizing.  Why
this is happening?  Because they are minimizing use of
force.  They are minimizing it.  Because body weight with
control hold, you know, is the most minimal use of force.
And no one is going to admit that they hit him in the head.

We looked at the police reports.  And then they
say Holloway was kicking with Renegar with legs, justifying
Taser.  Well, Gonzales did not say that.  He's there he
didn't see that.  He said on direct exam, Holloway was
passively resisting on the ground.  Did not see him punch or
strike anyone.  He also said, *I didn't use the Taser.*
Meaning, I didn't use the Taser.  Renegar used the Taser.  I
didn't find it necessary.  So you can't get control of this
unarmed disabled man on the ground -- five officers -- and
you have to use the Taser?

No, that was malicious.  That was malicious.  And
Holloway is in the face-down position.  This is not a
position of advantage to kick at anyone.  He was barefoot.
You saw how he was taken, pulled from the ground in Pahel's
tape.  This man was pressed on the ground by the force of
multiple officers, hefty officers with their uniforms, with

*Deborah D. Parker, U.S. Court Reporter*

72

life when those in power abuse that authority? How can we have pursuit of happiness when those in power we have given that much power? We have given them guns. We have given them power over us to arrest us. How are we going to live our lives if we entrust our lives to them, and they abuse it?

This officers had to restrain themselves. This officers had to use their proper judgment. They have training. They received hours of training.

This man had issues. He had psychological issues. He was on anxiety medications. They are trained to deal with difficult people. They are trained to deal with even mentally sick people. There are people who have serious mental health problems. They are trained. And they -- basically, what they did was to pick on the weak one. Pick on the weak one on that campground. They thought he might be homeless. It was clear to them, because he has two tents with lots of supplies. They searched him the first time. They saw his stuff there. They knew he's homeless. They thought, oh, what are the chances that he's going to actually take us to federal court? What are the chances?

This is why it's not about Mr. Holloway. Today it's about this homeless veteran. Tomorrow it's going to be one of us.

MR. WRONIAK: Objection. Argumentative. Improper

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01469          7-RenSER-01469

75

memo.  That didn't happen.  But he falsified that to justify the use of force.

I'm asking you to think about assessing punitive damages against this officer, especially Renegar but also Gotts.  Why is he denying his blood on his uniform?  Why?  You could have just said, *Yes, I came.  I got involved. Accidentally, I have blood on my uniform and my hands.*

They are denying because they don't want to admit that they hit him in the head.  So punitive damages is to deter so that if we as a society do not have the same kind of situation.  I ask you to issue punitive damages against each officer in the amount of at the very least $30,000. That I'm asking you, personally, because this is so outrageous to me as a citizen.  You don't come to court and try it bring your falsifications here and try to do, what? What are you trying to do?  This is the integrity of this justice system.  They are bringing their falsehoods and trying to make you believe that?  I think that's outrageous to me, because this Holloway -- today is Holloway.  Tomorrow it's going to be someone else.

MR. WRONIAK:  Objection.  Improper.

THE COURT:  Overruled.

MS. MKRTCHYAN:  And there's malice.  There's malice here.  There's reckless disregard here.  Because they know what they did.  And they're denying him -- they are

*Deborah D. Parker, U.S. Court Reporter*

76

denying, you know, striking in the head. So I ask you, please, you know, whatever you decide to compensate Mr. Holloway -- I give you a lot of -- I trust that you will be able to come to a number with the pain and suffering.

But punitive damages is critical, because we need to make sure that we say to this officers, *You do not dare to do that again. You do not dare to lie under oath. You do not dare to lie on police reports,* okay?

Because we as a society will perish. Society will perish. We'll perish. American justice system will not survive if we have officers, people entrusted with law who lie. We cannot handle that. We will collapse. There are many countries in the world who have collapsed because they did not --

MR. WRONIAK: Objection.

MS. MKRTCHYAN: -- their rights.

MR. WRONIAK: Objection. Improper.

THE COURT: Overruled.

We have -- we live in America. Why do we live in America?

Why people like us came from another country to live in America? There's a reason behind it. How many people from the world, all over the world like me, came to this country? Why? Because we believe in the Constitution. Because we believe in the integrity of the legal system, law

*Deborah D. Parker, U.S. Court Reporter*

77

and order.  We believe.  My -- my dad was a police --

MR. WRONIAK:  Objection.

