DOCKET NOS. 25-7132, 25-7297

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

JEREMY HOLLOWAY,
Plaintiff-Appellant-Appellee,

vs.

CHAD RENEGAR,
Defendant-Appellee-Appellant.

---

On Appeal from a Decision of the
United States District Court for the Central District of California
Hon. David Carter
District Court Case No. 8:19-cv-01514-DOC-DFM

---

**CHAD RENEGAR'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 8 OF 9**

---

Michael L. Wroniak, Esq. (State Bar No. 210347) mwroniak@ccllp.law
Christie B. Swiss, Esq. (State Bar No. 245151) cswiss@ccllp.law
*James C. Jardin, Esq. (State Bar No. 187482) jjardin@ccllp.law
COLLINS + COLLINS LLP
750 The City Drive, Suite 400, Orange, CA 92868
(714) 823-4100; Fax (714) 823-4101

Attorneys for Defendant-Appellee-Appellant
CHAD RENEGAR

S. Frank Harrell (SBN 133437)
sharrell@lynberg.com
Catherine Naltsas (SBN 262259)
cnaltsasA@lynberg.com
Ryane Skinner (SBN 356970)
rskinner@lynberg.com
**LYNBERG & WATKINS**
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant DEPUTY JAMESON GOTTS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>            Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, et al.,<br><br>            Defendant. | CASE NO. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 10 A*<br><br>**DECLARATION OF F. SHEL HARRELL IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR NEW TRIAL**<br><br>Date:      July 14, 2025<br>Time:     8:30 a.m.<br>Location:  10A<br><br>Complaint Filed: August 6, 2019<br><br>Trial Date: May 1, 2025 |

1

**DEFENSE COUNSEL'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR NEW TRIAL**

8-RenSER-01488          8-RenSER-01488

## DECLARATION OF S. FRANK HARRELL

I, S. Frank Harrell, do declare and state as follows:

1. I am an attorney at law duly licensed to practice before all the courts of the State of California and am a partner in the law firm of Lynberg & Watkins, attorneys of record for Deputy Jameson Gotts ("Defendant") in the above-captioned matter.

2. I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so. I submit this Declaration in connection with my client's Motion for New Trial.

3. A true and correct copy of pertinent portions of the transcript of pre-trial proceedings on April 4, 2025, is attached hereto as **Exhibit "J."**

4. A true and correct copy of the Courtsmart trial transcript on May 6, 2025, is attached hereto as **Exhibit "K."**

5. A true and correct copy of pertinent portions of the trial transcript on May 6, 2025; Vol I, is attached hereto as **Exhibit "L."**

6. A true and correct copy of pertinent portions of the trial transcript on May 8, 2025, is attached hereto as **Exhibit "M."**

7. A true and correct copy of the unredacted version of trial exhibit 26 displayed to the Jury on May 8, 2025, is attached hereto as **Exhibit "N."**

8. A true and correct copy of pertinent portions of the trial transcript on May 9, 2025, Vol. I, is attached hereto as **Exhibit "O."**

9. A true and correct copy of pertinent portions of the trial transcript on May 13, 2025, Vol. II, is attached hereto as **Exhibit "P."**

10. A true and correct copy of pertinent portions of the trial transcript on May 14, 2025, Vol. I, is attached hereto as **Exhibit "Q."**

11. A true and correct copy of pertinent portions of the trial transcript on May 16, 2025, is attached hereto as **Exhibit "R."**

**DEFENSE COUNSEL'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR NEW TRIAL**

8-RenSER-01489                    8-RenSER-01489

12. A true and correct copy of pertinent portions of the trial transcript on May 5, 2025, Vol. IV, is attached hereto as **Exhibit "S."**

13. A true and correct copy of pertinent portions of the trial transcript on May 7, 2025, Vol. I, is attached hereto as **Exhibit "T."**

14. A true and correct copy of pertinent portions of the trial transcript on May 7, 2025, Vol. II, is attached hereto as **Exhibit "U."**

I declare the foregoing under penalty of perjury under the law of the United States of America that the forgoing is true and correct. Executed this 16th day of June 2025 in the City of Orange, County of Orange, State of California.

By: */s/ S. Frank Harrell*
    **S. Frank Harrell**
    Declarant

**DEFENSE COUNSEL'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR NEW TRIAL**

8-RenSER-01490      8-RenSER-01490

# EXHIBIT J

8-RenSER-01491

8-RenSER-01491

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Vs. | ) | No. SACV19-01514-DOC |
| | ) | |
| | ) | |
| | ) | |
| COUNTY OF ORANGE, ET AL., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*Motion Hearing*

SANTA ANA, CALIFORNIA

FRIDAY, APRIL 4, 2025

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
411 WEST FOURTH STREET, SUITE 1-053
SANTA ANA, CALIFORNIA 97201
VELIZBAIRDMIRIAM@GMAIL.COM

8-RenSER-01492                    8-RenSER-01492

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**
**JEREMY HOLLOWAY:**

NARINE MKRTCHYAN
655 NORTH CENTRAL AVENUE
SUITE 1700
GLENDALE, CA 91203

**IN BEHALF OF THE DEFENDANT,**
**COUNTY OF ORANGE, ET AL.,:**

S. FRANK HARRELL
RYANE SKINNER
LYNBERG AND WATKINS APC
1100 WEST TOWN AND COUNTRY
ROAD
SUITE 1450
ORANGE, CA 92868

CHRISTIE BODNAR SWISS
MICHAEL WRONIAK
CATHERINE NALTSAS
COLLINS AND COLLINS LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CA 92011

UNITED STATES DISTRICT COURT

8-RenSER-01493                    8-RenSER-01493

-- putting the pressure on you to say, well, Judge, we're going to cut off emotional distress. Now, if you do, this isn't even on the table. Understood?

But if you're going into emotional distress, this is wide open for the Court. And what I don't want to hear later on is, Judge, I was surprised. I'm telling you right now that that is still on the table.

So if emotional distress is going to carry over to damages from X point forward at some point, it's ridiculous. First of all, he hasn't even had an operation that I know of.

MS. MKRTCHYAN: Well, Your Honor, may I?

THE COURT: Sure. Absolutely. And I'm not putting you to the choice now, but I am telling you I'm not ruling against the defendant at this time. That's going to come back on the table.

MS. MKRTCHYAN: Your Honor, if you recall at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages by plaintiff are limited to the time he left.

THE COURT: Time out.

MS. MKRTCHYAN: We already agreed to that, so what is the problem here?

THE COURT: No, you haven't. No, you haven't. This is a new trial.

MS. MKRTCHYAN: That's why I'm agreeing now,

UNITED STATES DISTRICT COURT

because I don't want -- my argument is this, that --

THE COURT: Well, hold on. Wait. Wait. Just reach an agreement.

MS. MKRTCHYAN: Yeah.

THE COURT: If you're agreeing now to that same instruction, then I'm making the same ruling. These alternate stressors aren't coming in.

MS. MKRTCHYAN: Yeah, because this is a prejudicial issue.

THE COURT: You're winning on this. No more. We have an agreement, then. The same instruction is going to be read which now cuts off these alternate stressors. We're done.

Okay. So by agreement of counsel, the instruction -- and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after. That makes the alternate stressors irrelevant in Rhode Island. Okay -- I'm sorry. I mean Pennsylvania. My apologies.

MR. HARRELL: They're often confused.

THE COURT: Yeah. Okay. Then 730 is that David and Goliath argument. We've gone through that before. This is the concern you have that you're going to be -- well, your motion.

MR. HARRELL: Your Honor, briefly. We have no

UNITED STATES DISTRICT COURT

8-RenSER-01495                    8-RenSER-01495

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY, | ) Case No. SA CV 19-01514-DOC |
| | )                (DFMx) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Santa Ana, California |
| | ) |
| COUNTY OF ORANGE, et al., | ) Tuesday, May 6, 2025 |
| | ) |
| Defendants. | ) (12:59 p.m. to 1:09 p.m.) |
| _____ | ) (5:52 p.m. to 6:59 p.m.) |
| | (7:01 p.m. to 7:11 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF JURY TRIAL
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                    See next page.

Court Reporter:                 Recorded;CourtSmart

Courtroom Deputy:               Karlen Dubon

Transcribed by:                 Jordan Keilty
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

8-RenSER-01496                                        8-RenSER-01496

APPEARANCES:

For the Plaintiff:                      NARINE MKRTCHYAN, ESQ.
                                        Mkrtchyan Law
                                        655 North Central Avenue
                                        Suite 1700
                                        Glendale, California 91203
                                        (818) 388-7022

For the Defendants:                     S. FRANK HARRELL, ESQ.
                                        RYANE SKINNER, ESQ.
                                        Lynberg & Watkins, APC
                                        1100 West Town and Country
                                        Road, Suite 1450
                                        Orange, California 92868
                                        (714) 937-1010

                                        CATHERINE A. NALTSAS, ESQ.
                                        Lynberg & Watkins, APLC
                                        1150 South Olive Street
                                        Suite 1800
                                        Los Angeles, California 90015
                                        (213) 624-8700

                                        CHRISTIE B. SWISS, ESQ.
                                        Collins & Collins, LLP
                                        2011 Palomar Airport Road
                                        Suite 207
                                        Carlsbad, California 92011
                                        (760) 274-2110

                                        MICHAEL L. WRONIAK, ESQ.
                                        Collins & Collins, LLP
                                        750 The City Drive
                                        Suite 400
                                        Orange, California 92868
                                        (714) 823-4100

*Echo Reporting, Inc.*

8-RenSER-01497                                      8-RenSER-01497

3

<u>Santa Ana, California; Tuesday, May 6, 2025 12:59 p.m.</u>

--o0o--

(Call to Order)

THE COURT: I want to speak to counsel outside the presence of the jury. I'll ask the witness also would you remain outside. Would you remain in the hallway for just a moment. No discourtesy meant. I want to have a frank conversation with counsel.

(Pause.)

THE CLERK: Your Honor, we're on Courtsmart. Can you call the case.

THE COURT: Yeah. This is the Holloway matter versus Deputy Renegar and Deputy Gotts.

And I want to go back through yesterday before we get started with whatever motions we're going to have and what the Court's going to do.

With my repeated requests for an indication of who's going to testify -- and I'm asking that to head off problems. So, I've just heard a criticism of the Court, and that is, Well, Judge, you could have cut me off. I specifically asked yesterday for witnesses. And the witnesses that were given to me were as follows: Lieutenant Lavinia Beltzer Vega, Doctor Susan -- and I can't pronounce her name, and I apologize, Hopp --

MR. HARRELL: Hoppmidani.

8-RenSER-01498                    8-RenSER-01498

4

THE COURT:  -- Hoppmidani, who I thought was going to be presented by transcript form, and Tafoya, the mom, correct?  I have that written in my notes.

(No response.)

THE COURT:  All right.  I didn't expect this to go beyond damages and photographs, and it's not a comfortable place for me to be making decisions by surprise.

Are either one of you requesting a mistrial?  I want you to think that through.  I'm not representing what I would do at the next trial.  So, my hands aren't tied.  I would probably set it for early next year if I -- if I have the space.  If not, it will be March or April.  Why don't you discuss that with the deputies, and I hope you've discussed that with your client.

My ruling, though, will be as follows.  So, on cross examination of the mother, you may ask if the daughter was removed from Mr. Holloway 2017, but that's as far as you can go.  In other words, that -- I'm concerned about getting into the court and where that leads.  Then it's the choice of the Plaintiff to come back, and if that door is open and we go down that line, then you may be getting into a court order, but I'm trying to foreclose that for the time being. It's enough that it's a stressor when the child was removed. The jury can draw whatever inferences.

Now, does anybody want a mistrial?  If so, I'll

*Echo Reporting, Inc.*

5

grant it.

(No response.)

THE COURT:  Counsel?

MS. MKRTCHYAN:  Well, after three trials --

THE COURT:  Counsel --

MS. MKRTCHYAN:  -- my client --

THE COURT:  -- do you want a mistrial?

MS. MKRTCHYAN:  -- does not have the money and resources and stamina to do another trial and ask for a mistrial.

THE COURT:  Then, please, work with --

MS. MKRTCHYAN:  That would have been the proper thing to do, but I'm not asking for that, nor am I going to ask for that because that's just -- it's just improper.  How many times are we going to try this case, your Honor?

THE COURT:  As many times as we need to until I get cooperation from all the parties and this Court is prepared.  And, so far, the following has happened.  There has been a jury that has hung up on the first trial.  On the second trial, the prejudice was created by your client, which caused a mistrial.  That is not the fault of the Court nor the Defense.

On the third trial, liability was reached against the two officers in this matter.  So, the jury's found liability -- in fact, five officers on that, five officers.

8-RenSER-01500                                         8-RenSER-01500

6

So, everybody's forewarned.  They're coming around.  The jury's already been there one time.  And, so, when you ask for a new trial, if there's liability again, you've already got an uphill climb.  And that's why I'm asking you if you want a mistrial.  You've got an uphill climb with this Court if one jury's already found liability.

Now, the game may be what's it worth.  In other words, you may be here because you're willing to say to the officers, Well, I'll send this up on appeal.  But, remember, their careers are at stake also.  From the Park's position, they're the ones who asked for a new trial on the third trial.  You didn't.  They did.  I granted that because of the abnormality of the jury instructions.  But, quite frankly, you stipulated to them.

So, I hear that you have financial problems, and you have to hear that this case is going to get to the Circuit in such a way that at least I can hold my breath and hope that the Circuit sees the totality of all of these trials and what's occurred, let alone any trial and any liability finding or nonliability finding.  And right now, this door was opened, and that's a final decision.

Do you want a mistrial?

MR. HARRELL:  Your Honor --

THE COURT:  Do you want a mistrial, yes or no?

MR. HARRELL:  We need to know if Pennsylvania is

*Echo Reporting, Inc.*

8-RenSER-01501                                    8-RenSER-01501

7

going to come in based on what she said happened in Montana.

THE COURT:  No.  I'm going to limit this -- well, strike that.  Let me not be as definitive about that.  I now believe that she's opened that door as far as the 2017 removal of the daughter, and it's close enough in time. I've always been concerned with what Mr. Holloway -- what this Court would allow after the fact, and I've been very careful to exclude Pennsylvania and some of these areas because if Mr. Holloway was beaten by the police, I would expect him to be angry.  I would expect him to do certain things that may not be his character.  So, I've been very careful to stay away from Pennsylvania and Montana.

She opened that door.  That's the problem.  And before, we had a limiting instruction in the first trial, if you recall, where we cut off emotional damages.  That didn't happen here.  And, so, I -- I thought in good faith that both of you folks would stay away from the emotional damages part or the emotion that comes out of the Pennsylvania and Montana --

MS. MKRTCHYAN:  Well --

THE COURT:  -- and that -- because we had a stipulation, and I was prepared to declare a mistrial on the first -- on the third occasion.  You two reached an accommodation.

Now, it's as simple as this.  If either one of you

8-RenSER-01502                                    8-RenSER-01502

8

want a mistrial, I'm probably going to grant it.  Okay.  So, think about it very carefully.  And I'm not going to hear your client's destitute anymore.  This is your responsibility, and I'm putting it right back on you on both sides to conduct a clean and fair trial and to give the Court a chance, for goodness sakes, to try to make the best rulings, and that's not happening here.  This is by surprise half the time to the Court.  I've got 400 cases, Counsel.  Whether I try you or another case is irrelevant to me.

MS. MKRTCHYAN:  Your Honor, at the present --

THE COURT:  No, no.  Do you want a mistrial, yes or no?

MS. MKRTCHYAN:  No, but I object to this constant --

THE COURT:  I don't care what you object to, and I want to be blunt about that.  If you want a mistrial, I'm granting it.  Otherwise, you abide by my rulings.

MS. MKRTCHYAN:  I have always abided by this Court's rulings.

THE COURT:  All right.  Thank you very much.

Do you want a mistrial, yes or no?

UNIDENTIFIED SPEAKER:  No.

THE COURT:  Do you want a mistrial, yes or no?

MS. SWISS:  Wwe do not, your Honor, but we would

8-RenSER-01503        8-RenSER-01503

9

like to make a record.

THE COURT:  No.  Thank you very much.  I'm exhausted listening to both of you battle back and forth and argue with each other.  I want to bluntly state that to both sides.  I've got noncooperation.  I'm not pleased with this record, and this case will not go to the Circuit until I'm satisfied.  So, I'll hang out until the end of the case with you and bear with you, but I'm putting you on warning.  Conduct yourselves accordingly.  Obey my rulings.

Okay.  Now, I'm going to go get the jury.)

(Portion of proceedings omitted.)

THE COURT:  All right.  Have you been able to come up with any suggestions between all of you concerning the Pennsylvania, Montana issue, other than once again arguing that your positions are correct, that you want it -- you want to exclude it because it's prejudicial, whether the door was opened or not?  Do you have any suggestions?

MS. MKRTCHYAN:  Well, your Honor, first of all, what I would like to say is this.  They had motions in limine.  Parties agreed, and I had agreed that this stressors in Pennsylvania generally speaking, subsequent stressors, we were going to limit our emotional distress damages to July 2018.  We have not -- we have not withdrawn that stipulation.  Neither did we open any doors, and I would like to again point out that this issue of

8-RenSER-01504

8-RenSER-01504

10

homelessness has no relevance to this case.  We never argued, neither did the mom argue that my client was homeless in Montana as a result of this incident.  She testified only that he was homeless.  It was a fact that it was only two, three days.  She said that then he went and started living -- it is only two, three days.  So, we did not ever open doors.  This issue of homelessness has absolutely no relevance to emotional distress damages claimed in this case.  We have stipulated.  We never even talked about this issue that he was emotionally distressed as a result of this incident in Montana, no.  In fact, he's now testified that Montana was good, and he, you know, was fine there and it -- you know, he's been well there, et cetera.  So, there has been absolutely -- we have -- we have not withdrawn from our stipulation.  We have agreed to limit it.  We have not introduced any evidence contrary to our stipulation to limit this.

THE COURT:  If I gave that jury instruction and that stipulation then that the jury is to disregard emotional distress from June of 2018, as we reached before, would that be acceptable to you?

MS. MKRTCHYAN:  Yes.  And we have agreed to that.

THE COURT:  I'm sorry.  Yes?

MS. MKRTCHYAN:  Yes.

THE COURT:  Counsel?

8-RenSER-01505          8-RenSER-01505

11

MR. HARRELL:  No, your Honor.  She did make an agreement.  She made an agreement at the prior trial.  We pulled the transcript where she made the same agreement for this trial.  July 2018 --

THE COURT:  Read that agreement to me concerning this trial.

MR. HARRELL:  Your Honor, it was -- I have -- it is in a --

THE COURT:  Read it to me.

MR. HARRELL:  -- transcript of April 4, 2025.  I'm happy to hand that to --

THE COURT:  No.  Read it to me.

MR. HARRELL:  -- to the Court.

THE COURT:  April 4, 2025.  Read that so -- or put it up on the screen so we can all see it at the same time.

MS. SWISS:  Your Honor, it's reflected in a motion in limine, a court order.

THE COURT:  I'm ordering you to do this, not asking you now.  Put it on the ELMO.

MS. SWISS:  Mr. Seaver (phonetic) is putting it up, your Honor.

THE COURT:  Okay.  Thank you.

(Pause.)

THE COURT:  Okay.  Would one of you help me with the screens.

8-RenSER-01506                                        8-RenSER-01506

12

(Pause.)

THE COURT:  Now, show me the agreement.

(Pause.)

MR. HARRELL:  Your Honor, you have --

THE COURT:  Counsel, read those --

MR. HARRELL:  -- the pertinent page up.

THE COURT:  -- portions that you think are relevant, okay.

MR. HARRELL:  Ms. Mkrtchyan now -- and I'm reading from the transcript:

"Your Honor, if you recall at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages by Plaintiff are limited to the time he left.

THE COURT:  Time out.

MS. MKRTCHYAN:  We already agreed to that.  So, what is the problem here?

THE COURT:  No, you haven't.  No, you haven't.  This is a new trial.

MS. MKRTCHYAN:  That's why I'm agreeing now, because I don't want -- my argument is this, that --

THE COURT:  Well, hold on.  Wait.

*Echo Reporting, Inc.*

8-RenSER-01507   8-RenSER-01507

13

Wait.  Just reach an agreement.

MS. MKRTCHYAN:  Yeah.

THE COURT:  If you're agreeing now to that same instruction, then I'm making the same ruling.  These alternate stressors aren't coming in.

MS. MKRTCHYAN:  Yeah, because this is a prejudicial issue.

THE COURT:  You're winning on this. No more.  We have an agreement then. The same instruction is going to be read which now cuts off these alternate stressors.  We're done.  Okay.  So, by agreement of counsel, the instruction -- and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after.  That makes the alternate stressors irrelevant in Rhode Island. Okay.  I'm sorry.  I mean Pennsylvania. My apologies."

And that was the on-the-record agreement, your Honor.

THE COURT:  And then we have the mother that gets up on the stand.  We have a narrative.  Did you object in

8-RenSER-01508                    8-RenSER-01508

14

that period of time?

MR. HARRELL:  Your Honor, I did not.

THE COURT:  Okay.  Now, that can be for two reasons.  First of all, tactical, so that then you can come back -- and I'm not accusing you of this, but I'm saying tactically then to come back and say, Well, the Plaintiff overstepped the line, and get in these stressors.

MR. HARRELL:  Your Honor, if I may address that?

THE COURT:  You haven't done that, Counsel.  I'm just saying the end result, though, is it leaves everybody in the position that this homelessness in Montana should have never come in, and these emotional factors that go past June of 2018 should not be in this case, but it's curable. It is curable by an instruction and admonishment to this jury that they are to disregard that portion of the testimony of Ms. -- Ms. Tafoya.  And I need to give that right away tomorrow first thing so it's fresh in the jury's mind, and I'm going to request that you pull that instruction from the first trial and have it to me by 7:30 tomorrow.

MR. HARRELL:  Your Honor, if I may, this is important to my client.  The reason why I did not object and why I don't think anybody in our team objected --

THE COURT:  Sure.

MR. HARRELL:  -- is because this witness is a

8-RenSER-01509

8-RenSER-01509

15

grieving mother.

THE COURT:  Right.

MR. HARRELL:  I wanted to be very respectful to her.  I did not want to antagonize the jury, especially since I knew we had an agreement, and it was maybe okay the first time it was blurted out, but there was more that came out, and at this point -- your Honor, if I may, with great respect, the -- the mother stated that there was homelessness in Montana in 2024, with the implication being there's stress associated with that that my clients are responsible for.  There is a stroke in December of 2024 with the implication being there's stress there that my clients are responsible for.

There was heart surgery that she testified to, and -- with the implication being there's stress there, and this takes place in January of 2025.  And, your Honor, the transcript is the cold transcript, but I think everybody can agree that she was an impactful witness.  This information is out there, and I know that instructions from the Court carry great weight.  I know this.  But -- and this is one of these rare circumstances that I don't believe that this can be fixed.  I do not believe it can be fixed, and I'll tell you why.

I do not have -- this -- this came out of nowhere. I do not have a doctor, for example, prepared to get up on

*Echo Reporting, Inc.*

8-RenSER-01510                                             8-RenSER-01510

16

the stand and say that this stroke in Montana in December of 2024 has nothing to do with our incident.

Plaintiff -- Plaintiff's counsel intentionally elicited this. This was intentionally done, in violation of our on-the-record agreement. And it -- we're -- we're all dumbfounded. This heart surgery, she intentionally elicited that, in violation of our agreement. That's the only way to look at it, intentional, knowing. She meant to do this.

MS. MKRTCHYAN: And I --

MR. HARRELL: And now, I --

MS. MKRTCHYAN: -- wasn't --

MR. HARRELL: -- may --

MS. MKRTCHYAN: Stop -- you're raising your voice. Stop raising your voice and antagonizing me and doing this. I produced -- excused me. This is already getting --

THE COURT: Excuse me, Counsel.

MS. MKRTCHYAN: -- out of hand.

THE COURT: I'm listening --

MS. MKRTCHYAN: I produced --

THE COURT: Counsel, Counsel, I'm listening now to the Defendant. You've raised your voice.

MS. MKRTCHYAN: Well, I didn't --

THE COURT: He's raising his voice.

MS. MKRTCHYAN: I was not --

THE COURT: Counsel, I'm going to listen now to

8-RenSER-01511          8-RenSER-01511

17

the Defendant, and then I'll hear from you.

Counsel?

MR. HARRELL:  I don't have doctors to rebut what has come out of Mr. Holloway's mother on the witness stand, that this stroke has something to do with our case that took place in 2024.  I don't have a doctor to say that this heart surgery has nothing to do with our case.  And I have good reason for not having these doctors.  We had an agreement.  This is -- this is how it's supposed to be done.  Lawyers reach agreements.  They put them on the record, and then everybody does their job, playing fair by the agreements that we have reached.

We have not been treated fairly, and it's -- it's happened so many times, and I'm going back to the second trial.  The Court was crystal clear no one will mention that there was a prior trial in this case.  What do they do?  They get up on the stand, and they do it.  And this, again, it's hard to avoid the conclusion, since Mr. Holloway has been here every single day.  He knew he wasn't supposed to do that, and he did it.  And, so, here we are, again, with another violation of the agreement.  And, yes, there are always mistakes, and they didn't mean to do it.  Why do all the mistakes that they make hurt my client and put them in a position where they're facing millions of dollars of damages?  That's a question I would like answered.

8-RenSER-01512                                        8-RenSER-01512

18

So, your Honor, I know that this Court has the ability to give an instruction and tell people to disregard things, but this witness was so emotional and so powerful, frankly, that I don't think we can unring this.

Now, here's what I would propose that we do.  I propose that we have a mistrial, and then I propose before we have a new trial set, we need to have some briefing in this case on whether their -- Plaintiff, based on their prior demonstrated conduct, has the right to another trial.  If you don't treat the other side with respect, if you don't treat courts with respect -- and we go all the way back to the Magistrate Judge, who has many tens of thousands of dollars that have been addressed for what my clients went through in the pretrial phase that have never been paid, if we go all the way back there, we believe that we can lay out for this Court a compelling record.  Plaintiff has forfeited his right to further time, energy, and attention from this Court.  To the contrary, the Court should devote its valuable time to people that comply with their agreements, follow the rules, and are fair to everyone, including our bench officers and including opposing counsel.

That's my motion.  We're moving for a mistrial.

THE COURT:  Counsel?

MR. WRONIAK:  We join in the motion, your Honor.

THE COURT:  All right.  Now --

8-RenSER-01513 8-RenSER-01513

19

MS. SWISS:  Your Honor, may I --

THE COURT:  No.  One of you may.  Who's arguing?

MS. SWISS:  I will, your Honor.

THE COURT:  All right.  You may.

MS. SWISS:  In addition to what Mr. Harrell has argued, there was an objection with regard to the credit card debt that Ms. Tafoya testified to.  The Court sustained the objection, and Plaintiff's counsel continued, and the witness did testify that she incurred $40,000 in damages and credit card debt plus interest from the date of the incident until the present.

Even if the Court were to give a jury instruction to the jury to ignore that amount, this mother, who seems to be an innocent party in this case, could garner sympathy from this jury and could cause them to award damages to Plaintiff so that he could pay his mother back, which would be unfair to our clients and in violation of the stipulation that damages were cut off from June 2018 to the present.

The mother also testified that because of this incident, that the Plaintiff was fearful of police, putting chairs against the doors, like in a hotel room, et cetera. And, so, that would also prejudice our clients and not be allowed to then bring in other incidents involving other police that he may have encountered that would have caused him emotional distress.

8-RenSER-01514                                                        8-RenSER-01514

20

With that, I will submit and join in Mr. Harrell's motion on behalf of Deputy Gotts.

THE COURT:  Now, the Plaintiff, uninterrupted.

MS. MKRTCHYAN:  So, any time Plaintiff starts getting close to any sort of a verdict -- and, by the way, no one has sought millions of dollars of damages for this poor man.  We have been seeking special damages in a moderate amount of $56,000.  We have sought a stipulation from this counsel to stipulate to a very limited number of special damages.  We have limited our emotional distress damages to July of 2018 by agreement in the motions in limine.  But any time Plaintiff is coming very close to any sort of a resolution of this case, any sort of a favorable resolution, the Defendants ask for mistrial as they did at second trial.  They asked for mistrial.  The Court granted, even though there was absolutely no prejudice to Defendants, when they were the ones cross examining very heavily my client on his prior testimony from prior trial.  And, of course, my client had a slip of the tongue.

There has been absolutely no bad faith on part of Ms. Mkrtchyan, who has been continuously disparaged, continuously disrespected, continuously attacked by a football team of attorneys, five, six lawyers on one side, me, one attorney who has limited resources, with no assisting attorneys.  I have been, you know, constantly

*Echo Reporting, Inc.*

21

sandbagged here, number one.

Number two, but here's the main issue here. There has been absolutely no evidence of bad faith. We produced my client's medical records from Montana that involved his stroke. There was evidence as of February of 2025 that we produced to these Defendants that he had a stroke, and he had heart surgery. They were on notice. They sought designation of a new expert toxicologist, and yet they never raised this issue of medical records. Did they see, to exclude these medical records in a motion in limine? No. So, they don't care about this case. They don't prepare for this case. They come to court. They don't want to produce witnesses. They don't want to agree on any exhibits, and now they're telling us, they're telling this Court that Ms. Mkrtchyan is acting in bad faith. If you have a problem of Mr. Holloway, whether his mom or himself testify about his new stroke as of last year in Montana, you had the medical records. You could have moved to exclude that, and we would have litigated that issue.

We listed Ms. Tafoya also in the witness -- witness list as of February 2025, three months before this trial. If you had any problem of Ms. Tafoya testifying about my client's damages, pain and suffering, you knew very well why I was putting her on. You could have had a Rule 16 meet and confer with me. You could have moved to exclude. You have

*Echo Reporting, Inc.*

8-RenSER-01516                                          8-RenSER-01516

22

not done anything.  You have regurgitated the same motions in limine you have brought before.  You have not raised a single argument, single motion in limine with respect to my client's new stroke.  That's one issue.

So, no one has done any sort of bad faith here.  I have been up front.  I have produced everything to the Defendants from the beginning we have this trial, and am I happy to have a fourth trial?  Am I exuberant about doing a fourth trial in this case?  Absolutely not.  And my client is thrilled to be in this court again?  Absolutely not.  We had a verdict.  We sought for another trial only on damages or resolution.  The Court could have sent us up to Ninth Circuit, could have done -- there's a lot of options there.  We were ordered to do this trial, and we are complying with this Court's order to the best of our abilities, despite all the financial resources and my client's health issues.  As of right now, he's sitting here today.  He's on a series of medications.  So, that's number one.

Number two, stroke.  And how is that opening the door?  We have the transcript of Ms. Tafoya's testimony where she testified.  There was absolutely no inference by her that the stroke, the new stroke Mr. Holloway sustained last year was as a result of this incident.  It was just a piece of information, his medical health issues, that was discussed.  I never asked her -- I never brought a witness,

8-RenSER-01517                                                    8-RenSER-01517

23

I never brought a doctor who would causally connect his second stroke to the incident.  I have not done that, nor have I argued, nor have I even insinuated during her testimony, direct examination, that, Oh, you know, then as a result of 2018 incident, he sustained another stroke in 2024.  No.  That was not the -- it was just my client's history, his medical health issues.  That's all.

THE COURT:  Just a moment.

(Pause to confer with clerk.)

THE COURT:  Okay.

MS. MKRTCHYAN:  Secondly, so, this issue of Ms. Tafoya testifying, the Defendant said he didn't want to antagonize.  Well, you know what?  They did antagonize her very severely during cross examination, and it was Mr. Harrell, again, talking about the Montana situation.  It was her talking about on cross examination talking about more of this homelessness issue.  If Mr. Harrell had no intent to, you know, oh, prejudice his clients, then why did he ask the same questions?  He did exactly same thing during all the trials with my client.  This is just an excuse.  If Ms. Tafoya did not testify, if my client testified, they were going to argue he raised -- the opened the doors.

Okay.  This is all excuses.  If you look at the three trial transcripts, the way he questioned my client every time he asked same questions, Oh, so, you know, you're

8-RenSER-01518                                        8-RenSER-01518

24

telling us nothing else in your life was bothering you. Nothing else in your life was happening bad way.  Oh, you know, he raised these issues.  He goes on and on about stressors.

But legally -- let's talk about legally.  So, we didn't open any doors.  There was no inference drawn that the -- Mr. Holloway's stroke or homelessness was a result of this incident, and when that coupled with our -- our agreement to limit our emotional distress damages to July 2018 when the time he left for Pennsylvania, that is very clear -- made very clear to jury where we are going with this.  We're not asking for millions of dollars as these attorneys are claiming here.  Okay.

Next issue is the issue of prejudicial impact of this stuff.  This is character evidence.  Let's just be very clear this is not alternative stressors.  Under the rubric of alternative stressors, what these attorneys are trying to do is to color Mr. Holloway as a bad person, person who, as we already saw, desperately they reached out and brought in again and again his domestic violence related stuff.  They are bringing the fact that he was deprived of custody of his only child.  Now they want to go into Pennsylvania stuff. And, by the way, nobody's going to hear to say -- who's to say that anything that happened after this incident related with police is not a result of this incident?  If my client

8-RenSER-01519                    8-RenSER-01519

25

had bad relationship with the police after the incident, it's, quite frankly, very much acceptable and norm.  He was -- he had PTSD after the police.  In fact, it would hurt the Defendants that he has such bad relationship with the police that he got into severe interactions with them in Pennsylvania.

