**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

Case No. NINTH CIRCUIT CASE Nos. 25-7132, 25-7297

---

JEREMY HOLLOWAY,
Plaintiff – Appellant

vs.

THE COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace office
Defendants – Appellees

---

On Appeal from the
United States District Court for the Central District of California,
(District Court No. 8:19-cv-01514-DOC-DFM)
The Hon. David O. Carter Judge Presiding

---

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 2 OF 6**

---

CATHERINE A. NALTSAS [SBN 262259]
JESSE K. COX [SBN 285218]
LYNBERG & WATKINS, APC
1100 Town & County Road, Suite 1450
Orange, California 92868
Tel: (714) 937-1010/Fax: (714) 937-1003
**Attorneys for Appellees**

S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEREMY HOLLOWAY,

Plaintiff,

vs.

COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.

Defendants.

CASE NO. 8:19-cv-01514-DOC-DFM

*Assigned to:*
*Hon. David O. Carter, Courtroom 9D*

**DEFENDANT COUNTY OF ORANGE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: MONELL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ASSISTANT SHERIFF JON BRIGGS AND S. FRANK HARRELL; EXHIBITS**

Date: December 14, 2020
Time: 8:30 a.m.
Dept.: 9D

**[SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS CONCURRENTLY FILED]**

*Trial Date: January 19, 2021*
*Second Amended Complaint filed: December 10, 2019*


2-GottsSER-00051

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on **December 14, 2020**, at **8:30 a.m.**, or as soon thereafter as counsel may be heard, in Courtroom 9D of the above-entitled Court located at 411 W. 4th Street, Santa Ana, CA 92701, Defendant County of Orange will, and hereby does, move the Court, pursuant to Fed.R.Civ.P. 56, for an order granting summary judgment against Plaintiff Jeremy Holloway as to Plaintiff's sole cause of action against the County – i.e., Plaintiff's Second Cause of Action for "Violation of Federal Civil Rights" under 42 U.S.C. § 1983. (See, Second Amended Complaint, ¶¶ 18-23, Dkt. No. 28).

The County seeks summary judgment on the grounds that there are no triable issues of material fact as to Plaintiff's Second Cause of Action under 42 U.S.C. §1983 for "Violation of Federal Civil Rights" and the claim is consequently meritless ***as a matter of law***. See, Fed. R. Civ. P. 56.

Defendant's Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Assistant Sheriff Jon Briggs and S. Frank Harrell, the Exhibits attached thereto, the concurrently-filed Separate Statement of Uncontroverted Material Facts and Conclusions of Law, the complete files and records of this action, and upon such other oral or written matters as may properly come before this Court.

/ / / /

/ / / /

/ / / /

/ / /

/ / /


2-GottsSER-00052

This Motion is made following Defendant's unsuccessful meet and confer efforts which began on August 14, 2020 and continued to August 27, 2020. See, Local Rule 7-3.

DATED: October 23, 2020

Respectfully submitted,

**LYNBERG & WATKINS**

By: */s/ S. Frank Harrell*
**S. FRANK HARRELL**
**TAMARA M. HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson


2-GottsSER-00053

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This case is part of the legal aftermath of Plaintiff Jeremy Holloway's decision to beat a female companion on January 28, 2018. Violence against women seems to be a recurring feature of Holloway's life. Specifically, another female has recently obtained a Superior Court restraining order against Holloway. And at least two Superior Court warrants have issued for Holloway's arrest on a variety of criminal charges. As best as the defense can determine, Holloway has responded to all these state court orders by fleeing California altogether and he now evidently hides out somewhere on the East Coast.

In the meantime, Holloway has filed this lawsuit claiming that law enforcement improperly subjected ***him*** to a physical beating during his January 28, 2018 domestic-abuse incident. Orange County, its responding Sheriff's Deputies and third-party witnesses to Holloway's misconduct all stand at the ready to forcefully debunk Holloway's pestiferous "excessive force" assertions at trial.

But many of Holloway's claims are frankly not worthy of trial – or further consumption of this Court's time for that matter. These include Plaintiff's claims against Orange County under a federal law theory first announced in Monell v. New York Department of Social Services, 436 U.S. 658 (1978). Specifically, Holloway alleges that Orange County maintains inadequate "policies and procedures" in violation of the federal constitution. (See, Second Amended Complaint, ¶¶ 18-23, Dkt. No. 28). Plaintiff also claims that Orange County fails to "properly train, monitor and supervise" its employees. (Id.)

In order to proceed with any of these claims, however, Holloway must demonstrate that the conduct of which he complains is part of a pattern of "persistent and widespread" unconstitutional conduct by many County employees, spanning many years. See, Monell, supra, 436 U.S. at 690. Needless to say, Holloway has no such evidence, and for good reason — there is ***none***. Accordingly, Plaintiff's federal

Monell claims fail ***as a matter of law***. See, Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989) ("Consistent with the commonly understood meaning of custom, proof of random acts or isolated events [is] insufficient to establish custom.")

In short, the legal principles which bar Holloway's case against the County are for the Court to apply. There are no material factual disputes to be resolved by a jury. Accordingly, as set forth in further detail below, Orange County is entitled to dismissal of Plaintiff's Monell claim without further consumption of party or judicial resources. See, Fed. R. Civ. P. 56.

## II. STATEMENT OF FACTS

As noted above, Plaintiff Jeremy Holloway claims that he was victimized by Orange County Sheriff's Deputies during a January 2018 incident which occurred at an O'Neal Regional Park campground. (See, Second Amended Complaint, ¶ 7, Ex. "A", Dkt. No. 28). At that time, "[t]he deputies informed [Plaintiff] that they were following up on a domestic violence complaint for which he was a suspect." (Id.) According to Holloway, multiple Orange County Sheriff's Department deputies thereafter subjected him to a variety of unconstitutional acts for no reason, including multiple uses of "excessive force". (Id.)

As regards Defendant County of Orange, Holloway's operative complaint alleges that the individual deputy illegality of which he complains took place pursuant to alleged unconstitutional County "policies, customs, practices and usages". (Second Amended Complaint, ¶ 20, Ex. "A", Dkt. No. 28). More particularly, Holloway claims that "Defendant County knowingly maintains and permits official sub-rosa policies or customs of permitting the occurrence of the kinds of wrongs set forth above, by deliberate indifference to widespread police abuses…" (Id., ¶ 21). Plaintiff also claims


2-GottsSER-00055

that "Defendant County and OCSD failed to adequately train and educate officers in the use of reasonable and proper force…" (Id., ¶ 22(13)[sic]).

But Holloway has no admissible evidence to support these wild assertions. The admissible evidence in this case paints an altogether different picture. See, Gordon v. County of Orange, 2019 WL 4279036, at *4 (C.D.Cal. 2019) (in summary judgment proceedings, "[t]he evidence the parties present must be admissible.")(citations omitted).

According to the OCSD Assistant Sheriff for Professional Standards, Jon Briggs, "[i]t is the policy, practice and custom of the Orange County Sheriff's Department to treat all citizens, arrestees, detainees and/or inmates in a legal, lawful, and professional manner, and to only use such force that is reasonable under the circumstances." (Briggs Decl., ¶ 4; UMF No. 1.). "This was the policy of the Orange County Sheriff's Department at the time of the incident in this case and at all times before and after that date." (Briggs Decl., ¶ 5; UMF No. 2.). It was also "the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to conduct themselves in a reasonable and professional manner consistent with the federal Constitution and the laws of the State of California." (Briggs Decl., ¶ 6; UMF No. 3.). "Further, it was the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to only use such force as is reasonable under the circumstances under the Fourth Amendment." (Briggs Decl., ¶ 5, Exh. A; UMF No. 4.) And, "… all sworn members of the Orange County Sheriff's Department receive extensive training on the application of reasonable force, professional deportment as well as professional communication skills and conflict resolution (including verbal and non-verbal techniques for responding to hostile situations). This training begins during the Sheriff's Academy and continues throughout the careers of each sworn peace officer (through both formal classroom training and application exercises, and by way of on-the-job training." (Briggs Decl. ¶ 6, UMF No. 5.) Holloway has no admissible evidence to the contrary.

### III. PLAINTIFF'S FEDERAL "MONELL" CLAIM IS MERITLESS.

Plaintiff's Second Cause of Action is premised on Orange County's supposed violation of the municipal liability principles first expressed in Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978). Congress enacted the civil rights statutes in order to provide citizens with a means of seeking civil damages against public employees who violate their federal Constitutional rights. See, Baker v. McCollan, 443 U.S. 137 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution..."). In order to seek recovery against a municipal employer, however, the United States Supreme Court requires a substantial additional showing beyond the fact that "it employ[ed] a tortfeasor." Bryan County v. Brown, 520 U.S. 397, 403 (1997); see, Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986) ("[W]hile Congress never questioned its power to impose civil liability on municipalities for their own illegal acts, Congress did doubt its constitutional power to impose civil liability in order to oblige municipalities to control the ***conduct of others***.") (Emphasis added.)

Accordingly, the Supreme Court has "consistently refused to hold municipalities liable under a theory of respondeat superior." Brown, supra, 520 U.S. at 403, citing, Monell, supra, 436 U.S. at 690. It is only when an explicit or tacit wrongful government "policy or custom" causes government employees to inflict an injury that a government entity may be liable under Section 1983. Id.

Thus, in order to state a Section 1983 claim against a government entity defendant, such as the County of Orange here, a plaintiff must prove the existence of a wrongful policy by either: (i) identifying a specific unconstitutional government policy pronouncement, or (ii) identifying a pattern of unconstitutional acts by government officials which are "so permanent and well settled as to constitute an [unspoken] 'custom or usage' with the force of law." Monell, supra, 436 U.S. at 694. Simply stated, Plaintiff has no evidence to support either of these alternative elements.


2-GottsSER-00057

**A. Plaintiff has No Evidence of an Unconstitutional Policy.**

In order to establish the "policy" element of Section 1983, a Monell plaintiff is required to prove that the conduct of which s/he complains was ordered by the highest level of local government. See, Pembaur, supra, 475 U.S. at 479; Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981); Owen v. Independence, 445 U.S. 622 (1980). For example, Pembaur concerned a decision by the county prosecutor to direct deputies to forcibly enter a place of business. Pembaur, supra, 475 U.S. at 485. In Owen, the city council allegedly discharged an employee without a proper hearing. Owen, supra, 334 U.S. at 627-629, 633, and n.13. In Fact Concerts, the city council canceled a license permitting a concert following a dispute over the performances' content. Fact Concerts, supra, 453 U.S. at 252. In all three of these cases, the Supreme Court found that "each decision, duly promulgated by city lawmakers, could trigger municipal liability if the decision itself was unconstitutional." Brown, supra, 520 U.S. at 406.

The contrast between these cases and Plaintiff's attempted Monell claims here could not be more graphic. Holloway prudently does not claim that the County's lawmakers (its the Board of Supervisors) voted to violate his Constitutional rights. See, Frandzen v. County of San Diego, 101 Cal. 317, 319-320 (1894) (The "board of supervisors are the chief legislative and executive authority of the County."); Cal. Gov. Code § 25303 ("The board of supervisors shall supervise the official conduct of all county officers, and officers of all districts and other subdivisions of the county. . . ."). Indeed, such an ill-considered assertion would be an open invitation to sanctions under Fed. R. Civ. P. 11.

Thus, to the extent that Plaintiff's Section 1983 claims against Orange County are premised on an alleged unconstitutional "policy" decisions, Holloway's assertions fail as a matter of law. See, Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir. 1989)(Dismissal ordered where the plaintiff "makes no reference to a decision or policy enactment by any ... official who could conceivably be regarded as

an official policymaker for [the public entity defendant]"); Penrod v. County of San Bernardino, 126 Cal. App. 4th 185, 192-193 (2005)("[U]nder Cal.Gov.Code § 25303, the Board [of Supervisors] is legally authorized and obliged to supervise the sheriff…").

**B. Plaintiff has No Admissible Evidence of a "Custom" or "Practice" of Unconstitutional Conduct.**

Courts have proven to be particularly sensitive to claims that a government entity maintains an unspoken "custom" of violating its citizens' constitutional rights. In City of Oklahoma City, 471 U.S. 808, 823-824 (1985), the Supreme Court emphasized that a Section 1983 plaintiff cannot recover under a "custom" theory by simply producing evidence of the single, isolated incident of which s/he complains. Rather, a civil rights plaintiff must prove a pattern of "persistent and widespread" unconstitutional conduct by its employees which is so "permanent and well settled as to constitute a custom." Monell, supra, 436 U. S. at 690; see, Sloman v. City of Simi Valley, 21 F.3d 1462, 1470 (9th Cir. 1994) ("Customary practices ... are a sufficient basis for municipal liability" only where they are "widespread among police employees."); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989) ("[P]roof of random acts or isolated events are insufficient to establish custom."), overruled on other grounds by Bull v. City & County of San Francisco, 595 F.3d 964, 981 (9th Cir. 2010).

In light of this authority, courts have repeatedly required Section 1983 plaintiffs to support their "custom" allegations with multiple, similar past incidents — thereby demonstrating official knowledge and tacit approval of an unconstitutional course of conduct by municipal employees. See, Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir. 1989) (Dismissing Monell "custom" allegation where plaintiff fails to produce evidence of "widespread abuses or practices. . .[which] are so pervasive as to have the force of law"); Meehan v. Los Angeles County, 856 F.2d 102 (9th Cir. 1988) (Two incidents not sufficient to establish actionable Monell custom);

Davis v. Ellensburg, 869 F.2d 1230 (9th Cir. 1989) (Manner of one arrest insufficient to establish wrongful Monell policy).

If anything, even more incidents are required to establish a Monell "custom" where, as here, the defendant municipality is heavily populated. See, e.g., Ramirez v. County of Los Angeles, 397 F. Supp. 2d 1208, 1228 (C.D. Cal. 2005) ("[T]he contention that in 13 cases, out of the tens of thousands handled by the Sheriff's Department, a defendant was found factually innocent does not prove that there was any civil rights violation in those cases, let alone prove the content of the unlawful custom, policy or practice."); Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."); Henderson v. City & County of San Francisco, 2006 U.S. Dist. LEXIS 87262, 28-29 (N.D. Cal. 2006) ("On plaintiffs' account, then, fewer than one-quarter of one percent of county jail inmates complain of any kind of force in a year. . ..The court agrees with defendants that instead of creating an issue of fact on the existence of a pervasive custom of excessive force, plaintiffs' proffered evidence forecloses it.")[1]

In the absence of multiple, prior similar incidents, a Section 1983 plaintiff proceeding on a tacit, wrongful "custom" theory fails to make a prima facie case against a governmental entity. See, Sloman v. City of Simi Valley, 21 F.3d 1462, 1470 (9th Cir. 1994) ("Individual action like [the defendant officer's] does not rise to the level of the 'well-settled', 'widespread' practices contemplated in the cases

---

[1] See also, Carter v. District of Columbia, 795 F. 2d 116, 123-124 (D.C. Cir. 1986) (plaintiff produced evidence of approximately eleven prior incidents in an effort to establish municipal custom; Court enters directed verdict for city: "This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer use of force, persisting in the District because of [supervisory] tacit approval. . .."); Ramos v. City of Chicago, 707 F. Supp. 345, 347 (N.D. Ill. 1989) (Six prior incidents fails to make out prima facie civil rights case against large municipality).

discussing municipal liability"; Jury verdict against city defendant for one employee officer's "habitual" conduct overturned as error.); Blankenhorn v. City of Orange, 485 F.3d 463, 484-485 (9th Cir. 2007) ("Because Blankenhorn has limited his proof to the City's failure to train only Nguyen, he did not meet his burden to withstand Defendants' motion for summary judgment [on Monell issues]. We therefore affirm this aspect of the grant of summary judgment in the City's favor."); Meehan v. Los Angeles County, 856 F.2d 102 (9th Cir. 1988) (Two incidents not sufficient to establish actionable Monell custom); Davis v. Ellensburg, 869 F.2d 1230 (9th Cir. 1989) (Manner of one arrest insufficient to establish wrongful Monell policy).

Against this backdrop, there is no Monell "custom" in this case of systemic unlawful conduct. Indeed, Orange County has produced evidence establishing the obvious — that the County has no official or unofficial "custom" or "policy" of unconstitutional behavior. As stated by Assistant Sheriff Jon Briggs:

> It is the policy, practice, and custom of the Orange County Sheriff's Department to treat all citizens, arrestees, detainees and/or inmates in a legal, lawful, and professional manner, and to only use such force that is reasonable under the circumstances. This was the policy of the Orange County Sheriff's Department at the time of the incident in this case and at all times before and after that date. (Briggs Decl., ¶ 4; UMF Nos. 1-2).

Against this backdrop, to the extent that Holloway has attempted to prove a tacit, wrongful "policy and procedure," his municipal liability claim is hopelessly defective. Plaintiff has no evidence of the requisite repeated pattern of wrongful acts sufficient to raise an inference that such a "practice" or "custom" exists. At best, Holloway simply proceeds on the facts of the one, isolated incident of which he complains. Thus, Plaintiff's Monell "custom" claims against the Orange County Defendants represent the precise type of valueless, deficient assertions which courts have repeatedly condemned and rejected. See, Sloman v. City of Simi Valley, 21 F.3d 1462, 1470 (9th Cir. 1994) ("Individual action like [the defendant officer's] does not


2-GottsSER-00061

rise to the level of the 'well-settled', 'widespread' practices contemplated in the cases discussing municipal liability"; Jury verdict against city defendant for one employee officer's "habitual" conduct overturned as error).

**C. Plaintiff has No Evidence of a "Failure to Train".**

Consistent with the forgoing, an actionable "lack of training" claim under Monell requires a showing of municipal "deliberate indifference" to a known problem in training reflected by numerous past errant incidents. See, City of Canton v. Harris, 489 U.S. 378, 397-398 (1989). As stated by the Supreme Court itself:

> The lower courts that have applied the 'deliberately indifferent' standard we adopt today have required a showing of a pattern of violations from which a kind of 'tacit authorization' by city policymakers can be inferred. See, e. g., Fiacco v. Rensselaer, 783 F. 2d 319, 327 (2nd Cir. 1986) (Multiple incidents required for finding of deliberate indifference); Patzner v. Burkett, 779 F. 2d 1363, 1367 (8th Cir. 1985) ('[A] municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference to the offensive acts'); Languirand v. Hayden, 717 F. 2d 220, 227-228 (5th Cir. 1983) (Municipal liability for failure to train requires 'evidence at least of a pattern of similar incidents in which citizens were injured or endangered'); Wellington v. Daniels, 717 F. 2d 932, 936 (4th Cir. 1983) ('[A] failure to supervise gives rise to § 1983 liability, however, only in those situations where there is a history of widespread abuse. Only then may knowledge be imputed to the supervisory personnel'). The Court's opinion recognizes this requirement.
>
> City of Canton v. Harris, 489 U.S. 378, 397-398 (1989).

Following Canton, "evidence of the failure to train a single officer is


2-GottsSER-00062

insufficient to establish a municipality's deliberate policy." Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007). see, Merritt v. County of Los Angeles, 875 F.2d 765, 769-70 (9th Cir.1989) (Finding that a single incident of errant behavior did not demonstrate actionable "inadequate training"). Thus, the single incident raised by Plaintiff is inadequate to establish municipal liability under Monell.

By contrast, Defendants have produced evidence establishing the obvious — that the Orange County Sheriff's Department and Health Care Agency train their personnel to the highest standards of professional competence. (UMF Nos. 1-4); (See, Briggs Decl. ¶ 4-6, Exh. A.)(". . . all sworn members of the Orange County Sheriff's Department receive extensive training on the application of reasonable force, professional deportment as well as professional communication skills and conflict resolution (including verbal and non-verbal techniques for responding to hostile situations). This training begins during the Sheriff's Academy and continues throughout the careers of each sworn peace officer (through both formal classroom training and application exercises, and by way of on-the-job training)."); (UMF No. 5.) Thus, Plaintiff's defective "Failure to Train" claim fails along with the balance of her defective Monell allegations. See, Fed. R. Civ. P. 56.

## IV. CONCLUSION

Holloway's Monell claim is barred by a host of well-settled Supreme Court principles. Accordingly, Defendant County of Orange respectfully request that this Court grant its Motion for Summary Judgment as prayed. See, Fed. R. Civ. P. 56.

DATED: October 23, 2020

Respectfully submitted,

**LYNBERG & WATKINS**

By: */s/ S. Frank Harrell*
**S. FRANK HARRELL**
**TAMARA M. HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson

**DECLARATION OF JON BRIGGS**

I, Jon Briggs, do state and declare as follows:

1. I am employed by the Orange County Sheriff's Department in the capacity of Assistant Sheriff, and am currently assigned at the Professional Services Command. I have been employed by the Orange County Sheriff's Department for 29 years. I have been assigned as the Assistant Sheriff for the Professional Services Command since January 2019. The following facts are within my personal knowledge and, if called upon to do so, I could and would competently testify to the facts set forth herein based on my own personal knowledge.

2. As the Assistant Sheriff for the Professional Services Command, I am responsible for overseeing the Department's professional standards and training to sworn and professional staff.

3. I am informed that Plaintiff Jeremy Holloway ("Plaintiff") contends that he was mistreated during and following a use of force encounter with Orange County Sheriff's Department personnel that took place on or about January 21, 2018, and that his injuries were the result of the employment and retention of persons as peace officers who have demonstrated their brutality, dishonesty and general unfitness to serve in law enforcement. As I understand it, Mr. Holloway contends his alleged unlawful injuries (and these alleged employment deficiencies) occurred pursuant to "unconstitutional policies, practices, or customs" of the Sheriff's Department. These claims are inaccurate.

4. It is the policy, practice, and custom of the Orange County Sheriff's Department to treat all citizens, arrestees, detainees and/or inmates in a legal, lawful, and professional manner, and to only use such force that is reasonable under the circumstances. This was the policy of the Orange County Sheriff's Department at the time of the incident in this case and at all times before and after that date. It is reflected in the Department's "Use of Force" Policy 300 in effect at the time of the


2-GottsSER-00064

subject incident, which accounts for prevailing legal standards for uses of force. A true and correct copy of Policy 300 is attached hereto as Exhibit "A."

5. As regards the use of force in this case, I am informed Plaintiff Jeremy Holloway contends deputies used unreasonable force on him or failed to intervene in the use of unreasonable force. As I understand it, Mr. Holloway alleges that these alleged acts of "police abuse" and dishonesty were due to our Department's refusal to competently and impartially investigate allegations of abuse and misconduct alleged to have been committed by deputies. These claims are inaccurate. At the time of the January 21, 2018 incident, it was the policy, practice, and custom of the Orange County Sheriff's Department to use only that force as is reasonable under the Fourth Amendment, and not to engage in police brutality, unprofessional abuse or any of the other actions claimed by Jeremy Holloway. Department members must fulfill their responsibilities with consideration, self-control, impartiality, and honesty. The Sheriff's Department acts forcefully to address peace officer misconduct when the facts establish that misconduct has occurred. This was the policy of the Orange County Sheriff's Department at the time of the incident in this case, on January 21, 2018, and at all times before and after that date.

6. I am also informed that Plaintiff Jeremy Holloway contends there was a failure to train and educate sworn officers and a failure to enforce the Department's written regulations and supervise with respect to interaction with suspects, arrestees and inmates all pursuant to an alleged unconstitutional policy, practice, or custom at the Orange County Sheriff's Department. These claims are inaccurate. Among other things, all sworn members of the Orange County Sheriff's Department receive extensive training on the application of reasonable force, professional deportment as well as professional communication skills and conflict resolution (including verbal and non-verbal techniques for responding to hostile situations). This training begins during the Sheriff's Academy and continues throughout the careers of each sworn


2-GottsSER-00065

peace officer (through both formal classroom training and application exercises, and by way of on-the-job training). The Academy is a rigorous program accredited by the California Commission on Peace Officer Standards and Training ("P.O.S.T."). After the Academy, deputies receive core training specific to their operations and they participate in continuing education and training, much of which includes curriculum developed by P.O.S.T. and is taught by P.O.S.T. certified instructors. Training is also provided during the Department's Field Training Program and through periodic training bulletins and memoranda, which educate officers on evolving law enforcement topics and techniques as well as court decisions. These materials and the foregoing demonstrate that at all times relevant to this incident it was the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to conduct themselves in a reasonable and professional manner consistent with the federal Constitution and the laws of the State of California. Further, it was the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to only use such force as is reasonable under the circumstances under the Fourth Amendment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22 day of October, 2020, in Santa Ana, California.

Jon J Briggs

ASSISTANT SHERIFF JON BRIGGS,
Declarant

# EXHIBIT "A"


2-GottsSER-00067

# Use of Force

## 300.1 PURPOSE AND SCOPE

This policy recognizes that the use of force by law enforcement requires constant evaluation. Any use of force is a serious responsibility. The purpose of this policy is to provide deputies of this department with guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, each deputy is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

**Revised:** June 21, 2016

### 300.1.1 PHILOSOPHY

The use of force by law enforcement personnel is a matter of critical concern both to the public and to the law enforcement community. Deputies are involved on a daily basis in numerous and varied human encounters and when warranted, may use force in carrying out their duties. Deputies must have an understanding of, and true appreciation for, the limitations of their authority. This is especially true with respect to deputies overcoming resistance while engaged in the performance of their duties. The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. It is also understood that vesting deputies with the authority to use reasonable force and protect the public welfare requires a careful balancing of all human interests.

The use of force is based on the "Objectively Reasonable" standard as stated in U.S. Supreme Court case Graham vs. Connor (1989). This is the standard considered to be the benchmark across America. It is contemporary, reflecting the most current judicial wisdom and it mirrors the standard prescribed by the Commission on Peace Officer Standards and Training (POST). The appropriate application of this standard requires that all factors surrounding a particular event be considered. This is true when determining whether to use force, as well as writing the requisite reports to document an event where force was used and in the supervisory review of the same event to determine the appropriateness of the action.

## 300.2 POLICY

It is the policy of this department that deputies shall use only that amount of force that appears objectively reasonable, given the facts and circumstances perceived by the deputy at the time of the event, to effectively bring an incident under control. "Reasonableness" of the force used must be judged from the perspective of a reasonable deputy on the scene at the time of the incident. Any interpretation of reasonableness must allow for the fact the sheriff's deputies are often forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is objectively reasonable in a particular situation.

Given that no policy can realistically predict every possible situation a deputy might encounter in the field, it is recognized that each deputy must be entrusted with well reasoned discretion in determining the appropriate use of force in each incident. While it is the ultimate objective of every

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

law enforcement encounter to minimize injury to everyone involved, nothing in this policy requires a deputy to actually sustain physical injury before applying reasonable force. Law enforcement personnel shall use no more force than is objectively reasonable to accomplish lawful objectives. The use of any force to accomplish unlawful objectives is prohibited. The Department will not tolerate excessive and/or punitive force.

### 300.2.1 USE OF REASONABLE FORCE TO EFFECT AN ARREST

Any peace officer that has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance of the person being arrested nor shall such officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance (Penal Code § 835(a)).

### 300.2.2 DEFINITIONS

**Use of Force:**

A use of force is defined as any incident in which a Department member, either on or off duty, while performing a law enforcement function, overcomes resistance through the application of physical contact or any other force option.

This does not include the use of a firm grip control while performing routine functions such as searching, handcuffing or escorting. It also does not include reasonable intervention necessitated by the physical incapacity of the subject (e.g., lifting an intoxicated or disabled person). However, personnel shall make appropriate notifications in any instance that results in injury, the appearance of injury or complaint of pain.

**Deadly and Non-Deadly Force:**

Deadly force is that which creates a substantial risk of serious physical injury or death. Non-deadly force is any other physical force.

**Objectively Reasonable Force:**

Force that is proportionate to the threat presented by, or the need to lawfully control, a subject in a particular moment, as the threat or need would be perceived in that moment, and without benefit of hindsight. Force is not objectively reasonable if under the circumstances and in the relevant moment, it would be clear to a reasonable officer that lesser force would likely lead to safe control.

**Serious Physical Injury:**

"Serious physical injury" means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

**Physical Force:**

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department




2-GottsSER-00069

Striking, holding, pulling, pushing, throwing, or exerting strength against another person.

## 300.3 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE

When determining whether or not to apply any level of force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration.

These factors include, but are not limited to:

(a) The conduct of the individual being confronted (as reasonably perceived by the deputy at the time).

(b) Deputy/subject factors (age, size, relative strength, skill level, injury/exhaustion and number of deputies vs. subjects).

(c) Influence of drugs/alcohol (mental capacity).

(d) Proximity of weapons.

(e) Time and circumstances permitting, the availability of other options (what resources are reasonably available to the deputy under the circumstances).

(f) Seriousness of the suspected offense or reason for contact with the individual.

(g) Training and experience of the deputy.

(h) Potential for injury to citizens, deputies and suspects.

(i) Risk of escape.

(j) Other exigent circumstances.

It is recognized that deputies are expected to make split-second decisions and that the amount of a deputy's time available to evaluate and respond to changing circumstances may impact his/her decision.

While various degrees of force exist, each deputy is expected to use only that degree of force reasonable under the circumstances to successfully accomplish the legitimate law enforcement purpose in accordance with this policy.

### 300.3.1 NON-DEADLY FORCE APPLICATIONS

Each deputy is provided with equipment, training and skills to assist in the apprehension and control of suspects as well as protection of deputies and the public. Non-deadly force applications may include but are not limited to control holds/take downs, chemical agents, Electronic Control Weapon described in Policy Manual § 306 and 309 less lethal, baton, and personal body weapons.

### 300.3.2 VOLUNTARY COMPLIANCE

Voluntary compliance is the preferred means of achieving resolution to potential use of force encounters. When practicable, deputies should ask for and allow reasonable time for compliance.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

300.3.3 CONTROL HOLD/PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be very effective in controlling a passive or actively resisting individual. Deputies may only apply those techniques for which the deputy has received departmentally approved training and only when the deputy reasonably believes that the use of such a technique appears necessary to further a legitimate law enforcement purpose. Deputies utilizing any control technique should consider the totality of the circumstance including, but not limited to:

(a) The potential for injury to the deputy(s) or others if the technique is not used.

(b) The potential risk of serious injury to the individual being controlled.

(c) The degree to which a pain compliance technique may be applied should be proportionate to the amount of resistance by the suspect.

(d) The nature of the offense involved.

(e) The level of resistance of the individual(s) involved.

(f) The need for prompt resolution of the situation.

(g) If time permits (e.g., passive demonstrators), other reasonable alternatives.

The application of any control technique shall be discontinued once the deputy determines that compliance has been achieved.

300.3.4 CAROTID CONTROL HOLD

**Standard for Deployment**

The carotid control hold is a distinctive and more restricted controlling force option. As with other authorized holds (the use of which is governed by 300.3.3), the Department recognizes that proper application of the carotid control hold may be effective in safely restraining a subject. However, because of added risks associated with physically contacting the head and neck of a subject, the use of the carotid control hold shall be further limited by the following conditions:

(a) The deputy shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b) The deputy is engaged in an altercation with a combative or assaultive subject who poses an immediate threat of injury to the deputy or others; and

(c) Other controlling techniques are unlikely to be effective in subduing or controlling the subject.

**Other Considerations**

(a) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the deputy, the

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

subject or others, and the deputy reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

1. Juveniles
2. Elderly
3. Pregnant women
4. Visibly frail
5. Individuals who have a pre-existing medical condition that increases the risk of injury (i.e. Down Syndrome), and of which deputies become aware of

(b) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(c) The deputy shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(d) Any deputy attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(e) The use or attempted use of the carotid control hold shall be thoroughly documented by the deputy in any related reports.

### 300.3.5 FORCE WEAPONS, TOOLS, AND EQUIPMENT

All weapons, force tools, or restraint equipment carried while on-duty, or off duty under the deputy's authority as a sworn deputy, shall be those issued by the Department or approved for carry by the Sheriff or his/her designee. No other such instruments shall be carried or used. No issued or approved equipment or weapon is to be altered or modified unless specifically authorized by the Sheriff or his/her designee. All weapons, tools, and equipment shall be maintained in good working order and any defect shall be reported to appropriate authority and resolved expeditiously. All weapons and equipment shall be carried and used in a manner consistent with Department training as well.

## 300.4 DEADLY FORCE APPLICATIONS

While the use of a firearm is expressly considered deadly force, other force might also be considered deadly force if the deputy reasonably anticipates and intends that the force applied will create a substantial risk of serious physical injury or death. Use of deadly force is justified in the following circumstances:

(a) A deputy may use deadly force to protect himself/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

(b) A deputy may use deadly force to stop a fleeing suspect when the deputy has probable cause to believe that the suspect has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the deputy reasonably believes that there is an imminent or future potential risk of serious bodily injury or death to any other person if the suspect is not immediately apprehended. In this case, deputies shall give some warning, if feasible, prior to the use of deadly force. (Example: "Police/Sheriff's department! Stop or I'll shoot!).

(c) To stop a dangerous animal.

1. Deputies are authorized to use deadly force against an animal in circumstances where the animal reasonably appears to pose an imminent threat to human safety and alternative methods to neutralize the threat are not reasonably available or would likely be ineffective.

2. In circumstances in which deputies have sufficient advanced notice that a potentially dangerous domestic animal (e.g. dog) may be encountered, such as in serving of a search warrant, deputies should develop reasonable contingency plans for dealing with the animal without the use of deadly force (e.g. fire extinguisher, Taser, OC Spray, animal control officer). Nothing in this policy shall prohibit any deputy from resorting to deadly force to control a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical.

3. Injured animals (with the exception of dogs and cats) may be euthanized only after a reasonable search to locate the owner has been made (Penal Code § 597.1(b)). Injured dogs and cats found without their owners shall be taken to an appropriate veterinarian for determination of whether they should be treated or humanely destroyed (Penal Code § 597.1(c)). However, if any animal is too severely injured to move or where veterinarian is not available and it would be more humane to dispose of the animal, the deputy may euthanize the animal after obtaining approval of a supervisor (Penal Code § 597.1(e)). **Department Commander notification shall be made as soon as reasonably possible prior to or immediately following the euthanizing of any animal.**

### 300.4.1 SHOOTING AT MOVING VEHICLES

Deputies shall actively attempt to move out of the path of an approaching motor vehicle. Deputies should not position themselves or intentionally remain in the path of a moving vehicle. A deputy shall only discharge a weapon at a motor vehicle or at its occupants under the following conditions:

1. The vehicle or suspect poses an imminent threat of death or serious bodily injury to the deputy or another person, AND

2. The deputy has no reasonable alternative course of action to prevent the death or serious bodily injury.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

For further information regarding the use of firearms during a vehicle pursuit, see Policy 314.7.3

300.4.2 WARNING SHOTS
Generally, warning shots or shots fired for the purpose of summoning aid are discouraged and may not be discharged unless the deputy reasonably believes that they appear necessary, effective and reasonably safe.

300.4.3 REPORT OF WEAPON DISCHARGE
Any department member who discharges a weapon intentionally, whether on or off duty, while exercising peace officer powers, shall notify the Department Commander as soon as circumstances permit.

Any department member who discharges a weapon unintentionally shall notify his/her immediate supervisor and the Department Commander as soon as circumstances permit. All unintentional discharges will be reviewed to determine if the discharge was the result of accident, equipment malfunction, negligence or inadequate training.

300.4.4 POST SHOOTING PROCEDURE INVOLVING INJURED SUSPECT(S), VICTIM(S), ARRESTEE(S), OR ANY SUBJECT(S) WITHIN THE CARE OR CUSTODY OF THIS DEPARTMENT
If it becomes necessary for a deputy to use deadly force, the following post-shooting procedures should be followed.

(a) Approach with caution; be alert for additional subjects and weapons.

(b) Handcuff and immediately search the subject. Keep the subject under continuous observation and control.

(c) After you have determined the subject is no longer a threat:

    1. Notify dispatch of your location and circumstances if it has already not been done.

    2. Render whatever first aid that may be required.

    3. Preserve the scene.

    4. Assist paramedics when and if they respond, but continue to maintain control and observation of the subject until he/she is removed from the scene.

    5. If he/she is removed from the scene in an ambulance, a Deputy shall accompany that subject inside the ambulance in order to preserve evidence, to ensure the recording and legitimacy of dying declarations, and to provide safety to both the injured and medical personnel.

**300.5 MEDICAL CONSIDERATIONS**
Prior to booking at the jail or release in the field, medical assistance shall be obtained for any person subjected to a Use of Force.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department



2-GottsSER-00074

(a) Based upon the sergeant's/deputy's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. The on-scene supervisor, or if not available, the primary handling deputy shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the sergeant/deputy reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

(b) Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed. Any individual exhibiting signs of distress after an application of force shall be medically evaluated as soon as practicable by either paramedics at the scene or taken to a hospital for examination. Signs of distress may include shortness of breath, chest pain, and/or dizziness.

(c) Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called excited delirium), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Personnel who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

(d) If the subject is in custody or is the responsibility of the Department and requires transportation by ambulance/paramedic unit, a Deputy shall accompany that subject inside the ambulance until properly relieved.

(e) If the subject is an inmate at one of the five Orange County Sheriff's jail facilities at the time of the use of force, then CMS will be notified and directed to respond, and once on scene will assume responsibility for medical care.

