**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

Case No. NINTH CIRCUIT CASE Nos. 25-7132, 25-7297

---

JEREMY HOLLOWAY,
Plaintiff – Appellant

vs.

THE COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace office
Defendants – Appellees

---

On Appeal from the
United States District Court for the Central District of California,
(District Court No. 8:19-cv-01514-DOC-DFM)
The Hon. David O. Carter Judge Presiding

---

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 3 OF 6**

---

CATHERINE A. NALTSAS [SBN 262259]
JESSE K. COX [SBN 285218]
LYNBERG & WATKINS, APC
1100 Town & County Road, Suite 1450
Orange, California 92868
Tel: (714) 937-1010/Fax: (714) 937-1003
**Attorneys for Appellees**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | SACV NO. 19-01514-DOC |
| | ) | Day 9, Volume II |
| | ) | |
| COUNTY OF ORANGE, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| ___________________________________ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 13, 2025

12:16 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


3-GottsSER-00344

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com


3-GottsSER-00345

Case: 25-7132, 08/25/2026, DktEntry: 44.4, Page 4 of 91

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Bryan Stever, Litigation Support Defense


3-GottsSER-00346

I N D E X


| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHAD MATTHEW RENEGAR | | 10 | | |
| MARTIN RAMIREZ | 18<br>33 | 40 | | |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 243-1 Unredacted Version of Ramirez Memo re Onwuka Incident | 47 | |

E X H I B I T S

| DEFENDANTS' EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 243 Ramirez Memo re Onwuka Incident | | 24 |



3-GottsSER-00347

03:09:17 MS. SWISS: Objection. Outside the scope.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q Were you told by the defense counsel that the same
03:09:23 captain who gave a slap [phonetic] to Deputy Chad Renegar in this incident found him in violation of a host of policies after this incident -- just a year after?
MR. HARRELL: Vague.
MS. SWISS: Outside the scope.
03:09:37 THE COURT: Sustained. Sustained.
The jury is to disregard this completely.
You're to absolutely disregard this, understood?
All right. Thank you.
BY MS. MKRTCHYAN:
03:09:47 Q And you said that Deputy Chad Renegar's report was consistent with your review of the video, right?
A That's correct.
Q Okay. Isn't it true you read his report?
A I did.
03:09:59 Q Okay. Let's go back to his report. I'm going to show it on my screen.
Thank you, Mr. Staver?
MR. HARRELL: Stever.
MS. MKRTCHYAN: Stever. Thank you.
03:10:08 I would like to publish to the jury what has been



 3-GottsSER-00348

03:36:00 and Luna, and there is no other, and whatever words you want to put in there. In other words, no other inference which is a weak way of saying it. You can be stronger, but there's no other evidence before this Court.

03:36:15 MR. HARRELL: Your Honor, another only very quick --

MS. MKRTCHYAN: Excuse me. Your Honor, I need to respond --

MR. HARRELL: -- point --

03:36:18 *(Overtalking: Unable to report.)*

MS. MKRTCHYAN: Excuse me.

I am not going to be speaking already. If there is an accusation here, I want to -- actually, the transcript to be read. What specifically did I say that is 03:36:30 objectionable? Because there is this all --

And the Court is advocating for the defense. I might as well be, basically, going up against defense counsel and -- which is -- yes, the Court is advocating.

THE COURT: I'm not going to --

03:36:41 *(Overtalking: Unable to report.)*

THE COURT: -- again tonight -- you've already wished this Court and the whole body here a stroke, among other things. And I'm starting to now pull those. It's been redundant and repetitive.

03:36:55 MS. MKRTCHYAN: No, but let's --




3-GottsSER-00349

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY HOLLOWAY, | ) | Case No. SA CV 19-01514-DOC-(DFMx) |
| Plaintiff, | ) | |
| | ) | Santa Ana, California |
| vs. | ) | |
| | ) | Wednesday, May 14, 2025 |
| COUNTY OF ORANGE, et al., | ) | |
| | ) | (1:12 p.m. to 1:58 p.m.) |
| Defendants. | ) | (2:11 p.m. to 3:06 p.m.) |
| | ) | (3:20 p.m. to 4:47 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF TRIAL (DAY 10)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE, and a jury

Appearances: See next page.

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Melissa H. Kunig

Transcribed by: Jessica Reuter
Echo Reporting, Inc.
9711 Cactus Street, Suite B
Lakeside, California 92040
(858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

did he point you to?
A Campsite 65.
Q Why do you say that?
A Because where his tent was located inside the campground, directly across would be campsite 65.
Q Did Mr. Gomez point you in the direction of campsite 66?
A No.
Q Did he say anything to you that led you to believe that the domestic violence was taking place in campsite 66?
A No, and there was no indication that campsite 66 had anything to do with our call.
Q So after you left Mr. Gomez' site, where did you go?
A I walked back out of his campsite back towards campsite 65, and that's when we came into contact with another female -- or with a female who had just walked out of her campsite on to the road. And that's why we spoke with her, because our call involved a male and a female, and we happened to find a female outside her tent.
Q Did you rule her out as being involved in the domestic violence incident?
A Yes. Our call was involving a male and female, and she said that she was in there with her partner, which she indicated was another female.
Q Okay. What did you do after you spoke to that female


3-GottsSER-00351

walking down the road?
A At that point Deputy Borba had come over and indicated it was campsite 65, and we went to campsite 65. We ran the truck's license plate over air -- over the radio, and our dispatcher came back with who it belonged to or who it was registered to, and that's when we contacted Mr. Holloway at his tent. And I identified myself as the Sheriff's Department and asked him to come out and talk to us.
Q And before you got to Mr. Holloway's tent and asked him to come out, did you see a white truck in his campsite?
A Yes. His campsite was the only one with a white truck in it.
Q Was there a white truck in campsite 66?
A No, there was not.
Q Did you see a white truck in any other campsites in the vicinity of Mr. Holloway's campsite 65?
A No, there was no white truck. It was only campsite 65.
Q Did the fact there was a white truck in campsite 65 have any significance to you at that time?
A Yes, because our dispatcher had told us that it was in the tent to the campsite to the right of campsite 63, which was campsite 65, with a white truck, and that's where we went to.
Q Based on all the information you had before contacting Mr. Holloway, did you believe you were in the right campsite



 3-GottsSER-00352

where this domestic violence might have occurred?
A Yes.
Q Why did you believe that?
A Based on the totality of everything. Our call was to the right of campsite 63 with a tent and a truck. And Mr. Holloway's campsite was to the right of campsite 63 with a blue tent and a white truck. And we had talked to campsite 67, a female that was walking around, and then Deputy Borba spoke with the original informant who was here earlier, Brian Fuerbach, who told Deputy Borba that it was that tent right there -- or tent to the right. So we were under -- we came to the assumption that we were in the right place.
Q And by the way, did you have a flashlight with you that evening?
A I did, yes.
Q Were you using it as you were walking around the campsite before you contacted Mr. Holloway?
A Yes.
Q Were you using it when you approached Mr. Holloway's tent before making contact with him?
A Yes, I did.
Q Okay. So when you approached Mr. Holloway's tent the first time, did you make any observations of the campsite itself?
A Yeah. There was two tents, a firepit, a table, the --



 3-GottsSER-00353

there was dirt and gravel, and that he had knives spread out throughout his campground.
Q Okay. So this campsite is not paved, is it?
A No. The road's paved, but the campsite itself is dirt and gravel.
Q Did you observe any rocks in the campsite?
A Yes, there's rocks in the campsite.
Q I think you mentioned knives as well, correct?
A Yes.
Q Where did you observe knives?
A There was a knife by the firepit -- or there was a machete by the firepit, and there's different knives throughout the campground.
Q Okay. Sitting here today do you remember how many knives you saw in the campground as you approached Mr. Holloway's tent the first time?
A No.
Q Okay. But you saw knives?
A Yes. And you hear on Borba's tape, he says, knives, knives, knives. And every deputy that was there that has testified have said there's knives throughout the campground.
Q You mentioned a machete. Where did you see that?
A By the firepit.
Q Did you see an ax?


3-GottsSER-00354

A Yes.
Q Where was that located?
A I believe it was by the picnic table.
Q And based on your observations of the campsite, did you believe you were dealing with a homeless individual?
A No.
Q Why not?
A There was no indication that he was homeless.
Q Did any of these observations that you made of the campsite cause you any safety concerns?
A Yes. The type of call, it's domestic violence. The location, again, it's in a campground, it's dark. The knives throughout the campground. Everything adds to the totality of what we were there for.
Q Why did the knives present a safety concern to you?
A Because you can be injured and hurt if a knife is used on you.
Q Did the machete cause you a safety concern?
A Yes. It's still a longer bladed weapon.
Q How about the ax?
A Yeah, it still has the potential to hurt you.
Q So when you first contacted Mr. Holloway, what did you say?
A Sheriff's Department. Can you come out and talk to us?
Q What was his response?


3-GottsSER-00355

Case: 25-7132, 08/25/2026, DktEntry: 44.4, Page 14 of 91



A He said he was the only one in there.
Q Was that significant to you?
A Yes, because prior to me saying that or asking him to come out, we had never told him why we were there. We had just identified ourselves, and his first response was, he's the only one in there.
Q How long did it take Mr. Holloway to get out of his tent?
A A minute, minute and a half, something right around there.
Q Did that cause you any concerns?
A We don't know -- or, yes, because we don't know what he has inside his tent or if anybody's in the tent with him.
Q So after Mr. Holloway exits the tent, what do you do next?
A I asked him if I could pat him down.
Q Why?
A One, officer safety, because we do see the knives and everything throughout his campsite, but also just the time it took him to get out and for our safety.
Q What was Mr. Holloway's demeanor like when he exited the tent?
A No, he was upset.
Q Were you assessing Mr. Holloway's behavior?
A Yes.


3-GottsSER-00356

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY, | ) Case No. SA CV 19-01514-DOC-(DFMx) |
| Plaintiff, | ) |
| | ) Santa Ana, California |
| vs. | ) |
| | ) Wednesday, May 14, 2025 |
| COUNTY OF ORANGE, et al., | ) |
| | ) (1:12 p.m. to 1:58 p.m.) |
| Defendants. | ) (2:11 p.m. to 3:06 p.m.) |
| | ) (3:20 p.m. to 4:47 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF TRIAL (DAY 10)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE, and a jury

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Melissa H. Kunig |
| Transcribed by: | Jessica Reuter<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.


3-GottsSER-00357

A Yes.
Q Where was that located?
A I believe it was by the picnic table.
Q And based on your observations of the campsite, did you believe you were dealing with a homeless individual?
A No.
Q Why not?
A There was no indication that he was homeless.
Q Did any of these observations that you made of the campsite cause you any safety concerns?
A Yes. The type of call, it's domestic violence. The location, again, it's in a campground, it's dark. The knives throughout the campground. Everything adds to the totality of what we were there for.
Q Why did the knives present a safety concern to you?
A Because you can be injured and hurt if a knife is used on you.
Q Did the machete cause you a safety concern?
A Yes. It's still a longer bladed weapon.
Q How about the ax?
A Yeah, it still has the potential to hurt you.
Q So when you first contacted Mr. Holloway, what did you say?
A Sheriff's Department. Can you come out and talk to us?
Q What was his response?

 3-GottsSER-00358

Case: 25-7132, 08/25/2026, DktEntry: 44.4, Page 17 of 91



A He said he was the only one in there.
Q Was that significant to you?
A Yes, because prior to me saying that or asking him to come out, we had never told him why we were there. We had just identified ourselves, and his first response was, he's the only one in there.
Q How long did it take Mr. Holloway to get out of his tent?
A A minute, minute and a half, something right around there.
Q Did that cause you any concerns?
A We don't know -- or, yes, because we don't know what he has inside his tent or if anybody's in the tent with him.
Q So after Mr. Holloway exits the tent, what do you do next?
A I asked him if I could pat him down.
Q Why?
A One, officer safety, because we do see the knives and everything throughout his campsite, but also just the time it took him to get out and for our safety.
Q What was Mr. Holloway's demeanor like when he exited the tent?
A No, he was upset.
Q Were you assessing Mr. Holloway's behavior?
A Yes.


3-GottsSER-00359

Q How were you doing that?
A Just visually. It goes to the totality of everything that happened.
Q And why were you assessing his behavior?
A Because we're there to investigate a domestic violence incident.
Q Are you assessing his words?
A Yes.
Q What was he saying?
A He did not want to come out. He didn't want us to pat him down. He didn't want us to be there.
Q Were you assessing his tone of voice?
A Yes.
Q Why were you doing that?
A Just goes to the totality of the call. He was being verbally aggressive and cussing at us.
Q And so what was his tone of voice?
A Agitated.
Q Were you assessing his body language?
A Yes.
Q Why were you doing that?
A Again, it just kind of goes to the overall totality of everything.
Q So based on your observations of Mr. Holloway's demeanor, words and tone of voice and body language, were


3-GottsSER-00360

you getting any message from that?
A Yeah. He was not happy with us. He didn't want us to be around there. He's denied everything and didn't want the police there.
Q Did Mr. Holloway become verbally aggressive toward you?
A Yeah. Well, you -- yes, he became verbally aggressive I think with all of us there.
Q Did that cause you any concern?
A Just his demeanor and the way he was yelling, he was just agitated. And we're there for a domestic violence call, so it didn't add or -- it didn't subtract anything from the situation.
Q And Mr. Holloway was wearing a jacket when he exited the tent, right?
A Yes.
Q Did that cause you any safety concerns?
A Yes. It was big and bulky, and we didn't know what he had or if he had anything underneath it.
Q And did -- you asked Mr. Holloway if you could pat him down, correct?
A I did, yes.
Q Why did you do that?
A For our safety. People -- suspects can hide knives or things in their waistband or the pockets. It's a safety concern for not only me but other deputies there.


