**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

Case No. NINTH CIRCUIT CASE Nos. 25-7132, 25-7297

---

JEREMY HOLLOWAY,
Plaintiff – Appellant

vs.

THE COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace office
Defendants – Appellees

---

On Appeal from the
United States District Court for the Central District of California,
(District Court No. 8:19-cv-01514-DOC-DFM)
The Hon. David O. Carter Judge Presiding

---

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 5 OF 6**

---

CATHERINE A. NALTSAS [SBN 262259]
JESSE K. COX [SBN 285218]
LYNBERG & WATKINS, APC
1100 Town & County Road, Suite 1450
Orange, California 92868
Tel: (714) 937-1010/Fax: (714) 937-1003
**Attorneys for Appellees**

# EXHIBIT E


5-GottsSER-00731

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

JEREMY HOLLOWAY,
PLAINTIFF,
vs.
COUNTY OF ORANGE, et al.,
DEFENDANTS.

SACV NO. 19-01514-DOC
Day 7, Volume I

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

7:49 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


5-GottsSER-00732

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, JEREMY HOLLOWAY:

NARINE MKRTCHYAN
NARINE MKRTCHYAN, ATTORNEY AT LAW
1010 NORTH CENTRAL AVENUE
SUITE 204
GLENDALE, CALIFORNIA 91202
(818) 388-7022
narine57@gmail.com

FOR THE DEFENDANTS, COUNTY OF ORANGE, et al.:

S. FRANK HARRELL
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
sharrell@lynberg.com

CATHERINE A. NALTSAS
LYNBERG & WATKINS
1150 S. OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015
(213) 624-8700
cnaltsas@lynberg.com

RYANE SKINNER
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CALIFORNIA 92868
(714) 937-1010
rskinner@lynberg.com


5-GottsSER-00733

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, CHAD RENEGAR:

MICHAEL L. WRONIAK
COLLINS + COLLINS, LLP
750 THE CITY DRIVE
SUITE 400
ORANGE, CALIFORNIA 92868
(714) 823-4100
mwroniak@ccllp.law

CHRISTIE SWISS
COLLINS + COLLINS, LLP
2011 PALOMAR AIRPORT ROAD
SUITE 207
CARLSBAD, CALIFORNIA 92011
(760)274-2110
cswiss@ccllp.law

**Also Present:**

Jeremy Holloway, Plaintiff

Raymond Farahmand, Paralegal for Plaintiff

Jameson Gotts, Orange County Deputy Sheriff, Defendants

Chad Renegar, Orange County Deputy Sheriff, Defendants

Bryan Stever, Litigation Support, Defendants


5-GottsSER-00734

Case: 25-7132, 08/25/2026, DktEntry: 44.6, Page 6 of 177

# I N D E X


| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEREMY HOLLOWAY | | 19<br>97<br>111 | 133 | |



5-GottsSER-00735

**SANTA ANA, CALIFORNIA; FRIDAY, MAY 9, 2025; 7:49 A.M.**

**-oOo-**

*(The following proceedings were had outside the presence of the jury:)*

THE COURT: We're on the record.

The clerk told me you wanted to speak with me. Let's begin with the plaintiff and then we'll turn to defendant. But at 8 o'clock, we're going in session.

MS. MKRTCHYAN: Yes, I understood, Your Honor.

07:49:06 I just would like to raise a couple of issues here.

So if the Court is not going to limit cross-examination of my client in any shape or form on collateral and irrelevant issues that the defense was going

07:49:17 into -- for example, the relevancy --

THE COURT: Just a moment.

Where's the other counsel?

MS. NALTSAS: He's in line at security.

THE COURT: We're waiting for one of the counsel

07:50:49 on the defense side.

You've indicated that you got Joshua Gomez available today.

MS. SWISS: Your Honor, we've made arrangements that he will be coming on the 19th. He'll be back from the

07:51:04 training. He'll be out to sea next week.


5-GottsSER-00736

07:51:06 THE COURT: What is the date of the 19th?

MS. SWISS: It's Monday, the 19th. Not next week, the following week.

THE COURT: Are we still going to be presenting evidence on that day? 07:51:15

MS. SWISS: We expect to be, Your Honor.

THE COURT: Because yesterday, Mr. Harrell thought that we would conclude Wednesday.

That's not realistic; is it?

07:51:29 MR. WRONIAK: No, Your Honor.

THE COURT: Okay. That's fine. Just as long as we have an indication to the jury. All right.

Counsel, I stepped out at 6:30 and 6:45 last evening. You weren't here. So I assume everybody wanted to go home. That's what you told me, right? 07:51:49

MR. WRONIAK: Yes, Your Honor.

THE COURT: Just want you to know I was here, if you had any issues.

MS. SWISS: There is an issue that involves Deputy Renegar that we would like to address. 07:52:02

THE COURT: Not until Mr. Harrell is here.

And I know Mr. Renegar is not your client, but you're a joint defense in many ways with separate clients.

*(Pause.)*

07:55:26 *(Mr. Harrell enters courtroom.)*


5-GottsSER-00737

07:58:23 THE COURT: Mr. Harrell, be on time. Am I clear? Am I clear?

MR. HARRELL: Understood, Your Honor.

THE COURT: Counsel.

07:58:29 MS. MKRTCHYAN: Yes, Your Honor. So very briefly.

If the Court -- well, yesterday, I asked for a break during cross-examination. First, I needed a break to go to the restroom.

THE COURT: I gave you that break.

07:58:44 MS. MKRTCHYAN: No --

*(Court Reporter requests clarification for the record.)*

THE COURT: Counsel, I'm going to continue now to cross-examination. You take up your complaints with the 07:58:53 Court at the end of the day. I do not want this interrupted. And I do not like the fact that we're in the middle of cross-examination, when we get to a point where there's a good interchange going on about the facts, and suddenly, we need a break. That occurred during the first 07:59:07 couple trials also. And sometimes, I wonder if that's not tactical to speak to your client in the hallway.

MS. MKRTCHYAN: Your Honor --

THE COURT: I gave you the break yesterday --

*(Simultaneous speakers.)*

07:59:15 MS. MKRTCHYAN: I need to finish my record. No,


5-GottsSER-00738

07:59:17 I'm not going to participate in this. You know, Ninth Circuit is going to watch this. I need to make my record; otherwise, I'm not going to participate. You guys continue without me. Thank you very much.

07:59:41 *(Plaintiff's attorney exits the courtroom.)*

THE COURT: Counsel, we're going back on the record. We're missing one juror.

Mr. Harrell, please continue.

THE COURT REPORTER: She left, Your Honor.

08:00:05 THE COURT: Now she's missing.

Would you please get your counsel. When that juror goes back in, we go back into session.

*(Pause.)*

*(Ms. Mkrtchyan enters courtroom.)*

08:00:31 THE COURT: One juror is missing, so if you'd like to continue to make your record. We have a little bit of time until that juror -- but as soon as that juror is here, we're back in session.

MS. MKRTCHYAN: Your Honor, it seems to me that

08:00:36 we're going to go up on the Ninth Circuit. And I'm entitled to make my record without interruptions, without being told that --

THE COURT: I was here at 6:45 for you to make this record last evening, and you weren't here.

08:00:46 MS. MKRTCHYAN: Well, because the defense were not


5-GottsSER-00739

08:00:47 here. In any event --

THE COURT: No, no, you were not here --

*(Simultaneous speakers.)*

THE COURT: No, you may not in that regard.
08:00:52 Because you keep setting a bad record. I gave each of you the courtesy of being here at 6:45 last evening, just to hear this kind of concern and before the jury comes in. Now we're going through this and holding up a jury.

MS. MKRTCHYAN: 6:45 is not -- you're holding up
08:01:06 the jury because Mr. Harrell was late half an hour --

THE COURT: I just said that, Counsel; it's on the record. And I just admonished Mr. Harrell to be on time.

MS. MKRTCHYAN: Okay. Then may I make my record instead of being interrogated? This is Ninth Circuit issue,
08:01:15 and I need to raise it.

I have the right to rehabilitate my client when the defense asks him questions on collateral, irrelevant issues. His state of mind, as of right now, in this lawsuit, is irrelevant. He keeps going into issues, "What
08:01:32 do you know now about the 911 calls?" That is irrelevant. What is relevant is my client's state of mind at the time of the incident.

Now, if my client is being cross-examined without any breaks -- yesterday, my direct examination was stopped
08:01:46 twice by this Court *sua sponte*, but cross-examination was


5-GottsSER-00740

08:01:50 not stopped, even when I asked for restroom break, and I was basically admonished in front the jury.

But in any event, if that is the case, I have the right under the due process, under the Seventh Amendment right to jury trial, to rehabilitate my client. This Court has deprived me of my ability to represent my client in many ways. I'm not allowed to ask him questions about his current medical issues. His stroke -- multiple strokes have affected his cognitive abilities. If anyone has any information about strokes, which is in his medical records, it affects you cognitively, neurologically. This man has, currently, PTSD. This man is sitting there and, clearly, he's unable to cognitively process some of the questions that are being given to him.

We are not allowed to talk about his stroke. You can instruct this jury that, "Ladies and gentlemen, the stroke that Mr. Holloway had with surgery has nothing to do with this incident, nor does his stroke in 2016 have anything to do." However, I'm entitled to tell this jury why this man has difficulty of processing information and sitting there for hours and responding to same questions five times asked different ways by an attorney who has absolutely no compassion, no empathy for someone. I hope everyone in this courtroom gets a stroke. Everyone in this courtroom gets a stroke so that you understand what this man

08:03:12 is going through right now in this court. Sometimes he has to come to this court and testify on cross-exam, grueling sessions.

So I'm entitled to rehabilitate. I have the right 08:03:23 to do that for my client. Therefore, I'm going to present to this jury the fact that -- and I'm putting this on notice so that no one later says, "You've opened doors." I'm going to ask my client about his stroke, about his heart surgery, the medications he's now taking. And then I'm going to ask 08:03:39 him, "Is that stroke related to this incident?" And if anyone dares to argue that that's opening doors to some emotional distress damages that we've limited, we'll go up on the Ninth Circuit.

You can declare mistrial; no problem. You can 08:03:53 certify issues for appeal. I've had enough of this already. Okay. I am handicapped severely. "Oh, Mr. Harrell, you can't say this. You cannot present loss of wages. You cannot present emotional distress damages. You can barely talk about your client's medical costs." So what this is? 08:04:12 If I'm handicapped from representing my client, why don't we just go up on appeal and raise this issues civilly and very productively, legally, on appeal. But why do we have to go through series of --

THE COURT: Mr. Harrell, thank you very much. 08:04:27 You've made your record. Now please, be seated. I'd



 5-GottsSER-00742

appreciate that.

Now, let me respond to a few things.

*(Court Reporter requests for clarification.)*

THE COURT: First, yesterday, I told you that you could present the case any way you wanted to. You could proceed with this compensation and salary through the years. That was your choice. I was concerned where that would lead, but you could conduct your lawsuit.

Second, you got your restroom break.

Number three, we were in session a little less than an hour or just over an hour when you called for this break. We're right in the middle of a cross-examination where counsel believes that he is getting relevant or irrelevant information from your client. This happened numerous times in the past, and I'm wondering if this is a restroom break, which I gave you, versus counseling your client to calm down on the stand when his answers have been nonresponsive, quite frankly. The repetitiveness of this is because your client has not answered the questions -- and I'll make that record -- whether it's avoidance or his handicap.

When you warned the Court about what to do, this is a long series of confrontations with this Court, and it goes clear back to the magistrate judge, that you've chosen to conduct yourself on your rules, not the Court's rules.



 5-GottsSER-00743

And yesterday, you were so combative with the Court that I had ruled in your favor, and you continued to argue with the Court after that ruling that your client could answer those questions, because you were so combative you didn't hear or care. And I will pull that transcript for you.

And finally, your comment was, *Well, I just won't ask any questions, then.* I think you're more interested in confrontation, quite frankly, at this point and has become repetitive, quite frankly, and boring.

Control yourself. You can have that outburst in front of me, and I will absorb that. But if you do that in front of the jury, this Court will respond in the strongest terms. You don't tell the Court what to do. And I want that clear.

Am I clear with you? Am I clear with you?

Am I clear with you?

MS. MKRTCHYAN: Is this Court intimidating --

*(Court Reporter requests clarification.)*

THE COURT: No. I want to know that you understand what I've said, that I will make --

*(Overtalking: Unable to report.)*

MS. MKRTCHYAN: Is the Court above the law --

THE COURT: -- the rulings, and you will follow those rulings.


5-GottsSER-00744

08:07:02 MS. MKRTCHYAN: Is the Court above the law?

THE COURT: That's right. And you're not obeying it.

MS. MKRTCHYAN: Okay. Is the Court above the law?

08:07:07 THE COURT: You're not obeying my --

MS. MKRTCHYAN: I'm obeying it the way I understand. But you're depriving me of the right to represent my client. My client has a right to due process; doesn't he?

08:07:17 THE COURT: You are deciding what the rules will be and disobeying the admonitions of the Court. And if we made that record that counsel want to bring in terms of sanctions, that would be quite a record. And we can start with the magistrate judge, quite frankly, and carry on to 08:07:32 this Court.

Now, I'm counseling counsel that they can bring whatever motion they want, but I'm not going to grant terminating sanctions; I think that's totally inappropriate at this point.

08:07:43 But if you're really badgering the Court into a mistrial, and that's really want you want, and you stipulate to that, tell me that. Because I'm not declaring mistrial regardless of your antics so far. Your client has the right to get a jury on this issue. And we're trying to get there, 08:07:59 whether you like my rulings or not. I could have declared a

08:08:04 mistrial a couple times already; I've chosen not to. Now, if you really want that and you're stipulating to that, then I will do that for you. But I want to hear clearly, either you want a mistrial and you're stipulating to that.

08:08:19 And not hearing that, then I'm going to get the jury.

Now, Mr. Harrell and counsel, if you want to respond, you're more than welcome to make your record.

MR. HARRELL: Your Honor, are all of the jurors 08:08:32 here?

THE COURT: I don't know yet.

MR. HARRELL: Oh, okay.

We just heard from plaintiff's counsel -- and for the record, it's abundant record, that going into this 08:08:47 trial, plaintiff agreed at our pretrial conference that emotional distress was off the table, starting in the move to Pennsylvania by her client which took place July of 2018. Now, in addition to what's already in the record, we hear this morning that plaintiff's counsel wants to put her 08:09:17 client on the stand and talk about, among other things, ongoing PTSD.

If she wants to do that, I want to be very clear that, all by itself, is going to open the door to what happened in Pennsylvania which, frankly, to all appearances, 08:09:40 looks much more traumatic than anything that happened with


5-GottsSER-00746

08:09:45 the Orange County Sheriff's Department in our incident. I will also note that the Court has told plaintiff's counsel multiple times: Put on your case the way you want to put it on.

08:09:59 Yesterday, she brought in medical records from Montana. She proposed that those had been put into evidence. We objected in accord with the Court's prior ruling with regard to the mother. We were very clear. We objected to the introduction of that material. The Court 08:10:21 inquired of Mr. Harrell, plaintiff's counsel, words to the effect of, *Are these records with regard to treatment for physical injuries?* And the response was, "Yes."

And Your Honor, these records are replete with billings for treatment for emotional distress counseling. 08:10:47 And this comes after the events in Pennsylvania. What makes it worse is, she just gives us billings. She did not give us any counseling reports on what they talked about. So we don't know what they talked about.

And it gets worse. Because of all of this talk 08:11:12 about now he has PTSD and all these records from Montana about emotional stress, which are in evidence and in front of the jury, based on plaintiff's counsel's representation that there's nothing like that in the records, there's all types of things that we need to do. Strategically, she 08:11:35 wants to open the door to emotional distress after




5-GottsSER-00747

08:11:39 July 2018, which she agreed not to do. We need a IME --

THE COURT: I don't think that that's the issue. I'm going to interject, before you finish this argument, that emotional distress was an agreement between the two of 08:11:56 you, and I've made that ruling. But I never precluded the plaintiff from physical issues, such as his back, hearing, teeth, whatever. That's never been a preclusion.

These hospital records have been introduced, in fact. So if it shows -- and many of them show absolute 08:12:24 normalcy. Others show a misalignment of the back. I haven't precluded the amounts of the future operation, if he elected to undertake it, which was testimony of $250,000. There's been no preclusion regardless of what plaintiff's counsel argues in terms of physical injuries.

08:12:45 The difficulty now is that you can conduct yourself any way you like in physical injuries. But now we've got evidence also that the gentleman was working at Costco, out of the presence of the jury. I don't know what requirements are for Costco, but he was gainfully employed. 08:13:08 And the difficulty is the tie of these strokes back to a preexisting condition and then making the argument that these present strokes are related to this incident with the police. It may be. You're not precluded. I don't know if this is going to open the door regardless of each of you 08:13:30 telling the Court what you think you're going to do to [sic]


5-GottsSER-00748

08:13:34 Pennsylvania. But you put each other on notice now.

You present your case, Mr. Harrell; I told you yesterday. And please listen, because it was fascinating yesterday to the Court when you got rulings in your favor

08:13:45 that you continued to argue with the Court, even against the ruling that was in your favor, because of your combativeness. And I'll go out and pull that record, and you can pull the record from that transcript also. You were so combative yesterday that you not only had a favorable

08:14:05 ruling that your client could answer, you continued to argue with the Court, and then you stated to the Court, "Well, I just won't ask any questions, then."

You have threatened a mistrial. Are you stipulating to a mistrial?

08:14:22 MS. MKRTCHYAN: I need to respond to some points --

THE COURT: No. You'll respond to me now. I'm going to get the jury. We're done with this record now.

Are you stipulating to a mistrial?

08:14:31 MS. MKRTCHYAN: I'm not going to -- I'm not going to be interrogated. Thank you.

THE COURT: It's not an answer.

We'll get the jury.

*(Pause.)*

08:14:45 THE COURT: You are all ordered back at 6:45 this




5-GottsSER-00749

08:14:48 evening. We're not going through this on Monday morning again when I'm here, and you choose to go home.

*(Pause.)*

*(Jury enters courtroom.)*

08:16:49 *(The following proceedings were had in open court in the presence of the jury:)*

THE COURT: Thank you very much, Counsel, for your courtesy.

We're back in session. The jury is present, all

08:16:55 attorneys, all counsel, the parties.

Mr. Holloway, would you be kind enough to re-take the stand, sir.

*(Pause.)*

JEREMY HOLLOWAY, PLAINTIFF, PREVIOUSLY SWORN

08:17:26 THE COURT: Thank you. Good morning.

And, Counsel, your continued cross-examination, please.

CROSS-EXAMINATION

BY MR. HARRELL: *(Continuing)*

08:17:32 Q Sir, yesterday, when we left off, we were talking about what you were doing during your encounter with law enforcement, referenced "Domestic violence." And the second encounter, referenced "The little girl screaming."

Do you remember that?

08:17:52 A What question was asked, I don't remember, but okay.

08:17:55 I'll continue at that moment.

Q Okay, sir. I just want you to have the correct moment in time in mind when I'm asking you questions. Okay?

A Yes, sir.

08:18:03 Q All right. We're going to play some more of Joshua Gomez's 911 call about what was going on between encounter one and encounter two. And this is Exhibit 228, and this is -- encounter on it is 401, and it runs through and including 434.

08:18:48 *(The videotape was played.)*

BY MR. HARRELL:

Q Sir, let's put up a campsite map again. This is Exhibit 76, for the record, in evidence.

MR. HARRELL: If we can zoom in, Mr. Stever.

08:19:31 BY MR. HARRELL:

Q You're in Campsite 65, correct?

A Yes, sir.

Q And Mr. Gomez says he's in Campsite 67, right?

A Correct.

08:19:42 Q You know how loudly you were speaking when you were dealing with the sheriff's department, right?

A Yes.

Q And you hear Mr. Gomez says that he recognizes your voice from contact that someone was having, fighting with

08:19:58 his girlfriend, right?


5-GottsSER-00751

08:20:00 A Yes, that's what Fuerbach said.
Q Okay.
A I mean -- I'm sorry, Gomez.
Q And we hear how loudly you were speaking on the audiotape of encounter one, right?
08:20:12
A Yes.
Q We're going to play a segment of that again. It's already been played, but I want you to have it mind.
A Yes, sir.

08:20:22 MR. HARRELL: This is -- 162N is the internal marking. And this is a portion of Exhibit 102, Deputy Renegar's audiotape.

(*The audiotape was played.*)

BY MR. HARRELL:

08:20:54 Q Sir, do you have any reason to dispute that Mr. Gomez, at Campsite 67, was close enough that he could have heard you speaking to the sheriff's department at your Campsite 65, 65, earlier that night?
A Yeah. He paraphrased what I said.
08:21:17 Q Right, sir.

Do you have any reason to dispute that Mr. Gomez, at Campsite 67, was close enough to Campsite 65 to have heard you when you were speaking to the sheriff's department?
08:21:33 A I can't dispute anything what Fuerbach heard or not




5-GottsSER-00752

heard.
Q Okay.
MR. HARRELL: Let's play some more tape. This continues with Joshua Gomez's 911 call. This is Exhibit 228 in evidence. And this is from 4:30, is the counter, and it ends at 5:04, for a run time of 34 seconds.
*(The audiotape was played.)*
BY MR. HARRELL:
Q Sir, do you hear Mr. Gomez say that the suspect is now in someone's RV, right?
A Yes, I do.
Q And you admit you were outside of your tent during this time, right?
A Yes, I was.
Q Now, did you go inside someone's RV on that night?
A No. I never went in any RVs.
Q Did you see what Mr. Gomez reported on 911, a male inside of someone's RV on that night?
A Yes, I seen the 911 report.
Q Right, sir.
Did you see a male -- if it wasn't you, did you see a male inside someone's RV on that night?
MS. MKRTCHYAN: Objection, Your Honor.
BY MR. HARRELL:
Q Yes or no?



 5-GottsSER-00753

08:23:38 MS. MKRTCHYAN: That's argumentative. And vague and ambiguous. The campground....

THE COURT: Overruled.

You can answer the question.

08:23:49 THE WITNESS: No, I wasn't near 61.

BY MR. HARRELL:

Q Okay, sir.

MR. HARRELL: Let's play some more tape. And to correct the record, Mr. Gomez's 911 call, the audio of that, 08:24:09 is Exhibit 101-3. I'd like to play a clip. This starts at 4:57 and ends at 5:13.

*(The audiotape was played.)*

BY MR. HARRELL:

Q Sir, between your first encounter, referenced "Domestic 08:24:54 violence," and the second encounter, referenced "The little girl screaming," you were outside your tent walking around. True?

A Yes. Yes -- I was.

Q All right.

08:25:05 MR. HARRELL: Let's play some more tape. This is 5:18 and it runs to 6:24, for a run time of 1 minute and 6 seconds.

*(The audiotape was played.)*

BY MR. HARRELL:

08:26:27 Q Sir, do you hear Mr. Gomez report to 911 that the male

08:26:32 suspect is now cursing about whoever called 911 on him?
A Yes, I do.
Q Now, when the officers were at your tent earlier that night, you did express displeasure with whoever called 911
08:26:52 on you, right?
A Just in that moment when Renegar spoke. It wasn't necessarily at anyone in particular.
Q Well, you called whoever called 911 on you "assholes and morons," True?
08:27:04 A To be honest, I didn't believe there was any 911 call.
Q Right, sir. Which might be another question at another time.
My question right now is: You called whoever it was that dialed 911 to report the domestic violence that
08:27:26 they say happened at your campsite, "assholes and morons." True? Just yes or no.
A Yes, I did say that statement.
Q All right. And, again, while Mr. Gomez is on the phone with 911, you were outside your tent at this time, right?
08:27:49 A Yes.
Q Is there anyone else at that campground that you can identify for us that expressed displeasure about the person who called 911 on that night?
A No, I couldn't say.
08:28:05 MR. HARRELL: And let's play some more tape. This


5-GottsSER-00755

08:28:20 is -- the counter on this Exhibit 101-3 is -- starts at 6:08 and ends at 7 even, for a run time of 52 seconds.

*(The audiotape was played.)*

BY MR. HARRELL:

08:29:39 Q Sir, did you hear Mr. Gomez report that now there's a little girl screaming at the campground?

A Yes, I did.

Q You were outside your tent at this time, right?

A Yes, I was.

08:29:50 Q Did you hear a little girl screaming on that night, sir?

A No, I did not.

Q Did you cause a little girl to scream on that night, sir?

08:29:59 A No, I did not.

Q Is there anyone else, aside from you, that was outside their tent at that campground at this time, on this night. Yes or no?

A I can't answer that question "yes" or "no."

08:30:25 Q Well, you certainly aren't aware of anyone else that was outside of their camp --

MS. MKRTCHYAN: Calls for speculation.

MR. HARRELL: -- site.

THE COURT: Overruled.

08:30:33 You can answer the question.

08:30:34 BY MR. HARRELL:
Q Are you?
A I didn't see anybody, but that doesn't mean there wasn't people outside of their campsite.
08:30:48 Q Are you suggesting that law enforcement should have been looking for someone else on that night, sir?
MS. MKRTCHYAN: Objection. Calls for speculation. How is that --
THE COURT: Sustained.
08:30:57 Just re-ask the question.
MR. HARRELL: Let's play some more tape, sir. This is Exhibit 101-3, Joshua Gomez's 911 call. Counter on it is 7:10 through and including 7:47; run time of 37 seconds.
08:31:54 *(The audiotape was played.)*
BY MR. HARRELL:
Q Sir, do you hear Mr. Gomez report that the suspect is now yelling?
A Yes, I do.
08:32:33 Q Did you do any yelling when you were outside of your tent between your first and second encounters with law enforcement on that night?
A Yes.
Q What did you yell?
08:32:50 A I yelled to the Campsite 66 that they should have came



 5-GottsSER-00757

08:32:55 out of their tent to stop the incident, to let the sheriff's know what was happening. That it wasn't me; it was them.

Q Anything else?

A Nope. That's it.

08:33:09 Q Okay.

A I mean, I could have said --

Q Sir, thank you.

A Okay.

Q Let me ask you another question. Okay?

08:33:17 MR. HARRELL: This is further playing of Josh Gomez's 911 call, Exhibit 101-3, for the record. And the counter on this -- the counter on this is 7:44 through and including 9:47, for a run time of 2 minutes and 3 seconds.

08:35:22 *(The audiotape was played.)*

BY MR. HARRELL:

Q Sir, on the audio that was just played, do you hear approaching sirens on the tape?

A Yes, I do.

08:35:59 Q On that night, you also heard approaching sirens, right?

A Yes, I did.

Q Where were you located on that night when you first heard the approaching sirens?

08:36:14 A That would be standing in front of my tent.

08:36:19 Q Doing nothing, right?
A No, that's when I was about to do my -- everything -- getting ready to go to bed.
Q Okay. When you heard the sirens, did you return to your Campsite 65 from somewhere else?
08:36:34
A Yes. The ranger station and the restroom.
MR. HARRELL: Let's play some more tape. This is more of Exhibit 101-3. And the counter on this is 9:42 through and including 11:19.
08:37:00 *(The audiotape was played.)*
BY MR. HARRELL:
Q Sir, do you hear Mr. Gomez say he's going to get dressed and come out of his tent?
A Yes, I did.
08:38:40 Q And after that, did you hear Mr. Gomez say to 911, "They found him"?
A Yes, they did.
Q Now, after Mr. Gomez says, "They found him," you have a contact with law enforcement a second time that night, right?
08:38:57
A That's correct.
MR. HARRELL: Let's play some more tape. This is more of 101-3. Starts at 11:08 and ends at 11:30, for a run time of 22 seconds.
08:39:24 *(The audiotape was played.)*




5-GottsSER-00759

08:39:36 BY MR. HARRELL:
Q Sir, do you hear law enforcement on the tape shouting, "Get down"?
A Yes, you hear that in the background.
08:39:45 Q You admit you were told to "get down" when law enforcement returned to the campsite the second time that night, right?
A Yes, I did.
Q Aside from you, are you aware of anyone else that was
08:40:02 told to "get down" by law enforcement on that night?
A No. No one else was.
MR. HARRELL: Okay. Let's play some more tape. This is 11:20 through and including 12:45.
*(The audiotape was played.)*
08:41:01 BY MR. HARRELL:
Q Now, sir, you know that Joshua Gomez, before he went into the Navy, he used to be in a program called "The Explorers," right?
A Yes, sir.
08:41:58 Q And you understand "The Explorers" to be a group of young people --
MS. MKRTCHYAN: Objection. Relevance, Your Honor.
THE COURT: Sustained.
Mr. Gomez will testify.
////



 5-GottsSER-00760

BY MR. HARRELL:
Q Sir, you heard Mr. Gomez report that non-lethal force has been deployed by law enforcement, right?
A Yes.
Q You know now that's a shorthand term for a Taser deployment by law enforcement, right?
A Yes, sir.
Q Aside from you, is there any other camper that you can identify for us that had a Taser used on them on that night?
A No, there wasn't.
Q You're the only one that you're aware of, right?
A Yeah.
Q Yes?
A Yes.

MR. HARRELL: Let's play the last segment of tape. And this starts at 12:51 and continues through the end of the recorded 911 audio call; 2 minutes and 3 seconds.

*(The audiotape was played.)*

BY MR. HARRELL:
Q Sir, do you hear Mr. Gomez say in this portion of the audio that, "They have him in cuffs"?
A Yes.
Q Aside from you, are you aware of anyone else that was handcuffed on this night?
A Not in -- not in that area.




5-GottsSER-00761

08:45:26 Q Did you have any friction with Mr. Gomez before he placed his 911 call?
A I had no idea of anything about Gomez.
Q Right.
08:45:37 The two of you had never even met at the time he placed his 911 phone call, correct?
A Right. I never could even see his campground from my area.
Q Can you think of any reason for Mr. Gomez to lie about
08:45:51 what he's saying was going on at the campground on the night of the incident?
MS. MKRTCHYAN: Objection. Calls for speculation. Argumentative.
THE COURT: Well, relates to any personal
08:46:00 interchange between the two?
MR. HARRELL: Sure.
THE COURT: He's already answered; there's been no personal interchange.
You can answer the question, sir.
08:46:09 In other words, he's asking broadly is there any disagreements between the two of you beforehand.
THE WITNESS: I believe Gomez spoke to the best of his abilities and what he felt was happening at that moment.
BY MR. HARRELL:
08:46:28 Q What he felt was happening at that moment was the same




5-GottsSER-00762

08:46:32 individual involved in the domestic violence call was now walking around the campground and causing problems, right?

MS. MKRTCHYAN: Calls for speculation what Gomez felt. This line of questioning is improper.

08:46:45 THE COURT: Sustained.

Gomez will testify.

BY MR. HARRELL:

Q Sir, when you heard the approaching sirens on that night, you were busy doing something, right?

08:46:58 MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE COURT: Sustained.

BY MR. HARRELL:

Q Sir, when you heard the approaching sirens on that night, you were smoking marijuana, right?

08:47:09 A Yeah. Right before I was going to go to bed. I was getting ready to smoke a bowl, and that's when I saw the officers come up. And I hurried up and threw it in there because they had already been at me, and I didn't want a -- more thing.

08:47:26 Q Sir, did you just say that you were getting ready to smoke marijuana?

A Yeah. I was right there, about to smoke marijuana. I had a bowl packed, getting ready to light it, and I saw the cops.

08:47:42 Q Sir, you were smoking marijuana when you heard the




5-GottsSER-00763

08:47:47 sirens, correct?
A Okay. There was a little bit of smoke started on that bowl. That's fine.
Q Sir, you know what smoking marijuana is, right?
08:48:01 MS. MKRTCHYAN: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: Yes, I do.
BY MR. HARRELL:
Q That's when you inhale marijuana smoke into your lungs,
08:48:10 right?
A That is correct.
Q And it gets you high, right?
MS. MKRTCHYAN: Objection. It's argumentative, Your Honor.
08:48:16 THE COURT: Overruled.
THE WITNESS: In different people -- it affects different people.
BY MR. HARRELL:
Q Let's talk about you.
08:48:22 A Okay.
Q When you smoke marijuana, it gets you high; doesn't it?
A It makes me feel a little bit sleepy. It's good for falling asleep immediately.
Q Sir, I'm going to ask you about sleep later.
08:48:35 But right now, I'm going to ask again -- really,

08:48:38 the second or third time --

A Yes.

THE COURT: Counsel, we'll strike the comment. Just ask the question.

08:48:44 BY MR. HARRELL:

Q When you smoke marijuana, it gets you high. True?

MS. MKRTCHYAN: Asked and answered already.

THE COURT: Overruled.

Answer the question, please.

08:48:53 THE WITNESS: That's really not a term used anymore. Now when you purchase marijuana, you can buy it for sleep, for mood. It's now designated in each prescription form. It's not like, "I'm getting high." It's like, "I'm going to smoke this so I can go to sleep."

08:49:13 BY MR. HARRELL:

Q Sir, are you suggesting that when you smoke marijuana, it doesn't distort your reality?

A That is correct.

MS. MKRTCHYAN: Objection, Your Honor. That is 08:49:26 so -- it's improper.

THE COURT: Overruled.

MS. MKRTCHYAN: Vague and ambiguous.

THE COURT: Overruled.

BY MR. HARRELL:

08:49:31 Q If it doesn't get you high or distort your reality, why





5-GottsSER-00765

do you buy it?

MS. MKRTCHYAN: Objection, Your Honor. He already answered.

THE COURT: Overruled.

THE WITNESS: Well, because I've had an infection in my stomach, and I have trouble eating in the mornings. I have trouble with sleep. I take trazodone, but trazodone takes a moment. So if I smoke a little bit of marijuana, it immediately puts me to bed. And then the trazodone, you know, I get another five hours of sleep. It also helps with food and stomach ingestion [sic].

BY MR. HARRELL:

Q Okay, sir. I'm not sure I got an answer, so I'm going to ask again --

MS. MKRTCHYAN: Objection, Your Honor.

THE COURT: Sustained. Strike the comment.

BY MR. HARRELL:

Q Were you getting ready to smoke marijuana when you heard the sirens, or were you actively smoking marijuana when you got -- when you heard the sirens?

MS. MKRTCHYAN: Asked and answered already. Badgering the witness already.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: Yeah, I was getting ready. So I was


5-GottsSER-00766

08:50:40 puffing on -- but I didn't have enough to really make -- smoke a full bowl. But yeah, they immediately came when I was starting, taking my first puff. They showed up. Threw it in there.

08:50:54 MR. HARRELL: Your Honor, I would like to do a reading. And this -- for our record --

THE COURT: You make the record, but start up with this document.

MS. MKRTCHYAN: Improper impeachment, Your Honor.

08:51:08 MR. HARRELL: Prior proceeding, day 9, Volume I, dated December 16, 2022. And this is page 54, starting at line 15. And I'll repeat that. This is page 54, starting at line 15, excluding --

THE COURT: Counsel, it's too confusing. Start

08:51:32 again.

What page?

MR. HARRELL: Page 54.

THE COURT: What line?

MR. HARRELL: Starting at 15.

08:51:39 THE COURT: Just a moment.

*(Pause.)*

THE COURT: Now, you'll show him that transcript first to see if it refreshes his recollection. It's not impeaching yet. Show the witness that transcript, show him

08:51:54 the lines, and ask him if this refreshes his recollection.


5-GottsSER-00767

08:51:59 MR. HARRELL: Your Honor, may I approach?
THE COURT: You may. Rolls will do that for you.
Thank you, Rolls. They can do that from now on.
BY MR. HARRELL:
08:52:11 Q Sir, I'll point it out for you, if you give me a second.
A All right. Thank you.
Q For the record, we're at page 54, starting at line 15. Okay?
08:52:27 A Okay.
Q Look at line 15. And if you would, read through and including the next page, line 3, and I'll be happy to show you where that is, once you're done with 54. Okay?
A Say again when I'm ending.
08:52:44 Q Sure. Let me know when you're done with page 54 and then --
A Oh, okay.
Q There might be something else.
A *(Witness so complies.)*
08:53:13 Q Okay, sir. I'm going to turn over to page 55 now, and I would like you to read down to line 3, and stop there. Okay?
A Thank you, sir.
Q Yes, sir.
08:53:32 A *(Witness so complies.)*



 5-GottsSER-00768

08:53:32 Q Are you done with line 3?
A Yes, I am.
Q Okay. How about --
A Can I look one more time in the first -- I want to go
08:53:39 over because I'm a little slow.
Q I am too.
A I just want to go one more time.
Q Okay. Do you know where you're supposed to start?
A I was going to question on 15.
08:53:50 Q Line 15. Exactly.
A *(Witness so complies.)*

MS. MKRTCHYAN: That's not impeachment, Your Honor. It's not inconsistent. Thank you. Object.

THE COURT: He's refreshing his recollection,
08:53:59 Counsel.

So for both of you, you both know the rules; and that is, if you're going to try to impeach, the witness is entitled to see the document first to see if they -- refreshes their recollection.

08:54:11 THE WITNESS: Okay.

THE COURT: You both know that, on both sides.

BY MR. HARRELL:

Q Sir, the judge is done now.
Let me ask you a question.
08:54:21 A Yes, sir.


5-GottsSER-00769

08:54:22 Q Does that refresh your recollection?
A Yeah. And my verbiage is better, yeah. I was ready for this question then.
Q Sir, when you heard the sirens, you were smoking
08:54:40 marijuana. True?
A Yes. When -- I was -- answered that question, I said I was smoking a --
Q Sir, just --
THE COURT: No, Counsel.
08:54:47 Finish your answer, sir. You got cut off.
THE WITNESS: Yes, when I was answered -- when I read what I answered, what I was doing, I said yes, I was smoking a bowl.
BY MR. HARRELL:
08:54:59 Q Okay, sir. Now -- so during the second encounter, due to smoking marijuana, you were under the influence of the marijuana that you were smoking at that time. True?
MS. MKRTCHYAN: Objection. Lacks foundation. And calls for expert opinion.
08:55:28 THE COURT: "Influence" is a big word. You can ask him again what he was feeling concerning this. But I'm going to sustain the objection. It's ambiguous.
BY MR. HARRELL:
Q Sir, because you were smoking marijuana when you heard
08:55:45 the approaching sirens, you were feeling the effects of the




5-GottsSER-00770

08:55:50 marijuana you were smoking during the second encounter, referenced "The little girl screaming."

True?

A Not necessarily as much because I didn't get to smoke 08:56:02 enough due to tolerance. But I did smoke, but I wouldn't really say I had a head change.

Q What is "a head change," as you use that term, sir?

A When I start feeling tired and drowsy, and I'm ready to go to bed.

08:56:18 Q Okay, sir. Now, I believe that you told us that you smoke marijuana -- at least, your practice was at the time of the incident to smoke marijuana not to get high but to help you sleep, correct?

A Helps for back and sleep.

08:56:36 Q And that's why you smoked it, at least according to you, at the time of the incident, right?

A Yes.

Q It makes you sleepy.

A Yes.

08:56:48 Q Sir, have you found that when you're sleepy, you don't remember events as clearly as when you're fully alert?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Vague as to time.

THE COURT: Sustained.

08:56:59 As to on this occasion, Counsel, you can ask.


5-GottsSER-00771

08:57:02 BY MR. HARRELL:
Q Sir, on this occasion, in your mind, did the marijuana that you smoked to make you sleepy, was that starting to make you drowsy?
08:57:16 A No. Not at that moment in time.
Q Okay. Now, I believe you told us earlier in our discussion that on -- on sundown, when you went to sleep on the night of the incident, you took a drug called trazodone, right?
08:57:36 A Yes.
Q What effect does -- did trazodone have on you on the night of the incident?
A Well, it's about 45 to an hour acting sleeping pill. So took it. Watched a little bit of TV in my bed. And then
08:57:59 I fall asleep. Usually, only lasts about five to six hours. And I'm a little bit groggy -- as a deep sleep. I'm in a deep sleep.
Q Sir, were you feeling the effects of trazodone during incident two, "The little girl screaming." Yes or no?
08:58:20 A I never heard a little girl screaming.
Q Okay, sir. Were you feeling the effects of trazodone at the time of your second encounter with law enforcement on that night?
A No. It was already out of my system. I had been woken
08:58:44 up on the first one. This time, I was trying to get back to



 5-GottsSER-00772

08:58:48 sleep.
Q Okay, sir. Before we get to the second incident, I would like to ask you questions on another subject.
I believe that you mentioned when plaintiff's
08:59:08 counsel, your attorney, had the floor, that you were homeless at the time of the incident, correct?
A Correct.
Q And I believe that you told us, at least in your mind, the officers recognized that you were homeless, right?
08:59:26 A Right. They were looking in my truck. They could see all my clothes, food, everything, plus -- and my tent.
Q And I believe you told us -- you expressed the view that law enforcement viewed you as an easy target to pick on, right?
08:59:47 A Right.
Q All right. Let's talk about that.
You've carefully reviewed the audiotapes in this case, right?
A Yes, I have.
09:00:01 Q Even once, even one time, did you tell law enforcement that you were homeless. Yes or no?
A No.
Q In fact, sir, you were required to give an address when you came to the campground, right?
09:00:26 MS. MKRTCHYAN: Irrelevant, Your Honor, for



 5-GottsSER-00773

purposes of officers' state of mind.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: I'm trying to remember. As of now, I don't remember. I know I give [sic] license plate and name, for sure.

MR. HARRELL: Okay. We have Exhibit 54, which is the register of campers. Am I correct about that? I'm seeing affirmative headshakes from people that tell me that it is.

Your Honor, this is in evidence, to my record. Can we bring that up?

THE COURT: You may.

MR. HARRELL: Okay. Let's bring that up, Mr. Stever. And if we can go over to Campsite 65.

BY MR. HARRELL:

Q Which is where you were, correct, sir?

A Yes.

*(The exhibit was displayed on the screen.)*

BY MR. HARRELL:

Q You were asked by the campground staff for an address, right?

A That would have been probably written from my driver's license.

Q Sir, my question has another focus.


5-GottsSER-00774

09:01:26 MS. MKRTCHYAN: Asked and answered.

THE COURT: Overruled.

BY MR. HARRELL:

Q You were asked by campground staff to give them your address, correct?

09:01:33

A I always give them a driver's license.

Q Sir, the address that you supplied to campground staff where you lived, it doesn't say "homeless," right?

A It wasn't -- yeah, it doesn't say "homeless."

09:01:56 MS. MKRTCHYAN: Lacks foundation, Your Honor. He didn't compile this report.

THE COURT: Overruled.

Your answer, sir? You were cut off.

Just a minute.

09:02:10 Counsel, there's no answer. Re-ask the question.

BY MR. HARRELL:

Q Sir, you could have told the campground staff that you were homeless if that was the case, right?

A They never really discussed that. They give you their

09:02:26 [sic] license. They go in front of the computer, and then they print out a question. Even this one is even incorrect.

Q Sir, my question has another focus.

A Yes, sir.

Q You could have told the campground staff you were

09:02:43 homeless if that was the truth, right?




5-GottsSER-00775

09:02:46 A No. There is no questions like that done. They don't answer [sic]. They give -- they give you your information. They tell you about the wood. They tell you about your campsite. And that's it. They don't ask personal
09:03:01 questions.
Q Sir, the home address that you supplied to campground staff --
A Yes.
Q -- when you came there was a residential address in the
09:03:19 city of Santa Ana, correct?
A Yes. It was the address that was on my driver's license.
Q That's where you lived on the date of the incident, correct?
09:03:30 A No.
Q Why supply this address to campground staff?
MS. MKRTCHYAN: Objection, Your Honor. What's the relevance of this to excessive force case?
THE COURT: Because homelessness came up, Counsel,
09:03:44 repeatedly.
Overruled.
You can answer the question.
THE WITNESS: Because I didn't offer on that address. This was on my driver's license. And when you
09:03:53 give your driver's license, they took down the information


5-GottsSER-00776

and put it in their computer. Again, that is also an incorrect date. So it shows I did not put that in there.

BY MR. HARRELL:

Q All right, sir.

MR. HARRELL: Let's pull up Exhibit 35-1.

*(The exhibit was displayed on the screen.)*

MR. HARRELL: Let's pull up Exhibit 35-1.

I am sorry. Let's do 45, which is in evidence.

*(The exhibit was displayed on the screen.)*

MR. HARRELL: Page 4 of 45, about halfway down.

BY MR. HARRELL:

Q Do you see there, sir, the residential address you had on file with the DMV?

A Yes.

Q And that's not the same address as you gave the campground, is it?

MS. MKRTCHYAN: Objection, Your Honor. Lacks foundation. This is "Call Detail Information Report." And -- how is this relevant to my client's information? This is dispatcher putting something. So lacks foundation. Improper impeachment.

THE COURT: Overruled.

BY MR. HARRELL:

Q Sir, we have Renegar's police report in evidence -- no, we do not.

09:05:31 MR. HARRELL: Or do we? Let's check our records.
MR. WRONIAK: 35-1.
BY MR. HARRELL:
Q Okay. Sir, I'm told that Deputy Renegar's police report is in evidence, 35-1. Let's put that up and check the address that you gave at the time of this incident in our case.
Do you see that?
A Yes, I do.
09:06:00 Q Once again, you give a residential address, don't you?
A That's my mom's address.
Q Okay. What address was on your driver's license at the time of this incident, sir?
A The previous apartment before I let the lease out --
09:06:27 Q Right. The one on Exhibit 45.
A -- on Fair Haven, yes.
Q That was run on the night of the incident, right?
A Yes. That was on my driver's license on the night of the incident.
09:06:39 Q So now, at the time of the incident, we've seen three addresses that you have supplied, right?
MS. MKRTCHYAN: Objection. Lacks foundation. And misstates the testimony.
THE COURT: Overruled.
09:06:51 MS. MKRTCHYAN: He didn't supply this.




5-GottsSER-00778

09:06:55 THE COURT: Overruled.
BY MR. HARRELL:
Q Sir, we've seen three different residential addresses associated with you at the time of this incident, right?
09:07:06 A Right.
Q Not even one time did you state, "I'm homeless," right?
A Well, these are all not questioned from me. This is car registration, driver's license. And that's the address on -- I'm not sure where they got that address, to be
09:07:29 honest. I think --
Q Is there anyplace they could have gotten it, in your mind, other than you?
A I could have said it in court or when I was in jail. That could have been my mailing address. To be honest, I'm
09:07:49 not sure when that street came up. But that is my mother's address. So maybe I wanted my court documents going somewhere where I can get it, so I gave that. That's where I believe that happened.
Q Why do you say that you were homeless at the time of
09:08:10 this incident?
MS. MKRTCHYAN: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: Well, when my -- it was almost time for my lease to go up. And I had always wanted to do the
09:08:25 Pacific Crest Trail. So it was a perfect time to do it, and



 5-GottsSER-00779

so I started training. And I was working. I wasn't destitute; I was doing my best to work. But I really didn't need rent money, so I didn't -- I was working as much as I needed. I'd work Tuesday through about Thursday, and then I would be up in the mountains. I was -- I had a goal of 25 miles a day. So that's my training. And I was planning the certain month that you have to go, because you can't just go whenever you want because when you hit to the High Sierras, there's going to be a lot of snow, so you want to start in the opposite season.

So anyways, that's -- I -- I didn't get a house. I lived in my truck. I really enjoyed it, to be honest, doing what I was doing. I mostly lived in a tent. But, yeah, every once in a while, I had to go into O'Neill Park. There was also Blue Jay Campground, where I would sleep, where you can go for free. But, yeah, that's -- so I lived in my truck.

MR. HARRELL: Okay. Can we pull up Exhibit 26 in evidence.

BY MR. HARRELL:

Q These are your medical records from Montana, I believe. Yes. And Pennsylvania.

MS. MKRTCHYAN: Objection, Your Honor.

They were not admitted into evidence yet. There's -- it lacks foundation so far.




5-GottsSER-00780

09:10:23 THE COURT: There has to be a foundation for these records.

MR. HARRELL: Your Honor, this is Exhibit 26. I show it in evidence.

09:10:30 MS. MKRTCHYAN: No. We had the billing record, Your Honor, the front page of the billing.

THE COURT: Is this already in evidence, Rolls?

THE CLERK: Yes, Your Honor.

MS. MKRTCHYAN: Well, there was the front page,
09:10:41 sure.

THE COURT: Overruled.

MR. HARRELL: Okay. Mr. Stever, I'm going to ask you to put up Exhibit 26, page 5 of that.

BY MR. HARRELL:

09:10:53 Q And I got your drift. I realize this is --

THE COURT: Counsel, no commentary. Just put up page 5.

*(The exhibit was displayed on the screen.)*

BY MR. HARRELL:

09:11:40 Q Let's go over to page 5 of Exhibit 26, which is in evidence.

Sir, you recognize these as billing records associated with you, correct?

A Yes.

09:11:58 Q All right. Look at that very first entry.

09:12:05 This is September 21, 2018, right?
A Yes.
Q You were treating at that time for generalized anxiety disorder, correct?
09:12:21 A That is correct.
Q And then right under that, on September 21, 2018, you were treating with a psychologist, again, for generalized anxiety disorder?
MS. MKRTCHYAN: Objection, Your Honor. May we
09:12:38 approach?
THE COURT: Yes, you may.
Let me speak to counsel out in the hallway for just one moment.
*(The following was held at sidebar:)*
09:28:58 THE COURT: All right. We're on the record.
MS. MKRTCHYAN: Can I make my record?
THE COURT: We're on record.
I thought that and the carefulness that I'm -- well, I'm concerned about the following: The emotional
09:29:02 distress, I was instructed, ends in July of 2018. But here, we have an anxiety disorder. And part of the claims that we got into was this generalized billing ledger or ledgers that came in from different years. And it was hard for the Court to track on direct examination which were the physical
09:29:09 versus the treatment or continuing treatment for the

anxiety, et cetera. It's also difficult to sort out the emotional distress ruling that you both agreed to from the physical.

So now I'm going to hear from the plaintiff, and I'm going to hear from the defendant.

MS. MKRTCHYAN: Your Honor, this is bad faith sanctionable conduct. You know, why? Because every trial they say, *Oh. Exclude this. Exclude that. Exclude this and that.* And they open the door and they put me in a position.

Every trial we have Exhibit 26 introduced with redaction for any issues that they had about the psychiatric treatment in Pittsburgh. Every trial we had retracted.

At this trial, what I introduced was the front page of the billing about 20,000. They didn't raise an issue in advance. They could have said, *Oh, Ms. Mkrtchyan, some of this billing from Pittsburgh we need to redact.*

Did they raise that in meet and confer or to this Court? No. The jury has not seen -- the jury has not seen the entirety. I never introduce the entirety. I never use the entirety. It was only the front page, the number $20,000.

So we could have redacted psychological stuff, if they read an objection. They're introducing this.

They're opening the door and now they're going to



 5-GottsSER-00783

say, *Oops! Mr. Harrell, you opened the door.* Look, I didn't. You're opening the door. This is an agreement, stipulation we reached. This is bad faith. Sanctionable conduct. I ask for sanctions.

Now, basically, I'm the one rejecting to my client's own medical records.

THE COURT: All right.

MS. MKRTCHYAN: This is ridiculous. This is putting me --

THE COURT: Now, I want to hear from the defense.

MR. HARRELL: Your Honor, here's what the challenge my client is up against now.

Already in this trial, the Court has given extensive instruction when plaintiff's mother got up on the stand and stated without my objection, because I didn't want to confront her --

THE COURT: Get to the point, please.

MR. HARRELL: She got up on the stand and talked about a bunch of alternative stressors after our incident which continued through Pennsylvania and into Montana and almost up to the date of this trial.

THE COURT: But I have given an instruction that emotional distress has to be excluded. I was specific about credit cards. The jury is admonished to obey that.

Here's the real problem. The real problem is that

09:29:56 these records are going up with a total on the front $20,000. And what it allows on the plaintiff side is to the plaintiff to argue this is $20,000. And included in that may be areas of treatment for emotional distress after
09:30:02 July of 2018.

So on the other side, you find yourself in the position of monies being asked for that are not.

MS. MKRTCHYAN: Your Honor, this billing was produced to them. Why did they not raise it in a motion
09:30:07 *in limine*? This is, what? Trial by error? By ambush? They're opening the doors.

I brought this exhibits to them before trial, medical records. And by the way, this attorney, again and again, February 5, I produced medical records from Montana
09:30:12 updated. I produced all this stuff. If they have an issue -- and they done it every trial. This is a first-rate effort to declare a mistrial.

THE COURT: Counsel, here is the problem for both of you. The problem is that we had an agreement about this
09:30:17 and these records could have gone through before by both sides. But we had an agreement not to get into emotional distress after July of 2018. The error on the plaintiff's side is simply putting up the whole document without going through that. The error on the defense side would be now
09:30:23 going against my admonition. This has not been sorted out.




5-GottsSER-00785

09:30:24 There's no way for the Court to deal fairly with this, frankly. I'm at a little bit at a loss how to -- how to deal with this, but it is unfair that an agreement is reached on the plaintiff's side to put up the total amount 09:30:29 and then now you respond.

If you two want to go through these records after court, I think that we can resolve this easily by taking out those areas on these billings. Because what the plaintiff cannot do is simply put up a total billing without sorting 09:30:35 this out. I think we could almost reach a stipulation concerning what was left in terms of physical. In reading these records, though, it appears that it's elective surgery. It appears that if that surgery was undertaken, it's about 240- to $250,000. But all of this anxiety 09:30:41 evidence that came in, I don't know. Is that linked? The argument could be made that that's linked to the damages from the incident.

MR. HARRELL: That is a suggestion.

THE COURT: But if that comes in, where do we draw 09:30:45 the line in terms of anxiety versus emotional distress and how far that goes?

What it does is, it undermines the whole stipulation we entered into.

MS. MKRTCHYAN: Your Honor, that's -- excuse me.

09:30:49 THE COURT: Let plaintiff finish.



 5-GottsSER-00786

09:30:49 MS. MKRTCHYAN: Your Honor, this is why -- there is a reason why -- there is a reason why they have exhibits put down on exhibit list. I produced updated VA ledger before trial. If we had a problem, they should have raised before I even went into client's direct.

09:30:53 Moreover, the same exact issue -- it seems to me we're doing this trial without having any information before. We had the same situation with VA ledgers before, and we had done redactions. If they want to go --

09:30:58 *(Overtalking: Unable to report.)*

May I finish?

THE COURT: Please.

MS. MKRTCHYAN: If they want to go and reduce those amounts with my client, sure. But you're opening the door, not me.

09:31:01 THE COURT: For both of you, this is becoming repeated. This is another example. We put up homelessness. Now, homelessness is in front of the jury, not only the opening statement which I thought pertained to this brief stay in the campsite which came up in the first, second and third but then the mother surprises us with this homelessness in Montana. This is thrown out there in a sense, and you should not be precluded now going into homelessness.

09:31:06 09:31:11 The same repetitive thing is occurring concerning


5-GottsSER-00787

damages. A document is thrown up in terms of page 1. And then I don't see how I cut you off from rebutting what is anxiety and emotional distress for physical damages. Plus it was hard for me to keep track of when a document is put up and then start scrolling through each of the pages. And what occurred was not captured on the record, Counsel, is that we're putting up a document repeatedly over a hospital record, and I repeatedly asked you to slow down the scrolling. And the record will indicate at that time you were scrolling through the records. So I'm not certain if you put a page 1, because so many other pages of these documents were simply put up on the screen. I'm not going to preclude you once this is raised from getting into anxiety now because of the way that this evidence is being presented.

You've got to be able, on defense side also, in fairness, to rebut a document that's thrown up and then pages are shown. And I don't know if the pages were shown on this document. It was so repetitive. I just don't recall.

So, Counsel, unfortunately, this is going to underline emotional distress. Now, where do we go from there? I'm warning you both. Once we get into that area, you're both aggressive on each side. And the end result is, I know that you're going to now claim in the future -- trust

09:31:41 me, in the fourth trial -- *Judge, this now opens the door for Montana -- for the incident back in Pennsylvania.* No it doesn't. Not at this point. You can get into anxiety. I'm going to let you rebut that versus the physical, but that 09:31:46 doesn't open that door yet.

MR. HARRELL: Your Honor, if I may.

THE COURT: The problem is -- this can't be a vehicle for that, Counsel.

Now, your turn uninterrupted.

09:31:49 MR. HARRELL: We did reach an agreement that it all ends in July of 2018. And we came into trial with that agreement.

First of all, we were sandbagged by the mother who was not -- I'll say it, was [sic] unappropriately counseled 09:31:54 on the agreement before she got up on the witness stand, so we heard all types of things after July 2018 that we should not have heard.

The Court did admonish the jury, *Don't listen to that.* Words to that effect. That's not an issue. It was 09:31:59 forcefully delivered and very clear. And I thought we were done.

And then, yesterday, with Mr. Holloway on the stand, here we go again. She puts up a medical billing record that contains a total amount. That for sure 09:32:04 happened. I also have been a witness to the scrolling




5-GottsSER-00789

09:32:05 through documents and things just being shown. And my records show that Exhibit 26, not just page 1, she asked for it all to be admitted. We objected. Learning from our experience with the mother that we need to object, we listen 09:32:10 and we learn. And we try and we objected and we specifically said -- I believe my memory is correct -- words to the effect of, *Your Honor, we object to Montana and we object to Pennsylvania, after July of 2018.*

Our objection was unsuccessful. So we move on. 09:32:16 And we do the best that we can with the Court rulings for our clients. That's how our system works.

So now I'm going through the records last night and this morning. And, again, I apologize about being late. But it is replete, this $20,000, or whatever it is, on 09:32:21 page 1 is replete. The Court has the exhibit. It is replete.

THE COURT: I'm not going -- the ruling is as follows: With the way that this was introduced, you may go back through these records and sort out what's physical 09:32:26 or/and anxiety, but I am precluding the incident in Pennsylvania which is truly what you're after frankly. Because the prejudicial effect outweighs the probative value for the following reasons:

First of all, there was no conviction. No. 2, the 09:32:31 prejudice would be after the fact if he's walking across the



 5-GottsSER-00790

09:32:32 hallway in an incident involving a woman with the Court not being knowledgeable about what that involves. But regardless this is not a campsite. This does not involve a fact situation that is so same or similar -- well, strike
09:32:37 that. If another woman is introduced into this after the fact, you don't have to be a weatherman to know which way the wind is blowing. That's going to be an automatic non-liability. The prejudicial effect here is just too strong. I'm not precluding you from this record. I am
09:32:43 precluding you from this Pennsylvania incident.

MR. HARRELL: Well, Your Honor, here's where the challenge is.

THE COURT: There is no challenge. I'm being very clear right now.

09:32:46 MR. HARRELL: I understand.

But if I can give the Court some more information. What is in front of this jury is just billing records. We do not have what he is seeking treatment for. We don't have the counseling --

09:32:51 *(Overtalking: Unable to report.)*

THE COURT: Okay, please.

MS. MKRTCHYAN: Lies after lies.

THE COURT: Just a moment.

MR. HARRELL: What is in front of the jury now is
09:32:53 bills that we're being asked to pay in damages for emotional


5-GottsSER-00791

09:32:54 distress treatment in Pennsylvania and Montana. Aren't we entitled --

THE COURT: No, you're not. I've included and told them that they cannot view that. I'm giving you the 09:32:58 ability to go back through the records and sort out what's physical and what is emotional distress. That is what I've given you to sort out.

MR. HARRELL: Well, here's what I will offer to do to work --

09:33:03 THE COURT: No, I'm going to tell you what you're doing. You're not offering me anything. My ruling is final. Am I clear? You are not to get into Pennsylvania.

Am I miscommunicating with you in any way? The prejudicial effect outweighs the probative value. 09:33:08 Understood?

MR. HARRELL: Understood.

THE COURT: All right. Let's get out of here.

*(Sidebar discussion concluded.)*

*(The following proceedings were had in open court* 09:33:10 *in the presence of the jury:)*

THE COURT: We're back on the record.

Counsel, question, please.

MR. HARRELL: Thank you, Your Honor.

BY MR. HARRELL:

09:33:12 Q Sir, let's pick back up.

09:33:13 Before you had the second contact with law enforcement, in your mind, had you done or said anything that told the deputies you pose no safety threat to them?

MS. MKRTCHYAN: Objection. Vague and ambiguous,
09:33:16 Your Honor.

THE COURT: Do you understand the question, Mr. Holloway?

THE WITNESS: Making sure we're in the first incident; they're coming up, and how do I feel what's
09:33:19 happening?

BY MR. HARRELL:

Q No, sir. We already talked about that.

THE COURT: Just re-ask it.

BY MR. HARRELL:

09:33:21 Q In your mind, sir, just before you had the second contact with law enforcement, referenced "The little girl screaming," had you done or said anything to the deputies that told them you pose no safety threat to them. Yes or no?

09:33:26 A Yes.

Q What had you done or said before the second contact that, in your mind, gave the deputies assurance that you pose no safety threat to them?

MS. MKRTCHYAN: "Assurance," Your Honor, calls for
09:33:30 speculation as to officers' state of mind.




5-GottsSER-00793

09:33:31 THE COURT: Overruled.

This is as to your thoughts, your state of mind.

THE WITNESS: Right. And as the cops came, they told me to "Put your hands out." I put my hands out. And I feel, at that point, we're in a good position to where we could actually have a conversation, if they would have found out it was me and then, necessarily, handcuffs would have been the next step. And that's how I feel.

BY MR. HARRELL:

09:33:39 Q Okay, sir. Had you done anything in the first encounter that, in your mind, gave the deputies assurances that you pose no safety threat to them?

A Yes. I informed of everything and responded to his commands, with question, which I had every right to, but I responded to every command.

Q Between the first encounter, referenced "The domestic violence," and the second encounter, referenced "The little girl screaming," in your mind, had you done or said anything that gave the officers -- you pose no safety threat to them. Yes or no?

A I had no idea that there was any kind of screaming going on, so there was no -- any consideration at that moment, I guess.

Q Okay, sir.

09:33:54 MR. HARRELL: So let's pull the exhibit that's got



 5-GottsSER-00794

09:33:55 the knives on the picnic table. Mr. Stever can do that.

This is Exhibit 100-11 in evidence, to my record.

*(The exhibit was displayed on the screen.)*

BY MR. HARRELL:

09:34:07 Q Sir, when the deputies showed up to your tent the second time on that night, reference "The little girl screaming," you were still in possession of all these knives, the machete, and the axe. True?

A They were locked -- not locked away. They were put

09:34:30 away safely. I wasn't in possession on my person.

Q Okay, sir. We'll get to that in a second.

But let me ask you: Where were these knives and the machete and the axe when the deputies showed up the second time?

09:34:50 A The knives were inside backpacks in the tent. The axe was toward the rear of the picnic table on the seat. And the broken machete was leaned up against the picnic table because it was hot.

Q Okay. Was there any space -- let's focus on the knives

09:35:16 for a second. And we have Exhibit 100-11 up --

A Yes.

Q -- showing the knives that you owned at that time. True?

A Yes.

09:35:28 Q Was there any space for any of these knives to fit

09:35:31 inside your coat that you were wearing when you saw the deputies the second time that night?

A I guess one of the smaller ones could have been hidden in there.

09:35:44 Q Okay. In your mind, sir, when the deputies encountered you the second time, with you wearing that coat, in your mind, did they have any guarantee that you didn't have a knife inside of that coat?

MS. MKRTCHYAN: Objection, your Honor, as to 09:36:03 "guarantee." Officers' state of mind. How is this relevant for his state of mind?

THE COURT: Well, this is -- in your mind, sir, when the deputies encountered you the second time and you were wearing a coat, in your mind, did they have any 09:36:15 guarantee....

Counsel, I'm going to sustain that. It's -- talking about his state of mind.

BY MR. HARRELL:

Q Sir, in your mind, when you encountered the deputies 09:36:28 the second time, when they were telling you to get down on the ground at that time, in your mind, did the deputies have any guarantee that you didn't have one of your knives inside of your coat. Yes or no?

THE COURT: Counsel, no. You can argue that about 09:36:49 the deputies. They can state their state of mind. But it's

09:36:53 turning out to be a question really involving the deputies' state of mind.

BY MR. HARRELL:

Q Now, in the pretrial phase, and as you've confirmed here, you claim that you did everything in your power to help the deputies feel safe around you on that night. True?

A Yes.

Q Did it occur to you on that night, when you were directed to get on the ground, that the deputies are trained, having you on the ground would be safer for them. Yes or no?

MS. MKRTCHYAN: Your Honor, it again goes to officers' state of mind. Calls for speculation.

THE COURT: Once again, it transfers back to the officers' state of mind.

Sustained.

BY MR. HARRELL:

Q Sir, you were told to get on the ground, correct?

A That is correct.

Q And you also claimed in the pretrial phase that you conducted yourself during the entire incident with respect. True?

A Correct.

Q Sir, how many times were you told to get down on the ground?

09:38:13 A I have never counted. A few times.
Q Not important to you?
MS. MKRTCHYAN: Objection, Your Honor.
THE COURT: Do you understand --
09:38:21 Counsel, the question is?
BY MR. HARRELL:
Q Sir, how many times were you told to get down on the ground?
A I haven't counted. I know they did a few times.
09:38:32 Q Two? Three? That's your best estimate?
MS. MKRTCHYAN: Objection, Your Honor. Asked and answered. He's been through this.
THE COURT: Overruled.
THE WITNESS: Sure, that's around that.
09:38:43 BY MR. HARRELL:
Q Okay. Did you have any problem understanding what the officers were asking you to do?
A Well, at the same time, I was asking my questions. So in the mix, I believed -- my state of mind, I believed 09:39:01 before I was thrown on the ground, I believe that I had a right to know why they were there. That's my state of mind.
Q Right. I understand, sir. My question has another focus.
Did you understand, when the officers told you to 09:39:19 get on the ground, that they wanted you to get on the ground


5-GottsSER-00798

09:39:25 right then? Did you understand that on that night?
A I understand their words.
Q Including "Get on the ground," right?
A Yes, that's what they said.
09:39:39 Q And any of the two or three times that you say you were told to get on the ground, did you get down on the ground?
A No.
Q Did you tell the officers that you were even getting ready to get down to the ground?
09:39:56 A No. I was waiting for their response to my questions.
Q Sir, in your mind, do you think it was showing respect to the deputies when you declined to get down on the ground. Yes or no?
A I believe it's more of a question were the officers
09:40:17 treating me correctly.
Q Right, sir. My question has another focus.
A Yes, sir.
Q In your mind, was it showing the respect -- was it showing respect to the deputies when you did not get down on
09:40:37 the ground as they asked you to do. Yes or no?
A At that time, those weren't concerns of mine.
Q And because you weren't concerned about respecting what the deputies told you to do, that's part of the reason why you didn't get down on the ground, right?
09:40:59 MS. MKRTCHYAN: Objection, Your Honor. Vague and

09:41:00 ambiguous. And it's argumentative.

THE COURT: Do you understand the question?

THE WITNESS: Yes, I do.

THE COURT: You can answer it.

09:41:06 Overruled.

THE WITNESS: No. At that time, there's fear of my life and fear of movement, erratic yelling by numerous officers.

BY MR. HARRELL:

09:41:19 Q You understood what they were yelling, right?

A Yes, I understood the words.

Q "Get down on the ground" was what was being yelled, correct?

A Yes. They were screaming. And talking.

09:41:30 Q Now, when the officers were telling you to get on the ground, they hadn't searched you for knives yet during this second encounter. True?

A Not the second time, no.

Q You also told us in the pretrial phrase that you did 09:41:52 everything in your power to help the officers to feel safe, correct?

A I did everything in my power I was able to do.

Q And you told us that that included doing exactly as law enforcement asked in an effort to help them not to have 09:42:09 any safety concerns. True?


5-GottsSER-00800

A Yes. That was within my safety concerns considered also.
Q All right. Sir, was it outside of your power to get on the ground when the officers were asking you to do that?
MS. MKRTCHYAN: "Outside of your power," Your Honor, this is vague and ambiguous.
THE COURT: Overruled.
You can answer the question.
THE WITNESS: "Power" is your word. But I would say I was pretty scared, and I did not want to move. There could have been repercussion and mistakes.
BY MR. HARRELL:
Q You were afraid if you did exactly as the officers asked, that would increase the odds of you getting shot?
A Yes.
Q And so that's why you decided to not do as the officers were asking you, right?
A That's why I stayed in a safe spot and tried to speak in a clear and calm manner and wondered why I was being detained.
Q You decided not to do what the officers asked you because you thought that would decrease the chance that they would use force on you, right?
MS. MKRTCHYAN: Objection. "Decrease." It also goes to officers' state of mind, Your Honor.




5-GottsSER-00801

THE COURT: Overruled.

You may answer the question.

THE WITNESS: I understand officers should be the ones in charge of the de-escalation, as I was in a position where I was not moving, and I was just simply asking, *Why am I being detained?* And I'm scared. If I would have moved and they would have got nervous, their holding -- their holding guns. It's a scary feeling.

BY MR. HARRELL:

Q Okay.

MR. HARRELL: I would like you to have 102-3A ready. And if someone could communicate to me that it's ready.

THE COURT: One -- 0123A [sic]?

MR. HARRELL: Right. And this is an inquiry to my staff here. This is his interaction with Sergeant Rawlings.

BY MR. HARRELL:

Q Now, sir, you have given another version of why you didn't get down on the ground; it has nothing to do with being shot, right?

A I don't know if another version would be saying, but yes, I was asked about that -- by different officers.

Q Well, let's take a look.

You stated in the pretrial phase that you didn't get down on the ground because you believed that that was a

09:45:20 violation of your civil rights, correct?
A As I've been watching all of these, yes.
Q Well, sir, let's go back to your mindset at the time of the incident.
09:45:36 A Yes, sir.
Q Do you have that period of time in mind?
A I do.
Q You have stated in the pretrial phase that you didn't get down on the ground because you believed that was a
09:45:48 violation of your civil rights, correct?
A Can you refresh me where I said that at?
Q Sure. We have a transcript of a prior proceeding of August 3, 2023.
THE COURT: No, you won't put that up.
09:46:08 MR. HARRELL: We're not.
THE COURT: Well, something flashed up on the board.
MR. HARRELL: Your Honor, can we refresh the recollection of the witness?
09:46:14 THE COURT: Yes. That's the proper way to do it.
MR. HARRELL: Okay.
BY MR. HARRELL:
Q We're at Volume I. And, sir, I would like to direct your attention to page 49, lines 7 through 10, three lines
09:46:30 of text.

09:46:32 MR. HARRELL: Ms. Skinner, if you could point that out to the witness. Just open the page for him and just point out for him. If we can get the transcript.

Sir, can you hand the transcript to the nice lady there.

09:46:45 THE COURT: Refresh his recollection.

MR. HARRELL: Page 49, lines 7-10.

BY MR. HARRELL:

Q Just those three lines, sir, can you read that.

09:47:02 Please let us know when you're done. Just those three lines.

A *(Witness so complies.)*

Q Are you now done?

MS. SKINNER: What volume?

09:47:22 MR. HARRELL: Volume I, Page 49, lines 11 --

THE COURT: Counsel, why don't you come up and look at this. Counsel, come up and look.

MR. HARRELL: Ms. Skinner, can you stand down for a second.

09:47:50 THE COURT: Make sure that's what you want him to look at.

MR. HARRELL: Yes.

Sir, can I have that back?

THE WITNESS: Yes, sir.

09:47:57 MR. HARRELL: Thank you.



 5-GottsSER-00804

09:47:57 Where did Ms. Skinner go?
MS. SKINNER: You said to stand down.
MR. HARRELL: I misspoke. All right. Thanks.
BY MR. HARRELL:
09:48:06 Q All right. Sir, I'm going to show you some text. This is page 49 of the transcript. I've already identified lines 11 through 15. I'm going to point it out for you.
A Thank you.
Q Okay. Yeah.
09:48:22 Let me know when you've read that. Okay?
MR. HARRELL: Would the Court like a copy? I just gave it away.
THE WITNESS: *(Witness so complies.)*
THE COURT: If you have that copy, it will save
09:48:36 time to show me.
MR. HARRELL: Yeah, we might need it again.
BY MR. HARRELL:
Q No, no, no, sir, you're on the wrong lines. I even drew blue dots around it.
09:48:49 A I know, but there's a lot of context, so I'm just making sure I know everything that's going on.
Q Right, sir.
Can you please take a look what I've asked you to look at.
09:48:58 A I am. I am. Thank you, sir.

09:48:58 Q All right.
A It's now easier for me to read what that --
THE COURT: Read those lines, please, to yourself.
BY MR. HARRELL:
09:49:03 Q No, sir, you're at the wrong line. I've even drawn a box around it.
THE COURT: Mr. Holloway, he's actually circled those --
THE WITNESS: I know. I'm trying to read, and
09:49:11 he's interrupting me.
BY MR. HARRELL:
Q I apologize.
THE COURT: Counsel.
THE WITNESS: *(Witness so complies.)*
09:49:21 BY MR. HARRELL:
Q Please let us know when you're done.
A Okay.
Q All right. Sir, does that refresh your recollection?
A Yes, it does.
09:49:41 Q Sir, you have stated in the pretrial phase that you didn't get on the ground because you believed that was a violation of your civil rights, correct?
A Yes. That was the conversation during Sergeant Rawlings.
09:50:06 Q Okay, sir. You believed, when you with the officers



 5-GottsSER-00806

09:50:09 when they very first arrived on the second encounter, that you had a constitutional right not to get on the ground regardless of what the deputies' reasons were for asking you to get on the ground. True?

09:50:22 MS. MKRTCHYAN: Misstates the evidence -- misstates the testimony, Your Honor. Improper impeachment.

THE COURT: Overruled.

You can answer that question.

THE WITNESS: Can you repeat the question?

09:50:39 BY MR. HARRELL:

Q When the officers were asking you to get down on the ground -- do you have that period of time in mind, sir?

A Yes, sir.

Q At that time, you believed that you had a 09:50:53 constitutional right to not get down on the ground regardless of what the deputies' reasons were for asking you to get on the ground. True?

A I believe I had a right to ask questions on why I'm being detained. I believe I had a right that they shouldn't 09:51:16 have -- they should have talked to me before they tackled me. But all those thoughts go out of the window when you have guns pointed at your face. Now you're just -- I'm just staying still. The best thing to do is stay still and not move and try to talk.

09:51:43 Q Sir, I'm going to ask it again.


5-GottsSER-00807

09:51:46 A Yes, sir.
Q And this is just "yes" or "no." Do you understand?
A I can try my best.
Q At the time deputies are ordering you to get on the
09:52:01 ground, you believed that you had a constitutional right to not get on the ground regardless of what the deputies' reasons were. True?

MS. MKRTCHYAN: Asked and answered.

THE COURT: Overruled.

09:52:15 MS. MKRTCHYAN: He's badgering the witness.

THE COURT: Overruled.

THE WITNESS: At that time, I believe I should have been talked to before they jumped me. But having guns involved makes a big difference.

09:52:25 BY MR. HARRELL:
Q Are you refusing to answer my question, sir?
A Okay --

MS. MKRTCHYAN: Objection, Your Honor. This is improper.

09:52:32 THE COURT: The question needs to be answered.

Re-ask the question, Counsel.

Now listen very carefully, Mr. Holloway.

THE WITNESS: Okay.

MS. MKRTCHYAN: Asked and answered.

09:52:39 THE COURT: No, this question has not been


5-GottsSER-00808

answered, Counsel.

Overruled.

Please ask the question.

BY MR. HARRELL:

Q Sir, "yes" or "no," do you understand?

MS. MKRTCHYAN: What was the question? Now it's not clear.

THE COURT: Counsel, overruled.

Please ask the question.

THE WITNESS: At that very moment --

THE COURT: No, he's going to ask you the question again. So there's clarity. Listen to the question that's being asked.

BY MR. HARRELL:

Q Sir, "yes" or "no," when the deputies were ordering you to get on the ground, in your mind, you believed that you had a constitutional right to not get on the ground regardless of whatever the deputies' reasons were for ordering you to get on the ground. Yes or no?

A I'm going to say, if we're talking at that moment, no.

Q Okay. Well, sir, you did say that you believed being ordered to get on the ground was a violation of your civil rights, right?

A I believe so.

Q Which is just another word for your constitutional


5-GottsSER-00809

rights, at least in your mind, right?
A That is correct.
Q All right. Now, as a result of your felony fraud conviction five days before this incident, there were some consequences of that conviction. True?
MS. MKRTCHYAN: Objection.
THE WITNESS: True.
MS. MKRTCHYAN: That's vague and ambiguous, "consequences."
THE COURT: Sustained.
BY MR. HARRELL:
Q You made some agreements at that time in order to go on probation and stay out of jail. True?
A Yes, I did.
MR. HARRELL: Your Honor, this is -- this page is not in evidence. This is the "Waiver of Search and Seizure." I would like to put that up, in redacted form. And it's Exhibit 222, page 5 --
THE COURT: Is it part of the plea agreement? Is it a part of the condition?
MR. HARRELL: No, Your Honor. This is the "Waiver of Search and Seizure Conditions" that he initialed.
THE COURT: Was it initialed by the plaintiff?
MR. HARRELL: Yes, Your Honor.
THE COURT: What's the reference number to it?

09:54:58 MR. HARRELL: Your Honor, this is Exhibit 222, page 5, paragraph 2.

THE COURT: All right.

MR. HARRELL: Well....

09:55:14 THE COURT: All right.

MR. HARRELL: Wait, wait, wait.

THE COURT: Counsel, we've covered many of these conditions yesterday. If this is the waiver of the search and seizure, you can put that up briefly. But this is 09:55:24 consumptive of time. We've gone over this area now. So this is going to be very brief.

MR. HARRELL: For Mr. Stever, this is Exhibit 222, Pages 5 and 6, which contain Paragraph 13.

THE COURT: Just put up the paragraph you're 09:55:39 interested in. I don't want extraneous information up.

MR. HARRELL: Thank you.

*(The exhibit was displayed on the screen.)*

BY MR. HARRELL:

Q Sir, you see paragraph 13 in front of you?

09:55:51 A Yes, sir.

Q And you initialed that. True?

A Yes, sir.

Q Which, in your mind, signifies your agreement with this language, correct?

09:56:01 A Yes, sir.

09:56:03 Q And at that time, you understood that:
Under the Fourth and Fourteenth Amendment to the United States Constitution, I have the right to be free from unreasonable searches and seizures. I waive and give up
09:56:23 this right and further agree that for the period during which I am on probation --
Then the rest of the language:
-- I will submit my person to search and seizure at any time of the day or night by any law enforcement
09:56:44 officer with or without a warrant, probable cause, or reasonable suspicion.
And you did initial that, correct, sir?
A Yes, I did.
Q Now, let's talk about the right to be free from
09:57:08 unreasonable seizures of your person.
Your state of mind when you signed this document was that you generally had a constitutional right to stand, sit, and move your body the way you wanted to. True?
MS. MKRTCHYAN: Objection. Very vague and
09:57:29 ambiguous, Your Honor. And calls for legal conclusion, frankly.
THE COURT: I don't understand the question, Counsel.
BY MR. HARRELL:
09:57:44 Q Sir, what did it mean to you when you waived your




5-GottsSER-00812

Fourth and Fourteenth Amendment right against unreasonable seizure of your person? What did that mean to you?

A To let them search me. That we stay in one spot. Talk to me.

Q Okay. When you initialed this agreement, was it explained to you that these terms meant the officers could take physical custody of you, put you in handcuffs at any time that they believed -- they believed that was needed for their safety?

MS. MKRTCHYAN: Your Honor, that calls for speculation. That's a host of problems there. Calls for a legal conclusion. It doesn't go to his state of mind and his understanding.

THE COURT: This goes to your state of mind and what you understood. You can answer.

THE WITNESS: I understood a lot of the things, but I really did not believe that it was okay to -- again, I'm an innocent civilian, as far as I'm sitting in that situation. I believe they have to let me know what's going on. I really didn't believe signing that waiver meant I was free to just be tackled, whatever, I was walking on the street.

BY MR. HARRELL:

Q Well, sir, all the deputies asked you to do was get on the ground, right?


5-GottsSER-00813

09:59:21 A Yes. And all I asked them -- why they were there.
Q So you believed when you waived your Fourth and Fourteenth Amendment right for your person to be seized, that meant that before officers could tell you to do
09:59:43 anything, you had to have all your questions answered, right?
MS. MKRTCHYAN: Objection, Your Honor. Calls -- it's very vague and ambiguous.
THE COURT: Overruled.
09:59:51 You can answer that question.
THE WITNESS: I assumed officers would do a proper investigation before they just throw me on the ground and beat me up. I assumed there is professionalism.
MR. HARRELL: Let's put up Paragraph 13 again.
10:00:10 BY MR. HARRELL:
Q Sir, where does it say in this agreement that you initialed that you had to be satisfied with the professionalism of the officers before they could instruct you to do something like get down on the ground?
10:00:31 MS. MKRTCHYAN: Objection, Your Honor.
BY MR. HARRELL:
Q Where is that in Paragraph 13?
MS. MKRTCHYAN: Your Honor, it calls for a legal conclusion. It's improper.
10:00:39 THE COURT: Overruled.


5-GottsSER-00814

10:00:40 MS. MKRTCHYAN: Lacks foundation.
THE COURT: Overruled. This is his state of mind.
You can answer the question, sir.
BY MR. HARRELL:
10:00:45 Q Where does it state that, sir?
A It doesn't say it on there.
Q Right. This doesn't have any carve-out, allowing you to do what you want when you are dealing with law enforcement --
10:00:57 MS. MKRTCHYAN: Objection.
BY MR. HARRELL:
Q -- correct?
MS. MKRTCHYAN: Misstates the evidence -- I mean misstates the testimony.
10:01:02 THE COURT: This only refers, though, to the detention?
MR. HARRELL: Yes, Your Honor.
THE COURT: Overruled.
THE WITNESS: I expect, as a citizen, to be 10:01:14 treated correctly. They don't know what's going on. Just based on that, I just -- I would expect it. Right there, it's talking about Fourth Amendment. And I understood right there, just like I did to let them look in my pockets, told them everything I had. I told them I had knives. But I 10:01:35 really strongly, to this day, believed just because I signed


5-GottsSER-00815

that, doesn't mean I can be tackled for anything.

BY MR. HARRELL:

Q Sir, what you signed, the agreement that you made was:

"...for the period during which I am on probation, I will submit my person to seizure at any time of the day or night by any law enforcement officer with or without probable cause, a warrant, or a reasonable suspicion."

Right?

A I do not disagree with you.

Q Okay. When you made this agreement, when you initialed it, and at the time of the incident, did you understand officers did not need a warrant in order to ask you to get on the ground?

MS. MKRTCHYAN: Objection, Your Honor. That calls for legal conclusion, Your Honor.

THE COURT: This is his state of mind. Overruled.

THE WITNESS: Again, in my state of mind, I have trouble just because of this means I could be slammed on the ground. That seems excessive.

BY MR. HARRELL:

Q Sir, we're not talking about slamming on the ground. We're talking about the deputies' orders to get on the


5-GottsSER-00816

10:02:55 ground.

Do you understand the distinction?

A Do I understand -- say again.

Q Sure.

10:03:02 Do you understand that we're at the point of encounter two, where you're being ordered to get on the ground. Do you have that period of time in mind, sir?

A Yes.

Q Was it your mindset, at that time, that the officers 10:03:17 needed a warrant before they could order you to get on the ground. Yes or no?

A No.

Q Is it your mindset, when you were being told to get down on the ground, that the officers needed probable cause 10:03:34 to suspect you of a crime before they could order you to get down to the ground?

MS. MKRTCHYAN: Your Honor, calls for legal conclusion.

THE COURT: I don't know he knows what probable 10:03:44 cause is, Counsel.

BY MR. HARRELL:

Q Sir, "probable cause" is in paragraph 13 that you initialed, right?

MS. MKRTCHYAN: Objection, Your Honor. This is a 10:03:53 legal document. Calls for a legal conclusion.


5-GottsSER-00817

THE COURT: Just a moment. These are --

MS. MKRTCHYAN: And it's irrelevant as to --

THE COURT: Just a moment.

*(Pause.)*

THE COURT: Objection sustained, Counsel.

BY MR. HARRELL:

Q Sir, was it your understanding --

THE COURT: My apologies.

It's overruled. The last line. You're absolutely correct.

You can answer that question, sir. You can answer the question.

THE WITNESS: To be honest, I wasn't thinking of probable cause, anything at that moment. Again, I've -- little bit slow, I've had a stroke. I'm trying to figure out what's going on. I'm innocent. I'm trying to relay this to the officers. And I'm a little bit frustrated because nobody is listening to me.

BY MR. HARRELL:

Q Sir, you've already told us that you believed that you had a civil right not to get on the ground when you were told to do that, right?

A I believe everybody does, yes. I believe that.

Q How people that waive their Fourth Amendment rights and -- when they're on probation?

MS. MKRTCHYAN: Your Honor, calls for a legal conclusion. The Court will instruct the jury on the law.

THE COURT: Overruled.

This is your state of mind. You can answer the question.

THE WITNESS: I believe there's a lot of situations that could be involved with the person that has a Fourth Amendment waiver. I didn't do -- it wasn't a violent crime that I was guilty of. So I was arms out. So just because the cops have a Fourth Amendment waiver, I don't believe that's a waiver of corporal punishment.

BY MR. HARRELL:

Q Sir, you agreed that you would submit yourself to physical seizure by law enforcement at any time of the day or night whether you believed that they had a good reason or not, right?

A Yes.

Q Well, then why didn't you get down on the ground?

MS. MKRTCHYAN: Asked and answered. Badgering the witness. And unduly consumptive already.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: Because they asked me to go out there, I was in a position to where they could do their job, could search me, could put me on [sic] handcuffs. And then


5-GottsSER-00819

10:06:34 really fast, I get punched in the head. So for one, I don't really have time to get on the ground as much as I'm trying to ask why we're here before we have to even go to that step.

10:06:52 BY MR. HARRELL:

Q Sir, the officers gave you 29 seconds to get on the ground; didn't they?

A When you're standing there with guns and all that stuff is going on, 29 seconds lasts a long time -- I mean a -- it

10:07:07 feels like it's an immediate happening. I apologize; I said the opposite. But it's just everything's happening so fast.

Q Sir, when you signed this agreement in Paragraph 13, you were represented by an attorney, correct?

MS. MKRTCHYAN: Objection, Your Honor. It's

10:07:29 unduly consumptive already. This is not -- there's no relevance to his state of mind.

THE COURT: This goes to the quality of the information that you received.

Overruled.

10:07:41 You can answer the question.

THE WITNESS: Yes, I did.

BY MR. HARRELL:

Q So you had the opportunity to ask any questions that you wanted to about Paragraph 20 before you agreed to comply

10:07:50 with those conditions, correct?

10:07:53 A That is correct.
Q Okay. Sir, in short, when you signed Paragraph 20, you -- represented by counsel, you recognized that it contained no exception allowing you to determine whether or
10:08:25 not the officers had a good reason to ask you to get down on the ground, right?
MS. MKRTCHYAN: Vague and ambiguous. Unintelligible. I simply cannot understand the question.
THE COURT: Sustained.
10:08:43 BY MR. HARRELL:
Q Okay, sir. Sir, instead of getting on the ground, as you were asked to do, you made a statement "Why," a question to the officers, right?
A Yes.
10:09:27 Q You said this even though your understanding of the probation agreement was that the officers did not need a reason to order you to get on the ground, right?
MS. MKRTCHYAN: Your Honor, this is going into circles over the same issue; unduly consumptive already.
10:09:45 This is becoming really -- 403.
THE COURT: Counsel, hasn't this been asked and answered?
MR. HARRELL: I'll move on, Your Honor.
BY MR. HARRELL:
10:10:01 Q Sir, to sum up, you thought that you were following



 5-GottsSER-00821

10:10:08 your probationary terms in Paragraph 30 by not getting on the ground, as the officers asked, correct?
A I believe I was following along with my waiver, yes.
Q Okay. Now, sir, 29 seconds between the order to get on
10:10:35 the ground and the officers starting to force you to the ground. Does that sound about right?
A Yes.
Q Is it your testimony that 29 seconds was not enough time for you to get on the ground if you wanted to do that?
10:10:53 A At that time and in that situation, no, it wasn't.
Q Okay. How much time did you think that you needed, sir?
MS. MKRTCHYAN: Objection, Your Honor. It's argumentative.
10:11:04 THE COURT: Overruled.
THE WITNESS: I couldn't answer that. Any situation would be different.
BY MR. HARRELL:
Q On that night, sir, you did note that the officers
10:11:21 asked you to get on the ground instead of just running up and physically seizing you, right?
A Right. So I thought maybe they were able to talk also.
Q By giving 29 seconds to get on the ground, with repeated directions to get on the ground, did that suggest
10:11:48 to you that the deputies didn't want to use physical force


5-GottsSER-00822

10:11:52 on you on that night. Yes or no?

MS. MKRTCHYAN: Calls for speculation as to what officers were going to do, Your Honor. He would not know --

*(Simultaneous speakers.)*

10:12:01 THE COURT: -- ask the officers.

But as to your state of mind, though, you can answer that question about this amount of time and whether it was sufficient.

THE WITNESS: I think yelling, getting tased out,
10:12:13 getting lethals out, people running and yelling, I feel like, yes, there's about to be some physical confrontation. And I'm trying to calm it down. I'm trying to [sic] de-escalation and ask why. I haven't done anything.

BY MR. HARRELL:

10:12:28 Q Well, if you thought that there was going to be a physical confrontation by you refusing to get on the ground, why not just get on the ground?

A I got punched in the face.

Q Oh, is it your testimony that you were getting ready to
10:12:48 get down on the ground, and then somebody punched you in the face? Is that what you're telling us?

A No. While I was having a question with the officers that were pointing weapons at me and I was safely asking what was going on, and I was punched in the face.

10:13:08 Q Now, in your testimony, I believe that you stated that

10:13:14 Deputy Renegar started to approach you after the 29 seconds, correct?
A As I'm watching everything -- with the loss of my vision, I'm doing my best to see. I believe he's on the
10:13:27 left side. And I believe it's -- the other two were on the right side. And they're kind of trapping me in a half circle.
Q Is there something about the positioning of the officers that, in your mind, kept you from getting on the
10:13:41 ground when you were asked to do that?
A All I was thinking about is being overpowered or -- you know, they're putting that move -- they're getting in there -- I'm being circled. So that just makes me nervous. I'm anxious. I don't like somebody behind me. So I'm
10:14:03 making sure I'm safe.
Q Is part of the reason you were getting nervous your refusal to get on the ground, when you were asked to do that?
A No. It'd probably do with the loaded gun and yelling,
10:14:16 lethals. That's the most scared I felt that night.
Q Okay. Sir, when Deputy Renegar started to approach you, did it occur to you that he was approaching you to put you on the ground since you hadn't done that yet?
A Did not come to my mind.
10:14:42 Q Well, when Deputy Renegar did approach you, did it

10:14:48 occur to you to say to law enforcement words to the effect of, "Okay, I'm getting down on the ground"? Did it occur to you to say something like that, sir?

A No. Because I got hit in the head.

10:15:05 Q Is it your testimony that you didn't have an opportunity to tell the deputies, "There's no need to approach me. I'm getting on the ground"? Is that your testimony?

A That was never in my thought during that process. I
10:15:19 hadn't been to that point.

Q What was in your thought was you weren't going to get on the ground voluntarily ever, right?

MS. MKRTCHYAN: Asked and answered, Your Honor.

THE COURT: Overruled.

10:15:30 You can answer that question.

THE WITNESS: Mine was exactly what was on my mind was what I was saying during the video.

BY MR. HARRELL:

Q So even when Deputy Renegar approaches you, it never
10:15:52 occurred to you that this might be a good time to get on the ground. True?

A I got punched in the face.

Q Sir, you told us about that.

A Yes, sir.

10:16:00 Q Repeatedly.

10:16:01 A Yes, sir.
Q My question has another focus.
A Yes, sir.
Q I'll ask it again.
10:16:05 A Yes, sir.
Q Even when Deputy Renegar approached you, it's your testimony that it never occurred to you that this might be a good time to get on the ground. True?
A Not in this moment, to be honest. I wasn't thinking
10:16:24 that.
Q If you had to do it all over again, sir --
MS. MKRTCHYAN: Objection. Relevance, Your Honor.
THE COURT: Sustained.
BY MR. HARRELL:
10:16:32 Q Now, you have repeatedly claimed in this case, before you heard the actual tapes, that you 100 percent wanted to help the officers, right?
A Yes, I wanted to help.
Q If you wanted to help them, why not do what they say?
10:17:04 A That doesn't involve in helping.
Q Disobeying a directive from a law enforcement officer, in your mind, is helping them?
A At this moment, we have public services coming to an innocent civilian to do an investigation.
10:17:25 Q Right, sir. And we've heard about that. My question


5-GottsSER-00826

10:17:28 has another focus. I will ask it again.
A Yes.
Q In your mind, sir, is disobeying a directive to get on the ground, is that helping the officers?
10:17:41 MS. MKRTCHYAN: Objection. Calls for speculation as to what officers are thinking, not thinking.
THE COURT: No.
Overruled.
You can answer that question.
10:17:48 THE WITNESS: I could answer that with the same question that talking to the suspect without jumping on the ground would cause less of an incident.
BY MR. HARRELL:
Q Okay. That was your thinking at the time, correct?
10:18:02 A Yes. Complete opposite. See, the police --
Q Sir.
A Okay. Yes, sir. I apologize.
Q So because that was your thinking, you were going to stand there and discuss and debate with the officers until
10:18:17 you felt all of your questions had been answered. True?
A Well, I couldn't tell you to the future of the conversations. The questions I asked, as are on the video, is, What's going on**?** And maybe an investigation could have been helpful if I was treated better and felt more
10:18:40 comfortable.


5-GottsSER-00827

10:18:43 Q Okay, sir.

THE COURT: We're going to take a break, Counsel, in a few moments. So why don't you choose the time for that break.

10:19:02 MR. HARRELL: Your Honor, this would be a fine time.

THE COURT: Okay. That's kind of a hint.

Okay. Then 15 to 20 minutes, then. You're admonished not to discuss this matter amongst yourselves.

10:19:10 Go have a nice break.

Counsel, why don't you use the restroom. Let's return, let's say, 20 to the hour.

*(Recess taken from 10:19 a.m. to 10:44 a.m.)*

(The following proceedings were had in open court in the
10:19:19 presence of the jury:)

THE COURT: We're back in session.

All counsel are present. The parties are present.

Counsel, if you would like to continue on.

If you would be seated. Thank you for your
10:45:39 courtesy.

Continue cross-examination.

MR. HARRELL: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARRELL: *(Continuing)*

10:45:44 Q Sir, I believe you told us before we had the break that



 5-GottsSER-00828

10:45:51 what you were thinking when you were being told to get down on the ground is reflected on the tape, correct?

A Yes.

Q Okay.

10:46:05 MR. HARRELL: Your Honor, this is Deputy Pahel's tape. It is Exhibit 102-4. My records shows it's in evidence. I believe the whole thing has been played. I would like to play from 5:03- -- in the morning -- - :06 through and including 5:03:09.

10:46:33 THE COURT: You may do so.

MR. HARRELL: All right.

THE COURT: Now, this is Deputy Pahel's audio tape. This isn't Reneger. This isn't Gonzalez. This isn't what you heard in the background, with the witnesses being 10:46:52 interviewed. This is Deputy Pahel, who you haven't met yet.

MS. MKRTCHYAN: That was played, Your Honor.

THE COURT: Pardon me?

MS. MKRTCHYAN: That was played yesterday.

THE COURT: Yes, it was played yesterday. It was 10:47:02 the tape played all the way through yesterday.

Now, there's additional transcript for this? All right.

Now, remember, these transcripts may be accurate or inaccurate. The best evidence is what you hear. These 10:47:17 transcripts are only an aid. Understood?

10:47:21 Okay. I have unanimous nodding from all the jurors.

And, Rolls, could you help hand these out? I'll need a copy also.

10:47:38 THE CLERK: Yes, sir.

*(Pause.)*

BY MR. HARRELL:

Q All right. And our time, again, is 5:02:31 to 5:02:40, and I'll identify where we are in the transcript.

10:49:34 THE COURT: What page would that be?

MR. HARRELL: Your Honor, we're on page 3, lines 1 through 3 of the transcript.

THE COURT: Just a minute. Page 3, lines --

MR. HARRELL: One through 3.

10:49:54 THE COURT: One through 3. All right. Thank you.

Now, you can start playing a little bit before that in context, if you want to. But right now, we're going to focus on page 3, lines 1 through 3.

All right. You may play it.

10:50:16 *(The videotape was played.)*

BY MR. HARRELL:

Q Your Honor -- I'm sorry.

Mr. Holloway, did you hear yourself tell Deputy Pahel when you were told to get on the ground, "no"?

10:50:40 A Yes.




5-GottsSER-00830

10:50:42
Q That's what you were thinking at the time, correct?
A Yes.
Q You were not going to get on the ground, right?
A I was trying to talk to him. You heard me say, "I'm just -- you were just here." I was trying to speak with them.
10:50:53
Q When you said, "No," you intended to communicate some information to the officers, right?
MS. MKRTCHYAN: Vague and ambiguous.
10:51:10
THE COURT: Overruled.
You can answer that question. But -- it is ambiguous, I think, Counsel. He'd be guessing.
Sustained.
BY MR. HARRELL:
10:51:18
Q Sir, when Deputy Pahel told you, "Get on the ground now," and you responded with the word, "No," you were intending to communicate to all the deputies there you were not going to voluntarily get on the ground, correct?
A I was trying to talk to them right there. So I said, "No. You were just here." I was trying to reason with the officer.
10:51:42
Q Sir, I will ask again.
When Deputy Pahel says, "Get on the ground now," and you respond with the word, "no," you were intending to communicate to all the deputies there that you were not
10:52:08


5-GottsSER-00831

10:52:13 going to voluntarily get on the ground, correct? Yes or no?
A Yes. The deputies that were there was Pahel, talking to me, and I told him, "No."
Q And you intended to communicate to them, "I'm not going
10:52:30 to voluntarily get on the ground," correct?
A I didn't necessarily have any intent at any point except trying to figure out what was going on.
Q Okay, sir. So after you communicated, "no," to Deputy Pahel, that's when Deputy Renegar approached you;
10:52:59 didn't he?
MS. MKRTCHYAN: Objection. Vague as to time.
THE COURT: Overruled.
BY MR. HARRELL:
Q Correct?
10:53:05 A The best way to see it from the videos, I'm going to say, sum it up we have --
Q Sir --
*(Simultaneous speakers.)*
THE WITNESS: -- Pahel, Gonzalez --
10:53:14 BY MR. HARRELL:
Q Sir, if I can stop you there.
MS. MKRTCHYAN: Objection, Your Honor.
THE WITNESS: I would prefer to end this answer.
MS. MKRTCHYAN: Wait a minute.
10:53:20 Objection, Your Honor. Interrupting the witness.


5-GottsSER-00832

10:53:23 It's highly improper.

THE COURT: Overruled.

Did you understand the question, sir?

THE WITNESS: Well -- it wasn't a --

10:53:31 THE COURT: Did you understand the question?

THE WITNESS: I'll say, no, then. I guess not.

THE COURT: Ask the question again.

BY MR. HARRELL:

Q Sir, you've already told us that when Deputy Pahel says

10:53:45 "Get on the ground now," very next words that you speak is the word, "No," right?

A That's correct.

Q And you said that for a reason, right?

A Yes.

10:53:58 Q You were intending to communicate to the deputies in response to their directive, "Get on the ground," that you were not going to do that, correct?

A I was communicating -- deputy who spoke to me was Pahel. "No. I have just been checked." I'm trying to

10:54:20 reason with this officer. There was no reason at this time -- I'm -- there's no officer safety concerns. There is an ability for these officers to [sic] de-escalation and talk to me.

Q Sir, on that night, during this incident, you didn't

10:54:41 say any of that when Deputy Pahel told you to get on the





5-GottsSER-00833

10:54:46 ground, correct?
A No, not what when doctor -- excuse me -- Deputy Pahel told me at that time, no.
Q It was you that told Deputy Pahel, "No," when he
10:55:02 directed you to get on the ground, correct?
MS. MKRTCHYAN: We're talking about -- vague as to time, Your Honor.
THE COURT: Overruled.
THE WITNESS: I believe the same -- right, we're
10:55:12 talking about the same time, right, that we've been talking about right now?
BY MR. HARRELL:
Q Correct.
A Yeah. He asked me to get on the ground, and I said,
10:55:21 "No."
Q And by making that statement, did you have any concern that the deputies might understand your word, "no," to be a communication to them that you were not -- repeat, not going to voluntarily go to the ground? Is that something that you
10:55:50 were concerned about at the time?
MS. MKRTCHYAN: Very vague and --
*(Simultaneous speakers.)*
BY MR. HARRELL:
Q Yes or no?
10:55:58 MS. MKRTCHYAN: Objection. Vague.


5-GottsSER-00834

10:55:58 THE COURT: Overruled.
You can answer the question.
THE WITNESS: Can we summarize the long --
BY MR. HARRELL:
10:56:03 Q Sir, that's something maybe for you to do with your lawyer. Right now, I have a question. I would appreciate an answer.
MS. MKRTCHYAN: Objection. Argumentative, Your Honor. Badgering the witness --
10:56:12 THE COURT: Just a moment.
Let's stop the colloquy.
Do you understand the question?
THE WITNESS: No, it was a lot, and I got lost --
THE COURT: I'll have that question re-asked.
10:56:19 Re-ask the question, Counsel.
BY MR. HARRELL:
Q Sir, when you said, "No," to Deputy Pahel in response to his directive for you to get on the ground, did you have any concern that the deputies might view your response as
10:56:43 your stated refusal to voluntarily get on the ground? Was that something that you were considering at that time, on that night. Yes or no?
A Not at that moment, no.
Q Okay, sir. In any event, that is when Deputy Renegar
10:57:03 began to approach you, right? Correct?

10:57:08 A I'll agree with you.
Q And he was in the company, ultimately, of Deputy Joel Gonzalez, correct?
A Pahel was in company with Gonzalez. Deputy Renegar was on the other side of those two.
10:57:25
Q Sir, I'm talking about the deputies that approached you now. Do you understand?
A That's exactly what I answered to.
Q Sir, two deputies approached you after you said, "No," and their names are Deputy Renegar, seated here in the courtroom, and Deputy Joe Gonzalez who has already come to testify in this trial, right?
10:57:41
MS. MKRTCHYAN: Objection. Misstates the testimony. And misstates the evidence --
THE COURT: Two deputies?
10:57:56
MR. HARRELL: Yes.
MS. MKRTCHYAN: Misstates the testimony.
THE COURT: I thought there were three, Counsel.
BY MR. HARRELL:
Q Okay, sir. After you communicated, "No," to Deputy Pahel, multiple deputies approached you, right?
10:58:04
A I'm going to do my best -- out of context --
Q It's just "yes" or "no," sir.
MS. MKRTCHYAN: Objection, Your Honor.
THE COURT: Just a moment.
10:58:23



 5-GottsSER-00836

10:58:23 It may be unclear as to time. Re-ask it. This is initially approached him --

MR. HARRELL: Yes.

THE COURT: -- sequentially approached him? I

10:58:33 think that -- is there conflict between whether two or three approached him?

THE WITNESS: Well, I'm -- I'm -- I'm getting the question as to when they first approached me. And Pahel and Gonzalez reached -- talked to me.

10:58:48 THE COURT: Just re-ask your question, Counsel.

BY MR. HARRELL:

Q Sir, after you said, "No," to Deputy Pahel -- do you have that period of time in mind?

A I'm trying my best, yes.

10:59:02 Q Members of law enforcement approached you.

MS. MKRTCHYAN: Wait, wait --

THE WITNESS: Yes.

BY MR. HARRELL:

Q What are their names?

10:59:11 A I had the two --

Q I'm looking for names, sir.

MS. MKRTCHYAN: Excuse me, Your Honor. This is ridiculous, you know.

THE COURT: Counsel, no.

10:59:18 Overruled.




5-GottsSER-00837

THE WITNESS: Gonzales was with Pahel, who he was his training officer. And separately, independently, was Officer Reneger.

BY MR. HARRELL:

Q There was three deputies that ultimately approached you, correct?

A That is correct.

Q Two of them forced you to the ground, correct?

A One of them hit me in the head and grabbed me by the neck, and fell down to the ground with me.

Q And it was then that your face hit that gravel, right?

A No.

Q Okay, sir. There was then a struggle down on the ground, correct?

MS. MKRTCHYAN: Over vague and ambiguous. Vague as to time as well.

THE COURT: Overruled.

THE WITNESS: I don't think of it as a struggle. I believe they were detaining me while they were punishing me.

BY MR. HARRELL:

Q Okay, sir. Now let's talk about this struggle down on the ground.

You claimed in the pretrial phase, that during the situation on the ground, you said, "I can't breathe," right?


5-GottsSER-00838

11:00:36 A There was times when I can't breathe. And I watched those videos. And I swear I hear things, but you hear growling. You want to hear things. I felt it. I've said it the whole time. And it's just one of those things that I felt like I heard. Maybe it's not there; maybe it is.

Q Do you remember what I asked you?

A Yes, about if I heard the word, "I can't breathe."

Q Sir, I'm going to key it up again.

In the pretrial phase -- do you have that period of time in mind?

A I believe in the --

Q Just "yes" or "no."

MS. MKRTCHYAN: Very vague, Your Honor.

THE WITNESS: I'm kind of -- as far as what -- you say "pretrial," what is that considered?

THE COURT: Just a moment.

Re-ask the question, please.

BY MR. HARRELL:

Q Sir, you have claimed that during the situation on the ground you said, "I can't breathe." True?

A Yes, I have said that.

Q And you made this claim -- sir, you made this claim on August 14, of 2020, correct?

A Is that the first --

THE COURT: Just a moment.




5-GottsSER-00839

11:02:06 BY MR. HARRELL:
Q Sir --
THE COURT: Why don't you show him the transcript.
THE WITNESS: Yes, please.
11:02:29 MR. HARRELL: For the record, we are at the deposition of the plaintiff taken on August 14, 2020.
BY MR. HARRELL:
Q Sir, I would like you to look at page 180 and, again, I've got you through it. Okay?
11:02:44 A No, I'm fine. Yes.
Q All right. And we are starting at line 17, down to line 25. 17 to 25. I don't have anything to draw with. Okay? But just -- right. Sir, that's not the page.
A I'm just trying to figure out if this is the first or
11:03:08 second deposition.
Q Sir, this is the first one.
A This is the first one. Okay.
Q Um-hmm.
A Right there. I can't --
11:03:18 Q Sir --
A I'm sorry.
Q Just read it to yourself, if you would be so kind. Okay. Line 17 down to 25. See if that refreshes your recollection about you claiming on August 20 --
11:03:33 MR. HARRELL: Let me see the first page.


5-GottsSER-00840

11:03:35 THE WITNESS: Okay.
BY MR. HARRELL:
Q Have you looked at it?
A Yes.
11:03:39 Q All right. Does that refresh --
A Yes, it does.
Q Does that refresh your recollection?
A Yes, it does.
Q It was on August 14, 2020, that you claimed that during
11:03:50 the struggle on the ground, that you said, "I can't breathe," right?
A Yes.
Q Sir, this was just a few months after the situation with George Floyd in Minneapolis, correct?
11:04:09 MS. MKRTCHYAN: Objection. Irrelevant, Your Honor.
THE COURT: Sustained.
BY MR. HARRELL:
Q Sir, did you see some of the news coverage associated
11:04:14 with George Floyd?
MS. MKRTCHYAN: Objection, Your Honor.
THE COURT: Sustained.
Counsel, we're not going to go with George Floyd now. Okay?
////



 5-GottsSER-00841

11:04:22 BY MR. HARRELL:
Q Sir, I'm going to turn it over to Mr. Wroniak now. Okay?
A Yes. Thank you.
11:04:39 THE COURT: Cross-examination, Counsel.

CROSS-EXAMINATION

BY MR. WRONIAK:
Q Good morning, Mr. Holloway.
A Good morning.
11:05:03 Q So let's follow up on a couple things you've said here over the last couple days.
First off, you would agree that when law enforcement is called and told there's possibility that a man and a woman are in a domestic dispute, that
11:05:20 law enforcement should investigate that claim, correct?
A Definitely.
Q So even if there's one call, law enforcement should come, correct?
A I agree.
11:05:31 Q Sir, do you believe that the only way a 911 caller could have called about you on the night of the incident was to call in and say that Jeremy Holloway was involved in a domestic violence dispute?
MS. MKRTCHYAN: Objection, Your Honor.
11:05:44 THE COURT: Do you understand that question?


5-GottsSER-00842

11:05:45 THE WITNESS: Not really --

THE COURT: Counsel, it's ambiguous.

BY MR. WRONIAK:

Q You've testified that you didn't think the 911 calls were about you, correct?

11:05:52

MS. MKRTCHYAN: Objection. Misstates the testimony.

THE COURT: Overruled.

You can answer the question.

11:05:59 THE WITNESS: Yes, I -- as my [sic] understand that night, I didn't receive any calls because I knew my situation.

BY MR. WRONIAK:

Q Okay. And so when the deputies arrived to your tent the first time, you didn't believe the calls were about you because you didn't think you'd done anything, correct?

11:06:11

A That's correct.

Q But, again, you didn't know what the deputies were told before they arrived at your tent, correct?

11:06:21 A No, I did not.

Q Sir, you never met Deputy Chad Renegar before January 21, 2018; had you?

A No, I did not.

Q And yet you believe he was harassing you on the night of the incident at the first encounter, correct?

11:06:41


5-GottsSER-00843

A I felt he was being a little bit like a tyrant, and maybe that's just his police style. I don't know. But that's the way I felt like he was being to me.

Q So he had never met you before, but you think he's treating you as if --

*(Simultaneous speakers.)*

*(Court Reporter requests information.)*

BY MR. WRONIAK:

Q -- as if he was a tyrant?

A Yes. And I mean, he had multi-- what I had known he had -- and now know, he lied multiple times --

MR. WRONIAK: Objection, Your Honor.

BY MR. WRONIAK:

Q I'm going to stop you right there.

THE COURT: Sustained.

BY MR. WRONIAK:

Q I'm asking you what you knew at the time, sir.

A Oh, at the time.

At the time, I was sure he lied about 10 people and someone called specifically on me.

Q You would have believed he was lying if he said there was one call on you, correct?

A Yes.

Q So it didn't matter how many calls Deputy Renegar told you there were. You wouldn't have believed him, correct?


5-GottsSER-00844

11:07:40 A That is correct.
Q You also don't know what the deputies did -- let me start that one over.
At the time of the first encounter, you had no
11:07:55 idea what the deputies had done prior to coming to your tent, correct?
A No. Not that night.
Q Okay. You've only learned through this litigation as to what they did, correct?
11:08:08 A Correct.
Q Sir, you've said it a couple times through your testimony that you believed that Deputy Renegar was lying to you during that first encounter, correct?
A Yes, I did.
11:08:29 Q So during the second encounter, if he had calmly walked up to you and said, "I need to talk to you; there's been more calls," you would have thought he was lying, right?
MS. MKRTCHYAN: Objection. Vague and ambiguous. And it's argumentative.
11:08:38 THE COURT: Overruled.
You can answer the question.
THE WITNESS: I would have done just like the first instance, and -- with letting him know I don't agree with this, but end up sitting down and wait for them to do
11:08:53 their investigation. There was no need for an attack.




5-GottsSER-00845

BY MR. WRONIAK:
Q Sir, because you thought Deputy Renegar had lied to you during the first incident, during the second incident, if he had calmly walked up to you and said, "We've had more calls; we need to talk to you," you would have thought he was lying, correct?
MS. MKRTCHYAN: Objection. Relevance Your Honor. How is this relevant?
THE COURT: Overruled.
You can answer the question.
THE WITNESS: I sat down even though he lied to me last time because these gentlemen have guns. There's several of them. And what good would I have done to argue with them at that moment?
BY MR. WRONIAK:
Q Sir, I'm going to try one more.
A Yes, sir.
Q Let me preface this one first.
You've testified that the deputies should have just walked up to you and explained to you why they were there the second time, correct?
A So if they have their guns drawn and -- they should have talked to me, yes.
Q Thank you.
A If that's your answer [sic]. Yes.




5-GottsSER-00846

11:09:47 Q Thank you.

And as we just established, you thought Deputy Renegar was lying to you. So if he had calmly walked up to you as part of the second encounter and said, "We had 11:09:59 more calls," you would have thought he was lying on that night, correct?

MS. MKRTCHYAN: Calls for speculation, Your Honor. And it's irrelevant.

THE COURT: Overruled.

11:10:07 You can answer that question.

It goes to state of mind.

THE WITNESS: The first time I followed instructions that the cops came, even when he lied, so I would have done the same at the second time.

11:10:17 BY MR. WRONIAK:

Q You would have thought he was lying again, correct?

A I would have. And I would have asked him.

Q When the deputies arrived at your tent the first time and identified themselves as sheriff's deputies, you could 11:10:39 have come out of your tent at that time, correct?

MS. MKRTCHYAN: Objection. Misstates the evidence.

THE COURT: Overruled.

MS. MKRTCHYAN: It's vague.

11:10:45 THE COURT: You can answer the question.

11:10:48 THE WITNESS: That's one opinion.
BY MR. WRONIAK:
Q Sir, let me do this a little differently.
MS. MKRTCHYAN: Objection.
11:10:58 BY MR. WRONIAK:
Q You've testified that while you're sitting in your -- sleeping in your tent --
A Yes.
Q -- you hear an argument, which you now are claiming was
11:11:05 between the Fuerbachs to one side of you and Campsite 66 to the other, correct?
A You said I hear?
Q Correct.
A Okay. Yes.
11:11:11 *(Court Reporter requests information.)*
MR. WRONIAK: I'll try and slow down.
THE WITNESS: I was just making sure if he said if I heard the fight.
BY MR. WRONIAK:
11:11:25 Q You were awoken in the night by this fight?
A Yeah. I briefly was awoken. Went back to bed.
Q When did that, you understood, in your mind, that there was some type of fight between a man and a woman?
A Correct.
11:11:40 Q When the deputies arrived outside of your tent,




5-GottsSER-00848

11:11:43 announcing that the sheriff's department was there, you didn't think that it had to do with that domestic violence incident?

A At first, no, because I had just been woken up from a deep sleep. And then as we're talking -- and I even told them, "I think I know why you're here." But I want to know why they're there from them. I don't know. What if it's something else?

Q But you didn't ask them -- or tell them you knew why they were until after you had exited your tent and been talking to them for a few minutes?

MS. MKRTCHYAN: Argumentative, Your Honor.

THE COURT: Overruled. Goes to time frame.

THE WITNESS: Correct. There's a few minutes where I got out of the tent, got dressed, explained to them I have a knife. They tried to reach in, to my knife. And then I'm watching all the officers dig through my stuff, and I briefly say stuff about that.

BY MR. WRONIAK:

Q And you've indicated that the officers were digging through your stuff, including the knives, correct?

A They dumped my backpack, yes.

Q Where did they dump your backpack?

A Inside my tent.

Q So they dumped your backpack inside your tent, and the


5-GottsSER-00849

11:12:57 knives fall out?
A Yes.
MS. MKRTCHYAN: Objection. Argumentative, Your Honor.
11:13:01 THE COURT: Overruled.
BY MR. WRONIAK:
Q And your testimony is that the knives have always been -- or strike that.
The knives were always in the tent, correct?
11:13:12 A Yes.
Q But you've indicated that you've heard Deputy Borba's PVS where he says, "Knives, knives, knives," correct?
A When he sees inside my tent.
Q So your testimony is Deputy Borba saw the knives inside
11:13:29 the tent, and that's when he said that?
A I believe that's when he said, "Knives." Or when he seen my axe. But I would believe more, it's when he saw my tent.
Q So did you -- you used a cell phone to take pictures of
11:13:45 yourself after the incident; we've seen some of those, correct?
A I took a cell phone. I took a digital camera.
Q It was digital camera or a cell phone?
A Yes. I have an Olympus-style digital camera.
11:13:58 Q Did you own a cell phone on the date of the incident?

11:14:01 A No.
Q Did you have a phone number on the date of the incident?
A No.
11:14:06 Q Did you provide a phone number to the register for the campers?
A No.
Q Now, the second encounter, you claimed that you're standing there, arms out saying, "I'm not moving," and
11:14:39 Deputy Renegar just runs up and punches you in the face, correct?
A That is correct.
Q Is that the first thing that you claim Deputy Renegar did to you?
11:14:50 A I believe that when they were yelling and he didn't think that I got down fast enough for him, he punched me in the head.
Q So the first thing Deputy Renegar does, according to you, is runs up and punches you in the face?
11:15:05 A Like I said, I'm looking around, and I hear people yell, "Get down on the ground. Tase him," and I believe those are the words that are being said. I was just looking at everybody, watching, just for my safety.
Q Sir, the first thing, according to you, that
11:15:23 Deputy Renegar does as he approaches you is run up and punch


5-GottsSER-00851

11:15:27 you in the face, correct?
A Correct.
Q Okay. He didn't tackle you; did he?
A No, it's at the same time. As he's left-handed, he was
11:15:36 able to punch me, grab my neck, and fall -- I almost did it again. But, yeah, and fall backwards. And he fell down that way. And that's when I came to, is when I was on his stomach, because he's a lot bigger than me, and I'm being held by another deputy.
11:16:02 Q So Deputy Renegar punches you, correct?
A Yes.
Q And, simultaneously, then gets you in this chokehold?
A Correct.
Q And then you go to the ground?
11:16:14 A Yes.
Q And then you're on the ground with Deputy Renegar and, as you said, not resisting, but there's a scuffle, correct?
A Well, at that time, I'm just being held to. Yes. So -- I'm not scuffling. I'm being held down.
11:16:32 Q So at the time you go to the ground initially with Deputy Renegar, your testimony is you're -- Deputy Reneger's back is on the ground, and you're on his chest, correct?
A Yes.
Q And he's still got you in this chokehold?
11:16:47 A For a few seconds, he's punching me. I can't tell you

11:16:52 exactly what time he turned me. But you can hear certain, you know, times when he's choking me. And, you know, on each video, you hear. But I believe at that time, they choked me. And since they had my arms, it was easy to flip
11:17:09 me over while he was still staying maintained of my torso while staying on top of my buttocks area, while maintaining me. I am now on my stomach.
Q I want to make sure we've got this.
Deputy Renegar has you in a chokehold.
11:17:27 A Yes, sir.
Q And then somehow, your arms are out, being held by other deputies?
A Correct. They're controlling my arms as -- because Deputy Renegar, as he says, he's punching with me with one
11:17:44 arm and grabbing with my neck with the other one.
Q Sir, I didn't ask you what Deputy Renegar said. I'm asking you what happened, according to you. Do you understand that?
A Right. And that's what happened.
11:17:55 Q Okay. So as you're there, you've got two deputies holding your arms, and Renegar's got this chokehold on you?
A Yes, sir.
Q And at that point, did you feel you were under control?
A I'm under control?
11:18:12 Q Yeah.


5-GottsSER-00853

A Not at all.
Q Were you -- strike that.
MS. MKRTCHYAN: Vague question.
BY MR. WRONIAK:
Q Sir, you've also testified that as you were in this chokehold, you were getting kneed in the head, correct?
A There's knees, heads, punches.
Q Now, during the incident, you can hear yourself on multiple PVS recordings that we've listened to here today and through your testimony, where you say you're getting kicked or kneed in the head, right?
A That is correct.
Q And immediately after the incident, when you're sitting on the log, you mentioned being kneed in the head, correct?
A Right.
Q And you asked if that's within protocol, correct?
A That is correct.
Q Sir, you voluntarily made those statements, correct?
MS. MKRTCHYAN: Objection. "Voluntarily," vague and ambiguous.
THE COURT: Just a moment.
MS. MKRTCHYAN: That's vague and ambiguous, Your Honor.
THE COURT: No. Overruled -- well, strike that.
I'm going to sustain the objection, Counsel, as to

"voluntarily."

BY MR. WRONIAK:

Q Sir, you made those statements before anybody asked you what had happened, correct?

MS. MKRTCHYAN: Objection. Vague as to time. What are we talking about?

THE COURT: There are numerous statements.

BY MR. WRONIAK:

Q As you're sitting on the log --

THE COURT: "As you're sitting on the log."

BY MR. WRONIAK:

Q -- after the incident, you say, "Is kneeing in the head protocol," correct?

A That is correct.

Q And nobody asked you to make that comment or asked you what happened when you said that, correct?

A That's because nobody's asking me anything or telling me anything. I say several different things. I asked why I'm here. I say I haven't done anything wrong. I'm trying to get somebody to talk to me. I just have somebody pushing me down on my neck.

Q Sir, on the PVS recordings that we listened to, you never mentioned being put in a chokehold; do you?

A On the PVS?

Q Correct.



 5-GottsSER-00855

11:20:24 A No, while I was choking, I never said, "I'm currently being choked."
Q Sir.
A Yes, sir.
11:20:31 Q You've indicated that while you're sitting on the log, you asked if being kneed in the head is protocol, correct?
A Yes, sir.
Q You never asked if being choked was protocol; did you?
A No, sir.
11:20:44 Q While you're sitting on the log, you never asked if having a deputy run up and punch you in the face for no reason is protocol; did you?
A I said "punch me in the head."
Q When you were sitting on the log, you never said, "Is 11:20:57 having a deputy run up and punch me in the face for reason protocol"; did you?
A I didn't say that full sentence, but I said "punch in the head."
Q And you claim you were getting punched in the head 11:21:11 while you were on the ground, correct?
A Getting kneed and punched. Renegar also explains he did.
Q Now, sir, in, I think you said, May of 2018, you went back to O'Neill Park?
11:21:43 A Yes. I can't tell you exact date. I believe early

11:21:48 May.
Q So we're absolutely clear, you said sheriff's deputies came. Deputy Renegar was not one those deputies, correct?
A No, he was not there.
11:21:59 Q Neither was Deputy Gotts, right?
A No.
Q So you've testified you earned $60,000 or so in 2017?
A Yes.
Q You worked for Apex in 2017, correct?
11:22:17 A I worked for Apex, Work Market, and Barrister.
Q As it relates to Apex, you stopped working there in October of 2017, correct?
A That is correct.
Q So you were not working for Apex in January of 2018,
11:22:32 correct?
A No.
Q So you were not earning income from Apex in 2018, correct?
A No. I was working for myself, and it was -- I was more
11:22:50 lucrative.
Q The job you had in Pittsburgh in July of 2018 with the Wilson Group, that only lasted for about a year, correct?
A That is correct.
Q That was from July -- approximately July 2018 to
11:23:06 October 2019?




5-GottsSER-00857

A Approximately, yes.
Q And you were fired from that job at Wilson Group because you got in an argument with one of the boss's daughters, correct?
MS. MKRTCHYAN: Objection, Your Honor. Goes to parties' stipulation not to go into emotional distress damages after July 2018.
THE COURT: This isn't an emotional distress, though. Doesn't this go to the earnings?
MR. WRONIAK: Yes, Your Honor.
THE COURT: Compensation. Overruled.
And you answered, "Yes"?
THE WITNESS: My answer -- no, that's not correct.
BY MR. WRONIAK:
Q But you were fired from that job, correct?
A Yes, I was.
Q Sir, when was the last time you saw Dr. Raiszadeh for any orthopedic consultation?
A It would have to have been, I'm guessing 2019, 2020 area. The last time -- the documents we have -- I have not been back to California to be able to, but I have had Zoom with him. But that's it. It's been a couple years.
MR. WRONIAK: Mr. Stever, if you can pull up Exhibit 24, please. It's already in evidence.
*(The exhibit was displayed on the screen.)*



 5-GottsSER-00858

11:24:26 BY MR. WRONIAK:
Q Do you have that up in front of you, sir?
A Yes, sir.
Q This is the accounting activity from Dr. Raiszadeh.
11:24:33 Do you recognize that?
A Yes, sir.
Q And on page 1, you've got an out -- an office visit on August 12, 2020.
Do you see that? First entry.
11:24:47 A Yes, sir.
Q And you have a visit on 9/16/2020.
Do you see that?
A Yes, sir.
Q Another visit with him on October 7, 2020.
11:24:57 Do you see that?
A Yes, sir.
Q Those are for your orthopedic consultations with Dr. Raiszadeh, correct?
A Yes, sir.
11:25:07 Q If you turn to the next page, do you recognize what this is, page 2?
A Yes. Yes.
Q It's a balance due of 2500, correct?
A Yes, sir.
11:25:22 Q And the description is:


5-GottsSER-00859

11:25:24 Legal services. Report, review of medical records. Phone conference. See attached list.

Do you see that?

A Yes, I do.

11:25:35 Q Legal services are not orthopedic services; are they?

MS. MKRTCHYAN: Objection, Your Honor. It lacks foundation. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: As far as -- if I remember

11:25:51 correctly -- I could be wrong -- he was an expert witness for me about my back issues.

BY MR. WRONIAK:

Q So part of what you're including here would be the services Dr. Raiszadeh provided to you as an expert witness?

11:26:11 A Yes, sir.

Q And if you go to page 3, balance due of $3,050.

Do you see that?

A Yes, sir.

Q This is also for legal services, correct?

11:26:24 A Yes, sir.

MR. WRONIAK: If I can have one second, Your Honor.

*(Pause.)*

MR. WRONIAK: If we can look at Exhibit 54.

11:27:00 THE COURT: 54, five, four?

11:27:02 MR. WRONIAK: Five, four, which is the registered campers list.

THE COURT: And the last exhibit was Exhibit 24, to be certain for my record? The last exhibit you just referred to was two, four?

11:27:09

MR. WRONIAK: Yes, Your Honor.

THE COURT: Thank you.

BY MR. WRONIAK:

Q This is the register camper detail for your campsite, correct?

11:27:19

A Yes, sir.

Q Okay. And I think you testified that the rangers filled in your address based on your driver's license, correct?

11:27:34 A Correct. And I had been there a few times. So I had paid with a check before, too.

Q Okay. If you look down at the -- partway down there, "Primary Phone," there's a phone number listed, correct?

A Yes.

11:27:48 Q The phone number that you have is not listed on your driver's license; is it?

A No. That's an old phone. That was in my records there. It's no longer -- that is no longer valid.

Q But there was a phone number provided to the rangers, correct?

11:28:03




5-GottsSER-00861

11:28:03 A Yes, in my record. They had records there because I was a frequent visitor.

MR. WRONIAK: One second, Your Honor.

*(Pause.)*

11:28:29 BY MR. WRONIAK:

Q Lastly, Mr. Holloway, you have claimed, through this litigation, that you were tased three to four times that night, correct?

MS. MKRTCHYAN: Objection. Vague as to time.

11:28:56 THE COURT: Overruled.

THE WITNESS: I feel like I was. There's really no way to prove it. I watched the videos, and I feel it that way. I feel -- I mean, there's certain words that I feel that are saying, but it's -- it's what's up to how you

11:29:15 guys interpret it, but it's how I interpret it. There's certain different things that have been interpreted different by each [sic] parties.

BY MR. WRONIAK:

Q So that's a yes, correct?

11:29:29 A Yes.

MS. MKRTCHYAN: Vague and ambiguous, Your Honor. The question was ambiguous.

THE COURT: Overruled.

MR. WRONIAK: If I can have one more second,

11:29:44 Your Honor.




5-GottsSER-00862

11:29:44 *(Pause.)*

MR. WRONIAK: If we pull up Exhibit 222, which is the plea agreement. Before we pull it up, Mr. Stever.

Your Honor, I would like to get the factual basis for the plea. 11:30:11

THE COURT: That's denied.

MR. WRONIAK: With that, subject to bringing Mr. Holloway back...

THE COURT: Then redirect examination, Counsel.

11:30:26 MS. MKRTCHYAN: Sure. Thank you, Your Honor.

THE COURT: Do you need a break before you start?

MS. MKRTCHYAN: That's fine.

THE COURT: All right.

Do you need a break?

11:30:31 THE WITNESS: Yes, please.

THE COURT: All right. We'll take a brief break. We'll come right back. So, literally, only about a five-minute turnaround so we have some testimony -- let's make that 10 minutes before we go back into session.

11:30:47 *(Jury exits courtroom.)*

*(The following proceedings were had outside the presence of the jury:)*

THE COURT: Counsel, 10 minutes?

MR. HARRELL: Very good, Your Honor.

11:31:14 *(Recess taken from 11:31 a.m. to 11:41 a.m.)*



 5-GottsSER-00863

11:41:56 *(The following proceedings were had in open court in the presence of the jury:)*

THE CLERK: We're missing one, Your Honor.

*(Pause.)*

11:42:43 THE COURT: Rolls, did you miss that juror for us?

THE CLERK: You got it, Your Honor.

THE COURT: We're back in session. All counsel are present. The parties are present. The witness is present.

11:42:53 Counsel, redirect examination.

And then call your time when you get to a convenient place. If you want to go over at lunch hour, so be it. If you want to call it at 12:00 o'clock, then I'll recess. Make that convenient. So if you go to 12:15 or 11:43:07 12:30, that's up to you. Thank you.

REDIRECT EXAMINATION

BY MS. MKRTCHYAN:

Q Briefly, sir, when we went over Dr. Raiszadeh's billing yesterday, we didn't cover the legal services that your 11:43:22 attorney paid Dr. Raiszadeh for expert witness testimony; did we?

A No. Those were sent to you.

Q Right. We covered only the treatment, the bills for treatment, and the imaging bills done by the MRI center. 11:43:39 True?


5-GottsSER-00864

11:43:40 A Correct.
Q Now, let's go to your felony conviction, sir.
Your felony has been expunged?
A Yes, it's been expunged.
11:43:52 Q And at the time of this incident, you were, in fact, on informal probation, not formal?
A Yes, formal [sic].
Q Were you checking in with the probation department?
A No. There was no check-in, no calls. I was just told
11:44:04 no contact with police.
Q Were you -- let me ask you this: When you were sentenced, were you told by the state court that you needed to turn over any knives you possessed?
MR. WRONIAK: Objection. Hearsay.
11:44:17 THE COURT: Overruled.
You can answer the question.
THE WITNESS: No, I was never told any knives to be turned over.
BY MS. MKRTCHYAN:
11:44:24 Q Were you told about only that you could not possess a firearm?
A Yes. I was given a letter to -- told me to sell my firearms.
Q Okay. And at the time of your -- of this incident, did
11:44:39 you actually own any firearms?



 5-GottsSER-00865

11:44:42 A No, I did not.
Q Sir, let's go back to the time of the use of force.
At the time that you were on that ground, and this is going back to your --
11:45:18 MS. MKRTCHYAN: Your Honor, for the record, we would like to publish 100-2.
THE COURT: 100-2.
*(The exhibit was displayed on the screen.)*
BY MS. MKRTCHYAN:
11:45:34 Q At the time of the use of force, were you thinking about your felony probation?
A No, not at that immediate moment.
Q When you were there on the ground, were you thinking about any family-related issues that you had?
11:45:48 A No.
Q At the time of the incident, when officers came with guns drawn at you, did you think that if you went down to the ground, it was going to deescalate the situation?
A No. It just got scarier.
11:46:04 Q And when officers came with guns drawn at you, did you believe you actually were going to grab a knife and go against three officers with guns?
A No. I wouldn't have tried to pull a knife on a person with a gun.
11:46:18 Q And when they came the first time, they told you, "I'm


5-GottsSER-00866

going to pat you down," Deputy Renegar said.

Reluctantly, you agreed to be searched; didn't you?

MR. WRONIAK: Objection. Leading.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: Yes, I was reluctant.

BY MS. MKRTCHYAN:

Q Did you allow them to search you?

A I did.

Q Did you allow them to pat you down?

A Yes, I did.

Q If they came to you the second time and told you in a normal human voice, without yelling and screaming, without aggressively coming with guns drawn, without telling you why, if they had told you, *Sir, we're doing a probation check on you; we need to search you*, would you have complied with that?

MR. WRONIAK: Objection. Argumentative.

THE COURT: Overruled.

You can answer that question.

State of mind at the time.

THE WITNESS: If they would have actually came up and said, "We're doing a probation check," I would have been very surprised because nobody -- I wasn't under any



 5-GottsSER-00867

11:47:14 supervision.

BY MS. MKRTCHYAN:

Q In any event, if they came and told you, "We need to search you for weapons," would you have complied?

11:47:21 A Yes. And I did.

Q If they -- if they came and told you that *We are looking for little girl. We need to investigate. Is there anyone in your tent?*, would you have complied and assisted them?

11:47:33 A I believe if I was spoken to a little bit more, and I got less agitated and anxiety, I would have been better able to help them in their investigation. I just, I got -- I didn't appreciate the way they were talking to me, and it didn't turn out too well.

11:47:53 Q Okay. The anxiety symptoms that you had, sir -- you were on medications at the time of the incident, as we covered it, right?

A Yes.

Q And the anxiety, can you tell us the symptoms that you

11:48:05 had of anxiety at the time of incident, after your stroke?

A Well, you feel like you have to be very watchful. You're just kind of on guard a lot. You're a little bit weaker. Again, I can't see, so I'm having to -- that's a new time, and it's still a little bit rough. I run into

11:48:30 walls. But I'm having to get used to if I stand straight, I


5-GottsSER-00868

don't even see my hand until right about right there (indicating), I see my hand. So I'm getting used to all of this. And I have headaches. I'm now --

Q Not right now. I'm talking about at the time. Let's go back to the time of the incident. Okay?

At the time of the incident, your anxiety symptoms, did you sill have headaches?

A Yes. It gave me headaches.

Q Migraines?

A Yes.

Q Did you have difficulty of responding to challenging situations?

MR. WRONIAK: Objection --

MR. HARRELL: Leading.

THE COURT: That's leading, Counsel.

Just re-ask the question.

BY MS. MKRTCHYAN:

Q You explain --

*(Court Reporter requests clarification.)*

THE COURT: And, Counsel, please take down the photograph. This will be for argument.

MS. MKRTCHYAN: No, we didn't finish the --

THE COURT: Well, take it down until you get to the photograph. So take it down, please. Then you can put it back up if it's relevant.




5-GottsSER-00869

11:49:36 All right. Please proceed.

BY MS. MKRTCHYAN:

Q Sir, when you were -- you said that "I was slow" on cross-examination. What did you mean when you said, "I was
11:49:44 slow," at the time of the incident?

A I have cognitive response issues. I forget words, basic words. It's just my -- so I get a little bit more frustrated because I know what I want to say sometimes, and it just doesn't want to come out. And there's a lot of
11:50:09 also -- dizziness. I want to say -- I can't -- the correct word, but dizziness. I'm not supposed to be up on a high ladder anymore.

Q Okay. And this is at the time of the incident, after your stroke?

11:50:27 A Correct.

Q And when you had the stroke, were you told that you had some sort of a brain condition?

A Yes.

Q What were you told?

11:50:40 MR. HARRELL: Hearsay.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: Where I had my concussion in the Marine Corps, I have now a giant cyst in the back of my
11:50:54 head, and that's what causes my blindness.



 5-GottsSER-00870

11:50:57 BY MS. MKRTCHYAN:
Q Did you also have some physical weakness to your left side as a result of your stroke?
A Yes. I did gain -- on their strength tests, I did lose
11:51:13 strength and coordination on my left side.
Q So knowing your medical issues, because there was a lot of talk about your Marine Corps training -- when you went to the Marines was it 1990, late 1990? The year, when did you go to the Marines?
11:51:34 A I went in late 1994.
Q You got out about 2000?
A Yes. I got out in 2001 -- or 2000. Middle of 2000.
Q Okay. So now fast-forward to 2018. This is how many years? 18 years after --
11:51:51 A Yes. Yes.
Q Okay. Was your physical fitness, physical health the same as you were in the Marines, 18 years before?
A I would say I'm a decent hiker. But I stopped running years ago. There was that moment I was like, "No one is
11:52:14 trying to kill me anymore. Why am I running?" I hated it. So I stopped running. But it was mostly hiking. Trying to eat right. But no extensive gym membership or anything like that.
Q Okay. So knowing the medical health issues you had at
11:52:31 the time of this incident, that you had stroke symptoms, you



 5-GottsSER-00871

11:52:34 had panic attacks, you had anxiety, did that make you feel, you know, ready to go into fighting mode with these police officers when they came and ordered you to get down on the ground?

11:52:47 A No. My whole life plan was to be farther away from people. Again, I was only -- O'Neill Park for the week -- couple week days, and then I go back up to Arroyo Canyon. I'm up there wherever there's dispersed camping.

Q Okay. So were you going to fight with these officers?

11:53:13 A I had no intentions to fight with these officers.

Q When they came with guns drawn and told you, "Get down on the ground," did they even give you a chance, a human ability and opportunity to process this and comply with their commands?

11:53:26 MR. WRONIAK: Objection. Argumentative.

THE COURT: Overruled. It goes to the time frame. This is his perception of the time and whether he was given the ability.

THE WITNESS: At that time, I don't know anything 11:53:36 about what's going on. And I believe -- you know, we don't just go around punching people in the world. I believe that I'm -- I'm asking. I believe I have the right to know what's going on and why they're detaining me. I just -- that's why I asked.

////



 5-GottsSER-00872

11:53:55 BY MS. MKRTCHYAN:
Q And did you expect that if you're asking questions, if you're simply asking questions and you're hesitating to comply with commands, for whatever reason, at that point in
11:54:11 time, on that day, did you expect that you were going to be beat up, taken down to the ground in the manner you described?
A No. I mean, we're talking -- I'm supposed to be talking to a professional.
11:54:23 Q And when you were down on the ground --
MS. MKRTCHYAN: Can we pull up this photograph?
*(The exhibit was displayed on the screen.)*
BY MS. MKRTCHYAN:
Q When you were down on the ground and you're there with
11:54:33 the officers there, on the ground, right there, on that point in time, were you able, in any shape or form, to even defend yourself from the blows that were coming at you?
A No. There was too many people.
Q Okay. When you were there on the ground, when you're
11:54:52 getting kicked, punched, placed in a chokehold, what was your mindset at the time?
A I'm scared. I'm -- these are last seconds, maybe.
Q And when you're down on the ground, did you even think about, "Oh, you know, probation. Oh, you know, I have
11:55:14 knives"? Did you think about those things?


5-GottsSER-00873

11:55:16 A When I was on the ground, no. I didn't understand. They had already searched me.

MS. MKRTCHYAN: No further questions. Thank you.

THE COURT: And you can go to the lunch hour also.

11:55:27 So let's start with Mr. Harrell. Questions?

MR. HARRELL: No questions, Your Honor.

THE COURT: Counsel?

MR. WRONIAK: No, Your Honor.

THE COURT: All right. Sir, thank you very much.

11:55:36 You may step down.

THE WITNESS: Yes, sir.

THE COURT: Why don't you go to lunch. Can you return a little -- a little after an hour, about 1:00 o'clock. Okay? And then we'll try to release you by

11:55:48 4:30 at the latest today. Okay? Thank you.

Counsel, if you will remain for just a moment.

*(Jury exits courtroom.)*

THE COURT: For the parties for Mr. Holloway, Deputy Gotts, Deputy Renegar, you don't have to remain. I

11:56:15 just want to talk to counsel about timing.

Who is the next witness?

MS. MKRTCHYAN: We're supposed to have deputy -- Sergeant Rawlings. That's what I requested to have. Sergeant Rawlings or --

11:56:31 THE COURT: Is Rawlings available? There's no way

11:56:35 you can time the case, so if he's not, I'm not going to be concerned. Is he available, though?

MS. NALTSAS: We're going to try.

THE COURT: Okay. If Rawlings isn't available, 11:56:50 then who would be called?

MS. MKRTCHYAN: Well, if Rawlings is not available, then we're left with Deputy Brown or Deputy Renegar.

THE COURT: Okay. So either one.

11:56:58 So we're down to very few witnesses left, at least on my trial, as from the first trial. It's Brown -- Deputy Brown, Deputy Renegar, and Sergeant Rawlings. Is that what I'm hearing?

*(No audible response.)*

11:57:09 THE COURT: Have a seat for just a moment.

We've been moving our calendar for Monday to try to get continuous days. So Monday, we'll be back in session at 8:00 or maybe 8:30, depending. We have a 7:30 calendar. Probably 8:30. And you'll have a full day Monday. You'll 11:57:43 have a full day Tuesday. You'll have a full day Wednesday.

But, Mr. Harrell, before you came in, there was a conversation, and counsel on behalf of Deputy Renegar doesn't believe that they'll finish this week. Joshua Gomez, apparently, is going to come back on the 11:58:03 following Monday, when he's back from the Navy.



 5-GottsSER-00875

11:58:04 It's probably realistic anyway, because on May 15th, which is Thursday, I'm in Los Angeles. I'm in Los Angeles the entire day on a series of hearings involving the mayor, councilmen, Governor Newsom is invited. You
11:58:22 don't need to know the drama, but it's an entire day about where this homeless money went.

There's going to be a lot of testimony, potentially, in that case. But I'm going to recess that matter and come right back to this matter on Friday. So you
11:58:36 know that you've got one day that you're out of, at least, litigation. But I need to get these jury instructions back in order on this second trial -- or fourth trial, I'm sorry.

I'm proposing that you get together in my court on Thursday because I don't know how quickly your case will
11:58:58 come to an end on the plaintiff's side. My guess is that the majority of the evidence is probably coming in, but maybe not. But Joshua Gomez sounds like probably one of your last witnesses. So you can be arguing as early as Tuesday. And what I don't want to do is take another day
11:59:18 off.

All right. Now, will you reserve Thursday, then, to go start laying out these instructions? And I'll be back, by the way. I'll be back from L.A. as early as 3:00 o'clock, but I'll be back as late as 6:00 o'clock or
11:59:37 7:00 o'clock. I want to see you that evening. Okay? I



 5-GottsSER-00876

11:59:39 want to know how far you've gotten and have gotten on cooperation. So be it. But these instructions need to get laid out on the table again.

Now, you wanted to bring to my attention something
11:59:50 on behalf of Deputy Renegar yesterday, and I kind of pushed you, because I want to have continuity with his testimony.

What was your concern?

MS. SWISS: The concern, Your Honor, is how to comply with the Court's order regarding the Taser policy.
12:00:08 The Court previously granted qualified immunity on the use of the Taser --

*(Court Reporter requests clarification for the record.)*

MS. SWISS: The Court previously granted qualified
12:00:19 immunity on the use of the Taser, and then when Roger Clark, plaintiff's expert, testified, he was permitted to opine that the use of the Taser was unreasonable and not appropriate. So we want to know how that's going to be --

THE COURT: Yeah.

12:00:30 MS. SWISS: -- instructed to the jury --

THE COURT: I didn't grant qualified immunity on the Taser. I granted qualified immunity on the officers. There's no such thing as qualified immunity on a Taser, okay?

12:00:39 And what I was concerned about, was it coming

12:00:43 through Gonzales? Gonzalez never used a Taser. And I didn't see why we were getting into policies and procedures concerning the Taser.

An expert can testify to hearsay. An expert can
12:00:57 testify to almost anything, as you know. They can rely upon hearsay. I just need to instruct the jury that it's not for the truth of the matter; it's simply for the opinion of that expert. You can even ask experts like you can children or people -- a leading question. Those are the three
12:01:14 exceptions. So experts can be asked leading questions, believe it or not.

I'm not going to get into the, quote/unquote, "policy." And I'm a little concerned it's a red herring here. But it's part of the excessive force. In other
12:01:31 words, the real essence of this is whether a punch or kicks were landed. That's where we're at. And quite frankly, the employment of the Taser is de minimis, and we're spending too much time on it, frankly.

By the same token, you're going to be allowed in
12:01:51 rebuttal to get into the Taser and its appropriate application through Rawlings. We had done that before with Rawlings.

MS. SWISS: Understood.

THE COURT: You're not precluded.

12:01:57 MS. SWISS: In Document 679, when the Court ruled



 5-GottsSER-00878

12:02:03 on the post-trial motions from trial three, the Court indicated that the use of the Taser was protected by qualified immunity; and so therefore, we did not feel that it was an issue for this trial --

12:02:12 THE COURT: My mistake then, and I apologize. I think because it ruled in in the first trial, I may have assumed, in the heat of it, that it was coming in here. So....

MS. SWISS: Therein lies my question of how we 12:02:25 question Rawlings and how we present the rest of the evidence.

MR. WRONIAK: And I know --

THE COURT: I understand that now, yeah.

Well, help me.

12:02:36 MS. SWISS: Our concern is that jury --

THE COURT: I know your concern. Is there a solution to this?

MS. SWISS: We would ask that the jury be asked to disregard the testimony with regard to whether the use of 12:02:46 the Taser was reasonable or unreasonable by Mr. Clark, and the jury should be so instructed that the focus of the excessive force for Deputy Renegar on the verdict form is this punch. We want it to be very clear what force is at issue so there's no question, when the verdict comes back, 12:03:04 on what the jury's decision is; what specific force was




5-GottsSER-00879

excessive versus not at issue or not excessive.

MR. HARRELL: Your Honor, on that point, if I can make a suggestion. Just to put it out there, I believe, given some of the Court's prior rulings, that this case positively cries out for special interrogatories to go to the jury.

Question 1: Was Deputy Renegar punched -- did he punch him to the face in an unreasonable way?

Question 2: Did Deputy Gotts unreasonably knee Mr. Holloway in the head?

That's my understanding of what we were here to do, based on my understanding of the Court's prior rulings.

THE COURT: Well, first -- without making a snap decision, I think you may be right. In other words, I would like to know, and I know the appellate court would like to know if there is liability here, you know what the basis of that liability is. And whether there is a punch to the face. But I'd have to see that. So before I represent to you that I'm going to do that, I need to see what you're going to draft in terms of special findings, special findings by the jury.

MR. HARRELL: Understood. We'll try to work with plaintiff's counsel on that.

THE COURT: But the second thing is, as I stated to you before, this detention shouldn't be in question. In


5-GottsSER-00880

12:04:28 other words, here, the officers have a right to respond and to detain; the question is the force used in the detention.

And the second is, that this Taser did come in, in the previous trial.

12:04:43 And, Counsel, thank you, but the focus of this Taser is not inappropriate. And the difficulty is, I think, from the plaintiff's perspective, though, a concern that all of this is part of this excessive force claim and taken in the totality of that. If I follow that line, then we're 12:05:11 going down the line of a tremendous focus on the use of the Taser, the malfunctioning of it, the reuse of it.

Let me think about that over the lunchtime for a few moments. Okay?

The appropriate admonition may be to simply have 12:05:33 that stricken. It may be to allow it concerning the totality of the force used. The policy, though, here, I don't think is in question. I think that the policy I would find and probably be prepared to -- well, I'm not sure yet. Let me think that through. The policy here doesn't seem to 12:05:54 be a misapplication of policy. It's the totality of what occurred out at that scene.

Now, if I rule that the policy is not an issue, then why would I detract and exclude the Taser? In other words, if the policy was followed, would I then instruct the 12:06:21 jury to disregard any use of the Taser? I think then the




5-GottsSER-00881

12:06:25 plaintiffs should be able to argue, *No, Judge, this is the totality of the officers' alleged retribution*, quite frankly, for the attitude of Mr. Holloway.

MR. HARRELL: Your Honor, I'm going to suggest 12:06:38 again that we have a special verdict with special interrogatories targeted at the punch and the knee to the head. And maybe our jury instructions should also help --

THE COURT: Yeah. But we have Renegar -- the reason I've been asking about the witnesses is, believe it 12:06:54 or not, I prepare at night. And it's been very hard, I've informed both counsel, to properly prepare during the evening hours when I don't know who the witnesses are the next day.

MS. MKRTCHYAN: Can I respond, Your Honor?

12:07:06 THE COURT: Certainly. We got all lunch hour.

MS. MKRTCHYAN: I would prefer not to. But if the defense raises an issue during lunch hour --

*(Court reporter requests clarification.)*

THE COURT: Go ahead.

12:07:17 MS. MKRTCHYAN: So here's the issue we have. First of all, there is a violation of the policy. The policy of the Orange County Sheriff's Department says:

Authorized Members may use ECD to subdue or control a subject who poses an immediate threat to the 12:07:34 safety of the Member, when the Member has an objective


5-GottsSER-00882

12:07:37 reason to believe that less intrusive tactics are unlikely to be effective.

"Immediate threat" should be understood
to mean the following: A violent or
12:07:47 physically aggressive subject, or an
imminent likelihood of violent or
physical aggression, as indicated beyond
mere agitation or noncompliance."

Evidence has shown my client has -- was passively 12:08:01 resisting, at the very least, on the ground, when multiple officers were on top of him. We had cops already arriving, Borba arriving. He was nonviolent. He was not aggressive on that ground. Basically, it's his testimony. The jury is entitled to look at the policy because violation of policy 12:08:18 under Ninth Circuit authority is well-established years and years of authorities; specifically, *Drummond versus City of Anaheim*.

*(Court Reporter requests clarification for the record.)*

12:08:31 MS. MKRTCHYAN: *Drummond versus City of Anaheim,* and I've cited it in my proposed jury instruction, says that violation of departmental policy is relevant consideration in consideration of excessive use of force.

I am left only with excessive force charge here, 12:08:43 claim. And if I'm going to be taken away the Taser, what am


5-GottsSER-00883

I going to be left with? Then they're going to say, "Oh, look, Mr. Holloway is lying about the punch."

THE COURT: A punch to the face --

*(Simultaneous speakers.)*

MS. MKRTCHYAN: No. That's -- that's -- Your Honor, that's controverted. They're leaving me with something that basically is controverted. The Taser is uncontroverted. And it's very unfair. We already have liability verdict. Yes, the Court took it away; that's fine, I understand.

But we have Chad Reneger using Taser. In fact, this case is about a Taser, not about a punch. And we have uncontroverted evidence Taser was applied, in violation of their own policy. And I'm entitled to bring this under Ninth Circuit Court authority, whether -- regardless of the qualified immunity ruling, which we understand the Court has dismissed some of the defendants, this is not a factual finding. Evidence of the Taser will come in anyway. The Taser has come in already. Are they going to take it out to the jury and say, *Oh, look, whatever we admit happened is not for you to decide here*." This is handicapping plaintiff's ability to prove excessive force because if you look at the combination, they need to look at the totality, quantum and degree of force. You don't just look and say, "Oh" --




5-GottsSER-00884

12:10:03 THE COURT: And, in fact, just a little bit slower. We get can't a record.

In fact, Rolls, do you know how to put CourtSmart on?

12:10:10 THE CLERK: No, I do not, Your Honor.

THE COURT: Ally does in back.

Would you ask her to come out and put the CourtSmart on?

THE CLERK: Certainly, Your Honor.

12:10:13 Deb, you can't keep up with that pace.

THE COURT REPORTER: No.

THE COURT: Just a moment, Counsel.

We're going to go to CourtSmart because of the pace of the argument. So just give me just a moment.

12:10:30 *(Pause.)*

THE COURT: In a perfect world, I'd like more time to think about that. But this is why I'm asking when Reneger is going to be called and who the next witness is.

We're going to stop now. I need CourtSmart 12:10:59 because you're just too quick.

*(Pause.)*

*(Further proceedings reported by CourtSmart, in Volume II.)*

12:12:06 *(At 12:10 p.m., proceedings were recessed.)*




5-GottsSER-00885

-oOo-



 5-GottsSER-00886

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: May 10, 2025

/s/DEBORAH D. PARKER
DEBORAH D. PARKER, OFFICIAL REPORTER




5-GottsSER-00887

BY MR. HARRELL:
[115] 19/19 20/11 20/15 21/14 22/8 22/24 23/6 23/13 23/24 25/4 26/1 26/16 27/16 28/11 29/1 29/15 29/25 30/19 31/24 32/7 32/12 33/8 33/18 34/5 34/15 34/24 35/12 35/17 37/4 38/22 39/14 39/23 41/1 43/16 43/20 44/3 44/16 46/3 46/11 46/23 47/3 48/2 49/20 50/14 50/19 61/24 62/11 62/14 63/9 64/4 65/18 66/3 66/17 67/6 67/15 69/9 70/12 71/9 71/17 72/22 73/8 74/4 74/17 75/4 75/11 75/15 76/10 77/15 78/4 78/14 79/11 80/18 81/24 82/23 83/15 83/21 84/4 84/11 85/2 85/23 86/21 87/6 87/19 88/12 89/5 89/22 90/10 90/24 91/18 92/14 94/18 95/14 96/13 97/24 99/7 99/21 100/14 101/13 101/20 102/8 103/12 103/23 104/4 104/16 105/19 106/11 106/18 107/4 107/21 108/18 109/1 109/7 110/2 110/18 110/25
BY MR. WRONIAK:
[24] 111/7 112/3 112/13 113/8 113/13 113/16 115/1 115/15 116/15 117/2 117/5 117/19 118/19 119/6 123/4 124/2 124/8 124/11 127/14 128/1 129/12 130/8 131/5 131/18
BY MS. MKRTCHYAN:
[10] 133/17 134/19 135/9 136/8 137/2 138/17 139/2 140/1 141/25 142/13
MR. HARRELL: [85] 7/3 15/9 15/12 20/14 21/10 22/3 23/8 23/20 24/25 25/23 26/11 27/10 28/7 28/22 29/12 30/15 31/16 36/5 36/10 36/17 36/19 37/1 43/7 43/14 46/5 46/7 46/10 47/1 49/18 50/3 50/12 53/11 53/18 55/18 58/6 58/10 60/11 60/15 60/24 61/8 61/16 61/23 63/25 71/11 71/15 72/15 72/18 72/21 73/1 73/7 73/15 73/18 73/22 73/25 74/3 74/11 74/16 79/15 79/21 79/24 80/1 80/4 80/6 80/12 80/16 83/14 84/17 90/23 97/5 97/22 98/5 98/11 99/11 99/14 105/16 106/3 109/5 109/25 132/24 138/14 139/20 143/6 149/2 149/22 151/4
MR. WRONIAK: [22] 6/10 6/16 47/2 113/12 117/16 127/10 127/23 129/21 129/24 130/1 130/6 131/3 131/24 132/2 132/7 134/14 136/4 136/19 138/13 141/15 143/8 148/12
MS. MKRTCHYAN:
[145] 5/9 7/5 7/10 7/22 7/25 8/19 8/25 9/9 9/13 13/18 13/23 14/1 14/4 14/6 18/15 18/20 22/23 23/1 25/22 26/7 29/22 31/12 32/3 32/10 33/5 33/13 34/7 34/19 34/22 35/2 35/15 35/21 36/9 38/12 39/18 40/22 42/25 44/1 44/10 45/17 46/17 47/22 47/25 48/21 49/23 50/5 50/9 51/9 51/16 52/6 53/8 54/8 55/24 56/1 56/13 60/22 62/4 62/24 65/9 66/12 67/3 67/11 68/25 70/5 70/24 76/5 77/8 77/10 77/18 77/24 78/6 79/6 79/8 81/19 82/10 83/7 83/20 83/23 84/1 84/10 84/13 85/16 86/17 86/24 87/2 88/1 88/19 89/14 90/7 90/18 91/13 92/2 94/13 95/12 96/5 98/16 98/18 100/9 101/11 101/22 101/24 103/6 103/21 103/25 104/8 105/13 105/17 105/24 106/16 106/22 107/15 108/13 110/15 110/21 111/24 112/6 114/18 115/7 116/7 116/21 116/24 117/4 118/12 119/3 123/3 123/19 123/22 124/5 127/5 129/6 131/9 131/21 132/10 132/12 135/5 138/22 142/11 143/3 143/22 144/6 151/14 151/16 151/20 152/20 153/5
MS. NALTSAS: [2] 5/18 144/3
MS. SKINNER: [2] 73/14 74/2
MS. SWISS: [12] 5/23 6/2 6/6 6/19 146/8 146/14 146/20 147/23 147/25 148/9 148/15 148/18
THE CLERK: [6] 50/8 99/5 133/3 133/6 154/5 154/9
THE COURT REPORTER: [2] 8/9 154/11
THE COURT: [255]
THE WITNESS: [72] 23/5 31/22 33/7 33/16 34/10 35/5 35/25 38/20 39/11 43/4 45/23 48/23 62/8 63/3 67/14 69/3 69/6 70/9 71/3 73/24 74/13 75/9 75/14 76/9 77/12 77/23 78/10 79/7 82/16 83/11 84/19 85/20 87/13 88/6 88/23 89/21 91/16 92/9 94/16 96/10 101/19 101/23 102/4 102/6 103/9 104/3 104/13 106/7 106/17 107/1 107/18 108/14 109/4 110/1 112/1 112/10 114/22 115/11 116/12 117/1 117/17 118/14 127/13 129/9 131/11 132/15 134/17 136/7 136/23 139/23 141/19 143/11

$

$20,000 [4] 52/22 54/2 54/3 59/14
$250,000 [2] 17/12 55/14
$3,050 [1] 129/16
$60,000 [1] 126/7

-

- :06 [1] 98/8
-oOo [2] 5/2 155/1

.

...for [1] 85/4

/

/s/DEBORAH [1] 156/12

0

0123A [1] 71/14
053 [1] 1/22

1

1 minute [1] 23/21
1-053 [1] 1/22
10 [4] 72/24 73/7 113/19 156/9
10 minutes [2] 132/19 132/23
100 percent [1] 95/16
100-2 [2] 135/6 135/7
101-3 [1] 28/23
1010 [3] 2/4 2/11 2/20
102 [1] 21/11
102-3A [1] 71/11
10342 [1] 1/20
10:19 [1] 97/13
10:44 [1] 97/13
11 [4] 64/2 64/20 73/15 74/7
1100 [2] 2/9 2/18
1150 [1] 2/14
11:08 [1] 28/23
11:19 [1] 28/9
11:20 [1] 29/13
11:30 [1] 28/23
11:31 [1] 132/25
11:41 [1] 132/25
12 [1] 128/8
12:00 o'clock [1] 133/13
12:10 [1] 154/25
12:15 [1] 133/14
12:30 [1] 133/15
12:45 [1] 29/13
12:51 [1] 30/16
13 [6] 80/13 80/19 83/14 83/22 86/22 89/12
14 [3] 108/23 109/6 110/9
1450 [2] 2/10 2/19
15 [9] 36/12 36/13 36/19 37/8 37/11 38/9 38/10 74/7 97/8
15th [1] 145/2
16 [1] 36/11
162N [1] 21/10
17 [3] 109/11 109/12 109/23
18 years [2] 140/14 140/17
180 [1] 109/8
1800 [1] 2/14
19-01514-DOC [1] 1/8
1990 [2] 140/8 140/8
1994 [1] 140/10
19th [3] 5/24 6/1 6/2
1:00 o'clock [1] 143/14

2

2 minutes [2] 27/13 30/17
20 [4] 89/24 90/2 97/12 109/24
20 minutes [1] 97/8
20,000 [1] 52/15
2000 [3] 140/11 140/12 140/12
2001 [1] 140/12
2011 [1] 3/8
2016 [1] 10/18
2017 [3] 126/7 126/9 126/12
2018 [18] 15/17 17/1 51/1 51/6 51/20 54/5 54/22 58/11 58/16 59/8 112/22 125/23 126/14 126/17 126/21 126/24 127/7 140/13
2019 [2] 126/25 127/19
2020 [7] 108/23 109/6 110/9 127/19 128/8 128/11 128/14
2022 [1] 36/11
2023 [1] 72/13
2025 [3] 1/16 5/1 156/9
204 [1] 2/4
207 [1] 3/8
21 [3] 51/1 51/6 112/22
2110 [1] 3/9
213 [1] 2/15
22 seconds [1] 28/24
222 [4] 79/18 80/1 80/12 132/2
228 [2] 20/7 22/4
229-4305 [1] 1/23
24 [2] 127/24 130/3
240 [1] 55/14
25 [3] 109/12 109/12 109/23
25 miles [1] 49/6
2500 [1] 128/23
26 [6] 49/18 50/3 50/13 50/20 52/11 59/2
274-2110 [1] 3/9
28 [1] 156/3
29 seconds [6] 89/6 89/9 91/4 91/8 91/23 93/1

3

3 seconds [2] 27/14 30/17
30 [1] 91/1
34 seconds [1] 22/6
35-1 [2] 47/2 47/5
37 seconds [1] 26/14
388-7022 [1] 2/5
3:00 o'clock [1] 145/24
3A [1] 71/11

4

400 [1] 3/4
401 [1] 20/8
403 [1] 90/20
4100 [1] 3/5
411 [1] 1/22
4305 [1] 1/23
434 [1] 20/9
45 [4] 41/13 46/8 46/10 47/15
49 [4] 72/24 73/7 73/15 74/6
4:30 [2] 22/5 143/15
4:57 [1] 23/11

5

52 seconds [1] 25/2
54 [9] 36/11 36/12 36/17 37/8 37/13 37/15 43/7 129/24 129/25
55 [1] 37/20
5:02:31 [1] 99/8
5:02:40 [1] 99/8
5:03 [1] 98/8
5:03:09 [1] 98/9
5:04 [1] 22/6
5:13 [1] 23/11
5:18 [1] 23/21

6

6 seconds [1] 23/22
61 [1] 23/5
624-8700 [1] 2/15
65 [6] 20/16 21/18 21/18 21/22 28/5 43/15
657 [1] 1/23
66 [2] 26/25 117/10
67 [3] 20/18 21/16 21/22
679 [1] 147/25
6:00 o'clock [1] 145/24
6:08 [1] 25/1
6:24 [1] 23/21
6:30 [1] 6/13
6:45 [5] 6/13 8/23 9/6 9/9 18/25

7

7022 [1] 2/5
714 [3] 2/11 2/20 3/5
750 [1] 3/4
753 [1] 156/2
76 [1] 20/13
760 [1] 3/9
7:00 o'clock [1] 145/25
7:10 [1] 26/13
7:30 [1] 144/18
7:44 [1] 27/12
7:47 [1] 26/13
7:49 [2] 1/17 5/1


5-GottsSER-00888

8

8 o'clock [1] 5/8
818 [1] 2/5
823-4100 [1] 3/5
8700 [1] 2/15
8:00 [1] 144/18
8:30 [2] 144/18 144/19

9

9/16/2020 [1] 128/11
90015 [1] 2/15
911 [22] 9/20 20/6 22/4 22/17 22/19 23/9 23/25 24/1 24/4 24/8 24/10 24/14 24/19 24/23 26/12 27/11 28/15 30/17 31/2 31/6 111/20 112/4
91202 [1] 2/5
92011 [1] 3/9
92701 [1] 1/23
92868 [3] 2/10 2/19 3/5
937-1010 [2] 2/11 2/20
9:42 [1] 28/8
9:47 [1] 27/13

:

:06 [1] 98/8

A

a.m [6] 1/17 5/1 97/13 97/13 132/25 132/25
abilities [2] 10/9 31/23
ability [6] 10/6 61/5 102/22 141/13 141/18 153/22
able [8] 57/16 69/22 91/22 121/5 127/21 137/11 142/16 151/1
about [96] 7/18 9/20 10/7 10/10 10/15 11/8 11/8 11/19 12/22 15/20 16/17 16/18 16/20 16/21 19/20 20/6 24/1 24/22 28/2 31/3 31/9 32/22 33/19 33/24 38/3 41/13 41/15 42/16 43/8 45/3 45/3 46/10 49/4 51/19 52/12 52/15 53/19 53/23 54/19 55/14 59/13 60/2 62/12 65/17 65/24 68/22 71/22 81/14 84/22 85/24 85/25 89/24 91/6 92/7 92/11 93/8 93/11 94/23 95/25 103/6 103/10 103/11 103/20 105/6 107/22 108/7 109/24 111/21 112/5 112/15 113/19 118/18 124/6 126/22 129/11 132/17 134/20 135/11 135/14 138/1 138/4 140/7 140/11 141/20 142/24 142/25 143/13 143/20 145/5 146/25 150/12 151/9 153/2 153/12 153/12 154/17
above [4] 13/23 14/1 14/4 156/5
above-entitled [1] 156/5
absolute [1] 17/9
absolutely [3] 10/23 87/9 126/2
absorb [1] 13/12
abundant [1] 15/14
accord [1] 16/7
according [4] 40/15 120/18 120/24 122/17
accounting [1] 128/4
accurate [1] 98/23
across [1] 59/25
acting [1] 41/13
actively [1] 35/19
activity [1] 128/4
actual [1] 95/16
actually [5] 63/6 75/7 134/25 135/21 136/23
addition [1] 15/18
additional [1] 98/21
address [21] 6/20 42/23 43/21 44/5 44/7 45/6 45/9 45/11 45/16 45/24 46/12 46/15 47/6 47/10 47/11 47/12 48/8 48/9 48/14 48/16 130/13
addresses [2] 47/21 48/3
admit [3] 22/12 29/5 153/20
admitted [2] 49/24 59/3
admonish [1] 58/18
admonished [4] 9/12 10/2 53/24 97/9
admonition [2] 54/25 150/14
admonitions [1] 14/11
advance [1] 52/16
affected [1] 10/9
affects [2] 10/11 33/16
affirmative [1] 43/9
afraid [1] 70/13
after [30] 13/3 16/15 16/25 28/15 28/18 53/19 54/4 54/22 55/6 58/16 59/8 59/21 59/25 60/5 60/22 93/1 101/8 105/9 105/20 106/12 110/13 118/10 119/20 123/13 124/12 127/7 137/20 139/13 140/14 143/13
again [41] 19/2 20/12 21/7 24/18 33/25 35/14 36/15 37/14 39/21 46/1 47/10 51/7 54/13 54/14 58/23 59/13 66/12 66/14 74/16 76/25 78/12 82/17 83/14 85/20 86/3 87/14 95/4 95/11 96/1 99/8 100/22 102/7 108/8 109/8 112/18 116/16 121/6 137/23 141/6 146/3 151/5
against [6] 18/5 53/12 54/25 64/17 82/1 135/22
aggression [1] 152/7
aggressive [3] 57/24 152/5 152/12
aggressively [1] 136/15
agitated [1] 137/11
agitation [1] 152/8
ago [1] 140/19
agree [5] 81/5 105/1 111/12 111/19 114/23
agreed [6] 13/15 17/1 52/2 88/13 89/24 136/2
agreement [17] 17/4 53/2 54/19 54/21 55/3 58/10 58/12 58/15 79/19 80/23 82/5 83/16 85/3 85/12 89/12 90/16 132/3
agreements [1] 79/12
ahead [1] 151/19
aid [1] 98/25
AIRPORT [1] 3/8
al [2] 1/9 2/7
alert [1] 40/21
all [71] 6/12 15/9 15/23 15/24 16/19 16/20 16/23 18/25 19/9 19/10 20/5 23/19 24/18 37/7 42/11 42/16 46/4 48/7 50/25 51/15 53/7 54/15 55/14 58/11 58/13 58/16 59/3 59/24 61/17 64/7 70/3 72/2 74/3 74/5 75/1 75/18 76/21 79/3 80/3 80/5 82/24 83/1 83/5 89/8 93/11 95/11 96/20 97/17 98/11 98/20 98/21 99/1 99/8 99/15 99/19 100/17 100/25 109/11 110/5 118/17 123/1 132/13 132/16 133/7 138/2 139/1 143/9 145/21 150/7 151/15 151/21
alleged [1] 151/2
allow [3] 136/9 136/11 150/15
allowed [3] 10/7 10/15 147/19
allowing [2] 84/7 90/4
allows [1] 54/2
Ally [1] 154/6
almost [5] 48/23 53/21 55/10 121/5 147/5
along [1] 91/3
already [26] 11/15 15/1 15/18 21/8 31/17 32/18 34/7 35/2 35/21 35/22 41/24 50/7 53/13 62/12 74/6 87/20 88/20 89/15 90/19 102/9 105/11 127/24 143/2 152/11 153/8 153/19
also [26] 3/12 7/20 16/2 17/17 18/8 27/20 35/10 46/1 49/15 52/1 57/16 58/25 66/20 69/19 70/2 70/24 91/22 99/4 114/2 123/5 125/21 129/19 139/10 140/2 143/4 151/7
alternative [1] 53/19
always [4] 44/6 48/24 119/7 119/9
am [23] 7/1 7/2 11/16 13/16 13/16 13/17 38/2 38/6 43/8 46/8 59/20 60/9 61/12 61/13 71/5 74/25 74/25 81/6 85/4 122/7 140/20 152/24 152/25
ambiguous [21] 23/2 32/10 34/22 39/22 40/22 62/4 69/1 70/6 79/8 81/20 83/8 90/7 100/9 100/12 107/15 112/2 114/18 123/20 123/22 131/21 131/22
ambush [1] 54/10
Amendment [8] 10/4 81/2 82/1 83/3 84/22 87/24 88/8 88/10
among [1] 15/20
amongst [1] 97/9
amount [3] 55/4 58/24 92/7
amounts [2] 17/11 56/14
ANA [5] 1/3 1/15 1/23 5/1 45/10
Anaheim [2] 152/17 152/20
ANGELES [3] 2/15 145/2 145/3
announcing [1] 118/1
another [19] 24/11 24/11 27/9 35/10 42/3 43/25 44/22 56/17 60/5 67/22 68/16 71/18 71/21 78/25 95/2 96/1 121/9 128/14 145/19
answer [49] 13/4 18/10 18/22 23/4 25/19 25/25 31/19 34/9 35/13 35/24 39/10 43/3 44/13 44/15 45/2 45/22 69/4 70/8 71/2 76/8 77/16 82/15 83/10 84/3 87/11 87/11 88/4 88/22 89/20 91/16 92/7 94/15 96/9 96/10 100/11 101/23 104/2 104/7 112/9 114/21 115/10 115/25 116/10 116/25 127/13 134/16 136/6 136/21 139/22
answered [21] 12/19 31/17 34/7 35/3 35/21 39/6 39/11 39/12 44/1 67/12 77/8 77/20 77/24 78/1 83/5 88/19 90/22 94/13 96/20 105/8 127/12
answers [1] 12/17
antics [1] 14/23
anxiety [16] 51/3 51/8 51/21 52/1 55/14 55/20 57/3 57/14 58/3 59/20 137/11 137/15 137/19 137/20 138/6 141/1
anxious [1] 93/14
any [60] 5/13 6/18 9/1 9/24 10/3 10/9 12/5 13/8 16/17 17/16 18/12 21/15 21/21 22/16 24/10 26/20 30/8 31/1 31/9 31/14 31/20 52/12 56/7 61/13 63/21 63/22 64/19 64/25 64/25 65/7 65/14 65/22 67/16 68/5 69/25 81/9 81/9 82/7 84/7 85/6 85/7 88/14 89/23 91/16 101/6 101/6 102/25 103/16 104/19 104/24 112/11 127/18 134/13 134/17 134/25 135/14 136/25 137/3 142/16 150/25
anybody [2] 26/3 124/3
anymore [3] 34/11 139/12 140/20
anyone [9] 10/9 11/11 24/7 24/21 25/16 25/20 29/9 30/23 137/8
anyplace [1] 48/11
anything [22] 10/19 15/25 21/25 27/3 31/3 61/11 62/2 62/17 63/10 63/18 83/5 85/1 87/14 92/13 109/12 112/16 124/17 124/18 124/19 140/22 141/19 147/5
anyway [2] 145/1 153/18
anyways [1] 49/11
apartment [1] 47/14
Apex [5] 126/9 126/10 126/11 126/14 126/17
apologies [1] 87/8
apologize [5] 59/13 75/12 89/10 96/17 148/5
apparently [1] 144/24
appeal [3] 11/15 11/21 11/22
appearances [3] 1/25 2/22 15/24
appears [2] 55/12 55/13
appellate [1] 149/15
application [1] 147/21
applied [1] 153/13
appreciate [3] 12/1 104/6 137/13
approach [7] 37/1 51/10 93/1 93/21 93/25 94/7 104/25
approached [11] 95/6 101/9 105/6 105/9 105/21 106/2 106/4 106/6 106/8 106/15 107/5
approaches [2] 94/19 120/25
approaching [7] 27/18 27/20 27/24 32/8 32/13 39/25 93/22
appropriate [3] 146/18 147/20 150/14
approximately [2] 126/24 127/1
are [60] 6/4 10/14 10/15 14/10 15/9 16/11 16/13 16/21 17/19 17/22 18/13 18/19 18/25 26/2 26/5 29/9 30/23 34/16 38/1 48/7 49/21 54/1 54/7 57/18 61/12 66/9 73/13 77/4 77/16 84/8 87/1 96/6 96/22 97/17 97/17 98/25 99/9 105/10 106/19 109/5 109/11 111/14 117/9 120/22 120/22 122/11 124/6 124/7 128/17 129/5 129/5 131/14 133/8 133/8 137/6 142/22 147/9 151/12



5-GottsSER-00889

A
are... [2] 152/1 153/19
area [6] 30/25 31/8 57/23 80/10 122/6 127/20
areas [2] 54/4 55/8
aren't [2] 25/20 61/1
argue [8] 11/11 13/3 18/5 18/10 54/3 65/24 115/13 151/1
argues [1] 17/14
arguing [1] 145/18
argument [7] 17/3 17/21 55/16 117/9 127/3 138/21 154/14
argumentative [13] 23/1 31/13 33/5 33/13 48/21 69/1 91/14 104/8 114/19 118/12 119/3 136/19 141/15
arm [1] 122/15
arms [6] 88/9 120/9 122/4 122/11 122/13 122/21
around [8] 23/16 32/2 66/6 67/14 74/19 75/6 120/20 141/21
arrangements [1] 5/23
arrived [5] 76/1 112/14 112/19 116/18 117/25
arriving [2] 152/11 152/12
Arroyo [1] 141/7
as [93] 6/11 6/11 8/17 8/17 9/18 17/6 40/4 40/7 40/21 40/21 40/23 40/25 41/16 42/13 43/4 46/15 49/3 49/3 50/22 59/17 62/25 63/2 63/3 65/9 66/4 68/20 69/23 70/13 70/16 71/4 72/2 79/3 82/18 82/18 84/19 87/2 89/2 89/2 90/11 91/2 92/2 92/6 93/3 96/6 96/22 101/11 103/6 104/19 106/1 106/8 107/16 107/16 107/18 108/14 108/14 112/10 113/5 113/9 114/8 116/2 116/4 116/19 118/5 120/25 121/4 121/17 122/13 122/14 122/20 123/5 123/25 124/5 124/9 124/10 126/11 129/9 129/9 129/14 131/9 137/16 140/3 140/17 144/11 145/18 145/18 145/23 145/23 145/24 145/24 146/23 147/5 149/24 152/7
aside [4] 25/16 29/9 30/8 30/23
ask [49] 10/7 11/8 11/9 13/8 18/12 26/10 27/9 33/24 33/25 34/4 35/14 36/25 38/24 39/21 40/25 42/3 44/15 45/4 50/12 53/4 62/13 64/12 76/18 76/25 77/21 78/3 78/9 78/11 85/14 89/3 89/23 90/5 92/5 92/13 95/4 96/1 100/22 102/7 104/15 106/1 106/10 108/17 118/9 122/16 134/11 138/16 147/8 148/18 154/7
asked [50] 7/6 10/1 10/22 19/25 34/7 35/21 43/21 44/1 44/4 54/7 57/8 59/2 60/25 67/11 68/20 69/24 70/14 70/21 71/22 74/23 77/8 77/24 78/13 82/24 83/1 88/19 88/23 90/12 90/21 91/2 91/20 93/10 93/17 94/13 96/22 103/14 104/14 108/6 116/17 123/16 124/3 124/15 124/15 124/18 125/6 125/8 125/10 141/24 147/10 148/18
asking [19] 20/3 31/20 67/17 67/18 70/4 70/17 71/5 76/3 76/11 76/16 92/23 113/17 122/17 124/17 141/22 142/2 142/3 151/9 154/17
asks [1] 9/17
asleep [2] 33/23 41/15
assholes [2] 24/8 24/15
assisted [1] 137/8
associated [3] 48/4 50/23 110/19
assume [1] 6/14
assumed [3] 83/11 83/13 148/7
assurance [2] 62/22 62/24
assurances [1] 63/11
attached [1] 129/2
attack [1] 114/25
attacks [1] 141/1
attention [2] 72/24 146/4
attitude [1] 151/3
attorney [7] 2/3 8/5 10/22 42/5 54/13 89/13 133/20
attorneys [1] 19/10
audible [1] 144/14
audio [5] 23/9 27/17 30/17 30/21 98/12
audiotape [13] 21/5 21/12 21/13 22/7 23/12 23/23 25/3 26/15 27/15 28/10 28/25 29/14 30/18
audiotapes [1] 42/17
August [6] 72/13 108/23 109/6 109/24 110/9 128/8
August 12 [1] 128/8
August 14 [3] 108/23 109/6 110/9
August 20 [1] 109/24
August 3 [1] 72/13
authorities [1] 152/16
authority [2] 152/15 153/15
Authorized [1] 151/23
automatic [1] 60/7
available [5] 5/22 143/25 144/2 144/4 144/7
AVENUE [1] 2/4
avoidance [1] 12/20
aware [4] 25/20 29/9 30/11 30/23
away [6] 64/9 64/10 74/12 141/5 152/25 153/9
awoken [2] 117/20 117/21
axe [4] 64/8 64/13 64/15 119/17

B
back [47] 5/24 8/6 8/12 8/12 8/18 12/24 17/6 17/10 17/20 18/25 19/9 40/14 41/25 58/2 59/19 61/5 61/21 61/25 66/14 72/3 73/23 97/16 117/21 121/22 125/24 127/21 129/11 132/8 132/17 132/19 133/7 135/2 135/4 138/5 138/25 139/24 141/7 144/17 144/24 144/25 145/9 145/11 145/23 145/23 145/24 148/24 154/6
background [2] 29/4 98/14
backpack [3] 118/22 118/23 118/25
backpacks [1] 64/15
backwards [1] 121/6
bad [3] 9/5 52/6 53/3
badgering [5] 14/20 35/22 77/10 88/19 104/9
balance [2] 128/23 129/16
barely [1] 11/18
Barrister [1] 126/10
based [4] 16/22 84/21 130/13 149/12
basic [1] 139/7
basically [4] 10/2 53/5 152/13 153/7
basis [2] 132/4 149/16
be [108] 5/24 5/24 5/25 6/4 6/6 7/1 9/12 11/25 14/11 14/13 15/22 17/23 18/21 19/11 24/10 24/11 27/25 29/17 29/20 37/12 37/18 48/9 48/14 49/5 49/9 49/12 50/1 53/23 54/4 54/24 55/16 56/23 57/16 58/7 59/3 59/25 60/6 60/7 66/1 66/10 71/3 71/21 77/20 80/11 81/3 81/14 82/21 83/3 83/17 84/19 85/1 85/21 87/13 88/7 91/17 92/11 92/15 94/20 95/7 95/9 97/5 97/19 98/23 99/10 100/12 103/17 106/1 109/22 127/21 129/10 129/13 130/4 133/13 134/18 136/2 137/21 138/21 139/11 141/5 142/5 142/8 144/1 144/5 144/17 145/7 145/18 145/22 145/23 145/24 146/2 146/18 147/10 147/19 148/18 148/21 148/23 149/14 149/25 150/14 150/15 150/18 150/20 151/1 152/2 152/3 152/25 153/1 154/18
beat [2] 83/13 142/6
because [59] 6/7 8/25 9/5 9/10 12/19 13/4 14/22 16/19 18/3 18/6 32/18 35/5 38/5 39/24 40/4 45/19 45/23 49/7 49/8 52/7 53/15 55/8 57/11 57/14 59/22 64/18 68/22 70/22 71/25 72/9 75/21 84/25 85/21 87/18 88/10 88/23 94/4 96/18 112/11 112/16 115/2 115/12 118/4 121/8 122/13 124/17 127/3 131/1 136/25 139/8 140/6 145/1 145/14 146/6 148/6 152/14 153/22 154/13 154/20
become [1] 13/9
becoming [2] 56/16 90/20
bed [6] 28/3 32/15 35/9 40/9 41/14 117/21
been [45] 12/17 16/6 17/7 17/8 17/13 21/8 26/6 30/3 31/17 32/18 41/24 43/23 48/14 54/25 58/25 63/8 65/3 67/12 70/11 72/2 77/13 77/25 90/21 94/10 96/20 96/24 98/7 102/19 103/10 114/16 118/4 118/10 119/8 127/19 127/21 127/22 130/15 131/16 134/3 134/4 136/24 137/11 144/16 151/9 151/10
before [44] 9/7 17/3 29/16 31/1 32/15 42/2 47/14 54/12 54/20 56/4 56/5 56/8 56/8 58/15 62/1 62/15 62/21 67/20 76/20 77/13 79/4 83/4 83/12 83/18 86/10 86/15 89/3 89/24 95/15 97/25 99/16 112/19 112/21 113/4 124/3 130/16 132/3 132/11 132/19 140/17 144/21 147/21 149/18 149/25
beforehand [1] 31/21
began [1] 104/25
begin [1] 5/7
behalf [2] 144/22 146/5
behind [1] 93/14
being [37] 8/21 9/6 9/14 9/23 10/14 54/7 57/14 59/1 59/13 60/2 60/13 60/25 69/12 70/19 71/6 71/20 76/19 78/13 78/21 86/6 86/13 93/11 93/13 98/1 98/14 113/1 113/3 120/22 121/8 121/18 121/19 122/11 123/14 124/23 125/2 125/6 125/8
believe [51] 24/10 31/22 40/10 41/6 42/4 42/8 42/12 48/18 49/21 59/6 67/20 68/14 76/18 76/19 77/12 78/24 82/17 82/19 82/20 87/23 87/23 88/6 88/11 91/3 92/25 93/4 93/5 97/25 98/7 103/9 107/19 108/11 111/20 112/15 112/24 119/16 119/17 120/15 120/21 122/3 125/25 135/21 137/10 141/20 141/21 141/22 144/23 147/11 149/3 151/9 152/1
believed [19] 67/19 67/19 71/25 72/9 75/21 75/25 76/14 77/5 78/16 78/21 82/8 82/8 83/2 84/25 87/20 88/15 113/21 113/25 114/12
believes [1] 12/13
best [11] 31/22 49/2 59/10 67/10 76/23 77/3 93/4 98/24 101/15 105/22 106/14
better [3] 39/2 96/24 137/11
between [11] 17/4 20/6 23/14 26/21 31/15 31/21 63/16 91/4 106/5 117/10 117/23
beyond [1] 152/7
big [2] 39/20 77/14
bigger [1] 121/8
billing [11] 50/5 50/6 50/22 51/22 52/15 52/17 54/8 55/9 58/23 60/17 133/18
billings [3] 16/14 16/16 55/8
bills [3] 60/25 133/23 133/24
bit [16] 8/16 33/2 33/22 35/8 41/14 41/16 55/2 87/15 87/17 99/16 113/1 137/10 137/22 137/24 139/7 154/1
blindness [1] 139/25
blowing [1] 60/7
blows [1] 142/17
blue [2] 49/15 74/19
board [1] 72/17
body [1] 81/18
Borba [2] 119/14 152/12
Borba's [1] 119/11
boring [1] 13/10
boss's [1] 127/3
both [11] 38/16 38/16 38/21 38/21 52/2 54/18 54/20 56/16 57/23 57/24 151/11
bowl [5] 32/16 32/23 33/3 36/2 39/13
box [1] 75/6
brain [1] 139/17
break [16] 7/7 7/7 7/9 7/19 7/23 10/1 12/9 12/12 12/16 97/2 97/4 97/10 97/25 132/11



5-GottsSER-00890

B

break... [2] 132/14 132/16
breaks [1] 9/24
breathe [5] 107/25 108/1 108/7 108/20 110/11
brief [3] 56/19 80/11 132/16
briefly [5] 7/5 80/9 117/21 118/18 133/18
bring [6] 14/12 14/16 43/12 43/14 146/4 153/14
bringing [1] 132/7
broadly [1] 31/20
broken [1] 64/17
brought [2] 16/5 54/12
Brown [3] 144/7 144/11 144/12
Bryan [1] 3/17
bunch [1] 53/19
busy [1] 32/9
buttocks [1] 122/6
buy [2] 34/11 35/1

C

calendar [2] 144/16 144/18
CALIFORNIA [11] 1/2 1/15 1/23 2/5 2/10 2/15 2/19 3/5 3/9 5/1 127/21
call [16] 20/6 22/4 23/9 24/10 26/12 27/11 30/17 31/2 31/6 32/1 46/18 111/17 111/22 113/22 133/11 133/13
called [14] 12/11 24/1 24/4 24/8 24/8 24/13 24/23 29/17 41/8 111/13 111/21 113/20 144/5 154/18
caller [1] 111/20
calls [29] 9/20 25/22 26/7 31/12 32/3 39/19 62/24 66/13 81/20 82/10 82/11 83/7 83/23 85/17 86/17 86/25 88/1 92/2 96/5 112/4 112/11 112/15 113/24 114/17 115/4 116/5 116/7 129/7 134/9
calm [3] 12/17 70/19 92/12
calmly [3] 114/15 115/4 116/3
came [24] 26/25 36/2 42/24 45/9 45/19 48/15 51/23 55/15 56/20 58/11 63/3 116/13 121/7 126/3 135/16 135/20 135/25 136/13 136/23 137/3 137/6 141/3 141/11 144/21
camera [3] 119/22 119/23 119/24
camp [1] 25/21
camper [2] 30/8 130/9
campers [3] 43/8 120/6 130/2
campground [17] 23/2 24/21 25/6 25/17 31/7 31/10 32/2 42/24 43/21 44/4 44/7 44/17 44/24 45/6 45/16 46/16 49/15
camping [1] 141/8
campsite [18] 20/12 20/16 20/18 21/16 21/18 21/22 21/22 24/15 26/4 26/25 28/5 29/6 43/15 45/4 56/20 60/3 117/10 130/9
Campsite 65 [5] 20/16 21/18 21/22 28/5 43/15
Campsite 66 [2] 26/25 117/10
Campsite 67 [3] 20/18 21/16 21/22
can [99] 10/16 11/14 11/14 11/18 13/11 14/13 14/16 17/15 18/8 20/14 23/4 24/21 25/25 30/8 31/9 31/19 34/11 34/14 35/24 37/3 38/4 39/20 40/25 43/3 43/12 43/15 45/22 48/17 49/16 49/18 51/16 55/7 58/3 59/10 60/16 64/1 65/24 65/25 69/4 70/8 72/11 72/18 73/3 73/4 73/9 73/18 73/23 74/23 76/8 76/9 77/3 80/9 82/15 83/10 84/3 85/1 87/11 87/11 88/4 88/22 89/20 92/6 94/15 96/9 99/16 100/11 101/21 104/2 104/3 112/9 114/21 115/10 116/10 116/25 122/1 123/8 127/23 129/21 129/24 131/24 134/16 136/6 136/21 137/19 138/24 139/22 142/11 143/4 143/12 144/1 145/18 147/4 147/4 147/5 147/8 147/8 147/10 149/2 151/14
can't [17] 11/17 21/25 25/19 49/7 58/7 107/25 108/1 108/7 108/20 109/19 110/10 121/25 125/25 137/23 139/10 154/2 154/10
cannot [5] 11/17 11/18 55/9 61/4 90/8
Canyon [1] 141/7
captured [1] 57/6
car [1] 48/8
cards [1] 53/24
care [1] 13/5
carefully [2] 42/17 77/22
carefulness [1] 51/18
CARLSBAD [1] 3/9
carry [1] 14/14
CARTER [1] 1/4
carve [1] 84/7
carve-out [1] 84/7
case [14] 10/3 12/5 16/3 18/2 42/18 44/18 45/18 47/7 95/15 144/1 145/8 145/14 149/4 153/12
CATHERINE [1] 2/13
cause [8] 25/13 81/10 85/8 86/14 86/20 86/22 87/14 96/12
causes [1] 139/25
causing [1] 32/2
ccllp.law [2] 3/6 3/10
cell [4] 119/19 119/22 119/23 119/25
center [1] 133/24
CENTRAL [2] 1/2 2/4
certain [6] 49/7 57/10 122/1 130/4 131/13 131/16
certainly [3] 25/20 151/15 154/9
CERTIFICATE [1] 155/2
CERTIFIED [1] 1/5
certify [2] 11/15 156/2
cetera [1] 52/1
CHAD [4] 3/2 3/16 112/21 153/11
challenge [3] 53/12 60/12 60/13
challenging [1] 138/11
chance [2] 70/22 141/12
change [2] 40/6 40/7
charge [2] 71/4 152/24
check [6] 47/1 47/5 130/16 134/9 136/17 136/24
check-in [1] 134/9
checked [1] 102/19
checking [1] 134/8
chest [1] 121/22
children [1] 147/8
choice [1] 12/7
choked [3] 122/4 125/2 125/8
chokehold [7] 121/12 121/24 122/9 122/21 123/6 124/23 142/20
choking [2] 122/2 125/1
choose [2] 19/2 97/3
chosen [2] 12/24 15/1
CHRISTIE [1] 3/7
circle [1] 93/7
circled [2] 75/7 93/13
circles [1] 90/19
Circuit [6] 8/2 8/20 9/14 11/13 152/15 153/15
cited [1] 152/21
citizen [1] 84/19
city [4] 3/4 45/10 152/16 152/20
civil [5] 72/1 72/10 75/22 78/22 87/21
civilian [2] 82/18 95/24
civilly [1] 11/21
claim [9] 57/25 66/5 108/22 108/22 111/15 120/13 125/19 150/8 152/25
claimed [7] 66/20 95/15 107/24 108/19 110/9 120/8 131/6
claiming [2] 109/24 117/9
claims [1] 51/21
clarification [7] 7/11 12/3 13/19 138/19 146/12 151/18 152/18
clarity [1] 78/12
Clark [2] 146/15 148/20
clear [16] 7/1 7/2 12/24 13/15 13/16 13/16 13/17 15/22 16/8 58/20 60/14 61/12 70/19 78/7 126/2 148/23
clearly [3] 10/12 15/3 40/21
clerk [1] 5/6
client [23] 5/13 6/22 7/21 9/16 9/23 10/5 10/6 11/5 11/8 11/20 12/14 12/17 12/19 13/3 14/8 14/8 14/23 15/17 15/20 18/10 53/12 56/14 152/9
client's [5] 9/21 11/19 46/19 53/6 56/5
clients [2] 6/23 59/11
clip [1] 23/10
close [2] 21/16 21/22
clothes [1] 42/11
cnaltsas [1] 2/16
coat [5] 65/1 65/6 65/8 65/14 65/23
Code [1] 156/3
cognitive [2] 10/9 139/6
cognitively [2] 10/11 10/13
collateral [2] 5/14 9/17
COLLINS [4] 3/3 3/3 3/7 3/7
colloquy [1] 104/11
combative [3] 13/1 13/4 18/9
combativeness [1] 18/7
combination [1] 153/23
come [18] 11/2 28/13 32/17 73/16 73/17 93/24 105/11 111/18 116/20 132/17 139/9 144/24 145/9 145/15 150/3 153/18 153/19 154/7
comes [4] 9/7 16/15 55/19 148/24
comfortable [1] 96/25
coming [9] 5/24 62/9 95/23 114/5 136/15 142/17 145/16 146/25 148/7
command [1] 63/15
commands [3] 63/14 141/14 142/4
comment [4] 13/7 34/3 35/16 124/15
commentary [1] 50/16
communicate [6] 71/12 100/7 100/17 100/25 101/4 102/15
communicated [2] 101/8 105/20
communicating [1] 102/18
communication [1] 103/18
company [2] 105/2 105/4
compassion [1] 10/23
compensation [2] 12/6 127/11
compile [1] 44/11
complaints [1] 7/14
Complete [1] 96/15
complied [3] 136/17 137/4 137/8
complies [6] 37/19 37/25 38/11 73/12 74/13 75/14
comply [4] 89/24 141/13 142/4 146/9
computer [2] 44/20 46/1
concern [8] 9/7 103/16 104/19 146/7 146/8 148/15 148/16 150/7
concerned [7] 12/7 51/19 68/22 103/20 144/2 146/25 147/13
concerning [5] 39/21 55/11 56/25 147/3 150/15
concerns [4] 68/21 69/25 70/1 102/21
conclude [1] 6/8
concluded [1] 61/18
conclusion [7] 81/20 82/12 83/24 85/17 86/18 86/25 88/2
concussion [1] 139/23
condition [3] 17/21 79/20 139/17
conditions [3] 79/22 80/8 89/25
conduct [5] 12/8 12/25 17/15 52/7 53/4
conducted [1] 66/21
confer [1] 52/18
conference [3] 15/15 129/2 156/7
confirmed [1] 66/4
conflict [1] 106/5
conformance [1] 156/6
confront [1] 53/16
confrontation [3] 13/9 92/11 92/16
confrontations [1] 12/23
confusing [1] 36/14
consequences [2] 79/5 79/9
consideration [3] 63/22 152/22 152/23
considered [2] 70/1 108/15
considering [1] 104/21
Constitution [1] 81/3
constitutional [6] 76/2 76/15 77/5 78/17 78/25 81/17
consultation [1] 127/18
consultations [1] 128/17
consumptive [4] 80/10 88/20 89/15 90/19
contact [6] 20/24 28/19 62/1 62/16 62/21 134/10
contain [1] 80/13
contained [1] 90/4
contains [1] 58/24
context [3] 74/20 99/17 105/22
continue [7] 7/13 8/4 8/8 8/16 20/1 97/18 97/21
continued [5] 13/2 18/5 18/10 19/16 53/20
continues [2] 22/4 30/16



5-GottsSER-00891

C
continuing [3] 19/19 51/25 97/24
continuity [1] 146/6
continuous [1] 144/17
control [4] 13/11 122/23 122/24 151/24
controlling [1] 122/13
controverted [2] 153/6 153/7
convenient [2] 133/12 133/14
conversation [3] 63/6 75/23 144/22
conversations [1] 96/22
conviction [4] 59/24 79/4 79/5 134/2
cooperation [1] 146/2
coordination [1] 140/5
cops [5] 32/24 63/3 88/10 116/13 152/11
copy [3] 74/11 74/14 99/4
corporal [1] 88/11
Corps [2] 139/24 140/7
correct [133] 20/2 20/16 20/19 23/9 28/21 31/6 33/1 33/11 34/18 40/13 42/6 42/7 43/8 43/17 44/5 45/10 45/14 50/23 51/4 51/5 59/6 66/18 66/19 66/23 69/13 69/21 72/1 72/10 75/22 79/2 80/24 81/12 84/12 87/10 89/13 89/25 90/1 91/2 93/2 96/14 98/2 100/1 100/18 101/1 101/5 101/14 102/12 102/17 103/1 103/5 103/13 104/25 105/3 107/6 107/7 107/8 107/14 108/23 110/14 111/15 111/18 112/5 112/16 112/17 112/19 112/25 113/22 113/25 114/1 114/6 114/9 114/10 114/13 115/6 115/21 116/6 116/16 116/20 117/11 117/13 117/24 118/14 118/21 119/9 119/12 119/21 120/11 120/12 121/1 121/2 121/10 121/13 121/17 121/22 122/13 123/6 123/12 123/14 123/16 123/17 123/18 124/4 124/13 124/14 124/16 124/25 125/6 125/20 126/3 126/9 126/12 126/13 126/15 126/18 126/22 126/23 127/4 127/13 127/15 128/18 128/23 129/19 130/10 130/14 130/15 130/18 130/25 131/8 131/19 134/1 139/10 139/15 156/4
correctly [3] 68/15 84/20 129/10
Costco [2] 17/18 17/19
costs [1] 11/19
could [42] 12/5 12/5 12/8 13/4 14/25 18/10 21/16 27/6 31/7 42/10 44/17 44/24 48/11 48/13 48/14 52/16 52/23 54/20 55/10 55/16 63/6 65/3 70/11 71/12 73/1 82/6 83/4 83/18 85/21 86/10 86/15 88/7 88/24 88/25 88/25 96/10 96/23 99/3 111/21 116/19 129/10 134/20
couldn't [3] 24/24 91/16 96/21
councilmen [1] 145/4
counsel [79] 2/1 3/1 5/17 5/19 6/13 7/4 7/13 8/6 8/11 9/11 12/13 14/12 14/16 15/7 15/13 15/19 16/2 16/10 17/14 19/7 19/10 19/16 34/3 36/14 38/15 39/9 40/25 42/5 44/15 45/19 50/16 51/12 54/18 57/6 57/21 58/8 61/22 65/16 65/24 67/5 73/16 73/17 75/13 77/21 78/1 78/8 80/7 81/23 86/20 87/5 90/3 90/21 97/2 97/11 97/17 97/18 100/12 104/15 105/18 106/10 106/24 110/23 111/5 112/2 123/25 132/9 132/23 133/7 133/10 138/15 138/20 143/7 143/16 143/20 144/22 149/23 150/5 151/11 154/12
counsel's [1] 16/22
counseled [1] 58/14
counseling [5] 12/16 14/16 16/14 16/17 60/19
counted [2] 67/1 67/9
counter [6] 22/5 25/1 26/12 27/12 27/12 28/8
COUNTRY [2] 2/9 2/18
COUNTY [6] 1/9 2/7 3/15 3/16 16/1 151/22
couple [8] 5/10 7/20 15/1 111/10 111/11 114/11 127/22 141/7
court [67] 1/1 1/21 1/21 5/12 7/6 7/11 7/15 9/25 10/5 11/1 11/2 12/3 12/22 12/23 13/2 13/3 13/13 13/14 13/18 13/19 13/23 14/1 14/4 14/11 14/15 14/20 16/2 16/9 17/25 18/4 18/5 18/11 18/11 19/5 48/13 48/16 51/23 52/19 53/13 55/1 55/7 58/18 59/10 59/15 60/1 60/16 61/19 74/11 88/2 97/14 113/7 117/15 133/1 134/12 138/19 145/13 146/10 146/12 146/14 147/25 148/1 149/15 151/18 152/18 153/9 153/15 153/16
Court's [5] 12/25 16/7 146/9 149/4 149/12
courtesy [3] 9/6 19/8 97/20
courtroom [9] 6/25 8/5 8/14 10/24 10/25 19/4 105/11 132/20 143/17
CourtSmart [5] 154/3 154/8 154/13 154/19 154/22
cover [1] 133/19
coverage [1] 110/19
covered [3] 80/7 133/23 137/17
credit [1] 53/24
Crest [1] 48/25
cries [1] 149/5
crime [2] 86/15 88/9
cross [16] 4/3 5/13 7/7 7/14 7/17 9/23 9/25 11/2 12/12 19/16 19/18 97/21 97/23 111/5 111/6 139/4
cross-exam [1] 11/2
cross-examination [13] 5/13 7/7 7/14 7/17 9/25 12/12 19/16 19/18 97/21 97/23 111/5 111/6 139/4
cross-examined [1] 9/23
CSR [1] 1/20
cswiss [1] 3/10
cuffs [1] 30/21
current [1] 10/8
currently [2] 10/12 125/1
cursing [1] 24/1
custody [1] 82/7
cut [3] 39/10 44/13 57/2
cyst [1] 139/24

D
damages [7] 11/12 11/18 55/16 57/1 57/3 60/25 127/7
dares [1] 11/11
date [8] 6/1 45/13 46/2 53/21 119/25 120/2 125/25 156/9
dated [1] 36/11
daughters [1] 127/4
DAVID [1] 1/4
day [18] 1/8 6/5 7/15 36/10 49/6 81/9 84/25 85/6 88/14 142/5 144/19 144/20 144/20 145/3 145/5 145/10 145/19 151/13
day 9 [1] 36/10
days [4] 79/4 111/11 141/7 144/17
ddparker.com [1] 1/24
de [4] 71/4 92/13 102/22 147/17
de minimis [1] 147/17
de-escalation [3] 71/4 92/13 102/22
deal [2] 55/1 55/3
dealing [2] 20/21 84/8
Deb [1] 154/10
debate [1] 96/19
DEBORAH [3] 1/20 156/12 156/12
December [1] 36/11
December 16 [1] 36/11
decent [1] 140/18
decide [1] 153/21
decided [2] 70/16 70/21
deciding [1] 14/10
decision [2] 148/25 149/14
declare [2] 11/14 54/17
declared [1] 14/25
declaring [1] 14/22
declined [1] 68/12
decrease [2] 70/22 70/24
deep [3] 41/16 41/17 118/5
deescalate [1] 135/18
defend [1] 142/17
defendant [3] 3/2 5/8 52/5
defendants [6] 1/10 2/7 3/15 3/16 3/17 153/17
defense [9] 5/14 5/20 6/23 8/25 9/17 53/10 54/24 57/16 151/17
Definitely [1] 111/16
degree [1] 153/24
delivered [1] 58/20
denied [1] 132/6
department [7] 16/1 20/21 21/17 21/24 118/1 134/8 151/22
departmental [1] 152/22
depending [1] 144/18
deployed [1] 30/3
deployment [1] 30/6
deposition [2] 109/6 109/15
deprived [1] 10/6
depriving [1] 14/7
deputies [45] 62/3 62/17 62/22 63/11 64/5 64/13 65/2 65/5 65/13 65/19 65/21 65/25 66/6 66/9 68/12 68/19 68/23 77/4 78/15 82/24 91/25 94/6 100/17 100/25 101/2 102/15 103/17 104/19 105/6 105/9 105/15 105/21 107/5 112/14 112/18 114/2 114/5 115/19 116/18 116/19 117/25 122/12 122/20 126/2 126/3
deputies' [6] 66/1 76/3 76/16 77/6 78/18 85/25
deputy [67] 3/15 3/16 6/20 21/12 47/4 93/1 93/21 93/25 94/19 95/6 98/5 98/12 98/15 99/24 100/15 100/23 101/9 101/9 102/9 102/18 102/25 103/2 103/4 104/17 104/24 105/3 105/4 105/10 105/11 105/21 106/12 112/21 113/24 114/12 115/2 116/3 119/11 119/14 120/10 120/13 120/18 120/25 121/9 121/10 121/16 121/21 121/21 122/9 122/14 122/16 125/11 125/15 126/3 126/5 136/1 143/19 143/19 143/22 144/7 144/8 144/12 144/12 144/22 146/5 148/22 149/7 149/9
Deputy Borba [1] 119/14
Deputy Borba's [1] 119/11
Deputy Brown [2] 144/7 144/12
Deputy Chad Renegar [1] 112/21
Deputy Gotts [3] 126/5 143/19 149/9
Deputy Joe Gonzalez [1] 105/11
Deputy Joel Gonzalez [1] 105/3
Deputy Pahel [12] 98/15 99/24 100/15 100/23 101/9 102/9 102/25 103/2 103/4 104/17 105/21 106/12
Deputy Pahel's [2] 98/5 98/12
Deputy Renegar [33] 6/20 93/1 93/21 93/25 94/19 95/6 101/9 104/24 105/4 105/10 113/24 114/12 115/2 116/3 120/10 120/13 120/18 120/25 121/10 121/16 121/21 122/9 122/14 122/16 126/3 136/1 143/19 144/8 144/12 144/22 146/5 148/22 149/7
Deputy Renegar's [2] 21/12 47/4
Deputy Reneger's [1] 121/21
described [1] 142/7
description [1] 128/25
designated [1] 34/12
destitute [1] 49/2
detail [2] 46/18 130/9
detain [1] 150/2
detained [3] 70/20 71/6 76/19
detaining [2] 107/19 141/23
detention [3] 84/16 149/25 150/2
determine [1] 90/4
detract [1] 150/23
dialed [1] 24/14
did [123] 16/16 22/15 22/17 22/21 22/21 24/4 24/17 25/5 25/7 25/10 25/12 25/13 25/15 26/20 26/24 27/22 28/4 28/14 28/15 28/17 29/8 31/1 32/20 40/5 41/2 41/11 42/20 46/2 48/6 52/18 54/9 58/10 58/18 65/7 65/14 65/21 66/5 66/8 67/9 67/16 67/24 68/1 68/6 68/8 68/19 69/19 69/22 70/10 70/13 74/1 78/21 79/14 81/12 81/13 81/25 82/2 82/17 84/23 85/13 85/14 89/21 90/16 91/11 91/19 91/24


5-GottsSER-00892

D
did... [58] 93/22 93/24 93/25 93/25 94/2 99/23 102/3 102/5 103/16 104/18 110/19 112/20 112/23 114/2 114/9 114/14 117/22 118/23 119/19 119/25 120/2 120/5 120/14 121/3 121/5 122/23 125/8 125/12 125/16 125/22 133/5 133/21 134/24 135/1 135/17 135/20 136/9 136/10 136/11 136/12 137/5 138/7 138/11 139/4 140/2 140/4 140/4 140/8 141/1 141/12 142/2 142/5 142/23 142/25 148/3 149/7 149/9 150/3
didn't [51] 13/5 24/10 26/3 32/18 36/1 40/4 44/11 45/23 47/25 49/2 49/3 49/11 52/15 53/2 53/15 65/7 65/22 68/24 71/19 71/24 72/8 75/21 82/20 88/8 88/18 89/7 91/25 94/5 101/6 101/10 102/24 112/4 112/11 112/15 112/16 112/18 113/24 118/2 118/9 120/15 121/3 122/16 125/17 133/19 136/2 137/13 137/14 138/22 143/1 146/21 147/2
difference [1] 77/14
different [10] 10/22 33/16 33/17 48/3 51/23 71/22 91/17 124/18 131/16 131/17
differently [1] 117/3
difficult [1] 52/1
difficulty [5] 10/20 17/15 17/20 138/11 150/6
dig [1] 118/17
digging [1] 118/20
digital [3] 119/22 119/23 119/24
direct [5] 4/3 9/24 51/24 56/5 72/23
directed [2] 66/9 103/5
directions [1] 91/24
directive [4] 95/21 96/3 102/16 104/18
disagree [1] 85/11
disagreements [1] 31/21
discuss [2] 96/19 97/9
discussed [1] 44/19
discussion [2] 41/7 61/18
dismissed [1] 153/17
disobeying [3] 14/11 95/21 96/3
disorder [3] 51/4 51/8 51/21
dispatcher [1] 46/20
dispersed [1] 141/8
displayed [9] 43/19 46/6 46/9 50/18 64/3 80/17 127/25 135/8 142/12
displeasure [2] 24/4 24/22
dispute [5] 21/15 21/21 21/25 111/14 111/23
disregard [2] 148/19 150/25
distinction [1] 86/2
distort [2] 34/17 34/25
distress [18] 11/12 11/18 15/16 16/14 16/25 17/4 51/20 52/2 53/23 54/4 54/22 55/20 57/3 57/22 61/1 61/6 127/6 127/8
DISTRICT [3] 1/1 1/2 1/21
DIVISION [1] 1/3
dizziness [2] 139/10 139/11
DMV [1] 46/13
do [128] 7/15 7/16 9/20 10/17 10/19 11/5 11/22 12/22 13/12 13/14 15/3 15/22 16/24 17/1 17/25 19/24 21/15 21/21 22/9 22/11 23/25 24/2 26/17 26/19 26/20 27/17 27/19 28/2 28/12 29/2 30/20 33/7 35/1 36/5 37/2 37/3 38/8 46/8 46/12 46/25 47/1 47/8 47/9 48/19 48/24 48/25 55/9 55/19 57/22 59/10 60/18 61/8 62/6 62/9 64/1 67/4 67/17 68/11 68/20 68/23 69/2 69/3 69/22 70/4 70/16 70/21 71/19 72/6 72/7 72/20 76/12 76/23 77/2 78/5 82/24 83/4 83/11 83/19 84/8 85/11 86/2 86/3 86/5 86/7 87/22 88/8 88/24 90/12 91/9 92/3 93/10 93/17 93/19 95/11 95/19 95/24 98/10 102/17 104/5 104/12 105/7 105/22 106/12 108/6 108/9 111/20 111/25 114/24 117/3 118/2 122/17 124/23 128/2 128/5 128/9 128/12 128/15 128/20 129/3 129/4 129/17 132/11 132/14 145/19 149/12 149/19 154/3 154/5
DOC [1] 1/8
doctor [1] 103/2
document [11] 36/8 38/18 54/23 57/1 57/4 57/7 57/17 57/19 81/16 86/25 147/25
Document 679 [1] 147/25
document first [1] 38/18
documents [4] 48/16 57/12 59/1 127/20
does [18] 10/18 39/1 41/11 55/22 60/3 75/18 75/19 83/16 84/5 87/23 91/6 110/5 110/6 110/7 110/8 120/18 120/25 154/6
doesn't [18] 14/9 26/3 33/21 34/17 34/25 44/8 44/9 58/3 58/5 82/12 84/6 84/7 85/1 95/20 127/9 139/9 144/23 150/19
doing [13] 19/21 28/1 32/9 39/12 49/2 49/13 49/13 56/7 61/11 69/23 93/4 136/16 136/24
domestic [8] 19/22 23/14 24/14 32/1 63/16 111/14 111/23 118/2
don't [49] 11/20 13/14 15/11 16/18 17/2 17/18 17/23 19/25 40/20 43/5 45/1 45/4 47/10 55/15 57/2 57/18 57/19 58/18 60/6 60/18 71/21 73/16 80/15 81/22 84/20 86/19 88/10 89/1 93/14 97/3 97/11 107/18 109/3 109/12 113/2 114/2 114/23 118/7 138/1 141/19 141/20 143/12 143/19 145/5 145/14 145/19 150/17 151/12 153/24
done [27] 18/18 37/13 37/15 38/1 38/23 45/1 54/16 56/9 58/21 62/2 62/17 62/21 63/10 63/18 73/10 73/13 75/16 92/13 93/23 112/16 114/5 114/22 115/13 116/14 124/19 133/24 147/21
door [10] 15/23 16/25 17/24 52/9 52/25 53/1 53/2 56/15 58/1 58/5
doors [3] 11/7 11/11 54/11
dots [1] 74/19
down [64] 12/17 29/3 29/5 29/10 37/21 45/25 46/10 56/3 57/8 65/20 66/24 67/7 68/6 68/9 68/12 68/19 68/24 69/12 71/19 71/25 72/9 73/18 74/2 76/11 76/15 83/19 86/14 86/16 88/18 90/5 92/12 92/20 94/2 98/1 107/10 107/13 107/22 109/11 109/23 114/24 115/11 117/16 120/16 120/21 121/6 121/19 124/21 130/17 130/17 135/17 136/1 136/11 138/20 138/23 138/24 141/3 141/11 142/6 142/10 142/14 142/23 143/10 144/10 150/10
Dr. [6] 127/17 128/4 128/18 129/14 133/18 133/20
Dr. Raiszadeh [5] 127/17 128/4 128/18 129/14 133/20
Dr. Raiszadeh's [1] 133/18
draft [1] 149/20
drama [1] 145/5
draw [2] 55/19 109/12
drawn [6] 75/5 115/22 135/17 135/20 136/15 141/11
dressed [2] 28/13 118/15
drew [1] 74/19
drift [1] 50/15
DRIVE [1] 3/4
driver's [10] 43/23 44/6 45/11 45/24 45/25 47/12 47/18 48/8 130/13 130/21
drowsy [2] 40/8 41/4
drug [1] 41/8
Drummond [2] 152/16 152/20
due [6] 10/4 14/8 39/15 40/5 128/23 129/16
dump [1] 118/23
dumped [2] 118/22 118/25
during [25] 7/7 7/19 19/21 22/12 39/15 40/1 41/18 66/21 69/16 75/23 81/5 85/4 94/9 94/17 102/24 107/24 108/19 110/9 114/13 114/15 115/3 115/3 123/8 151/11 151/17

E
each [8] 9/5 17/24 18/1 34/12 57/5 57/24 122/3 131/17
earlier [3] 21/18 24/3 41/6
early [3] 125/25 145/18 145/23
earned [1] 126/7
earning [1] 126/17
earnings [1] 127/9
easier [1] 75/2
easily [1] 55/7
easy [2] 42/13 122/4
eat [1] 140/22
eating [1] 35/6
ECD [1] 151/23
effect [8] 16/11 41/11 58/19 59/7 59/22 60/8 61/14 94/1
effective [1] 152/2
effects [3] 39/25 41/18 41/21
effort [2] 54/17 69/24
either [2] 15/3 144/9
elected [1] 17/12
elective [1] 55/12
else [11] 24/21 25/16 25/20 26/6 27/3 28/5 29/9 29/11 30/23 37/18 118/8
emotional [19] 11/12 11/18 15/16 16/14 16/21 16/25 17/4 51/19 52/2 53/23 54/4 54/21 55/20 57/3 57/22 60/25 61/6 127/6 127/8
empathy [1] 10/23
employed [1] 17/19
employment [1] 147/17
encounter [23] 19/21 19/23 20/7 20/7 20/8 21/5 23/14 23/15 39/15 40/1 41/22 63/11 63/16 63/17 69/17 76/1 86/6 112/25 114/4 114/13 114/15 116/4 120/8
encountered [3] 65/5 65/13 65/19
encounters [1] 26/21
end [6] 7/15 30/16 57/24 101/23 114/24 145/15
ending [1] 37/14
ends [6] 22/6 23/11 25/2 28/23 51/20 58/11
enforcement [25] 19/22 26/5 26/22 28/19 29/2 29/6 29/10 30/3 30/6 41/22 42/13 42/20 62/2 62/16 69/24 81/9 84/9 85/7 88/14 94/1 95/21 106/15 111/13 111/15 111/17
enjoyed [1] 49/12
enough [8] 11/15 19/11 21/16 21/22 36/1 40/5 91/8 120/16
entered [1] 55/23
enters [3] 6/25 8/14 19/4
entire [3] 66/21 145/3 145/5
entirety [3] 52/20 52/20 52/21
entitled [8] 8/20 10/19 11/4 38/18 61/2 152/14 153/14 156/5
entry [2] 50/25 128/9
erratic [1] 69/7
error [3] 54/10 54/22 54/24
escalation [3] 71/4 92/13 102/22
essence [1] 147/15
established [2] 116/2 152/15
estimate [1] 67/10
et [3] 1/9 2/7 52/1
et cetera [1] 52/1
even [27] 10/1 18/5 25/2 31/5 31/7 42/20 42/20 44/21 44/21 48/6 56/5 68/8 74/18 75/5 89/3 90/15 94/19 95/6 111/17 115/11 116/13 118/5 138/1 141/12 142/16 142/23 147/8
evening [6] 6/14 8/24 9/6 19/1 145/25 151/12
event [4] 9/1 10/3 104/24 137/3
events [2] 16/15 40/21
ever [1] 94/12
every [7] 49/14 52/7 52/11 52/13 54/16 63/14 63/15
everybody [3] 6/14 87/23 120/23
everyone [2] 10/24 10/24
everything [9] 28/2 42/11 63/13 66/5 69/20 69/22 74/21 84/24 93/3


5-GottsSER-00893

E

everything's [1] 89/11
evidence [31] 6/5 16/7 16/21 17/17 20/13 22/5 43/11 46/8 46/24 47/5 49/19 49/24 50/4 50/7 50/21 55/15 57/14 64/2 76/5 79/16 84/13 98/7 98/24 105/14 116/22 127/24 145/16 148/11 152/9 153/13 153/18
exact [2] 56/6 125/25
exactly [6] 38/10 69/23 70/13 94/16 105/8 122/1
exam [1] 11/2
examination [18] 5/13 7/7 7/14 7/17 9/24 9/25 12/12 19/16 19/18 51/24 97/21 97/23 111/5 111/6 132/9 133/10 133/16 139/4
examined [1] 9/23
example [2] 5/15 56/17
except [1] 101/7
exception [1] 90/4
exceptions [1] 147/10
excessive [10] 45/18 85/22 147/14 148/22 149/1 149/1 150/8 152/23 152/24 153/22
exclude [4] 52/8 52/8 52/8 150/23
excluded [1] 53/23
excluding [1] 36/13
excuse [3] 55/24 103/2 106/22
exhibit [43] 20/7 20/13 21/11 22/4 23/10 25/1 26/12 27/11 28/8 43/7 43/19 46/5 46/6 46/7 46/9 47/15 49/18 50/3 50/13 50/18 50/20 52/11 56/3 59/2 59/15 63/25 64/2 64/3 64/20 79/18 80/1 80/12 80/17 98/6 127/24 127/25 129/24 130/3 130/3 130/4 132/2 135/8 142/12
Exhibit 100-11 [2] 64/2 64/20
Exhibit 101-3 [5] 23/10 25/1 26/12 27/11 28/8
Exhibit 102 [1] 21/11
Exhibit 102-4 [1] 98/6
Exhibit 222 [4] 79/18 80/1 80/12 132/2
Exhibit 228 [2] 20/7 22/4
Exhibit 24 [2] 127/24 130/3
Exhibit 26 [6] 49/18 50/3 50/13 50/20 52/11 59/2
Exhibit 35-1 [2] 46/5 46/7
Exhibit 45 [1] 47/15
Exhibit 54 [2] 43/7 129/24
Exhibit 76 [1] 20/13
exhibits [2] 54/12 56/2
exited [1] 118/10
exits [3] 8/5 132/20 143/17
expect [5] 6/6 84/19 84/21 142/2 142/5
experience [1] 59/4
expert [8] 39/19 129/10 129/14 133/20 146/16 147/4 147/4 147/8
experts [2] 147/8 147/10
explain [1] 138/18
explained [3] 82/6 115/20 118/15
explains [1] 125/21
Explorers [2] 29/18 29/20
express [1] 24/4
expressed [2] 24/22 42/12
expunged [2] 134/3 134/4
extensive [2] 53/14 140/22
extraneous [1] 80/15

F

face [14] 76/22 92/18 92/21 92/24 94/22 107/11 120/10 120/19 121/1 125/11 125/15 149/8 149/18 153/3
fact [11] 7/16 11/6 17/9 42/23 59/25 60/4 60/6 134/5 153/11 154/1 154/3
facts [1] 7/18
factual [2] 132/4 153/17
Fair [1] 47/16
fairly [1] 55/1
fairness [1] 57/17
faith [2] 52/6 53/3
fall [4] 41/15 119/1 121/5 121/6
falling [1] 33/23
family [1] 135/14
family-related [1] 135/14
far [7] 14/23 49/25 55/21 82/18 108/14 129/9 146/1
Farahmand [1] 3/14
farther [1] 141/5
fascinating [1] 18/3
fast [4] 89/1 89/11 120/16 140/13
fast-forward [1] 140/13
favor [3] 13/2 18/4 18/6
favorable [1] 18/9
fear [2] 69/6 69/7
February [1] 54/14
February 5 [1] 54/14
feel [15] 33/22 62/9 63/5 63/8 66/6 69/20 92/10 122/23 131/11 131/12 131/13 131/14 137/21 141/1 148/3
feeling [6] 39/21 39/25 40/8 41/18 41/21 71/8
feels [1] 89/10
fell [2] 107/10 121/6
felony [4] 79/3 134/2 134/3 135/11
felt [10] 31/23 31/25 32/4 93/20 96/20 96/24 108/3 108/5 113/1 113/3
few [11] 12/2 67/1 67/9 97/3 110/13 118/11 118/14 121/25 130/15 144/10 150/13
fight [5] 117/18 117/20 117/23 141/9 141/10
fighting [2] 20/24 141/2
figure [3] 87/15 101/7 109/14
file [1] 46/13
filled [1] 130/13
final [1] 61/12
finally [1] 13/7
find [2] 54/6 150/18
finding [1] 153/18
findings [2] 149/20 149/21
fine [6] 6/11 33/3 97/5 109/10 132/12 153/10
finish [7] 7/25 17/3 39/10 55/25 56/11 138/22 144/23
firearm [1] 134/21
firearms [2] 134/23 134/25
fired [2] 127/2 127/15
first [46] 7/7 7/19 12/4 23/14 26/21 27/23 36/3 36/23 38/4 38/18 41/25 50/25 54/16 56/20 58/13 59/24 62/8 63/10 63/16 76/1 106/8 108/24 109/14 109/16 109/17 109/25 111/12 112/15 112/25 114/4 114/13 114/23 115/3 115/18 116/12 116/18 118/4 120/13 120/18 120/24 128/9 135/25 144/11 148/6 149/13 151/21
first-rate [1] 54/16
fit [1] 64/25
fitness [1] 140/16
five [7] 10/22 35/10 41/15 79/4 129/25 130/1 132/18
five days [1] 79/4
five hours [1] 35/10
five-minute [1] 132/18
flashed [1] 72/16
flip [1] 122/4
floor [1] 42/5
Floyd [3] 110/14 110/20 110/23
focus [11] 43/25 44/22 64/19 67/23 68/16 95/2 96/1 99/18 148/21 150/5 150/10
follow [3] 13/24 111/10 150/9
followed [2] 116/12 150/24
following [14] 5/3 6/3 19/5 51/14 51/19 59/23 61/19 90/25 91/3 97/14 132/21 133/1 144/25 152/4
follows [1] 59/18
food [2] 35/11 42/11
force [18] 30/2 45/18 70/23 91/5 91/25 135/2 135/10 147/14 148/22 148/23 148/25 150/2 150/8 150/16 152/23 152/24 153/22 153/24
forced [1] 107/8
forcefully [1] 58/20
foregoing [1] 156/3
forget [1] 139/6
form [5] 5/13 34/13 79/17 142/16 148/22
formal [2] 134/6 134/7
format [1] 156/6
forward [1] 140/13
found [4] 28/16 28/18 40/20 63/6
foundation [9] 39/18 44/10 46/18 46/20 47/22 49/25 50/1 84/1 129/7
four [4] 129/25 130/1 130/5 131/7
Fourteenth [3] 81/2 82/1 83/3
Fourteenth Amendment [3] 81/2 82/1 83/3
fourth [10] 1/22 58/1 81/2 82/1 83/2 84/22 87/24 88/8 88/10 145/12
Fourth Amendment [4] 84/22 87/24 88/8 88/10
frame [2] 118/13 141/16
FRANK [1] 2/8
frankly [11] 12/18 13/9 13/10 14/14 15/24 55/2 59/21 81/21 147/16 147/18 151/3
fraud [1] 79/3
free [4] 49/16 81/3 81/14 82/21
frequent [1] 131/2
friction [1] 31/1
FRIDAY [3] 1/16 5/1 145/9
front [16] 10/2 13/12 13/13 16/21 27/25 44/20 50/6 50/9 52/14 52/21 54/1 56/18 60/17 60/24 80/19 128/2
frustrated [2] 87/17 139/8
Fuerbach [2] 21/1 21/25
Fuerbachs [1] 117/10
full [5] 36/2 125/17 144/19 144/20 144/20
fully [1] 40/21
further [4] 27/10 81/5 143/3 154/22
future [3] 17/11 57/25 96/21

G

gain [1] 140/4
gainfully [1] 17/19
gave [13] 7/9 7/23 9/5 12/16 46/15 47/6 48/17 62/22 63/11 63/19 74/12 89/6 138/8
generalized [3] 51/3 51/7 51/22
generally [1] 81/17
gentleman [1] 17/17
gentlemen [2] 10/16 115/12
George [3] 110/14 110/20 110/23
George Floyd [2] 110/14 110/20
get [118] 7/17 8/11 14/24 14/24 15/5 18/18 18/23 28/12 29/3 29/5 29/10 34/25 35/10 40/4 40/12 41/25 42/2 48/17 49/11 53/17 54/21 57/23 58/3 61/12 61/17 64/11 65/20 66/9 66/18 66/24 67/7 67/25 67/25 68/3 68/6 68/6 68/9 68/12 68/19 68/24 69/12 69/15 70/3 71/19 71/25 72/9 73/3 75/21 76/2 76/4 76/11 76/15 76/17 77/4 77/6 78/16 78/17 78/19 78/22 82/24 83/19 85/14 85/25 86/6 86/10 86/13 86/15 87/21 88/18 89/1 89/2 89/6 90/5 90/17 91/4 91/9 91/20 91/23 91/24 92/16 92/17 92/20 93/17 94/11 94/20 95/8 96/3 98/1 99/24 100/3 100/15 100/18 100/23 101/1 101/5 102/10 102/16 102/25 103/5 103/14 104/18 104/20 120/21 124/20 132/4 133/11 137/25 138/23 139/7 141/3 141/11 144/17 145/11 145/13 146/2 147/12 147/20 154/2
gets [7] 10/24 10/25 16/19 33/12 33/21 34/6 121/12
getting [29] 12/13 28/3 32/16 32/20 32/23 34/13 35/18 35/25 57/13 68/8 70/14 90/11 91/1 92/9 92/10 92/19 93/9 93/12 93/16 94/2 94/7 106/7 123/6 123/10 125/19 125/21 138/2 142/20 147/2
giant [1] 139/24
girl [12] 19/23 23/16 25/6 25/10 25/13 40/2 41/19 41/20 62/16 63/18 64/6 137/7
girlfriend [1] 20/25
give [15] 16/16 37/5 42/23 43/5 44/4 44/6 44/19 45/2 45/2 45/25 47/10 60/16 81/4 141/12 154/14
given [8] 10/14 53/13 53/22 61/7 71/18 134/22 141/17 149/4
gives [1] 16/16
giving [2] 61/4 91/23
GLENDALE [1] 2/5
gmail.com [1] 2/6
go [63] 6/15 7/8 8/12


5-GottsSER-00894

## G


go... [60] 8/20 11/12 11/21 11/22 18/7 19/2 22/15 28/3 32/15 34/14 38/4 38/7 40/9 43/15 44/20 48/24 49/7 49/8 49/14 49/16 50/20 55/6 56/9 56/13 57/22 58/23 59/18 61/5 72/3 74/1 76/21 79/12 82/12 88/23 89/3 97/10 103/19 110/23 121/14 121/20 127/6 127/9 129/16 132/19 133/12 133/14 134/2 135/2 135/21 138/5 140/9 141/2 141/7 141/21 143/4 143/12 145/22 149/5 151/19 154/13
goal [1] 49/5
goes [11] 8/12 12/24 55/21 66/12 70/25 82/14 89/17 116/11 118/13 127/5 141/16
going [124] 5/8 5/12 5/14 6/4 7/13 7/18 8/1 8/2 8/3 8/6 8/20 9/8 9/19 11/1 11/5 11/7 11/9 14/17 15/5 15/14 15/23 17/3 17/24 17/25 18/18 18/20 18/20 19/1 20/5 20/6 21/7 28/12 31/10 32/15 33/24 33/25 34/14 35/13 37/20 38/9 38/17 39/22 48/16 49/9 50/12 52/4 52/5 52/25 54/1 54/23 54/25 56/23 57/12 57/21 57/25 58/4 59/12 59/17 60/7 61/10 63/22 65/16 74/5 74/7 74/21 76/25 78/11 78/20 80/11 82/19 84/20 87/16 89/9 90/18 92/3 92/15 92/24 94/11 96/18 96/23 97/2 99/17 100/3 100/18 101/1 101/4 101/7 101/15 102/17 103/18 105/22 108/8 110/23 111/2 113/14 115/16 123/25 135/4 135/18 135/21 136/1 141/9 141/20 141/23 142/5 144/1 144/3 144/24 145/7 145/8 146/18 147/12 147/19 149/19 149/20 150/10 151/4 152/25 153/1 153/1 153/19 154/13 154/18 154/19
Gomez [27] 5/21 20/18 20/23 21/3 21/15 21/21 22/9 22/17 23/25 24/18 25/5 26/17 28/12 28/15 28/18 29/16 29/24 30/2 30/20 31/1 31/3 31/9 31/22 32/3 32/6 144/24 145/17
Gomez's [5] 20/6 22/4 23/9 26/12 27/11
gone [2] 54/20 80/10
Gonzales [2] 107/1 147/1
Gonzalez [7] 98/13 101/19 105/3 105/4 105/11 106/9 147/1
good [12] 7/18 19/15 33/22 63/5 88/15 90/5 94/20 95/8 111/8 111/9 115/13 132/24
got [38] 5/21 12/9 17/17 18/4 35/13 35/20 39/10 48/9 50/15 51/22 53/14 53/18 57/16 58/15 63/25 71/7 92/18 94/4 94/22 104/13 109/9 118/15 118/15 120/16 121/24 122/8 122/20 122/21 127/3 128/7 133/6 135/19 137/11 137/12 140/11 140/12 145/10 151/15
gotten [3] 48/11 146/1 146/1
Gotts [4] 3/15 126/5 143/19 149/9
Governor [1] 145/4
grab [2] 121/5 135/21
grabbed [1] 107/9
grabbing [1] 122/15
grant [2] 14/17 146/21
granted [3] 146/10 146/14 146/22
gravel [1] 107/11
groggy [1] 41/16
ground [115] 65/21 66/9 66/10 66/18 66/25 67/8 67/20 67/25 67/25 68/3 68/6 68/6 68/9 68/12 68/20 68/24 69/12 69/16 70/4 71/19 71/25 72/9 75/21 76/2 76/4 76/12 76/15 76/17 77/5 77/6 78/16 78/17 78/19 78/22 82/25 83/12 83/19 85/15 85/22 85/24 86/1 86/7 86/11 86/14 86/16 87/21 88/18 89/2 89/7 90/6 90/11 90/17 91/2 91/5 91/6 91/9 91/20 91/23 91/24 92/16 92/17 92/20 93/10 93/17 93/23 94/2 94/7 94/12 94/21 95/8 96/4 96/12 98/2 99/24 100/3 100/15 100/18 100/23 101/1 101/5 102/10 102/16 103/1 103/5 103/14 103/19 104/18 104/20 107/8 107/10 107/14 107/23 107/25 108/20 110/10 120/21 121/14 121/16 121/20 121/22 125/20 135/3 135/13 135/18 141/4 141/12 142/6 142/10 142/14 142/15 142/19 142/23 143/1 152/10 152/13
group [3] 29/20 126/22 127/2
growling [1] 108/3
grueling [1] 11/2
guarantee [4] 65/7 65/10 65/15 65/22
guard [1] 137/22
guess [4] 65/23 65/3 102/6 145/15
guessing [2] 100/12 127/19
guilty [1] 88/9
gun [2] 93/19 135/24
guns [11] 71/8 76/22 77/13 89/8 115/12 115/22 135/17 135/20 135/22 136/15 141/11
guys [2] 8/3 131/15
gym [1] 140/22


## H


had [101] 5/3 6/18 10/17 11/15 13/2 16/6 18/9 19/5 30/9 31/3 31/5 32/18 32/23 35/5 40/6 41/24 42/5 46/12 48/24 49/5 49/14 50/5 52/12 52/13 54/19 54/21 56/4 56/8 56/9 61/19 62/1 62/2 62/15 62/17 62/21 63/10 63/14 63/18 63/21 67/20 76/2 76/14 76/18 76/19 77/5 78/17 81/17 83/5 83/17 84/24 84/24 87/15 87/21 88/15 89/23 90/5 95/11 96/20 97/14 97/25 106/20 112/22 113/4 113/10 113/10 113/11 114/4 114/5 114/15 115/2 115/4 115/4 116/3 116/4 118/2 118/4 118/10 122/4 124/4 126/21 127/21 130/15 130/15 131/1 132/21 133/1 135/14 136/16 137/15 137/20 139/16 139/16 139/23 140/24 140/25 141/1 141/1 141/10 143/2 147/21 152/11
hadn't [3] 69/16 93/23 94/10
half [2] 9/10 93/6
halfway [1] 46/10
hallway [3] 7/21 51/12 60/1
hand [4] 73/4 99/3 138/1 138/2
handcuffed [1] 30/24
handcuffs [3] 63/7 82/7 88/25
handed [1] 121/4
handicap [1] 12/21
handicapped [2] 11/16 11/20
handicapping [1] 153/21
hands [2] 63/4 63/4
happened [11] 12/14 15/24 15/25 24/15 48/18 58/25 122/17 122/19 124/4 124/16 153/20
happening [6] 27/2 31/23 31/25 62/10 89/10 89/11
happy [1] 37/12
harassing [1] 112/24
hard [3] 51/23 57/4 151/10
HARRELL [16] 2/8 6/7 6/21 6/25 7/1 8/8 9/10 9/12 11/16 11/24 15/7 16/10 18/2 53/1 143/5 144/21
has [39] 10/6 10/9 10/11 10/17 10/20 10/22 11/1 12/19 13/9 14/8 14/23 16/2 16/20 30/3 43/25 44/22 50/1 52/19 52/19 53/13 53/23 54/25 59/15 67/22 68/16 71/19 77/25 88/7 95/2 96/1 98/7 105/11 122/9 134/3 151/25 152/9 152/9 153/16 153/19
hasn't [1] 90/21
hated [1] 140/20
have [183]
Haven [1] 47/16
haven't [5] 17/11 67/9 92/13 98/15 124/19
having [9] 20/24 56/7 66/10 77/13 92/22 125/11 125/15 137/23 137/25
he [77] 5/24 9/19 11/1 12/13 14/9 16/20 17/11 17/19 20/23 21/16 21/19 29/16 29/17 31/1 31/5 31/23 31/25 35/2 39/21 44/10 47/25 60/18 79/22 86/19 92/3 93/22 101/10 103/4 103/14 105/2 107/1 112/24 113/1 113/3 113/4 113/9 113/10 113/10 113/11 113/19 113/21 113/21 114/15 114/17 115/3 115/5 115/11 116/3 116/5 116/13 116/16 117/17 119/12 119/13 119/15 119/16 119/16 119/17 120/15 120/16 120/25 121/3 121/3 121/4 121/6 122/1 122/5 122/14 125/21 126/4 129/10 141/17 144/2 146/16 149/7 152/12 152/12
He'd [1] 100/12
He'll [2] 5/24 5/25
he's [25] 5/18 10/13 11/9 20/18 28/12 31/10 31/17 31/20 38/14 59/25 67/12 75/7 75/10 77/10 78/11 93/4 113/4 121/4 121/8 121/24 121/25 122/2 122/14 144/1 144/25
head [17] 40/6 40/7 89/1 94/4 107/9 120/17 123/6 123/11 123/14 124/12 125/6 125/13 125/18 125/19 139/25 149/10 151/7
headaches [3] 138/3 138/7 138/8
heads [1] 123/7
headshakes [1] 43/9
health [2] 140/16 140/24
hear [31] 9/7 13/5 15/3 15/18 20/23 21/4 22/9 23/25 25/5 25/10 26/17 27/17 28/12 28/15 29/2 29/4 30/20 52/4 52/5 53/10 98/24 99/23 108/2 108/2 108/3 117/9 117/12 120/20 122/1 122/3 123/8
heard [27] 15/13 21/16 21/23 21/25 22/1 27/20 27/24 28/4 30/2 32/8 32/13 32/25 35/19 35/20 39/4 39/24 41/20 58/16 58/17 95/16 95/25 98/14 100/4 108/5 108/7 117/18 119/11
hearing [3] 15/5 17/6 144/13
hearings [1] 145/3
hearsay [4] 134/14 139/20 147/4 147/6
heart [1] 11/8
heat [1] 148/7
held [6] 51/14 121/9 121/18 121/19 122/11 156/5
help [11] 40/13 66/6 69/20 69/24 95/17 95/18 95/19 99/3 137/12 148/14 151/7
helpful [1] 96/24
helping [3] 95/20 95/22 96/4
helps [2] 35/10 40/14
her [4] 15/17 15/19 53/16 154/7
here [37] 5/11 6/14 6/17 6/21 8/17 8/23 8/24 9/1 9/2 9/6 15/10 19/2 51/20 54/18 58/23 60/8 61/17 66/5 71/16 89/3 100/5 100/20 105/10 111/10 118/6 123/9 124/19 129/13 147/14 148/7 149/11 149/16 150/1 150/16 150/19 152/24 153/21
here's [5] 53/11 53/25 60/11 61/8 151/20
hereby [1] 156/2
herring [1] 147/13
hesitating [1] 142/3
hidden [1] 65/3
high [8] 33/12 33/21 34/6 34/13 34/25 40/12 49/9 139/11
High Sierras [1] 49/9
highly [1] 102/1
hiker [1] 140/18
hiking [1] 140/21
him [30] 9/17 10/7 10/14 11/10 24/1 28/16 28/18 30/21 36/22 36/24 36/25 39/21 73/2 73/3 73/20 100/4 101/3 106/2 106/4 106/6 109/3 113/25 114/23



5-GottsSER-00895

H
him... [7] 116/17 120/16 120/21 127/22 128/14 149/8 152/11
hint [1] 97/7
his [39] 9/18 10/7 10/8 10/9 10/10 10/15 10/18 11/8 11/8 12/17 12/20 17/6 20/25 28/13 31/2 31/6 31/7 31/23 36/23 36/25 38/14 63/13 65/11 65/17 71/16 73/6 82/12 82/13 84/2 85/18 89/16 104/18 107/2 113/2 121/7 121/22 141/17 146/6 152/13
hit [4] 49/8 94/4 107/9 107/11
hmm [1] 109/18
holding [5] 9/8 9/9 71/7 71/8 122/21
HOLLOWAY [19] 1/6 2/2 3/13 10/17 19/11 19/14 58/22 62/7 75/7 77/22 99/23 111/8 111/22 131/6 132/8 143/18 149/10 151/3 153/2
home [3] 6/15 19/2 45/6
homeless [10] 42/6 42/9 42/21 44/8 44/9 44/18 44/25 48/6 48/19 145/6
homelessness [5] 45/19 56/17 56/18 56/22 56/24
honest [6] 24/10 48/10 48/14 49/12 87/13 95/9
Honor [120] 5/9 5/23 6/6 6/10 6/16 7/3 7/5 7/22 8/9 8/19 15/9 16/13 22/23 29/22 33/14 34/19 35/2 35/15 36/5 36/9 37/1 38/13 42/25 43/11 44/10 45/17 46/17 49/23 50/3 50/6 50/8 51/9 52/6 53/11 54/8 55/24 56/1 58/6 59/7 60/11 61/23 62/5 62/24 65/9 66/12 67/3 67/11 68/25 70/6 70/25 72/18 76/6 77/18 79/15 79/21 79/24 80/1 81/20 82/10 83/7 83/20 83/23 84/17 85/16 85/17 86/17 86/24 88/1 89/14 90/18 90/23 91/13 92/3 94/13 95/12 97/5 97/22 98/5 98/16 99/11 99/22 101/22 101/25 103/7 104/9 105/24 106/22 108/13 110/16 110/21 111/24 113/12 115/7 116/7 118/12 119/4 123/23 127/5 127/10 129/6 129/22 130/6 131/3 131/21 131/25 132/4 132/10 132/24 133/3 133/6 135/5 143/6 143/8 146/8 149/2 151/4 151/14 153/6 154/5 154/9
HONORABLE [1] 1/4
hope [1] 10/23
hospital [2] 17/8 57/7
host [1] 82/11
hot [1] 64/18
hour [10] 9/10 12/11 12/11 41/13 97/12 133/12 143/4 143/13 151/15 151/17
hours [4] 10/21 35/10 41/15 151/12
house [1] 49/11
how [29] 20/20 21/4 26/8 38/3 46/19 55/2 55/2 55/21 57/2 59/11 62/9 63/8 65/10 66/24 67/7 87/24 91/11 113/24 115/8 131/14 131/15 140/13 145/14 146/1 146/8 146/18 148/9 148/10 154/3
However [1] 10/19
human [2] 136/14 141/12
hurried [1] 32/17

I
I'd [5] 11/25 23/10 49/4 149/18 154/16
I'll [19] 12/20 18/7 20/1 36/12 37/5 37/12 58/14 90/23 95/4 99/3 99/9 102/6 104/14 105/1 117/16 133/13 145/22 145/23 145/24
I'm [153] 7/13 8/1 8/3 8/20 10/7 10/19 11/4 11/5 11/6 11/7 11/9 11/20 12/15 14/6 14/16 14/17 14/22 15/5 17/3 18/17 18/20 18/20 19/2 20/3 21/3 33/24 33/25 34/13 34/14 35/13 35/13 37/14 37/20 38/5 39/21 40/8 41/16 41/16 43/4 43/8 47/4 48/6 48/9 48/14 50/12 51/18 51/19 52/4 52/5 53/5 55/2 57/10 57/12 57/23 58/3 59/12 59/17 60/9 60/13 61/4 61/10 65/16 71/6 74/5 74/7 74/20 75/9 76/18 76/22 76/25 78/20 82/18 82/18 87/15 87/16 87/16 87/17 89/2 92/12 92/12 93/3 93/4 93/13 93/14 93/14 93/15 94/2 94/7 99/22 100/4 101/4 101/15 102/19 102/21 105/6 105/22 106/7 106/7 106/7 106/14 106/21 108/8 108/14 109/10 109/14 109/21 111/2 113/14 113/17 115/16 118/17 120/9 120/20 121/8 121/18 121/19 121/19 122/16 122/24 123/25 124/19 124/19 125/1 127/19 135/25 137/23 137/25 138/2 138/3 138/4 139/11 140/18 141/8 141/22 141/22 142/8 142/22 142/22 144/1 144/13 145/2 145/2 145/8 145/12 145/13 147/12 147/13 149/19 150/18 151/4 152/25 153/14 154/17
I've [18] 11/15 13/21 15/1 17/5 35/5 61/3 61/6 72/2 74/6 74/23 75/5 87/14 87/15 108/3 109/9 151/9 151/10 152/21
idea [3] 31/3 63/21 114/5
identified [2] 74/6 116/19
identify [3] 24/22 30/9 99/9
II [1] 154/23
imaging [1] 133/24
IME [1] 17/1
immediate [4] 89/10 135/12 151/24 152/3
immediately [4] 33/23 35/9 36/2 123/13
imminent [1] 152/6
immunity [7] 146/10 146/15 146/21 146/22 146/23 148/3 153/16
impeach [1] 38/17
impeaching [1] 36/24
impeachment [4] 36/9 38/12 46/21 76/6
important [1] 67/2
improper [8] 32/4 34/20 36/9 46/21 76/6 77/19 83/24 102/1
inaccurate [1] 98/24
inappropriate [2] 14/18 150/6
incident [56] 9/22 10/18 11/10 16/1 17/22 27/1 31/11 40/12 40/16 41/8 41/12 41/19 42/2 42/6 45/13 47/6 47/13 47/17 47/19 47/20 48/4 48/20 53/19 55/17 58/2 59/20 60/1 60/10 62/9 66/21 72/4 79/4 85/13 96/12 102/24 111/21 112/25 115/3 115/3 118/3 119/20 119/25 120/3 123/8 123/13 124/12 134/5 134/24 135/16 137/16 137/20 138/5 138/6 139/5 139/13 140/25
included [3] 54/3 61/3 69/23
including [10] 20/9 26/13 27/13 28/9 29/13 37/12 68/3 98/9 118/21 129/13
income [1] 126/17
inconsistent [1] 38/13
incorrect [2] 44/21 46/2
increase [1] 70/14
independently [1] 107/2
indicate [1] 57/9
indicated [6] 5/21 118/20 119/11 125/5 148/2 152/7
indicating [1] 138/2
indication [1] 6/12
individual [1] 32/1
infection [1] 35/5
influence [2] 39/16 39/20
informal [1] 134/6
information [14] 10/10 10/20 12/14 45/2 45/25 46/18 46/19 56/7 60/16 80/15 89/18 100/8 113/7 117/15
informed [2] 63/13 151/11
ingestion [1] 35/11
inhale [1] 33/9
initial [1] 81/12
initialed [7] 79/22 79/23 80/21 82/5 83/17 85/12 86/23
initially [2] 106/2 121/20
injuries [3] 16/12 17/14 17/16
innocent [3] 82/18 87/16 95/24
inquired [1] 16/10
inquiry [1] 71/15
inside [11] 22/15 22/18 22/22 64/15 65/1 65/8 65/22 118/24 118/25 119/13 119/14
instance [1] 114/23
instead [3] 9/14 90/11 91/20
instruct [5] 10/16 83/18 88/2 147/6 150/24
instructed [3] 51/20 146/20 148/21
instruction [3] 53/14 53/22 152/21
instructions [5] 116/13 145/11 145/22 146/2 151/7
intended [2] 100/7 101/4
intending [3] 100/17 100/24 102/15
intent [1] 101/6
intentions [1] 141/10
interaction [1] 71/16
interchange [3] 7/18 31/15 31/18
interested [2] 13/8 80/15
interject [1] 17/3
internal [1] 21/10
interpret [2] 131/15 131/15
interpreted [1] 131/16
interrogated [2] 9/14 18/21
interrogatories [2] 149/5 151/6
interrupted [1] 7/16
interrupting [2] 75/10 101/25
interruptions [1] 8/21
interviewed [1] 98/15
intimidating [1] 13/18
introduce [1] 52/20
introduced [5] 17/8 52/11 52/14 59/18 60/5
introducing [1] 52/24
introduction [1] 16/9
intrusive [1] 152/1
investigate [2] 111/15 137/7
investigation [5] 83/12 95/24 96/23 114/25 137/12
invited [1] 145/4
involve [2] 60/3 95/20
involved [4] 32/1 77/14 88/7 111/22
involves [2] 6/19 60/2
involving [3] 60/1 66/1 145/3
irrelevant [9] 5/14 9/17 9/19 9/20 12/14 42/25 87/2 110/15 116/8
is [326]
isn't [5] 98/13 98/13 98/13 127/8 144/4
issue [15] 6/19 9/14 14/24 17/2 52/16 54/16 56/6 58/19 90/19 148/4 148/24 149/1 150/22 151/17 151/20
issues [15] 5/10 5/14 6/18 9/18 9/19 10/8 11/15 11/21 17/6 52/12 129/11 135/14 139/6 140/6 140/24
it [220]
It'd [1] 93/19
it's [74] 6/2 9/11 12/20 15/14 18/22 21/7 33/13 33/22 34/12 34/13 34/13 34/20 36/14 36/23 38/13 39/22 41/13 52/1 55/12 55/14 65/16 65/25 68/14 69/1 71/8 71/12 75/2 78/6 79/18 83/8 83/24 84/22 87/2 87/9 89/10 89/11 89/14 91/13 93/5 95/6 98/6 102/1 105/23 108/4 108/5 112/2 114/19 116/8 116/24 118/7 119/17 121/4 127/22 127/24 128/23 130/23 131/14 131/14 131/15 134/4 137/24 138/25 139/7 144/11 145/1 145/5 147/6 147/7 147/13 147/14 150/20 151/10 152/13 153/8
its [1] 147/20
itself [1] 15/23

J
jail [2] 48/13 79/13
Jameson [1] 3/15
January [2] 112/22 126/14
January 21 [1] 112/22
Jay [1] 49/15
JEREMY [5] 1/6 2/2 3/13 19/14 111/22
Jeremy Holloway [1] 111/22
job [4] 88/24 126/21 127/2 127/15
Joe [1] 105/11
Joel [1] 105/3


5-GottsSER-00896

J
joint [1] 6/23
Josh [1] 27/11
Josh Gomez's [1] 27/11
Joshua [7] 5/21 20/6 22/4 26/12 29/16 144/24 145/17
Joshua Gomez [4] 5/21 29/16 144/24 145/17
Joshua Gomez's [3] 20/6 22/4 26/12
judge [6] 1/4 12/24 14/14 38/23 58/1 151/1
Judicial [1] 156/7
July [12] 15/17 17/1 51/20 54/5 54/22 58/11 58/16 59/8 126/21 126/24 126/24 127/7
July 2018 [4] 17/1 58/16 126/24 127/7
July of [1] 54/5
jumped [1] 77/13
jumping [1] 96/11
juror [6] 8/7 8/12 8/15 8/17 8/17 133/5
jurors [2] 15/9 99/2
jury [47] 5/4 6/12 9/7 9/8 9/10 10/2 10/5 10/16 10/19 11/6 13/13 14/24 15/6 16/22 17/18 18/18 18/23 19/4 19/6 19/9 52/19 52/19 53/24 56/18 58/18 60/17 60/24 61/20 88/2 97/15 132/20 132/22 133/2 143/17 145/11 146/20 147/6 148/15 148/18 148/21 149/6 149/21 150/25 151/7 152/13 152/21 153/20
jury's [1] 148/25
just [111] 5/10 5/16 6/11 6/17 9/6 9/11 9/12 11/21 12/11 13/7 15/13 16/16 18/12 20/2 24/6 24/16 26/10 27/17 32/20 34/4 36/20 38/7 39/8 44/14 49/8 50/16 51/13 57/19 59/1 59/2 60/8 60/17 60/23 62/13 62/15 71/5 73/2 73/2 73/9 73/10 74/11 74/20 76/22 76/22 77/2 78/25 80/14 82/21 83/12 84/20 84/21 84/23 84/25 85/21 87/1 87/3 88/9 89/11 91/20 92/17 93/13 99/13 100/5 100/5 100/20 102/19 104/10 105/23 105/25 106/10 108/4 108/12 108/16 108/25 109/13 109/14 109/22 110/13 113/2 114/22 115/20 116/2 117/17 118/4 120/10 120/22 120/23 121/18 123/21 124/20 130/4 134/9 135/19 137/12 137/22 138/16 139/7 139/9 141/21 141/23 143/16 143/20 144/15 147/6 149/3 153/24 154/1 154/12 154/14 154/14 154/20

K
keep [3] 9/5 57/4 154/10
keeps [1] 9/19
kept [1] 93/9
key [1] 108/8
kicked [2] 123/11 142/20
kicks [1] 147/15
kill [1] 140/20
kind [9] 9/7 19/11 63/21 93/6 97/7 108/14 109/22 137/22 146/5
knee [2] 149/9 151/6
kneed [5] 123/6 123/11 123/14 125/6 125/21
kneeing [1] 124/12
knees [1] 123/7
knew [3] 112/11 113/17 118/9
knife [5] 65/8 118/16 118/16 135/21 135/23
knives [22] 64/1 64/8 64/12 64/15 64/19 64/22 64/25 65/22 69/16 84/24 118/21 119/1 119/7 119/9 119/12 119/12 119/12 119/14 119/16 134/13 134/17 142/25
know [71] 6/17 6/22 8/1 9/20 13/20 15/11 16/18 17/18 17/23 20/20 27/2 29/16 30/5 33/4 35/10 37/15 38/8 38/16 38/21 43/5 52/7 55/15 57/18 57/25 60/6 67/9 67/21 71/21 73/10 74/10 74/20 74/21 75/9 75/16 82/19 84/20 86/19 92/3 93/12 106/23 112/18 113/2 113/11 114/2 114/23 118/6 118/6 118/7 122/2 122/2 139/8 141/2 141/19 141/20 141/22 142/24 142/24 145/5 145/10 145/14 146/1 146/18 147/5 148/12 148/16 149/15 149/15 149/16 149/16 151/12 154/3
knowing [2] 140/6 140/24
knowledgeable [1] 60/2
known [1] 113/10
knows [1] 86/19

L
L.A [1] 145/23
lacks [8] 39/18 44/10 46/17 46/20 47/22 49/25 84/1 129/6
ladder [1] 139/12
Ladies [1] 10/16
lady [1] 73/4
laid [1] 146/3
landed [1] 147/16
language [2] 80/24 81/7
last [14] 6/13 8/24 9/6 30/15 59/12 87/9 111/11 115/12 127/17 127/20 130/3 130/4 142/22 145/18
lasted [1] 126/22
Lastly [1] 131/6
lasts [2] 41/15 89/9
late [5] 9/10 59/13 140/8 140/10 145/24
later [2] 11/7 33/24
latest [1] 143/15
law [30] 2/3 13/23 14/1 14/4 19/22 26/5 26/22 28/19 29/2 29/6 29/10 30/3 30/6 41/22 42/13 42/20 62/2 62/16 69/24 81/9 84/9 85/7 88/2 88/14 94/1 95/21 106/15 111/13 111/15 111/17
law enforcement [25] 19/22 26/5 26/22 28/19 29/2 29/6 29/10 30/3 30/6 41/22 42/13 42/20 62/2 62/16 69/24 81/9 84/9 85/7 88/14 94/1 95/21 106/15 111/13 111/15 111/17
lawsuit [2] 9/19 12/8
lawyer [1] 104/6
laying [1] 145/22
lead [1] 12/8
leading [5] 136/4 138/14 138/15 147/9 147/10
leaned [1] 64/17
learn [1] 59/5
learned [1] 114/8
Learning [1] 59/3
lease [2] 47/14 48/24
least [7] 40/11 40/15 42/8 79/1 144/10 145/10 152/10
leaving [1] 153/6
ledger [2] 51/22 56/3
ledgers [2] 51/22 56/8
left [11] 8/9 19/20 55/11 93/5 121/4 140/2 140/5 144/7 144/10 152/24 153/1
left-handed [1] 121/4
legal [12] 81/20 82/12 83/23 85/17 86/17 86/25 86/25 88/1 129/1 129/5 129/19 133/19
legally [1] 11/22
less [4] 12/10 96/12 137/11 152/1
let [23] 12/2 27/1 27/9 37/15 38/24 47/14 51/12 55/25 58/4 64/12 73/10 74/10 75/16 82/3 82/19 84/23 109/25 114/2 115/18 117/3 134/11 150/12 150/19
let's [38] 5/7 20/12 22/3 23/8 23/20 24/25 26/11 28/7 28/22 29/12 30/15 33/19 42/16 43/14 46/5 46/7 46/8 47/1 47/5 50/20 61/17 61/25 63/25 64/19 71/23 72/3 81/14 83/14 97/11 97/12 104/11 107/22 111/10 132/18 134/2 135/2 138/4 143/5
lethal [1] 30/2
lethals [2] 92/10 93/20
letter [1] 134/22
letting [1] 114/23
liability [4] 60/8 149/16 149/17 153/9
license [12] 43/5 43/24 44/6 44/20 45/12 45/24 45/25 47/12 47/18 48/8 130/13 130/21
lie [1] 31/9
lied [5] 113/11 113/19 115/2 115/11 116/13
lies [3] 60/22 60/22 148/9
life [2] 69/7 141/5
light [1] 32/23
like [43] 5/10 6/20 7/16 8/15 14/25 16/23 17/16 23/10 34/13 34/14 36/5 37/21 42/3 45/1 71/11 72/23 74/11 79/17 83/19 84/23 89/10 92/11 93/14 94/3 97/18 98/8 108/5 109/8 113/1 113/3 114/22 120/20 131/11 132/4 135/6 137/21 140/19 140/22 145/17 147/8 149/15 149/15 154/16
likelihood [1] 152/6
limine [1] 54/10
limit [1] 5/12
limited [1] 11/12
line [19] 5/18 32/4 36/12 36/13 36/18 37/8 37/11 37/12 37/21 38/1 38/10 55/20 75/5 87/9 109/11 109/12 109/23 150/9 150/10
line 15 [4] 36/12 36/13 37/8 37/11
line 17 [2] 109/11 109/23
line 25 [1] 109/12
line 3 [3] 37/12 37/21 38/1
lines [13] 36/25 72/24 72/24 73/7 73/9 73/11 73/15 74/7 74/18 75/3 99/11 99/13 99/18
lines 1 [2] 99/11 99/18
lines 11 [1] 74/7
lines 7 [1] 72/24
lines 7-10 [1] 73/7
linked [2] 55/15 55/16
list [3] 56/3 129/2 130/2
listed [2] 130/18 130/20
listen [5] 18/3 58/18 59/4 77/22 78/12
listened [2] 123/9 124/22
listening [1] 87/18
literally [1] 132/17
litigation [4] 3/17 114/8 131/7 145/11
little [34] 8/16 12/10 19/23 23/15 25/6 25/10 25/13 33/2 33/22 35/8 38/5 40/2 41/14 41/16 41/19 41/20 55/2 62/16 63/17 64/6 87/15 87/17 99/16 113/1 117/3 137/7 137/10 137/22 137/24 139/7 143/13 143/13 147/13 154/1
lived [5] 44/8 45/13 49/12 49/13 49/16
LLP [2] 3/3 3/7
loaded [1] 93/19
located [1] 27/23
locked [2] 64/9 64/9
log [6] 123/14 124/9 124/10 125/5 125/10 125/14
long [4] 6/11 12/23 89/9 104/3
longer [2] 130/23 130/23
look [20] 37/11 38/4 50/25 53/1 71/23 73/17 73/17 73/21 74/23 74/24 84/23 109/8 129/24 130/17 152/14 153/2 153/20 153/23 153/23 153/24
looked [1] 110/3
looking [6] 26/6 42/10 106/21 120/20 120/22 137/7
looks [1] 15/25
LOS [3] 2/15 145/2 145/3
Los Angeles [2] 145/2 145/3
lose [1] 140/4
loss [3] 11/17 55/2 93/3
lost [1] 104/13
lot [10] 49/9 74/20 82/16 88/6 104/13 121/8 137/22 139/9 140/6 145/7
loudly [2] 20/20 21/4
lucrative [1] 126/20
lunch [5] 133/12 143/4 143/12 151/15 151/17
lunchtime [1] 150/12
lungs [1] 33/9
lying [8] 113/21 114/12 114/17 115/6 116/3 116/5 116/16 153/2
LYNBERG [3] 2/9 2/13 2/18
lynberg.com [3] 2/11 2/16 2/20

M
machete [3] 64/8 64/13 64/17
made [13] 5/23 11/25 14/12 17/5 55/16 79/12 85/3 85/12 90/12 108/22 108/22 123/18 124/3
magistrate [2] 12/24 14/14
mailing [1] 48/14
maintained [1] 122/5
maintaining [1] 122/6
majority [1] 145/16
make [20] 8/2 8/16 8/21 8/23 9/13 12/20 13/21 15/8 36/1 36/7 41/3 41/4 51/16 73/20 122/8



5-GottsSER-00897

## M

make... [5] 124/15 132/19 133/14 141/1 149/3
makes [5] 16/15 33/22 40/18 77/14 93/13
making [7] 17/21 62/8 74/21 93/15 103/16 117/17 149/13
male [4] 22/17 22/21 22/22 23/25
malfunctioning [1] 150/11
man [6] 10/11 10/12 10/20 10/25 111/14 117/23
manner [2] 70/19 142/6
many [10] 6/23 10/6 17/9 57/11 66/24 67/7 80/7 113/24 140/13 142/18
map [1] 20/12
marijuana [21] 32/14 32/21 32/22 32/25 33/4 33/9 33/21 34/6 34/11 34/16 35/8 35/18 35/19 39/5 39/16 39/17 39/24 40/1 40/11 40/12 41/2
Marine [2] 139/24 140/7
Marines [3] 140/8 140/9 140/17
Market [1] 126/10
marking [1] 21/11
material [1] 16/9
matter [6] 97/9 113/24 145/9 145/9 147/7 156/5
may [29] 1/16 5/1 9/4 9/13 17/23 37/1 37/2 43/13 51/9 51/11 54/4 56/11 58/6 59/18 71/2 98/10 98/23 99/19 106/1 125/23 126/1 143/10 145/2 148/6 149/14 150/14 150/15 151/23 156/9
May 15th [1] 145/2
maybe [11] 48/16 91/22 96/23 104/5 108/5 108/5 113/2 142/22 144/18 145/17 151/7
mayor [1] 145/4
me [110] 5/6 5/6 6/15 8/4 8/19 10/6 12/2 13/12 14/7 14/22 18/17 27/2 27/9 32/18 33/22 35/9 37/5 37/15 38/24 43/9 48/7 51/12 52/9 53/9 55/24 56/6 56/15 57/4 58/1 61/11 63/4 63/7 64/12 68/15 71/12 72/11 74/10 74/15 75/2 75/10 76/20 76/21 77/13 82/3 82/4 82/19 83/12 83/13 87/18 88/23 88/25 88/25 92/23 93/6 93/13 93/14 94/7 98/17 100/4 101/3 102/18 102/23 103/2 103/3 103/14 106/8 106/9 106/22 107/9 107/9 107/10 107/19 107/20 109/25 113/3 113/20 114/2 115/1 115/18 115/23 117/3 120/16 121/5 121/8 121/25 122/1 122/2 122/4 122/5 122/7 122/14 124/17 124/18 124/20 124/21 125/13 125/15 129/11 134/11 134/22 137/13 138/8 140/20 141/23 143/2 148/14 150/12 150/19 153/6 154/14
mean [13] 21/3 26/3 27/6 81/25 82/2 84/13 85/1 89/9 113/10 131/13 139/4 142/8 152/4
means [1] 85/21
meant [3] 82/6 82/20 83/4
medical [12] 10/8 10/10 11/19 16/5 49/21 53/6 54/13 54/14 58/23 129/1 140/6 140/24
medications [2] 11/9 137/16
meet [1] 52/18
Member [2] 151/25 151/25
Members [2] 106/15 151/23
membership [1] 140/22
memory [1] 59/6
mentioned [3] 42/4 123/14 124/23
mere [1] 152/8
met [4] 31/5 98/15 112/21 113/4
MICHAEL [1] 3/3
middle [3] 7/17 12/12 140/12
might [7] 24/11 37/18 74/16 94/20 95/7 103/17 104/19
Migraines [1] 138/9
miles [1] 49/6
mind [58] 9/18 9/21 20/3 21/8 41/2 42/8 43/1 48/12 62/2 62/15 62/22 62/25 63/2 63/11 63/18 65/5 65/7 65/10 65/11 65/12 65/14 65/17 65/19 65/21 65/25 66/2 66/13 66/15 67/19 67/21 68/11 68/18 70/25 72/6 76/12 78/16 79/1 80/23 81/16 82/12 82/14 84/2 85/18 85/20 86/7 88/4 89/16 92/6 93/9 93/24 94/16 95/22 96/3 106/13 108/10 116/11 117/22 136/22
mindset [4] 72/3 86/9 86/13 142/21
mine [2] 68/21 94/16
minimis [1] 147/17
Minneapolis [1] 110/14
minute [5] 23/21 44/14 99/13 101/24 132/18
minutes [7] 27/13 30/17 97/8 118/11 118/14 132/19 132/23
misalignment [1] 17/10
misapplication [1] 150/20
miscommunicating [1] 61/13
miss [1] 133/5
missing [4] 8/7 8/10 8/15 133/3
misspoke [1] 74/3
misstates [10] 47/23 76/5 76/6 84/13 84/14 105/13 105/14 105/17 112/6 116/21
mistake [1] 148/5
mistakes [1] 70/11
mistrial [9] 11/14 14/21 14/22 15/1 15/4 18/13 18/14 18/19 54/17
mix [1] 67/19
MKRTCHYAN [4] 2/3 2/3 8/14 52/16
mode [1] 141/2
mom's [1] 47/11
moment [32] 5/16 20/1 20/2 24/6 31/23 31/25 35/8 36/20 41/5 51/13 60/23 63/23 78/10 78/20 87/1 87/3 87/14 95/9 95/23 104/10 104/23 105/25 108/16 108/25 115/14 123/21 135/12 140/19 143/16 144/15 154/12 154/14
moments [2] 97/3 150/13
Monday [6] 6/2 19/1 144/16 144/17 144/19 144/25
money [2] 49/3 145/6
monies [1] 54/7
Montana [9] 16/6 16/20 49/21 53/20 54/14 56/22 58/2 59/7 61/1
month [1] 49/7
months [1] 110/13
mood [1] 34/12
more [30] 13/8 15/8 15/25 20/5 22/3 23/8 23/20 24/25 26/11 28/7 28/8 28/22 28/23 29/12 32/19 38/4 38/7 60/16 68/14 96/24 114/17 115/4 115/16 116/5 119/17 126/19 131/24 137/10 139/7 154/16
Moreover [1] 56/6
morning [7] 15/19 19/1 19/15 59/13 98/8 111/8 111/9
mornings [1] 35/6
morons [2] 24/9 24/15
most [1] 93/20
mostly [2] 49/13 140/21
mother [5] 16/8 53/14 56/21 58/13 59/4
mother's [1] 48/15
motion [2] 14/17 54/9
motions [1] 148/1
mountains [1] 49/5
move [7] 15/16 59/9 70/10 76/24 81/18 90/23 93/12
moved [1] 71/6
movement [1] 69/7
moving [3] 71/5 120/9 144/16
Mr [1] 6/25
Mr. [57] 6/7 6/21 6/22 7/1 8/8 9/10 9/12 10/17 11/16 11/24 15/7 16/10 18/2 19/11 20/14 20/18 20/23 21/15 21/21 22/9 22/17 23/9 23/25 24/18 25/5 26/17 28/12 28/15 28/18 29/24 30/2 30/20 31/1 31/9 43/15 50/12 53/1 58/22 62/7 64/1 75/7 77/22 80/12 99/23 111/2 111/8 127/23 131/6 132/3 132/8 143/5 143/18 144/21 148/20 149/10 151/3 153/2
Mr. Clark [1] 148/20
Mr. Gomez [18] 20/18 20/23 21/15 21/21 22/9 22/17 23/25 24/18 25/5 26/17 28/12 28/15 28/18 29/24 30/2 30/20 31/1 31/9
Mr. Gomez's [1] 23/9
Mr. Harrell [14] 6/7 6/21 7/1 8/8 9/10 9/12 11/16 11/24 15/7 16/10 18/2 53/1 143/5 144/21
Mr. Holloway [14] 10/17 19/11 58/22 62/7 75/7 77/22 99/23 111/8 131/6 132/8 143/18 149/10 151/3 153/2
Mr. Renegar [1] 6/22
Mr. Stever [7] 20/14 43/15 50/12 64/1 80/12 127/23 132/3
Mr. Wroniak [1] 111/2
MRI [1] 133/24
Ms [1] 8/14
Ms. [4] 52/16 73/1 73/18 74/1
Ms. Mkrtchyan [1] 52/16
Ms. Skinner [3] 73/1 73/18 74/1
much [10] 8/4 11/24 15/25 19/7 40/4 49/3 89/2 91/11 143/9 147/18
multi [1] 113/10
multiple [6] 10/8 16/3 105/21 113/11 123/9 152/10
mwroniak [1] 3/6
my [131] 5/13 7/25 8/2 8/21 9/13 9/16 9/21 9/23 9/24 10/5 10/6 10/6 11/5 11/8 11/20 14/5 14/8 14/8 14/25 24/13 27/25 28/2 31/7 35/6 36/3 39/2 41/14 41/24 42/10 42/11 42/11 43/11 43/23 43/25 44/22 45/11 45/24 46/19 47/11 47/18 48/14 48/15 48/16 48/23 48/24 49/2 49/6 49/12 49/17 51/16 53/5 53/12 53/15 54/25 56/14 59/1 59/6 61/11 63/4 64/2 64/10 67/18 67/19 67/21 67/22 68/10 68/16 69/7 69/22 70/1 71/15 77/3 77/16 81/8 84/23 85/5 85/20 87/8 91/3 93/3 93/4 93/24 94/9 94/16 95/2 95/25 98/6 105/22 106/14 112/10 112/11 118/16 118/17 118/22 118/24 119/13 119/17 119/17 120/23 121/5 122/4 122/5 122/6 122/7 122/13 122/15 124/21 127/13 129/11 130/4 130/22 131/1 134/22 138/1 138/2 139/7 139/23 139/24 139/25 140/5 141/5 144/11 145/13 145/15 146/4 148/5 148/9 149/11 149/12 152/9 152/21
myself [1] 126/19

## N

NALTSAS [1] 2/13
name [1] 43/6
names [3] 105/10 106/19 106/21
NARINE [2] 2/3 2/3
narine57 [1] 2/6
Navy [2] 29/17 144/25
near [1] 23/5
necessarily [4] 24/7 40/4 63/7 101/6
neck [4] 107/10 121/5 122/15 124/21
need [30] 7/19 7/25 8/2 9/15 16/24 17/1 18/15 49/3 52/17 59/4 74/16 85/14 90/16 94/6 99/4 114/16 114/25 115/5 132/11 132/14 136/17 137/3 137/7 145/5 145/11 146/2 147/6 149/19 153/23 154/19
needed [7] 7/7 49/4 82/8 86/10 86/14 91/11 134/12
needs [1] 77/20
Neither [1] 126/5
nervous [3] 71/7 93/13 93/16
neurological [1] 10/11
never [22] 17/5 17/7 22/16 31/5 31/7 41/20 44/19 52/20 52/20 67/1 94/9 94/19 95/7 112/21 113/4 124/23 125/1 125/8 125/10 125/14 134/17 147/1
new [1] 137/24
news [1] 110/19
Newsom [1] 145/4
next [9] 5/25 6/2 37/12 63/8 102/10 128/20 143/21 151/13 154/18
nice [2] 73/4 97/10
night [48] 21/18 22/15


5-GottsSER-00898

N

night... [46] 22/18 22/22 24/4 24/23 25/10 25/13 25/17 26/6 26/22 27/20 27/23 28/19 29/7 29/10 30/9 30/24 31/10 32/9 32/14 41/8 41/12 41/23 47/17 47/18 59/12 64/6 65/2 66/6 66/8 68/1 81/9 85/6 88/15 91/19 92/1 93/20 102/24 104/22 111/21 112/11 112/24 114/7 116/6 117/20 131/8 151/10
Ninth [6] 8/2 8/20 9/14 11/13 152/15 153/15
Ninth Circuit [4] 8/2 8/20 11/13 153/15
no [176]
No. [1] 59/24
No. 2 [1] 59/24
nobody [3] 87/18 124/15 136/25
nobody's [1] 124/17
nodding [1] 99/1
non [2] 30/2 60/8
non-lethal [1] 30/2
non-liability [1] 60/8
noncompliance [1] 152/8
nonresponsive [1] 12/18
nonviolent [1] 152/12
Nope [1] 27/4
normal [1] 136/14
normalcy [1] 17/10
NORTH [1] 2/4
not [176]
note [2] 16/2 91/19
nothing [4] 10/17 16/23 28/1 71/19
notice [2] 11/6 18/1
now [104] 7/13 8/10 9/7 9/18 9/20 9/23 11/1 11/9 11/25 12/2 14/16 15/1 15/7 15/18 16/20 17/15 17/16 18/1 18/17 18/18 22/9 22/15 24/1 24/3 24/13 25/5 26/18 28/18 29/16 30/5 32/1 33/25 34/11 34/12 36/22 37/3 37/20 38/23 39/15 40/10 41/6 43/4 47/20 52/4 52/25 53/5 53/10 53/12 54/24 55/5 56/18 56/23 57/14 57/22 57/25 58/1 58/9 59/12 60/14 60/24 66/4 69/15 71/18 73/13 75/2 76/22 77/22 78/6 79/3 80/10 81/14 91/4 92/25 95/15 98/12 98/21 98/23 99/16 99/17 100/16 100/23 102/10 103/11 104/6 105/7 107/22 110/24 111/2 113/11 117/9 120/8 122/7 123/8 125/23 134/2 138/3 138/4 139/24 140/13 145/21 146/4 148/13 150/22 154/19
number [8] 12/10 52/21 79/25 120/2 120/5 130/18 130/20 130/24
numerous [3] 12/15 69/7 124/7

O

o'clock [6] 5/8 133/13 143/14 145/24 145/24 145/25
O'Neill [3] 49/14 125/24 141/6
O'Neill Park [1] 125/24
obey [1] 53/24
obeying [3] 14/2 14/5 14/6
object [4] 38/13 59/4 59/7 59/8
objected [4] 16/7 16/9 59/3 59/5
objection [69] 22/23 26/7 29/22 31/12 32/10 33/5 33/13 34/19 35/2 35/15 39/18 39/22 40/22 45/17 46/17 47/22 48/21 49/23 51/9 52/24 53/15 59/9 62/4 65/9 67/3 67/11 68/25 70/24 77/18 79/6 81/19 83/7 83/20 84/10 85/16 86/24 87/5 89/14 91/13 95/12 96/5 101/11 101/22 101/25 103/25 104/8 105/13 105/24 110/15 110/21 111/24 112/6 113/12 114/18 115/7 116/21 117/4 119/3 123/19 123/25 124/5 127/5 129/6 131/9 134/14 136/4 136/19 138/13 141/15
objective [1] 151/25
occasion [2] 40/25 41/2
occur [4] 66/8 93/22 94/1 94/2
occurred [5] 7/19 57/6 94/20 95/7 150/21
occurring [1] 56/25
October [3] 126/12 126/25 128/14
October 2019 [1] 126/25
October 7 [1] 128/14
odds [1] 70/14
off [7] 15/16 19/20 39/10 44/13 57/2 111/12 145/20
offer [2] 45/23 61/8
offering [1] 61/11
office [1] 128/7
officer [8] 81/10 85/7 95/21 100/21 102/20 102/21 107/2 107/3
Officer Reneger [1] 107/3
officers [56] 24/3 32/17 42/9 63/19 67/17 67/24 68/8 68/14 69/8 69/15 69/20 70/4 70/13 70/16 70/21 71/3 71/22 75/25 76/11 82/6 83/4 83/11 83/18 85/14 86/9 86/14 87/17 89/6 90/5 90/13 90/16 91/2 91/5 91/19 92/3 92/5 92/22 93/9 95/17 96/4 96/6 96/19 100/8 102/22 118/17 118/20 135/16 135/20 135/22 141/3 141/9 141/10 142/15 146/22 150/1 152/11
officers' [7] 43/1 62/25 65/10 66/13 66/15 70/25 151/2
OFFICIAL [2] 1/21 156/12
Oh [12] 11/16 15/12 37/17 52/8 52/16 92/19 113/18 142/24 142/24 153/1 153/20 153/25
okay [106] 6/11 9/13 11/16 14/4 15/12 19/25 20/2 20/3 21/2 22/2 23/7 27/5 27/8 27/9 28/4 29/12 33/2 33/20 35/13 37/9 37/10 37/13 37/17 37/20 37/22 38/3 38/8 38/20 39/15 40/10 41/6 41/21 42/2 43/7 43/14 47/4 47/12 49/18 50/12 60/21 63/10 63/24 64/11 64/19 65/5 67/16 71/10 72/21 74/9 74/10 75/17 75/25 77/17 77/23 78/21 82/5 82/17 85/12 90/2 90/11 91/4 91/11 93/21 94/2 96/14 96/17 97/1 97/7 97/8 98/4 99/1 101/8 104/24 105/20 107/13 107/22 109/9 109/13 109/17 109/23 110/1 110/24 111/3 112/14 114/8 117/14 121/3 122/20 130/12 130/17 134/24 137/15 138/5 139/13 140/13 140/16 140/24 141/9 142/19 143/14 143/15 144/4 144/9 145/25 146/24 150/13
old [1] 130/22
OLIVE [1] 2/14
Olympus [1] 119/24
Olympus-style [1] 119/24
once [7] 37/13 42/20 47/10 49/14 57/13 57/23 66/14
one [47] 5/19 8/7 8/15 11/7 20/7 21/5 29/11 30/11 38/4 38/7 41/25 42/20 44/21 47/15 48/6 51/13 53/5 65/3 65/22 71/14 82/3 89/1 99/14 99/15 107/9 108/4 109/16 109/17 111/17 113/22 114/3 115/16 115/18 117/1 117/10 122/14 122/15 126/3 127/3 129/21 131/3 131/24 133/3 140/19 144/9 145/10 145/17
ones [2] 65/3 71/4
ongoing [1] 15/21
only [15] 18/9 30/11 41/15 52/21 56/18 84/15 98/25 111/20 114/8 126/22 132/17 133/23 134/20 141/6 152/24
oOo [2] 5/2 155/1
Oops [1] 53/1
open [10] 15/23 16/25 17/24 19/5 52/9 58/5 61/19 73/2 97/14 133/1
opened [2] 11/7 53/1
opening [6] 11/11 52/25 53/2 54/11 56/14 56/19
opens [1] 58/1
operation [1] 17/11
opine [1] 146/16
opinion [3] 39/19 117/1 147/7
opportunity [3] 89/23 94/6 141/13
opposite [3] 49/10 89/11 96/15
ORANGE [9] 1/9 2/7 2/10 2/19 3/5 3/15 3/16 16/1 151/22
order [8] 79/12 85/14 86/10 86/15 90/17 91/4 145/12 146/9
ordered [4] 18/25 78/22 86/6 141/3
ordering [3] 77/4 78/15 78/19
orders [1] 85/25
orthopedic [3] 127/18 128/17 129/5
other [17] 5/17 15/20 18/1 30/8 31/20 48/12 54/6 57/11 93/5 105/5 117/11 122/12 122/15 147/14 149/14 150/1 150/23
Others [1] 17/10
otherwise [1] 8/3
our [15] 15/15 16/1 36/6 41/6 47/1 47/7 53/19 59/3 59/9 59/11 59/11 99/8 144/16 148/15 151/7
out [57] 5/25 6/13 17/18 18/7 27/1 28/13 37/5 41/24 44/21 47/14 51/12 52/1 54/25 55/7 55/10 56/22 59/19 61/5 61/7 61/17 63/4 63/4 63/7 66/1 73/2 73/3 74/7 76/21 79/13 84/7 87/16 88/9 88/23 92/9 92/10 99/3 101/7 105/22 109/14 116/20 118/15 119/1 120/9 122/11 128/7 137/14 139/9 140/11 140/12 145/10 145/22 146/3 149/3 149/5 150/21 153/19 154/7
outburst [1] 13/11
outside [13] 5/3 22/12 23/16 24/19 25/8 25/16 25/21 26/4 26/20 70/3 70/5 117/25 132/21
outweighs [2] 59/22 61/14
over [19] 12/11 37/20 38/5 43/15 50/20 57/7 80/10 90/19 95/11 107/15 111/2 111/11 114/3 122/5 133/12 133/18 134/13 134/18 150/12
overpowered [1] 93/11
overruled [64] 23/3 25/24 33/6 33/15 34/8 34/21 34/23 35/4 35/23 43/2 44/2 44/12 45/21 46/22 47/24 48/1 48/22 50/11 63/1 67/13 69/5 70/7 71/1 76/7 77/9 77/11 78/2 78/8 83/9 83/25 84/2 84/18 85/19 87/9 88/3 88/21 89/19 91/15 94/14 96/8 100/10 101/12 102/2 103/8 104/1 106/25 107/17 112/8 114/20 115/9 116/9 116/23 118/13 119/5 123/24 127/11 129/8 131/10 131/23 134/15 136/5 136/20 139/21 141/16
Overtalking [3] 13/22 56/10 60/20
own [4] 53/6 119/25 134/25 153/14
owned [1] 64/22

P

p.m [1] 154/25
pace [2] 154/10 154/14
Pacific [1] 48/25
packed [1] 32/23
page [40] 36/11 36/12 36/16 36/17 37/8 37/12 37/15 37/20 46/10 50/6 50/9 50/13 50/17 50/20 52/15 52/21 57/1 57/11 59/2 59/15 72/24 73/2 73/7 73/15 74/6 79/15 79/18 80/2 99/10 99/11 99/13 99/18 109/8 109/13 109/25 128/7 128/20 128/21 129/16 156/6
page 1 [4] 57/1 57/11 59/15 128/7
page 180 [1] 109/8
page 2 [1] 128/21
page 3 [4] 99/11 99/13 99/18 129/16
Page 4 [1] 46/10
page 49 [4] 72/24 73/7 73/15 74/6
page 5 [5] 50/13 50/17 50/20 79/18 80/2
page 54 [5] 36/11 36/12 36/17 37/8 37/15
page 55 [1] 37/20
pages [5] 57/5 57/11 57/18 57/18 80/13
Pages 5 [1] 80/13
Pahel [18] 98/15 99/24 100/15 100/23 101/2 101/9 101/19 102/9 102/19 102/25 103/2 103/4 104/17 105/4 105/21 106/8 106/12 107/1
Pahel's [2] 98/5 98/12


 5-GottsSER-00899

P


paid [2] 130/16 133/20
PALOMAR [1] 3/8
panic [1] 141/1
paragraph [11] 80/2 80/13 80/14 80/19 83/14 83/22 86/22 89/12 89/24 90/2 91/1
paragraph 13 [6] 80/13 80/19 83/14 83/22 86/22 89/12
paragraph 2 [1] 80/2
Paragraph 20 [2] 89/24 90/2
Paragraph 30 [1] 91/1
Paralegal [1] 3/14
paraphrased [1] 21/19
Pardon [1] 98/17
Park [3] 49/14 125/24 141/6
PARKER [3] 1/20 156/12 156/12
part [9] 51/21 68/23 79/19 79/20 93/16 116/4 129/13 147/14 150/8
participate [2] 8/1 8/3
particular [1] 24/7
parties [5] 19/10 97/17 131/17 133/8 143/18
parties' [1] 127/6
partway [1] 130/17
passively [1] 152/9
past [1] 12/15
pat [2] 136/1 136/11
Pause [14] 6/24 8/13 18/24 19/3 19/13 36/21 87/4 99/6 129/23 131/4 132/1 133/4 154/15 154/21
pay [1] 60/25
Pennsylvania [12] 15/17 15/24 16/15 18/1 49/22 53/20 58/2 59/8 59/21 60/10 61/1 61/12
people [13] 26/4 29/21 33/16 33/17 43/9 87/24 92/10 113/19 120/20 141/6 141/21 142/18 147/9
percent [1] 95/16
perception [1] 141/17
perfect [2] 48/25 154/16
period [7] 72/6 76/12 81/5 85/4 86/7 106/13 108/9
permitted [1] 146/16
person [9] 24/22 64/10 81/8 81/15 82/2 83/3 85/5 88/7 135/23
personal [3] 31/14 31/18 45/4
perspective [1] 150/7
pertained [1] 56/19
phase [7] 66/4 66/20 71/24 72/8 75/20 107/24 108/9
phone [14] 24/18 31/6 119/19 119/22 119/23 119/25 120/2 120/5 129/2 130/18 130/18 130/20 130/22 130/24
photograph [3] 138/21 138/24 142/11
phrase [1] 69/19
physical [20] 16/12 17/6 17/14 17/16 51/24 52/3 55/11 57/3 58/4 59/19 61/6 82/7 88/14 91/25 92/11 92/16 140/2 140/16 140/16 152/7
physically [2] 91/21 152/5
pick [2] 42/13 61/25
picnic [3] 64/1 64/16 64/17
pictures [1] 119/19
pill [1] 41/13
Pittsburgh [3] 52/13 52/17 126/21
place [2] 15/17 133/12
placed [3] 31/2 31/6 142/20
plaintiff [15] 1/7 2/2 3/13 3/14 5/7 15/15 17/6 19/14 52/4 54/2 54/3 55/8 55/25 79/23 109/6
plaintiff's [17] 4/3 8/5 15/13 15/19 16/2 16/10 16/22 17/13 42/4 53/14 54/22 55/4 145/15 146/16 149/23 150/7 153/22
plaintiffs [1] 151/1
plan [1] 141/5
planning [1] 49/6
plate [1] 43/5
play [14] 20/5 21/7 22/3 23/8 23/10 23/20 24/25 26/11 28/7 28/22 29/12 30/15 98/8 99/19
played [20] 20/10 21/8 21/13 22/7 23/12 23/23 25/3 26/15 27/15 27/17 28/10 28/25 29/14 30/18 98/7 98/16 98/18 98/19 98/20 99/20
playing [2] 27/10 99/16
plea [3] 79/19 132/3 132/5
please [23] 8/8 8/11 11/25 18/3 19/17 34/9 53/17 56/12 60/21 61/22 73/10 74/23 75/3 75/16 78/3 78/9 108/17 109/4 127/24 132/15 138/20 138/24 139/1
plus [2] 42/11 57/3
pockets [1] 84/23
point [17] 7/17 13/9 14/19 37/5 53/17 58/3 63/5 73/1 73/3 74/7 86/5 94/10 101/6 122/23 142/4 142/16 149/2
pointed [1] 76/22
pointing [1] 92/23
points [1] 18/16
police [7] 17/23 46/24 47/4 96/15 113/2 134/10 141/2
policies [1] 147/2
policy [14] 146/9 147/13 150/16 150/17 150/19 150/20 150/22 150/24 151/21 151/22 152/14 152/14 152/22 153/14
portion [2] 21/11 30/20
pose [5] 62/3 62/18 62/23 63/12 63/19
poses [1] 151/24
position [5] 52/10 54/7 63/5 71/4 88/24
positioning [1] 93/8
positively [1] 149/5
possess [1] 134/20
possessed [1] 134/13
possession [2] 64/7 64/10
possibility [1] 111/13
post [1] 148/1
post-trial [1] 148/1
potentially [1] 145/8
power [6] 66/5 69/20 69/22 70/3 70/5 70/9
practice [1] 40/11
preclude [1] 57/13
precluded [5] 17/5 17/11 17/23 56/23 147/24
precluding [3] 59/20 60/9 60/10
preclusion [2] 17/7 17/13
preexisting [1] 17/21
preface [1] 115/18
prefer [2] 101/23 151/16
prejudice [1] 59/25
prejudicial [3] 59/22 60/8 61/14
prepare [2] 151/10 151/11
prepared [1] 150/18
prescription [1] 34/13
presence [7] 5/4 17/18 19/6 61/20 97/15 132/22 133/2
present [14] 3/12 11/5 11/17 11/18 12/5 17/22 18/2 19/9 97/17 97/17 133/8 133/8 133/9 148/10
presented [1] 57/15
presenting [1] 6/4
PRESIDING [1] 1/4
pretrial [10] 15/15 66/4 66/20 69/19 71/24 72/8 75/20 107/24 108/9 108/15
pretty [1] 70/10
previous [2] 47/14 150/4
previously [3] 19/14 146/10 146/14
Primary [1] 130/18
print [1] 44/21
prior [6] 16/7 36/10 72/12 114/5 149/4 149/12
probable [6] 81/10 85/8 86/14 86/19 86/22 87/14
probably [7] 43/23 93/19 144/19 145/1 145/16 145/17 150/18
probation [11] 79/13 81/6 85/5 87/25 90/16 134/6 134/8 135/11 136/16 136/24 142/24
probationary [1] 91/1
probative [2] 59/22 61/14
problem [8] 11/14 53/25 53/25 54/18 54/19 56/4 58/7 67/16
problems [2] 32/2 82/11
procedures [1] 147/2
proceed [2] 12/6 139/1
proceeding [2] 36/10 72/12
proceedings [10] 1/14 5/3 19/5 61/19 97/14 132/21 133/1 154/22 154/25 156/5
process [5] 10/4 10/13 14/8 94/9 141/13
processing [1] 10/20
produced [4] 54/9 54/14 54/15 56/3
productively [1] 11/22
professional [1] 142/9
professionalism [2] 83/13 83/18
program [1] 29/17
proper [2] 72/20 83/11
properly [1] 151/11
proposed [2] 16/6 152/21
proposing [1] 145/13
protected [1] 148/2
protocol [6] 123/16 124/13 125/6 125/8 125/12 125/16
prove [2] 131/12 153/22
provide [1] 120/5
provided [2] 129/14 130/24
psychiatric [1] 52/12
psychological [1] 52/23
psychologist [1] 51/7
PTSD [3] 10/12 15/21 16/20
public [1] 95/23
publish [1] 135/6
puff [1] 36/3
puffing [1] 36/1
pull [12] 13/5 18/7 18/8 46/5 46/7 49/18 63/25 127/23 132/2 132/3 135/23 142/11
punch [14] 120/25 121/5 125/11 125/13 125/15 125/17 147/15 148/23 149/8 149/17 151/6 153/2 153/3 153/12
punched [10] 89/1 92/18 92/20 92/24 94/22 120/16 125/19 125/21 142/20 149/7
punches [4] 120/10 120/19 121/10 123/7
punching [3] 121/25 122/14 141/21
punishing [1] 107/19
punishment [1] 88/11
purchase [1] 34/11
purposes [1] 43/1
pursuant [1] 156/2
pushed [1] 146/5
pushing [1] 124/20
put [35] 15/19 16/3 16/3 16/6 18/1 20/12 46/1 46/2 47/5 50/13 50/16 52/9 55/4 55/9 56/3 56/17 57/4 57/11 57/12 63/4 63/4 64/9 72/14 79/17 80/9 80/14 82/7 83/14 88/25 93/22 124/23 138/24 149/3 154/3 154/7
puts [2] 35/9 58/23
putting [6] 11/6 46/20 53/9 54/23 57/7 93/12
PVS [4] 119/12 123/9 124/22 124/24


Q


qualified [7] 146/10 146/14 146/21 146/22 146/23 148/3 153/16
quality [1] 89/17
quantum [1] 153/24
question [95] 19/25 23/4 24/11 24/13 25/19 25/25 26/10 27/9 31/19 34/4 34/9 35/24 38/9 38/24 39/3 39/6 43/3 43/25 44/15 44/21 44/22 45/22 61/22 62/6 63/14 66/1 67/5 67/22 68/14 68/16 69/2 70/8 71/2 76/8 76/9 77/16 77/20 77/21 77/25 78/3 78/6 78/9 78/11 78/12 81/22 83/10 84/3 87/11 87/12 88/5 88/22 89/20 90/8 90/12 92/7 92/22 94/15 95/2 95/25 96/9 96/11 100/11 102/3 102/5 102/7 104/2 104/6 104/12 104/14 104/15 106/8 106/10 108/17 111/25 112/9 114/21 115/10 116/10 116/25 123/3 131/22 134/16 136/6 136/21 138/16 139/22 147/9 148/9 148/10 148/24 149/7 149/9 149/25 150/2 150/17
questioned [1] 48/7
questioning [1] 32/4
questions [25] 9/17 10/7 10/13 10/21 12/19 13/4 13/8 18/12 20/3 42/3 45/1 45/5 67/18 68/10 76/18 83/5 89/23 96/20 96/22 142/2 142/3 143/3 143/5 143/6 147/10
quick [1] 154/20
quickly [1] 145/14
quite [7] 12/18 13/9 13/10 14/13 14/14 147/16 151/2
quote [1] 147/12
quote/unquote [1] 147/12


R


raise [6] 5/10 9/15



5-GottsSER-00900

R
raise... [4] 11/21 52/15 52/18 54/9
raised [2] 56/4 57/13
raises [1] 151/17
Raiszadeh [5] 127/17 128/4 128/18 129/14 133/20
Raiszadeh's [1] 133/18
ranger [1] 28/6
rangers [2] 130/12 130/24
rate [1] 54/16
Rawlings [11] 71/16 75/24 143/23 143/24 143/25 144/4 144/6 144/12 147/21 147/22 148/10
Raymond [1] 3/14
re [11] 19/11 26/10 44/15 62/13 77/21 104/14 104/15 106/1 106/10 108/17 138/16
re-ask [9] 26/10 44/15 62/13 77/21 104/15 106/1 106/10 108/17 138/16
re-asked [1] 104/14
re-take [1] 19/11
reach [3] 55/10 58/10 118/16
reached [3] 53/3 55/4 106/9
read [10] 37/11 37/21 39/12 52/24 73/9 74/10 75/2 75/3 75/9 109/22
reading [2] 36/6 55/11
ready [13] 28/3 32/16 32/20 32/23 35/18 35/25 39/2 40/8 68/9 71/12 71/13 92/19 141/2
real [3] 53/25 53/25 147/15
realistic [2] 6/9 145/1
reality [2] 34/17 34/25
realize [1] 50/15
really [19] 14/20 14/21 15/2 33/25 34/10 36/1 40/6 44/19 49/2 49/12 66/1 82/17 82/20 84/25 89/1 89/2 90/20 112/1 131/11
rear [1] 64/16
reason [19] 21/15 21/21 31/9 56/2 56/2 68/23 88/15 90/5 90/17 93/16 100/20 102/13 102/20 102/20 125/12 125/15 142/4 151/9 152/1
reasonable [3] 81/11 85/9 148/20
reasons [5] 59/23 76/3 76/16 77/7 78/18
rebut [2] 57/17 58/4
rebuttal [1] 147/20
rebutting [1] 57/2
recall [1] 57/20
receive [1] 112/11
received [1] 89/18
recess [4] 97/13 132/25 133/14 145/8
recessed [1] 154/25
recognize [3] 50/22 128/5 128/20
recognized [2] 42/9 90/3
recognizes [1] 20/23
recollection [10] 36/23 36/25 38/14 38/19 39/1 72/19 73/6 75/18 109/24 110/7
record [47] 5/5 7/12 7/25 8/3 8/7 8/16 8/21 8/24 9/5 9/12 9/13 11/25 12/20 14/12 14/13 15/8 15/14 15/14 15/18 18/7 18/8 18/18 20/13 23/9 27/11 36/6 36/7 37/8 43/11 50/5 51/15 51/16 51/17 57/6 57/8 57/9 58/24 60/9 61/21 64/2 109/5 130/4 131/1 135/5 146/13 152/19 154/2
recorded [1] 30/17
recordings [2] 123/9 124/22
records [28] 10/10 16/5 16/11 16/13 16/20 16/23 17/8 47/1 49/21 50/2 50/22 53/6 54/1 54/13 54/14 54/20 55/6 55/12 57/10 59/2 59/12 59/19 60/17 61/5 98/6 129/2 130/22 131/1
RECROSS [1] 4/3
red [1] 147/13
redact [1] 52/17
redacted [2] 52/23 79/17
redaction [1] 52/12
redactions [1] 56/9
redirect [4] 4/3 132/9 133/10 133/16
reduce [1] 56/13
reference [2] 64/6 79/25
referenced [8] 19/22 19/23 23/14 23/15 40/2 62/16 63/16 63/17
referred [1] 130/5
refers [1] 84/15
reflected [1] 98/2
refresh [7] 39/1 72/11 72/18 73/6 75/18 110/5 110/7
refreshes [4] 36/23 36/25 38/19 109/23
refreshing [1] 38/14
refusal [2] 93/17 104/20
refusing [2] 77/16 92/16
regard [4] 9/4 16/8 16/11 148/19
regarding [1] 146/9
regardless [9] 14/23 17/13 17/24 60/3 76/3 76/16 77/6 78/18 153/15
register [3] 43/8 120/5 130/9
registered [1] 130/1
registration [1] 48/8
regulations [1] 156/7
rehabilitate [3] 9/16 10/5 11/4
rejecting [1] 53/5
related [3] 11/10 17/22 135/14
relates [2] 31/14 126/11
relay [1] 87/16
release [1] 143/14
relevance [5] 29/22 45/18 89/16 95/12 115/7
relevancy [1] 5/15
relevant [7] 9/21 12/13 46/19 65/10 115/8 138/25 152/22
reluctant [1] 136/7
Reluctantly [1] 136/2
rely [1] 147/5
remain [2] 143/16 143/19
remember [8] 19/24 19/25 40/21 43/4 43/5 98/23 108/6 129/9
RENEGAR [40] 3/2 3/16 6/20 6/22 24/6 93/1 93/21 93/25 94/19 95/6 101/9 104/24 105/4 105/10 112/21 113/24 114/12 115/2 116/3 120/10 120/13 120/18 120/25 121/10 121/16 121/21 122/9 122/14 122/16 125/21 126/3 136/1 143/19 144/8 144/12 144/22 146/5 148/22 149/7 151/8
Renegar's [4] 21/12 46/24 47/4 122/21
Reneger [4] 98/13 107/3 153/11 154/18
Reneger's [1] 121/21
rent [1] 49/3
repeat [3] 36/12 76/9 103/18
repeated [2] 56/17 91/24
repeatedly [5] 45/20 57/7 57/8 94/25 95/15
repercussion [1] 70/11
repetitive [3] 13/10 56/25 57/19
repetitiveness [1] 12/18
replete [4] 16/13 59/14 59/15 59/16
report [14] 13/22 22/19 23/25 24/14 25/5 26/17 30/2 44/11 46/18 46/24 47/5 56/10 60/20 129/1
reported [3] 22/17 154/22 156/4
reporter [11] 1/21 7/11 12/3 13/19 113/7 117/15 117/15 138/19 146/12 151/18 152/18 156/12
REPORTER'S [1] 1/14
reports [1] 16/17
represent [3] 10/6 14/8 149/18
representation [1] 16/22
represented [2] 89/13 90/3
representing [1] 11/20
requested [1] 143/23
requests [9] 7/11 12/3 13/19 113/7 117/15 138/19 146/12 151/18 152/18
required [1] 42/23
requirements [1] 17/19
reserve [1] 145/21
residential [4] 45/9 46/12 47/10 48/3
resisting [2] 121/17 152/10
resolve [1] 55/7
respect [4] 66/21 68/11 68/18 68/19
respecting [1] 68/22
respond [9] 12/2 13/13 15/8 18/15 18/17 55/5 100/24 150/1 151/14
responded [3] 63/13 63/15 100/16
responding [2] 10/21 138/11
response [7] 16/12 68/10 102/16 104/17 104/19 139/6 144/14
rest [2] 81/7 148/10
restroom [6] 7/8 10/1 12/9 12/16 28/6 97/11
result [3] 57/24 79/3 140/3
retracted [1] 52/13
retribution [1] 151/2
return [3] 28/4 97/12 143/13
returned [1] 29/6
reuse [1] 150/11
review [1] 129/1
reviewed [1] 42/17
ridiculous [2] 53/8 106/23
right [180]
rights [6] 72/1 72/10 75/22 78/23 79/1 87/24
ROAD [3] 2/9 2/18 3/8
Roger [1] 146/15
Roger Clark [1] 146/15
Rolls [6] 37/2 37/3 50/7 99/3 133/5 154/3
rough [1] 137/24
rskinner [1] 2/20
rule [1] 150/22
ruled [3] 13/2 147/25 148/6
rules [4] 12/25 12/25 14/10 38/16
ruling [9] 13/3 16/8 17/5 18/6 18/10 52/2 59/17 61/11 153/16
rulings [7] 13/24 13/25 14/25 18/4 59/10 149/4 149/12
run [11] 22/6 23/21 25/2 26/13 27/13 28/23 47/17 120/25 125/11 125/15 137/24
running [5] 91/20 92/10 140/18 140/20 140/21
runs [4] 20/8 23/21 120/10 120/19
RV [4] 22/10 22/15 22/18 22/22
RVs [1] 22/16
RYANE [1] 2/17
S
SACV [1] 1/8
safe [4] 66/6 69/20 70/18 93/15
safely [2] 64/10 92/23
safer [1] 66/10
safety [11] 62/3 62/18 62/23 63/12 63/19 69/25 70/1 82/9 102/21 120/23 151/25
said [56] 9/11 13/21 21/1 21/19 27/6 39/6 39/12 48/13 52/16 59/6 62/2 62/17 62/21 63/18 68/4 72/11 74/2 89/10 90/15 100/7 100/19 102/13 103/14 104/17 105/9 106/12 107/25 108/3 108/20 108/21 110/10 111/10 113/21 114/11 114/16 115/4 116/4 117/12 117/17 119/15 119/16 120/20 120/22 121/17 122/16 124/16 125/1 125/13 125/14 125/17 125/23 126/2 136/1 136/24 139/3 139/4
salary [1] 12/6
same [16] 10/21 31/25 46/15 56/6 56/8 56/25 60/4 67/18 90/19 96/10 103/9 103/10 116/14 121/4 140/17 147/19
sanctionable [2] 52/7 53/3
sanctions [3] 14/13 14/18 53/4
sandbagged [1] 58/13
SANTA [5] 1/3 1/15 1/23 4/7 45/10
Santa Ana [1] 45/10
sat [1] 115/11
satisfied [1] 83/17
save [1] 74/14
saw [6] 32/16 32/23 65/1 119/14 119/17 127/17
say [46] 11/17 22/9 24/15 24/17 24/24 28/12 28/15 30/20 32/20 37/14 40/6 44/8 44/9 48/19 52/8 53/1 58/14 68/5 70/10 78/20 78/21 83/16 84/6 86/3 94/1 94/3 95/19 97/12 100/4 101/16 102/6 102/25 108/15 111/22 118/18 123/10 124/12 124/18 124/19 125/17 139/8 139/10 140/18 153/1 153/20 153/24
saying [5] 31/10 71/21 94/17 120/9 131/14
says [10] 11/7 20/18 20/23 28/18 100/23 102/9 119/12 122/14 151/22 152/21
scared [4] 70/10 71/6 93/20 142/22
scarier [1] 135/19
scary [1] 71/8


5-GottsSER-00901

S

scene [1] 150/21
scream [1] 25/13
screaming [13] 19/23 23/16 25/6 25/10 40/2 41/19 41/20 62/17 63/18 63/21 64/7 69/14 136/14
screen [10] 43/19 46/6 46/9 50/18 57/12 64/3 80/17 127/25 135/8 142/12
scrolling [4] 57/5 57/9 57/10 58/25
scuffle [1] 121/17
scuffling [1] 121/19
sea [1] 5/25
search [9] 79/16 79/22 80/8 81/8 82/3 88/25 136/9 136/17 137/4
searched [3] 69/16 136/2 143/2
searches [1] 81/4
season [1] 49/10
seat [2] 64/16 144/15
seated [3] 11/25 97/19 105/10
second [43] 12/9 19/23 23/15 26/21 28/19 29/6 34/1 37/6 39/15 40/1 41/22 42/2 56/20 62/1 62/15 62/21 63/17 64/6 64/11 64/14 64/20 65/2 65/6 65/13 65/20 69/17 69/18 73/19 76/1 109/15 114/15 115/3 115/21 116/4 116/14 120/8 129/21 131/3 131/24 136/13 145/12 149/24 150/3
seconds [15] 22/6 23/22 25/2 26/14 27/14 28/24 30/17 89/6 89/9 91/4 91/8 91/23 93/1 121/25 142/22
Section [1] 156/2
security [1] 5/18
see [32] 22/17 22/21 22/22 26/3 31/7 36/23 38/18 38/18 42/10 46/12 47/8 57/2 80/19 93/4 96/15 101/15 109/23 109/25 110/19 128/9 128/12 128/15 129/2 129/3 129/17 137/23 138/1 138/2 145/25 147/2 149/18 149/19
seeing [1] 43/9
seeking [1] 60/18
seem [1] 150/19
seems [3] 8/19 56/6 85/22
seen [7] 22/19 47/20 48/3 52/19 52/19 119/17 119/20
sees [1] 119/13
segment [2] 21/7 30/15
seized [1] 83/3
seizing [1] 91/21
seizure [7] 79/17 79/22 80/9 81/8 82/2 85/6 88/14
seizures [2] 81/4 81/15
sell [1] 134/22
sense [1] 56/23
sent [1] 133/22
sentence [1] 125/17
sentenced [1] 134/12
separate [1] 6/23
separately [1] 107/2
September [2] 51/1 51/6
September 21 [2] 51/1 51/6
sequentially [1] 106/4
Sergeant [5] 71/16 75/24 143/23 143/24 144/12
Sergeant Rawlings [5] 71/16 75/24 143/23 143/24 144/12
series [3] 11/23 12/23 145/3
services [7] 95/23 129/1 129/5 129/5 129/14 129/19 133/19
session [9] 5/8 8/12 8/18 12/10 19/9 97/16 132/19 133/7 144/17
sessions [1] 11/3
setting [1] 9/5
Seventh [1] 10/4
several [2] 115/13 124/18
severely [1] 11/16
shape [2] 5/13 142/16
sharrell [1] 2/11
she [12] 8/9 15/22 16/5 16/6 16/16 16/16 16/24 17/1 53/18 58/15 58/23 59/2
she's [1] 8/10
Sheriff [2] 3/15 3/16
sheriff's [9] 16/1 20/21 21/17 21/23 27/1 116/19 118/1 126/2 151/22
short [1] 90/2
shorthand [1] 30/5
shot [2] 70/14 71/20
should [16] 26/5 26/25 56/4 56/23 58/16 71/3 76/20 77/12 111/15 111/17 115/19 115/22 148/21 151/1 151/7 152/3
shouldn't [2] 76/19 149/25
shouting [1] 29/2
show [11] 17/9 17/10 36/22 36/24 36/24 37/12 50/4 59/2 74/5 74/15 109/3
showed [3] 36/3 64/5 64/13
showing [4] 64/22 68/11 68/18 68/19
shown [4] 57/18 57/18 59/1 152/9
shows [3] 17/9 46/2 98/6
sic [14] 17/25 35/11 43/5 44/20 45/2 58/14 71/14 88/25 92/12 102/22 112/10 115/25 131/17 134/7
side [15] 5/20 54/2 54/6 54/23 54/24 55/4 57/16 57/24 93/5 93/6 105/5 117/10 140/3 140/5 145/15
sidebar [2] 51/14 61/18
sides [2] 38/21 54/21
Sierras [1] 49/9
signed [5] 81/16 84/25 85/3 89/12 90/2
signifies [1] 80/23
signing [1] 82/20
sill [1] 138/7
similar [1] 60/4
simply [8] 54/23 55/9 57/12 71/5 90/8 142/3 147/7 150/14
Simultaneous [7] 7/24 9/3 92/4 101/18 103/22 113/6 153/4
simultaneously [1] 121/12
since [2] 93/23 122/4
sir [229]
sirens [11] 27/18 27/20 27/24 28/4 32/8 32/13 33/1 35/19 35/20 39/4 39/25
sit [1] 81/18
site [1] 25/23
sitting [11] 10/12 10/21 82/18 114/24 117/6 123/13 124/9 124/10 125/5 125/10 125/14
situation [10] 56/8 60/4 82/19 91/10 91/17 107/25 108/19 110/13 112/12 135/18
situations [2] 88/7 138/12
six [1] 41/15
six hours [1] 41/15
SKINNER [4] 2/17 73/1 73/18 74/1
slammed [1] 85/21
slamming [1] 85/24
sleep [13] 33/24 34/12 34/14 35/7 35/10 40/13 40/14 41/7 41/16 41/17 42/1 49/15 118/5
sleeping [2] 41/13 117/7
sleepy [4] 33/22 40/18 40/20 41/3
slow [6] 38/5 57/8 87/15 117/16 139/3 139/5
slower [1] 154/2
smaller [1] 65/3
smoke [16] 32/16 32/21 32/22 33/2 33/9 33/21 34/6 34/14 34/16 35/8 35/18 36/2 40/4 40/5 40/11 40/12
smoked [2] 40/15 41/3
smoking [11] 32/14 32/25 33/4 35/19 39/4 39/7 39/13 39/16 39/17 39/24 40/1
snap [1] 149/13
snow [1] 49/9
so [131] 5/12 6/14 7/5 8/15 10/25 11/4 11/7 11/19 13/1 13/4 14/23 16/17 17/9 18/9 34/14 34/20 35/8 35/13 35/25 37/19 37/25 38/11 38/16 39/15 41/14 46/2 46/20 47/20 48/16 48/17 48/25 49/1 49/3 49/6 49/9 49/11 49/16 49/25 52/4 52/23 54/6 57/10 57/11 57/19 57/21 58/15 59/9 59/12 60/4 63/22 63/25 67/18 70/16 73/12 74/13 74/20 75/14 78/12 78/24 80/10 83/2 88/9 88/9 89/1 89/11 89/23 91/22 93/13 93/14 94/19 96/18 97/3 98/10 100/19 101/8 109/22 111/10 111/17 112/14 113/4 113/24 114/15 115/22 116/3 116/13 118/25 119/14 119/19 120/18 121/10 121/19 121/20 122/20 126/2 126/7 126/7 126/14 126/17 129/13 130/15 131/19 132/17 132/18 133/12 133/14 137/23 138/2 138/24 139/7 140/6 140/13 140/21 140/24 141/9 143/5 144/1 144/9 144/10 144/17 145/9 145/18 146/2 146/18 147/10 148/3 148/8 148/21 148/24 149/18 151/20 154/14
solution [1] 148/17
some [27] 10/13 11/11 18/15 20/5 22/3 23/8 23/20 24/25 26/11 28/7 28/22 29/12 52/17 60/16 74/5 79/4 79/12 92/11 100/7 110/19 117/23 119/20 132/18 139/17 140/2 149/4 153/17
somebody [4] 92/20 93/14 124/20 124/20
somehow [1] 122/11
someone [5] 10/23 20/24 26/6 71/12 113/20
someone's [4] 22/10 22/15 22/18 22/22
something [13] 32/9 37/18 46/20 72/16 83/19 93/8 94/3 103/19 104/5 104/21 118/8 146/4 153/7
sometimes [3] 7/20 11/1 139/8
somewhere [2] 28/5 48/17
soon [1] 8/17
sorry [5] 21/3 46/8 99/22 109/21 145/12
sort [5] 52/1 59/19 61/5 61/7 139/17
sorted [1] 54/25
sorting [1] 55/9
sound [1] 91/6
sounds [1] 145/17
SOUTHERN [1] 1/3
space [2] 64/19 64/25
speak [6] 5/6 7/21 51/12 70/18 100/5 102/10
speakers [7] 7/24 9/3 92/4 101/18 103/22 113/6 153/4
speaking [4] 20/20 21/4 21/17 21/23
special [5] 149/5 149/20 149/20 151/5 151/5
specific [2] 53/23 148/25
specifically [3] 59/6 113/20 152/16
speculation [11] 25/22 26/7 31/12 32/3 62/25 66/13 82/11 92/2 96/5 116/7 129/7
spending [1] 147/17
spoke [3] 24/6 31/22 102/18
spoken [1] 137/10
sponte [1] 9/25
spot [2] 70/18 82/3
staff [8] 43/21 44/4 44/7 44/17 44/24 45/7 45/16 71/16
stand [12] 12/17 15/20 19/12 53/15 53/18 58/15 58/23 73/18 74/2 81/17 96/19 137/25
standing [3] 27/25 89/8 120/9
start [12] 14/13 36/7 36/14 38/8 40/8 49/10 57/5 99/16 114/3 132/11 143/5 145/22
started [4] 33/2 49/1 93/1 93/21
starting [9] 15/16 36/3 36/11 36/12 36/19 37/8 41/3 91/5 109/11
starts [4] 23/10 25/1 28/23 30/16
state [30] 9/18 9/21 43/1 48/6 62/25 63/2 65/10 65/11 65/17 65/25 65/25 66/2 66/13 66/15 67/19 67/21 70/25 81/16 82/12 82/14 84/2 84/5 85/18 85/20 88/4 89/16 92/6 116/11 134/12 136/22
stated [8] 18/11 53/15 71/24 72/8 75/20 92/25 104/20 149/24
statement [4] 24/17 56/19 90/12 103/16
statements [3] 123/18 124/3 124/7
STATES [5] 1/1 1/21 81/3 156/3 156/7
station [1] 28/6
stay [4] 56/20 76/23 79/13 82/3
stayed [1] 70/18
staying [3] 76/23 122/5 122/6
stenographically [1] 156/4


5-GottsSER-00902

S
step [3] 63/8 89/4 143/10
stepped [1] 6/13
Stever [8] 3/17 20/14 43/15 50/12 64/1 80/12 127/23 132/3
still [7] 6/4 64/7 76/23 76/23 121/24 122/5 137/24
stipulate [1] 14/21
stipulating [4] 15/2 15/4 18/14 18/19
stipulation [4] 53/3 55/10 55/23 127/6
stomach [4] 35/6 35/11 121/8 122/7
stop [6] 27/1 37/21 101/21 104/11 113/14 154/19
stopped [5] 9/24 10/1 126/11 140/18 140/21
straight [1] 137/25
Strategically [1] 16/24
street [4] 1/22 2/14 48/15 82/22
strength [2] 140/4 140/5
stress [1] 16/21
stressors [1] 53/19
stricken [1] 150/15
strike [6] 34/3 35/16 60/4 119/8 123/2 123/24
stroke [14] 10/8 10/15 10/17 10/18 10/24 10/25 11/8 11/10 87/15 137/20 139/14 139/16 140/3 140/25
strokes [4] 10/8 10/10 17/20 17/22
strong [1] 60/9
strongest [1] 13/13
strongly [1] 84/25
struggle [4] 107/13 107/18 107/22 110/10
stuff [6] 52/23 54/15 89/8 118/17 118/18 118/21
style [2] 113/2 119/24
sua [1] 9/25
subdue [1] 151/23
subject [4] 42/3 132/7 151/24 152/5
submit [3] 81/8 85/5 88/13
such [2] 17/6 146/23
suddenly [1] 7/19
sufficient [1] 92/8
suggest [2] 91/24 151/4
suggesting [2] 26/5 34/16
suggestion [2] 55/18 149/3
SUITE [7] 1/22 2/4 2/10 2/14 2/19 3/4 3/8
sum [2] 90/25 101/16
summarize [1] 104/3
sundown [1] 41/7
supervision [1] 137/1
supplied [3] 44/7 45/6 47/21
supply [2] 45/16 47/25
Support [1] 3/17
supposed [4] 38/8 139/11 142/8 143/22
sure [21] 31/16 35/13 37/15 43/6 48/9 48/15 50/10 56/14 58/24 62/8 67/14 72/12 73/20 74/21 86/4 93/15 113/19 117/17 122/8 132/10 150/18
surgery [4] 10/17 11/8 55/13 55/13
surprised [1] 136/25
surprises [1] 56/21
suspect [5] 22/9 24/1 26/17 86/15 96/11
suspicion [2] 81/11 85/9
sustain [3] 39/22 65/16 123/25
sustained [15] 26/9 29/23 32/5 32/11 35/16 40/24 66/16 79/10 87/5 90/9 95/13 100/13 110/17 110/22 113/15
swear [1] 108/2
SWISS [1] 3/7
SWORN [1] 19/14
symptoms [4] 137/15 137/19 138/7 140/25
system [2] 41/24 59/11

T
table [5] 15/16 64/1 64/16 64/17 146/3
tackle [1] 121/3
tackled [3] 76/20 82/21 85/1
tactical [1] 7/21
tactics [1] 152/1
take [14] 7/14 19/11 35/7 71/23 74/23 82/7 97/2 119/19 132/16 138/20 138/23 138/24 145/19 153/19
taken [6] 97/13 109/6 132/25 142/6 150/8 152/25
takes [1] 35/8
taking [3] 11/9 36/3 55/7
talk [19] 10/15 11/19 15/20 16/19 33/19 42/16 76/24 81/14 82/3 91/22 100/4 100/19 102/23 107/22 114/16 115/5 124/20 140/7 143/20
talked [8] 16/17 16/18 53/18 62/12 76/20 77/13 106/9 115/23
talking [20] 19/20 65/17 69/14 78/20 84/22 85/24 85/25 96/11 101/2 103/6 103/10 103/10 105/6 118/5 118/11 124/6 137/13 138/4 142/8 142/9
tape [15] 22/3 23/8 23/20 24/25 26/11 27/18 28/7 28/22 29/2 29/12 30/15 98/2 98/6 98/13 98/20
tapes [1] 95/16
target [1] 42/13
targeted [1] 151/6
Tase [1] 120/21
tased [2] 92/9 131/7
Taser [26] 30/5 30/9 146/9 146/11 146/15 146/17 146/22 146/23 147/1 147/3 147/17 147/20 148/2 148/20 150/3 150/6 150/11 150/23 150/25 152/25 153/7 153/11 153/12 153/13 153/18 153/19
teeth [1] 17/7
tell [17] 10/19 13/14 14/22 42/20 43/9 45/3 45/3 61/10 68/8 83/4 94/6 96/21 99/23 118/9 121/25 125/25 137/19
telling [6] 17/25 65/20 69/15 92/21 124/17 136/15
tent [30] 22/12 23/16 24/3 24/19 25/8 25/17 26/21 27/1 27/25 28/13 42/11 49/13 64/5 64/15 112/14 112/19 114/6 116/18 116/20 117/7 117/25 118/10 118/15 118/24 118/25 119/9 119/13 119/15 119/18 137/8
term [3] 30/5 34/10 40/7
terminating [1] 14/18
terms [9] 13/14 14/12 17/14 55/11 55/20 57/1 82/6 91/1 149/20
testified [7] 112/4 115/19 117/6 123/5 126/7 130/12 146/16
testify [6] 11/2 29/24 32/6 105/12 147/4 147/5
testimony [24] 17/12 47/23 76/6 84/14 91/8 92/19 92/25 94/5 94/8 95/7 105/14 105/17 112/7 114/12 119/7 119/14 121/21 123/10 132/18 133/20 145/7 146/6 148/19 152/13
tests [1] 140/4
text [2] 72/25 74/5
than [5] 12/11 15/8 15/25 48/12 121/8
thank [28] 8/4 11/24 18/21 19/7 19/15 27/7 37/3 37/7 37/23 38/13 61/23 73/25 74/8 74/25 80/16 97/19 97/22 99/15 111/4 115/24 116/1 130/7 132/10 133/15 143/3 143/9 143/15 150/5
Thanks [1] 74/3
that [665]
that's [92] 6/9 6/11 6/15 7/20 11/11 14/2 14/18 14/21 17/2 17/7 21/1 23/1 27/4 28/2 28/21 30/5 32/16 33/3 33/9 34/10 38/12 40/15 45/4 45/13 46/15 47/11 48/8 48/17 49/6 49/11 49/16 55/16 55/24 57/17 58/19 59/11 60/7 63/8 63/25 67/10 67/14 67/21 68/4 68/23 70/16 70/18 72/20 73/20 74/21 78/12 79/8 82/11 88/11 93/20 97/7 100/1 101/9 102/12 104/5 105/8 109/13 112/17 113/2 113/3 115/25 117/1 119/15 119/16 121/7 122/19 123/16 123/22 124/17 127/13 127/22 130/22 131/19 132/6 132/12 133/15 137/23 138/15 139/25 141/24 143/23 146/18 147/16 149/11 153/5 153/5 153/6 153/9
their [24] 25/17 25/21 26/4 27/1 38/19 44/19 46/1 65/25 68/2 68/10 71/7 71/7 82/9 87/24 88/24 102/16 105/10 106/19 114/25 115/22 137/12 140/4 141/14 153/14
them [42] 17/9 27/2 30/9 44/4 44/6 54/9 54/12 61/4 62/3 62/18 62/18 62/23 63/12 63/19 66/10 69/24 82/3 83/1 84/23 84/24 84/24 95/19 95/22 100/6 100/19 101/4 103/18 107/8 107/9 114/24 115/13 115/14 118/6 118/7 118/9 118/9 118/11 118/15 136/9 136/11 137/9 137/12
themselves [1] 116/19
then [55] 5/7 9/13 11/9 13/8 15/2 15/5 17/21 18/11 18/12 35/9 37/16 39/3 41/14 44/20 49/4 51/6 55/5 56/21 57/2 57/5 57/17 58/22 63/7 68/1 81/7 88/18 88/25 92/20 97/8 97/8 102/6 107/11 107/13 118/5 118/17 121/12 121/14 121/16 122/11 132/9 133/11 133/13 138/24 141/7 143/14 144/5 144/7 145/21 146/15 148/5 150/9 150/23 150/24 150/25 153/1
there [102] 6/19 10/12 10/21 14/24 24/10 24/21 25/16 26/3 30/8 30/10 31/20 32/17 32/22 33/2 36/4 37/18 37/21 45/1 45/9 46/2 46/12 48/11 49/15 50/1 50/9 56/1 56/2 56/22 57/23 59/24 60/13 63/21 63/22 64/19 64/25 65/4 67/21 70/10 73/5 79/4 82/11 83/1 83/13 84/6 84/21 84/23 88/24 89/8 92/15 93/8 93/13 96/19 100/17 100/19 100/25 101/2 101/21 102/20 102/21 105/18 106/5 107/5 107/13 108/1 108/5 109/19 113/14 113/21 113/25 114/25 115/21 117/22 118/1 118/7 120/9 122/20 124/7 126/4 126/11 130/15 130/17 130/23 130/24 131/1 134/9 135/13 137/7 138/1 140/6 140/19 141/8 142/14 142/15 142/15 142/18 142/19 144/21 148/16 149/3 149/16 149/17 151/21
there's [36] 7/18 16/23 16/23 17/13 25/5 31/17 44/15 49/9 49/25 55/1 69/6 74/20 78/12 88/6 89/15 92/11 94/6 98/21 102/21 111/13 111/17 114/16 115/12 118/14 121/17 123/7 130/18 131/11 131/13 131/15 139/9 141/8 143/25 145/7 146/23 148/24
therefore [2] 11/5 148/3
Therein [1] 148/9
these [36] 16/11 16/13 16/20 17/8 17/20 17/22 48/7 49/21 50/1 50/22 54/1 54/20 55/6 55/8 55/12 57/11 59/19 64/7 64/12 64/25 72/2 80/7 82/6 87/1 98/23 98/24 99/3 102/22 115/12 141/2 141/9 141/10 142/22 145/11 145/22 146/2
they [119] 14/16 14/17 16/17 16/18 24/15 26/25 28/16 28/17 28/18 30/21 32/18 36/2 36/3 37/3 38/18 42/10 42/10 44/19 44/19 44/20 44/21 45/1 45/2 45/2 45/3 45/3 45/4 45/25 48/9 48/11 49/24 52/8 52/9 52/9 52/12 52/15 52/16 52/18 52/24 54/9 54/15 54/16 56/2 56/4 56/9 56/13 61/4 63/3 63/6 64/9 64/9 65/7 65/14 65/20 65/25 67/9 67/21 67/25 68/4 68/20 69/10 69/14 69/16 70/22 71/7 76/1 76/19 76/20 76/20 77/13 82/8 82/8 82/19 83/1 83/12 83/18 84/20 86/10 86/15 88/15 88/23 88/24 89/7 91/22 95/19 106/8 107/19 107/19 112/19 114/9 115/20 115/22 115/22 118/10 118/16 118/22 118/23 118/25 120/15 122/3 122/4 129/5 131/1 135/25 135/25 136/13 136/16 136/23 137/3 137/6 137/6


5-GottsSER-00903

## T

they... [8] 137/13 141/3 141/11 141/12 143/2 147/5 153/19 153/23
they'll [1] 144/23
they're [14] 52/24 52/25 52/25 54/11 62/9 87/25 93/6 93/12 93/12 118/7 122/13 141/23 153/1 153/6
thing [9] 32/19 56/25 76/23 98/7 120/13 120/18 120/24 146/23 149/24
things [13] 12/2 15/20 16/24 58/16 59/1 82/16 108/2 108/3 108/4 111/10 124/18 131/16 142/25
think [34] 13/8 14/18 17/2 17/25 31/9 48/10 55/7 55/10 68/11 91/11 92/9 100/12 106/5 107/18 112/4 112/16 113/4 118/2 118/6 120/16 125/23 130/12 135/17 142/23 142/25 148/6 149/14 150/6 150/12 150/17 150/17 150/19 150/25 154/17
thinking [11] 87/13 93/11 95/9 96/6 96/6 96/14 96/18 98/1 100/1 135/10 135/13
third [2] 34/1 56/21
this [289]
those [24] 13/4 13/25 16/6 55/8 56/14 68/21 73/9 73/10 75/3 75/8 76/21 89/25 105/5 108/2 108/4 119/20 120/22 123/18 124/3 126/3 128/17 133/22 142/25 147/9
though [9] 55/12 84/15 90/15 92/6 115/11 127/9 144/2 150/7 150/16
thought [17] 6/7 51/18 56/19 58/20 70/22 90/25 91/22 92/15 94/9 94/11 105/18 114/17 115/2 115/5 116/2 116/5 116/16
thoughts [2] 63/2 76/21
threat [7] 62/3 62/18 62/23 63/12 63/19 151/24 152/3
threatened [1] 18/13
three [15] 12/10 47/20 48/3 67/10 68/5 72/24 73/9 73/11 105/18 106/5 107/5 131/7 135/22 147/9 148/1
threw [2] 32/17 36/3
through [42] 9/8 11/1 11/23 12/6 19/1 20/8 26/13 27/12 28/9 29/13 30/16 37/11 49/4 53/20 54/20 54/24 55/6 57/5 57/10 59/1 59/12 59/19 61/5 67/12 72/24 74/7 98/9 98/20 99/12 99/14 99/15 99/18 109/9 114/8 114/11 118/17 118/21 123/10 131/6 147/1 147/21 150/19
throw [1] 83/12
thrown [4] 56/22 57/1 57/17 67/20
Thursday [4] 49/4 145/2 145/14 145/21
tie [1] 17/20
time [144] 7/1 8/17 9/12 9/21 20/3 22/6 22/13 23/21 24/12 24/19 25/2 25/8 25/17 26/13 27/13 28/19 28/24 29/6 31/5 34/1 38/4 38/7 39/17 40/11 40/16 40/23 41/5 41/22 41/25 42/6 42/20 47/6 47/13 47/20 48/4 48/6 48/19 48/23 48/25 51/3 57/9 64/6 64/14 64/22 65/2 65/6 65/13 65/20 65/21 67/18 68/21 69/6 69/18 72/3 72/6 74/15 76/12 76/14 77/4 77/12 79/12 80/10 81/1 81/9 82/8 85/6 85/13 86/7 86/9 88/14 89/2 89/9 91/9 91/10 91/11 92/7 94/20 95/8 96/14 97/3 97/6 99/8 100/1 101/11 102/21 103/3 103/7 103/10 103/20 104/21 106/1 106/13 107/16 108/4 108/10 112/15 113/17 113/18 113/19 114/4 115/12 115/21 116/12 116/14 116/18 116/20 118/13 121/4 121/18 121/20 122/1 122/3 124/5 127/17 127/20 131/9 133/11 134/5 134/24 135/2 135/3 135/10 135/16 135/25 136/13 136/22 137/16 137/20 137/24 138/4 138/5 138/6 139/5 139/13 140/25 141/16 141/17 141/19 142/5 142/16 142/21 144/1 147/18 154/16
times [15] 10/22 12/15 15/1 16/3 66/24 67/1 67/7 67/9 68/5 108/1 113/11 114/11 122/2 130/15 131/7
timing [1] 143/20
tired [1] 40/8
Title [1] 156/3
today [3] 5/22 123/9 143/15
together [1] 145/13
token [1] 147/19
told [59] 5/6 6/15 8/21 12/4 16/2 18/2 29/5 29/10 40/10 41/6 42/8 42/12 44/17 44/24 47/4 61/4 62/3 62/18 63/4 66/18 66/24 67/7 67/24 68/6 68/23 69/19 69/23 84/23 84/24 86/13 87/20 87/22 94/23 97/25 98/1 99/24 100/15 101/3 102/9 102/25 103/3 103/4 111/13 112/18 113/24 118/5 134/9 134/12 134/17 134/20 134/22 135/25 136/13 136/16 137/3 137/6 139/16 139/19 141/11
tolerance [1] 40/5
too [8] 36/14 38/6 60/8 130/16 137/14 142/18 147/18 154/20
took [7] 15/17 41/8 41/14 45/25 119/22 119/22 153/9
top [2] 122/6 152/11
torso [1] 122/5
total [4] 54/1 55/4 55/9 58/24
totality [5] 150/9 150/16 150/20 151/2 153/23
totally [1] 14/18
toward [1] 64/16
TOWN [2] 2/9 2/18
track [2] 51/24 57/4
Trail [1] 48/25
trained [1] 66/10
training [5] 5/25 49/1 49/6 107/2 140/7
transcript [16] 1/5 1/14 13/5 18/8 36/22 36/24 72/12 73/3 73/4 74/6 98/21 99/9 99/12 109/3 156/4 156/6
transcripts [3] 1/24 98/23 98/25
transfers [1] 66/14
trapping [1] 93/6
traumatic [1] 15/25
trazodone [7] 35/7 35/7 35/9 41/8 41/11 41/18 41/21
treated [2] 84/20 96/24
treating [4] 51/3 51/7 68/15 113/5
treatment [10] 16/11 16/14 51/25 51/25 52/13 54/4 60/18 61/1 133/23 133/24
tremendous [1] 150/10
trial [25] 10/5 15/15 52/7 52/11 52/13 52/14 53/13 53/21 54/10 54/12 54/16 56/4 56/7 58/1 58/11 105/12 144/11 144/11 145/12 145/12 148/1 148/1 148/4 148/6 150/4
trials [1] 7/20
tried [3] 70/18 118/16 135/23
trouble [3] 35/6 35/7 85/21
truck [3] 42/10 49/12 49/17
true [27] 23/17 24/9 24/16 34/6 39/5 39/17 40/3 64/8 64/23 66/6 66/22 69/17 69/25 76/4 76/17 77/7 79/5 79/7 79/13 80/21 81/18 94/21 95/8 96/20 108/20 133/25 156/3
truly [1] 59/21
trust [1] 57/25
truth [2] 44/25 147/7
try [10] 38/17 59/5 76/24 77/3 115/16 117/16 143/14 144/3 144/16 149/22
trying [20] 14/24 41/25 43/4 75/9 87/15 87/16 89/2 92/12 92/12 100/4 100/5 100/19 100/20 101/7 102/19 106/14 109/14 124/19 140/20 140/21
Tuesday [3] 49/4 144/20 145/19
turn [7] 5/7 37/20 58/9 111/2 128/20 134/13 137/14
turnaround [1] 132/18
turned [2] 122/1 134/18
turning [1] 66/1
TV [1] 41/14
twice [1] 9/25
two [19] 17/4 20/7 31/5 31/15 31/21 41/19 55/6 67/10 68/5 86/6 93/5 105/5 105/9 105/15 106/5 106/20 107/8 122/20 130/5
type [1] 117/23
types [2] 16/24 58/16
tyrant [2] 113/1 113/9

## U

ultimately [2] 105/2 107/5
Um [1] 109/18
Um-hmm [1] 109/18
unable [4] 10/13 13/22 56/10 60/20
unanimous [1] 99/1
unappropriately [1] 58/14
unclear [1] 106/1
uncontroverted [2] 153/8 153/13
under [10] 10/4 10/4 39/16 51/6 81/2 122/23 122/24 136/25 152/15 153/14
underline [1] 57/22
undermines [1] 55/22
understand [33] 10/25 13/21 14/7 29/20 60/15 62/6 67/4 67/22 67/24 68/1 68/2 69/2 71/3 77/2 78/5 81/22 85/13 86/2 86/3 86/5 90/8 102/3 102/5 103/17 104/12 105/7 111/25 112/10 122/18 143/1 148/13 153/10 153/16
understanding [6] 67/16 82/13 87/7 90/15 149/11 149/12
understood [15] 5/9 7/3 61/15 61/16 69/10 69/11 81/1 82/15 82/16 84/22 98/25 117/22 147/23 149/22 152/3
undertake [1] 17/12
undertaken [1] 55/13
unduly [3] 88/20 89/15 90/19
unfair [2] 55/3 153/8
unfortunately [1] 57/21
Unintelligible [1] 90/8
uninterrupted [1] 58/9
UNITED [5] 1/1 1/21 81/3 156/3 156/7
United States [2] 81/3 156/7
unlikely [1] 152/1
unquote [1] 147/12
unreasonable [6] 81/4 81/15 82/1 146/17 148/20 149/8
unreasonably [1] 149/9
unsuccessful [1] 59/9
until [6] 6/21 8/17 96/19 118/10 138/1 138/23
up [88] 7/14 8/20 9/8 9/9 11/12 11/21 20/12 32/17 32/17 36/3 36/7 41/25 43/12 43/14 45/19 46/5 46/7 47/5 48/15 48/24 49/5 49/18 50/13 50/16 53/12 53/14 53/18 53/21 54/1 54/23 55/4 55/9 56/17 56/20 57/1 57/5 57/7 57/12 57/17 58/15 58/23 61/25 62/9 64/5 64/13 64/17 64/20 72/14 72/16 73/16 73/17 79/17 80/9 80/14 80/15 81/4 83/13 83/14 90/25 91/20 101/16 108/8 111/10 114/16 114/24 115/4 115/20 116/4 118/4 120/10 120/19 120/25 125/11 125/15 127/23 128/2 131/14 132/2 132/3 133/15 136/23 138/25 139/11 141/7 141/8 142/6 142/11 154/10
updated [2] 54/15 56/3
upon [1] 147/5
us [20] 16/16 16/17 24/22 30/9 40/10 41/6 42/8 42/12 56/21 69/19 69/23 73/10 75/16 87/20 92/21 94/23 97/25 102/9 133/5 137/19
use [16] 40/7 52/20 70/23 91/25 97/11 135/2 135/10 146/10 146/15 146/17 148/2 148/19 150/10 150/25 151/23 152/23
used [9] 29/17 30/9 34/10 119/19 137/25 138/2 147/1 150/2 150/16
using [1] 153/11
Usually [1] 41/15

## V

VA [2] 56/3 56/8
vague [28] 23/1 32/10 34/22 40/22 40/23 62/4



5-GottsSER-00904

## V

vague... [22] 68/25 70/6 79/8 81/19 83/8 90/7 100/9 101/11 103/6 103/21 103/25 107/15 107/15 108/13 114/18 116/24 123/3 123/19 123/22 124/5 131/9 131/21
valid [1] 130/23
value [2] 59/22 61/14
vehicle [1] 58/8
verbiage [1] 39/2
verdict [4] 148/22 148/24 151/5 153/9
version [2] 71/18 71/21
versus [7] 12/16 51/25 55/20 58/4 149/1 152/16 152/20
very [28] 7/5 8/4 11/21 11/24 15/22 16/8 19/7 50/25 58/20 60/13 76/1 77/22 78/10 80/11 81/19 83/8 102/10 103/21 108/13 132/24 136/25 137/21 143/9 144/10 148/23 151/10 152/10 153/8
video [3] 94/17 96/22 122/3
videos [3] 101/15 108/2 131/12
videotape [2] 20/10 99/20
view [3] 42/12 61/4 104/19
viewed [1] 42/13
violation [8] 72/1 72/10 75/22 78/22 151/21 152/14 152/22 153/13
violence [7] 19/22 23/15 24/14 32/1 63/17 111/23 118/2
violent [3] 88/8 152/4 152/6
vision [1] 93/4
visit [3] 128/7 128/11 128/14
visitor [1] 131/2
voice [2] 20/24 136/14
volume [6] 1/8 36/10 72/23 73/14 73/15 154/23
Volume I [3] 36/10 72/23 73/15
voluntarily [9] 94/12 100/18 101/1 101/5 103/19 104/20 123/18 123/19 124/1
vs [1] 1/8

## W

wages [1] 11/17
wait [7] 80/6 80/6 80/6 101/24 106/16 106/16 114/24
waiting [2] 5/19 68/10
waive [2] 81/4 87/24
waived [2] 81/25 83/2
waiver [8] 79/16 79/21 80/8 82/20 88/8 88/10 88/11 91/3
walked [4] 114/15 115/4 115/20 116/3
walking [4] 23/16 32/2 59/25 82/21
walls [1] 137/25
want [47] 6/17 7/15 13/14 13/20 14/12 14/17 14/21 14/21 15/2 15/3 15/4 15/7 15/22 16/3 20/2 21/8 32/18 38/4 38/7 49/8 49/9 53/10 53/15 55/6 56/9 56/13 70/10 73/20 80/15 84/8 91/25 99/17 108/3 118/6 122/8 133/12 133/13 139/8 139/9 139/10 143/20 145/19 145/25 146/1 146/6 146/18 148/23
wanted [13] 5/6 6/14 12/5 48/16 48/24 67/25 81/18 89/24 91/9 95/16 95/18 95/19 146/4
wants [3] 15/19 15/22 16/25
warned [1] 12/22
warning [1] 57/23
warrant [4] 81/10 85/8 85/14 86/10
was [300]
was going [1] 5/14
wasn't [15] 22/21 23/5 24/6 26/4 27/2 30/10 44/9 49/1 64/10 87/13 88/8 91/10 95/9 102/4 136/25
watch [1] 8/2
watched [3] 41/14 108/1 131/12
watchful [1] 137/21
watching [4] 72/2 93/3 118/17 120/23
WATKINS [3] 2/9 2/13 2/18
way [23] 12/5 14/6 16/3 17/16 54/13 55/1 57/14 59/18 60/6 61/13 72/20 81/18 98/20 101/15 111/20 113/3 121/7 131/12 131/13 137/13 143/25 145/23 149/8
ways [3] 6/23 10/7 10/22
we [139] 6/4 6/6 6/8 6/12 6/20 7/17 7/19 8/12 8/16 10/15 11/20 11/22 12/10 14/11 14/13 15/13 15/18 16/7 16/8 16/8 16/17 16/24 17/1 19/20 19/20 20/14 21/4 42/2 43/7 43/12 43/15 46/24 46/25 47/1 49/18 50/5 51/9 51/21 51/21 52/11 52/13 52/17 52/23 53/3 54/19 54/21 55/7 55/10 55/19 55/23 56/4 56/8 56/9 56/17 57/22 57/23 58/10 58/11 58/13 58/16 58/16 58/20 58/23 59/3 59/4 59/4 59/5 59/5 59/5 59/5 59/7 59/7 59/9 59/10 59/10 60/17 60/18 61/1 62/12 63/5 64/20 72/12 72/18 73/3 74/16 82/3 89/3 95/23 97/25 99/9 101/16 104/3 109/5 109/11 115/5 116/2 116/4 124/6 124/22 127/20 129/24 132/2 132/3 132/18 132/19 133/18 133/19 133/21 133/23 135/5 136/17 137/3 137/6 137/7 137/16 138/22 141/20 142/11 144/18 146/18 147/2 147/21 148/3 148/9 148/10 148/18 148/23 149/11 151/5 151/8 151/15 151/20 152/11 153/8 153/11 153/12 153/16 153/20 154/2
we'll [10] 5/7 11/12 18/23 34/3 64/11 132/16 132/17 143/14 144/17 149/22
we're [55] 5/5 5/8 5/19 7/16 8/6 8/7 8/18 8/20 9/8 12/12 14/24 18/18 19/1 19/9 20/5 21/7 37/8 51/15 51/17 56/7 57/7 60/25 61/21 62/8 63/5 72/15 72/23 78/20 85/24 85/25 86/5 89/3 97/2 97/16 99/11 99/17 103/6 103/9 110/23 118/5 126/2 133/3 133/7 136/16 136/24 142/8 143/22 144/3 144/7 144/10 147/16 147/17 150/9 154/13 154/19
we've [14] 5/23 11/12 17/17 47/20 48/3 80/7 80/10 95/25 103/10 115/4 119/20 122/8 123/9 144/16
weaker [1] 137/23
weakness [1] 140/2
weapons [2] 92/23 137/4
wearing [3] 65/1 65/6 65/14
weatherman [1] 60/6
Wednesday [2] 6/8 144/20
week [6] 5/25 6/2 6/3 141/6 141/7 144/23
welcome [1] 15/8
well [41] 7/6 8/25 13/7 18/11 24/8 25/20 31/14 35/5 41/13 48/7 48/23 50/9 51/19 60/4 60/11 61/8 65/12 67/18 71/23 72/3 72/16 78/21 80/4 82/24 88/18 92/15 93/25 96/21 102/4 106/7 107/16 121/18 123/24 137/14 137/21 138/23 144/6 148/14 149/13 150/18 152/15
well-established [1] 152/15
went [11] 22/16 29/16 41/7 56/5 117/21 125/23 133/18 138/17 140/7 140/10 145/6
were [179]
weren't [5] 6/14 8/24 68/21 68/22 94/11
WEST [1] 1/22
what [134] 6/1 6/15 9/19 9/21 10/25 11/19 12/22 13/14 13/21 14/10 15/23 16/15 16/17 16/18 17/13 17/18 17/25 19/21 19/25 20/6 21/1 21/19 21/25 22/17 26/24 27/2 31/10 31/23 31/25 32/3 33/4 36/16 36/18 39/12 39/12 39/21 40/7 41/11 47/12 49/13 52/14 53/11 54/2 54/10 55/8 55/11 55/22 57/2 57/6 59/21 60/2 60/17 60/18 60/24 61/6 61/6 61/8 61/10 62/21 67/16 68/4 68/22 69/10 69/12 70/21 73/14 73/20 74/23 75/2 76/3 76/16 77/6 78/6 81/25 82/2 82/15 84/8 85/3 86/19 92/2 92/21 92/24 94/11 94/16 94/17 95/19 96/6 98/1 98/14 98/24 99/10 100/1 101/7 103/2 105/8 106/19 108/6 108/14 108/15 112/18 113/10 113/17 114/2 114/5 114/9 115/13 118/7 122/1 122/16 122/17 122/19 124/4 124/6 124/16 128/20 129/13 139/4 139/8 139/19 139/25 142/20 143/23 144/13 145/19 146/7 146/25 148/23 148/25 148/25 149/11 149/16 149/19 150/20 152/25
what's [13] 15/18 45/17 59/19 61/5 62/9 79/25 82/19 84/20 87/16 96/23 131/14 141/20 141/23
whatever [7] 14/17 17/7 59/14 78/18 82/21 142/4 153/20
when [155] 7/17 8/11 9/16 10/1 12/11 12/17 12/22 18/4 19/2 19/20 20/3 20/20 21/23 24/3 24/6 26/20 27/23 28/2 28/4 29/5 32/8 32/13 32/16 32/25 33/9 33/21 34/6 34/11 34/16 35/18 35/20 35/20 36/2 37/14 37/15 39/4 39/6 39/11 39/11 39/24 40/8 40/20 40/21 41/7 42/4 42/23 45/9 45/24 48/13 48/15 48/23 49/8 53/14 57/4 64/5 64/13 65/1 65/5 65/13 65/19 65/20 66/8 67/24 68/12 68/19 69/15 70/4 73/10 74/10 75/16 75/25 76/1 76/11 76/21 78/15 81/16 81/25 82/5 83/2 84/8 85/12 85/12 86/13 87/21 87/25 89/8 89/12 90/2 93/10 93/17 93/21 93/25 94/19 95/6 98/1 99/24 100/7 100/15 100/23 101/9 102/9 102/25 103/2 103/4 104/17 104/24 106/8 108/1 111/12 112/14 116/13 116/18 117/22 117/25 119/13 119/15 119/16 119/16 119/17 120/15 121/7 121/7 122/2 123/13 124/16 125/14 127/17 133/11 133/18 134/11 135/13 135/16 135/20 135/25 139/3 139/4 139/16 140/7 140/8 141/3 141/11 142/10 142/14 142/19 142/19 142/23 143/1 144/25 146/15 147/25 148/24 151/12 151/25 152/10 154/17
whenever [1] 49/8
where [35] 7/17 12/7 12/13 27/23 37/13 38/8 43/17 44/8 45/13 48/9 48/17 48/17 49/15 49/16 55/19 57/22 60/11 63/5 64/12 71/5 72/11 74/1 83/16 83/22 84/5 86/6 88/24 99/9 118/15 118/23 119/12 123/10 139/23 145/6 147/16
Where's [1] 5/17
wherever [1] 141/8
whether [11] 12/20 14/25 88/15 90/4 92/7 106/5 141/17 147/15 148/19 149/17 153/15
which [29] 10/10 12/16 15/17 15/24 16/21 17/1 17/12 24/11 43/7 43/17 46/8 50/20 51/24 53/20 56/19 56/20 59/21 60/6 63/14 78/25 80/13 80/23 81/6 85/4 117/9 130/1 132/2 145/2 153/16
while [12] 24/18 49/14 92/22 107/19 117/6 122/5 122/6 122/6 125/1 125/5 125/10 125/20
who [12] 10/22 24/23 58/13 98/15 102/18 105/11 107/1 143/21 144/5 151/12 151/24 154/18
whoever [4] 24/1 24/4 24/8 24/13
whole [5] 54/23 55/22 98/7 108/4 141/5
why [44] 10/20 11/20 11/22 34/25 40/15 45/16 48/19 52/7 54/9 56/1 56/2 56/2 67/21 68/23 70/16 70/18



5-GottsSER-00905

W

why... [28] 70/19 71/5 71/18 73/16 76/18 83/1 88/18 89/3 90/12 92/13 92/17 95/19 97/3 97/11 109/3 115/20 118/6 118/7 118/9 124/18 136/16 140/20 141/23 141/24 143/12 147/2 150/23 154/17
will [25] 5/24 13/5 13/12 13/13 13/21 13/24 14/10 15/3 16/2 29/24 32/6 37/2 57/9 61/8 74/14 81/8 85/5 88/2 96/1 100/22 138/21 143/16 145/14 145/21 153/18
Wilson [2] 126/22 127/2
wind [1] 60/7
window [1] 76/21
within [2] 70/1 123/16
without [15] 8/4 8/21 8/21 9/23 53/15 54/23 55/9 56/7 81/10 85/8 96/11 136/14 136/14 136/15 149/13
witness [23] 35/22 36/24 37/19 37/25 38/11 38/17 58/15 58/25 72/19 73/2 73/12 74/13 75/14 77/10 88/20 101/25 104/9 129/10 129/14 133/8 133/20 143/21 154/18
witnesses [6] 4/3 98/14 144/10 145/18 151/9 151/12
woken [2] 41/24 118/4
woman [4] 60/1 60/5 111/14 117/23
won't [3] 13/7 18/12 72/14
wonder [1] 7/20
wondered [1] 70/19
wondering [1] 12/15
wood [1] 45/3
word [9] 39/20 70/9 78/25 100/16 100/24 102/11 103/17 108/7 139/11
words [16] 16/10 31/20 58/19 59/6 68/2 69/11 94/1 102/10 120/22 131/13 139/6 139/7 147/15 149/14 150/1 150/24
work [5] 49/2 49/4 61/9 126/10 149/22
worked [2] 126/9 126/10
working [6] 17/17 49/1 49/3 126/11 126/14 126/19
works [1] 59/11
world [2] 141/21 154/16
worse [2] 16/16 16/19
would [78] 5/10 6/8 6/20 8/11 12/7 14/13 19/11 27/25 36/5 37/11 37/21 42/3 43/23 49/5 49/15 54/24 59/25 63/6 63/7 66/10 70/9 70/14 70/22 70/23 71/6 71/7 71/11 71/21 72/23 74/11 79/17 83/11 84/21 88/13 91/17 92/3 96/12 97/5 97/18 97/19 98/8 99/10 101/23 104/6 109/8 109/22 111/12 113/21 114/17 114/22 115/5 115/13 116/5 116/14 116/16 116/17 116/17 119/17 127/19 129/13 132/4 135/6 136/17 136/23 136/24 137/4 137/8 137/11 140/18 144/5 148/18 149/14 149/15 150/17 150/23 150/24 151/16 154/7
wouldn't [3] 40/5 113/25 135/23
written [1] 43/23
wrong [4] 74/18 75/5 124/19 129/10
WRONIAK [2] 3/3 111/2

Y

yeah [20] 21/19 30/12 32/15 32/22 35/25 36/2 39/2 39/2 44/9 49/14 49/16 74/9 74/16 103/14 117/21 121/6 122/25 146/19 148/13 151/8
year [2] 126/22 140/8
years [9] 12/6 51/23 127/22 140/14 140/14 140/17 140/19 152/15 152/16
yell [2] 26/24 120/21
yelled [2] 26/25 69/12
yelling [9] 26/18 26/20 69/7 69/10 92/9 92/10 93/19 120/15 136/14
yes [212]
yesterday [18] 6/7 7/6 7/23 9/24 12/4 13/1 16/5 18/3 18/4 18/9 19/20 58/22 80/8 98/18 98/19 98/20 133/19 146/5
yet [9] 15/11 36/24 49/24 58/5 69/16 93/23 98/15 112/24 150/18
you [980]
you'd [2] 8/15 112/16
you'll [5] 18/17 36/22 144/19 144/19 144/20
you're [67] 6/23 9/9 13/8 14/2 14/5 14/7 14/20 15/2 15/4 15/8 17/23 17/25 20/16 30/11 30/11 37/13 37/15 38/8 38/17 40/20 40/21 53/2 56/14 57/24 57/25 59/21 61/3 61/10 61/11 73/10 74/18 75/5 75/16 76/22 80/14 86/6 87/9 89/8 92/21 97/8 117/6 118/6 120/8 121/16 121/21 121/22 122/20 123/10 123/13 124/9 124/10 125/5 125/10 129/13 137/22 137/22 142/2 142/3 142/3 142/14 142/19 142/23 145/10 147/19 147/24 149/19 154/20
you've [26] 5/21 11/7 11/25 12/24 42/17 57/16 66/4 74/10 87/20 102/9 111/10 112/4 114/8 114/11 115/19 117/6 118/20 119/11 119/11 122/20 123/5 125/5 126/7 128/7 145/10 146/1
young [1] 29/21
your [308]
Your Honor [47] 5/23 6/6 7/22 16/13 33/14 35/2 36/5 38/13 44/10 50/3 50/6 62/5 70/6 76/6 77/18 79/24 81/20 82/10 84/17 85/17 89/14 90/23 92/3 97/5 97/22 99/11 101/22 101/25 103/7 104/9 110/16 113/12 115/7 116/7 118/12 119/4 123/23 127/10 129/6 131/21 131/25 132/4 135/5 143/8 149/2 151/14 153/6
yourself [12] 12/25 13/11 17/16 54/6 66/21 75/3 88/13 99/23 109/22 119/20 123/8 142/17
yourselves [1] 97/9

Z

zoom [2] 20/14 127/21


5-GottsSER-00906