**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

Case No. NINTH CIRCUIT CASE Nos. 25-7132, 25-7297

---

JEREMY HOLLOWAY,
Plaintiff – Appellant

vs.

THE COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace office
Defendants – Appellees

---

On Appeal from the
United States District Court for the Central District of California,
(District Court No. 8:19-cv-01514-DOC-DFM)
The Hon. David O. Carter Judge Presiding

---

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 6 OF 6**

---

CATHERINE A. NALTSAS [SBN 262259]
JESSE K. COX [SBN 285218]
LYNBERG & WATKINS, APC
1100 Town & County Road, Suite 1450
Orange, California 92868
Tel: (714) 937-1010/Fax: (714) 937-1003
**Attorneys for Appellees**

# EXHIBIT I


6-GottsSER-00908

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| JEREMY HOLLOWAY, Plaintiff, | **Certified Transcript** |
| vs. | Case No. 8:19-cv-01514-DOC-DFM |
| COUNTY OF ORANGE, et al., Defendants. | **DAY 5, VOLUME I** |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
WEDNESDAY, MAY 7, 2025
7:51 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com


6-GottsSER-00909

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, ATTORNEY AT LAW
655 North Central Avenue
Suite 1700
Glendale, California 91203
818-388-7022
narine57@gmail.com

**FOR DEFENDANT COUNTY OF ORANGE, et al.:**

LYNBERG & WATKINS APC
BY: S. FRANK HARRELL, ESQ.
1100 West Town & Country Road
Suite 1450
Orange, California 92868
714-937-1010
sharrell@lynberg.com

LYNBERG & WATKINS APLC
BY: CATHERINE A. NALTSAS, ATTORNEY AT LAW
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
213-624-8700
cnaltsas@lynberg.com

LYNBERG & WATKINS PC
BY: TAMARA M. HEATHCOTE, ATTORNEY AT LAW
1100 West Town & Country Road
Suite 1450
Orange, California 92868
(714) 937-1010
theathcote@lynberg.com

LYNBERG & WATKINS
BY: RYANE CORINNE SKINNER, ATTORNEY AT LAW
1100 Town and Country Road
Suite 1450
Orange, California 92868
714-937-1010
rskinner@lynberg.com


6-GottsSER-00910

**APPEARANCES (continued):**

**FOR DEFENDANT CHAD RENEGAR:**

COLLINS & COLLINS LLP
BY: MICHAEL L. WRONIAK, ESQ.
750 The City Drive
Suite 400
Orange, California 92868-4940
714-823-4100
mwroniak@ccllp.law

COLLINS & COLLINS LLP
BY: CHRISTIE BODNAR SWISS, ATTORNEY AT LAW
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
760-274-2110
cswiss@ccllp.law

**ALSO PRESENT:**

Raymond Farahmand, plaintiff's paralegal
Bryan Stever, defense IT technician


6-GottsSER-00911

**I N D E X**


| WITNESSES | PAGE |
|---|---|
| **JAMESON GOTTS, CALLED BY THE PLAINTIFF** | |
| Direct Examination by Ms. Mkrtchyan (continued) | 14 |
| Cross-Examination by Mr. Harrell | 60 |
| Redirect Examination by Ms. Mkrtchyan | 114 |
| **ROGER ALMA CLARK, CALLED BY THE PLAINTIFF** | |
| Direct Examination by Ms. Mkrtchyan | 134 |


**EXHIBITS**

(None offered.)


6-GottsSER-00912

**SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 7, 2025**

**7:51 A.M.**

**- - -**

07:51AM **(Out of the presence of the jury.)**

THE COURT: We'll go on the record. First, all counsel are present; the parties are present.

The Court's had a brief conversation, to memorialize it, at 7:30 this morning. The Court is limited to a total of 07:52AM 90 hours by plaintiff -- strike that -- 90 minutes, my apologies, by plaintiff and 90 minutes by the defendant. You can divide that any way you want to on the defense side.

The second issue is you tried to call to the Court's attention some motion, and I immediately cut you off because I 07:52AM don't have a record. Now I do have a record.

What did you want to bring to my attention?

MS. SWISS: Thank you, Your Honor. Yesterday evening the defense made a motion for a mistrial, which this Court denied. And we also requested time to make a motion for 07:52AM terminating sanctions, which the Court indicated that although the parties could likely make a good record, the Court was inclined to deny that motion should it be made because --

THE COURT: No, I also said I'm not precluding you from that motion. I just kind of put you on forewarning that 07:53AM the Ninth Circuit frowns on terminating sanctions. But the end


6-GottsSER-00913

result is you can certainly bring a motion for terminating sanctions. You're invited to draft that if you want to, if you have a good record, and it might be a good time to bring it. But right now I'm giving you an indication that we're going forward. What I'm not going to do is recess in the meantime while you bring that motion. You're more than welcome to bring the motion.

MS. SWISS: Understood, Your Honor. We wanted to bring to the Court's attention new evidence that has come to light since yesterday evening in that Mr. Holloway himself has made Facebook and Instagram posts directly about this trial, including a photograph taken inside this courtroom and posted it within -- since this trial has started. He has also named our clients in his Facebook posts, which has incited comments from the public and is potentially threatening to these police officers who are out in the public now that their names are out there in his specific Facebook and Instagram posts.

And we feel that the motion for mistrial should be renewed in light of this information and, at the least, orders that these posts be taken down, and an order that nothing should be posted with regard to this case or this trial by Mr. Holloway. He is now specifically personally attacking the officers involved, which is threatening to them and to their safety and their families' safety, which may require them to retain their own private counsel and seek restraining orders.

So we'd ask the Court to intervene at this time. And we have binders made of the post so that the Court and all parties can review them.

MS. MKRTCHYAN: First of all, may I respond to this? 07:54AM Again, this is sandbagging. Plaintiff's counsel has not received any notice of this. I'm not prepared to argue this.

THE COURT: I'm going to bring the jury in at 8:00 o'clock. I'm going to take this up over the lunch hour.

So why don't you start sharing that information with 07:55AM plaintiff's counsel. I haven't seen any of this information. It may be something I take up after court tonight. But what I'm not willing to do is delay this while the deputy is on the stand. I think it's prejudicial to both sides. So thank you for calling that to my attention.

07:55AM Prepare your binders, and you're more than welcome to bring a motion for terminating sanctions. I'm just indicating to you that's a hard road to climb, but there have been warnings. I'm not precluding you from that, but I'll really take a look at the Ninth Circuit law in terms of 07:55AM terminating sanctions. I think you're going to have the case right back here if the Court granted that, quite frankly, in two years.

By the same token, you can build that record on a motion for new trial, prejudice to your clients, et cetera. So 07:55AM I'm not dissuading you from doing that. In fact, it's quite a


6-GottsSER-00915

history. I'm well aware of the magistrate judge in those instances also, but the Circuit is not aware of that. The Circuit will simply see this as probably a very poorly tried case with all the conflicts that's gone on. But you can bring 07:56AM that motion.

MS. SWISS: Thank you, Your Honor. Would the Court like the binder now or at the lunch hour?

THE COURT: I want you to show those to the defense [sic] first. And then if you get those to Karlen when she 07:56AM comes in so I've got a record and if you'd formally file that. I don't want that simply given to the Court. I don't have a good record. I need a docket number on it or something on it. And I don't want to rush into that next collateral event, but I will take it up.

07:56AM MS. SWISS: Thank you, Your Honor.

THE COURT: Probably at the end of the day when we have time. Okay.

Also just as an indication to both of you, if I had granted your motion for a new trial, I probably simply would 07:57AM have tried to start the case over in two or three weeks. I have to carve out and call the criminal bar because they've got precedence. In other words, we wouldn't be leaving here. We wouldn't be going over until January or February. And I've weighed that.

07:57AM I just think without the objection coming at that

time, it doesn't give the Court an opportunity to make that ruling, and as such -- and I understand the tactical decision. But as such, I think that this admonishment will cure that, and I think it's legally correct and appropriate for me to give 07:57AM that admonishment at this time to the jury. So we'll see if the jury is in and bring them out in just a moment.

Have you tested out the equipment? And are you ready to --

MS. MKRTCHYAN: Yes, Your Honor.

07:58AM THE COURT: We have an hour -- for my record, we have an hour and 15 minutes total time left on the plaintiff's side with Gibbs [sic] except playing the tape one time through that I won't count. Okay?

MR. HARRELL: Your Honor, understood. I just do 07:58AM want to note --

THE COURT: I mean Gotts. I'm sorry. I said "Gibbs." Yeah.

MR. HARRELL: We do have dailies now, and we do have a record of objections that we can place in front of the Court 07:58AM regarding yesterday and the mother being on the witness stand.

THE COURT: I leave that to you. The admonishment I'm going to read. And I'm not going to discuss it with counsel. This is not negotiable with the parties now, is that the plaintiff's emotional distress damages are limited to the 07:58AM time period January 21st, 2018, to July 31st, 2018. The

Case: 25-7132, 08/25/2026, DktEntry: 44.7, (12 of 198)


parties previously stipulated to the Court that plaintiff's emotional damages were limited to this time period of January 21st, 2018, to July 31st, 2018.

Any evidence offered by the witness, Ms. Tafoya, that pertains to any events after the date of July 31st, 2018, such as heart attacks, strokes, alleged homelessness that was testified to by the witness Tafoya is to be disregarded and not considered in your deliberations concerning any alleged damages to emotional distress.

07:59AM

That's not negotiable, counsel. That's what the Court will read.

**(Recess from 7:59 a.m. to 8:01 a.m.)**

THE COURT: All right. Thank you very much, counsel, for your courtesy. You may be seated.

08:01AM

All parties are present. The jury is present. The alternates are present.

I want to begin this morning with an admonition to you. The plaintiff's claim of emotional distress concerning damages are limited to the time period between January 21st of 2018, when this altercation took place between the plaintiff and the defendant, to July 31st, 2018. The parties have previously stipulated to this Court that the plaintiff's emotional distress damages are and were limited to this time period from January 21st, 2018, to July 31st, 2018, approximately seven months.



6-GottsSER-00918

Any evidence by the witness Ms. Tafoya yesterday concerning any of her testimony concerning evidence or testimony of those things that occurred after July 31st, 2018, such as the heart attack, stroke, homelessness that was testified to by this witness is to be disregarded. It's irrelevant. It is not to be considered by you in any discussion or if you reach any finding concerning these alleged damages for emotional distress.

I'll also give you that instruction or a similar instruction at the end of the case.

Do all of you understand that instruction? Okay.

Then, counsel, the deputy was on the stand, Deputy Gotts. And there's going to be a time limitation with some of the witnesses. This witness will have an hour and 15 minutes total left on the plaintiff's side, however that's divided. There will be a little more time on the defendants' side because 40 minutes were used yesterday by an hour and a half to an hour and 45 minutes to be divided between the defendants so they see fit. So you know that we'll finish this witness this morning.

An expert, Mr. Clark, is in the hallway standing by. We want to get to him today so we don't have to have him return tomorrow, overnight. The limitation on both parties are 90 minutes apiece. So you know that we'll finish Mr. Clark today, as a courtesy.


6-GottsSER-00919

Counsel, good morning, and your examination, please, of the deputy.

MS. MKRTCHYAN: Yes, Your Honor. Before we play the video, I need to provide the transcripts to the jury.

08:05AM THE COURT: All right.

MR. HARRELL: Is there a copy for this side? We haven't seen the transcript.

THE COURT: Counsel, do you have an extra copy?

If not, you can have mine.

08:06AM MS. MKRTCHYAN: That was in the exhibit books provided to the defense, Your Honor. They have copies.

MR. HARRELL: Might we have an exhibit number, please.

THE COURT: Oh, if you could have an exhibit number.

08:06AM What exhibit number would this be?

MS. MKRTCHYAN: That would be 102.

THE COURT: Now, is the tape going to be 102 also? Are we playing the same tape or is this Deputy Gotts's tape?

MS. MKRTCHYAN: This is going to be 102- --

08:06AM THE COURT: Is this Deputy Gotts's tape, his body cam?

MS. MKRTCHYAN: Yes. That's 102-5, Your Honor.

THE COURT: All right. Now, is this Deputy Gotts's body cam?

08:06AM MS. MKRTCHYAN: Yes. Patrol vehicle, not body cam.




6-GottsSER-00920

THE COURT: This is purported to be Deputy Gotts's body cam.

Deputy, if you don't recognize this when it's played, just let me know immediately.

08:06AM THE WITNESS: Thank you, Your Honor.

THE COURT: All right. And, counsel, do you want my copy?

MR. HARRELL: Your Honor, we're good. We have it now in the book.

08:06AM THE COURT: Okay. Counsel, you may play this tape.

**JAMESON GOTTS, PREVIOUSLY SWORN, RESUMES THE STAND**

**(Videotape played, not reported.)**

THE COURT: First of all, Deputy Gotts, this is your body cam?

08:07AM THE WITNESS: Yes, Your Honor. It's the patrol vehicle recording from my --

THE COURT: I'm sorry, patrol vehicle. My apologies.

**(Videotape played, not reported.)**

08:08AM THE COURT: Remember, counsel, so there's no surprise, hour and 15 minutes is the remainder on redirect and recross.

MS. MKRTCHYAN: I can't hear you, Your Honor. Sorry.

08:08AM THE COURT: Remember that hour and 15 is the


6-GottsSER-00921

remainder for our redirect and recross also.

MS. MKRTCHYAN: Yes.

THE COURT: So plan accordingly.

MS. MKRTCHYAN: We will follow. And this playing time, do you want me to play the whole thing?

THE COURT: I'm not counting the tape in that time.

MS. MKRTCHYAN: Thank you.

**(Videotape played, not reported.)**

**DIRECT EXAMINATION (continued)**

BY MS. MKRTCHYAN:

Q Now, this was your PVS recording, sir -- right? -- from that night?

A Yes, ma'am.

Q Can you please have your microphone close to you, because I can't hear you. Thank you.

So let's back up a little bit and look at some of the points here. Isn't it true when you are arriving, this is your car you are driving, and next to you is Justin Gunderson?

A Yes, ma'am.

Q Okay.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q As you are arriving, on the corner of this video clip, we can see actually the pile of the officers next to the tent of Mr. Holloway?


6-GottsSER-00922

A I see what looks like a tent, a white truck, and there's a blur of something there on the screen.
Q Let's play it.
**(Videotape played, not reported.)**
08:29AM BY MS. MKRTCHYAN:
Q Do you see during that segment that we can actually see the officers on top of Mr. Holloway? Let me play that again.
**(Videotape played, not reported.)**
BY MS. MKRTCHYAN:
08:30AM Q Do you see that, sir?
A Yes, ma'am.
Q And you did have the option to actually park your car in a way that we could see the scene -- true? -- with your lights?
A I guess I could have backed my car in. I could have parked my car any which way. But at the time there was an active altercation occurring. So my focus was on parking my vehicle and getting to that active altercation.
Q Sure. And this was happening in a dark campground and you needed lights; true?
08:30AM A Yes, it was dark out.
Q Please have your microphone close because I need to hear you. I can't hear you. Thank you.
So then this is in front of you. Deputy Borba stops his car and jumps out of his car; true?
08:30AM A Yes. I see Deputy Borba exit his vehicle.



 6-GottsSER-00923

Q And then your car -- within seconds you arrive with Borba; true?
A Yes, ma'am.
Q And we know as part of the record already that Gonzalez, Pahel, and Renegar were on the ground with Mr. Holloway as you arrived; true?
A Yes.
Q And yet in your report there is absolutely no mention of either Pahel or Gonzalez; true?
A Correct.
Q And is it true that you minimized -- you didn't put down all the officers there piled up on Holloway so that you justify your involvement in the use of force?
MR. HARRELL: Argumentative.
THE COURT: That's argumentative, Counsel. Sustained.
BY MS. MKRTCHYAN:
Q If there were four officers already involved with him, we know for a fact Borba arrived seconds before you. Was there any need for you and Justin Gunderson to get involved, fifth and sixth officer involved?
MR. WRONIAK: Objection. Assumes facts not in evidence.
THE COURT: No. Overruled.
Not sure of the exact number, but by the time you

arrived there were at least four other officers; correct?
THE WITNESS: Yes, Your Honor.
THE COURT: All right. Thank you.
BY MS. MKRTCHYAN:
08:32AM Q Well, you arrived with Gunderson; right?
A Yes, ma'am.
Q Okay. So we have already -- while he's on the ground with three officers, you have three more officers joining into this so-called altercation; true?
08:32AM MR. WRONIAK: Objection. Assumes facts not in evidence.
THE COURT: No. Overruled.
You can answer that question if you know it -- the answer.
08:32AM THE WITNESS: Not true.
BY MS. MKRTCHYAN:
Q What is not true about it? Tell me. We watched this tape. We have Gonzalez, Pahel, Renegar with him. We see Borba arrive as the fourth officer. You arrive fifth and sixth with
08:32AM Gunderson. What is not true about that? Tell us.
A You continue to insert Deputy Gunderson as being involved in the altercation.
Q He was there at scene. He came to the scene with you; true?
08:32AM A Numerous deputies and two sergeants responded to the

scene, but that doesn't mean they became involved in the altercation.

Q I'm talking about the active altercation.

Let's play the tape.

08:33AM THE COURT: No, Counsel. Just a moment, for both of you, the question was: Who was involved in the altercation? The deputy's answer: Renegar, Pahel, Gonzalez, Borba; he joined, but Gunderson was not involved in the altercation.

You're referring to who's at the scene. Make that
08:33AM clear. Gunderson is at the scene, but the deputy's saying he's not involved at that time in the altercation.

BY MS. MKRTCHYAN:

Q He did not admit to use of force; true?

MR. HARRELL: Objection. "He." Vague.

08:33AM THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q Let's continue playing this. I'm not going to get a straight answer from you anyway.

MR. HARRELL: Objection. Motion to strike.

08:33AM THE COURT: Sustained.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Isn't this Gunderson running towards the scene of the active altercation after Borba and you?

08:33AM A Yes, ma'am.


6-GottsSER-00926

Q Okay.

THE COURT: Ladies and gentlemen, you are to disregard the side comments. Comments like "I'm not going to get a straight answer from you" are entirely inappropriate. Is that understood? That can later be argued that there's whatever involved. But those side comments along the way, I'm going to admonish you, are to be completely disregarded and are entirely improper.

Is that understood by the jury?

**(No audible response.)**

THE COURT: Okay, Counsel.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q After you arrived, after you jumped out of the car and Borba arrived, then we hear Mr. Holloway screaming he's bleeding, and we hear Deputy Renegar loudly yell out, "Taser, Taser, Taser"; true?

A Can you replay that part of the video where we hear "Taser, Taser, Taser."

Q Sure.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Did you hear that now?

A Yes, ma'am.

Q Okay. So we have established now, based on this patrol

vehicle recording, a Taser warning was given by Renegar after you arrived and after Mr. Holloway was screaming, "I'm bleeding from my head. You are hitting me in my head"; true?

08:35AM

A As I recall, there were two Taser applications by Deputy Renegar in this incident.

Q Okay. How many warnings did you ever hear him give?

A In the video, we just heard one of the warnings.

Q Okay. He said, "Taser, Taser, Taser," three times; true?

A Yes, ma'am.

08:36AM

Q Okay. And let's continue.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Based on this video, at 5:14:14, Taser has been applied; true? 5:04:14 Taser has been applied?

08:36AM

A I believe Taser has been applied when Deputy Renegar said "Taser, Taser, Taser." Usually a Taser application occurs after that.

Q Yes. So that's what we are establishing, sir, that Taser was applied by now after you arrived to the scene; true? And joined in on the ground with Mr. Holloway; true?

08:37AM

A I'm not going to say that the Taser application occurred at 5:04 and 14 seconds if that's what you're asking me, ma'am.

Q That's not what I'm asking you.

A That's the timestamp that you just asked me about for a Taser deployment.

08:37AM


6-GottsSER-00928

Q I asked you by this time -- listen carefully, sir, because we are being timed.

5:04:14, by that time -- we played the tape. Do you want me to play it again, the use of force part?

08:37AM We hear Renegar yell out "Taser, Taser, Taser" to give warning. And isn't it true you are trained to give warning on Taser before you apply it; true?

A When practical, we are to give a warning that we are deploying the Taser.

08:37AM Q And why is that done? Why do you give warning Taser application?

MR. WRONIAK: Objection. Relevance. 403.

THE COURT: Overruled.

You can answer the question.

08:38AM THE WITNESS: The X26 electronic control device, when activated, has a popping sound. And we give a warning so that other officers know that a Taser is being deployed versus a lethal option, such as a handgun or a firearm.

BY MS. MKRTCHYAN:

08:38AM Q Okay. So is it only for other officers, or is it also for the suspect to know that Taser is being applied?

A Well, if the warning is being given, then the Taser application is going to occur.

Q In any event, sir --

08:38AM A Generally speaking.

Q Okay. So -- but we've established, sir, that Taser has been applied and while you were there; true?
A Yes, ma'am. We hear Deputy Renegar say, "Taser, Taser, Taser," on my PVS video.
08:38AM Q Right. And we hear Holloway screaming when Taser is applied; true?
A I don't know that he's screaming during the Taser application. I don't know the exact time in terms of a stamp on here when the Taser is deployed. I hear "Taser, Taser,
08:39AM Taser."
Q But isn't it true in your report there is absolutely no indication that Taser was applied after you arrived; true?
A Correct. I did not deploy a Taser.
Q Okay. Isn't it true you did not talk about how many
08:39AM officers were on the ground with Mr. Holloway. You didn't talk about when the Taser was applied so that you justify your involvement in this use of force; true?
MR. HARRELL: Compound.
MR. WRONIAK: Argumentative.
08:39AM THE COURT: Overruled.
You can answer the question. Do you understand it?
THE WITNESS: Yes, Your Honor.
THE COURT: All right, please. Thank you.
THE WITNESS: The use of force is an investigation
08:39AM that's conducted by a sergeant. So I am writing my report,

which is going to be submitted to the sergeant, and it's going to be reviewed in totality with other reports that are written by deputies that were involved in the use of force.
BY MS. MKRTCHYAN:
08:40AM Q But you are required, as we've learned, to notify your supervisor of your involvement in the use of force; true?
A Yes, I believe in the video you hear me notify Sergeant Rawlings of my use of force, as well as my field training officer.
08:40AM Q And the purpose behind that notification is also for you to explain to the sergeant why it was necessary for you to apply force; true?
A The requirement is that I notify him of a use of force. He then conducts an investigation. And if he were to determine 08:40AM that that was unreasonable, then it would go to wherever it goes beyond that.
Q You wrote in your report that the reason you actually came in there and placed your knee on his back was because Deputy Renegar was unable to gain control of him. You remember 08:41AM that? Your report?
A Yes, ma'am.
Q Okay. So if Taser was applied -- and Deputy Renegar is going to testify here that "Once Taser was applied, we placed him in handcuffs without any incident." If Taser was applied, 08:41AM you came right around that time, then there was no need for you

to get involved in the first place in this use of force; isn't it true?

MR. WRONIAK: Objection. Compound. Misstates the evidence. Assumes facts not in evidence.

THE COURT: Well, that is as to what Deputy Renegar is going to testify to. But if the question was changed to "if he was to testify to that," you can answer that question.

THE WITNESS: Thank you, Your Honor.

I don't know what Mr. -- I'm sorry, what Deputy Renegar is going to testify to, ma'am. But when I arrived on scene, there was an active altercation, and Mr. Holloway's hands were not secure. And it was also stated via radio that Mr. Holloway had several knives, including a machete and other bladed weapons on his campsite. Also prior to my arrival, there was a deputy who advised on the radio that he had Mr. Holloway or one at gunpoint.

So I don't know the status of that deputy's gun after he puts out on the radio "415," which implies that he's in a physical altercation with that deputy -- or with that subject at that time. So I don't know. Is the gun reholstered? Is the gun laying around? Is the gun underneath Mr. Holloway? Does Mr. Holloway have a knife on his person?

BY MS. MKRTCHYAN:

Q So, sir, basically you're telling me it was necessary for five people at the very least by your own admission -- you,



 6-GottsSER-00932

Borba, Gonzalez, Pahel, Renegar -- five people was necessary to handcuff this one man?
A Yes.
Q Okay. And so let's continue playing this and see more of the stuff that is happening here.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:
Q So you became aware -- this is on your tape -- that Mr. Holloway was bleeding; true?
08:43AM A You will hear a deputy advise on scene that there's blood.
Q Okay. Did you actually see him bleeding from his head?
A I don't recall at the time if I saw Mr. Holloway bleeding from the head. I know, as I sit here right now, that Mr. Holloway sustained injuries and that blood was involved.
08:43AM Q Well, I'm talking about at the scene. Did you become aware of -- when everyone said "blood" and he's talking about "I'm bleeding from my head," did you become aware he was bleeding? Yes or no.
A I don't recall there being some kind of knowledge that I had on scene that Mr. Holloway was bleeding from the head at the time of the altercation, ma'am.
Q Okay. So if he was bleeding from his head and you are telling us that "I placed my knee only on his back" -- we saw your pants bloodied. We saw it on this tape. Are you going to deny to this jury that --


6-GottsSER-00933

THE COURT: Counsel, now it's becoming compound. The question is -- in other words, I could read this back to you. Please, ask the question.

BY MS. MKRTCHYAN:

Q Are you going to deny your pants were bloodied from his blood? Look at the jury and tell them that that was not --

MR. HARRELL: Objection.

BY MS. MKRTCHYAN:

Q -- your blood --

THE COURT: Counsel, Counsel.

BY MS. MKRTCHYAN:

Q -- that was not my client's blood.

THE COURT: Counsel, you asked the question and then you go on. Let him answer the question, please. Otherwise, I'm going to get an objection, compound; I'm going to have to sustain that objection.

MS. MKRTCHYAN: Yes, please.

THE COURT: Now, once again, a simple sentence -- question.

MS. MKRTCHYAN: I asked him a question. Question pending.

BY MS. MKRTCHYAN:

Q Please tell us -- we saw -- you know, we saw you in the frame cleaning your pants and hands with a wipe from the blood. You said to Borba, "I've got blood all over me."

MR. HARRELL: Objection. Misstates.

THE COURT: Sustained.

MS. MKRTCHYAN: Let's play this then.

THE COURT: Counsel, your original question was -- go back.

BY MS. MKRTCHYAN:

Q Yeah. Original question was: Are you denying that this was blood on your pants?

A I have no recollection of blood being on my pants. In the video I state, "I have some blood on my hands." There's also two sergeants on scene. Neither one pointed out that I had blood on my uniform. I also reported this to my FTO. My FTO did not report that I had blood on my uniform. There were numerous officers on scene that did not point out that I had blood on my uniform.

Q You covered it up. All of you covered it up. That's why you did not report either the head strikes or the fact that he was bleeding from his head; true?

MR. HARRELL: Objection.

MR. WRONIAK: Objection.

MR. HARRELL: Argumentative.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q So all of the officers involved in this denied anywhere in their reports that Mr. Holloway was hurt in the head, that


6-GottsSER-00935

he was bleeding; true?

MR. WRONIAK: Objection. Misstates the evidence.

THE COURT: Sustained.

**(Videotape played, not reported.)**

08:46AM BY MS. MKRTCHYAN:

Q Isn't this Officer Borba who is wiping his hands, and you have first aid there in your car?

MR. WRONIAK: Objection. Compound.

THE COURT: Overruled.

08:46AM You can answer the question: Is that Officer Borba?

THE WITNESS: I recognize Deputy Borba in the video. I'm not sure what your second question was.

THE COURT: Wiping his hands.

THE WITNESS: Yes, Your Honor. I do see 08:46AM Deputy Borba in the video. It does appear that he's wiping his hands or pulling out some type of wipe.

You asked about first aid, though.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

08:47AM Q And the second officer joins in, it's you -- right? -- Jameson Gotts?

A Yes, ma'am.

Q With all your uniform, with all your gear; right?

A Yes, ma'am.

08:47AM Q So --

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q As you're wiping something, what are you wiping, sir, on your pants?

A I don't know. My pants were wet.

Q Wet from what? Was this raining that night?

A It was cold and, I believe, damp out.

Q Okay. So you are denying to this jury that you were actually wiping off your pants from blood?

A Again, I state I have no recollection of blood being on my uniform that night.

Q Are you also denying that you were wiping off your hands from blood?

A No. I believe in the video I state I have blood on my hands.

Q Okay. You said, "I've got blood all over my" -- let's play that again, sir. This is the best evidence -- isn't it true? -- the video?

THE COURT: Counsel, your question.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Did you say "hands" there?

A You moved it forward 10 or 15 seconds. There's a follow-up statement that I make of having blood on my hands.

Q I'm talking about 5:09:37. When you join Deputy Borba


6-GottsSER-00937

and ask for wipes, you say, "I've got blood all over my --" and that's it; true?
A I hear that in the video, yes, ma'am.
Q Okay. In any event, sir, let me ask you this: If Mr. Holloway was bleeding from his head, not from his back, not from his shoulders -- nowhere else was there blood except for his head -- and you said that "I placed my knee only on his back," how could you have gotten your pants wet somewhere? Can you please explain to us. It was dry night. There was no rain.
THE COURT: Counsel, you're going on now with the questions. It's going to cause an objection of compound.
MS. MKRTCHYAN: Yes.
THE COURT: Please answer that question, sir.
THE WITNESS: I testified yesterday that as I exited my patrol vehicle, I lost my footing, and then I got back up, and I ran to the altercation.
BY MS. MKRTCHYAN:
Q Right. And then what, you fell and you -- you know, you had wet pants after you fell on a dry ground. We don't see any rain that night; is that true? Is that what you are telling us?
MR. WRONIAK: Objection. Compound. Argumentative.
THE COURT: Overruled.
You can answer the question.

THE WITNESS: I don't see rain that night. I don't recall it raining.

BY MS. MKRTCHYAN:

Q Okay.

A It was 4:00 something in the morning.

Q Okay, sir. And I discussed with you your -- Justin Gunderson's -- your FTO, that's your field training officer -- deposition when he was asked the question where he believed you had this blood on your pants. We asked that question. And are you aware that he said that --

MR. WRONIAK: Objection. Improper.

THE COURT: Sustained.

MS. MKRTCHYAN: I haven't finished my question.

THE COURT: It's improper. I have to have that transcript if it's impeaching. And who are you referring to? Are you referring to Gotts's prior statement or another officer's?

MS. MKRTCHYAN: No. This is Justin Gunderson who was asked -- and I -- remember, the Court told me to bring that transcript, and I have it for the Court to look.

THE COURT: I need that.

MS. MKRTCHYAN: I will give it also to the witness with the Court's permission. Thank you.

THE COURT: Would you just hand it to me informally.

MS. MKRTCHYAN: Page 243, Your Honor, lines 16


6-GottsSER-00939

through -- yeah, thank you. 243.

And, sir, for you too, please.

THE WITNESS: Thank you, ma'am.

MS. MKRTCHYAN: Thank you very much.

08:52AM THE COURT: But this is Gunderson's testimony; is that correct?

MS. MKRTCHYAN: Yes, Your Honor. His field training officer. And if you want to look at next page, Your Honor, 244 --

08:52AM THE COURT: Are you asking Deputy Gotts to speculate about what Gunderson would testify to?

MS. MKRTCHYAN: No, Your Honor.

THE COURT: This is Gunderson's opinion?

MS. MKRTCHYAN: Yes. But I asked -- he talked about 08:53AM if -- right now he just testified, Your Honor, that if his FTO or sergeant saw blood on his uniform, they would have said anything -- something. And he also said that "I fell down on the ground." His FTO thought differently, that the blood on his pants would have been from Mr. Holloway.

08:53AM THE COURT: But he also says, "I'm not sure."

MS. MKRTCHYAN: Well, may I --

THE COURT: I'm going to let Gunderson testify. Gunderson can come in. You both can call him.

But I'm going to sustain the objection. This is 08:53AM improper. You can ask about Gotts, what he did, what his


6-GottsSER-00940

explanation is for this blood. But Gunderson will testify if you each choose. Bring him into court.

MS. MKRTCHYAN: Okay. Sure.

BY MS. MKRTCHYAN:

08:53AM Q But you are denying, as of right now you are sitting here today, that this was blood from Mr. Holloway?

MR. HARRELL: Asked and answered, 403.

THE COURT: Overruled. You can answer it one more time because it's gotten confusing.

08:54AM THE WITNESS: Thank you, Your Honor.

Yes, I have no recollection of blood being on my uniform, nor was it ever brought to my attention on the scene.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

08:54AM Q And we can see on this screen, 5:10:45, Mr. Holloway is seated on the log by a deputy -- held by a deputy while you are wiping off your hands. No one is actually attending to him -- true? -- during this period of time we see on the screen; true?

MR. HARRELL: Relevance. 403.

08:54AM THE COURT: Do you understand the question?

THE WITNESS: Yes, Your Honor.

THE COURT: You can answer it.

Overruled.

THE WITNESS: It appears there is a deputy standing

08:54AM next to him.

BY MS. MKRTCHYAN:
Q Well, do you see that deputy actually doing anything to wipe his blood from his face? Wipe and helping, giving wipes. Do you ever give him any wipes to clean his head from bleeding?
08:55AM MR. HARRELL: Multiple questions.
BY MS. MKRTCHYAN:
Q If you are wiping your hands, if you have first aid in your car, this man is bleeding actively. We see him seated there on the log and held like -- as if he's a, you know, dog
08:55AM or something on a leash.
THE COURT: Sustained, Counsel. We're going to start again. It's objectionable.
BY MS. MKRTCHYAN:
Q Is there anywhere that we see on this tape that until
08:55AM paramedics arrived 15 minutes after this, that someone was actually attending to his bleeding wounds? Yes or no? Do we see that?
A I didn't attend to his wounds, if that's what you're asking me, ma'am. I don't know if someone else did, but I know
08:55AM paramedics were requested for him.
Q Well, we watched your tape. Let's watch it again, continue playing this, and see if actually anyone approaches and gives him anything.
**(Videotape played, not reported.)**
08:56AM BY MS. MKRTCHYAN:


6-GottsSER-00942

Q Then you say at 5:10:55 -- you said twice -- "I came in there with a knee"; true?
A Yes.
Q Okay. You wrote in your report and yesterday you testified you didn't remember that you said, "I came in there with a knee."
Do you remember that?
MR. HARRELL: Misstates.
BY MS. MKRTCHYAN:
Q I asked you yesterday. I asked you what statements did you tell about this knee placement, and you denied?
A That's an inaccurate repeat of the record, ma'am.
BY MS. MKRTCHYAN:
Q Okay. All right. You wrote in your report that "I placed my knee on the back of his" -- let's, you know, pull up your report again for a moment.
A Yesterday I specifically testified that I used the verbiage "I came in with a knee." And you're portraying to the jury that I did not.
Q We'll let the record reflect what happened yesterday. That's fine.
MR. HARRELL: Motion to strike.
THE COURT: Stricken.
BY MS. MKRTCHYAN:
Q But in any event, sir, you came in there with a knee.

You are telling this to your deputies -- other deputies at scene; true?
A I believe in the segment I'm telling my FTO, Deputy Gunderson, who's probably looking to me to determine whether or not I recognize that I was involved in a use of force because he's evaluating me as a patrol trainee at this point.
And so I'm letting him know that I was involved in a use of force and that I'm going to need to stick around to report this to the supervisor when they arrive on scene.
Q Okay. But when you said "I came in there with a knee," what did you mean by that, sir?
A I meant that I was involved in a use of force. Applying a knee to somebody is a use of force.
Q Well, I understand that. But you came in there with a knee. It can be interpreted many ways: I came in there with a knee to place on the head. I came in there and struck him with my knee in the head. I came in there and placed my knee on his back.
You never said here where you came in there and placed his knee; true?
MR. WRONIAK: Objection. Argumentative. Compound.
THE COURT: Just a moment. (Reading:)
"I understand that. But you came in there with a knee. It can be interpreted many ways: You

came in there with a knee to place on the head. I came in there and struck him with my knee in the head. Came in there and placed my knee on his back."

08:58AM It's sustained. It's not argumentative. It's compound also.

BY MS. MKRTCHYAN:

Q You did not tell Deputy Gunderson where you came in there with your knee; true? You didn't tell him which body parts?

08:58AM THE COURT: Counsel, just stop at that point. If you go on, I'm going to get an objection, compound, and I'm going to sustain it.

Do you have the question, sir?

THE WITNESS: Yes, Your Honor.

08:59AM THE COURT: All right. You can answer the question.

THE WITNESS: It's correct, ma'am. I simply notified Deputy Gunderson that I came in with a knee, which would be enough for him to know that I used force and I'm going to need to report it to my supervisor.

08:59AM BY MS. MKRTCHYAN:

Q But isn't it true there is a big difference between kneeing someone in the head and placing your knee in the back of someone's body; true?

A Yes. But Deputy Gunderson isn't doing the use-of-force

08:59AM evaluation.

Q Well, did you tell Rawlings when he arrived actually how you placed your knee?
A I believe we hear that in the audio.
Q We'll play it. But did you actually tell Rawlings in detail how you placed your knee in the back of his body as you claimed in your report?
MR. HARRELL: "In detail," vague.
THE COURT: Well, overruled.
You can answer the question.
THE WITNESS: Thank you, Your Honor.
Yes, I believe in the audio we hear me report to Deputy -- I'm sorry, Sergeant Rawlings that I came in with a knee, placed it on the back of his -- between his shoulder blades, something to that effect. It's on the audio, ma'am.
BY MS. MKRTCHYAN:
Q How long was your conversation with Sergeant Rawlings, sir, at the scene?
A Long enough to report to him that I was involved in a use of force and the general gist of it.
Q Okay. And, of course, you never told him that "Look, you know, I have blood on my pants." Or he never asked you, "Where did you get your pants wet?" He never asked you that question, did he?
A I think I've stated that -- during my testimony several times now that Sergeant Rawlings didn't point out that there

was blood on my uniform.
Q Okay. So let's continue playing. We will bring out some more points here.

**(Videotape played, not reported.)**

09:00AM BY MS. MKRTCHYAN:
Q At this juncture we heard Deputy Renegar tell someone, "Can you grab all the knives and place them somewhere."
Did you hear that at 5:11:20?
A Yes, ma'am.
09:01AM Q And isn't it true on your tape we see Deputy Brown actually go inside the tent of Mr. Holloway, pick up knives and place them on a picnic table; true?
A I'm not sure where we see that. I see a white pickup truck and a police car right now.
09:01AM Q You've actually watched this tape many times before, haven't you? Is this very new to you?
MR. WRONIAK: Objection. Argumentative.
MS. MKRTCHYAN: We will continue playing. Thank you.
09:01AM THE COURT: Overruled.
You can answer the question.
BY MS. MKRTCHYAN:
Q You have not seen this tape recently?
A No, I have, ma'am. What I'm telling you is that the video
09:01AM segment that's on the screen in front of me right now is a

white pickup truck and a police car.
Q I understand that. I asked you on this tape did you see Brown -- let's continue playing, sir. That's okay.
**(Videotape played, not reported.)**
09:02AM BY MS. MKRTCHYAN:
Q You turn your car around here to face his campsite now; right?
A Yes, ma'am.
Q Okay. Nothing prevented you to actually -- when you
09:02AM arrived and saw the altercation on the ground to actually park your car in a way that we could have seen everything that happened?
MR. HARRELL: Asked and answered.
THE COURT: You can answer it again.
09:02AM THE WITNESS: As I stated before, my focus was just on parking the car and going to assist the deputies who were in an active altercation.
BY MS. MKRTCHYAN:
Q Sure. Okay, sir. And then -- so isn't it true, though,
09:02AM this campground remained to be dark and was illuminated only by your flashlights and your car lights; true?
A Yeah, I would agree with that. It was dark out.
Q And this tent that we see in this -- this is Mr. Holloway's tent; true?
09:03AM A Yes, ma'am.


6-GottsSER-00948

Q This is not a transparent tent; this is an opaque tent. You can't see through it; true?
A I can't see it -- through it in the video right now. I don't know.
09:03AM Q Well, you were there. You don't remember whether you could see through this tent or not?
A It wasn't the focus of my involvement. I don't know, ma'am.
Q Okay. All right.
09:03AM **(Videotape played, not reported.)**
BY MS. MKRTCHYAN:
Q Do you see this is Deputy Brown came out of the tent, and he's reaching out towards the picnic table?
MR. WRONIAK: Objection. Assumes facts not in
09:04AM evidence. Speculation.
THE COURT: Overruled. You can answer the question.
THE WITNESS: I see a deputy in the video. If you play it forward or whatnot, I can probably tell you if it's Deputy Brown or not.
09:04AM BY MS. MKRTCHYAN:
Q You spoke with him on this tape. You said, "Brown," this and that. You went and talked to him near the tent. Okay? You are having difficulty recognizing --
THE COURT: We know Deputy Brown is there from the
09:04AM tape. The question is if this is him. Is there anything else


6-GottsSER-00949

you can play and then see if you can identify him?

**(Videotape played, not reported.)**

THE COURT: Is that enough tape?

THE WITNESS: Yes, Your Honor. I do recognize Deputy Brown in the video.

09:04AM

BY MS. MKRTCHYAN:

Q Let's see how many times he -- on this -- just in this segment on your tape goes inside the tent, picks something, and goes out towards the picnic table. Okay?

09:05AM **(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q This is the second time you saw him based on this tape that we are playing right now at 5:14:39?

A Yes, ma'am.

09:05AM Q Okay. And we saw him holding something; true?

A Yes.

Q And we looked at the photographs yesterday at what was placed on the picnic table; true?

A Yes, ma'am.

09:05AM Q Those were the knives and the camping tools of Mr. Holloway?

A Yes.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

09:06AM Q 5:15:20, this is the third time he got something out of

the tent and is reaching for the picnic table; true?

MR. WRONIAK: Objection. Assumes facts not in evidence.

THE COURT: Overruled. If you know the answer, you can answer it. If you don't --

THE WITNESS: I see him exiting the tent. I don't know if he's holding something in his hands or not. Are you able to identify something in the video that --

BY MS. MKRTCHYAN:

Q Sir, you know that Deputy Renegar asked Brown to grab the knives; true? You heard that there?

A Yes, ma'am.

Q Okay. Deputy Brown is going to follow what Deputy Renegar asked him to do; true?

THE COURT: But, Counsel, you're asking what he saw.

MS. MKRTCHYAN: Yes.

THE COURT: The difference is he may see Brown, he may see him going into a tent. The question is what does he see. And if he sees the knives, tell us. If you don't, tell us. Just ask him.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q This is 5:15:59, fourth time he saw him get out of the tent and place something on the picnic table; true?

A I see him exit the tent. I can see what looks like

something reflective in his left hand briefly, and he's walking towards the picnic table, yes, ma'am.

Q After he placed these items on the picnic table, that's when Deputy Renegar took a picture that we've seen with the knives; true?

A I don't know when Deputy Renegar took those photographs, ma'am.

Q Let's see. And this is you already; right?

Let's continue playing this.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q That was you that just past passed by; true?

A I don't know, ma'am. I don't think so because my pants would have been a darker green, but...

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Who's this person, individual, with Brown that just went inside the tent?

A I'm not sure, ma'am. Probably have to ask Deputy Brown.

Q So -- okay. We have a second deputy who reached out inside the tent and went towards the picnic table; true?

A I saw him in the tent. I don't know if he has something in his hands or not, ma'am. If you are able to back up the video, maybe I can identify something.

**(Videotape played, not reported.)**


6-GottsSER-00952

BY MS. MKRTCHYAN:

Q Isn't that Deputy Renegar walking around near the picnic table?

A Yes, ma'am. Now that you've played the video forward, I recognize that as Deputy Renegar.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q Was this you, sir, or not?

A I believe that is me. The pants do look like they're the Class "A" pants.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So you asked -- what did you talk with Brown at this point in time?

A In the video I can hear myself say something, "Did you talk to" -- I'm not sure.

Q Let's continue.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So this conversation was about the investigation of the call, what actually happened prior to the use of force, and who -- the reporting parties. You were trying to talk to reporting parties who reported this call; true?

MR. WRONIAK: Objection. Compound.

THE COURT: No. Overruled.

You can answer that question.

THE WITNESS: I didn't talk to any of the reporting parties or other campers.

BY MS. MKRTCHYAN:

Q Did I ask you whether you talked, sir? I asked you this conversation --

THE COURT: Counsel, it was compound, but I allowed it. It was what happened concerning the reporting parties, the call, et cetera. So just re-ask.

BY MS. MKRTCHYAN:

Q I asked you, sir, what was this conversation with Deputy Brown? Yesterday when I asked you about this --

THE COURT: Counsel, that's enough. "What was your conversation with Deputy Brown?" You can answer that question.

MS. MKRTCHYAN: Yes.

THE WITNESS: From the video it sounds like we're trying to assist Deputy Renegar. Or there's a comment about Deputy Renegar trying to figure out whose RV Mr. Holloway was trying to enter.

BY MS. MKRTCHYAN:

Q Did you find out? Did you have a chance to find out if Mr. Holloway ever went into anyone's RV?

A As I just stated, I didn't go and talk to any witnesses or reporting parties.

**(Videotape played, not reported.)**


6-GottsSER-00954

BY MS. MKRTCHYAN:

Q Is this the time, at 5:18:06, that you speak with Sergeant Rawlings?

A Yes, ma'am. I believe so.

09:13AM Q Okay. And this entirety of this conversation -- let's see how many minutes is that.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So 5:18:47 that conversation ends; right? This is like a 09:14AM 40-second conversation -- true? -- with Sergeant Rawlings?

A Yes, ma'am. It's merely a notification that I was involved in a use of force.

Q Right. And this was -- in 40 seconds you were able to tell him what happened in its entirety, your involvement in the 09:14AM use of force?

A No.

Q Well, did we hear on this tape -- and you left; right? You didn't speak with Rawlings anymore about this until you said sometime after -- we will discuss that later -- at the 09:14AM scene, this is the only conversation you had, the 40-second conversation with Sergeant Rawlings? Yes or no.

A Yes, ma'am. Per Policy 300.7, this was my notification to my supervisor that I was involved in a use of force.

Q Sure. So 40 seconds.

09:15AM Did he ever ask you basically who was involved on

the ground with Mr. Holloway when you arrived? Did we hear that?

A No.

Q Did he ever ask you when was the Taser applied, before or after you arrived?

MR. WRONIAK: Objection. Relevance. 403.

THE COURT: Just a moment. Overruled.

You can answer the question.

THE WITNESS: No.

BY MS. MKRTCHYAN:

Q Did he ever ask you, "This man has visible head injuries. Can you please tell me if you observed someone hitting him in the head?"

A No.

Q Did he ever ask you, "Please make sure your report reflects what was the officer's -- other officers' involvement in the use of force before you applied force?" Did he ever ask you that?

A He would have asked me to write a supplemental report for a use of force.

Q Well, sir, specifically did he ask you to report other officers' involvement in the use of force? Yes or no?

A No. That wouldn't be the expectation, ma'am.

Q So -- okay. But you are not a sergeant investigating use of force. You were never having this kind of duties to know


6-GottsSER-00956

whether that's his responsibility or not; true?
A True. But I'm aware of my responsibility when it comes to writing a use-of-force report.
Q Sir, have you ever investigated any use of force to claim what is his responsibility?
MR. WRONIAK: Objection.
THE WITNESS: Again, ma'am, I'm not a sergeant. I'm not responsible for investigating the use of force. However, I am aware of my responsibilities when it comes to writing a use-of-force report.
BY MS. MKRTCHYAN:
Q Okay, sir. And isn't it true there is also a duty on the part of the officers to intervene in -- on justified use of force when you witness it?
A Yes, ma'am. If I witnessed --
MR. WRONIAK: Objection.
THE WITNESS: -- an unreasonable, unjustified use of force, then I would be obligated to intervene, and I would do so as a peace officer.
BY MS. MKRTCHYAN:
Q That's the law; right? That's not only just the policy, that's the law. You have a duty --
MR. HARRELL: Objection.
MS. MKRTCHYAN: Excuse me. May I finish?
BY MS. MKRTCHYAN:

Q You have a duty -- this is my question. Maybe have -- you have a duty to intervene in other officers' unjustified use of force, not just by policy, but by law, Penal Code section; true?

09:17AM MR. HARRELL: Objection. Legal conclusion.

THE COURT: Overruled.

If you know that, this is your personal perception.

THE WITNESS: We have a policy in our department that requires it. I believe there is a Penal Code associated

09:17AM as well.

BY MS. MKRTCHYAN:

Q Okay, sir. And so if -- we've covered this. You have to intervene. If Mr. Holloway was bleeding from his head, you heard him say, "You're kneeing me in the head. You are kicking

09:17AM me in the head. I just got kicked."

If you had observed head strikes, would you have a duty to tell Sergeant Rawlings that "Yes, I observed someone hitting him in the head"?

MR. WRONIAK: Objection. Incomplete hypothetical.

09:18AM 403.

THE COURT: Just a moment.

MR. WRONIAK: Relevance.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

09:18AM Q Would head strikes be allowed? Generally, are you


6-GottsSER-00958

allowed to hit someone in the head?
A Are you referring to this incident, or are you referring to --
Q Your training.
09:18AM A -- in general in our policy?
Q Your training. We are talking now about your training. Because you claim you have --
THE COURT: Counsel, there's a question pending.
You can answer the question, sir.
09:18AM THE WITNESS: Yes.
BY MS. MKRTCHYAN:
Q Yes what?
A You asked, "Are head strikes permitted within our policy?" And I gave you an answer, yes.
09:18AM Q Yes, it's allowed? Okay.
So then in what situations are you allowed to hit someone in the head?
MR. WRONIAK: Objection. Calls for legal conclusion. Expert testimony.
09:19AM BY MS. MKRTCHYAN:
Q Because you are telling us it is allowed.
THE COURT: Well, you can answer in relation to this situation; otherwise, it's just too broad a question. There's a scenario of so many times it may or may not be appropriate.
09:19AM So in relation to this evening, you can answer that question.


6-GottsSER-00959

THE WITNESS: Thank you, Your Honor.

So referring to this incident, ma'am? Is that your question?

BY MS. MKRTCHYAN:

09:19AM Q Well, you said that --

THE COURT: I'm going to limit it to this evening. This is what we're talking about, this evening. Otherwise, we could have all sorts of hypotheticals, and I'm going to get an objection, and I'm going to end up sustaining the objection, 09:19AM and I don't want this taking too much time.

It's only related to this evening, and it only relates to what you said, heard, or did.

So your question, Counsel, is: Would head strikes be appropriate in this situation by this officer? Is that 09:19AM correct?

MS. MKRTCHYAN: No, Your Honor.

THE COURT: Okay. Then re-ask your question. My apologies. I didn't understand.

BY MS. MKRTCHYAN:

09:20AM Q My question -- well, first of all, you are denying that you hit him in the head; true?

A Yes, ma'am.

Q You are denying that you ever saw anyone hit him in the head; true?

09:20AM A Yes. I did not witness any head strikes.

Q You also are denying that he ever was bleeding from his head; true?
A That's not what I stated.
Q Okay. So would head strikes be appropriate under these circumstances that we've observed in this case?
MR. WRONIAK: Objection. Incomplete hypothetical. Lacks foundation. Calls for speculation as to this witness.
THE COURT: And by whom? Are you referring to another officer? It's too broad. Are you referring to Deputy Gotts?
BY MS. MKRTCHYAN:
Q Well, if you came in there -- if you came in there, the scene, as you've described to us, that officers could not take -- multiple officers could not take and place this man in handcuffs, one man, multiple officers, would you be allowed, under your policy, to hit him in the head?
THE COURT: And this pertains to this deputy when he is arriving with what he sees at that time.
You can answer that question.
THE WITNESS: Thank you, Your Honor.
I would not have found it reasonable to strike Mr. Holloway in the head with what I was facing at that exact moment. However, in the hypothetical of Mr. Holloway producing a weapon or continuing to actively resist or do something like kick a deputy, then that may become reasonable at that point in

time.

BY MS. MKRTCHYAN:

Q But you didn't see that happen; right? When you came, did you see him kick anyone?

09:21AM A Again, ma'am, for the 15 seconds or so that I was involved in this use of force, I did not -- I did not use head strikes, nor did I witness head strikes.

Q That's not my question. Listen carefully.

I said when you came, did you see him kick anyone

09:21AM with his legs? Yes or no; I don't know?

A I don't recall. What I observed was active resistance and three deputies trying to get him under control with the fourth deputy that arrived just before me.

Q "Active resistance" means a lot of things to me. We want

09:22AM to know what you observed because active resistance is a generic language that you are using.

MR. HARRELL: Objection.

BY MS. MKRTCHYAN:

Q I'm asking you what you saw.

09:22AM THE COURT: We're going to go right back to the question, then, of "Did you see..."

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

Q Did you see him kick anyone with his legs when you

09:22AM arrived and joined in? Yes or no?

A I don't recall him kicking anybody.
Q Did you see him placing someone in a headlock?
A No.
Q Did you see him strike anyone -- actively, violently striking someone?
A No.
Q Isn't it true he was face down when you arrived, sir?
A As I testified yesterday, he was on his stomach, chest. I don't know whether his head was to the left, to the right, face down on the dirt.
Q Okay. So but in that situation, when you arrived, that moment in time -- I'm not talking about what happened before you were there. I'm talking about the moment you arrived and saw that pile of officers on the ground with Mr. Holloway. Would that be appropriate for you to hit him in the head?
MR. WRONIAK: Objection. Argumentative.
THE COURT: We're not dealing with hitting the head. Aren't we dealing with kicking?
MS. MKRTCHYAN: Either, Your Honor. Either hitting or kicking in the head.
THE COURT: You can answer that question.
THE WITNESS: The force option that I selected was to apply my knee to his upper back area, ma'am. I would assume that at the time I wouldn't have found it reasonable to hit him in the head based on the circumstances that I was facing.


6-GottsSER-00963

BY MS. MKRTCHYAN:
Q Right. And isn't it true if someone hit him in the head or kicked him in the head at that point in time when you came and saw him face down on the ground, that also would have been unreasonable; true?
MR. WRONIAK: Objection. Legal conclusion.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q And then, you know, when we are talking about the Taser -- first of all, isn't it true your PVS recordings are not in sync with GPS? You know what is GPS?
MR. HARRELL: Objection on testimony. The initial part is testimony and move to strike that.
THE COURT: Well, I think this is easy to resolve by the two of you. There are different tapes at different times, and I don't see why we can't have a stipulation concerning that.
MS. MKRTCHYAN: No, Your Honor. That's not the point.
THE COURT: All right. Then re-ask your question. Maybe I didn't understand it.
MS. MKRTCHYAN: The point is something else.
BY MS. MKRTCHYAN:
Q So isn't it true your tape -- have you ever compared your tape -- the time on your tape to, for example,

Sergeant Rawlings' time on his tape, have you ever done that?
A Specifically Sergeant Rawlings, no, but I've compared my tape to segments of other tapes.
Q Okay, sir. So as it pertains to, for example, with Deputy Renegar's tape, have you compared with Deputy Renegar's tape?
A Again, segments of other deputies involved. I don't recall specifically who.
Q Okay. And isn't it true your tape is -- and I can compare it, and I can play it for you if you have difficulty. But isn't it true your tape is not in sync with, for example, Rawlings's tape, and your tape is a few seconds behind?

MR. HARRELL: Objection. Vague as to "in sync." We also have an expert coming to testify about this.

THE COURT: Overruled.

If you know that answer, you can give an answer to it.

THE WITNESS: Thank you, Your Honor.

I don't know, ma'am.

BY MS. MKRTCHYAN:
Q Okay. So let's confirm one thing on your tape, and then when we have Sergeant Rawlings testify, we will look at his tape.

At 5:18, as we discussed, you spoke to him with -- you spoke with Sergeant Rawlings; true ? This is your

conversation at 5:18 with Sergeant Rawlings; right?

A Yes, ma'am.

Q Okay. So let's see at what point in time on your tape you talk about him about your knee and how you came in with a knee. Let's look at that.

09:26AM

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q So you talked about the knee on his back, telling Rawlings about that, and we have the current time on your tape, 5:18:23; correct?

09:27AM

THE COURT: 5:18:23? Thank you.

BY MS. MKRTCHYAN:

Q 5:18:23; correct?

A Yes, ma'am.

09:27AM

Q Okay. So let's make that part of the record, and we will later on play that.

THE COURT: Now I'd like to take a recess at this point. We've been in session about an hour and a half. You're admonished not to discuss this matter amongst yourselves. Let's take a few recesses this morning.

09:27AM

**(Out of the presence of the jury.)**

THE COURT: Sir, if you'd be seated. Thank you.

We've got about 15 minutes left of the time I designated. So as a courtesy, you can continue that -- complete with direct; then there won't be a redirect. But

09:28AM

you've got about 15 -- and I'll say 20 minutes, to be certain.

I want to see the notebook. I don't want to get involved in the collateral matter at this time. I'd just like to see what you're going to submit to me so I can start looking at it. I don't want a distraction, though, by the plaintiff. There's going to be plenty of time to discuss this. So we're not going to rush into this until this evening and all of us have had a chance so you can get some rest and stay focused. I'll see you at 9:45.

09:28AM

09:45AM **(Recess from 9:28 a.m. to 9:45 a.m.)**

**(In the presence of the jury.)**

THE COURT: Counsel, have a seat. Thank you for your courtesy. We're back in session. Counsel and parties are present. Deputy Gotts is present and on the stand.

09:45AM Counsel, you have 15 more minutes, please.

MS. MKRTCHYAN: Yes, Your Honor. I have no more questions.

THE COURT: Reserve the rest, then, for cross -- I'm sorry, redirect.

09:46AM And then, Counsel, cross-examination.

MR. HARRELL: Thank you, Your Honor.

THE COURT: Now, we had 40 minutes yesterday. We had an hour today, an hour and 15. So you have about an hour and a half or so, right in that area, divided between the two of you.

09:46AM


6-GottsSER-00967

MR. HARRELL: Understood, Your Honor.

THE COURT: All right.

**CROSS-EXAMINATION**

BY MR. HARRELL:

09:46AM Q Good morning, sir.

A Good morning.

Q So the jury can get to know a little bit about you, do you have any family?

MS. MKRTCHYAN: Objection, Your Honor. Relevance.

09:46AM THE COURT: No. Overruled. We're going to develop -- so far, through the mother, we've developed a whole background with Mr. Holloway. We know a lot about him. I'm going to let you develop some background about the individual officers as well. And I'll let Mr. Holloway develop his

09:46AM background family as well. Overruled.

BY MR. HARRELL:

Q Sir, do you have any family?

A Yes, I do, sir.

Q Who?

09:46AM A I am happily married with three children, ages 6, 2, and 5 months.

Q Sir, when did you go to the sheriff's academy?

A I attended the deputy sheriff's academy in January of 2013 through approximately July of that same year.

09:47AM Q And why did you decide to go into law enforcement?




6-GottsSER-00968

A My father was a law enforcement officer with the Orange County Probation Department, and my grandfather was a state trooper in the state of Michigan. And I decided I want to follow in their footsteps and serve the community that I lived in.

09:47AM

Q Let's talk about the academy a little bit. Is there an academic part to the academy? Do you learn about the rules about when officers may and may not use force in order to subdue criminal suspects?

09:47AM

A Yes, sir.

Q Are there classroom lectures on that?

A Yes, sir.

Q Is there written testing to make sure you have properly absorbed what you've been taught?

09:48AM

A Yes, sir.

Q Now, with reference to the academy, is there a physical fitness part to the academy?

A Yes, sir.

Q What time do you need to wake up when you're in the Orange County Sheriff's academy?

09:48AM

A As I recall, around 5:00 in the morning.

Q Okay. And what time do they let you get some sleep?

MS. MKRTCHYAN: Objection, Your Honor. Relevance -- relevance of this.

09:48AM

THE COURT: Counsel?

Not about sleep.

MR. HARRELL: It's to --

THE COURT: All right. Let's move on.

MR. HARRELL: It's to show how hard it is to get the job.

09:48AM

THE COURT: I'm letting you, for both sides, to develop some family background, who they are. This came in through the mother, Mr. Holloway, that courtesy. I'm giving you that courtesy.

09:49AM

But sustained. What time they get up in the morning is irrelevant.

BY MR. HARRELL:

Q Sir, how long does the academy go on for?

A It's approximately six months.

09:49AM

Q Between the academic requirements and the physical fitness requirements, did everybody in your academy class make it through and graduate?

MS. MKRTCHYAN: Objection, Your Honor. This is not relevant.

09:49AM

THE COURT: Well, it goes to show the degree of training. If it relates to physical force, I'll allow the question, Counsel.

THE WITNESS: No.

BY MR. HARRELL:

09:49AM

Q Did you make it through?

A Yes, I did, sir. I graduated in approximately July of that year.
Q And remind us again what year that is.
A 2013. Sorry about that.
09:50AM Q Okay, sir. So you became a peace officer in the state of California at that time; true?
A Yes, sir. I was sworn in as a peace officer in the state of California.
Q So at the time of this incident, you had been a law
09:50AM enforcement officer for about how long approximately?
A Approximately five years.
Q Now, during that time and following your graduation from the sheriff's academy, have you had additional training on when and how force may be used in order to subdue criminal suspects?
09:50AM A Yes, sir. We receive training on an annual and biennial basis for use-of-force application. It comes under our perishable skills.
Q Okay, sir. And is that a requirement in your department?
A Yes.
09:50AM Q As you understand it, why is there continued training on use of force after you've been to the sheriff's academy?
A Well, the title kind of sums it up, perishable skills. California POST has determined that use of force, arrest tactics and techniques, de-escalation are all things that we
09:51AM need continuous training on so that we can keep it fresh as we

apply it in the field.
Q At the time of this incident, January 21 of 2018, how much training do you believe that you had had as a law enforcement officer, including the academy?
A I would have been to a handful of perishable skills classes, the annual training classes that we receive as well as the six months in the academy.
Q Can you quantify that in terms of hours? What does it all add up to in terms of the training that you had to be a law enforcement officer at the time that you were called for this incident?
A I don't recall the exact number of hours. I could get a calculator out and try to give you some quick math, sir.
Q Well, no, that's not necessary. Can you give us a best estimate? Are we talking three hours? 30 hours? More, less?
A There are several hundred hours of training between the academy and the ongoing perishable skills classes that we have after the academy.
Q Okay, sir, with all that training and your experience of five years at that point, when you received the call in this case about the little girl in trouble, did you believe that you had the training to help out?
A Yes.
Q Well, let's get right to it, then.
Were you involved in the first contact with


6-GottsSER-00972

Mr. Holloway in reference to the domestic violence at his tent?
A No, sir.
Q Where were you at that time?
A Probably driving into the station that I work at.
Q And that station is located where?
A 20202 Windrow Drive in the city of Lake Forest, known as the Saddleback Substation.
Q Okay. So what first attracted your attention to the incident that turned into this lawsuit?
A Well, at approximately 4:30 in the morning, I went in service in the city of Rancho Santa Margarita, which borders the Trabuco Canyon area where O'Neill Park is located. And as I recall, dispatch was advising the unincorporated units who normally patrol that area of a second response for an altercation that was occurring at the campground.
Q Okay. And this is about what time of day or night?
A 4:30 in the morning approximately.
Q And what type of disturbance did you hear about from 911?
A As I recall, there was a -- an initial broadcast regarding the same subject that they had previously contacted was now going from campsite to campsite. And it was a general broadcast for a 415, which is the Penal Code for disturbing the peace.
Q So, sir, based on your training and experience, when you heard this information from 911, is this the type of call


6-GottsSER-00973

that's worthy of a law enforcement response?
A Yes. And dispatch believes so as well as they sent deputies.
Q So when you first receive notice that there was a problem at O'Neill campground with regard to somebody causing a disturbance with their neighbors, where were you at that time?
A I believe I was in the area of Rancho Santa Margarita or commuting, driving to in the patrol car with my FTO, Deputy Gunderson.
Q Okay. Did Deputy Gunderson, G-u-n-d-e-r-s-o-n, did he have any supervisory role with regards to your work on that night?
A Yes, he did, sir.
Q Describe that for us a little bit.
A Deputy Gunderson was my Phase 4 field training officer. His job would have been to evaluate me and determine whether I was considered able to operate as a patrol deputy in a solo, competent manner.
Q Was Deputy Gunderson on scene -- and I'm jumping ahead now. Was Deputy Gunderson, your supervisor, was he present on scene when you say you put your knee on Mr. Holloway's back to help hold him down?
A He was on scene. However, he wouldn't have been my supervisor, just my field training officer.
Q Okay. He was on scene. Your field training officer,



 6-GottsSER-00974

Deputy Gunderson, was on scene at the time you say you placed your knee on Mr. Holloway's back; true?

A Yes.

Q All right. So after you receive information from dispatch about somebody causing a disturbance at the campsite, did you receive any more information about what that suspect was doing before you arrived on scene?

A Yes, I did.

Q What did you learn?

A Dispatch upgraded the call to a Priority 1 response and advised that one of the 911 callers had reported that there was a little girl or female screaming, and then they requested that deputies respond Code 3, which would be our lights and sirens.

Q Now, are you at the wheel in the patrol car with Gunderson, or is he at the wheel?

A Deputy Gunderson would have been in the front passenger seat; I would have been in the driver's seat.

Q All right. So when you heard the broadcast about lights and sirens, what did you do?

A From approximately the area of what would have been Santa Margarita Parkway, El Paseo, somewhere in that civic area of Rancho Santa Margarita, I responded to the O'Neill campground.

Q Okay. Are your lights and sirens, are they activated?

A Yes, sir.

Q Do you accelerate your speed to get there more quickly?
A Yes, sir.
Q Okay, sir. In order to do your job, do you have a working knowledge of California criminal law?
09:58AM A Yes, I do, sir.
Q And where do you get that information from?
A We receive basic training on California law when we're in the academy. And then throughout the field training program, we're constantly tested on our knowledge of penal codes, health and safety codes, welfare and institution codes.
09:58AM
Q Okay. So let's go back to how you were thinking on that night. Based on your training and experience, is a report that a suspect that's causing a loud disturbance in the middle of the night, can that possibly be a crime under California law, based on your training and experience?
09:59AM
A Yes, sir. Under California Penal Code 415(1), -(2), or -(3), there could be a disturbance.
Q Disturbing the peace is a crime in our state?
A Yes, sir.
09:59AM Q All right. How about going into someone's RV that doesn't belong to you? Can that be a crime under your understanding of the California Penal Code?
A Yes. That would constitute potentially California Penal Code 459, which is a burglary.
09:59AM Q All right. A little girl screaming could be anything


6-GottsSER-00976

from an assault, or God forbid, a murder; right?

MS. MKRTCHYAN: Objection, Your Honor. Assumes facts not in evidence.

THE COURT: Misleading.

10:00AM Just re-ask it.

BY MR. HARRELL:

Q Sir, do you have any concerns on that night that the report of the little girl screaming could possibly be a violation of California law?

10:00AM A Yes, sir. And our department would classify that as unknown trouble at the time as we don't specifically know what's going on. We just know that there's somebody in distress.

Q All right. And who was it that told you to go to

10:00AM Priority 1?

A Dispatch upgraded the call to a Priority 1, Code 3 response.

Q Did you second-guess that at all when dispatch told you to upgrade the call to Priority 1?

10:00AM MS. MKRTCHYAN: Objection. Vague and ambiguous, "second-guess."

THE COURT: Do you understand the question?

THE WITNESS: Yes, I do, Your Honor.

THE COURT: You can answer it then.

10:00AM Overruled.

THE WITNESS: No. Based on my training and experience, I recognized that dispatch was advising there was a subject in distress and there were numerous penal code violations occurring. So for public safety, it warranted a Code 3 response.

BY MR. HARRELL:

Q Okay, sir. So based on the information that you had to this point, when you activated your lights and sirens and started on your way, did you have any safety concerns for yourself?

A Yes.

Q Did you have any safety concerns for the people in the campground that were experiencing loud, threatening shouts?

A Yes, sir.

Q Did you have any safety concerns for the people in the RV?

A Yes.

Q Did you have any safety concerns for the little girl?

A Yes, I did.

Q Did you think that you could help out if you got there in time?

A Yes, I did.

Q Now, you did have a screen in your patrol vehicle that flashes up information; true?

A Yes, sir.

Q How does that help you do your job on calls like this one?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE COURT: Overruled. That has a time on it also, doesn't it?

THE WITNESS: I'm sorry?

THE COURT: It has a time on it also, doesn't it?

THE WITNESS: Yes, Your Honor.

THE COURT: Overruled.

THE WITNESS: So the MDC, which is abbreviated for mobile data center, which is essentially a laptop that's positioned in our patrol vehicle, there's several applications that run on that, one of which is a CAD, which is essentially a patrol log of what is occurring. It doesn't necessarily verbatim quote what dispatch is giving us over the air, but it's a general synopsis of what dispatch is providing, line by line.

BY MR. HARRELL:

Q And we've already seen some of that in this trial; true?

A Yes, sir.

Q The information that flashes up on your screen, as you understand it, is stored on a computer so it can be printed out later if that needs to happen; right?

A Yes, sir.

Q Okay. Now, have you done anything to get ready for this

trial in terms of reviewing the dispatch information that you received on that night?

A Yes, sir.

Q Okay, sir. Now, how did you eventually settle on Campsite 65 as a place that you needed to be on the second call, the only one that you responded to?

A Well, dispatch had advised that the disturbance was a second response and the initial response was to Campsite 65.

Q Okay. Now, when you did arrive on scene, what did you see when you very first got there?

A To the left of my patrol vehicle I could see an altercation occurring at a campsite that had a blueish multicolored tent and a white pickup truck.

Q Now, you now know that the altercation involved Mr. Holloway; true?

A Yes, sir.

Q Going into this incident, did you know anything about him apart from what you had seen on your dispatch screen in your vehicle?

A No, sir. I had no prior knowledge of Mr. Holloway.

Q Did you have some type of grudge or grievance against him when you received the call to go to Campsite 65?

A No. I never had contact with Mr. Holloway prior to the incident.

Q What was your law enforcement objective when you showed


6-GottsSER-00980

up on that night as you did? What did you want to do?
A I was dispatched as a follow deputy. So the objective was to ultimately assist the handling deputy. More broadly, to make the scene safe and to ensure that we didn't have a little girl that was in trouble, screaming in distress, as well as stop any active threat to potentially the campers in the RV or anywhere else at the campsite.
Q Now, you say when you very first arrived on scene, that there were three sheriff's deputies engaged in a struggle with Mr. Holloway; correct?
A Yes, sir.
Q Were they already on the ground at this time?
A I saw an altercation occurring on the ground. I don't know who exactly was on the ground at that point.
Q When you did show up on scene, did it occur to you that there was already enough law enforcement there, that you weren't needed?
A No.
Q Why did you stay and help out?
A There was an active altercation occurring, which, to me, based on my training and experience, indicated that this individual wasn't under control. He wasn't handcuffed. And based on the information that dispatch had advised that there were knives previously observed in this individual's campsite, I don't know whether he has a weapon or not.


6-GottsSER-00981

Also just prior to my arrival, the deputy had broadcasted that they had this individual at gunpoint, followed by a transmission of 415, which indicates there's a physical altercation now appearing between that deputy and that individual. And I don't know whether that gun has been secured or whether that gun is in this individual's possession, whether or not there's an active struggle occurring for this gun.

Q Now, sir, you've heard the term "command presence" in this trial; true?

A Yes, sir.

Q You've been trained on that term; true?

A Yes, sir.

Q Sir, based on your training and experience, by having multiple officers there squared off against one suspect, based on your training and experience, is that supposed to make it more likely or less likely that force will need to be used?

MS. MKRTCHYAN: Objection. Lacks foundation.

THE COURT: Just a moment.

Do you understand the question?

THE WITNESS: Yes, Your Honor.

MS. MKRTCHYAN: It's vague and ambiguous.

THE COURT: Overruled.

You can answer that question.

THE WITNESS: Thank you, Your Honor.

The general objective of having multiple officers


6-GottsSER-00982

respond to an active altercation is to try and de-escalate the situation by having multiple deputies presenting command presence to try and encourage the individual to cooperate versus become combative.

10:08AM BY MR. HARRELL:

Q Based on your training and experience, does bringing multiple officers to a situation like this one, does that generally work in avoiding any use of force?

MS. MKRTCHYAN: Objection again. It's irrelevant.

10:08AM THE COURT: Too broad also. You can talk about his experience and if he's had that experience personally. But it's too broad a question. Sustained.

BY MR. HARRELL:

Q Well, sir, how many deputies were engaged in the struggle
10:08AM with Mr. Holloway when you arrived on scene? Please remind us.

A When I initially arrived, there were three. However, Deputy Borba arrived just moments before me -- or just seconds before me. And before I became involved in the altercation, Deputy Borba -- sorry, Deputy Borba was involved in the
10:08AM altercation by that point. So a total of four before I became involved.

Q So, sir, based on your command presence training, would it have been consistent with that training for you to leave?

MS. MKRTCHYAN: Objection. Vague and ambiguous.
10:09AM Incomplete hypothetical.

THE COURT: No. At that point in time. Overruled. You can answer the question.

THE WITNESS: Thank you, Your Honor.

THE COURT: And this is confined to that night at that point in time where Borba is just in front of you.

THE WITNESS: Well, no. And at that point in time, we would be beyond mere command presence to try to gain compliance. There is an active struggle going on with an individual who's actively resisting being taken into custody.

BY MR. HARRELL:

Q Now, when your patrol vehicle comes to a stop, you exit the vehicle; correct?

A Yes, sir.

Q And when you do exit the vehicle, how far away are you from this struggle that's going on on the ground?

A I don't recall the exact distance. If there's prior testimony that indicates a more accurate number, I would defer to that. But I would say probably about 30 feet.

Q Okay. That is your best estimate at this point in time?

A Yes, sir.

Q All right. And what is the lighting like?

A Well, it's pitch black. There's no street lamps or anything like that that I'm aware of at the campground. So outside of the lights from the patrol vehicle, it would have been completely dark.


6-GottsSER-00984

Q So, sir, you were asked by plaintiff's Counsel why not move your car around such that the headlights of the car are shining on this struggle.

Do you remember that?

10:10AM A Yes, sir.

Q Why not take time to move your car around such that lighting is on the struggle that's going on?

A Well, my focus at the time of parking the vehicle was to get to the active altercation and make the scene safe. Again, 10:10AM I reiterate that I don't know if this individual's armed with a bladed weapon or if the gun that my partner had him at gunpoint with is in the mix of this. And I would hate to be positioning my car in such a way, taking the time to do that, and then have one of my partners get shot by a gun that's in the mix or 10:11AM stabbed.

MS. MKRTCHYAN: Objection, Your Honor. This is -- assumes facts not in evidence.

THE COURT: Overruled.

BY MR. HARRELL:

10:11AM Q Which did you think was more important, sir? Going to help out in this situation or driving your car such that there were lights on the struggle that you were observing?

A My training and experience would tell me that assisting the deputies who are in an active struggle or altercation with 10:11AM an individual would take priority over parking my car in such a


6-GottsSER-00985

manner.
Q Now, let's talk about your path to the struggle. As you made your way there, describe how quickly or slowly you were moving to get to this struggle.
A I believe in the video you can hear my door opening and closing while the car is still going into park. As for the pathway to the altercation, the campground has an asphalt narrow roadway, which I was initially parked on, and then it would transition to loose gravel and dirt as I made my way towards the campsite.
Q Okay, sir. And how quickly or slowly are you moving to the struggle when you're on foot?
A I would say at a pretty brisk pace, quickly.
Q Okay. And I believe that you told us that you fell on your way to the struggle?
A Yes, sir.
Q Can you describe that for us.
A As I exited my patrol vehicle and transitioned from what I believe was asphalt to dirt or gravel, I lost my footing, went to the ground very briefly, popped myself back up, and continued towards the altercation at a quick, brisk pace. I would call it running towards the altercation.
Q Why run instead of walk?
A Well, there's an active altercation with an individual who may be armed with a bladed weapon. Again, I don't know the


6-GottsSER-00986

status of my partner's firearm.
Q So when you fell to the ground, did your palms make contact with the ground at that time?
A Yes, they did, sir.
10:13AM Q Did you receive any cuts or abrasions to your palms at that time?
A I recall having some minor abrasions and cuts to my hand.
Q Did your palms bleed as a result of falling to the ground?
10:13AM A I do recall wiping blood off my hands when I was on scene.
Q All right. Did that blood on your palms, did that have anything to do with physical contact with Mr. Holloway?
A I don't believe so. My hands were only involved in trying to get his left arm out from underneath him.
10:14AM Q Okay. Now, when you did fall, did you say, "Wait a minute. I'm hurt. I can't help out"? Did you say anything like that?
A No. If I would have sustained an injury that would have prevented me from returning toward the altercation, I wouldn't be able to go there. But that didn't occur.
Q So what did you do after you picked yourself up?
A I continued towards the altercation to assist my partners.
Q So did you eventually make contact with Mr. Holloway down on the ground?
10:14AM A Yes, I did, sir.

Q Okay. Sorry, sir, just getting oriented with my pens.
So what did you do when you initially started to help out?
A As I stated, I came in with a knee, and I placed it on Mr. Holloway's upper back. I recall it being a little bit more to the left, but believe it was somewhere in between his shoulder blades.
Q Okay. And why did you do that, based on your training and experience?
A Well, Mr. Holloway was on the ground, stomach and chest on the ground, and his arms had been underneath his chest. Based on my training and experience, somebody could have a weapon concealed on their person in those areas, such as a waistband, coat pocket, anywhere like that. So applying the knee would immediately prevent Mr. Holloway from being able to get up and produce a weapon.
Additionally, by applying the knee with some force, we would potentially be able to get Mr. Holloway's arm -- in this case, left arm since that's the side I was on -- freed from underneath him so that we could get it under control, place it in the small of his back, and place handcuffs on him.
Q Have you been trained, to this point in your career on the night of the incident, on using body weight to help keep a suspect on the ground?
A Yes. Body weight is often used to keep suspects in place

on the ground during an active altercation. It falls under controlling force in our department's policy.

Q Why not let Holloway up and let him do anything that he wants?

A That would be how someone would potentially get hurt.

Q Why do you say that? What were you concerned about?

MS. MKRTCHYAN: Objection, Your Honor. It's vague and ambiguous, and it's irrelevant.

THE COURT: Overruled. This goes to the officer's state of mind at the time.

Counsel, you can --

Or you can answer that question.

THE WITNESS: Thank you, Your Honor.

Sir, could you repeat the question.

BY MR. HARRELL:

Q Sure. Why not let Mr. Holloway get up and do anything that he wants? Why use your knee to help secure him on the ground?

A Well, there's a number of reasons. One, Mr. Holloway was under arrest at that point for California Penal Code 148(a)(1), potentially California Penal Code 69. So allowing him to just walk around isn't an option. He's being taken into custody.

Number 2, there's safety concerns for the public and for officers on scene. Number 3, ideally we'd like Mr. Holloway to just cooperate so that we can proceed forward

with the investigation, place him in handcuffs, figure out what's going on, and resolve this whole thing without any force.

Q So there has been a claim in this case that somebody kneed Mr. Holloway in the head. I want you to describe what you did with your knee and how you did it on that night.

A Yes, sir. So as I stated, as I proceeded towards the altercation, I came into where the altercation was with Mr. Holloway, who was on the ground, again, stomach and chest on the ground, back facing upwards towards me. I placed my right knee with some force into Mr. Holloway's upper back, somewhere between his shoulder blades. Again, I recall it being a little closer to the left side.

I then assisted with getting Mr. Holloway's left arm out from underneath his chest/stomach area so that it could be placed on the small of his back and he could ultimately be handcuffed.

Q And, again, what side of Holloway are you on? The right? The left? Someplace else?

A I'm on his left side.

Q Okay. When you placed your knee on Mr. Holloway's back, with you on the left side, were you trying to hurt him at that time?

A Well, the application of body weight would be controlling force. However, the application of knee would fall under


6-GottsSER-00990

potentially injuring force. And the objective was, again, to get Mr. Holloway's left arm out from underneath of him. Again, not knowing whether he's armed with a bladed object, not knowing the status of my partner's firearm, the objective is to get the arm out, place it in the small of his back so he could be handcuffed.

Q Now, sir, who were the three other deputies that were with Mr. Holloway when you first arrived on scene? Their names, please.

10:20AM A As I know now or at the time of my arrival, sir?

Q As you know now.

A The three initial deputies were Deputy Renegar. And as I know now, Deputy Pahel and Deputy Gonzalez.

Q Okay. Of those three, did you know any of them prior to the date of this incident?

A Yes, sir.

Q Who?

A I knew Deputy Renegar, and I knew Deputy Pahel.

Q How about Deputy Gonzalez?

10:21AM A I don't recall knowing Deputy Gonzalez prior to this. I may have had -- we worked out of the same station, so perhaps passed each other in the hallway or the locker room. But I don't recall having any knowledge of him other than now in this lawsuit.

10:21AM Q Okay. And when you did place your knee on Mr. Holloway's

back, your field training officer, Deputy Gunderson was there evaluating your conduct; right?

MS. MKRTCHYAN: Objection. Calls for speculation. Lacks foundation.

BY MR. HARRELL:

Q That was your understanding at least?

THE COURT: Just a moment. He was there certainly. And your question, then, is also evaluating his conduct at that time in the altercation or after?

MR. HARRELL: I can rephrase it.

THE COURT: All right. I'm going to sustain the objection. Oh, there's no objection, but it's compound.

BY MR. HARRELL:

Q Sir, when you placed your knee on Mr. Holloway's back in the manner you've told us about, was Deputy Gunderson on scene?

A Yes, sir.

Q Whether he was evaluating your conduct at that time, you don't know one way or the other; right?

A Correct, sir. I don't know. My focus wasn't what Deputy Gunderson was doing. My focus was, again, dealing with the subject who the active altercation was occurring with.

Q But you do know your FTO, your field training officer, was there on scene, and his assignment at that time, in part, was to evaluate your conduct; true?

A Yes, sir.

Q All right. So going back to Deputy Renegar, you said you knew him at that time?
A Yes, sir.
Q Is he somebody you socialized with outside of work?
A No, sir.
Q Deputy Kevin Pahel, you said he was also there?
A Yes, sir.
Q Is he somebody that you socialized with outside of work?
A No, sir.
Q I believe plaintiff's Counsel mentioned kicks to the head. Do you remember that when she had the podium?
A Yes, sir.
Q Did you ever kick Mr. Holloway in the head?
A No, sir.
Q Did you see any of your colleagues ever kick Mr. Holloway in the head?
A No.
Q Did anything like that happen?
A I did not witness any kicks to the head from anybody on scene.
Q Okay. Did you come running up and knee Mr. Holloway in the head?
A No.
Q Did you do, for lack of a better word, just a drop-knee on Mr. Holloway and just drop your body weight with your knee



6-GottsSER-00993

making contact with Mr. Holloway's head?
A No.
Q Did your knee even brush up against Mr. Holloway's head on that night?
A I have no recollection of my knee contacting Mr. Holloway's head during this incident.
Q Now, when your knee was on Mr. Holloway's back, where was his face at that time?
A Well, as I previously testified, Mr. Holloway was down on the ground, stomach and chest. His face would be generally down. I don't know whether it was moving to the left, to the right.
Q Okay. While Mr. Holloway was down there on the ground during this struggle, as you observed it, was Mr. Holloway making an effort to keep his face elevated up off the ground at all times while this struggle was going on?
MS. MKRTCHYAN: Objection, Your Honor. Lacks foundation. Calls for speculation. Vague and ambiguous.
THE COURT: It also lacks foundation.
It's sustained, Counsel. You can ask him what he saw, heard, or did.
BY MR. HARRELL:
Q Sir, did you ever see Mr. Holloway, while this struggle was going on, at least while you were there, do anything with his head that you considered to be an effort by Mr. Holloway to


6-GottsSER-00994

keep his face from receiving cuts or abrasions from the gravel on the ground?

MS. MKRTCHYAN: Objection, Your Honor.

THE COURT: I'm going to sustain that, Counsel. You can ask if he tried to raise his head or what the position was, et cetera, but there's no way of knowing what Mr. Holloway is thinking.

BY MR. HARRELL:

Q Sir, did you ever see Mr. Holloway raise his face up such that it was not making contact with the gravel and the dirt?

A Mr. Holloway's head wasn't my focus during my force application. I don't recall seeing Mr. Holloway lifting his head up. And I know that his arms were initially tucked underneath of his chest/stomach area. So I didn't see them covering his face at any time.

Q So let's get back to Mr. Holloway and your arriving there on scene. When you first arrived on scene, the other three deputies, are they already in physical contact with Mr. Holloway?

A Yes, sir.

MS. MKRTCHYAN: Asked and answered, Your Honor. It's already going into same cumulative.

THE COURT: Overruled.

BY MR. HARRELL:

Q Who had ahold of what when you first arrived on scene?


6-GottsSER-00995

A When I initially arrived on scene, the only deputy that I recognized was Deputy Renegar. I saw him down near the legs area of Mr. Holloway. I don't know -- or at the time of my response, I did not know who the deputy to the left of and the deputy to the right of Mr. Holloway was.

10:27AM

And then as I testified earlier, Deputy Mark Borba arrived seconds before me and became involved. When I arrived on scene, Deputy Borba was to the right of Mr. Holloway, his, like, shoulder area.

10:28AM

Q Okay. You now know that Deputy Kevin Pahel is over to Mr. Holloway's left-hand side; true? You now know their names; right?

A Yes, sir.

Q Okay. When you first arrived on scene, did Deputy Pahel, to your observation, did he have a hold of any part of Mr. Holloway?

10:28AM

A I believe there -- Deputy Pahel was trying to secure Mr. Holloway's arm, again, underneath of his chest. But my focus wasn't necessarily on what Deputy Pahel or Deputy Gonzalez was doing. So I don't know their exact techniques or maneuvers that they were doing during this altercation.

10:28AM

Q Fair enough. Generally speaking, Deputy Pahel is over to Mr. Holloway's left-hand side while he's face down?

10:29AM

MS. MKRTCHYAN: Objection. Lacks foundation.


6-GottsSER-00996

BY MR. HARRELL:

Q Is that accurate?

MS. MKRTCHYAN: He already testified that he didn't see what other officers were doing.

10:29AM THE COURT: It's also leading, Counsel. You can ask him what he saw.

BY MR. HARRELL:

Q Sir, do you have a memory of whether or not the deputy who you now know to be Kevin Pahel, do you have a memory of whether he was on Mr. Holloway's left side, his right side, or someplace else when you first arrive on scene?

A Well, I know there was a deputy on his left side, the left midsection area, and I now know that to be Deputy Pahel.

Q Okay. Let's move to the right side.

10:29AM Do you have any understanding as to who, generally speaking, was over on Mr. Holloway's right side while he was face down on the gravel?

THE COURT: Then or now?

MR. HARRELL: Okay.

10:30AM BY MR. HARRELL:

Q At the time that you first arrived, okay, at that time, did you see anybody over to Mr. Holloway's right side, the right side of his body while he was face down in the gravel?

A Yes, I did.

10:30AM Q Do you now know who that is?


6-GottsSER-00997

A Yes, I do.
Q What is that individual's name?
A I now know that individual to be Deputy Gonzalez.
Q Okay. Did you see Deputy Gonzalez having any physical contact with Mr. Holloway at that time when you first arrived on scene?
A Again, I recall the active struggle to -- by both deputies on the left and right to get the arms out from underneath him. However, I couldn't testify to their individual actions. It wasn't my focus at the time.
Q Okay, sir. So let's get back to what you did.
After you placed the knee on Mr. Holloway's upper back, what did you do next?
A I assisted with getting his left arm out from underneath of him so that we can place it in the small of his back and handcuff him.
Q Okay. And what is your law enforcement objective in wanting to get Mr. Holloway handcuffed?
A Once we have an individual handcuffed, it greatly reduces the likelihood or probability that an individual is going to be able to be combative or use their hands to access a weapon that could cause harm to us or the general public.
Q Now, your first involvement in this incident involving two encounters was the second encounter when Mr. Holloway was already down on the ground; right?

Case: 25-7132, 08/25/2026, DktEntry: 44.7, (93 of 198)



A Yes, sir.
Q Speaking for yourself, when you were trying to get his arm out and get him handcuffed, did you know whether or not Mr. Holloway might have a weapon somewhere underneath of his body that he was trying to reach for?
10:32AM
MS. MKRTCHYAN: This has been asked and answered, Your Honor, several times.
THE COURT: I'm going to let you answer that one more time.
10:32AM
THE WITNESS: Thank you, Your Honor.
As I testified to earlier, I don't know at the time of my arrival whether Mr. Holloway has a bladed weapon on his person, under his person, or whether the firearm that was involved when my partner put out one at gunpoint had been reholstered or was involved in this altercation at that time.
10:33AM
BY MR. HARRELL:
Q What did you do to try to get Mr. Holloway's hand out from under his body?
MS. MKRTCHYAN: Asked and answered, Your Honor. We went through these series of questions several times already.
10:33AM
THE COURT: Counsel, haven't we covered this? I'll give you latitude one more time but just to be certain.
THE WITNESS: Well, initially as I approached, came in with a knee, placed it with some force into Mr. Holloway's upper back, again, we're calling it being a little more towards
10:33AM



 6-GottsSER-00999

the left side. Objective with that was to keep him on the ground but also try and get him to release his left arm, which, again, I could see an active struggle between the deputies that were there to try and get Mr. Holloway's arms out from underneath of him. Then I transitioned to helping try to get that left arm out so we could place him in the small of his back and handcuff him.

BY MR. HARRELL:

Q When you first pulled on Mr. Holloway's arm, were you able to get the hand out?

A And if I may add to the last question that you'd asked me so there's no confusion with the jury, while I was assisting to get the left arm out, my knee remained in place on Mr. Holloway's upper back.

And then your last question, sir? I'm sorry.

Q Sure. When you first -- and my question, again, was what did you do to get his arm out?

A As I recall, it would have been just grabbing ahold of it and trying to pull it out.

Q Did Mr. Holloway work with you at that time and bring his arm out?

A Initially there was active resistance in keeping it tucked under there. But we were able to get it out and, again, within the somewhat less than 15 seconds that I was involved, wherever the time frame is on that.

Q Okay. Now, you had with you a baton on that night?
A I had a collapsible baton known as an ASP, for the record, A-S-P.
Q What is an ASP?
10:35AM A It's a collapsible baton. When normally carried, it's roughly 6 to 8 inches in length. There's a motion that you do with it to extend it outward in which time it becomes roughly 8 to 20 inches in length, depending on the type.
Q Okay. When Mr. Holloway resisted your initial efforts to 10:36AM get his arm out, why not use the baton and start hitting Mr. Holloway?
A I didn't feel like that was a reasonable force application at that time.
Q What type of injuries would you expect to produce on 10:36AM Mr. Holloway if that baton had made contact with one of his bones?
MS. MKRTCHYAN: Objection. Relevance, Your Honor. There is no allegation that the baton was used.
THE COURT: Overruled.
10:36AM You can answer that question.
THE WITNESS: Thank you, Your Honor.
Well, the baton falls under the upper end of injuring force within our department policy. We're trained that baton strikes can often result in broken bones or internal 10:36AM damage to an individual, internal injuries.


6-GottsSER-01001

BY MR. HARRELL:
Q So you did not use a baton on that night, did you?
A No, sir.
Q Now, you were asked by my opponent what your colleagues were doing or not doing; right?
A Yes, sir.
Q When you were down there on the ground with Mr. Holloway, based on your training and experience -- based on your training and experience, do you have some obligation to visually check out what everybody else is doing at all times?

MS. MKRTCHYAN: Objection, Your Honor.

THE COURT: Sustained.

You can re-ask it. It's a proper question. But are you asking about police policy or what he saw? There's "some obligation" is what's confusing me. I don't understand what that means.

MR. HARRELL: Right.

BY MR. HARRELL:
Q Sir, based on your training at the Orange County Sheriff's Department, when you were down there on the ground with Mr. Holloway, are you required to visually check out what everybody else is doing at all times?

MS. MKRTCHYAN: Same objection, Your Honor. That is -- first of all, it's irrelevant.

THE COURT: Yeah, I'm going to sustain that,


6-GottsSER-01002

Counsel. Sustained.

BY MR. HARRELL:

Q Sir, why not check out what everybody else is doing at all times when you're down there on the ground with Mr. Holloway?

THE COURT: That's confined to this evening in this incident, not generally.

MS. MKRTCHYAN: That's argumentative, Your Honor. It's vague.

THE COURT: Overruled. You can answer that question.

THE WITNESS: Thank you, Your Honor.

Force application is a technical activity for best, for lack of better terms. So my focus, when I'm using force, is on my actions and what I'm doing and continuously making sure that what I'm doing is in response to an action or resistance that I'm facing. So my focus isn't going to be on what other officers or deputies are doing because then I would lose sight of the force that I'm applying and whether or not it's reasonable for that circumstance that I'm continuing to face.

So a use of force is a fluid incident, and there are ever-changing components that are occurring within that. And so we have to constantly adjust the force that we're using based on the compliance or the resistance that we're


6-GottsSER-01003

encountering.

BY MR. HARRELL:

Q Now, sir, based on your training and experience at the sheriff's department, when you write a report, are you supposed to account for what all your colleagues are saying and doing?

A No.

Q Why do you say that?

A Well, when a use-of-force investigation occurs, it's not done in a vacuum of one deputy's report, unless there is only one deputy involved in the incident. If there are multiple deputies involved in a use-of-force incident, then there's going to be numerous reports from each one of those deputies indicating what their force application was and why they believed that they were justified in applying that force at the time of the incident. So in investigation would encompass all of those reports, and they would be reviewed, for a lack of better terms, totality of the circumstances during that use-of-force investigation.

Q When you were down there on the ground on that night, was there any particular person that you had your eyes on, that you had your focus on?

A Well, my focus was on getting Mr. Holloway under control.

Q Why not put your visual focus on your colleagues instead of Mr. Holloway? What were you taught about that?

A Well, again, as I testified a few moments ago, during the

use-of-force application, my focus needs to be on the force that I'm applying and whether or not the resistance that I'm encountering is continuing to justify that force.

Q Did there come to be a time where Mr. Holloway was successfully handcuffed?

A Yes, sir.

Q Were you involved in that?

A Yes, I was.

Q And what was your involvement in applying handcuffs to Mr. Holloway?

A Again, as I stated, I assisted with getting his left arm out. I don't recall whether I specifically placed handcuffs on Mr. Holloway or whether I held his hand in place while another deputy put the handcuffs on.

Q Okay, sir. Did you use any force on Mr. Holloway after the handcuffs were applied?

A No, sir.

Q Sir, have we now heard about all the force that you used on that night?

A Yes, sir.

Q Which, just to sum up, is a knee placed on Mr. Holloway's upper back towards the left side; true?

A Yes, sir.

Q You grabbing ahold of one of Mr. Holloway's arms and pulling on that to try to get his arm out; right?

A Yes, sir.
Q Did you use any other force aside from those two that we just mentioned?
A No, sir.
10:42AM Q Okay, sir. Now, when plaintiff's counsel had the floor, you indicated that you had looked at the timestamp on your tape of the incident; true?
A Yes, sir.
Q Why did you do that?
10:42AM A In our prior proceeding, Mr. Holloway had made an allegation about a specific time that I had kneed him in the head.
Q Okay, sir.

MR. HARRELL: Your Honor, this -- we'd now like to
10:42AM read one question and one answer from a prior proceeding.

THE COURT: Just a moment. I don't know what you're reading from.

MR. HARRELL: Your Honor, we have a transcript.

THE COURT: You may have a transcript, but I still
10:42AM don't know what you're reading from.

MR. HARRELL: Your --

MS. MKRTCHYAN: Your Honor, I object. First of all, this is improper impeachment.

THE COURT: Just hand it to me, Counsel. Let me see
10:43AM what this is.

MS. MKRTCHYAN: His testimony --
THE COURT: Counsel, just a moment. I want to see what this is before we get into an argument.
Is this --
MR. HARRELL: Your Honor, this is a prior proceeding. It bears the date of August 1, 2023.
THE COURT: Counsel, you'll put that in front of me now. Just come on up informally and hand it to me.
**(Document handed to the Court.)**
THE COURT: Great. Thank you.
Now, what page are you attempting to read from?
MR. HARRELL: Your Honor, this is page 116.
THE COURT: 116.
MR. HARRELL: Starting at line 25.
THE COURT: Just a moment.
MS. MKRTCHYAN: And I don't have a copy, but that's fine, just for the record.
THE COURT: We'll get you a copy.
116, line 25, it starts with "Answer"?
MR. HARRELL: 116, line 25.
THE COURT: Starts with an answer?
MR. HARRELL: Should start with a question.
THE COURT: That's line 23. Are you sure you're giving me the right line?
MR. HARRELL: Through and including 117 --

THE COURT: I'm not sure you've got the right volume if we don't have the line correct. Line 25 has an answer.

MR. HARRELL: This is Volume I, Your Honor.

THE COURT: Counsel, I'm going to give you back whatever you gave me. Look at the bottom of page 116, the line you directed me to, and it starts with an answer. Starts with the word "that."

Just a moment. This is an unclear record. Now where are we? What page are we on, and what line are we on?

MR. HARRELL: Your Honor, 116, line 12.

THE COURT: Line 12, not line 25. Now hand a copy or something to counsel so she sees this also.

I don't understand if this is impeaching, if you're introducing this for inconsistent statement. Just a moment.

On direct examination, there was a list of the time on the tape of Deputy Gotts talking with Rawlings was 5:18:23. Was that your recollection, sir?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. And then defense counsel --

MR. HARRELL: Your Honor, the relevant page and line is 116, line 12, through and including 117, line 5. And then once we get centered on this time --

THE COURT: Just a moment, Counsel.

Ladies and gentlemen, this would be a good time for a break. You don't need to watch me read, okay? Why don't you

go back and relax. Please don't discuss this matter amongst yourselves nor form or express an opinion concerning the case. Thank you.

**(Out of the presence of the jury.)**

10:47AM THE COURT: First of all, all I know -- I apologize to each you for my ignorance -- I'm being told that there's something at page 116, line 25. First of all, for our record, that's not the correct line; correct?

MR. HARRELL: True.

10:47AM THE COURT: That's causing the initial confusion.

The second is I have no idea, when I'm told I was supposed to look at page 116, who I'm dealing with. So let's clear up this mystery. Who's testifying here?

MR. HARRELL: Your Honor, this is direct testimony 10:48AM from the plaintiff at our third trial.

THE COURT: Now, this is the plaintiff.

MR. HARRELL: True.

THE COURT: This is Ms. Mkrtchyan asking, "We hear some growling at 5:03:25." So, first of all, through that 10:48AM testimony, you'd like to show that there's a difference between the 5:03:18 that Deputy Gotts testified to and the 5:03:25?

MR. HARRELL: Your Honor, if I may, I would like to read to the jury:

"QUESTION: 5:03:32."

10:48AM THE COURT: Counsel, just a moment. "We hear some

growling at 5:03:25." That's what it says. Doesn't say "32." Now, this is causing mass confusion. First of all, you're giving me the wrong line to look at. Second, I have no idea what you're asking me to look at. And number three, it's not "32," it's "25." Help me.

10:48AM

MR. HARRELL: Your Honor, I'm going to now try to help now that I have the actual, physical transcript.

THE COURT: Well, it would be helpful if we had it -- I'm just joking with you -- but this is causing mass confusion for me.

10:49AM

MR. HARRELL: Your Honor, I apologize. I'd like the Court to take a look at page 117, line 8 to line 12.

THE COURT: 117, line 8?

MR. HARRELL: Yes.

10:49AM

THE COURT: And there we see "QUESTION: 5:03:32," not on the prior page; correct? So I have a record?

MR. HARRELL: That's correct, Your Honor. I sent the Court to the wrong place.

THE COURT: So we hear you say something. What are you saying at this point? Why am I hearing that through Deputy Gotts when Holloway is going to testify and you can ask him the same question?

10:49AM

MR. HARRELL: Because I would like this deputy -- rather than call him back up to the witness stand later, I would like to get Holloway's claim out there about what's going

10:50AM




6-GottsSER-01010

on at 5:03:32 in the morning. I'd like him to testify, as he already has, that he went and looked at times. And then I'd like to play his PVS tape that shows the jury, like I told them in opening statement, he wasn't even there. That's what I'd like to do.

MS. MKRTCHYAN: And may I -- Your Honor, for the record, that is improper impeachment. As I was not allowed to impeach him with Gunderson's testimony, I'm basically now, you know, forced to bring Gunderson if I need to impeach his credibility. I don't think this is proper for him to talk about -- explain what my client meant on direct examination at a prior proceeding. My client is the proper person.

THE COURT: This is a tactic. In other words, no matter what, this is going to come out.

MR. HARRELL: I hope so.

THE COURT: No, no. It's going to come out. It's going to come out, though, properly when Mr. Holloway testifies. And you're going to be allowed -- he's going to say it's 5:03:32. And if not, then you're going to be able to read back his prior testimony.

MR. HARRELL: Yes.

THE COURT: All that's happening here is what I call a shortcut so you don't have to bring Gotts back. That's not proper. It has to develop. So I don't know how this would be an inconsistent statement by Deputy Gotts. It has nothing to

do with Deputy Gotts' credibility. It's something that you want to show, you're going to be allowed to show that discrepancy in time. But it has to be because Holloway testifies to that or you bring forth an expert that says, you know, "32" and "28" and "he's not there" and -- you can do it either way. But you do it through Gotts. I think we're stretching the deputy's credibility.

MR. HARRELL: All right. Your Honor, this education might help us throughout the rest of the trial. I do understand that the law is -- my understanding of the law is a deposition can be used for any purpose. But I am unfamiliar with the rules of what happens with a prior proceeding. I'm trying to treat this as I would deposition testimony, put it out there for any purpose.

I have a purpose. Ask him -- once we read it to the jury and we get centered on what Mr. Holloway has said about the time, have him then say "Yes, this is my tape. This is what's going on at 5:03:32. I'm not even there," and then we're pretty close to wrapping up with Deputy Gotts.

THE COURT: Well, doesn't matter about wrapping up with Deputy Gotts. You've got plenty of time with him, so I'm not too worried about you being precluded from time. What I'm worried about is stretching Gotts into an advocate in terms of time. And Holloway hasn't even testified yet.

So now we've got Gotts -- now, trust me, I haven't


6-GottsSER-01012

been perfect because I've been trying to preclude plaintiff's counsel, by the same token, just reading in depositional testimony, but this is the same thing.

MR. HARRELL: Mr. Gotts, unlike -- strike that.

10:53AM THE COURT: Deputy.

MR. HARRELL: Mr. Holloway, unlike Deputy Gunderson, is a party. He is a party; Deputy Gunderson is not.

THE COURT: Can you show me where depositions can be used for all purposes? I need to get educated. Apparently, I 10:53AM didn't know that.

MS. MKRTCHYAN: And, Your Honor --

THE COURT: Hold on, Counsel. We've got time now. If you keep jumping in -- I need some time here. Bear with me.

I thought they were to refresh recollection to 10:53AM impeach, generally speaking, but maybe I need the education after 42 years.

MR. HARRELL: Your Honor --

THE COURT: Can you show me that case law, Counsel, where it can be used in this way, and I'm happy to do it.

10:54AM MR. HARRELL: Your Honor, I'm learning, and I'm growing. I'm trying, okay. So that was my tactic coming --

THE COURT: Deputy Gotts, you may be coming back. Okay? It's just -- for both you and the plaintiff, if I start allowing this, then I might as well allow it for both sides. 10:54AM Anybody can just read anything in for tactical purposes. So


6-GottsSER-01013

you may have to come back for a very limited purpose, just testifying according to these time frames. You just weren't there.

10:54AM You both need to weigh the prejudice of that because, quite frankly, you may be highlighting that. In other words, for both of you, think about what you really want to get into in terms of stipulations or not. So Mr. Holloway, Counsel, plaintiff, I'm not going to allow it. Well, I'm sorry. You have a book in front of you that says I can allow it for all purposes?

10:54AM MR. HARRELL: I don't know yet.

THE COURT: You go do some research. I'll take a two-page brief from you by noon or by 1:00 o'clock or by 5:00 o'clock. If I'm wrong, I'm happy to allow it. But it's going to open up a Pandora's box on the other side.

10:55AM MR. HARRELL: Your Honor, I think it's limited to a party.

THE COURT: Okay. Well, you get me the brief on that. You prepare me -- you show me that under the law so I'm not scrambling off the bench. Right now, my understanding is refresh recollection or impeach. But if it's all purposes -- and does it say a party --

10:55AM MR. HARRELL: Your Honor, I'm trying to do something that it's now plain to me the Court is not comfortable with.

10:55AM THE COURT: I'm really uncomfortable.


6-GottsSER-01014

MR. HARRELL: Let's move on.
THE COURT: If you're right, no problem.
MR. HARRELL: Your Honor, something tells me that --
THE COURT: I may be wrong.
10:55AM MR. HARRELL: Something tells me that the Court knows more than I do about this.
THE COURT: No. No, no, no, no. No, I don't. No, I don't. Listen, after 42 years you make lots of mistakes. And if you've you ever seen a perfect trial, please go down the
10:55AM hallway to my next colleague. There's no such thing.

So when things like this come up, I've got to be prepared because I'm desperately trying to make the right decision, and I'm not trying to preclude either party. But when I just get a transcript of 116, line 25, that causes the
10:56AM first confusion. Then I go to line 12, that causes more confusion. Now I'm over to line 17 and finally understanding what you're trying to do, which I had no idea about. Now I've got something -- no, it's me. Courts always bear the responsibility.

10:56AM Now I'm being asked to have Deputy Gotts stretch his credibility, quite frankly, and now almost become an advocate in terms of time when this is all going to become clear with Holloway. And the end result is that Holloway is going to testify. Now, go ahead and read the code section to me,
10:56AM Counsel, and I'm probably wrong.

MR. HARRELL: Your Honor, I'm going to put it out there.

THE COURT: Sure.

MR. HARRELL: This is Federal Rules of Civil Procedure 32 from our handy trial book here. This is Subsection (a) on use of depositions. And then under that there is a subparagraph 2. And reading now:

"The deposition of a party or anyone that was running a company may be used by an adverse party for any purpose."

THE COURT: Well, Counsel, you may be right then. Then does that apply to the plaintiff also? Because I would deem a party not only to be the two deputies here but all of the prior officers involved initially. They were parties. Do we really want to go down that road?

You have a conversation about that because that's going to open up a lot of areas in the past because I was using it to refresh recollection and for impeachment.

And by the way, it says "may." That's discretionary. That means my call. And my call -- this bar has been trying to limit the hearsay coming in from depositional testimony.

And I'll give you an example. If you two really want to do this, I'll go with you. But you're going to be allowed to reopen and re-ask some of those questions that you


6-GottsSER-01016

dragged out of those transcripts before. So what's good for the goose is good for the gander.

MR. HARRELL: Your Honor, the --

THE COURT: Hold on. No, no. We're having fun with this now.

10:58AM

MR. HARRELL: Okay.

THE COURT: I'm having a great time. We got all the time in the world. Hope you do.

I want to take this depositional testimony that you had. Remember this morning, you -- one of you went into Gotts -- I think it was the plaintiff in this case, and it's on page 243, line 14. Now this is going to be fun watching you scramble to try to find that page as you've asked me to scramble.

10:58AM

MS. NALTSAS: Is it a deposition, Your Honor?

10:58AM

THE COURT: I'm playing with you right now. You see the difficulty the Court has when you just throw out a page? You have no idea what I'm talking about, but I'll refresh your recollection.

This was plaintiff. And plaintiff wanted to get into this area concerning Gotts having blood on his pants.

10:59AM

Now, first of all, on line 14:

"MS. HEATHCOTE: Objection. Calls for speculation."

So I know now automatically that there is an

10:59AM



 6-GottsSER-01017

objection, and although this may be prior testimony, a court needs to rule on that objection before I allow it in.

(Reading:)

"THE WITNESS: I believe Gotts would have gotten whatever that was on his pants from when he was knelt down next to Jeremy because that's what we saw in the photos. Jeremy did bleed onto the ground. So whether Gotts' leg came in contact with the ground where Jeremy was bleeding or from Jeremy's head bleeding, dripping into his pants, I'm not sure."

Pure speculation. I've got one deputy testifying about what Gotts had on his pants through pure speculation. But presumably, presumably, I would say his pants touched the ground where there was blood on the ground.

Now I'm just going to talk to both of them about it. Can you imagine Deputy Gotts sitting on the stand wondering, "Well, here's" -- and who is this from? Is this from Renegar?

MS. MKRTCHYAN: Gunderson.

MR. HARRELL: Gunderson.

THE COURT: Gunderson. That's right. Here's Gunderson testifying about what he thinks he saw, and it's pure speculation. First of all, I would have ruled that this was speculative and it wouldn't come in. There's an objection, and the Court didn't even have a chance to do on it.


6-GottsSER-01018

Now, this is discretionary. And I think depositions aren't used for this purpose. If you want to establish a different time frame, that's because Holloway was on the stand, you can ask him on cross about the time if they don't bring that out. You can tie down the time. And if he says something different, you're going to be able to get into 4:03:22.

MR. HARRELL: Very good.

THE COURT: Or 5:03:22.

But it can't just be because you choose to bring it out tactically. And I think it destroys -- it really harms the witness's credibility, quite frankly. Puts him in a position of talking about time frames and defending himself already when we haven't even heard this difference in time. Now really defensive. I mean, I just don't understand why you'd be in that position, frankly.

So you may be back briefly.

And if he comes back, here's the danger to both of you: Now it's highlighted.

So walk through this with me because remember, when I practiced, I never won a case. So here you are, Mr. Holloway, and they've got at 5:03 --

MR. HARRELL: 5:03:32.

THE COURT: No, no. Not initially. On direct examination, it was 5:18:23. 5:18:23.

MR. HARRELL: Your Honor, that was the incorrect

page and line that we gave you.

THE COURT: I know. I know. But that's what we've got, don't we? And according to my notes -- I'll read it: "Time on tape of Gotts talking with Rawlings is 5:18:23."

11:02AM You want to have the transcript played back?

MR. HARRELL: I don't think that's necessary.

THE COURT: Okay. I mean, see how confusing that is? We're not even in the ballpark in terms of this time right now, are we?

11:02AM So now we're going to run Deputy Gotts in to testify, "Well, it's really not 5:18. It's really 5:03, maybe 18, but it's really 5:03:23, or it might be 5:18:23."

MR. HARRELL: Your Honor, understood. Let me make good use of the Court's break time.

11:02AM THE COURT: Oh, no. I'm on a roll now. I'm having a great time. I'm just joking with both of you.

We need to get the jury back in here and finish his testimony.

I think all of this is going to come in, but right 11:02AM now it would come in with such nonclarity that I don't think anybody would understand what either of you are trying to do in terms of the time.

And I just think Deputy Gotts is the wrong vehicle. And it's improper because it's a may, not a shall. And I don't 11:03AM believe that the transcript should be used for this purpose by



 6-GottsSER-01020

the plaintiff or by the defendant and certainly not from depositional testimony where there's already a pending objection where the Court never even ruled on it as we did with our training officer, Gunderson. I mean that's --

11:03AM MR. HARRELL: Your Honor, I think we're clear on the expectations of the Court.

THE COURT: I think it will come in. I think it will come in in a much clearer fashion, quite frankly. Okay.

So can we get the jury back?

11:03AM MS. MKRTCHYAN: Your Honor, I need to use the restroom before --

THE COURT: We're taking a break, Counsel. I promise you. See you in ten minutes.

MS. MKRTCHYAN: Yes, thank you.

11:17AM **(Recess from 11:03 a.m. to 11:17 a.m.)**

**(In the presence of the jury.)**

THE COURT: The jury is present. All counsel, the parties are present. Deputy Gotts is present.

Counsel, your questions, please.

11:17AM MR. HARRELL: Your Honor, thank you. I have no further questions.

THE COURT: All right. And --

MR. WRONIAK: No questions.

THE COURT: Let me turn back to redirect.

11:17AM MS. MKRTCHYAN: Yes, thank you.

**REDIRECT EXAMINATION**

BY MS. MKRTCHYAN:

Q Sir -- so do you remember, sir, when we talked about your duty to notify about the use of force, we covered the use-of-force policy. You remember that?

11:18AM

A Good morning again, ma'am. Yes, I do.

Q Okay. And you said that, you know, "No, I don't have to document everything in my report, only on my involvement"; true? You said that.

11:18AM A Yes, ma'am.

Q You also testified earlier on cross-examination that you are trained in POST procedures; right?

A Can you point that out in my testimony?

Q You testified that you're POST-certified, that you received training in the POST procedures?

11:18AM

A I attended a POST-certified academy approximately six months long, graduated in roughly July of 2013, and was sworn in as a California peace officer.

Q Okay, sir. But isn't it true you are POST-certified officer as of right now you are sitting here today?

11:19AM

A Yes, ma'am.

Q And you know the POST procedures were involved -- right? -- as far as your job duties are concerned?

A Yes. And I'm not sure what specific procedures you're referring to.

11:19AM


6-GottsSER-01022

Q Procedure about notifying use of force. Let's look at your use-of-force policy.

MS. MKRTCHYAN: This is, again, Exhibit 44, Your Honor. With Court's permission, we will publish it.

11:19AM THE WITNESS: Was there a pending question about -- I'm sorry.

THE COURT: Just a moment. This is going to involve POST procedure. You're going to refer to the use-of-force policy; correct?

11:19AM MS. MKRTCHYAN: Yes, Your Honor.

THE COURT: You may do so.

BY MS. MKRTCHYAN:

Q Okay. We have this as Orange County Sheriff's Department policy we looked at. This is 300.6 POST use of force

11:19AM procedures. It states -- let's look at it together:

"Any use of force by a member of this department shall be documented by that member promptly, completely, and accurately in an appropriate report depending on the nature of the

11:20AM incident. When documenting a use of force event, department personnel may review OCSD audio/video recordings (PVS, jail facility cameras) as a means of ensuring factual accuracy and enhancing recollection. Use of such materials in preparation

11:20AM of reports shall be documented and done on an

individual rather than collective basis."

Do you see this, sir?

A Yes. You're referring to the Orange County Sheriff's Department's use-of-force policy?

Q Yes, sir.

A As far as I know, we don't have a POST policy about use-of-force reporting. It would be the Orange County Sheriff's Department's use-of-force policy.

THE COURT: And that's confusion. The question started off with POST, but we're really now referring to an Orange County Sheriff's Department Policy, 300.6.

BY MS. MKRTCHYAN:

Q Yes. And let's look at what this policy -- use of force. This is Orange County -- this is the departmental policy by -- you know, for use of force; true? Do you see that on your screen? Look at your screen, please.

A Yes, ma'am. I'm not disputing that this is the Orange County Sheriff's Department's use-of-force policy. In 300.6, which is the paragraph you're referring to, I believe the term "post" there refers to the term "after" a use of force has occurred, not the Peace Officers Standards and Training for the State of California.

Q But in any event, sir, that post procedure is incorporated within your departmental policy, requiring you to document any use of force promptly, completely, and accurately.


6-GottsSER-01024

Yes or no?

MR. WRONIAK: Objection. Lacks foundation. Speculation.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

11:21AM Q This is part of your policy. Are you denying this? This is part of your policy?

THE COURT: Counsel, I sustained that objection.

BY MS. MKRTCHYAN:

11:21AM Q When we looked at your report, and you testified -- let's back up a little bit.

You testified on cross-examination that "Oh, I did see Renegar and Pahel and Gonzalez and Borba's involvement in the use of force."

11:22AM Do you remember that?

A No.

Q Earlier the defense attorney asked you, "Okay. So what was the position of Gonzalez when you arrived?"

And you said, "He was, I believe, to one side of

11:22AM Mr. Holloway as opposed to Pahel being on another side."

Do you remember that?

A Well, you're leaving some things out of my testimony there.

Q Sir, you were very well -- you know, very sure that you

11:22AM were aware of both Gonzalez and Pahel when you arrived to the



 6-GottsSER-01025

scene; correct?
A You're misstating my testimony. What I stated under oath on the stand here was that I was aware that there was a deputy to the left and a deputy to the right of Mr. Holloway, who, at the time of my arrival, I did not know who they were. But as I sit here now on the stand under oath, I am aware that that is Deputy Pahel and Deputy Gonzalez.
Q Okay. I asked you the same questions earlier, and you said, "No, I didn't know what was the involvement of Gonzalez. I didn't know what was the involvement of Pahel. I didn't know what was the involvement of Borba." Because you said -- you told me under oath that "When I go and get involved in a use of force, I'm only interested in my participation. I'm focused on the suspect"; true?
A You said multiple things there, ma'am. I'm not sure -- what am I answering to right now?
Q You testified -- I'm asking you that question. How is it that suddenly you remember now on cross-examination that "Oh, both Gonzalez, Pahel were involved, and I saw them when I arrived to the scene"?
MR. HARRELL: Argumentative.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q Which is true, sir ? That either you were -- when you were involved on the ground with Mr. Holloway, you were

absolutely not sure who was there, what they were doing? Or you knew what they were doing, and you simply didn't want to tell us because you are minimizing the use of force collectively by the officers. Which is true?

11:24AM MR. HARRELL: Argumentative.

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q Let's go back to your report. Let's go back to your report, sir. This is Exhibit 35. As we covered this before,

11:24AM is there any reference to Deputy Gonzalez in the two paragraphs you wrote in this report? Yes or no?

A No.

Q In fact, we have an impression from this report, the first paragraph, that only Renegar was trying to gain control

11:24AM of him; true? Right there on the paragraph above the first paragraph, you say, "I saw Deputy Renegar trying to gain control"; true?

A Yes.

Q The impression is left that it's only one officer trying

11:25AM to gain control, not enough manpower, and you need to, in fact, go there, fearing Jeremy may try to get up; therefore, "I place my knee to hold him, and then I try to get his arm." There's no reference whatsoever here about Gonzalez, Pahel, Borba; true ?

11:25AM A If I understand --

MR. HARRELL: It's vague.

THE COURT: Overruled, Counsel.

You can answer the question. The essence of the question is if there's mention about Borba, Cahill [sic] -- or Pahel -- Gonzalez or Pahel.

BY MS. MKRTCHYAN:

Q True?

A As I understand your question, in a vacuum, somebody reading my report may assume that. But in the totality of the use-of-force investigation, the sergeant who's reviewing all of the reports involved would understand that this was my use-of-force report, the force that I applied, the justification for it, and what my initial observations were when I arrived on scene.

Q Okay, sir. You said -- you testified here about Renegar being down to his legs. Do you remember that testimony a few minutes ago, that he was trying to gain control of Mr. Holloway's legs. You remember that when you arrived?

A Yes.

Q Okay. So how is that consistent with what you wrote there, "Renegar trying to gain control of a subject"? I asked you earlier. I asked you that same question that this attorney was asking.

THE COURT: Counsel, now you're getting into colloquy again. Your question is what?

BY MS. MKRTCHYAN:

Q I asked you earlier what was Renegar doing when you arrived?

THE COURT: Now answer.

11:26AM MS. MKRTCHYAN: No, but I didn't finish my question.

THE COURT: No, no. That's your question now, Counsel, because if you go to the next sentence, I'm going to get an objection. It's going to be compound or argumentative.

MS. MKRTCHYAN: Well, Your Honor, I didn't finish

11:26AM my --

THE COURT: That is your question, Counsel.

You can answer that question.

THE WITNESS: As I stated in my report, "attempting to get ahold" -- sorry, "attempting to gain control of the

11:26AM subject." And as I testified earlier, I observed an active altercation with an individual.

THE COURT: Next question.

BY MS. MKRTCHYAN:

Q So --

11:27AM THE COURT: You can re-ask it if you want to, but if you add on to it, I'm going to get an objection, and I'll sustain it.

BY MS. MKRTCHYAN:

Q In any event, sir, when you are writing your report, POST

11:27AM procedure requires when you're involved in a use of force to


6-GottsSER-01029

accurately, completely, and fully and promptly write and document the use of force; true?

MR. WRONIAK: Objection. Vague. Incomplete hypothetical.

11:27AM THE COURT: Overruled.

THE WITNESS: Can you show me where the Peace Officer Standards and Training --

BY MS. MKRTCHYAN:

Q Well, I just showed you.

11:27AM A -- Policy is for that? Because you keep showing me the Orange County Sheriff's Department use-of-force policy, 300.6, which refers to "post" as in after a use of force has occurred.

Q Okay. Isn't this -- this report was written after use of force occurred; true? Isn't this your documentation of the use

11:27AM of force?

A Yes.

Q Okay. So we are talking about exactly same thing?

THE COURT: Counsel, just --

BY MS. MKRTCHYAN:

11:28AM Q Now let's look about Borba. You said here to cross-examination of this attorney that "Oh, I saw Borba get involved too, seconds before my arrival, and he was trying to gain control of his arm too."

Do you remember that?

11:28AM A I recall testifying something to the effect of Borba was

on Mr. Holloway's right side somewhere near his shoulder area.

Q Well, what was Borba doing? What was Borba doing when you arrived and got involved in this use of force?

Do you remember that?

A No.

Q Okay. Do you remember earlier I asked you this same series of questions at your deposition. I asked you, "What was Borba's involvement?"

MR. HARRELL: Improper use of the deposition.

THE COURT: Sustained. Sustained.

BY MS. MKRTCHYAN:

Q I asked you about Borba's involvement in this use of force, and I asked you same series of questions. You remember? You told me he was trying to gain control --

MR. HARRELL: Improper use.

THE COURT: I'm going to sustain this area if we're going back into depositions. Ask him what he saw, heard, or did. Then if you have something impeaching, bring it forward. That's what's missing here. Please just ask him what he saw, heard, or did on this occasion. And then if you have --

MS. MKRTCHYAN: And he said, "No, I don't remember what Borba was doing," and now I'm impeaching him, Your Honor. What is the --

THE COURT: Show me the page.

MS. MKRTCHYAN: And I'm trying to do that.

Can you turn off the screen so that I can look at my screen.

THE COURT: We're not going to put something up on the screen. I get to see it.

11:29AM MS. MKRTCHYAN: Yes. So page -- the Court's permission, it's pages 99, lines 12 through 13. Do you need the transcript, Your Honor?

THE COURT: Just a moment.

MR. HARRELL: Your Honor, inquiry. Is this Borba,

11:29AM Gotts, or someone else?

THE COURT: I believe it refers to Borba.

MS. MKRTCHYAN: No, this is --

THE COURT: And I'm looking at.

MS. MKRTCHYAN: No, Your Honor. That is deposition

11:30AM of Mr. Gotts, Officer Gotts.

THE COURT: But now we're referring to Borba's testimony to impeach Deputy Gotts? Sustained.

MS. MKRTCHYAN: No, that's not what we are doing, Your Honor. We are --

11:30AM THE COURT: Counsel, you have five more minutes. So please make use of this time.

MS. MKRTCHYAN: I am trying to impeach him with his prior testimony.

THE COURT: I've sustained that objection, Counsel.

11:30AM We're not doing that through other -- transcripts from another

person.

MS. MKRTCHYAN: That's not another person. It's his own deposition transcript.

THE COURT: If this is Gotts's deposition --

11:30AM MS. MKRTCHYAN: It is.

THE COURT: But you told me it was Borba's.

MS. MKRTCHYAN: No, it's --

THE COURT: I'm looking at Gotts's deposition.

MS. MKRTCHYAN: Yes, page 99.

11:30AM THE COURT: 99. I'm looking at Gotts, and you should get that in front of me because I have another deposition on August 8th. So which one do you want?

MS. MKRTCHYAN: This is Borba.

THE COURT: Let me see it, please. Thank you.

11:30AM MS. MKRTCHYAN: I believe the witness must have his copy.

THE COURT: Counsel.

MS. MKRTCHYAN: 99. Page 99, Your Honor.

THE COURT: All right. Counsel, show him this page,

11:31AM lines 4 through 21. See if that refreshes his recollection first.

MS. MKRTCHYAN: Sure.

THE COURT: This is Gotts's testimony; correct?

MS. MKRTCHYAN: Yes, I believe he had --

11:32AM THE COURT: Counsel, I'll give this back to you. I

think I --

MS. MKRTCHYAN: Where is this transcript?

Thank you, Your Honor.

THE COURT: It's page 99. Show it to the witness.

11:32AM THE WITNESS: Ma'am, you left these with me. They're from another transcript, though. Thank you.

THE COURT: Then ask him if this refreshes his recollection.

THE WITNESS: I'm sorry, Your Honor. Which lines?

11:32AM THE COURT: You can read the whole page if you want to.

THE WITNESS: Thank you, Your Honor.

**(Pause in proceedings.)**

THE COURT: Now you can ask him if that refreshes

11:33AM his recollection.

MS. MKRTCHYAN: Yes, sir.

BY MS. MKRTCHYAN:

Q Did you read it? Did it refresh your memory?

A Yes, ma'am.

11:33AM Q So isn't it true you did tell us under oath at a prior deposition that you believed Deputy Borba was trying to control his right arm when you arrived?

A Yes, ma'am, about five years ago during the deposition transition -- testimony, I -- I have a recollection now that I

11:33AM told you that Deputy Borba was trying to control his right arm.

Q And that was more near the time of this incident than today, 2025; true?

A Yes. And also consistent with my prior testimony that he was near Mr. Holloway's right side shoulder area.

11:33AM Q And isn't it true I also asked you at the same deposition what were Gonzalez and Pahel doing at the time you arrived. You remember that?

MR. HARRELL: Improper use, Your Honor.

THE COURT: No, you can refer to the area.

11:34AM Overruled.

You can answer the question. Do you recall any testimony concerning Gonzalez and Pahel?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

11:34AM BY MS. MKRTCHYAN:

Q Do you remember telling us that "I don't know what they were doing."

Do you remember that?

MR. HARRELL: Improper use.

11:34AM MS. MKRTCHYAN: That's on the same page that you just read; true?

THE COURT: Overruled.

THE WITNESS: What I'm confused about --

BY MS. MKRTCHYAN:

11:34AM Q Yes or no --

A Which question are you asking me about right now, ma'am?

Q I asked you very simple question. I asked you at the deposition just the same way as this defense counsel asked you.

THE COURT: Counsel, this is getting confusing again because you're making a statement. What's your question?

BY MS. MKRTCHYAN:

Q I asked you what were Gonzalez and Pahel doing at the time you arrived? You remember that? You just read it on the same page, didn't you?

11:35AM THE COURT: Counsel.

THE WITNESS: As I testified today, I didn't know who Deputy Gonzalez and Pahel were at the time, or I didn't identify them on scene. However, I did say that there was two deputies, one to the left and one to the right of Mr. Holloway.

11:35AM BY MS. MKRTCHYAN:

Q No, my question was very different, sir. I asked you what officers were doing, what they were doing, not who they were, okay? That's the difference. I didn't ask you to identify the names of the officers. I asked you what they were doing.

THE COURT: Counsel, your question is what were the two officers doing; is that right?

MS. MKRTCHYAN: Yes.

BY MS. MKRTCHYAN:

11:35AM Q Yes. Prior to your arrival.



 6-GottsSER-01036

THE COURT: Now, just a moment --

BY MS. MKRTCHYAN:

Q And you said --

MS. MKRTCHYAN: Can I read it for the record?

11:35AM THE COURT: No, you may not. Absolutely not.

You may answer that question now.

THE WITNESS: As I recall, I told Mr. Harrell that I don't know exactly what their actions were. My focus wasn't on their specific individual actions at the time of my arrival.

11:36AM My focus was on my use-of-force application and the resistance that I was encountering.

BY MS. MKRTCHYAN:

Q Well, you testified that, in fact, you saw Gonzalez on one side trying to grab one arm, and you saw Pahel on the other

11:36AM side of Mr. Holloway when you arrived; true? Did I -- did I miss -- did I hear it wrong?

THE COURT: Counsel, the confusion is he stated that he saw two officers. He now knows who they are. That's what's causing the confusion.

11:36AM BY MS. MKRTCHYAN:

Q But we are not talking about the identity of the officers. We are talking about the quantum of force applied on Mr. Holloway prior to your arrival.

Do you understand the question?

11:36AM MR. HARRELL: Well, that calls for speculation.


6-GottsSER-01037

THE COURT: Sustained.

BY MS. MKRTCHYAN:

Q When you arrived, I asked you what these officers were doing, at a deposition. And you said, "I was -- I didn't know what they were doing." You remember that?

MS. MKRTCHYAN: I will read it for the record, Your Honor.

MR. HARRELL: Objection. Misstates --

THE COURT: Show me the page, please.

11:37AM MS. MKRTCHYAN: The same page.

THE COURT: Page 8?

MS. MKRTCHYAN: Yes. Page 99, Your Honor. The same page that I gave to this witness.

THE COURT: Page 99?

11:37AM MS. MKRTCHYAN: Yes.

THE COURT: Just a moment. Do you have page 99? Can I borrow that from you?

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

11:37AM MS. MKRTCHYAN: And it's going on to page 100.

THE COURT: Counsel, Counsel. Give me an opportunity to read this now.

**(Pause in proceedings.)**

THE COURT: Counsel, this is not impeaching. This

11:38AM refers on this page to a question asked about what they were

doing prior to his arrival. Look at pages -- lines 19 through 21. It's not impeaching.

MS. MKRTCHYAN: Yes, Your Honor.

THE COURT: Objection sustained.

11:38AM BY MS. MKRTCHYAN:

Q And I also asked you what were exactly Gonzalez, Pahel trying to do to control his arms.

Do you remember that?

A During your direct examination earlier or --

11:38AM Q No. I asked you at the deposition.

THE COURT: Let me see this again. Counsel, that wasn't the question. The question you asked was referring to what they were doing prior to arrival.

MS. MKRTCHYAN: Your Honor, there was --

11:39AM THE COURT: No. "This is the same arm, though, that both Gonzalez and Pahel were trying to control prior to your arrival when you just came." You're referring to an incident that he's not present at. Sustained.

MS. MKRTCHYAN: There is a continuing question.

11:39AM THE COURT: Counsel, one more question, please, and then we'll turn to the other side.

MS. MKRTCHYAN: Okay, Your Honor. We'll move on.

BY MS. MKRTCHYAN:

Q So, sir, you basically testified that when you are

11:39AM involved in the use of force, your focus is on your

involvement, on your actions, and on the suspect; true?
A You're summing it up, but, yes.
THE COURT: Thank you very much, Counsel.
MS. MKRTCHYAN: But, Your Honor, I have --
11:39AM THE COURT: Counsel, thank you very much. That concludes your time.
Questions, Counsel?
MR. HARRELL: There are none.
THE COURT: Sir, thank you much. You may step down.
11:40AM THE WITNESS: Thank you, Your Honor.
THE COURT: Counsel, please call your next witness.
MS. MKRTCHYAN: Yes, Your Honor. We will call Mr. Clark, who's waiting in the attorney room.
THE COURT: Thank you. Let's see if we can get to
11:40AM him before lunch. If you want to, counsel, we can go partway through lunch if it's convenient for the jury so we have consistency.
I'm going to give each side an hour and 15 minutes. I've gone back through depositions, et cetera. That's more
11:40AM than an adequate time here.
DEPUTY GOTTS: Your Honor, I apologize. I left my water bottle.
THE COURT: Sure.
**(Pause in proceedings.)**
11:41AM THE COURT: Thank you, sir. If you'd step forward

between the double doors, please. Sir, would you raise your right hand, please.

**ROGER ALMA CLARK, PLAINTIFF WITNESS, IS SWORN**

THE COURT: Thank you. Please be seated, sir. The entrance to the jury box is closest to this wall. It's not the small door.

Sir, would you state your full name. After you're seated, would you face the jurors.

THE WITNESS: Roger Alma Clark.

11:42AM THE COURT: Would you spell your last name, sir.

THE WITNESS: C-l-a-r-k.

THE COURT: Thank you. Now each side has 1 hour and 15 minutes timed. So, therefore, I want you to be aware of that, each Counsel aware of that. Okay?

11:42AM THE WITNESS: Yes, sir.

THE COURT: Counsel, your direct examination.

By the way, if you're comfortable, we'll go partway through the lunch hour. But at some point we'll probably take a break and bring you back after lunch.

11:43AM THE WITNESS: That's fine.

THE COURT: And you'll call that time that's comfortable for you.

MS. MKRTCHYAN: Okay. Thank you.

///

11:43AM ///



6-GottsSER-01041

**DIRECT EXAMINATION**

BY MS. MKRTCHYAN:

Q Mr. Clark, so let's briefly go over your background and qualifications. Actually lieutenant; right? Lieutenant Clark?

11:43AM A Yes.

Q Tell us, please, what's your background?

A So I'm a retired L.A. County sheriff. Retired out as a lieutenant.

Q Okay. And when did you retire?

11:43AM A I retired in 1993 at 27 and a half years of service. So I started in 1965.

Q Okay. And you were -- how long were you in the rank of lieutenant prior to your retirement?

A 15 and a half years.

11:43AM Q And as part of your training there, describe to me your knowledge of the POST guidelines specifically as it relates to use of force.

A As it relates to my --

Q Use of force.

11:44AM A Oh, use of force?

Q Yes.

A Well, starts with the academy training. I'm POST-certified. POST-certified is at three levels. I retired out with the highest certification. What's important here, I

11:44AM think, besides having gone through the curriculum, I was a


6-GottsSER-01042

faculty at the patrol school, four years as a sergeant and then, as a lieutenant, enforced and taught at the academy, both the reserve academy and the regular academy.

It was noted in my qualifications with the department on four specific cases or four specific aspects: use of force, tactics, ethics, demographics. So I very frequently, almost every academy class, taught those lessons.

11:44AM

Q Okay. And also you were received -- you've got extensive training and experience on Tasers, ECD?

A Yes. So when I retired out, I was police procedures consultant. That's what I'm doing now. And I've been acknowledged in the courts for the general use and deployment of the Taser.

11:45AM

Q Okay.

MR. WRONIAK: Objection. Irrelevant. 403. Move to strike.

11:45AM

THE COURT: No, here with an expert, Counsel, involving use of force. I'm going to allow the witness to testify to the Taser, and I'm going to allow him to testify from policy or procedures.

11:45AM

MS. MKRTCHYAN: Thank you.

BY MS. MKRTCHYAN:

Q So for -- how many times approximately have you testified -- have you testified in courts as a use-of-force expert?

11:45AM


6-GottsSER-01043

A Well, this -- I've given testimony over 1500 times, both in trial and in depositions since my retirement. So in courts for use of force, I would say 400, 500 times in cases involving force.
11:45AM Q Okay. And how many times in a ballpark have you been qualified as an expert witness to testify in cases involving law enforcement?
A Every case. Every case I've testified. I mean, I have not been ever excluded.
11:46AM Q So approximately how many times, though, you have consulted in cases as an expert witness?
A So this case is number 2,003. And so since this case I've had another couple hundred, so it's about 2300 cases I've consulted on.
11:46AM Q Okay. And also your opinions in terms of use-of-force procedures and policies have been relied upon by courts, specifically the Ninth Circuit, in how many -- on how many occasions?
A Well, I've had cases cited in the Ninth Circuit as well as 11:46AM other circuits, Fifth and First. And I've testified throughout the country in over 35 states both in federal and state courts.
Q Let's talk about law enforcement standards and POST standards. So when you look at the propriety of a use of force, there are guidelines that you follow; true?
11:47AM A Yes.

Q What are those guidelines? Tell the jury, please, briefly.

A Well, the training and -- for the calculus, what's appropriate is based on conduct of the person they're dealing with. And it's fundamentally broken into four categories. So first is cooperative and, of course, only -- the level of force as trained would be officer presence and verbal skills.

Then there's a category called resistive behavior. It's not assaultive on the officer. It's pulling away, jerking away, running away. That's not assaultive. And there are certain categories of force there to restrain. It depends -- the term is -- that's used is "totality of circumstance." So based on how big the guy is, for example, or the nature of the crime or weapons or how serious things are, how many officers are present, they all flavor whether you're going to go to grappling or something on your belt.

Next is assaultive-combative. Now, that -- and incidentally, in the resistive category, there's passive resistance and active resistance. You can imagine what that's like. Passive is chaining yourself to the fence, sitting down in the roadway, not moving, that kind of thing. You pick them up and move them. That's what you do.

In the assaultive-combative, that's where the suspect says, "Come and get me" or "I want to fight through this." And, of course, the things on the belt are the typical

methods of response plus -- and that includes the baton. That's kinetic energy, the things you have available yourself: your fist, your arm, your leg. They're called personal weapons.

11:49AM Chemical agent, that's the OC spray. That's a different -- gets a different type of response, but it's intent to overcome resistance or combative behavior. And then the Taser, which is an electronic or electrical energy type of device that causes incapacitation.

11:49AM THE COURT: Just a moment. If you need to go to CourtSmart --

Karlen could you call out one of the law clerks.

**(Discussion off the record.)**

THE COURT: Counsel, your question.

11:49AM BY MS. MKRTCHYAN:

Q So --

A And the last category is life threatening. That's when there's a weapon, and, of course, the officer is authorized to either protect him or herself or someone else, life threatening, and that's where the firearm is typically -- comes into use.

Q Okay. So -- and isn't it true when you are evaluating use of force, the propriety of it, you look at the POST procedures?

11:50AM A Yes. And that's the basic. My testimony here is about

what is the basic requirement, not -- you know, there are other methods and techniques and levels of expertise. But what's appropriate here is what's basically trained and expected.

Q Okay. And you've trained other officers as a deputy sheriff, lieutenant, before you retired?

11:50AM

A Yes.

Q Okay. So let's -- what was your assignment in this case? What was your, you know -- why were you -- I asked you to look at the use of force and give an opinion in this case; true?

11:50AM

A Yes, you did.

Q Okay. And you wrote a report after reviewing voluminous materials in this case; true?

A Yes.

Q And those materials involved deposition testimony of all individuals involved -- parties, plaintiff, defendants -- true?

11:51AM

A Correct.

Q The patrol vehicle recordings that you reviewed; true?

A Yes.

Q 911 calls?

11:51AM

A Yes.

Q Everything. Everything in this case, medical records, you have looked at?

A Well, everything you gave me, and it's listed in my report.

11:51AM

Q Right. And that involved sufficient data for you to



6-GottsSER-01047 6-GottsSER-01047

actually provide an opinion?
A That's the basis of my opinion. I rendered ten opinions, actually, in the report.
Q Okay. And let's go over those opinions, sir.
11:51AM So you have described the spectrum of interactions of police citizens and how conduct of an individual determines the degree of force applied and propriety of it; true?
A Yes.
Q Okay. So let's look at the opinions that you formulated
11:51AM in terms of this case. On page 20 -- starting your page 30, we had Opinion Number 1 -- well, that was Number 2. You looked at that actual scope and magnitude of the force applied on Mr. Holloway, and you had an opinion about that; right?
A Yes.
11:52AM Q And what was your opinion? Please tell us.
A Well, I used -- I introduced that opinion with the definition as trained in POST, what is reasonable force versus unreasonable force in the training. And the training calculus is when force is not necessary or appropriate, exactly the
11:52AM type, the degree, and duration of the force is not necessary or appropriate, then it crosses the line into excessive force. And the training is defined.
So that opinion -- I introduced the other nine opinions with my first opinion and then started to parse out
11:53AM the different aspects. So it starts with was this force, as I

reviewed the material, necessary or appropriate the way it was inflicted? And I determined it was not.

Q Okay.

MR. WRONIAK: Objection. Calls for a legal conclusion. Move to strike.

THE COURT: Overruled.

BY MS. MKRTCHYAN:

Q So you determined --

THE COURT: Now, a number of experts may be provided by either/or both sides. You can accept or reject. That eventually is your determination. And they are not the decider of this. You the jury are. So they're here to give their expertise concerning this use of force.

BY MS. MKRTCHYAN:

Q And when you determined that this force, you wrote in your report, was grossly excessive, violated policy and law, it was unreasonable, what guideline did you use in the POST? Was there any learning domain that you referenced?

A Well, as I -- I listed out a number of learning domains and quite a few of them. There are 42. The learning domains are the skill sections. They're identified, called learning domains. There are 42. And about a third of those I listed out as flavoring the opinions that I would have and related to the case. And use of force is big in this matter. It's Learning Domain Number 20.

But there are other learning domains that would -- as far as the approach, officers are trained that they're responsible for their tactical decisions that result in force. So how this whole situation evolved, and I wrote extensively about that, and quoted some statements that -- those types of things.

Q Right. So Learning Domain Number 20, you quoted in your report that:

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct. When the force used is unreasonable, the officer can face criminal and civil liability and agency disciplinary action."

This is the learning domain that you quoted?

A Right. That section of the Learning Domain 20 is when force is used as a reprisal. Sometimes it's called street justice, and that's forbidden, and it requires intervention with -- by other officers if they see it happening.

And in the very beginning in the report, I said there were things the jury would be determining. But if it's determined that this was an infliction of force as a reprisal, then it would be malicious. The code as taught is 149, assault under color of authority.

Q And that is POST -- isn't it true that is the training that all officers receive in California?

A It's the training, and that's why I quoted the statement rather than just expressing it in my words.

Q And then you had second opinion about whether Mr. Holloway's detention or arrest was violative of the POST procedures; true?

A Right.

Q That was Opinion Number 3.

A That was one of my opinions is Number 3, yes.

Q So tell us what did you believe about this domestic violence investigation occurring on that night by these officers and their tactics? You learned from the materials, in the first encounter Mr. Holloway was not arrested for DV and that incident was found unfounded as it related to him. You remember that?

A I remember that.

Q And then the officers arrived back on the scene based on the 911 call by a second caller who said, "The man you were just talking to is going from camp to camp, yelling "Who called the cops on me?" The call was upgraded to Priority 1, little girl screaming. There was some information provided to dispatch by Joshua Gomez that the man is looking for his things -- for things in his campsite. He was by Campsite 61 in an RV. You've heard the 911 calls in this case; true?

MR. WRONIAK: Objection. Compound. Counsel's testifying.

THE COURT: Overruled.

THE WITNESS: I listened to the 911 calls, and I'm aware that there were two separate contacts. And the first flavors -- that's my term -- what happens in the second. So -- and that was embedded in this opinion.

BY MS. MKRTCHYAN:

Q So tell us why you believed -- what was the basis of your opinion based on that set of circumstances; priority call, little girl screaming, the DV incident. Based on that set of facts that we've heard, how did you reach an opinion that there was no justification for Mr. Holloway's detention or arrest?

MR. WRONIAK: Objection. Irrelevant. 403.

THE COURT: I thought he was being produced as a use-of-force expert.

MS. MKRTCHYAN: Your Honor, they are bringing issues. They said that my client was lawfully arrested for PC 148, this officers.

THE COURT: I'll allow this, Counsel.

MS. MKRTCHYAN: Thank you.

BY MS. MKRTCHYAN:

Q So was -- under the set of circumstances -- yes, so you can answer, Mr. -- Lieutenant, please. What made you believe -- tell us why you reached this opinion based on this set of circumstances.

A So as I said, this is -- there are two episodes, and

they're connected. That's a connection between the two. The first was there was a disturbance -- these are the way I understand the situation -- there was a disturbance, officers responded -- deputies responded. Nothing was going on. It was all quiet on arrival. But nonetheless, there was a contact; there was an exchange of information. And certainly, officers cannot ignore the target or the person involved or one of the persons involved is not -- can be asked to stay. That's called a detention. It's not an arrest. They have authority to say "You can't leave. I want some information from you." And it was cooperative. And there's no weapons whatsoever, and there was no victim. And they left the scene.

THE COURT: Let's do this. Let's go to lunch at this time. Okay? And we'll see you at 1:00 o'clock. You're admonished not to discuss this matter amongst yourselves nor form or express any opinion concerning this case. Have a nice lunch.

Counsel, if you would remain, please.

**(Out of the presence of the jury.)**

THE COURT: First, jury is no longer present.

Mr. Clark, you can remain for a moment and hear this discussion.

He's here for a use-of-force expert, but the oddity is we've gotten into 148, et cetera. I don't know that this case centers around the reasonableness or unreasonableness of


6-GottsSER-01053

the 148. In other words, that isn't the inquiry. Whether the officers are right or wrong in terms of filing a 602 or a 415 or a 459 inside the campsite isn't why I've allowed this expert to testify. It really considers use of force.

12:00PM But for his testimony, he has to be aware of the facts surrounding the case. And obviously, you're aware of the first incident and the second incident. I'm a little concerned that we're stretching your credibility and, quite frankly, going beyond why I've allowed you to testify about use of force. 12:01PM You can certainly testify about all of the factors that went into this. But as far as the 148, I'm just a little concerned that we're moving outside into a level where you're subject to a lot of examination that isn't really relevant to the case.

12:01PM So let me hear from the parties for a moment because you're not an advocate. So sit back and relax for just a moment.

MS. MKRTCHYAN: Yes, Your Honor. I need to be heard on this.

12:01PM THE COURT: Yeah, Counsel. Please. Yes.

MS. MKRTCHYAN: First of all, here's the problem we have. The Court has dismissed that motion for summary judgment, the false arrest claim.

However, this defendants continuously have brought 12:01PM their training and beliefs that my client was violating the

law. And he was -- they testified, both Gonzalez and Renegar -- or I'm sorry, Gotts testified that at the point in time when they were using force on him, he was already in violation of Penal Code Section 148 at the very least. And then they arrested him for Penal Code Section 69 and 243.

12:02PM So now regardless of the claims left for the jury, they are using that. They are using their beliefs and training that my client was resisting and he was violating the law to say that our use of force was justified. And I'm allowed to rebut that by a use-of-force expert who's, in fact, also -- his opinions about use of force were actually underlying in Rule 26.

12:02PM This defendants had an opportunity to file again and again -- we are talking about very skilled attorneys. They had an opportunity to file a motion *in limine* to exclude or limit his testimony related to any of the opinions they have problems with. Why did they not do that? Why are we supposed to take up the lunchtime when we need to eat?

12:02PM THE COURT: Counsel, this is -- I appreciate the lunchtime; it's not helpful. Let me turn to the other side, and I'll be right back to you.

12:03PM Counsel, what's your position?

MR. WRONIAK: First off, Your Honor, as counsel's even noted, you've already ruled that there was probable cause to arrest him and dismissing the false imprisonment claims. So

12:03PM


6-GottsSER-01055

the issue was raised and we have to address it is -- her argument in -- through the witness is and the questioning is "You had no reason to even come into contact; therefore, you had no reason to use force." And if we're going through to establish the fact that he resisted is on search and seizure terms, has to comply, doesn't get on the ground, that in and of itself is an arrestable offense.

12:03PM

THE COURT: I not only found probable cause here, but if you press me, I'll probably find reasonable cause to detain here. And the issue now is really the force. And the simplicity of the issue is really under this fact situation you're aware of, which you're going to be able to lay a foundation concerning all of these facts. You know, what's this ultimate force that's applied and whether it's appropriate or not. I'm a little afraid that if we get into the 415, et cetera, I, quite frankly, will rule that there's enough to detain here and will inform the jury of that.

12:03PM

12:04PM

So I think that that puts you in an unenviable position, getting into the situation of if I made that ruling in front of the jury, it would take your expertise, and I'm concerned. I think you're here for excessive force. I find you a qualified witness. I'll state that on the record. But I think we're going to stretch this if we get into 415 and detention.

12:04PM

But, I'll turn back to counsel.

12:04PM


6-GottsSER-01056

MS. MKRTCHYAN: First of all, Your Honor, if you recall, we had a discussion. I filed a motion *in limine* to exclude their expert Fonzi from testifying about probable cause for arrest. In fact, I also filed a motion to exclude Court's prior ruling for motion for summary judgment because that's not a finding of fact. That's a legal finding that there's no sufficient evidence for false arrest. Therefore, that's not an issue. The Court would be, by law, precluded to tell this jury that there was probable cause to arrest. In any event --

12:04PM

THE COURT: Counsel.

12:05PM

MS. MKRTCHYAN: I didn't finish, Your Honor. Can I finish?

THE COURT: I apologize.

MS. MKRTCHYAN: I'm sorry. Because when you interrupt me, my train of thought goes down the drain, and I'm hungry. I need lunch. And I requested always to give me timely breaks because --

12:05PM

THE COURT: I'll make a very quick ruling if you need lunch. I would find that this was a proper detention. Under these facts, this is a proper detention by law enforcement. It's as simple as that. And I don't want this expert to get skewered on the stand. I think he's here for use of force and how that's applied regardless. And therefore I think it's very harmful for you not to have me make that ruling.

12:05PM

12:05PM


6-GottsSER-01057

This is a proper detention by law enforcement under the circumstances. And I've already ruled that there's probable cause also prior to this. So if we press this point, I'm going to be put in the position of informing the jury, quite frankly, that I find that there's a proper detention. I've been trying not to. I've been trying to leave that ultimately to the jury also.

THE WITNESS: Your Honor, that was my position.

THE COURT: I'm sorry. Could you speak -- use the microphone. Use the microphone. I couldn't hear you.

THE WITNESS: I expected that's exactly what I was going to say next. It was appropriate to tell him he couldn't leave, and it was a reasonable suspicion detention.

THE COURT: So you were going to say anyway it was a proper detention?

THE WITNESS: Well, yes. And the term is --

THE COURT: Well, hold on, hold on. Then what's the firefight about?

MS. MKRTCHYAN: There's a difference -- Your Honor, this is the problem we have. There is a difference between arrest and detention on -- legally, Fourth Amendment constitutionally there is a difference. We never disputed that there was reasonable suspicion under the Constitution to detain this man pending an investigation. But what we have disputed that there was probable cause and this defendants have already


6-GottsSER-01058

12:07PM testified, this is a very fine area of law constitution.

This defendants have come to court and testified already in front of this jury that we believe he was under arrest, there was probable cause to arrest him for Penal Code Section 148 and Penal Code 69, and that's where we have the problem. And Fonzi is going to come to court and say, "Oh, there was probable cause to arrest him for this and this and this, lying, and stuff." I'm allowed to rebut it, Your Honor, because then they're going to say it's violent crime.

12:07PM THE COURT: This is such a collateral event because your client is going to be able to get up on the stand. He's going to be able to testify he was arrested, and he's also going to be allowed by the Court to testify that these charges were dismissed.

12:07PM MR. HARRELL: Your Honor --

THE COURT: We're taking an undue amount of time on this detention or arrest, plus it's a fine line. He's certainly legally detained. Whether he's arrested or not will become clear through Holloway without stretching your 12:07PM expertise. And I'm deeply concerned that we're putting you in a position as an expert of getting into an area where your credibility is going to be attacked on a collateral matter that, quite frankly, is almost irrelevant to this lawsuit.

And the difference between detention and arrest is 12:08PM almost meaningless when the officers are responding in the

middle of this melee. It's enough that I know and find that he was properly detained at that time and subject to detention.

12:08PM Now, what followed that, Mr. Holloway can explain that he was arrested. He can also explain that charges were dismissed. And therefore, whatever these officers believed was in terms of a 148, gone.

12:08PM But this is unduly consumptive of time. I'm going to limit your testimony. I think that that's a courtesy so we're not stretching this and you're not caught by surprise. You are, though, in the middle of a question that leaves them hanging, and if your response is that this was a proper detention, I'll let you state that because you're left with this question.

12:09PM I'm just a little concerned, and let me repeat that, that you be caught by surprise if we get into this constant bickering back and forth between Counsel, and then the Court starts ruling that this is a proper detention.

12:09PM All right. Now, Counsel, you wanted to go to lunch, go to lunch. But I would encourage you: This is excessive force, you can bring out all the facts. First encounter, second encounter, what he's doing in between, how they respond, the number, et cetera, what's used. All that's proper in terms of your expertise. But getting into detention and arrest, that's a fine line. There's just scuffling around the floor.

12:09PM All right, counsel. That's the final decision. Go



 6-GottsSER-01060

Case: 25-7132, 08/25/2026, DktEntry: 44.7, (155 of 198)


to lunch.

**(Proceedings concluded at 12:09 p.m.)**

**--oOo--**



6-GottsSER-01061

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date: May 11, 2025*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*


6-GottsSER-01062

## /

**/S** [1] - 154:19

## 1

**1** [8] - 67:10, 69:15, 69:16, 69:19, 99:6, 133:12, 140:11, 143:19
**1-053** [1] - 1:24
**10** [1] - 29:23
**100** [1] - 130:20
**102** [3] - 12:16, 12:17, 12:19
**102-5** [1] - 12:22
**11** [1] - 154:15
**1100** [3] - 2:10, 2:18, 2:22
**114** [1] - 4:5
**1150** [1] - 2:14
**116** [10] - 99:12, 99:13, 99:19, 99:20, 100:5, 100:10, 100:21, 101:7, 101:12, 107:14
**117** [4] - 99:25, 100:21, 102:12, 102:13
**11:03** [1] - 113:15
**11:17** [1] - 113:15
**12** [6] - 100:10, 100:11, 100:21, 102:12, 107:15, 124:6
**12:09** [1] - 153:2
**13** [1] - 124:6
**134** [1] - 4:7
**14** [4] - 4:4, 20:22, 109:12, 109:22
**1450** [3] - 2:11, 2:19, 2:23
**148** [7] - 144:17, 145:24, 146:1, 146:11, 147:4, 151:5, 152:6
**148(a)(1** [1] - 81:20
**149** [1] - 142:22
**15** [15] - 9:11, 11:14, 13:21, 13:25, 29:23, 34:15, 54:5, 58:23, 59:1, 59:15, 59:23, 92:24, 132:18, 133:13, 134:14
**1500** [1] - 136:1
**16** [1] - 31:25
**17** [1] - 107:16
**1700** [1] - 2:5
**18** [1] - 112:12
**1800** [1] - 2:15
**19** [1] - 131:1
**1965** [1] - 134:11
**1993** [1] - 134:10
**1:00** [2] - 106:13, 145:14

## 2

**2** [5] - 60:20, 68:16, 81:23, 108:7, 140:11
**2,003** [1] - 136:12
**20** [6] - 59:1, 93:8, 140:10, 141:25, 142:7, 142:15
**2011** [1] - 3:9
**2013** [3] - 60:23, 63:4, 114:17
**2018** [11] - 9:25, 10:3, 10:5, 10:20, 10:21, 10:24, 11:3, 64:2
**20202** [1] - 65:6
**2023** [1] - 99:6
**2025** [4] - 1:13, 5:1, 127:2, 154:15
**207** [1] - 3:9
**21** [3] - 64:2, 125:20, 131:2
**213-624-8700** [1] - 2:16
**21st** [4] - 9:25, 10:3, 10:19, 10:24
**23** [1] - 99:23
**2300** [1] - 136:13
**243** [4] - 31:25, 32:1, 109:12, 147:5
**244** [1] - 32:9
**25** [8] - 99:14, 99:19, 99:20, 100:2, 100:11, 101:7, 102:5, 107:14
**26** [1] - 147:12
**27** [1] - 134:10
**28** [2] - 104:5, 154:8

## 3

**3** [7] - 67:13, 68:17, 69:16, 70:5, 81:24, 143:7, 143:8
**30** [3] - 64:15, 76:18, 140:10
**300.6** [4] - 115:14, 116:11, 116:18, 122:11
**300.7** [1] - 47:22
**31st** [6] - 9:25, 10:3, 10:5, 10:21, 10:24, 11:3
**32** [4] - 102:1, 102:5, 104:5, 108:5
**35** [2] - 119:9, 136:21

## 4

**4** [2] - 66:15, 125:20
**40** [4] - 11:17, 47:13, 47:24, 59:22
**40-second** [2] - 47:10, 47:20
**400** [2] - 3:5, 136:3
**403** [7] - 21:12, 33:7, 33:19, 48:6, 50:20, 135:15, 144:12
**411** [1] - 1:24
**415** [6] - 24:18, 65:22, 74:3, 146:2, 148:15, 148:23
**415(1** [1] - 68:16
**42** [4] - 105:16, 107:8, 141:20, 141:22
**44** [1] - 115:3
**45** [1] - 11:18
**459** [2] - 68:24, 146:3
**4:00** [1] - 31:5
**4:03:22** [1] - 111:6
**4:30** [2] - 65:10, 65:17
**4TH** [1] - 1:24

## 5

**5** [3] - 1:8, 60:20, 100:21
**500** [1] - 136:3
**5:00** [2] - 61:21, 106:14
**5:03** [2] - 111:21, 112:11
**5:03:18** [1] - 101:21
**5:03:22** [1] - 111:8
**5:03:23** [1] - 112:12
**5:03:25** [3] - 101:19, 101:21, 102:1
**5:03:32** [6] - 101:24, 102:15, 103:1, 103:19, 104:18, 111:22
**5:04** [1] - 20:22
**5:04:14** [2] - 20:14, 21:3
**5:09:37** [1] - 29:25
**5:10:45** [1] - 33:15
**5:10:55** [1] - 35:1
**5:11:20** [1] - 39:8
**5:14:14** [1] - 20:13
**5:14:39** [1] - 42:13
**5:15:20** [1] - 42:25
**5:15:59** [1] - 43:23
**5:18** [3] - 57:24, 58:1, 112:11
**5:18:06** [1] - 47:2
**5:18:23** [8] - 58:10, 58:11, 58:13, 100:16, 111:24, 112:4, 112:12
**5:18:47** [1] - 47:9

## 6

**6** [2] - 60:20, 93:6
**60** [1] - 4:5
**602** [1] - 146:2
**61** [1] - 143:22
**65** [3] - 72:5, 72:8, 72:22
**655** [1] - 2:5
**69** [3] - 81:21, 147:5, 151:5

## 7

**7** [2] - 1:13, 5:1
**714** [1] - 2:20
**714-823-4100** [1] - 3:6
**714-937-1010** [2] - 2:12, 2:24
**750** [1] - 3:5
**753** [1] - 154:8
**760-274-2110** [1] - 3:10
**7953** [2] - 1:23, 154:20
**7:30** [1] - 5:9
**7:51** [2] - 1:14, 5:2
**7:59** [1] - 10:12

## 8

**8** [5] - 93:6, 93:7, 102:12, 102:13, 130:11
**818-388-7022** [1] - 2:6
**8:00** [1] - 7:8
**8:01** [1] - 10:12
**8:19-cv-01514-DOC-DFM** [1] - 1:7
**8th** [1] - 125:12

## 9

**90** [4] - 5:10, 5:11, 11:23
**90015** [1] - 2:15
**911** [7] - 65:18, 65:25, 67:11, 139:19, 143:17, 143:23, 144:2
**91203** [1] - 2:6
**92011** [1] - 3:10
**92701** [1] - 1:24
**92868** [3] - 2:11, 2:19, 2:23
**92868-4940** [1] - 3:6
**937-1010** [1] - 2:20
**99** [9] - 124:6, 125:9, 125:10, 125:18, 126:4, 130:12, 130:14, 130:16
**9:28** [1] - 59:10
**9:45** [2] - 59:9, 59:10

## A

**A-S-P** [1] - 93:3
**a.m** [6] - 10:12, 59:10, 113:15
**A.M** [2] - 1:14, 5:2
**abbreviated** [1] - 71:10
**able** [15] - 43:8, 44:23, 47:13, 66:17, 79:20, 80:15, 80:18, 90:21, 92:10, 92:23, 103:19, 111:6, 148:12, 151:11, 151:12
**above-entitled** [1] - 154:11
**abrasions** [3] - 79:5, 79:7, 87:1
**absolutely** [4] - 16:8, 22:11, 119:1, 129:5
**absorbed** [1] - 61:14
**academic** [2] - 61:7, 62:15
**academy** [22] - 60:22, 60:23, 61:6, 61:7, 61:16, 61:17, 61:20, 62:13, 62:16, 63:13, 63:21, 64:4, 64:7, 64:17, 64:18, 68:8, 114:16, 134:22, 135:2, 135:3, 135:7
**accelerate** [1] - 68:1
**accept** [1] - 141:10
**access** [1] - 90:21
**according** [2] - 106:2, 112:3
**accordingly** [1] - 14:3
**account** [1] - 96:5
**accuracy** [1] - 115:23
**accurate** [2] - 76:17, 89:2
**accurately** [3] - 115:18, 116:25, 122:1
**acknowledged** [1] - 135:12
**action** [2] - 95:16, 142:13
**actions** [5] - 90:9, 95:15, 129:8, 129:9,

132:1
**activated** [3] - 21:16, 67:24, 70:8
**active** [24] - 15:16, 15:17, 18:3, 18:24, 24:11, 40:17, 54:11, 54:14, 54:15, 73:6, 73:20, 74:7, 75:1, 76:8, 77:9, 77:24, 78:24, 81:1, 84:21, 90:7, 92:3, 92:22, 121:15, 137:19
**actively** [4] - 34:8, 53:24, 55:4, 76:9
**activity** [1] - 95:13
**actual** [2] - 102:7, 140:12
**add** [3] - 64:9, 92:11, 121:21
**additional** [1] - 63:13
**additionally** [1] - 80:17
**address** [1] - 148:1
**adequate** [1] - 132:20
**adjust** [1] - 95:24
**admission** [1] - 24:25
**admit** [1] - 18:13
**admonish** [1] - 19:7
**admonished** [2] - 58:19, 145:15
**admonishment** [3] - 9:3, 9:5, 9:21
**admonition** [1] - 10:17
**adverse** [1] - 108:9
**advise** [1] - 25:10
**advised** [4] - 24:15, 67:11, 72:7, 73:23
**advising** [2] - 65:13, 70:2
**advocate** [3] - 104:23, 107:21, 146:16
**afraid** [1] - 148:15
**agency** [1] - 142:12
**agent** [1] - 138:5
**ages** [1] - 60:20
**ago** [3] - 96:25, 120:17, 126:23
**agree** [1] - 40:22
**ahead** [2] - 66:19, 107:24
**ahold** [4] - 87:25, 92:18, 97:24, 121:14
**aid** [3] - 28:7, 28:17, 34:7
**air** [1] - 71:15
**Airport** [1] - 3:9
**al** [2] - 1:7, 2:8
**allegation** [2] - 93:18, 98:11
**alleged** [3] - 10:6, 10:8, 11:7
**allow** [9] - 62:21, 105:24, 106:8, 106:9, 106:14, 110:2, 135:18, 135:19, 144:18
**allowed** [16] - 46:7, 50:25, 51:1, 51:15, 51:16, 51:21, 53:15, 103:7, 103:18, 104:2, 108:25, 146:3, 146:9, 147:9, 151:8, 151:13
**allowing** [2] - 81:21, 105:24
**Alma** [1] - 133:9
**ALMA** [2] - 4:6, 133:3
**almost** [4] - 107:21, 135:7, 151:23, 151:25
**ALSO** [1] - 3:12
**altercation** [42] - 10:20, 15:16, 15:17, 17:9, 17:22, 18:2, 18:3, 18:6, 18:8, 18:11, 18:24, 24:11, 24:19, 25:21, 30:17, 40:10, 40:17, 65:15, 72:12, 72:14, 73:13, 73:20, 74:4, 75:1, 75:18, 75:20, 77:9, 77:24, 78:7, 78:21, 78:22, 78:24, 79:19, 79:22, 81:1, 82:8, 84:9, 84:21, 88:22, 91:15, 121:16
**alternates** [1] - 10:16
**ambiguous** [6] - 69:20, 71:3, 74:21, 75:24, 81:8, 86:18
**Amendment** [1] - 150:21
**amount** [1] - 151:16
**ANA** [3] - 1:14, 1:24, 5:1
**Angeles** [1] - 2:15
**ANGELES** [1] - 154:3
**annual** [2] - 63:15, 64:6
**answer** [50] - 17:13, 17:14, 18:7, 18:18, 19:4, 21:14, 22:21, 24:7, 26:14, 28:10, 30:14, 30:25, 33:8, 33:22, 37:15, 38:9, 39:21, 40:14, 41:16, 43:4, 43:5, 46:1, 46:14, 48:8, 51:9, 51:14, 51:22, 51:25, 53:19, 55:21, 57:16, 69:24, 74:23, 76:2, 81:12, 91:8, 93:20, 95:10, 98:15, 99:19, 99:21, 100:2, 100:6, 120:3, 121:4, 121:12, 127:11, 129:6, 144:22
**answered** [5] - 33:7, 40:13, 87:21, 91:6, 91:19
**answering** [1] - 118:16
**anyway** [2] - 18:18, 150:14
**apart** [1] - 72:18
**APC** [1] - 2:9
**apiece** [1] - 11:24
**APLC** [1] - 2:13
**apologies** [3] - 5:11, 13:18, 52:18
**apologize** [4] - 101:5, 102:11, 132:21, 149:13
**appear** [1] - 28:15
**APPEARANCES** [2] - 2:1, 3:1
**appearing** [1] - 74:4
**application** [14] - 20:16, 20:21, 21:11, 21:23, 22:8, 63:16, 82:24, 82:25, 87:12, 93:12, 95:13, 96:13, 97:1, 129:10
**applications** [2] - 20:4, 71:12
**applied** [21] - 20:13, 20:14, 20:15, 20:19, 21:21, 22:2, 22:6, 22:12, 22:16, 23:22, 23:23, 23:24, 48:4, 48:17, 97:16, 120:12, 129:22, 140:7, 140:12, 148:14, 149:23
**apply** [5] - 21:7, 23:12, 55:23, 64:1, 108:12
**applying** [7] - 36:13, 80:14, 80:17, 95:19, 96:14, 97:2, 97:9
**appreciate** [1] - 147:19
**approach** [1] - 142:2
**approached** [1] - 91:23
**approaches** [1] - 34:22
**appropriate** [13] - 9:4, 51:24, 52:14, 53:4, 55:15, 115:19, 137:4, 139:3, 140:19, 140:21, 141:1, 148:14, 150:12
**area** [19] - 55:23, 59:24, 65:12, 65:14, 66:7, 67:20, 67:21, 82:15, 87:14, 88:3, 88:9, 89:13, 109:21, 123:1, 123:16, 127:4, 127:9, 151:1, 151:21
**areas** [2] - 80:13, 108:17
**argue** [1] - 7:6
**argued** [1] - 19:5
**argument** [2] - 99:3, 148:2
**Argumentative** [3] - 36:22, 39:17, 55:16
**argumentative** [10] - 16:14, 16:15, 22:19, 27:21, 30:23, 37:5, 95:8, 118:21, 119:5, 121:8
**arm** [25] - 79:14, 80:18, 80:19, 82:14, 83:2, 83:5, 88:18, 90:14, 91:3, 92:2, 92:6, 92:9, 92:13, 92:17, 92:21, 93:10, 97:11, 97:25, 119:22, 122:23, 126:22, 126:25, 129:14, 131:15, 138:3
**armed** [3] - 77:10, 78:25, 83:3
**arms** [6] - 80:11, 87:13, 90:8, 92:4, 97:24, 131:7
**arrest** [17] - 63:23, 81:20, 143:4, 144:11, 145:9, 146:23, 147:25, 149:4, 149:7, 149:9, 150:21, 151:4, 151:7, 151:17, 151:24, 152:23
**arrestable** [1] - 148:7
**arrested** [6] - 143:12, 144:16, 147:5, 151:12, 151:18, 152:4
**arrival** [13] - 24:15, 74:1, 83:10, 91:12, 118:5, 122:22, 128:25, 129:9, 129:23, 131:1, 131:13, 131:17, 145:5
**arrive** [6] - 16:1, 17:19, 36:10, 72:9, 89:11
**arrived** [47] - 16:6, 16:19, 17:1, 17:5, 19:14, 19:15, 20:2, 20:19, 22:12, 24:11, 34:15, 38:1, 40:10, 48:1, 48:5, 54:13, 54:25, 55:7, 55:11, 55:13, 67:7, 73:8, 75:15, 75:16, 75:17, 83:8, 87:17, 87:25, 88:1, 88:7, 88:14, 89:21, 90:5, 117:18, 117:25, 118:20, 120:14, 120:18, 121:3, 123:3, 126:22, 127:6, 128:8, 129:15, 130:3, 143:16
**arriving** [4] - 14:17, 14:23, 53:18, 87:16
**aside** [1] - 98:2
**ASP** [2] - 93:2, 93:4
**aspects** [2] - 135:5, 140:25
**asphalt** [2] - 78:7, 78:19
**assault** [2] - 69:1, 142:22
**assaultive** [4] - 137:9, 137:10, 137:17, 137:23
**assaultive-combative** [2] - 137:17, 137:23
**assaults** [1] - 142:9
**assignment** [2] - 84:23, 139:7
**assist** [4] - 40:16, 46:17, 73:3, 79:22
**assisted** [3] - 82:14, 90:14, 97:11
**assisting** [2] - 77:23, 92:12
**associated** [1] - 50:9
**assume** [2] - 55:23, 120:9
**assumes** [7] - 16:22, 17:10, 24:4, 41:14, 43:2, 69:2, 77:17
**AT** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**attack** [1] - 11:4
**attacked** [1] - 151:22
**attacking** [1] - 6:22
**attacks** [1] - 10:6
**attempting** [3] - 99:11, 121:13, 121:14


6-GottsSER-01064

**attend** [1] - 34:18
**attended** [2] - 60:23, 114:16
**attending** [2] - 33:17, 34:16
**attention** [6] - 5:14, 5:16, 6:9, 7:14, 33:12, 65:8
**ATTORNEY** [5] - 2:4, 2:14, 2:18, 2:22, 3:8
**attorney** [4] - 117:17, 120:22, 122:21, 132:13
**attorneys** [1] - 147:14
**attracted** [1] - 65:8
**audible** [1] - 19:10
**audio** [3] - 38:3, 38:11, 38:14
**audio/video** [1] - 115:21
**August** [2] - 99:6, 125:12
**authority** [2] - 142:23, 145:9
**authorized** [1] - 138:18
**automatically** [1] - 109:25
**available** [1] - 138:2
**Avenue** [1] - 2:5
**avoiding** [1] - 75:8
**aware** [18] - 8:1, 8:2, 25:8, 25:16, 25:17, 31:10, 49:2, 49:9, 76:23, 117:25, 118:3, 118:6, 133:13, 133:14, 144:3, 146:5, 146:6, 148:12

## B

**backed** [1] - 15:14
**background** [6] - 60:12, 60:13, 60:15, 62:7, 134:3, 134:6
**ballpark** [2] - 112:8, 136:5
**bar** [2] - 8:21, 108:20
**based** [28] - 19:25, 20:13, 42:12, 55:25, 65:24, 68:12, 68:15, 70:1, 70:7, 73:21, 73:23, 74:13, 74:14, 75:6, 75:22, 80:8, 80:11, 94:8, 94:19, 95:25, 96:3, 137:4, 137:13, 143:16, 144:8, 144:9, 144:23
**basic** [3] - 68:7, 138:25, 139:1
**basis** [4] - 63:16, 116:1, 140:2, 144:7
**baton** [10] - 93:1, 93:2, 93:5, 93:10, 93:15, 93:18, 93:22, 93:24, 94:2, 138:1
**batteries** [1] - 142:9
**bear** [2] - 105:13, 107:18
**bears** [1] - 99:6
**became** [6] - 18:1, 25:8, 63:5, 75:18, 75:20, 88:7
**become** [7] - 25:15, 25:17, 53:25, 75:4, 107:21, 107:22, 151:19
**becomes** [1] - 93:7
**becoming** [1] - 26:1
**begin** [1] - 10:17
**beginning** [1] - 142:19
**behavior** [2] - 137:8, 138:7
**behind** [2] - 23:10, 57:12
**beliefs** [2] - 146:25, 147:7
**believes** [1] - 66:2
**belong** [1] - 68:21
**belt** [2] - 137:16, 137:25
**bench** [1] - 106:20
**best** [4] - 29:17, 64:14, 76:19, 95:13
**better** [3] - 85:24, 95:14, 96:17
**between** [19] - 10:19, 10:20, 11:18, 37:21, 38:13, 59:24, 62:15, 64:16, 74:4, 80:6, 82:12, 92:3, 101:20, 133:1, 145:1, 150:20, 151:24, 152:16, 152:21
**beyond** [3] - 23:16, 76:7, 146:9
**bickering** [1] - 152:16
**biennial** [1] - 63:15
**big** [3] - 37:21, 137:13, 141:24
**binder** [1] - 8:7
**binders** [2] - 7:2, 7:15
**bit** [6] - 14:16, 60:7, 61:6, 66:14, 80:5, 117:11
**black** [1] - 76:22
**bladed** [5] - 24:14, 77:11, 78:25, 83:3, 91:12
**blades** [3] - 38:14, 80:7, 82:12
**bleed** [2] - 79:8, 110:7
**bleeding** [19] - 19:16, 20:2, 25:9, 25:11, 25:12, 25:17, 25:18, 25:20, 25:22, 27:18, 28:1, 30:5, 34:4, 34:8, 34:16, 50:13, 53:1, 110:9, 110:10
**blood** [35] - 25:10, 25:14, 25:16, 26:6, 26:9, 26:12, 26:24, 26:25, 27:8, 27:9, 27:10, 27:12, 27:13, 27:15, 29:9, 29:10, 29:13, 29:14, 29:16, 29:24, 30:1, 30:6, 31:9, 32:16, 32:18, 33:1, 33:6, 33:11, 34:3, 38:21, 39:1, 79:10, 79:11, 109:21, 110:15
**bloodied** [2] - 25:24, 26:5
**blueish** [1] - 72:12
**blur** [1] - 15:2
**BODNAR** [1] - 3:8
**body** [15] - 12:20, 12:24, 12:25, 13:2, 13:14, 37:9, 37:23, 38:5, 80:23, 80:25, 82:24, 85:25, 89:23, 91:5, 91:18
**bones** [2] - 93:16, 93:24
**book** [3] - 13:9, 106:9, 108:5
**books** [1] - 12:10
**Borba** [35] - 15:23, 15:25, 16:2, 16:19, 17:18, 18:7, 18:24, 19:15, 25:1, 26:25, 28:6, 28:10, 28:11, 28:15, 29:25, 75:17, 75:19, 76:5, 88:6, 88:8, 118:11, 119:23, 120:4, 122:20, 122:21, 122:25, 123:2, 123:22, 124:9, 124:11, 125:13, 126:21, 126:25
**Borba's** [5] - 117:13, 123:8, 123:12, 124:16, 125:6
**borders** [1] - 65:11
**borrow** [1] - 130:17
**bottle** [1] - 132:22
**bottom** [1] - 100:5
**box** [2] - 106:15, 133:5
**break** [4] - 100:25, 112:14, 113:12, 133:19
**breaks** [1] - 149:17
**brief** [3] - 5:8, 106:13, 106:18
**briefly** [5] - 44:1, 78:20, 111:16, 134:3, 137:2
**bring** [22] - 5:16, 6:1, 6:3, 6:6, 6:9, 7:7, 7:16, 8:4, 9:6, 31:19, 33:2, 39:2, 92:20, 103:9, 103:23, 104:4, 111:4, 111:9, 123:18, 133:19, 152:20
**bringing** [2] - 75:6, 144:15
**brisk** [2] - 78:13, 78:21
**broad** [4] - 51:23, 53:9, 75:10, 75:12
**broadcast** [3] - 65:19, 65:22, 67:18
**broadcasted** [1] - 74:2
**broadly** [1] - 73:3
**broken** [2] - 93:24, 137:5
**brought** [2] - 33:12, 146:24
**Brown** [15] - 39:10, 40:3, 41:12, 41:19, 41:21, 41:24, 42:5, 43:10, 43:13, 43:17, 44:17, 44:19, 45:13, 46:12, 46:14
**brush** [1] - 86:3
**Bryan** [1] - 3:14
**build** [1] - 7:23
**burglary** [1] - 68:24
**but..** [1] - 44:14
**BY** [147] - 2:4, 2:14, 3:8, 4:4, 4:6, 14:10, 14:22, 15:5, 15:9, 16:17, 17:4, 17:16, 18:12, 18:16, 18:22, 19:13, 19:22, 20:12, 21:19, 23:4, 24:23, 25:7, 26:4, 26:8, 26:11, 26:22, 27:6, 27:23, 28:5, 28:19, 29:2, 29:21, 30:18, 31:3, 33:4, 33:14, 34:1, 34:6, 34:13, 34:25, 35:9, 35:13, 35:24, 37:7, 37:20, 38:15, 39:5, 39:22, 40:5, 40:18, 41:11, 41:20, 42:6, 42:11, 42:24, 43:9, 43:22, 44:11, 44:16, 45:1, 45:7, 45:12, 45:19, 46:4, 46:10, 46:20, 47:1, 47:8, 48:10, 49:11, 49:20, 49:25, 50:11, 50:24, 51:11, 51:20, 52:4, 52:19, 53:11, 54:2, 54:18, 54:23, 56:1, 56:8, 56:23, 57:20, 58:7, 58:12, 60:4, 60:16, 62:12, 62:24, 69:6, 70:6, 71:18, 75:5, 75:13, 76:10, 77:19, 81:15, 84:5, 84:13, 86:22, 87:8, 87:24, 89:1, 89:7, 89:20, 91:16, 92:8, 94:1, 94:18, 95:2, 96:2, 114:2, 115:12, 116:12, 117:5, 117:9, 118:23, 119:7, 120:6, 121:1, 121:18, 121:23, 122:8, 122:19, 123:11, 126:17, 127:15, 127:24, 128:6, 128:15, 128:24, 129:2, 129:12, 129:20, 130:2, 131:5, 131:23, 134:2, 135:22, 138:15, 141:7, 141:14, 144:6, 144:20

## C

**C-l-a-r-k** [1] - 133:11
**CA** [1] - 1:24
**CAD** [1] - 71:13
**Cahill** [1] - 120:4
**calculator** [1] - 64:13
**calculus** [2] - 137:3, 140:18
**CALIFORNIA** [4] - 1:2, 1:14, 5:1, 154:4
**California** [23] - 2:6, 2:11, 2:15, 2:19, 2:23, 3:6, 3:10, 63:6, 63:8, 63:23, 68:4, 68:7, 68:14, 68:16, 68:22, 68:23, 69:9, 81:20, 81:21, 114:18, 116:22, 142:25, 154:7
**CALLED** [2] - 4:4, 4:6
**caller** [1] - 143:17



6-GottsSER-01065 6-GottsSER-01065

**callers** [1] - 67:11
**cam** [5] - 12:21, 12:24, 12:25, 13:2, 13:14
**cameras** [1] - 115:22
**camp** [2] - 143:18
**campers** [2] - 46:3, 73:6
**campground** [8] - 15:18, 40:20, 65:15, 66:5, 67:23, 70:13, 76:23, 78:7
**camping** [1] - 42:20
**campsite** [11] - 24:14, 40:6, 65:21, 67:5, 72:12, 73:7, 73:24, 78:10, 143:22, 146:3
**Campsite** [4] - 72:5, 72:8, 72:22, 143:22
**cannot** [1] - 145:7
**Canyon** [1] - 65:12
**car** [25] - 14:18, 15:12, 15:14, 15:15, 15:24, 16:1, 19:14, 28:7, 34:8, 39:14, 40:1, 40:6, 40:11, 40:16, 40:21, 66:8, 67:14, 77:2, 77:6, 77:13, 77:21, 77:25, 78:6
**career** [1] - 80:22
**carefully** [2] - 21:1, 54:8
**Carlsbad** [1] - 3:10
**carried** [1] - 93:5
**CARTER** [1] - 1:3
**carve** [1] - 8:21
**case** [28] - 6:21, 7:20, 8:4, 8:20, 11:10, 53:5, 64:21, 80:19, 82:4, 101:2, 105:18, 109:11, 111:20, 136:8, 136:12, 139:7, 139:9, 139:12, 139:21, 140:10, 141:24, 143:23, 145:16, 145:25, 146:6, 146:14
**Case** [1] - 1:6
**cases** [6] - 135:5, 136:3, 136:6, 136:11, 136:13, 136:19
**categories** [2] - 137:5, 137:11
**category** [3] - 137:8, 137:18, 138:17
**CATHERINE** [1] - 2:14
**caught** [2] - 152:9, 152:15
**causes** [3] - 107:14, 107:15, 138:9
**causing** [7] - 66:5, 67:5, 68:13, 101:10, 102:2, 102:9, 129:19
**center** [1] - 71:11
**centered** [2] - 100:22, 104:16
**centers** [1] - 145:25
**CENTRAL** [1] - 1:2
**Central** [2] - 2:5, 154:7
**certain** [3] - 59:1, 91:22, 137:11
**certainly** [6] - 6:1, 84:7, 113:1, 145:6, 146:10, 151:18
**CERTIFICATE** [1] - 154:1
**certification** [1] - 134:24
**certified** [5] - 114:14, 114:16, 114:19, 134:23
**Certified** [1] - 1:5
**certify** [1] - 154:7
**cetera** [7] - 7:24, 46:9, 87:6, 132:19, 145:24, 148:16, 152:22
**CHAD** [1] - 3:3
**chaining** [1] - 137:20
**chance** [3] - 46:21, 59:8, 110:25
**changed** [1] - 24:6
**changing** [1] - 95:23
**charges** [2] - 151:13, 152:4
**check** [3] - 94:9, 94:21, 95:3
**chemical** [1] - 138:5
**chest** [6] - 55:8, 80:10, 80:11, 82:9, 86:10, 88:18
**chest/stomach** [2] - 82:15, 87:14
**children** [1] - 60:20
**choose** [2] - 33:2, 111:9
**CHRISTIE** [1] - 3:8
**Circuit** [6] - 5:25, 7:19, 8:2, 8:3, 136:17, 136:19
**circuits** [1] - 136:20
**circumstance** [2] - 95:20, 137:12
**circumstances** [7] - 53:5, 55:25, 96:17, 144:8, 144:21, 144:24, 150:2
**cited** [1] - 136:19
**citizens** [1] - 140:6
**city** [2] - 65:6, 65:11
**City** [1] - 3:5
**civic** [1] - 67:21
**Civil** [1] - 108:4
**civil** [1] - 142:12
**claim** [6] - 10:18, 49:4, 51:7, 82:4, 102:25, 146:23
**claimed** [1] - 38:6
**claims** [2] - 147:6, 147:25
**CLARK** [2] - 4:6, 133:3
**Clark** [7] - 11:21, 11:24, 132:13, 133:9, 134:3, 134:4, 145:21
**class** [2] - 62:16, 135:7
**Class** [1] - 45:10
**classes** [3] - 64:6, 64:17
**classify** [1] - 69:10
**classroom** [1] - 61:11
**clean** [1] - 34:4
**cleaning** [1] - 26:24
**clear** [5] - 18:10, 101:13, 107:22, 113:5, 151:19
**clearer** [1] - 113:8
**clerks** [1] - 138:12
**client** [6] - 103:11, 103:12, 144:16, 146:25, 147:8, 151:11
**client's** [1] - 26:12
**clients** [2] - 6:14, 7:24
**climb** [1] - 7:17
**clip** [1] - 14:23
**close** [3] - 14:14, 15:21, 104:19
**closer** [1] - 82:13
**closest** [1] - 133:5
**closing** [1] - 78:6
**cnaltsas@lynberg.com** [1] - 2:16
**coat** [1] - 80:14
**code** [3] - 70:3, 107:24, 142:22
**Code** [16] - 50:3, 50:9, 65:22, 67:13, 68:16, 68:22, 68:24, 69:16, 70:5, 81:20, 81:21, 147:4, 147:5, 151:4, 151:5, 154:8
**codes** [3] - 68:9, 68:10
**cold** [1] - 29:7
**collapsible** [2] - 93:2, 93:5
**collateral** [4] - 8:13, 59:3, 151:10, 151:22
**colleague** [1] - 107:10
**colleagues** [4] - 85:15, 94:4, 96:5, 96:23
**collective** [1] - 116:1
**collectively** [1] - 119:4
**COLLINS** [4] - 3:4, 3:8
**colloquy** [1] - 120:25
**color** [1] - 142:23
**combative** [5] - 75:4, 90:21, 137:17, 137:23, 138:7
**comfortable** [3] - 106:24, 133:17, 133:22
**coming** [5] - 8:25, 57:14, 105:21, 105:22, 108:21
**command** [4] - 74:8, 75:2, 75:22, 76:7
**comment** [1] - 46:17
**comments** [3] - 6:14, 19:3, 19:6
**Comments** [1] - 19:3
**committed** [1] - 142:9
**community** [1] - 61:4
**commuting** [1] - 66:8
**company** [1] - 108:9
**compare** [1] - 57:10
**compared** [3] - 56:24, 57:2, 57:5
**competent** [1] - 66:18
**complete** [1] - 58:25
**completely** [5] - 19:7, 76:25, 115:18, 116:25, 122:1
**compliance** [2] - 76:8, 95:25
**comply** [1] - 148:6
**components** [1] - 95:23
**Compound** [5] - 24:3, 28:8, 30:23, 45:24, 143:24
**compound** [10] - 22:18, 26:1, 26:15, 30:12, 36:22, 37:6, 37:11, 46:7, 84:12, 121:8
**computer** [1] - 71:22
**concealed** [1] - 80:13
**concerned** [7] - 81:6, 114:23, 146:7, 146:12, 148:21, 151:20, 152:14
**concerning** [13] - 10:8, 10:18, 11:2, 11:7, 46:8, 56:16, 101:2, 109:21, 127:12, 141:13, 145:16, 148:13
**concerns** [6] - 69:7, 70:9, 70:12, 70:15, 70:18, 81:23
**concluded** [1] - 153:2
**concludes** [1] - 132:6
**conclusion** [4] - 50:5, 51:19, 56:6, 141:5
**conduct** [7] - 84:2, 84:8, 84:17, 84:24, 137:4, 140:6, 142:10
**conducted** [1] - 22:25
**conducts** [1] - 23:14
**Conference** [1] - 154:12
**confined** [2] - 76:4, 95:6
**confirm** [1] - 57:21
**conflicts** [1] - 8:4
**conformance** [1] - 154:12
**confused** [1] - 127:23
**confusing** [4] - 33:9, 94:15, 112:7, 128:4
**confusion** [9] - 92:12, 101:10, 102:2, 102:10, 107:15, 107:16, 116:9, 129:17, 129:19
**connected** [1] - 145:1
**connection** [1] - 145:1
**considered** [4] - 10:8, 11:6, 66:17, 86:25
**considers** [1] - 146:4
**consistency** [1] - 132:17
**consistent** [3] - 75:23, 120:20, 127:3
**constant** [1] - 152:15
**constantly** [2] - 68:9, 95:24
**constitute** [2] - 68:23, 142:10
**Constitution** [1] - 150:23
**constitution** [1] - 151:1
**constitutionally** [1] - 150:22
**consultant** [1] - 135:11
**consulted** [2] - 136:11, 136:14
**consumptive** [1] - 152:7
**contact** [13] - 64:25, 72:23, 79:3, 79:12, 79:23, 86:1, 87:10, 87:18, 90:5, 93:15, 110:8, 145:5, 148:3

**contacted** [1] - 65:20
**contacting** [1] - 86:5
**contacts** [1] - 144:3
**continue** [11] - 17:21, 18:17, 20:10, 25:4, 34:22, 39:2, 39:18, 40:3, 44:9, 45:17, 58:24
**continued** [6] - 3:1, 4:4, 14:9, 63:20, 78:21, 79:22
**continuing** [4] - 53:24, 95:20, 97:3, 131:19
**continuous** [1] - 63:25
**continuously** [2] - 95:15, 146:24
**control** [18] - 21:15, 23:19, 54:12, 73:22, 80:20, 96:22, 119:14, 119:17, 119:20, 120:17, 120:21, 121:14, 122:23, 123:14, 126:21, 126:25, 131:7, 131:16
**controlling** [2] - 81:2, 82:24
**convenient** [1] - 132:16
**conversation** [13] - 5:8, 38:16, 45:20, 46:6, 46:11, 46:14, 47:5, 47:9, 47:10, 47:20, 47:21, 58:1, 108:16
**cooperate** [2] - 75:3, 81:25
**cooperative** [2] - 137:6, 145:11
**copies** [1] - 12:11
**cops** [1] - 143:19
**copy** [7] - 12:6, 12:8, 13:7, 99:16, 99:18, 100:11, 125:16
**CORINNE** [1] - 2:22
**corner** [1] - 14:23
**correct** [22] - 9:4, 16:10, 17:1, 22:13, 32:6, 37:16, 52:15, 58:10, 58:13, 73:10, 76:12, 84:19, 100:2, 101:8, 102:16, 102:17, 115:9, 118:1, 125:23, 139:16, 154:9
**counsel** [22] - 5:7, 6:25, 7:5, 7:10, 9:23, 10:10, 10:14, 11:12, 12:1, 12:8, 13:6, 13:10, 13:20, 98:5, 100:12, 100:19, 105:2, 113:17, 128:3, 132:15, 148:25, 152:25
**COUNSEL** [1] - 2:1
**Counsel** [80] - 16:15, 18:5, 19:11, 26:1, 26:10, 26:13, 27:4, 29:19, 30:11, 34:11, 37:10, 43:15, 46:7, 46:13, 51:8, 52:13, 59:12, 59:13, 59:15, 59:20, 61:25, 62:22, 77:1, 81:11, 85:10, 86:20, 87:4, 89:5, 91:21, 95:1, 98:24, 99:2, 99:7, 100:4, 100:23, 101:25, 105:12, 105:18, 106:8, 107:25, 108:11, 113:12, 113:19, 117:8, 120:2, 120:24, 121:7, 121:11, 122:18, 124:20, 124:24, 125:17, 125:19, 125:25, 128:4, 128:10, 128:21, 129:17, 130:21, 130:24, 131:11, 131:20, 132:3, 132:5, 132:7, 132:11, 133:14, 133:16, 135:17, 138:14, 144:18, 145:18, 146:20, 147:19, 147:22, 149:10, 152:16, 152:18
**counsel's** [2] - 143:24, 147:23
**count** [1] - 9:13
**counting** [1] - 14:6
**country** [1] - 136:21
**Country** [3] - 2:10, 2:18, 2:22
**County** [11] - 61:2, 61:20, 94:19, 115:13, 116:3, 116:7, 116:11, 116:14, 116:18, 122:11, 134:7
**COUNTY** [3] - 1:7, 2:8, 154:3
**couple** [1] - 136:13
**course** [4] - 38:20, 137:6, 137:25, 138:18
**Court** [31] - 5:9, 5:19, 5:20, 5:21, 7:1, 7:2, 7:21, 8:6, 8:11, 9:1, 9:19, 10:1, 10:11, 10:22, 31:19, 31:20, 99:9, 102:12, 102:18, 106:24, 107:5, 109:17, 110:25, 113:3, 113:6, 146:22, 149:8, 151:13, 152:16, 154:6, 154:20
**court** [5] - 7:11, 33:2, 110:1, 151:2, 151:6
**COURT** [288] - 1:1, 1:23, 5:6, 5:23, 7:7, 8:8, 8:16, 9:10, 9:16, 9:21, 10:13, 12:5, 12:8, 12:14, 12:17, 12:20, 12:23, 13:1, 13:6, 13:10, 13:13, 13:17, 13:20, 13:25, 14:3, 14:6, 16:15, 16:24, 17:3, 17:12, 18:5, 18:15, 18:20, 19:2, 19:11, 21:13, 22:20, 22:23, 24:5, 26:1, 26:10, 26:13, 26:18, 27:2, 27:4, 27:22, 28:3, 28:9, 28:13, 29:19, 30:11, 30:14, 30:24, 31:12, 31:14, 31:21, 31:24, 32:5, 32:10, 32:13, 32:20, 32:22, 33:8, 33:20, 33:22, 34:11, 35:23, 36:23, 37:10, 37:15, 38:8, 39:20, 40:14, 41:16, 41:24, 42:3, 43:4, 43:15, 43:17, 45:25, 46:7, 46:13, 48:7, 50:6, 50:21, 50:23, 51:8, 51:22, 52:6, 52:17, 53:8, 53:17, 54:20, 55:17, 55:21, 56:7, 56:14, 56:20, 57:15, 58:11, 58:17, 58:22, 59:12, 59:18, 59:22, 60:2, 60:10, 61:25, 62:3, 62:6, 62:20, 69:4, 69:22, 69:24, 71:4, 71:7, 71:9, 74:18, 74:22, 75:10, 76:1, 76:4, 77:18, 81:9, 84:7, 84:11, 86:19, 87:4, 87:23, 89:5, 89:18, 91:8, 91:21, 93:19, 94:12, 94:25, 95:6, 95:10, 98:16, 98:19, 98:24, 99:2, 99:7, 99:10, 99:13, 99:15, 99:18, 99:21, 99:23, 100:1, 100:4, 100:11, 100:19, 100:23, 101:5, 101:10, 101:16, 101:18, 101:25, 102:8, 102:13, 102:15, 102:19, 103:13, 103:16, 103:22, 104:20, 105:5, 105:8, 105:12, 105:18, 105:22, 106:12, 106:18, 106:25, 107:2, 107:4, 107:7, 108:3, 108:11, 109:4, 109:7, 109:16, 110:21, 111:8, 111:23, 112:2, 112:7, 112:15, 113:7, 113:12, 113:17, 113:22, 113:24, 115:7, 115:11, 116:9, 117:4, 117:8, 118:22, 119:6, 120:2, 120:24, 121:4, 121:6, 121:11, 121:17, 121:20, 122:5, 122:18, 123:10, 123:16, 123:24, 124:3, 124:8, 124:11, 124:13, 124:16, 124:20, 124:24, 125:4, 125:6, 125:8, 125:10, 125:14, 125:17, 125:19, 125:23, 125:25, 126:4, 126:7, 126:10, 126:14, 127:9, 127:14, 127:22, 128:4, 128:10, 128:21, 129:1, 129:5, 129:17, 130:1, 130:9, 130:11, 130:14, 130:16, 130:19, 130:21, 130:24, 131:4, 131:11, 131:15, 131:20, 132:3, 132:5, 132:9, 132:11, 132:14, 132:23, 132:25, 133:4, 133:10, 133:12, 133:16, 133:21, 135:17, 138:10, 138:14, 141:6, 141:9, 144:1, 144:13, 144:18, 145:13, 145:20, 146:20, 147:19, 148:8, 149:10, 149:13, 149:18, 150:9, 150:14, 150:17, 151:10, 151:16, 154:6
**Court's** [8] - 5:8, 5:13, 6:9, 31:23, 112:14, 115:4, 124:5, 149:4
**courtesy** [7] - 10:14, 11:25, 58:24, 59:13, 62:8, 62:9, 152:8
**courtroom** [1] - 6:12
**courts** [6] - 107:18, 135:12, 135:24, 136:2, 136:16, 136:21
**CourtSmart** [1] - 138:11
**covered** [6] - 27:16, 50:12, 91:21, 114:4, 119:9
**covering** [1] - 87:15
**credibility** [7] - 103:10, 104:1, 104:7, 107:21, 111:11, 146:8, 151:22
**crime** [5] - 68:14, 68:18, 68:21, 137:14, 151:9
**criminal** [5] - 8:21, 61:9, 63:14, 68:4, 142:12
**cross** [7] - 59:18, 59:20, 111:4, 114:11, 117:12, 118:18, 122:21
**Cross** [1] - 4:5
**CROSS** [1] - 60:3
**Cross-Examination** [1] - 4:5
**cross-examination** [5] - 59:20, 114:11, 117:12, 118:18, 122:21
**CROSS-EXAMINATION** [1] - 60:3
**crosses** [1] - 140:21
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 154:20
**cswiss@ccllp.law** [1] - 3:11
**cumulative** [1] - 87:22
**cure** [1] - 9:3
**current** [1] - 58:9


6-GottsSER-01067

**curriculum** [1] - 134:25
**custody** [2] - 76:9, 81:22
**cut** [1] - 5:14
**cuts** [3] - 79:5, 79:7, 87:1

## D

**dailies** [1] - 9:18
**damage** [1] - 93:25
**damages** [6] - 9:24, 10:2, 10:8, 10:19, 10:23, 11:8
**damp** [1] - 29:7
**danger** [1] - 111:17
**dark** [5] - 15:18, 15:20, 40:20, 40:22, 76:25
**darker** [1] - 44:14
**data** [2] - 71:11, 139:25
**date** [3] - 10:5, 83:15, 99:6
**Date** [1] - 154:15
**DAVID** [1] - 1:3
**DAY** [1] - 1:8
**de** [2] - 63:24, 75:1
**de-escalate** [1] - 75:1
**de-escalation** [1] - 63:24
**dealing** [5] - 55:17, 55:18, 84:20, 101:12, 137:4
**DEBBIE** [3] - 1:23, 154:5, 154:19
**Debbie** [1] - 154:20
**decide** [1] - 60:25
**decided** [1] - 61:3
**decider** [1] - 141:11
**decision** [3] - 9:2, 107:13, 152:25
**decisions** [1] - 142:3
**deem** [1] - 108:13
**deeply** [1] - 151:20
**defendant** [3] - 5:11, 10:21, 113:1
**DEFENDANT** [2] - 2:8, 3:3
**defendants** [6] - 11:19, 139:15, 146:24, 147:13, 150:25, 151:2
**Defendants** [1] - 1:8
**defendants'** [1] - 11:16
**defending** [1] - 111:12
**defense** [8] - 3:14, 5:12, 5:18, 8:8, 12:11, 100:19, 117:17, 128:3
**defensive** [1] - 111:14
**defer** [1] - 76:17
**defined** [1] - 140:22
**definition** [1] - 140:17
**degree** [3] - 62:20, 140:7, 140:20
**delay** [1] - 7:12
**deliberations** [1] - 10:8
**demographics** [1] - 135:6
**denied** [3] - 5:19, 27:24, 35:11
**deny** [3] - 5:22, 25:25, 26:5
**denying** [8] - 27:7, 29:8, 29:12, 33:5, 52:20, 52:23, 53:1, 117:6
**department** [8] - 50:8, 63:18, 69:10, 93:23, 96:4, 115:17, 115:21, 135:5
**Department** [5] - 61:2, 94:20, 115:13, 116:11, 122:11
**department's** [1] - 81:2
**Department's** [3] - 116:4, 116:8, 116:18
**departmental** [2] - 116:14, 116:24
**deploy** [1] - 22:13
**deployed** [2] - 21:17, 22:9
**deploying** [1] - 21:9
**deployment** [2] - 20:25, 135:12
**deposition** [19] - 31:8, 104:11, 104:13, 108:8, 109:15, 123:7, 123:9, 124:14, 125:3, 125:4, 125:8, 125:12, 126:21, 126:23, 127:5, 128:3, 130:4, 131:10, 139:14
**depositional** [4] - 105:2, 108:22, 109:9, 113:2
**depositions** [6] - 105:8, 108:6, 111:1, 123:17, 132:19, 136:2
**deputies** [24] - 17:25, 23:3, 36:1, 40:16, 54:12, 57:7, 66:3, 67:13, 73:9, 75:2, 75:14, 77:24, 83:7, 83:12, 87:18, 90:7, 92:3, 95:18, 96:11, 96:12, 108:13, 128:14, 145:4
**DEPUTY** [1] - 132:21
**Deputy** [100] - 11:13, 12:18, 12:20, 12:23, 13:1, 13:13, 15:23, 15:25, 17:21, 19:16, 20:5, 20:15, 22:3, 23:19, 23:22, 24:5, 24:10, 28:11, 28:15, 29:25, 32:10, 36:4, 37:8, 37:17, 37:24, 38:12, 39:6, 39:10, 41:12, 41:19, 41:24, 42:5, 43:10, 43:14, 44:4, 44:6, 44:19, 45:2, 45:5, 46:11, 46:14, 46:17, 46:18, 53:9, 57:5, 66:9, 66:10, 66:19, 66:20, 67:1, 75:17, 75:19, 83:12, 83:13, 83:18, 83:19, 83:20, 84:1, 84:15, 84:20, 85:1, 88:2, 88:6, 88:8, 88:10, 88:14, 88:17, 88:19, 88:20, 88:23, 89:13, 90:3, 90:4, 100:16, 101:21, 102:21, 103:25, 104:1, 104:19, 104:21, 105:6, 105:7, 105:22, 107:20, 110:17, 112:10, 112:23, 113:18, 118:7, 119:10, 119:16, 124:17, 126:21, 126:25, 128:12
**deputy** [40] - 7:12, 11:12, 12:2, 13:3, 24:15, 24:19, 25:10, 33:16, 33:24, 34:2, 41:17, 43:13, 44:20, 53:17, 53:25, 54:13, 59:14, 60:23, 66:15, 66:17, 67:16, 73:2, 73:3, 74:1, 74:4, 85:6, 88:1, 88:4, 88:5, 89:8, 89:12, 96:10, 97:14, 102:23, 105:5, 110:12, 118:3, 118:4, 139:4
**deputy's** [5] - 18:7, 18:10, 24:17, 96:9, 104:7
**describe** [5] - 66:14, 78:3, 78:17, 82:5, 134:15
**described** [2] - 53:13, 140:5
**designated** [1] - 58:24
**desperately** [1] - 107:12
**destroys** [1] - 111:10
**detail** [2] - 38:5, 38:7
**detain** [3] - 148:10, 148:17, 150:23
**detained** [2] - 151:18, 152:2
**detention** [17] - 143:4, 144:11, 145:9, 148:24, 149:19, 149:20, 150:1, 150:5, 150:13, 150:15, 150:21, 151:17, 151:24, 152:2, 152:12, 152:17, 152:23
**determination** [1] - 141:11
**determine** [3] - 23:14, 36:4, 66:16
**determined** [5] - 63:23, 141:2, 141:8, 141:15, 142:21
**determines** [1] - 140:6
**determining** [1] - 142:20
**develop** [5] - 60:11, 60:13, 60:14, 62:7, 103:24
**developed** [1] - 60:11
**device** [2] - 21:15, 138:9
**dhinospaan@yahoo.com** [1] - 1:25
**difference** [9] - 37:21, 43:17, 101:20, 111:13, 128:18, 150:19, 150:20, 150:22, 151:24
**different** [8] - 56:15, 111:3, 111:6, 128:16, 138:6, 140:25
**differently** [1] - 32:18
**difficulty** [3] - 41:23, 57:10, 109:17
**DIRECT** [2] - 14:9, 134:1
**direct** [7] - 58:25, 100:15, 101:14, 103:11, 111:23, 131:9, 133:16
**Direct** [2] - 4:4, 4:7
**directed** [1] - 100:6
**directly** [1] - 6:11
**dirt** [4] - 55:10, 78:9, 78:19, 87:10
**disciplinary** [1] - 142:13
**discrepancy** [1] - 104:3
**discretionary** [2] - 108:20, 111:1
**discuss** [6] - 9:22, 47:19, 58:19, 59:6, 101:1, 145:15
**discussed** [2] - 31:6, 57:24
**Discussion** [1] - 138:13
**discussion** [3] - 11:7, 145:22, 149:2
**dismissed** [3] - 146:22, 151:14, 152:5
**dismissing** [1] - 147:25
**dispatch** [14] - 65:13, 66:2, 67:5, 67:10, 69:16, 69:18, 70:2, 71:15, 71:16, 72:1, 72:7, 72:18, 73:23, 143:21
**dispatched** [1] - 73:2
**disputed** [2] - 150:22, 150:24
**disputing** [1] - 116:17
**disregard** [1] - 19:3
**disregarded** [3] - 10:7, 11:5, 19:7
**dissuading** [1] - 7:25
**distance** [1] - 76:16
**distraction** [1] - 59:5
**distress** [8] - 9:24, 10:9, 10:18, 10:23, 11:8, 69:13, 70:3, 73:5
**District** [2] - 154:6, 154:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**disturbance** [8] - 65:18, 66:6, 67:5, 68:13, 68:17, 72:7, 145:2, 145:3
**disturbing** [2] - 65:22, 68:18
**divide** [1] - 5:12
**divided** [3] - 11:16, 11:18, 59:24
**DIVISION** [1] - 1:2
**docket** [1] - 8:12
**document** [3] - 114:8,

116:25, 122:2
**Document** [1] - 99:9
**documentation** [1] - 122:14
**documented** [2] - 115:17, 115:25
**documenting** [1] - 115:20
**dog** [1] - 34:9
**domain** [2] - 141:18, 142:14
**Domain** [3] - 141:25, 142:7, 142:15
**domains** [4] - 141:19, 141:20, 141:22, 142:1
**domestic** [2] - 65:1, 143:9
**done** [5] - 21:10, 57:1, 71:25, 96:9, 115:25
**door** [2] - 78:5, 133:6
**doors** [1] - 133:1
**double** [1] - 133:1
**down** [28] - 6:20, 16:11, 32:17, 55:7, 55:10, 56:4, 66:22, 79:23, 86:9, 86:11, 86:13, 88:2, 88:24, 89:17, 89:23, 90:25, 94:7, 94:20, 95:4, 96:19, 107:9, 108:15, 110:6, 111:5, 120:16, 132:9, 137:20, 149:15
**draft** [1] - 6:2
**dragged** [1] - 109:1
**drain** [1] - 149:15
**dripping** [1] - 110:10
**Drive** [2] - 3:5, 65:6
**driver's** [1] - 67:17
**driving** [4] - 14:18, 65:4, 66:8, 77:21
**drop** [2] - 85:24, 85:25
**drop-knee** [1] - 85:24
**dry** [2] - 30:9, 30:20
**duration** [1] - 140:20
**during** [14] - 15:6, 22:7, 33:18, 38:24, 63:12, 81:1, 86:6, 86:14, 87:11, 88:21, 96:17, 96:25, 126:23, 131:9
**duties** [2] - 48:25, 114:23
**duty** [6] - 49:12, 49:22, 50:1, 50:2, 50:17, 114:4
**DV** [2] - 143:12, 144:9

## E

**easy** [1] - 56:14
**eat** [1] - 147:18
**ECD** [1] - 135:9
**educated** [1] - 105:9
**education** [2] - 104:8, 105:15
**effect** [2] - 38:14, 122:25
**effort** [2] - 86:15, 86:25
**efforts** [1] - 93:9
**either** [9] - 16:9, 27:17, 55:19, 104:6, 107:13, 112:21, 118:24, 138:19
**either/or** [1] - 141:10
**El** [1] - 67:21
**electrical** [1] - 138:8
**electronic** [2] - 21:15, 138:8
**elevated** [1] - 86:15
**embedded** [1] - 144:5
**emotional** [6] - 9:24, 10:2, 10:9, 10:18, 10:23, 11:8
**encompass** [1] - 96:15
**encounter** [4] - 90:24, 143:12, 152:20, 152:21
**encountering** [3] - 96:1, 97:3, 129:11
**encounters** [1] - 90:24
**encourage** [2] - 75:3, 152:19
**end** [6] - 5:25, 8:16, 11:10, 52:9, 93:22, 107:23
**ends** [1] - 47:9
**energy** [2] - 138:2, 138:8
**enforced** [1] - 135:2
**enforcement** [13] - 60:25, 61:1, 63:10, 64:4, 64:10, 66:1, 72:25, 73:16, 90:17, 136:7, 136:22, 149:21, 150:1
**engaged** [2] - 73:9, 75:14
**enhancing** [1] - 115:23
**ensure** [1] - 73:4
**ensuring** [1] - 115:23
**enter** [1] - 46:19
**entirely** [2] - 19:4, 19:8
**entirety** [2] - 47:5, 47:14
**entitled** [1] - 154:11
**entrance** [1] - 133:5
**episodes** [1] - 144:25
**equipment** [1] - 9:7
**escalate** [1] - 75:1
**escalation** [1] - 63:24
**ESQ** [2] - 2:10, 3:4
**essence** [1] - 120:3
**essentially** [2] - 71:11, 71:13
**establish** [2] - 111:2, 148:5
**established** [2] - 19:25, 22:1
**establishing** [1] - 20:18
**estimate** [2] - 64:15, 76:19
**et** [9] - 1:7, 2:8, 7:24, 46:9, 87:6, 132:19, 145:24, 148:16, 152:22
**ethics** [1] - 135:6
**evaluate** [2] - 66:16, 84:24
**evaluating** [5] - 36:6, 84:2, 84:8, 84:17, 138:22
**evaluation** [1] - 37:25
**evening** [8] - 5:18, 6:10, 51:25, 52:6, 52:7, 52:11, 59:7, 95:6
**event** [9] - 8:13, 21:24, 30:4, 35:25, 115:20, 116:23, 121:24, 149:9, 151:10
**events** [1] - 10:5
**eventually** [3] - 72:4, 79:23, 141:11
**ever-changing** [1] - 95:23
**evidence** [15] - 6:9, 10:4, 11:1, 11:2, 16:23, 17:11, 24:4, 28:2, 29:17, 41:15, 43:3, 69:3, 77:17, 149:7
**evolved** [1] - 142:4
**exact** [6] - 16:25, 22:8, 53:22, 64:12, 76:16, 88:20
**exactly** [6] - 73:14, 122:17, 129:8, 131:6, 140:19, 150:11
**Examination** [4] - 4:4, 4:5, 4:5, 4:7
**examination** [12] - 12:1, 59:20, 100:15, 103:11, 111:24, 114:11, 117:12, 118:18, 122:21, 131:9, 133:16, 146:13
**EXAMINATION** [4] - 14:9, 60:3, 114:1, 134:1
**example** [5] - 56:25, 57:4, 57:11, 108:23, 137:13
**except** [2] - 9:12, 30:6
**excessive** [4] - 140:21, 141:16, 148:21, 152:19
**exchange** [1] - 145:6
**exclude** [3] - 147:15, 149:3, 149:4
**excluded** [1] - 136:9
**excuse** [1] - 49:24
**Exhibit** [2] - 115:3, 119:9
**exhibit** [4] - 12:10, 12:12, 12:14, 12:15
**EXHIBITS** [1] - 4:15
**exit** [4] - 15:25, 43:25, 76:11, 76:14
**exited** [2] - 30:15, 78:18
**exiting** [1] - 43:6
**expect** [1] - 93:14
**expectation** [1] - 48:23
**expectations** [1] - 113:6
**expected** [2] - 139:3, 150:11
**experience** [18] - 64:19, 65:24, 68:12, 68:15, 70:2, 73:21, 74:13, 74:15, 75:6, 75:11, 77:23, 80:9, 80:12, 94:8, 94:9, 96:3, 135:9
**experiencing** [1] - 70:13
**expert** [15] - 11:21, 51:19, 57:14, 104:4, 135:17, 135:25, 136:6, 136:11, 144:14, 145:23, 146:3, 147:10, 149:3, 149:22, 151:21
**expertise** [5] - 139:2, 141:13, 148:20, 151:20, 152:23
**experts** [1] - 141:9
**explain** [5] - 23:11, 30:9, 103:11, 152:3, 152:4
**explanation** [1] - 33:1
**express** [2] - 101:2, 145:16
**expressing** [1] - 143:2
**extend** [1] - 93:7
**extensive** [1] - 135:8
**extensively** [1] - 142:4
**extra** [1] - 12:8
**eyes** [1] - 96:20

## F

**face** [17] - 34:3, 40:6, 55:7, 55:9, 56:4, 86:8, 86:10, 86:15, 87:1, 87:9, 87:15, 88:24, 89:17, 89:23, 95:21, 133:8, 142:12
**Facebook** [3] - 6:11, 6:14, 6:17
**facility** [1] - 115:22
**facing** [4] - 53:22, 55:25, 82:10, 95:17
**fact** [11] - 7:25, 16:19, 27:17, 119:13, 119:20, 129:13, 147:10, 148:5, 148:11, 149:4, 149:6
**factors** [1] - 146:10
**facts** [12] - 16:22, 17:10, 24:4, 41:14, 43:2, 69:3, 77:17, 144:10, 146:6, 148:13, 149:20, 152:20
**factual** [1] - 115:23
**faculty** [1] - 135:1
**fair** [1] - 88:23
**fall** [2] - 79:15, 82:25
**falling** [1] - 79:8
**falls** [2] - 81:1, 93:22
**false** [3] - 146:23, 147:25, 149:7
**families'** [1] - 6:24
**family** [4] - 60:8, 60:15, 60:17, 62:7
**far** [6] - 60:11, 76:14, 114:23, 116:6, 142:2, 146:11
**Farahmand** [1] - 3:13
**fashion** [1] - 113:8
**father** [1] - 61:1
**fearing** [1] - 119:21
**February** [1] - 8:23
**federal** [1] - 136:21
**FEDERAL** [2] - 1:23, 154:5
**Federal** [2] - 108:4,


6-GottsSER-01069

154:20
**feet** [1] - 76:18
**fell** [5] - 30:19, 30:20, 32:17, 78:14, 79:2
**female** [1] - 67:12
**fence** [1] - 137:20
**few** [5] - 57:12, 58:20, 96:25, 120:16, 141:20
**field** [10] - 23:8, 31:7, 32:7, 64:1, 66:15, 66:24, 66:25, 68:8, 84:1, 84:22
**fifth** [2] - 16:20, 17:19
**Fifth** [1] - 136:20
**fight** [1] - 137:24
**figure** [2] - 46:18, 82:1
**file** [3] - 8:10, 147:13, 147:15
**filed** [2] - 149:2, 149:4
**filing** [1] - 146:2
**final** [1] - 152:25
**finally** [1] - 107:16
**fine** [6] - 35:21, 99:17, 133:20, 151:1, 151:17, 152:24
**finish** [8] - 11:19, 11:24, 49:24, 112:17, 121:5, 121:9, 149:11, 149:12
**finished** [1] - 31:13
**firearm** [5] - 21:18, 79:1, 83:4, 91:13, 138:20
**firefight** [1] - 150:18
**First** [2] - 101:5, 136:20
**first** [47] - 5:6, 7:4, 8:9, 13:13, 24:1, 28:7, 28:17, 34:7, 52:20, 56:10, 64:25, 65:8, 66:4, 72:10, 73:8, 83:8, 87:17, 87:25, 88:14, 89:11, 89:21, 90:5, 90:23, 92:9, 92:16, 94:24, 98:22, 101:7, 101:19, 102:2, 107:15, 109:22, 110:23, 119:14, 119:15, 125:21, 137:6, 140:24, 143:12, 144:3, 145:2, 145:20, 146:7, 146:21, 147:23, 149:1, 152:20
**fist** [1] - 138:3
**fit** [1] - 11:19
**fitness** [2] - 61:17, 62:16
**five** [6] - 24:25, 25:1, 63:11, 64:20, 124:20, 126:23
**flashes** [2] - 70:24, 71:21
**flashlights** [1] - 40:21
**flavor** [1] - 137:15
**flavoring** [1] - 141:23
**flavors** [1] - 144:4
**floor** [2] - 98:5, 152:24
**fluid** [1] - 95:22
**focus** [18] - 15:16, 40:15, 41:7, 77:8, 84:19, 84:20, 87:11, 88:19, 90:10, 95:14, 95:17, 96:21, 96:22, 96:23, 97:1, 129:8, 129:10, 131:25
**focused** [2] - 59:8, 118:13
**follow** [6] - 14:4, 29:24, 43:13, 61:4, 73:2, 136:24
**follow-up** [1] - 29:24
**followed** [2] - 74:2, 152:3
**following** [1] - 63:12
**Fonzi** [2] - 149:3, 151:6
**foot** [1] - 78:12
**footing** [2] - 30:16, 78:19
**footsteps** [1] - 61:4
**FOR** [3] - 2:3, 2:8, 3:3
**forbid** [1] - 69:1
**forbidden** [1] - 142:17
**force** [146] - 16:13, 18:13, 21:4, 22:17, 22:24, 23:3, 23:6, 23:8, 23:12, 23:13, 24:1, 36:6, 36:9, 36:13, 36:14, 37:18, 37:24, 38:19, 45:21, 47:12, 47:15, 47:23, 48:17, 48:20, 48:22, 48:25, 49:3, 49:4, 49:8, 49:10, 49:14, 49:18, 50:3, 54:6, 55:22, 61:8, 62:21, 63:14, 63:16, 63:21, 63:23, 74:16, 75:8, 80:17, 81:2, 82:3, 82:11, 82:25, 83:1, 87:11, 91:24, 93:12, 93:23, 95:13, 95:14, 95:19, 95:22, 95:24, 96:8, 96:11, 96:13, 96:14, 96:18, 97:1, 97:3, 97:15, 97:18, 98:2, 114:4, 114:5, 115:1, 115:2, 115:8, 115:14, 115:16, 115:20, 116:4, 116:7, 116:8, 116:13, 116:15, 116:18, 116:20, 116:25, 117:14, 118:13, 119:3, 120:10, 120:12, 121:25, 122:2, 122:11, 122:12, 122:14, 122:15, 123:3, 123:13, 129:10, 129:22, 131:25, 134:17, 134:19, 134:20, 135:6, 135:18, 135:24, 136:3, 136:4, 136:15, 136:24, 137:6, 137:11, 138:23, 139:9, 140:7, 140:12, 140:17, 140:18, 140:19, 140:20, 140:21, 140:25, 141:13, 141:15, 141:24, 142:3, 142:11, 142:16, 142:21, 144:14, 145:23, 146:4, 146:10, 147:3, 147:9, 147:10, 147:11, 148:4, 148:10, 148:14, 148:21, 149:23, 152:20
**forced** [1] - 103:9
**foregoing** [1] - 154:9
**Forest** [1] - 65:6
**forewarning** [1] - 5:24
**form** [2] - 101:2, 145:16
**formally** [1] - 8:10
**format** [1] - 154:11
**formulated** [1] - 140:9
**forth** [2] - 104:4, 152:16
**forward** [7] - 6:5, 29:23, 41:18, 45:4, 81:25, 123:18, 132:25
**foundation** [8] - 53:7, 74:17, 84:4, 86:18, 86:19, 88:25, 117:2, 148:13
**four** [7] - 16:18, 17:1, 75:20, 135:1, 135:5, 137:5
**Fourth** [1] - 150:21
**fourth** [3] - 17:19, 43:23, 54:12
**frame** [3] - 26:24, 92:25, 111:3
**frames** [2] - 106:2, 111:12
**FRANK** [1] - 2:10
**frankly** [10] - 7:21, 106:5, 107:21, 111:11, 111:15, 113:8, 146:8, 148:16, 150:5, 151:23
**freed** [1] - 80:19
**frequently** [1] - 135:7
**fresh** [1] - 63:25
**front** [10] - 9:19, 15:23, 39:25, 67:16, 76:5, 99:7, 106:9, 125:11, 148:20, 151:3
**frowns** [1] - 5:25
**FTO** [8] - 27:12, 31:7, 32:15, 32:18, 36:3, 66:8, 84:22
**full** [1] - 133:7
**fully** [1] - 122:1
**fun** [2] - 109:4, 109:12
**fundamentally** [1] - 137:5

## G

**gain** [10] - 23:19, 76:7, 119:14, 119:16, 119:20, 120:17, 120:21, 121:14, 122:23, 123:14
**gander** [1] - 109:2
**gear** [1] - 28:23
**general** [7] - 38:19, 51:5, 65:21, 71:16, 74:25, 90:22, 135:12
**generally** [8] - 21:25, 50:25, 75:8, 86:10, 88:23, 89:15, 95:7, 105:15
**generic** [1] - 54:16
**gentlemen** [2] - 19:2, 100:24
**Gibbs** [2] - 9:12, 9:17
**girl** [8] - 64:21, 67:12, 68:25, 69:8, 70:18, 73:5, 143:20, 144:9
**gist** [1] - 38:19
**given** [4] - 8:11, 20:1, 21:22, 136:1
**Glendale** [1] - 2:6
**God** [1] - 69:1
**Gomez** [1] - 143:21
**Gonzalez** [28] - 16:4, 16:9, 17:18, 18:7, 25:1, 83:13, 83:19, 83:20, 88:20, 90:3, 90:4, 117:13, 117:18, 117:25, 118:7, 118:9, 118:19, 119:10, 119:23, 120:5, 127:6, 127:12, 128:7, 128:12, 129:13, 131:6, 131:16, 147:1
**goose** [1] - 109:2
**Gotts** [36] - 9:16, 11:13, 13:13, 28:21, 32:10, 32:25, 53:10, 59:14, 100:16, 101:21, 102:21, 103:23, 103:25, 104:6, 104:19, 104:21, 104:23, 104:25, 105:4, 105:22, 107:20, 109:11, 109:21, 110:4, 110:13, 110:17, 112:4, 112:10, 112:23, 113:18, 124:10, 124:15, 124:17, 125:10, 147:2
**GOTTS** [3] - 4:4, 13:11, 132:21
**Gotts'** [2] - 104:1, 110:8
**Gotts's** [8] - 12:18, 12:20, 12:23, 13:1, 31:16, 125:4, 125:8, 125:23
**GPS** [2] - 56:11
**grab** [3] - 39:7, 43:10, 129:14
**grabbing** [2] - 92:18, 97:24
**graduate** [1] - 62:17
**graduated** [2] - 63:1, 114:17
**graduation** [1] - 63:12
**grandfather** [1] - 61:2
**granted** [2] - 7:21, 8:19
**grappling** [1] - 137:16
**gravel** [6] - 78:9, 78:19, 87:1, 87:10, 89:17, 89:23
**great** [2] - 109:7, 112:16
**Great** [1] - 99:10
**greatly** [1] - 90:19
**green** [1] - 44:14

**grievance** [1] - 72:21
**grossly** [1] - 141:16
**ground** [42] - 16:5, 17:7, 20:20, 22:15, 30:20, 32:18, 40:10, 48:1, 55:14, 56:4, 73:12, 73:13, 73:14, 76:15, 78:20, 79:2, 79:3, 79:9, 79:24, 80:10, 80:11, 80:24, 81:1, 81:18, 82:9, 82:10, 86:10, 86:13, 86:15, 87:2, 90:25, 92:2, 94:7, 94:20, 95:4, 96:19, 110:8, 110:9, 110:15, 118:25, 148:6
**growing** [1] - 105:21
**growling** [2] - 101:19, 102:1
**grudge** [1] - 72:21
**guess** [3] - 15:14, 69:18, 69:21
**guideline** [1] - 141:17
**guidelines** [3] - 134:16, 136:24, 137:1
**gun** [9] - 24:17, 24:20, 24:21, 74:5, 74:6, 74:7, 77:11, 77:14
**Gunderson** [36] - 14:18, 16:20, 17:5, 17:20, 17:21, 18:8, 18:10, 18:23, 31:18, 32:11, 32:22, 32:23, 33:1, 36:4, 37:8, 37:17, 37:24, 66:9, 66:10, 66:15, 66:19, 66:20, 67:1, 67:15, 67:16, 84:1, 84:15, 84:20, 103:9, 105:6, 105:7, 110:19, 110:20, 110:21, 110:22, 113:4
**GUNDERSON** [1] - 66:10
**Gunderson's** [4] - 31:7, 32:5, 32:13, 103:8
**gunpoint** [4] - 24:16, 74:2, 77:11, 91:14
**guy** [1] - 137:13

**H**

**half** [5] - 11:18, 58:18, 59:24, 134:10, 134:14
**hallway** [3] - 11:21, 83:22, 107:10
**hand** [12] - 31:24, 44:1, 79:7, 88:11, 88:24, 91:17, 92:10, 97:13, 98:24, 99:8, 100:11, 133:2
**handcuff** [3] - 25:2, 90:16, 92:7
**handcuffed** [7] - 73:22, 82:17, 83:6, 90:18, 90:19, 91:3, 97:5
**handcuffs** [8] - 23:24, 53:15, 80:21, 82:1, 97:9, 97:12, 97:14, 97:16
**handed** [1] - 99:9
**handful** [1] - 64:5
**handgun** [1] - 21:18
**handling** [1] - 73:3
**hands** [17] - 24:12, 26:24, 27:10, 28:6, 28:13, 28:16, 29:12, 29:15, 29:22, 29:24, 33:17, 34:7, 43:7, 44:23, 79:10, 79:13, 90:21
**handy** [1] - 108:5
**hanging** [1] - 152:11
**happily** [1] - 60:20
**happy** [2] - 105:19, 106:14
**hard** [2] - 7:17, 62:4
**harm** [1] - 90:22
**harmful** [1] - 149:24
**harms** [1] - 111:10
**HARRELL** [117] - 2:10, 9:14, 9:18, 12:6, 12:12, 13:8, 16:14, 18:14, 18:19, 22:18, 26:7, 27:1, 27:19, 27:21, 33:7, 33:19, 34:5, 35:8, 35:22, 38:7, 40:13, 49:23, 50:5, 54:17, 56:12, 57:13, 59:21, 60:1, 60:4, 60:16, 62:2, 62:4, 62:12, 62:24, 69:6, 70:6, 71:18, 75:5, 75:13, 76:10, 77:19, 81:15, 84:5, 84:10, 84:13, 86:22, 87:8, 87:24, 89:1, 89:7, 89:19, 89:20, 91:16, 92:8, 94:1, 94:17, 94:18, 95:2, 96:2, 98:14, 98:18, 98:21, 99:5, 99:12, 99:14, 99:20, 99:22, 99:25, 100:3, 100:10, 100:20, 101:9, 101:14, 101:17, 101:22, 102:6, 102:11, 102:14, 102:17, 102:23, 103:15, 103:21, 104:8, 105:4, 105:6, 105:17, 105:20, 106:11, 106:16, 106:23, 107:1, 107:3, 107:5, 108:1, 108:4, 109:3, 109:6, 110:20, 111:7, 111:22, 111:25, 112:6, 112:13, 113:5, 113:20, 118:21, 119:5, 120:1, 123:9, 123:15, 124:9, 127:8, 127:19, 129:25, 130:8, 132:8, 151:15
**Harrell** [2] - 4:5, 129:7
**hate** [1] - 77:12
**head** [61] - 20:3, 25:11, 25:13, 25:17, 25:20, 25:22, 27:17, 27:18, 27:25, 30:5, 30:7, 34:4, 36:17, 36:18, 37:1, 37:3, 37:22, 48:11, 48:13, 50:13, 50:14, 50:15, 50:16, 50:18, 50:25, 51:1, 51:13, 51:17, 52:13, 52:21, 52:24, 52:25, 53:2, 53:4, 53:16, 53:22, 54:6, 54:7, 55:9, 55:15, 55:17, 55:20, 55:25, 56:2, 56:3, 82:5, 85:11, 85:13, 85:16, 85:19, 85:22, 86:1, 86:3, 86:6, 86:25, 87:5, 87:11, 87:13, 98:12, 110:10
**headlights** [1] - 77:2
**headlock** [1] - 55:2
**health** [1] - 68:9
**hear** [31] - 13:23, 14:15, 15:21, 15:22, 19:15, 19:16, 19:18, 19:23, 20:6, 21:5, 22:3, 22:5, 22:9, 23:7, 25:10, 30:3, 38:3, 38:11, 39:8, 45:15, 47:17, 48:1, 65:18, 78:5, 101:18, 101:25, 102:19, 129:16, 145:21, 146:15, 150:10
**heard** [16] - 20:7, 39:6, 43:11, 50:14, 52:12, 65:25, 67:18, 74:8, 86:21, 97:18, 111:13, 123:17, 123:20, 143:23, 144:10, 146:18
**hearing** [1] - 102:20
**hearsay** [1] - 108:21
**heart** [2] - 10:6, 11:4
**HEATHCOTE** [2] - 2:18, 109:23
**held** [4] - 33:16, 34:9, 97:13, 154:10
**help** [13] - 64:22, 66:22, 70:20, 71:1, 73:19, 77:21, 79:16, 80:3, 80:23, 81:17, 102:5, 102:7, 104:9
**helpful** [2] - 102:8, 147:20
**helping** [2] - 34:3, 92:5
**hereby** [1] - 154:7
**herself** [1] - 138:19
**highest** [1] - 134:24
**highlighted** [1] - 111:18
**highlighting** [1] - 106:5
**himself** [2] - 6:10, 111:12
**HINO** [3] - 1:23, 154:5, 154:19
**Hino** [1] - 154:20
**HINO-SPAAN** [3] - 1:23, 154:5, 154:19
**Hino-Spaan** [1] - 154:20
**history** [1] - 8:1
**hit** [8] - 51:1, 51:16, 52:21, 52:23, 53:16, 55:15, 55:24, 56:2
**hitting** [6] - 20:3, 48:12, 50:18, 55:17, 55:19, 93:10
**hold** [7] - 66:22, 88:15, 105:12, 109:4, 119:22, 150:17
**holding** [2] - 42:15, 43:7
**Holloway** [112] - 6:10, 6:22, 14:25, 15:7, 16:5, 16:12, 19:15, 20:2, 20:20, 22:5, 22:15, 24:13, 24:16, 24:22, 25:9, 25:12, 25:14, 25:20, 27:25, 30:5, 32:19, 33:6, 33:15, 39:11, 42:21, 46:18, 46:22, 48:1, 50:13, 53:22, 53:23, 55:14, 60:12, 60:14, 62:8, 65:1, 72:15, 72:20, 72:23, 73:10, 75:15, 79:12, 79:23, 80:10, 80:15, 81:3, 81:16, 81:19, 81:25, 82:5, 82:9, 82:18, 83:8, 85:13, 85:15, 85:21, 85:25, 86:9, 86:13, 86:14, 86:23, 86:25, 87:6, 87:9, 87:12, 87:16, 87:19, 88:3, 88:5, 88:8, 88:16, 90:5, 90:18, 90:24, 91:4, 91:12, 92:20, 93:9, 93:11, 93:15, 94:7, 94:21, 95:5, 96:22, 96:24, 97:4, 97:10, 97:13, 97:15, 98:10, 102:21, 103:17, 104:3, 104:16, 104:24, 105:6, 106:7, 107:23, 111:3, 111:21, 117:20, 118:4, 118:25, 128:14, 129:15, 129:23, 140:13, 143:12, 151:19, 152:3
**HOLLOWAY** [1] - 1:4
**Holloway's** [37] - 24:12, 40:24, 66:21, 67:2, 80:5, 80:18, 82:11, 82:14, 82:21, 83:2, 83:25, 84:14, 86:1, 86:3, 86:6, 86:7, 87:11, 88:11, 88:18, 88:24, 89:10, 89:16, 89:22, 90:12, 91:17, 91:24, 92:4, 92:9, 92:14, 97:21, 97:24, 102:25, 120:18, 123:1, 127:4, 143:4, 144:11
**homelessness** [2] - 10:6, 11:4
**Honor** [123] - 5:17, 6:8, 8:6, 8:15, 9:9, 9:14, 12:3, 12:11, 12:22, 13:5, 13:8, 13:15, 13:23, 17:2, 22:22, 24:8, 28:14, 31:25, 32:7, 32:8, 32:12, 32:15, 33:10, 33:21, 37:14, 38:10, 42:4, 52:1, 52:16, 53:20, 55:19, 56:18,


6-GottsSER-01071

57:18, 59:16, 59:21, 60:1, 60:9, 61:23, 62:18, 69:2, 69:23, 71:8, 74:20, 74:24, 76:3, 77:16, 81:7, 81:13, 86:17, 87:3, 87:21, 91:7, 91:10, 91:19, 93:17, 93:21, 94:11, 94:23, 95:8, 95:12, 98:14, 98:18, 98:22, 99:5, 99:12, 100:3, 100:10, 100:18, 100:20, 101:14, 101:22, 102:6, 102:11, 102:17, 103:6, 104:8, 105:11, 105:17, 105:20, 106:16, 106:23, 107:3, 108:1, 109:3, 109:15, 111:25, 112:13, 113:5, 113:10, 113:20, 115:4, 115:10, 121:9, 123:22, 124:7, 124:9, 124:14, 124:19, 125:18, 126:3, 126:9, 126:12, 127:8, 127:13, 130:7, 130:12, 130:18, 131:3, 131:14, 131:22, 132:4, 132:10, 132:12, 132:21, 144:15, 146:18, 147:23, 149:1, 149:11, 150:8, 150:19, 151:8, 151:15
**HONORABLE** [1] - 1:3
**hope** [2] - 103:15, 109:8
**hour** [16] - 7:8, 8:7, 9:10, 9:11, 11:14, 11:17, 11:18, 13:21, 13:25, 58:18, 59:23, 132:18, 133:12, 133:18
**hours** [6] - 5:10, 64:8, 64:12, 64:15, 64:16
**hundred** [2] - 64:16, 136:13
**hungry** [1] - 149:16
**hurt** [4] - 27:25, 79:16, 81:5, 82:22
**hypothetical** [5] - 50:19, 53:6, 53:23, 75:25, 122:4
**hypotheticals** [1] - 52:8

**I**

**idea** [4] - 101:11, 102:3, 107:17, 109:18
**ideally** [1] - 81:24
**identified** [1] - 141:21
**identify** [5] - 42:1, 43:8, 44:24, 128:13, 128:19
**identity** [1] - 129:21
**ignorance** [1] - 101:6
**ignore** [1] - 145:7
**illuminated** [1] - 40:20
**imagine** [2] - 110:17, 137:19
**immediately** [3] - 5:14, 13:4, 80:15
**impeach** [6] - 103:8, 103:9, 105:15, 106:21, 124:17, 124:22
**impeaching** [6] - 31:15, 100:13, 123:18, 123:22, 130:24, 131:2
**impeachment** [3] - 98:23, 103:7, 108:18
**implies** [1] - 24:18
**important** [2] - 77:20, 134:24
**impression** [2] - 119:13, 119:19
**imprisonment** [1] - 147:25
**improper** [11] - 19:8, 31:11, 31:14, 32:25, 98:23, 103:7, 112:24, 123:9, 123:15, 127:8, 127:19
**inaccurate** [1] - 35:12
**inappropriate** [1] - 19:4
**incapacitation** [1] - 138:9
**inches** [2] - 93:6, 93:8
**incident** [27] - 20:5, 23:24, 51:2, 52:2, 63:9, 64:2, 64:11, 65:9, 72:17, 72:24, 80:23, 83:15, 86:6, 90:23, 95:7, 95:22, 96:10, 96:11, 96:15, 98:7, 115:20, 127:1, 131:17, 143:13, 144:9, 146:7
**incidentally** [1] - 137:18
**incited** [1] - 6:14
**inclined** [1] - 5:22
**includes** [1] - 138:1
**including** [5] - 6:12, 24:13, 64:4, 99:25, 100:21
**incomplete** [4] - 50:19, 53:6, 75:25, 122:3
**inconsistent** [2] - 100:14, 103:25
**incorporated** [1] - 116:24
**incorrect** [1] - 111:25
**indicated** [3] - 5:20, 73:21, 98:6
**indicates** [2] - 74:3, 76:17
**indicating** [2] - 7:17, 96:13
**indication** [3] - 6:4, 8:18, 22:12
**individual** [18] - 44:17, 60:13, 73:22, 74:2, 74:5, 75:3, 76:9, 77:25, 78:24, 90:3, 90:9, 90:19, 90:20, 93:25, 116:1, 121:16, 129:9, 140:6
**individual's** [4] - 73:24, 74:6, 77:10, 90:2
**individuals** [1] - 139:15
**inflicted** [1] - 141:2
**infliction** [1] - 142:21
**inform** [1] - 148:17
**informally** [2] - 31:24, 99:8
**information** [15] - 6:19, 7:9, 7:10, 65:25, 67:4, 67:6, 68:6, 70:7, 70:24, 71:21, 72:1, 73:23, 143:20, 145:6, 145:10
**informing** [1] - 150:4
**initial** [7] - 56:12, 65:19, 72:8, 83:12, 93:9, 101:10, 120:13
**injuries** [4] - 25:14, 48:11, 93:14, 93:25
**injuring** [2] - 83:1, 93:23
**injury** [1] - 79:18
**inquiry** [2] - 124:9, 146:1
**insert** [1] - 17:21
**inside** [6] - 6:12, 39:11, 42:8, 44:18, 44:21, 146:3
**Instagram** [2] - 6:11, 6:17
**instances** [1] - 8:2
**instead** [2] - 78:23, 96:23
**institution** [1] - 68:10
**instruction** [3] - 11:9, 11:10, 11:11
**intent** [1] - 138:6
**interactions** [1] - 140:5
**interested** [1] - 118:13
**internal** [2] - 93:24, 93:25
**interpreted** [2] - 36:16, 36:25
**interrupt** [1] - 149:15
**intervene** [5] - 7:1, 49:13, 49:18, 50:2, 50:13
**intervention** [1] - 142:17
**introduced** [2] - 140:16, 140:23
**introducing** [1] - 100:14
**investigated** [1] - 49:4
**investigating** [2] - 48:24, 49:8
**investigation** [10] - 22:24, 23:14, 45:20, 82:1, 96:8, 96:15, 96:18, 120:10, 143:10, 150:24
**invited** [1] - 6:2
**involve** [1] - 115:7
**involved** [52] - 6:23, 16:18, 16:20, 16:21, 17:21, 18:1, 18:6, 18:8, 18:11, 19:6, 23:3, 24:1, 25:14, 27:24, 36:5, 36:8, 36:13, 38:18, 47:12, 47:23, 47:25, 54:5, 57:7, 59:3, 64:25, 72:14, 75:18, 75:19, 75:21, 79:13, 88:7, 91:14, 91:15, 92:24, 96:10, 96:11, 97:7, 108:14, 114:22, 118:12, 118:19, 118:25, 120:11, 121:25, 122:22, 123:3, 131:25, 139:14, 139:15, 139:25, 145:7, 145:8
**involvement** [17] - 16:13, 22:17, 23:6, 41:7, 47:14, 48:16, 48:22, 90:23, 97:9, 114:8, 117:13, 118:9, 118:10, 118:11, 123:8, 123:12, 132:1
**involving** [4] - 90:23, 135:18, 136:3, 136:6
**irrelevant** [8] - 11:6, 62:11, 75:9, 81:8, 94:24, 135:15, 144:12, 151:23
**IS** [1] - 133:3
**issue** [5] - 5:13, 148:1, 148:10, 148:11, 149:8
**issues** [1] - 144:16
**IT** [1] - 3:14
**items** [1] - 44:3
**itself** [1] - 148:7

**J**

**jail** [1] - 115:22
**JAMESON** [2] - 4:4, 13:11
**Jameson** [1] - 28:21
**January** [7] - 8:23, 9:25, 10:3, 10:19, 10:24, 60:23, 64:2
**Jeremy** [4] - 110:6, 110:7, 110:9, 119:21
**JEREMY** [1] - 1:4
**Jeremy's** [1] - 110:10
**jerking** [1] - 137:9
**job** [5] - 62:5, 66:16, 68:3, 71:1, 114:23
**join** [1] - 29:25
**joined** [3] - 18:8, 20:20, 54:25
**joining** [1] - 17:8
**joins** [1] - 28:20
**joking** [2] - 102:9, 112:16
**Joshua** [1] - 143:21
**JUDGE** [1] - 1:3
**judge** [1] - 8:1
**judgment** [2] - 146:23, 149:5
**Judicial** [1] - 154:12
**July** [9] - 9:25, 10:3, 10:5, 10:21, 10:24, 11:3, 60:24, 63:1, 114:17
**jumped** [1] - 19:14
**jumping** [2] - 66:19, 105:13
**jumps** [1] - 15:24
**juncture** [1] - 39:6
**jurors** [1] - 133:8

**jury** [37] - 5:5, 7:7, 9:5, 9:6, 10:15, 12:4, 19:9, 25:25, 26:6, 29:8, 35:19, 58:21, 59:11, 60:7, 92:12, 101:4, 101:23, 103:3, 104:16, 112:17, 113:9, 113:16, 113:17, 132:16, 133:5, 137:1, 141:12, 142:20, 145:19, 145:20, 147:6, 148:17, 148:20, 149:8, 150:4, 150:7, 151:3
**JURY** [1] - 1:13
**justice** [1] - 142:17
**justification** [2] - 120:13, 144:11
**justified** [3] - 49:13, 96:14, 147:9
**justify** [3] - 16:12, 22:16, 97:3
**Justin** [4] - 14:18, 16:20, 31:6, 31:18

## K

**Karlen** [2] - 8:9, 138:12
**keep** [8] - 63:25, 80:23, 80:25, 86:15, 87:1, 92:1, 105:13, 122:10
**keeping** [1] - 92:22
**Kevin** [3] - 85:6, 88:10, 89:9
**kick** [6] - 53:25, 54:4, 54:9, 54:24, 85:13, 85:15
**kicked** [2] - 50:15, 56:3
**kicking** [4] - 50:14, 55:1, 55:18, 55:20
**kicks** [2] - 85:10, 85:19
**kind** [5] - 5:24, 25:19, 48:25, 63:22, 137:21
**kinetic** [1] - 138:2
**knee** [53] - 23:18, 25:23, 30:7, 35:2, 35:6, 35:11, 35:15, 35:18, 35:25, 36:11, 36:14, 36:16, 36:17, 36:18, 36:21, 36:25, 37:1, 37:2, 37:3, 37:9, 37:17, 37:22, 38:2, 38:5, 38:13, 55:23, 58:4, 58:5, 58:8, 66:21, 67:2, 80:4, 80:14, 80:17, 81:17, 82:6, 82:11, 82:21, 82:25, 83:25, 84:14, 85:21, 85:24, 85:25, 86:3, 86:5, 86:7, 90:12, 91:24, 92:13, 97:21, 119:22
**kneed** [2] - 82:5, 98:11
**kneeing** [2] - 37:22, 50:14
**knelt** [1] - 110:6
**knife** [1] - 24:22
**knives** [8] - 24:13, 39:7, 39:11, 42:20, 43:11, 43:19, 44:5, 73:24
**knowing** [4] - 83:3, 83:4, 83:20, 87:6
**knowledge** [6] - 25:19, 68:4, 68:9, 72:20, 83:23, 134:16
**known** [2] - 65:6, 93:2
**knows** [2] - 107:6, 129:18

## L

**L.A** [1] - 134:7
**lack** [3] - 85:24, 95:14, 96:16
**Lacks** [3] - 74:17, 88:25, 117:2
**lacks** [4] - 53:7, 84:4, 86:17, 86:19
**ladies** [2] - 19:2, 100:24
**Lake** [1] - 65:6
**lamps** [1] - 76:22
**language** [1] - 54:16
**laptop** [1] - 71:11
**last** [4] - 92:11, 92:15, 133:10, 138:17
**latitude** [1] - 91:22
**law** [31] - 7:19, 49:21, 49:22, 50:3, 60:25, 61:1, 63:9, 64:3, 64:9, 66:1, 68:4, 68:7, 68:14, 69:9, 72:25, 73:16, 90:17, 104:10, 105:18, 106:19, 136:7, 136:22, 138:12, 141:16, 147:1, 147:8, 149:8, 149:20, 150:1, 151:1
**LAW** [6] - 2:4, 2:4, 2:14, 2:18, 2:22, 3:8
**lawfully** [1] - 144:16
**lawsuit** [3] - 65:9, 83:24, 151:23
**lay** [1] - 148:12
**laying** [1] - 24:21
**leading** [1] - 89:5
**learn** [2] - 61:7, 67:9
**learned** [2] - 23:5, 143:11
**Learning** [3] - 141:25, 142:7, 142:15
**learning** [7] - 105:20, 141:18, 141:19, 141:20, 141:21, 142:1, 142:14
**leash** [1] - 34:10
**least** [6] - 6:19, 17:1, 24:25, 84:6, 86:24, 147:4
**leave** [5] - 9:21, 75:23, 145:10, 150:6, 150:13
**leaves** [1] - 152:10
**leaving** [2] - 8:22, 117:22
**lectures** [1] - 61:11
**left** [39] - 9:11, 11:15, 44:1, 47:17, 55:9, 58:23, 72:11, 79:14, 80:6, 80:19, 82:13, 82:14, 82:19, 82:20, 82:22, 83:2, 86:11, 88:4, 88:11, 88:24, 89:10, 89:12, 90:8, 90:14, 92:1, 92:2, 92:6, 92:13, 97:11, 97:22, 118:4, 119:19, 126:5, 128:14, 132:21, 145:12, 147:6, 152:12
**left-hand** [2] - 88:11, 88:24
**leg** [2] - 110:8, 138:3
**legal** [5] - 50:5, 51:18, 56:6, 141:4, 149:6
**legally** [3] - 9:4, 150:21, 151:18
**legs** [5] - 54:10, 54:24, 88:2, 120:16, 120:18
**length** [2] - 93:6, 93:8
**less** [3] - 64:15, 74:16, 92:24
**lessons** [1] - 135:7
**lethal** [1] - 21:18
**letting** [2] - 36:8, 62:6
**level** [2] - 137:6, 146:12
**levels** [2] - 134:23, 139:2
**liability** [1] - 142:12
**lieutenant** [6] - 134:4, 134:8, 134:13, 135:2, 139:5
**Lieutenant** [1] - 144:22
**life** [2] - 138:17, 138:19
**lifting** [1] - 87:12
**light** [2] - 6:10, 6:19
**lighting** [2] - 76:21, 77:7
**lights** [9] - 15:13, 15:19, 40:21, 67:13, 67:18, 67:24, 70:8, 76:24, 77:22
**likelihood** [1] - 90:20
**likely** [3] - 5:21, 74:16
**limine** [2] - 147:15, 149:2
**limit** [4] - 52:6, 108:21, 147:15, 152:8
**limitation** [2] - 11:13, 11:23
**limited** [7] - 5:9, 9:24, 10:2, 10:19, 10:23, 106:1, 106:16
**line** [32] - 71:16, 71:17, 99:14, 99:19, 99:20, 99:23, 99:24, 100:2, 100:5, 100:9, 100:10, 100:11, 100:20, 100:21, 101:7, 101:8, 102:3, 102:12, 102:13, 107:14, 107:15, 107:16, 109:12, 109:22, 112:1, 140:21, 151:17, 152:24
**lines** [5] - 31:25, 124:6, 125:20, 126:9, 131:1
**list** [1] - 100:15
**listed** [3] - 139:23, 141:19, 141:22
**listen** [3] - 21:1, 54:8, 107:8
**listened** [1] - 144:2
**lived** [1] - 61:5
**LLP** [2] - 3:4, 3:8
**located** [2] - 65:5, 65:12
**locker** [1] - 83:22
**log** [3] - 33:16, 34:9, 71:14
**look** [25] - 7:19, 14:16, 26:6, 31:20, 32:8, 38:20, 45:9, 57:22, 58:5, 100:5, 101:12, 102:3, 102:4, 102:12, 115:1, 115:15, 116:13, 116:16, 122:20, 124:1, 131:1, 136:23, 138:23, 139:8, 140:9
**looked** [7] - 42:17, 98:6, 103:2, 115:14, 117:10, 139:22, 140:11
**looking** [6] - 36:4, 59:4, 124:13, 125:8, 125:10, 143:21
**looks** [2] - 15:1, 43:25
**loose** [1] - 78:9
**Los** [1] - 2:15
**LOS** [1] - 154:3
**lose** [1] - 95:19
**lost** [2] - 30:16, 78:19
**loud** [2] - 68:13, 70:13
**loudly** [1] - 19:16
**lunch** [13] - 7:8, 8:7, 132:15, 132:16, 133:18, 133:19, 145:13, 145:17, 149:16, 149:19, 152:18, 152:19, 153:1
**lunchtime** [2] - 147:18, 147:20
**lying** [1] - 151:8
**LYNBERG** [4] - 2:9, 2:13, 2:17, 2:21

## M

**ma'am** [57] - 14:13, 14:19, 15:11, 16:3, 17:6, 18:25, 19:24, 20:9, 20:22, 22:3, 23:21, 24:10, 25:21, 28:22, 28:24, 30:3, 32:3, 34:19, 35:12, 37:16, 38:14, 39:9, 39:24, 40:8, 40:25, 41:8, 42:14, 42:19, 43:12, 44:2, 44:7, 44:13, 44:19, 44:23, 45:4, 47:4, 47:11, 47:22, 48:23, 49:7, 49:15, 52:2, 52:22, 54:5, 55:23, 57:19, 58:2, 58:14, 114:6, 114:10, 114:21, 116:17, 118:15, 126:5, 126:19, 126:23, 128:1
**machete** [1] - 24:14
**magistrate** [1] - 8:1
**magnitude** [1] - 140:12


6-GottsSER-01073

**malicious** [2] - 142:9, 142:22
**man** [8] - 25:2, 34:8, 48:11, 53:14, 53:15, 143:17, 143:21, 150:24
**maneuvers** [1] - 88:21
**manner** [3] - 66:18, 78:1, 84:15
**manpower** [1] - 119:20
**Margarita** [4] - 65:11, 66:7, 67:21, 67:22
**Mark** [1] - 88:6
**married** [1] - 60:20
**mass** [2] - 102:2, 102:9
**material** [1] - 141:1
**materials** [4] - 115:24, 139:12, 139:14, 143:11
**math** [1] - 64:13
**matter** [9] - 58:19, 59:3, 101:1, 103:14, 104:20, 141:24, 145:15, 151:22, 154:11
**MAY** [2] - 1:13, 5:1
**MDC** [1] - 71:10
**mean** [7] - 9:16, 18:1, 36:12, 111:14, 112:7, 113:4, 136:8
**meaningless** [1] - 151:25
**means** [4] - 54:14, 94:16, 108:20, 115:22
**meant** [2] - 36:13, 103:11
**meantime** [1] - 6:5
**medical** [1] - 139:21
**melee** [1] - 152:1
**member** [2] - 115:16, 115:17
**memorialize** [1] - 5:8
**memory** [3] - 89:8, 89:9, 126:18
**mention** [2] - 16:8, 120:4
**mentioned** [2] - 85:10, 98:3
**mere** [1] - 76:7
**merely** [1] - 47:11
**methods** [2] - 138:1, 139:2
**MICHAEL** [1] - 3:4
**Michigan** [1] - 61:3
**microphone** [4] - 14:14, 15:21, 150:10
**middle** [3] - 68:13, 152:1, 152:10
**midsection** [1] - 89:13
**might** [6] - 6:3, 12:12, 91:4, 104:9, 105:24, 112:12
**mind** [1] - 81:10
**mine** [1] - 12:9
**minimized** [1] - 16:11
**minimizing** [1] - 119:3
**minor** [1] - 79:7
**minute** [1] - 79:16
**minutes** [19] - 5:10, 5:11, 9:11, 11:15, 11:17, 11:18, 11:24, 13:21, 34:15, 47:6, 58:23, 59:1, 59:15, 59:22, 113:13, 120:17, 124:20, 132:18, 133:13
**misleading** [1] - 69:4
**miss** [1] - 129:16
**missing** [1] - 123:19
**misstates** [5] - 24:3, 27:1, 28:2, 35:8, 130:8
**misstating** [1] - 118:2
**mistakes** [1] - 107:8
**mistrial** [2] - 5:18, 6:18
**mix** [2] - 77:12, 77:14
**MKRTCHYAN** [233] - 2:4, 2:4, 7:4, 9:9, 12:3, 12:10, 12:16, 12:19, 12:22, 12:25, 13:23, 14:2, 14:4, 14:7, 14:10, 14:22, 15:5, 15:9, 16:17, 17:4, 17:16, 18:12, 18:16, 18:22, 19:13, 19:22, 20:12, 21:19, 23:4, 24:23, 25:7, 26:4, 26:8, 26:11, 26:17, 26:20, 26:22, 27:3, 27:6, 27:23, 28:5, 28:19, 29:2, 29:21, 30:13, 30:18, 31:3, 31:13, 31:18, 31:22, 31:25, 32:4, 32:7, 32:12, 32:14, 32:21, 33:3, 33:4, 33:14, 34:1, 34:6, 34:13, 34:25, 35:9, 35:13, 35:24, 37:7, 37:20, 38:15, 39:5, 39:18, 39:22, 40:5, 40:18, 41:11, 41:20, 42:6, 42:11, 42:24, 43:9, 43:16, 43:22, 44:11, 44:16, 45:1, 45:7, 45:12, 45:19, 46:4, 46:10, 46:15, 46:20, 47:1, 47:8, 48:10, 49:11, 49:20, 49:24, 49:25, 50:11, 50:24, 51:11, 51:20, 52:4, 52:16, 52:19, 53:11, 54:2, 54:18, 54:22, 54:23, 55:19, 56:1, 56:8, 56:18, 56:22, 56:23, 57:20, 58:7, 58:12, 59:16, 60:9, 61:23, 62:18, 69:2, 69:20, 71:3, 74:17, 74:21, 75:9, 75:24, 77:16, 81:7, 84:3, 86:17, 87:3, 87:21, 88:25, 89:3, 91:6, 91:19, 93:17, 94:11, 94:23, 95:8, 98:22, 99:1, 99:16, 103:6, 105:11, 110:19, 113:10, 113:14, 113:25, 114:2, 115:3, 115:10, 115:12, 116:12, 117:5, 117:9, 118:23, 119:7, 120:6, 121:1, 121:5, 121:9, 121:18, 121:23, 122:8, 122:19, 123:11, 123:21, 123:25, 124:5, 124:12, 124:14, 124:18, 124:22, 125:2, 125:5, 125:7, 125:9, 125:13, 125:15, 125:18, 125:22, 125:24, 126:2, 126:16, 126:17, 127:15, 127:20, 127:24, 128:6, 128:15, 128:23, 128:24, 129:2, 129:4, 129:12, 129:20, 130:2, 130:6, 130:10, 130:12, 130:15, 130:20, 131:3, 131:5, 131:14, 131:19, 131:22, 131:23, 132:4, 132:12, 133:23, 134:2, 135:21, 135:22, 138:15, 141:7, 141:14, 144:6, 144:15, 144:19, 144:20, 146:18, 146:21, 149:1, 149:11, 149:14, 150:19
**Mkrtchyan** [4] - 4:4, 4:5, 4:7, 101:18
**mobile** [1] - 71:11
**moment** [26] - 9:6, 18:5, 35:16, 36:23, 48:7, 50:21, 53:23, 55:12, 55:13, 74:18, 84:7, 98:16, 99:2, 99:15, 100:8, 100:14, 100:23, 101:25, 115:7, 124:8, 129:1, 130:16, 138:10, 145:21, 146:15, 146:17
**moments** [2] - 75:17, 96:25
**months** [5] - 10:25, 60:21, 62:14, 64:7, 114:17
**morning** [15] - 5:9, 10:17, 11:20, 12:1, 31:5, 58:20, 60:5, 60:6, 61:21, 62:10, 65:10, 65:17, 103:1, 109:10, 114:6
**mother** [3] - 9:20, 60:11, 62:8
**motion** [20] - 5:14, 5:18, 5:19, 5:22, 5:24, 6:1, 6:6, 6:7, 6:18, 7:16, 7:24, 8:5, 8:19, 35:22, 93:6, 146:22, 147:15, 149:2, 149:4, 149:5
**Motion** [1] - 18:19
**move** [10] - 56:13, 62:3, 77:2, 77:6, 89:14, 107:1, 131:22, 135:15, 137:22, 141:5
**moved** [1] - 29:23
**moving** [5] - 78:4, 78:11, 86:11, 137:21, 146:12
**MR** [148] - 9:14, 9:18, 12:6, 12:12, 13:8, 16:14, 16:22, 17:10, 18:14, 18:19, 21:12, 22:18, 22:19, 24:3, 26:7, 27:1, 27:19, 27:20, 27:21, 28:2, 28:8, 30:23, 31:11, 33:7, 33:19, 34:5, 35:8, 35:22, 36:22, 38:7, 39:17, 40:13, 41:14, 43:2, 45:24, 48:6, 49:6, 49:16, 49:23, 50:5, 50:19, 50:22, 51:18, 53:6, 54:17, 55:16, 56:6, 56:12, 57:13, 59:21, 60:1, 60:4, 60:16, 62:2, 62:4, 62:12, 62:24, 69:6, 70:6, 71:18, 75:5, 75:13, 76:10, 77:19, 81:15, 84:5, 84:10, 84:13, 86:22, 87:8, 87:24, 89:1, 89:7, 89:19, 89:20, 91:16, 92:8, 94:1, 94:17, 94:18, 95:2, 96:2, 98:14, 98:18, 98:21, 99:5, 99:12, 99:14, 99:20, 99:22, 99:25, 100:3, 100:10, 100:20, 101:9, 101:14, 101:17, 101:22, 102:6, 102:11, 102:14, 102:17, 102:23, 103:15, 103:21, 104:8, 105:4, 105:6, 105:17, 105:20, 106:11, 106:16, 106:23, 107:1, 107:3, 107:5, 108:1, 108:4, 109:3, 109:6, 110:20, 111:7, 111:22, 111:25, 112:6, 112:13, 113:5, 113:20, 113:23, 117:2, 118:21, 119:5, 120:1, 122:3, 123:9, 123:15, 124:9, 127:8, 127:19, 129:25, 130:8, 132:8, 135:15, 141:4, 143:24, 144:12, 147:23, 151:15
**MS** [237] - 5:17, 6:8, 7:4, 8:6, 8:15, 9:9, 12:3, 12:10, 12:16, 12:19, 12:22, 12:25, 13:23, 14:2, 14:4, 14:7, 14:10, 14:22, 15:5, 15:9, 16:17, 17:4, 17:16, 18:12, 18:16, 18:22, 19:13, 19:22, 20:12, 21:19, 23:4, 24:23, 25:7, 26:4, 26:8, 26:11, 26:17, 26:20, 26:22, 27:3, 27:6, 27:23, 28:5, 28:19, 29:2, 29:21, 30:13, 30:18, 31:3, 31:13, 31:18,

31:22, 31:25, 32:4, 32:7, 32:12, 32:14, 32:21, 33:3, 33:4, 33:14, 34:1, 34:6, 34:13, 34:25, 35:9, 35:13, 35:24, 37:7, 37:20, 38:15, 39:5, 39:18, 39:22, 40:5, 40:18, 41:11, 41:20, 42:6, 42:11, 42:24, 43:9, 43:16, 43:22, 44:11, 44:16, 45:1, 45:7, 45:12, 45:19, 46:4, 46:10, 46:15, 46:20, 47:1, 47:8, 48:10, 49:11, 49:20, 49:24, 49:25, 50:11, 50:24, 51:11, 51:20, 52:4, 52:16, 52:19, 53:11, 54:2, 54:18, 54:22, 54:23, 55:19, 56:1, 56:8, 56:18, 56:22, 56:23, 57:20, 58:7, 58:12, 59:16, 60:9, 61:23, 62:18, 69:2, 69:20, 71:3, 74:17, 74:21, 75:9, 75:24, 77:16, 81:7, 84:3, 86:17, 87:3, 87:21, 88:25, 89:3, 91:6, 91:19, 93:17, 94:11, 94:23, 95:8, 98:22, 99:1, 99:16, 103:6, 105:11, 109:15, 109:23, 110:19, 113:10, 113:14, 113:25, 114:2, 115:3, 115:10, 115:12, 116:12, 117:5, 117:9, 118:23, 119:7, 120:6, 121:1, 121:5, 121:9, 121:18, 121:23, 122:8, 122:19, 123:11, 123:21, 123:25, 124:5, 124:12, 124:14, 124:18, 124:22, 125:2, 125:5, 125:7, 125:9, 125:13, 125:15, 125:18, 125:22, 125:24, 126:2, 126:16, 126:17, 127:15, 127:20, 127:24, 128:6, 128:15, 128:23, 128:24, 129:2, 129:4, 129:12, 129:20, 130:2, 130:6, 130:10, 130:12, 130:15, 130:20, 131:3, 131:5, 131:14, 131:19, 131:22, 131:23, 132:4, 132:12, 133:23, 134:2, 135:21, 135:22, 138:15, 141:7, 141:14, 144:6, 144:15, 144:19, 144:20, 146:18, 146:21, 149:1, 149:11, 149:14, 150:19

**multicolored** [1] - 72:13

**multiple** [9] - 34:5, 53:14, 53:15, 74:14, 74:25, 75:2, 75:7, 96:10, 118:15

**murder** [1] - 69:1

**must** [1] - 125:15

**mwroniak@ccllp.law** [1] - 3:7

**mystery** [1] - 101:13

## N

**NALTSAS** [2] - 2:14, 109:15

**name** [3] - 90:2, 133:7, 133:10

**named** [1] - 6:13

**names** [4] - 6:16, 83:9, 88:11, 128:19

**NARINE** [1] - 2:4

**narine57@gmail.com** [1] - 2:7

**narrow** [1] - 78:8

**nature** [2] - 115:19, 137:13

**near** [6] - 41:22, 45:2, 88:2, 123:1, 127:1, 127:4

**necessarily** [2] - 71:14, 88:19

**necessary** [8] - 23:11, 24:24, 25:1, 64:14, 112:6, 140:19, 140:20, 141:1

**need** [26] - 8:12, 12:4, 15:21, 16:20, 23:25, 31:21, 36:9, 37:19, 61:19, 63:25, 74:16, 100:25, 103:9, 105:9, 105:13, 105:15, 106:4, 112:17, 113:10, 119:20, 124:6, 138:10, 146:18, 147:18, 149:16, 149:19

**needed** [3] - 15:19, 72:5, 73:17

**needs** [3] - 71:23, 97:1, 110:2

**negotiable** [2] - 9:23, 10:10

**neighbors** [1] - 66:6

**never** [9] - 36:20, 38:20, 38:21, 38:22, 48:25, 72:23, 111:20, 113:3, 150:22

**new** [4] - 6:9, 7:24, 8:19, 39:16

**next** [13] - 8:13, 14:18, 14:24, 32:8, 33:25, 90:13, 107:10, 110:6, 121:7, 121:17, 132:11, 137:17, 150:12

**nice** [1] - 145:16

**night** [22] - 14:12, 29:6, 29:11, 30:9, 30:21, 31:1, 65:16, 66:12, 68:12, 68:14, 69:7, 72:2, 73:1, 76:4, 80:23, 82:6, 86:4, 93:1, 94:2, 96:19, 97:19, 143:10

**nine** [1] - 140:23

**Ninth** [4] - 5:25, 7:19, 136:17, 136:19

**nonclarity** [1] - 112:20

**none** [2] - 4:16, 132:8

**nonetheless** [1] - 145:5

**noon** [1] - 106:13

**normally** [2] - 65:14, 93:5

**North** [1] - 2:5

**note** [1] - 9:15

**notebook** [1] - 59:2

**noted** [2] - 135:4, 147:24

**notes** [1] - 112:3

**nothing** [4] - 6:20, 40:9, 103:25, 145:4

**notice** [2] - 7:6, 66:4

**notification** [3] - 23:10, 47:11, 47:22

**notified** [1] - 37:17

**notify** [4] - 23:5, 23:7, 23:13, 114:4

**notifying** [1] - 115:1

**nowhere** [1] - 30:6

**Number** [6] - 140:11, 141:25, 142:7, 143:7, 143:8

**number** [15] - 8:12, 12:12, 12:14, 12:15, 16:25, 64:12, 76:17, 81:19, 81:23, 81:24, 102:4, 136:12, 141:9, 141:19, 152:22

**numerous** [4] - 17:25, 27:14, 70:3, 96:12

## O

**o'clock** [4] - 7:8, 106:13, 106:14, 145:14

**O'Neill** [3] - 65:12, 66:5, 67:22

**oath** [4] - 118:2, 118:6, 118:12, 126:20

**object** [2] - 83:3, 98:22

**Objection** [1] - 26:7

**objection** [76] - 8:25, 16:22, 17:10, 18:14, 18:19, 21:12, 24:3, 26:15, 26:16, 27:1, 27:19, 27:20, 28:2, 28:8, 30:12, 30:23, 31:11, 32:24, 36:22, 37:11, 39:17, 41:14, 43:2, 45:24, 48:6, 49:6, 49:16, 49:23, 50:5, 50:19, 51:18, 52:9, 53:6, 54:17, 55:16, 56:6, 56:12, 57:13, 60:9, 61:23, 62:18, 69:2, 69:20, 71:3, 74:17, 75:9, 75:24, 77:16, 81:7, 84:3, 84:12, 86:17, 87:3, 88:25, 93:17, 94:11, 94:23, 109:23, 110:1, 110:2, 110:24, 113:3, 117:2, 117:8, 121:8, 121:21, 122:3, 124:24, 130:8, 131:4, 135:15, 141:4, 143:24, 144:12

**objectionable** [1] - 34:12

**objections** [1] - 9:19

**objective** [7] - 72:25, 73:2, 74:25, 83:1, 83:4, 90:17, 92:1

**obligated** [1] - 49:18

**obligation** [2] - 94:9, 94:15

**observation** [1] - 88:15

**observations** [1] - 120:13

**observed** [9] - 48:12, 50:16, 50:17, 53:5, 54:11, 54:15, 73:24, 86:14, 121:15

**observing** [1] - 77:22

**obviously** [1] - 146:6

**OC** [1] - 138:5

**occasion** [1] - 123:20

**occasions** [1] - 136:18

**occur** [3] - 21:23, 73:15, 79:20

**occurred** [5] - 11:3, 20:21, 116:21, 122:12, 122:14

**occurring** [11] - 15:16, 65:15, 70:4, 71:14, 72:12, 73:13, 73:20, 74:7, 84:21, 95:23, 143:10

**occurs** [2] - 20:16, 96:8

**OCSD** [1] - 115:21

**oddity** [1] - 145:23

**OF** [8] - 1:2, 1:7, 1:12, 2:1, 2:8, 154:1, 154:3, 154:4

**offense** [1] - 148:7

**offered** [2] - 4:16, 10:4

**officer** [28] - 16:21, 17:19, 23:9, 28:20, 31:7, 32:8, 49:19, 52:14, 53:9, 61:1, 63:5, 63:7, 63:10, 64:4, 64:10, 66:15, 66:24, 66:25, 84:1, 84:22, 113:4, 114:18, 114:20, 119:19, 137:7, 137:9, 138:18, 142:11

**Officer** [4] - 28:6, 28:10, 122:7, 124:15

**officer's** [3] - 31:17, 48:16, 81:9

**officers** [49] - 6:16, 6:23, 14:24, 15:7, 16:12, 16:18, 17:1, 17:8, 21:17, 21:20, 22:15, 27:14, 27:24, 49:13, 53:13, 53:14, 53:15, 55:14, 60:14, 61:8, 74:14, 74:25, 75:7, 81:24, 89:4, 95:18, 108:14,

119:4, 128:17, 128:19, 128:22, 129:18, 129:22, 130:3, 137:14, 139:4, 142:2, 142:10, 142:18, 142:25, 143:11, 143:16, 144:17, 145:3, 145:6, 146:2, 151:25, 152:5
**Officers** [1] - 116:21
**officers'** [3] - 48:16, 48:22, 50:2
**Official** [1] - 154:20
**OFFICIAL** [3] - 1:23, 154:1, 154:5
**often** [2] - 80:25, 93:24
**Olive** [1] - 2:14
**once** [5] - 23:23, 26:18, 90:19, 100:22, 104:15
**one** [41] - 9:12, 20:7, 24:16, 25:2, 27:11, 33:8, 33:17, 53:15, 57:21, 67:11, 71:2, 71:13, 72:6, 74:14, 75:7, 77:14, 81:19, 84:18, 91:8, 91:14, 91:22, 93:15, 96:9, 96:10, 96:12, 97:24, 98:15, 109:10, 110:12, 117:19, 119:19, 125:12, 128:14, 129:14, 131:20, 138:12, 143:8, 145:7
**ongoing** [1] - 64:17
**oOo** [1] - 153:3
**opaque** [1] - 41:1
**open** [2] - 106:15, 108:17
**opening** [2] - 78:5, 103:4
**operate** [1] - 66:17
**opinion** [16] - 32:13, 101:2, 139:9, 140:1, 140:2, 140:13, 140:15, 140:16, 140:23, 140:24, 143:3, 144:5, 144:8, 144:10, 144:23, 145:16
**Opinion** [2] - 140:11, 143:7
**opinions** [9] - 136:15, 140:2, 140:4, 140:9, 140:24, 141:23, 143:8, 147:11, 147:16
**opponent** [1] - 94:4
**opportunity** [4] - 9:1, 130:22, 147:13, 147:15
**opposed** [1] - 117:20
**option** [4] - 15:12, 21:18, 55:22, 81:22
**Orange** [13] - 2:11, 2:23, 3:6, 61:2, 61:20, 94:19, 115:13, 116:3, 116:7, 116:11, 116:14, 116:17, 122:11
**ORANGE** [2] - 1:7, 2:8
**orange** [1] - 2:19
**order** [4] - 6:20, 61:8, 63:14, 68:3
**orders** [2] - 6:19, 6:25
**oriented** [1] - 80:1
**original** [2] - 27:4, 27:7
**otherwise** [3] - 26:14, 51:23, 52:7
**outside** [4] - 76:24, 85:4, 85:8, 146:12
**outward** [1] - 93:7
**overcome** [1] - 138:7
**overnight** [1] - 11:23
**overruled** [34] - 16:24, 17:12, 21:13, 22:20, 28:9, 30:24, 33:8, 33:23, 38:8, 39:20, 41:16, 43:4, 45:25, 48:7, 50:6, 57:15, 60:10, 60:15, 69:25, 71:4, 71:9, 74:22, 76:1, 77:18, 81:9, 87:23, 93:19, 95:10, 120:2, 122:5, 127:10, 127:22, 141:6, 144:1
**own** [3] - 6:25, 24:25, 125:3

## P

**p.m** [1] - 153:2
**pace** [2] - 78:13, 78:21
**PAGE** [1] - 4:3
**page** [37] - 31:25, 32:8, 99:11, 99:12, 100:5, 100:9, 100:20, 101:7, 101:12, 102:12, 102:16, 106:13, 109:12, 109:13, 109:17, 112:1, 123:24, 124:5, 125:9, 125:18, 125:19, 126:4, 126:10, 127:20, 128:9, 130:9, 130:10, 130:11, 130:12, 130:13, 130:14, 130:16, 130:20, 130:25, 140:10, 154:11
**pages** [2] - 124:6, 131:1
**Pahel** [31] - 16:5, 16:9, 17:18, 18:7, 25:1, 83:13, 83:18, 85:6, 88:10, 88:14, 88:17, 88:19, 88:23, 89:9, 89:13, 117:13, 117:20, 117:25, 118:7, 118:10, 118:19, 119:23, 120:5, 127:6, 127:12, 128:7, 128:12, 129:14, 131:6, 131:16
**palms** [4] - 79:2, 79:5, 79:8, 79:11
**Palomar** [1] - 3:9
**Pandora's** [1] - 106:15
**pants** [22] - 25:24, 26:5, 26:24, 27:8, 27:9, 29:4, 29:5, 29:9, 30:8, 30:20, 31:9, 32:19, 38:21, 38:22, 44:13, 45:9, 45:10, 109:21, 110:5, 110:10, 110:13, 110:14
**paragraph** [4] - 116:19, 119:14, 119:15, 119:16
**paragraphs** [1] - 119:10
**paralegal** [1] - 3:13
**paramedics** [2] - 34:15, 34:20
**park** [3] - 15:12, 40:10, 78:6
**Park** [1] - 65:12
**parked** [2] - 15:15, 78:8
**parking** [4] - 15:16, 40:16, 77:8, 77:25
**Parkway** [1] - 67:21
**parse** [1] - 140:24
**part** [13] - 16:4, 19:18, 21:4, 49:13, 56:13, 58:15, 61:7, 61:17, 84:23, 88:15, 117:6, 117:7, 134:15
**participation** [1] - 118:13
**particular** [1] - 96:20
**parties** [18] - 5:7, 5:21, 7:3, 9:23, 10:1, 10:15, 10:21, 11:23, 45:22, 45:23, 46:3, 46:8, 46:24, 59:13, 108:14, 113:18, 139:15, 146:15
**partner** [2] - 77:11, 91:14
**partner's** [2] - 79:1, 83:4
**partners** [2] - 77:14, 79:22
**parts** [1] - 37:9
**partway** [2] - 132:15, 133:17
**party** [8] - 105:7, 106:17, 106:22, 107:13, 108:8, 108:9, 108:13
**Paseo** [1] - 67:21
**passed** [2] - 44:12, 83:22
**passenger** [1] - 67:16
**passive** [2] - 137:18, 137:20
**past** [2] - 44:12, 108:17
**path** [1] - 78:2
**pathway** [1] - 78:7
**patrol** [19] - 12:25, 13:15, 13:17, 19:25, 30:16, 36:6, 65:14, 66:8, 66:17, 67:14, 70:23, 71:12, 71:14, 72:11, 76:11, 76:24, 78:18, 135:1, 139:17
**Pause** [3] - 126:13, 130:23, 132:24
**PC** [2] - 2:17, 144:17
**Peace** [2] - 116:21, 122:6
**peace** [7] - 49:19, 63:5, 63:7, 65:23, 68:18, 114:18, 142:10
**penal** [2] - 68:9, 70:3
**Penal** [12] - 50:3, 50:9, 65:22, 68:16, 68:22, 68:23, 81:20, 81:21, 147:4, 147:5, 151:4, 151:5
**pending** [5] - 26:21, 51:8, 113:2, 115:5, 150:24
**pens** [1] - 80:1
**people** [4] - 24:25, 25:1, 70:12, 70:15
**per** [1] - 47:22
**perception** [1] - 50:7
**perfect** [2] - 105:1, 107:9
**perhaps** [1] - 83:21
**period** [5] - 9:25, 10:2, 10:19, 10:24, 33:18
**perishable** [4] - 63:17, 63:22, 64:5, 64:17
**permission** [3] - 31:23, 115:4, 124:6
**permitted** [1] - 51:13
**person** [11] - 24:22, 44:17, 80:13, 91:13, 96:20, 103:12, 125:1, 125:2, 137:4, 145:7
**personal** [2] - 50:7, 138:3
**personally** [2] - 6:22, 75:11
**personnel** [1] - 115:21
**persons** [1] - 145:8
**pertains** [3] - 10:5, 53:17, 57:4
**Phase** [1] - 66:15
**photograph** [1] - 6:12
**photographs** [2] - 42:17, 44:6
**photos** [1] - 110:7
**physical** [9] - 24:19, 61:16, 62:15, 62:21, 74:3, 79:12, 87:18, 90:4, 102:7
**pick** [2] - 39:11, 137:21
**picked** [1] - 79:21
**picks** [1] - 42:8
**pickup** [3] - 39:13, 40:1, 72:13
**picnic** [10] - 39:12, 41:13, 42:9, 42:18, 43:1, 43:24, 44:2, 44:3, 44:21, 45:2
**picture** [1] - 44:4
**pile** [2] - 14:24, 55:14
**piled** [1] - 16:12
**pitch** [1] - 76:22
**place** [22] - 9:19, 10:20, 24:1, 36:17, 37:1, 39:7, 39:12, 43:24, 53:14, 72:5, 80:21, 80:25, 82:1, 83:5, 83:25, 90:15, 92:6, 92:13, 97:13, 102:18, 119:21
**placed** [23] - 23:18, 23:23, 25:23, 30:7, 35:15, 36:18, 36:21, 37:3, 38:2, 38:5, 38:13, 42:18, 44:3,

67:1, 80:4, 82:10, 82:16, 82:21, 84:14, 90:12, 91:24, 97:12, 97:21
**placement** [1] - 35:11
**placing** [2] - 37:22, 55:2
**plain** [1] - 106:24
**plaintiff** [14] - 5:10, 5:11, 10:20, 59:5, 101:15, 101:16, 105:23, 106:8, 108:12, 109:11, 109:20, 113:1, 139:15
**PLAINTIFF** [4] - 2:3, 4:4, 4:6, 133:3
**Plaintiff** [1] - 1:5
**plaintiff's** [13] - 3:13, 7:5, 7:10, 9:11, 9:24, 10:1, 10:18, 10:22, 11:15, 77:1, 85:10, 98:5, 105:1
**plan** [1] - 14:3
**play** [15] - 12:3, 13:10, 14:5, 15:3, 15:7, 18:4, 21:4, 27:3, 29:17, 38:4, 41:18, 42:1, 57:10, 58:16, 103:3
**played** [37] - 13:4, 13:12, 13:19, 14:8, 14:21, 15:4, 15:8, 18:21, 19:12, 19:21, 20:11, 21:3, 25:6, 28:4, 28:18, 29:1, 29:20, 33:13, 34:24, 39:4, 40:4, 41:10, 42:2, 42:10, 42:23, 43:21, 44:10, 44:15, 44:25, 45:4, 45:6, 45:11, 45:18, 46:25, 47:7, 58:6, 112:5
**playing** [12] - 9:12, 12:18, 14:4, 18:17, 25:4, 34:22, 39:2, 39:18, 40:3, 42:13, 44:9, 109:16
**plenty** [2] - 59:6, 104:21
**plus** [2] - 138:1, 151:17
**pocket** [1] - 80:14
**podium** [1] - 85:11
**point** [26] - 27:14, 36:7, 37:10, 38:25, 45:14, 53:25, 56:3, 56:19, 56:22, 58:3, 58:18, 64:20, 70:8, 73:14, 75:20, 76:1, 76:5, 76:6, 76:19, 80:22, 81:20, 102:20, 114:13, 133:18, 147:2, 150:3
**pointed** [1] - 27:11
**points** [2] - 14:17, 39:3
**police** [6] - 6:15, 39:14, 40:1, 94:14, 135:10, 140:6
**policies** [1] - 136:16
**Policy** [2] - 47:22, 116:11
**policy** [26] - 49:21, 50:3, 50:8, 51:5, 51:13, 53:16, 81:2, 93:23, 94:14, 114:5, 115:2, 115:9, 115:14, 116:4, 116:6, 116:8, 116:13, 116:14, 116:18, 116:24, 117:6, 117:7, 122:10, 122:11, 135:20, 141:16
**poorly** [1] - 8:3
**popped** [1] - 78:20
**popping** [1] - 21:16
**portraying** [1] - 35:18
**position** [9] - 87:5, 111:11, 111:15, 117:18, 147:22, 148:19, 150:4, 150:8, 151:21
**positioned** [1] - 71:12
**positioning** [1] - 77:12
**possession** [1] - 74:6
**possibly** [2] - 68:14, 69:8
**post** [4] - 7:2, 116:20, 116:23, 122:12
**POST** [21] - 63:23, 114:12, 114:14, 114:15, 114:16, 114:19, 114:22, 115:8, 115:14, 116:6, 116:10, 121:24, 134:16, 134:23, 136:22, 138:23, 140:17, 141:17, 142:24, 143:4
**POST-certified** [5] - 114:14, 114:16, 114:19, 134:23
**posted** [2] - 6:12, 6:21
**posts** [4] - 6:11, 6:14, 6:17, 6:20
**potentially** [7] - 6:15, 68:23, 73:6, 80:18, 81:5, 81:21, 83:1
**practical** [1] - 21:8
**practiced** [1] - 111:20
**precedence** [1] - 8:22
**preclude** [2] - 105:1, 107:13
**precluded** [2] - 104:22, 149:8
**precluding** [2] - 5:23, 7:18
**prejudice** [2] - 7:24, 106:4
**prejudicial** [1] - 7:13
**preparation** [1] - 115:24
**prepare** [2] - 7:15, 106:19
**prepared** [2] - 7:6, 107:12
**presence** [11] - 5:5, 58:21, 59:11, 74:8, 75:3, 75:22, 76:7, 101:4, 113:16, 137:7, 145:19
**PRESENT** [1] - 3:12
**present** [14] - 5:7, 10:15, 10:16, 59:14, 66:20, 113:17, 113:18, 131:18, 137:15, 145:20
**presenting** [1] - 75:2
**press** [2] - 148:9, 150:3
**presumably** [2] - 110:14
**pretty** [2] - 78:13, 104:19
**prevent** [1] - 80:15
**prevented** [2] - 40:9, 79:19
**previously** [5] - 10:1, 10:22, 65:20, 73:24, 86:9
**PREVIOUSLY** [1] - 13:11
**printed** [1] - 71:22
**priority** [2] - 77:25, 144:8
**Priority** [5] - 67:10, 69:15, 69:16, 69:19, 143:19
**private** [1] - 6:25
**probability** [1] - 90:20
**probable** [8] - 147:24, 148:8, 149:3, 149:9, 150:3, 150:25, 151:4, 151:7
**Probation** [1] - 61:2
**problem** [5] - 66:4, 107:2, 146:21, 150:20, 151:6
**problems** [1] - 147:16
**Procedure** [1] - 108:5
**procedure** [4] - 115:1, 115:8, 116:23, 121:25
**procedures** [10] - 114:12, 114:15, 114:22, 114:24, 115:15, 135:10, 135:20, 136:16, 138:24, 143:5
**proceed** [1] - 81:25
**proceeded** [1] - 82:7
**proceeding** [5] - 98:10, 98:15, 99:6, 103:12, 104:12
**Proceedings** [1] - 153:2
**proceedings** [4] - 126:13, 130:23, 132:24, 154:10
**PROCEEDINGS** [1] - 1:12
**produce** [2] - 80:16, 93:14
**produced** [1] - 144:13
**producing** [1] - 53:23
**program** [1] - 68:8
**promise** [1] - 113:13
**promptly** [3] - 115:18, 116:25, 122:1
**proper** [12] - 94:13, 103:10, 103:12, 103:24, 149:19, 149:20, 150:1, 150:5, 150:15, 152:11, 152:17, 152:22
**properly** [3] - 61:13, 103:17, 152:2
**propriety** [3] - 136:23, 138:23, 140:7
**protect** [1] - 138:19
**provide** [2] - 12:4, 140:1
**provided** [3] - 12:11, 141:9, 143:20
**providing** [1] - 71:16
**public** [5] - 6:15, 6:16, 70:4, 81:23, 90:22
**publish** [1] - 115:4
**pull** [2] - 35:15, 92:19
**pulled** [1] - 92:9
**pulling** [3] - 28:16, 97:25, 137:9
**pure** [3] - 110:12, 110:13, 110:22
**purported** [1] - 13:1
**purpose** [8] - 23:10, 104:11, 104:14, 104:15, 106:1, 108:10, 111:2, 112:25
**purposes** [4] - 105:9, 105:25, 106:10, 106:21
**pursuant** [1] - 154:8
**put** [11] - 5:24, 16:11, 66:21, 91:14, 96:23, 97:14, 99:7, 104:13, 108:1, 124:3, 150:4
**puts** [3] - 24:18, 111:11, 148:18
**putting** [1] - 151:20
**PVS** [5] - 14:11, 22:4, 56:10, 103:3, 115:22

## Q

**qualifications** [2] - 134:4, 135:4
**qualified** [2] - 136:6, 148:22
**quantify** [1] - 64:8
**quantum** [1] - 129:22
**QUESTION** [2] - 101:24, 102:15
**questioning** [1] - 148:2
**questions** [12] - 30:12, 34:5, 59:17, 91:20, 108:25, 113:19, 113:21, 113:23, 118:8, 123:7, 123:13, 132:7
**quick** [3] - 64:13, 78:21, 149:18
**quickly** [4] - 68:1, 78:3, 78:11, 78:13
**quiet** [1] - 145:5
**quite** [11] - 7:21, 7:25, 106:5, 107:21, 111:11, 113:8, 141:20, 146:8, 148:16, 150:5, 151:23
**quote** [1] - 71:15
**quoted** [4] - 142:5, 142:7, 142:14, 143:1

## R

**radio** [3] - 24:13, 24:15, 24:18
**rain** [3] - 30:10, 30:21, 31:1
**raining** [2] - 29:6, 31:2
**raise** [3] - 87:5, 87:9, 133:1

**raised** [1] - 148:1
**ran** [1] - 30:17
**Rancho** [3] - 65:11, 66:7, 67:22
**rank** [1] - 134:12
**rather** [3] - 102:24, 116:1, 143:2
**Rawlings** [18] - 23:8, 38:1, 38:4, 38:12, 38:16, 38:25, 47:3, 47:10, 47:18, 47:21, 50:17, 57:2, 57:22, 57:25, 58:1, 58:9, 100:16, 112:4
**Rawlings'** [1] - 57:1
**Rawlings's** [1] - 57:12
**Raymond** [1] - 3:13
**re** [7] - 46:9, 52:17, 56:20, 69:5, 94:13, 108:25, 121:20
**re-ask** [7] - 46:9, 52:17, 56:20, 69:5, 94:13, 108:25, 121:20
**reach** [3] - 11:7, 91:5, 144:10
**reached** [2] - 44:20, 144:23
**reaching** [2] - 41:13, 43:1
**read** [19] - 9:22, 10:11, 26:2, 98:15, 99:11, 100:25, 101:23, 103:19, 104:15, 105:25, 107:24, 112:3, 126:10, 126:18, 127:21, 128:8, 129:4, 130:6, 130:22
**Reading** [2] - 36:23, 110:3
**reading** [5] - 98:17, 98:20, 105:2, 108:7, 120:9
**ready** [2] - 9:8, 71:25
**really** [15] - 7:19, 106:6, 106:25, 108:15, 108:23, 111:10, 111:13, 112:11, 112:12, 116:10, 146:4, 146:13, 148:10, 148:11
**REALTIME** [1] - 154:5
**reason** [3] - 23:17, 148:3, 148:4
**reasonable** [9] - 53:21, 53:25, 55:24, 93:12, 95:20, 140:17, 148:9, 150:13, 150:23
**reasonableness** [1] - 145:25
**reasons** [1] - 81:19
**rebut** [2] - 147:10, 151:8
**receive** [8] - 63:15, 64:6, 66:4, 67:4, 67:6, 68:7, 79:5, 142:25
**received** [6] - 7:6, 64:20, 72:2, 72:22, 114:15, 135:8
**receiving** [1] - 87:1
**recently** [1] - 39:23
**Recess** [3] - 10:12, 59:10, 113:15
**recess** [2] - 6:5, 58:17
**recesses** [1] - 58:20
**recognize** [5] - 13:3, 28:11, 36:5, 42:4, 45:5
**recognized** [2] - 70:2, 88:2
**recognizing** [1] - 41:23
**recollection** [14] - 27:9, 29:10, 33:11, 86:5, 100:17, 105:14, 106:21, 108:18, 109:19, 115:24, 125:20, 126:8, 126:15, 126:24
**record** [24] - 5:6, 5:15, 5:21, 6:3, 7:23, 8:10, 8:12, 9:10, 9:19, 16:4, 35:12, 35:20, 58:15, 93:2, 99:17, 100:8, 101:7, 102:16, 103:7, 129:4, 130:6, 138:13, 148:22
**recording** [3] - 13:16, 14:11, 20:1
**recordings** [3] - 56:10, 115:22, 139:17
**records** [1] - 139:21
**recross** [2] - 13:22, 14:1
**REDIRECT** [1] - 114:1
**redirect** [5] - 13:21, 14:1, 58:25, 59:19, 113:24
**Redirect** [1] - 4:5
**reduces** [1] - 90:19
**refer** [2] - 115:8, 127:9
**reference** [4] - 61:16, 65:1, 119:10, 119:23
**referenced** [1] - 141:18
**referring** [15] - 18:9, 31:15, 31:16, 51:2, 52:2, 53:8, 53:9, 114:25, 116:3, 116:10, 116:19, 124:16, 131:12, 131:17
**refers** [4] - 116:20, 122:12, 124:11, 130:25
**reflect** [1] - 35:20
**reflective** [1] - 44:1
**reflects** [1] - 48:16
**refresh** [5] - 105:14, 106:21, 108:18, 109:18, 126:18
**refreshes** [3] - 125:20, 126:7, 126:14
**regard** [2] - 6:21, 66:5
**regarding** [2] - 9:20, 65:19
**regardless** [2] - 147:6, 149:23
**regards** [1] - 66:11
**regular** [1] - 135:3
**regulations** [1] - 154:12
**reholstered** [2] - 24:21, 91:15
**reiterate** [1] - 77:10
**reject** [1] - 141:10
**related** [4] - 52:11, 141:23, 143:13, 147:16
**relates** [4] - 52:12, 62:21, 134:16, 134:18
**relation** [2] - 51:22, 51:25
**relax** [2] - 101:1, 146:16
**release** [1] - 92:2
**Relevance** [3] - 21:12, 48:6, 93:17
**relevance** [5] - 33:19, 50:22, 60:9, 61:23, 61:24
**relevant** [3] - 62:19, 100:20, 146:13
**relied** [1] - 136:16
**remain** [2] - 145:18, 145:21
**remainder** [2] - 13:21, 14:1
**remained** [2] - 40:20, 92:13
**remember** [31] - 13:20, 13:25, 23:19, 31:19, 35:5, 35:7, 41:5, 77:4, 85:11, 109:10, 111:19, 114:3, 114:5, 117:15, 117:21, 118:18, 120:16, 120:18, 122:24, 123:4, 123:6, 123:13, 123:21, 127:7, 127:16, 127:18, 128:8, 130:5, 131:8, 143:14, 143:15
**remind** [2] - 63:3, 75:15
**rendered** [1] - 140:2
**Renegar** [35] - 16:5, 17:18, 18:7, 19:16, 20:1, 20:5, 20:15, 21:5, 22:3, 23:19, 23:22, 24:5, 24:10, 25:1, 39:6, 43:10, 43:14, 44:4, 44:6, 45:2, 45:5, 46:17, 46:18, 83:12, 83:18, 85:1, 88:2, 110:18, 117:13, 119:14, 119:16, 120:15, 120:21, 121:2, 147:2
**RENEGAR** [1] - 3:3
**Renegar's** [2] - 57:5
**renewed** [1] - 6:19
**reopen** [1] - 108:25
**repeat** [3] - 35:12, 81:14, 152:14
**rephrase** [1] - 84:10
**replay** [1] - 19:18
**report** [42] - 16:8, 22:11, 22:25, 23:17, 23:20, 27:13, 27:17, 35:4, 35:14, 35:16, 36:10, 37:19, 38:6, 38:11, 38:18, 48:15, 48:19, 48:21, 49:3, 49:10, 68:12, 69:8, 96:4, 96:9, 114:8, 115:19, 117:10, 119:8, 119:9, 119:11, 119:13, 120:9, 120:12, 121:13, 121:24, 122:13, 139:11, 139:24, 140:3, 141:16, 142:8, 142:19
**reported** [37] - 13:12, 13:19, 14:8, 14:21, 15:4, 15:8, 18:21, 19:12, 19:21, 20:11, 25:6, 27:12, 28:4, 28:18, 29:1, 29:20, 33:13, 34:24, 39:4, 40:4, 41:10, 42:2, 42:10, 42:23, 43:21, 44:10, 44:15, 44:25, 45:6, 45:11, 45:18, 45:23, 46:25, 47:7, 58:6, 67:11, 154:10
**Reporter** [1] - 154:20
**REPORTER** [3] - 1:23, 154:1, 154:6
**REPORTER'S** [1] - 1:12
**reporting** [6] - 45:22, 45:23, 46:2, 46:8, 46:24, 116:7
**reports** [6] - 23:2, 27:25, 96:12, 96:16, 115:25, 120:11
**reprisal** [2] - 142:16, 142:21
**requested** [4] - 5:19, 34:20, 67:12, 149:16
**require** [1] - 6:24
**required** [2] - 23:5, 94:21
**requirement** [3] - 23:13, 63:18, 139:1
**requirements** [2] - 62:15, 62:16
**requires** [3] - 50:9, 121:25, 142:17
**requiring** [1] - 116:24
**research** [1] - 106:12
**reserve** [2] - 59:18, 135:3
**resist** [1] - 53:24
**resistance** [11] - 54:11, 54:14, 54:15, 92:22, 95:17, 95:25, 97:2, 129:10, 137:19, 138:7
**resisted** [2] - 93:9, 148:5
**resisting** [2] - 76:9, 147:8
**resistive** [2] - 137:8, 137:18
**resolve** [2] - 56:14, 82:2
**respond** [4] - 7:4, 67:13, 75:1, 152:21
**responded** [5] - 17:25, 67:22, 72:6, 145:4
**responding** [1] - 151:25
**response** [13] - 19:10, 65:14, 66:1, 67:10, 69:17, 70:5, 72:8, 88:4, 95:16, 138:1,


6-GottsSER-01078

138:6, 152:11
**responsibilities** [1] - 49:9
**responsibility** [4] - 49:1, 49:2, 49:5, 107:19
**responsible** [2] - 49:8, 142:3
**rest** [3] - 59:8, 59:18, 104:9
**restrain** [1] - 137:11
**restraining** [1] - 6:25
**restroom** [1] - 113:11
**result** [5] - 6:1, 79:8, 93:24, 107:23, 142:3
**RESUMES** [1] - 13:11
**retain** [1] - 6:25
**retire** [1] - 134:9
**retired** [6] - 134:7, 134:10, 134:23, 135:10, 139:5
**retirement** [2] - 134:13, 136:2
**return** [1] - 11:22
**returning** [1] - 79:19
**review** [2] - 7:3, 115:21
**reviewed** [4] - 23:2, 96:16, 139:17, 141:1
**reviewing** [3] - 72:1, 120:10, 139:11
**road** [2] - 7:17, 108:15
**Road** [4] - 2:10, 2:18, 2:22, 3:9
**roadway** [2] - 78:8, 137:21
**ROGER** [2] - 4:6, 133:3
**roger** [1] - 133:9
**role** [1] - 66:11
**roll** [1] - 112:15
**room** [2] - 83:22, 132:13
**ROOM** [1] - 1:24
**roughly** [3] - 93:6, 93:7, 114:17
**rskinner@lynberg.com** [1] - 2:24
**Rule** [1] - 147:12
**rule** [2] - 110:2, 148:16
**ruled** [4] - 110:23, 113:3, 147:24, 150:2
**Rules** [1] - 108:4
**rules** [2] - 61:7, 104:12
**ruling** [6] - 9:2, 148:19, 149:5, 149:18, 149:25, 152:17
**run** [3] - 71:13, 78:23, 112:10
**running** [5] - 18:23, 78:22, 85:21, 108:9, 137:10
**rush** [2] - 8:13, 59:7
**RV** [6] - 46:18, 46:22, 68:20, 70:16, 73:6, 143:23
**RYANE** [1] - 2:22

**S**

**Saddleback** [1] - 65:7
**safe** [2] - 73:4, 77:9
**safety** [9] - 6:24, 68:10, 70:4, 70:9, 70:12, 70:15, 70:18, 81:23
**sanctions** [5] - 5:20, 5:25, 6:2, 7:16, 7:20
**sandbagging** [1] - 7:5
**Santa** [4] - 65:11, 66:7, 67:21, 67:22
**SANTA** [3] - 1:14, 1:24, 5:1
**saw** [31] - 25:12, 25:23, 25:24, 26:23, 32:16, 40:10, 42:12, 42:15, 43:15, 43:23, 44:22, 52:23, 54:19, 55:14, 56:4, 73:13, 86:21, 88:2, 89:6, 94:14, 110:7, 110:22, 118:19, 119:16, 122:21, 123:17, 123:19, 129:13, 129:14, 129:18
**scenario** [1] - 51:24
**scene** [52] - 15:13, 17:23, 18:1, 18:9, 18:10, 18:23, 20:19, 24:11, 25:10, 25:15, 25:20, 27:11, 27:14, 33:12, 36:2, 36:10, 38:17, 47:20, 53:13, 66:19, 66:21, 66:23, 66:25, 67:1, 67:7, 72:9, 73:4, 73:8, 73:15, 75:15, 77:9, 79:10, 81:24, 83:8, 84:15, 84:23, 85:20, 87:17, 87:25, 88:1, 88:8, 88:14, 89:11, 90:6, 118:1, 118:20, 120:14, 128:13, 143:16, 145:12
**school** [1] - 135:1
**scope** [1] - 140:12
**scramble** [2] - 109:13, 109:14
**scrambling** [1] - 106:20
**screaming** [10] - 19:15, 20:2, 22:5, 22:7, 67:12, 68:25, 69:8, 73:5, 143:20, 144:9
**screen** [12] - 15:2, 33:15, 33:18, 39:25, 70:23, 71:21, 72:18, 116:16, 124:1, 124:2, 124:4
**scuffling** [1] - 152:24
**search** [1] - 148:5
**seat** [3] - 59:12, 67:17
**seated** [6] - 10:14, 33:16, 34:8, 58:22, 133:4, 133:8
**second** [18] - 5:13, 28:12, 28:20, 42:12, 44:20, 65:14, 69:18, 69:21, 72:5, 72:8, 90:24, 101:11, 102:3, 143:3, 143:17, 144:4, 146:7, 152:21
**second-guess** [2] - 69:18, 69:21
**seconds** [12] - 16:1, 16:19, 20:22, 29:23, 47:13, 47:24, 54:5, 57:12, 75:17, 88:7, 92:24, 122:22
**section** [3] - 50:3, 107:24, 142:15
**Section** [4] - 147:4, 147:5, 151:5, 154:8
**sections** [1] - 141:21
**secure** [3] - 24:12, 81:17, 88:17
**secured** [1] - 74:5
**see** [80] - 8:3, 9:5, 11:19, 14:24, 15:1, 15:6, 15:10, 15:13, 15:25, 17:18, 25:4, 25:11, 28:14, 30:20, 31:1, 33:15, 33:18, 34:2, 34:8, 34:14, 34:17, 34:22, 39:10, 39:13, 40:2, 40:23, 41:2, 41:3, 41:6, 41:12, 41:17, 42:1, 42:7, 43:6, 43:17, 43:18, 43:19, 43:25, 44:8, 47:6, 54:3, 54:4, 54:9, 54:24, 55:2, 55:4, 56:16, 58:3, 59:2, 59:4, 59:9, 72:10, 72:11, 85:15, 86:23, 87:9, 87:14, 89:4, 89:22, 90:4, 92:3, 98:24, 99:2, 102:15, 109:16, 112:7, 113:13, 116:2, 116:15, 117:13, 124:4, 125:14, 125:20, 131:11, 132:14, 142:18, 145:14
**see..** [1] - 54:21
**seeing** [1] - 87:12
**seek** [1] - 6:25
**sees** [3] - 43:19, 53:18, 100:12
**segment** [4] - 15:6, 36:3, 39:25, 42:8
**segments** [2] - 57:3, 57:7
**seizure** [1] - 148:5
**selected** [1] - 55:22
**sent** [2] - 66:2, 102:17
**sentence** [2] - 26:18, 121:7
**separate** [1] - 144:3
**sergeant** [8] - 22:25, 23:1, 23:11, 32:16, 48:24, 49:7, 120:10, 135:1
**Sergeant** [13] - 23:8, 38:12, 38:16, 38:25, 47:3, 47:10, 47:21, 50:17, 57:1, 57:2, 57:22, 57:25, 58:1
**sergeants** [2] - 17:25, 27:11
**series** [3] - 91:20, 123:7, 123:13
**serious** [1] - 137:14
**serve** [1] - 61:4
**service** [2] - 65:11, 134:10
**session** [2] - 58:18, 59:13
**set** [4] - 144:8, 144:9, 144:21, 144:24
**settle** [1] - 72:4
**seven** [1] - 10:25
**several** [6] - 24:13, 38:24, 64:16, 71:12, 91:7, 91:20
**shall** [3] - 112:24, 115:17, 115:25
**sharing** [1] - 7:9
**sharrell@lynberg.com** [1] - 2:12
**sheriff** [2] - 134:7, 139:5
**sheriff's** [6] - 60:22, 60:23, 63:13, 63:21, 73:9, 96:4
**Sheriff's** [8] - 61:20, 94:20, 115:13, 116:3, 116:8, 116:11, 116:18, 122:11
**shining** [1] - 77:3
**shortcut** [1] - 103:23
**shot** [1] - 77:14
**shoulder** [6] - 38:13, 80:7, 82:12, 88:9, 123:1, 127:4
**shoulders** [1] - 30:6
**shouts** [1] - 70:13
**show** [15] - 8:8, 62:4, 62:20, 73:15, 101:20, 104:2, 105:8, 105:18, 106:19, 122:6, 123:24, 125:19, 126:4, 130:9
**showed** [2] - 72:25, 122:9
**showing** [1] - 122:10
**shows** [1] - 103:3
**sic** [3] - 8:9, 9:12, 120:4
**side** [34] - 5:12, 9:12, 11:15, 11:17, 12:6, 19:3, 19:6, 80:19, 82:13, 82:18, 82:20, 82:22, 88:11, 88:24, 89:10, 89:12, 89:14, 89:16, 89:22, 89:23, 92:1, 97:22, 106:15, 117:19, 117:20, 123:1, 127:4, 129:14, 129:15, 131:21, 132:18, 133:12, 147:20
**sides** [4] - 7:13, 62:6, 105:24, 141:10
**sight** [1] - 95:19
**similar** [1] - 11:9
**simple** [3] - 26:18, 128:2, 149:21
**simplicity** [1] - 148:11
**simply** [5] - 8:3, 8:11, 8:19, 37:16, 119:2
**sirens** [4] - 67:13, 67:19, 67:24, 70:8
**sit** [3] - 25:13, 118:6, 146:16
**sitting** [4] - 33:5, 110:17, 114:20, 137:20
**situation** [10] - 51:23, 52:14, 55:11, 75:2,

75:7, 77:21, 142:4, 145:3, 148:11, 148:19
**situations** [1] - 51:16
**six** [3] - 62:14, 64:7, 114:16
**sixth** [2] - 16:21, 17:19
**skewered** [1] - 149:22
**skill** [1] - 141:21
**skilled** [1] - 147:14
**skills** [5] - 63:17, 63:22, 64:5, 64:17, 137:7
**SKINNER** [1] - 2:22
**sleep** [2] - 61:22, 62:1
**slowly** [2] - 78:3, 78:11
**small** [6] - 80:21, 82:16, 83:5, 90:15, 92:6, 133:6
**so-called** [1] - 17:9
**socialized** [2] - 85:4, 85:8
**solo** [1] - 66:17
**someone** [14] - 34:15, 34:19, 37:22, 39:6, 48:12, 50:17, 51:1, 51:17, 55:2, 55:5, 56:2, 81:5, 124:10, 138:19
**someplace** [2] - 82:19, 89:11
**sometime** [1] - 47:19
**sometimes** [1] - 142:16
**somewhat** [1] - 92:24
**somewhere** [7] - 30:8, 39:7, 67:21, 80:6, 82:12, 91:4, 123:1
**sorry** [18] - 9:16, 13:17, 13:24, 24:9, 38:12, 59:19, 63:4, 71:6, 75:19, 80:1, 92:15, 106:9, 115:6, 121:14, 126:9, 147:2, 149:14, 150:9
**sorts** [1] - 52:8
**sound** [1] - 21:16
**sounds** [1] - 46:16
**South** [1] - 2:14
**SOUTHERN** [1] - 1:2
**Spaan** [1] - 154:20
**SPAAN** [3] - 1:23, 154:5, 154:19
**speaking** [5] - 21:25, 88:23, 89:16, 91:2, 105:15
**specific** [6] - 6:17, 98:11, 114:24, 129:9, 135:5
**specifically** [9] - 6:22, 35:17, 48:21, 57:2, 57:8, 69:11, 97:12, 134:16, 136:17
**spectrum** [1] - 140:5
**speculate** [1] - 32:10
**speculation** [10] - 41:15, 53:7, 84:3, 86:18, 109:24, 110:12, 110:13, 110:23, 117:3, 129:25
**speculative** [1] - 110:24
**speed** [1] - 68:1
**spell** [1] - 133:10
**spray** [1] - 138:5
**squared** [1] - 74:14
**stabbed** [1] - 77:15
**stamp** [1] - 22:8
**stand** [11] - 7:13, 9:20, 11:12, 59:14, 102:24, 110:17, 111:3, 118:3, 118:6, 149:22, 151:11
**STAND** [1] - 13:11
**Standards** [2] - 116:21, 122:7
**standards** [2] - 136:22, 136:23
**standing** [2] - 11:21, 33:24
**start** [7] - 7:9, 8:20, 34:12, 59:4, 93:10, 99:22, 105:23
**started** [6] - 6:13, 70:9, 80:2, 116:10, 134:11, 140:24
**starting** [2] - 99:14, 140:10
**starts** [7] - 99:19, 99:21, 100:6, 134:22, 140:25, 152:17
**STATE** [1] - 154:4
**State** [1] - 116:22
**state** [13] - 27:10, 29:10, 29:14, 61:3, 63:5, 63:7, 68:18, 81:10, 133:7, 136:21, 148:22, 152:12
**statement** [7] - 29:24, 31:16, 100:14, 103:4, 103:25, 128:5, 143:1
**statements** [2] - 35:10, 142:5
**States** [3] - 154:6, 154:8, 154:13
**states** [2] - 115:15, 136:21
**STATES** [1] - 1:1
**station** [3] - 65:4, 65:5, 83:21
**status** [3] - 24:17, 79:1, 83:4
**stay** [3] - 59:8, 73:19, 145:8
**stenographically** [1] - 154:10
**step** [2] - 132:9, 132:25
**Stever** [1] - 3:14
**stick** [1] - 36:9
**still** [2] - 78:6, 98:19
**stipulated** [2] - 10:1, 10:22
**stipulation** [1] - 56:16
**stipulations** [1] - 106:7
**stomach** [4] - 55:8, 80:10, 82:9, 86:10
**stop** [3] - 37:10, 73:6, 76:11
**stops** [1] - 15:23
**stored** [1] - 71:22
**straight** [2] - 18:18, 19:4
**Street** [1] - 2:14
**STREET** [1] - 1:24
**street** [2] - 76:22, 142:16
**stretch** [2] - 107:20, 148:23
**stretching** [5] - 104:7, 104:23, 146:8, 151:19, 152:9
**stricken** [1] - 35:23
**strike** [9] - 5:10, 18:19, 35:22, 53:21, 55:4, 56:13, 105:4, 135:16, 141:5
**strikes** [10] - 27:17, 50:16, 50:25, 51:13, 52:13, 52:25, 53:4, 54:6, 54:7, 93:24
**striking** [1] - 55:5
**stroke** [1] - 11:4
**strokes** [1] - 10:6
**struck** [2] - 36:17, 37:2
**struggle** [18] - 73:9, 74:7, 75:14, 76:8, 76:15, 77:3, 77:7, 77:22, 77:24, 78:2, 78:4, 78:12, 78:15, 86:14, 86:16, 86:23, 90:7, 92:3
**stuff** [2] - 25:5, 151:8
**subdue** [2] - 61:9, 63:14
**subject** [8] - 24:20, 65:20, 70:3, 84:21, 120:21, 121:15, 146:13, 152:2
**submit** [1] - 59:4
**submitted** [1] - 23:1
**subparagraph** [1] - 108:7
**Subsection** [1] - 108:6
**Substation** [1] - 65:7
**successfully** [1] - 97:5
**suddenly** [1] - 118:18
**sufficient** [2] - 139:25, 149:7
**Suite** [6] - 2:5, 2:11, 2:15, 2:23, 3:5, 3:9
**suite** [1] - 2:19
**sum** [1] - 97:21
**summary** [2] - 146:22, 149:5
**summing** [1] - 132:2
**sums** [1] - 63:22
**supervisor** [6] - 23:6, 36:10, 37:19, 47:23, 66:20, 66:24
**supervisory** [1] - 66:11
**supplemental** [1] - 48:19
**supposed** [4] - 74:15, 96:4, 101:12, 147:17
**surprise** [3] - 13:21, 152:9, 152:15
**surrounding** [1] - 146:6
**suspect** [8] - 21:21, 67:6, 68:13, 74:14, 80:24, 118:14, 132:1, 137:24
**suspects** [3] - 61:9, 63:14, 80:25
**suspicion** [2] - 150:13, 150:23
**sustain** [8] - 26:16, 32:24, 37:12, 84:11, 87:4, 94:25, 121:22, 123:16
**sustained** [29] - 16:16, 18:15, 18:20, 25:14, 27:2, 27:22, 28:3, 31:12, 34:11, 37:5, 50:23, 56:7, 62:10, 75:12, 79:18, 86:20, 94:12, 95:1, 117:4, 117:8, 118:22, 119:6, 123:10, 124:17, 124:24, 130:1, 131:4, 131:18
**sustaining** [1] - 52:9
**SWISS** [5] - 3:8, 5:17, 6:8, 8:6, 8:15
**sworn** [2] - 63:7, 114:17
**SWORN** [2] - 13:11, 133:3
**sync** [3] - 56:11, 57:11, 57:13
**synopsis** [1] - 71:16

## T

**table** [10] - 39:12, 41:13, 42:9, 42:18, 43:1, 43:24, 44:2, 44:3, 44:21, 45:3
**tactic** [2] - 103:13, 105:21
**tactical** [3] - 9:2, 105:25, 142:3
**tactically** [1] - 111:10
**tactics** [3] - 63:24, 135:6, 143:11
**Tafoya** [3] - 10:4, 10:7, 11:1
**TAMARA** [1] - 2:18
**tape** [44] - 9:12, 12:17, 12:18, 12:20, 13:10, 14:6, 17:18, 18:4, 21:3, 25:8, 25:24, 34:14, 34:21, 39:10, 39:15, 39:23, 40:2, 41:21, 41:25, 42:3, 42:8, 42:12, 47:17, 56:24, 56:25, 57:1, 57:3, 57:5, 57:6, 57:9, 57:11, 57:12, 57:21, 57:23, 58:3, 58:9, 98:6, 100:16, 103:3, 104:17, 112:4
**tapes** [2] - 56:15, 57:3
**target** [1] - 145:7
**Taser** [51] - 19:16, 19:17, 19:19, 20:1, 20:4, 20:8, 20:13, 20:14, 20:15, 20:16, 20:18, 20:21, 20:25, 21:5, 21:7, 21:9, 21:10, 21:17, 21:21, 21:22, 22:1, 22:3, 22:4, 22:5, 22:7, 22:9, 22:10, 22:12, 22:13, 22:16, 23:22, 23:23, 23:24, 48:4, 56:10, 135:13, 135:19, 138:8
**Tasers** [1] - 135:9
**taught** [5] - 61:14, 96:24, 135:2, 135:7,


6-GottsSER-01080

142:22
**technical** [1] - 95:13
**technician** [1] - 3:14
**techniques** [3] - 63:24, 88:21, 139:2
**ten** [2] - 113:13, 140:2
**tent** [21] - 14:24, 15:1, 39:11, 40:23, 40:24, 41:1, 41:6, 41:12, 41:22, 42:8, 43:1, 43:6, 43:18, 43:24, 43:25, 44:18, 44:21, 44:22, 65:1, 72:13
**term** [7] - 74:8, 74:11, 116:19, 116:20, 137:12, 144:4, 150:16
**terminating** [5] - 5:20, 5:25, 6:1, 7:16, 7:20
**terms** [18] - 7:19, 22:8, 64:8, 64:9, 72:1, 95:14, 96:17, 104:23, 106:7, 107:22, 112:8, 112:22, 136:15, 140:10, 146:2, 148:6, 152:6, 152:22
**tested** [2] - 9:7, 68:9
**testified** [32] - 10:7, 11:5, 30:15, 32:15, 35:5, 35:17, 55:8, 86:9, 88:6, 89:3, 91:11, 96:25, 101:21, 104:24, 114:11, 114:14, 117:10, 117:12, 118:17, 120:15, 121:15, 128:11, 129:13, 131:24, 135:24, 136:8, 136:20, 147:1, 147:2, 151:1, 151:2
**testifies** [2] - 103:18, 104:4
**testify** [22] - 23:23, 24:6, 24:7, 24:10, 32:11, 32:22, 33:1, 57:14, 57:22, 90:9, 102:21, 103:1, 107:24, 112:11, 135:19, 136:6, 146:4, 146:9, 146:10, 151:12, 151:13
**testifying** [7] - 101:13, 106:2, 110:12, 110:22, 122:25, 143:25, 149:3
**testimony** [36] - 11:2, 11:3, 32:5, 38:24, 51:19, 56:12, 56:13, 76:17, 99:1, 101:14, 101:20, 103:8, 103:20, 104:13, 105:3, 108:22, 109:9, 110:1, 112:18, 113:2, 114:13, 117:22, 118:2, 120:16, 124:17, 124:23, 125:23, 126:24, 127:3, 127:12, 136:1, 138:25, 139:14, 146:5, 147:16, 152:8
**testing** [1] - 61:13
**THE** [360] - 2:3, 4:4, 4:6, 5:6, 5:23, 7:7, 8:8, 8:16, 9:10, 9:16, 9:21, 10:13, 12:5, 12:8, 12:14, 12:17, 12:20, 12:23, 13:1, 13:5, 13:6, 13:10, 13:11, 13:13, 13:15, 13:17, 13:20, 13:25, 14:3, 14:6, 16:15, 16:24, 17:2, 17:3, 17:12, 17:15, 18:5, 18:15, 18:20, 19:2, 19:11, 21:13, 21:15, 22:20, 22:22, 22:23, 22:24, 24:5, 24:8, 26:1, 26:10, 26:13, 26:18, 27:2, 27:4, 27:22, 28:3, 28:9, 28:11, 28:13, 28:14, 29:19, 30:11, 30:14, 30:15, 30:24, 31:1, 31:12, 31:14, 31:21, 31:24, 32:3, 32:5, 32:10, 32:13, 32:20, 32:22, 33:8, 33:10, 33:20, 33:21, 33:22, 33:24, 34:11, 35:23, 36:23, 37:10, 37:14, 37:15, 37:16, 38:8, 38:10, 39:20, 40:14, 40:15, 41:16, 41:17, 41:24, 42:3, 42:4, 43:4, 43:6, 43:15, 43:17, 45:25, 46:2, 46:7, 46:13, 46:16, 48:7, 48:9, 49:7, 49:17, 50:6, 50:8, 50:21, 50:23, 51:8, 51:10, 51:22, 52:1, 52:6, 52:17, 53:8, 53:17, 53:20, 54:20, 55:17, 55:21, 55:22, 56:7, 56:14, 56:20, 57:15, 57:18, 58:11, 58:17, 58:22, 59:12, 59:18, 59:22, 60:2, 60:10, 61:25, 62:3, 62:6, 62:20, 62:23, 69:4, 69:22, 69:23, 69:24, 70:1, 71:4, 71:6, 71:7, 71:8, 71:9, 71:10, 74:18, 74:20, 74:22, 74:24, 75:10, 76:1, 76:3, 76:4, 76:6, 77:18, 81:9, 81:13, 84:7, 84:11, 86:19, 87:4, 87:23, 89:5, 89:18, 91:8, 91:10, 91:21, 91:23, 93:19, 93:21, 94:12, 94:25, 95:6, 95:10, 95:12, 98:16, 98:19, 98:24, 99:2, 99:7, 99:10, 99:13, 99:15, 99:18, 99:21, 99:23, 100:1, 100:4, 100:11, 100:18, 100:19, 100:23, 101:5, 101:10, 101:16, 101:18, 101:25, 102:8, 102:13, 102:15, 102:19, 103:13, 103:16, 103:22, 104:20, 105:5, 105:8, 105:12, 105:18, 105:22, 106:12, 106:18, 106:25, 107:2, 107:4, 107:7, 108:3, 108:11, 109:4, 109:7, 109:16, 110:4, 110:21, 111:8, 111:23, 112:2, 112:7, 112:15, 113:7, 113:12, 113:17, 113:22, 113:24, 115:5, 115:7, 115:11, 116:9, 117:4, 117:8, 118:22, 119:6, 120:2, 120:24, 121:4, 121:6, 121:11, 121:13, 121:17, 121:20, 122:5, 122:6, 122:18, 123:10, 123:16, 123:24, 124:3, 124:8, 124:11, 124:13, 124:16, 124:20, 124:24, 125:4, 125:6, 125:8, 125:10, 125:14, 125:17, 125:19, 125:23, 125:25, 126:4, 126:5, 126:7, 126:9, 126:10, 126:12, 126:14, 127:9, 127:13, 127:14, 127:22, 127:23, 128:4, 128:10, 128:11, 128:21, 129:1, 129:5, 129:7, 129:17, 130:1, 130:9, 130:11, 130:14, 130:16, 130:18, 130:19, 130:21, 130:24, 131:4, 131:11, 131:15, 131:20, 132:3, 132:5, 132:9, 132:10, 132:11, 132:14, 132:23, 132:25, 133:4, 133:9, 133:10, 133:11, 133:12, 133:15, 133:16, 133:20, 133:21, 135:17, 138:10, 138:14, 141:6, 141:9, 144:1, 144:2, 144:13, 144:18, 145:13, 145:20, 146:20, 147:19, 148:8, 149:10, 149:13, 149:18, 150:8, 150:9, 150:11, 150:14, 150:16, 150:17, 151:10, 151:16
**theathcote@lynberg.com** [1] - 2:20
**therefore** [6] - 119:21, 133:13, 148:3, 149:7, 149:23, 152:5
**they've** [2] - 8:21, 111:21
**thinking** [2] - 68:11, 87:7
**thinks** [1] - 110:22
**third** [3] - 42:25, 101:15, 141:22
**threat** [1] - 73:6
**threatening** [5] - 6:15, 6:23, 70:13, 138:17, 138:20
**three** [15] - 8:20, 17:8, 20:8, 54:12, 60:20, 64:15, 73:9, 75:16, 83:7, 83:12, 83:14, 87:17, 102:4, 134:23
**throughout** [3] - 68:8, 104:9, 136:20
**throw** [1] - 109:17
**tie** [1] - 111:5
**timed** [2] - 21:2, 133:13
**timely** [1] - 149:17
**timestamp** [2] - 20:24, 98:6
**title** [1] - 63:22
**Title** [1] - 154:8
**today** [7] - 11:22, 11:24, 33:6, 59:23, 114:20, 127:2, 128:11
**together** [1] - 115:15
**token** [2] - 7:23, 105:2
**tomorrow** [1] - 11:23
**tonight** [1] - 7:11
**took** [3] - 10:20, 44:4, 44:6
**tools** [1] - 42:20
**top** [1] - 15:7
**total** [4] - 5:9, 9:11, 11:15, 75:20
**totality** [4] - 23:2, 96:17, 120:9, 137:12
**touched** [1] - 110:14
**toward** [1] - 79:19
**towards** [13] - 18:23, 41:13, 42:9, 44:2, 44:21, 78:10, 78:21, 78:22, 79:22, 82:7, 82:10, 91:25, 97:22
**Town** [3] - 2:10, 2:18, 2:22
**Trabuco** [1] - 65:12
**train** [1] - 149:15
**trained** [10] - 21:6, 74:11, 80:22, 93:23, 114:12, 137:7, 139:3, 139:4, 140:17, 142:2
**trainee** [1] - 36:6
**training** [54] - 23:9, 31:7, 32:7, 51:4, 51:6, 62:21, 63:13, 63:15, 63:20, 63:25, 64:3, 64:6, 64:9, 64:16, 64:19, 64:22, 65:24, 66:15, 66:24, 66:25, 68:7, 68:8, 68:12, 68:15, 70:1, 73:21, 74:13, 74:15, 75:6, 75:22, 75:23, 77:23, 80:8, 80:12, 84:1, 84:22, 94:8, 94:19, 96:3, 113:4, 114:15, 134:15, 134:22, 135:9, 137:3, 140:18,

140:22, 142:24, 143:1, 146:25, 147:7
**Training** [2] - 116:21, 122:7
**Transcript** [1] - 1:5
**transcript** [15] - 12:7, 31:15, 31:20, 98:18, 98:19, 102:7, 107:14, 112:5, 112:25, 124:7, 125:3, 126:2, 126:6, 154:9, 154:11
**TRANSCRIPT** [1] - 1:12
**transcripts** [3] - 12:4, 109:1, 124:25
**transition** [2] - 78:9, 126:24
**transitioned** [2] - 78:18, 92:5
**transmission** [1] - 74:3
**transparent** [1] - 41:1
**treat** [1] - 104:13
**trial** [13] - 6:11, 6:13, 6:21, 7:24, 8:19, 71:19, 72:1, 74:9, 101:15, 104:9, 107:9, 108:5, 136:2
**TRIAL** [1] - 1:13
**tried** [4] - 5:13, 8:3, 8:20, 87:5
**trooper** [1] - 61:3
**trouble** [3] - 64:21, 69:11, 73:5
**truck** [4] - 15:1, 39:14, 40:1, 72:13
**true** [119] - 14:17, 15:13, 15:19, 15:24, 16:2, 16:6, 16:9, 16:11, 17:9, 17:15, 17:17, 17:20, 17:24, 18:13, 19:17, 20:3, 20:8, 20:14, 20:19, 20:20, 21:6, 21:7, 22:2, 22:6, 22:11, 22:12, 22:14, 22:17, 23:6, 23:12, 24:2, 25:9, 27:18, 28:1, 29:18, 30:2, 30:21, 33:18, 35:2, 36:2, 36:21, 37:9, 37:21, 37:23, 39:10, 39:12, 40:19, 40:21, 40:24, 41:2, 42:15, 42:18, 43:1, 43:11, 43:14, 43:24, 44:5, 44:12, 44:21, 45:23, 47:10, 49:1, 49:2, 49:12, 50:4, 52:21, 52:24, 53:2, 55:7, 56:2, 56:5, 56:10, 56:24, 57:9, 57:11, 57:25, 63:6, 67:2, 70:24, 71:19, 72:15, 74:9, 74:11, 84:24, 88:11, 97:22, 98:7, 101:9, 101:17, 114:9, 114:19, 116:15, 118:14, 118:24, 119:4, 119:15, 119:17, 119:23, 120:7, 122:2, 122:14, 126:20, 127:2, 127:5, 127:21, 129:15, 132:1, 136:24, 138:22, 139:9, 139:12, 139:15, 139:17, 140:7, 142:24, 143:5, 143:23, 154:9
**trust** [1] - 104:25
**try** [13] - 64:13, 75:1, 75:3, 76:7, 91:17, 92:2, 92:4, 92:5, 97:25, 102:6, 109:13, 119:21, 119:22
**trying** [36] - 45:22, 46:17, 46:18, 46:19, 54:12, 79:13, 82:22, 88:17, 91:2, 91:5, 92:19, 104:13, 105:1, 105:21, 106:23, 107:12, 107:13, 107:17, 108:21, 112:21, 119:14, 119:16, 119:19, 120:17, 120:21, 122:22, 123:14, 123:25, 124:22, 126:21, 126:25, 129:14, 131:7, 131:16, 150:6
**tucked** [2] - 87:13, 92:22
**turn** [6] - 40:6, 113:24, 124:1, 131:21, 147:20, 148:25
**turned** [1] - 65:9
**twice** [1] - 35:1
**two** [19] - 7:22, 8:20, 17:25, 20:4, 27:11, 56:15, 59:24, 90:24, 98:2, 106:13, 108:13, 108:23, 119:10, 128:13, 128:22, 129:18, 144:3, 144:25, 145:1
**two-page** [1] - 106:13
**type** [9] - 28:16, 65:18, 65:25, 72:21, 93:8, 93:14, 138:6, 138:8, 140:20
**types** [1] - 142:5
**typical** [1] - 137:25
**typically** [1] - 138:20

## U

**U.S** [1] - 1:3
**ultimate** [1] - 148:14
**ultimately** [3] - 73:3, 82:16, 150:7
**unable** [1] - 23:19
**unclear** [1] - 100:8
**uncomfortable** [1] - 106:25
**under** [30] - 53:4, 53:16, 54:12, 63:16, 68:14, 68:16, 68:21, 73:22, 80:20, 81:1, 81:20, 82:25, 91:13, 91:18, 92:23, 93:22, 96:22, 106:19, 108:6, 118:2, 118:6, 118:12, 126:20, 142:23, 144:21, 148:11, 149:20, 150:1, 150:23, 151:3
**underlying** [1] - 147:11
**underneath** [12] - 24:21, 79:14, 80:11, 80:20, 82:15, 83:2, 87:14, 88:18, 90:8, 90:14, 91:4, 92:5
**understood** [6] - 6:8, 9:14, 19:5, 19:9, 60:1, 112:13
**undue** [1] - 151:16
**unduly** [1] - 152:7
**unenviable** [1] - 148:18
**unfamiliar** [1] - 104:11
**unfounded** [1] - 143:13
**uniform** [8] - 27:12, 27:13, 27:15, 28:23, 29:11, 32:16, 33:12, 39:1
**unincorporated** [1] - 65:13
**United** [3] - 154:6, 154:8, 154:13
**UNITED** [1] - 1:1
**units** [1] - 65:13
**unjustified** [2] - 49:17, 50:2
**unknown** [1] - 69:11
**unlawful** [1] - 142:10
**unless** [1] - 96:9
**unlike** [2] - 105:4, 105:6
**unreasonable** [6] - 23:15, 49:17, 56:5, 140:18, 141:17, 142:11
**unreasonableness** [1] - 145:25
**up** [47] - 7:8, 7:11, 8:14, 14:16, 16:12, 27:16, 29:24, 30:16, 35:15, 39:11, 44:23, 52:9, 61:19, 62:10, 63:22, 64:9, 70:24, 71:21, 73:1, 73:15, 78:20, 79:21, 80:15, 81:3, 81:16, 85:21, 86:3, 86:15, 87:9, 87:13, 97:21, 99:8, 101:13, 102:24, 104:19, 104:20, 106:15, 107:11, 108:17, 117:11, 119:21, 124:3, 132:2, 137:22, 147:18, 151:11
**upgrade** [1] - 69:19
**upgraded** [3] - 67:10, 69:16, 143:19
**upper** [8] - 55:23, 80:5, 82:11, 90:12, 91:25, 92:14, 93:22, 97:22
**upwards** [1] - 82:10
**use-of-force** [24] - 37:24, 49:3, 49:10, 63:16, 96:8, 96:11, 96:18, 97:1, 114:5, 115:2, 115:8, 116:4, 116:7, 116:8, 116:18, 120:10, 120:12, 122:11, 129:10, 135:24, 136:15, 144:14, 145:23, 147:10

## V

**vacuum** [2] - 96:9, 120:8
**vague** [8] - 18:14, 38:7, 57:13, 74:21, 81:7, 86:18, 95:9, 120:1
**Vague** [4] - 69:20, 71:3, 75:24, 122:3
**vehicle** [19] - 12:25, 13:16, 13:17, 15:17, 15:25, 20:1, 30:16, 70:23, 71:12, 72:11, 72:19, 76:11, 76:12, 76:14, 76:24, 77:8, 78:18, 112:23, 139:17
**verbal** [1] - 137:7
**verbatim** [1] - 71:15
**verbiage** [1] - 35:18
**versus** [3] - 21:17, 75:4, 140:17
**via** [1] - 24:13
**victim** [1] - 145:12
**video** [23] - 12:4, 14:23, 19:18, 20:7, 20:13, 22:4, 23:7, 27:10, 28:11, 28:15, 29:14, 29:18, 30:3, 39:24, 41:3, 41:17, 42:5, 43:8, 44:24, 45:4, 45:15, 46:16, 78:5
**Videotape** [33] - 13:12, 13:19, 14:8, 14:21, 15:4, 15:8, 18:21, 19:12, 19:21, 20:11, 25:6, 28:4, 28:18, 29:1, 29:20, 33:13, 34:24, 39:4, 40:4, 41:10, 42:2, 42:10, 42:23, 43:21, 44:10, 44:15, 44:25, 45:6, 45:11, 45:18, 46:25, 47:7, 58:6
**violated** [1] - 141:16
**violating** [2] - 146:25, 147:8
**violation** [2] - 69:9, 147:4
**violations** [1] - 70:4
**violative** [1] - 143:4
**violence** [2] - 65:1, 143:10
**violent** [1] - 151:9
**violently** [1] - 55:4
**visible** [1] - 48:11
**visual** [1] - 96:23
**visually** [2] - 94:9, 94:21
**VOLUME** [1] - 1:8
**volume** [1] - 100:1
**Volume** [1] - 100:3
**voluminous** [1] - 139:11
**vs** [1] - 1:6

## W

**waistband** [1] - 80:13


6-GottsSER-01082

**wait** [1] - 79:15
**waiting** [1] - 132:13
**wake** [1] - 61:19
**walk** [3] - 78:23, 81:22, 111:19
**walking** [2] - 44:1, 45:2
**wall** [1] - 133:5
**wants** [2] - 81:4, 81:17
**warning** [7] - 20:1, 21:6, 21:7, 21:8, 21:10, 21:16, 21:22
**warnings** [3] - 7:18, 20:6, 20:7
**warranted** [1] - 70:4
**watch** [2] - 34:21, 100:25
**watched** [3] - 17:17, 34:21, 39:15
**watching** [1] - 109:12
**water** [1] - 132:22
**WATKINS** [4] - 2:9, 2:13, 2:17, 2:21
**ways** [2] - 36:16, 36:25
**weapon** [10] - 53:24, 73:25, 77:11, 78:25, 80:12, 80:16, 90:21, 91:4, 91:12, 138:18
**weapons** [4] - 24:14, 137:14, 138:4, 145:11
**WEDNESDAY** [2] - 1:13, 5:1
**weeks** [1] - 8:20
**weigh** [1] - 106:4
**weighed** [1] - 8:24
**weight** [4] - 80:23, 80:25, 82:24, 85:25
**welcome** [2] - 6:6, 7:15
**welfare** [1] - 68:10
**WEST** [1] - 1:24
**West** [2] - 2:10, 2:18
**wet** [5] - 29:5, 29:6, 30:8, 30:20, 38:22
**whatnot** [1] - 41:18
**whatsoever** [2] - 119:23, 145:11
**wheel** [2] - 67:14, 67:15
**white** [4] - 15:1, 39:13, 40:1, 72:13
**whole** [5] - 14:5, 60:11, 82:2, 126:10, 142:4
**willing** [1] - 7:12
**Windrow** [1] - 65:6
**wipe** [4] - 26:24, 28:16, 34:3
**wipes** [3] - 30:1, 34:3, 34:4
**wiping** [10] - 28:6, 28:13, 28:15, 29:3, 29:9, 29:12, 33:17, 34:7, 79:10
**WITNESS** [72] - 13:5, 13:15, 17:2, 17:15, 21:15, 22:22, 22:24, 24:8, 28:11, 28:14, 30:15, 31:1, 32:3, 33:10, 33:21, 33:24, 37:14, 37:16, 38:10, 40:15, 41:17, 42:4, 43:6, 46:2, 46:16, 48:9, 49:7, 49:17, 50:8, 51:10, 52:1, 53:20, 55:22, 57:18, 62:23, 69:23, 70:1, 71:6, 71:8, 71:10, 74:20, 74:24, 76:3, 76:6, 81:13, 91:10, 91:23, 93:21, 95:12, 100:18, 110:4, 115:5, 121:13, 122:6, 126:5, 126:9, 126:12, 127:13, 127:23, 128:11, 129:7, 130:18, 132:10, 133:3, 133:9, 133:11, 133:15, 133:20, 144:2, 150:8, 150:11, 150:16
**witness** [23] - 9:20, 10:4, 10:7, 11:1, 11:5, 11:14, 11:20, 31:22, 49:14, 52:25, 53:7, 54:7, 85:19, 102:24, 125:15, 126:4, 130:13, 132:11, 135:18, 136:6, 136:11, 148:2, 148:22
**witness's** [1] - 111:11
**witnessed** [1] - 49:15
**WITNESSES** [1] - 4:3
**witnesses** [2] - 11:14, 46:23
**won** [1] - 111:20
**wondering** [1] - 110:17
**word** [2] - 85:24, 100:7
**words** [6] - 8:22, 26:2, 103:13, 106:6, 143:2, 146:1
**world** [1] - 109:8
**worried** [2] - 104:22, 104:23
**worthy** [1] - 66:1
**wounds** [2] - 34:16, 34:18
**wrapping** [2] - 104:19, 104:20
**write** [3] - 48:19, 96:4, 122:1
**writing** [4] - 22:25, 49:3, 49:9, 121:24
**written** [3] - 23:2, 61:13, 122:13
**WRONIAK** [33] - 3:4, 16:22, 17:10, 21:12, 22:19, 24:3, 27:20, 28:2, 28:8, 30:23, 31:11, 36:22, 39:17, 41:14, 43:2, 45:24, 48:6, 49:6, 49:16, 50:19, 50:22, 51:18, 53:6, 55:16, 56:6, 113:23, 117:2, 122:3, 135:15, 141:4, 143:24, 144:12, 147:23
**wrote** [8] - 23:17, 35:4, 35:14, 119:11, 120:20, 139:11, 141:15, 142:4

**X**

**X26** [1] - 21:15

**Y**

**year** [3] - 60:24, 63:2, 63:3
**years** [9] - 7:22, 63:11, 64:20, 105:16, 107:8, 126:23, 134:10, 134:14, 135:1
**yell** [2] - 19:16, 21:5
**yelling** [1] - 143:18
**yesterday** [14] - 5:17, 6:10, 9:20, 11:1, 11:17, 30:15, 35:4, 35:10, 35:17, 35:20, 42:17, 46:12, 55:8, 59:22
**yourself** [5] - 70:10, 79:21, 91:2, 137:20, 138:2
**yourselves** [3] - 58:19, 101:2, 145:15


6-GottsSER-01083

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

JEREMY HOLLOWAY, )
)
Plaintiff, ) **Certified Transcript**
)
vs. ) Case No.
) 8:19-cv-01514-DOC-DFM
COUNTY OF ORANGE, et al., )
)
Defendants. ) **DAY 9, VOLUME I**
)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TUESDAY, MAY 13, 2025
8:02 A.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com



 6-GottsSER-01084

to place handcuffs on this one man; true?

MR. WRONIAK: Objection. Argumentative.

THE COURT: It's also been asked and answered, Counsel.

You can answer it one more time, sir.

09:07AM THE WITNESS: At the conclusion of the use of force, it took five of us to get him handcuffed, yes.

BY MS. MKRTCHYAN:

Q Okay. And you know about your Taser and when to use the Taser; true?

09:07AM

MR. WRONIAK: Objection. Relevance. 403.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: I do.

09:08AM BY MS. MKRTCHYAN:

Q You are trained to apply the Taser, under what circumstances to apply; true?

A I am.

Q Yes?

09:08AM A Yes.

Q Okay. Isn't it true you're allowed to use the Taser when someone is violent or aggressive towards you?

A That is one of the parameters that we're allowed to use it for.

09:08AM Q Are you allowed to use the Taser when someone is



 6-GottsSER-01085

passively resisting, on the ground, face down, barefoot with multiple officers on top of him?
A Is that a hypothetical?
MR. WRONIAK: Objection. Incomplete hypothetical. Legal conclusion.
THE COURT: Sustained.
BY MS. MKRTCHYAN:
Q Well, you've described it to us, that he was face down, that he was -- there were at least, based on your report, Gonzalez and Pahel there with you, and you used the Taser; true?
A Yes, but you're leaving out the fact that I've testified multiple times that he was still actively struggling and fighting with us.
Q Actively struggling. If someone -- you know, right? -- when -- we've heard him on the tape: "You're kneeing me in the face. I am bleeding." Did you hear those things while he's face down on the ground before you applied the Taser maliciously and --
MR. WRONIAK: Objection. Argumentative.
THE COURT: Sustained.
It is stricken, Counsel.
MS. MKRTCHYAN: Let's play the tape. Let's go back to playing the tape.
THE COURT: Counsel, just a moment. If this is the

tape of the deposition, I've given you those pages. What tape is it now?

MS. MKRTCHYAN: Video clip of his --

THE COURT: Okay. Of Renegar's videotape. All right. You may play that. Thank you.

MS. MKRTCHYAN: That's 102-2. It's going to be 4:58. That's going to be 102-2, and we are going to play at 5:02.

**(Videotape played, not reported.)**

BY MS. MKRTCHYAN:

Q The first time you hear him complain "You're kneeing me in the head," it's 5:02:29 seconds; true? I'm sorry, 5:03, okay; true?

A Yes.

Q Okay. Did you hear that on the ground as this was ongoing when he says "You're kneeing me in the head"?

A No. I don't recall hearing that because at that time I was down by his legs. I was not by his head at that point.

Q Okay. So you were completely unaware that this man was complaining that "You're kneeing me in the head," that "I'm bleeding"? You are completely unaware?

A I don't hear him say "I'm bleeding" on that, but I'm down by the legs. I don't hear him say that.

Q Isn't it true, even before you approached him, you threatened him with the Taser? You said, "Get down on the

ground or you will be tased"; true?

MR. WRONIAK: Objection. Argumentative.

THE COURT: I'll allow the question. I'll strike the word "threatened."

09:13AM Isn't it true, even before you approached him with the Taser, you said, "Get down on the ground or you'll be tased"; true?

THE WITNESS: Yes, I did say that. And Deputy Gonzalez had pulled out his Taser at that point. That is a

09:13AM warning for Mr. Holloway.

BY MS. MKRTCHYAN:

Q Okay. And you actually realized that threat. You basically used the Taser on him --

MR. WRONIAK: Objection.

09:13AM BY MS. MKRTCHYAN:

Q -- on the ground when he was face down and screaming, "You're kneeing me in the head. I'm bleeding," et cetera; true?

MR. WRONIAK: Objection. Argumentative.

09:13AM THE COURT: Do you understand the question?

THE WITNESS: No, I do not.

THE COURT: It's argumentative, Counsel. I'm going to sustain the objection.

BY MS. MKRTCHYAN:

09:14AM Q Sir, you made the threat, and you used the Taser on him.



 6-GottsSER-01088

COPY

**SHERIFF'S DEPARTMENT**
**ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**

DR #: 18-002898

**SUPPLEMENT**

**Reporting Area:** South Uninc

**NARRATIVE**

On 1/21/18, Deputy J. Gunderson #9090 and I were working uniformed patrol in the Rancho Santa Margarita, County of Orange, CA. At about 0459 hours, we responded to 30892 Trabuco Canyon Road (Oneill Park campgrounds) in Trabuco Canyon regarding a disturbance involving a subject known to have knives. Upon arrival, I saw Deputy C. Renegar #9250 trying to gain control of a subject, later identified as Jeremy Ryan Holloway (10/23/76), on the ground.

Fearing Jeremy may try to get up, I placed my knee in between his shoulders and used my body weight to hold him down. Jeremy tucked left arm into his side and appeared to be reaching for his waistband. I ordered Jeremy to give me his left arm and pulled it away from his waistband and side. Jeremy tucked his arm back into his side, refusing to surrender it to me. I again pulled his arm away from his side and was able to gain control of it. Jeremy was handcuffed by another deputy on scene.

I notified Sergeant S. Rawlings #1854 of the incident.

| INVOLVEMENT TYPE | OFFICER NAME | DATE OF REPORT |
|---|---|---|
| Supplementing Officer | Gotts, J. 08699 | 1/21/2018 |

Confidential Pursuant to Protective Order Case 8:19-cv-00514


6-GottsSER-01089

7/25/2018 Orange County Sheriff Department 10:53:33AM

## Call Detail Information Report

Call Number: 180121-0093

| Call Number | 180121-0093 |
|---|---|

## Call Detail Information

| Call Number | Class | Taker | Pos | Call Owner | Date - Time Received | Cat |
|---|---|---|---|---|---|---|
| 180121-0093 | C | morrisondl | 12 | | 01/21/2018 03:39:44 | 0 |

| Complaint | Ten Code | Priority | Disp Zone | IRA | How Received |
|---|---|---|---|---|---|
| 241 ASSAULT ON POLICE OFFICER | | 2 | SE | TC01 | WIRE |

| Incident Location | Apt/Suite | Floor/Bldg | Incident City | Grid |
|---|---|---|---|---|
| 30892 TRABUCO CANYON RD | | | TC | 893A1 |

| Caller Name | Patrol Zone | Telephone | Tower ID | Jurisdiction | Tract |
|---|---|---|---|---|---|
| BRIAN | 89 | 714-928-4939 | 714-511-3776 | OCSD | TC |

☐ Images ☐ Medical ☐ Hazard ☒ Previous ☐ DR Issued In Error

| ALI Time | Call Rec'd | Xmit | Dispatch | Enroute | OnScene | Departed | Arrived | Comp | Unit |
|---|---|---|---|---|---|---|---|---|---|
| 03:39:32 | 03:39:44 | 03:40:57 | 03:42:36 | 03:42:36 | 03:54:46 | 05:40:18 | 06:01:46 | 14:11:55 | 489 |

**Narrative**

[01/21/2018 14:13:23 : pos4 : CHAVEZGA]
DR= 243b/69

Barrientos/ Brown [01/21/2018 13:47:25 : pos4 : LGALLANT]
Unit : [redacted]
10-49 AREA

Barrientos/ Brown [01/21/2018 13:12:00 : pos4 : LGALLANT]
Unit : [redacted]
10-97 OCJ

Barrientos/ Brown [01/21/2018 12:50:29 : pos4 : LGALLANT]
Unit : [redacted]
10-15

Barrientos/ Brown [01/21/2018 06:01:42 : pos4 : LGALLANT]
Unit : [redacted]
10-97 MISSION

Barrientos/ Brown [01/21/2018 05:39:07 : pos4 : JURGENSENWA]
Unit : [redacted]
WILL BE EN RTE TO MISSION HOSPITAL WITH THE SUSPECT ALL OTHER UNITS C4 10-6

Renegar [01/21/2018 05:34:40 : pos4 : JURGENSENWA]
Unit : [redacted]
REQ DR WILL ADV ON TITLE

[01/21/2018 05:25:04 : pos12 : morrisondl]
STA 17 ADVISED - EXTENDED ETA FROM ORANGE

Barrientos/ Brown [01/21/2018 05:19:32 : pos4 : JURGENSENWA]
Unit : [redacted]
REQ ANIMAL CONTROL FOR 5 LB DOG

Borba [01/21/2018 05:07:30 : pos4 : JURGENSENWA]
Unit : [redacted]
SEND IN OCFA FOR OUR SUBJ

Borba
[01/21/2018 05:06:06 : pos4 : JURGENSENWA]
Unit [redacted]
10-34 ON Y3

[01/21/2018 05:05:42 : pos1 : RAMIREZLV]
INF IS: JOSH GOMEZ #714-583-5615

Borba
[01/21/2018 05:04:57 : pos4 : JURGENSENWA]
Unit : [redacted]
SUFFICIENT UNITS

Borba
[01/21/2018 05:04:27 : pos4 : JURGENSENWA]
Unit : [redacted]
ALL RESPONDING UNITS SHUT DOWN CODE

[01/21/2018 05:04:13 : pos1 : RAMIREZLV]
INF STATING NON LETHAL HAS BEEN DEPLOYED

Borba
[01/21/2018 05:04:07 : pos4 : JURGENSENWA]
Unit : [redacted]
1 AT CUFFS....TAZER DEPLOYMENT

Gonzalez/ Pahel
[01/21/2018 05:03:31 : pos4 : JURGENSENWA]
Unit : [redacted]
415

[01/21/2018 05:02:55 : pos4 : JURGENSENWA]
PER 4S66 DO NOT NEED ADDL UNNITS AT THIS TIME

Renegar
[01/21/2018 05:02:49 : pos4 : JURGENSENWA]
Unit : [redacted]
1 AT GP AT CAMP 65

[01/21/2018 05:02:38 : pos1 : RAMIREZLV]
DESK ON 10-21 WITH SUBJ HAS CONTACT WITH DEPS

Renegar
[01/21/2018 05:02:29 : pos4 : JURGENSENWA]
Unit : [redacted]
ASK INF WHERE IS HE AT NOW AND DESCRIP

[01/21/2018 05:01:48 : pos4 : JURGENSENWA]
10-33 ON Y3

7/25/2018 | Orange County Sheriff Department | 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

Renegar
[01/21/2018 05:00:49 : pos4 : JURGENSENWA]
Unit : [redacted]
KEEP INF ON THE LINE

[01/21/2018 05:00:27 : pos1 : RAMIREZLV]
INF IS AT CAMPSITE 67

Borba
[01/21/2018 04:59:58 : pos4 : JURGENSENWA]
Unit : [redacted]
C3 SADDLEBACK//ROBINSON RANCH

Gotts/ Gunderson
[01/21/2018 04:59:41 : pos4 : JURGENSENWA]
Unit : [redacted]
C3 SMP//PLANO TRABUCO

[01/21/2018 04:59:32 : pos1 : RAMIREZLV]
INF STS THE MALE SUBJ IS YELLING AND THERE IS STILL A LITTLE GIRL SCREAMING

Gonzalez/ Pahel
[01/21/2018 04:59:13 : pos4 : JURGENSENWA]
Unit : [redacted]
C3 PLANO TRABUCO//SMP

Renegar
[01/21/2018 04:59:04 : pos4 : JURGENSENWA]
Unit : [redacted]
C3 PLANO TRABUCO//SMP

[01/21/2018 04:58:29 : pos1 : RAMIREZLV]
INF NOW STATING A LITTLE GIRL IS SCREAMING UPGRADED TO A P1

[01/21/2018 04:58:18 : pos1 : RAMIREZLV]
INF STS MALE SUBJ IS GOING THROUGH THINGS IN HIS CAMPSITE

[01/21/2018 04:56:36 : pos1 : RAMIREZLV]
INF STS MALE SUBJ IS BY CAMPSITE 61 IN AN WHITE RV

[01/21/2018 04:55:38 : pos1 : RAMIREZLV]
**Appended Information from duplicate call:
Caller Name : , Phone : ,Complaint : 415
Apt/Suite : , Flr/Bldg :
Narrative : Landmark Comment: 893A1 92692
Landmark: ONEILL PARK

7/25/2018 Orange County Sheriff Department 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

Cross streets: TRABUCO CANYON RD//
NBH: 893A1 92679 33.6530325102696,-117.599035586489
ARROYO SOUTH CAMPGROUND INF STATING MALESUBJ IS WALKING AROUND FROM CAMPSITE TO CAMPITE LOOKING FOR THE SUBJ WHO CALLED POLICE
**End of Appended Information.

[01/21/2018 04:48:13 : pos4 : JURGENSENWA]
[Cleared with unit 489]
Renegar PER [redacted] INF HAS SEVERAL MACHETES, HAMMERS, KNIVES, AND DENIED HAVING A HANDGUN BUT IT IS POSSIBLE. 489 ADV TO SEND 3 UNITS NEXT CALL AND THE SUBJ IS ON FORMAL PROBATION ALTHOUGH HE ADV INFORMAL

Renegar [01/21/2018 04:47:30 : MOB : [redacted]
spoke with multiple info who all stated it was campsite 65. spoke with subj who was un cooperative. subj was alone in campsite no female present. subj on formal probation. ***lots of knives in campsite.***** Subj agressive**** no injuries seen 10-98.

Renegar [01/21/2018 04:33:02 : pos4 : JURGENSENWA]
Unit : [redacted]
C4 10-6

[01/21/2018 04:23:50 : pos4 : JURGENSENWA]
REG VALID FROM: 04/30/13 TO 04/30/14
LIC#:7U75121 YRMD:05 MAKE:CHEV BTM :PK VIN :2GCEC19V851284104
R/O :HOLLAWAY JEREMY R, 1100 E FAIRHAVEN 160 CITY:SANTA ANA C.C.:30
RIP OFC:691 D:04/13/16 ID/S:E00005 T:H00
PENDING MASTER FILE RECORD
LIC#: YRMD:05 MAKE:CHEV BTM :PK VIN :2GCEC19V851284104
R/O :HOLLAWAY JEREMY R, 615 E ADAMS AVE CITY:ORANGE C.C.:30 ZIP#:92867

Renegar [01/21/2018 04:23:19 : pos4 : JURGENSENWA]
Unit : [redacted]
CONTACT W INF WILL BE CAMP SITE 65

Borba [01/21/2018 04:16:05 : pos4 : JURGENSENWA]
Unit : [redacted]
CAMPSITE 67

Billinger [01/21/2018 04:15:25 : pos4 : JURGENSENWA]
Unit : [redacted]
HAVE CONTACT WITH BOTH PARTIES

[01/21/2018 04:13:30 : pos4 : JURGENSENWA]
PER ECB SUPER SOUTH ARROYA CAMPGROUND

7/25/2018 **Orange County Sheriff Department** 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

[01/21/2018 04:08:06 : pos4 : JURGENSENWA]
INF IS AT ARROYO CAMPGROUND IN ONEIL PARK, DV POSS OCCURRING AT 65

[01/21/2018 04:06:58 : pos4 : JURGENSENWA]
DV OCCURRING WHITE TRUCK AND A TENT TO THE RT OF CAMP #63

[01/21/2018 04:05:24 : pos4 : JURGENSENWA]
Billinger Unit : [redacted]
UTL SO FAR CAN YOU CONFIRM THE CAMP SITE WITH RP

[01/21/2018 03:40:57 : pos12 : morrisondl]
Cross streets: TRABUCO CANYON RD//
Landmark: ONEILL PARK
NBH: 893A1 92679 33.6530325102696,-117.599035586489
Landmark Comment: 893A1 92692
ALI X Coordinate: 33.63307700
ALI Y Coordinate: -117.611711
ALI Uncertainty Factor: 4043
ALI Confidence Factor: 100
MALE VS FEMALE IN A PHYSICAL 415 OCCURING TO THE RIGHT OF CAMP SITE # 63 INF IS NOT INVOLVED

| Location Comment |
|---|
| NBH: 893A1 92679 33.6530325102696,-117.599035586489 |

## Call Dispositions

| Date - Time | Disposition | Unit | |
|---|---|---|---|
| 01/21/2018 04:47:33 | Assist | [redacted] | Renegar |
| 01/21/2018 04:48:13 | No Report Needed | [redacted] | Renegar |
| 01/21/2018 05:35:14 | Assisting Officer-Backup | [redacted] | Baek |
| 01/21/2018 07:10:06 | Report Taken | [redacted] | Renegar |

## Department

| Department | OCA Number |
|---|---|
| OCUN | 18-002898 |

## Call Complaints

| Date-Time | Complaint | Action By |
|---|---|---|
| 1/21/2018 7:55:50AM | 415 | LGALLANT |

## Call Locations

| Date-Time | Location | City |
|---|---|---|

## Call Log

As Reflected

| Unit | Status | Date-Time | Dept | Comments | Deputy ID | Deputy | Odometer |
|---|---|---|---|---|---|---|---|
| [redacted] | ENR | 01/21/2018 03:42:36 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| [redacted] | ENR | 01/21/2018 03:42:37 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| [redacted] | ONS | 01/21/2018 03:54:46 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| [redacted] | ONS | 01/21/2018 03:54:47 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |

7/25/2018 Orange County Sheriff Department 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

[redacted]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | ENR | 01/21/2018 04:09:14 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | ENR | 01/21/2018 04:09:14 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | ONS | 01/21/2018 04:12:59 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | ONS | 01/21/2018 04:24:47 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | | 01/21/2018 04:48:09 | OCUN | Primary Unit | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | COM | 01/21/2018 04:48:13 | OCRS | COM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | COM | 01/21/2018 04:48:13 | OCRS | COM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | COM | 01/21/2018 04:48:14 | OCUN | COM | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | COM | 01/21/2018 04:48:14 | OCUN | COM | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | | 01/21/2018 04:55:26 | | Reactivated | | | 0.0 |
| | DIS | 01/21/2018 04:55:31 | OCRS | 30892 TRABUCO CANYON RD, TC As | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | DIS | 01/21/2018 04:55:31 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | DIS | 01/21/2018 04:55:32 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | DIS | 01/21/2018 04:55:32 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | REM | 01/21/2018 04:55:44 | OCRS | REM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | REM | 01/21/2018 04:55:45 | OCRS | REM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | ENR | 01/21/2018 04:55:50 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | REM | 01/21/2018 04:56:06 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | ENR | 01/21/2018 04:56:11 | OCUN | 30892 TRABUCO CANYON RD, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | ENR | 01/21/2018 04:56:33 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | ENR | 01/21/2018 04:57:26 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | REM | 01/21/2018 04:57:28 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | ENR | 01/21/2018 04:59:32 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | ONS | 01/21/2018 05:01:35 | OCUN | 30892 TRABUCO CANYON RD, TC | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |

As Reflected

7/25/2018 | Orange County Sheriff Department | 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

As Reflected

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| [redacted] | ONS | 01/21/2018 05:01:35 | OCUN | 30892 TRABUCO CANYON RD, TC | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | ONS | 01/21/2018 05:01:55 | OCRS | 30892 TRABUCO CANYON RD, TC | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | ONS | 01/21/2018 05:03:13 | OCRS | 30892 TRABUCO CANYON RD, TC | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 39659.0 |
| | ENR | 01/21/2018 05:03:42 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | ENR | 01/21/2018 05:03:42 | OCRS | 30892 TRABUCO CANYON RD, TC | 3313 | BAEK,PATRICK LEE | 0.0 |
| | ONS | 01/21/2018 05:03:55 | OCRS | 30892 TRABUCO CANYON RD, TC | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | ONS | 01/21/2018 05:03:57 | OCRS | 30892 TRABUCO CANYON RD, TC | 3313 | BAEK,PATRICK LEE | 0.0 |
| | ONS | 01/21/2018 05:05:40 | OCUN | 30892 TRABUCO CANYON RD, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | REM | 01/21/2018 05:25:46 | OCRS | REM | 8699/9090 | GOTTS,JAMESON/GUNDERSON,JUSTIN | 0.0 |
| | ONS | 01/21/2018 05:29:30 | OCRS | 30892 TRABUCO CANYON RD, TC | 1854 | RAWLINGS,STEWART ALAN | 0.0 |
| | LEF | 01/21/2018 05:40:18 | OCUN | Left Scene, MISSION HOSPITAL MV, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | REM | 01/21/2018 05:42:14 | OCRS | REM | 9153 | BILLINGER,BRENDEN RAY | 0.0 |
| | REM | 01/21/2018 05:45:48 | OCRS | REM | 3313 | BAEK,PATRICK LEE | 0.0 |
| | REM | 01/21/2018 05:58:31 | OCRS | REM | 5073 | BORBA,MARK WILLIAM | 0.0 |
| | ENR | 01/21/2018 05:58:46 | OCUN | 30892 TRABUCO CANYON RD, TC | 5732 | DANIELS,JASON GARRETT | 0.0 |
| | ARR | 01/21/2018 06:01:46 | OCUN | Radio Communication, MISSION, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | ONS | 01/21/2018 06:11:51 | OCUN | 30892 TRABUCO CANYON RD, TC | 5732 | DANIELS,JASON GARRETT | 0.0 |
| | REM | 01/21/2018 06:12:41 | OCRS | REM | 1854 | RAWLINGS,STEWART ALAN | 0.0 |
| | REM | 01/21/2018 06:30:21 | OCUN | REM | 5732 | DANIELS,JASON GARRETT | 0.0 |
| | REM | 01/21/2018 07:10:06 | OCUN | REM | 9250 | RENEGAR,CHAD MATTHEW | 0.0 |
| | REM | 01/21/2018 07:10:08 | OCUN | REM | 1397/8534 | GONZALEZ,JOEL NMN/PAHEL,KEVIN BRIAN | 0.0 |
| | LEF | 01/21/2018 12:50:32 | OCUN | Left Scene, OCJ, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | ARR | 01/21/2018 13:12:03 | OCUN | Radio Communication, OCJ, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | LEF | 01/21/2018 13:47:29 | OCUN | Left Scene, 10-49 REA, TC | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |
| | REM | 01/21/2018 14:09:14 | OCUN | REM | 3724/9289 | BARRIENTOS,CARLOS/BROWN,MATTHEW | 0.0 |

7/25/2018 | Orange County Sheriff Department | 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

| | Unit | Department | DIS | ENR | ONS | LEF | ARR | BUS | REM | COM |
|---|---|---|---|---|---|---|---|---|---|---|
| Billinger | [redacted] | OCRS | 04:55:31 | 03:42:36 | 03:54:46 | | | | 05:42:14 | 04:48:13 |
| Borba | [redacted] | OCRS | 04:55:31 | 03:42:37 | 03:54:47 | | | | 05:58:31 | 04:48:13 |
| Gonzalez/Pahel | [redacted] | OCUN | 04:55:32 | 04:09:14 | 04:24:47 | | | | 07:10:08 | 04:48:14 |
| Renegar | [redacted] | OCUN | 04:55:32 | 04:09:14 | 04:12:59 | | | | 07:10:06 | 04:48:14 |
| Gotts/Gunderson | [redacted] | OCRS | | 04:55:50 | 05:03:13 | | | | 05:25:46 | |
| Barrientos/Brown | [redacted] | OCUN | | 04:56:11 | 05:05:40 | 05:40:18 | 06:01:46 | | 14:09:14 | |
| Baek | [redacted] | OCRS | | 05:03:42 | 05:03:57 | | | | 05:45:48 | |
| Rawlings | [redacted] | OCRS | | | 05:29:30 | | | | 06:12:41 | |
| Daniels | [redacted] | OCUN | | 05:58:46 | 06:11:51 | | | | 06:30:21 | |

## Unit Log

| Date Time | Dept | Unit | Deputy | Action | Comments |
|---|---|---|---|---|---|
| 01/21/2018 03:42:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:42:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:42:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:54:38 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 03:59:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 03:59:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 03:59:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 03:59:29 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:04:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:04:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:04:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:05:11 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:05:11 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:05:12 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:05:24 | OCRS | [redacted] | 9153 | Note Billinger | UTL SO FAR CAN YOU CONFIRM THE CAMP SITE WITH RP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:06:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:06:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:06:53 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:07:52 | OCRS | [redacted] | 9153 | Billinger | |

7/25/2018 — Orange County Sheriff Department — 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

| | | | | | |
|---|---|---|---|---|---|
| 01/21/2018 04:12:54 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:12:54 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:12:54 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:13:25 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:13:25 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:13:25 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:15:12 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:15:12 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:15:12 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:15:25 | OCRS | [redacted] | 9153 | Note Billinger | HAVE CONTACT WITH BOTH PARTIES, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:15:34 | OCRS | [redacted] | 9153 | Note Billinger | HAVE CONTACT WITH BOTH PARTIES, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:15:53 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:15:53 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:15:53 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:04 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:04 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:04 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:05 | OCRS | [redacted] | 5073 | Note Borba | CAMPSITE 67, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:16:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:11 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:39 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:39 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:16:39 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 04:18:01 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:18:01 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:18:01 | OCUN | [redacted] | 9250 | Renegar | |
| 01/21/2018 04:19:51 | OCUN | [redacted] | 1397/8534 | Gonzalez/Pahel | |
| 01/21/2018 04:19:51 | OCUN | [redacted] | 1397/8534 | Gonzalez/Pahel | |
| 01/21/2018 04:19:51 | OCUN | [redacted] | 1397/8534 | Gonzalez/Pahel | |
| 01/21/2018 04:20:22 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:22 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:22 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:31 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:31 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:31 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:56 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 04:20:56 | OCRS | [redacted] | 9153 | Billinger | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 04:20:56 | OCRS | [redacted] | 9153 | | Billinger | |
| 01/21/2018 04:22:08 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:08 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:08 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:14 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:14 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:14 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:25 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:25 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:25 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:59 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:59 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:22:59 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:23:19 | OCUN | [redacted] | 9250 | Note | Renegar | CONTACT W ING WILL BE CAMP SITE 65, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:32:56 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:32:56 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:32:56 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:33:02 | OCUN | [redacted] | 9250 | Note | Renegar | C4 10-6, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:47:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:47:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:47:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:56:50 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:56:50 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:56:50 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:57:25 | OCRS | [redacted] | 8699/9090 | | Gotts/Gunderson | |
| 01/21/2018 04:57:25 | OCRS | [redacted] | 8699/9090 | | Gotts/Gunderson | |
| 01/21/2018 04:57:25 | OCRS | [redacted] | 8699/9090 | | Gotts/Gunderson | |
| 01/21/2018 04:58:53 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:58:53 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:58:53 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 04:59:04 | OCUN | [redacted] | 9250 | Note | Renegar | C3 PLANO TRABUCO//SMP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:59:12 | OCUN | [redacted] | 3724/9289 | | Barrientos/Brown | |
| 01/21/2018 04:59:12 | OCUN | [redacted] | 3724/9289 | | Barrientos/Brown | |
| 01/21/2018 04:59:12 | OCUN | [redacted] | 3724/9289 | | Barrientos/Brown | |
| 01/21/2018 04:59:13 | OCUN | [redacted] | 1397/8534 | Note | Gonzalez/Pahel | C3 PLANO TRABUCO//SMP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:59:20 | OCRS | [redacted] | 5073 | | Borba | |
| 01/21/2018 04:59:20 | OCRS | [redacted] | 5073 | | Borba | |

7/25/2018 | Orange County Sheriff Department | 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 04:59:20 | OCRS | [redacted] | 5073 | | Borba | |
| 01/21/2018 04:59:41 | OCRS | [redacted] | 8699/9090 | Note | Gotts/Gunderson | C3 SMP//PLANO TRABUCO, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 04:59:56 | OCRS | [redacted] | 5073 | Note | Borba | C3 SADDLEBACK//ROBINSON RANCH, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:00:38 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:00:38 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:00:38 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:00:49 | OCUN | [redacted] | 9250 | Note | Renegar | KEEP INF ON THE LINE, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:01:29 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:29 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:29 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:39 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:01:51 | OCRS | [redacted] | 5073 | | Borba | |
| 01/21/2018 05:01:51 | OCRS | [redacted] | 5073 | | Borba | |
| 01/21/2018 05:01:51 | OCRS | [redacted] | 5073 | | Borba | |
| 01/21/2018 05:02:09 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:09 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:09 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:12 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:12 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:12 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:29 | OCUN | [redacted] | 9250 | Note | Renegar | ASK INF WHERE IS HE AT NOW AND DESCRIP, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:02:37 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:37 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:37 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:02:49 | OCUN | [redacted] | 9250 | Note | Renegar | 1 AT GP AT CAMP 65, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:03:16 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:03:16 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:03:16 | OCUN | [redacted] | 9250 | | Renegar | |
| 01/21/2018 05:03:22 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |
| 01/21/2018 05:03:22 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |
| 01/21/2018 05:03:22 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |
| 01/21/2018 05:03:26 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |
| 01/21/2018 05:03:26 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |
| 01/21/2018 05:03:26 | OCUN | [redacted] | 1397/8534 | | Gonzalez/Pahel | |

| | | | | | |
|---|---|---|---|---|---|
| 01/21/2018 05:03:31 | OCUN | [redacted] | 1397/8534 | Note Gonzalez/Pahel | 415, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:03:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 05:03:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 05:03:51 | OCRS | [redacted] | 9153 | Billinger | |
| 01/21/2018 05:04:00 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:01 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:01 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:07 | OCRS | [redacted] | 5073 | Note Borba | 1 AT CUFFS, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:04:13 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:13 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:13 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:27 | OCRS | [redacted] | 5073 | Note Borba | ALL RESPONDING UNITS SHUT DOWN CODE, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:04:41 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:41 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:41 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:04:57 | OCRS | [redacted] | 5073 | Note Borba | SUFFICIENT UNITS, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:05:01 | OCRS | [redacted] | 3313 | Baek | |
| 01/21/2018 05:05:02 | OCRS | [redacted] | 3313 | Baek | |
| 01/21/2018 05:05:02 | OCRS | [redacted] | 3313 | Baek | |
| 01/21/2018 05:05:12 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:13 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:13 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:21 | OCRS | [redacted] | 5073 | Borba | |
| 01/21/2018 05:05:36 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:05:36 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:05:36 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:06:06 | OCRS | [redacted] | 5073 | Note Borba | 10-34 ON Y3, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:07:30 | OCRS | [redacted] | 5073 | Note Borba | SEND IN OCFA FOR OUR SUBJ, 30892 TRABUCO CANYON RD, TC |
| 01/21/2018 05:18:37 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:18:37 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:18:37 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:17 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:18 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:18 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:25 | OCUN | [redacted] | 3724/9289 | Barrientos/Brown | |

7/25/2018 | **Orange County Sheriff Department** | 10:53:33AM

**Call Detail Information Report**

**Call Number: 180121-0093**

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 05:19:25 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:25 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:19:32 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | REQ ANIMAL CONTROL FOR 5 LB DOG, 30892 TRABUCO CANYON RD, TC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 05:25:34 | OCRS | [redacted] | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:25:34 | OCRS | [redacted] | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:25:34 | OCRS | [redacted] | | 8699/9090 | Gotts/Gunderson | |
| 01/21/2018 05:34:14 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:34:14 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:34:15 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:34:40 | OCUN | [redacted] | | 9250 | Note Renegar | REQ DR WILL ADV ON TITLE, 30892 TRABUCO CANYON RD, TC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 05:34:48 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:34:48 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:34:48 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 05:38:42 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:38:42 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:38:42 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 05:39:07 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | WILL BE EN RTE TO MISSION HOSPITAL WITH THE SUSPECT ALL OTHER UNITS C4 10-6, 30892 TRABUCO CANYON RD, TC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 05:42:09 | OCRS | [redacted] | | 9153 | Billinger | |
| 01/21/2018 05:42:09 | OCRS | [redacted] | | 9153 | Billinger | |
| 01/21/2018 05:42:09 | OCRS | [redacted] | | 9153 | Billinger | |
| 01/21/2018 05:58:17 | OCRS | [redacted] | | 5073 | Borba | |
| 01/21/2018 05:58:17 | OCRS | [redacted] | | 5073 | Borba | |
| 01/21/2018 05:58:17 | OCRS | [redacted] | | 5073 | Borba | |
| 01/21/2018 06:01:32 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:32 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:32 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 06:01:42 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | 10-97 MISSION, MISSION HOSPITAL MV, TC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 06:11:45 | OCUN | [redacted] | | 5732 | Daniels | |
| 01/21/2018 06:11:45 | OCUN | [redacted] | | 5732 | Daniels | |
| 01/21/2018 06:11:45 | OCUN | [redacted] | | 5732 | Daniels | |
| 01/21/2018 06:12:35 | OCRS | [redacted] | | 1854 | Rawlings | |
| 01/21/2018 06:12:35 | OCRS | [redacted] | | 1854 | Rawlings | |
| 01/21/2018 06:12:35 | OCRS | [redacted] | | 1854 | Rawlings | |
| 01/21/2018 06:30:13 | OCUN | [redacted] | | 5732 | Daniels | |
| 01/21/2018 06:30:13 | OCUN | [redacted] | | 5732 | Daniels | |
| 01/21/2018 06:30:13 | OCUN | [redacted] | | 5732 | Daniels | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/21/2018 07:09:54 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 07:09:54 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 07:09:54 | OCUN | [redacted] | | 9250 | Renegar | |
| 01/21/2018 12:50:20 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 12:50:20 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 12:50:20 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 12:50:29 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | 10-15, MISSION, TC |
| 01/21/2018 13:11:51 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:11:52 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:11:52 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:12:00 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | 10-97 OCJ, OCJ, TC |
| 01/21/2018 13:47:17 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:47:18 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:47:18 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 13:47:25 | OCUN | [redacted] | | 3724/9289 | Note Barrientos/Brown | 10-49 AREA, OCJ, TC |
| 01/21/2018 14:08:41 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 14:08:41 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |
| 01/21/2018 14:08:41 | OCUN | [redacted] | | 3724/9289 | Barrientos/Brown | |

## Call Vehicles

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 8J90643 | | | |

| Comments | Owner |
|---|---|
| | |

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 6L52058 | | | |

| Comments | Owner |
|---|---|
| | |

| Year | Make | Model | VIN | Plate | Color | Towed | BOLO |
|---|---|---|---|---|---|---|---|
| | | | | 7U75121 | | | |

| Comments | Owner |
|---|---|
| | |

## Subject

| Category | Last Name | First Name | Middle Name | Suffix | Race | Ethnic |
|---|---|---|---|---|---|---|
| SUBJ | HOLLOWAY | JEREMY | RYAN | | H | H |

| Height | Weight | Age | DOB | SSN | OL-State | OLN | Description |
|---|---|---|---|---|---|---|---|
| 505 | 185 | 41 | 10/23/1976 | - - | CA | B3003420 | |

## Call Reference Information

| Reference Type | Reference | Related Calls |
| --- | --- | --- |