THE COURT:  Overruled -- just a moment.  My apologies.  Sustained.

Sustained.

MS. MKRTCHYAN:  We believe in the integrity of law enforcement.  But when one officer lies, every one else goes down the drain.  It leaves a trace.  It's, basically, like a pebble you throw into a lake.  It's not going -- it's going to go and reverberate.  And it's going to make the lake, you know, dark and that lake is not going to be pure anymore.  We need to vigilantly guard this because otherwise, we're going to turn into a tyranny.  We're going to turn into a tyranny by those who have power.  They have grounds.  What about our rights as the people?

We have decided this is government of the people.  Not by the police officers, not by the -- those in power.  It is extremely disturbing to have an officer we give that much power to lie and do this kind of -- on the weak person.

So we need to send a clear, long message, ladies and gentlemen, to officers --

(Overtalking:  Unable to report.)

MR. WRONIAK:  Objection.  Improper.

MS. MKRTCHYAN:  Before --

MR. WRONIAK:  Move to strike.

*Deborah D. Parker, U.S. Court Reporter*

78

THE COURT:  Sustained.

MS. MKRTCHYAN:  -- this is going to be deterrent effect.  You will hear the jury instruction which says why punitive damages are assessed is to deter.  It's to deter this conduct.  And, you know, we have -- if we are going to let this injustice from this court remain, remain untouched without any accountability, what is that going to do to the rest of us?

Because injustice to one is injustice to everyone.

So let's look at the verdict forms here.  What I'm going to ask you to do when you go back, you're going to have this verdict forms printed [sic] to you.  You're going to choose a foreperson who will help you and foreperson, of course, decides how to organize everything.  But everyone I want to -- I want everyone to deliberate.  I want everyone to voice their opinions.  I want you to please look at the exhibits.

Here's the special verdict that you will get:  We, the jury, in the above-entitled action, render the following findings of fact by this verdict.  First question: Deputy Jameson Gotts use excessive force on plaintiff, Jeremy Holloway?

You say "Yes".  All of you unanimously, you have to be unanimous.

No. 2:  Did Deputy Chad Renegar use excessive

*Deborah D. Parker, U.S. Court Reporter*

81

so that's -- you know, he's allowed to ask questions.

Right to reasonable self-defense against excessive force by peace officers. If Mr. Holloway on that ground believed even that he's going to face death, he had the right to make movements to protect himself. He testified that the only thing he was doing is to cover his head with his arm -- right arm. And they are claiming, *Oh, he was not giving his arms.* Are you serious? He has the right to self-defense himself against the blows to his head. And that's how he's got his sleeves blood-stained.

Probation. They're going to say, *Oh, he waived his Fourth Amendment rights.* Nope, that's not what the law says. The law says the fact that plaintiff -- this is your jury instruction -- was on probation does not legally amount to a waiver of his Fourth Amendment rights. Think about it. If I am placed on probation with search and seizure terms, does that entitle this officers to assault me? Does that entitle them to attack me and use excessive force?

No. And, you know, so it's -- that's -- Probation is irrelevant as to excessiveness of the force. Probation allowed them to search him, but they didn't come second time and say, *Mr. Holloway, you know what? We've heard calls, again, on you. We want to search.*

You know, they came with guns drawn. Told him, *Get down on the ground,* no questions asked. What kind of,

*Deborah D. Parker, U.S. Court Reporter*

82

you know -- what kind of a system we have?  Today they're going to tell us *Get on the ground* and then they will Taser us.  Tomorrow they will shoot us, if we don't get down on the ground.  Is that what we want from our police officers?

What crime did they investigate?  Think about it. Disturbance of the peace, uncorroborated 911 calls in the dark campground.

First call is unreliable.  They come.  They don't find a female.  Why are picking on this homeless guy?  Why are they picking on this homeless guy?  Oh, because they didn't like his attitude.

Well, ladies and gentlemen, so far as we know in this country, attitude does not entitle them to beat you up, so --

And then the excessive force instruction, it will give you guidelines in the determining what officers -- what are the circumstances?  You need to consider extent of plaintiff's injury, availability of alternative methods to take the plaintiff into custody and subdue plaintiff.