So, that is there as well, the PTSD in this case. So, therefore, courts have looked at subsequent events and said, Look, this is -- this is not an alternative stressor. This is very much direct result of this incident.  But what is the prejudicial impact over probative value?  And the courts, like many courts in our country, have excluded this kind of stuff because this is character evidence, directly character evidence.

So, you know, I'm not sure where this is going right now.  These Defendants are going to ask for mistrial every time they're going to trial and we are reaching -- getting close to any sort of resolution.  We want closure. We want resolution.  If this Court is going to decide, any ruling we will abide by it in the -- the right way in this country to go and, you know, we will appeal issues.  But at this point I'll just say this.  Honestly, I'm shocked and outraged with the accusations towards us when the record is clear I produced medical records.  If you have problem with any of that to come in at this trial, you should have raised

8-RenSER-01520                                        8-RenSER-01520

26

within a motion in limine.  I raised Tafoya in a witness list.  If you had any problem with that, you could have deposed her.  You could have limited her questioning so that we could right now not have this kind of a discussion on a third day of trial after picking a jury, after I spent my -- I've taken my time from my other cases.  I have my client travel from Montana.  He had to take the train to be here, and now you're asking for mistrial on some bogus excuse that Ms. Tafoya was such a great witness that, your Honor, oh, we cannot handle the idea of losing this case and paying some modicum of money to Mr. Holloway.  Please stop this bleeding.  Your Honor, please stop Ms. Mkrtchyan from getting a resolution of this case.  That's what is happening here.  That's what is happening.  That's what happened at second trial.  That's what happened third trial.  Why are we sitting here resolving -- why are we even doing a third trial on all issues when we had a liability verdict.

So, you know, this is just frustrating to me.  I mean, this is turning into an uphill battle.  And, quite frankly, I'm shocked when we haven't even sought multiple millions of dollars in this case.  What would they have done if they really -- if we really sought multiple millions of dollars?  They would have shot me right there at the door of this courtroom.  They would have shot me.  They would have leashed my client.  What is this happening?  I do not

8-RenSER-01521

8-RenSER-01521

27

recognize this -- this is becoming really outrageous to me. Can we have some civil sort of without attacking, accusing and lynching me and my client?  What is this?  United States of America.  Let's just have some sort of a decent resolution of this case.  You want to grant a mistrial.  Go for it.  But, you know what?  You know, you're going to really belittle any -- any sort of -- you know, this is becoming really kind of -- quite frankly, I am shocked.

With that, I will abide by any court order.  I have agreed.  I have not violated any court orders.  Yes, I'm an aggressive attorney.  Yes, you know, if you cannot handle me, go litigate with another attorney.  Settle the case.  Pay us some money.  We'll get out the door, man, you know.  You cannot handle me?  You are five attorneys cannot handle me?  And I have not violated a single court order here.  This is, frankly, very outrageous to me.

So, period, you know.  I am really disappointed here.  But, in any event, I need to also file -- file briefing on this issue.  I'm going to request recess tomorrow because if this is actually going to go down to a mistrial or if this issue is going to go into -- before the jury, additional -- additional criminal records history of my client being brought and showcased in front of the jury, I need recess to do briefing for the -- so that we can prepare the appeal for this issue.  But at this point, you

8-RenSER-01522          8-RenSER-01522

28

know, I will -- I'm just objecting to this vigorously because this is just -- it's very improper, very improper.

Are they denying that I produced medical records? What is their explanation, and why are they excusing themselves, their inactivity, by now bringing this issue after Ms. Tafoya testified?  And now they're asking for mistrial?  No.  If you were all that concerned, you should have raised these issues before trial, and we could have litigated this issue.  So, you sit there.  You don't prepare for trial.  You come to court unprepared, and now suddenly, in the third day of trial, you want a mistrial, and then you're asking this judge to introduce stuff when we have not opened a single door, single door.

MR. HARRELL:  Your Honor, if I may.

THE COURT:  Counsel.  And just identify yourself because we're on Courtsmart.

MR. HARRELL:  Yes.  This is Shel Harrell for Deputy Gotts, S-H-E-L, H-A-R-R-E-L-L, for Deputy Gotts, G-O-T-T-S.

Let me start at the outset by what I'm not going to talk about.  I thought I heard my opponent say that we were unprepared.  I thought I heard something about somebody shooting her or lynching her client.  I'm not going to respond to that.  All right.  What I'm going to do is I'm going to stay very focused on the merits.

*Echo Reporting, Inc.*

29

And, with regard to the merits, I listened very closely to what my opponent said.  She did not deny that we did reach an agreement going into trial on the record, which was read at the outset of this evening's proceedings, that six months after the incident, Mr. Holloway moved to Pennsylvania and that's when emotional distress damages were going to cut off, end.  No discussion, nothing else, after July of 2018.

Nowhere did I hear Plaintiff's counsel deny that one of their witnesses in response to their questioning on direct, that being Mr. Holloway's mother, mentioned that Mr. Holloway was homeless in Montana in 2024, with the unavoidable implication being we had something to do about that and this emotional distress.  I did not hear her deny that her witness that she called on direct exam testified that there -- Mr. Holloway suffered a stroke in December of 2024 with the implication being that there was stress and we were somehow responsible for that.  I did not hear my opponent deny that their witness testified that Mr. Holloway had heart surgery, with the implication being that there was stress associated with that in January of 2025.  There was no denial of any of that, and it's on the record, and I did not hear any principled argument as to how this testimony intentionally elicited by Plaintiff's counsel can possibly be viewed as in accordance with our agreement that emotional

8-RenSER-01524                                        8-RenSER-01524

30

distress cuts off in July of 2018.

If I can direct the Court's attention back to voir dire. One of the standout moments in this trial until this point was voir dire where Plaintiff's counsel began questioning the jury about their views on homelessness. And, quite frankly, we were all scratching our heads on the Defense side and asking ourselves questions. What is this all about? This is an excessive force case, and the Court put an exclamation point on it by rightly admonishing the jury that, No, this is an excessive force case. Please let's not be confused why we're all here.

That leads me to conclude that even then, during the voir dire case, my opponent knew exactly what she was planning on doing. She was planning then to elicit this information about homelessness in Montana and to leave the implication that I'm mentioning it because that's something the Defense is responsible for. Total violation of our agreement.

Plaintiff's counsel made mention of the fact that she gave us medical records for some things that have happened in Montana. Yes. Plaintiff's counsel gives us many things that don't matter and never see the light of day. Throughout the course of the case, when we got these medical records from Montana, we asked ourselves, Well, we don't need to worry about this because she has agreed that

8-RenSER-01525

8-RenSER-01525

31

all this cuts off in July of 2018, and I do need to say that none of us, none of us want to be making this motion.  We don't.  But all of the lawyers here have an obligation for our clients who are present to fight with everything we have to get them a fair trial, to do the best job that we can.  This is staring us right in the face now.  She's violated an agreement that she made on the record, and the prejudice to our client is something that is -- that cannot be fixed, even -- it can't.  We need to advocate for our clients, and we need to make a motion for a mistrial, and I'll note again there does need to be some briefing in this case, but it needs to be focused on what has happened during our few days of trial, the agreement that has been reached, and some of the problems that we have had in this case going back to the Magistrate Judge who issued an order, and it's very clear in my memory, in accordance with the Ninth Circuit that expressed a -- a view towards warnings being issued to attorneys that appear in front of judges.  Before their case is dismissed, they need to be warned about the consequences of further disobedience to court orders.

Your Honor, there's a 25-page limit of briefing, and we could fill 25 pages just with regard to that.  There have been violations of court orders, repeated, unremedied, and as a result of that, the latest violation of an agreement stated on the record.  My client is looking at an

8-RenSER-01526                                                    8-RenSER-01526

32

unfair record that's been placed in front of this jury.  The only remedy that we have right now on this night is to ask for a mistrial, and that's what we're doing.

THE COURT:  Counsel, state your name.

MS. SWISS:  Christie Swiss on behalf of Deputy Chad Renegar.

I would concur in the arguments made by Deputy Gotts' counsel.  In addition, I would like to add that with regard to these additional medical records from earlier in 2025, Plaintiff's counsel never actually disclosed them to our office on behalf of Deputy Renegar.  Myself and Mr. Wroniak have been counsel for Renegar since 2021.  So, unclear why they were not ever disclosed.

Additionally, counsel --

THE COURT:  Excuse me.  When were they first disclosed to you?

MS. SWISS:  They were disclosed in preparation for this trial from Lynberg and Watkins office.

THE COURT:  When?

MR. HARRELL:  March 12th to our office of 2025.

THE COURT:  Counsel, when to your office?

MS. SWISS:  To my office?  After that, in probably --

MS. MKRTCHYAN:  What are we talking about?

MS. SWISS:  Before this trial, so March or April

8-RenSER-01527                                    8-RenSER-01527

33

of 2025.  So, they were never produced by Ms. Mkrtchyan's office to our office.

Second, counsel suggested that the Defense file a motion in limine, and we did just that.  Motion in limine number 10 Docket Number 728 is with regard to the alternative stressors and asking the Court to allow the alternative stressors to be admitted.  It was in regard to arguing that particular motion that the parties agreed on the record -- and we read that transcript into the record earlier this evening -- that there was the agreement that the stressors would not come in after June of July of 2018 because there was an agreement that the damages would cut off.  Therefore, the Defendants respectfully stipulated to that and did not seek any further experts or testimony with regard to anything after that, including the stroke in 2024 and the heart surgery of 2025.  So, we abide by the agreement in preparation for this trial, and now our clients are severely prejudiced by the fact that this has come out and this bell cannot be unrung after Ms. Tafoya testified. And, with that, I'll submit.

THE COURT:  Back to the Plaintiff.  Just state your name for the record.

MS. MKRTCHYAN:  Yes.  Narine Mkrtchyan.  This is -- I was not sure of what was discussed about what was not disclosed to this Defense.  In any event, it's a joint

8-RenSER-01528                                    8-RenSER-01528

34

defense, and whenever they have a lot of attorneys on the email chain, a lot of attorneys, a lot of attorneys, and sometimes, whatever emails that were sent from my office, from me to these attorneys --

THE COURT:  When was this disclose?

MS. MKRTCHYAN:  What?  What?  I don't even know what they are talking about disclosed.

THE COURT:  The -- the medical records custodian, the --

MS. MKRTCHYAN:  Medical records.  I can open my emails and tell you.  It was in February --

THE COURT:  When were these disclosed?

MS. MKRTCHYAN:  -- of 2025, February.  And I can give you the date.  If I -- if you allow me, I will open my email.  That is not something that is an issue.  I have produced medical records to these attorneys, whether it's, you know, one firm or the other firm, it's a joint defense.  They write motions.  They file motions.

THE COURT:  Would you please -- would you please get me the day.

MS. MKRTCHYAN:  Yes.  Let me just find that email, sir.  And next issue that I would like to discuss while I'm looking for this email --

THE COURT:  Counsel, I'm going to focus on one thing at a time.  I'd like to get the date, and then I'll

*Echo Reporting, Inc.*

35

give you all the time, but we keep segueing over into other matters.  I'm simply asking for both parties the day for counsel representing Mr. Gotts, you represent March 12th?

MR. HARRELL:  That's correct, your Honor.

THE COURT:  And the other counsel doesn't know but assumes it's on or about the same date.  Go in your records and find that date for me on behalf of Deputy Renegar.

MR. HARRELL:  We're looking, your Honor.  And, again, this is Shel Harrell for Deputy Gotts.  It would be March 12th of 2025 if I hadn't said a year yet.

THE COURT:  All right.  Now, I'm turning to counsel who represents Deputy Renegar.  I want to know the date you received this.

MS. SWISS:  I'm searching the emails, your Honor.

MS. MKRTCHYAN:  Well, yeah, it will take me, you know, some time, your Honor, to find this email, but --

THE COURT:  Counsel --

MS. MKRTCHYAN:  -- I know for a fact --

THE COURT:  Counsel, I want to find the email from both of you now.  It's a simple thing to ask.

(Pause.)

MS. MKRTCHYAN:  Yes.  I have the email here to -- on February 5, I sent them a dropbox link.  Please see attached the link to medical records of Plaintiff Holloway as part of Plaintiff's Rule 26 disclosures that Plaintiff

*Echo Reporting, Inc.*

36

may use at trial.  The email was sent to multiple parties here from Lynberg.com, and there were multiple people there.

And, by the way, these attorneys are claiming now that they haven't -- the other attorneys did not receive. Well, they have a joint defense.

THE COURT:  Who did you --

MS. MKRTCHYAN:  They have --

THE COURT:  Who did you send those to?

MS. MKRTCHYAN:  This is all multiple people at the --

THE COURT:  Oh, no.  I --

MS. MKRTCHYAN:  -- Lynberg and Watkins.  Diane Esparza, Shel Harrell, Catherine Naltsas, Craig Smith, Tamar Heathco (phonetic), Ryane Skinner, Debora Miranda, Carla Fonseca, again, Diane Esparza.  This is February 5.

THE COURT:  February 5th.

MS. MKRTCHYAN:  And I can copy that for the Court.

THE COURT:  Just a moment, Counsel.  I'll get a copy from you.

Counsel?

(Pause.)

MR. HARRELL:  Your Honor, I'm told that's correct.

THE COURT:  It was February 5th?

MR. HARRELL:  Yes.

THE COURT:  Okay.  Thank you.  All right.

8-RenSER-01531                    8-RenSER-01531

37

MS. MKRTCHYAN:  So, that's number one issue I wanted to address.

Number two issue, here's the interesting thing. I'm feeling like we are talking about completely in different worlds.  To them, issue of stroke, issue of, you know, this heart surgery, is related to emotional distress. That's not how I see it.  I see anything related -- for example, my client continued his physical therapy, his treatment for his back pain, his treatment for his headaches, his treatment for his stroke-related symptoms, after he left from California.  He went to Pittsburgh, Pennsylvania.  Those are his physical injuries.  Back pain is the key injury here we've been focused on.  His headaches exacerbated after this injury.  It just show -- we covered it even with Doctor Susan Hoppmidani.  These are neurological issues.  That is physical injury.  Someone does not get a stroke, by the way, as a result of emotional distress alone.  You need to have physical predisposition, physical, as this man has had apparently -- he has had blood clots and what was the word the other used, basically aneurism, something like that, in the brain.  That is -- is a personal -- a physical injury.  It's not related to emotional distress.  So, anyone who's sitting here, bring any doctor, medical doctor, he'll tell you that, Oh, you don't get -- ask them, Doctor, do you get a stroke as a

*Echo Reporting, Inc.*

8-RenSER-01532                                    8-RenSER-01532

38

result of emotional distress? If that was the case, God forbid, I would get a stroke every day because I am in emotional -- severe emotional distress as a result of this Holloway trial anyway. So, I would get a stroke every day. No, that's not the way it works.

So, what I'm trying to detach here is this notion that Plaintiff went and intentionally elicited this information in violation of her agreement. That is not the case. It's very easy to argue that Plaintiff's counsel is an obstructionist. It's hard to prove. Here we have never agreed to limit my client's physical injuries related to his orthopedic treatment to time he left for California. We never agreed to limit his physical injuries for headaches, symptoms of headaches that exacerbated after this incident. He was hit in the head. He had post-concussive syndrome. You saw it. And after that, he continued taking his neuro -- his drugs related to stroke. And now, though, I never even come that far to argue that the stroke he had last year is directly resulted from this incident. I haven't even come that far. I haven't brought a single doctor to testify. I have read back testimony of prior trials. They have the advantage right now. In fact, they have unlimited resources. They're going to go get their trauma specialist. They're going to go get their -- four experts they have lined up. They're going to have their advantage. Where is

*Echo Reporting, Inc.*

8-RenSER-01533          8-RenSER-01533

39

the prejudice here?  I have never argued that my client suffered the second stroke and heart surgery because of this incident, no.  All I've argued, all I've brought is the damages.  And, in fact, mother was focused -- I specifically focused her on pain and suffering of Mr. Holloway before he left California.  That was the focus of this woman's testimony.  So, this is reaching out, hanging on straws, just the same way they've been hanging on straws with the toxicologist expert.

Again, once again, when in February they received these medical records, we have -- I send them Rule 16 meet and confer.  They could have met and conferred with me.  They could have said, We have concern about these medical records.  They want to make it clear that Plaintiff is not going to use them at the trial.  That's the way to litigate a case.  If you had a problem with his medical records, you could have brought a motion in limine.  We would have litigated, and the Court could have excluded that, and we would not have a single reference to that.

As it pertains to homelessness issue, homelessness issue came in this case to -- to show my client's state of mind.  It's a fact that he's homeless on the date of the incident, okay.  That was the issue, and that's why we raised it in voir dire.  So, I don't even understand why this is an issue.  This man had a state of mind that he was

8-RenSER-01534     8-RenSER-01534

40

being targeted by the police because he was homeless. That's why homelessness was an issue.

So, this other homelessness came out in Montana. I was -- I never elicited that.  It was -- came in on direct, narrative way.  I didn't want to stop Ms. Tafoya. We didn't even -- it's not in violation of our agreement, because homelessness was not argued to be an emotional distress as a result of this incident.  We never said that, Oh, because of this incident, therefore, he was homeless years after.  No.  That was nothing.  We said that it was after his second stroke that he went into homelessness and that was the mom said.  And the stroke also we never connected to the incident.  So, all this is, you know, basically reaching out, hoping to get a mistrial, hoping to bring in his criminal record history, character evidence. How is this fair?  I don't know.  But clearly, your Honor, this is like hanging at straws.  I would like to -- you know, clearly, of course, they have portrayed me as an obstructionist, sure.  It's very easy to argue that Plaintiff's counsel is an obstructionist violating court orders, violating agreements, violating this and that, put me in jail.  Why don't you just kill me?  You know, Ms. Mkrtchyan, you know, you need to die.  How dare you to represent Mr. Holloway?

What I'm just saying is this.  You know, you want

*Echo Reporting, Inc.*

8-RenSER-01535                    8-RenSER-01535

41

a mistrial, why don't you brief it.  Bring legal arguments how is Ms. Tafoya's testimony really violation of that court agreement.  I never did any -- anything that was near coming close to that.  And you have the benefit of all this medical history.  Even in the medical records it was discussed he was staying at a shelter.  Did you raise that?  Did you argue that that's improper?  And even -- did you even object to Ms. Tafoya's testimony during trial?  Why didn't you stop her?  In fact, you could have objected to her testimony in the first place.  What were you trying to do?  This is the bad faith.  They are trying to say after the fact, Oh, your Honor, we didn't object to anything so that now we can ask for mistrial.  No, that doesn't work.  You object, you -- you fail to object, you've waived it.  That's how it works. You waive your right when you fail to object.  It's not like you're going to say, Oops, oh, we forgot.  We should have maybe objected, and now, your Honor, we are asking you to salvage our position asking for mistrial.  Now you've already brought in very damaging information about my client.  We are faced -- we are on basically the same position as we did at the last trial.  It's highly -- I highly doubt we will have a resolution of this case anyway because you already portrayed my client as a father who's been deprived of his kid.  So, damage is already done.  I am the one who should be, you know, claiming prejudice here,

8-RenSER-01536                                              8-RenSER-01536

42

but I'm asking for resolution of this case, closure of this case for good, so that my client does not have to come back to this courtroom.  We don't want to come back to this courtroom.  Nobody wants to come back to this courtroom.  He doesn't want to come back to California, period.  You know, seriously.  We don't want to be back and take up any time with this case from anyone.  We just want to resolve this case, period.  And they have done everything to that end.  I have done everything.  I have put all my cases away, and I have produced -- I have been up front.  I have produced all the witnesses.  I have given you all my work product, all my attorney work product from the get go, and I was hoping to have some sort of an amicable resolution to this case.  But, no, you're going to keep bringing up some sort of bad faith arguments to try to make me look bad here in front of the judge and alienate the jury.  That's what has been done.  Basically you've worked very hard to alienate the jury from my client.

So, I would like to part -- make this part of the record, the February 5 production of these records.  I also would like to make part of the record the witness list that I sent them as early on as in February, listing Ms. Tafoya as a witness in this case.  That is key evidence, and that is the, you know, evidence.  And I would ask the Court if the Court is seriously entertaining to declare a mistrial or

8-RenSER-01537                    8-RenSER-01537

43

if the Court is interested in allowing these other subsequent events in Pennsylvania damage my client's case. I would ask for, you know, additional briefing.  We've done some briefing.  We will need to do additional briefing because this is unfair and prejudicial to my client.

THE COURT:  I want to thank all counsel.  I don't know where to begin, so, I'll begin with the last argument. Some of this is somewhat inconsequential, but in and of itself, this Court would not consider a mistrial concerning the credit card indebtedness.  What's transpired is that the Court allowed the bail and bond amount to go in front of the jury as a bona fide expense for their consideration because this occurred on or around the date of the incident with the Sheriffs and Mr. Holloway.

It's close in time.  It's an expense that they can consider.  That amount, I believe, from memory, was about $2,000.  The hiring of an attorney is also a bona fide expense that the jury can consider.  Those allegations were brought through the Sheriffs Office with a charged criminal complaint that was later dismissed.  And that is at or near the time of this incident.  There's a nexus.

What went too far are the expenses run up over a period of time that came in in a narrative fashion without objection about the heart attack, the stroke, the homelessness, the mother supporting Mr. Holloway.

8-RenSER-01538                                      8-RenSER-01538

44

What I'm balancing is that no objection was made on one hand giving this Court an opportunity to recess or even think about this.  And I understand your tactical decision, but that's not a legal decision.  I have to have the ability to get an objection and then consider this or, once again, intercede.  I recognize for your record, for my record, that Ms. Tafoya was a very sympathetic witness, but I have to have a timely objection at that point.

By the same token, read the agreement back into the record for a moment that you just read to me and cite the location.

MR. HARRELL:  Your Honor, this is the Reporter's Transcript of Proceedings on our pretrial conference, and it's Friday April 4, 2025.  With regret, I don't have page numbers associated with the transcript.  I'm happy to file it, though or lodge it.

THE COURT:  I'll want the page numbers for my record.  I'll want the date, and you've previously stated that to the Court.  So, begin reading and your co-counsel will find this.

MS. MKRTCHYAN:  Can we have it on the screen, please?

THE COURT:  Yeah, we'll put it on the screen. Counsel, why don't you go to the lectern so I can see it also.

*Echo Reporting, Inc.*

8-RenSER-01539                                    8-RenSER-01539

45

MR. HARRELL:  Yes.

THE COURT:  And just put it on the screen, and let's read this once again back into the record.  And if co-counsel could help find the location --

MR. HARRELL:  We've got it.

THE COURT:  Okay.  Then state that so it's clear.

MS. SWISS:  Page 68 and 69.

MR. HARRELL:  Your Honor, this begins on page 68, line 16.

THE COURT:  And what date and where will I find this?

MR. HARRELL:  Your Honor, this is our transcript from Friday, April 4, 2025.

THE COURT:  Okay.  Now read that into the record.

MR. HARRELL:  All right.

"MS. MKRTCHYAN:  Your Honor, if you recall, at the last trial" --

THE COURT:  Put it on the lectern.  I just want to be able to see it.  Well, there it is.  Thank you.  "Your Honor, if you recall" -- keep reading.

MR. HARRELL:  MS. Mkrtchyan speaks:

MS. MKRTCHYAN:  Your Honor, if you recall, at the last trial, we actually read the instruction to the jury telling them that the emotional distress damages

8-RenSER-01540                                    8-RenSER-01540

46

by Plaintiff are limited to the time he left.

THE COURT:  Time out.

MS. MKRTCHYAN:  We already agreed to that.  So, what is the problem here?

THE COURT:  No, you haven't.  No, you haven't.  This is a new trial.

MS. MKRTCHYAN:  That's why I'm agreeing now, because I don't want -- my argument is this, that --

THE COURT:  Well, hold on.  Wait. Wait.  Just reach an agreement.

MS. MKRTCHYAN:  Yeah.

THE COURT:  If you're agreeing now to that same instruction, then I'm making the same ruling.  These alternate stressors aren't coming in.

MS. MKRTCHYAN:  Yeah, because this is a prejudicial issue.

THE COURT:  You're winning on this. No more.  We have an agreement then. The same instruction is going to be read which now cuts off these alternate stressors.  We're done.  Okay.  So, by agreement of counsel, the instruction --

8-RenSER-01541                                    8-RenSER-01541

47

and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after.  That makes the alternate stressors irrelevant in Rhode Island.

Okay.  I'm sorry.  I mean Pennsylvania.

My apologies."

And this concludes at line 19.

THE COURT:  With that agreement, now turning to the Plaintiff, after my concern about no objection being made by the Defendant, there's absolutely no reason to bring in through this witness the mother, these events after June or July of 2018 pursuant to the prior instruction and pursuant to the agreement, and there was no reason to emphasize homelessness, which caused the Court to literally instruct the jury during the opening statements that homelessness was not the center or gravamen of this case, that this was about excessive force.

And I believed, without warning, that any issue concerning homelessness that you were referring to was what had come up in the first trial about the O'Neil Campsite.  I never envisioned that we would get the sympathetic testimony of two or three days of homelessness which counsel has argued, and I think he's right, has a nexus back and an inference to this jury that this homelessness and this

8-RenSER-01542                                    8-RenSER-01542

48

continuing number of problems are caused by this incident.

These medical records, when you examine them, are also replete, if you look at them closely, about December 12th, 1919 (sic), appears to be feeling well.  April 5th, 2018, and I'm writing quickly, Doctor Schuller (phonetic), no fracture identified, alert, oriented, no acute intercranial hemorrhage, mass effect or shift, suffered concussion.

So, on one hand, I believe you disregarded the agreement.  On the other hand, you haven't, regardless of your tactical consideration, objected in a timely fashion. I'm going to go back and weigh this.

(Pause.)

THE COURT:  And the third area that has little to do with this is this statement that we could have sent this up to the Ninth Circuit.  I want to retrace that on the first jury trial, this was a hung jury, no fault of either counsel.  The jury hung.  On the second trial, this was a blatant disregard of this Court's admonition, which caused a mistrial.  This lies with the Plaintiff if there's going to be a fourth or fifth or sixth trial.

On the third trial, this was the Defense -- or strike that -- the Plaintiff's motion for a new trial, which the Court granted.  I could have sent this up to the circuit, and if both of you want to stipulate and send it up

*Echo Reporting, Inc.*

49

to the Circuit on the last trial, I'm happy to do so.  But there, the jury apparently believed that they'd reached an equitable decision, they had found liability against the five officers involved.  The difficulty was in the inconsistency and the damages.  Perhaps I should have just sent it up.  But I actually granted the Plaintiff's motion in this regard.  So, when we look to going to the Circuit for the next time, the Plaintiff really has prevailed in -- or caused two of these mistrials.

I'll reflect for a few moments in chambers. You're ordered to remain.

(Proceedings recessed briefly.)

THE COURT:  We're on the record.  All counsel are present.  I'm not to be interrupted.  Is that understood by all counsel?

MR. HARRELL:  Yes, your Honor.

THE COURT:  Is that understood by all counsel?

MS. MKRTCHYAN:  I'm sorry?

THE COURT:  I'm not to be interrupted when I start.

(No response.)

THE COURT:  Am I understood?

MS. MKRTCHYAN:  Yes, your Honor.

THE COURT:  Am I understood?

MR. HARRELL:  Yes, your Honor.

8-RenSER-01544

8-RenSER-01544

50

THE COURT: If I was inclined to grant a mistrial and you brought a motion for terminal sanctions, I think you could create quite a record, beginning with the Magistrate Judge and some of the things that have occurred in this Court. But if I weigh that, Mr. Holloway's entitled, regardless, of some of the actions by counsel to put this in front of a jury at some point. And, therefore, the actions, if you were correct and I ruled in your favor by counsel would be punishing Mr. Holloway. I don't think that I would be inclined to grant such a motion. But, of course, you could file a motion, and I would allow you to do so if I granted a mistrial.

The second issue is the fairness to your clients. When that envelope of Court's rulings are either ignored or not understood -- and I'm not quite certain on occasion whether it's blatant or just unintentional -- it gets to the point that if a verdict is rendered in Plaintiff's favor, you as counsel and your clients, I can understand, would be concerned about what you perceive has been the way questions were asked and the disregard of the Court's order.

By the same token, this Court has done the best it can to make the rulings, and the reverse could be said, and that is the Plaintiff may feel because she may believe that some of these questions are appropriate and proper that I've ruled on, that this is a matter of advocacy, and her client

8-RenSER-01545                    8-RenSER-01545

51

is being punished unfairly.

Second, it's of great concern to me when an agreement is reached between each of you but more importantly on the record with the Court, that that's obeyed. And here it wasn't. And I need to say this directly to you on -- as Plaintiff's counsel and that is this issue of homelessness is sympathetic. It's a societal issue that everyone is -- God, it's the number one issue in Southern California literally by polling, and it was very clear that June or July of 2018 was the agreed date that emotional damages would not go forward on. And yet we have a heart attack, stroke, homelessness, all with the inference that that's tied back to the January 2018 incident.

By the same token, the mother was always going to be a sympathetic witness. She was always going to make a good impression. Any mother would. And, so, I don't hear anything other than she's a devastating witness in terms of her presentation and perhaps you'd like a do over, and I can sympathize and understand your tactical decision. I don't want that to go by the wayside, but I can't make a ruling unless you do object, and you've been voluminous with your objections. The record will reflect that every appropriate time you objected I have tried to rule on that, and I think if we go back through the record, you'll see a huge number of objections that were sustained.

8-RenSER-01546

8-RenSER-01546

52

I'm going to cure this in the following way, and it's temporarily satisfactory for me, but if a verdict is reached, I control at the end of the case the overall fairness or lack thereof of a jury.

First, I believe that the jury instruction that I gave before, that both of you stipulated to, is an appropriate instruction. Second, tomorrow this jury will be admonished as follows, and I'll write this out tonight, but the gist of it will be close in time to Ms. Tafoya's testimony, the jury is to disregard all testimony concerning stroke, heart attack, alleged homelessness in Montana, as completely irrelevant, and this is to be disregarded by the jury, and I'm admonishing you close in time to this testimony.

So, let's fully understand and reiterate it once again, that this is not to be considered by you in any way in terms of substantive evidence, sympathy, nor damages. That will cure that up to this point.

The problem is if you don't heed my admonition and you press, I'm not warning you. I'm telling you that you're going to be able to go forward, but you are testing the limits of advocacy, and if you are going to object, your duty is to make a timely objection at the time, which you've certainly done time and time again, and it causes me to draw back and wonder why it didn't occur in this place regardless

*Echo Reporting, Inc.*

8-RenSER-01547                    8-RenSER-01547

53

of her "being a sympathetic witness".  If that objection had been made, I think I could have dealt with it very quickly without the prejudice, but what you won't have on the Defense side is now you won't be able to get in these stressors from Pennsylvania.  That's precluded.

Now, that's a final ruling by the Court.  I think that that's the right legal ruling at this time, but don't test me.  Draw your questions in, and make them succinct. Stop the compound questions, and don't argue with the Court when I make a ruling for either side.

Am I clear?

MS. SWISS:  Yes, your Honor.

MR. HARRELL:  Understood, your Honor.

THE COURT:  Because in front of the jury, I will come back strongly with an admonition in front of them from this point forward, and that will be devastating to the person who's disobeying my ruling.  Am I clear?

(No response.)

THE COURT:  Am I clear?

MS. MKRTCHYAN:  Yes, your Honor.

THE COURT:  Am I clear?

MR. HARRELL:  Understood.

THE COURT:  Am I clear?

MR. WRONIAK:  Yes.

THE COURT:  You're ordered into my court at 7:30

*Echo Reporting, Inc.*

8-RenSER-01548                                              8-RenSER-01548

54

tomorrow morning.  Goodnight.

(Proceedings concluded.)


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                        5/9/2025
Transcriber                             Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*

8-RenSER-01549                          8-RenSER-01549

Case 25-7132, 07/27/2026, DktEntry-29.06, (64 of 250)

# EXHIBIT L

8-RenSER-01550

8-RenSER-01550

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

|  |  |
|---|---|
| JEREMY HOLLOWAY, | ) |
|  | ) |
| Plaintiff, | ) **Certified Transcript** |
|  | ) |
| vs. | ) Case No. |
|  | ) 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) |
|  | ) |
| Defendants. | ) **DAY 4, VOLUME I** |
|  | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TUESDAY, MAY 6, 2025
8:06 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

8-RenSER-01551                                  8-RenSER-01551

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

MKRTCHYAN LAW
BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
655 North Central Avenue
Suite 1700
Glendale, California 91203
818-388-7022
narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

LYNBERG & WATKINS APC
BY:  S. FRANK HARRELL, ESQ.
1100 West Town & Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

LYNBERG & WATKINS APLC
BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
213-624-8700
cnaltsas@lynberg.com

LYNBERG & WATKINS PC
BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
1100 West Town & Country Road
Suite 1450
Orange, California 92868
(714) 937-1010
theathcote@lynberg.com

LYNBERG & WATKINS
BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

8-RenSER-01552                    8-RenSER-01552

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

       COLLINS & COLLINS LLP
       BY:  MICHAEL L. WRONIAK, ESQ.
       750 The City Drive
       Suite 400
       Orange, California 92868-4940
       714-823-4100
       mwroniak@ccllp.law

       COLLINS & COLLINS LLP
       BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
       2011 Palomar Airport Road
       Suite 207
       Carlsbad, California 92011
       760-274-2110
       cswiss@ccllp.law


**ALSO PRESENT:**

       Raymond Farahmand, plaintiff's paralegal
       Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

8-RenSER-01553                                   8-RenSER-01553

4

# I N D E X

**WITNESSES**                                                    **PAGE**
_____

**JOEL GONZALEZ, CALLED BY THE PLAINTIFF**
    Cross-Examination by Mr. Harrell (continued)      5
    Cross-Examination by Mr. Wroniak                   57
    Redirect Examination by Ms. Mkrtchyan               67
    Recross-Examination by Mr. Harrell                  98

**LAVINIA SUE BETZLER, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan                109
    Cross-Examination by Mr. Wroniak                   132
    Redirect Examination by Ms. Mkrtchyan              144
    Recross-Examination by Mr. Wroniak                 148

**LORETTA HOLLOWAY TAFOYA, CALLED BY THE PLAINTIFF:**
    Direct Examination by Ms. Mkrtchyan                150

# EXHIBITS

**(None offered.)**

**UNITED STATES DISTRICT COURT**

8-RenSER-01554                                    8-RenSER-01554

THE COURT:  Okay.  Thank you.  And if we need you, we'll be polite.  We'll find you.  Thank you very much.  You may step down.