(f) Any individual who refuses medical attention shall have his or her refusal fully documented in related reports and be witnessed by medical personnel and if possible, another Deputy/SSO. If medical staff is willing to provide a copy of the subject's medical refusal, this document should be collected and included with the report package. If possible, an audio recording of the refusal should also be made and a notation in the report indicating the subject's refusal was recorded and either booked as evidence or stored on the Department's Digital video server system.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department

### 300.6 POST USE OF FORCE PROCEDURES

Any use of force by a member of this department shall be documented by that member promptly, completely, and accurately in an appropriate report depending on the nature of the incident. When documenting a Use of Force event, Department personnel may review OCSD audio/video recordings (e.g. PVS, jail facility cameras) as a means of ensuring factual accuracy and enhancing recollection. Use of such materials in preparation of reports shall be documented, and done on an individual rather than collective basis.

**Exception to reporting:**

Supervisors responsible for analyzing a Use of Force incident requiring a response from the Homicide Detail, the District Attorney's office or the ART Team will not be required to complete the Supervisory Use of Force Analysis report. The Department Commander or Jail Watch Commander will assign another available supervisor to handle and enter the initial notification of the incident into the CRM database system. Hospitalization is defined as receiving some form of medical treatment at a medical facility, other than an x-ray or being cleared for booking.

#### 300.6.1 LESS-LETHAL REPORTING PROTOCOL

(a) Any time less lethal munitions (40mm or .12 Gauge Super Sock "bean bag") are deployed and the suspect or anyone involved in the incident sustains serious bodily injury or is hospitalized, the Homicide Unit shall be notified, via the Department Commander, and be responsible for conducting the investigation. Hospitalization is defined as receiving some form of medical treatment at a medical facility, other than an xray or being cleared for booking.

(b) In the event that the Homicide Unit does not respond, the incident will be handled per 300.9. In those incidents in which the Homicide Unit responds, the Homicide Unit will make available basic statistical information necessary for the SAFE Division to enter the initial notification of the use of force incident into the CRM database system. The Homicide Unit shall not release any information deemed sensitive to an ongoing investigation.

(c) Any time a less-lethal munition (40 mm or 12 gauge Super Sock "bean bag") misfires, the round is primed but fails to fire, or the weapon malfunctions during an <u>actual tactical deployment</u>, either clear the malfunction or transition to a different force option and re-engage the suspect. When it is safe to do so, notification shall be made to the Hazardous Devices Section (HDS) who will render the un-discharged round "safe." In the event of a weapon malfunction, the weapon shall immediately be taken out of service, rendered "safe," and a thorough inspection will be conducted by the Department's Special Weapons Section (SWAT) or Range Armory as appropriate.

Any time a less-lethal munition (40mm or 12 gauge Super Sock "bean bag") misfires/or the round is primed but fails to fire during a <u>training scenario</u>, the weapon shall be pointed in a safe direction and notification shall be made to the Hazardous Devices Section (HDS) who will render the round "safe." In the event of a weapon malfunction, the weapon shall immediately be rendered

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department


2-GottsSER-00076

"safe," and a thorough inspection will be conducted by the Department's Special Weapons Section (SWAT) or Range Armory as appropriate.

**300.7 WITNESS TO A USE OF FORCE**

Any employee involved in or who witnesses a use of force shall notify a supervisor as soon as practical. Failure to notify a supervisor of a use of force may result in discipline pursuant to department policy. Such notification shall be made as soon as practical.

**300.8 IMMEDIATE NOTIFICATION TO SUPERVISORS AND SUPERVISORY RESPONSE REQUIRED**

Supervisory notification shall be made as soon as reasonably possible following a use of force.

**300.9 SUPERVISOR RESPONSIBILITY**

Upon notification of a use of force, (with the exception of any Officer Involved Shooting - See “Shooting Incidents” Policy #310), the supervisor shall respond and conduct an investigation of the incident. If the designated supervisor is unable to respond, the Patrol Department Commander or Jail Watch Commander will assign another available supervisor. A supervisor who is a participant and applies force during the involved incident cannot conduct the supervisory analysis.

The handling supervisor's responsibilities include but are not limited to the following:

(a) Shall obtain the basic facts from the involved deputy(s).

(b) Ensure that any injured parties are examined and treated.

(c) Separately interview the subjects(s) upon whom force was applied. The first stage of questioning should be related to possible injures sustained during the use of force and/or if the subject(s) has received medical attention. Prior to investigatory questioning, the supervisor will advise the subject(s) of their Miranda Rights warning due to the questioning possibly or likely eliciting an incriminating response. The entire interview shall be recorded.

(d) Ensure that photographs have been taken of any areas involving visible injury or complaint of pain as well as overall photographs of uninjured areas (consistent with PC 4030).

(e) Identify and interview any witnesses not already included in related reports.

(f) Complete a summary of the audio and video/digital recording (s) and include with the incident documentation.

(g) When possible, review and approve all related reports.

(h) Complete the “Preliminary Notification” in the Customer Relationship Management (CRM) system as soon as practical as well as the Supervisory Use of Force Analysis report to include assigning a determination to each staff member involved as:

    (a) Use of Force within policy; no futher action required.

    (b) Use of Force within policy; training or corrective action addressed.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department




2-GottsSER-00077

(c) Refer to Command Staff with a recommendation for Internal Affairs investigation.

(i) Scan and attach all related reports to the notes section of CRM.

(j) Forward electronically to the assigned Lieutenant for review.

**300.10 LIEUTENANT RESPONSIBILITY**

(a) Review and evaluate all submitted reports and audio/video.

(b) Based on all submitted documentation, evaluate the overall incident and the appropriateness of all actions taken by staff.

(c) Review the Supervisory Use of Force Analysis submitted into the CRM by the supervisor. Resubmit to the Supervisor for any changes and ultimately approve the Supervisory Use of Force. Assign a determination to each staff member involved as:

(a) Use of Force within policy: no further action required.

(b) Use of Force within policy; training or corrective action addressed.

(c) Refer to Command Staff with a recommendtion for Internal Affairs investigations.

(d) Forward electronically to the Division Commander for review.

**300.11 DIVISION COMMANDER**

(a) Review and evaluate all submitted reports and audio/video recordings.

(b) Based on all submitted documentation, evaluate the overall incident and the appropriateness of all actions taken by each staff member.

(c) Assign a determination to each staff member involved in the incident as:

1. Use of Force within policy; no further action required.

2. Use of Force within policy; training or corrective action addressed.

3. Use of Force within policy; Risk Management component identified and addressed

4. Refer to Command Staff with a recommendation for Internal Affairs investigation.

(d) Finalize the Supervisor's, Lieutenant's, and Division Commander's determinations by electronically submitting the completed assessment within the CRM system.

**300.12 NOTICE OF DISPOSTION**

If the Division Commander responsible for reviewing the Supervisory Use of Force Analysis determines the staff member's actions were "within policy; no further action required", he/she will provide the staff member a written or emailed notice of that determination. If any other determination is assigned (i.e. "training or corrective action"; "recommendation for Internal Affairs investigation") staff members will be provided with a notice of disposition at the conclusion of investigation.

Copyright Lexipol, LLC 2018/01/19, All Rights Reserved.
Published with permission by Orange County Sheriff-Coroner Department




2-GottsSER-00078

Case: 25-7182, 08/25/2026, DktEntry: 44.3, Page 30 of 293

**DECLARATION OF S. FRANK HARRELL**

I, S. Frank Harrell, do state and declare as follows:

1. I am an attorney at law duly licensed to practice before all the courts of the State of California, and am a partner in the law firm of Lynberg & Watkins, A.P.C., attorneys of record for Defendant County of Orange in the above-captioned matter.

2. I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so. This Declaration is made in support of Defendant County of Orange's ("Defendant") Motion for Summary Judgment as to Plaintiff Jeremy Holloway's ("Plaintiff") Second Amended Complaint, presently set for hearing on December 14, 2020.

3. Attached hereto as **Exhibit "B"** is a true and correct copy of Plaintiff's Second Amended Complaint, filed December 10, 2019. (See, ECF Docket No. 28.)

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 23rd day of October, 2020, in Orange, California.

*/s/ S. Frank Harrell*
**S. FRANK HARRELL, Declarant**

4841-9686-5743, v. 4


2-GottsSER-00079

# EXHIBIT "B"

 2-GottsSER-00080

**Narine Mkrtchyan, Esq. (SBN 243269)**
**MKRTCHYAN LAW**
655 N. Central Ave, Suite 1700
Glendale, CA 91203
Telephone: (818) 388-7022
Web: www.narinelaw.com
Email: narine57@gmail.com

Attorney for Plaintiff Jeremy Holloway

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**




2-GottsSER-00081

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | No. 8:19-cv-01514-DOC-DFM<br><br>***SECOND AMENDED* COMPLAINT FOR DAMAGES**<br><br>1. Violation of Civil Rights (42 U.S.C. §1983)<br>2. *Monell* Claim (42 U.S.C. §1983)<br><br>**DEMAND FOR JURY TRIAL** |

**JURISDICTION**

1. Jurisdiction of this court is invoked under 28 U.S.C. §§ 1343, (1), (2), (3) and (4). This action at law for money damages arises under Title 42 U.S.C. Section 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the Fourth, and Fourteenth Amendments of the United States Constitution.

 2-GottsSER-00082

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

2. At all times herein mentioned, Plaintiff JEREMY HOLLOWAY was a 41-year old homeless resident of the County of Orange.

3. At all times herein mentioned Deputy CHAD RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS, Deputy JUSTIN GUNDERSON, and DOES 1-10, inclusive and each of them, were employees of the COUNTY OF ORANGE, and the ORANGE COUNTY SHERIFF'S DEPARTMENT.

4. Defendant COUNTY OF ORANGE (hereinafter referred to as "COUNTY") is and at all times herein mentioned has been a public entity and an incorporated county duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant COUNTY has possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the ORANGE COUNTY SHERIFF'S DEPARTMENT, ("OCSD") and particularly said Department's Patrol, Internal Investigations and Training and Personnel Divisions and other operations and subdivisions presently unidentified to Plaintiff, and their tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, the use and deployment of dangerous weapons, the use of force, and powers of arrest by its rank and file.

5. Plaintiff is informed and believes and thereon alleges that Deputy CHAD

 2-GottsSER-00083

RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS, and Deputy JUSTIN GUNDERSON, and each of the Defendants designated as a DOE, is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged. The true names and capacities of DOES 1 through 10, inclusive, and each of them, are not now known to Plaintiff who therefore sues said Defendants by such fictitious names and will be added to this action as provided by California Code of Civil Procedure Section 484 and FRCP Section 15.

6. Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well-established and settled law.

7. On January 21, 2018 at or around 2:00 am 41-year old Plaintiff JEREMY HOLLOWAY, a then-homeless veteran of the United States Marine Corps, was camping at O'Neill Regional Park in Trabuco Canyon, Orange County and sleeping peacefully in a tent with his dog. All his personal belongings were at his campsite and in his truck. His sleep was suddenly interrupted when he was awakened by Defendants Deputy CHAD RENEGAR, Deputy JOEL GONZALEZ, and Deputy KEVIN PAHEL who directed their flashlights at JEREMY while demanding he come out of his tent. The deputies informed JEREMY that they were following up on a domestic violence complaint for which he was a suspect. In stark contrast to the deputies' accusations, however, JEREMY had been sleeping at the campsite with his dog the entire evening, making it impossible for him to have been involved in any domestic dispute. As at least one Defendant continued to question JEREMY without a Miranda warning, Deputy

CHAD RENEGAR with the assistance of at least one other defendant, searched JEREMY's belongings in his tent without his consent, tossed and turned everything around, knowingly violating JEREMY's Fourth Amendment rights. In spite of this clear rights violation, JEREMY continued to cooperate with the officers and answer their questions for several minutes before they left him alone.

Once the officers left, JEREMY walked to the ranger station to make a complaint about the incident. He also told the family next to his camp to tell the deputies that the noise was coming from their campsite as he had heard a woman screaming from their camp that night. As he approached the station, he noticed that two police SUVs remained parked near the ranger station. Within minutes, additional police SUVs began to circle around where he was standing. Prevented from complaining to the ranger station by their presence, in fear JEREMY began to walk back towards his campsite. Suddenly, approximately 10 police officers, including Deputy CHAD RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS, and Deputy JUSTIN GUNDERSON ran towards JEREMY with their guns drawn and ordered him to put his hands behind his head. He complied with their commands to step away from the tent and put his hands up, but asked them 'Why are you doing this to me?' JEREMY was then surrounded by Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, and GUNDERSON and became frightened as he heard one of the deputies repeatedly order his colleagues, "tase him!" Suddenly and without provocation, at least one Defendant punched JEREMY on the left side of his face, causing him to fall to the ground. Immediately after his fall, he had deputies get on top

of him while choking him and kneeing him in the temple, maliciously causing him pain and suffering. While on the ground already detained, he was shot with a taser approximately five times. As he lay helpless on the ground bleeding profusely, he was ruthlessly attacked from all sides, and could feel the right side of his face get kneed and his head get kicked multiple times. JEREMY then experienced a violent blow to his temple, which caused him to temporarily lose consciousness. As Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, and GUNDERSON battered JEREMY, he continued to get shocked by a taser.

When Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, and GUNDERSON'S relentless attack finally ceased, JEREMY was left with bruised ribs and legs, head injury, severely bleeding and swollen face, lost eyesight vision, severe pain in his back, and periodic loss of consciousness. He was also under a severe emotional distress. Understanding the severity of the injuries that Defendants had inflicted during their violent attack, Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, and GUNDERSON turned JEREMY back on his stomach, handcuffed him, and had him transported to the emergency room at Mission Hospital in Mission Viejo by Deputies Carlos Barrientos and Matthew Brown after JEREMY was briefly interviewed by Sergeant Rawlings. The Sergeant as the only supervising officer arriving at scene grossly minimized the extent and scope of injuries by reporting them as 'minor scratches.'

At the hospital, JEREMY was treated for removal of taser probes and a number of injuries, including an eyelid laceration which required sutures, cervical strain, a closed head injury, and a rib contusion. After spending the night in the hospital, he was transported by



 2-GottsSER-00086

Deputies RENEGAR, GONZALEZ, and PAHEL to the County Jail in Santa Ana where they made the decision to book him on false felony charges of California Penal Code Sec. 69, Resisting an Executive Officer and 243(b), Battery on a Peace Officer based on false claims that he used force or the threat of force against officers. Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, and GUNDERSON then formed a quick meeting of the minds to author false police reports and/or refused to provide with exculpatory information, to justify their brutality and made a recommendation for felony criminal charges filed against JEREMY. JEREMY remained incarcerated for three full days before he bailed out, and during that time, he was ridiculed and sexually harassed in jail by deputies. His complaint in jail against deputies went nowhere. Furthermore, Deputies RENEGAR, GONZALEZ, PAHEL, BILLINGER, BORBA, GOTTS, GUNDERSON confiscated his camping equipment and injured his primary companion, his dog. In an implicit admission of the false nature of the Defendants' allegations, the Orange County District Attorney ultimately declined to file charges against JEREMY, but only after JEREMY had expended sums to retain an attorney to represent him in criminal court. While no citizen should be subjected to such inhumane treatment by officers, the sacrifices JEREMY has made to serve his country make the mistreatment he experienced all the more reprehensible.

On May 23-24, 2018 JEREMY returned to O'Neill Regional Park in hopes that he could camp there peacefully as he had prior to the incident in January. As he was working on his car, between 5 and 6 officers, OCSD Deputies approached JEREMY and began verbally harassing him and searching his vehicle and his camp. JEREMY was immediately terrified and feared for

his life as he recognized that between 1 and 2 of the officers were the same deputies who had attacked him during the previous incident in January. This second encounter, in tandem with the violent attack on January 21, 2018, permanently impacted JEREMY's emotional well-being and sense of safety and security. Several weeks after this second encounter JEREMY vowed to never return to the O'Neill Regional Park and packed his belongings and moved to Pennsylvania, where he currently receives ongoing treatment from the Department of Veteran's Affairs for his mental and physical injuries, including vision loss, headaches, backache, and severe emotional distress stemming from Defendants' brutal beating.

JEREMY retained an attorney and filed a state law tort claim for damages on July 10, 2018. In a letter dated July 13, 2018, JEREMY was notified that his tort claim had been referred to the County of Orange Risk Management Office for processing and recommendation. In a letter dated August 29, 2018 the County of Orange Risk Management Office notified JEREMY that its investigation of his attack had been completed and disclosed no negligence on behalf of the County of Orange.

Through his lawyer JEREMY also filed a formal citizen complaint by a letter directed to OCSD Chief policymaker Sheriff Coroner Sandra Hutchens on April 24, 2018. JEREMY was not interviewed regarding his complaint, nor was asked to provide any supporting documentation. In a letter dated July 4, 2018, Sheriff Captain Sheryl Dubsky notified Jeremy that the unwarranted violence inflicted on him did not violate the Department's policies or procedures or otherwise fail to meet its expectations, while adding, "I do feel the situation may have been handled better." On information and belief, none of the Defendants who attacked



 2-GottsSER-00088

JEREMY have been disciplined for their actions. Through these acts and omissions, the OCSD and the County of Orange have effectively ratified the egregious misconduct and unlawful police practices, as it has been their long-standing custom and practice with respect to other detainees and citizens.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF CIVIL RIGHTS- UNREASONABLE SEARCH AND SEIZURE, EXCESSIVE FORCE, FALSE ARREST, CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS – 42 U.S.C. § 1983)**
**(By Plaintiff Against All Individual Defendants)**

8. Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 7 of this complaint, and by this reference incorporate the same herein and make each a part hereof.

9. This action at law for money damages arises under Title 42 U.S.C. § 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the Fourth, and Fourteenth Amendments of the United States Constitution.

10. Commencing at or about the aforementioned date and place, without cause or

justification, and acting under color of law, Defendants DEPUTY CHAD RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS, Deputy JUSTIN GUNDERSON and DOES 1-10, inclusive and each of them, intentionally and maliciously deprived Plaintiff of rights secured to him by the Fourth, and Fourteenth Amendments to the United States Constitution in that Defendants, and each of them, subjected Plaintiff to unreasonable detention, unreasonable search, false arrest, and unreasonable force as they in concert detained, searched, brutally battered, injured and arrested Plaintiff without probable cause or justification.

11. The aforementioned acts and omissions were committed in accordance with widespread policies, practices and customs maintained by COUNTY and OCSD as elaborated hereinafter at paragraphs 18-23.

12. Defendants, and each of them, quickly and spontaneously reached meeting of minds to carry out and perpetrate the mutually supportive conspiracy to deprive Plaintiff of his rights by participating in a corrupt effort to search and arrest Plaintiff without probable cause, to deploy the use of unreasonable force against him and falsify reports to justify their actions.

13. As a proximate result of the aforesaid acts and omissions of Defendants, and each of them, Plaintiff sustained great physical and mental pain and shock to his nervous system, fear, anxiety, torment, degradation and emotional distress.

14. By reason of the aforementioned acts and omissions of Defendants, and each of


2-GottsSER-00090

them, Plaintiff incurred medical expenses in an amount as proved.

15. In addition, by reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiff was kept from attending to his usual occupations, and has suffered loss and impairment of earnings and employment opportunities all to his damage in an amount as proved.

16. By reason of the aforementioned acts of Defendants, and each of them, Plaintiff was compelled to secure the services of an attorney at law to redress the wrongs hereinbefore mentioned and by virtue thereof, Plaintiff is indebted and liable for attorney's fees.

17. The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully and maliciously, with the intent to harm, injure, vex, harass and oppress Plaintiff with a conscious disregard of Plaintiff's constitutional rights and by reason thereof, Plaintiff seeks punitive and exemplary damages from Defendants, and each of them, (except Defendant COUNTY) in an amount as proved.

**SECOND CAUSE OF ACTION**

**(UNLAWFUL CUSTOM AND PRACTICE UNDER SECTION 1983)**
**(By Plaintiff Against Defendant COUNTY)**

18. Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 17 of this complaint, and by this reference incorporate the same herein and make each a part hereof.



 2-GottsSER-00091

19. Defendant COUNTY is and at all times herein mentioned has been a public entity and an incorporated municipality duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant COUNTY, possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the OCSD and its tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, and the proper uses of force by its rank and file, generally.

20. At all times herein mentioned, Defendants, and each of them, were employees acting under the COUNTY's direction and control, who knowingly and intentionally promulgated, maintained, applied, enforced and suffered the continuation of policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendments respectively to the United States Constitution, which customs, policies, practices and usages at all times herein mentioned required and encouraged the employment, deployment and retention of persons as peace officers who have demonstrated their brutality, dishonesty, bigotry, and numerous other serious abuses of their powers as peace officers in the employment of the COUNTY and OCSD.

21. Defendant COUNTY knowingly maintains and permits official sub-rosa policies or customs of permitting the occurrence of the kinds of wrongs set forth above, by deliberate indifference to widespread police abuses, failing and refusing to impartially investigate,

discipline or prosecute peace officers who commit acts of felonious dishonesty and crimes of violence, each ratified and approved by COUNTY and OCSD.

22. The unconstitutional policies, practices or customs promulgated, sanctioned or tolerated by Defendants COUNTY and OCSD include, but are not limited to:

(1) Defendant COUNTY, and OCSD had knowledge, prior to and since this incident, of repeated allegations of abuse and assaultive misconduct toward detainees and arrestees and refused to enforce established administrative procedures to ensure the safety of detainees and arrestees. Specifically, COUNTY and OCSD knew Defendants Deputy CHAD RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS, Deputy JUSTIN GUNDERSON, and DOES 1-10, inclusive and each of them, had in the past committed acts of police abuse, dishonesty and prevarication against members of the public, most of them members of protected minority classes. COUNTY and OCSD failed to train, discipline and supervise Defendants and further exonerated them of any wrongdoing without proper investigation of Plaintiff's citizen complaint.

(2) On August 19, 2018 an OCSD dashcam video caught Orange County Sheriff's Deputies Michael Devitt and Eric Ota repeatedly punching a motorist in the face while apprehending him for misdemeanor intoxication. Mohamed Sayem was sleeping in his vehicle when officers approached to ask for his identification. When Sayem did not comply and moved his left leg out of the car, Officer Devitt placed his hand on him, which upset

Sayem. When Sayem asked the Deputy not to touch him and attempted to pull away, Devitt responded by violently striking Sayem in the face at least 3-4 times, with the force causing him to fall to the ground. When Sayem asked the deputies if they were going to shoot him, Officer Ota responded that he'd "like to." Despite video footage indicating that officers were the sole perpetrators of violence, the deputies falsely arrested and charged Sayem with felony resisting arrest, to which he has plead not guilty. https://ktla.com/2018/10/19/video-assistant-public-defender-alleges-excessive-force-in-stanton-arrest-sheriffs-department-stands-behind-deputy/; https://www.latimes.com/local/lanow/la-me-ln-deputy-force-20181018-story.html.

(3) On October 12, 2017 Orange County Sheriff's Deputies Cortes and Sheek deployed excessive force against an unarmed man who suffered from mental illness and had no criminal history. One of Mark Hanalei Matias' neighbors had contacted law enforcement to complain that Matias, after getting into a verbal altercation with another neighbor, retreated into his house, came back outside with a firearm, and then returned inside. In making his complaint to the police, the neighbor emphasized that Matias never pointed the firearm at anyone nor threatened them with it, and indicated that Matias suffered from mental health challenges. Despite this information, deputies notified a SWAT team and upon arriving to Matias' residence they ordered him to come out of his home. Deputy Cortes proceeded to fire at least three "less lethal" shotgun rounds at Matias' front torso and back, and as Matias attempted to retreat to protect himself from further violence Deputy Sheek deployed a K-9 to attack Matias, resulting in severe injuries to his left wrist. Although video footage of the incident shows Matias calmly engaging with deputies and complying with their orders, Matias was falsely charged with resisting arrest in an effort to cover up the violation of his civil rights. Mark Hanalei Matias v. County of Orange et al No. 8:18-cv-


2-GottsSER-00094

02209-AG-KES; https://ocweekly.com/oc-deputies-sued-for-unneccessarily-shooting-and-launching-k-9-attack-on-disabled-man/.

(4) Tragically, many of these unnecessarily violent encounters with Orange County Sheriff's Deputies have resulted in civilian fatalities over the past several years. In April 2018, 33-year-old Cristobal Solano had been transported to the county jail after being arrested on a disturbing the peace-related charge in Tustin. During intake, Orange County Sheriff's Deputies became frustrated when Solano could not open his mouth wide enough for them to conduct an oral cavity search. In response, at least seven deputies forcefully shoved Solano against the cell wall, violently pushed his face down onto a concrete bunk, and placed their collective weight of more than 1,000 pounds onto him as he pleaded for them to stop and stated he could not breathe. Solano became unresponsive and was pronounced dead two days later. M. H. et al v. County of Orange et al 8:19-cv-00549-JVS-ADS; https://ocweekly.com/orange-county-sheriff-jail-death/.

(5) On August 20, 2018 Orange County Sheriff's Deputies unlawfully detained and arrested 23-year-old Andru Maldonado. Witnesses to the incident stated that Maldonado had merely been "acting strange" inside shops, was walking through traffic, and appeared to be in need of psychological help. When deputies arrived to the scene, they deployed multiple electroshocks from a taser rather than attempt to address his mental health needs. After deploying the taser, deputies failed to timely summon medical attention, which contributed to Maldonado's untimely death. Alisha Maldonado v. County of Orange et al. No. 8:19-cv-00883-JLS-JDE; https://ocweekly.com/deputy-taser-death-orange-county/.

(6) In February 2018 deputies were called to the residence of Paul Mono, a 65-year-old retired cartoonist and screenwriter who was suffering a mental crisis due to the increasing loss of his vision. During a meeting with his real estate agent Mono had retrieved an antique revolver and began waving it around. The real estate agent persuaded him to put it down and did not believe it was loaded. When officers arrived to the scene, instead of taking time to assess the situation they shot through the windows and doors 14 times, fatally shooting Mono and narrowly missing his wife. Susan Peck et al v. County of Orange et al. No. 2:19-cv-04654-DSF-SS; https://www.latimes.com/local/lanow/la-me-blind-man-lawsuit-sheriffs-killed-20190529-story.html. Other notable recent incidents include the 2013 fatal shooting of Connor Zion, whom officers shot nine times and stomped on his head as he lay on the ground (https://www.usnews.com/news/best-states/california/articles/2019-01-24/jury-california-deputy-used-excessive-force-in-shooting; https://abc7.com/$11-million-settlement-reached-in-oc-excessive-force-case/5335263/; https://www.nbclosangeles.com/news/local/Federal-Judge-Upholds-360k-Verdict-to-Mom-of-Man-Killed-by-Deputy-508622741.html) and Brandon Lee Witt, who was shot by Deputy Nicholas Petropulos while sitting in a parked car outside an Extended Stay America motel on Feb. 15, 2016 while being apprehended for a missing license plate on his vehicle. (https://www.latimes.com/local/lanow/la-me-ln-oc-sheriff-shooting-lawsuit-20190430-story.html; https://www.ocregister.com/2019/04/29/jury-awards-3-4-million-to-parents-of-man-killed-by-sheriffs-deputy-in-yorba-linda-finds-officer-used-excessive-force/.)

(7) Defendant COUNTY and OCSD failed to do proper background investigations of Defendants under Cal. Gov. Code §1031 before hiring for employment as peace officers.

(8) Defendant COUNTY and OCSD refused to take citizen complaints, interview involved officers and adequately discipline individual officers and employees found to have committed similar acts of abuse and misconduct.

(9) Defendant COUNTY and OCSD refused to competently and impartially investigate allegations of abuse and misconduct alleged to have been committed by Defendants and other OCSD deputies;

(10) Defendant COUNTY and OCSD reprimanded, threatened, intimidated, demoted and fired officers who reported acts of abuse by other deputies;

(11) Defendant COUNTY and OCSD covered up acts of misconduct and abuse by OCSD deputies and sanctioned a code of silence by and among officers;

(12) Defendant COUNTY and OCSD rewarded officers who displayed aggressive and abusive behavior towards detainees and arrestees;

(13) Defendant COUNTY and OCSD failed to adequately train and educate officers in the use of reasonable and proper force and failed to enforce the department's written regulations with respect to uses of force;

(14) Defendant COUNTY and OCSD and failed to adequately supervise the actions of officers under their control and guidance;



 2-GottsSER-00097

(15) Defendant COUNTY and OCSD condoned and participated in the practice of prosecuting known groundless criminal charges for the purpose of insulating the County of Orange, OCSD and its officers from civil liability and reducing or dismissing criminal charges against individuals in return for release from civil liability;

(16) Defendant COUNTY and OCSD condone and encourage a conspiracy of silence among its employees for the purpose of concealing and furthering wrongful and illegal conduct by its employees;

(17) Defendant COUNTY and OCSD engaged in the practice and custom of withholding from criminal defendants, judges and prosecutors, known Brady evidence favorable to defendants and unfavorable to its officers in violation of law and the Constitution.

(18) Defendant COUNTY and OCSD fostered and encouraged an atmosphere of lawlessness, abuse and misconduct, which by January 21, 2018 and thereafter, represented the unconstitutional policies, practices and customs of the COUNTY and OCSD.

23. By reason of the aforesaid policies, customs, practices and usages, Plaintiff's rights under the Fourth, and Fourteenth Amendments to the United States Constitution were deprived.

 2-GottsSER-00098

**PRAYER**

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1. For General damages according to proof;
2. For Special damages according to proof;
3. For Punitive damages as provided by law, in an amount to be proved against each individual Defendant;
4. For Attorney's fees pursuant to 42 U.S.C § 1988;
5. For Costs of suit;
6. For such other and further relief as the Court may deem proper.

DATED: November 5, 2019 MKRTCHYAN LAW

By: /s/Narine Mkrtchyan
Narine Mkrtchyan
Attorney for Plaintiff


2-GottsSER-00099

**PLAINTIFF'S JURY TRIAL DEMAND**

Plaintiff hereby demands trial by jury.

DATED: November 5, 2019

MKRTCHYAN LAW

By: /s/Narine Mkrtchyan
Narine Mkrtchyan
Attorney for Plaintiff




2-GottsSER-00100

S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEREMY HOLLOWAY,

Plaintiff,

vs.

COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.

Defendants.

CASE NO. 8:19-cv-01514-DOC-DFM

*Assigned to:*
*Hon. David O. Carter, Courtroom 9D*

**DEFENDANT COUNTY OF ORANGE'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Date: December 14, 2020
Time: 8:30 a.m.
Dept.: 9D

Filed Concurrently with Notice of Motion and Motion for Summary Judgment; Supporting Declarations; [Proposed] Order

*Trial Date: January 19, 2021*
*Second Amended Complaint filed: December 10, 2019*


2-GottsSER-00101

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant County of Orange, pursuant to Central District Local Rule ("CDLR") 56-1 hereby submits its Separate Statement of Uncontroverted Facts and Conclusions of Law in support of its concurrently filed Motion for Summary Judgment, as follows:

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW**

Plaintiff's Second Cause of Action against Defendant County of Orange under 42 U.S.C. § 1983 for "Violation of Federal Civil Rights" is without merit and fails as a matter of law.

**UNCONTROVERTED MATERIAL FACTS**

| **UNDISPUTED MATERIAL FACT:** | **SUPPORTING EVIDENCE:** |
|---|---|
| 1. "It is the policy, practice and custom of the Orange County Sheriff's Department to treat all citizens, arrestees, detainees and/or inmates in a legal, lawful, and professional manner, and to only use such force that is reasonable under the circumstances." | 1. Declaration of Jon Briggs ("Briggs Decl."), ¶ 4. |
| 2. "This was the policy of the Orange County Sheriff's Department at the time of the incident in this case and at all times before and after that date." | 2. Briggs Decl. ¶ 4. |
| 3. It was "the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to conduct themselves in a reasonable and professional manner consistent with the federal Constitution and the laws of the State of California." | 3. Briggs Decl. ¶ 6. |
| 4. "Further, it was the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to only use such force as is reasonable under the circumstances under the Fourth Amendment." | 4. Briggs Decl. ¶ 5, Force Policy, Ex. A. |


2-GottsSER-00102

| | |
|---|---|
| 5. "[A]ll sworn members of the Orange County Sheriff's Department receive extensive training on the application of reasonable force, professional deportment as well as professional communication skills and conflict resolution (including verbal and non-verbal techniques for responding to hostile situations). This training begins during the Sheriff's Academy and continues throughout the careers of each sworn peace officer (through both formal classroom training and application exercises, and by way of on-the-job training." | 5. Briggs Decl. ¶ 6. |

**CONCLUSIONS OF LAW**

Congress enacted the civil rights statutes in order to provide citizens with a means of seeking civil damages against public employees who violate their federal Constitutional rights. See, Baker v. McCollan, 443 U.S. 137 (1979 ("Section 1983 imposes liability for violations of rights protected by the Constitution..."). In order to seek recovery against a municipal employer, however, the United States Supreme Court requires a substantial additional showing beyond the fact that "it employ[ed] a tortfeasor." Bryan County v. Brown, 520 U.S. 397, 403 (1997); see, Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986) ("[W]hile Congress never questioned its power to impose civil liability on municipalities for their own illegal acts, Congress did doubt its constitutional power to impose civil liability in order to oblige municipalities to control the ***conduct of others***.") (Emphasis added.)

Accordingly, the Supreme Court has "consistently refused to hold municipalities liable under a theory of respondeat superior." Brown, supra, 520 U.S. at 403, citing, Monell, supra, 436 U.S. at 690. It is only when an explicit or tacit wrongful government "policy or custom" causes government employees to inflict an injury that a government entity may be liable under Section 1983. Id.

To the extent that Plaintiff's Section 1983 claim against the Defendant County of Orange is premised on an alleged unconstitutional "policy" decision, Plaintiff's





 2-GottsSER-00103

assertions fail as a matter of law. See, Monell v. New York Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978). Plaintiff has pointed to no unconstitutional enactment by the Orange County Board of Supervisors. See, Frandzen v. County of San Diego, 101 Cal. 317, 319-320 (1894) (The "board of supervisors are the chief legislative and executive authority of the County.");

In City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S. Ct. 2427 (1985), the United States Supreme Court emphasized that a Section 1983 plaintiff cannot recover under a "custom" theory by simply producing evidence of the single, isolated incident of which he complains. Id. Rather, a civil rights plaintiff must prove a pattern of "persistent and widespread" unconstitutional conduct by its employees which is so "permanent and well settled as to constitute a custom..." Monell, supra, 436 U.S. at 690; see, Sloman v. City of Simi Valley, 21 F.3d 1462, 1470 (9th Cir. 1994) ("Individual action like [the defendant officer's] does not rise to the level of the 'well-settled', 'widespread' practices contemplated in the cases discussing municipal liability"; Jury verdict against city defendant for one employee officer's "habitual" conduct overturned as error).

The inadequacy of training only serves as a basis for Section 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. City of Canton v. Harris, 489 U.S. 378, 390, n. 10 and 397-398 (1989). To establish deliberate indifference under Section 1983, the plaintiff must show prior incidences of similar unconstitutional conduct demonstrating that the county has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury. Id.

/ / /

/ / /

/ / /

/ / /


2-GottsSER-00104

Plaintiff has also failed to demonstrate that the conduct of which he complains is part of a pattern of "persistent and widespread" unconstitutional conduct by the County of Orange spanning many years as required by law. See, Monell v. New York Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

DATED: October 23, 2020

Respectfully submitted,

**LYNBERG & WATKINS**

By: */s/ Tamara M. Heathcote*
**S. FRANK HARRELL**
**TAMARA M. HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson

4830-9567-2015, v. 6


2-GottsSER-00105

S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEREMY HOLLOWAY,

Plaintiff,

vs.

COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.

Defendants.