3-GottsSER-00361

Q Mr. Holloway tell you if he had any weapons on him?
A He said he believed he had a pocketknife.
Q When you patted him down did you find a pocketknife?
A No.
Q Did you find anything when you patted him down?
A I think he had a lighter in his pocket.
Q During that first encounter when you talking to Mr. Holloway, did you ever tell him that you wanted to put him in handcuffs?
A No. I told him I was not going to put him in handcuffs.
Q Why did you tell him that?
A Because at that point he was just being detained for our investigation. And, you know, as long as he was cooperating with us, there was -- at that point I didn't feel like there was a need to put him in handcuffs.
Q At the time you're asking to pat him down, had you told him why you were there yet?
A Not yet, no.
Q Why not?
A Because, one, the way he was acting, and we were just trying to first render the scene safe before we started getting into our investigation.
Q Did you eventually tell Mr. Holloway that 10 people had called and brought you to his tent?

A Yes.
Q Why did you tell him that?
A One, it was trying to de-escalate the situation. I was -- the hope was that he would understand that people had called on him, and that maybe he would realize he did something wrong or is being too loud. The next is, I didn't want him to try to figure out who called. People have the right to be anonymous and not have people know that they called the 911 -- or called for emergency. And I didn't want -- not knowing if he had an alternation with somebody in the campground before, for him to automatically assume that those were the people that called the cops.
Q Was this a de-escalation technique on your part?
A Yes, in my mind it was.
Q And Mr. Holloway told you he was on -- or strike that.
You asked him if he was on probation or parole, correct?
A Yes.
Q Why did you ask him that?
A Just the way he was acting and -- yeah, just the way he was acting.
Q He told you he was on probation, correct?
A Yes.
Q Did you ever find a female with Mr. Holloway?
A No.



 3-GottsSER-00363

Case: 25-7132, 08/25/2026, DktEntry: 44.4, Page 22 of 91

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY, | ) Case No. SA CV 19-01514-DOC-(DFMx) |
| Plaintiff, | ) |
| | ) Santa Ana, California |
| vs. | ) |
| | ) Wednesday, May 14, 2025 |
| COUNTY OF ORANGE, et al., | ) |
| | ) (1:12 p.m. to 1:58 p.m.) |
| Defendants. | ) (2:11 p.m. to 3:06 p.m.) |
| ______________________________ | ) (3:20 p.m. to 4:47 p.m.) |

TRANSCRIPT OF EXCERPTED PORTION OF TRIAL (DAY 10)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE, and a jury

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Melissa H. Kunig |
| Transcribed by: | Jessica Reuter<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

Q Was aggressive toward you, correct?
A Verbally, yes.
Q And was uncooperative?
A Yes.
Q As a deputy had you ever been cursed at before by somebody you were talking to?
A Yes.
Q How many -- how many times?
A Probably once every couple weeks. Typically, people aren't happy with law enforcement, especially just the types of calls we respond to.
Q Do you get upset or angry at individuals who curse at you?
A No.
Q Were you angry at Mr. Holloway because he had cursed at you?
A No. I thought we were going back to Ladera Ranch to conclude our night.
Q Had -- prior to encountering Mr. Holloway, had you ever had your authority questioned as a deputy?
A Sometimes a couple times before, especially in the jails with -- we just -- it's just part of the job.
Q Does it upset you when somebody questions your authority?
A No.


3-GottsSER-00365

Q Were you upset with Mr. Holloway because he questioned your authority?
A No.
Q As you left O'Neill Park, were you intending to go back to Mr. Holloway's campsite for any reason?
A No, I had no intention of going back to Mr. Holloway's campground.
Q Were you upset with him at all?
A No.
Q So, at some point you were dispatched back to O'Neill Park, right?
A Yes.
Q When you were -- where were you when you were dispatched back, do you recall?
A I was in the City of Rancho Santa Margarita going towards -- back towards Ladera Ranch.
Q When you were dispatched back, what were you told?
A That there was a male going campsite to campsite yelling.
Q And when you heard that, did you believe at that time that it was Mr. Holloway who was doing that?
A Yes, because our dispatcher reactivated the call that he were on previously. And on our screen it sends us right back to -- indicated we were going right back to the campsite we were just at.


3-GottsSER-00366

Q So, in your mind, this was not a separate and unrelated call?
A No. It was just a reactivation of the first call.
Q And as you were heading back to O'Neill Park, did you receive any additional information?
A Yes. We received that he was now in a different campsite going through things. And then it got updated again that he was in an RV and there was a girl screaming, a little girl screaming.
Q And that's being relayed to you by the dispatcher, correct?
A Yes. That's being relayed to everybody over the radio.
Q And in your line of work do you rely upon the dispatcher and the information he or she is providing you?
A Yes.
Q Why?
A Because that's what we know of when we get sent to calls. That's the information we get. So we rely on -- for the most part, solely on what we already -- what we are given by our dispatcher.
Q Okay. At the time you're receiving additional information from the dispatcher as you're coming back to O'Neill Park, did you have any reason to question what the dispatcher was telling you?
A No.

Q And this call gets upgraded to a priority one, correct?
A Yes.
Q What is priority one?
A Priority one for us just means that there's a threat to life or injury to life. And so it gets upgraded to -- which pretty much just means we're allowed to go -- it's called code 3, which is just lights and sirens.
Q And that was in -- was that in reference to the little girl screaming?
A Yes. Because dispatch was told that there was a girl screaming, it upgrades it because there's a threat of life or injury to life.
Q And when you were heading back to O'Neill Park with lights and sirens going, did you think you were going to find or investigate a little girl screaming?
A Yes.
Q Was that a high priority for you as you were driving back to O'Neill park?
A Yes, it is.
Q Why?
A Because we don't want the girl to get hurt or injured or worse.
Q And as you're returning back to O'Neill Park and you're getting this information from the dispatcher, did you have in mind your prior contact with Mr. Holloway?

A Yes.
Q What did you have in mind?
A Just the way he was acting, the location of the campground and just his overall demeanor. He didn't like the -- it appeared he didn't like us. He was agitated and cursing at us, things like that.
Q Did you have in mind his failure to cooperate with you the first time?
A Yeah.
Q Did you have in mind his probation with search and seizure terms?
A Yes. I knew he was on probation with search and seizure terms.
Q Did you have in mind that you observed knives in the campground?
A Yes. It adds to the totality and I -- and officer safety.
Q And Mr. Holloway in your first encounter also told you he had knives in the campground, correct?
A Yes.
Q Did you have that in mind that he told you he had knives, whether you could see them or not, in his campground?
A Yes. He let us know that he had multiple knives.
Q Did you have the machete in your mind as you were



 3-GottsSER-00369

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, | **Certified Transcript** |
| vs. | Case No. 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., Defendants. | **DAY 10, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com




3-GottsSER-00370

Q Okay. I believe in an earlier answer you also said that it sounded to you like there was something making contact with the fabric of the tent?

A Yeah. Coincided with the sounds of the contact, the fist blows.

08:48AM

Q What type of movement did you see that you associated with the fist blows?

A Just a general -- you know, it sounded like somebody's fist going along the contours of the tent, zip, zip, and then (imitating sound).

08:48AM

Q It sounded to you like the fist on the way to striking the woman was in direct contact with the fabric --

MS. MKRTCHYAN: Objection, Your Honor.

BY MR. HARRELL:

08:48AM

Q -- of the tent?

MS. MKRTCHYAN: This is a series --

BY MR. HARRELL:

Q Do I have it correctly?

MS. MKRTCHYAN: Speculation.

08:48AM

THE COURT: Sustained. Just re-ask the question.

MR. HARRELL: Sure.

BY MR. HARRELL:

Q Sir, can you describe for us, paint a word picture for us on what you saw in terms of the sound of a body part moving along the fabric of the tent. Describe what you observed and

08:49AM



 3-GottsSER-00371

08:49AM what you heard.
A As it was happening, the tent was shimmying, and we can hear the yelling. And then the zip, bam, zip, bam. I don't know how to best describe it. I don't.
Q That works fine, sir.
While this was going on, was the male voice saying anything?
A Oh, yelling, "You want more fucking of this?" Or -- he was cussing, and she was crying out, just "Why you doing this? Why you doing this? I'm just a girl."
Q What about -- did you make any phone calls in response to what you were seeing?
A I called 911.
Q What about your observations made you call 911?
A This incident. It was -- somebody was clearly getting assaulted.
Q We're going to play your 911 call from that night, sir.
MR. HARRELL: This is in evidence. It is Exhibit 228.
BY MR. HARRELL:
Q And we're going to get you a copy of a transcript, okay, if you hang on for one second, and for the jury too.
**(Counsel confer off the record.)**
MR. HARRELL: It's my understanding the jury already has a copy. We're going to have one for you.




3-GottsSER-00372

08:50AM BY MR. HARRELL:

Q Ms. Skinner, from our office, is going to bring you a copy, Mr. Fuerbach. I have a copy. It's fine if we give this --

THE COURT: Do you also have an extra copy, by any chance?

MS. SKINNER: I do, Your Honor.

THE COURT: Thank you. Make sure that the jury has -- do you have a copy of this?

08:51AM MR. HARRELL: Your Honor, can you let our team know when it's okay to play?

THE COURT: Pardon me?

MR. HARRELL: Can you let us know when it's okay to play the tape?

08:51AM THE COURT: Just a moment. Jury is shuffling through numerous transcripts at the present time.

Okay.

**(Audio recording played, not reported.)**

BY MR. HARRELL:

08:52AM Q Sir, have you now heard the 911 call?

A Yes.

Q Do you recognize your voice on that tape?

A I do.

Q Are the statements you made to 911 truthful?

08:52AM A Yes.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, vs. COUNTY OF ORANGE, et al., Defendants. | **Certified Transcript** <br> Case No. 8:19-cv-01514-DOC-DFM <br> **DAY 10, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com


3-GottsSER-00374

A I believe I was just entering the park by the front, by the gate.

Q And then if we jump -- so that's how we read this going down.

11:52AM Let's go back up to "Call Dispositions" and the entries that are just above that. Are you with me?

A Okay.

Q There's an entry at 3:40:57.

Do you see that?

11:52AM A Yes.

Q Okay. Can you please explain to the jury how to read that portion of Exhibit 45.

A Starting at the top, that's the time and date. Position -- where it says "Position 12," that's either the call 11:52AM taker or the dispatcher. It's just kind of like the seat that they sit in up at dispatch.

The next is the name of whoever -- or the last name and first initial of whatever dispatcher or call taker it is.

Moving down, "cross streets" is cross streets.

11:53AM "Landmark" is O'Neill Park. Typically if there's, like, a big building or like an Angel Stadium or some giant landmark that people would understand, that would be there.

"NBH" is the grid. So if you guys remember the Thomas Guides, that would be a grid from a Thomas Guide. The 11:53AM ZIP code and then the latitude and longitude of where the call



 3-GottsSER-00375

11:53AM is taking place. And then the rest are the same thing, just broken down vertically.

And then at the very bottom where it says "Male versus female in a physical," that is the start of the call or whatever the dispatcher or call taker is putting on the call.

Q So it was -- based on this document was that the initiation of the call to Mr. Holloway's site?

A Yes.

Q And then if we want to look at the progression of calls that are coming in on dispatch communication, do we read up from that -- on that portion of the document?

A Yes, this part you read from bottom up.

Q So the first entry at 3:40:57:

"Male versus female in a physical 415, occurring to the right of the Campsite Number 63. INF is not involved."

Do you see that?

A Yes.

Q First off, what is "INF"?

A "INF" is -- stands for informant. You'll see it sometimes as INFO.

Q Was that information that you were aware of as you were driving to O'Neill Park that evening?

A Yes.

Q And just again for the jury, what is a 415?