I asked Lieutenant Clark -- this is a, you know, veteran from LA County Sheriff's Department.  I asked, *Are there any other ways to put him into custody?*

Sure.  They could have told him, *Place your hands behind your back.  I'm going to handcuff you.*  There are

*Deborah D. Parker, U.S. Court Reporter*

84

desperation.  Laundry list of excuses.

Did you see they didn't even bring their toxicologist, Dr. Clark.  They said -- because I had the first witness, Dr. Okorocha, who testified that Trazodone, marijuana had no impact, could not have had an impact on someone who had used it for awhile.  Did they bring their toxicologist to desperately argue that, *Oh, Mr. Holloway might have been under the influence of this legally prescribed medications and marijuana and, therefore, he does not remember what happened.*

Did they bring their toxicologist?  No, they did not.  So this is -- it's a tale of desperation.

They're objecting to everything.  How many times did we hear "objection"?  And I was getting frustrated, because this is a court of law.

MR. WRONIAK:  Objection. Objection. Improper.

THE COURT:  Sustained.

MS. MKRTCHYAN:  So in any event, I trust in the jury system.  You've heard enough.

I'm going to leave you with one final remark: When one of us is in trouble, when one of us is in danger, the rest of the society --

MR. WRONIAK:  Objection.  Improper.

THE COURT:  Sustained.

Back to the case, Counsel.  Facts of this case.

*Deborah D. Parker, U.S. Court Reporter*

7-RenSER-01476          7-RenSER-01476

133

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 22, 2025

                    /s/DEBORAH D. PARKER
            DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

**Michael L. Wroniak (State Bar No. 210347)**
**Christie B. Swiss (State Bar No. 245151)**
**Bonnie J. Bennett (State Bar No. 240313)**
**COLLINS + COLLINS LLP**
**750 The City Drive, Suite 400**
**Orange, CA 92868**
**(714) 823-4100 – FAX (714) 823-4101**
**Email: mwroniak@ccllp.law**
**Email: cswiss@ccllp.law**
**Email: bbennett@ccllp.law**

Attorneys for Defendant
DEPUTY CHAD RENEGAR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DISTRICT

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>                    Plaintiff,<br><br>     vs.<br><br>COUNTY OF ORANGE; DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer. DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS, individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1 through 10, Inclusive<br><br>                    Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br>*Honorable David O. Carter; Courtroom 10A*<br><br>**DECLARATION OF CHRISTIE SWISS, ESQ IN SUPPORT OF APPLICATION TO FILE CERTAIN DOCUMENTS UNDER SEAL IN SUPPORT OF MOTION FOR NEW TRIAL (L.R. 79-5.2.2)**<br><br>**Complaint Filed: August 6, 2019**<br><br>**Trial Date: April 29, 2025** |

*FILE # 23084*

1

**DECLARATION ISO APPLICATION TO FILE UNDER SEAL**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01478          7-RenSER-01478

## DECLARATION OF CHRISTIE B. SWISS

I, Christie B. Swiss, hereby declare as follows:

1.     I am attorney admitted to practice before all the courts of the State of California and the Central District of California.  I am a partner with the law firm of Collins + Collins LLP and am co-lead trial counsel of record for Defendant Chad Renegar ("Renegar"). I have personal knowledge of the facts stated herein, except as to those matters that I state upon information and belief, and as to those matters I believe them to be true.  If called upon to testify I could and would competently do so.

2.     This Declaration is in support of County Defendants' Application to File Documents Under Seal required under Local Rule 79-5.2.2.

3.     In an effort to comply with the Local Rules, on June 12, 2025, I sent an email to plaintiff's counsel indicating that I was intending to file this Application and seeking whether Plaintiff would oppose.  The same day, plaintiff's counsel responded and said they would oppose.  A true and correct copy of the meet and confer correspondence is attached hereto as Exhibit 1.

4.     As detailed below, there is good cause to grant the Application and to allow the following exhibits to be filed under seal:

   a.  Exhibit 78 A, B, C documents from Criminal Case No 21CF0438;
   b.  Exhibit 79 internal Orange County Sheriff's department documents related to Onwuka jail incident;
   c.  Exhibit 80 internal Orange County Sheriff's department documents related to Luna jail incident;
   d.  Exhibit 243 report of Lt. Martin Ramirez related to Onwuka jail incident.