Then, Counsel, you have a transcript or a --

MS. MKRTCHYAN:  I have a next witness, Your Honor.

THE COURT:  All right.  First of all, how are you folks holding up?  Need a break?  Then let's see if we can go to noon.  Okay?  And if you need one, let me know.

Counsel, call your next witness, please.

If you'd please step forward.  And would you please raise your right hand.

**LORETTA TAFOYA, PLAINTIFF WITNESS, IS SWORN**

THE COURT:  Thank you.  If you'd please be seated here in the witness box.  The entrance to the witness box is closest to this wall.  It's not this door.  And when you face the jury, would you state your full name, please.

THE WITNESS:  Loretta Holloway -- I mean, Tafoya. Loretta Holloway Tafoya.

THE COURT:  I'm going to move that microphone close to you.  Now state your name again.

THE WITNESS:  Loretta Tafoya.

THE COURT:  Just a minute.  Would you spell your first name for me, please.

THE WITNESS:  L-o-r-e-t-t-a; last name T-a-f-o-y-a.

THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

8-RenSER-01555                                    8-RenSER-01555

Direct examination, please.

**DIRECT EXAMINATION**

BY MS. MKRTCHYAN:

Q    So, Mrs. Tafoya, your previous last name was what?

A    Holloway.

Q    Holloway.  So speak to the microphone because --

A    Okay.

Q    -- you need to get close to the microphone as we can see.

So your last name now has changed because you remarried?

A    Yes.

Q    Okay.  You're the mother of Mr. Holloway?

A    Yes.

Q    Okay.  How old are you?

A    68.

Q    Now -- so just briefly about your background, are you -- what is -- what do you currently do?

A    I'm retired.  I work as a sub every once in a while at a school.

Q    Where?  What --

A    At a school district in -- Corona-Norco School District.

Q    Where did you retire from?  What was your occupation?

A    Secretary to the chief of police in Santa Ana.

Q    Santa Ana what?

A    Santa Ana Police Department.

**UNITED STATES DISTRICT COURT**

8-RenSER-01556                                    8-RenSER-01556

151

Q     Okay.  For how many years did you work for Santa Ana
Police Department?

A     28.

Q     Okay.  When did you retire?

A     In 2013.

Q     Okay.  And you have three kids.  One of them is Jeremy
Holloway?

A     Yes.

Q     So tell me your -- so Jeremy Holloway, is he the older
one?  Tell me the first, second, and third.  Tell me your kids.

A     I have -- the oldest is -- I have a son that's oldest,
Jeremy is second, and then I have a daughter that's younger.

Q     Okay.  Jeremy is the middle, and how old is your other
son?

A     He's 50.

Q     Okay.  Your daughter, how old is she?

A     She's 46.

Q     Okay.  You raised this kids without a father?

A     Right.

Q     And so you were married.  And, you know, when did you
divorce the father of Mr. Holloway?

A     I think -- I believe it was in '86 -- no, probably '84.

Q     That's fine.  So it's been a while?

A     It's been a long time.

Q     And, you know, how old were your kids when you divorced

UNITED STATES DISTRICT COURT

8-RenSER-01557                                              8-RenSER-01557

the father?

A    I believe they were like -- because they were two years apart, so it's -- they were like --

Q    You don't have to say exact ages.

A    Okay.  Around -- from 11 to, like, 13 maybe.

Q    Okay.  And you raised them after that by yourself?

A    Yes.  Uh-huh.

Q    Okay.  And so your other son, what does he do?

A    He's in law enforcement.

Q    Okay.  Your daughter, what does she do?

A    She's in financial -- she's financial -- she works at a bank.

Q    So your kids --

A    She's the manager of a bank.

Q    Okay.  And your kids, and Mr. Holloway as well, they were raised by you without a father until you remarried?

A    Yes.

Q    When you remarried, they were already adults and on their way?

A    Yes.  My sons were in the military.  They had just been -- I believe they were just getting out.  They weren't totally out, but they were, you know, pretty much out.  My daughter was still at home with me for a little bit.

Q    Right.  And so, you know, you worked your way out as a single mom basically?

**UNITED STATES DISTRICT COURT**

8-RenSER-01558                    8-RenSER-01558

153

A    Yes.

Q    So both sons went to the military?

A    Yes.

Q    So focusing on Mr. Holloway, Jeremy, he went to the military?

A    Yes.

Q    Which branch of the military?

A    The Marines.

Q    How long was he in the military?

A    Four and a half years.

Q    Okay.  And were you proud that he went to the military?

A    Yes.

Q    Did he sustain any injuries in the military?

A    Yes, he did.

Q    What kind of injuries?

A    I know he had hurt his mouth, which he had injuries in his mouth, with his teeth.  And then he had gotten stitches on the -- the back of his head -- or I should say staples.  And -- which I know was pretty rough because afterwards they didn't -- really didn't even let him go to the hospital to get the stitches removed.  They just did it there at the -- you know. So that was hard to hear, you know, because I wasn't there.  He was stationed -- he was stationed more, like, in the desert, you know.  In the --

Q    He wasn't local?

**UNITED STATES DISTRICT COURT**

8-RenSER-01559                                             8-RenSER-01559

154

A     No.  They were -- he was six months out to sea and then six months --

Q     Right.  So he had those injuries.  Did he have any other injuries related to the military?

A     I think just more -- I think he said a couple times he had stitches, I believe, and then the injury to the mouth.  But those were the major ones.  But they're -- because he was -- his job was patrolling.  So, you know, there are times where, you know, he had to fight people.  And so there was...

Q     When he came out of the military -- so flash-forward to 2016.  He had a stroke?

A     Yes.

Q     You were aware of that --

A     Yes.

Q     -- right?

       So after that stroke, how -- first of all, did you notice any health issues related on him -- to him?  How did his health -- how did that stroke affect his health?

A     It was traumatic.  He had no more peripheral vision.  Emotionally, it was tough because then, you know, he couldn't really work too much.  So he thought to help -- because when you have the stroke, it sort of causes anxiety because, you know, you don't know if you're going to have another one.

       So he likes being outdoors.  So he just -- at that time that's when he thought, "You know what.  I've got -- I got

UNITED STATES DISTRICT COURT

to get my, you know, self together."  So that's when he started his camping, a little bit after that.  And --

Q    Right.  Yes, yes.  So did you notice -- so aside from, like, the anxiety thing, did you notice any other personality issues with him after the stroke?

A    Well, it affected everything.  I think any time you have anxiety, you -- it just affects your whole personality and everything.  It was a big difference.

Q    Big difference.  So you noticed big difference after the stroke in him?

A    Yes.

Q    Okay.  And now, did you know that he was having financial hardship at the time of the incident that caused him to stay at the park and be homeless?

A    Yeah.  But that's where he thought he could -- because he had a job that was local.  And so he thought, "Well, you know what" -- you know, that's his safe place is being out.  He loves -- you know, he just loves the outdoors.  His goal was to go up the John Muir Trail that takes, like, you know...

So he thought, "You know what.  This is a good time," because what he did was he worked at the PD.  He worked at the school district.  He worked -- and so it was a local campground that he could work.  He had all his tools in his truck.  And he didn't have to worry about rent, but he just had to live in that way.  You know, that was his goal.  "Let me do

8-RenSER-01561                                    8-RenSER-01561

156

this.  I'll do that.  Get myself back together.  Do this trail thing" and -- you know.

So -- and when he first did it, I really was able to see sort of a -- like, he was like, "Oh, you know what.  This is good for you."  You know, I'd meet him, and we'd both go hiking because I loved the outdoors myself.  So we would both go hiking.  I would go and meet him out there, and we'd go the trails.

Q    Right.  So -- and did you -- so he was going to camping a lot.  You were aware of that?

A    Uh-huh.

Q    And you knew that he was traveling in his truck?

A    Yes.  Uh-huh.

Q    But he was working?

A    Yes.

Q    And the jobs he was doing was repairing -- he was technical repairman?

A    Yes.  Uh-huh.

Q    Okay.  Now, 2018, you knew he was going a lot to O'Neill Regional Park?

A    Yes.  That's where he was sort of -- that's where he stayed mostly because of the fact that he was able to work, you know, come home.  And he'd take pictures.  "Oh, look.  Here's my dinner."  You know, he was sort of proud that he was, you know, surviving.  He liked it.

**UNITED STATES DISTRICT COURT**

Q     Right.  And it was helping him, you noticed, with anxiety?

A     Oh, yes, uh-huh.  Because he was able to -- he has a little support dog.  That was another thing that the VA had him -- he was able to get a support dog that sort of helped the anxiety because you're not just focusing on yourself.  You have to focus on something else, and he was able -- you know, he was taking care of the dog.  That was his life.  With his job, he was able to take his dog with him.

Q     Right.  So this was a dog Bowser?

A     Bowser.

Q     Was the dog that was recommended by the doctor to alleviate his anxiety symptoms?

A     Yes.  Uh-huh.

Q     Okay.  And so you were supportive of him camping and --

A     Yes.

Q     Okay.  Even though you did have a home yourself, you know, he was not staying with you.  He was --

A     No.  I was taking care of my mom also at that time.

Q     And you lived in a -- how big of an apartment did you live?

A     Well, I lived in a home, but it was only a two-bedroom.  So my mom had one, and then my husband had the other one.

Q     So, in any event, Holloway was staying at this campsite, traveling.  Flash-forward to 2018.  You learn of this incident;

**UNITED STATES DISTRICT COURT**

8-RenSER-01563                                      8-RenSER-01563

158

right?

A     Yes.

Q     How did you learn?  What was the first time -- how did you learn of this incident with the police?

A     Well, when things happen, they never happen at a good time.  It was actually a good time for me because I was celebrating my daughter's birthday.  We were on a cruise and not thinking anything.  I was -- when we docked, my phone just -- I got reception.  My phone just started -- I had all these messages, and I thought, "Oh, my gosh."  I could tell they were from Jeremy.

And my first reaction was "Oh, my gosh."  He was hiking, you know, and something happened to him, you know, hiking.  I thought -- first thing he -- that's because, you know, I always worry about hiking when you're by yourself.  But that was my first reaction.

Q     Okay.

A     You know.  But then when -- and then I found out that, you know -- and I guess my first reaction, because I did work at the police department, "What did you do?" you know.

And -- but he says, "Mom, I swear I didn't do anything."  And then he told me the story.  And so as soon as I got home, I -- we went home.  My husband went home, and I went and got in the car, went over there and...

Q     Where did you go?  You went to jail?

UNITED STATES DISTRICT COURT

8-RenSER-01564                                          8-RenSER-01564

A    I went to the jail.  First, I had to go bail him out.  I had access to his bank account.  So I was able to get some of his money and the -- which wasn't enough, so I had to use some of my money and bailed him out.  He told me where he'd be.  And I think my husband was actually with me.  He was with me.  He went with me.  And I -- we met on the corner, and I seen him.

Q    How did you see him?

A    Sorry.

        MS. MKRTCHYAN:  Can you pull up the photograph 100-13.

        **(Exhibit displayed.)**

BY MS. MKRTCHYAN:

Q    When you picked him up from jail, he was bruised, blackened, and --

A    One eye.  One eye was closed when I picked him up.  And it actually looked worse than the picture because I guess the blood was starting -- because I didn't get to pick him up until, like -- I don't know, three, four days after he was already in the jail.  So his face was even more -- because when bruises come, they get, you know, a little bit darker.  So -- he only had one eye opened.

        I said, "What happened?"  So we -- I took him back to the house, and we -- he put some clothes on because he just had all this stuff on and the jacket.  So he went home and got ready, and I told him -- we had to go get his dog because that

**UNITED STATES DISTRICT COURT**

8-RenSER-01565                                                    8-RenSER-01565

was -- he was panicking.  He said, "I want to get my dog. Let's go get Bowser."  We got Bowser and that became even an issue.

So I finally got the dog, and then we drove to the campsite, and his stuff was all thrashed, the tent.  Everything was just -- it was torn.  We went to the truck and even in the back of the truck, there was smelling salts thrown in there, and I said, "Jeremy, what happened?"  Did you go -- you know, because they're not going to do -- and there was towels of blood in the back of his truck.  It was like -- and then there was also a vial, little glass vial of something.  I said, "Well, I wonder what this -- what did they do to you?"  You know.

And I didn't even think of taking pictures or anything.  But that scared me too because I thought, you know, when you're doing smelling salts, he must have, you know, went unconscious too.  So that even sort of made me worry, you know, especially since -- and then things start flashing in my head of mine.  "Oh, my gosh, he had a -- here, he had a stroke. What are going to be the chances of him getting another stroke?"  You know, because stroke is actually a blood clot, you know, in your brain, and you're getting hit in the head, you know.  So it was -- it was tough.  So, you know --

Q    And how was he -- let me ask you this:  So when he came out of jail in this condition -- first of all, did he have a

8-RenSER-01566          8-RenSER-01566

jacket on?

A    Yes.  He had his jacket on, which is really a thick, thick jacket.  And that was another thing that was very shocking that he had this big old jacket, but yet the wounds under the jacket didn't help protect the wound -- I mean, you know, that's a thick jacket.  I could -- I mean, that's all I could just say was when he took it off and I seen his wounds, and I was, like, "You had that jacket on?"

Q    And he had no shirt on him?

A    I don't even think there was a shirt on him when I picked him up because they just took him the way he was.  But he did have the jacket on.  And I don't think he had shoes on either.

Q    And how did he -- what kind of emotional condition was he when you picked him up?  How was his condition?

A    Well, when I picked him up and when he got his truck -- my husband went with me -- I was scared that he wasn't going to come to my house.  He was -- I kept telling my husband, "Slow down because I don't see the truck."  Because I was worried.

Q    Right.  And when you picked him up and then -- first of all, you also paid for bail; right?

A    Bail for the -- him and Bowser because it cost me a couple hundred dollars just to get Bowser out.

Q    Do you remember approximately how much bail did you post on him?

A    Oh, gosh, it's been so long.  I don't know.  Maybe, what,

8-RenSER-01567                                    8-RenSER-01567

4,000.

Q    Okay.  Let's pull this up.

A    I don't really remember.

Q    Sure.  So let's just pull it up.

This is Exhibit 65, the bail bonds payment that you paid for Mr. Holloway.

MR. HARRELL:  Your Honor, objection.  Relevance. 403.

MS. MKRTCHYAN:  Goes to his damages.

MR. HARRELL:  Probable cause ruling.

THE COURT:  For damages, Counsel?  Is this for damages?

MS. MKRTCHYAN:  Yes.

THE COURT:  All right.  Briefly.  Overruled.

BY MS. MKRTCHYAN:

Q    So according to this document, there was a bail for charges of PC 69 and PC 243 on Mr. Holloway.  The bond amount was 20,000.  The bail bond premium was $2,000; right?  So you paid $2,000 to bail him out according to this document; right?

A    Yes.  Yes.

Q    Okay.  So then after that, when you took out -- you know, you went to this campground, you know, and Jeremy was telling you what happened, do you remember his condition when you were going over his stuff at the campground?

A    Yes, I remember his condition.  Yeah.  He was just -- pain

UNITED STATES DISTRICT COURT

8-RenSER-01568          8-RenSER-01568

163

bodywise and emotionally.  And it was -- and I think -- because of everything that he owned was in that tent, it was just like, you know, "What do I do now?  What do I do?  Where do I go?"

And then of course the mom in me, you know, we went to Bass Pro Shop and bought all new camping supplies because, you know.

Q    How much did you approximately pay for the new camping gear for him?

MS. SWISS:  Objection.

MS. MKRTCHYAN:  Goes to his damages, Your Honor.

MS. SWISS:  Relevance.  Mother's costs versus plaintiff.

THE COURT:  I'll allow the testimony.  I'll let the jury decide if there is liability here, what those damages are.

BY MS. MKRTCHYAN:

Q    So go ahead.  Continue.

A    So we did get him a new tent and camping supplies and just for him to start all over again.  So he stayed with me for a little while until he can physically at least walk.  We did a lot of trips to the --

THE COURT:  No, ma'am.  I'm sorry, the question was the cost.

THE WITNESS:  Oh, I would say maybe about 3- -- close to 2-, $3,000.  I ended up taking some money out of my retirement.

**UNITED STATES DISTRICT COURT**

8-RenSER-01569                                                    8-RenSER-01569

THE COURT:  Okay.  Thank you.

Counsel.

BY MS. MKRTCHYAN:

Q    So you were lending him this money --

A    Yes.

Q    -- to get this stuff?

A    Yes.

Q    Okay.  Then, so flash-forward, you took him to
hospital -- right?  --

A    Yes.

Q    -- after the jail --

Let me finish because the court reporter has to take
it down.

A    Oh, sorry.

Q    Then after that camping gear stuff and you picked up the
animal, you took him to the hospital, the Long Beach VA.  You
personally took him?

A    Yes.

Q    Why?  He couldn't drive?

A    No, he couldn't drive, and he knew there was still other
issues with -- I was worried about his head.  And then he was
having a hard time walking, you know, with his back.  So I told
him, "Let's go to the VA, and let's do another check."

Q    Right.  So you took him to hospital.

Did you remember how long after that his eye

8-RenSER-01570                                                    8-RenSER-01570

165

stitches were removed?

A    It was a while because of the -- it wasn't like a clean cut.  It was more gashy, and they had a hard time stitching him up.

Q    And after the hospital, he stayed at your place for some time?

A    Yes.

Q    How long?  Do you remember?

A    I -- it's been so long.  I don't know.  Maybe at least a month.  And then he thought, "You know what, mom, let me try to -- let me go back."  Because he wanted to try to see if he can go back to work, but they wouldn't let him go back to work.  Because where he worked, it wouldn't look good, you know.  So he was --

Q    As a result -- the bruises, is that why?

A    Yes.  Because he did work at a school.  And they said they can't let him go to -- he can't go to work with the -- the injuries.  But he didn't -- he hated to impose on me, and he said, "Mom, I can't."  And I said, "Well" -- I mean, you can't.

THE COURT:  Just a moment.  This is turning into a narrative.

THE WITNESS:  Sorry.

THE COURT:  This is for damages or what she saw in relation to her son, okay?  Let's limit this now.

BY MS. MKRTCHYAN:

8-RenSER-01571                          8-RenSER-01571

Q      So, you know, for that period of time as he was staying inside of your home, how was his emotional condition?  Describe to us.  What was he --

A      Scared of everything.

Q      Okay.

A      And that's why I took him everywhere too because he was scared of everything.

Q      So you were driving him everywhere?

A      Yes.

Q      Was he able to get out of home on his own that period of time?

A      No.

Q      Okay.  Was he telling you that -- what was he saying to you about his emotional pain?

A      He was just afraid that somebody was going to come and get him.

Q      Okay.  Were you aware that the prosecution -- prosecuting authorities did not prosecute him?

            MR. HARRELL:  Objection.  403.

            THE COURT:  I'm going to sustain the objection. I'll speak to both of you about that at lunchtime.

BY MS. MKRTCHYAN:

Q      Did you help him to actually hire a lawyer, criminal defense attorney?

            MS. SWISS:  Objection.  Relevance.

UNITED STATES DISTRICT COURT

8-RenSER-01572                                                    8-RenSER-01572

MR. HARRELL:  Join.

THE COURT:  Overruled.

MS. MKRTCHYAN:  That goes to his damages.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q    So he did hire an attorney separately to represent him against this charges that were filed -- that were being imposed on him by this officers' arrests?

A    Yes.

MS. SWISS:  Objection.  Argumentative.

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q    So he was staying with you --

THE COURT:  Also, you're right, Counsel.  Last part got added onto that:  "Were imposed on him by this officers' arrests."  That's sustained, Counsel.  Just reask the question, Counsel.  Damages.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    So you hired an attorney.  You paid for bail, et cetera. Then you said that he was staying with you, and then you said he --

THE COURT:  No, Counsel, just a moment.  You asked about the attorney.  If there's no fees put forward by the mother, then this is irrelevant.  You need to -- that's why I

UNITED STATES DISTRICT COURT

8-RenSER-01573                                                    8-RenSER-01573

168

allowed that.  What fees, if any, were paid?  What came out of her pocket?

MS. MKRTCHYAN:  Yes.

THE COURT:  All right.  Then ask the question about attorneys.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q     So did you happen to hire an attorney?

A     Yes.

Q     Okay.  Do you remember how much money was that?

A     I'm just --

Q     Maybe we can --

A     I don't really remember.

Q     That's okay.

So then basically you said that he didn't want to impose.  He tried to camp out --

THE COURT:  Just a moment.  No, I'm going to strike that area of inquiry, then.  In other words, first, the jury will determine if there's liability.  If they don't, then it's resolved.  If they determine liability, then they may weigh damages.  The question is:  If there was money paid out of your pocket and if you don't remember or money wasn't paid -- was money paid out of your pocket?

THE WITNESS:  I think -- was it 6,000?  Because I looked back.  I was trying to look back on some of my receipts

UNITED STATES DISTRICT COURT

8-RenSER-01574                                                                          8-RenSER-01574

stuff.  I believe it was 6,000 that was --

BY MS. MKRTCHYAN:

Q    Up to this date, for example, you know, you've also assisted him with other living costs; true?

A    Yes.

Q    You've given him -- you've lent him money?

A    Lent him, yes.

Q    Now let's focus on the time near the incident.  After some time, he left California; true?

A    Yes.

Q    But -- do you remember it was in July of 2018 when he left California?

A    Yes.

Q    Was it as a result of this incident that he left California?

              MS. SWISS:  Objection.  Lacks foundation.

              THE COURT:  Sustained.  Stricken.

BY MS. MKRTCHYAN:

Q    To your knowledge, why did he leave California?

A    Because when he tried to go back to the campground, they -- and the sheriff's department went up to him again.  And so he just packed everything up and said, "Mom, I've got to leave."

         So he applied for a job and went to -- applied for several jobs.  And whatever job he could get to take him out of

**UNITED STATES DISTRICT COURT**

8-RenSER-01575                                                      8-RenSER-01575

California, the first one that offered him a job, he took.  And he drove an old truck to Pennsylvania.

Q    Okay.  So it was after another incident when he went back to that campground, O'Neill Regional Park, when he was also encountered by the sheriff's department officers, deputies, and he left California?

A    Yes.

MS. SWISS:  Objection.  Motion to strike.  Counsel's testifying.

MR. HARRELL:  Leading for sure.

THE COURT:  Sustained.  Sustained.

MS. MKRTCHYAN:  Your Honor, I --

THE COURT:  You just asked a question.  She's already --

MS. MKRTCHYAN:  I didn't hear you, Your Honor.

THE COURT:  It was sustained.

MS. MKRTCHYAN:  Okay.  Thank you.

BY MS. MKRTCHYAN:

Q    Now, basically, then, after he left -- between the time he left and Pennsylvania -- for Pennsylvania, was he able to do work as he had been able to do, in California?

A    No.

Q    Why not?

A    Well, he emotionally was -- he tried to work but between the job that he got, he had to use a car, and he had a hard

8-RenSER-01576                                    8-RenSER-01576

time because of the peripheral vision.  And emotionally he was still having a hard time.  So -- but even on the way there, I had to lend him money to -- his truck broke down.  So I ended up giving him a credit card --

Q     Yes.

A     -- to live on.

Q     Right.  And so you have given him your credit card, you know, to help him with this kind of cost because he couldn't leave -- work the same way as he used to do?

A     Right.

MS. SWISS:  Objection.  Leading.  Counsel's testifying.  Relevance.

THE COURT:  Counsel, you keep summarizing it.  We want to hear from the witness.  Sustained.

MS. MKRTCHYAN:  This goes to damages.

BY MS. MKRTCHYAN:

Q     In any event what credit card did you give him?

MS. SWISS:  Relevance.

THE COURT:  Yeah, I think this is getting peripheral at this point, Counsel.  I think that the damages surrounding the incident, the credit card I'm going to exclude, Counsel.

BY MS. MKRTCHYAN:

Q     Well, how much money have you lent Mr. Holloway thus far, to date, for living costs, for rent, for food, for traveling?  How much money so far have you calculated you've lent him?

UNITED STATES DISTRICT COURT

8-RenSER-01577                                    8-RenSER-01577

172

A      At least $40,000.

Q      Okay.  And 40,000, that's part of his credit card?

A      It's our credit card.

Q      Right.  And are you still paying those credit card bills?

A      Yes.

Q      And is there interest on this credit card bills?

A      Yes.

Q      Okay.  When he went to Pittsburgh, Pennsylvania, and after that he went to Montana; right?

A      Yes.

Q      Right.  And was he homeless for certain periods of time in Montana?

A      Yes.

Q      To get him off the streets, did you help him with rent?

A      I did for a certain amount of time, but my credit card got maxed, and so he ended up living on the streets for a couple days.  But then that's when he called me and said come and get his dog.  And I knew what that meant.  So I got more money, and I told him to get a hotel.  But thank goodness, Montana is very good for VA.  He did get to go to a shelter.

Q      So he had a stroke?

A      He ended up having another stroke.  This was right -- that's right.  He had -- that was another reason why he couldn't work.  He had another stroke in the same spot where his head was -- I had to fly out there.  And he still has two

**UNITED STATES DISTRICT COURT**

8-RenSER-01578                                                                8-RenSER-01578

173

aneurysms still in his head now.

Q    Right.  And when was this stroke that he sustained approximately?  Was it last year?

A    It's been -- it's probably been about, what, four months ago or so.

Q    Okay.  And he had a heart surgery after the stroke?

A    He's had -- he's had heart surgery.  When he had the stroke, you know, because of his age, they're trying to figure out why.  So they've been doing a lot of testing.  So they said he needed heart surgery.  So with all this, he has not been able to work again.  And so -- but yes, he had another stroke.  And he was talking to me on the phone, actually, when he had gotten the stroke.  He said, "I'm feeling funny," and I told him to call.

Q    And how old is he now?

A    48.

Q    Right.  And you didn't expect him at 48 to be dependent on you?

A    No.

Q    And you had to -- when you retired, did you expect to go back to work?

A    No, not really.

Q    And now you're working, you said, part time?

A    Yes.

            MS. SWISS:  Objection.  Relevance.

UNITED STATES DISTRICT COURT

8-RenSER-01579                                    8-RenSER-01579

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    Because you're paying --

THE COURT: Counsel, sustained. Sustained.

BY MS. MKRTCHYAN:

Q    So after the incident, when you took him to hospital, you were aware of the injuries that he was told he sustained by doctors; true?

A    Yes. Uh-huh.

Q    Okay. And after that, you know, was he able to get back on and do the camping that he enjoyed that affected -- calmed him down? Was he able to do camping and hiking?

A    No.

Q    And that also had a bad effect on his health?

A    Right.

Q    And that -- because he was -- camping and hiking and being in the nature helped him to calm his anxiety?

MS. SWISS: Objection.

MR. HARRELL: Leading.

THE COURT: Sustained.

This is argument, Counsel. You're more than welcome to argue it, but you're testifying now.

MS. MKRTCHYAN: Understood.

BY MS. MKRTCHYAN:

Q    So after this incident basically, can you tell me how his

UNITED STATES DISTRICT COURT

life has changed in terms of his ability to do things he loved doing before?

A    It changed dramatically.  He can't hike like he used to. Working is very hard.  He tried a couple jobs in Montana, but he has to be very aware what he can do --

Q    Back problems?

A    -- with back problems.  So he has to do, like, little jobs that he doesn't carry anything.  But he does walk to work. And -- you know, and he does send me -- he tries to send me money whenever he gets paid because he does feel very bad about that, you know.  I've had to help him; so he does try to help me.

THE COURT:  All right.  Thank you.

MS. MKRTCHYAN:  Yes, Your Honor.  Is this -- I'm not sure of the ruling.

THE COURT:  Counsel, couple more questions.

MS. MKRTCHYAN:  Sure.  Yes.  Wrapping up, Your Honor.  Sure.

BY MS. MKRTCHYAN:

Q    And basically after this incident, he left for California.  Prior to leaving California, you know, he was staying with you.  But during that stay, can you tell me any type of -- specifically how his demeanor was that -- you know, you said emotionally he was not in good shape.  Tell me specifically, what do you remember during that period of time

8-RenSER-01581                                                    8-RenSER-01581

that struck you?

A     Well, I know at first, when he -- when he tried to get --
anytime he went somewhere that wasn't at my house, he would put
chairs up against -- he was scared.  He put -- would put chairs
up against a door, like, a hotel or whatever and, you know, or
call me and say -- you know.  It's just I know -- I began
anxiety too.

When he comes to my house -- I live in a gated
community, and I'll never forget this one time when he was in
California, there was, you know, sheriff's department by my
house and by the gate.  And my first reaction was, "Oh, my
gosh," you know, I -- and I was, like -- I told him, "I can
imagine what your anxiety is because, you know, my first
reaction when I seen him by my house, I'm like, you know,
something's happened."  They're coming to get him again or
something.  It just -- it was a weird feeling.

MS. SWISS:  Objection.  Narrative.  Move to strike.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     And that, you know, he's --

THE COURT:  I'm sorry.  Counsel, another question.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q     So basically he was traumatized as a result of this
incident, and he had recurrent fear from police during that

UNITED STATES DISTRICT COURT

8-RenSER-01582                                          8-RenSER-01582

time you observed him in California?

MS. SWISS:  Objection.

MR. HARRELL:  Leading.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you, Counsel.

Then, ladies and gentlemen, I'm going to send you to lunch.  I'm going to ask you to come back at 1:00 o'clock.  Okay?  Please don't discuss this matter nor form or express any opinion concerning the case.  We'll see you at 1:00 o'clock.

**(Out of the presence of the jury.)**

THE COURT:  And thank you very much.  You may step down.  If you'd return at 1:00 o'clock, we'd appreciate that.

All right, Counsel.  Have a seat for just a moment.  This witness did not testify in the prior trials, did she?

MR. HARRELL:  Correct, Your Honor.  She did not.

THE COURT:  This raises the whole question of stressors again that I had excluded.  And here, the Court has previously excluded the stressor of the divorce in 2016, which occurred before this incident.  In the first trials, I was confident of that decision.

With this testimony, I'm no longer confident of that decision.  The difficulty is I'm inclined now to reverse that decision because of this testimony and to allow the stressor of

8-RenSER-01583                                                      8-RenSER-01583

the divorce.  What I'm concerned about, though, is what you apparently really want to get into, and that is the terms that the Court imposed.

I tentatively still feel that that anger management by the Court, the probative value is outweighed by the prejudicial effect.  But here, with the divorce in 2016, that is a stressor that I think, in light of this testimony now, that I'm prepared to reverse.  So I'm going to have you each make your record.  I know you'll want more from the defendant.  I know that you'll want none of this from the plaintiff.  But this substantially changes this stressor issue.

So, Counsel --

MR. HARRELL:  Your Honor, a quick point.  Let's set aside the terms imposed by the Superior Court for anger management.  Let's set that aside.  We want in the removal of his daughter.  He was barred six months before this incident of having any contact of any type with his only daughter.

THE COURT:  How old was the daughter?

MR. HARRELL:  Very minor.

THE COURT:  Well, you're not helping me.  Can anybody help me?  Can you help me with the age?

MR. HARRELL:  Six years of age.

THE COURT:  Now, that then would be an inference that he has done something in the relationship that is so consequential from a court standpoint that the daughter's been

8-RenSER-01584                                          8-RenSER-01584

removed.  I agree with you that the divorce, I believe, is a stressor in this period of time.  I'm concerned about the daughter and how that's portrayed because, once again, the inference would be that a court caused this.

But I didn't expect the mother's testimony.  I hadn't heard her before.

Now, Counsel, I'd like to hear from the plaintiff, please.

MS. MKRTCHYAN:  Well, Your Honor, this is, like, a very interesting situation.  So my client is not allowed to introduce whatsoever any evidence about damages.  This is why we are here today, fourth trial.

THE COURT:  Counsel, that's false.  You've gotten tremendous -- I'm not going to allow that to occur with my record.  You've gotten tremendous leeway in terms of these damages.  I've even -- you've even gone around me in terms of the credit card and got in a payment debt of $40,000.  That's directly against what I ruled, but it's in front of the jury, and I'm hesitant to ask what the defendants' position is because, from their point, it might be blatant.

Now, regardless of my thoughts, that's now in front of the jury.  But the sweep of this now is the only stressors being the Marine Corps, his treatment, and this incident.  And now that is not a correct portrayal.  He's minimally gone through a divorce, and minimally I'm going to allow that.

**UNITED STATES DISTRICT COURT**

8-RenSER-01585                                    8-RenSER-01585

The question now is, as Counsel says, the real stressor here may be on top of that, the daughter.  And what I'm weighing is whether the prejudicial effect outweighs the probative value in terms of the, quote-unquote, "removal" of the daughter because that then brings in the -- apparently the inference of a court order.

MS. MKRTCHYAN:  Is the court going to allow me to make any record, Your Honor?