CASE NO. 8:19-cv-01514-DOC-DFM

*Assigned for All Purposes to:*
*Hon. David O. Carter, Courtroom 9D*

*Assigned for Discovery Purposes to:*
*Hon. Douglas F. McCormick, Courtroom 6B*

**INDIVIDUAL DEFENDANTS' SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION SUMMARY ADJUDICATION**

**Date:** December 14, 2020
**Time:** 8:30 a.m.
**Dept.:** 9D

*Trial Date: January 19, 2021*
*Second Amended Complaint filed: December 10, 2019*

**TO THE COURT, PLAINTIFF, AND HER COUNSEL OF RECORD**:


2-GottsSER-00106

**PLEASE TAKE NOTICE** that Defendants DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON ("Individual Defendants") hereby submit the following Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Summary Adjudication.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW

## UNCONTROVERTED MATERIAL FACTS

**ISSUE 1:** Plaintiff's First Claim under 42 U.S.C. §1983 for "Detention and Arrest" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is barred by qualified immunity and fails as a matter of law.

| UNDISPUTED MATERIAL FACT: | SUPPORTING EVIDENCE: |
|---|---|
| 1. On January 21, 2018, Brian Fuerbach called 9-1-1. | 1. Declaration of Brian Fuerbach ("Fuerbach Decl."), ¶ 9 |
| 2. Brian Fuerbach reported to 9-1-1 that he had heard a male and female yelling, fists being landed on somebody, and a woman yelling to stop hitting her, that she's just a girl. | 2. Fuerbach Decl., ¶ 9 |
| 3. On January 21, 2018 at approximately 3:40 a.m., Deputy Renegar became aware of a call for service to O'Neill Park, an unincorporated area of the | 3. Declaration of Chad Renegar ("Renegar Decl.") ¶ 4; Call Detail Log, p. 5, Ex. "A" to the Renegar Decl. |


2-GottsSER-00107

| | |
|---|---|
| County of Orange. This call at 3:40 a.m. consisted of the reporting party advising that there was a male versus female in a physical altercation that was disturbing the peace occurring to the right of campsite 63. | |
| 4. At approximately 4:07 a.m., Deputy Renegar heard dispatch state that per the reporting party, domestic violence was occurring in a tent by a white truck to the right of campsite 63. Once at the scene, witness Joshua Gomez advised Deputy Renegar that he heard the sounds of fighting and arguing coming from Holloway's campsite (65). | 4. Renegar Decl., ¶ 6 and 7: Call Detail Log, p. 5, Ex. "A". |
| 5. Deputy Renegar made contact with Mr. Holloway at campsite 65 and found Mr. Holloway's denials of domestic violence unconvincing in light of the multiple third party reports that implicated Mr. Holloway. | 5. See, Renegar Decl., ¶ 8. |
| 6. Deputy Renegar could not come up with any reason for the witnesses reporting Mr. Holloway to lie. | 6. Renegar Decl., ¶ 8. |
| 7. Deputy Renegar believed he had | 7. Renegar Decl., ¶ 8. |

| | |
|---|---|
| reasonable suspicion to detain Mr. Holloway for battery/domestic violence based on the third party reports against Mr. Holloway. | |
| 8. Deputy Renegar did not detain Mr. Holloway or charge him with a crime at the time based on his inability to locate the victim. | 8. Renegar Decl., ¶ 8. |
| 9. After the encounter with Mr. Holloway, Deputy Renegar went back to his vehicle and drove to the entrance of the park, pulled over and ran Mr. Holloway through the system. At that time, Deputy Renegar discovered that Mr. Holloway was on probation and subject to search and seizure at any time. | 9. Renegar Decl., ¶ 9. |
| 10. As Deputy Renegar was driving back to his patrol area, he became aware of another call for service at approximately 4:55 a.m. to O'Neill Park. The reporting party advised that a male subject was walking from campsite to campsite looking for the individual(s) who had called the police. | 10. Renegar Decl., ¶ 10; Call Detail Log, pp. 3-4, Ex. "A". |
| 11. While Deputy Renegar was en | 11. Renegar Decl., ¶ 11; See, Call |


2-GottsSER-00109

| | |
|---|---|
| route to O'Neill Park at approximately 4:58 a.m. Deputy Renegar learned from dispatch that the reporting party stated the male subject was by campsite 61 in a white R.V. | Detail Log, p. 3, Ex. "A". |
| 12. Deputy Renegar also learned from dispatch that the reporting party was stating that a little girl was screaming and the call was upgraded to a priority one. | 12. Renegar Decl., ¶ 11; See, Call Detail Log, p. 3, Ex "A". |
| 13. Deputy Renegar approached Mr. Holloway for a second time that on January 21, 2018. Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway and investigate for the occurrence of any crime based on the reports of the persons reporting the incident to dispatch. | 13. See, Renegar Decl., ¶ 12. |
| 14. However, Deputy Renegar confined his charges to what he personally observed Mr. Holloway do during Deputy Renegar's second encounter with him. | 14. Renegar Decl., ¶ 12 |

**CONCLUSIONS OF LAW**

Congress enacted 42 U.S.C. § 1983 in order to provide citizens with a means to


2-GottsSER-00110

seek civil damages against public employees who violate their federal constitutional rights. See, Baker v. McCollan, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution . . .."). However, the Supreme Court has recognized that Section 1983 damage suits against governmental employees entail substantial "social costs" which include the "expense of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office." Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). The qualified immunity doctrine addresses these concerns by providing for pre-trial judicial screening of Section 1983 claims. See, Johnson v. County of Los Angeles, 340 F.3d 787, 791 (9th Cir 2003)(It is for "courts, not juries to settle the ultimate questions of qualified immunity."); Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000)("Whether a public official is entitled to qualified immunity is a question of law."). For this reason, "[q]ualified immunity is particularly amenable to summary judgment adjudication . . .." Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

The Supreme Court has emphasized that qualified immunity determinations involve two levels of judicial screening. See, Saucier v. Katz, 533 U.S. 194, 201 (2001). To "defeat ... officials' defense of qualified immunity," a plaintiff "must show, 'first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct.'" Hamby v. Hammond, 821 F.3d 1085, 1090 (9th Cir. 2016)(alterations in original)(quoting Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015)(per curiam)). The Court "may decide for [itself] which step of the analysis to undertake first." Id. "Failing at either one will negate [a plaintiff's] eligibility to recover damages." Id.

The Supreme Court has recently devoted substantial time and effort to qualified immunity issues – with a particular emphasis on the "clearly established law" aspect of the doctrine. See, White v. Pauly, 137 S.Ct. 548, 551 (2017) (per curiam) (The Court "has issued a number of opinions reversing federal courts in qualified immunity


2-GottsSER-00111

cases" over "the last five years."). As recently emphasized by the Supreme Court, "clearly established" means that, at the time of the public employee's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, a Section 1983 plaintiff must cite pre-incident case law whose facts and holding plainly outlawed the decisions the public employee made during the subject incident. See, District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018)("The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the ***particular circumstances*** before him.")(emphasis added.); Saucier v. Katz, 533 U.S. 194, 202 (2001)(the rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); id. at 209 (a Section 1983 plaintiff must point to case law that states "a clearly established rule prohibiting the [public employee] from acting as he did ... [i]n the ***circumstances presented*** to the [employee].")(emphasis added).

"This requires a high 'degree of specificity'" (District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018))(citations omitted), inasmuch as qualified immunity is a "fact-specific, highly contextualized" inquiry. Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016); see, White v. Pauly, 137 S.Ct. 548, 552 (2017)("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."); Kisela v. Hughes, 138 S.Ct. 1148, 1153 (2018)(per curiam)(public employees "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue"); Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [public employees] *in this case* that *their particular conduct* was unlawful.")(italics original).

A police officer may, of course, temporarily detain a person for investigatory purposes if the officer has "reasonable suspicion" the person is engaged in criminal

activity. Terry v. Ohio, 392 U.S. 1, 20-21 (1968); see, United States v. Arvizu, 534 U.S. 266, 273 (2002)("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot,'….")(citations omitted.); see also, People v. Bennett, 17 Cal. 4th 373, 386 (1998), as modified (Apr. 1, 1998)(A police officer "may temporarily detain a suspect based only on a "reasonable suspicion" that the suspect has committed or is about to commit a crime.").

Probable cause to arrest, on the other hand, "exists when, under the totality of the circumstances known to the arresting officer…, a prudent person would believe the suspect had committed a crime." Dubner v. City & County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001). Probable cause requires "***only the probability***, and not a prima facie showing, of criminal activity." Franklin v. Fox, 312 F.3d 423, 438 (9th Cir. 2002) (citations omitted; emphasis added). "Requiring more would unduly hamper law enforcement." Beck v. Ohio, 379 U.S. 89, 91 (1964).

**ISSUE 2:** Plaintiff's First Claim under 42 U.S.C. §1983 for "Excessive Force" against Deputy Brandon Billinger and Deputy Justin Gunderson is barred by qualified immunity and fails as a matter of law.

| **UNDISPUTED MATERIAL FACT:** | **SUPPORTING EVIDENCE:** |
|---|---|
| 15. Based on Deputy Renegar's observations during the incident, Deputies Gunderson and Billinger had no physical contact with Mr. Holloway. | 15. Renegar Decl., ¶ 13. |
| 16. Deputies Gunderson and Billinger did not any use force on Mr. Holloway, let alone excessive force. | 16. Renegar Decl., ¶ 13. |


2-GottsSER-00113

## CONCLUSIONS OF LAW

An "excessive force" plaintiff cannot reach a jury against a peace officer defendant when s/he used no force at all. See, e.g., Susag v. City of Lake Forest, 94 Cal. App. 4th 1401, 1415-1416 (2002)("We reject [plaintiff's] contention that summary judgment was improper because the deputies can be liable for using excessive force even if they had no physical contact with him."); Collins v. Nagle, 892 F.2d 489, 487 (6th Cir. 1989)(court rejected a claim that an officer violated an individual's Fourth Amendment rights when he pointed a gun at the individual; a "show of force" is not tantamount and "the actual use of force."); Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir. 2000)(court found no excessive use of force when the officer drew his gun and required the appellant to lie on the ground during an investigatory stop.); Edwards v. Giles, 51 F.3d 155, 157 (8th Cir. 1995)(court rejects claim that the mere pointing of a gun at a suspect constituted excessive force.)

**ISSUE 3:** Plaintiff's First Claim under 42 U.S.C. §1983 for "Illegal Search" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is barred by qualified immunity.

| **UNDISPUTED MATERIAL FACT:** | **SUPPORTING EVIDENCE:** |
|---|---|
| 9. After the encounter with Mr. Holloway, Deputy Renegar went back to his vehicle and drove to the entrance of the park, pulled over and ran Mr. Holloway through the system. At that time, Deputy Renegar discovered that Mr. Holloway was on probation and subject to search and seizure at any time. | 9. Renegar Decl., ¶ 9. |


2-GottsSER-00114

## CONCLUSIONS OF LAW

Supreme Court uphold a search that police had conducted pursuant to the terms of a defendant's probation, which authorized searches "with or without a search warrant, warrant of arrest or reasonable cause." United States v. Knights, 534 U.S. 112, 114 (2001).

DATED: 10/23/2020

Respectfully submitted,
**LYNBERG & WATKINS**
A Professional Corporation

By: */s/ S. Frank Harrell*
**S. FRANK HARRELL**
**TAMARA HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson

4825-3429-1663, v. 1


2-GottsSER-00115

S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEREMY HOLLOWAY,

Plaintiff,

vs.

COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.

Defendants.

CASE NO. 8:19-cv-01514-DOC-DFM

*Assigned for All Purposes to:*
*Hon. David O. Carter, Courtroom 9D*

*Assigned for Discovery Purposes to:*
*Hon. Douglas F. McCormick, Courtroom 6B*

**INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: December 14, 2020
Time: 8:30 a.m.
Dept.: 9D

*Trial Date: January 19, 2021*
*Second Amended Complaint filed: December 10, 2019*


2-GottsSER-00116

**TO THE PARTIES HEREIN AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 14, 2020 at 8:30 a.m., or as soon thereafter as counsel may be heard, in Courtroom 9D of the above-entitled Court located at 411 W. 4th Street, Santa Ana, California, Defendants County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson ("Defendants") will, and hereby do, move the Court, pursuant to Fed. R. Civ. P. 56, for an order granting summary adjudication as to each of the following enumerated claims.

The grounds for issuing an order granting adjudication are as follows:

1. Plaintiff's First Claim under 42 U.S.C. §1983 for "Detention and Arrest" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is barred by qualified immunity and fails as a matter of law;

2. Plaintiff's First Claim under 42 U.S.C. §1983 for "Excessive Force" against Deputy Brandon Billinger and Deputy Justin Gunderson is barred by qualified immunity and fails as a matter of law; and

3. Plaintiff's First Claim under 42 U.S.C. §1983 for "Illegal Search" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is barred by qualified immunity.

Defendants' Motion is made on the grounds that there is no triable issue of material fact as to any of the foregoing issues, and that Defendants are consequently entitled to dismissal as a matter of law. See, Fed. R. Civ. P. 56.

Defendants' Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Chad Renegar and Tamara M. Heathcote and the Exhibits submitted therewith, the concurrently-filed Separate Statement of Uncontroverted Material Facts and Conclusions of Law, the complete files and records of this action, and upon such other and further oral or written matters


2-GottsSER-00117

as may properly come before this Court.

This Motion is made following Defendant's unsuccessful meet and confer efforts which began on August 14, 2020 and continued to August 27, 2020. See, Local Rule 7-3.

DATED: October 23, 2020

Respectfully submitted,

**LYNBERG & WATKINS**

By: */s/ S. Frank Harrell*
**S. FRANK HARRELL**
**TAMARA M. HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson


2-GottsSER-00118

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT 1
II. FACTUAL BACKGROUND ..... 1
III. PLAINTIFF'S CLAIMS ARE BARRED BY QUALIFIED IMMUNITY. ..... 5
A. Plaintiff's "False Arrest" Claim is Meritless. ..... 10
(i) Plaintiff Cannot Establish a Constitutional Violation. ..... 10
(ii) There Was No "Clearly Established" Law Giving Deputies Notice That Their Conduct Was Unconstitutional. ..... 15
B. Plaintiff's "Excessive Force" Claim Against Two Deputy Defendants Is Meritless. ..... 16
C. Plaintiff's "Illegal Search" Claim Is Meritless. ..... 17
IV. CONCLUSION. ..... 17


2-GottsSER-00119

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Creighton,
483 U.S. 635 (1987)........7

Arnsberg v. United States,
757 F.2d 971 (1984)........8, 12

Ashcroft v. al-Kidd,
563 U.S. 731 (2011)........7, 8, 9

Ault v. Speicher,
634 F.3d 942 (7th Cir. 2011)........6

Baker v. McCollan,
443 U.S. 137 (1979)........5

Baker v. Racansky,
887 F.2d 183 (9th Cir. 1989)........16

Barry v. Fowler,
902 F.2d 770 (9th Cir. 1990)........16

Beck v. Ohio,
379 U.S. 89 (1964)........11

Blankenhorn v. City of Orange,
485 F.3d 463 (9th Cir. 2007)........14

Bonomi v. City & Cty. of San Francisco,
2012 WL 2935624 (N.D.Cal. 2012)........14

Brewster v. Board of Educ. of Lynwood Unified School Dist.,
149 F.3d 971 (9th Cir. 1998)........6

Cabrera v. City of Huntington Park,
159 F.3d 374 (9th Cir. 1998)........14

City of Escondido, Cal. v. Emmons,
139 S. Ct. 500 (2019)........9, 10

Collins v. Nagle,
892 F.2d 489 (6th Cir. 1989)........16

Crockett v Cumberland College,
316 F.3d 571 (6th Cir. 2003)........13

De la Cruz v. Kauai County,
279 F.3d 1064 (9th Cir. 2002)........15

Devenpeck v. Alford,
543 U.S. 146 (2004)........12


2-GottsSER-00120

District of Columbia v. Wesby, 138 S.Ct. 577 (2018) .......... 7, 9, 10

Dubner v. City & County of San Francisco, 266 F.3d 959 (9th Cir. 2001) .......... 11

Edwards v. Giles, 51 F.3d 155 (8th Cir. 1995) .......... 17

Franklin v. Fox, 312 F.3d 423 (9th Cir. 2002) .......... 11

Gonzales v. Nork, 20 Cal. 3d 500 (1978) .......... 10

Hamby v. Hammond, 821 F.3d 1085 (9th Cir. 2016) .......... 6, 7, 10

Harlow v. Fitzgerald, 457 U.S. 800 (1982) .......... 6

Hunter v. Bryant, 502 U.S. 224 (1991) .......... 6

Ismail v. County of Orange, 676 Fed.Appx. 690 (9th Cir. 2017) .......... 16

Jackson v. Sauls, 206 F.3d 1156 (11th Cir. 2000) .......... 17

Johnson v. County of Los Angeles, 340 F.3d 787 (9th Cir 2003) .......... 6, 18

Kisela v. Hughes, 138 S.Ct. 1148 (2018) .......... 7, 15

Krainski v. State ex rel. Bd. of Regents, 616 F.3d 963 (9th Cir. 2010) .......... 13

Malley v. Briggs, 475 U.S. 335 (1986) .......... 10

Maraziti v. First Interstate Bank of California, 953 F.2d 520 (9th Cir. 1992) .......... 8

Martin v. City of Oceanside, 360 F.3d 1078 (9th Cir. 2004) .......... 6

Martinez v. Simonetti, 202 F.3d 625 (2d Cir. 2000) .......... 13

Mason v. Town of New Paltz Police Dep't, 103 F. Supp. 2d 562 (N.D.N.Y. 2000) .......... 13

Nunez v. Davis,


2-GottsSER-00121

169 F.3d 1222 (9th Cir. 2000) .......... 6, 17

People v. Bennett,
17 Cal. 4th 373 (1998) .......... 11

People v. Thompson,
38 Cal. 4th 811 (2006) .......... 13

Plumhoff v. Rickard,
134 S. Ct. 2012 (2014) .......... 16, 17

Rosenbaum v. Washoe Cnty.,
663 F.3d 1071 (9th Cir. 2011) .......... 15

S.B. v. County of San Diego,
864 F.3d 1010 (9th Cir. 2017) .......... 9

Saucier v. Katz,
533 U.S. 194 (2001) .......... 6, 7, 10, 15

Sealey v. Fishkin,
1998 WL 1021470 (E.D.N.Y. 1998) .......... 16

Shafer v. County of Santa Barbara,
868 F.3d 1110 (9th Cir. 2017) .......... 7, 9

Sharp v. County of Orange,
871 F.3d 901 (9th Cir. 2017) .......... 8, 9

Sorgen v. City and County of San Francisco,
2006 WL 2583683 (N.D.Cal. 2006) .......... 16

Spiegel v. Cortese,
196 F.3d 717 (7th Cir. 1999) .......... 13

Stoudemire v. Mich. Dep't of Corr.,
705 F.3d 560 (6th Cir. 2013) .......... 6

Susag v. City of Lake Forest,
94 Cal. App. 4th 1401 (2002) .......... 16

Taylor v. Barkes,
135 S. Ct. 2042 (2015) .......... 6

Terry v. Ohio,
392 U.S. 1 (1968) .......... 11, 14

United States v. Arvizu,
534 U.S. 266 (2002) .......... 11

United States v. Knights,
534 U.S. 112 (2001) .......... 17

United States v. Mayo,
394 F.3d 1271 (9th Cir. 2005) .......... 13


2-GottsSER-00122

Ward v. County of San Diego,
791 F.2d 1329 (9th Cir.1986) .......... 9, 10

White v. Pauly,
137 S.Ct. 548 (2017) .......... 7, 9, 15

Whiteley v. Warden,
401 U.S. 560 (1971) .......... 12

Wilson v. Layne,
526 U.S. 603 (1999) .......... 8

**Statutes**

42 U.S.C. § 1983 .......... passim

California Penal Code § 21a .......... 16

California Penal Code § 242 .......... 12

California Penal Code § 243.2(a)(1) .......... 12

California Penal Code § 245(4) .......... 12

California Penal Code § 415(2) .......... 12, 14

Fed. R. Civ. P. 56 .......... 18


2-GottsSER-00123

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

On January 21, 2018, the Orange County Sheriff's Department received middle - of – the - night "911" calls regarding a man attacking a woman at a County - owned campground. Law enforcement responded to the scene and encountered one Jeremy Holloway – who had just been released on probation following his latest conviction on felony charges.

Holloway unconvincingly denied the campers' allegations against him. But as Holloway's female victim had fled the scene, no arrest was made.

Holloway thereafter pressed his luck by threatening the campground witnesses against him as soon as officers departed the scene. When deputies returned in response to frightened campers' latest "911" calls, Holloway was subdued and arrested. After warrants subsequently issued for Holloway's arrest, he responded by: (1) filing this pestiferous litigation, and (2) by fleeing California for the East Coast.

Plaintiff's operative complaint, includes recovery theories against a host of individual peace officer Defendants. Specifically, Holloway seeks recovery under the civil rights provisions of 42 U.S.C. § 1983 for "False Arrest", "Excessive Force" and "Illegal Search". (See, Plaintiff's SAC ¶ 10). As set forth in further detail below, however, none of Plaintiff's claims can survive scrutiny under the qualified immunity doctrine. See, Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000) ("Whether a public official is entitled to qualified immunity is a question of law."); Johnson v. County of Los Angeles, 340 F.3d 787, 791 (9th Cir. 2003) (It is for "courts, not juries to settle the ultimate questions of qualified immunity.").

## II. FACTUAL BACKGROUND

On January 20, 2028, Brian Fuerbach and his wife went camping for one night at O'Neill Park in their Recreational Vehicle ("R.V."), arriving during the afternoon. (See, Declaration of Brian Fuerbach ("Fuerbach Decl."), ¶ 3.) Mr. Fuerbach's R.V. was located in campsite 63. (See, Fuerbach Decl., ¶ 5.) Mr. Fuerbach's R.V. had a


2-GottsSER-00124

large (2' x 5') window on the side of his R.V. located above the dinette/bed area which faced campsite 65. (See, Fuerbach Decl., ¶ 4.)

At approximately 2:00 a.m. on January 21, 2018, Mr. Fuerbach was awakened by a sound coming from campsite 65 which was located directly next door to him which he understands now was the campsite of Plaintiff, Jeremy Holloway. (See, Fuerbach Decl., ¶ 6.)

The loud noise at 2:00 a.m. sounded to Fuerbach like something had hit his R.V. (See, Fuerbach Decl., ¶ 7.) The sound was like "boom, boom". (See, Fuerbach Decl., ¶ 7.) Mr. Fuerbach looked out of the large window above the bed and discovered that it was the sound of the two doors closing on the white truck that had arrived at campsite 65. (See, Fuerbach Decl., ¶ 7.) After he heard a male and female talking inside one of the two tents at campsite 65, he then fell back to sleep. (See, Fuerbach Decl., ¶ 7.)

At approximately 3:00 a.m. Mr. Fuerbach was awakened again to the sound of yelling and expletives coming from campsite 65. (See, Fuerbach Decl., ¶ 8.) Mr. Fuerbach also heard fist blows being landed on somebody. (See, Fuerbach Decl., ¶ 8.) He opened the window above the bed to look out and heard a woman yelling "No, no, no. Please stop. I'm just a girl." (See, Fuerbach Decl., ¶ 8.) Mr. Fuerbach could also see the tent in campsite 65 move and hear what appeared to be the noise of someone's arm rubbing the inside of the tent fabric followed by the sound of further fist blows being landed on somebody. (See, Fuerbach Decl., ¶ 8.) Mr. Fuerbach heard his wife yell out the window toward campsite 65, "Stop hitting her". (See, Fuerbach Decl., ¶ 8.)

At this point, concerned for the woman's safety, Mr. Fuerbach called 9-1-1. (See, Fuerbach Decl., ¶ 9; UMF No. 1) He reported he had heard a male and female yelling, fists being landed on somebody, and a woman yelling to "stop hitting her", that "she's just a girl". (See, Fuerbach Decl., ¶ 9; UMF No. 2.) Afterward, while listening for the deputies to arrive, Mr. Fuerbach heard the sound of a tent unzip and

the sound of footsteps running across gravel. (See, Fuerbach Decl., ¶ 10.)

On January 21, 2018, Chad Renegar was an Orange County Deputy Sheriff assigned to patrol. (See, Declaration of Chad Renegar ("Renegar Decl."), ¶ 3.) Generally speaking, Deputy Renegar's duties were to patrol his assigned area of Orange County and respond to calls for service in protection of the public. (See, Renegar Decl., ¶ 3.)

At approximately 3:40 a.m., Deputy Renegar became aware of a call for service to O'Neill Park, an unincorporated area of the County of Orange. (See, Renegar Decl., ¶ 4; UMF No. 3.) This call at 3:40 a.m. consisted of the reporting party advising that there was a male versus female in a physical altercation that was disturbing the peace occurring to the right of campsite 63. (See, Renegar Decl., ¶ 4; Call Detail Log, p. 5, Ex. "A" to the Renegar Decl.; UMF No. 4.)

At approximately 4:07 a.m., Deputy Renegar heard dispatch state that per the reporting party, domestic violence was occurring in a tent by a white truck to the right of campsite 63. (See, Renegar Decl., ¶ 6.: Call Detail Log, p. 5, Ex. "A"; UMF No. 4; UMF No. 4.)

At the campground, Deputy Renegar spoke with one of the reporting parties whom he later learned to be Joshua Gomez and his girlfriend. (See, Renegar Decl., ¶ 7.) Mr. Gomez indicated he knew where the sound of fighting and arguing was coming from and pointed to campsite 65. (See, Renegar Decl., ¶ 7.)

Deputy Renegar then made contact with Mr. Holloway at campsite 65. (See, Renegar Decl., ¶ 8; UMF No. 5.) Deputy Renegar found Mr. Holloway's denials of domestic violence unconvincing in light of the multiple third party reports that implicated Mr. Holloway. (See, Renegar Decl., ¶ 8; UMF No. 5.) Deputy Renegar could not come up with any reason for the witnesses reporting Mr. Holloway to lie. (See, Renegar Decl., ¶ 8; UMF No. 5.) Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway for battery/domestic violence based on the third party reports against Mr. Holloway. (See, Renegar Decl., ¶ 8; UMF No. 7.) Even so,


2-GottsSER-00126

Deputy Renegar did not detain Mr. Holloway or charge him with a crime at this time based on his inability to locate the victim. (See, Renegar Decl., ¶ 8: UMF No. 8.)

After the encounter with Mr. Holloway, Deputy Renegar went back to his vehicle and drove to the entrance of the park, pulled over and ran Mr. Holloway through the system. (See, Renegar Decl., ¶ 9; UMF No. 9.) At that time, Deputy Renegar discovered that Mr. Holloway was on probation and subject to search and seizure at any time. (See, Renegar Decl., ¶ 9; UMF No. 9.)

After the deputies left, it was quiet for approximately ten minutes. (See, Fuerbach Decl., ¶ 12.) After this period of quiet, however, Jeremy Holloway started going up and down the campground road yelling at the various campsites for the person who called the police to come out. (See, Fuerbach Decl., ¶ 12.) When Mr. Holloway got in front of Mr. Fuerbach's R.V., he stopped and was yelling "I know it was you, mother f*cker. Come out." (See, Fuerbach Decl., ¶ 12.) Due to Mr. Holloway's actions Mr. Fuerbach felt threatened and was afraid of what Mr. Holloway might do. (See, Fuerbach Decl., ¶ 12.)

Within minutes, Deputy Renegar was departing the scene he became aware of another call for service at approximately 4:55 a.m. to O'Neill Park. (See, Renegar Decl., ¶ 10; UMF No. 10.) The reporting party advised that a male subject was walking from campsite to campsite looking for the individual(s) who had called the police. (See, Renegar Decl., ¶ 10; see, Call Detail Log, pp. 3-4, Ex. "A"; UMF No. 10.) Deputy Renegar turned around to return to O'Neill Park. (See, Renegar Decl., ¶ 10.)

While Deputy Renegar was en route to O'Neill Park at approximately 4:58 a.m. Deputy Renegar learned from dispatch that the reporting party stated the male subject was by campsite 61 in a white R.V. (See, Renegar Decl., ¶ 11; See, Call Detail Log, p. 3, Ex. "A"; UMF No. 11.) A few seconds later, Deputy Renegar learned from dispatch that the reporting party was stating that a little girl was screaming and the call was upgraded to a priority one. (See, Renegar Decl., ¶ 12; see, Call Detail Log, p. 3,


2-GottsSER-00127

Ex "A"; UMF No. 12.) A priority one call assignment means that there is a life threatening or potentially life threatening emergency and deputies are to proceed with lights and sirens to the call site. (See, Renegar Decl., ¶ 11.)

Deputy Renegar approached Mr. Holloway for a second time that night. (See, Renegar Decl., ¶ 12; UMF No. 13.) Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway and investigate for the occurrence of any crime based on the reports of the persons reporting the incident to dispatch. (See, Renegar Decl., ¶ 12; UMF No. 13.) However, Deputy Renegar confined his charges to what he personally observed Mr. Holloway do during Deputy Renegar's second encounter with him. (See, Renegar Decl., ¶ 12; UMF No. 14.) Specifically, Deputy Renegar was required to use force against Mr. Holloway to address officer safety concerns during Deputy Renegar's second encounter with him. (See, Renegar Decl., ¶ 13.)

Deputy Renegar also understands that, in addition to himself, Mr. Holloway sued Deputies Gunderson and Billinger for excessive force. (See, Renegar Decl., ¶ 13.) Based on Deputy Renegar's observations during the incident, Deputies Gunderson and Billinger had no physical contact with Mr. Holloway. (See, Renegar Decl., ¶ 13; UMF No. 15.) Based on Rengar's observations, they did not any use force on Mr. Holloway, let alone excessive force. (See, Renegar Decl., ¶ 13; UMF No. 16.)

## III. PLAINTIFF'S CLAIMS ARE BARRED BY QUALIFIED IMMUNITY.

Congress enacted 42 U.S.C. § 1983 in order to provide citizens with a means to seek civil damages against public employees who violate their federal constitutional rights. See, Baker v. McCollan, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution . . .."). However, the Supreme Court has recognized that Section 1983 damage suits against governmental employees entail substantial "social costs" which include the "expense of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office." Harlow v. Fitzgerald, 457 U.S. 800, 814


2-GottsSER-00128

(1982). The qualified immunity doctrine addresses these concerns by providing for pre-trial judicial screening of Section 1983 claims. See, Johnson v. County of Los Angeles, 340 F.3d 787, 791 (9th Cir 2003)(It is for "courts, not juries to settle the ultimate questions of qualified immunity."); Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000)("Whether a public official is entitled to qualified immunity is a question of law."). For this reason, "[q]ualified immunity is particularly amenable to summary judgment adjudication…" Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991).).

The Supreme Court has emphasized that qualified immunity determinations involve two levels of judicial screening. See, Saucier v. Katz, 533 U.S. 194, 201 (2001). To "defeat ... officials' defense of qualified immunity," a plaintiff "must show, 'first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct.' " Hamby v. Hammond, 821 F.3d 1085, 1090 (9th Cir. 2016)(alterations in original)(quoting Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015)(per curiam)). The Court "may decide for [itself] which step of the analysis to undertake first." Id. "Failing at either one will negate [a plaintiff's] eligibility to recover damages." Id.

The plaintiff bears the burden of overcoming qualified immunity. See, Stoudemire v. Mich. Dep't of Corr., 705 F.3d 560, 568 (6th Cir. 2013) ("Ultimately,…the 'burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity.') (internal citation omitted). At the outset, "[i]n seeking to defeat a claim of qualified immunity, the plaintiff bears the burden of proving…that [the] elements of his claim are resolved in his favor…." Brewster v. Board of Educ. of Lynwood Unified School Dist., 149 F.3d 971, 982 (9th Cir. 1998); see, Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011)("'[I]n a § 1983 claim, the plaintiff bears the burden of proof on the constitution deprivation that underlies the claim….") Also, "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." Shafer v. County of Santa Barbara, 868

F.3d 1110, 1118 (9th Cir. 2017)(internal quotation marks and citation omitted). The Supreme Court has recently devoted substantial time and effort to qualified immunity issues – with a particular emphasis on the "clearly established law" aspect of the doctrine. See, White v. Pauly, 137 S.Ct. 548, 551 (2017) (per curiam) (The Court "has issued a number of opinions reversing federal courts in qualified immunity cases" over "the last five years."). As recently emphasized by the Supreme Court, "clearly established" means that, at the time of the public employee's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, a Section 1983 plaintiff must cite pre-incident case law whose facts and holding plainly outlawed the decisions the public employee made during the subject incident. See, District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018)("The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the ***particular circumstances*** before him.")(emphasis added.); Saucier v. Katz, 533 U.S. 194, 202 (2001)(the rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); id. at 209 (a Section 1983 plaintiff must point to case law that states "a clearly established rule prohibiting the [public employee] from acting as he did ... [i]n the ***circumstances presented*** to the [employee].")(emphasis added).

"This requires a high 'degree of specificity'" District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018))(citations omitted), inasmuch as qualified immunity is a "fact-specific, highly contextualized" inquiry. Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016); see, White v. Pauly, 137 S.Ct. 548, 552 (2017)("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."); Kisela v. Hughes, 138 S.Ct. 1148, 1153 (2018)(per curiam)(public employees "are entitled to qualified immunity unless existing precedent 'squarely


2-GottsSER-00130

governs' the specific facts at issue"); Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [public employees] *in this case* that *their particular conduct* was unlawful.")(italics original).

Several corollary rules follow from the forgoing principles. For starters, a Section 1983 plaintiff cannot properly resist qualified immunity by citing general Constitutional language. See, Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)("We have repeatedly told courts. . .not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of ***particular conduct*** is clearly established.")(emphasis added and citations omitted.); Maraziti v. First Interstate Bank of California, 953 F.2d 520, 524 (9th Cir. 1992)("Maraziti presents no case law establishing a constitutional violation in this situation. Instead, he contends that '[c]learly, the IRS agents cannot argue that the United States Constitution is not a well known constitutional development.' Generalized allegations of constitutional violations, however, are insufficient to rebut an official's assertion of a qualified immunity defense.").

Nor do citations to general Constitutional balancing tests give rise to "clearly established" law. See, Sharp v. County of Orange, 871 F.3d 901, 917 (9th Cir. 2017)("Plaintiffs point only to cases that establish the general framework for evaluating how much force is constitutionally excessive. . .. But that is not enough to defeat a qualified-immunity defense."). Similarly, a lack of consensus among courts on the proper resolution of the relevant constitutional fact pattern requires qualified immunity. See, Wilson v. Layne, 526 U.S. 603, 618 (1999)("If judges . . .disagree on a constitutional question, it is unfair to subject [public employees] to money damages for picking the losing side of the controversy.").

A Section 1983 plaintiff also cannot defeat qualified immunity with "factually distinguishable" case cites. Arnsberg v. United States, 757 F.2d 971, 982 (1984); see,


2-GottsSER-00131

Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)(qualified immunity granted where "[o]ur case differs materially" from the facts in precedent cited by plaintiff.); id. ("Plaintiffs offer only one controlling case that they believe meets [the 'clearly established' law] standard, . . . but we reject it as too dissimilar on its facts."); Shafer v. County of Santa Barbara, 868 F.3d 1110, 1117–18 (9th Cir. 2017)("We are mindful of the Supreme Court's pronouncement . . . that, to satisfy th[e]. . .qualified immunity analysis, we generally must 'identify a case where an officer acting under similar circumstances . . .was held to have violated the [Constitution].' We are aware of no such case. [Plaintiff] cites four cases with comparable degrees of force used by officers, but none of which involved a challenging environment or an act of physical resistance or obstruction by the arrestee.")(citation omitted); S.B. v. County of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017)("We hear the Supreme Court loud and clear. Before a court can impose liability on Moses, we must identify precedent as of August 24, 2013 — the night of the shooting — that put Moses on clear notice that using deadly force in ***these particular circumstances*** would be excessive.")(emphasis added); see also, Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986)(this Circuit does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians.").

In short, in order to overcome qualified immunity, a plaintiff must cite pre-incident case law whose factual particulars and holdings made the illegality of the public employee's conduct "beyond debate" at the time s/he acted. Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011); see, City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 504 (2019)("existing precedent must place the lawfulness of the particular [action] beyond debate....")(quoting District of Columbia v. Wesby, 138 S.Ct., at 581); White v. Pauly, 137 S.Ct. at 551 ("existing precedent must have placed the statutory or constitutional question beyond debate.")(citations and internal quotes


2-GottsSER-00132

omitted)1. This "demanding standard" protects "all but the plainly incompetent or those who knowingly violate the law." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).[2]

Here, even if Plaintiffs could prove violations of a constitutional right (they cannot), Defendants would still be entitled to summary judgment as a matter of law because that right was not "clearly established". See, City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 504 (2019).

**A. Plaintiff's "False Arrest" Claim is Meritless.**

**(i) Plaintiff Cannot Establish a Constitutional Violation.**

Holloway initially claims that "Defendants DEPUTY CHAD RENEGAR, Deputy JOEL GONZALEZ, Deputy KEVIN PAHEL, Deputy BRANDON BILLINGER, Deputy MARK BORBA, Deputy JAMESON GOTTS [and] Deputy JUSTIN GUNDERSON . . .subjected Plaintiff to unreasonable detention, . . .false arrest, and . . . arrested Plaintiff without probable cause or justification." (See, Plaintiff's SAC ¶ 10). But Plaintiff has no facts to support these claims and they therefore fail under the first level of qualified immunity analysis. See, Saucier v. Katz, supra, 533 U.S. at 201 (The first qualified immunity inquiry asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

---

[1] Qualified immunity's refined formulation matches up with the "abuse of discretion" standard already employed in most jurisdictions to review trial court orders. See, e.g., Gonzales v. Nork, 20 Cal. 3d 500, 507 (1978) ("As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of the action.'")

[2] Accordingly, as the Ninth Circuit has recently explained, "state officials are entitled to qualified immunity so long as 'none of our precedents squarely governs the facts'" they confronted. Hamby, 821 F.3d at 1091(citations omitted). And if "it is at least debatable that the prison officials ... complied with the [Constitution]," then they "are ... entitled to qualified immunity." Id. at 1096; see, Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986) (in qualified immunity cases, this Circuit does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians.").

A police officer may, of course, temporarily detain a person for investigatory purposes if the officer has "reasonable suspicion" the person is engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 20-21 (1968); see, United States v. Arvizu, 534 U.S. 266, 273 (2002) ("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot,'….")(citations omitted.); see also, People v. Bennett, 17 Cal. 4th 373, 386 (1998), as modified (Apr. 1, 1998)(A police officer "may temporarily detain a suspect based only on a 'reasonable suspicion' that the suspect has committed or is about to commit a crime.").