 3-GottsSER-00376

A 415 is just a physical altercation. It's police jargon for that.
Q So as you are heading to O'Neill Park, the information you had was that a domestic violence was occurring to the right of Campsite 63?
A Yes.
Q Based on reviewing this, do you know who made that entry?
A No, I don't. Not this.
Q Okay.
A Well, are you talking about who called? The dispatcher or call taker is Morrison, and you see that at the top. The person who called 911, we don't know that.
Q It was a poor question. Thank you.
I was asking if you know who made the entry that we see on Exhibit 45.
A Oh, yes, at the top right next to the highlight it says, "Position 12 Morrison DL." So whatever dispatcher or call taker is -- last name is Morrison.
Q So as you're driving to O'Neill Park, you continued to receive information?
A Yes.
Q If you look up at the entry at 4:06:58, do you see that?
A Yes.
Q "DV occurring. White truck and a tent to the right of Camp Number 63"; correct?



 3-GottsSER-00377

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, et al.,<br>Defendants. | **Certified Transcript**<br>Case No. 8:19-cv-01514-DOC-DFM<br>**DAY 10, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 14, 2025
8:10 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

Q But you still prepared the new report?
A Yes, because at the time what the sergeant was telling us, it made sense.
Q And do you regret creating that new report?
11:43AM A Yes, because it almost ruined my career.
Q How so?
A I was investigated and charged by the Orange County DA's Office.
Q And then you pled guilty to a misdemeanor for willfully
11:43AM and unlawfully omitting to do a legal duty required of you as a peace officer; correct?
A That's correct.
Q Were you sentenced as a result of that?
A I was.
11:43AM Q Did you perform all the terms of your sentence?
A I did.
Q So you've taken responsibility for your actions; correct?
A Yes.
Q Now let's turn your attention to the incident that's
11:43AM actually the subject of this, the one that occurred on January 21, 2018. Okay?
A Okay.
Q What was your shift that day?
A I worked night shift. So it started at 6:00 p.m. and went
11:44AM to 6:30 in the morning the next -- the following day.



 3-GottsSER-00379

Q And you were out on patrol?
A Correct.
Q For what area?
A It's called unincorporated southeast. So, again, it's Trabuco Canyon, Coto, Ladera, the new community of Rancho Mission Viejo, and the Ortega Highway all the way down to Lake Elsinore and the all mountain areas in between.
Q Were you dispatched to O'Neill Park on January 21, 2018?
A Yes.
Q Can you explain to the jury how the dispatch system works?
A Yes. So if you call 911, it goes to either two places. It goes to CHP, or it goes to your local municipality. So in this case, the sheriff's department.

When you talk -- the first person you talk to -- for the sheriff's department's view it's called a call taker, so it's just a man or a woman that takes all the basic facts or whatever you're telling them is going on.

From there they generate a call that gets sent to a dispatcher, and then the dispatcher puts it over the air to whatever unit or patrol area it is. And they assign, most of the time randomly, whatever deputy or officer, if you're not in the sheriff's department's purview, to that call. And then depending on which call, they will send either a second person with you or sometimes a third. Typically at night, it's a --




3-GottsSER-00380

every call is a two-person call just because of the time.
Q Are you verbally in contact with the dispatcher?
A Just over the radio.
Q So you're able to communicate on the radio with the dispatcher?
A Yes.
Q Are you also in communication with other deputies through a radio?
A Yes.
Q How does that work?
A All the radios and all the deputies that work in certain areas, we all work on the same what's called a radio channel. So all the deputies, for example, in this instance that work Mission Viejo, Lake Forest unincorporated, and Rancho Santa Margarita, we share the same channels. So we're able to talk to any deputy that's working in that area. We do have the ability to switch channels and talk to people in different areas, but all those deputies are assigned on that channel.
Q We've heard some testimony about a computer that you have inside of your unit. Do you recall that?
A Yes.
Q What is that called?
A We call it an MDC. I believe it stands for mobile data center. It's a laptop.
Q Can you please explain -- what's the purpose of the MDC?

A So the MDC, the main function is -- the program that we use, we can see the dispatcher send us the call. So when we receive a call, it will show the location, the grid -- for those of you who remember what a Thomas Guide is -- the caller number, and then any notes that are put on by either the call taker, the dispatcher, or if a deputy adds notes to it, you can see it as well.
Q So you're in verbal communication with the dispatcher; right?
A Yes.
Q And verbal communication with your fellow deputies?
A Yes.
Q And then you also have the MDC where you can see information that's being exchanged?
A Yes.
Q So why were you dispatched to O'Neill Park? We're talking about the first instance. Why were you dispatched to O'Neill Park that evening?
A The first one was for a domestic violence dispute between a male and a woman.
Q Do you recall where you were when you were dispatched?
A Yeah. I was down on the Ortega Highway, I believe by the fire station, which is on Hot Springs Road.
Q How far away is that from O'Neill Park?
A About 20, 25 miles.



 3-GottsSER-00382

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| JEREMY HOLLOWAY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 19-01514-DOC |
| | ) Day 11 |
| | ) |
| COUNTY OF ORANGE, et al., | ) |
| | ) |
| DEFENDANTS. | ) |
| ________________________________ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 16, 2025

8:04 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

01:45:01 to refer back to? These are just numbers to them.

MS. NALTSAS: Understood. I'll try to explain it as best I can. Last week we handed out a transcript that says Transcript of Video Recorded, Body Cam Footage,

01:45:12 Deputy Kevin Pahel, January 21, 2018. And if you flip to the --

THE COURT: Why don't you put the first page up, so we can all see it, because they have quite a group of transcripts by now.

01:45:26 MS. NALTSAS: Sure. It looks like --

THE COURT: Put it on the ELMO. Now, flip to the first page so we see: 4:58:40: Dispatch 489. Inaudible. That's your first page. That's your first line, correct?

MS. NALTSAS: Correct.

01:45:44 THE COURT: All right. Just a moment. Do you folks have that? Got it?

Okay. Counsel.

MS. NALTSAS: Thank you.

*(Pause.)*

01:46:14 THE COURT: All right. Please continue.

MS. NALTSAS: Thank you.

*(The videotape was played.)*

THE COURT: Will you turn that up, please.

BY MS. NALTSAS:

01:51:37 Q Deputy, is this your PVS of you arriving to the scene



 3-GottsSER-00384

01:51:43 of the second incident?
A Yes.
Q And when you did make contact with Mr. Holloway the second time, what did you want him to do?
01:51:53 A Initially, wanted him to show me his hands. And then after he showed his hands, I wanted him to get down on the ground.
Q And why did you want to see his hands?
A Make sure that he didn't have any weapons in his hands.
01:52:08 Q And why did you want him on the ground?
A Position of disadvantage. Generally under high-risk calls like this, we try to minimize any use of force and so we'll have someone prone down on the ground. That way we can safely handcuff them without anyone getting injured.
01:52:27 Q So based on your training and experience, does having Mr. Holloway on the ground, does that improve your -- lessen your officer safety concerns? Lower your officer safety concerns?
MS. MKRTCHYAN: Vague and ambiguous.
01:52:45 THE COURT: Overruled.
You can answer the question.
THE WITNESS: Could you repeat that question?
BY MS. NALTSAS:
Q Yes. Based on your training and experience, would
01:52:52 having Mr. Holloway on the ground lower your officer safety




3-GottsSER-00385

01:52:55 concerns?
A Yes.
Q Did you communicate anything to Mr. Holloway that you wanted him to get on the ground?
01:53:06 A Yes.
Q And did he say "No"?
A He stated, *I'm not moving. I'm not fucking moving.*
Q Did you ask him more than once?
A I did.
01:53:20 Q And what was your tone when you asked him?
A Initially, pretty normal voice. And then you can hear me raise my voice in a more authoritative manner to get the point across that this was a serious call that we were responding to and we need him to listen.
01:53:36 Q Were you trying to be rude to Mr. Holloway when you asked him on the ground?
A No.
Q Did you want Mr. Holloway to know that you were serious when you ordered him to the ground?
01:53:45 A Yes.
Q And was he listening to your commands?
A No.
Q After you raised your voice, did Mr. Holloway comply with your commands?
01:53:56 A He took his hands out of his pockets and placed his



 3-GottsSER-00386

01:54:01 arms out to the side, but he would not get on the ground.
Q Did his refusal to get on the ground, did that elevate your officer safety concerns?
A Yes.
01:54:12 Q At the time of the incident that night, did you have a concern he may try to run away from you or flee the scene?
MS. MKRTCHYAN: Objection.
THE COURT: It's leading, counsel. Sustained.
MS. NALTSAS: Thank you.
01:54:23 BY MS. NALTSAS:
Q At that -- the time of the second incident when you ordered him to the ground, what was in your mind in terms of your officer safety concerns?
A I saw the machete on the first call that was behind the
01:54:39 fire pit which was very close to where he was standing at the time. I didn't want to -- didn't want him to obtain a weapon or take off running.
Q Now, when Mr. Holloway was not getting on the ground, did you have a concern that he could reach for a weapon that
01:54:58 you might have seen during your first encounter?
A Yes.
Q Had you searched Mr. Holloway between the first encounter and the time you ordered him to the ground?
A I did not.
01:55:12 Q How was he dressed, if you recall, when you arrived for




3-GottsSER-00387

01:55:15 the second incident?
A He was wearing a bulky jacket and blue jeans.
Q Did you know whether Mr. Holloway had a weapon underneath his clothing?
01:55:28 A I did not.
Q Are you trained at the Orange County Sheriff's Department to assume someone is not armed in a situation like this?
A No.
01:55:37 Q What are you trained?
A Common weapon areas. Pockets, armpits, waistband are common areas to hide weapons.
Q And before you told him to get down on the ground, did you walk up to Mr. Holloway calmly and explain to
01:55:55 Mr. Holloway the officer safety concerns you had at that time?
A No.
Q And why not?
A That would be unreasonable, given the type of call.
01:56:04 It's a priority one call. It's not something we would just arrive to and have a casual conversation with someone. In that case, we need to get them detained as safely, as quickly as possible and then further investigate.
Q And when you arrived during the second incident, did
01:56:22 you walk up to Mr. Holloway and explain your suspicions of



 3-GottsSER-00388

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY, )
)
PLAINTIFF, )
)
vs. ) SACV NO. 19-01514-DOC
) Day 12, Volume III
)
COUNTY OF ORANGE, et al., )
)
DEFENDANTS. )
____________________________________)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, MAY 19, 2025

8:23 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

Case: 25-7132, 08/25/2026, DktEntry: 44.4, Page 48 of 91

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com


3-GottsSER-00390

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Jameson Gotts, Orange County Deputy Sheriff, Defendant

Chad Renegar, Orange County Deputy Sheriff, Defendant

Bryan Stever, Litigation Support, Defendants


3-GottsSER-00391

I N D E X



| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MATTHEW BROWN | 96 | 106 | | |

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSHUA ANTHONY GOMEZ | 14 | 35 | | |
| ROBERT FONZI | 111 | | | |




3-GottsSER-00392

09:57:21 THE COURT: All right. Just a moment.
THE WITNESS: As far as direction, I did provide it, yes.
BY MS. MKRTCHYAN:
09:57:30 Q You provided the direction.
THE COURT: Counsel, just a moment.
MS. MKRTCHYAN: That's what I'm trying to establish here.
THE COURT: Because it's not impeaching on this
09:57:38 page, Counsel.
MS. MKYRTCHYAN: Your Honor, let the jury decide, please. Thank you.
THE COURT: No, Counsel, the jury is not going to look at this transcript as this is what you directed them
09:57:47 to, because this is not impeaching.
You're directing to page 76 --
*(Overtalking: Unable to report.)*
THE COURT: I won't argue with you, Counsel.
MS. MKRTCHYAN: Thank you.
09:57:54 BY MS. MKRTCHYAN:
Q Please read that for your memory and see if that refreshes your memory about what you discussed when officers arrived the first time they arrived and spoke to you, please.
09:58:11 THE COURT: And you're looking at page 76; is that



 3-GottsSER-00393

J
just... [62] 62/6 63/17 64/7 65/22 70/9 71/10 72/15 72/15 72/16 77/19 81/11 81/14 81/15 82/15 82/17 82/20 84/2 85/7 85/9 85/11 85/20 86/6 86/7 86/14 90/5 90/12 90/14 90/16 90/18 95/6 95/20 102/19 107/12 109/12 109/20 109/21 109/25 110/25 114/14 114/23 116/15 118/21 119/1 119/3 119/16 119/21 120/10 120/13 120/15 120/17 122/23 125/19 125/24 128/3 130/20 140/3 140/11 141/22 143/22 143/24 144/9 145/2

K
Karlen [4] 20/3 84/13 108/20 110/17
keep [3] 20/6 32/4 84/6
kept [1] 19/3
key [2] 17/23 17/24
kicking [2] 19/3 90/13
kill [1] 118/12
kind [4] 15/17 43/20 88/15 120/22
kinds [1] 129/4
knew [2] 69/9 89/14
knife [3] 135/6 135/11 135/12
knives [15] 97/19 97/22 98/8 98/22 99/3 101/20 102/14 102/24 103/4 103/10 104/18 107/14 129/12 129/16 135/14
knock [2] 47/14 88/19
knocked [1] 83/21
know [38] 19/9 23/14 23/15 24/24 28/20 32/4 40/17 49/14 51/9 58/12 58/15 58/24 58/25 59/18 67/19 73/13 76/6 76/13 81/6 81/18 82/19 85/1 88/2 88/24 89/23 90/23 92/6 97/6 98/6 99/23 99/25 103/4 106/21 110/25 135/10 136/15 137/12 137/22
knowing [4] 126/13 126/14 126/14 129/8
known [1] 140/19