5.     The above-named exhibits were admitted in trial.  Exhibits 78, 79, and 80 were admitted over defendants' objections.  Exhibit 243 was admitted by the Court at the request of defense counsel, but only in rebuttal to Plaintiff's Exhibit 79 being

*FILE # 23084*

2

**DECLARATION ISO APPLICATION TO FILE UNDER SEAL**

**COLLINS + COLLINS** LLP
750 The City Drive
Suite 400
Orange, CA  92868
Phone   (714) 823-4100
Fax       (714) 823-4101

admitted, as it was the Lieutenant's memorandum clearing Deputy Renegar of any alleged wrongdoing.

6. Although the exhibits were admitted at trial, they should not be permitted to become part of the public electronic docket accessible by anyone because they name third parties who were involved in the incidents with Deputy Renegar but who are unrelated to this civil litigation. In particular, inmate witnesses and other law enforcement witnesses are identified, their statements are included in the documents, and there are evaluations of other law enforcement personnel's actions by their superiors documented. None of these witnesses are parties to this suit, and they have not received any notice that that these documents would be made available on the Court's electronic docket for public consumption.

7. Additionally, the documents are part of Deputy Renegar's Orange County Sheriff's Department personnel file, which is not generally available to the public.

8. The documents were also part of a stipulated protective order made early in the case before my office became counsel of record for Deputy Renegar. See ECF 23 and 24.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 12, 2025 at Carlsbad, California.

CHRISTIE BODNAR SWISS

*FILE # 23084*

3

**DECLARATION ISO APPLICATION TO FILE UNDER SEAL**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

# EXHIBIT 1

7-RenSER-01481

7-RenSER-01481

**Megan K. Lieber**

| | |
|---|---|
| **From:** | Narine Mkrtchyan <narine57@gmail.com> |
| **Sent:** | Thursday, June 12, 2025 1:45 PM |
| **To:** | Christie B. Swiss |
| **Cc:** | Michael L. Wroniak; Megan K. Lieber; Mariah G. Stephens; Jazmin Ruiz; Shel Harrell; Catherine Naltsas; Tamara Heathcote; Ryane Skinner |
| **Subject:** | Re: Holloway matter meet and confer re Application to file under seal- 23084 |

Counsel,

There is no basis for sealing records that were incorporated and were exhibits at a publicly held trial. The mere fact they were part of a stipulated protective order by its terms does not justify sealing. It is against public policy and established law to seal records after they were admitted at a public trial. Do you have any legal authority to the contrary? We will object to such.

Furthermore, this is not a proper meet and confer under the Rules before a motion for new trial is filed. We do not waive any of Plaintiff's rights under Local Rules and FRCP on post-trial motions.

**Narine Mkrtchyan**
Attorney at Law
MKRTCHYAN LAW
655 N. Central Ave, Suite 1700
Glendale, CA 91203
Tel:     (818) 388-7022
Web:     www.narinelaw.com

This is a communication between an attorney's office & client, & is protected by the attorney client privilege &/or is the result of research performed at the request of an attorney & is protected by the attorney work product privilege. Sending an e-mail to an attorney will not establish an attorney/client relationship. Such a relationship is not typically established until an attorney knows that so doing will not create a conflict of interest and mutual agreement is reached on the terms of representation.

The information contained in this email is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. This e-mail and any attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, are confidential, privileged and not to be read or disclosed to anyone other than the intended recipient. If you are not the intended recipient or an agent responsible to deliver it to the intended recipient, disclosure, dissemination, copying or other use of the contents of this e-mail is prohibited.

7-RenSER-01482

7-RenSER-01482

On Thu, Jun 12, 2025 at 1:01 PM Christie B. Swiss <CSwiss@ccllp.law> wrote:

Narine,

I am writing to meet and confer per Local Rule 79-5.2.2 regarding our intent to file certain documents under seal in support of Deputy Renegar's Motion for New Trial.  We intend to file an Application to file under seal the following documents:

- Exhibit 78 A, B, C documents from Criminal Case No 21CF0438;
- Exhibit 79 internal Orange County Sheriff's department documents related to Onwuka jail incident;
- Exhibit 80 79 internal Orange County Sheriff's department documents related to Luna jail incident;
- Exhibit 243 report of Lt. Martin Ramirez related to Onwuka jail incident.