THE COURT:  I am, but I'm not going to allow you to make a false record concerning damages, and that's where you started.

MS. MKRTCHYAN:  If it's false, let the Ninth Circuit decide because I do not want to go to the Ninth Circuit after I'm being continuously interrupted on key issues in this case.  So may I make my record without an interruption?  Because there's a lot of misinformation even here.

THE COURT:  No, you may not.  You may make a correct record, and I will give you wide latitude.  But when you start that you've been precluded from damages, that fundamentally is false.

MS. MKRTCHYAN:  Well, I didn't even finish my sentence.  Maybe just have some understanding that the attorney representing plaintiff has a right to speak.

THE COURT:  You don't have a right to go against my orders.

8-RenSER-01586                                   8-RenSER-01586

MS. MKRTCHYAN:  I didn't go anywhere against any of the orders.  I'm just trying to make the record straight.

THE COURT:  I won't argue with you, but the record is very clear.

MS. MKRTCHYAN:  That's fine.

THE COURT:  No.  That I precluded credit cards and you went right back at it, Counsel, right against my order.

MS. MKRTCHYAN:  That is lending --

THE COURT:  Let's move on from that.

MS. MKRTCHYAN:  No.  The way I understood your order was this:  Here's the thing.  You keep bringing out issues that your understanding, your perception of my questioning.  That was not what happened.  You said credit cards.  I went --

THE COURT:  No, I will set the record now.  That is not only false, that is an affront to this Court, and I will be blunt about that.

MS. MKRTCHYAN:  Again, you know --

THE COURT:  You need to learn to ask questions and to quit asking compound questions and ambiguous questions.  And you need to quit quarreling with the Court, frankly.

MS. MKRTCHYAN:  Well, I don't think there's, at this point, any need for any record because right now you're accusing me of stuff, attacking me.  We are in the fourth trial, Your Honor.

THE COURT:  Would you like another trial?  I'm

8-RenSER-01587                    8-RenSER-01587

182

willing.

MS. MKRTCHYAN:  Sure.  I would right now ask at this point --

THE COURT:  Ms. --

MS. MKRTCHYAN:  -- the Court to allow me -- no -- to allow me to finish.  If we are not going to be allowed to finish, may I have a break, have lunch?

THE COURT:  You're going to be allowed to finish. Quite frankly, you've been given an inordinate amount of time. And at some point, some of the questions you've asked have been to the point, quite frankly, of going around my orders repeatedly.  And therefore, I tell you you're very close to a mistrial again.  So I'm going to give you latitude.  Whatever you'd like to say, Counsel.

MS. MKRTCHYAN:  I'm not sure where are we here right now, trying to, again --

THE COURT:  We're discussing stressors.

MS. MKRTCHYAN:  Yes.  So let me, then, make my record because there are a lot of stressors in life.  The purpose of this witness is very narrow.  She was brought to testify about my client's pain and suffering as a result of this incident and the damages.

Now, she had the right -- my client has sustained physical injuries, number one.  Emotional stressors, emotional distress is general damages.  It's very different from physical

UNITED STATES DISTRICT COURT

injuries.  And my client also has a right to introduce evidence of pain and suffering.

There are a lot of stressors in anyone's life.  The issue here whether, whether, the incident caused pain and suffering, not whether all the condition of my client as a result of a divorce that happened in 2003.  By the way, there is a lot of misrepresentations about things here.  My client's divorce occurred 15 years before the incident, in 2003.  So we have someone's cell phone.  It was in 2003, my client's divorce.

And then he went on for years of child custody-related issues, many years before the incident.  So it was not nearly close in time.  The divorce itself was years before the incident.  Child custody issues also begin years before.  I have attached in my opposition to defendants' motion to bring this alternative stressors, et cetera, both the law on the subject and the -- actually the facts in this case.

I think it's incumbent upon the Court, instead of just talking about generalities, to look at the actual record and see when the divorce occurred vis-à-vis the incident.  How is that relevant?  Let's say I get a divorce years before the incident.  That affected me, sure.

Nobody is saying why Mr. Holloway got a stroke.  Nobody is saying that Mr. Holloway got a stroke as a result of this incident in 2016.  All we are talking about is this guy is

8-RenSER-01589                    8-RenSER-01589

an eggshell skull plaintiff with physical injuries that were aggravated as a result of head strikes.  That's all we are talking about.

Where are we going with this?  We did not even raise an issue about his pain and suffering in Pittsburgh, Pennsylvania; Montana.  No, we talked about his physical injuries, the head strikes, and how they might have impacted him.  And I very severely limited the pain and suffering testimony about before he left for Pennsylvania.

So all this effort, continuous effort by this defendants -- and the Court constantly revisits this issue -- is nothing else but to prejudice the plaintiff.  We are talking about probative value of this evidence to the pain and suffering related to the brutality by police.  How different is it, the divorce with child custody issues for years and years that was ongoing with an incident where you are beat up by police and traumatized?  The law is very clear on that.

There is a lot of law which says those kind of emotional stressors you need to connect.  You need to connect and say, "Oh, is this emotional distress related to this specific incident?  How is this probative of police brutalities then?  How is this probative of the pain and suffering caused by the police brutality?"

So this is preposterousness after preposterousness that I keep coming up in this trial every time.  First of all,

8-RenSER-01590                                                    8-RenSER-01590

Loretta Tafoya was listed as a witness in this case, in the trial witness list. If defendants had filed a motion *in limine* prior to trial, trying to exclude her testimony, and if I were told by this Court that "Ms. Mkrtchyan, if you produce this witness to try to bring in any evidence of pain and suffering and damages, then you are going to be opening the door."

This is why we have motions *in limine*, sir. We have -- this is a court of law where we have evidentiary issues. If they have a problem with Loretta Tafoya being listed as a witness, they should have asked for offer of proof. They should have filed a motion *in limine*. They should have put the plaintiff on notice that if you produce it, therefore, you're going to open some doors.

But here we are -- no, I didn't finish. Thank you. If you're going to go up the Ninth Circuit, then I need to have full record on this issue, Your Honor, because the Court keeps interrupting me. I don't appreciate it.

So the Court has not made a ruling in advance on this issue as far as Loretta Tafoya. Plaintiff has not violated any court orders by producing her. If the Court was concerned, for example, that I was opening doors, the Court could have recessed this. The Court could have stopped that so that I would not violate any court rulings. So therefore, this is extremely prejudicial to plaintiff, extremely unfair to me, and then I am being accused, attacked that I am violating court

8-RenSER-01591                                                8-RenSER-01591

orders.

No, there was a specific court ruling which denied introduction of alternative stressors. There was a specific ruling which said -- and I can bring it -- on April 4th the Court's admonition to defense that the probative value of this stuff on domestic violence, divorce, child custody stuff, you know, is outweighed by this prejudicial effect. That's the ruling we have.

THE COURT: Thank you, Counsel.

Counsel, response, please.

MR. HARRELL: Your Honor, yes. There are two types of emotional stressors that are now in play due to plaintiff's election to have this witness respond to questions that open doors. The first set of opened doors have to do with Mr. Holloway's emotional distress or the source of that at the time of this incident due to the testimony by Mr. Holloway's mother. She flat-out said he was dealing with anxiety at the time of this incident that comes from a source that has nothing to do with my client. She mentions stroke, but she knows that there's more. We all do. Six months before this incident -- and I understood the Court to be referring to the divorce as the whole constellation of court proceedings that Mr. Holloway was enmeshed in.

THE COURT: That is my -- the divorce in and of itself is not the issue.

8-RenSER-01592          8-RenSER-01592

MR. HARRELL:  I understand.

THE COURT:  It's part of this whole court proceeding and how far I would allow this to come in.

MR. HARRELL:  And it all culminated over in Superior Court with a rightly exasperated Superior Court judge that barred Mr. Holloway for having any further contact with his daughter because he would not follow court orders.  And Mr. Holloway -- now, that has become an issue.  The prior court ruling that plaintiff's Counsel referenced was without the interjection of this new open door testimony from plaintiff's mother.  They were in charge of the questions.  They are intimately familiar with the Court rulings, and they elected to do that.

THE COURT:  The difficulty is it that went into a narrative.  It wasn't controlled by plaintiff's Counsel.  And this idea that the Court's going to intercede is not well taken.  It came out too quickly, quite frankly, and it was much too broad.

MR. HARRELL:  Yes.  I'm sorry.  Is the Court done?

THE COURT:  I'm done.

MR. HARRELL:  All right.  Which is -- as we all know, hopefully, starting in law school, you control that by having a conversation with the witness that you're going to call, and you educate them about whatever guardrails have been sent up by your presiding trial judge.  If that happened, it

UNITED STATES DISTRICT COURT

8-RenSER-01593                                    8-RenSER-01593

wasn't absorbed by this witness because she went there and opened this door, talking about anxiety.

THE COURT:  Here was my expectation -- I'm going to cut you off for just a moment -- unlike the first trials, I hadn't heard this witness.  When she took the stand, I assumed the damages would be in play, and those had been allowed, in fact, overly allowed, but they're in front of the jury.  I wouldn't declare a mistrial over that.

Second, I thought it would be the condition of Mr. Holloway as she found him with the photographs, et cetera, and that was put on the screen.

Third, I thought it would be the emotional state primarily after the incident and immediately following.  What surprised the Court was going back into the stressors that appeared to be solely placed upon the Marine Corps and in service and then leaving out the child custody issues.

I already allowed a stressor occurring a short time before, which was the conviction.  I allowed it for two reasons.  First of all, the primary reason was credibility issues.  The same problem that the -- Deputy Renegar faced, the defendant faced, also partially because of the stressor so close in time.  This is really a false betrayal, now, of the whole package.  And I think this:  A lie walks around on legs.

There's no reason now that this stressor doesn't come in but for the following, and that is, my concern that the

**UNITED STATES DISTRICT COURT**

8-RenSER-01594                                              8-RenSER-01594

189

court orders now get involved.  But I don't see a way around that in the sense of the child apparently being barred by the Court.

The problem is if I simply allow you to state that the child was removed and I leave that hanging, now then you would feel that that was prejudicial because why was the child removed?  The plaintiff is always going to feel that that's prejudicial and obviously doesn't see the new testimony in the way the light court does.  That's my decision, though.

If we were to do this again and we were forewarned, perhaps we could all have had a conversation and limited this. Do you want a mistrial?

MS. MKRTCHYAN:  Your Honor, first of all?

THE COURT:  Just a moment.  Do you want a mistrial?

MS. MKRTCHYAN:  First of all, I'm not sure what the Court is saying, "opening doors."  I need to --

THE COURT:  I'm going to allow, first of all --

MS. MKRTCHYAN:  I need to respond to this issue, Your Honor.

THE COURT:  I'm sorry.  I thought you had.

MS. MKRTCHYAN:  Because he spoke, and I need to respond, right?

THE COURT:  Yes.

MS. MKRTCHYAN:  You are talking about opening doors. Anxiety -- his anxiety as a result of a stroke was introduced

**UNITED STATES DISTRICT COURT**

8-RenSER-01595                                                    8-RenSER-01595

in his medical records by his medical expert testimony. Anxiety as a result of his stroke was never new -- was never new. Number one, military service. He testified about his military service before. No doors have been opened here.

This is why every trial, this is what happens. You're handicapping me with a defense to prove my case, and this is why we are still here for trial. This is outrageous to me.

THE COURT: Counsel, once again, I'm going to, unfortunately, correct my record. "You're handicapping me with a defense to prove my case." That's an attack on the Court again.

MS. MKRTCHYAN: No. But because what I am saying -- you are telling me I'm opening doors. What doors have been opened? I'm going to make it very clear. Anxiety as a result of his stroke is part of his medical history. Dr. Susan Hopp-Midani testified about that three times at this trial. We had multiple doctors at the VA testify that after the stroke this man suffered from generalized anxiety disorder. None of these doctors at the VA said his generalized anxiety disorder started because of his divorce with the wife. No. No. That is not part -- see, this is why it's misstatement.

Number two, when we have exhibits, we introduce exhibits to opposition of motions. This is Document 754, Plaintiff's Opposition to Defendant's Stressors Motion, where I

8-RenSER-01596                                          8-RenSER-01596

attached Exhibit A, where the history of my client's custody issues begin.  That started the child custody visitation issues as of August 18, 2008.  This is an '18 -- my -- the incident here in this case occurred in 2018.  This is ten-year old situation with his wife.

THE COURT:  When was the child removed from his custody?

MS. MKRTCHYAN:  That was ongoing situation.

MR. HARRELL:  June of 2017, Your Honor, by court order.

THE COURT:  Counsel --

MS. MKRTCHYAN:  No, that is incorrect.  That is incorrect.  He had custody issues beginning from his divorce starting in August of 20 -- 2008.  It was ongoing.  Look, this is the docket I have introduced.  You can go to the docket, Exhibit A.

So -- but going back to -- more importantly to opening of doors, there has been no doors opened.  Okay.  Again, anxiety of my client, there has been absolutely no impression, no whatsoever that my client had this, you know, basically beautiful life before the police incident.  No, in fact, it's the opposite.  In fact, the defendants can use this and say, "Look, he was already emotionally distressed as a result of his stroke.  He was already a broken mess before the police came to this campsite."  So that, in fact, helps them.

UNITED STATES DISTRICT COURT

8-RenSER-01597                                    8-RenSER-01597

But what they are trying to do here is to bring out character evidence.  This is -- this is -- if we need to, we will have a published Ninth Circuit on this issue.

THE COURT:  Counsel, thank you.

MS. MKRTCHYAN:  I didn't finish.

THE COURT:  You have finished now.  I don't mean to be impolite, but this has become a filibuster.

My ruling is as follows:  In this witness's cross-examination, you may ask this witness about the -- if the child was removed and, if so, when that occurred.  You may not get into the factual portion of that with court records at the present time.  This witness is capable of answering that.  She should be aware of that.  She should be able to state, yes, the child was removed from his custody on or about 2016.  And that is a valid stressor.

But as far as getting into the documents, especially the court order concerning his anger management, that still is precluded.  And the actual court documents, if she denies that, I'll take that up outside the presence of the jury.

MR. HARRELL:  Your Honor, I do have a copy of the pertinent court order printed.  I can share it with plaintiff's Counsel.

THE COURT:  You're limited to that.  In other words, you're limited to asking if the child was removed in 2016 from the custody of -- 2017.  I'm sorry, I misstated that -- 2017

**UNITED STATES DISTRICT COURT**

8-RenSER-01598                    8-RenSER-01598

from the custody of the plaintiff.

MS. MKRTCHYAN:  And I object, and I ask for mistrial because this is ridiculous.  Every trial we have the same situation.  They bring in extraneous matters, character evidence to basically --

THE COURT:  If you'd like a mistrial, I'm prepared to grant that, but I can tell you I will allow this now in the second trial.  Now, this has become relevant.  Unless you can shape the testimony of the mother appropriately and exclude some of this, I would be happy to discuss that with you.  But if you'd like a mistrial, I'm prepared to grant it.  Go talk about it with your client.

MS. MKRTCHYAN:  I need a break actually because it's lunchtime and I have not had lunch.

THE COURT:  You two talk about that.  I'm prepared to grant it.  Now, you're ordered back at 1:00 o'clock.

**(Proceedings concluded at 12:22 p.m.)**

--oOo--

**UNITED STATES DISTRICT COURT**

8-RenSER-01599                    8-RenSER-01599

194

CERTIFICATE OF OFFICIAL REPORTER


COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

                I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

COURT REPORTER, in and for the United States District Court for

the Central District of California, do hereby certify that

pursuant to Section 753, Title 28, United States Code that the

foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter and that the transcript page format is in

conformance with the regulations of the Judicial Conference of

the United States.


Date:  May 27, 2025




                            /S/ DEBBIE HINO-SPAAN

                            Debbie Hino-Spaan, CSR No. 7953
                            Federal Official Court Reporter

8-RenSER-01600                                          8-RenSER-01600

Case 25-7132, 07/27/2026, DktEntry 30.9, 116 of 250

# EXHIBIT M

8-RenSER-01601

8-RenSER-01601

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

JEREMY HOLLOWAY,                       )
                                       )
                  Plaintiff,           )  **Certified Transcript**
                                       )
       vs.                             )  Case No.
                                       )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,              )
                                       )
                  Defendants.          )  **DAY 6**
                                       )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

8-RenSER-01602                                    8-RenSER-01602

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF:**

      MKRTCHYAN LAW
      BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
      655 North Central Avenue
      Suite 1700
      Glendale, California 91203
      818-388-7022
      narine57@gmail.com


**FOR DEFENDANT JAMESON GOTTS:**

      LYNBERG & WATKINS APC
      BY:  S. FRANK HARRELL, ESQ.
      1100 West Town & Country Road
      Suite 1450
      Orange, California 92868
      714-937-1010
      sharrell@lynberg.com

      LYNBERG & WATKINS APLC
      BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
      1150 South Olive Street
      Suite 1800
      Los Angeles, California 90015
      213-624-8700
      cnaltsas@lynberg.com

      LYNBERG & WATKINS PC
      BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
      1100 West Town & Country Road
      Suite 1450
      Orange, California 92868
      (714) 937-1010
      theathcote@lynberg.com

      LYNBERG & WATKINS
      BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
      1100 Town and Country Road
      Suite 1450
      Orange, California 92868
      714-937-1010
      rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

8-RenSER-01603                                        8-RenSER-01603

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

       COLLINS & COLLINS LLP
       BY:  MICHAEL L. WRONIAK, ESQ.
       750 The City Drive
       Suite 400
       Orange, California 92868-4940
       714-823-4100
       mwroniak@ccllp.law

       COLLINS & COLLINS LLP
       BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
       2011 Palomar Airport Road
       Suite 207
       Carlsbad, California 92011
       760-274-2110
       cswiss@ccllp.law

**ALSO PRESENT:**

       Raymond Farahmand, plaintiff's paralegal
       Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

8-RenSER-01604
8-RenSER-01604

4

**I N D E X**

**WITNESSES**                                                        **PAGE**

**JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan                              5
    Cross-Examination by Mr. Harrell                               149

**EXHIBITS**

**(None offered.)**

**UNITED  STATES  DISTRICT  COURT**

8-RenSER-01605                                        8-RenSER-01605

A     Yes.

Q     Okay.  About 22,279?

A     Yes.

Q     Okay.  Then we have some billing that you received from treatment for -- at the Hardy Physical Therapy in Pennsylvania?

A     Yes.

Q     You were getting this kind of bills in Pennsylvania for Hardy Physical Therapy treatment periodically?

A     Yes.  Every time I went I got a bill.

Q     So isn't you true you were getting this treatment through the VA hospital?

A     Yes.

Q     Okay.  And you've got billing also from the VA hospital are related to your medical costs, treatment for this injuries?

A     Yes.

Q     Okay.  So let's pull up that and look at that.  This is your billing from VA hospital where --

          MR. WRONIAK:  Objection.  Excuse me.  Exhibit number, please.

          MS. MKRTCHYAN:  Exhibit 26.

BY MS. MKRTCHYAN:

Q     This is compilation of some of the bills that we received from VA for treatment in Montana, Long Beach, Pittsburgh?

A     Yes.

Q     20,396?

UNITED STATES DISTRICT COURT

8-RenSER-01606                                                    8-RenSER-01606

137

A     Yes.

Q     Okay.

            MR. HARRELL:  Your Honor, objection to Montana, for sure.

            THE COURT:  Well, Counsel, I'm leaving that to you. If we're going to extend this beyond, you know, the date that's --

            MS. MKRTCHYAN:  Your Honor, this is Montana related to --

            THE COURT:  That's fine.

            MS. MKRTCHYAN:  -- his treatment for back pain.

            MR. HARRELL:  Your Honor, objection to Montana and to Pennsylvania after July 2018.

            THE COURT:  This is not emotional distress though. This is physical.  Overruled.

BY MS. MKRTCHYAN:

Q     So then we go into some of your billing that you received here in California.  This is for the paramedics' treatment that you've got?

A     Yes.  This is for the ride.

Q     Okay.  We looked at the dental work that you did.  You went through doctor -- neurologist there.  Let's look at some of those billing.  And you're responsible for this billing, aren't you?

A     Yes.

**UNITED STATES DISTRICT COURT**

8-RenSER-01607                                                        8-RenSER-01607

# EXHIBIT N

8-RenSER-01608

8-RenSER-01608

 

## U.S. Department of Veterans Affairs

The VA Office of General Counsel has determined that VA has provided and/or paid for the treatment of the below-captioned VA beneficiary under circumstances that give VA the right to recover the costs it has incurred in providing and/or paying for that treatment. This billing ledger details the relevant care and associated costs that VA is entitled to recover. The claim detailed herein represents an asset of the United States. The only way to discharge the liability underlying this claim is by payment to the United States. No one other than an authorized representative of the United States may enter into an agreement affecting this claim.

| | |
|---|---|
| Veteran | Jeremy Holloway |
| Date of Injury | 1/21/2018 |
| Ledger Date | April 21, 2025 |
| Total Claim to Date | $20,396.54 |
| GCLAWS ID | 472396 |

**VA Facilities**

**Fort Harrison VA Medical Center**
**Fort Harrison, MT**

| | |
|---|---|
| Facility ID | 436 |
| Tax ID | 81-0233746 |
| Balance | $2,796.81 |
| Case ID | 436-H-20250414-44545 |

**VA Long Beach Healthcare System**
**Long Beach, CA**

| | |
|---|---|
| Facility ID | 600 |
| Tax ID | 33-0587175 |
| Balance | $11,803.60 |
| Case ID | 600-H-20200211-22251 |

**VA Pittsburgh Healthcare System**
**Pittsburgh, PA**

| | |
|---|---|
| Facility ID | 646 |
| Tax ID | 25-1723912 |
| Balance | $5,796.13 |
| Case ID | 646-H-20200811-85526 |

P1056

8-RenSER-01609     8-RenSER-01609



**Department of Veterans Affairs**
**Office of General Counsel**
**Revenue Law Group**

This Notice of Claim for Reimbursement for the Cost of Medical Care and VA's Ledger of Billed Charges are self-authenticating documents, Federal Rule of Evidence 902. The below signed hereby attests and certifies that the documents and billed charges therein contained were created and are asserted within VA's routine business processes in accordance with federal law and regulation. 38 U.S.C. § 1729, 42 U.S.C. § 2651, 38 C.F.R. § 17.101.

---

## VA'S FEDERAL MEDICAL CARE RECOVERY PROGRAM

This program ensures the responsible party pays for injury-related medical care provided by VA instead of the American taxpayer. Money recovered supplements funds appropriated by Congress to help each VA medical facility provide the excellent medical care and services that each Veteran deserves. VA's medical facilities together form one of the largest health care systems in the world. In addition to medical care for Veterans, VA provides training to a majority of America's health professionals & operates medical research programs benefiting society at large. Advancements include: the nicotine patch (1984), benefits of one aspirin a day (1994), movement of paralyzed limbs (1991), sense of touch (2007) and electronic power (2014) to prosthetics, continued leadership in research on PTSD & traumatic brain injury (2008, 2013).

---

## NOTICE OF CLAIM FOR REIMBURSEMENT FOR THE COST OF MEDICAL CARE

VA submits the attached ledger of charges and will continue to update its claim and forward revised ledgers in accordance with the creation of billing for any additional VA care related to this matter. If you know of related VA care which is not included on the attached ledger, notify the Case Manager of the date(s) of service.

If there is an objection to a particular service's relevancy to injuries incurred, timely written documentation supporting that position must be sent directly to the Case Manager.

The VA Bill Ledger will contain charges for care provided by a non-VA physician/medical facility which was paid for by VA under VA's Fee/Purchased Care Program and/or Choice Program. Normally, once VA has made payment to a non-VA provider, that provider is required to accept VA's payment as payment in full and may not bill the Veteran for the care. The amount non-VA providers billed VA, the amount paid by VA, and the amount on the VA Bill Ledger can differ. The VA bill ledger reflects the accurate VA claim amount for such treatment, as authorized by 38 C.F.R. §17.100. If you have knowledge of non-VA care that VA paid for, provide evidence of the same including evidence of amounts paid by VA to the Case Manager. VA will take this information into consideration when determining its final claim amount and/or in response to a request for compromise.

VA is entitled to reimbursement of reasonable charges for injury-related treatment it provided or paid for, or will provide or paid for, from a tortfeasor and any applicable insurer under 42 U.S.C. § 2651, and from a VA beneficiary's insurance policy for medical payments (i.e. uninsured or underinsured motorist coverage), a workers compensation plan, and an auto reparation plan, among others, under 38 U.S.C. § 1729. VA's

For further program information, please visit www.va.gov/ogc/collections.asp

P863

8-RenSER-01610                              8-RenSER-01610 026-001

reasonable charges are set by methodology based on type of care and geographic area. The type of care is determined by the medical provider based on the patient's medical needs. Reasonable charges for each type of care are determined by type-of-care formulas using national base rates adjusted for geographic area (with the single exception of prescription drugs billed at cost to VA). Rates are published in the Federal Register, 38 C.F.R. § 17.101(a)(2) and at: https://www.va.gov/communitycare/revenue_ops/payer_rates.asp. The national base rates usually change annually on January 1st (outpatient/professional) and October 1st (inpatient).

VA's billing rates shall be judicially noticed. 44 U.S.C. § 1507. State courts are subject to and bound by judicial notice of federal laws and regulations. Further, the government is not required to litigate reasonableness of administratively fixed rates as compared to prevailing rates at non-governmental facilities.

VA is not subject to state law conditions (i.e., time limits, fee schedules) where in conflict with federal law.

If an injured party's health insurer makes payment to VA for treatment on the attached ledger, VA will reconcile with the health insurer when payment is made to VA from parties other than the health insurer.

**BE ADVISED:**

**VA'S CLAIM IS NOT EXTINGUISHED BY A RELEASE FROM THE INJURED PARTY. THE CLAIM MUST BE PAID AT THE TIME OF DISTRIBUTION. *CONTACT VA CASE MANAGER BEFORE SETTLEMENT TO CONFIRM FINAL VA CLAIM AMOUNT.***

VA's right of recovery from the tortfeasor and insurer(s) for reasonable charges for medical care provided or paid for by VA is independent of that of the VA beneficiary. Payment to VA beneficiary and a VA beneficiary-signed release do not impact liability of a tortfeasor or their insurer for payment to VA. Payment for VA medical treatment must be made directly to the Department of Veterans Affairs.

**Submit payment by check, payable to the Department of Veterans Affairs, and mail to**

West CPAC
Attn: Cash Management
1085 Palms Airport Drive
Las Vegas, NV 89119

Check must state IDENTIFICATION TITLE IN MEMO SECTION to ensure proper processing. See accompanying cover sheet for IDENTIFICATION TITLE.

No communications, other than payments, should be mailed to the above address. Misdirected correspondence may not be processed.

**Please direct all other correspondence relating to this case to Case Manager:**

R.A. Freddy Fuentes
Legal Assistant
P: 504.507.7865
F: 202.496.5974
Rafael.fuentes@va.gov

For further program information, please visit www.va.gov/ogc/collections.asp

P864

8-RenSER-01611　　　　　　　　　　　　　　　8-RenSER-01611 026-002

Understanding VA Bill Ledger

Please be advised that the Department of Veterans Affairs (VA) Notice of Claim and VA Bill Ledger may contain charges for care provided by a non-VA physician/medical facility in which the VA reimbursed a non-VA provider/facility for the care via either the VA Fee/Purchased Care Program and/or the VA Choice Program.

In some cases, the amount billed by community care providers, the amount paid by the VA for those services, and the amount reflected on the VA bill ledger can differ. Please note that the VA bill ledger reflects the accurate VA claim amount, as authorized by 38 C.F.R. §17.100.

If you have knowledge of non-VA care that the VA paid for, provide evidence of the same to this office. Additionally, if you have knowledge of a difference between a VA bill amount and the amount that the VA reimbursed a non-VA provider/facility, please identify each such bill and provide evidence of the difference. The VA will take this information into consideration when determining its final claim amount and/or in response to a request for compromise.

**VA Billing**:

38 C.F.R. § 17.101 establishes reasonable charges based on the type of care being billed (note that per the regulation, several types of care may be billed for a single encounter). The type of care is a question determined by medical providers under VA policy. Reasonable charges for each of the twelve types of care are determined by specific type-of-care formulas using national base rates that are adjusted for the geographic area of the care provided (with the single exception of prescription drugs which are billed at the cost to VA). VA publishes the national base rates for each type of care in the Federal Register and at:

https://www.va.gov/communitycare/revenue_ops/payer_rates.asp.

The national base rates usually change annually on January 1st (outpatient/ professional) and October 1st (inpatient). For billing format purposes, VA policy groups the twelve types of care into two types: Facility (billed on Form UB-04) and Professional (billed on Form CMS 1500) charges.

VA's "reasonable charges" are set by methodology and published in the Federal Register as required by 38 C.F.R. §17.101(a)(2). Once published, VA billing rates are presumed to have been duly issued, prescribed, and promulgated. 44 U.S.C. §1507.