Probable cause to arrest, on the other hand, "exists when, under the totality of the circumstances known to the arresting officer…, a prudent person would believe the suspect had committed a crime." Dubner v. City & County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001). Probable cause requires "***only the probability***, and not a prima facie showing, of criminal activity." Franklin v. Fox, 312 F.3d 423, 438 (9th Cir. 2002) (citations omitted; emphasis added). "Requiring more would unduly hamper law enforcement." Beck v. Ohio, 379 U.S. 89, 91 (1964).

Against this backdrop, Officer Renegar had a wealth of compelling facts justifying Holloway's detention or arrest. As noted above, immediately before initially encountering Holloway, Deputy Renegar received a radio report that Holloway was beating a woman. (UMF Nos. 2-4). An eyewitness to the reported abuse, Brian Fuerbach, has confirmed that he witnessed the beating in issue – and that he made a "911" call to request law enforcement assistance for the apparent victim. (UMF Nos. 1 and 2). Once Renegar arrived on scene, witnesses Joshua Gomez and his girlfriend also advised the deputy that he knew where the sound of fighting and arguing was coming from and pointed to Holloway's campsite (number 65). (UMF No. 4).

Following a discussion, Deputy Renegar concluded that Holloway's denials of the reports against him were unconvincing. (UMF Nos. 5 and 6). He also concluded that the third party complainants against Holloway had no motive to lie about what


2-GottsSER-00134

they say they saw and heard. (Id.)

In short, there was no obvious innocent explanation for all these converging and incriminating facts, and even if there were "[i]t is not uncommon for seemingly innocent conduct to provide the basis for probable cause." United States v. Rodriguez, 869 F.2d 479, 483 (9th Cir. 1989). Based on the totality of the circumstances, even the most naïve observer would conclude that Holloway had committed, or had attempted to commit, a variety of arrestable crimes. These include assault and battery. See, California Penal Code § 245(4) ("Any person who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."); California Penal Code § 242 ("A battery is any willful and unlawful use of force or violence upon the person of another."); California Penal Code § 243.2(a)(1) (separately criminalizing conduct "when a battery is committed on . . .park property").

The loud, middle of the night ruckus Holloway caused also created probable cause for a "Disturbing the Peace" arrest. See, California Penal Code § 415(2) (". . .the following persons shall be punished by imprisonment in the county jail for a period of not more than 90 days, a fine of not more than four hundred dollars ($400), or both such imprisonment and fine: . . .Any person who maliciously and willfully disturbs another person by loud and unreasonable noise. . ..")[3]

But there is more. First, police radio bulletins of illegal conduct, like the one Renegar received, routinely give rise to probable cause to arrest. See, e.g., Whiteley v. Warden, 401 U.S. 560, 568 (1971)(" We do not, of course, question that the . . . police

---

[3] The United States Supreme Court held that the existence of "probable cause" to arrest under any penal code section defeats a "false arrest" claim, even if the arresting officer did not actually invoke that section. See, Devenpeck v. Alford, 543 U.S. 146, 152-153 (2004).

were entitled to act on the strength of the [police] radio bulletin" in forming their reasonable suspicion/probable cause opinion.); United States v. Mayo, 394 F.3d 1271, 1275 (9th Cir. 2005) (As a matter of Fourth Amendment search and seizure law, an officer is entitled to rely on information learned from a police "dispatcher [who] told him to investigate suspicious narcotics activity and gave him a description of the cars involved . . ..")

And this is particularly so where, as here, the radio bulletin was based on eyewitness "911" reports of illegal conduct – like that made by Mr. Fuerbach in this case. Indeed, "[a] police officer, when making a probable cause determination, is entitled to rely on the allegations of a victim or witness that a crime has been committed." Mason v. Town of New Paltz Police Dep't, 103 F. Supp. 2d 562, 566 (N.D.N.Y. 2000). Courts have made the point over and over again. See, e.g., Krainski v. State ex rel. Bd. of Regents, 616 F.3d 963, 969 (9th Cir. 2010)("We conclude that qualified immunity applies, as 'a reasonable police officer could have believed that his or her conduct was lawful' when arresting a suspect following a report from two university employees and a student alleging an attack."); Crockett v Cumberland College, 316 F.3d 571, 584 (6th Cir. 2003)("It is clearly established that reliance on the account of an eyewitness is sufficient to establish probable cause."); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) ("It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."); Spiegel v. Cortese, 196 F.3d 717, 726 (7th Cir. 1999)("So long as a reasonably credible witness . . . informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity [even] if the arrestee is later found innocent."); see also, People v. Thompson, 38 Cal. 4th 811, 819 (2006)(California Supreme Court concluding that a report by a private citizen to police that the defendant had thrown an empty vodka bottle from his car, passed out, woke up, drove away erratically and too


2-GottsSER-00136

fast and ran red lights and stop signs, established probable cause justifying the warrantless arrest of the driver.)[4]

The second Holloway incident in this case – just moments after the first – also requires dismissal of Plaintiff's "False Arrest" claim. Specifically, probable cause to arrest Holloway also existed based on the subsequent radio report that Plaintiff was making loud, disturbing statements to other campers in the middle of the night. (UMF Nos. 10-13). The radio report of Holloway's new round of misconduct, backed up again by eyewitness observations, gave officers probable cause for Holloway's arrest on another count of "Disturbing the Peace" charges. See, California Penal Code § 415(2)(disturbing the peace includes conduct by "[a]ny person who maliciously and willfully disturbs another person by loud and unreasonable noise. . ..")

In short, as the Deputy Defendants had "reasonable suspicion" to detain (and "probable cause" to arrest) Holloway, Plaintiff's First Claim for unlawful "Detention and Arrest" fails ***as a matter of law.*** See, Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his Section 1983 claim for false arrest…, [plaintiff] would have to demonstrate that there was no probable cause to arrest him."); Bonomi v. City & Cty. of San Francisco, 2012 WL 2935624, at *4 (N.D.Cal. 2012), citing, Terry v. Ohio, 392 U.S. 1, 20–21 (1968) ("The . . . cause of action for unlawful detention and confinement fails because. . .[a]n investigatory detention — a brief, warrantless seizure by police officers — is lawful if based on reasonable suspicion."); Blankenhorn v. City of Orange, 485 F.3d 463, 475 (9th Cir. 2007) ("[O]ur inquiry is not whether [plaintiff] ***was*** trespassing. Rather, it is whether a reasonable officer had probable cause to think he could have been.")(emphasis original.).

---

[4] Mr. Gomez's on scene identification of Holloway as a lawbreaker only adds additional witness support to the probable cause calculus. (UMF No. 4).

/ / /

**(ii) There Was No "Clearly Established" Law Giving Deputies Notice That Their Conduct Was Unconstitutional.**

Plaintiff's Section 1983 "False Arrest" claim otherwise fails under the second level of qualified immunity analysis, which, as noted above, requires him to cite factually analogous case law which would have plainly told Deputies that their challenged conduct was unconstitutional. See, White v. Pauly, 137 S.Ct. 548, 552 (2017)("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."); Kisela v. Hughes, 138 S.Ct. 1148, 1153 (2018)(per curiam)(public employees "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue"); Saucier v. Katz, 533 U.S. 194, 209 (2001) (A Section 1983 plaintiff must identify case law "demonstrating a clearly established rule prohibiting the officer from acting as he did...[i]n the circumstances presented to [the] officer...."). In the absence of such authority, a defendant officer is "entitled to qualified immunity, and the suit should [be] dismissed . . .." Saucier v. Katz, 533 U.S. 194, 209 (2001); see, De la Cruz v. Kauai County, 279 F.3d 1064, 1069 (9th Cir. 2002) (Where a Section 1983 plaintiff fails to "cit[e] any case" barring the officer's conduct, qualified immunity required because "[i]t would not be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.")(citations omitted).

Put simply, at the time the Deputies in this case acted, there was no factually analogous case telling them that Holloway could not be suspected for assault, battery and disturbing the peace. And even if the law was fairly debatable on this point, Plaintiff's case would still fail under a separate level of qualified immunity analysis. As noted above, at this stage, Plaintiff must demonstrate — through citation to factually relevant case law — that the issue Deputies faced ***was not even subject to reasonable debate***. See, Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1076 (9th Cir.2011) (officers are entitled to qualified immunity whenever "it is ***reasonably***





 2-GottsSER-00138

***arguable*** that there was probable cause for arrest.")(emphasis original); Ismail v. County of Orange, 676 Fed.Appx. 690, 692 (9th Cir. 2017) ("Arguable probable cause to support an arrest is all that is necessary to protect an officer from liability under § 1983."); Baker v. Racansky, 887 F.2d 183, 187 (9th Cir. 1989) ("[L]aw enforcement personnel who have at least arguable probable cause" under existing law are entitled to qualified immunity.); see also, Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (plaintiff must show that "'existing precedent . . .placed the statutory or constitutional question' confronted by the official '***beyond debate.***'") (emphasis added and citations omitted.)[5]

### B. Plaintiff's "Excessive Force" Claim Against Two Deputy Defendants Is Meritless.

Plaintiff alleges a Section 1983 "excessive force" claim against a host of Deputies – even though at least two of them used no force at all in the incident of which Holloway complains. (See, Plaintiff's SAC ¶ 10). Specifically, Deputies Billinger and Gunderson used no force against Holloway during his arrest. (UMF No. 13). Needless to say, an "excessive force" plaintiff cannot reach a jury against a peace officer defendant when s/he used no force at all. See, e.g., Susag v. City of Lake Forest, 94 Cal. App. 4th 1401, 1415-1416 (2002)("We reject [plaintiff's] contention that summary judgment was improper because the deputies can be liable for using excessive force even if they had no physical contact with him."); Collins v. Nagle, 892 F.2d 489, 487 (6th Cir. 1989)(court rejected a claim that an officer violated an individual's Fourth Amendment rights when he pointed a gun at the individual; a "show of force" is not tantamount and "the actual use of force."); Jackson v. Sauls,

[5] ***Attempted*** crimes are also punishable in California. See, California Penal Code § 21a. And "[a] plaintiff suing for "false arrest" must show that the police lacked probable cause to arrest him for ***any*** unlawful conduct." Sealey v. Fishkin, 1998 WL 1021470, at *4 (E.D.N.Y. 1998)(emphasis added); see, Barry v. Fowler, 902 F.2d 770, 773 n. 5 (9th Cir. 1990) (same); Sorgen v. City and County of San Francisco, 2006 WL 2583683, at *6 (N.D.Cal. 2006)(same). Plaintiff cannot meet this burden here.

206 F.3d 1156, 1171-72 (11th Cir. 2000)(court found no excessive use of force when the officer drew his gun and required the appellant to lie on the ground during an investigatory stop.); Edwards v. Giles, 51 F.3d 155, 157 (8th Cir. 1995)(court rejects claim that the mere pointing of a gun at a suspect constituted excessive force.)

Plaintiff has no "clearly established" law to the contrary. See, Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (plaintiff must show that "'existing precedent . . .placed the statutory or constitutional question' confronted by the official '***beyond debate.***'") (emphasis added and citations omitted.) Accordingly, for this reason too, dismissal is required. Id.

**C. Plaintiff's "Illegal Search" Claim Is Meritless.**

Plaintiff's "illegal search" claim is also barred by qualified immunity. (See, Plaintiff's SAC ¶ 10). As noted above, Deputy Renegar received a radio report during the incident that Holloway was on probation, one of the terms of which authorized a search at law enforcement discretion. (UMF No. 9). State court probation terms of this type are fully constitutional. See, United States v. Knights, 534 U.S. 112, 114 (2001)(Supreme Court uphold a search that police had conducted pursuant to the terms of a defendant's probation, which authorized searches "with or without a search warrant, warrant of arrest or reasonable cause.").

Holloway has no "clearly established" law to the contrary. See, Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (plaintiff must show that "'existing precedent . . .placed the statutory or constitutional question' confronted by the official '***beyond debate.***'") (emphasis added and citations omitted.) Accordingly, for this reason too, dismissal is required. Id.

**IV. CONCLUSION.**

Plaintiff's case includes too many Defendants and too many theories that cannot survive scrutiny under qualified immunity principles. And the qualified immunity issue is for resolution by the Court alone. See, Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000) ("Whether a public official is entitled to qualified immunity is a

question of law."); Johnson v. County of Los Angeles, 340 F.3d 787, 791 (9th Cir. 2003) (It is for "courts, not juries to settle the ultimate questions of qualified immunity.") For this reason, and for the other reasons stated herein, the Court should grant Defendants' Motion and order dismissal as prayed. See, Fed. R. Civ. P. 56.

DATED: October 23, 2020

Respectfully submitted,
**LYNBERG & WATKINS**

By: */s/ S. Frank Harrell*
**S. FRANK HARRELL**
**TAMARA HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson


2-GottsSER-00141

4845-4624-6863, v. 4


2-GottsSER-00142

**MKRTCHYAN LAW**
Narine Mkrtchyan, Esq. (SBN. 243269)
1010 North Central Avenue, Suite 204
Glendale, CA 91202
Telephone No. (818) 388-7022
Web: www.narinelaw.com
Email: narine56@msn.com

Attorney for Jeremy Holloway

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to: Hon. David O. Carter, Courtroom 9D*<br><br>*Assigned for Discovery Purposes to: Hon. Douglas F. McCormick, Courtroom 6B*<br><br>**PLAINTIFF'S DISPUTED STATEMENT OF FACTS/*MONELL* IN OPPOSITION TO DEFENDANT COUNTY OF ORANGE'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>**Date: December 14, 2020**<br>**Time: 8:30 a.m.**<br>**Dept.: 9D**<br><br>*Trial Date: January 19, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |




2-GottsSER-00143

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that PLAINTIFF will and hereby oppose the DEFENDANT COUNTY OF ORANGE'S Motion for Summary Judgment and Summary Adjudication based on the following disputed set of facts.

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Plaintiff Jeremy Holloway


2-GottsSER-00144

| **DEFENDANTS' FACTUAL STATEMENTS** | **PLAINTIFF'S DISPUTE OF DEFENDANT'S FACTS** |
|---|---|
| 1. "It is the policy, practice and custom of the Orange County Sheriff's Department to treat all citizens, arrestees, detainees and/or inmates in a legal, lawful, and professional manner, and to only use such force that is reasonable under the circumstances." [Declaration of Jon Briggs ("Briggs Decl."), ¶ 4.] | Disputed.<br>1) Plaintiff alleges the County and the Sheriff's Department promote and have historically promoted the code of silence that enables officers, including the named parties in this case, to falsify the true version of events, use excessive force in detention, fail to report the use of force to their superiors and falsify official reports to recommend criminal charges for detainees, as was the case with Plaintiff and other similarly situated individuals. (Roger Clark Declaration, pp. 30-36)(Exhibit 18); Plaintiff's Separate Statement of Disputed Material Facts; Plaintiff's Disputed Statement of Facts; Declaration of Counsel Narine Mkrtchyan; See Mark Hanalei Matias v. County of Orange et al. No. 8:18-cv-02209-AG-KES (Exhibit 19); M. H. et al v. County of Orange et al. 8:19-cv-00549-JVS-ADS (Exhibit 20); Alisha Maldonado v. County of |

| | |
|---|---|
| | Orange et al. No. 8:19-cv-00883-JLS-JDE (Exhibit 21); Susan Peck et al v. County of Orange et al. No. 2:19-cv-04654-DSF-SS (Exhibit 22); https://ktla.com/2018/10/19/video-assistant-public-defender-alleges-excessive-force-in-stanton-arrest-sheriffs-department-stands-behind-deputy/(Exhibit 23); https://www.latimes.com/local/lanow/la-me-ln-deputy-force-20181018-story.html(Exhibit 24); https://www.pressreader.com/usa/los-angeles-times/20090423/281599531440084 (Code of Silence' Remark Highlights O.C. Rift)(Exhibit 25)<br><br>2) Plaintiff also alleges the County fails to properly supervise these Defendants and that its hands-off policy and practice led directly to the violation of Plaintiff's rights. (Roger Clark Declaration, pp. 30-36, Exhibit 18) When Plaintiff filed a citizen complaint to the OCSD, the |




2-GottsSER-00146

| | |
|---|---|
| | Department did not do any investigation. Instead, despite the conflict of interest, the Department assigned the complaint to the same sergeant, Sergeant Stewart Rawlings, who had approved of the use of force by the deputies, who failed to interview the Plaintiff, the victim here, failed to review the Plaintiff's medical records and failed to separately interview the involved officers, the Defendants here.<br><br>Based on the token personnel complaint investigation and shallow use of force investigation, the Department ratified the conduct of these Defendants with respect to the Plaintiff, as the Department has done so in the past in numerous other incidents, available to Plaintiff via discovery in this case. Declaration of Counsel Narine Mkrtchyan. The specific facts below demonstrate the Department's actions and omissions to properly conduct an investigation |


2-GottsSER-00147

| | |
|---|---|
| | into the personnel complaint and use of force:<br>A. The Department's Mere Token Personnel Complaint Investigation<br>• Holloway's attorney wrote a letter of complaint, which reads, "Holloway was caused emotional trauma and major injuries to his upper torso, head, and eyesight, eyelid laceration, cervical strain, and a closed-head injury along with rib contusions." [Rawlings Deposition (Exhibit 10), pp. 76-77, 138].<br>• Rawlings testified that he has a duty to investigate a personnel complaint. [Id. at 289]. And the scope of a personnel complaint investigation centers around the complaint. [Id.].<br>• Rawlings could not unequivocally testify on whether he investigated Holloway's personnel complaint. [Id. at 25].<br>• Rawlings testified to not remembering whether he |




2-GottsSER-00148

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 100 of 293

| | |
|---|---|
| | performed any investigation into Holloway's complaint despite a lieutenant assigning the investigation to Rawlings, Rawlings signing and acknowledging receipt of Holloway's complaint, and Rawlings reviewing Holloway's complaint before the deposition. [Id. at 25-28].<br>• Rawlings concluded that, "The use of force incident was thoroughly investigated at the time and found to be reasonable and within department policy." [Id. at 73-74].<br>• Rawlings made this conclusion even though he did not inquire or request access from internal affairs on the officer's, who were involved in the Holloway complaint, history of misconduct or use of force reports. [Id. at 40, 46-47].<br>• Rawlings did not have access to information that Renegar is under criminal investigation for criminal |



2-GottsSER-00149

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 101 of 293

| | |
|---|---|
| | deceit by the District Attorney's Office. [Id. at 27-47].<br>• Rawlings only knew of the criminal investigation into Renegar on the day before his deposition on August 19, 2020. [Id. at 41-43].<br>• Rawlings testified that internal affairs investigations are confidential such that even he, as the supervisor, is not privy to information regarding a criminal investigation into one of his own subordinates. [Id. at 43].<br>• Rawlings did not know of Renegar's approximately 30 use of force incidents while under his own supervision. [Id. at 108-09].<br>• Rawlings did not visit Holloway at the hospital or jail to find out more information about Holloway's injuries, and even though he had an opportunity to acquire a HIPAA waiver. [Id. at 132-136].<br>• Rawlings has never used a HIPAA waiver before during his use of |



2-GottsSER-00150

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 102 of 293

| | |
|---|---|
| | force investigations, and Rawlings testified that he could not know of additional injuries sustained by complainants of police excessive force without a HIPAA waiver. [Id. at 140-42].<br>• Rawlings also did not attempt to seek further information from Holloway after receiving the personnel complaint investigation, including allegations that Holloway violated Penal Code 69. [Id. at 70-71].<br>• Rawlings did not make any inquiries during his internal investigation into Holloway's allegations that he was falsely arrested and charged with a felony. [Id. at 71].<br>• Disposition by Captain Sheryl Dubsky and Lieutenant Gonzalez exonerating these Defendants and finding the complaint unfounded. [Id. at 322-25].<br><br><u>B. The Shallow Use of Force Investigation</u> |



2-GottsSER-00151

| | |
|---|---|
| | • Rawlings was a supervisor for the Orange County Sheriff's Department where he was in charge of use of force investigations. [Rawlings Deposition (Exhibit 10), p. 17].<br>• Rawlings testified that his duty as a supervisor includes handling a use of force investigation. [Id. at 287-88]. And that a use of force investigation includes detailing basic facts of who was at the incident, what type of force was used, interviewing independent witnesses, reviewing videos, and providing an independent judgment whether the force used was within policy and whether the force used was justified. [Id. at 287-88, 289].<br>• At the time of the incident involving Holloway, the OCSD had an "Early Warning System" in place, which tallied the amount of lawsuits and use of force incidents a police officer had. |




2-GottsSER-00152

| | |
|---|---|
| | [Id. at 22].<br>• Rawlings did not have access to the Early Warning System even as a supervisor, which contains the profile of the officers that he supervises. [Id. at 29].<br>• Rawlings is not provided access to prior use of force reports on officers that he is supervising, which prevented Rawlings from investigating use of force incidents by any of the officers involved in Holloway's complaint. [Id. at 32-39].<br>• As a supervisor, Rawlings has never requested for a use of force incident report or misconduct history on any of the officers he supervises. [Id. at 36]. And Rawlings cannot access such information even as a supervisor. [Id.].<br>• Rawlings knew that Renegar rushed at Holloway and punched him; that Holloway sustained a bleeding wound to the head [Id. |




2-GottsSER-00153

| | |
|---|---|
| | at 90]; that the officers tased Holloway [Id. at 117]; that Holloway was kneed in the head while on the ground [Id. at 94].<br>• Rawling's PVS shows that Rawlings asked Holloway why he did not get on the ground when ordered to do so. [Id. at 50]. Holloway told Rawlings after the use of force, "I didn't do anything wrong." [Id. at 186]. While interacting with Holloway shortly after the use of force incident, Rawlings did not ask Holloway about the use of the taser or the source of the head injury during his use of force investigation. [Id. at 204-05, 207].<br>• Rawlings did not ask Holloway about the taser used against him, the number of jolts deployed, and other questions. [Id. at 117].<br>• Rawlings could not specifically recall what use of force inquiries he performed or whether he conducted any investigation after |



 2-GottsSER-00154

| | |
|---|---|
| | learning about Holloway being kneed in the head. [Id. at 94].<br>• Holloway's attorney wrote a letter, which reads, "Holloway was caused emotional trauma and 15 major injuries to his upper torso, head, and 16 eyesight, eyelid laceration, cervical strain, and a 17 closed-head injury along with rib contusions." [Id. at 138].<br>• The use of force investigation only addressed the eyebrow laceration. [Id.].<br>• Rawlings failed to investigate inconsistencies between Renegar's police report and a video recording. [Id. at 221-37, 249-52].<br>• Rawlings failed to investigate inconsistencies in the police reports written by the different deputies. [Id. at 258-78].<br>• Rawlings did not obtain a copy of the EMS report from the fire department to support his use of force report, and did not request a |

| | |
|---|---|
| | HIPAA waiver to obtain such a report. [Id. at 285-86]. <br>• The Department's use of force policy 300.7 reads, "Any employee involved in and who witnesses a use of force shall notify supervisor as soon as possible." Rawlings has read the policy. [Id. at 291-92]. Rawlings testified that he did not expect witnesses to a use of force incident to come forward with information about another person's use of force. [Id. at 292-98]. <br>• The Department's use of force policy 300.9 reads that an investigation requires, "Separately interview[ing] the subjects whom the force was applied" and that "The supervisor shall respond and conduct an investigation of the incident." [Id. at 299, 301]. Rawlings testified that according to basic police investigative tactics, when |



2-GottsSER-00156 2-GottsSER-00156

| | |
|---|---|
| | attempting to acquire information from multiple suspects, the suspects are interviewed separately. [Id. at 299-300]. But, Rawlings interviewed Renegar and Borba together. [Id. at 299-306].<br>• The Department policy reads, "Prior to the investigatory questioning, the supervisor will advise the subject of their Miranda Rights warning due to possibly or likely eliciting a criminal incriminating response. The entire interview shall be recorded." [Id. at 308]. Rawlings testified that he did not know that portions of Holloway's interview was not recorded." [Id. at 309-10].<br>• Subparagraph D of 300.9 of the Department's policy reads, "…photographs have been taken of any areas involving visible injury or complaint of pain as well as overall photographs of |

| | |
|---|---|
| | uninjured areas consistent with PC 4030." [Id. at 310]. Rawlings could not conclusively testify whether he had photos of Holloway's punctured skin from the taser deployment [Id. at 311]; ad photos of Holloway's body parts, such as thighs, calves, and legs to show the taser contact [Id. at 312-13]. Rawlings could only remember photos of Holloway's head and hands. [Id. at 313].<br>• Subparagraph E of 300.9 of the Department's policy reads "Identify and interview <u>any witnesses</u> not already included in the related reports." [Id. at 313 (underline added)]. Rawlings was not aware that a young woman, who was Deputy Billinger's ride-a-long, had witnessed the incident with Holloway. Rawlings did not attempt to identify or connect with this witness. [Id. at 58-59, 63]. |




2-GottsSER-00158

| | |
|---|---|
| | • Rawlings failed to investigate Billinger with respect to his statement of not being at the campsite during the use of force incident, which is inconsistent with images contained in Borba's video. [Id. at 313-321].<br>• Rawlings wrote the following witness statement and summary based on an interview with the informant Joshua Gomez, which he never showed to the informant. [Id. at 125-26]:<br><br>*One of the responding deputies asked him if he knew where the suspect that had been yelling and going through other people's campsites. "He told the deputy that it was the same subject that they had talked to earlier in the evening about the domestic violence incident. He pointed out the suspect to the deputy. He saw the deputies confront the suspect at his campsite. He heard them give him verbal commands to get on the* |




2-GottsSER-00159

| | |
|---|---|
| | *ground, but the suspect was noncompliant, arguing that he hadn't done anything wrong. He saw the deputies try to take control of the suspect and get him into handcuffs. But the suspect, quote, 'wasn't having it.' "He saw the suspect physically resisting the deputies while they were on the ground struggling to get him handcuffed. He heard the deputy give the suspect warnings that he was going to tase him if he continued to resist. He then heard the sound of the taser deploy. The suspect remained noncompliant until he was in handcuffs.* [Id. at 122-23 (underline added)].<br><br>• The witness statement crafted by Rawlings is contradicted by testimony that Renegar fired his taser into Holloway while Holloway was still standing and before any officer touched Holloway. [Gomez Deposition (Exhibit 3), pp. 109-10]. |




2-GottsSER-00160

| | |
|---|---|
| | • Gomez testified that he was unable to see the events on the ground because there was an obstruction to his view. [Id. at 109-10, 118-19, 129-32].<br>• Gomez also testified he never pointed out the suspect because he was not asked nor would he be able to identify him because he had not seen the man involved in the domestic dispute. [Id. at 28-34, 38-40, 54-56, 60, 126-28].<br>• Rawlings also made a statement about Holloway being drunk and wanting to fight everyone despite Rawlings not hearing any broadcast or report from anyone and not having any clear basis for making such a statement. [Rawlings Deposition, Exhibit 10 at 84-88].<br><br>Deputies Renegar and Gotts had amassed a lengthy use of force history which went ignored by the Department in their deliberate |

| | |
|---|---|
| | indifference to the rights of detainees. [Renegar and Gotts RFA responses](Exhibits 17, 26). When Deputy Renegar became a subject of a criminal investigation by the OC District Attorney's Office for allegations related to professional dishonesty and falsification, there is no evidence that the Department disciplined him as a result. [Renegar Deposition (Exhibit 2), p. 31; Rawlings Deposition (Exhibit 10), pp. 41-43].<br><br>Similar to the Plaintiff's incident, there is evidence that the Internal Affairs has not investigated other citizen complaints: https://www.ocregister.com/2019/12/05/dozens-of-internal-affairs-complaints-allegedly-buried-by-oc-sheriffs-department-without-investigation/(Exhibit 27).<br><br>The Department has a history of not disciplining but promoting rogue |




2-GottsSER-00162

| | |
|---|---|
| | deputies for misconduct: https://www.ocregister.com/2020/03/02/this-oc-sheriffs-deputy-mishandled-evidence-92-of-the-time-and-got-a-promotion/(Exhibit 28). |
| 2. "This was the policy of the Orange County Sheriff's Department at the time of the incident in this case and at all times before and after that date." [Briggs Decl. ¶ 4.]. | Disputed. See Fact No. 1 above. |
| 3. It was "the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to conduct themselves in a reasonable and professional manner consistent with the federal Constitution and the laws of the State of California." [Briggs Decl. ¶ 6]. | Undisputed. Plaintiff's allegations under *Monell* are not based on failure to train, but failure to supervise/ratification, and promoting a code of silence. See Fact No. 1 above. |
| 4. "Further, it was the policy of the Orange County Sheriff's Department to properly and adequately train its personnel to only use such force as is reasonable under the circumstances | Undisputed. Plaintiff's allegations under *Monell* are not based on failure to train, but failure to supervise/ratification, and promoting a code of silence. See |




2-GottsSER-00163

| | |
|---|---|
| under the Fourth Amendment." [Briggs Decl. ¶ 5, Force Policy, Ex. A.]. | Fact No. 1 above. |
| 5. "[A]ll sworn members of the Orange County Sheriff's Department receive extensive training on the application of reasonable force, professional deportment as well as professional communication skills and conflict resolution (including verbal and non-verbal techniques for responding to hostile situations). This training begins during the Sheriff's Academy and continues throughout the careers of each sworn peace officer (through both formal classroom training and application exercises, and by way of on-the-job training." [Briggs Decl. ¶ 6]. | Undisputed. Plaintiff's allegations under *Monell* are not based on failure to train, but failure to supervise/ratification, and promoting a code of silence. See Fact No. 1 above. |

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Jeremy Holloway





2-GottsSER-00164

**MKRTCHYAN LAW**
Narine Mkrtchyan, Esq. (SBN. 243269)
1010 North Central Avenue, Suite 204
Glendale, CA 91202
Telephone No. (818) 388-7022
Web: www.narinelaw.com
Email: narine56@msn.com

Attorney for Jeremy Holloway

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE,<br>DEPUTY CHAD RENEGAR, individually and as a peace officer,<br>DEPUTY JOEL GONZALEZ, individually and as a peace officer,<br>DEPUTY KEVIN PAHEL, individually and as a peace officer,<br>DEPUTY BRANDON BILLINGER, individually and as a peace officer,<br>DEPUTY MARK BORBA, individually and as a peace officer,<br>DEPUTY JAMESON GOTTS individually and as a peace officer,<br>DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 9D*<br><br>*Assigned for Discovery Purposes to:*<br>*Hon. Douglas F. McCormick, Courtroom 6B*<br><br>**PLAINTIFF'S <u>DISPUTED</u> STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>**Date: December 14, 2020**<br>**Time: 8:30 a.m.**<br>**Dept.: 9D**<br><br>*Trial Date: January 19, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |


2-GottsSER-00165

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that PLAINTIFF will and hereby oppose the DEFENDANTS' DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON Motion for Summary Judgment and Summary Adjudication based on the following disputed set of facts.

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Plaintiff Jeremy Holloway


2-GottsSER-00166

Case: 25-7132, 08/25/2026, DktEntry: 44.3, (118 of 293)

**ISSUE 1: Plaintiff's First Claim under 42 U.S.C. §1983 for "Detention and Arrest" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is <u>NOT</u> barred by qualified immunity.**

| <u>**DEFENDANTS' FACTUAL STATEMENTS**</u> | <u>**PLAINTIFF'S DISPUTE OF DEFENDANT'S FACTS**</u> |
|---|---|
| 1. On January 21, 2018, Brian Fuerbach called 9-1-1. [Declaration of Brian Fuerbach ("Fuerbach Decl."), ¶ 9]. | Undisputed. |
| 2. Brian Fuerbach reported to 9-1-1 that he had heard a male and female yelling, fists being landed on somebody, and a woman yelling to stop hitting her, that she's just a girl. [Fuerbach Decl., ¶ 9]. | Disputed in part. Fuerbach did not actually see the male and female who were making the noise, yet he reported that fists landed on somebody. [Fuerbach Deposition, p. 17-18](Exhibit 1). Fuerbach only saw the tent moving and perceived as if people were moving in the tent. He did not come out of his tent to see who was involved. He could not see which campsite it was coming from and only provided general information and potential |



 2-GottsSER-00167

| | |
|---|---|
| | location about what he and his wife heard to the dispatch [Id. at 19-20].<br><br>Deputy Renegar testified that Fuerbach told him that the domestic disturbance was coming from Holloway's campsite 65. [Renegar Deposition, pp. 51-55](Exhibit 2). However, Deputy Renegar later testified that he does not recall whether Fuerbach told him the specific campsite number or only the direction where the alleged domestic disturbance was coming from. [Id. at 110].<br><br>Fuerbach denies he ever spoke with the officers when they first arrived to the campground and contacted Plaintiff. [Fuerbach Deposition, at 21-22](Exhibit 1). He testified that they came to speak with him only after the use of force and arrest of Holloway after the second encounter finished [Id. at 40-41] |

| | |
|---|---|
| | Deputy Renegar testified that the allegations of a domestic disturbance incident were unfounded and that there was no female with Holloway. [Renegar Deposition, pp. 108, 114, 121-122](Exhibit 2). |
| 3. On January 21, 2018 at approximately 3:40 a.m., Deputy Renegar became aware of a call for service to O'Neill Park, an unincorporated area of the County of Orange. This call at 3:40 a.m. consisted of the reporting party advising that there was a male versus female in a physical altercation that was disturbing the peace occurring to the right of campsite 63. [Declaration of Chad Renegar ("Renegar Decl.") ¶ 4; Call Detail Log, p. 5, Ex. "A" to the Renegar Decl.]. | Undisputed. |
| 4. At approximately 4:07 a.m., Deputy Renegar heard dispatch state that per the reporting party, domestic violence was occurring in a tent by a white truck to the right of campsite 63. Once at the scene, witness Joshua Gomez advised Deputy Renegar that he heard the sounds of fighting | Disputed. Gomez did not advise Deputy Renegar that he heard sounds specifically coming from Holloway's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he |


2-GottsSER-00169

| | |
|---|---|
| and arguing coming from Holloway's campsite (65). [Renegar Decl., ¶ 6 and 7: Call Detail Log, p. 5, Ex. "A"]. | believed the sounds were coming from by pointing to a general south-southeast direction with multiple campsites. [Gomez Deposition, pp. 28-34, 38-40](Exhibit 3). |
| 5. Deputy Renegar made contact with Mr. Holloway at campsite 65 and found Mr. Holloway's denials of domestic violence unconvincing in light of the multiple third party reports that implicated Mr. Holloway. [See, Renegar Decl., ¶ 8]. | Disputed in part. None of the third party calls/reports specifically implicated Holloway or his campsite. [See above]. Renegar was investigating the source of the disturbance and going from camp to camp prior to contacting Holloway. [Renegar PVS Recording 4:07-4:23.](Exhibit 7). Deputy Renegar testified that the allegations of a domestic disturbance incident were unfounded and that there was no female with Holloway [Renegar Deposition, pp. 108, 114](Exhibit 2); Holloway was not cited for any violations when the officers left Holloway's campsite for the first time [Id. at 108]; and the officers determined that Holloway did not commit any crimes before the officers left after the first interaction |




2-GottsSER-00170

| | |
|---|---|
| | with Holloway. [Id. at 111]. |
| 6. Deputy Renegar could not come up with any reason for the witnesses reporting Mr. Holloway to lie. [Renegar Decl., ¶ 8]. | Disputed. After receiving information from the sheriff's dispatch and informant, the officers determined that there was no probable cause to believe that Holloway was involved in an altercation, and the officers left the campground completely. [Renegar Deposition, pp. 123-125, 128][Exhibit 2].<br><br>Deputy Renegar failed to investigate further after he contacted Holloway the first time. Holloway had informed the officers that it was the people next to his campsite who were fighting, yet Deputy Renegar did not follow up on this information. [Holloway Deposition, pp. 125; 154-55](Exhibit 4). Holloway Declaration ¶ 6 (Exhibit 9). The officers also did not ask further questions from the informant and did not investigate the other campsites in close proximity to |




2-GottsSER-00171

| | |
|---|---|
| | Holloway's. [Renegar Deposition, pp. 123-128](Exhibit 2). |
| 7. Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway for battery/domestic violence based on the third party reports against Mr. Holloway. [Renegar Decl., ¶ 8]. | Disputed. Deputy Renegar was not sure if a crime actually occurred during the first contact with Holloway. [Renegar Deposition, p. 110](Exhibit 2).<br><br>During the first contact, Deputy Renegar did not believe there was cause to search both of Holloway's tents. [Id. at 112-113, 123]. However, despite what Renegar asserts, the other deputies and Renegar went beyond a protective sweep and searched all of Holloway's campsite by tossing and turning things, dumping the contents of his backpacks, and tossing things out of Holloway's tents without Holloway's consent. The officers did not find a trace of anyone else let alone a female, on Holloway's campsite. Only Holloway's dog was on the campsite. And as the officers |

| | |
|---|---|
| | searched Holloway's tent, they laughed at Holloway and made him feel like dirt. [Holloway Deposition, pp. 78, 86, 98, 103, 113, 343-44](Exhibit 4). Holloway Declaration ¶ 8 (Exhibit 9).<br><br>The officers performed a protective sweep of Holloway's campsite and no female was ever found on Holloway's campsite. [Renegar Deposition, pp. 114-15](Exhibit 2).<br><br>Deputy Renegar testified that Holloway had told him that Holloway was alone the whole night. [Id. at 123]. |
| 8. Deputy Renegar did not detain Mr. Holloway or charge him with a crime at the time based on his inability to locate the victim. [Renegar Decl., ¶ 8]. | Disputed in part. Deputy Renegar testified that the allegations of a domestic disturbance incident were unfounded [Renegar Deposition, pp. 108, 114, 121](Exhibit 2); Holloway was not cited for any violations when the officers left Holloway's campsite for the first time [Id. at 108]; and it was determined that |