L
lab [1] 113/22
lack [1] 128/7
lacks [1] 107/2
Ladies [4] 64/20 86/23 109/11 144/16
laid [1] 18/13
large [7] 51/18 103/24 104/1 108/13 109/16 109/17 113/20
larger [1] 98/14
last [3] 27/14 96/7 111/7
late [1] 95/15
later [12] 18/14 19/13 45/7 70/8 70/21 77/4 89/17 113/4 113/12 113/14 133/12 134/17
Laughter [1] 110/3
Lauren [2] 19/9 88/15
law [28] 11/3 34/5 73/22 74/1 74/4 111/25 112/14 112/14 112/22 113/8 113/9 114/19 116/21 118/12 120/7 121/6 121/14 122/17 122/18 126/24 130/7 134/4 136/3 138/15 139/3 141/12 142/2 143/4
law enforcement [25] 34/5 73/22 74/1 74/4 111/25 112/14 112/14 113/8 113/9 114/19 116/21 118/12 120/7 121/6 121/14 122/17 122/18 126/24 134/4 136/3 138/15 139/3 141/12 142/2 143/4
laying [1] 100/22
lead [1] 136/24
leading [7] 21/14 25/9 25/9 29/18 33/12 136/22 136/23
learn [2] 16/6 118/15
learned [3] 16/9 74/20 89/25
least [3] 85/15 139/21 139/22
leave [3] 28/14 72/6 87/21
led [1] 19/1
left [13] 17/13 18/13 24/16 58/17 60/9 63/12 68/17 69/21 70/25 71/25 95/20 96/3 130/24
less [4] 78/15 79/3 128/15 137/23
let [8] 57/7 62/11 75/3 81/18 85/11 92/6 109/12 109/12
let's [48] 28/14 34/14 35/15 39/2 40/11 43/3 44/4 44/10 45/12 47/18 47/19 48/22 50/17 50/20 51/8 51/14 52/8 52/23 53/25 54/12 55/23 56/4 58/1 63/18 65/24 66/1 66/22 67/1 67/24 68/4 71/16 71/17 91/14 92/14 98/7 99/7 99/8 100/6 100/15 100/19 101/11 102/2 103/13 103/20 104/8 105/21 118/10 123/12
lethal [3] 78/15 79/3 79/10
level [8] 120/19 121/2 121/3 121/7 121/15 121/24 124/14 126/15
levels [8] 120/6 120/11 120/20 122/2 122/8 143/9 143/10 143/12
lie [1] 94/4
lieu [1] 130/16
lieutenant [4] 113/12 113/13 115/6 115/6
life [2] 121/5 122/11
life-threatening [2] 121/5 122/11
lifeline [1] 127/4
light [1] 22/22
lights [5] 74/14 74/16 75/13 134/2 134/18
like [66] 15/15 16/6 18/2 18/8 19/15 19/16 19/23 20/1 20/13 22/12 23/2 24/22 24/25 25/20 26/6 26/6 26/6 26/18 28/5 28/8 30/6 30/12 31/4 31/11 32/21 32/21 32/25 33/4 33/10 43/15 43/19 43/19 43/21 44/21 56/2 56/19 56/22 57/15 58/11 58/16 60/13 60/15 74/8 82/12 82/24 83/21 83/24 84/1 87/6 88/2 88/15 88/16 88/16 88/20 90/16 91/23 92/2 109/5 110/10 110/13 116/15 120/16 122/3 134/21 138/3 143/18
like...12 [1] 45/5
limit [1] 126/7
line [39] 22/13 23/3 24/5 25/21 26/21 27/16 28/9 31/20 31/25 43/16 44/6 44/6 45/11 54/3 54/4 54/7 54/7 54/9 54/10 56/15 56/16 57/5 57/23 58/2 64/9 65/8 65/10 65/11 83/8 85/4 85/5 85/14 85/16 85/22 85/23 86/2 86/13 86/22 127/6
line 1 [1] 24/5
line 10 [1] 54/7
line 15 [3] 23/3 27/16 44/6
line 16 [2] 86/2 86/13
line 18 [1] 57/23
line 19 [1] 64/9
line 2 [4] 28/9 85/4 85/5 86/22
line 20 [1] 22/13
line 22 [2] 44/6 56/15
line 25 [1] 54/4
line 3 [2] 56/16 57/5
line 5 [3] 26/21 31/20 31/25
line 6 [4] 25/21 65/10 65/11 85/16
Line 8 [1] 85/23
lined [1] 51/23
lines [10] 32/19 44/20 54/5 64/4 64/11 64/16 86/2 86/16 86/18 86/19
lines 16 [1] 86/18
lines 19 [2] 64/4 64/16
lines 2 [1] 54/5
lines 20 [1] 86/2
lines 22 [1] 44/20
listed [1] 118/9
listen [2] 68/24 127/22
listened [1] 127/9
listening [4] 127/19 127/25 128/14 139/20
litigation [2] 12/17 111/23
little [37] 19/15 26/3 26/6 26/7 26/11 26/19 26/19 42/12 42/15 42/18 43/24 46/5 46/17 72/21 72/25 75/14 75/16 75/21 76/3 76/6 76/10 77/12 81/3 83/6 83/13 102/19 109/13 133/24 134/6 134/24 136/21 137/2 137/10 137/17 138/3 141/25 142/4
living [2] 111/15 111/21
LLP [2] 12/3 12/7
locate [2] 130/23 132/11
located [1] 50/18
location [9] 48/18 48/24 49/2 50/24 64/19 69/1 119/23 123/23 126/20
log [5] 51/9 52/7 100/13 100/16 101/6
logical [1] 103/12
logically [1] 103/9
long [6] 18/4 73/16 96/18 97/8 112/2 114/12
look [28] 16/22 32/1 40/20 43/3 43/16 44/10 45/12 47/19 48/6 52/23 54/3 55/23 56/4 56/8 56/14 58/16 60/22 61/9 62/14 63/18 65/24 66/22 67/1 85/17 90/9 91/23 92/14 137/2
looked [3] 19/15 48/19 83/21
looking [24] 17/2 18/21 21/25 25/5 26/9 26/21 28/20 29/2 29/2 32/19 41/24 42/6 43/12 48/18 52/1 61/23 62/25 67/6 68/5 68/18 86/8 107/12 132/7 136/21
looks [1] 56/2
LOS [1] 11/15
lot [7] 24/22 30/9 46/20 73/21 120/23 125/19 132/16
loud [1] 23/17
loudly [1] 76/1
low [5] 120/11 120/11 120/19 121/7 122/7
lower [3] 122/2 143/10 143/13
lunch [3] 144/13 144/19 145/1
lying [1] 94/10
LYNBERG [3] 11/9 11/13 11/18
lynberg.com [3] 11/11 11/16 11/20

M
ma'am [2] 43/2 71/7
machete [4] 100/4 100/4 129/12 135/13
made [13] 17/21 18/20 20/20 23/22 24/1 24/20 30/6 36/5 70/13 70/20 91/20 92/11 115/16
Mainly [1] 41/11
maintain [1] 119/3
majority [4] 112/10 113/7 122/23 130/14
make [23] 26/17 32/2 36/12 67/2 67/13 88/20 90/2 91/3 94/12 98/14 108/16 115/9 116/18 118/24 119/1 124/23 136/19 136/20 137/6 137/6 137/6 137/7 138/6
makes [2] 139/11 142/24
making [13] 33/6 37/19 38/2 38/9 42/17 42/19 46/20 49/12 55/8 55/21 71/3 72/25 108/20
male [12] 38/2 42/19 45/3 59/15 60/1 69/22 71/20 71/21 71/22 71/25 72/9 73/1
man [34] 14/19 19/11 36/1 37/14 37/14 37/21 38/3 38/15 38/18 38/19 38/23 39/15 39/20 40/2 40/3 41/19 41/23 42/6 47/9 57/10 58/20 69/25 70/9 70/10 71/8 71/12 72/9 73/4 78/8 81/4 81/25 83/14 89/22 90/20
many [8] 49/14 87/4 112/4 116/1 124/12 126/15 127/6 139/18
map [13] 16/23 17/2 47/19 58/17 65/24 65/24 66/1 66/22 67/1 67/3 67/6 67/8 67/13
material [17] 117/3 123/13 124/5 126/19 129/11 130/2 130/22 133/23 138/12 139/15 139/23 141/5 142/25 143/16 143/20 144/3 144/7
materials [5] 116/16 117/22 118/3 132/4 133/18
Matt [1] 96/6
matter [8] 112/17 117/11 118/1 118/6 123/12 124/12 144/20 146/5
MATTHEW [1] 95/24
may [41] 10/16 14/1 15/15 20/7 20/8 20/8 20/15 22/14 23/4 23/5 24/6 24/9 25/22 26/22 26/23 27/17 27/18 28/10 28/11 45/22 55/13 55/16 56/7 56/24 57/7 57/19 82/2 84/25 108/6 118/19 119/14 120/22 122/2 122/25 123/3 123/9 123/24 126/21 131/23 137/5 146/9
maybe [9] 45/4 45/14 46/8 52/4 55/23 81/7 84/13 95/10 101/8
me [30] 18/1 18/17 18/25 19/1 19/1 22/22 22/23 27/5 34/2 40/6


3-GottsSER-00394

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY, PLAINTIFF,

vs.

COUNTY OF ORANGE, et al., DEFENDANTS.

SACV NO. 19-01514-DOC
Day 13, Volume I

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 20, 2025

8:11 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


3-GottsSER-00395

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com


3-GottsSER-00396

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Jameson Gotts, Orange County Deputy Sheriff, Defendant

Chad Renegar, Orange County Deputy Sheriff, Defendant

Bryan Stever, Litigation Support, Defendants


3-GottsSER-00397

# I N D E X

CLOSING ARGUMENT: PAGE

By Ms. Mkrtchyan 34

By Mr. Wroniak 86


3-GottsSER-00398

10:23:17 And you've heard him, the gut feeling that you had when he testified. What was your gut feeling? I had that gut feeling when he came to my office years ago and he told me this story. Trust that instinct. Trust that gut and gave him what he deserves for past pain and suffering, how he felt on that ground when he was fighting for life and death, when he's taken down the ground and he sees he's bleeding, he knows he has a prior stroke. This is an -- plaintiff, because the person who has pre-existing injury. He had an injury to his head from the military. He had a stroke, brain aneurysm. If he bleeds, he can die. For the horror, you can hear his screams. The horror he felt at that point moment will not escape us. We will remember it for the rest of our lives. I will remember.

10:24:14 This case has taken an emotional toll on me, too.

MR. WRONIAK: Objection. Improper.

THE COURT: Sustained.

MS. MKRTCHYAN: So he's entitled to do that for, you know -- we have to decide as a nation that very long ago, all men are created equal, regardless of their race, regardless of their sex, regardless of their national origin, regardless of their criminal background. That all of us are endowed with certain unalienable rights, which includes life, liberty and pursuit of happiness. What does that mean to you, each and every one of us? How can we have




3-GottsSER-00399

10:39:29 you know -- what kind of a system we have? Today they're going to tell us *Get on the ground* and then they will Taser us. Tomorrow they will shoot us, if we don't get down on the ground. Is that what we want from our police officers?

10:39:43 What crime did they investigate? Think about it. Disturbance of the peace, uncorroborated 911 calls in the dark campground.

First call is unreliable. They come. They don't find a female. 10:39:55 Why are picking on this homeless guy? Why are they picking on this homeless guy? Oh, because they didn't like his attitude.

Well, ladies and gentlemen, so far as we know in this country, attitude does not entitle them to beat you up, so -- 10:40:07

And then the excessive force instruction, it will give you guidelines in the determining what officers -- what are the circumstances? You need to consider extent of plaintiff's injury, availability of alternative methods to take the plaintiff into custody and subdue plaintiff. 10:40:25

I asked Lieutenant Clark -- this is a, you know, veteran from LA County Sheriff's Department. I asked, *Are there any other ways to put him into custody?*

Sure. They could have told him, *Place your hands behind your back. I'm going to handcuff you.* There are 10:40:42

S. Frank Harrell (SBN 133437)
sharrell@lynberg.com
Catherine Naltsas (SBN 262259)
cnaltsasA@lynberg.com
Ryane Skinner (SBN 356970)
rskinner@lynberg.com
**LYNBERG & WATKINS**
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant DEPUTY JAMESON GOTTS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, et al.,<br>Defendant. | CASE NO. 8:19-cv-01514-DOC-DFM<br>*Assigned for All Purposes to: Hon. David O. Carter, Courtroom 10 A*<br>**DEPUTY DEFENDANT JAMESON GOTTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW; DECLARATION OF CATHERINE A. NALTSAS; EXHIBITS**<br>**Fed. R. Civ. P. 50(b)**<br>**Date:** **July 14, 2025**<br>**Time:** **9:00 a.m.**<br>**Location:** **10A** |


3-GottsSER-00401

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 14, 2025 at 9:00 a.m., or as soon thereafter as counsel may be heard, Defendant Jameson Gotts ("Gotts") will, and hereby does, move for Judgment As A Matter of Law against Plaintiff Jeremy Holloway pursuant to Fed. R. Civ. P. 50(b). The hearing shall take place before the Hon. David O. Carter in Courtroom 10A at the United States District Courthouse located at 411 W. 4th St., in Santa Ana, California.