The basis for the Application is that the documents will protect the privacy of the third-party individuals who are identified in the documents and were part of the stipulated protective order in the case.  The Application would also protect Deputy Renegar's privacy rights regarding documents in his confidential personnel file.

Please advise if you will oppose the Application to file under seal.  I am available to discuss today or tomorrow.  Thank you.

**Christie B. Swiss**
Attorney at Law

**T**: 760-274-2110 | **C**: 626-807-8103
2011 Palomar Airport Road, Suite 207
Carlsbad, CA 92011
cswiss@ccllp.law

**www.ccllp.law**



Pasadena 626-243-1100 - Orange 714-823-4100 - San Diego 760-274-2110
Northern California 510-844-5100 - Inland Empire 909-581-6100 - Nevada 725-258-3110

2

PLEASE NOTE: The information contained in this e-mail transmission is intended to be sent only to the stated recipient of the e-mail. If the reader of this message is not the intended recipient or the intended recipient's agent, you are hereby notified that we do not intend to waive any privilege that might ordinarily attach to this communication and that any dissemination, distribution, or copying of the information contained in this e-mail is therefore prohibited. You are further asked to notify us of any such error in transmission as soon as possible at the telephone number shown below and to delete the e-mail. Thank you for your cooperation.

7-RenSER-01484

7-RenSER-01484

**PROOF OF SERVICE**

**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California,                           )
                                              )  ss.
County of San Bernardino.         )

I am employed in the County of San Bernardino, State of California. I am over the age of 18 and not a party to the within action; my business address is 10681 Foothill Boulevard, Suite 260, Rancho Cucamonga, California 91730.

On this date, I served the foregoing document described as **DECLARATION OF CHRISTIE SWISS, ESQ IN SUPPORT OF APPLICATION TO FILE CERTAIN DOCUMENTS UNDER SEAL IN SUPPORT OF MOTION FOR NEW TRIAL (L.R. 79-5.2.2)** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Rancho Cucamonga, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Rancho Cucamonga, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Rancho Cucamonga, California.

☐ **BY EXPRESS MAIL OR ANOTHER METHOD OF DELIVERY PROVIDING FOR OVERNIGHT DELIVERY**

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached Service on: June 13, 2025

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☐ **(BY FACSIMILE)** - I caused the above-described document(s) to be transmitted to the offices of the interested parties at the facsimile number(s) indicated on the attached Service List and the activity report(s) generated by facsimile number (760) 274-2111 indicated all pages were transmitted.

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

Executed on **June 13, 2025** at Rancho Cucamonga, California.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
MARIAH STEPHNS
mstephens@ccllp.law

*FILE # 23084*

4

**DECLARATION ISO APPLICATION TO FILE UNDER SEAL**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone  (714) 823-4100
Fax     (714) 823-4101

**SERVICE LIST**
**Case Name: Holloway v. County of Orange, et al.**
**Case Number: 8:19-cv-01514-DOC-DFM**
**CCMS: 23084**

| | |
|---|---|
| Narine Mkrtchyan<br>655 North Central Avenue Suite 1700<br>Glendale CA, CA 91203<br>**Mailing Address:**<br>10063 Riverside Dr #2288<br>Toluca Lake, CA 91602<br>Tel: 818-388-7022<br>Email: narine56@msn.com<br>**ATTORNEYS FOR PLAINTIFF JEREMY HOLLOWAY** | S. Frank Harrell<br>Tamara M. Heathcote<br>Lynberg and Watkins APC<br>1100 West Town and Country Road Suite 1450<br>Orange, CA 92868<br>714-937-1010<br>Fax: 714-937-1003<br>Email: sharrell@lynberg.com;<br>theathcote@lynberg.com<br>jbond@lynberg.com<br>srodriguez@lynberg.com<br>**ATTORNEY FOR Deputy Jameson Gotts,** |

*FILE # 23084*

5

**DECLARATION ISO APPLICATION TO FILE UNDER SEAL**

COLLINS + COLLINS LLP
750 The City Drive
Suite 400
Orange, CA 92868
Phone (714) 823-4100
Fax (714) 823-4101

7-RenSER-01486 7-RenSER-01486