For further program information, please visit www.va.gov/ogc/collections.asp

8-RenSER-01612                                  8-RenSER-01612    026-003



Name:     HOLLOWAY, JEREMY R

Date of Injury:                    1/21/2018

Identification Title:          Pittsburgh VAMC 646-H-20200811-85526
                               Long Beach VAMC 600-H-20200211-22251

GCLAWS#                         472396

VA Claim to Date:
     PITTSBURGH VAMC      $16,747.54
     LONG BEACH VAMC      $11,803.60
             TOTAL        $28,551.14

P866

8-RenSER-01613                                        8-RenSER-01613   026-004

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | | TAX ID: 25-1723912 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | | Purch Svc | Payment | | Balance Due | |
| 646-K10F2B5 | 9/21/2018 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.1 (ICD-10; Generalized anxiety disorder) | 90791-AH | None | $ | 250.16 | NO | $ | - | $ | 250.16 |
| 646-K10EV5H | 9/21/2018 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.1 (ICD-10; Generalized anxiety disorder) | 919 90791 | None | $ | 313.93 | NO | $ | - | $ | 313.93 |
| 646-K10F2B6 | 10/3/2018 | 1 | OUTP | Profee-Hospital | AJAY KHURANA M.D. | Internal Medicine | F41.1 (ICD-10; Generalized anxiety disorder) | 90792 ; 99202-25 | None | $ | 401.05 | NO | $ | - | $ | 401.05 |
| 646-K10EV5I | 10/3/2018 | 1 | OUTP | Outpatient | AJAY KHURANA M.D. | Internal Medicine | F41.1 (ICD-10; Generalized anxiety disorder) | 510 99202-25 ; 900 90792 | None | $ | 624.74 | NO | $ | - | $ | 624.74 |
| 646-K10F2BB | 10/19/2018 | 1 | OUTP | Profee-Hospital | JULIA POLAT M.D. | Ophthalmology | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 92004-25 ; 92083-26 | None | $ | 262.09 | NO | $ | - | $ | 262.09 |
| 646-K10EV5J | 10/19/2018 | 1 | OUTP | Outpatient | JULIA POLAT M.D. | Ophthalmology | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 920 92004-25 ; 920 92083-TC | None | $ | 827.11 | NO | $ | - | $ | 827.11 |
| 646-K10F2L3 | 11/13/2018 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 636 99605 | None | $ | 238.17 | NO | $ | - | $ | 238.17 |
| 646-K10F2BL | 11/19/2018 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Optometrist | H52.13 (ICD-10; Myopia, bilateral) | 92012 | None | $ | 85.61 | NO | $ | - | $ | 85.61 |
| 646-K10EV5L | 11/19/2018 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Optometrist | H52.13 (ICD-10; Myopia, bilateral) | 920 92012 | None | $ | 317.87 | NO | $ | - | $ | 317.87 |
| 646-K10F0NE | 11/20/2018 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Optometrist | H52.4 (ICD-10; Presbyopia) | 292 V2100 | None | $ | 72.32 | NO | $ | - | $ | 72.32 |
| 646-K10F2NR | 11/26/2018 | 1 | OUTP | Profee-Hospital | PITTSBURGH HJH VAMC | Social Worker / Clinical | Z65.9 (ICD-10; Problem related to unspecified psychosocial circumstances) | T1016-AJ | None | $ | 112.64 | NO | $ | - | $ | 112.64 |

2 of 12

P867

8-RenSER-01614
8-RenSER-01614 026-005

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | | TAX ID: 25-1723912 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K10F2LK | 1/4/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 636 99606 | None | $ 210.17 | NO | $ - | $ 210.17 |
| 646-K10F2C7 | 2/13/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist / Clinical | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90837-AH | None | $ 245.09 | NO | $ - | $ 245.09 |
| 646-K10EV5P | 2/13/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist / Clinical | F41.9 (ICD-10; Anxiety disorder, unspecified) | 914 90837 | None | $ 337.68 | NO | $ - | $ 337.68 |
| 646-K10F2CB | 2/15/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |
| 646-K10EV5Q | 2/15/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10F2CD | 2/22/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |
| 646-K10EV5R | 2/22/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10F2CH | 3/1/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |
| 646-K10EV5S | 3/1/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10EV5U | 3/15/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10F2CP | 3/15/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |

3 of 12

8-RenSER-01615          8-RenSER-01615          0126-006

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | | TAX ID: 25-1723912 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K10EV5V | 3/29/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10F2CT | 3/29/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |
| 646-K10EV5W | 4/12/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 915 90853 | None | $ 310.41 | NO | $ - | $ 310.41 |
| 646-K10F2CX | 4/12/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychologist | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90853-AH | None | $ 48.44 | NO | $ - | $ 48.44 |
| 646-K10F2N8 | 4/16/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 636 99606 ; 636 99607 | None | $ 420.34 | NO | $ - | $ 420.34 |
| 646-K10F2D5 | 5/30/2019 | 1 | OUTP | Profee-Hospital | BRIANNA ROSSITER | Internal Medicine | R21. | 99213-GR | None | $ 124.08 | NO | $ - | $ 124.08 |
| 646-K10F2D2 | 5/30/2019 | 1 | OUTP | Outpatient | BRIANNA ROSSITER | Internal Medicine | R21. | 510 99213 | None | $ 245.69 | NO | $ - | $ 245.69 |
| 646-K10EV5Z | 6/17/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 510 99213 | None | $ 245.69 | NO | $ - | $ 245.69 |
| 646-K10F2D8 | 6/17/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 99213 | None | $ 124.08 | NO | $ - | $ 124.08 |
| 646-K10F2N0 | 7/29/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 636 99606 ; 636 99607 | None | $ 420.34 | NO | $ - | $ 420.34 |
| 646-K10F2MS | 8/30/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | F41.1 (ICD-10; Generalized anxiety disorder) | 636 99606 ; 636 99607 | None | $ 420.34 | NO | $ - | $ 420.34 |
| 646-K00EX15 | 9/30/2019 | 1 | OUTP | Outpatient | SCOTT HERRLE M.D. | Internal Medicine | M54.9 (ICD-10; Dorsalgia, unspecified) | 320 72110-TC ; 510 99211-25-27 ; 510 99213-25 ; 636 90658 ; 771 90471 | None | $ 1,604.35 | NO | $ - | $ 1,604.35 |
| 646-K00EX3C | 9/30/2019 | 1 | OUTP | Profee-Hospital | AMR MOURAD MD | Radiology / Diagnostic Radiology | M54.5 (ICD-10; Low back pain) | 72110-26 | None | $ 79.44 | NO | $ - | $ 79.44 |

4 of 12

P869

8-RenSER-01616

8-RenSER-01616 126-007

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | TAX ID: 25-1723912 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K00EX3B | 9/30/2019 | 1 | OUTP | Profee-Hospital | SCOTT HERRLE M.D. | Internal Medicine | M54.5 (ICD-10; Low back pain) | 99213-GR | None | $ 124.08 | NO | $ - | $ 124.08 |
| 646-K10F2MF | 10/3/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 636 99606 ; 636 99607 | None | $ 420.34 | NO | $ - | $ 420.34 |
| 646-K10EV63 | 11/19/2019 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 510 99213 | None | $ 245.69 | NO | $ - | $ 245.69 |
| 646-K10F2DE | 11/19/2019 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 99213 | None | $ 124.08 | NO | $ - | $ 124.08 |
| 646-K10EV67 | 1/7/2020 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 510 99213 | None | $ 241.39 | NO | $ - | $ 241.39 |
| 646-K10F2DL | 1/7/2020 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 99213 | None | $ 125.51 | NO | $ - | $ 125.51 |
| 646-K10EV68 | 1/8/2020 | 1 | OUTP | Outpatient | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 915 90853 | None | $ 233.42 | NO | $ - | $ 233.42 |

5 of 12

P870

8-RenSER-01617

8-RenSER-01617 026-008

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | | TAX ID: 25-1723912 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K10F2DM | 1/8/2020 | 1 | OUTP | Profee-Hospital | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90853-AH | None | $ 48.83 | NO | $ - | $ 48.83 |
| 646-K10EV69 | 1/22/2020 | 1 | OUTP | Outpatient | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 915 90853 | None | $ 233.42 | NO | $ - | $ 233.42 |
| 646-K10F2DQ | 1/22/2020 | 1 | OUTP | Profee-Hospital | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90853-AH | None | $ 48.83 | NO | $ - | $ 48.83 |
| 646-K10EV6A | 1/29/2020 | 1 | OUTP | Outpatient | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 915 90853 | None | $ 233.42 | NO | $ - | $ 233.42 |
| 646-K10F2DS | 1/29/2020 | 1 | OUTP | Profee-Hospital | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90853-AH | None | $ 48.83 | NO | $ - | $ 48.83 |
| 646-K10EV6B | 2/12/2020 | 1 | OUTP | Outpatient | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 915 90853 | None | $ 233.42 | NO | $ - | $ 233.42 |

6 of 12

P871

8-RenSER-01618 8-RenSER-01618 126-009

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | TAX ID: 25-1723912 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K10F2E7 | 2/12/2020 | 1 | OUTP | Profee-Hospital | UNIONTOWN VA CLINIC | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90853-AH | None | $ 48.83 | NO | $ - | $ 48.83 |
| 646-K10EV6C | 3/25/2020 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 99213-95-25 ; 90833-95 | None | $ 249.57 | NO | $ - | $ 249.57 |
| 646-K10F2EF | 5/12/2020 | 1 | OUTP | Profee-Hospital | UNIONTOWN VA CLINIC | Psychologist / Clinical | F33.9 (ICD-10; Major depressive disorder, recurrent, unspecified) | 90834-AH | None | $ 163.81 | NO | $ - | $ 163.81 |
| 646-K10F0NC | 5/18/2020 | 1 | OUTP | Outpatient | PITTSBURGH VAMC | Optometrist | H52.4 (ICD-10; Presbyopia) | 292 V2100 | None | $ 70.07 | NO | $ - | $ 70.07 |
| 646-K00F08Z | 5/19/2020 | 1 | OUTP | Profee-Hospital | MAUREEN GEORGE PA-C | Physician Assistant / Medical | M54.5 (ICD-10; Low back pain) | 99214 | None | $ 166.75 | NO | $ - | $ 166.75 |
| 646-K00EX3A | 5/19/2020 | 1 | OUTP | Outpatient | MAUREEN GEORGE PA-C | Physician Assistant / Medical | M54.5 (ICD-10; Low back pain) | 510 99214-25 ; 636 90715 ; 771 90471 | None | $ 701.59 | NO | $ - | $ 701.59 |
| 646-K10EV6D | 5/21/2020 | 1 | OUTP | Profee-Hospital | ROKSANA KORCHYNSKY PH.D. | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90832-95-AH | None | $ 120.07 | NO | $ - | $ 120.07 |
| 646-K10EV6E | 5/28/2020 | 1 | OUTP | Profee-Hospital | ROKSANA KORCHYNSKY PH.D. | Psychologist / Clinical | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 90832-95-AH | None | $ 120.07 | NO | $ - | $ 120.07 |
| 646-K10F2EJ | 8/5/2020 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 99443 | None | $ 194.22 | NO | $ - | $ 194.22 |

P872

8-RenSER-01619

8-RenSER-01619 126-010

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | TAX ID: 25-1723912 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |
| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
| 646-K10F2EM | 9/23/2020 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 99443 | None | $ 194.22 | NO | $ - | $ 194.22 |
| 646-K10EV6F | 11/16/2020 | 1 | OUTP | Outpatient | JENNIFER MCGRATH O.D. | Optometrist | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 920 92014 | None | $ 338.69 | NO | $ - | $ 338.69 |
| 646-K10F2ES | 11/16/2020 | 1 | OUTP | Profee-Hospital | JENNIFER MCGRATH O.D. | Optometrist | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 92014 | None | $ 126.47 | NO | $ - | $ 126.47 |
| 646-K10EV6G | 11/30/2020 | 1 | OUTP | Outpatient | JENNIFER MCGRATH O.D. | Optometrist | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 920 92083-TC | None | $ 551.57 | NO | $ - | $ 551.57 |
| 646-K10F2EW | 11/30/2020 | 1 | OUTP | Profee-Hospital | JENNIFER MCGRATH O.D. | Optometrist | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 92083-26 | None | $ 86.94 | NO | $ - | $ 86.94 |
| 646-K10F2LB | 2/26/2021 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Pharmacist / Pharmacist Clinician (PhC)/ Clinical Pharmacy Specialist | Z51.81 (ICD-10; Encounter for therapeutic drug level monitoring) | 99607-95 ; 99606-95 | None | $ 522.90 | NO | $ - | $ 522.90 |
| 646-K10E4HT | 3/23/2021 | 1 | OUTP | Profee-Hospital | MAUREEN GEORGE PA-C | Physician Assistant / Medical | Z00.01 (ICD-10; Encounter for general adult medical exam w abnormal findings) | 99396 | None | $ 176.48 | NO | $ - | $ 176.48 |

8-RenSER-01620

8-RenSER-01620

226-011

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 3221 | | 646: PITTSBURGH VAMC | | Ledger date: 5/20/2021 | | TAX ID: 25-1723912 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646-K10E4HS | 3/23/2021 | 1 | OUTP | Outpatient | MAUREEN GEORGE PA-C | Physician Assistant / Medical | Z00.01 (ICD-10; Encounter for general adult medical exam w abnormal findings) | 510 99396 | None | $ 221.77 | NO | $ - | $ 221.77 |
| 646-K10F2F4 | 3/29/2021 | 1 | OUTP | Profee-Hospital | PITTSBURGH VAMC | Psychiatry & Neurology / Psychiatry | F32.9 (ICD-10; Major depressive disorder, single episode, unspecified) | 99443 | None | $ 196.18 | NO | $ - | $ 196.18 |
| | | | | | | | | | TOTALS: | $ 16,747.54 | | $ - | $ 16,747.54 |

9 of 12

P874

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 411273221 | | 600: LONG BEACH VAMC | | Ledger date: 5/20/2021 | TAX ID: 33-0587175 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |
| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | | Balance Due |
| 600-K0080UC | 1/23/2018 | 1 | OUTP | Profee-Hospital | LONG BEACH VAMC | Radiology / Diagnostic Radiology | R51. | 70450-26 | None | $ 233.39 | NO | $ - | $ | 233.39 |
| 600-K0080UB | 1/23/2018 | 1 | OUTP | Profee-Hospital | LONG BEACH VAMC | Emergency Medicine | F07.81 (ICD-10; Postconcussional syndrome) | 99284 | None | $ 566.43 | NO | $ - | $ | 566.43 |
| 600-K0080UA | 1/23/2018 | 1 | OUTP | Outpatient | LONG BEACH VAMC | Emergency Medicine | F07.81 (ICD-10; Postconcussional syndrome) | 351 70450-TC ; 450 99284-25 | None | $ 4,007.02 | NO | $ - | $ | 4,007.02 |
| 600-K008A6G | 1/23/2018 | 1 | RX | Pharmacy | LONG BEACH PHARMACY | Emergency Medicine | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 17.72 | NO | $ - | $ | 17.72 |
| 600-K008A6D | 1/23/2018 | 1 | RX | Pharmacy | LONG BEACH PHARMACY | Emergency Medicine | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 17.97 | NO | $ - | $ | 17.97 |
| 600-K0082ZV | 1/29/2018 | 1 | OUTP | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | H02.841 (ICD-10; Edema of right upper eyelid) | 510 99211-PO | None | $ 362.20 | NO | $ - | $ | 362.20 |
| 600-K008A55 | 2/2/2018 | 1 | RX | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 17.97 | NO | $ - | $ | 17.97 |
| 600-K0080UF | 2/2/2018 | 1 | OUTP | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | M54.89 (ICD-10; Other dorsalgia) | 510 99214-PO | None | $ 605.46 | NO | $ - | $ | 605.46 |
| 600-K0080UG | 2/2/2018 | 1 | OUTP | Profee-Hospital | SUSAN HOPP-MIDANI M.D. | General Practice | M54.89 (ICD-10; Other dorsalgia) | 99214 | None | $ 197.01 | NO | $ - | $ | 197.01 |
| 600-K109Y07 | 2/21/2018 | 1 | RX | Pharmacy | LONG BEACH PHARMACY | Student in an Organized Health Care Education/Training Program | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 17.71 | NO | $ - | $ | 17.71 |
| 600-K0080UI | 2/26/2018 | 1 | OUTP | Profee-Hospital | LONG BEACH VAMC | Optometrist / Low Vision Rehabilitation | S09.90XA (ICD-10; Unspecified injury of head, initial encounter) | 92014-25 ; 92225-RT | None | $ 201.96 | NO | $ - | $ | 201.96 |

10 of 12

P875

8-RenSER-01622                                                      8-RenSER-01622      226-013

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 411273221 | | 600: LONG BEACH VAMC | | Ledger date: 5/20/2021 | **TAX ID: 33-0587175** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Account ID | Service Date | LOS | Bill Classification | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS Code(s) | Billed DRG | Billed Charges | Purch Svc | Payment | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 600-K0080UH | 2/26/2018 | 1 | OUTP | Outpatient | LONG BEACH VAMC | Optometrist / Low Vision Rehabilitation | S09.90XA (ICD-10; Unspecified injury of head, initial encounter) | 920 92014-25 ; 920 92015 ; 920 92133-TC ; 920 92225-RT | None | $ 1,479.04 | NO | $ - | $ 1,479.04 |
| 600-K0080UL | 3/14/2018 | 1 | OUTP | Profee-Hospital | SUSAN HOPP-MIDANI M.D. | General Practice | M54.2 (ICD-10; Cervicalgia) | 99214 | None | $ 197.01 | NO | $ - | $ 197.01 |
| 600-K0080UJ | 3/14/2018 | 1 | OUTP | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | M54.2 (ICD-10; Cervicalgia) | 510 99214-PO | None | $ 605.46 | NO | $ - | $ 605.46 |
| 600-K0082ZZ | 4/5/2018 | 1 | OUTP | Outpatient | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z71.9 (ICD-10; Counseling, unspecified) | 780 Q3014-PO | None | $ 54.88 | NO | $ - | $ 54.88 |
| 600-K008A53 | 4/5/2018 | 1 | RX | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 18.81 | NO | $ - | $ 18.81 |
| 600-K0082ZY | 4/5/2018 | 1 | OUTP | Profee-Hospital | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | S06.300A (ICD-10; Unsp focal TBI w/o loss of consciousness, init) | 99241-95 | None | $ 90.36 | NO | $ - | $ 90.36 |
| 600-K008A50 | 4/10/2018 | 1 | RX | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 17.97 | NO | $ - | $ 17.97 |
| 600-K008A4Z | 4/19/2018 | 1 | RX | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 36.90 | NO | $ - | $ 36.90 |
| 600-K008A4W | 4/20/2018 | 1 | RX | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 18.83 | NO | $ - | $ 18.83 |
| 600-K00830T | 4/27/2018 | 1 | OUTP | Profee-Hospital | ELI BENDAVID M.D. | Radiology / Diagnostic Radiology | M51.34 (ICD-10; Other intervertebral disc degeneration, thoracic region) | 72070-26 ; 72040-26 | None | $ 123.90 | NO | $ - | $ 123.90 |

11 of 12

P876

8-RenSER-01623                                                                 8-RenSER-01623  026-014

Department of Veterans Affairs
Ledger of Billed Charges

| HOLLOWAY, JEREMY R | SSN: 411273221 | | 600: LONG BEACH VAMC | | Ledger date: 5/20/2021 | **TAX ID: 33-0587175** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Account ID** | **Service Date** | **LOS** | **Bill Classification** | **Bill Type** | **Provider Name** | **Provider Taxonomy** | **Primary Diagnosis** | **Billed CPT/HCPCS Code(s)** | **Billed DRG** | **Billed Charges** | **Purch Svc** | **Payment** | **Balance Due** |
| 600-K00830S | 4/27/2018 | 1 | OUTP | Profee-Hospital | JASON KOH D.O. | Physical Medicine & Rehabilitation | M54.2 (ICD-10; Cervicalgia) | 99244 | None | $ 427.20 | NO | $ - | $ 427.20 |
| 600-K00830N | 4/27/2018 | 1 | OUTP | Outpatient | JASON KOH D.O. | Physical Medicine & Rehabilitation | M54.2 (ICD-10; Cervicalgia) | 320 72040-TC ; 320 72070-TC ; 510 99244-25 | None | $ 2,402.04 | NO | $ - | $ 2,402.04 |
| 600-K008A4V | 4/27/2018 | 1 | RX | Pharmacy | LONG BEACH PHARMACY | Student in an Organized Health Care Education/Training Program | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 49.60 | NO | $ - | $ 49.60 |
| 600-K008A4T | 7/8/2018 | 1 | RX | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | None | $ 36.76 | NO | $ - | $ 36.76 |
| | | | | | | | | | **TOTALS:** | $ 11,803.60 | | $ - | $ 11,803.60 |

12 of 12

8-RenSER-01624

8-RenSER-01624 026-015

| Veteran: Jeremy Holloway | | | CASE ID: 436-H-20250414-44545 | | | Ledger Date: April 21, 2025 | | |
|---|---|---|---|---|---|---|---|---|
| Facility: 436 - Fort Harrison VA Medical Center | | | Facility Tax ID: 81-0233746 | | | | | $2,796.81 |

| VA Account ID/Non-VA Claim Number | Svc Start | Svc End | DRG | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS/HIPPS Code(s) | Non-VA Care | Billed Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 436-K50ID5B | 5/18/2023 | 5/18/2023 | | Profee-Hospital | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 90792 | | $331.15 |
| 436-K50ID55 | 5/18/2023 | 5/18/2023 | | Outpatient | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 900 90792 | | $190.53 |
| 436-K50ID6B | 12/18/2023 | 12/18/2023 | | Profee-Hospital | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F43.12 (ICD-10; Post-traumatic stress disorder, chronic) | 90833 | | $119.38 |
| 436-K50ID5I | 12/18/2023 | 12/18/2023 | | Outpatient | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F43.12 (ICD-10; Post-traumatic stress disorder, chronic) | 914 90833 | | $113.43 |
| 436-K50ID5G | 12/18/2023 | 12/18/2023 | | Outpatient | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F43.12 (ICD-10; Post-traumatic stress disorder, chronic) | 914 90833 | | $113.43 |
| 436-K50ID6F | 3/25/2024 | 3/25/2024 | | Profee-Hospital | BETHEACRYSTAL N | Social Worker / Clinical | F43.10 (ICD-10; Post-traumatic stress disorder, unspecified) | 90837-95-AJ | | $236.26 |
| 436-K50ID6E | 3/25/2024 | 3/25/2024 | | Outpatient | BETHEACRYSTAL N | Social Worker / Clinical | F43.10 (ICD-10; Post-traumatic stress disorder, unspecified) | 914 90837-95-AJ | | $206.73 |
| VA-CCN4-K177X2LJL0000 | 6/14/2024 | 6/14/2024 | | Facility | KALISPELL REGIONAL MEDICAL CENTER INC | Family Medicine | M43.17 - SPONDYLOLISTHESIS, LUMBOSACRAL REGION | 72110 | X | $112.19 |
| VA-CCN4-K177X2LKB0000 | 6/14/2024 | 6/14/2024 | | Facility | KALISPELL REGIONAL MEDICAL CENTER INC | Family Medicine | M54.2 - CERVICALGIA | 72050 | X | $112.19 |
| VA-CCN4-K178X2RW70000 | 6/14/2024 | 6/14/2024 | | Professional | KALISPELL REGIONAL MEDICAL CENTER, INC | Radiology (Diagnostic Radiology) | M51.34 - OTHER INTERVERTEBRAL DISC DEGENERATION, THORACIC REGION | 72050(26); 72072(26); 72110(26) | X | $35.59 |
| VA-CCN4-K267X18H90000 | 9/12/2024 | 9/12/2024 | | Professional | KALISPELL REGIONAL MEDICAL CENTER, INC | Physician Assistant | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | 99214; G2211 | X | $122.70 |
| VA-CCN4-K308X0BXB0000 | 10/10/2024 | 10/10/2024 | | Professional | KALISPELL REGIONAL MEDICAL CENTER, INC | Physician Assistant | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | 99214; G2211 | X | $122.70 |
| VA-CCN4-K312X3BQ20000 | 10/15/2024 | 10/15/2024 | | Professional | KALISPELL REGIONAL MEDICAL CENTER, INC | Physical Therapist | G89.29 - OTHER CHRONIC PAIN | 97163(GP); 97530(GP) | X | $151.75 |
| VA-CCN4-K352X0HGM0000 | 12/5/2024 | 12/5/2024 | | Professional | KALISPELL REGIONAL MEDICAL CENTER, INC | Physician Assistant | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | 99214(95); G2211(95) | X | $122.70 |
| 436-K50ID6K | 2/27/2025 | 2/27/2025 | | Profee-Hospital | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 98006; 90833 | | $375.21 |
| 436-K50ID6I | 2/27/2025 | 2/27/2025 | | Outpatient | WLODARSKIJENNIFER A | Psychiatry & Neurology / Psychiatry | F41.9 (ICD-10; Anxiety disorder, unspecified) | 914 90833; 914 98006 | | $330.87 |

P1057

8-RenSER-01625

8-RenSER-01625

| Veteran: Jeremy Holloway | | | | CASE ID: 600-H-20200211-22251 | | | | Ledger Date: April 21, 2025 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility: 600 - VA Long Beach Healthcare System | | | | Facility Tax ID: 33-0587175 | | | | | | |

|  | | | | | | | | | | $11,803.60 |
|---|---|---|---|---|---|---|---|---|---|---|
| VA Account ID/Non-VA Claim Number | Svc Start | Svc End | DRG | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS/HIPPS Code(s) | Non-VA Care | Billed Amount |
| 600-K008A6G | 1/23/2018 | 1/23/2018 | | Pharmacy | LONG BEACH PHARMACY | Emergency Medicine | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $17.72 |
| 600-K008A6D | 1/23/2018 | 1/23/2018 | | Pharmacy | LONG BEACH PHARMACY | Emergency Medicine | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $17.97 |
| 600-K0080UC | 1/23/2018 | 1/23/2018 | | Profee-Hospital | LONG BEACH VAMC | Radiology / Diagnostic Radiology | R51 (ICD-10; Headache) | 70450-26 | | $233.39 |
| 600-K0080UB | 1/23/2018 | 1/23/2018 | | Profee-Hospital | LONG BEACH VAMC | Emergency Medicine | F07.81 (ICD-10; Postconcussional syndrome) | 99284 | | $566.43 |
| 600-K0080UA | 1/23/2018 | 1/23/2018 | | Outpatient | LONG BEACH VAMC | Emergency Medicine | F07.81 (ICD-10; Postconcussional syndrome) | 351 70450-TC; 450 99284-25 | | $4,007.02 |
| 600-K0082ZV | 1/29/2018 | 1/29/2018 | | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | H02.841 (ICD-10; Edema of right upper eyelid) | 510 99211-PO | | $362.20 |
| 600-K008A55 | 2/2/2018 | 2/2/2018 | | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $17.97 |
| 600-K0080UG | 2/2/2018 | 2/2/2018 | | Profee-Hospital | SUSAN HOPP-MIDANI M.D. | General Practice | M54.89 (ICD-10; Other dorsalgia) | 99214 | | $197.01 |
| 600-K0080UF | 2/2/2018 | 2/2/2018 | | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | M54.89 (ICD-10; Other dorsalgia) | 510 99214-PO | | $605.46 |
| 600-K109Y07 | 2/21/2018 | 2/21/2018 | | Pharmacy | LONG BEACH PHARMACY | Student in an Organized Health Care Education/Training Program | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $17.71 |
| 600-K0080UI | 2/26/2018 | 2/26/2018 | | Profee-Hospital | LONG BEACH VAMC | Optometrist / Low Vision Rehabilitation | S09.90XA (ICD-10; Unspecified injury of head, initial encounter) | 92014-25; 92225-RT | | $201.96 |
| 600-K0080UH | 2/26/2018 | 2/26/2018 | | Outpatient | LONG BEACH VAMC | Optometrist / Low Vision Rehabilitation | S09.90XA (ICD-10; Unspecified injury of head, initial encounter) | 920 92014-25; 920 92015; 920 92133-TC; 920 92225-RT | | $1,479.04 |
| 600-K0080UL | 3/14/2018 | 3/14/2018 | | Profee-Hospital | SUSAN HOPP-MIDANI M.D. | General Practice | M54.2 (ICD-10; Cervicalgia) | 99214 | | $197.01 |
| 600-K0080UJ | 3/14/2018 | 3/14/2018 | | Outpatient | SUSAN HOPP-MIDANI M.D. | General Practice | M54.2 (ICD-10; Cervicalgia) | 510 99214-PO | | $605.46 |
| 600-K008A53 | 4/5/2018 | 4/5/2018 | | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $18.81 |
| 600-K0082ZZ | 4/5/2018 | 4/5/2018 | | Outpatient | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z71.9 (ICD-10; Counseling, unspecified) | 780 Q3014-PO | | $54.88 |
| 600-K0082ZY | 4/5/2018 | 4/5/2018 | | Profee-Hospital | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | S06.300A (ICD-10; Unsp focal TBI w/o loss of consciousness, init) | 99241-95 | | $90.36 |
| 600-K008A50 | 4/10/2018 | 4/10/2018 | | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $17.97 |
| 600-K008A4Z | 4/19/2018 | 4/19/2018 | | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $36.90 |
| 600-K008A4W | 4/20/2018 | 4/20/2018 | | Pharmacy | SUSAN HOPP-MIDANI M.D. | General Practice | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $18.83 |
| 600-K008A4V | 4/27/2018 | 4/27/2018 | | Pharmacy | LONG BEACH PHARMACY | Student in an Organized Health Care Education/Training Program | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $49.60 |
| 600-K00830T | 4/27/2018 | 4/27/2018 | | Profee-Hospital | ELI BENDAVID M.D. | Radiology / Diagnostic Radiology | M51.34 (ICD-10; Other intervertebral disc degeneration, thoracic region) | 72070-26; 72040-26 | | $123.90 |
| 600-K00830S | 4/27/2018 | 4/27/2018 | | Profee-Hospital | JASON KOH D.O. | Physical Medicine & Rehabilitation | M54.2 (ICD-10; Cervicalgia) | 99244 | | $427.20 |
| 600-K00830N | 4/27/2018 | 4/27/2018 | | Outpatient | JASON KOH D.O. | Physical Medicine & Rehabilitation | M54.2 (ICD-10; Cervicalgia) | 320 72040-TC; 320 72070-TC; 510 99244-25 | | $2,402.04 |
| 600-K008A4T | 7/8/2018 | 7/8/2018 | | Pharmacy | STEVEN SCHREIBER MD | Psychiatry & Neurology / Neurology | Z76.0 (ICD-10; Encounter for issue of repeat prescription) | 250 J8499 | | $36.76 |

P1058

8-RenSER-01626          8-RenSER-01626

| Veteran: Jeremy Holloway | | | | CASE ID: 646-H-20200811-85526 | | | Ledger Date: April 21, 2025 | |
|---|---|---|---|---|---|---|---|---|
| Facility: 646 - VA Pittsburgh Healthcare System | | | | Facility Tax ID: 25-1723912 | | | | |
| | | | | | | | | **$5,796.13** |
| VA Account ID/Non-VA Claim Number | Svc Start | Svc End | DRG | Bill Type | Provider Name | Provider Taxonomy | Primary Diagnosis | Billed CPT/HCPCS/HIPPS Code(s) | Non-VA Care | Billed Amount |
| 646-K10F2BB | 10/19/2018 | 10/19/2018 | | Profee-Hospital | JULIA POLAT M.D. | Ophthalmology | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 92004-25; 92083-26 | | $262.09 |
| 646-K10EV5J | 10/19/2018 | 10/19/2018 | | Outpatient | JULIA POLAT M.D. | Ophthalmology | H53.462 (ICD-10; Homonymous bilateral field defects, left side) | 920 92004-25; 920 92083-TC | | $827.11 |
| 646-K00EX3C | 9/30/2019 | 9/30/2019 | | Profee-Hospital | AMR MOURAD MD | Radiology / Diagnostic Radiology | M54.5 (ICD-10; Low back pain) | 72110-26 | | $79.44 |
| 646-K00EX3B | 9/30/2019 | 9/30/2019 | | Profee-Hospital | SCOTT HERRLE M.D. | Internal Medicine | M54.5 (ICD-10; Low back pain) | 99213-GR | | $124.08 |
| 646-K00EX15 | 9/30/2019 | 9/30/2019 | | Outpatient | SCOTT HERRLE M.D. | Internal Medicine | M54.9 (ICD-10; Dorsalgia, unspecified) | 320 72110-TC; 510 99211-25-27; 510 99213-25; 636 90658; 771 90471 | | $1,604.35 |
| 646-K00F08Z | 5/19/2020 | 5/19/2020 | | Profee-Hospital | MAUREEN GEORGE PA-C | Physician Assistant / Medical | M54.5 (ICD-10; Low back pain) | 99214 | | $166.75 |
| 646-K00EX3A | 5/19/2020 | 5/19/2020 | | Outpatient | MAUREEN GEORGE PA-C | Physician Assistant / Medical | M54.5 (ICD-10; Low back pain) | 510 99214-25; 636 90715; 771 90471 | | $701.59 |
| VA-CCN1-G153X044R0000 | 5/26/2020 | 5/26/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97162(GP); G0283(GP); 97035(GP) | X | $230.50 |
| VA-CCN1-G153X1WNG0000 | 5/29/2020 | 5/29/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97110(GP); G0283(GP) | X | $98.00 |
| VA-CCN1-G162X1PJ80000 | 6/2/2020 | 6/2/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97110(GP); 97035(GP); G0283(GP) | X | $190.50 |
| VA-CCN1-G162X1PJ70000 | 6/4/2020 | 6/4/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97110(GP); G0283(GP); 97035(GP) | X | $190.50 |
| VA-CCN1-G168X0X4P0000 | 6/9/2020 | 6/9/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97110(GP); G0283(GP); 97035(GP) | X | $190.50 |
| VA-CCN1-G168X0X4Q0000 | 6/11/2020 | 6/11/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97035(GP); G0283(GP) | X | $90.50 |
| 302019600016796000 | 6/17/2020 | 6/17/2020 | | Facility | HIGHLANDS HOSPITAL AND HEALTH CENTER | Emergency Medicine | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE | 80053; 85025; 70450(TC); 70496(TC); 70498(TC); 99285(25); Q9967; 93005 | X | $614.42 |
| VA-CCN1-G177X20WW0000 | 6/18/2020 | 6/18/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97035(GP); G0283(GP); 97124(GP) | X | $111.75 |
| VA-CCN1-G176X29YW0000 | 6/23/2020 | 6/23/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | G0283(GP); 97035(GP); 97124(GP) | X | $111.75 |
| VA-CCN1-G183X1MM90000 | 6/30/2020 | 6/30/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | G0283(GP); 97035(GP); 97124(GP) | X | $111.75 |
| VA-CCN1-G266X1QHJ0000 | 9/15/2020 | 9/15/2020 | | Professional | HARDY PHYSICAL THERAPY LLC | Specialist | M54.5 - LOW BACK PAIN | 97164(GP); 97140(GP); G0283(GP); M54.6(72072 - X-RAY EXAM THORAC SPINE 3VWS) | X | $90.55 |

P1059

8-RenSER-01627                    8-RenSER-01627

| Veteran: HOLLOWAY, JEREMY | | | SSN: ***-**-3221 | Report Date: April 11, 2025 | | Total Paid: $2,922.73 |
|---|---|---|---|---|---|---|
| Claim No. | Svc Date(s) - Claim | (Dx Code) Description | Billing Provider Name | Billing NPI | VA Facility | Total Paid |
| Claim Line | Svc Date(s) - Line | (Dx Code) Description (Line) | Attend/Rendering Provider Name | Attending NPI | | |
| | Inpt DRG | (CPT/HCPCS/HIPPS) Description (Line) | Attend/Rendering Provider Taxonomy | | | Line Payment |
| | Bill Type | CPT Mod (Line) | Referring Provider Name | Referring NPI | Units | |
| VA-CCN1-G153X044R0000 | 5/26/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $230.50 |
| 1 | 5/26/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97162 - PT EVAL MOD COMPLEX 30 MIN | Specialist | | | $140.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 2 | 5/26/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 3 | 5/26/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97035 - ULTRASOUND THERAPY | Specialist | | | $42.50 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| VA-CCN1-G153X1WNG0000 | 5/29/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $98.00 |
| 1 | 5/29/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97110 - THERAPEUTIC EXERCISES | Specialist | | | $50.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 2 | 5/29/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| VA-CCN1-G162X1PJ80000 | 6/2/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $190.50 |
| 1 | 6/2/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97110 - THERAPEUTIC EXERCISES | Specialist | | | $100.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 2 | |
| 2 | 6/2/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97035 - ULTRASOUND THERAPY | Specialist | | | $42.50 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 3 | 6/2/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| VA-CCN1-G162X1PJ70000 | 6/4/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $190.50 |
| 1 | 6/4/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97110 - THERAPEUTIC EXERCISES | Specialist | | | $100.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 2 | |
| 2 | 6/4/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 3 | 6/4/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97035 - ULTRASOUND THERAPY | Specialist | | | $42.50 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| VA-CCN1-G168X0X4P0000 | 6/9/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $190.50 |
| 1 | 6/9/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97110 - THERAPEUTIC EXERCISES | Specialist | | | $100.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 2 | |
| 2 | 6/9/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 3 | 6/9/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97035 - ULTRASOUND THERAPY | Specialist | | | $42.50 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| VA-CCN1-G168X0X4Q0000 | 6/11/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $90.50 |
| 1 | 6/11/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | 97035 - ULTRASOUND THERAPY | Specialist | | | $42.50 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 2 | 6/11/2020 | M54.5 - LOW BACK PAIN | HARDY, EDWARD | 1134490170 | | |
| | | G0283 - ELEC STIM OTHER THAN WOUND | Specialist | | | $48.00 |
| | Professional | GP | HARDY PHYSICAL THERAPY LLC | 1497027429 | 1 | |
| 302019600016796000 | 6/17/2020 | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE | HIGHLANDS HOSPITAL AND HEALTH CENTER | 1144215039 | 646 | $614.42 |
| 1 | 6/17/2020 | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE | SAHOTA, SANDEEP | 1427008077 | | |
| | | 80053 - COMPREHEN METABOLIC PANEL | Emergency Medicine | | | $0.00 |
| | Facility | | | | 1 | |
| 2 | 6/17/2020 | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE | SAHOTA, SANDEEP | 1427008077 | | |
| | | 85025 - COMPLETE CBC W/AUTO DIFF WBC | Emergency Medicine | | | $0.00 |
| | Facility | | | | 1 | |