2-GottsSER-00173
2-GottsSER-00173

| | |
|---|---|
| | Holloway did not commit any crimes before the officers left for the first time. [Id. at 111]. |
| 9. After the encounter with Mr. Holloway, Deputy Renegar went back to his vehicle and drove to the entrance of the park, pulled over and ran Mr. Holloway through the system. At that time, Deputy Renegar discovered that Mr. Holloway was on probation and subject to search and seizure at any time. [Renegar Decl., ¶ 9]. | Undisputed Holloway was on probation with search and seizure conditions. Disputed when and how Renegar learned of it. Deputy Renegar testified that during the first encounter with Holloway, Holloway told him his name and that he was on informal probation. [Renegar Deposition, p. 120-121](Exhibit 2). It was not determined at that time whether Holloway was subject to search and seizure conditions [Id.]<br><br>Deputy Billinger testified that during the second encounter with Holloway, he was instructed by Deputy Renegar to input Holloway's information into a computer and perform a criminal history check. Deputy Billinger performed the criminal history search ***after*** the broadcast stating, "one at gunpoint" and "one in cuffs" when Holloway was already under |


2-GottsSER-00174

| | |
|---|---|
| | arrest in handcuffs. [Billinger Deposition, pp. 73-74, 104-105, 106, 139](Exhibit 5). Deputy Billinger then inputted the information to a system that is accessible to any person that is assigned to the call. [Id. at 116].<br><br>Deputy Billinger testified that he learned from the criminal history search that Holloway was either on probation or parole, but that he does not recall whether Holloway was subject to search and seizure waivers. [Id. at 104-106]. |
| 10. As Deputy Renegar was driving back to his patrol area, he became aware of another call for service at approximately 4:55 a.m. to O'Neill Park. The reporting party advised that a male subject was walking from campsite to campsite looking for the individual(s) who had called the police. [Renegar Decl., ¶ 10; Call Detail Log, pp. 3-4, Ex. "A"]. | Undisputed. |
| 11. While Deputy Renegar was en route to O'Neill Park at approximately 4:58 a.m. | Undisputed that the Call Detail Info report states that. Disputed as to |




2-GottsSER-00175

| | |
|---|---|
| Deputy Renegar learned from dispatch that the reporting party stated the male subject was by campsite 61 in a white R.V. [Renegar Decl., ¶ 11; See, Call Detail Log, p. 3, Ex. "A"]. | what Renegar remembered and how acted on this call. Deputy Renegar's deposition testimony and police report indicates that the male subject was by campsite 67, not 61. Deputy Renegar's police report indicates that, during the second call, the dispatch broadcasted that the "The male does not reside in campsite 67. Going through things in the campsite." Additionally, Deputy Renegar testified that he went to campsite 67." [Renegar Deposition, pp. 137-138, 142-143](Exhibit 2). The officers did not find the male subject at campsite 67. [Id. at 143]. Holloway was not at campsite 67, but on his campsite 65. [Id. at 146]. |
| 12. Deputy Renegar also learned from dispatch that the reporting party was stating that a little girl was screaming and the call was upgraded to a priority one. [Renegar Decl., ¶ 11; See, Call Detail Log, p. 3, Ex "A"]. | Disputed in part as to what Renegar remembered and how he acted on it. The dispatch did not communicate that a male subject was yelling about calling the cops. [Renegar Deposition, p. 148](Exhibit 2). Rather, the dispatch was updated and communicated that, "We have a male |

| | |
|---|---|
| | yelling and a little girl screaming." [Id.]. |
| 13. Deputy Renegar approached Mr. Holloway for a second time on January 21, 2018. Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway and investigate for the occurrence of any crime based on the reports of the persons reporting the incident to dispatch. [See, Renegar Decl., ¶ 12]. | Disputed.<br>Deputy Renegar *assumed* that Holloway was the male subject reported to have been screaming based on the first contact. [Renegar Deposition, p. 151](Exhibit 2). Deputy Renegar could not explain why his assumptions were valid given that the officers had not found a trace of a female at Holloway's campsite within half an hour during their first contact with Holloway. [Id. at 148-152]. The officers did not, however, have information from the informant regarding the male subject's name or description. [Id. at 151]. Gomez testified that the officers also did not talk to him at campsite 67 at all when they returned to the campground and went directly to Holloway's campsite 65. [Gomez Deposition, p. 60](Exhibit 3). In contrast, Renegar testified that he went to campsite 67 and did not |

| | |
|---|---|
| | speak to the informant before going to Holloway's campsite despite not including this information in his police report, [Renegar Deposition, pp. 146-147](Exhibit 2), and later contradicts himself by testifying that he asked the informant where the male subject was. [Id. at 143]. Deputy Renegar testified that Holloway was not with a little girl. [Id. at 151-152].<br><br>The reporting party, Gomez, who called the dispatch the second time, testified that the man walking up and down the walkway asking for those who called the police might not have had any connection with the little girl screaming or the earlier domestic altercation at the campsite and he did not ever see Holloway with a female. [Gomez Deposition, pp. 54-56](Exhibit 3). Furthermore, Holloway testified that he never went to anyone else's campsite. [Holloway Deposition, p. |




2-GottsSER-00178

| | |
|---|---|
| | 159](Exhibit 4). Holloway was arrested at gunpoint based on assumptions from the first contact where it was already determined that the allegations of a domestic disturbance were unfounded and that Holloway did not commit a crime. [Renegar Deposition, p. 151](Exhibit 2). |
| 14. However, Deputy Renegar confined his charges to what he personally observed Mr. Holloway do during Deputy Renegar's second encounter with him. [Renegar Decl., ¶ 12]. | Vague and ambiguous. Disputed.<br><br>There was no indicia of evidence that Holloway had committed any crime outside or within the officers' presence. During the second encounter, the officers did not receive information about the male subject's name or description from the informant. [Renegar Deposition, p. 151](Exhibit 2). The officers also did not talk to the informant Gomez at all when they returned to the campground for the second time and went directly to Holloway's campsite. [Gomez |




2-GottsSER-00179

| | |
|---|---|
| | Deposition, p. 60] (Exhibit 3). The updated dispatch communicated that, "We have a male yelling and a little girl screaming" [Renegar Deposition, p. 148](Exhibit 2). However, Deputy Renegar testified that Holloway was within his campsite when the officers arrived for the second time [Id. at 295-96]; and that Holloway was alone in his campsite and was not with a little girl. [Id. at 151, 296]. Moreover, Holloway testified that he never went to anyone else's campsite. [Holloway Deposition, p. 159] (Exhibit 4).<br><br>Deputy Renegar testified that he talked to the informant, Gomez, at campsite 67, who told him that, "He went back," before going to Holloway's campsite 65. [Renegar Deposition, pp. 142-43](Exhibit 2). However, Gomez testified that the officers did not talk to him at all and went directly to Holloway's |




2-GottsSER-00180

| | |
|---|---|
| | campsite. [Gomez Deposition, p. 60](Exhibit 3).<br><br>Deputy Renegar only *assumed* that Holloway was the male subject of the second call based on the first contact where it was determined that the domestic disturbance complaint was unfounded; there was no female with Holloway; and Holloway had committed no crime. [Renegar Deposition, pp. 111, 151](Exhibit 2).<br><br>Regardless of the lack of reasonable suspicion or probable cause, the officers detained Holloway at gunpoint as he was getting ready to go to sleep and was attacked maliciously by multiple deputies. [Holloway Deposition, pp. 166-172, 176-208, 218](Exhibit 4). Holloway Declaration (Exhibit 9). Holloway was then arrested without probable cause for felony Resisting Police and Battery on Peace Officer. |




2-GottsSER-00181

| | |
|---|---|
| | *See* Plaintiff's Separate Statement of Disputed Material Facts. |

**ISSUE 2: Plaintiff's First Claim under 42 U.S.C. §1983 for "Excessive Force" against Deputy Brandon Billinger and Deputy Justin Gunderson is <u>NOT</u> barred by qualified immunity.**

| **<u>DEFENDANTS' FACTUAL STATEMENTS</u>** | **<u>PLAINTIFF'S DISPUTE OF DEFENDANT'S FACTS</u>** |
|---|---|
| 15. Based on Deputy Renegar's observations during the incident, Deputies Gunderson and Billinger had no physical contact with Mr. Holloway. [Renegar Decl., ¶ 13]. | Disputed in part<br><u>Deputy Billinger</u><br>Deputy Billinger testified that he never actually saw someone pointing a gun at anyone. [Billinger Deposition, p. 91](Exhibit 5); and that he only assumed that there was a use of force when he heard over broadcast, "one at gunpoint"; he saw the other deputies escorting someone to the vehicle; and he saw Deputy Renegar covered in dirt. [Id. at 112-114].<br><br>However, Holloway testified that six to seven police officers were present at the scene, and all of them pointed their guns at him prior to taking him |




2-GottsSER-00182

| | |
|---|---|
| | down to the ground. [Holloway Deposition, pp. 167-170](Exhibit 4). Holloway Declaration ¶ 12 (Exhibit 9). Moreover, the call history record indicates that Deputy Billinger was at the scene of the incident for 39 minutes from the time Holloway was on the ground succumbed by deputies. [Billinger Deposition, pp. 138-140 (Exhibit 5), Call Detail Info Report, p. 2, 7 (Exhibit 8); PVS recording Billinger 5:02 (Exhibit 7)]. Deputy Billinger testified that he spent 20 minutes inputting Holloway's information into his laptop and searching for criminal history. However, Deputy Billinger cannot account for the remaining time that he was at the scene. [Billinger Deposition, p. 140](Exhibit 5). Furthermore, video footage shows an image of Deputy Billinger at the scene with the five other deputies while Holloway was sitting on the log *before* Holloway was escorted to the patrol vehicle. |




2-GottsSER-00183

| | |
|---|---|
| | [Id. at 140-143].<br><br><u>Deputy Gunderson</u><br>Deputy Gunderson testified that he witnessed the use of force incident when he arrived to the campsite with Gotts [Gunderson Deposition, p. 24](Exhibit 6); he saw Holloway laying facedown with multiple deputies on top of him [Id. at 37]; he witnessed Officers Gotts and Borba place their knees on Holloway's back [Id. at 40-41]; he saw Holloway bleeding as he was being lifted from the ground [Id. at 44-45]; although he did not see Holloway being tased, he knew that Holloway had been tased [Id. at 51]. Yet, Deputy Gunderson chose not to intervene or stop any of the deputies' force used against Holloway. [Id. 109-112]. [PVS Recording Gotts 5:03](Exhibit 7). |
| 16. Deputies Gunderson and Billinger did not use any force on Mr. Holloway, let alone excessive force. [Renegar Decl., ¶ | Disputed in part. Although Holloway could not see who struck which blow, there were multiple |



 2-GottsSER-00184

| | |
|---|---|
| 13]. | officers involved in attacking him and/or failed to intervene in the unjustified beating. [Holloway Deposition, pp. 167-173, 176-215](Exhibit 4). Holloway Declaration ¶ 12-16 (Exhibit 9). Holloway testified that: six to seven police officers were present at the scene, and all of them pointed their guns at him [Id. at 167-170]; Deputy Renegar punched him in the face with enough force to cause him to lose consciousness [Id. at 172-173]; Deputy Renegar then placed him in a chokehold [Id. at 178-179]; he repeatedly said about ten times that he could not breathe, yet none of the other officers intervened. [Id. at 189-190]; while being choked, another officer kneeled on his head and kicked in the head repeatedly until he started bleeding profusely, and another officer sat on his legs while two officers held his arms [Id. at 180-182]; meanwhile, he was being hit in the ribs, then tased four |




2-GottsSER-00185

| | |
|---|---|
| | times. [Id. at 190-208]. Holloway Declaration ¶ 12-16 (Exhibit 9).<br><br>Gunderson and Billinger were admittedly at the scene, but failed to intervene and stop the brutal beating. [*See* Item 15].<br>The call history and PVS Recordings provide uncontroverted evidence that both Gunderson and Billinger were present at scene during the use of force against Holloway. They saw the unjustified beating but failed to take any action and further refused to tell the truth about it in line with the code of silence. [Call Detail Info Report, p. 2, 7 (Exhibit 8); PVS Recordings Gotts 5:03 (Exhibit 7); Billinger 5:02; *See* Plaintiff's Separate Statement of Disputed Material Facts]. |

**ISSUE 3: Plaintiff's First Claim under 42 U.S.C. §1983 for "Illegal Search" against all Defendants in alleged violation of the Fourth Amendment of the Constitution is <u>NOT</u> barred by qualified immunity.**




2-GottsSER-00186

| DEFENDANTS' FACTUAL STATEMENTS | PLAINTIFF'S DISPUTE OF DEFENDANT'S FACTS |
| --- | --- |
| 17[1]. After the encounter with Mr. Holloway, Deputy Renegar went back to his vehicle and drove to the entrance of the park, pulled over and ran Mr. Holloway through the system. At that time, Deputy Renegar discovered that Mr. Holloway was on probation and subject to search and seizure at any time. [Renegar Decl., ¶ 9]. | Undisputed Holloway was on probation with search and seizure conditions. Disputed when and how Renegar learned of it. Deputy Renegar testified that during the first encounter with Holloway, Holloway told him his name and that he was on informal probation. [Renegar Deposition, pp. 120-121](Exhibit 2). It was not determined at that time whether Holloway was subject to search and seizure conditions. [Id.].<br><br>Deputy Billinger testified that during the second encounter with Holloway, he was instructed by Deputy Renegar to input Holloway's information into a computer and perform a criminal history check. Deputy Billinger performed the criminal history search ***after*** the broadcast stating, "one at gunpoint" and "one in cuffs" |

[1] Defendants numbered this disputed facts as "9." The correct numbering is 17.




2-GottsSER-00187

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 139 of 293

| | |
|---|---|
| | when Holloway was already under arrest in handcuffs. [Billinger Deposition, pp. 73-74, 104, 106, 139](Exhibit 5). Deputy Billinger then inputted the information to a system that is accessible to any person that is assigned to the call." [Id. at 116].<br><br>Deputy Billinger testified that he learned from the criminal history search that Holloway was either on probation or parole, but that he does not recall whether Holloway was subject to search and seizure waivers. [Id. at 104-106]. |

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Jeremy Holloway



 2-GottsSER-00188

**MKRTCHYAN LAW**
Narine Mkrtchyan, Esq. (SBN 243269)
1010 N. Central Ave, Suite 204
Glendale, CA 91202
Telephone No. (818) 388-7022
Web: www.narinelaw.com
Email: narine57@gmail.com

Attorney for Plaintiff Jeremy Holloway

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM<br><br>**PLAINTIFF'S SEPARATE STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>**HONORABLE DAVID O. CARTER**<br><br>**Date: December 14, 2020**<br>**Time: 8:30 am**<br>**Ctrm: 9D** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE of PLAINTIFF'S Separate Statement of Facts in Opposition to DEFENDANTS' County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark




2-GottsSER-00189

Borba, Deputy Jameson Gotts and Deputy Justin Gunderson Motion for Summary Judgment and Summary Adjudication.

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Plaintiff Jeremy Holloway

| **PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF FACT** | **EVIDENTIARY SUPPORT** |
|---|---|
| 1. In the early morning hours around 4:23 am of January 21, 2018, 41-year old Plaintiff Jeremy Holloway, an honorably discharged then homeless veteran, Sergeant of the Amphibian Battalion in the United States Marine Corps, was lawfully camping at the O'Neill Regional Park in Trabuco Canyon, Orange County and sleeping peacefully in a tent with his dog. | Holloway Deposition, pp. 51, 64-66 (Exhibit 4); Holloway Declaration ¶ 2-4 (Exhibit 9). |




2-GottsSER-00190

| | |
|---|---|
| 2. Defendants Chad Renegar, Joel Gonzalez, Kevin Pahel, Brendon Billinger and Mark Borba awoke him, representing themselves as the 'Sheriff's Department', and insisted he come out of his tent to speak with them. | Holloway Deposition, pp. 71, 77 (Exhibit 4)(testimony that five officers were present during the first encounter); Holloway Declaration ¶6 (Exhibit 9); Rawlings Deposition, pp. 170; 236-38 (Exhibit 10)(testimony that Borba was present during the first encounter); Borba Deposition, pp. 67-71, 82-84 (Exhibit 11)(Borba's testimony that Borba, Billinger, and Renegar made contact with Jeremy during the first encounter); Renegar Deposition, pp. 75-78 (Exhibit 2)(Renegar testifies to approaching Jeremy's campsite with Pahel and Gonzalez); Pahel Deposition, pp. 62-70 (Exhibit 12) (Pahel, Gonzalez, and Renegar make contact with Jeremy at his campsite for the first time); Gonzalez Deposition, pp. 35-44 (Exhibit 13); PVS Recording, Borba 4:23; PVS Recording, Renegar 4:23-4:32 (Exhibit 7).<br>Call Detail Info Report shows |



2-GottsSER-00191

| | |
|---|---|
| | Renegar, Gonzalez, Pahel, Borba and Billinger arrive to the campground in response to the 911 call for disturbance. (Call Detail Info Report, pp. 5-6) (Exhibit 8). |
| 3. Half-awake and upset with this intrusion, Jeremy inquired from inside his tent, 'Why? Why do you need to talk to me? It is cold outside.' | Holloway Deposition, pp. 72-74 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 4. Renegar insisted by raising his voice, demanding he come out of his tent, still not explaining why they needed to talk to him. | Holloway Deposition, pp. 71-74 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 5. As Jeremy put on a jacket and came out, he saw 5 deputies surrounding his campsite and his tent. | Holloway Deposition, pp. 75-76 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 6. Getting more and more frustrated and fearful with this unjustified intrusion, he inquired further, as to why they awakened him and are harassing him. | Holloway Deposition, pp. 89-90, 94, 103-105 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 7. Renegar rudely continued, demanding to pat him down for weapons, still not | Holloway Deposition, pp. 77-78, 86-90 (Exhibit 4); Holloway |




2-GottsSER-00192

| | |
|---|---|
| explaining why they were there. | Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 8. Renegar asked him if there was anyone else in his tent with him then or earlier, to which Jeremy replied no and that he was alone the whole evening and night. | Holloway Deposition, p. 75 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 9. Jeremy was then patted down for claimed 'officer safety', asked if he had any weapons anywhere on his campsite. | Holloway Deposition, pp. 87, 90, 129 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 10. He truthfully said he had a pocket knife, which turned out to be a lighter and camping knives (that were in backpacks in the tent, not strewn around as deputies later claimed), but protesting why they were harassing him. | Holloway Deposition, pp. 127-128 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 11. Renegar then falsely claimed Jeremy was a subject of an unidentified call from other campers. | Holloway Deposition, pp. 74-75, 104-05 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32; Renegar PVS Recording 4:07-4:23 (Exhibit 7)(Renegar was investigating the call for disturbance and did not know if it was coming from Jeremy's |




2-GottsSER-00193

| | |
|---|---|
| | campsite because he had checked on different campsites to determine the source of the disturbance. None of the campers could conclusively identify which campsite the noise was coming from and gave a direction); Fuerbach Deposition, pp. 17-20 (Exhibit 1)(Fuerbach did not actually see the male and female who were making the noise. Fuerbach only saw the tent moving and perceived as if people were moving in the tent. He did not come out of his tent to see who was involved. He could not see which campsite it was coming from and only provided general information and potential location about what he and his wife heard to the dispatch); Gomez Deposition, pp. 28-34, 38-40 (Exhibit 3)(Gomez did not advise Deputy Renegar that he heard sounds specifically coming from Jeremy's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds |




2-GottsSER-00194

| | |
|---|---|
| | were coming from by pointing to a general south-southeast direction with multiple campsites). |
| 12. Jeremy got even more frustrated and inquired further, as to who could have called on him, when he was alone camping and minding his own business that whole weekend. | Holloway Deposition, pp. 74-75 (Exhibit 4); Holloway Declaration ¶ 6-7 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 13. Renegar's tone was getting increasingly accusatory as he told him, 'I take it you have been through this before!' | Renegar PVS Recording 4:23-4:32 (Exhibit 7). |
| 14. Jeremy kept asking what he had done, was ordered to sit on a log surrounded by five deputies, who then tossed and turned things in his tents and all belongings in backpacks, searching them for no justification. | Holloway Deposition, pp. 78, 86, 343-44 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 15. Jeremy kept protesting and asking why they were doing this, harassing him in the middle of the night but cooperated and provided all information they asked for, his identification. | Holloway Deposition, pp. 94, 113, 145-46 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 16. He still did not get a proper explanation as to what was going on and what he was being accused of. | Holloway Deposition, p. 78 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |




2-GottsSER-00195

| | |
|---|---|
| 17. The deputies did not find a trace of a female or anyone else anywhere in his campsite, or his belongings, except his only companion, his dog. | Renegar Deposition, pp. 108, 114-15, 121-23 (Exhibit 2); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 18. Then they justified their intrusion by claiming, 'If we get a call, we need to investigate.' | PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 19. They again falsely claimed they got multiple calls on his campsite, when the calls were not about a specific campsite or Jeremy and the deputies were still investigating the source of the disturbance by going into different campsites before they came to Jeremy's that night. | PVS Recording, Renegar 4:07-4:23; PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 20. Jeremy then told them that they should instead be going to the campsite next to him, No. 66, where he heard a fight earlier that night, a man and a female arguing. | Holloway Deposition, pp. 153-57 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 21. The deputies apologetically wished him a good night and left his campsite. | Holloway Deposition, p. 131 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 22. Renegar, the primary unit handling this call, did not go to Camp No. 66, that was only about 20 feet away from Jeremy's camp to speak with their occupants and left | Holloway Deposition, pp. 153-157 (Exhibit 4); Holloway Declaration ¶ 8 (Exhibit 9); Renegar Deposition, pp. 108, 114-15, 121-129 (Exhibit |




2-GottsSER-00196

| | |
|---|---|
| the campground by registering the incident as 'Unfounded' for Jeremy. | 2); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). |
| 23. Jeremy was not arrested or cited for anything at this time. | Renegar Deposition, pp. 108, 111, 114 (Exhibit 2); PVS recording of the incident, Renegar 4:23-4:32 (Exhibit 7). |
| 24. Upset and agitated Jeremy then walked to the Ranger Station to file a complaint and use the restroom. | Holloway Deposition, pp. 149, 151 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9). |
| 25. As he walked to the Ranger Station, the lights were on, but the doors locked. | Holloway Deposition, pp. 149, 151 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9). |
| 26. He could see Sheriff's SUVs parked near the Ranger station. | Holloway Deposition, p. 149 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9). |
| 27. Intimidated, he walked back to his campsite, and attempted to get the attention of his neighbors at Camp 66, by telling them to tell the sheriff's they were the cause of the disturbance. | Holloway Deposition, pp. 151-54, 157-59 (Exhibit 4); Holloway Declaration ¶ 10 (Exhibit 9). |
| 28. As the neighbors ignored him, he got ready to get back to sleep, took off his shoes and was near his tent, when he saw the multiple Sheriff's SUVs coming back on the driveway with lights and sirens on. | Holloway Deposition, pp. 161-64 (Exhibit 4); Holloway Declaration ¶ 10 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:14; Pahel 4:57-5:14 (Exhibit 7). |




2-GottsSER-00197

| | |
|---|---|
| 29. Thinking to himself, they must have found the person they were looking for, he got taken aback when he saw multiple deputies, at least 7 of them swarming towards him with guns drawn. | Holloway Deposition, pp. 158, 163-68 (Exhibit 4); Holloway Declaration ¶ 11-12 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:14; Pahel 4:57-5:14 (Exhibit 7). |
| 30. As Defendants Renegar, Gonzalez, Pahel first approached and circled his campsite at gunpoint, they told him to get away from the tent, get in the middle of the campsite, arms out to the side and feet together. | Holloway Deposition, p. 168-70 (Exhibit 4); Holloway Declaration ¶ 12(Exhibit 9); Gonzalez Deposition, p. 85 (Exhibit 13); PVS Recording Renegar 4:58-5:08; Pahel 5:02-5:07 (Exhibit 7). |
| 31. He complied by moving towards the center of his campsite, by extending his arms out to the sides. He showed his hands, by extending them like a cross from his shoulders with palms open and kept asking, 'Why? What did I do? You were just here!' | Holloway Deposition, pp. 170-71 (Exhibit 4); Holloway Declaration ¶ 12 (Exhibit 9); PVS Recording Renegar 4:58-5:08 (Exhibit 7). |
| 32. Then they yelled at him multiple times, 'Get down on the ground! Or you will be tased!' He also heard another officer yell 'Tase him!' | Holloway Deposition, pp. 167-172 (Exhibit 4); Holloway Declaration ¶ 12-13 (Exhibit 9); Renegar Deposition, pp. 362-63 (Exhibit 2); Gonzalez Deposition, p. 85 (Exhibit 13); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). |




2-GottsSER-00198

| | |
|---|---|
| 33. In fear for his life, he stood there in disbelief and in fear that if he went down to the ground, he would be shot. | Holloway Deposition, p. 171 (Exhibit 4); Holloway Declaration ¶12-13 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). |
| 34. As he stood with his arms out as directed, Defendant Renegar rushed towards him, punched him to the left side of his face. | Holloway Deposition, pp. 172-73, 177 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9); PVS Recording Renegar 4:58-5:08 (Exhibit 7). |
| 35. Jeremy had lost his peripheral vision to the left side, and could not have seen it coming. | Holloway Deposition, p. 176 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9). |
| 36. The punch was so strong that Jeremy blacked out momentarily. | Holloway Deposition, p. 178 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9). |
| 37. When he came back to himself, he was being forced down to the ground by Renegar who held Jeremy in a chokehold. | Holloway Deposition, pp. 178-179 (Exhibit 4); Holloway Declaration ¶ 13-15 (Exhibit 9). |
| 38. As he was growling from inability to breathe, and was attempting to free his neck from the hold, he could see another officer kneeing him in the head and kicking him multiple times in the head and temple area until he started bleeding profusely. | Holloway Deposition, pp. 180-84 (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9); Gotts Deposition, p. 117 (Exhibit 14)(Gotts witnessed Jeremy bleeding from his face). |
| 39. Additional Defendants were holding | Holloway Deposition, pp. 184-86 |




2-GottsSER-00199

| | |
|---|---|
| him forcefully to the ground by bodyweight and restraining his arms and legs. | (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9). |
| 40. He kept screaming from pain, that he could not breathe, and that he was bleeding. | Holloway Deposition, pp. 180-82 (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9). |
| 41. Defendants delivered multiple punches to his ribs and stomach areas, and kicked him in the head multiple times. | Holloway Deposition, pp. 190-93 (Exhibit 4); Holloway Declaration ¶ 14-16 (Exhibit 9). |
| 42. To top that, he was turned to his stomach and tasered at least 4 times without warning. | Holloway Deposition, pp. 193-94, 196-208 (Exhibit 4); Holloway Declaration ¶ 14-16 (Exhibit 9). |
| 43. Jeremy is a 5.5 feet tall 175 lbs man, was taken to the ground by Defendant Renegar who then enlisted Gonzalez, Pahel, Borba, Gotts admittedly engaging in this unjustified use of force against him. | Holloway Deposition, pp. 172-73, 176-86, 190, 196, 199-208 (Exhibit 4); Holloway Declaration ¶ 12-16 (Exhibit 9).<br><br>Renegar Deposition (Exhibit 2), pp. 313-23 (Renegar punched Jeremy in the ribcage), 323 (Renegar held down Jeremy's feet), 337-40 (Renegar tased Jeremy for the first time), 341-43 (Renegar tased Jeremy for the second time), 352-53 (Gonzalez joined in taking down Jeremy), 357-59 (Renegar's police report identifies Pahel and Gonzalez |




2-GottsSER-00200

| | |
|---|---|
| | as among the officers using force); Gonzalez Deposition (Exhibit 13), pp. 123-156 (Gonzalez's account from when Jeremy is taken down to the ground to when Jeremy is handcuffed), 123-131 (Gonzalez and Renegar use force to take down Jeremy to the ground), 137-144 (Gonzalez witnessing Renegar throwing punches at Jeremy's rib cage), 151-52 (Gonzalez hears the taser warnings and the taser sound).<br><br>Borba Deposition (Exhibit 11) , pp. 138-41 (Borba identifies Renegar and Gonzalez placing their weight on Holloway's back before the first taser deployment), 140-160 (Borba grabbed Holloway's left arm and placed his right knee on Holloway's upper back before and after the first taser deployment), 169-170 (Borba witnessing Holloway bleeding from the top of his head), 204-206 (discussion of video footage of Holloway bleeding from the face), |



2-GottsSER-00201
2-GottsSER-00201

| | |
|---|---|
| | 277-282 (Gotts used force on Holloway along with Renegar, Gonzalez, and Borba before Holloway was placed in handcuffs), 282-285 (Pahel's police report indicating that before Holloway was placed in handcuffs, Borba pulled out his firearm, assisted Renegar and Gonzalez in taking down Holloway to the ground, attempted to control Holloway's hands, and placed his knee on Jeremy's upper back).<br><br>Gotts Deposition (Exhibit 14), pp. 85-89 (Gotts identifies the officers involved in the use of force as Renegar, Gonzalez, Pahel, Borba, and himself), 89-96, 99-102 (Gotts testified that he used his body weight by pinning down Jeremy's upper back with his knee and tried to control Jeremy's left arm, that he witnessed Renegar on Jeremy's legs, that he witnessed Gonzalez and Pahel controlling Jeremy's arms, that he witnessed Borba using body |



 2-GottsSER-00202

| | |
|---|---|
| | weight on Jeremy's mid to upper torso and trying to control Jeremy's right arm), 97-98 (Gotts testified that he is 6 feet and he observed Jeremy being 5 foot eight inches, shorter than him, and of medium build); 102-03 (Gotts believes that Borba is taller and heavier than he), 105-107 (Gotts heard the taser deployed before using force on Jeremy).<br><br>Pahel Deposition (Exhibit 12), pp. 139-161 (Pahel's account from when he participated in the use of force to when Jeremy is handcuffed), 139-40, 231-33 (Pahel testifying that he used force on Jeremy, including kneeling on his back).<br><br>Gunderson Deposition (Exhibit 6), pp. 39-41 (Gunderson testifying that multiple deputies, Gotts, Borba, Renegar, Gonzalez and Pahel were positioned and involved with Jeremy). |




2-GottsSER-00203

| | |
|---|---|
| | PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). |
| 44. He believes, there were more than 5 officers engaged in the use of force, because initially he saw 6 or 7 officers swarming around him. At some point he also saw an unidentified uniformed female who was standing back and watching. | Holloway Deposition (Exhibit 4), pp. 167-68 (Jeremy testifies seeing 6 or 7 officers, and all have their guns drawn); 341-42 (Jeremy testifies to a uniformed female witness); Holloway Declaration ¶ 12 (Exhibit 9); Plaintiff's Disputed Statement of Facts, #15-16 (Billinger's testimony that he was not at the scene during the use of force contradicts Jeremy's testimony and is inconsistent with the call history and video footage); Gunderson Deposition (Exhibit 6), pp. 24 (Gunderson testified that he witnessed the use of force incident), 37 (Gunderson saw Jeremy laying facedown with multiple deputies on top of him), 40-41 (Gunderson witnessed Gotts and Borba place their knees on Jeremy's back), 44-45 (Gunderson saw Jeremy bleeding as he was being lifted from the ground), 51 (although Gunderson did not see |


2-GottsSER-00204

| | |
|---|---|
| | Jeremy being tased, he knew that Jeremy had been tased); Call Detail Info Report shows in addition to Renegar, Gonzalez, Pahel, Borba and Gotts, who admittedly were involved in the use of force, Billinger and Gunderson arrived at around the same time when Jeremy was on the ground by the other deputies, pp. 2, 7 (Exhibit 8). |
| 45. The detail call log and the PVS recordings prove that at least by the time he was tasered there were 7 officers at the scene, Defendants Renegar, Gonzalez who arrived with Pahel, Borba, Billinger, Gotts who arrived with Gunderson. | Holloway Deposition (Exhibit 4), pp. 167-68; Holloway Declaration ¶ 12 (Exhibit 9); PVS recordings Renegar 5:01-5:08; Gotts 5:03-5:09; Pahel 5:02-5:07; Billinger 5:02-5:08; Borba 05:03-05:07 (Exhibit 7); Call Detail Info Report, pp. 2, 7 (Exhibit 8). |
| 46. When the brutal beating ceased, blood was oozing from Jeremy's face and head. | Holloway Deposition (Exhibit 4), pp. 200, 211-13; Holloway Declaration ¶ 12-16 (Exhibit 9); Borba Deposition (Exhibit 11), pp. 170-71 (Borba witnessed blood flowing from Jeremy's forehead while still on the ground); Gotts Deposition (Exhibit 14), p. 182. |




2-GottsSER-00205

| | |
|---|---|
| 47. He could hear himself telling them, 'You kicked and kneed in my head. That is why I am bleeding. I did not do anything wrong! You guys got the wrong person!' Nobody was listening to him. | Holloway Deposition (Exhibit 4), pp. 181, 200, 214-15; Holloway Declaration ¶ 12-16 (Exhibit 9); PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; Renegar 5:08-5:23 |
| 48. He was then seated on the log, with multiple deputies, including Defendants Renegar, Gonzalez, Pahel, Borba, Billinger, Gunderson, Gotts surrounding him but not attending to his bleeding wounds. | Holloway Deposition (Exhibit 4), pp. 211-16; Holloway Declaration ¶ 18 (Exhibit 9); Gunderson Deposition (Exhibit 6), pp. 106-112 (Gunderson identifying himself and Borba at the scene and testifying that none of the officers did anything to stop Jeremy from bleeding), 178-203 (identifying seven officers, including Gunderson, Billinger, Gotts, Renegar, Gonzalez, Borba, and Pahel); Renegar Deposition (Exhibit 2), pp. 61-62, 254, 261; PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; Renegar 5:08-5:23; Rawlings 5:17; 5:27-5:49; Gotts Deposition (Exhibit 14), pp. 104, 181-85, 233, 284-86. |
| 49. More deputies kept arriving to the scene, including Sergeant Stewart Rawlings, who then actively engaged in a | Plaintiff's Disputed Statement of Facts In Opposition to Defendant County of Orange's Motion for Summary |

| | |
|---|---|
| cover-up of his subordinates' actions by a shallow and biased use of force investigation at scene. | Judgment/*Monell* ("Disputed Statement of Facts/*Monell*), pp. 8-19; Holloway Declaration ¶ 16-19 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36. PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; Renegar 5:08-5:23; Rawlings 5:17; 5:27-5:52. |
| 50. Deputies then began their active cover-up of their actions, by creating a false story line. | PVS Recordings (Exhibit 7) Renegar 5:11-5:40; Renegar 5:40-5:55; Borba 5:07-5:34; Gotts 5:09-5:14. |
| 51. With knowledge they had no evidence against Jeremy for domestic dispute that originated the calls to the campground, Renegar falsely arrested him for felony resisting police, Cal. PC 69 and battery on a peace officer, 243(b) claiming himself, Gonzalez and Pahel as victims of the non-existent crimes. | Renegar Deposition (Exhibit 2), pp. 65-66, 108, 114; 273-276; Police Reports (Exhibit 15); Holloway Declaration ¶ 16-19, 21 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36 |
| 52. Renegar then provided a false version of what happened to his supervisor Rawlings and in the police report that Jeremy was the one who placed a head restraint on him by attempting to grab his ballistic vest, when Jeremy neither had the opportunity nor ability to do it while | Holloway Deposition (Exhibit 4), pp. 351-53; Holloway Declaration ¶ 16 (Exhibit 9); Roger Clark Declaration (Exhibit 18); PVS Recordings (Exhibit 7), Renegar 5:19-5:22; 5:34-5:37 (Renegar and Borba, Pahel telling Rawlings how the incident happened); |


2-GottsSER-00207

| | |
|---|---|
| compressed to the ground by Defendants Renegar, Gonzalez, Pahel, Borba and Gotts. | Renegar Deposition (Exhibit 2), pp. 218, 229-232, 273 (Renegar testifies how Jeremy placed his arm around his head and attempted to grab his ballistic vest), 314-16, 321-26, 328-343, 349-359 (Renegar testifies about the headlock, makes inconsistent statements about whether Jeremy attempted or actually grabbed his ballistic vest, and that Jeremy was only tased twice); Rawlings Deposition (Exhibit 10), pp. 328-335; Gunderson Deposition (Exhibit 6), pp. 50, 66-68 (testifying that he neither saw Jeremy grab any officer's vest nor place any officer in a headlock), 77-80 (Gunderson testifying that he did not see Jeremy rotate to his stomach and contradicting Renegar's police report that Jeremey rotated his body towards Renegar on the ground and attempted to grab Renegar's ballistic vest and wrap his arm around Renegar's head); Gonzalez Deposition (Exhibit 13), pp. 162, 249-50 (testifying that he did not |