Gotts' Motion will be made on the grounds that Plaintiff's case is meritless as a matter of law, is barred by qualified immunity and it otherwise fails for lack of admissible evidence. See, Fed. R. Civ. P. 50(b).

Defendant's Motion will be based on this Notice, the attached Memorandum of Points and Authorities, the Declaration of Catherine A. Naltsas, the Exhibits submitted therewith and upon such other and further matters as may properly come before the Court.

Respectfully submitted,

DATED: May 30, 2025

**LYNBERG & WATKINS**
A Professional Corporation

By: */s/ Catherine Naltsas*
**S. FRANK HARRELL**
**CATHERINE NALTSAS**
**RYANE C. SKINNER**
Attorneys for Defendant Deputy Jameson Gotts


3-GottsSER-00402

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ……………………………..6

I. PRELIMINARY STATEMENT ………………………………………………….6

A. As to the "Excessive Force", Plaintiff Fails to Specifically Identify Deputy Gotts … 7

B. Because Deputy Gotts's Conduct Cannot Be Identified, Plaintiff Cannot establish Gotts' conduct is plainly outlawed, and thus Gotts is entitled to Qualified Immunity. 9

C. As to Punitive Damages, Plaintiff Fails to Present any Evident that Deputy Gotts's Conduct was malicious, oppressive or reckless ……………………………………9

II. JUDGMENT AS A MATTER OF LAW IS PROPER AND TIMELY ………………10

III. PLAINTIFF FAILS TO IDENTIFY JAMESON GOTTS AT TRIAL AS INVOLVED IN THE USE OF FORCE ……………………………………………………………..11

i. Plaintiff Never Named Deputy Gotts as Using Any Force on Him …………….12

ii. Plaintiff's Use of Force Expert Failed to Opine to any Use of Force by Deputy Gotts ………………………………………………………………………….16

iii. Plaintiff Failed to Ask Use of Force Expert Sargeant Stewart Rawlings Any Questions Regarding Deputy Gotts' Use of Force ……………………………..17

iv. No Other Deputy Provided Testimony of Gotts' Use of Force …………………18

IV. DEPUTY GOTTS IS ENTITLED TO QUALIFIED IMMUNITY ……………………18

A. The Qualified Immunity Doctrine Is a Demanding Standard ………………………18

B. Plaintiff has Failed at Trial to Carry His Burden to Cite to Factually Relevant Clearly Established Law that Deputy Gotts' Conduct was Unconstitutional ………………..24

i. Looking at the Evidence in the Light Most Favorable to the Plaintiff, Deputy Gotts is Still Entitled to Qualified Immunity ………………………………..24

V. PLAINTIFF FAILED TO PROVIDE ANY EVIDENCE AT TRIAL THAT DEPUTY GOTTS' CONDUCT WAS MALICIOUS, OPPRESSIVE OR RECKLESS …………25

VI. CONCLUSION ……………………………………………………………………26


3-GottsSER-00403

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Creighton,
483 U.S. 635 (1987)....................21
Arnsberg v. United States,
757 F.2d 971 (1984)....................23
Ashcroft v. al–Kidd,
563 U.S. 731 (2011)....................18, 21, 22
Ault v. Speicher,
634 F.3d 942 (7th Cir. 2011)....................20
Avalos v. Baca,
596 F.3d 583 (9th Cir. 2010)....................15
Baker v. McCollan,
443 U.S. 137 (1979)....................19
Brewster v. Board of Educ. of Lynwood Unified School Dist.,
149 F.3d 971 (9th Cir. 1998)....................20
City of Escondido, Cal. v. Emmons,
139 S. Ct. 500 (2019)....................18
City of Tahlequah, Oklahoma v. Bond,
2021 WL 4822664 (U.S. Oct. 18, 2021)....................18, 22
Devereaux v. Abbey,
263 F.3d 1070 (9th Cir. 2001)....................15
District of Columbia v. Wesby,
138 S.Ct. 577 (2018)....................9, 18, 19, 21
Esteem v. City of Pasadena,
2007 WL 4270360 (C.D. Cal. 2007)....................8, 15
First Union Nat'l Bank v. Benham,
423 F.3d 855 (8th Cir. 2005)....................8, 10, 15, 26
Gonzales v. Nork,
20 Cal. 3d 500 (1978)....................19
Hamby,
821 F.3d....................19, 20, 21
Harlow v. Fitzgerald,
457 U.S. 800 (1982)....................19, 21
Harper v. City of Los Angeles,
533 F.3d 1010 (9th Cir. 2008)....................15
Johnson v. County of Los Angeles,
340 F.3d 787 (9th Cir 2003)....................19


3-GottsSER-00404

Jones v. Williams,
297 F.3d 930 (9th Cir. 2002) .......... 8, 15, 16
Kisela v. Hughes,
138 S.Ct. 1148 (2018).......... 21
Lane v. Washington State Department of Corr.,
2019 WL 6686730 (W.D. Wash. 2019).......... 15
Malley v. Briggs,
475 U.S. 335 (1986).......... 19
Maraziti v. First Interstate Bank of California,
953 F.2d 520 (9th Cir. 1992) .......... 22
McNeil v. City of Easton,
694 F. Supp. 2d 375 (E.D. Pa. 2010).......... 8, 11
Nunez v. Davis,
169 F.3d 1222 (9th Cir. 2000) .......... 19
Reichle v. Howards,
566 U.S. 658 (2012).......... 21
Rivas-Villegas v. Cortesluna,
2021 WL 4822662 (U.S. Oct. 18, 2021) .......... 22, 23
S.B. v. County of San Diego,
864 F.3d 1010 (9th Cir. 2017) .......... 23, 24
Saucier v. Katz,
533 U.S. 194 (2001).......... 20, 21
Shafer v. County of Santa Barbara,
868 F.3d 1110 (9th Cir. 2017) .......... 20, 23
Sharp v. County of Orange,
871 F.3d 901 (9th Cir. 2017) .......... 21, 22, 23
Soremekun v. Thrifty Payless, Inc.,
509 F.3d 978 (9th Cir. 2007) .......... 8, 14
Stoudemire v. Mich. Dep't of Corr.,
705 F.3d 560 (6th Cir. 2013) .......... 20
Tapia v. Huntington Park Police Department,
2011 WL 13142128 (C.D. Cal. 2011) .......... 8
Taylor v. Barkes,
135 S. Ct. 2042 (2015).......... 20
Ward v. County of San Diego,
791 F.2d 1329 (9th Cir.1986) .......... 19, 23
White v. Pauly,
137 S.Ct.......... 18, 20, 21
Wilson v. Layne,
526 U.S. 603 (1999) 23


3-GottsSER-00405

**Statutes**

42 U.S.C. § 1983 .......... passim

**Rules**

Fed. R. Civ. P. 50(b) .......... 1, 7, 10

Fed. R. Civ. P. 59 .......... 1, 10

Fed. R. Civ. P. 50 .......... 6, 26


3-GottsSER-00406

## MEMORANDUM OF POINTS & AUTHORITIES

### I. PRELIMINARY STATEMENT

As this Court may recall, Deputy Jameson Gotts was not granted qualified immunity and Gotts's post-trial FRCP Rule 50 motion was denied following the Third Trial because Plaintiff Jeremy Holloway ("Plaintiff" or "Holloway") specifically identified Defendant Deputy Jameson Gotts ("Gotts") as "kneeing" him in the head. [Dkt. 679] (See, Declaration of Catherine Naltsas ("Naltsas Decl.") ¶3, Exhibit A, pg. 11:5-10).[1] Moreover, this Court has subsequently reiterated that Deputy Gotts would have been granted qualified immunity had Mr. Holloway not specifically identified him as the person who had allegedly "kneed" him in the Third Trial. (See, Naltsas Decl. ¶4, Exhibit B, Trial Transcript on May 7, 2025, Vol. II, pg.163:23 – 164:4).[2]

However, each trial stands on its own evidentiary record and Plaintiff was consequently required to make a showing in ***the fourth trial*** that Gotts personally used excessive force. But Holloway failed to do so. In support of his case, Plaintiff and his use of force expert ***entirely failed*** to mention Defendant Deputy Gotts ***at all*** – let alone accuse Gotts of "kneeing" him in the head.

The evidentiary record is undisputed. First, during opening statements, Plaintiff's counsel never uttered Deputy Gotts's name even once. (See, Naltsas

---

[1] The Court's Ruling:
"For Gotts, the qualified immunity question is a close one. Viewing the evidence in the light most favorable to Holloway, Gotts arrived on the scene a few seconds before Borba. At the time he arrived, two officers were trying to free one of Holloway's arms, and Renegar was trying to control Plaintiff's legs. Despite four officers being on top of Plaintiff and Renegar preparing to apply the stun gun to Plaintiff, Gotts, **Holloway testified, kneed Holloway in the head several times."** (emphasis added)

[2] The Court's reiteration:
"And therefore the time limits on Gotts. Deputy Gotts responded later on. Whatever those actions are or aren't, he's not in the initial encounter, et cetera. **But for the identification that the third trial by Mr. Holloway, as the person who kicked him, frankly, I would have granted qualified immunity on him**, but that's why, as a gatekeeper, he's here." (emphasis added)


3-GottsSER-00407

Decl.¶5, Exhibit C, Plaintiff's Opening Statement, pgs. 6-38). Similarly, Plaintiff's use of force expert, Roger Clark, failed to mention Deputy Gotts as using any force against Mr. Holloway. Even more, on cross examination Mr. Clark appeared to not even know who Deputy Gotts is. Had it not been for Plaintiff's counsel's inappropriate speaking objection, it is clear that Mr. Clark would have drawn a faintly comical total blank on this issue. (See, Naltsas Decl. ¶8, Exhibit F, Trial Testimony on May 7, 2025, Vol. II, pgs. 90:3-91:2). Mr. Clark's testimonial silence came with good reason. He made no opinions or findings as to Deputy Gotts in his Rule 26 report. (See, Naltsas Decl. ¶9, Exhibit G, Roger Clark's Rule 26 Report).

Plaintiff also called Sgt. Stewart Rawlings, another use of force expert. and asked no questions about Gotts's use of force. Rather, Plaintiff asked Sgt. Rawlings about every other deputies' use of force on the night of January 21, 2018, besides that of Deputy Gotts. (See, Naltsas Decl. ¶10, Exhibit H, Trial Testimony on May 9, 2025, Vol. III).

When Holloway took the stand, he not only failed to mention Deputy Gotts, but he also failed to identify Deputy Gotts as using ***any*** force, let alone using excessive force on him. (See, Naltsas Decl. ¶¶6-7, Exhibits D-E).

In short, there is no evidence presented by Plaintiff to the jury on Gotts's use of force. Plaintiff having rested his case, Defendant Gotts submits this Memorandum in support his pending Motion for Judgment as a Matter of Law. See, Fed. R. Civ. P. 50(b).

**A. As to the "Excessive Force," Plaintiff fails to Specifically Identify Deputy Gotts**

Plaintiff Jeremy Holloway argues that (1) he was punched in the face by Deputy Renegar and (2) that he was punched, kneed and/or kicked in the head while on the ground which constitutes "excessive force." Plaintiff, during his case in chief, entirely failed to mention Gotts or enter into the record any conduct by Deputy Gotts for which a reasonable jury could find for Plaintiff and against Deputy Gotts. Plaintiff's claims as to Deputy Gotts are absent in the record. They are not there. Judgment as a


3-GottsSER-00408

matter of law is therefore proper as "the record contains no proof beyond speculation to support a verdict." First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005).

In order to establish a civil rights violation, those responsible for the alleged violative conduct ***must be specifically identified***. In a case directly on point (McNeil v. City of Easton, 694 F. Supp. 2d 375 (E.D. Pa. 2010)), the Court held that a plaintiff's inability to identify which officer kicked him in the head during an arrest was fatal to his excessive force claim against all officers. Put differently, Holloway "cannot hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct." Esteem v. City of Pasadena, 2007 WL 4270360, *14 (C.D. Cal. 2007) (citations omitted); see, Jones v. Williams, 297 F.3d 930, 935 n. 25 (9th Cir. 2002) ("merely being present at the scene" where alleged unconstitutional conduct occurs is never enough to impose individual liability.)