P1060

8-RenSER-01628

8-RenSER-01628

| | Svc Date(s) - Claim | (Dx Code) Description | Billing Provider Name | Billing NPI | VA Facility | Total Paid |
|---|---|---|---|---|---|---|
| **Veteran:** HOLLOWAY, JEREMY | | | **SSN** ***-**-3221 | **Report Date:** April 11, 2025 | | **Total Paid:** $2,922.73 |
| Claim No. | Svc Date(s) - Claim | (Dx Code) Description | Billing Provider Name | Billing NPI | VA Facility | Total Paid |
| Claim Line | Svc Date(s) - Line Inpt DRG Bill Type | (Dx Code) Description (Line) (CPT/HCPCS/HIPPS) Description (Line) CPT Mod (Line) | Attend/Rendering Provider Name Attend/Rendering Provider Taxonomy Referring Provider Name | Attending NPI Referring NPI | Units | Line Payment |
| 3 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE 70450 - CT HEAD/BRAIN W/O DYE TC | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 1 | $0.00 |
| 4 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE 70496 - CT ANGIOGRAPHY HEAD TC | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 1 | $293.43 |
| 5 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE 70498 - CT ANGIOGRAPHY NECK TC | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 1 | $0.00 |
| 6 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE 99285 - EMERGENCY DEPARTMENT VISIT FOR THE EVALUATION AND MANAGEMENT OF A PATIENT, WHICH REQUIRES A MEDICALLY APPROPRIATE HISTORY AND/OR EXAMINATION AND HIGH LEVEL OF MEDICAL DECISION MAKING 25 | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 1 | $320.99 |
| 7 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE Q9967 - LOCM 300-399MG/ML IODINE,1ML | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 100 | $0.00 |
| 8 | 6/17/2020 Facility | H53.469 - HOMONYMOUS BILATERAL FIELD DEFECTS, UNSPECIFIED SIDE 93005 - ELECTROCARDIOGRAM TRACING | SAHOTA, SANDEEP Emergency Medicine | 1427008077 | 1 | $0.00 |
| VA-CCN1-G177X20WW0000 | 6/18/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $111.75 |
| 1 | 6/18/2020 Professional | M54.5 - LOW BACK PAIN 97035 - ULTRASOUND THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $42.50 |
| 2 | 6/18/2020 Professional | M54.5 - LOW BACK PAIN G0283 - ELEC STIM OTHER THAN WOUND GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $48.00 |
| 3 | 6/18/2020 Professional | M54.5 - LOW BACK PAIN 97124 - MASSAGE THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $21.25 |
| VA-CCN1-G176X29YW0000 | 6/23/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $111.75 |
| 1 | 6/23/2020 Professional | M54.5 - LOW BACK PAIN G0283 - ELEC STIM OTHER THAN WOUND GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $48.00 |
| 2 | 6/23/2020 Professional | M54.5 - LOW BACK PAIN 97035 - ULTRASOUND THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $42.50 |
| 3 | 6/23/2020 Professional | M54.5 - LOW BACK PAIN 97124 - MASSAGE THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $21.25 |
| VA-CCN1-G183X1MM90000 | 6/30/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $111.75 |
| 1 | 6/30/2020 Professional | M54.5 - LOW BACK PAIN G0283 - ELEC STIM OTHER THAN WOUND GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $48.00 |
| 2 | 6/30/2020 Professional | M54.5 - LOW BACK PAIN 97035 - ULTRASOUND THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $42.50 |
| 3 | 6/30/2020 Professional | M54.5 - LOW BACK PAIN 97124 - MASSAGE THERAPY GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $21.25 |
| VA-CCN1-G266X1QHJ0000 | 9/15/2020 | M54.5 - LOW BACK PAIN | HARDY PHYSICAL THERAPY LLC | 1497027429 | 646 | $90.55 |
| 1 | 9/15/2020 Professional | M54.5 - LOW BACK PAIN 97164 - PT RE-EVAL EST PLAN CARE GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $58.20 |
| 2 | 9/15/2020 Professional | M54.5 - LOW BACK PAIN 97140 - MANUAL THERAPY 1/> REGIONS GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $22.13 |
| 3 | 9/15/2020 Professional | M54.5 - LOW BACK PAIN G0283 - ELEC STIM OTHER THAN WOUND GP | HARDY, EDWARD Specialist HARDY PHYSICAL THERAPY LLC | 1134490170 1497027429 | 1 | $10.22 |
| VA-CCN4-K177X2L3X0000 | 6/14/2024 | M54.6 - PAIN IN THORACIC SPINE | KALISPELL REGIONAL MEDICAL CENTER INC | 1417945627 | 436 | $112.19 |

8-RenSER-01629  8-RenSER-01629

| Veteran:<br>HOLLOWAY, JEREMY | | | | SSN:<br>***-**-3221 | | Report Date:<br>April 11, 2025 | | Total Paid:<br>$2,922.73 |
|---|---|---|---|---|---|---|---|---|
| **Claim No.** | **Svc Date(s) - Claim** | **(Dx Code) Description** | | **Billing Provider Name** | | **Billing NPI** | **VA Facility** | **Total Paid** |
| **Claim Line** | **Svc Date(s) - Line**<br>**Inpt DRG**<br>**Bill Type** | **(Dx Code) Description (Line)**<br>**(CPT/HCPCS/HIPPS) Description (Line)**<br>**CPT Mod (Line)** | | **Attend/Rendering Provider Name**<br>**Attend/Rendering Provider Taxonomy**<br>**Referring Provider Name** | | **Attending NPI**<br><br>**Referring NPI** | **Units** | **Line Payment** |
| | 6/14/2024 | M54.6 - PAIN IN THORACIC SPINE | | SWANSON, SCOT | | 1104268887 | | |
| 1 | | 72072 - X-RAY EXAM THORAC SPINE 3VWS | | Family Medicine | | | | $112.19 |
| | Facility | | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| VA-CCN4-K177X2LJL0000 | 6/14/2024 | M43.17 - SPONDYLOLISTHESIS, LUMBOSACRAL REGION | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 436 | $112.19 |
| | 6/14/2024 | M43.17 - SPONDYLOLISTHESIS, LUMBOSACRAL REGION | | SWANSON, SCOT | | 1104268887 | | |
| 1 | | 72110 - X-RAY EXAM L-2 SPINE 4/>VWS | | Family Medicine | | | | $112.19 |
| | Facility | | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| VA-CCN4-K177X2LKB0000 | 6/14/2024 | M54.2 - CERVICALGIA | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 436 | $112.19 |
| | 6/14/2024 | M54.2 - CERVICALGIA | | SWANSON, SCOT | | 1104268887 | | |
| 1 | | 72050 - X-RAY EXAM NECK SPINE 4/5VWS | | Family Medicine | | | | $112.19 |
| | Facility | | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| VA-CCN4-K178X2RW70000 | 6/14/2024 | M51.34 - OTHER INTERVERTEBRAL DISC DEGENERATION, THORACIC REGION | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1093477176 | 436 | $35.59 |
| | 6/14/2024 | M51.34 - OTHER INTERVERTEBRAL DISC DEGENERATION, THORACIC REGION | | STINE, VALERIE | | 1639514003 | | |
| 1 | | 72050 - X-RAY EXAM NECK SPINE 4/5VWS | | Radiology (Diagnostic Radiology) | | | | $12.64 |
| | Professional | 26 | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| | 6/14/2024 | M51.34 - OTHER INTERVERTEBRAL DISC DEGENERATION, THORACIC REGION | | STINE, VALERIE | | 1639514003 | | |
| 2 | | 72072 - X-RAY EXAM THORAC SPINE 3VWS | | Radiology (Diagnostic Radiology) | | | | $10.64 |
| | Professional | 26 | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| | 6/14/2024 | M51.34 - OTHER INTERVERTEBRAL DISC DEGENERATION, THORACIC REGION | | STINE, VALERIE | | 1639514003 | | |
| 3 | | 72110 - X-RAY EXAM L-2 SPINE 4/>VWS | | Radiology (Diagnostic Radiology) | | | | $12.31 |
| | Professional | 26 | | KALISPELL REGIONAL MEDICAL CENTER INC | | 1417945627 | 1 | |
| VA-CCN4-K267X18H90000 | 9/12/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 436 | $122.70 |
| | 9/12/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 1 | | 99214 - OFFICE O/P EST MOD 30-39 MIN | | Physician Assistant | | | | $108.84 |
| | Professional | | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| | 9/12/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 2 | | G2211 - | | Physician Assistant | | | | $13.86 |
| | Professional | | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| VA-CCN4-K308X0BXB0000 | 10/10/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 436 | $122.70 |
| | 10/10/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 1 | | 99214 - OFFICE O/P EST MOD 30-39 MIN | | Physician Assistant | | | | $108.84 |
| | Professional | | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| | 10/10/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 2 | | G2211 - | | Physician Assistant | | | | $13.86 |
| | Professional | | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| VA-CCN4-K312X3BQ20000 | 10/15/2024 | G89.29 - OTHER CHRONIC PAIN | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 436 | $151.75 |
| | 10/15/2024 | G89.29 - OTHER CHRONIC PAIN | | ALLRED, GARREN | | 1396106985 | | |
| 1 | | 97163 - PT EVAL HIGH COMPLEX 45 MIN | | Physical Therapist | | | | $100.17 |
| | Professional | GP | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| | 10/15/2024 | G89.29 - OTHER CHRONIC PAIN | | ALLRED, GARREN | | 1396106985 | | |
| 2 | | 97530 - THERAPEUTIC ACTIVITIES | | Physical Therapist | | | | $51.58 |
| | Professional | GP | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 2 | |
| VA-CCN4-K352X0HGM0000 | 12/5/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 436 | $122.70 |
| | 12/5/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 1 | | 99214 - OFFICE O/P EST MOD 30-39 MIN | | Physician Assistant | | | | $108.84 |
| | Professional | 95 | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |
| | 12/5/2024 | M46.1 - SACROILIITIS, NOT ELSEWHERE CLASSIFIED | | BELANGER, ERIC | | 1053503987 | | |
| 2 | | G2211 - | | Physician Assistant | | | | $13.86 |
| | Professional | 95 | | KALISPELL REGIONAL MEDICAL CENTER, INC | | 1568086452 | 1 | |

P1062

8-RenSER-01630

8-RenSER-01630

**BE ADVISED**:  VA's claim is not extinguished by a payment to or a release from the injured party. 38 C.F.R. § 17.106(c). VA's claim must be paid at the time of distribution. Contact the VA case manager before settlement to confirm the final claim amount.

A payment of less than the total amount documented herein will not satisfy VA's claim unless approved by an authorized official in the Department of Veterans Affairs Office of General Counsel, Revenue Law Group. Absent such approval, any outstanding amount remains due. VA's deposit of a payment that is less than full does not constitute the approval of a reduction or compromise of VA's claim.

---

**To make payment for care associated with facility 600 (VA Long Beach Healthcare System), please submit a secure electronic payment:**

pay.gov portal (ACH debit)

*If you are not able to click the link, copy and paste this url to your browser: https://www.pay.gov/public/form/start/1152111181*

IDENTIFICATION NUMBER: 600-H-20200211-22251

Amount: $11,803.60

Company ID (if requested by your bank): 3600120083

A payment confirmation will be sent to the email address you provide on the form.

If you are unable to use the pay.gov platform, you may send a check, payable to the Department of Veterans Affairs, in the amount of $11,803.60 to:

West CPAC

Attn: Cash Management

1085 Palms Airport Drive

Las Vegas, NV 89119

For proper processing, please ensure that the check references the case ID: 600-H-20200211-22251

---

**To make payment for care associated with facility 646 (VA Pittsburgh Healthcare System), please submit a secure electronic payment:**

pay.gov portal (ACH debit)

*If you are not able to click the link, copy and paste this url to your browser: https://www.pay.gov/public/form/start/1152111181*

P1063

8-RenSER-01631                                   8-RenSER-01631

**BE ADVISED**:  VA's claim is not extinguished by a payment to or a release from the injured party. 38 C.F.R. § 17.106(c). VA's claim must be paid at the time of distribution. Contact the VA case manager before settlement to confirm the final claim amount.

A payment of less than the total amount documented herein will not satisfy VA's claim unless approved by an authorized official in the Department of Veterans Affairs Office of General Counsel, Revenue Law Group. Absent such approval, any outstanding amount remains due. VA's deposit of a payment that is less than full does not constitute the approval of a reduction or compromise of VA's claim.

IDENTIFICATION NUMBER: 646-H-20200811-85526

Amount: $5,796.13

Company ID (if requested by your bank): 3600120083

A payment confirmation will be sent to the email address you provide on the form.

If you are unable to use the pay.gov platform, you may send a check, payable to the Department of Veterans Affairs, in the amount of $5,796.13 to:

North East CPAC

Attn: Cash Management

1700 South Lincoln Ave. Building 2

Lebanon, PA 17042

For proper processing, please ensure that the check references the case ID: 646-H-20200811-85526

**To make payment for care associated with facility 436 (Fort Harrison VA Medical Center), please submit a secure electronic payment:**

pay.gov portal (ACH debit)

*If you are not able to click the link, copy and paste this url to your browser: https://www.pay.gov/public/form/start/1152111181*

IDENTIFICATION NUMBER: 436-H-20250414-44545

Amount: $2,796.81

Company ID (if requested by your bank): 3600120083

A payment confirmation will be sent to the email address you provide on the form.

P1064

8-RenSER-01632                                                           8-RenSER-01632

**BE ADVISED**:  VA's claim is not extinguished by a payment to or a release from the injured party. 38 C.F.R. § 17.106(c). VA's claim must be paid at the time of distribution. Contact the VA case manager before settlement to confirm the final claim amount.

A payment of less than the total amount documented herein will not satisfy VA's claim unless approved by an authorized official in the Department of Veterans Affairs Office of General Counsel, Revenue Law Group. Absent such approval, any outstanding amount remains due. VA's deposit of a payment that is less than full does not constitute the approval of a reduction or compromise of VA's claim.

If you are unable to use the pay.gov platform, you may send a check, payable to the Department of Veterans Affairs, in the amount of $2,796.81 to:

Central Plains CPAC

Attn: Cash Management

3819 Franklin Ave.

Leavenworth, KS 66048

For proper processing, please ensure that the check references the case ID: 436-H-20250414-44545

P1065

8-RenSER-01633                                                                                    8-RenSER-01633

# EXHIBIT O

8-RenSER-01634

8-RenSER-01634

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,                          )
                                          )
              PLAINTIFF,                   )
                                          )
       vs.                                ) SACV NO. 19-01514-DOC
                                          ) Day 7, Volume I
                                          )
COUNTY OF ORANGE, et al.,                 )
                                          )
              DEFENDANTS.                  )
_____   )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01635                                          8-RenSER-01635

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01636                                                      8-RenSER-01636

```
APPEARANCES OF COUNSEL:

        FOR THE DEFENDANT, CHAD RENEGAR:

                        MICHAEL L. WRONIAK
                        COLLINS + COLLINS, LLP
                        750 THE CITY DRIVE
                        SUITE 400
                        ORANGE, CALIFORNIA 92868
                        (714) 823-4100
                        mwroniak@ccllp.law

                        CHRISTIE SWISS
                        COLLINS + COLLINS, LLP
                        2011 PALOMAR AIRPORT ROAD
                        SUITE 207
                        CARLSBAD, CALIFORNIA 92011
                        (760)274-2110
                        cswiss@ccllp.law


Also Present:

    Jeremy Holloway, Plaintiff

    Raymond Farahmand, Paralegal for Plaintiff

    Jameson Gotts, Orange County Deputy Sheriff, Defendants

    Chad Renegar, Orange County Deputy Sheriff, Defendants

    Bryan Stever, Litigation Support, Defendants
```

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01637                                          8-RenSER-01637

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEREMY HOLLOWAY | | 19 | 133 | |
| | | 97 | | |
| | | 111 | | |

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01638                                             8-RenSER-01638

7

THE COURT:  Mr. Harrell, be on time.  Am I clear?
Am I clear?

MR. HARRELL:  Understood, Your Honor.

THE COURT:  Counsel.

MS. MKRTCHYAN:  Yes, Your Honor.  So very briefly.

If the Court -- well, yesterday, I asked for a
break during cross-examination.  First, I needed a break to
go to the restroom.

THE COURT:  I gave you that break.

MS. MKRTCHYAN:  No --

*(Court Reporter requests clarification for the
record.)*

THE COURT:  Counsel, I'm going to continue now to
cross-examination.  You take up your complaints with the
Court at the end of the day.  I do not want this
interrupted.  And I do not like the fact that we're in the
middle of cross-examination, when we get to a point where
there's a good interchange going on about the facts, and
suddenly, we need a break.  That occurred during the first
couple trials also.  And sometimes, I wonder if that's not
tactical to speak to your client in the hallway.

MS. MKRTCHYAN:  Your Honor --

THE COURT:  I gave you the break yesterday --

*(Simultaneous speakers.)*

MS. MKRTCHYAN:  I need to finish my record.  No,

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01639                                                           8-RenSER-01639

I'm not going to participate in this.  You know,
Ninth Circuit is going to watch this.  I need to make my
record; otherwise, I'm not going to participate.  You guys
continue without me.  Thank you very much.

(Plaintiff's attorney exits the courtroom.)

THE COURT:  Counsel, we're going back on the
record.  We're missing one juror.

Mr. Harrell, please continue.

THE COURT REPORTER:  She left, Your Honor.

THE COURT:  Now she's missing.

Would you please get your counsel.  When that
juror goes back in, we go back into session.

(Pause.)

(Ms. Mkrtchyan enters courtroom.)

THE COURT:  One juror is missing, so if you'd like
to continue to make your record.  We have a little bit of
time until that juror -- but as soon as that juror is here,
we're back in session.

MS. MKRTCHYAN:  Your Honor, it seems to me that
we're going to go up on the Ninth Circuit.  And I'm entitled
to make my record without interruptions, without being told
that --

THE COURT:  I was here at 6:45 for you to make
this record last evening, and you weren't here.

MS. MKRTCHYAN:  Well, because the defense were not

*Deborah D. Parker, U.S. Court Reporter*

here.  In any event --

THE COURT:  No, no, you were not here --

*(Simultaneous speakers.)*

THE COURT:  No, you may not in that regard. Because you keep setting a bad record.  I gave each of you the courtesy of being here at 6:45 last evening, just to hear this kind of concern and before the jury comes in.  Now we're going through this and holding up a jury.

MS. MKRTCHYAN:  6:45 is not -- you're holding up the jury because Mr. Harrell was late half an hour --

THE COURT:  I just said that, Counsel; it's on the record.  And I just admonished Mr. Harrell to be on time.

MS. MKRTCHYAN:  Okay.  Then may I make my record instead of being interrogated?  This is Ninth Circuit issue, and I need to raise it.

I have the right to rehabilitate my client when the defense asks him questions on collateral, irrelevant issues.  His state of mind, as of right now, in this lawsuit, is irrelevant.  He keeps going into issues, "What do you know now about the 911 calls?"  That is irrelevant. What is relevant is my client's state of mind at the time of the incident.

Now, if my client is being cross-examined without any breaks -- yesterday, my direct examination was stopped twice by this Court *sua sponte*, but cross-examination was

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01641                                                          8-RenSER-01641

not stopped, even when I asked for restroom break, and I was basically admonished in front the jury.

But in any event, if that is the case, I have the right under the due process, under the Seventh Amendment right to jury trial, to rehabilitate my client. This Court has deprived me of my ability to represent my client in many ways. I'm not allowed to ask him questions about his current medical issues. His stroke -- multiple strokes have affected his cognitive abilities. If anyone has any information about strokes, which is in his medical records, it affects you cognitively, neurologically. This man has, currently, PTSD. This man is sitting there and, clearly, he's unable to cognitively process some of the questions that are being given to him.

We are not allowed to talk about his stroke. You can instruct this jury that, "Ladies and gentlemen, the stroke that Mr. Holloway had with surgery has nothing to do with this incident, nor does his stroke in 2016 have anything to do." However, I'm entitled to tell this jury why this man has difficulty of processing information and sitting there for hours and responding to same questions five times asked different ways by an attorney who has absolutely no compassion, no empathy for someone. I hope everyone in this courtroom gets a stroke. Everyone in this courtroom gets a stroke so that you understand what this man

8-RenSER-01642                    8-RenSER-01642

11

is going through right now in this court.  Sometimes he has to come to this court and testify on cross-exam, grueling sessions.

So I'm entitled to rehabilitate.  I have the right to do that for my client.  Therefore, I'm going to present to this jury the fact that -- and I'm putting this on notice so that no one later says, "You've opened doors."  I'm going to ask my client about his stroke, about his heart surgery, the medications he's now taking.  And then I'm going to ask him, "Is that stroke related to this incident?"  And if anyone dares to argue that that's opening doors to some emotional distress damages that we've limited, we'll go up on the Ninth Circuit.

You can declare mistrial; no problem.  You can certify issues for appeal.  I've had enough of this already.  Okay.  I am handicapped severely.  "Oh, Mr. Harrell, you can't say this.  You cannot present loss of wages.  You cannot present emotional distress damages.  You can barely talk about your client's medical costs."  So what this is?  If I'm handicapped from representing my client, why don't we just go up on appeal and raise this issues civilly and very productively, legally, on appeal.  But why do we have to go through series of --

THE COURT:  Mr. Harrell, thank you very much.  You've made your record.  Now please, be seated.  I'd

*Deborah D. Parker, U.S. Court Reporter*

appreciate that.

Now, let me respond to a few things.

*(Court Reporter requests for clarification.)*

THE COURT:  First, yesterday, I told you that you could present the case any way you wanted to.  You could proceed with this compensation and salary through the years.  That was your choice.  I was concerned where that would lead, but you could conduct your lawsuit.

Second, you got your restroom break.

Number three, we were in session a little less than an hour or just over an hour when you called for this break.  We're right in the middle of a cross-examination where counsel believes that he is getting relevant or irrelevant information from your client.  This happened numerous times in the past, and I'm wondering if this is a restroom break, which I gave you, versus counseling your client to calm down on the stand when his answers have been nonresponsive, quite frankly.  The repetitiveness of this is because your client has not answered the questions -- and I'll make that record -- whether it's avoidance or his handicap.

When you warned the Court about what to do, this is a long series of confrontations with this Court, and it goes clear back to the magistrate judge, that you've chosen to conduct yourself on your rules, not the Court's rules.

*Deborah D. Parker, U.S. Court Reporter*

And yesterday, you were so combative with the Court that I had ruled in your favor, and you continued to argue with the Court after that ruling that your client could answer those questions, because you were so combative you didn't hear or care.  And I will pull that transcript for you.

And finally, your comment was, *Well, I just won't ask any questions, then.*  I think you're more interested in confrontation, quite frankly, at this point and has become repetitive, quite frankly, and boring.

Control yourself.  You can have that outburst in front of me, and I will absorb that.  But if you do that in front of the jury, this Court will respond in the strongest terms.  You don't tell the Court what to do.  And I want that clear.

Am I clear with you?  Am I clear with you?

Am I clear with you?

MS. MKRTCHYAN:  Is this Court intimidating --

*(Court Reporter requests clarification.)*

THE COURT:  No.  I want to know that you understand what I've said, that I will make --

*(Overtalking:  Unable to report.)*

MS. MKRTCHYAN:  Is the Court above the law --

THE COURT:  -- the rulings, and you will follow those rulings.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01645                                        8-RenSER-01645

14

MS. MKRTCHYAN: Is the Court above the law?

THE COURT: That's right. And you're not obeying it.

MS. MKRTCHYAN: Okay. Is the Court above the law?

THE COURT: You're not obeying my --

MS. MKRTCHYAN: I'm obeying it the way I understand. But you're depriving me of the right to represent my client. My client has a right to due process; doesn't he?

THE COURT: You are deciding what the rules will be and disobeying the admonitions of the Court. And if we made that record that counsel want to bring in terms of sanctions, that would be quite a record. And we can start with the magistrate judge, quite frankly, and carry on to this Court.

Now, I'm counseling counsel that they can bring whatever motion they want, but I'm not going to grant terminating sanctions; I think that's totally inappropriate at this point.

But if you're really badgering the Court into a mistrial, and that's really want you want, and you stipulate to that, tell me that. Because I'm not declaring mistrial regardless of your antics so far. Your client has the right to get a jury on this issue. And we're trying to get there, whether you like my rulings or not. I could have declared a

*Deborah D. Parker, U.S. Court Reporter*

these records are going up with a total on the front $20,000. And what it allows on the plaintiff side is to the plaintiff to argue this is $20,000. And included in that may be areas of treatment for emotional distress after July of 2018.

So on the other side, you find yourself in the position of monies being asked for that are not.

MS. MKRTCHYAN: Your Honor, this billing was produced to them. Why did they not raise it in a motion *in limine*? This is, what? Trial by error? By ambush? They're opening the doors.

I brought this exhibits to them before trial, medical records. And by the way, this attorney, again and again, February 5, I produced medical records from Montana updated. I produced all this stuff. If they have an issue -- and they done it every trial. This is a first-rate effort to declare a mistrial.

THE COURT: Counsel, here is the problem for both of you. The problem is that we had an agreement about this and these records could have gone through before by both sides. But we had an agreement not to get into emotional distress after July of 2018. The error on the plaintiff's side is simply putting up the whole document without going through that. The error on the defense side would be now going against my admonition. This has not been sorted out.

*Deborah D. Parker, U.S. Court Reporter*

55

There's no way for the Court to deal fairly with this, frankly.  I'm at a little bit at a loss how to -- how to deal with this, but it is unfair that an agreement is reached on the plaintiff's side to put up the total amount and then now you respond.

If you two want to go through these records after court, I think that we can resolve this easily by taking out those areas on these billings.  Because what the plaintiff cannot do is simply put up a total billing without sorting this out.  I think we could almost reach a stipulation concerning what was left in terms of physical.  In reading these records, though, it appears that it's elective surgery.  It appears that if that surgery was undertaken, it's about 240- to $250,000.  But all of this anxiety evidence that came in, I don't know.  Is that linked?  The argument could be made that that's linked to the damages from the incident.

MR. HARRELL:  That is a suggestion.

THE COURT:  But if that comes in, where do we draw the line in terms of anxiety versus emotional distress and how far that goes?

What it does is, it undermines the whole stipulation we entered into.

MS. MKRTCHYAN:  Your Honor, that's -- excuse me.

THE COURT:  Let plaintiff finish.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01648                                                8-RenSER-01648

56

MS. MKRTCHYAN: Your Honor, this is why -- there is a reason why -- there is a reason why they have exhibits put down on exhibit list. I produced updated VA ledger before trial. If we had a problem, they should have raised before I even went into client's direct.

Moreover, the same exact issue -- it seems to me we're doing this trial without having any information before. We had the same situation with VA ledgers before, and we had done redactions. If they want to go --

*(Overtalking: Unable to report.)*

May I finish?

THE COURT: Please.

MS. MKRTCHYAN: If they want to go and reduce those amounts with my client, sure. But you're opening the door, not me.

THE COURT: For both of you, this is becoming repeated. This is another example. We put up homelessness. Now, homelessness is in front of the jury, not only the opening statement which I thought pertained to this brief stay in the campsite which came up in the first, second and third but then the mother surprises us with this homelessness in Montana. This is thrown out there in a sense, and you should not be precluded now going into homelessness.

The same repetitive thing is occurring concerning

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01649                                          8-RenSER-01649

damages. A document is thrown up in terms of page 1. And then I don't see how I cut you off from rebutting what is anxiety and emotional distress for physical damages. Plus it was hard for me to keep track of when a document is put up and then start scrolling through each of the pages. And what occurred was not captured on the record, Counsel, is that we're putting up a document repeatedly over a hospital record, and I repeatedly asked you to slow down the scrolling. And the record will indicate at that time you were scrolling through the records. So I'm not certain if you put a page 1, because so many other pages of these documents were simply put up on the screen. I'm not going to preclude you once this is raised from getting into anxiety now because of the way that this evidence is being presented.

You've got to be able, on defense side also, in fairness, to rebut a document that's thrown up and then pages are shown. And I don't know if the pages were shown on this document. It was so repetitive. I just don't recall.

So, Counsel, unfortunately, this is going to underline emotional distress. Now, where do we go from there? I'm warning you both. Once we get into that area, you're both aggressive on each side. And the end result is, I know that you're going to now claim in the future -- trust

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01650                                    8-RenSER-01650

58

me, in the fourth trial -- *Judge, this now opens the door for Montana -- for the incident back in Pennsylvania.* No it doesn't. Not at this point. You can get into anxiety. I'm going to let you rebut that versus the physical, but that doesn't open that door yet.

MR. HARRELL: Your Honor, if I may.

THE COURT: The problem is -- this can't be a vehicle for that, Counsel.

Now, your turn uninterrupted.

MR. HARRELL: We did reach an agreement that it all ends in July of 2018. And we came into trial with that agreement.

First of all, we were sandbagged by the mother who was not -- I'll say it, was [sic] unappropriately counseled on the agreement before she got up on the witness stand, so we heard all types of things after July 2018 that we should not have heard.

The Court did admonish the jury, *Don't listen to that.* Words to that effect. That's not an issue. It was forcefully delivered and very clear. And I thought we were done.

And then, yesterday, with Mr. Holloway on the stand, here we go again. She puts up a medical billing record that contains a total amount. That for sure happened. I also have been a witness to the scrolling

*Deborah D. Parker, U.S. Court Reporter*

59

through documents and things just being shown.  And my records show that Exhibit 26, not just page 1, she asked for it all to be admitted.  We objected.  Learning from our experience with the mother that we need to object, we listen and we learn.  And we try and we objected and we specifically said -- I believe my memory is correct -- words to the effect of, *Your Honor, we object to Montana and we object to Pennsylvania, after July of 2018.*

Our objection was unsuccessful.  So we move on. And we do the best that we can with the Court rulings for our clients.  That's how our system works.

So now I'm going through the records last night and this morning.  And, again, I apologize about being late. But it is replete, this $20,000, or whatever it is, on page 1 is replete.  The Court has the exhibit.  It is replete.

THE COURT:  I'm not going -- the ruling is as follows:  With the way that this was introduced, you may go back through these records and sort out what's physical or/and anxiety, but I am precluding the incident in Pennsylvania which is truly what you're after frankly. Because the prejudicial effect outweighs the probative value for the following reasons:

First of all, there was no conviction.  No. 2, the prejudice would be after the fact if he's walking across the

*Deborah D. Parker, U.S. Court Reporter*

hallway in an incident involving a woman with the Court not being knowledgeable about what that involves. But regardless this is not a campsite. This does not involve a fact situation that is so same or similar -- well, strike that. If another woman is introduced into this after the fact, you don't have to be a weatherman to know which way the wind is blowing. That's going to be an automatic non-liability. The prejudicial effect here is just too strong. I'm not precluding you from this record. I am precluding you from this Pennsylvania incident.

MR. HARRELL: Well, Your Honor, here's where the challenge is.

THE COURT: There is no challenge. I'm being very clear right now.

MR. HARRELL: I understand.

But if I can give the Court some more information. What is in front of this jury is just billing records. We do not have what he is seeking treatment for. We don't have the counseling --

(Overtalking: Unable to report.)

THE COURT: Okay, please.

MS. MKRTCHYAN: Lies after lies.

THE COURT: Just a moment.

MR. HARRELL: What is in front of the jury now is bills that we're being asked to pay in damages for emotional

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01653                                         8-RenSER-01653

61

distress treatment in Pennsylvania and Montana.  Aren't we entitled --

THE COURT:  No, you're not.  I've included and told them that they cannot view that.  I'm giving you the ability to go back through the records and sort out what's physical and what is emotional distress.  That is what I've given you to sort out.

MR. HARRELL:  Well, here's what I will offer to do to work --

THE COURT:  No, I'm going to tell you what you're doing.  You're not offering me anything.  My ruling is final.  Am I clear?  You are not to get into Pennsylvania.

Am I miscommunicating with you in any way?  The prejudicial effect outweighs the probative value.  Understood?

MR. HARRELL:  Understood.

THE COURT:  All right.  Let's get out of here.

*(Sidebar discussion concluded.)*

*(The following proceedings were had in open court in the presence of the jury:)*

THE COURT:  We're back on the record.

Counsel, question, please.

MR. HARRELL:  Thank you, Your Honor.