 2-GottsSER-00208

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 160 of 293

| | |
|---|---|
| | see Jeremy place Renegar in a headlock). |
| 53. None of the deputies involved in the use of force could corroborate that assertion by Renegar either in their reports or at their depositions. But all of them attempted to justify their own actions by falsely claiming Jeremy was actively resisting them, kicking at them on the ground, refusing to give up his arms and trying to get up. | Holloway Declaration ¶ 16 (Exhibit 9);<br>Gonzalez Deposition (Exhibit 13), pp. 162-63 (Gonzalez testifying that he did not see Jeremy place Renegar in a headlock), 102, 109, 125-38, 140-41 (Gonzalez testifying that Jeremy was neither complying nor listening to commands and resisting), 300-01 (Gonzalez testifying that he did not see Jeremy choke or restrain Renegar).<br><br>Pahel Police Report (Exhibit 15)(Pahel did not mention Jeremy placing Renegar in a headlock in his police report).<br>Pahel Deposition (Exhibit 12), pp. 139-41 (Pahel testifying that Holloway had both arms tucked under his waist area), 224-230 (testifying that Jeremy resisted and would not comply and stay on the ground). |



2-GottsSER-00209

| | |
|---|---|
| | Borba Deposition (Exhibit 11), pp. 191 (testifying that Jeremy never assaulted or used violence on an officer and never made any threats to an officer at any time and during the officers' use of force on Jeremy), 147-154 (testifying that Jeremy was physically resisting).<br><br>Gotts Deposition (Exhibit 14), pp. 98 (testifying that Jeremy was actively resisting when he arrived at the use of force scene), 249 (testifying that he did not see Jeremy place a chokehold on Renegar although admits it is what Renegar says happened).<br><br>Billinger Deposition (Exhibit 5), pp. 196-97, 311 (Billinger did not witness Jeremy allegedly placing Renegar in a chokehold).<br><br>Gunderson Deposition (Exhibit 6), p. 67 (Gunderson testifying that he did not see Jeremy placing Renegar in a chokehold), 71-73 (Gunderson |



 2-GottsSER-00210

| | |
|---|---|
| | testifying as to seeing Jeremy trying to get up off the ground and tucking his arms). |
| 54. In line with this code of silence, they failed to account for the prohibited head strikes that caused visible injuries and bleeding to Jeremy, denied they had smeared themselves with Jeremy's blood and claimed not to recall what other officers did during the use of force. | Holloway Declaration ¶ 14-15 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36<br>PVS Recordings (Exhibit 7) Renegar 5:11-5:40; Renegar 5:40-5:55; Borba 5:07-5:34; Gotts 5:09-5:14.<br><br>Renegar Deposition (Exhibit 2), pp. 156-57 (Renegar not remember Borba's actions during the use of force), 158 (Renegar not recalling Gotts' supplemental report where Gotts admits to using force), 165-68 (testifying that he cannot speak to what the other deputies did or did not do and not remembering whether any deputy commanded Jeremy to face away and put his hands behind his back), 219-221, 227 (Renegar stating that he cannot speak about Gonzalez's actions despite Renegar writing a police report that indicates Gonzalez's actions and testifying that he cannot |




2-GottsSER-00211

| | |
|---|---|
| | recall the other deputies' actions as he performed an attempted armbar takedown on Jeremy), 240 (Renegar testifying that he is not sure how many officers were on top of Jeremy while Jeremy lay on the ground and stating that he cannot speak for the actions of the other officers because Jeremy purportedly placed him in a headlock), 242-44 (Renegar testifying that he does not know of anyone who put their knee on Jeremy while Jeremy lay on the ground), 246-48 (discussing how Renegar omitted from his police report Jeremy's head injuries), 253 (Renegar testifying that he did not see Jeremy's head impact the ground and that he does not know why Jeremy's head was bleeding), 253-58 (Renegar denying having any knowledge on why Jeremy was bleeding, denying kicking Jeremy in the head, and denying seeing anyone or any object hit Jeremy in the head), 264-69 (Renegar unable to explain how Jeremy received a black eye and |




2-GottsSER-00212

| | |
|---|---|
| | testifying that he neither punched Jeremy in the face nor witnessed other deputies punch Jeremy), 346-47 (Renegar cannot explain Jeremy's right eye injury, Jeremy kicked in the head), 343-44 (Renegar cannot recall the other deputies' actions when the taser was removed from Jeremey's calf).<br><br>Gonzalez Deposition (Exhibit 13), pp. 144-46 (Gonzalez not remember details about Renegar punching Jeremy in the ribcage), 150-53 (Gonzalez testifying that he did not witness the taser deployment), 155-162 (denying knowledge of the deputy's identity, who placed his knee on Jeremy's back and denying knowledge of when the deputy removed the knee from Jeremy's back), 157-58 (Gonzalez not recalling which deputies raised Jeremy from his stomach to his feet and not knowing why Jeremy's face was bleeding), 159-61 (testifying as to not having |


2-GottsSER-00213

| | |
|---|---|
| | knowledge about Borba and Gott's participation in the use of force), 214-15 (denying having any knowledge of how Jeremy injured his head and face), 294-95 (Gonzalez not recalling whether Borba or Gotts assisted him in grabbing Jeremy's right hand), 296 (testifying as to not knowing Renegar's body position), 298-99 (not knowing which deputy worked with Pahel in using force).<br><br>Billinger Deposition (Exhibit 5), p. 288 (testifying as to not having seen any use of force on Jeremy).<br><br>Gunderson Deposition (Exhibit 6), pp. 41 (Gunderson unable to recall Renegar's physical position in relation to Jeremy and not remembering Renegar using the taser on Jeremy), 42 (Gunderson not recalling the physical position of Gonzalez and Pahel in relation to Jeremy during the use of force), 123-25 (Gunderson testifying that the head is a sensitive area, that |


2-GottsSER-00214

| | |
|---|---|
| | using impact weapons can be considered deadly force, and that a kick to the head can be deadly), 104 (Jeremy saying, "You guys kicked me in the head, that's why" and Gunderson denying seeing anyone kick Jeremy in the head), 150-54 (Gunderson testifying as to not seeing Billinger or Baek at all), 243-47 (Gunderson unable to explain the blood stains on Gotts' pants).<br><br>Gotts Deposition (Exhibit 14), pp. 87-88 (Gotts testifying that he and Gunderson arrived at the scene together, but he did not see Gunderson's actions during the use of force), 88-94 (Gotts unable to recall Jeremy's position on the ground and the actions of Renegar, Gonzalez, Pahel, and Borba during the use of force), 105-07 (Gotts testifying that he heard the Taser sound, but that he did not include the Taser use in his police report), 181-82 (Gotts denying having knowledge on who lifted Jeremy from |

| | |
|---|---|
| | the ground despite testifying as to having assisted in lifting Jeremy and escorting him to a log), 182-185 (Gotts testifying that he saw Jeremy's face bleeding, but showing no concern or knowledge of how Jeremy was injured), 186-88 (Gotts testifying that the scratches on his hands were not caused by the use of force despite testifying earlier that he received scratches from the use of force), 233-34 (Gotts unable to explain Jeremy's bleeding face and bleeding head), 256 (Gotts denies discussing with Borba about the blood on Borba's hands), 256-283 (Gotts unable to explain why he said that he has blood all over himself and providing inconsistent statements as to where the blood came from).<br><br>Borba Deposition (Exhibit 11), pp. 141-45 (Borba testifying that he does not recall what physical positions the other deputies are in while using force on Holloway on the ground, but |




2-GottsSER-00216

| | |
|---|---|
| | remembering other details), 149-53 (Borba testifying as to not recalling Renegar and Gonzalez's actions during the use of force despite their close proximity to Borba, and to not recalling the identify of other deputies involved in the use of force), 159-61 (Borba not recalling who placed handcuffs of Jeremy, whether he handcuffed Jeremy, or whether he offered his hand cuffs to another deputy), 161-62 (Borba unable to recall the actions of Gonzalez, Renegar, Pahel, or Gotts after Jeremy is handcuffed and after Borba used his radio), 165-66 (Borba unable to recall multiple questions about what happened to Jeremy after being handcuffed and unable to recall Renegar's actions immediately after using the Taser on Jeremy), 171 (Borba unable to recall whether Jeremy complained about his pain or injury), 190-91 (Borba testifying as to having no knowledge about the blows to the head Jeremy endured and |


2-GottsSER-00217

| | |
|---|---|
| | Jeremy's forehead injury), 200-01 (Borba explaining that he was looking at his palms because he had numerous cuts to his hands from a separate incident and that he was concerned about Jeremy's blood contaminating him).<br><br>Pahel Deposition (Exhibit 12), pp. 153 (Pahel claiming not to see Gonzalez during the use of force), 171-73 (Pahel testifying that he heard Jeremy complaining about getting kicked in the head and that he did not see the kick), 141 (Pahel testifying as to not knowing what physical positions the other officers were in while they used force on Holloway on the ground), 145-149 (Pahel testifying hearing an officer say, "Taser, Taser, Taser," yet not knowing who used the Taser on Holloway despite only two other deputies using force on Holloway at this time), 148 (Pahel testifying that he cannot speak for the other officers about what commands they gave |

| | |
|---|---|
| | Holloway as the officers used force on him on the ground), 152-53, 156-57 (Pahel providing conflicting testimony that he did not see how Gonzalez participated in the use of force despite providing details earlier and later in the testimony about Gonzalez's actions), 157 (Pahel testifying that he does not know whether Renegar or Gonzalez applied force on Holloway's legs, but later identifying Gonzalez as the deputy applying force between Holloway's waist and armpit area), 161, 203-204 (Pahel testifying to knowing at least one other deputy that assisted in handcuffing Jeremy, but to not knowing the deputy's identity and to not being asked by Rawlings to identify the deputy after the use of force).<br><br>Billinger Deposition (Exhibit 5), p. 288 (testifying as to not having seen any use of force on Jeremy). |
| 55. In line with these false stories, Defendants Renegar, Gonzalez, Pahel, | Police Reports/Probable Cause Declaration (Exhibit 15); Holloway |




2-GottsSER-00219

| | |
|---|---|
| Borba and Gotts then wrote false police reports and a false probable cause declaration in violation of Cal Penal Code Section 118.1. | Declaration ¶ 16, 21 (Exhibit 9). Roger Clark Declaration, (Exhibit 18) pp. 30-36<br><br>Renegar Deposition (Exhibit 2), pp. 65-66, 271, 274-82 (Jeremy was arrested and charged with a felony for allegedly violating Penal Code §§ 69 and 243. Renegar, in his police report, included Gonzalez, Pahel and himself as the victims during the use of force, even though Renegar testified as to not knowing what happened to Gonzalez and Pahel during the use of force and Renegar could not explain how Gonzalez and Pahel are victims), 65-68 (Renegar wrote a probable cause declaration that did not include the knives and other weapons Renegar included in his police report as among the reasons he pointed a gun at Jeremy and detained him), 70-75, 160-61 (Renegar's police report indicated that "Multiple knives scattered throughout the campsite within close range to Jeremy" in contradiction with photos |


2-GottsSER-00220

| | |
|---|---|
| | showing no knives and weapons scattered around the campsite), 224-25, 232, 319-20, 355-58 (Renegar wrote in his police report that Jeremy wrapped his arms around the back of Renegar's head, which is not corroborated by any of the other deputies' account of the use of force incident, *see* Fact #52-53 above), 243-49, 256-63 (testimony about how Renegar's police report does not include Jeremy's head injury and indicates only an "apparent minor injury" even though Jeremy's head was bleeding profusely), 229-33, 348-55 (Renegar wrote in his report that "Jeremy rotated his body towards me on the ground and attempted to grab ahold of my ballistic vest" and offered conflicting testimony on how Jeremy was able to grab his vest), 319-20, 355-58 (Renegar's testimony that Jeremy placed him in a headlock is not corroborated by the other deputies' reports), 348-49, 351-55 (Renegar offered conflicting testimony on how |



 2-GottsSER-00221

| | |
|---|---|
| | Jeremy grabbed his vest), 359-65 (inconsistencies between Renegar's probable cause declaration and Renegar's testimony); 256-63 (testimony about how Renegar's police report does not include Jeremy's head injury and indicates only an "apparent minor injury" even though Jeremy's head was bleeding profusely).<br><br>Gotts Deposition (Exhibit 14), pp. 105-116 (Gotts did not mention the taser in his police report despite knowing that it was deployed before he participated in the use of force, and omitted Gonzalez, Pahel, and Borba from his report despite testifying as to his knowledge of their presence and participation in the use of force), 128-142 (Gotts provides inconsistent testimony as to whether he saw the taser deployed), 142-53 (discussions about the code of silence and how Gotts' police report omitted the use of force by the other deputies and the use |


2-GottsSER-00222

| | |
|---|---|
| | of the taser), 168-81 (showing inconsistencies between Gotts' police report and testimony and Renegar's police report), 192, 233-36, 244-51 (none of the police reports mentioned a head strike and Jeremy's bleeding head injury).<br><br>Borba Deposition (Exhibit 11), pp. 167-68 (Borba testifies that there may have been a fourth officer engaged in use of force but could not identify whom), 272-76 (Borba omitted the contact use of the taser on Jeremy's buttock area), 277-81 (showing inconsistencies between Borba's testimony and Gotts' police report as to using force on Jeremy's left arm), 282-88 (Gotts never mentioned Pahel in his report despite Pahel's involvement in the use of force incident).<br><br>Gonzalez Deposition (Exhibit 13), pp. 284 (Gonzalez wrote in his report, "Jeremy was walking around O'Neill |


2-GottsSER-00223

| | |
|---|---|
| | Park campground harassing campers" in contradiction with Renegar's and witness testimony, *see* Plaintiff's Disputed Statement of Facts #10-14). Police Reports (Exhibit 15)(Gonzalez wrote in his report that when he pointed his taser and ordered Jeremy, 'Get on the ground or you will be tased,' Jeremy replied, 'Do it.' He corroborated Renegar in his claim that Jeremy attempted to grab Renegar's ballistic vest and confirmed Jeremy was resisting while on the ground, necessitating his and other deputies' involvement to succumb him); Gonzalez Deposition (Exhibit 13), p. 116-118, 126-128, 281-301.<br><br>Pahel Deposition (Exhibit 12), pp. 218-223 (Pahel wrote in his police report that "[t]here were multiple large-bladed knives on the ground within a reach of [Jeremy]. Jeremy had both of his hands in his pockets and appeared to be agitated"), 223-24 (Pahel wrote in his police report that |



2-GottsSER-00224

| | |
|---|---|
| | "Renegar attempted to take Jeremy to the ground using an arm bar takedown on Jeremy's left arm. As Jeremy was going towards the ground, he began to stand back up."), 227 (Pahel wrote in his police report, "Renegar fell to the ground with Jeremy and was struggling to keep Jeremy from getting back to his feet"), 229 (Pahel wrote in his police report that he "took Jeremy to the ground with the assistance of Renegar and Gonzalez in contradiction with his earlier testimony that Jeremy fell to the ground with Renegar and Gonzalez's testimony that only he and Renegar took Jeremy to the ground, *see* Pahel Deposition, p. 227, Gonzalez Deposition, pp. 123-131), 231 (Pahel writing in his police report, "I took Jeremy to the ground with the assistance of Renegar and Gonzalez. Once on the ground, I attempted to gain control of Jeremy's hands, but he was tucking them underneath his body near his front waistband"), 233-35 (Pahel wrote "Jeremy continued to |




2-GottsSER-00225

| | |
|---|---|
| | struggle the entire time. I finally gained control of Jeremy's hands and placed them into handcuffs”). |
| 56. Fabrication of reports is not new to Renegar, who has been subject of a criminal investigation most recently for falsifying official papers. | Rawlings Deposition (Exhibit 10), pp. 41-43; Renegar Deposition (Exhibit 2), pp. 31-34; *See* Court Docket for in-camera records related to Renegar criminal investigation. Doc. 41, 47, 49 |
| 57. Renegar, Gonzalez, Pahel, Borba, Gotts, Gunderson, Billinger falsely claimed that the reporting parties identified Jeremy’s campsite as the source of trouble, that Jeremy had multiple knives strewn around his campsite, necessitating the brutal attack and beating for ‘officer safety.’ | Police Reports (Exhibit 15); Holloway Declaration ¶ 6-9, 17 (Exhibit 9). <br><br>The Officer’s False Claims That Jeremy’s Campsite Was the Source of Trouble – First Interaction With Jeremy<br><br>Renegar Decl., ¶ 8 (Renegar declaring that he made contact with Jeremy at campsite 65 and found Jeremy’s denials of domestic violence unconvincing in light of the multiple third party reports that implicated Mr. Holloway)(*see* Defendants’ Exhibits).<br><br>Renegar Deposition (Exhibit 2), pp. 108, 114 (Renegar testifying that the allegations of a domestic disturbance |

| | |
|---|---|
| | incident were unfounded and that there was no female with Holloway, 108 (Holloway was not cited for any violations when the officers left Holloway's campsite for the first time), 111 (the officers determined that Holloway did not commit any crimes before the officers left after the first interaction with Holloway), 51-53 (Renegar testifying that Fuerbach told him that the domestic disturbance was coming from Holloway's campsite 65,) 110 (Renegar later testified that he does not recall whether Fuerbach told him the specific campsite number or only the direction where the alleged domestic disturbance was coming from).<br><br>Fuerbach Deposition (Exhibit 1), pp. 19-20 (Fuerbach only saw the tent moving and perceived as if people were moving in the tent. He did not come out of his tent to see who was involved. He could not see which |


2-GottsSER-00227

| | |
|---|---|
| | campsite it was coming from and only provided general information and potential location about what he and his wife heard to the dispatch).<br><br>Renegar Decl., ¶ 6 and 7 (Renegar declaring that witness Joshua Gomez advised him that he heard the sounds of fighting and arguing coming from Holloway's campsite (65))(*see* Defendants' Exhibits).<br><br>Gomez Deposition (Exhibit 3), pp. 28-34, 38-40 (Gomez testifying that he did not advise Deputy Renegar that he heard sounds specifically coming from Holloway's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds were coming from by pointing to a general south-southeast direction with multiple campsites), 33-34 (Gonzalez testified that a person pointed the deputies towards |




2-GottsSER-00228

| | |
|---|---|
| | Jeremy's campsite 65).<br><br>Borba Deposition (Exhibit 11), pp. 64-67 (Borba testifying that they spoke with subject at campsite 63 prior to contacting Jeremy the first time, who was adamant the disturbance had been at Campsite 65).<br><br>Billinger Deposition (Exhibit 5), pp. 22-23, 27, 29-30 (Billinger testifying that he learned over broadcast the source of the reported domestic violence was Jeremy's campsite 65), 41-42 (Billinger testifying that he was "looking for campsite 65 or any of the numbers associated to that location.")<br><br>Gunderson Deposition (Exhibit 6), pp. 35-36 (Gunderson testifying that he did not know the nature of the first call, but the second call concerned the same subject, who was "trying to find the person who |




2-GottsSER-00229

| | |
|---|---|
| | called the police on him from the previous call"). <br><br> Gotts Deposition (Exhibit 14), pp. 119-120 (Gotts connecting the subject of the first dispatch call to the second dispatch call), 121 (Gotts connecting the little girl screaming to Jeremy's campsite). <br><br> <u>The Officer's False Claims That Jeremy's Campsite Was the Source of Trouble – Second Interaction With Jeremy</u> <br><br> Renegar Decl., ¶ 10 (Renegar declared that a reporting party advised that a male subject was walking from campsite to campsite looking for the individual(s) who had called the police)(*see* Defendants' Exhibits). <br><br> Renegar Deposition (Exhibit 2), pp. 148 (Renegar testified that he *assumed* that the male subject was Holloway based on the first contact), 148-152 |




2-GottsSER-00230

| | |
|---|---|
| | (Renegar testifying that he could not explain why his assumptions were valid given that the officers had not found a trace of a female at Holloway's campsite within half an hour during their first contact with Holloway).<br><br>Gonzalez Deposition (Exhibit 13), pp. 68-69, 75-76, 82-84 (Gonzalez testifying on the second call they came looking for Jeremy again, even though he did not see Renegar make contact with Reporting Party).<br><br>Pahel Deposition (Exhibit 12), pp. 107-109 (Pahel testifying about the second call regarding how he was following Renegar's direction to focus on Campsite 65 even though he could not tell whether Renegar made contact with the Reporting Party).<br><br>Gunderson Deposition (Exhibit 6), pp. 35 (Gunderson testifying that an |




2-GottsSER-00231

| | |
|---|---|
| | officer broadcasted over the radio that the same person was the subject of the first and second dispatch call), 35-37 (Gunderson testifying as to his belief that Borba knew where the disturbance was occurring and which campsite to go to on the second dispatch call based on the first dispatch call, and that Gunderson and Gotts followed Borba to Jeremy's campsite 65), 54 (Gunderson agreeing that Jeremy was being detained for causing a domestic disturbance and other reasons), 176-77 (Gunderson testifying that the first dispatch call brought the officers to Jeremy's campsite 65 during the second dispatch call).<br><br>Gotts Deposition (Exhibit 14), pp. 119-23 (Gotts testifying that the second dispatch call was the "second response for a subject who was creating a disturbance at the campground, looking for, I believe, a |

| | |
|---|---|
| | person who had called the police on him earlier.”).<br><br>Billinger Deposition (Exhibit 5), pp. 109-110 (Billinger testifying that he heard over radio broadcast that a child was screaming, but he did not make any effort to investigate the identity of the child or the reporting party or witnesses), 219 (Billinger testifying that Pahel was unsuccessful in finding the child reported to be screaming).<br><br>The Multiple Knives Around the Campsite As Pretense For the Brutal Attack and Beating<br><br>Renegar Deposition (Exhibit 2), pp. 67-68, 159 (Renegar testifying that the knives scattered around the campsite was among the reasons for detaining Jeremy at gunpoint).<br><br>Gonzalez Deposition (Exhibit 13), pp. 90-91 (testifying that he took his |




2-GottsSER-00233

| | |
|---|---|
| | firearm out because of the knives, ax, and machete, among other reasons), 68-72 (testifying about a broadcast communicating to all units that Jeremy's campsite had knives), 281-82 (discussing Gonzalez's report, which mentions several knives, hammers, machetes, and an ax at Jeremy's campsite).<br><br>Borba Deposition (Exhibit 11), pp. 71-73 (testifying that he noticed officer safety issues and signaled to the other officers that there were multiple weapons within very close proximity to Jeremy spread throughout the campsite), 282-83 (discussing Pahel's police report which indicated that multiple large-bladed knives on the ground were within reach and Gonzalez testifying that he saw the knives).<br><br>Pahel Deposition (Exhibit 12), pp. 191-192; 218-219 (discussing the knives strewn around the campsite); |

| | |
|---|---|
| | 236-240 (discussing what he wrote in his report regarding reporting party Gomez' statements).<br><br>Gunderson Deposition (Exhibit 6), pp. 33-37 (Gunderson testifying that he heard over the radio that Jeremy had multiple weapons at his campsite, including possibly a gun). |
| 58. When Renegar arrived to the campground the first time and spoke with the reporting party Joshua Gomez at 67, Gomez did not tell Renegar that Jeremy was the source, but that the noise was coming from the general direction of Jeremy's campsite 65. Gomez indicated he heard the noise coming from across his campsite, which was Campsite 66, not Campsite 65 where Jeremy was. This was the same direction that Jeremy gave to Renegar at the initial contact, but Renegar failed to follow-up and investigate Campsite 66. | Holloway Declaration ¶ 5-6 (Exhibit 9); Google Map Overview (Exhibit 16);<br>Gomez Deposition (Exhibit 3), pp. 28-34, 38-40, (Gomez did not advise Deputy Renegar that he heard sounds specifically coming from Holloway's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds were coming from by pointing to a general south-southeast direction with multiple campsites.)<br><br>Holloway Deposition (Exhibit 4), pp. 153-57 (Deputy Renegar failed to |




2-GottsSER-00235

| | |
|---|---|
| | investigate further after he contacted Holloway the first time. Holloway had informed the officers that it was the people next to his campsite at Campsite 66 who were fighting, yet Deputy Renegar did not follow up on this information.) Renegar Deposition (Exhibit 2), pp. 123-128 (The officers also did not ask further questions from the informant and did not investigate the other campsites in close proximity to Holloway's.) |
| 59. The reality is that the campers had never seen Jeremy with a female on his campsite, and never provided a description of the male, and had made 911 calls from what they could hear from inside their tents at nighttime. Prior to circling Holloway with guns drawn, Renegar and deputies did not speak with the reporting parties the second time they arrived to confirm where the noise was coming this time. | Fuerbach Deposition (Exhibit 1), pp. 17-22; 40-41; Gomez Deposition (Exhibit 3), pp. 28-34, 38-40, 60, 54-56; Renegar Deposition (Exhibit 2), p. 110; Google Map Overview of the Campground (Exhibit 16); PVS Recording Renegar 4:15-4:17; 5:25-5:30; 5:34-5:36; 5:44-5:49; Pahel 5:30-5:34 (Exhibit 7). |
| 60. There were multiple campsites tightly situated next to one another within 20 feet, and the deputies simply failed to find the actual source of the disturbance. | Holloway Deposition (Exhibit 4), pp. 153-157 Google Map Overview (Exhibit 16); PVS Recording (Exhibit 7) Renegar 4:15-4:17; 5:25-5:30; 5:34- |



 2-GottsSER-00236

| | |
|---|---|
| | 5:36; 5:44-5:49; Pahel 5:30-5:34 (Exhibit 7). |
| 61. No knives were strewn around Jeremy's campsite within his arms reach, but were in his backpack in the tent, later removed by deputies and placed on the picnic table at the time they booked this into evidence. | Holloway Deposition (Exhibit 4), pp. 345-347, 348-351; 354; Holloway Declaration ¶ 6, 17 (Exhibit 9); PVS Recording (Exhibit 7) Renegar 5:14, Pahel 5:14 (deputies removing knives from inside the tent and arranging them on the picnic table). |
| 62. After a five minute accusatory interview with Sergeant Rawlings, when Jeremy was accused of not getting down to the ground with alacrity in response to the deputies' demands, Jeremy was treated by the paramedics at scene who arrived to treat his bleeding wounds, and was transported to the Mission Hospital for further medical treatment. | Rawlings Deposition (Exhibit 10), pp. 50-51; Holloway Deposition (Exhibit 4), pp. 233-35, 236-37; Holloway Declaration ¶ 18-20 (Exhibit 9); PVS Recording (Exhibit 7) Rawlings 5:27-5:34. |
| 63. Jeremy was treated for a number of injuries at the Mission Hospital, including head contusion, rib contusion, and eye laceration. | Holloway Deposition (Exhibit 4), pp. 237, 244-45, 313-323; Holloway Declaration ¶ 20 (Exhibit 9); PVS Recording (Exhibit 7) Rawlings 5:27-5:34. |
| 64. Thereafter, Jeremy was jailed in the Santa Ana jail, and booked on false | Holloway Deposition (Exhibit 4), pp. 245-46; Holloway Declaration ¶ 21 |




2-GottsSER-00237

| | |
|---|---|
| allegations of felony Cal PC 69 Resisting peace officer and Cal PC 243 (b) Battery on peace officer. | (Exhibit 9); Renegar Deposition (Exhibit 2), p. 65; Rawlings Deposition (Exhibit 10), pp. 56-57. |
| 65. The District Attorney's Office did not prosecute him for these charges but only after Jeremy paid for bail and lawyer to defend himself in criminal court. | Holloway Deposition (Exhibit 4), pp. 248-49; Holloway Declaration ¶ 21 (Exhibit 9). |
| 66. Jeremy continued his treatment at the Veteran's Hospital for his ongoing injuries. | Holloway Deposition (Exhibit 4), pp. 52, 307; Holloway Declaration ¶ 26 (Exhibit 9). |
| 67. He has sustained a number of neurological and orthopedic injuries, including vision loss, continued headaches, blackouts, spinal/back and neck pain. | Holloway Deposition (Exhibit 4), pp. 307-310, 313-324; Holloway Declaration ¶ 26 (Exhibit 9). |
| 68. His injuries including emotional distress he suffered as a result have affected his ability to work and maintain a stable work history as a copy machine/technical repairman. | Holloway Deposition (Exhibit 4), pp. 35-38, 40-41, 310-311; 312-313, 324-26; Holloway Declaration ¶ 26 (Exhibit 9). |
| 69. After another incident in May of 2018 where he was harassed by the Sheriff's deputies at the same campground, Jeremy vowed to never return to the O'Neill Regional Park. As a long-term resident of the Orange County, he felt unsafe, left for Pittsburgh, Pennsylvania where he | Holloway Deposition (Exhibit 4), pp. 26-27, 33, 255-57, 307-313; Holloway Declaration ¶ 25 (Exhibit 9). |




2-GottsSER-00238

| | |
|---|---|
| continued treatment for his injuries at the VA's. | |
| 70. Jeremy filed a citizen complaint with the Department and it went to the same Sergeant who had approved of the use of force by these Defendants, Sergeant Stewart Rawlings. | Rawlings Deposition (Exhibit 10), pp. 25-29, 72-77, 138; Holloway Declaration ¶ 24 (Exhibit 9). |
| 71. Sergeant Stewart Rawlings who had arrived at scene of the incident, and had approved of the use of force by covering up for his employees, did nothing to investigate the citizen complaint, did not interview Jeremy, did not review his medical injuries, did not do any separate interviews of the Deputies for the incident in violation of the established procedures, misrepresented his interview with reporting party Gomez, claiming Gomez told him he identified Jeremy as the one involved in the domestic dispute when that never happened and could not have happened because Gomez said that he had not seen the couple fighting. | Plaintiff's Disputed Statement of Facts /*Monell*, pp. 3-19; Holloway Declaration ¶ 24 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36; Gomez Deposition (Exhibit 3), pp. 28-34, 38-40, 54-56, 60, 126-128. |
| 72. The Departmental heads then approved the citizen complaint without any further | Rawlings Deposition (Exhibit 10), pp. 70-78; Plaintiff's Disputed Statement of Facts/*Monell*, pp 3-19. |



2-GottsSER-00239

| | |
|---|---|
| review or discipline of the involved officers thereby ratifying their conduct. | |
| 73. Deputy Renegar with a long history of use of force was not disciplined for his conduct culminating in deprivation of Jeremy's rights. His activities though brought him under a spotlight of the OC District Attorney's Office prompting a criminal investigation into his professional dishonesty for fabricating reports. | Renegar Deposition (Exhibit 2), p. 31; Rawlings Deposition (Exhibit 10), pp. 41-43; RFA Responses by Renegar (Exhibit 17). *See* Court Docket for in-camera records related to Renegar criminal investigation. Doc. 41, 47, 49 |

## CONCLUSIONS OF LAW

1. At summary judgment, an officer may be denied qualified immunity in a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).
2. In making this determination, the Court still must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650 (2014).
3. For the right to be clearly established**,** the standard is not whether a case on all fours exists, but rather whether "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" *Taylor v. Riojas*, No. 19-1261 (Nov. 2, 2020)



 2-GottsSER-00240

4. In this case, there is a material dispute as to the operative facts the officers are relying in support of their arguments and as discussed more below, there is decisional law that applies to the specific conduct in question that placed these officers on notice that they were violating the Plaintiff's clearly established right to be free from unreasonable seizure and arrest.
5. The investigatory detention of Jeremy turned into a de facto arrest requiring probable cause when the deputies arrived the second time and circled him with guns drawn**.** *Robinson v. Solano County*, supra, 218 F.3d 1030, 1035**;** *Green v. City and County of San Francisco*, 751 F.3d 1039.
6. Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Lopez-Soto*, 205 F.3d at 1105.
7. The 'reasonable suspicion' necessary to justify an investigatory stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama* v. *White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)" The standard takes into account "the totality of the circumstances—the whole picture." *Cortez, supra,* at 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Although a mere "'hunch'" does not create reasonable suspicion, *Terry, supra,* at 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States* v. *Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). *Navarette v. California*, 572 U.S. 393, 397 (2014)
8. Renegar's facts amount to no more than subjective (mis)impressions and assumptions. When he and his deputies arrived the second time with guns

drawn and circled Jeremy, Renegar had no reasonable suspicion that Jeremy had been the man who had been yelling in connection with a little girl screaming, that caused the call to become a priority one.

9. Jeremy was entitled to an explanation as to why he was being detained again, within the half hour period, after the same deputies searched him and his campsite with negative results. His verbal protestation and delay in getting down to the ground in the absence of physical interference with deputies, did not amount to a criminal activity of resisting police giving deputies' probable cause to arrest him.

10. It has been established, that momentary hesitation and alacrity to comply with officers' commands is not in violation of the relevant penal code sections. See *People v. Wetzel*, 11 Cal.3d 104, 110 (1974) (no 148PC offense committed by refusing to open door to officers in alleged hot pursuit of a suspect). "[I]n *People v. Cressey*, 2 Cal.3d 836 (1970), the California Supreme Court stated that the refusal to open a door upon a *proper* police request, was not a violation of § 148. And in *Cressey*, the defendant never did capitulate." *Mackinney v. Nielsen*, 69 F.3d 1002, 1006 (9th Cir. 1995). *Bryan v. MacPherson* 608 F.3d 614, 626 (Cal. 2010).

11. In determining whether a detention is prolonged, the Court stated, "we determine whether '[i]n attempting to confirm or dispel his suspicions of illegal activity, [the officer] used ... threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics.'" *Liberal v. Estrada*, 632 F.3rd 1064 (9th Cir. 2011) (citing *U.S. v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996))

12. Even if arguendo there was reason to detain Jeremy the second time for an initial investigation of the 911 call, the manner and the degree of force




2-GottsSER-00242

applied impermissibly extended the scope of the detention making it a full-blown arrest without probable cause.

13. When the Deputies escalated their initial detention by attacking Jeremy and getting physical with him, when Renegar rushed and punched him taking him down to the ground, with Deputies uncritically following him, they violated his Fourth Amendment rights by unreasonable and brutal force in effecting an arrest for non-existing crime.

14. Gunderson who arrived to the scene with Gotts, saw how the deputies maliciously attacked and brutalized Holloway but with ability and opportunity to stop did not intervene.

15. The same holds for Billinger, whose account of how he was there but did not see the use of force lacks credibility, because he could not account for his activities at scene at the same time Jeremy was being detained and attacked.

16. Both of these officers, are liable to Jeremy on 'failure to intervene' theory alone, in adherence to the same code of silence. *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994)

17. Bystander liability applies to the prevention of an illegal or unlawful arrest and conspiracies to deprive civil rights as here. 42 U.S.C. § 1986; *Gagnon v. Ball*, 696 F.2d 17, 21 (2nd Cir. 1982)

18. At summary judgment, the burden of establishing probable cause rests with the arresting officer, not the arrested plaintiff. *Dubner v. City and County of San Francisco* (2001) 266 F.3d 959, 965; *Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978); *Martin v. Duffie* (10th Cir.1972) 463 F.2d 464, 468-469; *Dellums v. Powell*, 566 F.2d 167, 175-176 (D.C.Cir 1977), *Patzig v. O'Neill* 577 F.2d 841, 849 n.9 (3rd Cir. 1978); *Cervantez v. J.C. Penny Co.* 24 Cal.3d 579, 592 (1979); *Cameron v. Fogarty*, 649F.Supp. 3,5 (E.D.N.Y. 1985).




2-GottsSER-00243

19. Probable cause to arrest exists when the facts and circumstances known to the arresting officer at the time of the arrest justify a prudent person in believing that the suspect committed or was committing an offense. *Hart v. Parks* 450 F.3d 1059, 1065 -1066 (9th Cir. 2006)*; Hunter v. Bryant* (1991) 502 U.S. 224, 228; *Gerstein v. Pugh* (1975) 420 U.S. 103, 111; *People v. Souza* (1994) 9 Cal.4th 224, 230.

20. Penal Code Section § 415 is entitled: Disturbing the peace. Subsection (2) states the offense is committed when "Any person who *maliciously* and *willfully* disturbs another person by loud and *unreasonable* noise."

21. "We are satisfied that loud shouting and cheering constitute the loud 'noise' prohibited by section 415 only in two situations: 1) where there is a clear and present danger of imminent violence and 2) where the purported communication is used as a guise to disrupt lawful endeavors." *People v. Superior Court (Commons)* 135 Cal.App.3d 812, 817, 185 Cal.Rptr. 492, 495 (Cal.App.,1982), *In re Brown* (1973) 9 Cal.3d 612, 621, 108 Cal.Rptr. 465, 510 P.2d 1017

22. Based on the facts presented here, the Deputies only had cause to investigate further the second time they arrived. Furthermore, there was no cognizable victim at the time of the arrest. The deputies never found any female or little girl when they arrived.

23. A reporting party's telephone call does not amount to probable cause to arrest anyone. It merely provided the basis to investigate. *Arvin v. Santa Clara Valley Transp. Agency*, 261 f.3d 912, 925 (9th Cir. 2001)

24. When the crime defines the suspect's state of mind as 415(2) requires both malice and willfulness to disturb, Deputy Renegar was required to have these facts to support probable cause without speculating.




2-GottsSER-00244

25. With respect to qualified immunity, none of the Defendants would be entitled to the defense because it has been established since at least 1972 that 415(2) cannot be violated unless there is a clear and present danger of imminent violence and where the noise is used as a guise to disrupt lawful endeavors. *In re Brown, supra*. *People v. Superior Court (Commons), supra*.