In previous proceedings, Holloway alleged that Deputy Gotts arrived after the altercation on the ground began and participated in securing Plaintiff's hands in handcuffs. In the Third Trial, Holloway alleged that Deputy Gotts kneed him in the head at 5:03:23. **However, in *this case*, Holloway failed to identify Gotts at all!** This is not enough to reach a jury as regards Deputy Gotts

Holloway's "excessive force" claim against Deputy Gotts rests on rank speculation – asking the jury to make the leap that, even though Holoway failed to testify or specify any wrongdoing, Gotts is somehow culpable. This is not enough to make a viable case in federal court. See, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007)("Conclusory, speculative testimony" is not enough to survive dismissal); First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005)("the record contains no proof beyond speculation to support a verdict."); Tapia v. Huntington Park Police Department, 2011 WL 13142128 (C.D. Cal. 2011)("[S]peculation is insufficient to survive [dismissal].")


3-GottsSER-00409

**B. Because Deputy Gotts's conduct cannot be identified, Plaintiff cannot establish Gotts's conduct is plainly outlawed, and thus Gotts is entitled to Qualified Immunity**

Plaintiff Jeremy Holloway alleges that Deputy Jameson Gotts was at the scene after Plaintiff was already on the ground, face down, and may have participated in some use of force. The only testimony related to Gotts's use of force came ***from Gotts, himself.*** Gotts testified that he placed his knee on Holloway's upper back and pulled on his left arm. (See, Naltsas Decl., ¶11, Exhibit I, pgs. 82:4-20, 90:11-16, 91:17-92:7; see also, Deputy Gotts' Use of Force Report Exhibit 35-3 admitted on May 6, 2025). That's all the jury has heard regarding Gotts during Plaintiff's case in chief.

In order to survive an assertion of qualified immunity, a Section 1983 plaintiff must cite pre-incident case law whose facts and holding plainly outlawed the decisions the public employee made during the subject incident. See, District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018). Plaintiff has failed to cite to established requisite case law holding that Deputy Gotts' conduct was plainly outlawed. Dismissal is therefore required for this reason alone.

**C. As to Punitive Damages, Plaintiff fails to present any evidence that Deputy Gotts's conduct was malicious, oppressive or reckless**

To submit a claim for punitive damages, Plaintiff must set forth actual evidence that Defendant's "conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard" of Plaintiff's rights. (See, Ninth Circuit Model Jury Instructions, No. 5.5). Holloway has presented no evidence to support the notion that Deputy Gotts acted with the type of black-hearted intent the law requires. In particular, as to Deputy Gotts, the evidence presented ***by Gotts himself*** was that he arrived near the end of the use of force during the second encounter with Plaintiff, and he merely participated in securing Plaintiff's arrest by placing a knee on his upper back and pulling on his left arm. As set forth previously, Plaintiff provided no testimony that Gotts used any other force on him.

In short, Plaintiff's claims are insufficient to reach the jury. Judgment as a matter of law is therefore proper as "the record contains no proof beyond speculation to support a verdict." First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005).

## II. JUDGMENT AS A MATTER OF LAW IS PROPER AND TIMELY

Rule 50(b) recites:

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a) , the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59 . In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Defendant timely moved under Fed.R.Civ.P. 50(a) after Plaintiff rested. This motion is timely made. In the event the Court is disinclined to render Judgment as a Matter of Law in favor of Deputy Gotts,

## III. PLAINTIFF FAILS TO IDENTIFY JAMESON GOTTS AT TRIAL AS INVOLVED IN THE USE OF FORCE

In order to establish a civil rights violation, those responsible for the alleged violating conduct ***must be specifically identified***. See, McNeil v. City of Easton, 694 F. Supp. 2d 375 (E.D. Pa. 2010). The Mc Neil facts are nearly identical to those in this matter. In Mc Neil, two officers responded to a domestic dispute complaint raised by plaintiff's neighbor. Hearing screams and loud banging, and in light of the 911 call,


3-GottsSER-00411

the officers called for backup and telephonically confirmed with their supervisor they could enter the residence without a warrant. Other officers arrived at the scene.

At the time the officers arrived, plaintiff did not comply with the officer's commands and a taser was deployed — twice. During attempts to subdue the plaintiff, plaintiff alleged that an unidentified officer kicked him in the back of the head. In an amended complaint, the plaintiff in McNeil v. City of Easton raised what appeared to be five 42 U.S.C. § 1983 claims, including one for excessive force. The defendants moved for summary judgment.

In granting summary judgment, the court found the plaintiff's inability to specifically identify the alleged officer who kicked him in the head precluded an excessive force claim against all the defendants for this event. McNeil v. City of Easton, 694 F. Supp. 2d 375, 376 (E.D. Pa. 2010).

Holloway's "excessive force" claim is nearly identical: (1) the claim that Deputy Renegar "punched" him in the face, (2) that Deputies Renegar and Joel Gonzalez knocked him to the ground after Plaintiff refused the officers' commands, (3) that Renegar "tased" Plaintiff when he was on the ground after Plaintiff refused the officers' commands, (4) that unidentified deputies struck him while he was on the ground.

As to the punch to the face and taser, it is undisputed that Deputy Gotts had no involvement in the claim that Deputy Renegar "punched" Holloway in the face or the taser deployment. As to the takedown, Plaintiff presented no evidence that Deputy Gotts was involved whatsoever. As to unidentified officers allegedly kneeing and/or kicking Plaintiff in the head, it is undisputed that Plaintiff presented no evidence Gotts kneed him in the head.

**i. Plaintiff Never Named Deputy Gotts as Using Any Force on Him**

Holloway's ever evolving testimony of events is devoid of Deputy Gotts. The extent to which Deputy Gotts was identified by Mr. Holloway as being involved in

this use of force incident was confirming that a man on one of the PVS recordings was Deputy Gotts. (See, Naltsas Decl., ¶6, Exhibit D, Trial testimony of Jeremy Holloway on May 8, 2025, Vol. I, pg.48:16-17). The only testimony related to Gotts's use of force came ***from Gotts, himself.*** Gotts testified that he placed his knee on Holloway's upper back and pulled on his left arm. (See, Naltsas Decl., ¶11, Exhibit I, pgs. 82:4-20, 90:11-16, 91:17-92:7; see also, Deputy Gotts's Use of Force Report Exhibit 35-3 admitted on May 6, 2025). That's all the jury has heard regarding Gotts during Plaintiff's case in chief.

Mr. Holloway gave many different versions in this Trial alone on how his claimed excessive force occurred. However, what is clear is that in all his versions, Deputy Gotts is never mentioned, nor was Deputy Gotts on scene when Holloway's alleged kneeing to the head occurred.

On both direct and cross examination, Mr. Holloway testified that he was "face up" when he was being kneed in the head. On direct examination, Mr. Holloway testified that he was getting kneed in the head whilst in a claimed chokehold by Deputy Renegar. (See, Naltsas Decl., ¶6, Exhibit D, pg. 30:16-24).[3] On cross examination, Holloway then doubled down on his assertion that he was getting kneed, punched, and kicked whilst in a chokehold. (See, Naltsas Decl., ¶7, Exhibit E, Trial Testimony of Jeremy Holloway on May 9, 2025, Vol. I, pgs.123:5-7).[4] It is undisputed

---

[3] On direct examination: "

Q: And then we hear you make sounds -- growling sounds, and then you say, "You're kneeing me in the head." Did you hear that?

A: Yes.

Q: Okay. And is this the point in time when you were held in a chokehold by Renegar, as you testified?

A: Yes. I believe -- because it happens -- in reality it happens actually kind of fast. I believe this is in the time when I'm getting choked and switched over.

[4] On cross examination: "

Q: Sir, you've also testified that as you were in this chokehold, you were getting kneed in the head, correct?


3-GottsSER-00413

by both parties that Deputy Gotts arrived on scene when Mr. Holloway was facedown on the ground. (See, Naltsas Decl., ¶11, Exhibit I, Trial Testimony of Deputy Jameson Gotts on May 7, 2025, Vol. I, pgs.55:7-10, 82:4-10). Thus, Deputy Gotts could not have been kneeing Mr. Holloway, as he claims, at the same time he was being placed in a chokehold as he was not even at the scene when this supposed action was occurring.

As further evidence that Mr. Holloway has failed to identify Deputy Gotts, Mr. Holloway testified that he was kneed on the right side of his head, and he went as far as to pull his right arm out to stop the blows. (See, Naltsas Decl., ¶6, Exhibit D, pg.23:5-10).[5] Even if one were to take this testimony as true, it still does not implicate Deputy Gotts in any manner. Deputy Gotts has testified consistently that he was on Mr. Holloway's left side, assisting with retrieving Mr. Holloway's left arm. (See, Naltsas Decl., ¶11, Exhibit I, pgs. 82:4-20, 90:11-16, 91:17-92:7; see also, Deputy Gotts' Use of Force Report Exhibit 35-3 admitted on May 6, 2025; see also, Video Exhibit 102-5A admitted on May 7, 2025). No contrary evidence that Gotts was "on the left side" was offered by any party. Holloway's "excessive force" claim against Deputy Gotts rests on rank speculation – asking the jury to make the leap that, even though Holoway failed to testify or specify any wrongdoing, Gotts is somehow culpable.

Finally, each of Holloway's alleged claims of getting kneed in the head by "someone," occur before Gotts is even on scene. At trial, Plaintiff's counsel played Deputy Renegar's PVS recording (Exhibit 102-2) and stated definitively that at "5:03.29" Mr. Holloway was complaining that he was being kneed in the head. (See,

---

A: There's knees, heads, punches.

[5] On direct examination: "
A: And then I see another officer that wasn't from the first three come and knee me right in the eye, in the temple area of my right side. And there is a moment where I did pull up my right arm to try to block my -- to save my face. And you do see blood on my arm from where I was trying to protect my head.


3-GottsSER-00414

Naltsas Decl., ¶12, Exhibit J, pg.38:11-14).[6] However, irrefutable video evidence establishes that Deputy Gotts ***wasn't even at*** O'Neill Campground at 5:03:29. (See, Video Exhibit 102-4 admitted on May 8, 2025). Frankly, Mr. Holloway can be heard once more accusing someone of "kneeing" him in the head on Deputy Pahel's PVS at "5:03.44." (See, Video Exhibit 102-4 admitted on May 8, 2025). This means the "kneeing" complained of took place slightly before the complaint which can be heard at 5:03:44, so possibly 5:03:43 or 5:03:42. Yet, once again, Deputy Gotts' PVS video will show that he had just arrived at the scene at 5:03.44 and the car hadn't even come to a full and complete stop until 5:03.45. (See, Video Exhibit 102-5 admitted on May 7, 2025). From then on, Mr. Holloway never again accuses anyone of kneeing him in the head during the active struggle on the ground.

As a result, given all of the evidence in front of the jury, it is impossible to conclude that Gotts kneed Plaintiff in the head.

Plaintiff's claim against Deputy Gotts fails as a matter of law because Plaintiff failed at trial to identify Deputy Gotts as being responsible for the force of which he complains. Instead, Plaintiff has left everyone to speculate as to Gotts's involvement. See, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir.2007)("Conclusory, speculative testimony" is not enough to survive dismissal); First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005)("the record contains no proof beyond speculation to support a verdict.") Plaintiff's speculative "excessive force" claims here therefore cannot survive Judgment as a Matter of Law. See, Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

---

[6] On direct examination of Chad Renegar: "
Q: The first time you hear him complain "You're kneeing me in the head," it's 5:02:29 seconds; true? I'm sorry, 5:03, okay; true?
A: Yes.


3-GottsSER-00415

(internal citation omitted).

Plaintiff's "excessive force" claim requires proof that ***each*** Deputy Defendant – including Gotts -- "personally participated" in the constitutional deprivation, and that ***each*** Defendant's conduct was the "actionable cause" of the claimed injury. Avalos v. Baca, 596 F.3d 583, 587 (9th Cir. 2010); see, Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008). Stated otherwise, it is Holloway's burden to prove causation as to each Deputy Defendant. See, Lane v. Washington State Department of Corr., 2019 WL 6686730, at *11 (W.D. Wash. 2019) ("In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.")

This means that there is no such thing as "group liability" in civil rights cases of this type. Stated otherwise, liability under § 1983 may ***not*** be premised on "team liability" or a "team effort." Jones v. Williams, 297 F.3d 930, 935 (9th Cir.2002); see, Esteem v. City of Pasadena, 2007 WL 4270360, *14 (C.D. Cal. 2007) (plaintiff "cannot hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct.")(citations omitted); id. at *14 (summary judgment granted where "Plaintiffs cannot back up [their] allegations with any evidence that these, or any other identifiable, officers trained their weapons on the minor Plaintiffs.")

The Ninth Circuit found these principles foreclosed liability in a similar situation where a plaintiff failed to identify which peace officer supposedly urinated in her home:

> Besides the destruction in her living room, the other incident that Jones claimed required a group liability instruction was the urine smell in the iron. Jones claimed that when she went to iron her clothes on Sunday she smelled a funny smell from the iron. When she asked her son, he said he too had smelled it earlier in the day when he had ironed. Jones testified that the smell was that of

urine. Only two officers were asked about urinating in the iron. Both officers denied it. As our analysis above demonstrates, holding individual officers who were merely present at the search liable for such misconduct would go well beyond what [our precedent] would allow.