BY MR. HARRELL:

Q    Sir, let's pick back up.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01654                                                  8-RenSER-01654

Case 25-7192, 07/27/2026, DktEntry 89.9, 169 of 250

# EXHIBIT P

8-RenSER-01655

8-RenSER-01655

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 9, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 13, 2025

12:16 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01656                    8-RenSER-01656

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01657                    8-RenSER-01657

```
APPEARANCES OF COUNSEL:

        FOR THE DEFENDANT, CHAD RENEGAR:

                        MICHAEL L. WRONIAK
                        COLLINS + COLLINS, LLP
                        750 THE CITY DRIVE
                        SUITE 400
                        ORANGE, CALIFORNIA 92868
                        (714) 823-4100
                        mwroniak@ccllp.law

                        CHRISTIE SWISS
                        COLLINS + COLLINS, LLP
                        2011 PALOMAR AIRPORT ROAD
                        SUITE 207
                        CARLSBAD, CALIFORNIA 92011
                        (760)274-2110
                        cswiss@ccllp.law


   Also Present:

        Jeremy Holloway, Plaintiff

        Raymond Farahmand, Paralegal for Plaintiff

        Bryan Stever, Litigation Support Defense
```

*Deborah D. Parker, U.S. Court Reporter*

```
                             I N D E X


DEFENDANTS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 CHAD MATTHEW RENEGAR               10

 MARTIN RAMIREZ             18     40
                           33




                      E X H I B I T S

PLAINTIFF'S EXHIBITS:                IDENTIFICATION  EVIDENCE

 243-1  Unredacted Version of             47
        Ramirez Memo re Onwuka
        Incident




                      E X H I B I T S

DEFENDANTS' EXHIBITS:                IDENTIFICATION  EVIDENCE

 243   Ramirez Memo re Onwuka                          24
       Incident
```

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01659                                8-RenSER-01659

84

MS. SWISS:  Objection.  Outside the scope.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Were you told by the defense counsel that the same captain who gave a slap [phonetic] to Deputy Chad Renegar in this incident found him in violation of a host of policies after this incident -- just a year after?

MR. HARRELL:  Vague.

MS. SWISS:  Outside the scope.

THE COURT:  Sustained.  Sustained.

The jury is to disregard this completely.

You're to absolutely disregard this, understood?

All right.  Thank you.

BY MS. MKRTCHYAN:

Q    And you said that Deputy Chad Renegar's report was consistent with your review of the video, right?

A    That's correct.

Q    Okay.  Isn't it true you read his report?

A    I did.

Q    Okay.  Let's go back to his report.  I'm going to show it on my screen.

Thank you, Mr. Staver?

MR. HARRELL:  Stever.

MS. MKRTCHYAN:  Stever.  Thank you.

I would like to publish to the jury what has been

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01660                                    8-RenSER-01660

97

Now, what that creates is absolute prejudice?

MS. MKRTCHYAN:  Your Honor, that's -- I'm sorry.
May I make it very easy --

THE COURT:  No, I'm going to finish this.

MS. MKRTCHYAN:  But that's not relevant to this
issue, because --

THE COURT:  Well, this is relevant --

MS. MKRTCHYAN:  -- admitted by this Court.  The
reference was made to letter of reprimand by
Captain Paul D'Auria which was admitted by this Court.  I
did not violate any Court ruling and their objection was
improper.  This was introduced as exhibit number -- let me
tell the Court.  It was already admitted.

THE COURT:  The Captain's findings were only as to
this incident.  It wasn't to a series of incidents that puts
Deputy Renegar in a position of being portrayed as having
numerous excessive force incidences inside the jail.

Now --

MS. MKRTCHYAN:  It was Exhibit 80, Your Honor.

THE COURT:  Thank you, Counsel.

My record is clear now.  And although you continue
to interrupt, this is really putting the Court in a
difficult, difficult position.

On one hand, Mr. Holloway, I want to get to this
jury, if at all possible.  But having this type of prejudice

*Deborah D. Parker, U.S. Court Reporter*

98

for you, Deputy Renegar, puts you in an extraordinarily difficult position.  If I've made a ruling and then that ruling in a sense is a ruling that puts additional findings or additional incidences, which I've looked at extensively in your record, and I precluded those incidences over defendants' absolute objection.  And you can make a record at the end of day, but I'm not going to hold up the jury any longer.

I'm going to admonish this jury in the strongest form again that this was absolutely to be disregarded by them.  I've done that once.  And if we get to the end of this trial, I'm going to very closely look at a motion for new trial at that time and try to weigh those instances where my orders were disobeyed.

I'm not saying I'm going to grant a new trial, but I will give you leave if there is liability to put together a whole string of incidences where this Court has made a ruling and then to try to thoughtfully sit down and decide whether a motion for a new trial is to be granted or not. I'm not inferring that that's going to happen, so don't get your expectations up, but I would like to see us limp to some conclusion, Mr. Holloway, for your benefit and not coming back a fifth time.  And Deputy Renegar and Deputy Gotts, I would like to end this ongoing saga concerning your careers.  It's got to be causing devastation

*Deborah D. Parker, U.S. Court Reporter*

99

not only professionally but personally. I just can't have my orders disobeyed. And now I'm going to get stronger.

My admonition to this jury was that that was inappropriate, and I will add the word "inappropriate." It was not to be put before them and that they are to completely to disregard any insinuation.

Now, let me go back and draft that.

MS. MKRTCHYAN: I need to make my record --

THE COURT: You can create the record at the --

MS. MKRTCHYAN: -- because you say something. Then let me respond. Let me make my record.

THE COURT: Please.

MS. MKRTCHYAN: Because this Court is erroneous. I have referenced -- and the record is clear, I would like to ask the record to be reflected. I specifically referenced Exhibit 80 when I asked questions to Ramirez. This is the second use-of-force incident, letter reprimand that Deputy Chad Renegar was given. This Court has admitted this evidence. And this was by the same Captain Paul D'Auria. Here's on my screen, this is letter reprimand by Captain Paul D'Auria. This is the same Captain Paul D'Auria who had reviewed this prior use-of-force incident with -- that was investigated by Lieutenant Ramirez that I just received unredacted copy.

So I, basically, am given unredacted copy on --

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01663                                                    8-RenSER-01663

104

and Luna, and there is no other, and whatever words you want to put in there.  In other words, no other inference which is a weak way of saying it.  You can be stronger, but there's no other evidence before this Court.

MR. HARRELL:  Your Honor, another only very quick --

MS. MKRTCHYAN:  Excuse me.  Your Honor, I need to respond --

MR. HARRELL:  -- point --

(Overtalking:  Unable to report.)

MS. MKRTCHYAN:  Excuse me.

I am not going to be speaking already.  If there is an accusation here, I want to -- actually, the transcript to be read.  What specifically did I say that is objectionable?  Because there is this all --

And the Court is advocating for the defense.  I might as well be, basically, going up against defense counsel and -- which is -- yes, the Court is advocating.

THE COURT:  I'm not going to --

(Overtalking:  Unable to report.)

THE COURT:  -- again tonight -- you've already wished this Court and the whole body here a stroke, among other things.  And I'm starting to now pull those.  It's been redundant and repetitive.

MS. MKRTCHYAN:  No, but let's --

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01664                                    8-RenSER-01664

(Overtalking:  Unable to report.)

THE COURT:  And I can't -- I can't get this case to trial with one party obeying my admonitions in the other -- and the other --

MS. MKRTCHYAN:  Your Honor, let's have the transcript read --

THE COURT:  You --

(Overtalking:  Unable to report.)

MS. MKRTCHYAN:  Because this Court continuously -- excuse me.  The Court continuously disparages me -- disparages me --

THE COURT:  I'm not disparaging you.  I'm giving you --

MS. MKRTCHYAN:  -- and admonishing -- excuse me.

(Overtalking:  Unable to report.)

MS. MKRTCHYAN:  Where is the transcript?

THE COURT:  Do not take her comment --

(Overtalking:  Unable to report.)

MS. MKRTCHYAN:  Where is the transcript?  Where is the transcript?

I request the transcript read where I said anything that is prejudicial to defendants.  Enough is enough.  I'm continuously accused of prejudicial conduct and being admonished continuously daily, intimidation tactics by consolidated efforts of defense counsel.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01665                                                          8-RenSER-01665

# EXHIBIT Q

8-RenSER-01666

8-RenSER-01666

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY,                        )
                                        )
                    Plaintiff,          )  **Certified Transcript**
                                        )
        vs.                             )  Case No.
                                        )  8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al.,               )
                                        )
                    Defendants.         )  **DAY 10, VOLUME I**
                                        )

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

8-RenSER-01667                                    8-RenSER-01667

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        MKRTCHYAN LAW
        BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
        655 North Central Avenue
        Suite 1700
        Glendale, California 91203
        818-388-7022
        narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

        LYNBERG & WATKINS APC
        BY:  S. FRANK HARRELL, ESQ.
        1100 West Town & Country Road
        Suite 1450
        Orange, California 92868
        714-937-1010
        sharrell@lynberg.com

        LYNBERG & WATKINS APLC
        BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
        1150 South Olive Street
        Suite 1800
        Los Angeles, California 90015
        213-624-8700
        cnaltsas@lynberg.com

        LYNBERG & WATKINS PC
        BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
        1100 West Town & Country Road
        Suite 1450
        Orange, California 92868
        (714) 937-1010
        theathcote@lynberg.com

        LYNBERG & WATKINS
        BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
        1100 Town and Country Road
        Suite 1450
        Orange, California 92868
        714-937-1010
        rskinner@lynberg.com


**UNITED STATES DISTRICT COURT**

8-RenSER-01668                                         8-RenSER-01668

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

       COLLINS & COLLINS LLP
       BY:  MICHAEL L. WRONIAK, ESQ.
       750 The City Drive
       Suite 400
       Orange, California 92868-4940
       714-823-4100
       mwroniak@ccllp.law

       COLLINS & COLLINS LLP
       BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
       2011 Palomar Airport Road
       Suite 207
       Carlsbad, California 92011
       760-274-2110
       cswiss@ccllp.law


**ALSO PRESENT:**

       Raymond Farahmand, plaintiff's paralegal
       Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

8-RenSER-01669                                    8-RenSER-01669

4

**I N D E X**

**WITNESSES**                                                                          **PAGE**

**KENDALL WAGNER, M.D., CALLED BY THE DEFENDANTS**
    Cross-Examination by Ms. Mkrtchyan                                                     6

**BRIAN FUERBACH, CALLED BY THE DEFENDANTS**
    Direct Examination by Mr. Harrell                                                     24
    Cross-Examination by Ms. Swiss                                                        52
    Cross-Examination by Ms. Mkrtchyan                                                    53
    Redirect Examination by Mr. Harrell                                                  117
    Recross-Examination by Ms. Mkrtchyan                                                 122

**CHAD MATTHEW RENEGAR, CALLED BY THE PLAINTIFF:**
    Direct Examination by Mr. Wroniak                                                    130


**EXHIBITS**

|                |                          | IN EVIDENCE | WITHDRAWN OR REJECTED |
|----------------|--------------------------|-------------|-----------------------|
| **EXHIBIT**    |                          |             |                       |
| 39             | Deputy Johnston's report | 122         |                       |


**UNITED STATES DISTRICT COURT**

8-RenSER-01670                                                                8-RenSER-01670

A       No.  No, I did not.

Q       Okay.  So now, when you --

A       So it's an estimate.

Q       Okay.  And you were hearing this noises from your window of an RV.  Isn't it true your window --

MS. MKRTCHYAN:  Let's open -- can you have this played for a second?

MS. SWISS:   Exhibit number?

MS. MKRTCHYAN:   This is Gotts' tape.

THE COURT:   Gotts' tape.

MS. MKRTCHYAN:   We already played it before.   Thank you.

Just play this.

MR. HARRELL:   Your Honor, counter number, please, for our record.

THE COURT:   Counsel, just play the tape.

MS. MKRTCHYAN:   Yes.

BY MS. MKRTCHYAN:

Q       So if there are no lights there, are you telling me that you were able to see through the window of your RV what was going on at Mr. Holloway's tent?

A       Yes.

Q       Okay.  So, sir, let's see.  You told Deputy Johnston just two weeks after, on February 8, 2018, that you never -- you never saw any female.  You just heard noises and called 911;

8-RenSER-01671                                              8-RenSER-01671

isn't it true?

A    It's true I didn't see a female.  I heard a female.  I could see the tent.

Q    Sir, let's -- so were you -- let me ask you this:  Was the memory of this incident in your mind more fresh on February 8, 2018, or today here, 2025?

A    2018.

Q    Okay.  And when you recall -- throughout this period of time since toward the night of the incident up until today, you have cooperated with this defense counsel; true?

A    True.

Q    Okay.  And when my private investigator has tried to spoke to you as early as in 2019, isn't it true you refused to speak with him?  Two investigators, separate occasions, tried to speak with you.

A    Do you want to talk about the harassment of your investigator?  Jeffrey --

Q    Sir?

A    -- LeTourneau?

Q    Sir, I'm talking about Robert --

A    Chasing my children down, harassing my -- yeah, laugh about it.  It's not funny to me at all.

Q    Sir, private investi- -- so you're biased in favor of police; isn't it true?

            MS. SWISS:  Objection.

UNITED STATES DISTRICT COURT

8-RenSER-01672                                    8-RenSER-01672

BY MS. MKRTCHYAN:  What you told --

THE COURT:  Overruled.

BY MS. MKRTCHYAN:

Q     -- Mr. Acosta was that the guy -- you know, you got the impression the guy was possibly a transient.  Is that false?  Is that false?

A     That is false.

Q     Okay.  So private investigator, certified by the -- California, is going to lie in report when he has no stake in the outcome of this lawsuit?

MS. SWISS:  Objection.

THE WITNESS:  And I do?

MS. SWISS:  Objection.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Let's continue what you told him.  You told him that you didn't really want to talk about the incident, didn't know the guy had that much time to bring a lawsuit.  You told him you didn't want to say anything to help the individual we were representing.  And you also said that "If the attorney wants to depose me, that's the only way I will discuss anything."  You said that to Mr. Acosta on November 6, 2019?

A     I did.  I did.  It was a very cordial conversation, and I just laid it out.  Basically I'm not going to help a criminal.

Q     I see.  Sir --

**UNITED STATES DISTRICT COURT**

8-RenSER-01673                                    8-RenSER-01673

MR. HARRELL:  403.

MS. SWISS:  Asked and answered.

THE COURT:  Just a moment.  It's also multiple -- also.

MS. MKRTCHYAN:  Your Honor, these objections are interrupting the flow of my questioning.

THE COURT:  First of all, we need to calm the voice down and address -- first of all, it's going to cause a confrontation.  I'm going to ask you just to reduce the level of the voice to the witness for a moment.

And now I'm going to look back at the record for a moment.

(Pause in proceedings.)

THE COURT:  Counsel, re-ask the question.

MS. MKRTCHYAN:  And I forgot my question.

THE COURT:  Well, there were multiple questions.

MS. MKRTCHYAN:  In any event, that's fine.

BY MS. MKRTCHYAN:

Q    Sir, so let's go back.  Isn't it true you never saw the man leave the campground -- campsite next to you in a truck?

MR. HARRELL:  Asked and answered.

THE COURT:  Overruled.

You can answer it one more time, sir, just because of interchange.

THE WITNESS:  No, I never saw anybody at that

8-RenSER-01674                                    8-RenSER-01674

Q    Sure.  And when you opened the window, did you actually see the domestic violence disturbance?

A    I could see the tent moving, and I can tell precisely where the noise was coming from.

Q    Well --

A    20 feet away isn't very far.

Q    Sir, you say you saw it.  It was still dark campground; right?  There were no lights there; true?

A    That's true.

Q    True?

A    True.

Q    Okay.  So -- and you didn't actually -- did you have x-ray vision?  This tent is not transparent, is it?  Right now we see -- can we play --

        THE COURT:  Counsel, the question.  Now you --

BY MS. MKRTCHYAN:

Q    Was his tent transparent?

A    No, it's not.

Q    Okay.  And so when you are telling us that you actually saw something in the tent, you're assuming that actually what you saw was a man and a woman struggling; true?  Isn't it true?

A    That's true.

Q    Okay.  And you told deputies on February 2018 you heard a male say -- this is what was described, what you telling:

        "On Sunday, January 21, 2018, at

8-RenSER-01675                                    8-RenSER-01675

all.

BY MS. MKRTCHYAN:

Q    Let me then paraphrase it for you.

A    Okay.

Q    So is there anywhere in this report by Deputy Johnston on February 8, 2018, any indication that you actually saw, other than heard the noises -- the domestic violence noises, sir?  Is there anything?  Would you like me to show this report?

    THE COURT:  Counsel, your question.

BY MS. MKRTCHYAN:

Q    Is there anything that we read in this report that states that you actually saw the tent moving, that you actually saw through this -- you know --

    THE COURT:  Counsel, this is argument.  Just ask the question.

    MS. MKRTCHYAN:  That's what I'm saying.

BY MS. MKRTCHYAN:

Q    Is there anything saying here that you actually saw the domestic violence disturbance that night?  Yes or no?

    THE COURT:  Just a moment.

    You can answer the question fully.

    THE WITNESS:  No, there isn't anything in there, but what I'd like to say -- can I say something?

    THE COURT:  You can finish.

    THE WITNESS:  The details are not -- there wasn't

UNITED STATES DISTRICT COURT

8-RenSER-01676                                    8-RenSER-01676

anything that -- you're reading into that as if it was a full statement like my deposition.  And you're inferring things that simply aren't true.

BY MS. MKRTCHYAN:

Q    Well, sir, Deputy --

A    My intention wasn't to deceive anybody.

MR. HARRELL:  Might the witness --

THE WITNESS:  That's how I feel you're phrasing this.

BY MS. MKRTCHYAN:

Q    Well, sir --

MR. HARRELL:  Can the witness finish?

THE COURT:  Just a moment.  Just a moment, both of you --

MS. MKRTCHYAN:  It's like --

THE COURT:  Counsel.

MS. MKRTCHYAN:  I don't think he should -- thank you.

THE COURT:  Counsel, Counsel -- no, Counsel.  Thank you.

Now, there's going to be silence for a couple minutes, okay?  We're all going to calm down.

Now, Counsel, sit down for a moment, please.

And, Mr. Fuerbach, we're going to take a rest.

And, Counsel, we're going to take a rest.

8-RenSER-01677                                              8-RenSER-01677

82

We're resting.

(Pause in proceedings.)

THE COURT:   All right.   Now, Counsel, your question, please.

BY MS. MKRTCHYAN:

Q    It wasn't only Deputy Johnston that you spoke to; right?
There was another deputy that came to speak to you on the same
night?

A    The same night --

Q    Deputy Pahel came and talked to you?

A    At the campground?

Q    Yes.  On the same very night, sir.

A    I believe somebody did come talk to me.

Q    Right.  And isn't it true you did tell the same deputy on
the same very night, Deputy Pahel, you didn't see anything;
that you only heard noises, you thought it was possibly DV, and
that's why you called 911?

A    I didn't see anything?  I saw a lot.  I heard a lot.

Q    That's what you -- okay.  You heard a lot, yes.  But we
are talking about seeing.  There is a difference between seeing
something and hearing; isn't it true?  Isn't it true, sir?

A    Yes.

Q    Okay.  So would you like me to play Deputy Pahel's
video/audio where he is talking to you, where you are
discussing this incident on the same very night, and he is

UNITED STATES DISTRICT COURT

8-RenSER-01678                                         8-RenSER-01678

(Videotape played, not reported.)

BY MS. MKRTCHYAN:

Q    So this is your motor home that we see on the screen; right?  Your RV?

A    Yes.

Q    Okay.  And we hear you give your name to Deputy Pahel; true?

A    Yeah, I heard.

Q    Okay.  So you did speak with Deputy Pahel that same morning about this incident, about the DV, and what you've heard and what you've seen; true?

A    Yes.

Q    Okay.  And Deputy Pahel then -- do you have any reason to think that Deputy Pahel would not accurately tell other deputies about what you said?

MR. HARRELL:  403.  Deputy Pahel will be here.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    So isn't it true you told Deputy Pahel you did not see anything?  You heard noises about -- related to DV and you called 911?

A    Correct.

Q    Okay.  So then here you are adding at this trial because you are cooperating with the defense --

MR. HARRELL:  Argumentative.

UNITED STATES DISTRICT COURT

Case 8:19-cv-01514...Case 25-7132, Document...846-8...Entry 28.06...Filed 06/10/25...of 250)...Page 15 of 24 Page
ID #:34432

93

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q    -- you are adding --

THE COURT: Counsel, that is stricken. That's improper.

BY MS. MKRTCHYAN:

Q    Well, you have not cooperated with us; true? You have not. You refused to speak to --

MS. SWISS: Objection.

BY MS. MKRTCHYAN:

Q    -- two investigators. We had to subpoena you after multiple attempts to come talk at a deposition. And then throughout these years of this litigation, you have never cooperated with us. You have cooperated with the defense; true?

MS. SWISS: Objection.

THE WITNESS: Not true. You didn't subpoena me. I contacted you after you had your goon chase my kids around and trespass on my property, saying that he was coming to serve me, which was a lie. He took pictures of my RV -- walked in a posted no trespassing, came into my backyard, and took pictures of my RV, turned around, and left. I have it all on video.

BY MS. MKRTCHYAN:

Q    You were upset; isn't it true? You were upset that we were trying to contact you to get your statement about this

8-RenSER-01680                                    8-RenSER-01680

night?

A    Could have come to my work.  My wife kept telling him, "He's at work.  He's always at work."

Q    Sir, you were upset --

A    Instead they harassed my family.

Q    You were upset.  You didn't want to cooperate with us, but you have been very cooperative -- you even wrote a declaration in support of their motion for summary judgment. Do you remember that?  You signed a declaration.  Do you remember that?

A    I do.

MS. SWISS:  Objection.  Compound.  Argument.

BY MS. MKRTCHYAN:

Q    Isn't it true?  You didn't even want to talk to investigators twice, but you wrote a declaration for the defense, and you are telling this jury, adding statements that you never told the police that night; isn't it true?

A    I didn't add statements.

MS. SWISS:  Argument.  Compound.  Move to strike.

BY MS. MKRTCHYAN:

Q    Let's focus on your statements today.  You said, "I saw the tent even though I did not have night vision.  This tent is not transparent.  I saw the tent moving, and I saw a fist going and struggling.  I saw -- I saw something."

You said that here under oath; true?  True?  Yes or

**UNITED STATES DISTRICT COURT**

8-RenSER-01681                                        8-RenSER-01681

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     You didn't see a female leaving a car because there was only one car parked at Mr. Holloway's campsite; true?

A     True.  There's guest parking in the front.

Q     Sir, did you see a female actually walk towards the guest parking at park rangers?  Did you ever see that?

A     I didn't.

Q     Did you see any female that night at Mr. Holloway's campsite that you are telling us, "100 percent I believe there was a female"?

A     Two voices don't lie.

Q     Sir, two voices don't lie.

Isn't it true your wife, when she said "Stop hitting on her," the male voice responded by cussing at her.  Do you remember, like, said "bitch," something like that; isn't it true?

A     He didn't cuss at my wife.

Q     No, something to the effect of, you know, "you, the bitch," et cetera; right?  You were upset about that?

A     "You want more of this, bitch?  You want more of this?"  Smack, smack.  "You want more of this?"

Q     I'm talking --

MR. HARRELL:  Don't interrupt the witness.  Please, Your Honor.

105

MS. MKRTCHYAN:  And I don't want interruptions from defense counsel.

THE COURT:  Just a moment.  The question --

BY MS. MKRTCHYAN:

Q    Now, the question is the following:  When your wife said "Stop beating on her," the male voice retorted something directly to your wife; isn't it true?

A    No.

Q    Well, if Mr. Holloway testified that, in fact, he heard the conversation between your wife and the male voice at Campsite 66 yelling at each other --

A    What?

Q    -- your wife saying, "Stop beating on her," and then the male saying, "You fucking bitch," this and that, that would be false?

A    100 percent.

Q    And so your wife is not going to come to court to testify, is she?

MR. HARRELL:  Relevance.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    And, in fact, we asked --

A    Call her.

Q    -- we asked you --

THE COURT:  Counsel, sustained.

8-RenSER-01683                                        8-RenSER-01683

BY MS. MKRTCHYAN:

Q     Well, do you remember our investigator asked if we could interview your wife about what happened.

Do you remember that?

MS. SWISS:   Objection.

THE COURT:   Sustained.

MS. MKRTCHYAN:   That's relevant, Your Honor.   It goes to his bias.   It goes to the fact that he is not telling us the whole truth.

His wife was there.

THE COURT:   Counsel, just a moment.

Each of you are free to subpoena any witness and --

MS. MKRTCHYAN:   No, we didn't have his wife's information, Your Honor.   It was never --

MS. SWISS:   Objection.

MS. MKRTCHYAN:   Excuse me.

THE COURT:   Well, just a moment.

MS. MKRTCHYAN:   If we are going to make this --

THE COURT:   Counsel.

MS. MKRTCHYAN:   -- the record in front of the jury --

THE COURT:   Counsel, Counsel, no.   You actually went to the house, not you, but investigators went to this home. You're free to subpoena, if you want to, his wife.   You're free to subpoena any witness.   But to get into this kind of

UNITED STATES DISTRICT COURT

8-RenSER-01684                                                    8-RenSER-01684

comparison --

MS. MKRTCHYAN: Sir, Your Honor, we never were given her information to subpoena her, for this witness.

MS. SWISS: Objection.

MR. HARRELL: Your Honor, objection. They were at her house.

MS. MKRTCHYAN: Then why --

THE WITNESS: I'll give it to you.

BY MS. MKRTCHYAN:

Q    Right now?  I'm not interested in right now.

A    I'll write it down.

Q    I'm interested in when we --

A    I'll give you her personal phone number.  You can call her.

Q    We asked you, sir.  How many times we asked private investigator to give us --

THE COURT:  Counsel.  Counsel, let's lower the voice.

MS. MKRTCHYAN:  Yes.  No, but, you know, this is becoming out of control.  And this is improper.

THE COURT:  No, it is, and I'd like you just to lower your voice just a little.

MS. MKRTCHYAN:  Sure.

BY MS. MKRTCHYAN:

Q    Sir, isn't it true my private investigator several times,

8-RenSER-01685                                    8-RenSER-01685

112

Q      You did not see him give -- you know, kick at any officer; true?

A      No.

Q      All you saw was that he was not going down on the ground, and to you, according to what you observed, he was tasered while standing, and then he was taken down to the ground; true?

A      Yeah.

Q      Okay.  So then in your understanding, if someone is not going down on the ground, that is considered, the way you wrote in that declaration, extremely combative and threatening?

A      Yeah.  He was cussing at the officers and after threatening an entire campground, yeah.

Q      And --

A      He brought it on himself.

Q      Let's go back to that threatening the entire campground thing.  You didn't come out of your RV; true?

MS. SWISS:  Asked and answered.  403.

THE COURT:  Counsel, that's been asked and answered.

MS. MKRTCHYAN:  No, it wasn't asked and -- I did not go into details about --

MR. HARRELL:  Motion to strike.

MS. MKRTCHYAN:  Your Honor, I didn't go into details about that second encounter.  This is like --

THE COURT:  Are you now at the second encounter?

MS. MKRTCHYAN:  Before the police arrived the second

UNITED STATES DISTRICT COURT

8-RenSER-01686                                          8-RenSER-01686

Deputy Johnston those statements that I just read?

A    No, I didn't.

Q    Okay.  So this report that we have with Deputy Johnston is not false, is it?

MS. SWISS:  Asked and answered.

THE COURT:  I don't understand the question.

BY MS. MKRTCHYAN:

Q    What I wrote to you that you told him you were not in fear and that you would have called 911 if the yelling lasted longer, that's what you told Deputy Johnston two weeks after the incident?

A    You took it out of context, though.

Q    Okay, sir.

A    That statement is missing a lot of nuance because it was just a quick conversation I had with him, and you're trying to turn it into a -- my character, which is being misrepresented.

Q    Sir, we are talking about what you observed and you are testifying under oath.  The deposition occurred after you spoke with Deputy Johnston, two years after in July 10, 2020; true? Your deposition.

A    True.

Q    Prior to deposition after you spoke with Deputy Johnston, you spoke with this defense counsel; true?

A    True.

Q    And then after that deposition, you prepared a

8-RenSER-01687                                    8-RenSER-01687

declaration assisted by the same defense counsel where you maintained that my client was extremely combative and threatening; true?

A     True.

Q     So the declaration was basically given to you by this defense -- same defense counsel where you read and signed with no questions asked; true?

MR. HARRELL:   Objection.

BY MS. MKRTCHYAN:

Q     True?

MR. HARRELL:   Misstates.

THE COURT:   Sustained.

BY MS. MKRTCHYAN:

Q     Did you actually write the declaration, or was it prepared by defense counsel for you to sign?

A     It was prepared, and I did some edits to it as I recall.

Q     So and then flash-forward throughout this years of this case up until today, 2025, you have cooperated actively with the defense counsel; true?

A     Yeah, I cooperate with them.  Definitely.

Q     You come to and speak with them.  You do not even say hello to us in the morning; true?

MS. SWISS:   Relevance.

MR. HARRELL:   Relevance.

THE COURT:   Sustained.

**UNITED STATES DISTRICT COURT**

8-RenSER-01688                                                    8-RenSER-01688

BY MS. MKRTCHYAN:

Q    You have lunch with them?

BY MS. MKRTCHYAN:

Q    You have lunch with them?

MS. SWISS:  Relevance.  Assumes facts.

THE WITNESS:  Not true.

THE COURT:  Counsel, this is irrelevant.

MS. MKRTCHYAN:  Yes, sir.

BY MS. MKRTCHYAN:

Q    You understand that when you are camping at a campground and you provide information to the 911 callers, you have to be accurate to the best of your recollection; true?  To the best of your information and knowledge; true?

A    Definitely, yes.

Q    Okay.  And you understand that when you provide information to the 911 call, you need to give them personal knowledge based -- information that is based on your personal knowledge, not assumptions; true?  Isn't it true?

A    True.

Q    Isn't it true you were assuming that night -- very, very, very severely assuming -- that there was a female when you never saw any female at Mr. Holloway's campsite?

MR. HARRELL:  "Severely assuming," vague.

THE WITNESS:  Would you be asking this of a blind man?

BY MS. MKRTCHYAN:

Q    Okay.  You are not blind.  We know you are not blind.

UNITED STATES DISTRICT COURT

8-RenSER-01689                                    8-RenSER-01689

# EXHIBIT R

8-RenSER-01690

8-RenSER-01690

8-RenSER-01691

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 11 |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 16, 2025

8:04 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01691                    8-RenSER-01691

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

>NARINE MKRTCHYAN
>NARINE MKRTCHYAN, ATTORNEY AT LAW
>1010 NORTH CENTRAL AVENUE
>SUITE 204
>GLENDALE, CALIFORNIA 91202
>(818) 388-7022
>narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

>S. FRANK HARRELL
>LYNBERG & WATKINS
>1100 TOWN & COUNTRY ROAD
>SUITE 1450
>ORANGE, CALIFORNIA 92868
>(714) 937-1010
>sharrell@lynberg.com

>CATHERINE A. NALTSAS
>LYNBERG & WATKINS
>1150 S. OLIVE STREET
>SUITE 1800
>LOS ANGELES, CALIFORNIA 90015
>(213) 624-8700
>cnaltsas@lynberg.com

>RYANE SKINNER
>LYNBERG & WATKINS
>1100 TOWN & COUNTRY ROAD
>SUITE 1450
>ORANGE, CALIFORNIA 92868
>(714) 937-1010
>rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01692                    8-RenSER-01692

```
APPEARANCES OF COUNSEL:

        FOR THE DEFENDANT, CHAD RENEGAR:

                        MICHAEL L. WRONIAK
                        COLLINS + COLLINS, LLP
                        750 THE CITY DRIVE
                        SUITE 400
                        ORANGE, CALIFORNIA 92868
                        (714) 823-4100
                        mwroniak@ccllp.law

                        CHRISTIE SWISS
                        COLLINS + COLLINS, LLP
                        2011 PALOMAR AIRPORT ROAD
                        SUITE 207
                        CARLSBAD, CALIFORNIA 92011
                        (760)274-2110
                        cswiss@ccllp.law


  Also Present:

        Jeremy Holloway, Plaintiff

        Raymond Farahmand, Paralegal for Plaintiff

        Bryan Stever, Litigation Support Defense
```

*Deborah D. Parker, U.S. Court Reporter*

```
                              I N D E X



 DEFENDANTS' WITNESSES:       DIRECT   CROSS   REDIRECT   RECROSS

  MARK BORBA                     6       22
                                         24
                                        111


  KEVIN PAHEL                   136      165
                                         166




                         E X H I B I T S

 PLAINTIFF'S EXHIBITS:                    IDENTIFICATION   EVIDENCE

  37    Supplemental Report                                  74
        Mark Borba, 01/23/2018




                         E X H I B I T S

 DEFENDANTS' EXHIBITS:                    IDENTIFICATION   EVIDENCE

  35-4  Deputy Pahel's Arrest                               138
        Report of Incident

 102-13 Patrol Vehicle System,                               8
        Video/Audio,
        Deputy Mark Borba
```

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01694                                       8-RenSER-01694

34

THE COURT:  The question needs to be answered.

You were cut off.  Finish your answer.

THE WITNESS:  I have no problem answering your questions.  The problem is I don't have what you're talking about in front of me.  So if you're asking me to testify to a specific time, if you just put that exhibit in front of me, I will gladly do so.

BY MS. MKRTCHYAN:

Q    Sir, we just looked at it.  We just looked --

THE COURT:  Counsel.  Just --

BY MS. MKRTCHYAN:

Q    Let's look at this document.

THE COURT:  Just a moment.  This is unduly consumptive.  Just put the document in front of him so he has that as a reference.

MS. MKRTCHYAN:  Your Honor, this -- showing to him.

THE COURT:  No, then I'm going to exclude it. Just put the document in front of him.

MS. MKRTCHYAN:  It's right there.  It's right there, Your Honor.

THE COURT:  Okay.  Thank you.  I appreciate it.

Now we have the document in front of you.

*(The exhibit was displayed on the screen.)*

////

*Deborah D. Parker, U.S. Court Reporter*

37

If you understand the question, you can answer it.

THE WITNESS:  So at 3:42 hours, that's when I would have used my pack set, advised dispatch that I would be en route to the location.  That's doesn't mean I'm at the location.  It doesn't even mean that I'm driving to the location.  It's just when I acknowledge that I will be en route.