26. Renegar does not claim that either of these conditions ever existed. All these defendants are held to have known in January 2018 that they cannot lawfully seize and book the plaintiff for a violation of 415(2) under the circumstances presented to them.

27. Ninth Circuit authority "places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials." *Ward v. San Diego County*, 791 F.2d 1329, 1332 (9th Cir. 1986).

28. The reporting parties testified that the deputies did not speak with them when they arrived to the campground the second time.

29. Plaintiff's opposing evidence proves each of the co-defendants joined together to violate the plaintiff's constitutionally protected rights.

30. Willful conduct bars the qualified immunity defense. *Carnell v. Grimm* 74 F.3d 977, 978-979 (9th Cir. 1996)(qualified immunity unavailable where material facts are disputed); *Mendecino Environmental Center v. Mendecino County*, 192 F.3d 1283, 1295 (9th Cir. 1999); *Del La Cruz v. Kauai County*, (2002) 123 S.Ct. 608, 154 L.Ed. 2d 531. See also, *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1310 (9th Cir. 1994)(qualified immunity denied to deputy based on warrant issued by judge which was induced by deputy's misrepresentations of probable cause).




2-GottsSER-00245

31. An officer who manufactures probable cause for an arrest and conspires with other officers to suppress the truth of the events is *never* entitled to qualified immunity. *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997).

32. California Penal Code section 182, subdivision (2) criminalizes such conduct. Subdivision (1) criminalizes conspiracies to commit *any* crime.

33. Penal Code section 146 criminalizes any unlawful arrest or detention of a person against his will under color of law.

34. Penal Code section 118.1 criminalizes knowing and intentional falsehoods in police reports.

35. Hence, evidence that defendants conducted themselves in intentional violation of these criminal prohibitions categorically requires the denial of qualified immunity. Qualified immunity is unavailable to "those who knowingly violate the law." *Malley v. Briggs* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

DATED: November 30, 2020

**MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan_________

**NARINE MKRTCHYAN**

Attorney for Jeremy Holloway




2-GottsSER-00246

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

\- - - - - - -

| | | |
|---|---|---|
| JEREMY HOLLOWAY, Plaintiff, vs. COUNTY OF ORANGE, et al., Defendants. | ) ) ) ) ) ) ) ) ) ) | **CERTIFIED** No. 8:19-CV-01514-DOC Day 5, Volume I |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Monday, August 23, 2021

Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

**APPEARANCES:**

FOR PLAINTIFF JEREMY HOLLOWAY:

Narine Mkrtchyan
1010 North Central Avenue
Suite 204
Glendale, California 91202
818-388-7022
narine57@gmail.com

FOR DEFENDANT COUNTY OF ORANGE, et al.:

S. Frank Harrell
LYNBERG & WATKINS APC
1100 West Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

Tamara M. Heathcote
LYNBERG & WATKINS PC
1100 West Town and Country Road, Suite 1450
Orange, California 92868
714-937-1010
theathcote@lynberg.com

Jonathan C. Bond
LYNBERG & WATKINS APC
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
jbond@lynberg.com


2-GottsSER-00248

**APPEARANCES (continued):**

FOR DEFENDANT CHAD RENEGAR:

Michael L. Wroniak
COLLINS COLLINS MUIR & STEWART LLP
750 The City Drive, Suite 400
Orange, California 92868
714-823-4100
mwroniak@ccllp.law

Christie Bodnar Swiss
COLLINS & COLLINS LLP
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
760-274-2110
cswiss@ccllp.law

ALSO PRESENT:

Jeremy Holloway, Plaintiff

Thomas Beck

Deputy Joel Gonzalez

Deputy Kevin Pahel

Deputy Brandon Billinger

Deputy Mark Borba

Deputy Jameson Gotts

Deputy Justin Gunderson

Bryan Stever, defense technician

# I N D E X


| PROCEEDINGS | PAGE |
|---|---|
| JURY TRIAL - DAY 5, VOLUME I | |
| RAISZADEH, Dr. Kamshad (via Zoom) (called by plaintiff) | 21 |
| (Further proceedings reported by Debbie Hino Spaan in Volume II.) | |


**WITNESSES**


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RAISZADEH, Dr. Kamshad (via Zoom) | | | | |
| By Ms. Mkrtchyan | 22 | | 69 | |
| By Mr. Harrell | | 48 | | 76 |
| By Ms. Swiss | | 67 | | |



2-GottsSER-00250

Case: 25-7132, 08/25/2026, DktEntry: 44.3, Page 202 of 293



-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held telephone in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: August 23, 2021

/s/ Debbie Gale
________________________________
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR, CCRR

08:37 MS. MKRTCHYAN: Your Honor, before the jury comes in, may we take up an issue, Your Honor?

08:38 *(Clerk escorts Juror Number 1 out of the courtroom.)*

08:38 *(Outside the presence of the jury.)*

08:38 THE COURT: You know, here's my concern with both of you, co-equally. These pop-ups are getting burdensome, and I've been asking you to come in at 8:30 or 8:00. From now on, maybe we should just come in an hour earlier, because these last-moment pop-ups can't be of great concern. So the first pop-up is, if there's one for the plaintiff, now it's with the defendant.

08:38 What's your last-moment issue or concern, Counsel?

08:38 MR. HARRELL: Your Honor, the defense does not have plaintiff's paper exhibits. We don't. We're four days into trial now, and we've tried to be good sports about it. We have asked nicely. We have reasked nicely. It was promised in writing that we were gonna have them today. And so if plaintiff's counsel has brought them, great.

08:39 THE COURT: Okay. Well, just ask her.

08:39 MR. HARRELL: I don't see them.

08:39 MS. MKRTCHYAN: They didn't ask me. See, this is the problem, Your Honor. They did not ask me this morning. I have them in the attorney conference room. They were just -- we need to bind them because we didn't get a chance.


2-GottsSER-00252

08:39 THE COURT: I'm not worried about binding. Can we get through the first witness at least, the doctor, apparently, who is waiting for us by Zoom? And can we at least get those documents to you for cross-examination purposes?

08:39 Now, if you've seen them in another form; in other words, if you're seen them in electronic exchange.

08:39 MS. MKRTCHYAN: I --

08:39 THE COURT: No. Have you seen these documents in any other form?

08:39 MR. HARRELL: Your Honor, it's my understanding it's been represented to us that plaintiff's counsel has sent them electronically, but they weren't the best organized, and we don't have numbers to clearly correlate --

08:39 THE COURT: I see.

08:39 MR. HARRELL: -- with what -- and so, for example, plaintiff's counsel will say, "I'd like to show the witness Plaintiff's Number 1," and we over here are looking at each other going, "What is that? What is everybody looking at?"

08:40 THE COURT: So can we just for a moment -- to get this doctor's testimony, can we just get those paper copies exchanged between the two of you for the first witness today? Could you go get those for us?

08:40 MS. MKRTCHYAN: Yes.

08:40 THE COURT: Thank you.

08:40 MS. MKRTCHYAN: And by the way, Your Honor, just FYI, I have provided them electronic exhibits. They gave me their flash drive. They are numbered electronically, and had they come to me this morning, I would have told them exhibits are in the room.

08:40 THE COURT: Let's not waste time, 'cause you've got the doctor waiting. Go get those exhibits for them, and then we'll get them to you in paper form.

08:40 MS. MKRTCHYAN: Yes.

08:40 THE COURT: And if we need to bring the person back if either party is not prepared, we'll do so.

08:40 But let's do that right now first. Let's accomplish that.

08:41 *(Pause in the proceedings at 8:41 a.m.)*

08:42 MS. MKRTCHYAN: Your Honor, I --

08:42 THE COURT: I'm going to get to your motion for just a moment. Let me handle the jury first. Okay? I promise we'll be back with you.

08:43 *(In the presence of the jury.)*

08:43 THE COURT: Good morning. First of all, we're on record. All counsel and the parties are present. If you would be seated, please. Let me first of all start with a compliment to all of you.

08:43 I'm amazed at the ethics, and I'm always amazed and surprised by how great this country is because of you

INTENTIONALLY LEFT BLANK


2-GottsSER-00255

# INTENTIONALLY LEFT BLANK


2-GottsSER-00256

# INTENTIONALLY LEFT BLANK


2-GottsSER-00257

INTENTIONALLY
LEFT BLANK

# INTENTIONALLY LEFT BLANK

 2-GottsSER-00259

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| JEREMY HOLLOWAY, | ) CASE NO: 8:19-cv-01514-DOC-DFMx |
| Plaintiff, | ) CIVIL |
| vs. | ) Santa Ana, California |
| COUNTY OF ORANGE, ET AL., | ) Thursday, December 8, 2022 |
| | ) ( 9:53 a.m. to 10:45 a.m.) |
| Defendants. | ) (11:01 a.m. to 12:00 p.m.) |

VOLUME II

JURY TRIAL - DAY 3

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.


2-GottsSER-00260

**APPEARANCES:**

For Plaintiff: NARINE MKRTCHYAN, ESQ.
P.O. Box 2288
Toluca Lake, CA 91610
818-388-7022

For Defendants: S. FRANK HARRELL, ESQ.
TAMARA M. HEATHCOTE, ESQ.
Lynberg & Watkins
1100 West Town and Country Road
Suite 1450
Orange, CA 92868
714-937-1010

CHRISTIE B. SWISS, ESQ.
Collins & Collins
2011 Palomar Airport Road
Suite 207
Carlsbad, CA 92011
760-274-2110

MICHAEL L. WRONIAK, ESQ.
Collins Collins Muir & Stewart
750 The City Drive
Suite 400
Orange, CA 92868
714-823-4100

 2-GottsSER-00261

**INDEX**

| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHAD RENEGAR | 4 | -- | -- | -- |

**THE COURT:** Overruled.
A Well, every situation is different. To effect an arrest, we're allowed to use reasonable force to overcome resistance, effect an arrest, and prevent escape.
Q Right. But that's when you're arresting someone, right?
You are allowed, by Policy 300.2.1, when you are arresting someone, when you have probable cause to arrest someone, then you can use reasonable force to effect the arrest, to prevent escape, or to overcome resistance. True? Do you disagree with that?
A I don’t disagree with that. But there's a lot of movement in that.
Q Okay.
**MR. WRONIAK:** Your Honor, objection to the document being published.
**MS. MKRTCHYAN:** Well, Your Honor --
**THE COURT:** Yeah. Counsel, take down the document, please.
**MS. MKRTCHYAN:** Well, Your Honor, clearly --
**THE COURT:** Counsel, that's --
**MS. MKRTCHYAN:** -- we have --
**THE COURT:** -- an order.
**MS. MKRTCHYAN:** -- the problem with --
**THE COURT:** Counsel, that's an order. Thank you very much.




2-GottsSER-00263

**MS. MKRTCHYAN:** Well, I request --

**THE COURT:** It has not been --

**MS. MKRTCHYAN:** -- this document --

**THE COURT:** Counsel -- Counsel, that has not been received yet. Nothing goes up until I receive the document.

**MS. MKRTCHYAN:** There has been no objection to this document before, Your Honor.

**THE COURT:** Thank you very much, Counsel. You're next question now, please.

**BY MS. MKRTCHYAN:**

Q Well, is it your understanding that, even when you're not arresting someone, you can use that kind of force that we just discussed?

A Again, every situation is different. If we go to try to place handcuffs on somebody to detain them, and they start pulling away or fighting with us, that's now a crime. So we would be able to use force to effect-an-arrest them.

Q Well, sir -- okay. But at this point, you are not arresting Holloway, correct? You are detaining him, pending an investigation of a 911 call, correct?

A Again --

Q Yes or no?

A Say the question again?

Q Are you arresting Holloway or not, sir? Can we get a straight answer to any of my questions this morning?

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY, Plaintiff, vs. COUNTY OF ORANGE, et al., Defendants.

**Certified Transcript**

Case No. 8:19-cv-01514-DOC-DFM

**DAY 9**

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
FRIDAY, DECEMBER 16, 2022
9:31 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com


2-GottsSER-00265

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 North Central Avenue
Suite 204
Glendale, California 91202
818-388-7022
narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

LYNBERG & WATKINS APC
BY: S. FRANK HARRELL, ESQ.
1100 West Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

LYNBERG & WATKINS PC
BY: TAMARA M. HEATHCOTE, ATTORNEY AT LAW
1100 West Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
theathcote@lynberg.com

LYNBERG & WATKINS APC
BY: JONATHAN C. BOND, ESQ.
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
jbond@lynberg.com


2-GottsSER-00266

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

COLLINS COLLINS MUIR & STEWART LLP
BY: MICHAEL L. WRONIAK, ESQ.
750 The City Drive
Suite 400
Orange, California 92868-4940
714-823-4100
mwroniak@ccllp.law

COLLINS & COLLINS LLP
BY: CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
760-274-2110
cswiss@ccllp.law

**ALSO PRESENT:**

Jeremy Holloway
Deputy Joel Gonzalez
Deputy Kevin Pahel
Deputy Mark Borba
Deputy Jameson Gotts
Bryan Stever, defense technician
Zinnia Sayegh, plaintiff


2-GottsSER-00267

# I N D E X


| WITNESSES | PAGE |
|---|---|
| **JEREMY HOLLOWAY, CALLED BY THE PLAINTIFF** | |
| Cross-Examination by Mr. Harrell | 5 |


**EXHIBITS**

(None offered.)


2-GottsSER-00268

placed his 911 call?
A I don't even know who Mr. Gomez is. To this day, the only time I've seen him is in a prior trial.
Q Did you two ever meet before Mr. Gomez placed his 911 call?
A No.
Q Can you think of any reason for Mr. Gomez to lie about what he's saying was going on at the campground on the night of the incident?
A Yes, I can.
Q And that would be what, sir?
A Again, there's an indoctrination group involved in the police force. It's called The Explorers. And for people that are excited about law enforcement, this gives them the ability to, like, be a kid but, like, to get to be involved. They take the kids to events. They pass out fliers. They get to do ride-alongs. It's fun. It's fun for children.
This guy was one of them. And so this was his moment. He got everything mistaken, which was tragic because mistaken 911 calls lead to people dying.
But that's why -- I don't think he was -- he had anything against me. I just believe he was an overexcited kid that was trying to help. But he never seen anything. And so the only thing he was doing was guessing, which is very dangerous.

Q Sir, does listening to Mr. Gomez's 911 call help you understand why law enforcement came to Campsite 65 on that night?

MS. MKRTCHYAN: Vague and ambiguous as to time.

THE COURT: It's vague, Counsel. Sustained.

Q BY MR. HARRELL: Sir, let's talk about the second encounter that you had with law enforcement.

THE COURT: Counsel, would this be a good time for a recess? I think the jury's getting --

MR. HARRELL: It would.

THE COURT: Ladies and gentlemen, why don't you take 15 minutes. And then if we can, we'll go partway through the lunch hour, but we'll still get you the necessary time.

Please don't discuss this matter, nor form or express an opinion.

Mr. Holloway, you can step down.

**(Recess from time 11:17 a.m. to 11:35 a.m.)**

**(Out of the presence of the jury.)**

THE COURT: We're on the record. And, Counsel, the clerk said that you wanted to speak to the Court in camera -- or strike that -- a sidebar. The jury is not present. And I don't know which counsel --

MR. HARRELL: Your Honor, the defense would like to make a motion.

THE COURT: Okay.

MR. HARRELL: I believe the record will reflect that, unprovoked and unsolicited, Mr. Holloway blurted out that there was a prior trial in this matter.

The Court was very clear going into this trial, "Tell all of your clients not to do that." And we have and we do. In our emails to witnesses, to everybody, it's right in there. And we say it orally, "Do not do this."

The Court was very clear that if anyone says anything about a prior trial, that is a mistrial. And that's what we have now. There are certain lines in litigation that you just do not cross. Those lines have been crossed many times in this case, but now it's reached a new level.

Now we have mention of a prior trial in front of this jury, and I do not know how our clients can get a fair trial now with that poisonous information out there. That bell can't be unrung. We need a mistrial.

THE COURT: And counsel on behalf of Renegar, you move --

MR. WRONIAK: We concur, on behalf of Deputy Renegar.

THE COURT: Counsel, your thoughts?

MS. MKRTCHYAN: Yes, Your Honor. My thought on it is that that was completely inadvertent. First of all, the mention of the trial is prejudicial to both sides. I never wanted this jury to learn that there was a hung jury.

Absolutely not. And I have advised both my client and all witnesses not to mention it.

My client was confused when I spoke to him a minute after this. He was confused. He thought that when we are constantly talking about "prior hearing," "prior hearing," he thought that that was allowed. He basically -- that's what -- his understanding was that when we are referencing "prior hearing," "prior hearing," he thought that that was allowed now. So he was under complete misimpression.

I think that the jury did not even pay attention to that, frankly. I would be the one to actually ask for mistrial if I believed that that made an impression on the jury. Because that's prejudicial, frankly, to both sides. I would never have wanted any of the jurors to know that we had a hung jury. Are you kidding me?

So -- but I think this was inadvertent. Nobody paid attention. And it was brought only because Mr. Harrell keeps hammering my client on unrelated issues.

We have had how many days already? Yesterday we started. Today we are going into the lunch hour. We haven't even gotten to the use of force, the claims in this case, Your Honor. And he keeps asking the same questions over and over. And my client, of course he's stressed. Of course sometimes he's not giving direct answers to questions, true. But at the same time, you know, if there are issues that are

being irrelevant, it takes undue consumption of time to keep hammering him on the collateral issues.

The issues here are excessive force. We haven't gotten there. So I think that the -- you know, I object to even, you know, talking about this. My client blurted this out when he was stressed. Nobody paid attention. Half of the jury did not even listen to that.

And when we talk about prior hearing, I think a lot of people might have actually an inclination to think "What kind of a prior hearing?" We let the cat out the door anyway by keep talking about prior deposition, prior hearing. The jury is going to kind of have an idea that this case has been going on.

And by the way, Mr. Harrell was the one, in his opening statement, said, "Oh, we've been -- we really going over this case for several months and years. We want closure, ladies and gentlemen."

And when we talk about prior hearings and they bring out transcripts of prior hearings, the jury has a very good idea that this case has been going on for quite some time in the court system.

So I think that, Your Honor, this is really -- I've instructed my client not to blurt out statements like that. He was, again, under misimpression that when we are talking about prior hearings, then he's allowed to talk about prior trial.


2-GottsSER-00273

And, again, it was not intentional on his part. So, therefore, there's no grounds for mistrial.

THE COURT: Counsel?

MR. WRONIAK: Your Honor, briefly. Whether it was intentional or not, it was said. We cannot unring that bell. They've now heard about prior hearings, which the Court has indicated was appropriate to use. But Mr. Holloway got up there and said, "In a prior trial." And the Court's direction was clear: Any mention of a prior trial will be an immediate mistrial misaction, and we are requesting a mistrial.

THE COURT: Okay. Counsel, are you joining?

MR. HARRELL: Join, Your Honor.

THE COURT: Give me a few moments.

**(Pause in proceedings.)**

THE COURT: All right. Counsel, all of you be seated.

The Court means what it says. It's as simple as that. And this case is now mistried.

You're ordered to meet and confer with this Court on Monday afternoon, Mr. Holloway, because you're still in the area. I'm going to take a look at my calendar. We're going to be setting as quick a trial date as we can. And I want to go over that calendar with all counsel so there's as little inconvenience as possible. I just don't know those dates yet, okay?


2-GottsSER-00274

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**- - - - - - -**

| | |
|---|---|
| **JEREMY HOLLOWAY,** | ) |
| | ) **CERTIFIED TRANSCRIPT** |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **No. 8:19-CV-01514-DOC** |
| | ) |
| **COUNTY OF ORANGE, et al.,** | ) |
| | ) **TRIAL DAY 3, VOL. 2** |
| **Defendants.** | ) |
| | ) |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**Jury Trial**

**Santa Ana, California**

**MONDAY, JULY 20, 2023**

**SHARON A. SEFFENS**
**Federal Official Court Reporter**
**United States District Court**
**411 West 4th Street, Room 1-053**
**Santa Ana, California 92701**
**(612) 804-8655**



 2-GottsSER-00275

01:52 testified previously that taser could not be used on a passively resisting individual.

01:52 MR. HARRELL: That misstates the testimony.

01:52 THE COURT: Counsel, point me to that line, please. That's not pages 297 or 298, counsel.

01:53 Ladies and gentlemen, I'm going to caution you to please disregard --

01:53 MS. MKRTCHYAN: I can find it. It's inappropriate. Give me a moment. I will find it. Objection.

01:53 THE COURT: Counsel --

01:53 MS. MKRTCHYAN: Is the Court not allowing me to impeach credibility of this officer with his prior deposition testimony, sir?

01:53 THE COURT: Your statement to the jury was just misleading, counsel. There is no statement on 297 nor 298 as to your question. As to the ruling of the Court, now be very careful.

01:53 MS. MKRTCHYAN: On page --

01:53 THE COURT: Counsel, on 297 and 298, I specifically instructed you to point out that line. That line does not exist. Your question was improper.

01:53 Ladies and gentlemen --

01:53 MS. MKRTCHYAN: 298, I'm getting you the line.

01:53 THE COURT: Ladies and gentlemen --



 2-GottsSER-00276

01:53 I don't wish to engage you, counsel.

01:53 Ladies and gentlemen, you are ordered to disregard
01:53 the comments of counsel.

01:53 MS. MKRTCHYAN: Well, I object.

01:53 THE COURT: I'm going to have to take a recess for
01:53 just a moment. Thank you very much.

01:54 (Jury not present)

01:54 THE COURT: Have a seat, counsel.

01:54 Counsel, I'm going to admonish you that you need a
01:54 cooling period. When you confront the Court, you are on the
01:54 edge of contempt. This is your first warning. If you
01:54 confront me again, that will be the second I'm going to try
01:54 to forebear.

01:54 You have directly confronted this Court with a
01:54 specific ruling. Your statement to the jury was not only
01:54 improper, but it was misleading. That statement that you
01:54 made does not exist on page 297 or 298.

01:54 Now, I am going to take a recess.

01:55 MS. MKRTCHYAN: I need to --

01:55 THE COURT: Thank you, counsel. You have made
01:55 your record.

01:55 MS. MKRTCHYAN: Excuse me. I am moving for a
01:55 mistrial. I am done with this Court. I am moving for a
01:55 mistrial. Thank you.

01:55 (Recess)



 2-GottsSER-00277

THE COURT: We are back in session outside the presence of the jury. Counsel are present. The parties are present. Thank you for your courtesy.

I am going to go back to page 297 and 298. Once again, after having asked plaintiff's counsel where this appeared, I'm not seeing this after reading these two pages. I will give you a chance to show me on 297 and 298 where that appears.

MS. MKRTCHYAN: Yes. The question was asked of him if you believe taser is permitted on a passively resisting individual.

THE COURT: Would you say that again?

MS. MKRTCHYAN: I asked him a question at this trial right now.

THE COURT: Passively resisting a taser. Show me where that is on page 297 and 298. Maybe it appears some other place, but it's not on these pages.

MS. MKRTCHYAN: On the application of taser, we have going down about him being asked about on the application of taser: "Is that permissible to use for a non-compliant -- a verbally noncompliant person?" The witness says --

THE COURT: That isn't responsive. That's why I read both of these pages, and I don't see any response to that question. It's not permissible. What he's saying is,

all right, on the application of the taser -- this is the question: "The ECD as you guys call it, is that permissible to use for a non-compliant -- a verbally non-compliant person?"

It goes down, and I didn't see any response to that question.

MS. MKRTCHYAN: Well, then continue, Your Honor. Read it on page 298.

THE COURT: I read both pages.

MS. MKRTCHYAN: I would like to read it for the record, please.

THE COURT: No, no. I am asking you to show me that. I don't see that on 297 or 298.

MS. MKRTCHYAN: Then it goes on. It says: "All right" -- on the top of 298, it says:

"Q. All right. So we're not talking about a combative or physically aggressive person. We're talking about a resistant person, true?

"A. Yes.

"Q. All right."

THE COURT: That's not a verbally non-compliant person, counsel.

MS. MKRTCHYAN: Your Honor, I asked him is it allowed on a passively resisting individual. It's for the jury to determine.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

\- - - - - - -

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, | CERTIFIED TRANSCRIPT |
| vs. | No. 8:19-CV-01514-DOC |
| COUNTY OF ORANGE, et al., Defendants. | TRIAL DAY 10, VOL. 1 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Thursday, August 3, 2023

SHARON A. SEFFENS
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(612) 804-8655



 2-GottsSER-00280

08:59 not allow me.

08:59 And now we are here. My client is being cross-examined. After a full day of cross-examination, which was unlimited, I did not object. The Court did not take recesses as many times as we did for the defendants. And now my client is going to be cross-examined further about some extraneous matters unrelated to this incident. And what is the prejudicial effect, particularly of that DV incident?

08:59 The fact of the matter is that there is a suspicion and allegation in this case that he was detained for a DV incident, and he has denied it. Now, in order to strengthen, bootstrap, their desperate effort to justify the use of force and to assassinate him further, they are trying to -- they are going to bring in this evidence and say, look, oh -- this is indirectly influencing this jury to say, look, this guy is lying to us. He's losing his credibility because, see, he was with a female that night. They didn't find a female. He was involved in a DV with his ex. What are the chances he was not involved with a DV last night?

09:00 So this is what is going on. This is exactly what's going on, not law enforcement bias. And my client did not open any doors. Therefore, this Court is ensuring with this ruling that -- first of all, 403 is not applied in this Court evenhandedly. 403 was applied against us very

heavily to limit our ability to impeach these defendants' testimony, but 403 is not being applied to limit my client's -- you know, the character assassination of Mr. Holloway to deprive him of any ability to recover for his injuries. Undue consumption of time does not apply to us.

Furthermore, you know, it's ensuring that we are going to have another mistrial, because I guarantee none of these jurors -- none of these jurors are going to give a defense verdict. These people are not going to give a defense verdict. You can bet on it. These defendants are not going to walk away. And if I was a prosecutor, if I was a U.S. Attorney, I would have prosecuted them. They are only lucky I'm not a U.S. Attorney. Someday, I may become. Someday, I may take this Court's bench, and I will ensure that law enforcement will be held accountable.

But at this point, I'm going to do only what is in my power, and my power is to ask this Court to apply the law, 403, evenhandedly and not ensure another mistrial, because I can tell that we are going to have another mistrial. This jury is going to be prejudiced against my client with this sandbagged evidence. They are not going to be able to reach a verdict.

We already had a long break last week. We came back. They are not going to come back beyond August 14. They are taking another day of cross-exam.





2-GottsSER-00282

09:02 THE COURT: Let's set the record straight on that. You've asked me to file an in-camera document. Part of that break in the Court's scheduling was to accommodate you, counsel, after you filed that document with the Court.

MS. MKRTCHYAN: What document, Your Honor? I'm not sure what you are referring to.

THE COURT: You filed a document with this -- do you want me to state this on the record?

MS. MKRTCHYAN: I did not file any document.

THE COURT: Yes, you did. You filed a document with this Court saying you couldn't hold up to the hours. You submitted a document to the Court from your -- counsel, be very careful with this now. Part of this Court's scheduling was to accommodate you because of your claim that you couldn't keep the Court's hours. You filed that document with the Court. Do you want me to produce it for you?

MS. MKRTCHYAN: That is not the issue here.

THE COURT: Yes, it is. So when you make the statement that we had a recess last week, partially that was as an accommodation to you.

MS. MKRTCHYAN: Well, I don't believe so, but I appreciate that.

THE COURT: Okay. Well, thank you very much. I do appreciate that because partially that was because you



 2-GottsSER-00283

filed an in-camera document saying you couldn't hold up to the Court's hours, so I decided under those circumstances let's go eight days and have a recess. That's an inconvenience to the defendants, quite frankly, and they didn't know about that until this. So when you create a record about a delay, this delay was to accommodate you, so I had a record that you wouldn't keep extraneous hours because you constantly complained about being able to start at 7:30. I start my court at 7:30 and accommodate you by starting at 8:30.

MS. MKRTCHYAN: I did not request --

THE COURT: I've taken all the recesses you've asked except for your interruption yesterday, and you're not going to interrupt cross-examination depending upon how your client is doing, so I went an hour and forty-five minutes. I gave you two hours the prior day. So I don't appreciate a record that's false, quite frankly. This was to accommodate you to make certain you could hold up.

MS. MKRTCHYAN: I didn't --

THE COURT: I want you to continue your argument on the merits because I don't wish to confront you over this.

MS. MKRTCHYAN: Well, first of all, I --

THE COURT: It's a false record you're creating.

MS. MKRTCHYAN: No. First of all, I didn't ask



 2-GottsSER-00284

09:03 for a one-week break. The only -- the doctor's letter specifically said provide the same break --

09:03 THE COURT: Well, fine. We'll go straight through to the end if we get to the end.

09:03 MS. MKRTCHYAN: Your Honor, that's not the issue here. As you --

09:04 THE COURT: I know it's not, so don't create that record. Stay with the issue. You're throwing in extraneous things attacking the Court. I really don't appreciate that.

09:04 MS. MKRTCHYAN: I'm not attacking the Court.

09:04 THE COURT: Yes, you are.

09:04 MS. MKRTCHYAN: I'm making my record for appeal.

09:04 THE COURT: Then make your record for appeal on the issue.

09:04 MS. MKRTCHYAN: Okay. Yes --

09:04 THE COURT: Don't throw in gratuitous things about the hours because that was, quite frankly, a kindness on this Court.

09:04 MS. MKRTCHYAN: That was a misunderstanding on the Court's part. That was not my complaint. The breaks that we asked for were two timely scheduled breaks, lunch break. You know, the Court had kept us after --

09:04 THE COURT: Let's go on the merits, counsel. This isn't --

09:04 MS. MKRTCHYAN: Yes. The merits are very simple,



 2-GottsSER-00285

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

JEREMY HOLLOWAY, )
)
PLAINTIFF, )
)
vs. ) SACV NO. 19-01514-DOC
) Day 3, Volume III
)
COUNTY OF ORANGE, et al., )
)
DEFENDANTS. )
_______________________________)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, MAY 5, 2025

10:24 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

11:35:21 as well. We have a copy.

(*The videotape was played.)*

BY MS. MKRTCHYAN:

Q Okay. Sir, we heard this call. And, of course, you
11:50:22 didn't get this call in your car. You were getting what the dispatch was telling you about this call. True?

A True.

Q Okay. And when -- by the way, as an officer, you are trained to investigate 911 calls. True?

11:50:37 A True.

Q Okay. You don't just go by the 911 call. You come and investigate. True?

A Yes.

Q And the caller that we heard, Joshua Gomez, never
11:50:48 identified the campsite number of Jeremy Holloway?

A True.

Q And he never gave his name either?

A True.

Q And it was clear to you after you spoke with him after
11:50:58 the incident, he never came out of his tent to verify where this noise was coming from. True?

A I did not talk to him.

Q Deputy Pahel spoke to him?

A I don't know. I don't remember.

11:51:13 Q We'll go over the video, but -- in any way, when you


2-GottsSER-00287

11:51:17 arrived, you had this brief exchange with Joshua Gomez. He just gave you direction where he heard the noise. True?
A I did not have any exchange with Mr. Gomez.
Q Okay. So when you approached Jeremy Holloway -- let's
11:51:33 go to that point in time. When you arrived, you had your guns drawn. You had your flashlights. You with Kevin Pahel and joined then by Deputy Renegar. True?
You had your guns drawn?
A Yes.
11:51:46 Q Okay. And you also had your flashlights, because it was dark. True?
A Yes.
Q Still dark, right?
A Yes.
11:51:52 Q So aside from your flashlights, your guns and the patrol car lights, still dark. True?
A Yes.
Q Okay. When you approached, you saw him standing there within his campsite. True?
11:52:06 A Yes.
Q He was not yelling or screaming. True?
A True.
Q And you didn't see a girl with him. True?
A No, I did not.
11:52:15 Q And you did not hear a girl screaming there, did you?



 2-GottsSER-00288

11:52:19 A I did not.
Q And so at this point in time when you arrived with guns drawn, was there a crime ongoing in your presence?
A No, there was not.
11:52:30 Q Your first order, with Deputy Pahel, was what? Show his hands, right? You ordered him, *Let me see your hands*. True?
A True.
Q And that's for officer safety. You want to make sure no one is armed. True?
11:52:40
A That is true.
Q And he -- after brief hesitation, he showed his hands. He stood there like a cross not moving. True?
A That is true.
11:52:54 Q He did not move towards you. True?
A True.
Q He made it very clear he's not moving. He said it several times, *I'm not moving.* He's standing there very stationary. True?
11:53:06 A True.
Q Okay. And you did not see -- you saw his hands. They were visible to you. True?
A I can't recall. I mean, it was dark, so I don't remember. I know his hands were out to his side, though.
11:53:21 Q Did you see any weapon that you could see in his hands,


2-GottsSER-00289

11:53:23 sir? Yes or no?
A No, I did not.
Q Did he make any threats to you? Did he say anything that was threatening towards you?
11:53:33 A No, he did not.
Q He was asking why. *What did I do? Why am I being detained,* since you were there just a few minutes, you said within a half an hour. True?
A That is true.
11:53:44 Q Okay. Did you provide him an explanation why you were detaining him second time now with guns drawn?
A I was not going to.
Q Okay. So now you did not see a crime in progress. You didn't see him armed. He had his arms extended and yet -- 11:54:03 and you were investigating a call for disturbance at this point in time. True?
A No. I -- I -- we were there because we heard -- based on dispatch, he was threatening the campers and there was a little girl crying.
11:54:19 Q Well, sir, that's what the dispatch told you. And you just told me you have to investigate calls. You just don't go by the 911 call, do you?
A We do investigate it, but we have to make sure the scene is safe first.
11:54:29 Q Sure. And, of course, when you came, did you make any

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, vs. COUNTY OF ORANGE, et al., Defendants. | Case No. SA CV 19-01514-DOC (DFMx) Santa Ana, California Tuesday, May 6, 2025 (12:59 p.m. to 1:09 p.m.) (5:52 p.m. to 6:59 p.m.) (7:01 p.m. to 7:11 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF JURY TRIAL
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded;CourtSmart |
| Courtroom Deputy: | Karlen Dubon |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.


2-GottsSER-00291

APPEARANCES:

For the Plaintiff:

NARINE MKRTCHYAN, ESQ.
Mkrtchyan Law
655 North Central Avenue
Suite 1700
Glendale, California 91203
(818) 388-7022

For the Defendants:

S. FRANK HARRELL, ESQ.
RYANE SKINNER, ESQ.
Lynberg & Watkins, APC
1100 West Town and Country
Road, Suite 1450
Orange, California 92868
(714) 937-1010

CATHERINE A. NALTSAS, ESQ.
Lynberg & Watkins, APLC
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
(213) 624-8700

CHRISTIE B. SWISS, ESQ.
Collins & Collins, LLP
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
(760) 274-2110

MICHAEL L. WRONIAK, ESQ.
Collins & Collins, LLP
750 The City Drive
Suite 400
Orange, California 92868
(714) 823-4100


2-GottsSER-00292

within a motion in limine. I raised Tafoya in a witness list. If you had any problem with that, you could have deposed her. You could have limited her questioning so that we could right now not have this kind of a discussion on a third day of trial after picking a jury, after I spent my -- I've taken my time from my other cases. I have my client travel from Montana. He had to take the train to be here, and now you're asking for mistrial on some bogus excuse that Ms. Tafoya was such a great witness that, your Honor, oh, we cannot handle the idea of losing this case and paying some modicum of money to Mr. Holloway. Please stop this bleeding. Your Honor, please stop Ms. Mkrtchyan from getting a resolution of this case. That's what is happening here. That's what is happening. That's what happened at second trial. That's what happened third trial. Why are we sitting here resolving -- why are we even doing a third trial on all issues when we had a liability verdict.

So, you know, this is just frustrating to me. I mean, this is turning into an uphill battle. And, quite frankly, I'm shocked when we haven't even sought multiple millions of dollars in this case. What would they have done if they really -- if we really sought multiple millions of dollars? They would have shot me right there at the door of this courtroom. They would have shot me. They would have leashed my client. What is this happening? I do not


2-GottsSER-00293

recognize this -- this is becoming really outrageous to me. Can we have some civil sort of without attacking, accusing and lynching me and my client? What is this? United States of America. Let's just have some sort of a decent resolution of this case. You want to grant a mistrial. Go for it. But, you know what? You know, you're going to really belittle any -- any sort of -- you know, this is becoming really kind of -- quite frankly, I am shocked.

With that, I will abide by any court order. I have agreed. I have not violated any court orders. Yes, I'm an aggressive attorney. Yes, you know, if you cannot handle me, go litigate with another attorney. Settle the case. Pay us some money. We'll get out the door, man, you know. You cannot handle me? You are five attorneys cannot handle me? And I have not violated a single court order here. This is, frankly, very outrageous to me.

So, period, you know. I am really disappointed here. But, in any event, I need to also file -- file briefing on this issue. I'm going to request recess tomorrow because if this is actually going to go down to a mistrial or if this issue is going to go into -- before the jury, additional -- additional criminal records history of my client being brought and showcased in front of the jury, I need recess to do briefing for the -- so that we can prepare the appeal for this issue. But at this point, you


2-GottsSER-00294

and we have to pull it, and we'll set out a specific date that emotional damages aren't being claimed from that point after. That makes the alternate stressors irrelevant in Rhode Island. Okay. I'm sorry. I mean Pennsylvania. My apologies."