Jones v. Williams, 297 F.3d 930, 936–37 (9th Cir. 2002); see, id. at 936 ("a 'team effort' standard is impermissible because it 'allows the jury to lump all the Defendant together, rather than require it to base each individual's liability on his own conduct.' ")(citations omitted); id. ("merely being present at the scene" where unconstitutional conduct occurs is insufficient to warrant an inference of individual liability.)

Because Plaintiff Holloway has entirely failed to provide any evidence at trial as to what force Deputy Gotts used, and whether such force was "excessive force," Deputy Gotts is entitled to Judgment as a Matter of Law.

**ii. Plaintiff's Use of Force Expert Failed to Opine to any Use of Force by Deputy Gotts**

Additionally, Plaintiff's use of force expert Roger Clark failed to mention Deputy Gotts as using ***any*** force against Holloway, let alone unreasonable force. In fact, he focused his entire examination on Deputy Renegar.

Moreover, it was evident that Mr. Clark did not know who Deputy Gotts was and how he related to this lawsuit. (See, Naltsas Decl. ¶8, Exhibit F, Trial Testimony on May 7, 2025, Vol. II, pg. 90:1-91:2). Had it not been for Plaintiff's counsel's inappropriate speaking objection announcing to the witness that Deputy Gotts arrived later, it is clear that Mr. Clark would not have been able to testify at all regarding Deputy Gotts. In fact, Mr. Clark testified that he never calculated when Deputy Gotts arrived on scene. (See, Naltsas Decl. ¶8, Exhibit F, pg. 90:21-25).[7] Further, when defense counsel asked Mr. Clark for a specific time for when Deputy Gotts arrived at

[7] Q: When did Gotts arrive on scene, according to your review of the materials?

A: Well, he was after No. 3. Renegar and Paul and Gonzalez were one, two and three. **I didn't calculate the rest**.


3-GottsSER-00417

the scene, Mr. Clark stated, "I don't know." (Id. at pg. 91:1-2).

Not surprisingly, given his lack of familiarity with Deputy Gotts as apparent from his testimony on the stand in front of the jury, Plaintiff's use of force expert made no opinions or findings as to Deputy Gotts in his Rule 26 report. (See, Naltsas Decl. ¶9, Exhibit G, Roger Clark's Rule 26 Report).

**iii. Plaintiff Failed to Ask Use of Force Expert Sargeant Stewart Rawlings Any Questions Regarding Deputy Gotts' Use of Force**

After Plaintiff's use of force expert Roger Clark failed to opine to any conduct regarding Deputy Gotts, Plaintiff had another chance when he called Sargent Stewart Rawlings, another use of force expert, to testify. However, once again, Plaintiff asked no questions about Gotts's use of force. Rather, Plaintiff asked Sargeant Rawlings about every other deputies' use of force on the night of January 21, 2018, besides that of Deputy Gotts. (See, Naltsas Decl. ¶10, Exhibit H, Trial Testimony on May 9, 2025, Vol. III, pgs. 221:21-227:22). Plaintiff's counsel went one by one with Sargeant Rawlings regarding every deputies' use of force on the night of the incident except for Deputy Gotts.

Therefore, once again leaving the jury to speculate and wonder what Deputy Gotts actually did when it comes to his use of force on the night of the incident. Plaintiff's case allowed the jury to lump Deputy Gotts together with the other non-deputy defendants' conduct, rather than require them to base Deputy Gotts' liability on his own conduct.

**iv. No Other Deputy Provided Testimony of Gotts's Use of Force**

Plaintiff called Deputies Pahel and Borba to the stand. Neither testified that Deputy Gotts struck Jeremy Holloway in the face or head. (See, Naltsas Decl. ¶13 Exhibit K and ¶14, trial testimony on May 16, 2025).

Further, during the first time during closing argument, Plaintiff advanced a new theory that Deputy Gotts's pants were bloodied and that this must have been because he "kneed" Holloway on the right side of his face. However, Plaintiff never obtained

testimony from anyone, including Mark Borba who handed Jeremy Holloway the wipe to wipe his pant legs, what he saw on the pant leg. No witness was ever asked, and therefore the only "evidence" in the record that there was even blood on the pants of Deputy Gotts came from Plaintiff's *counsel*.

Therefore, once again leaving the jury to speculate and wonder what Deputy Gotts actually did when it comes to his use of force on the night of the incident. Plaintiff's case forced the jury to lump Deputy Gotts together with the other non-deputy defendants' conduct, rather than require them to base Deputy Gotts' liability on his own conduct.

## IV. DEPUTY GOTTS IS ENTITLED TO QUALIFIED IMMUNITY

### A. The Qualified Immunity Doctrine Is a Demanding Standard

In order to overcome qualified immunity, a plaintiff must cite pre-incident case law whose factual particulars and holdings made the illegality of the public employee's conduct "beyond debate" at the time s/he acted. Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011)[8]; see, City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 504 (2019)("existing precedent must place the lawfulness of the particular [action] beyond debate....")(quoting Wesby, 138 S.Ct., at 581); White v. Pauly, 137 S.Ct. at 551 ("existing precedent must have placed the statutory or constitutional question beyond debate.")(citations and internal quotes omitted).[9] This "demanding standard" protects

---

[8] Only pre-incident case cites matter in the "clearly established" law analysis. See, e.g., City of Tahlequah, Oklahoma v. Bond, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021)(finding cited case "decided after the shooting at issue, is of no use in the clearly established inquiry.")(citations omitted).

[9] Qualified immunity's refined formulation matches up with the "abuse of discretion" standard already employed in most jurisdictions to review trial court orders. See, e.g., Gonzales v. Nork, 20 Cal. 3d 500, 507 (1978)("As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of the action.'")


3-GottsSER-00419

"all but the plainly incompetent or those who knowingly violate the law." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).[10]

Congress enacted 42 U.S.C. § 1983 in order to provide citizens with a means to seek civil damages against public employees who violate their federal constitutional rights. See, Baker v. McCollan, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution . . .."). However, the Supreme Court has recognized that Section 1983 damage suits against governmental employees entail substantial "social costs" which include the "expense of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office." Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). The qualified immunity doctrine addresses these concerns by providing for pre-trial judicial screening of Section 1983 claims. See, Johnson v. County of Los Angeles, 340 F.3d 787, 791 (9th Cir 2003)(It is for "courts, not juries to settle the ultimate questions of qualified immunity."); Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000)("Whether a public official is entitled to qualified immunity is a question of law.").

The Supreme Court has emphasized that qualified immunity determinations involve two levels of judicial screening. See, Saucier v. Katz, 533 U.S. 194, 201 (2001). To "defeat ... officials' defense of qualified immunity," a plaintiff "must show, 'first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct.' "

[10] Accordingly, as the Ninth Circuit has recently explained, "state officials are entitled to qualified immunity so long as 'none of our precedents squarely governs the facts'" they confronted. Hamby, 821 F.3d at 1091(citations omitted). And if "it is at least debatable that the prison officials ... complied with the [Constitution]," then they "are ... entitled to qualified immunity." Id. at 1096; see, Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986) (in qualified immunity cases, this Circuit does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians.").


3-GottsSER-00420

Hamby v. Hammond, 821 F.3d 1085, 1090 (9th Cir. 2016)(alterations in original)(quoting Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015)(per curiam)). The Court "may decide for [itself] which step of the analysis to undertake first." Id. "Failing at either one will negate [a plaintiff's] eligibility to recover damages." Id.

The plaintiff bears the burden of overcoming qualified immunity. See, Stoudemire v. Mich. Dep't of Corr., 705 F.3d 560, 568 (6th Cir. 2013) ("Ultimately,…the 'burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity.') (internal citation omitted). At the outset, "[i]n seeking to defeat a claim of qualified immunity, the plaintiff bears the burden of proving…that [the] elements of his claim are resolved in his favor…." Brewster v. Board of Educ. of Lynwood Unified School Dist., 149 F.3d 971, 982 (9th Cir. 1998); see, Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011)("'[I]n a § 1983 claim, the plaintiff bears the burden of proof on the constitution deprivation that underlies the claim….") Also, "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." Shafer v. County of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017)(internal quotation marks and citation omitted).

The Supreme Court has devoted substantial time and effort to qualified immunity issues – with a particular emphasis on the "clearly established law" aspect of the doctrine. See, White v. Pauly, 137 S.Ct. 548, 551 (2017) (per curiam) (The Court "has issued a number of opinions reversing federal courts in qualified immunity cases" over "the last five years."). As recently emphasized by the Supreme Court, "clearly established" means that, at the time of the public employee's conduct, the law was " 'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, a Section 1983 plaintiff must cite pre-incident case law whose facts and holding plainly outlawed the decisions the public employee made during the subject incident. See, District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018)("The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the ***particular***


3-GottsSER-00421

***circumstances*** before him.")(emphasis added.); Saucier v. Katz, 533 U.S. 194, 202 (2001)(the rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); id. at 209 (a Section 1983 plaintiff must point to case law that states "a clearly established rule prohibiting the [public employee] from acting as he did ... [i]n the ***circumstances presented*** to the [employee].")(emphasis added).

"This requires a high 'degree of specificity'" (District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018))(citations omitted), inasmuch as qualified immunity is a "fact-specific, highly contextualized" inquiry. Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016); see, White v. Pauly, 137 S.Ct. 548, 552 (2017)("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."); Kisela v. Hughes, 138 S.Ct. 1148, 1153 (2018)(per curiam)(public employees "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue"); Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [public employees] *in this case* that *their particular conduct* was unlawful.")(italics original).[11]

---

[11] The Supreme Court has never squarely decided whether "the state of the law should be evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court." Harlow v. Fitzgerald, 457 U.S. 800, 819, n. 32 (1982)(citations omitted); see, District of Columbia v. Wesby, 138 S.Ct. 577, 593, n.8 (2018) ("We have not yet decided what precedents — other than our own — qualify as controlling authority for purposes of qualified immunity."); Reichle v. Howards, 566 U.S. 658, 665–666 (2012) (reserving the question whether court of appeals decisions can be "a dispositive source of clearly established law").

However, the Supreme Court has recently confined discussion of "clearly established" law to ***only*** what ***its own case law*** has enunciated. See, Rivas-Villegas v. Cortesluna, 2021 WL 4822662, at *3 (U.S. Oct. 18, 2021)(granting qualified immunity where "[n]either [plaintiff] nor the Court of Appeals identified any ***Supreme Court*** case that addresses facts like the ones at issue here.")(emphasis added).


3-GottsSER-00422

Several corollary rules follow from the forgoing principles. For starters, a Section 1983 plaintiff cannot properly resist qualified immunity by citing general Constitutional language. See, Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)("We have repeatedly told courts. . .not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of ***particular conduct*** is clearly established.")(emphasis added and citations omitted.); Maraziti v. First Interstate Bank of California, 953 F.2d 520, 524 (9th Cir. 1992)("Maraziti presents no case law establishing a constitutional violation in this situation. Instead, he contends that '[c]learly, the IRS agents cannot argue that the United States Constitution is not a well known constitutional development.' Generalized allegations of constitutional violations, however, are insufficient to rebut an official's assertion of a qualified immunity defense.").

Nor do citations to general Constitutional balancing tests give rise to "clearly established" law. See, Sharp v. County of Orange, 871 F.3d 901, 917 (9th Cir. 2017)("Plaintiffs point only to cases that establish the general framework for evaluating how much force is constitutionally excessive. . .. But that is not enough to defeat a qualified-immunity defense."); see also, City of Tahlequah, Oklahoma v. Bond, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021)(court of appeals case finding that "deliberate or reckless preseizure conduct can render a later use of force excessive" does not "clearly establish" the law: "[T]hat formulation of the rule is much too general to bear on whether the officers' ***particular conduct*** here violated the Fourth Amendment.")(emphasis added). Similarly, a lack of consensus among courts on the proper resolution of the relevant constitutional fact pattern requires qualified immunity. See, Wilson v. Layne, 526 U.S. 603, 618 (1999)("If judges . . .disagree on a constitutional question, it is unfair to subject [public employees] to money damages for picking the losing side of the controversy.").

A Section 1983 plaintiff also cannot defeat qualified immunity with "factually distinguishable" case cites. Arnsberg v. United States, 757 F.2d 971, 982 (1984); see,


3-GottsSER-00423

Rivas-Villegas v. Cortesluna, 2021 WL 4822662, at *3 (U.S. Oct. 18, 2021)( granting qualified immunity where "[n]either [plaintiff] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here. . ..The situation in [plaintiff's cited case] and the situation at issue here diverge in several respects."); Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)(qualified immunity granted where "[o]ur case differs materially" from the facts in precedent cited by plaintiff.); id. ("Plaintiffs offer only one controlling case that they believe meets [the 'clearly established' law] standard, . . . but we reject it as too dissimilar on its facts."); Shafer v. County of Santa Barbara, 868 F.3d 1110, 1117–18 (9th Cir. 2017)("We are mindful of the Supreme Court's pronouncement . . . that, to satisfy th[e]. . .qualified immunity analysis, we generally must 'identify a case where an officer acting under similar circumstances . . .was held to have violated the [Constitution].' We are aware of no such case. [Plaintiff] cites four cases with comparable degrees of force used by officers, but none of which involved a challenging environment or an act of physical resistance or obstruction by the arrestee.")(citation omitted); S.B. v. County of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017)("We hear the Supreme Court loud and clear. Before a court can impose liability on Moses, we must identify precedent as of August 24, 2013 — the night of the shooting — that put Moses on clear notice that using deadly force in ***these particular circumstances*** would be excessive.")(emphasis added); see also, Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986)(this Circuit does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians.").