Q    Okay.  We'll look at your patrol vehicle recording as well.  But in any event, based on this document, which is an official record, at the very least we know you're on scene 3:54:47 seconds.  True?

That's within how many minutes of the call that --

THE COURT:  Just a moment.  Now, it's multiple questions, Counsel.

Answer the question about when you were on scene.

THE WITNESS:  So this shows me arriving at 3:54 hours which -- I mean, I'm not doing math in my head. 15 or 20 minutes after the call came in?  That's a significant amount of time.

BY MS. MKRTCHYAN:

Q    In any event, you know, you're asking your questions.

Do you have a problem with answering my questions?

MS. NALTSAS:  Objection.

MS. SWISS:  Objection.

THE COURT:  Sustained.  Stricken.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01696                                          8-RenSER-01696

38

BY MS. MKRTCHYAN:

Q    Okay.  So I'm asking you, specifically, you came -- based on this document, you were at scene and they have a patrol vehicle recording indicating that you were at scene at the very least talking with Deputy Billinger at 3:56:57.  This is the transcript you gave us.

Is there any problem with confirming times?

MS. NALTSAS:  Objection.

MS. SWISS:  Argumentative.

MS. NALTSAS:  Compound.

THE COURT:  Sustained.  That assumes he's having problems confirming time.

Sustained.

BY MS. MKRTCHYAN:

Q    So, in any event, sir, you were at scene, give a ballpark within 20 minutes of the call that came in saying "Male versus Female."  True?  Yes or no?

I'm not interested in your --

THE COURT:  Counsel.  Counsel, just ask the question without adding to it.

You can answer that question, sir.

BY MS. MKRTCHYAN:

Q    Yes or no?

A    I will agree with that statement.

Q    Okay.  Let's see what else you're going to agree with

*Deborah D. Parker, U.S. Court Reporter*

39

us.

So you came -- you didn't see a female.  You were walking there in dark with no flashlights.  You did not hear anything.  And you were about to clear the call.  True?

A    So we do illuminate our flashlights.  You can actually see that a few times on the video, I believe.  So we're actively searching the area for anyone who may need our assistance.  We're listening for an altercation.  We're trying to figure out where it's occurring, if we're in the right spot.  There's a multiple -- multitude of factors that are going on rather than just clearing the call.  That's not the case.

Q    But in any event, we heard transcript.  You were there.  You were telling everyone, *I don't hear anything.*

And then Deputy Renegar shows up with other officers.  True?

A    So Deputy Renegar did show up.  He didn't show up to the area that we were just referring to.  We had actually left that location, driven back to the entrance of the park and that's where we met with Deputy Renegar.

Q    Right.  So you actually went back to the exit -- the park ranger station area.  You left your -- you, basically, got inside your cars, you and Billinger, and you left the area towards the ranger station.  True?

A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01698                                        8-RenSER-01698

82

Q    So if Pahel was also involved in this and you missed it, how is this --

MS. NALTSAS:  Objection.

MS. MKRTCHYAN:  Excuse me.

BY MS. MKRTCHYAN:

Q    How is this report accurate if you're missing other officers at scene?

MS. NALTSAS:  Objection.  Pahel will testify.

THE COURT:  That assumes facts not in evidence. Sustained.

This is his use of force, what he saw when he arrived, Counsel.

MS. MKRTCHYAN:  Yes.  And Pahel was here, Your Honor.

THE COURT:  This is for argument.  Later on, you're more than welcome to argue this.

BY MS. MKRTCHYAN:

Q    Well, would you like me to put Pahel's report as to what exactly he was doing at the time before you arrived?

MS. SWISS:  Objection.

THE COURT:  Sustained.

Pahel will testify, Counsel.

MS. MKRTCHYAN:  No, Your Honor.  It goes to impeaching --

THE COURT:  Pahel -- Thank you, Counsel.  Pahel

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01699                                         8-RenSER-01699

MS. NALTSAS:  Compound.

THE COURT:  It is compound, Counsel.  Re-ask the question.

BY MS. MKRTCHYAN:

Q   He was screaming.  When you arrived to hear on your tape.  True?

A   There's -- you hear Mr. Holloway a lot on my tape.  I don't know to which point you're referring to.

Q   I'm talking about when the point in time you arrived.  And you said it was necessary for you to place your right knee, your body weight onto his upper back, even though other officers were also doing the same thing.

I'm trying to figure out what you saw.  You heard this man screaming, *You're kneeing me in the head.  I've got blood in my head.*

THE COURT:  Counsel, this is argument.

If the question is, simply:  When you applied your knee and what you heard at that time, you can ask it, but you're arguing this matter.  Please.

BY MS. MKRTCHYAN:

Q   So you heard him scream.  You heard him complain, and yet you found it necessary to place your body weight onto his upper back.  That's what you admit you have done.  True?

MS. NALTSAS:  Argumentative.

THE COURT:  Sustained.

*Deborah D. Parker, U.S. Court Reporter*

93

BY MS. MKRTCHYAN:

Q    Right?  That's the only thing --

THE COURT:  Counsel, Counsel, that question is sustained.

You can re-ask it.

BY MS. MKRTCHYAN:

Q    According to your report, no other force was applied on him by you.  True?

A    False.

Q    What else did you do then that is not reported in your report?

MS. SWISS:  Misstates --

THE COURT:  What else did you do at what time?

BY MS. MKRTCHYAN:

Q    At the time you arrived to the scene and got involved in the use of force, what else did you do that is not reported in this report as you said?

MS. NALTSAS:  Misstates the evidence.

THE COURT:  Sustained.

Counsel, just ask him what he did.

MS. MKRTCHYAN:  That's what I'm trying to do.

BY MS. MKRTCHYAN:

Q    Sir, is this all you did, based on your report:  Applied body weight on his upper back?

A    Misstates my report.

*Deborah D. Parker, U.S. Court Reporter*

Q   You grabbed his left arm.  That's what you wrote. Let's continue reading this:  Holloway had gotten his --

Continuing on, "I immediately grabbed control of Holloway's left arm, using both of my hands and placed it behind his back," right?  That's what you did?

A   Correct.

Q   Nothing else.  You grabbed his left arm, which he was trying to lift himself from the ground as a Superman from the combined body weight of multiple officers.  True?

MS. NALTSAS:  Objection.  "Superman."

THE COURT:  Argumentative.

Sustained.

BY MS. MKRTCHYAN:

Q   If I were to show you Pahel reports where he says *I also was grabbing his left arm and I was placing my body weight on top of Mr. Holloway because he was trying to left himself off the ground --*

MS. NALTSAS:  Objection.

BY MS. MKRTCHYAN:

Q   -- is that going to be -- is that going to be basically same scenario you're telling us?

MS. NALTSAS:  Objection.  Pahel will testify.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q   Have you read Pahel's report?

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01702                                           8-RenSER-01702

95

A     At some point in time, I may have read it.

Q     Okay.  And you've noticed -- and I asked you the same questions at your deposition -- do you recall that? -- about how Gotts and Pahel are describing their involvement exactly the same way as you have.

Do you remember that?

MS. NALTSAS:  Improper use.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q     Well, you remember this discussion about how you were involved and I was comparing it with how Pahel described it at your deposition?

MS. NALTSAS:  Improper use.

THE COURT:  Counsel, you're going to be able to argue this from the testimony of the different witnesses, but we're not going to get --

MS. MKRTCHYAN:  State of mind, Your Honor.

THE COURT:  No, no.  Pahel will testify.

BY MS. MKRTCHYAN:

Q    And you agree --

THE COURT:  Borba is testifying.  Gonzalez is testifying.

BY MS. MKRTCHYAN:

Q    Did you see --

MS. MKRTCHYAN:  Yes, Your Honor.  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01703                                        8-RenSER-01703

98

is significantly different from the evening versus what he later knew. And when those questions were asked of Gotts, those were because he was being asked from the perspective of what he knew then after the incident.

The second thing is, we're running into difficulty because my record is -- and I know we have a dispute -- when you refer me to 132, there is nothing about his application of body weight. When you referred me to 138 and 139, it's not his application of body weight. And then you're arguing with the Court and throwing out an additional page so it appears to the jury that somehow this Court is withholding information and the inference is that the deputy is being untruthful when, in fact, the pages you are referring to do not contain this information.

Now, I'm going to give you an extra 10 minutes, but we're at 90 minutes now. I want to pay you the courtesy of about 10 more minutes just to be certain that you refocus on the questions that you think are essential.

And we're going to take a break for 15 minutes and then come back.

So, Deputy, if you will return --

MS. MKRTCHYAN: I need to make my record about the impeachment --

THE COURT: Well, please. I'm more than happy to.

MS. MKRTCHYAN: First of all, this is again

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01704 8-RenSER-01704

99

ongoing situation with this Court.  Every time I try to pull out a deposition transcript of any of this witnesses, key witnesses, either defendant or key witness, the Court scrutinizes heavily.  This is my attorney work-product. This is my understanding of what was discussed, and I provided pages.  The Court does not really look at the context and then talks about, you know, this is not impeachment.

The pages that I gave was discussing right around the time he arrived.  So if you're going to talk about pages taken out of context, it's not helpful.  But he discussed at his deposition, in fact, how body weight was applied, not just by him but by other officers.

Continuing on, I asked him questions when he reviewed his patrol vehicle recordings --

And I don't want to make my record in front of this witness, because that is improper.

THE COURT:  Sir, would you step down and take a recess for a moment.

Thank you very much.

(Pause.)

MS. MKRTCHYAN:  I was asking him on Patrol Vehicle Recordings how he's discussing the incident to Rawlings. And I asked him, "Isn't it true you did not tell Rawlings about the body weight?  You only told him about the

*Deborah D. Parker, U.S. Court Reporter*

100

control-hold on Jeremy's arm?"

THE COURT:  You can ask that question.  That has nothing to do with the question you previously asked.

MS. MKRTCHYAN:  Your Honor, we're going with a hostile witness who is refusing to answer questions multiple times.

First of all, I object -- the Court is not the one who is deciding credibility of this witnesses.  The Court is continuously getting involved in my ability to present this evidence to the jury.  It's not for this Court to decide this case.  It's for the jury.  And when I'm continuously deprived of opportunity to impeach the way I believe -- I know in depositions [sic] by heart.  I would say that the Court should have certain amount of, you know, faith in my presentation of this evidence, because I've done this trial three times already, you know.  So there's absolutely no bad faith here.  I know this deposition transcripts by heart. He testified three times already about the same thing.  He was asked about body weight and he discussed it at this deposition.

Here, he's trying to minimize use of force and it's incumbent on me to show this is excessive force.  But this Court continuously interjects, not just every -- every issue the Court continues to interject.  How is that proper? Basically, the Court is sitting as a juror and telling the

*Deborah D. Parker, U.S. Court Reporter*

Case 8:19-cv-01515-DOC-DFM Document 684 Entry ID: 39.06/28/25 Page 18 of 25   Page
Case 25-7132, 07/27/2026, DktEntry: 30.06/26/25 of 250)
ID #:34459

101

jury, *No, this is -- this witness is credible to me and therefore you should disregard Ms. Mkrtchyan's questioning.* How that is proper?

My client has the right to jury trial, not to bench trial.  So pages -- I wanted to make my record clear.

On pages 132 through 139, he was discussing -- I was asking him, What were Renegar and Gonzalez doing at the time he arrived?  And he talked about them applying body weight on them.  And then continuing on after that, I asked him multiple times, what -- how he was applying his body weight, pages 148, 149.

So the Court -- it's a flow.  Cross-examination is a flow.  And, you know, there's a lot of questions there.  This witness is hostile.  And the Court is, basically, depriving my client of his right to impeach credibility of a key witness who came to the scene and was involved in the use of force.

So I object.  This is not just new to me.  Gonzalez, I was not allowed to impeach credibility.  Renegar, I was not allowed.  You might as well just decide the issue.  Maybe we should, you know, have the Judge try this case and jury should be dismissed so that the Court decides whether Mr. Holloway has proved his case or not.  How is that proper?

No, I request the Court to give me leeway.  I've

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01707                                                    8-RenSER-01707

done this three times already.  I've known this deposition transcript several times.  I'm giving pages.  But if you're not reading the transcript in its context -- it's the attorney who knows.  It's for the jury to decide if it's impeachment or not.  And if the Court --

Let the witness read.  If he refreshes his memory of what he said, then question ends.

THE COURT:  Counsel, I would like to hear a response now from the defense.

MR. HARRELL:  Your Honor, briefly.

The Court has an important role to play at every stage of the trial that we're now engaged in.  Right now, with the witness on the stand, the Court has a critically important role in ruling on the admissibility of evidence, including objections that are made to evidence.

The record will reflect that again and again and over again, the Court issues its rulings and it is met from plaintiff's counsel with combative statements that sometimes rise to insults.  And I think we need to all recognize what's going on here.  This is nothing short of an assault on our judicial system.  And there's a remedy for conduct of that type.  We all know what that is.  How does it impact my client?

My client is entitled to have his liability assessed, based on our Federal Rules of Civil Procedure, our

*Deborah D. Parker, U.S. Court Reporter*

108

That's not contradictory and it's not impeaching.

Now, Counsel, now you make your record, please, and refer me to any other pages.

MS. MKRTCHYAN:  Again --

*(Court Reporter requests clarification for the record.)*

MS. MKRTCHYAN:  I'm not responsible with the speed that everyone works in this courtroom.  I'm also not responsible with how well other attorneys or this Court knows the facts here.  I'm not responsible for that.

I'm only responsible as to my knowledge and understanding of the facts after I've done this case since 2018 through three trials through all this depositions.

By the way, I did have a liability verdict against this defendant with the same line of questioning.  So let's not forget that.

Secondly -- now, the issue here is minimizing.  In his report, there is no indication of body weight applied.  He says, "Right knee onto his upper left."  There are many different ways of placing someone's right knee on upper back.  And that's what he testified to this jury in this case, yesterday and today.

Now, if is there any -- there is minimization of the use of force by someone who arrives while -- before the Taser is applied.  This is highly relevant to plaintiff's

*Deborah D. Parker, U.S. Court Reporter*

case.  I have been deprived many times.  This is not just the first time.  Continuously, the Court is sitting as a juror.  And when I challenge the way the Court admonishes the jury, I am entitled to do that.  There is now nothing improper --

THE COURT:  This is --

MS. MKRTCHYAN:  I didn't finish.

THE COURT:  -- this is a general --

MS. MKRTCHYAN:  I didn't finish.

THE COURT:  Yes, you have now, Counsel.

This is a general attack on the Court's ruling.

And, quite frankly, there is nothing impeaching thus far, in terms of the description of where this deputy placed his knee and there is nothing that I can see that would infer impeachment thus far, including the prior pages you referred me to that had nothing to do with your question which was concerning body weight.

The implication is that 225 pounds, he put his knee in the back and the implication is, which you can argue, he couldn't get up.  Why were you placing the knee in his body weight [sic]?  You can argue what Reneger was doing from these tapes, et cetera and Pahel and Gonzalez.  That's all argument.  But there's nothing here that is impeaching. And what is happening is that the inferences that it's impeaching, as you continually bring up these pages.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01710                                    8-RenSER-01710

Case 8:19-cv-0151 Case 25-7132, 07/27/2026 Document 846 Entry 39.06(28 of 250) Filed 06/26/29 Page 22 of 25   Page ID #:34463

110

Thank goodness that the jury is not receiving a lot of this because the Court has made the determination with what is in front of it.  Also, as you claim concern on the defendant's part, most of this is not going to the jury, because many of the objections have been sustained.  So far I don't see any prejudice to either party at least concerning this witness.

Now, the compilation of this may be something you want to put together and argue to the Court, if there is liability here and a motion for new trial.  I leave that to you.  I don't encourage it or discourage it, but that's premature right now.  With the diatribe and attack on the Court, quite frankly, is getting a little wearisome.

We're going to be in recess for another 10 minutes so that you can use the restroom facilities.

Thank you.

(Recess taken from 11:16 a.m. to 11:27 a.m.)

(Jury enters courtroom.)

(The following proceedings were had in open court in the presence of the jury:)

THE COURT:  We're back in session.

Counsel, thank you for your courtesy.  If you will be seated.

All parties and the witnesses are present.

And counsel, your continued examination, please.

*Deborah D. Parker, U.S. Court Reporter*

123

"ANSWER:  After the --

MS. NALTSAS:  Objection.

THE COURT:  Just a moment.  It's being stated as a fact.  Ask him if he made this statement.

BY MS. MKRTCHYAN:

Q    Yes.  Did you tell us at your deposition, sworn deposition after the Electronic Control Device finished its cycle, "Mr. Holloway began to stop pulling away and we were able to place his hands together and cuff him."

Do you remember that?

A    Yes.

Q    This is after the first very first cycle when you -- I mean, Chad Renegar, placed this Taser on his buttocks, so there was no need to have a second application.

MS. SWISS:  Objection.  Relevance.

THE COURT:  Argumentative.  Also sustained.

BY MS. MKRTCHYAN:

Q    Right now you're telling us, no, it was not --

THE COURT:  Counsel, you're arguing with the Court's ruling.  He didn't apply the second Taser, so this comes through Renegar, Gonzalez, if he drew his Taser, et cetera.

MS. MKRTCHYAN:  It goes to his testimony, Counsel.

THE COURT:  No, Counsel.  Thank you very much.

Counsel, a couple of more minutes.  I've been

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01712                                    8-RenSER-01712

124

generous with this.  I've let you go over the time period.

A couple more questions, please.

BY MS. MKRTCHYAN:

Q    And the Taser was applied while you still had your
bodily weight on Mr. Holloway.  True?

A    I don't recall.

Q    Well, you testified about that, too, at your
deposition.

Are you telling us that your deposition --

MS. NALTSAS:  Objection.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    -- is entirely false?

MS. NALTSAS:  Move to strike "your deposition" was
"false."

THE COURT:  Stricken at this time.

Ask the question.

BY MS. MKRTCHYAN:

Q    He asked you the same question:

"When the Taser was applied, did you

still have your knee with body weight on

Mr. Holloway?"

And you said, "Yes."

Do you remember that?

A    If you want to show me the deposition, I'll gladly go

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01713                                    8-RenSER-01713

132

BY MS. MKRTCHYAN:

Q    When you got up and you're 6.3 feet officer, right? You're tall, as we discussed?

A    Yes.

Q    You were among the tallest officers [sic] at the scene, right?

MS. SWISS:  Relevance.

THE COURT:  Counsel, please ask the question.

MS. MKRTCHYAN:  Yes.

BY MS. MKRTCHYAN:

Q    Did you stomp on his leg when you got up from the ground -- from Mr. Holloway's back?

A    No.

THE COURT:  Thank you very much.

Now, Counsel, this is redirect.

BY MS. MKRTCHYAN:

Q    Sir, and then --

MS. MKRTCHYAN:  Well, I didn't finish.

THE COURT:  I know you haven't finished.  You've got your record.  I've been generous now with the time.

All right.  Counsel, redirect.

MS. NALTSAS:  No further questions, on behalf of Deputy Gotts.

MS. SWISS:  No questions.

THE COURT:  Deputy, if we need you to return,

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01714                                        8-RenSER-01714

# EXHIBIT S

8-RenSER-01715

8-RenSER-01715

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| Plaintiff, | ) **Certified Transcript** |
| | ) |
| vs. | ) Case No. |
| | ) 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| Defendants. | ) **DAY 3, VOLUME IV** |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
MONDAY, MAY 5, 2025
1:32 P.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

UNITED STATES DISTRICT COURT

8-RenSER-01716　　　　　　　　8-RenSER-01716

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

          MKRTCHYAN LAW
          BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
          655 North Central Avenue
          Suite 1700
          Glendale, California 91203
          818-388-7022
          narine57@gmail.com


**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

          LYNBERG & WATKINS APC
          BY:  S. FRANK HARRELL, ESQ.
          1100 West Town & Country Road
          Suite 1450
          Orange, California 92868
          714-937-1010
          sharrell@lynberg.com

          LYNBERG & WATKINS APLC
          BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
          1150 South Olive Street
          Suite 1800
          Los Angeles, California 90015
          213-624-8700
          cnaltsas@lynberg.com

          LYNBERG & WATKINS PC
          BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
          1100 West Town & Country Road
          Suite 1450
          Orange, California 92868
          (714) 937-1010
          theathcote@lynberg.com

          LYNBERG & WATKINS
          BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
          1100 Town and Country Road
          Suite 1450
          Orange, California 92868
          714-937-1010
          rskinner@lynberg.com

**UNITED  STATES  DISTRICT  COURT**

8-RenSER-01717                                          8-RenSER-01717

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

      COLLINS & COLLINS LLP
      BY:  MICHAEL L. WRONIAK, ESQ.
      750 The City Drive
      Suite 400
      Orange, California 92868-4940
      714-823-4100
      mwroniak@ccllp.law

      COLLINS & COLLINS LLP
      BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
      2011 Palomar Airport Road
      Suite 207
      Carlsbad, California 92011
      760-274-2110
      cswiss@ccllp.law


**ALSO PRESENT:**

      Raymond Farahmand, plaintiff's paralegal
      Bryan Stever, defense IT technician

**UNITED STATES DISTRICT COURT**

8-RenSER-01718                                                    8-RenSER-01718

4

**I N D E X**

**WITNESSES**                                                    **PAGE**

**JOEL GONZALEZ, CALLED BY THE PLAINTIFF**
    Direct Examination by Ms. Mkrtchyan (continued)      12

**EXHIBITS**

(None offered.)

**UNITED STATES DISTRICT COURT**

8-RenSER-01719                                        8-RenSER-01719

Q      Let's look at the policy.  300 --

THE COURT:  No, Counsel.  Put the policy down now for just a moment.  Just ask him the question again about use-of-force policy and whether he has a duty to report it.

BY MS. MKRTCHYAN:

Q      Do you have a duty to report any use of force that you witness?

A      My understanding --

THE COURT:  Counsel, just a moment.  We're going to take this screen down now.  I'm going to preclude this screen until I give permission to put it up.  This is a violation of that.  Understood?  All right.

Now, Counsel, ask him about this use-of-force policy.

BY MS. MKRTCHYAN:

Q      Yes.  So --

A      So my understanding of the policy is if they do not report it, then I need to report it.  But I do know that they did report it, so I did not report it.  And I only did what I -- I report what I did.

Q      So, wait a minute.  Let's look --

MS. MKRTCHYAN:  Actually, I need to pull the report because --

THE COURT:  Counsel, your next question now.

BY MS. MKRTCHYAN:

8-RenSER-01720                                                    8-RenSER-01720

# <u>EXHIBIT T</u>

8-RenSER-01721

8-RenSER-01721

Case: 25-7192, 07/27/2026, DktEntry: 30.9, (836 of 250)

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
|        Plaintiff, | )  **Certified Transcript** |
| | ) |
|   vs. | )  Case No. |
| | )  8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
|       Defendants. | )  **DAY 5, VOLUME I** |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 7, 2025
7:51 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

8-RenSER-01722          8-RenSER-01722

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

       MKRTCHYAN LAW
       BY:  NARINE MKRTCHYAN, ATTORNEY AT LAW
       655 North Central Avenue
       Suite 1700
       Glendale, California 91203
       818-388-7022
       narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

       LYNBERG & WATKINS APC
       BY:  S. FRANK HARRELL, ESQ.
       1100 West Town & Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       sharrell@lynberg.com

       LYNBERG & WATKINS APLC
       BY:  CATHERINE A. NALTSAS, ATTORNEY AT LAW
       1150 South Olive Street
       Suite 1800
       Los Angeles, California 90015
       213-624-8700
       cnaltsas@lynberg.com

       LYNBERG & WATKINS PC
       BY:  TAMARA M. HEATHCOTE, ATTORNEY AT LAW
       1100 West Town & Country Road
       Suite 1450
       Orange, California 92868
       (714) 937-1010
       theathcote@lynberg.com

       LYNBERG & WATKINS
       BY:  RYANE CORINNE SKINNER, ATTORNEY AT LAW
       1100 Town and Country Road
       Suite 1450
       Orange, California 92868
       714-937-1010
       rskinner@lynberg.com

**UNITED STATES DISTRICT COURT**

8-RenSER-01723                    8-RenSER-01723

**APPEARANCES (continued):**


**FOR DEFENDANT CHAD RENEGAR:**

                COLLINS & COLLINS LLP
                BY:  MICHAEL L. WRONIAK, ESQ.
                750 The City Drive
                Suite 400
                Orange, California 92868-4940
                714-823-4100
                mwroniak@ccllp.law

                COLLINS & COLLINS LLP
                BY:  CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
                2011 Palomar Airport Road
                Suite 207
                Carlsbad, California 92011
                760-274-2110
                cswiss@ccllp.law


**ALSO PRESENT:**

                Raymond Farahmand, plaintiff's paralegal
                Bryan Stever, defense IT technician


**UNITED STATES DISTRICT COURT**

8-RenSER-01724                                8-RenSER-01724

4

**I N D E X**

| WITNESSES | PAGE |
|---|---|

**JAMESON GOTTS, CALLED BY THE PLAINTIFF**

Direct Examination by Ms. Mkrtchyan (continued)     14
Cross-Examination by Mr. Harrell     60
Redirect Examination by Ms. Mkrtchyan     114

**ROGER ALMA CLARK, CALLED BY THE PLAINTIFF**

Direct Examination by Ms. Mkrtchyan     134

**EXHIBITS**

(None offered.)

**UNITED STATES DISTRICT COURT**

8-RenSER-01725              8-RenSER-01725

scene, but that doesn't mean they became involved in the altercation.

Q    I'm talking about the active altercation.

Let's play the tape.

THE COURT:  No, Counsel.  Just a moment, for both of you, the question was:  Who was involved in the altercation? The deputy's answer:  Renegar, Pahel, Gonzalez, Borba; he joined, but Gunderson was not involved in the altercation.

You're referring to who's at the scene.  Make that clear.  Gunderson is at the scene, but the deputy's saying he's not involved at that time in the altercation.

BY MS. MKRTCHYAN:

Q    He did not admit to use of force; true?

MR. HARRELL:  Objection.  "He."  Vague.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Let's continue playing this.  I'm not going to get a straight answer from you anyway.

MR. HARRELL:  Objection.  Motion to strike.

THE COURT:  Sustained.

(Videotape played, not reported.)

BY MS. MKRTCHYAN:

Q    Isn't this Gunderson running towards the scene of the active altercation after Borba and you?

A    Yes, ma'am.

8-RenSER-01726                                8-RenSER-01726

Q      Okay.

THE COURT:  Ladies and gentlemen, you are to disregard the side comments.  Comments like "I'm not going to get a straight answer from you" are entirely inappropriate.  Is that understood?  That can later be argued that there's whatever involved.  But those side comments along the way, I'm going to admonish you, are to be completely disregarded and are entirely improper.

Is that understood by the jury?

**(No audible response.)**

THE COURT:  Okay, Counsel.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q      After you arrived, after you jumped out of the car and Borba arrived, then we hear Mr. Holloway screaming he's bleeding, and we hear Deputy Renegar loudly yell out, "Taser, Taser, Taser"; true?

A      Can you replay that part of the video where we hear "Taser, Taser, Taser."

Q      Sure.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q      Did you hear that now?

A      Yes, ma'am.

Q      Okay.  So we have established now, based on this patrol

**UNITED STATES DISTRICT COURT**

8-RenSER-01727                                    8-RenSER-01727

THE COURT: Counsel, now it's becoming compound. The question is -- in other words, I could read this back to you. Please, ask the question.

BY MS. MKRTCHYAN:

Q    Are you going to deny your pants were bloodied from his blood?  Look at the jury and tell them that that was not --

MR. HARRELL:  Objection.

BY MS. MKRTCHYAN:

Q    -- your blood --

THE COURT:  Counsel, Counsel.

BY MS. MKRTCHYAN:

Q    -- that was not my client's blood.

THE COURT:  Counsel, you asked the question and then you go on.  Let him answer the question, please.  Otherwise, I'm going to get an objection, compound; I'm going to have to sustain that objection.

MS. MKRTCHYAN:  Yes, please.

THE COURT:  Now, once again, a simple sentence -- question.

MS. MKRTCHYAN:  I asked him a question.  Question pending.

BY MS. MKRTCHYAN:

Q    Please tell us -- we saw -- you know, we saw you in the frame cleaning your pants and hands with a wipe from the blood. You said to Borba, "I've got blood all over me."

UNITED STATES DISTRICT COURT

8-RenSER-01728                                    8-RenSER-01728

# <u>EXHIBIT U</u>

8-RenSER-01729

8-RenSER-01729

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 5, Volume II |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 7, 2025

1:07 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01730                                    8-RenSER-01730

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

        NARINE MKRTCHYAN
        NARINE MKRTCHYAN, ATTORNEY AT LAW
        1010 NORTH CENTRAL AVENUE
        SUITE 204
        GLENDALE, CALIFORNIA 91202
        (818) 388-7022
        narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

        S. FRANK HARRELL
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        sharrell@lynberg.com

        CATHERINE A. NALTSAS
        LYNBERG & WATKINS
        1150 S. OLIVE STREET
        SUITE 1800
        LOS ANGELES, CALIFORNIA 90015
        (213) 624-8700
        cnaltsas@lynberg.com

        RYANE SKINNER
        LYNBERG & WATKINS
        1100 TOWN & COUNTRY ROAD
        SUITE 1450
        ORANGE, CALIFORNIA 92868
        (714) 937-1010
        rskinner@lynberg.com

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01731                    8-RenSER-01731

```
APPEARANCES OF COUNSEL:

        FOR THE DEFENDANT, CHAD RENEGAR:

                        MICHAEL L. WRONIAK
                        COLLINS + COLLINS, LLP
                        750 THE CITY DRIVE
                        SUITE 400
                        ORANGE, CALIFORNIA 92868
                        (714) 823-4100
                        mwroniak@ccllp.law

                        CHRISTIE SWISS
                        COLLINS + COLLINS, LLP
                        2011 PALOMAR AIRPORT ROAD
                        SUITE 207
                        CARLSBAD, CALIFORNIA 92011
                        (760)274-2110
                        cswiss@ccllp.law


  Also Present:

        Jeremy Holloway, Plaintiff

        Raymond Farahmand, Paralegal for Plaintiff

        Jameson Gotts, Orange County Deputy Sheriff, Defendant

        Chad Renegar, Orange County Deputy Sheriff, Defendant

        Bryan Stever, Litigation Support, Defendant
```

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01732                                                      8-RenSER-01732

```
                        I N D E X


PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 ROGER ALMA CLARK            5      49       107        119
                                   103


 JEREMY HOLLOWAY            123
```

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01733                                    8-RenSER-01733

131

This is -- we just went there on a random day to see how this campsite looks like, right?

A    That is correct.

Q    Okay.  So we can see the fire pit here.  We can see a log here.  There is a tree there.  And behind this tree is what?  What is behind this tree?  What campsite is this?

A    That would be the next door Campsite 66.

Q    Okay.  So let's see.  And how far would you say was Campsite 66 from your campsite?

A    On that side where the driveway was, it was pretty close.  Maybe five to 10 feet.  But for my sleeping, it was over 20 feet.

Q    So then, this is a picnic table *(indicating)*.  And this is Campsite 63 that we are looking right now in this segment?

            MR. WRONIAK:  Leading.

            THE COURT:  Sustained.

            Have the witness identify these.

            MS. MKRTCHYAN:  Leading is allowed.  Leading questions on preliminary issues, but sure.

BY MS. MKRTCHYAN:

Q    What campsite is this, sir?

A    This would be Campsite 63.

Q    Okay.  So then we have --

            THE COURT:  And is this your second video or the

*Deborah D. Parker, U.S. Court Reporter*

148

letting them know I think I have a pocketknife.  Again, I just woke up.  I don't remember.  I just usually have one so I let them know.

Q    And then you did not have a pocketknife?

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Did you have a pocketknife?

A    No, I had it taken out.  I guess it fell out in the sleeping bag.  There's nothing in my pocket.

Q    Okay.  So flash forward, the officers, when they approached and took you out of your tent, did you hear anyone telling you why you needed to get out of your tent?

A    No.

Q    Did you expect -- did you expect officers tell you why you needed to get out and talk to them?

A    Yes.

Q    Okay.  Now, when Chad Renegar started patting you down and the colloquy ensued, you were not happy, were you?

MR. HARRELL:  Leading.

THE COURT:  Sustained.

BY MS. MKRTCHYAN:

Q    Were you happy when he patted you down?

A    I was letting them pat me down under duress.

Q    Okay.  And then, though, you did tell them also --

MR. HARRELL:  Leading.

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01735                                    8-RenSER-01735

149

MS. MKRTCHYAN:  I haven't even finished my question, Your Honor.

THE COURT:  Next question.

MS. MKRTCHYAN:  This is ridiculous.  We heard the tapes.  There is no secret here.

THE COURT:  Just a minute.  We'll strike the comment between both counsel.

Counsel, your question.

MS. MKRTCHYAN:  No, I want an admonition to this attorney.  Leading --

THE COURT:  No, Counsel.  That's an improper objection.  It's leading.

BY MS. MKRTCHYAN:

Q   We heard the tape.  Let's move on.  We've heard the tape -- did you use any physical aggression?  Did you make any threatening physical movement toward any of the officers at that point in time when they were surrounding your campsite?

A   No.

MR. WRONIAK:  Objection.  Vague as to time.

BY MS. MKRTCHYAN:

Q   Were officers there at scene when you came out of your tent?

A   I believe I pointed out five.

Q   Did they have their flashlights?

*Deborah D. Parker, U.S. Court Reporter*

8-RenSER-01736                                                8-RenSER-01736