And this concludes at line 19.

THE COURT: With that agreement, now turning to the Plaintiff, after my concern about no objection being made by the Defendant, there's absolutely no reason to bring in through this witness the mother, these events after June or July of 2018 pursuant to the prior instruction and pursuant to the agreement, and there was no reason to emphasize homelessness, which caused the Court to literally instruct the jury during the opening statements that homelessness was not the center or gravamen of this case, that this was about excessive force.

And I believed, without warning, that any issue concerning homelessness that you were referring to was what had come up in the first trial about the O'Neil Campsite. I never envisioned that we would get the sympathetic testimony of two or three days of homelessness which counsel has argued, and I think he's right, has a nexus back and an inference to this jury that this homelessness and this



 2-GottsSER-00295

is being punished unfairly.

Second, it's of great concern to me when an agreement is reached between each of you but more importantly on the record with the Court, that that's obeyed. And here it wasn't. And I need to say this directly to you on -- as Plaintiff's counsel and that is this issue of homelessness is sympathetic. It's a societal issue that everyone is -- God, it's the number one issue in Southern California literally by polling, and it was very clear that June or July of 2018 was the agreed date that emotional damages would not go forward on. And yet we have a heart attack, stroke, homelessness, all with the inference that that's tied back to the January 2018 incident.

By the same token, the mother was always going to be a sympathetic witness. She was always going to make a good impression. Any mother would. And, so, I don't hear anything other than she's a devastating witness in terms of her presentation and perhaps you'd like a do over, and I can sympathize and understand your tactical decision. I don't want that to go by the wayside, but I can't make a ruling unless you do object, and you've been voluminous with your objections. The record will reflect that every appropriate time you objected I have tried to rule on that, and I think if we go back through the record, you'll see a huge number of objections that were sustained.


2-GottsSER-00296

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, vs. COUNTY OF ORANGE, et al., Defendants. | **Certified Transcript** Case No. 8:19-cv-01514-DOC-DFM **DAY 4, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TUESDAY, MAY 6, 2025
8:06 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

time because of the peripheral vision. And emotionally he was still having a hard time. So -- but even on the way there, I had to lend him money to -- his truck broke down. So I ended up giving him a credit card --

11:47AM
Q Yes.
A -- to live on.
Q Right. And so you have given him your credit card, you know, to help him with this kind of cost because he couldn't leave -- work the same way as he used to do?

11:47AM
A Right.

MS. SWISS: Objection. Leading. Counsel's testifying. Relevance.

THE COURT: Counsel, you keep summarizing it. We want to hear from the witness. Sustained.

11:48AM
MS. MKRTCHYAN: This goes to damages.

BY MS. MKRTCHYAN:
Q In any event what credit card did you give him?

MS. SWISS: Relevance.

THE COURT: Yeah, I think this is getting peripheral

11:48AM
at this point, Counsel. I think that the damages surrounding the incident, the credit card I'm going to exclude, Counsel.

BY MS. MKRTCHYAN:
Q Well, how much money have you lent Mr. Holloway thus far, to date, for living costs, for rent, for food, for traveling?

11:48AM
How much money so far have you calculated you've lent him?


2-GottsSER-00298

A At least $40,000.
Q Okay. And 40,000, that's part of his credit card?
A It's our credit card.
Q Right. And are you still paying those credit card bills?
11:48AM A Yes.
Q And is there interest on this credit card bills?
A Yes.
Q Okay. When he went to Pittsburgh, Pennsylvania, and after that he went to Montana; right?
11:49AM A Yes.
Q Right. And was he homeless for certain periods of time in Montana?
A Yes.
Q To get him off the streets, did you help him with rent?
11:49AM A I did for a certain amount of time, but my credit card got maxed, and so he ended up living on the streets for a couple days. But then that's when he called me and said come and get his dog. And I knew what that meant. So I got more money, and I told him to get a hotel. But thank goodness, Montana is very
11:50AM good for VA. He did get to go to a shelter.
Q So he had a stroke?
A He ended up having another stroke. This was right -- that's right. He had -- that was another reason why he couldn't work. He had another stroke in the same spot where
11:50AM his head was -- I had to fly out there. And he still has two

aneurysms still in his head now.
Q Right. And when was this stroke that he sustained approximately? Was it last year?
A It's been -- it's probably been about, what, four months ago or so.
Q Okay. And he had a heart surgery after the stroke?
A He's had -- he's had heart surgery. When he had the stroke, you know, because of his age, they're trying to figure out why. So they've been doing a lot of testing. So they said he needed heart surgery. So with all this, he has not been able to work again. And so -- but yes, he had another stroke. And he was talking to me on the phone, actually, when he had gotten the stroke. He said, "I'm feeling funny," and I told him to call.
Q And how old is he now?
A 48.
Q Right. And you didn't expect him at 48 to be dependent on you?
A No.
Q And you had to -- when you retired, did you expect to go back to work?
A No, not really.
Q And now you're working, you said, part time?
A Yes.
MS. SWISS: Objection. Relevance.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | **Certified Transcript** |
| | ) | |
| vs. | ) | Case No. |
| | ) | 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., | ) | |
| | ) | |
| Defendants. | ) | **DAY 5, VOLUME I** |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 7, 2025
7:51 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, ATTORNEY AT LAW
655 North Central Avenue
Suite 1700
Glendale, California 91203
818-388-7022
narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

LYNBERG & WATKINS APC
BY: S. FRANK HARRELL, ESQ.
1100 West Town & Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

LYNBERG & WATKINS APLC
BY: CATHERINE A. NALTSAS, ATTORNEY AT LAW
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
213-624-8700
cnaltsas@lynberg.com

LYNBERG & WATKINS PC
BY: TAMARA M. HEATHCOTE, ATTORNEY AT LAW
1100 West Town & Country Road
Suite 1450
Orange, California 92868
(714) 937-1010
theathcote@lynberg.com

LYNBERG & WATKINS
BY: RYANE CORINNE SKINNER, ATTORNEY AT LAW
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
rskinner@lynberg.com

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

COLLINS & COLLINS LLP
BY: MICHAEL L. WRONIAK, ESQ.
750 The City Drive
Suite 400
Orange, California 92868-4940
714-823-4100
mwroniak@ccllp.law

COLLINS & COLLINS LLP
BY: CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
760-274-2110
cswiss@ccllp.law

**ALSO PRESENT:**

Raymond Farahmand, plaintiff's paralegal
Bryan Stever, defense IT technician


2-GottsSER-00303

# I N D E X


| WITNESSES | PAGE |
|---|---|
| **JAMESON GOTTS, CALLED BY THE PLAINTIFF** | |
| Direct Examination by Ms. Mkrtchyan (continued) | 14 |
| Cross-Examination by Mr. Harrell | 60 |
| Redirect Examination by Ms. Mkrtchyan | 114 |
| **ROGER ALMA CLARK, CALLED BY THE PLAINTIFF** | |
| Direct Examination by Ms. Mkrtchyan | 134 |


**EXHIBITS**

(None offered.)



 2-GottsSER-00304

scene, but that doesn't mean they became involved in the altercation.
Q I'm talking about the active altercation.
Let's play the tape.
THE COURT: No, Counsel. Just a moment, for both of you, the question was: Who was involved in the altercation? The deputy's answer: Renegar, Pahel, Gonzalez, Borba; he joined, but Gunderson was not involved in the altercation.
You're referring to who's at the scene. Make that clear. Gunderson is at the scene, but the deputy's saying he's not involved at that time in the altercation.
BY MS. MKRTCHYAN:
Q He did not admit to use of force; true?
MR. HARRELL: Objection. "He." Vague.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q Let's continue playing this. I'm not going to get a straight answer from you anyway.
MR. HARRELL: Objection. Motion to strike.
THE COURT: Sustained.
**(Videotape played, not reported.)**
BY MS. MKRTCHYAN:
Q Isn't this Gunderson running towards the scene of the active altercation after Borba and you?
A Yes, ma'am.

Q Okay.

THE COURT: Ladies and gentlemen, you are to disregard the side comments. Comments like "I'm not going to get a straight answer from you" are entirely inappropriate. Is that understood? That can later be argued that there's whatever involved. But those side comments along the way, I'm going to admonish you, are to be completely disregarded and are entirely improper.

Is that understood by the jury?

**(No audible response.)**

THE COURT: Okay, Counsel.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q After you arrived, after you jumped out of the car and Borba arrived, then we hear Mr. Holloway screaming he's bleeding, and we hear Deputy Renegar loudly yell out, "Taser, Taser, Taser"; true?

A Can you replay that part of the video where we hear "Taser, Taser, Taser."

Q Sure.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Did you hear that now?

A Yes, ma'am.

Q Okay. So we have established now, based on this patrol

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, et al.,<br>Defendants. | **Certified Transcript**<br>Case No. 8:19-cv-01514-DOC-DFM<br>**DAY 5, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 7, 2025
7:51 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

time.

BY MS. MKRTCHYAN:

Q But you didn't see that happen; right? When you came, did you see him kick anyone?

09:21AM A Again, ma'am, for the 15 seconds or so that I was involved in this use of force, I did not -- I did not use head strikes, nor did I witness head strikes.

Q That's not my question. Listen carefully.

I said when you came, did you see him kick anyone

09:21AM with his legs? Yes or no; I don't know?

A I don't recall. What I observed was active resistance and three deputies trying to get him under control with the fourth deputy that arrived just before me.

Q "Active resistance" means a lot of things to me. We want

09:22AM to know what you observed because active resistance is a generic language that you are using.

MR. HARRELL: Objection.

BY MS. MKRTCHYAN:

Q I'm asking you what you saw.

09:22AM THE COURT: We're going to go right back to the question, then, of "Did you see..."

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

Q Did you see him kick anyone with his legs when you

09:22AM arrived and joined in? Yes or no?


2-GottsSER-00308

A I don't recall him kicking anybody.
Q Did you see him placing someone in a headlock?
A No.
Q Did you see him strike anyone -- actively, violently striking someone?
A No.
Q Isn't it true he was face down when you arrived, sir?
A As I testified yesterday, he was on his stomach, chest. I don't know whether his head was to the left, to the right, face down on the dirt.
Q Okay. So but in that situation, when you arrived, that moment in time -- I'm not talking about what happened before you were there. I'm talking about the moment you arrived and saw that pile of officers on the ground with Mr. Holloway. Would that be appropriate for you to hit him in the head?
MR. WRONIAK: Objection. Argumentative.
THE COURT: We're not dealing with hitting the head. Aren't we dealing with kicking?
MS. MKRTCHYAN: Either, Your Honor. Either hitting or kicking in the head.
THE COURT: You can answer that question.
THE WITNESS: The force option that I selected was to apply my knee to his upper back area, ma'am. I would assume that at the time I wouldn't have found it reasonable to hit him in the head based on the circumstances that I was facing.

BY MS. MKRTCHYAN:

Q Right. And isn't it true if someone hit him in the head or kicked him in the head at that point in time when you came and saw him face down on the ground, that also would have been unreasonable; true?

09:23AM

MR. WRONIAK: Objection. Legal conclusion.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q And then, you know, when we are talking about the Taser -- first of all, isn't it true your PVS recordings are not in sync with GPS? You know what is GPS?

09:24AM

MR. HARRELL: Objection on testimony. The initial part is testimony and move to strike that.

THE COURT: Well, I think this is easy to resolve by the two of you. There are different tapes at different times, and I don't see why we can't have a stipulation concerning that.

09:24AM

MS. MKRTCHYAN: No, Your Honor. That's not the point.

THE COURT: All right. Then re-ask your question. Maybe I didn't understand it.

09:24AM

MS. MKRTCHYAN: The point is something else.

BY MS. MKRTCHYAN:

Q So isn't it true your tape -- have you ever compared your tape -- the time on your tape to, for example,

09:24AM

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY, )
)
Plaintiff, ) **Certified Transcript**
)
vs. ) Case No.
) 8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al., )
)
Defendants. ) **DAY 5, VOLUME I**
)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 7, 2025
7:51 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

on the ground during an active altercation. It falls under controlling force in our department's policy.

Q Why not let Holloway up and let him do anything that he wants?

10:17AM A That would be how someone would potentially get hurt.

Q Why do you say that? What were you concerned about?

MS. MKRTCHYAN: Objection, Your Honor. It's vague and ambiguous, and it's irrelevant.

THE COURT: Overruled. This goes to the officer's state of mind at the time. 10:17AM

Counsel, you can --

Or you can answer that question.

THE WITNESS: Thank you, Your Honor.

Sir, could you repeat the question.

10:17AM BY MR. HARRELL:

Q Sure. Why not let Mr. Holloway get up and do anything that he wants? Why use your knee to help secure him on the ground?

A Well, there's a number of reasons. One, Mr. Holloway was under arrest at that point for California Penal Code 148(a)(1), potentially California Penal Code 69. So allowing him to just walk around isn't an option. He's being taken into custody. 10:17AM

Number 2, there's safety concerns for the public and for officers on scene. Number 3, ideally we'd like Mr. Holloway to just cooperate so that we can proceed forward 10:18AM


2-GottsSER-00312

with the investigation, place him in handcuffs, figure out what's going on, and resolve this whole thing without any force.

Q So there has been a claim in this case that somebody kneed Mr. Holloway in the head. I want you to describe what you did with your knee and how you did it on that night.

A Yes, sir. So as I stated, as I proceeded towards the altercation, I came into where the altercation was with Mr. Holloway, who was on the ground, again, stomach and chest on the ground, back facing upwards towards me. I placed my right knee with some force into Mr. Holloway's upper back, somewhere between his shoulder blades. Again, I recall it being a little closer to the left side.

I then assisted with getting Mr. Holloway's left arm out from underneath his chest/stomach area so that it could be placed on the small of his back and he could ultimately be handcuffed.

Q And, again, what side of Holloway are you on? The right? The left? Someplace else?

A I'm on his left side.

Q Okay. When you placed your knee on Mr. Holloway's back, with you on the left side, were you trying to hurt him at that time?

A Well, the application of body weight would be controlling force. However, the application of knee would fall under


2-GottsSER-00313

potentially injuring force. And the objective was, again, to get Mr. Holloway's left arm out from underneath of him. Again, not knowing whether he's armed with a bladed object, not knowing the status of my partner's firearm, the objective is to get the arm out, place it in the small of his back so he could be handcuffed.

Q Now, sir, who were the three other deputies that were with Mr. Holloway when you first arrived on scene? Their names, please.

A As I know now or at the time of my arrival, sir?

Q As you know now.

A The three initial deputies were Deputy Renegar. And as I know now, Deputy Pahel and Deputy Gonzalez.

Q Okay. Of those three, did you know any of them prior to the date of this incident?

A Yes, sir.

Q Who?

A I knew Deputy Renegar, and I knew Deputy Pahel.

Q How about Deputy Gonzalez?

A I don't recall knowing Deputy Gonzalez prior to this. I may have had -- we worked out of the same station, so perhaps passed each other in the hallway or the locker room. But I don't recall having any knowledge of him other than now in this lawsuit.

Q Okay. And when you did place your knee on Mr. Holloway's

BY MR. HARRELL:
Q Is that accurate?
MS. MKRTCHYAN: He already testified that he didn't see what other officers were doing.
THE COURT: It's also leading, Counsel. You can ask him what he saw.
BY MR. HARRELL:
Q Sir, do you have a memory of whether or not the deputy who you now know to be Kevin Pahel, do you have a memory of whether he was on Mr. Holloway's left side, his right side, or someplace else when you first arrive on scene?
A Well, I know there was a deputy on his left side, the left midsection area, and I now know that to be Deputy Pahel.
Q Okay. Let's move to the right side.
Do you have any understanding as to who, generally speaking, was over on Mr. Holloway's right side while he was face down on the gravel?
THE COURT: Then or now?
MR. HARRELL: Okay.
BY MR. HARRELL:
Q At the time that you first arrived, okay, at that time, did you see anybody over to Mr. Holloway's right side, the right side of his body while he was face down in the gravel?
A Yes, I did.
Q Do you now know who that is?


2-GottsSER-00315

A Yes, I do.
Q What is that individual's name?
A I now know that individual to be Deputy Gonzalez.
Q Okay. Did you see Deputy Gonzalez having any physical contact with Mr. Holloway at that time when you first arrived on scene?
A Again, I recall the active struggle to -- by both deputies on the left and right to get the arms out from underneath him. However, I couldn't testify to their individual actions. It wasn't my focus at the time.
Q Okay, sir. So let's get back to what you did.
After you placed the knee on Mr. Holloway's upper back, what did you do next?
A I assisted with getting his left arm out from underneath of him so that we can place it in the small of his back and handcuff him.
Q Okay. And what is your law enforcement objective in wanting to get Mr. Holloway handcuffed?
A Once we have an individual handcuffed, it greatly reduces the likelihood or probability that an individual is going to be able to be combative or use their hands to access a weapon that could cause harm to us or the general public.
Q Now, your first involvement in this incident involving two encounters was the second encounter when Mr. Holloway was already down on the ground; right?

A Yes, sir.

Q Speaking for yourself, when you were trying to get his arm out and get him handcuffed, did you know whether or not Mr. Holloway might have a weapon somewhere underneath of his body that he was trying to reach for?

MS. MKRTCHYAN: This has been asked and answered, Your Honor, several times.

THE COURT: I'm going to let you answer that one more time.

THE WITNESS: Thank you, Your Honor.

As I testified to earlier, I don't know at the time of my arrival whether Mr. Holloway has a bladed weapon on his person, under his person, or whether the firearm that was involved when my partner put out one at gunpoint had been reholstered or was involved in this altercation at that time.

BY MR. HARRELL:

Q What did you do to try to get Mr. Holloway's hand out from under his body?

MS. MKRTCHYAN: Asked and answered, Your Honor. We went through these series of questions several times already.

THE COURT: Counsel, haven't we covered this? I'll give you latitude one more time but just to be certain.

THE WITNESS: Well, initially as I approached, came in with a knee, placed it with some force into Mr. Holloway's upper back, again, we're calling it being a little more towards

the left side. Objective with that was to keep him on the ground but also try and get him to release his left arm, which, again, I could see an active struggle between the deputies that were there to try and get Mr. Holloway's arms out from underneath of him. Then I transitioned to helping try to get that left arm out so we could place him in the small of his back and handcuff him.

BY MR. HARRELL:

Q When you first pulled on Mr. Holloway's arm, were you able to get the hand out?

A And if I may add to the last question that you'd asked me so there's no confusion with the jury, while I was assisting to get the left arm out, my knee remained in place on Mr. Holloway's upper back.

And then your last question, sir? I'm sorry.

Q Sure. When you first -- and my question, again, was what did you do to get his arm out?

A As I recall, it would have been just grabbing ahold of it and trying to pull it out.

Q Did Mr. Holloway work with you at that time and bring his arm out?

A Initially there was active resistance in keeping it tucked under there. But we were able to get it out and, again, within the somewhat less than 15 seconds that I was involved, wherever the time frame is on that.


2-GottsSER-00318

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, ) | |
| ) | |
| Plaintiff, ) | **Certified Transcript** |
| ) | |
| vs. ) | Case No. |
| ) | 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., ) | |
| ) | |
| Defendants. ) | **DAY 6** |
| ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

Renegar's second tape.

THE COURT: All right. This will be from Deputy Renegar's video -- or from his body cam. Counsel.

MS. MKRTCHYAN: Yes. Let me just briefly do this.

08:38AM THE COURT: Is this going to be a video?

MS. MKRTCHYAN: Yes, Your Honor.

THE COURT: We need to get that copied then. Thank you.

MS. MKRTCHYAN: Yes.

08:38AM **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So this point in time when you are saying "I'm not moving. I'm not moving. "Why am I being --" your sentence is interrupted?

08:39AM A That is correct.

Q Now, what were you trying to express? What was going on in your mind when you were saying "I'm not moving. I'm not moving"?

A At that point they had told me to stay at that point. I
08:39AM didn't want to move. I told you I'm scared at this moment. And I'm trying to ask "Why am I being detained?" because I felt I have the right to know -- as a citizen, to know why because I don't know why they're there. I have no idea what's going on.

Q Right. So -- and your sentence is interrupted. And
08:40AM let's continue playing this.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So when you said, "I'm not. Why am I being --" is that the point in time when you felt the blow to your face?

08:40AM A Yes.

MR. WRONIAK: Objection. Leading.

THE COURT: No, overruled.

You can answer that question concerning timing.

THE WITNESS: Yes. That's when I was hit in the head.

08:40AM

BY MS. MKRTCHYAN:

Q So -- and then when you are on the ground, we hear punches. Are you the one doing these punches, or is it the officer who's throwing punches on you?

08:41AM A No. I'm being detained and punched.

Q And then we hear you make sounds -- growling sounds, and then you say, "You're kneeing me in the head." Did you hear that?

A Yes.

08:41AM Q Okay. And is this the point in time when you were held in a chokehold by Renegar, as you testified?

A Yes. I believe -- because it happens -- in reality it happens actually kind of fast. I believe this is in the time when I'm getting choked and switched over.

08:41AM Q Okay. So -- but when you are growling, you are making

sounds of growling, is that the point in time when you cannot breathe?

A Right. You can hear me trying to say words, and I'm just being in pain. I can't breathe.

08:41AM **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So what are you saying at this juncture?

A Again, I'm still pleading with these officers, "I have not done anything." Nobody has said anything to this point. I have -- they -- still don't know why they're there at my campsite.

08:42AM

Q And when you are saying "What are you doing? I didn't do anything," what are you trying to express to them?

A They're beating me up. I'm telling you, I haven't done anything. There's no reason for this, what they're doing to me.

08:42AM

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q At this point in time, you are saying what?

A That's about the time I'm getting hit in the -- kneed in the eye socket. You could hear me saying "I'm bleeding."

08:42AM

Q And then we have the -- what, Renegar?

A "Taser, Taser, Taser."

Q So are you actively resisting at this point in time on the ground when you are bleeding? You were just hit in the

08:43AM


2-GottsSER-00322

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, et al.,<br>Defendants. | **Certified Transcript**<br>Case No. 8:19-cv-01514-DOC-DFM<br>**DAY 6** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, MAY 8, 2025
8:05 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

A I would guess 20 -- 20 minutes or so, plus, minus.
Q And did you recognize these officers from the first time?
A I recognized a couple of them.
Q Okay. So when you were asking this questions and they were not talking to you, the only command you heard, we hear on tape, is what?
A Just "Get on the ground."
Q Okay. And why didn't you get down on the ground?
A I was scared.
Q Okay. What was your thinking at that point in time when they are telling you "Get down on the ground" without explanation?
A If I would have moved at this moment, the way everything was going on, the way they were yelling, I felt if I would have moved at any moment, it would have been -- he reached for his waistband. He grabbed something. Again, I thought I was going to get shot.
Q And did anyone tell you how you were supposed to get down on the ground? Face down, on your knees, your hands up? Did anyone give you those kind of instructions that you would follow?
A No. I just have multiple officers screaming at me.
Q And did anyone try to verbally communicate with you that, "Sir," you know, "we are from the sheriff's department," you know, "We are trying to investigate another call. Were you




2-GottsSER-00324

disturbing your neighbors?"
A There was never any de-escalation.
Q How many seconds passed, from your memory, without thinking about the video? From that point in time, you're standing there, putting yourself in that moment. How many minutes or seconds passed from the time you were told "Get down on the ground" and to the time when you first were hit -- struck?
A Without watching the video and putting my state of mind at that moment, it happened like that. I'm asking what happened. They're running. And boom, I get hit in the head.
Q Did you see that coming -- from what direction it was coming?
A No, because as I was going -- listening to different commands, watching both -- all three of these officers, I'm on my -- again, left side, I'm blind from my stroke -- I'm hit in the head. And at that point I see light, like blackout. I just --
Q Right. And that came from your left side?
A Yes.
Q Okay. And we know from this diagram that you drew, on your left side was who, initially when you saw?
A Yes. When I was watching, Deputy Renegar was the deputy on the left side that was coming at me.
Q Okay. With gun drawn?

A Yes, ma'am.
Q Okay. When -- and did you see Gonzalez come towards you from the right side?
A I was watching both of them, yes. And I was watching their actions for my safety. I was scared at this moment.
Q Did Gonzalez give another command? Did he have something about the Taser?
A I don't remember him giving a command. I just remember yelling, "Tase him, tase him."
Q Okay. And did you hear them talking about lethal?
A Yes, I heard -- this is when it just -- it got really real when I hear "You have your lethals?" And everybody is "Yes, yes."
Q How fast did you feel officer -- Deputy Renegar approach you and then you were punched?
A I actually --
MR. WRONIAK: Objection. Calls for speculation.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q How quickly this happened when you were standing there and you were punched?
A Standing that moment in that time, it happened immediately.
Q Okay. So you felt a blow to your face?
A Yes, I felt -- I felt a blow to my left side.

Q Okay. Did you black out? Because you described something like "I had lights." What happened?
A Yes, I believe I blacked out. I can't tell you how long I was. Again, I'm not on a stop -- I'm not counting.
08:28AM So I come to and I'm laying down on top of Officer Renegar. He's laying -- his back is on the ground, and I'm being held. His elbow pit is on my neck, and he's holding me and punching me with his other. And I have other officers holding my arms.
08:28AM Q So tell us what happens next. Tell us that moment in time when you find yourself on the ground. You were face up, you said?
A Yes.
Q Okay. So you didn't go face down?
08:29AM A I did eventually.
Q Okay. I'm talking about the moment in time when you are punched by Renegar and you find yourself after brief blackout, you were face up?
A Yes. By the initial officers, I was being punched in the 08:29AM ribs and punched in the head, being choked to where I could not breathe.
Q Okay. What else did you feel at that point in time? What other use of force was applied on you?
A Well, as we go, I'm being turned over. I have an officer 08:29AM on my back. I have officers holding my arms, and I'm laying



 2-GottsSER-00327

down like this (indicating) on the ground. And I'm watching what's going on, trying to figure out what's going on. I'm still yelling, "I have not done anything wrong," trying to figure out what's going on.

And then I see another officer that wasn't from the first three come and knee me right in the eye, in the temple area of my right side. And there is a moment where I did pull up my right arm to try to block my -- to save my face. And you do see blood on my arm from where I was trying to protect my head.

Q Did you actually feel when you started bleeding from your face?

A Yes. And I even say it.

Q And how did you feel the moment in time when you saw blood?

A The moment I saw blood, because it was warm and it was in my eye.

Q And how did you feel when that -- when you saw blood?

A I was scared. I'm just trying to -- we're now in life or death. I'm getting hit in my temple, in my eye. And -- you know, and then I'm getting kicked everywhere right now, and I'm being held down. It's like I have -- nothing I can do because I'm being held down and beaten. I can't do anything.

I'm trying my best to -- so I wasn't fighting. I was protecting my head. But everything else I had a large

officer on my legs, on my calf area. I believe Officer Renegar was on my butt area, lower back. And I had other officers holding my -- arms held out while I had one leaning on his buddy, using leverage to knee me in the head. And I see that until like -- and that's why I'm trying to do that as I'm lying on the ground.

08:31AM

Q So you did feel actually knee strikes on your head?

A Yes, I did. And I say it.

Q Okay. And then -- so after that, did you -- and this was ongoing -- were you actually striking them in any shape or way? Can you strike them?

08:32AM

A No. I even tell them, "I'm not fighting you." And my words -- the best way to say it is I wasn't fighting them; they were fighting me. They were just -- and then with one officer starting it and officers seeing their other buddies in an altercation, they automatically want to save the other officer. So I become now the victim of -- it's pretty much of just -- it's chaos.

08:32AM

Q So -- all right. So let's -- going to that moment again. So did you feel the Taser?

08:32AM

A Yes, I did. I felt it several times.

Q Okay. And you felt the Taser. And when the Taser was applied, did you feel it -- where did you feel it in your body, the Taser?

A I felt it in my whole body. So I couldn't have told you

08:33AM





2-GottsSER-00329

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY, PLAINTIFF,

vs.

COUNTY OF ORANGE, et al., DEFENDANTS.

SACV NO. 19-01514-DOC
Day 7, Volume I

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


2-GottsSER-00330

11:16:52 exactly what time he turned me. But you can hear certain, you know, times when he's choking me. And, you know, on each video, you hear. But I believe at that time, they choked me. And since they had my arms, it was easy to flip

11:17:09 me over while he was still staying maintained of my torso while staying on top of my buttocks area, while maintaining me. I am now on my stomach.

Q I want to make sure we've got this.

Deputy Renegar has you in a chokehold.

11:17:27 A Yes, sir.

Q And then somehow, your arms are out, being held by other deputies?

A Correct. They're controlling my arms as -- because Deputy Renegar, as he says, he's punching with me with one

11:17:44 arm and grabbing with my neck with the other one.

Q Sir, I didn't ask you what Deputy Renegar said. I'm asking you what happened, according to you. Do you understand that?

A Right. And that's what happened.

11:17:55 Q Okay. So as you're there, you've got two deputies holding your arms, and Renegar's got this chokehold on you?

A Yes, sir.

Q And at that point, did you feel you were under control?

A I'm under control?

11:18:12 Q Yeah.



 2-GottsSER-00331

11:18:13 A Not at all.
Q Were you -- strike that.
MS. MKRTCHYAN: Vague question.
BY MR. WRONIAK:
11:18:19 Q Sir, you've also testified that as you were in this chokehold, you were getting kneed in the head, correct?
A There's knees, heads, punches.
Q Now, during the incident, you can hear yourself on multiple PVS recordings that we've listened to here today
11:18:39 and through your testimony, where you say you're getting kicked or kneed in the head, right?
A That is correct.
Q And immediately after the incident, when you're sitting on the log, you mentioned being kneed in the head, correct?
11:18:52 A Right.
Q And you asked if that's within protocol, correct?
A That is correct.
Q Sir, you voluntarily made those statements, correct?
MS. MKRTCHYAN: Objection. "Voluntarily," vague
11:19:07 and ambiguous.
THE COURT: Just a moment.
MS. MKRTCHYAN: That's vague and ambiguous, Your Honor.
THE COURT: No. Overruled -- well, strike that.
11:19:19 I'm going to sustain the objection, Counsel, as to



 2-GottsSER-00332

"voluntarily."
BY MR. WRONIAK:
Q Sir, you made those statements before anybody asked you what had happened, correct?
MS. MKRTCHYAN: Objection. Vague as to time. What are we talking about?
THE COURT: There are numerous statements.
BY MR. WRONIAK:
Q As you're sitting on the log --
THE COURT: "As you're sitting on the log."
BY MR. WRONIAK:
Q -- after the incident, you say, "Is kneeing in the head protocol," correct?
A That is correct.
Q And nobody asked you to make that comment or asked you what happened when you said that, correct?
A That's because nobody's asking me anything or telling me anything. I say several different things. I asked why I'm here. I say I haven't done anything wrong. I'm trying to get somebody to talk to me. I just have somebody pushing me down on my neck.
Q Sir, on the PVS recordings that we listened to, you never mentioned being put in a chokehold; do you?
A On the PVS?
Q Correct.




2-GottsSER-00333

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,
PLAINTIFF,
vs.
COUNTY OF ORANGE, et al.,
DEFENDANTS.

SACV NO. 19-01514-DOC
Day 7, Volume I

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com


2-GottsSER-00335

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Jameson Gotts, Orange County Deputy Sheriff, Defendants

Chad Renegar, Orange County Deputy Sheriff, Defendants

Bryan Stever, Litigation Support, Defendants


2-GottsSER-00336

# I N D E X



| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEREMY HOLLOWAY | | 19<br>97<br>111 | 133 | |




2-GottsSER-00337

07:58:23 THE COURT: Mr. Harrell, be on time. Am I clear? Am I clear?

MR. HARRELL: Understood, Your Honor.

THE COURT: Counsel.

07:58:29 MS. MKRTCHYAN: Yes, Your Honor. So very briefly.

If the Court -- well, yesterday, I asked for a break during cross-examination. First, I needed a break to go to the restroom.

THE COURT: I gave you that break.

07:58:44 MS. MKRTCHYAN: No --

*(Court Reporter requests clarification for the record.)*

THE COURT: Counsel, I'm going to continue now to cross-examination. You take up your complaints with the 07:58:53 Court at the end of the day. I do not want this interrupted. And I do not like the fact that we're in the middle of cross-examination, when we get to a point where there's a good interchange going on about the facts, and suddenly, we need a break. That occurred during the first 07:59:07 couple trials also. And sometimes, I wonder if that's not tactical to speak to your client in the hallway.

MS. MKRTCHYAN: Your Honor --

THE COURT: I gave you the break yesterday --

*(Simultaneous speakers.)*

07:59:15 MS. MKRTCHYAN: I need to finish my record. No,




2-GottsSER-00338

07:59:17 I'm not going to participate in this. You know, Ninth Circuit is going to watch this. I need to make my record; otherwise, I'm not going to participate. You guys continue without me. Thank you very much.

07:59:41 *(Plaintiff's attorney exits the courtroom.)*

THE COURT: Counsel, we're going back on the record. We're missing one juror.

Mr. Harrell, please continue.

THE COURT REPORTER: She left, Your Honor.

08:00:05 THE COURT: Now she's missing.

Would you please get your counsel. When that juror goes back in, we go back into session.

*(Pause.)*

*(Ms. Mkrtchyan enters courtroom.)*

08:00:31 THE COURT: One juror is missing, so if you'd like to continue to make your record. We have a little bit of time until that juror -- but as soon as that juror is here, we're back in session.

MS. MKRTCHYAN: Your Honor, it seems to me that 08:00:36 we're going to go up on the Ninth Circuit. And I'm entitled to make my record without interruptions, without being told that --

THE COURT: I was here at 6:45 for you to make this record last evening, and you weren't here.

08:00:46 MS. MKRTCHYAN: Well, because the defense were not


2-GottsSER-00339

08:00:47 here. In any event --

THE COURT: No, no, you were not here --

*(Simultaneous speakers.)*

THE COURT: No, you may not in that regard.

08:00:52 Because you keep setting a bad record. I gave each of you the courtesy of being here at 6:45 last evening, just to hear this kind of concern and before the jury comes in. Now we're going through this and holding up a jury.

MS. MKRTCHYAN: 6:45 is not -- you're holding up

08:01:06 the jury because Mr. Harrell was late half an hour --

THE COURT: I just said that, Counsel; it's on the record. And I just admonished Mr. Harrell to be on time.

MS. MKRTCHYAN: Okay. Then may I make my record instead of being interrogated? This is Ninth Circuit issue,

08:01:15 and I need to raise it.

I have the right to rehabilitate my client when the defense asks him questions on collateral, irrelevant issues. His state of mind, as of right now, in this lawsuit, is irrelevant. He keeps going into issues, "What

08:01:32 do you know now about the 911 calls?" That is irrelevant. What is relevant is my client's state of mind at the time of the incident.

Now, if my client is being cross-examined without any breaks -- yesterday, my direct examination was stopped

08:01:46 twice by this Court *sua sponte*, but cross-examination was




2-GottsSER-00340

08:01:50 not stopped, even when I asked for restroom break, and I was basically admonished in front the jury.

But in any event, if that is the case, I have the right under the due process, under the Seventh Amendment 08:02:01 right to jury trial, to rehabilitate my client. This Court has deprived me of my ability to represent my client in many ways. I'm not allowed to ask him questions about his current medical issues. His stroke -- multiple strokes have affected his cognitive abilities. If anyone has any 08:02:19 information about strokes, which is in his medical records, it affects you cognitively, neurologically. This man has, currently, PTSD. This man is sitting there and, clearly, he's unable to cognitively process some of the questions that are being given to him.

08:02:36 We are not allowed to talk about his stroke. You can instruct this jury that, "Ladies and gentlemen, the stroke that Mr. Holloway had with surgery has nothing to do with this incident, nor does his stroke in 2016 have anything to do." However, I'm entitled to tell this jury 08:02:51 why this man has difficulty of processing information and sitting there for hours and responding to same questions five times asked different ways by an attorney who has absolutely no compassion, no empathy for someone. I hope everyone in this courtroom gets a stroke. Everyone in this 08:03:08 courtroom gets a stroke so that you understand what this man




2-GottsSER-00341

08:03:12 is going through right now in this court. Sometimes he has to come to this court and testify on cross-exam, grueling sessions.

So I'm entitled to rehabilitate. I have the right 08:03:23 to do that for my client. Therefore, I'm going to present to this jury the fact that -- and I'm putting this on notice so that no one later says, "You've opened doors." I'm going to ask my client about his stroke, about his heart surgery, the medications he's now taking. And then I'm going to ask 08:03:39 him, "Is that stroke related to this incident?" And if anyone dares to argue that that's opening doors to some emotional distress damages that we've limited, we'll go up on the Ninth Circuit.

You can declare mistrial; no problem. You can 08:03:53 certify issues for appeal. I've had enough of this already. Okay. I am handicapped severely. "Oh, Mr. Harrell, you can't say this. You cannot present loss of wages. You cannot present emotional distress damages. You can barely talk about your client's medical costs." So what this is? 08:04:12 If I'm handicapped from representing my client, why don't we just go up on appeal and raise this issues civilly and very productively, legally, on appeal. But why do we have to go through series of --

THE COURT: Mr. Harrell, thank you very much. 08:04:27 You've made your record. Now please, be seated. I'd


2-GottsSER-00342