### B. Plaintiff has Failed at Trial to Carry His Burden to Cite to Factually Relevant Clearly Established Law that Deputy Gotts's Conduct was Unconstitutional

Plaintiff has wholly failed to carry ***his burden*** to cite factually relevant, pre-incident "clearly established" law barring Deputy Gotts's alleged conduct. At trial, Plaintiff's opening statement merely mentioned broad, fact-free Constitutional amendments (over sustained objections). (See, Naltsas Decl.¶5, Exhibit C, Plaintiff's

Opening Statement, pgs. 6-38). Plaintiff has never gone further and (1) mentioned Deputy Gotts; (2) addressed Deputy Gotts's specific conduct; or (3) established that Deputy Gotts's conduct constitutes a constitutional violation in violation of factually relevant "clearly established" law. See, S.B. v. County of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017)("We hear the Supreme Court loud and clear. Before a court can impose liability on Moses, we must identify precedent as of August 24, 2013 — the night of the shooting — that put Moses on clear notice that using deadly force in ***these particular circumstances*** would be excessive.")(emphasis added).

**i. Looking at the Evidence in the Light Most Favorable to the Plaintiff, Deputy Gotts is Still Entitled to Qualified Immunity**

Even when looking at the evidence presented at trial in the light most favorable to the Plaintiff, there is no evidence that Deputy Gotts' specific conduct constitutes a violation of clearly established constitutional law.

The question for the jury to answer is whether Deputy Gotts kneed Mr. Holloway in the head. Plaintiff has failed to provide any evidence that specifically identifies Deputy Gotts as the perpetrator of such an act. At trial, Plaintiff's counsel played Deputy Renegar's PVS recording (Exhibit 102-2) and stated definitively that at "5:03.29" Mr. Holloway was complaining that he was being kneed in the head. (See, Naltsas Decl., ¶12, Exhibit J, pg.38:11-14).[12] However, irrefutable video evidence establishes that Deputy Gotts ***wasn't even at*** O'Neill Campground at 5:03:29. (See, Video Exhibit 102-5A admitted on May 7, 2025). Frankly, Mr. Holloway can be heard once more accusing someone of "kneeing" him in the head on Deputy Pahel's PVS at "5:03.44." (See, Video Exhibit 102-4 admitted on May 8, 2025). Yet, once again,

[12] On direct examination of Chad Renegar: "

Q: The first time you hear him complain "You're kneeing me in the head," it's 5:02:29 seconds; true? I'm sorry, 5:03, okay; true?

A: Yes.

Deputy Gotts' PVS video will show that he had just arrived at the scene at "5:03.44" and the car hadn't even come to a full and complete stop. (See, Video Exhibit 102-5A admitted on May 7, 2025). From then on, Mr. Holloway never again accuses anyone of kneeing him in the head during the active struggle on the ground.

Put simply, Deputy Gotts had not arrived at the scene or was involved in the altercation on the ground at any of the times Plaintiff is accusing someone of kneeing him in the head. Having discredited that allegation, the evidence viewed charitably is that Gotts arrived at the scene when the scuffle on the ground to apprehend and handcuff Holloway had already begun. There is absolutely no clearly established law that arriving at the scene, where a suspect is facedown on the ground actively resisting and putting body weight (a knee) between Plaintiffs shoulder blades in order to apprehend him and handcuff him is unconstitutional. As a result, Plaintiff failed to present any evidence at trial that Deputy Gotts' specific conduct constitutes a constitutional violation in violation of clearly established law and Deputy Gotts is entitled to qualified immunity.

## V. PLAINTIFF FAILED TO PROVIDE ANY EVIDENCE AT TRIAL THAT DEPUTY GOTTS' CONDUCT WAS MALICIOUS, OPRESSIVE OR RECKLESS.

To award punitive damages, the jury must be presented with specific evidence Defendant' "conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard" of Plaintiff's rights. (See, Ninth Circuit Model Jury Instructions, No. 5.5.). Holloway's evidence again falls short. To submit a claim for punitive damages, Plaintiff must set forth **actual evidence** that Defendant's "conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard" of Plaintiff's rights. (See, Ninth Circuit Model Jury Instructions, No. 5.5). Holloway has presented no evidence to support the notion that Deputy Gotts acted with the type of malicious, reckless or oppressive intent the law requires. He wasn't there during the first encounter. He had no animus or axe to grind against Holloway. He arrived late in the second encounter


3-GottsSER-00426

when fellow deputies needed help. And, he was only on scene for 14 seconds of force. This is hardly the malice required for a punitive damages award.

In short, Plaintiff's claims for punitive damages as to Deputy Gotts were insufficient to reach the jury. Judgment as a matter of law is therefore proper as "the record contains no proof beyond speculation to support a verdict." First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir. 2005), and the $30,000 award of punitive damages against Deputy Gotts is unwarranted based on the facts and evidence.

## IV. CONCLUSION

Plaintiff's case fails for lack of substantial evidence, and for lack of citation to "clearly established" law. For these reasons, Deputy Defendant Gotts is entitled to judgment as a matter of law on Plaintiff's remaining claims. See, Fed. R. Civ. P. 50.

Respectfully submitted,

DATED: May 30, 2025

**LYNBERG & WATKINS**
A Professional Corporation

By: */s/ Catherine Naltsas*
**S. FRANK HARRELL**
**CATHERINE NALTSAS**
**RYANE C. SKINNER**
Attorneys for Defendant Deputy Jameson Gotts


3-GottsSER-00427

3-GottsSER-00428

S. Frank Harrell (SBN 133437)
sharrell@lynberg.com
Catherine Naltsas (SBN 262259)
cnaltsasA@lynberg.com
Tamara M. Heathcote (SBN 193312)
theathcote@lynberg.com
Ryane Skinner (SBN 356970)
rskinner@lynberg.com
**LYNBERG & WATKINS**
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant DEPUTY JAMESON GOTTS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, et al.,<br>Defendant. | CASE NO. 8:19-cv-01514-DOC-DFM<br>*Assigned for All Purposes to: Hon. David O. Carter, Courtroom 10 A*<br>**DECLARATION OF CATHERINE A. NALTSAS IN SUPPORT OF DEFENDANT DEPUTY GOTTS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW**<br>**Fed. R. Civ. P. 50(b)**<br>**Date: July 14, 2025**<br>**Time: 9:00 A.M.**<br>**Location: 10A** |


3-GottsSER-00429

# DECLARATION OF CATHERINE A. NALTSAS

I, Catherine A. Naltsas, do declare and state as follows:

1. I am an attorney at law duly licensed to practice before all the courts of the State of California and am a partner in the law firm of Lynberg & Watkins, attorneys of record for Defendant Jameson Gotts (collectively, "**Defendant Gotts**") in the above-captioned matter.

2. I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so. This Declaration is made in support of the foregoing Motion for Judgment as a Matter of Law (the "**Motion**").

3. Deputy Jameson Gotts was not granted qualified immunity and Gotts's post-trial FRCP Rule 50 motion was denied following the Third Trial because Plaintiff Jeremy Holloway specifically identified Deputy Gotts as kneeing him in the head. A true and correct copy of Dkt. 679 the Court's Omnibus Order on Post Trial Motions Submitted After the Third Trial Filed 3-18-2024 is attached as **Exhibit A.**

4. The Court reiterated that Deputy Gotts would have been granted qualified immunity had Mr. Holloway not specifically identified him as the person who had allegedly kneed him the Third Trial. A true and correct copy of Trial Transcript May 7, 2025, Vol. II, p163 line 23 - p164 line 4, is attached as **Exhibit B**.

5. Plaintiff's case in chief has been utterly devoid of any mention of Deputy Gotts. During opening statements, Plaintiff's counsel never uttered Deputy Gotts' name. Plaintiff's opening statement merely mentioned broad, fact-free Constitutional Amendments (over sustained objections). A true and correct copy of Plaintiff's Opening Statement, p 6-38, is attached as **Exhibit C.**

6. When Mr. Holloway took the stand, he not only failed to mention Deputy Gotts, but also failed to identify Gotts as using any force, let alone using excessive

force on him. The extent to which Deputy Gotts was identified by Mr. Holloway as being involved in the use of force incident was confirming that a man on one of the PVS recordings was Deputy Gotts. On both direct and cross examination, Mr. Holloway testified that he was "face up" when he was being kneed in the head. On direct examination, Mr. Holloway testified that he was getting kneed in the head whilst in a claimed chokehold by Deputy Renegar. Mr. Holloway further testified that he was kneed on the right side of his head, and he went as far as to pull his arm to stop the blows. A true and correct copy of the trial testimony of Jeremy Holloway on May 8, 2025, Vol. I, p23 line 5-10, p30 line 16-24, p48 line 16-17, is attached as **Exhibit D.**

7. On the second day on the stand, Mr. Holloway again failed to mention Deputy Gotts and further failed to mention any use of force by Gotts. Further, on cross-examination, Mr. Holloway doubled down on his assertion that he was getting kneed, punched and kicked whilst in a chokehold. A true and correct copy of the trial testimony of Jeremy Holloway on May 9, 2025, Vol. I, p123 line 5-7, is attached as **Exhibit E.**

8. Plaintiff's use of force expert, Roger Clark, failed to mention Deputy Gotts as using any force against Mr. Holloway and moreover appeared to not know who Deputy Gotts was and how he related to this lawsuit. Had it not been for Plaintiff's counsel's inappropriate speaking objections, it is clear that Mr. Clark would not have been able to testify at all regarding Deputy Gotts. In fact, Mr. Clark testified that he never calculated when Deputy Gotts arrived on scene. A true and correct copy of the trial testimony of Plaintiff's use of force expert Roger Clark on May 7, 2025, Vol. II, p90 line 1 – p91 line2, is attached as **Exhibit F.**

9. Roger Clark made no opinions or findings as to Deputy Gotts in his Rule 26 Report. A true and correct copy of pertinent portions of the Rule 26 report of Plaintiff's use of force expert Roger Clark is attached as **Exhibit G.**


3-GottsSER-00431

10. Plaintiff's counsel called Sgt. Stewart Rawlings, another use of force expert, and asked no questions about Gotts' use of force. Rather, Plaintiff's counsel asked about every other deputies' use of force on the night of January 21, 2018, besides that of Deputy Gotts. A true and correct copy of the trial testimony of Sgt. Stewart Rawlings on May 9, 2025, Vol. III, p221 line 21- p227 line 22, is attached as **Exhibit H.**

11. The only testimony related to Gotts use of force came from Gotts, himself. Gotts testified that he placed his knee on Mr. Holloway's upper back and pulled on his left arm. It is undisputed by both parties that Deputy Gotts arrived on scene when Mr. Holloway was face down on the ground. Further Deputy Gotts has testified consistently that he was on Mr. Holloway's left side, assisting with retrieving Mr. Holloway's left arm. A true and correct copy of the trial testimony of Deputy Jameson Gotts on May 7, 2025, Vol. I, p55 line 7-10, p82 line 4-20, p90 line 11-16, and p91 line 17- p92 line 7, is attached as **Exhibit I.**

12. At trial, Plaintiff's counsel played Deputy Renegar's PVS recording and (Exhibit 102-2) and stated definitively that at "5:03:29" Mr. Holloway was complaining that he was being kneed in the head. However, irrefutable video evidence establishes that Deputy Gotts wasn't even at O'Neil Campgroup at 5:03:29. A true and correct copy of the trial testimony of Deputy Chad Renegar on May 13, 2025, Vol. I, pg. 38:11-14 is attached **as Exhibit J.**

13. During trial, Plaintiff called Deputy Borba and Deputy Pahel to the stand. Neither Deputy testified that Deputy Gotts struck Jeremy Holloway in the face or head. A true and correct copy of the trial testimony on May 16, 2025 is attached as **Exhibit K.**

14. During trial, Plaintiff called Deputy Pahel to the stand, who never testified that Deputy Gotts struck Jeremy Holloway in the face or head. A true and correct copy of the trial testimony of Deputy Pahel on May 16, 2025 is attached as


3-GottsSER-00432

**Exhibit L.**

I declare the foregoing under penalty of perjury under the law of the United States of America.

May 30, 2025, in Orange, California.

*/s/ Catherine A. Naltsas*
**CATHERINE A. NALTSAS**


3-GottsSER-00433